**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **CORE SCIENTIFIC, INC.,** *et al.,* | § | **Case No. 22-90341 (DRJ)** |
| | § | |
| | § | **(Joint Administration Requested)** |
| **Debtors.**[1] | § | **(Emergency Hearing Requested)** |
| | § | |

**EMERGENCY MOTION OF DEBTORS**
**FOR ENTRY OF INTERIM AND FINAL ORDERS**
**(I) AUTHORIZING DEBTORS TO PAY (A) CRITICAL VENDOR**
**CLAIMS AND (B) LIEN CLAIMS; AND (II) GRANTING RELATED RELIEF**

---

**EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN THE MORNING OF THURSDAY, DECEMBER 22, 2022.**

**IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

---

Core Scientific, Inc. and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (the "**Motion**"):

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisitions, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisition I, LLC (9717); and American Property Acquisitions, VII, LLC (3198).  The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

## Background

1.      On the date hereof (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.  The Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**").

2.      The Debtors, together with their non-debtor affiliates (collectively, the "**Company**"), are one of the largest blockchain infrastructure, hosting provider, and digital asset mining companies in North America, with fully operational data centers in Texas, Georgia, Kentucky, North Carolina, and North Dakota.

3.      Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Michael Bros in Support of the Debtors' Chapter 11 Petitions and First Day Relief*, (the "**Bros Declaration**"), which has been filed with the Court contemporaneously herewith and is incorporated by reference herein.

## Jurisdiction

4.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Relief Requested**

5.      By this Motion, pursuant to sections 105(a), 363(b), and 541 of title 11 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, and Bankruptcy Local Rule 9013-1, the Debtors request (i) authority, but not direction, to pay in the ordinary course of business, in their sole discretion and based on their sound business judgment, prepetition amounts owed to (a) Critical Vendors (as defined below), and (b) Lien Claimants (as defined below) (collectively, the "**Vendors**" and, the Vendors' prepetition claims, the "**Vendor Claims**") and (ii) related relief.

6.      Pursuant to this Motion, the Debtors request authority to pay the Vendor Claims (i) in an aggregate amount not to exceed $600,000 upon entry of the Proposed Interim Order (as defined below) and (ii) the Vendor Claims in an aggregate amount not to exceed $800,000 upon entry of the Proposed Final Order (as defined below), inclusive of amounts paid under the Proposed Interim Order, in each case as they become due in the ordinary course of business.  The following chart summarizes the relief requested in the Motion with respect to Vendor Claims the Debtors seek authority to pay:

| Vendors | Interim Amount | Final Amount |
|---------|----------------|--------------|
| Critical Vendors[2] | $300,000 | $400,000 |
| Lien Claimants | $300,000 | $400,000 |
| **Total** | $600,000 | $800,000 |

7.      A proposed form of order granting the relief requested herein on an interim basis is annexed hereto as **Exhibit A** (the "**Proposed Interim Order**") and, pending a final hearing

---

[2] For the avoidance of doubt, the Critical Vendor Claims proposed to be paid pursuant to the Proposed Orders do not include claims of creditors whose prepetition claims are addressed in any other first day motion filed contemporaneously herewith.

on the relief requested herein, on a final basis as **Exhibit B** (the "**Proposed Final Order**" and,

together with the Proposed Interim Order, the "**Proposed Orders**"), respectively.

**Debtors' Vendors**

**A.      Critical Vendors**

8.      As further described in the Bros Declaration, the Debtors are one of the

largest blockchain infrastructure, hosting provider, and digital asset mining companies in North

America, with seven fully operational data centers (the "**Data Centers**") in Georgia (2), Kentucky,

North Carolina (2), North Dakota, and Texas.  The Company mines digital assets for its own

account and for third-party hosting customers.

9.      The Data Centers house, among other things, the Debtors' and their

customers' cryptocurrency miners (the "**Miners**").  The Data Centers are constructed with the

technological specifications and capabilities necessary to generate the computing power required

for the operation of the Miners.  To facilitate the uninterrupted operations of the Data Centers, the

Debtors rely on a number of vendors that provide critical goods and services to the Debtors. These

vendors provide, among other things, specialty hardware, transformers, replacement computer

parts, computer chips, and other equipment necessary to maintain the Miners.  The Debtors also

rely on various vendors to provide information technology and other data-related services to

facilitate the continued operations of the Data Centers and the Miners.  Further, the Debtors require

significant power generation to run the Data Centers and Miners, some of which is provided by

utilities and energy providers pursuant to energy sales agreements.

10.      Consequently, to continue operating the Data Centers safely and reliably

during these chapter 11 cases, the Debtors, with the assistance of their advisors, have identified

the universe and type of vendors they deem to be critical to their ongoing operations (the "**Critical**

**Vendors**").  The Debtors and their advisors have spent considerable time and effort leading up to

4

the Petition Date analyzing and reviewing, among other things, the Debtors' operational requirements, accounts payable systems, historical vendor usage, and vendor and service provider lists to identify those parties that are critical to the Debtors' operations. Without these Critical Vendors, the Debtors may not be able to operate the Data Centers and Miners, which could materially harm the Debtors' business, to the detriment of all stakeholders in these chapter 11 cases.  In this process, the Debtors and their advisors assessed a variety of factors, including:

- the general availability of goods or services provided by a vendor or supplier;

- whether the Debtors' current inventory levels or service coverage is sufficient to meet customer demands while an alternative vendor or service provider could be located or qualified;

- whether goods or services are provided pursuant to an executory contract or on a purchase-order basis;

- whether failure to pay all or part of a particular vendor's claim could cause the vendor to refuse to provide inventory or critical services on a postpetition basis;

- whether the Debtors could maintain postpetition relationships with a vendor through non-bankruptcy alternatives, including prepayment or cash-on-delivery terms;

- whether the Debtors would be unable to obtain comparable goods or services from alternative sources on a cost-effective basis within a reasonable timeframe;

- whether alternative vendors are available that could provide requisite volumes of similar goods or services on equal or better terms and, if so, whether the Debtors would be able to continue operating while transitioning business thereto; and

- the degree to which the services provided by the vendor require heightened experience, and specialized training

11.    In some instances, the Critical Vendors are the only available source for services, due to the highly specialized nature of such services.  In other instances, the Critical Vendors are the most preferred source from which the Debtors can procure goods or services

within a timeframe and at a price that will permit the Debtors to continue to operate their business smoothly and effectively.  Some of the Critical Vendors have existing relationships with the Debtors and provide services at several of the Data Centers. Replacing such Critical Vendors, even in the infrequent instances where possible, could result in substantially higher costs for the Debtors and their estates and risk delays that could harm the Debtors' businesses.  Creditor Vendors refusing to do business with the Debtors moving forward would have an adverse effect on the Debtors' ability to continue operations without disruption.  For example, the Debtors require specific parts and equipment to ensure that the Miners run without interruption and an inability to procure these parts and equipment can adversely impact the Debtors' operations.  Similarly, the Debtors rely on data service providers to, among other things, host voluminous mining data. Absent these services, the Debtors' operations may face interruption.

12.     Accordingly, the Debtors seek authority, but not direction, to pay the claims of Critical Vendors Claimants (the "**Critical Vendor Claims**"), the nonpayment of which would which would harm Debtors' business.  The Debtors seek to pay such Critical Vendor Claims in an aggregate amount not to exceed a maximum aggregate amount of $400,000, including up to $300,000 in the first 30 days of the chapter 11 cases (the "**Interim Period**").

**B.     Lien Claimants**

13.     In the ordinary course of business, the Debtors routinely engage a number of third parties to maintain and service the Data Centers and Miners, including equipment manufacturers, contractors, subcontractors, repair technicians, architects, engineers and other service providers (collectively, the "**Lien Claimants**").  For example, various specialized contractors and subcontractors perform construction and ordinary maintenance on the Data Centers and Miners.  Other Lien Claimants service, among other things, the electrical systems, plumbing, lighting, and/or HVAC systems at the Data Centers, and still others broker power and provide

equipment vital to the functioning of Debtors' business.  To continue operating the Data Centers and Miners without disturbance, Debtors must be able to continue their business relationships with the Lien Claimants.

14.     The Debtors expect that, as of the Petition Date, certain Lien Claimants will have outstanding invoices or accrued unbilled charges for goods and services that were provided to the Debtors prior to the Petition Date.  Pursuant to applicable laws in the jurisdictions in which the Debtors operate, under these circumstances, the Lien Claimants may be able to assert and perfect liens, including mechanic's liens, artisan's liens, construction liens, and other similar liens, against the Debtors' property.[3]

15.     Accordingly, the Debtors seek authority, but not direction, to pay the claims of Lien Claimants (the "**Lien Claims**") that the Debtors believe have created, or could give rise to, a lien against the Debtors' property, regardless of whether the related Lien Claimants have already perfected their interests, in an aggregate amount not to exceed a maximum aggregate amount of $400,000, including up to $300,000 during the Interim Period.

### Postpetition Continuation of Customary Trade Terms

16.     In return for paying the Vendor Claims, the Debtors will use commercially reasonable efforts to require the Vendor claimants to provide favorable trade terms in line with historical practice (the "**Customary Trade Terms**") for the postpetition delivery of goods and services or to otherwise continue supplying the Debtors with goods and services for the duration of these chapter 11 cases.  The Debtors further seek authority, but not direction, to condition

---

[3] Pursuant to section 362(b)(3) of the Bankruptcy Code, the act of perfecting such liens, to the extent consistent with section 546(b) of the Bankruptcy Code, might be excluded from the automatic stay. Under section 546(b) of the Bankruptcy Code, a debtor's lien avoidance powers "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection." 11 U.S.C. § 546(b)(1)(A).

payment of the Vendor Claims upon such Vendor claimants' entry into a vendor agreement, substantially in the form annexed hereto as **Exhibit C** (each, a "**Vendor Agreement**").  Such a Vendor Agreement, once agreed to and accepted by a Vendor, shall be a legally binding, contractual arrangement between the Debtors and such Vendor, governing the commercial trade relationship as provided therein.  The Debtors also seek limited authority to pay the Vendor Claims even if no Vendor Agreement has been executed should the Debtors determine, in their business judgment in consultation with the Ad Hoc Group,[4] that a formal Vendor Agreement is unnecessary to ensure such Vendor's continued performance on the Customary Trade Terms.  In connection with any payment to a Vendor without a Vendor Agreement, the Debtors will notify such Vendor of the disgorgement procedures (the "**Disgorgement Procedures**") set forth in the Proposed Orders, as applicable.

17.     If, either after executing a Vendor Agreement or receiving notification of the Disgorgement Procedures, a Vendor accepts payment pursuant to the relief requested by this Motion and thereafter does not continue to provide the applicable goods and services to the Debtors on the Customary Trade Terms, then, subject to such Vendor's right to file an objection with the Bankruptcy Court within 14 days of a notice of non-performance, and subject to any Vendor Agreement that may be executed between the Debtors and such Vendor: (i) such payment by the Debtors to such Vendor may be deemed to be an improper postpetition transfer on account of a prepetition claim and, therefore, immediately recoverable by the Debtors in cash upon written

---

[4] The term "Ad Hoc Group" is defined as that ad hoc group of holders of secured convertible notes, issued pursuant to (i) the Secured Convertible Note Purchase Agreement by and among Core Scientific Holding Inc., as issuer, the guarantors, the initial purchasers, the additional purchasers, and U.S. Bank National Association, as note agent and collateral agent, dated as of April 19, 2021, as supplemented or amended from time to time and/or (ii) the Convertible Note Purchase Agreement by and among Core Scientific Holding Inc., as issuer, the guarantors, the initial purchasers, the additional purchasers, and U.S. Bank National Association, as note agent and collateral agent, dated as of August 20, 2021, as supplemented or amended from time to time.

request; (ii) upon recovery by the Debtors of such payment, any prepetition Vendor Claim of such Vendor shall be reinstated as if the payment by the Debtors had not been made in the first instance; and (iii) if there exists an outstanding postpetition balance due from the Debtors to such Vendor, then the Debtors may elect to recharacterize and apply any payment made by the Debtors to such Vendor pursuant to the relief requested by the Motion to such outstanding postpetition balance, and such Vendor will be required to repay to the Debtors such paid amounts exceeding the postpetition obligations then outstanding from the Debtors to such Vendor without the right of any setoffs, claims, provisions for payment of any claims, or otherwise. The Debtors propose that, as a further condition to receiving payment of a Vendor Claim, any Vendor that possesses a Lien Claim must agree to take all necessary actions to remove any lien at such Vendor's sole expense.

## Relief Requested Should Be Granted

### A.      Payment of Critical Vendor Claims Is Warranted and Should be Approved

18.     The Court may grant the relief requested herein pursuant to section 363(b) of the Bankruptcy Code, which provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons. *See, e.g.*, *In re BNP Petroleum Corp.*, 642 F. App'x 429, 435 (5th Cir. 2016); *In re Cont'l Air Lines*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *see also In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the

ordinary course of business, but the movant must articulate some business justification for the sale."); *In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989).

19.     In addition, under section 1107(a) of the Bankruptcy Code, a debtor has, among other things, the "implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value.'" *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (*quoting In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)).  Under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a); *see also CoServ*, 273 B.R. at 497 (holding that sections 105 and 1107 of the Bankruptcy Code provide authority for a debtor-in-possession to pay prepetition claims; *In re Tusa-Expo Holdings, Inc.*, Case No. 08-45057-DML-11, 2008 WL 4857954, at *1 (Bankr. N.D. Tex. Nov. 7, 2008); *CEI Roofing*, 315 B.R. at 56; *In re Mirant Corp.*, 296 B.R. 427 (Bankr. N.D. Tex. 2003).  Moreover, Bankruptcy Rule 6003 itself implies that the payment of prepetition obligations may be permissible within the first 21 days of a case where doing so is "necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003.  Accordingly, the Bankruptcy Code authorizes the postpetition payment of prepetition claims where, as here, such payments are critical to preserving the going-concern value of a debtor's estate.

20.     Courts in the Fifth Circuit have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve a debtor's estate, including an operating business's going-concern value.  *See*, *e.g*., *CoServ,* 273 B.R. at 497 (authorizing the payment of certain prepetition claims pursuant to the "doctrine of necessity"); *In re Equalnet Commc'ns Corp*., 258 B.R. 368, 369–70 (Bankr. S.D. Tex. 2000) (noting that the payment of prepetition claims is permissible when the transactions are critical to the survival of

the business of the debtor); *In re Gulf Air, Inc.*, 112 B.R. 152, 153 (Bankr. W.D. La. 1989) ("While pre-petition claims are normally disposed of in a plan of reorganization . . . there are well-established 'necessity of payment' and similar exceptions."); *see also In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept.").

21.     Further, courts have noted that there are instances in which debtors may fulfill their fiduciary duties only "by the preplan satisfaction of a prepetition claim." *CoServ*, 273 B.R. at 497.  The *CoServ* court specifically noted that the preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duties when the payment "is the only means to effect a substantial enhancement of the estate," and also when the payment was to the "sole suppliers of a given product." *Id.* at 497–98.  Courts in the Fifth Circuit, including the Southern District of Texas, have followed *CoServ*'s three-part test, set forth below, to determine whether the prepetition claim of a critical vendor may be paid by a debtor outside of the chapter 11 plan process on a postpetition basis.

22.     First, it must be critical that the debtor deal with the claimant.  Second, unless it deals with the claimant, the debtor risks the probability of harm or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim.  Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.  *Id.* at 498; *see also Mirant Corp.*, 296 B.R. at 429–30.  Accordingly, the Bankruptcy Code authorizes the postpetition payment of prepetition claims where, as here, such payments are critical to preserving the going-concern value of a debtor's estate.

23.     Courts in this district and others have granted authority for debtors to pay similar obligations as those sought to be paid hereunder as a routine matter in similar cases. *See, e.g., In re Talen Energy Supply, LLC*, Case No. 22-90054 (MI) (Bankr. S.D. Tex. May 13, 2022) (Docket No. 464); *In re Basic Energy Servs., Inc.*, Case No. 21-90002 (DRJ) (Bankr. S.D. Tex. Aug. 17, 2021) (Docket No. 938); *In re CBL & Assocs. Props., Inc.*, Case No. 20-35226 (DRJ) (Bankr. S.D. Tex. Nov. 2, 2020) (Docket No. 63); *In re Fieldwood Energy LLC*, Case No. 20-33948 (MI) (Bankr. S.D. Tex. Aug. 5, 2020) (Docket No. 58). Similar relief is also appropriate here.

24.     As described above, payment of Critical Vendor Claims is necessary for the Debtors to continue operating their businesses and to maintain their hosting and mining operations. Such payment is vital to ensure that the Debtors have access to service providers, including those that provide services relating to power, equipment, information technology, and data services. Consequently, payment of the Critical Vendor Claims is necessary and appropriate to preserve the value of the Debtors' estates and to ensure uninterrupted operations for the benefit of all stakeholders. Further, the execution of the Trade Agreements that require the Critical Vendors to provide Customary Trade Terms will benefit the estates by ensuring that Critical Vendors provide goods and services on favorable terms.[5]

25.     Additionally, payment of the Critical Vendor Claims will ensure that the Debtors maintain strong relationships with the Critical Vendors. If these relationships are harmed, either through non-payment of the claims or through perceived difficulties of dealing with chapter

---

[5] Certain of the Critical Vendors Claims may also otherwise be entitled to administrative expense priority pursuant to section 503(b)(9) of the Bankruptcy Code.

11 debtors, the Debtors may encounter particularized controversies with their Critical Vendors, unnecessary costs and distractions, and corresponding harm to their businesses.

26.     For the foregoing reasons, satisfying the Critical Vendor Claims is necessary, appropriate, and in the best interests of the Debtors, their estates, and all other parties in interest in these chapter 11 cases.  Accordingly, for the reasons set forth herein, the Debtors respectfully submit that the Court should authorize the Debtors to satisfy the Critical Vendor Claims as set forth herein.

**B.     Payment of Lien Claims Is Necessary to Ensure Continuation of Debtors' Operations**

27.     The Court should likewise approve the payment of the Lien Claims.  As discussed above, if the Debtors were to cease payments to the Lien Claimants, the Lien Claimants may assert liens on the Debtors' property, including the Data Centers and Miners, under various state laws to secure payment for the materials, supplies, equipment, labor, or services provided.  If the Lien Claimants do, in fact, possess lien rights with respect to goods in their possession, failure to satisfy such claims could have a materially adverse effect on the Debtors' businesses, which would be to the detriment of the Debtors' estates and their economic stakeholders.  Moreover, even if it were to be determined that the Lien Claimants do not have valid, perfected liens over the Debtors' goods, the distraction and disruption caused by litigating the validity of such liens would be costly, time consuming, and burdensome for the Debtors' management team.

28.     Reflecting the recognition that the payment of prepetition claims of lien claimants can be critical to a debtor's ability to preserve going-concern value, courts in this district and in other jurisdictions regularly authorize chapter 11 debtors to pay prepetition claims to lien claimants where the payments are essential to such debtor's continued operations. *See, e.g., In re Talen Energy Supply, LLC*, Case No. 22-90054 (MI) (Bankr. S.D. Tex. May 13, 2022) (Docket

No. 464); *In re CBL & Assocs. Props., Inc.*, Case No. 20-35226 (DRJ) (Bankr. S.D. Tex. Nov. 2, 2020) (Docket No. 63).

29.     Further, the Lien Claims are secured claims to the extent they have validly perfected security interests.  As such, they are entitled to the full value of their secured claims under any chapter 11 plan.  Authorization to pay the Lien Claims as a result of this Motion impacts only the timing of their payment, not whether they are paid at all.  Allowing Debtors to pay the Lien Claims earlier rather than later ultimately does not impact the recovery of the Debtors' stakeholders, but does avoid potential disruptions to the Debtors' business and liens being placed upon Debtors' property, creating complications in the chapter 11 Cases.

30.     Accordingly, as set forth herein, the Court should authorize the Debtors to satisfy the lien claims as set forth herein.

<strong>Applicable Financial Institutions Should Be<br>Authorized To Receive, Process, Honor, and Pay Checks Issued<br>and Transfers Requested to Pay Prepetition Obligations</strong>

31.     The Debtors further request that the Court authorize applicable financial institutions (the "**Banks**") to receive, process, honor, and pay any and all checks issued, or to be issued, and electronic funds transfers requested, or to be requested, by the Debtors relating to the Vendor Claims owing to Vendors, to the extent that sufficient funds are on deposit in available funds in the applicable bank accounts to cover such payment.  The Debtors also seek authority to issue new postpetition checks or effect new postpetition electronic funds transfers in replacement of any checks or fund transfer requests on account of Vendor Claims owing to Vendors dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases.

<strong>Bankruptcy Rule 6003(b) Has Been Satisfied</strong>

32.     Pursuant to Bankruptcy Local Rule 9013-1, the Debtors respectfully request emergency consideration of this Motion under Bankruptcy Rule 6003, which provides that the

Court may grant relief within the first twenty-one (21) days after the Petition Date to the extent such relief is necessary to avoid immediate and irreparable harm.  As described herein and in the Bros Declaration, the relief requested is essential to avoid the immediate and irreparable harm that would be caused if the Debtors were unable to access the vital goods they rely on to provide hosting services for their customers as well as the vendors necessary to ensure the Debtors are able to ensure that their Data Centers continue to operate.  Absent continuity in access to the essential goods and services provided by the Vendors, the Debtors will be unable to smoothly transition into chapter 11, significantly impacting their ability to maximize the value of their estates or satisfy the hosting obligations their customers rely on.  Accordingly, the Debtors submit that the requirements of Bankruptcy Rule 6003 are satisfied.

<b>Compliance with Bankruptcy Rule 6004(a)<br>and Waiver of Bankruptcy Rule 6004(h)</b>

33.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion satisfies Bankruptcy Rule 6004(a) and that the Court waive the 14-day period under Bankruptcy Rule 6004(h).

<b>Reservation of Rights</b>

34.     Nothing contained herein is intended to be or shall be deemed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver or limitation of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (iv) an agreement or obligation to pay any claims, (v) a waiver of any claims or causes of action which may exist against any creditor or interest holder, (vi) an admission as to the validity of any liens satisfied pursuant to this Motion, or (vii) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program,

or policy under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to dispute such claim subsequently.

## Notice

35.     Notice of this Motion will be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

## No Previous Request

36.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.


*[Remainder of page intentionally left blank]*

WHEREFORE the Debtors respectfully request entry of the Proposed Interim Order and Proposed Final Order and Proposed Final Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:  December 21, 2022
      Houston, Texas

Respectfully submitted,

  /s/ Alfredo R. Perez
WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:   Alfredo.Perez@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C. (*pro hac vice* pending)
Ronit J. Berkovich (*pro hac vice* pending)
Moshe A. Fink (*pro hac vice* pending)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:   Ray.Schrock@weil.com
       Ronit.Berkovich@weil.com
       Moshe.Fink@weil.com

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

## Certificate of Service

I hereby certify that on December 21, 2022, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

 _/s/ Alfredo R. Perez_____
Alfredo R. Perez