**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **CORE SCIENTIFIC, INC., *et al.*,** | § | **Case No. 22-90341 (DRJ)** |
| | § | |
| | § | **(Joint Administration Requested)** |
| **Debtors.**[1] | § | **(Emergency Hearing Requested)** |
| | § | |

**EMERGENCY MOTION OF DEBTORS
FOR ENTRY OF AN ORDER (I) AUTHORIZING DEBTORS TO (A) PAY
PREPETITION WAGES, SALARIES, EMPLOYEE BENEFITS, AND OTHER
COMPENSATION, AND (B) MAINTAIN EMPLOYEE BENEFITS PROGRAMS
AND PAY RELATED OBLIGATIONS; AND (II) GRANTING RELATED RELIEF**

---

**EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED
NOT LATER THAN THE MORNING OF THURSDAY, DECEMBER 22, 2022.**

**IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT
EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST
APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN
RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE
PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE
PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

---

Core Scientific, Inc. and its debtor affiliates in the above-captioned chapter 11 cases, as

debtors and debtors in possession (collectively, the "**Debtors**"), respectfully represent as follows

in support of this motion (the "**Motion**"):

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisitions, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisition I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

**Background**

1.      On the date hereof (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.  The Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**").

2.      The Debtors, together with their non-debtor affiliates (collectively, the "**Company**"), are one of the largest blockchain infrastructure, hosting provider, and digital asset mining companies in North America, with fully operational data centers in Texas, Georgia, Kentucky, North Carolina, and North Dakota.

3.      Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Michael Bros in Support of the Debtors' Chapter 11 Petitions and First Day Relief*, (the "**Bros Declaration**"),[2] which has been filed with the Court contemporaneously herewith and is incorporated by reference herein.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Bros Declaration.

**Jurisdiction**

4.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Relief Requested**

5.      By this Motion, pursuant to sections 105(a), 363(b), and 507 of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and Bankruptcy Local Rule 9013-1(b), the Debtors request entry of an order (i) authorizing but not directing them to (a) pay all Employee Obligations (as defined below) and related fees, costs, and expenses incident to the foregoing, including amounts owed to third-party service providers and administrators and taxing authorities, and (b) maintain, and continue to honor and pay amounts with respect to, the Debtors' business practices, programs, and policies for their employees as such were in effect prior to the Petition Date and as such may be modified, amended, or supplemented from time to time in the ordinary course of business, and (ii) granting related relief.  The Debtors further request that the Court authorize financial institutions to receive, process, honor, and pay all checks presented for payment and to honor all funds transfer requests related to such fees, costs, expenses, and obligations.

6.      Pursuant to this Motion, the Debtors request authority to pay prepetition obligations related to the Employee Obligations upon entry of the Proposed Order (defined below), in an amount not to exceed $1,223,070, as they become due in the ordinary course of business.  As described in more detail herein, the Debtors estimate that, as of the Petition Date, they owe the following aggregate amounts on account of the Employee Obligations:

3

| Employee Obligations | Approx. Amount Outstanding as of Petition Date |
|---|---|
| Employee Compensation Obligations | $1,185,400 |
| Employee Benefits Obligations | $37,670 |
| **Total Estimated Prepetition Employee Obligations** | $1,223,070 |

7.     A proposed form of order granting the relief requested herein on a final basis is annexed hereto as **Exhibit A** (the "**Proposed Order**").

**Debtors' Workforce**

8.     As of the Petition Date, the Debtors employ approximately 330 employees (each, an "**Employee**"), of which approximately 266 are employed full-time and approximately 64 are employed part-time.  The Employees perform a number of critical functions in connection with the Debtors' cryptocurrency mining and hosting operations that are critical to operate the Debtors' business effectively.  As of the Petition Date, approximately 149 of the Employees are salaried (the "**Salaried Employees**") and approximately 177 of the Employees are paid on an hourly basis (the "**Hourly Employees**").  In addition to Employees, the Debtors also utilize Supplemental Workers (as defined herein) to perform certain critical functions.  No Employees are party to collective bargaining agreements or other similar labor agreements, and no Employees are members of labor unions.

9.     In the ordinary course of their operations, the Debtors incur a number of obligations to, or on account of, their Employees, including those related to compensation ("**Employee Compensation Obligations**") and benefits ("**Employee Benefits Obligations**" and, together with the Employee Compensation Obligations, the "**Employee Obligations**").  The

Debtors estimate that they owe approximately $1,223,070 in prepetition Employee Obligations as of the Petition Date.

### Compensation and Benefits Programs

10.     As with similarly situated companies, the Debtors maintain various compensation and benefits programs and pay various administrative fees and premiums in connection therewith, including:

(a)     TriNet and Globalization Partners Professional Services;

(b)     Compensation;

(c)     Supplemental Workforce Obligations;

(d)     Gross Pay Deductions, Governmental Withholdings, and Payroll Taxes;

(e)     Employee Expenses;

(f)     Employee Leave Benefits;

(g)     Health and Welfare Benefits;

(h)     401(k) Savings Plan; and

(i)     Severance Program.

11.     The Debtors believe that the vast majority of their Employees rely exclusively or primarily on the compensation and benefits they receive through the Employee Obligations to pay their daily living expenses and support their families.  Thus, Employees will face significant financial consequences if the Debtors are not permitted to continue to administer and pay the Employee Obligations in the ordinary course of business.  Further, the Debtors' failure to honor their obligations in connection with the Employee Obligations, including payment of outstanding prepetition amounts, likely would result in attrition and low morale at a time when the Debtors need to retain their Employees and motivate their Employees to perform at peak

efficiency.  Therefore, it is essential that the Debtors maintain and promote loyalty and morale among their Employees at this critical juncture.

12.     Subject to the Court's approval and the terms and conditions of the Proposed Order, the Debtors intend to continue to administer and pay their Employee Obligations in the ordinary course of business and in accordance with prior practice.  The Debtors further request confirmation of their right to modify, change, and/or discontinue any of their Employee Obligations and to implement new programs, policies, and/or benefits in the ordinary course of business during these chapter 11 cases, without the need for further Court approval, subject to applicable orders entered in these chapter 11 cases, any agreements executed in contemplation of these chapter 11 cases, and the requirements of the Bankruptcy Code, Bankruptcy Rules, and Bankruptcy Local Rules.

13.     The Debtors do not believe that any Employee is owed payment on account of Employee Obligations in an amount exceeding the $15,150 cap imposed by sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

**Employee Compensation Obligations**

14.     The Employee Compensation Obligations and the estimated outstanding prepetition amounts owed as of the Petition Date are summarized in the following chart.  Each of the various categories of Employee Compensation Obligations is described in further detail below.

| Obligation | Description | Approx. Amount Outstanding as of Petition Date |
|---|---|---|
| TriNet Professional Services | Administrative fees owed to TriNet HR III, LLC ("**TriNet**"), the Debtors' payroll servicer and benefits administrator, for its services | $33,200 |

| Obligation | Description | Approx. Amount Outstanding as of Petition Date |
|---|---|---|
| Globalization Partners Professional Services | Administrative fees owed to Globalization Partners LLC ("**Globalization Partners**" and together with TriNet, the "**PEOs**"), the Debtors' Canadian payroll servicer and benefits administrator, for its services | $0 |
| Compensation | Obligations related to Employees' net salaries (paid through the PEOs) | $133,000 |
| Supplemental Workforce Obligations | Obligations owed to Staffing Firms and Temp Agencies (as defined below) on account of individual wages and staffing services | $908,000 |
| Gross Pay Deductions, Governmental Withholdings and Payroll Taxes | Income-based taxes owing pursuant to applicable federal and local laws and Employee contributions to Employee Benefits (paid through the PEOs) | $51,000 |
| Employee Expenses | Obligations related to expenses incurred by Employees related to the performance of their job duties | $60,000 |
| Expensify Services | Administrative fees owed to Expensify Payments LLC ("**Expensify**"), the Debtors' expense management system provider, for its services | $200 |
| **Total Estimated Employee Compensation Obligations** | | $1,185,400 |

## A.   TriNet and Globalization Partners Professional Services

15.   As is common with many small and medium sized companies, the Debtors outsource certain responsibilities related to human resources, payroll, and employee benefits to a professional employer organization, also known as a "PEO." The Debtors utilize TriNet to provide such services, and TriNet is a co-employer of the Employees.[3] Given that TriNet provides benefits for numerous employers, it can use the combined size of all the employers in the PEO to obtain

---

[3]  Given that TriNet provides benefits for numerous employers, it can use the combined size of all the employers in the PEO to obtain volume discounts normally reserved for very large employers.  This allows the PEO to provide better health insurance, disability insurance, 401(k) plans, and other benefits that a small employer frequently cannot afford.

volume discounts normally reserved for very large employers.  This allows the PEO to provide better health insurance, disability insurance, 401(k) plans, and other benefits that a small employer frequently cannot afford.

16.     In its role as payroll servicer, TriNet efficiently manages the processing and payment of the various obligations described in this Motion by providing services relating to payroll processing, tax computation and withholding, payment preparation, and payroll transfer administration.  Specifically, TriNet is responsible for ensuring that (i) Employees are paid on time, (ii) appropriate deductions are made, (iii) payroll reporting is accurate, and (iv) appropriate amounts are remitted to the applicable taxing authorities and other payees.  Accordingly, the services that TriNet provides are critical to the smooth functioning of the Debtors' payroll system.

17.     In addition to its role as payroll servicer, TriNet also sponsors the Debtors' various employee benefit programs and makes the Employee Benefits (as defined below) available to qualifying Employees.  The services TriNet provides to the Debtors in this capacity include (i) managing Employee enrollment in Employee Benefits via its online portal, (ii) acting as the single employer sponsor of the Debtors' benefit plans, and (iii) transferring payments to the employee benefit providers as such payments come due.

18.     The Debtors pay TriNet approximately $60 in administrative fees per Employee per Pay Period (as defined below) to provide the aforementioned payroll and employee benefit services.  The Debtors pay additional fees to TriNet for onboarding and offboarding employees.  As of the Petition Date, the Debtors estimate that they owe TriNet approximately $33,200 on account of prepetition administrative fees.  Pursuant to the Motion, the Debtors seek authority to pay all such amounts owing to TriNet and to continue payment postpetition in the ordinary course of business and consistent with prepetition practices.

19.     In addition, the Debtors employ one Employee in Canada through Globalization Partners.  The relationship between the Debtors and Globalization Partners operates in a similar manner as the TriNet relationship.  As of the Petition Date, the Debtors believe that they do not owe Globalization Partners any amounts on account of prepetition administrative fees. Pursuant to the Motion, the Debtors seek authority to continue payment postpetition in the ordinary course of business and consistent with prepetition practices.

**B.     Compensation**

20.     In the ordinary course of business, the Debtors incur and pay salaries, wages, and related obligations to Employees (the "**Compensation**").[4]  Employees are paid for the services they provide bi-weekly or semi-monthly (the "**Pay Period**"), on a current basis, i.e., paid for the pay period immediately preceding the Pay Day: TriNet pays the U.S. Employees bi-weekly on every other Friday, while Globalization Partners pays the Canadian Employee semi-monthly on the 15th and the 30th of the month (each, a "**Pay Day**").  On average, the Debtors pay approximately $1.1 million per Pay Period on account of Employees' net salaries.[5]  Rather than paying their Employees directly, the Debtors remit to the PEOs the amount owed in Compensation to their Employees two business days prior to the relevant Pay Day.  In turn, on the applicable Pay Day, the PEOs pay the Compensation to the Employees.

21.     In addition to cash compensation, the Debtors have also historically granted restricted stock units ("**RSUs**") to their Employees upon the commencement of the applicable Employees' employment and, in some instances, upon promotions.  The RSUs have a four (4) year

---

[4]  The Debtors also pay Compensation to one independent contractor who is not employed through a staffing agency (the "**Non-Agency Independent Contractor**").  As of the Petition Date, a portion of his wages is paid in cryptocurrency.  As discussed below, the remainder of the Independent Contractors are paid through the Temp Agencies.

[5]  This figure represents Employees' net pay and excludes all applicable taxes and deductions withheld from Employees' gross pay, which are discussed separately below.  *See*, *infra*, section E.

vesting period, with 25% vesting each year.  The Debtors are not seeking any relief with respect to the RSUs in connection with this Motion, but reserve the right to request appropriate relief at a later date.

22.     As of the Petition Date, the Debtors believe that they owe approximately $133,000 on account of prepetition Compensation.  Pursuant to the Motion, the Debtors seek authority to pay such amounts and to continue payment of Compensation postpetition in the ordinary course of business and consistent with prepetition practices.[6]

**C.     Supplemental Workforce**

23.     The Debtors' workforce also consists of approximately 22 independent contractors (the "**Independent Contractors**") and approximately 60 temporary employees (the "**Temporary Employees**" and, together with the Independent Contractors, the "**Supplemental Workers**").  The Supplemental Workers provide various services that are critical to the Debtors' operations, including data center support, facility maintenance, and custodial services.[7]  To maintain its supplemental workforce, the Debtors utilize the services of various staffing firms, including Cushman & Wakefield, to provide the Independent Contractors and the Temporary Employees (the "**Temp Agencies**").

24.     The Debtors do not pay wages to or withhold taxes from the Supplemental Workers, nor do the Debtors provide benefits to them.  Rather, the Debtors make payments to the Temp Agencies (the "**Temp Compensation**") based upon the number of hours worked by the Supplemental Workers.  In turn, the Temp Agencies pay the Supplemental Workers' wages minus

---

[6]  The Debtors also pay fees to three members of the board of directors of Core Scientific, Inc. on a monthly or quarterly basis, depending on director, in the approximate amount of $287,500 per quarter.  Although there are no outstanding amounts owed to board members as of the Petition Date, the Debtors intend to continue paying such fees to board members on a postpetition basis in the ordinary course of business.

[7]  In addition, the Company employs four consultants, three of which are paid in equity only and one of which is not paid.  The Debtors do not seek any relief with respect to such consultants.

any administrative fees, such as benefit contributions.  The frequency of the payments made to the Temp Agencies varies agency.  The Debtors pay the Temp Agencies approximately $324,000 per month for the services of the Supplemental Workers.

25.     The Debtors also utilize the services of American Security and Protection Services LLC and Securitas Security Services USA, Inc. (the "**Security Providers**") to provide approximately 83 security officers that guard each of the Debtors' data centers twenty-four hours a day, seven days a week.  The Debtors pay approximately $250,000 per month for the security services provided by the Security Providers.

26.     As of the Petition Date, the Debtors estimate that approximately $533,000 in prepetition Temp Compensation has accrued but not been paid to the Temp Agencies and approximately $375,000 in prepetition compensation to the Security Providers has accrued but not been paid (the "**Supplemental Workforce Obligations**").  The Debtors seek authority to pay all outstanding Supplemental Workforce Obligations pursuant to the Motion and to continue payment postpetition amounts due on account of Supplemental Workforce Obligations in the ordinary course of business and consistent with prepetition practices.

**D.      Governmental Withholdings, Gross Pay Deductions, and Payroll Taxes**

27.     Each Pay Period, the Debtors, through the PEOs, routinely deduct certain amounts from each Employee's gross payroll, including (as applicable) 401(k) contributions, garnishments, child support, spousal support, service chargers, and other pre- and post-tax deductions payable pursuant to certain of the employee benefit programs discussed herein (such as an Employee's share of health care benefits and insurance premiums, contributions under flexible spending plans, and certain other miscellaneous deductions) (collectively, the "**Deductions**").  Approximately $128,000 in aggregate Deductions are made each Pay Period, which the PEOs remit to the appropriate third-party recipients.

28.     In addition to the Deductions, federal and state laws require the Debtors to withhold amounts from each Employee's gross pay related to federal, state, and local income taxes, including Social Security and Medicare taxes, for remittance to the appropriate federal, state, or local taxing authorities (collectively, the "**Withheld Amounts**").  The PEOs collect the Withheld Amounts from the Debtors' gross payroll on the Debtors' behalf.  The Debtors must then match, from their own funds, amounts for Social Security and Medicare taxes and additional amounts for federal and state unemployment insurance based on a percentage of gross payroll (collectively, the "**Employer Payroll Taxes**" and, together with the Withheld Amounts, the "**Payroll Taxes**"). The PEOs then remit the Payroll Taxes to the relevant government authorities.  In the aggregate, the Payroll Taxes, including both the employee and employer portions, total approximately $224,000 per Pay Period.

29.     As of the Petition Date, the Debtors believe that they do owe approximately $19,000 on account of accrued Deductions and $32,000 accrued Payroll Taxes.  By this Motion, the Debtors request authority to (i) pay or remit, or to direct third-party administrators (*e.g.*, the PEOs) to pay or remit, any outstanding prepetition Payroll Taxes on a postpetition basis and (ii) to continue to honor and process, or to direct third-party administrators to process, Payroll Taxes and Deductions on a postpetition basis, in the ordinary course of business and consistent with prepetition practices (whether or not related to the prepetition period).

E.     **Employee Expenses**

30.     In the ordinary course of business, certain Employees incur, and are reimbursed by the Debtors for, business expenses in connection with their employment duties (collectively, the "**Employee Expenses**").  Employees are entitled to reimbursement of certain reasonable and necessary expenses incurred while performing their employment duties, including expenses relating to transportation, airfare, automobile rentals, lodging, and dining that are

incurred in connection with business travel, miscellaneous office supplies and expenses, postage/courier fees, printing costs, and various dues and subscriptions. Furthermore, certain Employees are entitled to reimbursement of relocation expenses.

31. In accordance with the Debtors' policies, Employees submit receipts or other supporting documentation to the Debtors covering the Employee Expenses that the Employees seek to have reimbursed. The Debtors utilize an expense management system through Expensify to help track and process claims by Employees for Employee Expenses. On a weekly basis, Expensify processes the Employees' reimbursement requests and generates expense reports, which are then reviewed by a manager and accounts payable personnel. Upon approval of an expense report, the Company, through Expensify, reimburses the applicable Employee for the Employee Expenses by direct deposit to the Employee.

32. Given the irregular nature of requests for Employee Expense reimbursements, it is difficult for the Debtors to determine the amount of unpaid Employee Expenses at any given time. The Debtors estimate that, as of the Petition Date, they owe their Employees approximately $60,000 in prepetition Employee Expenses.[8] The Debtors also pay Expensify approximately $35 per month per person in administrative fees for its services. As of the Petition Date, the Debtors estimate that owe approximately $200 to Expensify on account of such prepetition services (the "**Expensify Services**").

---

[8] The Employee Expenses discussed herein exclude expenses incurred by Employees through a corporate-issued credit card issued and paid for by the Debtors. The Debtors have separately sought authority to pay expenses related to the corporate credit cards and continue the use thereof pursuant to the *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue Their Existing Cash Management System, (B) Maintain Existing Business Forms and Intercompany Arrangements, (C) Continue Intercompany Transactions, and (D) Continue Utilizing Employee Credit Cards; and (II) Granting Related Relief*, filed contemporaneously herewith.

33.     Pursuant to the Motion, the Debtors seek authority to reimburse all outstanding prepetition Employee Expenses and to continue such reimbursement practices, including payment of administrative fees owed to Expensify, in the ordinary course postpetition.

### Employee Benefit Obligations

34.     In the ordinary course of business, the Debtors make various benefit plans available to the Employees and their dependents.[9]   These benefit plans (collectively, the "**Employee Benefits Plans**") fall within the following categories: (i) paid time off, including personal time off and holidays (the "**Employee Leave Benefits**"); (ii) medical, dental, vision, and prescription drug benefits, flexible spending accounts and health savings accounts, life insurance, accidental death and dismemberment insurance, and disability insurance (collectively, the "**Health and Welfare Benefits**"); (iii) a 401(k) retirement savings plan; and (iv) an informal severance program (the "**Severance Program**") (each of (i) through (iv), an "**Employee Benefit**").

35.     By this Motion, the Debtors seek authority to continue the Employee Benefits in the ordinary course and to pay any prepetition obligations owed on account of the Employee Benefits (the "**Employee Benefit Obligations**").   As of the Petition Date, the Debtors estimate that approximately $37,670 remains outstanding on account of Employee Benefits Obligations.[10]

---

[9]   The Debtors' Temporary Workers and Independent Contractors are not eligible to participate in the Employee Benefits Plans.

[10]      Contemporaneously herewith, the Debtors have sought authority, but not direction, to pay certain prepetition claims held by claimants under the Debtors' workers' compensation insurance policies pursuant to the *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue Insurance Programs and Surety Bonds and (B) Pay Certain Obligations With Respect Thereto; (II) Granting Relief from Automatic Stay With Respect to Workers' Compensation Claims; and (III) Granting Related Relief* (the "**Insurance Motion**").   By this Motion, the Debtors do not seek authority to pay prepetition claims that may be covered by the relief sought in the Insurance Motion.

36.     A description of the Employee Benefits Obligations and the estimated amounts outstanding as of the Petition Date are summarized in the following chart, and described in further detail below:

| Obligations | Description | Approx. Amount Outstanding as of Petition Date |
|---|---|---|
| Employee Leave Benefits | Obligations related to Employee paid time off and related benefits | $8,000 |
| Health and Welfare Benefits | Obligations related to medical benefits, disability benefits, and other health and welfare programs | $24,170 |
| 401(k) Savings Plan | Obligations related to the 401(k) Match | $5,000 |
| Severance Program | Obligations owed to Employees upon termination of their employment by the Debtors | $0 |
| Other Voluntary Benefits | Obligations related to other voluntary benefits provided to Employees, such as accident insurance, auto insurance, pet insurance, and commuter benefits | $500 |
| **Total Employee Benefit Obligations ($)** | | $37,670 |

37.     As described above, the PEOs serve as the Debtors' benefits administrator. Accordingly, in advance of each Pay Day, the Debtors remit to the PEOs the amounts necessary to satisfy the Employee Benefit Obligations.  Thereafter, the PEOs transfer the requisite amounts to the applicable third parties on account of the Employee Benefits.  Most, if not all, amounts constituting Employee Benefit Obligations are amounts that the Debtors seek authority to transfer to the PEOs or, if already transferred to the PEOs, amounts that the PEOs should be authorized to transfer to the applicable third party recipients.

A.     **Employee Leave Benefits**

38.     The Debtors offer all Employees certain Employee Leave Benefits, which include, among other things, paid time off ("**PTO**") for Hourly Employees, discretionary time off

("**DTO**") for Salaried Employees, holidays, bereavement leave, family and medical leave, jury duty, and leave for military service.[11]

39.     With respect to PTO, Hourly Employees are eligible for ten (10) PTO days per year, but may accrue additional PTO at an accrual rate, which varies depending on the applicable Employee's length of employment.  Upon termination, the Debtors pay the Employee for any accrued but unused PTO.  Salaried Employees are entitled to DTO, which is subject to manager approval, department staffing, and business needs.

40.     Furthermore, pursuant to the federally-mandated Family and Medical Leave Act ("**FMLA**"), the Debtors offer all Employees up to twelve (12) weeks unpaid leave for certain circumstances specified in FMLA.  The Debtors also offer up to six (6) weeks of paid parental leave to eligible Employees.  Employees are not eligible to receive payment for unpaid parental leave upon termination.

41.     As of the Petition Date, the Debtors estimate that they owe approximately $8,000 in outstanding prepetition amounts.  Should Employees who are eligible for such Employee Leave Benefits be terminated postpetition, the Debtors seek authority to assess and pay the Employee Leave Benefits in the ordinary course of business and in accordance with past practice.

**B.     Health and Welfare Benefits**

42.     The Debtors offer several Health and Welfare Benefits to all Employees. The Health and Welfare Benefits and related obligations are discussed below.  All of the Health and Welfare Benefits are sponsored by the PEOs through a variety of carriers, including amounts due under the Consolidated Omnibus Budget Reconciliation Act ("**COBRA**").  The Debtors seek

---

[11] All Hourly Employees receive paid leave for up to three days for jury duty and up to three days of bereavement leave.

authority to pay outstanding amounts and to continue the Health and Welfare Benefits in the ordinary course of business and consistent with prepetition practices.

1.     Medical Benefits

43.     The Debtors offer the following medical benefit plans through various insurers to Employees and their families:

| Type of Benefits | Benefits Provider(s) |
|---|---|
| Medical & Prescription Drugs | Aetna; Tufts; BS CA; BCBS NC; Kaiser Permanente; UnitedHealthcare (UHC); Florida Blue; Group Health |
| Dental | Aetna; Delta Dental; Guardian; MetLife |
| Vision | Aetna; Vision Service Plan (VSP) |
| HSA & FSA | Citibank (Administered by PayFlex); Optum Bank; BNY Mellon Bank |

44.     *Medical and Prescription Drug Plan*.  Through the PEOs, the Debtors offer Employees medical care and prescription drug coverage (the "**Medical and Prescription Drug Plans**") via a variety of plans offered by various insurance carriers, depending on, among other things, the applicable Employee's location.  As of the Petition Date, the Debtors estimate that approximately 220 Employees are covered by the Medical and Prescription Drug Programs, and approximately 6 participants are covered under the COBRA program.

45.     The coverage in the Medical and Prescription Drug Plans differs depending on the carrier plan and/or level of coverage an Employee elects to receive, and monthly health care premiums differ depending on the plan in which an Employee is enrolled and whether the Employee has dependents covered by the applicable Medical and Prescription Drug Plan.  The Debtors, through the PEOs, pay 100% of participating Employees' premiums.

46.     The Debtors pay approximately $150,000 per Pay Period to the PEOs on account of the Medical and Prescription Drug Plans.  As of the Petition Date, the Debtors estimate that they owe approximately $22,000 on account of prepetition obligations under the Medical and Prescription Drug Plans.

47.     *Dental Plans*.  Through the PEOs, the Debtors offer Employees the option to participate in dental coverage (the "**Dental Plans**") offered by a variety of insurers (collectively, the "**Dental Insurers**").  As of the Petition Date, the Debtors estimate that the Dental Plans have approximately 220 active program participants.   The coverage in the Dental Plans differs depending on the level of coverage an Employee elects to receive and monthly costs vary accordingly. The Debtors pay the cost for each Employee participant in the base Dental Plan, and any additional coverage is at the Employee's expense.

48.      The Debtors pay approximately $8,800 per Pay Period to the PEOs on account of the Dental Plans.  As of the Petition Date, the Debtors estimate that they owe approximately $1,300 on account of prepetition obligations under the Dental Plans.

49.     *Vision Plan*.  Through the PEOs, the Debtors also offer Employees and their families the right to participate in a vision insurance plan (the "**Vision Plan**") offered by a variety of insurers (collectively, the "**Vision Insurers**").  As of the Petition Date, the Debtors estimate that the Vision Plan has approximately 205 active program participants.  The Debtors pay 75% of participating Employees' premiums for the Vision Plan.

50.     The Debtors pay approximately $1,000 per Pay Period to the PEOs on account of the Vision Plan.   As of the Petition Date, the Debtors estimate that they owe approximately $200 on account of prepetition obligations under the Vision Plan.

51.     *HSA & FSA.*  The Debtors offer the Employees the option to contribute a portion of their pre-tax compensation to pay for certain health care or dependent care expenses through a health savings account (the "**HSA**") or flexible spending account (the "**FSA**" and together, the "**Account Programs**"), which are sponsored by the PEOs.  Approximately 40 Employees participate in the Account Programs.  The Debtors do not contribute funds to the Account Programs.  Rather, pursuant to the Account Programs, eligible Employees contribute pre-tax dollars, which the PEOs withhold from participants' pre-tax payroll and are included in the estimated amount of Deductions, discussed above.

2.  Life Insurance and Disability Benefits

52.     The Debtors offer certain types of life insurance, disability, and similar benefit plans to the Employees, in some cases automatically and in others upon an Employee's election.  These benefits are sponsored by the PEOs, utilizing a variety of insurance carriers.  The chart below outlines the available programs and specifies whether those programs are paid by the Debtors or funded through Employee contribution.

| Type of Benefit | Provided by Debtor/Voluntary |
| --- | --- |
| Basic Life and AD&D | Provided by Debtors through TriNet |
| Supplemental Life and AD&D | Voluntary |
| Short Term Disability | Provided by Debtors through TriNet |
| Long Term Disability | Provided by Debtors through TriNet |

53.     The Debtors provide Employees with basic life insurance and basic accidental death and dismemberment ("**AD&D**") coverage equal to 1, 2, or 3 times annual

earnings[12] up to $1,000,000 (the "**Basic Life & AD&D Insurance Plan**"), at no cost to Employees.  The Debtors also provide Employees with the option to obtain the following forms of supplemental life and AD&D insurance coverage (collectively, the "**Supplemental Life and AD&D Insurance Plans**"): (i) supplemental life insurance for the Employee; (ii) life insurance for the Employee's spouse and dependent children; and (iii) supplemental AD&D insurance for the Employee.  The policies available to Employees pursuant to the Supplemental Life and AD&D Insurance Plans are entirely elective and funded exclusively by Employee contributions each Pay Period.

54.     The Basic Life and AD&D Insurance Plan and the Supplemental Life and AD&D Insurance Plans are sponsored by the PEOs.  The Basic Life and AD&D Insurance Plan has 205 participants.  The Debtors remit approximately $3,500 per Pay Period to the PEOs on account of the Basic Life & AD&D Insurance Plan.  As of the Petition Date, the Debtors estimate that they owe approximately $500 on account of prepetition obligations under the Basic Life and AD&D Insurance Plan.  The Debtors seek authority to pay these amounts in the ordinary course and continue to the Basic Life & AD&D Insurance Plan and the Supplemental Life & AD&D Insurance Plans in the ordinary course of business and consistent with prepetition practices.

55.     The Debtors also provide long-term disability coverage and short-term disability coverage to all Employees through the PEOs via a variety of carriers (collectively, the "**Disability Plans**").  The Debtors pay 100% of the premiums associated with the Disability Plans.  Pursuant to the short-term disability plan, Employees who meet the definition of disabled are eligible to receive a benefit equal to 50% or 60%, at the Employees' election, of their basic weekly earnings up to a maximum benefit of $1,154 or $2,308 per week, depending on the plan

---

[12] Coverage automatically reduces at ages 65 and 70 across all Basic Life & AD&D Plans.

chosen.  The short-term disability benefits are provided for up to 24 weeks.  Employees who meet the definition of disabled under the long-term disability plan are eligible to receive a benefit equal to 50%, 60%, or 66%, at the Employees election, of their salary up to a maximum benefit of $5,000 or $10,000 per month, depending on the plan chosen.  Through the Disability Plans, approximately 144 Employees are enrolled in long-term disability coverage and approximately 132 Employees are enrolled in short-term disability coverage.  The Debtors pay approximately $700 per Pay Period to the PEOs on account of the Disability Plans.  As of the Petition Date, the Debtors estimate that they owe approximately $100 on account of prepetition obligations under the Disability Plans. The Debtors seek authority to pay these amounts in the ordinary course and continue the Disability Plans in the ordinary course of business and consistent with prepetition practices.

3.   COBRA

56.   Pursuant to COBRA, employers are obligated to give employees who have their employment terminated the option to continue health coverage under the employer's health benefits plans post-termination, at the employee's cost, for a limited period of time and under certain circumstances.  Accordingly, COBRA benefits are provided by the Debtors through the PEOs to exiting Employees as required by law.

57.   As of the Petition Date, the Debtors estimate that they have accrued approximately $70 of prepetition obligations under the COBRA program.  The Debtors seek authority to pay these and postpetition obligations relating to COBRA in the ordinary course of business and consistent with prepetition practices.

**C.   401(k) Savings Plan**

58.   The Debtors maintain a defined contribution plan for the benefit of certain Employees meeting the requirements of section 401(k) of the Internal Revenue Code (the "**401(k) Savings Plan**"), which is sponsored by the PEOs and managed by Empower Retirement LLC

("**Empower**"). Employees that are 18 years of age or older are eligible to enroll in the 401(k) Savings Plan. Each eligible Employee's contributions to his or her 401(k) Savings Plan is deducted automatically from his or her paycheck by the PEOs each Pay Period. The Debtors currently have a matching program pursuant to which they match participating Employees' 401(k) Savings Plan contributions on a dollar-for-dollar basis (not to exceed the Internal Revenue Service contribution limits) (the "**401(k) Match**"), up to 6% of the applicable Employee's salary. The Debtors accrue 401(k) Match obligations each Pay Period throughout the year and the contributions are transferred from the Debtors to the PEOs in advance of payroll and then from the PEOs to Empower on each such payroll. Approximately 135 active Employees have current account balances in the 401(k) Savings Plan.

59.     The Debtors contribute approximately $34,000 per Pay Period through the PEOs on account of the 401(k) Match. As of the Petition Date, the Debtors estimate that they owe approximately $5,000 on account of prepetition obligations under the 401(k) Match. By this Motion, the Debtors seek authority to continue the 401(k) Savings Plan and 401(k) Match in the ordinary course of business, including payment of the outstanding 401(k) Match obligations.

**D.     Severance Program**

60.     In the normal course of business, the Debtors pay severance to certain eligible Employees following termination of employment. Although the Debtors do not have a formal severance program, upon employment termination in covered circumstances, including a reduction in force or job elimination, the Debtors have historically provided Employees with a discretionary severance payment (the "**Severance Pay**"). The Debtors have historically provided Severance Pay in an amount equal to at least 5 weeks of that Employee's salary.

61.     In all cases, pursuant to the Severance Program, former employees are only entitled to severance if their employment is terminated through no fault of their own. Furthermore,

an Employee's entitlement to severance is conditioned on the Employee's execution of a release of claims and non-compete agreement that is satisfactory to the Debtors.  Amounts owing on account of the Debtors' Severance Pay obligations are paid to former employees as part of payroll in one lump sum payment.  The applicable amount of Severance Pay is automatically debited from the Debtors' account by the PEOs.

62.     As of the Petition Date, the Debtors believe that they do not owe any amounts on account of Severance Pay to non-insider former employees.  Pursuant to this Motion, the Debtors also seek authority to continue the Severance Program in connection with the termination of any non-insider Employees arising after the commencement of these chapter 11 cases.

**E.     Other Voluntary Benefits**

63.     The Debtors offer, through the PEOs, various additional voluntary benefits, which include (i) accident insurance, critical illness insurance, and hospital indemnity insurance through Aflac, (ii) pet insurance and legal plan through MetLife, (iii) Farmers GroupSelect Home & Auto Insurance, (iv) Chubb Personal Excess Liability Insurance, and (v) a pre-tax commuter benefits program used to pay for public transit and qualified parking expenses as part of Employees' daily commute to work (the "**Other Voluntary Benefits**").

64.     The Debtors pay approximately $3,500 per Pay Period to the PEOs on account of the Other Voluntary Benefits.  As of the Petition Date, the Debtors estimate that they owe approximately $500 on account of prepetition obligations under the Other Voluntary Benefits. The Debtors seek authority to continue payment postpetition in the ordinary course of business and consistent with prepetition practices.

**Key Employee Retention Plan**

65.     In December 2022, to retain and incentivize key employees during the Debtors' exploration of a restructuring transaction, the Debtors adopted and implemented a key employee retention program (the "**KERP**"), with input from an independent compensation consultant and approval of the Board of Directors of Core Scientific, Inc. (the "**Board**"), for approximately twenty-five (25) critical nonexecutive Employees and nine (9) critical executive Employees.  An aggregate of up to $1.25 million remains payable to the nonexecutive Employees following the commencement of these chapter 11 cases.  By this Motion, the Debtors do not seek authority to make any payments under the KERP, and will do so by separate motion to the extent necessary.

**Relief Requested Should Be Granted**

66.     Under section 507(a)(4)(A) of the Bankruptcy Code, claims of employees against a debtor for "wages, salaries, or commissions, including vacation, severance, and sick leave pay," that are "earned within 180 days before" the date on which a debtor's chapter 11 case is commenced are afforded priority unsecured status up to $15,150 per individual.  11 U.S.C. § 507(a)(4)(A).  Similarly, under section 507(a)(5) of the Bankruptcy Code, employees' claims for contributions to certain employee benefits plans are also afforded priority unsecured status to the extent of $15,150 per employee covered by such plans, less any amount paid pursuant to section 507(a)(4) of the Bankruptcy Code.  *Id*. at § 507(a)(5).

67.     The Court may grant the relief requested herein pursuant to section 363 of the Bankruptcy Code, which provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the

24

Bankruptcy Code upon a finding that such use is supported by sound business reasons. *See, e.g.*, *In re BNP Petroleum Corp.*, 642 F. App'x 429, 435 (5th Cir. 2016); *In re Cont'l Air Lines*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *see also In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale."); *In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989).

68.     In addition, under section 1107(a) of the Bankruptcy Code, a debtor has, among other things, the "implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value.'" *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)).  Under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." *See CoServ*, 273 B.R. at 497 (holding that sections 105 and 1107 of the Bankruptcy Code provide authority for a debtor-in-possession to pay prepetition claims); *see also In re Tusa-Expo Holdings, Inc.*, Case No. 08-45057-DML-11, 2008 WL 4857954, at *1 (Bankr. N.D. Tex. Nov. 7, 2008); *CEI Roofing*, 315 B.R. at 56; *In re Mirant Corp.*, 296 B.R. 427 (Bankr. N.D. Tex. 2003).  Moreover, Bankruptcy Rule 6003 itself implies that the payment of prepetition obligations may be permissible within the first twenty-one (21) days of a case where doing so is "necessary to avoid immediate and irreparable harm."  Accordingly, the Bankruptcy Code

authorizes the postpetition payment of prepetition claims where, as here, such payments are critical to preserving the going-concern value of a debtor's estate.

**Payment of Employee Obligations Is Essential to Debtors' Successful Reorganization**

69.     The Employees and Supplemental Workforce are vital to the Debtors' businesses.  Any delay in paying, or failure to pay, the Employee Obligations could irreparably impair the morale of the Debtors' workforce at the time when their dedication, confidence, retention, and cooperation are most crucial.  It could also inflict a significant financial hardship on their families.  The Debtors cannot risk such a substantial disruption to their business operations, and it is inequitable to put Employees at risk of such hardship.

70.     Payment of these obligations in the ordinary course of business would enable the Debtors to focus on their restructuring efforts and maximize the value of the estates, which benefits all parties-in-interest.  Without this relief, otherwise-loyal Employees may seek other work opportunities, thereby putting at risk the Debtors' continued operation as a reorganized enterprise.  The total amount sought to be paid by the Motion is modest compared to the magnitude of the Debtors' overall business.  Furthermore, failure to pay employee obligations timely may place the Debtors in violation of applicable law in a number of jurisdictions.

71.     Furthermore, it is critical that the Debtors be able to continue honoring their obligations with respect to the Supplemental Workers.  Failure to pay the Supplemental Workforce Obligations could interrupt the Debtors' mining and hosting operations and have widespread negative effects throughout the Debtors' businesses.  Staying current with respect to the Supplemental Workforce Obligations thus will help minimize unnecessary disruption to the Debtors' business.  Accordingly, the Debtors submit that it is appropriate for the Court to authorize the Debtors to satisfy the Supplemental Workforce Obligations as set forth herein. *See, e.g.*, *In re*

*Halcon Res. Corp.*, No. 19-34446 (DRJ) (Bankr. S.D. Tex. Aug. 8, 2019) (ECF No. 66) (authorizing payment of independent contractors provided by employment agencies, where the debtors paid such agencies for work performed and associated fees); *In re Legacy Reserves Inc.*, No. 19-33395 (MI) (Bankr. S.D. Tex. June 20, 2019) (ECF No. 80) (authorizing payment of independent contractors and vendors); *In re Westmoreland Coal Co.*, No. 18-35672 (DRJ) (Bankr. S.D. Tex. Nov. 15, 2018) (ECF No. 516) (authorizing payment of temporary, independent contractors, and approximately 15 staffing agencies); *In re Fieldwood Energy LLC*, No. 18-30648 (DRJ) (ECF No. 75) (Bankr. S.D. Tex. Feb. 16, 2018) (authorizing payment of temporary employees, independent contractors, and employment firms); *In re EXCO Res., Inc.*, No. 18-30155 (MI) (Bankr. S.D. Tex. Jan. 18, 2018) (ECF No. 102) (authorizing payment of independent contractors, temporary employees, and various staffing agencies); *In re Castex Energy Partners, L.P.*, No. 17-35835 (MI) (Bankr. S.D. Tex. Oct. 18, 2017) (ECF No. 38) (authorizing payment under a shared services agreement, which provided debtors with a supplemental workforce to perform business operations).

72.     In addition, the reimbursement of Employee Expenses is necessary because any other treatment of Employees would be highly inequitable.  Employees who have incurred Employee Expenses should not be forced to bear the cost of the Employee Expenses personally, especially because the Employees incurred the Employee Expenses for the Debtors' benefit, in the course of their employment by the Debtors, and with the understanding that they would be reimbursed.

73.     The Debtors believe that most of the obligations that they seek to pay by this Motion are entitled to priority treatment under sections 507(a)(4) or 507(a)(5) of the Bankruptcy Code.  The Debtors do not believe that the relief requested in this Motion will result

in a payment to any single Employee exceeding an amount that falls outside the statutory priorities granted in sections 507(a)(4) and (a)(5).  As priority claims, these obligations are entitled to payment in full before any general unsecured claims asserted against the Debtors can be satisfied. Thus, payment of such obligations at this time will not diminish the assets available for payment of general unsecured claims and should not prejudice the rights of general unsecured creditors or other parties in interest.

74.     The Debtors seek authority to pay Deductions and Payroll Taxes to the appropriate federal and state entities.  These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from the Employees' paychecks.  Indeed, some Deductions are not property of the Debtors' estates pursuant to section 541(b) of the Bankruptcy Code because they have been withheld from the Employees' paychecks on another party's behalf.  *See* 11 U.S.C. § 541(b).  For instance, Employee contributions to the 401(k) Savings Plan are contributions to a deferred compensation plan under section 457 of the Internal Revenue Code, which are excluded from the Debtors' estates by section 541(b)(7)(A)(i)(II) of the Bankruptcy Code.  Payment of Payroll Taxes would not prejudice other creditors because Payroll Taxes that the Debtors withhold are held in trust for the taxing authorities and the withheld funds are not property of the Debtors' estates under section 541 of the Bankruptcy Code.  *See Begier v. IRS*, 496 U.S. 53, 66–67 (1990) (concluding that withholding taxes are property held by a debtor in trust for another and are therefore not property of debtor's estate).  In any event, Payroll Taxes generally give rise to priority claims under section 507(a)(8) of the Bankruptcy Code and would be entitled to payment in full under any subsequent plan of reorganization.

75.     The payment of administrative fees to the administrators and providers of the Employee Benefits Plans is also necessary.  Without the continued service of these administrators and providers, the Debtors will be unable to continue to honor their obligations to Employees under the Employee Benefits Plans in an efficient and cost-effective manner.

76.     The Debtors do not seek to alter any of the Employee Benefits Plans.  The Motion requests only permission for the Debtors, in their discretion, to (i) make payments consistent with existing policies to the extent that such payments could otherwise be inconsistent with the provisions of the Bankruptcy Code and (ii) continue to honor practices, programs, and policies with respect to Employees as such were in effect before the Petition Date.

77.     By this Motion, the Debtors also seek authority to pay outstanding Severance Pay to non-insider Employees and continue the Severance Program in the ordinary course of business (including honoring Severance Obligations that arise after the Commencement Date exclusively for non-insider Employees).  The Debtors submit that paying outstanding Severance Pay to terminated employees will maximize the value of the Debtors' estates.  The Debtors believe, in their business judgment, that maintaining a positive relationship with such former employees by honoring all Severance Pay obligations is in the best interest of the Debtors' estates and all parties in interest.  In addition, in an effort to provide comfort to the Debtors' current Employees given the uncertainty attendant to a company operating in chapter 11, the Debtors request authority to continue the Severance Program with respect to non-insider Employees terminated postpetition in the ordinary course of business.  The Debtors believe that it is important to reassure their Employees that they intend to continue their prepetition practices with respect to Employees during the chapter 11 cases—both during and after their tenure with the Debtors. Maintaining the Severance Program with respect to non-insiders postpetition will assuage

Employees' concerns and motivate them to continue working for the Debtors as is required to achieve the Debtors' chapter 11 objectives.

78.     For the avoidance of doubt, the Debtors are not requesting authority to and will not make any payments that fall outside the limitations of section 503(c) of the Bankruptcy Code, to the extent applicable.  Moreover, the Severance Program does not implicate section 503(c)(3) of the Bankruptcy Code because maintaining the program is within the ordinary course of the Debtors' business.  *See* 11 U.S.C. § 503(c)(3) (prohibiting certain payments "outside of the ordinary course of business").  If section 503(c) of the Bankruptcy Code is not implicated, the Court may grant the requested relief if it finds that a non-insider severance program satisfies the requirements of section 363(b) of the Bankruptcy Code.  *See In re Mesa Air Group, Inc.*, Ch. 11 Case No. 10-10018 (MG), 2010 WL 3810899, at *3 (Bankr. S.D.N.Y. Sept. 24, 2010) (noting that compensation plans within the ordinary course of business are governed by section 363 of the Bankruptcy Code, not section 503(c)).  For the reasons stated, discretion to continue the Severance Program—like all of the relief sought in this Motion—is critical and necessary to assuage Employee fears and motivate them to achieve the Debtors' chapter 11 objectives.  Accordingly, the requested relief should be approved.

79.     For the foregoing reasons, payment of the Employee Obligations, as requested herein and in accordance with the Debtors' prepetition business practices, is necessary, appropriate, and in the best interests of the Debtors, their estates, and all other parties in interest in these cases.  Accordingly, the Court should authorize the relief requested by the Debtors.

80.     Courts in this district and others have frequently approved payment of prepetition claims for compensation, benefits, and expense reimbursements similar to those described herein as a routine matter in similar cases.  *See, e.g.*, *In re Talen Energy Supply, LLC,*

Case No. 22-90054 (MI) (Bankr. S.D. Tex. May 10, 2022) (Docket No. 118); *In re Basic Energy Services, Inc.*, Case No. 21-90002 (DRJ) (Bankr. S.D. Tex. Aug. 17, 2021) (Docket No. 44); *In re CBL & Associates Properties, Inc., et al.*, Case No. 20-35226 (DRJ) (Bankr. S.D. Tex. Nov. 2, 2020) (Docket No. 69); *In re Fieldwood Energy LLC*, Case No. 20-33948 (MI) (Bankr. S.D. Tex. Aug. 4, 2020) (Docket No. 51); *In re CEC Ent., Inc.*, No. 20-33163 (MI) (Bankr. S.D. Tex. June 26, 2020) (Docket No. 75); *In re Gavilan Res.*, LLC, No. 20-32656 (MI) (Bankr. S.D. Tex. May 18, 2020) (Docket No. 53); *In re Speedcast Int'l Ltd.*, No. 20-32243 (MI) (Bankr. S.D. Tex. April 27, 2020) (Docket No. 115); *In re EP Energy Corp.*, No. 19-35654 (MI) (Bankr. S.D. Tex. Oct. 4, 2019) (Docket No. 58); *In re Fieldwood Energy LLC*, No. 18-30648 (DRJ) (Bankr. S.D. Tex. Feb. 16, 2018) (Docket No. 75).  Similar relief is also appropriate here.

### Applicable Financial Institutions
### Should Be Authorized to Receive, Process, Honor, and
### Pay Checks Issued and Transfers Requested to Pay Employee Obligations

81.     The Debtors further request that the Court authorize applicable financial institutions (the "**Banks**") to receive, process, honor, and pay any and all checks issued, or to be issued, and electronic funds transfers requested, or to be requested, by the Debtors relating to the Employee Obligations, to the extent that sufficient funds are on deposit in available funds in the applicable bank accounts to cover such payment.  The Debtors also seek authority to issue new postpetition checks or effect new postpetition electronic funds transfers in replacement of any checks or fund transfer requests on account of prepetition Employee Obligations dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases.

### Bankruptcy Rule 6003(b) Has Been Satisfied

82.     Pursuant to Bankruptcy Local Rule 9013-1, the Debtors respectfully request emergency consideration of this Motion under Bankruptcy Rule 6003, which provides that the Court may grant relief within the first twenty-one (21) days after the Petition Date to the extent

such relief is necessary to avoid immediate and irreparable harm.  As described herein and in the Bros Declaration, the relief requested is essential to avoid the immediate and irreparable harm that would be caused by the Debtors' inability to transition smoothly into chapter 11.  Accordingly, the Debtors submit that the requirements of Bankruptcy Rule 6003 are satisfied.

### Compliance with Bankruptcy Rule 6004(a) and Waiver of Bankruptcy Rule 6004(h)

83.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion satisfies Bankruptcy Rule 6004(a) and that the Court waive the 14-day period under Bankruptcy Rule 6004(h).

### Reservation of Rights

84.     Nothing contained herein is intended to be or shall be deemed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver or limitation of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (iv) an agreement or obligation to pay any claims, (v) a waiver of any claims or causes of action which may exist against any creditor or interest holder, (vi) an admission as to the validity of any liens satisfied pursuant to this Motion, or (vii) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to dispute such claim subsequently.

## **Notice**

85.     Notice of this Motion will be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

## **No Previous Request**

86.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

[*Remainder of page intentionally left blank*]

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:  December 21, 2022
       Houston, Texas

Respectfully submitted,

  /s/  Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:   Alfredo.Perez @weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C. (*pro hac vice* pending)
Ronit J. Berkovich (*pro hac vice* pending)
Moshe A. Fink (*pro hac vice* pending)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:   Ray.Schrock@weil.com
        Ronit.Berkovich@weil.com
        Moshe.Fink@weil.com

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**<u>Certificate of Service</u>**

I hereby certify that on December 21, 2022, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

_/s/  Alfredo R. Pérez_____

Alfredo R. Pérez