## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **CORE SCIENTIFIC, INC.,** *et al.,* | § | **Case No. 22-90341 (DRJ)** |
| | § | |
| | § | **(Joint Administration Requested)** |
| **Debtors.**[1] | § | **(Emergency Hearing Requested)** |
| | § | |

**EMERGENCY MOTION OF DEBTORS FOR ENTRY OF INTERIM
AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) CONTINUE
THEIR EXISTING CASH MANAGEMENT SYSTEM, (B) MAINTAIN
EXISTING BUSINESS FORMS AND INTERCOMPANY ARRANGEMENTS,
(C) CONTINUE INTERCOMPANY TRANSACTIONS, AND (D) CONTINUE
UTILIZING EMPLOYEE CREDIT CARDS; AND (II) GRANTING RELATED RELIEF**

> **EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN THE MORNING OF THURSDAY, DECEMBER 22, 2022.**
>
> **IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

Core Scientific, Inc. and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (the "**Motion**"):

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisitions, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisition I, LLC (9717); and American Property Acquisitions, VII, LLC (3198).  The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

**Background**

1.      On the date hereof (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.  The Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**").

2.      The Debtors, together with their non-debtor affiliates (collectively, the "**Company**"), are one of the largest blockchain infrastructure, hosting provider, and digital asset mining companies in North America, with fully operational data centers in Texas, Georgia, Kentucky, North Carolina, and North Dakota.

3.      Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Michael Bros in Support of the Debtors' Chapter 11 Petitions and First Day Relief*, (the "**Bros Declaration**"),[2] which has been filed with the Court contemporaneously herewith and is incorporated by reference herein.

---

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Bros Declaration.

**Jurisdiction**

4.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Relief Requested**

5.      By this Motion, pursuant to sections 105(a), 345, 363(b)(1), 363(c)(1), and 364(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, the Debtors request authority to:

> (i)     (a) continue to process the Debtors' existing cash management system (the "**Cash Management System**"), as described herein, including, without limitation, the continued maintenance of their existing Bank Accounts, Bitcoin Mining Pools, and Bitcoin Wallets (each as defined below and together, the "**Institutions**"), (b) continue to process electronic funds transfers (including wire transfers, book transfers, and automated clearinghouse ("**ACH**") transfers), and (c) continue to process their Business Forms (as defined below);

> (ii)    implement changes to the Cash Management System in the ordinary course of business including, without limitation, opening new or closing accounts at existing Institutions (as defined below);

> (iii)   continue operating the Debtors' Bitcoin Management System (as defined below), including bitcoin sales operations and Bitcoin Wallet account opening and closings;

> (iv)    continue utilizing Employee Credit Cards (as defined below) and paying all obligations related thereto, each in the ordinary course of business consistent with prior practice;

> (v)     provide administrative expense priority for postpetition Intercompany Claims (as defined below) against the Debtors; and

> (vi)    honor and pay all prepetition and postpetition Bank Fees and Bitcoin Wallet Fees (each as defined below) payable by the Debtors in the ordinary course of business.

6.      The Debtors further request that the Court (i) grant an extension of time to comply with the requirements of 11 U.S.C. § 345(b), (ii) authorize the Banks to continue to

charge Bank Fees (as defined below) and to charge back returned items to the Bank Accounts, whether such items are dated before, on, or after the commencement of these chapter 11 cases; and (iii) grant related relief.

7.     A proposed form of order granting the relief requested herein on an interim basis is annexed hereto as **Exhibit A** (the "**Proposed Interim Order**") and, pending a final hearing on the relief requested herein, on a final basis as **Exhibit B** (the "**Proposed Final Order**")

### Cash Management System

8.     To facilitate the efficient operation of their business, the Debtors utilize the Cash Management System, an integrated, centralized cash management system.  The Cash Management System facilitates cash monitoring, forecasting, and reporting and enables the Debtors to maintain control over the administration of approximately ten (10) bank accounts (together with any other bank accounts the Debtors may open in the ordinary course of their business, the "**Bank Accounts**") owned by the Debtors and maintained with multiple banks (each a "**Bank**" and collectively, the "**Banks**"), including those set forth on **Exhibit C** attached hereto.  The Debtors Cash Management System is reflected in the diagram attached hereto as **Exhibit D**.  The Debtors' treasury department maintains daily oversight of the Cash Management System and implements cash management controls for entering, processing, and releasing funds, which funds include both cash and bitcoin.

9.     As it relates to the Bank Accounts, the Cash Management System is similar to those commonly employed by businesses in comparable size and scale to the Debtors. Businesses such as the Debtors use integrated systems to help control funds, ensure cash availability for each entity, and reduce administrative expenses by facilitating the movement of funds among multiple entities.  Any disruption of the Cash Management System would be

detrimental to the Debtors' operations, as their business requires prompt and reliable access to cash and accurate cash tracking.

10.     The Cash Management System is tailored to meet the Debtors' operating needs—enabling the Debtors to control and monitor corporate funds, ensure cash availability and liquidity, comply with the requirements of their financing agreements, and reduce administrative expenses by facilitating the movement of funds and the development of accurate account balances.

### A.  Bank Accounts

11.     The Debtors' Bank Accounts are maintained by the following Banks:

(i)     Bank of America ("**BofA**") maintains seven (7) Bank Accounts and is the Debtors' primary Cash Management Bank;

(ii)    City National Bank ("**CNB**") maintains two (2) Bank Accounts and, CNB issues the Debtors' credit cards; and

(iii)   Bremer Bank National Association ("**Bremer Bank**") maintains one (1) Bank Account.

12.     The Debtors' primary Bank Accounts generally have three (3) functions: (i) as general operating accounts that receive funds and disburse funds to vendors and employees (the "**Operating Accounts**"), (ii) as depository accounts that collect and hold funds that are not needed to fund daily operations (the "**Concentration Accounts**"), and (iii) as restricted cash and deposits accounts (the "**Collateral Accounts**").  A portion of the Debtors' cash receipts comes from the sale of bitcoin, this process is discussed in greater detail in the Bitcoin Management System section below.  Further descriptions of Bank Accounts are below:

| Accounts | Description of Accounts |
|---|---|
| **Operating Accounts**<br><br>Main Operating Account – | The Debtors' primary Bank Account is an Operating Account with BofA (Acct. No. 7713) (the "**Main Operating Account**") in the name of Core Scientific Operating Company ("**Core Operating**").  The Main |

| Accounts | Description of Accounts |
|---|---|
| BofA account ending 7713<br><br>DIP Depository Account – BofA account ending 6773<br><br>DIP Fees Account – BofA account ending 6786<br><br>Blockcap Depository Account – BofA account ending 7616<br><br>CNB Operating Account – CNB account ending 7395 | Operating Account is used to disburse funds for the Debtors' expenses, including payroll and their credit cards. It receives funds from the Bitcoin Wallets, as well as the Main Concentration Account (as defined below) on an as-needed basis to fund the Debtors' operations for the next day and disburses funds as required throughout the Debtors' Cash Management System.<br><br>Funds in the Main Operating Account are generally swept into the Main Concentration Account at the end of every business day, leaving a $0 overnight balance in the Main Operating Account.  Accordingly, as of the Petition Date, the Main Operating Account had a balance of approximately $0.<br><br>In connection with the DIP Financing, the Debtors created the following two (2) accounts: (i) the DIP proceeds account with BofA (Acct. No. 6773) (the "**DIP Proceeds Account**"); and (ii) the processional fees account with BofA (Acct. No. 6786) (the "**Professional Fees Account**"). As of the Petition Date, the DIP Proceeds Account and the Professional Fees Account each had a $0 balance.[3]<br><br>Debtor Core Scientific Acquired Mining LLC maintains a depository account for Blockcap at BofA (Acct. No. 7616) (the "**Blockcap Depository Account**") to (i) receive cash wires from the Coinbase Blockcap Wallet (as defined below) and (ii) pay certain nominal fees associated with the internet connectivity for certain Blockcap mining computers.  In the ordinary course of business, the Debtors transfer nearly all cash out of the Blockcap Depository Account and into the Main Concentration Account when the value in the Blockcap Depository Account reaches a significant amount,  as of the Petition Date the Blockcap Depository Account had a balance of $8,406.<br><br>CNB, which issued the Debtors' credit cards and a letter of credit, maintains two Bank Accounts, one in the name of Core Operating and one in the name of Core Scientific, Inc. |

---

[3] The DIP Financing is defined and discussed in greater depth in the Emergency Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief (ECF No. [●]).

| Accounts | Description of Accounts |
|---|---|
| | (Acct Nos. 7395 and 7589, respectively). The CNB operating account is owned by Core Operating and is issued by CNB (Acct. No. 7395) (the "**CNB Operating Account**").[4] As of the Petition Date, the CNB Operating Account had a balance of $99,905. |
| <u>**Concentration and Deposit Accounts**</u><br><br>Main Concentration Account – BofA account ending 7817<br><br>Overnight Deposit Account – BofA account ending 8262 | The Debtors' primary Concentration Account is an account held by Core Operating at BofA (Acct. No. 7817) (the "**Main Concentration Account**").<br><br>The Main Concentration Account is the primary account used by the Debtors to hold cash not needed for daily operations. It also accepts payments from hosting customers.<br><br>Funds from the Main Concentration Account are distributed to the Debtors' other Bank Accounts, primarily the Main Operating Account, as needed to fund operations. Unused funds are swept into the Overnight Deposits Account at the end of every day.<br><br>As of the Petition Date, the Main Concentration Account had a balance of $3,315,958.<br><br>The Overnight Deposits Account is held by Core Operating at BofA (Acct. No. 8262) (the "**Overnight Deposit Account**"). As of the Petition Date the Overnight Deposit Account had a balance of $169,185. |
| **Collateral Accounts**<br><br>Credit Card Account – CNB account ending 7589<br><br>Loan Payments Account – Bremer Bank account ending 1154<br><br>Adequate Assurance Account – BofA 7360 | The Debtors maintain four (4) Collateral Accounts.<br><br>CNB, which issued the Debtors' credit cards and a letter of credit, maintains two Bank Accounts, one in the name of Core Operating and one in the name of Core Scientific, Inc. (Acct Nos. 7395 and 7589, respectively). As noted above, the Debtors' credit cards are issued by CNB. The Debtors' obligations to CNB relating to the credit cards are fully secured by an account owned by Core Scientific, Inc. at CNB (Acct. No. 7589) (the "**Credit Card Account**").<br><br>The Credit Card account is a locked account that CNB may |

---

[4] The letter of credit was issued on January 25, 2022, by CNB for the benefit of SRPF A QR Riversouth LLC ("**River South**"). River South leased office space to the Debtors pursuant to an agreement by and between River South and Core Scientific, Inc. on August 11, 2021. The Debtors anticipate the Letter of Credit account will be fully drawn down by CNB to satisfy River South's claim against the letter of credit.

| Accounts | Description of Accounts |
|---|---|
| | draw from in the event of a default on a CNB credit card. As of the Petition Date, the Debtors' credit card balance was $25,933, and the balance in the Credit Card Account was $175,043.  The Debtors' credit cards are discussed in greater detail below.<br><br>Bremer Bank (Acct No. 1154) maintains a single account in the name of Core Operating.  The Bremer Bank account is a restricted account that holds a three-month security deposit that Bremer Bank can draw on if a loan payment is missed (the "**Loan Payments**").[5]  As of the Petition Date, the balance in the Loan Payments account was $783,678.<br><br>The adequate assurance account is maintained by BofA (Acct. No. 7360) (the "**Adequate Assurance Account**") in the name of Core Operating, for the benefit of certain of the Debtors' utility providers.   The Adequate Assurance Account was a dormant account prior to the Petition Date and will be used exclusively to maintain adequate assurance for the benefit of Debtors' utilities providers during the pendency of these chapter 11 cases.[6]  As of the Petition Date, the Adequate Assurance Account had a balance of $0. |

13.     The Debtors incur periodic service charges and other fees, charges, costs, and expenses in connection with the maintenance of the Cash Management System (the "**Bank Fees**").  The Bank Fees are paid monthly and are automatically deducted from the Debtors' Bank Accounts as they are assessed by each respective Bank.

14.     Seven (7) of the Debtors ten (10) Bank Accounts are maintained at an authorized depository under the Operating Guidelines and Reporting Requirements for Debtors

---

[5] Core Scientific Operating Company (formerly known as Core Scientific, Inc. and Bremer Bank, National Association entered into a construction real estate term loan on December 10, 2021. In addition to Bremer Bank's lien on certain real estate assets, the Bremer Bank loan is secured by the balance in the Debtors' Loan Payments account, which Bremer Bank may use to set off any past due amount.

[6] The Debtors' adequate assurance is discussed in greater depth in Emergency Motion of Debtors for Entry of an Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies; (II) Establishing Procedures for Resolving Objections by Utility Companies; (III)  Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service; and (IV) Granting Related Relief [●].

in Possession and Trustees (the "**UST Operating Guidelines**") published by the Office of the United States Trustee for Region 7 (the "**U.S. Trustee**").  The total aggregate balance of the Debtors' Bank Accounts held at an authorized depository is approximately $3.5 million.  The non-authorized Bank Accounts are held for the benefit of third-parties, are not accessible by the Debtors, and do not fund any daily operations of the Debtors.  The total aggregate balance of the Debtors' Bank Accounts held at a non-authorized depository is $1.1 million.

### B.  Bitcoin Management System

15.    An element of the Cash Management System is the Debtors' bitcoin mining and sales operations (collectively, the "**Bitcoin Management System**").  In the ordinary course of business, the Debtors earn a significant percentage of their revenue from their bitcoin mining operations.  The Bitcoin Management System facilitates the monitoring, forecasting, and reporting of the Debtors' liquidity in the form of bitcoin and generates liquidity for the Debtors in the form of bitcoin sales.  As described below in more detail, the Bitcoin Management System entails four (4) Bitcoin Mining Pools (as defined below) and four (4) active Bitcoin Wallets (as defined below), including those set forth on **Exhibit C**.  The diagram of the Cash Management System attached hereto as **Exhibit D** demonstrates the interaction between the Bitcoin Management System and the rest of the Debtors Cash Management System.

16.    As a result of the Debtors' acquisition of Blockcap, Inc. ("**Blockcap**")[7] in July 2021, the Bitcoin Management System is bifurcated into the mining operations of the Blockcap-owned miners and the mining operations of the rest of the Debtors' miners.

17.    Similar to other large bitcoin miners, the Debtors contribute or "pool" their resources through a bitcoin mining pool provided by third-party pooling platforms (the

---

[7] Blockcap is a Debtor and a wholly-owned subsidiary of Debtor Core Scientific Acquired Mining LLC.

"**Bitcoin Mining Pools**").  A Bitcoin Mining Pool uses the combined computing power of all of its members' computers (also called "rigs" or "miners") to solve the algorithmic problems required to mine bitcoin and compensates miners for their pro rata share of bitcoin assets mined by the collective efforts of the pool.  Pooling provides the Debtors and other miners greater predictability and consistency from their mining operations and reduces risks of unpredictable mining results arising from individual mining efforts.

18.    The Debtors' Bitcoin Mining Pools are hosted by the following entities: (i) DCG Foundry, LLC ("**Foundry**") is the Debtors' primary Bitcoin Mining Pool.[8]  The Debtors maintain two Bitcoin Mining Pools, one registered in Core Operating's name and one registered in Blockcap's name; and (ii) Luxor Technology Corp. ("**Luxor**")[9] is the Debtors' backup Bitcoin Mining Pool.[10]  As in the case of the Foundry Bitcoin Mining Pool, the Debtors maintain two pools, one registered in Core Operating's name and one registered in Blockcap's name.

19.    The Bitcoin Mining Pool deposits the Debtors' newly mined Bitcoin into one of the Debtors' Bitcoin wallets (the "**Bitcoin Wallets**").  A Bitcoin Wallet is an interface that stores Bitcoin and allows parties to access their Bitcoin.[11]  Bitcoin deposited into a Bitcoin Wallet can be transferred between Bitcoin Wallets or sold for cash.  Bitcoin Wallets can hold both Bitcoin and cash.

---

[8] The Foundry pool is governed by Foundry's standard terms and conditions, effective August 27, 2020, and updated from time-to-time.

[9] The Luxor Bitcoin Mining Pool is currently dormant but may become active in the event of an outage or other disturbance impacts the Foundry Bitcoin Mining Pool. The Luxor pool is governed by Luxor's terms of service, and are updated from time-to-time.

[10] Given the critical contribution that bitcoin mining makes to the Debtors' overall revenue composition, the Debtors maintain a backup Bitcoin Mining Pool with Luxor as a hedge against potential disruptions at Foundry. Disruptions may include periods of outages during which time the Debtors' would be unable to effectively mine bitcoin.  As of the Petition Date, the Debtors' exclusively mine bitcoin with Foundry.

[11] Cryptocurrency that is mined by the Debtors' customers is deposited directly into the Debtors' customer-selected, third-party wallets.  The Debtors never hold any customer cryptocurrency assets.

20.     The Debtors' Bitcoin Wallets are provided by Coinbase, Inc. ("**Coinbase**") and are governed by identical Coinbase Prime Broker Agreements dated February 15, 2022, Core Scientific, Inc. and Blockcap each executed with Coinbase, Inc., (together the "**Coinbase Agreement**").[12]  The Debtors hold four (4) Bitcoin Wallets, one (1) pair in the name of Core Scientific, Inc. (the "**Core Wallets**") and one (1) pair in the name of Blockcap (the "**Blockcap Wallets**").  Each pair of Bitcoin Wallets consists of one (1) non-trading or "cold" wallet (the "**Non-Trading Wallets**") and one (1) trading or "hot" wallet (the "**Trading Wallets**").  Bitcoin in the Non-Trading Wallets is stored offline for security purposes, meaning they cannot be accessed through the internet.[13]

21.     Initially, the bitcoin allocated to the Debtors from the Bitcoin Mining Pool is deposited into one of the Debtors' Non-Trading Wallets.  Those generated from Blockcap's miners are deposited into a Blockcap Wallet and the rest into a Core Wallet.  Due to the Debtors' liquidity needs over the last few months, the Debtors sell nearly all bitcoin they mine for U.S. dollars.  To access the bitcoin stored in a Non-Trading Wallet, the Debtors contact Coinbase and request that bitcoin in such accounts be transferred into a Trading Wallet.  Transferring bitcoin from a Non-Trading Wallet to a Trading Wallet is a manual process that can take up to several hours to complete.  The Debtors have a system of controls in place that requires two authenticators before bitcoin may be transferred from a Non-Trading Wallet to a Trading Wallet.

---

[12] In addition to Coinbase, the Debtors have additional dormant Bitcoin Wallets with Genesis Custody Limited (a non-trading account) and with Bittrex, Inc. (a trading account), each of which are no longer used and hold no assets.  The Debtors elected to leave these accounts dormant rather than close the wallets due to the complexities involved with closing a Bitcoin Wallet.  The Debtors do not intend to use these dormant wallets during the pendency of this chapter 11 case, and are seeking no relief related thereto.

[13] Pursuant to the Coinbase Prime Broker Agreement by and between Coinbase, Inc. and the Debtors, and as provided for in Exhibit A section 4, Assets held within the Coinbase Prime Vault are secured within its cold storage environment.  *Id.* Assets that are held in custodial accounts at Coinbase Prime Vault are held in segregated wallets, and therefore, are not commingled with other assets of other Coinbase customers.  *Id.* Assets held by Coinbase are not property of Coinbase.  *Id.* Coinbase will not, directly or indirectly, lend, pledge, hypothecate, or re-hypothecate any of the Debtors' bitcoin assets.  *Id.*

Only after bitcoin has been deposited into a Trading Wallet may it be sold.  The Debtors employ a bitcoin trading professional to manage all bitcoin sales such that the Debtors maximize the potential execution price.  Cash from bitcoin sales is deposited initially into the Trading Wallet that initiated the bitcoin sale.  The Debtors then transfer the U.S. dollars received from bitcoin sales from a Bitcoin Trading Wallet into one of the Debtors' Bank Accounts through a wire transfer.

22.     Finally, from time-to-time the Debtors evaluate their Bitcoin Wallets. Based on the needs of the business and the state of the Bitcoin Wallet industry, the Debtors may decide at some point during the pendency of these chapter 11 cases to open new Bitcoin Wallets at different institutions to mitigate risks and to minimize fees.

23.     As part of the Bitcoin Management System, the Debtors incur monthly service charges and brokerage related costs, fees, and expenses in connection with the maintenance of Bitcoin Wallets (the "**Bitcoin Wallet Fees**").  The Bitcoin Wallet Fees are paid monthly and are manually submitted by the Debtors to Coinbase.  The Coinbase monthly fees are loosely calculated based on the average dollar-denominated value of the bitcoin that is maintained in the Debtors' Non-Trading Wallets.  Coinbase also assess a small brokerage fee for each sales transaction.  The Coinbase fees are paid by the Debtors monthly.  The Debtors have agreements with their Bitcoin Mining Pools such that they pay no fees and receive the entire pro rata share of bitcoin that they mine.

24.     The Debtors' bitcoin operations are ordinary course operations – mining and selling bitcoin are the Debtors' primary business.  Nevertheless, out of an abundance of caution, to avoid significant disruptions to their business cash management operations that would result from a disruption in bitcoin mining and sales, by this Motion the Debtors request to

continue these bitcoin transactions in the ordinary course, which include mining using the Bitcoin Mining Pools, selling bitcoin for U.S. Dollars, transferring bitcoin between the Debtors' Coinbase Bitcoin Wallets, transferring cash from the Bitcoin Wallets to the Bank Accounts, and paying all fees and expenses related thereto.  Finally, the Debtors seek approval to open new Bitcoin Wallets in the ordinary course of business.

**C.  Description of Funds Processing**

25.     A diagram of the Cash Management System, including the Bitcoin Management System, setting forth the flow of funds among the Institutions is attached hereto as **Exhibit D**.  The following list describes the manner in which cash generally moves through the Cash Management System and Bitcoin Management System.

     i.    *Receipts*: The Debtors' cash receipts enter the Cash Management System via check, wire transfer, or ACH transfer.  The Debtors have two primary sources of revenue.  First, Debtors earn a significant percentage of their revenue from the sale of mined bitcoin.  As described above, mined bitcoin is transferred from the Bitcoin Mining Pools into the applicable Coinbase Non-Trading Wallet.  Those bitcoin are then transferred to the applicable Coinbase Trading Wallet and sold for U.S. dollars.  Cash revenue from bitcoin sales are deposited via wire transfer from the applicable Coinbase Trading Wallet into either the Main Operating Account or the Blockcap Depository Account.  Second, Debtors earn revenue from hosting services they provided to other cryptocurrency miners.  Hosting customer payments are deposited into the Main Concentration Account.

    ii.    *Concentration*: The Debtors use the Main Concentration Account to concentrate deposits from the Main Operating Account and the Blockcap Depository Account.   Funds in the Main Concentration Account are transferred to the Debtors other accounts on an as-needed basis.  Funds in the Main Concentration Account are periodically swept into the Debtors Overnight Deposit Account.

    iii.    *Disbursements*: The Debtors' third-party disbursements are made primarily through the Main Operating Account.  The Debtors' cash disbursements from the Main Operating Account generally include (i) electricity expense for running the Debtors' mining and hosting business; (ii) insurance expenses; (iii) various third-party vendor, contractor, and construction related costs; (iv) taxes; (v) corporate overhead expenses; (vi) payment on account of funding indebtedness; (viii) rent; and (ix) expenses and payroll.

The Debtors also directly fund certain loan payments using the Main Concentration Account.

**D.  Debtors' Existing Business Forms and Records**

26.     In the ordinary course of their business, the Debtors use a variety of preprinted business forms, including letterhead, correspondence forms, invoices, purchase orders, and other business forms in the ordinary course of business (collectively, and as they may be modified from time to time, the "**Business Forms**").  The Debtors also maintain books and records to document their financial results and a wide array of necessary operating information (collectively, the "**Books and Records**").  To avoid a significant disruption to their business operations that would result from a disruption of the Cash Management System and to avoid unnecessary expense, the Debtors request authorization to continue using all of the Business Forms and Books and Records in use immediately before the Petition Date (and as may be amended or modified in the ordinary course from time to time), including with respect to the Debtors' ability to update authorized signatories and services, as needed—without reference to the Debtors' status as chapter 11 debtors in possession—rather than requiring the Debtors to incur the expense and delay of ordering new Business Forms and creating new Books and Records.

**E.  Intercompany Transactions**

27.     As explained above, since the Debtors' acquisition of Blockcap on July 30, 2021, the Debtors have maintained separate Blockcap-only Bitcoin Mining Pools and Bitcoin Wallets, as well as a Blockcap Depository Account (collectively, the "**Blockcap Accounts**"). The Debtors transfer funds from the Blockcap Depository Account to the Main Concentration Account in the ordinary course of their business and maintain records of the intercompany transactions resulting therefrom (collectively, the "**Intercompany Transactions**" and each

intercompany receivable and payable generated pursuant to an Intercompany Transaction, an "**Intercompany Claim**").  Transfers from the Blockcap Accounts to the Main Concentration Account are the Debtors' only intercompany cash transfers.

28.     Aside from Blockcap, the Debtors do not maintain separate Bank Accounts or balance sheets for each Debtor entity.  In the regular course of business, all transactions are recorded at the Core Scientific, Inc. entity level regardless of which entity owns the relevant assets, earns the revenue, or incurs the cost relating to the transaction. The Debtors do not track intercompany transactions or maintain intercompany balances in the regular course of business; however, the Debtors may record certain intercompany transactions on an as-needed basis.  Through the relief requested by this Motion, the Debtors request that any payment made by one Debtor entity on account of another receive an administrative expense claim status.

29.     To avoid significant disruptions to the Cash Management System—specifically, as they relate to the Blockcap Accounts—that would result from a disruption in Intercompany Transactions, by this Motion the Debtors request to continue to conduct Intercompany Transactions and process Intercompany Claims in the ordinary course, and any related thereto.

### F.  Employee Credit Cards Programs

30.     In the ordinary course business, the Debtors maintain employee issued credit cards that are paid for by the Debtors (the "**Employee Credit Cards**").[14]  In general, the Employee Credit Cards are used by certain of the Debtors' executives and employees for various travel expenses and other incidentals including, but not limited to, airfare, hotel, business meals, vehicle maintenance, and other required business expenses.  In addition, certain regular cost of

---

[14] Employees are not liable for any charges made on an Employee Credit Card.

business charges are directly charged to the Employee Credit Cards, including costs related to certain information technology provider subscriptions as well as certain computer related hardware and software products.

31.     The Employee Credit Cards are issued by CNB and Visa Inc. ("**Visa**"). The Debtors' arrangement with CNB under Employee Credit Cards is set forth in that certain *Commercial Card Agreement*, entered June, 2020 between the Core Scientific, Inc. and CNB (as amended, modified, supplemented or restated from time to time, the "**Commercial Card Agreement**").  Pursuant to an agreement between the Core Scientific, Inc. and CNB, as of November 22, 2022 the Employee Credit Cards are fully secured (the "**Cash Collateral Agreement**") by the Credit Card Account in the amount of $175,000, which corresponds to the Debtors' $175,000 total line of credit under the Employee Credit Cards.

32.     The Debtors estimate that they incur total liabilities of approximately $70,000 per week on account of the Employee Credit Cards.  The Debtors pay the Employee Credit Cards in full every Monday for transactions incurred during the prior week.  As of the Petition Date, the Debtors estimate that there are approximately seventy 70 issued and active Employee Credit Cards and that they owe approximately $25,933 on account of the Employee Credit Cards.

33.     To avoid significant disruptions to the Cash Management System and the Debtors' business operations, by this Motion the Debtors request to continue to utilize the Employee Credit Cards, and to pay all charges, fees, and expenses related thereto in the ordinary course.

<u>**Relief Requested Should Be Granted**</u>

**A. Continuation of Cash Management System Is in the Best Interests of Debtors and All Other Parties in Interest**

34. The efficient and economical operation of the Debtors' business requires that the Cash Management System continue during the pendency of these chapter 11 cases. As a practical matter, it would be difficult and expensive to establish and maintain a separate cash management system for each Debtor. Further, requiring the Debtors to adopt new, segmented cash management systems at this early and critical stage of these chapter 11 cases would be expensive, create unnecessary administrative burdens, and be extraordinarily disruptive to their business operations. Any such disruption would have a severe and adverse impact upon the success of these chapter 11 cases. Accordingly, the Debtors seek authority to continue using the Cash Management System in the same manner as the Cash Management System was utilized prior to the Petition Date, and to implement ordinary course changes to it consistent with past practices. The Bankruptcy Code provides for such relief.

35. Section 363(c)(1) of the Bankruptcy Code authorizes the debtor in possession to "enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business . . . and may use property of the estate in the ordinary course of business without notice or a hearing." The purpose of section 363(c)(1) is to provide a debtor in possession with the flexibility to engage in the ordinary transactions required to operate its business without unneeded oversight by its creditors or the court. *In re HLC Props., Inc.*, 55 B.R. 685, 686 (Bankr. N.D. Tex. 1985) (finding "no need to further burden the docket or the staff of the Court with a superfluous order" when a transaction is in the ordinary course of business); *Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997); *Chaney v. Official Comm. of Unsecured Creditors of Crystal Apparel, Inc.* (*In re Crystal Apparel, Inc.*),

207 B.R. 406, 409 (S.D.N.Y. 1997).  Included within the purview of section 363(c) is a debtor's

ability to continue the "routine transactions" necessitated by a debtor's cash management system.

*Amdura Nat'l Distrib. Co. v. Amdura Corp. (In re Amdura Corp.)*, 75 F.3d 1447, 1453

(10th Cir. 1996).  A cash management system allows a debtor "to administer more efficiently

and effectively its financial operations and assets."  *Southmark Corp. v. Grosz (In re Southmark

Corp.)*, 49 F.3d 1111, 1114 (5th Cir. 1995).  Accordingly, section 363(c)(1) authorizes the

continuation of the Cash Management System as it operated prepetition without the Court's

approval.

36.    To the extent the relief requested herein is found to fall outside of the

Debtors' ordinary course of business, the Court may grant such relief pursuant to section 363(b)

of the Bankruptcy Code, which provides, in relevant part, that "[t]he [debtor], after notice and a

hearing, may use, sell, or lease, other than in the ordinary course of business, property of the

estate."  11 U.S.C. § 363(b)(1).  Courts in the Fifth Circuit have granted a debtor's request to use

property of the estate outside of the ordinary course of business pursuant to section 363(b) of the

Bankruptcy Code upon a finding that such use is supported by sound business reasons.  *See, e.g.*,

*In re BNP Petroleum Corp.*, 642 F. App'x 429, 435 (5th Cir. 2016); *In re Cont'l Air Lines*, 780

F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary

duty to the debtor, creditors and equity holders, there must be some articulated business

justification for using, selling, or leasing the property outside the ordinary course of business.");

*see also In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy

Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than

in the ordinary course of business, but the movant must articulate some business justification for

the sale."); *In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989).

Maintaining the existing Cash Management System is in the best interests of the Debtors' estates and all parties in interest and, therefore, should be approved.  If the Debtors are required to alter the way in which they collect and disburse cash throughout the Cash Management System, their operations will experience severe disruptions, which ultimately would frustrate the Debtors' ability to effectuate their restructuring strategy and maximize the value of their estates.  Further, the Cash Management System provides significant benefits to the Debtors, including the ability to (i) control corporate funds, (ii) ensure the maximum availability of funds when and where necessary, including distributing funds to the Debtors with immediate liquidity needs, and (iii) reduce costs and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account information. Accordingly, the Debtors request that they be permitted to maintain and continue to use their existing Cash Management System and Bank Accounts to the extent set forth herein.

37.     Courts in this district and others have approved postpetition continuation of a debtor's prepetition cash management system as a routine matter in similar cases.  *See, e.g.*, *In re Talen Energy Supply, LLC*, No. 22-90054 (MI) (Bankr. S.D. Tex. Sept. 26, 2022) (Docket No. 1271); *In re Basic Energy Serv., Inc.*, No. 21-90002 (DRJ) (Bankr. S.D. Tex. Sept. 13, 2021) (Docket No. 339); *In re CBL & Assoc. Prop., Inc.*, No. 20-35226 (DRJ) (Bankr. S.D. Tex. Nov. 23, 2020) (Docket No. 263); *In re Fieldwood Energy LLC*, Case No. 20-33948 (MI) (Bankr. S.D. Tex. Sept. 14, 2020) (Docket No. 341); *In re CEC Ent., Inc.*, No. 20-33163 (MI) (Bankr. S.D. Tex. July 23, 2020) (Docket No. 410); *In re Gavilan Res., LLC*, No. 20-32656 (DRJ) (Bankr. S.D. Tex. June 9, 2020) (Docket No. 111); *In re Speedcast Int'l Ltd.*, No. 20-32243 (MI) (Bankr. S.D. Tex. May 20, 2020) (Docket No. 235).  Similar relief is also appropriate here.

**B.  Continued Performance of Intercompany Transactions Is Warranted and Intercompany Claims Should Be Granted Administrative Expense Priority**

38.     As stated above, under section 363(c)(1) of the Bankruptcy Code, a debtor in possession "may use property of the estate in the ordinary course of business without notice or a hearing."  The Debtors believe that they do not require the Court's approval to continue entering into and performing under their Intercompany Transactions.  The Debtors enter into and perform under Intercompany Transactions "in the ordinary course of business" within the meaning of section 363(c)(1) of the Bankruptcy Code.  Intercompany Transactions are not just a matter of routine in the Debtors' business, they are the sort of transactions that are common among many business enterprises that operate through multiple affiliates.  It is precisely because of their routine nature that the Intercompany Transactions are integral to the Debtors' ability to operate their business and successfully emerge from these chapter 11 cases.  Accordingly, out of an abundance of caution, the Debtors request express authority to engage in such transactions postpetition.

39.     The Debtors also request that the Court grant administrative expense status to all Intercompany Claims arising postpetition as a result of any Intercompany Transaction. Section 503(b)(1)(A) of the Bankruptcy Code provides, "[a]fter notice and a hearing, there shall be allowed administrative expenses . . . including . . . the actual, necessary costs and expenses of preserving the estate . . . ."  If the Intercompany Claims are accorded administrative expense status, each entity that utilizes the Cash Management System and provides benefit to the Debtors' estate will be assured that it will be compensated for its efforts.  Courts in this district and in other districts have granted administrative expense status to postpetition Intercompany Claims in similar cases.  *See, e.g.*, *In re Talen Energy Supply, LLC*, No. 22-90054 (MI) (Bankr. S.D. Tex. Sept. 26, 2022) (Docket No. 1271); *In re Basic Energy Serv., Inc.*, No. 21-90002

(DRJ) (Bankr. S.D. Tex. Sept. 13, 2021) (Docket No. 339); *In re CBL & Assoc. Prop., Inc.*, No. 20-35226 (DRJ) (Bankr. S.D. Tex. Nov. 23, 2020) (Docket No. 263); *In re Fieldwood Energy LLC*, Case No. 20-33948 (MI) (Bankr. S.D. Tex. Sept. 14, 2020) (Docket No. 341); *In re CEC Ent., Inc.*, No. 20-33163 (MI) (Bankr. S.D. Tex. July 23, 2020) (Docket No. 410); *In re Gavilan Res., LLC*, No. 20-32656 (DRJ) (Bankr. S.D. Tex. June 9, 2020) (Docket No. 111); *In re Speedcast Int'l Ltd.*, No. 20-32243 (MI) (Bankr. S.D. Tex. May 20, 2020) (Docket No. 235). Similar relief is also appropriate here.

### C. Court Should Authorize Debtors to Maintain Their Employee Credit Cards and to Pay Obligations Related Thereto

40.     As stated above, under section 363(c)(1) of the Bankruptcy Code, a debtor in possession may use property of the estate in the ordinary course of business without a hearing. Furthermore, section 364(a) of the Bankruptcy Code permits a debtor in possession to "obtain unsecured credit and incur unsecured debt in the ordinary course of business" without a court order. Purchases made using the Employee Credit Cards fall within the ordinary course of business under section 363(c)(1) of the Bankruptcy Code. The use of credit cards and similar payment methods is widespread at companies across the United States as a means of facilitating day-to-day business activities. As a result, the Debtors believe that they do not require the Court's approval to continue using the Employee Credit Cards on a postpetition basis. Further, pursuant to sections 363(b)(1) and 105(a) of the Bankruptcy Code, the Debtors request authority to pay any prepetition obligations related to the Credit Card Program.

41.     Nonetheless, out of an abundance of caution, the Debtors request authority to continue using the Employee Credit Cards in the ordinary course of business, and to pay all obligations related thereto. In the event the Court finds that such transactions do not fall within

the ordinary course of business, the Debtors request authority pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code.

42.     Continued use of the Employee Credit Cards is integral to the success and stability of the Debtors' business.  The Debtors rely on the ability of their employees to pay for expenses incurred in the ordinary course and to make other reasonable work-related purchases necessary to fulfill their day-to-day professional obligations.  Permitting the Debtors to continue using the Employee Credit Cards will ensure that the Debtors' employees are able to fulfill their daily professional obligations and, in turn, prevent significant disruption to the Debtors' business operations.

43.     The Court should also authorize the Debtors to pay all outstanding prepetition amounts owing on the Employee Credit Cards.  If the Debtors do not pay outstanding amounts owing, there is a significant risk that (i) CNB could set-off amounts owing against cash in the Debtors' Bank Accounts it maintains, and (ii) CNB or Visa could restrict the Debtors' access to its Employee Credit Card programs or cease extending credit to the Debtors after the Petition Date.  If that were to occur, it would be costly, disruptive to the Debtors' operations, burdensome to the Debtors and their estates, and time-consuming for the Debtors to establish new credit card programs with one or more alternative providers.  To avoid any disruption, the Debtors could be forced to ask employees to front the cost of purchases and expenses on their own (and seek reimbursement later), which would more than likely damage the Debtors' relationships with such employees.  Accordingly, the Debtors should be authorized to pay any outstanding amounts owing to CNB and Visa on account of the Credit Cards.  Courts in this district have permitted debtors to continue using their existing corporate credit cards.  *See, e.g.*, *In re Talen Energy Supply, LLC*, No. 22-90054 (MI) (Bankr. S.D. Tex. Sept. 26, 2022) (Docket

No. 1271); *In re Basic Energy Serv., Inc.*, No. 21-90002 (DRJ) (Bankr. S.D. Tex. Sept. 13, 2021)

(Docket No. 339); *In re CBL & Assoc. Prop., Inc.*, No. 20-35226 (DRJ) (Bankr. S.D. Tex. Nov.

23, 2020) (Docket No. 263); *In re Fieldwood Energy LLC*, Case No. 20-33948 (MI) (Bankr. S.D.

Tex. Sept. 14, 2020) (Docket No. 341); *In re CEC Ent., Inc.*, No. 20-33163 (MI) (Bankr. S.D.

Tex. July 23, 2020) (Docket No. 410); *In re Gavilan Res., LLC*, No. 20-32656 (DRJ) (Bankr.

S.D. Tex. June 9, 2020) (Docket No. 111); *In re Speedcast Int'l Ltd.*, No. 20-32243 (MI) (Bankr.

S.D. Tex. May 20, 2020) (Docket No. 235).  Similar relief is also appropriate here.

### D. Court Should Authorize Debtors to Pay Prepetition Bank Fees and Bitcoin Wallet Fees

44.     The Court should authorize the Debtors to pay Bank Fees and Bitcoin

Wallet Fees and similar service charges, if any, incurred prior to the commencement of these

chapter 11 cases.  The Debtors estimate that any prepetition Bank Fees and Bitcoin Wallet Fees

are unlikely to exceed $5,000.  As the *CoServ* court stated, "it is only logical that the bankruptcy

court be able to use section 105(a) of the Code to authorize satisfaction of the prepetition claim

in aid of preservation or enhancement of the estate."  *In re CoServ, L.L.C.*, 273 B.R. 487, 497

(Bankr. N.D. Tex. 2002).

45.     Under section 1107(a) of the Bankruptcy Code, a debtor has, among other

things, the "implied duty of the debtor-in-possession to 'protect and preserve the estate,

including an operating business' going-concern value.'"  *In re CEI Roofing, Inc.*, 315 B.R. 50, 59

(Bankr. N.D. Tex. 2004) (quoting *CoServ*, 273 B.R. at 497).  Under section 105(a) of the

Bankruptcy Code, "[t]he court may issue any order, process, or judgment that is necessary or

appropriate to carry out the provisions of this title."  *See CoServ*, 273 B.R. at 497 (holding that

sections 105 and 1107 of the Bankruptcy Code provide authority for a debtor-in-possession to

pay prepetition claims); *see also In re Tusa-Expo Holdings, Inc.*, Case No. 08-45057-DML-11,

2008 WL 4857954, at *1 (Bankr. N.D. Tex. Nov. 7, 2008); *CEI Roofing*, 315 B.R. at 56; *In re Mirant Corp.*, 296 B.R. 427 (Bankr. N.D. Tex. 2003).   Moreover, Bankruptcy Rule 6003 itself implies that the payment of prepetition obligations may be permissible within the first 21 days of a case where doing so is "necessary to avoid immediate and irreparable harm."   Accordingly, the Bankruptcy Code authorizes the postpetition payment of prepetition claims where, as here, such payments are critical to preserving the going-concern value of a debtor's estate.

46.     Here, payment of any prepetition Bank Fees and Bitcoin Wallet Fees is in the best interests of the Debtors and all parties-in-interest in these cases because it will prevent any disruption to the Cash Management System and ensure that the Debtors' receipt of and access to funds is not delayed.   Further, because the Bank may have setoff rights for the Bank Fees, payment of prepetition Bank Fees should not alter the rights of unsecured creditors in these chapter 11 cases.   Accordingly, the Court should authorize the Debtors to pay any outstanding prepetition Bank Fees and Bitcoin Wallet fees and similar service charges to maintain the Cash Management System.   Courts in this district and in other districts have granted debtors similar relief in other complex chapter 11 cases.   *See, e.g.*, *In re Talen Energy Supply, LLC*, No. 22-90054 (MI) (Bankr. S.D. Tex. Sept. 26, 2022) (Docket No. 1271); *In re Basic Energy Serv., Inc.*, No. 21-90002 (DRJ) (Bankr. S.D. Tex. Sept. 13, 2021) (Docket No. 339); *In re CBL & Assoc. Prop., Inc.*, No. 20-35226 (DRJ) (Bankr. S.D. Tex. Nov. 23, 2020) (Docket No. 263); *In re Fieldwood Energy LLC*, Case No. 20-33948 (MI) (Bankr. S.D. Tex. Sept. 14, 2020) (Docket No. 341); *In re CEC Ent., Inc.*, No. 20-33163 (MI) (Bankr. S.D. Tex. July 23, 2020) (Docket No. 410); *In re Gavilan Res., LLC*, No. 20-32656 (DRJ) (Bankr. S.D. Tex. June 9, 2020) (Docket No. 111); *In re Speedcast Int'l Ltd.*, No. 20-32243 (MI) (Bankr. S.D. Tex. May 20, 2020) (Docket No. 235).   Similar relief is also appropriate here.

### E. Maintenance of Debtors' Existing Bank Accounts and Business Forms is Warranted

47.     The UST Operating Guidelines generally require that a chapter 11 debtor, among other things: (i) open new bank accounts at a depository approved by the U.S. Trustee; (ii) establish one debtor in possession account for all estate monies required for the payment of taxes (including payroll taxes); (iii) close all existing Bank Accounts and open new debtor in possession accounts; (iv) maintain a separate debtor in possession account for cash collateral; (v) obtain checks that bear the designation "Debtor in Possession"; and (vi) reference the debtor's bankruptcy case number and type of account on each such check. *See* U.S. Dep't of Justice, Region 7 Guidelines for Debtors-in-Possession § IV (2020).[15]

48.     The Debtors request that the Court waive the requirements of the UST Operating Guidelines, which would require, among other things, the closure of the Bank Accounts and the opening of new deposit accounts.  Strict enforcement of the UST Operating Guidelines with respect to the Cash Management System will severely disrupt the Debtors' ordinary financial operations by reducing efficiencies, increasing administrative burdens, and creating unnecessary expenses.  These chapter 11 cases will be more orderly if the Debtors are permitted to maintain all Bank Accounts with the same account numbers during these cases.  By preserving business continuity and avoiding the disruption and delay to the Debtors' disbursement obligations, all parties-in-interest, including employees, vendors, and customers, will be best served by the relief requested herein.  Furthermore, the Debtors' continued use of their existing Business Forms will not prejudice parties in interest because parties doing business with the Debtors will know of the Debtors' status as debtors in possession.  In addition, to the extent necessary, the Debtors request authority to make ordinary course changes to the Cash

---

[15] https://www.justice.gov/ust-regions-r07/file/r07_dip_guidelines.pdf/download.

Management System, such as opening or closing their accounts in accordance with the Debtors'

prepetition practices.  Courts in this district and in other districts have granted debtors similar

relief in other complex chapter 11 cases.  *See, e.g.*, *In re Talen Energy Supply, LLC*, No. 22-

90054 (MI) (Bankr. S.D. Tex. September 26, 2022) (Docket No. 1271); *In re Basic Energy Serv.,*

*Inc.*, No. 21-90002 (DRJ) (Bankr. S.D. Tex. Sept. 13, 2021) (Docket No. 339); *In re CBL &*

*Assoc. Prop., Inc.*, No. 20-35226 (DRJ) (Bankr. S.D. Tex. Nov. 23, 2020) (Docket No. 263); *In*

*re Fieldwood Energy LLC*, Case No. 20-33948 (MI) (Bankr. S.D. Tex. Sept. 14, 2020) (Docket

No. 341) *In re CEC Ent., Inc.*, No. 20-33163 (MI) (Bankr. S.D. Tex. July 23, 2020) (Docket No.

410); *In re Gavilan Res., LLC*, No. 20-32656 (DRJ) (Bankr. S.D. Tex. June 9, 2020) (Docket No.

111); *In re Speedcast Int'l Ltd.*, No. 20-32243 (MI) (Bankr. S.D. Tex. May 20, 2020) (Docket

No. 235).  Similar relief is also appropriate here.

### F.  Extension of Time to Comply with Section 345(b) of the Bankruptcy Code Is Warranted

49.     Section 345 of the Bankruptcy Code governs a debtor's deposit and

investment of cash during a chapter 11 case and authorizes deposits or investments of money as

"will yield the maximum reasonable net return on such money, taking into account the safety of

such deposit or investment."  11 U.S.C. § 345(a).  Funds deposited into Bank Accounts at BofA

comply with section 345(a) of the Bankruptcy Code.  CNB is not an Authorized Depository;

however, the Debtors believe that it meets the standards of section 345(a) because (i) CNB is a

highly rated and federally charted bank subject to supervision by federal banking regulators, and

(ii) the U.S. Trustee Offices in other regions, namely Region 16, designate CNB as an authorized

depository.  Accordingly, funds deposited into the Bank Accounts at CNB comply with section

345(a) of the Bankruptcy Code.  Additionally, Bremer Bank is subject to federal banking

regulations and deposited funds are covered by the Federal Deposit Insurance Corporation up to

the maximum amount allowed. Accordingly, funds deposited into the Bank Account at Bremer Bank should be deemed to comply with section 345(a) of the Bankruptcy Code.

50. For deposits or investments that are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) requires the estate to obtain, from the entity with which money is deposited or invested, a bond in favor of the United States and secured by the undertaking of an adequate corporate surety, unless the Court, for cause, orders otherwise. *Id.* § 345(b). In the alternative, the estate may require the entity to deposit governmental securities pursuant to 31 U.S.C. § 9303, which provides that when a person is required by law to give a surety bond, that person, in lieu of a surety bond, may instead provide an eligible obligation, designated by the Secretary of the Treasury as an acceptable substitute for a surety bond. *See* 31 U.S.C. §§ 9301, 9303.

51. Investment of cash in strict compliance with the requirements of section 345(b) would, in large chapter 11 cases such as these, be inconsistent with section 345(a), which permits a debtor in possession to make such investments of money of the estate "as will yield the maximum reasonable net return on such money." Thus, in 1994, to avoid "needlessly handcuff[ing] larger, more sophisticated debtors," Congress amended section 345(b) to provide that its strict investment requirements may be waived or modified if the Court so orders "for cause." 140 Cong. Rec. H10,752-01, H10,768 (Oct. 4, 1994), 1994 WL 545773.

52. Additionally, the UST Operating Guidelines generally require chapter 11 debtors to, among other things, deposit all estate funds into an account with an authorized depository that agrees to comply with the requirements of the Office of the U.S. Trustee.

53. As stated above, seven (7) of the Debtors' ten (10) Bank Accounts are maintained with BofA, an authorized depository under the UST Operating Guidelines that is insured by the Federal Deposit Insurance Corporation. Accordingly, the Debtors respectfully submit that funds deposited into such Bank Accounts comply with section 345 of the Bankruptcy Code.

54. However, for the two (2) Bank Accounts at CNB, and one (1) Bank Account at Bremer Bank, the Debtors request a 90-day extension of the deadline to come into compliance with section 345(b) of the Bankruptcy Code and any of the U.S. Trustee's requirements or guidelines, which deadline may be further extended by written stipulation between the Debtors and the U.S. Trustee without further order of the Court.

55. With regards to the four (4) Coinbase Bitcoin Wallets, the Debtors do not intend to maintain large balances in their Coinbase accounts. The Debtors intend to sell all available bitcoin that they mine to fund daily operations. Cash received from bitcoin sales are transferred to one of the Debtors' BofA accounts, an authorized depository under the UST Operating Guidelines, the same day that the bitcoin are sold. Furthermore, Coinbase has represented to the Debtors in the master services agreement by and between Coinbase and the Debtors that Coinbase "will safe keep the [d]igital [a]ssets and segregate all [d]igital [a]ssets from both the (a) property of Coinbase Custody, and (b) assets of other customers of Coinbase Custody."[16]  Accordingly, the Debtors' exposure to Coinbase arising as the provider of the Debtors' Bitcoin Wallets is minimal. Requiring the Debtors to post a bond would place a needless burden on the Debtors and impose unnecessary costs on the Debtors' estates.

---

[16] See footnote 12, above, for additional details of the Coinbase policy.

**Bankruptcy Rule 6003(b) Has Been Satisfied**

56.     Pursuant to Bankruptcy Local Rule 9013-1, the Debtors respectfully request emergency consideration of this Motion under Bankruptcy Rule 6003, which provides that the Court may grant relief within the first 21 days after the Petition Date to the extent such relief is necessary to avoid immediate and irreparable harm.  As described herein and in the Bros Declaration, the relief requested is essential to avoid the immediate and irreparable harm that would be caused by the Debtors' inability to transition smoothly into chapter 11.  Accordingly, the Debtors submit that the requirements of Bankruptcy Rule 6003 are satisfied.

**Compliance with Bankruptcy Rule 6004(a) and
Waiver of Bankruptcy Rule 6004(h)**

57.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion satisfies Bankruptcy Rule 6004(a) and that the Court waive the 14-day period under Bankruptcy Rule 6004(h).

**Reservation of Rights**

58.     Nothing contained herein is intended to be or shall be deemed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver or limitation of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (iv) an agreement or obligation to pay any claims, (v) a waiver of any claims or causes of action which may exist against any creditor or interest holder, (vi) an admission as to the validity of any liens satisfied pursuant to this Motion, or (vii) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and

should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to dispute such claim subsequently.

### Notice

59.     Notice of this Motion will be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

### No Previous Request

60.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

*[Remainder of page intentionally left blank]*

WHEREFORE the Debtors respectfully request entry of the Proposed Interim Order and Proposed Final Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:  December 21, 2022
   Houston, Texas

           Respectfully submitted,

           _/s/  Alfredo R. Pérez_
           WEIL, GOTSHAL & MANGES LLP
           Alfredo R. Pérez (15776275)
           700 Louisiana Street, Suite 1700
           Houston, Texas 77002
           Telephone:  (713) 546-5000
           Facsimile:  (713) 224-9511
           Email:   Alfredo.Perez @weil.com

           -and-

           WEIL, GOTSHAL & MANGES LLP
           Ray C. Schrock, P.C. (_pro hac vice_ pending)
           Ronit J. Berkovich (_pro hac vice_ pending)
           Moshe A. Fink (_pro hac vice_ pending)
           767 Fifth Avenue
           New York, New York 10153
           Telephone:  (212) 310-8000
           Facsimile:  (212) 310-8007
           Email:   Ray.Schrock@weil.com
              Ronit.Berkovich@weil.com
              Moshe.Fink@weil.com

           _Proposed Attorneys for Debtors_
           _and Debtors in Possession_

**<u>Certificate of Service</u>**

I hereby certify that on December 21, 2022, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

_/s/  Alfredo R. Pérez_____
Alfredo R. Pérez