## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| CORE SCIENTIFIC, INC., *et al.,* | § | Case No. 22-90341 (DRJ) |
| | § | |
| | § | (Joint Administration Requested) |
| Debtors.[1] | § | (Emergency Hearing Requested) |
| | § | |

## EMERGENCY MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) CONTINUE INSURANCE PROGRAMS AND SURETY BONDS, AND (B) PAY CERTAIN OBLIGATIONS WITH RESPECT THERETO; (II) GRANTING RELIEF FROM AUTOMATIC STAY WITH RESPECT TO WORKERS' COMPENSATION CLAIMS; AND (III) GRANTING RELATED RELIEF

---

**EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN THE MORNING OF THURSDAY, DECEMBER 22, 2022.**

**IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

---

Core Scientific, Inc. and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (the "**Motion**"):

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisitions, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisition I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

## Background

1.      On the date hereof (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.  The Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**").

2.      The Debtors, together with their non-debtor affiliates (collectively, the "**Company**"), are one of the largest blockchain infrastructure, hosting provider, and digital asset mining companies in North America, with fully operational data centers in Texas, Georgia, Kentucky, North Carolina, and North Dakota.

3.      Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Michael Bros in Support of the Debtors' Chapter 11 Petitions and First Day Relief*, (the "**Bros Declaration**"),[2] which has been filed with the Court contemporaneously herewith and is incorporated by reference herein.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Bros Declaration.

## Jurisdiction

4.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C.
§ 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the
Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

5.      By this Motion, pursuant to sections 105(a), 362(d), 363(b), and 503(b) of
the Bankruptcy Code and Bankruptcy Rules 4001, 6003, and 6004, the Debtors request entry of
interim and final orders (i) authorizing, but not directing them to (a) continue to maintain and
renew, amend, supplement, replace, or extend (if necessary) their Insurance Programs and Surety
Bonds (each as defined below) in accordance with their applicable insurance policies and
indemnity and reimbursement agreements and to continue to perform their obligations with respect
thereto during these chapter 11 cases, and (b) pay certain prepetition obligations arising under the
Insurance Programs or Surety Bonds; (ii) modifying the automatic stay to the limited extent
necessary to permit the Debtors' employees to proceed with any claims they may have under the
Workers' Compensation Program (as defined below); and (iii) granting related relief.  The Debtors
further request that the Court authorize financial institutions to receive, process, honor, and pay all
checks presented for payment and to honor all funds transfer requests related to such obligations.

6.      A proposed form of order granting the relief requested herein on an interim
basis is annexed hereto as **Exhibit A** (the "**Proposed Interim Order**") and, pending a final hearing
on the relief requested herein, on a final basis as **Exhibit B** (the "**Proposed Final Order**"),
respectively.

## Debtors' Insurance Programs

7.      In the ordinary course of their bitcoin mining and cryptocurrency hosting
operations, the Debtors maintain workers' compensation, third-party liability, property, and

various other insurance programs (collectively, the "**Insurance Programs**").  In connection with the Insurance Programs, the Debtors incur obligations to pay premiums and other obligations, including, but not limited to, taxes, fees, collateral, and deductibles (collectively, the "**Insurance Obligations**"), in accordance with, or relating to, their respective insurance policies (each, an "**Insurance Policy**") through several insurance carriers (each, an "**Insurance Carrier**").  The Debtors' Insurance Programs includes: (i) coverage of workers' compensation and employer's liability (the "**Workers' Compensation Program**"); (ii) coverage of potential third-party liability in connection with the Debtors' business (the "**General Liability Program**"); (iii) coverage for property, cargo, and equipment losses (the "**Property Program**"); (iv) coverage of management and directors' and officers' liability (the "**Management Liability Program**"); (v) excess coverage for various Insurance Policies coverage for losses outside the scope of the Debtors' other policies, as described below (the "**Umbrella and Excess Liabilities Program**"); and (vi) coverage for claims arising from, among other things, crime liability, cyber liability, automobile liability, flood and other natural disaster liability, and travel liability (collectively, the "**Other Insurance Programs**").  A detailed list of the Insurance Programs is attached as **Exhibit C** hereto.  The Debtors also retain the services of various insurance service providers in connection with maintaining the Debtors' Insurance Programs.[3]

8.      The Debtors are obligated to make premium payments related to the Insurance Policies based upon a fixed rate established and billed by each Insurance Carrier (collectively, the "**Insurance Premiums**").  The Debtors pay approximately $13.2 million in Insurance Premiums each year, not including applicable taxes and surcharges, deductibles, broker and consulting fees, and commissions.  These Insurance Premiums are generally prepaid annually.

---

[3] In addition to its Insurance Program, the Debtors have Surety Bonds, which are defined and discussed below.

The primary exception to the annual prepayment schedule is the primary property insurance policy through General Casualty Co. of Wisconsin (the "**Primary Property Policy**"), which is described below.

9.      The following chart summarizes the Debtors' prepetition obligations related to the Insurance Programs, including amounts coming due in the next thirty (30) days (the "Interim Period"):

| Insurance Obligations | Prepetition Amount Outstanding as of the Petition Date | Due in the Interim Period |
|---|---|---|
| Workers' Compensation Program | $5,000 | $5,000 |
| General Liability Programs | $0 | $0 |
| Property Programs | $1,700,000 | $330,000 |
| Management Liability Program | $0 | $0 |
| Umbrella and Excess Coverage Programs | $0 | $0 |
| Other Insurance Programs | $0 | $0 |
| Surety Bonds Obligations | $0 | $0 |
| **TOTAL** | **$1,705,000** | **$335,000** |

10.     By this Motion, the Debtors seek authority, but not direction, to maintain their Insurance Policies in the ordinary course of business and to pay their Insurance Obligations, including all premium payments, taxes, and deductibles related to their Insurance Policies, as they come due, whether arising from the prepetition or postpetition period, throughout these chapter 11 cases.   Additionally, pursuant to this motion, the Debtors are requesting authority, but not direction, to renew or amend the Insurance Policies in the ordinary course.

11.     In addition, the Debtors seek authority to lift the automatic stay to enable employees with Workers' Compensation Claims to pursue such claims in the appropriate forum

regardless of whether they arose before or after the Petition Date.  Although the Debtors are unaware of any unpaid obligations under the Workers' Compensation Program, which is administered by Trinet (as defined below), they seek this relief out of an abundance of caution.

### A. Workers' Compensation Insurance

12.     In the ordinary course of business, as required by applicable law in many of the jurisdictions in which the Debtors operate, the Debtors are required to provide their employees with workers' compensation coverage for claims arising from or related to an individual's employment with the Debtors (the "**Workers' Compensation Claims**").

13.     As is common with many companies, the Debtors outsource certain responsibilities related to human resources, payroll, and employee benefits to a professional employer organization (the "**PEO**").[4]  The Debtors utilize TriNet HR III, LLC ("**TriNet**") and Globalization Partners[5] ("**Globalization Partners**" and, together with TriNet, the "**PEOs**") as their PEOs.

14.     The PEOs procure workers' compensation policies covering the Workers' Compensation Claims.  The PEOs are the name insured on such workers' compensation policies, pay the insurance premiums thereunder for the benefit of all of the employers that utilize PEOs' workers' compensation-related services (including the Debtors), and administer and process any Workers' Compensation Claims asserted by the Debtors' employees.[6]  The Debtors pay the PEOs on either a bi-weekly (Trinet) or semi-monthly (Globalization Partners) basis for administering the

---

[4]  The PEOs are discussed in greater depth in the Emergency Motion of Debtors for Entry of an Order (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation, and (B) Maintain Employee Benefits Programs and Pay Related Obligations; and (II) Granting Related Relief (ECF No. [●]).

[5]  As of January 2023, the Company may be switching PEOs from Globalization Partners to TriNet Canada.

[6]  The Debtors also maintain a North Dakota Workforce Safety and Insurance Program, as required by the state of North Dakota, which is included in the Debtors' payments to the PEOs.

Workers' Compensation Programs (the "**Workers' Compensation Payments**"). Payments to the PEOs reflect various factors including, among other things, the number of employees and Workers' Compensation Claims. The Debtors do not pay or reimburse the PEOs on a per-claim basis. Accordingly, while the Debtors are aware of several Workers' Compensation Claims that have been filed with the PEOs, the Debtors are not aware of any Workers' Compensation Claim asserted against them directly as of the Petition Date. In the event that any such claim is asserted, it would be satisfied under the Workers' Compensation Program without any deductible or other amounts owed by the Debtors.

15. As of the Petition Date, the Debtors estimate that their Workers' Compensation Payments for 2022 will aggregate approximately $250,000.[7] As of the Petition Date, the Debtors estimate that they owe approximately $5,000 to the PEOs on account of accrued Workers' Compensation Payments, which is due to be paid during the Interim Period. The Debtors seek authority to pay any outstanding prepetition amounts related to the Workers' Compensation Program as they become due and owing during these chapter 11 cases.

16. Further, although the Debtors are not aware of any pending Workers' Compensation Claims asserted against the Debtors, out of an abundance of caution, the Debtors seek authority to lift the automatic stay to enable the Employees with Workers' Compensation Claims to pursue such claims in the appropriate forum regardless of whether they arose before or after the Petition Date to the extent such relief from the stay is necessary.

---

[7] The Debtors' Workers' Compensation Payment for the month of October totaled approximately $20,000. The estimated figure of $250,000 is an annualized calculation using the October 2022 Workers' Compensation Payment. Any increase in the Debtors' workforce would result in increased costs of the Workers' Compensation Program.

**B.  General Liability Program**

17.     The Debtors maintain the General Liability Program in the ordinary course of business.  The General Liability Program cover liabilities up to $1,000,000 per occurrence, and up to $2,000,000 in the aggregate, for general liability claims.  The General Liability Program covers the period between August 24, 2022 through August 24, 2023.

18.     As of the Petition Date, the Debtors do not believe they owe any prepetition amounts on account of premiums under the General Liability Program.  To the extent there are any amounts under the General Liability Program relating to the prepetition period that become due and owing postpetition, including deductibles, the Debtors request authority, but not direction, to pay such amounts in the ordinary course of business.  Likewise, the Debtors request authority, but not direction, to renew the policies under the General Liability Program in the ordinary course.

**C.  Property Program**

19.     The Property Program is broadly designed to protect the Debtors from various risks and hazards, both natural and mechanical, relating to their bitcoin mining facilities and cryptocurrency-mining machines or "rigs" that are located across all of the Debtors' hosting locations, as well as equipment and property during transport.  The Property Program provides coverage for both the Debtors' real property and their personal property, including their cryptocurrency rigs, hosting servers, and other computing equipment.  Risks and hazards of this type can be debilitating to the Debtors' business operations and, as the potential liabilities tend to be high, the Debtors have obtained a great degree of protection to limit, if not nullify, these economic risks.  Although the exact coverage varies slightly by location, the Property Program generally covers two primary areas in connection with such risks and hazards:

      i.    <u>All Risk Coverage</u>: This coverage provides protection for physical loss or damages associated with (i) named windstorms, such as hurricanes and other named tropical storms, and associated flooding including storm surge,

(ii) earthquakes and associated flooding, and (iii) flooding that is not associated with a named windstorm.

ii.   <u>Business Risk Coverage</u>: This coverage provides protection of physical loss or damages for various operational risks associated with the Debtors' bitcoin mining and hosting operations. Among other things, this would include debris removal, defense costs, fire brigade, interruption by civil or military authority, and pollution clean up of land or water.

20.   The Property Program is administered through a consortium of twelve (12) insurance providers. A complete list of the Property Program insurance providers are provided in Exhibit C.

21.   The coverage period for the Property Program, including both areas of coverage, is August 24, 2022 through August 24, 2023. All of the premiums relating to the Property Program, with the exception of the premiums on the Primary Property Policy, are annual policies that were paid for in full at the start of the applicable policy.

22.   The Primary Property Policy covers liabilities up to $100 million per occurrence. Premiums on the Primary Property Policy are paid with a one-time 25% deposit, and ten (10) monthly incremental payments thereafter. Five (5) of the ten (10) payments have been made and the next payment is due on December 24, 2022. The Debtors estimate that the total amount of premiums that remain to be paid under the Property Program is $1.7 million, of which $330,000 will become due during the Interim Period.

23.   Accordingly, the Debtors seek authority, but not direction, to pay the monthly premiums of the Primary Property Policy and any other amounts associated with the Property Program. To the extent there are any other amounts relating to the prepetition period that become due and owing postpetition, including deductibles, the Debtors request authority, but not direction, to pay such amounts in the ordinary course of business. Likewise, the Debtors request

authority, but not direction, to renew the policies under the Property Program in the ordinary course.

**D. Management Liability Program**

24.     The Management Liability Program provides preventative protection against a variety of liability and damages that could be associated with the Debtors' directors, managers, officers, and other senior management, including:

i.     <u>Employment Practices Liability</u>:  This provides coverage through Beazley (Lloyd's Syndicate 2623) ("**Beazley**") against claims made by employees alleging discrimination, wrongful termination, harassment, and other employment-related issues against the Debtors.  The coverage period is September 28, 2021 through January 19, 2023 and the annual premium was paid in full prior to the Petition Date.

ii.    <u>Directors and Officers Liability</u>:  This provides coverage through numerous carriers mentioned below for liability arising from the Debtors' directors and officers for alleged wrongful acts (the "**D&O Liability Program**").  The Debtors purchased and fully paid for an extension to the D&O Liability Program prior to the Petition Date.  The new D&O Liability Program will take effect immediately upon expiration of the existing policy on January 19, 2023.  The D&O Liability Program extension coverage period is from January 19, 2023 through January 19, 2024.[8]

25.     The Company has ten (10) layers of coverage exclusively for the D&O Liability Program indicated above.  The Insurance Carriers are as follows: Berkley National Insurance Company, XL Specialty Insurance Co., QBE Insurance Co., Columbia Casualty Company, Obsidian Specialty Insurance Co., Pennsylvania Insurance Co., Vantage Risk Specialty Insurance Co., Lloyd's, Berkshire Hathaway Specialty Insurance Co., and National Union Fire Insurance Co. of Pittsburgh.

26.     The Debtors do not believe they owe any prepetition premium amounts on account of the Management Liability Program as of the Petition Date.  To the extent there are any

---

[8] Prior to the Petition Date, the Debtors also funded the premiums for tail coverage under the D&O Liability Program.

amounts under the Management Liability Program relating to the prepetition period that become due and owing postpetition, including deductibles, the Debtors request authority, but not direction, to pay such amounts in the ordinary course of business.  Likewise, the Debtors request authority, but not direction, to renew the policies under the Management Liability Program in the ordinary course.

### E.  Umbrella and Excess Liabilities Program

27.     The Umbrella and Excess Liabilities Program provides coverage that supplements the coverage provided in the casualty programs above, including the employers' liability insurance under the Workers' Compensation Program, the General Liability Program, and the Automobile Program.  Losses that fall outside of the Debtors' other insurance policies are covered by this program.  The Umbrella and Excess Liabilities Program policy is provided by Federal Insurance Co. and Berkley National Insurance Company.  The coverage period for the Excess Liabilities Program is August 24, 2022 through August 24, 2023.  The annual premiums for the twelve month period commencing August 24, 2022 were paid in full prior to the petition date.

28.     Accordingly, the Debtors do not believe they owe any prepetition premium amounts on account of the Excess Liabilities Program as of the Petition Date.  To the extent there are any amounts under the Excess Liabilities Program relating to the prepetition period that become due and owing postpetition, including deductibles, the Debtors request authority, but not direction, to pay such amounts in the ordinary course of business.  Likewise, the Debtors request authority, but not direction, to renew the policies under the Umbrella and Excess Liabilities Program in the ordinary course.

**F.  Other Insurance Programs**

29.     The Debtors maintain the Other Insurance Programs in the ordinary course of business.  As discussed above, the Other Insurance Programs provide coverage for claims arising from, among other things, crime liability, cyber liability, automobile liability, flood and other natural disaster liability, and travel liability.  The Insurers, policy period, and applicable premiums associated with the Other Insurance Programs are detailed in Exhibit C hereto.

30.     The Debtors do not believe they owe any prepetition premium amounts on account of the Other Insurance Programs as of the Petition Date.  To the extent there are any amounts under the Other Insurance Programs relating to the prepetition period that become due and owing postpetition, including deductibles, the Debtors request authority, but not direction, to pay such amounts in the ordinary course of business.  Likewise, the Debtors request authority, but not direction, to renew the policies under the Other Insurance Program in the ordinary course.

## Insurance Service Providers

31.     The Debtors contract with CAC Specialty and Aon to serve as their insurance brokers and consultants for certain of the Insurance Programs (each in such capacity, an "**Insurance Broker**" and, together, the "**Insurance Service Providers**").  The Insurance Brokers provide access to specific insurance markets and expertise in certain lines and types of coverage.  In addition, the Insurance Brokers often act as the intermediary between the Debtors and the Insurance Carriers, transferring insurance premiums and claims asserted for various Insurance Programs to the various Insurance Carriers.  Fees payable to the Insurance Service Providers are paid at the start of each policy, and the Debtors are unaware of any outstanding amounts owed as of the Petition Date.

32.     Accordingly, the Debtors do not believe they owe any prepetition amounts on account of the Insurance Service Providers as of the Petition Date.  To the extent there are any

amounts owing to the Insurance Service Providers relating to the prepetition period that become due and owing postpetition, the Debtors request authority, but not direction, to pay such amounts in the ordinary course of business.

### Debtors' Surety Bonds

33.     In the ordinary course of business, the Debtors are or may be required by statutes or ordinances to provide surety bonds to secure the Debtors' payment or performance of certain obligations relating to their facilities and/or equipment (the "**Surety Bonds**").  The issuance of a Surety Bond shifts the risk of the Debtors' nonperformance or nonpayment to a surety.  Unlike an insurance policy, if a surety incurs a loss on a surety bond due to nonperformance or nonpayment, the surety is entitled to recover the full amount of that loss from the principal.

34.     Currently, the Debtors' only outstanding Surety Bond is a $2.5 million surety bond with Harco National Insurance Company for the benefit of U.S. Customs and Border Protection (the "**U.S. Customs Surety Bond**") as obligee, to secure the Debtors' payment or performance of certain obligations in connection with server purchases from outside the United States.  The U.S. Customs Surety Bond is required by the federal government.  The U.S. Customs Surety Bond is uncollateralized and was prepaid in full prepetition for the 2022 calendar year.  As of the Petition Date, there are no outstanding amounts owed.  The Debtors expect to renew their insurance arrangement to cover the U.S. Customs Surety Bond for the 2023 calendar year in the first quarter of 2023, which the Debtors estimate will cost approximately $70,000 (the "**Surety Bonds Obligations**").  The Debtors request authority, but not direction, to pay all amounts in connection with the Surety Bond Obligations that the Debtors believe are necessary to maintain the Surety Bonds, including any brokers' fees related thereto, in the ordinary course of business.  Additionally, the Debtors request authority, but not direction, to enter into any renewal or

extension of the U.S. Customs Surety Bond, to issue new Surety Bonds, and to pay any related

Surety Bond Obligations, whether incurred prior to or after the Petition Date, including those that

come due within the Interim Period to the extent necessary during these chapter 11 cases.

**Maintaining Certain of the Insurance Programs and the Surety Bonds is
Required by Law, Bankruptcy Code, and U.S. Trustee Operating Guidelines**

35.     Under section 1112(b)(4)(C) of the Bankruptcy Code, a "failure to maintain

appropriate insurance that poses a risk to the estate or to the public" is "cause" for mandatory

conversion or dismissal of a chapter 11 case.  11 U.S.C. § 1112(b)(4)(C).  In addition, in many

instances, the coverage provided under the Insurance Obligations is required by the regulations,

laws, and contracts that govern the Debtors' commercial activities, including the operating

guidelines (the "**U.S. Trustee Operating Guidelines**") issued by the Office of the United States

Trustee for Region 7 (the "**U.S. Trustee**"), which includes the Southern District of Texas.  Given

this backdrop, it is essential to the Debtors' estates, and consistent with the Bankruptcy Code and

the U.S. Trustee Operating Guidelines, that the Debtors be permitted to maintain and continue

making all payments required under their Insurance Programs and Surety Bonds.  It is similarly

critical that the Debtors have the authority to supplement, place, amend, extend, renew, or replace

their Insurance Programs and Surety Bonds as needed, in their business judgment, without further

order of the Court.

36.     Likewise, certain of the jurisdictions in which the Debtors operate their

business require the Debtors to maintain the Workers' Compensation Program in accordance with

applicable law.  If the Debtors fail to maintain the Workers' Compensation Program, applicable

law may prohibit the Debtors from operating in those states.  Maintaining the Workers'

Compensation Program and the payment of all Workers' Compensation Claims are therefore

crucial to the Debtors' continued operations and the success of the Debtors' ongoing chapter 11
process.

**Payments Made to Maintain Insurance
Programs and Surety Bonds Are Ordinary Course
Transactions Authorized Pursuant to Section 363(c)(1) of Bankruptcy Code**

37.     The Debtors believe that payments made to maintain the Insurance
Programs and the Surety Bonds, as well as the payments of any Insurance Obligations and Surety
Bonds Obligations made in connection therewith, fall within the ordinary course of business and
are therefore authorized pursuant to section 363(c)(1) of the Bankruptcy Code.

38.     Section 363(c)(1) of the Bankruptcy Code authorizes the debtor in
possession to "use property of the estate in the ordinary course of business without notice or a
hearing."  11 U.S.C. § 363(c)(1).  The purpose of section 363(c)(1) is to provide a debtor in
possession with the flexibility to engage in the ordinary transactions required to operate its
business without unneeded oversight by its creditors or the court.  *See Med. Malpractice Ins. Ass'n
v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997); *Chaney v. Off. Comm. of Unsecured
Creditors of Crystal Apparel, Inc. (In re Crystal Apparel, Inc.)*, 207 B.R. 406, 409 (S.D.N.Y.
1997).

39.     Here, maintaining the Insurance Programs and the Surety Bonds and
honoring certain obligations arising thereunder, including undertaking renewals as they expire, or
entering into new insurance arrangements through the Insurance Service Providers or surety,
indemnity, or reimbursement agreements, are the type of ordinary-course transactions
contemplated by section 363(c)(1).  Accordingly, section 363(c)(1) of the Bankruptcy Code

15

authorizes continuation of the Insurance Programs and the Surety Bonds without this Bankruptcy

Court's approval.

**Continuation of Payments for Insurance Programs
and Surety Bond, and Payment of Any Prepetition Amounts
Owed With Respect Thereto Is Necessary to Protect and Preserve Debtors' Estates**

40.      As discussed above, the Debtors believe that payments made to maintain

the Insurance Programs and the Surety Bonds, as well as the payments of any Insurance

Obligations and Surety Bonds Obligations made in connection therewith, fall within the ordinary

course of business and are therefore authorized pursuant to section 363(c)(1) of the Bankruptcy

Code.  To the extent any such actions do not constitute ordinary-course transactions, however, the

Debtors request that the Court authorize the Debtors to continue payments for the Insurance

Programs and the Surety Bonds, as well as to pay necessary prepetition amounts owed with respect

thereto if any come to light postpetition, pursuant to sections 105(a), 363(b), and 503(b) of the

Bankruptcy Code.

41.      The Court may grant the relief requested herein pursuant to section 363 of

the Bankruptcy Code, which provides, in relevant part, that "[t]he [debtor], after notice and a

hearing, may use, sell, or lease, other than in the ordinary course of business, property of the

estate[.]"  11 U.S.C. § 363(b)(1).  Courts in the Fifth Circuit have granted a debtor's request to use

property of the estate outside of the ordinary course of business pursuant to section 363(b) of the

Bankruptcy Code upon a finding that such use is supported by sound business reasons.  *See, e.g.,*

*Black v. Shor (In re BNP Petroleum Corp.)*, 642 F. App'x 429, 435 (5th Cir. 2016); *Institutional*

*Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d

1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty

to the debtor, creditors and equity holders, there must be some articulated business justification for

using, selling, or leasing the property outside the ordinary course of business."); *see also In re*

*Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale[.]"); *In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989).

42.     In addition, under section 1107(a) of the Bankruptcy Code, a debtor has, among other things, the "implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value.'" *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)).  Under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a); *see CoServ*, 273 B.R. at 497 (holding that sections 105 and 1107 of the Bankruptcy Code provide authority for a debtor-in-possession to pay prepetition claims); *see also In re Tusa-Expo Holdings, Inc.*, Case No. 08-45057-DML-11, 2008 WL 4857954, at *1 (Bankr. N.D. Tex. Nov. 7, 2008); *CEI Roofing*, 315 B.R. at 56; *In re Mirant Corp.*, 296 B.R. 427 (Bankr. N.D. Tex. 2003).  Moreover, Bankruptcy Rule 6003 itself implies that the payment of prepetition obligations may be permissible within the first twenty-one (21) days of a case where doing so is "necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003.  Accordingly, the Bankruptcy Code authorizes the postpetition payment of prepetition claims where, as here, such payments are critical to preserving the going-concern value of a debtor's estate.

43.     The Debtors' use of estate funds to pay obligations arising from the Insurance Programs is justified because such obligations are necessary costs of preserving the Debtors' estates.  The Insurance Programs are essential to the Debtors' operations, as the Debtors would be exposed to significant liability if the Insurance Programs were allowed to lapse or

terminate.  Such exposure could be detrimental to the success of these chapter 11 cases.  The Debtors' operations involve significant and expensive facilities and equipment, and the Insurance Programs are both necessary and appropriate.   In addition, failure to timely pay outstanding premium amounts, if any, could expose the Debtors to potential penalties or termination of the policy.

44.     The Insurance Programs are also vital to the Debtors' continued operations. Applicable law mandates that certain Debtors maintain workers' compensation coverage for their employees.  The Debtors' failure to pay their obligations to the PEOs to maintain the Workers' Compensation Program could jeopardize their coverage and expose the Debtors to significant liability in fines by state workers' compensation boards.  In addition, the risk that eligible workers' compensation claimants would not receive timely payments for prepetition employment-related injuries could negatively impact the financial well-being and morale of those claimants and, in turn, the Debtors' entire employee base.  This could result in employee departures, causing a significant disruption in the Debtors' business with a materially adverse impact on the Debtors' operations, the value of their estates, and the interests of all parties in these chapter 11 cases.

45.     Similarly, to continue their business operations during the chapter 11 cases, the Debtors must also be able to provide financial assurances to their contract counterparties as well as the many state and federal governments and regulatory agencies that oversee the Debtors' business.  This requires the Debtors to maintain their existing Surety Bonds in the ordinary course of business, including the payment of surety bond premiums as and when they come due, and to enter into new surety bonds as needed in the ordinary course of business and executing other agreements in connection therewith.  Failing to provide, maintain, or timely replace their Surety Bonds may prevent the Debtors from undertaking essential functions related to their operations.

Accordingly, approval of the relief requested herein with respect to Surety Bonds Obligations should be granted.

46.     For the foregoing reasons, payment of the obligations in connection with Insurance Programs and the Surety Bond is necessary, appropriate, and in the best interests of the Debtors, their estates, and all other parties-in-interest in these cases.  Courts in this district have permitted chapter 11 debtors to continue their insurance and Surety Bonds and to pay obligations, including prepetition obligations, related thereto as a routine matter in similar cases.  *See, e.g.*, *In re Talen Energy Supply, LLC*, Case No. 22-90054 (MI) (Bankr. S.D. Tex. Sept. 26, 2022) (Docket No. 461); *In re Basic Energy Servs., Inc.*, Case No. 21-90002 (DRJ) (Bankr. S.D. Tex. Sept. 13, 2021) (Docket No. 341); *In re CBL & Assocs. Props., Inc.*, Case No. 20-35226 (DRJ) (Bankr. S.D. Tex. Nov. 2, 2020) (Docket No. 70); *In re Fieldwood Energy LLC*, Case No. 20-33948 (MI) (Bankr. S.D. Tex. Sept. 14 2020) (Docket No. 340); *In re CEC Ent., Inc.*, No. 20-33163 (MI) (Bankr. S.D. Tex. July 23, 2020) (Docket No. 409); *In re Gavilan Res.*, LLC, No. 20-32656 (MI) (Bankr. S.D. Tex. July 6, 2020) (Docket No. 154); *In re Speedcast Int'l Ltd.*, No. 20-32243 (MI) (Bankr. S.D. Tex. May 18, 2020) (Docket No. 0212).  The same relief is also appropriate here.

47.     Accordingly, based on the foregoing, the Court should authorize the Debtors to maintain all of their Insurance Programs and the Surety Bonds, and to pay all obligations, including any prepetition obligations, related thereto.

### Automatic Stay Should Be Modified
### for Workers' Compensation Claims to the Extent Necessary

48.     Section 362(a)(1) of the Bankruptcy Code operates to stay

the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . . 11 U.S.C. § 362(a)(1).

49.     Section 362(d), however, permits a debtor or other party-in-interest to request a modification or termination of the automatic stay for "cause."  To the extent this stay relief is required, and to the extent the Debtors' employees hold valid Workers' Compensation Claims, the Debtors seek authority under section 362(d) to permit, in the Debtors' sole discretion, those employees to proceed with their Workers' Compensation Claims, each in the appropriate judicial or administrative forum.

50.     There is cause to modify the automatic stay because staying the Workers' Compensation Claims could cause employee departures or otherwise harm employee morale, which could severely disrupt the Debtors' business and prevent a successful reorganization. Accordingly, the Court should (i) modify the automatic stay as it relates to valid Workers' Compensation Claims to allow, in the Debtors' sole discretion, any such claims to proceed to resolution and (ii) waive corresponding notice requirements under Bankruptcy Rule 4001.  The Court should also authorize the Debtors, as necessary, and to the extent required by law or under the Workers' Compensation Program, to pay all or part of a claim related thereto directly to an employee, any of his or her medical providers, or any of his or her heirs or legal representatives, as set forth in the applicable law or policy.

51.     Courts in this district have granted similar relief in other complex chapter 11 cases.  *See, e.g.*, *In re Talen Energy Supply, LLC*, Case No. 22-90054 (MI) (Bankr. S.D. Tex. Sept. 26, 2022) (Docket No. 461); *In re Basic Energy Servs., Inc.*, Case No. 21-90002 (DRJ) (Bankr. S.D. Tex. Sept. 13, 2021) (Docket No. 341); *In re CBL & Assocs. Props., Inc.*, Case No. 20-35226 (DRJ) (Bankr. S.D. Tex. Nov. 2, 2020) (Docket No. 70); *In re Fieldwood Energy LLC*, Case No. 20-33948 (MI) (Bankr. S.D. Tex. Sept. 14 2020) (Docket No. 340); *In re CEC Ent., Inc.*, No. 20-33163 (MI) (Bankr. S.D. Tex. July 23, 2020) (Docket No. 409); *In re Gavilan Res.*, LLC,

No. 20-32656 (MI) (Bankr. S.D. Tex. July 6, 2020) (Docket No. 154); *In re Speedcast Int'l Ltd.*, No. 20-32243 (MI) (Bankr. S.D. Tex. May 18, 2020) (Docket No. 0212).  The same relief is also appropriate here.

### Applicable Financial Institutions Should Be Authorized to Receive, Process, Honor, and Pay Checks Issued and Transfers Requested to Pay Insurance Obligations and Surety Bonds Obligations

52.     The Debtors further request that the Court authorize applicable financial institutions (the "**Banks**") to receive, process, honor, and pay any and all checks issued, or to be issued, and electronic funds transfers requested, or to be requested, by the Debtors relating to the Insurance Obligations, Surety Bonds Obligations, and Workers' Compensation Claims, to the extent that sufficient funds are on deposit in available funds in the applicable bank accounts to cover such payment.  The Debtors also seek authority, but not direction, to issue new postpetition checks or effect new postpetition electronic funds transfers in replacement of any checks or fund transfer requests on account of prepetition Insurance Obligations, Surety Bonds Obligations, and Workers' Compensation Claims dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases.

### Bankruptcy Rule 6003 Has Been Satisfied

53.     Pursuant to Bankruptcy Local Rule 9013-1, the Debtors respectfully request emergency consideration of this Motion under Bankruptcy Rule 6003, which provides that the Court may grant relief within the first twenty-one (21) days after the Petition Date to the extent such relief is necessary to avoid immediate and irreparable harm.  As described herein and in the Bros Declaration, the Debtors are under a legal obligation to maintain many of their Insurance Policies, the Workers' Compensation Program, and their Surety Bonds.  In addition, the termination, suspension, or nonrenewal of any of the Insurance Policies, the Workers' Compensation Program or Surety Bonds as a result of nonpayment could subject the Debtors to

substantial administrative liability as well as a potential cessation of operations, to the detriment of all parties in interest.  The relief requested is essential to avoid the immediate and irreparable harm that would be caused by the Debtors' inability to transition smoothly into chapter 11. Accordingly, the Debtors submit that the requirements of Bankruptcy Rule 6003 are satisfied.

**Compliance with Bankruptcy Rule 6004(a)**
**and Waiver of Bankruptcy Rule 6004(h)**

54.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion satisfies Bankruptcy Rule 6004(a) and that the Court waive the 14-day period under Bankruptcy Rule 6004(h).

**Reservation of Rights**

55.     Nothing contained herein is intended to be or shall be deemed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver or limitation of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (iv) an agreement or obligation to pay any claims, (v) a waiver of any claims or causes of action which may exist against any creditor or interest holder, (vi) an admission as to the validity of any liens satisfied pursuant to this Motion, or (vii) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code.  Likewise, if the Bankruptcy Court grants the relief sought herein, any payment made pursuant to the Bankruptcy Court's order is not intended to be, and should not be, construed as an admission to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to dispute such claim subsequently.

**<ins>Notice</ins>**

56.     Notice of this Motion will be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

**<ins>No Previous Request</ins>**

57.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

[*Remainder of page intentionally left blank*]

WHEREFORE the Debtors respectfully request entry of the Proposed Interim Order and Proposed Final Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:  December 21, 2022
       Houston, Texas

Respectfully submitted,

  /s/  Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:   Alfredo.Perez @weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C. (*pro hac vice* pending)
Ronit J. Berkovich (*pro hac vice* pending)
Moshe A. Fink (*pro hac vice* pending)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:   Ray.Schrock@weil.com
       Ronit.Berkovich@weil.com
       Moshe.Fink@weil.com

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**<u>Certificate of Service</u>**

I hereby certify that on December 21, 2022, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.


        */s/  Alfredo R. Pérez*
        Alfredo R. Pérez