## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § § | Chapter 11 |
| CORE SCIENTIFIC, INC., *et al.*, | § § § | Case No. 22-90341 (DRJ) |
| Debtors.[1] | § § § § | (Joint Administration Requested) (Emergency Hearing Requested) |

**EMERGENCY MOTION OF DEBTORS FOR ENTRY OF
INTERIM AND FINAL ORDERS (A) AUTHORIZING THE
DEBTORS TO OBTAIN POSTPETITION FINANCING, (B) AUTHORIZING
THE DEBTORS TO USE CASH COLLATERAL, (C) GRANTING LIENS
AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE
EXPENSE STATUS, (D) GRANTING ADEQUATE PROTECTION TO THE
PREPETITION SECURED PARTIES, (E) MODIFYING THE AUTOMATIC STAY,
(F) SCHEDULING A FINAL HEARING, AND (G) GRANTING RELATED RELIEF**

> **EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED
> NOT LATER THAN THE MORNING OF THURSDAY, DECEMBER 22, 2022.**
>
> **IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT
> EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST
> APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN
> RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE
> PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE
> PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

Core Scientific, Inc. and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**" or "**Borrower**"), respectfully move and represent as follows in support of this motion (the "**Motion**"):

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisitions, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisition I, LLC (9717); and American Property Acquisitions, VII, LLC (3198).  The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

## Preliminary Statement[2]

1.    By this Motion, the Debtors seek authorization to obtain postpetition financing, and approval of their entry into a superpriority priming senior secured debtor-in-possession credit facility in an aggregate principal amount of up to $75 million (the "**DIP Facility**"), provided by certain of the Debtors' prepetition secured lenders or their affiliates (solely in such capacity, the "**DIP Lenders**") and agented by Wilmington Savings Fund Society, FSB (solely in such capacity, the "**DIP Agent**"). The DIP Facility consists of (i) a new money multiple draw term loan facility in an aggregate principal amount of up to $75 million (the "**New Money Term DIP Facility**", and the loans made thereunder, the "**DIP Loans**"), and (ii) upon the final order, a credit facility pursuant to which $75 million in aggregate principal amount outstanding under the Prepetition Secured Notes (as defined below) held by each Backstop Party (as defined in the DIP Loan Agreement) and/or each Prepetition Secured Noteholder (as defined below) in which a Backstop Party is an affiliate, partner or investor (each such Backstop Party and/or Prepetition Lender, a "**Rolled Up Noteholder Party**"), shall, <u>upon entry of the Final Order</u>, automatically be deemed substituted and exchanged for, and converted into, DIP Loans (such conversion, the "**Roll Up**") on a cashless, interest free, dollar for dollar basis.

2.    The New Money Term DIP provides an aggregate principal amount of $35 million-$40 million (open issues), which shall be borrowed (the "**Interim DIP Borrowing**") in a single borrowing on the Closing Date (as defined in the DIP Loan Agreement) upon entry of the Interim Order. Following entry of the Final Order (as defined below), the remaining aggregate principal amount under the DIP Facility ($75 million total) shall be available, in one or more

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the DIP Declaration, the Bros Declaration, the DIP Loan Agreement, and the Interim Order (each, as defined herein), as applicable.

WEIL:\98942921\6\39031.0011

borrowings.[3]  By this Motion, the Debtors also seek the authority to use Cash Collateral throughout the chapter 11 process.

3.     As of the time of the filing of this Motion, the Debtors are still negotiating a few key issues with the Ad Hoc Group but expect to reach agreement before the hearing scheduled for December 22, 2022.  The Interim Order attached hereto is the latest draft proposed by the Ad Hoc Group; the Debtors have proposed changes.  The information below highlights key open issues.  The Debtors will file revised documents prior to the hearing.

4.     The DIP Facility is the result of extensive marketing and hard-fought negotiations, involving both principals and advisors, in a competitive environment that allowed the Debtors to achieve their strategic goals in obtaining postpetition financing in connection with commencing these chapter 11 cases.  The result is a DIP Facility that provides the Debtors with up to 9 months of runway and significant flexibility in terms of milestones and covenants governing the term loan.  The DIP Facility lays the foundation on which the Debtors will pursue confirmation of a chapter 11 plan and a reorganization of their business to maximize value for all stakeholders.

5.     Approval of the DIP orders (the "**DIP Orders**") on and interim and ultimately final basis, which will enable the Debtors to use Cash Collateral and obtain new capital, is the only source of postpetition financing currently available to the Debtors and thus represents the best source of postpetition financing.  As described herein, the DIP Facility contains terms that are reasonable under the circumstances and provides the Debtors with the urgent liquidity needed to (a) avoid immediate and irreparable harm, (b) pay outstanding prepetition amounts to

---

[3] As of the date hereof, the Ad Hoc Noteholder Group has agreed to provide DIP Facility commitments of up to $57.26 million and has agreed to support the syndication of up to $75 million in new money DIP Facility loans to all holders of Convertible Notes.

employees, vendors, taxing authorities, and other critical stakeholders, as requested by the Debtors in the First Day Motions (as defined in the Bros Declaration), (c) pay their ordinary course operating expenses to continue their bitcoin mining and hosting operations, and (d) provide a stable path forward for the duration of these chapter 11 cases.

6.     Additional information regarding the DIP Facility is set forth in the *Declaration of John Singh in Support of Emergency Motion of Debtors For Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims With Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief,* sworn to the date hereof (the "**DIP Declaration**") and the *Declaration of Michael Bros in Support of Debtors' Chapter 11 Petitions and First Day Relief*, sworn to on the date hereof (the "**Bros Declaration**").

### Relief Requested

7.     By this Motion, pursuant to sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014, the Bankruptcy Local Rules, and the Complex Case Procedures, the Debtors request entry of the Interim Order, as attached hereto as **Exhibit A**:

> (a)     authorizing the Debtors to obtain postpetition financing on a superpriority priming senior secured basis (the "**DIP Facility**", and the loans made, advanced or deemed advanced thereunder, the "**DIP Loans**") in the form of (i) a new money multiple draw term loan facility in an aggregate principal amount of up to $75 million (the "**New Money Term DIP Facility**"), pursuant to which (A) an aggregate principal amount of $35 million - $40 million (open issue) shall be borrowed (the "**Interim DIP Borrowing**") in a single borrowing on the Closing Date (as defined in the DIP Loan Agreement), and (B) following entry of the Final Order (as defined below), the remaining aggregate principal amount under the New Money Term DIP Facility shall be available, in one or more borrowings (each such borrowing, including the Interim DIP Borrowing, a "**DIP Borrowing**",

4

and, collectively, the "**DIP Borrowings**"), and (ii) a credit facility pursuant to which $75 million in aggregate principal amount outstanding under the Prepetition Secured Notes (as defined below) held by each Backstop Party (as defined in the DIP Loan Agreement) and/or each Prepetition Secured Noteholder (as defined below) in which a Backstop Party is an affiliate, partner or investor (each such Backstop Party and/or Prepetition Lender, a "**Rolled Up Noteholder Party**"), shall, upon and subject to entry of the Final Order, automatically be deemed substituted and exchanged for, and converted into, DIP Loans (such conversion, the "**Roll Up**") on a cashless dollar for dollar basis, in each case, in accordance with and subject to the terms and conditions (including, without limitation, any conditions precedent to each of the DIP Borrowings) set forth in that certain Senior Secured Super-Priority Debtor-In-Possession Loan and Security Agreement, substantially in the form attached to this Interim Order as Exhibit 1 and otherwise in form and substance acceptable to the Required DIP Lenders[4] (as may be amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof and thereof, the "**DIP Loan Agreement**", and, together with all other agreements, guarantees, pledge, collateral and security agreements, mortgages, deeds, charges, control agreements, instruments, certificates, notes, any separate fee letter agreements between any of the Debtors, on the one hand, and the DIP Agent and/or the DIP Lenders, on the other hand, and other documents executed, filed and/or delivered in connection therewith, including the "**Loan Documents**" (as defined in the DIP Loan Agreement) (each as amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof and thereof, together with the DIP Loan Agreement, collectively, the "**DIP Loan Documents**"), by and among Core Scientific, as borrower (the "**DIP Borrower**"), each of the direct and indirect subsidiaries of the DIP Borrower, as guarantors (collectively, the "**DIP Guarantors**", and together with the DIP Borrower, the "**DIP Loan Parties**"), Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent (in such capacities, together with its successors and permitted assigns, the "**DIP Agent**"), and the lenders party thereto from time to time (the "**DIP Lenders**", and together with the DIP Agent, the "DIP **Secured Parties**") and this Interim Order;

(b)     authorizing the DIP Loan Parties to (i) execute, deliver, and perform under the DIP Loan Agreement and each of the DIP Loan Documents, (ii) incur all loans, advances, extensions of credit, financial accommodations, indemnification and reimbursement obligations and other obligations, and pay all principal, interest, premiums, fees, costs, expenses, charges and all other amounts payable under the DIP Loan Documents, including without limitation, all "Obligations" (as defined in the DIP Loan Agreement), whether or not such obligations arose before or after the Petition Date, whenever the same shall become due or payable, whether at stated maturity, by prepayment, declaration, acceleration or otherwise, in each

---

[4]     The term "***Required DIP Lenders***" shall have the meaning ascribed to the term "Required Lenders" in the DIP Loan Agreement.

case, in accordance with the DIP Loan Documents and this Interim Order (collectively, the "**DIP Obligations**"), and (iii) perform such other and further acts as may be necessary, required or desirable to implement and effectuate the terms of this Interim Order, the DIP Loan Documents and the transactions contemplated hereunder and thereunder;

(c)     authorizing the DIP Borrower to incur, and the DIP Guarantors to jointly and severally guarantee, all DIP Obligations, in accordance with this Interim Order and the DIP Loan Documents;

(d)     granting to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, the DIP Liens (as defined below) in all DIP Collateral (as defined below), as set forth in this Interim Order, subject to the Carve Out and subject to the relative priorities set forth in this Interim Order;

(e)     granting to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, allowed super-priority administrative expense claims against each of the Debtors, on a joint and several basis, in respect of all DIP Obligations, subject in each case to the Carve Out, as set forth in this Interim Order;

(f)     authorizing the Debtors to use the proceeds of the DIP Facility, the DIP Collateral and the Prepetition Collateral (as defined below), including Cash Collateral (as defined below), solely in accordance with the terms and conditions set forth in this Interim Order and the DIP Loan Documents, including the Approved Budget (as defined below), subject to any variances expressly permitted under the DIP Loan Agreement (the "**Permitted Variances**");

(g)     granting adequate protection, as and to the extent set forth in this Interim Order, to the Prepetition Secured Parties (as defined below) to protect against any Diminution in Value (as defined below) of their respective Prepetition Liens (as defined below) in the Prepetition Collateral (including Cash Collateral);

(h)     approving certain stipulations, waivers, and releases by the Debtors with respect to, inter alia, (i) the DIP Secured Parties, the DIP Loan Documents, the DIP Liens, the DIP Obligations and the DIP Collateral, and (ii) the Prepetition Secured Parties, the Prepetition Notes Documents, the Prepetition Liens, the Prepetition Secured Obligations (each as defined below) and the Prepetition Collateral, in each case, subject to the terms and provisions of this Interim Order;

(i)     approving the Debtors' waiver of the right to surcharge the DIP Collateral as to the DIP Secured Parties and the Prepetition Collateral as to the Prepetition Secured Parties, pursuant to section 506(c) of the Bankruptcy Code or otherwise, in each case, upon the terms set forth in this Interim Order;

(j)     approving (i) the Debtors' waiver of the equitable doctrine of "marshaling" and other similar doctrines with respect to the DIP Collateral as to the DIP Secured Parties, and (ii)  the Debtors' waiver of the equitable doctrine of "marshaling" and the Debtors' waiver of any "equities of the case" exception under section 552(b)

WEIL:\98942921\6\39031.0011

of the Bankruptcy Code with respect to the Prepetition Collateral as to the Prepetition Secured Parties, in each case, upon the terms set forth in this Interim Order;

(k)   modifying or vacating the automatic stay imposed by sections 105(a) and 362 of the Bankruptcy Code or otherwise, to the extent necessary, required or desirable to implement and effectuate the terms and provisions of this Interim Order and the DIP Loan Documents, as set forth herein, waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of this Interim Order, providing for the immediate effectiveness of this Interim Order, and granting related relief; and

(l)   scheduling a final hearing (the "**Final Hearing**") on the Motion to consider entry of a final order (the "**Final Order**") authorizing the relief requested in the Motion on a final basis, which order shall be in form and substance and on terms and conditions acceptable in all respects to the Required DIP Lenders, and approving the form of notice with respect to such Final Hearing.

### **Summary of Terms of DIP Facility**[5]

8.       In accordance with Rules 4001(b)-(d) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and the *Procedures for Complex Cases in the Southern District of Texas* (the "**Complex Case Procedures**"), as incorporated by Rule 1075-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "**Bankruptcy Local Rules**"), the below chart summarizes the significant terms of the Interim Order and the DIP Loan Agreement.

| MATERIAL TERMS | | LOCATION |
|---|---|---|
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | Core Scientific, Inc. (the "**Borrower**"). | Interim Order Preamble. |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | Each of the other Debtors (the "**DIP Guarantors**"). | Interim Order, Preamble. |

---

[5] This summary is qualified in its entirety by reference to the applicable provisions of the DIP Documents. To the extent there exists any inconsistency between this summary and the provisions of the DIP Documents or the DIP Orders, the provisions of the DIP Documents or the DIP Orders, as applicable, shall control. Any capitalized terms used but not otherwise defined in these summaries shall have the respective meanings ascribed to such terms in the DIP Documents and/or the Interim Order, as applicable. The Debtors reserve the right to supplement the statements made pursuant to Bankruptcy Rule 4001 and Local Rule 4001–2 herein.

Furthermore, certain DIP Documents have not yet been finalized as of the time of filing of this Motion. Accordingly, the summaries reflect the current state of the relevant provisions and are subject to change.

WEIL:\98942921\6\39031.0011

| MATERIAL TERMS | | LOCATION |
|---|---|---|
| **DIP Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | The lenders that are signatories to the DIP Loan Agreement (the "**DIP Lenders**"). | DIP Loan Agreement, Signature Pages. |
| **DIP Agent**<br>Bankruptcy Rule 4001(c)(1)(B) | Wilmington Savings Fund Society, FSB. | Interim Order, Preamble. |
| **DIP Facility and Borrowing Limits**<br>Bankruptcy Rule 4001(c)(1)(B) | DIP Facility includes: (i) a new money term loan facility in the aggregate principal amount of $75 million (the "**New Money Term DIP Facility**"), of which (1) $35 million - $40 million (open issue) will be borrowed (the "**Interim DIP Borrowing**") in a single borrowing on the Closing Date (as defined in the DIP Loan Agreement), and (2) following entry of the Final Order (as defined below), the remaining aggregate principal amount under the DIP Facility shall be available, in one or more borrowings (each, including the Interim DIP Borrowing, a "**DIP Borrowing**", and, collectively, the "**DIP Borrowings**") and (ii) a credit facility pursuant to which $75 million in aggregate principal amount outstanding under the Prepetition Secured Notes held by each Backstop Party (as defined in the DIP Loan Agreement) and/or each Prepetition Secured Noteholder in which a Backstop Party is an affiliate, partner or investor (each such Backstop Party and/or Prepetition Lender, (a "**Rolled Up Noteholder Party**"), shall, upon and subject to entry of the Final Order, automatically be deemed substituted and exchanged for, and converted into, DIP Loans (such conversion, the "**Roll Up**") on a cashless dollar for dollar basis, in each case, in accordance with and subject to the terms and conditions (including, without limitation, any conditions precedent to each of the DIP Borrowings) set forth in the DIP Loan Agreement. | Interim Order, Preamble. |
| **Budget**<br>Bankruptcy Rule 4001(c)(1)(B) | The use of Cash Collateral and proceeds of DIP Facility are subject to compliance with the Approved Budget then in effect (subject to Permitted Variances). The Approved Budget shall reflect, on a line item, cumulative and aggregate basis, (i) the Debtors' projected cash receipts expected to be collected, and necessary disbursements and expenditures (including debt service costs) expected to be incurred or made, by the Debtors for each calendar week during the period from the calendar week ending on the Friday of the week in which the Petition Date occurs through and including the end of the thirteenth (13th) calendar week thereafter, (ii) the sum of weekly unused availability under the DIP Facility, plus restricted and unrestricted balances of cash on hand, (iii) the weekly outstanding principal balance of amounts outstanding under the DIP Facility, and (iv) a professional fee accrual budget with respect to the anticipated professional fees and expenses to be incurred by each of the Professional Persons (as defined below) during such period.<br><br>The Initial Budget is attached to the Interim Order as **Exhibit A**. | Interim Order, ¶ E,<br><br>DIP Loan Agreement, §§ 6.1.1; 6.2.3; 10.1.13 |
| **Interest Rate**<br>Bankruptcy Rule 4001(c)(1)(B) | The "Applicable Rate" on the New Money Term DIP Facility is 10% per annum, paid in kind.<br><br>The "Applicable Rate" under the Roll Up loan shall be 0%. | DIP Loan Agreement, §§ 1.1, 3.1. |

8

| MATERIAL TERMS | | LOCATION |
|---|---|---|
| | The Default Rate is set forth as follows: with respect to (a) overdue principal of any Loan, the Applicable Rate plus 2.00% per annum, and (b) any other overdue Obligation or amount, including overdue interest, fees, premiums, expenses (to the extent permitted by Applicable Law), the Applicable Rate plus 2.00% per annum.<br><br>As of the occurrence of, and at all times during the continuance of, any Insolvency Proceeding with respect to any Obligor, or any other Event of Default (including if any Loans or other Obligations (or portion thereof) shall remain unpaid as of the Termination Date), all outstanding Loans and overdue Obligations shall automatically accrue interest at the Default Rate (whether before or after any judgment), until Full Payment thereof, and such interest shall be payable in cash on each Regular Interest Payment Date (unless a demand therefor is made on the Borrower sooner or on a more frequent basis, as determined by the Administrative Agent). Interest accrued at the Default Rate shall be due and payable on demand. | |
| **Expenses and Fees**<br>Bankruptcy Rule 4001(c)(1)(B) | *New Money Loan Commitment Payment.* 2.00% (paid-in-kind) of New Money Loans under the New Money Term DIP Facility, accrued and earned on the date New Money Loans are drawn by the Borrower.<br><br>*Backstop Payment.*   Up to $2,000,000 on the Closing Date to each Backstop Party, paid-in-kind, on a pro rata basis.[6]<br><br>*Termination Fee.*  To pay off the DIP Facility in most circumstances, upon entry of the Interim Order, the Debtors will need to pay 115% of all outstanding New Money Loans in cash, in addition to other obligations outstanding.   The parties are still negotiating whether such 115% termination fee should also apply to any accrued PIK interest or PIK fees. Upon the Final Order, (i) the Termination Fee for the Roll Up Loan is 2% in cash (except 2% in PIK for an "Acceptable Roll") and (ii) in certain circumstances when the DIP is replaced by an Exit Loan under a chapter 11 plan, there will be an exit fee of 3% on the New Money Loans (open issue regarding whether this applies to PIK interest or PIK fees), plus amounts payable under the RSA.<br><br>*Extension Fee.* 2.00%, paid-in-kind, of the aggregate loans outstanding on the date the Borrower extends the Maturity Date of all obligations under the DIP Facility by an additional three (3) months. | DIP Loan Agreement, §§ 1.1; 2.1.5; 3.2.4; 3.2.5; 5.12; |
| **Maturity Date; Duration for Use of DIP Collateral**<br>Bankruptcy Rule 4001(c)(1)(B) | The Maturity Date shall be the date that is six (6) months after the Petition Date, with an optional three (3) month extension as set forth in the DIP Loan Agreement, subject to paying the Extension Fee. | DIP Loan Agreement, §§ 1.1, 2.1.5. |

---

[6] There is an open issue as to whether the $2 million will be paid notwithstanding the fact that the $75 million is not fully committed as of the Closing Date.

| MATERIAL TERMS | LOCATION |
|---|---|
| **Prepayments**<br>Bankruptcy Rule 4001(c)(1)(B) | <u>Voluntary Prepayments</u>: Loans may be prepaid from time to time, without penalty or premium, subject to the requirements with respect to the Termination Payment.<br><br><u>Mandatory Prepayments</u>:<br>1.  <u>Termination Date</u>. On the Termination Date, the Borrower shall repay all outstanding Loans and other Obligations in full in cash to the extent required to constitute Full Payment hereunder.<br><br>2.  <u>Change of Control</u>.  Immediately upon any Change of Control, the Borrower shall (i) prepay, or cause to be prepaid, the Loans (together with the Termination Payment) and other Obligations, and (ii) terminate, or cause to be terminated, the Commitments, in each case, in an amount that would cause the Full Payment thereof; provided, that, pending prepayment of the Loans in accordance herewith, and at all times until Full Payment, all cash, Cash Equivalents and other funds and proceeds thereof shall be held in a Deposit Account subject to a Control Agreement in favor of the Administrative Agent, and no payments, withdrawals, transfers or disbursements shall be made or permitted to be made therefrom at any time (whether or not such payment, withdrawal, transfer or disbursement is otherwise in accordance with the Approved Budget or otherwise permitted hereunder).<br><br>3.  <u>Debt Issuance</u>.  Within one (1) Business Day of the receipt by any Obligor or Subsidiary thereof of the proceeds of any Debt Issuance that is not Permitted Debt, the Borrower shall prepay the Loans (together with the Termination Payment thereon) as hereinafter provided in an aggregate amount equal to 100% of such proceeds; provided, that, pending application of such amounts towards prepayment of the Loans in accordance herewith, all funds shall be held in a Deposit Account subject to a Control Agreement in favor of the Administrative Agent.<br><br>4.  <u>Effect of Prepayments</u>. No prepayments or repayments of any Loans shall (or shall be deemed to), cause or result in any increase to, or replenish or give rise to any increase to, any Commitment, and the Borrower shall not be permitted to request to borrow additional Loans as a result of any such prepayment or repayment. | DIP Loan Agreement, §§ 5.2, 5.3, 5.12. |
| **Conditions to Closing**<br>Bankruptcy Rule 4001(c)(1)(B) | Usual and customary for financings of this type, including, among other things:<br><br>(a)  The Obligors and the other parties thereto shall have entered into the Restructuring Support Agreement and, on and as of the Closing Date, the Restructuring Support Agreement shall be in full force and effect, and no breach or default thereunder shall have occurred or be continuing;<br>(b)  the Obligors shall have commenced the chapter 11 cases in the Bankruptcy Court in accordance with the requirements of Restructuring Support Agreement;<br>(c)  each Obligor shall be a debtor and debtor-in-possession in the chapter 11 cases, in each case, in accordance with the requirements of Restructuring Support Agreement; | DIP Loan Agreement, §§ 6.1 |

| MATERIAL TERMS | LOCATION |
|---|---|
| (d)  the Obligors shall have filed with the Bankruptcy Court (i) the First Day Motions and the DIP Motion, in each case, no later than the Petition Date, and (ii) all other motions and other documents required to be filed with or submitted to the Bankruptcy Court in connection with the chapter 11 cases, by such time as required pursuant to the Bankruptcy Code (or as requested by the Bankruptcy Court), in a form and in substance satisfactory to the Required Lenders;<br><br>(e)  not later than the date that is three (3) calendar days following the Petition Date, all interim orders relating to the First Day Motions and the DIP Motion (including the Interim DIP Order) shall have been entered by the Bankruptcy Court;<br><br>(f)  the Obligors shall have established a cash management system subject to the entry of the DIP Orders reasonably satisfactory to the Obligors and the Required Lenders;<br><br>(g)  the Obligors shall have made no payments after the Petition Date on account of any Debt or other obligations arising prior to the Petition Date unless such payment is made pursuant to a Chapter 11 Order and subject to Permitted Variances, in accordance with the Approved Budget;<br><br>(h)  the Interim DIP Order (i) shall have been entered by the Bankruptcy Court in the chapter 11 cases not later than 5 calendar days after the Petition Date, (ii) shall be in full force and effect on the Closing Date, (iii) shall not have been vacated or reversed, (iv) shall not be subject to a stay, and (v) shall not have been modified or amended in any respect without the prior written consent of the Required Lenders;<br><br>(i)  the Interim DIP Order shall be effective to create, in favor of the Administrative Agent, for the benefit of the Secured Parties, a valid, binding, enforceable and fully and automatically perfected Lien on the Collateral, on the basis and with the priority set forth therein;<br><br>(j)  the Restructuring Support Agreement shall be in full force and effect on and as of the Closing Date, and no Termination Event (as defined in the Restructuring Support Agreement) or notice delivered by any party thereto in respect thereof shall have occurred;<br><br>(k)  each Milestone required to be satisfied prior to the Closing Date shall have been satisfied (or waived) in accordance with the terms hereof; and<br><br>(l)  Administrative Agent and the Lenders shall have received from the Obligors the Initial Budget and the same shall be sufficient to constitute the Approved Budget in effect as of such time. | |
| **Superpriority Expense Claims** Bankruptcy Rule 4001(c)(1)(B)(i) | Subject to the Carve Out, the DIP Agent and DIP Lenders are granted DIP Superpriority Claims granted on account of all DIP Obligations. | Interim Order, ¶ 7. |

11

| MATERIAL TERMS | | LOCATION |
|---|---|---|
| **Collateral and Priority**<br>Bankruptcy Rule 4001(c)(1)(B)(i), 4001(c)(1)(B)(ii) | The DIP Liens shall be subject to the following priorities (subject in each case to the Carve Out):<br><br>1. <u>First Priority Liens on Unencumbered Property</u>. Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected first priority liens and security interests in all DIP Collateral that is not subject to any liens and security interests that were valid, non-avoidable and properly perfected as of the Petition Date (or that were properly perfected subsequent to the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code), including, subject to entry of the Final Order, all Avoidance Actions and Avoidance Action Proceeds (collectively, the "Unencumbered Assets"), which DIP Liens shall be junior and subordinated only to the Carve Out.<br><br>2. <u>Priming Liens and Liens Junior to Certain Other Liens</u>. Pursuant to sections 364(c)(3) and 364(d)(1) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected liens and security interests in all DIP Collateral (other than the DIP Collateral described in paragraph 6(c)(i) hereof, as to which DIP Liens are described in such paragraph), which DIP Liens shall be (A) subject only to the (1) Carve Out, (2) the liens and security interests listed in Schedule 10.2.2 of the DIP Loan Agreement, which schedule shall be acceptable to the Required DIP Lenders (in each case, to the extent such liens and security interests are valid, perfected and non-avoidable as of the Petition Date, the "Permitted Prior Liens"), and (3) the Equipment Lender Adequate Protection Liens in Prepetition Equipment Financing Collateral (as applicable), and (B) senior to any and all other liens and security interests in the DIP Collateral, including, without limitation, the Prepetition Liens, the Equipment Lender Adequate Protection Liens in the Prepetition Collateral and the Noteholder Adequate Protection Liens. | Interim Order ¶ 6. |
| **Covenants**<br>Bankruptcy Rule 4001(c)(1)(B) | Usual and customary affirmative covenants for financings of this type including stipulations to, among other things:<br><br>(a) Permitting Administrative Agent to inspect properties of the Debtor;<br>(b) Keep adequate records and books of account with respect to its business activities and furnish same to Administrative Agent;<br>(c) Provide notice of certain legal and pending legal actions against the Debtors;<br>(d) Comply will all Applicable Laws;<br>(e) Continue paying obligations and taxes and comply with applicable law in all material respects; and<br>(f) Maintain satisfactory insurance;<br>(g) Keep each License affecting any collateral; and<br>(h) Deliver updated budgets, cash flow forecasts, and variance reports. | DIP Loan Agreement, § 10. |

| MATERIAL TERMS | LOCATION |
|---|---|
| Usual and customary negative covenants for financings of this type including stipulations to not, among other things, other than in accordance with the DIP Loan Agreement:<br><br>(a) Incur, create, assume, or permit indebtedness generally except Permitted Debt;<br>(b) Create, incur, assume, or permit existence of any liens on any property or assets, except for Permitted Liens;<br>(c) Declare or make any Distributions, except as permitted under the DIP Loan Agreement;<br>(d) Make any Restricted Investment;<br>(e) Make any Asset Disposition, except a Permitted Asset Disposition;<br>(f) Make any payment or any Creditor Distribution with respect to any Debt, except payments to the extent permitted by, and made in accordance with, the Approved Budget or DIP Order;<br><br>Usual and customary financial covenants for financings of this type including stipulations to, among other things:<br><br>(a) Comply with budget and variance covenants;<br>(b) Maintain minimum Liquidity of no less than $5,000,000; and<br>(c) Not incur payment obligations or make payment disbursement unless in compliance with the Approved Budget, in compliance with the liquidity and budget covenants, and no Event of Default exists or arises at such time. | |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Usual and customary events of default for financings of this type, including but not limited to:<br><br>(a) The failure to pay principal, interest and other amounts when and as required by the DIP Loan Agreement, subject to certain grace periods, as applicable;<br>(b) Any representation or warranty being incorrect when made by or on behalf of any Obligor in connection with any Loan Document in a material respect;<br>(c) The filing of a plan of reorganization that does not propose an Acceptable Chapter 11 Plan, or any disclosure statement, document or instrument related to a plan of reorganization that is not an Acceptable Chapter 11 Plan; and<br>(d) Any Restructuring Transaction Document becoming, in whole or in part, no longer effective and legally binding, or any Obligor repudiation of its obligations under any Restructuring Transaction Document. | DIP Loan Agreement, § 11. |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)(vi)<br><br>The DIP Loan Agreement contains the following Milestones:<br><br>a) as soon as reasonably practicable, but in no event later than five (5) days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;<br>b) as soon as reasonably practicable, but in no event later than thirty-five (35) days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order; | DIP Loan Agreement, Schedule 10.1.13. |

| MATERIAL TERMS | LOCATION |
|---|---|
| c) as soon as reasonably practicable, but in no event later than seventy-five (75) days after the Petition Date, the Company shall have filed with the Bankruptcy Court the Plan and the Disclosure Statement;<br><br>d) soon as reasonably practicable, but in no event later than one hundred and fifty (150) days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order, provided that such Milestone shall automatically be extended to two hundred and forty (240) days after the Petition Date in the event that the Maturity Date (as defined in the DIP Loan Agreement) is extended to the date that is nine (9) months after the Petition Date in accordance with the terms in the DIP Loan Agreement; and<br><br>e) as soon as reasonably practicable, but in no event later than one hundred and sixty-five (165) days after the Petition Date, the Effective Date shall have occurred, provided that such Milestone shall automatically be extended to two hundred and fifty-five (255) days after the Petition Date in the event that the Maturity Date (as defined in the DIP Loan Agreement) is extended to the date that is nine (9) months after the Petition Date in accordance with the terms in the DIP Loan Agreement (the "**Effective Date Milestone**"). | |
| **Carve Out**<br>Bankruptcy Rule 4001(b)(1)(B)(iii) | Equal to the sum of:<br><br>(i) all fees required to be paid to the clerk of the Court and to the U.S. Trustee plus interest at the statutory rate;<br><br>(ii) all reasonable and documented fees and expenses, in an aggregate amount not to exceed $25,000, incurred by a trustee;<br><br>(iii) to the extent allowed at any time, whether by interim order, final order, or other order, all accrued but unpaid fees and expenses (excluding any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors) (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "**Debtor Professionals**") and the Official Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**", and together with the Debtor Professionals, the "**Professional Persons**") at any time on or before the date of delivery by the DIP Agent (at the instruction of the Required DIP Lenders) of a Carve Out Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Notice (the amounts set forth in the foregoing <u>clauses (i), (ii) and (iii)</u>, the "**Pre-Carve Out Notice Amount**"); and<br><br>(iv) Allowed Professional Fees of Professional Persons incurred after the date of delivery by the DIP Agent (at the instruction of the Required DIP Lenders) of the Carve Out Notice, to the extent allowed at any time, whether by interim order, final order, or other court order, in an aggregate amount not to exceed $2.0 million (the amount set forth in this | Interim Order ¶ 22. |

14

| MATERIAL TERMS | | LOCATION |
|---|---|---|
| | clause (iv) being the "**Post-Carve Out Notice Amount**", and together with the Pre-Carve Out Notice Amount, the "**Carve Out Amount**") | |
| **Terms of Use and Purposes for Use of DIP Proceeds and Cash Collateral** Bankruptcy Rule 4001(c)(1)(B) | All proceeds of DIP Loans and all Cash Collateral shall, in each case, only be permitted to be used by the Obligors or their Subsidiaries in accordance with the Approved Budget, this Agreement and the DIP Orders (including to pay obligations arising from or related to the Professional Fee Escrow Account).<br><br>Proceeds of the DIP Loans and Cash Collateral may not be used for certain enumerated purposes that are contrary to the rights and interests of the Prepetition Secured Parties and DIP Secured Parties (e.g., for investigations and litigation against such parties, incurring indebtedness without prior consent of the DIP Agent, etc.). | DIP Loan Agreement § 2.1.3.<br><br>Interim Order, ¶ 24. |
| **Parties with an Interest in Cash Collateral** Bankruptcy Rule 4001(b)(1)(B)(i) | Prepetition Secured Parties | Interim Order, ¶ 12. |
| **Liens, Cash Payments or Adequate Protection Provided for Use of Cash Collateral** Bankruptcy Rule 4001(b)(1)(B)(iv) | *Adequate Protection.* The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their Prepetition Liens in Prepetition Collateral (including Cash Collateral), as follows (the liens, security interests, payments and other obligations set forth in this paragraph 10 are collectively referred to herein as the "**Noteholder Adequate Protection Obligations**"):<br><br>a) *Noteholder Adequate Protection Claims.* The Prepetition Agents, for their own benefit and for the benefit of the Prepetition Secured Noteholders, are hereby granted, in the amount of any aggregate Diminution in Value of the Prepetition Liens in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, superpriority administrative expense claims contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors (the "**Noteholder Adequate Protection Claims**"), which shall be payable by each of the Debtors on a joint and several basis, and shall have recourse to all DIP Collateral. The Noteholder Adequate Protection Claims shall be (a) subject and subordinate only to the Carve Out and the DIP Superpriority Claims, and (b) senior to any and all other administrative expense claims and all other claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, the Equipment Lender Adequate Protection Claims.<br><br>b) *Noteholder Adequate Protection Liens.* The Prepetition Agents, for the benefit of themselves and for the benefit of the Prepetition Secured Noteholders, are hereby granted, effective and perfected as of the entry of the Interim Order, and without the necessity of the execution, recordation or filing by the DIP Loan Parties or any of the Prepetition Secured Parties of any pledge, collateral or security documents, mortgages, deeds of | Interim Order, ¶ 10. |

| MATERIAL TERMS | LOCATION |
|---|---|
| trust, financing statements, notations of certificates of title for titled goods, or any similar document or instrument, or the taking of any other action (including, without limitation, entering into any control agreements or taking possession or control of any DIP Collateral or Prepetition Collateral), in the amount of any aggregate Diminution in Value of the Prepetition Liens in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, valid, binding, enforceable and automatically perfected post-petition liens and security interests in all DIP Collateral (the "**Noteholder Adequate Protection Liens**"). The Noteholder Adequate Protection Liens shall be (i) junior and subordinated only to (A) the Carve Out, (B) the Permitted Prior Liens, (C) the DIP Liens, and (D) the Equipment Lender Adequate Protection Liens in the Prepetition Equipment Financing Collateral, (ii) *pari passu* with the Equipment Lender Adequate Protection Liens in Unencumbered Assets, and (iii) senior to any and all other liens and security interests in the DIP Collateral, including, without limitation, the Equipment Lender Adequate Protection Liens in the Prepetition Collateral.<br><br>c) *Noteholder Professional Fees and Expenses.* The DIP Loan Parties are authorized and directed to pay, without the necessity of filing fee applications with the Court or compliance with the U.S. Trustee's fee guidelines, all of the out of pocket fees, costs and expenses of (i) the Prepetition Agents, including, without limitation, the reasonable and documented fees and expenses of Shipman & Goodwin LLP, counsel to the Prepetition Agents, and (ii) the fees and expenses of the ad hoc group of certain Prepetition Secured Noteholders (the "**Ad Hoc Group**"), including, without limitation, (A) the reasonable and documented fees and expenses of Paul Hastings, as counsel to the Ad Hoc Group, (B) the fees and expenses of Moelis, as investment banker and financial advisor to the Ad Hoc Group, pursuant to the terms of the Moelis Fee Letter, and (C) such other professionals that may be retained by the Ad Hoc Group (subject in the case of <u>clause (C)</u> to the consent of the DIP Borrower, which consent shall not be unreasonably withheld or delayed, provided that such DIP Borrower consent shall not be required following the occurrence of a DIP Termination Event) (collectively, the "**Noteholder Professional Fees and Expenses**"), in each case, whether arising on, prior to or after the Petition Date.<br><br>d) *Reporting.* The Debtors shall contemporaneously provide the Prepetition Agents and the Ad Hoc Group (and their respective advisors) with all reports, documents and other information required to be delivered to the DIP Secured Parties under the DIP Loan Documents and the Interim Order.<br><br>e) *Cash Management Covenant.* The DIP Loan Parties shall maintain their cash management arrangements in a manner consistent with those described in the applicable "first day" | |

16

| MATERIAL TERMS | | LOCATION |
|---|---|---|
| | order, which shall be in form and substance reasonably acceptable to the Ad Hoc Group. | |
| **Determination Regarding Prepetition Claims** Bankruptcy Rule 4001(c)(1)(B)(iii) | The Interim Order contains stipulations of fact by the Debtors, including those related to the validity and enforceability of the Debtors' prepetition secured obligations. | Interim Order, ¶ E. |
| **Liens on Avoidance Actions** Bankruptcy Rule 4001(c)(1)(B)(xi) | Subject to entry of the Final Order, the DIP Agent and the DIP Lenders will receive a lien on the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code. | Interim Order, ¶ 6. |
| **Effect of Debtors' Stipulations on Third Parties** Bankruptcy Rule 4001(c)(1)(B)(iii), (viii) | Subject to the Challenge Period, the stipulations, admissions, agreements, and releases contained in the Interim Order shall be binding upon the Debtors, any statutory or non-statutory committees, and all other parties in interest.   The "**Challenge Period**", collectively, means the date that is (i)  the earlier of (A) seventy-five (75) calendar days from the date of entry of the Interim Order, or (B) the date that is sixty (60) calendar days from the date of appointment of the Official Committee (the time period set forth in this this <u>sub-clause (i)</u>, the "**Initial Challenge Deadline**"), (ii) such later date as has been agreed to in writing by the DIP Agent (acting at the instruction of the Required DIP Lenders) and the affected Prepetition Agent (acting at the instruction of the requisite Prepetition Secured Parties under the affected Prepetition Notes Documents), or (iii) such later date as has been ordered by the Court, for cause shown, upon a motion filed with the Court prior to the Initial Challenge Deadline. | Interim Order, ¶ 23. |
| **Waiver or Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby vacated and modified, without application to or further order of this Court, to permit: (a) the DIP Loan Parties to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the DIP Secured Parties may request to assure the perfection and priority of the DIP Liens, (b) the DIP Loan Parties to incur all liabilities and obligations to the DIP Secured Parties as contemplated under the Interim Order and the DIP Loan Documents, (c) the Debtors to grant the Adequate Protection Liens and the Adequate Protection Claims, and to perform such acts as the Prepetition Agents may request to assure the perfection and priority of the Adequate Protection Liens, (d) the DIP Loan Parties to incur all liabilities and obligations to the Prepetition Secured Parties, including all Adequate Protection Obligations, as contemplated under the Interim Order and the DIP Loan Documents, (e) the DIP Loan Parties to pay all amounts required hereunder and under the DIP Loan Documents, (f) the DIP Secured Parties and the Prepetition Secured Parties to retain and apply payments made in accordance with the terms of the Interim Order and the DIP Loan Documents, (g)  subject to paragraph 20(b) of the Interim Order, the DIP Secured Parties and the Prepetition Secured Parties to exercise, upon the occurrence of any DIP Termination Event (as defined below), all rights and remedies provided for in the Interim Order, the DIP Loan Documents, the Prepetition Notes Documents or applicable law, (h) the DIP Loan Parties to perform under the Interim Order and the DIP Loan Documents, | Interim Order, ¶¶ Interim Order Preamble ¶ (k), 14, 15(c), 20(b). |

17

| MATERIAL TERMS | LOCATION |
|---|---|
| and to take any and all other actions that may be necessary, required or desirable for the performance by the DIP Loan Parties under the Interim Order and the DIP Loan Documents and the implementation of the transactions contemplated hereunder and thereunder, and (i) the implementation of all of the terms, rights, benefits, privileges, remedies, and provisions of the Interim Order and the DIP Loan Documents.

The automatic stay shall be modified to the extent necessary to permit the DIP Agent or the Prepetition Agents to take all actions, as applicable, regarding perfection of DIP Liens and Adequate Protection Liens.

Upon the occurrence of a DIP Termination Event, without further application to or order from the Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Agent (acting at the instruction of the Required DIP Lenders) and/or, with respect to clause (vi) below, the Prepetition Agents (acting at the instruction of the requisite Prepetition Secured Parties under the applicable Prepetition Notes Documents), as applicable, to take any of the following actions, at the same or different time: (i) deliver a written notice (which may be via electronic mail) to lead restructuring counsel for the Debtors, the U.S. Trustee and lead restructuring counsel for the Official Committee (the "***Remedies Notice***")[7] declaring the occurrence of a DIP Termination Event (such date, the "***DIP Termination Declaration Date***") and/or deliver a Carve Out Notice (as defined below), (ii) declare the termination, reduction or restriction of the commitments under the DIP Facility (to the extent any such commitment remains), (iii) declare all DIP Obligations to be immediately due and payable, without presentment, demand or protest or other notice of any kind, all of which are expressly waived by the DIP Loan Parties, (iv) declare the termination of the DIP Facility and the DIP Loan Documents as to any further liability or obligation thereunder, but without affecting the DIP Liens, the DIP Superpriority Claims or the DIP Obligations, (v) declare the reduction or restriction on the DIP Facility or the DIP Loan Documents, (vi) declare the termination, restriction or revocation of the ability of the Debtors to use Cash Collateral, (vii) invoke a Cash Dominion Period and/or sweep all cash or other amounts contained in the DIP Funding Account, and (viii) charge interest at the default rate set forth in the DIP Loan Agreement; *provided, however,* that following the occurrence of a DIP Termination Event, prior to the exercise or enforcement of any rights against DIP Collateral or Prepetition Collateral (as the case may be), the DIP Agent (acting at the instruction of the Required DIP Lenders) and/or the Prepetition Agents (acting at the instruction of the requisite Prepetition Secured Parties under the applicable Prepetition Notes Documents), as applicable, shall be required to file a motion with the Court on five (5) calendar days' notice (subject to the Court's availability) seeking an emergency hearing (the "***Stay Relief Hearing***") to determine whether a DIP Termination Event has occurred (and the DIP Loan Parties and the Official Committee shall not object to the shortened notice with respect to such Stay Relief Hearing). In the event the Court determines during a Stay | |

---

[7]     For the avoidance of doubt, the Carve Out Notice and the Remedies Notice may be included in the same notice.

WEIL:\98942921\6\39031.0011

| MATERIAL TERMS | | LOCATION |
|---|---|---|
| | Relief Hearing that a DIP Termination Event has occurred, the Court may fashion an appropriate remedy, which may include, *inter alia*, (A) the exercise of any and all rights or remedies available to the DIP Secured Parties under this Interim Order, the DIP Loan Documents or applicable law against the DIP Collateral, and (B) following the Payment in Full of all DIP Obligations (unless the Required DIP Lenders have otherwise agreed in writing), the exercise of any and all rights and remedies available to the Prepetition Secured Parties under this Interim Order, the Prepetition Notes Documents and applicable law against the DIP Collateral and/or Prepetition Collateral; *provided* that the rights of the Debtors to contest such relief are expressly preserved. | |
| **Waiver or Modification of Authority to File a Plan, Extend Time to File Plan, Request Use of Cash Collateral, or Request Authority to Obtain Credit** Bankruptcy Rule 4001(c)(1)(B)(v) | The limitations on parties' abilities to file a plan, request cash collateral, or request authority to obtain credit without the consent of the DIP Loan Parties or the Prepetition Loan Parties are still being negotiated. At a minimum, the Debtors may be prohibited from doing so unless they seek financing that will result in Full Payment of all DIP Obligations. | Interim Order, ¶ 24; 29(b); 30(a); 30(b) |
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien** Bankruptcy Rule 4001(c)(1)(B)(vii) | All security interests in and liens on collateral securing the obligations under the DIP Loan Agreement shall be valid and perfected upon entry of the Interim Order and without the necessity of the execution, recordation or filing by any of the DIP Loan Parties or the DIP Secured Parties of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title, or any similar document or instrument, or the taking of any other action (including, without limitation, entering into any control agreements or taking any other action to take possession or control of any DIP Collateral). <br><br>Noteholder Adequate Protection Liens. The Prepetition Agents, for the benefit of themselves and for the benefit of the Prepetition Secured Noteholders, are hereby granted, effective and perfected as of the entry of the Interim Order, and without the necessity of the execution, recordation or filing by the DIP Loan Parties or any of the Prepetition Secured Parties of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title for titled goods, or any similar document or instrument, or the taking of any other action (including, without limitation, entering into any control agreements or taking possession or control of any DIP Collateral or Prepetition Collateral), in the amount of any aggregate Diminution in Value of the Prepetition Liens in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, valid, binding, enforceable and automatically perfected post-petition liens and security interests in all DIP Collateral (the "**Noteholder Adequate Protection Liens**"). | Interim Order, ¶ 6(a); 10(b); 41(b) |

| MATERIAL TERMS | | LOCATION |
|---|---|---|
| | _Equipment Lender Adequate Protection Liens_. The Prepetition Equipment Lenders are each hereby granted, effective and perfected as of the entry of the Interim Order, and without the necessity of the execution, recordation or filing by the DIP Loan Parties or any of the Prepetition Equipment Lenders of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title for titled goods, or any similar document or instrument, or the taking of any other action (including, without limitation, entering into any control agreements or taking possession or control of any DIP Collateral), in the amount of any aggregate Diminution in Value of the purported Prepetition Equipment Liens in the Prepetition Equipment Financing Collateral (as applicable) from and after the Petition Date, valid, binding, enforceable and automatically perfected post-petition liens and security interests in all DIP Collateral (the "**Equipment Lender Adequate Protection Liens**", and together with the Noteholder Adequate Protection Liens, the "**Adequate Protection Liens**"). | |
| **Release, Waivers or Limitation on any Claim or Cause of Action** Bankruptcy Rule 4001(c)(1)(B)(viii) | Effective as of entry of the Interim Order, the Debtors waive and release, _inter alia_, (i) the Prepetition Secured Parties, and (ii) the DIP Secured Parties, in each case, subject to the terms and provisions of the Interim Order | Interim Order, Preamble ¶¶ E(h); 33. |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | The DIP Documents and Interim Order contain indemnification provisions ordinary and customary for debtor-in-possession financings of this type. | Interim Order, ¶ (2)(d). DIP Loan Agreement § 12.6. |
| **Section 506(c) Waiver** Bankruptcy Rule 4001(c)(1)(B)(x) | DIP Secured Parties—Interim Order Prepetition Secured Parties—Final Order  Except to the extent of the Carve Out, no costs or expenses of administration of the chapter 11 cases or any Successor Cases (or any future proceedings that may result therefrom) at any time, including, without limitation, any costs and expenses incurred in connection with the preservation, protection, or enhancement of realization by the DIP Secured Parties or the Prepetition Secured Parties upon the DIP Collateral or the Prepetition Collateral, respectively, shall be charged against or recovered from the DIP Collateral as to DIP Secured Parties or the Prepetition Collateral as to the Prepetition Secured Parties, whether pursuant to section 506(c) of the Bankruptcy Code or other similar legal or equitable doctrine or otherwise, without the prior written consent of the Required DIP Lenders with respect to the DIP Collateral or the requisite Prepetition Secured Parties under the applicable Prepetition Notes Documents with respect to the Prepetition Collateral, each in their sole discretion, and no such consent shall be implied, directly or indirectly, from anything contained in the Interim Order (including, without limitation, consent to the Carve Out or the approval of any budget hereunder) or from any other action, inaction, or acquiescence by any of the DIP Secured Parties or any of the Prepetition Secured Parties to any charge, lien, assessment or claim against the DIP Secured Parties or the Prepetition Secured Parties with | Interim Order, ¶ 25 |

| MATERIAL TERMS | | LOCATION |
|---|---|---|
| | respect to the DIP Collateral or the Prepetition Collateral, whether under section 506(c) of the Bankruptcy Code or otherwise; provided, however, that with respect to the Prepetition Secured Parties and the Prepetition Collateral, the foregoing shall be subject to the entry of the Final Order. | |
| **Section 552(b) Waiver**<br><br>Bankruptcy Rule 4001(c)(1)(B) | . Subject to entry of the Final Order, each of the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition Secured Parties or the Prepetition Collateral. | Interim Order, ¶ 26. |

## **Statement Regarding Significant Provisions**

9. Pursuant to paragraph 8 of the Complex Case Procedures, the DIP Loan Agreement and/or DIP Orders contain the following provisions ("**Significant Provisions**"):

| **DIP Facility Term** | **Relief Requested** |
|---|---|
| **Sale or Plan Confirmation Milestones**<br>Complex Case Procedures ¶ 8(a) | The DIP Loan Agreement, attached hereto as **Exhibit B**, requires the Debtors to comply with the following milestones including:<br><br>a) as soon as reasonably practicable, but in no event later than five (5) days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;<br>b) as soon as reasonably practicable, but in no event later than thirty-five (35) days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order;<br>c) as soon as reasonably practicable, but in no event later than seventy-five (75) days after the Petition Date, the Company shall have filed with the Bankruptcy Court the Plan and the Disclosure Statement;<br>d) soon as reasonably practicable, but in no event later than one hundred and fifty (150) days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order, provided that such Milestone shall automatically be extended to two hundred and forty (240) days after the Petition Date in the event that the Maturity Date (as defined in the DIP Loan Agreement) is extended to the date that is nine (9) months after the Petition Date in accordance with the terms in the DIP Loan Agreement; and<br>e) as soon as reasonably practicable, but in no event later than one hundred and sixty-five (165) days after the Petition Date, the Effective Date shall have occurred, provided that such Milestone shall automatically be extended to two hundred and fifty-five (255) days after the Petition Date in the event that the Maturity Date (as defined in the DIP Loan Agreement) is extended to the date that is nine (9) months after the Petition Date in accordance with the terms in the DIP Loan Agreement (the "**Effective Date Milestone**"). |

21

| DIP Facility Term | Relief Requested |
|---|---|
| | Justification: These milestones are appropriate given the amount of funding the DIP Lenders' are willing to make available to the Debtors to fund these chapter 11 cases. The Debtors believe that the DIP Lenders would not have otherwise provided the DIP Loans. |
| **Cross-Collateralization** Complex Case Procedures ¶ 8(b) | The Interim Order does not provide for cross collateralization. |
| **Roll-ups** Complex Case Procedures ¶ 8(c) | The Roll Up provides that (i) upon entry of the Final Order, $75 million in obligations arising under the Prepetition Secured Notes shall automatically be deemed "rolled up" and converted into the DIP Facility, on a cashless basis, and shall automatically be deemed to be substituted and exchange for, and deemed to be, DIP Loans for all purposes hereunder. Justification.  The Roll-Up is a key feature of the DIP Facility and was required by the DIP Lenders as a condition to their commitment to provide the New Money Term DIP Facility.  The Debtors and the DIP Lenders engaged in arm's-length negotiations and agreed to the Roll-Up Loans as consideration for, among other things, the DIP Lenders' commitment to fund the New Money DIP Term Facility.  Further, the Roll-Up will not prejudice the Debtors' stakeholders because the DIP Liens have junior liens to existing properly perfected liens related to equipment financing, mortgages, mechanics' liens, and other scheduled Permitted Prior Liens and only prime Prepetition Liens, the Equipment Lender Adequate Protection Liens in the Prepetition Collateral and the Noteholder Adequate Protection Liens. |
| **Liens on Avoidance Actions or Proceeds of Avoidance Actions** Complex Case Procedures ¶ 8(d) | The DIP Collateral includes, upon entry of the Final Order, any proceeds or property recovered, unencumbered or otherwise from Avoidance Actions under Chapter 5 of the Bankruptcy Code.  Interim Order ¶ 6(b). Justification.  The Debtors submit that granting DIP Liens and DIP Superpriority Claims on proceeds and property recovered in respect of Avoidance Actions is appropriate because the DIP Facility and use of Cash Collateral provide the Debtors with new money to fund the Debtors' reorganization and ensure the Debtors are able to maximize value for their estates. Moreover, the liens were required by the DIP Lenders as a condition to extending credit, and by the Prepetition Secured Parties as a condition to permitting use of cash collateral.  The Debtors respectfully submit that granting liens on Avoidance Proceeds is an appropriate under these circumstances because it is subject to a final order and will allow parties in interest the opportunity to object. |
| **Default Provisions and Remedies** Complex Case Procedures ¶ 8(e) | The Interim Order provides for certain Events of Default and remedies upon Events of Default, including customary termination events for, among other things, any material default, violation, or breach of the terms of the Interim Order by the Debtors, filing a plan of reorganization that is not acceptable to the DIP Lenders, or any event of default under the DIP Loan Agreement.  Interim Order ¶20. |

WEIL:\98942921\6\39031.0011

| DIP Facility Term | Relief Requested |
|---|---|
| | <u>Justification</u>.  These Events of Default appropriately balance, in the Debtors' view, the DIP Lenders' need for protection and the Debtors' need for debtor-in-possession financing and continued access to Cash Collateral.  In addition, the DIP Agent must provide 5 calendar days' notice prior to exercising its rights under the DIP Documents and file a motion (the "**Stay Relief Motion**") seeking emergency relief from the automatic stay.  Until such time as the Stay Relief Motion has been adjudicated by the Court, the Debtors may use Cash Collateral solely to fund (i) payroll and other critical operating expenses included in (and subject to) the Approved Budget that are critically necessary to keep the Debtors' businesses operating or that have been consented to by the Required DIP Lenders (which consent shall not be unreasonably withheld or delayed), and (ii) the Professional Fees Escrow Amount.  Therefore, the Interim Order does ***not*** provide for the automatic lifting of the stay upon an Event of Default. |
| **Releases of Claim Against Lender or Others**<br>Complex Case<br>Procedures ¶ 8(f) | Effective as of the date of entry of the Interim Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of its past, present and future predecessors, successors, heirs, subsidiaries, and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits:<br><br>a) each of the Prepetition Secured Parties and each of their respective Representatives (in their capacities as such) from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, cross-claims, demands, defenses, objections, challenges, offsets or setoff, debts, accounts, contracts, liabilities, remedies, suits, controversies, actions, causes of action, losses, damages, indemnities, reimbursement obligations, attorneys' fees, costs, expenses or judgments, of every kind or nature whatsoever, whether matured or unmatured, known or unknown, asserted or unasserted, suspected or unsuspected, foreseen or unforeseen, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, pending or threatened, arising in law or equity, upon contract or tort, under the Bankruptcy Code, any state or federal common law, statute, rule, regulation or otherwise, in each case, that may be asserted by any of the Debtors, their respective estates, predecessors, successors or assigns, against the Prepetition Secured Parties or their respective Representatives (in their capacities as such) for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time prior to the date of the Interim Order, in each case, arising under, in connection with or related to the Interim Order, the Prepetition Notes, the Prepetition Liens, the Prepetition Collateral, the Prepetition Secured Obligations, the Prepetition Notes Documents, the Adequate Protection Obligations, the transactions contemplated thereunder or hereunder, or the negotiation thereof or hereof, including, without limitation, any claim or cause of action seeking (i) any so-called lender liability, (ii) any and all claims arising under the Bankruptcy Code, whether under Chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or (iii) reduction, recoupment, recharacterization, |

| DIP Facility Term | Relief Requested |
|---|---|
| | subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge or recovery, or any other claim or cause action with respect to the validity, enforceability, priority, scope, extent or perfection of the Prepetition Liens, the Prepetition Secured Obligations or the Prepetition Notes Documents; and

b) the DIP Secured Parties and each of their respective Representatives (in their capacities as such) from any and all obligations and liabilities to the DIP Loan Parties (and their successors and assigns) and from any and all claims, counterclaims, cross-claims, demands, defenses, objections, challenges, offsets or setoff, debts, accounts, contracts, liabilities, remedies, suits, controversies, actions, causes of action, losses, damages, indemnities, reimbursement obligations, attorneys' fees, costs, expenses or judgments, of every kind or nature whatsoever, whether matured or unmatured, known or unknown, asserted or unasserted, suspected or unsuspected, foreseen or unforeseen, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, pending or threatened, arising in law or equity, upon contract or tort, under the Bankruptcy Code, any state or federal common law, statute, rule, regulation or otherwise, including, without limitation, any claim or cause of action seeking (i) any so-called lender liability, (ii) any and all claims arising under the Bankruptcy Code, whether under Chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), or otherwise, (iii) reduction, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge or recovery, in each case, that may be asserted by any of the DIP Loan Parties, their respective estates, predecessors, successors and assigns, in each case, against any of the DIP Secured Parties or their respective Representatives (in their capacities as such) for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time prior to the date of the Interim Order, in connection with, arising under or related to the Interim Order, the DIP Facility, the DIP Liens, the DIP Obligations, the DIP Collateral, the transactions contemplated thereunder or hereunder, or the negotiation thereof or hereof, including, without limitation, any claim or cause action with respect to the validity, enforceability, priority, scope, extent or perfection of the DIP Liens, the DIP Obligations or the DIP Loan Documents; *provided, however*, subject to the occurrence of the Closing Date, nothing contained in the foregoing shall release the DIP Secured Parties from their obligations under the DIP Facility from and after the date hereof.

Interim Order ¶¶ E(g); 33.

<u>Justification</u>. The release is appropriate because (i) the Debtors are being provided consideration in the form of the DIP Facility and the and the Prepetition Secured Parties consent to the Debtors' use of Cash |

| DIP Facility Term | Relief Requested |
|---|---|
| | Collateral, which is essential to the Debtors' ability to maximize value for their estates, and (ii) the release complies with the requirements of paragraph 8 of the Complex Case Procedures because the release is subject to the Challenge Period (i.e., no later than a date that is the later of (x) if a Creditors' Committee is not appointed, 60 days after entry of the Interim Order and (y) if a Creditors' Committee is appointed, 60 days after entry of the Final Order, (ii) any such later date as has been agreed to, in writing, by the applicable Prepetition Agent and the DIP Agent, and (iii) any such later date as has been ordered by the Court for cause upon a motion filed and served within any applicable period of time set forth in paragraph 33 of the Interim Order). *See* Interim Order, ¶ 23. |
| **Limitations on the Use of Cash Collateral** Complex Case Procedures ¶ 8(g) | Cash Collateral may not be used for certain enumerated purposes that are contrary to the rights and interests of the Lenders, the DIP Agent, and  Prepetition Secured Parties (*e.g.*, for investigations and litigation against such parties).  Interim Order ¶ 24. <br><br> Justification.  These limitations are usual and customary. The Debtors, having engaged in arm's length negotiations with the DIP Lenders, DIP Agent, Prepetition Secured Parties, agreed to limit the Debtors' use of Cash Collateral as consideration for, among other things, the provision of new money within the broader context the Debtors' value-maximizing restructuring process.  The limitation is reasonable given the facts and circumstances of these Chapter 11 cases. |
| **Priming Liens** Complex Case Procedures ¶ 8(h) | Pursuant to sections 364(c)(3) and 364(d)(1) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected liens and security interests in all DIP Collateral (other than the DIP Collateral described in paragraph 6(c)(i) hereof, as to which DIP Liens are described in such paragraph), which DIP Liens shall be (A) subject only to the (1) Carve Out, (2) the liens and security interests listed in Schedule 10.2.2 of the DIP Loan Agreement, which schedule shall be acceptable to the Required DIP Lenders (in each case, to the extent such liens and security interests are valid, perfected and non-avoidable as of the Petition Date, the "**Permitted Prior Liens**"), and (3) the Equipment Lender Adequate Protection Liens in Prepetition Equipment Financing Collateral (as applicable), and (B) senior to any and all other liens and security interests in the DIP Collateral, including, without limitation, the Prepetition Liens, the Equipment Lender Adequate Protection Liens in the Prepetition Collateral and the Noteholder Adequate Protection Liens. Interim Order ¶ 6(c)(ii). <br><br> Justification.  It is appropriate to provide priming liens to the DIP Lenders to secure the DIP Obligations because Prepetition Secured Parties (the only party with liens that are being primed) are consenting and are receiving adequate protection in the form of adequate protection liens, superpriority claims, and fees and expenses.  To be clear, the DIP Lenders' liens are not priming other known liens, such as the Debtors' equipment lenders' liens, mortgages, and mechanics' liens. |

WEIL:\98942921\6\39031.0011

### Jurisdiction

10.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Background

**A.  General Background**

11.     On the date hereof (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.  The Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**").

12.     The Debtors, together with their non-debtor affiliates (collectively, the "**Company**"), are one of the largest blockchain infrastructure, hosting provider, and digital asset mining companies in North America, with fully operational data centers in Texas, Kentucky, North Carolina, North Dakota, and Georgia.

13.     Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Michael Bros in Support of the Debtors' Chapter 11 Petitions and First Day*

26

*Relief*, (the "**Bros Declaration**"),[8] which has been filed with the Court contemporaneously herewith and is incorporated by reference herein.

**B. Significant Prepetition Indebtedness**

14.     The following table provides a summary of the Debtors' prepetition funded debt obligations and lease arrangements (the "**Prepetition Secured Obligations**") under their prepetition s(the "**Prepetition Secured Facilities**"):[9]

| Name | Principal Amount (approximate) | Lien Priority and Collateral |
|---|---|---|
| Prepetition April NPA | $316.1 million (included accreted) | First priority lien on substantially all assets of the Debtors (except equipment subject to other liens and real estate) |
| Prepetition August NPA | $298.3 million | Second priority lien on substantially all assets of the Debtors (except equipment subject to other liens and real estate) |
| Secured Mining Equipment Financing and Leases | $284 million | First lien on the ASIC Miners set forth in each lender's agreement |
| Secured Non-Mining Financings and Leases | $20.8 million | First lien on non-mining equipment (and real estate facilities) set forth in each lender's agreement |
| Facility Mortgages | $0.8 million | Real estate facilities set forth in each lender's agreement |
| Asserted Mechanics' Liens | Over $65 million (non-duplicative) | Real estate; priority and perfection under review |

15.     Additional details for each of the Debtors' debt instruments is provided in the Bros Declaration.  A summary of the secured debt instruments is provided below.

---

[8]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Bros Declaration.

[9] The Debtors reserve the right to assert that any of the debt is not secured due to invalidly perfected liens or otherwise.

WEIL:\98942921\6\39031.0011

a.      *April and August Convertible Notes.*

16.     The Debtors have two sets of convertible secured notes with nearly identical terms (the "**Prepetition April NPA**" and the "**Prepetition August NPA**", together, the "**Prepetition NPAs**").  The Prepetition April NPA is dated April 19, 2021, and the Prepetition August NPA is dated August 20, 2021.  The Prepetition NPAs maturity date is April 19, 2025. The Prepetition NPAs carry the same interest rate and are convertible into shares of common stock of Core Scientific at a conversion price of $8.00 per share.

17.     The obligations under the Prepetition April NPA are secured pursuant to (i) that certain Security Agreement, dated as of April 19, 2021 (the "**April Convertible Notes Security Agreement**"), by and among Core Scientific Holding Co., the NPA Guarantors, as guarantors, and the Note Agent (in its capacity as collateral agent), and (ii) that certain Intellectual Property Security Agreement, dated as of April 19, 2021 (the "**April Convertible Notes IP Security Agreement**").

18.     The obligations of the Debtors under the Prepetition August NPA are secured pursuant to (i) that certain Security Agreement, dated as of August 7, 2022 (the "**August Convertible Notes Security Agreement**"), by and among Core Parent, the NPA Guarantors, as guarantors, and the Note Agent (in its capacity as collateral agent for the August Convertible Notes), and (ii) that certain Intellectual Property Security Agreement, dated as of August 7, 2022 (the "**August Convertible Notes IP Security Agreement**" and collectively with the April Convertible Notes Security Agreement, the April Convertible Notes IP Security Agreement, and the August Convertible Notes Security Agreement, the "**Convertible Notes Security Agreements**")

28

b.      *Secured Mining Equipment Financing and Leases*.

19.      The Debtors utilized equipment leases or secured financing or arrangements to finance application-specific equipment for the mining of bitcoin (the "**ASIC Miners**").  As of the Petition Date, the Debtors have an aggregate of approximately $284 million of equipment leases and secured financing outstanding under different facilities with respective first lien security interests against approximately 91,000 of the Debtors' ASIC Miners.  The ASIC Miners are Excluded Property under such that they are not collateral for the NPA.

c.      *Secured Non-Mining Equipment Financing and Leases*.

20.      In addition to financing secured against mining equipment, the Debtors utilize secured financing and leases against non-mining assets to finance and utilize various infrastructure needs of the Debtors for their day-to-day operations.  As of the Petition Date, the Debtors have approximately $800,000 of facility mortgages, $20.8 million of non-mining equipment financing, and $9.3 million of non-mining equipment leases, each secured by various assets.  Like the ASIC Miners, the assets that secure the non-mining financing and leases are considered Excluded Property under the NPA.

**C.  Need for DIP Facility and Use of Cash Collateral**

21.      As discussed in the DIP Declaration and Bros Declaration, the Debtors have an immediate and critical need to obtain DIP financing and the authority to use Cash Collateral throughout the chapter 11 process, among other reasons, to enable the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers, and hosting customers, to make payroll, to make capital expenditures, to satisfy other working capital and operational needs, and to fund expenses of these chapter 11 cases.  The Debtors are entering chapter 11 with approximately $4 million of cash on hand and their operating cash flow, as currently projected, is not sufficient to fund ongoing operations and expenses for the projected

duration of the chapter 11 cases, including costs associated with these chapter 11 cases. Moreover, the Debtors' available cash on hand may be subject to the liens of Prepetition Secured Parties.

22.      Approval of debtor in possession financing will also send a positive message to the market that these chapter 11 cases are sufficiently funded, which is critical to address concerns raised by the Debtors' hosting customers, employees, vendors, and other stakeholders.

### D.  Efforts to Obtain Postpetition Financing

23.      As set forth in the DIP Declaration, beginning in December 2022, the Debtors, through PJT, launched a broad marketing process designed to maximize competition and solicit proposals from a wide range of prospective lenders, including (i) creditors already in the Debtors' capital structure, (ii) banks outside of the Debtors' capital structure, (iii) institutional and alternative lenders outside the Debtors' capital structure, and (iv) strategic parties. The Debtors' primary strategic considerations when marketing and financing the opportunity included the following (among others):

i.    *Adequate Sizing* – adequate sizing to (i) fund the Debtors' contemplated Approved Budget for up to 9 months and (ii) maintain optimal liquidity levels for operating the Debtors' business at all times;[10]

ii.   *Competitive Pricing* – competitive pricing and terms, including interest rate, nature of interest payments (i.e., paid-in-kind vs. cash), and fees; and

iii.  *Operational and Financial Flexibility* – limited financial covenants and case controls, including milestones.

24.      Because most of the Debtors' assets are encumbered PJT's strategy to obtain the best source of financing from the market was reflective of the practical realities of the Debtors' existing capital structure.

---

[10] The terms of the Approved Budget remains under negotiation and has yet to be finalized.

25.     PJT contacted 24 potential lenders that it believed may have been interested in providing the Debtors with postpetition financing, including an ad hoc group of the Prepetition Secured Parties (the "**Ad Hoc Group**"), the holder of the Company's Unsecured Bridge Notes, and several alternative lenders outside of the Debtors' capital structure.  Nine (9) parties signed non-disclosure agreements, and the Debtors received two (2) initial proposals.

26.     As discussed in further in the DIP Declaration, while the Debtors analyze and negotiated various proposals for postpetition financing, the Debtors ultimately determined that the best path forward would be pursuing the DIP Facility with the Ad Hoc Group, which combined many favorable features from the various proposals.

27.     The negotiations with the Ad Hoc Group were rigorous, marked by hard bargaining, and resulted in significant concessions by the Ad Hoc Group and additional benefits to the Debtors.  The commitment from the Ad Hoc Group also required significant negotiations within the Ad Hoc Group, as the members of the Ad Hoc Group come from holders across two separate tranches of Prepetition Secured Notes.  It is unlikely that the Debtors would be unable to obtain this level of credit on more attractive terms, taken as a whole, within the timeframe required.

28.     Accordingly, the DIP Facility, taken as a whole, is reasonable under the facts and circumstances and is the Debtors' best option.

## Key Benefits of Proposed DIP Facility

29.     In addition to providing a liquidity infusion necessary to fund various critical expenditures, the proposed DIP Facility contains severable favorable terms and conditions to the Debtors.  Specifically, the proposed DIP Facility:

      a.   is being funded by a group of the Debtors' Prepetition Secured Noteholders who have a vested interest in the success of the Chapter 11 Cases;

WEIL:\98942921\6\39031.0011

b. includes interest structured almost entirely as PIK interest designed to alleviate the Debtors' cash debt service obligations during the Chapter 11 Cases;

c. is structured to be available to fund by all Prepetition Secured Parties on a *pro rata* basis (i.e., contains no holdback provisions);

d. is nonetheless backstopped by certain Prepetition Secured Parties that are members of the Ad Hoc Group so as to eliminate any risk of the Debtors not receiving the contemplated liquidity infusion on the expected timeline;

e. provides one three-month maturity extension beyond the original six-month maturity of the DIP Facility, exercisable at the Company's option, with payment of a non-cash fee;

f. permits proceeds from asset sales from collateral of the DIP Facility to remain with the Debtors' estate;

g. flexibility on exit treatment, with options for either repayment or conversion to equity, at the Debtors' option; and

h. provides for acceptable milestones that are consistent with the Debtors' reorganization strategy.

30. As a result of comprehensive good-faith and arm's-length negotiations and a competitive dynamic, the proposed DIP Facility satisfies the Debtors' primary strategic considerations outlined above. Based on the foregoing, it is my belief that the proposed use of Cash Collateral and the DIP Facility will satisfy the Debtors' postpetition liquidity needs, will provide the Debtors with sufficient flexibility to operate their business in an efficient manner in the ordinary course of business, and is in the best interests of the Debtors and their estates.

### **Terms of DIP Facility Are Reasonable Under the Circumstances**

31. As discussed in the DIP Declaration, the obligations, interest rate, fees, maturity, covenants, and milestones under the DIP Facility are reasonable, taken as a whole, under the circumstances and are generally consistent with market terms for companies facing similar circumstances as the Debtors and provides the best financing option currently available to the Debtors under the circumstances. Accordingly, the DIP Lenders have acted in good faith and have

32

agreed to provide the DIP Facility to the Debtors on terms, on fair and reasonable under the current circumstances and market conditions

32. ***Consensual Priming Liens***. Priming lien may only be granted (a) with the consent of the affected secured lenders or (b) if adequate protection exists for such priming lien. Here, the requisite Prepetition Secured Parties have consented (or are deemed to have consented) to the priming liens and to the adequate protection package provided to the Prepetition Secured Parties and would have likely contested such priming liens in an Alternative DIP Proposal.

33. ***Junior Liens***. A substantial portion of the Debtors' assets consist of equipment that is encumbered by secured financing arrangements other than under the Prepetition NPAs, as well as some real estate encumbered by mortgages and mechanics' liens. Rather than insisting on a non-consensual priming lien on such encumbered property, the DIP Lenders have agreed to receive junior liens on such assets, with the goal of enhancing the collateral securing the DIP Facility and avoiding objections from these other secured parties. While much of the Debtors' equipment and real estate assets are encumbered by equipment financing, mortgages, and mechanics' liens, as applicable, the DIP Lenders would not provide capital without receiving liens that are junior to the liens securing these assets.

34. ***Liens on Unencumbered Assets.*** In addition, the DIP Lenders require a perfected first priority security interest and lien on substantially all of the Debtors' unencumbered assets. In my view, absent such protections, the DIP Lenders would not have agreed to provide the DIP Facility to the Debtors.

35. ***Roll Up***. After entry of the Final DIP Order, a portion of the Prepetition Secured Obligations will roll up into DIP Loans on a cashless basis, in an amount equal to the principal amount of all DIP Borrowings advanced under the New Money Term DIP Facility, on a

WEIL:\98942921\6\39031.0011

dollar-for-dollar basis.  The Roll Up of a portion of the Prepetition Secured Obligations was heavily negotiated and was a critical condition to the DIP Lenders providing the DIP Facility. Such rolled up amount will be secured by the same collateral and have the same priority as the DIP Borrowings under the DIP Facility, but no interest will be paid on account of rolled up amounts.[11] The Roll Up of a portion of the Prepetition Secured Obligations was a critical condition to the DIP Lenders providing the DIP Facility and without the inclusion of the Roll Up, the DIP Lenders would not have provided the DIP Facility.

36.     Moreover, notwithstanding the Roll Up, the DIP Facility provides numerous benefits to the Debtors, their estates, and their stakeholders.  For example, given that the DIP Lenders (which consist of Prepetition Secured Parties) are the Debtors' incumbent lenders, moving forward with certain other DIP proposals would have likely resulted in the Prepetition Secured Parties asking for additional adequate protection and further arguing that there is insufficient value in unencumbered assets to cover both a third-party DIP financing and adequate protection to the Prepetition Secured Parties.  Additionally, any Prepetition Secured Obligations that are rolled up into DIP Loans will not require any interest payments during the term of the DIP Loan.

37.     The terms of DIP Facility, including the liens being granted and the Roll Up, are an important part of the DIP Facility that will allow the Debtors to maintain sufficient liquidity while they strive to achieve a comprehensive restructuring solution for their creditors and other stakeholders.

**Fees in Connection with DIP Facility Are Fair and Reasonable**

---

[11] Under the RSA, upon repayment or refinancing of the DIP Facility, such Roll Up amount will revert to secured claim of the Prepetition Secured Parties and will receive the same treatment in in these chapter 11 cases as the secure claims of the Prepetition Secured Parties.

WEIL:\98942921\6\39031.0011

38.     The DIP Lenders have committed to provide a substantial amount of capital to ensure successful execution of the DIP Facility.  As discussed in the DIP Declaration, in view of those commitments and the circumstances of these cases, including the magnitude of the Debtors' Chapter 11 Cases and the tangible benefit to the estates of a substantial committed postpetition financing, the consideration being provided to the DIP Lenders, taken as a whole, in exchange for providing such commitment, is reasonable in amount, appropriately compensates the DIP Lenders for their costs and the assurances they are providing to the process, and is necessary to obtain the DIP Facility, which will permit the Debtors to both (i) continue operating their business and (ii) maximize the value of their estates.

### A.     DIP Fees

39.     In consideration for the DIP Agent's and DIP Lenders' respective commitments in connection with the DIP facility, the Debtors have agreed to, among other things, (i) pay certain fees (the "**DIP Fees**"), as discussed in the table above, (ii) pay reasonable and documented out-of-pocket fees and expenses for the DIP Lenders (including reasonable and documented fees and expenses of outside counsel) (the "**Out-of-Pocket Expenses**" and, together with the DIP Fees, the "**DIP Fees and Expenses**"), and (iii) indemnify the DIP Lenders in accordance with the DIP Loan Agreement.

### B.     DIP Fees Are Reasonable

40.     The DIP Fees were the subject of arm's-length and good-faith negotiations between the Debtors and the DIP Lenders, are integral components of the overall terms of the DIP Facility, and were required by the DIP Lenders as consideration for the extension of postpetition financing.  As discussed in the DIP Declaration, it is unlikely that a financing commitment with terms similar to those in the DIP Facility was available to the Debtors for lower fees given the

existing liens against the Debtors' assets, the Debtors' liquidity position, and the overall depression in bitcoin prices that has resulted in stress within the cryptocurrency industry.

### Relief Requested Should be Granted

41.     The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances.  As set forth in the DIP Declaration, the Debtors were unable to procure sufficient financing in the form of unsecured credit, which would be allowable under section 503(b)(1) or as an administrative expense, in accordance with sections 364(a) or (b) of the Bankruptcy Code.  *See* 11 U.S.C. §§ 364(a)-(b), 503(b)(1).  Having determined that postpetition financing was only available pursuant to sections 364(c) and (d) of the Bankruptcy Code, the Debtors negotiated with the DIP Lenders to secure the DIP Facility on the terms described herein. For these reasons, as discussed further below, the Debtors satisfy the necessary conditions under sections 364(c) and (d) for authority to enter into the DIP Facility.

### A.  Entry into the DIP Facility is an Exercise of the Debtors' Sound Business Judgment

42.     Several reasons justify the relief requested herein:

   i.    The Debtors expect that vendors, customers, and their employees will be highly focused on whether these chapter 11 cases are appropriately funded.

   ii.   The Debtors are entering chapter 11 with limited cash on hand. Immediate access to DIP Facility is therefore critical to ensure sufficient working capital to operate their business and to administer their estates.

   iii.  The Debtors' proposed interim draw of up to $35 million - $40 million (open issue) under the New Money Facility is necessary for the Debtors to avoid immediate and irreparable harm to their estates.

   iv.   Negotiations with the proposed DIP Lenders were conducted in good faith and at arms' length.  As confirmed by the Debtors' prepetition process to solicit proposals for third-party debtor-in-

WEIL:\98942921\6\39031.0011

> possession financing, there is no better alternative financing
> available to the Debtors in the market.  The DIP Facility, taken as
> a whole, is reasonable under the facts and circumstances and is the
> Debtors' best—and in fact only—currently available option.

For those reasons and the reasons set forth below, the Debtors respectfully request that the Court

grant the relief requested herein.

43.     If an agreement to obtain secured credit does not run afoul of the provisions

of, and policies underlying, the Bankruptcy Code, courts give debtors considerable deference in

acting in accordance with their sound business judgment in obtaining such credit.  *See, e.g.*, *In re*

*N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (Docket No. 21) (order

approving postpetition financing on an interim basis as exercise of debtors' business judgment);

*In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost

always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't*

*Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's

discretion under section 364 is to be utilized on grounds that permit reasonable business judgment

to be exercised so long as the financing agreement does not contain terms that leverage the

bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit

a party-in-interest.").

44.     Courts generally will not second-guess a debtor's business decisions when

those decisions involve the appropriate level of care in arriving at the decision on an informed

basis, in good faith, and in the honest belief that the action was taken in the best interest of the

debtor.  *See In re Los Angeles Dodgers LLC*, 457 B.R. at 313.  To determine whether the business

judgment test is met, "the court 'is required to examine whether a reasonable business person

would make a similar decision under similar circumstances.'"  *In re Dura Auto. Sys. Inc*., No. 06-

11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted).

37

Further, in considering whether the terms of postpetition financings are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855—86 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Tr. Co. of Escanaba (In re Ellingsen MacLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

45.    The Debtors' determination to move forward with the DIP Facility is a sound exercise of their business judgment following a thorough process conducted with the guidance of experienced advisors, and after careful evaluation of alternatives.  Given the nature of the Debtors' relatively limited unencumbered asset pool, the DIP Lenders are the best available financing source that could commit to a facility on the most favorable terms, and enable the Debtors to avoid a potentially costly and protracted priming fight at the outset of these chapter 11 cases.  The Debtors negotiated the DIP Loan Agreement with the DIP Lenders in good faith, at arm's length, and with the assistance of their advisors, and the Debtors believe that they have obtained the best financing available in an amount sufficient to fund operations and the costs of these chapter 11 cases, and on reasonable terms.  Accordingly, the Court should authorize the Debtors' entry into the DIP Documents as a reasonable exercise of the Debtors' business judgment.

### a.    Debtors Should Be Authorized to Obtain DIP Financing on a Secured and Superpriority Basis

46.    The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances.  Specifically, section 364(c) of the Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:

(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien[.]

11 U.S.C. § 364(c).

47.     To satisfy the requirements of section 364(c) of the Bankruptcy Code, Courts will consider whether (a) the debtor made reasonable effort, but failed, to obtain unsecured credit under sections 364(a) and 364(b) of the Bankruptcy Code, (b) the credit transaction benefits the debtor as necessary to preserve estate assets, and (c) the terms of the credit transaction are fair, reasonable, and adequate, given the circumstances of the debtor and proposed lender.  *See In re Republic Airways Holdings Inc.*, No. 16-10429(SHL) 2016 WL 2616717, at *11 (Bankr. S.D.N.Y. May 4, 2016); *In re Los Angeles Dodgers LLC*, 457 B.R. at 312–13; *In re Ames Dep't Stores, Inc.*, 115 B.R. at 40.  However, section 364 "imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986).

48.     First, PJT contacted 24 potential lenders, including the Prepetition Secured Parties, to seek proposals for postpetition financing.  Nine (9) parties signed non-disclosure agreements, and the Debtors received two (2) initial proposals.  Only the DIP Facility was actionable.  The Court should, therefore, authorize the Debtors to provide the DIP Agent and the DIP Lenders with superpriority administrative expense status for any DIP Obligations as provided for in section 364(c)(1) of the Bankruptcy Code, with (i) first priority senior liens on the Debtors' unencumbered property pursuant to section 364(c)(2) of the Bankruptcy Code, (ii) valid priming liens (the "**Priming Liens**") on any property encumbered with an existing lien pursuant to section

364(d)(1) of the Bankruptcy Code, and (iii) junior liens on all property subject to valid, perfected and non-avoidable liens in existence as of the Petition Date or perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code (other than the Primed Liens) pursuant to section 364(c)(3) of the Bankruptcy Code.

49.     Second, the DIP Facility is necessary to preserve the Debtors' estates.  The Debtors require access to the DIP Facility and access to Cash Collateral to ensure they have sufficient liquidity to operate their businesses, enter into postpetition agreements, post cash collateral, and administer their estates in the ordinary course for the duration of these chapter 11 cases.  The Debtors are entering chapter 11 with approximately $4 million of cash on hand. Therefore, their operating cash flow, as currently projected, is not be sufficient to fund ongoing operations and expenses for the projected duration of the chapter 11 cases, including costs associated with these chapter 11 cases.

50.     Third, the terms of the DIP Facility are fair, reasonable, and adequate under the circumstances.  The DIP Facility represents the most favorable source of postpetition financing and is designed to provide the Debtors with sufficient liquidity for the duration of these chapter 11 cases.

### b.  Debtors Should Be Authorized to Obtain Postpetition Financing Secured by Liens Priming the Prepetition Secured Parties

51.     In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on encumbered property if the debtor cannot otherwise obtain such credit and the interests of existing lien holders are adequately protected.  *See* 11 U.S.C. § 364(d)(1).  Specifically, section 364(d)(1) of the Bankruptcy Code provides:

> (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:
>
> > (A) the trustee is unable to obtain such credit otherwise; and
> >
> > (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).  "Section 364(d) 'does not require that debtors seek alternative financing from every possible lender.  However, the debtor must make an effort to obtain credit without priming a senior lien.'" *In re Republic Airways Holdings Inc.*, 2016 WL 2616717, at *11.  Consent by the secured creditors to priming obviates the need to show adequate protection.  *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

52.    Here, the requisite Prepetition Secured Parties have consented to (i) the Debtors' use of Cash Collateral; (ii) the Debtors' entry into the DIP Facility; (iii) the granting of the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and the Adequate Protection Obligations; and (iv) the priming of the Prepetition Liens, in each case, upon the terms set forth in the Interim Order and the DIP Loan Documents.  Accordingly, the Debtors Should Be authorized to obtain postpetition financing secured by liens priming the Prepetition Secured Parties.

**B.  Debtors Should Be Authorized to Use Cash Collateral**

53.    For the reasons set forth herein, the Debtors require use of the Cash Collateral for working capital and to fund their chapter 11 cases.  Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral.  Section 363(c) provides, in pertinent part, that:

The trustee may not use, sell, or lease cash collateral . . . unless—

(A) each entity that has an interest in such cash collateral consents; or

(B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).  Further, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

54.     The Debtors have satisfied the requirements of sections 363(c)(2) and (e), and should be authorized to use Cash Collateral.  As noted above, the Prepetition Agent has consented to the Adequate Protection to be provided pursuant to the Interim Order and the Debtors are providing the Prepetition Secured Parties with adequate protection for the use of Cash Collateral.  Accordingly, the Court should grant the Debtors the authority to use Cash Collateral under section 363(c) of the Bankruptcy Code.

### C.  Debtors Should Be Authorized to Pay Fees Required by DIP Documents

55.     As described herein, the Debtors have agreed, subject to Court approval, to pay the DIP Fees in exchange for their providing the DIP Facility.  As set forth in the DIP Declaration, taken as a whole, the terms of the DIP Documents, including the fees imposed thereunder, are reasonable under the facts and circumstances and are the Debtors' best—and in fact only—currently available option to maintain their ongoing business operations and to fund their chapter 11 cases.

56.     The Debtors considered the DIP Fees when determining in their sound business judgment whether entry into the DIP Facility constituted the best path forward, and the

WEIL:\98942921\6\39031.0011

Debtors determined that paying these fees in order to obtain the DIP Facility is in the best interests of the Debtors' estates.  Accordingly, the Court should authorize the Debtors to pay the DIP Fees.

### D.  Carve-Out Is Appropriate

57.    The DIP subjects the DIP Lenders' security interests, superpriority administrative expense claims, and the adequate protection claims and liens to the Carve Out. Without the Carve Out, the Debtors' estates or other parties in interest could be harmed because the services professionals might otherwise provide in these chapter 11 cases could be restricted. *See In re Ames Dep't Stores*, 115 B.R. at 38 (observing that courts insist on Carve Outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties in interest are sorely prejudiced").  Additionally, the Carve Out protects against administrative insolvency during the pendency of the chapter 11 cases by ensuring that assets are available to pay U.S. Trustee's fees and professional fees of the Debtors and any statutory committee.  Accordingly, the Debtors submit that the Carve Out is appropriate.

### E.  DIP Lenders Should Be Deemed Good Faith Lenders under Section 364(e)

58.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or to grant such liens is later reversed or modified on appeal.  Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

43

59.     Here, the Debtors believe the DIP Facility embodies the most favorable terms on which the Debtors could obtain postpetition financing.   As described in the DIP Declaration, the negotiations of the terms of the DIP Facility with the DIP Lenders were conducted at arms' length.   Under the circumstances, the terms and conditions of the DIP Documents are reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code, in accordance with the DIP Orders and the DIP Documents and in accordance with the Budget (subject to any Permitted Variance).   Further, no consideration is being provided to any party to the DIP Documents other than as described herein.   Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and that the DIP Lenders thus are entitled to all of the protections afforded by that section.

### F.   Modification of Automatic Stay is Warranted

60.     The relief requested herein contemplates a modification of the automatic stay (if applicable) to (a) permit the Debtors to grant the security interests, liens, and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens, and (b) permit the DIP Agent, DIP Lenders, and the Prepetition Secured Parties to exercise rights and remedies under certain circumstances.   These provisions were part of the quid pro quo for the Debtors' ability to obtain the DIP Facility and use Cash Collateral as provided therein and in the Interim Order.   Notably, the exercise of remedies (including remedies with respect to prepetition claims and collateral) will be subject to five calendar days' notice to allow the Debtors to cure or seek other relief.   Moreover, following the delivery of such notice, the DIP Agent may file a Stay Relief Motion seeking emergency relief from the automatic stay and until such time as the Stay Relief Motion has been adjudicated by the Court, the Debtors may use the proceeds of the DIP Facilities (to the extent drawn prior to the

44

occurrence of the Event of Default (as defined in the DIP Loan Agreement)) or Cash Collateral to fund operations in accordance with the DIP Loan Agreement.   Under these circumstances, the Debtors believe that the extent of the modifications to the automatic stay under the Interim Order is reasonable and should be approved.

   61. Stay modifications of this kind are ordinary and standard features of postpetition financing facilities and, in the Debtors' business judgment, are appropriate under the present circumstances. *See, e.g.*, *In re Sheridan Holding Company II, LLC*, No. 19-35198 (MI) (Bankr. S.D. Tex. October 21, 2019) (Docket No. 178) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Vanguard Natural Resources, Inc.*, No. 19-31786 (DRJ) (Bankr. S.D. Tex. April 3, 2019) (Docket No. 118) (same); *In re Southcross Holdings LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. Apr. 11, 2016) (Docket No. 183) (same); *In re Autoseis, Inc.*, No. 14-20130 (RSS) (Bankr. S.D. Tex. Mar. 27, 2014) (Docket No. 64) (same); *In re ATP Oil & Gas Corp.*, No. 12-36187 (MI) (Bankr. S.D. Tex. Aug. 21, 2012) (Docket No. 135) (same).

### G.  Debtors Require Immediate Access to Cash Collateral and DIP Financing

   62. The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code if, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing."   Fed. R. Bankr. P. 4001(b)(2), (c)(2).  In examining requests for interim relief under this rule, Courts generally apply the same business judgment standard applicable to other business decisions.  *See Ames Dep't Stores*, 115 B.R. at 36.

   63. As described in the DIP Declaration, as of the Petition Date, the Debtors will only have approximately $4 million in cash on hand.  Absent authority to enter into and access the proceeds of the DIP Facility, even for a limited period of time, the Debtors will be unable to continue operating their business, resulting in a deterioration of value and immediate and

irreparable harm to the Debtors' estates. Thus, the Debtors require immediate access to the proceeds of the DIP Facility, as well as access to Cash Collateral, to finance their operations and continue operating as a going concern during the pendency of these chapter 11 cases. In addition, access to the DIP Facility will provide the Debtors with financial stability in the event of unforeseen circumstances attendant to the uncertain and volatile bitcoin market. Accordingly, for the reasons set forth above, prompt entry of the Interim Order is necessary to avoid value-destruction that would lead to immediate and irreparable harm to the Debtors' estates.

## H. The "Equities of the Case" Waiver is Appropriate

64. The Prepetition Secured Parties are consenting, subject to the terms of the Interim Order, to the priming of their liens by the DIP Facility and to the Debtors' use of Cash Collateral, thereby permitting the Debtors to obtain sufficient funds to continue to operate their business and providing a substantial benefit to the Debtors' estates. As a condition to providing such consent, the Prepetition Secured Parties required the Debtors to waive the "equities of the case" exception under section 552(b) of the Bankruptcy Code, subject to and effective upon entry of the Final Order. Absent the Prepetition Secured Parties' consent, the Debtors would have been required to seek to prime the Prepetition Secured Parties' liens and to use Cash Collateral on a non-consensual basis, which would have proven costly to the Debtors were they unable to prevail in such a priming fight. In addition, the Debtors are seeking approval of the "equities of the case" waiver only upon entry of the Final Order, thereby allowing parties in interest an opportunity to be heard in connection therewith. Therefore, the Debtors submit that the proposed "equities of the case" waiver is appropriate.

## I. Interests of Prepetition Secured Parties Are Adequately Protected

65. Parties with an interest in cash collateral are entitled to adequate protection. *See* 11 U.S.C. § 363(e). Adequate protection may be provided in various forms, including, among

WEIL:\98942921\6\39031.0011

other things, payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims.  Thus, what constitutes adequate protection is decided on a case-by-case basis.  *See, e.g., In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

66.    The adequate protection package provided to the requisite Prepetition Secured Parties, as described above, is consensual and appropriately safeguards the Prepetition Secured Parties from the diminution in the value (if any) of their interests in the Prepetition Collateral.  The Debtors submit that their provision of adequate protection to the Prepetition Secured Parties is fair and reasonable and is sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

### Request for Final Hearing

67.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for consideration of entry of the Final Order.  The Debtors request that they be authorized to serve a copy of the signed Interim Order, which fixes the time and date for the filing of any objections by first class mail upon the notice parties listed below.  The Debtors further request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

WEIL:\98942921\6\39031.0011

### **Bankruptcy Rule 6003(b) Has Been Satisfied**

68.     Pursuant to Bankruptcy Local Rule 9013-1, the Debtors respectfully request emergency consideration of this Motion under Bankruptcy Rule 6003, which provides that the Court may grant relief within the first twenty-one (21) days after the Petition Date to the extent such relief is necessary to avoid immediate and irreparable harm.  As described herein and in the DIP Declaration, the relief requested is essential to avoid the immediate and irreparable harm that would be caused by the Debtors' inability to transition smoothly into chapter 11.  Accordingly, the Debtors submit that the requirements of Bankruptcy Rule 6003 are satisfied.

### **Compliance with Bankruptcy Rule 6004(a) and Waiver of Bankruptcy Rule 6004(h)**

69.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion satisfies Bankruptcy Rule 6004(a) and that the Court waive the 14-day period under Bankruptcy Rule 6004(h).

### **Reservation of Rights**

70.     Nothing contained herein is intended to be or shall be deemed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver or limitation of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (iv) an agreement or obligation to pay any claims, (v) a waiver of any claims or causes of action which may exist against any creditor or interest holder, (vi) an admission as to the validity of any liens satisfied pursuant to this Motion, or (vii) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be

48

construed as an admission to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to dispute such claim subsequently.

## **Notice**

71.     Notice of this Motion will be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

## **No Previous Request**

72.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

49

WHEREFORE the Debtors respectfully request entry of the Interim Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:  December 21, 2022

Houston, Texas

Respectfully submitted,

_/s/ Alfredo R. Perez_
WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:          Alfredo.Perez @weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C. (_pro hac vice_ pending)
Ronit J. Berkovich (_pro hac vice_ pending)
Moshe A. Fink (_pro hac vice_ pending)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:   Ray.Schrock@weil.com
             Ronit.Berkovich@weil.com
             Moshe.Fink@weil.com

_Proposed Attorneys for Debtors_
_and Debtors in Possession_

**<u>Certificate of Service</u>**

I hereby certify that on December 21, 2022, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.


         */s/ Alfredo R. Perez*
         Alfredo R. Pérez

WEIL:\98942921\6\39031.0011