IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

BANKRUPTCY DIVISION

| | |
|---|---|
| IN RE: | § CASE NO. 22-90341-11 |
| | § JOINTLY ADMINISTERED |
| | § HOUSTON, TEXAS |
| CORE SCIENTIFIC, INC., | § THURSDAY, |
| | § DECEMBER 22, 2022 |
| DEBTOR. | § 9:15 A.M. TO 11:34 A.M. |

## FIRST DAY HEARINGS (VIA ZOOM)

BEFORE THE HONORABLE DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                         SEE NEXT PAGE

COURTROOM DEPUTY:                    ALBERT ALONZO

(Recorded via CourtSpeak; Not all callers could be heard
clearly.)

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

<u>APPEARANCES (VIA ZOOM)</u>:

For the Debtor:                        WEIL GOTSHAL & MANGES, LLP
                                       Alfredo Perez, Esq.
                                       Ray C, Schrock, PC
                                       Ronit Berkovich, Esq.
                                       Destiny Reyes, Esq.
                                       Alex Kane, Esq.
                                       Moshe Fink, Esq.
                                       700 Louisiana, Ste. 1700
                                       Houston, TX  77002


For the Interested Parties:

                                       TJC PARTNERS
                                       John Singh, Esq.

                                       PAUL HASTINGS, LLP
                                       Kris Hansen, Esq.
                                       Erez Giland, Esq.

                                       WILLKIE FARR & GALLAGHER, LLP
                                       Jennifer Hardy, Esq.

                                       PRYOR CASHMAN, LLP
                                       Matthew Silverman, Esq.

                                       HAYNES AND BOONE, LLP
                                       Matt Ferris, Esq.

                                       KIRKLAND & ELLIS, LLP
                                       Chris Koenig, Esq.

                                       SIDLEY AUSTIN, LLP
                                       Dennis Twomey, Esq.

                                       ARNOLD & PORTER
                                       Brian Lohan, Esq.

                                       US DEPARTMENT OF JUSTICE
                                       Jayson Ruff, Esq.


(Please also see Electronic Appearances.)

**HOUSTON, TEXAS; THURSDAY, DECEMBER 22, 2022; 9:15 A.M.**

1

2          THE COURT:  Okay.  Initially, good morning,

3     everyone.  This is Judge Jones.  The time is 9:15 Central.

4     Today is December 22, 2022.  This is the docket for Houston,

5     Texas.

6          On the 9:15 docket, we have First Day Hearings on

7     the jointly administered cases under Case No. 22-90341, Core

8     Scientific, Inc.

9          Folks, please don't forget to make your electronic

10    appearance today.  If it's been awhile, or perhaps even a

11    first time, that's a quick trip to my website, a couple of

12    mouse clicks.  It'll take you less than 20 seconds to

13    accomplish that, and you can do that at any time prior to the

14    conclusion of this morning's hearing.

15         First time that you speak, and you only need to do

16    it the first time, but if you would, please state your name

17    and who you represent.  It really does give the court reporter

18    a good point of reference in the event that a transcript

19    request is made.

20         And finally, we are recording this morning using

21    CourtSpeak.  We'll have the audio up on the docket, available

22    for your download shortly after the conclusion of the hearing.

23    Let me also say I know a number of pro hacs have been filed.

24         It's my belief I got them all.  If I missed one, I

25    will get it.  Just don't need to worry.  If you have filed a

1    pro hac, and I haven't signed it, you are certainly free to

2    appear and encouraged to appear this morning, and I will come

3    back behind, and again, if I missed one, I will pick that up.

4            All right.  Mr. Perez, good morning.  Are you

5    starting us off?

6            MR. PEREZ:  Yes, good morning, Your Honor.  Thank

7    you, first of all, thank you for hearing us on short notice.

8    Also want to thank the Court staff, Mr. Alonzo, for getting

9    this all together and getting it assigned, you know, right up

10   to the holiday season.

11           And we've been working very, very cooperatively with

12   the U.S. Trustee.  Want to thank them for reaching out in

13   their efforts, and their frankly very, very quick turnaround

14   with respect to all of our motions.

15           With that, Your Honor, I was handling

16   (indiscernible) administration which I think has been entered.

17   So I will have to go on to Mr. Schrock who will be kind of

18   leading us today.

19           In addition to Mr. Schrock, and he'll introduce the

20   company, we have Ms. Ronit Berkovich, one of our partners, and

21   then several of our other colleagues.  Mr. Ferris, who you

22   know, will be handling some of the First Day Motions, but with

23   that, Your Honor, I will turn this over to Mr. Schrock for his

24   comments.

25           THE COURT:  Terrific.  Thank you.

1           Mr. Schrock, good morning.

2           MR. SCHROCK:  Good morning, Your Honor.  Can you

3   hear me okay?

4           THE COURT:  Loud and clear.  I was going to say, it

5   looks like someone got a new pair of AirPods for Christmas, or

6   either we've stolen the young ones.  I'm just obviously

7   joking.  No, you are completely clear.  Thank you.

8           MR. SCHROCK:  Excellent.  Thanks very much, Your

9   Honor.

10           Just echoing Mr. Perez' comments, thanks very much

11   for hearing us on short notice, and thanks very much to office

12   of the United States Trustee.

13           I do think we're down to, I think, one issue just

14   relating to the Chapter 7 challenge period between our

15   proposed Debtor-in-Possession lenders and the office of the

16   United States Trustee will make sure we're corrected on that.

17           Thanks for the Court staff.

18           And we're very pleased to be before you today, Your

19   Honor, having sought Chapter 11 protection in the early

20   morning hours yesterday.  Your Honor, joining me here in the

21   courtroom today, in addition to the other team members that we

22   had mentioned for Weil, we also have my litigation partners,

23   David Lender and Todd Becker Reeves, to the extent there are

24   any contested matters.

25           They'll be handling the witness work.  And we do

1   have our lead investment banker, and I believe he's on camera,

2   John Singh, from TJC Partners --

3            THE COURT:  Know him well.

4            MR. SCHROCK:  I think he submitted it.

5            THE COURT:  And as I said, know him -- I know him

6   well.  I know his skill set.

7            Good morning, Mr. Singh.

8            He hadn't hit five, star, but I read his lips.

9            MR. SINGH:  Thank you, Your Honor.

10            THE COURT:  Got it.

11            MR. SCHROCK:  Yeah, John, don't forget to hit five,

12   star, so you can hear me.

13            We also have Mr. Michael Brose (phonetic).  He's the

14   gentleman with the Core Scientific background.  He is our

15   first day declarant, and he is also in the courtroom with you

16   today.

17            THE COURT:  Thank you.  Good morning, Mr. Brose.

18            MR. SCHROCK:  Your Honor, it's been a tough few days

19   here for the team to get here on the eve of the holidays, and

20   certainly Christmas for many of us.  What I'd like to do is we

21   did file a first day presentation.

22            And I think it'll be helpful just to kind of set the

23   stage to take you and the parties-in-interest through it

24   without -- just to say it, without -- it's a presentation and

25   everybody can have their right to reserve, but we wanted at

1  least give an opportunity to present, you know, how we see the

2  case is coming into it.

3       THE COURT:  Certainly.  Let me ask this before we

4  get started.

5       Mr. Schrock, who is responsible for the Declaration

6  filed on behalf of Mr. Brose at Docket No. 5?  Was there

7  someone who was in charge of that?

8       MR. SCHROCK:  Yes, Your Honor.  You know, I think

9  that certainly Mr. Crabtree, you know, Ms. Berkovich, myself

10  and Mr. Fink, you know, those are the parties that primarily

11  were responsible.

12       THE COURT:  So you think I'm going to criticize, but

13  I wasn't.  What I wanted to tell you, you know, obviously I've

14  read, you know, hundreds of those things.  And normally I come

15  to one of these situations with at least some amount of

16  personal experience.

17       And you know, I work my way through it, and you

18  know, it's -- sometime, most of the time they are of limited

19  help.  This was simply the best piece of writing that I have

20  ever read.

21       I spent about an hour with it, and again, you know,

22  crypto is something when it started coming, I read everything

23  I can find.  I talked to everybody that will talk to me about

24  it, and I often end up with more questions than I started with

25  after I've completed that exercise.

1          And I will just tell you, not that this answered all

2     of my questions.  I would -- you know, whoever's the most

3     knowledgeable, I would love to take them out after the case is

4     over, and you know, happy hour on me because I have all sorts

5     of questions I would love to ask.

6          But it is simply the most persuasive piece of

7     writing I have ever read.  I've actually sent parts of it to

8     other lawyers, a couple of my colleagues that just says you

9     really ought to read this.

10          So whoever it was that was responsible or who led

11     the charge, it's just a nice piece of work.  I wish that

12     everything I read was just as nicely done.

13          So thank you.

14          MR. SCHROCK:  Very good.  It's our pleasure, Your

15     Honor.  And I also failed to mention that, you know, our

16     associate, Destiny Reyes, you know, also played, you know,

17     frankly a very leading role in that, and I should have called

18     her out.  And of course, I was hedging by inserting my own

19     name in that, Your Honor.  But --

20          THE COURT:  Well, I got it.  You were protecting

21     your team.  That's why I could tell.  I appreciated you doing

22     that.

23          MR. SCHROCK:  Exactly.

24          THE COURT:  I got it.  So let me -- who do I need --

25          MR. SCHROCK:  Okay.

1          THE COURT:  -- to give presentation control to?

2          MR. SCHROCK:  I believe that would be Austin

3     Crabtree should be getting that control, Your Honor.

4          THE COURT:  Okay.  Hold on a second.

5        (Pause in the proceedings.)

6          THE COURT:  All right.  Mr. Crabtree --

7          MR. SCHROCK:  Great.

8          THE COURT:  -- should have control.

9          MR. SCHROCK:  Okay.  Great.  All right.  Looks like

10    we're getting the full screen mode.  Let's go ahead and flip

11    the page, please, Austin, and the next page.

12          So Your Honor, just a little bit of background about

13    the company.

14          I know a lot of this is covered in the First Day

15    Declaration.  The company was founded in 2017, and the

16    company's revenue stream was from bitcoin that it mined from

17    film account and for variety hosting services to third party

18    customers.

19          They -- you know, since its inception, the Debtors

20    have built a considerable asset base of approximately 180,000

21    miners, or computers.  They've gained market trust.

22          I believe they're one of the, if not the leading

23    miner here in the United States.  And this company unlike, you

24    know, I would say, you know, some of the companies that we

25    have the pleasure of working with, it is cashflow positive

1    before debt service.

2          It mines bitcoin.  It converts that bitcoin into

3    cash.  And it has been, you know, in the past, in the very

4    recent past very significantly cashflow positive.  It's just

5    had a cascading series of events that have hit it over the

6    very recent past.

7          Its most profitable business segment comes from

8    mining bitcoin with machines that it owns that they're self-

9    mining.  It also has posting for many other companies and it

10    sold wholesale computers.  The miners take care of them and

11    will be provided a fixed case.

12          We have eight fully operational data centers, all

13    located in the U.S.  Those are in Texas, Georgia, Kentucky,

14    North Carolina and North Dakota.

15          We've got a couple of large transactions that were

16    undertaken prior to commencing these cases, including

17    acquiring one of our largest customers, Block Cat.  And that's

18    significantly increased the number of miners.

19          We also entered into a spec merger during which the

20    company merged with a company and changed its name to Core

21    Scientific.  And after going public at the start of 2022, we

22    experienced tremendous growth.

23          You know, market conditions and the price of

24    bitcoin, the price of power and many other things went to the

25    company to refocus our efforts in resource and self-mining.

1     And we've had some challenges over, you know, the third and

2     fourth quarters that we will take through as well.

3              Next page, please.

4              So for me personally, Your Honor, this was a helpful

5     page, not being, you know, fully factual in, you know, what it

6     is that bitcoin mining is.  And you know, admittedly when we

7     first started working with the company, I had to question like

8     how do you even mine, you know, a bitcoin?  How does this

9     actually take place?  This diagram, you know -- it simply is

10    a, you know, when people engage in the transaction, they, you

11    know, have to have that transaction validated.

12             It then is that block chain that's broadcast out to

13    all of the mining nodes across the world, and there's

14    effectively, you know, a competition to see who can complete

15    the algorithm quickly and the fastest in order to prove out

16    the transaction.

17             And those who are first, you know, in fact, you

18    know, get rewarded with a piece of bitcoin.  So the ingenious

19    system is something that has become, you know, certainly part

20    of the contemporary lexicon, but it is something that also

21    happens to be an extremely profitable business.

22             So this business has, you know, a large amount of

23    significant, not just digital assets, but also real assets

24    that support bitcoin mining.

25             Next page, please.

1          You know, the competition and economic effect of

2     bitcoin mining really feed on itself to, you know, cause, you

3     know, some of the issues that we're dealing with.

4          You know, if you get more miners and they increase

5     competition, that increases the overall cost of bitcoin mine

6     including power that, you know, as we saw earlier this year,

7     power costs were a big part during the summer of, and into the

8     fall of what was causing these issues, and certainly the

9     cascading series of events relating to bitcoin.

10          But when you put all of these things in here, it's a

11    relatively simple business model that we've outlined in the

12    diagram below.  And in addition, to control the supply of

13    bitcoin, the reward amount for solving the algorithm increases

14    over time as more bitcoins have been released into the market,

15    and there are fewer bitcoins left to be mined.  It's a fixed

16    supply.

17          And the next big event in this industry -- not the

18    next one, but one of them is certainly there's another having

19    event where they have the number of bitcoins that are actually

20    available that's coming up certainly next year.

21          You know, determining, you know, what effect that's

22    going to have on the company, I think it depends on who you

23    talk to, but I think that, you know, many people believe that

24    you reduce the supply of bitcoin, the price of bitcoin should

25    theoretically increase.

1          And you know, certainly the believers and the

2     investors in this company, the creditors in this company, I

3     think a lot of people believe that listen, this is what's

4     going to happen.

5          Has that always happened in the past, not

6     necessarily, but this particular industry becomes so

7     sophisticated over such a quick period of time, that there's a

8     lot of thought and resources that certainly go into it, and

9     it's really quite amazing.

10          You know, this is a type of business that even just

11     a few years ago we wouldn't think exists, and now we have, you

12     know, couple hundred employees, you know, significant number

13     of investors here, and people that, you know, are really

14     behind this business.

15          We think this company and we are confident that

16     there's a tremendous amount of interest in reorganizing this

17     company.  We will reorganize pursuant to Chapter 11, and we'll

18     take you through an RSA that, you know, is subject to a slot

19     for materiality that we believe could put us in the position

20     to even have even better offers and better opportunities for

21     our stakeholders.

22          Let's go ahead and flip the page then.

23          So this is an overview of our capital structure

24     which is relatively simple.  You know, we have two convertible

25     notes tranches.  They are secured.

1        There's some peculiar aspects of those private notes
2   that we don't have to get into today, but I'm sure will be
3   discussed further on in the future.  We have a lot of miner
4   equipment financing, and a lot of those already -- you know,
5   we were extremely active with -- in the weeks leading up to,
6   and month leading up to these cases.

7        There's, you know, various interest rates behind
8   these.  You know, it depends on -- you know, if you can
9   imagine with computers, it really depends on the type of
10  computer, how new they are, how fast they are as to how much
11  they're going to be worth.

12       We've been working with them cooperatively and in
13  fact, we were trying to negotiate a couple of different
14  transactions leading up to these cases.  But there was a high
15  degree of dialogue with those parties.

16       We also have some non-miner financing, relatively
17  small amounts.  There's an unsecured note owed to B. Riley,
18  and you know, there was certainly a lot of interaction with
19  Mr. Riley, and it was being -- leading up to these cases.

20       We have an unsecured loan, which is called the Novak
21  loan.  And just to look -- give you an impression just how
22  profitable this company was in the recent past.  The EBITDA
23  was 358 million, as of just six months ago.  We think that,
24  you know, as of the recent past, and lowers, you know,
25  significantly.

1          We haven't announced public results so I don't want

2     to get too far in front of the company on that.  But you know,

3     there's other significant liabilities that we are dealing

4     with.  The company, due to its explosive growth, had very

5     significant construction commitments.

6          There's a number of parties out there, and so you

7     have to front load all of these costs, get the miners online

8     and then begin producing.  Simply all of the cap fees series

9     of events that were facing the company, those constructions

10    got ahead of us.

11         We were in discussions with literally many, many

12    parties in the weeks leading up to these cases about certain

13    construction liens across various space, including our

14    noteholders.  And then we have various litigation and disputed

15    liabilities that, you know, we were dealing with leading up to

16    these cases.

17         But this is really a classic case in my view, Your

18    Honor, where we simply -- we had so many things that the

19    company was dealing with so quickly that, you know, we had to

20    get the Court's protection in order to get this company -- to

21    save the company, to get it reorganized.

22         We tried so hard to get this done out of court, but

23    at the end of the day, the Special Committee that was formed

24    made a determination, one that we strongly agree with, that

25    was the right to do this was an open and transparent fashion,

1    you know, to get the company reorganized and to save the

2    company from what was really kind of a cascading series of

3    defaults that we'll talk a little bit about.

4              Okay, next page then.

5              So some of the key parties, Mr. Levitt, the chairman

6    of the board, Chief Executive Officer, someone of extremely

7    high integrity that we've been working with over the last few

8    months.

9              Chief Legal Officer and President, Todd Duchene,

10   senior vice president, the capital market and acquisitions,

11   Mr. Brodis (phonetic).  The Special Committee was apprised of

12   three members, the independent members, Jarvis Hollingsworth,

13   Neil and Youngblood, two Texans, and Neil Goldman that has

14   also been committee member, I know, on a number of Chapter 11

15   cases.

16             The main players with whom we were negotiating pre-

17   petition include the ad hoc convertible noteholders, Paul

18   Hastings, lead by Mr. Hansen, and Moelis, Mr. Brock Klein, as

19   well as equipment lenders from a number of firms, some of

20   which have filed notices of appearance here today.

21             B. Riley is represented by Willkie Farr, and Celsius

22   is represented by Kirkland and Ellis.  I think a number of

23   attorneys need to file notices of appearance.  There is a very

24   significant dispute in our -- you know, leading up to these

25   cases, over the interpretation of that contract.

1            Celsius is obviously is in its own bankruptcy case

2       in front of Judge Glenn, in the Southern District of New York.

3       And I'm sure, you know -- listen, we're looking forward to

4       engaging with them as we move forward.

5            I think it's fair to say we've had our differences

6       in the recent past, but we are -- we're going to look forward

7       and see if we can find a path forward that obviously minimizes

8       expense.

9            But I just wanted, you know, to give a quick shout

10      out.  I really do thank Mr. Hansen, the Moelis team, for, you

11      know, working with us over the last several days.  It's

12      been last several weeks.

13           You know, they've been very good partners.  They

14      have been flexible.  They've worked with the company in, you

15      know -- under very difficult circumstances.  And you know, we

16      do really appreciate that on behalf of the company or involved

17      in the industry.

18           Let's go ahead and flip it, please.

19           So the circumstances in just a little bit more about

20      this.  The climb in the price of bitcoin, the increase in

21      power costs, the Celsius nonpayment of related litigation, you

22      know, why I first became involved, you know, when this dispute

23      was really coming into full view during October.

24           And you know, this was certainly -- it was a very

25      difficult situation.  I think that Celsius felt very strongly,

1     or feels very strongly about their interpretation of the

2     contract.

3           I think it's less of an issue now because frankly,

4     if we, you know, can't work it out, then that means we

5     satisfactorily (indiscernible).  You know, they understand

6     that we have powers of rejection, you know, related to a

7     hosting agreement.

8           I don't think that that's something they would

9     seriously contest.  But that particular issue was causing the

10    company to lose, you know, millions of dollars per month

11    because of -- due to the power pass through issues that were

12    in dispute in that contract.

13          It fluctuates of course because the price of power

14    fluctuates.  You know, the pass through can be a huge problem

15    one month is you're unhedged on power.  It could be not as big

16    of a problem the next month.

17          The price of power's come down recently as we've

18    entered the colder season, but you know, could very well go up

19    as we end up in the truly cold weather season.  The

20    significant construction costs which, you know, with myriad

21    counterparties is also a big problem.

22          And you know, the high equipment financing

23    indebtedness and in particular, amortization payments that we

24    were facing was also a huge problem for us.  We had to stop

25    making those amortization payments in late October, with a lot

1       of miners.

2                  We were working with them to try and find solutions,

3       but even as we were working on out of court solutions, we did

4       have one very significant liability accelerate in the days

5       leading up to these cases.

6                  That caused a corresponding profit fall, even if we

7       sent -- you know, would cause profits to fall under the

8       convertible note, and you know, that was certainly a

9       significant factor for us as we considered, you know, what

10      path do we have to go down here to get the company protected?

11                 And then I think just the litigation and other

12      debts, this is something where we have so many disputes out

13      there, we need the automatic stay, to be very frank.  We need

14      the Court's protection to give the company a chance to be able

15      to look at these things, to move forward.

16                 Okay, let's go ahead and flip, please.

17                 So the only thing I want to mention here, Your

18      Honor, that we haven't talked about, and it's actually not on

19      the page.  But we also were looking at, and had serious

20      interests in, you know, selling non-Core assets.

21                 And I think that there are some assets in the way of

22      certain facilities that we may be able to actually generate

23      some very significant amounts.  But I think there was not

24      time, the real estate and real property listed.

25                 And I know that our estate counterparties when we

1      did execute the RSA in the early morning hours today, they

2      have consent rights under the terms of the DIP financing to

3      consent to those.

4              But we are confident there's real buyers out there

5      that certainly we could be working with as part of this

6      process.  And unlike many of our, you know, other cases, you

7      know, we did have unencumbered assets coming into these cases.

8              The convertible noteholders had the means on, you

9      know, certain soft -- you know, personal property, UCC-1

10     protected property I would say in large part.  But the real

11     property of the company is unencumbered largely.

12             And you know, it takes both of things obviously to

13     generate enterprise value for an operation like this.  And the

14     equipment financiers have liens on the equipment.  Convertible

15     noteholders have liens on certain assets, and then we had

16     unencumbered assets coming into it.

17             So there's going to be many interested parties that

18     I think have a vested interest in seeing this company

19     reorganize.  I think people have strong views about where the

20     value lies related to this company.

21             But we're looking forward to continuing our pre-

22     petition negotiations, and you know, bringing these

23     negotiations to a conclusion and get this company reorganized,

24     you know, for the benefit of all stakeholders.

25             Scrolling, keep flipping, yes.

1           So we did sign a Restructure Support Agreement and

2      it does have, I believe, more than two-thirds of the

3      convertible note tranches that are supporting it.

4           We outlined the claims that are there.  The DIP

5      financing, which is going to be -- we're going to turn to

6      next.  I will leave that primarily to Ms. Berkovich to explain

7      to you exactly where we wind up on the terms which were

8      moving, and you know, being finalized right up until prior to

9      this hearing.

10          But it does provide for up to $75 million in new

11     money.  It contemplates a roll up, but only at the final DIP

12     hearing.  The interest rates are set forth there and the fees

13     are also set forth as part of the DIP financing.

14          The bad (indiscernible) the company is desperately

15     in need of financing.  We need to get the financing approved,

16     the company needs access to that capital because frankly the

17     company is -- you know, the cash balance is almost at zero.

18          Going -- flip, please.

19          Under the terms of Restructure Support Agreement,

20     there's exit term loans that we can entered into, you know.

21     If we're unable to obtain an exit term loan facility, we can

22     roll up the DIP facility into an exit facility.

23          There's mortgage exit financing that can't exceed

24     45 million, to secure the company's debt in the Texas data

25     center.  And the company has the option to terminate this deal

1     if it's inconsistent with its fiduciary duty.

2              The fiduciary duty of, you know, termination of that

3     was something that is as it always is, is subject of a high

4     amount of negotiation.  It was extremely important to the

5     company especially in light of how we had to commence these

6     cases.

7              But you know, I think we'll see if any other further

8     opportunities present themselves, and certainly we hope they

9     do.

10             There's various termination rights that are there

11    that are pretty standard.

12             No, let's go ahead, Austin, you can flip the page.

13             The convertible notes, here's the treatment,

14    97 percent that will be found and shared from a solution by

15    the DIP (indiscernible) to the new.  There's paid back debt

16    for the miner equipment financing that the amounts are their

17    secured collateral value.

18             We do believe that many of the miners are

19    significantly under secured.  I think that'll be something

20    that, you know, is going to be something we're going to have

21    to work on over the near term just to see how those claims are

22    going to be treated.

23             We'd like to reinstate the non-equipment financing

24    to standard secured claim treatment.  The general and secured

25    treatment is set forth there.  There's a concept for

1      management incentive plan for up to 10 percent of new common

2      shares.

3              And then we do have the opportunity at various value

4      levels for significant warrant packages for value to be shared

5      with existing common stakeholders.  That was also something

6      that we were fighting very strongly for, and we are looking

7      forward to see if we can try and improve those terms should

8      the situation (indiscernible).

9              Flip, please.

10             The milestones are set forth here.  One thing is

11     certain about the milestones, I'm certain they'll change.

12     They're always going to be subject to what the Court believes,

13     and we'll have to see how the circumstances fold out, or

14     unfold in these cases.

15             Right now, we're contemplating a six-month case.

16     And you know, with any commodity based case, I think it's

17     worth just emphasizing, you know, a lot of the value of this

18     company is dependent on the price of bitcoin.

19             So I don't think anybody can predict at the moment,

20     at least nobody I know, of what the price of bitcoin is going

21     to be, you know, a month out, let alone six months out.  So

22     we're going to have to be flexible moving forward.

23             We certainly hope the price of the bitcoin goes up

24     significantly, and it gives, you know, the company a chance to

25     distribute further value.  But we'll frankly -- we're just

1    going to have to see how that goes as we move forward.

2              And then looks like -- flip to the next one.

3              So you know, what's our path forward?  We want to

4    pursue the Restructure Support Agreement.  I think that there

5    were any altered (indiscernible) if they present themselves.

6    We are also going to pursue the sale in cooperation with our

7    convertible noteholder partners the sales of non-Core assets.

8              We'll address (indiscernible) the stakeholder

9    disputes and related settlements, I think including the

10   Celsius and other parties.  And frankly just proceed with a

11   Plan of Reorganization and emergence.

12             So it's a relatively straightforward path forward.

13   We'll see how easy it becomes, or how hard it becomes as we

14   move forward, but Your Honor, I'm happy to answer any

15   questions, or I'm prepared to try to move the evidence in, in

16   support of the relief we're seeking today.

17             THE COURT:  Thank you, Mr. Schrock.

18             I do have just one question, and it just sort of --

19   as I look at the timing and I try to get a general feel for

20   things.  This -- oh, I agree with you.

21             This all seems relatively straightforward with the

22   exception of, you know, dealing with the valuation issues with

23   the equipment financiers.  Are you contemplating some sort of

24   expedited process, you want to try to wait?

25             I don't know how you'd do that, but are you trying

1    to wait till after confirmation?  Did you have thoughts on

2    that, just as I try to work through the schedule because I

3    will tell you, the schedule doesn't bother me all.

4          My view is it's actually too long.  But I also

5    understand that, you know, there are whole host of issues that

6    you're trying to plan.  I got all of that.  All I'm trying to

7    convey is I do think that the company's better off, the

8    employees are better off, the process is better off to the

9    extent that the company is going to survive, is that it get

10   out sooner rather than later.

11         And so I'm telling you that I'm prepared for a

12   process that's quicker than the one that you outlined.  It's

13   also not going to bother me if it turned out to be longer

14   because those are just things that happen.

15         But I am -- when I read through everything, the one

16   thing that stuck out at me is it is a big issue is how do you

17   deal with the valuation issue on the equipment financiers?

18         MR. SCHROCK:  It's a great question, Your Honor.  If

19   I could just give a couple points to that?

20         So one of the first issues that may present itself,

21   I think there would be (indiscernible) related to the

22   equipment financiers would -- you know, we contemplated ask

23   for a protection package for the equipment financiers that's

24   allowed under the terms of the DIP financing.

25         There's been a lot of reservations of rights that

1     have already been filed, and I think that between the interim

2     Order and the Final Order, there's going to have to be some

3     discussions with those equipment financiers to see exactly

4     what are we going to do, is there going to be a change in

5     terms, are we going to have a dispute?

6            You know, and it's unique to each equipment

7     financier, you know, what their -- you know, how they should

8     be treated.  I also think that, you know, we're certainly

9     going to come to a point here, and we hope to work this out

10    consensually.

11           But I think depending on how those initial

12    negotiations or discussions go, and then moving forward with a

13    plan, you know, we are going to have to determine, you know,

14    the value of their collateral in conjunction with the plan

15    process.

16           I don't have a straight answer for you, Your Honor,

17    about when precisely we would do that, but I, you know, think

18    that there's so many parties, you know, and in this world that

19    are interested in the company including potentially some of

20    those equipment financiers.

21           You know, it's an ecosystem that depends upon one

22    another.  You know, for all I know, some of those parties may

23    be interested in investing in the company in one form or

24    another.  And I think with Celsius, with whom, you know, we're

25    hosting a significant number of companies.

1          They are also, I should note, one of our largest

2     convertible noteholders, and they, you know, certainly

3     expressed an interest in trying to have discussions with us

4     related to what's going to happen to their machines, and you

5     know, are we going to continue hosting, if so, on what terms,

6     how is all that going to work out?

7          But I think, Your Honor, hopefully as between now

8     and the second day hearing, we can lay out in conjunction with

9     our RSA parties a process for you that will bring it forward

10    in an organized fashion, you know, to determine the value of

11    that collateral.

12         Right now, we think it's significantly under

13    secured.  I'm sure they have different views about that, and

14    I'd probably leave it there.

15         THE COURT:  Fair enough.  All I was really trying to

16    convey, as the parties start to talk, and I do realize that

17    each particular party may be a distinct case.  I am -- you

18    know, this is not something that is going to be foreign to me.

19         It's relatively easy for me, from my point of view.

20    And to the extent that perhaps Rule 7001 implicates the

21    outcome and the parties are willing to proceed under 9014, you

22    know, happy to do that.

23         I am more than happy to create an expedited process

24    that reserves the rights of everybody, but to get an answer to

25    some of this relatively quickly because I do think that it's

1    important, and I do think that it drives perhaps at least part

2    of this.

3              I may be completely wrong, but happy to entertain

4    all of that.  It's not going to bother me, surprise me, and I

5    look forward to you all continuing to talk because I do agree

6    there probably do need to be some more discussions.

7              I just simply was trying to convey to everyone, I am

8    going to be incredibly flexible in terms of coming up with a

9    process that gets some of those answers because I don't think

10   we can really get -- I don't think we can know what the end

11   looks like until we get some of those issues resolved.  That's

12   all I was trying to convey.

13             And with respect to the Celsius issue, again happy

14   to drive that on an expedited schedule.  Obviously I want to

15   be -- and I don't follow Celsius, nor do I talk to Judge

16   Glenn, not for any reason, other than I just won't talk to

17   him.

18             I obviously don't want to step down on Judge Glenn's

19   process, but to the extent that, you know, that end is

20   covered, and the parties want to have an expedited process to

21   try and move that issue forward.

22             I don't really see that as important as I do the

23   equipment financiers.  I obviously may be wrong, but I'm going

24   to be open there again so long as you respect Judge Glenn's

25   process in his case.

1          MR. SCHROCK:  No, heard loud and clear, Your Honor.

2          And you know, on Celsius, we were actually going to

3    go to trial over an equipment interpretation issue and the

4    Celsius Chapter 11.  We agreed, you know, consensually with

5    the team, that listen, looks put it off, just in light of

6    everything that's going on with Core Scientific.

7          You know, I'm not sure if that's really going to be

8    necessary to have that trial at this point, just given that,

9    you know, there -- it's one thing to interpret the contract.

10   I think it's another thing if we can't work it out to just --

11   to deal with rejection issues.

12          And so I think that we're still talking.  We have a

13   good relationship with the team and we'll certainly move

14   forward, you know, in an efficient manner as possible, but I

15   think that, you know, there should be an opportunity for

16   people to speak.

17          THE COURT:  We could have a joint hearing with Jones

18   and Glenn.  That would be exciting for everybody.

19      (Laughter.)

20          MR. SCHROCK:  Yes, it would.  Yes, it would, Judge.

21   We'll try and avoid that, but I will -- that would be

22   exciting.

23          THE COURT:  No, I was just having a little fun with

24   you.

25          MR. SCHROCK:  So --

1          THE COURT:  Let's -- before we go to Ms. Berkovich,

2     let me just take a pause and see does anyone else want to make

3     what I'll just take as opening comments, or just a statement

4     of where you see the case going, or particular problems you

5     want to highlight for me?

6          And again, if haven't already done so --

7          MR. HANSEN:  Yes, Your Honor.

8          THE COURT:  Mr. Hansen, I'm happy to start with you.

9     I don't think I've seen you since the big event.

10     Congratulations to you and your team.

11          MR. HANSEN:  Thank you very much, Your Honor.  I do

12     appreciate that.  It's nice to see you again.  I just wanted

13     to take a minute and introduce you to who we are in this one.

14     So first, I also want to say thank you to Wild (indiscernible)

15     teams.

16          We've all been really hard at work over the last

17     couple of weeks as Mr. Schrock pointed out to bring the case

18     to this point.  As you know, these things are at least quite

19     chaotic.  There's a lot of people in the hearing today who

20     haven't slept very much, not only last night, but for the past

21     couple of nights.

22          And so I just again wanted to convey our gratitude

23     to everybody around the teams.  It's been an all hands effort.

24     I was going to try to take credit for the First Day

25     Declaration, but you know, you beat me to it.

1        So Your Honor, I'd also just want to introduce

2    quickly who we are in the case.  So the convertible notes were

3    issued by the company, obviously pre-petition in connection

4    with the build out of their platform.

5        The holders of those notes, and we represent more

6    than 75 percent of the two tranches of those notes, together

7    more than 80 percent of the August tranche, and more than

8    58 percent of the (indiscernible) tranche.  And we have signed

9    up to the RSA as Mr. Schrock pointed out.  So those two

10   tranches of notes are working together.  They've hired us as

11   their counsel, and (indiscernible) as their investment banker.

12       And I want -- it's not the usual case where we show

13   up and we say that 100 percent of the holders of these notes

14   were the original purchasers of these notes, Your Honor.  And

15   I think that's important for you to understand because the

16   speed in which the crypto currency world writ large, so to

17   speak, has been impacted over the course of the last couple of

18   quarters.  It has resulted in an awful lot of tumult for these

19   businesses.  And so people believed in this business, they

20   invested in this business as original holders, and they still

21   hold those notes.

22       And so it's not been fun for them to see where the

23   price of the coin is right now, and to see what happened with

24   respect to the company.  And so for them to come together and

25   not only support this restructuring, but also be prepared to

1    write a money check into it from a DIP lending perspective

2    because they're also serving in the capacity of DIP lenders,

3    is a real testament to their desire to stick to this process,

4    and their belief in the future of the company.

5         However, they also know that this company has

6    sustained an extraordinarily volatile larger universe.  You

7    only need to look at the price of bitcoin and where it's been

8    and where it is now.

9         There's lots of hopeful people that hope it'll go

10   back in the other direction.  But we aren't in the future,

11   we're in the now.  And I think for our clients, you know, when

12   you look at the terms of the DIP, or we look at the terms of

13   the restructuring in total, those are very fair terms, given

14   the volatility that's associated with the marketplace and what

15   this company plays.

16        And so that's really all I wanted to say, Your

17   Honor.  And I also wanted to introduce my partners who are

18   with me as well.  You'll see Mr. Collett (phonetic).  He is in

19   one of boxes over here on my computer.

20        So (indiscernible) Collett over there.  And you'll

21   see my other partner, Cheyenne (indiscernible) who is in the

22   other box.  They'll probably be doing most of the talking at

23   the hearing today which I know you can't believe.  But I will

24   probably cede the mic to them for the bulk of it.

25        So nice to see you again, Your Honor.  Thank you.

1          THE COURT:  Got it.  Thank you, and good morning to

2     the team.

3          Anyone else?  Ms. Hardy, I saw you pop on, and I'll

4     ask you, did you have any opening comments that you wanted to

5     make?  And you --

6          MS. HARDY:  Yes, Your Honor, very quickly.  Jennifer

7     Hardy of Willkie Farr, on behalf of B. Riley, financed secured

8     noteholder in these cases.

9          Your Honor, I'd like wholly to reserve all rights

10    with respect to the final DIP here.

11         There are aspects of the DIP which are problematic,

12    particularly as an unsecured creditor, the one (indiscernible)

13    the roll up.  You know, as Mr. Schrock mentioned in his

14    opening presentation, there are substantial unencumbered

15    assets here.

16         And those, that value would be swallowed by

17    essentially 100 percent fee on the DIP borrowing.  But you

18    know, it's that, and other issues are issues for the final

19    hearing, and would certainly be subject to close scrutiny by

20    the Creditors Committee.  We're not formally objecting to

21    today's relief, but just want to put that reservation on the

22    Record.

23         THE COURT:  Fair enough, Ms. Hardy, and I look

24    forward to B. Riley submitting a far better and cheaper DIP.

25         MS. HARDY:  Thank you, Your Honor.

1          THE COURT:  Anyone else?

2          I think I saw Mr. Silverman?

3          MR. SILVERMAN:  That's right, Your Honor.  This is

4    Matthew Silverman, Pryor Cashman.  Good to see you this

5    morning, Your Honor.  Good morning.

6          Your Honor, I represent (indiscernible).  It is a

7    digital asset mining company and a customer of the Debtor,

8    third party hosting services.

9          We are involved in a pre-petition litigation with

10   the Debtor which is noted in the Debtor's First Day

11   Declaration.  The suit involves claims in excess of

12   $35 million tied to a deposit that was paid to the Debtor.

13         But curiously, the Debtor didn't include

14   (indiscernible) on their top 30 creditor list despite the fact

15   that (indiscernible) was brought in at I believe number two on

16   that list, haven't been included.

17         I raised this issue with Debtor's counsel prior to

18   the hearing.  I haven't received a subsequent response on that

19   yet.  That said, (indiscernible) doesn't object to any of the

20   relief sought today.  I rise merely to introduce ourselves to

21   the Court, and note that we intend to be an active participant

22   in these cases.

23         THE COURT:  And number one, thank you, and I assume

24   that if you hadn't already reached out to Mr. Ruff, he now

25   knows that you exist, and he's made a note about that.  So I

1    appreciate you're doing that.  All right.

2              MR. SILVERMAN:  Thank you, sir.

3              THE COURT:  Anyone else?

4              MR. FERRIS:  Yes, Your Honor.  Can you hear me?

5              THE COURT:  Yes, sir.  Go ahead, please.

6              MR. FERRIS:  Good morning, Your Honor, Matt Ferris,

7    Haynes and Boone, on behalf of BlockFi.  We are one of the

8    mining equipment lenders in this case, and this is mentioned

9    in the papers.

10             And as Your Honor may be aware, we are a leading

11   crypto currency lender that is subject to our own capital

12   lending proceeding that's currently pending in the district of

13   New Jersey.

14             And I mention that only because we are very much in

15   this industry and are a sophisticated party, and as reflected

16   in the First Day Declaration and other papers, Your Honor, we

17   currently have -- it's really two that collectively have a

18   principal balance of approximately $54 million, which are

19   secured by approximately 14,500 of these AS IC mining

20   machines.

21             We are one of a member of this group.  As Debtor's

22   noted, we are not all exactly in the same situation.  But we

23   did very quickly mobilize as a group yesterday, and began to

24   try to coordinate efforts on identifying our concerns with

25   respect to the DIP and the first day rulings request, to make

1    this as efficient as a process as possible.

2           We've been engaging with the Debtors as a group, and

3    I think as a result of that, we've been able to narrow the

4    issues pretty substantially for today.  I don't speak on

5    behalf of the other lenders, but I have been tapped with

6    because we are similarly situated, trying to coordinate our

7    comments so that we don't all have the stand up and rise and

8    repeat the same comments.

9           I will say, and I'll reserve my comments for the DIP

10   motion which -- that relates to the DIP motion, there are some

11   open issues with respect to the DIP motion.  I did just want

12   to say for purposes of today's hearing though, you know, one

13   of the overarching concerns from our standpoint is -- well,

14   one of them of course is the issue that you bring, the

15   valuation issue, Your Honor.

16          And we do think that's going to be an important

17   issue, and we don't necessarily agree with the value that the

18   Debtors have put forth, but we will take that issue up in due

19   course.

20          A second overarching issue for us is adequate

21   protection, and there is a adequate protection package

22   provided in the DIP Order that is in the form of a

23   (indiscernible).  So we could talk more about it when we get

24   into the DIP Order itself.

25          But the DIP budget does not have any provision for

1    payment of monetary adequate protection.  We confirmed with

2    Debtor's counsel that they do not anticipate making monetary

3    adequate protection payments at this point.

4            And as reflected in the Debtor's papers, you know,

5    they are in crypto currency mining business.  They intend to

6    use our equipment, collateral on a go-forward basis.  The DIP

7    budget shows that they intend to fund a substantial portion of

8    this case with proceeds of, you know, the coins mined from

9    using that equipment collaterally.

10           And we believe, my client believes, Your Honor,

11   that there is a, you know, tangible and demonstrable

12   diminution of value that occurs every day that this equipment

13   is used.  Obviously there's a diminution value that's related

14   to physical use.

15           My understanding is these -- this equipment

16   typically run 24 hours a day, and so there's just a natural

17   physical deterioration that happens.  Of course, we're talking

18   about tech equipment so there's a performance obsolescence

19   aspect to this as well as new technology comes online.

20           There's also an issue of each piece of mining

21   equipment is housed in its proportional share of bitcoin as I

22   understand it, Your Honor.  And as there's even more mining

23   equipment, or a reduction in the available bitcoin which you

24   heard Debtor's counsel reference a halving of the available

25   bitcoin to be mined in April, 2023, that obviously reduces the

1    proportionate value of each piece of mining equipment.

2              And then of course, there's more supply and demand

3    issue, and there's more of this equipment available for sale.

4    That has a corresponding effect on the value of the

5    collateral.

6              So all that's to say, Your Honor, we believe

7    adequate protection is an important issue.  We believe that it

8    needs to be addressed.  We don't feel that what has been

9    proposed in the interim DIP Order is a sufficient adequate

10   protection package.

11             We've already had some preliminary discussions with

12   the Debtors and the DIP lender's counsel about this issue.

13   We've all committed to work constructively on this, on a

14   go-forward basis, so we're not going to hold up the hearing

15   today on this issue.

16             But I do want to mention it because, you know,

17   obviously this is a time sensitive issue for us.  The longer

18   this process goes, and we don't have resolution on adequate

19   protection, you know, the more we believe our position is

20   impaired, particularly given that the Debtor's position is

21   that we are significantly under collateralized already.

22             So you know, we will work diligently to try to

23   resolve these issues consensually over the coming days and

24   weeks.  But to the extent we're not able to do that, we very

25   well may have to come back before your Court on a motion for

1    adequate protection.

2           With that, Your Honor, I'll reserve my comments on

3    the DIP, for the actual -- taking that up.

4           THE COURT:  Certainly.

5           MR. FERRIS:  Thank you.

6           THE COURT:  So Mr. Ferris, so that you know, I mean

7    I am sensitive to these issues.  I do understand the

8    degradation that occurs when electronic equipment is running.

9    I also understand the degradation of electronic equipment when

10   you turn the power off.

11          So I've got all of that, and the commitment that I

12   was trying to convey when -- obviously, you guys are all super

13   great at what you do.  But when you hit loggerheads, don't

14   wait.  I am ready to jump in and deal with this issue.

15          And I do understand the critical nature of the

16   issue, and that everybody needs to know where they stand.  So

17   the commitment I was trying, when I was responding to

18   Mr. Schrock, the commitment that I'm making to him, to you, to

19   all those in the same situation, I am ready to go on that

20   issue because I understand how important it is.

21          And as soon -- if you all can agree on a process,

22   you know, I will do my best to accommodate.  If I need to

23   clear time, and obviously the sooner you can let Mr. Alonzo

24   know that a problem is coming, the harder I can work to try to

25   create the time to try and resolve some of these issues.

1          So number one, I hear you loud and clear, and I'm

2     ready to go as soon as your -- and I'm sorry to say, your

3     clients, your group.  And I got the position that you're in

4     today.

5          MR. FERRIS:  Appreciate that.  Thank you, Your

6     Honor.

7          THE COURT:  All right.  Thank you.

8          Is there anyone else?

9          MR. KOENIG:  Good morning, Your Honor.

10         MR. TWOMEY:  Good morning, Your Honor.

11         THE COURT:  So I think I saw Mr. Koenig first.

12         Mr. Koenig, good morning.

13         MR. KOENIG:  Good morning, Your Honor.  Chris

14    Koenig, from Kirkland & Ellis on behalf of Celsius Mining,

15    LLC, and its affiliated Debtors and Debtors-in-Possession with

16    a case pending in Southern District of New York.

17         Prior to its bankruptcy filing, Celsius ran one of

18    the largest bitcoin currency platforms in the world.  In

19    addition to that, retail customer base included in this,

20    Celsius also owns and operates one of the largest crypto

21    mining businesses in the United States through Celsius mining.

22         Celsius Mining is one of the largest customers of

23    the Core Debtors.  We have over 37,000 rigs that are deployed

24    in four (indiscernible).  They host our rates and mine bitcoin

25    for us.

1          Celsius has continued its mining operations

2     following our own Chapter 11 filing, in the ordinary course of

3     business.  As Mr. Schrock, we're one of their largest

4     convertible noteholders as well.

5          We have $54 million of the convert, which is about

6     10 percent of the issuance.  And as Mr. Schrock previewed, we

7     have an ongoing contractual dispute before about provisions in

8     the contract (indiscernible) passed the power charges to us.

9          We filed a motion in our case, they filed a motion

10    for evidence (indiscernible) in our case.  We mutually agreed

11    to abate that litigation to see if we could come to sort of

12    consensual resolution given, among other things, for financial

13    distress.

14         And of course, in light of Core's own Chapter 11

15    filing, I understand and appreciate Mr. Schrock's comments

16    that this litigation and disagreement about the contract may

17    be irrelevant given the powers that Core now has.

18         So to be clear, Celsius is focused on the long term

19    future of Core.  We remain ready to engage with Core, and now

20    that they've filed for bankruptcy, see if there's a mutually

21    agreeable path forward.

22         We appreciate Mr. Schrock's comments about looking

23    to the future, and we feel exactly the same way.  As one of

24    the largest noteholders, and customers, we're very invested

25    and continue to (indiscernible) Core.  We've been a little bit

1   on the outside up to this point.

2         I think in part because of the multiple hats that we

3   wear as both a customer and a large noteholder.  And obviously

4   we've had litigation with them recently.  But from our

5   perspective, it's imperati-forward strategy here.

6         We look forward to engaging with the Core Debtors

7   more (indiscernible) the parties.  We don't expect to object

8   to any of the interim relief today, but we just wanted to

9   (indiscernible) and introduce ourselves to the Court.

10        THE COURT:  Well, Mr. Koenig, number one, I

11  appreciate you doing that, too.  You've been in here before.

12  You know how I react when you're -- when you see something

13  that you think would make the process more efficient, or

14  achieve any sort of an advantage in terms of efficiency, I

15  encourage and expect you to speak up.

16        And I again want to be respectful of Judge Glenn's

17  case, but I again, you know I don't like form over substance.

18  I want to get to the heart of the matter.  And you see an

19  issue that's, you know -- needs to be resolved, I'm here, and

20  I expect you to ask.

21        MR. KOENIG:  Okay.  Thank you, Your Honor.  We

22  understand the procedure comment.  Thank you.

23        THE COURT:  Thank you.  I think there was someone

24  else that was behind Mr. Koenig.  Let me just -- anyone else?

25        MR. TWOMEY:  Yes, Your Honor.

1              THE COURT:  Mr. Twomey, I was hoping to hear from

2      you.

3              MR. TWOMEY:  Yes, good morning, Judge Jones.  I

4      appreciate it.  Dennis Twomey with Sidley Austin, on behalf of

5      (indiscernible) LLC.  We did file a short reservation of

6      rights shortly before the hearing.

7              And I'm guessing Your Honor has read that based on

8      some of the comments that Your Honor has already made, which

9      we really appreciate.  As noted, Your Honor, we're not today

10     objecting to approval of the DIP on an interim basis.

11             But we do have an issue that you've already really

12     focused in on, and frankly Mr. Schrock and Mr. Ferris have,

13     too, so I won't go through it all again.  And it's really the

14     point that we want to, you know, highlight is adequate

15     protection here.

16             And we appreciate your willingness to see that it is

17     an important issue, and it's somewhat urgent.  You know, not

18     something obviously that we brought before Your Honor today,

19     but it is an urgent issue in the sense that the equipment does

20     tend to diminish in value, maybe more than some other

21     equipment that we often see in these types of cases.

22             So we really appreciate the comments that you've

23     already made.  The only other point I wanted to just mention

24     for Your Honor, and you've already observed this, too, is

25     that, and as did Mr. Schrock, that not all of the equipment

1    lenders are in the same position.

2           We do believe that (indiscernible) just based on the

3    information, the First Day Declaration likely has, you know,

4    relatively speaking the best collateralized of the equipment

5    loans in the sense that it has more a fixed, relative to the

6    outstanding loan amounts than other parties.

7           And so, you know, that's the position we're in.  We

8    have not quite as much although, you know, we're happy to do

9    whatever is most efficient for this process.  We have not

10   really been speaking a whole lot with the other equipment

11   lenders at this point.

12          We certainly have pre-petition discussions with the

13   Weil team and appreciate those and look forward to continuing

14   that, you know, as we move forward here, and the issue that

15   is, you know, highest in our mind is the one that we've

16   already talked about and other parties have talked about here.

17          So we are going to be looking to see if we can get

18   those issues solved in the, you know, coming days and weeks so

19   that we can get the process moving quickly one way or another

20   on that.

21          And so the only other thing is just to note what

22   everyone else has already noted, we do have some other issues

23   potentially with the DIP financing which we're not going to

24   get into today in part because we still need to get some

25   answers to some of our questions.

1          And so we'll just reserve our rights on all of those

2     issues for the final hearing, and look forward to speaking

3     with the Weil team and others here in the coming days and

4     weeks.

5          Thank you, Your Honor.

6          THE COURT:  Mr. Twomey, thank you.  And again, I did

7     focus on your objection and the issues that are raised.  I

8     want to take just a moment and -- because I don't think -- if

9     you have, I don't remember.

10          But I don't think you've appeared before me yet, and

11     I wanted to just tell you and all others that are in the same

12     boat, Albert Alonzo is my case manager.  His cell phone and

13     email address are posted on my website.

14          He is your vehicle to tell me that you need court

15     time.  I do not ever want my schedule to be the reason that

16     the case can't progress.  So if you need something, and you

17     need scheduling, you know what not to talk to the Court staff

18     about.  And I depend on that degree of professionalism.  But

19     he's there, use him.  The folks who do this on a regular basis

20     here, I think will tell you, he's probably the best part of my

21     court, me included.

22          And so just being able to reach out to him and tell

23     him what you need in terms of timing, or that something's

24     coming, or whatever it is, you know, he's there, and he's part

25     of the overall service.

1          MR. TWOMEY:  Thank you, Your Honor.

2          I really appreciate that, and I have had some

3     dealings with him in the past, in connection with mediation

4     rather than hearings, but everything you have described is

5     absolutely consistent with my dealings with him in the past.

6     So greatly appreciate that, and his willingness to help here.

7          THE COURT:  Of course, thank you.

8          Anyone else before we go to Ms. Berkovich?

9          MR. LOHAN:  Yes, Your Honor.  Good morning.

10          THE COURT:  Morning.

11          MR. LOHAN:  Brian Lohan, Arnold Porter, on behalf of

12     Barings.

13          I only raised to introduce myself in variance to the

14     Court.  We are an equipment lender.  We have attempted to kind

15     of streamline our comments with Mr. Ferris, for purposes of

16     keeping this morning's hearing efficient.

17          We've worked with Ms. Berkovich and Mr.

18     (indiscernible) last night late, and this morning.  I think

19     we've resolved a lot of our issues.  There may be a couple

20     open issues that require clarification when we get to the DIP

21     motion itself, regarding the, you know, DIP lenders not

22     priming the equipment lenders' names.

23          But we really tried to kind of reserve our rights

24     and kick to the final hearing the issues that can be dealt

25     with at the final hearing.  But I just want to introduce

1    myself to the Court, and Mr. Ferris will likely address the

2    Court when it comes to the DIP motion for our case.

3              THE COURT:  Thank you, Mr. Lohan.

4              And again, one, I appreciate you doing that, and

5    two, did I say anything this morning that surprised you or

6    caused you heartburn?

7              MR. LOHAN:  No, Your Honor.  I think the Record and

8    the discussion we've had in the past hour is very much

9    expected to this case, and how to proceed.

10             Thank you.

11             THE COURT:  All right.  Thank you.

12             Anyone else?

13        (No audible response.)

14             THE COURT:  All right.  Ms. Berkovich?

15             MR. SCHROCK:  Your Honor, it's Mr. Schrock.  Just

16   one last point I have before we turn it over.  I think I was

17   supposed to move in the Declaration into evidence before we

18   turn it over to Ms. Berkovich.  But I'm prepared to do that.

19             THE COURT:  My apologies.  Go ahead.

20             MR. SCHROCK:  No.  So Your Honor, (glitch in the

21   audio) --

22             THE COURT:  Mr. Schrock, I think we lost you, and

23   for whatever reason it was very broken, and I'm not sure we

24   heard you.

25             MR. SCHROCK:  Yeah, I (indiscernible) into evidence.

1          Say again, Your Honor?

2          THE COURT:  So I was going -- I was trying to tell

3    you.  Let me ask you.  Are you connected, are you using like a

4    voice over internet to actually dial in?

5          MR. SCHROCK:  I may have been, Your Honor.  Can you

6    hear me now?

7          THE COURT:  I can hear you now, yes, because your

8    video broke right with your sound so I was thinking it was the

9    same string.  But I can hear you now.  So I think what you

10   were doing, I think what I heard was you offered in Mr. Brose

11   Declaration at number five, and that's where we lost you.

12          And now we've really lost him.

13          MR. SCHROCK:  Let somebody handle it.  Sorry, go

14   ahead.

15          MR. PEREZ:  All right.  Your Honor, Alfredo Perez.

16   Your Honor, we would move in those two Declarations,

17   Mr. Brose, and Mr. Singh's Declaration that was filed a bit

18   earlier before the hearing.

19          THE COURT:  All right.  Thank you.

20          Now we've got Perez on evidence.  We have reached

21   new highs.  Let me --

22          MR. SCHROCK:  Nobody (glitch in the audio)

23   Declaration though.

24          THE COURT:  All right.  So let me ask first.  We'll

25   do them one by one.  Any objection to the admission of

1     Mr. Brose Declaration found at docket entry number five?

2          (No response.)

3               THE COURT:  All right.  Then it's admitted.  Any

4     party going to wish to cross-examine Mr. Brose?

5          (No response.)

6               THE COURT:  All right.  Anyone have -- object to the

7     Declaration of Mr. Singh found at Docket No. 98?

8          (No response.)

9               THE COURT:  All right.  It's admitted.

10               Anyone wish to cross examine Mr. Singh?

11          (No response.)

12               THE COURT:  All right.  Thank you.  Then with that,

13     are we -- can we go to Ms. Berkovich?  Ms. Berkovich, my

14     apologies.

15               MR. SCHROCK:  Yes, Your Honor.

16               THE COURT:  All right.  Thank you.

17               Ms. Berkovich, whenever you're ready.

18               MS. BERKOVICH:  Good morning, Your Honor, can you

19     hear me?

20               THE COURT:  Loud and clear.  Thank you.

21               MS. BERKOVICH:  Okay.  This is Ronit Berkovich from

22     Weil Gotshal & Manges, for the Debtors.  Your Honor, the next

23     item on the Agenda is Docket No. 38, the Debtor's motion for

24     approval of DIP financing and use of cash collateral.

25               We separately, last night, filed this budget, Docket

1    No. 97, the DIP credit agreement at Docket No. 96, and just
2    before the hearing, at Docket No. 108, we filed the revised
3    DIP Order and a redlined of that DIP Order against the one
4    that was included with our motion.

5         For evidentiary support of the DIP motion, we filed
6    a Declaration of John Singh at Docket No. 36.  This was just
7    admitted into evidence.  And Your Honor, Mr. Singh, as
8    Mr. Schrock said, is in the virtual courtroom today and
9    available for cross-examination if needed.

10        We also, for evidentiary support, relying on the
11   Brose Declaration which was also admitted.  So I would like to
12   start this morning by giving Your Honor a brief overview of
13   the DIP, and a brief summary of the Debtor's pre-petition DIP
14   marketing process.

15        Your Honor, the Debtors and the ad hoc group of
16   secured noteholders have been working around the clock to
17   finalize the terms of the RSA and the DIP.  And as the
18   documents that we filed in the last 24 hours demonstrate, we
19   successfully reached a deal.

20        Everything is final.  There's a few open items in
21   the credit agreements, but those can be resolved this morning.
22   In a nutshell, Your Honor, Debtors seek authority between
23   (indiscernible) finding Debtor-in-Possession financing, and
24   either gets principal amounts of new money, not to exceed
25   75 million (indiscernible) conditions of the DIP credit

1    agreement attached to the DIP motion, and the proposed DIP

2    Order.

3         At the interim hearing today, we're only seeking

4    authority to borrow up to 37.5 million of that 75 million.  I

5    think it's important to note that of the 75 million, only

6    approximately 57 million is fully committed at this time.

7         That number's from the ad hoc group.  However, the

8    DIP is going to be fully self-syndicated to other pre-petition

9    secured noteholders, and our hope is to have the full

10   75 million by the time of the final hearing.

11        Note there is also a (indiscernible) that will not

12   go into effect until the final hearing.  We actually

13   negotiated very hard to push off all controversial terms in

14   the DIP Order until the Final Order.

15        And from the comments that we've heard this morning,

16   I think that we're generally successful.  Just for the Record,

17   we very much welcome (indiscernible) Riley or anyone else

18   coming in to take out this DIP with a better DIP prior to the

19   Final Order.  It's been negotiated very broad, (indiscernible)

20   carve out in the RSA to allow us to talk to other parties

21   about DIP, or a reduction transaction broadly speaking, on

22   better terms than we've been able to negotiate with our pre-

23   petition DIP or noteholders.

24        And we do have unencumbered assets available for

25   that financing, but of course, it's (indiscernible) come in,

1    we have to take out different issues today.

2            We're also seeking to use the pre-petition

3    third-party cash collateral and provide them adequate

4    protection as set forth in the proposed Order.

5            Your Honor, unless Your Honor has any questions

6    about that, I'll move into some of the key terms of the DIP.

7            THE COURT:  So I don't --

8            MS. BERKOVICH:  Our belief --

9            THE COURT:  My apologies.  No, I don't have any -- I

10   don't have any questions.  I do have a couple of comments, but

11   I'm happy to wait until you finish going through the terms.

12           MS. BERKOVICH:  Okay.  I think that based on those

13   (indiscernible) of an Order, so I'll just very high level

14   touch on some of the (indiscernible) or the key terms.  The

15   borrowers will be pursuant to an approved budget with

16   variances, very standard.

17           The maturity of this DIP is six months, and was

18   negotiate and be able to extend the DIP by an additional three

19   months by paying a two percent fee.  Interest rate on the DIP

20   is 10 percent.

21           And very important, one major concession we got is

22   to be able to pay that interest in kind, which eliminates the

23   cash burden on the Debtor during the case.

24           Talking about the fees for a moment.  There are

25   three categories of fees.  These are also all paid in kind.

1    First, there's the new money loan commitment payment.  This is

2    effectively an up (indiscernible) of two percent.

3         Further on the dates the new money loans are drawn

4    by the borrower.  So (indiscernible) over, 37.5 million.

5    There is a backstop payment fee that we're seeking approval

6    of.  I did mention the DIP is going to be syndicated to all

7    convertible noteholders.  But the members of the Ad Hoc Group

8    were already committed 57 million are given a backstop fee for

9    committing (indiscernible) amount.  We initially negotiated

10   that fee to be $2 million for the whole $75 million

11   commitment.

12        As we noted in the DIP motion, which we filed and

13   never (indiscernible) economic issues, which (indiscernible)

14   those economic issues were, we were successful in getting the

15   noteholders to agree that is could be (indiscernible) down to

16   the lower commitment amount.

17        So (indiscernible) 1.6 mil is for the backstop fee.

18   And then these group will also be paid in kind.

19        Then there's the termination fee.  It gets a little

20   complicated but at the time the Debtors payoff of the DIP

21   facility in these circumstances, the Debtors will move to pay

22   115 percent of all outstanding new money loans with cash, in

23   addition to other obligations outstanding.

24        We knew at the time we filed the DIP motion that

25   there was still some back and forth as to whether this

1   15 percent termination fee would apply (indiscernible) with

2   interest, or pay fees on the outstanding loan amounts.

3          That industry should be (indiscernible), it will

4   because it was -- to provide an example, in order to pay off

5   the $37.5 million DIP during the interim period, the Debtors

6   would have to pay -- we would have to pay off that

7   37.5 million, plus the two percent up-front fee, plus the

8   (indiscernible) backstop fee, plus (indiscernible) interest,

9   and an additional 15 percent of all those combined.

10         So just (indiscernible) calculation, that's about

11  four weeks to pay off the $37.5 million DIP.  The Debtors

12  would need to pay almost $9 million more, or $46.25 million.

13         There are additional termination fees for the roll

14  up loans.  And depending on how the DIP is paid off at the

15  exit, but those are really not applicable in the interim

16  period, so I won't get into those now.

17         And as set forth in Mr. Singh's Declaration, these

18  are the best we could negotiate, and we believe they are

19  reasonable under the circumstances as a package deal, and

20  (indiscernible) benefits the Debtors are getting from the DIP

21  financing.

22         Okay.  So we talked briefly, and Mr. Schrock talked

23  about the milestones.  These are set forth in the DIP.  It's

24  actually (indiscernible) nimble, but not super tight.  It

25  gives us the time to (indiscernible) we need to do.

1          I just (indiscernible) our equipment lenders, and

2     maybe somebody else will come along at some point, if the

3     price of bitcoin goes up.  So they're comfortable with these

4     milestones, 75 (indiscernible) file a plan.

5          But there's an additional 75 million, 150 days for

6     the Court to enter the confirmation Order.  And that, they

7     might automatically extend it, extend the maturity date that

8     they have the right to do.

9          And the effective date milestone is 155

10    (indiscernible).

11         The next I was going to turn to the discussion of

12    the collateral and priority and (indiscernible), unless Your

13    Honor has any questions about what I've already talked about?

14         THE COURT:  No, I'm with you so far.

15         MS. BERKOVICH:  Thank you, Your Honor.

16         So I did want to talk about the collateral for a

17    minute.  This is not a typical situation where the primary

18    pre-petition unsecured creditor has a blanket lien on all

19    assets and are only a secured party.

20         We've already heard from some of our equipment

21    lenders this morning, and last night, we heard from one of our

22    parties with a mechanic's lien.  Importantly, the equipment

23    lenders have liens on equipment that's not part of the

24    convertible noteholder collateral package.

25         And we have a lot of real estate that was not

1    encumbered by the convertible noteholders lien.  At this

2    point, over $65 million in mechanic's liens have been filed

3    against that real estate for unpaid construction amounts.

4              And here's how this all shapes out in the DIP Order.

5    So the DIP lenders are getting a first priority lien on

6    substantially all of the unencumbered property.  The DIP

7    lenders are keeping a lien junior to what we call permitted

8    prior senior liens and this is a concept that's changed a

9    little bit in the DIP Order from the version that we had on

10   file yesterday, from what we filed this morning.  And so when

11   I get a chance to walk through the DIP Order, I will point out

12   where this is.

13             But the permitted prior (indiscernible) definition

14   is from the credit agreement.  And I'll read it for the

15   Record.  It's liens on the assets of property financed by the

16   debt or other obligations set forth in Schedule 10.2.2, to the

17   extent such liens and security interest were valid, protected

18   and non-avoidable as of the petition date," end quote.

19             So the Schedule that we prepared as part of the

20   credit agreement with equipment and non-equipment secured

21   loans and mechanic's liens that the Debtors have identified.

22   It does not list the equipment (indiscernible).

23             It also will contain language that would include

24   mechanic's liens that are properly perfected after the

25   petition date, pursuant to Section 536(b).  So it goes back to

1      the DIP lenders for (indiscernible).

2          The DIP lenders are priming, and other existing

3      liens including the convertible noteholders pre-petition

4      liens.  All of those categories are what we call DIP

5      collateral, and the DIP lenders are also getting a

6      superpriority admin claim.

7          Now to move onto the noteholders.  As adequate

8      protection for the diminution in value of their collateral,

9      pre-petition secured noteholders are getting what placement

10     means in the DIP collateral, junior to DIP liens.

11         And they're also getting junior superpriority admin

12     claims.

13         So I will spend a minute on the equipment lenders

14     and lessors.  They are an important (indiscernible), and we

15     have been talking about it for months.

16         This is not the first that we're seeking

17     (indiscernible) from them.  They are many of them, the debt

18     exceeds $300 million.  285 million of that approximately is

19     the debt from the mining equipment, you know, the miners that

20     actually produce the bitcoin.

21         We did in this Order provide, you know, gratuitously

22     from the adequate protection for them, but this Order was

23     never intended to be a conclusive determination, but they're

24     adequately protected.  There's no request for termination in

25     that Order.

1          We understand from talking to their counsel that
2    what we put in there, which I'll get to, may not be sufficient
3    but it is a starting point.

4          They have the right under the Code to ask for
5    adequate protection and we are committed to speaking to them
6    to try to dissolved their concerns about adequate protection,
7    as well as we can (indiscernible) each of them in the
8    (indiscernible) of restructuring.

9          Your Honor early properly touched on some of the
10   issues in the process that might be required for that.  In the
11   first instance, we will try to work out the valuation issues
12   consensually, but we've heard loud and clear that Your Honor
13   is ready to go if we need the Court's assistance with any of
14   this and the Court is very familiar with the issues involved.

15         As Mr. Ferris, the attorney for BlockFi,
16   represented, some of the equipment lenders, not all of them,
17   have organized as a group with some of their concerns, which
18   is coming across that they are concerned over adequate
19   protection in the Order.  That's very helpful to us.  It's not
20   your typical group because they all have different agreements
21   and they have different collateral, they have different
22   values, some are better machines than others, some are more
23   under-secured than others.  They have individual issues, but
24   they also have issues that overlap or they're similar.

25         And so what we do provide in the Order -- this is

1    even prior to the negotiation with them -- we do give them

2    adequate protection claim for any diminution in value of their

3    equipment and adequate protection replacement liens that are,

4    with respect to their existing collateral, senior to all other

5    liens including DIP liens and liens of the prepetition secured

6    noteholders.

7            And then with respect to the noteholder prepetition

8    collateral, the equipment lender adequate protection liens are

9    junior (indiscernible) and these are junior to DIP liens, but

10   *pari passu* with the noteholder adequate protection liens on

11   assets that are currently unencumbered.  And all of this is

12   subject to those lenders having valid and properly perfectly

13   liens.

14           We'll go through the language in the Order in a

15   minute and I'm sure if I didn't get it exactly right,

16   Mr. Gilad will come in and (indiscernible) that, but

17   everything's, of course, just language in the Order.

18           There's also a standard carve-out for professional

19   fees.

20           So I will pause there because this is a little more

21   complex than normal and I don't know if this is the issue that

22   the Court had questions on.

23           THE COURT:  So let me -- now is a great breaking

24   point.

25           So with respect to -- number one, I appreciate the

1    redline.  When I was listening to the opening presentation, I

2    had the opportunity to review the redline that is attached to

3    108.  I don't have any questions.  If you want to highlight a

4    certain provision for me, I'm happy to go there, but I've also

5    had the opportunity to look at and I'm relatively comfortable

6    with what's there and more focused on the changes that were

7    made.  None of the changes caused me any heartburn at all.

8         I do have just a couple of issues that I want to

9    highlight and maybe this will help others, maybe it won't.

10   With respect to the avoidance action issue on the liens that

11   are granted, conceptually I don't have a problem with it.  I

12   do generally ask that there be a last-look provision added

13   with respect to avoidance proceeds and just given the way that

14   this is, I don't see any harm and it takes a strategic concern

15   out of play for me.

16        So I would ask that as you work toward a final

17   because I know that this isn't coming today is that you look

18   at other Orders that the other parties talk about some last-

19   look language for avoidance proceeds.

20        With respect to the roll up, again I got what's

21   being done.  I do really, really like the dollar-for-dollar

22   creep because it protects interests in case something we all

23   don't anticipate occurring, that it just protects everybody's

24   rights and so actually it stops a lot of the jockeying or at

25   least it's been my experience.  So I would ask that as you

1    look at that roll up is that you think about the dollar-for-

2    dollar creep.

3          And perhaps that's just -- maybe I should explain

4    that because now that I'm listening to myself, that sounds a

5    little weird but it just simply, as advances are made, that

6    the roll up creeps up with the total advances that have been

7    made so I just ask that you think about that.

8          With respect to the exercising of remedies, you

9    covered all of my concerns.  I appreciate your pulling that

10   from somewhere else because again I think that that's just the

11   right balance.

12         I think other than that, again I -- this is

13   expensive money.  I don't think anybody's to say that this is

14   just a bargain.  It's expensive money.  Lending into this type

15   of situation is going to be expensive because I don't know how

16   you assess the risk.  And given the PIC feature, I mean, PIC

17   loans are always expensive and I got that issue too.  It's

18   just part of the risk assessment.  So I understand it.

19   Obviously if Ms. Hardy comes up with something that's better,

20   faster, stronger, cheaper, we're all going to applaud her and

21   have another conversation, but I got it.  It's not out of the

22   range of what I expected to see.

23         I think those are my general comments with

24   respect -- again this is just -- it's an interim request.  I

25   don't know if there are other comments or arguments the

1    parties want to make with respect to the interim with the

2    understanding that again however you all choose to resolve

3    these issues with respect to adequate protection of valuation

4    or otherwise, I stand ready to go.  But if there are other

5    arguments that folks want to make with respect to the revised

6    proposed Order that can be found at Docket 108, I'm happy to

7    hear them and engage.

8             Mr. Ferris, you want to go first?

9             MR. FERRIS:  Yes.  Thank you, Your Honor.  Again for

10   the Record, Matt Ferris, Haynes and Boone, on behalf of

11   BlockFi.

12            Your Honor, I appreciate Ms. Berkovich's comments.

13   Those are helpful.  And those -- they're consistent with our

14   understanding of the way the lien priorities are supposed to

15   look and consistent with the Motion and the Declaration in

16   support of the DIP.

17            Unfortunately, we don't find the Order to be quite

18   as clear on that.  And this permitted prior lien concept,

19   that's a fairly recent concept that's been added and that's

20   not to say that it is not a workable concept, but it

21   references a schedule that we haven't seen yet and so we fully

22   expect that the schedule will be consistent with what's been

23   represented.  We just haven't seen it.

24            And I also have -- my personal preference,

25   Your Honor, is rather than having references to documents that

1    are not necessarily attached to the Order is to just have the

2    Order reflect what's happening, which is that, as we

3    understand it, there is no priming of the equipment miner

4    liens, that any liens that are being granted in connection

5    with the DIP are going to be junior to the valid properly

6    perfected prepetition equivalent of liens as well as adequate

7    protection liens on that that are replacement liens on that

8    same collateral.

9                THE COURT:  Sure.

10               MR. FERRIS:  The one issue -- I'm sorry, excuse me,

11   Your Honor, go ahead.

12               THE COURT:  No, my fault.  What I was going to

13   suggest is, Ms. Berkovich, if you haven't already done so, if

14   you could have somebody send that schedule and maybe even

15   perhaps a highlighted version over to Mr. Ferris?  We've got a

16   number of other things to talk about and perhaps maybe someone

17   else on the Weil team and, Mr. Ferris, someone else at your

18   shop who's involved in this could perhaps talk offline, see if

19   we have an issue or not and then we can revisit toward the end

20   or we can say, "Well, we're going to make -- we're going to

21   add this language or delete that language and we're good for

22   purposes of the interim."

23               Could I ask you folks to do that?  No need to stake

24   out a position.  Let's just get -- let's get to it and see if

25   we have a problem or not.  Can we do that?

1          MR. FERRIS:  That works for us.

2          MS. BERKOVICH:  Yes, sir.

3          THE COURT:  All right.  Thank you.

4          MS. BERKOVICH:  And we send over to Mr. Ferris and

5     the other equipment lenders we've been talking about.  I can

6     represent that his client is on there and then muted.  And I

7     understand why he wants to (indiscernible) himself.

8          THE COURT:  Of course.

9          MS. BERKOVICH:  Any equipment lender that we know

10    about we've put on that schedule.  We worked on that

11    (indiscernible) resolved any issues connected with the Order.

12          THE COURT:  I got it.  If I could do this:

13    Mr. Ferris, do you want this to come to you or is there

14    someone else who is off camera that is as engaged as you are

15    in this issue?

16          MR. FERRIS:  Yeah.  My partner, Arsalan Muhammad, is

17    participating in the hearing as well and he's been on the

18    email traffic so if they can just send it to him, that'd be

19    great.

20          THE COURT:  Fair enough.  I just didn't want to miss

21    someone because we didn't mention them, so that's -- I know

22    Mr. Muhammad well and he will be on this just as quickly as he

23    gets it so terrific.

24          And, Mr. Ferris, I interrupted you.  I didn't mean

25    to do that.  I just wanted to deal with that issue.

1          What was your other concern?

2          MR. FERRIS:  Your Honor, that was the overarching

3    concern.  Again I'm not going to belabor the point on adequate

4    protection.  We will work with the Debtors on that and if we

5    need to come back, we will.

6          I will say that we have not been included in some of

7    the typical secured lender protection so we will continue to

8    work on that in connection with a final.  And as others have

9    done, we just reserve all rights with respect to issues that

10   are set for the final hearing including the roll up

11   as -- to the extent not (indiscernible) as a potential -- as a

12   (indiscernible) deficiency claim.

13         THE COURT:  I got it.  I haven't been involved in

14   those discussions either so we'll just work through those

15   issues together if, as and when they are -- they remain live,

16   okay?

17         MR. FERRIS:  Thank you.

18         THE COURT:  Yes, sir.  Let me ask:  Anyone else?

19         MR. GILAD:  Your Honor, this is Erez Gilad with Paul

20   Hastings.  Can I be heard?

21         THE COURT:  Of course.

22         MR. GILAD:  Good morning, Your Honor.  Erez Gilad

23   for the Record, Paul Hastings, counsel to the DIP lenders and

24   the Convertible Noteholder Ad Hoc Group.

25         THE COURT:  Yes, sir.

1          MR. GILAD:  So my comments address both substance

2     and process, but let me address Your Honor's latest comments

3     first.  In terms of process, it is fair to say that this was

4     an (indiscernible) process that occurred over the last 24-48

5     hours and it was rolling so there is a pending version of the

6     DIP Credit Agreement and the same schedule that is being

7     edited as we speak.

8          And we can confirm, as Ms. Berkovich already did,

9     that Mr. Ferris' client is on this payment schedule so we plan

10    -- we and the Debtors plan to get that over to him right away.

11    We still think that times out.  I think there are some tweaks

12    on our side we want to incorporate and then absolutely we're

13    confident that the materials we send over will (indiscernible)

14    his concerns.  And then if they don't, we'll do our best to

15    address his comments and we can go from there.

16         And in terms of other equipment financing lenders,

17    we hope that we solve this issue not just for Mr. Ferris, but

18    for all the other counsel that reached out.  We told everyone

19    that we would and we hereby represent that the DIP liens do

20    not prime the mechanic liens and they do not prime liens and

21    the machines and equipment that secure the equipment financing

22    to the extent they're validly perfected as of the petition

23    date.

24         If I may, there are some other comments I'd like to

25    make in terms of some of the statements made in respect to the

1        DIP and the final hearing, if that's okay.

2                    THE COURT:  Sure.

3                    MR. GILAD:  One other aspect about the DIP roll up

4        that I think Your Honor will find to be fascinating is the

5        roll up, if and when implemented, does not throw up any

6        interest so a zero percent interest roll up so that, I think,

7        is maybe the first of its kind.

8                    Number two, one clarification.  An earlier iteration

9        of the DIP had a creeping roll up concept to it, but in light

10       of the shift and evolution of the negotiations, the roll up

11       will fully occur upon --

12                   THE COURT:  To their lien.

13                   MR. GILAD:  -- if and when the final Order is

14       entered, but bear in mind however that the amount of the roll

15       up is far below the traditional two-to-one ratio that the

16       Court typically sees.  So I think that between the economic

17       terms of the roll up, the need for the financing, which is

18       essentially a lifeline for the company, we do hope that it

19       will meet with the Court's approval, but again that's all

20       rights reserved at the final hearing.

21                   THE COURT:  Wait.

22                   MR. GILAD:  In terms of --

23                   THE COURT:  Can in interrupt you for just a second?

24       You're just telling me that the creep has no effect because

25       you're going to fully draw at a final hearing.

1          MR. GILAD:  I believe that it may not be fully drawn

2     at the final hearing.

3          THE COURT:  Okay.

4          MR. GILAD:  There may be interim -- there may

5     borrowings that occur from and after the final, but the full

6     committed amount will be rolled up.

7          THE COURT:  I got it.  I just misunderstood what you

8     said.  I got it.  And I wasn't saying that's a requirement.  I

9     just said I like it.  It's easier -- it's an accretive thing

10    for me and there are other issues that I'm willing to just

11    simply bite my tongue on as part of an overall deal and that

12    tends to be one that is easy to accomplish when folks know

13    that I really do like the one-for-one creep.  That's all.

14         MR. GILAD:  Thank you, Your Honor.  The last comment

15    I'll make and because a lot has been made about this in terms

16    of purported unencumbered value.

17         THE COURT:  Uh-huh.

18         MR. GILAD:  Yes, there is unencumbered value in the

19    case, but it's also important to put these into perspective

20    and proper context and not overstate the extent of that

21    unencumbered value.

22         I guess the best practical way to understand the

23    concept is that this is a chapter 11 filing that has been very

24    well previewed.  It's not advertised for many weeks prior to

25    the actual filing date and I think it's fair to say that in

1      looking at the demonstrative exhibits prepared for the First

2      Day Hearing, which is very helpful, I think nearly all members

3      of the capital structure are here in front of you at the table

4      and in court.

5              The Debtors, as far as we are aware, extensively

6      marketed the DIP and were in active dialog with many if not

7      all of the people that are currently before you in the court.

8      And here we are, this is only committed financing that is

9      available to the Debtors.  So I think that that should speak

10     to the overall concept as to the role if any that the notion

11     that there's unencumbered value here would play into future

12     misgivings if any about this DIP financing.

13             So I'll leave it at that other than to say we do

14     appreciate the efforts of the Debtors and their professionals.

15     It's been a very active process.  I'd like to say that this

16     was more than arm's length.  It was arm wrestling.  Ms.

17     Berkovich was very successful in the negotiations.  So I'll

18     leave it at that and thank the Court.

19             THE COURT:  All right.  Thank you, sir.

20             Anyone else?  Mr. Lohan?

21             MR. LOHAN:  Your Honor, Brian Lohan, on behalf of

22     Barings again.  I've been wanting to do this at the risk of

23     opening the floodgates because we tried to streamline

24     everything through Mr. Ferris, but if -- it would be really

25     helpful if Ms. Berkovich or Mr. Gilad could confirm to Barings

1    who will also be on that schedule 10.2 as well.

2            THE COURT:  So let's do this because I don't want to

3    open that floodgate because every single person will do that.

4    I assume that you're on the circulation list for the revised

5    agreement on the schedule.

6            MS. BERKOVICH:  Yes.

7            MR. LOHAN:  Yeah.

8            THE COURT:  All right.  Why don't we -- Mr. Lohan,

9    if you're not, then we need to ask why not, but let's get the

10   schedule so that I don't get every single person saying,

11   "Well, what about me," and "What about me?"  If it turns out

12   that there's a problem, I will sit here as long as we need to

13   and I will be available to resolve this issue, but let's see

14   the document and let's just save the headache if we could.

15           MR. LOHAN:  Of course, Your Honor.

16           MS. BERKOVICH:  Yeah.  We'll send it out when we

17   (indiscernible) with Mr. Lohan, Mr. Ferris and all the

18   (indiscernible) lenders that we spoke to last night.  If

19   anyone else would like to see the schedule, please send me an

20   email.  My email address is on the pleadings and I will send

21   you the schedule as well.

22           THE COURT:  Terrific.  Thank you.  All right.

23           Anyone else?

24           MR. RUFF:  Good afternoon -- or good morning still,

25   Your Honor.  Jayson Ruff for the US Trustee's Office.

1          Can you hear me okay?

2          THE COURT:  I'm clear.  Thank you.  And good

3     morning.

4          MR. RUFF:  Okay, great.  Your Honor, I only rise

5     just to raise the one outstanding issue that we have and our

6     purpose, our role really is more to, in these interim

7     proceedings, just try to preserve people's rights, due process

8     rights and see that the status quo is achieved as much as

9     possible.

10          And the only open issue -- first of all, I just want

11     to extend my thanks to the Debtors and probably the lender

12     group in the background for their willingness to work through

13     what's a very compressed time frame.  The only issue that we

14     still had, Your Honor, was with respect to the time amount --

15     the time allowed for a trustee whether it's a chapter 7 or

16     chapter 11 trustee.

17          THE COURT:  Uh-huh.

18          MR. RUFF:  We would originally propose that there be

19     a 10-day time frame.  We had asked for 60 days.  The Debtors -

20     - and I guess with an agreement -- the lender group came back

21     at 30 days.  We still believe that's a little bit too

22     compressed of a time frame to allow for a trustee to actually

23     perform their duty.  And so we proposed a 45-day period as a

24     compromise so that's the only issue that we have and I just

25     wanted to flag that for Your Honor.

1          THE COURT:  No, Mr. Ruff, I appreciate it very much.

2     I think that 30 days is just fine.  Thank you.

3          Anyone else?

4          MR. TWOMEY:  Yes, Judge Jones, one final request.

5          THE COURT:  Yes, sir.

6          MR. TWOMEY:  Again Dennis Twomey, on behalf of

7     NYDIG.  I think 10(b) -- Section 10(b) of the DIP Order

8     provides that the Debtors will provide reportings to the

9     secured parties and to the prepetition agents of the Ad Hoc

10    Group.  We would ask that those same materials be shared with

11    -- I'm guessing all of the equipment lenders would like them,

12    but I'll certainly -- on behalf of NYDIG, if we could also get

13    those materials shared with us, we would appreciate that.

14         THE COURT:  Unless there's some confidential

15    business reason not to do this.

16         Ms. Berkovich, if we appoint Mr. Ferris as the

17    beginning of the distribution list, would you have any problem

18    adding Mr. Ferris?

19         MS. BERKOVICH:  So I believe what's being asked for

20    now is the reporting that the DIP lenders get under the DIP

21    loan and shortly before this hearing, we were (indiscernible)

22    separate from Mr. Ferris' group asked for that reporting.  We

23    told him that we just need to look at what it is and think

24    about whether there's any confidentiality issues or any other

25    reason, competitive issues that we would not want to give the

1   same level of reporting the DIP lender gets to our equipment

2   lenders.  They're not entitled to reporting at this time.

3          We will work out an adequate protection package with

4   them and some of that might include reporting and we may have

5   no problem giving him reporting that he's asking for.  I just

6   cannot say that at this time.  Perhaps someone --

7          THE COURT:  Fair enough.  So let me deal with this.

8   So, one, I do want to be concerned because of the comments

9   earlier that one or more equipment lenders may be purchasers.

10  They may have other roles in the case and I'm sensitive to

11  that.  I'm also sensitive to competitive issues.  Let's do

12  this -- and again I -- this is not an adequate protection

13  issue with me so much as it is just a transparency of the

14  process issue.

15         So, Mr. Twomey, what I'm going to ask is that you

16  engage on what it is you're looking for because again I'm

17  still learning as well and I certainly am not trying to tip

18  the scale in any direction, but I do like transparency over

19  less transparency and so I'm going to ask you to have that

20  conversation.

21         If it turns out that there is a problem, I am

22  perfectly happy to take that issue up on an emergency basis in

23  and of itself, but I do think it's probably worth -- I mean,

24  now that I've said what I've said, it's probably worth having

25  a conversation just to see what information it is that you're

1    really interested in.

2         And also again I want the professionals to all look at

3    this because I do not want something that, in my effort to

4    have transparency, all of a sudden change competitive

5    advantage or the economics of anything to the Estate's

6    detriment.  So if I could ask you to have that with a promise

7    that if you can't find common ground or there's something you

8    really believe you need, I will take that up on an emergency

9    basis as soon as you ask, okay?

10             MR. TWOMEY:  Thank you, Your Honor.

11             MS. BERKOVICH:  Thank you, Your Honor.

12             MR. TWOMEY:  I appreciate it and I'm confident we'll

13   be able to work something out.

14             THE COURT:  Okay.  Thank you.  Anything else?

15             MS. BERKOVICH:  Your Honor, I did want to just

16   clarify one point in my describing the equipment liens

17   earlier.  The equipment lenders have a lien in about half of

18   the company's miners.  The company also has tens of thousands

19   of miners that are not subject to the liens of the equipment

20   lenders that are part of the collateral that was granted to

21   the featured noteholders.  So I just want to make sure that

22   there's no confusion in the Record on that point.

23             THE COURT:  I am absolutely certain there's all

24   sorts of confusion and we'll just work our way through that.

25   I do want the document to get circulated so we can all not be

1    guessing and trying to be protective and we can actually say,

2    "This works" or "It doesn't work," and we'll just -- we're

3    just going to have to deal with that.  But I got the point.

4    We'll figure out a way to address all this.  But I do want

5    everybody to see the same document so we all know what we're

6    working from.

7           Let me ask -- last opportunity.  Anyone want to

8    raise an issue, have an objection?

9         (No verbal response.)

10         THE COURT:  All right.  Then again with the

11   understanding that we will address many of these issues again

12   at a final, based upon the Record that I've got before me both

13   regarding the lack of alternatives, the nature of the

14   business, the current cash position, I am going to find that

15   the requested relief is appropriate.  It meets the relevant

16   provisions of the Bankruptcy Code.

17           From a practical perspective, we have to be able to

18   get from point A to point B.  It's expensive money, but it's

19   the only game in town and it is money that solves a lot of

20   short-term issues.

21           So I am going to find that the Debtor has properly

22   exercised its business judgment.  And again I think those

23   critical issues that needed to be dealt with on an interim,

24   they have been.  And again we're going to revisit some of this

25   issues on a final, but I'm concern that as best we can -- and

1    it's not always possible to preserve the status quo and it

2    shouldn't be because there is an extension of the value that

3    is sorely needed that is being injected.

4         I'm going to approve the interim request as we have

5    modified with various statements in the Record this morning

6    with again the revisions set forth in what is Docket No. 108.

7    I will approve the DIP on an interim basis.

8         Ms. Berkovich, as you -- as we work through -- and

9    if we need to come back and deal with specific language on a

10   propose Order, we can.  But this is subject to the submission

11   of a revised form of Order that everyone who has an interest

12   or has expressed an interest and seen it has had the

13   opportunity to look at it.

14        The one thing I need to give you is your next

15   hearing date.  Did you have thoughts in mind?

16        MS. BERKOVICH:  Your Honor, I'll just say one thing.

17   We should have coordinated on this before but with everything

18   going on we did not.  I do know that the clients would like

19   the hearing to be before January 21st in Order to get the

20   financing done by then so sometime in that week.  I will turn

21   it over to Mr. Schrock to try to figure that out with you.

22        THE COURT:  Okay.  The 19th or 20th seems to me to

23   give everybody maximum time and still meet the requirement

24   that you've expressed by your client.

25        Do you have a preference, Mr. Schrock,

1       Ms. Berkovich, anyone else?

2               MR. SCHROCK:  The 19th sounds good, Your Honor.

3               THE COURT:  The 19th?  What about -- just given

4       everything else I've got that day, what about 3:30 Central

5       time?  Would that work for everyone?  I know it's a little

6       late in the day for our East Coast colleagues but that's the

7       best for me.

8               MR. SCHROCK:  Okay.

9               THE COURT:  Does that work?  Okay.

10              MR. GILAD:  If I may, Your Honor?  This is

11      Erez Gilad from Paul Hastings.  I'm out of the country that

12      week.

13              THE COURT:  Are you able --

14              MR. GILAD:  Is it possible to -- I don't know if the

15      Debtors are available on Monday, the 23rd, or if the Court's

16      available.

17              MS. BERKOVICH:  That might be a holiday.  If that

18      will give -- if that's okay from a --

19              THE COURT:  Yeah, the holiday is the 16th.

20              MS. BERKOVICH:  Okay.

21              MR. SCHROCK:  Yeah, that's the weekend.  That's okay

22      for me, Ronit, if it's okay for you.

23              MS. BERKOVICH:  I think (indiscernible) 23rd works

24      for the company.  It probably does.  Let me just confirm

25      offline and then we'll confirm the hearing date shortly.

1          THE COURT:  All right.  So let me do this because I
2     have a trial that starts that day, but I will just send
3     everybody to lunch so what I would be offering would be noon
4     on the 23rd.
5          MR. SCHROCK:  Why don't we pencil that in,
6     Your Honor?
7          THE COURT:  Okay.
8          MR. SCHROCK:  And we'll let you know if there are
9     any issues, but that sounds fine.
10          THE COURT:  All right.  Anyone have a problem with
11     noon on the 23rd?
12       (No verbal response.)
13          THE COURT:  Okay.  With objections due -- since the
14     16th is a holiday, objections due by close of business on the
15     17th?
16          MR. SCHROCK:  Uh-huh.
17          THE COURT:  Okay.
18          MR. SCHROCK:  That's good, Your Honor.  And I heard
19     from the company since you've been speaking.  That's a
20     confirmed time.  Thank you.
21          THE COURT:  All right.  Terrific.  And again subject
22     to the submission of a revised proposed Order,
23     Ms. Berkovich, if you would simply just have somebody on your
24     team coordinate with Mr. Alonzo, I will -- and again the
25     redline is always much appreciated, just makes my life a whole

1      lot easier.

2              MS. BERKOVICH:  Understood and will do,

3      Your Honor.  Thank you very much.

4              THE COURT:  All right.  Thank you.

5              MR. SCHROCK:  Thank you, Your Honor.

6              THE COURT:  Yes, sir.  Thank you.

7              What's next?

8              MR. SCHROCK:  Ronit, do you want to turn it over to

9      (indiscernible)?

10             MS. BERKOVICH:  Next on the Agenda is the Motion to

11     approve the payment to critical vendors.  My colleague,

12     Destiny Reyes, will be handling that.

13             THE COURT:  All right.  Thank you.  Let's see,

14     Ms. Reyes -- Ms. Reyes, is fancy.  There we go.  All right.

15     Ms. Reyes, good morning.

16             MS. REYES:  Good morning, Your Honor.

17             Destiny Reyes of Weil Gotshal and Manges, on behalf

18     of the Debtors.

19             THE COURT:  All right.  Thank you.  Whenever you're

20     ready.

21             MS. REYES:  Your Honor -- thank you.  Your Honor,

22     the next item on the Agenda is Item No. 4, the Debtor's

23     critical vendor Motion, filed at Docket No. 4.  The Debtors

24     seek interim authority to pay prepetition claims of certain

25     vendors including those whose goods and services are critical

1     to the Debtor's operation and lien vendors that may be

2     entitled to liens against the Debtors or their customers'

3     assets.

4           We settled any concerns of the United States Trustee

5     prior to this hearing.

6           The Debtors are seeking authority to pay $300,000 in

7     the interim on critical vendor claims and an additional $300

8     on lien claims.

9           MALE SPEAKER:  300,000.

10          MS. REYES:  300,000, yes.

11          THE COURT:  Big difference.

12      (Laughter.)

13          MS. REYES:  Sorry.  Thank you.

14          THE COURT:  No, because my --

15          MS. REYES:  Further, the Debtors --

16          THE COURT:  My salary is $300.  Yours is probably

17    closer to 300,000.

18          MS. REYES:  300,000 for each critical vendor and

19    liens.  Sorry about that.

20          THE COURT:  Quite all right.

21          MS. REYES:  Further, the Debtors seek authority to

22    enter into trade agreements substantially in the form of

23    Exhibit C of the Motion in Order to solidify favorable trade

24    terms for the Debtors.  The Debtors also seek limited

25    authority to pay vendor claims in the event that no agreement

1    can be executed or where one is unnecessary or prohibited.

2           The uninterrupted continuation of the Debtor's

3    business depends upon the continued support of those vendor

4    claimants and we're going to pay the vendors on the terms and

5    conditions set forth in the interim Order, would likely create

6    a crisis in confidence among such vendors and consequently the

7    hosting customers, which would significantly harm the Debtor's

8    business to the detriment of all the stakeholders.  I'm happy

9    to answer any questions Your Honor may have.

10          THE COURT:  All right.  Thank you.  Mr. Ruff, this

11   seems pretty straightforward to me and actually is a modest

12   request.

13          Any concerns?

14          MR. RUFF:  No concerns and they did preview it with

15   us, Your Honor, so we're -- no opposition to this.

16          THE COURT:  All right.  Thank you.  Anyone else wish

17   to address the request?

18      (No verbal response.)

19          THE COURT:  All right.  Again I think the request is

20   modest.  I think that it is undeniable that being able to

21   address transition issues aids in increasing or maximizing the

22   value of the Estate and the ongoing value of the business.  I

23   don't have any concerns of the request.

24          I'll find that under the circumstances, due process

25   has been served and a notice is sufficient.

1          Let me ask:  Ms. Reyes, it seems to me we've got a

2    blank that we need to fill in.  Were you thinking of trying to

3    have this on the 23rd as well or did you have another time in

4    mind?

5          MS. REYES:  The 23rd works for us, Your Honor.

6          THE COURT:  All right.  So let me do this.

7       (Pause in the proceedings.)

8          THE COURT:  So January the 23rd at 12:00 o'clock

9    noon.

10         And objection deadline we said the 17th, didn't we?

11         MALE SPEAKER:  Uh-huh.

12         MS. REYES:  Yes.

13         THE COURT:  All right.  And we didn't pick a time

14   for objections, but it just seems to me if we just said

15   4:00 o'clock Central, does that make sense?

16         MALE SPEAKER:  That's good.

17         MS. REYES:  Yes.

18         THE COURT:  All right.  Ms. Reyes, I have

19   interlineated those blanks on the proposed Order.  I'm happy

20   to show it to you if you don't trust me, but I'm pretty

21   confident I got that part right.

22         MS. REYES:  We trust you.  I do want to flag one

23   thing for Your Honor.  On paragraph 4 of the Order, there is a

24   date of December 31st but we want to change that to

25   January 31st, if there's no objection from Mr. Ruff, as

1      agreed.

2              THE COURT:  Okay.  So you want to --

3              MR. RUFF:  No opposition to that, Your Honor.

4              THE COURT:  All right.  So I'm interlineate -- or

5      I'm going to replace December 31, 2022 with January 31st, 2023

6      in paragraph 4, correct, Ms. Reyes?

7              MS. REYES:  Thank you.

8              THE COURT:  Okay.

9              MS. REYES:  Yes.

10             THE COURT:  Okay.  Anything else?

11          (No verbal response.)

12             THE COURT:  All right.  That Order has been signed

13     and it is off to docketing.

14             Ms. Reyes, what's next?

15             MS. REYES:  Thank you, Your Honor.  The next item on

16     the Agenda is No. 5, the Debtor's insurance Motion filed at

17     Docket No. 13.  We previewed the proposed interim and final

18     Orders with the US Trustee here as well, as well as the Ad Hoc

19     Group and they incorporated minor edits accordingly.

20             In this Motion, we're seeking authority to continue

21     the insurance program and to pay related prepetition

22     obligations related thereto as well as grant limited relief

23     from the automatic stay to permit workers compensation claims

24     to proceed in the ordinary course.

25             Your Honor, like any other company, the Debtors need

1     to maintain a wide variety of insurance programs in order to

2     conduct their business and remain good corporate citizens.

3     Accordingly, pursuant to this Motion, the Debtors are seeking

4     authority to maintain their various insurance programs and

5     (indiscernible) including the payment of broker fees in the

6     ordinary course of business.

7           In this interim period, we're requesting authority

8     to continue these insurance programs and to pay or otherwise

9     satisfy any insurance obligations in the ordinary course and

10    pay for prepetition amounts of $330,000 in property insurance

11    obligations and $5,000 in workers compensation program

12    obligations.  Again I'm happy to answer any questions Your

13    Honor may have.

14          THE COURT:  So let me ask you: what's the difference

15    between the interim request and the final request?  Because

16    doesn't this work a hardship on the company?  Because

17    everyone's going to look at an interim Order and say, "Well,

18    this really doesn't help because it's going to get revisited."

19    I mean, we all want the Debtor to be adequately insured.  I

20    mean, everybody wants that.  But what was the difference?

21          MS. REYES:  Right.  So the difference is really due

22    process and providing notice to those parties that might have

23    any objections in the interim, but providing that adequate

24    assurance and also having this be final would be most welcome

25    for us, Your Honor.

1          THE COURT:  I just -- this just seems to me to be

2    one of the stabilization issues so that everyone can know that

3    the Debtor is a commercial actor adequately insured with the

4    ability -- with no changes waiting to happen.  I just think

5    that it maximizes corporate opportunity.

6          Let me ask it this way: is there any objection to my

7    granting the insurance Motion on a final basis?

8          (No verbal response.)

9          THE COURT:  All right.  With that, again for those

10   reasons that I've expressed -- and I very much appreciate the

11   due process concerns.  This is one of those things that I

12   think the primary concern of the US Trustee and those folks

13   who will deal with the Debtor on an ongoing basis and I think

14   this is just a level of competence that is needed in order to

15   maximize the Debtor's chances going forward.

16         So I am going to grant the Motion.  I had a chance

17   to read it.  And I think the due process has been satisfied,

18   the notice is sufficient.  Given the requested relief and the

19   fact that we've got an active US Trustee present, I'm going to

20   grant the Motion on a final basis.  I'm going to use the

21   proposed form of Order that's found at 13-2.

22         Ms. Reyes, can you just verify that I've got that

23   right?

24         MS. REYES:  Yes, Your Honor, I believe so.

25         THE COURT:  All right.  Thank you.  That Order has

1      been signed and it is on its way to docketing.

2              What's next?

3              MS. REYES:  Thank you, Your Honor.  I'll pass the

4      podium to my colleague, Alex Kane.

5              THE COURT:  All right.  Thank you.  Can I do one

6      thing?  I meant to say this.  I just found my note.  With

7      respect to the DIP Order and the use of cash collateral, there

8      is a standard -- I didn't see it.  There's a standard

9      paragraph that the ad valorem taxing authorities always want

10     and the only thing is since I didn't see it, I just wanted to

11     remind the Debtor of it.  It avoids a fight.  You know it's

12     coming when somebody pays attention to it.  If it's already

13     there and I missed it, my apologies.  That was just a note

14     that I made myself and I'm sorry for not catching it first

15     time.

16             And, Ms. Reyes, I am -- sorry, who did you say you

17     were passing the lectern to?

18             MS. REYES:  Alex Kane.

19             THE COURT:  All right.  Thank you.

20             Mr. Kane [sic]?

21             MS. REYES:   Thank you.

22             THE COURT:  Thank you.

23             MS. KANE:  Good afternoon, Your Honor.  Alex Kane of

24     Weil Gotshal and Manges, on behalf of the Debtors.

25             THE COURT:  Ms. Kane, my --

1          MS. KANE:  Your Honor, the next item on --

2          THE COURT:  I was just going to apologize for

3     calling you "Mister" Kane.

4          Ms. Kane, please proceed.

5          MS. KANE:  It happens more than you think.

6          Your Honor, the next item on the Agenda is the

7     Debtor's taxes Motion, Docket No. 3.  By this Motion, the

8     Debtors are seeking authority to pay taxes and fees that arose

9     prior to the petition date and any (indiscernible) amounts

10    that may come due in the ordinary course.  The Debtors

11    estimate that approximately 8.9 million in taxes and fees

12    relating to the period prior to the petition date will become

13    due with approximately 2.95 million coming due within the 30

14    days following the petition date.

15         The table on page 4 of Docket No. 3, you'll see a

16    breakdown of the categories and the amounts the Debtors are

17    seeking to pay.  The Debtors discussed this Motion with the US

18    Trustee and we incorporated their comments and we believe

19    there are no outstanding objections or issues.

20         Unless Your Honor has any questions around this

21    Motion, the Debtors request that the Court enter the Order

22    approving the Motion.

23         THE COURT:  All right.  Thank you.  And it is the

24    Order that was attached to the Motion?

25         MS. KANE:  Yes, Your Honor.

1              THE COURT:  All right.  Thank you.

2              Anyone else wish to be heard?

3          (No verbal response.)

4              THE COURT:  All right.  Again I think that this is

5      just another matter of operational common sense.  The failure

6      to pay these amounts would result in the imposition of

7      extremely outrageous interest rates -- you can tell I'm  a

8      Texas taxpayer -- as well as penalties.  Again it just makes -

9      - it makes good commercial sense.  I don't have any issue at

10     all.  I've had a chance to review the proposed Order.

11             And, Mr. Ruff, just let me confirm you've had an

12     opportunity to look at the Order and are okay?

13             MR. RUFF:  We have, Your Honor, and we are okay.

14     Thank you.

15             THE COURT:  All right.  Thank you.  That Order has

16     been signed and it is off to docketing.  Okay.

17             What's next?

18             MS. KANE:  Thank you, Your Honor.  The next item on

19     the Agenda is the Debtor's Motion to extend time to file

20     schedules, statements and Rule 2015.3 reports, which is Docket

21     No. 11.  By this Motion, the Debtors are seeking entry of an

22     Order extending the deadlines to file their schedules and

23     statements by 30 days for a total of 44 days from the petition

24     date through and including February 3rd and the 2015.3 reports

25     until the later of 15 days after the 341 meeting or 45 days

1   from the petition date.

2          We believe this is appropriate considering the size

3   and complexity of the case.  Unless Your Honor has any

4   questions, the Debtors request that the Court enter the Order

5   approving the Motion.

6          THE COURT:  So the only question I have is: I want

7   to make sure that this gives you sufficient time to give me

8   you're a-game by the deadline.  We all want these to be right

9   the -- as right as they can be first time out and I don't want

10  to pick a date that's artificial.  I want to pick a date that

11  Mr. Ruff can schedule around, that creditors can have

12  confidence when they see the Schedules that they represent the

13  Debtor's best efforts.  And if you tell me that this works,

14  I'll accept it.  I just didn't want you to propose something

15  because you thought that's what I would do, but it's really

16  not enough time.

17         MS. KANE:  I think we're okay with the dates

18  suggested.

19         THE COURT:  Okay.  And I assume, Mr. Ruff, you've

20  previously okayed this.

21         MR. RUFF:  That is correct, Your Honor.  Thank you.

22         THE COURT:  All right.  Thank you.

23         Then anyone else wish to be heard?

24     (No verbal response.)

25         THE COURT:  All right.  Then I've had a chance to

1    review the Motion.  Again my only concern is that we get these

2    as accurate as they can be by the deadline.  I'll accept the

3    representation that this is sufficient time.

4            I'll grant the Motion.  I've reviewed the Order.

5    It's been signed and it is off to docketing.

6            What's next?

7            MS. KANE:  Thank you, Your Honor.  I'll be turning

8    the podium over to Mr. Fink (indiscernible).

9            THE COURT:  Should I have given you a harder time?

10   It sounds like you got away too easy and she just disappeared.

11   I got it.  I could ask more questions.

12           MS. KANE:  I mean, I'm fine if you're fine.

13       (Laughter.)

14           MS. KANE:  Okay.  Thank you, Your Honor.

15           THE COURT:  Thank you.  All right.

16           Mr. Fink, good morning.

17           MR. FINK:  Good morning, Your Honor.  Moshe Fink of

18   Weil Gotshal and Manges, on behalf of the Debtors.  I'm told

19   that it's almost lunchtime on the East Coast so I'm going to

20   try to be brief, Your Honor.  The first motion that I have is

21   the cash management Motion that's filed at Docket No. 12.

22   Pursuant to the Motion, Your Honor, we request authorization

23   to continue the existing cash management system and what we

24   call a "Bitcoin management system" maintaining existing

25   business forms, intercompany arrangements and company credit

1    cards.

2              Your Honor, that's a pretty standard cash management

3    motion.  The wrinkle that I would just like to flag for Your

4    Honor is that we're also requesting authority to sell Bitcoin

5    in the ordinary course.  Mr. Schrock mentioned an important

6    component of this business is mining Bitcoin and then selling

7    the Bitcoin.  We think it's ordinary course.  We just want to,

8    with an abundance of caution, make sure it was clear that we

9    can continue to do that as described in the Motion.

10             So with that, Your Honor, I wanted to flag that we

11   discussed the Motion with the US Trustee.  We incorporated

12   comments.  We did file a revised proposed Order at Docket No.

13   55 reflecting an additional comments received from the Ad Hoc

14   Group with respect to some reporting under the Motion.  At

15   55-2, there's a redline.  And we'd ask -- request that Your

16   Honor enter that Order.

17             THE COURT:  All right.  Thank you.

18             Anyone else wish to be heard?

19        (No verbal response.)

20             THE COURT:  Mr. Ruff, all of your comments get

21   incorporated?

22             MR. RUFF:  They have been, Your Honor.  Thank you.

23             THE COURT:  All right.  Thank you.  I had an

24   opportunity to review the proposed modified Order at 55.  I

25   don't have any concerns at all with the request.  I think it's

1    just a necessary part of transitioning into a chapter 11 case

2    on an orderly basis.

3            And, Mr. Fink, with respect to the request that you

4    made, whether it's ordinary course or not, I don't know.  I

5    also don't need to reach that conclusion to -- and as part of

6    its ongoing business.  It's clearly set forth in the First Day

7    Affidavit that there's generally a -- that the Bitcoin are

8    liquidated within 48 hours of the award being made and I want

9    that process to continue as the Debtor utilizes its business

10   judgment to make the best possible decisions for the Debtor.

11   And if that -- hopefully that will be sufficient for everyone.

12   If it's not, I'm happy to take some different approach.

13           Let me ask: with respect to your hearing on the

14   final, do you just want to put that on the 23rd as well or did

15   you want to do something different?

16           MR. FINK:  Your Honor, unless someone on my team

17   tells me otherwise, I would like to keep it on the same date,

18   keep everything together please.

19           THE COURT:  Okay.  Anyone on the team want to speak

20   up?

21       (No verbal response.)

22           THE COURT:  All right.

23           MR. FINK:  Mr. Schrock gave the thumbs up,

24   Your Honor.

25           THE COURT:  Okay.  Sorry, I was typing.  Let me -- I

1    have the Order up.  I am interlineating in paragraph 25 so

2    we'll set the hearing on the final to be January 23rd with

3    deadline of the 17th and I'm going to change -- that says,

4    "2022."  We'll change that to 2023.

5              And the last one I think we said 4:00 o'clock

6    Central just so it's 5:00 o'clock on the East Coast.

7              MR. FINK:  Thank you, Your Honor.

8              THE COURT:  Those changes have been made.  I have

9    signed the Order and it is off to docketing.

10              Mr. Fink, what's next?

11              MR. FINK:  Thank you, Your Honor.  The next motion

12    on task is the employee wages Motion that's at Docket No. 6.

13    Your Honor has previewed before the employees are the business

14    here, they're the lifeblood of the business.  Healthy

15    employees so there's nothing to talk about.

16              So pursuant to this Motion, we're seeking to pay

17    certain prepetition obligations owed to employees, about

18    1.2 million.  As discussed in the Motion, there's about 330

19    employees plus additional members of the temporary workforce.

20    We've spoken to the US Trustee.  We've incorporated comments.

21    And with that, Your Honor, we respectfully request that the

22    Order be entered.

23              THE COURT:  All right.  Thank you.

24              Anyone else wish to be heard?

25          (No verbal response.)

1          THE COURT:  All right.  Again you know that I

2     believe that this is the most important motion that we hear

3     all day.  I don't have any concerns at all.  In a business

4     like this, I agree with the comment even more than I normally

5     do that the employees are the business.  The institutional

6     knowledge that exists can't be replaced or at least not

7     easily.  I don't have any concerns at all.

8          I've had a chance to review the proposed Order.  I

9     have signed that Order and it is off to docketing.

10          MR. FINK:  Thank you, Your Honor.  Moving on to the

11     next item on the Agenda, it's the NOL Motion at Docket No. 7.

12     The Motion seeks to establish procedures to protect the

13     potential value of the Debtor's tax net operating while

14     carried forward certain other tax attributes.

15          The proposed procedures with narrowly tailored

16     restrictions and notification requirements with respect to the

17     stock -- with respect to the common stock of Core Scientific

18     and certain options or similar rights to acquire that stock.

19          Your Honor, I'm happy to -- if Your Honor has any

20     questions.  I will let you know that I came armed with a --

21     with one of my tax colleagues.  Mr. Stuart Goldring is in the

22     room with me in case Your Honor has any specific questions.

23          THE COURT:  I don't want him to feel like he came

24     for no purpose.  I mean, I can -- I'm happy to engage.  I also

25     think that again this process exists to protect everyone and I

1    think the process that has been employed is rational, it's

2    balanced, it protects all parties, it gives everyone the

3    opportunity and tells everyone how you come back if you want

4    relief from the -- from proposed requested relief.

5        I do have one question because again this is one of

6    my market certainty issues and I always ask.  And if you've

7    made an agreement, I'm not trying to change it, but this is

8    one of those that I believe ought to be done on a final basis

9    because you're going to send this out, people are going to

10   rely on it and if you send out an interim Order, then you run

11   the risk of people go, "Well, we're after that deadline, this

12   Order doesn't mean anything" or you start getting various

13   interpretations.

14       So unless there is some agreement that I'm not aware

15   of and maybe even if there is, I'd like to understand why we

16   shouldn't do this on a final basis.

17       MR. FINK:  Your Honor, I think that works for us,

18   Your Honor.  Mr. Goldring concurs with me.

19       THE COURT:  I really want to ask him something now

20   that I know he'll disagree with just to give him an

21   opportunity, but I won't.

22       MR. FINK:  Thank you, Your Honor.

23       THE COURT:  Mr. Ruff, let me ask you: have you had

24   the opportunity to look at 7-2, Mr. Ruff?

25       MR. RUFF:  I have, Your Honor.

1          THE COURT:  Do you have any concerns?

2          MR. RUFF:  No, Your Honor.  And I think in the past

3     the way we've dealt with this: as long as parties, if they do

4     have an issue with it, if it's without prejudice for the right

5     to seek relief from the Order, no issues --

6          THE COURT:  Absolutely.

7          MR. RUFF:  -- of it going final just so there is

8     certainty in the process.

9          THE COURT:  Absolutely.  Quite frankly, the Order

10    itself says, "If you want relief from the Order, here's how

11    you go about doing it."  And it's that process that I am

12    concerned with because I don't inadvertently want something of

13    value to disappear simply because -- perhaps even acting in

14    good faith.  I want to make sure that we don't trip over that.

15    So anyone can come back in and say, "This Order should be

16    modified in the following way for the following reasons,"

17    we'll have a hearing and we'll just deal with that.  So with

18    that, I have the proposed final Order that was filed at Docket

19    No. 7-2.  I've had a chance to review it.  Again I think this

20    is one of those market certainty issues.

21          Mr. Fink, if I could ask you: do you have a copy of

22    the Order available to you?

23          MR. FINK:  Yes, I do, Your Honor.  Let me -- yes,

24    Your Honor, right in front of me.

25          THE COURT:  Okay.  So what I would like: if you

1       would go to page 3 -- no, I'm sorry, it's actually page 2.

2       It's just the page numbering is off.  The second page.  The

3       paragraph that's above the "It is ordered," that page.

4               MR. FINK:  Yes.

5               THE COURT:  If you would go to the line that begins

6       "Notice need be provided," and it reads --

7               MR. FINK:  Yes, Your Honor.

8               THE COURT:  -- "And the Court having reviewed the

9       Motion, the Court having held," I'd like to strike the word

10      "interim" so it just says, "The Court having held a hearing on

11      the Motion."

12              MR. FINK:  Yes, Your Honor.

13              THE COURT:  And I would like to strike the rest of

14      that line, the entirety of the next sentence and then the --

15      and the next sentence all the way through the semicolon so it

16      would read now that "The Court having held a hearing on the

17      Motion and all objections (indiscernible) to the Motion been

18      withdrawn, resolved or overruled," and then it continues on

19      and in my mind reflects what we have done today.

20              Do you have any concerns or objections?

21              MR. FINK:  Thank you, Your Honor, that works for us.

22      Thank you.

23              THE COURT:  Thank you.  And with that, I have signed

24      the Order as modified on the Record.  I do think that the

25      notices and the attachments all again are easy to read or

1    easily understandable.  They accomplish the task in a very

2    balanced, evenhanded way.  I have signed that Order and it is

3    off to docketing.

4         Mr. Fink, what's next?

5         MR. FINK:  Thank you, Your Honor.  Next is

6    utilities.  That's at Docket No. 8.  Your Honor, I just wanted

7    to raise just two points about this.  In case Your Honor was

8    wondering or noticed this, the utility numbers in this Motion

9    are probably a bit higher than what Your Honor's accustomed to

10   seeing and that's due to what Mr. Schrock talked about before.

11   The amount of power necessary to run this business are large,

12   enormous.  So in order to run the data centers and the miners,

13   power is needed.

14        And the second point I just wanted to flag for

15   Your Honor is that unlike a, I guess, traditional utilities

16   motion where we talk about the -- only deposit, a number of

17   the company's utilities are on prepayment terms already prior

18   to the petition date and we're just seeking as adequate

19   assurance to continue that arrangement post-petition.

20        If you look at the -- if Your Honor looks at the

21   chart at the end of the Motion, the schedule, some will be

22   prepaid, some will get the deposit and the deposit as set

23   forth in the Motion will be about $6.75 million.

24        So other than that, Your Honor, we respectfully

25   request that Your Honor enter the Order.

1           And with respect to these hearings, if my math is

2   correct, I think the 23rd is 30 days out from today so if

3   that's the case, Your Honor, I would just propose to do the

4   utilities hearing at that same hearing as well.  I know

5   Your Honor's busy that day so if Your Honor wants to do that

6   another day, that's fine too but --

7           THE COURT:  All makes perfect sense to me.  Let me

8   ask first before I respond to the things you said.

9           Anyone else have a concern about this?

10          Mr. Ruff?

11          MR. RUFF:  No concerns.  We were able to preview the

12  Motion and work through any comments that we had, Your Honor.

13  And we're aware of the Debtor's need (indiscernible) in this

14  market and so no opposition to the Order proposed.

15          THE COURT:  All right.  Thank you.

16          Then, Mr. Fink, number one, I greatly appreciate

17  your pointing out the differences.  This is -- and I got it.

18  This is one quite honestly I expect -- it isn't going to

19  surprise me because we never see utilities pop in on these,

20  but if there was ever going to be a case in which they would,

21  this may be the one.

22          And again I think having the process as a place

23  where people can say, "Well, at least here's where we are,"

24  and they can make a business decision as to whether or not

25  they want to look for something different makes just perfect

1      sense to me.  The size of the deposit doesn't bother me at

2      all.  I understand the nature of the business and what drives

3      the business.

4              And I think the process again satisfies the

5      requirements of 366.  I think it's balanced and I think it

6      gives parties access to the Court in an expedited fashion if

7      they disagree with the Debtor's proposal.

8              So I have taken the Order that was attached at

9      No. 8.  I have modified paragraph 5, which is your hearing

10     time, to reflect January 23rd at 12:00 noon.

11             And with that unless, Mr. Fink, you tell me there's

12     something else that I've missed, then I'm prepared to sign

13     that.

14             MR. FINK:  Thank you, Your Honor.  I just note that

15     Your Honor's point -- we have actually already started

16     receiving inbounds from the utilities and we're talking to

17     them already so the process has kicked off as far as we're

18     concerned.

19             THE COURT:  Great.  Then this will just work like

20     it's supposed to.

21             The Motion -- the Order's been signed and it's on

22     its way to docketing.

23             MR. FINK:  Thank you, Your Honor.  So I think the

24     last one for me is at Docket No. -- is at ECF No. 9.  It's the

25     Motion to file a consolidated creditor matrix, consolidated

1    top 30 and relief with respect to redactions of employee info

2    -- of employee information and relief with respect to list of

3    equity holders, Your Honor.

4            Unless Your Honor has any questions, we respectfully

5    request that the Order be entered.

6            Your Honor, just on the equity holders piece,

7    obviously it's a publically-traded company with a lot of

8    equity holders.  We think that the relief is appropriate on

9    that front.

10            THE COURT:  All right.  Thank you.

11            Anyone else wish to be heard?

12        (No verbal response.)

13            THE COURT:  All right.  Then, Mr. Fink, again I know

14    I'm in the minority, but I'm a believer that we should do more

15    to protect the names, addresses.  And while not maybe personal

16    identifiable information under the statute, it is certainly

17    close enough.  You just look at events and people who show up

18    at people's houses and targets that occur and scam attempts

19    that go on, I'm of the belief that we should do more to

20    protect that information.

21            There are no objections to what's been requested

22    here and I'm not -- again not trying to change where we are.

23    I'm just telling the world that I think we all need to be more

24    sensitive to that issue and do more to protect folks.

25            I have -- I will grant the Motion.  I've signed the

1    Order.  Again that's the Order that was attached to the Motion

2    at Docket No. 9.

3          Mr. Fink, what else?

4          MR. FINK:  So, Your Honor, just quickly the last two

5    items on the Agenda is Item No. 13.  That's the Stretto

6    retention.  Your Honor, thank you very much.  We saw that the

7    Order on that had been entered.

8          And then the notice of designation as well as 14

9    rounds out the Agenda.

10         So unless -- I would turn it back to Mr. Schrock for

11    any closing remarks unless Your Honor has any questions for

12    me.

13         THE COURT:  Mr. Fink, as always, I appreciate your

14    diligence and preparation, quite frankly, the whole team

15    pretty impressive today.  I was so awed by the presentations

16    and the professionalism that I didn't decide who to pick on.

17    So the team should get a collective attaboy.  And have a good

18    holiday.

19         MR. FINK:  Thank you, Your Honor.

20         THE COURT:  Thank you.

21         MR. FINK:  Thank you.

22         THE COURT:  Mr. Schrock?

23         MR. SCHROCK:  Nothing else here, Your Honor.  Thanks

24    very much.

25         THE COURT:  All right.  Thank you.  So again to

1     everyone, I know that there are issues that need to be dealt

2     with.  I'll reiterate again I am here ready to begin

3     addressing those issues as soon as you're ready to sign your

4     name to a pleading.  So I don't want you to think that I shy

5     away from anything or that I want people to settle things.  I

6     genuinely don't care.  I'm here to resolve disputes and so

7     when you are ready to do that and you'll put your name on a

8     pleading, I'm ready to resolve it.  And I understand the

9     importance of this and I'll do my best to clear my Docket to

10    accommodate all of the parties.

11              And with that, I'm still looking for a DIP Order.

12              And, Mr. Ferris, you popped on.

13              Did you have -- have you had a chance to look at it?

14    Did you have a concern?  Do we need to talk or where are we?

15              MR. FERRIS:  So, Your Honor, before we close, I did

16    just want to make the Court aware.  And again we've heard your

17    comments and I fully expect the parties to continue to work

18    toward resolving the issues, but we have not actually yet seen

19    the schedule in the Record, schedule M.2.2 so that's still an

20    open issue.

21              And candidly the way the -- the current definition

22    of the "prepetition equipment lenders collateral" is still, we

23    believe, overly narrow so we still do have an unresolved issue

24    on the way, which is going to be an Order to clarify that

25    there is no timing of the equipment lenders rights.

1          THE COURT:  Got it.  Could I ask an accommodation

2     from you, Mr. Ferris, is that I assumed that --

3          MR. FERRIS:  Absolutely.

4          THE COURT:  I'm assuming that there are things you

5     haven't yet seen that are being floated and client approvals

6     and all the things that are required to occur.  If it turns

7     out that you have a problem -- and you can pick your deadline

8     -- if you would just communicate with Mr. Alonzo that says,

9     "Hey, we need a further hearing this afternoon, we need a

10    hearing tomorrow morning or we've reached an agreement" just

11    so I don't worried about it?  If you would just send that

12    email?  Obviously copy all the other folks who are involved.

13    I would greatly appreciate that.  So could I ask you to do

14    that as you see whatever it is you're going to receive?

15         MR. FERRIS:  Of course.  And again we will continue

16    to work doing all this consensually and hopefully we won't

17    have to let you know that we need additional time.

18         THE COURT:  Yeah.  Mr. Schrock's got to go change

19    the thermal paper in the fax machine.

20         (Laughter.)

21         MR. SCHROCK:  Yes, we'll do that, Your Honor.  And

22    I'm confident that we'll work out the language.  I should have

23    mentioned that we're going to get that around the current

24    issues.  We'll let you know, but I'm confident we're not

25    priming the equipment lenders' liens so we'll make sure that

1    that's handled.

2          THE COURT:  No, I got it.  There are a lot of things

3    going on.  I appreciate everyone's again attention, the prep

4    and the fact that I -- you all just do a fabulous job amongst

5    yourselves.

6          Whatever your particular event whether it be

7    Festivus or something else, I wish you all a very happy

8    holiday.  We'll be adjourned.

9        (Hearing adjourned at 11:34 a.m.)

10                        * * * * *

11        *I certify that the foregoing is a correct transcript*

12   *to the best of my ability produced from the electronic sound*

13   *recording of the Zoom/telephonic proceedings in the*

14   *above-entitled matter.*

15    *  /S./  MARY D. HENRY*

16   *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

17   *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

18   *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

19   *JTT TRANSCRIPT #66654*

20   *DATE FILED:  DECEMBER 28, 2022*

21

22

23

24

25