IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|   |   |
|---|---|
| In re: | ) <br> ) Chapter 11 <br> ) |
| CORE SCIENTIFIC, INC., *et al.*, | ) Case No. 22-90341 (DRJ) <br> ) |
| Debtors.[1] | ) (Jointly Administered) <br> ) |

**CERTIFICATE OF PUBLICATION FOR LARNYCE TABRON
OF THE NEW YORK TIMES**

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Special Mining (Oklahoma) LLC (4327); American Property Acquisitions, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisition I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704



**The New York Times Company**

620 8th Avenue
New York, NY 10018
nytimes.com

# PROOF OF PUBLICATION

December 29, 2022

Sworn to me this 29th day of December, 2022

_Ellen Herb_
Notary Public

I, Larnyce Tabron, in my capacity as a Principal Clerk of the Publisher of The New York Times, a daily newspaper of general circulation printed and published in the City, County, and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on.

12/29/2022, NYT, pg B3

Ellen Herb
Notary Public, State of New York
No. 01HE6163785
Qualified in New York County
Commission Expires April 2, 2023

_Larnyce Tabron_

**Information to identify the case:**
Debtor: Core Scientific, Inc., et al. (see below for list of all Debtors)
EIN: [86-1243837]
United States Bankruptcy Court for the Southern District of Texas (Houston Division)
Date case filed for chapter 11: December 21, 2022
Lead Case Number: 22-90341 (DRJ)
Official Form 309F1 (For Corporations or Partnerships)

**Notice of Chapter 11 Bankruptcy Case                       10/20**

For the debtor listed above, a case has been filed under chapter 11 of the Bankruptcy Code. An order for relief has been entered.

This notice has important information about the case for creditors and debtors, including information about the meeting of creditors and deadlines. Read both pages carefully.

The filing of the case imposed an automatic stay against most collection activities. This means that creditors generally may not take action to collect debts from the debtor or the debtor's property. For example, while the stay is in effect, creditors cannot sue, assert a deficiency, repossess property, or otherwise try to collect from the debtor. Creditors cannot demand repayment from the debtor by mail, phone, or otherwise. Creditors who violate the stay can be required to pay actual and punitive damages and attorney's fees.

Confirmation of a chapter 11 plan may result in a discharge of debt. A creditor who wants to have a particular debt excepted from discharge may be required to file a complaint in the bankruptcy clerk's office within the deadline specified in this notice. (See line 11 below for more information.)

To protect your rights, consult an attorney. All documents filed in the case may be inspected at the bankruptcy clerk's office at the address listed below or through PACER (Public Access to Court Electronic Records at https://pacer.uscourts.gov).

The staff of the bankruptcy clerk's office cannot give legal advice.
Do not file this notice with any proof of claim or other filing in the case.

1. **Debtors' full name(s)** (List of Jointly Administered Debtors): Name of Debtors, *Other Names Used by the Debtors in the last 8 years*, EIN Number, Case Numbers: Core Scientific Mining LLC, N/A, 92-1386971, 22-90340 (DRJ); Core Scientific, Inc., XPDI; Power & Digital Infrastructure Acquisition Corp.; Core Scientific Holding Co., 86-1243837, 22-90341 (DRJ); Core Scientific Acquired Mining LLC , Blockcap, Inc., N/A, 22-90342 (DRJ); Core Scientific Operating Company, Core Scientific, Inc.; MineCo Holdings, Inc., 82-3805526, 22-90343 (DRJ); Radar Relay, Inc., Radar Relay, LLC, 82-3430496, 22-90344 (DRJ); Core Scientific Specialty Mining (Oklahoma) LLC, GPU One Holdings, LLC, 84-5164327, 22-90345 (DRJ); American Property Acquisition, LLC, N/A, 82-5490825, 22-90346 (DRJ); Starboard Capital LLC, N/A, 36-4896677, 22-90347 (DRJ); RADAR LLC, N/A, 84-4125106, 22-90348 (DRJ); American Property Acquisitions I, LLC, 755 Palmer Lane, LLC, 82-5469717, 22-90349 (DRJ); American Property Acquisitions VII, LLC, N/A, 83-1663198, 22-90350 (DRJ)

2. **All other names used in the last 8 years:** SEE ABOVE LIST

3. **Address:** 210 Barton Springs Road, Suite 300, Austin, Texas 78704. 2407 S. Congress Ave, Ste. E-101, Austin, TX 78704 (mailing address)

4. **Debtor's attorney** (Name and address): **WEIL, GOTSHAL & MANGES LLP**, Alfredo R. Pérez (TX Bar No. 15776275), 700 Louisiana Street, Suite 1700, Houston, Texas 77002, Telephone: (713) 546-5000, Facsimile: (713) 224-9511, Email: Alfredo.Perez@weil.com -and- **WEIL, GOTSHAL & MANGES LLP**, Ray C. Schrock, P.C., Ronit J. Berkovich, Moshe A. Fink, 767 Fifth Avenue, New York, New York 10153, Telephone: (212) 310-8000, Facsimile: (212) 310-8007, Email: Ray.Schrock@weil.com, Ronit.Berkovich@weil.com, Moshe.Fink@weil.com

**Debtors' Claims and Noticing Agent** (for Court Documents and Case Information Inquiries): Core Scientific, Inc., et al., c/o Stretto,

410 Exchange, Suite 100, Irvine, CA 92602. US/Canada Toll-Free Number: (949) 404-4152. International Toll Number: (888) 765-7875. **Email inquiries:** TeamCoreScientific@stretto.com. **Case website:** https://cases.stretto.com/CoreScientific

5. **Bankruptcy clerk's office:** Bob Casey United States Courthouse, 515 Rusk Avenue, Houston, Texas 77002. Hours: Monday to Friday – 8:30 a.m. to 5:00 p.m. (Prevailing Central Time). Telephone: (713) 250-5500. Documents in this case may be filed at this address. You may inspect all records filed in this case at this office or online at https://pacer.uscourts.gov

6. **Meeting of creditors:** January 26, 2023 at 10:00 A.M. (CT). Location: Telephone Conference: Dial: 1-866-707-5468, Participant Code: 6166997#. The meeting may be continued or adjourned to a later date. If so, the date will be on the court docket. The Debtors' representative must attend the meeting to be questioned under oath. Creditors may attend, but are not required to do so.

7. **Proof of claim deadline: Deadline for filing proof of claim: To be Determined.** A proof of claim is a signed statement describing a creditor's claim. A proof of claim form may be obtained at www.uscourts.gov or any bankruptcy clerk's office. Your claim will be allowed in the amount scheduled unless: • your claim is designated as *disputed*, *contingent*, or *unliquidated*; • you file a proof of claim in a different amount; or • you receive another notice. If your claim is not scheduled or if your claim is designated as *disputed*, *contingent*, or *unliquidated*, you must file a proof of claim or you might not be paid on your claim and you might be unable to vote on a plan. You may file a proof of claim even if your claim is scheduled. You may review the schedules at the bankruptcy clerk's office or online at https://pacer.uscourts.gov. Secured creditors retain rights in their collateral regardless of whether they file a proof of claim. Filing a proof of claim submits a creditor to the jurisdiction of the bankruptcy court, with consequences a lawyer can explain. For example, a secured creditor who files a proof of claim may surrender important nonmonetary rights, including the right to a jury trial.

8. **Exception to discharge deadline:** The bankruptcy clerk's office must receive a complaint and any required filing fee by the following deadline. If § 523(c) applies to your claim and you seek to have it excepted from discharge, you must start a judicial proceeding by filing a complaint by the deadline stated below
**Deadline for filing the complaint: To be determined**

9. **Creditors with a foreign address:** If you are a creditor receiving notice mailed to a foreign address, you may file a motion asking the court to extend the deadlines in this notice. Consult an attorney familiar with United States bankruptcy law if you have any questions about your rights in this case.

10. **Filing a Chapter 11 bankruptcy case:** Chapter 11 allows debtors to reorganize or liquidate according to a plan. A plan is not effective unless the court confirms it. You may receive a copy of the plan and a disclosure statement telling you about the plan, and you may have the opportunity to vote on the plan. You will receive notice of the date of the confirmation hearing, and you may object to confirmation of the plan and attend the confirmation hearing. Unless a trustee is serving, the debtor will remain in possession of the property and may continue to operate its business.

11. **Discharge of debts:** Confirmation of a chapter 11 plan may result in a discharge of debts, which may include all or part of your debt. See 11 U.S.C. § 1141(d). A discharge means that creditors may never try to collect the debt from the debtor except as provided in the plan. If you want to have a particular debt owed to you excepted from the discharge and § 523(c) applies to your claim, you must start a judicial proceeding by filing a complaint and paying the filing fee in the bankruptcy clerk's office by the deadline.

## JPMorgan Is Accused Of Helping Epstein

**By EMILY FLITTER**

The attorney general of the U.S. Virgin Islands is accusing JPMorgan Chase of helping Jeffrey Epstein illegally exploit women and girls, according to a lawsuit filed Tuesday in federal court in Manhattan. The suit says JPMorgan provided banking services to Mr. Epstein after he had been convicted of sex charges, and failed to report his suspicious activities.

The lawsuit said the bank should have known about Mr. Epstein's illegal activities at a villa on Little St. James Island, an island he owned in the territory, and should have reported them to the authorities as part of its adherence to anti-money-laundering laws.

"JPMorgan knowingly, negligently and unlawfully provided and pulled the levers through which recruiters and victims were paid and was indispensable to the operation and concealment of the Epstein trafficking enterprise," the lawsuit said.

A JPMorgan spokeswoman declined to comment.

Mr. Epstein, a secretive financier, maintained close associations with a long list of wealthy men, politicians and celebrities even after he pleaded guilty in 2008 to two counts of soliciting prostitution from a teenage girl and faced allegations in 2016 that

*A bank aided in hiding exploitation of women, a suit claims.*

he had helped smother a larger investigation into his activities. He died in an apparent suicide in August 2019 while in federal custody on a new set of sex exploitation charges.

Mr. Epstein was a client of JPMorgan's high-end banking services for 15 years, a relationship that continued well after his 2008 conviction even though the bank's employees raised alarms about the legal and reputational risks. The bank ejected him as a client in 2013.

Tuesday's lawsuit, parts of which were redacted from public view, said the bank's failure to cut ties with Mr. Epstein after his 2008 conviction, as well as its failure to scrutinize his activities when new sexual abuse allegations against him became public, amounted to helping Mr. Epstein carry out his schemes.

The lawsuit cited civil racketeering claims that the territory's attorney general, Denise N. George, filed in 2020 against Mr. Epstein's estate. The 2020 case described a complex operation focused on bringing women and girls to Little St. James Island, where they were abused and then paid to stay silent.

On Nov. 30, Ms. George and the estate announced an agreement to settle the case for around $105 million, including $80 million in repayments to the government for tax benefits that Mr. Epstein inappropriately obtained, and about half the proceeds from the sale of Mr. Epstein's island, which could total $55 million. Neither the estate nor its executors admitted wrongdoing as part of the settlement.

This week's lawsuit against JPMorgan seeks to force the bank to turn over profits from its business with Mr. Epstein and his companies and to pay unspecified amounts in penalties and damages to the government.

"JPMorgan facilitated and concealed wire and cash transactions that raised suspicion of — and were in fact part of — a criminal enterprise whose currency was the sexual servitude of dozens of women and girls in and beyond the Virgin Islands," the lawsuit says.



GABRIELLA N. BAEZ FOR THE NEW YORK TIMES
Denise N. George, attorney general of the U.S. Virgin Islands, filed a suit against JPMorgan on Tuesday.

# 10 Months Into Job, Southwest Chief Faces a Giant Crisis

**FROM FIRST BUSINESS PAGE**

Travelers, lawmakers and even employees are increasingly demanding answers from Southwest and Mr. Jordan. While the company has repeatedly apologized for its performance, it has provided few details about how things went so wrong and what it is doing to right its operations. The company said on Wednesday that Mr. Jordan and other executives were not available for interviews.

In a video posted on Southwest's website late Tuesday, Mr. Jordan, who became chief executive in February after three decades at Southwest, implied that the airline was caught out by a rare event. "The tools we use to recover from disruption serve us well 99 percent of the time," he said, "but clearly we need to double down on our already existing plans to upgrade systems for these extreme circumstances."

Southwest has known for years that computer systems that manage customer reservations and assign pilots and flight attendants to each flight needed improvements. Union leaders and even the company's executives have acknowledged that the systems struggle to handle large numbers of changes when the company's operations are disrupted.

Disruptions can have a cascading effect on Southwest's flights because it operates a point-to-point system, in which planes travel from one destination to another; other large airlines use the hub-and-spoke system, with flights typically returning frequently to a hub airport.

Southwest is now trying to piece together its operations after many of its crews and planes were not where they were scheduled to be because of earlier flight cancellations, the company said in an emailed statement to The New York Times. Because the company's operations have been so thoroughly upended, the effort is expected to take days. To get crews and planes in the right places, Southwest had to reduce its schedule. This should allow the airline to bring crews to the airports where they are needed.

In his video on Tuesday, Mr. Jordan appeared to acknowledge that Southwest's model was susceptible to breaking down under stress. "Our network is highly complex, and the operation of the airline counts on all the pieces, especially aircraft and crews remaining in motion to where they're planned to go," he said.

The company has spent years trying to overhaul its technology systems, but this latest crisis is expected to ratchet up the pressure on Southwest and Mr. Jordan to make progress faster.

Union leaders said they had run out of patience with how the company had been updating the technology systems.

"We're at the point where we've given him enough grace," Michael Santoro, vice president of the Southwest Airlines Pilots Association, said in an interview, referring to Mr. Jordan.

Transport Workers Union Local 556, which represents Southwest's flight attendants, issued a statement agreeing with the pilots. "It is not weather; it is not staffing; it is not a concerted labor effort; it is the complete failure of Southwest Airlines' executive leadership. It is their decision to continue to expand and grow without the technology needed to handle it," the union's president, Lyn Montgomery, said.

These statements stand out because Southwest has generally had very good relations with most of its labor unions. After the meltdown, labor leaders have grown increasingly critical of the company this week. The pilots group, for example, expressed frustration that the company had not yet shared its plan for getting its operation back to normal, something it typically does after disruptions. "We have heard zero," Mr. Santoro said.

In the last few days, union officials, pilots and flight attendants have complained to journalists and on social media that crew members have often had to wait hours to be assigned to their next flight or be directed to hotels where they could spend the night.

Customers have also expressed frustration with the airline, saying it had become impossible to get any information from the company. Some people have said they waited hours at baggage and ticket counters and gates to speak to Southwest agents. Others have tried and failed to get through to the company by phone or online.

Howard Tutt came to Chicago's Midway airport on Wednesday to try to retrieve a bag his son had checked for a flight to California that was ultimately canceled. He said he had waited hours with other customers to speak to someone to no avail. Nearby, dozens of bags were waiting to be reunited with travelers outside Southwest's baggage office and near its carousels.

"He had to leave in the middle of Christmas dinner because they told him the only flight he could get on was at 9 p.m. on the 25th," Mr. Tutt, 61, said, referring to his son. "Then he got to the airport, checked his bags and was delayed for six hours before they canceled the flight."

Mr. Tutt, a resident of Orland Park, Ill., said the family had tried a variety of approaches to locate the bag, which contains Christmas gifts for his son's girlfriend and her family. "We've emailed, tried via chat message, and called but cannot reach anyone."

Analysts said that, as cancellations piled up, Southwest found itself in a dire position in which it needed to almost start from scratch to rebuild. "You've lost control of what you expected the operation to be," said Samuel Engel, a senior vice president and airline industry analyst at ICF, a consulting firm.

The question that will loom over the company for a long time is why Southwest's system broke down while those of other large airlines held up relatively well. Analysts say Southwest's point-to-point network, which is quite different from the hub-and-spoke system used by its peers, made it harder to restart operations.

But they also say Southwest's technology, despite yearslong efforts to modernize it, was lacking. And Mr. Jordan is likely to be asked why he didn't do more to make the systems strong enough to deal with weather and technology disruptions, which have dogged Southwest in recent years, including two mass flight cancellations and delays last year.

Though Mr. Jordan has been chief executive for a short time, he has long been a member of Southwest's senior leadership team, which would have given him plenty of opportunity to understand the company's strengths and weaknesses. He started at the company as a computer programmer, helped develop its frequent flier program and aided in incorporating the planes and crews of AirTran Airways after Southwest acquired that company.

Robert W. Mann Jr., a former airline executive who now runs the consulting firm R.W. Mann & Company, said Mr. Jordan was "in the hot seat right now."

But analysts were skeptical that Southwest could change quickly. They say the company's management suffers from "Southwest exceptionalism," or a stubborn belief that its unique approach to running an airline is best. Even though Southwest has its origins as an upstart taking on sleepy incumbents, analysts say its decision making can move at glacial speeds. "The airline has always been very cautious about change," Mr. Engel said.

Southwest's approach works well much of the time, and it has contributed to the company's strong financial performance over the last five decades, analysts say. It allowed, for instance, for planes to be used more quickly for their next flight. Longtime shareholders have done well. Southwest's stock is up 217 percent over the last decade, outpacing the wider stock market and its best-performing rivals. But this month, Southwest's stock, down by nearly a fifth, has performed worse than the market and its peers.

There is no evidence that Mr. Jordan is vulnerable. But poor crisis management has severely weakened other airline executives.

In February 2007 JetBlue experienced a meltdown when the airline did not act as quickly as its peers to cancel flights, hoping an ice storm on the East Coast would not have affected air travel as much as it did. At one point, nine JetBlue planes filled with passengers sat on the tarmac at Kennedy International Airport for six hours.

David G. Neeleman, JetBlue's founder and chief executive at the time, who was also a former Southwest executive, said he was "humiliated and mortified." Months later, he agreed to step down as chief executive.

Mr. Neeleman did not respond to requests for comment.

*Robert Chiarito contributed reporting.*



DANIEL BRENNER FOR THE NEW YORK TIMES

Many stranded travelers have expressed frustration that Southwest has not adequately shared information with them. Its chief executive, Bob Jordan, right, has seemed to acknowledge that the airline's model is susceptible to breaking down under stress.

CHRISTOPHER GOODNEY/BLOOMBERG

# Hubless System at Root of Chaos, Leaving Planes Without Crews

**FROM FIRST BUSINESS PAGE**

cars or spent hundreds of dollars to buy tickets on other airlines.

So what caused the meltdown?

### 'Point-to-Point' Model Failed

Southwest uses a "point-to-point" route model that often lets passengers fly directly from smaller cities and regions without having to stop at a central hub like Denver or New York. Point-to-point flights cut travel times by eliminating the intermediate stop — typically a big advantage for travelers who are not flying from major metro areas.

Other large carriers like United and American rely on a "hub-and-spoke" model in which planes typically fly from smaller cities to a hub airport where passengers change planes.

For example, a passenger flying on a United plane from Oklahoma City to Phoenix may have to stop in Denver for several hours. Southwest flies routes directly from Oklahoma City to Phoenix in less than three hours.

With a hub system, there's a ready pool of crew members and pilots who can report to work at a major airport, said Mike Arnot, an industry analyst. That makes it easier to regroup after a storm, he said. Planes also are kept closer to their home airports, rather than being spread across the country.

It's harder to have a reserve of standby crew members and pilots when airlines serve many smaller markets. There is not usually excess crew in places like Syracuse, N.Y., Mr. Arnot said.

As a result, Southwest's cancellations created a giant snowball effect that rippled across its carefully choreographed network, leaving planes and crews scattered across the country, he and other analysts said.

"The only way to reset is to get the planes and crew back to where they should be," Mr. Arnot said. "And the only way to do that is to cancel a huge amount of flights."

In a video message on Tuesday, Southwest's chief executive, Bob Jordan, likened the airline's route model to a "giant puzzle" that relies on airplanes and crews remaining in motion.

Because Southwest is the largest airline in 23 of the top 25 travel markets in the United States, when the severe weather led to many canceled flights, it resulted in airplanes and crew members being out of position in dozens of cities, he said.

The airline, he said, was "focused on safely getting all the pieces back into position to end this rolling struggle."

### Tech Problems Also Hurt

Airline scheduling is a "very intricate system" that must take into account union rules, federal regulations and airline policies when assigning crews and pilots to flights, said Kathleen Bangs, a former commercial airline pilot and spokeswoman for FlightAware.

Southwest's system, however, couldn't keep track of where its crew members and pilots were after so many flights were canceled, Mr. Arnot said.

Pilots and crew members looking for their next assignment waited hours — nine hours in one case — to speak to staff members at Southwest's overwhelmed operations center, said Casey A. Murray, president of the Southwest Airlines Pilots Association, the union that represents the almost 10,000 Southwest pilots. With nowhere to go, hundreds of pilots and crew members slept in airports next to passengers and luggage, he said.

"Once one card falls, the whole house falls here at Southwest," he said. "That's our problem. We couldn't keep up with the cascading events."

Mr. Murray said the union had been urging the airline for years to update "I.T. and infrastructure from the 1990s."

"We're seeing these meltdowns occur with more severity and more frequency and this past weekend was the exclamation point," he said. The airline also suffered a technology meltdown in June 2021 that resulted in a day when half of its flights were delayed and many were canceled; it took days before the situation could be resolved. In October of that year, it had similar issues and canceled more than 1,800 flights over one weekend.

Even before this week's problems, Mr. Jordan, Southwest's chief executive, had acknowledged that the scheduling system was outdated.

"We're behind," Mr. Jordan said in November, according to Fortune. "As we've grown, we've outrun our tools."

For example, Southwest does not have a quick, automated way to contact crew members who get reassigned, he said. "Someone needs to call them or chase them down in the airport and tell them," he said.

### Few Options for Customers

Unlike other major carriers, Southwest does not have agreements with other airlines that allow passengers to fly on competitors' planes when there is a cancellation or significant delay. "Most low-cost carriers do not have these agreements in place," Mr. Arnot said, largely because those agreements are expensive.

"If your flight is canceled, you are compensated," he said of Southwest passengers. Or passengers are rebooked on the next available flight with the same airline.

For thousands of Southwest passengers in the last few days that was not a viable alternative.

Katie McNamara, an art director from Brooklyn, visited family in Mississippi for the holiday with her husband, Justin, and their two children, who are 8 and 2.

They were scheduled to fly back on Wednesday from New Orleans but when their flight was canceled, they could find no other flights on Southwest's website until at least Jan. 31.

They paid $1,500 for four one-way tickets to New York on JetBlue on Friday. Ms. McNamara said she hoped Southwest will cover the extra cost but was waiting to call customer service. (The airline directed customers to a website to rebook flights or request refunds.)

"I doubt they're answering their phones at the moment," she said.

Southwest said that "requests for reasonable reimbursements directly related to the travel disruption" would be reviewed on a case-by-case basis.

Ms. McNamara, 37, who has used Southwest for years for direct flights to visit family in Texas, New Mexico and Mississippi, said the current fiasco won't keep her from booking with the airline again.

But she said she hopes Southwest will compensate her family in some way.

"Justin would probably be happy with some drink tickets," she said. Specifically, she said, for an "adult beverage."

**Information to identify the case:**
Debtor: Core Scientific, Inc., et al. (see below for list of all Debtors)
EIN: [86-1243837]
United States Bankruptcy Court for the Southern District of Texas (Houston Division)
Date case filed for chapter 11: December 21, 2022
Lead Case Number: 22-90341 (DRJ)
**Official Form 309F1 (For Corporations or Partnerships)**
**Notice of Chapter 11 Bankruptcy Case    10/20**
**For the debtor listed above, a case has been filed under chapter 11 of the Bankruptcy Code. An order for relief has been entered.**
This notice has important information about the case for creditors and debtors, including information about the meeting of creditors and deadlines. Read both pages carefully.

The filing of the case imposed an automatic stay against most collection activities. This means that creditors generally may not take action to collect debts from the debtor or the debtor's property. For example, while the stay is in effect, creditors cannot sue, assert a deficiency, repossess property, or otherwise try to collect from the debtor. Creditors cannot demand repayment from the debtor by mail, phone, or otherwise. Creditors who violate the stay can be required to pay actual and punitive damages and attorney's fees.

Confirmation of a chapter 11 plan may result in a discharge of debt. A creditor who wants to have a particular debt excepted from discharge may be required to file a complaint in the bankruptcy clerk's office within the deadline specified in this notice. (See line 11 below for more information.)

To protect your rights, consult an attorney. All documents filed in the case may be inspected at the bankruptcy clerk's office at the address listed below or through PACER (Public Access to Court Electronic Records at https://pacer.uscourts.gov).

**The staff of the bankruptcy clerk's office cannot give legal advice. Do not file this notice with any proof of claim or other filing in the case.**

1. **Debtors' full name(s)** (List of Jointly Administered Debtors): Name of Debtors, Other Names Used by the Debtors in the last 8 years, EIN Number, Case Numbers: Core Scientific Mining LLC, N/A, 92-1386971, 22-90340 (DRJ); Core Scientific, Inc., XPDI; Power & Digital Infrastructure Acquisition Corp.; Core Scientific Holding Co., 86-1243837, 22-90341 (DRJ); Core Scientific Acquired Mining LLC, Blockcap, Inc., N/A, 22-90342 (DRJ); Core Scientific Operating Company, Core Scientific, Inc., MineCo Holdings, Inc., 83-3805526, 22-90343 (DRJ); Radar Relay, Inc., Radar Relay, LLC, 82-3430496, 22-90344 (DRJ); Core Scientific Specialty Mining (Oklahoma) LLC, GPU One Holdings, LLC, 84-5164327, 22-90345 (DRJ); American Property Acquisition, LLC, N/A, 82-5490825, 22-90346 (DRJ); Starboard Capital LLC, N/A, 36-4896677, 22-90347 (DRJ); RADAR LLC, N/A, 84-4125106, 22-90348 (DRJ); American Property Acquisitions I, LLC, 155 Palmer Lane, LLC, 82-5469717, 22-90349 (DRJ); American Property Acquisitions VIII, LLC, N/A, 83-1663198, 22-90350 (DRJ)
2. **All other names used in the last 8 years: SEE ABOVE LIST**
3. **Address:** 210 Barton Springs Road, Suite 300, Austin, Texas 78704, 2407 S. Congress Ave. Ste. E-101, Austin, TX 78704 (mailing address)
4. **Debtor's attorney** (Name and address): WEIL, GOTSHAL & MANGES LLP, Alfredo R. Pérez (TX Bar No. 15776275), 700 Louisiana Street, Suite 1700, Houston, Texas 77002, Telephone: (713) 546-5000, Facsimile: (713) 224-9511, Email: Alfredo.Perez@weil.com -and- WEIL, GOTSHAL & MANGES LLP, Ray C. Schrock, P.C., Ronit J. Berkovich, Moshe A. Fink, 767 Fifth Avenue, New York, New York 10153, Telephone: (212) 310-8000, Facsimile: (212) 310-8007, Email: Ray.Schrock@weil.com, Ronit.Berkovich@weil.com, Moshe.Fink@weil.com
**Debtors' Claims and Noticing Agent** (for Court Documents and Case Information Inquiries): Core Scientific, c/o Stretto

410 Exchange, Suite 100, Irvine, CA 92602. US/Canada Toll-Free Number: (949) 404-4152. International Toll Number: (888) 765-7875. **Email inquiries:** TeamCoreScientific@stretto.com. **Case website:** https://cases.stretto.com/CoreScientific
5. **Bankruptcy clerk's office:** Bob Casey United States Courthouse, 515 Rusk Avenue, Houston, Texas 77002. **Hours:** Monday to Friday — 8:30 a.m. to 5:00 p.m. (Prevailing Central Time). **Telephone:** (713) 250-5500. Documents in this case may be filed at this address. You may inspect all records filed in this case at this office or online at https://pacer.uscourts.gov.
6. **Meeting of creditors:** January 26, 2023 at 10:00 A.M. (CT). **Location:** Telephone Conference: Dial: 1-866-707-5468, Participant Code: 6166997#. The meeting may be continued or adjourned to a later date. If so, the date will be on the court docket. The Debtors' representative must attend the meeting to be questioned under oath. Creditors may attend, but are not required to.
7. **Proof of claim deadline: Deadline for filing proof of claim: To Be Determined.** A proof of claim is a signed statement describing a creditor's claim. A proof of claim form may be obtained at www.uscourts.gov or any bankruptcy clerk's office. Your claim will be allowed in the amount scheduled unless: • your claim is designated as disputed, contingent, or unliquidated; • you file a proof of claim in a different amount; or • you receive another notice. If your claim is not scheduled or if your claim is designated as disputed, contingent, or unliquidated, you must file a proof of claim or you might not be paid on your claim and you might be unable to vote on a plan. You may file a proof of claim even if your claim is scheduled. You may review the schedules at the bankruptcy clerk's office or online at https://pacer.uscourts.gov. Secured creditors retain rights in their collateral regardless of whether they file a proof of claim. Filing a proof of claim submits a creditor to the jurisdiction of the bankruptcy court, with consequences a lawyer can explain. For example, a secured creditor who files a proof of claim may surrender important nonmonetary rights, including the right to a jury trial.
8. **Exception to discharge deadline:** The bankruptcy clerk's office must receive a complaint and any required filing fee by the following deadline. If § 523(c) applies to your claim and you seek to have it excepted from discharge, you must start a judicial proceeding by filing a complaint by the deadline stated below.
**Deadline for filing complaint: To be determined**
9. **Creditors with a foreign address:** If you are a creditor receiving notice mailed to a foreign address, you may file a motion asking the court to extend the deadlines in this notice. Consult an attorney familiar with United States bankruptcy law if you have any questions about your rights in this case.
10. **Filing a Chapter 11 bankruptcy case:** Chapter 11 allows debtors to reorganize or liquidate according to a plan. A plan is not effective unless the court confirms it. You may receive a copy of the plan and a disclosure statement telling you about the plan, and you may have the opportunity to vote on the plan. You will receive notice of date of the confirmation hearing, and you may object to confirmation of the plan and attend the confirmation hearing. Unless a trustee is serving, the debtor will remain in possession of the property and may continue to operate its business.
11. **Discharge of debts:** Confirmation of a chapter 11 plan may result in a discharge of debts, which may be of part of your debt. See 11 U.S.C. § 1141(d). A discharge means that creditors may never try to collect the debt from the debtor except as provided in the plan. If you want to have a particular debt owed to you excepted from the discharge and § 523(c) applies to your claim, you must start a judicial proceeding by filing a complaint and paying the filing fee in the bankruptcy clerk's office by the deadline.