**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| CORE SCIENTIFIC, INC., *et al.*,[1] | Case No. 22-90341 (DRJ) |
| Debtors. | (Jointly Administered) |

**AFFIDAVIT OF JUDSON BROWN, P.C. IN SUPPORT OF
CELSIUS MINING LLC'S PRELIMINARY OBJECTION TO THE DEBTORS'
EMERGENCY MOTION FOR ENTRY OF AN ORDER AUTHORIZING REJECTION
OF EXECUTORY CONTRACTS WITH CELSIUS MINING LLC**

I, Judson Brown, P.C., declare under penalty of perjury:

1.      I am an attorney at Kirkland & Ellis, LLP, representing Celsius Mining LLC and its debtor affiliates (collectively, "Celsius") in their Chapter 11 cases pending in the Bankruptcy Court for the Southern District of New York[2] (the "Celsius Chapter 11 Case").

2.      I submit this affidavit in support of *Celsius Mining LLC's Preliminary Objection to the Debtors' Emergency Motion for Entry of an Order Authorizing Rejection of Executory Contracts with Celsius Mining LLC* (the "Objection").

3.      On September 28, 2022, Celsius filed *Debtors' Motion to Enforce the Automatic Stay and for Civil Contempt, In re Celsius Network LLC*, No. 22-10964 (MG) [Celsius Docket No. 917] (the "Contempt Motion") in the SDNY Bankruptcy Court, seeking to compel Core

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198).    The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

[2]    Hereinafter referred to as the "SDNY Bankruptcy Court."

Scientific to comply with the parties' executory contract.  In connection with the Contempt Motion, Celsius attached copies of the agreements between the parties, and the parties engaged in substantial discovery, including document productions and depositions.

4.      Attached hereto as **Exhibit 1** is a true and correct copy of the Master Services Agreement signed by Core Scientific, Inc. and Celsius Mining LLC (d/b/a Celsius Core LLC at the time of signing), dated December 18, 2020.

5.      Attached hereto as **Exhibit 2** is a true and correct copy of Order #10 signed by Core Scientific, Inc. and Celsius Mining LLC (d/b/a Celsius Core LLC at the time of signing), dated September 27, 2021.

6.      Attached hereto as **Exhibit 3** is a true and correct copy of excerpts from the November 1, 2022, deposition transcript of Jeffrey Pratt, Senior Vice President, Operations & Finance, at Core Scientific.

7.      Attached hereto as **Exhibit 4** is a true and correct copy of excerpts from the November 8, 2022, deposition transcript of Michael Levitt, Chief Executive Officer at Core Scientific.

8.      Attached hereto as **Exhibit 5** is a true and correct copy of excerpts from the October 31, 2022, deposition transcript of Monica Xia, Accounting Manager at Core Scientific.

9.      Attached hereto as **Exhibit 6** is a true and correct copy of excerpts from the November 7, 2022, deposition transcript of Russell Cann, Executive Vice President, Client Services, at Core Scientific.

10.      Attached hereto as **Exhibit 7** is a true and correct copy of excerpts from the October 26, 2022, deposition transcript of KC Mares, an expert witness retained by Core Scientific in connection with the Contempt Motion.

11.     Attached hereto as **Exhibit 8** is a true and correct copy of email correspondence dated between July 13 and July 18, 2022, between Monica Xia, Ed Haney, and other Core Scientific employees, and an attachment thereto, produced by Core Scientific in connection with the Contempt Motion with a beginning bates stamp of CORE-00009902.

12.     Attached hereto as **Exhibit 9** is a true and correct copy of email correspondence dated September 2, 2021, between Taras Kulyk of Core Scientific, Amir Ayalon of Celsius, and other Celsius and Core Scientific employees, and an attachment thereto, produced by Core Scientific in connection with the Contempt Motion with a beginning bates stamp of CORE-00007612.

13.     Attached hereto as **Exhibit 10** is a true and correct copy of email correspondence dated between June 18 and June 23, 2021, between Jeff Pratt of Core Scientific, Patrick Holert of Celsius, and other Celsius and Core Scientific employees, produced by Core Scientific in connection with the Contempt Motion with a beginning bates stamp of CORE-00000071.

14.     Attached hereto as **Exhibit 11** is a true and correct copy of email correspondence dated August 24, 2021, between Taras Kulyk and other Core Scientific employees, and an attachment thereto, produced by Core Scientific in connection with the Contempt Motion with a beginning bates stamp of CORE-00007667.

15.     Attached hereto as **Exhibit 12** is a true and correct copy of email correspondence dated September 2, 2021, between Taras Kulyk and other Core Scientific employees, and an attachment thereto, produced by Core Scientific in connection with the Contempt Motion with a beginning bates stamp of CORE-00000508.

16.     Attached hereto as **Exhibit 13** is a true and correct copy of excerpts from the November 1, 2022, deposition transcript of Quinn Lawlor, Chief Strategy Officer at Celsius Mining LLC.

17.     Attached hereto as **Exhibit 14** is a true and correct copy of email correspondence dated October 6, 2021, between Quinn Lawlor of Celsius and Russell Cann and Moses Marure Jr. of Core Scientific, attached as Exhibit A to the *Declaration of Monica Xia in Support of Core Scientific, Inc.'s Opposition to Debtors' Motion to Enforce the Automatic Stay and for Civil Contempt*, Case No. 22-10964 (MG) (Bankr. S.D.N.Y. 2022) [Celsius Dkt. 1142].

18.     Attached hereto as **Exhibit 15** is a true and correct copy of the Core Scientific, Inc. FQ2 2022 Earnings Call, dated August 11, 2022, produced by Celsius in connection with the Contempt Motion with a beginning bates stamp of CEL_CS-00006971.

19.     Attached hereto as **Exhibit 16** is a true and correct copy of email correspondence dated between November 16 and December 3, 2021, between Jeff Pratt, Russell Cann, and other Core Scientific employees, produced by Core Scientific in connection with the Contempt Motion with a beginning bates stamp of CORE-00000004.

20.     Attached hereto as **Exhibit 17** is a true and correct copy of email correspondence dated June 10, 2022, between Monica Xia and other Core Scientific employees, and an attachment thereto, produced by Core Scientific in connection with the Contempt Motion with a beginning bates stamp of CORE- 00017182.

21.     Attached hereto as **Exhibit 18** is a true and correct copy of email correspondence dated between April 19 and May 24, 2022, between Core Scientific's Director of Finance Mark Geras, Russell Cann, Jeff Pratt, and other Core Scientific employees, and an attachment thereto,

produced by Core Scientific in connection with the Contempt Motion with a beginning bates stamp of CORE-00000719.

22.     Attached hereto as **Exhibit 19** is a true and correct copy of email correspondence dated between December 6, 2021, and January 12, 2022, between Core Scientific's Head of Financial Planning & Analysis Richard Horowitz, Russell Cann, Jeff Pratt and other Core Scientific employees, produced by Core Scientific in connection with the Contempt Motion with a beginning bates stamp of CORE-00008415.

23.     Attached hereto as **Exhibit 20** is a true and correct copy of email correspondence dated between November 5 and December 7, 2021, between Monica Xia, Jeff Pratt, and other Core Scientific employees, produced by Core Scientific in connection with the Contempt Motion with a beginning bates stamp of CORE-00015184.

24.     Attached hereto as **Exhibit 21** is a true and correct copy of email correspondence dated between June 20 and June 24, 2022, between Monica Xia and external auditors, produced by Core Scientific in connection with the Contempt Motion with a beginning bates stamp of CORE-00017174.

25.     Attached hereto as **Exhibit 22** is a true and correct copy of email correspondence dated June 23 and July 19, 2022, between Core Scientific's Vice President of Accounting Policy Ed Haney, Monica Xia, and external auditors, produced by Core Scientific in connection with the Contempt Motion with a beginning bates stamp of CORE-00017155.

26.     Attached hereto as **Exhibit 23** is a true and correct copy of email correspondence dated between July 15 and July 27, 2022, between Monica Xia, Moses Marure Jr., other Core Scientific employees, and one of Core Scientific's hosting clients, and attachments thereto,

produced by Core Scientific in connection with the Contempt Motion with a beginning bates stamp of CORE-00007801.

27.     Attached hereto as **Exhibit 24** is a true and correct copy of email correspondence dated July 22, 2022, from Monica Xia to Core Scientific's general counsel Todd DuChene, transmitting a letter from one of Core Scientific's hosting clients, produced by Core Scientific in connection with the Contempt Motion with a beginning bates stamp of CORE-00002520.

28.     Attached as **Exhibit 25** is a true and correct copy of Core Scientific's October 24, 2022     Form     8-K     and     associated     documents,     available     here: https://d18rn0p25nwr6d.cloudfront.net/CIK-0001839341/105018f3-6218-4869-b23f-458eaf584810.pdf.

29.     Attached hereto as **Exhibit 26** is a true and correct copy of email correspondence dated between June 19 and June 22, 2022, between Core Scientific's Senior Revenue Accountant Hailun Zhang and one of Core Scientific's hosting clients, produced by Core Scientific in connection with the Contempt Motion with a beginning bates stamp of CORE-00004156.

30.     Attached hereto as **Exhibit 27** is a true and correct copy of email correspondence dated between June 17 and June 27, 2022, between Moses Marure Jr. and one of Core Scientific's hosting clients, and attachments thereto, produced by Core Scientific in connection with the Contempt Motion with a beginning bates stamp of CORE-00004165.

31.     Attached hereto as **Exhibit 28** is a true and correct copy of email correspondence dated July 12, 2022, between Monica Xia, Jeff Pratt, and Director of Treasury & Risk Kristen Carnevali, produced by Core Scientific in connection with the Contempt Motion with a beginning bates stamp of CORE-00009801.

32.     Attached hereto as **<u>Exhibit 29</u>** is a true and correct copy of email correspondence dated between June 17 and June 21, 2022, between Hailun Zhang and one of Core Scientific's hosting clients, produced by Core Scientific in connection with the Contempt Motion with a beginning bates stamp of CORE-00004132.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Dated: January 2, 2023

*/s/* Judson Brown         
Judson Brown, P.C.

# CELSIUS EXHIBIT NO. 1

## <u>MASTER SERVICES AGREEMENT</u>

This Master Services Agreement ("**Agreement**") effective as of December 18, 2020 ("**Effective Date**") is between CORE SCIENTIFIC, INC. ("**Company**") and CELSIUS CORE LLC ("**Client**").

**WHEREAS**, Client desires access to locate its Client Equipment (as defined below) at the Company Facility (as defined below) and receive certain Services (as defined below); and

**WHEREAS**, Company desires to provide such Services at its Company Facility.

The parties agree as follows:

1.      **AGREEMENT STRUCTURE**

a.      This Agreement provides general terms applicable to Company's provision of certain services, including, without limitation, colocation, hosting, rack space, security, monitoring, maintenance, utilities, Client Equipment maintenance and repair, facility management, account management, network and data access, technical support, and heat and thermal management services ("**Services**") to Client in a data center owned or operated by Company or its affiliates ("**Company Facility**") in mutually agreed transactions described in mutually executed ordering documents in the form of Exhibit A attached hereto that reference and are governed by this Agreement ("**Orders**"). Each Order will be a separate agreement between Company and Client and will be deemed to incorporate the terms of this Agreement by reference. Company may require Customer to provide evidence of creditworthiness or credit support acceptable to Company in its sole discretion as a condition to accepting any Order. In the event of any conflict or inconsistency between the terms of this Agreement and the specific terms of an Order, the specific terms of the Order govern with respect to such Order.

2.      **SERVICES AND COMPANY FACILITY**

a.      Company will provide Client the Services at a Company Facility set forth in an Order. This Agreement is not intended to and does not constitute a lease of any real or personal property or a grant of any other real property interest.   Unless otherwise set forth in an Order, Client Equipment is owned by Client will not be construed as fixtures or fittings or otherwise attached to a Company Facility. Company retains title to all racking, connectors, fittings, parts and other materials used or provided by Company at a Company Facility to provide Client the Services. Client acknowledges and agrees that access to a Company Facility may be provided only during Company's ordinary business hours and only upon Company's prior written consent, which shall be subject in all events to the terms of this Agreement and may be withheld, conditioned or delayed in Company's sole discretion.. Client will be liable for the actions of all persons accessing Company Facility on its behalf.

b.      Company has the right to review and the sole right to approve any delivery, installation (including, without limitation, the location and position of Client Equipment at the Company Facility), replacement or removal work with respect to Client's computer hardware or other tangible equipment ("**Client Equipment**") at a Company Facility. Client shall be fully responsible for delivering all Client Equipment to Company at a specified Company Facility on or before the applicable scheduled delivery date, each as specified in an Order. Client will be responsible for all risk of loss or damage to Client Equipment at all times until such Client Equipment is accepted by Company at a designated Company Facility.

c.      Client Equipment will adhere to Company's specifications, procedures, rules, and regulations, including, without limitation, equipment labeling and tracking and security practices and policies for the Company Facility, all of which are incorporated herein by this reference. If Company determines in its sole

Exhibit No.
1
KC Mares
10/26/22

1

Case 22-90341   Document 212   Filed in TXSB on 01/02/23   Page 10 of 135

DocuSign Envelope ID: B20F8BC9-A9F5-44CB-B57A-E36A4B6B9BB5   22-10964-mg   Doc 915-7   Filed 09/28/22   Entered 09/28/22 22:12:49   Main Document
Pg 30 of 245

discretion that Client Equipment or related operating software does not conform to its policies or is not suitable for the provision of Services at the Company Facility, Company may suspend installation of Client Equipment and operating software or commencement of the Services until Company approves of the Client Equipment and operating software. Company has no responsibility or liability for any loss or damage to Client Equipment, including without limitation any damage to Client Equipment, failure to adhere to any manufacturer warranty, the voiding of any manufacturer warranty or loss of or inability to collect under any manufacturer warranty, unless directly caused by the gross negligence, bad faith or willful misconduct of Company.

d.      Client is responsible for costs and expenses regarding the installation, repair, replacement and removal of Client Equipment and tariffs, taxes, shipping costs or other expenses associated with owning, shipping, importing or transporting Client Equipment. Upon any expiration or termination of an applicable Order, Company will provide Client with a written notice, which may be by email (the "**Retrieval Notice**"), of the date when Client Equipment is ready to be removed from Company Facility, which will be at Client's sole expense. Such notice will document the condition of Client Equipment being prepared for shipment, any outstanding amounts owed by Client to Company and Client shall have five (5) calendar days from the date set forth in the Retrieval Notice to pay any outstanding amounts owed to Company and remove at Client's sole cost and expense Client Equipment from Company Facility. Client will hold Company harmless from any damage caused to Client Equipment during such pickup and removal of Client Equipment. The failure or delay by Client to retrieve Client Equipment on or before the date set forth in the Retrieval Notice will constitute abandonment of Client Equipment under the laws of the jurisdiction where the Client Equipment is located and Company will be entitled to pursue at Client's sole risk and expense all available remedies, including, without limitation, the actions set forth in Section 4(d), as applicable.

e.      In order to continue to provide the Services, from time to time Company may request, and Client shall promptly provide, information regarding Client Equipment, Client's related operating software, Client's systems, and other information reasonably necessary in Company's provision of the Services.

f.      If software and services of a third party are requested by Client in conjunction with the Services ("**Third Party Services**") and identified in an Order, Client acknowledges and agrees that such Third Party Services are the responsibility of the third party, subject to separate terms and conditions between such third party and Client and Company accepts no responsibility for the performance of such Third Party Services or any loss or damage arising from or associated with the provision of such Third Party Services.

3.      **PAYMENT TERMS AND TAXES**

a.      Company will invoice Client monthly in advance for all applicable fees for use of Company Facility and provision of Services as set forth in the applicable Order. Client will pay all invoiced amounts in US dollars within ten (10) calendar days of the date of the invoice. All payments must be (i) in US dollars into an ACH account number as set forth in the applicable Order; or (ii) to another account or form of payment directed by Company. Interest shall be charged on past due amounts at the lesser of (A) one and a half percent (1.5%) per month; or (B) the highest rate permitted by applicable law.

b.      Client may, in good faith, dispute any invoice or any part thereof (a "**Disputed Amount**") by submitting a written notice of such dispute along with reasonable supporting documentation within three (3) calendar days of the date of the initial invoice on which the Disputed Amount appears, failing which Client waives all rights to dispute such Disputed Amount and to file any claim. Company will review the Disputed Amount after its receipt of the relevant notice and if Company determines that Client was billed in error, a credit for the amount invoiced incorrectly will be made to the next invoice. If Company determines that the amount was invoiced correctly, Client will pay the amount by the due date of the next invoice. For clarity, Client shall promptly pay all undisputed amounts.

2

c.      All amounts payable to Company under this Agreement exclude applicable taxes. Client is responsible for (i) taxes related to its activities and the ownership and operation of Client Equipment and (ii) taxes imposed, levied or assessed thereon by any governmental or other authorities. If Client is required to make any deduction, withholding or payment for taxes in any jurisdiction on amounts payable to Company, such amounts will be increased such that after making such deduction, Company receives an amount equal to what it would have received if such deduction, withholding or payment had not been made.

## 4.      TERM, TERMINATION, MODIFICATION AND SUSPENSION

a.      This Agreement commences on the Effective Date and continues until terminated as permitted by this Agreement. Each Order commences on the effective date set forth in the Order, has the initial term ("**Initial Term**") set forth in the Order, and thereafter automatically renews for the additional periods set forth in the Order, or if no renewal period is set forth then one (1) year periods, (each, a "**Renewal term**" and collectively, the "**Term**") unless Client notifies Company in writing not less than ninety (90) calendar days before such renewal of its desire for the other not to renew.

b.      Either party may terminate an Order upon written notice to the other party and take such other action identified in Section 4 d. below if the other party materially breaches such Order or this Agreement and fails to cure such breach within thirty (30) calendar days (5 days in the case of failure to pay an Unpaid Balance (as defined below) or 2 days in the case of failure to pay an Unpaid Balance two or more times during any twelve month period) . If the breach (other than Client failure to pay amounts when due) cannot be cured within thirty (30) calendar days, the breaching party shall be given a reasonable period of time, but not to exceed sixty (60) calendar days after receipt of the notice, to cure the breach, provided that the breaching party acts promptly and diligently to cure such breach.

c.      Either party may terminate this Agreement upon written notice to the other party if there have been no Orders in effect for twelve (12) consecutive months.

d.      In addition to the remedy set forth in Section 4 b. above if Client fails to pay all invoiced amounts when due (an "**Unpaid Balance**"), or otherwise fails to perform any of its obligations under this Agreement after opportunity to cure as provided in Section 4 b above Company may, in its sole discretion, take certain actions including, without limitation, the following actions, at Client's sole risk and expense:

      (i)      suspend the provision of the Services;

      (ii)      disconnect Client Equipment and store it;

      (iii)      declare all amounts due under the applicable Order through the balance of the Term to be immediately due and payable;

      (iv)      operate Client Equipment for cryptocurrency mining and other activities at Company's sole discretion and direct all resulting proceeds to Company's own account until Company has recovered all amounts due, including, without limitation, any reinstatement, disconnection or storage fees or costs;

      (v)      terminate this Agreement and all Orders; and

      (vi)      exercise all other rights under this Agreement, at law, in equity or otherwise.

Unless Company has terminated this Agreement, Company will reverse the suspension of the provision of the Company Facility and Services and disconnection of Client Equipment as soon as reasonably practical after it is satisfied Client has cured the acts or omissions giving rise to the suspension and disconnection. In connection with the foregoing, Company may charge a reinstatement fee. Thereafter, Company may, at its sole discretion, require an advance payment equal to the amount of one billing invoice.

e.      Notwithstanding anything in this Agreement to the contrary, Company may suspend its provision of

all or a portion of the Services and disconnect all of a portion of Client Equipment immediately if Company determines in its sole discretion that: Client's use of the Services or Client Equipment (i) may adversely impact or pose a security risk to Company's operation or maintenance of the Company Facility or Company's other clients; (ii) may subject Company to liability; or (iii) is not in compliance with this Agreement or Company's policies.  Company will use commercially reasonable efforts to notify Client, which may be via email or telephone, of such suspension or disconnection.  Company will use commercially reasonable efforts to reverse such suspension or disconnection as soon as reasonably practical after it is satisfied that Client has cured the acts or omissions giving rise to such suspension and disconnection.  In connection with the foregoing, Company may charge a reinstatement fee as set forth in the applicable Order.  Further, Company may terminate this Agreement and all Orders if such suspension or disconnection continues for at least two (2) calendar days or occurs more than three (3) times in any twelve (12) month period.  For clarity, during the period of suspension or disconnection, Client remains responsible for all fees and charges Client incurs during such period.  Further, after the Effective Date, if Company determines in its sole and absolute discretion that as a result of any change in, or interpretation, introduction or administration of, any laws, regulations, statutes, treaties, rules, guidelines, ordinances, codes or the like, or any proposed or anticipated changes in, or interpretations, introduction or administration of the foregoing (a "**Change in Law**"), has resulted in an increase in Company's cost of compliance with such Change in Law then Company may, in its commercially reasonable discretion, take certain actions, including, without limitation, the following actions, at Client's sole risk and expense: (i) terminate this Agreement, any or all Orders; and/or (ii) modify the Services as may be necessary to account for such Change in Law. Company will use commercially reasonable efforts to notify Client of such Company actions and the effective date of such actions.

f.      Further, and notwithstanding the Change in Law related costs above, after the Effective Date, if there are any increases, changes in, or introduction or administration of, any new taxes, levies, tariffs or governmental fees and charges with respect to the provision of Services, Company may, in its sole and absolute discretion, pass through all such amounts to Client ("**Increased Costs**") and Client shall pay all Increased Costs in accordance with the payment and invoicing procedures as set forth in this Agreement.

g.      Company shall not be liable for any Client loss or damage whatsoever as a result of the exercise of its rights under this Agreement.  Upon termination of this Agreement or an Order by Company, Company is entitled to recover from Client all loss or damages incurred by Client as a result of such termination, outstanding fees, costs, charges, assessments, reimbursements, and expenses (including, without limitation, costs of collection and reasonable attorneys' fees).

h.      In addition to Section 4(f), the Company may terminate or suspend all or a portion of the Services if necessary to be in compliance with applicable law, rules, regulations, administrative or judicial orders or decree.   Company will use commercially reasonable efforts to notify Client, which may be via email or telephone, of such suspension.  Client agrees that the Company shall have no liability whatsoever to Client for any damage, loss, expense or cost as a result of such termination or suspension.

**5.      WARRANTIES, LIMITATION OF LIABILITY, INDEMNITY**

a.      Each party represents, warrants, and covenants that it has full legal capacity, right, power and authority to execute and perform its obligations under this Agreement.  Company represents, warrants, and covenants that it will provide Company Facility and perform the Services in a professional and workmanlike manner. Client represents, warrants, and covenants (i) Client owns and has good title to Client Equipment, free and clear of any mortgage, pledge, lien, charge, security interest, claim or other encumbrance or has interest in Client Equipment as part of a financing or other arrangement disclosed and approved by Company; (ii) Client Equipment has no defects, is in good condition and is adequate for the purpose it will be used, and is not in need of maintenance or repair except for ordinary, routine maintenance and repairs that are not material in nature or cost; (iii) Client Equipment has not experienced any failure or outage and has

not been modified in any way from its original manufactured condition; (iv) Client Equipment is in a condition suitable for continued optimal cryptocurrency mining operations, including, without limitation, in the same manner as conducted prior to the Effective Date; (v) Client Equipment has been operated at all times indoors in an appropriate temperature-controlled environment and consistent with the manufacturer's recommended temperatures and operating conditions; (vi) Client Equipment has always been transported and/or handled in a protected manner normally expected when transporting and/or handling sensitive computer hardware; (vii) Client will use the Services only for lawful purposes, and Client will not transmit, retransmit or store material with or in Client Equipment or with or in Company Facility in violation of any federal or state law or regulations or local code, rule, regulation or ordinance; and (viii) Client will comply with applicable laws and regulations in connection with this Agreement. Without limiting the foregoing, Client further represents, warrants, and covenants neither Client, any officer, director, employee, partner, controlling shareholder, affiliated entity nor anyone acting on Client's behalf (A) has used or disclosed or will use or disclose non-public information obtained from Company, (B) has violated or will violate applicable anti-bribery or anti-corruption laws, including the U.S. Foreign Corrupt Practices Act and the U.K. Bribery Act 2010, (C) has violated or will violate applicable anti-money laundering statutes, or (D) is a Denied Party or subject to any U.S. sanction imposed by the Office of Foreign Assets Control of the U.S. Department of the Treasury.

b.      EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEMENT, COMPANY DOES NOT MAKE AND HEREBY DISCLAIMS ALL WARRANTIES, INCLUDING, WITHOUT LIMITATION, EXPRESS, IMPLIED AND STATUTORY WARRANTIES THAT COMPANY FACILITY OR SERVICES WILL BE UNINTERRUPTED, ERROR-FREE, OR COMPLETELY SECURE, AND THE IMPLIED WARRANTIES OF MERCHANTABILITY OR SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT OF ANY THIRD PARTY'S INTELLECTUAL PROPERTY RIGHTS. ALL COMPANY FACILITY AND SERVICES ARE PROVIDED OR PERFORMED ON AN "AS IS", "AS AVAILABLE" BASIS, AND CLIENT'S USE OF THE COMPANY FACILITY AND SERVICES IS SOLELY AT ITS OWN RISK. CLIENT ACKNOWLEDGES AND AGREES THAT COMPANY DOES NOT AND CANNOT CONTROL THE FLOW OF DATA OR POWER TO OR FROM COMPANY'S NETWORK AND/OR THE INTERNET OR POWER GRID, WHICH ARE PROVIDED OR CONTROLLED BY THIRD PARTIES, AND THAT ACTIONS OR INACTIONS OF THIRD PARTIES CAN IMPAIR OR DISRUPT COMPANY'S CONNECTIONS TO THE INTERNET OR POWER GRID (OR PORTIONS THEREOF) INCLUDING, WITHOUT LIMITATION, INTERRUPTIONS IN SERVICE CAUSED BY GOVERNMENT REGULATIONS OR ORDERS, SYSTEM CAPACITY LIMITATIONS OR LIMITATIONS IMPOSED BY, OR FAILURES OF, AN UNDERLYING COMMUNICATIONS CARRIER. COMPANY WILL ENDEAVOR TO TAKE ACTIONS IT DEEMS APPROPRIATE IN ITS SOLE DISCRETION TO REMEDY AND AVOID SUCH EVENTS. HOWEVER, COMPANY CANNOT AND DOES NOT GUARANTEE THAT SUCH EVENTS WILL NOT OCCUR, AND COMPANY DISCLAIMS ANY AND ALL LIABILITY RESULTING FROM OR RELATED TO SUCH EVENTS. COMPANY HEREBY DISCLAIMS ALL RESPONSIBILITY FOR THE ACTS OR OMISSIONS BY COMPANY'S OTHER CUSTOMERS AND CLIENTS AND OTHER THIRD PARTIES.

c.      NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR (I) LOST PROFITS; (II) LOSS OF BUSINESS; (III) LOSS OF REVENUES (EXCEPT THAT CLIENT SHALL BE LIABLE FOR ANY FEES OR OTHER AMOUNTS OWED TO COMPANY UNDER THIS AGREEMENT); (IV) LOSS, INTERRUPTION OR USE OF DATA OR LOSS OF USE OF CLIENT EQUIPMENT; (V) ANY CONSEQUENTIAL OR INDIRECT DAMAGES; OR (VI) COST OF COVER, ANY INCIDENTAL, SPECIAL, RELIANCE, EXEMPLARY OR PUNITIVE DAMAGES (IF APPLICABLE), EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

d.      NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT,

COMPANY'S TOTAL LIABILITY TO CLIENT IN THE AGGREGATE FOR THE ENTIRE TERM (REGARDLESS OF WHETHER THE CLAIMS ARE BROUGHT DURING OR AFTER THE TERM) WITH RESPECT TO ALL CLAIMS ARISING FROM OR RELATED TO THE SUBJECT MATTER OF THIS AGREEMENT (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES) WILL NOT EXCEED AN AMOUNT EQUAL TO ONE (1) MONTHS FEE PAYABLE TO COMPANY PURSUANT TO THE APPLICABLE ORDER.

e.     EXCEPT FOR CLIENT'S BREACH OF ITS OBLIGATIONS UNDER SECTIONS 4, 5 a, 5 h AND 6, AND LOSS OR DAMAGE ARISING OUT OF CLIENT'S GROSS NEGLIGENCE, BAD FAITH OR WILLFUL MISCONDUCT, THE LIMITATIONS SET FORTH IN SECTIONS 5 c AND 5 d WILL APPLY TO ALL CLAIMS AND CAUSES OF ACTION, REGARDLESS OF WHETHER IN CONTRACT, TORT, STRICT LIABILITY OR OTHER THEORY.

f.     Client hereby waives the right to bring any claim against Company arising out of or in any way relating to an Order more than one (1) year after the date such Order expires or is terminated. Each party recognizes and agrees that the warranty disclaimers, limitations of liability and remedy limitations in this Agreement are materially bargained for by the parties.

g.     Client acknowledges that cryptocurrency price movement, cryptocurrency difficulty, and legal and regulatory risks could have a material adverse impact on cryptocurrencies, cryptocurrency mining, Client Equipment, Services, and this Agreement. Client assumes responsibility for all such risks, and Company disclaims all types of liabilities or loss of funds that may arise as a result.

h.     Client shall indemnify, defend and hold harmless Company and its affiliates, stockholders, directors, officers, employees, subcontractors and invitees from and against any losses, liabilities, damages, costs and expenses (including, without limitation, reasonable attorneys' fees) arising from or relating to (i) death, personal injury, bodily injury or property damage caused by Client or Client's customers or clients or Client Equipment; (ii) breach of Client's representations, warranties, or covenants in this Agreement or in an Order or Sections 2 or 6; (iii) fraud, bad faith, negligence or willful or reckless conduct of or by Client or Client's customers or clients; (iv) Client's or Client's customers' or clients' use of the Company Facility, Services, or Client Equipment; (v) any claim whatsoever by Client's customers or clients, or any third party related to the Services or Client Equipment; or (vi) any change in, or interpretation or administration of, any laws, regulations, statutes, treaties, rules, guidelines, ordinances, codes or the like, or any proposed or anticipated changes in, or interpretations or administration of the foregoing.

**6.     CONFIDENTIAL INFORMATION**

a.     Each party acknowledges that it and its employees or agents may, in the course of performing its responsibilities under this Agreement, be exposed to or acquire information which is proprietary to or confidential to the other party, including, without limitation, business plans, strategies, forecasts and projections and information about business structures, operations, systems, finances, assets, investments, investment strategies, software and other technology systems, and personnel, customers and suppliers (collectively, "**Confidential Information**"). Company's Confidential Information also includes the design, address and location of the Company Facilities (which is deemed to be not publicly known), the Services provided, equipment used at the Company Facilities, the configuration of cables, networks and services at the Company Facilities and the terms of this Agreement. Neither party may use or copy any Confidential Information except to the limited extent necessary to perform its obligations under this Agreement and will not disclose any Confidential Information to any person or entity other than to its employees who have a need to know the Confidential Information or as otherwise expressly permitted by this Agreement. Each party shall use the same measures that it uses to protect its own most confidential and proprietary information to protect the Confidential Information from use or disclosure in violation of this Agreement, but in no event less than commercially reasonable measures.

6

b.     The restrictions on use of Confidential Information do not apply to information if it (i) is known to the receiving party prior to receipt from the disclosing party directly or indirectly from a source other than one having an obligation of confidentiality to the disclosing party; (ii) becomes known (independently of disclosure by the disclosing party) to the receiving party directly or indirectly from a source other than one having an obligation of confidentiality to the disclosing party; (iii) becomes publicly known or otherwise ceases to be confidential, except through a breach of this Agreement by the receiving party; or (iv) is independently developed by the receiving party. For the avoidance of doubt, the mere placement of materials or equipment containing information at a Company Facility does not constitute disclosure of such information to Company.

c.     Upon termination or expiration of this Agreement, or at any other time at the request of the other party, each party shall return to the other party, or destroy and delete, as applicable, all Confidential Information and any copies thereof in its possession or control.

d.     Neither party may use the other party's trademarks, service marks, trade names, copyrights, other intellectual property rights or other designations in any promotion, publication or press release without the prior written consent of the other party in each case, which consent may be given in an Order.

**7.     INSURANCE**

a.     Client agrees to maintain the following insurance, at its expense, during the Term, with insurers having a minimum AM Best rating of A- VII or S&P rating of A: (i) Commercial General Liability or Public Liability Insurance with a limit of US $2,000,000 per occurrence, US $4,000,000 in the aggregate (or the local currency equivalent), provided these limits may be achieved through a combination of primary and excess policies and such insurance will include coverage for bodily injury and property damage.

b.     Client will furnish Company with certificates of insurance upon request that evidence the minimum levels of insurance set forth herein, list Company as an additional insured or interested party on the Commercial General Liability or Public Liability Insurance and designate that Client's insurance is primary and non-contributory. Client will provide at least thirty (30) days' prior written notice to Company of any non-renewal or cancellation of the policies referenced above.

**8.     MISCELLANEOUS**

a.     <u>Notice</u>. Except where expressly provided in this Agreement or an Order, all notices, consents, or approvals required by this Agreement will only be in writing and sent by overnight courier, certified or registered mail, overnight delivery requiring a signature upon receipt, or delivery by hand to the parties at the respective addresses set forth on the first page of this Agreement. Notice is effective when received.

b.     <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the parties with respect to the subject matter of this Agreement, and supersedes and replaces all prior or contemporaneous discussions, negotiations, proposals, understandings and agreements, written or oral, as well as any industry custom. Each party acknowledges that, in entering into this Agreement, it has not relied on, and shall have no right or remedy in respect of, any statement, representation, assurance or warranty other than as expressly set out in this Agreement. This Agreement may be executed in two (2) or more counterparts (and the signature pages may be delivered with ink or electronic signature or by e-mail), each will be deemed an original, but all together will constitute one and the same instrument. Except where otherwise expressly provided in this Agreement, this Agreement may be amended only by the written agreement of both parties.

c.     <u>Survival</u>. Any provision of this Agreement, which, by its nature, would survive termination or expiration of this Agreement will survive any such termination or expiration, including, without limitation,

7

those provisions concerning confidentiality, indemnification and limitation of liability.

d.      Subcontracting and Assignment.  Company may permit any affiliate, independent contractor or other third party to perform any of Company's obligations hereunder provided that Company remains primarily liable for the performance of its obligations.  Company may assign, delegate, or transfer this Agreement or any of its rights and obligations hereunder without notice to or prior written consent of Client.  Client may not assign, delegate or transfer this Agreement or any of its rights and obligations hereunder without the prior written consent of Company.  Any assignment or transfer in violation of this Agreement is void.  This Agreement will be binding upon and inure to the benefit of all permitted successors and assigns.  Nothing in this Agreement is intended to or will confer upon any third party any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement

e.      Force Majeure.  Except for Client's obligation to pay amounts owed under this Agreement, neither party will be responsible or in any way liable to the other party, and neither party will have any termination or other rights, arising out of or relating to a Force Majeure Event.  A "**Force Majeure Event**" is a failure by the other party to perform any of its obligations under this Agreement if such failure is caused by events or circumstances beyond its reasonable control, including, without limitation, acts of God, war, labor strike, terrorist act, fire, flood, earthquake, landslide, hurricane, typhoon, tsunami, volcanic eruption, inclement weather, health epidemic or any law, order, regulation or other action of any governing authority or agency.

f.      Governing Law and Arbitration.  This Agreement and all claims arising out of or related to this Agreement are governed by and construed in accordance with the laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any jurisdiction other than the State of Delaware.  Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including, without limitation, the determination of the scope or applicability of this Agreement to arbitrate, shall be determined exclusively by arbitration in King County, Washington before three (3) arbitrators.  The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules & Procedures.  Any award, order or judgment pursuant to arbitration ("**Award**") is final and may be entered and enforced in any court of competent jurisdiction, and each party shall submit to any court of competent jurisdiction for purposes of the enforcement of any Award.  The arbitrator may, in the Award, allocate all or part of the costs of the arbitration, including, without limitation, the fees of the arbitrator and the reasonable attorneys' fees of the prevailing party.

g.      General.  The rights and remedies provided for herein are cumulative and not exclusive of any rights or remedies that a party would otherwise have.  The parties are independent contractors, and this Agreement does not establish any relationship of partnership, joint venture, employment, franchise or agency between them.  Neither party may bind the other or incur obligations on the other's behalf without the other's prior written consent.  There are no third-party beneficiaries to this Agreement.  No waiver of any breach of any provision of this Agreement will constitute a waiver of any prior, concurrent or subsequent breach of the same or any other provisions hereof, and no waiver will be effective unless made in writing and signed by an authorized representative of the waiving party.

*[Signature page follows]*

8

**Core Scientific, Inc.**

DocuSigned by:

By: _Michael Trzupek_
    4963E00350804A8...

Name: Michael Trzupek

Title: Authorized Representative

Date: 12/18/2020

**Celsius Core LLC**

DocuSigned by:

By: _S. Daniel Leon_
    40B7E44670FB4C8...

Name: S. Daniel Leon

Title: S. Daniel Leon, President/COO

Date: 12/18/2020

9

# CELSIUS EXHIBIT NO. 2

DocuSign Envelope ID: 9BF454B5-39DF-4CAA-B6CF-42096B665DE1

## MASTER SERVICES AGREEMENT ORDER # 10

This Order, including the terms and conditions hereunder, incorporates by reference the terms of the Master Services Agreement dated as of December 18, 2020 (the "**Agreement**") between Provider and Client (as defined below). If any terms of this Order conflict with the terms of the Agreement, the terms of this Order shall govern with respect to this Order. Capitalized terms used but not defined in this Order shall have the meanings ascribed in the Agreement.

| Commencement Date: | September 20, 2021 and then the fifteenth of every remaining month beginning with October 15, 2021 until December 15, 2022, respectively. | | |
|---|---|---|---|
| Facility: | Provider Facility as determined by Provider. | | |
| Equipment hosted**: | **Deployment Month** | **Quantity & Type of Unit (the "Units")** | **Assumed power consumption per Unit (KWh):** |
| | SEP 2021 | 2,250 - M30S+ or Equivalent | 3.57 |
| | MAR 2022 | 3,530 - M30S+ or Equivalent | 3.57 |
| | APR 2022 | 4,710 - M30S+ or Equivalent | 3.57 |
| | MAY 2022 | 2,350 - M30S+ or Equivalent | 3.57 |
| | JUNE 2022 | 2,350 - M30S+ or Equivalent | 3.57 |
| | JUL 2022 | 2,350 - M30S+ or Equivalent | 3.57 |
| | AUG 2022 | 2,350 - M30S+ or Equivalent | 3.57 |
| | SEP 2022 | 2,350 - M30S+ or Equivalent | 3.57 |
| | OCT 2022 | 2,350 - M30S+ or Equivalent | 3.57 |
| | NOV 2022 | 2,350 - M30S+ or Equivalent | 3.57 |
| | DEC 2022 | 2,350 - M30S+ or Equivalent | 3.57 |
| Hosting-Services Rate: | **Deployment Month** | | **Hosting-Services Rate:** |
| | SEP 2021 | | USD $.0575/ KWh; USD $.06/Kwh after hosting month 12 |
| | MAR 2022 | | USD $.0593/ KWh; USD $.06/kwh after hosting month 12 |
| | APR 2022 – DEC 2022 | | USD $.00625/ KWh; USD $0.6/kwh after hosting month 12 |
| Payment Due Prior to Installation: | **USD $10,736,252.50 on or before September 20, 2021 consisting of:** <br> • $1,685,800.00, 100% of the prepayment for hosting services for SEP 2021 Units to be applied as a credit against future monthly invoices as they become due. <br> • $1,909,775.00, 70% of the prepayment for hosting services for MAR 2022 Units to be applied as a credit against future monthly invoices as they become due. <br> • $1,342,547.50, 35% of the prepayment for hosting services for APR 2022 Units to be applied as a credit against future monthly invoices as they become due. <br> • $5,358,780.00, 35% of the prepayment for hosting services for MAY 2022 – DEC 2022 Units ($669,847.50 for each of MAY 2022, JUN 2022, JUL 2022, AUG 2022, SEP 2022, OCT 2022, NOV 2022 and DEC 2022 Units) to be applied as a credit against future monthly invoices as they become due. <br> • $439,350.00, Equipment Configuration Fee for SEP 2021 – DEC 2022 Units listed above. <br><br> **USD $1,342,547.50 on or before October 20, 2021 consisting of:** <br> • $1,342,547.50, 35% of the prepayment for hosting services for APR 2022 | | |

1

**Exhibit No. 2**
KC Mares
10/26/22

Ex. C, Page 1 of 5

| | |
|---|---|
| | Units to be applied as a credit against future monthly invoices as they become due. |
| | **USD $669,847.50 on or before November 20, 2021 consisting of:**<br>• $669,847.50, 35% of the prepayment for hosting services for MAY 2022 Units to be applied as a credit against future monthly invoices as they become due. |
| | **USD $669,847.50 on or before December 20, 2021 consisting of:**<br>• $669,847.50, 35% of the prepayment for hosting services for JUNE 2022 Units to be applied as a credit against future monthly invoices as they become due. |
| | **USD $669,847.50 on or before January 20, 2022 consisting of:**<br>• $669,847.50, 35% of the prepayment for hosting services for JUL 2022 Units to be applied as a credit against future monthly invoices as they become due. |
| | **USD $1,488,322.50 on or before February 20, 2022 consisting of:**<br>• $669,847.50, 35% of the prepayment for hosting services for AUG 2022 Units to be applied as a credit against future monthly invoices as they become due.<br>• $818,475.00, the remaining 30% of the prepayment for hosting services for MAR 2022 Units to be applied as a credit against future monthly invoices as they become due. |
| | **USD $1,820,602.50 on or before March 20, 2022 consisting of:**<br>• $669,847.50, 35% of the prepayment for hosting services for SEP 2022 Units to be applied as a credit against future monthly invoices as they become due.<br>• $1,150,755.00, the remaining 30% of the prepayment for hosting services for APR 2022 Units to be applied as a credit against future monthly invoices as they become due. |
| | **USD $1,244,002.50 on or before April 20, 2022 consisting of:**<br>• $669,847.50, 35% of the prepayment for hosting services for OCT 2022 Units to be applied as a credit against future monthly invoices as they become due.<br>• $574,155.00, the remaining 30% of the prepayment for hosting services for MAY 2022 Units to be applied as a credit against future monthly invoices as they become due. |
| | **USD $1,244,002.50 on or before May 20, 2022 consisting of:**<br>• $669,847.50, 35% of the prepayment for hosting services for NOV 2022 Units to be applied as a credit against future monthly invoices as they become due.<br>• $574,155.00, the remaining 30% of the prepayment for hosting services for JUN 2022 Units to be applied as a credit against future monthly invoices as they become due. |
| | **USD $1,244,002.50 on or before June 20, 2022 consisting of:**<br>• $669,847.50, 35% of the prepayment for hosting services for DEC 2022 |

2

| | |
|---|---|
| | Units to be applied as a credit against future monthly invoices as they become due. <br> • $574,155.00, the remaining 30% of the prepayment for hosting services for JUL 2022 Units to be applied as a credit against future monthly invoices as they become due. <br><br> **USD $574,155.00 on or before July 20, 2022 consisting of:** <br> • $574,155.00, the remaining 30% of the prepayment for hosting services for AUG 2022 Units to be applied as a credit against future monthly invoices as they become due. <br><br> **USD $574,155.00 on or before August 20, 2022 consisting of:** <br> • $574,155.00, the remaining 30% of the prepayment for hosting services for SEP 2022 Units to be applied as a credit against future monthly invoices as they become due. <br><br> **USD $574,155.00 on or before September 20, 2022 consisting of:** <br> • $574,155.00, the remaining 30% of the prepayment for hosting services for OCT 2022 Units to be applied as a credit against future monthly invoices as they become due. <br><br> **USD $574,155.00 on or before October 20, 2022 consisting of:** <br> • $574,155.00, the remaining 30% of the prepayment for hosting services for NOV 2022 Units to be applied as a credit against future monthly invoices as they become due. <br><br> **USD $574,155.00 on or before November 20, 2022 consisting of:** <br> • $574,155.00, the remaining 30% of the prepayment for hosting services for DEC 2022 Units to be applied as a credit against future monthly invoices as they become due. |
| **Estimated Delivery Date:** | As of fifteenth of every month beginning with December 15, 2021 until December 15, 2022, respectively. <br><br> Client to notify Provider as soon as reasonably possible in advance if Units will not be delivered by this date. Provider may terminate this Order if substantially all the Units are not delivered within 60 days of the Estimated Delivery Date, respectively. |
| **Fees:** | Equipment Configuration Fee: $15/Unit payable as provided above. |
| **Fees payable pursuant to Section 4 in connection with Service Termination/ Suspension** | Equipment disconnection fee: $25/Unit <br> Storage Fee: $10/month/Unit <br> Reinstatement fee: $25/Unit <br> Equipment Recycle fee: $25/Unit decommissioned or disposed of during the term |

**Order Term.** Subject to acceptance by Provider, the term of this Order shall commence on the **Commencement Date** and continue until the second anniversary of the Commencement Date (the "**Initial Term**"), unless sooner terminated (i) by Provider, as provided above, (ii) by mutual agreement of the parties, or (iii) pursuant to Section 4 of the Agreement. Unless earlier terminated, this Order shall automatically renew for successive 12-month renewal terms ("**Renewal Term**") unless terminated during a renewal term as set forth in the Agreement.

Ex. C, Page 3 of 5

**Fees.** Client shall pay the fees provided for in this Order. The Fees for Services will be determined initially by reference to the Assumed power consumption per Unit of each deployed Unit, multiplied by the Hosting-Services Rate (each as set forth above in this Order). Subsequent invoices will contain any additional charges incurred by Client and adjustments resulting from any differences between the Fees for Services invoiced in the preceding month and the Fee for Services based on Provider's determination of power utilized by Client during that month, as well as any adjustments to Provider's estimate of power to be utilized by Client in the upcoming month. Fees for Services for each month shall be paid in advance, in accordance with Section 3 of the Agreement.

**Third Party Code.** Except to the extent arising from or relating to Provider's gross negligence, fraud or willful misconduct, Client shall indemnify, defend and hold harmless Company and its affiliates, stockholders, directors, officers, employees, subcontractors and invitees from and against any losses, liabilities, damages, costs and expenses (including, without limitation, reasonable attorneys' fees) arising from or relating to Client's installation or use of any non-standard software or firmware in connection with the Client Equipment.

**Subcontracting and Assignment. Section 8d. of the Agreement is hereby amended to read in its entirety:**

 d.  Subcontracting and Assignment. Company may permit any affiliate, independent contractor or other third party to perform any of Company's obligations hereunder provided that Company remains primarily liable for the performance of its obligations. Company may assign, delegate, or transfer this Agreement or any of its rights and obligations hereunder without notice to or prior written consent of Client. Client may not assign, delegate or transfer this Agreement or any of its rights and obligations hereunder without the prior written consent of Company; provided, however, Client may assign, delegate or transfer an Order pursuant to this Agreement to a third party upon the written consent of the Company, which consent shall not be unreasonably, withheld, obstructed or delayed if such assignment is to a third party not competitive to Company and such party executes a new Order on standard terms and conditions containing the hosting price and hosting term set forth in the Order to be assigned. Any assignment or transfer in violation of this Agreement is void. This Agreement will be binding upon and inure to the benefit of all permitted successors and assigns. Nothing in this Agreement is intended to or will confer upon any third party any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement

**Warranty:** Company does not make and hereby disclaims all warranties with respect to the Units. Company shall initiate warranty claims with Unit manufacturer. Company cannot and does not guarantee that warranty claims will be accepted by manufacturer.

Client agrees and confirms that:

 (i)  It has clean title to the Client Equipment and has not entered into any agreement that would interfere with Provider's exercise of its remedies under section 4.d of the Agreement.
 (ii)  Neither Client nor Client's customers will use the Services for any illegal activity; and
 (iii)  Neither Client nor its customers are subject to any sanctions imposed by the Office of Foreign Asset control of the U.S. Department of the Treasury.

**Notification of Hosting Availability:** Company will notify Client as soon as practicable of additional hosting availability, if any, and provide Client up to 10 additional MW per month at a hosting services rate of $0.0625

4

per KWh. Additional hosting availability if available will be the subject of a separate order and provided to Client on a priority basis, subject to Client acceptance.

**Client agrees to replace sold, damaged and other inoperable Units within 90 days to maintain the aggregate number of Units subject to this Order. Provider agrees to a 500 Unit inoperable threshold for Client to replace, sold, damages and other inoperable Units. Additional equipment may be added to this Order at the Hosted Services Rate provided upon the mutual agreement of Provider and Client.

By: _Roni Cohen Pavon_
Celsius Core LLC "Client"
Name: __Roni Cohen Pavon__
Title: __Chief Revenue Officer__
Date: 9/27/2021

By: _Michael Trzupek_
Core Scientific, Inc., "Provider"
Name: __Michael Trzupek__
Title: __CFO__
Date: 9/27/2021

5

Ex. C, Page 5 of 5

# CELSIUS EXHIBIT NO. 3
# (Portions Filed Under Seal)

# JEFFREY PRATT

# DEPOSITION EXCERPTS

1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK


In re:                          )
                                )
CELSIUS NETWORK LLC, et al.,    )
                                ) Case No. 22-10964 (MG)
            Debtor.             )
                                )
                                )


VIDEOTAPED DEPOSITION OF JEFFREY PRATT


November 1, 2022


Seattle, Washington


***** Highly Confidential *****


Reporter: Teri Simons, CCR, RMR, CRR

12

1    purchasing energy and the utility providing that energy.

2  Q  When you say the word "tariff" is all encompassing, what

3     do you mean by that?

4  A  It means every component of the utility bill or invoice

5     or charges to the company are underneath the umbrella

6     term "tariff."

7  Q  So in your view a tariff is every component of the bill

8     or invoice received from a utility?

9  A  Yes, that's correct.

10 Q  What's the basis for that understanding, Mr. Pratt?

11 A  When I joined Core Scientific three years ago, I realized

12    I had to learn as much as I could about the electricity

13    industry, so from reading about the industry, from

14    talking to our power experts and looking at power

15    contracts and meeting people in the industry, it became

16    clear to me that the word "tariff" is commonly understood

17    as an all-encompassing term.

18 Q  And so in your view tariff equals utility costs, correct?

19 A  Absolutely, yeah, without a doubt.

20 Q  Is there any difference between a tariff and a utility

21    cost, Mr. Pratt?

22 A  Not in regards to electricity.

23        "Utility" is a broader word, so I don't understand

24    the question fully.

25 Q  So when it comes to electricity and power, there's no

26

1       (Recess 9:31 to 9:32 p.m.)

2                   VIDEOGRAPHER:  Back on record.  The

3       time now is 9:32 a.m.

4   Q   (By Mr. Brown)  Mr. Pratt, when you say that Core

5       energizes machines for Celsius or other clients, what

6       that means is providing power to those machines, correct?

7   A   Power, software, internet access, a variety of things.

8   Q   Including power, right?

9   A   Including power.

10  Q   Okay.  So Core has to purchase power itself, right?

11  A   Correct.

12  Q   From a provider such as a utility, right?

13  A   Correct.

14  Q   Sometimes a private entity, correct?

15  A   That's correct.

16  Q   And Core purchases power pursuant to a power purchase

17      agreement?

18  A   Yes, we do.

19  Q   Those are known as PPAs, correct?

20  A   Yes, they are.

21  Q   Does Core hedge its exposure to fluctuating power prices?

22  A   That is sort of outside my area of expertise.

23          I don't know all of the activities of our treasury

24      department, but we talk about it.

25  Q   I am not asking if you know all of the activities of the

27

```
 1      treasury department.
 2          Based on your time at Core, the knowledge that
 3      you've developed while at the company, can you tell me,
 4      does-- excuse me-- does Core hedge its exposure to
 5      fluctuating power prices?
 6  A   I don't know the specific hedge we purchased on power
 7      prices.  I don't know of one.
 8  Q   As a general matter, do you know whether Core hedges its
 9      exposure to power prices?
10  A   I know we talk about it as a strategy.  I don't know if
11      we do it.
12  Q   So all you know about Core's hedging activity is that
13      folks at the company talk about hedging Core's exposure
14      to fluctuating power prices as a strategy?
15                      MR. LENDER:  Object to the form.
16          You can answer.
17                      THE WITNESS:  We discuss the
18      affordability of hedging versus, you know, the amount of
19      profit we have in our business.
20          We have discussed that, yes.
21  Q   (By Mr. Brown)  Who is "we"?
22  A   We--
23  Q   Who discusses hedging Core's exposure to power prices?
24  A   I am sure it was discussed at a power team meeting.
25          You know, we have a variety-- we have a team of
```

32

1   A   30 years, off and on.

2   Q   You understand the difference between fixed and variable,

3       right?

4   A   I do understand the difference.

5   Q   Describe for me the difference between fixed and

6       variable, Mr. Pratt.

7   A   Fixed would mean it doesn't change.  Variable would mean

8       it can change.

9   Q   And so your view of the pricing structure between Core

10      and Celsius, and the rate, is it's variable?

11  A   Absolutely.

12  Q   Have you ever referred to a rate as flat?

13  A   Maybe.

14      We sometimes talk about a flat rate to estimate the

15      prepayment, the down payment, so sometimes we use that

16      word.

17  Q   And what is a flat rate, Mr. Pratt?

18  A   A flat rate would be an estimated rate.  It's an

19      estimate.

20  Q   So it's your testimony that the rate set forth in Order

21      No. 10, that's identified in the section of Order No. 10

22      called "Hosting services rate," that's an estimate?

23  A   Yes, it's absolutely an estimate.

24  Q   Where do you see the word "estimate" in that section of

25      Order No. 10, Mr. Pratt?

33

1   A   It's not stated explicitly in this.

2   Q   Is it stated implicitly in Order No. 10?

3   A   Yes, it is.

4   Q   Where?

5   A   Through the signed agreement, Section 4F, where it's

6       subject to increase.

7   Q   4F is in the MSA, right?

8   A   Right, which is-- they work together.

9   Q   Is there anything in Order No. 10 that says, "Here is the

10      hosting services rate, subject to variability per 4F of

11      the MSA"?

12  A   No, but the agreement is signed underneath the umbrella,

13      so I think the umbrella language determines that.

14  Q   And so when Core puts a hosting services rate in its

15      agreements, that is merely an estimate?

16  A   It's the best estimate at the time, yes.

17  Q   Now, in your view a flat rate is also an estimate?

18  A   Yes, it is.

19  Q   Is a flat rate fixed or variable, Mr. Pratt?

20  A   A flat rate is variable.

21  Q   What's the meaning of "flat" then, Mr. Pratt?

22  A   The meaning of "flat" is a number used to estimate the

23      amount after prepayment.

24          We calculate consumption on an every-ten-minute

25      basis, so we have to have some basis to have a discussion

34

```
 1    with a client about what we think their bill might be

 2    each month, and then each month we take an estimated

 3    prepayment, and then we look at the actual, we compare

 4    the two, and we discuss the variability and changes and

 5    all the different issues associated with that bill with

 6    the client.

 7  Q  So when you describe a rate as flat, that means it's an

 8    estimate subject to variability?

 9  A  Absolutely, yeah.

10       It's an entry point.

11  Q  So let's talk about this.

12       Is the rate in Order No. 10 a floor on the rate that

13    Core will charge to Celsius?

14  A  Yes, you could call it a floor rate.

15  Q  In other words, Core will never charge a rate below those

16    specified here in the hosting services rate section of

17    Order No. 10, correct?

18  A  I'm sure in the three-year history of our company, going

19    back to startup days, you could probably find some

20    renegotiated rates that were lower than the contractual--

21    I'm sure that scenario has happened.

22  Q  Absent a renegotiation of rates though, the rates

23    specified in an order are the floor for the rate, in your

24    view, that Core is entitled to charge its customers?

25  A  Yes, that's correct.
```

51

1    every facility, so we share in-- we bear the-- we share

2    the burden of higher costs on our own machines at the

3    same time as our clients are potentially subject to

4    increased costs pass-through.

5  Q  Sure, that's just on a pro rata basis based on the amount

6    of rigs that you are hosting versus deploying for

7    yourself, right?

8  A  No.  It is based on an actual-- every single machine is

9    pinged every ten minutes by our software to determine the

10   invoice to the customer at the spec rate, which is then

11   analyzed, compared to if there's an increased costs that

12   need to be passed through, which are then added as a

13   separate identifiable line item on the invoice day by

14   day, every single day, every ten minutes averaged on the

15   bill.

16 Q  Are there any price increases-- strike that.

17       Are there any power price increases that a customer

18   is not obligated to pay, under your view of the

19   contractual relationship?

20 A  No.

21 Q  So Core can pass through fuel cost adjustments or

22   surcharges, in your view?

23 A  Yes, fuel cost adjustments are a part of the

24   pass-through, part of the tariff.

25 Q  Core can pass-through a change in the base rate of power

                                                                        52

 1      to a customer, correct?

 2   A   Yes, we can do that.

 3   Q   Any change, any increase in the power costs to Core can

 4      be passed through to a customer, that's your testimony?

 5   A   Yes, absolutely.

 6                    MR. BROWN:  Okay.  Why don't we take a

 7      break.

 8                    MR. LENDER:  Great.  Thank you.

 9                    VIDEOGRAPHER:  Going off record.  The

10      time now is 10:08 a.m.

11                        (Recess 10:08 to 10:20 a.m.)

12                        (Exhibit No. 51 marked

13                            for identification.)

14                    VIDEOGRAPHER:  Back on record.  The

15      time now is 10:20 a.m.

16   Q   (By Mr. Brown)  Mr. Pratt, I am going to hand you a

17      document marked Debtor's Exhibit No. 51.

18          Do you have that document?

19   A   Yeah, I do have that document.

20   Q   It is an e-mail chain from April of 2021.

21          Do you see that?

22   A   Yes, I see it.

23   Q   It starts on the back, really at the bottom of the first

24      page, that carries over to the back.

25          Do you see that?

125

1      did, in fact, do that.

2   Q   Okay.  How is it that Core would decide, "Well, we are

3       going to pass through for Marble, but we are not going to

4       pass through for Dalton"?

5   A   We generally, again, try to determine if the increase was

6       short or long term and impact on customer success, client

7       success, client reputations-- sorry, our reputation with

8       clients, and occasionally we chose to bear those costs

9       ourselves.

10  Q   Well, I will represent to you that Core bore those costs

11      every month at every facility, other than Marble 2, until

12      invoices in June 2022 for actual consumption in May 2022,

13      and didn't pass those through to any customer, Celsius or

14      otherwise.

15          Why would that be, Mr. Pratt?

16                      MR. LENDER:  Object to the form.

17                      THE WITNESS:  I think we just

18      discussed that we passed them through in the prior

19      months.

20  Q   (By Mr. Brown)  Only at Marble 2.

21          So why only pass through at Marble 2, and no other

22      site, when Core is hit with fuel riders, increased hourly

23      costs in the base rate?

24          If your position is Core had the contractual right

25      to pass through these costs that are impacting Core's

126

1    profit margin, why did Core not pass them through at any

2    site other than Marble 2, until June 2022?

3  A  For a short period of time, we had a policy that we would

4    bear the costs within a tiny range of variability.

5        This particular month may have fell within that tiny

6    range of variability, where we chose not to do the work

7    of the pass-through.

8  Q  You say "for a short period of time."

9        What period of time was that?

10 A  I do not know exactly, but we have always had the policy

11   of power pass-through, and we have always analyzed power

12   costs each month--

13 Q  So your view is that-- sorry, I thought you were done.

14 A  And we used that analysis to determine when we will or

15   will not pass through the increased costs.

16 Q  So in response to Mr. Schmuhl's December 3rd e-mail,

17   Mr. Trzupek sends an e-mail on December 7th.

18       Do you see that?

19 A  Yes, I do.

20 Q  At 6:30 a.m.

21       Do you see where I'm at?

22 A  Yes, I see it.

23 Q  Core's CFO early that morning writes, "Tom, Todd,

24   previous discussions on this topic centered around

25   whether contractually these increases could be passed.

177

```
 1              THE WITNESS:  I wasn't involved.

 2         I don't know exactly how-- I don't know if it was a

 3      formal recommendation or it was a "Here is what we're

 4      going to go do" or just an update on an informational,

 5      "Hey, Mike, we've solved this at your request" or

 6      something like that.

 7         I don't know the answer.

 8         I don't know how that worked.

 9         We did have a lot of meetings.

10  Q  (By Mr. Brown)  Did the chief executive have to approve

11      of passing through increased power costs?

12  A  No, he did not.

13  Q  Did he approve of passing through increased power costs?

14  A  He approved of us, yeah, passing through power costs,

15      absolutely.

16  Q  Did anyone seek his guidance on whether and when to

17      actually pass through increased power costs?

18  A  Our CEO didn't like the concept or the practice of us

19      bearing the cost of short-term fluctuations, and he said,

20      "My guidance to you would be to pass through all

21      increased costs, as per the contract, and I would like

22      you to move forward with that," and then people went away

23      and worked on that project.

24  Q  And when did Mr. Levitt give that guidance?

25  A  He was studying the profitability and the performance and
```

178

```
1     the viability of the hosting business almost monthly, so
2     that guidance may have come in a variety of months.  It
3     may have come January, February, March, and April, maybe
4     all three, maybe all four months.
5          It might have been part of the monthly discussion.
6  Q  You just don't know one way or another?
7  A  Not the very specifics.
8          He wanted us to improve the performance of the
9     hosting business.
10         He felt it might not be viable to continue hosting.
11         We were constantly debating what is our pricing,
12    what is our go-to-market, how can we improve our
13    business.
14    ██████████████████████████████████████████████████
15    ████████████████████████████████████████
16       ████████████████████
17    ███████████████
18 Q  And he also references a new MSA.
19         Do you see that?
20 A  Yes.
21 Q  That's MSA No. 2, as you referred to it before?
22 A  We call it MSA 2.
23 Q  And MSA 2 is the one that adds the clause permitting a
24    pass through of utility costs, correct?
25                    MR. LENDER:  Object to the form.
```

# CELSIUS EXHIBIT NO. 4

# MICHAEL LEVITT
# DEPOSITION EXCERPTS

1

1            UNITED STATES BANKRUPTCY COURT

2              SOUTHERN DISTRICT OF NEW YORK

3

4    In re                    )
                              )
5    CELSIUS NETWORK LLC,      )
     et al.,                   )   Case No.
6                              )   22-10964 (MG)
                Debtor.        )
7                              )

8

9

10

11              HIGHLY CONFIDENTIAL

12    _____

13

14         VIDEO RECORDED EXAMINATION OF

              MICHAEL LEVITT
15
      _____
16
                    TAKEN ON
17

18         TUESDAY, NOVEMBER 8, 2022

19

20

21

22
     CERTIFIED STENOGRAPHER:
23    JESSIE WAACK, RDR, CRR, CCRR, NYRCR, NYACR,
      CCR-NJ (No. 30XI008238700) CSR-TX (No. 11958)
24    CCR-WA (No. 21007264), CSR-CA (No. 14420),
      REALTIME SYSTEMS ADMINISTRATOR
25    JOB NO.:  870736

34

1        A.    Can you repeat the original

2    question, please?

3        Q.    Yeah.

4              When did Core begin exploring

5    strategic alternatives regarding its

6    capital structure?

7        A.    Within the last month.

8        Q.    So efforts around strategic

9    alternatives to Core's capital structure

10   started in October?

11       A.    Yes.

12       Q.    And why did those efforts begin?

13       A.    We found ourselves in a more

14   difficult liquidity position.

15       Q.    Why?

16       A.    One, the sustained depressed

17   price of bitcoin; two, a sustained

18   relatively higher than expected global hash

19   rate; three, the pressure placed on our

20   stock as a result of announcements in and

21   around this matter compromised our ability

22   to use our equity line of credit; four, the

23   cash required, not only to subsidize

24   Celsius's operations, but to retain

25   attorneys and bankers to deal with the

35

1    Celsius situation, simply put us in a

2    position where our liquidity was

3    compromised.

4         Q.    You referenced "pressure placed

5    on Core's stock as a result of

6    announcements in and around this matter."

7              What did you mean by that?

8         A.    When Celsius decided to move in

9    bankruptcy court for judgment against us on

10   various matters.

11        Q.    And how did Celsius's motion

12   compromise Core's ability to use its equity

13   line of credit?

14        A.    It further depressed our stock

15   price, which resulted in utilization

16   becoming untenable, unfortunately.

17        Q.    How did Celsius's motion depress

18   Core's stock price?

19        A.    Well, as I said earlier, we were

20   having to use a significant portion of our

21   cash flow to both subsidize inappropriately

22   mining activities by Celsius and to hire

23   attorneys and other advisors to address the

24   motions filed by Celsius.

25        Q.    How much cash flow is Core

99

```
 1   power cost pass-through?
 2        A.   You're asking me to read this
 3   page to you?
 4        Q.   No.  I'm asking you if there's a
 5   row in this chart for power cost
 6   pass-through.
 7        A.   There is not a row that states
 8   the words "power cost pass-through."
 9        Q.   Is there a row that shows the
10   hosting rate is subject to adjustment?
11        A.   It's not necessary.
12        Q.   It's not here, correct?
13        A.   It's not necessary.
14        Q.   I understand your testimony is
15   it's not necessary.  I just want to make
16   sure we're on the same page, that there's
17   no row here that shows the hosting rate is
18   subject to adjustment, correct?
19        A.   We are both on page 5.
20        Q.   And there's no row here that
21   shows that the hosting rate is subject to
22   adjustment, correct?
23        A.   There is no verbiage on this page
24   that says that, but, of course, it's not
25   necessary.
```

176

1      Q.   The third paragraph begins, "We

2   took."

3           Do you see where I'm at?

4      A.   Yes.

5      Q.   You said, "We took a long hard

6   look at your hosting businesses."

7      A.   Right.

8      Q.   "Historically the business

9   delivered low profitability."

10          Do you see that?

11     A.   Uh-huh.

12     Q.   Is that a "yes"?

13     A.   Yes.

14     Q.   What did you mean by "low

15   profitability"?

16     A.   That we thought that the business

17   was somewhere between break-even to losing

18   money, which certainly didn't make sense.

19     Q.   When you say "historically," what

20   do you mean by that?

21     A.   Over the last couple of years.

22     Q.   And so what you're saying here

23   effectively is over the last couple of

24   years, the hosting business was break-even

25   or losing money from a profit perspective,

177

```
 1   correct?
 2       A.   Correct.
 3       Q.   You then say, "We will no longer
 4   take on hosting business that is not
 5   sufficiently profitable from day one."
 6            Do you see that?
 7       A.   Yes.
 8       Q.   What did you mean by
 9   "sufficiently profitable"?
10       A.   That any of our new agreements or
11   renewals had to be priced in such a manner
12   that we were going to fully cover the cost
13   of providing those services with some
14   margin.
15       Q.   What margin was Core seeking to
16   hit on its hosting business?
17       A.   Well, the answer to that is as
18   large as we can get while still having a
19   hosting business.
20       Q.   And did you hit a -- strike that.
21            Did you have a goal for the
22   profit margin on the hosting business?
23       A.   Well, the goal would be that
24   ultimately it could be, you know,
25   contributing on a cash basis in the range
```

# CELSIUS EXHIBIT NO. 5
# Portions Filed Under Seal

# MONICA XIA

# DEPOSITION EXCERPTS

1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK


In re:                              )
                                    )
CELSIUS NETWORK LLC, et al.,        )
                                    ) Case No. 22-10964 (MG)
               Debtor.              )
                                    )


VIDEOTAPED DEPOSITION OF MONICA XIA


October 31, 2022



***** Highly Confidential *****

Reporter: Teri Simons, CCR, RMR, CRR

14

1  A   I'm the accounting manager who is in charge of billing

2      and revenue.

3  Q   When did you start at Core Scientific?

4  A   About two and a half years ago.

5  Q   Two and a half years ago?

6  A   Yeah.  I think June 2020.

7  Q   June 2020?

8  A   Mm-hm.

9  Q   When you started, what was your role?

10 A   Accounting manager, same.

11 Q   So you've been accounting manager for the full two and a

12     half years that you've been at Core Scientific?

13 A   Yes.

14 Q   What is a tariff?

15 A   Could you be more specific or like--

16 Q   You submitted a declaration in this matter, correct?

17 A   Yes.

18        Tariffs is utility tariffs charged by power

19     company, utility company.

20 Q   Does that include the base rate of power that Core pays

21     to utility companies?

22 A   No.

23 Q   It does not include that?

24 A   It does not include a base rate.

25 Q   Does it include surcharges due to curtailment?

22

```
 1   Q   How many other hosting customers does Core have

 2       presently?

 3   A   Presently, about 30-- no, I think it's less than 30

 4       because-- yeah, our client base is changing right now.

 5   Q   When did your client base start changing?

 6   A   It's always changing, and it changed like more than

 7       usual recently.

 8   Q   Why did it change more than usual recently?

 9   A   Because the increase in the hosting billing.

10   Q   So many clients have left Core because of the increases

11       in the hosting billing?

12   A   Yes.

13                       MR. LENDER:  Objection to form.

14   Q   (By Ms. Hamlin)  How many clients left?

15   A   About five to ten.

16   Q   Did they expressly tell you that they were leaving

17       because of the increases in the billing?

18   A   No.

19   Q   How do you know that they're leaving because of the

20       increases in the billing?

21   A   They started the termination process right after we sent

22       the recent bills.

23   Q   So your assumption is that the cost has gotten too high?

24   A   I think that is correct, but there are like also other

25       reasons.
```

26

1   A   Yes.

2   Q   But in this contract, you don't understand "changes" to

3       mean decrease?

4   A   I understand, but in this context I don't think it can

5       mean decrease.

6   Q   Does Core pass through to its customers any decreases in

7       utility costs?

8   A   No, because it's not in the contract.

9   Q   Because "changes in" does not mean decreases, in your

10      view?

11  A   Correct.

12  Q   There is a Section 4F in the MSA of every one of Core's

13      hosting customers, right?

14  A   Correct.

15  Q   Is this Section 4F, that's in Celsius's MSA, identical

16      to the Section 4F in every other hosting customer's MSA?

17  A   Not in every other hosting client's MSA, but the

18      majority, yes.

19  ██████████████████████████████████████████████

20      ████████████████████████████████████

21  ██████████████████████████████████

22  ████████████████████

23  ███████████████████████████████████████████

24      ████████████████████████████

25  ██████████████







39

1   decreases?

2 A  Correct.

3 Q  So Core's view is that this hosting services rate is the

4    floor for the price of the contract?

5 A  Yes.

6 Q  What is your understanding of a fixed rate?

7 A  Fixed--

8                      MR. LENDER:  Sorry, we are back to

9    30(b)(1), so go ahead.

10                     THE WITNESS:  Fixed rate, in terms of

11   in this contract or--

12 Q (By Ms. Hamlin)  Not in this contract, just in general,

13   what is your understanding of the meaning of the word

14   "fixed rate"?

15 A  It's pricing.

16 Q  Can you explain more?

17 A  It's a price times quantity equals final amount that

18   like is billable or something.

19 Q  Would you agree that a fixed rate means that the amount

20   charged for that contract doesn't vary based on market

21   factors?

22 A  No.

23 Q  How would you describe a fixed rate?

24 A  First, this-- like-- the fees will vary based on usage

25   power volume, and, second, it's a fixed per kilowatt

57

1  Q   And in that declaration you stated that one of the

2      reasons that Order 10 is not a fixed price contract is

3      this fees provision, right?

4  A   Yes.

5  Q   And in that declaration you bolded and italicized the

6      clause that says, "Subsequent invoices will contain any

7      additional charges incurred by Client, and adjustments."

8          Do you recall that?

9  A   Yes.

10 Q   When Order 10 says, "Additional charges incurred by

11     Client," "Client," means Celsius, right?

12 A   In this case, yes.

13 Q   What are those additional charges that this refers to?

14 A   Power cost pass-through.

15 Q   "Additional charges" refers to power cost pass-through?

16 A   Yes.

17 Q   So additional charges incurred by Celsius includes those

18     additional utility costs incurred by Core?

19 A   Correct.

20 Q   Do Celsius's invoices contain any charges aside from the

21     hosting services charge?

22 A   Yes.

23 Q   What are those?

24 A   Repair services and the sales tax.

25 Q   Any other charges aside from repair services and sales

58

```
 1        tax that are on Celsius's invoices?

 2   A    They had the repair service agreement, which we-- like

 3        they have like a dedicated technician for their miners,

 4        yeah.

 5   Q    So the technician charge would be an additional charge

 6        that appears on Celsius's invoices?

 7   A    Yes.

 8   Q    Any other charges, aside from the hosting services

 9        charge, sales tax, repair costs, the technician charge,

10        that appear on Celsius's invoices?

11   A    I think there might be reimbursable costs too, like for

12        shipping.

13   Q    Any others you can think of?

14   A    Not that I can think of now.

15   Q    Let's drop to the bottom of Page 4 now, to the section

16        titled, "Notification of hosting availability."

17            Do you see that?

18   A    Yes.

19   Q    Are you familiar with this provision?

20   A    I know the language there.

21   Q    You're familiar with the orders of other customers,

22        right?

23   A    Yes.

24   Q    Are you aware of this "notification of hosting

25        availability" term appearing on the orders of any
```

75

1  Q   This e-mail does not mention Section 4F, right?

2  A   Correct.

3  Q   And this e-mail does not use the word "tariff"?

4  A   Correct.

5  Q   And you can turn the page to the invoice, Invoice 42206.

6      There is no power pass-through line item on Invoice

7      42206 either, right?

8  A   Yes, correct.

9  Q   Okay.  You can put that to the side.

10     And you have your declaration, so you can refer

11     back to it if you'd like.

12     In Paragraph 9 of your declaration-- is that

13     Exhibit No. 26, the declaration?

14 A   25.

15 Q   25.

16     So Paragraph 9 you say, "Between October 2021 and

17     April 2022, Core passed through the increased tariffs

18     due to curtailment, and Celsius paid those increased

19     tariffs without objection."

20     So I want to break down what Celsius was paying in

21     this period.

22     From October 2021 to April 2022 were the increased

23     costs that Celsius paid all for the Marble 2 site?

24 A   Yes.

25 Q   Marble 2 is the same site that in October 2021

76

```
 1      Mr. Lawlor had given Core permission to pass through the

 2      increased power costs, right?

 3   A  Yes.

 4   Q  And in this period, October 2021 to April 2022, the

 5      increased costs that Celsius paid were all due to

 6      curtailment, right?

 7   A  Yes.

 8   Q  And again, in this period, from October 2021 to

 9      April 2022, the increased costs that Celsius paid were

10      for a period of days not the entire month, right?

11   A  Correct.

12   Q  In the period from October 2021 to April 2022, did

13      Core's e-mails or invoices to Celsius ever refer to

14      these increased costs as a tariff?

15   A  No.

16   Q  In the period of October 2021 to April 2022 did Core's

17      invoices or e-mails to Celsius ever refer to Section 4F

18      as the basis for passing through these increased power

19      costs as a tariff?

20   A  No.

21   Q  In the period of October 2021 to April 2022 did Core's

22      invoices or e-mails ever include a line item called

23      "power cost pass-through"?

24   A  No.

25   Q  Was Core passing through these increased utility costs
```

1   A   Yes.

2   Q   How long had Core been considering making that decision?

3   A   I don't have the details.

4   Q   You, as the accounting manager, were not involved in the

5       decision to pass through increased costs?

6   A   That is correct.

7   Q   Was anyone in finance involved in that decision?

8   A   I don't have the details.

9   Q   Do you know if anyone in finance was involved in the

10      decision to expand pass-throughs to all customers?

11  A   My understanding will be yes, but I don't have the-- I

12      don't know the details.

13  Q   What do you mean "my understanding will be yes"?

14  A   I think it must be like approved by finance somehow, but

15      who was involved, I don't know.

16  Q   You don't know?

17  A   Nuh-uh.

18  Q   Do you know why Core decided it needed to expand the

19      power costs it was going to pass through?

20  A   Why?

21  Q   Yes.

22  A   Yeah.  Because the power costs increased too much.

23  Q   When did the power costs start increasing so much that

24      Core decided it needed to make this change on the

25      pass-throughs?

103

1  A    I'm not sure there is a specific time point, but the

2       power costs have been increasing.

3  Q    And because those power costs were increasing, Core's

4       profit margins for its hosting contracts were

5       decreasing, right?

6  A    Yes.

7  Q    And so Core wanted to maintain the profitability for its

8       hosting contracts by passing through these additional

9       costs, right?

10                    MR. LENDER:  Object to the form.

11                    THE WITNESS:  I'm not sure that it's

12      maintaining.  More like not losing.

13  Q   (By Ms. Hamlin)  Core wanted to avoid losing money on

14      its hosting contracts by passing through these power

15      costs, right?

16  A   Yes.

17                    (Exhibit No. 30 marked

18                        for identification.)

19                    MS. HAMLIN:  Let's mark Exhibit

20      No. 30.

21          For the record, Exhibit No. 30 is an e-mail chain

22      dated June 13th, 2022, "Subject: Power pass-thru -

23      immediate," from Russell Cann to Kyle Buckett, Jeff

24      Pratt, Mike Geras, Monica Xia, Richard Horowitz, and

25      copying Denise Sterling.





219

1   A    The sentence?

2   Q    Yes.

3   A    Because Ed doesn't work on the AR side.

4        He doesn't have visibility.

5   Q    Well, you do, and so I'm asking you:

6        As of your knowledge, on July 18th, 2022, is the

7        statement by Mr. Haney, "There is currently no challenge

8        from any client on the legality of the pass-through

9        charges," a true statement?

10  A    This sentence is not as accurate as it's supposed to be.

11  Q    I want to get this straight.

12       Is the sentence, "There is currently no challenge

13       from any client on the legality of the pass-through

14       charges" true as of July 18th, 2022?

15  A    If the "no challenge" means litigation, it is correct.

16       If the "challenge" means disputes, it is not

17       correct.

18  Q    Does Mr. Haney say anything about litigation in that

19       statement?

20  A    No.

21  Q    No?

22  A    Nuh-uh.

23  Q    So when he says, without referencing litigation, "There

24       is currently no challenge from any client on the

25       legality of the pass-through charges," that is not a

# CELSIUS EXHIBIT NO. 6

# RUSSELL CANN

# DEPOSITION EXCERPTS

1

```
 1              UNITED STATES BANKRUPTCY COURT

 2              SOUTHERN DISTRICT OF NEW YORK

 3

 4    In re                     )
                                )
 5    CELSIUS NETWORK LLC,       )
      et al.,                    )   Case No.
 6                               )   22-10964 (MG)
                 Debtor.         )
 7                               )

 8

 9

                     HIGHLY CONFIDENTIAL
10
            _____
11

12
            VIDEO RECORDED EXAMINATION OF
13
                     RUSSELL CANN
14
            _____
15
                      TAKEN ON
16

17            MONDAY, NOVEMBER 7, 2022

18

19

20

21

22
      CERTIFIED STENOGRAPHER:
23      JESSIE WAACK, RDR, CRR, CCRR, NYRCR, NYACR,
        CCR-NJ (No. 30XI008238700) CSR-TX (No. 11958)
24      CCR-WA (No. 21007264), CSR-CA (No. 14420),
        REALTIME SYSTEMS ADMINISTRATOR
25      JOB NO.:  870735
```

37

1    maybe a CapEx recovery.  But that spot

2    price, the cost of generating that power,

3    the cost for that actual energy use itself

4    is one component of a tariff.

5        Q.   Okay.  So it's your position that

6    spot pricing or whatever the base

7    generation cost is, is part of a tariff?

8            MR. TSEKERIDES:  Object to the

9        form.

10           THE WITNESS:  Yes, sir.

11   BY MR. MCCARRICK:

12       Q.   So why would any customer

13   negotiate a fee at all with -- or a hosting

14   rate, I should say, with Core?

15       A.   And, again, you know, we debate

16   this all the time, whether we just want to

17   charge a management fee and then just have

18   a -- so in traditional data center world,

19   there's a management fee, and then power is

20   just directly passed through to the

21   customers.

22           And we debated a lot going to

23   that model, but, in general, our customers

24   prefer -- because Core is a self-miner and

25   Core is affected by the power cost, our

38

1    clients know that Core wants to control the

2    power cost as much as humanly possible.

3              So, in general, they want us to

4    try to manage that cost.  Because we have a

5    natural economic incentive to do so for

6    ourselves.  So if you're a small client,

7    you don't have a very complex power team.

8              So we have a power team made up

9    of several professionals that works very

10   hard to control our power cost in any way

11   possible, economically possibly.

12             There's also the economics of

13   bitcoin mining.  Because you can always

14   hedge and fix your power cost, but it

15   becomes economical for bitcoin mining if

16   the price of that control is too much.

17        Q.   When you say that Core wants to

18   "control the power cost as much as humanly

19   possible," what do you mean?

20        A.   So Core -- we are a self-miner.

21   And power is your primary input cost.  So

22   because we're a self-miner, the cost of

23   power greatly affects our own profitability

24   as a miner.

25        Q.   Do you also mean that Core wants

111

1          we would have turned the rig off.  But

2          in October '21, mining was so

3          profitable for our clients that I

4          didn't want clients to lose a lot of

5          money that they had already --

6          revenue, they had an opportunity to

7          stay on.

8               So in this instance -- and I

9          don't remember the exact numbers, but I

10         think clients could pay an extra 20 or

11         30 bucks a month because the increased

12         power cost was small compared to the

13         overall revenue they would make by

14         stay -- by keeping the units on.  So we

15         wanted clients to have that option to

16         do that versus us just turning them

17         off.

18    BY MR. MCCARRICK:

19         Q.   Okay.  So fair to say in October

20    of '21, the reason you offered clients the

21    opportunity to keep their mines on was

22    cost-benefit analysis; they were going to

23    make a way better margin keeping their rigs

24    on and mining rather than -- rather than

25    turning them off even if they pay the power

112

```
 1    cost?

 2         A.    Correct.

 3         Q.    Let me ask you this, why ask at

 4    all if you can pass-through?  If you're

 5    entitled in your -- if Core is entitled in

 6    their sole discretion to pass-through power

 7    costs, why ask at all?

 8         A.    Because they were turned off, and

 9    I wanted them turned them back on.  Core

10    was naturally going to turn them off.  I

11    said I wanted to use the pass-through

12    scenario to let the clients pay the

13    pass-through which is allowed under the

14    MSA.  So the natural inclination is to turn

15    them off.

16              We have the ability to pass

17    through, and I wanted to use the

18    pass-through to have the client say, "You

19    know what, we'll pay the extra power and

20    stay on."

21         Q.    Why not -- if you can just pass

22    through the costs, why not just run the

23    rigs?

24              MR. TSEKERIDES:  Object to the

25         form.
```

113

1          THE WITNESS:  Because there's no

2      economic benefit for us.  I mean, the

3      margins on hosting are de minimis.  The

4      benefit for the client is huge; so...

5  BY MR. MCCARRICK:

6      Q.   Is it your understanding that

7  Core can pass through increased power costs

8  in its sole discretion?

9      A.   Yes.

10     Q.   So why not -- withdrawn.

11          Why ask?  If it's economically

12  beneficial, why wouldn't you just run the

13  rigs in the October 2021 scenario?

14          MR. TSEKERIDES:  Object to form.

15          THE WITNESS:  Because running the

16      rigs in this case didn't benefit Core

17      at all, because the margins are so low

18      in hosting, but it benefitted the

19      client greatly.

20          So instead of just turning them

21      off, I said, "Look, from here -- here

22      on out, we're going to use this

23      analysis where if it makes money for

24      the client, let's let -- you know,

25      we're going to run the rigs and give

119

1    approval from?

2            MR. TSEKERIDES:  Object to the

3        form.

4            THE WITNESS:  In this instance,

5        we would have asked for everyone in

6        Marble 2.

7    BY MR. MCCARRICK:

8        Q.   Fair to say that this

9    October 2021 power cost was a Marble 2

10   specific event?

11       A.   Yes.

12       Q.   Had you ever passed through

13   increased power cost before this October

14   2021 Marble 2-specific event?

15       A.   No.

16       Q.   Would you agree with me that

17   there's a difference between this Marble 2,

18   2021 specific event and the power cost that

19   you passed through starting in June of

20   2022?

21           MR. TSEKERIDES:  Object to the

22       form.

23           THE WITNESS:  Yes, I will agree

24       with that.

25   ///

129

1   time.

2          If you multiply that one penny --

3   let's just say it was average for all 730

4   hours, you're going to pass through that

5   one penny for all 730 hours for that

6   particular site.  And you have to take that

7   site, and you have to do it for every site

8   in the fleet.

9          Q.   Okay.

10         A.   And every miner.

11         Q.   Okay.  Let me ask you this.

12              So we talked about the pricing

13  structure of the Celsius contract, right?

14         A.   Yes.

15         Q.   You described the pricing

16  structure as a floor -- or excuse me --

17  yeah, as a floor.

18         A.   Yes.

19         Q.   So let's take the example.  Let's

20  just say it's $0.06 per kilowatt hour,

21  right?

22         A.   Uh-huh.

23         Q.   You have -- suppose that the

24  electricity costs at the time that the

25  contract was entered was $0.02.  With me?

131

```
1        Q.   For a customer.

2        A.   Because for a customer, they're

3   going to know that they're going to have a

4   team that's going to actively manage that

5   power cost to the best of their ability.

6        Q.   At the time that a customer

7   enters a contract with Core, do they know

8   in what market their rigs are going to be

9   deployed?

10       A.   No.

11       Q.   Do they know the terms of your

12  PPAs or agreements with utilities?

13       A.   No.

14       Q.   So how is a customer supposed to

15  manage the electricity costs if they don't

16  know where the rigs are going to be

17  deployed and what the terms of your

18  agreements are?

19           MR. TSEKERIDES:  Object to form.

20           THE WITNESS:  Core manages the

21       electricity cost.

22  BY MR. MCCARRICK:

23       Q.   Okay.  When you say "Core manages

24  the electricity cost," what do you mean?

25       A.   I mean Core manages the utility
```

169

1          Did not what?  Object to form.

2               You can answer, if you understand

3          what he's asking.

4               THE WITNESS:  Yes, I think I

5          understand what he's asking.

6               MR. TSEKERIDES:  Okay.

7               THE WITNESS:  The old MSA allowed

8          us to pass through power.  The new MSA

9          allows us to pass through power.  And

10         the new MSA allows us to use a

11         fleetwide average whereas the old MSA

12         we had to go by site-by-site specific.

13    BY MR. MCCARRICK:

14         Q.   What under the new MSA, to the

15    best of your recollection, allows a

16    fleetwide average approach to passing

17    through power costs?

18         A.   To the best of my recollection,

19    we say all utilities versus just tariffs,

20    which implies a specific power bill at a

21    specific site, whereas utilities implies

22    all utilities, because that way I can use a

23    fleetwide average.

24         Q.   You said "tariff which implies a

25    specific power bill at a specific site."

170

```
 1              What do you mean by that?

 2        A.   So our current process we take

 3   the individual power bill, individual

 4   sites, we take the contract at which we

 5   currently have -- whenever someone signed

 6   an order form, whatever the power rate was,

 7   we look at the individual site.

 8              We look at individual power of

 9   that site.  And if there's increase in

10   power above what it was when the order form

11   was signed, we pass that on to that client

12   on a site-by-site basis.

13              So we use individual order forms

14   and individual site basis.  And then -- all

15   the way down to the individual machine.

16   And the process that I've been advocating

17   for is more of a fleetwide and more of an

18   average just so it's simpler for our

19   clients to understand.

20              So I wanted the new MSAs to make

21   it so that the clients can understand the

22   process easier, because the current process

23   is very cumbersome.

24        Q.   Okay.  So just to make sure I

25   understand, why do you think that adding
```

171

1  language about utility costs as opposed to

2  the old language that just said "tariff"

3  more clearly communicates what you just

4  said to clients?

5      A.   I don't -- I don't know why that

6  works.  I just know that I want to be able

7  to use this new process so I describe to

8  the clients that way.  And we updated the

9  MSA so that we could, if we wanted to in

10  2023, use this new process.

11     Q.   Okay.  Is it your view that you

12  couldn't use this process under the old

13  MSA?

14     A.   The new process, I don't know.  I

15  argued that we could use that old process

16  under the -- the new process under the old

17  MSA too.

18          But because of the way we wrote

19  it, we had to use this much more complex

20  process that we're using right now.

21     Q.   I think my question was a little

22  bit different.  I just want to make sure I

23  understand your testimony.

24          Is it your view that the new

25  process that you're advocating for in terms

# CELSIUS EXHIBIT NO. 7

# KC MARES

# DEPOSITION EXCERPTS

1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:                              )
                                    )
CELSIUS NETWORK LLC, et al.,        )
                                    ) Case No. 22-10964 (MG)
            Debtor.                 )
                                    )
                                    )


VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF KC MARES


October 26, 2022


Seattle, Washington


Reporter: Teri Simons, CCR, RMR, CRR

In Re: CELSIUS NETWORK LLC

1  A   That is correct, but I've never come across where it's

2      not-- where it's not commonplace.

3  Q   And you made a distinction between direct pass-through

4      costs, correct, and language that allows for increasing

5      energy as well as other utility costs to be passed on to

6      customers?

7          Do you recall making that distinction?

8                          MR. TSEKERIDES:  Object to the form.

9                          THE WITNESS:  Yes.

10 Q   (By Mr. McCarrick)  Okay.  And you said that direct

11     pass-through costs is most common?

12 A   Yes.

13 Q   What's a direct pass-through cost?

14 A   Very much like what you've been asking around.

15         There would be separate language that-- in which the

16     customer would directly pay for their electricity

17     consumption direct and/or pro rata or-- well, let's say

18     be charged for their direct energy usage, in some method,

19     versus through a rate increase that gets added on as an

20     add-on pass-through cost.

21 Q   And when you say "an add-on pass-through cost," what do

22     you mean?

23 A   Like what we are talking about here between Celsius and

24     Core Scientific, where the tariff or other regulated

25     government fee or, in this case, electricity, increases

# CELSIUS EXHIBIT NO. 8

# FILED UNDER SEAL

# CELSIUS EXHIBIT NO. 9

# FILED UNDER SEAL

# CELSIUS EXHIBIT NO. 10

# FILED UNDER SEAL

# CELSIUS EXHIBIT NO. 11

# FILED UNDER SEAL

# CELSIUS EXHIBIT NO. 12

# FILED UNDER SEAL

# CELSIUS EXHIBIT NO. 13

# QUINN LAWLOR
# DEPOSITION EXCERPTS

1

1        IN THE UNITED STATES BANKRUPTCY COURT

2           SOUTHERN DISTRICT OF NEW YORK

3                   - - - - -

4  CELSIUS NETWORK LLC, et        )  Chapter 11
   al.,                           )
5                                 )  Case No. 22-10964
        Debtors.                  )  (MG)
6                                 )  Jointly Administered

7

8  VIDEO RECORDED DEPOSITION OF QUINN LAWLOR 30(b)(6)

9        Tuesday, November 1, 2022, 8:58 a.m.

10

11           Weil Gotshal & Manges LLP

12               2001 M Street, NW

13               Washington, DC

14

15

16

17

18  Reported By: Marjorie Peters, FAPR, RMR, CRR, RSA

19  Job Number: 869682

20

21

22

88

1      A.      Correct.

2      Q.      That's several months before the

3  petition date; right?

4      A.      Correct.

5      Q.      If you turn to the front page, 3902,

6  Monica responds, "Hi, Patrick.  Thanks for reaching

7  out.  Of course, the increased hosting rates for

8  Marble 2 units' power consumption for certain days

9  were due to increased power fees in October."

10              You see that?

11     A.      Yes.

12     Q.      Okay.

13              Then in response to that e-mail,

14  Mr. Holert writes, "Thanks, Monica.  This makes

15  sense"; right?

16              That's what he wrote?

17     A.      Yes.

18     Q.      Okay.

19              He didn't tell her that he disputed

20  the increased power fee; right?

21     A.      Well, we consented to the power fee.

22     Q.      Okay.  He says, "This makes sense";

95

1    the decision on the economics.

2         Q.     Do you disagree with Mr. Holert's

3    statement that "While we signed a fixed-rate

4    contract with Core, we are still subject to paying

5    higher rates from time to time"?

6         A.     Well, in theory it's correct, and a

7    point of clarification there is we are billed based

8    off of a effective kilowatt-hour price, right?

9              So to give you an example, if the

10   government comes in and they say, "Hey, you're a

11   miner.  You now owe us 10,000 a month because you're

12   a miner," that gets added to the invoice and is

13   ultimately going to be reflected in a

14   dollar-per-kilowatt-hour price, that does not

15   necessarily have anything to do with the price of

16   power.

17             So you can have a situation where

18   you are paying a "higher rate" and has nothing to do

19   with the price of power because our rate is quoted

20   in a kilowatt-hour fashion.

21        Q.     Ms. Xia wrote in her e-mail, "Due to

22   increased power costs," right, in 19663.  "Due to

1    increased power costs."

2               That's what she wrote?

3    A.      19663.  Yes.

4    Q.      Okay.

5    A.       And I want to clarify that this was a

6    one-off situation where Core preemptively shut down

7    our rigs.  One of their operations manager, Moses,

8    called me explaining the situation why the rigs were

9    offline.  It was due to a nuclear power plant going

10   down in North Carolina which threw the grid out of

11   whack.  They informed us that we would be paying a

12   higher rate for approximately two to three weeks,

13   and it was our decision, our consent, our discretion

14   on whether we turned the rigs back on or not.

15   Q.      Okay.  You say "one-off."  We just

16   looked at Core Exhibit 6 where the prior month --

17   A.      I'm referring to October.

18   Q.      -- there was an increase.

19               Okay, but you said "one-off."  What

20   did you mean by "one-off"?

21   A.       It was a one-off extreme situation.  It

22   was effectively a grid emergency.  Utilities have

316

```
 1        Q.      Okay.  Do you recall being asked some

 2   questions by Mr.  Tsekerides about certain

 3   pass-through or increased power costs being charged

 4   to Celsius in November 2021?

 5        A.      Yes.

 6        Q.      What were the circumstances surrounding

 7   that pass-through in November of 2021?

 8        A.      The circumstances were I saw that batch

 9   of hardware at the Marble 2 site go offline.  When I

10   say "offline," I'm watching our pool account.  If

11   shows the amount of hash rate we're running.

12                     Shortly thereafter --

13                     (Clarification requested by the

14   Court Reporter.)

15        A.      -- I saw it go offline.  I got a call

16   from Moses, who frequently I talk to on day-to-day

17   operations-type subjects.  He let us know.

18                     Well, the first thing he said is,

19   Are you sitting down for this?

20                     I thought that meant our rigs lit on

21   fire.  Turns out that it was actually a nuclear

22   power plant that had some sort of -- don't know the
```

317

1  actual details of it, but it went offline

2  unexpectedly, and he was calling to ask me if we

3  were willing to eat higher pass-through power costs

4  over the next roughly two to three weeks, and he

5  quoted me a range of power costs, and whether we

6  wanted to turn our rigs on or off in light of this

7  news.

8           And I ran a quick cost/benefit

9  analysis relative to the margin we were making from

10 mining Bitcoin, and it was an easy business decision

11 to turn the rigs back on.  And the conversation

12 lasted less than five minutes.

13     Q.    Okay.  Why was it an easy business

14 decision to turn the rigs back on?

15     A.    The difference between running at the

16 contracted rate versus the temporarily elevated

17 rate, it was still net cash flow positive to the

18 business to continue to operate the mining rigs.

19     Q.    Okay.  In the context of that

20 five-minute conversation with Core, did you consult

21 the MSA at all, or Section 4(f) in particular?

22     A.    No.

# CELSIUS EXHIBIT NO. 14

| | |
|---|---|
| **To:** | Russell Cann[russell@corescientific.com]; Moses Marure Jr.[moses@corescientific.com] |
| **Cc:** | Amir Ayalon[amir.ayalon@celsius.network]; Patrick Holert[patrick.holert@celsius.network] |
| **From:** | Quinn Lawlor[quinn.lawlor@celsius.network] |
| **Sent:** | Wed 10/6/2021 2:55:37 PM (UTC-05:00) |
| **Subject:** | Unexpected Power curtailment in Marble |

Exhibit A

[EXTERNAL] Use caution when opening attachments or links.

Russell and Moses,
I authorize Core to turn our rigs back on in light of the unexpected economic power curtailment in Marble.

Please keep us apprised of the latest developments from the utility provider in regards to total increased power cost, curtailment timeline, and rig restart status.

Thanks,
Quinn

Reminder: Be aware of phishing sites and always make sure you are visiting the official https://celsius.network website and app. Celsius will never ask you for confidential information such as passwords, private keys, seed phrases, or secret codes. You should store this information privately and securely and report any suspicious activity.

©2021 Celsius Network

221 River Street, 9th Floor
Hoboken, NJ 07030 USA
Registered as a Money Services Business (MSB) number 31000192265811 with the US Financial Crimes Enforcement Network (FinCEN).

Celsius is not a bank, depository institution, custodian or fiduciary and the assets in your Celsius account are not insured by any private or governmental insurance plan (including FDIC or SIPC), nor are they covered by any compensation scheme (including FSCS).

Holding, trading or using crypto assets carry significant risks, please carefully read our Risk Disclosure page. Celsius does not provide any financial, legal or tax advice, nor should this email be viewed as an offer or inducement to make any financial decision.

Exhibit No.
**26**
M. Xia
10/31/22

# CELSIUS EXHIBIT NO. 15

**S&P Global**
Market Intelligence

# Core Scientific, Inc. NasdaqGS:CORZ
# FQ2 2022 Earnings Call Transcripts

## Thursday, August 11, 2022 8:30 PM GMT

S&P Global Market Intelligence Estimates

| | -FQ1 2022- | -FQ2 2022- | -FY 2022- | -FY 2023- |
|---|---|---|---|---|
| | CONSENSUS | CONSENSUS | CONSENSUS | CONSENSUS |
| **EPS Normalized** | 0.09 | 0.24 | 0.89 | 1.00 |
| **Revenue (mm)** | 196.67 | 161.90 | 719.37 | 1077.55 |

Currency: USD
Consensus as of Aug-04-2022 8:00 PM GMT



Stock Price [USD] vs. Volume [mm] with earnings surprise annotations

| | - EPS NORMALIZED - | | |
|---|---|---|---|
| | CONSENSUS | ACTUAL | SURPRISE |
| **FQ4 2021** | 0.31 | 0.55 | 77.42 % |
| **FQ1 2022** | 0.09 | 0.31 | 244.44 % |



EXHIBIT 86
Levitt
11/8/2022
Jessica Waack, CSR
RDR, CRR, NYACR, NYRCR

COPYRIGHT © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

1

CEL_CS-00006971

**Contents**

# Table of Contents

| | | |
|---|---|---|
| **Call Participants** | ............................................................................... | **3** |
| **Presentation** | ............................................................................... | **4** |
| **Question and Answer** | ............................................................................... | **10** |

COPYRIGHT © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

CEL_CS-00006972

# Call Participants

**EXECUTIVES**

**Denise Sterling**
*Executive VP & Chief Financial Officer*

**Michael Jeffrey Levitt**
*Co-Founder, Co-Chairman & CEO*

**Steven A. Gitlin**
*Senior Vice President of Investor Relations*

**ANALYSTS**

**Christopher Charles Brendler**
*D.A. Davidson & Co., Research Division*

**Kevin Dede**

**Lucas Nathaniel Pipes**
*B. Riley Securities, Inc., Research Division*

**Stephen William Glagola**
*Cowen and Company, LLC, Research Division*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.
**spglobal.com/marketintelligence**

CEL_CS-00006973

# Presentation

**Steven A. Gitlin**
*Senior Vice President of Investor Relations*

Good afternoon, ladies and gentlemen, and welcome to Core Scientific Second Quarter Fiscal Year 2022 Earnings Call. This is Steven Gitlin, Senior Vice President of Investor Relations for Core Scientific. [Operator Instructions] As a reminder, this conference is being recorded for replay purposes.

Before we begin, please note that on this call, certain information presented contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Forward-looking statements include, without limitation, any statement that may predict, forecast, indicate or imply future results, performance or achievements and may contain words such as believe, anticipate, expect, estimate, intend, project, plan or words or phrases with similar meaning. Forward-looking statements are based on current expectations, forecasts and assumptions that involve risks and uncertainties, including, but not limited to, economic, competitive, governmental and technological factors outside of our control that may cause our business strategy or actual results to differ materially from the forward-looking statements. For further information on these risks, we encourage you to review the risk factors discussed in Core Scientific's periodic reports on Form 10-K and Form 10-Q filed with the SEC and the Form 8-K filed today with the SEC, along with the associated earnings release and the safe harbor statement contained therein. This afternoon, we are also filing a slide presentation with our earnings release, and we're posting a presentation on our website at corescientific.com in the Events and Presentations section. The content of this conference call contains time-sensitive information that is fully accurate as of today, August 11, 2022. The company undertakes no obligation to make any revision to any forward-looking statements contained in our remarks today or to update them to reflect the events or circumstances occurring after this conference call.

Joining me today from Core Scientific are Chief Executive Officer, Mr. Mike Levitt; and Chief Financial Officer, Ms. Denise Sterling. We will begin with remarks from Mike Levitt. Mike?

**Michael Jeffrey Levitt**
*Co-Founder, Co-Chairman & CEO*

Thank you, Steve. On behalf of our entire team, welcome to today's second quarter 2022 earnings conference call. On today's call, we'll provide highlights from our second quarter, discuss our financial performance, comment on current market conditions and provide thoughts on how we are structuring our company for long-term success.

Core Scientific operates more bitcoin mining servers in our facilities than any other public company in the United States. We have 8 data centers operating in 5 states and expect to begin operation in our ninth data center in Oklahoma within the next few quarters. Our purpose-built company-owned data centers now hold over 200,000 servers and approximately 800,000 square feet.

By year-end, we expect to be operating approximately 300,000 servers, of which more than half will be for our own self mining operations in over 1 million square feet.

I will discuss our future plans in more detail later in this call. But first, I'd like to introduce my colleague and our CFO, Denise Sterling, to discuss our financial highlights.

**Denise Sterling**
*Executive VP & Chief Financial Officer*

Thank you, Mike, and good afternoon. I will review results for our second quarter as compared to the same period 1 year ago.

Total revenue consisting of self-mining, hosting and equipment sales increased by 118% to $164 million from $75.3 million, driven primarily by an increase in our self-mining revenue. The total number of Bitcoin produced in the second quarter was 3,365 compared to 180 for the 3 months ended June 30, 2021. The

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

average price of bitcoin was 32,500, a decrease of 30% as compared to 46,500 for the 3 months ended June 30, 2021.

Total hosting revenue increased by 110% to $38.9 million. Equipment sales for the quarter decreased by 90% to $30.5 million as the majority of our hosting customers now purchase their miners directly from manufacturers for deployments in our data centers.

Cost of revenue increased by $100.5 million to $151.3 million. The increase was primarily attributable to an increase in our number of self-mining and hosted servers operating in our facilities. Power consumption increased by $45.9 million. Depreciation rose by $46.3 million and personnel and related expenses and facilities costs increased by $25.8 million.

Related expenses included stock-based compensation of $16.9 million. The increases were offset by a decline in equipment sales of $17.6 million. Cost of revenue for the 3 months ended June 30, 2022, included depreciation expense of $49.1 million, of which $46.5 million was from the self-mining segment.

For the 3 months ended June 30, 2021, cost of revenue included depreciation expense of $2.8 million, of which $0.9 million was for self-mining segment. With increases in energy prices generally, we expect our average power price for the year to now come in at about $0.05 to $0.055 per kilowatt hour. Prices do move around seasonally and the extreme heat across the South has impacted our pricing for the second quarter and will continue to do so in the third quarter.

Gain from the sales of our digital assets was $11.8 million for the 3 months ended June 30, 2022, resulting from a total sales price of our digital assets sold of $265.8 million versus the carrying value of $254.0 million.

Consistent with prior quarters, we recorded several noncash accounting entries in the second quarter of 2022, including the impairment of digital assets, impairment of goodwill, a fair value adjustment to our convertible notes and stock-based compensation. Impairment of digital assets increased by $150.2 million for the second quarter as a result of a decline in the price of Bitcoin. An impairment is recorded when the carrying value of our digital assets exceed their fair value based on current market pricing.

We recorded a goodwill impairment of approximately $840 million due to a revaluation of our assets resulting from the sustained decline in Bitcoin price, the decline in the market capitalization of public bitcoin mining companies, including Core Scientific and the uncertain outlook for our industry.

We recorded a favorable noncash fair value adjustment to our convertible notes of $195 million due to a decrease in their value resulting from the decline in our stock price. We will continue to mark-to-market our convertible notes each quarter.

Total operating expenses increased by $106.9 million to $115.9 million. This increase was primarily driven by $92 million of stock-based compensation, representing 86% of the total increase. This resulted from the removal of the IPO transaction trigger from outstanding RSU awards that had previously met the time vesting requirement.

In order to ensure we are well-positioned to achieve our objectives, we have taken a disciplined approach to reducing operating expense growth. We have eliminated the majority of our discretionary expenses, reduced headcount by 10%, renegotiated vendor contracts and rightsized the organization to focus on our core business. We now expect our operating expenses in the second half of the year to be 25% lower compared to the first half of the year.

Net loss of $861.7 million decreased by $858.3 million from a net loss of $3.4 million. The increase in net loss was primarily driven by the noncash items I spoke about earlier.

Adjusted EBITDA increased by $38.3 million to $59.1 million. The increase was driven primarily by increased revenue of $88.7 million, offset by higher cost of revenue, excluding depreciation and stock-based compensation of $37.3 million and increased operating expenses of $13 million, excluding stock-based compensation.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.
**spglobal.com/marketintelligence**

CEL_CS-00006975

Adjusted EPS for the quarter ended June 30, 2022, was $0.18 per share. Our total cash position at June 30, 2022, including cash, cash equivalents and restricted cash was $140.5 million, a year-to-date increase of approximately $8.8 million. The primary drivers of this change included inflows from operations of $151.9 million and proceeds from borrowing of $415.1 million. These sources of cash were partially offset by cash outflows for infrastructure costs to build our purpose-built data centers of $238.5 million, payments to vendors for our ASIC servers of $217.7 million, interest and principal payments on our outstanding debt of $72.7 million and payment of tax obligations for vesting of employee RSUs of $29.3 million. By net settling our RSUs, we reduced our outstanding share count by approximately 14 million shares.

In order to better understand our self-mining business, cost structure and breakeven price for producing Bitcoin, we are introducing a metric that we call cash to mine. It produces a view of the marginal cash cost to mine a single bitcoin and represents the cash-based components of cost of revenue divided by the number of bitcoins mined for the period. There are 2 cash-based components of this calculation. The first is our power cost, which is based on price per kilowatt hour. The second is our data center cash-based operating costs, which include the expenses required to operate, maintain, and secure our data centers, including personnel and related expenses and facilities costs. These 2 components are included as part of our total cost of revenue. As the metric is cash based, it does not include expenses such as stock-based compensation or depreciation.

For the first half of 2022, our power cost per bitcoin was approximately 8,500 and our data center operating costs were approximately 1,700. As such, our cash to mine a bitcoin for the first half of 2022 was approximately $10,200. We expect our cash to mine a bitcoin going to vary quarter-by-quarter, primarily based on fluctuations in power costs and global hash rate.

Now I would like to turn the call back over to Mike.

**Michael Jeffrey Levitt**
*Co-Founder, Co-Chairman & CEO*

Thank you, Denise. In a previous earnings call, I explained that approximately 2/3 of our 2022 growth would occur in the second half of the year. We are now in the second half, and we remain confident that will be the case.

As we stand here today, we operate 8 data centers in 5 states with approximately 800,000 operating square feet. By year-end, we continue to expect to have developed a total of over 1 million square feet of operating facilities. We operate approximately 125,000 self-mining servers and expect to increase that number to approximately 170,000 by year-end. We operate 86,000 servers for our colocation customers and expect to increase that number to approximately 125,000 by year-end.

We deployed 14,000 servers in the month of July and have already deployed more than 17,000 servers in the first 10 days of August. We are currently mining over 40 bitcoin per day on average. And yesterday, we mined a record 45.7 bitcoin in a single day, likely the most bitcoin ever self-mined in a day by a public company.

As the market and economic environment deteriorated in the second quarter, we took a number of actions to ensure that our business remains well-positioned to navigate these difficult times. We conducted a full review of our businesses, our costs and our balance sheet.

First, I will address our balance sheet. On the asset side of our balance sheet, we've invested in excess of $1 billion in our infrastructure and our servers since the company's inception. Our approximate $0.5 billion investment to develop world-class blockchain computing data centers will generate returns for years to come. No other company in the United States has invested as heavily or built as significantly infrastructure to support the production of Bitcoin.

While others search for infrastructure to support their business, we own, control and operate our own. By developing purpose-built facilities, we have the ability to employ immersion or any other process that we believe will improve our productivity. We're currently running immersion pilot test in a number of our data centers.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

CEL_CS-00006976

Our $0.5 billion plus investment in servers will also generate returns for years to come. Our server should be mining Bitcoin well beyond their depreciable life.

We have built and maintained significant liquidity through these volatile times. We think it is prudent, and we think it is wise. We have chosen to create liquidity by selling our digital assets. In the current environment, we do not believe it is sensible to increase our debt.

We have total debt of approximately $960 million, excluding accounting reserve adjustments totaling just less than $200 million, as illustrated on Slide 12. Slightly more than $500 million of our debt is our privately placed convertible notes. These notes mature approximately 3 years from now in April of 2025.

We have little cash impact in the interim because they bear interest in cash at a rate of 4%. They have a noncash 6% pay in time feature and no principal payments required until maturity. We are very comfortable with the maturity in 2025 and the likelihood that our stock will be hopefully soon at a level where this debt converts to equity.

We owe B. Riley approximately $57 million, payable monthly over the course of the next 11 months. The loan was originally $75 million, but we have paid down $18 million already this year. Again, we are very comfortable with our obligations to B. Riley.

As for our equipment financing, out of the 170,000 or so self-mining servers we plan to operate by the end of the year, approximately 86,000 are currently encumbered by debt or leases. Equipment debt and leases total approximately $330 million today.

Through the end of July, we have paid approximately $75 million in principal amortization this year and are comfortable with our ability to continue to service our equipment debt. We have multiple options for creating and maintaining liquidity. We have and will continue to sell our bitcoin. Our current Bitcoin production provides us the unique ability to replenish our digital assets rapidly. As we previously discussed, we have also entered into a $100 million equity line of credit. We can tap that line any time over the next 2 years.

Environments like this demand focus and require critical decisions. Since Core Scientific was founded, we have focused a majority of our time and capital investments on site selection, development and technological innovation to facilitate the deployment and management of our infrastructure and mining servers.

We are a developer and operator of blockchain computing data centers. We own and operate more infrastructure and servers than any other company in the United States. That is what we do and who we are. That is our focus. Building reliable, geographically distributed data centers that enable the deployment and efficient operation of mining servers is the biggest challenge faced by the digital asset mining ecosystem.

This infrastructure did not always exist in the United States, and that is like Core Scientific accepted the challenge to build enterprise-grade digital asset mining data centers 5 years ago. We have paired our business back to concentrate on what we do best, develop data centers and operate ASICs in our purpose-built facilities. We have moved out of any business not central to our mission and are focusing our resources on continuing to build our core business.

To that end, we have discontinued our blockchain technologies development business. We have taken costs out of our corporate activities and are continuing to develop ways to execute our business more efficiently. To date, we have eliminated approximately 10% of our workforce, none of whom are involved in our data center activities.

While taking steps to become leaner and more efficient, we remain focused on growing our business and improving profitability. The current market turmoil and difficulties facing other companies attempting to develop infrastructure, have enabled us to work with our vendor partners to reduce expenses and build more efficiently.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

CEL_CS-00006977

As such, we believe our near-term data center development expenses over the next 6 months will be significantly less than what we had previously anticipated. We have paid for all but approximately $10 million of the cost of the remaining 50,000 self-mining servers to be deployed. We are confident that all 170,000 of our servers will be up and running by year-end.

We hope to expand our self-mining fleet beyond 170,000, but have not yet committed to purchase additional servers. We continue to make discounted offers for stranded new miners.

We took a long hard look at our hosting business. Historically, the business delivered low profitability. We will no longer take on hosting business that is not sufficiently profitable from day 1. We have restructured our pricing to improve margins over time, including refinements to price per kilowatt hour, contract term, infrastructure and configuration fees and prepayment terms. We want our customers to make a profit, but we also want to ensure that our business is making money too. We fully expect our hosting business to be profitable and cash generative going forward into 2023.

Over time, we think the hosting business should be a 20% to 30% EBITDA margin business. Initial customer acceptance, including our recently announced agreements for 75 megawatts of colocation capacity validate our new strategy. Even during this challenging digital asset market, customers are eager to co-locate their servers at Core Scientific because of the value they see in our offering.

Now let's talk a little bit about the future. We continue to expect to achieve an operating cash rate of between 30 and 32 exahashes in 1 gigawatt of power by the end of 2022. This is based on the continued expansion of our server fleet to approximately 300,000 units, approximately 170,000 of which will be dedicated to self-mining and continued progress in our data center projects in Texas and Oklahoma as well as continued demand from colocation customers.

Based on an end of 2022 network cash rate assumption of 250 exahashes, we expect to be producing or self-mining approximately 2,000 bitcoins a month by the end of 2022. Our self-mining fleet is new and efficient consisting of S19, S19 PROs and S19 XPs. We are well-positioned for years of productive mining.

Our company designed, developed, populated and now manages the largest blockchain computer data center business for self-mining and colocation services in North America. As we disclosed in last week's July update press release, we operated a total hash rate of 19.3 exahashes, including 10.9 exahashes in our self-mining business as of July 31. We have built our leadership position in the blockchain infrastructure market by investing a total of more than $1 billion in infrastructure and servers since the inception of our business.

We have strategically located and developed data centers in diverse geographic areas. While we continue to curtail our growing operations in Texas in response to grid operator needs, the majority of our data centers are located in other states, reducing the impact of Texas specific events on our overall bitcoin production.

Within Texas, we are working with ERCOT on the CLR program and aim to deploy our Minder software to help provide automatic demand response to the grid. Our track record of innovation and growth in our industry speaks for itself.

Denise introduced today our new cash to mine metric. Given the environment, we are pleased with a cash cost of slightly in excess of $10,000 to mine a single bitcoin in the first half of 2022. We believe this is an important way to assess our efficiency and future profitability. We offer a unique and powerful business model that represents a compelling equity investment in blockchain data centers and at a minimum, a levered investment to the price of bitcoin.

All said, despite the difficulties our industry has endured this year, assuming a constant bitcoin price and modest growth in the global hashrate, we are on pace to generate in excess of $700 million in revenue and approximately $300 million in EBITDA.

Thank you to our amazing team who continue to focus on executing our plan during a very challenging time. Thank you to our customers for continuing to rely on Core Scientific and thank you to our

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

CEL_CS-00006978

shareholders, who remain committed to the long-term opportunity this company and this team are working to realize.

Steve, we will now take questions.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.
**spglobal.com/marketintelligence**

CEL_CS-00006979

# Question and Answer

**Steven A. Gitlin**
*Senior Vice President of Investor Relations*

[Operator Instructions] Our first question comes from Lucas Pipes at B. Riley.

**Lucas Nathaniel Pipes**
*B. Riley Securities, Inc., Research Division*

Mike, I want to thank you for the disclosures. This is really a really terrific detail both in the release, the presentation and also the prepared remarks. So I appreciate that.

I want to follow-up on the power price a bit. I think you mentioned $0.055, in the prepared remarks it was mentioned. Just wanted to confirm that. And then if you could maybe speak maybe pushing power prices up and down. Obviously, there are inflationary pressures on the power side, but then you're also expanding in Texas. So wondering how kind of power costs could evolve for the next 6 to 12 months.

**Michael Jeffrey Levitt**
*Co-Founder, Co-Chairman & CEO*

Sure. So we think that all things considered, heat waves pressure on energy prices, macroeconomics, et cetera, that a reasonable full year assumption is in that $0.05 to $0.055 range. There are a number of things that move it around. One is certainly seasonality. So our power prices are probably net a bit higher in these warm months, especially when you get 50 days of 100-degree temperatures across the South, including Texas, that has an impact.

And there's also sort of a less well-known aspect of developing in Texas, which is that, generally speaking, the power prices are a bit higher as you develop a facility. And then as the facility scales, those prices come down considerably. And so it's fair to say, we think that our pricing in the fall and winter will probably come down from where is this summer.

It's also, I think, fair to assume that as we have our Texas facilities fully scaled going into next year that, on average, our power pricing overall should come down a bit from where we expected to be full year this year because we are -- to our detriment, we're ramping Texas this year. It's not fully up to scale. By the end of this year, our facilities in Texas will be fully scaled.

So it's going to move around a bit from this year to next year, but we expect that to be a positive movement as opposed to a negative movement. Did that answer your question, Lucas?

**Lucas Nathaniel Pipes**
*B. Riley Securities, Inc., Research Division*

Very helpful. And then staying on the topic of cost, I think it was also mentioned in the prepared remarks that you expect operating expenses to decline by about 25%. And I wondered what sort of -- first, did I hear that right? And then what are some of the drivers that bring those costs down?

**Denise Sterling**
*Executive VP & Chief Financial Officer*

I think consistent with what we commented on earlier, we really did take a disciplined approach. Quite frankly, it was more surgical than suggesting that we were going to take across-the-board reductions. And so as we suggested, the -- really the cost savings were around personnel and/or areas of our organization that were not necessarily part of that core business, as Mike had suggested that we were really doubling down on and going to focus on, in addition to taking a look at some of our project-related professional fees and things of that nature where we said, look, we have the ability to control these and the timing. And if they were not -- if they were discretionary, that we literally took a position that they were going to be eliminated. I don't think that this has a significant impact on our ability to meet our objectives. And as Mike has suggested, we did not impact anybody from a data center perspective.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

CEL_CS-00006980

**Lucas Nathaniel Pipes**
*B. Riley Securities, Inc., Research Division*

Please one last one, if possible. Just I was hoping if it might be possible to quantify the backlog on the hosting side. We continue to hear a lot about shortages. You mentioned some of your peers have all securing data center space. So how would you frame that up?

**Michael Jeffrey Levitt**
*Co-Founder, Co-Chairman & CEO*

So I think it's fair to say that what we hear from prospective customers anecdotally is that there continues to be a lack of availability of up and running now or in the near-term infrastructure that a number of folks have been highly disappointed with the delays that have occurred. We announced our -- now make a habit of any of significance announcing any significant hosting agreements as they occur in order to kind of provide as much transparency in that regard as we can. It continues to be the case that we are in dialogue with demand that exceeds our capacity this year.

Generally speaking, it does take some time to get to agreement. We think that we'll have some additional announcements this quarter with regard to hosting, but there is no guarantee of that, right? Of course, strength in bitcoin pricing helps. But the other aspect of it is a lot of folks that don't have a home for their mining equipment also don't have capital. And as we stated in our prior earnings call, we are only interested in working with colocation customers that have the ability to make prepayments and are very, very creditworthy as such. And so we're not talking to everybody that's got rigs on the ground and warehouses. We are talking to the folks that have capital and rigs on the ground.

And that said, the pipeline is very strong, but we're also quite sincere about making sure that our hosting business is a profitable business. In the, call it, the good old days, we used to be a reseller of servers and there was margin in that, and we could look at the margin in that and combine that with our hosting agreements and look at the overall profitability. Now that we really don't have a very vibrant reseller business because most folks are going direct to the manufacturers, our hosting business needs to stand on its own 2 feet without the benefit of margin coming from equipment sales. And so for some folks, that's a bigger hill to climb. But as demonstrated by the 70 megawatts of agreements that we recently announced, there are folks that are well capitalized and recognize the value in terms of the uptimes, the efficiency, the life of the servers and the technology overlay, they recognize the value. But without the benefit of those resale margins, we had to take a good hard look at the hosting business and reconstructed a little bit to make sure that we're getting paid for the investment we've made in infrastructure and technology and the capabilities that we offer.

**Steven A. Gitlin**
*Senior Vice President of Investor Relations*

Our next question comes from Chris Brendler at D.A. Davidson.

**Christopher Charles Brendler**
*D.A. Davidson & Co., Research Division*

Congratulations on the results and really echo comments earlier about the disclosure, very, very helpful. Along those lines, I really enjoy hearing more details about your power costs and the outlook. I think that's been a key question that a lot of us on the outside have been wrestling with.

Mike, if you can maybe talk to some specifics, if you can. I think there's been some challenges in Georgia, just getting sort of contracts aligned. And then in Texas, are you currently able to sell power back to the grid and take advantage of these spikes in prices or is that still on the comp?

**Michael Jeffrey Levitt**
*Co-Founder, Co-Chairman & CEO*

So we have not, if you will, earned revenue from Texas for curtailing. Obviously, we think it benefits our power costs, but we are not in an earning revenue mode. We are working, as we mentioned today on implementation of the CLR program, utilizing our software and technology capabilities. That's something

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

CEL_CS-00006981

that we hope to have in position sometime this year, but it probably will not be something that's in position by the time the heat wave hopefully subsides within the next few weeks. But in the future, we very well may have the ability to, in fact, have a mutually beneficial economic relationship with the grid operator, but we'll just have to see where that goes.

With regard to our facility in Georgia, we've been working with the power provider there to do sort of the best day and we can. That is the one place where we have the greatest, what I would call, exposure to the variability of natural gas pricing. And so we've been working with them to try to develop as efficient a program as possible. But it absolutely does impact our overall cost right now and has, and that's part of what has driven us to raise our full year estimate for where power pricing is coming in, has been kind of that facility, that factor as it relates to that power provider.

**Christopher Charles Brendler**
*D.A. Davidson & Co., Research Division*

And then a bigger picture question for you, Mike, is, as I've been talking to investors in sort of rippling with the outlook here as prices have come down, but now stabilizing and thinking about the having in 18 months or so or a little more than that. I think I'm really focused on companies that can take advantage of advanced power relationships and/or more efficient mining operations. So your high level thoughts on sort of behind the meter facilities that potentially would use renewables or fleet upgrades, emerging technology? Where do you stand on the XP? Is that going to be a significant part of your rig portfolio by the end of next year? Just some of those high-level comments would be great.

**Michael Jeffrey Levitt**
*Co-Founder, Co-Chairman & CEO*

Sure. In no particular order. One, we mentioned that we've been running immersion testing in a number of our facilities. And immersion to us is simply an economic question is, can we get the efficiency and productivity that makes it worth the expense?

We've been testing equipment from a number of immersion equipment providers to see what we like to see what is efficient to see what's worth the cost, et cetera. I would be surprised if within the next 12 months, we're not operating some considerable portion of our self-mining fleet in an immersion setting. So that's one. Two, we are trying to skew all of our development activity to more and more efficient and predictable power provision.

Looking back, clearly, perhaps the Georgia facility wasn't the best decision we ever made. I wasn't in the seat at the time. But we're trying to work that out with the power provider there. That said, we're going to be developing where we think we've got a really good handle on power and as high a predictability as possible. And that's true with our Texas sites. It's true with our Oklahoma site. We feel pretty good about those facilities. And those facilities probably buy into some point next year in the aggregate, will be a considerable percentage of our operating facilities.

We are actively engaged in conversations about alternative forms of power supplemental or other behind the meter and otherwise. I think that everybody in our industry is doing so because we would all like to get our power costs down prior to mid-2024, and to be managing them as inexpensively and prudently as we possibly can. There's nothing that we sitting here today can tell you or can promise, but we can say that we're working very hard on all of that.

As we also mentioned about our facilities, one of the nice things about having purpose-built facilities is not only are they purpose-built, but they are repurposeable. And so the fact that our business is not really built on steel containers in an exposed environment, but rather in structures allows us a lot more flexibility in pivoting to more efficient mining processes.

**Christopher Charles Brendler**
*D.A. Davidson & Co., Research Division*

What about the XPs? Are you -- I can't remember if you -- I don't think you placed a huge order of the peak of the market. So that was probably a smart --

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

CEL_CS-00006982

**Michael Jeffrey Levitt**
*Co-Founder, Co-Chairman & CEO*

I forgot about that part of your question. Yes, the answer is yes. We do have XPs coming. And as we mentioned, we've -- look, we're trying to be very, very efficient buyers in this market. There are a lot of stranded servers that are here today and that are coming tomorrow. And again, I can't promise that any of our conversations will be fruitful. But like you would expect, we're trying to pick up some high-quality equipment at low prices. We'll see how it plays out in the next 6 months.

**Steven A. Gitlin**
*Senior Vice President of Investor Relations*

[Operator Instructions] And our next question is coming from Stephen Glagola at Cowen.

**Stephen William Glagola**
*Cowen and Company, LLC, Research Division*

I just want to drill down a little bit more on the cost a bit more. Denise, you listed where the 25% OpEx is coming out of. Does that exclude noncash items?

**Denise Sterling**
*Executive VP & Chief Financial Officer*

It does.

**Stephen William Glagola**
*Cowen and Company, LLC, Research Division*

Okay. And also, Mike, I just wanted to get more color on the decision to amend the performance condition that allowed for the RSUs to vest. If you can just provide any color on that, that would be great.

**Michael Jeffrey Levitt**
*Co-Founder, Co-Chairman & CEO*

Sure, it wasn't a performance condition without throwing any lawyers under a bus. The way the RSU program was drafted way back when, as opposed to being drafted saying that there was an event, condition, which would be a sale of the company or going public, it's at a sale of the company if you will or technically an IPO. And it's just inadvertently frankly missed that you can go public through a SPAC. And so those RSUs were already time-vested. It represented frankly, 5 years of RSUs for our people. And so what our Board was doing was fulfilling what had been the intention and which makes a lot of sense, right? That's how companies usually work. You've got time vesting, and then, of course, you've got -- when you go public, plus when you time vest. For whatever reason, the way it was drafted, required our Board to take action or the RSUs would have -- even though we're public, nobody ever get their RSUs. And I don't know about my colleagues, but if I was never going to get my stock, I'm not sure I would have stayed, right? So it really was to correct something that just wasn't in my view, drafted properly when it was originally set up years ago.

But to be clear, we didn't accelerate anybody's RSUs. Every one of those RSUs -- and our RSUs vest over 4 years. It's not like it's a short vesting period or anything like that. All of those RSUs had met the time-vesting requirement. So it was a very technical issue that occurred.

Now we did elect to do a net settlement. And frankly, the reason was, and it looks like it was a pretty smart trade now was that our stock price at the time was so low that by net settling, we could effectively pull what was 4% to 5% of our outstandings out at a price that's well below where the stock is trading today. Did that answer?

**Stephen William Glagola**
*Cowen and Company, LLC, Research Division*

Yes, that was very helpful. If I can just ask one more follow-up here on the June update. I believe you said approximately 90% of the rigs were already paid for. Was there a downward market price adjustment on

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

that 90%? And if so, could you quantify it? And then additionally, like what is the remaining CapEx, if any, on the infrastructure spend?

**Michael Jeffrey Levitt**
*Co-Founder, Co-Chairman & CEO*

So the answer is yes. As I think we've said in the past, our agreements have the market price adjustment or mechanism in them. And yes, our manufacturer was -- did the right thing and was kind enough to agree that a market price adjustment was warranted. And that certainly significantly reduced our obligation as it related to those machines. And because we had already paid in so much because they're such near-term deliveries, it more or less took away most of what we owned at the time. So it was principally related to the adjustment. I don't remember the exact magnitude, frankly, of what we had left versus what they reduced at that time, but it was in the tens of millions of dollars order of magnitude, $1 million, $2 million or $3 million. It was yes, it was kind of I think it was in that 20% to 30% range, but I don't remember precisely. So that did have a very beneficial impact for us.

What was the second half of the question?

**Stephen William Glagola**
*Cowen and Company, LLC, Research Division*

Was just on the remaining infrastructure CapEx, what's remaining there?

**Michael Jeffrey Levitt**
*Co-Founder, Co-Chairman & CEO*

So we're currently sitting at about 600 megawatts operating. And to get to where we need to get to that kind of plus or minus 1 gig, which takes care of our miners and our contracted hosting. That's in the order of magnitude of $50 million to $75 million to get that up and running fully.

Yes. And the reason I give you a little bit of a range is I should have thanked also our vendors at the end of my thank yous, because the folks we work with in developing our infrastructure have been great partners in this time frame as well, which we're appreciative of. As you know, a lot of folks have had to cancel or risk on orders for everything. It's not just miners, it's also transformers. And I think our partners appreciate that we're still in there and making our payments. But in turn, they've also been good partners to us, and we benefited from some price reductions on some of the development activities we've got going on.

**Steven A. Gitlin**
*Senior Vice President of Investor Relations*

Our next question comes from Kevin Dede at H.C. Wainwright.

**Kevin Dede**

Mike, you and the team, super aggressive in site selection and build-out. I was wondering if you just sort of at a high-level kind of kick off the primary -- sort of the primary attributes of each site as you work into them. Just sort of based on your experience in Georgia, I'm kind of wondering how you shifted Core's approach.?

**Michael Jeffrey Levitt**
*Co-Founder, Co-Chairman & CEO*

Fair question and a good question. And in no particular order, one is power provision and predictability of that power provision. Related to that is being closer to the actual provider of power. One of the issues that we face in Georgia -- and the folks in Georgia, they're good folks, okay? And I like them, and we're all trying to be constructive and work through the issues, but they are generally a buyer -- it's a utility company. They're generally a buyer of power and then a provider of that power as opposed to a producer of power. We want to be closer to the production as opposed to simply the provision. So that's one, call it, lesson learned attribute that we are very focused on.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

CEL_CS-00006984

Second has to do with some of these grid and weather interrelationships, right? We love our sites in Texas, and we like the folks in Texas, and we're based in Texas. And I recognize that this is an unprecedented heat wave, but it's still not very fun to be curtailing kind of 4 to 5 hours a day when it's 104 degrees. That has implications for our productivity. And so we need to be very careful about what percentage of our operations reside where you can have that kind of an issue, right, is second.

Third is certainly our ability to get closer to renewable resources and kind of the behind-the-meter aspects that we were asked about. Fourth has to do with availability of talent in what is a hard to hire environment. We need good people, good maintenance techs that we can train in our facilities. So we are running big high-powered facilities with, on average, more than 30,000 servers in each. We're running them 24/7. So you need that. I think early on, we got the gig to make sure we were coming to places where we're welcome, where we're invited, where they want us, where they're glad to have us. And so I think our local relationships have all been very, very good.

We really haven't had any sort of governmental, political kind of issues. And scalability, I think early on, we were trying to make sure we could create facilities that are up were 100 to 150 megawatts. I think we're leaning more into 200 megawatt plus type sites now. We believe it's important to be geographically diversified for all sorts of reasons I've talked about in the past, some of which have been demonstrated this summer.

I don't know, Kevin, that's kind of my off the top of my head list. I'm sure that [Indiscernible] infrastructure would have more.

### Kevin Dede

No, all sensible points. And please don't take a sense of this. So I'm just super curious about the prospects in Georgia. Vogtle 3 and Vogtle 4 are coming on. I'd expect that could change pricing. And I'm just kind of wondering what your people have told you if there might be any sort of benefit to that?

### Michael Jeffrey Levitt
*Co-Founder, Co-Chairman & CEO*

I don't think they're related really to what we're doing. Given where we are, it's just different plans.

### Kevin Dede

Circling back on immersion, you mentioned a couple of tests. I was wondering if you could speak to kind of the data that you're seeing, sort of where you push the envelope to, how the kind of performance improvement you're seeing and any sort of initial feedback on these initial tests?

### Michael Jeffrey Levitt
*Co-Founder, Co-Chairman & CEO*

No, it's still too early to -- probably too early to comment. I don't want to speculate, sorry.

### Kevin Dede

No apologies. Understood. Fair. Do you think that any of the Texas heat issues could be mitigated through that technology or is it really more of an ERCOT-asked-you-to decision?

### Michael Jeffrey Levitt
*Co-Founder, Co-Chairman & CEO*

It's really more of a grid curtailment issue than it is an inability to operate the equipment in a passive air environment. When the grid gets down to kind of under 10 gigawatts, probably under 6 gigs of excess capacity, we get phone calls. Because we're -- even though the entire industry probably isn't 1 gig in the State yet, we can represent, call it, 20% of the excess capacity. We're less than 1.5% of the total capacity, but we're 20% of the excess capacity when they're trying to run up 4 to 5 gig excess.

### Kevin Dede

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

CEL_CS-00006985

Right. So I know you've been questioned on this already. So apologies again, Mike. But can you talk to the length of time it might take before you're able to leverage your PPA into a sale agreement?

**Michael Jeffrey Levitt**
*Co-Founder, Co-Chairman & CEO*

No. Look, we're having really constructive conversations with the folks at ERCOT. They're good people. We're trying to be a good citizen, right? We want to do what's right for our company. We want to do what's right for Texas. And so it's just too early to talk about how that's going to come out.

**Steven A. Gitlin**
*Senior Vice President of Investor Relations*

In the interest of schedule, we're going to have to call it here. And at this point, we thank you all for your attention and for your interest in Core Scientific. An archived version of this call, all SEC filings and relevant company and industry news can be found on our website, corescientific.com.
We wish you a good day, good afternoon, good evening, and we look forward to speaking with you again following next quarter's results.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

CEL_CS-00006986

**CORE SCIENTIFIC, INC. FQ2 2022 EARNINGS CALL | AUG 11, 2022**

Copyright © 2022 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2022 S&P Global Market Intelligence.

CEL_CS-00006987

# CELSIUS EXHIBIT NO. 16

# FILED UNDER SEAL

# CELSIUS EXHIBIT NO. 17

# FILED UNDER SEAL

# CELSIUS EXHIBIT NO. 18

# FILED UNDER SEAL

# CELSIUS EXHIBIT NO. 19

# FILED UNDER SEAL

# CELSIUS EXHIBIT NO. 20

# FILED UNDER SEAL

# CELSIUS EXHIBIT NO. 21

# FILED UNDER SEAL

# CELSIUS EXHIBIT NO. 22

# FILED UNDER SEAL

# CELSIUS EXHIBIT NO. 23

# FILED UNDER SEAL

# CELSIUS EXHIBIT NO. 24

# FILED UNDER SEAL

# CELSIUS EXHIBIT NO. 25

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d)**
**of the Securities Exchange Act of 1934**
**Date of Report (Date of earliest event reported): October 24, 2022**

# Core Scientific, Inc.
(Exact name of registrant as specified in its charter)

| Delaware | 001-40046 | 86-1243837 |
|:---:|:---:|:---:|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| 210 Barton Springs Road, Suite 300 Austin, Texas | 78704 |
|:---:|:---:|
| (Address of principal executive offices) | (Zip Code) |

**Registrant's telephone number, including area code: (512) 402-5233**

(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligations of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|:---:|:---:|:---:|
| Common stock, par value $0.0001 per share | CORZ | The Nasdaq Global Select Market |
| Warrants, exercisable for shares of common stock | CORZW | The Nasdaq Global Select Market |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 4.01   Changes in Registrant's Certifying Accountant**

At a meeting held on October 24, 2022, the Audit Committee of the Board of Directors of Core Scientific, Inc. (the "Company") approved the engagement of Marcum LLP ("Marcum") as its independent registered public accounting firm for the fiscal year ending December 31, 2022, subject to Marcum's completion of their client acceptance procedures. At the same meeting, the Audit Committee approved the dismissal of Ernst & Young LLP ("EY") as independent registered public accounting firm of the Company effective upon the date of the filing of the quarterly report on Form 10-Q for the quarter ending September 30, 2022.

The report of EY on the financial statements of Core Scientific Holding Co. and its subsidiaries ("Legacy Core") for the fiscal years ended December 31, 2021 and December 31, 2020, included in the Form 8-K/A of Core Scientific, Inc., which was filed with the SEC on March 31, 2022, did not contain an adverse opinion or a disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope or accounting principles.

In connection with the audits of Legacy Core's consolidated financial statements for each of the two fiscal years ended December 31, 2021 and December 31, 2020, and for the Company's financial statements in the subsequent interim periods through the date of this Current Report on Form 8-K (the "Form 8-K") there were no (i) disagreements, as that term is defined in Item 304(a)(1)(iv) of Regulation S-K and the related instructions, between the Company and EY on any matters of accounting principles or practices, financial statement disclosure, or auditing scope and procedure, which, if not resolved to the satisfaction of EY, would have caused EY to make reference to the matter in their reports for such fiscal years, and (ii) no "reportable events" (as that term is defined in Item 304(a)(1)(v) of Regulation S-K), except for the following material weaknesses identified in connection with the audit of Legacy Core's consolidated financial statements for the two fiscal years ended December 31, 2021 and December 31, 2020 and the review of the Company's consolidated financial statements for the interim period ended March 31, 2022 and the interim period ended June 30, 2022 in Core Scientific's internal control over financial reporting related to (i) insufficient accounting and supervision with respect to the appropriate level of technical accounting experience and appropriate processes and procedures to assess and apply the relevant accounting framework, particularly in new or non-routine areas, (ii) a lack of appropriate communication and recordkeeping, particularly related to equity transactions, (iii) design deficiencies in internal controls necessary to enforce appropriate segregation of duties for manual journal entries to our books and records, and (iv) design deficiencies in internal controls necessary to enforce appropriate segregation of duties for our digital asset wallets.

The Company has provided EY with a copy of the disclosures it is making in this Form 8-K and requested that EY furnish the Company a letter addressed to the U.S. Securities and Exchange Commission stating whether it agrees with the above statements. A copy of EY's letter, dated October 28, 2022 is filed as Exhibit 16.1 to this Form 8-K.

**Item 9.01   Financial Statement and Exhibits**

(d) Exhibits

| Exhibit No. | Description |
| --- | --- |
| 16.1 | Letter from Ernst & Young LLP addressed to the U.S. Securities and Exchange Commission |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document). |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**Core Scientific, Inc.**

Dated: October 28, 2022

| | |
|---|---|
| By: | */s/ Todd M. DuChene* |
| Name: | Todd M. DuChene |
| Title: | Executive Vice President, General Counsel, Chief Compliance Officer and Secretary |



Building a better
working world

Ernest & Young LLP
920 5th Avenue Ste 900
Seattle WA 98104

Tel: +1 206 621 1800
ey.com

October 28, 2022

Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549

Ladies and Gentlemen:

We have read Item 4.01 of Form 8-K dated October 28, 2022, of Core Scientific, Inc. and are in agreement with the statements contained in the four paragraphs on page 1 therein. We have no basis to agree or disagree with other statements of the registrant contained therein.

Regarding the registrant's statement concerning the lack of internal control to prepare financial statements, included in the third paragraph on page 1 therein, we had considered such matter in determining the nature, timing and extent of procedures performed in our audit of Core Scientific Holding Co.'s 2021 and 2020 financial statements.

/s/ Ernst & Young LLP

A member firm of Ernst & Young Global Limited

# CELSIUS EXHIBIT NO. 26

# FILED UNDER SEAL

# CELSIUS EXHIBIT NO. 27

# FILED UNDER SEAL

# CELSIUS EXHIBIT NO. 28

# FILED UNDER SEAL

# CELSIUS EXHIBIT NO. 29

# FILED UNDER SEAL