IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| CORE SCIENTIFIC, INC., *et al.*, | § | Case No. 22-90341 (DRJ) |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |
| | § | |

DEBTORS' APPLICATION FOR ENTRY
OF AN ORDER (I) AUTHORIZING THE RETENTION
AND EMPLOYMENT OF PJT PARTNERS LP AS INVESTMENT
BANKER TO THE DEBTORS AND (II) GRANTING RELATED RELIEF

> **IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE ELECTRONICALLY AT HTTPS://ECF.TXSB.USCOURTS.GOV/ WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. IF YOU DO NOT HAVE ELECTRONIC FILING PRIVILEGES, YOU MUST FILE A WRITTEN OBJECTION THAT IS ACTUALLY RECEIVED BY THE CLERK WITHIN TWENTY-ONE DAYS FROM THE DATE YOU WERE SERVED WITH THIS PLEADING. YOU MUST SERVE A COPY OF YOUR RESPONSE ON THE PERSON WHO SENT YOU THE NOTICE; OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

Core Scientific, Inc. and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), respectfully represent as follows in support of this application (the "**Application**"):[2]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

[2] The facts and circumstances supporting this Application are set forth in the *Declaration of Michael Bros in Support of the Debtors' Chapter 11 Petitions* (Docket No. 5) (as defined herein).

**Relief Requested**

1. By this Application, pursuant to sections 327(a) and 328(a) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2014(a) and 2016 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2014-1 and 2016-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**"), the Debtors seek entry of an order, substantially in the form attached hereto (the "**Order**"): (a) authorizing the retention and employment of PJT Partners LP ("**PJT**") as investment banker to the Debtors, in accordance with the terms and conditions set forth in that certain engagement letter (and the attachments and schedules thereto) between PJT and Weil, Gotshal & Manges LLP ("**Weil**" or the "**Firm**") (on behalf of the Debtors), effective as of October 6, 2022 (as may be amended, supplemented, or modified from time to time, the "**Engagement Letter**"),[3] a copy of which is attached as **Exhibit A** to the Order; and (b) granting related relief. In support of this Application, the Debtors submit the *Declaration of John Singh, Partner of PJT Partners LP, in Support of the Debtors' Application for Entry of an Order (I) Authorizing the Retention and Employment of PJT Partners LP as Investment Banker to the Debtors and (II) Granting Related Relief* (the "**Singh Declaration**"), attached hereto as **Exhibit B** and incorporated by reference herein.

**Jurisdiction**

2. The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[3] Any references to, or summaries of, the Engagement Letter in this Application are qualified by the express terms of the Engagement Letter, which shall govern if there is any conflict between the Engagement Letter and the summaries provided herein.

2

**Background**

3. On December 21, 2022 (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under the Bankruptcy Code. The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Bankruptcy Rules and Rule 1015-1 of the Bankruptcy Local Rules.

4. No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.

5. Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Michael Bros in Support of the Debtors' Chapter 11 Petitions* (Docket No. 5) (the "**First Day Declaration**").[4]

**PJT's Qualifications**

6. As detailed in the Singh Declaration, PJT's Restructuring and Special Situations Group ("**RSSG**") is one of the industry's leading advisors to companies and creditors in a variety of complex restructurings and bankruptcies. PJT was created in connection with a spin-off from The Blackstone Group L.P. ("**Blackstone**"), effective October 1, 2015. Upon the consummation of the spinoff, Blackstone's Restructuring and Reorganization advisory group became a part of PJT, and Blackstone's restructuring professionals became employees of PJT. The former Blackstone restructuring professionals, in their capacity as PJT employees, have been conducting business and providing their clients with the same high-quality restructuring services that

---

[4] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration or Engagement Letter, as applicable.

3

Blackstone had itself provided since the formation of its restructuring advisory practice approximately 31 years ago. PJT professionals have extensive experience working with financially troubled companies in complex financial restructurings. Since 1991, PJT professionals have advised on more than 700 distressed situations, both in- and out-of-court, involving more than $2.2 trillion of total liabilities.

7. The partners and members of RSSG have provided services to debtors, creditors' committees, and other constituencies in numerous chapter 11 cases.

8. PJT was engaged by the Debtors on or around October 6, 2022 to act as the Debtors' investment banker in connection with a potential Restructuring and/or Capital Raise.[5] Since that time, PJT has engaged in extensive due diligence of the Debtors' business, including its operations, assets, market dynamics, capital structure, contractual arrangements, cash flows, and liquidity to build a foundation for a restructuring strategy.

9. As a result of the prepetition and postpetition work performed by PJT on behalf of the Debtors over the past three months, PJT acquired significant knowledge of the Debtors' financial affairs, business operations, capital structure, assets, key stakeholders, financing documents, and other related materials and information. Likewise, in providing services to the Debtors, PJT's professionals have worked closely with the Debtors' management, the Debtors' boards of directors or managers, as applicable (each, a "**Board**," and collectively, the "**Boards**"), and the Debtors' other advisors. If this Application is approved, several of PJT's professionals,

---

[5] As defined in the Engagement Letter, (a) "**Restructuring**" means (i) any restructuring, reorganization (whether or not pursuant to chapter 11 of the Bankruptcy Code) and/or recapitalization of the Debtors affecting a material portion of their existing or potential debt obligations or other claims against the Debtors, including, without limitation, senior debt, junior debt, trade claims, general unsecured claims, and preferred stock (collectively, the "**Obligations**"), and/or (ii) a sale or other acquisition or disposition of a material portion of the assets and/or equity of the Debtors, and/or (iii) any complete or partial repurchase, refinancing, extension or repayment by the Debtors of any of the Obligations, and (b) "**Capital Raise**" means any financing arranged by PJT at the request of the Debtors.

all with substantial expertise in the areas discussed above, will continue to provide services to the Debtors and will work closely with the Debtors' management, the Boards, and the Debtors' other professionals throughout the reorganization process.

10. Since November 2022, PJT has spent a significant amount of time and effort regarding the Debtors' efforts to obtain critically important postpetition, debtor-in-possession financing ("**DIP Financing**"). More recently, since the Petition Date, PJT has continued to work closely with the Debtors, the DIP lenders, and their respective advisors with respect to such DIP Financing, as well as other critical issues in these chapter 11 cases. As a result of PJT's representation of the Debtors prior to and since the commencement of these chapter 11 cases and PJT's extensive experience representing chapter 11 debtors, PJT is well-qualified to provide its services to and represent the Debtors during these chapter 11 cases.

11. If the Debtors were required to retain an investment banker other than PJT in connection with these chapter 11 cases, the Debtors, their estates, and the Debtors' creditors, stakeholders, and other parties in interest would be unduly prejudiced by the time and expense necessary to familiarize another investment banker with the intricacies of the Debtors, their business operations, the terms and provisions of the DIP Financing, and the capital raising, asset disposition, and restructuring transactions the Debtors may pursue during these chapter 11 cases.

### Services to Be Provided

12. Subject to further order of the Court, and consistent with the terms of the Engagement Letter, PJT's anticipated services in these chapter 11 cases will, to the extent necessary, appropriate, feasible, and as may be requested by the Debtors, include the following:

    a. assist in the evaluation of the Debtors' businesses and prospects;

    b. assist in the development of the Debtors' long-term business plan and related financial projections;

  c. assist in the development of financial data and presentations to the Board of Directors and any committee thereof delegated authority to negotiate, consider, evaluate, and/or effectuate a Restructuring or a Capital Raise on behalf thereof, various creditors, and other third parties;

  d. analyze the Debtors' financial liquidity and evaluate alternatives to improve such liquidity;

  e. analyze various restructuring scenarios and the potential impact of these scenarios on the recoveries of those stakeholders impacted by the Restructuring;

  f. provide strategic advice with regard to restructuring or refinancing the Debtors' Obligations;

  g. evaluate the Debtors' debt capacity and alternative capital structures;

  h. participate in negotiations among the Debtors and their creditors, suppliers, lessors, and other interested parties;

  i. value securities offered by the Debtors in connection with a Restructuring;

  j. advise Weil on behalf of the Debtors and negotiate with lenders with respect to potential waivers or amendments of various credit facilities;

  k. assist in arranging financing for the Debtors, as requested;

  l. provide expert witness testimony concerning any of the subjects encompassed by the other investment banking services; and

  m. provide such other advisory services as are customarily provided in connection with the analysis and negotiation of a transaction similar to a potential Restructuring and/or Capital Raise, as requested and mutually agreed.

### **No Duplication of Services**

13. PJT's services are intended to complement, and not duplicate, the services to be rendered by any other professional retained by the Debtors in these chapter 11 cases. PJT has informed the Debtors that it understands that the Debtors have retained, and may retain, additional professionals during the term of the engagement and will use its reasonable efforts to work cooperatively with such professionals to integrate any respective work conducted by the professionals on behalf of the Debtors.

**Professional Compensation**

14. PJT's decision to advise and assist the Debtors in connection with these chapter 11 cases is subject to its ability to be retained in accordance with the terms of the Engagement Letter pursuant to section 328(a), and not section 330, of the Bankruptcy Code.  For the avoidance of doubt, the Engagement Letter specifies that PJT's retention is through Weil, as counsel to the Debtors.  However, the Engagement Letter states that the "all fees and expenses payable to [PJT] pursuant to [the Engagement Letter] shall be payable solely by the [Debtors]" and that Weil "shall have no obligation to pay [PJT's] fees or expenses."

15. In consideration of the services to be provided by PJT, and as more fully described in the Engagement Letter, subject to this Court's approval, the Debtors and PJT have agreed that PJT shall, in respect of its services, be compensated under the following fee structure (the "**Fee Structure**"):

> a. **Monthly Fee**.  The Debtors shall pay PJT a monthly advisory fee (the "**Monthly Fee**") in the amount of $200,000 per month. Fifty percent (50%) of any Monthly Fees paid to PJT after the sixth (6th) full Monthly Fee has been paid (i.e., after $1,200,000 in Monthly Fees have been paid to PJT) shall be credited against any Restructuring Fee (as defined below); provided that, any such credit of fees shall apply only in the event that all fees earned by PJT pursuant to the Engagement Letter are approved in their entirety by the Court pursuant to a final order not subject to appeal and which order is acceptable in all respects to PJT.
>
> b. **Capital Raising Fee**.  The Debtors shall pay a capital raising fee (the "**Capital Raising Fee**") for any Capital Raise, earned and payable upon the earlier of the receipt of a binding commitment letter and the closing of such Capital Raise. If access to the financing is limited by orders of the Court, a proportionate fee shall be payable with respect to each available commitment (irrespective of availability blocks, borrowing base, or other similar restrictions). The Capital Raising Fee will be calculated as:
>
>> - 1.5% of the total issuance and/or committed amount of senior debt financing,
>>
>> - 3.0% of the total issuance and/or committed amount of junior debt financing or unsecured debt financing (including, without limitation, financing that is junior in right of payment, second lien, subordinated (structurally or otherwise) and unsecured debt), and

7

- 5.0% of the issuance and/or committed amount of equity financing,

in each case, including by means of a back-stop commitment.

Notwithstanding the foregoing, (x) to the extent that any Capital Raise is raised from existing debt or equity holders of the Company as of October 6, 2022 (collectively, "**Existing Holders**") the Capital Raising Fee in respect of the portion of the Capital Raise raised from any Existing Holders shall be calculated as 0.75% of the total issuance and/or committed amount of senior debt financing, 1.5% of the total issuance and/or committed amount of junior debt financing (including, without limitation, financing that is junior in right of payment, second lien, subordinated (structurally or otherwise) and unsecured debt and preferred equity), and 2.5% of the issuance and/or committed amount of common and other non-preferred equity financing, in each case, including by means of back-stop commitment and (y) if financing arranged by PJT (and use of proceeds generated from such financing) is the only Restructuring undertaken, PJT, in its sole discretion, may choose to be paid either the Capital Raising Fee or the Restructuring Fee, but not both.

    c.  **Restructuring Fee**.  The Debtors shall pay an additional fee (the "**Restructuring Fee**") equal to $8,000,000, earned and payable upon the consummation of a Chapter 11 plan or any other Restructuring pursuant to an order of the Court or other applicable court.

    d.  **Expense Reimbursements**.  In addition to the fees described above, the Debtors agree to the reimbursement of all actual, reasonable, and documented out-of-pocket expenses incurred in connection with PJT's services under the Engagement Letter, including, but not limited to, travel and lodging, direct identifiable data processing, document production, publishing services and communication charges, courier services, working meals, reasonable and documented fees and out-of-pocket expenses of PJT's counsel (without the requirement that the retention of such counsel be approved by the court in any bankruptcy case) and other necessary expenditures, payable upon rendition of invoices setting forth in reasonable detail the nature and amount of such expenses.  Further, in connection with the reimbursement, contribution and indemnification provisions set forth in the Engagement Letter and Attachment A to the Engagement Letter (the "**Indemnification Agreement**"), which is incorporated therein by reference and addressed further below, the Debtors agree to reimburse each PJT Party (as defined in the Indemnification Agreement), for its legal and other expenses (including the cost of any investigation and preparation) as they are incurred in connection with any matter in any way relating to or referred to in the Engagement Letter or arising out of the matters contemplated by the Engagement Letter (including, without limitation, in enforcing the Engagement Letter), subject to certain exceptions, limitations, and requirements set forth in the Indemnification Agreement.

**Indemnification**

16. The Debtors have agreed to certain indemnification, contribution, and reimbursement obligations set forth in the Indemnification Agreement. The Indemnification Agreement provides, among other things, that the Debtors will indemnify PJT and other PJT Parties and that PJT and the PJT Parties shall have no liabilities related to, arising out of, or in connection with PJT's engagement except to the extent that any loss, claim, damage, fine, penalty, liability, or expense is found by a court of competent jurisdiction in a judgment that has become final in that it is no longer subject to appeal or other review to have resulted from such PJT Parties' fraud, gross negligence, bad faith, or willful misconduct. The terms of the Engagement Letter and Indemnification Agreement were negotiated at arm's-length and the Debtors respectfully submit that the indemnification, contribution, and reimbursement provisions are reasonable and appropriate under the circumstances.

17. The Debtors request that the Court approve the indemnification, contribution, and reimbursement provisions set forth in the Indemnification Agreement, subject, during the pendency of these chapter 11 cases, to the following

   a. subject to the provisions of subparagraphs (b) and (d) below, the Debtors are authorized to indemnify, and to provide contribution and reimbursement to, and shall indemnify, and provide contribution and reimbursement to, any PJT Party (as defined in the Indemnification Agreement) in accordance with the Indemnification Agreement for any claim arising from, related to, or in connection with the services provided for in the Engagement Letter;

   b. notwithstanding subparagraph (a) above or any provisions of the Indemnification Agreement to the contrary, the Debtors shall have no obligation to indemnify PJT or provide contribution or reimbursement to PJT (i) for any claim or expense that is judicially determined (the determination having become final and no longer subject to appeal) to have arisen from PJT's self-dealing, breach of fiduciary duty (if any), gross negligence, willful misconduct, or bad faith, (ii) for a contractual dispute in which the Debtors allege the breach of PJT's contractual obligations if this Court determines that

9

    indemnification, contribution, or reimbursement would not be permissible pursuant to *In re United Artists Theatre Co.*, 315 F.3d 217 (3d Cir. 2003), or (iii) for any claim or expense that is settled prior to a judicial determination as to the exclusions set forth in clauses (i) and (ii) above, but determined by this Court, after notice and a hearing pursuant to subparagraph (c) hereof to be a claim or expense for which PJT should not receive indemnity, contribution, or reimbursement under the terms of the Indemnification Agreement, as modified by the Order;

 c. if, during the pendency of the Debtors' cases, the indemnification is held unenforceable by reason of the exclusions set forth in subparagraph (b) above (*i.e.*, self-dealing, breach of fiduciary duty (if any), gross negligence, willful misconduct, or bad faith) and PJT makes a claim for the payment of any amounts by the Debtors on account of the Debtors' contribution obligations, then the proviso beginning with the word "provided" in the first sentence of the second paragraph of the Indemnification Agreement shall not apply; and

 d. if, before the earlier of (i) the entry of an order confirming a chapter 11 plan in these chapter 11 cases (that order having become a final order no longer subject to appeal) and (ii) the entry of an order closing these chapter 11 cases, PJT believes that it is entitled to the payment of any amounts by the Debtors on account of the Debtors' indemnification, contribution, and/or reimbursement obligations under the Indemnification Agreement (as modified by the Order), including without limitation, the advancement of defense costs, PJT must file an application in this Court, and the Debtors may not pay any such amounts to PJT before the entry of an order by this Court approving the payment. This subparagraph (d) is intended only to specify the period of time during which this Court shall have jurisdiction over any request by PJT for indemnification, contribution, and/or reimbursement, and not a provision limiting the duration of the Debtors' obligation to indemnify, or make contributions or reimbursements to, PJT.

18. The Debtors believe that the provisions of the Indemnification Agreement, as modified by the Order, are appropriate under the circumstances, consistent with recent orders entered in this jurisdiction, and should be approved. The Debtors believe that such an indemnification obligation is customary, reasonable, and necessary to retain the services of an investment banker in these chapter 11 cases.

19. To the best of the Debtors' knowledge, information, and belief, no promises have been received by PJT as to compensation in connection with these chapter 11 cases other than as outlined in the Engagement Letter, and PJT has no agreement with any other entity to share any compensation received with any person other than the principals and employees of PJT.

20. PJT will apply to the Court for allowance of compensation for professional services rendered and reimbursement of expenses incurred in connection with these chapter 11 cases, subject to the Court's approval and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and any orders entered in these chapter 11 cases regarding professional compensation and reimbursement of expenses (to the extent compliance is not waived).

21. PJT will maintain records in support of any actual, necessary costs and expenses incurred in connection with the rendering of its services in these chapter 11 cases. However, because (a) it is not the general practice of investment banking firms such as PJT to keep detailed time records similar to those customarily kept by attorneys, (b) PJT does not ordinarily keep time records on a "project category" basis, and (c) PJT's compensation is based on a fixed Monthly Fee, the Capital Raising Fee, and the Restructuring Fee, the Debtors request that PJT's professionals only be required to maintain records (in summary format) of the services rendered for the Debtors, including summary descriptions of those services, the approximate time expended in providing those services (in one-half hour increments), and the identity of the professionals who provided those services. PJT will present such records to this Court in its fee applications. The Debtors request that PJT's professionals not be required to keep time records on a "project category" basis, that its non-investment banking professionals and personnel in administrative departments (including legal) not be required to maintain any time records, and that it not be

required to provide or conform to any schedule of hourly rates. To the extent that PJT would otherwise be required to submit more detailed time records for its professionals by the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, or other applicable procedures and orders of the Court, the Debtors request that this Court waive or excuse compliance with such requirements or guidelines.

22. The Debtors believe that the Fee Structure described above and in the Engagement Letter is consistent with, and typical of, compensation arrangements entered into by PJT and other comparable firms in connection with the rendering of similar services under similar circumstances and is reasonable, market-based, and merited by PJT's restructuring expertise. After discussions and arm's-length negotiations, the Debtors believe that the Fee Structure is reasonable, market-based, and designed to compensate PJT fairly for its work and to cover customary expenses.

23. PJT's strategic and financial expertise, together with its capital markets knowledge, financing skills, and restructuring capabilities, some or all of which have and will be required by the Debtors during the term of PJT's engagement, as well as PJT's extensive prior involvement and deep familiarity with the Debtors' businesses and capital structure, were all important factors to the Debtors in determining the Fee Structure. The Debtors believe that the ultimate benefit of PJT's services hereunder cannot be measured by reference to the number of hours to be expended by PJT's professionals in the performance of such services. The Debtors and PJT have agreed upon the Fee Structure in anticipation that a substantial commitment of professional time and effort will be required of PJT and its professionals in connection with these chapter 11 cases and in light of the fact that: (a) such commitment may foreclose other opportunities for PJT and (b) the actual time and commitment required of PJT and its professionals to perform its services under the

12

Engagement Letter may vary substantially from week-to-week and month-to-month, creating "peak load" issues for PJT.

### PJT's Disinterestedness

24. PJT has reviewed the list of parties-in-interest provided by the Debtors. To the best of PJT's knowledge, as of the date hereof, and except to the extent disclosed herein or in the Singh Declaration, PJT: (a) is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code, as required by section 327(a) of the Bankruptcy Code; (b) does not hold or represent an interest adverse to the Debtors' estate; and (c) has no connection to the Debtors, their creditors, or related parties.

25. Given the large number of parties-in-interest in these chapter 11 cases, and despite the efforts to identify and disclose PJT's relationships with parties-in-interest in these chapter 11 cases, PJT is unable to state with certainty that every client relationship or other connection has been disclosed in the Singh Declaration. PJT will make continued inquiries following the filing of the Application, on a periodic basis, with additional disclosures to this Court if necessary or otherwise appropriate.

26. During the ninety-day period before the Petition Date, the Debtors paid PJT $496,774.19 for fees earned prior to the Petition Date. Prior to the Petition Date, PJT had also received advance payments from the Debtors in the aggregate amount of $345,967.75. Given the timing of the filing, PJT may not yet have accounted for all expenses it incurred before the Petition Date. In the event PJT subsequently becomes aware of additional prepetition expenses incurred on behalf of the Debtors, PJT will reduce its advance by such amounts. To the extent that amounts paid by the Debtors to PJT prior to the Petition Date exceed amounts incurred by PJT prepetition, such excess will be held by PJT as security throughout these chapter 11 cases until PJT's fees and expenses are fully paid.

27.     The Debtors are informed that PJT will not share any compensation to be paid by the Debtors, in connection with services to be performed after the Petition Date, with any other person, other than other principals and employees of PJT, to the extent required by section 504 of the Bankruptcy Code.

**Basis for Relief**

28.     The Debtors seek authority to employ and retain PJT as investment banker under sections 327(a) and 1107(b) of the Bankruptcy Code. Section 327(a) provides that a debtor is authorized to employ professional persons "that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [Debtors] in carrying out the [Debtors'] duties under this title." 11 U.S.C. § 327(a). Section 1107(b) of the Bankruptcy Code elaborates upon sections 101(14) and 327(a) of the Bankruptcy Code in cases under chapter 11 of the Bankruptcy Code and provides that "a person is not disqualified for employment under section 327 of the Bankruptcy Code by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case." 11 U.S.C. § 1107(b).

29.     In addition, the Debtors seek approval of the Fee Structure and the Engagement Letter (including the Indemnification Agreement) pursuant to section 328(a) of the Bankruptcy Code, which provides, in relevant part, that a debtor "with the court's approval, may employ or authorize the employment of a professional person under section 327 . . . on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis." 11 U.S.C. § 328(a). Accordingly, section 328 of the Bankruptcy Code permits the compensation of professionals, including investment bankers, on flexible terms that reflect the nature of their services and market conditions.

30.     Furthermore, the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 amended section 328(a) of the Bankruptcy Code to read as follows:

14

> The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis.

11 U.S.C. § 328(a). It is thus clear that a debtor may retain a professional on a fixed or percentage fee basis with Court approval, such as the Fee Structure for PJT in the Engagement Letter.

31. The Fee Structure in the Engagement Letter sets forth reasonable terms and conditions of employment and should be approved under section 328(a) of the Bankruptcy Code. The Fee Structure adequately reflects: (a) the nature of the services to be provided by PJT; and (b) fee structures and indemnification provisions typically utilized by PJT and other leading investment banking firms, which do not bill their time on an hourly basis and generally are compensated on a transactional basis. Furthermore, PJT did not vary its rate based on the location of these chapter 11 cases.

32. As set forth above, and notwithstanding approval of the Engagement Letter under section 328 of the Bankruptcy Code, PJT intends to apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with these chapter 11 cases, subject to the Court's approval and in compliance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and any other applicable procedures and orders of the Court, with certain limited modifications.

33. Specifically, the Debtors request that the requirements of Bankruptcy Rule 2016 be tailored to the nature of PJT's engagement and its compensation structure. PJT has requested, pursuant to section 328(a) of the Bankruptcy Code, payment of its fees on a fixed-rate and contingency basis and the payment of the fees described in the Engagement Letter, which, as set forth above, is customary in the investment banking industry. Additionally, it is not the general

15

practice of investment banking firms to keep detailed time records similar to those customarily kept by attorneys. As discussed above, however, PJT's personnel in these chapter 11 cases will keep summary time records in one-half hour increments describing their daily activities and the identity of persons who performed such tasks. In addition, apart from the time-recording practices described above, PJT's personnel do not maintain their time records on a "project category" basis. As such, the Debtors request modification of the requirements under Bankruptcy Rule 2016.

34. In addition, the provisions of the Indemnification Agreement are reasonable and have been approved and implemented in other large chapter 11 cases by courts in and outside of this jurisdiction. The relief requested in this Application is in the best interests of its estate, creditors, and all parties-in-interest to these chapter 11 cases.

35. The Debtors will regularly monitor the fees and expenses of PJT to ensure that PJT's professionals are assisting the Debtors in the most cost-effective and efficient manner. The Debtors will employ similar procedures for reviewing professional invoices that they have employed prior to the commencement of these chapter 11 cases.

36. Denial of the relief requested herein will deprive the Debtors of the assistance of a uniquely qualified investment banking firm. With the significant amount of services already provided to the Debtors over the past three months, a denial of PJT's employment would result in an unjust disadvantage to the Debtors and all parties-in-interest because of PJT's understanding of the Debtors' operations, capital structure, DIP Financing, and the transactions contemplated by the Debtors in connection with these chapter 11 cases. Indeed, if the Debtors were forced to engage a new investment banker who lacks a thorough understanding of the Debtors' business, such change would mandate the commitment of significant and costly resources to educate a replacement.

37. Based on the foregoing, the Debtors have satisfied the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules to support entry of an order authorizing the Debtors to retain and employ PJT in these chapter 11 cases on the terms described herein and in the Engagement Letter.

**Compliance with Bankruptcy Rule 6004(a)
and Waiver of Bankruptcy Rule 6004(h)**

38. To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion satisfies Bankruptcy Rule 6004(a) and that the Court waive the 14-day period under Bankruptcy Rule 6004(h).

**Notice**

39. Notice of this Application will be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

WHEREFORE the Debtors respectfully request entry of the Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

| | |
|---|---|
| Dated:  January 13, 2023<br>Austin, Texas | */s/ Todd DuChene*<br>Todd DuChene<br>President and Chief Legal Officer<br>Core Scientific, Inc. |

**Certificate of Service**

I hereby certify that on January 13, 2023, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ Alfredo R. Pérez
Alfredo R. Pérez