**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **CORE SCIENTIFIC, INC.,** *et al.,* | § | **Case No. 22-90341 (DRJ)** |
| | § | |
| **Debtors**[1] | § | **(Jointly Administered)** |
| | § | |

**RESERVATION OF RIGHTS**
**AND LIMITED OBJECTION OF**
**BARINGS BDC, INC., BARINGS CAPITAL**
**INVESTMENT CORPORATION, AND BARINGS**
**PRIVATE CREDIT CORP. TO THE EMERGENCY**
**MOTION OF DEBTORS FOR ENTRY OF INTERIM**
**AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS**
**TO OBTAIN POSTPETITION FINANCING, (B) AUTHORIZING**
**THE DEBTORS TO USE CASH COLLATERAL, (C) GRANTING LIENS**
**AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE**
**EXPENSE STATUS, (D) GRANTING ADEQUATE PROTECTION TO THE**
**PREPETITION SECURED PARTIES, (E) MODIFYING THE AUTOMATIC STAY,**
**(F) SCHEDULING A FINAL HEARING, AND (G) GRANTING RELATED RELIEF**

Barings BDC, Inc., Barings Capital Investment Corporation, and Barings Private Credit

Corp. (collectively, "***Barings***") as prepetition secured lenders under that certain Master Security

Agreement, dated as of March 24, 2022 (as amended, restated, supplemented or otherwise

modified from time to time, the "***MSA***" and all collateral schedules thereto, each a "***Schedule***" and

collectively, the "***Schedules***")[2] among Barings and Core Scientific, Inc., by and through its

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisitions, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisition I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

[2] Barings BDC, Inc., Barings Capital Investment Corporation and Barings Private Credit Corp. are each a prepetition secured lender solely with respect to each Schedule executed by it.

undersigned counsel hereby submits this reservation of rights and limited objection (the

"**Limited Objection**") to the *Emergency Motion of Debtors For Entry of Interim and Final Orders*

*(A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use*

*Cash Collateral, (C) Granting Liens and Providing Claims With Superpriority Administrative*

*Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E)*

*Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief*

[ECF No. 38] (the "**DIP Motion**").  In support of this Limited Objection, Barings respectfully

states as follows:

### PRELIMINARY STATEMENT[3]

1.      Barings recognizes that the Debtors have a legitimate need for capital to fund their

ongoing business operations during the pendency of these chapter 11 cases and therefore does not

object generally to the Debtors' decision to seek debtor-in-possession financing (such financing,

the "**DIP**") (though the need for such financing may be mitigated by the recent increase in Bitcoin

prices, to the extent such prices are sustained).  Indeed Barings, as a secured lender whose

collateral includes the specialized computing equipment needed by the Debtors to "mine"

Bitcoin—the primary source of revenue (and recovery to the Debtors' creditors)—believes the

Debtors' continued operations is in the interest of all stakeholders.  Barings objects on a limited

basis to certain aspects of the proposed DIP, as set forth herein, to ensure that the DIP is utilized

for the benefit of the estate and its stakeholders and not as a tool to disadvantage Equipment

Lenders as compared to other prepetition secured creditors.

2.      Barings does not affirmatively seek adequate protection in the form of cash

payments through this Limited Objection but notes the need for some form of adequate protection

---

[3]   Capitalized terms used but not defined in this Preliminary Statement shall have the meanings ascribed to them later in this Limited Objection.

beyond what the Debtors and the DIP Lenders have proposed and reserves the right to affirmatively seek appropriate relief via subsequent filings in the event it is unable to come to a consensual resolution with the Debtors.[4]  Such reservation is clearly articulated in the Interim DIP Order and reiterated herein.  That said, in light of the express reservation of rights on adequate protection, the DIP—and specifically, the proposed DIP Budget—presents a significant likelihood that such rights are, at a minimum, compromised and, to the extent cash adequate protection payments were to be ordered, potentially could result in the Debtors being forced to choose between defaulting on the DIP and returning Collateral that is critically needed to generate postpetition revenue.

3.       Additionally, while waivers under sections 506(c) and 552(b) are not uncommon,[5] the nature of the Debtors' business and the underlying collateral are unique and providing such waivers to the Prepetition Secured Noteholders without granting the same waivers to the Equipment Lenders is inequitable and inappropriate.  Granting waivers solely to the Prepetition Secured Noteholders (and not the Equipment Lenders) turns the economic realities of the Debtors' businesses and these cases on their head, and raises the possibility that the Equipment Lenders could be unfairly surcharged for the costs associated with the Debtors' use of the Equipment Lenders' collateral (and/or stripped of any security interest they hold in the proceeds of their collateral—including Bitcoin) while the Prepetition Secured Noteholders, in their capacity as such, as well as the DIP Lenders enjoy both the protections from 506(c) surcharges and the revenue

---

[4]    Barings has initiated conversations with the Debtors and hopes to reach a consensual resolution of its issues.

[5]    Section 506(c) claims are available to and an asset of the Debtors, and waivers of section 506(c) claims are not inappropriate as a matter of law when justified.  *See, e.g.*, *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) ("We conclude that 11 U.S.C. § 506(c) does not provide an administrative claimant an independent right to use the section to seek payment of its claim."); *In re Altera Infrastructure L.P.*, Case No. 22-90130 (MI) (Bankr. S.D. Tex. Aug. 12, 2022); *In re GWG Holdings, Inc.,* Case No. 22-90032 (MI) (Bankr. S.D. Tex. July 19, 2022); *In re Sungard AS New Holding, LLC*, Case No. 22-90018 (DRJ) (Bankr. S.D. Tex. May 11, 2022).

associated with the Debtors' use of the Equipment Lenders' collateral.  This is especially true because (i) Barings does not object to such waivers being granted to the DIP Lenders; and (ii) the Prepetition Secured Noteholders that are DIP Lenders enjoy the benefits of the roll-up.[6]

4.      Accordingly, Barings objects to the DIP to the extent of the following:[7]

    i.   the Final DIP Order provides for priming of any of Barings' Collateral, including any proceeds thereof;

    ii.  the Final DIP Order (and Budget) prejudices, in any way, (a) Barings' ability to seek and receive adequate protection, including periodic cash payments; (b) the Court's ability to provide any form of adequate protection it deems appropriate; and (c) the Debtors' ability to provide adequate protection, including periodic cash payments;

    iii. the Final DIP Order does not include a provision providing Barings and other Equipment Lenders all reports, documents and other information required to be delivered to the DIP Secured Parties under the DIP Loan Documents and the Interim DIP Order;

    iv.  the Final DIP Order does not provide that upon the occurrence of a DIP Termination Event the automatic stay be vacated and modified

---

[6]   While not an issue before the Court at this point, the 506(c) and 552(b) waivers indirectly raise a potential crucial issue—whose collateral is the Bitcoin generated by the mining equipment?  The DIP Lenders and Prepetition Secured Noteholders believe they have a lien on the Bitcoin—to the extent that is true, it further highlights the inappropriateness of the waivers.  If the Prepetition Secured Noteholders have a lien on the Bitcoin, it is completely inequitable they are absolved from a potential surcharge while the lenders with liens on the mining collateral that generates the Bitcoin are exposed to such a surcharge.  Both sets of lenders should receive waivers—or neither lender.  On the other hand, if the Equipment Lenders have a lien on the Bitcoin, then the DIP Lenders are, in fact, attempting to prime their collateral.

[7]   Barings (and the other Equipment Lenders) have requested to see a draft of the Final DIP Order multiple times and have not yet received it.  Barings reserves its rights in all respects with respect thereto.

to the extent necessary to permit Barings to exercise any remedies with respect to the Collateral, including but not limited to, the right to an emergency hearing; and

**v.** the Final DIP Order provides for 506(c) or 552(b) waivers for the Prepetition Secured Noteholders if such waivers are not also provided for Barings and the other Equipment Lenders.

## BACKGROUND

5. On December 21, 2022 (the "***Petition Date***"), each of the above-captioned debtors and debtors-in-possession (the "***Debtors***") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.[8]  The Debtors continue to manage and operate their business and property as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  An Official Committee of Unsecured Creditors was appointed on January 9, 2023.  *See Notice of Appointment of Official Committee of Unsecured Creditors* [ECF No. 256].  No trustee or examiner has been appointed in these chapter 11 cases.

**A.    The Debtors' Business, the Relevant Agreements, and the Collateral.**

6. The Debtors are entities headquartered in Austin, Texas that operate as an infrastructure, technology, and services company that owns and operates computer equipment used to process transactions conducted on blockchain networks in exchange for digital currency assets and transaction processing fees awarded in digital currency assets ("***Bitcoin***"), commonly referred to as "mining."  The Debtors mine Bitcoin for their own accounts and host mining operations for third-party customers at eight operation data centers in the United States.

---

[8]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the *Declaration of Michael Bros in Support of the Debtors' Chapter 11 Petitions and First Day Relief* [ECF No. 5] and the DIP Motion, as applicable.

7.      On March 24, 2022, the Debtors and Barings entered into the MSA, an equipment loan and security agreement in the total amount of $100,000,000.00 to finance the Debtors' purchase of equipment for the mining of Bitcoin (the "***Equipment***").  The Debtors entered into six (6) separate secured loan transactions (each a "***Secured Loan***" and collectively the "***Secured Loans***") with Barings, dated as of March 24, 2022, and April 27, 2022 (as applicable), each evidenced by a Schedule governing the payment terms applicable to each transaction and the collateral securing each of the Secured Loans.  The general terms and conditions applicable to each of the Secured Loan transactions evidenced by the Schedules are governed by the MSA.  The Debtors borrowed the first tranche of $30,000,000.00 in March 2022 and the second tranche of $39,600,000.00 in April 2022.  On June 30, 2022, the remaining $30,400,000.00 of the funding commitment expired unused.  As of October 31, 2022, the Secured Loans were outstanding in a principal amount in excess of $63,800,000.00.

8.      The obligations in respect of the Secured Loans are secured by security interests granted by Core Scientific, Inc. in the Equipment described in Schedule A of each of the Schedules as well as the following assets related to that Equipment (collectively, the "***Initial Collateral***"):

- all parts, attachments, accessories and accessions to, substitutions and replacements for, each item of Equipment;

- all accounts, chattel paper, and general intangibles arising from or related to any sale, lease, rental or other disposition of any Equipment to third parties, or otherwise resulting from the possession, use or operation of any Equipment by third parties, including instruments, investment property, deposit accounts, letter of credit rights, and supporting obligations arising thereunder or in connection therewith (including in respect of all Sublease Agreements);

- all insurance, warranty and other claims against third parties with respect to any Equipment;

- all software and other intellectual property rights used in connection therewith;

- proceeds of all of the foregoing, including insurance proceeds and any proceeds in the form of goods, accounts, chattel paper, documents, instruments, general intangibles, investment property, deposit accounts, letter of credit rights and supporting obligations; and

- all books and records regarding the foregoing, in each case, now existing or hereafter arising.

9.     Initially, the MSA specifically provided that "'Collateral' does not include any Bitcoin or other digital asset mined or produced by, or otherwise derived from, the Equipment." *See* MSA ¶ 13.

10.     On August 12, 2022, Barings and the Debtors entered into an amendment (the "***Amendment***") to the MSA and each of the Schedules thereto, to among other things, (i) defer principal payments on the Secured Loans for a period of six (6) months beginning with payments due in August 2022, and (ii) increase the effective interest rate on the Secured Loans from 9.8% to 13.0%.   To secure the Debtors' payment and performance, the Debtors granted to Barings additional collateral (the "***Additional Collateral***" and together with the Initial Collateral, the "***Collateral***").   The Debtors also issued to Barings 2,778 shares of the Debtors' common stock as an amendment fee.

11.     The Additional Collateral consists of Bitcoin computing equipment and "all proceeds thereof." *See* Amendment ¶ 3.  *The Amendment does not contain the language included in the MSA excluding an interest in Bitcoin or other digital assets produced by or derived from the*

*Equipment.*

12.     The Debtors have further entered into financing arrangements secured by interests in mining equipment and other infrastructure (the "***Mining Equipment Financing and Leases***") with other lenders (together with Barings, the "***Equipment Lenders***").  The approximate principal amount outstanding under all Mining Equipment Financing and Leases is $284,000,000.00.  *See* First Day Declaration ¶ 53.

13.     On October 27, 2022, the Debtors announced that they would suspend all principal and interest payments due in October and November to several of their Equipment Lenders and for other financings.  *See* Form 8-K (Oct. 27, 2022).

**B.     The Impact of "Crypto Winter" on the Debtors' Business and Barings' Collateral.**

14.     The Debtors' business is one that is particularly vulnerable to the ongoing downturn in the cryptocurrency market—termed "crypto winter."  As a miner of Bitcoin rather than a cryptocurrency exchange or brokerage, the Debtors are impacted by both the prolonged decrease in the price of Bitcoin—which lessens the demand for the Debtors' services—and the increases in energy costs—which increase the Debtors' operational costs.[9]

15.     As more fully laid out in the First Day Declaration, after a meteoric rise in the price of and demand for cryptocurrency from October 2020 through November 2021, a period that overlapped with low energy costs, the price of cryptocurrencies began to steadily and then rapidly decline.  The collapse of the digital coin UST ("***Terra***")—a "stablecoin" designed to track the value of the U.S. dollar—in May 2022 brought down with it one-quarter of the cryptocurrency

---

[9]     "Our mining operations can only be successful and ultimately profitable if the costs, including hardware and electricity costs, associated with mining digital assets are lower than the price of the digital assets we mine." Form 10-Q (Nov. 22, 2022).

market value and was followed by the chapter 11 filings of multiple companies in the cryptocurrency market, including Three Arrows Capital, Voyager, Celsius, BlockFi, and FTX in the summer and fall of 2022. As a result, the price of Bitcoin fell by approximately sixty-five percent (65.0%) in 2022. *See* First Day Declaration ¶ 67. Simultaneously, substantial increases in energy prices caused the Debtors' energy costs to consume approximately forty percent (40.0%) of revenue for the first half of 2022 because of the "tremendous" amounts of power required to support mining operations. *See* First Day Declaration ¶ 69.

16.    The Debtors' recent public statements and first day filings reflect this reality. On October 27, 2022, the Debtors filed a Form 8-K stating that operating performance and liquidity had been "severely impacted" by the factors noted above and, as a result, the Debtors were "in the process of exploring a number of potential strategic alternatives with respect to the Company's capital structure, including hiring strategic advisers, raising additional capital or restructuring its existing capital structure" and anticipated that existing cash reserves would be depleted by the end of 2022, if not sooner. Where the Debtors held 1,051 Bitcoins and approximately $29.5 million in cash as of September 30, 2022, the Debtors held only 24 Bitcoins and approximately $26.6 million in cash as of October 26, 2022. *See* Form 8-K (Oct. 27, 2022). In the First Day Declaration, the Debtors disclosed that the ongoing crypto winter and other factors resulted in a net loss of approximately $434.8 million for the quarter ending September 30, 2022, as compared to a net loss of approximately $16.6 million for the same quarter in 2021; liquidity of only approximately $4 million as of the Petition Date; and liabilities of $1.3 billion.

17.    The Equipment which serves as the Collateral for the Secured Loans consists of 13,353 application-specific integrated circuit equipment for the mining of Bitcoin ("***ASIC***

*Miners*").[10]  ASIC Miners, also known as "rigs," are computerized devices designed solely and specifically for the mining of cryptocurrencies.  In order to mine cryptocurrency, these ASIC Miners work to solve complex algorithms and require a tremendous amount of computational power to do so successfully.  Solving the algorithm results in the award of a cryptocurrency asset, such as Bitcoin.  As cryptocurrency is controlled so that supply grows at a limited rate based on a predetermined schedule, successfully mining cryptocurrency is difficult, and ASIC Miners are typically run twenty-four hours a day to maximize the amount of cryptocurrency that can be mined. *See* First Day Declaration ¶ 28.  Due to the high computational energy ASIC Miners use and their continuous operation, ASIC Miners have a finite lifecycle.  Where ASIC Miners are not properly maintained or are kept in unfavorable conditions, their lifecycle can be limited to months.

18.     The Debtors continue to use the ASIC Miners that serve as Barings' Collateral in the normal course of their operations and have given no indication they intend to cease using the Collateral during the chapter 11 proceedings through rejection of the MSA or otherwise.  As such, the value of the Collateral will decline during these chapter 11 cases due to (i) the finite lifecycle of the ASIC Miners; and (ii) the Debtors' continued use of the Collateral in the normal course of their operations.

        **C.     The Debtors' Proposed DIP Financing.**

19.     The Debtors seek Court approval to obtain postpetition financing (the "***DIP Financing***") through a superpriority priming senior secured debtor-in-possession credit facility in an aggregate principal amount of up to $150,000,000.00, consisting of (i) a new money multiple draw term loan facility in in an aggregate principal amount of $75,000,000.00, provided by certain

---

[10]     Based on the information provided in the First Day Declaration, the Equipment constitutes approximately 14.6% of the ASIC Miners the Debtors describe as subject to the largest equipment financing and equipment leases. First Day Declaration ¶ 54.

of the Debtors' prepetition secured lenders; and (ii) a credit facility pursuant to which prepetition convertible notes in an aggregate principal amount of $75,000,000.00 will be rolled up upon entry of the Final DIP Order. *See* DIP Motion ¶ 1.  This Court previously approved the DIP Financing on an interim basis, allowing the Debtors to borrow $37,500,00.00 under the DIP Facility.  *See Interim Order (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims With Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief* (the "***Interim DIP Order***") [ECF No. 130].

20.     Through the DIP Financing, the Debtors purport to provide Barings and other Equipment Lenders with adequate protection in the form of "superpriority administrative expense claims contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors" (the "***Equipment Lender Adequate Protection Claims***") and "valid, binding, enforceable and automatically perfected postpetition liens and security interests in all DIP Collateral" in an amount equal to the Diminution in Value (the "***Equipment Lender Adequate Protection Liens***" and together with the Equipment Lender Adequate Protection Claims, the "***Equipment Lender Adequate Protection***").  *See* Interim DIP Order ¶ 41(a)–(b).  The Equipment Lender Adequate Protection Claims are "(i) subject and subordinate only to the Carve Out, the DIP Superpriority Claims and the Noteholder Adequate Protection Claims, and (ii) senior to any and all other administrative expense claims and all other claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever."  *See* Interim DIP Order ¶ 41(a). The Equipment Lender Adequate Protection Liens are "(i) junior and subordinated to (A) the Carve Out, (B) the DIP Liens in Prepetition Collateral, (C) the Noteholder Adequate Protection Liens in

11

Prepetition Collateral, and (D) the Permitted Prior Liens, (ii) *pari passu* with the Noteholder Adequate Protection Liens in Unencumbered Assets, and (iii) senior to the DIP Liens in Prepetition Equipment Financing Collateral (as applicable) and the Adequate Protection Liens in Prepetition Equipment Financing Collateral (as applicable)."  *See* Interim DIP Order ¶ 41(b).

## **OBJECTION**

## I.   **Adequate Protection is Mandatory and the Proposed Adequate Protection is Insufficient.**

21.     A secured creditor is entitled to adequate protection as a matter of right—not as a matter of discretion—when the estate proposes to use the creditor's collateral. *See* 11 U.S.C. §§ 361, 362(d), 363(e); 3 Collier on Bankruptcy ¶ 361.02 (16th ed.) (citing H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 339, at 343-44 (1977)).

22.     Protection of a secured creditor's interest in collateral is rooted in the Fifth Amendment of the United States Constitution and is recognized as a property right afforded the highest protection under the law.  See H.R. Rep. No. 595, at 339 (1977) ("The concept is derived from the fifth amendment protection of property interests"); *In re DiSardi*, 340 B.R. 790, 797 (Bankr. S.D. Tex. 2006) ("The concept of adequate protection finds its basis in the Fifth Amendment's protection of property interest"); *see also Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 589 (1935) (stating that "[t]he bankruptcy power, like the other great substantive powers of Congress, is subject to the Fifth Amendment").  In *In re Timbers of Inwood Forest Assocs, Ltd.*, 793 F.2d 1380, 1397 (5th Cir. 1986), the Fifth Circuit analyzed case law and legislative history to determine that "adequate protection" was meant to provide a secured creditor with the benefit of its prepetition bargain, as articulated below:

> The [House] report does not explain the "benefit of their bargain" of which secured creditors should not be deprived.  In the context of the entire report, however, it

seems likely that the bargain referred to is the bargain to receive the collateral or its value upon default. Although the stay temporarily prevents that aspect of the bargain from being fulfilled, a creditor should not be prejudiced by a debtor's continued use of collateral during the proceeding. That bargain must be protected by compensating for a decline in the value of the collateral through its use during the pendency of the stay.

23. As the Debtors' intention is to continue using the Collateral in the ordinary course of their operations during the pendency of these chapter 11 cases, Barings is entitled to adequate protection to protect against the diminution in value that will result from such use. Section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Relief under section 363(e) is not discretionary— the section provides that the court "shall" grant the relief specified, at any time, on request of the secured party whenever a debtor seeks to use, sell, or lease that party's collateral. 11 U.S.C. § 363(e); *see also In re Metromedia Fiber Network, Inc.*, 290 B.R. 487, 492 (Bankr. S.D.N.Y. 2003).

24. Courts, therefore, have recognized that secured creditors are entitled to adequate protection on account of any diminution in value of non-cash collateral. *See, e.g.*, *In re Cent. Grocers, Inc.*, Case No. 17-10993 (LSS), 2017 WL 5483319, at *5 (Bankr. D. Del. May 5, 2017) (holding that adequate protection is appropriate for any diminution in the value of creditor's interest in prepetition collateral resulting from the automatic stay and/or debtors' use, sale, or lease of the prepetition collateral); *In re Marsh Supermarkets Holding, LLC*, Case No. 17-11066 (BLS), 2017 WL 5463219, at *10 (Bankr. D. Del. July 19, 2017).

25. The Bankruptcy Code does not specify the form that adequate protection must take. Such determination must be made on the facts of each case. 11 U.S.C. § 361; *see also In re Energy*

*Partners, Ltd.*, 409 B.R. 211, 236 (Bankr. S.D. Tex. 2009) ("Exactly what constitutes adequate protection must be decided on a case-by-case basis"); *In re Wilson*, 30 B.R. 371, 373 n.11 (Bankr. E.D. Pa. 1983) ("While 'adequate protection' is not defined in the Bankruptcy Code, the legislative history of section 361 reflects the intent of Congress to give the courts the flexibility to fashion the relief in light of the facts of each case and general equitable principles.").

26.     The Equipment Lender Adequate Protection proposed by the Debtors consists of (i) 507(b) superpriority administrative expense claims, and (ii) postpetition liens and security interests in all DIP Collateral.  *See* Interim DIP Order ¶ 41(a)–(b).  While Barings does not affirmatively request additional adequate protection through this Limited Objection, the adequate protection proposed by the Debtors to compensate Barings and the other Equipment Lenders for the use of collateral is not sufficient under the circumstances of these chapter 11 cases.[11]

27.     ***First***, the Equipment Lender Adequate Protection Claims consist of superpriority administrative expense claims contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors.  As discussed *infra*, Barings has concerns regarding the Debtors' ability to make these administrative expense payments in cash on the Effective Date.

28.     ***Second***, the Equipment Lender Adequate Protection Liens consist of liens on all DIP Collateral.  DIP Collateral is defined to include "all assets and properties of each of the DIP Loan Parties and their estates, of any kind or nature whatsoever, wherever located, whether tangible or intangible, real, personal or mixed, whether now owned or consigned by or to, or leased from or to, or hereafter acquired by, or arising in favor of, each of the DIP Loan Parties."  Interim DIP Order ¶ 6(b).  The value of the Collateral will likely decline during these chapter 11 cases,

---

[11]   The rights of Barings (and other Equipment Lenders) with respect to adequate protection are explicitly preserved in the Interim DIP Order and are reiterated herein.  *See* Interim DIP Order ¶ 12.

especially given the Debtors' continued and constant use of the Equipment.  However, Barings has no information and has received no information from the Debtors with respect to the value of the DIP Collateral and its ability to properly protect Barings against the Collateral's diminution in value during the course of these chapter 11 cases.

29.     **Third**, any Equipment Lender Adequate Protection Claims are "(i) subject and subordinate only to the Carve Out, the DIP Superpriority Claims and the Noteholder Adequate Protection Claims, and (ii) senior to any and all other administrative expense claims and all other claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever."  *See* Interim DIP Order ¶ 41(a).  Given the critical nature of  Barings' and other Equipment Lenders' collateral to the Debtors' operations, it is appropriate for the Equipment Lender Adequate Protection Claims  to be *pari passu* with the Noteholder Adequate Protection Claims, rather than subordinate thereto.

30.     While Barings does not affirmatively request additional adequate protection in this Limited Objection, given the insufficiency of the proposed Equipment Lender Adequate Protection alone, periodic cash payments as contemplated by section 361(1) of the Bankruptcy Code are an additional form of adequate protection necessary to protect Barings and the other Equipment Lenders against the diminution in value of their collateral.  Periodic cash payments as adequate protection are appropriate to protect secured creditors burdened with collateral that is at risk of diminution in value at a relatively constant rate.  *See, e.g.*, *In re Timbers of Inwood Forest Assocs.*, *Ltd.*, 793 F.2d 1380, 1396–97 (5th Cir. 1986); *see also In re Cason*, 190 B.R. 917, 924 (Bankr. N.D. Ala. 1995).

31.     While an undersecured creditor cannot require a debtor to make adequate protection payments, that does not bar a debtor from making such payments; to the contrary, it may be

necessary to avoid what would otherwise constitute "an improper taking of the secured creditor's collateral." *See In re 680 Fifth Ave. Assocs.*, 154 B.R. 38, 42 (Bankr. S.D.N.Y. 1993) ("[W]here a lender is undersecured, the debtor's use of that lender's cash collateral, absent adequate protection, would clearly cause a decrease in the value of that creditor's property in which the debtor had an interest . . . and would constitute an improper taking"); *see also In re Mathis*, 64 B.R. 279, 284–85 (N.D. Tex. 1986) (affirming bankruptcy court order awarding undersecured creditor adequate protection payments to compensate for diminution in value of farm equipment during bankruptcy proceeds). Here, the Debtors' assert that Barings and other Equipment Lenders are undersecured, stating in the First Day Declaration that the "equipment financing is largely undersecured, and as of the Petition Date, the Debtors believe that the value of the collateral securing the equipment may be $90 million or less." First Day Declaration ¶ 6.

32.     The Collateral is critical to the Debtors' operations and ability to produce revenue, but due to the high computational energy ASIC Miners use, their continuous operation, and technological advances, ASIC Miners have a finite lifecycle during which the ASIC Miners decline in value. Where the Debtors will continue to use the Collateral during the course of these chapter 11 cases to generate revenue for themselves, the DIP Lenders, and senior creditors— including the Prepetition Secured Noteholders—at the expense of the value of the Collateral, and where mere use of the Collateral in the ordinary course will result in diminution in value because of the nature of the Collateral and the Debtors' operations, a failure to provide adequate protection in the form of periodic cash payments would result in an "improper taking of such collateral." *In re 680 Fifth Avenue Assoc.*, 154 B.R. 38 at 42.

**II.     There are Insufficient Provisions in the DIP Budget and Other Restructuring Documents to Provide the Equipment Lenders with Adequate Protection Payments.**

16

A.    **DIP Budget**

33.    In connection with the DIP Motion, the Debtors filed an initial budget (the "***Budget***") to which the use of Cash Collateral and the proceeds of the DIP Facility are subject. *See Notice of Filing of Initial Budget* [ECF No. 97].  While the Debtors and DIP Lenders anticipate enjoying (and using) the revenues from the Bitcoin generated by the Collateral, absent from the Budget is the inclusion of any line item for adequate protection for the Equipment Lenders.

34.    Where adequate protection cannot be provided for collateral the debtor proposes to use, "such use, sale or lease of the collateral must be prohibited."  11 U.S.C. § 363(e); *see, e.g.*, *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204 (1983) ("At the secured creditor's insistence, the bankruptcy court must place such limits or conditions on the trustee's power to sell, use, or lease the property as are necessary to protect the creditor.  The creditor with a secured interest in property included in the estate must look to this provision [§ 363(e)] for protection, rather than to the non-bankruptcy remedy of possession."); *In re Best Prods. Co., Inc.*, 138 B.R. 155, 158 (S.D.N.Y. 1992) ("The debtor is given the option to surrender the property to the entity that has made the request, and avoid providing adequate protection, or provide adequate protection to such entity for the debtor's continued use of the collateral.").

35.    In the event that this Court determines that periodic cash payments are required to adequately protect the Equipment Lenders, the Debtors have no apparent ability to provide adequate protection under the Budget and will not be permitted to continue using the Collateral.[12] As the Debtors' operations consist of mining Bitcoin for their own accounts and hosting industrial scale Bitcoin mining operations for other miners, without use of the Collateral, the Debtors would

---

[12]    Barings notes for the Court that according to the Wall Street Journal, the closing price of Bitcoin as of January 16, 2023, was $21,129. On the Petition Date, the price of Bitcoin was approximately $16,800.  *See* First Day Declaration ¶ 23.

be severely limited in their ability to continue their operations as the Debtors derive substantially all of their revenue from these operations, with the only other revenue generated by the Debtors being the sale of equipment. *See* First Day Declaration ¶ 35.[13]

36.     Thus, it is necessary for the DIP Budget to be modified to account for any cash payments that may need to be made to the Equipment Lenders as adequate protection, including payment of the Equipment Lender Adequate Protection Claims.

> **B.     Restructuring Support Agreement**

37.     Similarly, the proposed Equipment Lender Adequate Protection consists, in part, of superpriority administrative expense claims under section 507(b) of the Bankruptcy Code. Section 507(b) of the Bankruptcy Code provides that if the adequate protection provided by a debtor proves to be inadequate, the secured creditor is provided a superpriority administrative expense claim in the amount of the diminution in value of the collateral. 11 U.S.C. § 507(b).

38.     The restructuring support agreement (the "***RSA***") entered into between the Debtors and the Convertible Noteholder Group provides that holders of Administrative Expense Claims (as defined in the RSA), including 507(b) claims, "will receive, in full and final satisfaction of such Claim, cash in an amount equal to such Allowed Claim on the Effective Date or as soon as practicable thereafter or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code." *See Notice of Filing of Exhibit B to the Declaration of Michael Bros in Support of the Debtors' Chapter 11 Petitions and First Day Relief* [ECF No. 72], at 35.

39.     Although this issue is ultimately one for a confirmation hearing, the Debtors have not demonstrated, through the RSA or otherwise, the source of payment for these 507(b)

---

[13]   Equipment sales revenue "is derived from [the Debtors'] ability to leverage its partnership with leading equipment manufacturers to secure equipment in advance, which is then sold to [the Debtors'] customers when they are unable to obtain them otherwise." Form 10-Q (Nov. 22, 2022).

administrative claims.  Accordingly, their ability to honor payment of such administrative claims on the occurrence of the Effective Date is unknown and uncertain.

### III.    Equipment Lenders are Entitled to Certain Information Related to the Debtors' Financial Condition.

40.    In connection with the Debtors' request for postpetition financing, the proposed Equipment Lender Adequate Protection, and these chapter 11 cases generally, the Equipment Lenders have requested certain documents and information from the Debtors.  The information and documents requested pertain to, among other things, the DIP Budget and adequate protection of the Equipment Lenders' collateral.

41.    "Adequate protection can only be determined if the Debtor is willing to cooperate with its secured creditor, providing sufficient, accurate information upon which both the creditor and the Court can make an informed decision." *In re O.P. Held, Inc.*, 74 B.R. 777, 784 (Bankr. N.D.N.Y. 1987).  As detailed in § II *supra*, the DIP Budget does not provide for a line item for cash adequate protection payments, and the RSA provides no information for the source of cash to pay the Equipment Lender Adequate Protection Claims on the Effective Date.  The Equipment Lenders have requested this information be made available.  Thus it is appropriate for the Debtors to provide this information to the Equipment Lenders and the Court so that the adequacy of the proposed Equipment Lender Adequate Protection can be properly evaluated.[14]

### IV.    Equipment Lenders Are Entitled to Waivers of Section 506(c) and 552(b) of the Bankruptcy Code.

42.    Given the facts and circumstances of these cases, Barings does not believe that the Prepetition Secured Noteholders are entitled to the protections under the Final DIP Order provided

---

[14]    Barings reserves all of its rights with respect to any arguments regarding the DIP, the RSA, and any other relief the Debtors seek pending receipt of the requested information.

by waivers under sections 506(c) and 552(b) of the Bankruptcy Code unless Barings and the other Equipment Lenders also receive the benefits of such waivers.

     **A.**     **Waiver of Surcharge Claims against Prepetition Collateral under Section 506(c) of the Bankruptcy Code.**

43.     Section 506(c) of the Bankruptcy Code allows a debtor to "recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of" such property.  11 U.S.C. § 506(c).  The "default rule" is that administrative expenses are paid from unencumbered property of the estate, and section 506(c) is an "extraordinary exception" to that general rule.  *See, e.g.*, *In re Grimland, Inc.*, 243 F.3d 228, 233 (5th Cir. 2001) ("The default rule in bankruptcy is . . . that administrative expenses are paid out of the estate and not by the secured creditors of the debtor."); *In re Delta Towers, Ltd.*, 924 F.2d 74, 76 (5th Cir. 1991) (observing that section 506(c) of the Bankruptcy Code "furnishes an exception to the general rule" only when the claimant can show the expenses were necessary, reasonable, and for the primary benefit of the secured creditor); *Matter of P.C., Ltd.*, 929 F.2d 203, 205 (5th Cir. 1991) (same).

44.     The purpose and rationale of section 506(c) is to permit a debtor to surcharge a secured creditor's collateral so that unsecured creditors and the debtor's estate are not unfairly responsible for costs that only benefit secured parties and their collateral.  *See, e.g.*, *In re JKJ Chevrolet, Inc.*, 26 F.3d 481, 483 (4th Cir. 1994) ("The purpose of [section 506(c)] is to prevent a windfall to a secured creditor at the expense of the estate."); *In re Proalert, LLC*, 314 B.R. 436, 442 (B.A.P. 9th Cir. 2004) ("The underlying rationale for charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that the general estate and unsecured creditors should not be required to bear the cost of protecting what is not theirs.").

45.     While the rationale of section 506(c) is typically not appropriate or applicable

where the Debtors are utilizing collateral to operate their businesses and generate revenue, the Debtors, DIP Lenders and Prepetition Secured Noteholders are attempting the following:

i.  using the Equipment Lenders' Collateral (without making any periodic cash payments for the diminution in its useful life) to mine Bitcoin;

ii.  converting such Bitcoin into revenue to fund these cases, including the administrative expenses associated with the DIP, as well as plan recoveries;

iii.  immunizing the Prepetition Secured Noteholders—who claim to have a lien on the Bitcoin generated by the Equipment Lenders' Collateral—from any surcharge; and

iv.  isolating the Equipment Lenders, as the only secured creditors to surcharge under 506(c).

46.     Under these circumstances, the Prepetition Secured Noteholders should not be entitled to a 506(c) waiver unless the Equipment Lenders are on equal footing.

**B.     Waiver of "Equities of the Case" Claims under Section 552(b) of the Bankruptcy Code.**

47.     The "equities of the case" provision of section 552(b) is an exception to the Bankruptcy Code's general principle that a prepetition security interest in a debtor's collateral extends to "proceeds, products, offspring or profits of such property, then such security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and applicable nonbankruptcy law."  11 U.S.C. § 552(b).  Thus, section 552(b) acts to ensure that a prepetition

security interest in the proceeds of collateral extends to proceeds acquired postpetition, subject to the court, "after notice and a hearing, and based on the equities of the case," ordering otherwise. *Id.*

48.     As detailed *supra*, Barings has a valid, perfected security interest in certain of the ASIC Miners and "all proceeds thereof" pursuant to the Amendment.  The sole function of the ASIC Miners which serve as Additional Collateral is to mine, or produce, Bitcoin for the Debtors' own accounts or third-party customers.  It would be inequitable to apply the exception under section 552(b) to cut off Barings' security interest in the proceeds of its Collateral, particularly because of the nature of the Collateral.  As the Collateral will decline in value due to the Debtors' use of the Collateral during the course of these chapter 11 cases, it is necessary that Barings be assured they will retain an interest in the postpetition proceeds of their Collateral.

49.     The Debtors have identified no reason why other parties—including the Prepetition Secured Noteholders—are entitled to such waiver and an assurance that their security interests will remain intact where Barings and other Equipment Lenders risk the loss of their interest in valuable postpetition collateral.

## **RESERVATION OF RIGHTS**

50.     This Limited Objection is submitted without prejudice to, and with full reservation of, Barings' rights, claims, defenses, and remedies, including the right to amend, modify, or supplement this Limited Objection, to seek discovery, to raise additional objections and to introduce evidence at any hearing related to this Limited Objection, and without in any way limiting any other rights of Barings to object to the to DIP Motion, on any grounds, as may be appropriate.  Barings reserves the right to amend or supplement this Limited Objection.

51.     Barings further reserves the right to seek entry of an order granting to Barings

additional adequate protection pursuant to sections 361 and 363(e) and other related relief.

## **CONCLUSION**

For the foregoing reasons, Barings respectfully requests that the Court grant the relief

requested by the DIP Motion subject in a form and manner which addresses the concerns raised

herein.

Dated: January 17, 2023
Houston, Texas

Respectfully submitted,

**ARNOLD & PORTER KAYE SCHOLER LLP**

By:   */s/ C. Thomas Kruse*

C. Thomas Kruse
ARNOLD & PORTER KAYE SCHOLER LLP
700 Louisiana St, Suite 4000
Houston, Texas 77002
Telephone: (713) 576-2400
Facsimile: (713) 576-2499
E-mail:   tom.kruse@arnoldporter.com

- and -

Michael D. Messersmith (admitted *pro hac vice*)
Brian J. Lohan (admitted *pro hac vice*)
Sarah Gryll (*pro hac vice* pending)
ARNOLD & PORTER KAYE SCHOLER LLP
70 West Madison Street, Suite 4200
Chicago, Illinois 60602
Telephone: (312) 583-2300
Facsimile: (312) 583-2360
E-mail:   michael.messersmith@arnoldporter.com
             brian.lohan@arnoldporter.com
             sarah.gryll@arnoldporter.com

- and -

Jeffrey A. Fuisz (admitted *pro hac vice*)
Robert T. Franciscovich (*pro hac vice* pending)
Madelyn A. Nicolini (admitted *pro hac vice*)

23

ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019
Telephone: (212) 836-8000
Facsimile: (212) 836-8689
E-mail:  jeffrey.fuisz@arnoldporter.com
         robert.franciscovich@arnoldporter.com
         madelyn.nicolini@arnoldporter.com

*Counsel to Barings BDC, Inc., Barings Capital Investment Corporation and Barings Private Credit Corp.*

**<u>Certificate of Service</u>**

I certify that on January 17, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ C. Thomas Kruse*
C. Thomas Kruse
