**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CORE SCIENTIFIC, INC. *et al.*,[1] | ) Case No. 22-90341 (DRJ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) [Re: Docket No. 38] |

**OBJECTION OF THE OFFICIAL COMMITTEE OF**
**UNSECURED CREDITORS TO DEBTORS' EMERGENCY**
**MOTION TO OBTAIN POST-PETITION DEBTOR-IN-POSSESSION FINANCING**

The Official Committee of Unsecured Creditors (the "Committee") of Core Scientific, Inc. and its debtor affiliates in the above-captioned cases (collectively, the "Debtors" or "Company"), by and through its undersigned proposed counsel, hereby submits this objection (this "Objection") to the *Emergency Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief* [Docket No. 38] (the "Motion").[2]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

[2] Capitalized terms used herein that are not otherwise defined shall have the meanings ascribed to them in the Singh Declaration (as defined below) or the Motion, as applicable.

**PRELIMINARY STATEMENT**

1.      The Debtors have good reason to be optimistic about their financial position five weeks into these cases.  Since the Petition Date, the price of bitcoin has increased over 36%.  At the same time, several favorable operational outcomes have materially increased and improved the Debtors' cash position.  Taken together, the Debtors are approximately ███████ ahead of initial projections on cash.  There is additional reason for optimism:  the Debtors have material, largely unencumbered, real estate assets, three of which are worth upwards of ███████ collectively.  The Debtors marketed these properties prior to the Petition Date and are confident ████████████████████████████████████████████████████ ███████████████████████████████████████████.  This good news has given the Company increasing momentum and led to two separate parties submitting competing debtor-in-possession financing proposals in the last 48 hours.

2.      Against this backdrop, it has become clear to the Committee that the Debtors do not require any additional financing beyond the $37.5 million borrowed pursuant to the Interim DIP Order.  Rather, the Debtors' current liquidity is more than sufficient to bridge them to the planned near-term asset sales and likely sufficient to operate until the conclusion of these cases even in the absence of any asset sales.  Nonetheless, the DIP Lenders seek to impose $60.0 million in new money loans on onerous terms, including a dollar-for-dollar roll up that would occur automatically upon entry of the Final DIP Order.[3]  Given the significant improvement in the

---

[3]    The Motion contemplated a $150 million debtor-in-possession financing facility, consisting of $75.0 million in new money loans and $75.0 million in roll up loans.  Based on conversations with the Debtors and the Ad Hoc Noteholder Group, the Committee understands that only approximately $60.0 million in new money loans will be subscribed and committed for.  Accordingly, this Objection refers to the upward amount of new money loans and roll up loans under the proposed DIP Facility as $60.0 million, rather than $75.0 million.

Debtors' cash position versus budget, there is simply no basis for a DIP Facility of this magnitude and the other unreasonable terms imposed by the DIP Lenders.

3.        Rather than a small, short-term bridge facility, the DIP Lenders seek to impose a DIP Facility on the Debtors that severely restricts the Debtors' ability to repay borrowed funds on reasonable terms and all but ensures that the Debtors will have little choice but to pursue the restructuring contemplated in the RSA.  Here, the RSA transaction would hand the Company over to the Convertible Noteholders, while unsecured creditors would receive less than 3% of the reorganized equity (and then only if they vote in favor of the plan contemplated by the RSA).  The DIP Facility contains several onerous terms, which both individually and collectively seek to accomplish this result:

- *First*, the DIP Facility precludes the Debtors from pursuing non-core asset sales if the net proceeds exceed $10,000,000.  This limitation ensures that the Debtors cannot sell their unencumbered real estate assets to pay off the DIP Lenders' absent the DIP Lenders' consent.  Such a result is particularly objectionable here, where the Debtors' business judgment is that it is in the best interests of the Debtors' estates to sell these assets and the proceeds of such sales could potentially be used to repay the DIP Facility ██████████ ██████ .

- *Second*, the DIP Facility requires the Debtors to make a "Termination Payment" of 15% in the event the DIP Facility is repaid in cash.  The Committee believes that an exit fee of this magnitude is unprecedented under the circumstances and appears designed to (i) chill third parties from refinancing the DIP Facility and (ii) encourage the Debtors to convert the DIP Facility into a Rolled Exit Facility (which would entitle the DIP Lenders to up to an additional 30% in warrants pursuant to the RSA).  At minimum, the Termination Payment unreasonably increases the hurdle for the Debtors to repay the DIP Facility during these cases.

- *Third*, the DIP Facility includes a Roll Up, potentially as high as $60.0 million despite the likelihood that only the $37.5 million in new money loans already extended by the DIP Lenders will be all that is required (*i.e.*, there is no dollar for dollar creep feature and instead the full amount of the Roll Up is automatically created upon entry of the Final DIP Order).  The Roll Up increases the DIP Facility's outstanding balance and therefore further minimizes the Debtors' ability to pay down the facility during these cases.  Said differently, if the Motion is granted without modification, the Debtors would need approximately $107.6 million (comprised of new money loans, Roll Up loans, and various fees).  That requirement would be particularly punitive here, where the Debtors' ultimate need for new money is likely no more than the $37.5 million already borrowed and the Debtors could be

in a position to make a material (or full) pay down of the DIP Facility in several weeks. Moreover, the DIP Lenders have already conceded that only prepetition secured debt held by the Convertible Noteholders will be subject to the Roll Up (*i.e.*, the Roll Up's obligations are *contingent* on the results of an eventual proceeding that values the Convertible Noteholders' limited prepetition collateral). Nonetheless, the DIP Facility would require the Debtors to repay the full Roll Up in order to retire the DIP Facility without any valuation of the Convertible Notes' prepetition collateral having occurred.[4]

4.     The Court should decline to approve these objectionable terms both because they fail to satisfy the requirement that any DIP financing is fair and reasonable under the circumstances and because they work together to impermissibly establish plan terms *sub rosa*. Absent meaningful modifications to the DIP Facility as set forth herein, the Motion should be denied.

## **BACKGROUND**

### A.     **General Background**

5.     On December 21, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. These cases are being jointly administered (collectively, the "Chapter 11 Cases").

6.     Pursuant to the Motion, the Debtors initially sought authorization to obtain a $150.0 million debtor-in-possession financing facility consisting of (a) a new money multiple draw term loan facility in an aggregate principal amount of up to $75.0 million, and (b) the conversion of up to $75.0 million on a dollar-for-dollar basis of amounts outstanding under the Convertible Notes into DIP Loans (such conversion, the "Roll Up"). In support of the relief requested in the Motion, the Debtors filed the *Declaration of John Singh* [Docket No. 98] (the "Singh Declaration"). The

---

[4]   The possibility that some portion of the Roll Up is unsecured is not some far-fetched concern. As set forth below, no intercreditor agreement exists between the holders of the April Convertible Notes and the holders of the August Convertible Notes. As a result, the holders of the August Convertible Notes actually have only a junior lien on the Convertible Note Collateral. Thus, to the extent the value of the Convertible Note Collateral does not exceed the principal amount of the April Convertible Notes (something the Committee believes is a very real possibility given the significant gaps in the Convertible Notes collateral package, as discussed below), the holders of the August Convertible Notes (who constitute the vast majority of the Roll Up lenders) would be entirely unsecured.

Committee now understands that the Debtors are seeking authorization to borrow up to $60.0 million in new money loans and a Roll Up of $60.0 million.

7.     The DIP Lenders are a subset of an ad hoc group (the "Ad Hoc Noteholder Group") of holders of the Debtors' prepetition Convertible Notes (the "Convertible Noteholders").  The Debtors and the members of the Ad Hoc Noteholder Group have entered into a *Restructuring Support Agreement* [Docket No. 72] that was negotiated prior to the Petition Date (the "RSA"). The RSA contemplates the Debtors confirming a plan of reorganization that would give 97% of the Company's reorganized equity value to the Convertible Noteholders.  Under that transaction, general unsecured creditors would get less than 3% of the remaining reorganized equity value if they vote in favor of the plan of reorganization, prior to dilution by potential DIP warrants and other post-emergence equity grants.

8.     Additional details regarding the Debtors and their business, the events leading to the filing of the Chapter 11 Cases, the DIP Facility, and the RSA are set forth in the *Declaration of Michael Bros in Support of Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 5] (the "Bros Declaration").

9.     On January 9, 2023, the Office of the United States Trustee appointed the Committee.  The Committee consists of three members: Dalton Utilities, Sphere 3D Corp., and BRF Finance Co., LLC.  Since its formation, the Committee and its advisors have worked tirelessly to understand all aspects of the Chapter 11 Cases, including the Debtors' business operations, the RSA, and most urgently, the DIP Facility's terms and the relief sought in the Motion.

**B.     The Convertible Notes**

10.     The Ad Hoc Noteholder Group consists of holders of two similar, but ultimately distinct, sets of convertible secured notes issued by the Debtors.  As of the Petition Date, there is

approximately $234 million outstanding under the first issuance of convertible notes (the "April Convertible Notes"), and $318 million outstanding under the second issuance (the "August Convertible Notes", and together with the April Convertible Notes, the "Convertible Notes"). The Convertible Notes share many of the same characteristics including maturity date (April 19, 2025), interest rate (10.0% per annum, of which 4.0% is payable in cash and 6.0% is paid in kind), and common stock conversion rights (convertible at $8.00 per share).

11.     The April Convertibles Notes are secured pursuant to (a) that certain Security Agreement, dated as of April 19, 2021, and (b) that certain Intellectual Property Security Agreement, dated as of April 19, 2021. Pursuant to these agreements, the April Convertibles Notes are secured by a first lien security interest in all of the Debtors' accounts, chattel paper, commercial tort claims, commodity accounts, contracts, deposit accounts, documents, general intangibles, goods, instruments, investment property, letter-of-credit rights and letters of credit, money, securities accounts, supporting obligations, property, other goods and personal property, certain intellectual property and proceeds of each, other than "Excluded Property" (collectively, the "Convertible Note Collateral").[5] As described in the Bros Declaration, the August Convertible Notes became secured by the Convertible Note Collateral pursuant to (c) that certain Security Agreement, dated as of February 7, 2022, and (d) that certain Intellectual Property Security Agreement, dated as of February 7, 2022 (together with (a), (b), and (c), the "Convertible Note Security Agreements").

12.     Importantly, the Convertible Note Security Agreements do not give the Convertible Noteholders a "blanket lien" on all of the Debtors' assets. Instead, the Convertible Noteholders'

---

[5]   The Committee intends to investigate whether the Convertible Note Collateral is properly perfected, including with respect to the deposit accounts. The Committee reserves all rights with respect thereto.

lien covers a limited subset of the Debtors' assets.  The Chapter 11 Cases are somewhat unusual because the Debtors have valuable, largely unencumbered assets, including six parcels of real property and bitcoin mining equipment.[6]  Three of the Debtors' properties alone—Muskogee, Oklahoma and the properties in Barstow (Cedarvale) and Pecos (Cottonwood), Texas—may be worth over ███████████.[7]

13.      While the similarities are numerous, there are key differences between the April Convertible Notes and the August Convertible Notes, two of which are particularly noteworthy:

- **April Convertible Notes are Senior to the August Convertible Notes**.  The Debtors' obligations under the April Convertible Notes are secured by certain of the Debtors' assets pursuant to the Convertible Note Security Agreements dated April 19, 2021.  Thereafter, the August Convertible Notes became secured on February 7, 2022. ***Importantly, there is no intercreditor agreement governing the relationship between the holders of the April Convertible Notes and the August Convertible Notes*** that would provide for the ratable sharing of Convertible Note Collateral.  Thus, the Court should view the Convertible Notes as being two separate tranches of debt, with the April Convertible Notes being the equivalent of a "first lien" tranche, and the August Convertible Notes being a "second lien" tranche.

- **Differing Rights to Receive 200% Repayment Amount**.  Under the documents governing the Convertible Notes, there are circumstances where the Debtors are obligated to repay holders 200% of the principal amount of the notes issued (each, a "<u>Repayment Amount</u>").  The Debtors' obligation under the April Convertible Notes is triggered upon (i) maturity and (ii) a voluntary prepayment prior to maturity.  If holders accelerate the April Convertible Notes, the Repayment Amount is not payable.  Separately, the Debtors' obligation to pay the Repayment Amount under the August Convertible Notes is only triggered upon a voluntary prepayment prior to maturity.

---

[6]   The Committee is investigating the full extent of the Debtors' unencumbered property as of the Petition Date and reserves all rights with respect thereto.  For example, certain equipment financing parties have asserted that either they or the Convertible Noteholders have a lien on bitcoin.  *See e.g.*, Docket No. 291.  The Committee reserves all rights with respect to this issue and is operating under the assumption that any bitcoin successfully mined by the Debtors is unencumbered collateral.

[7]   ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

**C.     Terms of the DIP Facility**

14.     As noted above, the DIP Facility would provide the Debtors with up to $60.0 million in new money loans and require the Debtors to effectuate the Roll Up.  The DIP Facility is secured by a first priority lien on all "DIP Collateral," including the Debtors' unencumbered assets as of the Petition Date.

15.     The credit agreement governing the DIP Facility (the "DIP Credit Agreement") imposes various restrictions on the Debtors.  Notably, the DIP Credit Agreement limits the Debtors' ability to sell non-core assets, such as the Muskogree, Cedarvale, and Cottonwood properties, capping such sales at $10,000,000 in aggregate net proceeds.  *See* DIP Credit Agreement § 1.1, *Permitted Asset Disposition, subclause (o).*  Moreover, the Debtors are obligated to maintain a minimum liquidity level of $5,000,000 pursuant to a financial covenant under the DIP Credit Agreement.  *See* DIP Credit Agreement § 10.3.2.

16.     The DIP Facility includes several standard fees, including a new money commitment fee, a backstop fee, and an extension fee.  However, the DIP Facility also includes an expensive 15% "Termination Payment."  Moreover, the DIP Credit Agreement's "Termination Payment" definition references the RSA, including provisions that, if applicable, obligate the Debtors to issue $0.001 warrants to the DIP Lenders exercisable for up to 30% of the Company's reorganized equity.  The Debtors' obligation to pay the Termination Payment under the DIP Credit Agreement works as follows:

- The Debtors are obligated to pay a "Termination Payment" in the event of a "Termination Payment Triggering Event."  The nature of the Termination Payment depends on the nature of the Termination Payment Triggering Event, of which there are two categories.

- The first category is the consummation of a transaction that is not an "Acceptable Exit Roll Transaction," which includes (i) the full or partial repayment of any loans under the DIP Facility, or (ii) refinancing of loans under the DIP Facility.  If this event occurs,

the Termination Payment will consist of (w) 15.00% of the aggregate principal amount of new money loans outstanding at such time (along with unpaid interest and other fees) and (x) 2.00% of the aggregate principal amount of Roll Up outstanding at such time. Under these circumstances, the Debtors must pay the Termination Payment in cash.

- The second category is the consummation of an "Acceptable Exit Roll Transaction" (*i.e.*, a roll of the DIP Facility in accordance with the RSA that results in a "Rolled Exit Facility"). If this event occurs, the Termination Payment will consist of (y) 3.00% of the aggregate principal amount of new money loans outstanding at such time (along with unpaid interest and other fees), and (z) 2.00% of the aggregate principal amount of Roll Up outstanding at such time. Under these circumstances, the Debtors must pay the Termination Payment in cash for the new money loans, and in-kind on the Roll Up.

- The occurrence of an "Acceptable Exit Roll Transaction" has other significant economic implications under the RSA. Specifically, if "the Debtors cause the DIP Facility to roll into the Rolled Exit Facility", the Debtors are required to issue the DIP Lenders their "pro rata share of the DIP Warrants," which entitle holders to purchase 30% of the Company's reorganized equity at a cost $0.001 per warrant. *See* RSA, Exhibit A, *Restructuring Term Sheet,* Exhibit C, *DIP Warrants*.

17.     The final point is worth emphasizing as it highlights the DIP Lenders' desired end result for the Chapter 11 Cases:  execution of the RSA transaction that results in an "Acceptable Exit Roll Transaction," which then obligates the Debtors to issue warrants to the DIP Lenders that can be exercised for up to 30% of the Company's reorganized equity.

**D.     Interim DIP Order**

18.     After the first-day hearing, on December 23, 2022, the Court entered the *Interim Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "Interim DIP Order") [Docket No. 130].  Thereafter, the Debtors made an initial draw of $37.5 million under the DIP Facility.

19.     The Interim DIP Order includes a number of stipulations made by the Debtors that are binding on third parties in the Chapter 11 Cases absent the initiation of a "Challenge." Typically, the contents of these stipulations are uncontroversial.  Here, however, the Interim DIP Order's stipulations give the holders of the April Convertible Notes a minimum claim of $316.1 million although the outstanding principal amount as of the Petition Date was only $234 million. The Debtors have identified the source of the approximately $82 million increase as being the Repayment Amount described above, but have described it as original issue discount (despite there being circumstances where the Repayment Amount is not payable and despite the fact that the Repayment Amount is never described as such in the governing documents).  The Committee intends to investigate all aspects of this claim settlement, including its economic nature and permissibility in light of the Fifth Circuit's recent decision *In re Ultra Petroleum Corp.*, 51 F.4th 138 (5th Cir. 2022).

**E.     The DIP Budgets and Rising Price of Bitcoin Reveal the Debtors' Lack of Incremental Financing Need**

20.     On December 22, 2022, the Debtors filed their initial budget in connection with the DIP Facility (the "Initial Budget") [Docket No. 97].  The Initial Budget's key assumption is that the Debtors would sell mined bitcoin at $15,000 throughout the course of the Chapter 11 Cases. In the nearly five weeks since the Debtors developed the Initial Budget, the price of bitcoin has increased over 36%.[8]  Unsurprisingly, the increasing price of bitcoin directly helps the Debtors' cash position and reduces their need for incremental draws under the DIP Facility.  ███████

████████████████████████████████████████████████████████████

---

[8]    *See Declaration of Adam W. Verost in Support of the Objection of the Official Committee of Unsecured Creditors to Debtors' Emergency Motion to Obtain Post-Petition Debtor-in-Possession Financing* (the "Verost Declaration") ¶5, filed simultaneously herewith.



[REDACTED][9] [REDACTED]

21. [REDACTED]

[REDACTED]. *See Deposition of Rodi Blokh* (attached hereto as **Exhibit A**) 30:21-25, 31:1–2.   By inputting conservative bitcoin price assumptions into the model, the Debtors set themselves up for needing to request more funds than they actually need.   As noted above, bitcoin prices have steadily risen since the Petition Date.

22. Potentially recognizing that [REDACTED] was entirely too conservative an assumption, on January 21, 2023, the Debtors shared an updated proposed DIP budget (the "Proposed DIP

---

[9] [REDACTED]. Verost Declaration ¶ 6.

Budget") with the Committee.[10]   The Proposed DIP Budget uses a projected bitcoin price of ████ throughout the course of the Chapter 11 Cases.  *See* CSD-00004135-4136 page 3 attached hereto as **Exhibit B**.  The Proposed DIP Budget also shows that the Debtors' current cash position is much stronger than the Initial Budget's projections. ████████████████████
████████████████████████████████████
Verost Declaration ¶5. ████████████████████
████████████████████ *Id*. ████████████
████████████████████████████████████
████████████████████.

23.     The Proposed DIP Budget uses a projected bitcoin price of ████ despite bitcoin trading above $20,000 for approximately the past two weeks and trading just over $23,000 as of the day of this Objection's filing.  If bitcoin stayed above approximately $17,700, with all other factors assumed to be constant, then the Committee believes there will be no need for the Debtors to draw another dollar from the DIP Facility based on the Proposed DIP Budget, and under that scenario the Debtors would continue to benefit from a ████ liquidity cushion at the minimum point in the forecast. *Id*. at ¶¶6-7. ████████████████████
████████████████████████████████████
████████████████████. *See* **Exhibit B**, at page 3. ████████████████
████████████████████████████████████
████████████████████████████████████

---

[10]  The Proposed DIP Budget is attached hereto as Exhibit B. ████████████████████
████████████████████████.

████████████████████████████████████████████████████████

████████████████████████ .

### F.    Committee's Negotiations with the Debtors and the Ad Hoc Noteholder Group

24.    Since its formation and selection of professionals, the Committee has been voicing its concerns about the DIP Facility to the Debtors and the Ad Hoc Noteholder Group.  After the Ad Hoc Noteholder Group rejected the Committee's request to adjourn the final hearing on the Motion to mid-February—which made particular sense given the Debtors' strong liquidity position and the first incremental draw under the DIP Facility is not forecasted by the Debtors until the week beginning February 25, 2023—the Committee made formal discovery requests of both the Debtors and the Ad Hoc Noteholder Group.  In parallel, the Committee's professionals continued negotiating with their counterparts in hopes of finding a consensual path forward.

25.    These negotiations only proved somewhat fruitful.  The Committee's working assumption has been that a substantial portion of the Convertible Notes may be undersecured in light of their relatively limited collateral package.  Accordingly, if approved on a final basis, the Roll Up might convert prepetition unsecured deficiency claims into post-petition secured, administrative priority claims—an unacceptable outcome for unsecured creditors.  The Committee's concerns were further heightened because it was unclear what members of the Ad Hoc Noteholder Group had agreed to be DIP Lenders: holders of effectively first-lien April Convertible Notes or second-lien August Convertible Notes.[11]

---

[11]  The Committee's concerns were well founded.  On January 18, 2023, the Ad Hoc Noteholder Group filed its *Verified Statement of the Ad Hoc Group of Secured Convertible Noteholders Pursuant to Bankruptcy Rule 2019* [Docket No. 305] (the "2019 Statement").  The 2019 Statement disclosed that of the $57.0 million in then-committed financing, approximately 71.5%/$40.8 million was committed by holders of only the August Convertible Notes, approximately 17.8%/$10.2 million was committed by holders of only the April Convertible Notes, and approximately 10.7%/$6.1 million was committed by holders of both the August Convertible Notes and the April Convertible Notes.  If the DIP financing was being provided solely by holders of the April Convertible Notes, the Committee would have less concern about the Roll Up.

26.     After several rounds of negotiations, the Committee and the Ad Hoc Noteholder Group reached an agreement on this point.  Specifically, the parties agreed to insert clarifying language into the Final DIP Order making it clear that prepetition unsecured claims cannot be subject to the Roll Up.  To the extent the value of the prepetition collateral securing the Convertible Notes is later valued at an amount less than the principal amount of the Roll Up, the shortfall will automatically be deemed a prepetition secured obligation (and therefore will not benefit from the Roll Up).  In other words, the extent of the Roll Up is now contingent on a proceeding later in the Chapter 11 Cases that values the Convertible Noteholders' prepetition collateral, and only prepetition secured debt is part of the Roll Up.  In exchange for this meaningful concession, the Committee agreed to withdraw its formal discovery requests of the Ad Hoc Noteholder Group. Although this settlement partially alleviates the Committee's concerns, it does not fully address the other deeply problematic aspects of the DIP Facility.

**G.    Recent Updates Regarding Alternative Financing Proposals**

27.     At the first day hearing, the Court noted its desire to see third parties come forward with "better and cheaper DIP[s]".  *See* Hr'g Tr. 33: 24, *In re Core Scientific, LLC*, Case No. 22-90341 (Bankr. S.D. Tex. Dec. 22, 2022).  Over the past 48 hours, the Court's wish has started to come true as the Debtors informed the Committee's professionals that they received two separate, alternative financing proposals.   The Committee understands that the Debtors view these alternatives as having materially better terms than the DIP Facility.  The Committee views the emergence of these competing proposals as a very positive development and looks forward to helping develop these offers into actionable alternatives.   To that end, the Committee would

support further adjourning the final hearing on the Motion if it would help facilitate a competitive process that achieves the best debtor-in-possession financing terms.[12]

## OBJECTIONS

**I.    The Debtors Cannot Satisfy Their Burden Under Section 364(d) of the Bankruptcy Code**

28.    To obtain post-petition financing under section 364(d) of the Bankruptcy Code, "a debtor has the burden of demonstrating that (i) the credit transaction is necessary to preserve the estate, and (ii) the terms of the transaction are fair and reasonable given the circumstances." *In re Futures Equity L.L.C.*, No. 00-33682 (BJH), 2001 Bankr. LEXIS 2229, at *14 (Bankr. N.D. Tex. April 11, 2001); *see also In re L.A. Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011).  For example, courts will not find that a debtor exercised reasonable business judgment by entering into debtor-in-possession  financing that: (a) is designed to favor secured lenders at the expense of other creditors; (b) converts the bankruptcy process from one designed to benefit all creditors in to one designed for the sole or primary benefit of the debtor's secured lenders; or (c) is not in the best interests of the estate.  *See In re Laffite's Harbor Dev. I, LP*, No. 17-36191 (KKB), 2018 WL 272781, at *2-3 (Bankr. S.D. Tex. Jan. 2, 2018); *see also In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (9th Cir. BAP 1992) ("[C]ourts look to whether the proposed terms would prejudice the powers and rights that the Code confers for the benefit of all creditors and leverage the Chapter 11 process by granting the lender excessive control over the debtor or its assets as to unduly prejudice the rights of other parties in interest.") (internal citations omitted).  Here, the DIP Facility includes a number of provisions—including asset sale restrictions, the Roll Up, the Termination Payment, and certain termination provisions—that are designed to favor the Convertible

---

[12]    The only reason that the Debtors do not appear to be amenable to an adjournment, which would benefit all stakeholders, is that there is a DIP milestone to get a Final DIP Order entered by next week, not that the Debtors need another DIP draw.

Noteholders at the expense of unsecured creditors.  In short, in spite of potentially little to no known financing need, the DIP Facility severely restricts the Debtors' ability to repay borrowed funds on reasonable terms and all but ensures that the Debtors will have no choice but to pursue the restructuring contemplated in the RSA, which improperly hands over the Company to the Convertible Noteholders.  Accordingly, the terms of the DIP Facility are not fair and reasonable under the circumstances and should not be approved.

### A.  The Size of the DIP Facility is Excessive

29.     Since the Petition Date, the Debtors' business has performed extremely well.  A confluence of factors has contributed to these results, including positive operational developments and a roughly 36% increase in bitcoin's trading price since the commencement of the Chapter 11 Cases.  ███████████████████████████████████████████████████████

████████████████████████████████████████████.  *See* Verost Declaration ¶6.  ███████

██████████████████████████████████████████████████████████████████████████

██████████████████████.  Unsurprisingly, comparing the Initial Budget and the Proposed DIP Budget confirms the Debtors' strong liquidity position: based on actual ending balances on January 13, the Debtors have approximately ████████████ of liquidity, approximately ████████████ ahead of the Initial Budget's projections.  *See* Verost Declaration ¶5.

30.     Inexplicably, however, the Proposed DIP Budget anticipates drawing down ████████ ██████ under the DIP Facility in the next ten weeks. *See* **Exhibit B**, page 3.  In light of the Debtors' strong liquidity profile, the Committee fundamentally opposes the Debtors incurring any additional draws under the DIP Facility because they are not necessary to preserve the estates' assets.  When determining whether to approve a proposed DIP financing arrangement, courts consider, among other factors, whether the proposed financing "is necessary to preserve the assets of the estate, and is necessary, essential, and appropriate for the continued operation of the Debtors'

businesses." *In re Mid-State Raceway, Inc.*, 323 B.R. 40, 60 (Bankr. N.D.N.Y. 2005). Under the DIP Facility's onerous terms—the prohibition on asset sales, the Roll Up, and the Termination Payment—each incremental draw transfers additional control over the Chapter 11 Cases to the DIP Lenders. Every dollar borrowed decreases the likelihood that non-core asset sales will allow the Debtors to repay the DIP Facility or that a third party will refinance the DIP Facility. ***Said differently, every dollar borrowed makes pursuing a path other than the RSA more difficult.*** The Debtors currently have something that most corporate debtors can only wish for: a conceivable path to paying off its debtor-in-possession financing during its case. Accordingly, the Debtors should treat the DIP Facility as a short-term bridge to closing its non-core asset sales and should be prohibited from making any additional draws thereunder.

31.     The underlying assumptions behind the Proposed DIP Budget—which support the Debtors' request to draw an additional ▉▉▉▉▉ under the DIP Facility—only heightens the Committee's concerns. The Proposed DIP Budget is predicated on overly conservative assumptions that result in the Debtors forecasting potential additional draws that they do not need. Verost Declaration at 5. Some of the more conservative assumptions are set forth below:



- ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Blokh Dep. 84:6-11 ▉▉▉▉▉▉▉▉▉▉▉▉ Verost Declaration ¶5. ▉▉▉▉▉▉▉▉▉▉ *Id.* at ¶6. ▉▉▉▉▉▉▉▉▉▉ Blokh Dep. 103:22-25, 104: 1-6.

- ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. Verost Declaration ¶7. ▉▉▉▉▉▉▉▉▉▉ Verost Declaration ¶¶7-8.

[redacted].

- [redacted] Verost Declaration ¶8. [redacted] *Id.*

32. In light of the Debtors' strong financial footing, and the harm additional new money loans will cause unsecured creditors, the Court should prohibit the Debtors from making additional draws under the DIP Facility.[13]

### *B. The DIP Credit Agreement Unreasonably Restricts the Sales of Non-Core Assets*

33. The Debtors own or lease three pieces of real estate that are not core to their daily business operations. Prior to the Petition Date, the Debtors were running sale processes with respect to these assets that, if successful, would have alleviated their immediate liquidity concerns and potentially eliminated the need to file for bankruptcy completely or, alternatively, would have permitted the Debtors to file without the need for DIP financing.

34. The Debtors are continuing to market the above properties. [redacted]. *See Deposition of John Singh* (attached hereto as **Exhibit C**) 70:13–15; 73:4-10. [redacted]. Singh Dep. 69:4–12. [redacted]. Singh Dep. 80:23–24. [redacted]

[13] If the Court is inclined to allow the Debtors to make further draws under the DIP Facility, the overall borrowings under the DIP Facility should be no more than $52.5 million (*i.e.*, the Debtors' view of their maximum projected liquidity need under the Proposed DIP Budget) and only be permitted in order for the Debtors to maintain a minimum liquidity level of $15.0 million.



. *See* ▉▉▉▉▉▉▉▉, page 4 attached hereto as **Exhibit D** and ▉▉▉▉▉▉▉

attached hereto as **Exhibit E**.

35.   ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉   *See* Singh Dep. 72:10–24; Verost Declaration ¶9.

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉. Singh Dep. 71:20–24; Verost Declaration ¶9.  Finally, selling

these properties would be an especially sound exercise of business judgment in the context of the

Chapter 11 Cases because the proceeds of such sales could (a) pay off the DIP Facility entirely

and (b) fund the remainder of the Chapter 11 Cases, thereby allowing the Debtors to explore more

value maximizing transactions. *See* Verost Declaration ¶9.

36.   Instead, the proposed DIP financing precludes the Debtors from fully exploring

these options.  Under the DIP Credit Agreement, the Debtors are authorized to sell Agreed Sale

Properties—including the Muskogee, Cedarvale, and Cottonwood properties—but only if the

aggregate net proceeds of such sales are less than $10,000,000.[14] ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

---

[14]  Subsection (o) of the definition of "Permitted Asset Disposition" provides in relevant part: the sale or other Disposition (in each case, at Fair Market Value) of one or more of the Agreed Sale Properties; provided, that as of the time of such sale, (i) the New Money Loan Commitment Shortfall is greater than zero ($0), and (ii) the amount of available New Money Loan Commitments is zero $(0), and no additional New Money Loan Commitments are then made available; ***provided, further* that, notwithstanding the foregoing, the Borrower shall not be permitted to sell or otherwise Dispose of any Agreed Sale Property in reliance on this clause (o) at any time if the aggregate amount of net proceeds received prior to such time (on a cumulative basis since the Closing Date) in respect of any sale or Disposition of any other Agreed Sale Properties pursuant to this clause (o) exceeded $10,000,000** (it being understood that no sale or other Disposition shall constitute a Permitted Asset Disposition hereunder if in violation of the foregoing) (emphasis added).

███████████████████████████████████████████████████████████████████████████████.

Moreover, even if the DIP Lenders provide relief from this provision and authorize the Debtors to

sell some or all of the non-core assets, as explained in further detail below, the Roll Up—especially

if it ultimately lacks a dollar-for-dollar creep feature—all but ensures that the Debtors will not be

able to pay down the DIP Facility in full.[15]  With this term included in the DIP Credit Agreement,

the Debtors' ability to pursue non-core asset sales as a means to paying off the DIP Facility is

purely illusory.  If the Court is inclined to grant the Motion with certain modifications, it should

remove the DIP Credit Agreement's limitations restricting the Debtors' ability to pursue non-core

asset sales, provided that such sale proceeds be used to pay down the DIP Facility.

### C.   The Roll Up Should be Eliminated or Must Be Modified to Allow the Debtors to Explore Alternative Restructuring Paths

37.    As a general matter, roll-ups are disfavored forms of post-petition financing

because they (a) typically help one creditor constituency rather than provide an economic benefit

to the debtor, (b) are contrary to the fundamental priority scheme of the Bankruptcy Code, and

(c) severely limit a debtor's ability to pursue different reorganization paths.  *See, e.g., In re*

*Saybrook Mfg. Co.*, 963 F.2d 1490, 1493–96 (11th Cir. 1992) (noting that post-petition cross-

collateralization is an "extremely controversial form of Chapter 11 financing" before holding it

was not authorized by Section 364); Hr'g Tr. 67:9-10, *In re Bruin E&P Partners, LLC,* (No. 20-

33605) (Bankr. S.D. Tex Jul. 17, 2020) (where Judge Isgur noted roll-ups are "heavily disfavored

under the Bankruptcy Code").  One of the reasons courts view roll-ups with skepticism is that they

have the effect of severely limiting a debtor's ability to pursue different reorganization paths.  *See*

3 COLLIER ON BANKRUPTCY 364.06[2] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.)

---

[15]  ███████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████ *See* Singh Dep. 95:18-25;
96:1-4.

(noting that roll-up financings "shift the dynamics of chapter 11 reorganization dramatically," by, among other things, creating structural impediments to plan alternatives). This is because roll-ups have the effect of giving prepetition debt administrative expense status, meaning a debtor is required to repay such claims in full, in cash if it intends to pay off the facility during the case or in connection with a confirmed plan of reorganization. As a result, the Committee believes that notwithstanding the DIP Lenders' concession, the Court should still decline to approve the Roll Up here or, alternatively, should condition its approval on certain modifications as set forth below.

38.     Here, the Debtors have two reasons to be optimistic about their ability to minimize borrowings under the DIP Facility. The Debtors are well ahead of their liquidity projections and, if the price of bitcoin remains at its current level, would likely not need to borrow any additional funds under the DIP Facility. *See* Verost Declaration ¶¶6-7. Moreover, if the Debtors can monetize their real estate assets, they will have a direct pathway to paying down the $37.5 million borrowed under the DIP Facility to date and potentially pay for the remainder of the Chapter 11 Cases with cash on hand and operational cash flows. Such a result would enable the Debtors to pursue value maximizing transactions other than the RSA, which is unfair to stakeholders generally and would deliver 97% of the Company's reorganized equity to the Convertible Noteholders.

39.     In light of the Committee's agreement with the Ad Hoc Noteholder Group that no unsecured debt will be subject to the Roll Up, if the Court is inclined to approve the Roll Up, the Court should further condition approval of the DIP Facility on two additional modifications to the Final DIP Order's Roll Up provisions. First, as noted by the Court at the first day hearing, the Roll Up should include a dollar-for-dollar creep feature. *See* Hr'g Tr. 60:21-24, *In re Core Scientific, LLC*, Case No. 22-90341 (Bankr. S.D. Tex. Dec. 22, 2022) ("I do really, really like the dollar-for-dollar creep because it protects interests in case something we all don't anticipate occurring, that

it just protects everybody's rights…").  Without this feature, the Debtors will owe up to $60.0 million in Roll Up even in the likely scenario where the Debtors only end up borrowing $37.5 million under the DIP Facility.  Thus, without a creep feature, a refinancing will cost as much as $97.5 million (prior to any fees, and $107.6 million, pro forma for assumed exit fees) after entry of the Final DIP Order, all but foreclosing the Debtors' ability to repay the DIP Facility using the proceeds from their real estate sales.  The absence of a dollar-for-dollar creep feature also minimizes the Debtors' ability to capture the benefits of bitcoin's recent increase in price, as avoiding additional DIP Facility draws currently does not change the amount of the Roll Up. Conversely, the inclusion of a dollar-for-dollar creep feature would protect the interests of all parties in a fair and reasonable manner, especially in light of bitcoin's recent rally.

40.     The second modification to the Roll Up is the logical extension of the agreement reached between the Committee and the Ad Hoc Noteholder Group.  Pursuant to that agreement, the DIP Lenders only realize the benefits of the Roll Up if the Convertible Noteholders' prepetition collateral ultimately is valued at a level that ensures that no unsecured claims are being rolled up. That valuation proceeding is likely to occur several months from now either shortly prior to or in connection with plan confirmation.  In the event the Debtors monetize their non-core assets during the Chapter 11 Cases—which may occur mere weeks after the hearing on the Motion—they should be able to satisfy the DIP Credit Agreement's obligations by paying off only the new money loans rather than the entire Roll Up.  Under the current levels of borrowing, that's the difference between the Debtors needing to repay $46.5 million (pro forma for assumed exit fees) and potentially upwards of $107.6 million (pro forma for assumed exit fees).  Requiring the Debtors to repay $60.0 million, plus a 2.0% termination fee on the Roll-Up, would be particularly punitive in these circumstances given that (a) the Debtors do not need incremental financing, (b) the DIP Facility's

maturity may ultimately be less than three months, and (c) at the point of a pay down, the Roll Up would be a contingent claim, subject to recharacterization (which, again, is a significant concern here given the Convertible Noteholders' limited collateral package and the fact that effectively second-lien August Convertible Notes are providing most of the DIP financing). This result would not meaningfully prejudice the DIP Lenders, as the Roll Up—to the extent it is not later recharacterized—will be treated like any other administrative expense claim pursuant to a plan of reorganization. It would also ensure that form is not elevated over substance, and that the timing of a proceeding to value the Convertible Noteholders' prepetition collateral does not trap the Debtors in a restrictive DIP Facility.

### D. The DIP Facility's Termination Payment is Excessive

41.     As set forth in the Verost Declaration, the Committee's proposed investment banker, Ducera Partners ("Ducera"), compared the economic fees and terms of the DIP Facility relative to comparable debtor-in-possession ("DIP") financing facilities in other cases. In selecting its comparison set, Ducera analyzed DIP financing facilities for companies that met certain criteria: (a) the companies had greater than $250 million in prepetition funded debt, (b) the DIP facility was between $25-300 million; (c) the DIP facility had a roll up component, and (d) the company's petition date was on January 1, 2021 or thereafter. Verost Declaration at 10. This search yielded eleven comparable debtor-in-possession financing facilities that served as the basis for the Committee's analysis (the "Peer Set").

42.     As noted above, under section 364 of the Bankruptcy Code, the Debtors have the burden of showing that the terms of the DIP Facility are fair and reasonable under the circumstances. *See In re L.A. Dodgers LLC*, 457 B.R. at 312. Based on Ducera's analysis, the DIP Facility is not fair and reasonable for the following reasons:

- **The DIP Facility is Materially More Expensive Than Comparable Financing Facilities**.  Based on the Initial Budget, Ducera calculated (i) the all-in costs of the DIP Facility as a percentage of the DIP Facility size, and (ii) the implied yield of the new money portion of the DIP Facility.  Here, the all-in cost of the DIP Facility—which includes economic components such as interest and fees—is 25.7%. Verost Declaration ¶10.  By comparison, the median all-in cost for the facilities in the Peer Set was 10.6%. *Id.* ¶¶ at 10-11.  Moving to the second metric—implied yield which measures the internal rate of return—the DIP Facility has an implied yield of 59.3%. *Id.* at ¶11.  By contrast, the facilities in the Peer Set have median implied yields of 27.2%. *Id.*

- **The Termination Payment is Unreasonably Expensive**.  The meaningfully higher cost of the DIP Facility (as compared to the Peer Set) is primarily driven by the 15.00% Termination Payment. *See id.* at ¶¶11-12.  Based on its analysis, Ducera determined that comparable exit/termination fees for debtor-in-possession facilities are typically around 3.0%. *See id.*  Moreover, the Termination Payment also applies to (i) unpaid and accrued interest, (ii) 2.0% commitment fee, and (iii) $1.636 million backstop fee, all of which are payable in kind, further increasing the costs of the DIP Facility.

43.     The Debtors' own testimony confirmed the unreasonableness of the Termination Payment.  Here, if the Termination Payment is triggered by an event that is not an "Acceptable Exit Roll Transaction", the Debtors are obligated to pay 15.00% on new money loans and 2.00% on Roll Up loans.  ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████. *See* Singh Dep. 61:8–19.  ████████████████████████

████████████████████████████████████████████████████████ *See* ██████████

██████████████████████ at p. 26, *attached hereto as* **Exhibit F**.  ████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████. *See* Singh Dep. at 138:8.  ████████████

████████████████████████████████████████████████████████████████████. *Id.*

at 171:22–25.

44.    

. Verost Declaration ¶27.

. *Id.*

45.    The Court should separately decline to approve the Termination Payment because it will create a chilling effect on the Debtors' restructuring.  The Termination Payment and Roll Up work together to dramatically decrease the ability of any third party to refinance the DIP Facility or pay it off in connection with a chapter 11 plan.  All in, if approved, a third party may need to provide $107.6 million to pay off the DIP Facility in full.  Verost Declaration ¶10.  By creating such a high bar, the DIP Facility and the RSA create a framework that all but ensures that the Debtors will need to roll the DIP Facility in connection with the consummation of a plan. When viewed in this light, the Termination Payment can be viewed as an excessive breakup fee that will chill interest from third party financers.  Fees with this chilling effect are heavily scrutinized by courts.  *In re Twenver, Inc.*, 149 B.R. 954, 957 (Bankr. D. Colo. 1992) (declining to approve 10% topping fee); *see also In re 995 Fifth Ave. Assocs., L. P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) ("But if such a fee is too large, it may chill the bidding to the detriment of …its creditors[].  In such instances, the fee is not protected by the business judgment rule…and is thus

subject to court supervision.").  Given the circumstances here, where the Termination Payment is so beyond a typical exit fee payable to debtor-in-possession lenders, the Court should refuse to approve the Termination Payment.

### E.  The Committee's Investigation Budget Should be Increased

46.    Under section 1103(c)(2) of the Bankruptcy Code, the Committee has a statutory duty to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor" and "any other matter relevant to the case or to the formulation of a plan."  11 U.S.C. § 1103(c)(2). The Final DIP Order will contain a number of stipulations, admissions, agreements, and releases by the Debtors that are binding on their estates and all parties in interest unless timely challenged by the Committee.  At the same time, the Final DIP Order would significantly impair the Committee's ability to investigate potential claims against the Ad Hoc Noteholder Group by limiting the size of the Committee's investigation budget to $50,000.  Although investigation budgets of such size might be reasonable in straightforward cases, the stipulations here are not straightforward and are worthy of a detailed investigation.

47.    Since the Committee was formed and engaged advisors, it has identified at least two issues that will require significant investigation.  First, although the Convertible Note Collateral includes the Debtors' "deposit accounts," the Committee has reason to believe that the Convertible Noteholders' security interest therein is unperfected.  Second, the governing documents of both the April Convertible Notes and the August Convertible Notes include provisions that entitle noteholders to be repaid 200% of the outstanding principal amount under certain circumstances.  The Interim DIP Order includes a stipulation that the size of the April Convertible Notes claim is approximately $316.1 million.  *See* Interim DIP Order at § E(a)(ii). That amount is significantly higher than the outstanding principal amount of the April Convertible Notes listed in the Bros Declaration, which notes an aggregate principal amount outstanding of

"approximately $234 million, which amount does not include any accretion of original issue discount."  Bros Declaration ¶ 48.

48.     If the Final DIP Order includes this controversial stipulation, the Committee will investigate its merits.  Because the Repayment Amount is only payable in certain circumstances, it looks more like a repayment premium than a provision providing noteholders with original issue discount.  Accordingly, the Committee will want to analyze whether this claim is even allowed as a matter of law in light of the Fifth Circuit's recent decision in *In re Ultra Petroleum*, 51 F.4th 138 (5th Cir. 2022) (finding make whole premium constitutes unmatured interest under section 502(b)(2) of the Bankruptcy Code).

49.     In addition to the merits of the claim, the Committee also believes that the use of stipulations in the Final DIP Order to settle such a material issue is inappropriate.  Specifically, the Committee believes that a resolution mechanism based more in transparency—such as a Rule 9019 settlement motion or plan confirmation process—is a more appropriate way to resolve this issue.

50.     In light of the foregoing, the Committee's investigation budget should be increased to at least $250,000.  *See, e.g.*, *In re Speedcast Int'l Ltd.*, No. 20-32243 (MI) (Bankr. S.D. Tex. May 20, 2020) [Docket No. 239] (providing a $250,000 cap for the investigation budget); *In re Sanchez Energy Corp.*, No. 19-34508 (MI) (Bankr. S.D. Tex. Jan. 22, 2020) [Docket No. 865] (same); *In re CJ Holding Co.*, No. 16-33590 (DRJ) (Bankr. S.D. Tex. Sept. 25, 2016) [Docket No. 497] (providing a $500,000 cap for the investigation of liens and claims).  The current $50,000 investigation budget is wholly insufficient to address the two issues identified above, let alone other potential issues that the Committee may uncover.

51.     Moreover, the Final DIP Order should make clear that to the extent the Committee objects to the stipulation "settling" the April Convertible Notes claim amount, its professionals will be compensated.  Section 24 of the Interim DIP Order precludes the Committee from using DIP Loans to object to claim amounts granted thereunder.  Although such a provision might make sense in the context of uncontroversial stipulations, here the stipulation is being used to settle a claim amount outside of the normal course of practice.  ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████.  Singh Dep. 201:15–24.  At bottom, if the Debtors and the Ad Hoc Noteholder Group want to use the Final DIP Order's stipulations in such a novel way, they should not also be allowed to diminish the ability of Committee to act as a check on such actions.

### F.  *Termination of the RSA Should Not Constitute a Termination Event Under the DIP Credit Agreement*

52.     Section 11.1(p)(xxii) of the DIP Credit Agreement provides that the Debtors' termination of the RSA constitutes an event of default.  This provision makes the RSA's fiduciary out purely illusory.  For example, if the Debtors wanted to pivot to a sale transaction that would lead to greater distributions for unsecured creditors, doing so would lead to a default under the DIP Credit Agreement and jeopardize the Debtors' access to cash collateral.  The RSA and the DIP Credit Agreement should be distinct obligations of the Debtors, not intertwined.  Accordingly, the DIP Credit Agreement's provision linking the two is not fair or reasonable under these circumstances.

## II.     The DIP Facility Impermissibly Establishes Plan Terms *Sub Rosa*

53.     As noted above, the DIP Facility includes a number of features that are objectionable on an individual basis.  Collectively, the DIP Facility's unnecessarily large size, the limitations on non-core asset sales, the Roll Up, the Termination Payment, and the RSA's cross-

default provision work together to ensure that the Debtors have no choice but to pursue the RSA's restructuring transaction—specifically one that results in the DIP Lenders receiving warrants exercisable for up to 30% of the Company's reorganized equity.  Said differently, approving the DIP Facility would render the remainder of the Chapter 11 Cases a *fait accompli*.

54.    When a transaction improperly dictates plan terms outside of the Bankruptcy Code's plan approval process, a separate basis for objecting to that transaction crystallizes.  A *sub rosa* plan is a transaction that has the "practical effect of dictating some of the terms of any future reorganization plan."  *In re Braniff Airways, Inc.,* 700 F.2d 935, 940 (5th Cir. 1983); *see In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 885 (Bankr. S.D.N.Y. 1990) ("A transaction which would effect a lock-up of the terms of a plan will not be permitted.").  As the Supreme Court has explained, debtors in chapter 11 are not permitted to enter into transactions that "circumvent the [Bankruptcy] Code's procedural safeguards."  *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017).  So-called "*sub rosa* plans are prohibited . . . based on a fear that a debtor-in-possession will enter into transactions that will, in effect, short circuit the requirements of [C]hapter 11 for confirmation of a reorganization plan."  *In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir. 2007) (internal quotation marks and citation omitted).

55.    Proposed debtor-in-possession financing transactions can trigger *sub rosa* plan issues.  "[A] bankruptcy court cannot, under the guise of section 364, approve financing arrangements that amount to a plan of reorganization but evade confirmation requirements."  *In re Def. Drug Stores, Inc.*, 145 B.R. at 317 (citation omitted).  Accordingly, "courts will reject proposed DIP loans as improper *sub rosa* plans where the terms of the loan include concessions to creditors or parties in interest that are unauthorized under, or in conflict with, provisions under the Bankruptcy Code."  *In re LATAM Airlines Grp. S.A.*, 620 B.R. 722, 816 (Bankr. S.D.N.Y. 2020);

*see also In re Belk Props., LLC*, 421 B.R. 221, 225–26 (Bankr. N.D. Miss. 2009) (rejecting as "*sub rosa* chapter 11 plan*" proposed DIP financing that would enable the lender to obtain a controlling equity stake in the debtor).

56.     Here, if approved, the DIP Facility would ensure that the Debtors' only path out of chapter 11 is through the RSA transaction. *First*, the Debtors will be unable to utilize non-core asset sales to generate sufficient proceeds to pay down the DIP Facility. Approving this term would remove the Debtors' only source of flexibility in the Chapter 11 Cases and would leave the Debtors reliant on third party refinancing. *Second*, such third party refinancing is unlikely to materialize given the high cost of refinancing the DIP Facility as a result of the Roll Up and the Termination Payment. Rather than refinancing a new money loan of potentially $37.5 million, any third party may need to provide upwards of $107.6 million upon entry of the Final DIP Order, a much harder (if not impossible) endeavor under current market conditions. For the same reason, a third party is unlikely to pay down the DIP Facility in cash as part of a plan of reorganization, thereby ensuring that the Debtors will need to roll the DIP Facility into a new facility—the exact result the DIP Lenders are hoping for, given that such a result will trigger the issuance of the DIP Warrants. *Third*, the RSA cross default provision in the DIP Credit Agreement all but eliminates the Debtors' ability to meaningfully evaluate and pursue alternative transactions, further ensuring that the Debtors will need to execute the RSA transaction.

57.     Although the Ad Hoc Noteholder Group documented this plan across several agreements, the cumulative effect is clear: approving the DIP Facility will lock up the terms on which the DIP Lenders will receive the DIP Warrants. These types of provisions—where a debtor proposes to use the currency of reorganized equity outside of a plan process—go well beyond what is appropriate in the early stages of a chapter 11 case.

**III.     Other Aspects of the DIP Facility and the Final DIP Order Should Not Be Approved**

58.     As set forth below, the Committee has a number of other technical objections to the

DIP Facility: [16]

i.     <u>Liens on Avoidance Actions</u>.  The DIP Facility should not be secured by liens on Chapter 5 avoidance actions, commercial tort claims, or the proceeds of the foregoing. Any Final DIP Order should expressly exclude such assets from the definition of DIP Collateral and clarify that any superpriority or adequate protection claims will not be paid from such assets or the proceeds thereof.  *See In re Klaas Talsma Frisia Hartley, LLC*, No. 10–43790–DML–11, 2010 WL 5209363, at \*4 (Bankr. N.D. Tex. Jun. 10, 2010) (excluding avoidance actions and proceeds thereof from the adequate protection package provided to Wells Fargo, a prepetition secured lender); *In re HSAD 3949 Lindell, Ltd.*, No. 10–33986–BJH, 2010 WL 5209266, at \*5 (Bankr. N.D. Tex. Sept. 2, 2010) (adequate protection package excluded "any and all avoidance actions under Chapter 5 of the Bankruptcy Code and any proceeds thereof").

ii.     <u>Marshalling</u>.  To the extent the Court is willing to grant the DIP Lenders a lien on avoidance actions and commercial tort claims, language should be added to the Final DIP Order that the DIP Lenders will marshal away from these assets and seek to satisfy their claims by first looking to other collateral.

iii.     <u>Credit Bidding</u>.  Any credit bid rights should be subject in all respects to section 363(k) of the Bankruptcy Code, particularly in the event of a successful challenge.

iv.     <u>Third Party Negotiations</u>.  Section 10.1.13(b)(ii) should be removed from the DIP Credit Agreement or otherwise clarified to make clear that the Debtors are permitted to negotiate alternative transactions with parties other than the Ad Hoc Noteholder Group.

v.     <u>Requirements for Bringing Challenges</u>.  For any challenge proceeding that could be brought by the Committee pursuant to the claim objection process, the Committee should not be required to file a motion to obtain standing or a draft complaint specifying the basis for such challenge.  Requiring the Committee to file a standing motion only increases the time and administrative cost of prosecuting a challenge.  Courts have routinely granted a creditors' committee standing in post-petition financing orders to bring a challenge to prepetition liens and claims.  *See, e.g., In re Patriot Well Solutions LLC*, Case No. 20-33642 (DRJ) (Bankr. S.D. Tex. Aug. 12, 2020) [Docket No. 167] (granting Committee standing to commence a Challenge Action without being required to file a motion or other request for such standing); *In re Lockwood Holdings,* Case No. 18-30197 (DRJ) (Bankr. S.D. Tex. Apr. 30, 2018) [Docket. No 359) (granting

---

[16]  The Committee has been discussing many of these points with the DIP Lenders as part of its discussions on a consensual resolution (as well as the size of the investigation budget).  The Committee has reached agreement on language that would resolve many of these issues but is currently awaiting feedback from the DIP Lenders as to whether they are willing to implement these changes in the absence of a global resolution.

Committee automatic standing to file a Challenge Action without the need for further Court order).

vi.    <u>Definition of Material DIP Amendment</u>.  The definition of Material DIP Amendment in the Final DIP Order should be modified to include any amendment that "adversely impacts the interests of unsecured creditors."

vii.    <u>Security Interest in Deposit Accounts</u>.  The Debtors' stipulation E(e)(i) stipulates that as of the Petition Date, the "Prepetition Liens in the Prepetition Collateral (A) are legal, valid, binding, enforceable, non-avoidable and fully perfected liens and security interests in the Prepetition Collateral."  However, the Committee understands that deposit account control agreements were never executed in favor of the Convertible Notes.  Therefore, it is not appropriate for the Debtors to be stipulating to that fact and putting the burden on the Committee to challenge that conclusion.

## **RESERVATION OF RIGHTS**

59.    This Objection is submitted without prejudice to, and with a full reservation of, the Committee's rights to supplement and amend this Objection, including by filing declarations in support thereof, to introduce evidence at any hearing relating to this Objection, and to further object to the Motion on any grounds that may be appropriate.

## **CONCLUSION**

60.    WHEREFORE, the Committee requests that the Court (a) deny the Motion or (b) grant the Motion and approve the DIP Facility subject to the modifications set forth in this Objection.

*[remainder of page left intentionally blank]*

Dated:     Houston, Texas
             January 26, 2023

Respectfully submitted,

**WILLKIE FARR & GALLAGHER LLP**

By:   /s/ Jennifer J. Hardy
Jennifer J. Hardy (Texas Bar No. 24096068)
600 Travis Street
Houston, Texas 77002
Telephone:  713-510-1700
Facsimile:  713-510-1799
Email:  jhardy2@willkie.com

**AND**

Brett H. Miller (admitted *pro hac vice*)
Todd M. Goren (admitted *pro hac vice*)
James H. Burbage (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone: 212-728-8000
Facsimile: 212-728-8111
Email: bmiller@willkie.com
       tgoren@willkie.com
       jburbage@willkie.com

*Proposed Counsel to the Official Committee of Unsecured Creditors*

# <u>Exhibit A</u>

Filed Under Seal Pursuant to the *Motion for Entry of an Order Authorizing the Official Committee of Unsecured Creditors to File Under Seal Certain Portions of the Committee's Objection to Debtors' Emergency Motion to Obtain Post-Petition Debtor-in-Possession Financing and Related Documents*

# __Exhibit B__

Filed Under Seal Pursuant to the *Motion for Entry of an Order Authorizing the Official Committee of Unsecured Creditors to File Under Seal Certain Portions of the Committee's Objection to Debtors' Emergency Motion to Obtain Post-Petition Debtor-in-Possession Financing and Related Documents*

# __Exhibit C__

Filed Under Seal Pursuant to the *Motion for Entry of an Order Authorizing the Official Committee of Unsecured Creditors to File Under Seal Certain Portions of the Committee's Objection to Debtors' Emergency Motion to Obtain Post-Petition Debtor-in-Possession Financing and Related Documents*

# <u>Exhibit D</u>

Filed Under Seal Pursuant to the *Motion for Entry of an Order Authorizing the Official Committee of Unsecured Creditors to File Under Seal Certain Portions of the Committee's Objection to Debtors' Emergency Motion to Obtain Post-Petition Debtor-in-Possession Financing and Related Documents*

# **<u>Exhibit E</u>**

Filed Under Seal Pursuant to the *Motion for Entry of an Order Authorizing the Official Committee of Unsecured Creditors to File Under Seal Certain Portions of the Committee's Objection to Debtors' Emergency Motion to Obtain Post-Petition Debtor-in-Possession Financing and Related Documents*

# <u>Exhibit F</u>

Filed Under Seal Pursuant to the *Motion for Entry of an Order Authorizing the Official Committee of Unsecured Creditors to File Under Seal Certain Portions of the Committee's Objection to Debtors' Emergency Motion to Obtain Post-Petition Debtor-in-Possession Financing and Related Documents*

**<u>Certificate of Service</u>**

I certify that on January 26, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

By:   /s/ Jennifer J. Hardy
       Jennifer J. Hardy