IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § | Chapter 11 |
| CORE SCIENTIFIC, INC., *et al.*, | § § § | Case No. 22-90341 (DRJ) |
| | § § | **(Jointly Administered)** |
| Debtors.¹ | § § § | Related Docket No. 38, 96, 97, 130 |

**OBJECTION OF AD HOC EQUITY GROUP TO THE EMERGENCY MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (B) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (C) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (D) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (E) MODIFYING THE AUTOMATIC STAY, (F) SCHEDULING A FINAL HEARING, AND (G) GRANTING RELATED RELIEF**

An ad hoc group (the "**Ad Hoc Equity Group**")[2] of beneficial holders of the common stock of Core Scientific, Inc. ("**Core Scientific**" or the "**Company**" and, together with its affiliated debtors and debtors in possession, the "**Debtors**"), by and through their undersigned counsel, hereby submits this objection (this "**Objection**") to the *Emergency Motion of Debtors For Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

[2] The members of the Ad Hoc Equity Group and their respective holdings are identified in Verified Statement of the *Ad Hoc Group of Equity Holders Pursuant to Bankruptcy Rule 2019*, filed contemporaneously herewith.

*Claims With Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granted Related Relief* [Docket No. 38] (the "**DIP Motion**").[3] In support of this Objection, the Ad Hoc Equity Group respectfully states as follows:

## PRELIMINARY STATEMENT

1. The Ad Hoc Equity Group is alarmed by the apparent trajectory and objectives of these Chapter 11 Cases. The Debtors claim to have been so badly battered by the so-called "crypto winter" that now—less than one year after going public at an equity valuation of $4 billion, *see Power & Digital Infrastructure Acquisition Corp.*, Amendment No. 6 to Registration Statement (Form S-4) at 5–6, 232 (Dec. 30, 2021)—they must forfeit their business to their secured noteholders, leaving stockholders and general unsecured creditors to share just 3% of the reorganized Company's new common stock.

2. There are compelling reasons to suspect that the Debtors' prearranged plan undervalues their business and affords the secured noteholders a windfall recovery at the expense of stockholders and others. Whether this noteholder-sponsored plan fairly values the Debtors' business and allocates that value in accordance with the Bankruptcy Code's requirements is ultimately a question for confirmation. But the noteholders should not be permitted to leverage the Debtors' postpetition financing requirements to crowd out competition and make their prearranged plan a *fait accompli*.

3. The current DIP Facility effectively does just that. That is true in two principal respects. First, its size and expense: as detailed below, the DIP Facility provides much more than

---

[3] Capitalized terms used but not defined herein have the meanings ascribed to them in the DIP Motion, the Interim Order, or the DIP Loan Agreement (each as defined in the DIP Motion).

2

the Debtors' reasonably require and at unreasonable cost. For less than $60 million of new-money loans—only a fraction of which are actually necessary—the Debtors will incur well over $100 million of superpriority obligations, all of which must be refinanced, and ultimately repaid, before a potentially superior restructuring proposal can be pursued and stockholders can receive their rightful recoveries.

4.  Second, its default and termination provisions: termination of the Restructuring Support Agreement—even pursuant to the Debtors' "fiduciary out"—is an immediate Event of Default under the DIP Loan Agreement, entitling the DIP Lenders to terminate the DIP Facility and accelerate the DIP Obligations. Thus, no competing restructuring transaction is tenable unless its sponsor refinances the DIP Facility at the outset—before the Debtors are obligated to pursue its transaction. The likelihood of any competing sponsor taking this leap of faith is doubtful. To make matters worse, the DIP Facility imposes a 15% Termination Fee on all DIP Obligations (other than Roll-Up Loans)[4] if the DIP Facility terminates for nearly any reason—including if it is paid in full in cash in connection with a refinancing.[5] The Debtors tellingly make no real effort to justify the Termination Fee. It is wildly off market and has no purpose but to squelch competition. For these and the other reasons described below, the Court should deny the DIP Motion outright if the DIP Lenders and the Debtors insist on prosecuting it on February 1.

---

[4]   The Termination Fee for Roll-Up Loans is 2%. DIP Loan Agreement § 1.1.

[5]   The one exception is an Acceptable Exit Roll Transaction (that is, the conversion of the DIP Facility into an exit facility on terms acceptable to the DIP Lenders). In that instance, the Termination Fee for DIP Obligations other than Roll-Up Loans is 3%. *Id.* Although the Termination Fee due upon an Acceptable Exit Roll Transaction is lower than that applicable to any other exit transaction, additional compensation to which the DIP Lenders are entitled in that scenario—including, most significantly, penny warrants for 30% of the new common stock of the reorganized Company, s*ee* Restructuring Support Agreement Ex. A, at 6–7, 26–27—more than makes up for the difference.

5. But there is a more constructive path available. Over the past several days, at least two other parties have advanced non-binding proposals for competing DIP facilities. To the best of the Ad Hoc Equity Group's knowledge, these proposals address the Debtors' legitimate liquidity requirements without burdening their estates with the prejudicial terms imposed by the incumbent DIP Lenders. The Ad Hoc Equity Group is optimistic that one or both such proposals will mature into a binding and actionable commitment soon. But more time may be required for the Debtors to bring a competing proposal to fruition. The need for additional time arises in large part from the Debtors' prior guidance to potential DIP providers, which apparently overstated the Debtors' financing requirements. But regardless, a modest extension would be time well spent if it yields an actionable proposal for a competing DIP.

6. Thus, unless these competing proposals are ready for consideration and approval on February 1, this Court should defer the Final Hearing by at least one week. The potential advantages of a short adjournment are considerable, and the downsides are few. The Debtors do not require additional borrowings next week. The putative exigency driving the Debtors to pursue final approval of the existing DIP Facility next week, while two potentially promising alternatives wait in the wings, is simply that the DIP Facility Milestones require it. *See* DIP Mot. at 13–14; DIP Loan Agreement § 10.1.13(a).[6] The DIP Lenders' insistence that the Final Hearing proceed next week, while understandable given their parochial economic interests, hardly justifies the cost that would be exacted on other stakeholders if the current DIP Facility is approved. To the extent the DIP Lenders will not consent to an adjournment, the Court should order one.

---

[6] The Creditors' Committee indicates that the DIP Lenders rebuffed a requested adjournment of the Final Hearing to mid-February. *See Obj. of the Official Comm. of Unsecured Creditors to Debtors' Emergency Mot. to Obtain Post-Petition Debtor-in-Possession Financing* ¶ 27 & n.12 [Docket No. 363] (cited as the "**UCC Obj.**").

7. The Court has ample authority to do so. The Ad Hoc Equity Group hopes that the existing DIP Lenders would respond commercially to a reasonable adjournment of the hearing, focusing their efforts in the intervening period on addressing stakeholders' significant concerns with the DIP Facility's current terms and responding to any competing proposals that may develop. Regardless, they have no right to exercise remedies without this Court's prior authorization. Upon an Event of Default, the DIP Agent may demand an emergency stay-relief hearing. *See* Interim Order ¶ 20(b). But the Debtors' right to contest any requested relief is "expressly preserved," and the Court retains the ultimate authority to determine what remedies, if any, are "appropriate." *Id.*

## ARGUMENT

**I.     The DIP Motion Should Be Denied.**

    **A.     The DIP Facility Is Disproportionately Large and Unreasonably Costly.**

8. Every dollar of DIP obligations is one more dollar that any competing plan sponsor must refinance, and ultimately that the Debtors must repay, before stockholders receive their rightful share of value. Thus, the Ad Hoc Equity Group is keen to ensure that the Debtors incur postpetition debt only to the extent necessary to address *bona fide* postpetition liquidity requirements and, then, only on commercially reasonable terms. As currently structured, the DIP Facility is inconsistent with these principles: the Debtors seek authority to borrow much more than they require, on unreasonable terms, and at prohibitive expense.

        *(i)     The DIP Facility Is Oversized.*

9. As an initial matter, the DIP Facility appears disproportionate to the Debtors' liquidity needs. The Debtors borrowed $37.5 million in New Money DIP Loans on the Closing Date. *See* DIP Loan Agreement §§ 1.1, 2.1.2(a); *see also* DIP Mot. at 8. They have sought authority to borrow up to $37.5 million more during the Final Availability Period, *see id.*, although their

advisors have indicated informally that this amount will be reduced to $22.5 million (for $60 million in total New Money Loan Commitments). *See* UCC Obj. ¶ 6.[7]

10. Either amount is excessive. Bitcoin has rallied markedly since the Petition Date, closing yesterday at more than 36% above its closing price on the Petition Date. *See Bitcoin USD (BTC-USD)*, Yahoo! Finance, https://finance.yahoo.com/quote/BTC-USD/ (last visited Jan. 27, 2023).[8] Because the Debtors' cash flows are highly sensitive to the price of Bitcoin, *see, e.g.*, First-Day Decl. ¶¶ 6, 64–68; Singh Decl. ¶ 15; First-Day Hr'g Tr. at 23:16–18, this pronounced upswing has surely resulted in a significant improvement in the Debtors' anticipated liquidity. But the Debtors have not adjusted their requested financing accordingly and thus seek more than their legitimate liquidity requirements can justify.

11. The Creditors' Committee shares this concern. *See* UCC Obj. ¶¶ 20–23. Its advisors have scrutinized the assumptions underlying the Debtors' cash-flow forecast and conclude that Bitcoin need only sell for $17,700—approximately 23% less than its current trading price—over the forecast period to obviate the need for *any* further DIP borrowings. *Id.* ¶ 23. The $75 million financing need to which the Debtors' investment banker attested, *see* Singh Decl. ¶ 17, apparently assumes that Bitcoin will hold steady at $15,000—far below yesterday's closing price and materially less even than the depressed price on the Petition Date, *see* UCC Obj. ¶ 20.[9] Lacking a financial advisor and without access certain non-public information to which the Creditors' Committee is privy, the Ad Hoc Equity Group cannot independently replicate the Creditors'

---

[7] As discussed in greater detail below, it is unclear that the DIP Lenders have committed to provide more than approximately $60 million in New Money DIP Loans in any case.

[8] Unless otherwise stated, all subsequent references to the price of Bitcoin are based on data available from Yahoo! Finance. Bitcoin trading never truly "closes" in the same manner as securities traded on an exchange, but is conventionally deemed to close at midnight UTC to facilitate pricing information and comparisons.

[9] Bitcoin closed at $23,032.78 yesterday and at $16,817.54 on the Petition Date.

Committee's analysis in all of its particulars, but its conclusion is persuasive. At any rate, it is the Debtors' burden to demonstrate they require the additional financing sought, *see, e.g.*, *In re Republic Airways Holdings Inc.*, No. 16-10429 (SHL), 2016 WL 2616717, at *10–11 (Bankr. S.D.N.Y. May 4, 2016); *In re L.A. Dodgers LLC*, 457 B.R. 308, 312–13 (Bankr. D. Del. 2011), and the record thus far does not sustain this burden.

### (ii) *The Other Economic Terms of the DIP Facility Are Disproportionately Burdensome Relative to its Benefits.*

12. This unnecessary money comes at a hefty price. While debtor-in-possession financing is rarely inexpensive credit, the economic terms of this DIP Facility are especially rich. In exchange for New Money Loan Commitments that notionally total $75 million (but, in reality, are likely significantly less, as explained below), the Debtors have agreed to:

- Roll up $75 million in prepetition convertible secured notes indebtedness, *see* DIP Loan Agreement § 2.1.1;

- Grant liens on substantially all previously unencumbered assets, including nearly all of the Debtors' valuable real property, to secure both the New Money Loans and Roll-Up Loans, *see* Interim Order ¶ 6;

- Grant the DIP Lenders penny warrants for up to 30% of the new common stock of the reorganized Company in the event the DIP Facility rolls into an exit credit facility, *see* Restructuring Support Agreement Ex. A, at 6–7, 26–27;

- Pay a litany of fees, including:

    – A 2% commitment fee on all New Money Loans borrowed, *see* DIP Loan Agreement §§ 1.1, 3.2.4;

    – A $1.636 million Backstop Party Payment to compensate the DIP Lenders for "among other things participat[ing] in the DIP Facility and provid[ing] [their] New Money Loan Commitments," DIP Loan Agreement § 3.2.5; *see also id.* § 1.1;

    – A 2% Maturity Extension Payment if the Debtors elect to extend the Maturity Date by three months, *see id.* § 2.1.5;

    – An undisclosed administrative agency fee, *see id.* § 3.2.1; and

    – As discussed in greater detail below, a Termination Payment equal to 15% of all obligations other than Roll-Up Loans (or, solely in the event that the DIP Facility rolls into an exit facility, 3% of such obligations) *plus* 2% of all Roll-Up Loans, *see id.* § 1.1.

As if that were not enough, the DIP Loan Agreement contains a catch-all provision encompassing other fees "set forth in all engagement letters, fee letters and other similar agreements." *Id.* § 3.2.2. Even at a quick glance, it is apparent that the DIP Lenders will be richly compensated. But closer examination reveals that the DIP Facility is even pricier than it appears on its face.

13. The obfuscatory characterization of the "backstop" fee in the DIP documents is a case in point. For context, the Debtors' investment banker testified that the Debtors "require approximately $75 million of postpetition financing and access to Cash Collateral." Singh Decl. ¶ 17. And although the DIP Facility notionally provides for "up to $75 million" in New Money Loans, only $57 million—$18 million less than the amount supposedly required—is actually committed. *Id.* at 19. The balance was to be "self-syndicated to other pre-petition secured noteholders." First-Day Hr'g Tr. at 51:8–9; *see also* DIP Mot. at ¶ 2 n.3; Singh. Decl. ¶ 19.

14. One might assume from the nomenclature the parties have adopted that the so-called "Backstop Parties" (*i.e.*, the DIP Lenders as of the Closing Date) have agreed to backstop the "remaining balance," Singh Decl. ¶ 32, between the $75 million supposedly required and the $57 million actually committed. Not so. The Backstop Parties are only "backstopping" their own respective commitments as of the Closing Date; the $1.636 million Backstop Party Payment is characterized as compensation for "among other things participat[ing] in the DIP Facility and provid[ing] its New Money Loan Commitments." DIP Loan Agreement § 3.2.5. Thus, the "Backstop Party Payment" is, in substance, just a disguised commitment fee payable *on top of* the express 2% commitment fee on New Money Loan Commitments.

15. Compounding matters, the Backstop Party Payment was paid by a deemed borrowing on the Closing Date. *See id.* The resulting Backstop Loans accrue PIK interest at the same rate as New Money Loans, and the principal amount (including capitalized PIK interest) and

accrued and unpaid interest on these Backstop Loans are subject to the same 15% Termination as New Money Loans. *See id.* §§ 1.1, 3.2.5. Thus, in exchange for the DIP Lenders' non-backstop of the $18 million "remaining balance" of New Money Loan Commitments, the Debtors will pay a substantial fee, interest on that fee, and, for good measure, an even greater fee for the privilege of finally repaying the same.

16. The "backstop" fee is just one salient example. The 2% commitment fee is also paid through deemed borrowings, on which 10% PIK interest accrues and is capitalized, and on which a 15% Termination Fee is ultimately assessed. *See id.* §§ 1.1, 2.1.2(c), 3.2.4. Even ordinary New Money Loans accrue compounding PIK interest, *see id.* §§ 1.1, 3.1.1—a putatively "favorable term[]" that, in reality, given the Debtors' current cash flows, benefits only the DIP Lenders, Singh Decl. ¶ 32. In short, the Debtors have promised the DIP Lenders a package of interest and fee obligations, the aggregate value of which far exceeds the sum of the parts. *Cf.* UCC Obj. ¶ 43 (observing that the DIP Facility has an all-in cost of 25.7% and implied yield of 59.3%).

> (iii) *The Debtors Did Not Adequately Market the DIP Facility and thus Cannot Defend its Terms as the Best Available.*

17. The economic terms of the DIP Facility might be more defensible if the Debtors could credibly establish that better terms were unavailable from third-party financing sources, but the record leaves that proposition very much in doubt. Although the Debtors' investment banker appears to have solicited DIP financing proposals from a fair number of parties, *see* Singh Decl. ¶ 26, it is far from clear that the Debtors' efforts were sufficient to foster fair competition between the ad hoc noteholder group and potential alternative financing sources. To the contrary, the Ad Hoc Equity Group understands that the Debtors made more exacting demands on potential alternative capital providers than on the ad hoc noteholder group and thus, purposefully or not, tilted the field in the latter's favor.

18. For example, the Ad Hoc Equity Group understands that the Debtors required that potential third-party lenders provide commitments well in excess of the $57 million committed by the current DIP Lenders. Similarly, the Debtors apparently rejected the leading alternative DIP proposal for, among other reasons, its "lack of a firm funding commitment." Singh Decl. ¶ 29. But they embraced a noteholder-led DIP that (as discussed above) similarly fails to provide binding commitments for the Debtors' professed financing needs. Likewise, the Ad Hoc Equity Group understands that the Debtors required that interest on a potential competing DIP not exceed 10%, even though the effective cost of the current DIP Facility significantly exceeds that amount, after taking into account the myriad fees discussed above. And it is unclear whether the Debtors considered proposals for non-priming DIP facilities secured by mortgages on the Debtors' previously unencumbered real estate—a structure that may have yielded a more economical solution without simultaneously provoking an adequate-protection dispute with the convertible secured noteholders. *Cf.* Singh Decl. ¶ 29 (observing that the Debtors rejected the principal alternative DIP proposal in part because it may have precipitated an "adequate protection dispute with the Prepetition Secured Parties").

19. Developments over the past several days have only heightened these concerns. The Ad Hoc Equity Group understands that at least one[10] potential third-party capital provider recently furnished a non-binding DIP proposal and is working expeditiously to develop its proposal into a binding commitment as soon as possible. Unfortunately, however, the Debtors previously advised this party that the Debtors require $90 million in committed financing and a rate no greater than 10%; only recently have the Debtors retreated from both requirements, clarifying that the Debtors

---

[10] The Creditors' Committee has learned that the Debtors recently received a second competing proposal. *See* UCC Obj. ¶ 27. The Ad Hoc Equity Group was not previously aware of this development but shares the Creditors' Committee's warm reaction.

require just $60 million in funding and that pricing greater than 10% *per annum* will be considered. The Ad Hoc Equity Group understands that this party, having previously believed that the Debtors' financing needs substantially exceeded the quantum of capital it could commit, suspended its work for some time. Now aware that the Debtors' financing needs are, in fact, substantially lower and their required economic terms more flexible than previously understood, this party has resumed work. But time has been lost.[11]

### B. The Terms of the DIP Facility Improperly Constrain the Debtors' Ability to Consider Potentially Superior Restructuring Transactions.

20. The DIP Facility improperly shields the noteholder-sponsored restructuring plan from competition in several other ways. To start, the DIP Loan Agreement cross-defaults to the Restructuring Support Agreement, thus effectively requiring any competing plan sponsor to immediately refinance the DIP Facility, potentially before the Debtors are obligated to pursue the sponsor's competing transaction. Then, exacerbating the burden, the DIP Loan Agreement imposes a 15% Termination Fee on all DIP obligations (other than Roll-Up Loans, for which the Termination Fee is 2%) upon any refinancing.

#### (i) *The DIP Credit Agreement's Cross-Default to the Restructuring Support Agreement Renders the Debtors' "Fiduciary Out" Effectively Illusory.*

21. Although the Debtors ascribe "extreme[] important[ce]" to the Restructuring Support Agreement's fiduciary out, First-Day Hr'g Tr. at 22:2–6, the cross-default provisions of the DIP Loan Agreement render it largely cosmetic. The Debtors may terminate the Restructuring Support Agreement if the special committee of Core Scientific's board determines, after consulting with outside counsel, that continued support for the noteholder-sponsored restructuring plan would

---

[11] The Ad Hoc Equity Group first introduced this party to the opportunity in late December 2022, and, notably, encouraged this party to resume its work, notwithstanding the Debtors' prior discouraging guidance concerning their financing requirements.

violate its fiduciary duties. Restructuring Support Agreement § 6(b)(ii). But termination of the Restructuring Support Agreement constitutes an immediate Event of Default under the DIP Loan Agreement, entitling the DIP Agent to accelerate the DIP Obligations. DIP Loan Agreement § 11.1(p)(xxii); Interim Order ¶ 20(b)(iv). Accordingly, the sponsor of any competing restructuring transaction effectively would be required to refinance the DIP Facility (potentially in excess of $107 million, see UCC Obj. ¶ 39), likely before the Debtors are obligated to pursue that transaction. But no counterparty is likely to commit the quantum of capital necessary to refinance the DIP Facility without reasonable assurances that its proposed transaction will close, rendering the self-applauded fiduciary out effectively illusory.

### (ii) The "Termination Fee" Improperly Penalizes the Debtors for Refinancing the DIP Facility.

22. The Termination Fee triggered upon *any* termination of the DIP Facility—even upon the repayment in full in cash of all DIP Obligations upon a refinancing—reinforces this result.[12] The Transaction Fee is an albatross around the neck of any competing transaction that, in tandem with the cross-default described above, likely renders the noteholder-sponsored plan a *fait accompli*. Notably, the Debtors mount no serious defense of the Termination Fee, offering in their DIP Motion just one short paragraph of bromides on the reasonableness of the DIP Facility fees, generally. *See* DIP Mot. ¶ 40 The Debtors identify no other recent DIP financing of comparable size that featured an exit fee of this magnitude, and the Ad Hoc Equity Group's research failed to uncover any. *Cf.* UCC Obj. ¶¶ 41–45.

---

[12] As described above, a Termination Fee is assessed on all principal and accrued interest outstanding at any time the DIP Facility terminates. DIP Loan Agreement § 1.1. The quantum of the fee varies depending on the class of loan and the circumstances of termination. Roll-Up Loans incurs a 2% Termination Fee, payable in cash, upon any termination of the DIP Facility. *Id.* All other loans (and accrued interest thereon) are subject to a 3% Termination Fee, payable in kind, if the DIP Facility rolls into an exit facility, and, in all other circumstances, a 15% Termination. *Id.*

## II. At Minimum, the Final Hearing Should be Adjourned to Permit the Debtors to Consider Alternatives.

23. To the extent the Final Hearing proceeds on February 1, the Court should deny the DIP Motion for all the reasons described above, even if no binding alternative has yet emerged. The more pragmatic alternative, however, is a reasonable adjournment of the Final Hearing to afford other potential financing sources more time to advance binding, actionable proposals. As noted above, at least two parties have furnished non-binding DIP financing proposals within the last several days. The Ad Hoc Equity Group understands that both parties are working diligently to develop their non-binding proposals into a fully committed financing proposal as quickly as possible. The Ad Hoc Equity Group is optimistic that these efforts will yield at least one actionable proposal for DIP financing that addresses the Debtors' *bona fide* liquidity requirements while omitting the most prejudicial terms of the existing DIP Facility.

24. The Debtors have no intrinsic business need to press forward on February 1. As described above, the Debtors likely require no incremental borrowings at all—much less next week. They insist that the February 1 hearing proceed solely because the DIP Lenders require it. *Cf.* UCC Obj. ¶ 27 n.12 (noting that the "only reason that the Debtors do not appear to be amenable to adjournment" is the Milestone for entry of the Final Order).[13]

25. Although the Ad Hoc Equity Group understands the predicament of a debtor whose postpetition lenders, armed with litany of covenants and case controls, insist that their interests take precedence, this Court need not be so easily swayed. The Ad Hoc Equity Group would hope that the DIP Lenders would respond to a reasonable adjournment of the Final Hearing

---

[13] The DIP Loan Agreement initially required entry of the Final Order within 35 days of the Petition Date (that is, January 25, 2023). *See* DIP Mot. at 13. The DIP Lenders subsequently agreed to extend this Milestone one week, to February 1, 2023. *See Updated Notes of Amended Dates and Deadlines with Respect to the DIP Loan Agreement* [Docket No. 306]. The Creditors' Committee indicates that the DIP Lenders denied a further extension to a mid-February date. UCC Obj. ¶ 24.

commercially and pragmatically, using the additional time to address stakeholders' reasonable concerns regarding the DIP Facility's current terms and responding to any competing proposals advanced. But even if they react hastily, this Court reserves ample discretion to fashion a fair solution that balances all stakeholders' interests.

26. To elaborate, the Interim Order permits the DIP Agent to request an emergency Stay Relief Hearing following an Event of Default under the DIP Loan Agreement (including a breach of any Milestone). Interim Order ¶ 20(b); DIP Loan Agreement § 11.1(d). The Court will determine at that hearing "whether a DIP Termination Event has occurred" and, if so, "may fashion an appropriate remedy." Interim Order ¶ 20(b). But the Debtors' rights to "contest such relief are expressly preserved," and the ultimate decision as to what—if any—remedy to authorize is committed to this Court's sound discretion. *Id.* The DIP Lenders are *not* entitled to exercise remedies without this Court's prior approval. *See id.*

## RESERVATION OF RIGHTS

27. This Objection is submitted without prejudice to, and with full reservation of, the Ad Hoc Equity Group's rights, claims, defenses, and remedies, including the right to amend, modify, or supplement this Objection, to seek discovery, to raise additional objections and to introduce evidence at any hearing related to this Objection, and without in any way limiting any other rights of the Ad Hoc Equity Group to object to the DIP Motion, on any grounds, as may be appropriate. The Ad Hoc Equity Group reserves the right to amend or supplement this Objection.

[*Remainder of page intentionally left blank*]

## CONCLUSION

The Ad Hoc Equity Group respectfully requests that this Court adjourn the Final Hearing on the DIP Motion as set forth herein and in accordance with the proposed order attached as **Exhibit A** or, to the extent the Final Hearing is not so adjourned, deny the DIP Motion and grant such other and further relief as may be just and proper.

Dated: Houston, Texas
January 27, 2023

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/ Noelle M. Reed*
Noelle M. Reed
Attorney-in-Charge
State Bar No. 24044211
Federal Bar No. 274247
1000 Louisiana Street
Suite 6800
Houston, Texas 77002
Tel: (713) 655-5122
Fax: (713) 483-9122
Email: Noelle.Reed@skadden.com

-and-

George N. Panagakis
(*Application for pro hac vice Admission Forthcoming*)
Ron E. Meisler
(*Application for pro hac vice Admission Forthcoming*)
155 North Wacker Drive
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700
Fax: (312) 407-0411
Email: George.Panagakis@skadden.com
Email: Ron.Meisler@skadden.com

-and-

Jennifer Madden
(*Application for pro hac vice Admission Forthcoming*)
525 University Avenue
Palo Alto, California 94301
(650) 470-4500
(650) 470-4570
Email: Jennifer.Madden@skadden.com

*Attorneys for the Ad Hoc Equity Group*

**CERTIFICATE PURSUANT TO
BANKRUPTCY LOCAL RULE 9013-1(g)(1)**

I hereby certify that counsel to the Ad Hoc Equity Group conferred with counsel to the Debtor prior to the filing of this Objection to attempt to resolve the relief requested in the DIP Motion without the necessity of a hearing. The parties were not able to resolve the dispute.

*/s/ Noelle M. Reed*
Noelle M. Reed

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing document to be served by electronic transmission via the Court's ECF system to all parties registered to receive electronic notice in this case.

*/s/ Noelle M. Reed*
Noelle M. Reed