# Exhibit 19

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| CORE SCIENTIFIC, INC., et al., | ) ) ) | Case No. 22-90341 (DRJ) |
| Debtors.[1] | ) ) ) | Jointly Administered |

**DECLARATION OF
ADAM W. VEROST IN SUPPORT OF THE OBJECTION OF THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' EMERGENCY
MOTION TO OBTAIN POST-PETITION DEBTOR-IN-POSSESSION FINACNING**

I, Adam W. Verost, declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that:

1. I am above 18 years of age, and I am competent to testify. I am a Partner of Ducera Partners LLC ("Ducera"), a financial advisory services firm located at 11 Times Square, 36th Floor, New York, NY 10036.

2. I submit this declaration (the "Declaration") in support of the *Objection of the Official Committee of Unsecured Creditors to Debtors' Emergency Motion to Obtain Post-Petition Debtor-in-Possession Financing* (the "Objection") which was filed by the Official Committee of Unsecured Creditors in the above captioned cases (the "Committee") in response to the *Emergency Motion of the Debtors for Entry of Interim and Final Orders (a) Authorizing the Debtors to Obtain Postpetition Financing, (b) Authorizing the Debtors to Use Cash Collateral, (c) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (d) Granting Adequate*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

*Protection to the Prepetition Secured Parties, (e) Modifying the Automatic Stay, (f) Scheduling a Final Hearing, and (g) Granting Related Relief* [Docket No. 38] (the "<u>Motion</u>").

3. The statements in this Declaration are, except as otherwise noted, based on my personal knowledge or opinion, information that is publicly available, provided by the Debtors or their advisors, or other interested parties, and Ducera's employees working directly with me or under my supervision or direction. If called upon to testify, I would testify to the facts set forth herein. Capitalized terms used herein but otherwise not defined shall have the meanings given to such terms in the Objection.

### Background and Qualifications

4. Ducera is an independent investment banking firm that provides strategic advisory, restructuring, and liability management services as well as capital markets knowledge, financing skills, and restructuring capabilities that are employed in corporate restructuring transactions. Ducera's professionals have extensive experience rendering investment banking services to financially distressed companies and to creditors, equity holders, and other constituencies in reorganization proceedings and complex financial restructurings, both in-court and out-of-court, from its offices in New York, California, and Connecticut.

5. Since its inception in 2015, Ducera has provided restructuring services in numerous large, complex chapter 11 cases to debtors, creditor groups, asset purchasers, committees, boards of directors, special committees, and trustees in a number of bankruptcy matters including, but not limited to: (a) *In re GBG USA Inc.*, Case No. 21-11369 (Bankr. S.D.N.Y); (b) *In re Mallinckrodt plc*, Case No. 20-12522 (Bankr. D. Del.); (c) *In re Superior Energy Services, Inc.*, Case No. 20-35812 (Bankr. S.D. Tex.); (d) *In re Remington Outdoor Co.*, Case No. 20-81688 (Bankr. N.D. Ala); (e) *In re Imerys Talc Am., Inc.*, Case No. 19-10289 (Bankr. D. Del.); (f) *In re Paniolo Cable*

*Co., LLC*, Case No. 18-01319 (Bankr. D. Haw.); (g) *In re Specialty Retail Shops Holding Corp., et al.,* Case No. 19-80064 (Bankr. D. Neb.); (h) *In re Sungevity*, Case No. 17-10561 (Bankr. D. Del.); (i) *In re Toys "R" Us, Inc.*, Case No. 17-034665 (Bankr E.D. Va.); (j) *In re Panda Temple Power, LLC*, Case No. 17-10839 (Bankr. D. Del.); (k) *In re Dacco Transmission Parts (NY), Inc.*, Case No. 16-13245 (Bankr. S.D.N.Y.); (l) *In re Hercules Offshore, Inc.*, Case No. 16-11385 (Bankr. D. Del.); (m) *In re Illinois Power Generating Co.*, Case No. 16-36326 (Bankr. S.D. Tex.); and (n) *In re Paragon Offshore PLC*, Case No. 16-10386 (Bankr. D. Del.).

6. I have been a partner in Ducera since June 2015. Before joining Ducera, I held positions at other restructuring advisory firms, including, most recently as a Managing Director, at Perella Weinberg Partners L.P. I have also held positions at Kramer Capital Partners, LLC, Greenhill & Co., and Houlihan Lokey, Inc. I received a Bachelor of Science degree from Indiana University in Finance, Accounting, and International Business.

7. I have advised on numerous large, complex chapter 11 cases to debtors, creditor groups, asset purchasers, committees, boards of directors, and special committees in a number of bankruptcy matters including, but not limited to: (a) *In re CBL & Associates Properties, Inc., et al.*, Case No. 20-35226 (Bankr. S.D. Tex.); (b) *In re Specialty Retail Shops Holding Corp.*, Case No. 19-80064 (Bankr. D. NE.); (c) *In re Atari Interactive, Inc.,* Case No. 13-10176 (Bankr. S.D.N.Y.); (d) *In re Masonite Corporation*, Case No. 09-10844 (Bankr. D. Del.); (e) *In re Complete Retreats, LLC*, Case No. 06-50245 (Bankr. D. Conn.); (f) *In re United Airlines Corporation, et al.*, Case No. 02-48191 (Bankr. N.D. Ill.); (g) *In re Orius Corp.*, Case No. 05-63876 (Bankr. N.D. Ill.); (h) *In re Stations Holding Co.*, Case No. 02-10882 (Bankr. D. Del.); (i) *In re KCS Energy, Inc.*, Case No. 00-0028 (Bankr. D. Del.) and (j) *In re Harnischfeger Industries, Inc.*, Case No. 99-2171 (Bankr. D. Del.).

8. I hold the Series 7 and Series 63 securities licenses.

9. I have served as the Co-Chairman of Ducera's Fairness Committee since its inception.

## Ducera's Involvement with the Committee

10. On January 10, 2023, the Committee engaged Ducera to provide investment banking and other restructuring services as needed throughout the course of the Debtors' chapter 11 cases (the "Chapter 11 Cases"). Since our engagement, my team has been working with the Debtors and their advisors to understand the Debtors' operational history, financial performance, restructuring process, and terms of the proposed debtor-in-possession financing (the "DIP Facility") as set forth in the Motion.

## Scope of the Declaration

11. I was asked by the Committee to evaluate (i) the Debtors' need to make additional draws under the DIP Facility, (ii) whether the Debtors' efforts to sell non-core assets represents a sound exercise of business judgement, and (iii) the cost of the DIP Facility in comparison to comparable debtor-in-possession financing facilities.

## Summary of Analysis and Conclusions

**A. No Further Draws under the Proposed DIP Facility Are Needed**

12. On December 22, 2022, the Debtors filed their initial budget in connection with the DIP Facility (the "Initial Budget") [Docket No. 97]. On January 21, 2023, the Debtors shared an updated proposed DIP budget with the Committee's advisors dated January 18, 2023 (the "Proposed DIP Budget") attached to the Objection as **Exhibit B**. The Proposed DIP Budget forecasts ▇ incremental draws totaling ▇▇▇▇, compared to incremental draws totaling $34.1 million in the Initial Budget. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████.

13. Based on conversations my team and I have had with the Debtors and their advisors, I understand there are a number of factors that have meaningfully improved the Debtors' liquidity position as compared to what was projected in the Initial Budget. The chief reasons for this improved liquidity position are (i) the Debtors' actual cash collection and operational cash flow performance relative to its budgeted performance, and (ii) improving market conditions and bitcoin prices. Specifically, as of January 13, 2023, the Company had approximately ████████ of liquidity, which is approximately ████████ ahead of the Initial Budget. Of the ████████, the Debtors believe that a minimum of ████████ will constitute "permanent" cash pickups.

14. It is my professional opinion that the Debtors' will not need to access the ████ ████ in additional draws as contemplated under the Proposed DIP Budget. This conclusion is based on my view that the Proposed DIP Budget contains material, overly-conservative assumptions.

15. *First*, I believe the Proposed DIP Budget is based on too conservative a price for bitcoin. Specifically, the Proposed DIP Budget assumes the Debtors will sell bitcoin at ████ throughout the course of the Chapter 11 Cases. However, as of the filing of this Objection, bitcoin's price is approximately $23,000 and its price is up over 36%[2] since the Petition Date.

16. The Debtors' assumption for the sale price of bitcoin is a crucial input to projecting the Debtors' cash flows. Generally speaking, and as reflected in the below table, for each

---

[2] The price of bitcoin increased from approximately $16,790 on December 21, 2022 to approximately $22,900 on January 24, 2023. *See* Bitcoin USD, *The Wall Street Journal*, https://www.wsj.com/market-data/quotes/fx/BTCUSD/historical-prices.

incremental $1,000 increase in the price of bitcoin, ███████████████████

███████████████████████.[3] ███████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████.

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

    17. ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████. In fact, based on my

---

[3] ███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████.

analysis, it is my professional opinion that the Debtors will not need any additional financing during the remainder of the Chapter 11 Cases if bitcoin remains above approximately $17,700, assuming all other variables in the Debtors' model held constant ████████████ ████████████.

18. As noted above, part of the reason for the positive outlook and ongoing liquidity improvements to the Debtors as compared to the Initial Budget includes bitcoin prices being higher than projected. In the nearly five weeks since the Debtors filed for chapter 11 protection, the price of bitcoin has increased 36% as reflected in the below chart.



19. *Second*, I believe the Proposed DIP Budget is too conservative because it utilizes an excessive contingency reserve. The Proposed DIP Budget includes ████████████ ██████, at least partly, as a cushion to protect against potential overruns. It is my understanding based on conversations with the Debtors' professionals that none of this contingency reserve has

been used to date or is forecasted to be used in the first 9 weeks of the case (i.e., an estimated amount of ▇▇▇). ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. *See* Objection, Exhibit A, Blokh Dep. 66:24-25; 67:1-6. Therefore, it is my professional opinion that some portion of this amount should be removed from the Proposed DIP Budget, therefore reducing the Debtors' projected need to draw upon the DIP Facility.

20. *Third,* I believe that further draws are unnecessary under the proposed DIP Facility because the Debtors are seeking to maintain an unnecessarily high target liquidity level of ▇▇▇. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. However, the Debtors accepted and successfully operated pursuant to an Initial Budget that included a minimum liquidity level of approximately ▇▇▇ million in the period ending March 17, 2023.

**B. Limitations on the Sale of Non-Core Assets Increase DIP Financing Costs**

21. It is my understanding that the DIP Credit Agreement does not permit the Debtors to sell three of its non-core real estate assets if the aggregate amount of net proceeds received from such sales exceeds $10 million. The three parcels of real estate are located in Barstow, Texas ("Cedarvale"), Pecos, Texas ("Cottonwood"), and Muskogee, Oklahoma ("Muskogee") (collectively, the "Agreed Sale Properties"). Based on conversations with the Debtors' advisors, it is my understanding that the Debtors and their advisors are (i) actively engaged in a marketing process to sell the Agreed Sale Properties, (ii) ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, and (iii)

██████████████████████████████████████████████████

███████████████████████████████████████.

22. Based on conversations I have had with the Debtors' professionals, I understand and agree with the Debtors' strategic reasons for selling these properties as quickly as possible.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████.

23. There is another reason why, in my professional opinion, I believe it would make sense for the Debtors to pursue sales of the Agreed Sale Properties. The Debtors could use the sale proceeds to potentially (i) pay off the proposed DIP Facility entirely, and (ii) fund the remainder of these Chapter 11 Cases, thereby allowing the Debtors to explore more value maximizing transactions. If the limitations on asset sales in the DIP Credit Agreement were removed, the net proceeds from selling one or more of the Agreed Sale Properties—which are not reflected in the Proposed DIP Budget—would represent another influx of cash to the Debtors' estate that could separately eliminate the Debtors' need for incremental borrowing under the DIP Facility.

C. **The All-In Cost of the Debtors' DIP Facility is Materially Higher than Costs of Typical DIP Facilities**

24. To assess the reasonableness of the various fees and costs of the Debtors' DIP

Facility, my team compared the DIP Facility's economic fees (e.g., backstop fee, commitment fee, and termination fee) and terms to comparable debtor-in-possession facilities in other cases. In conducting this analysis, Ducera relied on its review of the final orders, credit agreements, court filings, and other available information related to conduct its analysis. As noted in the Objection, if the Court approved the DIP Facility without modification, it would cost the Debtors approximately $107.6 million (comprised of new money loans, roll up loans and various fees) to refinance or pay down the entire DIP Facility.

25. In order to develop a sample set of debtor-in-possession ("DIP") financing facilities for comparison purposes, Ducera reviewed and analyzed DIP facilities that have similar characteristics to the DIP Facility. Ducera analyzed debtor-in-possession financing facilities for companies that met certain criteria: (i) the companies had greater than $250 million in pre-petition funded debt, (ii) the DIP facility was between $25-300 million; (iii) the DIP facility had a roll up component, and (iv) the company's petition date was on January 1, 2021 or thereafter.

26. Based on these criteria, Ducera identified eleven DIP facilities (collectively, the "Peer Set") borrowed by the following debtor companies: (i) Clovis Oncology, Inc., (ii) Pipeline Health System LLC, (iii) Phoenix Services International LLC, (iv) Altera Infrastructure, L.P., (v) First Guaranty Mortgage Corporation, (vi) LaForta - Gestão e Investimentos, Sociedade Unipessoal, Lda, (vii) Strike LLC, (viii) CalPlant I LLC, (ix) Basic Energy Services Inc., (x) Nine Point Energy Holdings, Inc., and (xi) CarbonLite Holdings LLC. Based on Ducera's analysis of the Peer Set, we came to the following conclusions:

- **The Proposed DIP Facility Is Materially More Expensive Than Comparable Financing Facilities**. Based on the Initial Budget, Ducera calculated (i) the all-in costs of the DIP Facility as a percentage of its size, and (ii) the implied yield of the new money portion of the DIP Facility. Here, the all-in cost of the DIP Facility—which includes economic components such as interest and fees—is 25.7% of the DIP Facility's $60 million size. By comparison, as shown in the below chart and **Attachment 1** hereto, the median

all-in cost for the facilities in the Peer Set was 10.6%.

| Company | All In Cost |
|---|---|
| Core Scientific, Inc. | 25.7% |
| Phoenix Services International LLC | 21.6% |
| LaForta - Gestão e Investimentos, Sociedade Unipessoal, Lda | 15.6% |
| Clovis Oncology, Inc. | 14.0% |
| Strike LLC | 13.2% |
| Pipeline Health System LLC | 11.7% |
| Basic Energy Services Inc. | 10.6% |
| CalPlant I LLC | 9.5% |
| Altera Infrastructure | 7.5% |
| CarbonLite Holdings LLC (Blended) | 7.4% |
| Nine Point Energy Holdings, Inc. | 4.8% |
| First Guaranty Mortgage Corporation (Blended) | 3.7% |
| Median (Excluding Core Scientific, Inc.) | 10.6% |

- Moving to the second metric—implied yield which measures the internal rate of return (i.e., the rate of return that the lenders would receive assuming the whole facility is repaid at maturity, receives cash interest on a monthly basis, and the facility is not extended —the DIP Facility here has an implied yield of 59.3%. By contrast, as shown in the below chart and **Attachment 1** hereto, the facilities in the Peer Set have median implied yields of 27.2%.

| Company | Implied Yield (IRR) | Months Until Initial Maturity Date |
|---|---|---|
| Strike LLC | 67.8% | 2.5 |
| Core Scientific, Inc. | 59.3% | 6.0 |
| Phoenix Services International LLC | 49.6% | 6.0 |
| Pipeline Health System LLC | 39.7% | 4.0 |
| Sociedade Unipessoal, Lda | 33.6% | 6.0 |
| Clovis Oncology, Inc. | 30.0% | 6.0 |
| Basic Energy Services Inc. | 27.2% | 5.0 |
| Altera Infrastructure | 24.7% | 4.0 |
| CarbonLite Holdings LLC (Blended) | 19.4% | 5.0 |
| Nine Point Energy Holdings, Inc. | 15.6% | 4.0 |
| CalPlant I LLC | 9.9% | 12.0 |
| First Guaranty Mortgage Corporation (Blended) | 9.3% | 5.0 |
| Median (Excluding Core Scientific, Inc.) | 27.2% | 5.0 |

In the event the Company became obligated to issue the DIP Warrants to the Debtors, depending on the value ascribed to the reorganized debtors, the total cost and implied yield of the DIP Facility could be even greater.

- **The Termination Payment is Unreasonably Expensive**. The meaningfully higher cost of the DIP Facility (as compared to the Peer Set) is primarily driven by the 15.00% Termination Payment. Based on its analysis, Ducera determined that comparable exit/termination fees for debtor-in-possession facilities are typically around 3.0%.[4] Moreover, the Termination Payment also applies to (i) unpaid and accrued interest, (ii) 2.0% commitment fee, and (iii) $1.636 million backstop fee, all of which are payable in kind, further increasing the costs of the DIP Facility.

D. **The Total Fees and Implied Yield of the Debtors' Proposed DIP Facility is Materially Higher Than DIP Facilities, With a Roll-Up Feature, Identified by the Debtors' Advisors**

27. As part of analyzing the reasonableness of the DIP Facility's cost, my team analyzed the comparison set of DIP facilities that the Debtors used to assess the reasonableness of the DIP Facility. To compare the costs of the various financing proposals received by the Debtors and provide a comparable analysis to the Debtors' Special Committee, the Debtors' advisors compared the DIP Facility's economic fees (e.g., backstop fee, commitment fee, and exit / termination fee) to comparable DIP facilities in other cases. ████████████████████ ████████████████████████████████████████████████████ ████████████████████████████.

28. ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

---

[4] Of the Peer Set's eleven DIP facilities, seven included an exit termination fee reflecting a median percentage of approximately 3.0%.

13





*[remainder of page left intentionally blank]*

14

\*　　\*　　\*

I certify under penalty of perjury that, based upon my knowledge, information, and belief as set forth in this Declaration, the foregoing is true and correct.

Executed on January 26, 2023

                          By: /s/ Adam W. Verost
                              Adam W. Verost
                              Partner
                              Ducera Partners LLC

## Attachment 1: DIP Analysis

| Company[1] | Petition Date | Tenor (Days) | Amount — New Money Portion Only | Rate — Spread | Rate — Ref. Rate[2] | Fees — Upfront / Commitment | Fees — Backstop | Fees — Exit / Termination | Fees — Exit Fee on Roll-Up | Cost — All-In Cost[3][4] | Cost — All-In Cost / New Money | Cost — Yield[4][5] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Clovis Oncology Inc. | Dec-22 | 180 | $45 | 800 bps | Fixed | 6.5% | – | 3.0% | – | $6.3 | 14.0% | 30.0% |
| Pipeline Health System LLC | Oct-22 | 120 | 40 | 1,000 bps | Fixed | 5.0% | – | 3.0% | 3.0% | 4.7 | 11.7% | 39.7% |
| Phoenix Services International LLC | Sep-22 | 180 | 50 | 1,200 bps | SOFR | 5.0% | 5.0% | 3.0% | – | 10.8 | 21.6% | 49.6% |
| Altera Infrastructure | Aug-22 | 120 | 50 | 1,100 bps | SOFR | 1.5% | – | 1.5% | 1.5% | 3.8 | 7.5% | 24.7% |
| First Guaranty (Cash Flow) | Jun-22 | 150 | 52 | 1,100 bps | Fixed | 2.0% | – | – | – | 3.5 | 6.7% | 17.1% |
| First Guaranty (Repo Facility) | Jun-22 | 150 | 125 | 300 bps | SOFR | 0.5% | – | – | – | 3.1 | 2.5% | 6.1% |
| **First Guaranty (Blended)** | **Jun-22** | **150** | **$177** | **534 bps** | **Varies** | **0.9%** | **–** | **–** | **–** | **$6.5** | **3.7%** | **9.3%** |
| LaForta | Jun-22 | 182 | 33 | 1,000 bps | Fixed | – | 5.0% | 5.0% | – | 5.1 | 15.6% | 33.6% |
| Strike LLC | Dec-21 | 75 | 26 | 1,000 bps | LIBOR | 7.5% | – | 3.0% | – | 3.4 | 13.2% | 67.8% |
| CalPlant I LLC | Oct-21 | 360 | 33 | 950 bps | Fixed | – | – | – | – | 3.2 | 9.5% | 9.9% |
| Basic Energy Services Inc | Aug-21 | 155 | 25 | 900 bps | LIBOR | 5.0% | – | 1.0% | – | 2.6 | 10.6% | 27.2% |
| Nine Point Energy Holdings, Inc. | Mar-21 | 115 | 20 | 750 bps | LIBOR | 2.0% | – | – | – | 1.0 | 4.8% | 15.6% |
| CarbonLite (CA Term Loan) | Mar-21 | 120 | 20 | 1,100 bps | Fixed | 3.0% | – | – | – | 1.3 | 6.7% | 22.4% |
| CarbonLite (CA ABL) | Mar-21 | 120 | 19 | 800 bps | Fixed | 2.0% | – | – | – | 0.9 | 4.7% | 15.1% |
| CarbonLite (PA Term Loan) | Mar-21 | 180 | 25 | 1,200 bps | Fixed | 3.0% | – | – | – | 2.3 | 9.0% | 19.9% |
| CarbonLite (TX Loan) | Mar-21 | 180 | 15 | 1,200 bps | Fixed | 3.0% | – | – | – | 1.4 | 9.0% | 19.9% |
| **CarbonLite (Blended)** | **Mar-21** | **180** | **$79** | **1,080 bps** | **Fixed** | **2.8%** | **–** | **–** | **–** | **$5.8** | **7.4%** | **19.4%** |
| **75th Percentile** | | | **$50** | **1,040 bps** | | **5.0%** | **5.0%** | **3.0%** | **2.6%** | **$6.0** | **13.6%** | **36.7%** |
| **Average** | | | **$53** | **938 bps** | | **4.0%** | **5.0%** | **2.8%** | **2.3%** | **$4.8** | **10.9%** | **29.7%** |
| **Median** | | | **$40** | **1,000 bps** | | **5.0%** | **5.0%** | **3.0%** | **2.3%** | **$4.7** | **10.6%** | **27.2%** |
| **25th Percentile** | | | **$30** | **850 bps** | | **2.0%** | **5.0%** | **2.3%** | **1.9%** | **$3.3** | **7.5%** | **17.5%** |
| Core Scientific[6] | Dec-22 | 182 | $60 | 1,000 bps | Fixed | 2.0% | 2.7% | 15.0% | 2.0% | $15.4 | 25.7% | 59.3% |

**Sources:** Court Filings

(1) Reflects DIP Final Orders with a Petition Date after July 2020, total new money DIP Facility size between $25mm and $300mm, and a prepetition debt amount greater than $250mm
(2) Assumes LIBOR and SOFR as of the Petition Date for calculation of any fees
(3) For illustrative purposes, calculation of all-in $ cost assumes facilities are fully drawn throughout case, no accrual of PIK interest, application of total fees on the New Money commitment amount and no extensions
(4) For illustrative purposes, excludes any cost associated with the roll-up and equity awarded
(5) For illustrative purposes, calculation of all-in-yield assumes facilities are fully drawn throughout the case, interest is paid in cash and no extensions are made
(6) The Motion contemplated a $150 million debtor-in-possession financing facility, with $75 million in new money financing and $75 million in roll up loans. Based on conversations with the Debtors and Ad Hoc Noteholder Group, the Committee understands that only $60.0 million in new money loans have been subscribed and committed for. Accordingly, this Objection refers to the upward amount of new money loans and roll up loans under the proposed DIP Facility as $60.0 million, rather than $75.0 million.



[6] *See* Objection, Exhibit F.



[7] *See* Objection, Exhibit F.