**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **CORE SCIENTIFIC, INC., *et al.,*** | § | **Case No. 22-90341 (DRJ)** |
| | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | **(Emergency Hearing Requested)** |
| | § | |

**EMERGENCY MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN REPLACEMENT SENIOR SECURED NON-PRIMING SUPERPRIORITY POSTPETITION FINANCING, (B) USE CASH COLLATERAL, AND (C) PAY OFF EXISTING POSTPETITION FINANCING FACILITY (II) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

> EMERGENCY RELIEF HAS BEEN REQUESTED.  RELIEF IS REQUESTED NOT LATER THAN 11:30 A.M. (CENTRAL PREVAILING TIME) ON WEDNESDAY, FEBRUARY 1, 2023.
>
> IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.
>
> YOU MAY PARTICIPATE IN THE HEARING EITHER IN PERSON OR BY AN AUDIO AND VIDEO CONNECTION.
>
> AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY.  YOU MAY ACCESS THE FACILITY AT 832-917-1510.  ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER.  JUDGE JONES' CONFERENCE ROOM NUMBER IS 205691. VIDEO

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198).  The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

> **COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE JONES' HOME PAGE.  THE MEETING CODE IS "JUDGEJONES". CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**
>
> **HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF BOTH ELECTRONIC AND IN-PERSON HEARINGS.   TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE JONES' HOME PAGE.  SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

Core Scientific, Inc. and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**" or "**Borrower**"), respectfully move and represent as follows in support of this motion (the "**Motion**"):

## Preliminary Statement[2]

1.      On January 30, 2023, the Debtors filed a notice with the Court [Docket No. 378] informing all parties that they reached an agreement with a lender on the terms of a replacement post-petition financing facility and intend to pay off their existing DIP financing loan. By this Motion, the Debtors seek authorization to obtain approval of their entry into a superpriority non-priming replacement senior secured debtor-in-possession credit facility in an aggregate principal amount of up to $70 million (the "**Replacement DIP Facility**"), provided by B. Riley Commercial Capital, LLC ("**B. Riley**" and solely in such capacity, the "**Replacement DIP Lender**") and agented by B. Riley Commercial Capital, LLC (solely in such capacity, the "**Replacement DIP Agent**").  The Replacement DIP Facility consists of a new money multiple draw term loan facility in an aggregate principal amount of up to $70 million (and the loans made under the Replacement DIP Facility, the "**Replacement DIP Loans**").  Details of the terms of the

---

[2]  Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the First Day Declaration and the Proposed Replacement Interim DIP Order (each, as defined herein), as applicable.

WEIL:\98991236\11\39031.0011

Replacement DIP Facility can be found in the "**Replacement DIP Term Sheet**" attached as **Exhibit 2** to the Proposed Replacement Interim DIP Order (as defined below).

2.      The Replacement DIP Facility will provide an aggregate principal amount of $35 million on an interim basis, which shall be borrowed in a single borrowing (the "**Interim DIP Borrowing**") on the Closing Date (as defined in the Replacement DIP Term Sheet) upon entry of the *Interim Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Non-priming Superpriority Replacement Postpetition Financing, (B) Use Cash Collateral, and (C) Pay Off Existing Postpetition Financing Facility, (II) Granting Liens and Providing Claims with Superpriority Administrative* (the "**Proposed Replacement Interim DIP Order**") attached hereto as **Exhibit A**.  Following entry of the Replacement Final DIP Order (as defined below), the remaining aggregate principal amount under the Replacement DIP Facility ($70 million total) shall be available, in one or more borrowings.

3.      By this Motion, the Debtors also seek the authority to pay off the Original DIP Facility and to use the Cash Collateral of their Prepetition Secured Noteholders.  As of the time of the filing of this Motion, the Debtors are in the process of negotiating the terms for the consensual use of Cash Collateral with the Ad Hoc Group and are hopeful that an agreement will be reached shortly.  If an agreement cannot be reached, the Debtors intend to seek the non-consensual use of cash collateral.  The Debtors continue to work with the Replacement DIP Lender, the Committee, and the Ad Hoc Group on the terms of the Proposed Replacement Interim DIP Order and will file revised documents prior to the hearing, which the Debtors seek to schedule for February 1, 2023 (the time for the hearing originally scheduled as the final hearing on the Original DIP Facility (as defined herein)).

3

4.     The Debtors announced a the outset these Chapter 11 Cases that they would seek to replace the Original DIP Facility with a replacement DIP facility with better terms and more flexibility than the Original DIP Facility.  They successfully achieved this goal with the Replacement DIP Facility.

5.     The Replacement DIP Facility is the result of extensive marketing and hard-fought negotiations with numerous potential lenders.  The Debtors kept both the Ad Hoc Group and the Committee fully informed throughout the marketing and negotiation process, and the Debtors understand that both the Committee and an ad hoc committee of shareholders are supportive of the Debtors' entry into the Replacement DIP Facility and the payoff of the Original DIP Facility prior to final approval thereof.  The Replacement DIP Facility provides the Debtors with up to 15 months of runway and significant flexibility, particularly as the Replacement DIP Facility has no plan-related milestones and is not conditioned on seeking approval of any specific chapter 11 plan.  It also contains economic terms that are reasonable and generally superior to those provided under the Original DIP Facility.  Its terms were also better than any alternative proposal the Debtors received.  The Replacement DIP Facility lays the foundation on which the Debtors will seek to negotiate a consensual chapter 11 plan with all of their key constituents and maximize value for all stakeholders.

6.     Approval of the DIP orders (the "**Replacement DIP Orders**") on an interim and ultimately final basis, will enable the Debtors to pay off the Original DIP Facility and is the best source of postpetition financing currently available to the Debtors.  Absent paying off the Original DIP Facility or obtaining a final order approving the Original DIP Facility (including the roll-up contemplated thereby) by February 2, 2023, the Debtors would be in default under the Original DIP Facility.  The Debtors do not believe it is prudent to proceed with approval of the

4

Original DIP Facility on a final basis given the availability of the superior Replacement DIP Facility. As the Debtors do not have the cash on hand to pay off the Original DIP Facility and still have liquidity to operate their business, the Debtors need authority to enter into the Replacement DIP Facility on an interim basis to avoid immediate and irreparable harm.

7.     Additional information regarding the Replacement DIP Facility is set forth in the *Declaration of John Singh in Support of Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Replacement Senior Secured Non-priming Replacement Superpriority Postpetition Financing, (B) Use Cash Collateral, and (C) Pay Off Existing Postpetition Financing Facility, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to The Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief*, sworn to the date hereof (the "**Second Singh Declaration**"), the *Declaration of Rodi Blokh in Support of Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Replacement Senior Secured Non-priming Superpriority Postpetition Financing, (B) Use Cash Collateral, and (C) Pay Off Existing Postpetition Financing Facility, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief*, sworn to on the date hereof (the "**Blokh Declaration**"), and *Declaration of Russell Cann in Support of Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Replacement Senior Secured Non-priming Replacement Superpriority Postpetition Financing, (B) Use Cash Collateral, and (C) Pay Off Existing Postpetition Financing Facility, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III)*

5

*Granting Adequate Protection to The Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief*, sworn to on the date hereof (the "**Cann Declaration**").[3]

## Relief Requested

8.       By this Motion, pursuant to sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014, the Bankruptcy Local Rules, and the Complex Case Procedures, the Debtors request entry of the Proposed Replacement Interim DIP Order, as attached hereto as **Exhibit A**:

(a)       authorizing the Debtors to obtain postpetition financing on a superpriority, non-priming, senior secured basis and the loans made, advanced or deemed advanced in the form of a non- amortizing multiple-draw term-loan Replacement DIP Facility, pursuant to which (i) an aggregate principal amount of $35 million shall be borrowed in a single borrowing on the Closing Date (as defined in the Replacement DIP Term Sheet (as defined below)), and (ii) following entry of the Replacement Final DIP Order (as defined below), the remaining aggregate principal amount under the Replacement DIP Facility shall be available, in one or more borrowings (each such borrowing, including the Interim DIP Borrowing, a "**Replacement DIP Borrowing**," and, collectively, the "**Replacement DIP Borrowings**"), and, in each case, in accordance with and subject to the terms and conditions (including any conditions precedent to each of the Replacement DIP Borrowings) set forth in the term sheet attached to the Proposed Replacement Interim DIP Order as **Exhibit 1** (the "**Replacement DIP Term Sheet**"), that certain *Commitment Letter*, dated as of January 29, 2023, by and between Core Scientific and the Replacement DIP Lender attached to the Proposed Replacement Interim DIP Order as **Exhibit 2** (the "**Commitment Letter**"), and, subject to entry of the Replacement Final DIP Order, on a final basis pursuant to a loan agreement (the "**Replacement DIP Credit Agreement**," and, together with all other agreements, guarantees, pledge, collateral and security agreements, mortgages, deeds, charges, control agreements, instruments, certificates, notes, any separate fee letter agreements between any of the Debtors, on the one hand, and the Replacement DIP Agent and/or the Replacement DIP Lender, on the other hand, and other documents executed, filed and/or delivered in connection therewith, including the

---

[3]  The Debtors have been in communication with the equipment lenders that filed objections to the Original DIP Facility to determine if they would continue to assert similar objections to the Replacement DIP Facility.  The Debtors believe that most, if not all, of the equipment lenders will be supportive of interim approval of the Replacement DIP Facility to replace the Original DIP Facility.  However, given the lack of finality on this point, the Debtors submit the Cann Declaration as evidence against the equipment lenders' assertions (without evidence) that the mining equipment is likely to decline in value.

Replacement DIP Term Sheet, collectively, the "**Replacement DIP Loan Documents**"), by and among Core Scientific, Inc., and its debtor affiliates as borrowers (the "**Replacement DIP Borrowers**"), each of the direct and indirect subsidiaries of Core Scientific, Inc. that are or become debtors in the Chapter 11 Cases, as guarantors (collectively, the "**Replacement DIP Guarantors**," and together with the Replacement DIP Borrowers, the "**Replacement DIP Loan Parties**"), B. Riley, as administrative agent and collateral agent (in such capacities, together with its successors and permitted assigns, the "**Replacement DIP Agent**"), and the lender party thereto (the "**Replacement DIP Lender**," and together with the Replacement DIP Agent, the "**Replacement DIP Secured Parties**") and the Proposed Replacement Interim DIP Order;

(b)     authorizing the Replacement DIP Loan Parties to (i) perform under the Replacement DIP Term Sheet and execute, deliver, and perform each of the Replacement DIP Loan Documents, (ii) incur all loans, advances, extensions of credit, financial accommodations, indemnification and reimbursement obligations and other obligations, and pay all principal, interest, premiums, fees, costs, expenses, charges and all other amounts payable under the Replacement DIP Loan Documents, whenever the same shall become due or payable, whether at stated maturity, by prepayment, declaration, acceleration or otherwise, in each case, in accordance with the Replacement DIP Loan Documents and the Proposed Replacement Interim DIP Order (collectively, the "**Replacement DIP Obligations**"), and (iii) perform such other and further acts as may be necessary, required or desirable to implement and effectuate the terms of this Interim Order, the Replacement DIP Loan Documents and the transactions contemplated hereunder and thereunder;

(c)     authorizing the Replacement DIP Borrowers to incur, and the Replacement DIP Guarantors to jointly and severally guarantee, all Replacement DIP Obligations, in accordance with the Proposed Replacement Interim DIP Order and the Replacement DIP Loan Documents;

(d)     granting to the Replacement DIP Agent, for the benefit of itself and the other Replacement DIP Secured Parties, the Replacement DIP Liens (as defined below) in all Replacement DIP Collateral (as defined below), as set forth in the Proposed Replacement Interim DIP Order, subject to the Carve-Out and subject to the relative priorities set forth in the Proposed Replacement Interim DIP Order;

(e)     granting to the Replacement DIP Agent, for the benefit of itself and the other Replacement DIP Secured Parties, allowed super-priority administrative expense claims against each of the Debtors, on a joint and several basis, in respect of all Replacement DIP Obligations, subject in each case to the Carve-Out, as set forth in the Proposed Replacement Interim DIP Order;

(f)     authorizing the Debtors to use the proceeds of the Replacement DIP Facility, the Replacement DIP Collateral and the Prepetition Secured Notes Collateral (as defined below), including Cash Collateral (as defined below), solely in accordance

with the terms and conditions set forth in the Proposed Replacement Interim DIP Order and the Replacement DIP Loan Documents, including the Approved Budget (as defined below), subject to any variances expressly permitted under the Replacement DIP Term Sheet (the "**Permitted Variances**");

(g)    authorizing the Debtors to irrevocably repay in full all obligations outstanding under that certain *Senior Secured Super-Priority Debtor in Possession Loan and Security Agreement*, dated as of December 22, 2022, as filed with the Court on December 28, 2022 (Docket No. 188) (as modified, the "**Original DIP Credit Agreement**" by and among the lenders from time to time party thereto (the "**Original DIP Lenders**"), the Administrative Agent (as defined therein) (the "**Original DIP Agent**"), and the postpetition financing facility provided thereby (the "**Original DIP Facility**")) with the proceeds from the Replacement DIP Facility as soon as practicable upon funding and terminating all liens granted to the Original DIP Agent and the Original DIP Lenders;

(h)    granting adequate protection, as and to the extent set forth in the Proposed Replacement Interim DIP Order, to the Prepetition Secured Parties (as in the Proposed Replacement Interim DIP Order) to protect against any Diminution in Value (as defined in the Proposed Replacement Interim DIP Order) of their respective Prepetition Notes Liens (as in the Proposed Replacement Interim DIP Order) in the Prepetition Secured Notes Collateral (including Cash Collateral);

(i)    approving certain stipulations, waivers, and releases by the Debtors with respect to, *inter alia*, the Replacement DIP Secured Parties, the Replacement DIP Loan Documents, the Replacement DIP Liens, the Replacement DIP Obligations and the Replacement DIP Collateral, in each case, subject to the terms and provisions of the Proposed Replacement Interim DIP Order;

(j)    approving the Debtors' waiver of the right to surcharge the Replacement DIP Collateral as to the Replacement DIP Secured Parties, pursuant to section 506(c) of the Bankruptcy Code or otherwise, upon the terms set forth in the Proposed Replacement Interim DIP Order;

(k)    approving the Debtors' waiver of the equitable doctrine of "marshaling" and other similar doctrines with respect to the Replacement DIP Collateral as to the Replacement DIP Secured Parties;

(l)    modifying or vacating the automatic stay imposed by sections 105(a) and 362 of the Bankruptcy Code or otherwise, to the extent necessary, required or desirable to implement and effectuate the terms and provisions of the Proposed Replacement Interim DIP Order and the Replacement DIP Loan Documents, as set forth herein, waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the Proposed Replacement Interim DIP Order, providing for the immediate effectiveness of the Proposed Replacement Interim DIP Order, and granting related relief; and

WEIL:\98991236\11\39031.0011

(m)   scheduling a final hearing (the "**Final Hearing**") on the Motion to consider entry of an order (the "**Replacement Final DIP Order**") authorizing the relief requested in the Motion on a final basis, which order shall be in form and substance and on terms and conditions reasonably acceptable in all respects to the Replacement DIP Lender and Replacement DIP Agent in accordance with the Replacement DIP Term Sheet, and approving the form of notice with respect to such Final Hearing.

### Summary of Terms of Replacement DIP Facility[4]

9.     In accordance with Rules 4001(b)-(d) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and the *Procedures for Complex Cases in the Southern District of Texas* (the "**Complex Case Procedures**"), as incorporated by Rule 1075-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "**Bankruptcy Local Rules**"), the below chart summarizes the significant terms of the Proposed Replacement Interim DIP Order and the Replacement DIP Facility.  Any capitalized terms used herein but not defined shall be used as defined in the Commitment Letter or the Replacement DIP Term Sheet, as applicable.

| MATERIAL TERMS | | LOCATION |
|---|---|---|
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | Core Scientific, Inc., Core Scientific Acquired Mining LLC, Core Scientific Operating Company, Core Scientific Specialty Mining (Oklahoma) LLC, American Property Acquisition, LLC, American Property Acquisitions I, LLC, American Property Acquisition VII, LLC, Radar Relay, Inc., Starboard Capital LLC, RADAR LLC and Core Scientific Mining LLC. (the "**Borrowers**") | Proposed Replacement Interim DIP Order Preamble<br><br>Replacement DIP Term Sheet - #1. |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | Core Scientific Acquired Mining LLC, Core Scientific Operating Company, Core Scientific Specialty Mining (Oklahoma) LLC, American Property Acquisition, LLC, American Property Acquisitions I, LLC, American Property Acquisition VII, LLC, Radar Relay, Inc., Starboard | Proposed Replacement Interim DIP |

---

[4] This summary is qualified in its entirety by reference to the applicable provisions of the Replacement DIP Documents.  To the extent there exists any inconsistency between this summary and the provisions of the Replacement DIP Documents or the Replacement DIP Orders, the provisions of the Replacement DIP Documents or the Replacement DIP Orders, as applicable, shall control.  Any capitalized terms used but not otherwise defined in these summaries shall have the respective meanings ascribed to such terms in the Replacement DIP Documents and/or the Replacement Interim DIP Order, as applicable.  The Debtors reserve the right to supplement the statements made pursuant to Bankruptcy Rule 4001 and Local Rule 4001–2 herein.

Furthermore, certain Replacement DIP Documents have not yet been finalized as of the time of filing of this Motion.  Accordingly, the summaries reflect the current state of the relevant provisions and are subject to change.

| MATERIAL TERMS | | LOCATION |
|---|---|---|
| | Capital LLC, RADAR LLC and Core Scientific Mining LLC. and any future subsidiaries of Core Scientific, Inc. that become debtors in the Chapter 11 Cases (the "**DIP Guarantors**") | Order, Preamble.<br><br>Replacement DIP Term Sheet - #2 |
| **Initial DIP Lender**<br>Bankruptcy Rule 4001(c)(1)(B) | B. Riley Commercial Capital, LLC | Replacement DIP Term Sheet - #3 |
| **DIP Agent**<br>Bankruptcy Rule 4001(c)(1)(B) | B. Riley Commercial Capital, LLC | Replacement DIP Term Sheet - #3 |
| **DIP Facility and Borrowing Limits**<br>Bankruptcy Rule 4001(c)(1)(B) | Replacement DIP Facility to include a non-amortizing super-priority senior secured term loan facility in an aggregate principal amount not to exceed $70 million consisting of up to $70 million in term loan commitments, of which (1) $35 million will be available to the Borrowers in a single draw of Replacement DIP Loans following the entry of the Proposed Replacement Interim DIP Order and prior to the entry of the Replacement Final DIP Order (the "**Initial Draw**") and (2) following entry of the Replacement Final DIP Order, the remaining amount of the then undrawn Replacement DIP Loans shall be available to the Debtors (the "**Other Draws**"), in each case in accordance with and ssubject to compliance with the terms, conditions and covenants described in Replacement DIP Term Sheet and in the DIP Documents (the Replacement DIP Lender's commitments under the Replacement DIP Facility being the "**Replacement DIP Commitments**" and the loans under the Replacement DIP Facility being the "**Replacement DIP Loans**").<br><br>The Replacement DIP Facility shall be used to permanently decrease the Replacement DIP Commitments and Replacement DIP Loans repaid (for any reason) may not be reborrowed unless (and solely to the extent that) they are repaid prior to the entry of the Replacement Final DIP Order. | Proposed Replacement Interim DIP Order, Preamble.<br><br>Replacement DIP Term Sheet - #4-6 |
| **Budget**<br>Bankruptcy Rule 4001(c)(1)(B) | The Debtors have prepared and delivered to the Replacement DIP Secured Parties the initial itemized cash flow forecast set forth on Exhibit 4 attached hereto, which has been approved by the Replacement DIP Lender (the "Initial Budget," as amended, supplemented or updated by the Debtors, and approved by the Replacement DIP Lender, from time to time in accordance with the terms of the Proposed Replacement Interim DIP Order and the Replacement DIP Term Sheet or Replacement DIP Credit Agreement, as applicable, the "**Approved Budget**"), reflecting, on a line item, cumulative and aggregate basis, the Debtors' projected cash receipts expected to be collected, and necessary disbursements and expenditures (including debt service costs) expected to be incurred or made, by the Debtors for each calendar week during the period from the calendar week ending on the Friday of the week in which the Court enters the Proposed Replacement Interim DIP Order through and including the week ending June 30, 2023. The Initial Budget is an integral part of the Proposed Replacement Interim DIP Order, and the Replacement DIP Secured Parties are relying, in part, upon the Debtors' agreement to comply with the Approved Budget (subject to Permitted Variances) in determining to enter | Proposed Replacement Interim DIP Order, ¶ H,<br><br>Replacement DIP Term Sheet #13, 22 |

| MATERIAL TERMS | | LOCATION |
|---|---|---|
| | into the Replacement DIP Facility and to allow the Debtors' use of proceeds of the Replacement DIP Facility in accordance with the terms of the Proposed Replacement Interim DIP Order and the Replacement DIP Loan Documents.<br><br>The Initial Budget is attached to the Proposed Replacement Interim DIP Order as **Exhibit 4**. | |
| **Interest Rate**<br>Bankruptcy Rule 4001(c)(1)(B) | The "Applicable Rate" on the Replacement DIP Facility is 10% per annum, payable in kind in arrears on the first day of each month.<br><br>The Default Rate with respect to the Replacement DIP Loans is the Applicable Rate plus 2.00% per annum.<br><br>As of the occurrence of, and at all times during the continuance of, any Insolvency Proceeding with respect to any Obligor, or any other Event of Default (including if any Loans or other Obligations (or portion thereof) shall remain unpaid as of the Termination Date), all outstanding Loans and overdue Obligations shall automatically accrue interest at the Default Rate (whether before or after any judgment), until Full Payment thereof. | Replacement DIP Term Sheet - #9 |
| **Expenses and Fees**<br>Bankruptcy Rule 4001(c)(1)(B) | *Monthly Replacement DIP Agent Fee.* $75,000 per month payable, in cash advance, to the Replacement DIP Agent for its sole account and benefit, on the Closing Date and the first business day of each calendar month thereafter.<br><br>*Upfront Premium.* 3.50% (paid-in-kind) of Replacement DIP Loans under the Replacement DIP Facility, accrued and earned on the date upon entry of the Proposed Replacement Interim DIP Order.<br><br>*Extension Fee.* 3.50% in cash of the aggregate loans outstanding on the date the Borrowers extend the Maturity Date of all obligations under the Replacement DIP Facility by an additional three (3) months.<br><br>*Exit Premium.* Following the entry of the Proposed Replacement Interim DIP Order, upon and concurrently with the repayment or satisfaction of the Replacement DIP Loans in whole or in part, the Borrowers shall pay to the Replacement DIP Agent, in cash, 5.00% of the amount of the Replacement DIP Loans being repaid, reduced or satisfied.<br><br>In addition to the above fees, the Proposed Replacement Interim DIP Order provides that the Replacement DIP Loan Parties are authorized and directed to pay any and all (i) amounts due (or that may become due) in respect of any and all indemnification obligations under the Replacement DIP Loan Documents, and (ii) any other amounts payable in connection with the Replacement DIP Facility and the Prepetition Secured Notes, including the payment of all out-of-pocket costs, expenses and disbursements of the Replacement DIP Secured Parties and Prepetition Secured Parties, including the reasonable and documented fees and expenses of (A)(1) Choate, Hall & Stewart LLP ("**Choate**"), as counsel to the Replacement DIP Secured Parties and (2) any other professionals that | Proposed Replacement Interim DIP Order, ¶ 2.<br><br>Replacement DIP Term Sheet - #10 - 11 |

| MATERIAL TERMS | LOCATION |
|---|---|
| | may be retained by the Replacement DIP Lender (with the consent of the Replacement DIP Borrowers, such consent not to be unreasonably withheld or delayed, which consent of the Replacement DIP Borrowers shall not be required after the occurrence of a DIP Termination Event (as defined below) (collectively, the "**DIP Professional Fees and Expenses**")) and (B) the Noteholder Professional Fees and Expenses (as defined in the section "Liens, Cash Payments or Adequate Protection Provided for Use of Cash Collateral" below). | |
| **Maturity Date; Duration for Use of Replacement DIP Collateral** Bankruptcy Rule 4001(c)(1)(B) | The Maturity Date shall be the earliest of:<br><br>i.   the date that is twelve (12) months after the Petition Date; *provided*, that the Borrowers shall be permitted to extend such date by three (3) months upon paying the DIP Agent the Extension Fee, in cash (any such date being the "**Scheduled Maturity Date**")<br><br>ii.   the effective date of any chapter 11 plan of reorganization with respect to the Borrowers or any other Debtor (a "**Plan**");<br><br>iii.   the consummation of any sale or other disposition of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code;<br><br>iv.   the date of the acceleration of the DIP Loans and the termination of the DIP Commitments in accordance herewith or with the DIP Documents;<br><br>v.   the date of the DIP Agent's written notice to the Borrowers of the occurrence of an Event of Default (as defined below) under the DIP Facility;<br><br>vi.   dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code; and<br><br>vii.   30 days after the date on which the Motion is filed (or such later date as agreed to by the DIP Agent), unless the Replacement Final DIP Order has been entered by the Bankruptcy Court on or prior to such date (such earliest date, the "**DIP Termination Date**"). | Replacement DIP Term Sheet - #7 |
| **Prepayments** Bankruptcy Rule 4001(c)(1)(B) | <u>Voluntary Prepayments</u>: The Replacement DIP Loans may be prepaid at any time, after entry of the Replacement Final DIP Order, subject to payment of the Exit Premium <u>provided</u>, that, any Replacement DIP Loans voluntarily prepaid prior to the Final Order may be re-drawn after entry into the Final Order.<br><br><u>Mandatory Prepayments</u>: Mandatory prepayment of the Replacement DIP Loans together with all previously uncapitalized interest then accrued and owing on such portion of the Replacement DIP Loan then being prepaid, including any Exit Premium shall be required from:<br><br>1.   Net proceeds from any sale, sale/leaseback, sublease of any real estate (or interests therein) identified in the Replacement DIP Term Sheet; and | Replacement DIP Term Sheet - #15 |

WEIL:\98991236\11\39031.0011

| MATERIAL TERMS | LOCATION |
|---|---|
| 2. Any Excess Cash (meaning any cash on hand (other than in the Carve-out Account)) in excess of $50 million as at the last day of each month, such prepayment being required on the fifth (5th) Business Days of each calendar month.<br><br>Such prepayments, in each case, shall be applied first to any previously uncapitalized interest then accrued and owing on such portion of the Replacement DIP Loan then being prepaid, second, to payment of any Exit Premium, third, to any accrued and unpaid fees and expenses owing to the Replacement DIP Agent or the Replacement DIP Lenders which are then due and owing and fourth, to the unpaid principal amount of the Replacement DIP Loans then outstanding. | |
| **Conditions to Closing**<br>Bankruptcy Rule 4001(c)(1)(B) | The closing and the obligation of the Replacement DIP Lender to make the Initial Draw includes usual and customary for financings of this type, including, among other things:<br><br>(a)   entry of the Interim Order, which order shall not be stayed or subject to appeal;<br><br>(b)   delivery of the Initial Budget and any subsequent Budget as applicable;<br><br>(c)   the payment in full of the obligations under, and the termination of, the Existing DIP Credit Agreement (as defined below) and the inclusion in the Interim Order of provisions terminating all liens granted to the agent and lenders thereunder effective as of the date of the Proposed Replacement Interim DIP Order;<br><br>(d)   customary stipulations by the Debtors and their estates disclaiming the existence of any claims or causes of action against each of the DIP Agent and DIP Lender, subject to a customary challenge period by the official committee of unsecured creditors; and<br><br>(e)   delivery by the Debtors of the notice of intent to terminate referenced in section 6(b)(ii) of the Restructuring Support Agreement dated as of December 22, 2022 entered into between the Debtors and the Consenting Creditors (as defined therein) (the "**RSA**") to the Ad Hoc Group Advisors (as defined in the RSA) (it being agreed that a copy of such notice shall have been provided to the Replacement DIP Agent for its review and reasonable comment prior to the Debtors' delivery thereof, as well as a final copy of such notice as so delivered by the Debtors).<br><br>The right of the Loan Parties to request, and the obligation of the DIP Lenders to advance, any Other Draws, shall also be subject to certain closing conditions, including, but not limited to:<br><br>(a)   execution and delivery of a credit agreement (the "**DIP Credit Agreement**") and other Replacement DIP Documents evidencing the Replacement DIP Facility, in each case, which shall be in form and substance substantially consistent with the Term Sheet and otherwise in form and substance acceptable to | Replacement DIP Term Sheet - #17, 18 |

WEIL:\98991236\11\39031.0011

| MATERIAL TERMS | | LOCATION |
|---|---|---|
| | the Replacement DIP Agent and the Replacement DIP Lender and the Borrowers and the Guarantors; | |
| | (b)   not later than 30 days following the date on which a motion to approve the Replacement DIP Facility is filed, the Proposed Replacement Final DIP Order as to the Replacement DIP Facility shall have been entered by the Bankruptcy Court, which the Proposed Replacement Final DIP Order shall be in the form of the Interim Order with such changes as are customary for a final order and such other changes as the DIP Agent may reasonably require and/or the parties may mutually agree, in all cases, to be acceptable to the Replacement DIP Agent; and | |
| | (c)   The RSA shall have been fully terminated and shall be of no further force or effect. | |
| **Superpriority Expense Claims** Bankruptcy Rule 4001(c)(1)(B)(i) | Subject to the Carve Out, the Replacement DIP Agent and Replacement DIP Lenders are granted DIP Superiority Claims granted on account of all Replacement DIP Obligations | Proposed Replacement Interim DIP Order, ¶ 7.<br><br>Replacement DIP Term Sheet - #23 |
| **Collateral and Priority** Bankruptcy Rule 4001(c)(1)(B)(i), 4001(c)(1)(B)(ii) | Subject to the Carve-Out, all Replacement DIP Obligations in respect of the Replacement DIP Facility shall be:<br><br>1.   secured, pursuant to Section 364(c)(2) of the Bankruptcy Code, by a valid, enforceable, fully perfected and automatic first priority lien on all property and assets (or interests therein) of the Borrowers' and the Guarantors' estates (whether tangible, intangible, real, personal or mixed and wherever located) as of the Petition Date that, as of the Petition Date, was unencumbered (the "**First Priority DIP Collateral**"); including, without limitation, all real property and the facility located in Marble, North Carolina; and<br><br>2.   secured, pursuant to Section 364(c)(3) of the Bankruptcy Code, by a valid, enforceable, fully perfected and automatic junior priority lien on all property (or interest therein) of the Borrowers' and Guarantors' estates (whether tangible, intangible, real, personal or mixed and wherever located) as of the Petition Date that (and subject and junior only to that):<br><br>     a.   is subject to valid, perfected, and nonavoidable liens in existence as of the Petition Date (including mortgages, mechanics' liens and fixture filings disclosed to the Replacement DIP Agent and the Replacement DIP Lender); limited, with respect to all real property and the facilities, to those located in:<br><br>        i.   Calvert City, Kentucky; | Proposed Replacement Interim DIP Order, ¶ 6.<br><br>Replacement DIP Term Sheet - #16 |

14

| MATERIAL TERMS | LOCATION |
|---|---|
|  | |

      ii.   Grand Forks, North Dakota;

     iii.   Muskogee, Oklahoma;

     iv.   Barstow, Texas (Cedarvale);

      v.   Pecos, Texas (Cottonwood); and

     vi.   Dalton, Georgia; and

    b.   is subject to valid liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code (this clause (2) being collectively, the "**Second Priority DIP Collateral**" and together with the First Priority DIP Collateral, the "**Replacement DIP Collateral**"); provided, however, that any Replacement DIP Liens (as defined below) in already encumbered collateral shall be junior to any adequate protection liens granted to existing creditors secured by such collateral.

   3.   upon entry of the Final Order, the proceeds of any causes of actions for preferences, fraudulent conveyances, and other avoidance power claims under sections 502(d), 544, 545, 547, 548, and 550 of the Bankruptcy Code (the "**Avoidance Actions**") (but not, for the avoidance of doubt, the Avoidance Actions themselves), and

   4.   any and all rents, issues, products, offspring, proceeds, and profits generated by any item of DIP Collateral, without the necessity of any further action of any kind or nature by the Replacement DIP Agent or the Replacement DIP Lender in order to claim or perfect such rents, issues, products, offspring, proceeds, and/or profits.

The DIP Liens shall be subject to the following priorities (subject in each case to the Carve-Out):

   1.   <u>First-Priority Liens on Unencumbered Property</u>.  Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected first-priority liens and security interests in all First-Priority DIP Collateral (the "Frist-Priority DIP Liens"), which First-Priority DIP Liens shall be junior and subordinated only to the Carve-Out.

   2.   <u>Liens Junior to Certain Other Liens</u>.  Pursuant to sections 364(c)(3) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected liens and security interests in all Junior-Priority DIP Collateral (the "Junior-Priority DIP Liens"), which Junior-Priority DIP Liens in such Junior Priority DIP Collateral shall be subject only to the (a) Carve-Out, in all respects, and, as applicable (b)(1) the Prior Senior Liens, (2) the Equipment

| MATERIAL TERMS | LOCATION |
|---|---|
| | Lender Adequate Protection Liens, (3) the Prepetition Notes Liens, and (4) the Noteholder Adequate Protection Liens.<br><br>The liens securing the Replacement DIP Facility (the "**Replacement DIP Liens**") shall mean the liens described above.  The Replacement DIP Liens described herein shall, to the fullest extent permitted by applicable law, be effected and perfected upon entry of the Proposed Replacement Interim DIP Order and without the necessity of the execution of mortgages, landlord agreements, security agreements, pledge agreements, control agreements, financing statements or other agreements. | |
| **Covenants**<br>Bankruptcy Rule 4001(c)(1)(B) | <u>Affirmative Covenants:</u> Usual and customary affirmative covenants for financings of this type including stipulations to, among other things:<br><br>1. Permitting Administrative Agent to inspect properties of the Debtor;<br><br>2. Keep adequate records and books of account with respect to its business activities and furnish same to Administrative Agent;<br><br>3. Provide notice of certain legal and pending legal actions against the Debtors;<br><br>4. Comply will all Applicable Laws;<br><br>5. Continue paying obligations and taxes and comply with applicable law in all material respects;<br><br>6. Maintain satisfactory insurance;<br><br>7. Keep each License affecting any collateral;<br><br>8. Deliver updated budgets, cash flow forecasts, and variance reports;<br><br>9. the Loan Parties and the Replacement DIP Agent agree to discuss in good faith with potential providers thereof and the Replacement DIP Agent an agreement to provide for forward sales or hedging agreements with respect to the Loan Parties' Bitcoin present and anticipated Bitcoin inventory; and<br><br>10. the Loan Parties shall covenant and agree to timely and diligently pursue and prosecute the termination of the RSA and to take such actions as are required pursuant to the terms of the RSA to effect the such termination by a date no later than the date the Replacement Final DIP Order is entered.<br><br><u>Negative Covenants:</u> Usual and customary negative covenants for financings of this type including stipulations to not, among other things, other than in accordance with the Replacement DIP Loan Agreement:<br><br>1. Incur, create, assume, or permit indebtedness generally except Permitted Debt; | Replacement DIP Term Sheet - #20, 21 |

| MATERIAL TERMS | LOCATION |
|---|---|
| 2. Create, incur, assume, or permit existence of any liens on any property or assets, except for Permitted Liens;<br><br>3. Declare or make any Distributions, except as permitted under the Replacement DIP Loan Agreement;<br><br>4. Make any Restricted Investment;<br><br>5. Make any Asset Disposition, except a Permitted Asset Disposition;<br><br>6. Make any payment or any Creditor Distribution with respect to any Debt, except payments to the extent permitted by, and made in accordance with, the Approved Budget or Replacement DIP Order;<br><br>7. The Loan Parties shall not take, participate or support any action, motion or claim to rescind its termination of, or to continue or reinstate the RSA, or shall cease or fail to take the actions specified in Affirmative Covenant 10 above; and<br><br>8. It is agreed that such covenants will permit (a) sales of (i) Bitcoin in the ordinary course and (ii) non-core assets (it being agreed that non-core assets shall NOT include the Debtors' real estate listed in Section 16 of the Replacement DIP Term Sheet) and, with the Replacement DIP Agent's prior consent, the Debtors' real estate listed in Section 16 of the Replacement DIP Term Sheet, so long as, in each case, net proceeds (including reductions to satisfy claims of other lienholders with respect to such assets including amounts to be escrowed or otherwise required to be held back or segregated by the Bankruptcy Court) thereof are used to repay the Replacement DIP Obligations (including any applicable Exit Premium) and (b) (i) transactions with respect to miners and equipment in the ordinary course of business and (ii) subject to the consent of the Replacement DIP Agent (subject to thresholds to be agreed) (x) the ability to reject or modify contracts, and (y) settlements of litigation.<br><br>Usual and customary financial covenants for financings of this type including stipulations to, among other things:<br><br>(a) Comply with budget and variance covenants; and<br><br>(b) Not incur payment obligations or make payment disbursement unless in compliance with the Approved Budget, in compliance with the liquidity and budget covenants, and no Event of Default exists or arises at such time. | |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Usual and customary events of default for financings of this type, including but not limited to:<br><br>(a) the entry of the Replacement Final DIP Order shall have not occurred within 30 days after the date the Motion is filed; | Replacement DIP Term Sheet - #26 |

| MATERIAL TERMS | LOCATION |
|---|---|
| (b) The failure to pay principal, interest and other amounts when and as required by the Replacement DIP Loan Agreement, subject to certain grace periods, as applicable; <br><br> (c) Any representation or warranty being incorrect when made by or on behalf of any Obligor in connection with any Loan Document in a material respect; <br><br> (d) the entry of an order in any of the Chapter 11 Cases granting relief from any stay or proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed with foreclosure against any material assets of the Loan Parties to which the fair market value of which exceeds $20,000,000; provided, however, that any such order with respect to the assets of either (x) BlockFi Lending LLC ("**BlockFi**") or (y) NYDIG or their affiliates (so long as (i) relating solely to such equipment provided by such party, or in the case of BlockFi, the debt owing to BlockFi pursuant to its agreements as in effect prior to the Petition Date and (ii) such arrangement shall not result in the improvement or enhancement of such party's claims in the Chapter 11 Cases or security or priority position with respect to any of the Debtors' collateral) shall not be an Event of Default; and <br><br> (e) The RSA is not fully and finally terminated and/or has not ceased to be in full force and effect on or prior to the date upon which the Final Order is to be entered; | |
| **Milestones** <br> Bankruptcy Rule 4001(c)(1)(B)(vi) | None. <br><br> The Final Replacement DIP Order must be entered into by no later than 30 days following the filing of the Motion. | Replacement DIP Term Sheet - #18, 27 |
| **Carve Out** <br> Bankruptcy Rule 4001(b)(1)(B)(iii) | Equal to the sum of: <br><br> (i) all fees required to be paid to the clerk of the Court and to the U.S. Trustee plus interest at the statutory rate; <br><br> (ii) all reasonable and documented fees and expenses, in an aggregate amount not to exceed $50,000, incurred by a trustee; <br><br> (iii) to the extent allowed at any time, whether by interim order, final order, or other order, all accrued but unpaid fees and expenses (excluding any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors) (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "**Debtor Professionals**") and the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**", and together with the Debtor Professionals, the "**Professional Persons**") at any time on or before the date of delivery by the Replacement DIP Agent (at the instruction of the Replacement DIP Lender) of a Carve Out Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Notice (the amounts set | Proposed Replacement Interim DIP Order, ¶ 22. <br><br> Replacement DIP Term Sheet - #25 |

18

| MATERIAL TERMS | | LOCATION |
|---|---|---|
| | forth in the foregoing <u>clauses (i), (ii) and (iii)</u>, the "**Pre-Carve Out Notice Amount**"); and<br><br>(iv) Allowed Professional Fees of Professional Persons incurred after the date of delivery by the Replacement DIP Agent (at the instruction of the Replacement DIP Lender) of the Carve Out Notice, to the extent allowed at any time, whether by interim order, final order, or other court order, in an aggregate amount not to exceed $2.0 million (the amount set forth in this <u>clause (iv)</u> being the "**Post-Carve Out Notice Amount**", and together with the Pre-Carve Out Notice Amount, the "**Carve Out Amount**"). | |
| **Terms of Use and Purposes for Use of DIP Proceeds and Cash Collateral**<br>Bankruptcy Rule 4001(c)(1)(B) | The proceeds of the Replacement DIP Facility shall be used only for the following purposes and, in the case of payments pursuant to clauses (ii), (iii), and (iv) below, subject to the Budget, the Carve-Out and any permitted variances as set forth below<br><br>i.         Payment in full of the obligations under that certain senior secured super-priority debtor-in-possession loan and security agreement, dated as of December 22, 2022 (the "Existing DIP Credit Agreement"), among the Borrowers, the lenders party thereto from time to time and Wilmington Savings Fund Society, FSB, as administrative agent, including, without limitation, any fees, premiums, costs or expenses related thereto; it being agreed that such amounts shall be payable from the Borrowers' existing cash at such time (including the Initial Draw);<br><br>ii.         working capital and other general corporate purposes of the Borrowers and the Guarantors and certain subsidiaries;<br><br>iii.         any adequate protection payments in accordance with the Proposed DIP Orders;<br><br>iv.         professional fees and expenses of administering the Chapter 11 Cases, to the extent the Bankruptcy Court authorizes payment (including fees incurred prior to the Closing Date);<br><br>v.         fees and expenses payable under the DIP Facility;<br><br>vi.         interest and other amounts payable under the DIP Facility; and<br><br>vii.         funding of the Carve-out Account.<br><br>Proceeds of the Replacement DIP Loans and Cash Collateral may not be used for certain enumerated purposes that are contrary to the rights and interests of the Prepetition Secured Parties and Replacement DIP Secured Parties (e.g., for investigations and litigation against such parties, incurring indebtedness without prior consent of the Replacement DIP Agent, etc.). | Replacement DIP Term Sheet - #13<br><br>Proposed Replacement Interim DIP Order, ¶ 24. |
| **Parties with an Interest in Cash Collateral**<br>Bankruptcy Rule 4001(b)(1)(B)(i) | Prepetition Secured Parties | Proposed Replacement Interim DIP Order, ¶ 12. |

| MATERIAL TERMS | LOCATION |
|---|---|
| **Liens, Cash Payments or Adequate Protection Provided for Use of Collateral and Cash Collateral** Bankruptcy Rule 4001(b)(1)(B)(iv) | <u>Adequate Protection to Prepetition Secured Parties.</u>  The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their Prepetition Liens in Prepetition Collateral (including Cash Collateral), as follows (the liens, security interests, payments and other obligations set forth in paragraph **Error! Reference source not found.** of the Proposed Replacement Interim DIP Order are collectively referred to herein as the "**Noteholder Adequate Protection Obligations**"): <br><br> a) *Noteholder Adequate Protection Claims.*  The Prepetition Agents, for their own benefit and for the benefit of the Prepetition Secured Noteholders, are hereby granted, in the amount of any aggregate Diminution in Value of the Prepetition Liens in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, superpriority administrative expense claims contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors (the "**Noteholder Adequate Protection Claims**"), which shall be payable by each of the Debtors on a joint and several basis, and shall have recourse to all Replacement DIP Collateral.  The Noteholder Adequate Protection Claims shall be (a) subject and subordinate only to the Carve Out and the DIP Superpriority Claims, (b) *pari passu* with the Equipment Lender Adequate Protection Claims (as defined below), and (c) senior to any and all other administrative expense claims and all other claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever. <br><br> b) *Noteholder Adequate Protection Liens.*  The Prepetition Agents, for the benefit of themselves and for the benefit of the Prepetition Secured Noteholders, are hereby granted, effective and perfected as of the entry of the Proposed Replacement Interim DIP Order, and without the necessity of the execution, recordation or filing by any of the Prepetition Secured Parties of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title for titled goods, or any similar document or instrument, or the taking of any other action (including entering into any control agreements or taking possession or control of any Prepetition Secured Notes Collateral), in the amount of any aggregate Diminution in Value of the Prepetition Notes Liens in the Prepetition Secured Notes Collateral (including Cash Collateral) from and after the Petition Date, valid, binding, enforceable and automatically perfected postpetition liens and security interests in all DIP Collateral (the "Noteholder Adequate Protection Liens").  The Noteholder Adequate Protection Liens shall be (i) junior and subordinated only to (A) the Carve-Out, (B) the First-Priority DIP Liens, (C) the Prior Senior Liens, and (D) the Equipment Lender Adequate Protection Liens in the Prepetition Equipment Financing Collateral, (ii) *pari passu* with the Equipment Lender Adequate Protection Liens in First-Priority DIP Liens, and (iii) senior to any and all other liens and security | Proposed Replacement Interim DIP Order, ¶ 10, 11, 42. |

WEIL:\98991236\11\39031.0011

| MATERIAL TERMS | LOCATION |
|---|---|

interests in the DIP Collateral, including the Equipment Lender Adequate Protection Liens.

c) *Noteholder Professional Fees and Expenses.* The Replacement DIP Loan Parties are authorized and directed to pay, without the necessity of filing fee applications with the Court or compliance with the U.S. Trustee's fee guidelines, all of the out of pocket fees, costs and expenses of (i) the Prepetition Agents, including, the reasonable and documented fees and expenses of Shipman & Goodwin LLP, counsel to the Prepetition Agents, and (ii) the fees and expenses of the Ad Hoc Group, including, the reasonable and documented fees and expenses of (A)Paul Hastings LLP, as counsel to the Original DIP Lenders and the Ad Hoc Group and (B) Moelis & Company, LLC ("**Moelis**"), as investment banker and financial advisor to the Original DIP Lenders and the Ad Hoc Group, pursuant to the terms of that certain letter agreement by and among Core Scientific and Moelis (collectively, the "**Noteholder Professional Fees and Expenses**")

d) *Reporting.* The Debtors shall contemporaneously provide the Prepetition Agents and the Ad Hoc Group (and their respective advisors) with all reports, documents and other information required to be delivered to the Replacement DIP Secured Parties under the Replacement DIP Loan Documents and the Proposed Replacement Interim DIP Order.

e) *Cash Management Covenant.* The Replacement DIP Loan Parties shall maintain their cash management arrangements in a manner consistent with those described in the applicable "first day" order, which shall be in form and substance reasonably acceptable to the Replacement DIP Lender and the Ad Hoc Group.

Adequate Protection to Prepetition Equipment Lenders. Pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, as adequate protection of their purported Prepetition Equipment Liens in Prepetition Equipment Collateral, the Prepetition Equipment Lenders shall be entitled to the following:

a) Equipment Lender Adequate Protection Claims. The Prepetition Equipment Lenders are each hereby granted, in the amount of any aggregate Diminution in Value of the respective purported Prepetition Equipment Liens in Prepetition Equipment Collateral (as applicable) from and after the Petition Date, superpriority administrative expense claims contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors (the "**Equipment Lender Adequate Protection Claims**," together with the Noteholder Adequate Protection Claims, the "**Adequate Protection Claims**"), which shall be payable by each of the Debtors on a joint and several basis, and shall have recourse to all DIP Collateral. The Equipment Lender Adequate Protection Claims shall be (i) subject and subordinate

WEIL:\98991236\11\39031.0011

| MATERIAL TERMS | LOCATION |
|---|---|
| only to the Carve-Out, the DIP Superpriority Claims, and the Noteholder Adequate Protection Claims and (ii) senior to any and all other administrative expense claims and all other claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever.<br><br>b) <u>Equipment Lender Adequate Protection Liens</u>. The Prepetition Equipment Lenders are each hereby granted, effective and perfected as of the entry of the Proposed Replacement Interim DIP Order, and without the necessity of the execution, recordation or filing by the Replacement DIP Loan Parties or any of the Prepetition Equipment Lenders of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title for titled goods, or any similar document or instrument, or the taking of any other action (including entering into any control agreements or taking possession or control of any DIP Collateral), in the amount of any aggregate Diminution in Value of the purported Prepetition Equipment Liens in the Prepetition Equipment Financing Collateral (as applicable) from and after the Petition Date, valid, binding, enforceable and automatically perfected post-petition liens and security interests in all DIP Collateral (the "Equipment Lender Adequate Protection Liens," and together with the Noteholder Adequate Protection Liens, the "Adequate Protection Liens"). The Equipment Lender Adequate Protection Liens shall be (i) junior and subordinated to (A) the Carve-Out, (B) the First-Priority DIP Liens in First-Priority DIP Collateral, (C) the Noteholder Adequate Protection Liens in Prepetition Secured Notes Collateral, and (D) the Prior Senior Liens (other than the Prepetition Equipment Liens that constitute Prior Senior Liens), (ii) *pari passu* with the Noteholder Adequate Protection Liens in the First-Priority DIP Collateral, and (iii) senior to the DIP Liens in Prepetition Equipment Financing Collateral (as applicable) and the Noteholder Adequate Protection Liens in Prepetition Equipment Financing Collateral (as applicable). | |
| **Determination Regarding Prepetition Claims**<br>Bankruptcy Rule 4001(c)(1)(B)(iii) | The Proposed Replacement Interim DIP Order contains stipulations of fact by the Debtors, including those related to the validity and enforceability of the Debtors' prepetition unsecured obligations with the Replacement DIP Lender and secured obligations with respect to the Prepetition Secured Parties. | Proposed Replacement Interim DIP Order, ¶ E, F. |
| **Liens on Avoidance Actions**<br>Bankruptcy Rule 4001(c)(1)(B)(xi) | Subject to entry of the Replacement Final DIP Order, the Replacement DIP Agent and the Replacement DIP Lender will receive a lien on the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code. | Proposed Replacement Interim DIP Order, ¶ 6. |
| **Effect of Debtors' Stipulations on Third Parties**<br>Bankruptcy Rule 4001(c)(1)(B)(iii), (viii) | Subject to the Challenge Period, the stipulations, admissions, agreements, and releases contained in the Proposed Replacement Interim DIP Order shall be binding upon the Debtors, any statutory or non-statutory committees, and all other parties in interest. The "**Challenge Period**", collectively, means the date that is (i) sixty (60) calendar days from the date of entry of the Proposed Replacement Interim DIP Order, (ii) such | Proposed Replacement Interim DIP Order, ¶ 23. |

| MATERIAL TERMS | LOCATION |
|---|---|
| | later date as has been agreed to in writing by the Replacement DIP Agent (acting at the instruction of the Replacement DIP Lender) and the affected Prepetition Agent (acting at the instruction of the requisite Prepetition Secured Parties under the affected Prepetition Notes Documents), or (iii) such later date as has been ordered by the Court, for cause shown, upon a motion filed with the Court prior to the Initial Challenge Deadline. | |
| **Waiver or Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby vacated and modified, without application to or further order of this Court, to permit: (a) the Replacement DIP Loan Parties to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the Replacement DIP Secured Parties may request to assure the perfection and priority of the DIP Liens, (b) the Replacement DIP Loan Parties to incur all liabilities and obligations to the Replacement DIP Secured Parties as contemplated under the Proposed Replacement Interim DIP Order and the Replacement DIP Loan Documents, (c) the Debtors to grant the Adequate Protection Liens and the Adequate Protection Claims, and to perform such reasonable acts as the Prepetition Agents may reasonably request to assure the perfection and priority of the Adequate Protection Liens, (d) the DIP Loan Parties to incur liabilities and obligations to the Prepetition Secured Parties related to the Adequate Protection Obligations, as contemplated under the Proposed Replacement Interim DIP Order, (e) the Replacement DIP Loan Parties to pay all amounts required hereunder and under the Replacement DIP Loan Documents, (f) the Replacement DIP Secured Parties and the Prepetition Secured Parties to retain and apply payments made in accordance with the terms of the Proposed Replacement Interim DIP Order and the DIP Loan Documents (as applicable), (g) subject to paragraph 20(b) of the Proposed Replacement Interim DIP Order, the Replacement DIP Secured Parties to exercise, upon the occurrence of any DIP Termination Event (as defined below), all rights and remedies provided for in the Proposed Replacement Interim DIP Order, the Replacement DIP Loan Documents, or applicable law, (h) the Replacement DIP Loan Parties to perform under the Proposed Replacement Interim DIP Order and the Replacement DIP Loan Documents, and to take any and all other actions that may be necessary, required or desirable for the performance by the Replacement DIP Loan Parties under the Proposed Replacement Interim DIP Order and the Replacement DIP Loan Documents and the implementation of the transactions contemplated hereunder and thereunder, and (i) the implementation of all of the terms, rights, benefits, privileges, remedies, and provisions of the Proposed Replacement Interim DIP Order and the Replacement DIP Loan Documents.<br><br>The automatic stay shall be modified to the extent necessary to permit the Replacement DIP Agent or the Prepetition Agents to take all actions, as applicable, regarding perfection of Replacement DIP Liens and Adequate Protection Liens.<br><br>The Replacement DIP Loan Parties shall immediately provide notice to counsel to the Replacement DIP Agent, the Replacement DIP Lender, the Prepetition Agents, and the Ad Hoc Group of the occurrence of any DIP Termination Event.  Upon the occurrence of a DIP Termination Event, | Proposed Replacement Interim DIP Order Preamble ¶ (f), 15, 16(c), 20(b). |

| MATERIAL TERMS | LOCATION |
|---|---|
| without further application to or order from the Court, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the Replacement DIP Agent (acting at the instruction of the Replacement DIP Lender) and/or, with respect to clause (vi) below, the Prepetition Agents (acting at the instruction of the requisite Prepetition Secured Parties under the applicable Prepetition Notes Documents), as applicable, to take any of the following actions, at the same or different time: (i) deliver a written notice (which may be via electronic mail) to lead restructuring counsel for the Debtors, the U.S. Trustee and lead restructuring counsel for the Official Committee (the "**Remedies Notice**") declaring the occurrence of a DIP Termination Event (such date, the "**DIP Termination Declaration Date**") and/or deliver a Carve-Out Notice, (ii) declare the termination, reduction or restriction of the commitments under the Replacement DIP Facility (to the extent any such commitment remains), (iii) declare all Replacement DIP Obligations to be immediately due and payable, without presentment, demand or protest or other notice of any kind, all of which are expressly waived by the Replacement DIP Loan Parties, (iv) declare the termination of the Replacement DIP Facility and the Replacement DIP Loan Documents as to any further liability or obligation thereunder, but without affecting the DIP Liens, the DIP Superpriority Claims or the Replacement DIP Obligations, (v) declare the reduction or restriction on the Replacement DIP Facility or the Replacement DIP Loan Documents, (vi) declare the termination, restriction or revocation of the ability of the Debtors to use Cash Collateral, (vii) invoke a Cash Dominion Period and/or sweep all cash or other amounts contained in the DIP Funding Account, and (viii) charge interest at the default rate set forth in the Replacement DIP Credit Agreement; provided that following the occurrence of a DIP Termination Event, prior to the exercise or enforcement of any rights against DIP Collateral or Prepetition Secured Notes Collateral (as the case may be), the Replacement DIP Agent (acting at the instruction of the Replacement DIP Lender) and/or the Prepetition Agents (acting at the instruction of the requisite Prepetition Secured Parties under the applicable Prepetition Notes Documents), as applicable, shall be required to file a motion with the Court on five (5) Business Days' notice (subject to the Court's availability) seeking an emergency hearing (the "**Stay Relief Hearing**") to determine whether a DIP Termination Event has occurred (and the Replacement DIP Loan Parties and the Official Committee shall not object to the shortened notice with respect to such Stay Relief Hearing). In the event the Court determines during a Stay Relief Hearing that a DIP Termination Event has occurred, the Court may fashion an appropriate remedy, which may include, inter alia, the exercise of any and all rights or remedies available to the Replacement DIP Secured Parties under the Proposed Replacement Interim DIP Order, the Replacement DIP Loan Documents or applicable law against the DIP Collateral; *provided* that the Debtors' rights to contest such relief are expressly preserved. | |
| **Waiver or Modification of Authority to File a Plan, Extend Time to File Plan,** | The limitations on parties' abilities to file a plan, request cash collateral, or request authority to obtain credit without the consent of the Replacement DIP Loan Parties or the Prepetition Loan Parties are still being negotiated. At a minimum, the Debtors may be prohibited from | |

| MATERIAL TERMS | | LOCATION |
|---|---|---|
| **Request Use of Cash Collateral, or Request Authority to Obtain Credit** Bankruptcy Rule 4001(c)(1)(B)(v) | doing so unless they seek financing that will result in Full Payment of all Replacement DIP Obligations. | |
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien** Bankruptcy Rule 4001(c)(1)(B)(vii) | DIP Liens. As security for the prompt and complete payment and performance of all Replacement DIP Obligations when due (whether upon stated maturity, prepayment, acceleration, declaration or otherwise), effective and perfected as of the entry of the Proposed Replacement Interim DIP Order, and without the necessity of the execution, recordation or filing by any of the Replacement DIP Loan Parties or the Replacement DIP Secured Parties of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title, or any similar document or instrument, or the taking of any other action (including entering into any control agreements or taking any other action to take possession or control of any DIP Collateral), the Replacement DIP Agent, for the benefit of itself and the Replacement DIP Lender, is hereby granted valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens and security interests (collectively, the "**DIP Liens**") in all DIP Collateral, in each case, subject and subordinate to the Carve-Out, and subject to the relative priorities set forth in the Proposed Replacement Interim DIP Order. <br><br> Noteholder Adequate Protection Liens. The Prepetition Agents, for the benefit of themselves and for the benefit of the Prepetition Secured Noteholders, are hereby granted, effective and perfected as of the entry of the Proposed Replacement Interim DIP Order, and without the necessity of the execution, recordation or filing by any of the Prepetition Secured Parties of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title for titled goods, or any similar document or instrument, or the taking of any other action (including entering into any control agreements or taking possession or control of any Prepetition Secured Notes Collateral), in the amount of any aggregate Diminution in Value of the Prepetition Notes Liens in the Prepetition Secured Notes Collateral (including Cash Collateral) from and after the Petition Date, valid, binding, enforceable and automatically perfected post-petition liens and security interests in all DIP Collateral (the "**Noteholder Adequate Protection Liens**"). <br><br> Equipment Lender Adequate Protection Liens. The Prepetition Equipment Lenders are each hereby granted, effective and perfected as of the entry of the Proposed Replacement Interim DIP Order, and without the necessity of the execution, recordation or filing by the Replacement DIP Loan Parties or any of the Prepetition Equipment Lenders of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title for titled goods, or any similar document or instrument, or the taking of any other action (including entering into any control agreements or taking possession or control of any DIP Collateral), in the amount of any aggregate Diminution in Value of the purported Prepetition Equipment Liens in the Prepetition Equipment Financing Collateral (as applicable) from and after the Petition Date, valid, | Proposed Replacement Interim DIP Order, ¶ 6(a); 10(b); 42(b) |

| MATERIAL TERMS | | LOCATION |
|---|---|---|
| | binding, enforceable and automatically perfected post-petition liens and security interests in all DIP Collateral (the "**Equipment Lender Adequate Protection Liens**," and together with the Noteholder Adequate Protection Liens, the "**Adequate Protection Liens**"). | |
| **Release, Waivers or Limitation on any Claim or Cause of Action** Bankruptcy Rule 4001(c)(1)(B)(viii) | Effective as of entry of the Proposed Replacement Interim DIP Order and subject to paragraph 23 thereof, the Debtors waive and release, *inter alia*, (i) the Prepetition Secured Parties, and (ii) the Replacement DIP Secured Parties, in each case, subject to the terms and provisions of the Proposed Replacement Interim DIP Order. | Proposed Replacement Interim DIP Order, Preamble ¶¶ E(d); F(e) 34. |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | The Replacement DIP Documents and Proposed Replacement Interim DIP Order contain indemnification provisions ordinary and customary for debtor-in-possession financings of this type. | Proposed Replacement Interim DIP Order, ¶ (2)(c). |
| **Section 506(c) Waiver** Bankruptcy Rule 4001(c)(1)(B)(x) | Except to the extent of the Carve Out, no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases (or any future proceedings that may result therefrom) at any time, including any costs and expenses incurred in connection with the preservation, protection, or enhancement of realization by the Replacement DIP Secured Parties upon the DIP Collateral, respectively, shall be charged against or recovered from the DIP Collateral as to Replacement DIP Secured Parties, whether pursuant to section 506(c) of the Bankruptcy Code or other similar legal or equitable doctrine or otherwise, without the prior written consent of the Replacement DIP Lender with respect to the DIP Collateral, and no such consent shall be implied, directly or indirectly, from anything contained in the Proposed Replacement Interim DIP Order (including consent to the Carve-Out or the approval of any budget hereunder) or from any other action, inaction, or acquiescence by any of the Replacement DIP Secured Parties to any charge, lien, assessment or claim against the Replacement DIP Secured Parties with respect to the DIP Collateral, whether under section 506(c) of the Bankruptcy Code or otherwise. | Proposed Replacement Interim DIP Order, ¶ 26 |
| **Section 552(b) Waiver** Bankruptcy Rule 4001(c)(1)(B) | In no event shall the Replacement DIP Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Replacement DIP Obligations, and all proceeds of DIP Collateral shall be received and applied in accordance with the Proposed Replacement Interim DIP Order, the Replacement DIP Loan Documents, as applicable; provided that the Replacement DIP Secured Parties shall use commercially reasonable efforts to first apply all DIP Collateral (other than any proceeds from Avoidance Action), to the extent such collateral may promptly be monetized in a commercially reasonable manner, before applying any proceeds from Avoidance Actions to satisfy the DIP Obligations and the Adequate Protection Obligations, as applicable | Proposed Replacement Interim DIP Order, ¶ 27. |

## Statement Regarding Significant Provisions

10.     Pursuant to paragraph 8 of the Complex Case Procedures, the Replacement DIP Loan Agreement and/or Replacement DIP Orders contain the following provisions ("**Significant Provisions**"):

| DIP Facility Term | Relief Requested |
|---|---|
| **Sale or Plan Confirmation Milestones**<br>Complex Case Procedures ¶ 8(a) | None. |
| **Cross-Collateralization**<br>Complex Case Procedures ¶ 8(b) | The Proposed Replacement Interim DIP Order does not provide for cross collateralization. |
| **Liens on Avoidance Actions or Proceeds of Avoidance Actions**<br>Complex Case Procedures ¶ 8(d) | The Replacement DIP Collateral includes, upon entry of the Replacement Final DIP Order, any proceeds or property recovered, unencumbered or otherwise from Avoidance Actions under Chapter 5 of the Bankruptcy Code.  Proposed Replacement Interim DIP Order ¶ 6(b).<br><br>Justification.  The Debtors submit that granting Replacement DIP Liens and DIP Superpriority Claims on proceeds and property recovered in respect of Avoidance Actions is appropriate because the Replacement DIP Facility and use of Cash Collateral provide the Debtors with new money to fund the Debtors' reorganization and ensure the Debtors are able to maximize value for their estates.  Moreover, the liens were required by the Replacement DIP Lenders as a condition to extending credit, and by the Prepetition Secured Parties as a condition to permitting use of cash collateral.  The Debtors respectfully submit that granting liens on Avoidance Proceeds is an appropriate under these circumstances because it is subject to a final order and will allow parties in interest the opportunity to object. |
| **Default Provisions and Remedies**<br>Complex Case Procedures ¶ 8(e) | The Proposed Replacement Interim DIP Order provides for certain Events of Default and remedies upon Events of Default, including customary termination events for, among other things, any material default, violation, or breach of the terms of the Proposed Replacement Interim DIP Order by the Debtors, the entry of the Final Order shall have not occurred within 30 days after the date on which a motion to approve the DIP Facility is filed, the RSA not being fully and finally terminated and/or has not ceased to be in full force and effect on or prior to the date upon which the Final Order is to be entered, or noncompliance, subject to any applicable grace and/or cure periods under the Motion, the Proposed Replacement Interim DIP Order or the Replacement DIP Documents.  Replacement Interim DIP Term Sheet ¶26.<br><br>Justification.  These Events of Default appropriately balance, in the Debtors' view, the Replacement DIP Lenders' need for protection and the Debtors' need for debtor-in-possession financing and continued access to Cash Collateral.  In addition, the Replacement DIP Agent must provide 5 calendar days' notice prior to exercising its rights under the |

WEIL:\98991236\11\39031.0011

| DIP Facility Term | Relief Requested |
|---|---|
| | Replacement DIP Documents and file a motion (the "**Stay Relief Motion**") seeking emergency relief from the automatic stay.  Until such time as the Stay Relief Motion has been adjudicated by the Court, the Debtors may use Cash Collateral solely to fund (i) payroll and other critical operating expenses included in (and subject to) the Approved Budget that are critically necessary to keep the Debtors' businesses operating or that have been consented to by the Replacement DIP Lenders (which consent shall not be unreasonably withheld or delayed), and (ii) the Professional Fees Escrow Amount.  Therefore, the Proposed Replacement Interim DIP Order does ***not*** provide for the automatic lifting of the stay upon an Event of Default. |
| **Releases of Claim Against Lender or Others**<br>Complex Case<br>Procedures ¶ 8(f) | Effective as of the date of entry of the Proposed Replacement Interim DIP Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of its past, present and future predecessors, successors, heirs, subsidiaries, and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits:<br><br>a)  Each of the Prepetition Secured Parties and each of their respective Representatives (in their capacities as such) from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, cross-claims, demands, defenses, objections, challenges, offsets or setoff, debts, accounts, contracts, liabilities, remedies, suits, controversies, actions, causes of action, losses, damages, indemnities, reimbursement obligations, attorneys' fees, costs, expenses or judgments, of every kind or nature whatsoever, whether matured or unmatured, known or unknown, asserted or unasserted, suspected or unsuspected, foreseen or unforeseen, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, pending or threatened, arising in law or equity, upon contract or tort, under the Bankruptcy Code, any state or federal common law, statute, rule, regulation or otherwise, in each case, that may be asserted by any of the Debtors, their respective estates, predecessors, successors or assigns, against the Prepetition Secured Parties or their respective Representatives (in their capacities as such) for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time prior to the date of the Proposed Replacement Interim DIP Order, in each case, arising under, in connection with, or related to the Proposed Replacement Interim DIP Order, the Prepetition Notes, the Prepetition Liens, the Prepetition Secured Notes Collateral, the Prepetition Secured Obligations, the Prepetition Notes Documents, the Adequate Protection Obligations, the transactions contemplated thereunder or hereunder, or the negotiation thereof or hereof, including any claim or cause of action seeking (i) any so-called lender liability, (ii) any and all claims arising under the Bankruptcy Code, whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or (iii) reduction, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, |

28

| DIP Facility Term | Relief Requested |
|---|---|
| | marshalling, surcharge or recovery, or any other related claim or cause of action with respect to the validity, enforceability, priority, scope, extent or perfection of the Prepetition Liens, the Prepetition Secured Obligations, or the Prepetition Notes Documents (as relevant); and<br><br>(b) each of the Replacement DIP Secured Parties and each of their respective Representatives (in their capacities as such) from any and all obligations and liabilities to the Replacement DIP Loan Parties (and their successors and assigns) and from any and all claims, counterclaims, cross-claims, demands, defenses, objections, challenges, offsets or setoff, debts, accounts, contracts, liabilities, remedies, suits, controversies, actions, causes of action, losses, damages, indemnities, reimbursement obligations, attorneys' fees, costs, expenses or judgments, of every kind or nature whatsoever, whether matured or unmatured, known or unknown, asserted or unasserted, suspected or unsuspected, foreseen or unforeseen, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, pending or threatened, arising in law or equity, upon contract or tort, under the Bankruptcy Code, any state or federal common law, statute, rule, regulation or otherwise, including any claim or cause of action seeking (i) any so-called lender liability, (ii) any and all claims arising under the Bankruptcy Code, whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), or otherwise, (iii) reduction, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge or recovery, in each case, that may be asserted by any of the Replacement DIP Loan Parties, their respective estates, predecessors, successors and assigns, in each case, against any of the Replacement DIP Secured Parties or their respective Representatives (in their capacities as such) for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time prior to the date of the Proposed Replacement Interim DIP Order, in connection with, arising under or related to the Proposed Replacement Interim DIP Order, the Replacement DIP Facility, the Replacement DIP Liens, the Replacement DIP Obligations, the Replacement DIP Collateral, the transactions contemplated thereunder or hereunder, or the negotiation thereof or hereof, including any claim or cause action with respect to the validity, enforceability, priority, scope, extent or perfection of the Replacement DIP Liens, the Replacement DIP Obligations or the Replacement DIP Loan Documents; *provided* that subject to the occurrence of the Closing Date, nothing contained in the foregoing shall release the Replacement DIP Secured Parties from their obligations under the Replacement DIP Facility from and after the date hereof.<br><br>Proposed Replacement Interim DIP Order ¶¶ E(d); F(e), 34. |

| DIP Facility Term | Relief Requested |
|---|---|
| | <u>Justification</u>.  The release is appropriate because (i) the Debtors are being provided consideration in the form of the Replacement DIP Facility and the and the Prepetition Secured Parties' consent to the Debtors' use of Cash Collateral, which is essential to the Debtors' ability to maximize value for their estates, and (ii) the release complies with the requirements of paragraph 8 of the Complex Case Procedures because the release is subject to the Challenge Period (i.e., no later than (i) a date that is the later of 60 days after entry of the Replacement Final DIP Order, (ii) any such later date as has been agreed to, in writing, by the applicable Prepetition Agent and the Replacement DIP Agent, and (iii) any such later date as has been ordered by the Court for cause upon a motion filed and served within any applicable period of time set forth in paragraph 33 of the Proposed Replacement Interim DIP Order).  *See* Proposed Replacement Interim DIP Order, ¶ **23**. |
| **Limitations on the Use of Cash Collateral**<br>Complex Case<br>Procedures ¶ 8(g) | Cash Collateral may not be used for certain enumerated purposes that are contrary to the rights and interests of the Lenders, the Replacement DIP Agent, and Prepetition Secured Parties (*e.g.*, for investigations and litigation against such parties).  Proposed Replacement Interim DIP Order ¶ 24.<br><br><u>Justification</u>.  These limitations are usual and customary.  The Debtors, having engaged in arm's length negotiations with the Replacement DIP Lenders, Replacement DIP Agent, Prepetition Secured Parties, agreed to limit the Debtors' use of Cash Collateral as consideration for, among other things, the provision of new money within the broader context the Debtors' value-maximizing restructuring process.  The limitation is reasonable given the facts and circumstances of these Chapter 11 cases. |

## <u>Comparison of Original DIP Facility and Replacement DIP Facility</u>

11.     As set forth in more detail in the Second Singh Declaration, the table below summarizes certain key features of both the Replacement DIP Facility and the Original DIP Facility in a side-by-side comparison.

| DIP Facility Term | Original DIP Facility | Replacement DIP Facility | Improvement vs. Original DIP Facility |
|---|---|---|---|
| **Annualized Cost of Capital on New Money** | Greater than 60% | Approximately 20% | Yes |
| **Maturity** | 6-month, with 3-month extension | 12-month, with 3-month extension | Yes |

30

| **Roll-up** | 1-to-1 roll-up, in full commitment amount upon entry of Final Order (*i.e.*, no creeping mechanism) | None | Yes |
|---|---|---|---|
| **RSA** | Linked | No link | Yes |
| **Refinancing Exit Treatment** | Exit: 115% of then-outstanding debt amount in cash | Exit: 105% of then-outstanding debt amount in cash | Yes |
| **Access to Incremental Liquidity** | Up to ~$28 million of incremental draws limited to schedule in approved budget, which requires consent from DIP Lender | Up to $35 million of incremental draws available at any time after Final Order, so long as cash balance is below $30 million | Yes |
| **Milestones** | Multiple, including regarding case timing as it relates to RSA | None, other than related to DIP documentation and Final DIP Order | Yes |
| **Potential for Challenges and Litigation** | Objections filed by the Committee and the ad hoc group of equity holders | Potentially Ad Hoc Group, regarding use of cash collateral | Yes |
| **Payment to Take Out Original DIP Facility** | No payment needed now to continue DIP Facility | Immediate payment of approximately $9 million to Original DIP Lenders for accrued interest, fees, and termination payments | No |
| **Asset Sales** | Limited to $10 million to the extent needed to fund shortfall of DIP commitments | Permitted; net proceeds used to repay Replacement DIP Facility | Yes |

## Jurisdiction

12.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

### A.  General Background

13.     On December 21, 2022 (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under the Bankruptcy Code.  The Debtors are authorized to continue to operate their business and manage their properties as debtors in

31

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Bankruptcy Rules and Rule 1015-1 of the Bankruptcy Local Rules.

14.    On January 9, 2023, the United States Trustee for Region 7 (the "**U.S. Trustee**") appointed an official committee of unsecured creditors (the "**Committee**").  No trustee or examiner has been appointed in these chapter 11 cases.

15.    On December 23 2022, the Court entered the *Interim Order (A) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (Docket No. 130) (the "**Original Interim DIP Order**").

16.    Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Michael Bros in Support of the Debtors' Chapter 11 Petitions* (Docket No. 5) (the "**First Day Declaration**").

### B.  Significant Secured Prepetition Indebtedness

17.    The following table provides a summary of the Debtors' prepetition funded debt obligations and lease arrangements (the "**Prepetition Secured Obligations**") under their prepetition s(the "**Prepetition Secured Facilities**"):[5]

| Name | Principal Amount (approximate) | Lien Priority and Collateral |
|---|---|---|
| Prepetition April NPA | $239.6 million | First priority lien on substantially all assets of the Debtors as of the Petition |

---

[5] The Debtors reserve the right to assert that any of the debt is not secured due to invalidly perfected liens or otherwise.

WEIL:\98991236\11\39031.0011

| Name | Principal Amount (approximate) | Lien Priority and Collateral |
|---|---|---|
| | | Date (except equipment subject to other liens and real estate) |
| Prepetition August NPA | $320.7 million | Second priority lien on substantially all assets of the Debtors as of the Petition Date (except equipment subject to other liens and real estate) |
| Secured Mining Equipment Financing and Leases | $284 million | First lien on the ASIC Miners set forth in each lender's agreement |
| Secured Non-Mining Financings and Leases | $20.8 million | First lien on non-mining equipment (and real estate facilities) set forth in each lender's agreement |
| Facility Mortgages | $0.8 million | Real estate facilities set forth in each lender's agreement |
| Asserted Mechanics' Liens | Over $65 million (non-duplicative) | Real estate; priority and perfection under review |

18.     Additional details for each of the Debtors' debt instruments is provided in the First Day Declaration.  A summary of the secured debt instruments is provided below.

**1.     April and August Convertible Notes.**

19.     The Debtors have two sets of convertible secured notes with nearly identical terms (the "**Prepetition April NPA**" and the "**Prepetition August NPA**", together, the "**Prepetition NPAs**").  The Prepetition April NPA is dated April 19, 2021, and the Prepetition August NPA is dated August 20, 2021.  The Prepetition NPAs maturity date is April 19, 2025.  The Prepetition NPAs carry the same interest rate and are convertible into shares of common stock of Core Scientific at a conversion price of $8.00 per share.

20.     The obligations under the Prepetition April NPA are secured pursuant to (i) that certain Security Agreement, dated as of April 19, 2021 (the "**April Convertible Notes Security Agreement**"), by and among Core Scientific Holding Co., the NPA Guarantors, as guarantors, and the Note Agent (in its capacity as collateral agent), and (ii) that certain Intellectual

33

Property Security Agreement, dated as of April 19, 2021 (the "**April Convertible Notes IP Security Agreement**").

21.     The obligations of the Debtors under the Prepetition August NPA are secured pursuant to (i) that certain Security Agreement, dated as of August 7, 2022 (the "**August Convertible Notes Security Agreement**"), by and among Core Parent, the NPA Guarantors, as guarantors, and the Note Agent (in its capacity as collateral agent for the August Convertible Notes), and (ii) that certain Intellectual Property Security Agreement, dated as of August 7, 2022 (the "**August Convertible Notes IP Security Agreement**" and collectively with the April Convertible Notes Security Agreement, the April Convertible Notes IP Security Agreement, and the August Convertible Notes Security Agreement, the "**Convertible Notes Security Agreements**")

## 2.     Secured Mining Equipment Financing and Leases.

22.     The Debtors utilized equipment leases or secured financing or arrangements to finance application-specific equipment for the mining of bitcoin (the "**ASIC Miners**").  As of the Petition Date, the Debtors have an aggregate of approximately $284 million of equipment leases and secured financing outstanding under different facilities with respective first lien security interests against approximately 91,000 of the Debtors' ASIC Miners.  The ASIC Miners are Excluded Property under such that they are not collateral for the NPA.

## 3.     Secured Non-Mining Equipment Financing and Leases.

23.     In addition to financing secured against mining equipment, the Debtors utilize secured financing and leases against non-mining assets to finance and utilize various infrastructure needs of the Debtors for their day-to-day operations.  As of the Petition Date, the Debtors have approximately $800,000 of facility mortgages, $20.8 million of non-mining equipment financing, and $9.3 million of non-mining equipment leases, each secured by various

WEIL:\98991236\11\39031.0011

assets.  Like the ASIC Miners, the assets that secure the non-mining financing and leases are considered Excluded Property under the NPA.

**C.  Need for Replacement DIP Facility and Use of Cash Collateral**

24.     As discussed in the Second Singh Declaration, the Debtors have an immediate and critical need to obtain replacement DIP financing to pay the Original DIP Facility and enter into a DIP financing with more favorable terms to maximize recoveries for all creditors.

25.     Further, the Debtors are seeking to reach an agreement with Ad Hoc Group that permits the Debtors to use Prepetition Secured Noteholders' Cash Collateral, in exchange for which the Debtors will provide adequate protection to the Prepetition Secured Noteholders.  At this time, the Debtors do not have an agreement with the Ad Hoc Group on this issue, but are continuing to work with the Ad Hoc Group to obtain consent.  If the Debtors do not obtain such consent, they will seek to use the cash collateral on a non-consensual basis.  The Approved Budget under the Replacement DIP Facility assumes access to Cash Collateral, and, absent the authority to use Cash Collateral, the Debtors' funding and operational needs are not anticipated to be met and the Debtors will likely not be able to continue operations in the ordinary course of business, which would have a detrimental impact on the value of the enterprise.

**D.  Efforts to Obtain Postpetition Financing**

26.     As set forth in the Second Singh Declaration, beginning in December 2022, the Debtors, through PJT, launched a broad marketing process designed to maximize competition and solicit proposals from a wide range of prospective lenders, including (i) creditors already in the Debtors' capital structure, (ii) banks outside of the Debtors' capital structure, (iii) institutional and alternative lenders outside the Debtors' capital structure, and (iv) strategic parties.

27.     Prior to the Petition Date, PJT contacted 24 potential lenders it believed may have been interested in providing the Debtors with postpetition financing, including an ad hoc

35

group of the Prepetition Secured Parties, B. Riley, and several alternative lenders outside of the Debtors' capital structure. Nine (9) parties signed non-disclosure agreements, and the Debtors received two (2) initial proposals, including one from the Ad Hoc Group and one from a third party that ceased negotiations prior to reaching an agreement with the Debtors.

28.     Subsequent to the entry of the Original Interim DIP Order, PJT contacted 48 potential lenders that it believed may have been interested in providing the Debtors with postpetition financing, seven (7) of which PJT had previously contacted prepetition and a number of which the financial advisors to the Committee recommended that PJT contact. Twenty (20) new parties signed non-disclosure agreements, and the Debtors received four (4) initial proposals for the Replacement DIP Facility. The Debtors negotiated with three of the four potential Replacement DIP Lenders, as the fourth proposal was received too late to be actionable in a timely manner, including trading multiple term sheets. All four potential lenders engaged in significant diligence during the postpetition DIP marketing process. The Replacement DIP Lender ultimately provided the Debtors with the best terms—as a whole—for a postpetition financing facility. Over the course of the past few days, the Debtors also provided the Ad Hoc Group with ample opportunity to improve their DIP Facility terms. Specifically, the Debtors requested that the Ad Hoc Group agree to several changes to the DIP Facility, including eliminating the Roll-Up, eliminating the default based on termination of the Restructuring Support Agreement, permitting asset sale proceeds to be used to pay off the DIP Facility, and improved economics. In addition, the Debtors shared the term sheets received from potential DIP lenders on a timely basis with both the Ad Hoc Group and the Committee. The Ad Hoc Group indicated an unwillingness to make the significant changes that would have been required to make its DIP Facility competitive with the other proposals the Debtors received.

WEIL:\98991236\11\39031.0011

29.     The negotiations with the Replacement DIP Lender were rigorous, marked by hard bargaining, and resulted in significant concessions by the Replacement DIP Lender and additional benefits to the Debtors.  It is unlikely that the Debtors would be unable to obtain this level of credit on more attractive terms, taken as a whole, within the timeframe required.

30.     Accordingly, the Replacement DIP Facility, taken as a whole, is the Debtors' best postpetition financing option and is reasonable under the facts and circumstances of Debtors' chapter 11 cases.

**Terms of Replacement DIP Facility Are Reasonable Under the Circumstances**

31.     As discussed in the Second Singh Declaration, the obligations, interest rate, fees, maturity, covenants, and lack of milestones under the Replacement DIP Facility are reasonable, taken as a whole, under the circumstances and are generally consistent with market terms for companies facing similar circumstances as the Debtors and provides the best financing option currently available to the Debtors under the circumstances.  Accordingly, the Replacement DIP Lender has acted in good faith and has agreed to provide the Replacement DIP Facility to the Debtors on terms, that are fair and reasonable under the current circumstances and market conditions.

32.     ***Junior Liens***.  A substantial portion of the Debtors' assets consists of equipment that is encumbered by secured financing arrangements other than under the Prepetition NPAs, as well as some real estate encumbered by mortgages, fixture filings and mechanics' liens. Rather than insisting on a non-consensual priming lien on such encumbered property, the Replacement DIP Lender has agreed to receive junior liens on such assets, with the goal of enhancing the collateral securing the Replacement DIP Facility and avoiding objections from these other secured parties.  While much of the Debtors' equipment and real estate assets are encumbered by equipment financing, mortgages, fixture filings and mechanics' liens, as applicable, the

37

Replacement DIP Lender would not provide capital without receiving liens that are junior to the liens securing these assets.

33. ***Liens on Unencumbered Assets.*** In addition, the Replacement DIP Lender requires a perfected first priority security interest and lien on substantially all of the Debtors' unencumbered assets. Absent such protections, the Replacement DIP Lender would not have agreed to provide the Replacement DIP Facility to the Debtors.

34. The terms of Replacement DIP Facility, including the liens being granted, are an important part of the Replacement DIP Facility that will allow the Debtors to maintain sufficient liquidity while they strive to achieve a comprehensive restructuring solution for their creditors and other stakeholders.

### Fees in Connection with Replacement DIP Facility Are Fair and Reasonable

35. The Replacement DIP Lender has committed to provide a substantial amount of capital to ensure successful execution of the Replacement DIP Facility. As discussed in the Second Singh Declaration, in view of those commitments and the circumstances of these cases, including the magnitude of the Debtors' Chapter 11 Cases and the tangible benefit to the estates of a substantial committed postpetition financing, the consideration being provided to the Replacement DIP Lender, taken as a whole, in exchange for providing such commitment, is reasonable in amount, appropriately compensates the Replacement DIP Lender for its costs and the assurances it is providing to the process, and is necessary to obtain the Replacement DIP Facility, which will permit the Debtors to both (i) continue operating their business and (ii) maximize the value of their estates.

### A. DIP Fees

36. In consideration for the Replacement DIP Agent's and Replacement DIP Lender's respective commitments in connection with the Replacement DIP facility, the Debtors

38

have agreed to, among other things, (i) pay certain fees (the "**Replacement DIP Fees**"), as discussed in the table above, (ii) pay reasonable and documented out-of-pocket fees and expenses for the Replacement DIP Lender (including reasonable and documented fees and expenses of outside counsel) (the "**Out-of-Pocket Expenses**" and, together with the Replacement DIP Fees, the "**Replacement DIP Fees and Expenses**"), and (iii) indemnify the Replacement DIP Lender in accordance with the Replacement DIP Loan Agreement.  Notwithstanding the foregoing, the Replacement DIP Loan Parties shall be authorized to make the foregoing payments whether or not the Replacement DIP Facility is consummated unless the Court rules that any Replacement DIP Lender has (x) materially breached its obligations under any Replacement DIP Loan Document or (y) failed to fund the Replacement DIP Loans as required under the Replacement DIP Loan Documents.

**B.  Replacement DIP Fees Are Reasonable**

37.    The Replacement DIP Fees were the subject of arm's-length and good-faith negotiations between the Debtors and the Replacement DIP Lender, are integral components of the overall terms of the Replacement DIP Facility, and were required by the Replacement DIP Lender as consideration for the extension of postpetition financing.  As discussed in the Second Singh Declaration, it is unlikely that a financing commitment with terms similar to those in the Replacement DIP Facility was available to the Debtors for lower fees given the existing liens against the Debtors' assets, the Debtors' liquidity position, and the overall depression in bitcoin prices that has resulted in stress within the cryptocurrency industry.

## Relief Requested Should be Granted

38.    The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances.  As set forth in the Second Singh Declaration, the Debtors were unable to

WEIL:\98991236\11\39031.0011

procure sufficient financing in the form of unsecured credit, which would be allowable under section 503(b)(1) or as an administrative expense, in accordance with sections 364(a) or (b) of the Bankruptcy Code. *See* 11 U.S.C. §§ 364(a)-(b), 503(b)(1). Having determined that postpetition financing was only available pursuant to sections 364(c) of the Bankruptcy Code, the Debtors negotiated with the Replacement DIP Lender to secure the Replacement DIP Facility on the terms described herein. For these reasons, as discussed further below, the Debtors satisfy the necessary conditions under sections 364(c) for authority to enter into the Replacement DIP Facility.

### A. The Refinancing DIP Facility Should be Approved

39. The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances. The Debtors would be unable to procure sufficient financing in the form of unsecured credit, which would be allowable under section 503(b)(1) or as an administrative expense, in accordance with sections 364(a) or (b) of the Bankruptcy Code. *See* 11 U.S.C. §§ 364(a)-(b), 503(b)(1). Having determined that postpetition financing was only available pursuant to sections 364(c) and (d) of the Bankruptcy Code, the Debtors negotiated with B. Riley to secure the Replacement DIP Facility on the terms described herein. For these reasons, and as discussed further below, the Debtors satisfy the necessary conditions under section 364 for authority to enter into the Replacement DIP Facility.

### 1. Entry into the Replacement DIP Facility and Repayment of the Original DIP Facility is an Exercise of the Debtors' Sound Business Judgment

40. Several reasons justify the relief requested herein:

    i. The Debtors expect that vendors, customers, and their employees will be highly focused on whether these chapter 11 cases are appropriately funded.

    ii. The terms of the Replacement DIP Facility, taken as a whole, are superior to the terms of the Original DIP Facility.

iii.    The Debtors are required to have their Original DIP Facility entered on a final basis or paid off by February 1, 2023. Immediate access to Replacement DIP Facility is therefore critical to repay the Original DIP Facility and ensure sufficient working capital to operate their business and to administer their estates.

iv.    The Debtors' proposed interim draw of up to $35 million under the Replacement DIP Facility is necessary for the Debtors to avoid immediate and irreparable harm to their estates.

v.    Negotiations with the proposed Replacement DIP Lender were conducted in good faith and at arms' length. As confirmed by the Debtors' prepetition process to solicit proposals for third-party debtor-in-possession financing, there is no better alternative financing available to the Debtors in the market. The Replacement DIP Facility, taken as a whole, is reasonable under the facts and circumstances and is the Debtors' best available option.

For those reasons and the reasons set forth below, the Debtors respectfully request that the Court grant the relief requested herein.

41.    If an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts give debtors considerable deference in acting in accordance with their sound business judgment in obtaining such credit. *See, e.g.*, *In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (Docket No. 21) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

41

42.     Courts generally will not second-guess a debtor's business decisions when those decisions involve the appropriate level of care in arriving at the decision on an informed basis, in good faith, and in the honest belief that the action was taken in the best interest of the debtor.  *See In re Los Angeles Dodgers LLC*, 457 B.R. at 313.  To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'"  *In re Dura Auto. Sys. Inc*., No. 06-11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted).  Further, in considering whether the terms of postpetition financings are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855—86 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Tr. Co. of Escanaba (In re Ellingsen MacLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

43.     The Debtors' determination to move forward with the Replacement DIP Facility is a sound exercise of their business judgment following a thorough process conducted with the guidance of experienced advisors, and after careful evaluation of alternatives.  Given the nature of the Debtors' relatively limited unencumbered asset pool, the Replacement DIP Lender is the best available financing source that could commit to a facility on the most favorable terms, and is a better financing source than that of the previous Original DIP Facility.  The Debtors negotiated the Replacement DIP Loan Agreement with the Replacement DIP Lender in good faith, at arm's length, and with the assistance of their advisors, and the Debtors believe that they have obtained the best financing available in an amount sufficient to fund operations and the costs of these chapter 11 cases, and on reasonable terms.

WEIL:\98991236\11\39031.0011

44.     Additionally, the removal of (i) the Roll-Up, (ii) the linking of DIP financings to the RSA, and (iii) significant milestones contained the Original DIP Facility allows the Debtors the flexibility in pursuit of a potential chapter 11 plan.  Further, the lower overall cost of capital provided under the Replacement DIP Facility will allow for more value to be allocated to the Debtors' stakeholders.  Accordingly, the Court should authorize the Debtors' entry into the Replacement DIP Documents as a reasonable exercise of the Debtors' business judgment.

## 2.     Debtors Should Be Authorized to Obtain Replacement DIP Financing on a Secured and Superpriority Basis

45.     The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances.  Specifically, section 364(c) of the Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien[.]

11 U.S.C. § 364(c).

46.     To satisfy the requirements of section 364(c) of the Bankruptcy Code, Courts will consider whether (a) the debtor made reasonable effort, but failed, to obtain unsecured credit under sections 364(a) and 364(b) of the Bankruptcy Code, (b) the credit transaction benefits the debtor as necessary to preserve estate assets, and (c) the terms of the credit transaction are fair, reasonable, and adequate, given the circumstances of the debtor and proposed lender.  *See In re Republic Airways Holdings Inc.*, No. 16-10429(SHL) 2016 WL 2616717, at *11 (Bankr. S.D.N.Y.

WEIL:\98991236\11\39031.0011

May 4, 2016); *In re Los Angeles Dodgers LLC*, 457 B.R. at 312–13; *In re Ames Dep't Stores, Inc.*, 115 B.R. at 40.  However, section 364 "imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986).

47.     First, subsequent to the entry of the Original Interim DIP Order, PJT contacted dozens of parties, received four new proposals, and negotiated with three parties before determining that the Replacement DIP Facility was the best option and superior to the Original DIP Facility for the reasons stated above.  The Court should, therefore, authorize the Debtors to provide the Replacement DIP Agent and the Replacement DIP Lenders with superpriority administrative expense status for any Replacement DIP Obligations as provided for in section 364(c)(1) of the Bankruptcy Code, with (i) first priority senior liens on the Debtors' unencumbered property pursuant to section 364(c)(2) of the Bankruptcy Code, and (ii) junior liens on all property subject to valid, perfected and non-avoidable liens in existence as of the Petition Date or perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code (other than the Primed Liens) pursuant to section 364(c)(3) of the Bankruptcy Code.

48.     Second, the Replacement DIP Facility is necessary to preserve the Debtors' estates.  The Debtors require access to the Replacement DIP Facility to pay off the Original DIP Facility and to ensure they have sufficient liquidity to operate their businesses and administer their estates in the ordinary course for the duration of these chapter 11 cases.  As discussed in the Blokh Declaration, the Interim DIP Borrowing of $35 million, along with cash on balance sheet, is projected to provide the Debtors with sufficient liquidity to repay the Original DIP Facility and fund the Debtors' operations and the Chapter 11 Cases until the final hearing.  After the final hearing, the Replacement DIP Facility will provide the Debtors with significant flexibility to

44

operate their business, including the option to draw—at their sole discretion—up to an additional $35 million, for an aggregate principal amount of up to $70 million.

49.     Third, the terms of the Replacement DIP Facility are fair, reasonable, and adequate under the circumstances.  The Replacement DIP Facility represents the most favorable source of postpetition financing and is designed to provide the Debtors with sufficient liquidity for the duration of these chapter 11 cases.

## B.  Debtors Should Be Authorized to Use Cash Collateral

50.     For the reasons set forth herein, the Debtors require use of the Cash Collateral for working capital and to fund their chapter 11 cases.  Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral.  Section 363(c) provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).  Further, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

51.     The Debtors have satisfied the requirements of sections 363(c)(2) and (e), and should be authorized to use Cash Collateral.  The Debtors expect that the Prepetition Agent will consent to the Adequate Protection to be provided pursuant to the Proposed Replacement Interim DIP Order.

45

52.     In the event the Prepetition Agent does not consent, the Debtors will demonstrate at the hearing that they are providing the Prepetition Secured Parties with adequate protection for the use of Cash Collateral.   Accordingly, the Court should grant the Debtors the authority to use Cash Collateral under section 363(c) of the Bankruptcy Code.

## C.  Debtors Should Be Authorized to Pay Fees Required by Replacement DIP Documents

53.     As described herein, the Debtors have agreed, subject to Court approval, to pay the Replacement DIP Fees in exchange for their providing the Replacement DIP Facility.  As set forth in the Second Singh Declaration, taken as a whole, the terms of the Replacement DIP Documents, including the fees imposed thereunder, are reasonable under the facts and circumstances and are the Debtors' best currently available option to maintain their ongoing business operations and to fund their chapter 11 cases.

54.     The Debtors considered the Replacement DIP Fees when determining in their sound business judgment whether entry into the Replacement DIP Facility constituted the best path forward, and the Debtors determined that paying these fees in order to obtain the Replacement DIP Facility is in the best interests of the Debtors' estates.  Accordingly, the Court should authorize the Debtors to pay the Replacement DIP Fees.

## D.  Carve-Out Is Appropriate

55.     The Replacement DIP subjects the Replacement DIP Lenders' security interests, superpriority administrative expense claims, and the adequate protection claims and liens to the Carve Out.  Without the Carve Out, the Debtors' estates or other parties in interest could be harmed because the services professionals might otherwise provide in these chapter 11 cases could be restricted.  *See In re Ames Dep't Stores*, 115 B.R. at 38 (observing that courts insist on Carve Outs for professionals representing parties in interest because "[a]bsent such protection, the

WEIL:\98991236\11\39031.0011

collective rights and expectations of all parties in interest are sorely prejudiced"). Additionally, the Carve Out protects against administrative insolvency during the pendency of the chapter 11 cases by ensuring that assets are available to pay U.S. Trustee's fees and professional fees of the Debtors and any statutory committee. Accordingly, the Debtors submit that the Carve Out is appropriate.

56.    In addition, the Carve Out enables the Debtors to pay the Original DIP Facility, enabling the Debtors to enter into the Replacement DIP Facility, which provides more favorable terms for the Debtors which will inure to the benefit of all parties in interest during these chapter 11 cases.

### E.  Replacement DIP Lenders Should Be Deemed Good Faith Lenders under Section 364(e)

57.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or to grant such liens is later reversed or modified on appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

58.    Here, the Debtors believe the Replacement DIP Facility embodies the most favorable terms on which the Debtors could obtain postpetition financing. As described in the Second Singh Declaration, the negotiations of the terms of the Replacement DIP Facility with the Replacement DIP Lenders were conducted at arms' length. Under the circumstances, the terms

47

and conditions of the Replacement DIP Documents are reasonable, and the proceeds of the Replacement DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code, in accordance with the Replacement DIP Orders and the Replacement DIP Documents and in accordance with the Budget (subject to any Permitted Variance).  Further, no consideration is being provided to any party to the Replacement DIP Documents other than as described herein. Accordingly, the Court should find that the Replacement DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and that the Replacement DIP Lenders thus are entitled to all of the protections afforded by that section.

### F.  Modification of Automatic Stay is Warranted

59.    The relief requested herein contemplates a modification of the automatic stay (if applicable) to (a) permit the Debtors to grant the security interests, liens, and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens, and (b) permit the Replacement DIP Agent, Replacement DIP Lenders, and the Prepetition Secured Parties to exercise rights and remedies under certain circumstances.  These provisions were part of the quid pro quo for the Debtors' ability to obtain the Replacement DIP Facility and use Cash Collateral as provided therein and in the Proposed Replacement Interim DIP Order.  Notably, the exercise of remedies (including remedies with respect to prepetition claims and collateral) will be subject to five calendar days' notice to allow the Debtors to cure or seek other relief.  Moreover, following the delivery of such notice, the Replacement DIP Agent may file a Stay Relief Motion seeking emergency relief from the automatic stay and until such time as the Stay Relief Motion has been adjudicated by the Court, the Debtors may use the proceeds of the Replacement DIP Facilities (to the extent drawn prior to the occurrence of the Event of Default (as defined in the Replacement DIP Loan Agreement)) or Cash Collateral to fund operations in accordance with the Replacement DIP Loan Agreement.

48

Under these circumstances, the Debtors believe that the extent of the modifications to the automatic stay under the Proposed Replacement Interim DIP Order is reasonable and should be approved.

60.     Stay modifications of this kind are ordinary and standard features of postpetition financing facilities and, in the Debtors' business judgment, are appropriate under the present circumstances. *See, e.g.*, *In re Sheridan Holding Company II, LLC*, No. 19-35198 (MI) (Bankr. S.D. Tex. October 21, 2019) (Docket No. 178) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Vanguard Natural Resources, Inc.*, No. 19-31786 (DRJ) (Bankr. S.D. Tex. April 3, 2019) (Docket No. 118) (same); *In re Southcross Holdings LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. Apr. 11, 2016) (Docket No. 183) (same); *In re Autoseis, Inc.*, No. 14-20130 (RSS) (Bankr. S.D. Tex. Mar. 27, 2014) (Docket No. 64) (same); *In re ATP Oil & Gas Corp.*, No. 12-36187 (MI) (Bankr. S.D. Tex. Aug. 21, 2012) (Docket No. 135) (same).

### G. Debtors Require Immediate Access to Cash Collateral and DIP Financing

61.     The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code if, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Fed. R. Bankr. P. 4001(b)(2), (c)(2).  In examining requests for interim relief under this rule, Courts generally apply the same business judgment standard applicable to other business decisions.  *See Ames Dep't Stores*, 115 B.R. at 36.

62.     As described in the Second Singh Declaration, the Debtors will use the Replacement DIP Facility and their cash on hand to pay off the Original DIP Facility, including approximately $9 million of take-out costs, consisting of approximately $0.5 million in accrued PIK interest, approximately $0.8 million of upfront fees, approximately $1.6 million in backstop fees, and approximately $6 million in termination fees, which were approved by the Court in the

49

Original Interim DIP Order.   Absent authority to enter into and access the proceeds of the Replacement DIP Facility, the Debtors will be either in default or subject to the inferior and burdensome terms of Original DIP Facility.   The Debtors require immediate access to the proceeds of the Replacement DIP Facility, as well as access to Cash Collateral, to repay the Original DIP Facility, finance their operations, and continue operating as a going concern during the pendency of these chapter 11 cases.   In addition, access to the Replacement DIP Facility will provide the Debtors with financial stability in the event of unforeseen circumstances attendant to the uncertain and volatile bitcoin market.   Accordingly, for the reasons set forth above, prompt entry of the Proposed Replacement Interim DIP Order is necessary to provide more flexible DIP financing that would lead to immediate benefit to the Debtors' estates.

### H.  Interests of Prepetition Secured Parties Are Adequately Protected

63.     Parties with an interest in cash collateral are entitled to adequate protection. *See* 11 U.S.C. § 363(e).  Adequate protection may be provided in various forms, including, among other things, payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims.   Thus, what constitutes adequate protection is decided on a case-by-case basis.  *See, e.g.*, *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

50

64.     The adequate protection package provided to the requisite Prepetition Secured Parties, as described above, is consensual and appropriately safeguards the Prepetition Secured Parties from the diminution in the value (if any) of their interests in the Prepetition Collateral.  The Debtors submit that their provision of adequate protection to the Prepetition Secured Parties is fair and reasonable and is sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

## **Request for Final Hearing**

65.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for consideration of entry of the Replacement Final DIP Order. The Debtors request that they be authorized to serve a copy of the signed Proposed Replacement Interim DIP Order, which fixes the time and date for the filing of any objections by first class mail upon the notice parties listed below.  The Debtors further request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

## **Compliance with Bankruptcy Rule 6004(a)**
## **and Waiver of Bankruptcy Rule 6004(h)**

66.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion satisfies Bankruptcy Rule 6004(a) and that the Court waive the 14-day period under Bankruptcy Rule 6004(h).

## **Reservation of Rights**

67.     Nothing contained herein is intended to be or shall be deemed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver or limitation of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (iv) an agreement or obligation to pay any

51

claims, (v) a waiver of any claims or causes of action which may exist against any creditor or interest holder, (vi) an admission as to the validity of any liens satisfied pursuant to this Motion, or (vii) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to dispute such claim subsequently.

## **Notice**

68.     Notice of this Motion will be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

## **No Previous Request**

69.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

[*Remainder of Page Intentionally Left Blank*]

WEIL:\98991236\11\39031.0011

WHEREFORE the Debtors respectfully request entry of the Proposed Replacement Interim DIP Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:  January 31, 2023

Houston, Texas

Respectfully submitted,

_/s/  Alfredo R. Pérez_

WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:      Alfredo.Perez@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock (admitted _pro hac vice_)
Ronit J. Berkovich (admitted _pro hac vice_)
Moshe A. Fink (admitted _pro hac vice_)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:   Ray.Schrock@weil.com
             Ronit.Berkovich@weil.com
             Moshe.Fink@weil.com

_Proposed Attorneys for Debtors_
_and Debtors in Possession_

**<u>Certificate of Service</u>**

I hereby certify that on January 31, 2023, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

                                   */s/ Alfredo R. Pérez*
                                   Alfredo R. Pérez

WEIL:\98991236\11\39031.0011