IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| CORE SCIENTIFIC, INC., *et al.*, | § | Case No. 22-90341 (DRJ) |
| | § | |
| | § | (Jointly Administered) |
| Debtors.[1] | § | |

DECLARATION OF RODI BLOKH IN SUPPORT OF
THE EMERGENCY MOTION OF DEBTORS FOR ENTRY OF INTERIM
AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN
REPLACEMENT SENIOR SECURED NON-PRIMING SUPERPRIORITY
POSTPETITION FINANCING AND (B) USE CASH COLLATERAL, (C) PAY OFF
EXISTING POSTPETITION FINANCING FACILITY, (II) GRANTING LIENS
AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE
EXPENSE STATUS, (III) GRANTING ADEQUATE PROTECTION TO THE
PREPETITION SECURED PARTIES, (IV) MODIFYING THE AUTOMATIC STAY,
(V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF

I, Rodi Blokh, pursuant to section 1746 of title 28 of the United States Code, hereby declare under the penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1.  I am above 18 years of age, and I am competent to testify. I am a Partner at AlixPartners, LLP ("**Alix**"), a restructuring and financial advisory firm with its principal offices at 909 Third Avenue, New York, New York 10022.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

2. I submit this declaration in support of the *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Replacement Senior Secured Non-priming Superpriority Postpetition Financing, (B) Use Cash Collateral, and (C) Pay Off Existing Postpetition Financing Facility (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "**Motion**").[2]

3. Since November 2022, Alix has provided financial, restructuring, and strategic advice to Core Scientific, Inc. ("**Core Scientific**") and its affiliated debtors in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), as debtors and debtors-in-possession (collectively, the "**Debtors**," and together with their non-Debtor subsidiaries, "**Core**," or the "**Company**"). Alix is the proposed financial advisor to the Company in the Chapter 11 Cases.

4. Except as otherwise indicated, all statements in this declaration are based on (i) my personal knowledge of the Debtors' operations and finances, (ii) my review of relevant documents, (iii) information provided to me by Alix employees working under my supervision, (iv) information provided to me by, or discussions with, the members of the Debtors' management team or their other advisors, and/or (v) my opinion based upon my experience as a financial restructuring professional. If called to testify, I could and would testify to each of the statements set forth herein on that basis.

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion and the *Interim Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Non-Priming Superpriority Replacement Postpetition Financing, (B) Use Cash Collateral, and (C) Pay Off Existing Postpetition Financing Facility, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "**Proposed Replacement Interim DIP Order**"), as applicable. (ECF No. 378-1).

**Qualifications and Professional Background**

5. I am a Partner in the Turnaround & Restructuring Services Group at Alix. I specialize in providing restructuring advisory services to companies, lenders, and other creditors across the capital structure.

6. Alix is an internationally recognized restructuring consulting firm with significant experience providing financial advisory services since its inception in 1981. Alix and its senior professionals have extensive experience providing financial advisory, crisis management, and restructuring services in large and complex chapter 11 cases on behalf of debtors and creditors throughout the United States, including several recent filings in this district.

7. I have been in the Turnaround & Restructuring Services Group at Alix since 2018, when Alix purchased Zolfo Cooper, LLC ("**Zolfo Cooper**"). Prior to that, I had been at Zolfo Cooper, a restructuring advisory firm, since 2013, most recently as a Director. I received an MBA from UC Berkeley's Haas School of Business, prior to which I worked at Bank of America Merrill Lynch from 2008 to 2011.

8. I have over 9 years of restructuring experience across a variety of industries and complex in-court and out-of-court distressed situations. This experience includes company or creditor roles in A&P, Bon-Ton, CarbonLITE, Dean Foods, Doral Financial, Energy Corporation of America, Haggen, Hertz, One Call, Outcome Health, Pacific Oil & Gas, Payless, Preferred Sands, Revlon, Strike, Tops, and UCI International.

**Alix's Retention**

9. On November 7, 2022, Alix was retained by Weil, Gotshal & Manges LLP ("**Weil**"), on behalf of the Debtors, to assist Weil in advising the Debtors in connection with their liquidity, cash management, and capital structure. Members of my team and I have worked closely with the Debtors' management and their other professionals in the analysis of the Debtors'

3

liquidity and business operations. As a result of this work, I have become familiar with the Debtors' liquidity needs, cash management strategies, and business operations.

10. During Alix's representation of the Debtors, I have, among other things, advised on the Debtors' finances, restructuring options, and financial outlook, including through development of the Debtors' short and long-term liquidity outlooks and funding needs analyses, subject to the various strategic alternatives being evaluated. To that end, along with my team, I have developed financial models and weekly cash flow forecasts, as well as budgets corresponding to the terms of the proposed debtor-in-possession transactions. I have participated in negotiations between the Debtors and their creditors and other parties in interest. Members of my team and I have also assisted the Debtors in reviewing the terms, conditions, and potential financial impact of various proposed transactions, including comparing iterations of debtor-in-possession financing proposals. Additionally, I have participated in numerous meetings with the Company's board of directors (the "**Board**") and its special committee (the "**Special Committee**") to, among other things, address the Debtors' liquidity needs, financial forecasts, and terms of the proposed debtor-in-possession superpriority priming senior secured financing facility described herein.

11. I am not being compensated specifically for this testimony other than through payments received by Alix as a professional proposed to be retained by the Debtors.

## The Replacement DIP Facility

12. On December 22, 2022, the Debtors filed their original budget (the "**Original Budget**") in connection with the DIP Facility (the "**Original DIP Facility**") [ECF No. 97]. The Original Budget contemplated $71.6 million in DIP financing draws. After entry of the Original Interim DIP Order, the Debtors made an initial draw of $37.5 million under the Original DIP Facility (the "**Original DIP Borrowings**").

13. After the Petition Date, the Debtors pursued potential alternative postpetition financing deals with improved terms. On January 28, 2023, after negotiating with other potential financing providers, the Special Committee determined that it was in the best interests of the estates and its stakeholders to enter into a new DIP financing agreement with B. Riley Financial (the "**Replacement DIP Facility**").

14. The Debtors, along with their advisors, which includes my team at Alix, reviewed and analyzed the Debtors' projected cash needs and prepared cash flow analyses to determine the need for, and adjusted size of, postpetition financing. The budget attached to the Proposed Replacement Interim DIP Order as Exhibit 4 (the "**Initial Budget**") provides an estimate of the Debtors' funding needs over the identified period, and is reasonable and appropriate given the uncertainties of the bitcoin market, the Debtors' operations and the Chapter 11 Cases.

15. The Replacement DIP Facility will provide the Debtors with the liquidity necessary to, among other things, pay off the Original DIP Facility, fund payroll, and satisfy their other working capital and general corporate purposes. An initial draw of $35 million (the "**Initial Draw**"), along with cash on balance sheet, is projected to provide the Debtors with sufficient liquidity to repay the Original DIP Facility and fund the Debtors' operations and the Chapter 11 Cases until the final hearing. After the final hearing, the Replacement DIP Facility will provide the Debtors with significant flexibility to operate their business, including the option to draw—at their sole discretion—up to an additional $35 million, for an aggregate principal amount of up to $70 million.[3]

---

[3] Under the Replacement DIP Facility, the Debtors can make draws of at least $5 million if their cash is under $30 million. The Debtors must pay down the Replacement DIP Facility if their cash exceeds $50 million.

16. If the court approves the Proposed Replacement Interim DIP Order, as defined in the Motion, the Debtors will immediately make the Initial Draw of $35 million under the Replacement DIP Facility. This draw, in addition to the cash on balance sheet, will provide the Debtors with sufficient liquidity to, among other things, pay off the amounts the Debtors owe under the Original DIP Facility. More specifically, in connection with entering into the Replacement DIP Facility, the Debtors must repay the Original DIP Facility lenders approximately $46 million, which includes the Original DIP Borrowings of $37.5 million and an additional approximately $9 million in interest, termination expenses and other fees. Given the Debtors' improved liquidity position and the fact that there are fees associated with drawing down on the Replacement DIP Facility, the Debtors have determined to use balance sheet cash, in part, for this repayment.

17. The $35 million Initial Draw also allows the Debtors to retain approximately $31 million in remaining liquidity after repayment of the Original DIP Facility, which is a level of liquidity that, under the Initial Budget, is projected to be sufficient to operate the business through at least the next potential draw period in week starting February 25 and address potential bitcoin price declines and other potential business disruptions, while also minimizing the use of borrowed funds.

18. Therefore, the Debtors' approach is prudent as it strikes a reasonable balance between using the Replacement DIP Facility funds to avoid expending too much of the Debtors' liquidity, while at the same time minimizing the amount of funds that the Debtors must draw from the Replacement DIP Facility to reduce associated fees. This approach is especially important because the Debtors cannot draw again from the Replacement DIP Facility until the final hearing.

19. Overall, the Initial Budget is reasonable because it accounts for the volatility in bitcoin prices by adopting reasonably conservative assumptions. The Debtors' self-mining revenues are closely tied to the price of bitcoin, but because bitcoin does not have a forward curve, it is difficult to forecast where bitcoin prices may go. The historical price of bitcoin and the speed of the recent run-up demonstrate the volatility of the asset class, and therefore, there is no guarantee that it will remain at current levels. Given this, even with the recent run-up in bitcoin prices, it is prudent that the Debtors have available additional financing through the Replacement DIP Facility that the Debtors can access if needed.

20. The Replacement DIP Facility does not factor in net proceeds from the potential sale of the Debtors' non-core real estate assets. It is my understanding that although the Debtors are marketing certain properties to potential buyers, there is no binding agreement on a sale, and the properties are subject to liens and mortgages, which amounts may be disputed. Accordingly, there is no way of knowing at this time what amount of net proceeds the sale of the Debtors' properties may generate.

21. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 31st day of January, 2023
New York, New York

By:   */s/ Rodi Blokh*
      Rodi Blokh