**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CORE SCIENTIFIC, INC. *et al.*,[1] | ) Case No. 22-90341 (DRJ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) [Re: Docket No. 389] |

**STATEMENT OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
**(I) IN SUPPORT OF REPLACEMENT DEBTOR-IN-POSSESSION FINANCING;**
**AND (II) OBJECTING TO CERTAIN REQUESTS OF THE ORIGINAL DIP LENDERS**

The Official Committee of Unsecured Creditors (the "<u>Committee</u>") of Core Scientific, Inc.

and its debtor affiliates in the above-captioned cases (collectively, the "<u>Debtors</u>" or "<u>Company</u>"),

by and through its undersigned proposed counsel, hereby submits this statement (the "<u>Statement</u>")

in support of the alternative debtor-in-possession financing (the "<u>Replacement DIP</u>") as disclosed

by the Debtors in the *Emergency Motion of Debtors for Entry of Interim and Final Orders (I)*

*Authorizing the Debtors to (A) Obtain Replacement Senior Secured Non-Priming Superpriority*

*Postpetition Financing, (B) Use Cash Collateral, and (C) Pay Off Existing Postpetition Financing*

*Facility (II) Granting Liens and Providing Claims with Superpriority Administrative Expense*

*Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the*

*Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No.

389] (the "<u>Replacement DIP Motion</u>"), which the Debtors filed following the filing of the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

Committee's objection [Docket No. 363] (the "Committee Objection")[2] to the *Emergency Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief* [Docket No. 38] (the "Original DIP Motion" and the facility thereunder, the "Original DIP").

## PRELIMINARY STATEMENT

1.      The Original DIP represented a substantial threat to unsecured creditor recoveries in these cases.  If approved, the Debtors would have been obligated to execute the RSA's restructuring transaction, which would have given 97% of the Company's reorganized equity value to the Convertible Noteholders and contingently provided less than 3% of such equity value to unsecured creditors.  Accordingly, the developments over the past week, culminating in the Debtors' decision to abandon the Original DIP in favor of the Replacement DIP, are extremely beneficial for unsecured creditors.  Unlike the Original DIP, the Replacement DIP gives the Debtors significant flexibility to pursue a plan of reorganization that will maximize value for all creditors, rather than just the Convertible Noteholders.  It does this, in large part, by removing substantially all of the Original DIP's objectionable features (which are highlighted in the Committee Objection), including the Roll Up, the restriction on non-core asset sales, and the commitment to execute the RSA's restructuring transaction, all with substantially reduced fees. Although the Debtors' decision to move forward with the Replacement DIP is a significant victory

---

[2]   Unless otherwise defined, capitalized terms used herein have the meanings ascribed to them in the Committee Objection.

for unsecured creditors, the Committee Objection is not fully resolved and at least one important issue still needs to be addressed in connection with the Original DIP.

2.      Specifically, in light of the Original DIP's refinancing, the Committee understands that the lenders thereunder (the "Original DIP Lenders") continue to assert entitlement to the 15% Termination Payment, which the Committee objected to in the Committee Objection. That equates to an approximately $6.0 million payment on a $37.5 million loan that the Debtors repaid in less than forty-five days (*i.e.*, a fee of over $135,000 per day). Although, as set forth in the Committee Objection, the Termination Payment is unreasonable based upon almost any metric, it is grossly unreasonable considering that the prompt payoff of the Original DIP would result in an internal rate of return of over 550%. If that sounds unreasonable, that's because it is. The Court approved the Termination Payment on an *interim basis* only, and should use the February 1 hearing to assess whether the Termination Payment is reasonable on a *final basis*. As set forth below—and as previously detailed in the Committee Objection—the proposed Termination Payment is well above market and should be denied or reduced to an appropriate amount.

3.      Separately, the Committee understands that the Convertible Noteholders have not yet consented to the use of their alleged cash collateral. To the extent the Convertible Noteholders do not ultimately consent, the Court should find that the Convertible Noteholders are adequately protected under the Replacement DIP. Here, the Convertible Noteholders' lien at best extends to only a fraction of the Debtors' cash (and does not extend to revenue from mined bitcoin), meaning the Debtors' requirement to provide adequate protection should be correspondingly limited. The Debtors' proposed use of that cash presents little to no risk of diminution in value of the Convertible Noteholders' collateral (and, in fact, is likely to increase the value of that collateral). Moreover, as part of its adequate protection package, the Replacement DIP gives the Convertible

Noteholders adequate protection liens on substantially all of the Debtors' property.  Therefore, in the unlikely event that the Convertible Noteholders do see their collateral decline in value, they will be able to look to the Debtors' valuable real estate assets and the Debtors' bitcoin mining revenues (which are up significantly in light of bitcoin's 36% increase in price since the Petition Date) to satisfy such diminution in value claim.

4.      The Debtors' decision to abandon the Original DIP and seek approval of the Replacement DIP —which is an unquestionably good result for unsecured creditors—has resolved the vast majority of issues raised in the Committee Objection.   However, payment of the Termination Payment in connection with the refinancing of the Original DIP remains a ripe issue that should be resolved in connection with the proposed *Interim Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Non-priming Superpriority Replacement Postpetition Financing, (B) Use Cash Collateral, and (C) Pay Off Existing Postpetition Financing Facility, (II) Granting Liens and Providing Claims with Superpriority Administrative E*xpense *Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief*, attached as Exhibit A to the Replacement DIP Motion (the "Proposed Interim Replacement DIP Order").  Moreover, to the extent the Convertible Noteholders do not consent to the use of their alleged cash collateral, the Court should find that they are adequately protected and enter the Proposed Interim Replacement DIP Order notwithstanding.

## RELEVANT BACKGROUND

5.      On December 21, 2022 (the "Petition Date"), the Debtors' filed the Original DIP Motion seeking authorization to enter into the Original DIP.  That proposed financing consisted of a $150.0 million debtor-in-possession financing facility comprised of (a) a new money multiple

draw term loan facility in an aggregate principal amount of up to $75.0 million, and (b) the conversion of up to $75.0 million on a dollar-for-dollar basis of amounts outstanding under the Convertible Notes into DIP Loans.

6.      On December 23, 2022, the Court approved the Original DIP Motion on an interim basis. *See* Docket No. 130 (the "Original Interim DIP Order").  Thereafter, the Debtors made an initial draw of $37.5 million to address their near-term working capital needs.

7.      On January 26, 2023, the Committee filed the Committee Objection.   The Committee Objection highlighted a number of the Original DIP's objectionable terms, including the Termination Payment that the Debtors would be required to pay to the Original DIP Lenders upon the facility's pay down.  In support of the Committee Objection, the Committee also filed the Verost Declaration, which detailed the unreasonableness of the 15% Termination Payment. Additional facts relevant to the Convertible Notes and the Original DIP are set forth in the Committee Objection and the Verost Declaration, which are incorporated herein by reference.

8.      On January 29, 2023, the Debtors filed a notice with the Court disclosing their intention to seek authorization to enter into the Replacement DIP provided by B. Riley Commercial Capital, LLC, an affiliate of BRF Finance Co., LLC ("B. Riley").[3]  *See* Docket No. 378.  If approved, the Replacement DIP would give the Debtors sufficient funds to pay down the Original DIP in full.

## OBJECTIONS

### I.    The Court Should Not Approve the 15% Termination Payment

---

[3]   B. Riley was originally appointed as a member of the Committee and participated on the Committee through January 24, 2023, on which date its affiliate determined to engage in providing an alternative DIP financing proposal to the Debtors.  Since that date, B. Riley has not participated in any Committee deliberations and has agreed to resign from the Committee upon its affiliate's execution of a commitment letter for the Replacement DIP.

9.      The Original DIP Lenders incorrectly argue that the Debtors are required to pay a 15.0% Termination Payment in connection with the Original DIP's refinancing.  *See* Original Interim DIP Order ¶¶ 2(d), 7.[4]  The Termination Payment would be equal to approximately $6.0 million, even though the Original DIP will have been outstanding less than forty-five days.  The Court is not bound by the Original Interim DIP Order's approval of the Original DIP's fees because it was not a final order.  In fact, the Original DIP Lenders' insistence that the excessive Termination Payment be payable highlights why the law works as it does.  Rather than forcing the Debtors to be bound to controversial financing terms with other parties having received little to no notice, the law allows for the Court and all other parties in interest to revisit these terms at a final hearing. That is what should happen here: a final hearing where the Court determines whether to approve the Termination Payment on a final basis.

### A.  *The Original Interim DIP Order Did Not Approve the Termination Payment on a Final Basis*

10.      It is black letter law that interim orders—such as the Original Interim DIP Order— are not final orders, and are subject to further examination.  *See In re 450 S. Burlington Partners LLC*, No. CV 09-4097, 2009 WL 2460880, *5 (C.D. Cal. Aug. 5, 2009) (noting orders that are "interim in nature and structured to permit further reexamination"); *see also In re FCX, Inc.*, 54

---

[4]   The Committee does not know the specific basis for the Original DIP Lenders' assertion of being entitled to the Termination Payment. Section 2(d) of the Original Interim DIP Order does provide in relevant part: "The DIP Loan Parties are authorized and directed to pay any and all (i) fees, premiums or other payments payable under the DIP Loan Documents…whether or not such payments, premiums, fees, costs, expenses, disbursements or other amounts arose before, on or after the Petition Date, and whether or not the transactions contemplated herein or in the DIP Loan Documents are consummated."  Moreover, section 7 of the Original Interim DIP Order states that the "DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code, including in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise."  However, the Termination Payment has not been actually paid and would only be payable upon approval of the Replacement DIP.

B.R. 833, 842 (Bankr. E.D.N.C. 1985) (modifying terms of interim post-petition financing order to allow creditors sufficient time to object to existence, perfection and priority of lender's prepetition lien). The Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") recognize that interim orders make particular sense in the context of emergency financing. *See* Fed. R. Bankr. P. 4001(c)(2) (noting for motions to obtain credit "the court may conduct a hearing before such 14-day period expires…to avoid immediate and irreparable harm to the estate ***pending a final hearing***") (emphasis added). Here, Bankruptcy Rule 4001(c)(2) is clearly applicable: the DIP Motion was filed on December 21, 2022, heard on an emergency basis on December 22, 2022, and granted on an interim basis pursuant the Original Interim DIP Order on December 23, 2022. Consistent with Bankruptcy Rule 4001(c)(2), the Court entered an *interim* order, which scheduled a *final* hearing with respect to the relief requested by the Debtors. The Original Interim DIP Order is exactly what it sounds like: an interim order, subject to further examination.

11. The use of interim and final orders strikes a balance between the need of debtors to obtain emergency relief, and the rights of other parties in interest to receive notice of the relief being sought and an opportunity to object. Indeed, at the first day hearing in these cases, the Court recognized the interim nature of the relief being sought, and noted that the Original DIP's "many issues" would be scrutinized further at the final DIP hearing. Hearing Transcript at 75:10–76:3 ("***Then again with the understanding that we will address many of these issues again at a final [hearing]***….") (emphasis added). Whether the Debtors are obligated to pay the Termination Payment—an excessive fee that is not even an "at-issuance" fee—is the exact type of issue that should be addressed at a final hearing after an official committee of creditors has been formed and has a fair opportunity to evaluate the reasonableness of the proposed financing. To the extent that the Original DIP Lenders argue that the language of the Original Interim DIP Order approved its

most objectionable fees—including the Termination Payment—on a "final" basis (or should otherwise not be subject to reexamination by the Court), such a position would completely undermine the point of having interim and final orders, and would only incentivize future lenders to seek excessive fees at a first day hearing on a "final" basis. Thus, for both legal and policy reasons, the Court should find that the Termination Payment has not been approved on a final basis.

### B.   The 15% Termination Payment is Excessive and Should Not Be Approved

12.     Approval of the Replacement DIP—which the Debtors will use to pay off the Original DIP—arguably triggers the Debtors' obligation to make the Termination Payment. Pursuant to section 364 of the Bankruptcy Code, the Debtors have the burden of showing that the terms of any financing are fair and reasonable under the circumstances. *See In re L.A. Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011).

13.     As set forth in the Verost Declaration, the Committee's proposed investment banker, Ducera Partners ("Ducera"), compared the economic fees and terms of the Original DIP relative to comparable debtor-in-possession ("DIP") financing facilities in other cases. Based on its analysis, Ducera determined that comparable exit/termination fees for DIP facilities are typically around 3.0% (*i.e.*, significantly less than the 15% Termination Payment). Verost Declaration ¶¶11-12. As detailed in the Committee Objection, the Debtors' own investment banker all but confirmed the unreasonableness of the Termination Payment. In fact, the Debtors' own set of over thirty DIP financing comparisons aligns with the Verost Declaration's conclusions and only found one example of an exit fee in excess of 10%. Moreover, when viewed in the context of the overall fee structure of the Original DIP, the Original DIP's fees would have resulted in a yield over nearly 60%—significantly in excess (and nearly double the average) of all of the comparable DIP financing facilities identified in the Verost Declaration. Those fees look even

more unreasonable in light of the limited borrowing and prompt repayment of the Original DIP, providing the Original DIP Lenders with an internal rate of return of over 550%.

14.    At bottom, it would neither be fair nor reasonable to require the Debtors to pay an approximately $6.0 million fee on a loan (a) that was repaid in approximately 40 days, and (b) where the lenders already received a 2.0% commitment fee.  To the extent the Court is unwilling to deny the payment of the Termination Payment in its entirety, it should meaningfully reduce the Termination Payment to an appropriate amount.

## II.    The Convertible Noteholders Would Be Adequately Protected Under the Replacement DIP

15.    To the extent the Convertible Noteholders do not consent to the use of their alleged cash collateral, the Court should approve the Debtors' use of cash collateral because the Convertibles Noteholders are adequately protected under the Replacement DIP.  In exchange for the Debtors' use of cash collateral, the Convertible Noteholders will receive an adequate protection package that includes: (a) adequate protection liens on substantially all of the Debtors' assets, (b) adequate protection superpriority claims, (c) payment of professional fees and expenses, and (d) reporting rights.  As discussed below, under these circumstances, the Replacement DIP satisfies the adequate protection standard under section 361 of the Bankruptcy Code.

16.    Adequate protection focuses on protecting secured creditors from any diminution in value of their collateral during the reorganization process.  *In re First S. Sav. Ass'n*, 820 F.2d 700, 710 (5th Cir. 1987).  The Bankruptcy Code does not explicitly define the term "adequate protection," but section 361 provides three ways in which adequate protection may be provided. *In re Good*, 428 B.R. 235, 242 (Bankr. E.D. Tex. 2010).  Courts must evaluate the sufficiency of an adequate protection package being given to secured lenders based on the circumstances of each case.  *In re First S. Sav. Ass'n*, 820 F.2d at 710 ("Its application is left to the vagaries of each

case"). In gauging whether adequate protection has been met, courts must "(1) establish the value of the secured creditor's interest, (2) identify the risks to the secured creditor's value resulting from the debtor's request for use of cash collateral, and (3) determine whether the debtor's adequate protection proposal protects value as nearly as possible against risks to that value consistent with the concept of indubitable equivalence." *In re Martin*, 761 F.2d 472, 477 (8th Cir. 1985). As detailed below, the Debtors have overwhelmingly met their burden and established that the Convertible Noteholders' interest in cash collateral is adequately protected.

### A. The Convertible Noteholders Have a Limited Interest in the Debtors' Cash

17.     As noted in the Bros Declaration, the Debtors have two main business units: a digital asset mining business (the "Mining Business"), and hosting miners for third parties (the "Hosting Business"). According to the Debtors' most recent proposed budget, of the $201.4 million in projected revenues, $165.8 million (approximately 82.0%) comes from the Mining Business, while the remaining $35.6 million (approximately 18.0%) comes from the Hosting Business.[5] As noted below, the Convertible Noteholders *arguably* have a lien on cash generated by the Hosting Business, but *do not* have a lien on the substantially greater amounts of cash generated by the Mining Business. Accordingly, the Convertible Noteholders, at best, only have an interest in a fraction of the Debtors' cash, and the Court should analyze their request for adequate protection accordingly.

18.     The distinction between cash generated by the Mining Business and the Hosting Business is a result of the Bankruptcy Code's treatment of the Convertible Notes Security Agreements. Specifically, section 552 of the Bankruptcy Code addresses the post-petition effect

---

[5]   *See* Proposed Interim Replacement DIP Order, Exhibit 4, *Initial Budget*. The recent rise in the price of bitcoin likely means that an even larger percentage of the Debtors' revenue is from the Hosting Business.

of a lender's prepetition security interest.  Subsection (a) provides a general rule that if a debtor acquires property after the petition date, it is not subject to that prepetition lender's lien.  Section 552(b) of the Bankruptcy Code then creates an exception to section 552(a)'s general rule. Specifically, if the prepetition security agreement that creates the lender's lien extends to proceeds of property acquired by the debtor before the petition date, then proceeds realized post-petition remain subject to the lien.

19.     Here, the Convertible Noteholders at best have a post-petition lien on cash generated from the Hosting Business because they have a lien on the Debtors' contracts and proceeds thereof (*i.e.*, section 552(b) of the Bankruptcy Code's exception applies).[6]  However, the Convertible Noteholders do not have a lien on bitcoin mined after the Petition Date because mined bitcoin does not constitute "proceeds" of any of the Convertible Noteholders' existing collateral (*i.e.*, section 552(a) of the Bankruptcy Code's general rule applies).   Said differently, the significantly greater amounts of cash generated by the Mining Business are not the Convertible Noteholders' cash collateral.   This distinction is critical to contextualizing the Convertible Noteholders' need for adequate protection, and recognizing that their interest in cash is quite limited.

### B.  The Proposed Use of the Convertible Noteholders' Cash Collateral Presents Minimal Risks of Diminution in Value

20.     The Debtors' decision to continue operating in the ordinary course of business is the best way to maintain or enhance the value of the Convertible Noteholders' collateral.   The Convertible Noteholders' lien extends to a limited number of the Debtors' assets.  For example,

---

[6]   Although not an issue for today, the Committee reserves all rights as to whether the section 552(b) equities of the case exception applies to the Convertible Noteholders' limited post-petition lien on cash collateral.

their lien does not cover the Debtors' real estate and other essential components of the business. Accordingly, in a liquidation scenario, the Convertible Noteholders would not have the ability to foreclose on an operational business, and their collateral would be worth a fraction of its current value. Here, the Debtors' proposed use of the Convertible Noteholders' cash collateral—simply keeping the business operational—is likely to either maintain or increases the value of that collateral over the course of these cases.

21.     Moreover, whether the Convertible Noteholders are adequately protected should not change just because they are no longer providing the debtor-in-possession financing. Under the Replacement DIP, the Debtors' use of cash collateral is virtually identical to the use of cash collateral under the Original DIP (*i.e.*, operating the business in the ordinary course and paying for the costs of the chapter 11 process). *See* Proposed Interim Replacement DIP Order, Exhibit 4, *Initial Budget*. Moreover, the adequate protection packages under the Original Interim DIP Order and the Proposed Interim Replacement DIP Order are also virtually identical. *Compare* Original Interim DIP Order ¶10 with Proposed Interim Replacement DIP Order ¶10. For the Convertible Noteholders to now argue that their adequate protection is inadequate is situationally convenient.

### C. The Proposed Adequate Protection Package Sufficiently Protects the Value of the Convertible Noteholders' Cash Collateral

22.     Even if diminution in value claims were a concern for the Convertible Noteholders—and they should not be based on the reasons set forth above—the Replacement DIP's adequate protection package sufficiently protects the value of the Convertible Noteholders' collateral. The Debtors are proposing to give the Convertible Noteholders adequate protection liens on all of the DIP Collateral (*i.e.*, substantially all of the Debtors' assets). Those liens are of significant economic value here, where the Debtors' unencumbered assets include six parcels of real estate, which collectively have value far in excess of the Replacement DIP. Those liens also

extend to the cash generated by the Mining Business on a post-petition basis, which should be bringing in millions of dollars in additional value each week given the 36% increase in the price of bitcoin since the Petition Date.  Put simply, given the Debtors' largely unencumbered assets and strong business operations, there will be a large bucket of value to satisfy both the DIP liens and any adequate protection liens.  Accordingly, the Replacement DIP's adequate protection package as it relates to the Convertible Noteholders is sufficient.

## <u>RESERVATION OF RIGHTS</u>

23.     This Statement is submitted without prejudice to, and with a full reservation of, the Committee's rights to supplement and amend this Statement, including by filing declarations in support thereof, to introduce evidence at any hearing relating to this Statement, and in connection with a final order approving the Replacement DIP.

## <u>CONCLUSION</u>

WHEREFORE, the Committee requests that the Court (a) approve the Replacement DIP, (b) deny any request by the Convertible Noteholders for additional adequate protection, and (c) determine that the Termination Payment is not payable or should be reduced to an appropriate amount.

Dated:      January 31, 2023
            Houston, Texas

Respectfully submitted,

**WILLKIE FARR & GALLAGHER LLP**

By:   /s/ *Jennifer J. Hardy*
Jennifer J. Hardy (Texas Bar No. 24096068)
600 Travis Street
Houston, Texas 77002
Telephone:  713-510-1700
Facsimile:  713-510-1799
Email:  jhardy2@willkie.com

-and-

Brett H. Miller (admitted *pro hac vice*)
Todd M. Goren (admitted *pro hac vice*)
James H. Burbage (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone: 212-728-8000
Facsimile: 212-728-8111
Email: bmiller@willkie.com
        tgoren@willkie.com
        jburbage@willkie.com

*Proposed Counsel to the Official Committee of
Unsecured Creditors*

**<u>Certificate of Service</u>**

I certify that on January 31, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.


By:   <u>/s/ *Jennifer J. Hardy*                    </u>
        Jennifer J. Hardy