UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CORE SCIENTIFIC, INC., *et al.*, | ) | Case No. 22-90341 (DRJ) |
|  | ) |  |
| Debtors.[1] | ) | (Jointly Administered) |
|  | ) | [Re: Docket No. 389; 397] |

**RESPONSE OF THE AD HOC GROUP TO (A) DEBTORS' EMERGENCY MOTION FOR REPLACEMENT DEBTOR-IN-POSSESSION FINANCING, AND (B) OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO CERTAIN REQUESTS OF THE ORIGINAL DIP LENDERS**

The ad hoc group of beneficial holders, or investment advisors or subadvisors, or managers of discretionary accounts that hold (the "***Ad Hoc Group***"), DIP Loans under the Existing DIP Facility (as defined below) and more than a majority of the Prepetition April NPA Secured Notes and the Prepetition August NPA Secured Notes,[2] by and through its undersigned counsel, hereby files this omnibus response to the Debtors' emergency motion [Docket No. 389] seeking entry of an order (the "***Replacement DIP Order***") authorizing the Debtors to obtain replacement debtor-in-possession financing (the "***Replacement DIP Facility***", and the lender thereunder, the "***Replacement Lender***") and irrevocably refinance (the "***Refinancing***") the existing DIP Facility

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704

[2] Each capitalized term that is not defined herein shall have the meaning ascribed to such term in the *Interim Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims With Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 130] as entered by the Court on December 23, 2022 (the "***Existing DIP Order***").

(the "*Existing DIP Facility*", and the lenders thereunder, the "*Existing DIP Lenders*"), and (b) the objection [Docket No. 397] (the "*Objection*") of the Official Committee of Unsecured Creditors (the "*Committee*") to the "Termination Payment" payable upon any repayment of the Existing DIP Facility, and, in support hereof, respectfully states as follows:

**RESPONSE**

1. Over the weekend, the Debtors publicly announced their determination to proceed with a Replacement DIP Facility and thus terminate their RSA with the members of the Ad Hoc Group. While the Ad Hoc Group fails to understand the logic behind the Debtors' decision given the volatile nature of Bitcoin, the cryptocurrency underpinning the entirety of the Debtors' business, it is the Debtors' prerogative to exercise its business judgment, risky or not. In making its determination, the Debtors are well aware that they are required to repay the DIP Obligations in full and in cash and to incur new commitment and agency fees for the Replacement DIP Facility. But that is the Debtors' decision, not the decision of the Existing DIP Lenders. As a result, the Ad Hoc Group has worked collaboratively with the Debtors and the Replacement DIP Lenders over the last 72 hours to develop a consensual form of proposed Replacement DIP Order that would ensure an orderly Refinancing and facilitate the continued use of Cash Collateral.

2. The Committee applauds the Debtors' decision to enter into the Replacement DIP Facility but completely ignores the Court's factual findings and legal rulings reflected in the Existing DIP Order. The Committee also ignores the very point that entry into the new financing and repayment of the existing financing is a choice made by the Debtors -- not the Ad Hoc Group -- and the Committee cannot evade the consequences of the decision it now supports.

3. Indeed, the Existing DIP Facility was approved by the Court following a comprehensive evidentiary presentation from the Debtors. The Debtor negotiated the terms of the DIP Facility with the Ad Hoc Group in good faith and the Court approved those terms as reasonable based on the submission of evidence demonstrating that the Debtors would cease operations absent the financing. The Committee's Objection should be directed at the exercise of the Debtors' business judgment to abandon the RSA and enter into the Replacement DIP Facility because it is *that* decision that triggers the payment of the Termination Fees on the Existing DIP Facility as well the incurrence of upfront commitment fees and monthly "agency" fees under the Replacement DIP Facility. Instead, the Committee ignores the well-established practice, embodied in the express terms of the Existing DIP Order, that fees and charges associated with amounts already drawn under a DIP financing at an interim hearing cannot be rescinded after the fact. Without this protection, there would have been no interim funding here. Sophisticated lenders simply would not extend credit if they knew that the compensation for extending that credit could be in jeopardy. . Without interim dip financing, financially distressed debtors would have no access to capital and most reorganizations would fail.

4. The Court should overrule the Committee's objection in order to protect the ability for debtors to obtain post-petition financing, control their cases and have a chance at a reorganization. The situation is no different here. As demonstrated below, the Interim Order contains endless and crystal-clear factual findings and express legal rulings by the Court that are common and allow a well-functioning DIP financing market to exist, and those provisions absolutely preclude the Committee's argument in totality.

**A.    Under the Express Terms of the Existing DIP Order, the Debtors are Irrevocably Obligated to Make the Termination Payment Upon a Refinancing**

5.  Pursuant to Section 5.12 of the DIP Credit Agreement, in the event of any full or partial voluntary or mandatory prepayment, repayment, refinancing or replacement of the Existing DIP Facility, the Debtors are required to pay a "Termination Payment" in an amount equal to 15.00% of the aggregate principal amount of all DIP Loans outstanding.

6.  The Debtors' obligation to make the Termination Payment in the event of a refinancing is literally laced throughout the entirety of the Interim Order. For example:

    (a)  the Debtors are authorized to borrow "$37.5 million (plus applicable interest … ***premiums, payments*** … ***and other amounts payable under this Interim Order and the DIP Loan Documents*** in connection with such borrowing)…." See ¶ 2(b));

    (b)  the Debtors are "***authorized and directed*** to pay any and all … fees, premiums or other payments payable under the DIP Loan Documents (including, without limitation, the … ***Termination Payments*** … and other payments, fees or amounts provided therein)…." See ¶ 2(d); and

    (c)  the Debtors are jointly and severally liable for all "principal, interest, payments, premiums or similar amounts … whether or not such obligations arose before or after the Petition Date, ***whenever the same shall become due and payable, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise***…." See ¶ 3(b).

7.  Thus, the Existing DIP Order makes clear that any amounts payable arising from DIP borrowings, whether before or after the borrowing is made, were authorized and approved and must be paid.

8.  The Existing DIP Order further provides that, other than with respect to DIP professional fees (which remain subject to specified fee review procedures), all payment obligations arising under the Existing DIP Order and the DIP Loan Documents are irrevocable and <u>not</u> subject to challenge, as follows:

> No ***obligation***, ***payment***, ***transfer***, or grant of liens or security interests under this Interim Order or the DIP Loan Documents to the DIP Secured Parties … shall be limited, stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law, or

4

> subject to any challenge, objection, defense or claim, including, without limitation, avoidance (whether under Chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge, recovery or other cause of action of any kind or nature whatsoever, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise …

Existing DIP Order ¶¶ 3(c) and 11(d).

9. Similarly, paragraph 34 of the Existing DIP Order provides that "*[a]ny and all payments … required to be remitted* to the DIP Secured Parties … pursuant to the DIP Loan Documents, this Interim Order, the Final Order (if and when entered) or any subsequent order of this Court shall be irrevocable…."

10. Moreover, the Existing DIP Order affords 364(e) protection to all advances, liabilities or indebtedness incurred under the Existing DIP Facility. Based on a full record presented to the Court at the Interim Hearing, which included uncontroverted testimony from the Debtors and their advisors (and which the Court found compelling), the Court determined that the Existing DIP Facility was negotiated at arm's length and in good faith among the Debtors, the DIP Secured Parties and the Prepetition Secured Parties, and that all of the Debtors' obligations arising under the Existing DIP Facility are made in express reliance upon the protections offered by sections 364(e) of the Bankruptcy Code. *See* Existing DIP Order ¶ G(k).

11. Based on such findings, the Existing DIP Order expressly confers section 364(e) protection upon all obligations incurred under the DIP Facility in the event of any modification to the Existing DIP Order, *including any modifications resulting from a subsequent judgment or order of this Court*, as follows:

5

> Based on the findings set forth in this Interim Order and the record presented during the Interim Hearing and the Chapter 11 Cases, and in accordance with section 364(e) of the Bankruptcy Code, in the event that any or all of the provisions of this Interim Order or the DIP Loan Documents ***are hereafter reversed, modified, vacated or stayed <u>by a subsequent judgment or order of this Court</u>*** or any other court, any such reversal, stay, modification or vacatur ***shall not affect*** (i) the validity or enforceability of advances previously made hereunder or under the DIP Loan Documents by the DIP Secured Parties to the Debtors, (ii) ***the validity or enforceability of any obligation, indebtedness or liability incurred under this Interim Order or the DIP Loan Documents*** (including, without limitation, ***the DIP Obligations*** …) by the DIP Loan Parties to the DIP Secured Parties …, (iii) the validity, enforceability, or perfection of any of the claims, liens, security interests, rights, privileges or benefits granted hereunder or under the DIP Loan Documents to the DIP Secured Parties…, or (iv) the payment of any fees, costs, expenses or other amounts to the DIP Secured Parties … under this Interim Order and the DIP Loan Documents, in each case, prior to the actual receipt of written notice by any DIP Agent … of the effective date of such reversal, stay, modification, or vacatur. ***Notwithstanding any such reversal, stay, modification or vacatur, the claims, liens, security interests, rights, privileges, remedies and benefits set forth in the Interim Order shall be governed in all respects by the original provisions of this Interim Order and the DIP Loan Documents.***

Existing DIP Order ¶ 30(d).

12. Consequently, based on the straightforward language of the Existing DIP Order, the economic terms tied to actual advances made by the DIP Lenders cannot be revisited merely because the Existing DIP Order is titled as an "interim" order. Rather, the express terms of this order make clear that any modifications to the order, including any modifications made by this Court, do not affect the costs associated with borrowings already made.

**B.  The Committee Inappropriately Seeks to Reshape History with Present Day Facts**

13. The evidentiary record supporting approval of the Existing DIP Facility generally, and the Termination Payments in particular, is well developed. The Court reviewed detailed testimony from the Debtors and their advisors regarding the Debtors' constrained liquidity position in the weeks leading to the bankruptcy filing, resulting from, other things, rapidly decreasing Bitcoin prices, rising power costs, ongoing litigation and vendor pressures. *See Declaration of*

*Michael Bros in Support of the Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 5] ("**First Day Declaration**") at ¶ 6-7, 23, 78.

14. Mr. Bros testified as to the immediate and significant liquidity concerns tied to the sudden and sustained drop in the price of Bitcoin, which was priced at an all-time high of over $67,000 in November 2021, dropped to under $20,000 during the "crypto winter" in June 2022, and remained at depressed levels, reaching a 52-week low of less than $16,000 in late November 2022 (just before the bankruptcy filing). *See First Day Declaration* at 23; *see also Declaration of John Singh In Support of Emergency Motion of Debtors For Entry of Interim and Final Orders (A) Authorizing the Debtors To Obtain Postpetition Financing, (B) Authorizing the Debtors To Use Cash Collateral, (C) Granting Liens and Providing Claims With Superpriority Administrative Expense Status, (D) Granting Adequate Protection To the Prepetition Secured Parties, (E) Modifying The Automatic Stay, (F) Scheduling A Final Hearing, and (G) Granting Related Relief* [Docket No. 98] ("**Singh Declaration**") at ¶ 15. As a result, the Debtors were left with $4 million in liquidity as of the Petition Date. *Id.* at ¶ 13.

15. Consequently, as reflected in the testimony of Mr. Singh of PJT Partners LP, the Debtors' investment banker, the Debtors had an "immediate and critical need to obtain DIP financing and authority to use Cash Collateral" to permit the orderly continuation of their businesses. *See Singh Declaration* at ¶ 13. Absent such funding, "the continued operation of the Company's business will be at risk and could result in serious, immediate and irreparable harm to the Debtors; estates, and their creditors". *Id*. at ¶ 24.

16. The Debtors also proffered testimony as to their efforts to solicit alternative DIP financing proposals from other constituents. Mr. Singh testified that PJT contacted 24 potential lenders; nine parties signed NDAs; and the Debtors received only one competing

proposal (other than the proposal from the Ad Hoc Group) from B. Riley. *See Singh Declaration* at ¶ 26. That proposal, as described by Mr. Singh, engendered (among other things) "execution risk, uncertainty regarding timely capital availability and the lack of a firm funding commitment" and would have triggered contested use of cash collateral. *Id.* at ¶ 29. Consequently, the Debtors determined in their business judgment to proceed with the Existing DIP Facility provided by the Ad Hoc Group. *Id*.

17. The economic terms of the Existing DIP Facility were appropriately summarized in various pleadings and declarations filed with the Court. Indeed, during the Interim Hearing, Debtors' counsel described in detail the calculation of the various fees associated with the Existing DIP Facility, including the Termination Payment, and noted that in order to repay the $37.5 million borrowed by the Debtors in approximately four weeks, "the Debtors would need to pay $9 million more, or $46.25 million." *See* First Day Hearing Transcript at 53:10-12, 24-25, 54:1-21.

18. As further explained in testimony presented to the Court, the Existing DIP Facility was found by the Debtors – and ultimately the Court – to be the best option then available to the Debtors under the circumstances (*see* Singh Declaration, at 34), and that the fees "while on the higher end, are taken as a whole, (a) within the range of comparable DIP financing transactions, and (b) are reasonable under the current circumstances and market conditions…" *Singh Declaration* at ¶ 44.

19. During the Interim Hearing, no opposition to the payment terms of the DIP Facility was raised by any party. Then-counsel to B. Riley (who now represents the Committee) participated in the hearing, and reserved rights generally with respect to the final hearing, and the roll up in particular, but did not object to the need for immediate financing or propose alternative

committed financing, and no reservations were expressed concerning the borrowing related fees and costs. *See First Day Hearing Transcript* at 33:6-23.

20.     After an extensive hearing, the Court ultimately approved the DIP Facility as a proper exercise of the Debtors' business judgment, and observed that "[i]t's expensive money, but it's the only game in town and it is money that solves a lot of short-term issues. Lending into this type of situation is going to be expensive because I don't know how you assess the risk. And given the PIC [sic] feature, I mean, PIC [sic] loans are always expensive and I got that issue too. It's just part of the risk assessment." *First Day Hearing Transcript* at 75: 12-18.

21.     Based on the foregoing, it is clear that the Court was presented with a comprehensive evidentiary record before determining to approve the fee structure and afford various lender protections in connection with the Existing DIP Facility. The Committee cannot now go back in time and upend the Debtors' business judgment and the Court's finding more than a month ago, without alleging that something was concealed from the Court, which is certainly not the case. Ultimately, it was the Debtors' business decision – which the Committee supports – to refinance the Existing DIP Facility and thereby accelerate payment of the Termination Payment. The Committee therefore cannot, now, avoid the legal requirements associated with that decision.

## C.     The Committee's Position Could Significantly Disrupt the DIP Financing Market

22.     Ultimately, the purposes of section 364(e) and similar protections commonly found in DIP financing orders in complex chapter 11 cases is to encourage lenders to advance funds to distressed companies in reliance upon a bankruptcy court order. Taken to its logical extreme, the Committee's argument that fees associated with advances already made could be revisited at a final hearing will destroy the well-established funding pipeline that is critical to chapter 11 reorganizations and cannot be countenanced.

**WHEREFORE,** based on the foregoing, the Ad Hoc Group respectfully requests that the Court condition its approval of the Alternative DIP Facility upon modifications requested by the Ad Hoc Group, overrule the Official Committee's Objection, and grant the Ad Hoc Group such other and further relief as the Court deems just and proper.

Date: February 1, 2023
Houston, Texas

Respectfully submitted

/s/ James T. Grogan III
**PAUL HASTINGS LLP**
James T. Grogan III (TX Bar No. 24027354)
600 Travis Street, 58th Floor
Houston, Texas 77002
Telephone: (713) 860-7300
Facsimile: (713) 353-3100
Email: jamesgrogan@paulhastings.com

-and-

Kristopher M. Hansen (admitted *pro hac vice*)
Erez E. Gilad (admitted *pro hac vice*)
Sayan Bhattacharyya (admitted *pro hac vice*)
Joanne Lau (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
Facsimile: (212) 319-4090
Email: krishansen@paulhastings.com
     erezgilad@paulhastings.com
     sayanbhattacharyya@paulhastings.com
     joannelau@paulhastings.com

*Counsel to the Ad Hoc Group of Secured Convertible Noteholders*

**Certificate of Service**

I certify that on February 1, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

                                               */s/ James T. Grogan III*
                                               James T. Grogan III