**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| *In re:* | ) | Chapter 11 |
| | ) | |
| Core Scientific, Inc., *et al.*,[1] | ) | Case No. 22-90341 (DRJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | Re: Docket Nos. 130, 389, 390, & 391 |

**ORDER**
**(I) AUTHORIZING THE DEBTORS ON**
**AN INTERIM BASIS TO (A) OBTAIN SENIOR**
**SECURED NON-PRIMING SUPERPRIORITY**
**REPLACEMENT POSTPETITION FINANCING AND**
**(B) USE CASH COLLATERAL, (II) AUTHORIZING THE DEBTORS**
**TO REFINANCE EXISTING POSTPETITION FINANCING ON A**
**FINAL BASIS, (III) GRANTING LIENS AND PROVIDING CLAIMS**
**WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS,**
**(IV) GRANTING ADEQUATE PROTECTION TO THE**
**PREPETITION SECURED PARTIES ON A FINAL BASIS,**
**(V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING**
**A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

Upon the motion (the "***Motion***") of Core Scientific, Inc. ("***Core Scientific***") and each of

its affiliates that are debtors and debtors in possession (collectively, the "***Debtors***") in the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR, LLC (5106); American Property Acquisition I, LLC (9717); and American Property Acquisitions, VII, LLC (3198).  The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

above-captioned chapter 11 cases (the "***Chapter 11 Cases***"), pursuant to sections 105, 361, 362, 363, 364, 503, 506, 507 and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "***Bankruptcy Code***"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and Rules 2002-1, 4001-1(b), 4002-1 and 9013-1 of the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas and the Procedures for Complex Chapter 11 Bankruptcy Cases (together, the "***Local Bankruptcy Rules***") promulgated by the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "***Court***"), seeking entry of this order (this "***Interim Order***"), among other things:

(a)     authorizing the Debtors to obtain replacement postpetition financing on a superpriority, non-priming, senior secured basis (the "***Replacement DIP Facility***," and the loans made or advanced thereunder, the "***Replacement DIP Loans***") in the form of a multiple-draw term-loan facility in an aggregate principal amount of up to $70 million (the "***Replacement DIP Facility***"), pursuant to which (i) an aggregate principal amount of $35 million shall be borrowed (the "***Interim DIP Borrowing***") in a single borrowing on the Closing Date (as defined in the DIP Term Sheet (as defined below)), and (ii) following entry of the Final Order (as defined below), the remaining aggregate principal amount under the Replacement DIP Facility shall be available, in one or more borrowings (each such borrowing, including the Interim DIP Borrowing, a "***DIP Borrowing***," and, collectively, the "***DIP Borrowings***"), and, in each case, in accordance with and subject to the terms and conditions (including any conditions precedent to each of the DIP Borrowings) set forth in the term sheet attached hereto as **Exhibit 1** (the "***Replacement DIP Term Sheet***"),  the terms of which are incorporated herein in their entirety and are deemed to be a part of this Interim Order, that certain *Commitment Letter*, dated as of January 29, 2023, by and between Core Scientific and the Replacement DIP Lender attached hereto as **Exhibit 2** (the "***Commitment Letter***") and, subject to entry of the Final Order, on a final basis pursuant to a loan agreement to be filed with the Court in substantially final form in advance of the Final DIP Objection Deadline (as defined below) (the "***Replacement DIP Credit Agreement***," and, together with all other agreements, guarantees, pledge, collateral and security agreements, mortgages, deeds, charges, control agreements, instruments, certificates, notes, any separate fee letter agreements between any of the Debtors, on the one hand, and the Replacement DIP Agent and/or the Replacement DIP Lender, on the other hand, and other documents executed, filed and/or delivered in connection therewith, including the Replacement DIP Term Sheet, collectively, the

"***Replacement DIP Loan Documents***"),[3] by and among each of the Debtors, as borrowers (the "***Replacement DIP Borrowers***"), each of the direct and indirect subsidiaries of Core Scientific that are or become debtors in the Chapter 11 Cases, as guarantors (collectively, the "***Replacement DIP Guarantors***," and together with the Replacement DIP Borrowers, the "***Replacement DIP Loan Parties***"), B. Riley Commercial Capital, LLC, as administrative agent and collateral agent (in such capacities, together with its successors and permitted assigns, the "***Replacement DIP Agent***"), and the lender party thereto (the "***Replacement DIP Lender***," and together with the DIP Agent, the "***Replacement DIP Secured Parties***") and this Interim Order;

(b)     authorizing the Replacement DIP Loan Parties to (i) execute, deliver, and perform under the Replacement DIP Term Sheet and each of the Replacement DIP Loan Documents, (ii) incur all loans, advances, extensions of credit, financial accommodations, indemnification and reimbursement obligations and other obligations, and pay all principal, interest, premiums, fees, costs, expenses, charges and all other amounts payable under the Replacement DIP Loan Documents, whenever the same shall become due or payable, whether at stated maturity, by prepayment, declaration, acceleration or otherwise, in each case, in accordance with the Replacement DIP Loan Documents and this Interim Order (collectively, the "***Replacement DIP Obligations***"), and (iii) perform such other and further acts as may be necessary, required or desirable to implement and effectuate the terms of this Interim Order, the Replacement DIP Loan Documents and the transactions contemplated hereunder and thereunder;

(c)     authorizing the Replacement DIP Borrowers to incur, and the Replacement DIP Guarantors to jointly and severally guarantee, all DIP Obligations, in accordance with this Interim Order and the Replacement DIP Loan Documents;

(d)     granting to the Replacement DIP Agent, for the benefit of itself and the other Replacement DIP Secured Parties, the DIP Liens (as defined below) in all DIP Collateral (as defined below), as set forth in this Interim Order, subject to the Carve-Out and subject to the relative priorities set forth in this Interim Order;

(e)     granting to the Replacement DIP Agent, for the benefit of itself and the other Replacement DIP Secured Parties, allowed super-priority administrative expense claims against each of the Debtors, on a joint and several basis, in respect of all Replacement DIP Obligations, subject in each case to the Carve-Out, as set forth in this Interim Order;

---

[3]     The Replacement DIP Lender is lending to the Replacement DIP Borrowers under the terms of the Replacement DIP Term Sheet. Subject to the terms and conditions set forth herein, the Replacement DIP Secured Parties and the Replacement DIP Borrowers will negotiate in good faith to document and execute formal credit and other security agreements consistent with the terms of this Interim Order and the Replacement DIP Term Sheet. Prior to the execution and delivery of such documentation, all references to the Replacement DIP Loan Agreement, the Replacement DIP Loan Documents and similar terms shall be deemed to be references to the Replacement DIP Term Sheet.

(f)     authorizing the Debtors to use the proceeds of the Replacement DIP Facility, the DIP Collateral and the Prepetition Secured Notes Collateral (as defined below), including Cash Collateral (as defined below), solely in accordance with the terms and conditions set forth in this Interim Order and the Replacement DIP Loan Documents, including the Approved Budget (as defined below), subject to any variances expressly permitted under the Replacement DIP Term Sheet (the "**Permitted Variances**");

(g)     authorizing the Debtors, on a final basis, to irrevocably and indefeasibly repay in full in cash (the "**Refinancing**") all obligations, including, without limitation, all principal, interest, fees, premiums, payments (including any Termination Payments and Agent Fees (each as defined in the Original DIP Credit Agreement (as defined below)), fees (including professional fees and expenses), costs, expenses, charges and other amounts payable under the Original DIP Loan Documents (as defined below) and the Original Interim Order (as defined below) (the "**Original DIP Obligations**") outstanding under the post-petition financing facility (the "**Original DIP Facility**") provided pursuant to that certain *Senior Secured Super-Priority Debtor in Possession Loan and Security Agreement*, dated as of December 22, 2022, as filed with the Court on December 28, 2022 [Docket No. 188] (the "**Original DIP Credit Agreement**" and together with all documents, agreements, filings and instruments executed and/or delivered in connection therewith, the "**Original DIP Loan Documents**"))[4] by and among the DIP Loan Parties (as defined in the Original Interim Order), the lenders from time to time party thereto (the "**Original DIP Lenders**") and the administrative agent thereunder (the "**Original DIP Agent**"), upon the closing of the Replacement DIP Facility in accordance with the terms of the payoff letter substantially in the form attached hereto as **Exhibit 6** and otherwise in form and substance acceptable to the Replacement DIP Loan Parties, the Original DIP Agent and the Original DIP Lenders (the "**Payoff Letter**");

(h)     granting adequate protection on a final basis, as and to the extent set forth in this Interim Order, to the Prepetition Secured Parties (as defined below) to protect against any Diminution in Value (as defined below) of their respective Prepetition Secured Notes Liens (as defined below) in the Prepetition Secured Notes Collateral (including Cash Collateral);

(i)     approving certain stipulations, waivers, and releases by the Debtors with respect to, *inter alia*, (i) the Replacement DIP Secured Parties, the Replacement DIP Loan Documents, the DIP Liens, the Replacement DIP Obligations and the Replacement DIP Collateral, (ii) the Original DIP Agent, the Original DIP Lenders, the Original DIP Loan Documents and the Original DIP Obligations, and (iii) the Prepetition Secured Parties, the Prepetition Secured Notes Documents, the Prepetition Secured

---

[4]     Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion, the Replacement DIP Term Sheet, or the Original DIP Credit Agreement, as applicable.

Notes Liens, the Prepetition Secured Notes Obligations (each as defined below), in each case, subject to the terms and provisions of this Interim Order;

(j)     approving the Debtors' waiver of the right to surcharge the DIP Collateral as to the DIP Secured Parties, and the Prepetition Secured Notes Collateral as to the Prepetition Secured Parties, pursuant to section 506(c) of the Bankruptcy Code or otherwise, in each case, upon the terms set forth in this Interim Order;

(k)     approving the Debtors' waiver of the (i) equitable doctrine of "marshaling" and other similar doctrines with respect to the DIP Collateral as to the Original DIP Agent and the Original DIP Lenders and the Replacement DIP Secured Parties, and (ii) equitable doctrine of "marshaling" and other similar doctrines, and the Debtors waiver of any "equities of the case exception" under section 552(b) of the Bankruptcy Code, with respect to the Prepetition Secured Notes Collateral as to the Prepetition Secured Parties, in each case, upon the terms set forth in this Interim Order;

(l)     modifying or vacating the automatic stay imposed by sections 105(a) and 362 of the Bankruptcy Code or otherwise, to the extent necessary, required or desirable to implement and effectuate the terms and provisions of this Interim Order and the Replacement DIP Loan Documents, as set forth herein, waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of this Interim Order, providing for the immediate effectiveness of this Interim Order, and granting related relief; and

(m)     scheduling a final hearing (the "***Final Hearing***") on the Motion to consider entry of a final order (the "***Final Order***") authorizing the relief requested in the Motion on a final basis, which order shall be in form and substance and on terms and conditions acceptable in all respects to the Replacement DIP Lender and Replacement DIP Agent in accordance with the Replacement DIP Term Sheet, and approving the form of notice with respect to such Final Hearing.

The Court, having considered the evidence submitted and arguments proffered or adduced at the interim hearing held before this Court on December 22, 2022, and the Court having entered the *Interim Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims With Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 130] on December 23, 2022 (the "***Original Interim Order***") authorizing and approving the Original DIP Facility on an interim basis.

The Court further having considered the Motion, the Replacement DIP Term Sheet, the Commitment Letter, the *Declaration of Michael Bros in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 5] (the "**First Day Declaration**"), the *Declaration of John Singh in Support of Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Replacement Senior Secured Non-Priming Replacement Superpriority Postpetition Financing, (B) Use Cash Collateral, and (C) Pay Off Existing Postpetition Financing Facility, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 390] (the "**Singh Declaration**"), and the *Declaration of Rodi Blokh in Support of the Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Replacement Senior Secured Non-Priming Superpriority Postpetition Financing, (B) Use Cash Collateral, and (C) Pay Off Existing Postpetition Financing Facility, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 391] (the "**Blokh Declaration**" and together with the Singh Declaration, the "**DIP Declarations**") the evidence submitted and arguments proffered or adduced at the interim hearing held before this Court on February 1, 2023 (the "**Interim Hearing**"), and upon the record of the Chapter 11 Cases; and due and proper notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 4001 and 9014 and all applicable Local Bankruptcy Rules; and it appearing that no other or further notice need be provided; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; the Court having determined that the

legal and factual bases set forth in the Motion and at the Interim Hearing established just cause for the relief granted herein; and it appearing to the Court that granting the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, their creditors, and all other parties in interest, represents a sound exercise of the Debtors' business judgment, is necessary for the continued operation of the Debtors' businesses and is necessary to preserve and maximize the value of the Debtors and their estates; and the Debtors having provided notice of the Motion as set forth in the Motion; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[5]**

A.     *Petition Date.* On December 21, 2022 (the "***Petition Date***"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court commencing these Chapter 11 Cases.

B.     *Debtors in Possession*. The Debtors continue to manage and operate their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in any of the Chapter 11 Cases.

C.     *Committee Formation*. On January 9, 2023, the Office of the United States Trustee (the "***U.S. Trustee***") appointed the Official Committee of Unsecured Creditors (the "***Official Committee***") pursuant to section 1102 of the Bankruptcy Code [Docket No. 256].

---

[5]     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

D.      *Jurisdiction and Venue*. This Court has jurisdiction over the Chapter 11 Cases, the

Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334. This Court's

consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b). Venue

for these Chapter 11 Cases and the proceedings on the Motion is proper in this district pursuant to

28 U.S.C. §§ 1408 and 1409. The predicates for the relief set forth herein are sections 105, 361,

362, 363, 364, 503, 506, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001,

6004, and 9014, and Local Bankruptcy Rule 4001-2.

E.      *Debtors' Stipulations, Releases and Acknowledgements with Respect to Replacement DIP Lenders.* In exchange for and as a material inducement to the Replacement DIP

Secured Parties to provide the Replacement DIP Facility, after consultation with their attorneys

and advisors, the Debtors, on behalf of themselves and their estates, hereby admit, stipulate,

acknowledge and agree as follows (without prejudice to the rights of the Official Committee and

other parties in interest in paragraph 23 of this Interim Order (subject to the limitations set forth

therein)):

(a)      ***Prepetition Unsecured Bridge Notes***.

(i)      *Bridge Notes*. Core Scientific has issued, to B. Riley Commercial Capital, LLC (the "***Bridge Noteholder***") as holder, (x) that certain $60,000,000 Bridge Promissory Note dated April 7, 2022 (the "***$60M Bridge Note***") and (y) that certain $15,000,000 Bridge Promissory Note also dated April 7 2022, (the "***$15M Bridge Note***," and together, with the $60M Bridge Note, collectively, as amended, restated or otherwise modified from time to time, the "***Bridge Notes***"). In connection with the Bridge Notes, Core Scientific and the Bridge Noteholder executed that certain Fee Letter, dated as of April 7, 2022 (the "***Fee Letter***," and together with all other agreements, instruments, certificates, and other documents executed and/or delivered in connection the Bridge Notes, the "***Bridge Note Documents***").

(ii)      *Bridge Note Obligations*. As of the Petition Date, Core Scientific was justly and lawfully indebted to the Bridge Noteholder, without defense, claim, counterclaim, challenge or offset of any kind, in the aggregate amount of approximately $42,000,000 on account of principal amounts outstanding under the Bridge Note Documents, plus accrued but unpaid interest thereon, plus all fees, costs, expenses (including attorneys', financial advisors' and other professionals' fees and expenses, as

-8-

relevant), charges, disbursements, indemnification and reimbursement obligations (contingent or otherwise), and all other amounts that may be due or owing under the Bridge Note Documents (collectively, the "***Bridge Note Obligations***").

(b)     *Validity and Enforceability of the Bridge Note Obligations.* As of the date hereof, (i) the Bridge Note Obligations constitute legal, valid, binding and non-avoidable obligations of Core Scientific, enforceable in accordance with the terms of the Bridge Note Documents; (ii) no challenges, objections, defenses, claims or counterclaims of any kind or nature whatsoever with respect to any of Bridge Note Obligations exist, and no portion of the Bridge Note Obligations is subject to any challenge, defense or claim (as defined in section 101(5) of the Bankruptcy Code) of any kind or nature whatsoever, including, without limitation, avoidance (whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, or recovery, in each case, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise; (iii) the Debtors waive, discharge, and release any right to challenge the enforceability or validity of any of the Bridge Note Obligations; and (iv) the Bridge Note Obligations constitute allowed claims within the meaning of section 502 of the Bankruptcy Code against Core Scientific and its respective estate.

(c)     *No Claims, Defenses, or Causes of Action against Replacement DIP Secured Parties*. As of the date hereof, there exists no challenge, objection, defense, claim, counterclaim, or other cause of action, of any kind or nature whatsoever, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise, against any of the Replacement DIP Secured Parties or any of their respective officers, directors, members, managers, partners, equity holders, subsidiaries, affiliates, related parties, employees, investment advisors or managers, agents, attorneys, advisors, professionals (collectively, together with each of their successors and assigns, the "***Representatives***") (in their capacities as such) arising from, in connection with, or relating to this Interim Order.

(d)     *Releases*. Subject to paragraph 23 of this Interim Order, effective as of the date of entry of this Interim Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of its predecessors, successors and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits each of the Replacement DIP Secured Parties and each of their respective Representatives (in their capacities as such) from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, cross-claims, demands, defenses, objections, challenges, offsets or setoff, debts, accounts, contracts, liabilities, remedies, suits, controversies, actions, causes of action, losses, damages, indemnities, reimbursement obligations, attorneys' fees, costs, expenses or judgments, of every kind or nature whatsoever, whether matured or unmatured, known or unknown, asserted or unasserted, suspected or unsuspected, foreseen or unforeseen, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, pending or threatened, arising in law or equity, upon contract or tort, under the Bankruptcy Code, any state or federal common law, statute, rule, regulation or otherwise, in each case, that may be asserted by any of the

Debtors, their respective estates, predecessors, successors or assigns, against the Replacement DIP Secured Parties or their respective Representatives (in their capacities as such) for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time prior to the date of this Interim Order, in each case, arising under, in connection with, or related to this Interim Order the transactions contemplated thereunder or hereunder, or the negotiation thereof or hereof, including any claim or cause of action seeking (i) any so-called lender liability, (ii) any and all claims arising under the Bankruptcy Code, whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or (iii) reduction, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge or recovery, or any other related claim or cause of action with respect to the validity, enforceability, priority, scope, extent or perfection of the DIP Liens, the Replacement DIP Obligations, or the Replacement DIP Loan Documents (as relevant).

F.      *Debtors' Stipulations, Releases and Acknowledgements with Respect to Prepetition Secured Parties.* In exchange for and as a material inducement to the use of Cash Collateral that constitutes Prepetition Secured Notes Collateral, after consultation with their attorneys and advisors, the Debtors, on behalf of themselves and their estates, hereby admit, stipulate, acknowledge and agree as follows (without prejudice to the rights of the Official Committee and other parties in interest in paragraph 23 of this Interim Order (subject to the limitations set forth therein)) (collectively, the admissions, stipulations, and acknowledgments and agreements set forth in paragraphs E and F of this Interim Order, the "***Debtors' Stipulations***"):

(a)     *Prepetition April NPA Secured Notes.*

(i)      *Prepetition April NPA.* Pursuant to (x) that certain Secured Convertible Note Purchase Agreement, dated as of April 19, 2021 (as amended, amended and restated, supplement or otherwise modified from time to time prior to the Petition Date, the "***Prepetition April NPA***"), by and among Core Scientific (f/k/a Core Scientific Holding Co.), the guarantors party thereto from time to time (the "***Prepetition April NPA Guarantors***," and together with Core Scientific, the "***Prepetition April NPA Notes Obligors***"), the "Initial Purchasers" and any "Additional Purchasers" party thereto from time to time (collectively, the "***Prepetition April NPA Secured Noteholders***") and U.S. Bank National Association, as note agent and collateral agent (in such capacities, the "***Prepetition April NPA Agent***," and together with the Prepetition April NPA Secured Noteholders, the "***Prepetition April NPA Secured Parties***"), and (y) all other agreements, guarantees, pledge, collateral and security documents, instruments, certificates, promissory notes and other documents executed and/or delivered in connection therewith, including,

without limitation, all "Note Documents" (as defined in the Prepetition April NPA) (collectively, together with the Prepetition April NPA, the "***Prepetition April NPA Documents***"), Core Scientific issued secured convertible notes (the "***Prepetition April NPA Secured Notes***"), and each of the Prepetition April NPA Guarantors, among other things, jointly and severally, irrevocably and unconditionally guaranteed the due and punctual payment and performance in full in cash of all Prepetition April NPA Secured Notes Obligations (as defined below).

(ii)     *Prepetition April NPA Secured Notes Obligations*. As of the Petition Date, the Prepetition April NPA Notes Obligors were justly and lawfully indebted to the Prepetition April NPA Secured Parties, on a joint and several basis, without defense, claim, counterclaim, challenge or offset of any kind, in the aggregate amount of approximately $239.6 million on account of principal amounts outstanding[6] under the Prepetition April NPA Secured Notes, plus accrued but unpaid interest thereon, plus all fees, costs, expenses (including attorneys', financial advisors' and other professionals' fees and expenses), charges, disbursements, indemnification and reimbursement obligations (contingent or otherwise), including all "Obligations" (as defined in the Prepetition April NPA) and all other amounts that may be due or owing under the Prepetition April NPA Documents (collectively, the "***Prepetition April NPA Secured Notes Obligations***").

(b)     *Prepetition August NPA Secured Notes*.

(i)     *Prepetition August NPA*. Pursuant to (x) that certain Secured Convertible Note Purchase Agreement, dated as of August 20, 2021 (as amended, amended and restated, supplement or otherwise modified from time to time prior to the Petition Date, the "***Prepetition August NPA***"), by and among Core Scientific (f/k/a Core Scientific Holding Co.), the guarantors party thereto from time to time (the "***Prepetition August NPA Guarantors***," and together with Core Scientific, the "***Prepetition August NPA Notes Obligors***"), the "Initial Purchasers" and any "Additional Purchasers" party thereto from time to time (collectively, the "***Prepetition August NPA Secured Noteholders***") and U.S. Bank National Association, as note agent and collateral agent (in such capacities, the "***Prepetition August NPA Agent***," and together with the Prepetition August NPA Secured Noteholders, the "***Prepetition August NPA Secured Parties***"), and (y) all other agreements, guarantees, pledge, collateral and security documents, instruments, certificates, promissory notes and other documents executed and/or delivered in connection therewith, including, without limitation, all "Note Documents" (as defined in the Prepetition August NPA) (collectively, together with the Prepetition August NPA, the "***Prepetition August NPA Documents***"), Core Scientific issued convertible notes (the "***Prepetition August NPA Secured Notes***"), and each of the Prepetition August NPA Guarantors, among other things, jointly and severally, irrevocably and unconditionally guaranteed the due and punctual payment and performance in full in cash of all Prepetition August NPA Secured Notes Obligations (as defined below).

---

[6]     The Prepetition April NPA Secured Parties assert an additional $84.2 million in Prepetition April NPA Secured Notes Obligations in accreted amounts. The Official Committee disputes such entitlement.

(ii)     *Prepetition August NPA Secured Notes Obligations*. As of the Petition Date, the Prepetition August NPA Notes Obligors were justly and lawfully indebted to the Prepetition August NPA Secured Parties, on a joint and several basis, without defense, claim, counterclaim, challenge or offset of any kind, in the aggregate amount of approximately $325.9 million on account of principal amounts outstanding under the Prepetition August NPA Secured Notes, plus accrued but unpaid interest thereon, plus all fees, costs, expenses (including attorneys', financial advisors' and other professionals' fees and expenses), charges, disbursements, indemnification and reimbursement obligations (contingent or otherwise), including all "Obligations" (as defined in the Prepetition August NPA) and all other amounts that may be due or owing under the Prepetition August NPA Documents (collectively, the "***Prepetition August NPA Secured Notes Obligations***").

(c)     *Validity and Enforceability of Prepetition Secured Notes Obligations and Prepetition Secured Notes Liens*. As of the Petition Date, (i) the Prepetition Secured Notes Liens in the Prepetition Secured Notes Collateral (A) are legal, valid, binding, enforceable, non-avoidable and fully perfected liens and security interests in the Prepetition Secured Notes Collateral (except with respect to cash held in the Debtors' deposit accounts that do not otherwise represent identifiable proceeds of Prepetition Secured Notes Collateral), (B) were granted to or for the benefit of the Prepetition Secured Parties for fair consideration and reasonably equivalent value, and (C) are senior with priority over any and all other liens or security interests in the Prepetition Secured Notes Collateral, subject only to certain liens and security interests that were valid, non-avoidable and properly perfected as of the Petition Date (or were properly perfected subsequent to the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code) and senior in priority by operation of law to the Prepetition Liens in the Prepetition Secured Notes Collateral as of the Petition Date (the "***Existing Senior Liens***"));[7] (ii) the Prepetition Secured Notes Obligations constitute legal, valid, binding and non-avoidable obligations of each of the Prepetition Secured Notes Obligors, enforceable in accordance with the terms of the applicable Prepetition Secured Notes Documents; (iii) no challenges, objections, defenses, claims or counterclaims of any kind or nature whatsoever with respect to any of the Prepetition Secured Notes Liens or the Prepetition Secured Notes Obligations exist, and no portion of the Prepetition Secured Notes Liens or the Prepetition Secured Notes Obligations is subject to any challenge, defense or claim (as defined in section 101(5) of the Bankruptcy Code) of any kind or nature whatsoever, including, without limitation, avoidance (whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), reduction, setoff, offset, recoupment, recharacterization, subordination   (whether   equitable,   contractual   or   otherwise),   reclassification,

---

[7]     Nothing contained herein shall constitute a finding or ruling by this Court that any alleged Existing Senior Lien is valid, senior, enforceable, prior, perfected or non-avoidable. Moreover, nothing contained herein shall prejudice the rights of any party in interest, including, but not limited to the Debtors, the Replacement DIP Secured Parties, the Prepetition Secured Parties, or the Official Committee, in each case, to the extent such party has standing to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any alleged Existing Senior Lien (subject to the terms of this Interim Order). For the purposes hereof, any alleged claim arising or asserted as a right of reclamation or return (whether asserted under section 546(c) of the Bankruptcy Code or otherwise) is not an Existing Senior Lien.

disgorgement, disallowance, impairment, marshalling, surcharge or recovery, in each case, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise; (iv) the Debtors waive, discharge, and release any right to challenge the enforceability, validity, priority or perfection of any of the Prepetition Secured Notes Obligations or the Prepetition Secured Notes Liens; and (v) the Prepetition Secured Notes Obligations constitute allowed secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code against each of the Prepetition Secured Notes Obligors and their respective estates.

(d)      *No Claims, Defenses, or Causes of Action against Prepetition Secured Parties*. As of the date hereof, there exists no challenge, objection, defense, claim, counterclaim, or other cause of action, of any kind or nature whatsoever, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise, against any of the Prepetition Secured Parties or any of their Representatives (in their capacities as such) arising from, in connection with, or relating to this Interim Order, the Original Interim DIP Order, the Prepetition Secured Notes Liens, the Prepetition Secured Notes Obligations, the Prepetition Secured Notes Documents or the Prepetition Secured Notes Collateral.

(e)      *Releases*. Subject to paragraph 23 of this Interim Order, effective as of the date of entry of this Interim Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of its predecessors, successors and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits each of the Prepetition Secured Parties and each of their respective Representatives (in their respective capacities as such) from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, cross-claims, demands, defenses, objections, challenges, offsets or setoff, debts, accounts, contracts, liabilities, remedies, suits, controversies, actions, causes of action, losses, damages, indemnities, reimbursement obligations, attorneys' fees, costs, expenses or judgments, of every kind or nature whatsoever, whether matured or unmatured, known or unknown, asserted or unasserted, suspected or unsuspected, foreseen or unforeseen, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, pending or threatened, arising in law or equity, upon contract or tort, under the Bankruptcy Code, any state or federal common law, statute, rule, regulation or otherwise, in each case, that may be asserted by any of the Debtors, their respective estates, predecessors, successors or assigns, against the Prepetition Secured Parties or their respective Representatives (in their capacities as such) for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time prior to the date of this Interim Order, in each case, arising under, in connection with, or related to this Interim Order, the Original Interim DIP Order, the Prepetition Secured Notes, the Prepetition Secured Notes Liens, the Prepetition Secured Notes Collateral, the Prepetition Secured Notes Obligations, the Prepetition Secured Notes Documents, the Adequate Protection Obligations, the transactions contemplated thereunder or hereunder, or the negotiation thereof or hereof, including any claim or cause of action seeking (i) any so-called lender liability, (ii) any and all claims arising under the Bankruptcy Code, whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or (iii) reduction, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification,

disgorgement, disallowance, impairment, marshalling, surcharge or recovery, or any other related claim or cause of action with respect to the validity, enforceability, priority, scope, extent or perfection of the Prepetition Secured Notes Liens, the Prepetition Secured Notes Obligations, or the Prepetition Secured Notes Documents (as relevant).

(f)     *Cash Collateral*.  All of the Debtors' cash (except for cash held in any "Excluded Accounts" (as defined in the Prepetition NPAs) that did not otherwise constitute identifiable proceeds of Prepetition Secured Notes Collateral), (i) as of the Petition Date, wherever located and held, including all cash and cash equivalents deposited or maintained by the Debtors in any accounts, whether as original Prepetition Secured Notes Collateral or proceeds of Prepetition Secured Notes Collateral, and (ii) after the Petition Date that constitutes proceeds, products, offspring or profits of the Prepetition Secured Notes Collateral, constitutes "cash collateral" within the meaning of section 363(a) of the Bankruptcy Code ("***Cash Collateral***"). For the avoidance of doubt, "Cash Collateral" shall not include the proceeds, products, offspring or profits of the First-Priority DIP Collateral.

(g)     *Certain Definitions*

(i)     "***Prepetition Agents***" means the Prepetition April NPA Agent and the Prepetition August NPA Agent.

(ii)    "***Prepetition Equipment Financings***" means loans or indebtedness incurred by Core Scientific or Core Scientific Operating Company (f/k/a Core Scientific, Inc.) to finance the acquisition of machines or equipment, including those incurred under any of the agreements or documents listed on the Schedule of Existing Liens attached hereto as **Exhibit 3**.

(iii)   "***Prepetition Equipment Financing Collateral***" means the property and assets of any Debtor (and proceeds thereof), in each case, as and to the extent a lien or security interest is granted or purported to be granted in such property, assets and/or proceeds thereof, as security for the respective Prepetition Equipment Financings, as more particularly set forth in the applicable Prepetition Equipment Loan Documents.

(iv)    "***Prepetition Equipment Financing Liens***" means the liens and security interests of, or asserted by, each of the Prepetition Equipment Lenders in the Prepetition Equipment Financing Collateral purportedly securing the respective Prepetition Equipment Financings to the extent such liens are valid, properly perfected, and non-avoidable. For the avoidance of doubt and notwithstanding anything contrary herein or in the Replacement DIP Loan Documents, the DIP Liens shall not prime the Prepetition Equipment Financing Liens that are Prior Senior Liens.

(v)     "***Prepetition Equipment Lenders***" means the lenders under the Prepetition Equipment Financings.

(vi)    "***Prepetition Equipment Loan Documents***" means loan documents, and all security, collateral and other agreements, statements, instruments and other documents executed and/or delivered by the Debtors and the Prepetition Equipment Lenders in connection with the Prepetition Equipment Financings.

(vii)    "***Prepetition NPAs***" means the Prepetition April NPA and the Prepetition August NPA.

(viii)    "***Prepetition Secured Notes Documents***" means the Prepetition April NPA Documents and the Prepetition August NPA Documents.

(ix)    "***Prepetition Secured Notes Liens***" means those liens granted to the Prepetition Agents, for the benefit of themselves and the applicable Prepetition Secured Noteholders, arising from the Prepetition Secured Notes Documents (including, among other Prepetition Secured Notes Documents, (a) the Security Agreement, dated as of April 19, 2021, in respect of the Prepetition April NPA Secured Notes, and (b) following the occurrence of a Conversion Event (as defined in the Prepetition August NPA), the Security Agreement, dated as of February 7, 2022, in respect of the Prepetition August NPA Secured Notes), to secure the Prepetition Secured Notes Obligations.

(x)    "***Prepetition Secured Noteholders***" means the Prepetition April NPA Secured Noteholders and the Prepetition August NPA Secured Noteholders.

(xi)    "***Prepetition Secured Notes***" means the Prepetition April NPA Secured Notes and the Prepetition August NPA Secured Notes.

(xii)    "***Prepetition Secured Notes Collateral***" means all "Collateral" as defined in the Prepetition Secured Notes Documents.

(xiii)    "***Prepetition Secured Notes Obligations***" means the Prepetition April NPA Secured Notes Obligations and the Prepetition August NPA Secured Notes Obligations.

(xiv)    "***Prepetition Secured Notes Obligors***" means the Prepetition April NPA Notes Obligors and the Prepetition August NPA Notes Obligors.

(xv)    "***Prepetition Secured Parties***" means the Prepetition April NPA Secured Parties and the Prepetition August NPA Secured Parties.

(xvi)    "***Prior Senior Liens***" means all liens and security interests on DIP Collateral, including those listed on the Schedule of Existing Liens attached hereto as **Exhibit 3**, in each case, solely to the extent such liens and security interests were existing, valid, fully perfected and non-avoidable as of the Petition Date (or are properly perfected subsequent to the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code).

G.    *Findings Regarding Corporate Authority.* Each of the Replacement DIP Loan Parties has all requisite power and authority to execute and deliver the Replacement DIP Loan Documents to which it is a party and to perform its obligations thereunder.

H.    *Findings Regarding Replacement DIP Facility and Use of Cash Collateral.*

(a)    *Good Cause*. Good and sufficient cause has been shown for the entry of this Interim Order and for the Debtors to obtain postpetition financing pursuant to the terms hereof and the Replacement DIP Loan Documents.

(b)    *Need for Postpetition Financing and Use of Cash Collateral*. The Debtors have an immediate and critical need to obtain the Replacement DIP Facility and use Cash Collateral in order to, among other things, (i) repay the Original DIP Facility to avoid an event of default thereunder and the exercise of remedies by the Original DIP Lenders, (ii) permit the orderly continuation and operation of their businesses, (iii) maintain business relationships with customers, vendors and suppliers, (iv) make payroll, (v) make capital expenditures, (vi) pay the expenses of the Chapter 11 Cases (including by funding the Carve-Out), (vii) satisfy working capital and operational needs of the Debtors, and (viii) for general corporate purposes, in each case, in accordance with and subject to the terms and conditions of this Interim Order and the Replacement DIP Loan Documents, including the Approved Budget (subject to Permitted Variances). The Debtors require immediate access to sufficient working capital and liquidity through the incurrence of loans and other financial accommodations under the Replacement DIP Facility and the use of the Prepetition Secured Parties' Cash Collateral in order to preserve, maintain and maximize the going concern value of the Debtors and to facilitate an orderly and successful reorganization of the Debtors. Without access to the DIP Facility and the authorized use of Cash Collateral upon the terms set forth herein, the Debtors and their estates will be immediately and irreparably harmed.

(c)    *No Credit Available on More Favorable Terms.* The Debtors are unable to obtain financing or other financial accommodations on more favorable terms from sources other

than the Replacement DIP Secured Parties. The Debtors are unable to obtain adequate unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code. The Debtors are also unable to obtain adequate secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without granting to the Replacement DIP Secured Parties the rights, benefits, remedies and protections set forth herein and the Replacement DIP Loan Documents, including the DIP Liens in all DIP Collateral and the DIP Superpriority Claims.

(d)     *Use of Proceeds of Replacement DIP Facility and Cash Collateral.* As a condition to providing the Replacement DIP Facility and their consent to the use of Prepetition Secured Notes Collateral (including Cash Collateral), each of the Replacement DIP Secured Parties and the Prepetition Secured Parties (as applicable) require, and the Debtors have agreed, that all proceeds of the DIP Loans and all Cash Collateral shall be used and/or applied solely for the purposes expressly permitted in, and in a manner consistent with, the Approved Budget (subject to Permitted Variances) including (i) to pay the costs of administration of the Chapter 11 Cases, (ii) for general corporate and working capital purposes, (iii) to pay adequate protection payments to the extent set forth in this Interim Order, (iv) to repay the Debtors' outstanding Original DIP Obligations under the Original DIP Loan Documents and the Original Interim Order, in accordance with the terms of this Interim Order and the Payoff Letter, and (v) to pay professional fees and expenses in accordance with the Original Interim Order and this Interim Order, in each case, subject to the terms and conditions of this Interim Order and the Replacement DIP Loan Documents.

(e)     *Approved Budget.* The Debtors have prepared and delivered to the Replacement DIP Secured Parties the initial itemized cash flow forecast set forth on **Exhibit 4** attached hereto, which has been approved by the Replacement DIP Lender and the Ad Hoc Group

(the "*Initial Budget*," as amended, supplemented or updated by the Debtors, and approved by the Replacement DIP Lender and the Ad Hoc Group, from time to time in accordance with the terms of this Interim Order and the Replacement DIP Term Sheet or Replacement DIP Credit Agreement, as applicable, the "*Approved Budget*") reflecting, on a line item, cumulative and aggregate basis, the Debtors' projected cash receipts expected to be collected, and necessary disbursements and expenditures (including debt service costs) expected to be incurred or made, by the Debtors for each calendar week during the period from the calendar week ending on the Friday of the week in which the Court enters this Interim Order through and including the week ending June 30, 2023. The Initial Budget is an integral part of this Interim Order, and the Replacement DIP Secured Parties are relying, in part, upon the Debtors' agreement to comply with the Approved Budget (subject to Permitted Variances) in determining to enter into the Replacement DIP Facility and to allow the Debtors' use of proceeds of the Replacement DIP Facility in accordance with the terms of this Interim Order and the Replacement DIP Loan Documents. In the event of a disagreement between the Replacement DIP Lender and the Ad Hoc Group with respect to whether a proposed budget constitutes an Approved Budget, the determination of the Replacement DIP Lender shall prevail; *provided* that, in such event, the Ad Hoc Group shall be entitled to object and seek relief from the Court (and the Replacement DIP Loan Parties and the Replacement DIP Secured Parties shall not object to such relief being heard on an emergency basis) (the respective rights in this final sentence of paragraph H(e), the "*Budget Resolution Right*").

(f)    *Adequate Protection*. Pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code, the Prepetition Secured Parties are entitled to adequate protection against any post-petition diminution in value of the Prepetition Secured Parties' respective liens and interests in the Prepetition Secured Notes Collateral (including Cash Collateral) resulting from, among other

things, (i) the use, sale or lease by the Debtors of Prepetition Secured Notes Collateral (including Cash Collateral), (ii) the imposition of the automatic stay, (iii) the imposition of the Carve-Out, and (iv) any other cause or reason to the maximum extent provided under the Bankruptcy Code and applicable law (collectively, the "***Diminution in Value***"), as set forth in this Interim Order. Based on the Motion, the DIP Declarations, the First Day Declaration, and the other evidence filed in support of the Motion, and the record presented to the Court in connection with the Interim Hearing, the terms of the adequate protection arrangements and the use of Prepetition Secured Notes Collateral (including Cash Collateral) set forth herein are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of Prepetition Secured Notes Collateral (including Cash Collateral); *provided* that nothing in this Interim Order shall (x) be construed as the affirmative consent by any of the Prepetition Secured Parties for the use of Cash Collateral or other Prepetition Secured Notes Collateral other than on the terms expressly set forth in this Interim Order, (y) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the DIP Collateral or the Prepetition Secured Notes Collateral (whether senior, *pari passu* or junior) other than on the terms expressly set forth in this Interim Order, or (z) prejudice, limit or otherwise impair the rights of any of the Prepetition Secured Parties to seek new, different or additional adequate protection after the date hereof or assert the interests of any of the Prepetition Secured Parties (and the rights of all parties-in-interest to object to any such relief are expressly preserved).

(g)     *Consent by the Prepetition Secured Parties*. The requisite Prepetition Secured Parties have consented (or are deemed to have consented) to the Debtors' use of Prepetition Secured Notes Collateral (including Cash Collateral), to the Debtors' entry into the Replacement DIP Facility, and to the granting of the DIP Liens, the DIP Superpriority Claims, the

Noteholder Adequate Protection Liens, the Noteholder Adequate Protection Obligations and the other liens and claims granted hereunder, in each case, upon the terms set forth in this Interim Order.

(h)      *Section 506(c), Section 552(b), and Marshalling Waivers*. Subject to paragraph 43, as a material inducement to the Replacement DIP Secured Parties and Prepetition Secured Parties to provide the Replacement DIP Facility and consent (or deemed consent) to use Cash Collateral, respectively, and in consideration of (i) the Replacement DIP Secured Parties' agreement to subordinate their DIP Liens to the Carve-Out, as set forth herein, (ii) the Prepetition Secured Parties' consent (or deemed consent) to the use of Prepetition Secured Notes Collateral (including Cash Collateral) as and to the extent expressly set forth herein, and (iii) the DIP Secured Parties' and the Prepetition Secured Parties' agreement to the payment of expenses of the administration of these cases, subject to the Approved Budget (subject to Permitted Variances), in accordance with the terms of this Interim Order and the Replacement DIP Loan Documents, (A) the Replacement DIP Loan Parties waive their right to surcharge any costs or expenses incurred in connection with the preservation, protection or enhancement of, or realization by the Replacement DIP Secured Parties or the DIP Collateral, whether pursuant to section 506(c) of the Bankruptcy Code or otherwise, and the Replacement DIP Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, and (B)(1) the Replacement DIP Loan Parties waive their right to surcharge any costs or expenses incurred in connection with the preservation, protection or engagement of, or realization by the Prepetition Secured Parties or the Prepetition Secured Notes Collateral, whether under section 506(c) of the Bankruptcy Code or otherwise, (2) the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and in no event shall the

"equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition Secured Parties or the Prepetition Secured Notes Collateral, and (3) the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Prepetition Secured Notes Collateral.

(i)     *No Control*. None of the Replacement DIP Secured Parties or the Prepetition Secured Parties control (or have in the past controlled) the Replacement DIP Loan Parties, their properties or operations, have authority to determine the manner in which any Replacement DIP Loan Parties' operations are conducted or are control persons or insiders of the Replacement DIP Loan Parties by virtue of any of the actions taken in connection with, arising under, or related to the Replacement DIP Loan Documents or the Prepetition Secured Notes Documents.

(j)     *Good Faith*. The terms of the Replacement DIP Facility and the Replacement DIP Loan Documents, the terms of adequate protection granted to the Prepetition Secured Parties hereunder, and the terms upon which the Debtors may continue to use Prepetition Secured Notes Collateral (including Cash Collateral) pursuant to the terms of the Original Interim Order (as it relates to the Prepetition Secured Parties) and this Interim Order and the Replacement DIP Loan Documents (as applicable), were negotiated in good faith and at arm's length among the Replacement DIP Loan Parties, the Replacement DIP Secured Parties, the Prepetition Secured Parties, and their respective Representatives, and all of the Replacement DIP Loan Parties' obligations and indebtedness arising under, in respect of, or in connection with, the Replacement DIP Facility, the Replacement DIP Loan Documents, the Original Interim Order (as it relates to the Prepetition Secured Parties) and this Interim Order, including all loans, advances, extensions of credit and other financial accommodations made to and guarantees issued by the Replacement

DIP Loan Parties pursuant to the Replacement DIP Loan Documents, shall each be deemed to have been extended by the Replacement DIP Secured Parties and each of their respective affiliates, in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by sections 364(e) of the Bankruptcy Code, and each of the claims, liens and security interests, rights, remedies, benefits and protections granted to the Replacement DIP Secured Parties and the Prepetition Secured Parties (and their successors and assigns) pursuant to the Original Interim Order (as it relates to the Prepetition Secured Parties), this Interim Order and the Replacement DIP Loan Documents (including the DIP Liens, the DIP Superpriority Claims, the DIP Obligations and the Noteholder Adequate Protection Obligations) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Original Interim Order (as it relates to the Prepetition Secured Parties), this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise. The Prepetition Secured Parties have acted in good faith, and each of the claims, liens and security interests, rights, remedies, benefits and protections granted to the Prepetition Secured Parties (and their successors and assigns) pursuant to the Original Interim Order and this Interim Order (including, without limitation, all Noteholder Adequate Protection Liens, Noteholder Adequate Protection Claims, and Noteholder Adequate Protection Obligations) shall be entitled to the full protection of section 363(m) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

(k)   *Proper Exercise of Business Judgment.* Based on the Motion, the Replacement DIP Declarations, the record presented to the Court at the Interim Hearing and the Chapter 11 Cases, the terms of the Replacement DIP Facility and the Replacement DIP Loan Documents, the terms of adequate protection granted to the Prepetition Secured Parties as set forth

in the Original Interim Order and this Interim Order, and the terms upon which the Debtors may continue to use Prepetition Secured Notes Collateral (including Cash Collateral) pursuant to the terms of the Original Interim Order, this Interim Order and the Replacement DIP Loan Documents (as applicable) (i) were negotiated in good faith and at arm's length among the Replacement DIP Loan Parties, the Replacement DIP Secured Parties and the Prepetition Secured Parties, (ii) are fair, reasonable, and the best available to the Debtors under the circumstances, (iii) reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and (iv) are supported by reasonably equivalent value and fair consideration.

(l)     *Notice*. Proper, timely, sufficient and appropriate notice of the Motion and the Interim Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, and no other or further notice of the Motion, the Interim Hearing or the entry of this Interim Order shall be required.

(m)     *Immediate Entry; Relief Essential.* The Debtors have requested, and the Court hereby finds that sufficient cause exists for, the immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Bankruptcy Rules. Unless the relief set forth in this Interim Order is granted, the Debtors' estates will be immediately and irreparably harmed. Consummation of the Replacement DIP Facility and the use of Prepetition Secured Notes Collateral (including Cash Collateral) upon the terms set forth in the Original Interim DIP Order, this Interim Order and the Replacement DIP Loan Documents (as applicable) are necessary to preserve and maximize the value of the Debtors, are in the best interests of the Debtors and their estates, and are consistent with the Debtors' exercise of their fiduciary duties.

**NOW THEREFORE**, based upon the foregoing findings and conclusions, the Motion, the First Day Declaration, the Replacement DIP Declaration, the evidence adduced at the Interim

Hearing and the record before the Court, and after due consideration, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      *Motion Granted.* The Motion is hereby granted on an interim basis, and the Replacement DIP Facility and the use of Cash Collateral is hereby authorized and approved on an interim basis, in each case, upon the terms and conditions set forth in this Interim Order, including as set forth in the Replacement DIP Term Sheet, (which is incorporated into this Interim Order in its entirety and is deemed to be a part of this Interim Order) and the Replacement DIP Loan Documents. Any objections to any of the relief set forth in this Interim Order that have not been withdrawn, waived, or settled, and all reservations of rights or other statements inconsistent with this Interim Order, are hereby denied and overruled. This Interim Order shall become effective and enforceable immediately upon its entry.

2.      *Authorization of Replacement DIP Facility and Replacement DIP Loan Documents.*

(a)      *Authorization of Replacement DIP Loan Documents.* The Replacement DIP Loan Parties are hereby authorized to (i) execute, deliver, enter into and perform all of their obligations, and to calculate and pay all fees, costs, expenses, indemnities and other amounts contemplated, under the Replacement DIP Loan Documents and this Interim Order, and (ii) perform all acts, to make, execute, deliver, enter into and perform under any and all other agreements, instruments, certificates, and other documents (including the execution and/or recordation of any collateral, pledge and security documents, mortgages, deeds of trust, control agreements, financing statements or other documents), and to perform all such other and further acts, that may be necessary, required or desirable for the Replacement DIP Loan Parties to perform

their obligations under the Replacement DIP Facility, the Replacement DIP Loan Documents and this Interim Order and to implement the transactions contemplated thereunder and hereunder.

(b) *Authorization to Borrow.* The Replacement DIP Borrowers are hereby authorized to borrow, and the Replacement DIP Guarantors are hereby authorized to jointly and severally guarantee the payment in full in cash of such borrowing with respect to, the principal amount of $35 million (plus applicable interest (including interest and other amounts payable-in-kind), premiums, payments, fees (including professional fees and expenses), costs, expenses, charges and other amounts payable under this Interim Order and the Replacement DIP Loan Documents in connection with such borrowing), under the Replacement DIP Facility, subject to the terms and conditions (including any conditions precedent to such borrowing) set forth in the Replacement DIP Loan Documents and this Interim Order. The Debtors are hereby authorized to use the proceeds of the Replacement DIP Facility and all Cash Collateral solely in the manner and for the purposes expressly permitted in the Approved Budget (subject to Permitted Variances), the Replacement DIP Loan Documents and this Interim Order. All actions taken prior to the date hereof by the Debtors, the Replacement DIP Secured Parties, the Original DIP Agent, the Original DIP Lenders and the Prepetition Secured Parties in accordance with or reliance upon the Original Interim Order and/or this Interim Order are hereby ratified and approved.

(c) *Payment of Fees and Expenses.* From and after the date hereof, the Replacement DIP Loan Parties are authorized and directed to pay any and all (i) fees payable under the Replacement DIP Loan Documents, including the Upfront Premium, the Exit Premium, the Extension Fee and the Monthly DIP Agent Fee (each as defined in the Replacement DIP Term Sheet), and each shall not be subject to reduction, setoff or recoupment, and each of which shall be deemed fully earned upon the occurrence of the Closing Date following entry of this Interim

Order, (ii) amounts due (or that may become due) in respect of any and all indemnification obligations under the Replacement DIP Loan Documents, and (iii) any other amounts payable in connection with the Replacement DIP Facility and the Prepetition Secured Notes, including the payment of all out-of-pocket costs, expenses and disbursements of the Replacement DIP Secured Parties and Prepetition Secured Parties, including (A) the reasonable and documented fees and expenses of (1) Choate, Hall & Stewart LLP ("**Choate**"), as counsel to the Replacement DIP Secured Parties and (2) any other professionals that may be retained by the Replacement DIP Lender (with the consent of the Replacement DIP Borrowers, such consent not to be unreasonably withheld or delayed, which consent of the Replacement DIP Borrowers shall not be required after the occurrence of a DIP Termination Event (as defined below) (collectively, the "***DIP Professional Fees and Expenses***")), and (B) the reasonable and documented fees and expenses (whether or not such costs, fees and expenses arose before, on or after the Petition Date or the date of this Interim Order, and whether or not the Replacement DIP Facility closes or the Replacement DIP Facility is subsequently terminated or repaid) of (1) the Prepetition Agents, including the reasonable and documented fees and expenses of Shipman & Goodwin LLP, counsel to the Prepetition Agents, and (2) the fees and expenses of the ad hoc group of certain Prepetition Secured Noteholders (the "***Ad Hoc Group***"), including (x) Paul Hastings LLP, as counsel to the Original DIP Lenders and the Ad Hoc Group and (y) Moelis & Company, LLC ("***Moelis***"), as investment banker and financial advisor to the Original DIP Lenders and the Ad Hoc Group, pursuant to the terms of that certain letter agreement by and among Core Scientific and Moelis (collectively, the "***Noteholder Professional Fees and Expenses***"). Notwithstanding the foregoing, the Replacement DIP Loan Parties shall be authorized to make the foregoing payments whether or not the Replacement DIP Facility is consummated unless the Court rules that, with respect to <u>clause (iii)(A)</u> only, the

Replacement DIP Lender has (x) materially breached its obligations under any Replacement DIP Loan Document or (y) failed to fund the Replacement DIP Loans as required under the Replacement DIP Loan Documents.

(d)     *Modification of Replacement DIP Loan Documents.* The Replacement DIP Loan Parties are hereby authorized to execute, deliver and perform under one or more amendments, waivers, consents, or other modifications (including, for the avoidance of doubt, the payment of any amendment fee, consent fee, waiver fee or similar fee paid or payable in connection therewith) to and under the Replacement DIP Loan Documents, in each case, in accordance with the provisions thereof governing amendments thereto, each without further application to or order of the Court; *provided* that any amendment to the Replacement DIP Credit Agreement shall require, at a minimum, the prior written consent of the Replacement DIP Lender; *provided*, *further*, that any amendment that (a) shortens the maturity of the extensions of credit thereunder, (b) increases the aggregate commitments thereunder, (c) increases the rate of interest payable with respect thereto, or (d) any other material amendment, modification or waiver (each, a "***Material DIP Amendment***"), shall be provided (which may be by electronic mail) to the U.S. Trustee and lead restructuring counsel to the Official Committee and the Ad Hoc Group and filed with the Court no later than three (3) Business Days prior to the anticipated date of effectiveness of any such Material DIP Amendment, and if no objection to the Material DIP Amendment is made by the U.S. Trustee, the Ad Hoc Group or the Official Committee within such three (3) Business Day period, then, without further application to or order of the Court, such Material DIP Amendment shall automatically be deemed approved and effective; *provided*, *further*, that, if an objection is made by the U.S. Trustee, the Ad Hoc Group or the Official Committee within such three (3) Business Day period, then such Material DIP Amendment shall be subject to a hearing and approval of the

Court.  Any amendment to the Replacement DIP Facility that does not constitute a Material DIP Amendment shall be provided as soon as reasonably practical prior to execution to lead restructuring counsel to the Official Committee and the Ad Hoc Group. Notwithstanding the foregoing or anything contained in the Replacement DIP Loan Documents or this Interim Order to the contrary, in no event shall the Replacement DIP Loan Documents or this Interim Order be amended, modified or supplemented in a manner that adversely affects the rights, liens, security interests, claims, benefits and protections of the Prepetition Secured Parties hereunder or under the Prepetition Secured Notes Documents without the prior written consent of the Ad Hoc Group or approval from this Court (upon notice to the Ad Hoc Group and a hearing).

(e)     *DIP Funding Account*. Upon entry of this Interim Order, the Replacement DIP Borrower is hereby authorized and directed to establish a new bank account or use an existing bank account (the "***Replacement DIP Funding Account***"), which shall be subject to a control agreement in form and substance acceptable to the Replacement DIP Agent, and shall at all times be subject to the exclusive control of the Replacement DIP Agent. Subject to the Carve-Out, and subject in all respects to paragraph 44 of this Interim Order, after all Original DIP Obligations are Paid in Full and the Refinancing is consummated in accordance with this Interim Order (the "***Refinancing Effective Date***"), the proceeds of all DIP Borrowings under the Replacement DIP Facility, and all cash receipts, and all proceeds from the sale or other disposition of, or other revenue of any kind attributable to, any DIP Collateral that is now in, or shall hereafter come into, the possession or control of any of the Replacement DIP Loan Parties, or to which any of the Replacement DIP Loan Parties is now or shall hereafter become entitled, shall be deposited into the DIP Funding Account, and all cash and other amounts held in or credited to the DIP Funding Account may not be withdrawn or used by the Replacement DIP Loan Parties other than as

expressly permitted hereunder or in the Replacement DIP Loan Documents (subject in all respects to paragraph 44 of this Interim Order).

(f)     *Perfection in Cash*. Subject to the Carve-Out, and subject to the terms of this Interim Order and the Replacement DIP Loan Documents, all financial institutions with which the Replacement DIP Loan Parties maintain accounts containing any of the Replacement DIP Loan Parties' cash that constitutes DIP Collateral are authorized and directed to comply with any request of the Replacement DIP Agent to turn over to the Replacement DIP Agent all cash therein without offset or deduction of any kind; *provided* that the foregoing shall be subject in all respects to paragraph 44 of this Interim Order. The Replacement DIP Agent shall be entitled to all of the rights and benefits of all deposit account control agreements, blocked account control agreements, securities account control agreements, and similar agreements to which any of the Replacement DIP Loan Parties may be a party, without the need to enter into any such agreements. Notwithstanding (and without limiting) the foregoing, the Replacement DIP Loan Parties are authorized to enter into, and cause the financial institutions servicing or maintaining the Replacement DIP Loan Parties' deposit accounts (or other accounts) to enter into, such deposit account control agreements and other collateral agreements with the Replacement DIP Agent and such financial institutions as the Replacement DIP Agent may reasonably request.

3.     *Replacement DIP Obligations.*

(a)     Upon execution and delivery of the Replacement DIP Loan Documents, the Replacement DIP Loan Documents shall constitute valid, binding, enforceable, and non-avoidable obligations of each of the Replacement DIP Loan Parties, and shall be fully enforceable against each of the Replacement DIP Loan Parties, their estates, and any successors thereto, including any estate representative or trustee appointed in any of the Chapter 11 Cases or in any case under

chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or relating to any of the foregoing, and/or upon the dismissal of any of the Chapter 11 Cases or any such successor cases (collectively, the "***Successor Cases***"), in each case, in accordance with the terms of the Replacement DIP Loan Documents and this Interim Order.

(b)     Upon execution and delivery of the Replacement DIP Loan Documents, the Replacement DIP Loan Parties shall be jointly and severally liable for all Replacement DIP Obligations, including all loans, advances, indebtedness, obligations, extensions of credit, financial accommodations, principal, interest, payments, premiums or similar amounts, fees, costs, expenses, charges, indemnification and reimbursement obligations (whether contingent or absolute), and all other amounts, whenever the same shall become due and payable, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, to the Replacement DIP Agent or the Replacement DIP Lender under the Replacement DIP Loan Documents or this Interim Order. The Replacement DIP Obligations shall be due and payable, without notice or demand on the DIP Termination Declaration Date (as defined below) (subject to paragraph 20(b) hereof).

(c)     All obligations incurred, payments made, and transfers or grants of liens and security interests set forth in the Original Interim Order, this Interim Order and the Replacement DIP Loan Documents by the Replacement DIP Loan Parties are granted to or for the benefit of the Replacement DIP Loan Parties for fair consideration and reasonably equivalent value and are granted contemporaneously with the making of the loans and commitments and other financial accommodations secured thereby. No obligation, payment, transfer, or grant of liens or security interests under the Original Interim Order, this Interim Order or the Replacement DIP

Loan Documents to the Replacement DIP Secured Parties or the Prepetition Secured Parties shall be limited, stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law, or subject to any challenge, objection, defense or claim, including avoidance (whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge, recovery or other cause of action of any kind or nature whatsoever, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise (subject, solely in the case of the DIP Professional Fees and Expenses and the Noteholder Professional Fees and Expenses, only to the procedures set forth in paragraph 11 of this Interim Order).

4.    *No Obligation to Extend Credit.* The Replacement DIP Secured Parties shall have no obligation to make any loan or advance available under the Replacement DIP Loan Documents unless all of the conditions precedent to the making of such loan or advance by the Replacement DIP Secured Parties have been satisfied in full (or waived) in accordance with the terms of the Replacement DIP Loan Documents and this Interim Order..

5.    *No Duty to Monitor Compliance*. None of the Replacement DIP Secured Parties nor the Prepetition Secured Parties shall have any obligation or responsibility to monitor the Debtors' use of DIP Collateral, the Prepetition Secured Notes Collateral, or Cash Collateral, and each of the DIP Secured Parties and the Prepetition Secured Parties may rely upon the Debtors' representations that the use of DIP Collateral, Prepetition Secured Notes Collateral, and Cash

Collateral complies with and is in accordance with the requirements of this Interim Order and the Replacement DIP Loan Documents (as applicable).

6.    *DIP Liens.*

(a)    As security for the prompt and complete payment and performance of all Replacement DIP Obligations when due (whether upon stated maturity, prepayment, acceleration, declaration or otherwise), effective and perfected as of the entry of this Interim Order, and without the necessity of the execution, recordation or filing by any of the Replacement DIP Loan Parties or the Replacement DIP Secured Parties of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title, or any similar document or instrument, or the taking of any other action (including entering into any control agreements or taking any other action to take possession or control of any DIP Collateral), the Replacement DIP Agent, for the benefit of itself and the Replacement DIP Lender, is hereby granted valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens and security interests (collectively, the "***DIP Liens***") in all DIP Collateral, in each case, subject and subordinate to the Carve-Out, and subject to the relative priorities set forth in this Interim Order.

(b)    The term "***DIP Collateral***" means (i) all assets and properties (or interest therein) of each of the Replacement DIP Loan Parties and their estates, of any kind or nature whatsoever, wherever located, whether tangible or intangible, real, personal or mixed, whether now owned or consigned by or to, or leased from or to, or hereafter acquired by, or arising in favor of, each of the Replacement DIP Loan Parties (including under any trade names, styles or derivations thereof), whether prior to or after the Petition Date, that is not subject to any liens and security interests that were valid, non-avoidable and properly perfected as of the Petition Date (or

that were properly perfected subsequent to the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code), limited, with respect to all real property and the facilities, to the facility located in Marble, North Carolina, and not including Avoidance Actions (as defined below) (the "*First-Priority DIP Collateral*"), (ii) all assets and properties (or interest therein) of the Replacement DIP Loan Parties' estates (whether tangible, intangible, real, personal or mixed and wherever located) as of the Petition Date that (A) are subject to the Prepetition Secured Notes Liens, (B) are subject to the Prepetition Equipment Financing Liens, (C) are subject to other valid, perfected, and non-avoidable liens in existence as of the Petition Date (including mortgages, mechanics' liens and fixture filings), limited, with respect to all real property and the facilities, to those located in Calvert City, Kentucky; Grand Forks, North Dakota; Muskogee, Oklahoma; Barstow, Texas (Cedarvale); Pecos, Texas (Cottonwood); and Dalton, Georgia, or (D) are subject to other valid liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (collectively, the "*Junior-Priority DIP Collateral*"), (iii) upon entry of the Final Order, the proceeds of any causes of actions for preferences, fraudulent conveyances, and other avoidance power claims under sections 502(d), 544, 545, 547, 548, and 550 of the Bankruptcy Code (the "*Avoidance Actions*") (but not, for the avoidance of doubt, the Avoidance Actions themselves), and (iv) any and all rents, issues, products, offspring, proceeds, and profits generated by any item of DIP Collateral, without the necessity of any further action of any kind or nature by the Replacement DIP Agent or the Replacement DIP Lender in order to claim or perfect such rents, issues, products, offspring, proceeds, and/or profits.

(c)     The DIP Liens shall be subject to the following priorities (subject in each case to the Carve-Out): [8]

(i)     *First-Priority Liens on Unencumbered Property.* Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected first-priority liens and security interests in all First-Priority DIP Collateral (the "***First-Priority DIP Liens***"), which First-Priority DIP Liens shall be junior and subordinated only to the Carve-Out.

(ii)     *Liens Junior to Certain Other Liens.* Pursuant to sections 364(c)(3) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected liens and security interests in all Junior-Priority DIP Collateral (the "***Junior-Priority DIP Liens***"), which Junior-Priority DIP Liens in such Junior Priority DIP Collateral shall be subject only to the (a) Carve-Out, in all respects, and, as applicable (b)(1) the Prior Senior Liens, (2) the Equipment Lender Adequate Protection Liens and the Equipment Lender Prepetition Liens in Prepetition Equipment Financing Collateral, and (3) the Prepetition Secured Notes Liens and the Noteholder Adequate Protection Liens in the Prepetition Secured Notes Collateral.

(d)     To the maximum extent permitted by the Bankruptcy Code, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document or other agreement that requires the consent or approval of one or more landlords, licensors or other parties, or requires the payment of any fees or obligations to any governmental entity, non-governmental entity or any other person or entity, in order for any Debtor to pledge, grant, mortgage, sell, assign, or otherwise transfer any interest therein (including any fee or leasehold interest), any proceeds thereof or other DIP Collateral, shall be deemed inconsistent with the provisions of the Bankruptcy Code and shall have no force or effect with

---

[8]     Notwithstanding the foregoing, and notwithstanding anything contained herein or the Replacement DIP Loan Documents to the contrary, prior to the Refinancing Effective Date, absent a further order of this Court, (a)(i) the DIP Liens under the Replacement DIP Facility shall be subject and junior in all respects to the DIP Liens (as defined in the Original Interim Order) arising under the Original DIP Facility (the "***Original DIP Liens***"), (ii) no lien or security interest shall be senior to or *pari passu* with the Original DIP Liens shall be granted, (iii) the DIP Superpriority Claims shall be subject and junior in all respects to the DIP Superpriority Claims (as defined in the Original DIP Order) arising under the Original DIP Facility (the "***Original DIP Superpriority Claims***"), (iv) no claim senior to or *pari passu* with the Original DIP Superpriority Claims shall be granted or allowed, and (v) no sale of any DIP Collateral shall occur except in the ordinary course of business.

respect to the granting of the DIP Liens or Adequate Protection Liens (as defined below) in any such interest therein or other DIP Collateral, or in the proceeds of any assignment and/or sale thereof by any Debtor in favor of the Replacement DIP Secured Parties in accordance with the DIP Loan Documents and this Interim Order.

(e)     For the avoidance of doubt and notwithstanding anything contrary herein or in the Replacement DIP Credit Agreement, the DIP Liens shall not prime or rank *pari passu* with (i) the Prepetition Secured Notes Liens in the Prepetition Secured Notes Collateral, and (ii) the Prepetition Equipment Financing Liens that are Prior Senior Liens.

7.     *DIP Superpriority Claims.* Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the Replacement DIP Obligations shall constitute allowed superpriority administrative expense claims against each of the Debtors, with priority over any and all other claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including any and all other administrative expense claims of the kind specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, or 1114 of the Bankruptcy Code, or any other provision of the Bankruptcy Code (including the Adequate Protection Claims and any other Adequate Protection Obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment (the "***DIP Superpriority Claims***"), subject only to the Carve-Out. The DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code. The DIP Superpriority Claims shall be payable by each of the Debtors, on a joint and several basis, and shall have recourse to all DIP Collateral, subject only to the Carve-Out. The DIP Superpriority Claims shall be entitled to the

full protection of section 364(e) of the Bankruptcy Code, including in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

8.    *Use of DIP Collateral and Cash Collateral.*

(a)    The Debtors are hereby authorized to use the proceeds of DIP Loans and all Cash Collateral solely to the extent expressly permitted under the Approved Budget (subject to Permitted Variances) and subject to the terms and conditions set forth in the Replacement DIP Loan Documents and this Interim Order; *provided* that the Prepetition Secured Parties are granted adequate protection as set forth herein; *provided*, *further*, that until the Refinancing Effective Date occurs, the consent of the Prepetition Secured Parties to the use of Prepetition Secured Notes Collateral (including Cash Collateral) shall terminate five (5) Business Days after the date of entry of this Interim Order if the Refinancing Effective Date has not occurred by such date (and such event shall constitute a Cash Collateral Termination Event for all purposes hereunder).

(b)    Without the prior written consent of the Replacement DIP Lender, the Replacement DIP Loan Parties shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral (or enter into any binding agreement to do so), except as may be expressly permitted by the Replacement DIP Loan Documents and this Interim Order.

(c)    Without either (i) the prior written consent of the Ad Hoc Group or (ii) a further order of this Court, the Replacement DIP Loan Parties shall not sell, transfer, lease, encumber, or otherwise dispose of DIP Collateral that constitutes Prepetition Secured Notes Collateral and/or proceeds, products, offspring, or profits thereof; *provided* that any such order shall provide that the Prepetition Secured Notes Liens shall attach to the proceeds of such disposition with the same rights and priorities in existence as of immediately prior to such disposition; *provided*, *further*, that nothing in this paragraph 8(c) shall restrict the disposition by

the Replacement DIP Loan Parties of DIP Collateral that constitutes Prepetition Secured Notes Collateral and/or proceeds, products, offspring, or profits thereof in the ordinary course of business.

(d)      All collection and proceeds of DIP Collateral, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnation, or otherwise, will be deposited and applied as required by this Interim Order and the Replacement DIP Loan Documents; *provided* that the foregoing shall be subject in all respects to paragraph 44 of this Interim Order. The Debtors shall not transfer any cash, assets, properties or other DIP Collateral to any Replacement DIP Loan Party or other affiliate of the Debtors that is not a Debtor in the Chapter 11 Cases without the prior written consent of the Replacement DIP Lender and the Ad Hoc Group, each in their discretion.

(e)      The Debtors are hereby authorized to use the proceeds of all Cash Collateral as set forth in and subject to the terms and conditions set forth in this Interim Order; *provided* that the Prepetition Secured Parties are granted adequate protection as set forth herein.

(f)      Except as may be provided in the Replacement DIP Loan Documents, the Debtors are authorized and directed, upon the closing of a sale of any of the First-Priority DIP Collateral, to immediately pay all proceeds of any such sale to the Replacement DIP Agent, for the benefit of itself and the Replacement DIP Lender, to satisfy the Replacement DIP Obligations in accordance with this Interim Order and the Replacement DIP Loan Documents until Paid in Full,[9] and any order approving the sale of such First-Priority DIP Collateral shall provide that the

---

[9]      For purposes hereof, the term "***Paid in Full***" or "***Payment in Full***" means, with respect to the Replacement DIP Obligations or the Prepetition Secured Notes Obligations (as the case may be), the irrevocable and indefeasible payment in full in cash of all Replacement DIP Obligations or Prepetition Secured Notes Obligations (as the case may be), other than contingent indemnification and expense reimbursement obligations for which no claim or demand has been asserted, and all commitments thereunder shall have irrevocably, permanently and finally expired or shall have been terminated, cancelled and discharged.

sale is conditioned upon the payment of such Replacement DIP Obligations (except to the extent otherwise agreed in writing by the Replacement DIP Lender); *provided* that notwithstanding the foregoing, and notwithstanding anything to the contrary in the Replacement DIP Loan Documents or this Interim Order, the proceeds of any disposition of assets subject to one or more Prior Senior Liens or Prepetition Secured Notes Liens shall be payable on account of Replacement DIP Obligations only after the obligations secured by such Prior Senior Liens or Prepetition Secured Notes Liens (as the case may be) have been Paid in Full or sufficient funds have been segregated to provide for such Payment in Full in an account for the sole benefit of the Prepetition Secured Noteholders.

9.      *Approved Budget.* The DIP Loan Parties shall comply at all times with the Approved Budget then in effect (subject to Permitted Variances). Any amendments, supplements or updates to the Initial Budget (or any subsequent Approved Budget) (each, a "***Budget Supplement***") shall be subject to the prior approval of (a) the Replacement DIP Lender in accordance with the Replacement DIP Loan Documents) and (b) subject to the Budget Resolution Right, the Ad Hoc Group, at the same times and upon the same conditions applicable to the Replacement DIP Agent or Replacement DIP Lender as set forth in the Replacement DIP Loan Documents (as currently in effect, without giving effect to any amendments or modifications thereto), and, in each case, any such Budget Supplement shall not constitute an "Approved Budget" unless and until it is so approved by the Replacement DIP Lender and, subject to the Budget Resolution Right, the Ad Hoc Group (and until any such Budget Supplement is approved by the Replacement DIP Lender and, subject to the Budget Resolution Right, the Ad Hoc Group, the prior Approved Budget shall remain in effect).   Notwithstanding anything contained herein to the contrary, the Debtors are hereby authorized and directed to pay all Replacement DIP Obligations

as such obligations become due under this Interim Order and the Replacement DIP Loan Documents, including all DIP Professional Fees and Expenses, regardless of whether payment of such amounts is authorized under the Approved Budget, and, notwithstanding anything contained in this Interim Order to the contrary, (i) such Replacement DIP Obligations and such DIP Professional Fees and Expenses shall not be tested for variance purposes related to the Approved Budget and (ii) the payment of the Replacement DIP Obligations in accordance with the terms thereof shall not, in and of itself, be the basis for a Cash Collateral Termination Event.

10.     *Adequate Protection*. The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, whether or not the Replacement DIP Facility is consummated or is subsequently terminated or repaid, to adequate protection of their Prepetition Secured Notes Liens in Prepetition Secured Notes Collateral (including Cash Collateral), as follows (the liens, security interests, payments and other obligations set forth in this paragraph 10, and the payment obligations with respect to the Noteholder Professional Fees and Expenses under the Original Interim Order and hereunder, are collectively referred to herein as the "***Noteholder Adequate Protection Obligations***"):

(a)     *Noteholder Adequate Protection Claims.* The Prepetition Agents, for their own benefit and for the benefit of the Prepetition Secured Noteholders, were, by the Original Interim Order, and are hereby granted, on a final basis, in the amount of any aggregate Diminution in Value of the Prepetition Secured Notes Liens in the Prepetition Secured Notes Collateral (including Cash Collateral) from and after the Petition Date, superpriority administrative expense claims contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors (the "***Noteholder Adequate Protection Claims***"), which shall be payable by each of the Debtors on a joint and several basis, and shall have recourse to all DIP Collateral, subject to the terms

hereof and priorities set forth herein. The Noteholder Adequate Protection Claims shall be (a) subject and subordinate only to the Carve-Out and the DIP Superpriority Claims, (b) *pari passu* with the Equipment Lender Adequate Protection Claims (as defined below), and (c) senior to any and all other administrative expense claims and all other claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever.

(b)    *Noteholder Adequate Protection Liens.* The Prepetition Agents, for the benefit of themselves and for the benefit of the Prepetition Secured Noteholders, were, by the Original Interim Order, and are hereby granted, on a final basis, effective and perfected as of the entry of the Original Interim Order, and without the necessity of the execution, recordation or filing by any of the Prepetition Secured Parties of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title for titled goods, or any similar document or instrument, or the taking of any other action (including entering into any control agreements or taking possession or control of any DIP Collateral or Prepetition Secured Notes Collateral), in the amount of any aggregate Diminution in Value of the Prepetition Secured Notes Liens in the Prepetition Secured Notes Collateral (including Cash Collateral) from and after the Petition Date, valid, binding, enforceable and automatically perfected post-petition liens and security interests in all DIP Collateral (the "***Noteholder Adequate Protection Liens***"). The Noteholder Adequate Protection Liens shall be (i) junior and subordinated only to (A) the Carve-Out, (B) the Prior Senior Liens, (C) the First-Priority DIP Liens in First-Priority DIP Collateral, (D) the Junior-Priority DIP Liens in Junior-Priority DIP Collateral (other than the Prepetition Secured Notes Collateral), and (E) the Equipment Lender Adequate Protection Liens in the Prepetition Equipment Financing Collateral, (ii) *pari passu* with the Equipment Lender Adequate Protection Liens in the First-Priority DIP Collateral and *pari passu* with the Equipment Lender

Adequate Protection Liens in the Junior-Priority DIP Collateral (other than Prepetition Equipment Financing Collateral and the Prepetition Secured Notes Collateral), and (iii) senior to any and all other liens and security interests in the DIP Collateral, including the Equipment Lender Adequate Protection Liens in the Prepetition Secured Notes Collateral.

(c)     *Reporting.* The Debtors shall contemporaneously provide the Prepetition Agents, the Ad Hoc Group (and their respective advisors) with all reports, documents and other information required to be delivered to the Replacement DIP Secured Parties under the Replacement DIP Loan Documents (as currently in effect, or pursuant to any additional requirements that may be added after the date hereof, whether or not the Replacement DIP Facility is subsequently terminated or repaid, unless the Court orders otherwise) and this Interim Order.

(d)     *Cash Management*. The Replacement DIP Loan Parties shall maintain their cash management arrangements in a manner consistent with those described in the applicable "first-day" order, which shall be in form and substance reasonably acceptable to the Replacement DIP Lender and the Ad Hoc Group.  The DIP Loan Parties shall not open any new deposit or securities account that is not subject to the liens and security interests of each of the Replacement DIP Secured Parties (in which case they shall be subject to the lien priorities and other provisions set forth in this Interim Order).

(e)     *Compliance with Approved Budget*. The Replacement DIP Loan Parties shall comply with the Approved Budget, subject to Permitted Variances, as set forth in the Replacement DIP Loan Documents.

(f)     *Survival of Adequate Protection Obligations*. Notwithstanding anything contained in this Interim Order or the Replacement DIP Loan Documents to the contrary, the

Adequate Protection Obligations to the Prepetition Secured Parties and the Prepetition Equipment Lenders shall survive termination or repayment of the Replacement DIP Facility.

      11.    *Fees and Expenses; Payments.*

      (a)    The payment of all DIP Professional Fees and Expenses and Noteholder Professional Fees and Expenses hereunder shall not be subject to further application to or approval of the Court, and shall not be subject to allowance or review by the Court or subject to the U.S. Trustee's fee guidelines, and no attorney or advisor to the Replacement DIP Secured Parties shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court; *provided* that any time such professionals seek payment of fees and expenses from the Debtors from and after the Closing Date but prior to the effective date of any chapter 11 plan, each such professional shall provide summary copies of its invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of their invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine) to lead restructuring counsel to the Debtors, the U.S. Trustee, and lead restructuring counsel to the Official Committee and Ad Hoc Group (collectively, the "***Review Parties***"); *provided* that the U.S. Trustee and the Official Committee and Ad Hoc Group reserve their rights to reasonably request additional detail regarding the services rendered and expenses incurred by such professionals. Any objections raised by any Review Party with respect to such invoices must be in writing and state with particularity the grounds therefor and must be submitted to the affected professional within ten (10) calendar days after delivery of such invoices to the Review Parties (such ten (10) day calendar period, the "***Review Period***"). If no written objection

is received prior to the expiration of the Review Period from the Review Parties, the Debtors shall pay such invoices within three (3) Business Days following the expiration of the Review Period. If an objection is received within the Review Period from the Review Parties, the Debtors shall promptly pay the undisputed amount of the invoice, and the disputed portion of such invoice shall not be paid until such dispute is resolved by agreement between the affected professional and the objecting party or by order of this Court. Any hearing to consider such an objection to the payment of any fees, costs or expenses set forth in a professional fee invoice hereunder shall be limited to the reasonableness of the fees, costs and expenses that are the subject of such objection.

(b)    Notwithstanding anything contained in this paragraph 11 to the contrary, the Replacement DIP Loan Parties are authorized and directed to pay the following: (i)(A) promptly following the entry of this Interim Order, the Replacement DIP Loan Parties shall pay in full in cash all DIP Professional Fees and Expenses and Noteholder Professional Fees and Expenses, in each case, whether arising on or after the Petition Date or the entry of this Interim Order, through the date of payment, (B) upon each of the Closing Date (as defined in the Replacement DIP Term Sheet) and the Refinancing Effective Date, the Replacement DIP Loan Parties shall pay in full in cash all DIP Professional Fees and Expenses (as defined in the Original Interim Order), all DIP Professional Fees and Expenses (as defined hereunder) and all Noteholder Professional Fees and Expenses, in each case, arising through and including the Closing Date or the Refinancing Effective Date (as the case may be), in each case, without the need for any professional engaged by or on behalf of the DIP Secured Parties (as defined in the Original DIP Order), the Replacement DIP Secured Parties, the Prepetition Agents or the Ad Hoc Group to first deliver a copy of its invoice to any of the Review Parties (other than the Replacement DIP Loan Parties), (iii) from and after the Closing Date, the Replacement DIP Loan Parties shall pay in full

in cash all DIP Professional Fees and Expenses and all Noteholder Professional Fees and Expenses incurred after the Closing Date in accordance with and subject to the procedures set forth above in this paragraph 11 of this Interim Order.

(c)     Notwithstanding anything contained in this paragraph 11 to the contrary, to the extent any chapter 11 plan filed in the Chapter 11 Cases and confirmed by an order of this Court provides for different procedures for the submission of invoices and payment of professional fees of any professional persons that the Debtors are authorized to pay pursuant to this Interim Order, then the procedures set forth in such confirmed chapter 11 plan shall control, provided that no such professional person shall be subject to more onerous procedures for compensation than are set forth herein.

(d)     Notwithstanding anything contained in this Interim Order to the contrary, any and all payments, premiums, fees, costs, expenses and other amounts paid at any time by any of the Replacement DIP Loan Parties to the Original DIP Agent, the Original DIP Lenders, the Replacement DIP Secured Parties or the Prepetition Secured Parties pursuant to the requirements of the Original DIP Loan Documents, the Original Interim Order, the Payoff Letter, this Interim Order or the DIP Loan Documents (as applicable), whether prior to, on or after the Petition Date, shall be non-refundable and irrevocable, are hereby approved (and to the extent paid prior to entry of the Interim Order, ratified in full), and shall not be subject to any challenge, objection, defense, claim or cause of action of any kind or nature whatsoever, including avoidance (whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), reclassification, disgorgement, disallowance, impairment,

marshaling, surcharge or recovery or any other cause of action, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise, by any person or entity (subject, solely in the case of the DIP Professional Fees and Expenses and the Noteholder Professional Fees and Expenses, to paragraphs 11(a), (b) and (c) of this Interim Order).

12. *Adequate Protection Reservation of Rights of Prepetition Secured Parties/Prepetition Equipment Lenders.* Notwithstanding any other provision hereof, the grant of adequate protection to the Prepetition Secured Parties and the Prepetition Equipment Lenders pursuant to this Interim Order shall not be deemed an admission that the interests of such Prepetition Secured Parties or the Prepetition Equipment Lenders are indeed adequately protected, and is without prejudice to the rights of (a) the Prepetition Secured Parties or the Prepetition Equipment Lenders to seek additional relief with respect to the use of Prepetition Secured Notes Collateral (including Cash Collateral), and (b) the Prepetition Equipment Lenders to seek additional relief with respect to the use of Prepetition Equipment Financing Collateral, or to seek modification of the grant of adequate protection provided hereby so as to provide different or additional adequate protection (including, among other things, debt service payments), and without prejudice to the right of the Debtors or any other party in interest to contest any such modification. Nothing herein shall be deemed to waive, modify or otherwise impair the respective rights of the Prepetition Secured Parties or the Prepetition Equipment Lenders under the Prepetition Secured Notes Documents and the Prepetition Equipment Loan Document, respectively, or under applicable law, and the Prepetition Secured Parties and the Prepetition Equipment Lenders expressly reserve all of their respective rights and remedies whether now existing or hereafter arising under the Prepetition Secured Notes Documents or the Prepetition Equipment Loan Documents and applicable law. Without limiting the foregoing, and subject only to the Carve-Out,

nothing contained in this Interim Order shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided hereunder is insufficient to compensate the Prepetition Secured Parties or the Prepetition Equipment Lenders for any Diminution in Value during the Chapter 11 Cases.

13. *Refinancing of the Original DIP Credit Agreement*.

(a)     The Refinancing is hereby approved on a final basis. The Replacement DIP Loan Parties are hereby authorized and directed to (i) execute and deliver, and to perform all of their obligations (including contingent expense reimbursement and indemnification obligations) under the Payoff Letter, (ii)(a) indefeasibly repay in full in cash and discharge all Original DIP Obligations owed under the Original DIP Facility in accordance with the Payoff Letter, and (b) indefeasibly pay in full in cash all Original DIP Obligations set forth in the Payoff Letter, in each case, upon the closing of the Replacement DIP Facility (in no event later than five (5) business days following the entry of this Interim Order), and (iii) upon the payment in full in cash of all Original DIP Obligations and the satisfaction of all other conditions set forth in the Payoff Letter, terminate the Original DIP Facility documents, execute, deliver, enter into and, as applicable, perform all actions under such documents as necessary or required (or reasonably requested by the Original DIP Agent) in furtherance of such repayment of the Original DIP Facility and termination of the Original DIP Facility Documents, and take such other and further acts as may be necessary, appropriate or desirable in connection therewith. The liens securing the obligations under the Original DIP Facility shall be automatically released and terminated upon the indefeasible and irrevocable repayment in full in cash of all Original DIP Obligations and the satisfaction of all other conditions set forth in the Payoff Letter. The terms and provisions of the Payoff Letter, including the releases set forth therein, are hereby authorized and approved on a final basis.

(b)     In furtherance of the foregoing and without further approval of this Court, each Replacement DIP Loan Party is authorized to make, execute and deliver all instruments, certificates, agreements, charges, deeds and documents necessary to evidence the repayment of the Original DIP Facility and the release of all security interests, liens, and claims related thereto (including, without limitation, the execution or recordation of documents necessary to release, cancel, or otherwise withdraw and pledge and security agreements, mortgages, financing statements and other similar documents), and to pay all fees and expenses required under the Original DIP Loan Documents in connection therewith in accordance with this Interim Order.

(c)     Notwithstanding anything in the Original Interim Order, this Interim Order, or the Replacement DIP Loan Documents to the contrary, the Refinancing is hereby approved on a final basis, shall be non-refundable and irrevocable, and shall not be subject to any challenge, objection, defense, claim or cause of action of any kind or nature whatsoever, including avoidance (whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), reclassification, disgorgement, disallowance, impairment, marshaling, surcharge or recovery or any other cause of action, whether arising under the Bankruptcy Code, applicable non-bankruptcy law, or otherwise, by any person or entity.

14.     *Reservation of Rights.* Except as otherwise expressly provided herein or in the Replacement DIP Loan Documents, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the rights of the Replacement DIP Secured Parties, the Prepetition Equipment Lenders, or the Prepetition Secured Parties to seek any

other or supplemental relief in respect of the Replacement DIP Loan Parties, (b) the rights of the Replacement DIP Secured Parties, the Prepetition Equipment Lenders, or the Prepetition Secured Parties under the Replacement DIP Loan Documents, the Prepetition Equipment Financing Documents or the Prepetition Secured Notes Documents, the Bankruptcy Code or applicable non-bankruptcy law (as applicable), including the right to request modification of the automatic stay of section 362 of the Bankruptcy Code, or (c) any other rights, claims, or privileges (whether legal, equitable or otherwise) of the Replacement DIP Secured Parties, the Prepetition Equipment Lenders, or the Prepetition Secured Parties.

15. *Modification of Automatic Stay.* The automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby vacated and modified, without application to or further order of this Court, to permit: (a) the Replacement DIP Loan Parties to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the Replacement DIP Secured Parties may request to assure the perfection and priority of the DIP Liens, (b) the Replacement DIP Loan Parties to incur all liabilities and obligations to the Replacement DIP Secured Parties as contemplated under this Interim Order and the Replacement DIP Loan Documents, (c) the Debtors to grant the Adequate Protection Liens and the Adequate Protection Claims, and to perform such reasonable acts as the Prepetition Agents may reasonably request to assure the perfection and priority of the Adequate Protection Liens, (d) the DIP Loan Parties to incur liabilities and obligations to the Prepetition Secured Parties related to the Adequate Protection Obligations, as contemplated under this Interim Order, (e) the Replacement DIP Loan Parties to pay all amounts required hereunder and under the Replacement DIP Loan Documents and to consummate the Refinancing, (f) the Replacement DIP Secured Parties and the Prepetition Secured Parties to retain and apply payments made in accordance with the terms of this Interim Order and the DIP Loan

Documents (as applicable), (g) subject to paragraph 20(b) of this Interim Order, (i) the Replacement DIP Secured Parties to exercise, upon the occurrence of any DIP Termination Event (as defined below), all rights and remedies provided for in this Interim Order, the Replacement DIP Loan Documents, or applicable law and (ii) the Prepetition Secured Parties to exercise, upon the occurrence of any Cash Collateral Termination Event (as defined below), all rights and remedies provided for in this Interim Order and applicable law, (h) the Replacement DIP Loan Parties to perform under this Interim Order and the Replacement DIP Loan Documents, and to take any and all other actions that may be necessary, required or desirable for the performance by the Replacement DIP Loan Parties under this Interim Order and the Replacement DIP Loan Documents and the implementation of the transactions contemplated hereunder and thereunder, including the Refinancing, and (i) the implementation of all of the terms, rights, benefits, privileges, remedies, and provisions of this Interim Order and the Replacement DIP Loan Documents.

16.     *Perfection of DIP Liens and Adequate Protection Liens.*

(a)     This Interim Order shall be sufficient and conclusive evidence of the attachment, validity, perfection, and priority of all liens and security interests granted hereunder and under the Replacement DIP Loan Documents, including the DIP Liens and the Adequate Protection Liens, without the necessity of the execution, recordation or filing of any pledge, collateral or security agreements, mortgages, deeds of trust, lockbox or control agreements, financing statements, notations of certificates of title for titled goods, or any other document or instrument, or the taking of any other action (including entering into any deposit account control agreement or other act to take possession or control of any DIP Collateral), to attach, validate, perfect or prioritize such liens and security interests, or to entitle the DIP Secured Parties and the

Prepetition Secured Parties to the priorities granted herein (other than, to the extent applicable, any such filings required under applicable non-U.S. law to attach, validate, perfect or prioritize such liens).

(b)        Without in any way limiting the automatically effective perfection of the liens and security interests granted under this Interim Order and the Replacement DIP Loan Documents, the Replacement DIP Agent is hereby authorized, but not required, as they in their sole discretion may determine for any reason, to execute, file and record (and to execute in the name of the Replacement DIP Loan Parties, as their true and lawful attorneys, with full power of submission, to the maximum extent permitted under applicable law) financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession or control over cash or securities (to the extent authorized by this Interim Order and the Replacement DIP Loan Documents), or to amend or modify security documents, or to subordinate existing liens and any other similar action or action in connection therewith or take any other action in order to validate, perfect, preserve and enforce the liens and security interests granted to them hereunder or under the Replacement DIP Loan Documents or to otherwise evidence such liens and security interests in all DIP Collateral (each, a "***Perfection Action***"); *provided* that, whether or not the Replacement DIP Agent determines to take any Perfection Action with respect to any liens or security interests granted hereunder, such liens and security interests shall nonetheless be deemed valid, perfected, allowed, enforceable, non-avoidable as of the entry of this Interim Order. Upon the reasonable request of the Replacement DIP Agent, the Replacement DIP Loan Parties and each of the Prepetition Secured Parties, without any further consent of any party, are authorized to take, execute, deliver and file such instruments (in each case, without representation or warranty of any kind) to enable the Replacement DIP

Agent to further validate, perfect, preserve and enforce the DIP Liens. All such documents will be deemed to have been recorded and filed as of the date of this Interim Order.

(c)     A certified copy of this Interim Order may, as the Replacement DIP Agent may reasonably determine in their discretion, be filed with or recorded in filing or recording offices in addition to or in lieu of any financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept such certified copy of this Interim Order for filing and/or recording, as applicable. The automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the Replacement DIP Agent to take all actions, as applicable, referenced in this paragraph 16.

17.     *Protection of Lenders' Rights.*

(a)     Until the Replacement DIP Obligations are Paid in Full, the Prepetition Secured Parties shall: (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens or security interests granted to the Prepetition Secured Parties in the First Priority DIP Collateral under this Interim Order, or otherwise seek to exercise or enforce any rights or remedies against any First Priority DIP Collateral, (ii) subject in all respects to paragraph 44 of this Interim Order, be deemed to have consented to any transfer, disposition or sale of, or release of liens or claims on such First Priority DIP Collateral (it being understood that such liens or claims shall attach to the proceeds thereof in the same priorities as of immediately prior to such sale) to the extent such transfer, disposition, sale, or release is authorized by the Replacement DIP Secured Parties in accordance with the Replacement DIP Loan Documents (as currently in effect, without giving effect to any amendment or modification thereto) and this Interim Order, or (iii) not file any further financing statements, patent filings, trademark filings, copyright filings, mortgages,

notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral other than, solely as to this clause (iii), the Prepetition Agents filing financing statements or other documents or instruments to perfect the liens granted pursuant to this Interim Order or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests existing as of the Petition Date, or (iv) subject in all respects to paragraph 44 of this Interim Order, deliver or cause to be delivered, at the Replacement DIP Loan Parties' cost and expenses, any termination statements, releases and/or assignments in favor of the Replacement DIP Agent and the Replacement DIP Lender or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of liens or security interests on any portion of DIP Collateral subject to any sale or disposition authorized hereunder and under the Replacement DIP Loan Documents.

(b)     Subject in all respects to paragraph 44 of this Interim Order, no Prepetition Secured Party may, directly or indirectly, (i) contest, or support any other Person in contesting, in any proceeding, the extent, validity, attachment, priority, or enforceability of any DIP Lien held by or on behalf of any of the Replacement DIP Secured Parties in the DIP Collateral (or the extent, validity, allowability, or enforceability of any Replacement DIP Obligations secured thereby or purported to be secured thereby) or the provisions of the Replacement DIP Loan Documents or this Interim Order, (ii) take any action that would restrain, hinder, limit, delay or otherwise interfere with the exercise of any rights or remedies by any of the DIP Secured Parties, or (iii) contest, object to, or support any other Person in contesting or objecting to, the manner in which any Replacement DIP Secured Party seeks to enforce or collect the DIP Obligations, the DIP Superpriority Claims or the DIP Liens or any amendment, waiver or modification of any Replacement DIP Loan Document or this Interim Order.

18.     *Maintenance of DIP Collateral.*

(a)     Until such time as all Replacement DIP Obligations are Paid in Full (or as otherwise agreed in writing by the Replacement DIP Agent), the Replacement DIP Loan Parties shall continue to maintain all property, operational, and other insurance as required and as specified in the Replacement DIP Loan Documents. Upon the entry of this Interim Order, the Replacement DIP Agent, for the benefit of itself and the Replacement DIP Secured Parties, shall automatically be deemed to be named as additional insured and lender loss payee under each insurance policy maintained by the Replacement DIP Loan Parties (including all property damage and business interruption insurance policies of the Replacement DIP Loan Parties, whether expired, currently in place, or to be put in place in the future), and shall act in that capacity and distribute any proceeds recovered or received in respect of any such insurance policies in accordance with the terms of this Interim Order and the Replacement DIP Loan Documents.

(b)     The Debtors shall maintain or continue to maintain all property, operational, and other insurance as required and specified in the Prepetition Equipment Loan Documents. The Debtors shall also timely pay all property taxes on the Prepetition Equipment Financing Collateral, as and when due and payable.

19.     *Reporting.* Without limiting the requirements contained herein or in the Replacement DIP Loan Documents, the Replacement DIP Loan Parties and their Representatives shall (a) provide the Replacement DIP Agent, the Replacement DIP Lender, the Ad Hoc Group, and the Official Committee (and each of their respective advisors) with (i) all reports, documents, and information required to be delivered to each such party under the Replacement DIP Loan Documents (contemporaneously when the same is required to be delivered thereunder) and this Interim Order (as applicable), and (ii) reasonable access, upon reasonable notice and during regular

business hours, to the Replacement DIP Loan Parties' books and records, assets and properties, for purposes of monitoring the Replacement DIP Loan Parties' businesses and operations and the value of the DIP Collateral, and (b) cooperate and consult with, and provide information reasonably requested by the Replacement DIP Agent, the Replacement DIP Lender, the Ad Hoc Group, or the Official Committee (and their respective advisors) concerning the Replacement DIP Loan Parties' businesses, financial condition, properties, business operations and assets, and the Replacement DIP Loan Parties hereby authorize their Representatives to cooperate and consult with, and promptly provide to the such parties (in each case, together with their respective advisors) such information.

20.     *Termination Events; Exercise of Remedies.*

(a)     *DIP Termination Events.* The occurrence of any of the following shall constitute a "DIP Termination Event" under this Interim Order (each a "***DIP Termination Event***"), unless waived in writing by the Replacement DIP Lender: (i) the occurrence of an "Event of Default" under and as defined in the Replacement DIP Credit Agreement, (ii) the occurrence of the "Termination Date" (as defined in the Replacement DIP Loan Documents), (iii) 11:59 p.m. New York City time on the date that is thirty (30) calendar days (and if such 30th calendar day is not a Business Day, the first succeeding Business Day thereafter) after the filing of the Motion (or such later date determined in writing (which may be via electronic mail) by counsel to the Replacement DIP Lenders), if the Final Order, in form and substance acceptable to the Required DIP Lenders in their discretion, has not been entered by the Court by such date and time, (iv) the substantial consummation (as defined in section 1101(2) of the Bankruptcy Code) of a chapter 11 plan of any of the Debtors, (v) any of the Replacement DIP Loan Parties seeks authorization from the Court for (or the Court enters an order authorizing or approving) any amendment, modification,

or extension of this Interim Order or the Replacement DIP Loan Documents without the prior written consent of the Replacement DIP Lender (and no such consent shall be implied by any other action, inaction, or acquiescence of any of the Replacement DIP Secured Parties), (vi) the failure of the Replacement DIP Loan Parties to make any payment required under this Interim Order or the Replacement DIP Loan Documents to any of the Replacement DIP Secured Parties as and when due and payable hereunder or thereunder, or (vii) the failure by any of the Replacement DIP Loan Parties to timely perform or comply with any of the other terms, provisions, conditions or other obligations under this Interim Order.

(b)     *Exercise of Remedies.* The Replacement DIP Loan Parties shall immediately provide notice to counsel to the Replacement DIP Agent, the Replacement DIP Lender, the Prepetition Agents, the Ad Hoc Group, the Official Committee, and the Prepetition Equipment Lenders (to the extent such Prepetition Equipment Lenders have provided the Debtors' lead restructuring counsel with an email asking to be included for purposes of this paragraph 20(b) of this Interim Order) of the occurrence of any DIP Termination Event. Upon the occurrence of a DIP Termination Event, without further application to or order from the Court, and subject in all respects to paragraph 44 of this Interim Order, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the Replacement DIP Agent (acting at the instruction of the Replacement DIP Lender) to take any of the following actions, at the same or different time: (i) deliver a written notice (which may be via electronic mail) to lead restructuring counsel for the Debtors, the U.S. Trustee and lead restructuring counsel for the Official Committee and the Ad Hoc Group (the "***Remedies Notice***")[10] declaring the occurrence

---

[10]     For the avoidance of doubt, with respect to the Replacement DIP Agent (acting on behalf of the Replacement DIP Lender), the Carve-Out Notice and the Remedies Notice may be included in the same notice.

of a DIP Termination Event (such date, the "**DIP Termination Declaration Date**") and/or deliver a Carve-Out Notice (as defined below), (ii) declare the termination, reduction or restriction of the commitments under the Replacement DIP Facility (to the extent any such commitment remains), (iii) declare all Replacement DIP Obligations to be immediately due and payable, without presentment, demand or protest or other notice of any kind, all of which are expressly waived by the Replacement DIP Loan Parties, (iv) declare the termination of the Replacement DIP Facility and the Replacement DIP Loan Documents as to any further liability or obligation thereunder, but without affecting the DIP Liens, the DIP Superpriority Claims or the Replacement DIP Obligations, (v) declare the reduction or restriction on the Replacement DIP Facility or the Replacement DIP Loan Documents, (vi) invoke a Cash Dominion Period and/or sweep all cash or other amounts contained in the DIP Funding Account, and (vii) charge interest at the default rate set forth in the Replacement DIP Credit Agreement; *provided* that following the occurrence of a DIP Termination Event, prior to the exercise or enforcement of any rights against DIP Collateral (subject in all respects to paragraph 44 of this Interim Order) , the Replacement DIP Agent (acting at the instruction of the Replacement DIP Lender) shall be required to file a motion with the Court on five (5) Business Days' notice (subject to the Court's availability) seeking an emergency hearing (the "**Stay Relief Hearing**") to determine whether a DIP Termination Event has occurred (and the Replacement DIP Loan Parties, the Ad Hoc Group and the Official Committee shall not object to the shortened notice with respect to such Stay Relief Hearing). In the event the Court determines during a Stay Relief Hearing that a DIP Termination Event has occurred, subject in all respects to paragraph 44 of this Interim Order, the Court may fashion an appropriate remedy, which may include, *inter alia*, the exercise of any and all rights or remedies available to the Replacement DIP Secured Parties under this Interim Order, the Replacement DIP Loan Documents or applicable

law against the DIP Collateral; *provided* that the rights of the Debtors, the Ad Hoc Group and the Official Committee to contest such relief are expressly preserved.

      (c)    *Cash Collateral Termination Events.* The occurrence of any of the following shall constitute a "Cash Collateral Termination Event" under this Interim Order (each a "***Cash Collateral Termination Event***"), unless waived in writing by the Ad Hoc Group:

      (i)    the occurrence of the DIP Termination Declaration Date;

      (ii)    the substantial consummation (as defined in section 1101(2) of the Bankruptcy Code) of a chapter 11 plan of any of the Debtors;

      (iii)    following notice to lead restructuring counsel to each of the Debtors and the Replacement DIP Agent and a 5 calendar day cure period from the date of delivery of such notice, the failure of the Replacement DIP Loan Parties to make any undisputed payment required under this Interim Order to any of the Prepetition Secured Parties as and when due and payable hereunder or thereunder;

      (iv)    following notice to lead restructuring counsel to each of the Debtors and the Replacement DIP Agent and a 10 business day cure period from the date of delivery of such notice, the failure by any of the Replacement DIP Loan Parties to timely perform or comply with any of their obligations to the Prepetition Secured Parties under this Interim Order;

      (v)    the entry of an order in the Chapter 11 Cases amending, supplementing, staying or vacating or otherwise modifying this Interim Order in a manner that is adverse to the interests of the Prepetition Secured Parties without the prior consent of the Ad Hoc Group;

      (vi)    the Noteholder Adequate Protection Liens or the Noteholder Adequate Protection Claims cease at any time to be valid, binding, enforceable and non-avoidable, and (as applicable), fully and properly perfected, and enforceable in all respects against each of the Replacement DIP Loan Parties;

      (vii)    (A) the Debtors shall initiate or commence any, challenge, proceeding or investigation (1) challenging the validity, enforceability, perfection or priority of the Prepetition Secured Notes Liens or the Prepetition Secured Notes Obligations, (2) seeking the avoidance, subordination, disgorgement, set off, or surcharge of all or any portion of the Prepetition Secured Notes Obligations (or any payments made on account thereof) or any Adequate Protection Obligations; or (B) the Debtors support any challenge, proceeding, or investigation initiated or commenced by any person or entity, or (C) the Court enters an order granting or sustaining any such relief;

(viii)   (A) the entry of an order by the Court appointing an interim or permanent trustee, a receiver or an examiner under section 1104 of the Bankruptcy Code, in each case, in any of the Chapter 11 Cases; or (B) the dismissal of any of the Chapter 11 Cases, or (C) the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code; or (D) the termination or modification of any of the Debtors' exclusive right to file and/or solicit acceptances of a chapter 11 plan; or (E) the Replacement DIP Loan Parties seek (or publicly support or join a third party that seeks) the foregoing relief;

(ix)   the entry of an order of this Court (A) authorizing the Debtors to obtain additional financing under section 364(c) or (d) of the Bankruptcy Code secured by a lien that is senior to or *pari passu* with the Noteholder Adequate Protection Liens or the Prepetition Secured Notes Liens, or (B) granting a lien that is senior to or *pari passu* with the Noteholder Adequate Protection Liens or the Prepetition Secured Notes Liens, or (C) granting a superpriority administrative expense claim that is senior to or *pari passu* with the Noteholder Adequate Protection Claims, in each case, except to the extent permitted under this Interim Order; or

(x)   the remittance, use or application of Cash Collateral by the DIP Loan Replacement Parties other than in accordance with this Interim Order and the Approved Budget (subject to Permitted Variances); or

(xi)   absent further order of the Court (upon notice to the Ad Hoc Group and a hearing), any of the Replacement DIP Loan Documents are amended, supplemented, waived, stayed, vacated or otherwise modified in a manner that adversely affects any of the rights, privileges, benefits, protections or consent rights of any of the Prepetition Secured Parties hereunder;

(xii)   absent further order of the Court (upon notice to the Ad Hoc Group and a hearing), the sale of any portion of the Prepetition Secured Notes Collateral outside of the ordinary course of business; or

(xiii)   the Court enters an order granting relief from the automatic stay arising under section 362 of the Bankruptcy Code to allow any creditor to execute upon or enforce a lien, interest or remedy in any Prepetition Secured Notes Collateral with a fair market value in excess of $1,000,000.

(d)   *Exercise of Remedies.* The Prepetition Secured Parties shall immediately provide notice to counsel to lead restructuring counsel to the Debtors and the Replacement DIP Agent of the occurrence of any Cash Collateral Termination Event. Upon the occurrence of a Cash Collateral Termination Event, without further application to or order from the Court, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent

necessary to permit the Prepetition Agents (acting at the instruction of the requisite Prepetition Secured Parties under the applicable Prepetition Secured Notes Documents), as applicable, to take any of the following actions, at the same or different time: (i) deliver a written notice (which may be via electronic mail) to lead restructuring counsel for the Debtors, the U.S. Trustee and lead restructuring counsel for Replacement DIP Agent and the Official Committee (the "***Cash Collateral Remedies Notice***")[11] declaring the occurrence of a Cash Collateral Termination Event (such date, the "***Cash Collateral Termination Declaration Date***") and/or deliver a Carve-Out Notice (as defined below), or (ii) declare the termination, restriction or revocation of the ability of the Debtors to use Prepetition Secured Notes Collateral (including Cash Collateral); *provided* that following the occurrence of a Cash Collateral Termination Event, prior to the exercise or enforcement of any rights against DIP Collateral (in respect of any Adequate Protection Obligations) or Prepetition Secured Notes Collateral (as the case may be), the Prepetition Agents (acting at the instruction of the requisite Prepetition Secured Parties under the applicable Prepetition Secured Notes Documents), as applicable, shall be required to file a motion with the Court on five (5) Business Days' notice (subject to the Court's availability) seeking an emergency Stay Relief Hearing to determine whether a Cash Collateral Termination Event has occurred (and the Replacement DIP Loan Parties and the Official Committee shall not object to the shortened notice with respect to such Stay Relief Hearing). In the event the Court determines during a Stay Relief Hearing that a Cash Collateral Termination Event has occurred, subject to paragraph 44 of this Interim Order, the Court may fashion an appropriate remedy, which may include, *inter alia*, the exercise of any and all rights or remedies available to the Prepetition Secured Parties under

---

[11]   For the avoidance of doubt, the Carve-Out Notice and the Cash Collateral Remedies Notice may be included in the same notice.

this Interim Order or applicable law against the DIP Collateral; *provided*, *further*, that the rights of the Official Committee, the Debtors and the Replacement DIP Agent to contest such relief are expressly preserved.

(e)     *Remedies Notice Period.* During the period from and after the DIP Termination Declaration Date or the Cash Collateral Termination Declaration Date (as the case may be) through the date of the Stay Relief Hearing (the "**Remedies Notice Period**"), the Debtors shall be permitted to use Cash Collateral solely to fund (i) payroll and other critical operating expenses included in (and subject to) the Approved Budget that the Debtors believe are critically necessary to keep the Debtors' businesses operating or that have been consented to by the Replacement DIP Lender or the Prepetition Agent (as applicable) (in each case, which consent shall not be unreasonably withheld or delayed), and (ii) the Professional Fees Escrow Amount; *provided* that any fees or expenses incurred by the Replacement DIP Loan Parties or the Official Committee during the Remedies Notice Period shall permanently reduce the Carve-Out Amount (as defined below). For the avoidance of doubt, during the Remedies Notice Period, the Replacement DIP Lender shall not be obligated to provide any DIP Loans or advance any credit at any time from and after the occurrence of a DIP Termination Event.

(f)     *Leased Premises.* On or after a DIP Termination Declaration Date, the Replacement DIP Secured Parties shall be entitled to enter upon any leased premises in accordance with (i) a separate agreement with the landlord by and between the Replacement DIP Agent and the applicable landlord, (ii) consent of the landlord, (iii) upon entry of an order of this Court, upon notice to the landlord and a hearing, or (iv) in accordance with the rights of the Replacement DIP Agent under applicable non-bankruptcy law and the Replacement DIP Loan Documents.

(g)      *Cooperation.* The Replacement DIP Loan Parties shall reasonably cooperate with the Replacement DIP Secured Parties and the Prepetition Secured Parties (as the case may be) in their efforts to enforce their liens and security interests in the DIP Collateral and (other than the right to contest whether a DIP Termination Event or Cash Collateral Termination Event has occurred and is continuing) the Replacement DIP Loan Parties shall not take or direct any entity to take any action designed or intended to hinder or restrict in any respect such party from enforcing its rights or remedies in the DIP Collateral.

(h)      For the avoidance of doubt, upon delivery of a Remedies Notice, all rights and remedies available to the Prepetition Equipment Lenders under this Interim Order, the Prepetition Equipment Loan Documents or applicable law, including, among other things, the right to file a motion with the Court seeking relief from the automatic stay to enforce rights and remedies against the Prepetition Equipment Financing Collateral, are hereby expressly preserved.

21.      *No Waiver by Failure to Seek Relief.* The rights and remedies of the Replacement DIP Secured Parties and the Prepetition Secured Parties specified herein are cumulative and not exclusive of any rights or remedies that the Replacement DIP Secured Parties or Prepetition Secured Parties may have under this Interim Order, the Replacement DIP Loan Documents, the Prepetition Secured Notes Documents, applicable law or otherwise. The failure or delay on the part of any of the Replacement DIP Secured Parties or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the Replacement DIP Loan Documents, the Prepetition Secured Notes Documents or applicable law, as the case may be, shall not constitute a waiver of any of their respective rights hereunder, thereunder or otherwise. Except as expressly set forth herein, none of the rights or remedies of the Replacement DIP Secured Parties or the Prepetition Secured Parties under this Interim Order, the Replacement DIP

Loan Documents and the Prepetition Secured Notes Documents shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing and signed by the requisite parties under the Replacement DIP Loan Documents and the requisite parties under the Prepetition Secured Notes Documents, as applicable. No consents required hereunder by any of the Replacement DIP Secured Parties or the Prepetition Secured Parties shall be implied by any inaction or acquiescence by any of the Replacement DIP Secured Parties or the Prepetition Secured Parties (as applicable).

    22.    *Carve-Out.*

    (a)    *Priority of Carve-Out*. Each of the DIP Liens, the DIP Superpriority Claims, the Prepetition Secured Notes Liens, the Adequate Protection Liens, and the Adequate Protection Claims shall be subject and subordinate to payment of the Carve-Out. The Carve-Out shall be senior to all claims and liens over all assets of the Debtors, including any DIP Collateral and Prepetition Secured Notes Collateral, as set forth in this Interim Order. For the avoidance of doubt, after the occurrence of the DIP Termination Declaration Date and the date upon which the DIP Obligations are Paid in Full, the Carve-Out shall remain in effect as to the Prepetition Secured Notes Obligations and the Adequate Protection Obligations, and the Debtors shall be permitted and required to continue to fund amounts in relation to the Carve-Out in accordance with the terms of this Interim Order.

    (b)    *Carve-Out.* As used in this Interim Order, the term "**Carve-Out**" means the sum of (i) all unpaid fees required to be paid to the Clerk of the Court and to the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest at the statutory rate pursuant to 31 U.S.C. § 3717, (ii) all unpaid reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code, (iii) to the extent allowed at any time, whether by interim order, final order, or

other order, all accrued but unpaid fees and expenses (excluding any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors) (the "***Allowed Professional Fees***") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "***Debtor Professionals***") and the Official Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "***Committee Professionals***," and together with the Debtor Professionals, the "***Professional Persons***") at any time on or before the date of delivery by the Replacement DIP Agent (at the instruction of the Replacement DIP Lender) of a Carve-Out Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve-Out Notice (the amounts set forth in the foregoing <u>clauses (i)</u>, <u>(ii)</u>, and <u>(iii)</u>, the "***Pre-Carve-Out Notice Amount***"), and (iv) Allowed Professional Fees of Professional Persons incurred after the date of delivery by the Replacement DIP Agent (at the instruction of the Replacement DIP Lender) of the Carve-Out Notice, to the extent allowed at any time, whether by interim order, final order, or other court order, in an aggregate amount not to exceed $2.0 million (the amount set forth in this <u>clause (iv)</u> being the "***Post-Carve-Out Notice Amount***," and together with the Pre-Carve-Out Notice Amount, the "***Carve-Out Amount***"); *provided* that nothing herein shall be construed to impair the ability of any party in interest to object to the fees, expenses, reimbursement, or compensation described herein on any grounds. For purposes of this Interim Order, the "***Carve-Out Notice***" shall mean a written notice (which may be via electronic mail) delivered by the Replacement DIP Agent (acting at the instruction of the Replacement DIP Lender) to lead restructuring counsel to the Debtors, the U.S. Trustee and lead restructuring counsel to the Official Committee, which notice may be delivered following the occurrence of a DIP Termination Event, stating that the Carve-Out has been invoked.

(c)      *Closing Date Funding of Carve-out Account.*  On the Closing Date, in accordance with the Replacement DIP Term Sheet, the Debtors shall transfer cash in an amount equal to the Post-Carve-out Notice Amount into that certain professional fees escrow account utilized with respect to the Original DIP Facility, which shall continue to function as a segregated account held in trust for and exclusively available for the payment of fees and expenses of Professional Persons (the "***Professional Fees Escrow Account***").

(d)      *Pre-Carve-Out Notice.* Prior to the delivery of a Carve-Out Notice, starting with the first full calendar week following the date of the Original Interim DIP Order, each Professional Person shall deliver to the Debtors, the Replacement DIP Agent, the Ad Hoc Group, the Replacement DIP Lender, and their respective advisors a weekly statement (each, a "***Weekly Statement***") setting forth a good-faith estimate of the amount of accrued but unpaid fees and expenses incurred by such Professional Person during the preceding week (the "***Weekly Estimated Fees and Expenses***"), and the Debtors shall, on a weekly basis, transfer cash proceeds from amounts previously drawn under the DIP Facility or cash on hand into the Professional Fees Escrow Account in an amount equal to the aggregate amount of Weekly Estimated Fees and Expenses based on the Weekly Fee Estimates submitted by each Professional Person (and if no such estimate is provided in a given week, then the amount forecasted for such Professional Person in the Approved Budget) that remain unpaid (and that were not previously funded to the Professional Fees Escrow Account). The Debtors shall use funds held in the Professional Fees Escrow Account exclusively to pay Allowed Professional Fees as they become allowed and payable pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, in accordance with any interim or final orders of the Court; *provided* that the Debtors' obligations to pay Allowed Professional Fees shall not be limited or be deemed limited to funds held in the

Professional Fees Escrow Account. For the avoidance of doubt, the Professional Fee Escrow may be the same account established under the Original Interim DIP Order, and the Debtors are authorized to continue to use such account in accordance with the terms of this Interim Order.

(e)     *Post-Carve-Out Notice.* On the date on which a Carve-Out Notice is delivered in accordance with this paragraph 22 of this Interim Order, (the "***Carve-Out Trigger Date***"), the Carve-Out Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date (net of any retainers) and any available cash thereafter held by any Debtor to fund into the Professional Fees Escrow Account an amount equal to (i) the Pre-Carve-Out Notice Amount and (ii) the Post-Carve-Out Notice Amount ((i) and (ii), each to the extent not previously funded to the Professional Fees Escrow Account). No later than one (1) Business Day after the delivery of a Carve-Out Notice, each Professional Person shall deliver one (1) additional statement to the Debtors, the Replacement DIP Agent, the Replacement DIP Lender, the Ad Hoc Group, and their respective advisors setting forth a good-faith estimate of the amount of accrued but unpaid fees and expenses incurred by such Professional Person during the period following the period covered by the most recent Weekly Statement previously delivered by such Professional Person through and including the Carve-Out Trigger Date (as defined below), and the Debtors shall transfer such amounts to the Professional Fees Escrow Account (as defined herein).

(f)     Notwithstanding anything to the contrary in this Interim Order, the Replacement DIP Loan Documents or the Prepetition Secured Notes Documents, following delivery of a Carve-Out Notice, the Replacement DIP Agent and the Prepetition Agents shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Professional Fees Escrow Account has been fully funded in an amount equal to all respective obligations benefitting from the Carve-Out as set forth herein. The

Professional Fees Escrow Account shall not be subject to the control of the Replacement DIP Agent, any Replacement DIP Lender or any of the Prepetition Secured Parties, and the funds transferred to the Professional Fees Escrow Account shall not be subject to the DIP Liens or the Adequate Protection Liens, nor constitute DIP Collateral; *provided* that the DIP Liens and the Adequate Protection Liens shall automatically attach to any residual interest in the Professional Fees Escrow Account (which liens shall be deemed automatically perfected senior first-priority liens as of entry of this Interim Order), with (i) any excess that was initially funded directly from borrowings under the Replacement DIP Facility shall be paid to the Replacement DIP Agent for application to the Replacement DIP Obligations in accordance with the Replacement DIP Loan Documents until the Replacement DIP Obligations are Paid in Full (unless the Replacement DIP Lender has otherwise agreed in writing), and (ii) any other excess amounts shall be applied in accordance with paragraph 44 of this Interim Order.

(g)     Notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Professional Fees Escrow Account shall not constitute loans or indebtedness under the Replacement DIP Loan Documents or the Prepetition Secured Notes Documents or otherwise increase or reduce the Replacement DIP Obligations or the Prepetition Secured Notes Obligations, (ii) the failure of the Professional Fees Escrow Account to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve-Out, and (iii) nothing contained herein shall constitute a cap or limitation on the amount that the Professional Persons may assert as administrative expense claims against the Debtors on account of Allowed Professional Fees incurred by such Professional Persons.

(h)     *Payment of Carve-Out on or After the Carve-Out Trigger Date.* Any payment or reimbursement made on or after the occurrence of the Carve-Out Trigger Date in

respect of any Allowed Professional Fees incurred after the occurrence of the Carve-Out Trigger Date shall permanently reduce the Carve-Out Amount on a dollar-for-dollar basis.

(i)     *No Direct Obligation to Pay Allowed Professional Fees.* None of the Replacement DIP Secured Parties or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code, regardless of whether such fees or expenses have been allowed by the Court. Nothing in this Interim Order or otherwise shall be construed to obligate the Replacement DIP Secured Parties or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

23.    *Effect of the Debtors' Stipulations on Third Parties.*

(a)     The Debtors' stipulations, admission, agreements and releases contained in this Interim Order shall be binding upon the Debtors and any successor thereto in all circumstances and for all purposes immediately upon entry of this Interim Order.

(b)     The Debtors' Stipulations in paragraphs E and F of this Interim Order shall be binding upon all parties in interest (other than the Debtors and their successors), including the Official Committee, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, and any other person or entity seeking to act on behalf of the Debtors' estates, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors in the Chapter 11 Cases or any Successor Cases, and each of their respective successors and assigns, in all circumstances and for all purposes, unless the Official Committee or such other party in interest (i) obtains requisite standing (subject in all respects to any agreement or applicable law that may

limit or affect such entity's right or ability to do so), to the extent standing is required, pursuant to an order of the Court entered prior to the Challenge Deadline (as defined below), (ii) timely and properly commences and serves an adversary proceeding or contested matter (subject to the limitations contained herein) (each, a "*Challenge Proceeding*") by no later than the Challenge Deadline (as defined below) as against the Replacement DIP Secured Parties (solely with respect to clauses (ii)(C)–(E)) and/or the Prepetition Secured Parties, as the case may be, (A) objecting to or alleging any basis to impair, restrict, deny or otherwise challenge the right of any of the Prepetition Secured Parties to credit bid, in whole or in part, the Prepetition Secured Notes Liens or the Prepetition Secured Notes Obligations under section 363(k) of the Bankruptcy Code or otherwise, (B) objecting to or challenging the amount, validity, perfection, enforceability, priority, scope or extent of the Prepetition Secured Notes Obligations, the Prepetition Secured Notes Liens, the Prepetition Secured Notes Collateral or the Prepetition Secured Notes Documents, (C) otherwise objecting to or challenging any of the admissions, stipulations, findings or releases included in the Debtors' Stipulations (as applicable), (D) asserting or prosecuting any claim or cause of action of any kind or nature whatsoever, including any claim or cause of action seeking reduction, setoff, offset, recoupment, avoidance (whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge or recovery, whether under the Bankruptcy Code, applicable non-bankruptcy law or otherwise, including, with respect to the Prepetition Secured Parties, the Prepetition Secured Notes Obligations, the Prepetition Secured Notes Liens, the Prepetition Secured Notes Collateral or the Prepetition Secured Notes Documents, or

(E) asserting or prosecuting any so-called "lender liability" claims, Avoidance Actions or any other claim, counterclaim, cause of action, objection, contest or defense, of any kind or nature whatsoever, whether arising under the Bankruptcy Code, applicable law or otherwise, against any of the Replacement DIP Secured Parties, Prepetition Secured Parties, or their respective Representatives (clauses (ii)(A)–(E), collectively, the "***Challenges***," and each, a "***Challenge***"), and (iii) obtains a final non-appealable order by a court of competent jurisdiction in favor of the plaintiff sustaining any such Challenge in any timely and duly-filed Challenge Proceeding; *provided* that any pleadings filed in connection with any Challenge Proceeding, including any motion served and filed with the Court seeking requisite standing (to the extent standing is required) and authority to pursue a Challenge, shall include a draft complaint attached thereto and shall otherwise set forth with specificity the basis for each such Challenge, and any Challenge not so specified in a Challenge Proceeding timely and properly filed prior to the Challenge Deadline shall be deemed forever, waived, released and barred.

(c)     If no such Challenge Proceeding is timely and properly filed by the Challenge Deadline, or if the Court rules does not rule in favor of plaintiff in any such timely and properly filed Challenge Proceeding, then, without application to or further order of the Court, (i) each of the admissions, stipulations, findings and releases contained in the Debtors' Stipulations shall be binding on all parties-in-interest, including the Official Committee, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, or any other party in interest (including any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors in the Chapter 11 Cases or any Successor Cases), (ii) the Prepetition Secured Notes Obligations shall constitute allowed claims against each of the Debtors in the Chapter 11 Cases and any Successor Cases, and the Prepetition Secured Notes Liens shall forever be deemed to be

legal, valid, binding, continuing, perfected and enforceable, as of the Petition Date, against each of the Debtors in the Chapter 11 Cases and any Successor Cases, (iii) the Prepetition Secured Notes Obligations and the Prepetition Secured Notes Liens shall not be subject to any other or further contest, cause of action, attack, objection, challenge, defense, claim, counterclaim, reduction, setoff, offset, recoupment, avoidance (whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge or recovery or any other Challenge, of any kind or nature whatsoever, whether under the Bankruptcy Code, applicable non-bankruptcy law or otherwise, by any person or entity, and (iii) any and all claims, counterclaims, cross-claims, causes of action, or other Challenges, of any kind or nature whatsoever, whether under the Bankruptcy Code, applicable non-bankruptcy law or otherwise, against the Replacement DIP Lender, the Prepetition Secured Parties or any of its or their Representatives (as the case may be) (in their capacities as such) shall be deemed forever waived, released and barred.

(d)     If any such Challenge Proceeding is timely filed by the Challenge Deadline, the Debtors' Stipulations shall nonetheless remain binding and preclusive on any Official Committee, any non-statutory committees appointed or formed in the Chapter 11 Cases, or any other party in interest (including any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors in the Chapter 11 Cases or any Successor Cases), except to the extent that any of the admissions, stipulations, findings or releases contained in the Debtors' Stipulations were expressly challenged in such Challenge Proceeding (and solely as to the plaintiff

party that timely filed such Challenge Proceeding and ***not***, for the avoidance of doubt, any other party in interest).

(e)     For purposes of this Interim Order, the "***Challenge Deadline***" means the date that is sixty (60) calendar days from the date of entry of this Interim Order (the "***Initial Challenge Deadline***"), (ii) such later date as has been agreed to in writing by the Replacement DIP Agent (acting at the instruction of the Replacement DIP Lender) and the affected Prepetition Agent (acting at the instruction of the requisite Prepetition Secured Parties under the affected Prepetition Secured Notes Documents), or (iii) such later date as has been ordered by the Court, for cause shown, upon a motion filed with the Court prior to the Initial Challenge Deadline (the time period established by <u>clauses (i)</u>, <u>(ii)</u>, and <u>(iii)</u> of this paragraph 23(e), the "***Challenge Period***"); *provided* that (x) if the Chapter 11 Cases are converted to chapter 7 and a chapter 7 trustee or a chapter 11 trustee is appointed or elected prior to the Challenge Deadline, then the Challenge Deadline for any such chapter 7 trustee or chapter 11 trustee shall be extended (solely as to such chapter 7 trustee or chapter 11 trustee) to the date that is the later of (1) the Challenge Deadline then in effect at the time of its appointment or election, or (2) the date that is thirty (30) calendar days after its appointment or election, and (y) the filing of a motion by the Official Committee prior to the Initial Challenge Deadline seeking requisite standing with respect to a Challenge, attaching a draft complaint setting forth such Challenge, shall toll the Challenge Deadline for the Official Committee solely in respect of such Challenge until the date that is one Business Day after the entry of an order of the Bankruptcy Court ruling on such motion (or such later date as agreed in writing by the Replacement DIP Agent (acting at the instruction of the Replacement DIP Lender); *provided*, *however*, that the Challenge Deadline for the Official Committee and the Replacement DIP Secured Parties (and solely for the Official Committee and

the Replacement DIP Secured Parties) to assert any Challenge with respect to the amount of the Prepetition April NPA Secured Notes Obligations arising under the Prepetition April NPA Secured Notes or to dispute the valuation of the Prepetition Secured Notes Collateral, and for the Ad Hoc Group or the Official Committee to assert any Challenge with respect to the Bridge Note Obligations or dispute the valuation of the Bridge Note Obligations, shall, in each case, be the objection deadline (as fixed by the Court) with respect to confirmation of the Debtors' chapter 11 plan.

(f)     Nothing in this Interim Order vests or confers on any person or entity, including any Official Committee or any statutory or non-statutory committee appointed or formed in the Chapter 11 Cases, or any other party in interest standing or authority to pursue any Challenge belonging to the Debtors or their estates, and all rights to object to any request for such standing are expressly reserved.

24.     *Limitations on Use of Replacement DIP Loan Parties' Interest in DIP Collateral, Cash Collateral, Carve-Out or Other Funds.* Notwithstanding anything contained in this Interim Order or any other order of the Court to the contrary, no DIP Collateral, DIP Loans, Cash Collateral, proceeds of any of the foregoing, any portion of the Carve-Out may be used (including to pay professional fees) by any of the Replacement DIP Loan Parties, the Official Committee, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any Successor Cases, or any other party in interest (including any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors in the Chapter 11 Cases or any Successor Cases), directly or indirectly, to:

(a)     investigate (including by way of examinations or discovery proceedings, whether formal or informal), prepare, initiate, commence, support or prosecute (or finance the preparation, initiation, commencement, support or prosecution of) any claim, counterclaim, cross-claim, cause of action, suit, arbitration, application, motion,

contested matter, objection, defense, adversary proceeding, litigation or other proceeding of any kind or nature (whether for monetary, injunctive, affirmative relief or otherwise) (i) against any of the Replacement DIP Secured Parties or their respective Representatives (each in their capacities as such), (ii) objecting to, challenging, contesting, or raising any defense to, the amount, validity, enforceability, perfection, priority, extent or scope of the claims, liens and security interests granted under this Interim Order, the Replacement DIP Loan Documents, (iii) asserting avoidance (whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), any so-called "lender liability" claims, or any other any claim or cause of action seeking reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharging or recovery, in each case, with respect to the DIP Liens, the DIP Obligations, the Replacement DIP Loan Documents, or the DIP Collateral, (vi) any claim or cause of action of any kind or nature whatsoever, whether arising under the Bankruptcy Code or applicable non-bankruptcy law, against any of the Replacement DIP Secured Parties or their respective Representatives;

(b)     object to or seek to impair, modify or interfere with any of the rights, remedies, priorities, privileges, protections or benefits granted to the Replacement DIP Secured Parties under this Interim Order, the Replacement DIP Loan Documents (other than to contest whether a DIP Termination Event has occurred); *provided* that this provision shall not apply to an objection filed by the Official Committee with the Court to the relief sought at the Final Hearing;

(c)     object to or seek to prevent, hinder, interfere with or otherwise delay any of the Replacement DIP Secured Parties' assertion, enforcement, exercise of remedies or realization upon any DIP Collateral in accordance with this Interim Order, or the Replacement DIP Loan Documents (other than to contest whether a DIP Termination Event has occurred);

(d)     seek or request authorization from the Court to obtain postpetition financing (whether equity or debt) or other financial accommodations pursuant to sections 364(c) or (d) of the Bankruptcy Code or otherwise, unless such financing is sufficient to cause the Payment in Full of all Replacement DIP Obligations contemporaneously with the consummation of such financing (or as otherwise agreed in writing by the Replacement DIP Lender);

(e)     seek or request authorization from the Court to obtain superpriority claims or liens or security interests (other than liens or security interests expressly permitted under this Interim Order or the Replacement DIP Loan Documents) in any portion of the DIP Collateral that are senior to or *pari passu* with the DIP Liens, the DIP Superpriority Claims, unless all Replacement DIP Obligations have been Paid in Full (or as otherwise agreed in writing by the Replacement DIP Lender);

(f)     use, request authorization to sell, or otherwise dispose of DIP Collateral or Cash Collateral (without the prior written consent of the Replacement DIP Lender and of the Prepetition Secured Parties, respectively) other than as expressly permitted in this Interim Order and in the Replacement DIP Loan Documents (as applicable); or

(g)     pay or seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are agreed to in writing by the Replacement DIP Lender (or are otherwise expressly included in the Approved Budget and do not violate any of the terms of the Replacement DIP Loan Documents).

25.     *Limitations on Use of Prepetition Secured Parties' Interest in Cash Collateral, Carve-Out or Other Funds.* Notwithstanding anything contained in this Interim Order or any other order of the Court to the contrary, no Prepetition Secured Notes Collateral (including Cash Collateral) may be used (including to pay professional fees) by any of the Replacement DIP Loan Parties, the Official Committee, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any Successor Cases, or any other party in interest (including any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors in the Chapter 11 Cases or any Successor Cases), directly or indirectly, to:

(a)     investigate (including by way of examinations or discovery proceedings, whether formal or informal), prepare, initiate, commence, support or prosecute (or finance the preparation, initiation, commencement, support or prosecution of) any claim, counterclaim, cross-claim, cause of action, suit, arbitration, application, motion, contested matter, objection, defense, adversary proceeding, litigation or other proceeding of any kind or nature (whether for monetary, injunctive, affirmative relief or otherwise) (i) against the Prepetition Secured Parties, or their respective Representatives (each in their capacities as such), (ii) objecting to, challenging, contesting, or raising any defense to, the amount, validity, enforceability, perfection, priority, extent or scope of the claims, liens and security interests granted under the Prepetition Secured Notes Documents, (iii) asserting avoidance (whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), any so-called "lender liability" claims, or any other any claim or cause of action seeking reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharging or recovery, in each case, with respect to the Adequate Protection Liens, the Adequate Protection Claims, and the other Adequate Protection Obligations, the Prepetition Secured Notes Liens, the Prepetition Secured Notes Obligations, the Prepetition Secured Notes Documents,

or the Prepetition Secured Notes Collateral, (vi) any claim or cause of action of any kind or nature whatsoever, whether arising under the Bankruptcy Code or applicable non-bankruptcy law, against any of the Prepetition Secured Parties or their respective Representatives;

(b)     object to or seek to impair, modify or interfere with any of the rights, remedies, priorities, privileges, protections or benefits granted to the Prepetition Secured Parties under this Interim Order or the Prepetition Secured Notes Documents;

(c)     object to or seek to prevent, hinder, interfere with or otherwise delay any of the Prepetition Secured Parties' assertion, enforcement, exercise of remedies or realization upon any DIP Collateral (in the case of Adequate Protection Liens) or Prepetition Secured Notes Collateral (in the case of Prepetition Notes Liens) in accordance with this Interim Order or the Prepetition Notes Documents (other than to contest whether a Cash Collateral Termination Event has occurred);

(d)     seek or request authorization from the Court to obtain superpriority claims or liens or security interests (other than liens or security interests expressly permitted under this Interim Order) in any portion of the DIP Collateral that are senior to or *pari passu* with the Adequate Protection Liens, the Adequate Protection Claims, the Prepetition Liens, or the Prepetition Secured Obligations;

*provided* that nothing herein shall limit the Official Committee from using the DIP Collateral, DIP Loans, or any other funds of the Debtors that does not constitute Prepetition Secured Notes Collateral (including Cash Collateral) from investigating, prosecuting, litigating, commencing or supporting any Challenge in any way whatsoever against the Prepetition Secured Parties.

26.     *Limitation on Charging Expenses.* Except to the extent of the Carve-Out and subject to paragraph 43 hereof, no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases (or any future proceedings that may result therefrom) at any time, including any costs and expenses incurred in connection with the preservation, protection, or enhancement of realization by the Replacement DIP Secured Parties upon the DIP Collateral or the Prepetition Secured Parties upon the Prepetition Secured Notes Collateral, respectively, shall be charged against or recovered from the DIP Collateral as to Replacement DIP Secured Parties or the Prepetition Secured Notes Collateral as to the Prepetition Secured Parties, whether pursuant to section 506(c) of the Bankruptcy Code or other similar legal or equitable doctrine or otherwise,

without the prior written consent of the Replacement DIP Lender with respect to the DIP Collateral or the requisite Prepetition Secured Parties under the applicable Prepetition Secured Notes Documents with respect to the Prepetition Secured Notes Collateral, each in their sole discretion, and no such consent shall be implied, directly or indirectly, from anything contained in this Interim Order (including consent to the Carve-Out or the approval of any budget hereunder) or from any other action, inaction, or acquiescence by any of the Replacement DIP Secured Parties or Prepetition Secured Parties to any charge, lien, assessment or claim against the Replacement DIP Secured Parties with respect to the DIP Collateral or the Prepetition Secured Parties with respect to the Prepetition Secured Notes Collateral, whether under section 506(c) of the Bankruptcy Code or otherwise..

27.    *No Marshalling; Section 552(b) Waiver.* Subject to paragraph 43 hereof, in no event shall the Replacement DIP Secured Parties or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Replacement DIP Obligations, the Prepetition Secured Notes Collateral or the Prepetition Secured Notes Obligations (as applicable), and all proceeds of DIP Collateral shall be received and applied in accordance with this Interim Order; *provided* that the Replacement DIP Secured Parties shall use commercially reasonable efforts to first apply all DIP Collateral (other than any proceeds from Avoidance Actions), to the extent such collateral may promptly be monetized in a commercially reasonable manner, before applying any proceeds from Avoidance Actions to satisfy the DIP Obligations and the Adequate Protection Obligations, as applicable. Subject to paragraph 43 hereof, each of the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and in no event shall the "equities of the case" exception

in section 552(b) of the Bankruptcy Code apply to the Prepetition Secured Parties or the Prepetition Secured Notes Collateral.

28.     *Right to Credit Bid.* Subject in all respects to paragraph 44 of this Interim Order, (a) the Replacement DIP Agent or its designee (in each case, acting at the instruction of the Replacement DIP Lender), shall have the right pursuant to section 363(k) of the Bankruptcy Code to credit bid all or any portion of the First-Priority DIP Collateral in accordance with the Replacement DIP Loan Documents up to the full amount of any Replacement DIP Obligations, and (b) the Prepetition Agents or their designee (in each case, acting at the instruction of the requisite Prepetition Secured Parties under the applicable Prepetition Secured Notes Documents), shall have the right pursuant to section 363(k) of the Bankruptcy Code to credit bid all or any portion of the Prepetition Secured Notes Collateral up to the full amount of any applicable Prepetition Secured Notes Obligations, in each case, in the sale of any of the Replacement DIP Loan Parties' assets, whether in a sale under or pursuant to section 363 of the Bankruptcy Code, a chapter 11 plan subject to confirmation under section 1129(b)(2)(A) of the Bankruptcy Code, a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code, or otherwise. The Replacement DIP Agent (acting at the instruction of the Replacement DIP Lender) and the Prepetition Agents or their designee (in each case, acting at the instruction of the requisite Prepetition Secured Parties under the applicable Prepetition Secured Notes Documents) shall have the absolute right to assign, transfer, sell, or otherwise dispose of its rights to credit bid (subject to this Interim Order) to any acquisition vehicle formed in connection with such bid or other designee by or on behalf of the Replacement DIP Agent (acting at the instruction of the Replacement DIP Lender) or the Prepetition Agents or their designee (in each case, acting at the

instruction of the requisite Prepetition Secured Parties under the applicable Prepetition Secured Notes Documents).

29.     *Binding Effect; Successors and Assigns.* Immediately upon entry of this Interim Order, subject to paragraph 23 of this Interim Order, the Replacement DIP Loan Documents and this Interim Order, including all findings and conclusions of law herein, shall be binding upon all parties in interest in the Chapter 11 Cases and any Successor Cases, including the Replacement DIP Secured Parties, the Prepetition Secured Parties, the Official Committee or any other statutory or non-statutory committee appointed or formed in the Chapter 11 Cases and any Successor Cases, and their respective successors and assigns (including any chapter 11 trustee or chapter 7 trustee or examiner appointed or elected in the Chapter 11 Cases or any Successor Cases, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), and shall inure to the benefit of each of the Debtors, the Replacement DIP Secured Parties, the Prepetition Secured Parties, and their respective successors and assigns; *provided* that the Replacement DIP Secured Parties and the Prepetition Secured Parties shall have no obligation to make any loan, permit the use of DIP Collateral or Prepetition Secured Notes Collateral (including Cash Collateral) or extend any financing to any chapter 11 trustee or chapter 7 trustee or similar responsible person appointed for the estate of any Debtor in the Chapter 11 Cases or any Successor Cases.

30.     *No Modification of Interim Order.*

(a)     The Replacement DIP Loan Parties irrevocably waive the right to seek, and shall not seek or consent to, directly or indirectly: (A) without the prior written consent of the Replacement DIP Lender (unless and until the Replacement DIP Obligations have been Paid in

Full), (i) any modification, stay, vacatur or amendment to this Interim Order, (ii) the allowance of any claim against any Debtor in the Chapter 11 Cases or any Successor Cases equal or superior to the DIP Superpriority Claims (other than the Carve-Out), (iii) the grant of any lien or security interest on any DIP Collateral with priority equal to or superior to the DIP Liens, except as expressly permitted hereunder or under the Replacement DIP Loan Documents, or (iv) the entry of any order authorizing the use of DIP Collateral (including Cash Collateral) that is inconsistent with this Interim Order (except in connection with a request for approval of financing sufficient to cause the Payment in Full of all Replacement DIP Obligations contemporaneously with the consummation of such financing), or (B) without the prior written consent of the Prepetition Agents (acting at the instruction of the requisite Prepetition Secured Parties) (unless and until the Prepetition Secured Notes Obligations have been Paid in Full), except as expressly permitted under this Interim Order, (i) any modification, stay, vacatur, or amendment to this Interim Order that materially adversely affects the applicable Prepetition Secured Parties' rights, remedies, benefits, or protections provided for in this Interim Order, (ii) the allowance of any claim against any Debtor in the Chapter 11 Cases or any Successor Cases equal or superior to the Noteholder Adequate Protection Claims, or (C) except as expressly permitted hereunder, the grant of any lien or security interest on any DIP Collateral with priority equal to or superior to the Noteholder Adequate Protection Liens.

(b)      Without limiting the provisions of the immediately preceding paragraph, if at any time prior to the Payment in Full of all Replacement DIP Obligations, either the Replacement DIP Loan Parties, the Replacement DIP Loan Parties' estates, any chapter 11 trustee, chapter 7 trustee or examiner with enlarged powers, or any responsible officer subsequently appointed in any of the Chapter 11 Cases or any Successor Cases, shall obtain credit or incur debt

pursuant to sections 364(b), (c), or (d) of the Bankruptcy Code in violation of this Interim Order or the Replacement DIP Loan Documents, then, unless otherwise agreed in writing by the Replacement DIP Lender (with respect to the Replacement DIP Obligations), all of the cash proceeds derived from such credit or debt shall immediately be turned over to the Replacement DIP Agent, for further distribution to the applicable Replacement DIP Secured Parties on account of their applicable Replacement DIP Obligations pursuant to the Replacement DIP Loan Documents.

(c)     For the avoidance of doubt, from and after the Payment in Full of all Prepetition Secured Notes Obligations, or following the occurrence of the DIP Termination Declaration Date or Cash Collateral Termination Declaration Date, the Debtors shall not be prohibited from seeking relief to use Cash Collateral on a non-consensual basis and the Prepetition Secured Parties' rights to object to such relief (and/or the right to seek relief, including without limitation, the right to seek additional adequate protection and/or seek to lift the automatic stay in order to exercise rights and against Prepetition Secured Notes Collateral) are expressly preserved.

31.     *Preservation of Rights Granted Under Interim Order.*

(a)     *Senior to Other Liens.* Other than the Carve-Out and the Prior Senior Liens, no claim (including any intercompany claim) or lien having a priority superior to or *pari passu* with those granted by the Interim Order to the Replacement DIP Secured Parties shall be permitted while any of the Replacement DIP Obligations remain outstanding, and, except as otherwise expressly provided in this Interim Order. The DIP Superpriority Claims and the Noteholder Adequate Protection Claims shall not be subject or junior to any intercompany or affiliate claims of the Debtors. The DIP Liens and the Noteholder Adequate Protection Liens shall not be: (A) subject or junior to any lien or security interest that is avoided and preserved for the benefit of

the Debtors' estates under section 551 of the Bankruptcy Code; (B) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise; (C) subordinated to or made *pari passu* with any liens arising after the Petition Date, including any liens or security interests granted in favor of any federal, state, municipal, or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors; or (D) subject or junior to any intercompany or affiliate lies or security interests of the Debtors.

(b)     *Payment in Full.* Until Payment in Full of all Replacement DIP Obligations, none of the Replacement DIP Loan Parties shall propose or support any chapter 11 plan or sale of all or substantially all of the Replacement DIP Loan Parties' equity or assets, or any order confirming such plan or approving such sale, that is not conditioned upon the Payment in Full (unless otherwise agreed in writing by the Replacement DIP Lender) of all Replacement DIP Obligations on or prior to the earlier to occur of the effective date of such chapter 11 plan or sale.

(c)     *Dismissal/Conversion.* Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code: (i) all of the claims, liens and security interests, rights, priorities, privileges, remedies, benefits and protections granted to the Replacement DIP Secured Parties and the Prepetition Secured Parties hereunder and under the Replacement DIP Loan Documents (as applicable) (including the DIP Superpriority Claims, the Noteholder Adequate Protection Claims, the DIP Liens, and the Noteholder Adequate Protection Liens), shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all Replacement DIP Obligations and Noteholder Adequate Protection Obligations shall have been Paid in Full, and all such claims, liens and security interests,

rights, priorities, privileges, remedies, benefits and protections shall, notwithstanding such dismissal or conversion, remain unaffected and shall remain binding on all parties in interest (and any such order shall, in accordance with sections 105 and 349 of the Bankruptcy Code, so provide), and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal or conversion, for the purposes of enforcing all such claims, liens and security interests, rights, priorities, privileges, remedies, benefits and protections granted to the Replacement DIP Secured Parties and the Prepetition Secured Parties hereunder and under the Replacement DIP Loan Documents (as applicable).

(d)     *Reversal/Modification.* Based on the findings set forth in this Interim Order and the record presented during the Interim Hearing and the Chapter 11 Cases, and in accordance with section 364(e) of the Bankruptcy Code, in the event that any or all of the provisions of this Interim Order or the Replacement DIP Loan Documents are hereafter reversed, modified, vacated or stayed by a subsequent judgment or order of this Court or any other court, any such reversal, stay, modification or vacatur shall not affect (i) the validity or enforceability of advances previously made hereunder or under the Replacement DIP Loan Documents by the Replacement DIP Secured Parties to the Debtors, (ii) the validity or enforceability of any obligation, indebtedness or liability incurred under this Interim Order or the Replacement DIP Loan Documents (including the Replacement DIP Obligations and the Noteholder Adequate Protection Obligations) by the Replacement DIP Loan Parties to the Replacement DIP Secured Parties and the Prepetition Secured Parties, (iii) the validity, enforceability, or perfection of any of the claims, liens, security interests, rights, privileges or benefits granted hereunder or under the Replacement DIP Loan Documents to the Replacement DIP Secured Parties and the Prepetition Secured Parties, or (iv) the payment of any fees, costs, expenses or other amounts to the Replacement DIP Secured

Parties and the Prepetition Secured Parties under this Interim Order and the Replacement DIP Loan Documents, in each case, prior to the actual receipt of written notice by any of the Replacement DIP Agent and/or the Prepetition Agents (as applicable) of the effective date of such reversal, stay, modification, or vacatur. Notwithstanding any such reversal, stay, modification or vacatur, the claims, liens, security interests, rights, privileges, remedies and benefits set forth in the Interim Order shall be governed in all respects by the original provisions of this Interim Order and the Replacement DIP Loan Documents.

(e)     *Survival*. Except as expressly provided in this Interim Order, until all of the Replacement DIP Obligations have been Paid in Full (unless the Replacement DIP Lender have otherwise agreed in writing in respect of the Replacement DIP Obligations), all claims, liens and security interests, rights, priorities, privileges, remedies, benefits, and protections granted to the Replacement DIP Secured Parties under this Interim Order and the Replacement DIP Loan Documents shall survive and shall not be modified, impaired, or discharged by: (i) the entry of an order confirming any chapter 11 plan in any of the Chapter 11 Cases (and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors hereby waive any discharge as to any remaining Replacement DIP Obligations), (ii) the entry of an order converting any or all of the Chapter 11 Cases to a case (or cases) under chapter 7 of the Bankruptcy Code, dismissing any or all of the Chapter 11 Cases, or terminating the joint administration of the Chapter 11 Cases or by any other act or omission, or (iii) the entry of an order approving the sale or disposition of any DIP Collateral (except to the extent expressly permitted in the DIP Loan Documents and this Interim Order).

32.     *Proofs of Claim.*

(a)     The Replacement DIP Agent and Replacement DIP Lender shall not be required to file proofs of claim with respect to their Replacement DIP Obligations under the

Replacement DIP Documents, and the evidence presented with the Motion and the record established at the Interim Hearing and the Final Hearing are deemed sufficient to, and do, constitute proofs of claim with respect to their obligations, senior secured status, and super-priority.

(b)     The Prepetition Secured Parties shall not be required to file proofs of claim in any of the Chapter 11 Cases or any of the Successor Cases in order to assert claims for payment of the Adequate Protection Obligations or the Prepetition Secured Notes Obligations. The Debtors' Stipulations, acknowledgments and provisions of this Interim Order, together with the evidence accompanying the Motion and presented at the Interim Hearing, are deemed sufficient to and do constitute timely filed proofs of claim in respect of such claims arising under the Adequate Protection Obligations and the Prepetition Secured Notes Obligations against each of the applicable Debtors.

(c)     Any order entered by the Court establishing a bar date in any of the Chapter 11 Cases or any Successor Chapter 11 Cases shall not apply to the Replacement DIP Secured Parties, the Prepetition Secured Parties, the Replacement DIP Obligations, the Adequate Protection Obligations or the Prepetition Secured Notes Obligations; *provided* that, notwithstanding any order entered by the Court establishing a bar date in any of the Chapter 11 Cases or any Successor Cases to the contrary, the Prepetition Agents (on behalf of themselves and the applicable Prepetition Secured Parties), in their discretion, may (but are not required to) file (and amend and/or supplement) in the Debtors' lead Chapter 11 Case, *In re Core Scientific, Inc.*, Case No. 22-90341 (DRJ), a consolidated master proof of claim on behalf of the Prepetition Secured Parties (as applicable) (the "***Master Proof of Claim***") against each of the Debtors. Upon the filing of the Master Proof of Claim by any of the Prepetition Agents, such Prepetition Agent shall be deemed

to have filed a proof of claim in the amount set forth opposite its name therein in respect of its claims against each of the Debtors and shall be treated as if it had filed a separate proof of claim in each of the Chapter 11 Cases. Such Master Proof of Claim shall not be required to (x) identify whether any Prepetition Secured Party acquired its claim from another party, the identity of any such party, or reflect a change in the holders of the claims set forth therein or a reallocation among the holders of the claims asserted therein resulting from the transfer of all or any portion of such claims, or (y) attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable party, which instruments, agreements or other documents will be provided upon reasonable written request to the applicable Prepetition Agent, as the case may be. The provisions of this paragraph 32 and each Master Proof of Claim are intended solely for the purpose of administrative convenience and shall not (i) affect the right of each Prepetition Secured Party (or its successors in interest) to vote separately on any chapter 11 plan proposed in these Chapter 11 Cases (or any Successor Cases), or (ii) any substantive rights of the Prepetition Secured Parties or any party in interest or their respective successors in interest.

33.    *Limitation of Liability.*

(a)    Nothing in this Interim Order, the Replacement DIP Loan Documents or any documents related thereto shall in any way be construed or interpreted to impose or allow the imposition upon any of the Replacement DIP Secured Parties or the Prepetition Secured Parties of any liability for any claim arising from, in connection with or related to the prepetition or postpetition activities of the Replacement DIP Loan Parties or their respective affiliates (as defined in section 101(2) of the Bankruptcy Code) in the operation of their businesses, their restructuring efforts or the administration of these Chapter 11 Cases.

(b)      In determining to make any loan or extension of credit under the Replacement DIP Loan Documents or permit the use of Prepetition Secured Notes Collateral (including Cash Collateral), or in exercising any rights or remedies under this Interim Order, the Replacement DIP Loan Documents or the Prepetition Secured Notes Documents, none of the Replacement DIP Secured Parties or the Prepetition Secured Parties shall (i) have any liability to any third party or be deemed to be in control of the operations of any of the Replacement DIP Loan Parties, (ii) owe any fiduciary duty to any of the Replacement DIP Loan Parties, their respective creditors, shareholders or estates, or (iii) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of any of the Replacement DIP Loan Parties (as such terms or any similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42, U.S.C. §§ 9601 *et seq*., as amended, or any other federal or state statute, including the Internal Revenue Code).

(c)      The Replacement DIP Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person, and all risk of loss, damage, or destruction of the DIP Collateral shall be borne solely by the Replacement DIP Loan Parties; *provided* that nothing contained in this paragraph 33(c) shall release the Replacement DIP Secured Parties from their obligations under the Replacement DIP Loan Documents (subject to the occurrence of the Closing Date).

34.      *Release of Replacement DIP Secured Parties*. Effective as of entry of the Interim Order and subject to paragraph 23 hereof, each of the Replacement DIP Loan Parties and its respective estate, on its own behalf and on behalf of its predecessors, successors and assigns,

hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits each of the Replacement DIP Secured Parties and each of their respective Representatives (in their capacities as such) from any and all obligations and liabilities to the Replacement DIP Loan Parties (and their successors and assigns) and from any and all claims, counterclaims, cross-claims, demands, defenses, objections, challenges, offsets or setoff, debts, accounts, contracts, liabilities, remedies, suits, controversies, actions, causes of action, losses, damages, indemnities, reimbursement obligations, attorneys' fees, costs, expenses or judgments, of every kind or nature whatsoever, whether matured or unmatured, known or unknown, asserted or unasserted, suspected or unsuspected, foreseen or unforeseen, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, pending or threatened, arising in law or equity, upon contract or tort, under the Bankruptcy Code, any state or federal common law, statute, rule, regulation or otherwise, including any claim or cause of action seeking (i) any so-called lender liability, (ii) any and all claims arising under the Bankruptcy Code, whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), or otherwise, (iii) reduction, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge or recovery, in each case, that may be asserted by any of the Replacement DIP Loan Parties, their respective estates, predecessors, successors and assigns, in each case, against any of the Replacement DIP Secured Parties or their respective Representatives (in their capacities as such) for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time prior to the date of this Interim Order, in connection with, arising under or related to this Interim Order, the Replacement DIP Facility, the DIP Liens, the Replacement DIP Obligations, the DIP

Collateral, the transactions contemplated thereunder or hereunder, or the negotiation thereof or hereof, including any claim or cause action with respect to the validity, enforceability, priority, scope, extent or perfection of the DIP Liens, the Replacement DIP Obligations or the Replacement DIP Loan Documents; *provided* that subject to the occurrence of the Closing Date, nothing contained in the foregoing shall release the Replacement DIP Secured Parties from their obligations under the Replacement DIP Facility from and after the date hereof.

35. *Payments Free and Clear.* Any and all payments or proceeds required to be remitted to the Replacement DIP Secured Parties or the Prepetition Secured Parties pursuant to the Replacement DIP Loan Documents, the Original Interim Order, this Interim Order, the Final Order (if and when entered) or any subsequent order of this Court shall be irrevocable (subject, solely in the case of the DIP Professional Fees and the Noteholder Professional Fees, only to the procedures set forth in paragraph 11 of this Interim Order), and shall be received free and clear of any claim, charge, assessment or other liability, including any claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code (whether asserted or assessed by, through or on behalf of the Replacement DIP Loan Parties), or otherwise.

36. *Joint and Several Liability.* Nothing in this Interim Order shall be construed to constitute or authorize a substantive consolidation of any of the DIP Loan Parties' estates, it being understood, however, that the DIP Loan Parties shall be jointly and severally liable for all obligations (including all DIP Obligations and all Adequate Protection Obligations) under this Interim Order and the DIP Loan Documents.

37. *Third-Party Beneficiary.* Except as expressly set forth herein, no rights are created hereunder for the benefit of any third party, any creditor, equity holder, or any direct, indirect or incidental beneficiary.

38.     *Interim Order Controls.* In the event of any express conflict between or among the terms or provisions of this Interim Order and any of the Replacement DIP Loan Documents, including the Replacement DIP Term Sheet (in accordance with the rules of interpretation therefor, as set forth in the Replacement DIP Term Sheet in the section titled "Documentation Principles"), unless such term or provision in this Interim Order is phrased in terms of "defined in" or "as set forth in" the Replacement DIP Credit Agreement or Replacement DIP Loan Documents, or in the event of any conflict or inconsistency between the terms of this Interim Order and any other order of the Court, the terms and provisions of this Interim Order shall govern and control. Notwithstanding anything contained in any other order entered by this Court to the contrary, any payment made pursuant to, or authorization contained in, any other order entered by this Court shall be consistent with and subject to the requirements set forth in this Interim Order and the Replacement DIP Loan Documents, including the Approved Budget (subject to Permitted Variances).

39.     *Effectiveness.* This Interim Order shall constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052 and shall take effect and be fully enforceable (in the case of the Adequate Protection Obligations and all liens, security interests, benefits and protections afforded to the Prepetition Secured Parties hereunder, *nunc pro tunc* to the Petition Date) immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 7062, or 9014, any Local Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

40.     *Bankruptcy Rules.* The requirements of Bankruptcy Rules 4001 and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

41.     *Headings.* Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order. When used in this Interim Order, the word "including" shall not imply limitation.

42.     *Adequate Protection to Prepetition Equipment Lenders.* Pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, as adequate protection of their purported Prepetition Equipment Liens in Prepetition Equipment Collateral, the Prepetition Equipment Lenders shall be entitled to the following (collectively, the obligations under this paragraph 42, together with the Noteholder Adequate Protection Obligations, the "***Adequate Protection Obligations***"):

(a)     *Equipment Lender Adequate Protection Claims.* The Prepetition Equipment Lenders were, by the Original Interim DIP Order, and are each hereby granted on a final basis in the amount of any aggregate Diminution in Value of the respective purported Prepetition Equipment Liens in Prepetition Equipment Collateral (as applicable) from and after the Petition Date, superpriority administrative expense claims contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors (the "***Equipment Lender Adequate Protection Claims***," together with the Noteholder Adequate Protection Claims, the "***Adequate Protection Claims***"), which shall be payable by each of the Debtors on a joint and several basis, and shall have recourse to all DIP Collateral. The Equipment Lender Adequate Protection Claims shall be (i) subject and subordinate only to the Carve-Out and the DIP Superpriority Claims, (ii) *pari passu* with the Noteholder Adequate Protection Claims, and (iii) senior to any and all other administrative expense claims and all other claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever.

(b)     *Equipment Lender Adequate Protection Liens.* The Prepetition Equipment Lenders were, by the Original Interim DIP Order, and are each hereby granted on a final basis, effective and perfected as of the entry of the Original Interim Order, and without the necessity of the execution, recordation or filing by the Replacement DIP Loan Parties or any of the Prepetition Equipment Lenders of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title for titled goods, or any similar document or instrument, or the taking of any other action (including entering into any control agreements or taking possession or control of any DIP Collateral), in the amount of any aggregate Diminution in Value of the purported Prepetition Equipment Liens in the Prepetition Equipment Financing Collateral (as applicable) from and after the Petition Date, valid, binding, enforceable and automatically perfected post-petition liens and security interests in all DIP Collateral (the "**Equipment Lender Adequate Protection Liens**," and together with the Noteholder Adequate Protection Liens, the "**Adequate Protection Liens**"). The Equipment Lender Adequate Protection Liens shall be (i) junior and subordinated to (A) the Carve-Out, (B) the First-Priority DIP Liens in First-Priority DIP Collateral, (C) the Noteholder Adequate Protection Liens in Prepetition Secured Notes Collateral, and (D) the Prior Senior Liens (other than the Prepetition Equipment Liens that constitute Prior Senior Liens), (ii) *pari passu* with the Noteholder Adequate Protection Liens in the First-Priority DIP Collateral and *pari passu* with the Noteholder Adequate Protection Liens in the Junior-Priority DIP Collateral (other than Prepetition Equipment Financing Collateral and the Prepetition Secured Notes Collateral), (iii) senior to the DIP Liens in Prepetition Equipment Financing Collateral (as applicable) and the Noteholder Adequate Protection Liens in Prepetition Equipment Financing Collateral (as applicable), and (iv) senior to any and all other liens and

security interests in the DIP Collateral, including the Noteholder Adequate Protection Liens in the Prepetition Equipment Financing Collateral.

43.     *Limitations of Certain Waivers*. Notwithstanding anything in this Interim Order to the contrary, solely from and after the Cash Collateral Termination Declaration Date, (i) the waiver of the right to surcharge the Prepetition Secured Notes Collateral as to the Prepetition Secured Parties pursuant to section 506(c) of the Bankruptcy Code shall not apply to costs and expenses of administering the Chapter 11 Cases incurred after the Cash Collateral Termination Declaration Date, and (ii) the waiver of any "equities of the case exception" under section 552(b) of the Bankruptcy Code with respect to the Prepetition Secured Notes Collateral as to the Prepetition Secured Parties shall not apply with respect to proceeds of Prepetition Secured Notes Collateral received by the Debtors after the Cash Collateral Termination Declaration Date, and, in the case of each of the foregoing, the rights of all parties in connection therewith are reserved.

44.     *Intercreditor Provisions.*

(a)     Notwithstanding anything set forth in this Interim Order or the Replacement DIP Loan Documents to the contrary, until the Replacement DIP Obligations have been Paid in Full, the Replacement DIP Agent (acting at the direction of the DIP Replacement Lender) shall have the sole and exclusive right to enforce rights, exercise remedies, and make determinations regarding the sale, release, or other disposition of all (1) First-Priority DIP Collateral, and (2) Junior-Priority DIP Collateral (other than Prepetition Equipment Financing Collateral and Prepetition Secured Notes Collateral), and each of the Prepetition Secured Parties and the Prepetition Equipment Lenders (x) will not exercise any right or remedies with respect to any such collateral or seek relief from the automatic stay in order to commence any action with respect to such rights and remedies, and (y) will not contest, protest or object to or otherwise interfere with

any action or proceeding brought by the Replacement DIP Agent to enforce its rights and remedies relating to such collateral. Following the Payment in Full of the Replacement DIP Obligations, until the Prepetition Secured Notes Obligations have been indefeasibly Paid in Full, (A) the Prepetition Agents (acting at the direction of the requisite Prepetition Secured Parties under the applicable Prepetition Secured Notes Documents) shall have the sole and exclusive right to enforce rights, exercise remedies, and make determinations regarding the sale, release, or other disposition of any such collateral, and (B) the Prepetition Equipment Lenders (x) will not exercise any right or remedies with respect to any such collateral or seek relief from the automatic stay in order to commence any action with respect to such rights and remedies, and (y) except as permitted in paragraph 20(d) hereof, will not contest, protest or object to or otherwise interfere with any action or proceeding brought by Prepetition Agents (acting at the instruction of the requisite Prepetition Secured Parties under the applicable Prepetition Secured Notes Documents) to enforce their rights and remedies relating to such collateral. Following the Payment in Full of the Prepetition Secured Notes Obligations, the respective Prepetition Equipment Lenders shall have the sole and exclusive right to enforce rights, exercise remedies, and make determinations regarding the sale, release, or other disposition of any of such collateral.

(b)     Notwithstanding anything set forth in this Interim Order or the Replacement DIP Loan Documents to the contrary, until the Prepetition Secured Notes Obligations are Paid in Full, the Prepetition Agents (acting at the instruction of the requisite Prepetition Secured Parties under the applicable Prepetition Secured Notes Documents) shall have the sole and exclusive right to enforce rights, exercise remedies, and make determinations regarding the sale, release, or other disposition of the Prepetition Secured Notes Collateral (including, for the avoidance of doubt, any Cash Collateral, whether on deposit in the Replacement DIP Funding Account or otherwise), and

each of the Replacement DIP Agent, the Replacement DIP Lender and the Prepetition Equipment Lenders (x) will not exercise any rights or remedies with respect to any such Prepetition Secured Notes Collateral or seek relief from the automatic stay in order to commence any action with respect to such rights and remedies, and (y) will not contest, protest or object to or otherwise interfere with any action or proceeding brought by the Prepetition Agents (acting at the instruction of the requisite Prepetition Secured Parties under the applicable Prepetition Secured Notes Documents) to enforce their rights and remedies relating to such Prepetition Secured Notes Collateral. Following the Payment in Full of the Prepetition Secured Notes Obligations, until the Replacement DIP Obligations have been indefeasibly Paid in Full, (A) the Replacement DIP Agent (acting at the instruction of the Replacement DIP Lender) shall have the sole and exclusive right to enforce rights, exercise remedies, and make determinations regarding the sale, release, or other disposition of any of such Prepetition Secured Notes Collateral, and (B) the Prepetition Equipment Lenders (x) will not exercise any right or remedies with respect to any such Prepetition Secured Notes Collateral or seek relief from the automatic stay in order to commence any action with respect to such rights and remedies, and (y) will not contest, protest or object to or otherwise interfere with any action or proceeding brought by the Replacement DIP Agent to enforce its rights and remedies relating to such Prepetition Secured Notes Collateral. Following the Payment in Full of the Replacement DIP Obligations, the respective Prepetition Equipment Lenders shall have the sole and exclusive right to enforce rights, exercise remedies, and make determinations regarding the sale, release, or other disposition of any of such Prepetition Secured Notes Collateral.

(c)     Unless and until the applicable "senior" debt obligations described in paragraph 44(a) and (b) of this Interim Order are Paid in Full, any DIP Collateral or proceeds thereof received by the applicable "junior" agent or any "junior" debt holder described in

paragraph 44(a) and (b) of this Interim Order, in connection with the exercise of any remedies hereunder or in connection with the receipt of any payment or distribution from the Replacement DIP Loan Parties, shall be segregated and held in trust and forthwith paid over to the applicable "senior" agent for the benefit of the applicable "senior" debt holders in the same form as received, with any necessary endorsements or as the applicable "senior" agent may otherwise direct.[12]

(d)     Nothing in this paragraph 44 shall be read to provide any creditor any right to exercise any remedies not otherwise permitted in this Interim Order, to permit the payment of any prepetition debt (absent further order of the Court), or to prevent the Debtors from seeking any relief from this Court or from operating their business in the ordinary course.

45.     *Necessary Action.* The Replacement DIP Loan Parties, the Replacement DIP Secured Parties are authorized to take any and all such actions as are necessary, required or appropriate to implement and effectuate the terms of this Interim Order, the Replacement DIP Loan Documents and the transactions contemplated hereunder and thereunder.

46.     *Retention of Jurisdiction.* The Court retains jurisdiction to hear, determine and enforce the terms of any and all matters arising from or related to the Replacement DIP Facility, the Replacement DIP Loan Documents and this Interim Order, and the Court's jurisdiction shall survive confirmation and consummation of any chapter 11 plan for any of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

47.     *Final Hearing.* The Final Hearing shall be held on February 27, 2023, at 3:00 p.m. (prevailing Central Time), and any objections to the final relief sought in the Motion shall be filed

---

[12]    A chart reflecting the relative priorities of each of the liens and security interests described in this Interim Order is attached hereto as **Exhibit 5**.

with the Court no later than February 21, 2023 at 4:00 p.m. (prevailing Central Time) (the "***Final DIP Objection Deadline***"), and served upon the following: (a)(i) Weil, Gotshal & Manges LLP, 700 Louisiana, Suite 1700, Houston, Texas, Attn: Alfredo Perez (alfredo.perez@weil.com), and (ii) Weil, Gotshal & Manges LLP, 767 Fifth Avenue New York, New York 10153, Attn: Ray Schrock (ray.schrock@weil.com) and Ronit Berkovich (ronit.berkovich@weil.com), counsel to the Debtors, (b) Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110, Attn: John F. Ventola (jventola@choate.com) and Douglas R. Gooding (dgooding@choate.com), counsel to the Replacement DIP Secured Parties, (c) Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, Attn: Brett Miller (BMiller@willkie.com), Todd Goren (tgoren@willkie.com), and James Burbage (JBurbage@willkie.com), lead counsel to the Official Committee, (d) Paul Hastings, LLP, 200 Park Avenue, New York, New York 10166, Attn: Kristopher Hansen (krishansen@paulhastings.com), Erez Gilad (erezgilad@paulhastings.com), and Sayan Bhattacharyya (sayanbhattacharyya@paulhastings.com), counsel to the Original DIP Lenders and the Ad Hoc Group.

Dated: _____, 2023
      Houston, Texas

                  _____
                  UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit 1</u>**

**Replacement DIP Term Sheet**

**Core Scientific, Inc.**
**Up to $70,000,000**
**Debtor-in-Possession Term Loan Facility**
**Summary of Terms and Conditions**

**THIS TERM SHEET IS PROVIDED FOR DISCUSSION PURPOSES ONLY AND DOES NOT CONSTITUTE AN OFFER, AGREEMENT OR COMMITMENT TO ENTER INTO THE DEFINITIVE DIP DOCUMENTS (AS DEFINED BELOW). NOTHING IN THIS TERM SHEET IS INTENDED TO REPRESENT A COMMITMENT ON THE PART OF THE PROSPECTIVE DIP AGENT OR DIP LENDER TO ENTER INTO THE DIP FACILITY OR ANY OTHER DEFINITIVE AGREEMENT WITH ANY PERSON**.

*The statements contained in this Term Sheet and all discussions between and among the parties in connection herewith constitute privileged communications that shall not be disclosed or introduced pursuant to Federal Rule of Evidence 408 and/or other applicable law, unless otherwise required by judicial order or applicable law. All assumptions, principles and numbers are based upon and subject to continuing due diligence and are subject to change as the parties' positions develop further.*

| 1. | *Borrowers:* | • Core Scientific, Inc., Core Scientific Acquired Mining LLC, Core Scientific Operating Company, Core Scientific Specialty Mining (Oklahoma) LLC, American Property Acquisition, LLC, American Property Acquisitions I, LLC, American Property Acquisition VII, LLC, Radar Relay, Inc., Starboard Capital LLC, RADAR LLC and Core Scientific Mining LLC (the "**Borrowers**"), as debtors and debtors-in-possession in Case **No. 22-90341 (DRJ) (Jointly Administered)** (together with the cases of certain of its affiliated debtors and debtors-in-possession, the "**Chapter 11 Cases**", and such affiliated debtors, together with the Borrowers, the "**Debtors**") under chapter 11 of title 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") commenced in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") on December 21, 2022 (the "**Petition Date")**. |
| | | • The Borrowers shall, in all cases, be jointly and severally liable for all DIP Obligations (as defined below). |
| 2. | *Guarantors:* | • Each of Core Scientific, Inc.'s existing and future, direct and indirect domestic or foreign subsidiaries that are debtors and debtors-in-possession in the Chapter 11 Cases, including all existing obligors under the Existing DIP Credit Agreement (as defined below) (collectively, the "**Guarantors**" and together with the Borrower, the "**Loan Parties**"). |
| | | • The DIP Obligations of the Borrowers shall be unconditionally guaranteed, on a joint and several basis, by the Guarantors. |
| 3. | *DIP Agent and Initial DIP Lender:* | • B. Riley Commercial Capital, LLC . |

| 4. | *Type and Amount of the DIP Facility:* | • A non-amortizing super-priority senior secured term loan facility in an aggregate principal amount not to exceed $70,000,000 (the "**Maximum DIP Commitment Amount**") consisting of up to $70,000,000 in term loan commitments (the "**DIP Facility**"; the definitive documentation evidencing the DIP Facility being the "**DIP Documents**"; the DIP Lender's commitments under the DIP Facility being the "**DIP Commitments**"; and the loans under the DIP Facility being the "**DIP Loans**"). |
|---|---|---|
| | | • The borrowing of DIP Loans shall permanently decrease the DIP Commitments and DIP Loans repaid (for any reason) may not be reborrowed unless (and solely to the extent that) they are repaid prior to the entry of the Final Order (as defined below). |
| | | • Loan proceeds to be funded into newly established (or, in the case of the Carve-out Account referred to below, a previously established (expressly for such purpose pursuant to Existing DIP Credit Agreement)) funding accounts, including a carve-out account (to be fully funded (to the extent of any deficiency) in the amount of the Post-Carve-out Notice Amount (as such term shall be defined in the Orders) from the Initial Draw) (the "**Carve-out Account**"), each to be initially maintained at Bank of America, N.A. |
| 5. | *Initial Availability:* | • Upon the Bankruptcy Court's entry of the Interim Order (as defined below), and satisfaction of all applicable conditions precedent described herein (the "**Closing Date**"), the Borrowers shall be entitled to make a single draw of DIP Loans in an amount of up to $35,000,000 prior to the entry of the Final Order (the "**Initial Draw**"). |
| 6. | *Full Availability:* | • Upon the Bankruptcy Court's entry of the Final Order, and satisfaction of all applicable conditions precedent described herein, following the Initial Draw, the full remaining amount of the then undrawn DIP Facility (after giving effect to any repayments of the Initial Draw prior to the entry of the Final Order) shall be available to the Debtors, subject to compliance with the terms, conditions and covenants described herein and in the DIP Documents in additional draws ("**Other Draws**"). Other Draws shall only be permitted when the Debtors' cash on hand (other than cash in the Carve-out Account) prior to giving effect to such draw is less than $30,000,000. In addition, Other Draws shall be made (x) only in a principal amount of not less than $5,000,000, per draw and (y) in no more than five (5) draws and (z) no more frequently than once every three (3) weeks. In addition, a final single draw (which shall also be deemed to be an "Other Draw" for purposes hereof (other than requiring satisfaction of the conditions set forth in clauses (x) and (y) above)) in an amount not to exceed the amount of the then undrawn DIP Commitment, as then in effect, may be requested; *provided* that at the time of (and prior to giving effect to) such final draw, the Debtors' cash then on hand (other than cash in the Carve-out Account) is less than $30,000,000 (the "**Final Draw**"). |

2

| 7. | *Maturity and Termination* | • All DIP Obligations (including, without limitation, all capitalized interest and fees) shall be due and payable in full in cash (or such other form of consideration as the DIP Agent and the DIP Lender may agree in their sole discretion) on the earliest of: |
|---|---|---|
| | | i. the date that is twelve (12) months after the Petition Date; *provided*, that the Borrowers shall be permitted to extend such date by three (3) months upon paying the DIP Agent an extension fee (the "**Extension Fee**"), in cash, in an amount equal to three and one-half percent (3.50%) of the aggregate amount of all DIP Obligations drawn and outstanding as of the effective date of the extension (after giving effect to the Final Draw) (any such date being the "**Scheduled Maturity Date**") |
| | | ii. the effective date of any chapter 11 plan of reorganization with respect to the Borrowers or any other Debtor (a "**Plan**"); |
| | | iii. the consummation of any sale or other disposition of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code; |
| | | iv. the date of the acceleration of the DIP Loans and the termination of the DIP Commitments in accordance herewith or with the DIP Documents; |
| | | v. the date of the DIP Agent's written notice to the Borrowers of the occurrence of an Event of Default (as defined below) under the DIP Facility; |
| | | vi. dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code; and |
| | | vii. 30 days after the date on which a motion to approve the DIP Facility is filed (or such later date as agreed to by the DIP Agent), unless the Final Order has been entered by the Bankruptcy Court on or prior to such date (such earliest date, the "**DIP Termination Date**"). |
| | | • The occurrence of the DIP Termination Date shall terminate the ability of the Borrowers to make the Other Draws or the Final Draw. |
| 9. | *Interest Rate:* | • The DIP Loans shall bear interest at a per annum rate equal to ten percent (10.00%), in each case payable in kind in arrears on the first day of each month (the "**Non-Default Interest**"). |
| | | • Notwithstanding the foregoing, after the occurrence and during the continuance of an Event of Default, the DIP Loans shall bear interest at an additional per annum rate of two percent (2.00%), in each case payable in kind, together with the Non-Default Interest, on the first day of each month. |

11226390v13

| 10. | *Monthly DIP Agent Fee:* | • $75,000 per month payable, in cash in advance, to DIP Agent for its sole account and benefit, on the Closing Date and the first business day of each calendar month thereafter (the "**Monthly DIP Agent Fee**"). |
|---|---|---|
| 11. | *Upfront & Exit Premium; Approvals:* | • An upfront premium of three and one-half percent (3.50%) of the Maximum DIP Commitment Amount (the "**Upfront Premium**"), payable in kind to the DIP Lenders and added to the total amount of the DIP Obligations. |
| | | • The Upfront Premium shall be approved by the Bankruptcy Court in the Interim Order and shall be deemed fully earned and payable upon entry of the Interim Order. |
| | | • Following entry of the Interim Order, upon and concurrently with the repayment or satisfaction of the DIP Loans in whole or in part (including any scheduled, mandatory or voluntary prepayment thereof, including upon the acceleration thereof and the final payment at maturity), the Borrowers shall pay to the DIP Agent, in cash, an exit premium equal to five percent (5.00%) of the amount of the DIP Loans being repaid, reduced or satisfied (the "**Exit Premium**"). |
| | | • The Upfront Premium, the Exit Premium, the Extension Fee and the Monthly DIP Agent Fee shall be approved by the Bankruptcy Court as part of the Interim Order and reaffirmed in the Final Order. |
| 13. | *Use of Proceeds:* | • The proceeds of the DIP Facility shall be used only for the following purposes and, in the case of payments pursuant to clauses (ii), (iii), and (iv) below, subject to the Budget, the Carve-Out and any permitted variances as set forth below |
| | |     i. Payment in full of the obligations under that certain senior secured super-priority debtor-in-possession loan and security agreement, dated as of December 22, 2022 (the "**Existing DIP Credit Agreement**"), among the Borrowers, the lenders party thereto from time to time and Wilmington Savings Fund Society, FSB, as administrative agent, including, without limitation, any fees, premiums, costs or expenses related thereto; it being agreed that such amounts shall be payable from the Borrowers' existing cash at such time (including the Initial Draw); |
| | |     ii. working capital and other general corporate purposes of the Borrowers and the Guarantors and certain subsidiaries; |
| | |     iii. any adequate protection payments in accordance with the Orders (as defined below); |
| | |     iv. professional fees and expenses of administering the Chapter 11 Cases, to the extent the Bankruptcy Court authorizes payment (including fees incurred prior to the Closing Date); |

4

v.    fees and expenses payable under the DIP Facility;

vi.    interest and other amounts payable under the DIP Facility; and

vii.    funding of the Carve-out Account.

- Notwithstanding any other provision of this Term Sheet, from and after the Closing Date, no DIP Loans or DIP Collateral (as defined below), or any portion of the Carve-Out may be used directly or indirectly by any Debtor, any Guarantor, any official committee appointed in the Chapter 11 Cases, or any trustee appointed in the Chapter 11 Cases or any successor cases, including any chapter 7 cases, or any other person, party or entity:

    i.    in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation

        a.    against the DIP Agent or the DIP Lender, or their respective predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors, or any action purporting to do the foregoing in respect of the DIP Obligations, DIP Liens (as defined below), DIP Claims (as defined below), or

        b.    challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the DIP Obligations and/or the liens, claims, rights, or security interests granted under the Orders, the DIP Documents, including, in each case, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise;

    ii.    to prevent, hinder, or otherwise delay the DIP Agent's or the DIP Lender's, as applicable, enforcement or realization on the DIP Obligations, DIP Collateral, and the liens, claims and rights granted to such parties under the Orders, each in accordance with the DIP Documents and the Orders; *provided, however,* this shall not apply to objections by the official committee of the unsecured creditors to the Final Order;

    iii.    to seek to modify any of the rights and remedies granted to the DIP Agent or the DIP Lender under the Orders (other than with the consents contemplated thereunder), or the DIP Documents, as applicable;

    iv.    to apply to the Bankruptcy Court for authority to approve superpriority claims or grant liens (other than the liens permitted pursuant to the DIP Documents) or

11226390v13

| | | |
|---|---|---|
| | | security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Claims, unless (x) permitted hereunder or under the DIP Documents or unless all DIP Obligations, and claims granted to the DIP Agent or DIP Lender under the Interim Order or the Final Order, as applicable, have been refinanced or paid in full in cash and the DIP Facility terminated or (y) otherwise agreed to in writing by the DIP Agent and the DIP Lender; or |
| | | v.  to pay any amount on account of any claims arising prior to the Petition Date unless such payments are permitted hereunder or under the DIP Documents or otherwise agreed to in writing by the DIP Agent and the DIP Lender, and in each case, included in the Budget, or otherwise approved pursuant to an order of the Bankruptcy Court. |
| 15. | ***Voluntary Prepayments/Mandatory Repayments:*** | • Voluntary prepayments of the DIP Loans shall be permitted at any time, subject to, after entry into the Final Order, payment of the Exit Premium; <u>provided</u>, that, any DIP Loans voluntarily prepaid prior to the Final Order may be re-drawn after entry into the Final Order (subject to Section 6 above). <br><br>• Mandatory prepayment of the DIP Loans, together with all previously uncapitalized interest then accrued and owing on such portion of the DIP Loan then being prepaid, including any Exit Premium shall be required from: <br><br>    (i) net proceeds from sale, sale/leaseback, sublease of any real estate (or interests therein) identified in Section 16 below; and <br><br>    (ii) any Excess Cash (meaning any cash on hand (other cash than in the Carve-out Account), in excess of $50,000,000 as at the last day of each month, such prepayment being required on the fifth (5th) Business Days of each calendar month). <br><br>• Such prepayments shall be applied first, to any previously uncapitalized interest then accrued and owing on such portion of the DIP Loan then being prepaid, second, to payment of any Exit Premium, third, to any accrued and unpaid fees and expenses owing to the DIP Agent or the DIP Lenders which are then due and owing and fourth, to the unpaid principal amount of the DIP Loans then outstanding. |
| 16. | ***Priority and Security:*** | • Subject to the Carve-Out, all obligations of the Borrowers and the Guarantors under the DIP Documents (or hereunder), including, without limitation, all principal, accrued interest, costs, fees, indemnities, reimbursements and premiums provided for herein and herein, and all obligations of the Debtors under the DIP Facility (the "***DIP Obligations***") shall be entitled to super priority claim status pursuant to section 364(c)(1) of the Bankruptcy Code, with priority |

over any and all administrative expense claims and unsecured claims, of any kind or nature whatsoever, now existing or hereafter arising under the Bankruptcy Code (the "**DIP Claims**")

- Subject to the Carve-Out, all DIP Obligations in respect of the DIP Facility shall be:

 i. secured, pursuant to Section 364(c)(2) of the Bankruptcy Code, by a valid, enforceable, fully perfected and automatic first priority lien on all property and assets (or interests therein) of the Borrowers' and the Guarantors' estates (whether tangible, intangible, real, personal or mixed and wherever located) as of the Petition Date that, as of the Petition Date, was unencumbered (the "**First Priority DIP Collateral**"); including, without limitation, all real property and the facility located in Marble, North Carolina; and

 ii. secured, pursuant to Section 364(c)(3) of the Bankruptcy Code, by a valid, enforceable, fully perfected and automatic junior priority lien on all property (or interest therein) of the Borrowers' and Guarantors' estates (whether tangible, intangible, real, personal or mixed and wherever located) as of the Petition Date that (and subject and junior only to that):

 a. is subject to valid, perfected, and nonavoidable liens in existence as of the Petition Date (including mortgages, mechanics' liens and fixture filings disclosed to the DIP Agent and the DIP Lender); limited, with respect to all real property and the facilities, to those located in:

 i. Calvert City, Kentucky;

 ii. Grand Forks, North Dakota;

 iii. Muskogee, Oklahoma;

 iv. Barstow, Texas (Cedarvale);

 v. Pecos, Texas (Cottonwood); and

 vi. Dalton, Georgia; and

 b. is subject to valid liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code (this clause (ii) being collectively, the "**Second Priority DIP Collateral**" and together with the First Priority DIP Collateral, the "**DIP Collateral**"); provided, however, that any DIP Liens in already encumbered collateral shall be junior to any adequate protection liens granted to existing creditors secured by such collateral.

| | | • | The liens securing the DIP Facility (the "**DIP Liens**") shall mean the liens described above.  The DIP Liens described herein shall, to the fullest extent permitted by applicable law, be effected and perfected upon entry of the Interim Order and without the necessity of the execution of mortgages, landlord agreements, security agreements, pledge agreements, control agreements, financing statements or other agreements. |
|---|---|---|---|
| | | • | DIP Collateral shall also include any and all rents, issues, products, offspring, proceeds, and profits generated by any item of DIP Collateral, without the necessity of any further action of any kind or nature by the DIP Agent or the DIP Lender in order to claim or perfect such rents, issues, products, offspring, proceeds, and/or profits. |
| 17. | *Conditions Precedent to Closing:* | • | The Closing and the obligation of the DIP Lender to make the Initial Draw (and the right of the Borrowers to request such Initial Draw) shall be subject to the satisfaction of the conditions precedent set forth below and such other conditions set forth in the Interim Order: |

      i. entry of the Interim Order, which order shall not be stayed or subject to appeal;

      ii. delivery of the Initial Budget and any subsequent Budget as applicable;

      iii. the payment in full of the obligations under, and the termination of, the Existing DIP Credit Agreement and the inclusion in the Interim Order of provisions terminating all liens granted to the agent and lenders thereunder effective as of the date of the Interim Order;

      iv. in addition to the release set forth in Section 30 hereof, the Interim Order shall include customary stipulations by the Debtors and their estates disclaiming the existence of any claims or causes of action against each of the DIP Agent and DIP Lender, subject to a customary challenge period by the official committee of unsecured creditors;

      v. delivery by the Debtors of the notice of intent to terminate referenced in section 6(b)(ii) of the Restructuring Support Agreement dated as of December 22, 2022 entered into between the Debtors and the Consenting Creditors (as defined therein) (the "**RSA**") to the Ad Hoc Group Advisors (as defined in the RSA) (it being agreed that a copy of such notice shall have been provided to the DIP Agent for its review and reasonable comment prior to the Debtors' delivery thereof, as well as a final copy of such notice as so delivered by the Debtors);

      vi. The DIP Agent shall have received Monthly DIP Agent Fee due and owing on the initial funding date (as set forth above);

| | | |
|---|---|---|
| | | vii.    no trustee, examiner, or receiver shall have been appointed or designated with respect to the Loan Parties' business, properties or assets and no motion shall be pending seeking similar relief or any other relief, which, if granted, would result in a person other than the Loan Parties exercising control over their assets; |
| | | viii.    no Event of Default or event or condition which with the giving of notice or lapse of time, or both, would constitute an Event of Default (a "**Default**") shall have occurred and be continuing (the requesting and acceptance of any such draw being deemed to be a representation and warranty by the Borrowers as to the satisfaction of this condition); and |
| | | ix.    accuracy of representations and warranties of the Debtors in all material respects (or, if such representation and warranty is qualified as to materiality, in all respects) as of the Closing Date and the date of the Initial Draw (or if such representation or warranty expressly speaks to an earlier date, as of such earlier date) (the requesting and acceptance of any such draw being deemed to be a representation and warranty by the Borrowers as to the satisfaction of this condition). |
| 18. | ***Conditions Precedent to Full Availability of DIP Loans:*** | •   The right of the Loan Parties to request, and the obligation of the DIP Lenders to advance, any Other Draws and/or the Final Draw shall be subject to the conditions precedent set forth below, in the Final Order, in the DIP Documents and as otherwise deemed incorporated herein (and/or to be included in the DIP Documents), in each case, in accordance with the Documentation Principles (all to be in form and substance satisfactory to the DIP Agent and DIP Lender), and shall include, without limitation: |
| | | i.    execution and delivery of a credit agreement (the "**DIP Credit Agreement**") and other DIP Documents evidencing the DIP Facility, in each case, which shall be in form and substance substantially consistent with this Term Sheet and otherwise in form and substance acceptable to the DIP Agent and the DIP Lender and the Borrowers and the Guarantors (it being agreed that the Initial Draw may be advanced based on the terms set forth in this Term Sheet and the Interim Order); |
| | | ii.    not later than 30 days following the date on which a motion to approve the DIP Facility is filed, the Final Order as to the DIP Facility shall have been entered by the Bankruptcy Court, which Final Order shall be in the form of the Interim Order with such changes as are customary for a final order and such other changes as the DIP Agent may reasonably require and/or the |

9

|  |  |  | parties may mutually agree, in all cases, to be acceptable to the DIP Agent; |
|  |  | iii. | in addition to the release set forth in Section 30 hereof, the Final Order shall include customary stipulations by the Debtors and their estates disclaiming the existence of any claims or causes of action against each of the DIP Agent and the DIP Lender, subject to a customary challenge period by the official committee of unsecured creditors; |
|  |  | iv. | the Final Order shall be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed, or subject to a stay pending appeal; |
|  |  | v. | the DIP Agent, the DIP Lenders and the Loan Parties shall have finalized and entered into the DIP Documents relating to the facilities contemplated hereby (and all of which have been approved by Bankruptcy Court); |
|  |  | vi. | the Debtors shall be in compliance in all respects with the Interim Order and the Final Order and the Loan Parties shall be in compliance in all respects with the DIP Documents; |
|  |  | vii. | at the time of each draw, no Default or Event of Default shall have occurred and be continuing (the requesting and acceptance of any such draw being deemed to be a representation and warranty by the Borrowers as to the satisfaction of this condition); |
|  |  | viii. | at the time of each draw, accuracy of representations and warranties of the Debtors in all material respects (or if such representation and warranty is qualified as to materiality, in all respects) as of such date (or, if such representation or warranty expressly speaks to an earlier date, as of such earlier date) (the requesting and acceptance of any such draw being deemed to be a representation and warranty by the Borrowers as to the satisfaction of this condition); |
|  |  | ix. | no order has been entered reversing, amending, staying, vacating, terminating or otherwise modifying in any manner adverse to the DIP Agent and DIP Lender the Interim Order or the Final Order, as applicable; |
|  |  | x. | delivery of a notice of borrowing, including a certification as to the satisfaction of the condition to the making of any Other Draws; |
|  |  | xi. | all costs, fees, expenses (including, without limitation, legal fees and expenses) set forth in the DIP Documents or otherwise to be paid to the DIP Agent or the DIP |

| | | |
|---|---|---|
| | | Lender on or before the Final Draw shall have been paid; and |
| | | xii.     The RSA shall have been fully terminated and shall be of no further force or effect. |
| 19. | *Representations and Warranties:* | • The Loan Parties shall make and be subject to (and are hereby deemed to agree to and make) the representations and warranties set forth herein, in the Orders, in the DIP Documents and as otherwise deemed incorporated herein (and/or to be included in the DIP Documents), in each case, in accordance with the Documentation Principles (all to be in form and substance satisfactory to the DIP Agent and DIP Lender). |
| 20. | *Affirmative Covenants:* | • The Loan Parties shall be subject to (and are hereby deemed to agree to and make) the covenants and undertakings set forth below, in the Orders, in the DIP Documents and as otherwise deemed incorporated herein (and/or to be included in the DIP Documents), in each case, in accordance with the Documentation Principles (all to be in form and substance satisfactory to the DIP Agent and DIP Lender), including, without limitation: |
| | | i.     the Loan Parties and the DIP Agent agree to discuss in good faith with potential providers thereof and the DIP Agent an agreement to provide for forward sales or hedging arrangements with respect to the Loan Parties' Bitcoin present and anticipated Bitcoin inventory; and |
| | | ii.     the Loan Parties shall covenant and agree to timely and diligently pursue and prosecute the termination of the RSA and to take such actions as are required pursuant to the terms of the RSA to effect the such termination by a date no later than the date the Final Order is entered. |
| 21. | *Negative Covenants:* | • The Loan Parties shall be subject to (and are hereby deemed to agree to and make) the covenants and undertakings set forth below, in the Orders, in the DIP Documents and as otherwise deemed incorporated herein (and/or to be included in the DIP Documents), in each case, in accordance with the Documentation Principles (all to be in form and substance satisfactory to the DIP Agent and DIP Lender), including, without limitation: |
| | | i.     The Loan Parties shall not take, participate or support any action, motion or claim to rescind its termination of, or to continue or reinstate the RSA, or shall cease or fail to take the actions specified in clause (ii) of Section 20 above. |
| | | ii.     It is agreed that such covenants will permit (a) sales of (i) Bitcoin in the ordinary course and (ii) non-core assets (it being agreed that non-core assets shall NOT include the Debtors' real estate listed in Section 16 above) and, with the DIP Agent's prior consent, the Debtors' real estate listed in Section 16 above, so long as, in each case, net proceeds (including reductions to satisfy claims of |

11226390v13

| | | |
|---|---|---|
| | | other lienholders with respect to such assets including amounts to be escrowed or otherwise required to be held back or segregated by the Bankruptcy Court) thereof are used to repay the DIP Obligations (including any applicable Exit Premium) and (b) (i) transactions with respect to miners and equipment in the ordinary course of business and (ii) subject to the consent of the DIP Agent (subject to thresholds to be agreed) (x) the ability to reject or modify contracts, and (y) settlements of litigation. |
| 22. | ***DIP Budget / Variance Reporting:*** | • On or prior to the Closing Date, the Loan Parties shall deliver to the DIP Agent and the DIP Lender an extended weekly budget commencing with the week during which the Interim Order is entered, containing line items of sufficient detail to reflect the consolidated operating cash flow of the Debtors through projected emergence (the "**Initial Budget**") (the Initial Budget, as modified from time to time in accordance herewith, shall be the "**Budget**"). |
| | | • The Budget shall be updated and provided to the DIP Agent and the DIP Lender on the fourth Wednesday following the prior Budget's approval and every fourth Wednesday thereafter, or more frequently at the reasonable discretion of either the Borrowers or the DIP Agent, with such updated Budget extending the term thereof and the DIP Agent, in its reasonable discretion, shall have the right to approve or reject any such updates (or any amendments) by providing the Borrowers specific notice thereof within such four (4) business days after the delivery by the Borrowers of any such update or amendment; provided that, (i) to the extent the DIP Agent does not provide notice of approval or rejection within such four (4) business day period, such update or amendment shall be deemed approved and consented to by the DIP Lender and shall be deemed to constitute the updated approved Budget ("**Updated Budget**") upon the expiration of such 4 business day objection period and, (ii) to the extent the DIP Lender provides notice rejecting the updates (or any amendments), the then existing Budget shall continue to constitute the applicable Budget until such time as an update or amendment is approved by the DIP Agent. |
| | | • On a weekly basis thereafter, the Borrowers shall deliver to the DIP Agent and DIP Lender a variance report for the four-week period ending the prior Friday comparing the difference/variance, expressed as a percentage (each, a "**Budget Variance**"), between: (x) total receipts for such period to total receipts for such period as set forth in the Budget on a cumulative 4 week rolling basis; (y) total disbursements for such period to total disbursements for such period as set forth in the Budget on a cumulative 4 week rolling basis (each a "**Measuring Period**") and explaining in reasonable detail all material variances, it being understood that any variance exceeding twenty percent (20%) shall be material (each such report, a |

"**Variance Report**," which shall be in a form satisfactory to the DIP Agent).

- For purposes of each Measuring Period, the Debtors shall calculate: (x) the numerical difference between total net receipts (with respect to self-mining and hosted miners) for such period to total net receipts (with respect to self-mining and hosted miners) for such period as set forth in the Budget on a cumulative 4 week rolling basis, and to the extent the difference is a negative number, the percentage such difference (as an absolute amount) is of the cumulative budgeted amount for receipts for such period (the "**Receipts Variance**"); and (y) the numerical difference between "net operating disbursements" plus "net capital expenditures" (such terms reflecting those line items illustrated in the Budget) for such period to "net operating disbursements" plus "net capital expenditures" for such period as set forth in the Budget on a cumulative 4 week rolling basis, and to the extent the difference is a positive number, the percentage such difference is of the cumulative budgeted amount for disbursements for such period (the "**Disbursements and Capital Expenditure Variance**"). For the avoidance of doubt, the Disbursements Variance shall not include any amounts in the Budget related to professional fees, utility deposits or adequate assurance payments.

- For purposes herein, a "Permitted Variance" shall be limited to not greater than (a) twenty-five percent (25%) for budget variances with respect to the Receipts Variance and (b) twenty percent (20%) for budget variances with respect to the Disbursements and Capital Expenditure Variance, each as set forth in the applicable Variance Report.

| 23. | *Interim Order:* | <ul><li>The interim order approving the DIP Facility, which shall include the terms hereof and shall otherwise be in form and substance reasonably acceptable to the DIP Agent and the DIP Lender (the "**Interim Order**"), shall, among other things, authorize and approve:<br><br>  i.  the terms set forth in this Term Sheet and the entry into the Commitment Letter to which this Term Sheet is attached;<br><br>  ii.  the Initial Draw;<br><br>  iii.  the making of the DIP Loans;<br><br>  iv.  the granting of the superpriority claims and liens against the Debtors and their assets in accordance with this Term Sheet and the DIP Documents with respect to the DIP Collateral;<br><br>  v.  the payment of all fees and expenses (including the fees and expenses of outside counsel and financial advisors) required to be paid to the DIP Agent and the DIP Lender as described herein under the heading "*Indemnification and Reimbursement of Expenses*" by the Debtors; it</li></ul> |
| --- | --- | --- |

13

|  |  | being acknowledged and agreed that all such fees and expenses may and will be withheld from the Initial Draw for direct payment thereof (to the DIP Agent, the DIP Lenders or such counsel and financial advisors) from such Initial Draw (without reducing the obligations of the Debtor to repay the entire amount of the Initial Draw); *provided, however,* notwithstanding anything to the contrary, fees and expenses incurred by the DIP Agent and the DIP Lender prior to the Interim Order and reimbursable pursuant to this clause (v) shall be limited to the fees and expenses of Choate, Hall & Stewart LLP, as counsel to the DIP Agent and the DIP Lender. |
|  |  | vi. the termination of the Existing DIP Credit Agreement and related documents and all liens granted thereunder (and/or the interim order approving such Existing DIP Credit Agreement) as security therefor; and |
|  |  | vii. the calculations and payment of the Monthly DIP Agent Fee, the Upfront Premium, the Extension Fee and the Exit Premium, which fee payments shall not be subject to reduction, setoff or recoupment, and shall be fully earned upon entry of the Interim Order. |
| 24. | *Final Order:* | • The final order approving the DIP Facility, which shall be substantially in the same form as the Interim Order (with such modifications as are necessary to convert the Interim Order into a final order), with such modifications or additions thereto as may reasonably be required by the DIP Agent or as mutually agreed to by the parties, but in any event, to be in form and substance acceptable to the DIP Agent and the DIP Lender (the "**Final Order**" and together with the Interim Order, the "**Orders**"), shall, among other things, authorize and approve the DIP Facility on a final basis, and the Final Draw. |
| 25. | *Carve out:* | • The "**Carve-Out**" shall, except as otherwise set forth herein, be consistent with the Existing DIP Credit Agreement. |
| 26. | *Events of Default:* | • The DIP Facility and the Loan Parties shall be subject to (and the Loan Parties hereby acknowledge and agree that the occurrence or existence thereof will constitute an Event of Default hereunder, under the Orders and under the DIP Documents) the Events of Default set forth below, in the Orders, in the DIP Documents and as otherwise deemed incorporated herein (and/or to be included in the DIP Documents), in each case, in accordance with the Documentation Principles (the "**Event of Default**"), including, without limitation: |
|  |  | i. the entry of the Final Order shall have not occurred within 30 days after the date on which a motion to approve the DIP Facility is filed; |

14

ii.   the dismissal of any of the Chapter 11 Cases or the conversion of any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code;

iii.   noncompliance, subject to any applicable grace and/or cure periods (other than in the case, among others pursuant the Documentation Principles, of any negative covenant (none of which shall be subject to any grace or cure period, except to the extent incorporated within any such covenant)), by any Loan Party or any of its subsidiaries with the terms of hereof (as giving effect to the Documentation Principles), the DIP Documents, the Interim Order or the Final Order;

iv.   the entry of an order staying, reversing, vacating or otherwise modifying the Interim Order or the Final Order, in each case, without the prior written consent of the DIP Agent and the DIP Lender;

v.   the entry of an order appointing a trustee, responsible officer, or an examiner having expanded powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Bankruptcy Code section 1104 (other than a fee examiner) in the Chapter 11 Cases, or the Bankruptcy Court shall have entered an order providing for such appointment, in each case without the prior written consent of the DIP Agent in its sole discretion;

vi.   the entry of an order in any of the Chapter 11 Cases granting relief from any stay or proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed with foreclosure against any material assets of the Loan Parties to which the fair market value of which exceeds $20,000,000; provided, however, that any such order with respect to the assets of either (x) Blockfi Lending LLC ("**BlockFi**") or (y) NYDIG or their affiliates (so long as (i) relating solely to such equipment provided by such party, or in the case of Blockfi, the debt owing to Blockfi pursuant to its agreements as in effect prior to the Petition Date and (ii) such arrangement shall not result in the improvement or enhancement of such party's claims in the Chapter 11 Cases or security or priority position with respect to any of the Debtors' collateral) shall not be an Event of Default;

vii.   the entry of an order (a) surcharging any of the DIP Collateral under Sections 105, 506(c), or any other section of the Bankruptcy Code, (b) allowing any administrative expense claim having priority over or ranking in parity with the DIP Claims or the rights of the

DIP Agent, or (c) resulting in the marshaling of any DIP Collateral;

viii.  any action by any Debtor to (a) challenge the rights and remedies of the DIP Agent or the DIP Lender under the DIP Facility in any of the Chapter 11 Cases or acting in a manner inconsistent with the DIP Documents or (b) avoid or require disgorgement by the DIP Agent or the DIP Lender of any amounts received in respect of the obligations under the DIP Facility;

ix.  any Debtor files a motion in the Chapter 11 Cases without the express written consent of DIP Agent to obtain additional financing from a party other than the DIP Lender under Section 364(d) of the Bankruptcy Code except if such financing contemplates payment in full of the DIP Facility and all DIP Obligations (including the Exit Premium);

x.  the making of any material payments in respect of prepetition obligations other than (a) as permitted by the Interim Order or the Final Order, (b) as permitted by any "first day" or "second day" orders reasonably satisfactory to the DIP Agent, (c) as permitted by any other order of the Bankruptcy Court reasonably satisfactory to the DIP Agent, (d) as permitted under the DIP Documents, or (e) as otherwise agreed to by the DIP Agent;

xi.  entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Debtor to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the DIP Agent and the DIP Lender;

xii.  the Debtors shall seek to, or support any other person's motion to, (a) disallow in whole or in part the DIP Obligations, (b) challenge the validity and enforceability of the DIP Liens or the DIP Claims, (c) contest any material provision of any DIP Document;

xiii.  any Debtor shall fail to execute and deliver to the DIP Agent any agreement, financing statement, trademark filing, copyright filing, mortgages, notices of lien or similar instruments or other documents that the DIP Agent may reasonably request from time to time to more fully evidence, confirm, validate, perfect, preserve and enforce the DIP Liens created in favor of the DIP Agent or the DIP Claims;

xiv.  The Borrowers, DIP Agent and DIP Lenders do not agree upon the terms of and execute the final DIP Documents (which DIP Documents shall be subject to Bankruptcy Court approval in the Final Order), prior to

16

|  |  | twenty (20) days after the Closing Date (or such later date to which the DIP Agent may otherwise agree), unless such failure is attributable to the DIP Agent's or the DIP Lender's bad faith in negotiating such documents (as determined in a final, non-appealable determination by a court of competent jurisdiction), or the Bankruptcy Court does not approve the Debtors' entry into the final DIP Documents; |
|  | xv. | The RSA is not fully and finally terminated and/or has not ceased to be in full force and effect on or prior to the date upon which the Final Order is to be entered; and/or |
|  | xvi. | Any Budget Variance exceeds the applicable Permitted Variance as set forth in the last bullet point in Section 22 above. |
| 27. | ***Milestone:*** | • None. |
| 28. | ***Remedies:*** | • The remedies exercisable by the DIP Agent and the DIP Lender following the occurrence of an Event of Default as set forth above shall be as set forth herein, in the Orders, in the DIP Documents, as deemed incorporated herein pursuant to the Documentation Principles and otherwise as  are usual and customary in loan documents for similar debtor-in-possession financings and, in each case, as are acceptable to the DIP Agent and the DIP Lender. |
| 29. | ***Indemnification and Reimbursement of Expenses:*** | • The Loan Parties shall be subject to and liable for the customary indemnifications in favor of the DIP Agent, the DIP Lenders and their related parties as are included herein, in the Orders, in the DIP Documents and as otherwise deemed incorporated herein (and/or to be included in the DIP Documents), in each case, in accordance with the Documentation Principles (all to be in form and substance satisfactory to the DIP Agent and DIP Lender). |
|  |  | • Subject to the DIP Documents and in accordance with the Documentation Principles, all reasonable and documented out-of-pocket accrued and unpaid fees, costs, disbursements, and expenses of (i) the DIP Agent and (ii) the DIP Lender, including the fees and expenses of Choate, Hall & Stewart LLP, as counsel to the DIP Agent and the DIP Lender, and as necessary, other local counsel in their capacity as counsel to the DIP Agent and the DIP Lender, incurred in connection with, the preparation, analysis, negotiation, documentation, execution and enforcement of, or actions or suits relating to, this Term Sheet, the related commitment letter, the DIP Documents, the Orders and/or otherwise in connection with the DIP Facility and the Chapter 11 Cases and/or the transactions contemplated thereby, shall be paid on a current basis <u>provided</u>, however, notwithstanding anything to the contrary, fees and expenses incurred prior to the Interim Order and reimbursable hereunder shall be limited to those of Choate, Hall & Stewart LLP, as counsel to the DIP Lender. |

| 30. | *Release:* | • | The Orders shall include a customary release of the DIP Agent and DIP Lender, each in their capacity as such, with respect to any and all claims and causes of action arising from or related to the DIP Facility. |
|-----|------------|---|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| 31. | *Waivers:* | • | The Orders shall include, in addition to those set forth herein, terms and conditions customary for final DIP financing orders or which shall otherwise be acceptable to the DIP Agent and DIP Lender (in their discretion), including, without limitation, waiver of the automatic stay, credit-bidding rights, "no marshaling" provisions, and waivers of the imposition of costs pursuant to Section 506(c) of the Bankruptcy code and the "equities of the case" exception in Section 552(b) of the Bankruptcy Code, in each case, to the extent applicable. |
| 32. | *Governing Law:* | • | New York (and to the extent applicable, the Bankruptcy Code). |
| 33. | *Documentation Principles:* | • | Without limiting and with the exception of any of the express provisions in this term sheet and/or in the Interim DIP Order or the Final Order, (x) until such time as definitive DIP Documents have been negotiated and executed by the Debtors, the DIP Agent and the DIP Lenders and approved by the Bankruptcy Court, the undertakings, restrictions, duties and obligations of the Debtors and the rights, remedies, protections, privileges, exculpations, and rights of reimbursement and indemnity of the DIP Agent and the DIP Lenders hereunder shall, in each case, be deemed to be governed by the terms of the Existing DIP Credit Agreement (unless and to the extent otherwise agreed to by the DIP Agent its discretion) as if the DIP Agent and the DIP Lenders were making the DIP Loans and the Debtors were incurring the DIP Obligations, in each case, under and pursuant to such Existing DIP Credit Agreement (and such agreement were among the Debtors, the DIP Agent and the DIP Lender), including as relating to the conditions precedent to lending, representations and warranties of the Debtors, affirmative and negative covenants and undertakings of the Debtors, events of default and the consequences thereof and the rights and remedies of the DIP Agent and the DIP Lender relating thereto, the agreements in Sections 3.4 through 3.7 and Sections 12 through Section 14 of the Existing DIP Credit Agreement, together in each case with the related definitions (to the extent relevant) and (y) the DIP Documents shall be based on the Existing DIP Credit Agreement, with such additions and modifications thereto as the DIP Agent deems reasonably appropriate to reflect the terms of this Term Sheet or which are usual and customary for similar debtor-in-possession financings or which the DIP Agent and the Borrowers deem reasonably appropriate in light of the transactions contemplated hereby (collectively, the "**Documentation Principles**"). Until such time as the DIP Documents are fully-executed and approved by the Bankruptcy Court, in the event of a conflict between the terms of the Existing DIP Credit Agreement and the terms set forth in this term sheet or the Interim Orders, the terms of this term sheet and the Interim Order shall control. Notwithstanding anything to the contrary |

|  |  | herein, in the event of (and solely to the extent of) any direct conflict between the provisions of the Interim Order and this Term Sheet (as so interpreted to incorporate the terms of the Existing DIP Credit Agreement), the terms of the Interim Order shall control. |

19

## **Exhibit 2**

**Commitment Letter**

**EXECUTION VERSION**

**B. Riley Commercial Capital, LLC**
299 Park Avenue
New York, NY 10171

January 29, 2023

Core Scientific, Inc.
210 Barton Springs Road, Suite 300
Austin, TX 78704
Attn: Todd DuChene; President, Chief Legal Officer and Secretary

<u>**Commitment Letter**</u>

Dear Ladies and Gentleman:

You have informed **B. Riley Commercial Capital, LLC** (the "***DIP Lender***") that Core Scientific, Inc., a Delaware corporation (the "***Company***") and certain of the Company's direct and indirect subsidiaries (collectively and together with the Company, the "***Debtors***" and "***you***") referred to in the DIP Term Sheet attached hereto as ***Annex A*** (including[1] all exhibits and schedules thereto, the "***DIP Term Sheet***"; capitalized terms used but not defined herein shall have the meanings given to them in the DIP Term Sheet) have commenced cases under chapter 11 (the "***Chapter 11 Cases***") of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***") under Case No. ***22-90341 (DRJ) (Jointly Administered)***, and wish to obtain the up to $70,000,000 DIP Facility referenced in the DIP Term Sheet, substantially on the terms set forth in this letter, as well as the DIP Term Sheet (such letter and the DIP Term Sheet, collectively, the "***Commitment Letter***"). The transactions contemplated by the DIP Term Sheet and this Commitment Letter are hereinafter collectively referred to as, the "***Transactions***".

1.  Upon the terms and subject only to the conditions set forth in this Commitment Letter (including paragraph 3 hereof) and the DIP Term Sheet (including the "Conditions Precedent to Closing and Funding the Initial Draw" set forth in the DIP Term Sheet), the DIP Lender is pleased to inform you of its commitment to provide up to $70,000,000 of the DIP Commitments (as defined in the DIP Term Sheet). You hereby agree that, effective upon your acceptance of this Commitment Letter, you shall not solicit any other bank, investment bank, financial institution, person or entity to provide, structure, arrange or syndicate any component of the DIP Facility or any other senior financing similar to or as a replacement of any component of the DIP Facility.

2.  In consideration of the DIP Lender's commitments hereunder, the Company agrees to pay the fees described in the DIP Term Sheet on the terms and subject to the conditions (including as to timing and amount) set forth therein, including, without limitation the fees required to be paid to the DIP Agent and the DIP Lender by the Debtors as described therein under the heading "Interim Order".

3. The DIP Lender's commitments and agreements hereunder in respect of the DIP Facility are subject to the satisfaction or waiver in writing (by the DIP Lender) of all conditions precedent set forth in this Commitment Letter and the DIP Term Sheet, including those conditions precedent set forth across the heading "Conditions Precedent to Closing" and, in the case of the borrowing of any DIP Loans after the Closing Date, also the conditions precedent set forth across from the heading "Conditions Precedent to Full Availability of DIP Loans", in each case, in the DIP Term Sheet.

4.  The Company, on behalf of itself and the other Debtors, represents and covenants that (i) all information, other

---

[1] For the avoidance of doubt, the terms "include", "includes" and "including" as used in this Commitment Letter are by way of example and not limitation, and shall be deemed to be followed by the words "without limitation" whether or not they are in fact followed by such words.

than Projections and Lien Information, which has been or is hereafter provided directly or indirectly by the Company or any of its affiliates, advisors or representatives to the DIP Lender or its affiliates in connection with the Transactions (the "*Information*") is and will be complete and correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not misleading and (ii) all financial projections concerning the Debtors and their subsidiaries that have been or will be made available to DIP Lender or its affiliates by the Company or any of its affiliates, advisors or representatives (the "*Projections*") and all information related to all outstanding liens (including, without limitation, mechanics' liens), the amount thereof, the validity of such liens, any claims or counterclaims with respect to such liens and any materials available to offset such liens, in each case, which has been or is hereafter provided directly or indirectly by the Company or any of its affiliates, advisors or representatives to the DIP Lender or its affiliates (the "*Lien Information*") have been and will be prepared in good faith based upon assumptions that are believed by the preparer thereof to be reasonable at the time made. You agree that if at any time prior to the Closing Date, any of the representations in the preceding sentence would be incorrect in any material respect if the Information, Projections and Lien Information were being furnished, and such representations were being made, at such time, then you will promptly supplement, or cause to be supplemented, the Information, Projections and Lien Information so that such representations will be correct in all material respects under those circumstances.

5. [Reserved].

6. [Reserved].

7. In addition, please note that the DIP Lender and its affiliates do not provide accounting, tax or legal advice. Notwithstanding anything herein to the contrary, DIP Lender (and each of its partners, officers, directors, employees, affiliates, agents, advisors and attorneys) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the Transactions and all materials of any kind (including tax opinions or other tax analyses) that are provided to DIP Lender relating to such tax treatment and tax structure. However, the foregoing sentence shall not apply to any information relating to the tax treatment or tax structure to the extent reasonably necessary to enable any person to comply with applicable securities laws.  For this purpose, "*tax treatment*" means U.S. federal income tax treatment, and "*tax structure*" is limited to any facts relevant to the U.S. federal income tax treatment of the Transactions.

8. The DIP Lender hereby notifies you that consistent with the USA PATRIOT ACT (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "*PATRIOT ACT*") and 31 C.F.R. § 1010.230 (the "*Beneficial Ownership Regulation*"), it may be required to obtain, verify and record information that identifies you and each Guarantor, which information includes the name and address of you and each Guarantor and other information that will allow the DIP Lender to identify you and each Guarantor, including the delivery of the certification regarding beneficial ownership in relation to you, in accordance with, or as otherwise required by, the PATRIOT ACT and the Beneficial Ownership Regulation.  In addition, the DIP Lender may also request corporate formation documents, or other forms of identification, to verify information provided.  This notice is given in accordance with the requirements of the PATRIOT ACT and the Beneficial Ownership Regulation and is effective for the DIP Lender, any other lender and agent (including the DIP Agent) in respect of the DIP Facility.

9. As you know, DIP Lender and/or its affiliates may from time to time effect transactions, for their own account or the account of customers, and hold positions in loans or options on loans of the Company and other companies that may be the subject of this Commitment Letter.  In addition, DIP Lender and/or its affiliates may from time to time effect transactions and hold positions in securities or options on securities of the Company and other companies that may be the subject of this Commitment Letter.  In addition, DIP Lender may employ the services of its affiliates in providing certain services hereunder and may exchange with such affiliates information concerning the Company and other companies that may be the subject of this Commitment Letter, and such affiliates shall be entitled to the benefits afforded to DIP Lender (subject to any limitations thereof) hereunder.

10.  The DIP Lender and its affiliates may have economic interests that conflict with those of the Company.  You agree that the DIP Lender will act under this Commitment Letter as an independent contractor and that nothing in this Commitment Letter or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between the DIP Lender and the Company, its stockholders or their affiliates. You acknowledge and agree that (i) the Transactions are arm's-length commercial transactions between the DIP Lender, on the one hand, and the Company and their affiliates, on the other, (ii) in connection therewith and with the process leading to such Transactions the DIP Lender is acting solely as a principal and not the agent or fiduciary of the Company, its management, stockholders, affiliates, creditors, or any other person, (iii) the DIP Lender has not assumed an advisory or fiduciary responsibility in favor of the Company and their affiliates with respect to the Transactions contemplated hereby or the process leading thereto (irrespective of whether the DIP Lender or any of its affiliates has advised or is currently advising the Company and their affiliates on other matters) or any other obligation to the Company and their affiliates except the obligations expressly set forth in this Commitment Letter and (iv) the Company has consulted its own legal and financial advisors to the extent it deemed appropriate.  The Company further acknowledges and agrees that it is responsible for making its own independent judgment with respect to such Transactions and the process leading thereto.  The Company, on behalf of itself and their affiliates, agrees that it will not claim that the DIP Lender has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to the Company and their affiliates, in connection with such Transaction or the process leading thereto.

11. This Commitment Letter (including the DIP Term Sheet) may not be amended or waived except by an instrument in writing signed by the DIP Lender and the Company. This Commitment Letter may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.  Delivery of an executed signature page of this Commitment Letter by facsimile or email transmission shall be effective as delivery of a manually executed counterpart thereof.

12. This Commitment Letter (i) supersedes all prior discussions, agreements, commitments, arrangements, negotiations and understandings, whether oral or written, of the parties with respect thereto (other than the Interim Order), (ii) SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS, and (iii) may not be assigned by the Company or the DIP Lender without the DIP Lender's or the Company's prior written consent, respectively, and any purported assignment without such consent shall be null and void, (iv) shall be binding upon the parties and their respective successors and assigns, and (v) may not be relied upon or enforced by any other person or entity and is not intended to confer any benefit upon, or create any right in favor of, any person other than the parties hereto except hereto except the entities and persons described in the definition of Indemnified Person.  ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY ACTION OR PROCEEDING ARISING IN CONNECTION WITH OR AS A RESULT OF EITHER THE TRANSACTIONS OR ANY MATTER REFERRED TO IN THE COMMITMENT LETTER OR THE DIP TERM SHEET IS HEREBY WAIVED BY THE PARTIES HERETO.  EACH OF THE COMPANY AND THE DIP LENDER AGREE THAT ANY SUIT OR PROCEEDING ARISING IN RESPECT OF THE TRANSACTIONS OR ANY MATTER REFERRED TO IN THE COMMITMENT LETTER OR THE DIP TERM SHEET WILL BE TRIED EXCLUSIVELY IN THE BANKRUPTCY COURT AND THE COMPANY AND THE DIP LENDER EACH AGREE TO SUBMIT TO THE JURISDICTION OF, AND TO VENUE IN, SUCH COURT.

13.  If any term, provision, covenant or restriction contained in this Commitment Letter is held by a court of competent jurisdiction to be invalid, void or unenforceable or against public policy, the remainder of the terms, provisions, covenants and restrictions contained herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated. The DIP Lender and the Company shall endeavor in good faith negotiations to replace the invalid, void or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, void or unenforceable provisions.

14. [Reserved].

15.  If you accept the terms and conditions of this Commitment Letter in accordance with, and by the deadline specified in, paragraph 18 hereof, the DIP Lender's commitments and other obligations hereunder will remain effective and terminate on February 2, 2023 at 11:59 p.m. (New York City time) unless prior to such time the Court has entered the Interim Order (the "Termination Date"); provided, that this Commitment Letter may otherwise be terminated by (x) mutual consent of the DIP Lender and the Company, (y) by the DIP Lender by written notice (i) prior to the Company's acceptance hereof or (ii) material breach by the Company of any of the conditions, representations, or its respective obligations or undertakings under this Commitment Letter or the DIP Sheet, as applicable, or (z) by the Company, in its reasonable discretion, to the extent that (i) it determines doing so would be required by its fiduciary duties and (ii) the Company promptly reimburses the DIP Lender, in full in cash, for all of its then-outstanding reasonable and documented fees and expenses (including, without limitation, the reasonable and documented fees and expenses of Choate, Hall & Stewart LLP, as counsel to the DIP Lender).

16. Paragraphs 2, 4, 7, 9, 10, 12 and 17 hereof shall remain in full force and effect regardless of whether any DIP Loans are funded or the DIP Documents shall be executed and delivered and notwithstanding the termination or expiration of this Commitment Letter or the DIP Lender's commitments hereunder; provided, that your obligations under this Commitment Letter (other than your obligations set forth in paragraphs 4, 5 and 14) shall automatically terminate and be superseded by the Interim Order and/or corresponding provisions of the DIP Documents upon the execution and delivery thereof, as applicable, in each case, solely to the extent such paragraphs (and the content thereof) are covered thereby with retroactive application to the date hereof.

17.  Subject to the Bankruptcy Court's approval of the Interim Order, you agree to indemnify and hold harmless the DIP Lender, its respective affiliates and its officers, directors, employees, agents, advisors, consultants, representatives, controlling persons, members and successors and assigns (each, an "***Indemnified Person***") from and against any and all losses, claims, damages, liabilities and expenses, joint or several ("***Losses***") to which any such Indemnified Person may become subject arising out of or in connection with this Commitment Letter, the DIP Facility, the use of proceeds thereof, the Transactions, to reimburse each such Indemnified Person from time to time upon their reasonable demand upon presentation of a summary statement, for any reasonable and documented out-of-pocket legal expenses (including one outside local counsel in each relevant jurisdiction) or other expenses incurred in connection with the DIP Facility, the enforcement of this Commitment Letter, the DIP Documents and any ancillary documents and security arrangements in connection therewith; provided, that the foregoing indemnity will not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or related expenses to the extent they are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted from such Indemnified Person's (x) gross negligence or willful misconduct or (y) material breach of obligations under this Commitment Letter, in each case, whether or not such investigation, litigation or proceeding is brought by you, your equityholders or creditors or an Indemnified Party, whether or not an Indemnified Party is otherwise a party thereto and whether or not any aspect of the Transaction is consummated. You agree that, notwithstanding any other provision of this Commitment Letter, no Indemnified Person shall have any liability (whether direct or indirect, in contract or tort or otherwise) to you or your respective equity holders or creditors or any other person or entity arising out of, related to or in connection with any aspect of the Transactions, the DIP Facility, the enforcement of this Commitment Letter, the DIP Documents and any ancillary documents and security arrangements in connection therewith, except to the extent of direct, as opposed to special, indirect, consequential or punitive, damages determined in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's (a) gross negligence or willful misconduct or (b) breach of obligations under this Commitment Letter.

18.  If the foregoing correctly sets forth the DIP Lender's agreement with you, please indicate your acceptance of the terms and conditions of this Commitment Letter (including the DIP Term Sheet) by returning an executed counterpart to this Commitment Letter to the Company's counsel Weil, Gotshal & Manges LLP (by electronic (pdf) transmission to Maximilien.Pucci-SistiMaisonrouge@weil.com, Claudia.Stantzyk-Guzek@weil.com and Kate.Waterman@weil.com) on or before 11:59 p.m. (New York City time) on January 29, 2023.

**Exhibit 3**

**Schedule of Existing Liens**

1.  Schedule of Existing Liens Master Equipment Financing Agreement, dated as of October 27, 2020, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as borrower, and Arctos Credit, LLC, as lender, and any and all schedules thereto.

2.  Equipment Financing Agreement, dated as of March 15, 2021, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as borrower, and Bank of the West, as lender.

3.  Master Equipment Financing Agreement, dated as of August 31, 2021, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as borrower, and Trinity Capital Inc., as lender, and any and all amendments, modifications and schedules thereto, including, without limitation, Equipment Financing Schedule Nos. 1 - 4 executed from time to time and any and all amendments and modifications thereto.

4.  Liens and security interests securing the payment and performance of Loan Agreement, dated as of October 4, 2021, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as borrower, and Bremer Bank, National Association, as lender.

5.  Liens and security interests securing the payment and performance of Promissory Note – Pace Equipment Term Loan, dated as of October 4, 2021, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as borrower, and Bremer Bank, National Association, as lender.

6.  Liens and security interests securing the payment and performance of Promissory Note – Improvement/Equipment Term Loan, dated as of October 4, 2021, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as borrower, and Bremer Bank, National Association, as lender.

7.  Liens and security interests securing the payment and performance of Promissory Note – Construction Real Estate Term Loan, dated as of October 10, 2021, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as borrower, and Bremer Bank, National Association, as lender.

8.  Payment Agreement, dated as of February 25, 2021, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as borrower, and Dell Financial Services L.L.C., as lender.

9.  Facility and Security Agreement, dated as of December 30, 2021, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as borrower, and BlockFi Lending LLC, as lender (and any and all amendments, modifications and collateral schedules thereto, including, without limitation, Schedule 2 thereto, and any and all amendments or modifications thereto).

10.    Facility and Security Agreement, dated as of December 30, 2021, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as borrower, and BlockFi Lending LLC, as lender (and any and all amendments, modifications and collateral schedules thereto, including, without limitation, Schedule 2 thereto, and any and all amendments or modifications thereto) .

11.    Equipment Loan and Security Agreement, dated as of March 11, 2022, by and between the Company, as borrower, and Anchorage Lending CA, LLC, as lender.

12.    Equipment Loan and Security Agreement, dated as of May 23, 2022, by and between Company, as borrower, and Anchorage Lending CA, LLC, as lender.

13.    Promissory Note, dated as of March 11, 2022, by and between Company, as borrower, and Anchorage Lending CA, LLC, as lender.

14.    Promissory Note, dated as of May 23, 2022, by and between Company, as borrower, and Anchorage Lending CA, LLC, as lender.

15.    Equipment Finance Agreement, dated as of March 22, 2022, by and between the Company, as borrower, and Liberty Commercial Finance LLC, as lender.

16.    Master Security Agreement, dated as of March 24, 2022, by and between the Company, as borrower, and Barings Private Credit Corp., Barings Capital Investment Corporation and Barings BDC, Inc. as lenders (and any and all amendments, modifications and collateral schedules thereto, including, without limitation, Collateral Schedules 1 - 6 executed from time to time and any and all amendments and modifications thereto).

17.    Term Loan and Purchase Money Security Agreement, dated as of January 30, 2021, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as borrower, and Jack Novak, as lender.

18.    Promissory Note, dated as of January 30, 2021, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as maker, and Jack Novak, as payee.

19.    Master Equipment Lease Agreement #32109 dated as of June 3, 2021 between Liberty Commercial Finance LLC (now known as Wingspire Equipment Finance LLC) and Core Scientific, Inc. and Core Scientific Holding Co. and Equipment Schedules thereto, including all amendments thereto.

20.    Master Equipment Financing Agreement, dated as of October 27, 2020, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as borrower, and NYDIG ABL LLC (f/k/a Arctos Credit, LLC), as lender.

21.    Master Lease Agreement dated December 3, 2021, between MassMutual Asset Finance LLC ("**MMAF**") and Core Scientific Operating Company, Inc. f/k/a Core Scientific, Inc. ("**Core**"), and Schedules 1-5 dated December 15, 2021, with respect thereto, as amended, (the Master Lease Agreement, Schedules, and amendments to the Schedules together, the "**Financing Agreements**").

**MORGAGES**

| | Document | Date Recorded | Recording Information | County | Claimant | Amount Claimed | Property Site |
|---|---|---|---|---|---|---|---|
| 1. | Leasehold Mortgage and Security Agreement with Fixture Financing Statement dated October 4, 2021 and recorded on October 7, 2021 by and between Core Scientific, Inc., as Borrower, and Bremer Bank, National Association, as Lender ("Leasehold Mortgage"), as modified by that certain Leasehold Mortgage Modification Agreement and Extension Affidavit dated December 6, 2021 and recorded on December 16, 2021 by and between Borrower and Lender ("Extension Agreement"), as modified by that certain 2021 Amendment to Loan Agreement, dated December 10, 2021 between Borrower and Lender ("Amendment"). | Leasehold Mortgage: October 7, 2021<br><br>Extension Agreement: December 16, 2021<br><br>Amendment: No recording information provided | Leasehold Mortgage: 819576<br><br>Extension Agreement: 821738<br><br>Amendment: No recording information provided | Grand Forks | Bremer Bank, National Association | 1. PACE/Equipment Term Loan: $6,800,000.00<br><br>2. Improvement/Equipment Term Loan: $9,359,000.00<br><br>3. Construction Real Estate Term Loan: $9,567,000.00 | 5601 11th Avenue South, Grand Forks, ND 58201 |
| 2. | Purchase Money Mortgage dated December 19, 2018 and recorded on December 21, 2018, by and between American Property Acquisition, LLC, as Borrower, and Holliwood LLC, as Lender. | December 21, 2018 | Book 897, Page 386 | Marshall | Holliwood LLC | $2,400,000.00 | 1035 Shar Cal Rd., Calvert City, KY 42029 |
| 3. | Purchase Money Deed to Secure Debt dated September 28, 2018 and recorded on October 1, 2018, by and between American | October 1, 2018 | Book 6674, Page 727-738 | Whitfield County | Brown Corporation | $1,000,000.00 | 2205 S Industrial Blvd, Dalton, GA |

| | Document | Date Recorded | Recording Information | County | Claimant | Amount Claimed | Property Site |
|---|---|---|---|---|---|---|---|
| | Property Acquisitions VI, LLC, as Mortgagor and Brown Corporation, as Mortgagee. | | | | | | |

# MECHANIC'S LIENS[13, 14]

---

[13]   All mechanic's liens arising by operation of law that are valid, non-avoidable and properly perfected as of the Petition Date (or were properly perfected subsequent to the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code).

[14]   For the avoidance of doubt, in addition to the mechanic's liens specified in this Schedule, any lien of Priority Power Management, LLC that is properly perfected postpetition in accordance with section 546(b) of the Bankruptcy Code is also deemed to be listed in this Schedule, and all parties' rights as to the ability of Priority Power Management, LLC to perfect a lien postpetition are preserved.

| | Document | Date Recorded | Document Number | County | Claimant | Amount Claimed | Property Site |
|---|---|---|---|---|---|---|---|
| 1. | Affidavit for Mechanic's Lien | 8/19/2022 | 2022-3219 | Ward | Priority Power Management, LLC | $16,319,916 | 3013 FM 516 North, Barstow, TX 79777<br><br>Property Ownership is unclear from the document, but may be Core Scientific. |
| | Partial Release of Lien | 9/27/2022 | 2022 - 3741 | Ward | Priority Power Management, LLC | Amount Released - $6,250,096<br><br>Amount Remaining - $10,069,820 | 3013 FM 516 North, Barstow, TX 79777 |
| | Amended Affidavit for Mechanic's Lien | 12/15/2022 | 2022-4794 | Ward | Priority Power Management, LLC | $8,920,490 | 3013 FM 516 North, Barstow, TX 79777 |
| 2. | Affidavit Claiming Mechanic's and Materialman's Lien | 9/9/2022 | 2022-3542 | Ward | Graybar Electric Company, Inc. | $839,883.12 | 3013 FM 516 North, Barstow, TX 79777<br><br>Cedarvale Project, located at 3015 ranch Road 516, Barstow, Texas - Property Ownership is unclear from the document, but may be Core Scientific. |
| 3. | Affidavit Claiming Mechanic's and Materialman's Lien | 11/14/2022 | 2022-4334 | Ward | Huband-Mantor Construction | $4,155,739.72 total ($2,949,813.67 due and the remainder in retainage) | 3013 FM 516 North, Barstow, TX 79777<br><br>Property Ownership is unclear from the document, but may be Core Scientific. |
| 4. | Affidavit Claiming Mechanic's and Materialman's Lien | 1/19/2023 | 2023-0202 | Ward | Huband-Mantor Construction | $10,297,562.23 | 3013 FM 516 North, Barstow, TX 79777 |

| | Document | Date Recorded | Document Number | County | Claimant | Amount Claimed | Property Site |
|---|---|---|---|---|---|---|---|
| 5. | Mechanic's Lien dated October 11, 2022 | 10/14/2022 | 2022-3951 | Ward | Wessely-Thompson Hardware, Inc. | $54,016.75 | 3013 FM 516 North, Barstow, TX 79777 |
| 6. | Affidavit for Mechanic's Lien | 11/15/2022 | 2022-4351 | Ward | MK Marlow Company, LLC | $536,728.57 | 3013 FM 516 North, Barstow, TX 79777<br><br>Property Ownership is unclear from the document, but may be Core Scientific. |
| 7. | Affidavit for Mechanic's and Materialman's Lien | 11/16/2022 | 2022-4371 | Ward | ComNet Communications, LLC | $31,875.00 | 3013 FM 516 North, Barstow, TX 79777<br><br>Core Scientific Texas 2 Cedarvale CVL I project. Property Ownership is unclear from the document, but may be Core Scientific. |
| 8. | Affidavit Claiming Mechanic's and Materialman's Lien | 11/21/2022 | 2022-4431 | Ward | Coonrod Electric Co., LLC | $1,547,802.40 | 3013 FM 516 North, Barstow, TX 79777<br><br>Property Ownership is unclear from the document, but may be Core Scientific. |
| 9. | Affidavit of Mechanics Lien by Tiered Contractor or Supplier | 11/28/2022 | 2022-4495 | Ward | Summit Electric Supply Co. | $309,162.20 | 3013 FM 516 North, Barstow, TX 79777 |
| 10. | Affidavit of Mechanics Lien by Tiered Contractor of Supplier | 11/30/2022 | 2022-4527 | Ward | Morsco Supply LLC DBA Morrison Supply Company | $4,466.68 | 3013 FM 516 North, Barstow, TX 79777 |
| 11. | Mechanic's and Materialman's Lien | 12/30/2022 | 22-90341 | Ward | Condair Inc. | $1,319,788.93 | 3013 FM 516 North, Barstow, TX 79777 |

| | Document | Date Recorded | Document Number | County | Claimant | Amount Claimed | Property Site |
|---|---|---|---|---|---|---|---|
| 12. | Affidavit for Mechanic's Lien | 8/18/2022 | 2022005550 | Reeves | Priority Power Management, LLC | $14,442,661 | 1851 FM 2119, Pecos, TX 79772 and/or<br><br>1939 FM 2119, Pecos, TX 79772<br><br>Property Owned by Jobe Ranch Family Limited Partnership |
| | Partial Release of Lien | 9/27/2022 | 202200662 | Reeves | Priority Power Management, LLC | Amount Released - $3,023,269<br><br>Amount Remaining - $11,419,392 | 1851 FM 2119, Pecos, TX 79772 and/or<br><br>1939 FM 2119, Pecos, TX 79772<br><br>Property Owned by Jobe Ranch Family Limited Partnership |
| 13. | Amended Affidavit for Mechanic's Lien | 12/15/2022 | 2022008754 | Reeves | Priority Power Management, LLC | $12,162,237.00 | 1851 FM 2119, Pecos, TX 79772 and/or<br><br>1939 FM 2119, Pecos, TX 79772 |
| 14. | Notice of Claim for Unpaid Labor and/or Materials | 9/9/2022 | 2022006200 | Reeves | Graybar Electric Company, Inc. | $1,153,226.72 | 1851 FM 2119, Pecos, TX 79772<br><br>Appears to be property owned by JRC/RGC34 Trade Tracts, LTD. |
| | Unconditional Waiver and Partial Release dated September 23, 2022 | No recording information provided | No recording information provided | Reeves | Graybar Electric Company, Inc. | Released Amount: $279,961.04<br><br>Remaining Amount: $873,265.68 | 1851 FM 2119, Pecos, TX 79772 |

| | Document | Date Recorded | Document Number | County | Claimant | Amount Claimed | Property Site |
|---|---|---|---|---|---|---|---|
| 15. | Affidavit for Mechanic's Lien dated November 11, 2022 | 11/15/2022 | 2022-4351 | Reeves | MK Marlow Company, LLC | $83,744.45 (including $24,157.65 in retainage) | 1851 FM 2119, Pecos, TX 79772 and/or 1939 FM 2119, Pecos, TX 79772 |
| 16. | Affidavit of Mechanic's Lien | 1/23/2023 | 338-1 (TXSB) | Reeves | MK Marlow Company, LLC | $978,127.96 | 1851 FM 2119, Pecos, TX 79772 and/or 1939 FM 2119, Pecos, TX 79772 |
| 17. | Affidavit Claiming Mechanic's and Materialman's Lien | 11/14/2022 | 2022007951 | Reeves | Huband-Mantor Construction | $9,007,945.01 total ($7,310,708.27 due and the remainder in retainage) | 1851 FM 2119, Pecos, TX 79772 and/or 1939 FM 2119, Pecos, TX 79772 Property Owned by Jobe Ranch Family Limited Partnership |
| 18. | Affidavit Claiming Mechanic's and Materialman's Lien | 11/14/2022 | 2022007953 | Reeves | Huband-Mantor Construction | $1,699,939.21 | 1851 FM 2119, Pecos, TX 79772 and/or 1939 FM 2119, Pecos, TX 79772 Core Scientific Cottonwood Data Center #2 Pecos Project in Reeves County – Appears to be property owned by Jobe Ranch Limited Partnership and Hawkins Investments, Inc. |

9

| | Document | Date Recorded | Document Number | County | Claimant | Amount Claimed | Property Site |
|---|---|---|---|---|---|---|---|
| 19. | Affidavit Claiming Mechanic's and Materialman's Lien | 1/18/2023 | 2023000447 | Reeves | Huband-Mantor Construction | $15,603,889.45 | 1851 FM 2119, Pecos, TX 79772 and/or<br><br>1939 FM 2119, Pecos, TX 79772<br><br>Core Scientific Cottonwood Data Center Pecos Project in Reeves County, Texas |
| 20. | Affidavit Claiming Mechanic's and Materialman's Lien | 1/18/2023 | 2023000448 | Reeves | Huband-Mantor Construction | $1,967,676.93 | 1851 FM 2119, Pecos, TX 79772 and/or<br><br>1939 FM 2119, Pecos, TX 79772<br><br>Core Scientific Cottonwood Data Center #2 Pecos Project in Reeves County |
| 21. | Affidavit Claiming Mechanic's and Materialman's Lien | 11/15/2022 | 2022007983 | Reeves | Coonrod Electric Co., LLC | $4,083,704.13 | 1851 FM 2119, Pecos, TX 79772 and/or<br><br>1939 FM 2119, Pecos, TX 79772<br><br>Cottonwood #1 Data Processing Center – Ownership of the Property is unclear |
| 22. | Affidavit Claiming Mechanic's and Materialman's Lien | 11/15/2022 | 2022007984 | Reeves | Coonrod Electric Co., LLC | $677,993.88 | 1851 FM 2119, Pecos, TX 79772 and/or<br><br>1939 FM 2119, Pecos, TX 79772<br><br>Cottonwood #2 Data Processing Center – |

| | Document | Date Recorded | Document Number | County | Claimant | Amount Claimed | Property Site |
|---|---|---|---|---|---|---|---|
| | | | | | | | Ownership of the Property is unclear |
| 23. | Affidavit of Mechanic's Lien by Tiered Contractor or Supplier | 11/30/2022 | 2022008322 | Reeves | Summit Electric Supply Co. | $821,433.16 | 1851 FM 2119, Pecos, TX 79772 and/or<br><br>1939 FM 2119, Pecos, TX 79772<br><br>60 acre surface lease property |
| 24. | Affidavit of Mechanic's Lien by Tiered Contractor or Supplier | 12/2/2022 | 2022008384 | Reeves | Summit Electric Supply Co. | $22,558.14 | 1851 FM 2119, Pecos, TX 79772 and/or<br><br>1939 FM 2119, Pecos, TX 79772<br><br>60 acre surface lease property |
| 25. | Affidavit for Mechanic's Lien | 12/15/2022 | 2022008777 | Reeves | T&D Moravits & Co., LLC | $305,769.50 | 1851 FM 2119, Pecos, TX 79772 |
| 26. | Affidavit for Mechanic's Lien | 12/15/2022 | 2022008778 | Reeves | T&D Moravits & Co., LLC | $82,240.00 | 1851 FM 2119, Pecos, TX 79772 |
| 27. | Affidavit for Mechanic's Lien | 12/15/2022 | 2022008779 | Reeves | T&D Moravits & Co., LLC | $96,192.50 | 1851 FM 2119, Pecos, TX 79772 |
| 28. | Affidavit for Mechanic's and Materialman's Lien | 12/16/2022 | 2022008811 | Reeves | Condair Inc. | $2,566,892.93 | 1851 FM 2119, Pecos, TX 79772 |
| 29. | Unrecorded Mechanic's and Materialman's Lien (documentation to be confirmed) | Not recorded | Not recorded | Multiple | Trilogy | $6,170,853.24 | |

| | Document | Date Recorded | Document Number | County | Claimant | Amount Claimed | Property Site |
|---|---|---|---|---|---|---|---|
| 30. | Affidavit for Mechanic's and Materialman's Lien | 10/28/2022 | 152295 | Denton | Sure Steel – Texas, L.P. | $1,237,031.22 | 8171 Jim Christal Road, Denton, TX 76207<br><br>DENTON DATA CENTER/ 8161 JIM CHRISTAL ROAD, DENTON, TEXAS; DESCRIBED IN DOCUMENT NUMBER 216662; PERMIT # 2202-0339; PARCEL ID 984633 |
| 31. | Affidavit for Mechanic's and Materialman's Lien - Leasehold | 11/1/2022 | 153496 | Denton | Way Mechanical | $151,316.10 | 8171 Jim Christal Road, Denton, TX 76207<br><br>Ownership of the Property is unclear, but appears to be in connection with a Core Scientific lease. |
| 32. | Affidavit for Mechanic's and Materialman's Lien - Leasehold | 11/1/2022 | 153498 | Denton | Way Mechanical | $284,712.90 | 8171 Jim Christal Road, Denton, TX 76207<br><br>Ownership of the Property is unclear, but appears to be in connection with a Core Scientific lease. |
| 33. | Affidavit for Mechanic's and Materialman's Lien - Leasehold | 11/1/2022 | 153497 | Denton | McCorvey Sheet Metal Works, LP | $20,895.50 | 8171 Jim Christal Road, Denton, TX 76207<br><br>Ownership of the Property is unclear, but appears to be in connection with a Core Scientific lease. |

| | Document | Date Recorded | Document Number | County | Claimant | Amount Claimed | Property Site |
|---|---|---|---|---|---|---|---|
| 34. | Affidavit for Mechanic's and Materialman's Lien | 11/3/2022 | 154942 | Denton | McCarthy Building Companies, Inc. | $3,685,631.28 | 8171 Jim Christal Road, Denton, TX 76207<br><br>Ownership of the Property is unclear, but appears to be in connection with a Core Scientific lease. |
| 35. | Amended Affidavit of Lien by McCarthy Building Companies Inc. | 11/14/2022 | 158011 | Denton | McCarthy Building Companies, Inc. | $17,052,583.65 | 8171 Jim Christal Road, Denton, TX 76207 |
| 36. | Mechanic's Lien Affidavit | 11/14/2022 | 157743 | Denton | BEAM Concrete Construction, Inc. | $878,306.82 | 8171 Jim Christal Road, Denton, TX 76207<br><br>Ownership of the Property is unclear, but appears to be in connection with a Core Scientific lease. |
| 37. | Lien Affidavit and Claim | 11/15/2022 | 158075 | Denton | Humphrey & Associates, Inc. | $9,365,366.20 | 8171 Jim Christal Road, Denton, TX 76207<br><br>leasehold interest in the Core Scientific Denton Data Center Project located at 8151 Jim Christal Road, Denton, Texas 76207, 8161 Jim Christal Road, Denton, Texas 76207, and/or<br><br>8171 Jim Christal Road, Denton, Texas<br><br>76207 |

| | Document | Date Recorded | Document Number | County | Claimant | Amount Claimed | Property Site |
|---|---|---|---|---|---|---|---|
| 38. | Affidavit Claiming Mechanic's and Materialman's Lien Including for Retainage | 12/1/2022 | 164584 | Denton | Housley Communications | $53,883.90 | 8171 Jim Christal Road, Denton, TX 76207 and/or<br><br>8151 Jim Christal Road, Denton, Texas 76207 |
| 39. | Lien Affidavit | 12/12/2022 | 168014 | Denton | Imperial Fire Protection, LLC | $209,210.00 | 8171 Jim Christal Road, Denton, TX 76207 and/or<br><br>8161 Jim Christal Road, Denton, Texas 79207 |
| 40. | Affidavit for Mechanic's and Materialman's Lien | 12/13/2022 | 168734 | Denton | ABLe Communications, Inc. | $1,228,932.14 total ($268,053.12 unpaid retainage) | leasehold interest in the Core Scientific Denton Data Center Project located at 8151 Jim Christal Road, Denton, Texas 76207 and/or<br><br>8171 Jim Christal Road, Denton, Texas 76207 |
| 41. | Affidavit for Mechanic's Lien | 12/15/2022 | 169545 | Denton | Pillar Electric Group, LP | $28,266.49 | leasehold interest located at 8151 Jim Christal Road, Denton, Texas 76207 and/or<br><br>8161 Jim Christal Road, Denton, Texas 76207 |
| 42. | Affidavit for Mechanic's Lien | 12/16/22 | 170453 | Denton | Power Engineering Services, Inc. | $98,440.00 | 8151 Jim Christal Road, Denton, Texas 76207 |
| 43. | Unrecorded Mechanic's and Materialman's Lien (documentation to be confirmed) | Not recorded | Not recorded | Denton | Maddox Transformers | $7,000,000 | 8151 Jim Christal Road, Denton, Texas 76207 |

| | Document | Date Recorded | Document Number | County | Claimant | Amount Claimed | Property Site |
|---|---|---|---|---|---|---|---|
| 44. | Mechanic's and Materialman's Lien Statement | 10/31/2022 | 2022-013536 | Muskogee | Harper Construction Company, Inc. | $7,500,000.00 | 1525 W Smith Ferry Rd, Muskogee, OK 74401 |
| 45. | Mechanic's and Materialman's Lien Statement | 11/02/2022 | 2022-013616 | Muskogee | Contech, Inc. | $602,556.08 | 1525 W Smith Ferry Rd, Muskogee, OK 74401 |
| 46. | Mechanic's and Materialman's Lien Statement | 11/28/2022 | 2022-014455 | Muskogee | Gaylor Electric, Inc. DBA Gaylor, Inc. | $5,245,601.81 | 1525 W Smith Ferry Rd, Muskogee, OK 74401 |
| 47. | Unrecorded Mechanic's and Materialman's Lien (documentation to be confirmed) | Not recorded | Not recorded | Muskogee | J.W. Didado | $6,000,000 | 1525 W Smith Ferry Rd, Muskogee, OK 74401 |

**<u>Exhibit 4</u>**

**Initial Budget**

# Detailed DIP Budget

| | Week 1 Fcst | Week 2 Fcst | Week 3 Fcst | Week 4 Fcst | Week 5 Fcst | Week 6 Fcst | Week 7 Fcst | Week 8 Fcst | Week 9 Fcst | Week 10 Fcst | Week 11 Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Starting | 1/28/2023 | 2/4/2023 | 2/11/2023 | 2/18/2023 | 2/25/2023 | 3/4/2023 | 3/11/2023 | 3/18/2023 | 3/25/2023 | 4/1/2023 | 4/8/2023 |
| Week Ending | 2/3/2023 | 2/10/2023 | 2/17/2023 | 2/24/2023 | 3/3/2023 | 3/10/2023 | 3/17/2023 | 3/24/2023 | 3/31/2023 | 4/7/2023 | 4/14/2023 |
| **Operating Cash Flows** | | | | | | | | | | | |
| Self-Mined BTC Sale Proceeds | 7.4 | 6.9 | 6.1 | 6.1 | 6.7 | 7.4 | 7.5 | 7.5 | 7.5 | 7.8 | 7.9 |
| Hosting Payments | 1.3 | - | - | - | 3.2 | - | - | - | 7.3 | - | - |
| **Net Receipts** | **8.8** | **6.9** | **6.1** | **6.1** | **9.9** | **7.4** | **7.5** | **7.5** | **14.7** | **7.8** | **7.9** |
| Power Costs | (7.1) | (9.4) | (5.4) | (5.5) | (12.1) | (5.3) | (5.3) | (5.4) | (4.0) | (10.5) | (5.0) |
| Operating Costs | (2.2) | (1.3) | (3.1) | (1.4) | (2.5) | (1.3) | (2.5) | (1.3) | (2.5) | (1.1) | (2.1) |
| Tax Payments | (0.0) | (0.0) | (0.0) | (0.0) | (0.7) | - | - | - | - | - | - |
| **Net Operating Disbursements** | **(9.3)** | **(10.8)** | **(8.5)** | **(6.9)** | **(15.3)** | **(6.6)** | **(7.7)** | **(6.6)** | **(6.5)** | **(11.7)** | **(7.1)** |
| Construction & Infrastructure Capex | - | - | - | (1.1) | (0.5) | - | - | - | (1.2) | - | - |
| Miner Capex (inc. Customs) | - | - | - | - | - | - | - | - | - | - | - |
| PP&E Sale Proceeds | - | - | - | - | - | - | - | - | - | - | - |
| **Net Capital Expenditures** | **-** | **-** | **-** | **(1.1)** | **(0.5)** | **-** | **-** | **-** | **(1.2)** | **-** | **-** |
| **Total Operating Cash Flows** | **(0.6)** | **(3.9)** | **(2.3)** | **(1.9)** | **(5.9)** | **0.8** | **(0.3)** | **0.9** | **7.0** | **(3.8)** | **0.8** |
| **Non-Operating Cash Flows** | | | | | | | | | | | |
| Professional Fees | (5.0) | (1.6) | (1.7) | (1.7) | (4.6) | (1.5) | (1.3) | (1.3) | (2.8) | (1.5) | (1.2) |
| Utility Deposits | - | - | - | - | - | - | - | - | - | - | - |
| Debt Service Costs | - | - | - | - | (0.1) | - | - | - | (0.1) | - | - |
| Other (TBD) | - | - | - | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) |
| **Net Non-Operating Cash Flows** | **(5.0)** | **(1.6)** | **(1.7)** | **(2.4)** | **(5.4)** | **(2.2)** | **(2.0)** | **(2.0)** | **(3.6)** | **(2.2)** | **(1.9)** |
| **Liquidity Balances** | | | | | | | | | | | |
| Starting Cash Balance | 46.5 | 29.6 | 24.1 | 20.1 | 15.8 | 24.5 | 23.1 | 20.8 | 19.7 | 23.2 | 22.1 |
| New Money / DIP Financing | 35.0 | - | - | - | 20.0 | - | - | - | - | 5.0 | - |
| Existing DIP Repayment and Fees | (46.4) | - | - | - | - | - | - | - | - | - | - |
| Net Cash Flow | (5.6) | (5.5) | (4.0) | (4.3) | (11.3) | (1.4) | (2.3) | (1.1) | 3.5 | (6.1) | (1.1) |
| **Ending Cash Balance** | **29.6** | **24.1** | **20.1** | **15.8** | **24.5** | **23.1** | **20.8** | **19.7** | **23.2** | **22.1** | **21.0** |
| BTC Held & In Transit | 1.1 | 1.0 | 0.9 | 0.9 | 1.0 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 |
| **Ending Liquidity** | **30.6** | **25.1** | **20.9** | **16.7** | **25.5** | **24.2** | **21.9** | **20.8** | **24.2** | **23.2** | **22.2** |

# Detailed DIP Budget (Continued)

| | Week 12 Fcst | Week 13 Fcst | Week 14 Fcst | Week 15 Fcst | Week 16 Fcst | Week 17 Fcst | Week 18 Fcst | Week 19 Fcst | Week 20 Fcst | Week 21 Fcst | Week 22 Fcst | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Starting | 4/15/2023 | 4/22/2023 | 4/29/2023 | 5/6/2023 | 5/13/2023 | 5/20/2023 | 5/27/2023 | 6/3/2023 | 6/10/2023 | 6/17/2023 | 6/24/2023 | | 01/28-06/30 |
| Week Ending | 4/21/2023 | 4/28/2023 | 5/5/2023 | 5/12/2023 | 5/19/2023 | 5/26/2023 | 6/2/2023 | 6/9/2023 | 6/16/2023 | 6/23/2023 | 6/30/2023 | | |
| **Operating Cash Flows** | | | | | | | | | | | | | |
| Self-Mined BTC Sale Proceeds | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | | 165.8 |
| Hosting Payments | - | - | 6.9 | - | - | - | 7.6 | - | - | - | 9.2 | | 35.6 |
| **Net Receipts** | **7.9** | **7.9** | **14.8** | **7.9** | **7.9** | **7.9** | **15.5** | **7.9** | **7.9** | **7.9** | **17.1** | | **201.4** |
| Power Costs | (4.8) | (5.0) | (10.6) | (4.8) | (4.7) | (4.8) | (8.7) | (5.1) | (4.9) | (5.0) | (5.6) | | (139.0) |
| Operating Costs | (0.8) | (2.1) | (0.9) | (2.1) | (1.3) | (2.1) | (0.9) | (2.6) | (1.2) | (2.5) | (1.2) | | (39.1) |
| Tax Payments | - | - | - | - | - | - | - | - | - | - | - | | (0.8) |
| **Net Operating Disbursements** | **(5.7)** | **(7.1)** | **(11.5)** | **(6.9)** | **(6.0)** | **(6.9)** | **(9.6)** | **(7.7)** | **(6.1)** | **(7.5)** | **(6.9)** | | **(178.8)** |
| Construction & Infrastructure Capex | - | - | (0.9) | - | - | - | (0.9) | - | - | - | (0.9) | | (5.6) |
| Miner Capex (inc. Customs) | - | - | - | - | - | - | - | - | - | - | - | | - |
| PP&E Sale Proceeds | - | - | - | - | - | - | - | - | - | - | - | | - |
| **Net Capital Expenditures** | **-** | **-** | **(0.9)** | **-** | **-** | **-** | **(0.9)** | **-** | **-** | **-** | **(0.9)** | | **(5.6)** |
| **Total Operating Cash Flows** | **2.3** | **0.8** | **2.4** | **1.0** | **1.9** | **1.0** | **5.0** | **0.3** | **1.8** | **0.4** | **9.3** | | **16.9** |
| **Non-Operating Cash Flows** | | | | | | | | | | | | | |
| Professional Fees | (1.2) | (1.2) | (2.8) | (1.2) | (1.2) | (1.2) | (2.2) | (1.1) | (1.1) | (1.1) | (16.5) | | (54.8) |
| Utility Deposits | - | - | - | - | - | - | - | - | - | - | 6.3 | | 6.3 |
| Debt Service Costs | - | - | (0.1) | - | - | - | (0.1) | - | - | - | (0.1) | | (0.4) |
| Other (TBD) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | | (9.5) |
| **Net Non-Operating Cash Flows** | **(1.5)** | **(1.5)** | **(3.2)** | **(1.5)** | **(1.5)** | **(1.5)** | **(2.6)** | **(1.5)** | **(1.5)** | **(1.5)** | **(10.6)** | | **(58.3)** |
| **Liquidity Balances** | | | | | | | | | | | | | |
| Starting Cash Balance | 21.0 | 21.8 | 21.1 | 20.3 | 19.9 | 20.2 | 19.7 | 22.1 | 20.9 | 21.2 | 20.0 | | 46.5 |
| New Money / DIP Financing | - | - | - | - | - | - | - | - | - | - | - | | 60.0 |
| Existing DIP Repayment and Fees | - | - | - | - | - | - | - | - | - | - | - | | (46.4) |
| Net Cash Flow | 0.7 | (0.7) | (0.8) | (0.5) | 0.4 | (0.5) | 2.4 | (1.2) | 0.3 | (1.1) | (1.3) | | (41.4) |
| **Ending Cash Balance** | **21.8** | **21.1** | **20.3** | **19.9** | **20.2** | **19.7** | **22.1** | **20.9** | **21.2** | **20.0** | **18.7** | | **18.7** |
| BTC Held & In Transit | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | | 1.1 |
| **Ending Liquidity** | **22.9** | **22.2** | **21.5** | **21.0** | **21.4** | **20.8** | **23.2** | **22.0** | **22.3** | **21.2** | **19.9** | | **19.9** |

**Exhibit 5**

**Lien Priorities Following Refinancing Effective Date (For Illustrative Purposes Only)**

| Rank | First-Priority DIP Collateral | Junior-Priority DIP Collateral | | |
|---|---|---|---|---|
| | | Junior-Priority DIP Collateral (other than Prepetition Equipment Financing Collateral or Prepetition Secured Notes Collateral) | Prepetition Equipment Financing Collateral | Prepetition Secured Notes Collateral |
| *First* | Carve-Out | Carve-Out | Carve-Out | Carve-Out |
| *Second* | DIP Liens | Prior Senior Liens | Prior Senior Liens | Prior Senior Liens |
| *Third* | Noteholder Adequate Protection Liens and Equipment Lender Adequate Protection Liens | DIP Liens | Equipment Lender Adequate Protection Liens | Noteholder Adequate Protection Liens |
| *Fourth* | | Noteholder Adequate Protection Liens and Equipment Lender Adequate Protection Liens | Prepetition Equipment Lender Liens | Prepetition Secured Notes Liens |
| *Fifth* | | | DIP Liens | DIP Liens |
| *Sixth* | | | Noteholder Adequate Protection Liens | Equipment Lender Adequate Protection Liens |

**<u>Exhibit 6</u>**

**Payoff Letter**

February [   ], 2023

**CORE SCIENTIFIC, INC.**
210 Barton Springs Road, Suite 300
Austin, TX 78704
**Attention:** Todd DuChene; President, Chief Legal Officer and Secretary

Ladies and Gentlemen:

Reference is hereby made to (i) that certain Senior Secured Super-Priority Debtor-In-Possession Loan and Security Agreement dated as of December 22, 2022, as filed with the Bankruptcy Court (as defined below) on December 28, 2022 (Docket No. 188) (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement"), by and among Core Scientific, Inc., a Delaware corporation and a debtor and debtor-in-possession in the Chapter 11 Cases, as the borrower (the "Borrower"), each Subsidiary Guarantor, as a Guarantor, an Obligor, and a debtor and debtor-in-possession in the Chapter 11 Cases, each Person party thereto from time to time as a Lender, and Wilmington Savings Fund Society, FSB, as Administrative Agent (the "Agent"), (ii) that certain *Interim Order (I) Authorizing The Debtors To (A) Obtain Senior Secured Priming Superpriority Postpetition Financing And (B) Use Cash Collateral, (II) Granting Liens And Providing Claims With Superpriority Administrative Expense Status, (III) Granting Adequate Protection To The Prepetition Secured Parties, (IV) Modifying The Automatic Stay, (V) Scheduling A Final Hearing, And (VI) Granting Related Relief* (Docket No. 38) (the "Original DIP Order"), (iii) that certain *Order (I) Authorizing The Debtors On An Interim Basis To (A) Obtain Senior Secured Non-Priming Superpriority Replacement Postpetition Financing And (B) Use Cash Collateral, (II) Authorizing The Debtors To Refinance Existing Postpetition Financing On A Final Basis, (III) Granting Liens And Providing Claims With Superpriority Administrative Expense Status, (IV) Granting Adequate Protection To The Prepetition Secured Parties On A Final Basis, (V) Modifying The Automatic Stay, (V) Scheduling A Final Hearing, And (VI) Granting Related Relief* (Docket No. [   ])[1] (which such order shall be in form and substance reasonably satisfactory to the Lenders, the "Replacement DIP Order") and (iv) that certain Funds Flow delivered to the Agent as of the date hereof (the "Funds Flow"). Capitalized terms used in this letter agreement (this "Payoff Letter") without definition have the meanings given to them in the DIP Credit Agreement, Original DIP Order or Replacement DIP Order, as applicable.

On December 21, 2022, each of the Borrower and certain direct and indirect Subsidiaries of the Borrower (each a "Debtor" and collectively, the "Debtors") filed voluntary petitions for relief under title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") initiating their respective jointly administered chapter 11 cases (with the lead case number Case No. 22-90341 (DRJ)) (collectively, the "Chapter 11 Cases"), and each Debtor has continued and is continuing in the possession of its assets and management of its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

In connection with the Chapter 11 Cases and pursuant to (i) the terms of that certain Commitment Letter, dated as of January 29, 2023, provided to the Borrower by B. Riley Commercial Capital, LLC and the Term Sheet attached thereto as Annex A and (ii) the Replacement DIP Order, the Obligors will be entering into certain transactions, including entry into the Replacement DIP Facility (as defined in the Replacement DIP Order), pursuant to which the Borrower intends to irrevocably and indefeasibly pay in full in cash all obligations arising under the DIP Credit Agreement, including, without limitation, all

---

[1] NTD: To be updated once available.

accrued but unpaid principal, interest, fees, premiums, payments (including any Termination Payments and Agent Fees (each as defined in the DIP Credit Agreement), fees (including professional fees), costs, expenses, charges and other amounts payable under the DIP Credit Agreement and the other DIP Loan Documents (as defined in the Original DIP Order), including, without limitation, all "Obligations" as defined in the DIP Credit Agreement (collectively, the "DIP Obligations").

The Agent has been notified by the Borrower that on February [2], 2023 (the "Payoff Date") the Borrower intends to cause all of the outstanding DIP Obligations owing to the Lenders under the DIP Loan Documents, including, without limitation, all outstanding principal, accrued and unpaid interest thereon, all applicable fees and all other DIP Obligations to be irrevocably and indefeasibly repaid in full in cash in accordance with the terms of this Payoff Letter and for the DIP Credit Agreement and other DIP Loan Documents to be terminated.

The parties hereto hereby agree that the total outstanding principal balance of the Loans made by the Lenders to or for the benefit of the Borrower and the other Obligors under the DIP Credit Agreement and all other DIP Loan Documents, together with all accrued but unpaid interest thereon, and the total amount of all fees, costs, expenses and other DIP Obligations owed by the Obligors under the DIP Credit Agreement and all other DIP Loan Documents necessary for Full Payment ("Paid in Full") to occur, if paid on the Payoff Date (as defined below) by 2:00 p.m. (Eastern Time) (the "Payoff Time"), is the amount set forth below (the "Payoff Amount"):

| | |
|---|---|
| Principal: | $[  ] |
| Fees: | $[  ] |
| Interest: | $[  ] |
| Agent Fees: | $[  ] |
| Paul Hastings Fees: | $[  ] |
| Moelis Fees: | $[  ] |
| **Total Payoff Amount:** | **$[  ]** |

If payment of the Payoff Amount is not made by the Payoff Time on the Payoff Date, the Payoff Amount will be recalculated to include an additional $[  ] per day (the "Per Diem Amount"); provided that the Agent receives the Payoff Amount together with all applicable Per Diem Amounts no later than 2:00 p.m. (Eastern Time) (or such later time as may be agreed to by the Agent) on the date of payment.

The Borrower shall pay or cause to be paid the Payoff Amount by wire transfer in immediately available funds, to the accounts set forth on, and pursuant to and in accordance with the wire instructions set forth on, Schedule I hereto.

The Borrower has requested that the Agent provide this Payoff Letter on behalf of the Lenders to acknowledge and evidence the Discharge of Obligations (as defined below), and set forth the terms on which all other DIP Obligations (except for any Surviving Obligations (as defined below), and all Liens on the Collateral securing the Secured Obligations, shall be deemed paid, discharged, satisfied and released in full.

The Agent (on behalf of itself and acting at the instruction of each Lender on behalf of such Lender) hereby agrees that, subject to the terms and conditions of this Payoff Letter, immediately and automatically upon receipt by the Agent, Paul Hastings LLP ("Paul Hastings") and Moelis & Company ("Moelis" and together with Paul Hastings, collectively, the "Advisors"), as applicable, of the Payoff Amount, all DIP Obligations owing or otherwise payable to the Lenders and the Agents as of the date hereof (other than (i)

heretofore unasserted contingent indemnity obligations which, by their terms, survive termination of the DIP Credit Agreement and other DIP Loan Documents and (ii) other obligations that survive the termination of the DIP Credit Agreement and the other DIP Loan Documents by each of their own terms and in accordance with the Original DIP Order and the Replacement DIP Order (clauses (i) and (ii), collectively, the "Surviving Obligations")) shall be deemed satisfied, discharged and Paid in Full (the "Discharge of Obligations") without any further action by the Bankruptcy Court or any party, subject to the Payoff Amount Reinstatement (as defined below).

Immediately upon and only upon (a) the receipt by the Agent of that portion of the Payoff Amount set forth opposite its name on the Funds Flow attached as Schedule I hereto (b) the receipt by the Agent of a fully executed copy of this Payoff Letter, duly executed and delivered by the Obligors, (c) receipt by each of the Advisors of the amount set forth opposite its name on the Funds Flow attached as Schedule I hereto and (d) entry of the Replacement DIP Order (the items described in clauses (a) through (d), collectively, the "Payoff Conditions"), the Agent, on behalf of itself and acting at the instruction of each Lender on behalf of such Lender agrees that all DIP Obligations of the Obligors under the DIP Loan Documents (other than Surviving Obligations) shall be deemed Paid in Full, released and satisfied, and all DIP Loan Documents and all related documents and instruments shall be automatically released and terminated without any further action by the Bankruptcy Court or any party, all commitments of the Lenders shall automatically be terminated without any further action by any party, all guarantees provided under the DIP Loan Documents shall automatically be terminated without any further action by the Bankruptcy Court or any party, and all security interests, liens, mortgages, pledges, charges or other encumbrances granted to the Lenders and/or the Agent, as applicable, in connection with the DIP Credit Agreement and the other DIP Loan Documents shall be automatically released and terminated without any further action by any party, except for the Surviving Obligations, which Surviving Obligations shall survive without prejudice and remain in full force and effect.

At the expense of the Borrower, the Agent (on behalf of itself and the other Secured Parties) will promptly, upon satisfaction of the Payoff Conditions, execute and deliver to the Borrower (and/or any designee of the Borrower) any such additional documents, shall provide such additional information and shall take such further actions as the Borrower (and/or any designee of the Borrower) may reasonably request, in each case, to carry out the terms of this Payoff Letter (including, without limitation, appropriate Uniform Commercial Code ("UCC") termination statements, lien releases, mortgage releases, discharges of security interests, pledges and guarantees, intellectual property releases, landlord waiver terminations, terminations of deposit account control agreements and all other similar discharge or release documents) as are reasonably requested to release, as of record, the security interests and all notices of security interests and liens previously filed by the Agent or on the Agent's behalf under the DIP Loan Documents, including those certain UCC termination statements in the forms attached hereto as Exhibit A. Upon satisfaction of the Payoff Conditions (the receipt of which shall be confirmed by the Agent to the Borrower, which confirmation may be via e-mail), (a) the Agent hereby authorizes the Borrower (or any designee of the Borrower) to file solely those certain UCC termination statements in the forms attached hereto as Exhibit A and any intellectual property releases and mortgage releases and (b) the Agent shall deliver to the Borrower (or any designee of the Borrower) originals of any instruments evidencing pledged debt and all equity certificates and any other similar collateral previously delivered by the Borrower or any other Obligor to the Agent under the DIP Loan Documents.

At any time after the satisfaction of the Payoff Conditions in accordance with the foregoing, and from time to time thereafter, upon the written request and at the expense of the Borrower, the Agent will execute and deliver any and all further instruments and documents and take such further action as the Borrower may reasonably request to effectuate, evidence or reflect of public record, the release of the security interests and liens referred to in this Payoff Letter.

If the Agent has not received the Payoff Amount by 2:00 p.m. (Eastern time) on February 3, 2023 (the "Expiration Time"), this Payoff Letter shall have no further force or effect.  The Obligors hereby agree that they will not request or otherwise incur additional loans under the DIP Credit Agreement on or after the date hereof through the Expiration Time.

Notwithstanding anything herein to the contrary, if at any time all or any part of the Payoff Amount is or must be rescinded or returned by the Agent or any Advisor for any reason whatsoever (including in the event the Replacement DIP Order is reversed, stayed, modified or appealed), the DIP Obligations, to the extent that such payment is or must be rescinded or returned, shall be deemed to have continued in existence, notwithstanding such application by the Agent or the Advisors, as applicable, and the DIP Credit Agreement and the other DIP Loan Documents shall continue to be effective or be reinstated, as the case may be, as to such DIP Obligations, all as though such application by the Agent or the Advisors as applicable, had not been made (the "Payoff Amount Reinstatement"). The provisions of this paragraph shall remain in full force and effect regardless of any termination of the DIP Obligations owing under the DIP Loan Documents or the termination of this Payoff Letter.

Effective immediately and automatically upon the satisfaction of the Payoff Conditions, and in consideration of the above and for other valuable consideration the receipt of which is hereby acknowledged, each of the Borrower and the other Obligors, on its own behalf and on behalf of its predecessors, successors and assigns, and on behalf of their respective estates, hereby unconditionally releases, waives and discharges and acquits each of the Agent, the Lenders, and each of their respective officers, directors, members, managers, partners, equity holders, subsidiaries, affiliates, related parties, employees, investment advisors or managers, agents, attorneys, advisors and professionals (collectively, the "Released Parties") (in their capacities as such) from any and all obligations and liabilities to the Borrower and the other Obligors (and their successors and assigns) and from any and all claims, counterclaims, cross-claims, demands, defenses, objections, challenges, offsets or setoff, debts, accounts, contracts, liabilities, remedies, suits, controversies, actions, causes of action, losses, damages, indemnities, reimbursement obligations, attorneys' fees, costs, expenses or judgments, of every kind or nature whatsoever, whether matured or unmatured, known or unknown, asserted or unasserted, suspected or unsuspected, foreseen or unforeseen, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, pending or threatened, arising in law or equity, upon contract or tort, under the Bankruptcy Code, any state or federal common law, statute, rule, regulation or otherwise, in each case, that may be asserted by the Borrower or any of the other Obligors, their respective estates, predecessors, successors or assigns, against any of the Released Parties in their capacities as such) for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time, in each case, arising under, in connection with, or related to the DIP Loan Documents, the Original DIP Order, the transactions contemplated thereunder or hereunder, the Replacement DIP Order, the transactions contemplated thereunder or hereunder (including the Refinancing and this Payoff Letter), including any claim or cause of action seeking (i) any so-called lender liability, (ii) any and all claims arising under the Bankruptcy Code, whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or (iii) reduction, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge or recovery, or any other related claim or cause of action with respect to the validity, enforceability, priority, scope, extent or perfection of the DIP Liens (as defined in the Original DIP Order) or the DIP Obligations.

This Payoff Letter (a) shall be governed by and shall be construed and enforced in accordance with, the laws of the State of New York and (b) sets forth the entire agreement among the parties relating to the subject matter pertaining hereto, and no term or provision hereof may be amended, changed, waived, discharged or terminated, except in writing signed by each party.

Without duplication of the foregoing, the Borrower and the Obligors acknowledge and agree that this Payoff Letter is a DIP Loan Document and that the indemnification and expense reimbursement provisions of the DIP Credit Agreement and the DIP Loan Documents, including, without limitation, as set forth in Sections 3.4 and 14.2 of the DIP Credit Agreement, will apply and be enforceable by the Agent and the Lenders in respect of (a) the execution and delivery of this Payoff Letter and the other instruments and agreements provided for herein, (b) all actions taken or omitted by the Agent or the Lenders with respect thereto and (c) all claims based upon or arising in connection with any of the foregoing.

By its execution and delivery of its signature page hereto, the Borrower and each Obligor represents and warrants that the execution of this Payoff Letter and all other documents contemplated hereby and the performance of any other actions contemplated hereby are authorized and permitted under the terms of the DIP Loan Documents and applicable law, and all conditions precedent to such release, execution and performance have been satisfied.

This Payoff Letter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

This Payoff Letter shall become effective only when signed by the Agent and accepted by the Borrower and the other Obligors in the spaces provided below. This Payoff Letter may be executed in any number of counterparts, each of which shall be an original and all of which shall constitute one agreement. Delivery of an executed signature page of this Payoff Letter by facsimile or by other electronic transmission shall be effective as delivery of a manually executed counterpart hereof. The words "execute," "execution," "signed," "signature," and words of like import in or related to any document to be signed in connection with this Payoff Letter and the transactions contemplated hereby shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper- based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; provided, that notwithstanding anything contained herein to the contrary the Agent is under no obligation to agree to accept electronic signatures in any form or in any format unless expressly agreed to by the Agent pursuant to procedures approved by it.

*[Signature pages follow]*