IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 22-90341-11 |
| | § | JOINTLY ADMINISTERED |
| | § | HOUSTON, TEXAS |
| CORE SCIENTIFIC, INC, ET AL, | § | WEDNESDAY, |
| | § | FEBRUARY 1, 2023 |
| DEBTORS. | § | 11:30 A.M. TO 1:03 P.M. |

**<u>MOTION HEARING (VIA ZOOM)</u>**

BEFORE THE HONORABLE DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                    SEE NEXT PAGE

**(Recorded via CourtSpeak)**

<u>TRANSCRIPTION SERVICE BY</u>:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES:

| | |
|---|---|
| For the Debtor: | WEIL GOTSHAL & MANGES, LLP |
| | Ray C. Schrock, PC |
| | Ronit Berkovich, Esq. |
| | Alex Cohen, Esq. |
| | Jeremy Cain, Esq. |
| | 700 Louisiana, Ste. 1700 |
| | Houston, TX  77002 |
| For the Ad Hoc Group: | |
| | PAUL HASTINGS, LLP |
| | Kris Hansen, Esq. |
| For the Creditors Committee: | WILLKIE FARR & GALLAGHER, LLP |
| | Brett Miller, Esq. |
| | Jennifer Hardy, Esq. |
| For NYDIG  ABL, LLC: | Sidley Austin |
| | Dennis Twomey, Esq. |
| For Ad Hoc Group of Equity Holders: | SKADDEN ARPS |
| | Ron Meisler, Esq. |
| | Noelle Reed, Esq. |
| For B. Riley: | CHOATE HALL & STEWART |
| | John Ventola, Esq. |
| Also present: | BARINGS |
| | Brian Lohan, Esq. |

(Please also see Electronic Appearances.)

1        **HOUSTON, TEXAS; WEDNESDAY, FEBRUARY 1, 2023; 11:30 A.M.**

2              THE COURT:  This is Judge Jones.  The time is 11:30.

3       Today is February the 1st, 2023.  This is the docket for

4       Houston, Texas.

5              On the 11:30 docket, we have the jointly

6       administered cases under Case Number 22-90341, Core

7       Scientific, Inc.

8              As always, if you'd make sure you record your

9       electronic appearance, it's a quick trip to the website.  You

10      can do that at any time prior to the conclusion of the

11      hearing.

12             The first time that you step up to the lectern, be

13      it the real one or the virtual one, if you'd please state your

14      name and who you represent, that really serves as a good point

15      of reference in the event that a transcript request is made.

16             And as always, we are recording using CourtSpeak.

17      We'll have the audio up on the docket shortly after the

18      conclusion of the hearing.

19             We do have a number of folks who are on the line.

20      I'm going to activate the hand-raising feature, just so folks

21      aren't interrupted.  If you know you're going to speaking, if

22      you'd go ahead and give me a five-star on your telephone.

23             AUTOMATED:  Conference muted.

24         (Pause in proceedings)

25             THE COURT:  All right.  Terrific.  Who is taking the

1    lead this morning?  Ah, Mr. Schrock.

2              MR. SCHROCK:  Good morning, Your Honor.

3              THE COURT:  Good morning.

4              MR. SCHROCK:  Ray Schrock, Weil Gotshal & Manges,

5    proposed counsel for the debtors.

6              THE COURT:  All right.  Thank you.

7              MR. SCHROCK:  Your Honor, my partner Ronit Berkovich

8    and my colleague Alex Cohen are going to be taking you through

9    where we are precisely on our new proposed DIP.  But I thought

10   it was worth just a general update to the Court and parties

11   about where we are in the cases and give you a little bit of

12   context for, you know, where we are in these cases.

13             THE COURT:  Love to hear it.

14             MR. SCHROCK:  Okay.  So, obviously, since we filed,

15   we've seen a pretty dramatic change in the price of bitcoin.

16   Bitcoin was, you know, depending on the time, you were talking

17   around the petition date right around 16,500, sixteen-eight.

18   You know, as of this morning -- somebody will correct me --

19   but I believe it's -- you know, it's been hovering around

20   23,000, which, you know, depending on your math, you know, 35

21   to, you know, 40 percent increase in the price from the

22   petition date.

23             I think that it's been quite evident that, you know,

24   this has had, you know, a dramatic impact on the debtors'

25   prospects.  You know, essentially, the company is, you know,

1      in many respects, a levered bitcoin option, so our cash flow

2      is substantially better than when, you know, we had forecasted

3      it under the initial DIP budget.

4              And we did have a very robust post-petition DIP

5      marketing process, consistent with our fiduciary obligations.

6      And so we have the unusual circumstance of presenting to Your

7      Honor today a replacement debtor-in-possession financing

8      facility.

9              A few notes about that:

10             One, it was a good faith process; it was run open,

11     fairly, and you know, we're presenting evidence to that

12     effect.

13             And it's with our partner B. Riley.

14             Just a couple of notes on the company's relationship

15     with B. Riley:

16             So B. Riley was running an at-the-market, you know,

17     type of equity raise, you know, pre-petition.

18             We also had a loan that was outstanding to them.

19             We had significant negotiations with B. Riley

20     leading up to the petition date about an out-of-court

21     transaction as we, you know, highlighted in some of our -- in

22     some of our pleadings.

23             THE COURT:  Right.

24             MR. SCHROCK:  Ultimately, we didn't get there.  And

25     I wouldn't always say that -- listen, it was contentious, you

1        know, between the parties, but good spirit -- good faith, but

2        spirited, I would say is the right way to characterize it pre-

3        petition.

4                You know, Mr. Riley's firm then went on to the

5        creditors' committee, they're the chair of the creditors'

6        committee.

7                They were not -- they didn't, you know, get serious

8        -- they were not the alternative DIP financing provider.  I

9        think the convertible noteholders' pleading that they filed

10       this morning referenced they were the alternative.  They --

11       that's not correct.

12               THE COURT:  Right.

13               MR. SCHROCK:  They were not the alternative DIP

14       financing provider.

15               But given that B. Riley was on the creditors'

16       committee, I think the committee has done a good job.  They

17       made sure that B. Riley was recused --

18               THE COURT:  Well, yeah.

19               MR. SCHROCK:  -- you know, kind of walled off from

20       any DIP financing discussions.

21               And Willkie Farr, who was counsel to B. Riley pre-

22       petition -- they're the creditors' committee counsel now --

23       they -- Riley brought in Choate as their DIP financing

24       counsel.

25               THE COURT:  Right.

1          MR. SCHROCK:  And assuming Your Honor approves the

2     financing, you know, my understanding is they'd be stepping

3     off the creditors' committee --

4          THE COURT:  Right.

5          MR. SCHROCK:  -- at that point.

6          So I note all of that just to make sure that -- you

7     know, I don't ever want you to think that we're not being

8     anything other than open and transparent.  There was a

9     relationship here --

10          THE COURT:  Right.

11          MR. SCHROCK:  -- but we have been completely down

12     the middle and aboveboard about the process and how we're

13     running this to date.

14          THE COURT:  So, number one, I'll -- you know I

15     appreciate transparency.  The pleadings have told the story

16     from day one.  And for those folks who haven't read all of the

17     pleadings, I think what you've done this morning is perfect.

18     I think anyone who has an interest in the case could not

19     participate and not know that there's a relationship there, so

20     I very much appreciate your telling me.

21          So let me ask because, at least as I read the

22     pleadings, the replacement DIP issue is really just down to

23     the termination fee, right, or are there other issues?

24          MR. SCHROCK:  I think there's a couple of issues,

25     Judge, that may be open.  I think, between the debtors and B.

1    Riley and the convertible noteholders, I think we've resolved
2    all of the issues.
3              I think the unsecured creditors' committee and the
4    ad hoc equity committee have raised concerns around the
5    termination fee that Your Honor would have to hear this
6    morning.
7              THE COURT:  Right.
8              MR. SCHROCK:  Also, just a note that, you know, in
9    conjunction with this, prior to closing the financing, we
10   would be terminating the pre-petition RSA with the convertible
11   noteholders.
12             That's simply because, listen, we're -- the company
13   is not under any mis-impression that we're not going to be
14   working with -- we're going to be working with the convertible
15   noteholders.  We are still firmly of the view and the special
16   committee is firmly of the view we need a substantial de-
17   leveraging as part of, you know, any kind of exit from Chapter
18   11.
19             That being said, when you have this kind of change
20   in value from the petition date and just given the splits that
21   we saw under that existing RSA --
22             THE COURT:  Uh-huh.
23             MR. SCHROCK:  -- you know, our judgment was it's
24   appropriate to sit down and reset.
25             And so I want to make clear that the company still

1     will and intends to have a good working relationship with the

2     convertible noteholders throughout these cases.  We want to

3     get to a consensual transaction and ensure the company's

4     emergence from Chapter 11, it's in the best interests of all

5     stakeholders.  And likewise, we recognize there's been a

6     change in circumstances since we initially filed these cases.

7              So I just wanted to give that context and that

8     assurance to the stakeholders that we're here and we're still

9     calling balls and strikes.

10             THE COURT:  No, I got it.  This is just the modern

11    digital Asarco case, right?  I mean, we were -- you know, we

12    were in the money and out of the money based on the price of

13    copper, and this is just a -- this is just a different

14    commodity --

15             MR. SCHROCK:  It's a different commodity.

16             THE COURT:  -- they we've got.

17             MR. SCHROCK:  I agree with that analogy, Your Honor.

18             THE COURT:  Let me ask you:  With -- and again, not

19    prejudicing anyone's right to get up and make whatever

20    argument.  So, as I -- have you don't worst-case/best-case

21    analysis of what the DIP looks like with different outcomes on

22    the termination fee?

23             MR. SCHROCK:  Your Honor, I'm going to have to defer

24    to Ms. Berkovich on that particular question.

25             THE COURT:  Sure.

1          MR. SCHROCK:  But I think that, you know, our

2     position on the termination fee is essentially, listen, we had

3     a deal --

4          THE COURT:  Right.

5          MR. SCHROCK:  -- with the converts.  The converts,

6     it's part of an initial order.

7          THE COURT:  Right.

8          MR. SCHROCK:  We approved -- the Court approved it.

9     And in our view, a deal is a deal, and you know, we're here,

10    we're standing behind that.

11         THE COURT:  Right.  So let me -- so I can tell

12    everyone this, and maybe it causes a change in how people are

13    acting today, how -- you know, how they're -- what they're

14    thinking about and how they're thinking about -- is no

15    question in my mind that I approve the termination fee.  That

16    was priced in and it was -- you know, and I complained it

17    about the cost or -- I did it nicely, but I complained about

18    the cost, but I also recognized the circumstances.

19         What I -- excuse me.  What I haven't thought all of

20    the way through -- and this -- you know, I've spent the past

21    three days up in your neck of the woods --

22         MR. SCHROCK:  Yes.

23         THE COURT:  -- you know 18 hours --

24         MR. SCHROCK:  Yeah.

25         THE COURT:  -- a day, I just hadn't had time to work

1    my way through this -- is, you know, if there are changed

2    circumstances, what discretion do I have to move the

3    termination fee.  The answer may be none.  It may be that I

4    have discretion.  And then it becomes a question of do I do

5    anything or not, again, because I do operate from the premise

6    that I assume that people rely on orders that I enter.

7             MR. SCHROCK:  Yes.

8             THE COURT:  And if it becomes a habit that I don't

9    really mean what I say, then the process doesn't work, and I

10   got all of that.

11            That being said is -- I thought it made some sense

12   to tell everyone that I do believe that there's a termination

13   fee that's part of the financing that I approved.  Is it --

14            MR. SCHROCK:  Yeah, we agree.

15            THE COURT:  Is it somewhere between, you know, zero

16   and, you know, the max fee that was under the financing?  You

17   know, I have my own feeling about that, but I'm certainly

18   willing to -- I'm certainly willing to hear that argument, if

19   folks wanted to -- you know, if folks wanted to do that.

20            I'm also a firm believer -- you know, when I stood

21   where you're standing, I liked to control my own destiny.  I

22   didn't like the guy who knew the least about the case, but who

23   would make the decision, making -- you know, making the

24   result, unless I just couldn't get there.

25            And so I -- because I was thinking through it.

1      Again, my thought was I would tell everyone that I do believe

2      there's a termination fee involved in this.

3                MR. SCHROCK:  Uh-huh.

4                THE COURT:  You know, whether it's something less

5      than the 15 percent, you know, I hadn't thought through.  And

6      I'm not going to take away anybody's right to make those

7      arguments.

8                And what I was really trying to sort out is:  Is

9      that something that folks want to say, you know, I didn't

10     think the Judge was going to do that, we want to talk about,

11     think about having different arguments --

12               MR. SCHROCK:  Uh-huh.

13               THE COURT:  -- on a different day, or do we all want

14     to make the argument today and, you know, we'll just see where

15     it goes?

16               I will go either way.  I'm just trying to be fair to

17     everybody because --

18               MR. SCHROCK:  Sure.

19               THE COURT:  -- you -- not everyone knows exactly how

20     I'm thinking about it.  And I'm talking to you, but obviously,

21     I'm talking to everyone.

22               MR. SCHROCK:  I understand.

23               THE COURT:  So I'm more than happy to do -- I'm more

24     than happy to do that.  I'm more than happy -- I mean, I think

25     the first issue -- or the first item that's on today's docket

1     is just easy and noncontroversial.

2             MR. SCHROCK:  Uh-huh.

3             THE COURT:  I didn't know if it made sense just to

4     get that out of the way, so, if there are pending deals, those

5     can -- you know, people can know that those are going to get

6     inked and get consummated, and we can move on past that

7     because, you know, it wasn't sort of move-the-case kind of

8     money.  I know it's real and I know it's --

9             MR. SCHROCK:  Uh-huh.

10            THE COURT:  -- a lot of money, but it's not really

11    move-the-case money.

12            MR. SCHROCK:  Yeah, I think --

13            THE COURT:  So --

14            MR. SCHROCK:  -- we had always -- all of our

15    forecasts are assuming that it is payable.  I think our new --

16    that our proposed DIP lender is prepared to --

17            THE COURT:  Right.

18            MR. SCHROCK:  -- you know, to make sure that it's

19    paid.

20            I think that your question -- and the parties will

21    get up -- I -- one, I think we should decide it today.

22            THE COURT:  Okay.

23            MR. SCHROCK:  I will say that, and I think we should

24    deal with it.

25            I do think that the Court always has discretion what

1      to put in an order.  Here, in this order, you know, you said

2      that, listen -- anything -- all the obligations and any feels

3      -- fees that are paid or payable --

4                  THE COURT:  Uh-huh.

5                  MR. SCHROCK:  -- are approved.

6                  And then I think parties may look to -- you know, I

7      imagine some parties will say, well, listen, under 364 of the

8      Code, once you make -- you know, if we're making loans on that

9      basis and reliance on that, that that's -- you know, we would

10     ask the Court to uphold that.

11                 THE COURT:  Yeah.  No, I --

12                 MR. SCHROCK:  I imagine that will be some of the

13     argument.  And others may say, listen, we think you have

14     discretion.  But I think that's where it's going to come down

15     to is probably the statutory --

16                 THE COURT:  I agree.

17                 MR. SCHROCK:  -- reliance.

18                 THE COURT:  And I'm telling everyone.  I mean, I --

19     again, when I enter an order, I expect people to abide by it

20     until it's reversed.  I want people to rely on the orders that

21     I enter.

22                 I also recognize -- and let me pick something that

23     won't apply, but it's an example of what exists in the Code.

24     I mean, you've got a standard under 328 that I can --

25                 MR. SCHROCK:  Uh-huh.

1          THE COURT:  -- approve a fee --

2          MR. SCHROCK:  Yes.

3          THE COURT:  -- and not that this is a fee, but I can

4     approve a fee in advance.  And then, if there are things that

5     I conclude that I couldn't reasonably have anticipated at the

6     time, then I can change it.

7          MR. SCHROCK:  Uh-huh.

8          THE COURT:  That's written into the statute.

9          And so, again, I'm not trying to take away anyone's

10    right to make any argument that they want to make, again, I'm

11    telling everyone I do believe that there's a termination fee

12    that's --

13         MR. SCHROCK:  Uh-huh.

14         THE COURT:  -- factored into the cost of the DIP.

15    You know, Hansen is a good lawyer.  He's going to listen to

16    me.  And I don't know if he wants to, you know, step out and,

17    you know, see if there's a small give to give certainty, or if

18    he wants to roll the dice and see what I'll do.

19         (Laughter)

20         THE COURT:  I mean, you know, that's his choice.

21    I'm just --

22         MR. SCHROCK:  That's --

23         THE COURT:  I'm trying --

24         MR. SCHROCK:  -- his choice.

25         THE COURT:  -- to give him information, to the

1   extent that I can.

2         MR. SCHROCK:  Yes.

3         THE COURT:  But happy to do that.  But as I

4   understand it, that's really the only issue, right?

5         MR. SCHROCK:  The only other --

6         THE COURT:  Yeah.

7         MR. SCHROCK:  Sorry to interrupt, Judge.  Just the

8   only other issue I believe that's out there is that, shortly

9   before we came to court, there was still an outstanding issue

10  on the 506(c) waiver and the 552(b) waiver to the convertible

11  noteholders.

12        THE COURT:  Oh --

13        MR. SCHROCK:  We have language that -- basically,

14  what we, the debtors, have agreed to do as part of this order

15  is that, so long as there's a consensual use of cash

16  collateral up through the termination date of cash collateral,

17  that we would give a 506(c) waiver during that time, the logic

18  of it being, you know, that, if we were going to have a

19  surcharge, it would be -- you know, someone could say, well,

20  listen, it -- that's under an approved budget, it would be

21  roughly equal to, you know, that use of cash collateral at

22  that time, and so that would be a fair exchange of -- for the

23  consensual use of cash collateral.

24        I think the other side of it is just, you know, how

25  does that interact with any 507(b) claim that could be later

1     asserted.  And you know, we see those as separate issues.  We

2     actually had the pleasure of litigating this in Sears up

3     through the Second Circuit, and so we have some intimate

4     familiarity with it.  I hope we never get there because that

5     would be a bad outcome for the case if we're arguing over

6     507(b) claims, but we did resolve it.

7           And I think the committee and the share -- ad hoc

8     shareholders group still have an issue around that particular

9     issue, is my understanding.  But they can tell you if there's

10    anything else outstanding.  We've been trying to --

11          THE COURT:  And again --

12          MR. SCHROCK:  -- play in the middle.

13          THE COURT:  -- I'll tell everyone, you know, my view

14    of that is, is that --

15          MR. SCHROCK:  Sure.

16          THE COURT:  -- those are debtor rights.  And I know

17    that sometimes debtors don't really have a choice, and that's

18    when I pay a lot more attention to it.

19          MR. SCHROCK:  Okay.

20          THE COURT:  But when debtors are freely exercising

21    their business judgment -- because they have the big view of

22    the case.  The -- you know, we're -- they're not -- you're not

23    just fighting issues, you've got to play the long game and

24    you've got to figure out how to get to an end result as

25    efficiently and as quickly and with minimum risk as you can.

1          And you know, if that's the evidence that I'm going
2     to hear, I'm just going to tell everyone, again -- I had
3     someone make the argument to me that this is not a debtor
4     right, it's a creditor right, and it was a long hearing and
5     they lost me from the very beginning.
6          (Laughter)
7          THE COURT:  You know, it's one thing to say that
8     it's a debtor right, but the debtors can't exercise it because
9     of -- pick your issue.  That I get --
10         MR. SCHROCK:  Uh-huh.
11         THE COURT:  -- and I know that that exists because
12    I've been exactly where you are.  And I've been told that, if
13    you want this, you don't have any discretion and I know that
14    goes on.
15         But when I've got a debtor in a position where they
16    go, look, we've made -- we thought through this, we've been
17    down all the branches of the decision tree, and this is how we
18    think our right ought to be used or not used, I'm going to pay
19    an awful lot of attention to that.  So, again, you know --
20         MR. SCHROCK:  Yes.
21         THE COURT:  -- I'm sort of talking to everybody on
22    that.
23         MR. SCHROCK:  Fair enough.  Thanks very much, Your
24    Honor.
25         So, you know, with that, I'd propose to turn the

1     podium over to my partner Ms. Berkovich and give you some more

2     of the specifics --

3               THE COURT:  Absolutely.  I want to give everyone

4     else a chance --

5               MR. SCHROCK:  Sure.

6               THE COURT:  -- to make --

7               MR. SCHROCK:  Sorry.

8               THE COURT:  -- opening comments.  And part of those

9     comments could be, you know, we'd like five minutes to think

10    about what you've said, and I'm certainly -- I would certainly

11    entertain that.  If that's, you know, we knew you were going

12    to say that in one form or another, we're ready to proceed,

13    then, you know, terrific --

14              MR. SCHROCK:  Okay.

15              THE COURT:  -- because, you know, my Mucinex is only

16    going to last so long.

17         (Laughter)

18              THE COURT:  It's -- you know, you gave me a cold

19    during my mediation.

20         (Laughter)

21              THE COURT:  But all --

22              MR. SCHROCK:  Sorry.

23              THE COURT:  All just fine.

24              MR. SCHROCK:  Okay.  Very good.

25              THE COURT:  Thank you, Mr. Schrock.

1          Let me ask:  Anyone else want to make opening

2     comments?

3          (No verbal response)

4          THE COURT:  Okay.  Oh, you know what I didn't do?

5          (Participants confer)

6          THE COURT:  Anyone on GoToMeeting wish to make

7     comments?

8          Yes, Ms. Hardy, come on up.

9          No one has actually turned on their video camera, so

10    I'm going to assume that everyone is just watching.

11         MS. HARDY:  Thank you, Your Honor.  Jennifer Hardy

12    of Willkie, Farr & Gallagher as proposed counsel to the

13    unsecured creditors' committee.

14         I just wanted to introduce some of my colleagues in

15    the courtroom because is the first time we've appeared as

16    counsel --

17         THE COURT:  Ah, okay.

18         MS. HARDY:  -- to the creditors' committee.

19         We have Brett Miller, who I believe you know from

20    previous matters.

21         THE COURT:  Good morning.

22         MS. HARDY:  Jim Dugan, Todd Goren, as well.

23         And as Mr. Schrock mentioned and as the Court knows,

24    B. Riley was a former client of Willkie Farr, so that's why we

25    have Mr. Brookner of Gray Reed as conflicts and efficiency

1       counsel in the courtroom, as well, so ...

2                   THE COURT:  Always good to see him.

3                   MS. HARDY:  Thank you, Your Honor.

4                   THE COURT:  All right.  Thank you.

5                   All right.  If there are no other comments -- yes,

6       ma'am, did you want to come up?

7                   MS. REED:  Yes, Your Honor, very briefly.  Noelle

8       Reed for the Ad Hoc Group of Equity Holders.

9                   THE COURT:  Yes, ma'am.

10                  MS. REED:  Just wanted to introduce ourselves.  We

11      anticipate we'll be filing a motion for appointment of an

12      official committee --

13                  THE COURT:  Okay.

14                  MS. REED:  -- within maybe the next 24 hours.  With

15      me is my partner Ron Meisler and one of our associates Ms.

16      Phelps, and Mr. Panagakis may or may not be on the line.

17                  THE COURT:  Go it.  Hadn't seen him yet, but

18      obviously I know him and I welcome his participation.

19                  What I would ask that you do, if you decide that

20      you're going to -- that you're going to seek official

21      recognition, talk to everybody because I assume that's not a

22      thirty-minute hearing.

23          (Laughter)

24                  THE COURT:  Talk to everybody and then reach out to

25      Mr. Alonzo and get a setting that, as much as it can, works

1    for everybody.  I assume that that will probably be an in-
2    person hearing, but just have that conversation with
3    everybody.
4              MS. REED:  Certainly, we will.
5              THE COURT:  All right.
6              MS. REED:  And just for your record, we did file an
7    objection to the original.
8              THE COURT:  I saw it.
9              MS. REED:  And of course --
10              THE COURT:  Yeah.
11              MS. REED:  -- that's mooted by the newly filed.
12              THE COURT:  Thank you.
13              All right.  No other takers.
14              Good morning.
15              MS. BERKOVICH:  Good morning, Your Honor.  For the
16    record, Ronit Berkovich from Weil Gotshal, proposed counsel to
17    the debtors.
18              THE COURT:  We need to find a way to lower that
19    screen, don't we?  Huh.
20              MS. BERKOVICH:  Lower the --
21              THE COURT:  I was just -- because it kind of blocks
22    your face.
23         (Participants confer)
24              MS. BERKOVICH:  I know.
25              THE COURT:  No, no, no.  I -- that's my fault and I

1    will --

2         (Participants confer)

3         (Laughter)

4         MS. BERKOVICH:  I do have another option.  Is that

5    better?

6         THE COURT:  So it's really -- so now I have to tell

7    you a story.  So, every year around Christmas time, I have a

8    Cub Scout group come in, and you know, they're learning about

9    the law.  And of course, you know, to a bunch of nine- and

10   ten-year-olds, the law is the Marshals come down and they tase

11   one another, and so they think that's super cool, and I don't

12   get them until after they do that.

13        And so I bring them in and, you know, obviously,

14   this is a Bankruptcy Court and that's an impossible abstract

15   thought, so we have a criminal case.  And there's -- it's

16   always a Santa Claus related thing, and someone stole cookies

17   and Santa is accused of committing a crime.  And so I have a

18   little small person's robe, and so we have a judge.  And then

19   I get a couple of lawyers and they tell people what to say and

20   they have an argument.  And I have to put a box of copy paper

21   right there for folks to stand on, which is what made me think

22   of that.

23        And I had one -- I had one advocate get so excited

24   that he fell off the box.

25        MS. BERKOVICH:  Oh, no.

1          (Laughter)

2               THE COURT:  And it was a message to this, so please

3      be careful.

4               MS. BERKOVICH:  I will be careful, and next -- I'm

5      wearing flats.  Next time, I'll wear my four-inch heels.

6               THE COURT:  I'm going to -- I just hadn't noticed

7      that before.  I'll figure out a way to deal with that.  I'll

8      move it to the side or figure out how to lower it.

9               MS. BERKOVICH:  Thank you, Your Honor.  I think we

10     have an interim solution.

11          Joining me today in the courtroom is John Singh from

12     PJT Partners, the proposed banker to the debtors.

13               THE COURT:  I see him.

14               MS. BERKOVICH:  Rodi Blokh from AlixPartners, the

15     proposed financial advisor to the debtors, and Russell Cann,

16     who's the head of mining and Executive Vice President of the

17     debtors.  Also joining us today --

18               THE COURT:  Find a way to put him on the stand.  I

19     really ...

20          (Laughter)

21               MS. BERKOVICH:  I knew you'd like that.  You

22     mentioned it from the very beginning, Your Honor.  But

23     unfortunately, as I'll get to, we're unlikely to need Mr.

24     Cann's testimony today.

25          Also joining us online via Zoom is Michael Bros, the

1      Senior Vice President of Capital Markets and Acquisitions of

2      Core Scientific, who is our first-day declarant.

3              And we have a few other of our colleagues from Weil

4      Gotshal.  We have my partner Ted Tsekerides and my colleagues

5      Jeremy Cain and Alex Cohen.

6              THE COURT:  Good morning to the entire team.  And if

7      she left you out, she didn't mean it.

8          (Laughter)

9              MS. BERKOVICH:  Did not.

10             Your Honor, we filed a revised agenda at Docket 426

11     today.  We are very happy to be in front of you seeking

12     approval for the proposed replacement interim DIP order and

13     the terms for the consensual use of cash collateral.

14             To provide maximum notice of our change in

15     circumstances, the second we had a deal, we filed the proposed

16     order in the wee hours of Monday, January 30th, at Docket 378,

17     and we attached a redline of the interim order that was

18     entered by this Court on December 23rd, which had been Docket

19     Number 130, as well as the termsheet.  B. Riley is funding

20     under a termsheet, given the speed with which we needed to

21     reach a deal with them.

22             We subsequently filed our motion to approve the

23     order at Docket Number 385.

24             And while we had coordinated with both the ad hoc

25     group of secured noteholders and the creditors' committee

1  prior to filing the initial order, we continued to work with

2  those groups, as well as our DIP lenders and our equipment

3  lenders, around the clock to make changes to the proposed

4  order to get to consensual among all the parties.

5       Just about an hour before the hearing, we were able

6  to reach a fully consensual deal between the debtors, the ad

7  hoc group, and the DIP lenders.  So, again, we have consensual

8  use of cash collateral.

9       I believe, based on email discussions, that the

10  equipment lenders are also not objecting to the interim DIP

11  order.  They're reserving their rights with respect to the

12  final order.

13       As a result of those changes that we made in the

14  version that we filed -- and we have some extra copies of the

15  blackline in the courtroom, in case people were not able to

16  access it, given the late filing -- we're not a hundred

17  percent sure, as Mr. Schrock said, whether any of the last-

18  minute second changes would be acceptable to the creditors'

19  committee.

20            THE COURT:  Okay.

21            MS. BERKOVICH:  And the revised order was filed this

22  morning at ECF 424.  My colleague Alex Cohen will walk the

23  Court through the relevant changes.

24            THE COURT:  Terrific.

25            MS. BERKOVICH:  So, before I summarize for the Court

1      the benefits and terms of our replacement DIP order, I would

2      like to move the Court to enter into evidence two of the three

3      declarations that we filed on January 31st in support of our

4      motion:  First is the declaration of John Singh at ECF Number

5      390, and second is the declaration of Rodi Blokh at ECF 391.

6      As I mentioned, they're both in the courtroom today and

7      available for cross-examination.

8                    THE COURT:  All right.  Thank you.

9                    Does anyone have an objection, again, for purposes

10     of today's hearing only, to Mr. Singh's declaration at CM/ECF

11     Number 390, Mr. Blokh's declaration at 391?  Any objection

12          (No verbal response)

13                    THE COURT:  All right.  They're admitted.

14          (Singh Declaration at ECF 390 received in evidence)

15          (Blokh Declaration at ECF 391 received in evidence)

16                    THE COURT:  Anyone wish to cross-examine either one

17     of those two gentlemen?

18          (No verbal response)

19                    THE COURT:  You okay?  All right.  And thank you,

20     folks.  Oh, Mr. Hansen, sorry.  I just didn't see you.

21                    MR. HANSEN:  No, it's all right, Your Honor.  So

22     Kris Hansen with Paul Hastings on behalf of the ad hoc group

23     and the existing DIP lenders, Your Honor.

24                    We would just reserve.  To the extent you permit the

25     committee to put their witnesses on with respect to comps, et

1      cetera, regarding the fee, we would like to cross the debtors'

2      witnesses because, obviously, they were declarants in

3      connection with the original DIP.  So, if we're going to get

4      in a time machine and go back to when we were here originally,

5      we need to have them on the stand to walk the Court back

6      through the original testimony.  And of course, we would like

7      to elicit further testimony from them about the circumstances

8      at the time of the original was entered.

9              I don't see a reason to cross them now, but I wanted

10     to make sure that you understood that, if the committee does -

11     - if you allow the committee to call its witness -- which we

12     think you shouldn't -- but if you do, then our position is

13     that we may have questions for the debtors' witnesses.

14             THE COURT:  Got it.  It seems an efficient way to

15     proceed.

16             Any objection?

17             MR. MILLER:  Your Honor, Brett Miller, Willkie, Farr

18     & Gallagher, proposed counsel to the creditors' committee.

19             We have no objection to that.  We would just like to

20     be subject to the same reservation, in case we do go forward

21     on, I'll call it a "contested hearing" with witnesses because

22     Mr. Singh did have some testimony regarding -- in deposition,

23     regarding what exit fees might be reasonable.

24             THE COURT:  Sure.  And at some point -- I don't want

25     this to be -- I don't want this to be, in any shape, way, or

1　　　form, a surprise -- I'm going to ask you the question.  You

2　　　know, I assume it's unreasonable.  Now tell why it is I --

3　　　because I have to put the process first.  Tell me why it is,

4　　　having done what I did, even if you convince me that it's

5　　　unreasonable -- and it wouldn't take a lot -- why should I

6　　　change it?

7　　　　　　　　MR. MILLER:  Do you want me to start now?

8　　　　　　　　THE COURT:  If you would like to -- you're only

9　　　going to get to do it once.  So would you like to hear

10　　　everything that's said and make the argument or do you want

11　　　to --

12　　　　　　　　MR. MILLER:  I --

13　　　　　　　　THE COURT:  -- make the --

14　　　　　　　　MR. MILLER:  I'll let --

15　　　　　　　　THE COURT:  -- argument now?

16　　　　　　　　MR. MILLER:  -- Weil make their case, and then --

17　　　　　　　　THE COURT:  Fair enough.  All right.  Thank you.

18　　　And you have the same reservation.

19　　　　　　　　MR. MILLER:  Thank you.

20　　　　　　　　THE COURT:  Yes, sir.

21　　　　　　　　MS. BERKOVICH:  We did file a third declaration in

22　　　support of the DIP motion from Russell Cann, that's at Docket

23　　　392.  But as I mentioned earlier, we will not be putting that

24　　　evidence in today, given the equipment lenders, I believe,

25　　　their agreement to -- not to object.

1          THE COURT:  Got it.  Do you need -- you said give

2     your belief.  Do you need to get confirmation of that or ...

3          MS. BERKOVICH:  There were many of them.  We just

4     filed the final order.  If any of them were to -- I see Mr.

5     Lohan, who's been sort of an informal leader for the group.  I

6     don't know if he has the views of everybody, but --

7          THE COURT:  Mr. Lohan, do you have your line

8     unmuted?

9          MR. LOHAN:  I believe I -- I believe I do, Your

10    Honor.  Can you hear me?

11         THE COURT:  Absolutely.

12         MR. LOHAN:  Good morning, Your Honor.  For the

13    record, Brian Lohan on behalf of Barings.

14         Ms. Berkovich is correct, we did file a limited

15    objection at Docket Number 291.  Several other equipment

16    lenders joined that objection.  But we think it makes sense,

17    given the positive developments of the case, to just reserve

18    our rights to the final hearing and we'll streamline the

19    issues that need to be decided at the interim -- at this

20    interim hearing.

21         THE COURT:  All right.

22         MR. LOHAN:  And you know, we support entry of the

23    order and are not pressing forward the objection.

24         THE COURT:  All right.  Thank you for the

25    announcement.

1          MR. LOHAN:  Thank you.

2          MR. TWOMEY:  Your Honor, if I may?  Dennis Twomey.

3     Can you hear me okay?

4          THE COURT:  Mr. Twomey, absolutely.  Thank you, sir.

5          MR. TWOMEY:  Thank you, Your Honor.  Good morning.

6     And it's Dennis Twomey with Sidley Austin on behalf of NYDIG

7     ABL, LLC.

8          Just confirming what Ms. Berkovich said, we also are

9     not planning on objecting today, but do reserve our rights for

10    the -- to the final hearing.  We do believe we have an

11    agreement.  We've spent a lot of time.  And thanks to Ms.

12    Berkovich and her team over the last several weeks, we do

13    think we have a resolution and expect that we'll be -- a

14    motion will be filed here in the next day or two on that.

15         And in the meantime, we're not going to be objecting

16    today.  And hopefully, our resolution will ultimately get

17    finalized and approved and we won't be objecting at the final

18    hearing.  But in the meantime, we do ask that we be permitted

19    to reserve our rights for that final hearing.

20         THE COURT:  Mr. Twomey, thank you for the

21    announcement and absolutely.

22         MR. TWOMEY:  Thank you, Your Honor.

23         THE COURT:  All right.  Ms. Berkovich?

24         MS. BERKOVICH:  All right.  So, Your Honor, on the

25    first-day hearing, I told you and Mr. Schrock told you that we

1     would be seeking replacement DIP financing and that's what

2     we've been doing for the last month plus, and working

3     tirelessly to find financing that would eliminate the roll-up,

4     eliminate the linkage to the RSA and the related milestones,

5     remove the restrictions on selling actions to improve our

6     liquidity, and provide overall better terms.

7           When we entered into bankruptcy, the debtors'

8     liquidity was in dire condition.  And I can say the original

9     DIP lenders, the ad hoc group, saved this company by being the

10    only party at that time willing to provide financing.

11          At the same time, you know, some of the terms of

12    that DIP -- and I -- it's in -- very well in our papers,

13    really were not the most favorable to the debtors, so we were

14    looking for a replacement DIP facility that could provide

15    greater value to all stakeholders than that of the original

16    DIP credit agreement.

17          We understand that the debtors' constituents, other

18    than the pre-petition secured noteholders, are thrilled with

19    our new DIP.  We've received no objections to it.

20          We know that the creditors' committee is supportive,

21    they filed their statement at ECF 397.  The Ad Hoc Committee

22    of Equity Holders has told us they are supportive, and the

23    same thing with the equipment lenders.

24          Our marketing process for this DIP was very robust.

25    And the Singh declarations provide -- declaration provides a

1    great deal of detail about the negotiations with the various

2    lenders we were talking to over the last week.  But at the end

3    of the day, the proposal that we were able to negotiate with

4    B. Riley, our largest unsecured creditor, was the superior

5    proposal.

6         We kept all of our stakeholders informed throughout

7    the process.  The major groups were not surprised when we

8    reached a deal.  We sent all of our DIP proposals to the UCC

9    and the ad hoc group and we were in touch throughout with the

10   equipment lenders, as well.

11        We did ask the ad hoc group whether it was willing

12   to provide a DIP more in line with the terms of the B. Riley

13   DIP.  And while we were potentially amenable to improving some

14   of the terms, they were not willing to go all the way there.

15        So, unless Your Honor has any questions about the

16   process, I would like to summarize the key terms of the DIP.

17        THE COURT:  Please.

18        MS. BERKOVICH:  It's actually a very simple DIP, one

19   of the things we like about it.

20        It's a seventy-million-dollar multiple draw term

21   loan facility.

22        Today, we're seeking interim approval for a draw of

23   35 million of that facility.  We will use those funds, along

24   with cash on hand, to repay the original DIP facility and for

25   general operating purposes.  And we did have a budget attached

1    to the proposed interim DIP order.

2           The maturity is 12 months with a three-month

3    extension.  That compares to the 6 months with three-month

4    extension we had under the original DIP.

5           The interest rate is the same, ten percent paid in

6    kind.

7           The exit treatment is -- total payment at exit is

8    105 percent as the then-outstanding debt, as compared to the

9    115 percent under the original debt facility.

10          We are permitted to use the net proceeds of any

11   asset sale -- to conduct assets and to use the net proceeds of

12   any asset sales to pay down the DIP, whereas that permission

13   was very restricted in the original DIP facility.

14          No roll-up, no RSA link, no real milestones except

15   for a final DIP order.

16          And Your Honor, the one, I guess, negative of this

17   new DIP is that we do have to pay the termination fee.  And I

18   will get to a little more about our views of that on the end.

19   But you did ask a question about how that impacts our

20   liquidity.

21          And I was passed a note by our financial advisor

22   that the takeaway that the termination fee does not impact our

23   cash or liquidity forecast, and also that the new DIP is still

24   superior to the old DIP, even when taking into account that we

25   have to pay these termination fees.

1          THE COURT:  Okay.

2          MS. BERKOVICH:  Also, these termination fees would

3     have been payable at any time, anyway, for the refinancing of

4     that DIP, whether it's now or later.

5          As noted in the Blokh declaration, this replacement

6     DIP facility will provide the debtors with the liquidity

7     necessary to pay off the original DIP facility, fund payroll,

8     and satisfy other working capital and general corporate

9     purposes.  And it is the debtors' business judgment that this

10    is the best DIP available.

11         As noted, we reached agreement with the ad hoc group

12    over the terms for the consensual use of cash collateral.

13         Their adequate protection package is, for the most

14    part, similar to what we had included in the original interim

15    order:  Replacement liens, 507(b) claims, and the payment of

16    professional fees.

17         There were some complicated issues relating to the

18    different lien priorities by different parties over different

19    assets and how that would all work by layering the DIP in

20    there.  The DIP is non-priming as to the existing liens, but

21    taking a first lien on unencumbered assets.

22         But we are grateful, again, to all the parties --

23    the DIP lenders, the equipment lenders, and the ad hoc group -

24    - for working through these issues to get to a final

25    resolution.

1          We do have an Exhibit 5 to the proposed order that

2     provides an illustrative chart of how the lien priorities work

3     with respect to different assets.  There's up to six different

4     liens that are applied to each different group of assets.

5          And unless there has -- Your Honor has any

6     questions, before turning the podium over to Mr. Cohen, I just

7     -- I want to reiterate the debtors' position on the

8     termination payment.

9          We do not agree with the committee's position.

10    Those fees were properly disclosed to the Court and all

11    parties-in-interest in both our written and oral submissions

12    to the Court, and they were approved in the interim order.

13         We also believe they were reasonable under the

14    circumstances as part of the overall package of terms in the

15    original DIP facility, which, at the time, was the only

16    financing facility, financing option available to the debtors.

17    This was supported in the Singh declaration at Docket 98.

18         Your Honor mentioned changed circumstances.  There

19    were no changed circumstances.  We were in front of you 40

20    days ago saying we want to find the replacement DIP, if we

21    find that DIP in 4 weeks, these are the fees that will be

22    paid.  That's exactly what happened.

23         And one more point.  And I mostly represent debtors,

24    our firm does.  And you know, I personally worry about the

25    chilling effect to the ability of a company distressed to be

1        able to get a DIP loan if the DIP lenders have to worry that

2        what they negotiate with the debtor and approve -- get

3        approved by the Court is later subsequently challenged.

4                So those are our views.  Does Your Honor have any

5        questions?

6                THE COURT:  I do.  So I just -- I think what I heard

7        you say -- and I just want to confirm it -- is you're telling

8        me that the debtors exercised their business judgment in

9        deciding to go forward with this, believing they were going to

10       have to pay the termination fee.

11               MS. BERKOVICH:  Yes, Your Honor.

12               THE COURT:  Okay.  I got it.

13               Anything else?

14               MS. BERKOVICH:  Nothing else?

15               THE COURT:  All right.

16               MS. BERKOVICH:  Thank you, Your Honor.

17               THE COURT:  Thank you.  All right.

18               Mr. Cohen, good morning.

19               UNIDENTIFIED:  Oh, sorry.

20          (Participants confer)

21               MR. COHEN:  Good morning, Your Honor.  Alex -- oh.

22       Alex Cohen, Weil, Gotshal & Manges, for the debtors.

23               THE COURT:  Yes, sir.  Thank you.  Good morning.

24               MR. COHEN:  Good morning.

25               First, I want to say that, next time you do the Boy

1    Scout trip, I would suggest that the Santa obtains replacement

2    DIP financing could be a good topic.

3        (Laughter)

4            MR. COHEN:  I'd be more than happy to write a

5    problem for you.

6            THE COURT:  I'm going to keep that in mind.

7            MR. COHEN:  Thank you, Your Honor.

8        (Laughter)

9            MR. COHEN:  And second, I always -- whenever people

10   walk through these orders, I think it kind of gets a bit

11   tedious to go through every single change.  So I think what's

12   probably more useful for the Court -- and please correct me if

13   you disagree -- is to highlight some of the high-level

14   changes.

15           THE COURT:  So I think -- I started reading it and I

16   stopped.  What I'd like to do -- and you'll just have to take

17   a deep breach because you'll know this far better than I do --

18   is let me get 424-2 up.  And then, as you walk me through, if

19   you could give me a page reference using 424-2, that would be

20   helpful.  And so I have it up.

21           MR. COHEN:  Okay.

22           THE COURT:  Where would you like to start?

23           MR. COHEN:  So I think, first, I'll note that it

24   looks a lot blue and -- more blue and more red than the

25   changes actually are.  More -- a lot of the changes are

1     clarifying, to make sure that -- some of them are defined term
2     fixes, some of them are --
3              THE COURT:  No, I --
4              MR. COHEN:  -- just --
5              THE COURT:  -- agree.
6              MR. COHEN:  -- technical corrections.
7              THE COURT:  Yeah.
8              MR. COHEN:  But I think the place that we should
9     start is on Page 15 of the redline.
10             THE COURT:  Okay.  Let me --
11             MR. COHEN:  Uh-huh.
12             THE COURT:  So I can go to 15 of 101?
13             MR. COHEN:  That's right.
14             THE COURT:  Okay.
15             MR. COHEN:  You should be able to, yeah.  It's --
16     this is -- at the top, it says "cash collateral."  Is that
17     what your exhibit shows?
18             THE COURT:  No.
19             MR. COHEN:  No?  Different page numbers?
20         (Participants confer)
21             MR. COHEN:  It's --
22             THE COURT:  Do you want to see what I'm looking at?
23             MR. COHEN:  There we go.  If you scroll down to the
24     next page.  Yep, down more.  Oh, 15 at the bottom.  I'm sorry.
25     I'm referring to the page numbers at the bottom.  There we go.

1    15 at the top.

2         So this clarifies -- there we go -- the definition

3    of "cash collateral," just clarifying the definition of "cash

4    collateral."  After discussions with the ad hoc group, all

5    parties agree with this definition.  Just minor changes to

6    ensure the proper scope.

7         THE COURT:  Okay.

8         MR. COHEN:  Okay.  Next is Page 19 at the bottom.

9    This deals with approval of the budget.

10         So the ad hoc group has consent rights over the

11    budget, as well as the replacement DIP lenders.  However, if

12    there's a disagreement between the two parties; so, if

13    somebody says yes, somebody say no to approving the budget,

14    then the provision at the bottom and then the top of Page 20

15    clarifies that, in the event of a conflict, the judgment of

16    the replacement DIP lender would govern.  However, all -- the

17    ad hoc group has the right to come back to court on an

18    emergency basis to dispute any issues, and Your Honor can hear

19    them in a budget resolution event.

20         THE COURT:  Okay.

21         MR. COHEN:  All right.  The next page I go to is 21,

22    the last paragraph of Page 21.  This is the 506(c), 552(b),

23    and marshaling waivers.  It appears a couple of places

24    throughout, but this is the first place.

25         And as Ms. Schrock previewed, the 506 and 552(b)

1    waivers are granted.  But to the extent that there's a cash

2    collateral termination event, those would burn off.  And

3    there's a paragraph at the end of the order to that effect.

4              THE COURT:  Okay.  Make sure you reference that for

5    me, if you would.

6              MR. COHEN:  Yes, Your Honor.

7              THE COURT:  All right.

8              MR. COHEN:  The -- and then the rest of the changes

9    on Page 22 reflect that change, as well.

10             Okay.  The next place I go is Page 28 of the

11   redline, at the bottom.  This is clarifying that the debtors

12   will pay all of the reasonable and documented fees of both the

13   ad hoc group and the replacement DIP lenders, regardless of

14   when they arose, related to the DIP financing.

15             THE COURT:  Okay.

16             MR. COHEN:  Okay.  The next place is the top of Page

17   30.  This paragraph relates to any modifications, amendments,

18   or changes to DIP loan documents.

19             Effectively, this limits the ability of the debtors

20   and the replacement DIP lenders from making modifications

21   without asking the ad hoc group and, in certain cases, getting

22   consent; or, if they can't get consent, coming to court and

23   asking for material modifications.

24             THE COURT:  All right.

25             MR. COHEN:  Okay.  The next place is the footnote at

1    the bottom of Page 36.

2         Now, because of the timing of how this all

3    sequences, the refinancing will happen no later than five

4    business days after Your Honor enters the order.  So there's a

5    small gap period in which we have to pay off the pre-petition

6    secured parties.  And this provision clarifies that, during

7    that gap period, there are certain things that the debtors

8    can't do, preserve -- basically preserving the status quo

9    under the original DIP order.

10        THE COURT:  Got it.  All right.

11        MR. COHEN:  Okay.  And then the next place is the

12   middle of Page 38 of the redline.  This is another reference

13   to the pay-down and the refinancing within five business days

14   of the entry of the order.  Again, this is all to protect the

15   status quo in this gap period and also making sure that it's

16   clear that adequate protection rights continue.

17        Bottom of 38, top of 38 -- excuse me, top of 39.

18   This is the same -- a similar provision, and except for, to

19   the extent that we're selling -- the debtors' are selling pre-

20   petition secured parties' collateral, there are certain

21   procedures we have to follow and making sure that, to the

22   extent they don't consent, that we have to come to Your Honor

23   or otherwise follow the provisions of this interim order.

24        So a lot of these provisions throughout, you'll see

25   we can't sell their collateral outside of the provisions of

1      the order.  There are certain guardrails baked in, and you're

2      seeing that throughout in a lot of these paragraphs.

3              The next is the bottom of Page 40.  This also

4      relates to the budget consent rights.

5              The (m)(2) in the middle of Page 41, it says that,

6      notwithstanding anything in here, that DIP professional fees,

7      notwithstanding anything, that professional fees will get

8      paid, even if there's an issue with the budget; and also, that

9      the replacement DIP obligations and DIP professional fees are

10      not included in variance testing of the approved budget.

11              And then, finally, that the repayment -- the payment

12      of replacement DIP obligations is not, in and of itself, a

13      cash collateral termination event.  This is, again, protecting

14      against an issue of a dispute with the budget.

15              Next is the middle of Page 43.  You'll also see a

16      lot of these provisions throughout, and I won't highlight it

17      everybody.  But this -- effectively, what we did in the order

18      is preserve the current waterfall, as Ms. Berkovich mentioned,

19      but layer in the addition of the DIP liens and the DIP

20      obligations, so that's a lot of these changes.

21              Page 13 -- or excuse me -- Page 48, Paragraph 13.

22      Again, this is the mechanics of the refinancing.

23              You'll see a reference in the order of -- to a

24      payoff letter, and that's in process.  It's almost done.

25      There's okay a couple of terms that are being discussed at

1        this point.  So we intend to file a revised form of order with

2        that attached as an exhibit.  Right now, we just have a slip

3        page.  But the parties are all working together on that payoff

4        letter.

5              Page 58 at the bottom, this is Paragraph 20(b) as in

6        bravo, five eight.  Oh, this is more clarifying changes

7        regarding the refinancing.  Yep.  And -- no.  Yeah, the 58.

8        There we go.

9              So another thing that we did to compromise and come

10       to an agreement here is to allow that the ad hoc group, the

11       pre-petition secured parties, have certain rights in the event

12       of -- in the event of default or similar type provisions in

13       this agreement.  We spell it out in a couple of paragraphs.

14             And effectively, if there is a cash collateral

15       termination event, then it triggers a similar remedies notice

16       period to a DIP.  And it's all subject to the Southern

17       District rules regarding coming in and trying to seek to lift

18       the stay.  And you'll see that in Pages 60 through 63, that's

19       all that blue.

20          (Pause in proceedings)

21             THE COURT:  All right.  Thank you.

22             MR. COHEN:  Okay.  Next, Page 73.  We skip a lot of

23       pages here.  Page 73, and then it spills over into the next

24       couple of pages, this is all related to the challenge and

25       everyone's right to challenge and making sure that it's clear

1    who can challenge what and when.

2         Effectively, everyone has the right to challenge

3    everybody else's liens, claims, obligations, basically just

4    preserving parity for all parties to have similar rights to

5    challenge.  You'll see that a lot of the challenge provisions

6    that we initially baked into the DIP order have not changed.

7    This is mostly clarifying who can challenge what and when.

8         THE COURT:  Okay.

9         MR. COHEN:  Okay.  Next is Page 80.  This is, again,

10   the 506(c), 552(b) equities of the case and then the

11   marshaling provisions.  This is similar to what we discussed

12   earlier, just flagging again that it's here.

13        And then 28 into 29 -- or excuse me -- Paragraph 28,

14   80 and 81 pages, are respect to credit bid rights of the

15   parties, clarifying everybody has the right to credit bid with

16   respect to the obligations that are set in this order.

17        Okay.  Next is Page 83, Your Honor, the protection

18   against material amendments or modifications to the order or

19   any documents.  Again, if there's any dispute or disagreement,

20   everything is set out here and pretty granular detail.

21        Okay.  For -- I think there's only a couple left.

22   The next is Page 95, Paragraph 43.  This is the technology

23   that Mr. Schrock was referencing that we spoke about earlier;

24   that, in the event of a cash collateral termination event,

25   that the equities of the case and the 506(c) waiver burn off.

1              THE COURT:  Okay.

2              MR. COHEN:  And this last set of blue that you'll

3      see, Paragraph 44, it's a lot meatier and longer than it

4      actually is.  It's -- it effectively preserves intercreditor

5      rights with respect to certain rights, obligations, liens, et

6      cetera, everything that Ms. Berkovich and I have spoken about

7      regarding the status quo, but layering in the DIP obligations,

8      to make sure what happens to whom and who has rights over what

9      in the event of any occasion that could occur.  So we tried to

10     bake those protections in and to preserve the status quo.

11             And then the final portion of the order is just

12     setting a date for the final hearing.  And we have a proposed

13     date in mind, but I don't know if you'd prefer that we reach

14     out to your chambers and schedule, or if you just want to do

15     it live.

16             THE COURT:  What date were you looking for?

17             MR. COHEN:  February 27th is what we were targeting,

18     it's a Monday.

19             THE COURT:  And do you have a time in mind?

20        (Participants confer)

21             MR. COHEN:  Afternoon works better.

22             THE COURT:  So I would have 2/27 at 3 p.m. central

23     available, if that works and assuming that we get to the end

24     today.

25             MR. COHEN:  That sounds good, Your Honor.  We'll put

1       it into this order whenever we submit the revised.

2               THE COURT:  All right.

3               MR. COHEN:  And nothing further.  Thank you, Your

4       Honor.

5               THE COURT:  All right.  Thank you.

6               All right.  Yes, sir.

7               MR. VENTOLA:  Hello, Your Honor.  My name is John

8       Ventola from Choate, Hall & Stewart, counsel to B. Riley in

9       their capacity as the proposed replacement DIP lender.

10              I really just wanted to introduce myself to the

11      Court, Your Honor.  And of course, if you have questions,

12      happy to answer anything we can.  My firm is new to this.  We

13      only got involved about eight days ago.  It seems longer,

14      candidly.  But we've been working very cooperatively with the

15      parties-in-interest to get to where we are today.  And again,

16      if you have any questions, Your Honor, please let me know.

17              THE COURT:  Got it.

18              MR. VENTOLA:  And --

19              THE COURT:  Number one, welcome to the dance.

20              MR. VENTOLA:  Thank you, Your Honor.

21              THE COURT:  It's -- I don't at present.

22              MR. VENTOLA:  Okay.  And I just wanted to confirm --

23      Mr. Schrock mentioned it in his opening remarks -- B. Riley's

24      intention is, in fact, to resign from the committee if this is

25      approved.

1          THE COURT:  Yeah, that's kind of a given to me, so I

2     -- but I appreciate you --

3          MR. VENTOLA:  Thank you, Your Honor.

4          THE COURT:  -- saying that for everyone.

5          All right.  Mr. Hansen?

6          MR. HANSEN:  Yes, Your Honor.  Kris Hansen with Paul

7     Hastings on behalf of the ad hoc group and the existing DIP

8     lenders.

9          Your Honor, did you want to hear on the affirmative

10     side or did you want to hear from the committee first from an

11     argument perspective and then --

12          THE COURT:  Yeah.

13          MR. HANSEN:  -- from us?

14          THE COURT:  I want to deal -- I want to understand

15     the evidentiary presentation.  You'll certainly have time to

16     come back on argument and -- but I want to understand what the

17     committee is proposing to do.  And given where the record is

18     now, where they think, whatever it is that they want to

19     present is going to be persuasive.  So let me do that and then

20     we'll circle back around.

21          MR. HANSEN:  Fair enough, Your Honor.  And

22     obviously, we reserve because our view is we don't think they

23     should be --

24          THE COURT:  No, you --

25          MR. HANSEN:  -- permitted --

1          THE COURT:  I --

2          MR. HANSEN:  -- to put evidence on.

3          THE COURT:  I want to get --

4          MR. HANSEN:  But I'll come back --

5          THE COURT:  -- this on the table --

6          MR. HANSEN:  Yep.

7          THE COURT:  -- because I want to understand it.

8          All right.  Mr. Miller.

9          MR. MILLER:  Thank you, Your Honor.  Brett Miller,

10   Willkie, Farr & Gallagher, proposed counsel to the creditors'

11   committee.

12          Your Honor, as you know more than most people, it's

13   your order.  And having spent the last three years in a case

14   across the hall with Judge Isgur, the Sanchez case, we've been

15   fighting over a DIP order that is long since approved and have

16   had multiple hearings, multiple mediation sessions.  And at

17   least here, we're only five weeks later, we're not three years

18   later.

19          And Judge Isgur said something during the  multiple

20   hearings that he wants to get it right.

21          THE COURT:  Uh-huh.

22          MR. MILLER:  And there are a lot of words in the DIP

23   order there, and a lot of people interpreting the words how --

24   as favorably as they can for their party.

25          Here, I think we have a little bit of a different

1     scenario.  Both sides seem to focus on 30(d) of the DIP order

2     and whether the termination payment is actually part of the

3     package that I'm sure Mr. Hansen will say was part of the

4     pricing of the DIP because I disagree with the statement in

5     the ad hoc group's pleading filed this morning that a finding

6     that, if we open up the termination payment provision -- and

7     the committee does not dispute a termination payment is -- can

8     be paid here.

9            It's a question of the reasonableness and that's ...

10    so, using the replacement DIP as a basis and a -- I think Ms.

11    Berkovich said a 105 percent -- I'll call it a "5 percent

12    termination fee," that's about $2 million --

13           THE COURT:  Uh-huh.

14           MR. MILLER:  -- whereas the interim order included a

15    15 percent payment or $6 million.  So we're talking about a

16    four-million-dollar delta here.

17           And if you look at the comps that are in the various

18    -- in the declaration submitted by the committee, 15 percent

19    is out of whack --

20           THE COURT:  Uh-huh.

21           MR. MILLER:  -- 5 percent is around normal.  And I

22    believe, if we actually went forward and put our witness on

23    the stand, it would be hard to find otherwise.  And I think,

24    if Mr. Singh was put on the stand and cross-examined, he would

25    find the same because we've seen a DIP comparison chart that

1    he's prepared.

2         So, to your point, the 15 percent fee is

3    unreasonable.  And the question now turns back to:  How can we

4    -- should we be determining whether an interim order that

5    approved a termination fee on 24 hours' notice without a

6    committee being formed satisfies the requirements of

7    Bankruptcy Rule 4001(c)(2), Section 364, and perhaps most

8    importantly 30(d) of the interim order because 30(d) says two

9    things -- well, it says multiple things, but two things that

10   are highlighted, one by the ad hoc committee and one by us.

11        And I don't know if we can put that on the screen.

12   You can actually, I think, use the version that Mr. Cohen was

13   just going through because it -- I think 30(b) stayed the

14   same.

15        THE COURT:  Sure.  I can do it either way.  I can

16   give your person control, I can put back up what we were just

17   looking at.

18        MR. MILLER:  I think --

19        THE COURT:  Which would --

20        MR. MILLER:  Why don't we -- why don't we put back

21   up what was just on?

22        THE COURT:  Give me just two seconds.

23      (Participants confer)

24        THE COURT:  And paragraph -- you said 30(d)?

25        MR. MILLER:  30(d), I think it's Page 86.

1          THE COURT:  Ah.

2          MR. MILLER:  It's a really long order.

3      (Pause in proceedings)

4          MR. MILLER:  So the -- yeah.  The ad hoc group, in

5      its statement, focuses on 2(I), the validity or enforceability

6      of any obligation, indebtedness incurred under this interim

7      order or the replacement DIP loan documents, et cetera.

8          Question:  Was or is the termination payment

9      incurred at the outset, as opposed to the other fees that the

10     committee doesn't challenge?  There were the up-front fees

11     that have been paid that no one is seeking to disgorge.  We

12     are simply looking at the termination payment.  And as I said,

13     it's approximately a four-million-dollar delta from what we

14     think is reasonable, versus what is being requested.

15         But when you look at 4(I), it talks about or the

16     payment of any fees, costs, expenses, or any amounts to the

17     replacement DIP secured parties, blah, blah, blah, in the case

18     prior to the actual receipt of the written notice of any

19     replacement DIP agent or the pre-petition agent on the -- as

20     of the effective date of such reversal, stay, or modification,

21     or vacatur.

22         I really have to question whether the payment --

23     that these fees were not payable at the interim hearing.  They

24     are contingent payments that could, might, may become payable

25     later.  And quite simply, we believe that's the purpose of

1     having an interim order or a final order two weeks, four

2     weeks, five weeks later.  That's what is intended by the

3     Bankruptcy Rules, that is intended by the Bankruptcy Code.

4            And where the ad hoc group thinks this is going to

5     turn DIP financing on its head, I actually think it's the

6     reverse because how -- if this is approved now and the

7     committee is basically neutered in any future discussions

8     regarding reasonableness of fees, then the next lender might

9     as well throw in a hundred percent termination fee because the

10    debtor has no choice.

11           I think what Ms. Berkovich said was the fee was

12    reasonable under the circumstances.  Well, and yes, the

13    circumstances changed.  And we understand that the debtor made

14    the deal.  We don't dispute that the debtor cut this deal,

15    they could the best deal they could do.  But they ran to court

16    with a deal that, upon scrutiny by a creditors' committee,

17    upon -- if we were to put on witnesses, they would show it is

18    unreasonable by approximately $4 million.

19           Then what is the purpose of a whole bunch of

20    sections of the Bankruptcy Code and laws and rules regarding

21    finding things reasonable before you use estate funds?

22    Because the use -- the approval of this will deprive unsecured

23    creditors, other stakeholders, other secured creditors of $4

24    million because that's what this comes down to.

25           It is a -- I'll call it an "up-front smash and grab"

1       of $4 million here, above what's reasonable.  And what will

2       happen, I think, is the next lender is going to do the same,

3       and then, after that, the same.  And before we know it, the

4       chart that our witness and Mr. Singh would put up of comps,

5       it's going to be littered with 15 percent across the board,

6       and that's going to become the new mean and median for DIP

7       termination fees.  And it really, really shouldn't be because

8       today should be the day that it stops.

9               And just like Judge Isgur, you should say I want to

10      get it right, and right is to limit the termination payment to

11      what is reasonable.  And we would put on evidence, if asked,

12      that something in the neighborhood of a two-million-dollar

13      payment is reasonable.

14              And with that, I'll rest.  And I'll say, Your Honor,

15      if -- I think we need to decide on the order first.  And if

16      you completely disagree with me -- which it's your order,

17      again -- then we will not put any evidence.  If this has

18      opened the door for putting on evidence or for Mr. Hansen and

19      I going in the hall room and -- in the hallway and having a

20      conversation, then we're happy to do that because this can be

21      litigated, it can be settled.

22              But we defer to Your Honor, it's your order again.

23      And I just do think, for the sake of the Bankruptcy Code and

24      this case, we should get it right.  Thank you.

25              THE COURT:  Okay.  Thank you.

1          All right.  Mr. Hansen.

2          MR. HANSEN:  Thank you, Your Honor.  And Your Honor,

3     Kris Hansen on -- with Paul Hastings on behalf of the ad hoc

4     group and the existing DIP lenders.

5          Your Honor, I'll start where Mr. Miller left off.

6     It was not a smash and grab.  The concept of that ignores the

7     reality of how the debtor came to this courtroom when it filed

8     for bankruptcy.

9          If you look at 4001(c)(2), you have to determine

10    whether the debtor is going to be the subject of immediate and

11    irreparable harm.  And you have that from an evidentiary

12    showing, both in the Bros declaration and in the Singh

13    declaration.  You also had it based on the presentation

14    provided by the debtors' counsel.

15         Debtors' counsel pointed out at that point in time

16    that there was a single DIP lender that was prepared to lend

17    to this company.  And if we look at that moment in time that

18    the debtor filed, the price of bitcoin -- and you -- actually,

19    Your Honor, I want to step back for a second.

20         You complimented the debtors on the first day on the

21    persuasiveness of the first-day declaration.  And it was a

22    great read because it explained the debtors' business in

23    pretty easy to understand terms, and these are not the easiest

24    businesses to understand.  Many of them have filed for

25    bankruptcy.  They do different things, but they are connected

1    across the -- I won't say -- I won't use it.  They are

2    connected by their digital currencies.

3         So the point being, Your Honor, that, at the moment

4    that the debtors found itself here, bitcoin was somewhere in

5    the range of $16,000.  And this business, as Mr. Bros'

6    declaration pointed out, is singularly tied to the volatility

7    of that underlying currency.

8         I don't want to address the comps in the sense that

9    I would like to cross-examine the witness if that happens, and

10   we'll go through them comp by comp.  But it's obvious that

11   none of them are a digital currency business, none of them are

12   so singularly tied to the underlying volatility associated

13   with the currency here.

14        So the debtors went out, they ran a process.  Mr.

15   Singh pointed out in his declaration that there were 24

16   parties that they approached.  They had 9 confidentiality

17   agreements executed, they had two indications of interest, and

18   they had 1 party prepared to lend.

19        I think, as you can also divine from the motion that

20   was filed to approve the DIP financing, even the DIP lenders,

21   the members of the ad hoc group, they weren't all in on the

22   DIP.  If you recall, when we were here at the interim hearing,

23   there was going to be a syndication process run between the

24   interim hearing and the final hearing to try to find more.

25        The debtors had asked for a higher commitment amount

1    and the members of the ad hoc group didn't get there

2    initially.  And the reason they didn't get there was the

3    volatility associated with this company.  It's a pretty scary

4    DIP.  And so what you also have is endless testimony about the

5    arm's length negotiation and the good faith nature of those

6    negotiations.

7         There was nothing there to demonstrate that there

8    was a smash and grab or there was some type of untoward

9    influence exercised over the debtor.  You heard Ms. Berkovich

10   just say it, the interim DIP saved this company.  Without that

11   interim DIP financing, again, go to the declarations.  There -

12   - the debtors said that they had $4 million of liquidity as

13   they entered bankruptcy.  I -- we can ask the debtor, if we

14   get to that, if that number might have even been lower as of

15   the day that it was here in the court, before it was able to

16   get authorization to borrow on the interim DIP.  And it

17   borrowed right away on the interim DIP.  That money helped to

18   save the business, so that it could ride to where it is now.

19        And really, what's happened is the debtors have

20   exercised their business judgment twice.  They exercised their

21   business judgment soundly and reasonably at the beginning to

22   enter into the first DIP.  And now, given where bitcoin prices

23   are today -- and no one -- right?  There is no forward curve

24   for bitcoin.  It's not like the power curve.  We don't get to

25   look off into the future.  We wake up every day --

1            THE COURT:  We wish --

2            MR. HANSEN:  -- and --

3            THE COURT:  -- there were one, right?

4            MR. HANSEN:  Yeah.  We wake up -- seriously, we wake

5    up every day and these prices are up or down, and we really

6    don't know where they're going, and sometimes we really don't

7    even know what they're driven by.

8            And so, Your Honor, the debtor is making another

9    business judgment call, and that business judgment call is I'm

10   going to enter into a new DIP and I am going to repay the old

11   DIP, which takes us back to where I was going to start, Your

12   Honor, which is:

13           There is an agreed-upon deal.  That deal was set

14   forth before the Court.  And candidly, even Your Honor said

15   I'm aware that this is expensive, but I am also aware of the

16   volatility associated with this business and I get it.  And

17   you said to the folks in the courtroom, most notably B.

18   Riley's attorney, I hope you come back with a less expensive

19   DIP, so -- or a less onerous DIP.  And you know what?  Those

20   were circumstances that all were foreseen at the time that you

21   approved the initial DIP.

22           And so the DIP lenders on my side, they made their

23   commitment.  They said we will advance our funds based upon

24   the documents that we've negotiated and the order that Your

25   Honor will enter that protects the promise that they made to

1     advance those funds to the debtor.  The debtor took those

2     funds, moved forward, saved their business.  And it allowed

3     them to come before the Court with the motion that they ask

4     the Court to approve today.

5           And beyond the multitude -- you know, Mr. Miller

6     likes to focus on 30(d) and says let's singularly look at

7     that.  It's really important and I'm going to come back to

8     that in a second.

9           But the entirety of the order -- when you go

10    through, there are only certain sections that say subject to

11    entry of the final order, right?  Those are things like the

12    roll-up, those were things like the 506(c) waiver and the

13    waiver on 552(b) equities of the case.  Things like that say

14    subject to entry of the final order.

15          But the other -- and it's far too long, all these

16    DIP orders are far too long at this point.  But the rest of

17    the DIP order itself is replete with provisions that say all

18    of the DIP documents are approved, the obligations that are

19    created thereunder are approved, the debtors are authorized to

20    enter into those.  This is an encyclopedic document which

21    approves the DIP deal that the debtors entered into.

22          But most importantly, those are also protected by

23    the concept of good faith.  And when you look at Section

24    364(e), it's there for a reason.  And Your Honor knows that

25    and you've incorporated it into this order in multiple places.

1       It protects the superpriority administrative expense claims,

2       it protects the priority of the liens, and it protects the

3       underlying aspects of the DIP financing in toto.  And so, when

4       you look at 364(e), parties have to rely on that.

5            And to just put this one to bed, the order says

6       whether it's overturned on appeal or otherwise.  And the "or

7       otherwise" would be a collateral attack.  Your Honor, we would

8       go so far as to say that this order having been entered,

9       candidly, based on all of the findings that were before it, is

10      law of the case at this point in time, too.

11           And to overturn that order, I guess you'd have to

12      prove that somebody defrauded the Court or that somebody

13      defrauded the debtors.  The standard can't really be that,

14      well, today, because the underlying currency that dictates the

15      value of this business is 30 or 40 percent higher than it was

16      on the day we filed, we should go back and tear up and rewrite

17      the promises upon which everybody relied when they entered the

18      court in good faith.

19           Your Honor, I would also point out that, if you

20      think about it again, the circumstances that the debtors

21      entered weren't just the lack of liquidity.  In those

22      declarations, you can look and see they defaulted on their

23      equipment loan debt pre-petition.  They weren't paying

24      anybody.  They issued a press release.  The that the ad hoc

25      committee was organized was they woke up to find a press

1       release by the debtors saying that they were no longer in the

2       position to be able to pay their equipment lenders and that

3       they were -- they might not be able to survive as a going

4       concern.

5               So the ad hoc group quickly organized to engage in

6       negotiations at the request of the debtor, and they did.  But

7       during that time, the debtors were not paying the equipment

8       lenders.  And one of the equipment lenders actually

9       accelerated and then cross-defaulted the convertible notes.

10              On top of that, the debtors had, as reported in

11      their declarations, an endless amount of unpaid loans on all

12      of their construction facilities, which resulted in mechanics

13      liens.  So this wasn't like a debtor that the ad hoc committee

14      had over a barrel.

15              And I think I pointed out at the first day, too,

16      Your Honor, the members of the ad hoc committee are the

17      original purchasers of these notes.  This is no -- this is not

18      a situation where, you know, a sophisticated distressed

19      community is trying to take advantage of a debtor.  These

20      convertible noteholders were hoping that they would be able to

21      convert their notes into equity at some point and ride the

22      wave of great returns associated with those notes.

23              So, when -- again, Your Honor, putting things in the

24      context that we have to look at them, which is where were we

25      when you approved the DIP and we entered this courtroom, the

1     circumstances may be different today, but that doesn't allow

2     us to overturn the order that you entered based upon all the

3     factors that everyone foresaw at that time.

4             And again, Your Honor, I come back to the point that

5     this is not the business judgment of the convertible

6     noteholders that's being imposed on the debtors.  The debtors,

7     it was their business judgment to enter into the DIP and it's

8     now their business judgment to eliminate the RSA and to move

9     into this current DIP.

10            I -- we don't -- from an ad hoc committee

11    perspective, we're a little bit nervous about that.  We now

12    have no way out of this case.  We're all going to sit down and

13    we're going to negotiate and see if we can get there.  But

14    bitcoin can go down just as much as it can go up.  And the ad

15    hoc committee is fearful that, as the largest secured creditor

16    and, you know, depending upon where regulators are, maybe a

17    very large unsecured creditor, as well, that we're going to

18    suffer the risk of that volatility more than most.

19            And so, from our perspective, we understand.  We

20    chose not to fight with the debtors today.  We said, fine, if

21    you'd like to refinance us, honor your obligations, we'll

22    negotiate an order with you moving forward from a cash

23    collateral perspective, and let's get to it, let's try to find

24    a way to get out of this bankruptcy case pretty quickly.

25            So, at a reasonableness level, the ad hoc committee

1    and the existing DIP lenders have been about as reasonable as

2    they possibly can be.  They extended credit, they saved the

3    company.  They allowed the company to get to where they are

4    now.  They've stepped out of the way to allow B. Riley to come

5    in, they've negotiated a good order, and we're prepared to

6    move forward.  None of that is a record where this Court

7    should revisit its initial decision to put the DIP in place,

8    and that DIP should be honored.

9         And from a policy perspective, I couldn't disagree

10   more with Mr. Miller.  Your Honor, if the sanctity of the

11   order is to be relied on, which is what we're all talking

12   about here, it needs to be relied on.  That's not going to

13   turn around and let predatory lenders suddenly say to a debtor

14   who might be in extremis, ah hah, I can charge whatever fee I

15   want, and as long as I get it approved on an interim basis,

16   I'm good because the reality is there should be a competitive

17   process that results in the DIP that's being presented to the

18   Court.

19        And you, Your Honor, if somebody walked in and said

20   I want a hundred percent fee, might say, you know what, the

21   creditors might be better off if this company liquidates than

22   if it takes your DIP financing.  And that's in -- within your

23   discretion to determine at the time.  And your discretion at

24   the time that this DIP was presented to you was to approve

25   this DIP with its termination fee.

1        And when we go to the provision that Mr. Miller
2    looks at in the DIP order, just for good purpose of going to
3    that, on Paragraph 30 --
4             UNIDENTIFIED:  It's on the screen.
5             MR. HANSEN:  -- you go to (d), and it says in (I)--
6    I'm sorry -- (ii):
7             "The validity and enforceability of any obligation
8    incurred under the interim DIP order or the loan" -- "the DIP
9    loan documents" --
10        The obligation, which is a fee associated with the
11    repayment of something that's borrowed, occurs at the time
12    that you enter into the contract that provides for it, so that
13    obligation was incurred as of the time of entry.  And
14    obviously, there is the whole point about the payments, which
15    are protected by the good faith standard, too, when they're
16    made.
17        So, Your Honor, on that record, which was the record
18    before the Court at the interim hearing, and the arguments
19    that are presented today, we ask that the Court continue to
20    enforce the interim order.  Let the debtors go where they need
21    to go next and stop what's happening here and let everybody
22    rely on the sanctity of the order that you entered and we'll
23    see where we can get -- hopefully, get the case out quickly.
24        We don't believe that evidence should be taken
25    because we think putting in evidence would open up the

1       evidentiary record associated with the interim order, which

2       was closed, and we would have to revisit that.  But again,

3       Your Honor, we reserve our rights, to the extent that evidence

4       would be taken, not only to cross-examine the committee's

5       witnesses and call the debtors' witnesses, but potentially to

6       call our own.

7                    THE COURT:  All right.

8                    MR. HANSEN:  Thank you --

9                    THE COURT:  Thank you.

10                   MR. HANSEN:  -- Your Honor.

11                   THE COURT:  Yes, sir.  Good morning or --

12                   MR. MEISLER:  Good morning, Your Honor.

13                   THE COURT:  -- good afternoon, at this point.

14                   MR. MEISLER:  True enough.  I'm tempted to take

15      Ms. Berkovich's binder, so I can get a little taller over

16      here.

17           (Laughter)

18                   MR. MEISLER:  Your Honor, Ron Meisler of Skadden

19      Arps on behalf of the Ad Hoc Group of Equity Holders,

20      representing approximately 70 million shares or nearly

21      20 percent of the outstanding amount of shares, including

22      insider shares.

23                   Your Honor, we're going to be brief, and that's

24      going to be consistent with what we're seeking, generally, in

25      these Chapter 11 cases.

1          Your Honor, we support the creditors' committee's

2     view.  We heard what you said.  The fee is unreasonable, a 544

3     percent IRR is unreasonable.  Maybe it's punitive.  One thing

4     is for sure, it's an unfortunate use of money.  And we

5     recognize it's not material to the overall liquidity of the

6     business, but we're trying to stay focused.  Is it a good use

7     of money?  Probably not.

8          Your Honor, we think that there's two, maybe three

9     issues:

10          One, due process.  Fundamentally, due process.  They

11     got it approved on December 22nd, the day after the petitions

12     were filed.

13          THE COURT:  Right.

14          MR. MEISLER:  I wasn't here.  Your Honor, my -- the

15     clients that I represent, they didn't have counsel to

16     represent them.  It's a due process issue.  Maybe it's binding

17     on the debtors, maybe it's binding on other people that

18     appeared in these cases.  But Your Honor, we do think it's a

19     due process issue.

20          Your Honor, with respect to business judgment,

21     that's a fair point, one that we acknowledge.  But let's

22     remember Judge Wiles' decision in Pacific Drilling in

23     September of 2018.  No one objected to the fees associated

24     with the rights offering.  Nonetheless, Judge Wiles took the

25     position that the fees were excessive; and, therefore, he

1    denied the request.

2            The other thing, Your Honor, quite candidly,

3    business judgment:  Did the special committee know

4    specifically about the termination fee and what it would cost

5    in return to the lenders if the DIP was replaced 40 days

6    later?  I don't know.  But if they didn't, I don't really know

7    how they could have exercised business judgment with respect

8    to that punitive fee.

9            Your Honor, the other issue is I think, as you have

10   suggested at the beginning, thoughtful consideration of this

11   issue, including whether such an incredibly high rate of

12   interest enforceable under applicable law.  I think, for that

13   reason, it's worth taking that break.  The parties should

14   brief it.  We, on behalf of the ad hoc group, we would

15   coordinate with the creditors' committee because, if there's

16   no reason for us to brief it, we won't.

17           THE COURT:  All right.  So, again, I know you don't

18   know me.  Your colleague does.  When I suggest taking  break,

19   I measure that in terms of minutes, not days.

20       (Laughter)

21           MR. MEISLER:  Understood, Your Honor.

22           THE COURT:  Right.

23           MR. MEISLER:  If the minutes are sufficient for

24   parties to brief it, that would be great.

25       (Laughter)

1          MR. MEISLER:  If they're insufficient, Your Honor,

2     of course this group defers to your judgment.  And with that,

3     Your Honor, those are my comments --

4          THE COURT:  All right.

5          MR. MEISLER:  -- and thoughts.

6          THE COURT:  Thank you.

7          MR. MEISLER:  Thank you.

8          THE COURT:  Thank you.

9          All right.  Let me do this.  And number one, I very

10    much appreciate the arguments.  I appreciate great lawyers

11    doing great things.  And it, quite frankly, makes my job a lot

12    easier when I don't have to round off the edges.

13         This is actually relatively simple for me.  There

14    are a number of competing concerns that drive everything I do:

15         Number one, the process comes first.  And if parties

16    can't rely on the process, then, given how fragile the process

17    is and the responsibilities that you all have, then it doesn't

18    work.  This is not like being in District Court with a

19    plaintiff and a defendant.  It's just very, very different.

20         You've also got a huge number of involuntary

21    participants who don't understand the process, who try and

22    make sense of it along the way.

23         And again, my orders have to mean something.  I'm

24    aware of what Judge Isgur said in the Sanchez case, I've -- I

25    think I've mediated it twice.  I understand the issues.  I

1    understand what he meant when he said I just want to get it

2    right, and that's because he's interpreting various provisions

3    that he put his name on, and I know which provisions they are.

4    And this is so far afield of that, that it's not really an

5    appropriate analogy.  Of course we all want to get it right.

6    There's no other reason that we sit here other than to get it

7    right.

8          I also want to make it clear about business

9    judgment.  Business judgment doesn't mean that I decide what I

10   would have done.  That's not the definition of business

11   judgment at all.  Business judgment is a party being well

12   informed, recognizing the obligations that they owe, making a

13   thoughtful, considered decision.  You can exercise proper

14   business judgment and be flat-out wrong.  It's the process

15   that you go through that is the business judgment evaluation.

16         And I agree with -- I agree with the comment that

17   was made, I think it was by Mr. Hansen, is that business

18   judgment has been exercised twice:

19         Once, when faced with a set of circumstances, the

20   debtor exercises business judgment and says, if I want to see

21   tomorrow, here's what I've got to do.  It got that

22   opportunity.

23         It's now seen tomorrow and it's rosier than perhaps

24   it thought it was going to be.  Obviously, there could be a

25   sunset today and a new day tomorrow and there could be a

1    further exercise of business judgment that calls into question

2    the decisions that got made previously.  That's the whole

3    concept of business judgment.  It's the process, it's the

4    thoughtfulness, it's the being aware, it's the being educated.

5    It's making sure that you understand, not only the issues that

6    run in your favor, but those that run against you.

7          There's also another fundamental comment that I just

8    believe in just to my core, and that's for every action there

9    has to be a consequence.  Sometimes those consequences are

10   positive; sometimes they're negative.  The fact that the

11   debtor has exercised its business judgment, and I believe in a

12   proper fashion, there's a consequence to having exercised that

13   business judgment, and it's the payment of that fee.

14         Again, you know, do I wish that I had questioned it

15   more?  I mean, I didn't like the deal when I got it.  I

16   thought it was incredibly expensive.  And I was just looking

17   at it from sort of an outsider's viewpoint going wow, is this

18   really where we are.  And I spent a lot of time talking to my

19   intern about how you actually view these things and how you

20   have to make a decision whether it's right or wrong.

21         And I think I said it on the record, I said -- I

22   also think I said, you know, I'm somewhat amazed about how

23   folks are able to quantify risk, given at least what I knew at

24   the time, that I wouldn't know where to begin, given where the

25   market was.

1          When I put all of that together, again, it's --

2   parties have to be -- have to rely on my orders.  If my orders

3   are always subject to somebody coming in and saying something

4   different in an effort to get me to change it, then the

5   process just fails.  If I got it wrong, then I'll do a better

6   job next time of trying to provide more avenues.

7          I'll encourage the U.S. Trustee to add this to the

8   list of things that they look at when they look at these

9   interim orders because that's the voice, at that point in

10  time, that's speaking for those parties that aren't here.

11         I just -- again, I got it that it's $6 million.  But

12  the process is far more important than $6 million.  Your

13  ability to go out and say I have this order and Jones signed

14  it and it's final is far more important than $6 million.  If

15  $6 million turns out to be the price of success versus failure

16  in this particular case and it's failure, then I'm prepared to

17  live with that because the process has to be bigger than any

18  particular case.

19         So I am -- based upon the record that I've got,

20  based upon just looking at this, I am -- I endorse the

21  debtors' business judgment.  It's made the decisions that it

22  thought was appropriate under the circumstances that it now

23  faces.

24         I'll -- I appreciate being walked through the

25  redline.  It's just a -- it's a better deal, it's a more

1    commercial deal, and the debtor is going to pay the

2    consequence of not having been able to get it the first time

3    around, which I think that we would all acknowledge it wasn't

4    available.

5         So I'm -- again, and I appreciate the committee

6    bringing it to my attention.  It's a learning experience for

7    me, I have no doubt it will be a learning experience and on

8    the list of those things that the U.S. Trustee looks on first-

9    day pleadings.

10        But I'm going to overrule the objection.  I'm going

11   to approve the refinancing, the new DIP.

12        You've got your hearing date.  I understand that

13   there were a few more tweaks that needed to be made.  I assume

14   that you will circulate them to all of the parties that want

15   to see them.  And then you'll let Mr. Alonzo know once that

16   hearing has been uploaded.

17        Ms. Berkovich, is that correct?

18        MS. BERKOVICH:  Yes, Your Honor.

19        THE COURT:  Oh, you're back on your --

20        MS. BERKOVICH:  I'm back on my binder.

21        That is correct, we will submit a revised order per

22   the process that Your Honor mentioned.

23        THE COURT:  So let me -- and again, just I know that

24   you probably need that today.

25        MS. BERKOVICH:  Yes, Your Honor.

1          THE COURT:  So I want to tell you I feel awful.

2     I've got one more hearing, and then I see a nap in my future,

3     somewhere other than the courthouse.

4          (Laughter)

5          THE COURT:  So if you would just make sure you

6     coordinate with Mr. Alonzo.  I'll take my computer home.  I'll

7     do it from wherever I am.  But you need to make sure you talk

8     to him because I'm not going to look for it.

9          MS. BERKOVICH:  Yes, Your Honor.  And we understand

10    the process and we will coordinate with Mr. Alonzo and --

11         THE COURT:  Terrific.

12         MS. BERKOVICH:  -- with -- just two quick points:

13         First, I want to make it clear for the record that

14    just because we've terminated the RSA and we're -- we're not

15    going to keep our eye off the ball here, which is to try to

16    get this company out of Chapter 11, but we're going to try to

17    do so with a good process and with input from all of our

18    stakeholders.  So that's our next task at hand here.

19         THE COURT:  I totally got that.  Look, it's the

20    respect that I have for the entire room.  You're all going to

21    do exactly what you're -- what you do better than anybody

22    else.  I mean, everybody has got a role to play, everybody has

23    got a position.  And it's those clashing positions that give

24    me confidence that the right result will come out of that,

25    whatever that is.

1          And I -- you know, I took Mr. Hansen at face value.

2    I mean, he doesn't like where he is, I got that.  But I also

3    know that, given his skill set, he'll figure out a way to

4    maximize whatever it is he has, and I know that your team will

5    do the same.  I know that the committee is going to fight hard

6    for those folks who are probably currently out of the money or

7    not much in the money.

8          And I -- again, I've known -- I don't know Ms.

9    Reed's colleague, but I do know Ms. Reed.  She's one of the

10   finest lawyers I've ever seen in the courtroom.  You know,

11   they're going to advocate for equity.

12          That's exactly what should happen and I'll make the

13   calls based upon the record that I get.  And hopefully, the

14   result that we get at the end of the day honors the Bankruptcy

15   Code, it recognizes the economics, both inside the company, as

16   well as in the industry, in the nation, whatever those happen

17   to be at the time, and the process will work.  It will be

18   transparent and people may not like the result.  No one says

19   you have to like it, you just have to be able to understand it

20   and see through it.  That's the goal.

21          MS. BERKOVICH:  Agree, Your Honor.

22          And there is one last item on the agenda.  We'll

23   keep it brief.  And my colleague Mr. Cain will handle that

24   motion.

25          THE COURT:  Perfect.  Mr. Cain.

1          MR. CAIN:  Good afternoon, Your Honor.

2          THE COURT:  Good afternoon.

3          MR. CAIN:  Jeremy Cain of Weil, Gotshal & Manges on

4     -- proposed counsel for the debtors.

5          THE COURT:  Yes, sir.

6          MR. CAIN:  I'll be brief and I will not use the step

7     stool.

8          THE COURT:  I don't want you to be brief.  I want to

9     see you're a game.  I don't know you.

10         (Laughter)

11         THE COURT:  I want to see you're a game.

12         MR. CAIN:  Your Honor, the debtors have moved for

13    authorization to sell all of their Bitmain coupons free and

14    clear of all encumbrances pursuant to Section 363(f) of the

15    Bankruptcy Code.  That motion is at Docket Number 346.

16         In support of the motion, the debtors have submitted

17    the declaration of Mr. Russell Cann at Docket Number 393.

18         This motion has been unopposed and we think that

19    it's noncontroversial for at least three reasons:

20         First, the debtors do not plan to use the coupons,

21    which are only valid for a specific model of bitcoin miners

22    from Bitmain.

23         Second, if no action is taken, all of these coupons

24    will expire worthless in the next two to three months, with

25    the vast majority expiring on March 22nd.

1          The third reason is that, if the motion is granted,

2     the debtors will have an opportunity to sell these coupons on

3     the market if they move quickly, and they've made the business

4     judgment that it is prudent to do so.

5          At this time, we move to admit the declaration of

6     Russell Cann in support of this motion, Docket Number 393.

7     And Mr. Cann is available here today, and is available in case

8     the Court or other parties have questions.

9          THE COURT:  All right.  Anyone have an objection to

10     the admission of Mr. Cann's declaration found at Docket Number

11     393?

12          (No verbal response)

13          THE COURT:  All right.  Then it's admitted.

14          (Cann Declaration and ECF 393 received in evidence)

15          THE COURT:  Anyone wish to cross-examine Mr. Cann?

16     I have such an inclination to call him, but I won't.

17          (Laughter)

18          THE COURT:  And I take it no one else is going to,

19     either.

20          (No verbal response)

21          THE COURT:  All right.  Then, with that, I'll accept

22     Mr. Cann's declaration.  I have read the declaration at 393.

23          I appreciate the argument.  You said exactly what

24     you needed to say in the last sentence.  It's just a practical

25     application, it's business judgment.  If we do nothing, it's

1       worth nothing.  If we do something, then we maximize value.

2                   MR. CAIN:  Yes, Your Honor.

3                   THE COURT:  All right.  Anyone else wish to be

4       heard?

5             (No verbal response)

6                   THE COURT:  All right.  Again, I find the requested

7       relief just makes good practical sense.  We all wish you could

8       get more, but I understand that the market is what the market

9       is for these things.  I think it's a good decision.  I'll

10      grant the motion.

11                  I want to make sure I got -- did we have revised

12      form of orders or was it just the original order that was

13      submitted with the motion?

14                  MR. CAIN:  I believe it was just the original form

15      of order that was submitted with the motion.

16                  THE COURT:  I will get that signed and on the

17      docket.  I've got a noon, which I have -- I need to deal with.

18      But I'll get that done early afternoon.

19                  MR. CAIN:  Thank you, Your Honor.

20                  THE COURT:  All right.  Thank you.

21                  Anything else we need to address?

22                  MS. BERKOVICH:  Nothing else, Your Honor.

23                  THE COURT:  All right.

24                  MS. BERKOVICH:  Thank you very much for your time.

25                  THE COURT:  Thank you.

1          Let's -- just one thing.  Does the committee see

2    things coming down the pike that we need to plan for or you're

3    still investigative planning/talking mode?  I just want to

4    make sure you have access if you need it.

5          MR. MILLER:  Your Honor, Brett Miller, Willkie Farr,

6    for the committee.

7          Because the ad hoc group is not the DIP lender;

8    therefore, the immediate challenge deadlines have been removed

9    from the new order.

10         THE COURT:  All right.

11         MR. MILLER:  So there will be time to look at some

12   of the things that we outlined in our initial objection.  So

13   there's nothing timely, other than getting up to speed and

14   hopefully watching bitcoin go up to 100,000.

15         THE COURT:  Yeah, that would be great.

16         And I assume that you -- everyone is working

17   together on exchanging documents and making sure that the

18   committee has access to those things that it needs.

19         MR. MILLER:  Having spent the better part of 30

20   years working opposite Weil and members of this team, as well

21   as Mr. Hanson and his team for a long time --

22         THE COURT:  Sure.

23         MR. MILLER:  -- everything has gone very smoothly,

24   very professionally, and there's been no complaints over that.

25         THE COURT:  Terrific.  I'm here if you need me.

1          And again, Ms. Reed, just to reiterate, when you

2     folks are ready, just coordinate with the major constituents,

3     reach out to Mr. Alonzo, get your hearing date, and we'll take

4     that up just as soon as you're ready.  Okay?  All right.

5          Then, everyone, I've got a new hearing, so I'm not

6     going to step down.  Please, as expeditiously and as quietly

7     as you can, gather up and go, and I will see everybody soon.

8     We'll be adjourned.

9          (Proceedings concluded at 1:03 p.m.)

10                              * * * * *

11          *I certify that the foregoing is a correct transcript*

12     *to the best of my ability produced from the electronic sound*

13     *recording of the proceedings in the above-entitled matter.*

14       */S./  MARY D. HENRY*

15     *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

16     *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

17     *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

18     *JTT TRANSCRIPT #66799*

19     *DATE FILED:  FEBRUARY 3, 2023*

20

21

22

23

24

25