IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| CORE SCIENTIFIC, INC., *et al.*, | § § | Case No. 22-90341 (DRJ) |
| | § § | (Joint Administration Requested) |
| Debtors.[1] | § § § | Related Docket No. 38 |

**DECLARATION OF JOHN SINGH IN SUPPORT
OF EMERGENCY MOTION OF DEBTORS FOR ENTRY OF
INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS
TO OBTAIN POSTPETITION FINANCING, (B) AUTHORIZING THE
DEBTORS TO USE CASH COLLATERAL, (C) GRANTING LIENS AND
PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE
EXPENSE STATUS, (D) GRANTING ADEQUATE PROTECTION TO THE
PREPETITION SECURED PARTIES, (E) MODIFYING THE AUTOMATIC STAY,
(F) SCHEDULING A FINAL HEARING, AND (G) GRANTING RELATED RELIEF**

I, John Singh, pursuant to section 1746 of title 28 of the United States Code, hereby declare under the penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1. I am above 18 years of age, and I am competent to testify. I am a Partner in the Restructuring and Special Situations Group at PJT Partners LP ("**PJT**"), an investment banking firm listed on the New York Stock Exchange with its principal offices at 280 Park Avenue, New York, New York 10017.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

2. Having been retained in October 2022 to provide general restructuring and strategic advice, PJT is the proposed investment banker for Core Scientific, Inc. ("**Core Scientific**") and its affiliated debtors in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), as debtors and debtors in possession (collectively, the "**Debtors**," and together with their non-Debtor subsidiaries, "**Core**," or the "**Company**").

3. I submit this declaration (this "**Declaration**") in support of the *Emergency Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Post-Petition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying the Automatic Stay and (F) Scheduling a Final Hearing and (G) Granting Related Relief* (the "**DIP Motion**").[2]

4. Except as otherwise indicated, all statements in this Declaration are based on (i) my personal knowledge of the Debtors' operations and finances, (ii) my review of relevant documents, (iii) information provided to me by PJT employees working under my supervision, (iv) information provided to me by, or discussions with, the members of the Debtors' management team or their other advisors, and/or (v) my opinion based upon my experience as a restructuring professional. If called to testify, I could and would testify to each of the statements set forth herein on that basis.

### Qualifications and Professional Background

5. As stated above, I am a Partner at PJT, where I specialize in advising distressed companies and other parties in recapitalization and restructuring situations.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Motion or in the Interim DIP Order attached as **Exhibit A** thereto.

6. PJT was spun off from The Blackstone Group L.P. ("**Blackstone**") effective October 1, 2015. Upon the consummation of the spin-off, Blackstone's Restructuring and Reorganization advisory group became a part of PJT, and Blackstone's restructuring professionals became employees of PJT. PJT and its senior professionals have extensive experience in the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 proceedings. PJT has more than 900 employees located in New York, Houston, San Francisco, Los Angeles, Boston, Chicago, London, Hong Kong, Frankfurt, Paris, and Madrid. PJT is a registered broker-dealer with the United States Securities and Exchange Commission, is a member of the Securities Investor Protection Corporation and is regulated by the Financial Industry Regulatory Authority.

7. I received a Bachelor of Science in Finance and Economics from New York University and a MBA from the Wharton School of the University of Pennsylvania. I have approximately thirteen (13) years of investment banking and restructuring experience and three (3) years of experience as a fixed income analyst before that. Prior to joining PJT, I was a Vice President in Blackstone's Restructuring & Reorganization Group. Since joining Blackstone in 2009, and continuing at PJT, I have worked on a broad range of restructuring and reorganization assignments for companies, creditor groups, special committees, governmental entities, and acquirers of distressed assets. Over the course of my career, I have advised senior management and boards of directors in a wide variety of industries in connection with restructurings, mergers and acquisitions, and financing transactions. In particular, I have been involved in numerous restructurings, including, among others: Automotores Gildemeister S.A.; Cecon ASA (re: Davie Shipyard); Bristow Group; Borden Dairy Company; Boy Scouts of America; CarbonLite Holdings, LLC; CBL & Associates Properties, Inc.; CHC Helicopter; Desarrolladora Homex,

S.A.B. de C.V.; Financial Guaranty Insurance Company; Fusion Connect, Inc.; Garrett Motion, Inc.; Glass Mountain Pipeline Holdings, LLC; High Ridge Brands Co.; Homer City Generation; Houston Astros; Inversiones Alsacia S.A.; Kerzner International; MBIA, Inc. (re: Bank of America); M&G Chemicals S.A.; Mortgage Guaranty Insurance Corporation; Nortel Networks Corporation; Pacific Exploration & Production Corporation; Pension Benefit Guaranty Corporation (re: Smurfit Stone); PES Holdings, LLC; Phoenix Services Topco LLC; Pierre Foods, Inc.; PHI, Inc.; Ruby Pipeline, L.L.C.; Simmons Bedding Company; Syncreon; Twin River; Village Roadshow Entertainment Group; Washington Prime Group Inc.; Waypoint Leasing Holdings Ltd.; and Westinghouse Electric Company LLC.

### PJT's Retention

8. Effective as of October 6, 2022, PJT was retained by Weil, Gotshal & Manges LLP ("**Weil**"), on behalf of the Debtors, to assist Weil in advising the Debtors in connection with an evaluation of alternatives with respect to their capital structure and a potential bankruptcy. Since that time, members of my team and I have worked closely with the Debtors' management and their other professionals in the analysis of the Debtors' business affairs, assets, financial position, contractual arrangements, and various proposed strategic transactions. Pursuant to this work, my team and I have become familiar with the Debtors' capital structure, liquidity needs, and business operations.

9. During PJT's representation of the Debtors, I have, among other things, provided advice on strategic transaction alternatives, restructuring options, and financings. I have participated in negotiations between the Debtors and their creditors and other parties in interest. Members of my team and I have also assisted the Debtors in reviewing the terms, conditions, and the potential impact of various proposed transactions, including comparing iterations of debtor-in-

possession financing proposals. Additionally, I have participated in numerous meetings with the Company's board of directors (the "**Board**") and its special committee (the "**Special Committee**") to, among other things, address the Debtors' need for postpetition financing generally, and terms of the proposed debtor-in-possession superpriority priming senior secured financing facility described herein (the "**DIP Facility**," and the lenders thereunder, the "**DIP Lenders**").

10. I am not being compensated specifically for this testimony other than through payments received by PJT as a professional proposed to be retained by the Debtors.[3]

## Summary of Relief Requested in DIP Motion

11. Pursuant to the DIP Motion, the Debtors request entry of an interim order (the "**Interim DIP Order**") authorizing the Debtors to, among other things:

   a. authorizing the Debtors to obtain postpetition financing on a superpriority priming senior secured basis (the "**DIP Facility**", and the loans made, advanced or deemed advanced thereunder, the "**DIP Loans**") in the form of (i) a new money multiple draw term loan facility in an aggregate principal amount of up to $75 million (the "**New Money Term DIP Facility**"), pursuant to which (A) an aggregate principal amount of $37.5 million shall be borrowed (the "**Interim DIP Borrowing**") in a single borrowing on the Closing Date (as defined in the DIP Loan Agreement), and (B) following entry of the Final Order (as defined below), the remaining aggregate principal amount under the New Money Term DIP Facility shall be available, in one or more borrowings (each such borrowing, including the Interim DIP Borrowing, a "**DIP Borrowing**", and, collectively, the "**DIP Borrowings**"), and (ii) a credit facility pursuant to which $75 million in aggregate principal amount outstanding under the Prepetition Secured Notes (as defined below) held by each Backstop Party (as defined in the DIP Loan Agreement) and/or each Prepetition Secured Noteholder (as defined below) in which a Backstop Party is an affiliate, partner or investor (each such Backstop Party and/or Prepetition Lender, a "**Rolled Up Noteholder Party**"), shall, upon and subject to entry of the Final Order, automatically be deemed substituted and exchanged for, and converted into, DIP Loans (such conversion, the "**Roll Up**") on a cashless dollar for dollar basis, in each case, in accordance with and subject to the terms and conditions set forth in the DIP Loan Agreement and the Interim Order;

---

[3] Pursuant to PJT's engagement letter entered into with the Debtors, and subject to approval of this Court, PJT will be entitled to receive a capital raising fee in respect of the DIP Facility equal to 0.75% x $75 million or $562,500.

b. authorizing the DIP Loan Parties to (i) execute, deliver, and perform under the DIP Loan Agreement and each of the DIP Loan Documents, (ii) incur all loans, advances, extensions of credit, financial accommodations, indemnification and reimbursement obligations and other obligations, and pay all principal, interest, premiums, fees, costs, expenses, charges and all other amounts payable under the DIP Loan Documents, including without limitation, all "Obligations" (as defined in the DIP Loan Agreement), whether or not such obligations arose before or after the Petition Date, whenever the same shall become payable, whether at stated maturity, by prepayment, declaration, acceleration or otherwise, in each case, in accordance with the DIP Loan Documents and the Interim Order (collectively, the "**DIP Obligations**"), and (iii) perform such other and further acts as may be necessary, required or desirable to implement and effectuate the terms of the Interim Order, the DIP Loan Documents and the transactions contemplated hereunder and thereunder;

c. authorizing the DIP Borrower to incur, and the DIP Guarantors to jointly and severally guarantee, all DIP Obligations, in accordance with the Interim Order and the DIP Loan Documents;

d. granting to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, the DIP Liens in all DIP Collateral (as defined below), as set forth in the Interim Order, subject to the Carve Out and subject to the relative priorities set forth in the Interim Order;

e. granting to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, allowed super-priority administrative expense claims against each of the Debtors, on a joint and several basis, in respect of all DIP Obligations, subject in each case to the Carve Out, as set forth in the Interim Order;

f. authorizing the Debtors to use the proceeds of the DIP Facility, the DIP Collateral and the Prepetition Collateral, including Cash Collateral, solely in accordance with the terms and conditions set forth in the Interim Order and the DIP Loan Documents, including the Approved Budget, subject to any variances expressly permitted under the DIP Loan Agreement (the "**Permitted Variances**");

g. granting adequate protection, as and to the extent set forth in the Interim Order, to the Prepetition Secured Parties to protect against any Diminution in Value of their respective Prepetition Liens in the Prepetition Collateral (including Cash Collateral);

h. approving certain stipulations, waivers, and releases by the Debtors with respect to, inter alia, (i) the DIP Secured Parties, the DIP Loan Documents, the DIP Liens, the DIP Obligations and the DIP Collateral, and (ii) the Prepetition Secured Parties, the Prepetition Loan Documents, the Prepetition Liens, the Prepetition Secured Obligations and the Prepetition Collateral, in each case, subject to the terms and provisions of the Interim Order;

i. approving the Debtors' waiver of the right to surcharge (a) the DIP Collateral as to the DIP Secured Parties, pursuant to section 506(c) of the Bankruptcy Code or otherwise, upon the terms set forth in the Interim Order and (b) the Prepetition Collateral as to the Prepetition Secured Parties, pursuant to section 506(c) of the Bankruptcy Code or otherwise, upon the terms set forth in and subject to the entry of the Final Order;

j. approving (i) the Debtors' waiver of the equitable doctrine of "marshaling" and other similar doctrines with respect to the DIP Collateral as to the DIP Secured Parties, and (ii) subject to the Final Order, the Debtors' waiver of the equitable doctrine of "marshaling" and the Debtors' waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code with respect to the Prepetition Collateral as to the Prepetition Secured Parties, in each case, upon the terms set forth in the Interim Order;

k. modifying or vacating the automatic stay imposed by sections 105(a) and 362 of the Bankruptcy Code or otherwise, to the extent necessary, required or desirable to implement and effectuate the terms and provisions of the Interim Order and the DIP Loan Documents, as set forth herein, waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the Interim Order, providing for the immediate effectiveness of the Interim Order, and granting related relief; and

l. scheduling a final hearing (the "**Final Hearing**") on the Motion to consider entry of a final order (the "**Final Order**") authorizing the relief requested in the Motion on a final basis, which order shall be in form and substance and on terms and conditions acceptable in all respects to the Required DIP Lenders, and approving the form of notice with respect to such Final Hearing.

12. I have personally observed, and it is therefore my opinion, based on my experience, in my professional judgment, and as a result of the broad marketing process undertaken regarding the DIP financing opportunity, that the proposed DIP Facility is the product of arm's-length negotiations, represents the best postpetition financing alternative available to the Debtors under the circumstances, and is in the best interest of the Debtors, their estates, and all parties in interest in these Chapter 11 Cases.

**Debtors' Need for DIP Financing and Use of Cash Collateral**

13. The Debtors have an immediate and critical need to obtain DIP financing and the authority to use Cash Collateral throughout the chapter 11 process to permit, among other

things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers, and hosting customers, to make payroll, to make capital expenditures, to satisfy other working capital and operational needs, and to fund expenses of these Chapter 11 Cases.[4] The Debtors have entered chapter 11 with approximately $4 million of cash on hand and their operating cash flow, as currently projected, is not sufficient to fund ongoing operations and expenses for the projected duration of the Chapter 11 Cases, including costs associated with these Chapter 11 Cases. Moreover, the Debtors' available cash on hand may be subject to the liens of Prepetition Secured Parties.

14. The Debtors' prepetition capital structure is described in detail in paragraphs 92–97 of the Bros Declaration filed contemporaneously herewith.

15. The Debtors' business is subject to substantial volatility based on both (i) fluctuating cryptocurrency prices, particularly related to fluctuations in the price of bitcoin, and (ii) fluctuating power pricing, which impacts the Debtors' largest operating cost component. As further described in the Bros Declaration, the Debtors commenced these Chapter 11 Cases in large part due to immediate and significant liquidity concerns that can be traced back to the sudden and sustained drop in the price of bitcoin and increase in power prices beginning in 2022, which resulted in a significant reduction of the Company's revenues and a significant increase in the Company's expenses related to mining bitcoin. The price of bitcoin was at an all-time high of over $67,000 per bitcoin in November 2021, dropped to under $20,000 per bitcoin during the "crypto winter" in June 2022, and has remained at depressed levels, reaching a 52-week low of less than $15,600 per bitcoin in late November 2022. In connection therewith, PJT has been

---

[4] *See Declaration of Michael Bros in Support of Debtors' Chapter 11 Petitions and First Day Relief* (the "**Bros Declaration**").

assisting the Debtors in exploring strategic and financial alternatives and/or other restructuring and financing options.

16. Beginning in November 2022, PJT, with the assistance of the Debtors' management and AlixPartners, LLP ("**Alix**"), undertook a detailed analysis of the Debtors' operations and funding needs. From this review and analysis, it became clear that the Debtors would require an infusion of capital to allow the Debtors to operate their business as they work with their advisors and key stakeholders to achieve their restructuring goals. Specifically, the Debtors and their advisors have determined that debtor in possession financing is necessary to ensure (a) sufficient working capital to operate their business and to administer their estates; (b) an appropriate liquidity cushion to account for volatility in bitcoin pricing and power pricing, as well as the existing and anticipated negative impacts to the Debtors' hosting customers, vendors and other counterparties during this current period of uncertainty and volatility in the cryptocurrency industry; (c) the timely payment of administrative expenses to be incurred; and (d) a positive message to the market that these Chapter 11 Cases are sufficiently funded, which is critical to address concerns raised by the Debtors' hosting customers, employees, vendors, and other stakeholders.

17. Based on this analysis, the Debtors and their advisors concluded that the Debtors would require approximately $75 million of postpetition financing and access to Cash Collateral to finance their operations and maintain sufficient liquidity assuming a duration of up to nine (9) months for these Chapter 11 Cases.[5] The Debtors and their advisors continued to update the budget leading up to the Petition Date to account for changes in the Debtors' funding needs resulting from, among other things, the estimated timing of the commencement of these Chapter

---

[5] The DIP Facility has a term of six months, which may be extended by an additional three months.

11 Cases. The Debtors' current cash flow forecast is attached to the Interim DIP Order as **Exhibit A** (the "**Cash Flow Forecast**").

18. The Cash Flow Forecast reflects the Debtors' need for DIP financing to fund the Debtors' chapter 11 process, while maintaining minimum required operating liquidity to operate the Debtors' business. The Cash Flow Forecast, along with previous iterations thereof, has been shared with the DIP Lenders and each of the major creditor groups with which the Debtors were actively engaged in the months leading up to the Petition Date, including the Prepetition Secured Parties, the lenders under the Company's secured equipment financing and equipment lease arrangements, and the holders of the Unsecured Bridge Notes.

19. Under the proposed DIP Facility, the Debtors will gain critical access to DIP financing in the aggregate amount of up to $75 million, with an Interim DIP Borrowing of $37.5 million following entry of the Interim DIP Order. The DIP Facility is backstopped by certain Prepetition Secured Parties that are members of the Ad Hoc Group (as defined below) in an amount of approximately $57 million, with syndication efforts for the remaining balance expected following entry of the Interim DIP Order.

20. In order for the Debtors to have sufficient time to prosecute these Chapter 11 Cases, prosecute the cases both efficiently and thoroughly, the DIP Lenders have provided a DIP Facility that matures in six (6) months from the Petition Date, which can be extended by an additional three (3) months.

21. The DIP Facility also provides for a Roll Up of the Prepetition Secured Obligations into DIP Loans on a cashless basis, upon entry of the Final Order, in an amount equal to the principal amount of all DIP Borrowings advanced under the New Money Term DIP Facility, on a dollar-for-dollar basis. The Roll Up of a portion of the Prepetition Secured Obligations was

heavily negotiated and was a critical condition to the DIP Lenders providing the DIP Facility. Notably, any Prepetition Secured Obligations that are rolled up into DIP Loans will not require any interest payments during the term of the DIP Loan.

22. Further, under the Interim DIP Order, the Debtors will be permitted to use Prepetition Collateral and, in exchange, the Debtors will provide adequate protection to the Prepetition Secured Parties. Without the ability to access the Prepetition Collateral, the Debtors would require considerably more financing under the DIP Facility, which, even if available, would result in additional interest, fees and other costs to the Debtors' estates. The Approved Budget under the DIP Facility assumes access to the Prepetition Collateral, and, absent the authority to use the Prepetition Collateral, the Debtors' funding and operational needs are not anticipated to be met and the Debtors will likely not be able to continue operations in the ordinary course of business, which would have a detrimental impact on the value of the enterprise.

23. The Debtors intend to use funds from the Interim DIP Borrowing to, among other things, (i) avoid irreparable harm, (ii) pay outstanding prepetition amounts to employees, vendors, taxing authorities, and other critical stakeholders, (iii) pay ordinary course operating expenses to continue their bitcoin mining and hosting operations, and (iv) provide a stable path forward for the duration of these chapter 11 cases.

24. I have reviewed the DIP Motion, and it is my belief that the relief sought therein is (a) critical to ensure the uninterrupted operation of the Debtors' business and the success of the Debtors' Chapter 11 Cases, and (b) necessary to avoid immediate and potentially irreparable harm to the Debtors' estates. Absent the Court's entry of the Interim DIP Order, I believe the continued operation of the Company's business will be at risk, and could result in serious, immediate, and irreparable harm to the Debtors' estates, and their creditor. Approval of the Interim

DIP Order will ensure the uninterrupted operation of the Company's business and will facilitate the consummation of the transactions contemplated by the Restructuring Support Agreement.

### Debtors' Efforts to Obtain Postpetition Financing

25. Beginning in December 2022, the Debtors, through PJT, launched a broad marketing process designed to maximize competition and solicit proposals from a wide range of prospective lenders, including (i) creditors already in the Debtors' capital structure, (ii) banks outside of the Debtors' capital structure, (iii) institutional and alternative lenders outside the Debtors' capital structure, and (iv) strategic parties. The Debtors' primary strategic considerations when marketing and financing the opportunity included the following (among others):

- *Adequate Sizing* – adequate sizing to (i) fund the Debtors' contemplated Approved Budget for up to 9 months and (ii) maintain optimal liquidity levels for operating the Debtors' business at all times;[6]

- *Competitive Pricing and Terms* – competitive pricing and terms, including interest rate, nature of interest payments (i.e., paid-in-kind vs. cash), and fees, among others; and

- *Operational and Financial Flexibility* – limited financial covenants and case controls, including milestones.

26. PJT contacted 24 potential lenders that it believed may have been interested in providing the Debtors with postpetition financing, including an ad hoc group of the Prepetition Secured Parties (the "**Ad Hoc Group**"), the holder of the Company's Unsecured Bridge Notes, and several alternative lenders outside of the Debtors' capital structure. Nine (9) parties signed non-disclosure agreements, and the Debtors received two (2) initial proposals.

27. The primary alternative to the proposed DIP Facility to be provided by the Ad Hoc Group consisted of a proposal (the "**Alternative DIP Proposal**") from a third-party financing source (the "**Potential Third-Party DIP Provider**"). The Debtors, through PJT and

---

[6] The terms of the Approved Budget remains under negotiation and has yet to be finalized.

their other advisors, engaged in good-faith negotiations with each of the potential DIP lenders, providing feedback through multiple rounds of negotiation and drafts of term sheets. The Debtors were able to use elements from the various proposals to foster competitive tension and drive the negotiations towards the proposed DIP Facility which meets their primary objectives.

28. Throughout this process, PJT continually informed the Debtors' management, the Board of Directors, and the Special Committee of the status of the marketing process, including negotiations with the Ad Hoc Group and the Potential Third-Party DIP Provider.

29. While the Alternative DIP Proposal had certain terms that, in certain respects, were superior to certain terms of the proposed DIP Facility, after due consideration of execution risk, uncertainty regarding timely capital availability and the lack of a firm funding commitment under the Alternative DIP Proposal, and the benefits of avoiding a contested cash collateral and adequate protection dispute with the Prepetition Secured Parties, along with the exigencies of the case, the Debtors ultimately determined that the best path forward would be pursuing the DIP Facility with the Ad Hoc Group, which combined many favorable features from the various proposals.

30. The negotiations with the Ad Hoc Group were rigorous, marked by hard bargaining, and resulted in significant concessions by the Ad Hoc Group and additional benefits to the Debtors. Also, my understanding is that the commitment from the Ad Hoc Group also required significant negotiations within the Ad Hoc Group, as the members of the Ad Hoc Group come from holders across two separate tranches of Prepetition Secured Notes. I am confident that the Debtors would be unable to obtain this level of credit on more attractive terms, taken as a whole, within the timeframe required. I believe entry into the DIP Facility is a reasonable exercise of the Debtors' business judgment.

### Key Benefits of Proposed DIP Facility

31. It is my belief based on my work with the Debtors and my experience that the proposed DIP Facility is essential to fund these Chapter 11 Cases and provides significant benefit to the Debtors and their estates. The proposed DIP Facility is critical because, to support their operations, the Debtors require a liquidity infusion to fund various critical expenditures (as detailed above), which is satisfied by the proposed DIP Facility.

32. The proposed DIP Facility contains severable favorable terms and conditions to the Debtors. Specifically, the proposed DIP Facility:

   a. is being funded by a group of the Debtors' Prepetition Secured Noteholders who have a vested interest in the success of the Chapter 11 Cases;

   b. includes interest structured entirely as PIK interest designed to alleviate the Debtors' cash debt service obligations during the Chapter 11 Cases;

   c. is structured such that all Prepetition Secured Parties may fund on a *pro rata* basis (i.e., contains no holdback provisions);

   d. is nonetheless backstopped by certain Prepetition Secured Parties that are members of the Ad Hoc Group in an amount of approximately $57 million, with syndication efforts for the remaining balance expected following entry of the Interim DIP Order, so as to reduce the risk of the Debtors not receiving the contemplated liquidity infusion on the expected timeline;

   e. provides one three-month maturity extension beyond the original six-month maturity of the DIP Facility, exercisable at the Company's option, with payment of a non-cash fee;

      f.  flexibility on exit treatment, with options for either repayment or conversion to equity, at the Debtors' option;

      g.  provides for acceptable milestones that are consistent with the Debtors' reorganization strategy; and

      h.  Roll-up provisions are subject to approval on a Final Order basis.

33.    As a result of comprehensive good-faith and arm's-length negotiations and a competitive dynamic, the proposed DIP Facility satisfies the Debtors' primary strategic considerations outlined above.  Based on the foregoing, it is my belief that the proposed use of Cash Collateral and the DIP Facility will satisfy the Debtors' postpetition liquidity needs, will provide the Debtors with sufficient flexibility to operate their business in an efficient manner in the ordinary course of business, and is in the best interests of the Debtors and their estates.

### Terms of DIP Facility Are Reasonable Under the Circumstances

34.    Based on my experience as a restructuring professional and my understanding of the Debtors' need for postpetition financing, the obligations, interest rate, fees, maturity, covenants, and milestones under the DIP Facility are reasonable, taken as a whole, under the circumstances.  Further, based on my experience with DIP financing transactions and my involvement in the negotiation of the DIP Loan Agreement and pursuit of alternative postpetition financing proposals, the DIP Facility provides the best financing option currently available to the Debtors under the circumstances.  In my view, the DIP Lenders have acted in good faith and have agreed to provide the DIP Facility to the Debtors on terms, taken as a whole, that I consider to be fair and reasonable under the current circumstances and market conditions

35.    Additionally, although the DIP Facility includes the Roll Up of a portion of the Prepetition Secured Notes Obligations, the DIP Facility provide numerous benefits to the Debtors, their estates, and their stakeholders.  For example, given that the DIP Lenders (which

consist of Prepetition Secured Parties) are the Debtors' incumbent lenders, moving forward with certain other DIP proposals would have likely resulted in the Prepetition Secured Parties asking for additional adequate protection and further arguing that there is insufficient value in unencumbered assets to cover both a third-party DIP financing and adequate protection to the Prepetition Secured Parties. Additionally, any Prepetition Secured Obligations that are rolled up into DIP Loans will not require any interest payments during the term of the DIP Loan.

36. ***Consensual Priming Liens***. I understand that a priming lien may only be granted (a) with the consent of the affected secured lenders or (b) if adequate protection exists for such priming lien. Here, the Note Agent under the Prepetition NPAs expressly consented to the priming liens and to the adequate protection package provided to the Prepetition Secured Parties and would have likely contested such priming liens in an Alternative DIP Proposal. Accordingly, I believe that granting priming liens to the DIP Lenders is reasonable, appropriate, and permissible under the Bankruptcy Code.

37. ***Junior Liens***. A substantial portion of the Debtors' assets consist of equipment that is encumbered by secured financing arrangements other than under the Prepetition NPAs, as well as some real estate encumbered by mortgages and mechanics' liens. Rather than insisting on a non-consensual priming lien on such encumbered property, the DIP Lenders have agreed to receive junior liens on such assets, with the goal of enhancing the collateral securing the DIP Facility and avoiding objections from these other secured parties. While much of the Debtors' equipment and real estate assets are encumbered by equipment financing, mortgages, and mechanics' liens, as applicable, the DIP Lenders would not provide capital without receiving liens that are junior to the liens securing these assets, which I believe is reasonable under the circumstances.

38. **_Liens on Unencumbered Assets._** In addition, the DIP Lenders require a perfected first priority security interest and lien on substantially all of the Debtors' unencumbered assets. In my view, absent such protections, the DIP Lenders would not have agreed to provide the DIP Facility to the Debtors. I believe that the request for such liens on unencumbered assets is reasonable under the circumstances.

39. **_Roll Up_.** After entry of the Final DIP Order, a portion of the Prepetition Secured Obligations will roll up into DIP Loans on a cashless basis, in an amount equal to the principal amount of all DIP Borrowings advanced under the New Money Term DIP Facility, on a dollar-for-dollar basis. The Roll Up of a portion of the Prepetition Secured Obligations was heavily negotiated and was a critical condition to the DIP Lenders providing the DIP Facility. Such rolled up amount will be secured by the same collateral and have the same priority as the DIP Borrowings under the DIP Facility, but no interest will be paid on account of rolled up amounts.[7] The Roll Up of a portion of the Prepetition Secured Obligations was a critical condition to the DIP Lenders providing the DIP Facility and without the inclusion of the Roll Up, the DIP Lenders would not have provided the DIP Facility. Given the comprehensive and good-faith negotiations between the Debtors and the DIP Lenders, during which the DIP Lenders made several key concessions to the Debtors, including the fact that no interest payments will be made in respect to Prepetition Secured Obligations that are rolled up into the DIP Facility, I believe the Roll Up feature of the DIP Facility is reasonable under the circumstances.

40. The terms of DIP Facility, including the liens being granted and the Roll Up, are an important part of the DIP Facility that will allow the Debtors to maintain sufficient

---

[7] Upon repayment or refinancing of the DIP Facility, such Roll Up amount will revert to secured claim of the Prepetition Secured Parties and will receive the same treatment in in these chapter 11 cases as the secure claims of the Prepetition Secured Parties.

liquidity while they strive to achieve a comprehensive restructuring solution for their creditors and other stakeholders.

### Fees in Connection with DIP Facility Are Fair and Reasonable

41.     The DIP Lenders have committed to provide a substantial amount of capital to ensure successful execution of the DIP Facility.  In view of those commitments and the circumstances of these cases, including the magnitude of the Debtors' Chapter 11 Cases and the tangible benefit to the estates of a substantial committed postpetition financing, I believe that the consideration being provided to the DIP Lenders, taken as a whole, in exchange for providing such commitment, is reasonable in amount, appropriately compensates the DIP Lenders for their costs and the assurances they are providing to the process, and is necessary to obtain the DIP Facility, which will permit the Debtors to both (i) continue operating their business and (ii) maximize the value of their estates.

A.     *DIP Fees*

42.     In consideration for the DIP Agent's and DIP Lenders' respective commitments in connection with the DIP facility, the Debtors have agreed to, among other things, (i) pay certain fees (the "**DIP Fees**"), which will all be paid-in-kind during the Chapter 11 Cases, with cash payments only occurring upon exit or repayment of the DIP Facility, (ii) pay reasonable and documented out-of-pocket fees and expenses for the DIP Lenders (including reasonable and documented fees and expenses of outside counsel) (the "**Out-of-Pocket Expenses**" and, together with the DIP Fees, the "**DIP Fees and Expenses**"), and (iii) indemnify the DIP Lenders in accordance with the DIP Loan Agreement.

B.     *DIP Fees Are Reasonable*

43.     The DIP Fees were the subject of arm's-length and good-faith negotiations between the Debtors and the DIP Lenders, are integral components of the overall terms of the DIP

Facility, and were required by the DIP Lenders as consideration for the extension of postpetition financing. I do not believe that a financing commitment with terms similar to those in the DIP Facility is available to the Debtors for lower fees given the condition of the Debtors' liquidity position and the overall depression in bitcoin prices that has resulted in stress within the cryptocurrency industry. Accordingly, I believe that the DIP Fees are reasonable under the circumstances of these Chapter 11 Cases.

44. In sum, it is my professional opinion that (i) the terms of the DIP Facility – including the fee structure and applicable interest rates – while on the higher end, are, taken as a whole, (a) within the range of comparable DIP financing transactions, and (b) are reasonable under the current circumstances and market conditions; (ii) the terms of the DIP Facility were the product of good faith, arm's-length negotiations; (iii) the DIP Facility will benefit all stakeholders in these Chapter 11 Cases; and (iv) absent the Court's entry of the Interim DIP Order, the Debtors' business will likely be immediately and irreparably harmed.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 21st day of December, 2022

                Respectfully submitted,

                By:    /s/ John Singh
                         John Singh
                         Partner
                         PJT Partners LP