IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| CORE SCIENTIFIC, INC., *et al.*, | § | Case No. 22-90341 (DRJ) |
| | § | |
| | § | (Jointly Administered) |
| Debtors.[1] | § | |

**DECLARATION OF JOHN SINGH IN SUPPORT
OF EMERGENCY MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL
ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN REPLACEMENT
SENIOR SECURED NON-PRIMING REPLACEMENT SUPERPRIORITY
POSTPETITION FINANCING, (B) USE CASH COLLATERAL, AND (C) PAY OFF
EXISTING POSTPETITION FINANCING FACILITY, (II) GRANTING
LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE
EXPENSE STATUS, (III) GRANTING ADEQUATE PROTECTION TO THE
PREPETITION SECURED PARTIES, (IV) MODIFYING THE AUTOMATIC STAY,
(V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

I, John Singh, pursuant to section 1746 of title 28 of the United States Code, hereby declare under the penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1. I am above 18 years of age, and I am competent to testify. I am a Partner in the Restructuring and Special Situations Group at PJT Partners LP ("**PJT**"), an investment banking firm listed on the New York Stock Exchange with its principal offices at 280 Park Avenue, New York, New York 10017.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

2. PJT was retained in October 2022 to provide general restructuring and strategic advice and is the proposed investment banker for Core Scientific, Inc. ("**Core Scientific**") and its affiliated debtors in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), as debtors and debtors in possession (collectively, the "**Debtors**," and together with their non-Debtor subsidiaries, "**Core**," or the "**Company**").

3. On December 22, 2022, I provided a declaration in support of the Original DIP Facility and the Original Interim DIP Order (Docket No. 98)[2] (the "**First Singh Declaration**").

4. I submit this declaration (this "**Declaration**") in support of the *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Replacement Senior Secured Non-priming Superpriority Replacement Postpetition Financing, (B) Use Cash Collateral, and (C) Pay Off Existing Postpetition Financing Facility, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "**Motion**").

5. Except as otherwise indicated, all statements in this Declaration are based on (i) my personal knowledge of the Debtors' operations and finances, (ii) my review of relevant documents, (iii) information provided to me by PJT employees working under my supervision,

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the *Interim Order (I) Authorizing the Debtors to (A) Obtain Replacement Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling A Final Hearing, and (VI) Granting Related Relief* (Docket No. 130) (the "**Original Interim DIP Order**"), or *Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Non-Priming Superpriority Replacement Postpetition Financing, (B) Use Cash Collateral, and (C) Pay Off Existing Postpetition Financing Facility, (II) Granting Liens and Providing Claims with SuperpriorityAdministrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "**Proposed Replacement Interim DIP Order**"), as applicable.

(iv) information provided to me by, or discussions with, the members of the Debtors' management team or their other advisors, (v) information received from discussions and negotiations with potential lenders, and/or (vi) my opinion based upon my experience as a restructuring professional. If called to testify, I could and would testify to each of the statements set forth herein on that basis.

6. Information about my qualifications and the retention of PJT may be found in the First Singh Declaration. I am not being compensated specifically for this testimony other than through payments received by PJT as a professional proposed to be retained by the Debtors.[3]

### Summary of Relief Requested in the Motion

7. Following an extensive marketing process, which is described in greater detail below, the Debtors have reached an agreement with B. Riley Financial, Inc. ("**B. Riley**" or the "**Replacement DIP Lender**") to provide the Debtors with a Replacement DIP Facility (as defined below).

8. Pursuant to the Motion, the Debtors request entry of the Proposed Replacement Interim DIP Order that, among other things:

(a) authorizes the Debtors to obtain postpetition financing on a superpriority, non-priming, senior secured basis (the "***Replacement DIP Facility***," and the loans made, advanced or deemed advanced thereunder, the "***Replacement DIP Loans***") in the form of a multiple-draw term-loan facility in an aggregate principal amount of up to $70 million, pursuant to which (i) an aggregate principal amount of $35 million shall be borrowed (the "***Second Interim DIP Borrowing***") in a single borrowing on the Closing Date (as defined in the Replacement DIP Term Sheet (as defined below)), and (ii) following entry of the Final Order (as defined below), the remaining aggregate principal amount under the Replacement DIP Facility shall be available, in one or more borrowings (each such borrowing, including the Second Interim DIP Borrowing, a "***DIP Borrowing***," and, collectively, the "***DIP Borrowings***"), and, in each case, in accordance with and subject to the terms and conditions (including any conditions precedent to each of the DIP Borrowings) set forth in the term sheet attached to the Motion as **Exhibit 1** (the "***Replacement DIP***

---

[3] Pursuant to PJT's engagement letter entered into with the Debtors, and subject to approval of this Court, PJT will be entitled to receive a capital raising fee in respect of the Replacement DIP Facility equal to, 0.75% x $70 million or $525,000. Furthermore, pursuant to PJT's engagement letter and subject to approval of this Court, PJT will be entitled to receive a capital raising fee in respect of the Original DIP Facility.

3

        *Term Sheet*"), that certain *Commitment Letter*, dated as of January 29, 2023, by and between Core Scientific and the Replacement DIP Lender attached to the Motion as **Exhibit 2** (the "*Commitment Letter*"), and, subject to entry of the Final Order, on a final basis pursuant to a loan agreement (the "*Replacement DIP Credit Agreement*," and, together with all other agreements, guarantees, pledge, collateral and security agreements, mortgages, deeds, charges, control agreements, instruments, certificates, notes, any separate fee letter agreements between any of the Debtors, on the one hand, and the Replacement DIP Agent and/or the Replacement DIP Lender, on the other hand, and other documents executed, filed and/or delivered in connection therewith, including the Replacement DIP Term Sheet, collectively, the "*Replacement DIP Loan Documents*"), by and among each of the Debtors, as borrowers (the "*Replacement DIP Borrowers*"), each of the direct and indirect subsidiaries of Core Scientific that are or become debtors in the Chapter 11 Cases, as guarantors (collectively, the "*Replacement DIP Guarantors*," and together with the Replacement DIP Borrowers, the "*Replacement DIP Loan Parties*"), B. Riley Commercial Capital, LLC, as administrative agent and collateral agent (in such capacities, together with its successors and permitted assigns, the "*Replacement DIP Agent*"), and the Replacement DIP Lender, and together with the DIP Agent, the "*Replacement DIP Secured Parties*") and this Interim Order;

(b)     authorizes the Replacement DIP Loan Parties to (i) execute, deliver, and perform under the Replacement DIP Term Sheet and each of the Replacement DIP Loan Documents, (ii) incur all loans, advances, extensions of credit, financial accommodations, indemnification and reimbursement obligations and other obligations, and pay all principal, interest, premiums, fees, costs, expenses, charges and all other amounts payable under the Replacement DIP Loan Documents, whenever the same shall become due or payable, whether at stated maturity, by prepayment, declaration, acceleration or otherwise, in each case, in accordance with the Replacement DIP Loan Documents and this Interim Order (collectively, the "*Replacement DIP Obligations*"), and (iii) perform such other and further acts as may be necessary, required or desirable to implement and effectuate the terms of this Interim Order, the Replacement DIP Loan Documents and the transactions contemplated hereunder and thereunder;

(c)     authorizes the Replacement DIP Borrowers to incur, and the Replacement DIP Guarantors to jointly and severally guarantee, all DIP Obligations, in accordance with this Interim Order and the Replacement DIP Loan Documents;

(d)     grants to the Replacement DIP Agent, for the benefit of itself and the other Replacement DIP Secured Parties, the DIP Liens (as defined in the Proposed Replacement Interim DIP Order) in all DIP Collateral (as defined in the Proposed Replacement Interim DIP Order), as set forth in this Interim Order, subject to the Carve-Out and subject to the relative priorities set forth in this Interim Order;

(e)     grants to the Replacement DIP Agent, for the benefit of itself and the other Replacement DIP Secured Parties, allowed super-priority administrative expense claims against each of the Debtors, on a joint and several basis, in respect of all

    Replacement DIP Obligations, subject in each case to the Carve-Out, as set forth in this Interim Order;

(f)  authorizes the Debtors to use the proceeds of the Replacement DIP Facility, the DIP Collateral and the Prepetition Secured Notes Collateral (as defined in the Proposed Replacement Interim DIP Order), including Cash Collateral (as defined below), solely in accordance with the terms and conditions set forth in this Interim Order and the Replacement DIP Loan Documents, including the Approved Budget (as defined in the Proposed Replacement Interim DIP Order), subject to any variances expressly permitted under the Replacement DIP Term Sheet (the "**Permitted Variances**");

(g)  authorizes the Debtors to irrevocably repay in full all obligations outstanding under that certain *Senior Secured Super-Priority Debtor in Possession Loan and Security Agreement*, dated as of December 22, 2022, as filed with the Court on December 28, 2022 [Docket No. 188] (as modified, the "*Original DIP Credit Agreement*") the lenders from time to time party thereto, the "*Original DIP Lenders*," the Administrative Agent (as defined therein) thereunder, the "*Original DIP Agent*," and the postpetition financing facility provided thereby, the "*Original DIP Facility*") with the proceeds from the Replacement DIP Facility as soon as practicable upon funding;

(h)  grants adequate protection, as and to the extent set forth in this Interim Order, to the Prepetition Secured Parties (as defined below) to protect against any Diminution in Value (as defined in the Proposed Replacement Interim DIP Order) of their respective Prepetition Notes Liens (as defined in the Proposed Replacement Interim DIP Order) in the Prepetition Secured Notes Collateral (including Cash Collateral);

(i)  approves certain stipulations, waivers, and releases by the Debtors with respect to, *inter alia*, the Replacement DIP Secured Parties, the Replacement DIP Loan Documents, the DIP Liens, the Replacement DIP Obligations and the Replacement DIP Collateral, in each case, subject to the terms and provisions of this Interim Order;

(j)  approves the Debtors' waiver of the right to surcharge the DIP Collateral as to the DIP Secured Parties, pursuant to section 506(c) of the Bankruptcy Code or otherwise, upon the terms set forth in this Interim Order;

(k)  approves the Debtors' waiver of the equitable doctrine of "marshaling" and other similar doctrines with respect to the DIP Collateral as to the Replacement DIP Secured Parties;

(l)  modifies or vacates the automatic stay imposed by sections 105(a) and 362 of the Bankruptcy Code or otherwise, to the extent necessary, required or desirable to implement and effectuate the terms and provisions of this Interim Order and the Replacement DIP Loan Documents, as set forth herein, waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and

enforceability of this Interim Order, providing for the immediate effectiveness of this Interim Order, and granting related relief; and

(m) schedules a final hearing (the "**Final Hearing**") on the Motion to consider entry of a final order (the "**Final Order**") authorizing the relief requested in the Motion on a final basis, which order shall be in form and substance and on terms and conditions reasonably acceptable in all respects to the Replacement DIP Lender and Replacement DIP Agent in accordance with the Replacement DIP Term Sheet, and approving the form of notice with respect to such Final Hearing.

9. I have personally observed, and it is therefore my opinion, based on my experience, in my professional judgment, and as a result of the broad marketing process undertaken regarding the DIP financing opportunity, and the subsequent negotiations and revised provisions of the Replacement DIP Facility agreed to by the Replacement DIP Lender, that the proposed Replacement DIP Facility is the product of good faith arm's-length negotiations, represents the best postpetition financing alternative currently available to the Debtors under the circumstances, and is in the best interest of the Debtors, their estates, and all parties in interest in these Chapter 11 Cases.

## **Debtors' Efforts to Obtain Postpetition Financing**

10. As discussed in the First Singh Declaration, leading up to the Petition Date, the Debtors, through PJT, launched a broad marketing process designed to maximize competition and solicit proposals from a wide range of prospective lenders, including (i) creditors already in the Debtors' capital structure, (ii) banks outside of the Debtors' capital structure, (iii) institutional and alternative lenders outside the Debtors' capital structure, and (iv) strategic parties.

11. Prior to the Petition Date, PJT contacted 24 potential lenders it believed may have been interested in providing the Debtors with postpetition financing, including an ad hoc group of the Prepetition Secured Parties (the "**Ad Hoc Group**"), B. Riley, and several alternative lenders outside of the Debtors' capital structure. Nine (9) parties signed non-disclosure agreements, and the Debtors received two (2) initial proposals, including one from the Ad Hoc

Group and one from a third party that ceased negotiations prior to reaching an agreement with the Debtors. The Debtors ultimately determined that the best path forward was pursuing the DIP Facility provided by the Ad Hoc Group, as that was the only remaining financing proposal and the Debtors were able to obtain several concessions from the Ad Hoc Group through negotiations.

12. Following entry of the Original Interim DIP Order, the Debtors continued to pursue potential alternative postpetition financing that would (i) improve terms relative to those of the Original DIP Facility and (ii) pay off the Original DIP Facility prior to final approval thereof and effectiveness of the roll-up contemplated thereunder.

13. Subsequent to the entry of the Original Interim DIP Order, PJT contacted forty-eight (48) potential lenders that it believed may have been interested in providing the Debtors with postpetition financing, seven (7) of which PJT had previously contacted during the prepetition DIP marketing process. Twenty (20) parties signed non-disclosure agreements, and the Debtors received four (4) initial proposals for a replacement DIP facility. The Debtors negotiated with three of the four potential Replacement DIP Lender, as the fourth proposal was received too late to be actionable in a timely manner, including trading multiple term sheets. All four potential lenders engaged in significant diligence during the postpetition DIP marketing process. From these discussions, it was clear that the negotiated term sheet with B. Riley would provide the Debtors with the best terms—as a whole—for a postpetition financing facility. The Debtors were able to reach an agreement with B. Riley, as reflected in the Replacement DIP Term Sheet. Over the course of the past few days, the Debtors also provided the Ad Hoc Group with ample opportunity to improve their DIP Facility terms. Specifically, the Debtors requested that the Ad Hoc Group agree to several changes to the DIP Facility, including eliminating the Roll-Up, eliminating the default based on termination of the Restructuring Support Agreement, permitting

asset sale proceeds to be used to pay off the DIP Facility, and improved economics. In addition, the Debtors shared the term sheets received on a timely basis with both the Ad Hoc Group and the Committee. The Ad Hoc Group indicated an unwillingness to make the significant changes that would have been required to make its DIP Facility competitive with the other proposals the Debtors received.

14. The Replacement DIP Facility provides numerous benefits to the Debtors' estates in the form of a lower cost of capital as well as greater flexibility to pursue a restructuring that will maximize value for all interested parties. It also eliminates the Roll Up contemplated in the Original DIP Facility and resolves the Creditors' Committee's objections to the Original DIP Facility. Such flexibility includes removing milestones and eliminating the Restructuring Support Agreement.

15. Under the proposed Replacement DIP Facility, the Debtors will gain access to DIP financing in the aggregate amount of up to $70 million, with an interim borrowing of $35 million following entry of the Proposed Replacement Interim DIP Order. In addition to providing liquidity for the business, the borrowing under the Proposed Replacement Interim DIP Order, along with cash on hand, will be used to repay the Original DIP Facility to avoid an event of default as contemplated under the Original DIP Facility. The Debtors will be in default of the Original DIP Facility if, by February 2, 2023, (a) the court has not entered the Final DIP Order as contemplated in the Interim Order or (b) the Original DIP Facility has not been repaid in full.

16. To ensure the Debtors have sufficient time to prosecute these Chapter 11 Cases and seek to negotiate a consensual chapter 11 plan with stakeholders throughout the capital structure, the Replacement DIP Lender has provided the Replacement DIP Facility that matures in

twelve (12) months from the date of the Replacement DIP Term Sheet, which can be extended by an additional three (3) months for a fee.

17. Further, the Debtors are seeking to reach an agreement with the Ad Hoc Group that permits the Debtors to use Prepetition Collateral, in exchange for which, the Debtors will provide adequate protection to the Prepetition Secured Noteholders as described in the Proposed Replacement Interim DIP Order filed on January 30, 2023. At this time, the Debtors do not have an agreement with the Ad Hoc Group on this issue, but are continuing to work to obtain consent. If the Debtors do not obtain such consent, they will seek to use the cash collateral on a non-consensual basis. The Approved Budget under the Replacement DIP Facility assumes access to the Prepetition Collateral, and, absent the authority to use the Prepetition Collateral, the Debtors' funding and operational needs are not anticipated to be met and the Debtors will likely not be able to continue operations in the ordinary course of business, which would have a detrimental impact on the value of the enterprise.

18. After nearly two months of prepetition and postpetition marketing and negotiations, I am confident that the Debtors are currently unable to obtain another DIP Facility on more attractive terms than those of the Replacement DIP Facility. I believe entry into the Replacement DIP Facility is a reasonable exercise of the Debtors' business judgment.

**The Replacement DIP Facility's Terms Are Vastly Superior to the Original DIP Facility**

19. It is my professional opinion based on my professional experience that the Replacement DIP Facility provides numerous benefits to the Debtors estates as compared to the Original DIP Facility.

20. The Replacement DIP Facility provides the Debtors with capital at a significantly lower cost. The cost of capital of the Replacement DIP Facility is approximately one-third of the annualized cost of the Original DIP Facility.

21. In addition, the Replacement DIP Facility has several features that provide the Debtors with greater ability to pursue the best possible outcome for all stakeholders in these chapter 11 cases. The Replacement DIP Facility eliminates all of the milestones under the Original DIP Facility and has a 12-month maturity with a 3-month extension compared to the Original DIP Facility, which has a 6-month maturity with a 3-month extension.[4] The Replacement DIP Facility eliminates the requirement that the Debtors pursue the Restructuring Support Agreement (including the chapter 11 plan term sheet) negotiated with the Ad Hoc Group. The Debtors understand that the Creditors' Committee and an ad hoc group of equity holders vehemently oppose the chapter 11 plan contemplated by the Restructuring Support Agreement. The Debtors intend to negotiate with all stakeholders to propose a confirmable, and hopefully consensual, chapter 11 plan following Court approval of the Replacement DIP Facility. Significantly, the Replacement DIP Facility also eliminates the Roll Up, which reduces takeout costs if the Original DIP Facility were to be approved on a final basis.

22. Although the Replacement DIP Facility does not come with the consensual use of cash collateral that was provided by the Original DIP Facility, negotiations have been ongoing with the Ad Hoc Group to reach a consensual agreement that would permit the Debtors to continue to use cash collateral.

23. The table below summarizes certain key features of both the Replacement DIP Facility and the Original DIP Facility in a side-by-side comparison. When viewed in this manner, the key differences between the two deals make it clear that the Replacement DIP Facility is a superior deal for the Debtors.

---

[4] The Replacement DIP Facility has a limited number of milestones related to documenting the Replacement DIP Facility and the timing of when a Final DIP Order must be entered.

| DIP Facility Term | Original DIP Facility | Replacement DIP Facility | Improvement vs. Original DIP Facility |
|---|---|---|---|
| **Annualized Cost of Capital on New Money** | Greater than 60% | Approximately 20% | Yes |
| **Maturity** | 6-month, with 3-month extension | 12-month, with 3-month extension | Yes |
| **Roll-up** | 1-to-1 roll-up, in full commitment amount upon entry of Final Order (*i.e.*, no creeping mechanism) | None | Yes |
| **RSA** | Linked | No link | Yes |
| **Refinancing Exit Treatment** | Exit: 115% of then-outstanding debt amount in cash | Exit: 105% of then-outstanding debt amount in cash | Yes |
| **Access to Incremental Liquidity** | Up to ~$28 million of incremental draws limited to schedule in approved budget, which requires consent from DIP Lender | Up to $35 million of incremental draws available at any time after Final Order, so long as cash balance is below $30 million | Yes |
| **Milestones** | Multiple, including regarding case timing as it relates to RSA | None, other than related to DIP documentation and Final DIP Order | Yes |
| **Potential for Challenges and Litigation** | Objections filed by the Committee and the ad hoc group of equity holders | Potentially Ad Hoc Group, regarding use of cash collateral | Yes |
| **Payment to Take Out Original DIP Facility** | No payment needed now to continue DIP Facility | Immediate payment of approximately $9 million to Original DIP Lenders for accrued interest, fees, and termination payments | No |
| **Asset Sales** | Limited to $10 million to the extent needed to fund shortfall of DIP commitments | Permitted; net proceeds used to repay Replacement DIP Facility | Yes |

24. As noted, the Debtors will use the Replacement DIP Facility and their cash on hand to pay off the Original DIP Facility, including approximately $9 million of take-out costs, consisting of approximately $0.5 million in accrued PIK interest, approximately $0.8 million of

11

upfront fees, approximately $1.6 million in backstop fees, and approximately $6 million in termination fees. These fees were approved by the Court in connection with its interim approval of the Original DIP Facility and most of these costs would have been due whether the DIP Facility is repaid early or repaid at maturity.

25. The Replacement DIP Facility also provided better terms than any of the other three postpetition financing proposals that the Debtors received over the last week. The Replacement DIP Facility provides the Debtors with greater flexibility relative to the Original DIP Facility and the other three postpetition financing proposals received, and the Replacement DIP Lender did not seek to prime any existing liens or link funding of the Replacement DIP Facility to any particular chapter 11 exit structure or chapter 11 plan.

26. In summary, it is my professional opinion that the benefits of the Replacement DIP Facility justify the Debtors replacing the Original DIP Facility.

**Terms of the Replacement DIP Facility Are Reasonable Under the Circumstances**

27. Based on my experience as a restructuring professional and my understanding of the Debtors' need for postpetition financing, the obligations, interest rate, fees, maturity, and covenants under the Replacement DIP Facility are reasonable, taken as a whole, under the circumstances, as well as compared to the Original DIP Facility and other DIP loans. Further, based on my experience with DIP financing transactions, my involvement in the negotiation of the Replacement DIP Facility, and the Debtors' pursuit of alternative postpetition financing proposals, the Replacement DIP Facility provides the best financing option currently available to the Debtors under the circumstances. In my view, the Replacement DIP Lender has acted in good faith and has agreed to provide the Replacement DIP Facility to the Debtors on

terms, taken as a whole, which I consider to be fair and reasonable under the current circumstances and market conditions, and as compared to other DIP loans.

28. **_Junior Liens_**.  A substantial portion of the Debtors' assets consist of equipment that is encumbered by the Prepetition NPAs and certain equipment loans, as well as some real estate encumbered by mortgages and mechanics' liens.  Rather than insisting on a non-consensual priming lien on such encumbered property, the Replacement DIP Lender has agreed to receive junior liens on such assets, with the goal of avoiding objections from these other secured parties.  The Replacement DIP Lender would not provide capital without receiving liens that are junior to the liens securing these assets, which I believe is reasonable under the circumstances.

29. **_Liens on Unencumbered Assets._**  In addition, the Replacement DIP Lender require a perfected first priority security interest and lien on substantially all of the Debtors' unencumbered assets.  In my view, absent such protections, the Replacement DIP Lender would not have agreed to provide the Replacement DIP Facility to the Debtors.  I believe that the request for such liens on unencumbered assets is reasonable under the circumstances.

<u>Fees in Connection with Replacement DIP Facility Are Fair and Reasonable</u>

30. The Replacement DIP Lender has committed to provide a substantial amount of capital to ensure successful execution of the Replacement DIP Facility.  In view of those commitments and the circumstances of these cases, I believe that the consideration being provided to the Replacement DIP Lender, taken as a whole, in exchange for providing such commitment, is reasonable in amount and appropriately compensates the Replacement DIP Lender for its costs and the assurances they are providing to the process.

A. *DIP Fees*

31. In consideration for the Replacement DIP Agent's and Replacement DIP Lender's respective commitments in connection with the Replacement DIP Facility, the Debtors

have agreed to, among other things, (i) pay certain fees (the "**DIP Fees**"), all of which will be paid-in-kind during the Chapter 11 Cases, with cash payments only occurring upon repayment of the Replacement DIP Facility, (ii) pay certain agent monitoring fees in the amount of $75,000 per month, (iii) pay reasonable and documented out-of-pocket fees and expenses for the Replacement DIP Lender (including reasonable and documented fees and expenses of outside counsel) (the "**Out-of-Pocket Expenses**" and, together with the DIP Fees and agent monitoring fees, the "**DIP Fees and Expenses**"), and (iv) indemnify the Replacement DIP Lender in accordance with the Replacement DIP Loan Agreement.

   B.  *DIP Fees Are Reasonable*

   32.  The DIP Fees were the subject of arm's-length and good-faith negotiations between the Debtors and the Replacement DIP Lender, are integral components of the overall terms of the Replacement DIP Facility, and were required by the Replacement DIP Lender as consideration for the extension of postpetition financing. I do not believe that a financing commitment with terms similar to those in the Replacement DIP Facility is available to the Debtors for lower fees. Accordingly, I believe that the DIP Fees are reasonable under the circumstances of these Chapter 11 Cases.

   33.  In sum, it is my professional opinion that (i) the terms of the Replacement DIP Facility – including the fee structure and applicable interest rates – are, taken as a whole, (a) within the range of comparable DIP financing transactions and (b) are reasonable under the current circumstances and market conditions; (ii) the terms of the Replacement DIP Facility were the product of good faith, arm's-length negotiations; (iii) the Replacement DIP Facility will benefit all stakeholders in these Chapter 11 Cases; and (iv) absent the Court's entry of the Proposed Replacement Interim DIP Order, the Debtors' business will likely be harmed.

      I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 31st day of January, 2023

New York, New York

                              Respectfully submitted,

                        By:    */s/ John Singh*
                                 John Singh