IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § | Chapter 11 |
| CORE SCIENTIFIC, INC., *et al.*, | § § § | Case No. 22-90341 (DRJ) |
| | § § | (Jointly Administered) |
| Debtors.[1] | § § | |

**DEBTORS' RESPONSE TO MOTION FOR APPOINTMENT
OF AN OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS**

Core Scientific, Inc. (the "**Company**") and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), hereby file this response to the *Motion of the Ad Hoc Group of Equity Holders of Core Scientific for Entry of an Order Directing the Appointment of an Official Committee of Equity Security Holders* (ECF No. 458) (the "**Motion**"), and respectfully represent as follows:[2]

**Preliminary Statement**

1. Given the unique facts and circumstances of these chapter 11 cases, the Debtors at this time support the formation of an Official Equity Committee with a limited scope and Budget (as defined and discussed below in more detail). The scope of the Official Equity Committee's mandate should be limited to valuation and plan negotiation issues, and a Budget

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6073); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Motion.

commensurately tailored to these responsibilities should limit the costs of the Official Equity Committee. After discussions between the Debtors and the Ad Hoc Equity Group, the Ad Hoc Equity Group has agreed to these conditions, including an agreed Budget of $4.75 million. *See Order Directing the Appointment of an Official Committee of Equity Security Holders* (ECF No. 568) (the "**Proposed Order**"), Proposed Order at ¶ 6. Therefore, the Debtors request that the Court enter the Proposed Order.

2. The Debtors, their advisors, and the Special Committee of Independent Directors of the Debtors' Board of Directors (the "**Special Committee**")[3] are keenly aware of the Debtors' duties to all stakeholders, including equity holders. After careful consideration and deliberation, the Special Committee determined that the appointment of an Official Equity Committee with a limited scope and Budget is appropriate at this time for two primary reasons. First, rising bitcoin prices and lower energy costs suggest the Debtors may be solvent (and, at the very least, are not "hopelessly insolvent").[4] Second, principles of fairness support equity holders, like other constituents in these cases, receiving representation from estate-paid professionals with respect to the two issues most important to them: valuation and plan negotiation. To be clear, the Debtors believe that equity holders are adequately represented in these cases without an Official Equity Committee, but believe the appointment of an Official Equity Committee is nonetheless warranted given the totality of the circumstances.

3. Further, as discussed below, the Debtors vehemently disagree with the suggestions in the Motion that any of their actions to date have not been appropriate or entirely consistent with their fiduciary duties. The Debtors are hopeful that as they move on to the next

---

[3] As of January 28, 2023, the Special Committee consists of Kneeland Youngblood and Neal Goldman.

[4] As discussed below, the Debtors have not finalized their business plan and their advisors have not completed a formal valuation.

stage of these cases, an Official Equity Committee will be a constructive partner in the Debtors' goal of negotiating a consensual and value-maximizing chapter 11 plan with all their major constituents.

<u>**Response**</u>

**A. Legal Standard**

4.  Section 1102(a)(2) of the Bankruptcy Code provides, in pertinent part, that "[o]n request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or equity security holders." 11 U.S.C. section 1102(a)(2). The Bankruptcy Code does not define the term "adequate representation." *In re Nat'l R.V. Holdings, Inc.*, 390 B.R. 690, 695 (Bankr. C.D. Cal. 2008). Instead, courts retain discretion to appoint an equity committee based on the facts of each individual case. *See In re SunEdison, Inc.*, (Bankr. S.D.N.Y. 2016) (quoting *In re Williams Communications Group, Inc.*, 281 B.R. 216, 220 (Bankr. S.D.N.Y. 2002)).

5.  Courts in this district generally consider the following factors when deciding a motion under section 1102(a)(2) of the Bankruptcy Code: (1) whether the debtors are likely to prove solvent; (2) whether equity is adequately represented by stakeholders already at the table; (3) the complexity of the debtors' cases; and (4) the likely cost to debtors' estates of an equity committee. *In re Pilgrim's Pride Corp.*, 407 B.R. 211, 216 (Bankr. N.D. Tex. 2009) (stating these four factors); *see also In re SandRidge*, Case No. 16-32488 (Bankr. S.D. Tex. Aug. 1, 2016) H'rg Tr. at 94:7–10 ("I am a big fan of the thought process that is set forth in *Pilgrim's Pride* and I do think that the Court exhibited a thoughtful analysis and weighing of the various issues and set forth the four factors"). In *SandRidge*, this Court added a practical fifth factor: whether the appointment of an equity committee "is going to add something to the case." H'rg Tr. at 94:10–

3

12 (adding practicality as a fifth factor).  Courts have noted that no one factor is dispositive.  *In re Edison Bros. Stores, Inc.* 1996 WL 534853 at *3 (D. Del. Sept. 17, 1996) (stating that "these factors are simply guidelines for the court to consider").

6. Bankruptcy courts have authority to limit the scope and budget of an equity committee.  *See Pilgrim's Pride*, 407 B.R. at 221–22 (requiring the equity committee to adhere to a budget; although the court chose not to limit the equity committee's scope at the outset, it noted its authority to do so and stated that equity committee professionals should expect a reduction or elimination of fees if they duplicate work done by the creditors' committee); *see also In re. J.C. Penney Co., Inc.*, Case No. 20-20182 (Bankr. S.D. Tex. June 10, 2020) H'rg Tr. at 61:3–12 (suggesting the debtors consent to the appointment of an equity committee with a limited budget).

**B. The Debtors Are Not Hopelessly Insolvent**

7. Courts have held that an equity committee is unwarranted when a debtor is "hopelessly insolvent."  *Pilgrim's Pride*, 407 B.R. at 217 n.15 ("[m]uch of the authority suggests—and the court agrees—that appointment of an equity committee should be denied in cases where there is no doubt about the debtor's insolvency"); *see also SunEdison*, 556 B.R. at 102 ("stockholders of a 'hopelessly insolvent' estate have no economic interest in the [bankruptcy] case, and under the absolute priority rule, are not entitled to any distribution under a plan absent the consent of the unsecured creditors").

8. The Debtors have not finalized their business plan and their advisors have not yet completed a formal valuation.  Nevertheless, based on market factors, the Debtors do not believe they are hopelessly insolvent.  Since the Petition Date, the price of bitcoin has risen from approximately $16,800 to around $23,000 as of the date of the filing of this response.  The price

4

of bitcoin has remained well-above $20,000 for more than a month.[5] As the Debtors' primary business (self-mining and selling mined bitcoin) is directly tied to bitcoin prices and the number of bitcoin mined, the recent improvement in bitcoin prices has had a direct positive impact on the Debtors' value.

9. To be sure, the price of bitcoin is volatile. It could rise significantly or decline significantly in a short period of time, as it has in the past. Taking a longer view, however, the Debtors note that bitcoin has generally remained above $20,000 for well over two years. Indeed, since January 1, 2021, bitcoin has only briefly dropped below $20,000, which occurred (i) during the four-month period immediately prior to the Petition Date and shortly thereafter,

---

[5] The U.S. Trustee requested the Debtors' position on the appointment of an Official Equity Committee in mid-January. On January 14, 2023, the Special Committee decided to oppose the appointment of an Official Equity Committee at that time and the Debtors informed the U.S. Trustee of this position on January 17, 2023 (the next business day). At that time, bitcoin had only recently risen to around $21,000, the Debtors had not yet secured the Replacement DIP Facility, and the Debtors had not yet terminated the RSA. The Debtors also believed the decision of whether to appoint an Official Equity Committee in these cases should be made by the Court, which has the authority to limit the committee's budget. As set forth in this response, the Debtors' circumstances have changed since their initial response to the U.S. Trustee, the rise in bitcoin prices has been more sustained, and the Ad Hoc Equity Group has now agreed to a limited scope and Budget. The Special Committee made the decision to support an Official Committee with a limited scope and budget on February 18, 2023. The chart below shows bitcoin prices on and preceding the Special Committee decisions.



Daily BTC Closing Price: October 1, 2022 to February 18, 2023

coinciding with the worst days of the crypto winter, particularly the November 2022 collapse of FTX Trading Ltd., and (ii) for a few days in June 2022, coinciding with the collapse of Three Arrows Capital Ltd. (a large cryptocurrency-focused hedge fund).



10.      At the same time, one of the Debtors' most significant operating costs – utilization of power to operate their mining facilities – has declined steadily since the Petition Date as underlying fuel costs have generally decreased.[6]  Higher bitcoin prices, lower power costs, and other developments have all served to improve the Debtors' prospects since filing.  The marketplace's interest in providing the Debtors debtor-in-possession financing in late January further evidences the Debtors' improved financial prospects since the Petition Date.  The Debtors received four new DIP financing proposals in January versus just one from the Ad Hoc Noteholder Group (as defined below) in December[7]

---

[6]  Indeed, the high price of power was one of the causes of the Debtors' financial decline and chapter 11 filing. *See Declaration of Michael Bros in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (ECF No. 5) (the "**Bros Declaration**") ¶ 69–72 (explaining how high energy costs negatively impact the Debtors' bitcoin mining and hosting businesses).

[7]  *Declaration of John Singh in Support Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (a) Obtain Replacement Senior Secured Non-priming Replacement Superpriority*

11. If current conditions continue to improve, it is likely that the Debtors are not "hopelessly insolvent," and plausible that the Debtors are solvent.

**C. Although the Equity Holders are Adequately Represented, the Debtors Support the Appointment of an Official Equity Committee With Limited Scope and Budget**

12. The Debtors believe the interests of equity holders are adequately represented. First, the Debtors and the Special Committee are aware of their fiduciary duties and are tasked with maximizing value for all stakeholders, including equity holders. The Special Committee can capably and independently represent the interest of equity holders. For example, the prior RSA with the ad hoc group of the Company's noteholders (the "**Ad Hoc Noteholder Group**"), negotiated prepetition during the darkest days of the crypto winter, provided for a return to equity holders. Further, the Special Committee directed the Debtors to locate replacement DIP financing and approved the Replacement DIP Facility, which will likely result in greater recoveries than provided by the RSA for all stakeholders, including equity holders. Numerous parties noted the benefits of the Replacement DIP Facility, including the Court (*see In re Core Scientific, Inc.* (Case No. 22-90341 (DRJ)) (Bankr. S.D. Tex. Feb. 1, 2023) (the "**Replacement DIP Hearing**") Hr'g Tr. at 71:25–72:4 (noting that the Replacement DIP Facility was "a better deal")), the Ad Hoc Equity Group (*see* Motion at ¶ 53 (applauding the Debtors' successful effort to secure the Replacement DIP Facility)), and the Creditors' Committee (*see Statement of the Official Committee of Unsecured Creditors (I) In Support of Replacement Debtor-In-Possession Financing; and (II) Objecting to Certain Request of the Original DIP Lenders* (ECF No. 397) ¶ 1 (noting that the rejection of the Original DIP Facility in favor of the Replacement DIP Facility was

---

*Postpetition Financing, (b) Use Cash Collateral, and (c) Pay Off Existing Postpetition Financing Facility, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (ECF No. 390) ("**Second Singh Declaration**") at ¶ 13.

"extremely beneficial for unsecured creditors")). The Special Committee also directed the Debtors to terminate the RSA as soon as a better alternative became available, including for equity holders. *See Notice of RSA Termination* (ECF No. 517).

13. Second, in this case, insiders hold a significant amount of the Debtors' equity and Board members account for a significant percentage of insider holdings,[8] factors courts consider in determining adequate representation. *See, e.g., Edison Bros*, 1996 WL 534853, at *3–5 (D. Del. 1996) (finding that equity holders were adequately represented by insider shareholders that owned 35% of the company). Although the Board has delegated certain decision-making to the Special Committee,[9] the Board (which includes the Special Committee members) still meets regularly, and directors and officers are free to express their views.

14. Third, the interests of the Creditors' Committee are aligned with those of equity holders – to increase the value of the Debtors' estates. *See SunEdison*, 556 B.R. at 105 (stating that the creditors' committee shared equity's interest in maximizing value).[10]

15. Finally, the equity holders are capable of representing their own interests without the appointment of an Official Equity Committee. *See In re Spansion, Inc.*, 421 B.R. 151, 156 (Bankr. D. Del. 2009) (reasoning that the ad hoc equity group adequately represented equity's interests without official status).

---

[8] Core Scientific, Inc., Form 4, (December 2, 2022); Core Scientific, Inc., Form 4, (September 6, 2022); Core Scientific, Inc., Form 4, (September 6, 2022); Core Scientific, Inc., Form 4, (August 17, 2022); Core Scientific, Inc., Form 4, (August 17, 2022); Core Scientific, Inc., Form 4, (June 6, 2022); Core Scientific, Inc., Form 3, (January 1, 2022); Core Scientific, Inc., Form S-1/A, (December 2, 2022).

[9] Bros Declaration at ¶¶79–80 (outlining the formation of and delegation to the Special Committee).

[10] In addition, the Creditors' Committee has generally served as an active watchdog in these chapter 11 cases, filing, for example, a limited objection to the fees owed under the Original DIP Facility. *See Statement of the Official Committee of Unsecured Creditors (I) In Support of Replacement Debtor-In-Possession Financing; and (II) Objecting to Certain Requests of the Original DIP Lenders* (ECF No. 397).

16. Notwithstanding such adequate representation, as discussed below in more detail, the Debtors and the Special Committee believe that fairness supports the appointment of an Official Equity Committee to ensure equity holders' views are expressed and that they believe they have an equal voice in the chapter 11 cases regarding the issues that are most important to them.

**D. The Other Pilgrim's Pride Factors, and this Court's Fifth Factor, Similarly Support the Limited Appointment of an Official Equity Committee**

i. The Debtors Cases Are Indisputably Complex

17. These chapter 11 cases are complex, as noted in the *Notice of Designation as Complex Cases* (ECF No. 10), which this Court granted in its *Order Granting Complex Case Treatment* (ECF No. 29). Additionally, as noted in the Motion, the Debtors operate in a highly technical industry, and carry more than $900 million in net debt. Motion at ¶ 8.

ii. The Limited Scope and Budget in the Proposed Order Will Limit the Cost of an Official Equity Committee

18. If the Court orders the appointment of an Official Equity Committee, it can impose a budget to limit the fees borne by the estate. *See Pilgrim's Pride*, 407 B.R. at 221 (concluding that the court could control the costs of an equity committee through the use of either a budget or limits on the equity committee's scope and noting that the equity committee "should expect reduction or even elimination by the court of fees sought for work duplicative of that performed by the [creditors' committee]").

19. The Debtors are concerned about the potentially unlimited cost of an Official Equity Committee. To assuage these concerns, the Debtors and the Ad Hoc Equity Group engaged in good faith, arms'-length negotiation to reach common ground regarding a limited scope and Budget that are mutually acceptable to the Ad Hoc Equity Group and the Debtors. The Debtors believe that limiting the scope of an Official Equity Committee to plan negotiation and valuation

9

and limiting costs to the agreed Budget strikes a fair balance between costs to the estate and benefits to equity holders.

20. The Debtors have agreed to support the Motion, subject to the limited scope and Budget outlined in the Proposed Order, to which the Ad Hoc Equity Group has agreed. The Creditors' Committee does not oppose the Motion, subject to the conditions in the Proposed Order. The Proposed Order would direct the appointment of an Official Equity Committee with a scope limited to (i) valuation and (ii) plan negotiations, and with a budget of $4,750,000, inclusive of legal and financial advisors' fees (the "**Budget**"). The Proposed Order provides that the Budget and scope can be increased only with (i) the prior written consent of the Debtors and the Creditors' Committee (which may be granted or withheld in the sole discretion of the Debtors or Creditors' Committee) or (ii) approval of the Court, it being understood that the Debtors and the Creditors' Committee may oppose any Budget or scope increase request.

21. The Debtors believe the Budget is appropriate under the circumstances. The Budget is sufficient to cover the costs of performing an independent valuation and negotiating a plan of reorganization. Individualized representation of equity is certainly not necessary with regard to activities such as investigation of liens, review of proposed asset sales, or any other activities in which the interests of the Debtors' creditors are fully aligned with those of equity holders. The Proposed Order balances the competing interests of the Debtors, to minimize costs, and the Ad Hoc Equity Group to ensure sufficient resources to represent equity holders adequately. Given the Official Equity Committee's limited scope, the Debtors request that the Court impose the Budget on the Official Equity Committee to ensure that the Official Equity Committee performs its role without burdening the Debtors' estates with unnecessary fees and expenses.

22. Further, the Proposed Order reserves the Debtors' right to request that the Court disband the Official Equity Committee in the event that the appointment of an Official Equity Committee is no longer necessary or appropriate to protect the interests of equity holders in these chapter 11 cases.

23. Accordingly, the Debtors request that the Court enter the Proposed Order.

iii. An Official Equity Committee Will Provide a Practical Benefit in These Chapter 11 Cases

24. This Court has added an additional factor to the four factors set out in *Pilgrim's Pride*, which considers if an Official Equity Committee will provide a practical benefit to the estate. As noted above, this case has several unique characteristics, including that the Debtors are not hopelessly insolvent and that valuation will be based, in part, on the volatile price of bitcoin, making the appointment of an Official Equity Committee practical in these cases.

25. In addition, the Debtors believe that principles of fairness support the practicality of the appointment of an Official Equity Committee. Other parties have estate-paid professionals, including the unsecured creditors (through the Creditors' Committee),[11] the Ad Hoc Noteholder Group,[12] and the lender under the Replacement DIP Facility, which is the Debtors' largest unsecured creditor.[13] The Debtors believe that, in the interests of fairness, equity holders,

---

[11] *Application for Entry of an Order Authorizing the Retention and Employment of Willkie Farr & Gallagher Llp as Counsel to the Official Committee of Unsecured Creditors Effective as of January 9, 2023* (ECF No. 505); *Application for Entry of Order Authorizing the Retention and Employment of Ducera Partners LLC as Investment Banker to the Official Committee of Unsecured Creditors Effective as of January 10, 2023* (ECF No. 506).

[12] *Order (I) Authorizing the Debtors on an Interim Basis to (a) Obtain Senior Secured Non-priming Superpriority Replacement Postpetition Financing and (b) Use Cash Collateral, (II) Authorizing the Debtors to Refinance Existing Postpetition Financing on a Final Basis, (III) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Secured Parties on a Final Basis, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (ECF No. 447) ¶ 2(c).

[13] *Id.*; *see also Voluntary Petition for Non-Individuals Filing for Bankruptcy* (ECF No. 1) (listing B. Riley Financial, Inc. as the Debtors' largest unsecured creditor.

whose recovery will be impacted by the outcome of these cases, should also receive estate-paid representation on the issue of valuation and plan negotiation. Given the Debtors' current financial situation, the Debtors believe it is important that equity holders feel they have an equal voice to other constituents in the case.

### E. The Court Should Disregard the Ad Hoc Equity Group's Ad Hominem Attacks on the Debtors

26. Although the Debtors support, in part, the relief requested in the Motion, the Debtors disagree with certain statements made by the Ad Hoc Equity Group therein.

27. The Ad Hoc Equity Group attempts to rewrite history by arguing that management somehow failed to represent equity holders adequately when it entered into the Original DIP Facility. This allegation simply ignores reality. On the Petition Date, the Debtors were no more than a few days away from running out of cash, which would have been value destructive for all interested parties. *See Declaration of John Singh in Support of Emergency Motion of Debtors for Entry of Interim and Final Orders (a) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief* (ECF No. 98, ¶13) (the "**Singh Original DIP Declaration**") (noting the Debtors' immediate need for cash and that they entered chapter 11 with only $4 million of cash on hand, which was not enough to fund ongoing operations). The Debtors searched for alternative financing, but the Original DIP Facility from the Ad Hoc Noteholder Group was the only viable option available. *Id.* at ¶ 29. The Debtors also sought to convince the Ad Hoc Noteholder Group to provide a DIP loan that was untethered to the RSA, but the Ad Hoc Noteholder Group conditioned its DIP loan on the RSA. Bros Declaration at ¶¶ 82, 94. The

Debtors then negotiated to get the best terms available on the RSA. *Id.* at ¶ 48. Although the Original DIP Facility was tied to the now-terminated RSA, it was simply the best option available to the Debtors at that time and under those circumstances. Indeed, the Court approved the Original DIP Facility on an interim basis and found that the Debtors' agreement to the Original DIP Facility was (i) a proper exercise of the Debtors' business judgment, (ii) "negotiated in good faith and at arm's length among the [parties]," and (iii) necessary to avoid immediate and irreparable harm. *Interim Order (I) Authorizing the Debtors to (a) Obtain Senior Secured Priming Superpriority Postpetition Financing and (b) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (ECF No. 130) (the "**Original DIP Order**") at ¶ G.(l), (n).

28. Similarly, the Ad Hoc Equity Group's assertions that the Debtors' procurement of the Replacement DIP Facility was somehow a result of the Debtors' failure to obtain such terms in the first instance and that the Original DIP Facility marketing process was inadequate are likewise incorrect. As set forth in the Singh Original DIP Declaration, the Original DIP Facility was the result of a robust marketing process in which PJT contacted over 20 potential lenders. Singh Original DIP Declaration ¶¶ 12, 25–26.[14] The Court found that the Debtors were unable to secure financing or other financial accommodations on more favorable terms than what was provided in the Original DIP Facility. Original DIP Order at ¶ G.(c).

29. Moreover, the Debtors immediately began seeking replacement DIP financing after approval of the Original DIP Order and as market conditions in the industry started

---

[14] It bears mentioning that the Debtors did contact the Replacement DIP Lender prepetition regarding debtor-in-possession financing; however, the lender was only willing to extend credit after market conditions improved.

to improve. *See Second Singh Declaration* ¶¶12–13.[15]  This resulted in the Replacement DIP Facility, which, as noted above, has significantly better terms for the Debtor than the Original DIP Facility.  The Court noted during the Replacement DIP Hearing that entry into the Replacement DIP Facility was a valid exercise of the Debtors' business judgment.  Replacement DIP Hearing, Hr'g Tr. at 69:8–22.  Any assertion by the Ad Hoc Equity Group that the Debtors' circumstances in December 2022 provided the flexibility to forego the Original DIP Facility or that the Debtors did not do everything possible to preserve and maximize value is an unsupported and absurd attack.[16]

30. The Debtors are hopeful that once appointed, an Official Equity Committee will work constructively with the Debtors on their shared goal of maximizing value through a successful restructuring.  The Debtors will continue to work with all stakeholders toward this end.

## Conclusion

31. For the reasons set forth herein, at this time, the Debtors support the appointment of an Official Equity Committee as set forth in the Proposed Order.

*[Remainder of Page Intentionally Left Blank]*

---

[15] The Ad Hoc Equity Group's spin on these events distorts the facts.  For example, while it is entirely possible that the Ad Hoc Equity Group "encouraged" one of the proposed DIP lenders to make a proposal (Motion ¶ 5), the Ad Hoc Equity Group did not introduce this lender to the Debtors.  This was one of the potential lenders PJT contacted prepetition.  That lender refused to make a proposal at that time given market conditions.  PJT then reached out again postpetition when market conditions improved.  Second Singh Declaration at ¶ 13.

[16] The Debtors disagree with many statements and assertions in the Motion, but only address certain points herein given the Debtors' position on the relief sought in the Motion.

Dated: February 24, 2023
Houston, Texas

Respectfully submitted,

  /s/  Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Email: Alfredo.Perez@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock (admitted *pro hac vice*)
Ronit J. Berkovich (admitted *pro hac vice*)
Moshe A. Fink (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Email:   Ray.Schrock@weil.com
             Ronit.Berkovich@weil.com
             Moshe.Fink@weil.com

*Attorneys for Debtors
and Debtors in Possession*

**Certificate of Service**

I hereby certify that on February 24, 2023, a true and correct copy of the foregoing document was served as provided by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

                                                                                           */s/ Alfredo R. Pérez*
                                                                                        Alfredo R. Pérez