**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CORE SCIENTIFIC, INC., *et al.*, | ) Case No. 22-90341 (DRJ) |
| | ) |
| Debtors.[1] | ) (Jointly Administered) |
| | ) |
| | ) Re: Docket Nos. 458, 568 |

**OBJECTION OF THE AD HOC**
**GROUP TO THE MOTION OF THE AD HOC**
**GROUP OF EQUITY HOLDERS OF CORE SCIENTIFIC**
**FOR ENTRY OF AN ORDER DIRECTING THE APPOINTMENT**
**OF AN OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS**

The ad hoc group (the "Ad Hoc Group") of beneficial holders and/or investment advisors or managers of discretionary accounts that hold (i) secured convertible notes issued pursuant to that certain Secured Convertible Note Purchase Agreement, dated as of April 19, 2021 (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, and including all related credit documents, and the notes issued thereunder, the "April Secured Convertible Notes") and/or (ii) the secured convertible notes issued pursuant to that certain Convertible Note Purchase Agreement, dated on or about August 20, 2021 (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, and including all related credit documents, and the notes issues thereunder, the "August Secured Convertible Notes", and collectively with the April Secured Convertible Notes,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

the "Prepetition Secured Notes"), each issued by Core Scientific, Inc. (as successor to or assignee of Core Scientific Holdings Co., "Core Scientific"),[2] hereby submits this objection (this "Objection") to the motion [Docket No. 458] (the "Equity Committee Motion")[3] filed by the ad hoc group of equity holders (the "Equity Group") of Core Scientific seeking the appointment of an official committee of equity security holders (the "Official Equity Committee") in the chapter 11 cases (the "Chapter 11 Cases") of the above-captioned debtors and debtors-in-possession (the "Debtors"). In support of this Objection, the Ad Hoc Group respectfully states as follows:

## PRELIMINARY STATEMENT

1.     The Equity Group's request to appoint an Official Equity Committee fails because it offers no substantive or credible evidence of solvency to support the Equity Committee Motion and, instead, pins its hope for a meaningful equity recovery exclusively on the current—but ever-changing and volatile—price of bitcoin. Speculation on future bitcoin pricing is not a business plan, nor does it justify the extraordinary relief sought in the Equity Committee Motion. The risks and costs associated with the case delays and exponential fee burn associated with the appointment of an Official Equity Committee would be borne solely by the Debtors' creditors. The Equity Group should not be permitted to gamble with the creditors' money.

2.     It is well-established that the appointment of an Official Equity Committee constitutes "extraordinary relief" to be granted only after the movant has satisfied its burden of demonstrating, among other things, that the Debtors are likely solvent and that equity holders are likely to receive a meaningful distribution. Here, the Equity Group can demonstrate neither. The

---

[2] The Ad Hoc Group collectively holds approximately 67.91% of the principal amount of the April Secured Convertible Notes outstanding and approximately 79.77% of the principal amount of the August Secured Convertible Notes outstanding, in the aggregate. *See Verified Statement of the Ad Hoc Group of Secured Convertible Noteholders Pursuant to Bankruptcy Rule 2019*, dated January 18, 2023 [Docket No. 305].

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Equity Committee Motion.

Debtors' massive debt load is wholly unsustainable; the Debtors are burdened with more than $1.5 billion in DIP financing, equipment financing, equipment leases and prepetition secured debt (inclusive of "Repayment Amounts" due under the Prepetition Secured Notes, which the holders of Prepetition Secured Notes are entitled to receive before it can be said that the Debtors are "solvent"), which the Debtors are unable to refinance.  The Debtors also face approximately $70 million in unsecured debt and more than $200 million in various other liabilities that would have to be paid in full, with postpetition interest, before equity would receive any recovery.  Indeed, the Debtors have been unable to pay their debts when they become due since at least October 27, 2022, and the Debtors currently are *not* paying *any* debt service on account of any of its secured funded debt or equipment debt.  Moreover, the Debtors have refused to make payments of post-petition interest on account of the Prepetition Secured Notes as adequate protection, notwithstanding their current support for the Equity Committee Motion—support that the Debtors recently agreed to, although they just a month ago opposed the formation of an equity committee when the U.S. Trustee considered the Equity Group's request.[4]

3.     Although bitcoin prices have increased since the Petition Date, the Equity Group fails to acknowledge the increase in the bitcoin network's hash rate, which in effect reduces the number of bitcoin that the Debtors may generate, thus offsetting the potential value associated with increased bitcoin pricing.  In any event, predicting the future price of bitcoin six months from now would be extremely difficult (if not impossible).  In the interim, it would be the secured and

---

[4] The "settlement" reached between the Debtors, Creditors' Committee and Equity Group (*see* Revised Form of Order, Docket No. 568-1 (the "Revised Proposed Order")), raises significant issues as to the Debtors' exercise of their fiduciary duties to maximize recoveries for its creditors ahead of its equity holders.  Accordingly, the Ad Hoc Group served discovery upon the Equity Group and Debtors earlier today, and filed a motion seeking to adjourn the hearing on the Equity Committee Motion to allow a reasonable time for such discovery to take place. *See The Ad Hoc Noteholder Group's Emergency Motion To Adjourn Hearing On Motion Of Ad Hoc Group Of Equity Holders Of Core Scientific For Entry Of An Order Directing The Appointment Of An Official Committee Of Equity Security Holders* [Docket No. 458], dated February 24, 2023 [Docket No. 569].

unsecured creditors of the Debtors that bear the risk of any intervening decline in the price of bitcoin.

4.       This Court summed it up well in the *Sandridge Energy* case, in which it articulated the fifth and all-encompassing factor to assess the appointment of an Official Equity Committee, namely, what value will the equity committee bring to the table.  *In re Sandridge Energy Inc.*, No. 16-32488 (Bankr. S.D. Tex. Aug. 1, 2016), Hr'g Tr. at 94:11-14, a copy of which is attached hereto as **<u>Exhibit A</u>**. The Equity Group is comprised of sophisticated individuals (including members of the former management team), is represented by competent counsel and has already been active in the Chapter 11 Cases.  The Equity Group fails to demonstrate how denial of the Equity Committee Motion would render it unable to represent its parochial interests going forward.  Between the equity held by members of the Ad Hoc Group, by the Equity Group and by the Debtors' current officers and directors, close to a majority of the Debtors' equity is already "at the table." The Debtors, the Creditors' Committee and the Equity Group are each adequately (and vigorously) representing the interests of equity holders (as evidenced by the Debtors' determination to pivot away from the RSA, refinance the existing DIP facility and, now, support the Equity Committee Motion).

5.       The Equity Committee Motion is, at best, premature—which is in fact highlighted by the nature of the "settlement" among the Equity Group, the Debtors and the Creditors' Committee.  The Revised Proposed Order limits the scope of the Official Equity Committee to (i) valuation and (ii) plan negotiations.  However, the Debtors do not have a new business plan that has been shared with their constituents, they have not done a valuation, and have not signaled that they are prepared to commence plan negotiations any time soon.  While the Debtors previously had the framework for a restructuring and a path to exit, by terminating the RSA, they are

essentially back to square one of a free fall (rendering their support for the appointment of an Official Equity Committee at this juncture curious).

6.    Ultimately, denial of the Equity Committee Motion would not in any way preclude the Equity Group from participating in the Chapter 11 Cases or having their day in Court.  And, if the Equity Group is able to prove its substantial benefit to the Debtors' estates, they may seek recourse under section 503(b) of the Bankruptcy Code

7.    Accordingly, the Ad Hoc Group respectfully requests that the Court deny the Equity Committee Motion.

## **OBJECTION**

8.    Section 1102(a)(2) of the Bankruptcy Code provides that, upon request of a party in interest, "the court may order the appointment of additional committees of creditors or of equity security holders if *necessary to assure adequate representation* of creditors or of equity security holders." 11 U.S.C. § 1102(a)(2) (emphasis added).

9.    Courts agree that the appointment of an official equity committee "constitutes extraordinary relief and is the exception rather than the rule in chapter 11 cases." *In re Eastman Kodak Co.*, 2012 WL 2501071, at *2 (Bankr. S.D.N.Y. June 28, 2012); *In re Williams Commc'ns Grp., Inc.*, 281 B.R. 216, 223 (Bankr. S.D.N.Y. 2002); *In re Dana Corp.*, 344 B.R. 35, 38 (Bankr. S.D.N.Y. 2006).  Thus, the appropriate standard for the appointment of an official equity committee is when *necessary* to protect the interests of equity holders, not simply when "useful or appropriate." *In re SunEdison Inc.*, 556 B.R. 94, 103 (Bankr. S.D.N.Y. 2016).  The Equity Group bears the heavy burden of demonstrating that an Official Equity Committee is necessary for equity holders to be adequately represented. *See id*.

10.     In assessing requests for the appointment of an official equity committee, this Court has generally looked to the *Pilgrim's Pride* factors, namely: (a) whether the debtors are likely to prove solvent; (b) whether equity is adequately represented by the stakeholders that are already at the table; (c) the complexity of the bankruptcy cases; and (d) the likely cost to the debtors' estates of an equity committee. *See Sandridge Energy Inc.* Hr'g Tr. at 94:7-14 (*citing In re Pilgrim's Pride Corp.*, 407 B.R. 211, 216 (Bankr. N.D. Tex. 2009)). However, in *Sandridge* Energy, this Court added a practical fifth factor, namely, "is it going to add something to the case…." *Id.*

### No Evidence of Solvency or Likelihood of Distribution to Equity

11.     Generally, an Official Equity Committee should not be appointed unless the movant can establish that "there is a substantial likelihood that they will receive a meaningful distribution in the case under a strict application of the absolute priority rule." *In re Celsius Network LLC*, 645 B.R. 165, 174 (Bankr. S.D.N.Y. 2022).  Moreover, on the issue of solvency, the relevant inquiry is whether a debtor appears to be hopelessly insolvent.  *SunEdison*, 556 B.R. at 102.)

12.     Here, the Equity Group offers no real evidence of solvency. The Equity Group cites in the Equity Committee Motion to a prepetition quarterly report for Q3 2022 and the Debtors' voluntary bankruptcy petitions, which are now stale and obsolete, reflect book value (as opposed to fair market value) and do not take into account any depreciation (which is significant).  Indeed, courts have recognized the inherent unreliability of this type of balance sheet data as a true measure of valuation.  *See SunEdison* 556 B.R. at 102 (noting that "[b]alance sheets…reflect book value, which does not ordinarily equate to market value). The Equity Group also relies upon the *Declaration of Michael Bros in Support of the Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 5] (the "First Day Declaration") to suggest balance sheet solvency, but, in fact, the

First Day Declaration demonstrates the opposite, and actually rebuts many of the colloquial arguments raised by the Equity Group in the Equity Committee Motion.

13.     Based on the Debtors' recently-filed Schedules and Statements of Financial Affairs ("Schedules and SoFAs"), the Debtors disclose total assets as of the Petition Date of approximately $1,315,701,143.98.  *See Schedules of Assets and Liabilities and Statements of Financial Affairs* [Docket Nos. 461, 462, 463, 464, 465, 466, 467, 468, 469, 470, 471, 490]. The Schedules and SoFAs reflect the Debtors' estimate of the "net book value" of their assets, which nets the recorded value of an asset against cumulated depreciation, as opposed to the fair market value of their assets. Accordingly, net book value likely overstates the realizable value associated with those assets on a going concern basis (and is substantially higher than the liquidation value associated with those assets).  Indeed, the Debtors note in their Schedules and SoFAs that, "[u]nless otherwise indicated, the Schedules and Statements reflect *net book values* ("NBV"), rather than current market values, *and may not reflect net realizable value*.  For this reason, amounts ultimately realized will vary, potentially materially, from NBV."  *Id*.

14.     In any event, a closer analysis of the various liabilities owed by the Debtors demonstrates the Debtors' deep insolvency.  Based on a review of the Schedules and SoFAs, and other publicly available information, the Debtors' liabilities are comprised of the following:

| | |
|---|---|
| **B. Riley DIP**[5] | $42,962,061.58 |
| **Secured Debt** | |
| April Secured Convertible Notes[6] | $499,735,270.50 |

---

[5] This is an estimated amount, which includes PIK interest, upfront fee and exit fee through December 21, 2023, the maturity date of the B. Riley DIP.

[6] This is an estimated amount, which includes a 200% "Repayment Amount", pursuant to the applicable notes (based upon accrued PIK interest through petition date) and interest through December 21, 2023, the maturity date of the B. Riley DIP.  Under the terms of the April Secured Convertible Notes, the Repayment Amount is payable upon both voluntary prepayments and on the Maturity Date of the April Secured Convertible Notes.  While the Ad Hoc Group reserves all rights with respect to arguments that may exist with respect to the allowance of the Repayment Amount of the April Secured Convertible Notes, the Ad Hoc Group submits that creditors of a solvent debtor are entitled to

| | |
|---|---|
| August Secured Convertible Notes[7] | $678,129,389.90 |
| Equipment Leases | $70,986,218.40 |
| Equipment Financings | $240,945,756.90 |
| Facility Mortgages | 695,409.90 |
| Mechanics Liens[8] | $99,695,246.21 |
| Other Secured Debt | TBD |
| **Unsecured Debt** | |
| Unsecured Trade Payables | $27,063,393.50 |
| Unsecured Bridge Loan | $42,437,565.91 |
| Taxes | TBD |
| Litigation | TBD |
| Deferred Revenue –Blockchain Hosting | TBD |
| Rejection Damages Claims | TBD |
| **Professional Fee Claims[9]** | $54,800,000.00 |
| **Total Liabilities** | **$1,757,450,312.80** |

15.     Even before taking into account unknown tax claims, litigation claims, deferred revenue claims, rejection claims and other liabilities, all of which have to be paid in full before equity may receive a recovery, equity holders are out of the money by several hundred million dollars.

16.     Next, the Equity Group alleges that the now-terminated RSA, which previously incorporated a "tip" to equity, is indicative of a meaningful recovery to equity.  Equity Committee Motion at ¶¶ 34-35.  But, the RSA reflected a global compromise reached—at the time—between

---

the full amount of their bargained for contractual payments before there can be a recovery to equity holders. *See In re Ultra Petroleum Corp.*, 51 F.4th 138, 145 (5th Cir. 2022).

[7] This is an estimated amount, which includes a 200% repayment amount, pursuant to the applicable notes (based upon accrued PIK interest through petition date) and interest through December 21, 2023, the maturity date of the B. Riley DIP.  Under the terms of the August Secured Convertible Notes, the Repayment Amount is payable upon a voluntary prepayment of the August Secured Convertible Notes.  While the Ad Hoc Group reserves all rights with respect to arguments that may exist with respect to the allowance of the Repayment Amount of the August Secured Convertible Notes, as with the April Secured Convertible Notes, the Ad Hoc Group submits that the holders of August Secured Convertible Notes are entitled to payment in full of their bargained for contractual amounts before there can be a recovery to the Debtors' equity holders.

[8] Based on notices of perfection of mechanic's lien filed in the Chapter 11 Cases.  [Docket Nos. 197, 198, 254, 316, 337, 369, 370, 371, 398, 399, 400, 412, 413, 545, 547, 338, 493, 494, 495].

[9] Based on the DIP Budget attached to the Interim Replacement DIP Order, professional fees are estimated to be approximately $54.8 million through June 30, 2023 and professional fee claims accruing after such date could increase such amount by tens of millions of dollars.

the Ad Hoc Group and the Debtors that incorporated a settlement (as insisted by the Debtors'
management team) under which a portion of the noteholders' recovery was redirected to equity to
facilitate a consensual restructuring.  That proposed settlement was not at all indicative of the value
the Debtors' equity holders would be entitled to (there is none) in a waterfall plan based on the
absolute priority rule.

17.     The Equity Group further asserts that the refinancing of the Original DIP Financing
"leaves more value in the Debtors' estates." In the Ad Hoc Group's view, the Debtors'
determination to refinance the Original DIP Financing, was, in fact, misguided.  In addition to
saddling the Debtors' estates with significant breakage costs, the Debtors chose to abandon the Ad
Hoc Group's exit financing commitments and scrap the RSA's plan settlement framework, which
served as a constructive starting point for creditor negotiations.  In doing so, the Debtors—like the
Equity Group—are simply gambling on the future pricing of bitcoin (with little regard for what
happens if bitcoin prices *fall*).  As a result, the Chapter 11 Cases are now rudderless, as the Debtors
and others pray for bitcoin prices to continue to rise, and refuse to come to the negotiating table.

18.     The Equity Group purports to cite trading multiples for comparable public digital
asset mining companies and the "surge" in the stock prices of certain of the Debtors' competitors
to prove that "hundreds of millions of dollars are available for shareholders" of Core Scientific.
Equity Committee Objection at ¶ 38-45.  But, the comparable company set cited by the Equity
Group is wholly inapposite to Core Scientific.  *First*, none of the cited companies are in chapter
11.  *Second*, virtually all of the cited companies have little to no debt: (a) **Riot Blockchain** has
*negative $233 million* in net debt (*i.e.*, $22 million in operating lease liabilities and $255 million
in cash), (b) **Hut 8 Mining Corp.** has only approximately *$17 million* in net debt (including
operating lease liabilities), and (c) **HIV Blockchain Technologies Ltd.** has only approximately

*$37 million* in net debt (including operating lease liabilities).  The Debtors, by way of contrast, have more than $1.5 billion in secured debt (inclusive of the Prepetition Secured Notes, equipment financings and equipment leases) and $42 million in unsecured funded debt.  If anything, the comparable company set presented by the Equity Group underscores the Debtors' excessive debt load relative to its "peers," and illustrates the near impossibility of refinancing all of their secured debt in cash.  Moreover, in its comparable company analysis, the Equity Group applies "comparable" trading multiples based off the 12-month period ending September 30, 2022, which conveniently disregards the events leading to, and the effects of, the Debtors' bankruptcy filing.  Rather, the Equity Group focuses heavily upon the recent increase in the price of bitcoin, and relies upon public letters filed by B. Riley Commercial Capital, LLC ("B. Riley") to demonstrate the impact of the increase in the price of bitcoin upon EBITDA.  Equity Committee Objection at ¶ 46.  These statements are pure conjecture, lack any evidentiary basis and fail to acknowledge various offsets to any increase in bitcoin pricing (as demonstrated below).

19.     By way of background, the charts below depict the price of bitcoin, the bitcoin network hash rate, and the Debtors' stock performance, in each case, from January 2022 to the present date:





See Historical Data of Core Scientific, Inc. (CORZQ), Yahoo Finance, https://finance.yahoo.com/quote/CORZQ/history?p=CORZQ (last visited Feb. 24, 2023); *see also* Historical Data of Bitcoin USD (BTC-USD), Yahoo Finance, https://finance.yahoo.com/quote/BTC-USD/history?p=BTC-USD (last visited Feb. 24, 2023); Bitcoin Hash Rate, NASDAQ, https://data.nasdaq.com/data/BCHAIN/HRATE-bitcoin-hash-rate (last visited Feb. 24, 2023).

20.     The juxtaposition of these charts illustrates the minimal increase in Core Scientific's "market capitalization" during the period after which Core Scientific publicly announced, on October 27, 2022, that it could no longer pay its debts as they become due to the present date.  Part of the reason for this is the offsetting impact of the increase in the global bitcoin network hash rate.   Generally speaking, the bitcoin network hash rate represents the total computing power of miners on the global bitcoin network.  Given the protocols and infrastructure of bitcoin mining, the number of bitcoin that the Debtors can expect to earn is a function of the aggregate hash rate of Core Scientific's mining rigs as a percentage of the global bitcoin network hash rate. Consequently, when the global network hash rate goes up, the Debtors existing mining fleet will produce *fewer* bitcoins in the form of block rewards.  Thus, the increase in the bitcoin network hash rate to historical highs has had a direct negative impact on the profitability of the Debtors' mining fleet, and serves as an offset to increased bitcoin prices. Indeed, Mr. Bros, whose

declaration the Equity Group relies upon in support of the Equity Committee Motion, acknowledges these facts: "[a]dditionally, the decrease in bitcoin prices have been accompanied by an increase in network difficulty resulting from increased network 'hash rates'—or the measure of computational power active on a particular blockchain network—*resulting in reduced revenues and profitability*."  First Day Declaration at ¶ 68.

21.     Thus, the Equity Group's attempt to establish a direct linear correlation between the price of bitcoin and EBITDA is wholly unsupported.  In any event, as has been acknowledged before the Court, the future pricing of bitcoin is unpredictable.  Indeed, B Riley has attempted, in its DIP credit agreement (the "B. Riley DIP Credit Agreement"), to require the Debtors to hedge its bitcoin exposure.  *See* B. Riley DIP Credit Agreement § 10.1.13.  Yet, to date, the Debtors have been unable to do so precisely because of the volatile and unpredictable nature of bitcoin pricing.

22.     The Equity Group also fails to address in the Equity Committee Motion the many operational and secular challenges facing the Debtors' businesses.  For instance, Mr. Bros testified that a number of factors rendered the Debtors' capital structure and debt burden unsustainable, affected the Debtors' liquidity position, and ultimately necessitated a bankruptcy filing, including:

(i)     the effect of the "precipitous and prolonged decline in the price of bitcoin during the 'crypto winter' that began in the spring of 2002" upon the Debtors' financial performance [First Day Declaration at ¶¶ 6, 65-68];

(ii)    the Debtors' heavy dependence on power to operate its computers – the Debtors' power costs for the first half of 2022 totaled $106 million, comprising 40% of cost of revenue – and the power price increases that have negatively affected the Debtors' margins [First Day Declaration at ¶¶ 6, 69–72];

(iii)   the filing of the Celsius bankruptcy case, one of the Debtors' largest hosting customers, and Celsius' failure to pay "power pass-though" charges owed to the Debtors [First Day Declaration at ¶¶ 6, 73–77];

(iv)    the Debtors' "over-commitment" for construction costs to build out additional mining capacity [First Day Declaration at ¶ 6 (the "Debtors are

committed to more than $200 million in construction costs and contracts
have asserted more than $99 million in mechanic's liens")];

(v)    the Debtors are indebted on more than $275 million in equipment
financings, *many of whom have not received any payments since as far back
as October 2022* [First Day Declaration at ¶ 6]; and

(vi)   the Debtors' unsustainable debt structure [First Day Declaration at ¶ 6].

The Equity Group fails to substantively address these fundamental operational and financial
challenges, other than to assert, in conclusory fashion, that the "market" has grown comfortable
with the Federal Reserve's pace of interest rate hikes, the purported moderate state of inflation and
that energy prices have settled. *See* Equity Motion at ¶ 36.  The Equity Group offers no substantive
discussion or evidence regarding the Debtors' financial performance, projected cash flows or
business plan (or lack thereof).

### The Interests of the Equity Holders are Adequately Represented

23.    Equity committees "should not be appointed unless equity holders establish
that…they are unable to represent their interests in the bankruptcy case without an official
committee.  [This] factor is critical because, in most cases, even those equity holders who do expect
a distribution in the case can adequately represent their interest without an official committee and
can seek compensation if they make a substantial contribution in the case."  *Williams Commc'ns
Grp.*, 281 B.R. at 223.  Here, there is no question that the Equity Group is represented by prominent
restructuring counsel with extensive experience in bankruptcy matters, and that the Equity Group,
which comprises sophisticated individuals (some of whom are former members of the Debtors'
management team), is clearly able to represent its own interests in the Chapter 11 Cases.  The
Equity Group claims to have been actively involved in the DIP financing process, and has filed
pleadings with and appeared in person before this Court.  *See* Equity Committee Motion at ¶ 62.

13

24.     Moreover, the Equity Group fails to allege, let alone demonstrate, that the Debtors are not prepared to advance the interests of their shareholders.  Although the Debtors' stock is publicly traded, much of it remains closely held and the interests of the Equity Group and the Debtors' significant shareholders are aligned.  Notably, the Debtors' directors and management team hold approximately 30% of the aggregate outstanding amount of the Debtors' common stock and have already evidenced their ability to advocate on behalf of equity holders on multiple occasions.  *See* Core Scientific, Inc., Schedule 14A Information (Proxy Statement) at 21 (April 8, 2022); *see also* Core Scientific, Inc., various Form 3s and Form 4s from and after March 28, 2022. Between the equity held by members of the Ad Hoc Group, the Equity Group and the Debtors' directors and management team, close to a majority of the Debtors' equity is currently "at the table" and can represent the interests of equity holders. And, the Debtors' purported "settlement" and agreement to now not oppose the Equity Committee Motion further demonstrates this alignment of interests.

25.     The recently reconstituted official committee of unsecured creditors is also capable of representing the interests of the equity holders.  The Equity Group's assertion that "[i]n its efforts to maximize recoveries for unsecured creditors, the Creditors' Committee may seek to trade higher general unsecured claim recoveries (or premium) for little or no equity recoveries" demonstrates a misunderstanding of the application of the absolute priority rule.   Equity Committee Motion ¶ 54.  General unsecured creditors may not recover more than the allowed amounts of their claims and equity is not entitled to any recovery until creditors are paid in full. As such, the official committee of unsecured creditors' duty to maximize the value of the Debtors' estates and ensure that it is properly managed will inure to the benefit of all stakeholders, including

equity holders who are entitled to any residual value once all creditors are paid in full.  *SunEdison*, 556 B.R. at 103; *Williams Commc'ns Grp.*, 281 B.R. at 221–22.

26.     Denial of the Equity Committee Motion would not leave the Equity Group without recourse.  As a threshold matter, the Equity Group remains free to continue to be active in the Chapter 11 Cases.  Moreover, the Equity Group may apply for compensation and expense reimbursement if they make a substantial contribution to the Chapter 11 Cases.  Finally, the Equity Committee Motion may be denied without prejudice, such that, if circumstances materially change, the Equity Group may renew its application.

### The Costs of an Official Equity Committee are not Justified

27.     An Official Equity Committee should not be appointed if "the cost of the additional committee sought significantly outweighs the concern for adequate representation."  *Celsius Network LLC*, 645 B.R. at 174.  Moreover, as this Court has noted, "the answer is not to pile another layer of administrative expense and another layer of cost in terms of just having the process go forward."  *Sandridge Energy*, Hr'g Tr. at 95:2–4.

28.     Here, the appointment of an Official Equity Committee would undoubtedly result in a duplication of efforts with the Debtors' other stakeholders, the costs of many of which are already being borne by the Debtors' estates.  An Official Equity Committee would have nothing to lose by incurring fees at the creditors' expense.  The Debtors' estates, and by extension, their creditors, including the members of the Ad Hoc Group and the Debtors unsecured creditors, should not have to bear additional costs and potentially, a diminution in recoveries, in order to effectively give equity holders a free option to wait out a potential increase in the price of bitcoin.

29.     In *Sandridge Energy*, this Court declined to appoint an official equity committee, citing the movant's failure to meet the burden of demonstrating the four traditional *Pilgrim's Pride*

factors, as well as the Court's "practical fifth factor" as to whether the movants would "add something" to the chapter 11 cases. Here, in addition to failing to satisfy the *Pilgrim's Pride* factors, the Equity Group fails to demonstrate how they will add something to these Chapter 11 Cases. And the increased administrative expenses that will result is evident: based on the proposed "settlement" that was filed with the Court, the Equity Group agreed to a $4,750,000 budget -- which does not constitute "a cap on fees and expenses"—and that is subject to numerous assumptions, while preserving the right of the Equity Group to seek to increase the budget. It is not at all apparent what the something is that will be added to these Chapter 11 Cases in exchange for such a significant expenditure.

**It Would Be Premature to Appoint Official Equity Committee.**

30.    Given that the Debtors currently do not have a viable business plan, let alone a plan of reorganization on file, it is (at best for the Equity Group), premature to appoint an Official Equity Committee in these early stages of the Chapter 11 Cases, when the Debtors are essentially in free fall bankruptcy cases without any viable path towards an exit, or any timeline for getting to the conclusion of these cases. The Equity Group has presented no credible evidence to support its requested relief. In the event the Court is not inclined to deny the Equity Committee Motion with prejudice, the motion may be denied without prejudice in these circumstances, given the indisputably uncertain path for these cases.

**CONCLUSION**

WHEREFORE, for the reasons set forth herein, the Ad Hoc Group respectfully requests that the Court deny the Equity Committee Motion and grant such other relief as is just and proper under the circumstances.

Respectfully submitted

Dated: February 24, 2023
      Houston, Texas

*/s/ James T. Grogan III*
_____

**PAUL HASTINGS LLP**
James T. Grogan III (TX Bar No. 24027354)
600 Travis Street, 58th Floor
Houston, Texas 77002
Telephone:  (713) 860-7300
Facsimile:  (713) 353-3100
Email: jamesgrogan@paulhastings.com

-and-

Kristopher M. Hansen (admitted *pro hac vice*)
Sayan Bhattacharyya (admitted *pro hac vice*)
Kenneth Pasquale ( admitted *pro hac vice* )
Erez E. Gilad (admitted *pro hac vice*)
Joanne Lau (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone:  (212) 318-6000
Facsimile:  (212) 319-4090
Email: krishansen@paulhastings.com
        sayanbhattacharyya@paulhastings.com
        kenpasquale@paulhastings.com
        erezgilad@paulhastings.com
        joannelau@paulhastings.com

*Counsel to the Ad Hoc Group of Secured Convertible Noteholders*

## **Certificate of Service**

I certify that on February 24, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ James T. Grogan III
James T. Grogan III

## Exhibit A

1   long, long way away from there being a recovery to equity

2   holders and for that reason, your Honor, we don't think the

3   appointment of an official equity committee is appropriate.

4          **THE COURT:**  All right, thank you.

5          **MR. QUERSHI:**  Thank you.

6          **THE COURT:**  Mr. Duran?

7          **MR. DURAN:**  My client declined to form an equity

8   committee under a very -- a more flexible and less rigorous

9   standard under 1102(a)(1).  We left it up to the Court when

10  they filed their motion although they're defined differently if

11  appropriate under 1102(a)(2).  It's a much more rigorous

12  standard.  My client didn't have the resources to do any sort

13  of valuation analysis.  My client has to rely on information

14  from the Debtors and the Committee.

15         Based on the standard here in the 1102(a)(2), if it's

16  -- you've got to make a showing that it's necessary to assure

17  adequate representation.  I don't believe that the Ad Hoc

18  Committee has reached that standard.

19         **THE COURT:**  All right, thank you.

20         All right.  I've got before me the emergency motion

21  to appoint an equity committee.  I have jurisdiction over the

22  matter pursuant to 28 U.S.C., Section 1334.  I do find that the

23  matter constitutes a core proceeding under 28 U.S.C., Section

24  157.  I further find that I have the requisite authority to

25  enter a final order with respect to the matter under the

94

1    Supreme Court's analysis in *Stern v Marshall*.  To the extent

2    that I'm wrong in my assessment, I find the parties have

3    consented and, therefore, I have the requisite authority so

4    long as I have jurisdiction, which I have found that I do, to

5    enter a final order under the *Executive Benefits* decision also

6    issued by the Supreme Court.

7            I am a big fan of the thought process that is set

8    forth in *Pilgrim's Pride* and I do think that the Court

9    exhibited a thoughtful analysis and weighing of the various

10   issues and set forth the four factors.  I add to those four

11   factors a practical fifth and that is, is it going to add

12   something to the case?  And based upon what I've heard today, I

13   will find that the Ad Hoc Committee has failed to sustain its

14   burden with respect to all four factors as well as my fifth.

15           I understand there's anger and I understand that

16   there is distrust.  I understand that there's a desire for

17   someone to give a third-party number.  That's not a basis to

18   form a committee.  It would have helped my thought process if I

19   had gotten what I know the answers are to some relatively

20   straightforward questions but for whatever reason, those

21   answers weren't forthcoming.

22           There's just not a burden.  The folks -- the

23   committee just hasn't met its burden and I'm troubled by the

24   fact because on one hand, I am sensitive to the loss of value

25   and the loss of shares and even those folks who are clearly

1   speculating, it's still a loss.  And I struggle with what to do

2   about that but the answer is not to pile another layer of

3   administrative expense and another layer of cost in terms of

4   just having the process go forward.

5          The Ad Hoc Committee certainly has the ability to

6   file objections.  They certainly have the ability to voice

7   their issues with respect to the plan and I'm going to take

8   those objections very seriously but in terms of appointing an

9   official committee, there's been no showing.  There's just not

10  a basis to do it and given what a committee -- the appointment

11  of an official committee entails and what it adds to the

12  administrative overlay not willing to do it based on faith --

13  not that I have any but I wouldn't be willing to do it based on

14  faith.  The record has got to exist.  Without that record,

15  there is no relief.

16         So I will deny the motion.  My proposal is just to

17  enter a very simple order that says, for the reasons stated on

18  the record pursuant to Bankruptcy Rule 7052, the emergency

19  motion is denied.

20         Does anybody have any issue with that form of order?

21         **MR. SLADE:**  No objection, your Honor.

22         **THE COURT:**  Mr. Gibbs?

23         **MS. MATTHEWS:**  No, your Honor.

24         **THE COURT:**  Ms. Matthews?

25         **MR. GIBBS:**  No objection.