**EXHIBIT 10**

EXECUTION VERSION

THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "***ACT***"), OR UNDER THE SECURITIES LAWS OF ANY STATES IN THE UNITED STATES. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT PURSUANT TO SECTION 5(C) HEREOF AND AS PERMITTED UNDER THE ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL IN FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER TO THE EFFECT THAT ANY PROPOSED TRANSFER OR RESALE IS IN COMPLIANCE WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

THIS NOTE HAS BEEN ISSUED WITH "ORIGINAL ISSUE DISCOUNT" (WITHIN THE MEANING OF SECTION 1273 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "***CODE***")). UPON WRITTEN REQUEST, THE COMPANY WILL PROMPTLY MAKE AVAILABLE TO ANY HOLDER OF THIS NOTE THE FOLLOWING INFORMATION: (1) THE ISSUE PRICE AND ISSUE DATE OF THE NOTE, (2) THE AMOUNT OF ORIGINAL ISSUE DISCOUNT ON THE NOTE AND (3) THE YIELD TO MATURITY OF THE NOTE. HOLDERS SHOULD CONTACT THE CHIEF FINANCIAL OFFICER OF THE COMPANY AT 2800 NORTHUP WAY SUITE 220 BELLEVUE, WA 98004.

## [FORM OF] SECURED CONVERTIBLE PROMISSORY NOTE

| | |
|---|---|
| Note Series: | 2021 Secured Convertible Promissory Notes |
| Date of Note: | April 19, 2021 |
| Initial Principal Amount of Note: | $[__], plus any PIK Interest that has accrued and been capitalized pursuant to the terms of this Note |

For value received **CORE SCIENTIFIC HOLDING CO.**, a Delaware corporation (the "***Company***"), promises to pay to the undersigned holder or such party's successors or permitted assigns (the "***Holder***") the principal amount set forth above with interest to accrue on such outstanding principal amount at a rate of 10% *per annum*, 4% of which shall be payable in cash ("***Cash Interest***") and 6% of which shall be payable in kind by capitalizing such interest payment and increasing the outstanding principal amount of this Note by the amount thereof ("***PIK Interest***"). Interest shall accrue on the outstanding principal amount of this Note commencing on (and including) the date of original issuance thereof (or the most recent interest payment date) and continuing until the earlier to occur of (x) the date this Note is repaid or prepaid in full and (y) the date this Note is converted in full by the Holder pursuant to Section 2 hereof. Cash Interest shall

be due and payable and PIK Interest shall be capitalized quarterly in arrears on the first day of each fiscal quarter, commencing on July 1, 2021. Interest shall be computed on the basis of a year of 365 days for the actual number of days elapsed. This Note shall be automatically deemed to include any accrued PIK Interest thereon and the Company shall not be obligated to issue any subsequent Notes reflecting PIK Interest. This Note is one of the "Notes" issued pursuant to the Purchase Agreement. All capitalized terms used but not otherwise defined in this Note will have the same meanings in this Note as in the Purchase Agreement referred to below.

The following is a statement of the rights of the Holder and the conditions to which this Note is subject, and to which the Holder, by the acceptance of this Note, agrees:

1. **BASIC TERMS**.

   (a) **Series of Notes**. This secured convertible promissory note (this "*Note*") is issued as part of a series of notes designated by the Note Series above (collectively, the "*Notes*"), having an initial aggregate principal amount of up to $215,000,000 and issued pursuant to, and to those persons and entities (collectively, the "*Holders*") party, as Purchasers, to, that certain Purchase Agreement, dated as of even date herewith (as amended, restated, supplemented and/or otherwise modified from time to time, the "*Purchase Agreement*"), by and among the Company, each Purchaser party thereto, U.S. Bank National Association, as Note Agent, and U.S. Bank National Association, as Collateral Agent for the Secured Parties. The Company shall maintain a ledger of all Holders ("*Ledger*"), which shall include all PIK Interest accrued and capitalized, and which shall be available (i) promptly upon request to the Agents and the Holder, (ii) promptly after any transfer or assignment of any Note, (iii) promptly upon conversion of any Note and (iv) on the tenth business day prior to any interest payment date.

   (b) **Payments**.

      (i) **Voluntary Prepayments**.

         (1) Prior to the occurrence of a Conversion Event, subject to the expiration of any applicable lockup period set forth under any lockup agreement to which the Holder, the Company and the Company's underwriters are a party, in the event that, following written request by the Company, the Holder does not timely consent to an amendment to the Purchase Agreement to increase the Secured Debt Cap, the Company may, upon ten (10) Business Days' prior written notice (which may be included in such written request) to any such non-consenting Holder (which notice may be conditioned or rescinded upon such events as may be specified in such notice) prepay all or any portion of each Note held by any non-consenting Holder in an amount equal to the sum of (A) the outstanding principal amount (including all accrued PIK Interest not already added to the principal amount of this Note) of the Note being prepaid at such time and (B) all accrued unpaid Cash Interest on such outstanding principal amount at such time (such amount, the "*Covenant Amendment Repayment Amount*"). In addition to paying the Covenant Amendment Repayment Amount, the Company shall issue to each such non-consenting Holder a warrant that will entitle the Holder to acquire, upon a Conversion Event, the number of shares of Equity Securities (or Common Stock in the event of a Change of Control) equal to the quotient of (A) the principal amount of each Note being prepaid, divided by (B) the Applicable Conversion Price (which shall be determined, for the avoidance of doubt, on the date of the

consummation of such Conversion Event). The per share exercise price for such warrants shall be the Applicable Conversion Price (which shall be determined, for the avoidance of doubt, on the date of the consummation of such Conversion Event).

(2) On or after the occurrence of an Offering, subject to and following the expiration of any applicable lockup period set forth under any lockup agreement to which the Holder, the Company and the Company's underwriters are a party, and unless otherwise converted in full or in part pursuant to Section 2 hereof (including following delivery of the Company's notice referred to in this subsection (b)(i)(2)), the Company may at any time, upon ten (10) Business Days' prior written notice to the Holder and the Note Agent (which notice may be conditioned or rescinded upon such events as may be specified in such notice) prepay all or any portion of this Note in an amount equal to (x) the outstanding principal amount (including all accrued PIK Interest not already added to the principal amount of this Note) of this Note being prepaid at such time, together with all accrued unpaid Cash Interest on such outstanding principal amount at such time *multiplied* by (y) 200% (such amount, the "***Repayment Amount***").

(ii) **Repayment**. Unless otherwise prepaid by the Company pursuant to Section 1(b)(i) or converted in full pursuant to Section 2 hereof, this Note shall be repaid in full on the earlier to occur of (x) April 19, 2025 (the "***Maturity Date***"), in an amount equal to the Repayment Amount, and (y) acceleration by the Holders representing at least twenty-five percent (25%) of the aggregate outstanding principal amount of the Notes issued pursuant to the Purchase Agreement at such time after the occurrence of an Event of Default in accordance with the terms hereof, in an amount equal to the outstanding principal (including all accrued PIK Interest not already added to the principal amount of this Note) of this Note, plus all unpaid accrued Cash Interest thereon.

(iii) **Payments Generally**.

(1) This Note and the other Notes issued pursuant to the Purchase Agreement are *pari passu* in right of payment and all payments (other than conversion) under this Note and such other Notes shall be made in accordance with each Holder's Pro Rata Share. All payments shall be applied first, to the payment of expenses due under this Note and the other Note Documents to the Agents, second, to the payment of expenses due under this Note and the other Note Documents to the Holders, third, unpaid accrued interest of this Note and fourth, if the amount of payment exceeds the amount of all such expenses and accrued interest, to the payment of outstanding principal (including all accrued PIK Interest not already added to the principal amount of this Note) of this Note. The conversion of this Note by the Holder pursuant to the terms hereof shall be deemed to be a repayment of the full outstanding principal amount (including all accrued PIK Interest not already added to the principal amount of this Note) of such Note together with any unpaid accrued Cash Interest thereon on the date of such conversion.

(2) All payments to be made by the Company shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff, except with respect to Taxes required to be deducted and/or withheld under applicable law. All payments (other than by means of conversion pursuant to the terms of the Notes), including any prepayments, of interest and principal to be made by the Company hereunder shall be made by the Company to the Note Agent, in cash, for the account of the respective Holders to which such payment is owed, at

3

the applicable Notes Agent's Principal Office for payment and in same day funds not later than 11:00 a.m. on the date specified herein. The Notes Agent will promptly distribute to each Holder its Pro Rata Share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to each Holder at the address specified in the Holder's Administrative Questionnaire (or at such other address as the Holder may indicate in writing to the Note Agent from time to time). All payments received by the Notes Agent after 11:00 a.m. may (at the sole discretion of the Notes Agent) in each case be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(3) If any payment to be made by the Company shall come due on a day other than a Business Day, any interest shall be payable, and any PIK Interest shall be capitalized, on the next succeeding Business Day without additional interest accruing thereon.

(4) Whenever any payment received by the Notes Agent under this Agreement or any of the other Notes Documents is insufficient to pay in full all amounts due and payable to the Notes Agent and the Holders under or in respect of this Agreement and the other Notes Documents on any date, such payment shall be distributed by the Notes Agent and applied by the Notes Agent and the Holders in the order of priority set forth in Section 1(b)(iii)(1). If the Notes Agent receives funds for application to the Obligations of the Company under or in respect of the Notes Documents under circumstances for which the Notes Documents do not specify the manner in which such funds are to be applied, the Notes Agent may, but shall not be obligated to, elect to distribute such funds to the Holders in accordance with the Holder's Pro Rata Share of such of the outstanding Notes or other Obligations then owing to the Holder.

(iv) **Withholding**. Notwithstanding anything to the contrary herein, the Company shall be entitled to deduct and withhold from the consideration otherwise payable under the Note such amounts as it is required to deduct and withhold under the Code, or any other tax law, with respect to the making of such payment. To the extent that amounts are so withheld, such withheld amounts shall be treated for all purposes of this Note as having been paid to the Person in respect of whom such deduction and withholding was made. If a payment is payable (in whole or in part) in consideration other than cash and if the cash portion of any such payment is insufficient to satisfy all required tax withholding obligations, the Company shall retain an amount of the non-cash consideration otherwise payable equal in value to the amount required to satisfy any applicable withholding taxes (as reasonably determined by the Company.

2. **CONVERSION**.

(a) **Conversion upon an Offering**. In the event that the Company (i) issues and sells shares of its equity securities ("*Equity Securities*") to investors (the "*Investors*") in a private offering or placement with total gross proceeds to the Company of at least $50,000,000 (excluding the conversion of the Notes or other convertible securities issued for capital raising purposes (*e.g.*, Simple Agreements for Future Equity)) or (ii) issues and sells Equity Securities to Investors in an underwritten public offering pursuant to an effective registration statement filed with the Securities and Exchange Commission in accordance with the Act or under equivalent securities laws and regulations of any other jurisdiction (including, for the avoidance of doubt, any transaction involving a special purpose acquisition corporation, a "*SPAC*"), (iii) the Company lists its Common Stock other than shares of Common Stock not eligible for resale under Rule 144 under

4

the Securities Act) on a national securities exchange by means of an effective registration statement on Form S-1 filed by the Company with the SEC that registers shares of existing capital stock of the Company for resale, as approved by the Company's board of directors, or (iv) the listing of the Company's Equity Securities on any stock exchange (the occurrence of each event set forth in clauses (i) through (iv) above, an "***Offering***" and, together with the occurrence of a Change of Control as provided in Section 2(b) below, each, a "***Conversion Event***"), in each case, while this Note remains outstanding, the Holder shall have the right at any time and from time to time during the period commencing on the date of consummation of such Offering until the Maturity Date, to convert, in whole or in part, the outstanding principal amount (including all accrued PIK Interest not already added to the principal amount of this Note) of this Note, together with all unpaid accrued Cash Interest thereon, into Equity Securities of the Company at a conversion price equal to the Applicable Conversion Price (as defined below) (which shall be determined, for the avoidance of doubt, on the date of the consummation of such Offering). The issuance of Equity Securities by the Company pursuant to the conversion of this Note shall be upon and subject to the same terms and conditions (other than as otherwise set forth herein) applicable to Equity Securities sold in the applicable Offering.

(b)     **Conversion upon a Change of Control**. In the event the Company consummates a Change of Control (as defined below) while this Note remains outstanding, the Company shall repay the outstanding principal amount of this Note in an amount equal to the Repayment Amount; provided, however, that upon the written election of the Holder made not less than five (5) days prior to the Change of Control, the Company shall convert the outstanding principal amount of this Note (including all accrued PIK Interest not already added to the principal amount of this Note) and any unpaid accrued Cash Interest into common stock of the Company ("***Common Stock***") at a conversion price equal to the Applicable Conversion Price (which shall be determined, for the avoidance of doubt, on the date of consummation of such Change of Control) (assuming conversion of all securities convertible into Common Stock and exercise of all outstanding options and warrants, but excluding the shares of equity securities of the Company issuable upon the conversion of Notes or other convertible securities issued for capital raising purposes (e.g., Simple Agreements for Future Equity)). The Company shall give the Holder and the Note Agent written notice of any Change of Control at least ten (10) Business Days prior to the consummation thereof, which notice will contain the material terms and conditions (including price and form of consideration) of the Change of Control, the identity of the parties to the Change of Control and the intended date of the Change of Control.

For purposes of this Note, (i) a "***Change of Control***" means, at any time, any Person or "group" other than the Permitted Holders (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act) shall have obtained the power (whether or not exercised) to elect a majority of the members of the board of directors of the Company; (ii) "***Permitted Holders***" means each of BCV 55 LLC, BCV 66 LLC, BCV 77 LLC and each of their respective Affiliates; (iii) "***Fair Market Value Per Common Share***" means the cash and/or the value of the property, rights or securities to be paid or distributed per share of Common Stock of the Company to the holders of Common Stock of the Company pursuant to a Change of Control or a SPAC (with the value of such property, rights or securities being determined in good faith by the board of directors of the Company); and (iv) the "***Applicable Conversion Price***" means a conversion price equal to (a) 80% of either (x) the cash price paid per share for Equity Securities of the Company by the Investors in an Offering (other than a SPAC) or (y) the Fair Market Value Per Common Share in a Change of Control or a

SPAC, as applicable, if the Conversion Event occurs on or prior to April 19, 2022, (b) 75% of either (x) the cash price paid per share for Equity Securities of the Company by the Investors in an Offering (other than a SPAC) or (y) the Fair Market Value Per Common Share in a Change of Control or a SPAC, as applicable, if the Conversion Event occurs on or after April 19, 2022 but prior to April 19, 2023, (c) 70% of either (x) the cash price paid per share for Equity Securities of the Company by the Investors in an Offering (other than a SPAC) or (y) the Fair Market Value Per Common Share in a Change of Control or a SPAC, as applicable, if the Conversion Event occurs on or after April 19, 2023 but prior to April 19, 2024 and (d) 65% of either (x) the cash price paid per share for Equity Securities of the Company by the Investors in an Offering (other than a SPAC) or (y) the Fair Market Value Per Common Share in a Change of Control or a SPAC, as applicable, if the Conversion Event occurs on or after April 19, 2024 but prior to April 19, 2025.

(c) **Procedure for Conversion**. Upon the conversion in whole or in part of this Note into Equity Securities or Common Stock of the Company (as applicable), the Holder shall surrender this Note to the Company and deliver to the Company any documentation reasonably required by the Company (including, in the case of an Offering, all financing documents executed by the Investors in connection with such Offering). The Company shall not be required to issue or deliver the Equity Securities or Common Stock of the Company (as applicable) into which this Note may convert until the Holder has surrendered this Note to the Company and delivered to the Company any such documentation. The Company shall, as soon as practicable after the surrender of this Note and delivery to the Company of such documentation deliver to the Holder (i) a certificate or certificates for the number of shares of Equity Securities or Common Stock of the Company (as applicable) into which this Note is convertible in whole or in part, rounded downward to the nearest whole share and cash for the amounts not so converted as a result of the above-referenced downward rounding, registered in the name of such Investor or registered nominee or assignee and (ii) to the extent the Holder has converted only a portion of the outstanding principal amount of this Note, a replacement Note for the outstanding principal amount of this Note not converted. Upon the conversion in full or in part of this Note into Equity Securities or Common Stock of the Company (as applicable) pursuant to the terms hereof, in lieu of any fractional shares to which the Holder would otherwise be entitled, the Company shall pay the Holder cash equal to such fraction multiplied by the price at which this Note converts. Upon conversion of this Note in full or in part and payment of cash representing any fractional share pursuant to this Section 2(c), the Company shall be forever released from all its obligations and liabilities under this Note and this Note shall be deemed of no further force or effect, whether or not the original of this Note has been delivered to the Company for cancellation.

(d) **Taxes**. The Company shall pay any and all stamp, stock transfer, stock issuance and other similar taxes that may be payable in respect of any issuance or delivery of shares of Equity Securities or Common Stock of the Company (as applicable) upon conversion of this Note pursuant to this Section 2. The Company shall not, however, be required to pay any income, capital gains or similar tax of the recipient of Equity Securities or Common Stock of the Company (as applicable) or any tax which may be payable in respect of any transfer involved in the issuance and delivery of shares of Equity Securities or Common Stock of the Company (as applicable) in a name other than that in which this Note so converted was registered, and no such issuance or delivery shall be made unless and until the person or entity requesting such issuance has paid to the Company the amount of any such tax or has established, to the satisfaction of the Company, that such tax has been paid.

**3.     SECURED NOTE.**

To secure the performance and payment in full of the Obligations, the Company has granted to the Collateral Agent, for the benefit of the Secured Parties, a first-priority Lien on the Collateral (subject to Permitted Liens) pursuant to the Security Agreement.

**4.     EVENTS OF DEFAULT.**

If there shall be any Event of Default (as defined below) hereunder, at the option and upon the declaration of the Holders representing at least twenty-five percent (25%) of the aggregate outstanding principal amount of the Notes issued pursuant to the Purchase Agreement at such time and upon written notice to the Company (which election and notice shall not be required in the case of an Event of Default under subsection (v) or (vi) below), this Note shall accelerate and all principal (including all accrued PIK Interest not already added to the principal amount of this Note) and all unpaid accrued Cash Interest shall automatically become immediately due and payable. The occurrence of any one or more of the following shall constitute an "***Event of Default***":

(i)     the Company fails to pay to the Holder (i) the principal of this Note as and when due or (ii) within five (5) Business Days after the same becomes due any Cash Interest on this Note or any fees or any other Obligations;

(ii)    any representation or warranty made or deemed made by or on behalf of the Company or any of its Subsidiaries to the Holder under or in connection with the Note Documents or any certificate or information delivered in connection therewith shall be materially false when made;

(iii)   the Company and its Subsidiaries fail to observe or perform any term, covenant, or provision contained in Section 7 of the Purchase Agreement and such non-observance or non-performance shall not have been remedied or waived within thirty (30) days after the earlier of (i) the Company becoming aware of such non-observance or non-compliance or (ii) receipt by the Company of notice from a Holder of such non-observance or non-compliance;

(iv)    the Company and its Subsidiaries fail to observe or perform any other term, covenant or provision contained in the Purchase Agreement (other than those specified elsewhere in this Section 4) or any other Note Document and such non-observance or non-performance shall not have been remedied or waived within thirty (30) days after the earlier of (i) the Company becoming aware of such non-observance or non-compliance or (ii) receipt by the Company of notice from a Holder of such non-observance or non-compliance;

(v)     the Company or any Material Subsidiary shall (i) apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (ii) admit in writing its inability to pay its debts generally as they mature, (iii) make a general assignment for the benefit of its or any of its creditors, (iv) be dissolved or liquidated, (v) commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or consent to any such relief or to the appointment

7

of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, or (vi) take any action for the purpose of effecting any of the foregoing;

(vi) proceedings for the appointment of a receiver, trustee, liquidator or custodian of the Company or any of its Material Subsidiaries, or of all or a substantial part of the property thereof, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with respect to the Company or any of its Material Subsidiaries, if any, or the debts thereof under any bankruptcy, insolvency or other similar law now or hereafter in effect shall be commenced, or an order for relief shall be entered in any such proceeding, or such proceeding shall not be dismissed or discharged within 60 days of commencement;

(vii) the Company fails to pay when due any principal of or interest on or any other amount payable in respect of, or breaches or defaults under any other term of, any mortgage, indenture, agreement or other instrument under which there may be outstanding any Indebtedness in an aggregate principal amount of in excess of $10,000,000, in each case, beyond the grace period, if any, if the effect of such non-payment, breach or default is to cause such Indebtedness to become or be declared due and payable (or subject to a compulsory repurchase or redemption) prior to its stated maturity;

(viii) any court, government, or Governmental Authority shall condemn, seize or otherwise appropriate, or take custody or control of, all or any material portion of the property of the Company and its Subsidiaries, taken as a whole;

(ix) one or more judgments or orders for the payment of money in excess of $10,000,000 (or the equivalent thereof in currencies other than U.S. dollars) in the aggregate shall be entered or filed against the Company or any of its Subsidiaries and shall remain undischarged, unvacated, unbonded or unstayed for a period of thirty (30) consecutive days;

(x) (i) the occurrence of a Reportable Event with respect to any Plan, (ii) the filing of a notice of intent to terminate a Plan by the Company, any ERISA Affiliate or any Subsidiary, the institution of proceedings to terminate a Plan by the PBGC or any other Person; (iii) the withdrawal in a "complete withdrawal" or a "partial withdrawal" as defined in Sections 4203 and 4205, respectively, of ERISA by the Company, any ERISA Affiliate or any Subsidiary of the Company from any Multiemployer Plan, (iv) the incurrence of any material increase in the contingent liability of the Company or any of its Subsidiaries with respect to any "employee welfare benefit plan" as defined in Section 3(1) of ERISA which covers retired employees and its beneficiaries or (v) the Unfunded Liabilities of all Single Employer Plans shall exceed (in the aggregate) $10,000,000, in each such case which, either individually or in the aggregate, would be reasonably expected to result in liability to any Note Party in excess of $10,000,000;

(xi) The institution by the Company, any ERISA Affiliate or any Subsidiary of steps to terminate any Plan if, in order to effectuate such termination, the Company, such ERISA Affiliate or such Subsidiary, as the case may be, would be required to make a contribution to such Plan, or would incur a liability or obligation to such Plan, in excess of $10,000,000, or the institution by the PBGC of steps to terminate any Plan, which would reasonably be expected to result in material liability to any Note Party;

8

(xii)    The Company or any Material Subsidiary shall (i) be the subject of any proceeding pertaining to the release by the Company, any such Material Subsidiary or any other Person of any Hazardous Material into the environment or (ii) violate any Environmental Law, which, in either case could reasonably be expected to have a Material Adverse Effect;

(xiii)   Any Collateral Document shall for any reason fail to create a valid and perfected first priority (subject to any Permitted Liens) security interest in any collateral purported to be covered thereby, except as permitted by the terms of any Collateral Document, or any Collateral Document shall fail to remain in full force or effect (other than in accordance with the terms hereof or thereof) or any action taken by the Company or any Subsidiary shall be taken to discontinue or to assert the invalidity or unenforceability of any Collateral Document;

(xiv)   any subordination or intercreditor agreement relating to any Indebtedness of any Note Party subordinated to the Obligations, or any subordination provisions of any note or other document running to the benefit of the Secured Parties in respect of such Indebtedness, shall cease for any reason to be in full force and effect other than in accordance with the terms hereof or thereof or any Note Party or any of their Subsidiaries shall so assert in writing; or

(xv)    The Note Parties shall be enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of the business of the Note Parties, taken as a whole.

5.   **MISCELLANEOUS PROVISIONS.**

(a)   **Waivers**.  The Company hereby waives demand, notice, presentment, protest and notice of dishonor.

(b)   **Further Assurances**.  The Holder agrees and covenants that at any time and from time to time the Holder will promptly execute and deliver to the Company such further instruments and documents and take such further action as the Company may reasonably require in order to carry out the full intent and purpose of this Note and to comply with state or federal securities laws or other regulatory approvals.

(c)   **Transfers of Notes**. Subject to the Company's prior written consent (not to be unreasonably withheld or delayed) and to the extent permitted by applicable law, this Note may be transferred only upon its surrender to the Company for registration of transfer, duly endorsed, or accompanied by a duly executed written instrument of transfer in form satisfactory to the Company. Thereupon, this Note shall be reissued to, and registered in the name of, the transferee, or a new Note for like principal amount and interest shall be issued to, and registered in the name of, the transferee. Interest and principal shall be paid solely to the registered holder of this Note. Such payment shall constitute full discharge of the Company's obligation to pay such interest and principal. Upon the effectiveness of any transfer pursuant to this Section 5(c) the Company shall provide an updated Ledger to the Note Agent. Any transfer of this Note in contravention of this Section 5(c) shall be void and the Company shall be entitled to continue to treat the Holder as the holder of this Note for all purposes under the Note Documents. The Company shall at all times

maintain a book-entry system, which shall reflect ownership of this Note and interests therein. This Note is intended to be in "registered form" for United States federal tax purposes.

(d) **Market Standoff**.  To the extent requested by the Company or an underwriter of securities of the Company, each Holder and any permitted transferee thereof shall not, without the prior written consent of the underwriters in an underwritten public offering pursuant to an effective registration statement filed with the Securities and Exchange Commission in accordance with the Act or under equivalent securities laws and regulations of any other jurisdiction, offer, sell, make any short sale of, grant or sell any option for the purchase of, lend, pledge, otherwise transfer or dispose of (directly or indirectly), enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership (whether any such transaction is described above or is to be settled by delivery of Securities or other securities, in cash, or otherwise), any Securities or other shares of stock of the Company then owned by such Holder or any transferee thereof, or enter into an agreement to do any of the foregoing, for up to 180 days following the consummation of any such offering. For purposes of this paragraph, "*Company*" includes the Company or any other direct or indirect parent entity of the Company into which the Company merges or consolidates. The Company may place restrictive legends on the certificates representing the shares subject to this paragraph and may impose stop transfer instructions with respect to the Securities and such other shares of stock of each Holder and any transferee thereof (and the shares or securities of every other person subject to the foregoing restriction) until the end of such period. Each Holder and any transferee thereof shall enter into any agreement reasonably required by the underwriters for such an offering to implement the foregoing within any reasonable timeframe so requested.  The underwriters for any such offering are intended third party beneficiaries of this paragraph and shall have the right, power and authority to enforce the provisions of this paragraph as though they were parties hereto.  The provisions of this paragraph shall survive any conversion and/or repayment of this Note.

(e) **Waiver of Statutory Information Rights**. Prior to the conversion in full of this Note, the Holder, on behalf of the Holder and all beneficial owners of the Securities now or hereafter owned by the Holder (a "*Beneficial Owner*"), acknowledges and agrees that that neither the Holder nor any of the Beneficial Owners will have any right to receive any information from the Company by virtue of ownership of any of the Securities. Without limiting the foregoing, prior to the conversion in full of this Note, to the fullest extent permitted by law, the Holder hereby unconditionally and irrevocably waives all rights under Section 220 of the Delaware General Corporation Law and all such similar information and/or inspection rights that may be provided under the law of any jurisdiction, or any federal, state or foreign regulation, that are, or may become, applicable to the Company or the Company's capital stock (the "*Inspection Rights*") on behalf of the Holder and all Beneficial Owners. The Holder, on behalf of the Holder and all Beneficial Owners, hereby covenants and agrees that neither the Holder nor any Beneficial Owner shall directly or indirectly commence, voluntarily aid in any way, prosecute, assign, transfer, or cause to be commenced any claim, action, cause of action, or other proceeding to pursue or exercise the Inspection Rights.  The Holder hereby further warrants and represents that the Holder has reviewed this waiver with its legal counsel, and that the Holder knowingly and voluntarily waives its rights otherwise provided by Section 220 of the Delaware General Corporation Law (or under similar rights under other applicable law). Notwithstanding the foregoing, Beneficial Owners that were issued Equity Securities other than by way of a conversion in connection with an Offering will not be subject to this Section 5(e). The terms of this Section 5(e) shall survive any

10

repayment of this Note.

(f)     **Amendment and Waiver**.  This Note and any term hereof may only be amended, waived or modified in accordance with Section 10.9 of the Purchase Agreement. Upon the effectuation of such amendment, waiver or modification with the consent of the Required Holders or each Holder, as applicable, in conformance with Section 10.9 of the Purchase Agreement, such amendment, waiver or modification shall be effective as to, and binding against the Holders of, all of the Notes, and the Company shall promptly give written notice thereof to the Holder if the Holder has not previously consented to such amendment, waiver or modification in writing; provided that the failure to give such notice shall not affect the validity of such amendment, waiver or modification.

(g)     **Binding Agreement**.  The terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and assigns of the parties.  Nothing in this Note, expressed or implied, is intended to confer upon any third party any rights, remedies, obligations, or liabilities under or by reason of this Note, except as expressly provided in this Note.

(h)     **Counterparts**.  This Note may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract. Any counterpart of a signature page to this Note may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.

(i)     **Headings; Interpretation**. Paragraph headings used in this Note are included for convenience of reference only and will not modify the provisions that they precede or affect the interpretation of this Note or any other Note Document.  The term "including" shall be interpreted to mean "including but not limited to".

(j)     **Notices**.  All communications and notices required or permitted to be given hereunder shall be delivered in accordance with Section 10.8 of the Purchase Agreement.

(k)     **GOVERNING LAW.**  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.

(l)     **Expenses, Etc**.  This Note is subject to the provisions of Section 10.3 (Jurisdiction and Venue), Section 10.4 (Waiver of Jury Trial) and Section 10.10 (Expenses and Indemnification) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*.

(m) **Delays or Omissions**. It is agreed that no delay or omission to exercise any right, power or remedy accruing to each Holder, upon any breach or default of the Company under this Note or any Note shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.  It is further agreed that any waiver, permit, consent or approval of any kind or character by a Holder of any breach or default under this Note, or any waiver by such Holder of any provisions or conditions of this Note must be in writing and shall be effective only to the extent specifically set forth in writing and that all remedies, either under this Note, or by law or otherwise afforded to such Holder, shall be cumulative and not alternative.

(n) **Entire Agreement**. This Note and the other Note Documents constitute the entire contract among the parties hereto regarding to the subject matters addressed herein and supersede any and all previous agreements, negotiations, and discussions, oral or written, by the parties regarding the subject matters addressed herein.

(o) **Exculpation among Holders**.  The Holder acknowledges that the Holder is not relying on any person, firm or corporation, other than the Company and its officers and board members, in making its investment or decision to invest in the Company.

(p) **Broker's Fees**. Each party hereto represents and warrants that no agent, broker, investment banker, person or firm acting on behalf of or under the authority of such party hereto is or will be entitled to any broker's or finder's fee or any other commission directly or indirectly in connection with the transactions contemplated herein. Each party hereto further agrees to indemnify each other party for any claims, losses or expenses incurred by such other party as a result of the representation in this subsection being untrue.

(q) **Repayment Amounts**.  The parties hereto hereby acknowledge and agree that payment of any Repayment Amount or the Covenant Amendment Repayment Amount hereunder constitutes liquidated damages and not a penalty, the actual amount of damages to the Holder or profits lost by the Holder as a result of a prepayment or conversion of this Note would be impracticable and extremely difficult to ascertain and the Repayment Amount or the Covenant Amendment Repayment Amount hereunder is part of an arm's length transaction between sophisticated parties represented by counsel and is bargained for consideration provided for and agreed to by mutual agreement of the Company and the Holder. THE NOTE PARTIES EXPRESSLY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE REPAYMENT AMOUNT TO THE EXTENT SUCH REPAYMENT AMOUNT IS DUE AND PAYABLE IN ACCORDANCE WITH THIS NOTE. The Note Parties expressly agree that: (i) the Repayment Amount or the Covenant Amendment Repayment Amount, as applicable, shall be payable notwithstanding the then prevailing market rates at the time payment is made; (ii) the Note Parties shall be estopped hereafter from claiming differently than as agreed to in this paragraph; and (iii) their agreement to pay the Repayment Amount or the Covenant Amendment Repayment Amount, as applicable, is a material inducement to the Holder to purchase the Note.

(r) **Tax Forms**. Prior to the date hereof, the Holder (and, in the event any

Person becomes an assignee or participant in respect of this Note, prior to the date such Person becomes such an assignee or participant) shall have delivered to the Company executed copies of Internal Revenue Service ("***IRS***") Form W-9 or appropriate IRS Form W-8, as applicable, as well as any reasonably necessary supporting information, certifying that any payments to such Holder (or assignee or participant) under this Note are exempt from U.S. federal withholding tax. The Holder (and assignee or participant) further agrees that if any such form or certification expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Company in writing of its legal inability to do so

(s) **Calculations**. The Company shall be responsible for making all calculations with respect to this Note, including, without limitation, accrued interest (including PIK Interest), the Fair Market Value Per Common Share, Applicable Conversion Price, and the Covenant Amendment Repayment Amount, and shall forward such calculations to the Agents and the Holder upon request.

*[Signature pages follow]*

EXECUTION VERSION

**IN WITNESS WHEREOF**, the parties hereto have executed this Note as of the date first written above.

**COMPANY:**

**CORE SCIENTIFIC HOLDING CO.**

By: _____

    Name:
    Title:

E-mail: _____

Address:

SIGNATURE PAGE TO CORE SCIENTIFIC HOLDING CO. CONVERTIBLE PROMISSORY NOTE

EXECUTION VERSION

**HOLDER (if an entity):**

Name of Holder: _____

By: _____

Name: _____
Title: _____

E-mail: _____

Address: _____
_____
_____

**HOLDER (if an individual):**

Name of Holder: _____

Signature: _____

E-mail: _____

Address: _____
_____
_____

SIGNATURE PAGE TO CORE SCIENTIFIC HOLDING CO. CONVERTIBLE PROMISSORY NOTE