**<u>EXHIBIT 11</u>**

## CONVERTIBLE NOTE PURCHASE AGREEMENT

THIS CONVERTIBLE NOTE PURCHASE AGREEMENT (this "*Agreement*") is made as of August 20, 2021, by and among Core Scientific Holding Co., a Delaware corporation (the "*Company*"), the Guarantors from time to time party hereto, the persons and entities named on the Schedule of Purchasers under the header 'Initial Purchasers' attached hereto as <u>Schedule 2</u> (individually, an "*Initial Purchaser*" and collectively, the "*Initial Purchasers*"), each Additional Purchaser from time to time party hereto and U.S. Bank National Association, as note agent (in such capacity, the "*Note Agent*") and, upon the execution and delivery of the Collateral Documents pursuant to Section 6.13, as collateral agent for the Secured Parties (in such capacity, the "*Collateral Agent*" and, together with the Note Agent, the "*Agents*").

### RECITALS

WHEREAS, the Company desires (i) to issue and to sell to the Initial Purchasers, and the Initial Purchasers have agreed to purchase from the Company, on the Initial Closing Date, convertible promissory notes substantially in the form attached hereto as <u>Exhibit A</u> (each, an "*Initial Note*" and collectively, the "*Initial Notes*") and (ii) to issue and to sell to Additional Purchasers on Additional Closing Dates convertible promissory notes substantially in the form attached hereto as <u>Exhibit A</u> (each, an "*Additional Note*" and collectively, the "*Additional Notes*" and, together with the Initial Notes, individually, a "*Note*" and collectively, the "*Notes*"), in an aggregate principal amount for all such Notes of up to $300,000,000.00 on the terms, and subject to the conditions, specified herein; and

WHEREAS, to induce the Purchasers to purchase the Notes, the Note Parties have agreed to execute and deliver, contemporaneously with the issuance, sale and purchase of the Initial Notes on the Initial Closing Date, the Guaranty, pursuant to which each Guarantor will guarantee the Obligations of the Company under the Notes and, as and when required pursuant to Section 6.13, the Security Agreement, pursuant to which the Note Parties will grant to the Collateral Agent, for the ratable benefit of the Secured Parties, a security interest in the Note Parties' assets to secure the Obligations or their respective Guaranteed Obligations (as applicable).

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, and the representations, warranties, covenants and conditions set forth below, which represent integral components of the transactions contemplated hereby and shall be fully enforceable by the parties hereto, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Note Parties, the Agents and each Purchaser, intending to be legally bound, hereby agree as follows:

1.    **DEFINITIONS.**

As used herein, the following terms shall have the meanings set forth below.

(a)    "*Act*" means the Securities Exchange Act of 1934, as amended.

(b)    "*Additional Closing Date*" has the meaning ascribed thereto in <u>Section 2.2</u>.

(c)    "*Additional Note*" or "*Additional Notes*" has the meaning ascribed thereto in <u>Section 2.2</u>.

1

(d)      "**Additional Purchaser**" or "**Additional Purchasers**" has the meaning ascribed thereto in <u>Section 2.2</u>.

(e)      "**Administrative Questionnaire**" means an Administrative Questionnaire substantially in the form attached hereto as <u>Exhibit G</u>.

(f)      "**Agent-Related Person**" means the Note Agent and the Collateral Agent, together with their affiliates, officers, directors, employees, agents and attorneys-in-fact of the Agents and their affiliates.

(g)      "**Agents**" has the meaning ascribed to such term in the preamble to this Agreement.

(h)      "**Asset Disposition**" means any sale, lease, license, transfer, assignment or other disposition (whether by a single transaction or through series of transactions, and including by means of a merger, consolidation, amalgamation or similar transaction) by the Company or any of its Subsidiaries of any asset or property.

(i)      "**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in the City of New York or the Principal Office are authorized or required to close.

(j)      "**Capital Lease**" means any lease of any property by such Person as lessee which would, in accordance with GAAP, be required to be accounted for as a capital lease on the balance sheet of such Person.

(k)      "**Capital Lease Obligations**" means, with respect to any Person, all obligations of such Person under Capital Leases.

(l)      "**Capital Stock**" means (a) any capital stock, partnership, membership, limited liability company, joint venture or other ownership or equity interest or other equivalent, participation or securities (whether voting or non-voting, whether preferred, common or otherwise, whether certificated or uncertificated, and however designated), and (b) any option, warrant, security, appreciation right, profits interests or other right directly or indirectly convertible into or exercisable or exchangeable for, or otherwise to acquire directly or indirectly, any capital stock, partnership, membership, limited liability company, joint venture or other ownership or equity interest, participation or security described in <u>clause (a)</u> above (excluding the Notes and any other Indebtedness convertible or exchangeable into any such capital stock, partnership, membership, limited liability company, joint venture or other ownership or equity interest, participation or security described in <u>clause (a)</u> above unless and to the extent converted or exchanged).

(m)      "**Charter Documents**" means (i) the articles or certificate of incorporation or formation (as applicable), (ii) the by-laws, operating agreement or limited liability company agreement (as applicable) and (iii) other similar organizational and governing documents of any Person, as amended, restated, supplemented or otherwise modified from time to time.

(n)      "**Closing Date**" means the Initial Closing Date or each Additional Closing Date, as the context may require.

(o)      "**Collateral**" means the "Collateral" as defined in the Security Agreement.

2

(p)     "**Collateral Agent**" has the meaning ascribed to such term in the preamble to this Agreement.

(q)     "**Collateral Documents**" means, collectively, the Security Agreement, the Intellectual Property Security Agreement and each other agreement or writing pursuant to which the Note Parties purport to pledge or grant a security interest in any property or assets securing the Obligations or the Guaranteed Obligations, as applicable, in each case, as amended, restated, supplemented and/or otherwise modified from time to time.

(r)     "**Company Covered Persons**" means those Persons specified in Rule 506(d)(1) promulgated under the Act; provided, however, that Company Covered Persons do not include (a) any Holder or (b) any person or entity that is deemed to be an affiliated issuer of the Company solely as a result of the relationship between the Company and any Holder.

(s)     "**Contractual Obligations**" means as to any Person, any provision of any security issued by such Person or of any agreement, undertaking, contract, indenture, mortgage, deed of trust or other instrument or arrangement (whether in writing or otherwise) to which such Person is a party or by which it or any of such Person's property is bound.

(t)     "**Conversion Event**" has the meaning ascribed to such term in the Notes.

(u)     "**Conversion Securities**" has the meaning ascribed to such term in Section 5.3.

(v)     "**Default**" means any condition or event which with the giving of notice or lapse of time or both would, unless cured or waived, become an Event of Default.

(w)     "**Disqualified Capital Stock**" means any Capital Stock issued by any Person that (a) matures or is mandatorily redeemable pursuant to a sinking fund obligation or otherwise, (b) is or may become redeemable or repurchaseable by such Person at the option of the holder thereof, in whole or in part (other than in connection with an asset sale, change of control or similar event) or (c) is convertible or exchangeable at the option of the holder thereof for Indebtedness or Capital Stock described in this definition, on or prior to, in the case of clause (a), (b) or (c), ninety (90) days after the Maturity Date (as defined in the Notes).

(x)     "**Environmental Laws**" means any and all federal, state, local and foreign statutes, laws, judicial decisions, regulations, ordinances, rules, judgments, orders, decrees, plans, injunctions, Licenses, concessions, grants, franchises, agreements and other governmental restrictions relating to (i) the protection of the environment, (ii) the effect of the environment on human health, (iii) emissions, discharges or releases of pollutants, contaminants, hazardous substances or wastes into surface water, ground water, air or land, or (iv) the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants, hazardous substances or wastes or the clean-up or other remediation thereof, including, without limitation, the Clean Air Act, 42 U.S.C. § 7401 et seq., the Clean Water Act, 33 U.S.C. § 1251 et seq. ("**CWA**"), the Solid Waste Disposal Act (as amended by the Resource Conservation and Recovery Act), 42 U.S.C. § 6901 et seq. ("**RCRA**") and the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq. ("**CERCLA**").

(y)     "**ERISA**" means the Employee Retirement Income Security Act of 1974.

(z)     "**ERISA Affiliate**" means, any person that for purposes of Title I or Title IV of ERISA or Section 412 of the Internal Revenue Code would be deemed at any relevant time to be a "single

employer" or otherwise aggregated with the Company or any of its Subsidiaries under Section 414(b), 414(c), 414(m) or 414(o) of the Internal Revenue Code or Section 4001 of ERISA.

(aa)    "***Event of Default***" has the meaning ascribed thereto in the Notes.

(bb)    "***Excluded Subsidiary***" means (i) any Subsidiary that is not a wholly-owned Subsidiary, (ii) any Subsidiary that is not a Material Subsidiary and (iii) any Subsidiary that is (a) a Foreign Subsidiary (as defined in the Security Agreement), (b) a CFC Holdco (as defined in the Security Agreement) or (c) a Subsidiary of a CFC or a CFC Holdco (as defined in the Security Agreement); provided that notwithstanding the foregoing clauses (i) through (iii), the Company may in its sole discretion designate any Excluded Subsidiary as a Guarantor.

(cc)    "***Existing Note Purchase Agreement***" means that certain Senior Secured Convertible Note Purchase Agreement, dated as of April 19, 2021, by and among the Company, the Guarantors from time to time party thereto, the Purchasers (as defined therein) party thereto and U.S. Bank National Association, as note agent and as collateral agent for the Secured Parties (as defined therein), as amended, restated, supplemented and/or otherwise modified from time to time.

(dd)    "***Existing Notes***" means the senior secured convertible promissory notes issued pursuant to the Existing Note Purchase Agreement.

(ee)    "***Existing Secured Note Obligations***" means all "Obligations" under and as defined in the Existing Note Purchase Agreement and any refinancing, refunding, renewal or extension thereof.

(ff)    "***GAAP***" means the United States generally accepted accounting principles in effect as of the date of determination thereof. GAAP will be deemed to treat operating leases and Capital Leases in a manner consistent with the treatment under GAAP as in effect prior to the issuance by the Financial Accounting Standards Board on February 25, 2016 of Accounting Standards Update No. 2016-02.

(gg)    "***Governmental Authority***" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

(hh)    "***Guarantee***" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly and including any obligation, direct or indirect, of the guarantor (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued in support of such Indebtedness or obligation; provided that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business. The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable

254153937 v7

amount of the primary obligation in respect of which such Guarantee is made or, if not so stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

(ii)       "*Guaranteed Obligations*" has the meaning ascribed thereto in the Guaranty.

(jj)       "*Guarantor*" means each Subsidiary of the Company party to the Guaranty and each other Subsidiary of a Note Party that becomes a Guarantor under the Note Documents pursuant to Section 6.10..

(kk)       "*Guaranty*" means the Guaranty, dated as the date hereof, made by the Guarantors in favor of the Note Agent, substantially in the form attached hereto as Exhibit C, (as amended, restated, supplemented and/or otherwise modified from time to time).

(ll)       "*Hazardous Materials*" means (i) any "hazardous substance", as defined by CERCLA, (ii) any "hazardous waste", as defined by RCRA, (iii) any petroleum product, (iv) any "pollutant," as defined by the CWA, or (v) contaminant or hazardous, dangerous or toxic chemical, material or substance within the meaning of any other Environmental Law.

(mm)       "*Holder*" or "*Holders*" means, individually and collectively, the holders of the Notes, including the Purchasers.

(nn)       "*Indebtedness*" as applied to any Person, means, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (c) all obligations of such Person in respect of the deferred purchase price of property or services (other than trade payables and accounts payable incurred in the ordinary course of business and any deferred compensation, earn-out, purchase price adjustment or other deferred purchase price obligation which is contingently payable based on the achievement of future financial performance); (d) all obligations of such Person under any conditional sale or other title retention agreement(s) relating to property acquired by such Person, (e) all obligations in respect of Capital Leases of such Person, (f) all obligations, contingent or otherwise, of such Person in respect of letters of credit, banker's acceptances or similar extensions of credit, (g) all Guarantees of such Person of Indebtedness of other Persons that would count as a liability on the balance sheet of such Person in accordance with the GAAP, (h) all Indebtedness of a third party secured by any Lien on any property or asset owned or held by such Person, whether or not such Indebtedness has been assumed by such Person, (i) all obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Disqualified Capital Stock of such Person and (j) all monetary obligations under any receivables factoring, receivables sales, receivable securitization or similar transactions or other off-balance sheet liabilities. The Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture in which such Person is a general partner or a joint venturer, except to the extent that the terms of such Indebtedness provide that such Person is not liable therefor.

(oo)       "*Initial Closing Date*" means August 20, 2021.

(pp)       "*Initial Note*" or "*Initial Notes*" has the meaning ascribed thereto in the recitals to this Agreement.

(qq)       "*Initial Purchaser*" or "*Initial Purchasers*" has the meaning ascribed thereto in the preamble to this Agreement.

5

(rr)    "***Intellectual Property***" means all intellectual and similar property of a Person, including inventions, designs, patents, copyrights, trademarks, service marks, trade names, trade secrets, confidential or proprietary information, customer lists, know-how, software and databases.

(ss)    "***Intellectual Property Security Agreement***" means the Intellectual Property Security Agreement, to be made by the applicable Note Parties in favor of the Collateral Agent, substantially in the form attached hereto as <u>Exhibit E</u> (as amended, restated, supplemented and/or otherwise modified from time to time).

(tt)    "***Intercreditor Agreement***" has the meaning ascribed thereto in Section 7.1(a).

(uu)    "***Ledger***" shall have the meaning ascribed thereto in the Notes.

(vv)    "***Licenses***" means all licenses, permits, authorizations, determinations, and registrations issued by any Governmental Authority to the Company or any Subsidiary in connection with the conduct of its business.

(ww)    "***Lien***" means any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing.

(xx)    "***Material Adverse Effect***" means, individually or in the aggregate, (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties or financial condition of the Company and its Subsidiaries taken as a whole; (b) a material impairment of the ability of the Note Parties to perform their obligations under the Note Documents or, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, the rights and remedies of the Secured Parties under the Note Documents; (c) a material adverse effect upon the legality, validity, binding effect or enforceability against the Note Parties of any Note Document; or (d) from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, a material adverse effect on the Liens in favor of the Collateral Agent (for the benefit of the Secured Parties) on the Collateral or the priority of such Liens.

(yy)    "***Material Subsidiary***" mean each Subsidiary which, as of the most recent fiscal quarter of the Company, for the period of four consecutive fiscal quarters of the Company then last ended (taken as one accounting period) in respect of which financial statements were (or were required to be) delivered pursuant to <u>Sections 6.1(a)</u> or <u>(b)</u>, as applicable (a "***Test Period***"), had Total Assets as of the last day of such Test Period that were in excess of 10% of the Total Assets of the Company and its Subsidiaries as of such date.

(zz)    "***Multiemployer Plan***" means any "multiemployer plan" as defined in Section 4001(a)(3) of ERISA, which is contributed to by (or to which there is or may be an obligation to contribute of) the Company, any of its Subsidiaries or an ERISA Affiliate, and each such plan for the five-year period immediately following the latest date on which the Company, any of its Subsidiaries or an ERISA Affiliate contributed to or had an obligation to contribute to such plan.

(aaa)    "***Note***" or "***Notes***" has the meaning ascribed thereto in the recitals to this Agreement.

(bbb)    "***Note Documents***" means, collectively, this Agreement, each Note, the Guaranty, each Collateral Document (if applicable), the fee schedule delivered from the Agents to the Company in connection with this Agreement, the Intercreditor Agreement (if applicable), and any other document,

254153937 v7

agreement or instrument which has or will be executed by or for the benefit of the Holders in connection with such agreements and the transactions described therein, each as may be amended, restated, supplemented/and or otherwise modified from time to time.

(ccc)   "***Note Party***" or "***Note Parties***" means, individually and collectively, the Company and the Guarantors. From and after a Parent Entity assumes or otherwise becomes a co-obligor with respect to the Company's Obligations in connection with a SPAC pursuant to Section 6.13, each reference to "Note Party" shall be deemed to include a reference to a Parent Entity.

(ddd)   "***Obligations***" means all advances to, and debts, liabilities (including without limitation (x) prepayment premiums (if any) and other premiums payable under the Notes (if any), including all or any portion of the Repayment Amount (as defined in the Notes), if applicable, (y) accrued and unpaid interest and (z) capitalized interest), obligations, fees, expenses, indemnities, covenants and duties of, the Note Parties arising under any Note Document or otherwise with respect to any Note, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against the Note Parties of any proceeding under any debtor relief laws naming any Note Party as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims or allowable in such proceeding.

(eee)   "***OFAC***" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

(fff)   "***Parent Entity***" has the meaning ascribed thereto in the definition of SPAC.

(ggg)   "***PBGC***" mean the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor thereto).

(hhh)   "***Permitted Lien***" means:

(i)   from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, Liens in favor of Collateral Agent for the benefit of Secured Parties granted pursuant to the Note Documents;

(ii)   Liens set forth on Schedule 5.17 existing as of the Initial Closing Date;

(iii)   Liens for taxes if obligations with respect to such taxes either (i) are not due and payable, (ii) are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and adequate reserves have been made in accordance with GAAP or (iii) could not reasonably be excepted to have a Material Adverse Effect;

(iv)   statutory Liens of landlords, banks (and rights of set-off), of carriers, warehousemen, mechanics, repairmen, workmen and materialmen, and other Liens imposed by law (other than any such Lien imposed pursuant to Section 401 (a)(29) or 412(n) of the Internal Revenue Code or by the Employee Retirement Income Security Act of 1974), in each case incurred in the ordinary course of business (i) for amounts not yet overdue, or (ii) for amounts that are overdue and that (in the case of any such amounts overdue for a period in excess of five (5) days) are being contested in good faith by appropriate proceedings, so long as such reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made for any such contested amounts;

7

(v)     Liens incurred in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, trade contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money or other indebtedness), so long as (x) no foreclosure, sale or similar proceedings have been commenced with respect to any portion of the Collateral on account thereof and (y) adequate reserves required by GAAP shall have been set aside therefor;

(vi)     easements, rights-of-way, restrictions, encroachments, and other minor defects or irregularities in title, in each case which do not and will not have a Material Adverse Effect;

(vii)     any interest or title of a lessor or sublessor under any lease of real estate permitted hereunder;

(viii)     Liens solely on any cash earnest money deposits made by the Company in connection with any letter of intent or purchase agreement permitted hereunder;

(ix)     purported Liens evidenced by the filing of precautionary UCC financing statements relating solely to operating leases of personal property entered into in the ordinary course of business;

(x)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods used in the ordinary course of business;

(xi)     any zoning or similar law or right reserved to or vested in any governmental office or agency to control or regulate the use of any real property;

(xii)     licenses of patents, trademarks and other Intellectual Property rights granted by the Company in the ordinary course of business;

(xiii)     Liens securing obligations of the Company incurred under leases (but not securing indebtedness for borrowed money) in the form of cash deposits made in the ordinary course of business;

(xiv)     Liens arising in favor of depository institutions as a result of set-off rights or otherwise securing obligations owed to such depository institution in connection with bank services provided to the Company or its Subsidiaries;

(xv)     Liens on cash deposits securing obligations owed to an issuer of a letter of credit at the request of the Company of any of its Subsidiaries;

(xvi)     Liens on any assets of the Note Parties securing any Indebtedness, including Capital Lease Obligations, incurred to finance the acquisition of any fixed or capital assets (including any real property assets) so long as such Liens encumber only the assets acquired or financed with the proceeds of such Indebtedness and do not attach to any other assets of any Note Party;

(xvii)     Liens on cash deposit accounts and cash and cash equivalents delivered or pledged to secure letters of credit;

(xviii)   Liens on Indebtedness permitted to be incurred in reliance on <u>Section 7.01(a)</u>;

(xix)   Liens arising from judgments for the payment of money in circumstances not constituting an Event of Default; and

(xx)   Liens on the Collateral securing the Existing Secured Note Obligations.

(iii)   "*Permitted Transferees*" means, (x) as to any Purchaser that is a limited or general partnership or a trust, to its partners (whether general or limited, including retired partners) or beneficiaries and to affiliated partnerships managed by the same management company or managing (general) partner or by an entity which directly or indirectly controls, is controlled by, or is under common control with, such management company or managing or general partner, or member (or retired member) of such Purchaser in accordance with limited liability company interests and (y) as to any other Purchaser, an entity which directly or indirectly controls, is controlled by, or is under common control with such Purchaser.

(jjj)   "*Person*" (regardless of whether capitalized) means any natural person, entity, or association, including without limitation any corporation, partnership, limited partnership, limited liability company, government (or agency or subdivision thereof), trust, joint venture, or proprietorship.

(kkk)   "*Plan*" means any "employee benefit plan" as defined in Section 3 of ERISA (other than a Multiemployer Plan) maintained or contributed to by any Note Party or any ERISA Affiliate or to which a Note Party or any ERISA Affiliate has or may have an obligation to contribute, and each such plan that is subject to Title IV of ERISA for the five-year period immediately following the latest date on which a Note Party or any ERISA Affiliate maintained, contributed to or had an obligation to contribute to (or is deemed under Section 4069 of ERISA to have maintained or contributed to or to have had an obligation to contribute to, or otherwise to have liability with respect to) such plan.

(lll)   "*Principal Office*" means the Note Agent's office, address or bank account as from time to time designated in writing by the Note Agent to the Company and each Holder, which shall initially be the office designated on the Note Agent's signature page to this Agreement.

(mmm) "*Pro Rata Share*" means, as to any Holder at any time, the ratio at such time of (x) the aggregate principal amount of the Notes held by such Holder to (y) the aggregate outstanding principal amount of all Notes issued hereunder.

(nnn)   "*Purchaser*" or "*Purchasers*" means, individually and collectively, the Initial Purchasers and the Additional Purchasers, as the context may require.

(ooo)   "*Reportable Event*" means any of the events set forth in Section 4043(c) of ERISA with respect to a Plan, other than those events as to which the thirty-day notice period is waived under subsection .22, .23, .25, .27, .28, .29, .30, .31, .32, .34, or .35 of PBGC Regulation Section 4043.

(ppp)   "*Required Holders*" means Holders representing more than fifty percent (50%) of the aggregate outstanding principal amount of the Notes (including all accrued PIK Interest) issued pursuant to this Agreement at the relevant time of reference.

(qqq)   "*Requirements of Law*" means as to any Person, provisions of the Charter Documents of such Person, or any law, treaty, code, rule, regulation, right, privilege, qualification,

9

License or franchise, or any determination of an arbitrator or a court or other Governmental Authority, in each case applicable to such Person or any of such Person's property or to which such Person or any of such Person's property is subject or pertaining to any or all of the transactions contemplated or referred to in the Note Documents, including, but not limited to the Fair Credit Reporting Act, the Gramm-Leach-Bliley Act, the Federal Trade Commission Act and comparable state laws, the Telephone Consumer Protection Act, the Telemarketing and Consumer Fraud and Abuse Prevention Act, the CAN-SPAM Act, the Electronic Fund Transfer Act, the U.S. Card Act, and any similar laws and regulations in Canada, including federal and provincial laws.

(rrr)    "**_Responsible Officer_**" means the chief financial officer, general counsel, secretary, controller or other authorized officer of the Note Parties set forth on an incumbency certificate delivered to the Note Agent from time to time.

(sss)    "**_Restricted Payment_**" means as to any Person (i) any dividend or other distribution (whether in cash, Capital Stock or other property) with respect to or on account of any shares of any Capital Stock of such Person or (ii) any payment by such Person on account of the purchase, redemption, retirement, defeasance, surrender, cancellation, termination or acquisition of any Capital Stock of such Person or any claim respecting the purchase or sale of any Capital Stock of such Person.

(ttt)    "**_Sanctioned Entity_**" means (a) an agency of the government of, (b) an organization directly or indirectly controlled by, or (c) a person resident in a country that is subject to a sanctions program identified on the list maintained by OFAC and available at http://www.treas.gov/offices/enforcement/ofac/programs, or as otherwise published from time to time as such program may be applicable to such agency, organization or person.

(uuu)    "**_Sanctioned Person_**" means a person named on the list of Specially Designated Nationals or Blocked Persons maintained by OFAC available at http://www.treas.gov/offices/enforcement/ofac/sdn/index.html, or as otherwise published from time to time.

(vvv)    "**_Secured Debt Cap_**" has the meaning ascribed thereto in Section 7.1(a).

(www)    "**_Secured Party_**" or "**_Secured Parties_**" means, individually and collectively, upon the execution and delivery of the Collateral Documents pursuant to Section 6.13, the Purchasers, Holders, the Agents, and their respective successors and permitted assigns.

(xxx)    "**_Securities_**" has the meaning ascribed thereto in Section 8.1.

(yyy)    "**_Security Agreement_**" means the Security Agreement, to be made by the Note Parties in favor of the Collateral Agent, for the benefit of the Secured Parties, substantially in the form attached hereto as Exhibit D (as amended, restated, supplemented and/or otherwise modified from time to time).

(zzz)    "**_Single Employer Plan_**" shall mean any Plan that is covered by Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, other than a Multiemployer Plan, that is maintained or contributed to by the Company or any Commonly Controlled Entity or to which the Company or a Commonly Controlled Entity has or may have an obligation to contribute, and such plan for the six-year period immediately following the latest date on which the Company or a Commonly Controlled Entity maintained, contributed to or had an obligation to contribute to (or is deemed under Section 4069 of ERISA to have maintained or contributed to or to have had an obligation to contribute to, or otherwise to have liability with respect to) such plan. For the purposes of this definition, "**_Commonly_**

10

*Controlled Entity*" means a person or an entity, whether or not incorporated, that is under common control with the Company within the meaning of Section 4001 of ERISA or is part of a group that includes the Company and that is treated as a single employer under Section 414 of the Code.

(aaaa)   "*Solvent*" means, with respect to any Person, that such Person (i) owns and will own assets the fair saleable value of which are greater than the amount that will be required to pay the probable liabilities of its then existing debts as they become absolute and matured considering all financing alternatives and potential asset sales reasonably available to it, (ii) has capital that is not unreasonably small in relation to its business as presently conducted or after giving effect to any contemplated transaction and (iii) does not intend to incur and does not believe that it will incur debts beyond its ability to pay such debts as they become due. In computing the amount of contingent or unliquidated liabilities at any time, such liabilities shall be computed at the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

(bbbb)   "*SPAC*" means a transaction, including, without limitation, the XPDI Transaction, involving a publicly listed special purpose acquisition company that, upon the consummation thereof, shall be the direct or indirect parent company of Core Scientific Holding Co. (or of the successor by merger to Core Scientific Holding Co.) (such parent company, a "*Parent Entity*"). The Company shall promptly notify the Agents in writing upon the occurrence of a SPAC or the XPDI Transaction.

(cccc)   "*Subsidiary*" means, with respect to any Person, any other Person of which an aggregate of more than fifty percent (50%) of the outstanding Capital Stock having ordinary voting power to elect a majority of the board of directors of such other Person is at the time, directly or indirectly, owned legally or beneficially by such Person or one or more Subsidiaries of such Person, or a combination thereof, or with respect to which any such Person has the right to vote or designate the vote of more than fifty percent (50%) of such Capital Stock whether by proxy, agreement, operation of law or otherwise. Unless the context otherwise requires, each reference to a Subsidiary shall mean a Subsidiary of the Company.

(dddd)   "*Taxes*" means any present or future United States federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp occupation, premium, windfall profits, environmental (including taxes under former Code §59A), customs duties, capital stock, franchise profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on-minimum, estimated, or other taxes, levies, assessments, fees or other charges imposed by any Governmental Authority, including any interest, penalty, or addition thereto, whether disputed or not.

(eeee)   "*Total Assets*" shall mean the total assets of the Company and its Subsidiaries on a consolidated basis, as shown on the applicable consolidated balance sheet of the Company and its Subsidiaries and computed in accordance with GAAP. Total Assets shall be calculated after giving effect to the transaction giving rise to the need to calculate Total Assets.

(ffff)   "*UCC*" means Uniform Commercial Code.

(gggg)   "*Unfunded Pension Liability*" of any Plan means the amount, if any, by which the value of the accumulated plan benefits under the Plan, determined on a plan termination basis in accordance with actuarial assumptions at such time consistent with those prescribed by the PBGC for purposes of Section 4044 of ERISA, exceeds the fair market value of all Plan assets allocable to such liabilities under Title IV of ERISA (excluding any accrued but unpaid contributions).

11

(hhhh) "*XPDI Transaction*" means the transactions contemplated by the Agreement and Plan of Merger and Reorganization, dated as of July 20, 2021, by and among Power & Digital Infrastructure Acquisition Corp., a Delaware corporation ("*XPDI*"), XPDI Merger Sub Inc., a Delaware corporation and wholly owned subsidiary of XPDI, XPDI Merger Sub 2, LLC, a Delaware limited liability company and wholly owned subsidiary of XPDI, and the Company, as amended, restated, supplemented and/or otherwise modified from time to time.

2.      TERMS OF THE CONVERTIBLE PROMISSORY NOTES.

2.1     **The Initial Notes**.

Subject to the satisfaction (or waiver in accordance with Section 10.9) of the conditions precedent set forth in Section 4.1, the Company shall issue and sell to each Initial Purchaser, and each Initial Purchaser shall purchase from the Company, an Initial Note on the Initial Closing Date in a principal amount equal to the amount opposite such Initial Purchaser's name set forth in the Schedule of Purchasers under the header 'Initial Purchasers' attached hereto as Schedule 2. By no later than 11:00 a.m. (New York time) on the Initial Closing Date (i) each Initial Purchaser shall wire transfer same day funds in U.S. dollars, at the Note Agent's Principal Office, in the amount of such Initial Purchaser's Initial Note and (ii) the Company shall issue and deliver to each such Initial Purchaser an Initial Note in favor of such Initial Purchaser payable in the principal amount of such Initial Purchaser's Initial Note.

2.2     **The Additional Notes**.

(a) Subject to the satisfaction (or waiver in accordance with Section 10.9) of the conditions precedent set forth in Section 4.2, at any time and from time to time after the Initial Closing Date, the Company shall issue and sell to each Person that executes a counterpart signature page to this Agreement in the form attached hereto as Exhibit B (individually, an "*Additional Purchaser*" and collectively, the "*Additional Purchasers*"), and each such Additional Purchaser shall purchase from the Company, an Additional Note in a principal amount to be mutually agreed between such Additional Purchaser and the Company. Each additional issuance, sale and purchase of Additional Notes as provided in this Section 2.2 shall take place on a date to be mutually agreed by the Company and such Additional Purchaser (each, an "*Additional Closing Date*"); provided that (i) each Additional Closing Date shall have occurred on or prior to December 31, 2021, (ii) all issuances, sales and purchases of Additional Notes on an Additional Closing Date shall be made on substantially identical terms and conditions as the Initial Notes, shall, to the extent permitted by law, be fungible for tax purposes with the Initial Notes and may only be amended pursuant to Section 10.9; (iii) the purchase price of each Additional Note shall be increased by the PIK Interest (as defined in the Note) and Cash Interest (as defined in the Note) that has accrued since the Initial Closing Date on the Initial Notes (it being understood and agreed that interest on all the Notes shall accrue PIK Interest and be payable on the same dates) and (iv) in no event shall the initial aggregate principal amount of all Notes issued hereunder exceed $300,000,000.00.

(b)      Any Additional Notes issued, sold and purchased pursuant to this Section 2.2 shall be deemed to be "Notes" for all purposes under this Agreement. By no later than 11:00 a.m. (New York time) on an Additional Closing Date (i) each Additional Purchaser shall wire transfer same day funds in U.S. dollars, at the Note Agent's Principal Office, in the amount of such Additional Purchaser's Additional Note and (ii) the Company shall issue and deliver to each such Additional Purchaser an Additional Note in favor of such Additional Purchaser payable in the principal amount of such Additional Purchaser's Additional Note. The Schedule of Purchasers may be amended by the Company without the consent of the Purchasers to include any Additional Purchasers upon the execution by such Additional Purchasers of a counterpart signature page hereto in the form attached hereto as Exhibit B.

254153937 v7

3.      **SECURITY.**

To secure the performance and payment in full of the Obligations and the Guaranteed Obligations, as applicable, each Note Party shall grant to the Collateral Agent, for the benefit of the Secured Parties, a first-priority Lien on the Collateral (subject to Permitted Liens) pursuant to the Security Agreement, as and when required pursuant to Section 6.13.

4.      **CONDITIONS PRECEDENT TO EACH CLOSING DATE.**

4.1      **Conditions Precedent to the Initial Closing Date**.

The obligation of the Company to issue and to sell, and of each Initial Purchaser to purchase, Initial Notes on the Initial Closing Date are subject to the satisfaction (or waiver in accordance with Section 10.9) of the following conditions precedent on or prior to the Initial Closing Date:

(a)      receipt by each Initial Purchaser of counterparts to this Agreement, the Guaranty and the Initial Notes;

(b)      receipt by each Initial Purchaser of a certificate signed by a Responsible Officer of each Note Party attaching (i) true, correct and complete copies of the Charter Documents of each Note Party as in effect on the Initial Closing Date, certified, with respect to the Charter Documents set forth in clause (ii) of the definition thereof, as of a recent date by the Secretary of State of the state of incorporation or organization (as applicable) of such Note Party, (ii) a certificate of good standing of each Note Party, certified as of a recent date by the Secretary of State of the state of incorporation or organization (as applicable) of such Note Party, (iii) the names of the Responsible Officers of each Note Party authorized to sign the Note Documents and their true signatures and (iv) true, correct and complete copy of resolutions duly adopted by the board of directors or similar governing body of each Note Party authorizing the execution, delivery and performance of this Agreement and the other Note Documents;

(c)      receipt by each Initial Purchaser of a certificate of solvency, executed by the chief financial officer (or equivalent) of the Company, substantially in the form attached hereto as Exhibit F;

(d)      receipt by each Initial Purchaser of a certificate signed by a Responsible Officer of the Company certifying that the condition specified in clause (j) of this Section 4.1 has been satisfied;

(e)      the Initial Purchasers and the Agents shall have received an opinion of Cooley LLP, counsel to the Company, in form and substance reasonably satisfactory to the Initial Purchasers;

(f)      all authorizations, consents, approvals or permits, if any, of any governmental authority or regulatory body that are required in connection with the lawful issuance and sale of the Initial Notes pursuant to this Agreement shall have been duly obtained and shall be effective on and as of the Initial Closing Date;

(g)      there shall be no claim, action, suit, investigation, litigation or proceeding, pending or, to the knowledge of the Company and its Subsidiaries, threatened, in any court or before any governmental authority with respect to the Note Documents or any transactions contemplated thereby or hereby;

(h)      the representations and warranties made pursuant to Section 5 hereof shall be true and correct in all material respects (or if a representation or warranties is qualified by materiality or

material adverse effect, in all respects) on and as of the Initial Closing Date with the same effect as though made on and as of such date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects (or if a representation or warranties is qualified by materiality or material adverse effect, in all respects) on and as of such earlier date;

(i)      immediately before and after giving effect to the issuance of the Initial Notes on the Initial Closing Date, no Event of Default shall exist;

(j)      the Company shall have paid all outstanding fees and expenses of the Agents, Shipman & Goodwin LLP, counsel to the Agents, and as otherwise required pursuant to Section 10(a);

(k)      receipt by the Company and the Note Agent of an Administrative Questionnaire and executed copies of IRS Form W-9 or appropriate IRS Form W-8, as applicable, as well as any reasonably necessary supporting information, certifying that payments to the Initial Purchasers under the Initial Notes are exempt from U.S. federal withholding Tax; and

(l)      the Company shall have delivered to the Initial Purchasers such other documents and instruments relating to the transactions contemplated by this Agreement as the Initial Purchasers or their counsel may reasonably request (which request shall have been made no later than 3 days prior to the Initial Closing Date).

**4.2      Conditions Precedent to each Additional Closing Date**.

The obligation of the Company to issue and to sell, and of each Additional Purchaser to purchase, Additional Notes on an Additional Closing Date are subject to the satisfaction (or waiver in accordance with Section 10.8) of the following conditions precedent on or prior to each such Additional Closing Date:

(a)      each Additional Purchaser shall have received copies of each of the documents set forth in clauses (a) through (e) and clause (l) of Section 4.1 delivered to the Initial Purchasers on the Initial Closing Date;

(b)      the representations and warranties made pursuant to Section 5 hereof shall be true and correct in all material respects (or if a representation or warranties is qualified by materiality or material adverse effect, in all respects) on and as of the applicable Additional Closing Date with the same effect as though made on and as of such date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects (or if a representation or warranties is qualified by materiality or material adverse effect, in all respects) on and as of such earlier date;

(c)      immediately before and after giving effect to the issuance of Additional Notes on the applicable Additional Closing Date, no Event of Default (as defined in the Notes) shall exist; and

(d)      receipt by the Company and the Note Agent of an Administrative Questionnaire and of executed copies of IRS Form W-9 or appropriate IRS Form W-8, as applicable, as well as any reasonably necessary supporting information, certifying that payments to the Additional Purchasers under Additional Notes are exempt from U.S. federal withholding Tax.

5.    **REPRESENTATIONS AND WARRANTIES OF THE NOTE PARTIES.**

Each Note Party hereby represents and warrants to each Initial Purchaser and the Agents as of the Initial Closing Date and to each Additional Purchaser and the Agents as of the applicable Additional Closing Date as follows:

**5.1    Organization, Good Standing and Qualification**.

(a)    *Organization; Good Standing; Qualification.* Each Note Party and each of its Subsidiaries: (i) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation, (ii) has all requisite corporate or limited liability company power and authority to own and operate its property, to lease the property it operates as lessee and to conduct the business in which it is currently, or is currently proposed to be, engaged; (iii) is duly qualified as a foreign entity, licensed and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification, except where the failure to be so qualified could not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect and (iv) has the corporate or limited liability company power and authority to execute, deliver and perform its obligations under each Note Document to which it is or will be a party and to borrow hereunder. Each Note Party's present name, former names within the last five (5) years (if any), owned and leased locations, place of formation, tax identification number and organizational identification number are correctly set forth in Schedule 5.1 hereto, as may be updated by the Company from time to time in a written notice provided to the Note Agent after the Initial Closing Date.

(b)    *Collateral.* Except for the Liens granted under the Security Agreement, each Note Party shall be the sole legal and equitable owner of each item of Collateral in which it purports to grant a security interest under the Security Agreement upon the execution and delivery thereof pursuant to Section 6.13, having good and marketable title thereto, free and clear of any and all Liens except for Permitted Liens and, upon filing of UCC financing statements in the UCC filing office applicable to such Note Party, the Collateral Agent shall have a perfected security interest in the Collateral, which such security interest shall be senior to all other Liens (other than Permitted Liens) to the extent the same can be perfected by filing.

**5.2    Corporate Power; No Contravention**. The execution, delivery and performance by the Company and each Subsidiary of each Note Document to which it is or will be a party and the consummation of the transactions contemplated hereby: (a) have been duly authorized by all necessary corporate or limited liability company action; (b) do not and will not contravene or violate the terms of the Charter Documents of the Company or any of its Subsidiaries or any amendment thereto or any material Requirement of Law applicable to the Company or such Subsidiary or the Company's or such Subsidiary's assets, business or properties; (c) do not and will not (i) conflict with, contravene, result in any violation or breach of or default under any material Contractual Obligation of the Company or such Subsidiary (with or without the giving of notice or the lapse of time or both) other than any right to consent, which consents have been obtained, (ii) create in any other Person a right or claim of termination or amendment of any material Contractual Obligation of the Company or such Subsidiary, or (iii) require modification, acceleration or cancellation of any material Contractual Obligation of the Company or such Subsidiary; and (d) do not and will not result in the creation of any Lien (or obligation to create a Lien) against any property, asset or business of the Company or such Subsidiary (other than those securing the Notes from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13).

**5.3    Authorization.** All corporate action on the part of the Company, its Subsidiaries and their respective directors and stockholders necessary for the authorization, execution, delivery and performance of this Agreement by the Company and its Subsidiaries and the performance of the

Company's obligations hereunder, including the issuance and delivery of the Notes and the reservation of the equity securities issuable upon conversion of the Notes (collectively, the "***Conversion Securities***") has been taken or will be taken prior to the issuance of such Conversion Securities. This Agreement and the Note Documents, when executed and delivered by the Note Parties, shall constitute valid and binding obligations of the Note Parties enforceable in accordance with their terms, subject to laws of general application relating to bankruptcy, insolvency, the relief of debtors and general principles of equity and, with respect to rights to indemnity, subject to federal and state securities laws. The Conversion Securities, when issued in compliance with the provisions of this Agreement or the Notes will be validly issued, fully paid and nonassessable and free of any Liens and issued in compliance with all applicable federal and state securities laws.

5.4     **Governmental Consents**. All consents, approvals, orders, or authorizations of, or registrations, qualifications, designations, declarations, or filings with, any Governmental Authority, required on the part of the Note Parties in connection with the valid execution and delivery of this Agreement and the other Note Documents, the offer, sale or issuance of the Notes and the Conversion Securities issuable upon conversion of the Notes and the consummation of any other transaction contemplated hereby shall have been obtained and will be effective on the Initial Closing Date.

5.5     **Compliance with Laws**.

(a)     No Note Party is in violation of any Requirements of Law, any applicable statute, rule, regulation, order or restriction of any domestic government or any instrumentality or agency thereof in respect of the conduct of its business or the ownership of its properties, which violation of which would materially and adversely affect the business, assets, liabilities, financial condition or operations of the Note Parties (individually and in the aggregate).

(b)     Neither the Company nor any of its Subsidiaries is registered or required to register as an "investment company" or a company "controlled" by an "investment company" under the Investment Company Act of 1940, as amended. Neither the Company nor any of its Subsidiaries is engaged as one of its important activities in extending credit for margin stock (under Regulations X, T and U of the Federal Reserve Board of Governors). The Company and each of its Subsidiaries has complied in all material respects with applicable provisions of the Federal Fair Labor Standards Act. Neither the Company nor any of its Subsidiaries is a "holding company" or an "affiliate" of a "holding company" or a "subsidiary company" of a "holding company" as each term is defined and used in the Public Utility Holding Company Act of 2005. Neither the Company's nor any of its Subsidiaries' properties or assets has been used by the Company or such Subsidiary or, to Company's knowledge, by previous Persons, in disposing, producing, storing, treating, or transporting any hazardous substance other than in material compliance with applicable laws. The Company and each of its Subsidiaries has obtained all consents, approvals and authorizations of, made all declarations or filings with, and given all notices to, all Governmental Authorities that are necessary to continue their respective businesses as currently conducted, except to the extent that the failure to obtain, make or give any of the foregoing would not reasonably be expected to have a Material Adverse Effect.

(c)     Neither the Company nor any Subsidiary (i) is a Sanctioned Person, (ii) has any assets in Sanctioned Entities, or (iii) derives any operating income from investments in, or transactions with Sanctioned Persons or Sanctioned Entities. The proceeds of the Notes will not be used and have not been used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity.

(d)     The Company and its Subsidiaries are in compliance, in all material respects, with any United States Requirements of Law relating to terrorism, sanctions or money laundering (the "Anti-

Terrorism Laws"), including the United States Executive Order No. 13224 on Terrorist Financing (the "***Anti-Terrorism Order***") and the Patriot Act. No part of the proceeds of any Note will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended or any other Anti-Terrorism Law.

(e)     No Note Party and no Subsidiary of any Note Party (i) is listed in the annex to, or is otherwise subject to the provisions of, the Anti-Terrorism Order, (ii) is owned or controlled by, or acting for or on behalf of, any person listed in the annex to, or is otherwise subject to the provisions of, the Anti-Terrorism Order or (iii) commits, threatens or conspires to commit or supports "terrorism" as defined in the Anti-Terrorism Order.

(f)     None of the funds to be provided under this Agreement will be used, directly or indirectly, (i) for any activities in violation of any applicable anti-money laundering, economic sanctions and anti-bribery laws and regulations laws and regulations or (ii) for any payment to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

**5.6     Compliance with Other Instruments**. The Company is not in violation or default of any term of its articles of incorporation, or of any provision of any mortgage, indenture or contract to which it is a party and by which it is bound or of any judgment, decree, order or writ, other than such violation(s) that would not have a Material Adverse Effect on the Company. The execution, delivery and performance of this Agreement and the other Note Documents, and the consummation of the transactions contemplated hereby and thereby will not result in any material violation or be in conflict with, or constitute, with or without the passage of time and giving of notice, either a default under any such material provision, instrument, judgment, decree, order or writ or an event that results in the creation of any material Lien upon any assets of the Company or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization or approval applicable to the Company, its business or operations or any of its material assets or properties. Without limiting the foregoing, the Company has obtained all waivers reasonably necessary with respect to any preemptive rights, rights of first refusal or similar rights, including any notice or offering periods provided for as part of any such rights, in order for the Company to consummate the transactions contemplated hereunder without any third party obtaining any rights to cause the Company to offer or issue any securities of the Company as a result of the consummation of the transactions contemplated hereunder.

**5.7     Solvency.**  As of the Initial Closing Date both immediately before and after giving effect to the transactions contemplated by the Note Documents, the Company is individually, and the Company and its Subsidiaries on a consolidated basis are, Solvent.

**5.8     Offering**. The offer, issue, and sale of the Notes and the Conversion Securities are and will be exempt from the registration and prospectus delivery requirements of the Act, and no qualification under the Trust Indenture Act of 1939, as amended, and the rules and regulations of the Securities and Exchange Commission promulgated thereunder is required in connection with, the issuance of the Notes and the Conversion Securities.

**5.9     No "Bad Actor" Disqualification**. The Company has exercised reasonable care to determine whether any Company Covered Person (as defined below) is subject to any of the "bad actor" disqualifications described in Rule 506(d)(1)(i) through (viii), as modified by Rules 506(d)(2) and (d)(3), under the Act ("***Disqualification Events***"). To the Company's knowledge, no Company Covered Person

17

is subject to a Disqualification Event. The Company has complied, to the extent required, with any disclosure obligations under Rule 506(e) under the Act.

5.10     **Litigation**. There are no legal actions, suits, proceedings, claims or disputes pending or, to the knowledge of any Note Party, threatened in writing, at law, in equity, in arbitration or before any Governmental Authority against or affecting the Company or its Subsidiaries that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; (b) there is no injunction, writ, temporary restraining order, decree or any order or determination of any nature by any arbitrator, court or other Governmental Authority purporting to enjoin or restrain the execution, delivery or performance of the Note Documents or which relates to the assets or the business of the Company or its Subsidiaries; and (c) there is no litigation, claim, audit, dispute, review, proceeding or investigation currently pending or threatened in writing against the Company or its Subsidiaries for any violation or alleged violation of any Requirements of Law, and neither the Company nor any Subsidiary has received written notice of any threat of any suit, action, claim, dispute, investigation, review or other proceeding pursuant to or involving any Requirements of Law.

5.11     **Taxes**.

(a)     Except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect, the Company and each of its Subsidiaries has timely filed all United States federal and state income and other material tax returns that it was required to file, in each case with due regard for any extension of time within which to file such tax return. Except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect, all Taxes due and payable by the Company or its Subsidiaries have been paid, in each case with due regard for any extension of time within which to file such tax return, other than any Taxes the amount or validity of which is being actively contested by Company or its Subsidiaries in good faith and by appropriate proceedings and with respect to which adequate reserves or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made or provided therefor. There are no Liens, other than Permitted Liens, on any of the assets of the Company or its Subsidiaries that arose in connection with any failure (or alleged failure) to pay any Tax. To the knowledge of the Company, no claim has been made by a Governmental Authority in a jurisdiction where the Company and its Subsidiaries do not file tax returns that the Company or any of its Subsidiaries is or may be subject to taxation by that jurisdiction that could reasonably be expected to have a Material Adverse Effect.

(b)     There is no action, suit, proceeding, investigation, examination, audit, or claim now pending or, to the knowledge of the Company, threatened in writing by any Governmental Authority regarding any Taxes relating to the Company or its Subsidiaries that could reasonably be expected to have a Material Adverse Effect.

5.12     **Financial Condition**.   The Note Parties have furnished the Purchasers with true, correct and complete copies of (i) the audited consolidated balance sheets of the Company and its Subsidiaries as of December 31, 2018, 2019 and 2020 and the related consolidated statements of income or operations, shareholders' equity and cash flows for each such fiscal year and (ii) the unaudited consolidated balance sheets of the Company and its Subsidiaries as of March 31, 2021 and the related consolidated statements of income or operations and cash flows for such fiscal quarter (collectively, the "***Financial Statements***"). The Financial Statements fairly present, in all material respects, the financial position of the Company and its Subsidiaries on a consolidated basis, as of the respective dates thereof, and the results of operations and cash flows thereof, as of the respective dates or for the respective periods set forth therein, and are in conformity with the past historical practices of the Note Parties, with GAAP consistently applied during the periods involved. As of the dates of the Financial Statements, neither the Company nor any Subsidiary had any known obligation, Indebtedness or liability (whether accrued, absolute, contingent

18

or otherwise, and whether due or to become due), which was not reflected or reserved against in the balance sheets which are part of the Financial Statements, except for those incurred in the ordinary course of business and which are fully reflected on the books of account of the Company or its Subsidiaries, as applicable.

5.13    **Subsidiaries**.  Except as set forth on Schedule 5.13, the Company does not have any Subsidiaries.

5.14    **Capitalization**. As of the Initial Closing Date, without giving effect to the transactions contemplated hereby and in the other Note Documents, the outstanding capitalization of the Company and its Subsidiaries is as set forth on Schedule 5.14.  All of the issued and outstanding Capital Stock of the Company has been, and Capital Stock of the Company issuable upon the exercise of outstanding securities when issued will be, duly authorized and validly issued and are fully paid and nonassessable. All outstanding Capital Stock of the Company's Subsidiaries are 100% owned by the Company or one of its Subsidiaries free and clear of all Liens other than Permitted Liens. Except as set forth in the Charter Documents (as in effect on the Initial Closing Date), the issuance of the foregoing Capital Stock is not and has not been subject to preemptive rights in favor of any Person other than such rights that have been waived and will not result in the issuance of any additional Capital Stock of the Company or the triggering of any down-round or similar rights contained in any options warrants, debentures or other securities or agreements of the Company or any of its Subsidiaries. On the Initial Closing Date, except as set forth on Schedule 5.14, there are no outstanding securities convertible into or exchangeable for Capital Stock of the Company or any of its Subsidiaries or options, warrants or other rights to purchase or subscribe for Capital Stock of the Company or any of its Subsidiaries, or contracts, commitments, agreements, understandings or arrangements of any kind to which the Company or any of its Subsidiaries is a party relating to the issuance of any Capital Stock of the Company or any of its Subsidiaries, or any such convertible or exchangeable securities or any such options, warrants or rights. On the Initial Closing Date, except as set forth on Schedule 5.14, neither the Company nor any of its Subsidiaries has any obligation, whether mandatory or at the option of any other Person, at any time to redeem or repurchase any Capital Stock of the Company or any of its Subsidiaries, pursuant to the terms of their respective Charter Documents or otherwise. All securities of the Company and its Subsidiaries (including all shares of the Company's common stock, securities, options and warrants to purchase shares of the Company's common stock (both outstanding as well as those that are no longer outstanding), have been and were issued and granted pursuant to an exception from the Act and otherwise in compliance, in all material respects, with all securities and other applicable laws.

5.15    **Private Offering**. No form of general solicitation or general advertising was used by the Company or its Subsidiaries or their respective representatives in connection with the offer or sale of the Notes to the Purchasers pursuant to this Agreement.

5.16    **Broker's, Finder's or Similar Fees**.  Except as set forth in that certain Engagement Letter, dated on or about of August 20, 2021, by and between the Company and GreensLedge Capital Markets LLC, there are no brokerage commissions, finder's fees or similar fees or commissions payable by the Company or its Subsidiaries in connection with the transactions based on any agreement, arrangement or understanding with the Company or its Subsidiaries or any action taken by the Company or its Subsidiaries. Notwithstanding the foregoing or any other provision herein, no Purchaser shall be liable for any brokerage commission, finder's fees or similar fees or commissions.

5.17    **Indebtedness**. Schedule 5.17 lists the amount of all Indebtedness of the Company and its Subsidiaries (other than Indebtedness under this Agreement) that is in existence immediately before the Initial Closing Date and will remain outstanding after the Initial Closing Date.

254153937 v7

6.      **AFFIRMATIVE COVENANTS OF THE NOTE PARTIES**

Each Note Party shall, and shall cause each of its Subsidiaries to:

6.1      **Reporting Obligations**. Deliver to the Note Agent (for prompt distribution to the Purchasers as specified in the applicable Administrative Questionnaire (or as otherwise specified by a Purchaser to the Note Agent in writing from time to time)):

(a)      as soon as available, but not later than 150 days after the end of each fiscal year of the Company, a copy of the audited consolidated balance sheets of the Company and its Subsidiaries as at the end of such fiscal year and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year, in each case, prepared in accordance with GAAP, setting forth in each case in comparative form the figures for the previous fiscal year, and accompanied by a report of any "Big Four" or, upon Required Holders' written consent (not to be unreasonably withheld), any other independent certified public accounting firm, which report shall contain an unqualified opinion (without any (A) "going concern" or like qualification or exception, (B) qualification or exception as to the scope of such audit, or (C) qualification which relates to the treatment or classification of any item and which, as a condition to the removal of such qualification, would require an adjustment to such item (except in the case of clauses (A) and (B) above as it relates to the Obligations during the last twelve months before the Maturity Date)), stating that such consolidated financial statements present fairly in all material respects the financial position for the periods indicated in conformity with GAAP applied on a basis consistent with prior years; and

(b)      as soon as available, but not later than 45 after the end of each fiscal quarter of each fiscal year (other than the fourth fiscal quarter), the unaudited consolidated balance sheets of the Company and its Subsidiaries as at the end of such fiscal quarter and the related unaudited consolidated statements of income and cash flows of the Company and its Subsidiaries for such fiscal quarter and for the period from the beginning of the then current fiscal year to the end of such fiscal quarter, all certified on behalf of the Company by a Responsible Officer of the Company as being complete and correct and fairly presenting, in all material respects, the financial position and the results of operations of the Company and its Subsidiaries, subject to normal year-end adjustments and absence of footnote disclosures.

(c)      promptly, and in any event within three (3) Business Days after the Company or any other Note Party becomes aware of or has knowledge of any event or condition that constitutes a Default or Event of Default, provide written notice of such event or condition and a statement of the curative action that the Company proposes to take with respect thereto.

Delivery of any reports, information and documents under this Section 6.2, as well as any other reports, information and documents pursuant to this Agreement, to the Note Agent is for informational purposes only and the Note Agent's receipt of the same shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of its covenants hereunder (as to which the Note Agent is entitled to rely exclusively on certificates of a Responsible Officer of the Company). The Note Agent shall have no responsibility or liability for the filing, timeliness or content of any report required under this Section 6.2 or any other reports, information and documents required under this Agreement.

6.2      **Taxes and Claims**.

(a)      Timely file complete and correct United States federal and state income and applicable foreign, state and local tax returns required by law, in each case with due regard for any extension of time

within which to file such tax returns, and pay when due all Taxes in each case, except to the extent that the failure to so file or pay could not reasonably be expected to have a Material Adverse Effect; provided that the Company and its Subsidiaries shall not be required to pay any such Taxes which are being contested in good faith by appropriate proceedings and with respect to which adequate reserves have been set aside in accordance with GAAP, which deferment of payment is permissible so long as no Lien, other than a Permitted Lien, has been entered and the Company's and its Subsidiaries' title to, and its and their right to use, its and their respective properties are not materially adversely affected thereby.

(b)     Pay all stamp, court or documentary, intangible, recording, filing or similar Taxes, if any, that arise solely in connection with the issuance of the Notes except to the extent such Taxes arise as a result of a transfer of a Note to a person other than the initial Holder of the Notes. The obligations of the Company under this Section 6.2(b) shall survive the payment of the Obligations and the termination of the Note Documents.

**6.3     Insurance**.

(a)     Maintain with reputable insurance companies insurance in such amounts and covering such risks as is consistent with sound business practice, including, without limitation, property and casualty insurance on all of its property, general liability insurance, workers compensation insurance and business interruption insurance. From and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, each Note Party will, and will cause each of its Subsidiaries to, furnish to the Collateral Agent, upon reasonable request, full information as to the insurance carried by it.

(b)     From and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, (i) at all times keep its property which is subject to the Lien of the Collateral Agent insured in favor of the Collateral Agent, and all policies or certificates (or certified copies thereof) with respect to such insurance and (ii) notify (and cause each of its Subsidiaries to notify) the Collateral Agent and the Purchasers, promptly, upon receipt of a notice of termination, cancellation, or non-renewal from its insurance company of any such policy.

(c)     If the Company shall fail to maintain all insurance in accordance with this Section 6.3 or to timely pay or cause to be paid the premium(s) on any such insurance, or if the Company shall fail to deliver all certificates with respect thereto, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, the Collateral Agent shall have the right (but shall be under no obligation) to procure such insurance or pay such premiums, and the Company agrees to reimburse the Purchasers, on demand, for all costs and expenses relating thereto.

**6.4     Compliance with Laws**. Comply with any and all Requirements of Law to which it may be subject including, without limitation, all Environmental Laws, and obtain any and all Licenses necessary to the ownership of its property or to the conduct of its businesses, except, in each case, where failure to do so could not reasonably be expected to have a Material Adverse Effect. Each Note Party will, and will cause each of its Subsidiaries to, timely satisfy all material assessments, fines, costs and penalties imposed by any Governmental Authority against such Person or any property of such Person except to the extent such assessments, fines, costs, or penalties are being contested in good faith by appropriate proceedings and for which the Company or such Subsidiary has set aside on its books adequate reserves in accordance with GAAP.

**6.5     Maintenance of Properties**. Do all things necessary to maintain, preserve, protect and keep its property (other than property that is obsolete, surplus, or no longer used or useful in the ordinary conduct of its business) in good repair, working order and condition (ordinary wear and tear and casualty and condemnation excepted), make all necessary and proper repairs, renewals and replacements such that

its business can be carried on in connection therewith and be properly conducted at all times and pay and discharge when due the cost of repairs and maintenance to its property, and pay all rentals when due for all real estate leased by such Person.

**6.6    Employee Benefit Plans**. (a) Keep in full force and effect any and all Plans which are presently in existence or may, from time to time, come into existence under ERISA and not withdraw from any such Plans, unless such withdrawal can be effected or such Plans can be terminated without material liability to the Company or its Subsidiaries, (b) make contributions to all such Plans in a timely manner and in a sufficient amount to comply in all material respects with the standards of ERISA, including, without limitation, the minimum funding standards of ERISA, (c) comply in all material respects with all requirements of ERISA, (d) notify the Purchasers promptly upon receipt by the Company or any Subsidiary of any notice concerning the imposition of any withdrawal liability or of the institution of any proceeding or other action which may result in the termination of any such Plans by the PBGC or the appointment of a trustee to administer such Plans, (c) promptly advise the Purchasers of the occurrence of any Reportable Event or non-exempt prohibited transaction (as defined in ERISA) with respect to any such Plans of which Company becomes aware, and (f) amend any Plan that is intended to be qualified within the meaning of Section 401 of the Code to the extent necessary to keep the Plan qualified and to cause the Plan to be administered and operated in a manner that does not cause the Plan to lose its qualified status.

**6.7    Environmental**. Use and operate all of its facilities and properties in material compliance with all Environmental Laws, keep all necessary Licenses in effect and remain in material compliance therewith, and handle all Hazardous Materials in material compliance with all applicable Environmental Laws.

**6.8    Intellectual Property**.

(a)    Each Note Party will take the steps described in this Section 6.8 with respect to all new or acquired Intellectual Property to which the Company or any Guarantor is now or later becomes entitled that is necessary in the conduct of such Person's business. The Company acknowledges and agrees that the Secured Parties shall have no duties with respect to any Intellectual Property or Licenses of the Company or its Subsidiaries.

(b)    The Note Parties shall have the duty, with respect to Intellectual Property that is necessary in the conduct of such Person's business (i) to prosecute diligently any trademark application or service mark application that is part of the trademarks pending as of the date hereof or hereafter, (ii) to prosecute diligently any patent application that is part of the patents pending as of the date hereof or hereafter, and (iii) to take all reasonable and necessary action to preserve and maintain all of the Note Parties' trademarks, patents, copyrights, Licenses, and its rights therein, including paying all maintenance fees and filing of applications for renewal, affidavits of use, and affidavits of non-contestability, except in the case of clauses (i) and (ii), where the Company, in its reasonable opinion, determines that the costs for engaging in such prosecution activities exceeds the likely benefit of continued prosecution and, except in the of case (iii), where the Company, in its reasonable opinion, determines that the costs of preserving and maintaining exceeds the value the Company obtains from such preservation and maintenance. Each Note Party will require all employees, consultants, and contractors of such Note Party who were involved in the creation or development of such Intellectual Property to sign agreements containing assignment to the Company or such Guarantor of Intellectual Property rights created or developed and obligations of confidentiality. No Note Party shall abandon any Intellectual Property or License that is necessary in the conduct of the Company's or such Guarantor's business.

254153937 v7

(c)      From and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, each Note Party will (i) promptly file, at such Note Party's sole cost and expense, any application to register any Intellectual Property with the United States Patent and Trademark Office or the United States Copyright Office if such registration is necessary in connection with the conduct of such Note Party's business, (ii) concurrently with the delivery of financial statements pursuant to Sections 6.1(a) or (b), deliver supplements to Schedule 4(c) to the Security Agreement and any other documents reasonably necessary for the Collateral Agent to record its security interest in such Intellectual Property with the United States Patent and Trademark Office or the United States Copyright Office and (iii) promptly after the delivery of the documents required by clause (ii) above, upon the reasonable request of the Collateral Agent, execute and deliver in favor of the Collateral Agent one or more Intellectual Property Security Agreements to further evidence the Purchasers' Lien on such Note Party's Intellectual Property.

6.9      **Use of Proceeds**. Use the proceeds of the Notes (i) to pay any fees and expenses incurred by the Company in connection with the transactions contemplated hereby and (ii) for general corporate purposes not in violation of any applicable laws. The Company shall not use any proceeds of the sale of the Notes hereunder to, directly or indirectly, purchase or carry any "margin stock" (as defined in Regulation U) or to extend credit to others for the purpose of purchasing or carrying any "margin stock", in either case, in violation of the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.

6.10     **Subsidiaries**.   If any Note Party creates, forms or acquires any Subsidiary (other than an Excluded Subsidiary) on or after the date of this Agreement, such Note Party will, and will cause such Subsidiary to, (a) within 30 days (which 30 days may be extended by the Note Agent at the direction of the Required Holders) of the creation, formation or acquisition of such new Subsidiary, cause such Subsidiary to join the Guaranty as a "Guarantor" thereunder and (b) from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, within 30 days (which 30 days may be extended by the Collateral Agent at the direction of the Required Holders) of the creation, formation or acquisition of such new Subsidiary, cause such Subsidiary to join the Security Agreement as a "Grantor" and take all such other actions and execute and deliver, or cause to be executed and delivered, all such documents, instruments, agreements, and certificates as are similar to those described in Sections 4.1(c) and, if requested by the Required Holders, 4.1(g) or that are necessary or desirable to protect, evidence or perfect the security interest of the Collateral Agent in a manner similar to the Liens and assets granted by the existing Note parties under the existing Collateral Documents either by executing and delivering to the Collateral Agent a counterpart or supplement to the existing Collateral Documents or such new documents as are necessary or desirable to evidence, grant or perfect a first priority lien in such assets in favor of Collateral Agent, for the benefit of Secured Parties (including, without limitation, any pledges of Capital Stock (other than with respect to Excluded Property (as defined in the Security Agreement))). The Agents shall be authorized to execute and deliver such documents upon receipt of a certificate from a Responsible Officer of the Company stating that such documents are authorized or permitted under the Note Documents.

6.11     **Piggyback Registration Rights**. The Company shall provide the Holders of the Notes with customary "piggyback" registration rights (with respect to the shares of common stock issued upon conversion of the Notes) on all registration statements of the Company, subject to the right, however, of the Company and its underwriters to reduce the number of shares proposed to be registered at the underwriter's discretion.

6.12     **Further Assurances**.   Each Note Party will take any action reasonably requested by any Holder in order to effectuate the purposes and terms contained in this Agreement or any other Note Document.

254153937 v7

**6.13    Conversion Event**. Within 30 calendar days of the occurrence of the first Conversion Event, (i) each of the Note Parties and the Collateral Agent hereby agrees that it shall execute and deliver to each Holder a counterpart of the Security Agreement and the Intellectual Property Security Agreement and take such actions and deliver such other documents as are reasonably necessary, or reasonably required by the Required Holdings, to give effect to this Section 6.13, including, without limitation, delivering and filing (or causing to be delivered and filed) UCC-1 financing statements with respect to the security interests to be granted thereby (provided that any such actions shall not be a condition precedent to the effectiveness of the Security Agreement) and furnishing certificates of insurance issued on applicable ACORD Forms with respect to property and liability insurance for the Company and (ii) in the event that such a Conversion Event is a SPAC and the Parent Entity assumes or otherwise becomes a co-obligor with respect to the Company's Obligations pursuant to Section 10.1, Core Scientific Holding Co. (or its successor by merger) shall remain a co-obligor with such Parent Entity with respect to such Obligations (other than any such Obligation of the Company to deliver Conversion Securities pursuant to Section 2 of the Note, with respect to which delivery Obligation Core Scientific Holding Co. (or successor by merger) hereby agrees that it shall execute and deliver to each Holder a supplement to the Guaranty, substantially in the form attached thereto as Exhibit C).

**7.    NEGATIVE COVENANTS OF THE NOTE PARTIES**

Each Note Party shall not, and shall cause each of its Subsidiaries not to:

**7.1    Liens, Restricted Payments and Dispositions**. Prior to the occurrence of a Conversion Event, so long as the Obligations remain outstanding:

(a)    Liens. Create, assume or suffer to exist any Liens on any assets of the Note Parties securing debt for borrowed money in excess of an amount at any time outstanding equal to the greater of (x) the sum of (I) the aggregate principal amount of the Existing Notes at any time outstanding (disregarding, for the purposes of this clause (I) any and all PIK Interest (as defined in the Existing Notes) that has been added to the aggregate principal amount of the Existing Notes) plus (II) $50,000,000 and (y) $265,000,000 (such clause (y), the "***Secured Debt Cap***"); provided that (x) in no event shall the aggregate principal amount of the Existing Notes at any time outstanding (disregarding, for the purposes of this proviso any and all PIK Interest (as defined in the Existing Notes) that has been added to the aggregate principal amount of the Existing Notes) exceed at any time $215,000,000, (y) the Collateral Agent and the authorized representative with respect to any Indebtedness that is secured on a pari passu basis with the Liens on the Collateral securing the Obligations that is permitted to be secured in reliance on this clause (a) shall have entered into an intercreditor agreement providing for equal and ratable lien priority and perfection for the holders and providers of such Indebtedness at the direction of the Required Holders and substantially in the form attached hereto as Exhibit H (it being understood that the form attached as Exhibit H is acceptable to the Holders) or such other form reasonably satisfactory to the Required Holders (the "***Intercreditor Agreement***") and (z) notwithstanding the foregoing, the Note Parties shall be permitted to incur any letters of credit and any Indebtedness, including Capital Lease Obligations, incurred to finance the acquisition of any fixed or capital assets (including, for the avoidance of doubt, any real property assets) so long as such Liens shall encumber only the assets acquired or financed with the proceeds of such Indebtedness (or, in the case of any letters of credit, cash collateral) and do not attach to any other assets of any Note Party, which letters of credit and Indebtedness set forth in this clause (z) shall, for the avoidance of doubt, be excluded from the calculation of the Secured Debt Cap.

(b)    Restricted Payments.

(i)    Pay or make any Restricted Payment to its direct or indirect equityholders; provided that, the foregoing shall not restrict or prohibit any Subsidiary from paying or

making any Restricted Payments, directly or indirectly, to the Company, and shall not restrict or prohibit any Restricted Payments, directly or indirectly, from the Company to its direct or indirect equityholders at such times and in such amounts as are necessary to permit:

(1)     such equityholder (A) to pay general administrative costs and expenses (including audit and tax fees payable to third party auditors and tax advisors, customary compensation and reasonable costs and expenses of the board of directors or similar managing body of such entity incurred in the ordinary course of business, and franchise taxes and other fees, taxes and expenses required to maintain such entity's existence), (B) to discharge its, its Subsidiaries' and its direct and indirect owners' income tax liabilities and (C) in the case that the Company is treated as a flow-through entity for U.S. income tax purposes, its direct and indirect owners to discharge their respective U.S. federal, state and local and non-U.S. income tax obligations associated with their ownership of the Company, in each case, so long the amount of any such Restricted Payment is applied for such purpose; and

(2)     (x) purchases or cash payments in lieu of fractional shares of Capital Stock arising out of stock dividends, splits, combinations or conversions of Capital Stock in the ordinary course of business and (y) purchases or cash payments in lieu of fractional shares upon conversion of the Notes.

(ii)     From and after the occurrence of a Conversion Event, any Restricted Payments made or paid to the direct or indirect equityholders of the Company (other than the Restricted Payments of the type referred to in the proviso to clause (i) above) shall also be made or paid to the Holders in accordance with their Pro Rata Share of the Notes on an as-converted basis as if such Notes had been converted pursuant to their terms at the time of the applicable Restricted Payment.

(c)     Asset Dispositions. Consummate any Asset Dispositions; provided that the foregoing shall not restrict or prohibit (A) sales of inventory in the ordinary course of business; (B) the use of cash or cash equivalents in a manner not prohibited by the Note Documents; (C) licenses, sublicenses, leases or subleases granted to third parties in the ordinary course of business not interfering with the business of the Company and its Subsidiaries and which do not materially impair the value of the property so licensed, sublicensed, leased or subleased; (D) dispositions of obsolete, damaged, surplus or worn-out or no longer used or useful equipment; (E) the lapse, abandonment or other dispositions of Intellectual Property that is, in the reasonable business judgment of the Company, no longer economically practicable or commercially desirable to maintain; (F) dispositions by (1) any Subsidiary to the Company, (2) the Company to any Note Party, (3) any Subsidiary to any Note Party or (4) any Subsidiary that is not a Note Party to any other Subsidiary that is not a Note Party; (G) dispositions resulting from any casualty or property losses or condemnation or similar proceeding of, any property or asset of the Company or any of its Subsidiaries; (H) the sale or other disposition of any assets or property of the Company not constituting Collateral; (I) any Asset Disposition so long as such Asset Disposition is made for fair market value; (J) any individual Asset Disposition so long as the consideration therefor does not exceed $1,000,000; and (K) any other Asset Dispositions to a non-affiliated third party so long as the aggregate consideration therefor does not exceed $10,000,000 per fiscal year; provided, further, that notwithstanding the foregoing, any Asset Disposition described in the foregoing clause (K) shall be permissible notwithstanding the fact that the counterparty is an affiliate or a Subsidiary of the Company so long as such Asset Disposition is on fair and reasonable terms no less favorable to the Company or such affiliate or Subsidiary than would be obtainable on comparable arm's length transaction with a non-affiliated third party.

**7.2     Issuances of Equity**.     Except to the extent permitted by Section 7.1(c), no Subsidiary of the Company shall issue or sell Capital Stock in such Subsidiary.

**7.3     Modifications of Charter Documents**. The Company will not permit, and will cause each of its Subsidiaries not to permit, such Person's Charter Documents to be amended or modified in any way that could reasonably be expected to materially or adversely affect the interests of the Holders in their capacity as Secured Parties (and not, for the avoidance of doubt, as holders of Capital Stock of the Company).

**7.4     Compensation or Credit Support**. Other than (x) to consenting or approving Holders in connection with a consent or amendment in accordance with Section 10.9 to the extent all Holders are afforded an opportunity to enter into such consent or amendment or (y) in connection with the issuance of warrants to non-consenting Holders pursuant to Section 1(b)(i)(1) of the Notes, the Company shall not enter into any arrangement with any Holder for the purposes of providing additional compensation (in the form of interest, fees or otherwise) or credit support (in the form of additional collateral or otherwise) to such Holder in connection with the Notes without providing such additional compensation or credit support for the ratable benefit of all Holders.

## 8.     REPRESENTATIONS AND WARRANTIES OF THE PURCHASERS

Each Initial Purchaser hereby represents and warrants as of the Initial Closing Date, and each Additional Purchaser hereby represents and warrants as of the applicable Additional Closing Date as follows:

**8.1     Purchase for Own Account**. Each Purchaser represents that it is acquiring a Note and the Conversion Securities (collectively, the "*Securities*") solely for its own account and beneficial interest for investment and not for sale or with a view to distribution of the Securities or any part thereof, has no present intention of selling (in connection with a distribution or otherwise), granting any participation in, or otherwise distributing the same, and does not presently have reason to anticipate a change in such intention.

**8.2     Information and Sophistication**. Without lessening or obviating the representations and warranties of the Note Parties set forth in Section 5 hereof or in any other Note Document or the right of such Purchaser to rely thereon, each Purchaser hereby: (i) acknowledges that it has received all the information it has requested from the Company and it considers necessary or appropriate for deciding whether to acquire the Securities, (ii) represents that it has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Securities and to obtain any additional information necessary to verify the accuracy of the information given the Purchaser, and (iii) further represents that it has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risk of this investment.

**8.3     Ability to Bear Economic Risk**. Each Purchaser acknowledges that investment in the Securities involves a high degree of risk, and represents that it is able, without materially impairing its financial condition, to hold the Securities for an indefinite period of time and to suffer a complete loss of its investment.

**8.4     Further Limitations on Disposition**. Without in any way limiting the representations set forth above, each Purchaser further agrees not to make any disposition of all or any portion of the Securities unless and until:

(c)     there is then in effect a registration statement under the Act covering such proposed disposition and such disposition is made in accordance with such registration statement; or

(d)      the Purchaser shall have notified the Company of the proposed disposition and shall have furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and if reasonably requested by the Company, such Purchaser shall have furnished the Company with an opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration under the Act and any applicable state securities laws, provided that no such opinion shall be required for dispositions in compliance with Rule 144, except in unusual circumstances.

Notwithstanding the provisions of paragraphs (a) and (b) above, no such registration statement or opinion of counsel shall be necessary for a transfer by such Purchaser to Permitted Transferees, or transfers by gift, will or intestate succession to any spouse or lineal descendants or ancestors of any Purchaser who is an individual, if all transferees agree in writing to be subject to the terms hereof to the same extent as if they were Purchasers hereunder

**8.5      Accredited Investor Status.** Each Purchaser is an "accredited investor" as such term is defined in Rule 501 under the Act.

**8.6      No "Bad Actor" Disqualification**. Each Holder represents and warrants that neither (A) such Holder nor (B) any entity that controls such Holder or is under the control of, or under common control with, such Holder, is subject to any Disqualification Event, except for Disqualification Events covered by Rule 506(d)(2)(ii) or (iii) or (d)(3) under the Act and disclosed in writing in reasonable detail to the Company. Each Holder represents that such Holder has exercised reasonable care to determine the accuracy of the representation made by such Holder in this paragraph, and agrees to notify the Company if such Holder becomes aware of any fact that makes the representation given by such Holder hereunder inaccurate.

**8.7      Foreign Investors**. If a Holder is not a United States person (as defined by Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended (the "***Code***")), such Holder hereby represents that he, she or it has satisfied itself as to the full observance of the laws of the Holder's jurisdiction in connection with any invitation to subscribe for the Securities or any use of its Note, including (A) the legal requirements within the Holder's jurisdiction for the purchase of the Securities, (B) any foreign exchange restrictions applicable to such purchase, (C) any governmental or other consents that may need to be obtained, and (D) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale or transfer of the Securities. The Holder's subscription, payment for and continued beneficial ownership of the Securities will not violate any applicable securities or other laws of the Holder's jurisdiction.

**8.8      Forward-Looking Statements**. With respect to any forecasts, projections of results and other forward-looking statements and information provided to a Holder, such Holder acknowledges that such statements were prepared based upon assumptions deemed reasonable by the Company at the time of preparation. There is no assurance that such statements will prove accurate, and the Company has no obligation to update such statements.

**8.9      GreensLedge as Placement Agent.** Each Purchaser represents, acknowledges and agrees that: (A) GreensLedge Capital Markets LLC ("***GreensLedge***") has acted as the Company's placement agent for the Securities, (B) such Purchaser is not relying on the advice or recommendations of GreensLedge (including any affiliate, agent, advisor or representative thereof) in connection with such Purchaser's purchase of Securities, (C) GreensLedge is not acting as an underwriter or initial purchaser with respect to any Securities, (D) GreensLedge has no responsibility with respect to any marketing or other disclosure documents relating to the Securities (or the completeness of any thereof) furnished to such Purchaser, (E) GreensLedge has not made, and will not make, any representation or warranty with respect to the Company or any Securities (and such Purchaser will not rely on any statements made by

27

GreensLedge, orally or in writing, to the contrary) and (F) GreensLedge and/or any affiliate or employee thereof may purchase or otherwise invest in the Securities.

**8.10    Further Assurances.** Each Purchaser agrees and covenants that at any time and from time to time it will promptly execute and deliver to the Company such further instruments and documents and take such further action as the Company may reasonably require in order to carry out the full intent and purpose of this Agreement and to comply with state or federal securities laws or other regulatory approvals.

## 9.    THE AGENTS

**9.1    Appointment and Authorization of the Agents.** Each Purchaser hereby irrevocably appoints, designates and authorizes the Note Agent to act as the "note agent" under the Note Documents and, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, the Collateral Agent to act as the "collateral agent" under the Note Documents and to act as the agent of (and to hold any security interest created by any Note Document for and on behalf of or on trust for) such Purchaser for purposes of acquiring, holding and enforcing any and all Liens on Collateral to be granted by the Company to secure any of the Obligations, and to take such other action on its behalf in accordance with the provisions of this Agreement and each other Note Document and to exercise such powers and perform such duties, in each case as are expressly delegated to the Agents by the terms of this Agreement or any other Note Document, together with such powers and discretion as are reasonably incidental thereto. Notwithstanding any provision to the contrary contained elsewhere herein or in any other Note Document, the Agents shall have no duties or responsibilities, except those expressly set forth herein, nor shall the Agents have or be deemed to have any fiduciary relationship with any Purchaser or participant, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Note Document or otherwise exist against the Agents. Without limiting the generality of the foregoing sentence, the use of the term "agent" herein and in the other Note Documents with reference to the Agents is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used merely as a matter of market custom and is intended to create or reflect only an administrative relationship between independent contracting parties. Without limiting the generality of the foregoing, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, the Purchasers hereby expressly authorize the Collateral Agent to execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Note Documents and acknowledge and agree that any such action by Collateral Agent shall bind the Purchasers. Whether or not expressly stated in any Note Document, the rights, privileges and immunities of the Agents shall be automatically incorporated by reference therein. Whether or not a party thereto, the Agents shall be express third party beneficiaries of the Notes, including without limitation the payment waterfall set forth therein.

**9.2    Liability of Agents.** No Agent-Related Person shall (a) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Note Document or the transactions contemplated hereby, or (b) be responsible in any manner to any Purchaser for any recital, statement, representation or warranty made by the Company or any officer thereof, contained herein or in any other Note Document, or in any certificate, report, statement or other document referred to or provided for in, or received by the Agents under or in connection with, this Agreement or any other Note Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Note Document, or the creation, perfection, maintenance of perfection or priority of any Lien or security interest created or purported to be created under the Note Documents, the convertibility of the Notes and the validity or the sufficiency of the Equity Securities (as defined in the Note), or for any failure of the Company or any other party (other than Agents) to any Note Document to

28

perform its obligations hereunder or thereunder, except to the extent such loss resulted from the gross negligence or willful misconduct of such Agent-Related Person, as determined by a final nonappealable order of a court of competent jurisdiction. The Note Agent shall have no obligation to monitor the Ledger in the absence of being providing such by the Company in accordance with the terms of the Notes, and may, in its sole discretion either: (i) conclusively rely on the Ledger most-recently delivered to it, (ii) conclusively rely on a statement by a Holder as to the outstanding principal amount of Notes held by it, or (iii) refrain from taking any action until the Note Agent receives a current Ledger from the Company. No Agent-Related Person shall be under any obligation to any Purchaser or participant to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Note Document, or to inspect the properties, books or records of the Company or any affiliate thereof.

The Agents shall not have any duties or obligations except those expressly set forth in the Note Documents. Without limiting the generality of the foregoing, (i) the Agents shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing and (ii) the Agents shall not have any duty to take any discretionary action or exercise any discretionary powers, except, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, discretionary rights and powers expressly contemplated hereby that the Collateral Agent is instructed in writing to exercise by the Required Holders (or such other requisite number or percentage of Holders as provided in Section 10.9).

In no event shall the Agents be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, epidemics, pandemics, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility, it being understood that the Agents shall use reasonable best efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

**9.3    Reliance by the Agents**. The Agents shall be entitled to rely, and shall be fully protected in relying, upon any writing, communication, signature, resolution, representation, notice, consent, certificate, affidavit, letter, facsimile or telephone message, electronic mail message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper person or persons, and upon advice and statements of legal counsel (including counsel to the Company), independent accountants and other experts selected by the Agents. The Agents shall be fully justified in failing or refusing to take any action under any Note Document unless it shall first receive such advice or concurrence of the Required Holders as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Holders against any and all loss, liability and expense which may be incurred by it by reason of taking or continuing to take any such action. The Agents shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Note Document in accordance with a request or consent of the Required Holders (or such greater number of Holders as may be expressly required hereby in any instance), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the of the same; provided that the Agents shall not be required to take any action that, in its opinion or in the opinion of its counsel, may expose the Agents to liability or that is contrary to any Note Document or applicable law.

**9.4    Notice of Default**. The Agents shall not be deemed to have knowledge or notice of the occurrence of any Event of Default, unless the Agents shall have received written notice from a Purchaser referring to this Agreement, describing such Event of Default and stating that such notice is a "notice of event of default." The Agents shall take such action with respect to any Event of Default as may be directed by the

254153937 v7

Required Holders in accordance with the terms of the Notes; provided that unless and until the Agents has received any such direction, the Agents may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Event of Default as it shall deem advisable or in the best interest of the Holders.

9.5     **Agent's Reimbursement.** Each of the Holders severally agrees to reimburse the Agents, in accordance with such Holder's Pro Rata Share, for any reasonable and documented out-of-pocket expenses not reimbursed by the Company (without limiting the obligation of the Company to make such reimbursement pursuant to Section 10.10): (a) for which the Agents are entitled to reimbursement by the Company under this Agreement or any Note Document and (b) after the occurrence and during the continuance of an Event of Default, for any other reasonable and documented expenses incurred by the Agents on the Holders' behalf in connection with the enforcement of the Holders' rights under this Agreement or any Note Document; provided, however, that (x) the Agents shall not be reimbursed for any such expenses arising as a result of its gross negligence or willful misconduct, as determined by a final nonappealable order of a court of competent jurisdiction and (y) in the event that the Company reimburses the Agents for any such reasonable and documented out-of-pocket expenses, any corresponding amounts previously reimbursed by the Holders to the Agents will be promptly returned to such Holders in accordance with their Pro Rata Share.

9.6     **Indemnification.** Each of the Holders shall severally indemnify the Agents and their officers, directors, employees, agents, attorneys, accountants, consultants and controlling Persons (to the extent not reimbursed by or on behalf of the Company pursuant to Section 10.10 and without limiting the obligations of the Company to do so), in accordance with their respective Pro Rata Share, from and against any and all liabilities, obligations, damages, penalties, actions, judgments, suits, losses (including accrued and unpaid Agents' fees), and reasonable and documented costs, expenses or disbursements of any kind whatsoever which may at any time be imposed on, incurred by or asserted against the Agents or such Persons relating to or arising out of this Agreement, any Note Document, the transactions contemplated hereby or thereby, or any action taken or omitted by the Agents in connection with any of the foregoing; provided, however, that the foregoing shall not extend to actions or omissions to the extent arising from gross negligence or willful misconduct of the Agents, as determined by a final nonappealable order of a court of competent jurisdiction. The Agents shall not be under any obligation to exercise any of the rights or powers vested in it by this Agreement at the request, order or direction of any of the Holders, pursuant to any provision of this Agreement, unless the Required Holders shall have offered (and, if requested, provided) to the Agents security or indemnity satisfactory to it against the costs, expenses and liabilities which may be incurred by it therein or thereby. The undertaking in this Section 9.6 shall survive the payment of all other Obligations and the resignation of the Agents.

9.7     **Collateral Matters**. The Purchasers irrevocably agree that, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, any Lien on any property granted to or held by the Collateral Agent under any Note Document for the benefit of the Secured Parties shall be automatically released (i) upon payment in full of all Obligations (it being understood and agreed that the conversion in full of a Note by the Holder thereof shall be deemed, for purposes of this Section 9.6, to be a repayment of the entire outstanding principal amount (including all capitalized interest) of such Note together with any unpaid accrued interest thereon on the date of such conversion), (ii) subject to Section 10.9, if the release of such Lien is approved, authorized or ratified in writing by the Purchasers or (iii) upon the sale, transfer or other disposition of any Collateral that is not prohibited by the Note Documents. Upon request by the Collateral Agent at any time from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, the Purchasers will confirm in writing the Collateral Agent's authority to release particular types or items of property. In each case as specified in this Section 9.7, the Collateral Agent will, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, promptly (and each Purchaser irrevocably authorizes the Collateral Agent to), at the Company's expense,

30

execute and deliver to the Company such documents as the Company may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Note Documents. In connection with any such release, the Collateral Agent shall be entitled to a certificate of a Responsible Officer of the Company stating that such release is authorized and permitted by the Note Documents, upon which the Collateral Agent may conclusively rely. Each party to this Agreement acknowledges and agrees that the Agents shall not have an obligation to file financing statements, amendments to financing statements, or continuation statements, or to perfect or maintain the perfection of the Collateral Agent's Lien on the Collateral.

9.8     **Successor Agents**. The Agents may resign as Agents upon fifteen (15) days' notice to the Holders. If an Agent resigns under this Agreement, the Holders shall unanimously appoint a successor representative for the Holders. If no successor representative is appointed prior to the effective date of the resignation of the Agent, the resigning Agent may appoint, after consulting with the Holders and the Company, a successor agent. Upon the acceptance of its appointment as successor representative hereunder, such successor representative shall succeed to all the rights, powers and duties of the retiring Agent, the term "Agents" shall mean such successor representative and the retiring Agent's appointment, powers and duties as Agents shall be terminated. After any retiring Agent's resignation hereunder as Agent, the provisions of this Section 9 and Section 10 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement. If no successor representative has accepted appointment as Agent by the date which is fifteen (15) days following a retiring Agent's notice of resignation, the retiring Agent's resignation shall nevertheless thereupon become effective and the Holders shall perform all of the duties of the Agents hereunder until such time, if any, as the Holders appoint a successor representative as provided for above.

9.9     **Intercreditor Agreement**. The Collateral Agent is hereby authorized to enter into the Intercreditor Agreement pursuant to Section 7.1(a) and the parties hereto acknowledge that such Intercreditor Agreement, upon execution of the same, shall be binding upon them. From and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, each Secured Party hereby (a) agrees that it will be bound by and will take no actions contrary to the provisions of the Intercreditor Agreement, (b) authorizes and instructs the Collateral Agent, without any further consent of such Secured Party, to enter into the Intercreditor Agreement provided by the Company and accompanied by the certificate specified in Section 7.1(a) and to subject the Liens on the Collateral securing the Obligations to the provisions thereof and (c) authorizes and instructs the Collateral Agent to execute and deliver on behalf of the Secured Parties any amendment (or amendment and restatement) or modification to the Intercreditor Agreement to provide for the incurrence of any Indebtedness permitted hereunder or such other amendments as the Required Holders may specify in writing to the Collateral Agent.

10.     **MISCELLANEOUS**

10.1     **Binding Agreement**. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, expressed or implied, is intended to confer upon any third party any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement. Notwithstanding anything to the contrary contained herein or in any other Note Documents, in the event of a SPAC, the Obligations of the Company to deliver Conversion Securities pursuant to Section 2 of the Note may be assigned to a Parent Entity, so long as such Parent Entity expressly assumes such Obligation of the Company and becomes a co-Obligor of each other Obligation of the Company (or its successor by merger) under the Note Documents, in each case pursuant to an joinder and assignment and assumption agreement, substantially in the form attached hereto as Exhibit I, and delivers certificates substantially identical to those delivered by the Company on the Initial Closing Date pursuant to clauses (b), (c) and (d) of Section 4.1.

**10.2    GOVERNING LAW.** THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.

**10.3    JURISDICTION AND VENUE.** EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ANY U.S. FEDERAL OR NEW YORK STATE COURT SITTING IN THE BOROUGH OF NEW YORK, NEW YORK IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR ANY OTHER NOTE DOCUMENT AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN ANY SUCH COURT AND IRREVOCABLY WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT OR THAT SUCH COURT IS AN INCONVENIENT FORUM. NOTHING HEREIN SHALL LIMIT THE RIGHT OF ANY PURCHASER, ANY HOLDER OR, FROM AND AFTER THE EXECUTION AND DELIVERY OF THE COLLATERAL DOCUMENTS PURSUANT TO SECTION 6.13, THE COLLATERAL AGENT, TO BRING PROCEEDINGS AGAINST THE COMPANY IN THE COURTS OF ANY OTHER JURISDICTION. ANY JUDICIAL PROCEEDING BY THE COMPANY AGAINST ANY PURCHASER, ANY HOLDER OR ANY OF THEIR AFFILIATES AND, FROM AND AFTER THE EXECUTION AND DELIVERY OF THE COLLATERAL DOCUMENTS PURSUANT TO SECTION 6.13, THE COLLATERAL AGENT OR ANY OF ITS AFFILIATES, INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT OR ANY OTHER NOTE DOCUMENT SHALL BE BROUGHT ONLY IN A COURT IN THE BOROUGH OF NEW YORK, NEW YORK.

**10.4    WAIVER OF JURY TRIAL.** EACH OF THE COMPANY, THE PURCHASERS, THE HOLDERS AND, FROM AND AFTER THE EXECUTION AND DELIVERY OF THE COLLATERAL DOCUMENTS PURSUANT TO SECTION 6.13, THE COLLATERAL AGENT HEREBY WAIVES TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT OR ANY OTHER NOTE DOCUMENT OR THE RELATIONSHIP ESTABLISHED THEREUNDER.

**10.5    Severability**. If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (a) such provision shall be excluded from this Agreement, (b) the balance of this Agreement shall be interpreted as if such provision were so excluded, and (c) the balance of this Agreement shall be enforceable in accordance with its terms.

**10.6    Counterparts.** This Agreement may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract. Any counterpart of a signature page to this Agreement may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the U.S. federal ESIGN Act of 2000 or the New York Electronic Signature and Records Act or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law. The Note Documents and all notices, approvals, consents, requests and any

communications hereunder must be in writing (provided that any such communication sent to Agents hereunder must be in the form of a document that is signed manually or by way of a digital signature provided by DocuSign (or such other digital signature provider as specified in writing to the Agents by the authorized representative)), in English. The Company agrees to assume all risks arising out of the use of using digital signatures and electronic methods to submit communications to the Note Agent, including without limitation the risk of the Note Agent acting on unauthorized instructions, and the risk of interception and misuse by third parties.

**10.7    Headings; Interpretation.** Paragraph headings used in this Agreement are included for convenience of reference only and will not modify the provisions that they precede or affect the interpretation of this Agreement or any other Note Document. The term "including" shall be interpreted to mean "including but not limited to". Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference.

**10.8    Notices.** All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient (and if not, then on the next Business Day), (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. Notices to the Agents shall be effective upon actual receipt thereof. All communications shall be sent, if to the Note Parties, at the address set forth on the signature page of the Company, if to the Agents, at the address set forth on the signature page thereof, and, if to a Purchaser, at the address(es) set forth on the Schedule of Purchasers attached hereto as <u>Schedule 2</u> or at such other address(es) as the Company or Purchaser may designate by ten (10) days' advance written notice to the other parties hereto. Except where notice is specifically required by this Agreement, no notice to or demand on the Company or any of its Subsidiaries in any case shall entitle the Company or any of its Subsidiaries to any other or further notice or demand in similar or other circumstances.

**10.9    Amendments; Waiver**. Any term of the Notes and this Agreement may be amended or waived with the written consent of the Company and the Required Holders; <u>provided</u>, that without the consent of each Holder, no amendment, modification, termination, or consent shall be effective if the effect thereof would (a) extend the scheduled final maturity of any Note held by any non-consenting Holder, (b) waive, reduce or postpone any scheduled repayment (but not prepayment) with respect to the Note held by any non-consenting Holder; (c) reduce the rate of interest or amount of any fees payable under any Note held by any non-consenting Holder; (d) extend the time for payment of any interest or fees payable under any Note held by any non-consenting Holder; (e) reduce the principal amount of any Note held by any non-consenting Holder; (f) amend, modify, terminate or waive any provision of this <u>Section 10.9</u>; (g) amend the definition of "Required Holders"; (h) release all or substantially all of the Collateral securing any Note (if any) held by any non-consenting Holder except as expressly provided in the Note Documents, (i) from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, subordinate the Collateral Agent's Liens on Collateral except as expressly provided in the Note Documents; (j) release any Guarantor except as expressly provided in the Note Documents or (k) consent to the assignment or transfer by the Company of any of its rights and obligations under any Note Document held by any non-consenting Holder. No amendment affecting the rights, privileges and immunities of the Agents shall be effective without the consent of such Agent. Notwithstanding anything to the contrary contained herein or in any other Note Documents, no consent of any Holder shall be required pursuant to this <u>Section 10.9</u> in connection with (i) an assignment and assumption by a Parent Entity of the Company's Obligations in connection with a SPAC, so long as the conditions set forth in Section 10.1 shall have been satisfied, and (ii) any Person (including, without limitation, a Parent Entity in connection with a SPAC) becoming a Guarantor or a co-issuer or co-obligor hereunder and under the

Notes; provided, that the Company shall deliver a certificate of a Responsible Officer to the Agents stating that any documents to be executed in connection with a SPAC are authorized and permitted pursuant to the Note Documents.

**10.10    Expenses and Indemnification.**

(a)    The Company shall not be responsible for any out-of-pocket costs or expenses incurred by such Initial Purchasers in connection with the preparation, execution and delivery of this Agreement and the other Note Documents. The Company shall pay all reasonable and documented out-of-pocket costs and expenses of the Agents (including reasonable and documented fees, expenses and disbursements of its outside counsel) relating to the negotiation, preparation and execution of the Note Documents, review of other documents (including for purposes of due diligence review) in connection with the transactions contemplated hereby and any amendments and waivers hereto or thereto. In addition, the Company agrees to promptly pay in full after the occurrence of an Event of Default, all costs and expenses (including, without limitation, reasonable and documented fees and disbursements of counsel, agents and professional advisers) incurred by the Holders or the Agents in enforcing any obligations of or in collecting any payments due hereunder or under the Notes by reason of such Event of Default or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a workout, or any insolvency or bankruptcy proceedings.

(b)    In addition to the payment of expenses pursuant to Section 10.10(a), the Company (as "**Indemnitor**") agrees to indemnify, pay and hold the Purchasers, the Holders and the Agents, and the officers, directors, employees, agents, and affiliates of the Purchasers, the Holders and the Agents (collectively called the "**Indemnitees**") harmless from and against any and all other liabilities, costs, expenses, liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for such Indemnitees) in connection with any investigative, administrative or judicial proceeding commenced or threatened (excluding claims among Indemnitees (other than claims against an Agent acting in its capacity as such) and, with the exception of claims arising out of otherwise indemnifiable matters (e.g., actions to enforce the indemnification rights provided hereunder), and excluding claims between the Company and an Indemnitee), whether or not such Indemnitee shall be designated a party thereto, which may be imposed on, incurred by, or asserted against that Indemnitee, in any manner relating to or arising out of this Agreement, the Notes, the Note Documents or the other documents related to the transactions contemplated hereby (including, without limitation, the existence or exercise of any security rights with respect to the Collateral in accordance with the Security Agreement), the Purchasers' agreement to purchase the Notes or the use or intended use of the proceeds of any of the proceeds thereof to the Company (the "**Indemnified Liabilities**"); provided, that the Indemnitor shall not have any obligation to an Indemnitee hereunder with respect to an Indemnified Liability to the extent that such Indemnified Liability arises from the gross negligence or willful misconduct of that Indemnitee as determined by a final nonappealable order of a court of competent jurisdiction. Each Indemnitee shall give the Indemnitor prompt written notice of any claim that might give rise to Indemnified Liabilities setting forth a description of those elements of such claim of which such Indemnitee has knowledge; provided, that any failure to give such notice shall not affect the obligations of the Indemnitor unless (and then solely to the extent) such Indemnitor is not aware of such claim and is materially prejudiced. The Indemnitor shall have the right at any time during which such claim is pending to select counsel to defend and control the defense thereof and settle any claims for which it is responsible for indemnification hereunder (provided that the Indemnitor will not settle any such claim without (i) the appropriate Indemnitee's prior written consent, which consent shall not be unreasonably withheld or (ii) obtaining an unconditional release of the appropriate Indemnitee from all claims arising out of or in any way relating to the circumstances involving such claim) so long as in any such event the Indemnitor shall have stated in a writing delivered to the Indemnitee that, as between the Indemnitor and the Indemnitee, the

34

Indemnitor is responsible to the Indemnitee with respect to such claim to the extent and subject to the limitations set forth herein; provided, that the Indemnitor shall not be entitled to control the defense of any claim in the event that in the reasonable opinion of counsel for the Indemnitee, there are one or more material defenses available to the Indemnitee which are not available to the Indemnitor, in which case the Indemnitee may retain separate counsel and the Company will pay the reasonable fees and expenses of such counsel (including the reasonable fees and expenses of counsel to such Indemnitee incurred in evaluating whether such a conflict exists); provided further, that with respect to any claim as to which the Indemnitee is controlling the defense, the Indemnitor will not be liable to any Indemnitee for any settlement of any claim pursuant to this Section 10.10(b) that is effected without its prior written consent, which consent shall not be unreasonably withheld. To the extent that the undertaking to indemnify, pay and hold harmless set forth in this Section 10.10(b) may be unenforceable because it is violative of any law or public policy, the Company shall contribute the maximum portion which it is permitted to pay and satisfy under applicable law, to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnitees or any of them. The obligations of each of the parties under this Section 10.10 will survive the payment or transfer of any Note, the enforcement, amendment or waiver of any provision of this Agreement, the resignation or removal of any Agent and the termination of this Agreement.

(c)     To the extent permitted by applicable law, none of the parties hereto shall assert, and each of the parties hereto hereby waives, any claim against the other parties (including their respective affiliates, partners, stockholders, members, directors, officers, agents, employees and controlling persons), on any theory of liability for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the transactions contemplated hereunder, any Note Document, the Notes or the use of the proceeds thereof; provided that nothing contained in this Section 10.10(c) shall limit the Notes Parties' indemnification and reimbursement obligations to the extent set forth in this Agreement.

**10.11    Delays or Omissions.** It is agreed that no delay or omission to exercise any right, power or remedy accruing to each Purchaser, upon any breach or default of the Company under this Agreement or any other Note Document shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. It is further agreed that any waiver, permit, consent or approval of any kind or character by a Purchaser of any breach or default under this Agreement, or any waiver by such Purchaser of any provisions or conditions of this Agreement must be in writing and shall be effective only to the extent specifically set forth in writing and that all remedies, either under this Agreement, or by law or otherwise afforded to such Purchaser, shall be cumulative and not alternative.

**10.12    Waiver of Conflicts**. Each party to this Note acknowledges that Cooley LLP ("*Cooley*"), outside general counsel to the Company, has in the past performed and is or may now or in the future represent the Holders or the Holders' affiliates in matters unrelated to the transactions contemplated by this Note (the "***Note Financing***"), including representation of the Holders or the Holders' affiliates in matters of a similar nature to the Note Financing. The applicable rules of professional conduct require that Cooley inform the parties hereunder of this representation and obtain their consent. Cooley has served as outside general counsel to the Company and has negotiated the terms of the Note Financing solely on behalf of the Company. The Company and the Holders hereby (i) acknowledge that they have had an opportunity to ask for and have obtained information relevant to such representation, including disclosure of the reasonably foreseeable adverse consequences of such representation; (ii) acknowledge that with respect to the Note Financing, Cooley has represented solely the Company, and not any Holder or any stockholder, board member or employee of the Company or director, stockholder or employee of the

Holder; and (iii) gives the Holder's informed consent to Cooley's representation of the Company in the Note Financing.

**10.13   Obligations Several**.   The Purchasers' obligations hereunder are several and not joint obligations and no Purchaser shall have any liability to any Person for the performance or non-performance of any obligation by any other Purchaser hereunder.

**10.14   Survival of Representations and Warranties**. All of the representations and warranties made by the Note Parties and their Subsidiaries herein shall survive the execution and delivery of this Agreement, any investigation by or on behalf of any Purchaser, acceptance of the Notes and payment therefor, or termination of this Agreement.

**10.15 Entire Agreement**. This Agreement and the other Note Documents constitute the entire contract among the parties hereto regarding to the subject matters addressed herein and supersede any and all previous agreements, negotiations, and discussions, oral or written, by the parties regarding the subject matters addressed herein.

**10.16   Withholding**. The Company shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement such amounts as it is required to deduct and withhold under the Code, or any Tax law, with respect to the making of such payment. To the extent that amounts are so withheld, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made. If a payment is payable (in whole or in part) in consideration other than cash and if the cash portion of any such payment is insufficient to satisfy all required Tax withholding obligations, the Company shall retain an amount of the non-cash consideration otherwise payable equal in value to the amount required to satisfy any applicable withholding taxes (as reasonably determined by the Company).**10.17 PATRIOT ACT**. The Agents hereby notify the Company that pursuant to the requirements of the PATRIOT Act, the Company may be required to obtain, verify and record information that identifies the Company, its subsidiaries and the Guarantors, including their respective names, addresses and other information that will allow the Agent to identify, the Company, its subsidiaries and the Guarantors in accordance with the PATRIOT Act.

*[Signature pages follow]*

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first written above.

**COMPANY:**

**CORE SCIENTIFIC HOLDING CO.**

By: _____
Name:  Michael Trzupek
Title:    Chief Financial Officer

Address for notices:
2800 Northup Way
Suite 220
Bellevue, WA 98004
Attention:  Michael Trzupek, Chief Financial Officer
Email:  mtrzupek@corescientific.com

Copy to:
Todd DuChene, General Counsel
Email:  tduchene@corescientific.com

*In each case, with a copy (which shall not constitute notice) to:*

Cooley LLP
1299 Pennsylvania AVE, NW
Suite 700
Washington, DC 20004
Attention:  Mike Tollini
Email:  mtollini@cooley.com

[Signature Page to Convertible Note Purchase Agreement]

**GUARANTORS:**

**CORE SCIENTIFIC, INC.,** a Delaware corporation

By: _____
Name: Michael Trzupek
Title:   Chief Financial Officer

**AMERICAN PROPERTY ACQUISITION, LLC,** a Delaware limited liability company

   By: Core Scientific, Inc., its sole member

By _____
Name: Michael Trzupek
Title:   Chief Financial Officer

**AMERICAN PROPERTY ACQUISITIONS I, LLC,** a North Carolina limited liability company

   By:  American Property Acquisition, LLC, its sole member

      By:  Core Scientific, Inc., its sole member

By: _____
Name: Michael Trzupek
Title:   Chief Financial Officer

[Signature Page to Convertible Note Purchase Agreement]

**AMERICAN PROPERTY ACQUISITIONS VII, LLC,** a Georgia limited liability company

By: American Property Acquisition, LLC, its sole member

By: Core Scientific, Inc., its sole member

By: _____
Name: Michael Trzupek
Title:  Chief Financial Officer

**BLOCKCAP, INC.,** a Nevada corporation

By: _____
Name: Todd DuChene
Title:  Secretary

[Signature Page to Convertible Note Purchase Agreement]

**U.S. BANK NATIONAL ASSOCIATION,** AS
**NOTE AGENT**


By: _____
Name:  Joshua A. Hahn
Title:  Vice President

Address for notices:
U.S. Bank National Association
West Side Flats
60 Livingston Avenue
EP-MN-WS3C
St. Paul, MN 55107
Attention: Joshua Hahn (Core Sciences)


*In each case, with a copy (which shall not
constitute notice) to:*

Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103
Attn: Nathan Plotkin (Core Scientific)

[Signature Page to Convertible Note Purchase Agreement]

**U.S. BANK NATIONAL ASSOCIATION, AS COLLATERAL AGENT**


By:_____

Name: Joshua A. Hahn
Title:  Vice President

Address for notices:
U.S. Bank National Association
West Side Flats
60 Livingston Avenue
EP-MN-WS3C
St. Paul, MN 55107
Attention: Joshua Hahn (Core Sciences)


*In each case, with a copy (which shall not constitute notice) to:*

Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103
Attn: Nathan Plotkin (Core Scientific)

[Signature Page to Convertible Note Purchase Agreement]

**PURCHASER:**

**MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY**

By: _____

Name:   Eric Partlan

Title:   Head of Portfolio Management

[Signature Page to Convertible Note Purchase Agreement]

PURCHASER:

CRYPTONIC BLACK, LLC

By: _____
Name:  Jennifer LaFrance
Title:   Manager

PURCHASER:

FIRST SUN INVESTMENTS, LLC

By:
Name:  Brent Berge
Title:   Manager

[Signature Page to Convertible Note Purchase Agreement]

PURCHASER:

DOUGLAS LIPTON

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

APOLLO TACTICAL VALUE SPN
INVESTMENTS, L.P.
By: Apollo Tactical Value SPN Management, LLC, its investment manager

By: _____

Name:  Joseph D. Glatt

Title:  Vice President

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

APOLLO CENTRE STREET PARTNERSHIP, L.P.
By: Apollo Centre Street Management, LLC, its investment manager

By: _____
Name: Joseph D. Glatt
Title:   Vice President

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

APOLLO LINCOLN FIXED INCOME FUND, L.P.
By: Apollo Lincoln Fixed Income Management, LLC, its investment manager

By: _____
Name: Joseph D. Glatt
Title:   Vice President

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

APOLLO MOULTRIE CREDIT FUND, L.P.
By: Apollo Moultrie Credit Fund Management, LLC, its investment manager

By: _____
Name:   Joseph D. Glatt
Title:    Vice President

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

BLOCKFI LENDING LLC

By: _Rene van Kesteren_
       4E48656DF99C4AC...
Name:
Title:

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

> The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

WOLFSWOOD PARTNERS LP

By: _____
Name:
Title:   JASON Comorchero
         Managing Member

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

_____
Robert Fedrock

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

TJC3 LLC

By: _____ *Thomas Coleman* _____

Name: Thomas J. Coleman

Title: Trustee of the Thomas J. Coleman Revocable Trust, as the Sole Member of TJC3 LLC

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

KMR CS Holdings, LLC

By: _____

Name: kamran@kmrequity.com

Title: Manager

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

The Sear Family 1996 Trust

By: _msear@EvokeAdvisors.com_____

Name: msear@EvokeAdvisors.com

Title: Mark Sear, Trustee

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

JSK Partnership LLC

By:_____

Name: sp@posnergroup.com

Title:  Co managing member

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Wormser Family Partnership II, LP

By: _Ken Wormser_____
Name: Ken Wormser
Title: ptr

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

> The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.
>
> **ADDITIONAL PURCHASER:**
>
> TBC 222 LLC
>
> By: _____
> Name: MSidman@threebayscapital.com
> Title: Managing partner

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

*frank@pollaro.com*

_____

Frank Polaro

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

David

_____

David Sarner

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

*James P. Pulaski*

_____

James Pulaski

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

SunnySide Consulting and Holdings, Inc.

By: _Taras Kulyk_____

Name: Taras Kulyk

Title: Director / Principal

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

ADDITIONAL PURCHASER:

1994 Steinfeld Family Trust

By: _____

Name: jake@steinfeld6.com

Title: Trustee

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Better Downtown Miami, LLC

By: _____
Name: Marc Roberts
Title: Manager

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

_____
Jason Capello

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

*Vineet Agrawal*

_____

Vineet Agrawal

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Milos Core LLC

By: _____

Name:      Scott Packman

Title:         Partner

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

> The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Barkley Investments, LLC

By: *Jason Paul Godfrey*
Name: Jason Paul Godfrey
Title: President, it's managing member, Godfrey Capital

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

ADDITIONAL PURCHASER:

Richard Katz 2016 GST TRUST

By: _____
Name:   Richard Katz
Title:   Dr

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

ADDITIONAL PURCHASER:

_____ *johnquinn@quinnemanuel.com* _____
John Quinn

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Northdata Holdings Inc.

By: _____
Name:  daniel rafuse
Title:   Chairman

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Monbanc Inc.

*daniel rafuse*

By:_____
Name: daniel rafuse
Title:
     Chairman

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Sabby Volatility Warrant Master Fund, Ltd.

By: _____

Name:   rgrundstern@sabbymanagement.com

Title:   COO

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Leon J. Simkins Non-Exempt Trust
FBO Michael Simkins

By:_____
Name: Michelle Simkins-Rubell
Title: trustee

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

> The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

FTF Diversified Holdings, LP

By:_____
Name:      Anthony Fadell
Title:     Principal

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

By:_____

Name:   Joaquin Palomo

Title:   Director   FGK Investments Ltd.

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

ADDITIONAL PURCHASER:

By: _____

Name: Ernesto Castillo Kriete    Director

Title: Neso Investment Group Ltd

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

By: _____

Name:   Marco Baldocchi Kriete

Title:    Director   Ferro Investments Ltd.

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Galaxy Digital LP
 by its general partner, Galaxy Digital GP LLC

By: _____
Name:   Chris Ferraro
Title:   Authorized Signatory

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Corbin ERISA Opportunity Fund, Ltd.

By:_____     _____
Name: Cesar Bello
Title: Deal Counsel

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Corbin Opportunity Fund, L.P.

By:_____
Name:  Cesar Bello
Title:  Deal Counsel

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Levbern Management LLC

By:_____

Name: Andrew Ward

Title: Member

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

JPAS - Crypto Infrastructure LLC

By:_____
Name:  George Lusch
Title:  Chief Financial Officer

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

JPAS - Crypto Infrastructure-A S.P.

By: _____

Name: George Lusch

Title:  Chief Financial Officer

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

JPAS - Credit-A S.P.

By: _____
Name:   George Lusch
Title:   Chief Financial Officer

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

JPAS - Credit LLC

By:_____
Name: George Lusch
Title:   Chief Financial Officer

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Cannon Investments LLC

By: _____

Name:   Andrew Rosen

Title:   Manager

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

ADDITIONAL PURCHASER:

Andrew Rosen 2004 Successor Insurance Trust

By: _____
Name:   Dan Nir
Title:   Manager

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

XMS Core Convert Holdings LLC

By: ~~John McGarrity~~
Name:
Title:    John McGarrity – Managing Director

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Amplify Transformational Data Sharing ETF

By: _____ *Charles A. Ragauss* _____
Name:   Charles A. Ragauss
Title:    Portfolio Manager

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Marsico AXS CS LLC

By:_____
Name:   jam@marsicoenterprises.com
Title:   Manager

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Gullane Digital Asset Partners, LLC

By: _Richard A. Miller, III_____
Name: Richard A. Miller, III
Title: Managing Partner

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Gullane Capital Partners, LLC

By: _____
Name:     Richard A. Miller, III
Title:    Managing Partner

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Marsico AXS CS LLC

By: _____
Name:   jam@marsicoenterprises.com
Title:   Manager

254153937 v7

## SCHEDULE 2

## SCHEDULE OF PURCHASERS

**Initial Purchasers**

| Name and Address for Notices | Principal Amount of Notes |
|---|---|
| **MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY**<br>One Marina Park Drive, MIP 1205<br>Boston, MA 02210<br>Attn:     Sarah Doyle; Chris Fredericks; Helder Pereira<br>Email:     sdoyle@massmutual.com; cfredericks54@massmutual.com;<br>     hpereira@massmutual.com<br>Phone #:617-235-1522; 617-695-4069; 413-744-7347 | $40,000,000.00 |
| **CRYPTONIC BLACK, LLC**<br>801 S. Rampart Blvd.<br>Las Vegas, NV 89145<br>Attn:     Jennifer LaFrance<br>Email:     jlafrance@asny.com<br>Phone #:702-967-5000 | $6,000,000.00 |
| **FIRST SUN INVESTMENTS, LLC**<br>6718 E. Rovey Avenue<br>Paradise Valley, AZ 85253<br>Attn:     Brent Berge<br>Email:     brentberge@bergegroup.com<br>Phone #:1-602-430-3673 | $4,000,000.00 |
| **DOUGLAS LIPTON**<br>4701 N Meridian Ave<br>Unit 315<br>Miami Beach, FL 33140<br>Attn:     Douglas Lipton<br>Email:     dlip44@gmail.com<br>Phone #:917-887-8869 | $250,000.00 |
| **TOTAL:** | **$50,250,000.00** |

**Additional Purchasers**

| Name and Address for Notices | Principal Amount of Notes |
|---|---|
| **Apollo Tactical Value SPN Investments LP**<br>9 West 57th Street<br>New York, NY 10019<br>Attn:     Joseph D. Glatt<br>Email:     jglatt@apollo.com | $4,700,000.00 |
| **Apollo Centre Street Partnership, LP**<br>9 West 57th Street<br>New York, NY 10019<br>Attn:     Joseph D. Glatt<br>Email:     jglatt@apollo.com | $2,500,000.00 |

| | |
|---|---|
| **Apollo Lincoln Fixed Income Fund, L.P.**<br>9 West 57th Street<br>New York, NY 10019<br>Attn:        Joseph D. Glatt<br>Email:        jglatt@apollo.com | $1,600,000.00 |
| **Apollo Moultrie Credit Fund, L.P.**<br>9 West 57th Street<br>New York, NY 10019<br>Attn:        Joseph D. Glatt<br>Email:        jglatt@apollo.com | $1,200,000.00 |
| **BlockFi Lending LLC**<br>201 Montgomery St #263<br>Jersey City, NJ 07302<br>Attn:        Sergey Pekarsky<br>Email:        tradingops@blockfi.com, Legal-inst@blockfi.com | $5,000,000.00 |
| **Wolfswood Partners LP**<br>140 Broadway<br>New York, NY 10005<br>Attn:        Jason Comerchero<br>Email:        jason.comerchero@wolfswoodpartners.com | $1,000,000.00 |
| **1994 Steinfeld Family Trust**<br>622 Toyota Drive<br>Pacific Palisades, CA 90272<br>Attn: Jake Steinfeld<br>Email: jake@steinfeld6.com | $500,000.00 |
| **Andrew Rosen 2004 Successor Insurance Trust**<br>810 Seventh Avenue, 7th Floor<br>New York, NY 10019<br>Attn: TAG Associates LLC<br>Email: NKim@tagassoc.com<br>Email: EWong@tagassoc.com | $250,000.00 |
| **Barkley Investments, LLC**<br>8231 Bay Colony Drive, Unit 802<br>Naples, FL<br>Attn: Jason Paul Godfrey<br>Email: jgodfrey@godfreycap.com | $2,000,000.00 |
| **Better Downtown Miami LLC**<br>4167 Main Street<br>Jupiter, FL 33458<br>Attn: Marc Roberts<br>Email: marc@marcroberts.com | $400,000.00 |
| **Cannon Investments LLC**<br>810 Seventh Avenue, 7th Floor<br>New York, NY 10019<br>Attn: TAG Associates LLC<br>Email: NKim@tagassoc.com<br>Email: EWong@tagassoc.com | $250,000.00 |
| **Corbin ERISA Opportunity Fund, Ltd.**<br>c/o Corbin Capital Partners, L.P.<br>590 Madison Ave, 31st Floor<br>New York, NY 10022<br>Attn: Corbin Operations<br>Email: corbinwso-fax@ifs.statestreet.com<br>Email: mmf-bankdebt@corbincapital.com<br>Email: corbin@viteos.com | $12,000,000.00 |

254153937 v7

| | |
|---|---|
| **Corbin Opportunity Fund, L.P.**<br>c/o Corbin Capital Partners, L.P.<br>590 Madison Ave, 31st Floor<br>New York, NY 10022<br>Attn: Corbin Operations<br>Email: corbinwso-fax@ifs.statestreet.com<br>Email: mmf-bankdebt@corbincapital.com<br>Email: corbin@viteos.com | $2,000,000.00 |
| **David Sarner**<br>2100 S. Ocean Blvd, #506<br>Palm Beach, FL 33480<br>Email: docsarner@gmail.com | $250,000.00 |
| **Ferro Investments Ltd**<br>2 Alhambra Plaza, Suite 802<br>Coral Gables, FL 33134<br>Attn: Jennifer Kanold<br>Email: reporting@icomia.com | $1,500,000.00 |
| **FGK Investments Ltd**<br>2 Alhambra Plaza, Suite 802<br>Attn: Jennifer Kanold<br>Email: reporting@icomia.com | $500,000.00 |
| **Frank Polaro**<br>10 Douglas Road<br>Morristown, NJ 07960<br>Email: frank@pollaro.com | $250,000.00 |
| **FTF Diversified Holdings, LP**<br>121 Alhambra Plaza, Suite 1202<br>Coral Gables, FL 33134<br>Attn: Archpoint Investors<br>Email: futureholdings@archpointinvestors.com<br>Email: reports@concertomgmt.com | $2,000,000.00 |
| **Galaxy Digital LP**<br>Attn: Chris Ferraro<br>Email: compliance@galaxydigital.io | $5,000,000.00 |
| **James Pulaski**<br>3921 Alton Road #360<br>Miami Beach, FL 33140<br>Attn: James Pulaski<br>Email: jim@jpulaski.com | $1,000,000.00 |
| **Jason Capello**<br>1404 N Lake Way<br>Palm Beach, FL 33480<br>Email: jcapello@mgatecap.com | $2,000,000.00 |
| **John B. Quinn**<br>Quinn Emanuel Urquhart & Sullivan, LLP<br>865 S. Figueroa Street, 10th Floor<br>Los Angeles, CA 90017<br>Email: johnquinn@quinnemanuel.com | $500,000.00 |
| **JPAS – Credit LLC**<br>100 Pine Street, Suite 2600<br>San Francisco, VA 94111<br>Attn: George Lusch<br>Email: George.lush@jordanpark.com | $8,333,653.00 |
| **JPAS – Credit-A S.P.**<br>100 Pine Street, Suite 2600 | $4,166,347.00 |

| | |
|---|---|
| San Francisco, VA 94111<br>Attn: George Lusch<br>Email: George.lush@jordanpark.com | |
| **JPAS – Crypto Infrastructure LLC**<br>100 Pine Street, Suite 2600<br>San Francisco, VA 94111<br>Attn: George Lusch<br>Email: George.lush@jordanpark.com | $11,619,743.00 |
| **JPAS – Crypto Infrastructure-A S.P.**<br>100 Pine Street, Suite 2600<br>San Francisco, VA 94111<br>Attn: George Lusch<br>Email: George.lush@jordanpark.com | $4,380,257.00 |
| **JSK Partnership LLC**<br>1691 Michigan Ave, Suite 445<br>Miami Beach, FL 33139<br>Attn: Sean Posner<br>Email: sp@posnergroup.com | $1,000,000.00 |
| **KMR CS Holdings, LLC**<br>377 Fifth Avenue, 5th Floor<br>Attn: Kamran Yaghoubzadeh<br>Email: kamran@kmrequity.com | $820,000.00 |
| **Leon J. Simkins Non-Exempt Trust FBO Michael Simkins**<br>5080 Biscayne Boulevard, #A<br>Miami, FL 33137<br>Attn: Michelle Simkins-Rubell<br>Email: Simkinslaw@gmail.com | $750,000.00 |
| **Levbern Management LLC**<br>45625 Cielito Drive<br>Indian Wells, CA 92210<br>Attn: Melina Bernecker<br>Email: melina@levbernmanagement.com<br>Attn: Drew Ward<br>Email: drew@levbernmanagement.com | $250,000.00 |
| **Milos Core LLC**<br>Attn: Mavrides, Moyal, Packman & Sadkin, LLP<br>Attn: Scott Packman<br>Email: spackman@mmps.com | $1,000,000.00 |
| **Monbanc Inc.**<br>290 Lakeshore<br>Pointe Claire, Quebec<br>H9s 413<br>Attn: Daniel Rafuse<br>Email: daniel@monbanc.com | $100,000.00 |
| **Neso Investment Group Ltd**<br>2 Alhambra Plaza, Suite 802<br>Attn: Jennifer Kanold<br>Email: reporting@icomia.com | $500,000.00 |
| **Northdata Holdings Inc.**<br>290 Lakeshore<br>Pointe Claire, Quebec<br>H9S 413<br>Attn: Daniel Rafuse<br>Email: daniel@monbanc.com | $200,000.00 |
| **Richard Katz 2016 Trust** | $250,000.00 |

| | |
|---|---|
| 55 Farrington Avenue<br>Email: Docatz@gmail.com | |
| **Robert Fedrock**<br>736-333 Adelaide St. E.<br>Toronto, Ontario M5A 4T4<br>Email: Robert.fedrock@originmerchant.com | $400,000.00 |
| **Sabby Management, LLC**<br>10 Mountainview Road, Suite 205<br>Upper Saddle River, NJ 07458<br>Attn: Robert Grundstein<br>Email: rgrundstein@sabbymanagement.com<br>Originals to:<br>Attn: Client Settlement, Wedbush Securities<br>1000 Wiltshire Blvd., Suite 850<br>Los Angeles, CA 90017 | $2,500,000.00 |
| **SunnySide Consulting and Holdings, Inc.**<br>214 Cherryhill Road<br>Oakville, Ontario, L6L3E2, Canada<br>Attn: Taras Kulyk<br>Email: taras@sunnysideinc.ca | $110,000.00 |
| **TBC 222 LLC**<br>8 Newbury Street, 5th Floor<br>Boston, MA 02116<br>Attn: Matthew Sidman – Managing Member<br>Email: msidman@threebayscapital.com | $2,500,000.00 |
| **The Sear Family 1996 Trust**<br>457 26th Street<br>Manhattan Beach, CA 90266<br>Attn: Mark Sear<br>Email: msear@evokeadvisors.com | $500,000.00 |
| **TJC3 LLC**<br>c/o Kensico Capital Management<br>55 Railroad Avenue, 2nd Floor<br>Greenwich, CT 06830<br>Attn: Family Office (Gino Labruzzo, Li Dick, Christina Malloy)<br>Email: familyoffice@kensicocapital.com | $4,000,000.00 |
| **Vineet Agrawal**<br>2 Brantwood Terrace<br>Short Hills, NJ 07078<br>Email: vagrawal@gmail.com | $250,000.00 |
| **Wormser Family Partnership II L.P.**<br>575 Lexington Avenue, 32nd Floor<br>New York, NY 10022<br>Attn: Ken Wormser<br>Email: kwormser@greensledge.com | $500,000.00 |
| **XMS Core Convert Holdings LLC**<br>321 N. Clark Street, Suite 2440<br>Chicago, IL 60091<br>Attn: John McGarrity<br>Email: jmcgarrity@xmscapital.com | $1,000,000.00 |
| **Marsico AXS CS LLC**<br>5251 DTC Parkway, Suite 410<br>Greenwood Village, CO 80111<br>Attn: Jonathan Marsico<br>Email: jam@marsicoenterprises.com | $19,604,095.00 |

| | |
|---|---|
| Attn: Michael Cirenza<br>Email: mac@marsicoenterprises.com | |
| **Gullane Digital Asset Partners, LLC**<br>640 S. Perkins Road<br>Memphis, TN 38117<br>Attn: Matthew R. Walker<br>Email: matt@gullanecapital.com | $22,500,00.00 |
| **Gullane Capital Partners, LLC**<br>640 S. Perkins Road<br>Memphis, TN 38117<br>Attn: Matthew R. Walker<br>Email: matt@gullanecapital.com | $2,500,000.00 |
| **Amplify Transformational Data Sharing ETF**<br>1001 Woodward Avenue, Suite 500<br>Detroit, MI 48226<br>Attn: Toroso Investments LLC<br>Email: cragauss@torosoam.com | $15,000,000.00 |
| **Marsico AXS CS LLC**<br>5251 DTC Parkway, Suite 410<br>Greenwood Village, CO 80111<br>Attn: Jonathan Marsico<br>Email: jam@marsicoenterprises.com | $1,960,774.00 |
| **TOTAL:** | $153,094,869.00 |

**SCHEDULE 5.1**

**NOTE PARTIES**

| Entity Name | Former Names (within last 5 years) | Jurisdiction of Organization | Taxpayer Identification Number | Organizational Number |
|---|---|---|---|---|
| Core Scientific Holding Co. | N/A | Delaware | 85-2941270 | 3377927 |
| Core Scientific Inc. | Mineco Holdings, Inc | Delaware | 82-3805526 | 6660521 |
| American Property Acquisition, LLC | N/A | Delaware | 82-540825 | 6857348 |
| American Property Acquisitions I, LLC | 155 Palmer Lane, LLC | North Carolina | 82-5469717 | 1687596 |
| American Property Acquisitions VII, LLC | N/A | Georgia | 83-1663198 | 18100016 |
| Blockcap Inc. | Block Capital, Inc. | Nevada | 85-4052367 | E10638672020-8 |

**SCHEDULE 5.13**

**SUBSIDIARIES**

| Entity Name | Owner | Ownership Percentage | Jurisdiction of Organization |
|---|---|---|---|
| Core Scientific Inc. | Core Scientific Holding Co. | 100% | Delaware |
| American Property Acquisition, LLC | Core Scientific, Inc. | 100% | Delaware |
| GPU One Holdings, LLC f/k/a IP Special Holdings, LLC | Core Scientific, Inc. | 100% | Delaware |
| American Property Acquisitions I, LLC | American Property Acquisition, LLC | 100% | North Carolina |
| American Property Acquisitions VII, LLC | American Property Acquisition, LLC | 100% | Georgia |
| Blockcap Inc. | Core Scientific Holding Co. | 100% | Nevada |
| Radar Relay, Inc. | Blockcap Inc. | 100% | Delaware |
| RADAR LLC | Blockcap Inc. | 100% | Colorado |
| Starboard Capital LLC | Blockcap Inc. | 100% | Colorado |

**SCHEDULE 5.14**

**CAPITALIZATION**

(see attached)

**SCHEDULE 5.17**

**INDEBTEDNESS**

1.  Existing Notes

2.  Mortgage in favor of Brown Corporation for that certain real property located at 206 Boring Drive, Dalton, GA 30721 in a principal amount of $547,733.71 as of February 1, 2021.

3.  Mortgage in favor of Holiwood LLC for that certain real property located at 1035 Shar-Cal Rd, Calvert City, KY 42029 in a principal amount of $1,354,209.33 as of February 1, 2021.

4.  That certain PPP Loan entered into April 2020, between Core Scientific, Inc. and City National Bank in a principal amount of $2,154,300.00 as of February 1, 2021.

5.  The following Equipment Financing:

| Equipment Financing | Issue Date | Original Amount | Maturity | Interest Rate | Outstanding Principal (as of 02/01/21) |
|---|---|---|---|---|---|
| Genesis Global Capital, LLC #1 | July 2020 | $1,833,625 | March 2022 | 16.0% | $1,477,318 |
| Genesis Global Capital, LLC #2 | August 2020 | 1,569,132 | April 2022 | 16.0% | 1,369,909 |
| Genesis Global Capital, LLC #3 | September 2020 | 1,307,610 | April 2022 | 16.0% | 1,215,593 |
| Arctos Credit, LLC | October 2020 | 774,250 | October 2022 | 15.0% | 660,692 |
| Novak | January 2021 | 10,000,000 | January 2023 | 10.0% | 10,000,000 |
| **Total Equipment Financing** | | **$15,484,617** | | | **$14,723,512** |

6.  The following Equipment Leases:

| Equipment Leases | Issue Date | Original Amount | Maturity | Interest Rate | Outstanding Principal (as of 02/01/21) |
|---|---|---|---|---|---|
| NEC Financial Services | July 2018 | $14,707 | July 2021 | 12.2% | $2,376 |
| Technology Finance Corporation #2 | May 2019 | 101,315 | May 2022 | 6.5% | 45,000 |
| Garic, Inc. | May 2019 | 466,379 | May 2022 | 6.5% | 179,847 |
| VFS, LLC | July 2019 | 421,576 | July 2022 | 7.3% | 210,510 |
| Advanced Business Equipment | October 2019 | 22,154 | October 2022 | 7.2% | 11,675 |
| Garic, Inc. #1 | September 2019 | 153,129 | September 2022 | 6.5% | 84,519 |
| 36th Street Capital #1 | October 2019 | 710,122 | October 2022 | 13.4% | 429,256 |
| 36th Street Capital #2 | December 2019 | 1,130,000 | December 2022 | 13.4% | 743,378 |
| 36th Street Capital #3 | December 2019 | 917,300 | June 2022 | 9.8% | 516,920 |
| 36th Street Capital #4 | December 2019 | 748,275 | December 2022 | 13.4% | 492,258 |
| Toyota Commercial Finance | January 2020 | 431,799 | June 2025 | 5.3% | 359,339 |
| Technology Finance Corporation #3 | March 2020 | 57,492 | February 2021 | 6.5% | - |
| Garic, Inc. #2 | March 2020 | 958,650 | March 2023 | 6.5% | 659,577 |
| De Lage Landen #1 | November 2020 | 290,246 | November 2023 | (5.3)% | 229,981 |

Core Scientific Cap Table - As Of August 12, 2021

| | Date | Shares | Capital Raised | $ Per Share | % of Total |
|---|---|---|---|---|---|
| **Preferred** | | | | | |
| Series A Convertible Preferred | 2019 / 2020 | 6,451,525 | $44,063,916 | $6.83 | 2.5% |
| Series B Convertible Preferred | 2020 | 314,285 | 1,100,000 | 3.50 | 0.1% |
| **Total Preferred Oustanding** | | **6,765,810** | **$45,163,916** | | **2.7%** |
| **Common Shares** | | | | | |
| Private Placement #1 | 1H 2018 | 7,505,000 | $48,032,000 | $6.40 | 3.0% |
| Private Placement #2 | 2H 2018 | 178,095 | 2,000,007 | 11.23 | 0.1% |
| **Business Combinations / Other** | | | | | |
| BCV 55, 66 & 77 | January 2018 | 88,501,449 | | | 35.0% |
| Matrix Mining Ltd. and MM Management Transaction | November 2018 | 1,250,000 | | | 0.5% |
| Slax Digital | September 2019 | 560,030 | | | 0.2% |
| Heldrick and Sluggles | September 2019 | 50,000 | | | 0.0% |
| Atrio | June 2020 | 561,938 | | | 0.2% |
| Blockcap | 7/1/2021 | 72,185,717 | | | 28.5% |
| **Total Common Shares Outstanding** | | **170,792,229** | **$50,032,007** | | **67.5%** |
| **Reserves & Other** | | | | | |
| RSUs Outstanding | | 53,937,486 | | | 21.3% |
| Options Outstanding | | 7,320,245 | | | 2.9% |
| Available for Future Issuance | | 10,088,856 | | | 4.0% |
| Warrants | | 4,284,887 | | | 1.7% |
| **Total Reserves & Other** | | **75,631,474** | | | **29.9%** |
| **Total Fully Diluted** | | **253,189,513** | **$95,195,923** | | **100.0%** |

1

| Equipment Leases | Issue Date | Original Amount | Maturity | Interest Rate | Outstanding Principal (as of 02/01/21) |
|---|---|---|---|---|---|
| De Lage Landen #2 | December 2020 | 99,650 | December 2023 | (5.5)% | 80,984 |
| De Lage Landen #3 | January 2021 | 228,180 | January 2024 | (0.5)% | 200,085 |
| De Lage Landen #4 | January 2021 | 99,950 | January 2024 | (5.5)% | 80,984 |
| Garic, Inc. #3 | February 2021 | 199,528 | February 2024 | 7.9% | 199,528 |
| **Total Equipment Leases** | | **$7,050,752** | | | **$4,526,215** |

**EXHIBIT A**

**FORM OF CONVERTIBLE PROMISSORY NOTE**

**(see attached)**

THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "*ACT*"), OR UNDER THE SECURITIES LAWS OF ANY STATES IN THE UNITED STATES. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT PURSUANT TO SECTION 5(C) HEREOF AND AS PERMITTED UNDER THE ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL IN FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER TO THE EFFECT THAT ANY PROPOSED TRANSFER OR RESALE IS IN COMPLIANCE WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

THIS NOTE HAS BEEN ISSUED WITH "ORIGINAL ISSUE DISCOUNT" (WITHIN THE MEANING OF SECTION 1273 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "*CODE*")). UPON WRITTEN REQUEST, THE COMPANY WILL PROMPTLY MAKE AVAILABLE TO ANY HOLDER OF THIS NOTE THE FOLLOWING INFORMATION:  (1) THE ISSUE PRICE AND ISSUE DATE OF THE NOTE, (2) THE AMOUNT OF ORIGINAL ISSUE DISCOUNT ON THE NOTE AND (3) THE YIELD TO MATURITY OF THE NOTE. HOLDERS SHOULD CONTACT THE CHIEF FINANCIAL OFFICER OF THE COMPANY AT 2800 NORTHUP WAY SUITE 220 BELLEVUE, WA 98004.

### [FORM OF] CONVERTIBLE PROMISSORY NOTE

|  |  |
|---|---|
| Note Series: | 2021 Convertible Promissory Notes |
| Date of Note: | [__], 2021 |
| Initial Principal Amount of Note: | $[__], plus any PIK Interest that has accrued and been capitalized pursuant to the terms of this Note |

For value received **CORE SCIENTIFIC HOLDING CO.**, a Delaware corporation (the "*Company*"), promises to pay to the undersigned holder or such party's successors or permitted assigns (the "*Holder*") the principal amount set forth above with interest to accrue on such outstanding principal amount at a rate of 10% *per annum*, 4% of which shall be payable in cash ("*Cash Interest*") and 6% of which shall be payable in kind by capitalizing such interest payment and increasing the outstanding principal amount of this Note by the amount thereof ("*PIK Interest*"). Interest shall accrue on the outstanding principal amount of this Note commencing on (and including) the date of original issuance thereof (or the most recent interest payment date) and continuing until the earlier to occur of (x) the date this Note is repaid or prepaid in full and (y) the date this Note is converted in full by the Holder pursuant to Section 2 hereof. Cash Interest shall be due and payable and PIK Interest shall be capitalized quarterly in arrears on the first day of each fiscal quarter, commencing on October 1, 2021. Interest shall be computed on the basis of a year of 365 days for the actual number of days elapsed. This Note shall be automatically deemed to include any accrued PIK Interest thereon and the Company shall not be obligated to issue any subsequent Notes reflecting PIK Interest. This Note is one of the "Notes" issued pursuant to the Purchase Agreement. All capitalized terms used but not otherwise defined in this Note will have the same meanings in this Note as in the Purchase Agreement referred to below.

The following is a statement of the rights of the Holder and the conditions to which this Note is subject, and to which the Holder, by the acceptance of this Note, agrees:

1.    **BASIC TERMS**.

(a)    **Series of Notes**. This convertible promissory note (this "***Note***") is issued as part of a series of notes designated by the Note Series above (collectively, the "***Notes***"), having an initial aggregate principal amount of up to $300,000,000.00 and issued pursuant to, and to those persons and entities (collectively, the "***Holders***") party, as Purchasers, to, that certain Convertible Note Purchase Agreement, dated as of even date herewith (as amended, restated, supplemented and/or otherwise modified from time to time, the "***Purchase Agreement***"), by and among the Company, each Purchaser party thereto, U.S. Bank National Association, as Note Agent, and, upon the execution and delivery of the Collateral Documents pursuant to Section 6.13 of the Purchase Agreement, U.S. Bank National Association, as Collateral Agent for the Secured Parties. The Company shall maintain a ledger of all Holders ("***Ledger***"), which shall include all PIK Interest accrued and capitalized, and which shall be available (i) promptly upon request to the Agents and the Holder, (ii) promptly after any transfer or assignment of any Note, (iii) promptly upon conversion of any Note and (iv) on the tenth business day prior to any interest payment date.

(b)    **Payments**.

(i)    **Voluntary Prepayments**. Subject to and following the expiration of any applicable lockup period set forth under any lockup agreement to which the Holder, the Company and the Company's underwriters are a party, and unless otherwise converted in full or in part pursuant to Section 2 hereof (including following delivery of the Company's notice referred to in this subsection (b)(i)(2)), the Company may at any time, upon ten (10) Business Days' prior written notice to the Holder and the Note Agent (which notice may be conditioned or rescinded upon such events as may be specified in such notice) prepay all or any portion of this Note in an amount equal to (x) the outstanding principal amount (including all accrued PIK Interest not already added to the principal amount of this Note) of this Note being prepaid at such time, together with all accrued unpaid Cash Interest on such outstanding principal amount at such time *multiplied* by (y) 200% (such amount, the "***Repayment Amount***").

(ii)    **Repayment**. Unless otherwise prepaid by the Company pursuant to Section 1(b)(i) or converted in full pursuant to Section 2 hereof, this Note shall be repaid in full on the earlier to occur of (x) April 19, 2025 (the "***Maturity Date***") and (y) acceleration by the Holders representing at least twenty-five percent (25%) of the aggregate outstanding principal amount of the Notes issued pursuant to the Purchase Agreement at such time after the occurrence of an Event of Default in accordance with the terms hereof, in each case, in an amount equal to the outstanding principal (including all accrued PIK Interest not already added to the principal amount of this Note) of this Note, plus all unpaid accrued Cash Interest thereon.

(iii)    **Payments Generally**.

(1)    This Note and the other Notes issued pursuant to the Purchase Agreement are *pari passu* in right of payment and all payments (other than conversion) under this Note and such other Notes shall be made in accordance with each Holder's Pro Rata Share. All payments shall be applied first, to the payment of expenses due under this Note and the other Note Documents to the Agents, second, to the payment of expenses due under this Note and the other Note Documents to the Holders, third, unpaid accrued interest of this Note and fourth, if the amount of payment exceeds the amount of all such expenses and accrued interest, to the payment of outstanding principal (including all accrued PIK Interest not already added to the principal amount of this Note) of this Note. The conversion of this Note by the Holder pursuant to the terms hereof shall be deemed to be a repayment of the full outstanding principal

2

amount (including all accrued PIK Interest not already added to the principal amount of this Note) of such Note together with any unpaid accrued Cash Interest thereon on the date of such conversion.

(2)    All payments to be made by the Company shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff, except with respect to Taxes required to be deducted and/or withheld under applicable law. All payments (other than by means of conversion pursuant to the terms of the Notes), including any prepayments, of interest and principal to be made by the Company hereunder shall be made by the Company to the Note Agent, in cash, for the account of the respective Holders to which such payment is owed, at the applicable Notes Agent's Principal Office for payment and in same day funds not later than 11:00 a.m. on the date specified herein. The Notes Agent will promptly distribute to each Holder its Pro Rata Share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to each Holder at the address specified in the Holder's Administrative Questionnaire (or at such other address as the Holder may indicate in writing to the Note Agent from time to time). All payments received by the Notes Agent after 11:00 a.m. may (at the sole discretion of the Notes Agent) in each case be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(3)    If any payment to be made by the Company shall come due on a day other than a Business Day, any interest shall be payable, and any PIK Interest shall be capitalized, on the next succeeding Business Day without additional interest accruing thereon.

(4)    Whenever any payment received by the Notes Agent under this Agreement or any of the other Notes Documents is insufficient to pay in full all amounts due and payable to the Notes Agent and the Holders under or in respect of this Agreement and the other Notes Documents on any date, such payment shall be distributed by the Notes Agent and applied by the Notes Agent and the Holders in the order of priority set forth in Section 1(b)(iii)(1). If the Notes Agent receives funds for application to the Obligations of the Company under or in respect of the Notes Documents under circumstances for which the Notes Documents do not specify the manner in which such funds are to be applied, the Notes Agent may, but shall not be obligated to, elect to distribute such funds to the Holders in accordance with the Holder's Pro Rata Share of such of the outstanding Notes or other Obligations then owing to the Holder.

(iv)    **Withholding**.  Notwithstanding anything to the contrary herein, the Company shall be entitled to deduct and withhold from the consideration otherwise payable under the Note such amounts as it is required to deduct and withhold under the Code, or any other tax law, with respect to the making of such payment. To the extent that amounts are so withheld, such withheld amounts shall be treated for all purposes of this Note as having been paid to the Person in respect of whom such deduction and withholding was made. If a payment is payable (in whole or in part) in consideration other than cash and if the cash portion of any such payment is insufficient to satisfy all required tax withholding obligations, the Company shall retain an amount of the non-cash consideration otherwise payable equal in value to the amount required to satisfy any applicable withholding taxes (as reasonably determined by the Company).

2.    CONVERSION.

(a)    **Conversion upon an Offering**. In the event that the Company (i) issues and sells shares of its equity securities ("***Equity Securities***") to investors (the "***Investors***") in a private offering or placement with total gross proceeds to the Company of at least $50,000,000 (excluding the conversion of the Notes or other convertible securities issued for capital raising purposes (*e.g.*, Simple Agreements for Future Equity)), (ii) issues and sells its common stock ("***Common Stock***") to Investors in an underwritten public offering pursuant to an effective registration statement filed with the Securities and Exchange Commission in accordance with the Act or under equivalent securities laws and regulations of any other

jurisdiction (including, for the avoidance of doubt, a SPAC), (iii) lists its Common Stock (other than shares of Common Stock not eligible for resale under Rule 144 under the Securities Act) on a national securities exchange by means of an effective registration statement on Form S-1 filed by the Company with the SEC that registers shares of existing capital stock of the Company for resale, as approved by the Company's board of directors, or (iv) lists its Common Stock on any stock exchange (the occurrence of each event set forth in clauses (i) through (iv) above, an "***Offering***" and, together with the occurrence of a Change of Control as provided in Section 2(b) below, each, a "***Conversion Event***"), in each case, while this Note remains outstanding, the Holder shall have the right at any time and from time to time during the period commencing on the date of consummation of such Offering until the Maturity Date, to convert, in whole or in part, the outstanding principal amount (including all accrued PIK Interest not already added to the principal amount of this Note) of this Note, together with all unpaid accrued Cash Interest thereon, into Equity Securities or Common Stock of the Company (as applicable) at a conversion price equal to the Applicable Conversion Price (as defined below) (which shall be determined, for the avoidance of doubt, on the date of the consummation of such Offering). The issuance of Equity Securities or Common Stock by the Company (as applicable) pursuant to the conversion of this Note shall be upon and subject to the same terms and conditions (other than as otherwise set forth herein) applicable to Equity Securities or Common Stock of the Company (as applicable), sold in the applicable Offering.

(b)     **Conversion upon a Change of Control**. In the event the Company consummates a Change of Control (as defined below) while this Note remains outstanding, the Company shall repay the outstanding principal amount of this Note in an amount equal to the Repayment Amount; provided, however, that upon the written election of the Holder made not less than five (5) days prior to the Change of Control, the Company shall convert the outstanding principal amount of this Note (including all accrued PIK Interest not already added to the principal amount of this Note) and any unpaid accrued Cash Interest into Common Stock at a conversion price equal to the Applicable Conversion Price (which shall be determined, for the avoidance of doubt, on the date of consummation of such Change of Control) (assuming conversion of all securities convertible into Common Stock and exercise of all outstanding options and warrants, but excluding the shares of equity securities of the Company issuable upon the conversion of Notes or other convertible securities issued for capital raising purposes (e.g., Simple Agreements for Future Equity)). The Company shall give the Holder and the Note Agent written notice of any Change of Control at least ten (10) Business Days prior to the consummation thereof, which notice will contain the material terms and conditions (including price and form of consideration) of the Change of Control, the identity of the parties to the Change of Control and the intended date of the Change of Control.

For purposes of this Note, (i) a "***Change of Control***" means, at any time, any Person or "group" other than the Permitted Holders (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act) shall have obtained the power (whether or not exercised) to elect a majority of the members of the board of directors of the Company; (ii) "***Permitted Holders***" means each of BCV 55 LLC, BCV 66 LLC, BCV 77 LLC and each of their respective affiliates; (iii) "***Fair Market Value Per Common Share***" means the cash and/or the value of the property, rights or securities to be paid or distributed per share of Common Stock of the Company to the holders of Common Stock of the Company pursuant to a Change of Control or a SPAC (with the value of such property, rights or securities being determined in good faith by the board of directors of the Company); (iv) the "***Applicable Conversion Price***" means a conversion price equal to (a) 80% of either (x) the cash price paid per share for Equity Securities or Common Stock of the Company (as applicable) by the Investors in an Offering (other than a SPAC) or (y) the Fair Market Value Per Common Share in a Change of Control or a SPAC, as applicable, if the Conversion Event occurs on or prior to April 19, 2022, (b) 75% of either (x) the cash price paid per share for Equity Securities or Common Stock of the Company (as applicable) by the Investors in an Offering (other than a SPAC) or (y) the Fair Market Value Per Common Share in a Change of Control or a SPAC, as applicable, if the Conversion Event occurs on or after April 19, 2022 but prior to April 19, 2023, (c) 70% of either (x) the cash price paid per share for Equity Securities or Common Stock of the Company (as applicable) by the Investors in an Offering (other than a

4

SPAC) or (y) the Fair Market Value Per Common Share in a Change of Control or a SPAC, as applicable, if the Conversion Event occurs on or after April 19, 2023 but prior to April 19, 2024 and (d) 65% of either (x) the cash price paid per share for Equity Securities or Common Stock of the Company (as applicable) by the Investors in an Offering (other than a SPAC) or (y) the Fair Market Value Per Common Share in a Change of Control or a SPAC, as applicable, if the Conversion Event occurs on or after April 19, 2024 but prior to April 19, 2025; (v) in connection with any SPAC, each reference to "Company" shall be deemed to also refer to a Parent Entity that has become a co-obligor with respect to the Company's Obligations hereunder (except that solely such Parent Entity, and not Core Scientific Holding Co. (or its successor by merger), shall be obligated to deliver Equity Securities or Common Stock pursuant to this Section 2); and (vi) in connection with any SPAC, each reference to "Common Stock" shall be deemed to refer to the kind and the amount of property that a holder of one share of Common Stock of the Company would be entitled to receive on account of the consummation of such SPAC.

(c)     **Procedure for Conversion**. Upon the conversion in whole or in part of this Note into Equity Securities or Common Stock of the Company (as applicable), the Holder shall surrender this Note to the Company and deliver to the Company any documentation reasonably required by the Company (including, in the case of an Offering, all financing documents executed by the Investors in connection with such Offering). The Company shall not be required to issue or deliver the Equity Securities or Common Stock of the Company (as applicable) into which this Note may convert until the Holder has surrendered this Note to the Company and delivered to the Company any such documentation. The Company shall, as soon as practicable after the surrender of this Note and delivery to the Company of such documentation deliver to the Holder (i) a certificate or certificates for the number of shares of Equity Securities or Common Stock of the Company (as applicable) into which this Note is convertible in whole or in part, rounded downward to the nearest whole share and cash for the amounts not so converted as a result of the above-referenced downward rounding, registered in the name of such Investor or registered nominee or assignee and (ii) to the extent the Holder has converted only a portion of the outstanding principal amount of this Note, a replacement Note for the outstanding principal amount of this Note not converted. Upon the conversion in full or in part of this Note into Equity Securities or Common Stock of the Company (as applicable) pursuant to the terms hereof, in lieu of any fractional shares to which the Holder would otherwise be entitled, the Company shall pay the Holder cash equal to such fraction multiplied by the price at which this Note converts. Upon conversion of this Note in full or in part and payment of cash representing any fractional share pursuant to this Section 2(c), the Company shall be forever released from all its obligations and liabilities under this Note and this Note shall be deemed of no further force or effect, whether or not the original of this Note has been delivered to the Company for cancellation.

(d)     **Taxes**. The Company shall pay any and all stamp, stock transfer, stock issuance and other similar taxes that may be payable in respect of any issuance or delivery of shares of Equity Securities or Common Stock of the Company (as applicable) upon conversion of this Note pursuant to this Section 2. The Company shall not, however, be required to pay any income, capital gains or similar tax of the recipient of Equity Securities or Common Stock of the Company (as applicable) or any tax which may be payable in respect of any transfer involved in the issuance and delivery of shares of Equity Securities or Common Stock of the Company (as applicable) in a name other than that in which this Note so converted was registered, and no such issuance or delivery shall be made unless and until the person or entity requesting such issuance has paid to the Company the amount of any such tax or has established, to the satisfaction of the Company, that such tax has been paid.

3.      SECURED NOTE.

Upon the execution and delivery of the Collateral Documents pursuant to Section 6.13 of the Purchase Agreement, this Note shall be secured by a first-priority Lien on the Collateral (subject to Permitted Liens) pursuant to the Security Agreement.

4.      EVENTS OF DEFAULT.

If there shall be any Event of Default (as defined below) hereunder, at the option and upon the declaration of the Holders representing at least twenty-five percent (25%) of the aggregate outstanding principal amount of the Notes issued pursuant to the Purchase Agreement at such time and upon written notice to the Company (which election and notice shall not be required in the case of an Event of Default under subsection (v) or (vi) below), this Note shall accelerate and all principal (including all accrued PIK Interest not already added to the principal amount of this Note) and all unpaid accrued Cash Interest shall automatically become immediately due and payable. The occurrence of any one or more of the following shall constitute an "*Event of Default*":

(i)      the Company fails to pay to the Holder (i) the principal of this Note as and when due or (ii) within five (5) Business Days after the same becomes due any Cash Interest on this Note or any fees or any other Obligations;

(ii)      any representation or warranty made or deemed made by or on behalf of the Company or any of its Subsidiaries to the Holder under or in connection with the Note Documents or any certificate or information delivered in connection therewith shall be materially false when made;

(iii)      the Company and its Subsidiaries fail to observe or perform any term, covenant, or provision contained in Section 7 of the Purchase Agreement and such non-observance or non-performance shall not have been remedied or waived within thirty (30) days after the earlier of (i) the Company becoming aware of such non-observance or non-compliance or (ii) receipt by the Company of notice from a Holder of such non-observance or non-compliance;

(iv)      the Company and its Subsidiaries fail to observe or perform any other term, covenant or provision contained in the Purchase Agreement (other than those specified elsewhere in this Section 4) or any other Note Document and such non-observance or non-performance shall not have been remedied or waived within thirty (30) days after the earlier of (i) the Company becoming aware of such non-observance or non-compliance or (ii) receipt by the Company of notice from a Holder of such non-observance or non-compliance;

(v)      the Company or any Material Subsidiary shall (i) apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (ii) admit in writing its inability to pay its debts generally as they mature, (iii) make a general assignment for the benefit of its or any of its creditors, (iv) be dissolved or liquidated, (v) commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, or (vi) take any action for the purpose of effecting any of the foregoing;

(vi)      proceedings for the appointment of a receiver, trustee, liquidator or custodian of the Company or any of its Material Subsidiaries, or of all or a substantial part of the property thereof, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with

respect to the Company or any of its Material Subsidiaries, if any, or the debts thereof under any bankruptcy, insolvency or other similar law now or hereafter in effect shall be commenced, or an order for relief shall be entered in any such proceeding, or such proceeding shall not be dismissed or discharged within 60 days of commencement;

(vii)    the Company fails to pay when due any principal of or interest on or any other amount payable in respect of, or breaches or defaults under any other term of, any mortgage, indenture, agreement or other instrument under which there may be outstanding any Indebtedness in an aggregate principal amount of in excess of $10,000,000, in each case, beyond the grace period, if any, if the effect of such non-payment, breach or default is to cause such Indebtedness to become or be declared due and payable (or subject to a compulsory repurchase or redemption) prior to its stated maturity;

(viii)    any court, government, or Governmental Authority shall condemn, seize or otherwise appropriate, or take custody or control of, all or any material portion of the property of the Company and its Subsidiaries, taken as a whole;

(ix)    one or more judgments or orders for the payment of money in excess of $10,000,000 (or the equivalent thereof in currencies other than U.S. dollars) in the aggregate shall be entered or filed against the Company or any of its Subsidiaries and shall remain undischarged, unvacated, unbonded or unstayed for a period of thirty (30) consecutive days;

(x)    (i) the occurrence of a Reportable Event with respect to any Plan, (ii) the filing of a notice of intent to terminate a Plan by the Company, any ERISA Affiliate or any Subsidiary, the institution of proceedings to terminate a Plan by the PBGC or any other Person; (iii) the withdrawal in a "complete withdrawal" or a "partial withdrawal" as defined in Sections 4203 and 4205, respectively, of ERISA by the Company, any ERISA Affiliate or any Subsidiary of the Company from any Multiemployer Plan, (iv) the incurrence of any material increase in the contingent liability of the Company or any of its Subsidiaries with respect to any "employee welfare benefit plan" as defined in Section 3(1) of ERISA which covers retired employees and its beneficiaries or (v) the Unfunded Pension Liabilities of all Single Employer Plans shall exceed (in the aggregate) $10,000,000, in each such case which, either individually or in the aggregate, would be reasonably expected to result in liability to any Note Party in excess of $10,000,000;

(xi)    the institution by the Company, any ERISA Affiliate or any Subsidiary of steps to terminate any Plan if, in order to effectuate such termination, the Company, such ERISA Affiliate or such Subsidiary, as the case may be, would be required to make a contribution to such Plan, or would incur a liability or obligation to such Plan, in excess of $10,000,000, or the institution by the PBGC of steps to terminate any Plan, which would reasonably be expected to result in material liability to any Note Party;

(xii)    the Company or any Material Subsidiary shall (i) be the subject of any proceeding pertaining to the release by the Company, any such Material Subsidiary or any other Person of any Hazardous Material into the environment or (ii) violate any Environmental Law, which, in either case could reasonably be expected to have a Material Adverse Effect;

(xiii)    from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13 of the Purchase Agreement, any Collateral Document shall for any reason fail to create a valid and perfected first priority (subject to any Permitted Liens) security interest in any collateral purported to be covered thereby, except as permitted by the terms of such Collateral Document, or any Collateral Document shall fail to remain in full force or effect (other than in accordance with the terms hereof or thereof) or any action taken by the Company or any Subsidiary shall be taken to discontinue or to assert the invalidity or unenforceability of such Collateral Document;

(xiv)   any intercreditor agreement or subordination agreement relating to any Indebtedness of any Note Party subordinated to the Obligations, or any subordination provisions of any note or other document running to the benefit of the Holders in respect of such Indebtedness, including, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13 of the Purchase Agreement, the Intercreditor Agreement, shall cease for any reason to be in full force and effect other than in accordance with the terms hereof or thereof or any Note Party or any of their Subsidiaries shall so assert in writing; or

(xv)   the Note Parties shall be enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of the business of the Note Parties, taken as a whole.

## 5.   MISCELLANEOUS PROVISIONS.

(a)   **Waivers**. The Company hereby waives demand, notice, presentment, protest and notice of dishonor.

(b)   **Further Assurances**. The Holder agrees and covenants that at any time and from time to time the Holder will promptly execute and deliver to the Company such further instruments and documents and take such further action as the Company may reasonably require in order to carry out the full intent and purpose of this Note and to comply with state or federal securities laws or other regulatory approvals.

(c)   **Transfers of Notes**. Subject to the Company's prior written consent (not to be unreasonably withheld or delayed) and to the extent permitted by applicable law, this Note may be transferred only upon its surrender to the Company for registration of transfer, duly endorsed, or accompanied by a duly executed written instrument of transfer in form satisfactory to the Company. Thereupon, this Note shall be reissued to, and registered in the name of, the transferee, or a new Note for like principal amount and interest shall be issued to, and registered in the name of, the transferee. Interest and principal shall be paid solely to the registered holder of this Note. Such payment shall constitute full discharge of the Company's obligation to pay such interest and principal. Upon the effectiveness of any transfer pursuant to this Section 5(c) the Company shall provide an updated Ledger to the Note Agent. Any transfer of this Note in contravention of this Section 5(c) shall be void and the Company shall be entitled to continue to treat the Holder as the holder of this Note for all purposes under the Note Documents. The Company shall at all times maintain a book-entry system, which shall reflect ownership of this Note and interests therein. This Note is intended to be in "registered form" for United States federal tax purposes.

(d)   **Market Standoff**. To the extent requested by the Company or an underwriter of securities of the Company, each Holder and any permitted transferee thereof shall not, without the prior written consent of the underwriters in an underwritten public offering pursuant to an effective registration statement filed with the Securities and Exchange Commission in accordance with the Act or under equivalent securities laws and regulations of any other jurisdiction, offer, sell, make any short sale of, grant or sell any option for the purchase of, lend, pledge, otherwise transfer or dispose of (directly or indirectly), enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership (whether any such transaction is described above or is to be settled by delivery of Securities or other securities, in cash, or otherwise), any Securities or other shares of stock of the Company then owned by such Holder or any transferee thereof, or enter into an agreement to do any of the foregoing, for up to 180 days following the consummation of any such offering. For purposes of this paragraph, "***Company***" includes the Company or any other direct or indirect parent entity of the Company into which the Company merges or consolidates. The Company may place restrictive legends on the certificates representing the shares subject to this paragraph and may impose stop transfer instructions with

respect to the Securities and such other shares of stock of each Holder and any transferee thereof (and the shares or securities of every other person subject to the foregoing restriction) until the end of such period. Each Holder and any transferee thereof shall enter into any agreement reasonably required by the underwriters for such an offering to implement the foregoing within any reasonable timeframe so requested. The underwriters for any such offering are intended third party beneficiaries of this paragraph and shall have the right, power and authority to enforce the provisions of this paragraph as though they were parties hereto. The provisions of this paragraph shall survive any conversion and/or repayment of this Note.

(e)    **Waiver of Statutory Information Rights**. Prior to the conversion in full of this Note, the Holder, on behalf of the Holder and all beneficial owners of the Securities now or hereafter owned by the Holder (a "***Beneficial Owner***"), acknowledges and agrees that that neither the Holder nor any of the Beneficial Owners will have any right to receive any information from the Company by virtue of ownership of any of the Securities. Without limiting the foregoing, prior to the conversion in full of this Note, to the fullest extent permitted by law, the Holder hereby unconditionally and irrevocably waives all rights under Section 220 of the Delaware General Corporation Law and all such similar information and/or inspection rights that may be provided under the law of any jurisdiction, or any federal, state or foreign regulation, that are, or may become, applicable to the Company or the Company's capital stock (the "***Inspection Rights***") on behalf of the Holder and all Beneficial Owners. The Holder, on behalf of the Holder and all Beneficial Owners, hereby covenants and agrees that neither the Holder nor any Beneficial Owner shall directly or indirectly commence, voluntarily aid in any way, prosecute, assign, transfer, or cause to be commenced any claim, action, cause of action, or other proceeding to pursue or exercise the Inspection Rights. The Holder hereby further warrants and represents that the Holder has reviewed this waiver with its legal counsel, and that the Holder knowingly and voluntarily waives its rights otherwise provided by Section 220 of the Delaware General Corporation Law (or under similar rights under other applicable law). Notwithstanding the foregoing, Beneficial Owners that were issued Equity Securities other than by way of a conversion in connection with an Offering will not be subject to this Section 5(e). The terms of this Section 5(e) shall survive any repayment of this Note.

(f)    **Amendment and Waiver**. This Note and any term hereof may only be amended, waived or modified in accordance with Section 10.9 of the Purchase Agreement. Upon the effectuation of such amendment, waiver or modification with the consent of the Required Holders or each Holder, as applicable, in conformance with Section 10.9 of the Purchase Agreement, such amendment, waiver or modification shall be effective as to, and binding against the Holders of, all of the Notes, and the Company shall promptly give written notice thereof to the Holder if the Holder has not previously consented to such amendment, waiver or modification in writing; provided that the failure to give such notice shall not affect the validity of such amendment, waiver or modification.

(g)    **Binding Agreement**. The terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Note, expressed or implied, is intended to confer upon any third party any rights, remedies, obligations, or liabilities under or by reason of this Note, except as expressly provided in this Note. Notwithstanding any assumption of the Company's Obligations under this Note by a Parent Entity in accordance with Section 10.1 of the Purchase Agreement, Core Scientific Holding Co. (or its successor by merger) shall remain a co-obligor with such Parent Entity with respect to such Obligations (other than any such Obligation of the Company to deliver Equity Securities or Common Stock pursuant to Section 2 of this Note, with respect to which delivery Obligation Core Scientific Holding Co. (or its successor by merger) shall be a Guarantor).

(h)    **Counterparts**. This Note may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract. Any counterpart of a signature page to this Note may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature

complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.

(i)     **Headings; Interpretation**. Paragraph headings used in this Note are included for convenience of reference only and will not modify the provisions that they precede or affect the interpretation of this Note or any other Note Document. The term "including" shall be interpreted to mean "including but not limited to".

(j)     **Notices**. All communications and notices required or permitted to be given hereunder shall be delivered in accordance with Section 10.8 of the Purchase Agreement.

(k)     **GOVERNING LAW.** THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.

(l)     **Expenses, Etc**. This Note is subject to the provisions of Section 10.3 (Jurisdiction and Venue), Section 10.4 (Waiver of Jury Trial) and Section 10.10 (Expenses and Indemnification) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*.

(m)     **Delays or Omissions**. It is agreed that no delay or omission to exercise any right, power or remedy accruing to each Holder, upon any breach or default of the Company under this Note or any Note shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. It is further agreed that any waiver, permit, consent or approval of any kind or character by a Holder of any breach or default under this Note, or any waiver by such Holder of any provisions or conditions of this Note must be in writing and shall be effective only to the extent specifically set forth in writing and that all remedies, either under this Note, or by law or otherwise afforded to such Holder, shall be cumulative and not alternative.

(n)     **Entire Agreement**. This Note and the other Note Documents constitute the entire contract among the parties hereto regarding to the subject matters addressed herein and supersede any and all previous agreements, negotiations, and discussions, oral or written, by the parties regarding the subject matters addressed herein.

(o)     **Exculpation among Holders**. The Holder acknowledges that the Holder is not relying on any person, firm or corporation, other than the Company and its officers and board members, in making its investment or decision to invest in the Company.

(p)     **Broker's Fees**. Each party hereto represents and warrants that no agent, broker, investment banker, person or firm acting on behalf of or under the authority of such party hereto is or will be entitled to any broker's or finder's fee or any other commission directly or indirectly in connection with the transactions contemplated herein. Each party hereto further agrees to indemnify each other party for any claims, losses or expenses incurred by such other party as a result of the representation in this subsection being untrue.

(q)     **Repayment Amounts**. The parties hereto hereby acknowledge and agree that

10

payment of any Repayment Amount hereunder constitutes liquidated damages and not a penalty, the actual amount of damages to the Holder or profits lost by the Holder as a result of a prepayment or conversion of this Note would be impracticable and extremely difficult to ascertain and the Repayment Amount hereunder is part of an arm's length transaction between sophisticated parties represented by counsel and is bargained for consideration provided for and agreed to by mutual agreement of the Company and the Holder. THE NOTE PARTIES EXPRESSLY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE REPAYMENT AMOUNT TO THE EXTENT SUCH REPAYMENT AMOUNT IS DUE AND PAYABLE IN ACCORDANCE WITH THIS NOTE. The Note Parties expressly agree that: (i) the Repayment Amount shall be payable notwithstanding the then prevailing market rates at the time payment is made; (ii) the Note Parties shall be estopped hereafter from claiming differently than as agreed to in this paragraph; and (iii) their agreement to pay the Repayment Amount is a material inducement to the Holder to purchase the Note.

(r)     **Tax Forms**. Prior to the date hereof, the Holder (and, in the event any Person becomes an assignee or participant in respect of this Note, prior to the date such Person becomes such an assignee or participant) shall have delivered to the Company executed copies of Internal Revenue Service ("***IRS***") Form W-9 or appropriate IRS Form W-8, as applicable, as well as any reasonably necessary supporting information, certifying that any payments to such Holder (or assignee or participant) under this Note are exempt from U.S. federal withholding tax. The Holder (and assignee or participant) further agrees that if any such form or certification expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Company in writing of its legal inability to do so.

(s)     **Calculations**. The Company shall be responsible for making all calculations with respect to this Note, including, without limitation, accrued interest (including PIK Interest), the Fair Market Value Per Common Share and the Applicable Conversion Price and shall forward such calculations to the Agents and the Holder upon request.

*[Signature pages follow]*

**IN WITNESS WHEREOF**, the parties hereto have executed this Note as of the date first written above.

COMPANY:

CORE SCIENTIFIC HOLDING CO.

By: _____

     Name:
     Title:

E-mail: _____

Address:

[Signature Page to Core Scientific Holding Co. Convertible Promissory Note]

**HOLDER (if an entity):**

Name of Holder: _____

By: _____

Name: _____
Title: _____

E-mail: _____

Address: _____
_____
_____

**HOLDER (if an individual):**

Name of Holder: _____

Signature: _____

E-mail: _____

Address: _____
_____
_____

[Signature Page to Core Scientific Holding Co. Convertible Promissory Note]

**EXHIBIT B**

**FORM OF COUNTERPART SIGNATURE PAGE**

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

[                    ]

By: _____
Name:
Title:

**EXHIBIT C**

**FORM OF GUARANTY**

**(see attached)**

<div align="center">

**GUARANTY**

</div>

**THIS GUARANTY** (this "***Agreement***"), dated as of August 20, 2021, is made by and among each guarantor executing a signature page hereto and each Additional Guarantor (as defined below) that becomes a party hereto pursuant to <u>Section 15</u> (each, a "***Guarantor***" and collectively, the "***Guarantors***") and U.S. Bank National Association, as note agent for the Guaranteed Parties referred to below (the "***Note Agent***") and Collateral Agent for the Secured Parties (when applicable).

<div align="center">

**RECITALS**

</div>

**WHEREAS**, the Guarantors entered into that certain Convertible Note Purchase Agreement, dated as of the date hereof (as amended, restated, supplemented and/or otherwise modified from time to time, the "***Purchase Agreement***"; capitalized terms used but not defined herein having the meanings ascribed thereto therein), by and among Core Scientific Holding Co., a Delaware corporation, the Guarantors party thereto, each Purchaser party thereto and the Note Agent; and

**WHEREAS**, to induce the Purchasers to purchase the Notes, the Guarantors have agreed to enter into this Agreement.

<div align="center">

**AGREEMENT**

</div>

**NOW, THEREFORE**, in consideration of the foregoing, and the representations, warranties and conditions set forth herein, the parties hereto, intending to be legally bound, hereby agree as follows:

1.     **Defined Terms.**

"***Additional Guarantor***" has the meaning assigned to such term in <u>Section 15</u>.

"***Aggregate Payments***" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (1) the aggregate amount of all payments and distributions made on or before such date by such Contributing Guarantor in respect of this Agreement (including in respect of <u>Section 3</u>), minus (2) the aggregate amount of all payments received on or before such date by such Contributing Guarantor from the other Contributing Guarantors as contributions under <u>Section 3</u>.

"***Bankruptcy Code***" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"***Commodity Exchange Act***" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended and in effect from time to time, and any successor statute.

"***Contributing Guarantors***" has the meaning assigned to such term in <u>Section 3</u>.

"***Fair Share***" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Fair Share Contribution Amount with respect to such Contributing Guarantor to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Contributing Guarantors *multiplied* by (b) the aggregate amount paid or distributed on or before such date by all Funding Guarantors under this Agreement in respect of the obligations guaranteed.

"***Fair Share Contribution Amount***" means, with respect to a Contributing Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Contributing Guarantor under this Agreement that would not render its obligations hereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Bankruptcy Code or any comparable

applicable provisions of state law; *provided*, solely for purposes of calculating the "Fair Share Contribution Amount" with respect to any Contributing Guarantor for purposes of Section 3, any assets or liabilities of such Contributing Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Contributing Guarantor.

"***Funding Guarantors***" has the meaning assigned to such term in Section 3.

"***Guaranteed Obligations***" has the meaning assigned to such term in Section 2.

"***Guaranteed Parties***" means the Purchasers, the Holders, the Agents, and their respective successors and permitted assigns.

"***Guarantor***" has the meaning assigned to such term in the preamble to this Agreement.

"***Qualified ECP Guarantor***" means, in respect of any Swap Obligation, each Note Party that has total assets exceeding Ten Million Dollars ($10,000,000.00) at the time the relevant Guarantee or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another Person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"***Swap Obligation***" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

**2.**     **Guaranty of the Obligations**.   The Guarantors jointly and severally hereby irrevocably and unconditionally guaranty to the Agent, for the ratable benefit of the Guaranteed Parties, the due and punctual payment and performance in full of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)) (collectively, the "***Guaranteed Obligations***").

**3.**     **Contribution by Guarantors**.   All Guarantors desire to allocate among themselves (collectively, the "***Contributing Guarantors***"), in a fair and equitable manner, their obligations arising under this Agreement.   Accordingly, in the event any payment or distribution is made on any date by a Guarantor (a "***Funding Guarantor***") under this Agreement such that its Aggregate Payments exceeds its Fair Share as of such date, such Funding Guarantor shall be entitled to a contribution from each of the other Contributing Guarantors in an amount sufficient to cause each Contributing Guarantor's Aggregate Payments to equal its Fair Share as of such date.   The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Funding Guarantor.   The allocation among Contributing Guarantors of their obligations as set forth in this Section 3 shall not be construed in any way to limit the liability of any Contributing Guarantor hereunder.   Each Guarantor is a third-party beneficiary to the contribution agreement set forth in this Section 3.

**4.**     **Payment by Guarantors**.   The Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Guaranteed Party may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of the Company to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)), the Guarantors will upon demand pay, or cause to be paid, in cash, to the Note Agent for the ratable benefit of

the Guaranteed Parties, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for the Company's becoming the subject of a case under the Bankruptcy Code, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against the Company for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to the Guaranteed Parties as aforesaid.

**5.  Liability of Guarantors Absolute**.  Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations.  In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a)  this Agreement is a guaranty of payment when due and not of collectability; this Agreement is a primary obligation of each Guarantor and not merely a contract of surety;

(b)  the Note Agent may enforce this Agreement upon the occurrence of an Event of Default notwithstanding the existence of any dispute between the Company and any Guaranteed Party with respect to the existence of such Event of Default;

(c)  the obligations of each Guarantor hereunder are independent of the obligations of the Company and the obligations of any other guarantor (including any other Guarantor) of the obligations of the Company, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against the Company or any of such other guarantors and whether or not the Company is joined in any such action or actions;

(d)  payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid; underlined provided that, without limiting the generality of the foregoing, if the Note Agent is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(e)  any Guaranteed Party, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for the benefit of such Guaranteed Party in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Guaranteed Party may have against any such security, in each case as such Guaranteed Party in its discretion may determine consistent herewith and any applicable security

3

agreement, including foreclosure on any such security pursuant to one or more judicial or non-judicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against the Company or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Note Documents; and

(f)  this Agreement and the obligations of the Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full of the Guaranteed Obligations), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Note Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to Events of Default) hereof, any of the other Note Documents or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Note Document or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Note Documents or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though any Guaranteed Party might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) any Guaranteed Party's consent to the change, reorganization or termination of the corporate structure or existence of the Company or any of its Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations; (vii) any defenses, set offs or counterclaims which the Company may allege or assert against any Guaranteed Party in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

**6.     Waivers by Guarantors**. Each Guarantor hereby waives, for the benefit of the Guaranteed Parties: (a) any right to require any Guaranteed Party, as a condition of payment or performance by such Guarantor, to (i) proceed against the Company, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from the Company, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any deposit account or credit on the books of any Guaranteed Party in favor of the Company or any other Person, or (iv) pursue any other remedy in the power of any Guaranteed Party whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of the Company or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of the Company or any other Guarantor from any cause other than payment in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Guaranteed Party's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to gross negligence or willful misconduct; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the

4

terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Guaranteed Party protect, secure, perfect or insure any security interest or Lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to the Company and notices of any of the matters referred to in <u>Section 5</u> and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

7.       **Guarantors' Rights of Subrogation, Contribution, etc.**  Until the Guaranteed Obligations shall have been indefeasibly paid in full (other than contingent obligations as to which no demand has been made or claim asserted), each Guarantor hereby waives any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against the Company or any other Guarantor or any of its assets in connection with this Agreement or the performance by such Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including (a) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter have against the Company with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that any Guaranteed Party now has or may hereafter have against the Company, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by any Guaranteed Party.  In addition, until the Guaranteed Obligations shall have been indefeasibly paid in full (other than contingent obligations as to which no demand has been made or claim asserted), each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guaranteed Obligations, including any such right of contribution as contemplated by <u>Section 3</u>.  Each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against the Company or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights any Guaranteed Party may have against the Company, to all right, title and interest any Guaranteed Party may have in any such collateral or security, and to any right any Guaranteed Party may have against such other guarantor.  If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations shall not have been finally and indefeasibly paid in full (other than contingent obligations as to which no demand has been made or claim asserted), such amount shall be held in trust for the Note Agent on behalf of the Guaranteed Parties and shall forthwith be paid over to the Note Agent for the benefit of the Guaranteed Parties to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

8.       **Subordination of Other Obligations**.  Any Indebtedness of the Company or any Guarantor now or hereafter held by any Guarantor (the "***Obligee Guarantor***") is hereby subordinated in right of payment to the Guaranteed Obligations, and any such indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust for the Note Agent on behalf of the Guaranteed Parties and shall forthwith be paid over to the Note Agent for the benefit of the Guaranteed Parties to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

254153973 v5

**9.**     **Continuing Guaranty**.  This Agreement is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations shall have been indefeasibly paid in full (other than contingent obligations as to which no demand has been made or claim asserted).  Each Guarantor hereby irrevocably waives any right to revoke this Agreement as to future transactions giving rise to any Guaranteed Obligations.

**10.**     **Authority of the Guarantors or the Company**.  It is not necessary for any Guaranteed Party to inquire into the capacity or powers of any Guarantor or the Company or the officers, directors or any agents acting or purporting to act on behalf of any of them.

**11.**     **Financial Condition of the Company**.  Any Notes may be issued to the Company without notice to or authorization from any Guarantor regardless of the financial or other condition of the Company at the time of any such grant or continuation.  No Guaranteed Party shall have any obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of the Company.  Each Guarantor has adequate means to obtain information from the Company on a continuing basis concerning the financial condition of the Company and its ability to perform its obligations under the Note Documents and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of the Company and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations.  Each Guarantor hereby waives and relinquishes any duty on the part of any Guaranteed Party to disclose any matter, fact or thing relating to the business, operations or conditions of the Company now known or hereafter known by any Guaranteed Party.

**12.**     **Bankruptcy, etc.**

(a)     So long as any Guaranteed Obligations remain outstanding, no Guarantor shall, without the prior written consent of the Note Agent acting pursuant to the instructions of Required Holders, commence or join with any other Person in commencing any bankruptcy, reorganization or insolvency case or proceeding of or against the Company or any other Guarantor.  The obligations of the Guarantors hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by any case or proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of the Company or any other Guarantor or by any defense which the Company or any other Guarantor may have by reason of the order, decree or decision of any court or administrative body resulting from any such proceeding.

(b)     Each Guarantor acknowledges and agrees that any interest on any portion of the Guaranteed Obligations which accrues after the commencement of any case or proceeding referred to in clause (a) above (or, if interest on any portion of the Guaranteed Obligations ceases to accrue by operation of law by reason of the commencement of such case or proceeding, such interest as would have accrued on such portion of the Guaranteed Obligations if such case or proceeding had not been commenced) shall be included in the Guaranteed Obligations because it is the intention of the Guarantors and the Guaranteed Parties that the Guaranteed Obligations which are guaranteed by the Guarantors pursuant hereto should be determined without regard to any rule of law or order which may relieve the Company of any portion of such Guaranteed Obligations.  The Guarantors will permit any trustee in bankruptcy, receiver, debtor in possession, assignee for the benefit of creditors or similar person to pay Agent, or allow the claim of the Note Agent in respect of, any such interest accruing after the date on which such case or proceeding is commenced.

(c)     In the event that all or any portion of the Guaranteed Obligations are paid by the Company, the obligations of the Guarantors hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from any Guaranteed Party as a preference, fraudulent transfer or otherwise,

254153973 v5

and any such payments which are so rescinded or recovered shall constitute Guaranteed Obligations for all purposes hereunder.

**13.**    **Discharge of Guaranty Upon Sale of a Guarantor**.  If all of the Capital Stock of any Guarantor or any of its successors in interest hereunder shall be sold or otherwise disposed of (including by merger or consolidation) in accordance with the terms and conditions of the Note Documents, the Guaranty of such Guarantor or such successor in interest, as the case may be, hereunder shall automatically be discharged and released without any further action by any Guaranteed Party or any other Person effective as of the time of such Asset Disposition.

**14.**    **Keepwell**.    Each Qualified ECP Guarantor hereby, jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Note Party to honor all of its obligations under this Agreement in respect of Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 14 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 14, or otherwise under this Agreement, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  The obligations of each Qualified ECP Guarantor under this Section 14 shall remain in full force and effect until all of the Guaranteed Obligations (other than contingent indemnity Obligations for which no claim has been asserted) shall have been paid in full.  Each Qualified ECP Guarantor intends that this Section 14 constitute, and this Section 14 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Note Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

**15.**    **Additional Guarantors.**  Each Subsidiary of the Company that is required to become a Guarantor pursuant to Section 6.10 of Purchase Agreement will become a Guarantor (each an "***Additional Guarantor***"), with the same force and effect as if such Subsidiary were originally named as a Guarantor herein, for all purposes of this Agreement upon the execution and delivery by such Subsidiary of a supplement to this Agreement substantially in the form of the supplement attached hereto as Exhibit A (each a "***Guaranty Supplement***").  Each reference to "Guarantor" (or any words of like import referring to a Guarantor) in this Agreement or any other Note Document shall also mean the Additional Guarantor and each reference in this Agreement or any other Note Document to this "Guaranty" (or words of like import referring to this Agreement) shall mean this Agreement, as supplemented by each Guaranty Supplement. No consent of any other Guarantor hereunder will be required for the execution and delivery of any Guaranty Supplement.  The rights and obligations of each Guarantor hereunder shall remain in full force and effect notwithstanding the addition of any Additional Guarantor as a party to this Agreement.

**16.**    **Severability**.  If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith.  In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (a) such provision shall be excluded from this Agreement, (b) the balance of this Agreement shall be interpreted as if such provision were so excluded, and (c) the balance of this Agreement shall be enforceable in accordance with its terms.

**17.**    **Waiver and Amendment; Entire Agreement**.  Any provision of this Agreement may be amended, waived or modified only by an instrument signed in writing by the Guarantors and the Note Agent (with the consent of any Guaranteed Party as required by Section 10.9 of the Purchase Agreement).  This Agreement and the other Note Documents constitute the entire contract among the parties hereto regarding to the subject matters addressed herein and supersede any and all previous agreements, negotiations, and discussions, oral or written, by the parties regarding the subject matters addressed herein.

18.     **Successors and Assigns**.  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties.  Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

19.     **GOVERNING LAW**.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.

20.     **Jurisdiction and Venue; Waiver of Jury Trial; Expenses and Indemnification**.  This Agreement is subject to the provisions of Section 10.3 (Jurisdiction and Venue), Section 10.4 (Waiver of Jury Trial) and Section 10.10(a) (Expenses and Indemnification) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*.

21.     **Notices**.  All communications and notices required or permitted to be given hereunder shall be delivered in accordance with Section 10.8 of the Purchase Agreement.

22.     **Headings; Interpretation**.  Paragraph headings used in this Agreement are included for convenience of reference only and will not modify the provisions that they precede or affect the interpretation of this Agreement or any other Note Document.  The term "including" shall be interpreted to mean "including but not limited to".

23.     **Counterparts**.  This Agreement may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract.  Any counterpart of a signature page to this Agreement may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.

24.     **Concerning the Agent**.  U.S. Bank National Association is entering into this Agreement solely in its capacity as Note Agent and Collateral Agent (when applicable) under the Purchase Agreement and shall be entitled to all of the rights, privileges and immunities of the Note Agent and Collateral Agent (when applicable) in acting hereunder.

25.     **Security**.  The parties hereto acknowledge that, upon delivery of the Collateral Documents required by Section 6.13 of Purchase Agreement, the Guaranteed Obligations shall be secured by a first priority Lien on the Collateral (subject to terms contained in such Collateral Documents).

*[Signature pages follow]*

8

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first written above.

**CORE SCIENTIFIC, INC.,** a Delaware corporation

By:_____
Name:  Michael Trzupek
Title:    Chief Executive Officer

**AMERICAN PROPERTY ACQUISITION, LLC,** a Delaware limited liability company

By: Core Scientific, Inc., its sole member

By:_____
Name:  Michael Trzupek
Title:    Chief Executive Officer

**AMERICAN PROPERTY ACQUISITIONS I, LLC,** a North Carolina limited liability company

By: American Property Acquisition, LLC, its sole member

By:  Core Scientific, Inc., its sole member

By:_____
Name:  Michael Trzupek
Title:    Chief Executive Officer

[Signature Page to Guaranty]

**AMERICAN PROPERTY ACQUISITIONS VII, LLC,** a Georgia limited liability company

By: American Property Acquisition, LLC, its sole member

By:  Core Scientific, Inc., its sole member

By:_____
Name:  Michael Trzupek
Title:    Chief Executive Officer

**BLOCKCAP, INC.,** a Nevada corporation

By:_____
Name:  Todd DuChene
Title:    Secretary

**NOTE AGENT AND COLLATERAL AGENT**:

**U.S. BANK NATIONAL ASSOCIATION**

By: _____
Name:
Title:

Exhibit A to
Guaranty Agreement

## FORM OF GUARANTY SUPPLEMENT

THIS G U A R A N T Y  SUPPLEMENT (this "**Supplement**"), dated as of [__], is entered into by and between [__] (the "**New Guarantor**") and U.S. BANK, NATIONAL ASSOCIATION, as note agent (in such capacity, the "**Agent**") under that certain Guaranty, dated as of August 20, 2021, by and among Core Scientific, Inc., American Property Acquisition, LLC, American Property Acquisitions I, LLC, American Property Acquisitions VII, LLC, each other Guarantor from time to time party thereto and the Note Agent (the "**Guaranty**").  Capitalized terms used but not defined herein shall have the meanings given to them in the Guaranty.

The New Guarantor and the Agent, for the benefit of the Guaranteed Parties, hereby agree as follows:

The New Guarantor hereby acknowledges, agrees and confirms that, by its execution of this Supplement, the New Guarantor will be deemed to be a "Guarantor" under the Guaranty for all purposes of the Guaranty and shall have all of the obligations of a Guarantor thereunder as if it had executed the Guaranty.  The New Guarantor hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Guaranty.

This Supplement is subject to the provisions of <u>Section 10.2</u> (Governing Law), <u>Section 10.3</u> (Jurisdiction and Venue) and <u>Section 10.4</u> (Waiver of Jury Trial) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*.

This Supplement may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract.  Any counterpart of a signature page to this Supplement may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.

U.S. Bank National Association is entering into this Supplements solely in its capacity as Note Agent and shall be entitled to all of the rights, privileges and immunities of the Note Agent under the Purchase Agreement in acting hereunder.

[*Signature page follows*]

Exhibit A to
Guaranty Agreement

**IN WITNESS WHEREOF**, the parties hereto have executed this Supplement as of the date first written above.

**[NEW GUARANTOR]**


By:_____
Name:
Title:


Acknowledged and accepted:


**AGENT**:

**U.S. BANK NATIONAL ASSOCIATION,**
as Note Agent [and Collateral Agent]


By: **_____**
Name:
Title:

**EXHIBIT D**

**FORM OF SECURITY AGREEMENT**

**(see attached)**

### [FORM OF] SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** (this "**_Agreement_**"), dated as of [__], is made by and among each Grantor executing a signature page hereto and each Additional Grantor (as defined below) that may become a party hereto pursuant to Section 5.8(b) (each, a "**_Grantor_**" and collectively, the "**_Grantors_**"), in favor of U.S. Bank National Association, in its capacity as collateral agent on behalf of the Secured Parties (the "**_Collateral Agent_**").

### RECITALS

**WHEREAS**, the Grantors entered into that certain Convertible Note Purchase Agreement, dated as of August 20, 2021 (as amended, restated, supplemented and/or otherwise modified from time to time, the "**_Purchase Agreement_**"), by and among the Grantors, each Purchaser party thereto and U.S. Bank National Association, as Note Agent and, upon the execution and delivery of the Collateral Documents pursuant to Section 6.13, as Collateral Agent for the Secured Parties;

**WHEREAS**, pursuant to the Purchase Agreement, each Purchaser has been issued by the Company one or more Notes (as defined in the Purchase Agreement), which are part of a series of Notes issued by the Company, in an aggregate principal amount of up to $300,000,000.00; and

**WHEREAS**, as continuing collateral security for the Obligations of the Company under the Purchase Agreement and the Guaranteed Obligations of the Guarantors under the Guaranty, the Grantors have agreed to enter into this Security Agreement, in favor of the Collateral Agent, for purposes of granting to the Collateral Agent, for the benefit of the Secured Parties, a security interest in the Grantors' assets, on the terms and subject to the conditions set forth therein.

### AGREEMENT

**NOW THEREFORE**, in consideration of the foregoing, and the representations, warranties and conditions set forth herein, the parties hereto, intending to be legally bound, hereby agree as follows:

**1.** **DEFINED TERMS**.  When used in this Agreement the following terms shall have the meanings set forth below (such meanings being equally applicable to both the singular and plural forms of the terms defined).  Any term used in the UCC and not defined herein shall have the meaning given to such term in the UCC and any capitalized term used but not otherwise defined herein shall have the meaning given to such term in the Notes or the Purchase Agreement, as applicable.

"**_Additional Grantors_**" shall have the meaning assigned in Section 5.8(b).

"**_CFC_**" shall mean a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"**_CFC Holdco_**" shall mean a Subsidiary of the Company that has no material assets other than Capital Stock (or Capital Stock and Indebtedness) of one or more direct or indirect Foreign Subsidiaries of the Company that are CFCs.

"**_Collateral_**" shall have the meaning assigned to such term in Section 2 of this Agreement.

"**_Contracts_**" means all contracts (including any customer, vendor, supplier, service or maintenance contract), personal property leases, licenses, undertakings, purchase orders, permits, franchise agreements or other agreements (other than any right evidenced by Chattel Paper, Documents or

Instruments), whether in written or electronic form, in or under which the Grantors now hold or hereafter acquire any right, title or interest, including, without limitation, with respect to an Account, any agreement relating to the terms of payment or the terms of performance thereof, and all assignments, amendments, restatements, supplements, extensions, renewals, replacements or modifications of the Contracts.

"*Copyright License*" means any agreement, whether in written or electronic form, in which the Grantors now hold or hereafter acquire any interest, granting any right in or to any Copyright or Copyright registration (whether the Grantors are the licensee or the licensor thereunder) including, without limitation, licenses pursuant to which the Grantors have obtained the exclusive right to use a copyright owned by a third party.

"*Copyrights*" means all of the following now owned or hereafter acquired or created (as a work for hire for the benefit of the Grantors) by the Grantors or in which the Grantors now hold or hereafter acquire or receive any right or interest, in whole or in part: (a) all copyrights, (statutory or common law, whether established or registered in the United States or any other country or any political subdivision thereof, whether registered or unregistered and whether published or unpublished), held pursuant to the laws of the United States, any State thereof or any other country; (b) registrations, applications, recordings and proceedings in the United States Copyright Office or in any similar office or agency of the United States, any State thereof or any other country; (c) any continuations, renewals or extensions thereof; (d) any registrations to be issued in any pending applications, and shall include any right or interest in and to work protectable by any of the foregoing which are presently or in the future owned, created or authorized (as a work for hire for the benefit of the Grantors) or acquired by the Grantors, in whole or in part; (e) prior versions of works covered by copyright and all works based upon, derived from or incorporating such works; (f) income, royalties, damages, claims and payments now and hereafter due and/or payable with respect to copyrights, including, without limitation, damages, claims and recoveries for past, present or future infringement; (g) rights to sue for past, present and future infringements of any copyright; and (h) any other rights corresponding to any of the foregoing rights throughout the world.

"*Excluded Account*" means any Account (including, for the avoidance of doubt, any cash, cash equivalents or other property contained therein) to the extent, and for so long as, such Account is pledged to secure (i) performance of tenders, bids, leases, statutory or regulatory obligations, surety and appeal bonds, government contracts, performance and return-of-money bonds, and other obligations of like nature, in each case, in the ordinary course of business or (ii) liability for reimbursement or indemnification obligations in respect of letters of credit or bank guarantees for the benefit of landlords, in each case whether such pledge is by escrow or otherwise.

"*Excluded Property*" means, collectively, (i) Excluded Accounts (and any assets contained therein), (ii) the Capital Stock of any Subsidiary that is a CFC or CFC Holdco, other than 65.00% of the total outstanding voting Capital Stock and 100.00% of the total outstanding nonvoting Capital Stock of a CFC or a CFC Holdco that, in each case, is directly owned by a Grantor, (iii) "intent-to-use" trademarks at all times prior to the first use thereof, whether by the actual use thereof in commerce, the recording of a statement of use with the United States Patent and Trademark Office or otherwise, (iv) any property, right or asset held by the Grantors or any Subsidiary to the extent that a grant of a security interest therein is prohibited by any Requirements of Law of a Governmental Authority or constitutes a breach or default under or results in the termination of or requires any consent not obtained under, any contract, license, agreement, instrument or other document evidencing or giving rise to such property, except (A) to the extent that the terms in such contract, license, instrument or other document providing for such prohibition, breach, default or termination, or requiring such consent are not permitted under this Agreement or (B) to the extent that such Requirements of Law or the term in such contract, license, agreement, instrument or other document providing for such prohibition, breach, default or termination or

2

requiring such consent is ineffective under Section 9406, 9407, 9408 or 9409 of the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law (including the Bankruptcy Code of the United States) or principles of equity; provided, however, that such security interest shall attach immediately at such time as such Requirements of Law is not effective or applicable, or such prohibition, breach, default or termination is no longer applicable or is waived, and to the extent severable, shall attach immediately to any portion of the Collateral that does not result in such consequences; and (v) any assets securing Indebtedness (including Capital Lease Obligations) incurred to finance the acquisition of any fixed or capital assets (including any real property assets) so long as a security interest therein only encumbers the assets so acquired or financed with the proceeds of such Indebtedness.

"*Foreign Subsidiary*" means any Subsidiary other than a Subsidiary organized under the laws of any state within the United States.

"*Intellectual Property License*" means, collectively with respect to the Grantors, any Copyright License, Patent License, Trademark License or other license of rights or interests, whether in-bound or out-bound, whether in written or electronic form, now or hereafter owned or acquired or received by the Grantors or in which the Grantors now hold or hereafter acquire or receives any right or interest, and shall include any renewals or extensions of any of the foregoing thereof.

"*Investment Property*" shall mean, collectively, (a) all "investment property" as such term is defined in Section 9-102(a)(49) of the UCC and (b) whether or not constituting "investment property" as so defined, all Pledged Stock.

"*Issuers*" shall mean, collectively, each issuer of any Investment Property.

"*Patent License*" means any agreement, whether in written or electronic form, in which the Grantors now hold or hereafter acquire any interest, granting any right with respect to any invention on which a Patent is in existence (whether the Grantors are the licensee or the licensor thereunder).

"*Patents*" means all of the following in which the Grantors now hold or hereafter acquire any interest: (a) all letters patent of the United States or any other country, all registrations and recordings thereof and all applications for letters patent of the United States or any other country, including, without limitation, registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country; (b) all reissues, divisions, continuations, renewals, continuations-in-part or extensions thereof; (c) all petty patents, divisionals and patents of addition; (d) all patents to issue in any such applications; (e) income, royalties, damages, claims and payments now and hereafter due and/or payable with respect to patents, including, without limitation, damages, claims and recoveries for past, present or future infringement; and (f) rights to sue for past, present and future infringements of any patent.

"*Pledged Stock*" shall mean all shares of Capital Stock, together with any other shares, stock certificates, options, interests or rights of any nature whatsoever in respect of the Capital Stock of any Person that may be issued or granted to, or held by, any Grantor while this Agreement is in effect.

"*Trademark License*" means any agreement, whether in written or electronic form, in which the Grantors now hold or hereafter acquire any interest, granting any right in and to any Trademark or Trademark registration (whether the Grantors are the licensee or the licensor thereunder).

"*Trademarks*" means any of the following in which the Grantors now hold or hereafter acquire any interest: (a) any trademarks, tradenames, corporate names, company names, business names, uniform

3

resource locators (URL's), domain names, trade styles, service marks, logos, other source or business identifiers, prints and labels on which any of the foregoing have appeared or appear, designs and general intangibles of like nature, now existing or hereafter adopted or acquired, all registrations and recordings thereof and any applications in connection therewith, including, without limitation, registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country (collectively, the "*Marks*"); (b) any reissues, extensions or renewals thereof; (c) the goodwill of the business symbolized by or associated with the Marks; (d) income, royalties, damages, claims and payments now and hereafter due and/or payable with respect to the Marks, including, without limitation, damages, claims and recoveries for past, present or future infringement; and (e) rights to sue for past, present and future infringements of the Marks.

**2.** **GRANT OF SECURITY INTEREST**.  As collateral security for the full, prompt, complete and final payment and performance when due (whether at stated maturity, by acceleration or otherwise) of all the Obligations and in order to induce the Holders to purchase the Notes, each Grantor hereby assigns, conveys, mortgages, pledges, hypothecates and transfers to the Collateral Agent, on behalf of the Secured Parties, and hereby grants to the Collateral Agent, on behalf of the Secured Parties, a security interest in all of such Grantor's right, title and interest in, to and under the following, whether now owned or hereafter acquired (all of which being collectively referred to herein as the "*Collateral*"):

      (a)     All Accounts of the Grantors;

      (b)     All Chattel Paper of the Grantors;

      (c)     The Commercial Tort Claims of the Grantors;

      (d)     All Commodity Accounts of the Grantors;

      (e)     All Contracts of the Grantors;

      (f)     All Deposit Accounts of the Grantors;

      (g)     All Documents of the Grantors;

      (h)     All General Intangibles of the Grantors, including, without limitation, Intellectual Property;

      (i)     All Goods of the Grantors**,** including, without limitation, Equipment, Inventory and Fixtures;

      (j)     All Instruments of the Grantors, including, without limitation, Promissory Notes;

      (k)     All Investment Property of the Grantors;

      (l)     All Letter-of-Credit Rights and Letters of Credit of the Grantors;

      (m)     All Money of the Grantors;

      (n)     All Securities Accounts of the Grantors;

      (o)     All Supporting Obligations of the Grantors;

4

(p)     All property of the Grantors held by any Secured Party, or any other party for whom any Secured Party is acting as agent, including, without limitation, all property of every description now or hereafter in the possession or custody of or in transit to any Secured Party or such other party for any purpose, including, without limitation, safekeeping, collection or pledge, for the account of the Grantors, or as to which the Grantors may have any right or power;

(q)     All other goods and personal property of the Grantors, wherever located, whether tangible or intangible, and whether now owned or hereafter acquired, existing, leased or consigned by or to the Grantors; and

(r)     To the extent not otherwise included, all Proceeds of each of the foregoing and all accessions to, substitutions and replacements for and rents, profits and products of each of the foregoing.

Notwithstanding the foregoing provisions of this <u>Section 2</u>, the grant, assignment and transfer of a security interest as provided herein shall not extend to, and the term "Collateral" shall not include any Excluded Property.

3.     RIGHTS OF SECURED PARTIES; COLLECTION OF ACCOUNTS.

(a)     Notwithstanding anything contained in this Agreement to the contrary, each Grantor expressly agrees that it shall remain liable under each of its Contracts, Chattel Paper, Documents, Instruments and Intellectual Property to observe and perform all the conditions and obligations to be observed and performed by it thereunder and that it shall perform all of its duties and obligations thereunder, all in accordance with and pursuant to the terms and provisions of each such Contract, Chattel Paper, Document, Instrument, and Intellectual Property.  The Secured Parties and the Collateral Agent shall not have any obligation or liability under any such Contract, Chattel Paper, Document, Instrument, or Intellectual Property by reason of or arising out of this Agreement or the granting to the Collateral Agent of a Lien therein or the receipt by any Secured Party or the Collateral Agent of any payment relating to any such Contract, Chattel Paper, Document, Instrument, or Intellectual Property pursuant hereto, nor shall any Secured Party or the Collateral Agent be required or obligated in any manner to perform or fulfill any of the obligations of the Grantors under or pursuant to any such Contract, Chattel Paper, Document, Instrument, or Intellectual Property, or to make any payment, or to make any inquiry as to the nature or the sufficiency of any payment received by it or the sufficiency of any performance by any party under any such Contract, Chattel Paper, Document, Instrument, or Intellectual Property, or to present or file any claim, or to take any action to collect or enforce any performance or the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

(b)     Upon the occurrence and during the continuance of any Event of Default, the Collateral Agent authorizes each Grantor to collect its Accounts and, at the request of the Collateral Agent (at the direction of the Required Holders), such Grantor shall deliver all original and other documents evidencing and relating to the performance of labor or service which created such Accounts, including, without limitation, all original orders, invoices and shipping receipts.

(c)     The Collateral Agent may at any time, upon the occurrence and during the continuance of any Event of Default, notify Account Debtors of the Grantors, parties to the Contracts of the Grantors, obligors in respect of Instruments of the Grantors, and obligors in respect of Chattel Paper of the Grantors that the Accounts and the right, title and interest of the Grantors in and under such Contracts, Instruments and Chattel Paper have been assigned to the Collateral Agent and that payments shall be made directly to the Collateral Agent for distribution to the Secured Parties.  Upon the occurrence and during the continuance of any Event of Default, upon the request of the Collateral Agent (at the

direction of the Required Holders), the Grantors shall so notify such Account Debtors, parties to such Contracts, obligors in respect of such Instruments and obligors in respect of such Chattel Paper.  The Collateral Agent may, in its name or in the name of others, communicate with such Account Debtors, parties to such Contracts, obligors in respect of such Instruments and obligors in respect of such Chattel Paper to verify with such parties, to the Collateral Agent's satisfaction, the existence, amount and terms of any such Accounts, Contracts, Instruments or Chattel Paper.

4.     **REPRESENTATIONS AND WARRANTIES**.   The Grantors hereby represent and warrant to the Collateral Agent and the other Secured Parties that:

(a)     Except for the security interest granted under this Agreement, the Grantors are the sole legal and equitable owner of each item of Collateral in which it purports to grant a security interest hereunder, having good and marketable title thereto, free and clear of any and all Liens except for Permitted Liens and, upon filing of a UCC financing statement in the UCC filing office, the Collateral Agent shall have a perfected security interest in the Collateral, which such security interest shall be senior to all other Liens (other than Permitted Liens).  None of the Collateral is owned, legally or equitably by any subsidiary or company controlled by the Grantors.

(b)     The Grantors' correct legal name is set forth on the signature page hereof.  The Grantors' chief executive office, jurisdiction of incorporation and the place where the Grantors maintain their records concerning the Collateral are presently located on Schedule 4(b).

(c)     Schedule 4(c) (as such schedule may be amended or supplemented from time to time) as required pursuant to the Purchase Agreement sets forth a true and complete list of (i) all United States, state and foreign registrations of and applications for Patents, Trademarks, and Copyrights owned by each Grantor and (ii) all Patent Licenses, Trademark Licenses and Copyright Licenses material to the business of such Grantor.

(d)     Schedule 4(d) sets forth a complete and accurate list of all Pledged Stock pledged by each Grantor hereunder on the Initial Closing Date. The Pledged Stock constitutes all issued and outstanding shares of all classes of the Capital Stock of each Issuer owned by such Grantor which is Collateral (and in the case of each Issuer which is required to become a Note Party pursuant to the terms of the Purchase Agreement, all the issued and outstanding shares of all classes of the Capital Stock of each such Issuer).  Each Grantor has delivered all Certificated Securities constituting Collateral held by such Grantor in a Subsidiary on the Initial Closing Date (or the date such Grantor becomes a party to this Agreement, as applicable) to the Collateral Agent, together with duly executed undated blank stock powers, or other equivalent instruments of transfer acceptable to the Collateral Agent in accordance with Section 5.08(c) below and (assuming possession by the Collateral Agent) the Collateral Agent has a first-priority Lien.

5.     **COVENANTS**.  Unless the Collateral Agent (at the direction of the Required Holders) otherwise consents (which consent shall not be unreasonably withheld), the Grantors covenant and agree with the Collateral Agent and the other Secured Parties that from and after the date of this Agreement and until the Obligations have been performed and paid in full:

5.1     **Change of Name, Jurisdiction of Organization, Relocation of Business**.  The Grantors shall not change their name or jurisdiction of organization or relocate their chief executive office, principal place of business or their records from such address(es) provided to the Collateral Agent pursuant to Section 4(b) above without at least seven (7) days prior notice to the Collateral Agent.

5.2     **Certain Restrictions on Future Agreements**.

(a)      Each Grantor agrees that until the Obligations have been satisfied in full, it will not sell or assign its interest in, or grant any license under, other than in the ordinary course of business or in connection with a Permitted Lien, the Collateral, or enter into any other agreement with respect to the Collateral that is inconsistent with such Grantor's obligations under this Agreement, without the prior written consent of the Required Holders, and the such Grantor further agree that it will not take any action, or permit any action to be taken by others subject to its control, including licensees, or fail to take any action, which would affect the validity or enforcement of the rights transferred to the Holders under this Agreement.

(b)      Upon any sale, lease, transfer or other disposition of any item of Collateral not prohibited by the terms of this Agreement or the other Note Documents, the Collateral Agent will, at the Grantors' sole cost and expense, execute and deliver to the Grantors such documents as the Grantors shall reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted hereby; provided, however, that (i) at the time of such request and such release no Event of Default shall have occurred and be continuing and (ii) the Grantors shall have delivered to the Collateral Agent prior to the date of the proposed release a written request for release describing the item of Collateral, together with a form of release for execution by the Collateral Agent, and such other information as the Collateral Agent may reasonably request.

5.3      **License**.  The Grantors hereby grant to the Collateral Agent a non-exclusive, worldwide and royalty-free license to use or otherwise exploit all Intellectual Property rights of the Company or Subsidiary for the purpose of: (a) completing the manufacture of any in-process materials following any Event of Default so that such materials become saleable inventory, all in accordance with the same quality standards previously adopted by the Grantors for their own manufacturing; and (b) selling, leasing or otherwise disposing of any or all collateral following any Event of Default.

5.4      **Duties of the Grantors**.  The Grantors will have the duty to preserve and maintain all rights in the Collateral and to cause the perfection of the Collateral Agent's security interest therein to the extent the same can be perfected by the filing of a UCC financing statement.  Any expenses incurred in connection with the Grantors' obligations under this Section 5.4 will be borne by the Grantors.

5.5      **Insurance**.  The Grantors shall maintain insurance policies insuring the Collateral against loss or damage from such risks and in such amounts and forms and with such companies as are customarily maintained by businesses similar to the Grantors.

5.6      **Taxes, Assessments, Etc**.  The Grantors shall pay promptly when due all property and other taxes, assessments and government charges or levies imposed upon, and all claims (including claims for labor, materials and supplies) against, the Collateral, except to the extent the validity or amount thereof is being contested in good faith and adequate reserves are being maintained in connection therewith.

5.7      **Defense of Intellectual Property**.  The Grantors shall use commercially reasonable efforts to (i) protect, defend and maintain the validity and enforceability of all Copyrights, Patents and Trademarks material to the Grantors' business and (ii) detect infringements of all Copyrights, Patents and Trademarks material to the Grantors' business.

5.8      **Further Assurances**.

(a)      At any time and from time to time, as necessary or upon the written request of the Collateral Agent (at the direction of the Required Holders), and at the sole expense of the Grantors, the Grantors shall promptly and duly execute and deliver any and all such further instruments and

documents and take such further action as is necessary or that the Collateral Agent may reasonably request to obtain the full benefits of this Agreement (including the seniority of the security interest granted hereby as described in Section 4(a)), including, without limitation, executing, delivering and causing to be filed (i) any financing or continuation statements under the UCC with respect to the security interests granted hereby and (ii) intellectual property security agreements appropriate for filing with the United States Patent and Trademark Office or United States Copyright Office (or any successor office) as may be necessary or advisable for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interests granted hereby.  The Grantors also hereby authorize the Collateral Agent to file any such financing or continuation statement without the signature of the Grantors . Notwithstanding the foregoing authorization, the Collateral Agent shall have no obligation to perfect or maintain the perfection of the Collateral Agent's security interest, including by filing UCC financing statements or continuation statements, which shall be the sole obligation of the Grantors.

(b)     From time to time subsequent to the date hereof, additional Persons may become parties hereto as additional Grantors (each, an "*Additional Grantors*"), by executing a joinder hereto substantially in the form of Exhibit A.  Upon delivery of any such counterpart agreement to the Collateral Agent, notice of which is hereby waived by Grantors, each Additional Grantors shall be a Grantors and shall be as fully a party hereto as if Additional Grantors were an original signatory hereto .  Each Grantor expressly agrees that its obligations arising hereunder shall not be affected or diminished by the addition or release of any other Grantors hereunder, nor by any election of Collateral Agent not to cause any Subsidiary of Company to become an Additional Grantors hereunder.  This Agreement shall be fully effective as to any Grantors that is or becomes a party hereto regardless of whether any other Person becomes or fails to become or ceases to be a Grantors hereunder.

(c)     On the date hereof (or, in respect of an Additional Grantor, on the date on which such Additional Grantor executes a joinder hereto), each Grantor will deliver to the Collateral Agent all certificates representing Certificated Securities constituting Collateral then owned by such Grantor, in suitable form for transfer by delivery or accompanied by duly executed instruments of transfer or assignments in blank, sufficient to transfer title to the Collateral Agent.  Thereafter, whenever such Grantor acquires any other Certificated Security constituting Collateral, such Grantor will promptly deliver such certificate to the Collateral Agent in suitable form for transfer by delivery or accompanied by duly executed instruments of transfer or assignments in blank, sufficient to transfer title to the Collateral Agent.  Any limited liability company and any partnership controlled by any Grantor shall either (a) not include in its operative documents any provision that any equity interest in such limited liability company or such partnership be a "security" as defined under Article 8 of the UCC or (b) certificate any equity interest in any such limited liability company or such partnership.  To the extent an interest in any limited liability company or partnership controlled by any Grantor and pledged hereunder that constitutes Collateral is certificated or becomes certificated, each such certificate shall be delivered to the Collateral Agent pursuant to this Section 5.8(c).  Each Grantor that is an issuer of Investment Property constituting Collateral pledged hereunder that is an "uncertificated security" for purposes of the UCC hereby agrees, subject to Section 6, to comply with the Collateral Agent's instructions with respect to such uncertificated security without further consent by such Grantor.

6.      **RIGHTS AND REMEDIES UPON DEFAULT.**

6.1     **General Remedial Provisions**.  Beginning on the date which is ten (10) business days after any Event of Default shall have occurred and while such Event of Default is continuing:

(a)     The Collateral Agent, on behalf of the Secured Parties, may exercise in addition to all other rights and remedies granted to it under this Agreement or the Notes, all rights and remedies of a secured party under the UCC.  Without limiting the generality of the foregoing, the Grantors expressly

8

agree that in any such event the Collateral Agent, without demand of performance or other demand, advertisement or notice of any kind (except the notice specified below of time and place of public or private sale) to or upon the Grantors or any other person, may (i) reclaim, take possession, recover, store, maintain, finish, repair, prepare for sale or lease, shop, advertise for sale or lease and sell or lease (in the manner provided herein) the Collateral, and in connection with the liquidation of the Collateral and collection of the Accounts pledged as Collateral, use any Trademark, Copyright, or process used or owned by the Grantors and (ii) forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and may forthwith sell, lease, assign, give an option or options to purchase or sell or otherwise dispose of and deliver said Collateral (or contract to do so), or any part thereof, in one or more parcels at public or private sale or sales, at any exchange or broker's board or at the Collateral Agent's offices or elsewhere at such prices as it may deem commercially reasonable, for cash or on credit or for future delivery without assumption of any credit risk.  The Grantors further agree, at the Collateral Agent's request (at the direction of the Required Holders), to assemble the Collateral and make it available to the Collateral Agent at places which the Collateral Agent shall reasonably select, whether at the Grantors' premises or elsewhere.  The Collateral Agent shall apply the net proceeds of any such collection, recovery, receipt, appropriation, realization or sale as provided in Section 6(d), below, with the Grantors remaining liable for any deficiency remaining unpaid after such application.  The Grantors agree that the Collateral Agent need not give more than twenty (20) days' notice of the time and place of any public sale or of the time after which a private sale may take place and that such notice is reasonable notification of such matters.

(b) The Grantors also agree to pay all fees, costs and expenses of the Collateral Agent, including, without limitation, reasonable attorneys' fees, incurred in connection with the enforcement of any of its rights and remedies hereunder.

(c) The Grantors hereby waive presentment, demand, protest or any notice (to the maximum extent permitted by applicable law) of any kind in connection with this Agreement or any Collateral.

(d) The Proceeds of any sale, disposition or other realization upon all or any part of the Collateral shall be distributed by the Collateral Agent in the following order of priorities:

FIRST, to the Collateral Agent in an amount sufficient to pay in full the costs of the Collateral Agent in connection with such sale, disposition or other realization, including all fees, costs, expenses, liabilities and advances incurred or made by the Collateral Agent in connection therewith, including, without limitation, reasonable attorneys' fees;

SECOND, to the Agents in amounts proportional to such Secured Party's Pro Rata Share of the then unpaid Obligations of each such Agent;

THIRD, to the other Secured Parties (other than the Agents) in amounts proportional to such Secured Party's Pro Rata Share of the then unpaid Obligations of each such Secured Party; and

FINALLY, upon payment in full of the Obligations, to the Grantors or their respective representatives, in accordance with the UCC or as a court of competent jurisdiction may direct.

(e) Upon the occurrence and during the continuation of an Event of Default, in addition to all other rights and remedies that may then be available to any Holder of any Note, each Holder of any Note and the Collateral Agent is hereby authorized at any time and from time to time, without notice to the Company (any such notice being expressly waived by the Company) to set off and apply any and all Indebtedness at any time owing by such Holder or the Collateral Agent to or for the

credit or the account of the Grantors against all amounts which may be owed to such Holder or the Collateral Agent by the Grantors in connection with this Agreement or any other Note Document.  If any Holder of the Notes shall obtain from the Company payment of any principal of or interest on any Note held by it or payment of any other amount under this Agreement or such Note held by it or any other Note Document through the exercise of any right of set-off, and, as a result of such payment, such Holder shall have received a greater percentage of the principal, interest or other amounts then due to such Holder under the Note Documents than the percentage received by any other Holder, the Company shall promptly make such adjustments (including without limitation purchasing risk participations) with such other Holder from time to time as shall be equitable, to the end that all the Purchasers of the Notes shall share the benefit of such excess payment (net of any expenses which may be incurred by such Holder in obtaining or preserving such excess payment) pro rata in accordance with the unpaid principal and/or interest on the Notes or other amounts (as the case may be) owing to each of the Purchasers of the Notes.  To such end, all Holders of the Notes shall make appropriate adjustments among themselves if such payment is rescinded or must otherwise be restore d.  Any Holder of the Notes taking action under this Section 6 shall promptly provide notice to the Company of any such action taken; provided that the failure of such Holder to provide such notice shall not prejudice its rights hereunder.

      **6.2**    **Pledged Stock**.

      (a)    Prior to an Event of Default each Grantor shall be permitted to receive dividends and other distributions in respect of the Pledged Stock paid in the normal course of business or otherwise as a result of the exercise of reasonable business judgment of the relevant Issuer, to the extent permitted by the Purchase Agreement, and to exercise all voting and corporate rights with respect to the Investment Property.

      (b)    If an Event of Default shall have occurred and be continuing, effective upon delivery by the Collateral Agent to the Company of a notice (which, for the avoidance of doubt, may be electronic notice delivered in accordance with Section 4 of the Notes) stating that it is exercising its rights under this Section 6.2 (an "***Enforcement Notice***") (*provided*, however, that failure by the Collateral Agent to provide such Enforcement Notice shall not limit or impair any of the Collateral Agent's rights under this Agreement), (i) the Collateral Agent shall have the right to receive any and all dividends, payments or other Proceeds paid in respect of the Investment Property and make application thereof to the Obligations in the order set forth in Section 1(b)(iii)(1) of the Notes, (ii) any or all of the Investment Property shall be registered in the name of the Collateral Agent or its nominee, and (iii) the Collateral Agent or its nominee may exercise (x) all voting, corporate and other rights pertaining to such Investment Property at any meeting of shareholders of the relevant Issuer or Issuers or otherwise and (y) any and all rights of conversion, exchange and subscription and any other rights, privileges or options pertaining to such Investment Property as if it were the absolute owner thereof (including, without limitation, the right to exchange, at its discretion, any and all of the Investment Property upon the merger, consolidation, reorganization, recapitalization or other fundamental change in the corporate structure of any Issuer, or upon the exercise by any Grantor or the Collateral Agent of any right, privilege or option pertaining to such Investment Property, and in connection therewith, the right to deposit and deliver any and all of the Investment Property with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as the Collateral Agent may determine), all without liability except to account for property actually received by it, but the Collateral Agent shall have no duty to any Grantor to exercise any such right, privilege or option and shall not be responsible for any failure to do so or delay in so doing.  Upon the Collateral Agent's request (at the direction of the Required Holders), each Grantor shall, at its sole cost and expense, execute and deliver to the Collateral Agent any and all appropriate documents and instruments as the Collateral Agent may request (at the direction of the Required Holders) in order to permit the Collateral Agent to exercise the voting and other rights which it may be entitled to exercise hereunder and to receive all distributions which it may be entitled to receive hereunder.

254221560 v4

(c)        Each Grantor hereby authorizes and instructs each Issuer of any Investment Property pledged by such Grantor hereunder to (i) comply with any instruction received by it from the Collateral Agent in writing that (x) states that an Event of Default has occurred and is continuing and (y) is otherwise in accordance with the terms of this Agreement, without any other or further instructions from such Grantor, and each Grantor agrees that each Issuer shall be fully protected in so complying and shall have no duty or right to inquire as to the Collateral Agent's authority to give such instruction and (ii) when required hereby, pay any dividends or other payments with respect to the Investment Property directly to the Collateral Agent.

(d)        In furtherance and not in limitation of the foregoing rights of the Collateral Agent pursuant to this Section 6.02, solely during any time that an Event of Default exists in respect of which the Collateral Agent has delivered an Enforcement Notice, each Grantor hereby appoints the Collateral Agent as its true and lawful attorney-in-fact to, and grants to Collateral Agent an irrevocable proxy with full power of substitution and resubstitution (and which is coupled with an interest) to, vote the Capital Stock owned by a Note Party, and such Note Party agrees to execute such other proxies as the Collateral Agent may request (at the direction of the Required Holders) (provided, however, that failure by the Collateral Agent to provide such Enforcement Notice shall not limit or impair any of the Collateral Agent's rights under this Agreement).

(e)        In furtherance of the proxy set forth in Section 6.2(d), upon the exercise of such proxy, all prior proxies given by any Grantor with respect to the applicable Capital Stock are hereby revoked, and no subsequent proxies (other than to the Collateral Agent) will be given with respect to any such Capital Stock, (i) the Collateral Agent will be empowered and may exercise such proxy at any and all times, including but not limited to, at any meeting of shareholders, partners or members, as the case may be, however called, and at adjournment thereof, or in any action by written consent, and may waive any notice otherwise required in connection therewith, (ii) to the fullest extent permitted by applicable law, the Collateral Agent shall have no agency, fiduciary or other implied duties to any Grantor or any other Person when acting with respect to such proxy, and (iii) each Grantor waives and releases any claim that it may have against the Collateral Agent with respect to any breach or alleged breach of any such agency, fiduciary or other duty

7.        MISCELLANEOUS.

7.1        **Severability**.  If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith.  In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (a) such provision shall be excluded from this Agreement, (b) the balance of this Agreement shall be interpreted as if such provision were so excluded, and (c) the balance of this Agreement shall be enforceable in accordance with its terms.

7.2        **Waiver and Amendment; Entire Agreement**.  Any provision of this Agreement may be amended, waived or modified only by an instrument signed in writing by the Grantors and the Collateral Agent (with the consent of any Holder or other Secured Party as required by Section 10.9 of the Purchase Agreement).  This Agreement and the other Note Documents constitute the entire contract among the parties hereto regarding to the subject matters addressed herein and supersede any and all previous agreements, negotiations, and discussions, oral or written, by the parties regarding the subject matters addressed herein.

7.3        **Termination**.  This Agreement shall terminate upon the payment and performance in full (including, for the avoidance of doubt, by way of conversion in full of the Notes pursuant to the terms

254221560 v4

thereof) of the Obligations (other than inchoate indemnity obligations) . At such time, the Collateral shall be automatically released from the Liens created hereby, this Agreement and all obligations (other than those expressly stated to survive such termination) of the Collateral Agent, the other Secured Parties and the Grantors hereunder shall automatically terminate, all without delivery of any instrument or performance of any act by any party, and all rights to the Collateral shall automatically revert to the Grantors. The Collateral Agent shall execute such documents, return any Collateral held by the Collateral Agent hereunder and take such other steps as are reasonably necessary to accomplish the foregoing, all at the Grantors' sole cost and expense. Any such documents shall be without recourse, representation or warranty to or by the Collateral Agent.

7.4   **Successors and Assigns**. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

7.5   **Cumulative Remedies**. All of the Secured Parties' rights and remedies with respect to the Collateral whether established hereby, by a Note, by any other agreements or by law will be cumulative and may be exercised singularly or concurrently. The Grantors acknowledge and agree that this Agreement is not intended to limit or restrict in any way the rights and remedies of a Holder under a Note but rather is intended to facilitate the exercise of such rights and remedies . Secured Parties will have, in addition to all other rights and remedies given them by the terms of this Agreement, the Notes and the other Note Documents, all rights and remedies allowed by law and the rights and remedies of a secured party under the UCC as enacted in any jurisdiction in which Collateral may be located.

7.6   **GOVERNING LAW.** THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.

7.7   **Jurisdiction and Venue; Waiver of Jury Trial; Expenses and Indemnification**. This Agreement is subject to the provisions of Section 10.3 (Jurisdiction and Venue), Section 10.4 (Waiver of Jury Trial) and Section 10.10(a) (Expenses and Indemnification) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*. Any amounts payable as provided hereunder shall be additional Obligations secured by this Agreement and the other Note Documents.

7.8   **Notices**. All communications and notices required or permitted to be given hereunder shall be delivered in accordance with Section 10.8 of the Purchase Agreement.

7.9   **Headings; Interpretation**. Paragraph headings used in this Agreement are included for convenience of reference only and will not modify the provisions that they precede or affect the interpretation of this Agreement or any other Note Document. The term "including" shall be interpreted to mean "including but not limited to".

7.10   **Counterparts**. This Agreement may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract. Any counterpart of a signature page to this Agreement may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic

Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.  The Grantors agree to assume all risks arising out of the use of using digital signatures and electronic methods to submit communications to the Note Agent, including without limitation the risk of the Note Agent acting on unauthorized instructions, and the risk of interception and misuse by third parties.

[*Signature page follows*]

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first written above.

[_____]


By:_____
Name:
Title:

**COLLATERAL AGENT**:

**U.S. BANK NATIONAL ASSOCIATION**

By: _____
Name:
Title:

254221560 v4

**SCHEDULE 4(b)**

**GRANTORS**

**SCHEDULE 4(c)**

**INTELLECTUAL PROPERTY**

**SCHEDULE 4(d)**

**INVESTMENT PROPERTY**

Exhibit A to
Security Agreement

**JOINDER AGREEMENT**

THIS JOINDER AGREEMENT (this "***Joinder***"), dated as of [__], is entered into by and between [__] (the "***New Grantor***") and U.S. BANK NATIONAL ASSOCIATION, as collateral agent (in such capacity, the "***Collateral Agent***") under that certain Security Agreement, dated as of [__], 2021, made by Core Scientific Holding Co., a Delaware corporation and each Guarantor from time to time party thereto, as grantors, in favor of the Collateral Agent (the "***Security Agreement***").  Capitalized terms used but not defined herein shall have the meanings given to them in the Security Agreement.

The New Grantor and the Collateral Agent, for the benefit of the Secured Parties, hereby agree as follows:

The New Grantor hereby acknowledges, agrees and confirms that, by its execution of this Joinder, the New Grantor will be deemed to be a "Grantor" under the Security Agreement for all purposes of the Security Agreement and shall have all of the obligations of a Grantor thereunder as if it had executed the Security Agreement.  The New Grantor hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Security Agreement.

This Joinder is subject to the provisions of <u>Section 10.2</u> (Governing Law), <u>Section 10.3</u> (Jurisdiction and Venue) and <u>Section 10.4</u> (Waiver of Jury Trial) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*.

This Joinder may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract.  Any counterpart of a signature page to this Joinder may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.

*[Signature page follows]*

Exhibit A to
Security Agreement

     **IN WITNESS WHEREOF**, the parties hereto have executed this Joinder as of the date first written above.

<div align="center">

**[NEW GRANTOR]**

</div>

By:_____
Name:
Title:

Acknowledged and accepted:

**COLLATERAL AGENT**:

**U.S. BANK NATIONAL ASSOCIATION**

By: _____
Name:
Title:

**EXHIBIT E**

**FORM OF INTELLECTUAL PROPERTY SECURITY AGREEMENT**

**(see attached)**

**[FORM OF] INTELLECTUAL PROPERTY SECURITY AGREEMENT**

**THIS INTELLECTUAL PROPERTY SECURITY AGREEMENT** (this "*Agreement*"), dated as of [__], is made by [__] (the "*Grantor[s]*") in favor of U.S. BANK NATIONAL ASSOCIATION, in its capacity as collateral agent (the "*Collateral Agent*") on behalf of the Secured Parties.

**RECITALS**

**WHEREAS**, the Grantor[s] entered into that certain Convertible Note Purchase Agreement, dated as of August 20, 2021 (as amended, restated, supplemented and/or otherwise modified from time to time, the "*Purchase Agreement*"), by and among the Grantors, each Purchaser party thereto, and U.S. BANK NATIONAL ASSOCIATION as Note Agent and, upon the execution and delivery of the Collateral Documents pursuant to Section 6.13, as Collateral Agent for the Secured Parties;

**WHEREAS**, pursuant to the terms of the Purchase Agreement, as continuing collateral security for the Obligations of the Company under the Purchase Agreement and the Guaranteed Obligations of the Guarantors under the Guaranty, the Grantors have entered into a Security Agreement, dated as of even date herewith (as amended, restated, supplemented and/or otherwise modified from time to time, the "*Security Agreement*"; capitalized terms used but not otherwise defined herein having the meaning ascribed thereto therein), made by Grantors in favor of the Collateral Agent, for the purposes of granting to the Collateral Agent, for the benefit of the Secured Parties, a security interest in Grantors' assets, on the terms and subject to the conditions set forth herein; and

**WHEREAS**, pursuant to the Security Agreement, the Grantor is required to grant a security interest to the Collateral Agent, in all of the Grantor's Intellectual Property, including the Patents, Trademarks and Copyrights listed on Schedule 1 hereto (collectively, the "*Intellectual Property*").

**AGREEMENT**

**NOW, THEREFORE**, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Grantor and the Collateral Agent hereby agree as follows:

1.      **Grant of Security Interest**.

(a)      As collateral security for the full, prompt, complete and final payment and performance when due (whether at stated maturity, by acceleration or otherwise) of all the Secured Obligations, the Grantor hereby pledges to the Collateral Agent, on behalf of the Secured Parties, and hereby grants to the Collateral Agent, on behalf of the Secured Parties, a security interest in all of the Grantor's right, title and interest in, to and under the Intellectual Property, whether now owned or hereafter acquired.

(b)      The security interest granted hereby is granted in conjunction with the security interest granted to the Collateral Agent under the Security Agreement. The rights and remedies of the Collateral Agent with respect to the security interest granted hereby are in addition to those set forth in the Security Agreement. In the event of any conflict between the terms of this Agreement and the terms of the Security Agreement, the terms of the Security Agreement shall control.

2.      **Termination of Security Interest**.

This Agreement shall terminate as set forth in the Security Agreement.

3.      **Modification of Agreement**.

Any provision of this Agreement may be amended, waived or modified only by an instrument signed in writing by the Grantor and the Collateral Agent (with the consents of any Holder or other Secured Party as required by Section 10.9 of the Purchase Agreement). Notwithstanding the foregoing, upon receipt of a certificate of a Responsible Officer, the Collateral Agent may modify this Agreement, after obtaining the Grantor's approval of or signature to such modification, by amending Schedule 1 hereto to include reference to any right, title or interest in any Patents, Trademarks or Copyrights currently owned by the Grantor or any Patents, Trademarks or Copyrights acquired or developed by the Grantor after the execution hereof or to delete any reference to any right, title or interest in any Patents, Trademarks or Copyrights in which the Grantor no longer has or claims any right, title or interest.

5.      **GOVERNING LAW**.

THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.

6.      **Jurisdiction and Venue; Waiver of Jury Trial; Expenses and Indemnification**.

This Agreement is subject to the provisions of Section 10.3 (Jurisdiction and Venue), Section 10.4 (Waiver of Jury Trial) and Section 10.10(a) (Expenses and Indemnification) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*. Any amounts payable as provided hereunder shall be additional Obligations secured by this Agreement and the other Note Documents. U.S. Bank National Association is entering into this Agreement solely in its capacity as Collateral Agent under the Purchase Agreement and shall be entitled to all of the rights, privileges and immunities of the Collateral Agent in acting hereunder.

7.      **Counterparts**.

This Agreement may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract. Any counterpart of a signature page to this Agreement may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.

*[Signature page follows]*

IN WITNESS WHEREOF, the Grantor and the Collateral Agent have caused this Agreement to be duly executed and delivered as of the date first above written.

**GRANTOR:**

[_____]

By:_____
Name:
Title:

**COLLATERAL AGENT:**

U.S. BANK NATIONAL ASSOCIATION


By: _____
Name:
Title:

SCHEDULE 1

INTELLECTUAL PROPERTY SECURITY AGREEMENT

**EXHIBIT F**

**FORM OF SOLVENCY CERTIFICATE**

**(see attached)**

**[FORM OF] SOLVENCY CERTIFICATE**

**CORE SCIENTIFIC HOLDING CO.**

**August 20, 2021**

This Solvency Certificate is delivered pursuant to Section 4.1(c) of that certain Convertible Note Purchase Agreement, dated as of the date hereof (the "***Purchase Agreement***"), by and among Core Scientific Holding Co., a Delaware corporation (the "***Company***"), the Guarantors party thereto, the Initial Purchasers named on the Schedule of Purchasers attached as Schedule 2 thereto and U.S. Bank National Association, as note agent and collateral agent.  Terms capitalized herein and not otherwise defined shall have the meanings assigned to them in the Purchase Agreement.

The undersigned, the Chief Financial Officer of the Company, does hereby certify, on behalf of the Company and not in his individual capacity, that as of the Initial Closing Date, both immediately before and after giving effect to the transactions contemplated by the Note Documents, the Company is individually, and the Company and its Subsidiaries on a consolidated basis are, Solvent.

*[Signature page follows]*

254890490 v2

**IN WITNESS WHEREOF**, the undersigned has hereunto set his hand on behalf of the Company as of the date first referenced above.

_____
Name:  Michael Trzupek
Title:   Chief Financial Officer

[Signature Page to Solvency Certificate]

**EXHIBIT G**

**FORM OF ADMINISTRATIVE QUESTIONNAIRE**

| **Purchaser Name** | |
|---|---|
| Name in Which to Register Note(s) | |
| Note Registration Number(s); Principal Amount(s) | |
| Payment on Account of Note(s)<br><br>Method<br><br>Account Information | |
| Accompanying Information | |
| Address / Fax # / Email for notices related to payments | |
| Address / Fax # / Email for all other notices | |
| Instructions re Delivery of Note(s) | |
| Tax Identification Number | |

**EXHIBIT H**

**FORM OF FIRST LIEN INTERCREDITOR AGREEMENT**

**[FORM OF] FIRST LIEN PARI PASSU INTERCREDITOR AGREEMENT**

THIS FIRST LIEN PARI PASSU INTERCREDITOR AGREEMENT (this "***Agreement***"), dated as of [__], by and among U.S. Bank National Association, as note agent for the Initial Note Claimholders (in such capacity, and together with its successors and permitted assigns in such capacity, the "***Initial First Lien Representative***") and as collateral agent for the Initial Note Claimholders (in such capacity, and together with its successors and permitted assigns in such capacity, the "***Initial First Lien Collateral Agent***"), U.S. Bank National Association, as note agent for the Other Note Claimholders (in such capacity, and together with its successors and permitted assigns in such capacity, the "***Other First Lien Representative***"), and as collateral agent for the Other Note Claimholders (in such capacity, and together with its successors and permitted assigns in such capacity, the "***Other First Lien Collateral Agent***"), and acknowledged and agreed to by [Parent Entity] (the "***Company***") and the other Grantors.  Capitalized terms used in this Agreement have the meanings assigned to them in Section 1.1 below.

Reference is made to (i) that certain Senior Secured Convertible Note Purchase Agreement, dated as of April 19, 2021, by and among the [Company (as successor interest of Core Scientific Holding Co.)][1], the other Grantors from time to time party thereto, the Purchasers (as defined therein) party thereto, the Initial First Lien Representative and the Initial First Lien Collateral Agent (as amended, restated, supplemented and/or otherwise modified from time to time, the "***Initial Purchase Agreement***") and (ii) that certain Convertible Note Purchase Agreement, dated as of August 20, 2021, by and among the Company (Core Scientific Holding Co.), the other Grantors from time to time party thereto, the Purchasers (as defined therein) party thereto, the Other First Lien Representative and the Other First Lien Collateral Agent (as amended, restated, supplemented and/or otherwise modified from time to time, the "***Other Purchase Agreement***").

The obligations of the Company under the Initial Purchase Agreement and the obligations of the Guarantors (as defined therein) under the guaranty of the Initial Purchase Agreement are secured on a first-priority basis (subject to Permitted Liens (as defined therein)) by Liens on substantially all of the assets of the Grantors, pursuant to the terms of the Initial Note Collateral Documents.

The obligations of the Company under the Other Purchase Agreement and the obligations of the Guarantors (as defined therein) under the guaranty of the Other Purchase Agreement are secured on a first-priority basis (subject to Permitted Liens (as defined therein)) by Liens on substantially all of the assets of the Grantors, pursuant to the terms of the Other Note Collateral Documents.

In consideration of the foregoing, the mutual covenants and obligations herein set forth and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, each of the Initial First Lien Representative (for itself and on behalf of each other Initial Note Claimholder), the Initial First Lien Collateral Agent (for itself and on behalf of each other Initial Note Claimholder), the Other First Lien Representative (for itself and on behalf of each other Other Note Claimholder) and the Other First Lien Collateral Agent (for itself and on behalf of each other Other Note Claimholder), intending to be legally bound, hereby agrees as follows:

---

[1] To the extent the Conversion Event giving rise to execution of this Agreement is the XPDI Transaction, references to the Company herein shall be updated to refer to the Parent Entity with other confirming changes consistent therewith.

1

ARTICLE I.

DEFINITIONS

SECTION 1.1          Certain Defined Terms.

Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Initial Purchase Agreement or the Other Purchase Agreement (whether or not then in effect), as applicable, and the following terms which are defined in the UCC are used herein as so defined (and if defined in more than one article of the UCC shall have the meaning specified in Article 9 thereof): Certificated Security, Commodity Account, Commodity Contract, Deposit Account, Electronic Chattel Paper, Promissory Note, Instrument, Letter of Credit Right, Securities Entitlement, Securities Account and Tangible Chattel Paper.  As used in this Agreement, the following terms have the meanings specified below:

"*Agreement*" has the meaning set forth in the introductory paragraph hereto.

"*Applicable Collateral Agent*" means (i) until the earliest of (x) the Discharge of Initial Purchase Agreement and (y) the Other First Lien Representative Enforcement Date, the Initial First Lien Collateral Agent and (ii) from and after the earlier of (x) the Discharge of Initial Purchase Agreement and (y) the Other First Lien Representative Enforcement Date, the Other First Lien Collateral Agent.

"*Applicable Representative*" means (i) until the earliest of (x) the Discharge of Initial Purchase Agreement and (y) the Other First Lien Representative Enforcement Date, the Initial First Lien Representative and (ii) from and after the earlier of (y) the Discharge of Initial Purchase Agreement and (z) the Other First Lien Representative Enforcement Date, the Other First Lien Representative.

"*Bankruptcy Case*" has the meaning set forth in Section 2.5(b).

"*Bankruptcy Code*" means Title 11 of the United States Code, as amended.

"*Bankruptcy Law*" means the Bankruptcy Code and any similar Federal, state or foreign law for the relief of debtors.

"*Business Day*" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close.

"*Capital Lease*" means, as applied to any Person, any lease by that Person as lessee that has been or should be, in accordance with GAAP, recorded as a capital lease on the balance sheet of that Person.

"*Collateral*" means all assets and properties subject to, or purported to be subject to, Liens created pursuant to any First Lien Collateral Document to secure either Series of First Lien Obligations and shall include any property or assets subject to replacement Liens or adequate protection Liens in favor of any First Lien Claimholder.

"*Collateral Agent*" means, collectively, the Initial First Lien Collateral Agent and the Other First Lien Collateral Agent.

"*Company*" has the meaning set forth in the introductory paragraph to this Agreement.

2

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by agreement or otherwise.  "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"**Control Collateral**" means any Shared Collateral in the "control" (within the meaning of Section 9-104, 9-105, 9-106, 9-107 or 8-106 of the UCC) of either Collateral Agent (or its agents or bailees), to the extent that control thereof perfects a Lien thereon under the UCC.  Control Collateral includes any Deposit Accounts, Securities Accounts, Securities Entitlements, Commodity Accounts, Commodity Contracts, Letter of Credit Rights or Electronic Chattel Paper over which either Collateral Agent has "control" under the UCC.

"**Controlling Claimholders**" means (i) at any time when the Initial First Lien Collateral Agent is the Applicable Collateral Agent, the Initial Note Claimholders and (ii) at any other time, the Other Note Claimholders.

"**Default**" means a "Default" (or similarly defined term) as defined in any First Lien Document.

"**DIP Financing**" has the meaning set forth in Section 2.5(b).

"**DIP Financing Liens**" has the meaning set forth in Section 2.5(b).

"**DIP Lenders**" has the meaning set forth in Section 2.5(b).

"**Discharge**" means, with respect to either Series of First Lien Obligations, that such Series of First Lien Obligations is no longer secured by, and no longer required to be secured by, any Shared Collateral pursuant to the terms of the applicable First Lien Documents for such Series of First Lien Obligations.  The term "**Discharged**" shall have a corresponding meaning.

"**Discharge of Initial Purchase Agreement**" means, except to the extent otherwise provided in Section 2.6, the Discharge of the Initial Note Obligations.

"**Equity Release Proceeds**" has the meaning set forth in Section 2.4(a).

"**Event of Default**" means an "Event of Default" (or similarly defined term) as defined in any First Lien Document.

"**First Lien Claimholders**" means, collectively, (i) the Initial Note Claimholders and (ii) the Other Note Claimholders.

"**First Lien Collateral Documents**" means, collectively, (i) the Initial Note Collateral Documents and (ii) the Other Note Collateral Documents.

"**First Lien Documents**" means, collectively, (i) the Initial Note Documents and (ii) the Other Note Documents.

"**First Lien Obligations**" means, collectively, (i) the Initial Note Obligations and (ii) the Other Note Obligations.

"**Grantors**" means the Company and each of the Guarantors.

"***Guarantors***" means the "Guarantors" as defined in each of the Initial Purchase Agreement and the Other Purchase Agreement.

"***Impairment***" has the meaning set forth in <u>Section 2.1(b)(ii)</u>.

"***Indebtedness***" means all indebtedness for borrowed money.

"***Initial First Lien Collateral Agent***" has the meaning set forth in the introductory paragraph to this Agreement.

"***Initial First Lien Representative***" has the meaning set forth in the introductory paragraph to this Agreement.

"***Initial Note Claimholders***" means the holders of any Initial Note Obligations, including the "Secured Parties", as defined in the Initial Purchase Agreement (including the Initial First Lien Representative and the Initial First Lien Collateral Agent).

"***Initial Note Collateral Documents***" means the Collateral Documents (as defined in the Initial Purchase Agreement) and any other agreement, document or instrument entered into for the purpose of granting a Lien to secure any Initial Note Obligations or to perfect such Lien (as each may be amended, restated, supplemented and/or otherwise modified from time to time).

"***Initial Note Documents***" means the Initial Purchase Agreement, each Initial Note Collateral Document and the other Note Documents (as defined in the Initial Purchase Agreement), and each of the other agreements, documents and instruments providing for or evidencing any other Initial Note Obligation, as each may be amended, restated, supplemented and/or otherwise modified from time to time.

"***Initial Note Obligations***" means:

(a)     (i) the Obligations (as defined in the Initial Purchase Agreement), (ii) all principal of and interest (including any Post-Petition Interest) and premium (if any) on all loans made pursuant to the Initial Purchase Agreement, and (iii) all guarantee obligations, fees, expenses and all other obligations under the Initial Purchase Agreement and the other Initial Note Documents, in each case whether or not allowed or allowable in an Insolvency or Liquidation Proceeding; and

(b)     to the extent any payment with respect to any Initial Note Obligation (whether by or on behalf of any Grantor, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any Other Note Claimholder, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of this Agreement and the rights and obligations of the Initial Note Claimholders and the Other Note Claimholders, be deemed to be reinstated and outstanding as if such payment had not occurred.  To the extent that any interest, fees, expenses or other charges (including Post-Petition Interest) to be paid pursuant to the Initial Note Documents are disallowed by order of any court, including by order of a court of competent jurisdiction presiding over an Insolvency or Liquidation Proceeding, such interest, fees, expenses and charges (including Post-Petition Interest) shall, as between the Initial Note Claimholders and the Other Note Claimholders, be deemed to continue to accrue and be added to the amount to be calculated as the "Initial Note Obligations".

"***Initial Purchase Agreement***" has the meaning set forth in the recitals to this Agreement.

"***Insolvency or Liquidation Proceeding***" means:

4

(a)      any voluntary or involuntary case or proceeding under the Bankruptcy Code with respect to any Grantor;

(b)      any other voluntary or involuntary insolvency, reorganization or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding with respect to any Grantor or with respect to a material portion of its assets;

(c)      any liquidation, dissolution, reorganization or winding up of any Grantor whether voluntary or involuntary and whether or not involving insolvency or bankruptcy; or

(d)      any assignment for the benefit of creditors or any other marshaling of assets and liabilities of any Grantor.

"*Intervening Creditor*" has the meaning set forth in <u>Section 2.1(b)(i)</u>.

"*Lien*" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Capital Lease having substantially the same economic effect as any of the foregoing), in each case, in the nature of security; <u>provided that</u> in no event shall a colocation agreement or an operating lease in and of itself be deemed a Lien.

"*Other First Lien Collateral Agent*" has the meaning set forth in the introductory paragraph to this Agreement.

"*Other First Lien Representative*" has the meaning set forth in the introductory paragraph to this Agreement.

"*Other First Lien Representative Enforcement Date*" means, with respect to the Other First Lien Representative, the date which is 180 days after the occurrence of both (i) an Event of Default (under and as defined in the Other Note Documents) and (ii) the Initial First Lien Collateral Agent's and the Initial First Lien Representative's receipt of written notice from the Other First Lien Representative certifying that (x) an Event of Default (under and as defined in the Other Note Documents) has occurred and is continuing and (y) the Other Note Obligations are currently due and payable in full (whether as a result of acceleration thereof or otherwise) in accordance with the terms of the applicable Other Note Document; <u>provided</u> that the Other First Lien Representative Enforcement Date shall be stayed and shall not occur and shall be deemed not to have occurred (1) at any time the Initial First Lien Collateral Agent acting on the instructions of the Initial First Lien Representative has commenced and is diligently pursuing any enforcement action with respect to Shared Collateral, (2) at any time the Grantor that has granted a security interest in Shared Collateral is then a debtor under or with respect to (or otherwise subject to) any Insolvency or Liquidation Proceeding or (3) if the Other First Lien Representative subsequently rescinds or withdraws the written notice provided for in clause (ii) above.

"*Other Note Claimholders*" means the holders of any Other Note Obligations, including the "Secured Parties", as defined in the Other Purchase Agreement (including the Other First Lien Representative and the Other First Lien Collateral Agent).

"*Other Note Collateral Documents*" means the Collateral Documents (as defined in the Other Purchase Agreement) and any other agreement, document or instrument entered into for the purpose

of granting a Lien to secure any Other Note Obligations or to perfect such Lien (as each may be amended, restated, supplemented and/or otherwise modified from time to time).

"*Other Note Documents*" means the Other Purchase Agreement, each Other Note Collateral Document and the other Note Documents (as defined in the Other Purchase Agreement), and each of the other agreements, documents and instruments providing for or evidencing any other Other Note Obligation, as each may be amended, restated, supplemented and/or otherwise modified from time to time.

"*Other Note Obligations*" means:

(a)     (i) the Obligations (as defined in the Other Purchase Agreement), (ii) all principal of and interest (including any Post-Petition Interest) and premium (if any) on all loans made pursuant to the Other Purchase Agreement, and (iii) all guarantee obligations, fees, expenses and all other obligations under the Other Purchase Agreement and the other Other Note Documents, in each case whether or not allowed or allowable in an Insolvency or Liquidation Proceeding; and

(b)     to the extent any payment with respect to any Other Note Obligation (whether by or on behalf of any Grantor, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any Initial Note Claimholder, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of this Agreement and the rights and obligations of the Other Note Claimholders and the Initial Note Claimholders, be deemed to be reinstated and outstanding as if such payment had not occurred.  To the extent that any interest, fees, expenses or other charges (including Post-Petition Interest) to be paid pursuant to the Other Note Documents are disallowed by order of any court, including by order of a court of competent jurisdiction presiding over an Insolvency or Liquidation Proceeding, such interest, fees, expenses and charges (including Post-Petition Interest) shall, as between the Other Note Claimholders and the Initial Note Claimholders, be deemed to continue to accrue and be added to the amount to be calculated as the "Other Note Obligations".

"*Other Purchase Agreement*" has the meaning set forth in the recitals to this Agreement.

"*Person*" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, limited partnership, governmental authority or other entity.

"*Possessory Collateral*" means any Shared Collateral in the possession of either Collateral Agent (or its agents or bailees), to the extent that possession thereof perfects a Lien thereon under the UCC or otherwise.  Possessory Collateral includes any Certificated Securities, Promissory Notes, Instruments, and Tangible Chattel Paper, in each case, delivered to or in the possession of either Collateral Agent under the terms of the First Lien Collateral Documents.

"*Post-Petition Interest*" means interest, fees, expenses and other charges that pursuant to the Initial Note Documents or Other Note Documents, as applicable, continue to accrue after the commencement of any Insolvency or Liquidation Proceeding, whether or not such interest, fees, expenses and other charges are allowed or allowable under the Bankruptcy Law or in any such Insolvency or Liquidation Proceeding.

"*Proceeds*" has the meaning set forth in Section 2.1(a).

"*Representative*" means, at any time, (i) in the case of any Initial Note Obligations or the Initial Note Claimholders, the Initial First Lien Representative and (ii) in the case of any Other Note Obligations or the Other Note Claimholders, the Other First Lien Representative.

"***Responsible Officer***" of any Person means the chief executive officer, the president, any vice president, the chief financial officer, treasurer or assistant treasurer or other similar officer of such Person and any other individual or similar official thereof responsible for the administration of the obligations of such Person in respect of this Agreement.  Any document delivered hereunder that is signed by a Responsible Officer of a Grantor shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Grantor and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Grantor.

"***Series***" means (a) with respect to the First Lien Claimholders, each of (i) the Initial Note Claimholders (in their capacities as such) and (ii) the Other Note Claimholders (in their capacities as such) and (b) with respect to any First Lien Obligations, each of (i) the Initial Note Obligations and (ii) the Other Note Obligations.

"***Shared Collateral***" means, at any time, Collateral in which the holders of First Lien Obligations (or their respective Representatives or Collateral Agents on behalf of such holders) hold, or purport to hold, or are required to hold pursuant to their respective First Lien Documents, a valid security interest or Lien at such time.

"***subsidiary***" means, with respect to any Person (a) any corporation, association, or other business entity (other than a partnership, limited liability company or similar entity) of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the directors, managers or trustees thereof is at the time of determination is owned or controlled by such Person or one or more of the other subsidiaries of that Person or a combination thereof and (b) any partnership, limited liability company or similar entity which (i) more than 50% of the voting interests or general partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other subsidiaries of that Person or a combination thereof whether in the form of membership, general, special or limited partnership or otherwise and (ii) such Person or any subsidiary of such Person is a controlling general partner or otherwise controls such entity.

"***UCC***" means the Uniform Commercial Code as in effect from time to time in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"***Underlying Assets***" has the meaning set forth in <u>Section 2.4(a)</u>.

SECTION 1.2          <u>Rules of Interpretation</u>.

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as amended, restated, supplemented and/or otherwise modified from time to time, however evidenced, whether in physical or electronic form and any reference herein to any statute or regulations shall include any amendment, renewal, extension or replacement thereof, (ii) any reference herein to any Person shall be construed to include such Person's permitted successors and assigns from time to time, (iii) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Articles, Sections and Annexes shall be construed to refer to Articles, Sections and Annexes

of this Agreement, (v) unless otherwise expressly qualified herein, the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights and (vi) the term "or" is not exclusive.

<div align="center">ARTICLE II.</div>

<div align="center">PRIORITIES AND AGREEMENTS WITH RESPECT TO SHARED COLLATERAL</div>

SECTION 2.1          Priority of Claims.

(a)          Anything contained herein or in any of the First Lien Documents to the contrary notwithstanding (but subject to Sections 2.1(b) and 2.10(b)), if an Event of Default has occurred and is continuing, and the Applicable Collateral Agent is taking action to enforce rights in respect of any Collateral, or any distribution is made in respect of any Shared Collateral in any Bankruptcy Case of any Grantor or any First Lien Claimholder receives any payment pursuant to any intercreditor agreement (other than this Agreement) or otherwise with respect to any Shared Collateral, the proceeds of any sale, collection or other liquidation of any Shared Collateral or Equity Release Proceeds received by any First Lien Claimholder or received by the Applicable Collateral Agent or any First Lien Claimholder pursuant to any such intercreditor agreement or otherwise with respect to such Collateral and proceeds of any such distribution (subject, in the case of any such distribution, to the sentence immediately following clause (iii) below) to which the First Lien Obligations are entitled under any intercreditor agreement (other than this Agreement) or otherwise (all proceeds of any sale, collection or other liquidation of any Collateral comprising either Shared Collateral or Equity Release Proceeds and all proceeds of any such distribution and any proceeds of any insurance covering the Shared Collateral received by the Applicable Collateral Agent and not returned to any Grantor under any First Lien Document being collectively referred to as "**Proceeds**"), shall be applied by the Applicable Collateral Agent in the following order:

(i)          FIRST, to the payment of all amounts owing to each Collateral Agent (in its capacity as such) and each Representative (in its capacity as such) secured by such Shared Collateral or, in the case of Equity Release Proceeds, secured by the Underlying Assets, including all reasonable costs and expenses incurred by each Collateral Agent (in its capacity as such) and each Representative (in its capacity as such) in connection with such collection or sale or otherwise in connection with this Agreement, any other First Lien Document or any of the First Lien Obligations, including all court costs and the reasonable fees and expenses of its agents and legal counsel, and any other reasonable costs or expenses incurred in connection with the exercise of any right or remedy hereunder or under any other First Lien Document and all fees and indemnities owing to such Collateral Agents and Representatives, ratably to each such Collateral Agent and Representative in accordance with the amounts payable to it pursuant to this clause (i);

(ii)          SECOND, subject to Sections 2.1(b) and 2.10(b), to the extent Proceeds remain after the application pursuant to preceding clause (i), to each Representative for the payment in full of the other First Lien Obligations of each Series secured by such Shared Collateral or, in the case of Equity Release Proceeds, secured by the Underlying Assets, and, if the amount of such Proceeds are insufficient to pay in full the First Lien Obligations of each Series so secured then such Proceeds shall be allocated among the Representatives of each Series secured by such Shared Collateral or, in the case of Equity Release Proceeds, secured by the Underlying Assets, pro rata according to the amounts of such First Lien Obligations owing to each such respective Representative and the other First Lien Claimholders represented by it for distribution by such Representative in accordance with its respective First Lien Documents; and

<div align="center">8</div>

(iii)     THIRD, any balance of such Proceeds remaining after the application pursuant to preceding <u>clauses (i)</u> and <u>(ii)</u>, to the Grantors, their successors or assigns from time to time, or to whomever may be lawfully entitled to receive the same.

If, despite the provisions of this <u>Section 2.1(a)</u>, any First Lien Claimholder shall receive any payment or other recovery in excess of its portion of payments on account of the First Lien Obligations to which it is then entitled in accordance with this <u>Section 2.1(a)</u>, such First Lien Claimholder shall hold such payment or recovery in trust for the benefit of all First Lien Claimholders for distribution in accordance with this <u>Section 2.1(a)</u>.

(b)     (i)     Notwithstanding the foregoing, with respect to any Shared Collateral or Equity Release Proceeds for which a third party (other than a First Lien Claimholder) has a Lien that is junior in priority to the Lien of one Series of First Lien Obligations but senior (as determined by appropriate legal proceedings in the case of any dispute) to the Lien of the other Series of First Lien Obligations (such third party an "***Intervening Creditor***"), the value of any Shared Collateral, Equity Release Proceeds or Proceeds which are allocated to such Intervening Creditor shall be deducted on a ratable basis solely from the Shared Collateral, Equity Release Proceeds or Proceeds to be distributed in respect of the Series of First Lien Obligations with respect to which such Impairment exists.

(ii)     In furtherance of the foregoing and without limiting the provisions of <u>Section 2.3</u>, it is the intention of the First Lien Claimholders of each Series that the holders of First Lien Obligations of such Series (and not the First Lien Claimholders of the other Series) bear the risk of (1) any determination by a court of competent jurisdiction that (x) any of the First Lien Obligations of such Series are unenforceable under applicable law or are subordinated to any other obligations (other than another Series of First Lien Obligations), (y) any of the First Lien Obligations of such Series do not have a valid and perfected security interest in any of the Collateral securing the other Series of First Lien Obligations and/or (z) any intervening security interest exists securing any other obligations (other than another Series of First Lien Obligations) on a basis ranking prior to the security interest of such Series of First Lien Obligations but junior to the security interest of the other Series of First Lien Obligations and (2) the existence of any Collateral (other than Equity Release Proceeds) for the other Series of First Lien Obligations that is not Shared Collateral (any such condition referred to in the foregoing clauses (1) or (2) with respect to either Series of First Lien Obligations, an "***Impairment***" of such Series); <u>provided</u> that the existence of a maximum claim with respect to any real property subject to a mortgage which applies to all First Lien Obligations shall not be deemed to be an Impairment of either Series of First Lien Obligations.  In the event of any Impairment with respect to either Series of First Lien Obligations, the results of such Impairment shall be borne solely by the holders of such Series of First Lien Obligations, and the rights of the holders of such Series of First Lien Obligations (including the right to receive distributions in respect of such Series of First Lien Obligations pursuant to <u>Section 2.1</u>) set forth herein shall be modified to the extent necessary so that the effects of such Impairment are borne solely by the holders of the Series of such First Lien Obligations subject to such Impairment.  Additionally, in the event the First Lien Obligations of either Series are modified pursuant to applicable law (including pursuant to Section 1129 of the Bankruptcy Code), any reference to such First Lien Obligations or the First Lien Documents governing such First Lien Obligations shall refer to such obligations or such documents as so modified.

(c)     It is acknowledged that the First Lien Obligations of either Series may, subject to the limitations set forth in the then existing First Lien Documents and subject to any limitations set forth in this Agreement, be increased, extended, renewed, replaced, restated, supplemented, restructured, repaid, refunded or otherwise amended or modified from time to time, all without affecting the priorities set forth

9

in Section 2.1(a) or the provisions of this Agreement defining the relative rights of the First Lien Claimholders of either Series.

(d)  Notwithstanding the date, time, method, manner or order of grant, attachment or perfection of any Liens securing either Series of First Lien Obligations granted on the Shared Collateral and notwithstanding any provision of the UCC or any other applicable law or the First Lien Documents or any defect or deficiencies in the Liens securing the First Lien Obligations of either Series or any other circumstance whatsoever (but, in each case, subject to Section 2.1(b)), each First Lien Claimholder hereby agrees that the Liens securing each Series of First Lien Obligations on any Shared Collateral shall be of equal priority.

SECTION 2.2        Actions with Respect to Shared Collateral; Prohibition on Contesting Liens.

(a)  Notwithstanding Section 2.1, (i) only the Applicable Collateral Agent shall act with respect to the Shared Collateral (including with respect to any other intercreditor agreement with respect to any Shared Collateral), (ii) the Applicable Collateral Agent shall act only on the instructions of the Applicable Representative and shall not follow any instructions with respect to the Shared Collateral (including with respect to any other intercreditor agreement with respect to any Shared Collateral) from the Other First Lien Representative (or any other First Lien Claimholder other than the Applicable Representative) and (iii) no Other Note Claimholder shall or shall instruct either Collateral Agent to, and the Collateral Agent that is not the Applicable Collateral Agent shall not, commence any judicial or nonjudicial foreclosure proceedings with respect to, seek to have a trustee, receiver, liquidator or similar official appointed for or over, attempt any action to take possession of, exercise any right, remedy or power with respect to, or otherwise take any action to enforce its security interest in or realize upon, or take any other action available to it in respect of, Shared Collateral (including with respect to any other intercreditor agreement with respect to Shared Collateral), whether under any First Lien Collateral Document (other than the First Lien Collateral Documents applicable to the Applicable Collateral Agent), applicable law or otherwise, it being agreed that only the Applicable Collateral Agent, acting in accordance with the First Lien Collateral Documents applicable to it, shall be entitled to take any such actions or exercise any remedies with respect to such Shared Collateral at such time.

(b)  Without limiting the provisions of Section 4.2, the Other First Lien Representative and the Other First Lien Collateral Agent hereby appoint the Applicable Collateral Agent as its agent and authorizes the Applicable Collateral Agent to exercise any and all remedies under each First Lien Collateral Document with respect to Shared Collateral and to execute releases in connection therewith.

(c)  Notwithstanding the equal priority of the Liens securing each Series of First Lien Obligations granted on the Shared Collateral, the Applicable Collateral Agent (acting on the instructions of the Applicable Representative) may deal with the Shared Collateral as if such Applicable Collateral Agent had a senior and exclusive Lien on such Shared Collateral.  Neither the Other First Lien Representative, the Other First Lien Collateral Agent nor the Other Note Claimholders will contest, protest or object to any foreclosure proceeding or action brought by the Applicable Collateral Agent, the Applicable Representative or the Controlling Claimholders or any other exercise by the Applicable Collateral Agent, the Applicable Representative or the Controlling Claimholders of any rights and remedies relating to the Shared Collateral.  The foregoing shall not be construed to limit the rights and priorities of any First Lien Claimholder or either Collateral Agent or Representative with respect to any Collateral not constituting Shared Collateral.

(d)  Each of the Other First Lien Collateral Agent and the Other First Lien Representative agrees that it will not accept any Lien on any Collateral for the benefit of the Other Note Obligations (other than funds deposited for the satisfaction, discharge or defeasance of the Other Purchase

10

Agreement) other than pursuant to the First Lien Collateral Documents, and by executing this Agreement, each of the Other First Lien Collateral Agent and the Other First Lien Representative agrees to be bound by the provisions of this Agreement and the other First Lien Collateral Documents applicable to it.

(e)     Each of the First Lien Claimholders agrees that it will not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the perfection, priority, validity or enforceability of a Lien held by or on behalf of any of the First Lien Claimholders in all or any part of the Collateral or the provisions of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair (i) the rights of either Collateral Agent or Representative to enforce this Agreement or (ii) the rights of any First Lien Claimholder to contest or support any other Person in contesting the enforceability of any Lien purporting to secure obligations not constituting First Lien Obligations.

SECTION 2.3     No Interference; Payment Over; Exculpatory Provisions.

(a)     Each First Lien Claimholder agrees that (i) it will not challenge or question or support any other Person in challenging or questioning in any proceeding the validity or enforceability of any First Lien Obligations of either Series or any First Lien Collateral Document or the validity, attachment, perfection or priority of any Lien under any First Lien Collateral Document or the validity or enforceability of the priorities, rights or duties established by or other provisions of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair the rights of any First Lien Claimholder from challenging or questioning the validity or enforceability of any First Lien Obligations constituting unmatured interest or the validity of any Lien relating thereto pursuant to Section 502(b)(2) of the Bankruptcy Code, (ii) it will not take or cause to be taken any action the purpose or intent of which is, or could be, to interfere, hinder or delay, in any manner, whether by judicial proceedings or otherwise, any sale, transfer or other disposition of the Collateral by the Applicable Collateral Agent, (iii) except as provided in Section 2.2, it shall have no right to and shall not otherwise (A) direct the Applicable Collateral Agent or any other First Lien Claimholder to exercise any right, remedy or power with respect to any Shared Collateral (including pursuant to any other intercreditor agreement) or (B) consent to, or object to, the exercise by, or any forbearance from exercising by, the Applicable Collateral Agent or any other First Lien Claimholder represented by it of any right, remedy or power with respect to any Collateral, (iv) it will not institute any suit or assert in any suit, bankruptcy, insolvency or other proceeding any claim against the Applicable Collateral Agent or any other First Lien Claimholder represented by it seeking damages from or other relief by way of specific performance, instructions or otherwise with respect to any Collateral and (v) it will not attempt, directly or indirectly, whether by judicial proceedings or otherwise, to challenge the enforceability of any provision of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair the rights of any of the Applicable Collateral Agent or any other First Lien Claimholder to (i) enforce this Agreement or (ii) contest or support any other Person in contesting the enforceability of any Lien purporting to secure obligations not constituting First Lien Obligations.

(b)     Each First Lien Claimholder hereby agrees that if it shall obtain possession of any Shared Collateral or shall realize any proceeds or payment in respect of any Shared Collateral, pursuant to any First Lien Collateral Document or by the exercise of any rights available to it under applicable law or in any Insolvency or Liquidation Proceeding or through any other exercise of remedies (including pursuant to any intercreditor agreement), at any time prior to the Discharge of each of the First Lien Obligations, then it shall hold such Shared Collateral, proceeds or payment in trust for the other First Lien Claimholders having a security interest in such Shared Collateral and promptly transfer any such Shared Collateral, proceeds or payment, as the case may be, to the Applicable Collateral Agent, to be distributed by such Applicable Collateral Agent in accordance with the provisions of Section 2.1(a) hereof, provided, however, that the foregoing shall not apply to any Shared Collateral purchased by any First Lien Claimholder for cash pursuant to any exercise of remedies permitted hereunder.

(c)     None of the Applicable Collateral Agent, either Applicable Representative or any other First Lien Claimholder shall be liable for any action taken or omitted to be taken by the Applicable Collateral Agent, such Applicable Representative or any other First Lien Claimholder with respect to any Collateral in accordance with the provisions of this Agreement.

SECTION 2.4          Automatic Release of Liens.

(a)     If, at any time any Shared Collateral is transferred to a third party or otherwise disposed of, in each case, in connection with any enforcement by the Applicable Collateral Agent in accordance with the provisions of this Agreement, then (whether or not any Insolvency or Liquidation Proceeding is pending at the time) the Liens in favor of the other Collateral Agent (or in favor of such other First Lien Claimholders if directly secured by such Liens) upon such Shared Collateral will automatically be released and discharged upon final conclusion of such disposition as and when, but only to the extent, such Liens of the Applicable Collateral Agent on such Shared Collateral are released and discharged; provided that any proceeds of any Shared Collateral realized therefrom shall be applied pursuant to Section 2.1 hereof.  If in connection with any such foreclosure or other exercise of remedies by the Applicable Collateral Agent, the Applicable Collateral Agent or related Applicable Representative of such Series of First Lien Obligations releases any Guarantor from its obligation under a guarantee of the Series of First Lien Obligations for which it serves as agent prior to a Discharge of such Series of First Lien Obligations, such Guarantor also shall be released from its guarantee of all other First Lien Obligations.  If in connection with any such foreclosure or other exercise of remedies by the Applicable Collateral Agent, the equity interests of any Person are foreclosed upon or otherwise disposed of and the Applicable Collateral Agent releases its Lien on the property or assets of such Person, then the Liens of the other Collateral Agent (or in favor of such other First Lien Claimholders if directly secured by such Liens) with respect to any Collateral consisting of the property or assets of such Person will be automatically released to the same extent as the Liens of the Applicable Collateral Agent are released; provided that any proceeds of any such equity interests foreclosed upon where the Applicable Collateral Agent releases its Lien on the assets of such Person on which another Series of First Lien Obligations holds a Lien on any of the assets of such Person (any such assets, the "***Underlying Assets***") which Lien is released as provided in this sentence (any such Proceeds being referred to herein as "***Equity Release Proceeds***" regardless of whether or not such other Series of First Lien Obligations holds a Lien on such equity interests so disposed of) shall be applied pursuant to Section 2.1 hereof.

(b)     Without limiting the rights of the Applicable Collateral Agent under Section 4.2, each Collateral Agent and each Representative agrees to execute and deliver (at the sole cost and expense of the Grantors) all such authorizations and other instruments as shall reasonably be requested by the Company or the Applicable Collateral Agent to evidence and confirm any release of Shared Collateral, Underlying Assets or guarantee provided for in this Section.

SECTION 2.5          Certain Agreements with Respect to Bankruptcy or Insolvency Proceedings.

(a)     This Agreement shall continue in full force and effect notwithstanding the commencement of any proceeding under the Bankruptcy Code or any other Federal, state or foreign bankruptcy, insolvency, receivership or similar law by or against any Grantor or any of its subsidiaries.

(b)     If any Grantor shall become subject to a case (a "***Bankruptcy Case***") under the Bankruptcy Code and shall, as debtor(s)-in-possession, move for approval of financing ("***DIP Financing***") to be provided by one or more lenders (the "***DIP Lenders***") under Section 364 of the Bankruptcy Code or the use of cash collateral under Section 363 of the Bankruptcy Code, each First Lien Claimholder (other than any Controlling Claimholder or the Representative of the Controlling Claimholder) agrees that it will

not raise any objection to any such financing or to the Liens on the Shared Collateral securing the same ("**DIP Financing Liens**") or to any use of cash collateral that constitutes Shared Collateral, unless the Representative of the Controlling Claimholders shall then oppose or object to such DIP Financing or such DIP Financing Liens or use of cash collateral (and (i) to the extent that such DIP Financing Liens are senior to the Liens on any such Shared Collateral for the benefit of the Controlling Claimholders, each Other Note Claimholder will subordinate its Liens with respect to such Shared Collateral on the same terms as the Liens of the Controlling Claimholders (other than any Liens of any First Lien Claimholders constituting DIP Financing Liens) are subordinated thereto, and (ii) to the extent that such DIP Financing Liens rank *pari passu* with the Liens on any such Shared Collateral granted to secure the First Lien Obligations of the Controlling Claimholders, each Other Note Claimholder will confirm the priorities with respect to such Shared Collateral as set forth herein), in each case so long as (A) the First Lien Claimholders of each Series retain the benefit of their Liens on all such Shared Collateral pledged to the DIP Lenders, including proceeds thereof arising after the commencement of such proceeding, with the same priority vis-à-vis all the other First Lien Claimholders (other than any Liens of the First Lien Claimholders constituting DIP Financing Liens) as existed prior to the commencement of the Bankruptcy Case, (B) the First Lien Claimholders of each Series are granted Liens on any additional collateral pledged to any First Lien Claimholders as adequate protection or otherwise in connection with such DIP Financing or use of cash collateral, with the same priority vis-à-vis the First Lien Claimholders as set forth in this Agreement (other than any Liens of any First Lien Claimholders constituting DIP Financing Liens), (C) if any amount of such DIP Financing or cash collateral is applied to repay any of the First Lien Obligations, such amount is applied pursuant to Section 2.1(a) of this Agreement, and (D) if any First Lien Claimholders are granted adequate protection with respect to the First Lien Obligations subject hereto, including in the form of periodic payments, in connection with such use of cash collateral, the proceeds of such adequate protection are applied pursuant to Section 2.1(a) of this Agreement; provided that the First Lien Claimholders of each Series shall have a right to object to the grant of a Lien to secure the DIP Financing over any Collateral subject to Liens in favor of the First Lien Claimholders of such Series or its Representative or Collateral Agent that shall not constitute Shared Collateral; provided, further, that the First Lien Claimholders receiving adequate protection shall not object to any other First Lien Claimholder receiving adequate protection comparable to any adequate protection granted to such First Lien Claimholders in connection with a DIP Financing or use of cash collateral.

(c)     If any First Lien Claimholder is granted adequate protection (A) in the form of Liens on any additional collateral, then each other First Lien Claimholder shall be entitled to seek, and each First Lien Claimholder will consent and not object to, adequate protection in the form of Liens on such additional collateral with the same priority vis-à-vis the First Lien Claimholders as set forth in this Agreement, (B) in the form of a superpriority or other administrative claim, then each other First Lien Claimholder shall be entitled to seek, and each First Lien Claimholder will consent and not object to, adequate protection in the form of a pari passu superpriority or administrative claim or (C) in the form of periodic or other cash payments, then the proceeds of such adequate protection must be applied to all First Lien Obligations pursuant to Section 2.1.

SECTION 2.6     Reinstatement.

In the event that any of the First Lien Obligations shall be paid in full and such payment or any part thereof shall subsequently, for whatever reason (including an order or judgment for disgorgement of a preference under Title 11 of the Bankruptcy Code, or any similar law, or the settlement of any claim in respect thereof), be required to be returned or repaid, the terms and conditions of this Agreement shall be fully applicable thereto until all such First Lien Obligations shall again have been paid in full in cash. This Section 2.6 shall survive termination of this Agreement.

SECTION 2.7     Insurance and Condemnation Awards.

As among the First Lien Claimholders, the Applicable Collateral Agent (acting at the direction of the Applicable Representative), shall have the right, but not the obligation, to adjust or settle any insurance policy or claim covering or constituting Shared Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding affecting the Shared Collateral. To the extent either Collateral Agent or any other First Lien Claimholder receives proceeds of such insurance policy and such proceeds are not permitted or required to be returned to any Grantor under the applicable First Lien Documents, such proceeds shall be turned over to the Applicable Collateral Agent for application as provided in <u>Section 2.1</u> hereof.

SECTION 2.8        <u>Gratuitous Bailee/Agent for Perfection</u>.

(a)        The Applicable Collateral Agent shall be entitled to hold any Possessory Collateral constituting Shared Collateral.

(b)        Notwithstanding the foregoing, each Collateral Agent agrees to hold any Possessory Collateral constituting Shared Collateral and any other Shared Collateral from time to time in its possession or control (or in the possession or control of its agents or bailees) as gratuitous bailee for the benefit of each other First Lien Claimholder (such bailment being intended, among other things, to satisfy the requirements of Sections 8-106(d)(3), 8-301(a)(2) and 9-313(c) of the UCC), solely for the purpose of perfecting the security interest granted in such Shared Collateral, if any, pursuant to the applicable First Lien Collateral Documents, in each case, subject to the terms and conditions of this <u>Section 2.8</u>. Solely with respect to any deposit accounts constituting Shared Collateral under the control (within the meaning of Section 9-104 of the UCC) of any Collateral Agent, each such Collateral Agent agrees to also hold control over such deposit accounts as gratuitous agent for each other First Lien Claimholder and any assignee solely for the purpose of perfecting the security interest in such deposit accounts, subject to the terms and conditions of this <u>Section 2.8</u>.

(c)        No Collateral Agent shall have any obligation whatsoever to any First Lien Claimholder to ensure that the Possessory Collateral and Control Collateral is genuine or owned by any of the Grantors or to preserve rights or benefits of any Person except as expressly set forth in this <u>Section 2.8</u>. The duties or responsibilities of each Collateral Agent under this <u>Section 2.8</u> shall be limited solely to holding any Possessory Collateral constituting Shared Collateral or any other Shared Collateral in its possession or control as gratuitous bailee (and with respect to Deposit Accounts, as gratuitous agent) in accordance with this <u>Section 2.8</u> and delivering the Possessory Collateral constituting Shared Collateral as provided in <u>Section 2.8(e)</u> below.

(d)        Neither Collateral Agents nor any of the First Lien Claimholders shall have by reason of the First Lien Documents, this Agreement or any other document a fiduciary relationship in respect of the other Collateral Agents or any other First Lien Claimholder, and each Collateral Agent and each First Lien Claimholder hereby waives and releases the other Collateral Agents and First Lien Claimholders from all claims and liabilities arising pursuant to either Collateral Agent's role under this <u>Section 2.8</u> as gratuitous bailee with respect to the Possessory Collateral constituting Shared Collateral or any other Shared Collateral in its possession or control (and with respect to the Deposit Accounts, as gratuitous agent).

(e)        At any time the Applicable Collateral Agent is no longer the Applicable Collateral Agent, such outgoing Applicable Collateral Agent shall deliver the remaining Possessory Collateral constituting Shared Collateral in its possession (if any) together with any necessary endorsements (which endorsement shall be without recourse and without any representation or warranty), <u>first</u>, to the then Applicable Collateral Agent to the extent First Lien Obligations remain outstanding and <u>second</u>, to the applicable Grantor to the extent no First Lien Obligations remain outstanding (in each case, so as to allow

such Person to obtain possession or control of such Shared Collateral) or to whomever may be lawfully entitled to receive the same. The outgoing Applicable Collateral Agent further agrees to take all other action reasonably requested by the then Applicable Collateral Agent or the Company at the expense of the Company in connection with the then Applicable Collateral Agent obtaining a first-priority security interest in the Shared Collateral.

SECTION 2.9          Amendments to First Lien Collateral Documents.

(a)          Without the prior written consent of each other Collateral Agent, each Collateral Agent agrees that no First Lien Collateral Document may be amended, restated, amended and restated, supplemented, replaced or refinanced or otherwise modified from time to time or entered into to the extent such amendment, supplement, refinancing or modification, or the terms of any new First Lien Collateral Document, would be prohibited by, or would require any Grantor to act or refrain from acting in a manner that would violate, any of the terms of this Agreement.

(b)          In determining whether an amendment to any First Lien Collateral Document is permitted by this Section 2.9, each Collateral Agent may conclusively rely on an officer's certificate of the Company stating that such amendment is permitted by this Section 2.9.

SECTION 2.10          Similar Liens and Agreements.

(a)          The parties hereto agree that it is their intention that the Collateral be identical for all First Lien Claimholders. In furtherance of, but subject to, the foregoing, the parties hereto agree, subject to the other provisions of this Agreement:

(i)          upon request by either Collateral Agent, to cooperate in good faith (and to direct their counsel to cooperate in good faith) from time to time in order to determine the specific items included in the Shared Collateral and the steps taken to perfect their respective Liens thereon and the identity of the respective parties obligated under the Initial Note Documents and the Other Note Documents; and

(ii)          that the documents and agreements creating or evidencing the Liens on Shared Collateral securing the Initial Note Obligations and the Other Note Obligations shall be in all material respects the same forms of documents as one another, except that the documents and agreements creating or evidencing the Liens securing the Other Note Obligations may contain additional provisions as may be necessary or appropriate to establish the intercreditor arrangements among the various separate classes of creditors holding Other Note Obligations.

ARTICLE III.

EXISTENCE AND AMOUNTS OF LIENS AND OBLIGATIONS

Whenever an Applicable Collateral Agent or an Applicable Representative shall be required, in connection with the exercise of its rights or the performance of its obligations hereunder, to determine the existence or amount of any First Lien Obligations of either Series, or the Shared Collateral subject to any Lien securing the First Lien Obligations of either Series, it may request that such information be furnished to it in writing by the other Representative or the other Collateral Agent and shall be entitled to make such determination or not make any determination on the basis of the information so furnished; provided, however, that if such Representative or Collateral Agent shall fail or refuse reasonably promptly to provide the requested information, the requesting Applicable Collateral Agent or Applicable Representative shall be entitled to make any such determination or not make any determination by such method as it

15

may, in the exercise of its good faith judgment, determine, including by reliance upon a certificate of the Company.  Each Applicable Collateral Agent and each Applicable Representative may rely conclusively, and shall be fully protected in so relying, on any determination made by it in accordance with the provisions of the preceding sentence (or as otherwise directed by a court of competent jurisdiction) and shall have no liability to any Grantor, any First Lien Claimholder or any other person as a result of such determination.

ARTICLE IV.

THE APPLICABLE COLLATERAL AGENT

SECTION 4.1          Authority.

(a)     Notwithstanding any other provision of this Agreement, nothing herein shall be construed to impose any fiduciary or other duty on any Applicable Collateral Agent to any Other Note Claimholder or give any Other Note Claimholder the right to direct the Applicable Collateral Agent, except that each Applicable Collateral Agent shall be obligated to distribute proceeds of any Shared Collateral in accordance with Section 2.1 hereof.

(b)     In furtherance of the foregoing, each Other Note Claimholder acknowledges and agrees that the Applicable Collateral Agent shall be entitled, for the benefit of the First Lien Claimholders, to sell, transfer or otherwise dispose of or deal with any Shared Collateral as provided herein and in the First Lien Collateral Documents, as applicable, without regard to any rights to which the Other Note Claimholder would otherwise be entitled as a result of the First Lien Obligations held by such Other Note Claimholders.  Without limiting the foregoing, each Other Note Claimholder agrees that none of the Applicable Collateral Agent, the Applicable Representative or any other First Lien Claimholder shall have any duty or obligation first to marshal or realize upon any type of Shared Collateral (or any other Collateral securing any of the First Lien Obligations), or to sell, dispose of or otherwise liquidate all or any portion of such Shared Collateral (or any other Collateral securing any First Lien Obligations), in any manner that would maximize the return to the Other Note Claimholder, notwithstanding that the order and timing of any such realization, sale, disposition or liquidation may affect the amount of proceeds actually received by the Other Note Claimholders from such realization, sale, disposition or liquidation.  Each of the First Lien Claimholders waives any claim it may now or hereafter have against the Collateral Agent or Representative of the other Series of First Lien Obligations or any other First Lien Claimholder of the other Series arising out of (i) any actions which any such Collateral Agent, Representative or any First Lien Claimholder represented by it take or omit to take (including actions with respect to the creation, perfection or continuation of Liens on any Collateral, actions with respect to the foreclosure upon, sale, release or depreciation of, or failure to realize upon, any of the Collateral and actions with respect to the collection of any claim for all or any part of the First Lien Obligations from any account debtor, guarantor or any other party) in accordance with the First Lien Collateral Documents or any other agreement related thereto or in connection with the collection of the First Lien Obligations or the valuation, use, protection or release of any security for the First Lien Obligations; provided that nothing in this clause (i) shall be construed to prevent or impair the rights of either Collateral Agent or Representative to enforce this Agreement, (ii) any election by the Applicable Representative or any holders of First Lien Obligations, in any proceeding instituted under the Bankruptcy Code, of the application of Section 1111(b) of the Bankruptcy Code or (iii) subject to Section 2.5, any borrowing, or grant of a security interest or administrative expense priority under Section 364 of the Bankruptcy Code or any equivalent provision of any other Bankruptcy Law, by the Company or any of its subsidiaries, as debtor-in-possession.  Notwithstanding any other provision of this Agreement, the Applicable Collateral Agent shall not (i) accept any Shared Collateral in full or partial satisfaction of any First Lien Obligations pursuant to Section 9-620 of the UCC, without the consent of the Representatives representing holders of First Lien Obligations for whom such Collateral constitutes Shared Collateral or (ii) "credit bid" for or purchase (other than for cash) Shared Collateral at any public, private

16

or judicial foreclosure upon such Shared Collateral, without the consent of the Representative representing holders of First Lien Obligations for whom such Collateral constitutes Shared Collateral.

SECTION 4.2         Power-of-Attorney.

The Other First Lien Representative and the Other First Lien Collateral Agent, for itself and on behalf of the Other Note Claimholders, hereby irrevocably appoints the Applicable Collateral Agent and any officer or agent of the Applicable Collateral Agent, which appointment is coupled with an interest with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Other First Lien Representative, the Other First Lien Collateral Agent and the Other Note Claimholders, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Agreement, including the exercise of any and all remedies under each First Lien Collateral Document with respect to Shared Collateral and the execution of releases in connection therewith.

ARTICLE V.

MISCELLANEOUS

SECTION 5.1         Integration/Conflicts.

This Agreement, together with the other First Lien Documents and the First Lien Collateral Documents, represents the entire agreement of each of the Grantors and the First Lien Claimholders with respect to the subject matter hereof and thereof and supersedes any and all previous agreements and understandings, oral or written, relating to the subject matter hereof and thereof.  There are no promises, undertakings, representations or warranties by either Representative, either Collateral Agent or the First Lien Claimholder relative to the subject matter hereof and thereof not expressly set forth or referred to herein or therein.  In the event of any conflict between the provisions of this Agreement and the provisions of the First Lien Documents the provisions of this Agreement shall govern and control.

SECTION 5.2         Effectiveness; Continuing Nature of this Agreement; Severability.

This Agreement shall become effective when executed and delivered by the parties hereto. This is a continuing agreement and the First Lien Claimholders of either Series may continue, at any time and without notice to any First Lien Claimholder of the other Series, to extend credit and other financial accommodations and lend monies to or for the benefit of the Company or any Grantor constituting First Lien Obligations in reliance hereon.  Each Representative and each Collateral Agent, on behalf of itself and each other First Lien Claimholder represented by it, hereby waives any right it may have under applicable law to revoke this Agreement or any of the provisions of this Agreement.  The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency or Liquidation Proceeding.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  The parties hereto shall endeavor in good faith negotiations to replace any invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to those of the invalid, illegal or unenforceable provisions. All references to the Company or any other Grantor shall include the Company or such Grantor as debtor and debtor in possession and any receiver, trustee or similar person for the Company or any other Grantor (as the case may be) in any Insolvency or Liquidation Proceeding.  This Agreement shall terminate and be of no further force and effect with respect to the Representative or Collateral Agent and the First Lien Claimholders represented by such Representative or Collateral Agent and their First Lien Obligations, on

17

the date on which there has been a Discharge of such Series of First Lien Obligations, subject to the rights of the First Lien Claimholders under Section 2.6; provided, however, that such termination shall not relieve any such party of its obligations incurred hereunder prior to the date of such termination.

SECTION 5.3    Amendments; Waivers.

(a)    No amendment, modification or waiver of any of the provisions of this Agreement shall be deemed to be made unless the same shall be in writing signed on behalf of each party hereto or its authorized agent and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time.  Notwithstanding the foregoing, the Company and the other Grantors shall not have any right to consent to or approve any amendment, modification or waiver of any provision of this Agreement except to the extent their rights are adversely affected.

SECTION 5.4    Information Concerning Financial Condition of the Grantors and their Subsidiaries.

The Representative and Collateral Agent and the other First Lien Claimholders of each Series shall each be responsible for keeping themselves informed of (a) the financial condition of the Grantors and their subsidiaries and all endorsers and/or guarantors of the First Lien Obligations and (b) all other circumstances bearing upon the risk of nonpayment of the First Lien Obligations, provided that the foregoing shall not impose any obligation on any Representative or Collateral Agent not expressly set forth in the applicable First Lien Documents.  The Representative and Collateral Agent and the other First Lien Claimholders of each Series shall have no duty to advise the Representative, Collateral Agent or First Lien Claimholders of the other Series of information known to it or them regarding such condition or any such circumstances or otherwise.  In the event the Representative or Collateral Agent or any of the other First Lien Claimholders, in its or their sole discretion, undertakes at any time or from time to time to provide any such information to the Representative, Collateral Agent or First Lien Claimholders of the other Series, it or they shall be under no obligation:

(a)    to make, and such Representative and Collateral Agent and such other First Lien Claimholders shall not make, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided;

(b)    to provide any additional information or to provide any such information on any subsequent occasion;

(c)    to undertake any investigation; or

(d)    to disclose any information, which pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

SECTION 5.5    Submission to Jurisdiction; Certain Waivers.

Each of the Company, each other Grantor, each Collateral Agent and each Representative, on behalf of itself and each other First Lien Claimholder represented by it, hereby irrevocably and unconditionally:

18

(a)      submits for itself and its property in any legal action or proceeding relating to this Agreement and the First Lien Collateral Documents (whether arising in contract, tort or otherwise) to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the exclusive (subject to Section 5.5(c)) general jurisdiction of the courts of the State of New York sitting in the Borough of Manhattan, the courts of the United States for the Southern District of New York sitting in the Borough of Manhattan, and appellate courts from any thereof;

(b)      agrees that all claims in respect of any such action or proceeding shall be heard and determined in such New York state court or, to the fullest extent permitted by applicable law, in such federal court;

(c)      agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law and that nothing in this Agreement or any other First Lien Document shall affect any right that either Collateral Agent, either Representative or any other First Lien Claimholder may otherwise have to bring any action or proceeding relating to this Agreement or any other First Lien Document against such Grantor or any of its assets in the courts of any jurisdiction;

(d)      waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement or any other First Lien Collateral Document in any court referred to in Section 5.5(a) (and irrevocably waives to the fullest extent permitted by applicable law the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court); and

(e)      waives, to the maximum extent not prohibited by law, any right it may have to claim or recover any special, exemplary, punitive or consequential damages.

SECTION 5.6          WAIVER OF JURY TRIAL.

**EACH PARTY HERETO AND THE COMPANY AND THE OTHER GRANTORS HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER FIRST LIEN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT, BREACH OF DUTY, COMMON LAW, STATUTE OR ANY OTHER THEORY). EACH PARTY HERETO AND THE COMPANY AND THE OTHER GRANTORS (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT EACH SUCH PARTY HERETO AND THE COMPANY AND EACH OTHER GRANTOR HAVE BEEN INDUCED TO ENTER INTO OR ACKNOWLEDGE THIS AGREEMENT AND THE OTHER FIRST LIEN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION. EACH PARTY HERETO AND THE COMPANY AND THE OTHER GRANTORS FURTHER REPRESENTS AND WARRANTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.**

SECTION 5.7          Notices.

Unless otherwise specifically provided herein, any notice hereunder shall be in writing and may be personally served or sent by facsimile, electronic mail or United States mail or courier service and shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof, upon receipt of facsimile or electronic mail, or three Business Days after depositing it in the United States mail with postage prepaid and properly addressed. For the purposes hereof, the addresses of the parties hereto shall be as set forth below each party's name on the signature pages hereto or, with respect to any Grantor that becomes a party hereto pursuant to Section 5.17, in the joinder agreement substantially in the form attached hereto as Exhibit A, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

SECTION 5.8        Further Assurances.

Each Representative and Collateral Agent, on behalf of itself and each other First Lien Claimholder represented by it, and the Company and each other Grantor, agree that each of them shall take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as either Representative and Collateral Agent may reasonably request to effectuate the terms of and the Lien priorities contemplated by this Agreement.

SECTION 5.9        Agency Capacities.

(a)        Except as expressly provided herein, (a) each of the Initial First Lien Representative and the Initial First Lien Collateral Agent is acting in the capacity of Representative and Collateral Agent, respectively, solely for the Initial Note Claimholders and pursuant to the direction set forth in the Initial Note Documents and (b) each of the Other First Lien Representative and the Other First Lien Collateral Agent is acting in the capacity of Representative and Collateral Agent, respectively, solely for the Other Note Claimholders and pursuant to the direction set forth in the Other Note Documents. Each Representative and each Collateral Agent shall be entitled to the rights, privileges and immunities of such Representative or such Collateral Agent as set forth in the applicable First Lien Documents in acting hereunder.

(b)        Neither Representative or Collateral Agent shall be responsible for the terms or sufficiency of this Agreement for any purpose. Neither Representative or Collateral Agent shall have any duties or obligations under or pursuant to this Agreement other than such duties as may be expressly set forth in this as duties on its part to be performed or observed. In entering into this Agreement, or in taking (or forbearing from) any action under or pursuant to this Agreement, each Representative and Collateral Agent shall have and be protected by all of the rights, immunities, indemnities and other protections granted to it under the applicable First Lien Documents. Neither Representative or Collateral Agent shall have any liability or responsibility for the actions or omissions of the other Collateral Agent, or for any other claimholder's or the other Collateral Agent's compliance with (or failure to comply with) the terms of this Agreement.

(c)        None of the provisions in this Agreement shall require the Representatives or the Collateral Agents to expend or risk their own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of their duties, or in the exercise of any of its rights or powers if they shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to them against such risk or liability is not assured to them.

(d)        Neither Representative or Collateral Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated by the applicable First Lien Documents that such Representative or Collateral Agent is required to exercise as directed in writing by the Required Holders (as defined in the Initial Purchase Agreement or Other Purchase Agreement, as applicable); *provided that*, either Representative and Collateral Agent shall be entitled to refrain from any act or the taking of any action hereunder under the applicable First Lien Documents or

20

from the exercise of any power or authority vested in it hereunder or thereunder unless and until such Representative or Collateral Agent shall have received instructions from the Required Holders (as defined in the Initial Purchase Agreement or Other Purchase Agreement, as applicable) and such Representative or Collateral Agent deems necessary, satisfactory indemnity has been provided to it, and neither such Representative nor Collateral Agent shall be liable for any such delay in acting.  Neither Representative or Collateral Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose it to liability or that is contrary to the applicable First Lien Documents or applicable law, including for the avoidance of doubt, any action that may be in violation of the automatic stay under any bankruptcy or insolvency law.  For purposes of clarity, phrases such as "satisfactory to", "approved by", "acceptable to", "as determined by", "in the discretion of", "selected by", "requested by" the Representatives or Collateral Agents and phrases of similar import authorize and permit the Representatives or Collateral Agents to approve, disapprove, determine, act or decline to act in its discretion.  Any exercise of discretion on behalf of the Other First Lien Representative or the Other First Lien Collateral Agent shall be exercised in accordance with the terms of the Other Note Documents.  Notwithstanding anything herein to the contrary, neither Representative or Collateral Agent shall have any responsibility for the preparation, filing or recording of any instrument, document or financing statement or for the perfection or maintenance of any security interest created hereunder.

SECTION 5.10       GOVERNING LAW.

**THIS AGREEMENT, AND ANY DISPUTE, CLAIM OR CONTROVERSY ARISING OUT OF OR RELATING TO THIS AGREEMENT (WHETHER ARISING IN CONTRACT, TORT OR OTHERWISE) SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAW RULES THAT WOULD RESULT IN THE APPLICATION OF A DIFFERENT GOVERNING LAW (OTHER THAN ANY MANDATORY PROVISIONS OF THE UCC RELATING TO THE LAW GOVERNING PERFECTION AND THE EFFECT OF PERFECTION OR PRIORITY OF THE SECURITY INTERESTS).**

SECTION 5.11       Binding on Successors and Assigns.

This Agreement shall be binding upon each Representative and each Collateral Agent, the First Lien Claimholders, the Company and the other Grantors, and their respective successors and assigns from time to time.  If either Representative and/or Collateral Agent resigns or is replaced pursuant to the applicable First Lien Documents its successor shall be deemed to be a party to this Agreement and shall have all the rights of, and be subject to all the obligations of, this Agreement.  No provision of this Agreement will inure to the benefit of a trustee, debtor-in-possession, creditor trust or other representative of an estate or creditor of any Grantor, including where any such trustee, debtor-in-possession, creditor trust or other representative of an estate is the beneficiary of a Lien securing Collateral by virtue of the avoidance of such Lien in an Insolvency or Liquidation Proceeding.

SECTION 5.12       Section Headings.

Section headings and the Table of Contents used in this Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

SECTION 5.13       Counterparts.

This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute

one and the same instrument. Delivery of an executed signature page of this Agreement by facsimile or other electronic transmission (e.g., "pdf" or "tif" format) shall be effective as delivery of a manually executed counterpart hereof. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this Agreement and/or any document to be signed in connection with this Agreement and the transactions contemplated hereby shall be deemed to include Electronic Signatures (as defined below), deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be. "*Electronic Signatures*" means any electronic symbol or process attached to, or associated with, any contract or other record and adopted by a person with the intent to sign, authenticate or accept such contract or record.

SECTION 5.14        Authorization.

By its signature, each Person executing this Agreement, on behalf of such party or Grantor but not in his or her personal capacity as a signatory, represents and warrants to the other parties hereto that it is duly authorized to execute this Agreement.

SECTION 5.15        No Third Party Beneficiaries/ Provisions Solely to Define Relative Rights.

The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the First Lien Claimholders in relation to one another. None of the Company, any other Grantor nor any other creditor thereof shall have any rights or obligations hereunder and no such Person is an intended beneficiary or third party beneficiary hereof, except, in each case, as expressly provided in this Agreement, and none of the Company or any other Grantor may rely on the terms hereof (other than Sections 5.3). Nothing in this Agreement is intended to or shall impair the obligations of any Grantor, which are absolute and unconditional, to pay the First Lien Obligations as and when the same shall become due and payable in accordance with their terms. Without limitation of any other provisions of this Agreement, the Company and each Grantor hereby (a) acknowledges that it has read this Agreement and consents hereto, (b) agrees that it will not take any action that would be contrary to the express provisions of this Agreement and (c) agrees to abide by the requirements expressly applicable to it under this Agreement.

SECTION 5.16        No Indirect Actions.

Unless otherwise expressly stated, if a party may not take an action under this Agreement, then it may not take that action indirectly, or support any other Person in taking that action directly or indirectly. "Taking an action indirectly" means taking an action that is not expressly prohibited for the party but is intended to have substantially the same effects as the prohibited action.

SECTION 5.17        Additional Grantors.

Each of the Company and the other Grantors agrees that it shall ensure that each of its subsidiaries that is or is to become a party to any First Lien Document and which grants or purports to grant a lien on any of its assets shall either execute this Agreement on the date hereof or shall confirm that it is a Grantor hereunder pursuant to a joinder agreement substantially in the form attached hereto as Exhibit A that is executed and delivered by such subsidiary prior to or concurrently with its execution and delivery of such First Lien Document.

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**U.S. BANK NATIONAL ASSOCIATION**, as Initial First Lien Representative and as Initial First Lien Collateral Agent

By: _____

    Name:
    Title:

Address for notices:
U.S. Bank National Association
West Side Flats
60 Livingston Avenue
EP-MN-WS3C
St. Paul, MN 55107
Attention: Joshua Hahn (Core Sciences)

**U.S. BANK NATIONAL ASSOCIATION**, as Other First Lien Representative and as Other First Lien Collateral Agent

By: _____

    Name:
    Title:

Address for notices:
U.S. Bank National Association
West Side Flats
60 Livingston Avenue
EP-MN-WS3C
St. Paul, MN 55107
Attention: Joshua Hahn (Core Sciences)

[Signature Page to Intercreditor Agreement]

**Acknowledged and Agreed to by:**

[_____]


By:_____
Name:
Title:

Exhibit A
to First Lien Pari Passu Intercreditor Agreement

FORM OF GRANTOR JOINDER AGREEMENT

GRANTOR JOINDER AGREEMENT NO.  [__] (this "***Grantor Joinder Agreement***"), dated as of [__], 20[__] to the PARI PASSU INTERCREDITOR AGREEMENT, dated as of [__], 2021 (the "***Pari Passu Intercreditor Agreement***"), by and among U.S. Bank National Association, as Initial First Lien Representative and Initial First Lien Collateral Agent, U.S. Bank National Association, as Other First Lien Representative and Other First Lien Collateral Agent, and acknowledged and agreed to by Core Scientific Holding Co. and the other Grantors from time to time party thereto.  Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Pari Passu Intercreditor Agreement.

The undersigned, [_____], a [_____], (the "***New Grantor***") wishes to acknowledge and agree to the Pari Passu Intercreditor Agreement and become a party thereto to the limited extent contemplated by Section 5.17 thereof and to acquire and undertake the rights and obligations of a Grantor thereunder.

Accordingly, the New Grantor agrees as follows for the benefit of the Representatives, the Collateral Agents and the First Lien Claimholders:

Section 1.        Accession to the Pari Passu Intercreditor Agreement.  The New Grantor (a) acknowledges and agrees to, and becomes a party to the Pari Passu Intercreditor Agreement as a Grantor to the limited extent contemplated by Section 5.17 thereof, (b) agrees to all the terms and provisions of the Pari Passu Intercreditor Agreement and (c) shall have all the rights and obligations of a Grantor under the Pari Passu Intercreditor Agreement.  This Grantor Joinder Agreement supplements the Pari Passu Intercreditor Agreement and is being executed and delivered by the New Grantor pursuant to Section 5.17 of the Pari Passu Intercreditor Agreement.

Section 2.        Representations, Warranties and Acknowledgement of the New Grantor.  The New Grantor represents and warrants to each Representative, each Collateral Agent and to the First Lien Claimholders that (a) it has full power and authority to enter into this Grantor Joinder Agreement, in its capacity as Grantor and (b) this Grantor Joinder Agreement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with the terms of this Grantor Joinder Agreement.

Section 3.        Counterparts.  This Grantor Joinder Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Grantor Joinder Agreement or any document or instrument delivered in connection herewith by telecopy or other electronic means shall be effective as delivery of a manually executed counterpart of this Grantor Joinder Agreement or such other document or instrument, as applicable.

Section 4.        Section Headings.  Section heading used in this Grantor Joinder Agreement are for convenience of reference only and are not to affect the construction hereof or to be taken in consideration in the interpretation hereof.

Section 5.        Benefit of Agreement.  The agreements set forth herein or undertaken pursuant hereto are for the benefit of, and may be enforced by, any party to the Pari Passu Intercreditor Agreement subject to any limitations set forth in the Pari Passu Intercreditor Agreement with respect to the Grantors.

Section 6.        Governing Law.  **THIS GRANTOR JOINDER AGREEMENT, AND ANY DISPUTE, CLAIM OR CONTROVERSY ARISING OUT OF OR RELATING TO THIS GRANTOR JOINDER AGREEMENT (WHETHER ARISING IN CONTRACT, TORT OR OTHERWISE) SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAW RULES THAT WOULD RESULT IN THE APPLICATION OF A DIFFERENT GOVERNING LAW (OTHER THAN ANY MANDATORY PROVISIONS OF THE UCC RELATING TO THE LAW GOVERNING PERFECTION AND THE EFFECT OF PERFECTION OR PRIORITY OF THE SECURITY INTERESTS IN THE COLLATERAL).**

Section 7.        Severability.  Any provision of this Grantor Joinder Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  The parties hereto shall endeavor in good faith negotiations to replace any invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to those of the invalid, illegal or unenforceable provisions.

Section 8.        Notices.  All communications and notices hereunder shall be in writing and given as provided in Section 5.7 of the Pari Passu Intercreditor Agreement.  All communications and notices hereunder to the New Grantor shall be given to it at the address set forth under its signature hereto, which information supplements Section 5.7 of the Pari Passu Intercreditor Agreement.

IN WITNESS WHEREOF, the New Grantor has duly executed this Grantor Joinder Agreement to the Pari Passu Intercreditor Agreement as of the day and year first above written.

[_____]

By_____
   Name:
   Title:

Address for notices:
         _____
         _____
         Attention of:_____
         Telecopy: _____

Exhibit A – Page 3

**EXHIBIT I**

**FORM OF JOINDER AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

## [FORM OF] JOINDER AND ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS JOINDER ASSIGNMENT AND ASSUMPTION AGREEMENT (this "*Agreement*"), dated as of [___], is made by and among [Parent Entity] (the "*Parent*"), [Core Scientific Holding Co.][1], a Delaware (the "*Company*") and U.S. BANK NATIONAL ASSOCIATION, as note agent (in such capacity, the "*Agent*"), under that certain Convertible Note Purchase Agreement, dated as of August 20, 2021 (as amended, restated, supplemented and/or otherwise modified from time to time, the "*Purchase Agreement*"), by and among the Company, the Guarantors party thereto, each Purchaser party thereto and the Note Agent.

## RECITALS

WHEREAS, pursuant to the Purchase Agreement, each Purchaser has been issued by the Company one or more Notes (as defined in the Purchase Agreement), which are part of a series of Notes issued by the Company, in an aggregate principal amount of up to $300,000,000.00;

WHEREAS, pursuant to Section 10.1 of the Purchase Agreement, in the event of a SPAC, the Parent Entity shall (a) assume the Obligation of the Company to deliver Conversion Securities pursuant to Section 2 of the Note and (b) assume each other Obligation of the Company under the Note Documents by becoming a joint and several co-obligor of each such other Obligation of the Company (or its successor by merger) under the Note Documents, in each case pursuant to this Agreement; and

WHEREAS, the Company and the Parent now seek to consummate the joinder and assignment and assumption contemplated by Section 10.1 of the Purchase Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the agreements and covenants contained in the Purchase Agreement, and the agreements and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties do hereby agree as follows:

1.      **Defined Terms**.  Capitalized terms used but not defined herein shall have the meanings set forth in the Purchase Agreement.

2.      **Assignment and Assumption**.  Under the terms and subject to the conditions set forth in the Purchase Agreement, the Company hereby assigns to the Parent, and the Parent hereby accepts, the Obligation of the Company to deliver Conversion Securities pursuant to Section 2 of the Note.

3.      **Joinder**.  The Parent hereby acknowledges, agrees and confirms that, by its execution of this Agreement, the Parent will be deemed to be an issuer under the Note Documents and each reference to the "Company" in the Purchase Agreement and each other Note Document shall be deemed to be a collective reference to the Parent and the Company and the Parent shall have all of the obligations of the Company thereunder as if it had executed the Note Documents as the Company.  The Parent hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Purchase Agreement.  Notwithstanding the foregoing, the Parent shall act as representative of the Company and Parent with respect to any obligation of the Company under any Note Document to deliver a certificate or notice from the Company.

---

[1] To be updated to refer to its successor by merger, if applicable.

4.        **Continuing Validity; Waiver and Amendment; Entire Agreement**.  Except as expressly modified pursuant to Agreement, the terms of the Note Documents remain unchanged and in full force and effect.  Any provision of this Agreement may be amended, waived or modified only by an instrument signed in writing by the Parties and the Note Agent.  This Agreement and the other Note Documents constitute the entire contract among the parties hereto regarding to the subject matters addressed herein and supersede any and all previous agreements, negotiations, and discussions, oral or written, by the parties regarding the subject matters addressed herein.

5.        **Successors and Assigns**.  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties.  Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

6.        **GOVERNING LAW**.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.

7.        **Jurisdiction and Venue; Waiver of Jury Trial; Expenses and Indemnification**.  This Agreement is subject to the provisions of Section 10.3 (Jurisdiction and Venue), Section 10.4 (Waiver of Jury Trial) and Section 10.10(a) (Expenses and Indemnification) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*.

8.        **Notices**.  All communications and notices required or permitted to be given hereunder shall be delivered in accordance with Section 10.8 of the Purchase Agreement.

9.        **Headings; Interpretation**.  Paragraph headings used in this Agreement are included for convenience of reference only and will not modify the provisions that they precede or affect the interpretation of this Agreement or any other Note Document.  The term "including" shall be interpreted to mean "including but not limited to".

10.       **Counterparts**.  This Agreement may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract.  Any counterpart of a signature page to this Agreement may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.

*[Signature page follows]*

2

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

**[PARENT ENTITY]**

By:_____
Name:
Title:


**[CORE SCIENTIFIC HOLDING CO.]**


By:_____
Name:
Title:

Acknowledged and accepted:


**AGENT**:

**U.S. BANK NATIONAL ASSOCIATION,**
as Note Agent [and Collateral Agent]


By: _____
Name:
Title:

## CONVERTIBLE NOTE PURCHASE AGREEMENT

THIS CONVERTIBLE NOTE PURCHASE AGREEMENT (this "*Agreement*") is made as of August 20, 2021, by and among Core Scientific Holding Co., a Delaware corporation (the "*Company*"), the Guarantors from time to time party hereto, the persons and entities named on the Schedule of Purchasers under the header 'Initial Purchasers' attached hereto as Schedule 2 (individually, an "*Initial Purchaser*" and collectively, the "*Initial Purchasers*"), each Additional Purchaser from time to time party hereto and U.S. Bank National Association, as note agent (in such capacity, the "*Note Agent*") and, upon the execution and delivery of the Collateral Documents pursuant to Section 6.13, as collateral agent for the Secured Parties (in such capacity, the "*Collateral Agent*" and, together with the Note Agent, the "*Agents*").

### RECITALS

WHEREAS, the Company desires (i) to issue and to sell to the Initial Purchasers, and the Initial Purchasers have agreed to purchase from the Company, on the Initial Closing Date, convertible promissory notes substantially in the form attached hereto as Exhibit A (each, an "*Initial Note*" and collectively, the "*Initial Notes*") and (ii) to issue and to sell to Additional Purchasers on Additional Closing Dates convertible promissory notes substantially in the form attached hereto as Exhibit A (each, an "*Additional Note*" and collectively, the "*Additional Notes*" and, together with the Initial Notes, individually, a "*Note*" and collectively, the "*Notes*"), in an aggregate principal amount for all such Notes of up to $300,000,000.00 on the terms, and subject to the conditions, specified herein; and

WHEREAS, to induce the Purchasers to purchase the Notes, the Note Parties have agreed to execute and deliver, contemporaneously with the issuance, sale and purchase of the Initial Notes on the Initial Closing Date, the Guaranty, pursuant to which each Guarantor will guarantee the Obligations of the Company under the Notes and, as and when required pursuant to Section 6.13, the Security Agreement, pursuant to which the Note Parties will grant to the Collateral Agent, for the ratable benefit of the Secured Parties, a security interest in the Note Parties' assets to secure the Obligations or their respective Guaranteed Obligations (as applicable).

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, and the representations, warranties, covenants and conditions set forth below, which represent integral components of the transactions contemplated hereby and shall be fully enforceable by the parties hereto, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Note Parties, the Agents and each Purchaser, intending to be legally bound, hereby agree as follows:

1. **DEFINITIONS.**

As used herein, the following terms shall have the meanings set forth below.

(a) "*Act*" means the Securities Exchange Act of 1934, as amended.

(b) "*Additional Closing Date*" has the meaning ascribed thereto in Section 2.2.

(c) "*Additional Note*" or "*Additional Notes*" has the meaning ascribed thereto in Section 2.2.

1

(d)　"***Additional Purchaser***" or "***Additional Purchasers***" has the meaning ascribed thereto in Section 2.2.

(e)　"***Administrative Questionnaire***" means an Administrative Questionnaire substantially in the form attached hereto as Exhibit G.

(f)　"***Agent-Related Person***" means the Note Agent and the Collateral Agent, together with their affiliates, officers, directors, employees, agents and attorneys-in-fact of the Agents and their affiliates.

(g)　"***Agents***" has the meaning ascribed to such term in the preamble to this Agreement.

(h)　"***Asset Disposition***" means any sale, lease, license, transfer, assignment or other disposition (whether by a single transaction or through series of transactions, and including by means of a merger, consolidation, amalgamation or similar transaction) by the Company or any of its Subsidiaries of any asset or property.

(i)　"***Business Day***" means a day other than a Saturday, Sunday or other day on which commercial banks in the City of New York or the Principal Office are authorized or required to close.

(j)　"***Capital Lease***" means any lease of any property by such Person as lessee which would, in accordance with GAAP, be required to be accounted for as a capital lease on the balance sheet of such Person.

(k)　"***Capital Lease Obligations***" means, with respect to any Person, all obligations of such Person under Capital Leases.

(l)　"***Capital Stock***" means (a) any capital stock, partnership, membership, limited liability company, joint venture or other ownership or equity interest or other equivalent, participation or securities (whether voting or non-voting, whether preferred, common or otherwise, whether certificated or uncertificated, and however designated), and (b) any option, warrant, security, appreciation right, profits interests or other right directly or indirectly convertible into or exercisable or exchangeable for, or otherwise to acquire directly or indirectly, any capital stock, partnership, membership, limited liability company, joint venture or other ownership or equity interest, participation or security described in clause (a) above (excluding the Notes and any other Indebtedness convertible or exchangeable into any such capital stock, partnership, membership, limited liability company, joint venture or other ownership or equity interest, participation or security described in clause (a) above unless and to the extent converted or exchanged).

(m)　"***Charter Documents***" means (i) the articles or certificate of incorporation or formation (as applicable), (ii) the by-laws, operating agreement or limited liability company agreement (as applicable) and (iii) other similar organizational and governing documents of any Person, as amended, restated, supplemented or otherwise modified from time to time.

(n)　"***Closing Date***" means the Initial Closing Date or each Additional Closing Date, as the context may require.

(o)　"***Collateral***" means the "Collateral" as defined in the Security Agreement.

(p)     "*Collateral Agent*" has the meaning ascribed to such term in the preamble to this Agreement.

(q)     "*Collateral Documents*" means, collectively, the Security Agreement, the Intellectual Property Security Agreement and each other agreement or writing pursuant to which the Note Parties purport to pledge or grant a security interest in any property or assets securing the Obligations or the Guaranteed Obligations, as applicable, in each case, as amended, restated, supplemented and/or otherwise modified from time to time.

(r)     "*Company Covered Persons*" means those Persons specified in Rule 506(d)(1) promulgated under the Act; provided, however, that Company Covered Persons do not include (a) any Holder or (b) any person or entity that is deemed to be an affiliated issuer of the Company solely as a result of the relationship between the Company and any Holder.

(s)     "*Contractual Obligations*" means as to any Person, any provision of any security issued by such Person or of any agreement, undertaking, contract, indenture, mortgage, deed of trust or other instrument or arrangement (whether in writing or otherwise) to which such Person is a party or by which it or any of such Person's property is bound.

(t)     "*Conversion Event*" has the meaning ascribed to such term in the Notes.

(u)     "*Conversion Securities*" has the meaning ascribed to such term in Section 5.3.

(v)     "*Default*" means any condition or event which with the giving of notice or lapse of time or both would, unless cured or waived, become an Event of Default.

(w)     "*Disqualified Capital Stock*" means any Capital Stock issued by any Person that (a) matures or is mandatorily redeemable pursuant to a sinking fund obligation or otherwise, (b) is or may become redeemable or repurchaseable by such Person at the option of the holder thereof, in whole or in part (other than in connection with an asset sale, change of control or similar event) or (c) is convertible or exchangeable at the option of the holder thereof for Indebtedness or Capital Stock described in this definition, on or prior to, in the case of clause (a), (b) or (c), ninety (90) days after the Maturity Date (as defined in the Notes).

(x)     "*Environmental Laws*" means any and all federal, state, local and foreign statutes, laws, judicial decisions, regulations, ordinances, rules, judgments, orders, decrees, plans, injunctions, Licenses, concessions, grants, franchises, agreements and other governmental restrictions relating to (i) the protection of the environment, (ii) the effect of the environment on human health, (iii) emissions, discharges or releases of pollutants, contaminants, hazardous substances or wastes into surface water, ground water, air or land, or (iv) the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants, hazardous substances or wastes or the clean-up or other remediation thereof, including, without limitation, the Clean Air Act, 42 U.S.C. § 7401 et seq., the Clean Water Act, 33 U.S.C. § 1251 et seq. ("*CWA*"), the Solid Waste Disposal Act (as amended by the Resource Conservation and Recovery Act), 42 U.S.C. § 6901 et seq. ("*RCRA*") and the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq. ("*CERCLA*").

(y)     "*ERISA*" means the Employee Retirement Income Security Act of 1974.

(z)     "*ERISA Affiliate*" means, any person that for purposes of Title I or Title IV of ERISA or Section 412 of the Internal Revenue Code would be deemed at any relevant time to be a "single

3

employer" or otherwise aggregated with the Company or any of its Subsidiaries under Section 414(b), 414(c), 414(m) or 414(o) of the Internal Revenue Code or Section 4001 of ERISA.

(aa)    "*Event of Default*" has the meaning ascribed thereto in the Notes.

(bb)    "*Excluded Subsidiary*" means (i) any Subsidiary that is not a wholly-owned Subsidiary, (ii) any Subsidiary that is not a Material Subsidiary and (iii) any Subsidiary that is (a) a Foreign Subsidiary (as defined in the Security Agreement), (b) a CFC Holdco (as defined in the Security Agreement) or (c) a Subsidiary of a CFC or a CFC Holdco (as defined in the Security Agreement); provided that notwithstanding the foregoing clauses (i) through (iii), the Company may in its sole discretion designate any Excluded Subsidiary as a Guarantor.

(cc)    "*Existing Note Purchase Agreement*" means that certain Senior Secured Convertible Note Purchase Agreement, dated as of April 19, 2021, by and among the Company, the Guarantors from time to time party thereto, the Purchasers (as defined therein) party thereto and U.S. Bank National Association, as note agent and as collateral agent for the Secured Parties (as defined therein), as amended, restated, supplemented and/or otherwise modified from time to time.

(dd)    "*Existing Notes*" means the senior secured convertible promissory notes issued pursuant to the Existing Note Purchase Agreement.

(ee)    "*Existing Secured Note Obligations*" means all "Obligations" under and as defined in the Existing Note Purchase Agreement and any refinancing, refunding, renewal or extension thereof.

(ff)    "*GAAP*" means the United States generally accepted accounting principles in effect as of the date of determination thereof. GAAP will be deemed to treat operating leases and Capital Leases in a manner consistent with the treatment under GAAP as in effect prior to the issuance by the Financial Accounting Standards Board on February 25, 2016 of Accounting Standards Update No. 2016-02.

(gg)    "*Governmental Authority*" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

(hh)    "*Guarantee*" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly and including any obligation, direct or indirect, of the guarantor (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued in support of such Indebtedness or obligation; provided that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business. The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable

amount of the primary obligation in respect of which such Guarantee is made or, if not so stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

(ii)     "*Guaranteed Obligations*" has the meaning ascribed thereto in the Guaranty.

(jj)     "*Guarantor*" means each Subsidiary of the Company party to the Guaranty and each other Subsidiary of a Note Party that becomes a Guarantor under the Note Documents pursuant to Section 6.10..

(kk)     "*Guaranty*" means the Guaranty, dated as the date hereof, made by the Guarantors in favor of the Note Agent, substantially in the form attached hereto as Exhibit C, (as amended, restated, supplemented and/or otherwise modified from time to time).

(ll)     "*Hazardous Materials*" means (i) any "hazardous substance", as defined by CERCLA, (ii) any "hazardous waste", as defined by RCRA, (iii) any petroleum product, (iv) any "pollutant," as defined by the CWA, or (v) contaminant or hazardous, dangerous or toxic chemical, material or substance within the meaning of any other Environmental Law.

(mm)     "*Holder*" or "*Holders*" means, individually and collectively, the holders of the Notes, including the Purchasers.

(nn)     "*Indebtedness*" as applied to any Person, means, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (c) all obligations of such Person in respect of the deferred purchase price of property or services (other than trade payables and accounts payable incurred in the ordinary course of business and any deferred compensation, earn-out, purchase price adjustment or other deferred purchase price obligation which is contingently payable based on the achievement of future financial performance); (d) all obligations of such Person under any conditional sale or other title retention agreement(s) relating to property acquired by such Person, (e) all obligations in respect of Capital Leases of such Person, (f) all obligations, contingent or otherwise, of such Person in respect of letters of credit, banker's acceptances or similar extensions of credit, (g) all Guarantees of such Person of Indebtedness of other Persons that would count as a liability on the balance sheet of such Person in accordance with the GAAP, (h) all Indebtedness of a third party secured by any Lien on any property or asset owned or held by such Person, whether or not such Indebtedness has been assumed by such Person, (i) all obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Disqualified Capital Stock of such Person and (j) all monetary obligations under any receivables factoring, receivables sales, receivable securitization or similar transactions or other off-balance sheet liabilities. The Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture in which such Person is a general partner or a joint venturer, except to the extent that the terms of such Indebtedness provide that such Person is not liable therefor.

(oo)     "*Initial Closing Date*" means August 20, 2021.

(pp)     "*Initial Note*" or "*Initial Notes*" has the meaning ascribed thereto in the recitals to this Agreement.

(qq)     "*Initial Purchaser*" or "*Initial Purchasers*" has the meaning ascribed thereto in the preamble to this Agreement.

5

(rr)   "***Intellectual Property***" means all intellectual and similar property of a Person, including inventions, designs, patents, copyrights, trademarks, service marks, trade names, trade secrets, confidential or proprietary information, customer lists, know-how, software and databases.

(ss)   "***Intellectual Property Security Agreement***" means the Intellectual Property Security Agreement, to be made by the applicable Note Parties in favor of the Collateral Agent, substantially in the form attached hereto as <u>Exhibit E</u> (as amended, restated, supplemented and/or otherwise modified from time to time).

(tt)   "***Intercreditor Agreement***" has the meaning ascribed thereto in Section 7.1(a).

(uu)   "***Ledger***" shall have the meaning ascribed thereto in the Notes.

(vv)   "***Licenses***" means all licenses, permits, authorizations, determinations, and registrations issued by any Governmental Authority to the Company or any Subsidiary in connection with the conduct of its business.

(ww)   "***Lien***" means any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing.

(xx)   "***Material Adverse Effect***" means, individually or in the aggregate, (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties or financial condition of the Company and its Subsidiaries taken as a whole; (b) a material impairment of the ability of the Note Parties to perform their obligations under the Note Documents or, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, the rights and remedies of the Secured Parties under the Note Documents; (c) a material adverse effect upon the legality, validity, binding effect or enforceability against the Note Parties of any Note Document; or (d) from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, a material adverse effect on the Liens in favor of the Collateral Agent (for the benefit of the Secured Parties) on the Collateral or the priority of such Liens.

(yy)   "***Material Subsidiary***" mean each Subsidiary which, as of the most recent fiscal quarter of the Company, for the period of four consecutive fiscal quarters of the Company then last ended (taken as one accounting period) in respect of which financial statements were (or were required to be) delivered pursuant to <u>Sections 6.1(a)</u> or <u>(b)</u>, as applicable (a "***Test Period***"), had Total Assets as of the last day of such Test Period that were in excess of 10% of the Total Assets of the Company and its Subsidiaries as of such date.

(zz)   "***Multiemployer Plan***" means any "multiemployer plan" as defined in Section 4001(a)(3) of ERISA, which is contributed to by (or to which there is or may be an obligation to contribute of) the Company, any of its Subsidiaries or an ERISA Affiliate, and each such plan for the five-year period immediately following the latest date on which the Company, any of its Subsidiaries or an ERISA Affiliate contributed to or had an obligation to contribute to such plan.

(aaa)   "***Note***" or "***Notes***" has the meaning ascribed thereto in the recitals to this Agreement.

(bbb)   "***Note Documents***" means, collectively, this Agreement, each Note, the Guaranty, each Collateral Document (if applicable), the fee schedule delivered from the Agents to the Company in connection with this Agreement, the Intercreditor Agreement (if applicable), and any other document,

6

agreement or instrument which has or will be executed by or for the benefit of the Holders in connection with such agreements and the transactions described therein, each as may be amended, restated, supplemented/and or otherwise modified from time to time.

(ccc) "*Note Party*" or "*Note Parties*" means, individually and collectively, the Company and the Guarantors. From and after a Parent Entity assumes or otherwise becomes a co-obligor with respect to the Company's Obligations in connection with a SPAC pursuant to Section 6.13, each reference to "Note Party" shall be deemed to include a reference to a Parent Entity.

(ddd) "*Obligations*" means all advances to, and debts, liabilities (including without limitation (x) prepayment premiums (if any) and other premiums payable under the Notes (if any), including all or any portion of the Repayment Amount (as defined in the Notes), if applicable, (y) accrued and unpaid interest and (z) capitalized interest), obligations, fees, expenses, indemnities, covenants and duties of, the Note Parties arising under any Note Document or otherwise with respect to any Note, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against the Note Parties of any proceeding under any debtor relief laws naming any Note Party as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims or allowable in such proceeding.

(eee) "*OFAC*" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

(fff) "*Parent Entity*" has the meaning ascribed thereto in the definition of SPAC.

(ggg) "*PBGC*" mean the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor thereto).

(hhh) "*Permitted Lien*" means:

(i) from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, Liens in favor of Collateral Agent for the benefit of Secured Parties granted pursuant to the Note Documents;

(ii) Liens set forth on Schedule 5.17 existing as of the Initial Closing Date;

(iii) Liens for taxes if obligations with respect to such taxes either (i) are not due and payable, (ii) are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and adequate reserves have been made in accordance with GAAP or (iii) could not reasonably be excepted to have a Material Adverse Effect;

(iv) statutory Liens of landlords, banks (and rights of set-off), of carriers, warehousemen, mechanics, repairmen, workmen and materialmen, and other Liens imposed by law (other than any such Lien imposed pursuant to Section 401 (a)(29) or 412(n) of the Internal Revenue Code or by the Employee Retirement Income Security Act of 1974), in each case incurred in the ordinary course of business (i) for amounts not yet overdue, or (ii) for amounts that are overdue and that (in the case of any such amounts overdue for a period in excess of five (5) days) are being contested in good faith by appropriate proceedings, so long as such reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made for any such contested amounts;

7

(v)     Liens incurred in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, trade contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money or other indebtedness), so long as (x) no foreclosure, sale or similar proceedings have been commenced with respect to any portion of the Collateral on account thereof and (y) adequate reserves required by GAAP shall have been set aside therefor;

(vi)     easements, rights-of-way, restrictions, encroachments, and other minor defects or irregularities in title, in each case which do not and will not have a Material Adverse Effect;

(vii)     any interest or title of a lessor or sublessor under any lease of real estate permitted hereunder;

(viii)     Liens solely on any cash earnest money deposits made by the Company in connection with any letter of intent or purchase agreement permitted hereunder;

(ix)     purported Liens evidenced by the filing of precautionary UCC financing statements relating solely to operating leases of personal property entered into in the ordinary course of business;

(x)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods used in the ordinary course of business;

(xi)     any zoning or similar law or right reserved to or vested in any governmental office or agency to control or regulate the use of any real property;

(xii)     licenses of patents, trademarks and other Intellectual Property rights granted by the Company in the ordinary course of business;

(xiii)     Liens securing obligations of the Company incurred under leases (but not securing indebtedness for borrowed money) in the form of cash deposits made in the ordinary course of business;

(xiv)     Liens arising in favor of depository institutions as a result of set-off rights or otherwise securing obligations owed to such depository institution in connection with bank services provided to the Company or its Subsidiaries;

(xv)     Liens on cash deposits securing obligations owed to an issuer of a letter of credit at the request of the Company of any of its Subsidiaries;

(xvi)     Liens on any assets of the Note Parties securing any Indebtedness, including Capital Lease Obligations, incurred to finance the acquisition of any fixed or capital assets (including any real property assets) so long as such Liens encumber only the assets acquired or financed with the proceeds of such Indebtedness and do not attach to any other assets of any Note Party;

(xvii)     Liens on cash deposit accounts and cash and cash equivalents delivered or pledged to secure letters of credit;

(xviii)   Liens on Indebtedness permitted to be incurred in reliance on Section 7.01(a);

(xix)   Liens arising from judgments for the payment of money in circumstances not constituting an Event of Default; and

(xx)   Liens on the Collateral securing the Existing Secured Note Obligations.

(iii)   "**Permitted Transferees**" means, (x) as to any Purchaser that is a limited or general partnership or a trust, to its partners (whether general or limited, including retired partners) or beneficiaries and to affiliated partnerships managed by the same management company or managing (general) partner or by an entity which directly or indirectly controls, is controlled by, or is under common control with, such management company or managing or general partner, or member (or retired member) of such Purchaser in accordance with limited liability company interests and (y) as to any other Purchaser, an entity which directly or indirectly controls, is controlled by, or is under common control with such Purchaser.

(jjj)   "**Person**" (regardless of whether capitalized) means any natural person, entity, or association, including without limitation any corporation, partnership, limited partnership, limited liability company, government (or agency or subdivision thereof), trust, joint venture, or proprietorship.

(kkk)   "**Plan**" means any "employee benefit plan" as defined in Section 3 of ERISA (other than a Multiemployer Plan) maintained or contributed to by any Note Party or any ERISA Affiliate or to which a Note Party or any ERISA Affiliate has or may have an obligation to contribute, and each such plan that is subject to Title IV of ERISA for the five-year period immediately following the latest date on which a Note Party or any ERISA Affiliate maintained, contributed to or had an obligation to contribute to (or is deemed under Section 4069 of ERISA to have maintained or contributed to or to have had an obligation to contribute to, or otherwise to have liability with respect to) such plan.

(lll)   "**Principal Office**" means the Note Agent's office, address or bank account as from time to time designated in writing by the Note Agent to the Company and each Holder, which shall initially be the office designated on the Note Agent's signature page to this Agreement.

(mmm)   "**Pro Rata Share**" means, as to any Holder at any time, the ratio at such time of (x) the aggregate principal amount of the Notes held by such Holder to (y) the aggregate outstanding principal amount of all Notes issued hereunder.

(nnn)   "**Purchaser**" or "**Purchasers**" means, individually and collectively, the Initial Purchasers and the Additional Purchasers, as the context may require.

(ooo)   "**Reportable Event**" means any of the events set forth in Section 4043(c) of ERISA with respect to a Plan, other than those events as to which the thirty-day notice period is waived under subsection .22, .23, .25, .27, .28, .29, .30, .31, .32, .34, or .35 of PBGC Regulation Section 4043.

(ppp)   "**Required Holders**" means Holders representing more than fifty percent (50%) of the aggregate outstanding principal amount of the Notes (including all accrued PIK Interest) issued pursuant to this Agreement at the relevant time of reference.

(qqq)   "**Requirements of Law**" means as to any Person, provisions of the Charter Documents of such Person, or any law, treaty, code, rule, regulation, right, privilege, qualification,

License or franchise, or any determination of an arbitrator or a court or other Governmental Authority, in each case applicable to such Person or any of such Person's property or to which such Person or any of such Person's property is subject or pertaining to any or all of the transactions contemplated or referred to in the Note Documents, including, but not limited to the Fair Credit Reporting Act, the Gramm-Leach-Bliley Act, the Federal Trade Commission Act and comparable state laws, the Telephone Consumer Protection Act, the Telemarketing and Consumer Fraud and Abuse Prevention Act, the CAN-SPAM Act, the Electronic Fund Transfer Act, the U.S. Card Act, and any similar laws and regulations in Canada, including federal and provincial laws.

(rrr)    "**_Responsible Officer_**" means the chief financial officer, general counsel, secretary, controller or other authorized officer of the Note Parties set forth on an incumbency certificate delivered to the Note Agent from time to time.

(sss)    "**_Restricted Payment_**" means as to any Person (i) any dividend or other distribution (whether in cash, Capital Stock or other property) with respect to or on account of any shares of any Capital Stock of such Person or (ii) any payment by such Person on account of the purchase, redemption, retirement, defeasance, surrender, cancellation, termination or acquisition of any Capital Stock of such Person or any claim respecting the purchase or sale of any Capital Stock of such Person.

(ttt)    "**_Sanctioned Entity_**" means (a) an agency of the government of, (b) an organization directly or indirectly controlled by, or (c) a person resident in a country that is subject to a sanctions program identified on the list maintained by OFAC and available at http://www.treas.gov/offices/enforcement/ofac/programs, or as otherwise published from time to time as such program may be applicable to such agency, organization or person.

(uuu)    "**_Sanctioned Person_**" means a person named on the list of Specially Designated Nationals or Blocked Persons maintained by OFAC available at http://www.treas.gov/offices/enforcement/ofac/sdn/index.html, or as otherwise published from time to time.

(vvv)    "**_Secured Debt Cap_**" has the meaning ascribed thereto in Section 7.1(a).

(www)    "**_Secured Party_**" or "**_Secured Parties_**" means, individually and collectively, upon the execution and delivery of the Collateral Documents pursuant to Section 6.13, the Purchasers, Holders, the Agents, and their respective successors and permitted assigns.

(xxx)    "**_Securities_**" has the meaning ascribed thereto in Section 8.1.

(yyy)    "**_Security Agreement_**" means the Security Agreement, to be made by the Note Parties in favor of the Collateral Agent, for the benefit of the Secured Parties, substantially in the form attached hereto as Exhibit D (as amended, restated, supplemented and/or otherwise modified from time to time).

(zzz)    "**_Single Employer Plan_**" shall mean any Plan that is covered by Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, other than a Multiemployer Plan, that is maintained or contributed to by the Company or any Commonly Controlled Entity or to which the Company or a Commonly Controlled Entity has or may have an obligation to contribute, and such plan for the six-year period immediately following the latest date on which the Company or a Commonly Controlled Entity maintained, contributed to or had an obligation to contribute to (or is deemed under Section 4069 of ERISA to have maintained or contributed to or to have had an obligation to contribute to, or otherwise to have liability with respect to) such plan. For the purposes of this definition, "**_Commonly_**

*Controlled Entity*" means a person or an entity, whether or not incorporated, that is under common control with the Company within the meaning of Section 4001 of ERISA or is part of a group that includes the Company and that is treated as a single employer under Section 414 of the Code.

(aaaa)  "*Solvent*" means, with respect to any Person, that such Person (i) owns and will own assets the fair saleable value of which are greater than the amount that will be required to pay the probable liabilities of its then existing debts as they become absolute and matured considering all financing alternatives and potential asset sales reasonably available to it, (ii) has capital that is not unreasonably small in relation to its business as presently conducted or after giving effect to any contemplated transaction and (iii) does not intend to incur and does not believe that it will incur debts beyond its ability to pay such debts as they become due. In computing the amount of contingent or unliquidated liabilities at any time, such liabilities shall be computed at the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

(bbbb)  "*SPAC*" means a transaction, including, without limitation, the XPDI Transaction, involving a publicly listed special purpose acquisition company that, upon the consummation thereof, shall be the direct or indirect parent company of Core Scientific Holding Co. (or of the successor by merger to Core Scientific Holding Co.) (such parent company, a "*Parent Entity*"). The Company shall promptly notify the Agents in writing upon the occurrence of a SPAC or the XPDI Transaction.

(cccc)  "*Subsidiary*" means, with respect to any Person, any other Person of which an aggregate of more than fifty percent (50%) of the outstanding Capital Stock having ordinary voting power to elect a majority of the board of directors of such other Person is at the time, directly or indirectly, owned legally or beneficially by such Person or one or more Subsidiaries of such Person, or a combination thereof, or with respect to which any such Person has the right to vote or designate the vote of more than fifty percent (50%) of such Capital Stock whether by proxy, agreement, operation of law or otherwise. Unless the context otherwise requires, each reference to a Subsidiary shall mean a Subsidiary of the Company.

(dddd)  "*Taxes*" means any present or future United States federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp occupation, premium, windfall profits, environmental (including taxes under former Code §59A), customs duties, capital stock, franchise profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on-minimum, estimated, or other taxes, levies, assessments, fees or other charges imposed by any Governmental Authority, including any interest, penalty, or addition thereto, whether disputed or not.

(eeee)  "*Total Assets*" shall mean the total assets of the Company and its Subsidiaries on a consolidated basis, as shown on the applicable consolidated balance sheet of the Company and its Subsidiaries and computed in accordance with GAAP. Total Assets shall be calculated after giving effect to the transaction giving rise to the need to calculate Total Assets.

(ffff)  "*UCC*" means Uniform Commercial Code.

(gggg)  "*Unfunded Pension Liability*" of any Plan means the amount, if any, by which the value of the accumulated plan benefits under the Plan, determined on a plan termination basis in accordance with actuarial assumptions at such time consistent with those prescribed by the PBGC for purposes of Section 4044 of ERISA, exceeds the fair market value of all Plan assets allocable to such liabilities under Title IV of ERISA (excluding any accrued but unpaid contributions).

11

(hhhh)  "*XPDI Transaction*" means the transactions contemplated by the Agreement and Plan of Merger and Reorganization, dated as of July 20, 2021, by and among Power & Digital Infrastructure Acquisition Corp., a Delaware corporation ("*XPDI*"), XPDI Merger Sub Inc., a Delaware corporation and wholly owned subsidiary of XPDI, XPDI Merger Sub 2, LLC, a Delaware limited liability company and wholly owned subsidiary of XPDI, and the Company, as amended, restated, supplemented and/or otherwise modified from time to time.

2.    TERMS OF THE CONVERTIBLE PROMISSORY NOTES.

2.1    **The Initial Notes**.

Subject to the satisfaction (or waiver in accordance with Section 10.9) of the conditions precedent set forth in Section 4.1, the Company shall issue and sell to each Initial Purchaser, and each Initial Purchaser shall purchase from the Company, an Initial Note on the Initial Closing Date in a principal amount equal to the amount opposite such Initial Purchaser's name set forth in the Schedule of Purchasers under the header 'Initial Purchasers' attached hereto as Schedule 2. By no later than 11:00 a.m. (New York time) on the Initial Closing Date (i) each Initial Purchaser shall wire transfer same day funds in U.S. dollars, at the Note Agent's Principal Office, in the amount of such Initial Purchaser's Initial Note and (ii) the Company shall issue and deliver to each such Initial Purchaser an Initial Note in favor of such Initial Purchaser payable in the principal amount of such Initial Purchaser's Initial Note.

2.2    **The Additional Notes**.

(a) Subject to the satisfaction (or waiver in accordance with Section 10.9) of the conditions precedent set forth in Section 4.2, at any time and from time to time after the Initial Closing Date, the Company shall issue and sell to each Person that executes a counterpart signature page to this Agreement in the form attached hereto as Exhibit B (individually, an "*Additional Purchaser*" and collectively, the "*Additional Purchasers*"), and each such Additional Purchaser shall purchase from the Company, an Additional Note in a principal amount to be mutually agreed between such Additional Purchaser and the Company. Each additional issuance, sale and purchase of Additional Notes as provided in this Section 2.2 shall take place on a date to be mutually agreed by the Company and such Additional Purchaser (each, an "*Additional Closing Date*"); provided that (i) each Additional Closing Date shall have occurred on or prior to December 31, 2021, (ii) all issuances, sales and purchases of Additional Notes on an Additional Closing Date shall be made on substantially identical terms and conditions as the Initial Notes, shall, to the extent permitted by law, be fungible for tax purposes with the Initial Notes and may only be amended pursuant to Section 10.9; (iii) the purchase price of each Additional Note shall be increased by the PIK Interest (as defined in the Note) and Cash Interest (as defined in the Note) that has accrued since the Initial Closing Date on the Initial Notes (it being understood and agreed that interest on all the Notes shall accrue PIK Interest and be payable on the same dates) and (iv) in no event shall the initial aggregate principal amount of all Notes issued hereunder exceed $300,000,000.00.

(b)    Any Additional Notes issued, sold and purchased pursuant to this Section 2.2 shall be deemed to be "Notes" for all purposes under this Agreement. By no later than 11:00 a.m. (New York time) on an Additional Closing Date (i) each Additional Purchaser shall wire transfer same day funds in U.S. dollars, at the Note Agent's Principal Office, in the amount of such Additional Purchaser's Additional Note and (ii) the Company shall issue and deliver to each such Additional Purchaser an Additional Note in favor of such Additional Purchaser payable in the principal amount of such Additional Purchaser's Additional Note. The Schedule of Purchasers may be amended by the Company without the consent of the Purchasers to include any Additional Purchasers upon the execution by such Additional Purchasers of a counterpart signature page hereto in the form attached hereto as Exhibit B.

3.      SECURITY.

To secure the performance and payment in full of the Obligations and the Guaranteed Obligations, as applicable, each Note Party shall grant to the Collateral Agent, for the benefit of the Secured Parties, a first-priority Lien on the Collateral (subject to Permitted Liens) pursuant to the Security Agreement, as and when required pursuant to Section 6.13.

4.      CONDITIONS PRECEDENT TO EACH CLOSING DATE.

4.1     **Conditions Precedent to the Initial Closing Date**.

The obligation of the Company to issue and to sell, and of each Initial Purchaser to purchase, Initial Notes on the Initial Closing Date are subject to the satisfaction (or waiver in accordance with Section 10.9) of the following conditions precedent on or prior to the Initial Closing Date:

(a)     receipt by each Initial Purchaser of counterparts to this Agreement, the Guaranty and the Initial Notes;

(b)     receipt by each Initial Purchaser of a certificate signed by a Responsible Officer of each Note Party attaching (i) true, correct and complete copies of the Charter Documents of each Note Party as in effect on the Initial Closing Date, certified, with respect to the Charter Documents set forth in clause (ii) of the definition thereof, as of a recent date by the Secretary of State of the state of incorporation or organization (as applicable) of such Note Party, (ii) a certificate of good standing of each Note Party, certified as of a recent date by the Secretary of State of the state of incorporation or organization (as applicable) of such Note Party, (iii) the names of the Responsible Officers of each Note Party authorized to sign the Note Documents and their true signatures and (iv) true, correct and complete copy of resolutions duly adopted by the board of directors or similar governing body of each Note Party authorizing the execution, delivery and performance of this Agreement and the other Note Documents;

(c)     receipt by each Initial Purchaser of a certificate of solvency, executed by the chief financial officer (or equivalent) of the Company, substantially in the form attached hereto as Exhibit F;

(d)     receipt by each Initial Purchaser of a certificate signed by a Responsible Officer of the Company certifying that the condition specified in clause (j) of this Section 4.1 has been satisfied;

(e)     the Initial Purchasers and the Agents shall have received an opinion of Cooley LLP, counsel to the Company, in form and substance reasonably satisfactory to the Initial Purchasers;

(f)     all authorizations, consents, approvals or permits, if any, of any governmental authority or regulatory body that are required in connection with the lawful issuance and sale of the Initial Notes pursuant to this Agreement shall have been duly obtained and shall be effective on and as of the Initial Closing Date;

(g)     there shall be no claim, action, suit, investigation, litigation or proceeding, pending or, to the knowledge of the Company and its Subsidiaries, threatened, in any court or before any governmental authority with respect to the Note Documents or any transactions contemplated thereby or hereby;

(h)     the representations and warranties made pursuant to Section 5 hereof shall be true and correct in all material respects (or if a representation or warranties is qualified by materiality or

13

material adverse effect, in all respects) on and as of the Initial Closing Date with the same effect as though made on and as of such date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects (or if a representation or warranties is qualified by materiality or material adverse effect, in all respects) on and as of such earlier date;

(i)        immediately before and after giving effect to the issuance of the Initial Notes on the Initial Closing Date, no Event of Default shall exist;

(j)        the Company shall have paid all outstanding fees and expenses of the Agents, Shipman & Goodwin LLP, counsel to the Agents, and as otherwise required pursuant to Section 10(a);

(k)        receipt by the Company and the Note Agent of an Administrative Questionnaire and executed copies of IRS Form W-9 or appropriate IRS Form W-8, as applicable, as well as any reasonably necessary supporting information, certifying that payments to the Initial Purchasers under the Initial Notes are exempt from U.S. federal withholding Tax; and

(l)        the Company shall have delivered to the Initial Purchasers such other documents and instruments relating to the transactions contemplated by this Agreement as the Initial Purchasers or their counsel may reasonably request (which request shall have been made no later than 3 days prior to the Initial Closing Date).

**4.2        Conditions Precedent to each Additional Closing Date**.

The obligation of the Company to issue and to sell, and of each Additional Purchaser to purchase, Additional Notes on an Additional Closing Date are subject to the satisfaction (or waiver in accordance with Section 10.8) of the following conditions precedent on or prior to each such Additional Closing Date:

(a)        each Additional Purchaser shall have received copies of each of the documents set forth in clauses (a) through (e) and clause (l) of Section 4.1 delivered to the Initial Purchasers on the Initial Closing Date;

(b)        the representations and warranties made pursuant to Section 5 hereof shall be true and correct in all material respects (or if a representation or warranties is qualified by materiality or material adverse effect, in all respects) on and as of the applicable Additional Closing Date with the same effect as though made on and as of such date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects (or if a representation or warranties is qualified by materiality or material adverse effect, in all respects) on and as of such earlier date;

(c)        immediately before and after giving effect to the issuance of Additional Notes on the applicable Additional Closing Date, no Event of Default (as defined in the Notes) shall exist; and

(d)        receipt by the Company and the Note Agent of an Administrative Questionnaire and of executed copies of IRS Form W-9 or appropriate IRS Form W-8, as applicable, as well as any reasonably necessary supporting information, certifying that payments to the Additional Purchasers under Additional Notes are exempt from U.S. federal withholding Tax.

14

5.      **REPRESENTATIONS AND WARRANTIES OF THE NOTE PARTIES.**

Each Note Party hereby represents and warrants to each Initial Purchaser and the Agents as of the Initial Closing Date and to each Additional Purchaser and the Agents as of the applicable Additional Closing Date as follows:

5.1      **Organization, Good Standing and Qualification**.

(a)      *Organization; Good Standing; Qualification.* Each Note Party and each of its Subsidiaries: (i) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation, (ii) has all requisite corporate or limited liability company power and authority to own and operate its property, to lease the property it operates as lessee and to conduct the business in which it is currently, or is currently proposed to be, engaged; (iii) is duly qualified as a foreign entity, licensed and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification, except where the failure to be so qualified could not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect and (iv) has the corporate or limited liability company power and authority to execute, deliver and perform its obligations under each Note Document to which it is or will be a party and to borrow hereunder. Each Note Party's present name, former names within the last five (5) years (if any), owned and leased locations, place of formation, tax identification number and organizational identification number are correctly set forth in Schedule 5.1 hereto, as may be updated by the Company from time to time in a written notice provided to the Note Agent after the Initial Closing Date.

(b)      *Collateral.* Except for the Liens granted under the Security Agreement, each Note Party shall be the sole legal and equitable owner of each item of Collateral in which it purports to grant a security interest under the Security Agreement upon the execution and delivery thereof pursuant to Section 6.13, having good and marketable title thereto, free and clear of any and all Liens except for Permitted Liens and, upon filing of UCC financing statements in the UCC filing office applicable to such Note Party, the Collateral Agent shall have a perfected security interest in the Collateral, which such security interest shall be senior to all other Liens (other than Permitted Liens) to the extent the same can be perfected by filing.

5.2      **Corporate Power; No Contravention**. The execution, delivery and performance by the Company and each Subsidiary of each Note Document to which it is or will be a party and the consummation of the transactions contemplated hereby: (a) have been duly authorized by all necessary corporate or limited liability company action; (b) do not and will not contravene or violate the terms of the Charter Documents of the Company or any of its Subsidiaries or any amendment thereto or any material Requirement of Law applicable to the Company or such Subsidiary or the Company's or such Subsidiary's assets, business or properties; (c) do not and will not (i) conflict with, contravene, result in any violation or breach of or default under any material Contractual Obligation of the Company or such Subsidiary (with or without the giving of notice or the lapse of time or both) other than any right to consent, which consents have been obtained, (ii) create in any other Person a right or claim of termination or amendment of any material Contractual Obligation of the Company or such Subsidiary, or (iii) require modification, acceleration or cancellation of any material Contractual Obligation of the Company or such Subsidiary; and (d) do not and will not result in the creation of any Lien (or obligation to create a Lien) against any property, asset or business of the Company or such Subsidiary (other than those securing the Notes from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13).

5.3      **Authorization.** All corporate action on the part of the Company, its Subsidiaries and their respective directors and stockholders necessary for the authorization, execution, delivery and performance of this Agreement by the Company and its Subsidiaries and the performance of the

15

Company's obligations hereunder, including the issuance and delivery of the Notes and the reservation of the equity securities issuable upon conversion of the Notes (collectively, the "***Conversion Securities***") has been taken or will be taken prior to the issuance of such Conversion Securities. This Agreement and the Note Documents, when executed and delivered by the Note Parties, shall constitute valid and binding obligations of the Note Parties enforceable in accordance with their terms, subject to laws of general application relating to bankruptcy, insolvency, the relief of debtors and general principles of equity and, with respect to rights to indemnity, subject to federal and state securities laws. The Conversion Securities, when issued in compliance with the provisions of this Agreement or the Notes will be validly issued, fully paid and nonassessable and free of any Liens and issued in compliance with all applicable federal and state securities laws.

5.4     **Governmental Consents**. All consents, approvals, orders, or authorizations of, or registrations, qualifications, designations, declarations, or filings with, any Governmental Authority, required on the part of the Note Parties in connection with the valid execution and delivery of this Agreement and the other Note Documents, the offer, sale or issuance of the Notes and the Conversion Securities issuable upon conversion of the Notes and the consummation of any other transaction contemplated hereby shall have been obtained and will be effective on the Initial Closing Date.

5.5     **Compliance with Laws**.

(a)     No Note Party is in violation of any Requirements of Law, any applicable statute, rule, regulation, order or restriction of any domestic government or any instrumentality or agency thereof in respect of the conduct of its business or the ownership of its properties, which violation of which would materially and adversely affect the business, assets, liabilities, financial condition or operations of the Note Parties (individually and in the aggregate).

(b)     Neither the Company nor any of its Subsidiaries is registered or required to register as an "investment company" or a company "controlled" by an "investment company" under the Investment Company Act of 1940, as amended. Neither the Company nor any of its Subsidiaries is engaged as one of its important activities in extending credit for margin stock (under Regulations X, T and U of the Federal Reserve Board of Governors). The Company and each of its Subsidiaries has complied in all material respects with applicable provisions of the Federal Fair Labor Standards Act. Neither the Company nor any of its Subsidiaries is a "holding company" or an "affiliate" of a "holding company" or a "subsidiary company" of a "holding company" as each term is defined and used in the Public Utility Holding Company Act of 2005. Neither the Company's nor any of its Subsidiaries' properties or assets has been used by the Company or such Subsidiary or, to Company's knowledge, by previous Persons, in disposing, producing, storing, treating, or transporting any hazardous substance other than in material compliance with applicable laws. The Company and each of its Subsidiaries has obtained all consents, approvals and authorizations of, made all declarations or filings with, and given all notices to, all Governmental Authorities that are necessary to continue their respective businesses as currently conducted, except to the extent that the failure to obtain, make or give any of the foregoing would not reasonably be expected to have a Material Adverse Effect.

(c)     Neither the Company nor any Subsidiary (i) is a Sanctioned Person, (ii) has any assets in Sanctioned Entities, or (iii) derives any operating income from investments in, or transactions with Sanctioned Persons or Sanctioned Entities. The proceeds of the Notes will not be used and have not been used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity.

(d)     The Company and its Subsidiaries are in compliance, in all material respects, with any United States Requirements of Law relating to terrorism, sanctions or money laundering (the "Anti-

Terrorism Laws"), including the United States Executive Order No. 13224 on Terrorist Financing (the "***Anti-Terrorism Order***") and the Patriot Act. No part of the proceeds of any Note will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended or any other Anti-Terrorism Law.

(e)     No Note Party and no Subsidiary of any Note Party (i) is listed in the annex to, or is otherwise subject to the provisions of, the Anti-Terrorism Order, (ii) is owned or controlled by, or acting for or on behalf of, any person listed in the annex to, or is otherwise subject to the provisions of, the Anti-Terrorism Order or (iii) commits, threatens or conspires to commit or supports "terrorism" as defined in the Anti-Terrorism Order.

(f)     None of the funds to be provided under this Agreement will be used, directly or indirectly, (i) for any activities in violation of any applicable anti-money laundering, economic sanctions and anti-bribery laws and regulations laws and regulations or (ii) for any payment to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

**5.6     Compliance with Other Instruments**. The Company is not in violation or default of any term of its articles of incorporation, or of any provision of any mortgage, indenture or contract to which it is a party and by which it is bound or of any judgment, decree, order or writ, other than such violation(s) that would not have a Material Adverse Effect on the Company. The execution, delivery and performance of this Agreement and the other Note Documents, and the consummation of the transactions contemplated hereby and thereby will not result in any material violation or be in conflict with, or constitute, with or without the passage of time and giving of notice, either a default under any such material provision, instrument, judgment, decree, order or writ or an event that results in the creation of any material Lien upon any assets of the Company or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization or approval applicable to the Company, its business or operations or any of its material assets or properties. Without limiting the foregoing, the Company has obtained all waivers reasonably necessary with respect to any preemptive rights, rights of first refusal or similar rights, including any notice or offering periods provided for as part of any such rights, in order for the Company to consummate the transactions contemplated hereunder without any third party obtaining any rights to cause the Company to offer or issue any securities of the Company as a result of the consummation of the transactions contemplated hereunder.

**5.7     Solvency.** As of the Initial Closing Date both immediately before and after giving effect to the transactions contemplated by the Note Documents, the Company is individually, and the Company and its Subsidiaries on a consolidated basis are, Solvent.

**5.8     Offering**. The offer, issue, and sale of the Notes and the Conversion Securities are and will be exempt from the registration and prospectus delivery requirements of the Act, and no qualification under the Trust Indenture Act of 1939, as amended, and the rules and regulations of the Securities and Exchange Commission promulgated thereunder is required in connection with, the issuance of the Notes and the Conversion Securities.

**5.9     No "Bad Actor" Disqualification**. The Company has exercised reasonable care to determine whether any Company Covered Person (as defined below) is subject to any of the "bad actor" disqualifications described in Rule 506(d)(1)(i) through (viii), as modified by Rules 506(d)(2) and (d)(3), under the Act ("***Disqualification Events***"). To the Company's knowledge, no Company Covered Person

is subject to a Disqualification Event. The Company has complied, to the extent required, with any disclosure obligations under Rule 506(e) under the Act.

**5.10    Litigation**. There are no legal actions, suits, proceedings, claims or disputes pending or, to the knowledge of any Note Party, threatened in writing, at law, in equity, in arbitration or before any Governmental Authority against or affecting the Company or its Subsidiaries that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; (b) there is no injunction, writ, temporary restraining order, decree or any order or determination of any nature by any arbitrator, court or other Governmental Authority purporting to enjoin or restrain the execution, delivery or performance of the Note Documents or which relates to the assets or the business of the Company or its Subsidiaries; and (c) there is no litigation, claim, audit, dispute, review, proceeding or investigation currently pending or threatened in writing against the Company or its Subsidiaries for any violation or alleged violation of any Requirements of Law, and neither the Company nor any Subsidiary has received written notice of any threat of any suit, action, claim, dispute, investigation, review or other proceeding pursuant to or involving any Requirements of Law.

**5.11    Taxes**.

(a)    Except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect, the Company and each of its Subsidiaries has timely filed all United States federal and state income and other material tax returns that it was required to file, in each case with due regard for any extension of time within which to file such tax return. Except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect, all Taxes due and payable by the Company or its Subsidiaries have been paid, in each case with due regard for any extension of time within which to file such tax return, other than any Taxes the amount or validity of which is being actively contested by Company or its Subsidiaries in good faith and by appropriate proceedings and with respect to which adequate reserves or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made or provided therefor. There are no Liens, other than Permitted Liens, on any of the assets of the Company or its Subsidiaries that arose in connection with any failure (or alleged failure) to pay any Tax. To the knowledge of the Company, no claim has been made by a Governmental Authority in a jurisdiction where the Company and its Subsidiaries do not file tax returns that the Company or any of its Subsidiaries is or may be subject to taxation by that jurisdiction that could reasonably be expected to have a Material Adverse Effect.

(b)    There is no action, suit, proceeding, investigation, examination, audit, or claim now pending or, to the knowledge of the Company, threatened in writing by any Governmental Authority regarding any Taxes relating to the Company or its Subsidiaries that could reasonably be expected to have a Material Adverse Effect.

**5.12    Financial Condition**.    The Note Parties have furnished the Purchasers with true, correct and complete copies of (i) the audited consolidated balance sheets of the Company and its Subsidiaries as of December 31, 2018, 2019 and 2020 and the related consolidated statements of income or operations, shareholders' equity and cash flows for each such fiscal year and (ii) the unaudited consolidated balance sheets of the Company and its Subsidiaries as of March 31, 2021 and the related consolidated statements of income or operations and cash flows for such fiscal quarter (collectively, the "***Financial Statements***"). The Financial Statements fairly present, in all material respects, the financial position of the Company and its Subsidiaries on a consolidated basis, as of the respective dates thereof, and the results of operations and cash flows thereof, as of the respective dates or for the respective periods set forth therein, and are in conformity with the past historical practices of the Note Parties, with GAAP consistently applied during the periods involved. As of the dates of the Financial Statements, neither the Company nor any Subsidiary had any known obligation, Indebtedness or liability (whether accrued, absolute, contingent

18

or otherwise, and whether due or to become due), which was not reflected or reserved against in the balance sheets which are part of the Financial Statements, except for those incurred in the ordinary course of business and which are fully reflected on the books of account of the Company or its Subsidiaries, as applicable.

5.13    **Subsidiaries**.   Except as set forth on Schedule 5.13, the Company does not have any Subsidiaries.

5.14    **Capitalization**. As of the Initial Closing Date, without giving effect to the transactions contemplated hereby and in the other Note Documents, the outstanding capitalization of the Company and its Subsidiaries is as set forth on Schedule 5.14.  All of the issued and outstanding Capital Stock of the Company has been, and Capital Stock of the Company issuable upon the exercise of outstanding securities when issued will be, duly authorized and validly issued and are fully paid and nonassessable. All outstanding Capital Stock of the Company's Subsidiaries are 100% owned by the Company or one of its Subsidiaries free and clear of all Liens other than Permitted Liens. Except as set forth in the Charter Documents (as in effect on the Initial Closing Date), the issuance of the foregoing Capital Stock is not and has not been subject to preemptive rights in favor of any Person other than such rights that have been waived and will not result in the issuance of any additional Capital Stock of the Company or the triggering of any down-round or similar rights contained in any options warrants, debentures or other securities or agreements of the Company or any of its Subsidiaries. On the Initial Closing Date, except as set forth on Schedule 5.14, there are no outstanding securities convertible into or exchangeable for Capital Stock of the Company or any of its Subsidiaries or options, warrants or other rights to purchase or subscribe for Capital Stock of the Company or any of its Subsidiaries, or contracts, commitments, agreements, understandings or arrangements of any kind to which the Company or any of its Subsidiaries is a party relating to the issuance of any Capital Stock of the Company or any of its Subsidiaries, or any such convertible or exchangeable securities or any such options, warrants or rights. On the Initial Closing Date, except as set forth on Schedule 5.14, neither the Company nor any of its Subsidiaries has any obligation, whether mandatory or at the option of any other Person, at any time to redeem or repurchase any Capital Stock of the Company or any of its Subsidiaries, pursuant to the terms of their respective Charter Documents or otherwise. All securities of the Company and its Subsidiaries (including all shares of the Company's common stock, securities, options and warrants to purchase shares of the Company's common stock (both outstanding as well as those that are no longer outstanding), have been and were issued and granted pursuant to an exception from the Act and otherwise in compliance, in all material respects, with all securities and other applicable laws.

5.15    **Private Offering**. No form of general solicitation or general advertising was used by the Company or its Subsidiaries or their respective representatives in connection with the offer or sale of the Notes to the Purchasers pursuant to this Agreement.

5.16    **Broker's, Finder's or Similar Fees**.   Except as set forth in that certain Engagement Letter, dated on or about of August 20, 2021, by and between the Company and GreensLedge Capital Markets LLC, there are no brokerage commissions, finder's fees or similar fees or commissions payable by the Company or its Subsidiaries in connection with the transactions based on any agreement, arrangement or understanding with the Company or its Subsidiaries or any action taken by the Company or its Subsidiaries. Notwithstanding the foregoing or any other provision herein, no Purchaser shall be liable for any brokerage commission, finder's fees or similar fees or commissions.

5.17    **Indebtedness**. Schedule 5.17 lists the amount of all Indebtedness of the Company and its Subsidiaries (other than Indebtedness under this Agreement) that is in existence immediately before the Initial Closing Date and will remain outstanding after the Initial Closing Date.

6.      **AFFIRMATIVE COVENANTS OF THE NOTE PARTIES**

Each Note Party shall, and shall cause each of its Subsidiaries to:

6.1      **Reporting Obligations**. Deliver to the Note Agent (for prompt distribution to the Purchasers as specified in the applicable Administrative Questionnaire (or as otherwise specified by a Purchaser to the Note Agent in writing from time to time)):

(a)      as soon as available, but not later than 150 days after the end of each fiscal year of the Company, a copy of the audited consolidated balance sheets of the Company and its Subsidiaries as at the end of such fiscal year and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year, in each case, prepared in accordance with GAAP, setting forth in each case in comparative form the figures for the previous fiscal year, and accompanied by a report of any "Big Four" or, upon Required Holders' written consent (not to be unreasonably withheld), any other independent certified public accounting firm, which report shall contain an unqualified opinion (without any (A) "going concern" or like qualification or exception, (B) qualification or exception as to the scope of such audit, or (C) qualification which relates to the treatment or classification of any item and which, as a condition to the removal of such qualification, would require an adjustment to such item (except in the case of <u>clauses (A)</u> and <u>(B)</u> above as it relates to the Obligations during the last twelve months before the Maturity Date)), stating that such consolidated financial statements present fairly in all material respects the financial position for the periods indicated in conformity with GAAP applied on a basis consistent with prior years; and

(b)      as soon as available, but not later than 45 after the end of each fiscal quarter of each fiscal year (other than the fourth fiscal quarter), the unaudited consolidated balance sheets of the Company and its Subsidiaries as at the end of such fiscal quarter and the related unaudited consolidated statements of income and cash flows of the Company and its Subsidiaries for such fiscal quarter and for the period from the beginning of the then current fiscal year to the end of such fiscal quarter, all certified on behalf of the Company by a Responsible Officer of the Company as being complete and correct and fairly presenting, in all material respects, the financial position and the results of operations of the Company and its Subsidiaries, subject to normal year-end adjustments and absence of footnote disclosures.

(c)      promptly, and in any event within three (3) Business Days after the Company or any other Note Party becomes aware of or has knowledge of any event or condition that constitutes a Default or Event of Default, provide written notice of such event or condition and a statement of the curative action that the Company proposes to take with respect thereto.

Delivery of any reports, information and documents under this <u>Section 6.2</u>, as well as any other reports, information and documents pursuant to this Agreement, to the Note Agent is for informational purposes only and the Note Agent's receipt of the same shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of its covenants hereunder (as to which the Note Agent is entitled to rely exclusively on certificates of a Responsible Officer of the Company). The Note Agent shall have no responsibility or liability for the filing, timeliness or content of any report required under this Section 6.2 or any other reports, information and documents required under this Agreement.

6.2      **Taxes and Claims**.

(a)      Timely file complete and correct United States federal and state income and applicable foreign, state and local tax returns required by law, in each case with due regard for any extension of time

20

within which to file such tax returns, and pay when due all Taxes in each case, except to the extent that the failure to so file or pay could not reasonably be expected to have a Material Adverse Effect; <u>provided</u> that the Company and its Subsidiaries shall not be required to pay any such Taxes which are being contested in good faith by appropriate proceedings and with respect to which adequate reserves have been set aside in accordance with GAAP, which deferment of payment is permissible so long as no Lien, other than a Permitted Lien, has been entered and the Company's and its Subsidiaries' title to, and its and their right to use, its and their respective properties are not materially adversely affected thereby.

(b)     Pay all stamp, court or documentary, intangible, recording, filing or similar Taxes, if any, that arise solely in connection with the issuance of the Notes except to the extent such Taxes arise as a result of a transfer of a Note to a person other than the initial Holder of the Notes. The obligations of the Company under this Section 6.2(b) shall survive the payment of the Obligations and the termination of the Note Documents.

**6.3     Insurance**.

(a)     Maintain with reputable insurance companies insurance in such amounts and covering such risks as is consistent with sound business practice, including, without limitation, property and casualty insurance on all of its property, general liability insurance, workers compensation insurance and business interruption insurance. From and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, each Note Party will, and will cause each of its Subsidiaries to, furnish to the Collateral Agent, upon reasonable request, full information as to the insurance carried by it.

(b)     From and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, (i) at all times keep its property which is subject to the Lien of the Collateral Agent insured in favor of the Collateral Agent, and all policies or certificates (or certified copies thereof) with respect to such insurance and (ii) notify (and cause each of its Subsidiaries to notify) the Collateral Agent and the Purchasers, promptly, upon receipt of a notice of termination, cancellation, or non-renewal from its insurance company of any such policy.

(c)     If the Company shall fail to maintain all insurance in accordance with this <u>Section 6.3</u> or to timely pay or cause to be paid the premium(s) on any such insurance, or if the Company shall fail to deliver all certificates with respect thereto, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, the Collateral Agent shall have the right (but shall be under no obligation) to procure such insurance or pay such premiums, and the Company agrees to reimburse the Purchasers, on demand, for all costs and expenses relating thereto.

**6.4     Compliance with Laws**. Comply with any and all Requirements of Law to which it may be subject including, without limitation, all Environmental Laws, and obtain any and all Licenses necessary to the ownership of its property or to the conduct of its businesses, except, in each case, where failure to do so could not reasonably be expected to have a Material Adverse Effect. Each Note Party will, and will cause each of its Subsidiaries to, timely satisfy all material assessments, fines, costs and penalties imposed by any Governmental Authority against such Person or any property of such Person except to the extent such assessments, fines, costs, or penalties are being contested in good faith by appropriate proceedings and for which the Company or such Subsidiary has set aside on its books adequate reserves in accordance with GAAP.

**6.5     Maintenance of Properties**. Do all things necessary to maintain, preserve, protect and keep its property (other than property that is obsolete, surplus, or no longer used or useful in the ordinary conduct of its business) in good repair, working order and condition (ordinary wear and tear and casualty and condemnation excepted), make all necessary and proper repairs, renewals and replacements such that

its business can be carried on in connection therewith and be properly conducted at all times and pay and discharge when due the cost of repairs and maintenance to its property, and pay all rentals when due for all real estate leased by such Person.

**6.6**     **Employee Benefit Plans**. (a) Keep in full force and effect any and all Plans which are presently in existence or may, from time to time, come into existence under ERISA and not withdraw from any such Plans, unless such withdrawal can be effected or such Plans can be terminated without material liability to the Company or its Subsidiaries, (b) make contributions to all such Plans in a timely manner and in a sufficient amount to comply in all material respects with the standards of ERISA, including, without limitation, the minimum funding standards of ERISA, (c) comply in all material respects with all requirements of ERISA, (d) notify the Purchasers promptly upon receipt by the Company or any Subsidiary of any notice concerning the imposition of any withdrawal liability or of the institution of any proceeding or other action which may result in the termination of any such Plans by the PBGC or the appointment of a trustee to administer such Plans, (c) promptly advise the Purchasers of the occurrence of any Reportable Event or non-exempt prohibited transaction (as defined in ERISA) with respect to any such Plans of which Company becomes aware, and (f) amend any Plan that is intended to be qualified within the meaning of Section 401 of the Code to the extent necessary to keep the Plan qualified and to cause the Plan to be administered and operated in a manner that does not cause the Plan to lose its qualified status.

**6.7**     **Environmental**. Use and operate all of its facilities and properties in material compliance with all Environmental Laws, keep all necessary Licenses in effect and remain in material compliance therewith, and handle all Hazardous Materials in material compliance with all applicable Environmental Laws.

**6.8**     **Intellectual Property**.

(a)     Each Note Party will take the steps described in this Section 6.8 with respect to all new or acquired Intellectual Property to which the Company or any Guarantor is now or later becomes entitled that is necessary in the conduct of such Person's business. The Company acknowledges and agrees that the Secured Parties shall have no duties with respect to any Intellectual Property or Licenses of the Company or its Subsidiaries.

(b)     The Note Parties shall have the duty, with respect to Intellectual Property that is necessary in the conduct of such Person's business (i) to prosecute diligently any trademark application or service mark application that is part of the trademarks pending as of the date hereof or hereafter, (ii) to prosecute diligently any patent application that is part of the patents pending as of the date hereof or hereafter, and (iii) to take all reasonable and necessary action to preserve and maintain all of the Note Parties' trademarks, patents, copyrights, Licenses, and its rights therein, including paying all maintenance fees and filing of applications for renewal, affidavits of use, and affidavits of non-contestability, except in the case of clauses (i) and (ii), where the Company, in its reasonable opinion, determines that the costs for engaging in such prosecution activities exceeds the likely benefit of continued prosecution and, except in the of case (iii), where the Company, in its reasonable opinion, determines that the costs of preserving and maintaining exceeds the value the Company obtains from such preservation and maintenance. Each Note Party will require all employees, consultants, and contractors of such Note Party who were involved in the creation or development of such Intellectual Property to sign agreements containing assignment to the Company or such Guarantor of Intellectual Property rights created or developed and obligations of confidentiality. No Note Party shall abandon any Intellectual Property or License that is necessary in the conduct of the Company's or such Guarantor's business.

(c)     From and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, each Note Party will (i) promptly file, at such Note Party's sole cost and expense, any application to register any Intellectual Property with the United States Patent and Trademark Office or the United States Copyright Office if such registration is necessary in connection with the conduct of such Note Party's business, (ii) concurrently with the delivery of financial statements pursuant to Sections 6.1(a) or (b), deliver supplements to Schedule 4(c) to the Security Agreement and any other documents reasonably necessary for the Collateral Agent to record its security interest in such Intellectual Property with the United States Patent and Trademark Office or the United States Copyright Office and (iii) promptly after the delivery of the documents required by clause (ii) above, upon the reasonable request of the Collateral Agent, execute and deliver in favor of the Collateral Agent one or more Intellectual Property Security Agreements to further evidence the Purchasers' Lien on such Note Party's Intellectual Property.

6.9     **Use of Proceeds**. Use the proceeds of the Notes (i) to pay any fees and expenses incurred by the Company in connection with the transactions contemplated hereby and (ii) for general corporate purposes not in violation of any applicable laws. The Company shall not use any proceeds of the sale of the Notes hereunder to, directly or indirectly, purchase or carry any "margin stock" (as defined in Regulation U) or to extend credit to others for the purpose of purchasing or carrying any "margin stock", in either case, in violation of the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.

6.10     **Subsidiaries**.   If any Note Party creates, forms or acquires any Subsidiary (other than an Excluded Subsidiary) on or after the date of this Agreement, such Note Party will, and will cause such Subsidiary to, (a) within 30 days (which 30 days may be extended by the Note Agent at the direction of the Required Holders) of the creation, formation or acquisition of such new Subsidiary, cause such Subsidiary to join the Guaranty as a "Guarantor" thereunder and (b) from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, within 30 days (which 30 days may be extended by the Collateral Agent at the direction of the Required Holders) of the creation, formation or acquisition of such new Subsidiary, cause such Subsidiary to join the Security Agreement as a "Grantor" and take all such other actions and execute and deliver, or cause to be executed and delivered, all such documents, instruments, agreements, and certificates as are similar to those described in Sections 4.1(c) and, if requested by the Required Holders, 4.1(g) or that are necessary or desirable to protect, evidence or perfect the security interest of the Collateral Agent in a manner similar to the Liens and assets granted by the existing Note parties under the existing Collateral Documents either by executing and delivering to the Collateral Agent a counterpart or supplement to the existing Collateral Documents or such new documents as are necessary or desirable to evidence, grant or perfect a first priority lien in such assets in favor of Collateral Agent, for the benefit of Secured Parties (including, without limitation, any pledges of Capital Stock (other than with respect to Excluded Property (as defined in the Security Agreement))). The Agents shall be authorized to execute and deliver such documents upon receipt of a certificate from a Responsible Officer of the Company stating that such documents are authorized or permitted under the Note Documents.

6.11     **Piggyback Registration Rights**. The Company shall provide the Holders of the Notes with customary "piggyback" registration rights (with respect to the shares of common stock issued upon conversion of the Notes) on all registration statements of the Company, subject to the right, however, of the Company and its underwriters to reduce the number of shares proposed to be registered at the underwriter's discretion.

6.12     **Further Assurances**.   Each Note Party will take any action reasonably requested by any Holder in order to effectuate the purposes and terms contained in this Agreement or any other Note Document.

23

**6.13** **Conversion Event**. Within 30 calendar days of the occurrence of the first Conversion Event, (i) each of the Note Parties and the Collateral Agent hereby agrees that it shall execute and deliver to each Holder a counterpart of the Security Agreement and the Intellectual Property Security Agreement and take such actions and deliver such other documents as are reasonably necessary, or reasonably required by the Required Holdings, to give effect to this Section 6.13, including, without limitation, delivering and filing (or causing to be delivered and filed) UCC-1 financing statements with respect to the security interests to be granted thereby (provided that any such actions shall not be a condition precedent to the effectiveness of the Security Agreement) and furnishing certificates of insurance issued on applicable ACORD Forms with respect to property and liability insurance for the Company and (ii) in the event that such a Conversion Event is a SPAC and the Parent Entity assumes or otherwise becomes a co-obligor with respect to the Company's Obligations pursuant to Section 10.1, Core Scientific Holding Co. (or its successor by merger) shall remain a co-obligor with such Parent Entity with respect to such Obligations (other than any such Obligation of the Company to deliver Conversion Securities pursuant to Section 2 of the Note, with respect to which delivery Obligation Core Scientific Holding Co. (or it successor by merger) hereby agrees that it shall execute and deliver to each Holder a supplement to the Guaranty, substantially in the form attached thereto as Exhibit C).

## 7. NEGATIVE COVENANTS OF THE NOTE PARTIES

Each Note Party shall not, and shall cause each of its Subsidiaries not to:

**7.1** **Liens, Restricted Payments and Dispositions**. Prior to the occurrence of a Conversion Event, so long as the Obligations remain outstanding:

(a)    Liens. Create, assume or suffer to exist any Liens on any assets of the Note Parties securing debt for borrowed money in excess of an amount at any time outstanding equal to the greater of (x) the sum of (I) the aggregate principal amount of the Existing Notes at any time outstanding (disregarding, for the purposes of this clause (I) any and all PIK Interest (as defined in the Existing Notes) that has been added to the aggregate principal amount of the Existing Notes) *plus* (II) $50,000,000 and (y) $265,000,000 (such clause (y), the "***Secured Debt Cap***"); provided that (x) in no event shall the aggregate principal amount of the Existing Notes at any time outstanding (disregarding, for the purposes of this proviso any and all PIK Interest (as defined in the Existing Notes) that has been added to the aggregate principal amount of the Existing Notes) exceed at any time $215,000,000, (y) the Collateral Agent and the authorized representative with respect to any Indebtedness that is secured on a pari passu basis with the Liens on the Collateral securing the Obligations that is permitted to be secured in reliance on this clause (a) shall have entered into an intercreditor agreement providing for equal and ratable lien priority and perfection for the holders and providers of such Indebtedness at the direction of the Required Holders and substantially in the form attached hereto as Exhibit H (it being understood that the form attached as Exhibit H is acceptable to the Holders) or such other form reasonably satisfactory to the Required Holders (the "***Intercreditor Agreement***") and (z) notwithstanding the foregoing, the Note Parties shall be permitted to incur any letters of credit and any Indebtedness, including Capital Lease Obligations, incurred to finance the acquisition of any fixed or capital assets (including, for the avoidance of doubt, any real property assets) so long as such Liens shall encumber only the assets acquired or financed with the proceeds of such Indebtedness (or, in the case of any letters of credit, cash collateral) and do not attach to any other assets of any Note Party, which letters of credit and Indebtedness set forth in this clause (z) shall, for the avoidance of doubt, be excluded from the calculation of the Secured Debt Cap.

(b)    Restricted Payments.

(i)    Pay or make any Restricted Payment to its direct or indirect equityholders; provided that, the foregoing shall not restrict or prohibit any Subsidiary from paying or

24

making any Restricted Payments, directly or indirectly, to the Company, and shall not restrict or prohibit any Restricted Payments, directly or indirectly, from the Company to its direct or indirect equityholders at such times and in such amounts as are necessary to permit:

(1)     such equityholder (A) to pay general administrative costs and expenses (including audit and tax fees payable to third party auditors and tax advisors, customary compensation and reasonable costs and expenses of the board of directors or similar managing body of such entity incurred in the ordinary course of business, and franchise taxes and other fees, taxes and expenses required to maintain such entity's existence), (B) to discharge its, its Subsidiaries' and its direct and indirect owners' income tax liabilities and (C) in the case that the Company is treated as a flow-through entity for U.S. income tax purposes, its direct and indirect owners to discharge their respective U.S. federal, state and local and non-U.S. income tax obligations associated with their ownership of the Company, in each case, so long the amount of any such Restricted Payment is applied for such purpose; and

(2)     (x) purchases or cash payments in lieu of fractional shares of Capital Stock arising out of stock dividends, splits, combinations or conversions of Capital Stock in the ordinary course of business and (y) purchases or cash payments in lieu of fractional shares upon conversion of the Notes.

(ii)     From and after the occurrence of a Conversion Event, any Restricted Payments made or paid to the direct or indirect equityholders of the Company (other than the Restricted Payments of the type referred to in the proviso to clause (i) above) shall also be made or paid to the Holders in accordance with their Pro Rata Share of the Notes on an as-converted basis as if such Notes had been converted pursuant to their terms at the time of the applicable Restricted Payment.

(c)     Asset Dispositions. Consummate any Asset Dispositions; provided that the foregoing shall not restrict or prohibit (A) sales of inventory in the ordinary course of business; (B) the use of cash or cash equivalents in a manner not prohibited by the Note Documents; (C) licenses, sublicenses, leases or subleases granted to third parties in the ordinary course of business not interfering with the business of the Company and its Subsidiaries and which do not materially impair the value of the property so licensed, sublicensed, leased or subleased; (D) dispositions of obsolete, damaged, surplus or worn-out or no longer used or useful equipment; (E) the lapse, abandonment or other dispositions of Intellectual Property that is, in the reasonable business judgment of the Company, no longer economically practicable or commercially desirable to maintain; (F) dispositions by (1) any Subsidiary to the Company, (2) the Company to any Note Party, (3) any Subsidiary to any Note Party or (4) any Subsidiary that is not a Note Party to any other Subsidiary that is not a Note Party; (G) dispositions resulting from any casualty or property losses or condemnation or similar proceeding of, any property or asset of the Company or any of its Subsidiaries; (H) the sale or other disposition of any assets or property of the Company not constituting Collateral; (I) any Asset Disposition so long as such Asset Disposition is made for fair market value; (J) any individual Asset Disposition so long as the consideration therefor does not exceed $1,000,000; and (K) any other Asset Dispositions to a non-affiliated third party so long as the aggregate consideration therefor does not exceed $10,000,000 per fiscal year; provided, further, that notwithstanding the foregoing, any Asset Disposition described in the foregoing clause (K) shall be permissible notwithstanding the fact that the counterparty is an affiliate or a Subsidiary of the Company so long as such Asset Disposition is on fair and reasonable terms no less favorable to the Company or such affiliate or Subsidiary than would be obtainable on comparable arm's length transaction with a non-affiliated third party.

**7.2     Issuances of Equity**.   Except to the extent permitted by Section 7.1(c), no Subsidiary of the Company shall issue or sell Capital Stock in such Subsidiary.

**7.3** **Modifications of Charter Documents**. The Company will not permit, and will cause each of its Subsidiaries not to permit, such Person's Charter Documents to be amended or modified in any way that could reasonably be expected to materially or adversely affect the interests of the Holders in their capacity as Secured Parties (and not, for the avoidance of doubt, as holders of Capital Stock of the Company).

**7.4** **Compensation or Credit Support**. Other than (x) to consenting or approving Holders in connection with a consent or amendment in accordance with Section 10.9 to the extent all Holders are afforded an opportunity to enter into such consent or amendment or (y) in connection with the issuance of warrants to non-consenting Holders pursuant to Section 1(b)(i)(1) of the Notes, the Company shall not enter into any arrangement with any Holder for the purposes of providing additional compensation (in the form of interest, fees or otherwise) or credit support (in the form of additional collateral or otherwise) to such Holder in connection with the Notes without providing such additional compensation or credit support for the ratable benefit of all Holders.

## 8. REPRESENTATIONS AND WARRANTIES OF THE PURCHASERS

Each Initial Purchaser hereby represents and warrants as of the Initial Closing Date, and each Additional Purchaser hereby represents and warrants as of the applicable Additional Closing Date as follows:

**8.1** **Purchase for Own Account**. Each Purchaser represents that it is acquiring a Note and the Conversion Securities (collectively, the "*Securities*") solely for its own account and beneficial interest for investment and not for sale or with a view to distribution of the Securities or any part thereof, has no present intention of selling (in connection with a distribution or otherwise), granting any participation in, or otherwise distributing the same, and does not presently have reason to anticipate a change in such intention.

**8.2** **Information and Sophistication**. Without lessening or obviating the representations and warranties of the Note Parties set forth in Section 5 hereof or in any other Note Document or the right of such Purchaser to rely thereon, each Purchaser hereby: (i) acknowledges that it has received all the information it has requested from the Company and it considers necessary or appropriate for deciding whether to acquire the Securities, (ii) represents that it has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Securities and to obtain any additional information necessary to verify the accuracy of the information given the Purchaser, and (iii) further represents that it has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risk of this investment.

**8.3** **Ability to Bear Economic Risk**. Each Purchaser acknowledges that investment in the Securities involves a high degree of risk, and represents that it is able, without materially impairing its financial condition, to hold the Securities for an indefinite period of time and to suffer a complete loss of its investment.

**8.4** **Further Limitations on Disposition**. Without in any way limiting the representations set forth above, each Purchaser further agrees not to make any disposition of all or any portion of the Securities unless and until:

(c) there is then in effect a registration statement under the Act covering such proposed disposition and such disposition is made in accordance with such registration statement; or

26

(d)      the Purchaser shall have notified the Company of the proposed disposition and shall have furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and if reasonably requested by the Company, such Purchaser shall have furnished the Company with an opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration under the Act or any applicable state securities laws, provided that no such opinion shall be required for dispositions in compliance with Rule 144, except in unusual circumstances.

Notwithstanding the provisions of paragraphs (a) and (b) above, no such registration statement or opinion of counsel shall be necessary for a transfer by such Purchaser to Permitted Transferees, or transfers by gift, will or intestate succession to any spouse or lineal descendants or ancestors of any Purchaser who is an individual, if all transferees agree in writing to be subject to the terms hereof to the same extent as if they were Purchasers hereunder

**8.5      Accredited Investor Status.** Each Purchaser is an "accredited investor" as such term is defined in Rule 501 under the Act.

**8.6      No "Bad Actor" Disqualification**. Each Holder represents and warrants that neither (A) such Holder nor (B) any entity that controls such Holder or is under the control of, or under common control with, such Holder, is subject to any Disqualification Event, except for Disqualification Events covered by Rule 506(d)(2)(ii) or (iii) or (d)(3) under the Act and disclosed in writing in reasonable detail to the Company. Each Holder represents that such Holder has exercised reasonable care to determine the accuracy of the representation made by such Holder in this paragraph, and agrees to notify the Company if such Holder becomes aware of any fact that makes the representation given by such Holder hereunder inaccurate.

**8.7      Foreign Investors**. If a Holder is not a United States person (as defined by Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended (the "*Code*")), such Holder hereby represents that he, she or it has satisfied itself as to the full observance of the laws of the Holder's jurisdiction in connection with any invitation to subscribe for the Securities or any use of its Note, including (A) the legal requirements within the Holder's jurisdiction for the purchase of the Securities, (B) any foreign exchange restrictions applicable to such purchase, (C) any governmental or other consents that may need to be obtained, and (D) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale or transfer of the Securities. The Holder's subscription, payment for and continued beneficial ownership of the Securities will not violate any applicable securities or other laws of the Holder's jurisdiction.

**8.8      Forward-Looking Statements**. With respect to any forecasts, projections of results and other forward-looking statements and information provided to a Holder, such Holder acknowledges that such statements were prepared based upon assumptions deemed reasonable by the Company at the time of preparation. There is no assurance that such statements will prove accurate, and the Company has no obligation to update such statements.

**8.9      GreensLedge as Placement Agent.** Each Purchaser represents, acknowledges and agrees that: (A) GreensLedge Capital Markets LLC ("*GreensLedge*") has acted as the Company's placement agent for the Securities, (B) such Purchaser is not relying on the advice or recommendations of GreensLedge (including any affiliate, agent, advisor or representative thereof) in connection with such Purchaser's purchase of Securities, (C) GreensLedge is not acting as an underwriter or initial purchaser with respect to any Securities, (D) GreensLedge has no responsibility with respect to any marketing or other disclosure documents relating to the Securities (or the completeness of any thereof) furnished to such Purchaser, (E) GreensLedge has not made, and will not make, any representation or warranty with respect to the Company or any Securities (and such Purchaser will not rely on any statements made by

GreensLedge, orally or in writing, to the contrary) and (F) GreensLedge and/or any affiliate or employee thereof may purchase or otherwise invest in the Securities.

8.10     **Further Assurances.** Each Purchaser agrees and covenants that at any time and from time to time it will promptly execute and deliver to the Company such further instruments and documents and take such further action as the Company may reasonably require in order to carry out the full intent and purpose of this Agreement and to comply with state or federal securities laws or other regulatory approvals.

## 9.     THE AGENTS

9.1     **Appointment and Authorization of the Agents.** Each Purchaser hereby irrevocably appoints, designates and authorizes the Note Agent to act as the "note agent" under the Note Documents and, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, the Collateral Agent to act as the "collateral agent" under the Note Documents and to act as the agent of (and to hold any security interest created by any Note Document for and on behalf of or on trust for) such Purchaser for purposes of acquiring, holding and enforcing any and all Liens on Collateral to be granted by the Company to secure any of the Obligations, and to take such other action on its behalf in accordance with the provisions of this Agreement and each other Note Document and to exercise such powers and perform such duties, in each case as are expressly delegated to the Agents by the terms of this Agreement or any other Note Document, together with such powers and discretion as are reasonably incidental thereto. Notwithstanding any provision to the contrary contained elsewhere herein or in any other Note Document, the Agents shall have no duties or responsibilities, except those expressly set forth herein, nor shall the Agents have or be deemed to have any fiduciary relationship with any Purchaser or participant, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Note Document or otherwise exist against the Agents. Without limiting the generality of the foregoing sentence, the use of the term "agent" herein and in the other Note Documents with reference to the Agents is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used merely as a matter of market custom and is intended to create or reflect only an administrative relationship between independent contracting parties. Without limiting the generality of the foregoing, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, the Purchasers hereby expressly authorize the Collateral Agent to execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Note Documents and acknowledge and agree that any such action by Collateral Agent shall bind the Purchasers. Whether or not expressly stated in any Note Document, the rights, privileges and immunities of the Agents shall be automatically incorporated by reference therein. Whether or not a party thereto, the Agents shall be express third party beneficiaries of the Notes, including without limitation the payment waterfall set forth therein.

9.2     **Liability of Agents.** No Agent-Related Person shall (a) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Note Document or the transactions contemplated hereby, or (b) be responsible in any manner to any Purchaser for any recital, statement, representation or warranty made by the Company or any officer thereof, contained herein or in any other Note Document, or in any certificate, report, statement or other document referred to or provided for in, or received by the Agents under or in connection with, this Agreement or any other Note Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Note Document, or the creation, perfection, maintenance of perfection or priority of any Lien or security interest created or purported to be created under the Note Documents, the convertibility of the Notes and the validity or the sufficiency of the Equity Securities (as defined in the Note), or for any failure of the Company or any other party (other than Agents) to any Note Document to

perform its obligations hereunder or thereunder, except to the extent such loss resulted from the gross negligence or willful misconduct of such Agent-Related Person, as determined by a final nonappealable order of a court of competent jurisdiction. The Note Agent shall have no obligation to monitor the Ledger in the absence of being providing such by the Company in accordance with the terms of the Notes, and may, in its sole discretion either: (i) conclusively rely on the Ledger most-recently delivered to it, (ii) conclusively rely on a statement by a Holder as to the outstanding principal amount of Notes held by it, or (iii) refrain from taking any action until the Note Agent receives a current Ledger from the Company. No Agent-Related Person shall be under any obligation to any Purchaser or participant to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Note Document, or to inspect the properties, books or records of the Company or any affiliate thereof.

The Agents shall not have any duties or obligations except those expressly set forth in the Note Documents. Without limiting the generality of the foregoing, (i) the Agents shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing and (ii) the Agents shall not have any duty to take any discretionary action or exercise any discretionary powers, except, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, discretionary rights and powers expressly contemplated hereby that the Collateral Agent is instructed in writing to exercise by the Required Holders (or such other requisite number or percentage of Holders as provided in Section 10.9).

In no event shall the Agents be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, epidemics, pandemics, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility, it being understood that the Agents shall use reasonable best efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

**9.3     Reliance by the Agents**. The Agents shall be entitled to rely, and shall be fully protected in relying, upon any writing, communication, signature, resolution, representation, notice, consent, certificate, affidavit, letter, facsimile or telephone message, electronic mail message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper person or persons, and upon advice and statements of legal counsel (including counsel to the Company), independent accountants and other experts selected by the Agents. The Agents shall be fully justified in failing or refusing to take any action under any Note Document unless it shall first receive such advice or concurrence of the Required Holders as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Holders against any and all loss, liability and expense which may be incurred by it by reason of taking or continuing to take any such action. The Agents shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Note Document in accordance with a request or consent of the Required Holders (or such greater number of Holders as may be expressly required hereby in any instance), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the of the same; provided that the Agents shall not be required to take any action that, in its opinion or in the opinion of its counsel, may expose the Agents to liability or that is contrary to any Note Document or applicable law.

**9.4     Notice of Default**. The Agents shall not be deemed to have knowledge or notice of the occurrence of any Event of Default, unless the Agents shall have received written notice from a Purchaser referring to this Agreement, describing such Event of Default and stating that such notice is a "notice of event of default." The Agents shall take such action with respect to any Event of Default as may be directed by the

Required Holders in accordance with the terms of the Notes; provided that unless and until the Agents has received any such direction, the Agents may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Event of Default as it shall deem advisable or in the best interest of the Holders.

9.5     **Agent's Reimbursement.** Each of the Holders severally agrees to reimburse the Agents, in accordance with such Holder's Pro Rata Share, for any reasonable and documented out-of-pocket expenses not reimbursed by the Company (without limiting the obligation of the Company to make such reimbursement pursuant to Section 10.10): (a) for which the Agents are entitled to reimbursement by the Company under this Agreement or any Note Document and (b) after the occurrence and during the continuance of an Event of Default, for any other reasonable and documented expenses incurred by the Agents on the Holders' behalf in connection with the enforcement of the Holders' rights under this Agreement or any Note Document; provided, however, that (x) the Agents shall not be reimbursed for any such expenses arising as a result of its gross negligence or willful misconduct, as determined by a final nonappealable order of a court of competent jurisdiction and (y) in the event that the Company reimburses the Agents for any such reasonable and documented out-of-pocket expenses, any corresponding amounts previously reimbursed by the Holders to the Agents will be promptly returned to such Holders in accordance with their Pro Rata Share.

9.6     **Indemnification.** Each of the Holders shall severally indemnify the Agents and their officers, directors, employees, agents, attorneys, accountants, consultants and controlling Persons (to the extent not reimbursed by or on behalf of the Company pursuant to Section 10.10 and without limiting the obligations of the Company to do so), in accordance with their respective Pro Rata Share, from and against any and all liabilities, obligations, damages, penalties, actions, judgments, suits, losses (including accrued and unpaid Agents' fees), and reasonable and documented costs, expenses or disbursements of any kind whatsoever which may at any time be imposed on, incurred by or asserted against the Agents or such Persons relating to or arising out of this Agreement, any Note Document, the transactions contemplated hereby or thereby, or any action taken or omitted by the Agents in connection with any of the foregoing; provided, however, that the foregoing shall not extend to actions or omissions to the extent arising from gross negligence or willful misconduct of the Agents, as determined by a final nonappealable order of a court of competent jurisdiction. The Agents shall not be under any obligation to exercise any of the rights or powers vested in it by this Agreement at the request, order or direction of any of the Holders, pursuant to any provision of this Agreement, unless the Required Holders shall have offered (and, if requested, provided) to the Agents security or indemnity satisfactory to it against the costs, expenses and liabilities which may be incurred by it therein or thereby. The undertaking in this Section 9.6 shall survive the payment of all other Obligations and the resignation of the Agents.

9.7     **Collateral Matters**. The Purchasers irrevocably agree that, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, any Lien on any property granted to or held by the Collateral Agent under any Note Document for the benefit of the Secured Parties shall be automatically released (i) upon payment in full of all Obligations (it being understood and agreed that the conversion in full of a Note by the Holder thereof shall be deemed, for purposes of this Section 9.6, to be a repayment of the entire outstanding principal amount (including all capitalized interest) of such Note together with any unpaid accrued interest thereon on the date of such conversion), (ii) subject to Section 10.9, if the release of such Lien is approved, authorized or ratified in writing by the Purchasers or (iii) upon the sale, transfer or other disposition of any Collateral that is not prohibited by the Note Documents. Upon request by the Collateral Agent at any time from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, the Purchasers will confirm in writing the Collateral Agent's authority to release particular types or items of property. In each case as specified in this Section 9.7, the Collateral Agent will, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, promptly (and each Purchaser irrevocably authorizes the Collateral Agent to), at the Company's expense,

30

execute and deliver to the Company such documents as the Company may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Note Documents. In connection with any such release, the Collateral Agent shall be entitled to a certificate of a Responsible Officer of the Company stating that such release is authorized and permitted by the Note Documents, upon which the Collateral Agent may conclusively rely. Each party to this Agreement acknowledges and agrees that the Agents shall not have an obligation to file financing statements, amendments to financing statements, or continuation statements, or to perfect or maintain the perfection of the Collateral Agent's Lien on the Collateral.

9.8     **Successor Agents**. The Agents may resign as Agents upon fifteen (15) days' notice to the Holders. If an Agent resigns under this Agreement, the Holders shall unanimously appoint a successor representative for the Holders. If no successor representative is appointed prior to the effective date of the resignation of the Agent, the resigning Agent may appoint, after consulting with the Holders and the Company, a successor agent. Upon the acceptance of its appointment as successor representative hereunder, such successor representative shall succeed to all the rights, powers and duties of the retiring Agent, the term "Agents" shall mean such successor representative and the retiring Agent's appointment, powers and duties as Agents shall be terminated. After any retiring Agent's resignation hereunder as Agent, the provisions of this Section 9 and Section 10 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement. If no successor representative has accepted appointment as Agent by the date which is fifteen (15) days following a retiring Agent's notice of resignation, the retiring Agent's resignation shall nevertheless thereupon become effective and the Holders shall perform all of the duties of the Agents hereunder until such time, if any, as the Holders appoint a successor representative as provided for above.

9.9     **Intercreditor Agreement**. The Collateral Agent is hereby authorized to enter into the Intercreditor Agreement pursuant to Section 7.1(a) and the parties hereto acknowledge that such Intercreditor Agreement, upon execution of the same, shall be binding upon them. From and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, each Secured Party hereby (a) agrees that it will be bound by and will take no actions contrary to the provisions of the Intercreditor Agreement, (b) authorizes and instructs the Collateral Agent, without any further consent of such Secured Party, to enter into the Intercreditor Agreement provided by the Company and accompanied by the certificate specified in Section 7.1(a) and to subject the Liens on the Collateral securing the Obligations to the provisions thereof and (c) authorizes and instructs the Collateral Agent to execute and deliver on behalf of the Secured Parties any amendment (or amendment and restatement) or modification to the Intercreditor Agreement to provide for the incurrence of any Indebtedness permitted hereunder or such other amendments as the Required Holders may specify in writing to the Collateral Agent.

10.     **MISCELLANEOUS**

10.1     **Binding Agreement**. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, expressed or implied, is intended to confer upon any third party any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement. Notwithstanding anything to the contrary contained herein or in any other Note Documents, in the event of a SPAC, the Obligations of the Company to deliver Conversion Securities pursuant to Section 2 of the Note may be assigned to a Parent Entity, so long as such Parent Entity expressly assumes such Obligation of the Company and becomes a co-Obligor of each other Obligation of the Company (or its successor by merger) under the Note Documents, in each case pursuant to an joinder and assignment and assumption agreement, substantially in the form attached hereto as Exhibit I, and delivers certificates substantially identical to those delivered by the Company on the Initial Closing Date pursuant to clauses (b), (c) and (d) of Section 4.1.

31

**10.2     GOVERNING LAW.** THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.

**10.3     JURISDICTION AND VENUE.** EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ANY U.S. FEDERAL OR NEW YORK STATE COURT SITTING IN THE BOROUGH OF NEW YORK, NEW YORK IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR ANY OTHER NOTE DOCUMENT AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN ANY SUCH COURT AND IRREVOCABLY WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT OR THAT SUCH COURT IS AN INCONVENIENT FORUM. NOTHING HEREIN SHALL LIMIT THE RIGHT OF ANY PURCHASER, ANY HOLDER OR, FROM AND AFTER THE EXECUTION AND DELIVERY OF THE COLLATERAL DOCUMENTS PURSUANT TO SECTION 6.13, THE COLLATERAL AGENT, TO BRING PROCEEDINGS AGAINST THE COMPANY IN THE COURTS OF ANY OTHER JURISDICTION. ANY JUDICIAL PROCEEDING BY THE COMPANY AGAINST ANY PURCHASER, ANY HOLDER OR ANY OF THEIR AFFILIATES AND, FROM AND AFTER THE EXECUTION AND DELIVERY OF THE COLLATERAL DOCUMENTS PURSUANT TO SECTION 6.13, THE COLLATERAL AGENT OR ANY OF ITS AFFILIATES, INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT OR ANY OTHER NOTE DOCUMENT SHALL BE BROUGHT ONLY IN A COURT IN THE BOROUGH OF NEW YORK, NEW YORK.

**10.4     WAIVER OF JURY TRIAL.** EACH OF THE COMPANY, THE PURCHASERS, THE HOLDERS AND, FROM AND AFTER THE EXECUTION AND DELIVERY OF THE COLLATERAL DOCUMENTS PURSUANT TO SECTION 6.13, THE COLLATERAL AGENT HEREBY WAIVES TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT OR ANY OTHER NOTE DOCUMENT OR THE RELATIONSHIP ESTABLISHED THEREUNDER.

**10.5     Severability**. If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (a) such provision shall be excluded from this Agreement, (b) the balance of this Agreement shall be interpreted as if such provision were so excluded, and (c) the balance of this Agreement shall be enforceable in accordance with its terms.

**10.6     Counterparts.** This Agreement may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract. Any counterpart of a signature page to this Agreement may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the U.S. federal ESIGN Act of 2000 or the New York Electronic Signature and Records Act or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law. The Note Documents and all notices, approvals, consents, requests and any

communications hereunder must be in writing (provided that any such communication sent to Agents hereunder must be in the form of a document that is signed manually or by way of a digital signature provided by DocuSign (or such other digital signature provider as specified in writing to the Agents by the authorized representative)), in English. The Company agrees to assume all risks arising out of the use of using digital signatures and electronic methods to submit communications to the Note Agent, including without limitation the risk of the Note Agent acting on unauthorized instructions, and the risk of interception and misuse by third parties.

     **10.7**    **Headings; Interpretation.** Paragraph headings used in this Agreement are included for convenience of reference only and will not modify the provisions that they precede or affect the interpretation of this Agreement or any other Note Document. The term "including" shall be interpreted to mean "including but not limited to". Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference.

     **10.8**    **Notices.** All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient (and if not, then on the next Business Day), (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. Notices to the Agents shall be effective upon actual receipt thereof. All communications shall be sent, if to the Note Parties, at the address set forth on the signature page of the Company, if to the Agents, at the address set forth on the signature page thereof, and, if to a Purchaser, at the address(es) set forth on the Schedule of Purchasers attached hereto as <u>Schedule 2</u> or at such other address(es) as the Company or Purchaser may designate by ten (10) days' advance written notice to the other parties hereto. Except where notice is specifically required by this Agreement, no notice to or demand on the Company or any of its Subsidiaries in any case shall entitle the Company or any of its Subsidiaries to any other or further notice or demand in similar or other circumstances.

     **10.9**    **Amendments; Waiver**. Any term of the Notes and this Agreement may be amended or waived with the written consent of the Company and the Required Holders; <u>provided</u>, that without the consent of each Holder, no amendment, modification, termination, or consent shall be effective if the effect thereof would (a) extend the scheduled final maturity of any Note held by any non-consenting Holder, (b) waive, reduce or postpone any scheduled repayment (but not prepayment) with respect to the Note held by any non-consenting Holder; (c) reduce the rate of interest or amount of any fees payable under any Note held by any non-consenting Holder; (d) extend the time for payment of any interest or fees payable under any Note held by any non-consenting Holder; (e) reduce the principal amount of any Note held by any non-consenting Holder; (f) amend, modify, terminate or waive any provision of this <u>Section 10.9</u>; (g) amend the definition of "Required Holders"; (h) release all or substantially all of the Collateral securing any Note (if any) held by any non-consenting Holder except as expressly provided in the Note Documents, (i) from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, subordinate the Collateral Agent's Liens on Collateral except as expressly provided in the Note Documents; (j) release any Guarantor except as expressly provided in the Note Documents or (k) consent to the assignment or transfer by the Company of any of its rights and obligations under any Note Document held by any non-consenting Holder. No amendment affecting the rights, privileges and immunities of the Agents shall be effective without the consent of such Agent. Notwithstanding anything to the contrary contained herein or in any other Note Documents, no consent of any Holder shall be required pursuant to this <u>Section 10.9</u> in connection with (i) an assignment and assumption by a Parent Entity of the Company's Obligations in connection with a SPAC, so long as the conditions set forth in Section 10.1 shall have been satisfied, and (ii) any Person (including, without limitation, a Parent Entity in connection with a SPAC) becoming a Guarantor or a co-issuer or co-obligor hereunder and under the

<div align="center">33</div>

Notes; provided, that the Company shall deliver a certificate of a Responsible Officer to the Agents stating that any documents to be executed in connection with a SPAC are authorized and permitted pursuant to the Note Documents.

**10.10    Expenses and Indemnification.**

(a)     The Company shall not be responsible for any out-of-pocket costs or expenses incurred by such Initial Purchasers in connection with the preparation, execution and delivery of this Agreement and the other Note Documents. The Company shall pay all reasonable and documented out-of-pocket costs and expenses of the Agents (including reasonable and documented fees, expenses and disbursements of its outside counsel) relating to the negotiation, preparation and execution of the Note Documents, review of other documents (including for purposes of due diligence review) in connection with the transactions contemplated hereby and any amendments and waivers hereto or thereto. In addition, the Company agrees to promptly pay in full after the occurrence of an Event of Default, all costs and expenses (including, without limitation, reasonable and documented fees and disbursements of counsel, agents and professional advisers) incurred by the Holders or the Agents in enforcing any obligations of or in collecting any payments due hereunder or under the Notes by reason of such Event of Default or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a workout, or any insolvency or bankruptcy proceedings.

(b)     In addition to the payment of expenses pursuant to Section 10.10(a), the Company (as "*Indemnitor*") agrees to indemnify, pay and hold the Purchasers, the Holders and the Agents, and the officers, directors, employees, agents, and affiliates of the Purchasers, the Holders and the Agents (collectively called the "*Indemnitees*") harmless from and against any and all other liabilities, costs, expenses, liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for such Indemnitees) in connection with any investigative, administrative or judicial proceeding commenced or threatened (excluding claims among Indemnitees (other than claims against an Agent acting in its capacity as such) and, with the exception of claims arising out of otherwise indemnifiable matters (e.g., actions to enforce the indemnification rights provided hereunder), and excluding claims between the Company and an Indemnitee), whether or not such Indemnitee shall be designated a party thereto, which may be imposed on, incurred by, or asserted against that Indemnitee, in any manner relating to or arising out of this Agreement, the Notes, the Note Documents or the other documents related to the transactions contemplated hereby (including, without limitation, the existence or exercise of any security rights with respect to the Collateral in accordance with the Security Agreement), the Purchasers' agreement to purchase the Notes or the use or intended use of the proceeds of any of the proceeds thereof to the Company (the "*Indemnified Liabilities*"); provided, that the Indemnitor shall not have any obligation to an Indemnitee hereunder with respect to an Indemnified Liability to the extent that such Indemnified Liability arises from the gross negligence or willful misconduct of that Indemnitee as determined by a final nonappealable order of a court of competent jurisdiction. Each Indemnitee shall give the Indemnitor prompt written notice of any claim that might give rise to Indemnified Liabilities setting forth a description of those elements of such claim of which such Indemnitee has knowledge; provided, that any failure to give such notice shall not affect the obligations of the Indemnitor unless (and then solely to the extent) such Indemnitor is not aware of such claim and is materially prejudiced. The Indemnitor shall have the right at any time during which such claim is pending to select counsel to defend and control the defense thereof and settle any claims for which it is responsible for indemnification hereunder (provided that the Indemnitor will not settle any such claim without (i) the appropriate Indemnitee's prior written consent, which consent shall not be unreasonably withheld or (ii) obtaining an unconditional release of the appropriate Indemnitee from all claims arising out of or in any way relating to the circumstances involving such claim) so long as in any such event the Indemnitor shall have stated in a writing delivered to the Indemnitee that, as between the Indemnitor and the Indemnitee, the

34

Indemnitor is responsible to the Indemnitee with respect to such claim to the extent and subject to the limitations set forth herein; provided, that the Indemnitor shall not be entitled to control the defense of any claim in the event that in the reasonable opinion of counsel for the Indemnitee, there are one or more material defenses available to the Indemnitee which are not available to the Indemnitor, in which case the Indemnitee may retain separate counsel and the Company will pay the reasonable fees and expenses of such counsel (including the reasonable fees and expenses of counsel to such Indemnitee incurred in evaluating whether such a conflict exists); provided further, that with respect to any claim as to which the Indemnitee is controlling the defense, the Indemnitor will not be liable to any Indemnitee for any settlement of any claim pursuant to this Section 10.10(b) that is effected without its prior written consent, which consent shall not be unreasonably withheld. To the extent that the undertaking to indemnify, pay and hold harmless set forth in this Section 10.10(b) may be unenforceable because it is violative of any law or public policy, the Company shall contribute the maximum portion which it is permitted to pay and satisfy under applicable law, to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnitees or any of them. The obligations of each of the parties under this Section 10.10 will survive the payment or transfer of any Note, the enforcement, amendment or waiver of any provision of this Agreement, the resignation or removal of any Agent and the termination of this Agreement.

(c)     To the extent permitted by applicable law, none of the parties hereto shall assert, and each of the parties hereto hereby waives, any claim against the other parties (including their respective affiliates, partners, stockholders, members, directors, officers, agents, employees and controlling persons), on any theory of liability for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the transactions contemplated hereunder, any Note Document, the Notes or the use of the proceeds thereof; provided that nothing contained in this Section 10.10(c) shall limit the Notes Parties' indemnification and reimbursement obligations to the extent set forth in this Agreement.

**10.11    Delays or Omissions.** It is agreed that no delay or omission to exercise any right, power or remedy accruing to each Purchaser, upon any breach or default of the Company under this Agreement or any other Note Document shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. It is further agreed that any waiver, permit, consent or approval of any kind or character by a Purchaser of any breach or default under this Agreement, or any waiver by such Purchaser of any provisions or conditions of this Agreement must be in writing and shall be effective only to the extent specifically set forth in writing and that all remedies, either under this Agreement, or by law or otherwise afforded to such Purchaser, shall be cumulative and not alternative.

**10.12    Waiver of Conflicts**. Each party to this Note acknowledges that Cooley LLP ("***Cooley***"), outside general counsel to the Company, has in the past performed and is or may now or in the future represent the Holders or the Holders' affiliates in matters unrelated to the transactions contemplated by this Note (the "***Note Financing***"), including representation of the Holders or the Holders' affiliates in matters of a similar nature to the Note Financing. The applicable rules of professional conduct require that Cooley inform the parties hereunder of this representation and obtain their consent. Cooley has served as outside general counsel to the Company and has negotiated the terms of the Note Financing solely on behalf of the Company. The Company and the Holders hereby (i) acknowledge that they have had an opportunity to ask for and have obtained information relevant to such representation, including disclosure of the reasonably foreseeable adverse consequences of such representation; (ii) acknowledge that with respect to the Note Financing, Cooley has represented solely the Company, and not any Holder or any stockholder, board member or employee of the Company or director, stockholder or employee of the

Holder; and (iii) gives the Holder's informed consent to Cooley's representation of the Company in the Note Financing.

**10.13   Obligations Several**.   The Purchasers' obligations hereunder are several and not joint obligations and no Purchaser shall have any liability to any Person for the performance or non-performance of any obligation by any other Purchaser hereunder.

**10.14   Survival of Representations and Warranties**. All of the representations and warranties made by the Note Parties and their Subsidiaries herein shall survive the execution and delivery of this Agreement, any investigation by or on behalf of any Purchaser, acceptance of the Notes and payment therefor, or termination of this Agreement.

**10.15 Entire Agreement**. This Agreement and the other Note Documents constitute the entire contract among the parties hereto regarding to the subject matters addressed herein and supersede any and all previous agreements, negotiations, and discussions, oral or written, by the parties regarding the subject matters addressed herein.

**10.16   Withholding**. The Company shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement such amounts as it is required to deduct and withhold under the Code, or any Tax law, with respect to the making of such payment. To the extent that amounts are so withheld, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made. If a payment is payable (in whole or in part) in consideration other than cash and if the cash portion of any such payment is insufficient to satisfy all required Tax withholding obligations, the Company shall retain an amount of the non-cash consideration otherwise payable equal in value to the amount required to satisfy any applicable withholding taxes (as reasonably determined by the Company).**10.17 PATRIOT ACT**. The Agents hereby notify the Company that pursuant to the requirements of the PATRIOT Act, the Company may be required to obtain, verify and record information that identifies the Company, its subsidiaries and the Guarantors, including their respective names, addresses and other information that will allow the Agent to identify, the Company, its subsidiaries and the Guarantors in accordance with the PATRIOT Act.

*[Signature pages follow]*

36

254153937 v7

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first written above.

**COMPANY:**

**CORE SCIENTIFIC HOLDING CO.**

By
Name:  Michael Trzupek
Title:    Chief Financial Officer

Address for notices:
2800 Northup Way
Suite 220
Bellevue, WA 98004
Attention:  Michael Trzupek, Chief Financial Officer
Email:  mtrzupek@corescientific.com

Copy to:
Todd DuChene, General Counsel
Email:  tduchene@corescientific.com

*In each case, with a copy (which shall not constitute notice) to:*

Cooley LLP
1299 Pennsylvania AVE, NW
Suite 700
Washington, DC 20004
Attention:  Mike Tollini
Email:  mtollini@cooley.com

[Signature Page to Convertible Note Purchase Agreement]

**GUARANTORS:**

**CORE SCIENTIFIC, INC.,** a Delaware corporation

By: _____
Name: Michael Trzupek
Title:   Chief Financial Officer

**AMERICAN PROPERTY ACQUISITION, LLC,** a Delaware limited liability company

By: Core Scientific, Inc., its sole member

By: _____
Name: Michael Trzupek
Title:   Chief Financial Officer

**AMERICAN PROPERTY ACQUISITIONS I, LLC,** a North Carolina limited liability company

By: American Property Acquisition, LLC, its sole member

By:  Core Scientific, Inc., its sole member

By: _____
Name: Michael Trzupek
Title:   Chief Financial Officer

[Signature Page to Convertible Note Purchase Agreement]

**AMERICAN PROPERTY ACQUISITIONS VII, LLC,** a Georgia limited liability company

By:  American Property Acquisition, LLC, its sole member

    By:  Core Scientific, Inc., its sole member

By: _____

Name:  Michael Trzupek

Title:   Chief Financial Officer


**BLOCKCAP, INC.,** a Nevada corporation

By: _____

Name:  Todd DuChene

Title:   Secretary

[Signature Page to Convertible Note Purchase Agreement]

**U.S. BANK NATIONAL ASSOCIATION, AS NOTE AGENT**

By: _____
Name:  Joshua A. Hahn
Title:  Vice President

Address for notices:
U.S. Bank National Association
West Side Flats
60 Livingston Avenue
EP-MN-WS3C
St. Paul, MN 55107
Attention: Joshua Hahn (Core Sciences)


*In each case, with a copy (which shall not constitute notice) to:*

Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103
Attn: Nathan Plotkin (Core Scientific)

[Signature Page to Convertible Note Purchase Agreement]

**U.S. BANK NATIONAL ASSOCIATION, AS COLLATERAL AGENT**


By: _____

Name: Joshua A. Hahn
Title: Vice President

Address for notices:
U.S. Bank National Association
West Side Flats
60 Livingston Avenue
EP-MN-WS3C
St. Paul, MN 55107
Attention: Joshua Hahn (Core Sciences)


*In each case, with a copy (which shall not constitute notice) to:*

Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103
Attn: Nathan Plotkin (Core Scientific)

PURCHASER:

**MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY**

By: _____
Name:   Eric Partlan
Title:   Head of Portfolio Management

[Signature Page to Convertible Note Purchase Agreement]

PURCHASER:

CRYPTONIC BLACK, LLC

By:
Name: Jennifer LaFrance
Title:  Manager

[Signature Page to Convertible Note Purchase Agreement]

PURCHASER:

FIRST SUN INVESTMENTS, LLC

By:
Name:  Brent Berge
Title:   Manager

[Signature Page to Convertible Note Purchase Agreement]

**PURCHASER:**

_____

**DOUGLAS LIPTON**

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

APOLLO TACTICAL VALUE SPN
INVESTMENTS, L.P.
By: Apollo Tactical Value SPN Management, LLC, its investment manager

By: _____
Name:  Joseph D. Glatt
Title:  Vice President

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

APOLLO CENTRE STREET PARTNERSHIP, L.P.
By: Apollo Centre Street Management, LLC, its investment manager

By: _____
Name: Joseph D. Glatt
Title:   Vice President

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

APOLLO LINCOLN FIXED INCOME FUND, L.P.
By: Apollo Lincoln Fixed Income Management, LLC, its investment manager

By: _____
Name: Joseph D. Glatt
Title:   Vice President

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

APOLLO MOULTRIE CREDIT FUND, L.P.
By: Apollo Moultrie Credit Fund Management, LLC, its investment manager

By: _____
Name:   Joseph D. Glatt
Title:    Vice President

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

BLOCKFI LENDING LLC

By: Rene van kesteren

DocuSigned by:

4E48656DF99C4AC...

Name:

Title:

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

WOLFSWOOD PARTNERS LP

By:

Name:

Title: JASON Comorchen

Managing Member

254153937 v7

## SCHEDULE 2
## SCHEDULE OF PURCHASERS

**Initial Purchasers**

| Name and Address for Notices | Principal Amount of Notes |
|---|---|
| **MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY** <br> One Marina Park Drive, MIP 1205 <br> Boston, MA 02210 <br> Attn:     Sarah Doyle; Chris Fredericks; Helder Pereira <br> Email:     sdoyle@massmutual.com; cfredericks54@massmutual.com; hpereira@massmutual.com <br> Phone #:617-235-1522; 617-695-4069; 413-744-7347 | $40,000,000.00 |
| **CRYPTONIC BLACK, LLC** <br> 801 S. Rampart Blvd. <br> Las Vegas, NV 89145 <br> Attn:     Jennifer LaFrance <br> Email:     jlafrance@asny.com <br> Phone #:702-967-5000 | $6,000,000.00 |
| **FIRST SUN INVESTMENTS, LLC** <br> 6718 E. Rovey Avenue <br> Paradise Valley, AZ 85253 <br> Attn:     Brent Berge <br> Email:     brentberge@bergegroup.com <br> Phone #:1-602-430-3673 | $4,000,000.00 |
| **DOUGLAS LIPTON** <br> 4701 N Meridian Ave <br> Unit 315 <br> Miami Beach, FL 33140 <br> Attn:     Douglas Lipton <br> Email:     dlip44@gmail.com <br> Phone #:917-887-8869 | $250,000.00 |
| **TOTAL:** | **$50,250,000.00** |

**Additional Purchasers**

| Name and Address for Notices | Principal Amount of Notes |
|---|---|
| **Apollo Tactical Value SPN Investments LP** <br> 9 West 57th Street <br> New York, NY 10019 <br> Attn:     Joseph D. Glatt <br> Email:     jglatt@apollo.com | $4,700,000.00 |
| **Apollo Centre Street Partnership, LP** <br> 9 West 57th Street <br> New York, NY 10019 <br> Attn:     Joseph D. Glatt <br> Email:     jglatt@apollo.com | $2,500,000.00 |

| | |
|---|---|
| **Apollo Lincoln Fixed Income Fund, L.P.**<br>9 West 57th Street<br>New York, NY 10019<br>Attn:    Joseph D. Glatt<br>Email:    jglatt@apollo.com | $1,600,000.00 |
| **Apollo Moultrie Credit Fund, L.P.**<br>9 West 57th Street<br>New York, NY 10019<br>Attn:    Joseph D. Glatt<br>Email:    jglatt@apollo.com | $1,200,000.00 |
| **BlockFi Lending LLC**<br>201 Montgomery St #263<br>Jersey City, NJ 07302<br>Attn:    Sergey Pekarsky<br>Email:    tradingops@blockfi.com, Legal-inst@blockfi.com | $5,000,000.00 |
| **Wolfswood Partners LP**<br>140 Broadway<br>New York, NY 10005<br>Attn:    Jason Comerchero<br>Email:    jason.comerchero@wolfswoodpartners.com | $1,000,000.00 |
| **TOTAL:** | **$16,000,000.00** |

**SCHEDULE 5.1**

**NOTE PARTIES**

| Entity Name | Former Names (within last 5 years) | Jurisdiction of Organization | Taxpayer Identification Number | Organizational Number |
|---|---|---|---|---|
| Core Scientific Holding Co. | N/A | Delaware | 85-2941270 | 3377927 |
| Core Scientific Inc. | Mineco Holdings, Inc | Delaware | 82-3805526 | 6660521 |
| American Property Acquisition, LLC | N/A | Delaware | 82-540825 | 6857348 |
| American Property Acquisitions I, LLC | 155 Palmer Lane, LLC | North Carolina | 82-5469717 | 1687596 |
| American Property Acquisitions VII, LLC | N/A | Georgia | 83-1663198 | 18100016 |
| Blockcap Inc. | Block Capital, Inc. | Nevada | 85-4052367 | E10638672020-8 |

**SCHEDULE 5.13**

**SUBSIDIARIES**

| Entity Name | Owner | Ownership Percentage | Jurisdiction of Organization |
|---|---|---|---|
| Core Scientific Inc. | Core Scientific Holding Co. | 100% | Delaware |
| American Property Acquisition, LLC | Core Scientific, Inc. | 100% | Delaware |
| GPU One Holdings, LLC f/k/a IP Special Holdings, LLC | Core Scientific, Inc. | 100% | Delaware |
| American Property Acquisitions I, LLC | American Property Acquisition, LLC | 100% | North Carolina |
| American Property Acquisitions VII, LLC | American Property Acquisition, LLC | 100% | Georgia |
| Blockcap Inc. | Core Scientific Holding Co. | 100% | Nevada |
| Radar Relay, Inc. | Blockcap Inc. | 100% | Delaware |
| RADAR LLC | Blockcap Inc. | 100% | Colorado |
| Starboard Capital LLC | Blockcap Inc. | 100% | Colorado |

**SCHEDULE 5.14**

**CAPITALIZATION**

(see attached)

**SCHEDULE 5.17**

**INDEBTEDNESS**

1. Existing Notes

2. Mortgage in favor of Brown Corporation for that certain real property located at 206 Boring Drive, Dalton, GA 30721 in a principal amount of $547,733.71 as of February 1, 2021.

3. Mortgage in favor of Holiwood LLC for that certain real property located at 1035 Shar-Cal Rd, Calvert City, KY 42029 in a principal amount of $1,354,209.33 as of February 1, 2021.

4. That certain PPP Loan entered into April 2020, between Core Scientific, Inc. and City National Bank in a principal amount of $2,154,300.00 as of February 1, 2021.

5. The following Equipment Financing:

| Equipment Financing | Issue Date | Original Amount | Maturity | Interest Rate | Outstanding Principal (as of 02/01/21) |
|---|---|---|---|---|---|
| Genesis Global Capital, LLC #1 | July 2020 | $1,833,625 | March 2022 | 16.0% | $1,477,318 |
| Genesis Global Capital, LLC #2 | August 2020 | 1,569,132 | April 2022 | 16.0% | 1,369,909 |
| Genesis Global Capital, LLC #3 | September 2020 | 1,307,610 | April 2022 | 16.0% | 1,215,593 |
| Arctos Credit, LLC | October 2020 | 774,250 | October 2022 | 15.0% | 660,692 |
| Novak | January 2021 | 10,000,000 | January 2023 | 10.0% | 10,000,000 |
| **Total Equipment Financing** | | **$15,484,617** | | | **$14,723,512** |

6. The following Equipment Leases:

| Equipment Leases | Issue Date | Original Amount | Maturity | Interest Rate | Outstanding Principal (as of 02/01/21) |
|---|---|---|---|---|---|
| NEC Financial Services | July 2018 | $14,707 | July 2021 | 12.2% | $2,376 |
| Technology Finance Corporation #2 | May 2019 | 101,315 | May 2022 | 6.5% | 45,000 |
| Garic, Inc. | May 2019 | 466,379 | May 2022 | 6.5% | 179,847 |
| VFS, LLC | July 2019 | 421,576 | July 2022 | 7.3% | 210,510 |
| Advanced Business Equipment | October 2019 | 22,154 | October 2022 | 7.2% | 11,675 |
| Garic, Inc. #1 | September 2019 | 153,129 | September 2022 | 6.5% | 84,519 |
| 36th Street Capital #1 | October 2019 | 710,122 | October 2022 | 13.4% | 429,256 |
| 36th Street Capital #2 | December 2019 | 1,130,000 | December 2022 | 13.4% | 743,378 |
| 36th Street Capital #3 | December 2019 | 917,300 | June 2022 | 9.8% | 516,920 |
| 36th Street Capital #4 | December 2019 | 748,275 | December 2022 | 13.4% | 492,258 |
| Toyota Commercial Finance | January 2020 | 431,799 | June 2025 | 5.3% | 359,339 |
| Technology Finance Corporation #3 | March 2020 | 57,492 | February 2021 | 6.5% | - |
| Garic, Inc. #2 | March 2020 | 958,650 | March 2023 | 6.5% | 659,577 |
| De Lage Landen #1 | November 2020 | 290,246 | November 2023 | (5.3)% | 229,981 |

Core Scientific Cap Table - As Of August 12, 2021

| | Date | Shares | Capital Raised | $ Per Share | % of Total |
|---|---|---|---|---|---|
| **Preferred** | | | | | |
| Series A Convertible Preferred | 2019 / 2020 | 6,451,525 | $44,063,916 | $6.83 | 2.5% |
| Series B Convertible Preferred | 2020 | 314,285 | 1,100,000 | 3.50 | 0.1% |
| **Total Preferred Outstanding** | | **6,765,810** | **$45,163,916** | | **2.7%** |
| | | | | | |
| **Common Shares** | | | | | |
| Private Placement #1 | 1H 2018 | 7,505,000 | $48,032,000 | $6.40 | 3.0% |
| Private Placement #2 | 2H 2018 | 178,095 | 2,000,007 | 11.23 | 0.1% |
| | | | | | |
| **Business Combinations / Other** | | | | | |
| BCV 55, 66 & 77 | January 2018 | 88,501,449 | | | 35.0% |
| Matrix Mining Ltd. and MM Management Transaction | November 2018 | 1,250,000 | | | 0.5% |
| Slax Digital | September 2019 | 560,030 | | | 0.2% |
| Heldrick and Stuggles | September 2019 | 50,000 | | | 0.0% |
| Atrio | June 2020 | 561,938 | | | 0.2% |
| Blockcap | 7/1/2021 | 72,185,717 | | | 28.5% |
| **Total Common Shares Outstanding** | | **170,792,229** | **$50,032,007** | | **67.5%** |
| | | | | | |
| **Reserves & Other** | | | | | |
| RSUs Outstanding | | 53,937,486 | | | 21.3% |
| Options Outstanding | | 7,320,245 | | | 2.9% |
| Available for Future Issuance | | 10,088,856 | | | 4.0% |
| Warrants | | 4,284,887 | | | 1.7% |
| **Total Reserves & Other** | | **75,631,474** | | | **29.9%** |
| | | | | | |
| **Total Fully Diluted** | | **253,189,513** | **$95,195,923** | | **100.0%** |

1

| Equipment Leases | Issue Date | Original Amount | Maturity | Interest Rate | Outstanding Principal (as of 02/01/21) |
|---|---|---|---|---|---|
| De Lage Landen #2 | December 2020 | 99,650 | December 2023 | (5.5)% | 80,984 |
| De Lage Landen #3 | January 2021 | 228,180 | January 2024 | (0.5)% | 200,085 |
| De Lage Landen #4 | January 2021 | 99,950 | January 2024 | (5.5)% | 80,984 |
| Garic, Inc. #3 | February 2021 | 199,528 | February 2024 | 7.9% | 199,528 |
| **Total Equipment Leases** | | **$7,050,752** | | | **$4,526,215** |

**EXHIBIT A**

**FORM OF CONVERTIBLE PROMISSORY NOTE**

**(see attached)**

THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "*ACT*"), OR UNDER THE SECURITIES LAWS OF ANY STATES IN THE UNITED STATES. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT PURSUANT TO SECTION 5(C) HEREOF AND AS PERMITTED UNDER THE ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL IN FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER TO THE EFFECT THAT ANY PROPOSED TRANSFER OR RESALE IS IN COMPLIANCE WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

THIS NOTE HAS BEEN ISSUED WITH "ORIGINAL ISSUE DISCOUNT" (WITHIN THE MEANING OF SECTION 1273 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "*CODE*")). UPON WRITTEN REQUEST, THE COMPANY WILL PROMPTLY MAKE AVAILABLE TO ANY HOLDER OF THIS NOTE THE FOLLOWING INFORMATION:  (1) THE ISSUE PRICE AND ISSUE DATE OF THE NOTE, (2) THE AMOUNT OF ORIGINAL ISSUE DISCOUNT ON THE NOTE AND (3) THE YIELD TO MATURITY OF THE NOTE. HOLDERS SHOULD CONTACT THE CHIEF FINANCIAL OFFICER OF THE COMPANY AT 2800 NORTHUP WAY SUITE 220 BELLEVUE, WA 98004.

**[FORM OF] CONVERTIBLE PROMISSORY NOTE**

| | |
|---|---|
| Note Series: | 2021 Convertible Promissory Notes |
| Date of Note: | [__], 2021 |
| Initial Principal Amount of Note: | $[__], plus any PIK Interest that has accrued and been capitalized pursuant to the terms of this Note |

For value received **CORE SCIENTIFIC HOLDING CO.**, a Delaware corporation (the "*Company*"), promises to pay to the undersigned holder or such party's successors or permitted assigns (the "*Holder*") the principal amount set forth above with interest to accrue on such outstanding principal amount at a rate of 10% *per annum*, 4% of which shall be payable in cash ("*Cash Interest*") and 6% of which shall be payable in kind by capitalizing such interest payment and increasing the outstanding principal amount of this Note by the amount thereof ("*PIK Interest*"). Interest shall accrue on the outstanding principal amount of this Note commencing on (and including) the date of original issuance thereof (or the most recent interest payment date) and continuing until the earlier to occur of (x) the date this Note is repaid or prepaid in full and (y) the date this Note is converted in full by the Holder pursuant to Section 2 hereof. Cash Interest shall be due and payable and PIK Interest shall be capitalized quarterly in arrears on the first day of each fiscal quarter, commencing on October 1, 2021. Interest shall be computed on the basis of a year of 365 days for the actual number of days elapsed. This Note shall be automatically deemed to include any accrued PIK Interest thereon and the Company shall not be obligated to issue any subsequent Notes reflecting PIK Interest. This Note is one of the "Notes" issued pursuant to the Purchase Agreement. All capitalized terms used but not otherwise defined in this Note will have the same meanings in this Note as in the Purchase Agreement referred to below.

The following is a statement of the rights of the Holder and the conditions to which this Note is subject, and to which the Holder, by the acceptance of this Note, agrees:

1.      **BASIC TERMS**.

(a)      **Series of Notes**. This convertible promissory note (this "***Note***") is issued as part of a series of notes designated by the Note Series above (collectively, the "***Notes***"), having an initial aggregate principal amount of up to $300,000,000.00 and issued pursuant to, and to those persons and entities (collectively, the "***Holders***") party, as Purchasers, to, that certain Convertible Note Purchase Agreement, dated as of even date herewith (as amended, restated, supplemented and/or otherwise modified from time to time, the "***Purchase Agreement***"), by and among the Company, each Purchaser party thereto, U.S. Bank National Association, as Note Agent, and, upon the execution and delivery of the Collateral Documents pursuant to Section 6.13 of the Purchase Agreement, U.S. Bank National Association, as Collateral Agent for the Secured Parties. The Company shall maintain a ledger of all Holders ("***Ledger***"), which shall include all PIK Interest accrued and capitalized, and which shall be available (i) promptly upon request to the Agents and the Holder, (ii) promptly after any transfer or assignment of any Note, (iii) promptly upon conversion of any Note and (iv) on the tenth business day prior to any interest payment date.

(b)      **Payments**.

(i)      **Voluntary Prepayments**. Subject to and following the expiration of any applicable lockup period set forth under any lockup agreement to which the Holder, the Company and the Company's underwriters are a party, and unless otherwise converted in full or in part pursuant to Section 2 hereof (including following delivery of the Company's notice referred to in this subsection (b)(i)(2)), the Company may at any time, upon ten (10) Business Days' prior written notice to the Holder and the Note Agent (which notice may be conditioned or rescinded upon such events as may be specified in such notice) prepay all or any portion of this Note in an amount equal to (x) the outstanding principal amount (including all accrued PIK Interest not already added to the principal amount of this Note) of this Note being prepaid at such time, together with all accrued unpaid Cash Interest on such outstanding principal amount at such time *multiplied* by (y) 200% (such amount, the "***Repayment Amount***").

(ii)      **Repayment**. Unless otherwise prepaid by the Company pursuant to Section 1(b)(i) or converted in full pursuant to Section 2 hereof, this Note shall be repaid in full on the earlier to occur of (x) April 19, 2025 (the "***Maturity Date***") and (y) acceleration by the Holders representing at least twenty-five percent (25%) of the aggregate outstanding principal amount of the Notes issued pursuant to the Purchase Agreement at such time after the occurrence of an Event of Default in accordance with the terms hereof, in each case, in an amount equal to the outstanding principal (including all accrued PIK Interest not already added to the principal amount of this Note) of this Note, plus all unpaid accrued Cash Interest thereon.

(iii)      **Payments Generally**.

(1)      This Note and the other Notes issued pursuant to the Purchase Agreement are *pari passu* in right of payment and all payments (other than conversion) under this Note and such other Notes shall be made in accordance with each Holder's Pro Rata Share. All payments shall be applied first, to the payment of expenses due under this Note and the other Note Documents to the Agents, second, to the payment of expenses due under this Note and the other Note Documents to the Holders, third, unpaid accrued interest of this Note and fourth, if the amount of payment exceeds the amount of all such expenses and accrued interest, to the payment of outstanding principal (including all accrued PIK Interest not already added to the principal amount of this Note) of this Note. The conversion of this Note by the Holder pursuant to the terms hereof shall be deemed to be a repayment of the full outstanding principal

2

amount (including all accrued PIK Interest not already added to the principal amount of this Note) of such Note together with any unpaid accrued Cash Interest thereon on the date of such conversion.

(2)     All payments to be made by the Company shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff, except with respect to Taxes required to be deducted and/or withheld under applicable law. All payments (other than by means of conversion pursuant to the terms of the Notes), including any prepayments, of interest and principal to be made by the Company hereunder shall be made by the Company to the Note Agent, in cash, for the account of the respective Holders to which such payment is owed, at the applicable Notes Agent's Principal Office for payment and in same day funds not later than 11:00 a.m. on the date specified herein. The Notes Agent will promptly distribute to each Holder its Pro Rata Share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to each Holder at the address specified in the Holder's Administrative Questionnaire (or at such other address as the Holder may indicate in writing to the Note Agent from time to time). All payments received by the Notes Agent after 11:00 a.m. may (at the sole discretion of the Notes Agent) in each case be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(3)     If any payment to be made by the Company shall come due on a day other than a Business Day, any interest shall be payable, and any PIK Interest shall be capitalized, on the next succeeding Business Day without additional interest accruing thereon.

(4)     Whenever any payment received by the Notes Agent under this Agreement or any of the other Notes Documents is insufficient to pay in full all amounts due and payable to the Notes Agent and the Holders under or in respect of this Agreement and the other Notes Documents on any date, such payment shall be distributed by the Notes Agent and applied by the Notes Agent and the Holders in the order of priority set forth in Section 1(b)(iii)(1). If the Notes Agent receives funds for application to the Obligations of the Company under or in respect of the Notes Documents under circumstances for which the Notes Documents do not specify the manner in which such funds are to be applied, the Notes Agent may, but shall not be obligated to, elect to distribute such funds to the Holders in accordance with the Holder's Pro Rata Share of such of the outstanding Notes or other Obligations then owing to the Holder.

(iv)     **Withholding**.  Notwithstanding anything to the contrary herein, the Company shall be entitled to deduct and withhold from the consideration otherwise payable under the Note such amounts as it is required to deduct and withhold under the Code, or any other tax law, with respect to the making of such payment. To the extent that amounts are so withheld, such withheld amounts shall be treated for all purposes of this Note as having been paid to the Person in respect of whom such deduction and withholding was made. If a payment is payable (in whole or in part) in consideration other than cash and if the cash portion of any such payment is insufficient to satisfy all required tax withholding obligations, the Company shall retain an amount of the non-cash consideration otherwise payable equal in value to the amount required to satisfy any applicable withholding taxes (as reasonably determined by the Company).

2.     CONVERSION.

(a)     **Conversion upon an Offering**. In the event that the Company (i) issues and sells shares of its equity securities ("***Equity Securities***") to investors (the "***Investors***") in a private offering or placement with total gross proceeds to the Company of at least $50,000,000 (excluding the conversion of the Notes or other convertible securities issued for capital raising purposes (*e.g.*, Simple Agreements for Future Equity)), (ii) issues and sells its common stock ("***Common Stock***") to Investors in an underwritten public offering pursuant to an effective registration statement filed with the Securities and Exchange Commission in accordance with the Act or under equivalent securities laws and regulations of any other

3

jurisdiction (including, for the avoidance of doubt, a SPAC), (iii) lists its Common Stock (other than shares of Common Stock not eligible for resale under Rule 144 under the Securities Act) on a national securities exchange by means of an effective registration statement on Form S-1 filed by the Company with the SEC that registers shares of existing capital stock of the Company for resale, as approved by the Company's board of directors, or (iv) lists its Common Stock on any stock exchange (the occurrence of each event set forth in clauses (i) through (iv) above, an "***Offering***" and, together with the occurrence of a Change of Control as provided in Section 2(b) below, each, a "***Conversion Event***"), in each case, while this Note remains outstanding, the Holder shall have the right at any time and from time to time during the period commencing on the date of consummation of such Offering until the Maturity Date, to convert, in whole or in part, the outstanding principal amount (including all accrued PIK Interest not already added to the principal amount of this Note) of this Note, together with all unpaid accrued Cash Interest thereon, into Equity Securities or Common Stock of the Company (as applicable) at a conversion price equal to the Applicable Conversion Price (as defined below) (which shall be determined, for the avoidance of doubt, on the date of the consummation of such Offering). The issuance of Equity Securities or Common Stock by the Company (as applicable) pursuant to the conversion of this Note shall be upon and subject to the same terms and conditions (other than as otherwise set forth herein) applicable to Equity Securities or Common Stock of the Company (as applicable), sold in the applicable Offering.

(b)     **Conversion upon a Change of Control**. In the event the Company consummates a Change of Control (as defined below) while this Note remains outstanding, the Company shall repay the outstanding principal amount of this Note in an amount equal to the Repayment Amount; provided, however, that upon the written election of the Holder made not less than five (5) days prior to the Change of Control, the Company shall convert the outstanding principal amount of this Note (including all accrued PIK Interest not already added to the principal amount of this Note) and any unpaid accrued Cash Interest into Common Stock at a conversion price equal to the Applicable Conversion Price (which shall be determined, for the avoidance of doubt, on the date of consummation of such Change of Control) (assuming conversion of all securities convertible into Common Stock and exercise of all outstanding options and warrants, but excluding the shares of equity securities of the Company issuable upon the conversion of Notes or other convertible securities issued for capital raising purposes (e.g., Simple Agreements for Future Equity)). The Company shall give the Holder and the Note Agent written notice of any Change of Control at least ten (10) Business Days prior to the consummation thereof, which notice will contain the material terms and conditions (including price and form of consideration) of the Change of Control, the identity of the parties to the Change of Control and the intended date of the Change of Control.

For purposes of this Note, (i) a "***Change of Control***" means, at any time, any Person or "group" other than the Permitted Holders (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act) shall have obtained the power (whether or not exercised) to elect a majority of the members of the board of directors of the Company; (ii) "***Permitted Holders***" means each of BCV 55 LLC, BCV 66 LLC, BCV 77 LLC and each of their respective affiliates; (iii) "***Fair Market Value Per Common Share***" means the cash and/or the value of the property, rights or securities to be paid or distributed per share of Common Stock of the Company to the holders of Common Stock of the Company pursuant to a Change of Control or a SPAC (with the value of such property, rights or securities being determined in good faith by the board of directors of the Company); (iv) the "***Applicable Conversion Price***" means a conversion price equal to (a) 80% of either (x) the cash price paid per share for Equity Securities or Common Stock of the Company (as applicable) by the Investors in an Offering (other than a SPAC) or (y) the Fair Market Value Per Common Share in a Change of Control or a SPAC, as applicable, if the Conversion Event occurs on or prior to April 19, 2022, (b) 75% of either (x) the cash price paid per share for Equity Securities or Common Stock of the Company (as applicable) by the Investors in an Offering (other than a SPAC) or (y) the Fair Market Value Per Common Share in a Change of Control or a SPAC, as applicable, if the Conversion Event occurs on or after April 19, 2022 but prior to April 19, 2023, (c) 70% of either (x) the cash price paid per share for Equity Securities or Common Stock of the Company (as applicable) by the Investors in an Offering (other than a

SPAC) or (y) the Fair Market Value Per Common Share in a Change of Control or a SPAC, as applicable, if the Conversion Event occurs on or after April 19, 2023 but prior to April 19, 2024 and (d) 65% of either (x) the cash price paid per share for Equity Securities or Common Stock of the Company (as applicable) by the Investors in an Offering (other than a SPAC) or (y) the Fair Market Value Per Common Share in a Change of Control or a SPAC, as applicable, if the Conversion Event occurs on or after April 19, 2024 but prior to April 19, 2025; (v) in connection with any SPAC, each reference to "Company" shall be deemed to also refer to a Parent Entity that has become a co-obligor with respect to the Company's Obligations hereunder (except that solely such Parent Entity, and not Core Scientific Holding Co. (or its successor by merger), shall be obligated to deliver Equity Securities or Common Stock pursuant to this <u>Section 2</u>); and (vi) in connection with any SPAC, each reference to "Common Stock" shall be deemed to refer to the kind and the amount of property that a holder of one share of Common Stock of the Company would be entitled to receive on account of the consummation of such SPAC.

(c)       **Procedure for Conversion**. Upon the conversion in whole or in part of this Note into Equity Securities or Common Stock of the Company (as applicable), the Holder shall surrender this Note to the Company and deliver to the Company any documentation reasonably required by the Company (including, in the case of an Offering, all financing documents executed by the Investors in connection with such Offering). The Company shall not be required to issue or deliver the Equity Securities or Common Stock of the Company (as applicable) into which this Note may convert until the Holder has surrendered this Note to the Company and delivered to the Company any such documentation. The Company shall, as soon as practicable after the surrender of this Note and delivery to the Company of such documentation deliver to the Holder (i) a certificate or certificates for the number of shares of Equity Securities or Common Stock of the Company (as applicable) into which this Note is convertible in whole or in part, rounded downward to the nearest whole share and cash for the amounts not so converted as a result of the above-referenced downward rounding, registered in the name of such Investor or registered nominee or assignee and (ii) to the extent the Holder has converted only a portion of the outstanding principal amount of this Note, a replacement Note for the outstanding principal amount of this Note not converted. Upon the conversion in full or in part of this Note into Equity Securities or Common Stock of the Company (as applicable) pursuant to the terms hereof, in lieu of any fractional shares to which the Holder would otherwise be entitled, the Company shall pay the Holder cash equal to such fraction multiplied by the price at which this Note converts. Upon conversion of this Note in full or in part and payment of cash representing any fractional share pursuant to this <u>Section 2(c)</u>, the Company shall be forever released from all its obligations and liabilities under this Note and this Note shall be deemed of no further force or effect, whether or not the original of this Note has been delivered to the Company for cancellation.

(d)       **Taxes**. The Company shall pay any and all stamp, stock transfer, stock issuance and other similar taxes that may be payable in respect of any issuance or delivery of shares of Equity Securities or Common Stock of the Company (as applicable) upon conversion of this Note pursuant to this <u>Section 2</u>. The Company shall not, however, be required to pay any income, capital gains or similar tax of the recipient of Equity Securities or Common Stock of the Company (as applicable) or any tax which may be payable in respect of any transfer involved in the issuance and delivery of shares of Equity Securities or Common Stock of the Company (as applicable) in a name other than that in which this Note so converted was registered, and no such issuance or delivery shall be made unless and until the person or entity requesting such issuance has paid to the Company the amount of any such tax or has established, to the satisfaction of the Company, that such tax has been paid.

3.    **SECURED NOTE.**

Upon the execution and delivery of the Collateral Documents pursuant to Section 6.13 of the Purchase Agreement, this Note shall be secured by a first-priority Lien on the Collateral (subject to Permitted Liens) pursuant to the Security Agreement.

4.    **EVENTS OF DEFAULT.**

If there shall be any Event of Default (as defined below) hereunder, at the option and upon the declaration of the Holders representing at least twenty-five percent (25%) of the aggregate outstanding principal amount of the Notes issued pursuant to the Purchase Agreement at such time and upon written notice to the Company (which election and notice shall not be required in the case of an Event of Default under subsection (v) or (vi) below), this Note shall accelerate and all principal (including all accrued PIK Interest not already added to the principal amount of this Note) and all unpaid accrued Cash Interest shall automatically become immediately due and payable. The occurrence of any one or more of the following shall constitute an "***Event of Default***":

(i)    the Company fails to pay to the Holder (i) the principal of this Note as and when due or (ii) within five (5) Business Days after the same becomes due any Cash Interest on this Note or any fees or any other Obligations;

(ii)    any representation or warranty made or deemed made by or on behalf of the Company or any of its Subsidiaries to the Holder under or in connection with the Note Documents or any certificate or information delivered in connection therewith shall be materially false when made;

(iii)    the Company and its Subsidiaries fail to observe or perform any term, covenant, or provision contained in Section 7 of the Purchase Agreement and such non-observance or non-performance shall not have been remedied or waived within thirty (30) days after the earlier of (i) the Company becoming aware of such non-observance or non-compliance or (ii) receipt by the Company of notice from a Holder of such non-observance or non-compliance;

(iv)    the Company and its Subsidiaries fail to observe or perform any other term, covenant or provision contained in the Purchase Agreement (other than those specified elsewhere in this Section 4) or any other Note Document and such non-observance or non-performance shall not have been remedied or waived within thirty (30) days after the earlier of (i) the Company becoming aware of such non-observance or non-compliance or (ii) receipt by the Company of notice from a Holder of such non-observance or non-compliance;

(v)    the Company or any Material Subsidiary shall (i) apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (ii) admit in writing its inability to pay its debts generally as they mature, (iii) make a general assignment for the benefit of its or any of its creditors, (iv) be dissolved or liquidated, (v) commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, or (vi) take any action for the purpose of effecting any of the foregoing;

(vi)    proceedings for the appointment of a receiver, trustee, liquidator or custodian of the Company or any of its Material Subsidiaries, or of all or a substantial part of the property thereof, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with

respect to the Company or any of its Material Subsidiaries, if any, or the debts thereof under any bankruptcy, insolvency or other similar law now or hereafter in effect shall be commenced, or an order for relief shall be entered in any such proceeding, or such proceeding shall not be dismissed or discharged within 60 days of commencement;

(vii)    the Company fails to pay when due any principal of or interest on or any other amount payable in respect of, or breaches or defaults under any other term of, any mortgage, indenture, agreement or other instrument under which there may be outstanding any Indebtedness in an aggregate principal amount of in excess of $10,000,000, in each case, beyond the grace period, if any, if the effect of such non-payment, breach or default is to cause such Indebtedness to become or be declared due and payable (or subject to a compulsory repurchase or redemption) prior to its stated maturity;

(viii)    any court, government, or Governmental Authority shall condemn, seize or otherwise appropriate, or take custody or control of, all or any material portion of the property of the Company and its Subsidiaries, taken as a whole;

(ix)    one or more judgments or orders for the payment of money in excess of $10,000,000 (or the equivalent thereof in currencies other than U.S. dollars) in the aggregate shall be entered or filed against the Company or any of its Subsidiaries and shall remain undischarged, unvacated, unbonded or unstayed for a period of thirty (30) consecutive days;

(x)    (i) the occurrence of a Reportable Event with respect to any Plan, (ii) the filing of a notice of intent to terminate a Plan by the Company, any ERISA Affiliate or any Subsidiary, the institution of proceedings to terminate a Plan by the PBGC or any other Person; (iii) the withdrawal in a "complete withdrawal" or a "partial withdrawal" as defined in Sections 4203 and 4205, respectively, of ERISA by the Company, any ERISA Affiliate or any Subsidiary of the Company from any Multiemployer Plan, (iv) the incurrence of any material increase in the contingent liability of the Company or any of its Subsidiaries with respect to any "employee welfare benefit plan" as defined in Section 3(1) of ERISA which covers retired employees and its beneficiaries or (v) the Unfunded Pension Liabilities of all Single Employer Plans shall exceed (in the aggregate) $10,000,000, in each such case which, either individually or in the aggregate, would be reasonably expected to result in liability to any Note Party in excess of $10,000,000;

(xi)    the institution by the Company, any ERISA Affiliate or any Subsidiary of steps to terminate any Plan if, in order to effectuate such termination, the Company, such ERISA Affiliate or such Subsidiary, as the case may be, would be required to make a contribution to such Plan, or would incur a liability or obligation to such Plan, in excess of $10,000,000, or the institution by the PBGC of steps to terminate any Plan, which would reasonably be expected to result in material liability to any Note Party;

(xii)    the Company or any Material Subsidiary shall (i) be the subject of any proceeding pertaining to the release by the Company, any such Material Subsidiary or any other Person of any Hazardous Material into the environment or (ii) violate any Environmental Law, which, in either case could reasonably be expected to have a Material Adverse Effect;

(xiii)    from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13 of the Purchase Agreement, any Collateral Document shall for any reason fail to create a valid and perfected first priority (subject to any Permitted Liens) security interest in any collateral purported to be covered thereby, except as permitted by the terms of such Collateral Document, or any Collateral Document shall fail to remain in full force or effect (other than in accordance with the terms hereof or thereof) or any action taken by the Company or any Subsidiary shall be taken to discontinue or to assert the invalidity or unenforceability of such Collateral Document;

(xiv)    any intercreditor agreement or subordination agreement relating to any Indebtedness of any Note Party subordinated to the Obligations, or any subordination provisions of any note or other document running to the benefit of the Holders in respect of such Indebtedness, including, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13 of the Purchase Agreement, the Intercreditor Agreement, shall cease for any reason to be in full force and effect other than in accordance with the terms hereof or thereof or any Note Party or any of their Subsidiaries shall so assert in writing; or

(xv)    the Note Parties shall be enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of the business of the Note Parties, taken as a whole.

5.    MISCELLANEOUS PROVISIONS.

(a)    **Waivers**. The Company hereby waives demand, notice, presentment, protest and notice of dishonor.

(b)    **Further Assurances**. The Holder agrees and covenants that at any time and from time to time the Holder will promptly execute and deliver to the Company such further instruments and documents and take such further action as the Company may reasonably require in order to carry out the full intent and purpose of this Note and to comply with state or federal securities laws or other regulatory approvals.

(c)    **Transfers of Notes**. Subject to the Company's prior written consent (not to be unreasonably withheld or delayed) and to the extent permitted by applicable law, this Note may be transferred only upon its surrender to the Company for registration of transfer, duly endorsed, or accompanied by a duly executed written instrument of transfer in form satisfactory to the Company. Thereupon, this Note shall be reissued to, and registered in the name of, the transferee, or a new Note for like principal amount and interest shall be issued to, and registered in the name of, the transferee. Interest and principal shall be paid solely to the registered holder of this Note. Such payment shall constitute full discharge of the Company's obligation to pay such interest and principal. Upon the effectiveness of any transfer pursuant to this Section 5(c) the Company shall provide an updated Ledger to the Note Agent. Any transfer of this Note in contravention of this Section 5(c) shall be void and the Company shall be entitled to continue to treat the Holder as the holder of this Note for all purposes under the Note Documents. The Company shall at all times maintain a book-entry system, which shall reflect ownership of this Note and interests therein. This Note is intended to be in "registered form" for United States federal tax purposes.

(d)    **Market Standoff**. To the extent requested by the Company or an underwriter of securities of the Company, each Holder and any permitted transferee thereof shall not, without the prior written consent of the underwriters in an underwritten public offering pursuant to an effective registration statement filed with the Securities and Exchange Commission in accordance with the Act or under equivalent securities laws and regulations of any other jurisdiction, offer, sell, make any short sale of, grant or sell any option for the purchase of, lend, pledge, otherwise transfer or dispose of (directly or indirectly), enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership (whether any such transaction is described above or is to be settled by delivery of Securities or other securities, in cash, or otherwise), any Securities or other shares of stock of the Company then owned by such Holder or any transferee thereof, or enter into an agreement to do any of the foregoing, for up to 180 days following the consummation of any such offering. For purposes of this paragraph, "*Company*" includes the Company or any other direct or indirect parent entity of the Company into which the Company merges or consolidates. The Company may place restrictive legends on the certificates representing the shares subject to this paragraph and may impose stop transfer instructions with

respect to the Securities and such other shares of stock of each Holder and any transferee thereof (and the shares or securities of every other person subject to the foregoing restriction) until the end of such period. Each Holder and any transferee thereof shall enter into any agreement reasonably required by the underwriters for such an offering to implement the foregoing within any reasonable timeframe so requested. The underwriters for any such offering are intended third party beneficiaries of this paragraph and shall have the right, power and authority to enforce the provisions of this paragraph as though they were parties hereto. The provisions of this paragraph shall survive any conversion and/or repayment of this Note.

(e) **Waiver of Statutory Information Rights**. Prior to the conversion in full of this Note, the Holder, on behalf of the Holder and all beneficial owners of the Securities now or hereafter owned by the Holder (a "***Beneficial Owner***"), acknowledges and agrees that that neither the Holder nor any of the Beneficial Owners will have any right to receive any information from the Company by virtue of ownership of any of the Securities. Without limiting the foregoing, prior to the conversion in full of this Note, to the fullest extent permitted by law, the Holder hereby unconditionally and irrevocably waives all rights under Section 220 of the Delaware General Corporation Law and all such similar information and/or inspection rights that may be provided under the law of any jurisdiction, or any federal, state or foreign regulation, that are, or may become, applicable to the Company or the Company's capital stock (the "***Inspection Rights***") on behalf of the Holder and all Beneficial Owners. The Holder, on behalf of the Holder and all Beneficial Owners, hereby covenants and agrees that neither the Holder nor any Beneficial Owner shall directly or indirectly commence, voluntarily aid in any way, prosecute, assign, transfer, or cause to be commenced any claim, action, cause of action, or other proceeding to pursue or exercise the Inspection Rights. The Holder hereby further warrants and represents that the Holder has reviewed this waiver with its legal counsel, and that the Holder knowingly and voluntarily waives its rights otherwise provided by Section 220 of the Delaware General Corporation Law (or under similar rights under other applicable law). Notwithstanding the foregoing, Beneficial Owners that were issued Equity Securities other than by way of a conversion in connection with an Offering will not be subject to this Section 5(e). The terms of this Section 5(e) shall survive any repayment of this Note.

(f) **Amendment and Waiver**. This Note and any term hereof may only be amended, waived or modified in accordance with Section 10.9 of the Purchase Agreement. Upon the effectuation of such amendment, waiver or modification with the consent of the Required Holders or each Holder, as applicable, in conformance with Section 10.9 of the Purchase Agreement, such amendment, waiver or modification shall be effective as to, and binding against the Holders of, all of the Notes, and the Company shall promptly give written notice thereof to the Holder if the Holder has not previously consented to such amendment, waiver or modification in writing; provided that the failure to give such notice shall not affect the validity of such amendment, waiver or modification.

(g) **Binding Agreement**. The terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Note, expressed or implied, is intended to confer upon any third party any rights, remedies, obligations, or liabilities under or by reason of this Note, except as expressly provided in this Note. Notwithstanding any assumption of the Company's Obligations under this Note by a Parent Entity in accordance with Section 10.1 of the Purchase Agreement, Core Scientific Holding Co. (or its successor by merger) shall remain a co-obligor with such Parent Entity with respect to such Obligations (other than any such Obligation of the Company to deliver Equity Securities or Common Stock pursuant to Section 2 of this Note, with respect to which delivery Obligation Core Scientific Holding Co. (or its successor by merger) shall be a Guarantor).

(h) **Counterparts**. This Note may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract. Any counterpart of a signature page to this Note may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature

complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.

(i)     **Headings; Interpretation**. Paragraph headings used in this Note are included for convenience of reference only and will not modify the provisions that they precede or affect the interpretation of this Note or any other Note Document. The term "including" shall be interpreted to mean "including but not limited to".

(j)     **Notices**. All communications and notices required or permitted to be given hereunder shall be delivered in accordance with Section 10.8 of the Purchase Agreement.

(k)     **GOVERNING LAW.** THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.

(l)     **Expenses, Etc**. This Note is subject to the provisions of Section 10.3 (Jurisdiction and Venue), Section 10.4 (Waiver of Jury Trial) and Section 10.10 (Expenses and Indemnification) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*.

(m)     **Delays or Omissions**. It is agreed that no delay or omission to exercise any right, power or remedy accruing to each Holder, upon any breach or default of the Company under this Note or any Note shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. It is further agreed that any waiver, permit, consent or approval of any kind or character by a Holder of any breach or default under this Note, or any waiver by such Holder of any provisions or conditions of this Note must be in writing and shall be effective only to the extent specifically set forth in writing and that all remedies, either under this Note, or by law or otherwise afforded to such Holder, shall be cumulative and not alternative.

(n)     **Entire Agreement**. This Note and the other Note Documents constitute the entire contract among the parties hereto regarding to the subject matters addressed herein and supersede any and all previous agreements, negotiations, and discussions, oral or written, by the parties regarding the subject matters addressed herein.

(o)     **Exculpation among Holders**. The Holder acknowledges that the Holder is not relying on any person, firm or corporation, other than the Company and its officers and board members, in making its investment or decision to invest in the Company.

(p)     **Broker's Fees**. Each party hereto represents and warrants that no agent, broker, investment banker, person or firm acting on behalf of or under the authority of such party hereto is or will be entitled to any broker's or finder's fee or any other commission directly or indirectly in connection with the transactions contemplated herein. Each party hereto further agrees to indemnify each other party for any claims, losses or expenses incurred by such other party as a result of the representation in this subsection being untrue.

(q)     **Repayment Amounts**. The parties hereto hereby acknowledge and agree that

10

payment of any Repayment Amount hereunder constitutes liquidated damages and not a penalty, the actual amount of damages to the Holder or profits lost by the Holder as a result of a prepayment or conversion of this Note would be impracticable and extremely difficult to ascertain and the Repayment Amount hereunder is part of an arm's length transaction between sophisticated parties represented by counsel and is bargained for consideration provided for and agreed to by mutual agreement of the Company and the Holder. THE NOTE PARTIES EXPRESSLY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE REPAYMENT AMOUNT TO THE EXTENT SUCH REPAYMENT AMOUNT IS DUE AND PAYABLE IN ACCORDANCE WITH THIS NOTE. The Note Parties expressly agree that: (i) the Repayment Amount shall be payable notwithstanding the then prevailing market rates at the time payment is made; (ii) the Note Parties shall be estopped hereafter from claiming differently than as agreed to in this paragraph; and (iii) their agreement to pay the Repayment Amount is a material inducement to the Holder to purchase the Note.

(r)     **Tax Forms**. Prior to the date hereof, the Holder (and, in the event any Person becomes an assignee or participant in respect of this Note, prior to the date such Person becomes such an assignee or participant) shall have delivered to the Company executed copies of Internal Revenue Service ("**IRS**") Form W-9 or appropriate IRS Form W-8, as applicable, as well as any reasonably necessary supporting information, certifying that any payments to such Holder (or assignee or participant) under this Note are exempt from U.S. federal withholding tax. The Holder (and assignee or participant) further agrees that if any such form or certification expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Company in writing of its legal inability to do so.

(s)     **Calculations**. The Company shall be responsible for making all calculations with respect to this Note, including, without limitation, accrued interest (including PIK Interest), the Fair Market Value Per Common Share and the Applicable Conversion Price and shall forward such calculations to the Agents and the Holder upon request.

*[Signature pages follow]*

11

**IN WITNESS WHEREOF**, the parties hereto have executed this Note as of the date first written above.

COMPANY:

CORE SCIENTIFIC HOLDING CO.

By: _____

      Name:
      Title:

E-mail: _____

Address:

**HOLDER (if an entity):**

Name of Holder: _____

By: _____

Name: _____
Title: _____

E-mail: _____

Address: _____
_____
_____

**HOLDER (if an individual):**

Name of Holder: _____

Signature: _____

E-mail: _____

Address: _____
_____
_____

[Signature Page to Core Scientific Holding Co. Convertible Promissory Note]

**EXHIBIT B**

**FORM OF COUNTERPART SIGNATURE PAGE**

      **IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

                                                 The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

                                               **ADDITIONAL PURCHASER:**

                                               [                ]

                                             By:_____
                                             Name:
                                             Title:

**EXHIBIT C**

**FORM OF GUARANTY**

**(see attached)**

## GUARANTY

**THIS GUARANTY** (this "*Agreement*"), dated as of August 20, 2021, is made by and among each guarantor executing a signature page hereto and each Additional Guarantor (as defined below) that becomes a party hereto pursuant to Section 15 (each, a "*Guarantor*" and collectively, the "*Guarantors*") and U.S. Bank National Association, as note agent for the Guaranteed Parties referred to below (the "*Note Agent*") and Collateral Agent for the Secured Parties (when applicable).

## RECITALS

**WHEREAS**, the Guarantors entered into that certain Convertible Note Purchase Agreement, dated as of the date hereof (as amended, restated, supplemented and/or otherwise modified from time to time, the "*Purchase Agreement*"; capitalized terms used but not defined herein having the meanings ascribed thereto therein), by and among Core Scientific Holding Co., a Delaware corporation, the Guarantors party thereto, each Purchaser party thereto and the Note Agent; and

**WHEREAS**, to induce the Purchasers to purchase the Notes, the Guarantors have agreed to enter into this Agreement.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the foregoing, and the representations, warranties and conditions set forth herein, the parties hereto, intending to be legally bound, hereby agree as follows:

1.     **Defined Terms.**

"*Additional Guarantor*" has the meaning assigned to such term in Section 15.

"*Aggregate Payments*" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (1) the aggregate amount of all payments and distributions made on or before such date by such Contributing Guarantor in respect of this Agreement (including in respect of Section 3), minus (2) the aggregate amount of all payments received on or before such date by such Contributing Guarantor from the other Contributing Guarantors as contributions under Section 3.

"*Bankruptcy Code*" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"*Commodity Exchange Act*" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended and in effect from time to time, and any successor statute.

"*Contributing Guarantors*" has the meaning assigned to such term in Section 3.

"*Fair Share*" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Fair Share Contribution Amount with respect to such Contributing Guarantor to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Contributing Guarantors *multiplied* by (b) the aggregate amount paid or distributed on or before such date by all Funding Guarantors under this Agreement in respect of the obligations guaranteed.

"*Fair Share Contribution Amount*" means, with respect to a Contributing Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Contributing Guarantor under this Agreement that would not render its obligations hereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Bankruptcy Code or any comparable

applicable provisions of state law; *provided*, solely for purposes of calculating the "Fair Share Contribution Amount" with respect to any Contributing Guarantor for purposes of Section 3, any assets or liabilities of such Contributing Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Contributing Guarantor.

"***Funding Guarantors***" has the meaning assigned to such term in Section 3.

"***Guaranteed Obligations***" has the meaning assigned to such term in Section 2.

"***Guaranteed Parties***" means the Purchasers, the Holders, the Agents, and their respective successors and permitted assigns.

"***Guarantor***" has the meaning assigned to such term in the preamble to this Agreement.

"***Qualified ECP Guarantor***" means, in respect of any Swap Obligation, each Note Party that has total assets exceeding Ten Million Dollars ($10,000,000.00) at the time the relevant Guarantee or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another Person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"***Swap Obligation***" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

**2.      Guaranty of the Obligations**.  The Guarantors jointly and severally hereby irrevocably and unconditionally guaranty to the Agent, for the ratable benefit of the Guaranteed Parties, the due and punctual payment and performance in full of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)) (collectively, the "***Guaranteed Obligations***").

**3.      Contribution by Guarantors**.  All Guarantors desire to allocate among themselves (collectively, the "***Contributing Guarantors***"), in a fair and equitable manner, their obligations arising under this Agreement.  Accordingly, in the event any payment or distribution is made on any date by a Guarantor (a "***Funding Guarantor***") under this Agreement such that its Aggregate Payments exceeds its Fair Share as of such date, such Funding Guarantor shall be entitled to a contribution from each of the other Contributing Guarantors in an amount sufficient to cause each Contributing Guarantor's Aggregate Payments to equal its Fair Share as of such date.  The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Funding Guarantor.  The allocation among Contributing Guarantors of their obligations as set forth in this Section 3 shall not be construed in any way to limit the liability of any Contributing Guarantor hereunder.  Each Guarantor is a third-party beneficiary to the contribution agreement set forth in this Section 3.

**4.      Payment by Guarantors**.  The Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Guaranteed Party may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of the Company to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)), the Guarantors will upon demand pay, or cause to be paid, in cash, to the Note Agent for the ratable benefit of

2

the Guaranteed Parties, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for the Company's becoming the subject of a case under the Bankruptcy Code, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against the Company for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to the Guaranteed Parties as aforesaid.

**5.   Liability of Guarantors Absolute**.   Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations.  In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a)     this Agreement is a guaranty of payment when due and not of collectability; this Agreement is a primary obligation of each Guarantor and not merely a contract of surety;

(b)     the Note Agent may enforce this Agreement upon the occurrence of an Event of Default notwithstanding the existence of any dispute between the Company and any Guaranteed Party with respect to the existence of such Event of Default;

(c)     the obligations of each Guarantor hereunder are independent of the obligations of the Company and the obligations of any other guarantor (including any other Guarantor) of the obligations of the Company, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against the Company or any of such other guarantors and whether or not the Company is joined in any such action or actions;

(d)     payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid; underlined provided that, without limiting the generality of the foregoing, if the Note Agent is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(e)     any Guaranteed Party, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for the benefit of such Guaranteed Party in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Guaranteed Party may have against any such security, in each case as such Guaranteed Party in its discretion may determine consistent herewith and any applicable security

agreement, including foreclosure on any such security pursuant to one or more judicial or non-judicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against the Company or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Note Documents; and

(f)     this Agreement and the obligations of the Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full of the Guaranteed Obligations), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Note Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to Events of Default) hereof, any of the other Note Documents or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Note Document or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Note Documents or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though any Guaranteed Party might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) any Guaranteed Party's consent to the change, reorganization or termination of the corporate structure or existence of the Company or any of its Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations; (vii) any defenses, set offs or counterclaims which the Company may allege or assert against any Guaranteed Party in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

**6.     Waivers by Guarantors**. Each Guarantor hereby waives, for the benefit of the Guaranteed Parties: (a) any right to require any Guaranteed Party, as a condition of payment or performance by such Guarantor, to (i) proceed against the Company, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from the Company, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any deposit account or credit on the books of any Guaranteed Party in favor of the Company or any other Person, or (iv) pursue any other remedy in the power of any Guaranteed Party whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of the Company or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of the Company or any other Guarantor from any cause other than payment in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Guaranteed Party's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to gross negligence or willful misconduct; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the

4

terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Guaranteed Party protect, secure, perfect or insure any security interest or Lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to the Company and notices of any of the matters referred to in Section 5 and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

7.      **Guarantors' Rights of Subrogation, Contribution, etc.**  Until the Guaranteed Obligations shall have been indefeasibly paid in full (other than contingent obligations as to which no demand has been made or claim asserted), each Guarantor hereby waives any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against the Company or any other Guarantor or any of its assets in connection with this Agreement or the performance by such Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including (a) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter have against the Company with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that any Guaranteed Party now has or may hereafter have against the Company, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by any Guaranteed Party.  In addition, until the Guaranteed Obligations shall have been indefeasibly paid in full (other than contingent obligations as to which no demand has been made or claim asserted), each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guaranteed Obligations, including any such right of contribution as contemplated by Section 3.  Each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against the Company or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights any Guaranteed Party may have against the Company, to all right, title and interest any Guaranteed Party may have in any such collateral or security, and to any right any Guaranteed Party may have against such other guarantor.  If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations shall not have been finally and indefeasibly paid in full (other than contingent obligations as to which no demand has been made or claim asserted), such amount shall be held in trust for the Note Agent on behalf of the Guaranteed Parties and shall forthwith be paid over to the Note Agent for the benefit of the Guaranteed Parties to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

8.      **Subordination of Other Obligations**.  Any Indebtedness of the Company or any Guarantor now or hereafter held by any Guarantor (the "***Obligee Guarantor***") is hereby subordinated in right of payment to the Guaranteed Obligations, and any such indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust for the Note Agent on behalf of the Guaranteed Parties and shall forthwith be paid over to the Note Agent for the benefit of the Guaranteed Parties to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

**9.      Continuing Guaranty**.  This Agreement is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations shall have been indefeasibly paid in full (other than contingent obligations as to which no demand has been made or claim asserted).  Each Guarantor hereby irrevocably waives any right to revoke this Agreement as to future transactions giving rise to any Guaranteed Obligations.

**10.      Authority of the Guarantors or the Company**.  It is not necessary for any Guaranteed Party to inquire into the capacity or powers of any Guarantor or the Company or the officers, directors or any agents acting or purporting to act on behalf of any of them.

**11.      Financial Condition of the Company**.  Any Notes may be issued to the Company without notice to or authorization from any Guarantor regardless of the financial or other condition of the Company at the time of any such grant or continuation.  No Guaranteed Party shall have any obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of the Company.  Each Guarantor has adequate means to obtain information from the Company on a continuing basis concerning the financial condition of the Company and its ability to perform its obligations under the Note Documents and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of the Company and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations.  Each Guarantor hereby waives and relinquishes any duty on the part of any Guaranteed Party to disclose any matter, fact or thing relating to the business, operations or conditions of the Company now known or hereafter known by any Guaranteed Party.

**12.      Bankruptcy, etc.**

(a)      So long as any Guaranteed Obligations remain outstanding, no Guarantor shall, without the prior written consent of the Note Agent acting pursuant to the instructions of Required Holders, commence or join with any other Person in commencing any bankruptcy, reorganization or insolvency case or proceeding of or against the Company or any other Guarantor.  The obligations of the Guarantors hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by any case or proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of the Company or any other Guarantor or by any defense which the Company or any other Guarantor may have by reason of the order, decree or decision of any court or administrative body resulting from any such proceeding.

(b)      Each Guarantor acknowledges and agrees that any interest on any portion of the Guaranteed Obligations which accrues after the commencement of any case or proceeding referred to in clause (a) above (or, if interest on any portion of the Guaranteed Obligations ceases to accrue by operation of law by reason of the commencement of such case or proceeding, such interest as would have accrued on such portion of the Guaranteed Obligations if such case or proceeding had not been commenced) shall be included in the Guaranteed Obligations because it is the intention of the Guarantors and the Guaranteed Parties that the Guaranteed Obligations which are guaranteed by the Guarantors pursuant hereto should be determined without regard to any rule of law or order which may relieve the Company of any portion of such Guaranteed Obligations.  The Guarantors will permit any trustee in bankruptcy, receiver, debtor in possession, assignee for the benefit of creditors or similar person to pay Agent, or allow the claim of the Note Agent in respect of, any such interest accruing after the date on which such case or proceeding is commenced.

(c)      In the event that all or any portion of the Guaranteed Obligations are paid by the Company, the obligations of the Guarantors hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from any Guaranteed Party as a preference, fraudulent transfer or otherwise,

6

and any such payments which are so rescinded or recovered shall constitute Guaranteed Obligations for all purposes hereunder.

**13.     Discharge of Guaranty Upon Sale of a Guarantor**.  If all of the Capital Stock of any Guarantor or any of its successors in interest hereunder shall be sold or otherwise disposed of (including by merger or consolidation) in accordance with the terms and conditions of the Note Documents, the Guaranty of such Guarantor or such successor in interest, as the case may be, hereunder shall automatically be discharged and released without any further action by any Guaranteed Party or any other Person effective as of the time of such Asset Disposition.

**14.     Keepwell**.   Each Qualified ECP Guarantor hereby, jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Note Party to honor all of its obligations under this Agreement in respect of Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 14 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 14, or otherwise under this Agreement, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  The obligations of each Qualified ECP Guarantor under this Section 14 shall remain in full force and effect until all of the Guaranteed Obligations (other than contingent indemnity Obligations for which no claim has been asserted) shall have been paid in full.  Each Qualified ECP Guarantor intends that this Section 14 constitute, and this Section 14 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Note Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

**15.     Additional Guarantors.**  Each Subsidiary of the Company that is required to become a Guarantor pursuant to Section 6.10 of Purchase Agreement will become a Guarantor (each an "***Additional Guarantor***"), with the same force and effect as if such Subsidiary were originally named as a Guarantor herein, for all purposes of this Agreement upon the execution and delivery by such Subsidiary of a supplement to this Agreement substantially in the form of the supplement attached hereto as Exhibit A (each a "***Guaranty Supplement***").  Each reference to "Guarantor" (or any words of like import referring to a Guarantor) in this Agreement or any other Note Document shall also mean the Additional Guarantor and each reference in this Agreement or any other Note Document to this "Guaranty" (or words of like import referring to this Agreement) shall mean this Agreement, as supplemented by each Guaranty Supplement. No consent of any other Guarantor hereunder will be required for the execution and delivery of any Guaranty Supplement.  The rights and obligations of each Guarantor hereunder shall remain in full force and effect notwithstanding the addition of any Additional Guarantor as a party to this Agreement.

**16.     Severability**.  If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith.  In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (a) such provision shall be excluded from this Agreement, (b) the balance of this Agreement shall be interpreted as if such provision were so excluded, and (c) the balance of this Agreement shall be enforceable in accordance with its terms.

**17.     Waiver and Amendment; Entire Agreement**.  Any provision of this Agreement may be amended, waived or modified only by an instrument signed in writing by the Guarantors and the Note Agent (with the consent of any Guaranteed Party as required by Section 10.9 of the Purchase Agreement).  This Agreement and the other Note Documents constitute the entire contract among the parties hereto regarding to the subject matters addressed herein and supersede any and all previous agreements, negotiations, and discussions, oral or written, by the parties regarding the subject matters addressed herein.

254153973 v5

18.     **Successors and Assigns**.  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties.  Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

19.     **GOVERNING LAW**.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.

20.     **Jurisdiction and Venue; Waiver of Jury Trial; Expenses and Indemnification**.   This Agreement is subject to the provisions of Section 10.3 (Jurisdiction and Venue), Section 10.4 (Waiver of Jury Trial) and Section 10.10(a) (Expenses and Indemnification) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*.

21.     **Notices**.  All communications and notices required or permitted to be given hereunder shall be delivered in accordance with Section 10.8 of the Purchase Agreement.

22.     **Headings; Interpretation**.   Paragraph headings used in this Agreement are included for convenience of reference only and will not modify the provisions that they precede or affect the interpretation of this Agreement or any other Note Document.  The term "including" shall be interpreted to mean "including but not limited to".

23.     **Counterparts**.  This Agreement may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract.  Any counterpart of a signature page to this Agreement may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.

24.     **Concerning the Agent**.  U.S. Bank National Association is entering into this Agreement solely in its capacity as Note Agent and Collateral Agent (when applicable) under the Purchase Agreement and shall be entitled to all of the rights, privileges and immunities of the Note Agent and Collateral Agent (when applicable) in acting hereunder.

25.     **Security**.  The parties hereto acknowledge that, upon delivery of the Collateral Documents required by Section 6.13 of Purchase Agreement, the Guaranteed Obligations shall be secured by a first priority Lien on the Collateral (subject to terms contained in such Collateral Documents).

*[Signature pages follow]*

8

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first written above.

**CORE SCIENTIFIC, INC.,** a Delaware corporation

By:_____
Name:  Michael Trzupek
Title:    Chief Executive Officer

**AMERICAN PROPERTY ACQUISITION, LLC,** a Delaware limited liability company

By: Core Scientific, Inc., its sole member

By:_____
Name:  Michael Trzupek
Title:    Chief Executive Officer

**AMERICAN PROPERTY ACQUISITIONS I, LLC,** a North Carolina limited liability company

By: American Property Acquisition, LLC, its sole member

By:  Core Scientific, Inc., its sole member

By:_____
Name:  Michael Trzupek
Title:    Chief Executive Officer

[Signature Page to Guaranty]

**AMERICAN PROPERTY ACQUISITIONS VII, LLC,** a Georgia limited liability company

By: American Property Acquisition, LLC, its sole member

By: Core Scientific, Inc., its sole member

By:_____
Name:  Michael Trzupek
Title:    Chief Executive Officer

**BLOCKCAP, INC.,** a Nevada corporation

By:_____
Name:  Todd DuChene
Title:    Secretary

**NOTE AGENT AND COLLATERAL AGENT**:

**U.S. BANK NATIONAL ASSOCIATION**


By: _____
Name:
Title:

Exhibit A to
Guaranty Agreement

## FORM OF GUARANTY SUPPLEMENT

THIS G U A R A N T Y  SUPPLEMENT (this "***Supplement***"), dated as of [__], is entered into by and between [__] (the "***New Guarantor***") and U.S. BANK, NATIONAL ASSOCIATION, as note agent (in such capacity, the "***Agent***") under that certain Guaranty, dated as of August 20, 2021, by and among Core Scientific, Inc., American Property Acquisition, LLC, American Property Acquisitions I, LLC, American Property Acquisitions VII, LLC, each other Guarantor from time to time party thereto and the Note Agent (the "***Guaranty***").  Capitalized terms used but not defined herein shall have the meanings given to them in the Guaranty.

The New Guarantor and the Agent, for the benefit of the Guaranteed Parties, hereby agree as follows:

The New Guarantor hereby acknowledges, agrees and confirms that, by its execution of this Supplement, the New Guarantor will be deemed to be a "Guarantor" under the Guaranty for all purposes of the Guaranty and shall have all of the obligations of a Guarantor thereunder as if it had executed the Guaranty.  The New Guarantor hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Guaranty.

This Supplement is subject to the provisions of <u>Section 10.2</u> (Governing Law), <u>Section 10.3</u> (Jurisdiction and Venue) and <u>Section 10.4</u> (Waiver of Jury Trial) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*.

This Supplement may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract.  Any counterpart of a signature page to this Supplement may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.

U.S. Bank National Association is entering into this Supplements solely in its capacity as Note Agent and shall be entitled to all of the rights, privileges and immunities of the Note Agent under the Purchase Agreement in acting hereunder.

*[Signature page follows]*

Exhibit A to
Guaranty Agreement

**IN WITNESS WHEREOF**, the parties hereto have executed this Supplement as of the date first written above.

**[NEW GUARANTOR]**

By:_____
Name:
Title:

Acknowledged and accepted:

**AGENT**:

**U.S. BANK NATIONAL ASSOCIATION,**
as Note Agent [and Collateral Agent]

By: **_____**
Name:
Title:

**EXHIBIT D**

**FORM OF SECURITY AGREEMENT**

**(see attached)**

## [FORM OF] SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "*Agreement*"), dated as of [__], is made by and among each Grantor executing a signature page hereto and each Additional Grantor (as defined below) that may become a party hereto pursuant to Section 5.8(b) (each, a "*Grantor*" and collectively, the "*Grantors*"), in favor of U.S. Bank National Association, in its capacity as collateral agent on behalf of the Secured Parties (the "*Collateral Agent*").

## RECITALS

WHEREAS, the Grantors entered into that certain Convertible Note Purchase Agreement, dated as of August 20, 2021 (as amended, restated, supplemented and/or otherwise modified from time to time, the "*Purchase Agreement*"), by and among the Grantors, each Purchaser party thereto and U.S. Bank National Association, as Note Agent and, upon the execution and delivery of the Collateral Documents pursuant to Section 6.13, as Collateral Agent for the Secured Parties;

WHEREAS, pursuant to the Purchase Agreement, each Purchaser has been issued by the Company one or more Notes (as defined in the Purchase Agreement), which are part of a series of Notes issued by the Company, in an aggregate principal amount of up to $300,000,000.00; and

WHEREAS, as continuing collateral security for the Obligations of the Company under the Purchase Agreement and the Guaranteed Obligations of the Guarantors under the Guaranty, the Grantors have agreed to enter into this Security Agreement, in favor of the Collateral Agent, for purposes of granting to the Collateral Agent, for the benefit of the Secured Parties, a security interest in the Grantors' assets, on the terms and subject to the conditions set forth therein.

## AGREEMENT

NOW THEREFORE, in consideration of the foregoing, and the representations, warranties and conditions set forth herein, the parties hereto, intending to be legally bound, hereby agree as follows:

1.     DEFINED TERMS.  When used in this Agreement the following terms shall have the meanings set forth below (such meanings being equally applicable to both the singular and plural forms of the terms defined).  Any term used in the UCC and not defined herein shall have the meaning given to such term in the UCC and any capitalized term used but not otherwise defined herein shall have the meaning given to such term in the Notes or the Purchase Agreement, as applicable.

"*Additional Grantors*" shall have the meaning assigned in Section 5.8(b).

"*CFC*" shall mean a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"*CFC Holdco*" shall mean a Subsidiary of the Company that has no material assets other than Capital Stock (or Capital Stock and Indebtedness) of one or more direct or indirect Foreign Subsidiaries of the Company that are CFCs.

"*Collateral*" shall have the meaning assigned to such term in Section 2 of this Agreement.

"*Contracts*" means all contracts (including any customer, vendor, supplier, service or maintenance contract), personal property leases, licenses, undertakings, purchase orders, permits, franchise agreements or other agreements (other than any right evidenced by Chattel Paper, Documents or

Instruments), whether in written or electronic form, in or under which the Grantors now hold or hereafter acquire any right, title or interest, including, without limitation, with respect to an Account, any agreement relating to the terms of payment or the terms of performance thereof, and all assignments, amendments, restatements, supplements, extensions, renewals, replacements or modifications of the Contracts.

"***Copyright License***" means any agreement, whether in written or electronic form, in which the Grantors now hold or hereafter acquire any interest, granting any right in or to any Copyright or Copyright registration (whether the Grantors are the licensee or the licensor thereunder) including, without limitation, licenses pursuant to which the Grantors have obtained the exclusive right to use a copyright owned by a third party.

"***Copyrights***" means all of the following now owned or hereafter acquired or created (as a work for hire for the benefit of the Grantors) by the Grantors or in which the Grantors now hold or hereafter acquire or receive any right or interest, in whole or in part: (a) all copyrights, (statutory or common law, whether established or registered in the United States or any other country or any political subdivision thereof, whether registered or unregistered and whether published or unpublished), held pursuant to the laws of the United States, any State thereof or any other country; (b) registrations, applications, recordings and proceedings in the United States Copyright Office or in any similar office or agency of the United States, any State thereof or any other country; (c) any continuations, renewals or extensions thereof; (d) any registrations to be issued in any pending applications, and shall include any right or interest in and to work protectable by any of the foregoing which are presently or in the future owned, created or authorized (as a work for hire for the benefit of the Grantors) or acquired by the Grantors, in whole or in part; (e) prior versions of works covered by copyright and all works based upon, derived from or incorporating such works; (f) income, royalties, damages, claims and payments now and hereafter due and/or payable with respect to copyrights, including, without limitation, damages, claims and recoveries for past, present or future infringement; (g) rights to sue for past, present and future infringements of any copyright; and (h) any other rights corresponding to any of the foregoing rights throughout the world.

"***Excluded Account***" means any Account (including, for the avoidance of doubt, any cash, cash equivalents or other property contained therein) to the extent, and for so long as, such Account is pledged to secure (i) performance of tenders, bids, leases, statutory or regulatory obligations, surety and appeal bonds, government contracts, performance and return-of-money bonds, and other obligations of like nature, in each case, in the ordinary course of business or (ii) liability for reimbursement or indemnification obligations in respect of letters of credit or bank guarantees for the benefit of landlords, in each case whether such pledge is by escrow or otherwise.

"***Excluded Property***" means, collectively, (i) Excluded Accounts (and any assets contained therein), (ii) the Capital Stock of any Subsidiary that is a CFC or CFC Holdco, other than 65.00% of the total outstanding voting Capital Stock and 100.00% of the total outstanding nonvoting Capital Stock of a CFC or a CFC Holdco that, in each case, is directly owned by a Grantor, (iii) "intent-to-use" trademarks at all times prior to the first use thereof, whether by the actual use thereof in commerce, the recording of a statement of use with the United States Patent and Trademark Office or otherwise, (iv) any property, right or asset held by the Grantors or any Subsidiary to the extent that a grant of a security interest therein is prohibited by any Requirements of Law of a Governmental Authority or constitutes a breach or default under or results in the termination of or requires any consent not obtained under, any contract, license, agreement, instrument or other document evidencing or giving rise to such property, except (A) to the extent that the terms in such contract, license, instrument or other document providing for such prohibition, breach, default or termination, or requiring such consent are not permitted under this Agreement or (B) to the extent that such Requirements of Law or the term in such contract, license, agreement, instrument or other document providing for such prohibition, breach, default or termination or

2

requiring such consent is ineffective under Section 9406, 9407, 9408 or 9409 of the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law (including the Bankruptcy Code of the United States) or principles of equity; provided, however, that such security interest shall attach immediately at such time as such Requirements of Law is not effective or applicable, or such prohibition, breach, default or termination is no longer applicable or is waived, and to the extent severable, shall attach immediately to any portion of the Collateral that does not result in such consequences; and (v) any assets securing Indebtedness (including Capital Lease Obligations) incurred to finance the acquisition of any fixed or capital assets (including any real property assets) so long as a security interest therein only encumbers the assets so acquired or financed with the proceeds of such Indebtedness.

"**_Foreign Subsidiary_**" means any Subsidiary other than a Subsidiary organized under the laws of any state within the United States.

"**_Intellectual Property License_**" means, collectively with respect to the Grantors, any Copyright License, Patent License, Trademark License or other license of rights or interests, whether in-bound or out-bound, whether in written or electronic form, now or hereafter owned or acquired or received by the Grantors or in which the Grantors now hold or hereafter acquire or receives any right or interest, and shall include any renewals or extensions of any of the foregoing thereof.

"**_Investment Property_**" shall mean, collectively, (a) all "investment property" as such term is defined in Section 9-102(a)(49) of the UCC and (b) whether or not constituting "investment property" as so defined, all Pledged Stock.

"**_Issuers_**" shall mean, collectively, each issuer of any Investment Property.

"**_Patent License_**" means any agreement, whether in written or electronic form, in which the Grantors now hold or hereafter acquire any interest, granting any right with respect to any invention on which a Patent is in existence (whether the Grantors are the licensee or the licensor thereunder).

"**_Patents_**" means all of the following in which the Grantors now hold or hereafter acquire any interest: (a) all letters patent of the United States or any other country, all registrations and recordings thereof and all applications for letters patent of the United States or any other country, including, without limitation, registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country; (b) all reissues, divisions, continuations, renewals, continuations-in-part or extensions thereof; (c) all petty patents, divisionals and patents of addition; (d) all patents to issue in any such applications; (e) income, royalties, damages, claims and payments now and hereafter due and/or payable with respect to patents, including, without limitation, damages, claims and recoveries for past, present or future infringement; and (f) rights to sue for past, present and future infringements of any patent.

"**_Pledged Stock_**" shall mean all shares of Capital Stock, together with any other shares, stock certificates, options, interests or rights of any nature whatsoever in respect of the Capital Stock of any Person that may be issued or granted to, or held by, any Grantor while this Agreement is in effect.

"**_Trademark License_**" means any agreement, whether in written or electronic form, in which the Grantors now hold or hereafter acquire any interest, granting any right in and to any Trademark or Trademark registration (whether the Grantors are the licensee or the licensor thereunder).

"**_Trademarks_**" means any of the following in which the Grantors now hold or hereafter acquire any interest: (a) any trademarks, tradenames, corporate names, company names, business names, uniform

254221560 v4

resource locators (URL's), domain names, trade styles, service marks, logos, other source or business identifiers, prints and labels on which any of the foregoing have appeared or appear, designs and general intangibles of like nature, now existing or hereafter adopted or acquired, all registrations and recordings thereof and any applications in connection therewith, including, without limitation, registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country (collectively, the "**Marks**"); (b) any reissues, extensions or renewals thereof; (c) the goodwill of the business symbolized by or associated with the Marks; (d) income, royalties, damages, claims and payments now and hereafter due and/or payable with respect to the Marks, including, without limitation, damages, claims and recoveries for past, present or future infringement; and (e) rights to sue for past, present and future infringements of the Marks.

**2.**     **GRANT OF SECURITY INTEREST**.  As collateral security for the full, prompt, complete and final payment and performance when due (whether at stated maturity, by acceleration or otherwise) of all the Obligations and in order to induce the Holders to purchase the Notes, each Grantor hereby assigns, conveys, mortgages, pledges, hypothecates and transfers to the Collateral Agent, on behalf of the Secured Parties, and hereby grants to the Collateral Agent, on behalf of the Secured Parties, a security interest in all of such Grantor's right, title and interest in, to and under the following, whether now owned or hereafter acquired (all of which being collectively referred to herein as the "**Collateral**"):

> (a)     All Accounts of the Grantors;

> (b)     All Chattel Paper of the Grantors;

> (c)     The Commercial Tort Claims of the Grantors;

> (d)     All Commodity Accounts of the Grantors;

> (e)     All Contracts of the Grantors;

> (f)     All Deposit Accounts of the Grantors;

> (g)     All Documents of the Grantors;

> (h)     All General Intangibles of the Grantors, including, without limitation, Intellectual Property;

> (i)     All Goods of the Grantors**,** including, without limitation, Equipment, Inventory and Fixtures;

> (j)     All Instruments of the Grantors, including, without limitation, Promissory Notes;

> (k)     All Investment Property of the Grantors;

> (l)     All Letter-of-Credit Rights and Letters of Credit of the Grantors;

> (m)     All Money of the Grantors;

> (n)     All Securities Accounts of the Grantors;

> (o)     All Supporting Obligations of the Grantors;

4

(p)     All property of the Grantors held by any Secured Party, or any other party for whom any Secured Party is acting as agent, including, without limitation, all property of every description now or hereafter in the possession or custody of or in transit to any Secured Party or such other party for any purpose, including, without limitation, safekeeping, collection or pledge, for the account of the Grantors, or as to which the Grantors may have any right or power;

(q)     All other goods and personal property of the Grantors, wherever located, whether tangible or intangible, and whether now owned or hereafter acquired, existing, leased or consigned by or to the Grantors; and

(r)     To the extent not otherwise included, all Proceeds of each of the foregoing and all accessions to, substitutions and replacements for and rents, profits and products of each of the foregoing.

Notwithstanding the foregoing provisions of this Section 2, the grant, assignment and transfer of a security interest as provided herein shall not extend to, and the term "Collateral" shall not include any Excluded Property.

3.     **RIGHTS OF SECURED PARTIES; COLLECTION OF ACCOUNTS.**

(a)     Notwithstanding anything contained in this Agreement to the contrary, each Grantor expressly agrees that it shall remain liable under each of its Contracts, Chattel Paper, Documents, Instruments and Intellectual Property to observe and perform all the conditions and obligations to be observed and performed by it thereunder and that it shall perform all of its duties and obligations thereunder, all in accordance with and pursuant to the terms and provisions of each such Contract, Chattel Paper, Document, Instrument, and Intellectual Property.  The Secured Parties and the Collateral Agent shall not have any obligation or liability under any such Contract, Chattel Paper, Document, Instrument, or Intellectual Property by reason of or arising out of this Agreement or the granting to the Collateral Agent of a Lien therein or the receipt by any Secured Party or the Collateral Agent of any payment relating to any such Contract, Chattel Paper, Document, Instrument, or Intellectual Property pursuant hereto, nor shall any Secured Party or the Collateral Agent be required or obligated in any manner to perform or fulfill any of the obligations of the Grantors under or pursuant to any such Contract, Chattel Paper, Document, Instrument, or Intellectual Property, or to make any payment, or to make any inquiry as to the nature or the sufficiency of any payment received by it or the sufficiency of any performance by any party under any such Contract, Chattel Paper, Document, Instrument, or Intellectual Property, or to present or file any claim, or to take any action to collect or enforce any performance or the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

(b)     Upon the occurrence and during the continuance of any Event of Default, the Collateral Agent authorizes each Grantor to collect its Accounts and, at the request of the Collateral Agent (at the direction of the Required Holders), such Grantor shall deliver all original and other documents evidencing and relating to the performance of labor or service which created such Accounts, including, without limitation, all original orders, invoices and shipping receipts.

(c)     The Collateral Agent may at any time, upon the occurrence and during the continuance of any Event of Default, notify Account Debtors of the Grantors, parties to the Contracts of the Grantors, obligors in respect of Instruments of the Grantors, and obligors in respect of Chattel Paper of the Grantors that the Accounts and the right, title and interest of the Grantors in and under such Contracts, Instruments and Chattel Paper have been assigned to the Collateral Agent and that payments shall be made directly to the Collateral Agent for distribution to the Secured Parties.  Upon the occurrence and during the continuance of any Event of Default, upon the request of the Collateral Agent (at the

5

direction of the Required Holders), the Grantors shall so notify such Account Debtors, parties to such Contracts, obligors in respect of such Instruments and obligors in respect of such Chattel Paper. The Collateral Agent may, in its name or in the name of others, communicate with such Account Debtors, parties to such Contracts, obligors in respect of such Instruments and obligors in respect of such Chattel Paper to verify with such parties, to the Collateral Agent's satisfaction, the existence, amount and terms of any such Accounts, Contracts, Instruments or Chattel Paper.

**4.**    **REPRESENTATIONS AND WARRANTIES**.    The Grantors hereby represent and warrant to the Collateral Agent and the other Secured Parties that:

(a)    Except for the security interest granted under this Agreement, the Grantors are the sole legal and equitable owner of each item of Collateral in which it purports to grant a security interest hereunder, having good and marketable title thereto, free and clear of any and all Liens except for Permitted Liens and, upon filing of a UCC financing statement in the UCC filing office, the Collateral Agent shall have a perfected security interest in the Collateral, which such security interest shall be senior to all other Liens (other than Permitted Liens). None of the Collateral is owned, legally or equitably by any subsidiary or company controlled by the Grantors.

(b)    The Grantors' correct legal name is set forth on the signature page hereof. The Grantors' chief executive office, jurisdiction of incorporation and the place where the Grantors maintain their records concerning the Collateral are presently located on Schedule 4(b).

(c)    Schedule 4(c) (as such schedule may be amended or supplemented from time to time) as required pursuant to the Purchase Agreement sets forth a true and complete list of (i) all United States, state and foreign registrations of and applications for Patents, Trademarks, and Copyrights owned by each Grantor and (ii) all Patent Licenses, Trademark Licenses and Copyright Licenses material to the business of such Grantor.

(d)    Schedule 4(d) sets forth a complete and accurate list of all Pledged Stock pledged by each Grantor hereunder on the Initial Closing Date. The Pledged Stock constitutes all issued and outstanding shares of all classes of the Capital Stock of each Issuer owned by such Grantor which is Collateral (and in the case of each Issuer which is required to become a Note Party pursuant to the terms of the Purchase Agreement, all the issued and outstanding shares of all classes of the Capital Stock of each such Issuer). Each Grantor has delivered all Certificated Securities constituting Collateral held by such Grantor in a Subsidiary on the Initial Closing Date (or the date such Grantor becomes a party to this Agreement, as applicable) to the Collateral Agent, together with duly executed undated blank stock powers, or other equivalent instruments of transfer acceptable to the Collateral Agent in accordance with Section 5.08(c) below and (assuming possession by the Collateral Agent) the Collateral Agent has a first-priority Lien.

**5.**    **COVENANTS**.    Unless the Collateral Agent (at the direction of the Required Holders) otherwise consents (which consent shall not be unreasonably withheld), the Grantors covenant and agree with the Collateral Agent and the other Secured Parties that from and after the date of this Agreement and until the Obligations have been performed and paid in full:

**5.1    Change of Name, Jurisdiction of Organization, Relocation of Business**. The Grantors shall not change their name or jurisdiction of organization or relocate their chief executive office, principal place of business or their records from such address(es) provided to the Collateral Agent pursuant to Section 4(b) above without at least seven (7) days prior notice to the Collateral Agent.

**5.2    Certain Restrictions on Future Agreements**.

(a)	Each Grantor agrees that until the Obligations have been satisfied in full, it will not sell or assign its interest in, or grant any license under, other than in the ordinary course of business or in connection with a Permitted Lien, the Collateral, or enter into any other agreement with respect to the Collateral that is inconsistent with such Grantor's obligations under this Agreement, without the prior written consent of the Required Holders, and the such Grantor further agree that it will not take any action, or permit any action to be taken by others subject to its control, including licensees, or fail to take any action, which would affect the validity or enforcement of the rights transferred to the Holders under this Agreement.

(b)	Upon any sale, lease, transfer or other disposition of any item of Collateral not prohibited by the terms of this Agreement or the other Note Documents, the Collateral Agent will, at the Grantors' sole cost and expense, execute and deliver to the Grantors such documents as the Grantors shall reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted hereby; provided, however, that (i) at the time of such request and such release no Event of Default shall have occurred and be continuing and (ii) the Grantors shall have delivered to the Collateral Agent prior to the date of the proposed release a written request for release describing the item of Collateral, together with a form of release for execution by the Collateral Agent, and such other information as the Collateral Agent may reasonably request.

5.3	**License**.  The Grantors hereby grant to the Collateral Agent a non-exclusive, worldwide and royalty-free license to use or otherwise exploit all Intellectual Property rights of the Company or Subsidiary for the purpose of: (a) completing the manufacture of any in-process materials following any Event of Default so that such materials become saleable inventory, all in accordance with the same quality standards previously adopted by the Grantors for their own manufacturing; and (b) selling, leasing or otherwise disposing of any or all collateral following any Event of Default.

5.4	**Duties of the Grantors**.  The Grantors will have the duty to preserve and maintain all rights in the Collateral and to cause the perfection of the Collateral Agent's security interest therein to the extent the same can be perfected by the filing of a UCC financing statement.  Any expenses incurred in connection with the Grantors' obligations under this Section 5.4 will be borne by the Grantors.

5.5	**Insurance**.  The Grantors shall maintain insurance policies insuring the Collateral against loss or damage from such risks and in such amounts and forms and with such companies as are customarily maintained by businesses similar to the Grantors.

5.6	**Taxes, Assessments, Etc**.  The Grantors shall pay promptly when due all property and other taxes, assessments and government charges or levies imposed upon, and all claims (including claims for labor, materials and supplies) against, the Collateral, except to the extent the validity or amount thereof is being contested in good faith and adequate reserves are being maintained in connection therewith.

5.7	**Defense of Intellectual Property**.  The Grantors shall use commercially reasonable efforts to (i) protect, defend and maintain the validity and enforceability of all Copyrights, Patents and Trademarks material to the Grantors' business and (ii) detect infringements of all Copyrights, Patents and Trademarks material to the Grantors' business.

5.8	**Further Assurances**.

(a)	At any time and from time to time, as necessary or upon the written request of the Collateral Agent (at the direction of the Required Holders), and at the sole expense of the Grantors, the Grantors shall promptly and duly execute and deliver any and all such further instruments and

documents and take such further action as is necessary or that the Collateral Agent may reasonably request to obtain the full benefits of this Agreement (including the seniority of the security interest granted hereby as described in Section 4(a)), including, without limitation, executing, delivering and causing to be filed (i) any financing or continuation statements under the UCC with respect to the security interests granted hereby and (ii) intellectual property security agreements appropriate for filing with the United States Patent and Trademark Office or United States Copyright Office (or any successor office) as may be necessary or advisable for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interests granted hereby. The Grantors also hereby authorize the Collateral Agent to file any such financing or continuation statement without the signature of the Grantors . Notwithstanding the foregoing authorization, the Collateral Agent shall have no obligation to perfect or maintain the perfection of the Collateral Agent's security interest, including by filing UCC financing statements or continuation statements, which shall be the sole obligation of the Grantors.

(b)      From time to time subsequent to the date hereof, additional Persons may become parties hereto as additional Grantors (each, an "*Additional Grantors*"), by executing a joinder hereto substantially in the form of Exhibit A. Upon delivery of any such counterpart agreement to the Collateral Agent, notice of which is hereby waived by Grantors, each Additional Grantors shall be a Grantors and shall be as fully a party hereto as if Additional Grantors were an original signatory hereto . Each Grantor expressly agrees that its obligations arising hereunder shall not be affected or diminished by the addition or release of any other Grantors hereunder, nor by any election of Collateral Agent not to cause any Subsidiary of Company to become an Additional Grantors hereunder. This Agreement shall be fully effective as to any Grantors that is or becomes a party hereto regardless of whether any other Person becomes or fails to become or ceases to be a Grantors hereunder.

(c)      On the date hereof (or, in respect of an Additional Grantor, on the date on which such Additional Grantor executes a joinder hereto), each Grantor will deliver to the Collateral Agent all certificates representing Certificated Securities constituting Collateral then owned by such Grantor, in suitable form for transfer by delivery or accompanied by duly executed instruments of transfer or assignments in blank, sufficient to transfer title to the Collateral Agent. Thereafter, whenever such Grantor acquires any other Certificated Security constituting Collateral, such Grantor will promptly deliver such certificate to the Collateral Agent in suitable form for transfer by delivery or accompanied by duly executed instruments of transfer or assignments in blank, sufficient to transfer title to the Collateral Agent. Any limited liability company and any partnership controlled by any Grantor shall either (a) not include in its operative documents any provision that any equity interest in such limited liability company or such partnership be a "security" as defined under Article 8 of the UCC or (b) certificate any equity interest in any such limited liability company or such partnership. To the extent an interest in any limited liability company or partnership controlled by any Grantor and pledged hereunder that constitutes Collateral is certificated or becomes certificated, each such certificate shall be delivered to the Collateral Agent pursuant to this Section 5.8(c). Each Grantor that is an issuer of Investment Property constituting Collateral pledged hereunder that is an "uncertificated security" for purposes of the UCC hereby agrees, subject to Section 6, to comply with the Collateral Agent's instructions with respect to such uncertificated security without further consent by such Grantor.

6.      **RIGHTS AND REMEDIES UPON DEFAULT.**

6.1      **General Remedial Provisions**.  Beginning on the date which is ten (10) business days after any Event of Default shall have occurred and while such Event of Default is continuing:

(a)      The Collateral Agent, on behalf of the Secured Parties, may exercise in addition to all other rights and remedies granted to it under this Agreement or the Notes, all rights and remedies of a secured party under the UCC. Without limiting the generality of the foregoing, the Grantors expressly

agree that in any such event the Collateral Agent, without demand of performance or other demand, advertisement or notice of any kind (except the notice specified below of time and place of public or private sale) to or upon the Grantors or any other person, may (i) reclaim, take possession, recover, store, maintain, finish, repair, prepare for sale or lease, shop, advertise for sale or lease and sell or lease (in the manner provided herein) the Collateral, and in connection with the liquidation of the Collateral and collection of the Accounts pledged as Collateral, use any Trademark, Copyright, or process used or owned by the Grantors and (ii) forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and may forthwith sell, lease, assign, give an option or options to purchase or sell or otherwise dispose of and deliver said Collateral (or contract to do so), or any part thereof, in one or more parcels at public or private sale or sales, at any exchange or broker's board or at the Collateral Agent's offices or elsewhere at such prices as it may deem commercially reasonable, for cash or on credit or for future delivery without assumption of any credit risk.  The Grantors further agree, at the Collateral Agent's request (at the direction of the Required Holders), to assemble the Collateral and make it available to the Collateral Agent at places which the Collateral Agent shall reasonably select, whether at the Grantors' premises or elsewhere.  The Collateral Agent shall apply the net proceeds of any such collection, recovery, receipt, appropriation, realization or sale as provided in Section 6(d), below, with the Grantors remaining liable for any deficiency remaining unpaid after such application.  The Grantors agree that the Collateral Agent need not give more than twenty (20) days' notice of the time and place of any public sale or of the time after which a private sale may take place and that such notice is reasonable notification of such matters.

(b)     The Grantors also agree to pay all fees, costs and expenses of the Collateral Agent, including, without limitation, reasonable attorneys' fees, incurred in connection with the enforcement of any of its rights and remedies hereunder.

(c)     The Grantors hereby waive presentment, demand, protest or any notice (to the maximum extent permitted by applicable law) of any kind in connection with this Agreement or any Collateral.

(d)     The Proceeds of any sale, disposition or other realization upon all or any part of the Collateral shall be distributed by the Collateral Agent in the following order of priorities:

FIRST, to the Collateral Agent in an amount sufficient to pay in full the costs of the Collateral Agent in connection with such sale, disposition or other realization, including all fees, costs, expenses, liabilities and advances incurred or made by the Collateral Agent in connection therewith, including, without limitation, reasonable attorneys' fees;

SECOND, to the Agents in amounts proportional to such Secured Party's Pro Rata Share of the then unpaid Obligations of each such Agent;

THIRD, to the other Secured Parties (other than the Agents) in amounts proportional to such Secured Party's Pro Rata Share of the then unpaid Obligations of each such Secured Party; and

FINALLY, upon payment in full of the Obligations, to the Grantors or their respective representatives, in accordance with the UCC or as a court of competent jurisdiction may direct.

(e)     Upon the occurrence and during the continuation of an Event of Default, in addition to all other rights and remedies that may then be available to any Holder of any Note, each Holder of any Note and the Collateral Agent is hereby authorized at any time and from time to time, without notice to the Company (any such notice being expressly waived by the Company) to set off and apply any and all Indebtedness at any time owing by such Holder or the Collateral Agent to or for the

credit or the account of the Grantors against all amounts which may be owed to such Holder or the Collateral Agent by the Grantors in connection with this Agreement or any other Note Document.  If any Holder of the Notes shall obtain from the Company payment of any principal of or interest on any Note held by it or payment of any other amount under this Agreement or such Note held by it or any other Note Document through the exercise of any right of set-off, and, as a result of such payment, such Holder shall have received a greater percentage of the principal, interest or other amounts then due to such Holder under the Note Documents than the percentage received by any other Holder, the Company shall promptly make such adjustments (including without limitation purchasing risk participations) with such other Holder from time to time as shall be equitable, to the end that all the Purchasers of the Notes shall share the benefit of such excess payment (net of any expenses which may be incurred by such Holder in obtaining or preserving such excess payment) pro rata in accordance with the unpaid principal and/or interest on the Notes or other amounts (as the case may be) owing to each of the Purchasers of the Notes.  To such end, all Holders of the Notes shall make appropriate adjustments among themselves if such payment is rescinded or must otherwise be restore d.  Any Holder of the Notes taking action under this Section 6 shall promptly provide notice to the Company of any such action taken; provided that the failure of such Holder to provide such notice shall not prejudice its rights hereunder.

> **6.2    Pledged Stock**.

> (a)    Prior to an Event of Default each Grantor shall be permitted to receive dividends and other distributions in respect of the Pledged Stock paid in the normal course of business or otherwise as a result of the exercise of reasonable business judgment of the relevant Issuer, to the extent permitted by the Purchase Agreement, and to exercise all voting and corporate rights with respect to the Investment Property.

> (b)    If an Event of Default shall have occurred and be continuing, effective upon delivery by the Collateral Agent to the Company of a notice (which, for the avoidance of doubt, may be electronic notice delivered in accordance with Section 4 of the Notes) stating that it is exercising its rights under this Section 6.2 (an "*Enforcement Notice*") (*provided*, however, that failure by the Collateral Agent to provide such Enforcement Notice shall not limit or impair any of the Collateral Agent's rights under this Agreement), (i) the Collateral Agent shall have the right to receive any and all dividends, payments or other Proceeds paid in respect of the Investment Property and make application thereof to the Obligations in the order set forth in Section 1(b)(iii)(1) of the Notes, (ii) any or all of the Investment Property shall be registered in the name of the Collateral Agent or its nominee, and (iii) the Collateral Agent or its nominee may exercise (x) all voting, corporate and other rights pertaining to such Investment Property at any meeting of shareholders of the relevant Issuer or Issuers or otherwise and (y) any and all rights of conversion, exchange and subscription and any other rights, privileges or options pertaining to such Investment Property as if it were the absolute owner thereof (including, without limitation, the right to exchange, at its discretion, any and all of the Investment Property upon the merger, consolidation, reorganization, recapitalization or other fundamental change in the corporate structure of any Issuer, or upon the exercise by any Grantor or the Collateral Agent of any right, privilege or option pertaining to such Investment Property, and in connection therewith, the right to deposit and deliver any and all of the Investment Property with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as the Collateral Agent may determine), all without liability except to account for property actually received by it, but the Collateral Agent shall have no duty to any Grantor to exercise any such right, privilege or option and shall not be responsible for any failure to do so or delay in so doing.  Upon the Collateral Agent's request (at the direction of the Required Holders), each Grantor shall, at its sole cost and expense, execute and deliver to the Collateral Agent any and all appropriate documents and instruments as the Collateral Agent may request (at the direction of the Required Holders) in order to permit the Collateral Agent to exercise the voting and other rights which it may be entitled to exercise hereunder and to receive all distributions which it may be entitled to receive hereunder.

(c)     Each Grantor hereby authorizes and instructs each Issuer of any Investment Property pledged by such Grantor hereunder to (i) comply with any instruction received by it from the Collateral Agent in writing that (x) states that an Event of Default has occurred and is continuing and (y) is otherwise in accordance with the terms of this Agreement, without any other or further instructions from such Grantor, and each Grantor agrees that each Issuer shall be fully protected in so complying and shall have no duty or right to inquire as to the Collateral Agent's authority to give such instruction and (ii) when required hereby, pay any dividends or other payments with respect to the Investment Property directly to the Collateral Agent.

(d)     In furtherance and not in limitation of the foregoing rights of the Collateral Agent pursuant to this Section 6.02, solely during any time that an Event of Default exists in respect of which the Collateral Agent has delivered an Enforcement Notice, each Grantor hereby appoints the Collateral Agent as its true and lawful attorney-in-fact to, and grants to Collateral Agent an irrevocable proxy with full power of substitution and resubstitution (and which is coupled with an interest) to, vote the Capital Stock owned by a Note Party, and such Note Party agrees to execute such other proxies as the Collateral Agent may request (at the direction of the Required Holders) (provided, however, that failure by the Collateral Agent to provide such Enforcement Notice shall not limit or impair any of the Collateral Agent's rights under this Agreement).

(e)     In furtherance of the proxy set forth in Section 6.2(d), upon the exercise of such proxy, all prior proxies given by any Grantor with respect to the applicable Capital Stock are hereby revoked, and no subsequent proxies (other than to the Collateral Agent) will be given with respect to any such Capital Stock, (i) the Collateral Agent will be empowered and may exercise such proxy at any and all times, including but not limited to, at any meeting of shareholders, partners or members, as the case may be, however called, and at adjournment thereof, or in any action by written consent, and may waive any notice otherwise required in connection therewith, (ii) to the fullest extent permitted by applicable law, the Collateral Agent shall have no agency, fiduciary or other implied duties to any Grantor or any other Person when acting with respect to such proxy, and (iii) each Grantor waives and releases any claim that it may have against the Collateral Agent with respect to any breach or alleged breach of any such agency, fiduciary or other duty

7.     **MISCELLANEOUS.**

7.1     **Severability**.  If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith.  In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (a) such provision shall be excluded from this Agreement, (b) the balance of this Agreement shall be interpreted as if such provision were so excluded, and (c) the balance of this Agreement shall be enforceable in accordance with its terms.

7.2     **Waiver and Amendment; Entire Agreement**.  Any provision of this Agreement may be amended, waived or modified only by an instrument signed in writing by the Grantors and the Collateral Agent (with the consent of any Holder or other Secured Party as required by Section 10.9 of the Purchase Agreement).  This Agreement and the other Note Documents constitute the entire contract among the parties hereto regarding to the subject matters addressed herein and supersede any and all previous agreements, negotiations, and discussions, oral or written, by the parties regarding the subject matters addressed herein.

7.3     **Termination**.  This Agreement shall terminate upon the payment and performance in full (including, for the avoidance of doubt, by way of conversion in full of the Notes pursuant to the terms

11

254221560 v4

thereof) of the Obligations (other than inchoate indemnity obligations) . At such time, the Collateral shall be automatically released from the Liens created hereby, this Agreement and all obligations (other than those expressly stated to survive such termination) of the Collateral Agent, the other Secured Parties and the Grantors hereunder shall automatically terminate, all without delivery of any instrument or performance of any act by any party, and all rights to the Collateral shall automatically revert to the Grantors.  The Collateral Agent shall execute such documents, return any Collateral held by the Collateral Agent hereunder and take such other steps as are reasonably necessary to accomplish the foregoing, all at the Grantors' sole cost and expense.  Any such documents shall be without recourse, representation or warranty to or by the Collateral Agent.

**7.4**     **Successors and Assigns**.  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties.  Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

**7.5**     **Cumulative Remedies**.  All of the Secured Parties' rights and remedies with respect to the Collateral whether established hereby, by a Note, by any other agreements or by law will be cumulative and may be exercised singularly or concurrently.  The Grantors acknowledge and agree that this Agreement is not intended to limit or restrict in any way the rights and remedies of a Holder under a Note but rather is intended to facilitate the exercise of such rights and remedies .  Secured Parties will have, in addition to all other rights and remedies given them by the terms of this Agreement, the Notes and the other Note Documents, all rights and remedies allowed by law and the rights and remedies of a secured party under the UCC as enacted in any jurisdiction in which Collateral may be located.

**7.6**     **GOVERNING LAW.**     THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.

**7.7**     **Jurisdiction and Venue; Waiver of Jury Trial; Expenses and Indemnification**.  This Agreement is subject to the provisions of Section 10.3 (Jurisdiction and Venue), Section 10.4 (Waiver of Jury Trial) and Section 10.10(a) (Expenses and Indemnification) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*.  Any amounts payable as provided hereunder shall be additional Obligations secured by this Agreement and the other Note Documents.

**7.8**     **Notices**.  All communications and notices required or permitted to be given hereunder shall be delivered in accordance with Section 10.8 of the Purchase Agreement.

**7.9**     **Headings; Interpretation**.  Paragraph headings used in this Agreement are included for convenience of reference only and will not modify the provisions that they precede or affect the interpretation of this Agreement or any other Note Document.  The term "including" shall be interpreted to mean "including but not limited to".

**7.10**     **Counterparts**.  This Agreement may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract.  Any counterpart of a signature page to this Agreement may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic

12

Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law. The Grantors agree to assume all risks arising out of the use of using digital signatures and electronic methods to submit communications to the Note Agent, including without limitation the risk of the Note Agent acting on unauthorized instructions, and the risk of interception and misuse by third parties.

[*Signature page follows*]

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first written above.

[_____]

By:_____
Name:
Title:

**COLLATERAL AGENT**:

**U.S. BANK NATIONAL ASSOCIATION**

By: _____
Name:
Title:

254221560 v4

**SCHEDULE 4(b)**

**GRANTORS**

**SCHEDULE 4(c)**

**INTELLECTUAL PROPERTY**

**SCHEDULE 4(d)**

**INVESTMENT PROPERTY**

Exhibit A to
Security Agreement

## JOINDER AGREEMENT

THIS J O I N D E R  AGREEMENT (this "***Joinder***"), dated as of [__], is entered into by and between [__] (the "***New Grantor***") and U.S. BANK NATIONAL ASSOCIATION, as collateral agent (in such capacity, the "***Collateral Agent***") under that certain Security Agreement, dated as of [__], 2021, made by Core Scientific Holding Co., a Delaware corporation and each Guarantor from time to time party thereto, as grantors, in favor of the Collateral Agent (the "***Security Agreement***"). Capitalized terms used but not defined herein shall have the meanings given to them in the Security Agreement.

The New Grantor and the Collateral Agent, for the benefit of the Secured Parties, hereby agree as follows:

The New Grantor hereby acknowledges, agrees and confirms that, by its execution of this Joinder, the New Grantor will be deemed to be a "Grantor" under the Security Agreement for all purposes of the Security Agreement and shall have all of the obligations of a Grantor thereunder as if it had executed the Security Agreement. The New Grantor hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Security Agreement.

This Joinder is subject to the provisions of <u>Section 10.2</u> (Governing Law), <u>Section 10.3</u> (Jurisdiction and Venue) and <u>Section 10.4</u> (Waiver of Jury Trial) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*.

This Joinder may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract. Any counterpart of a signature page to this Joinder may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.

*[Signature page follows]*

Exhibit A to
Security Agreement

**IN WITNESS WHEREOF**, the parties hereto have executed this Joinder as of the date first written above.

[NEW GRANTOR]

By:_____
Name:
Title:

Acknowledged and accepted:

**COLLATERAL AGENT**:

**U.S. BANK NATIONAL ASSOCIATION**

By: _____
Name:
Title:

**EXHIBIT E**

**FORM OF INTELLECTUAL PROPERTY SECURITY AGREEMENT**

**(see attached)**

**[FORM OF] INTELLECTUAL PROPERTY SECURITY AGREEMENT**

**THIS INTELLECTUAL PROPERTY SECURITY AGREEMENT** (this "*Agreement*"), dated as of [__], is made by [__] (the "*Grantor[s]*") in favor of U.S. BANK NATIONAL ASSOCIATION, in its capacity as collateral agent (the "*Collateral Agent*") on behalf of the Secured Parties.

**RECITALS**

**WHEREAS**, the Grantor[s] entered into that certain Convertible Note Purchase Agreement, dated as of August 20, 2021 (as amended, restated, supplemented and/or otherwise modified from time to time, the "*Purchase Agreement*"), by and among the Grantors, each Purchaser party thereto, and U.S. BANK NATIONAL ASSOCIATION as Note Agent and, upon the execution and delivery of the Collateral Documents pursuant to Section 6.13, as Collateral Agent for the Secured Parties;

**WHEREAS**, pursuant to the terms of the Purchase Agreement, as continuing collateral security for the Obligations of the Company under the Purchase Agreement and the Guaranteed Obligations of the Guarantors under the Guaranty, the Grantors have entered into a Security Agreement, dated as of even date herewith (as amended, restated, supplemented and/or otherwise modified from time to time, the "*Security Agreement*"; capitalized terms used but not otherwise defined herein having the meaning ascribed thereto therein), made by Grantors in favor of the Collateral Agent, for the purposes of granting to the Collateral Agent, for the benefit of the Secured Parties, a security interest in Grantors' assets, on the terms and subject to the conditions set forth herein; and

**WHEREAS**, pursuant to the Security Agreement, the Grantor is required to grant a security interest to the Collateral Agent, in all of the Grantor's Intellectual Property, including the Patents, Trademarks and Copyrights listed on Schedule 1 hereto (collectively, the "*Intellectual Property*").

**AGREEMENT**

**NOW, THEREFORE**, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Grantor and the Collateral Agent hereby agree as follows:

1.      **Grant of Security Interest**.

(a)      As collateral security for the full, prompt, complete and final payment and performance when due (whether at stated maturity, by acceleration or otherwise) of all the Secured Obligations, the Grantor hereby pledges to the Collateral Agent, on behalf of the Secured Parties, and hereby grants to the Collateral Agent, on behalf of the Secured Parties, a security interest in all of the Grantor's right, title and interest in, to and under the Intellectual Property, whether now owned or hereafter acquired.

(b)      The security interest granted hereby is granted in conjunction with the security interest granted to the Collateral Agent under the Security Agreement.  The rights and remedies of the Collateral Agent with respect to the security interest granted hereby are in addition to those set forth in the Security Agreement.  In the event of any conflict between the terms of this Agreement and the terms of the Security Agreement, the terms of the Security Agreement shall control.

2.      **Termination of Security Interest**.

This Agreement shall terminate as set forth in the Security Agreement.

3.      **Modification of Agreement**.

Any provision of this Agreement may be amended, waived or modified only by an instrument signed in writing by the Grantor and the Collateral Agent (with the consents of any Holder or other Secured Party as required by Section 10.9 of the Purchase Agreement).  Notwithstanding the foregoing, upon receipt of a certificate of a Responsible Officer, the Collateral Agent may modify this Agreement, after obtaining the Grantor's approval of or signature to such modification, by amending Schedule 1 hereto to include reference to any right, title or interest in any Patents, Trademarks or Copyrights currently owned by the Grantor or any Patents, Trademarks or Copyrights acquired or developed by the Grantor after the execution hereof or to delete any reference to any right, title or interest in any Patents, Trademarks or Copyrights in which the Grantor no longer has or claims any right, title or interest.

5.      **GOVERNING LAW**.

THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.

6.      **Jurisdiction and Venue; Waiver of Jury Trial; Expenses and Indemnification**.

This Agreement is subject to the provisions of Section 10.3 (Jurisdiction and Venue), Section 10.4 (Waiver of Jury Trial) and Section 10.10(a) (Expenses and Indemnification) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*. Any amounts payable as provided hereunder shall be additional Obligations secured by this Agreement and the other Note Documents. U.S. Bank National Association is entering into this Agreement solely in its capacity as Collateral Agent under the Purchase Agreement and shall be entitled to all of the rights, privileges and immunities of the Collateral Agent in acting hereunder.

7.      **Counterparts**.

This Agreement may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract. Any counterpart of a signature page to this Agreement may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.

*[Signature page follows]*

2

254153964 v3

IN WITNESS WHEREOF, the Grantor and the Collateral Agent have caused this Agreement to be duly executed and delivered as of the date first above written.

**GRANTOR:**

[_____]


By:_____
Name:
Title:

**COLLATERAL AGENT:**

U.S. BANK NATIONAL ASSOCIATION

By: _____
Name:
Title:

SCHEDULE 1

INTELLECTUAL PROPERTY SECURITY AGREEMENT

**EXHIBIT F**

**FORM OF SOLVENCY CERTIFICATE**

**(see attached)**

### [FORM OF] SOLVENCY CERTIFICATE

### CORE SCIENTIFIC HOLDING CO.

### August 20, 2021

This Solvency Certificate is delivered pursuant to Section 4.1(c) of that certain Convertible Note Purchase Agreement, dated as of the date hereof (the "***Purchase Agreement***"), by and among Core Scientific Holding Co., a Delaware corporation (the "***Company***"), the Guarantors party thereto, the Initial Purchasers named on the Schedule of Purchasers attached as Schedule 2 thereto and U.S. Bank National Association, as note agent and collateral agent.  Terms capitalized herein and not otherwise defined shall have the meanings assigned to them in the Purchase Agreement.

The undersigned, the Chief Financial Officer of the Company, does hereby certify, on behalf of the Company and not in his individual capacity, that as of the Initial Closing Date, both immediately before and after giving effect to the transactions contemplated by the Note Documents, the Company is individually, and the Company and its Subsidiaries on a consolidated basis are, Solvent.

*[Signature page follows]*

**IN WITNESS WHEREOF**, the undersigned has hereunto set his hand on behalf of the Company as of the date first referenced above.

_____
Name:  Michael Trzupek
Title:   Chief Financial Officer

[Signature Page to Solvency Certificate]

**EXHIBIT G**

**FORM OF ADMINISTRATIVE QUESTIONNAIRE**

| **Purchaser Name** | |
|---|---|
| Name in Which to Register Note(s) | |
| Note Registration Number(s); Principal Amount(s) | |
| Payment on Account of Note(s)<br><br>Method<br><br>Account Information | |
| Accompanying Information | |
| Address / Fax # / Email for notices related to payments | |
| Address / Fax # / Email for all other notices | |
| Instructions re Delivery of Note(s) | |
| Tax Identification Number | |

**EXHIBIT H**

**FORM OF FIRST LIEN INTERCREDITOR AGREEMENT**

**[FORM OF] FIRST LIEN PARI PASSU INTERCREDITOR AGREEMENT**

THIS FIRST LIEN PARI PASSU INTERCREDITOR AGREEMENT (this "*Agreement*"), dated as of [__], by and among U.S. Bank National Association, as note agent for the Initial Note Claimholders (in such capacity, and together with its successors and permitted assigns in such capacity, the "*Initial First Lien Representative*") and as collateral agent for the Initial Note Claimholders (in such capacity, and together with its successors and permitted assigns in such capacity, the "*Initial First Lien Collateral Agent*"), U.S. Bank National Association, as note agent for the Other Note Claimholders (in such capacity, and together with its successors and permitted assigns in such capacity, the "*Other First Lien Representative*"), and as collateral agent for the Other Note Claimholders (in such capacity, and together with its successors and permitted assigns in such capacity, the "*Other First Lien Collateral Agent*"), and acknowledged and agreed to by [Parent Entity] (the "*Company*") and the other Grantors.  Capitalized terms used in this Agreement have the meanings assigned to them in Section 1.1 below.

Reference is made to (i) that certain Senior Secured Convertible Note Purchase Agreement, dated as of April 19, 2021, by and among the [Company (as successor interest of Core Scientific Holding Co.)][1], the other Grantors from time to time party thereto, the Purchasers (as defined therein) party thereto, the Initial First Lien Representative and the Initial First Lien Collateral Agent (as amended, restated, supplemented and/or otherwise modified from time to time, the "*Initial Purchase Agreement*") and (ii) that certain Convertible Note Purchase Agreement, dated as of August 20, 2021, by and among the Company (Core Scientific Holding Co.), the other Grantors from time to time party thereto, the Purchasers (as defined therein) party thereto, the Other First Lien Representative and the Other First Lien Collateral Agent (as amended, restated, supplemented and/or otherwise modified from time to time, the "*Other Purchase Agreement*").

The obligations of the Company under the Initial Purchase Agreement and the obligations of the Guarantors (as defined therein) under the guaranty of the Initial Purchase Agreement are secured on a first-priority basis (subject to Permitted Liens (as defined therein)) by Liens on substantially all of the assets of the Grantors, pursuant to the terms of the Initial Note Collateral Documents.

The obligations of the Company under the Other Purchase Agreement and the obligations of the Guarantors (as defined therein) under the guaranty of the Other Purchase Agreement are secured on a first-priority basis (subject to Permitted Liens (as defined therein)) by Liens on substantially all of the assets of the Grantors, pursuant to the terms of the Other Note Collateral Documents.

In consideration of the foregoing, the mutual covenants and obligations herein set forth and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, each of the Initial First Lien Representative (for itself and on behalf of each other Initial Note Claimholder), the Initial First Lien Collateral Agent (for itself and on behalf of each other Initial Note Claimholder), the Other First Lien Representative (for itself and on behalf of each other Other Note Claimholder) and the Other First Lien Collateral Agent (for itself and on behalf of each other Other Note Claimholder), intending to be legally bound, hereby agrees as follows:

---

[1] To the extent the Conversion Event giving rise to execution of this Agreement is the XPDI Transaction, references to the Company herein shall be updated to refer to the Parent Entity with other confirming changes consistent therewith.

ARTICLE I.

DEFINITIONS

SECTION 1.1            <u>Certain Defined Terms</u>.

Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Initial Purchase Agreement or the Other Purchase Agreement (whether or not then in effect), as applicable, and the following terms which are defined in the UCC are used herein as so defined (and if defined in more than one article of the UCC shall have the meaning specified in Article 9 thereof): Certificated Security, Commodity Account, Commodity Contract, Deposit Account, Electronic Chattel Paper, Promissory Note, Instrument, Letter of Credit Right, Securities Entitlement, Securities Account and Tangible Chattel Paper.  As used in this Agreement, the following terms have the meanings specified below:

"*Agreement*" has the meaning set forth in the introductory paragraph hereto.

"*Applicable Collateral Agent*" means (i) until the earliest of (x) the Discharge of Initial Purchase Agreement and (y) the Other First Lien Representative Enforcement Date, the Initial First Lien Collateral Agent and (ii) from and after the earlier of (x) the Discharge of Initial Purchase Agreement and (y) the Other First Lien Representative Enforcement Date, the Other First Lien Collateral Agent.

"*Applicable Representative*" means (i) until the earliest of (x) the Discharge of Initial Purchase Agreement and (y) the Other First Lien Representative Enforcement Date, the Initial First Lien Representative and (ii) from and after the earlier of (y) the Discharge of Initial Purchase Agreement and (z) the Other First Lien Representative Enforcement Date, the Other First Lien Representative.

"*Bankruptcy Case*" has the meaning set forth in <u>Section 2.5(b)</u>.

"*Bankruptcy Code*" means Title 11 of the United States Code, as amended.

"*Bankruptcy Law*" means the Bankruptcy Code and any similar Federal, state or foreign law for the relief of debtors.

"*Business Day*" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close.

"*Capital Lease*" means, as applied to any Person, any lease by that Person as lessee that has been or should be, in accordance with GAAP, recorded as a capital lease on the balance sheet of that Person.

"*Collateral*" means all assets and properties subject to, or purported to be subject to, Liens created pursuant to any First Lien Collateral Document to secure either Series of First Lien Obligations and shall include any property or assets subject to replacement Liens or adequate protection Liens in favor of any First Lien Claimholder.

"*Collateral Agent*" means, collectively, the Initial First Lien Collateral Agent and the Other First Lien Collateral Agent.

"*Company*" has the meaning set forth in the introductory paragraph to this Agreement.

"***Control***" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by agreement or otherwise. "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"***Control Collateral***" means any Shared Collateral in the "control" (within the meaning of Section 9-104, 9-105, 9-106, 9-107 or 8-106 of the UCC) of either Collateral Agent (or its agents or bailees), to the extent that control thereof perfects a Lien thereon under the UCC. Control Collateral includes any Deposit Accounts, Securities Accounts, Securities Entitlements, Commodity Accounts, Commodity Contracts, Letter of Credit Rights or Electronic Chattel Paper over which either Collateral Agent has "control" under the UCC.

"***Controlling Claimholders***" means (i) at any time when the Initial First Lien Collateral Agent is the Applicable Collateral Agent, the Initial Note Claimholders and (ii) at any other time, the Other Note Claimholders.

"***Default***" means a "Default" (or similarly defined term) as defined in any First Lien Document.

"***DIP Financing***" has the meaning set forth in Section 2.5(b).

"***DIP Financing Liens***" has the meaning set forth in Section 2.5(b).

"***DIP Lenders***" has the meaning set forth in Section 2.5(b).

"***Discharge***" means, with respect to either Series of First Lien Obligations, that such Series of First Lien Obligations is no longer secured by, and no longer required to be secured by, any Shared Collateral pursuant to the terms of the applicable First Lien Documents for such Series of First Lien Obligations. The term "***Discharged***" shall have a corresponding meaning.

"***Discharge of Initial Purchase Agreement***" means, except to the extent otherwise provided in Section 2.6, the Discharge of the Initial Note Obligations.

"***Equity Release Proceeds***" has the meaning set forth in Section 2.4(a).

"***Event of Default***" means an "Event of Default" (or similarly defined term) as defined in any First Lien Document.

"***First Lien Claimholders***" means, collectively, (i) the Initial Note Claimholders and (ii) the Other Note Claimholders.

"***First Lien Collateral Documents***" means, collectively, (i) the Initial Note Collateral Documents and (ii) the Other Note Collateral Documents.

"***First Lien Documents***" means, collectively, (i) the Initial Note Documents and (ii) the Other Note Documents.

"***First Lien Obligations***" means, collectively, (i) the Initial Note Obligations and (ii) the Other Note Obligations.

"***Grantors***" means the Company and each of the Guarantors.

"**Guarantors**" means the "Guarantors" as defined in each of the Initial Purchase Agreement and the Other Purchase Agreement.

"**Impairment**" has the meaning set forth in Section 2.1(b)(ii).

"**Indebtedness**" means all indebtedness for borrowed money.

"**Initial First Lien Collateral Agent**" has the meaning set forth in the introductory paragraph to this Agreement.

"**Initial First Lien Representative**" has the meaning set forth in the introductory paragraph to this Agreement.

"**Initial Note Claimholders**" means the holders of any Initial Note Obligations, including the "Secured Parties", as defined in the Initial Purchase Agreement (including the Initial First Lien Representative and the Initial First Lien Collateral Agent).

"**Initial Note Collateral Documents**" means the Collateral Documents (as defined in the Initial Purchase Agreement) and any other agreement, document or instrument entered into for the purpose of granting a Lien to secure any Initial Note Obligations or to perfect such Lien (as each may be amended, restated, supplemented and/or otherwise modified from time to time).

"**Initial Note Documents**" means the Initial Purchase Agreement, each Initial Note Collateral Document and the other Note Documents (as defined in the Initial Purchase Agreement), and each of the other agreements, documents and instruments providing for or evidencing any other Initial Note Obligation, as each may be amended, restated, supplemented and/or otherwise modified from time to time.

"**Initial Note Obligations**" means:

(a)       (i) the Obligations (as defined in the Initial Purchase Agreement), (ii) all principal of and interest (including any Post-Petition Interest) and premium (if any) on all loans made pursuant to the Initial Purchase Agreement, and (iii) all guarantee obligations, fees, expenses and all other obligations under the Initial Purchase Agreement and the other Initial Note Documents, in each case whether or not allowed or allowable in an Insolvency or Liquidation Proceeding; and

(b)       to the extent any payment with respect to any Initial Note Obligation (whether by or on behalf of any Grantor, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any Other Note Claimholder, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of this Agreement and the rights and obligations of the Initial Note Claimholders and the Other Note Claimholders, be deemed to be reinstated and outstanding as if such payment had not occurred.  To the extent that any interest, fees, expenses or other charges (including Post-Petition Interest) to be paid pursuant to the Initial Note Documents are disallowed by order of any court, including by order of a court of competent jurisdiction presiding over an Insolvency or Liquidation Proceeding, such interest, fees, expenses and charges (including Post-Petition Interest) shall, as between the Initial Note Claimholders and the Other Note Claimholders, be deemed to continue to accrue and be added to the amount to be calculated as the "Initial Note Obligations".

"*Initial Purchase Agreement*" has the meaning set forth in the recitals to this Agreement.

"**Insolvency or Liquidation Proceeding**" means:

254438203 v7

(a)     any voluntary or involuntary case or proceeding under the Bankruptcy Code with respect to any Grantor;

(b)     any other voluntary or involuntary insolvency, reorganization or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding with respect to any Grantor or with respect to a material portion of its assets;

(c)     any liquidation, dissolution, reorganization or winding up of any Grantor whether voluntary or involuntary and whether or not involving insolvency or bankruptcy; or

(d)     any assignment for the benefit of creditors or any other marshaling of assets and liabilities of any Grantor.

"*Intervening Creditor*" has the meaning set forth in <u>Section 2.1(b)(i)</u>.

"*Lien*" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Capital Lease having substantially the same economic effect as any of the foregoing), in each case, in the nature of security; <u>provided that</u> in no event shall a colocation agreement or an operating lease in and of itself be deemed a Lien.

"*Other First Lien Collateral Agent*" has the meaning set forth in the introductory paragraph to this Agreement.

"*Other First Lien Representative*" has the meaning set forth in the introductory paragraph to this Agreement.

"*Other First Lien Representative Enforcement Date*" means, with respect to the Other First Lien Representative, the date which is 180 days after the occurrence of both (i) an Event of Default (under and as defined in the Other Note Documents) and (ii) the Initial First Lien Collateral Agent's and the Initial First Lien Representative's receipt of written notice from the Other First Lien Representative certifying that (x) an Event of Default (under and as defined in the Other Note Documents) has occurred and is continuing and (y) the Other Note Obligations are currently due and payable in full (whether as a result of acceleration thereof or otherwise) in accordance with the terms of the applicable Other Note Document; <u>provided</u> that the Other First Lien Representative Enforcement Date shall be stayed and shall not occur and shall be deemed not to have occurred (1) at any time the Initial First Lien Collateral Agent acting on the instructions of the Initial First Lien Representative has commenced and is diligently pursuing any enforcement action with respect to Shared Collateral, (2) at any time the Grantor that has granted a security interest in Shared Collateral is then a debtor under or with respect to (or otherwise subject to) any Insolvency or Liquidation Proceeding or (3) if the Other First Lien Representative subsequently rescinds or withdraws the written notice provided for in clause (ii) above.

"*Other Note Claimholders*" means the holders of any Other Note Obligations, including the "Secured Parties", as defined in the Other Purchase Agreement (including the Other First Lien Representative and the Other First Lien Collateral Agent).

"*Other Note Collateral Documents*" means the Collateral Documents (as defined in the Other Purchase Agreement) and any other agreement, document or instrument entered into for the purpose

of granting a Lien to secure any Other Note Obligations or to perfect such Lien (as each may be amended, restated, supplemented and/or otherwise modified from time to time).

"**Other Note Documents**" means the Other Purchase Agreement, each Other Note Collateral Document and the other Note Documents (as defined in the Other Purchase Agreement), and each of the other agreements, documents and instruments providing for or evidencing any other Other Note Obligation, as each may be amended, restated, supplemented and/or otherwise modified from time to time.

"**Other Note Obligations**" means:

(a)      (i) the Obligations (as defined in the Other Purchase Agreement), (ii) all principal of and interest (including any Post-Petition Interest) and premium (if any) on all loans made pursuant to the Other Purchase Agreement, and (iii) all guarantee obligations, fees, expenses and all other obligations under the Other Purchase Agreement and the other Other Note Documents, in each case whether or not allowed or allowable in an Insolvency or Liquidation Proceeding; and

(b)      to the extent any payment with respect to any Other Note Obligation (whether by or on behalf of any Grantor, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any Initial Note Claimholder, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of this Agreement and the rights and obligations of the Other Note Claimholders and the Initial Note Claimholders, be deemed to be reinstated and outstanding as if such payment had not occurred.  To the extent that any interest, fees, expenses or other charges (including Post-Petition Interest) to be paid pursuant to the Other Note Documents are disallowed by order of any court, including by order of a court of competent jurisdiction presiding over an Insolvency or Liquidation Proceeding, such interest, fees, expenses and charges (including Post-Petition Interest) shall, as between the Other Note Claimholders and the Initial Note Claimholders, be deemed to continue to accrue and be added to the amount to be calculated as the "Other Note Obligations".

"*Other Purchase Agreement*" has the meaning set forth in the recitals to this Agreement.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, limited partnership, governmental authority or other entity.

"**Possessory Collateral**" means any Shared Collateral in the possession of either Collateral Agent (or its agents or bailees), to the extent that possession thereof perfects a Lien thereon under the UCC or otherwise.  Possessory Collateral includes any Certificated Securities, Promissory Notes, Instruments, and Tangible Chattel Paper, in each case, delivered to or in the possession of either Collateral Agent under the terms of the First Lien Collateral Documents.

"**Post-Petition Interest**" means interest, fees, expenses and other charges that pursuant to the Initial Note Documents or Other Note Documents, as applicable, continue to accrue after the commencement of any Insolvency or Liquidation Proceeding, whether or not such interest, fees, expenses and other charges are allowed or allowable under the Bankruptcy Law or in any such Insolvency or Liquidation Proceeding.

"**Proceeds**" has the meaning set forth in <u>Section 2.1(a)</u>.

"**Representative**" means, at any time, (i) in the case of any Initial Note Obligations or the Initial Note Claimholders, the Initial First Lien Representative and (ii) in the case of any Other Note Obligations or the Other Note Claimholders, the Other First Lien Representative.

"***Responsible Officer***" of any Person means the chief executive officer, the president, any vice president, the chief financial officer, treasurer or assistant treasurer or other similar officer of such Person and any other individual or similar official thereof responsible for the administration of the obligations of such Person in respect of this Agreement.  Any document delivered hereunder that is signed by a Responsible Officer of a Grantor shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Grantor and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Grantor.

"***Series***" means (a) with respect to the First Lien Claimholders, each of (i) the Initial Note Claimholders (in their capacities as such) and (ii) the Other Note Claimholders (in their capacities as such) and (b) with respect to any First Lien Obligations, each of (i) the Initial Note Obligations and (ii) the Other Note Obligations.

"***Shared Collateral***" means, at any time, Collateral in which the holders of First Lien Obligations (or their respective Representatives or Collateral Agents on behalf of such holders) hold, or purport to hold, or are required to hold pursuant to their respective First Lien Documents, a valid security interest or Lien at such time.

"***subsidiary***" means, with respect to any Person (a) any corporation, association, or other business entity (other than a partnership, limited liability company or similar entity) of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the directors, managers or trustees thereof is at the time of determination is owned or controlled by such Person or one or more of the other subsidiaries of that Person or a combination thereof and (b) any partnership, limited liability company or similar entity which (i) more than 50% of the voting interests or general partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other subsidiaries of that Person or a combination thereof whether in the form of membership, general, special or limited partnership or otherwise and (ii) such Person or any subsidiary of such Person is a controlling general partner or otherwise controls such entity.

"***UCC***" means the Uniform Commercial Code as in effect from time to time in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"***Underlying Assets***" has the meaning set forth in <u>Section 2.4(a)</u>.

SECTION 1.2        Rules of Interpretation.

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as amended, restated, supplemented and/or otherwise modified from time to time, however evidenced, whether in physical or electronic form and any reference herein to any statute or regulations shall include any amendment, renewal, extension or replacement thereof, (ii) any reference herein to any Person shall be construed to include such Person's permitted successors and assigns from time to time, (iii) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Articles, Sections and Annexes shall be construed to refer to Articles, Sections and Annexes

of this Agreement, (v) unless otherwise expressly qualified herein, the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights and (vi) the term "or" is not exclusive.

ARTICLE II.

PRIORITIES AND AGREEMENTS WITH RESPECT TO SHARED COLLATERAL

SECTION 2.1          Priority of Claims.

(a)          Anything contained herein or in any of the First Lien Documents to the contrary notwithstanding (but subject to Sections 2.1(b) and 2.10(b)), if an Event of Default has occurred and is continuing, and the Applicable Collateral Agent is taking action to enforce rights in respect of any Collateral, or any distribution is made in respect of any Shared Collateral in any Bankruptcy Case of any Grantor or any First Lien Claimholder receives any payment pursuant to any intercreditor agreement (other than this Agreement) or otherwise with respect to any Shared Collateral, the proceeds of any sale, collection or other liquidation of any Shared Collateral or Equity Release Proceeds received by any First Lien Claimholder or received by the Applicable Collateral Agent or any First Lien Claimholder pursuant to any such intercreditor agreement or otherwise with respect to such Collateral and proceeds of any such distribution (subject, in the case of any such distribution, to the sentence immediately following clause (iii) below) to which the First Lien Obligations are entitled under any intercreditor agreement (other than this Agreement) or otherwise (all proceeds of any sale, collection or other liquidation of any Collateral comprising either Shared Collateral or Equity Release Proceeds and all proceeds of any such distribution and any proceeds of any insurance covering the Shared Collateral received by the Applicable Collateral Agent and not returned to any Grantor under any First Lien Document being collectively referred to as "**Proceeds**"), shall be applied by the Applicable Collateral Agent in the following order:

(i)          FIRST, to the payment of all amounts owing to each Collateral Agent (in its capacity as such) and each Representative (in its capacity as such) secured by such Shared Collateral or, in the case of Equity Release Proceeds, secured by the Underlying Assets, including all reasonable costs and expenses incurred by each Collateral Agent (in its capacity as such) and each Representative (in its capacity as such) in connection with such collection or sale or otherwise in connection with this Agreement, any other First Lien Document or any of the First Lien Obligations, including all court costs and the reasonable fees and expenses of its agents and legal counsel, and any other reasonable costs or expenses incurred in connection with the exercise of any right or remedy hereunder or under any other First Lien Document and all fees and indemnities owing to such Collateral Agents and Representatives, ratably to each such Collateral Agent and Representative in accordance with the amounts payable to it pursuant to this clause (i);

(ii)          SECOND, subject to Sections 2.1(b) and 2.10(b), to the extent Proceeds remain after the application pursuant to preceding clause (i), to each Representative for the payment in full of the other First Lien Obligations of each Series secured by such Shared Collateral or, in the case of Equity Release Proceeds, secured by the Underlying Assets, and, if the amount of such Proceeds are insufficient to pay in full the First Lien Obligations of each Series so secured then such Proceeds shall be allocated among the Representatives of each Series secured by such Shared Collateral or, in the case of Equity Release Proceeds, secured by the Underlying Assets, pro rata according to the amounts of such First Lien Obligations owing to each such respective Representative and the other First Lien Claimholders represented by it for distribution by such Representative in accordance with its respective First Lien Documents; and

8

(iii)    THIRD, any balance of such Proceeds remaining after the application pursuant to preceding <u>clauses (i)</u> and <u>(ii)</u>, to the Grantors, their successors or assigns from time to time, or to whomever may be lawfully entitled to receive the same.

If, despite the provisions of this <u>Section 2.1(a)</u>, any First Lien Claimholder shall receive any payment or other recovery in excess of its portion of payments on account of the First Lien Obligations to which it is then entitled in accordance with this <u>Section 2.1(a)</u>, such First Lien Claimholder shall hold such payment or recovery in trust for the benefit of all First Lien Claimholders for distribution in accordance with this <u>Section 2.1(a)</u>.

(b)    (i)    Notwithstanding the foregoing, with respect to any Shared Collateral or Equity Release Proceeds for which a third party (other than a First Lien Claimholder) has a Lien that is junior in priority to the Lien of one Series of First Lien Obligations but senior (as determined by appropriate legal proceedings in the case of any dispute) to the Lien of the other Series of First Lien Obligations (such third party an "***Intervening Creditor***"), the value of any Shared Collateral, Equity Release Proceeds or Proceeds which are allocated to such Intervening Creditor shall be deducted on a ratable basis solely from the Shared Collateral, Equity Release Proceeds or Proceeds to be distributed in respect of the Series of First Lien Obligations with respect to which such Impairment exists.

(ii)    In furtherance of the foregoing and without limiting the provisions of <u>Section 2.3</u>, it is the intention of the First Lien Claimholders of each Series that the holders of First Lien Obligations of such Series (and not the First Lien Claimholders of the other Series) bear the risk of (1) any determination by a court of competent jurisdiction that (x) any of the First Lien Obligations of such Series are unenforceable under applicable law or are subordinated to any other obligations (other than another Series of First Lien Obligations), (y) any of the First Lien Obligations of such Series do not have a valid and perfected security interest in any of the Collateral securing the other Series of First Lien Obligations and/or (z) any intervening security interest exists securing any other obligations (other than another Series of First Lien Obligations) on a basis ranking prior to the security interest of such Series of First Lien Obligations but junior to the security interest of the other Series of First Lien Obligations and (2) the existence of any Collateral (other than Equity Release Proceeds) for the other Series of First Lien Obligations that is not Shared Collateral (any such condition referred to in the foregoing clauses (1) or (2) with respect to either Series of First Lien Obligations, an "***Impairment***" of such Series); <u>provided</u> that the existence of a maximum claim with respect to any real property subject to a mortgage which applies to all First Lien Obligations shall not be deemed to be an Impairment of either Series of First Lien Obligations.  In the event of any Impairment with respect to either Series of First Lien Obligations, the results of such Impairment shall be borne solely by the holders of such Series of First Lien Obligations, and the rights of the holders of such Series of First Lien Obligations (including the right to receive distributions in respect of such Series of First Lien Obligations pursuant to <u>Section 2.1</u>) set forth herein shall be modified to the extent necessary so that the effects of such Impairment are borne solely by the holders of the Series of such First Lien Obligations subject to such Impairment.  Additionally, in the event the First Lien Obligations of either Series are modified pursuant to applicable law (including pursuant to Section 1129 of the Bankruptcy Code), any reference to such First Lien Obligations or the First Lien Documents governing such First Lien Obligations shall refer to such obligations or such documents as so modified.

(c)    It is acknowledged that the First Lien Obligations of either Series may, subject to the limitations set forth in the then existing First Lien Documents and subject to any limitations set forth in this Agreement, be increased, extended, renewed, replaced, restated, supplemented, restructured, repaid, refunded or otherwise amended or modified from time to time, all without affecting the priorities set forth

9

in Section 2.1(a) or the provisions of this Agreement defining the relative rights of the First Lien Claimholders of either Series.

(d)    Notwithstanding the date, time, method, manner or order of grant, attachment or perfection of any Liens securing either Series of First Lien Obligations granted on the Shared Collateral and notwithstanding any provision of the UCC or any other applicable law or the First Lien Documents or any defect or deficiencies in the Liens securing the First Lien Obligations of either Series or any other circumstance whatsoever (but, in each case, subject to Section 2.1(b)), each First Lien Claimholder hereby agrees that the Liens securing each Series of First Lien Obligations on any Shared Collateral shall be of equal priority.

SECTION 2.2        Actions with Respect to Shared Collateral; Prohibition on Contesting Liens.

(a)    Notwithstanding Section 2.1, (i) only the Applicable Collateral Agent shall act with respect to the Shared Collateral (including with respect to any other intercreditor agreement with respect to any Shared Collateral), (ii) the Applicable Collateral Agent shall act only on the instructions of the Applicable Representative and shall not follow any instructions with respect to the Shared Collateral (including with respect to any other intercreditor agreement with respect to any Shared Collateral) from the Other First Lien Representative (or any other First Lien Claimholder other than the Applicable Representative) and (iii) no Other Note Claimholder shall or shall instruct either Collateral Agent to, and the Collateral Agent that is not the Applicable Collateral Agent shall not, commence any judicial or nonjudicial foreclosure proceedings with respect to, seek to have a trustee, receiver, liquidator or similar official appointed for or over, attempt any action to take possession of, exercise any right, remedy or power with respect to, or otherwise take any action to enforce its security interest in or realize upon, or take any other action available to it in respect of, Shared Collateral (including with respect to any other intercreditor agreement with respect to Shared Collateral), whether under any First Lien Collateral Document (other than the First Lien Collateral Documents applicable to the Applicable Collateral Agent), applicable law or otherwise, it being agreed that only the Applicable Collateral Agent, acting in accordance with the First Lien Collateral Documents applicable to it, shall be entitled to take any such actions or exercise any remedies with respect to such Shared Collateral at such time.

(b)    Without limiting the provisions of Section 4.2, the Other First Lien Representative and the Other First Lien Collateral Agent hereby appoint the Applicable Collateral Agent as its agent and authorizes the Applicable Collateral Agent to exercise any and all remedies under each First Lien Collateral Document with respect to Shared Collateral and to execute releases in connection therewith.

(c)    Notwithstanding the equal priority of the Liens securing each Series of First Lien Obligations granted on the Shared Collateral, the Applicable Collateral Agent (acting on the instructions of the Applicable Representative) may deal with the Shared Collateral as if such Applicable Collateral Agent had a senior and exclusive Lien on such Shared Collateral.  Neither the Other First Lien Representative, the Other First Lien Collateral Agent nor the Other Note Claimholders will contest, protest or object to any foreclosure proceeding or action brought by the Applicable Collateral Agent, the Applicable Representative or the Controlling Claimholders or any other exercise by the Applicable Collateral Agent, the Applicable Representative or the Controlling Claimholders of any rights and remedies relating to the Shared Collateral. The foregoing shall not be construed to limit the rights and priorities of any First Lien Claimholder or either Collateral Agent or Representative with respect to any Collateral not constituting Shared Collateral.

(d)    Each of the Other First Lien Collateral Agent and the Other First Lien Representative agrees that it will not accept any Lien on any Collateral for the benefit of the Other Note Obligations (other than funds deposited for the satisfaction, discharge or defeasance of the Other Purchase

Agreement) other than pursuant to the First Lien Collateral Documents, and by executing this Agreement, each of the Other First Lien Collateral Agent and the Other First Lien Representative agrees to be bound by the provisions of this Agreement and the other First Lien Collateral Documents applicable to it.

(e)     Each of the First Lien Claimholders agrees that it will not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the perfection, priority, validity or enforceability of a Lien held by or on behalf of any of the First Lien Claimholders in all or any part of the Collateral or the provisions of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair (i) the rights of either Collateral Agent or Representative to enforce this Agreement or (ii) the rights of any First Lien Claimholder to contest or support any other Person in contesting the enforceability of any Lien purporting to secure obligations not constituting First Lien Obligations.

SECTION 2.3        No Interference; Payment Over; Exculpatory Provisions.

(a)     Each First Lien Claimholder agrees that (i) it will not challenge or question or support any other Person in challenging or questioning in any proceeding the validity or enforceability of any First Lien Obligations of either Series or any First Lien Collateral Document or the validity, attachment, perfection or priority of any Lien under any First Lien Collateral Document or the validity or enforceability of the priorities, rights or duties established by or other provisions of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair the rights of any First Lien Claimholder from challenging or questioning the validity or enforceability of any First Lien Obligations constituting unmatured interest or the validity of any Lien relating thereto pursuant to Section 502(b)(2) of the Bankruptcy Code, (ii) it will not take or cause to be taken any action the purpose or intent of which is, or could be, to interfere, hinder or delay, in any manner, whether by judicial proceedings or otherwise, any sale, transfer or other disposition of the Collateral by the Applicable Collateral Agent, (iii) except as provided in Section 2.2, it shall have no right to and shall not otherwise (A) direct the Applicable Collateral Agent or any other First Lien Claimholder to exercise any right, remedy or power with respect to any Shared Collateral (including pursuant to any other intercreditor agreement) or (B) consent to, or object to, the exercise by, or any forbearance from exercising by, the Applicable Collateral Agent or any other First Lien Claimholder represented by it of any right, remedy or power with respect to any Collateral, (iv) it will not institute any suit or assert in any suit, bankruptcy, insolvency or other proceeding any claim against the Applicable Collateral Agent or any other First Lien Claimholder represented by it seeking damages from or other relief by way of specific performance, instructions or otherwise with respect to any Collateral and (v) it will not attempt, directly or indirectly, whether by judicial proceedings or otherwise, to challenge the enforceability of any provision of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair the rights of any of the Applicable Collateral Agent or any other First Lien Claimholder to (i) enforce this Agreement or (ii) contest or support any other Person in contesting the enforceability of any Lien purporting to secure obligations not constituting First Lien Obligations.

(b)     Each First Lien Claimholder hereby agrees that if it shall obtain possession of any Shared Collateral or shall realize any proceeds or payment in respect of any Shared Collateral, pursuant to any First Lien Collateral Document or by the exercise of any rights available to it under applicable law or in any Insolvency or Liquidation Proceeding or through any other exercise of remedies (including pursuant to any intercreditor agreement), at any time prior to the Discharge of each of the First Lien Obligations, then it shall hold such Shared Collateral, proceeds or payment in trust for the other First Lien Claimholders having a security interest in such Shared Collateral and promptly transfer any such Shared Collateral, proceeds or payment, as the case may be, to the Applicable Collateral Agent, to be distributed by such Applicable Collateral Agent in accordance with the provisions of Section 2.1(a) hereof, provided, however, that the foregoing shall not apply to any Shared Collateral purchased by any First Lien Claimholder for cash pursuant to any exercise of remedies permitted hereunder.

(c)     None of the Applicable Collateral Agent, either Applicable Representative or any other First Lien Claimholder shall be liable for any action taken or omitted to be taken by the Applicable Collateral Agent, such Applicable Representative or any other First Lien Claimholder with respect to any Collateral in accordance with the provisions of this Agreement.

SECTION 2.4          Automatic Release of Liens.

(a)     If, at any time any Shared Collateral is transferred to a third party or otherwise disposed of, in each case, in connection with any enforcement by the Applicable Collateral Agent in accordance with the provisions of this Agreement, then (whether or not any Insolvency or Liquidation Proceeding is pending at the time) the Liens in favor of the other Collateral Agent (or in favor of such other First Lien Claimholders if directly secured by such Liens) upon such Shared Collateral will automatically be released and discharged upon final conclusion of such disposition as and when, but only to the extent, such Liens of the Applicable Collateral Agent on such Shared Collateral are released and discharged; provided that any proceeds of any Shared Collateral realized therefrom shall be applied pursuant to Section 2.1 hereof.  If in connection with any such foreclosure or other exercise of remedies by the Applicable Collateral Agent, the Applicable Collateral Agent or related Applicable Representative of such Series of First Lien Obligations releases any Guarantor from its obligation under a guarantee of the Series of First Lien Obligations for which it serves as agent prior to a Discharge of such Series of First Lien Obligations, such Guarantor also shall be released from its guarantee of all other First Lien Obligations.  If in connection with any such foreclosure or other exercise of remedies by the Applicable Collateral Agent, the equity interests of any Person are foreclosed upon or otherwise disposed of and the Applicable Collateral Agent releases its Lien on the property or assets of such Person, then the Liens of the other Collateral Agent (or in favor of such other First Lien Claimholders if directly secured by such Liens) with respect to any Collateral consisting of the property or assets of such Person will be automatically released to the same extent as the Liens of the Applicable Collateral Agent are released; provided that any proceeds of any such equity interests foreclosed upon where the Applicable Collateral Agent releases its Lien on the assets of such Person on which another Series of First Lien Obligations holds a Lien on any of the assets of such Person (any such assets, the "***Underlying Assets***") which Lien is released as provided in this sentence (any such Proceeds being referred to herein as "***Equity Release Proceeds***" regardless of whether or not such other Series of First Lien Obligations holds a Lien on such equity interests so disposed of) shall be applied pursuant to Section 2.1 hereof.

(b)     Without limiting the rights of the Applicable Collateral Agent under Section 4.2, each Collateral Agent and each Representative agrees to execute and deliver (at the sole cost and expense of the Grantors) all such authorizations and other instruments as shall reasonably be requested by the Company or the Applicable Collateral Agent to evidence and confirm any release of Shared Collateral, Underlying Assets or guarantee provided for in this Section.

SECTION 2.5          Certain Agreements with Respect to Bankruptcy or Insolvency Proceedings.

(a)     This Agreement shall continue in full force and effect notwithstanding the commencement of any proceeding under the Bankruptcy Code or any other Federal, state or foreign bankruptcy, insolvency, receivership or similar law by or against any Grantor or any of its subsidiaries.

(b)     If any Grantor shall become subject to a case (a "***Bankruptcy Case***") under the Bankruptcy Code and shall, as debtor(s)-in-possession, move for approval of financing ("***DIP Financing***") to be provided by one or more lenders (the "***DIP Lenders***") under Section 364 of the Bankruptcy Code or the use of cash collateral under Section 363 of the Bankruptcy Code, each First Lien Claimholder (other than any Controlling Claimholder or the Representative of the Controlling Claimholder) agrees that it will

12

not raise any objection to any such financing or to the Liens on the Shared Collateral securing the same ("**DIP Financing Liens**") or to any use of cash collateral that constitutes Shared Collateral, unless the Representative of the Controlling Claimholders shall then oppose or object to such DIP Financing or such DIP Financing Liens or use of cash collateral (and (i) to the extent that such DIP Financing Liens are senior to the Liens on any such Shared Collateral for the benefit of the Controlling Claimholders, each Other Note Claimholder will subordinate its Liens with respect to such Shared Collateral on the same terms as the Liens of the Controlling Claimholders (other than any Liens of any First Lien Claimholders constituting DIP Financing Liens) are subordinated thereto, and (ii) to the extent that such DIP Financing Liens rank *pari passu* with the Liens on any such Shared Collateral granted to secure the First Lien Obligations of the Controlling Claimholders, each Other Note Claimholder will confirm the priorities with respect to such Shared Collateral as set forth herein), in each case so long as (A) the First Lien Claimholders of each Series retain the benefit of their Liens on all such Shared Collateral pledged to the DIP Lenders, including proceeds thereof arising after the commencement of such proceeding, with the same priority vis-à-vis all the other First Lien Claimholders (other than any Liens of the First Lien Claimholders constituting DIP Financing Liens) as existed prior to the commencement of the Bankruptcy Case, (B) the First Lien Claimholders of each Series are granted Liens on any additional collateral pledged to any First Lien Claimholders as adequate protection or otherwise in connection with such DIP Financing or use of cash collateral, with the same priority vis-à-vis the First Lien Claimholders as set forth in this Agreement (other than any Liens of any First Lien Claimholders constituting DIP Financing Liens), (C) if any amount of such DIP Financing or cash collateral is applied to repay any of the First Lien Obligations, such amount is applied pursuant to Section 2.1(a) of this Agreement, and (D) if any First Lien Claimholders are granted adequate protection with respect to the First Lien Obligations subject hereto, including in the form of periodic payments, in connection with such use of cash collateral, the proceeds of such adequate protection are applied pursuant to Section 2.1(a) of this Agreement; provided that the First Lien Claimholders of each Series shall have a right to object to the grant of a Lien to secure the DIP Financing over any Collateral subject to Liens in favor of the First Lien Claimholders of such Series or its Representative or Collateral Agent that shall not constitute Shared Collateral; provided, further, that the First Lien Claimholders receiving adequate protection shall not object to any other First Lien Claimholder receiving adequate protection comparable to any adequate protection granted to such First Lien Claimholders in connection with a DIP Financing or use of cash collateral.

(c)     If any First Lien Claimholder is granted adequate protection (A) in the form of Liens on any additional collateral, then each other First Lien Claimholder shall be entitled to seek, and each First Lien Claimholder will consent and not object to, adequate protection in the form of Liens on such additional collateral with the same priority vis-à-vis the First Lien Claimholders as set forth in this Agreement, (B) in the form of a superpriority or other administrative claim, then each other First Lien Claimholder shall be entitled to seek, and each First Lien Claimholder will consent and not object to, adequate protection in the form of a pari passu superpriority or administrative claim or (C) in the form of periodic or other cash payments, then the proceeds of such adequate protection must be applied to all First Lien Obligations pursuant to Section 2.1.

SECTION 2.6          Reinstatement.

In the event that any of the First Lien Obligations shall be paid in full and such payment or any part thereof shall subsequently, for whatever reason (including an order or judgment for disgorgement of a preference under Title 11 of the Bankruptcy Code, or any similar law, or the settlement of any claim in respect thereof), be required to be returned or repaid, the terms and conditions of this Agreement shall be fully applicable thereto until all such First Lien Obligations shall again have been paid in full in cash. This Section 2.6 shall survive termination of this Agreement.

SECTION 2.7          Insurance and Condemnation Awards.

13

As among the First Lien Claimholders, the Applicable Collateral Agent (acting at the direction of the Applicable Representative), shall have the right, but not the obligation, to adjust or settle any insurance policy or claim covering or constituting Shared Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding affecting the Shared Collateral. To the extent either Collateral Agent or any other First Lien Claimholder receives proceeds of such insurance policy and such proceeds are not permitted or required to be returned to any Grantor under the applicable First Lien Documents, such proceeds shall be turned over to the Applicable Collateral Agent for application as provided in Section 2.1 hereof.

SECTION 2.8        Gratuitous Bailee/Agent for Perfection.

(a)        The Applicable Collateral Agent shall be entitled to hold any Possessory Collateral constituting Shared Collateral.

(b)        Notwithstanding the foregoing, each Collateral Agent agrees to hold any Possessory Collateral constituting Shared Collateral and any other Shared Collateral from time to time in its possession or control (or in the possession or control of its agents or bailees) as gratuitous bailee for the benefit of each other First Lien Claimholder (such bailment being intended, among other things, to satisfy the requirements of Sections 8-106(d)(3), 8-301(a)(2) and 9-313(c) of the UCC), solely for the purpose of perfecting the security interest granted in such Shared Collateral, if any, pursuant to the applicable First Lien Collateral Documents, in each case, subject to the terms and conditions of this Section 2.8. Solely with respect to any deposit accounts constituting Shared Collateral under the control (within the meaning of Section 9-104 of the UCC) of any Collateral Agent, each such Collateral Agent agrees to also hold control over such deposit accounts as gratuitous agent for each other First Lien Claimholder and any assignee solely for the purpose of perfecting the security interest in such deposit accounts, subject to the terms and conditions of this Section 2.8.

(c)        No Collateral Agent shall have any obligation whatsoever to any First Lien Claimholder to ensure that the Possessory Collateral and Control Collateral is genuine or owned by any of the Grantors or to preserve rights or benefits of any Person except as expressly set forth in this Section 2.8. The duties or responsibilities of each Collateral Agent under this Section 2.8 shall be limited solely to holding any Possessory Collateral constituting Shared Collateral or any other Shared Collateral in its possession or control as gratuitous bailee (and with respect to Deposit Accounts, as gratuitous agent) in accordance with this Section 2.8 and delivering the Possessory Collateral constituting Shared Collateral as provided in Section 2.8(e) below.

(d)        Neither Collateral Agents nor any of the First Lien Claimholders shall have by reason of the First Lien Documents, this Agreement or any other document a fiduciary relationship in respect of the other Collateral Agents or any other First Lien Claimholder, and each Collateral Agent and each First Lien Claimholder hereby waives and releases the other Collateral Agents and First Lien Claimholders from all claims and liabilities arising pursuant to either Collateral Agent's role under this Section 2.8 as gratuitous bailee with respect to the Possessory Collateral constituting Shared Collateral or any other Shared Collateral in its possession or control (and with respect to the Deposit Accounts, as gratuitous agent).

(e)        At any time the Applicable Collateral Agent is no longer the Applicable Collateral Agent, such outgoing Applicable Collateral Agent shall deliver the remaining Possessory Collateral constituting Shared Collateral in its possession (if any) together with any necessary endorsements (which endorsement shall be without recourse and without any representation or warranty), first, to the then Applicable Collateral Agent to the extent First Lien Obligations remain outstanding and second, to the applicable Grantor to the extent no First Lien Obligations remain outstanding (in each case, so as to allow

14

such Person to obtain possession or control of such Shared Collateral) or to whomever may be lawfully entitled to receive the same.  The outgoing Applicable Collateral Agent further agrees to take all other action reasonably requested by the then Applicable Collateral Agent or the Company at the expense of the Company in connection with the then Applicable Collateral Agent obtaining a first-priority security interest in the Shared Collateral.

SECTION 2.9        Amendments to First Lien Collateral Documents.

(a)        Without the prior written consent of each other Collateral Agent, each Collateral Agent agrees that no First Lien Collateral Document may be amended, restated, amended and restated, supplemented, replaced or refinanced or otherwise modified from time to time or entered into to the extent such amendment, supplement, refinancing or modification, or the terms of any new First Lien Collateral Document, would be prohibited by, or would require any Grantor to act or refrain from acting in a manner that would violate, any of the terms of this Agreement.

(b)        In determining whether an amendment to any First Lien Collateral Document is permitted by this Section 2.9, each Collateral Agent may conclusively rely on an officer's certificate of the Company stating that such amendment is permitted by this Section 2.9.

SECTION 2.10        Similar Liens and Agreements.

(a)        The parties hereto agree that it is their intention that the Collateral be identical for all First Lien Claimholders.  In furtherance of, but subject to, the foregoing, the parties hereto agree, subject to the other provisions of this Agreement:

(i)        upon request by either Collateral Agent, to cooperate in good faith (and to direct their counsel to cooperate in good faith) from time to time in order to determine the specific items included in the Shared Collateral and the steps taken to perfect their respective Liens thereon and the identity of the respective parties obligated under the Initial Note Documents and the Other Note Documents; and

(ii)        that the documents and agreements creating or evidencing the Liens on Shared Collateral securing the Initial Note Obligations and the Other Note Obligations shall be in all material respects the same forms of documents as one another, except that the documents and agreements creating or evidencing the Liens securing the Other Note Obligations may contain additional provisions as may be necessary or appropriate to establish the intercreditor arrangements among the various separate classes of creditors holding Other Note Obligations.

ARTICLE III.

EXISTENCE AND AMOUNTS OF LIENS AND OBLIGATIONS

Whenever an Applicable Collateral Agent or an Applicable Representative shall be required, in connection with the exercise of its rights or the performance of its obligations hereunder, to determine the existence or amount of any First Lien Obligations of either Series, or the Shared Collateral subject to any Lien securing the First Lien Obligations of either Series, it may request that such information be furnished to it in writing by the other Representative or the other Collateral Agent and shall be entitled to make such determination or not make any determination on the basis of the information so furnished; provided, however, that if such Representative or Collateral Agent shall fail or refuse reasonably promptly to provide the requested information, the requesting Applicable Collateral Agent or Applicable Representative shall be entitled to make any such determination or not make any determination by such method as it

15

may, in the exercise of its good faith judgment, determine, including by reliance upon a certificate of the Company.  Each Applicable Collateral Agent and each Applicable Representative may rely conclusively, and shall be fully protected in so relying, on any determination made by it in accordance with the provisions of the preceding sentence (or as otherwise directed by a court of competent jurisdiction) and shall have no liability to any Grantor, any First Lien Claimholder or any other person as a result of such determination.

ARTICLE IV.

THE APPLICABLE COLLATERAL AGENT

SECTION 4.1          Authority.

(a)          Notwithstanding any other provision of this Agreement, nothing herein shall be construed to impose any fiduciary or other duty on any Applicable Collateral Agent to any Other Note Claimholder or give any Other Note Claimholder the right to direct the Applicable Collateral Agent, except that each Applicable Collateral Agent shall be obligated to distribute proceeds of any Shared Collateral in accordance with Section 2.1 hereof.

(b)          In furtherance of the foregoing, each Other Note Claimholder acknowledges and agrees that the Applicable Collateral Agent shall be entitled, for the benefit of the First Lien Claimholders, to sell, transfer or otherwise dispose of or deal with any Shared Collateral as provided herein and in the First Lien Collateral Documents, as applicable, without regard to any rights to which the Other Note Claimholder would otherwise be entitled as a result of the First Lien Obligations held by such Other Note Claimholders.  Without limiting the foregoing, each Other Note Claimholder agrees that none of the Applicable Collateral Agent, the Applicable Representative or any other First Lien Claimholder shall have any duty or obligation first to marshal or realize upon any type of Shared Collateral (or any other Collateral securing any of the First Lien Obligations), or to sell, dispose of or otherwise liquidate all or any portion of such Shared Collateral (or any other Collateral securing any First Lien Obligations), in any manner that would maximize the return to the Other Note Claimholder, notwithstanding that the order and timing of any such realization, sale, disposition or liquidation may affect the amount of proceeds actually received by the Other Note Claimholders from such realization, sale, disposition or liquidation.  Each of the First Lien Claimholders waives any claim it may now or hereafter have against the Collateral Agent or Representative of the other Series of First Lien Obligations or any other First Lien Claimholder of the other Series arising out of (i) any actions which any such Collateral Agent, Representative or any First Lien Claimholder represented by it take or omit to take (including actions with respect to the creation, perfection or continuation of Liens on any Collateral, actions with respect to the foreclosure upon, sale, release or depreciation of, or failure to realize upon, any of the Collateral and actions with respect to the collection of any claim for all or any part of the First Lien Obligations from any account debtor, guarantor or any other party) in accordance with the First Lien Collateral Documents or any other agreement related thereto or in connection with the collection of the First Lien Obligations or the valuation, use, protection or release of any security for the First Lien Obligations; provided that nothing in this clause (i) shall be construed to prevent or impair the rights of either Collateral Agent or Representative to enforce this Agreement, (ii) any election by the Applicable Representative or any holders of First Lien Obligations, in any proceeding instituted under the Bankruptcy Code, of the application of Section 1111(b) of the Bankruptcy Code or (iii) subject to Section 2.5, any borrowing, or grant of a security interest or administrative expense priority under Section 364 of the Bankruptcy Code or any equivalent provision of any other Bankruptcy Law, by the Company or any of its subsidiaries, as debtor-in-possession.  Notwithstanding any other provision of this Agreement, the Applicable Collateral Agent shall not (i) accept any Shared Collateral in full or partial satisfaction of any First Lien Obligations pursuant to Section 9-620 of the UCC, without the consent of the Representatives representing holders of First Lien Obligations for whom such Collateral constitutes Shared Collateral or (ii) "credit bid" for or purchase (other than for cash) Shared Collateral at any public, private

16

or judicial foreclosure upon such Shared Collateral, without the consent of the Representative representing holders of First Lien Obligations for whom such Collateral constitutes Shared Collateral.

SECTION 4.2        Power-of-Attorney.

The Other First Lien Representative and the Other First Lien Collateral Agent, for itself and on behalf of the Other Note Claimholders, hereby irrevocably appoints the Applicable Collateral Agent and any officer or agent of the Applicable Collateral Agent, which appointment is coupled with an interest with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Other First Lien Representative, the Other First Lien Collateral Agent and the Other Note Claimholders, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Agreement, including the exercise of any and all remedies under each First Lien Collateral Document with respect to Shared Collateral and the execution of releases in connection therewith.

ARTICLE V.

MISCELLANEOUS

SECTION 5.1        Integration/Conflicts.

This Agreement, together with the other First Lien Documents and the First Lien Collateral Documents, represents the entire agreement of each of the Grantors and the First Lien Claimholders with respect to the subject matter hereof and thereof and supersedes any and all previous agreements and understandings, oral or written, relating to the subject matter hereof and thereof.  There are no promises, undertakings, representations or warranties by either Representative, either Collateral Agent or the First Lien Claimholder relative to the subject matter hereof and thereof not expressly set forth or referred to herein or therein.  In the event of any conflict between the provisions of this Agreement and the provisions of the First Lien Documents the provisions of this Agreement shall govern and control.

SECTION 5.2        Effectiveness; Continuing Nature of this Agreement; Severability.

This Agreement shall become effective when executed and delivered by the parties hereto.  This is a continuing agreement and the First Lien Claimholders of either Series may continue, at any time and without notice to any First Lien Claimholder of the other Series, to extend credit and other financial accommodations and lend monies to or for the benefit of the Company or any Grantor constituting First Lien Obligations in reliance hereon.  Each Representative and each Collateral Agent, on behalf of itself and each other First Lien Claimholder represented by it, hereby waives any right it may have under applicable law to revoke this Agreement or any of the provisions of this Agreement.  The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency or Liquidation Proceeding.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  The parties hereto shall endeavor in good faith negotiations to replace any invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to those of the invalid, illegal or unenforceable provisions.  All references to the Company or any other Grantor shall include the Company or such Grantor as debtor and debtor in possession and any receiver, trustee or similar person for the Company or any other Grantor (as the case may be) in any Insolvency or Liquidation Proceeding.  This Agreement shall terminate and be of no further force and effect with respect to the Representative or Collateral Agent and the First Lien Claimholders represented by such Representative or Collateral Agent and their First Lien Obligations, on

17

the date on which there has been a Discharge of such Series of First Lien Obligations, subject to the rights of the First Lien Claimholders under Section 2.6; provided, however, that such termination shall not relieve any such party of its obligations incurred hereunder prior to the date of such termination.

SECTION 5.3        Amendments; Waivers.

(a)        No amendment, modification or waiver of any of the provisions of this Agreement shall be deemed to be made unless the same shall be in writing signed on behalf of each party hereto or its authorized agent and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time.  Notwithstanding the foregoing, the Company and the other Grantors shall not have any right to consent to or approve any amendment, modification or waiver of any provision of this Agreement except to the extent their rights are adversely affected.

SECTION 5.4        Information Concerning Financial Condition of the Grantors and their Subsidiaries.

The Representative and Collateral Agent and the other First Lien Claimholders of each Series shall each be responsible for keeping themselves informed of (a) the financial condition of the Grantors and their subsidiaries and all endorsers and/or guarantors of the First Lien Obligations and (b) all other circumstances bearing upon the risk of nonpayment of the First Lien Obligations, provided that the foregoing shall not impose any obligation on any Representative or Collateral Agent not expressly set forth in the applicable First Lien Documents.  The Representative and Collateral Agent and the other First Lien Claimholders of each Series shall have no duty to advise the Representative, Collateral Agent or First Lien Claimholders of the other Series of information known to it or them regarding such condition or any such circumstances or otherwise.  In the event the Representative or Collateral Agent or any of the other First Lien Claimholders, in its or their sole discretion, undertakes at any time or from time to time to provide any such information to the Representative, Collateral Agent or First Lien Claimholders of the other Series, it or they shall be under no obligation:

(a)        to make, and such Representative and Collateral Agent and such other First Lien Claimholders shall not make, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided;

(b)        to provide any additional information or to provide any such information on any subsequent occasion;

(c)        to undertake any investigation; or

(d)        to disclose any information, which pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

SECTION 5.5        Submission to Jurisdiction; Certain Waivers.

Each of the Company, each other Grantor, each Collateral Agent and each Representative, on behalf of itself and each other First Lien Claimholder represented by it, hereby irrevocably and unconditionally:

18

(a)      submits for itself and its property in any legal action or proceeding relating to this Agreement and the First Lien Collateral Documents (whether arising in contract, tort or otherwise) to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the exclusive (subject to Section 5.5(c)) general jurisdiction of the courts of the State of New York sitting in the Borough of Manhattan, the courts of the United States for the Southern District of New York sitting in the Borough of Manhattan, and appellate courts from any thereof;

(b)      agrees that all claims in respect of any such action or proceeding shall be heard and determined in such New York state court or, to the fullest extent permitted by applicable law, in such federal court;

(c)      agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law and that nothing in this Agreement or any other First Lien Document shall affect any right that either Collateral Agent, either Representative or any other First Lien Claimholder may otherwise have to bring any action or proceeding relating to this Agreement or any other First Lien Document against such Grantor or any of its assets in the courts of any jurisdiction;

(d)      waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement or any other First Lien Collateral Document in any court referred to in Section 5.5(a) (and irrevocably waives to the fullest extent permitted by applicable law the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court); and

(e)      waives, to the maximum extent not prohibited by law, any right it may have to claim or recover any special, exemplary, punitive or consequential damages.

SECTION 5.6        WAIVER OF JURY TRIAL.

**EACH PARTY HERETO AND THE COMPANY AND THE OTHER GRANTORS HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER FIRST LIEN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT, BREACH OF DUTY, COMMON LAW, STATUTE OR ANY OTHER THEORY). EACH PARTY HERETO AND THE COMPANY AND THE OTHER GRANTORS (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT EACH SUCH PARTY HERETO AND THE COMPANY AND EACH OTHER GRANTOR HAVE BEEN INDUCED TO ENTER INTO OR ACKNOWLEDGE THIS AGREEMENT AND THE OTHER FIRST LIEN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION. EACH PARTY HERETO AND THE COMPANY AND THE OTHER GRANTORS FURTHER REPRESENTS AND WARRANTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.**

SECTION 5.7        Notices.

Unless otherwise specifically provided herein, any notice hereunder shall be in writing and may be personally served or sent by facsimile, electronic mail or United States mail or courier service and shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof, upon receipt of facsimile or electronic mail, or three Business Days after depositing it in the United States mail with postage prepaid and properly addressed.  For the purposes hereof, the addresses of the parties hereto shall be as set forth below each party's name on the signature pages hereto or, with respect to any Grantor that becomes a party hereto pursuant to Section 5.17, in the joinder agreement substantially in the form attached hereto as Exhibit A, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

SECTION 5.8        Further Assurances.

Each Representative and Collateral Agent, on behalf of itself and each other First Lien Claimholder represented by it, and the Company and each other Grantor, agree that each of them shall take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as either Representative and Collateral Agent may reasonably request to effectuate the terms of and the Lien priorities contemplated by this Agreement.

SECTION 5.9        Agency Capacities.

(a)        Except as expressly provided herein, (a) each of the Initial First Lien Representative and the Initial First Lien Collateral Agent is acting in the capacity of Representative and Collateral Agent, respectively, solely for the Initial Note Claimholders and pursuant to the direction set forth in the Initial Note Documents and (b) each of the Other First Lien Representative and the Other First Lien Collateral Agent is acting in the capacity of Representative and Collateral Agent, respectively, solely for the Other Note Claimholders and pursuant to the direction set forth in the Other Note Documents.  Each Representative and each Collateral Agent shall be entitled to the rights, privileges and immunities of such Representative or such Collateral Agent as set forth in the applicable First Lien Documents in acting hereunder.

(b)        Neither Representative or Collateral Agent shall be responsible for the terms or sufficiency of this Agreement for any purpose.  Neither Representative or Collateral Agent shall have any duties or obligations under or pursuant to this Agreement other than such duties as may be expressly set forth in this as duties on its part to be performed or observed.  In entering into this Agreement, or in taking (or forbearing from) any action under or pursuant to this Agreement, each Representative and Collateral Agent shall have and be protected by all of the rights, immunities, indemnities and other protections granted to it under the applicable First Lien Documents.  Neither Representative or Collateral Agent shall have any liability or responsibility for the actions or omissions of the other Collateral Agent, or for any other claimholder's or the other Collateral Agent's compliance with (or failure to comply with) the terms of this Agreement.

(c)        None of the provisions in this Agreement shall require the Representatives or the Collateral Agents to expend or risk their own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of their duties, or in the exercise of any of its rights or powers if they shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to them against such risk or liability is not assured to them.

(d)        Neither Representative or Collateral Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated by the applicable First Lien Documents that such Representative or Collateral Agent is required to exercise as directed in writing by the Required Holders (as defined in the Initial Purchase Agreement or Other Purchase Agreement, as applicable); *provided that*, either Representative and Collateral Agent shall be entitled to refrain from any act or the taking of any action hereunder under the applicable First Lien Documents or

from the exercise of any power or authority vested in it hereunder or thereunder unless and until such Representative or Collateral Agent shall have received instructions from the Required Holders (as defined in the Initial Purchase Agreement or Other Purchase Agreement, as applicable) and such Representative or Collateral Agent deems necessary, satisfactory indemnity has been provided to it, and neither such Representative nor Collateral Agent shall be liable for any such delay in acting.  Neither Representative or Collateral Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose it to liability or that is contrary to the applicable First Lien Documents or applicable law, including for the avoidance of doubt, any action that may be in violation of the automatic stay under any bankruptcy or insolvency law.  For purposes of clarity, phrases such as "satisfactory to", "approved by", "acceptable to", "as determined by", "in the discretion of", "selected by", "requested by" the Representatives or Collateral Agents and phrases of similar import authorize and permit the Representatives or Collateral Agents to approve, disapprove, determine, act or decline to act in its discretion.  Any exercise of discretion on behalf of the Other First Lien Representative or the Other First Lien Collateral Agent shall be exercised in accordance with the terms of the Other Note Documents.  Notwithstanding anything herein to the contrary, neither Representative or Collateral Agent shall have any responsibility for the preparation, filing or recording of any instrument, document or financing statement or for the perfection or maintenance of any security interest created hereunder.

SECTION 5.10        GOVERNING LAW.

**THIS AGREEMENT, AND ANY DISPUTE, CLAIM OR CONTROVERSY ARISING OUT OF OR RELATING TO THIS AGREEMENT (WHETHER ARISING IN CONTRACT, TORT OR OTHERWISE) SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAW RULES THAT WOULD RESULT IN THE APPLICATION OF A DIFFERENT GOVERNING LAW (OTHER THAN ANY MANDATORY PROVISIONS OF THE UCC RELATING TO THE LAW GOVERNING PERFECTION AND THE EFFECT OF PERFECTION OR PRIORITY OF THE SECURITY INTERESTS).**

SECTION 5.11        Binding on Successors and Assigns.

This Agreement shall be binding upon each Representative and each Collateral Agent, the First Lien Claimholders, the Company and the other Grantors, and their respective successors and assigns from time to time.  If either Representative and/or Collateral Agent resigns or is replaced pursuant to the applicable First Lien Documents its successor shall be deemed to be a party to this Agreement and shall have all the rights of, and be subject to all the obligations of, this Agreement.  No provision of this Agreement will inure to the benefit of a trustee, debtor-in-possession, creditor trust or other representative of an estate or creditor of any Grantor, including where any such trustee, debtor-in-possession, creditor trust or other representative of an estate is the beneficiary of a Lien securing Collateral by virtue of the avoidance of such Lien in an Insolvency or Liquidation Proceeding.

SECTION 5.12        Section Headings.

Section headings and the Table of Contents used in this Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

SECTION 5.13        Counterparts.

This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute

one and the same instrument.  Delivery of an executed signature page of this Agreement by facsimile or other electronic transmission (e.g., "pdf" or "tif" format) shall be effective as delivery of a manually executed counterpart hereof.  The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this Agreement and/or any document to be signed in connection with this Agreement and the transactions contemplated hereby shall be deemed to include Electronic Signatures (as defined below), deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be.  "*__Electronic Signatures__*" means any electronic symbol or process attached to, or associated with, any contract or other record and adopted by a person with the intent to sign, authenticate or accept such contract or record.

SECTION 5.14        __Authorization__.

By its signature, each Person executing this Agreement, on behalf of such party or Grantor but not in his or her personal capacity as a signatory, represents and warrants to the other parties hereto that it is duly authorized to execute this Agreement.

SECTION 5.15        __No Third Party Beneficiaries/ Provisions Solely to Define Relative Rights__.

The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the First Lien Claimholders in relation to one another.  None of the Company, any other Grantor nor any other creditor thereof shall have any rights or obligations hereunder and no such Person is an intended beneficiary or third party beneficiary hereof, except, in each case, as expressly provided in this Agreement, and none of the Company or any other Grantor may rely on the terms hereof (other than __Sections 5.3__).  Nothing in this Agreement is intended to or shall impair the obligations of any Grantor, which are absolute and unconditional, to pay the First Lien Obligations as and when the same shall become due and payable in accordance with their terms.  Without limitation of any other provisions of this Agreement, the Company and each Grantor hereby (a) acknowledges that it has read this Agreement and consents hereto, (b) agrees that it will not take any action that would be contrary to the express provisions of this Agreement and (c) agrees to abide by the requirements expressly applicable to it under this Agreement.

SECTION 5.16        __No Indirect Actions__.

Unless otherwise expressly stated, if a party may not take an action under this Agreement, then it may not take that action indirectly, or support any other Person in taking that action directly or indirectly.  "Taking an action indirectly" means taking an action that is not expressly prohibited for the party but is intended to have substantially the same effects as the prohibited action.

SECTION 5.17        __Additional Grantors__.

Each of the Company and the other Grantors agrees that it shall ensure that each of its subsidiaries that is or is to become a party to any First Lien Document and which grants or purports to grant a lien on any of its assets shall either execute this Agreement on the date hereof or shall confirm that it is a Grantor hereunder pursuant to a joinder agreement substantially in the form attached hereto as __Exhibit A__ that is executed and delivered by such subsidiary prior to or concurrently with its execution and delivery of such First Lien Document.

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**U.S. BANK NATIONAL ASSOCIATION**, as Initial First Lien Representative and as Initial First Lien Collateral Agent

By: _____
      Name:
      Title:

Address for notices:
U.S. Bank National Association
West Side Flats
60 Livingston Avenue
EP-MN-WS3C
St. Paul, MN 55107
Attention: Joshua Hahn (Core Sciences)

**U.S. BANK NATIONAL ASSOCIATION**, as Other First Lien Representative and as Other First Lien Collateral Agent

By: _____
      Name:
      Title:

Address for notices:
U.S. Bank National Association
West Side Flats
60 Livingston Avenue
EP-MN-WS3C
St. Paul, MN 55107
Attention: Joshua Hahn (Core Sciences)

[Signature Page to Intercreditor Agreement]

**Acknowledged and Agreed to by:**

[_____]

By:_____
Name:
Title:

Exhibit A
to First Lien Pari Passu Intercreditor Agreement

FORM OF GRANTOR JOINDER AGREEMENT

GRANTOR JOINDER AGREEMENT NO.  [___] (this "***Grantor Joinder Agreement***"), dated as of [___], 20[__] to the PARI PASSU INTERCREDITOR AGREEMENT, dated as of [___], 2021 (the "***Pari Passu Intercreditor Agreement***"), by and among U.S. Bank National Association, as Initial First Lien Representative and Initial First Lien Collateral Agent, U.S. Bank National Association, as Other First Lien Representative and Other First Lien Collateral Agent, and acknowledged and agreed to by Core Scientific Holding Co. and the other Grantors from time to time party thereto.  Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Pari Passu Intercreditor Agreement.

The undersigned, [_____], a [_____], (the "***New Grantor***") wishes to acknowledge and agree to the Pari Passu Intercreditor Agreement and become a party thereto to the limited extent contemplated by Section 5.17 thereof and to acquire and undertake the rights and obligations of a Grantor thereunder.

Accordingly, the New Grantor agrees as follows for the benefit of the Representatives, the Collateral Agents and the First Lien Claimholders:

Section 1.        Accession to the Pari Passu Intercreditor Agreement.  The New Grantor (a) acknowledges and agrees to, and becomes a party to the Pari Passu Intercreditor Agreement as a Grantor to the limited extent contemplated by Section 5.17 thereof, (b) agrees to all the terms and provisions of the Pari Passu Intercreditor Agreement and (c) shall have all the rights and obligations of a Grantor under the Pari Passu Intercreditor Agreement.  This Grantor Joinder Agreement supplements the Pari Passu Intercreditor Agreement and is being executed and delivered by the New Grantor pursuant to Section 5.17 of the Pari Passu Intercreditor Agreement.

Section 2.        Representations, Warranties and Acknowledgement of the New Grantor.  The New Grantor represents and warrants to each Representative, each Collateral Agent and to the First Lien Claimholders that (a) it has full power and authority to enter into this Grantor Joinder Agreement, in its capacity as Grantor and (b) this Grantor Joinder Agreement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with the terms of this Grantor Joinder Agreement.

Section 3.        Counterparts.  This Grantor Joinder Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Grantor Joinder Agreement or any document or instrument delivered in connection herewith by telecopy or other electronic means shall be effective as delivery of a manually executed counterpart of this Grantor Joinder Agreement or such other document or instrument, as applicable.

Section 4.        Section Headings.  Section heading used in this Grantor Joinder Agreement are for convenience of reference only and are not to affect the construction hereof or to be taken in consideration in the interpretation hereof.

Section 5.        Benefit of Agreement.  The agreements set forth herein or undertaken pursuant hereto are for the benefit of, and may be enforced by, any party to the Pari Passu Intercreditor Agreement subject to any limitations set forth in the Pari Passu Intercreditor Agreement with respect to the Grantors.

Section 6.        Governing Law.  **THIS GRANTOR JOINDER AGREEMENT, AND ANY DISPUTE, CLAIM OR CONTROVERSY ARISING OUT OF OR RELATING TO THIS GRANTOR JOINDER AGREEMENT (WHETHER ARISING IN CONTRACT, TORT OR OTHERWISE) SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAW RULES THAT WOULD RESULT IN THE APPLICATION OF A DIFFERENT GOVERNING LAW (OTHER THAN ANY MANDATORY PROVISIONS OF THE UCC RELATING TO THE LAW GOVERNING PERFECTION AND THE EFFECT OF PERFECTION OR PRIORITY OF THE SECURITY INTERESTS IN THE COLLATERAL).**

Section 7.        Severability.  Any provision of this Grantor Joinder Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  The parties hereto shall endeavor in good faith negotiations to replace any invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to those of the invalid, illegal or unenforceable provisions.

Section 8.        Notices.  All communications and notices hereunder shall be in writing and given as provided in Section 5.7 of the Pari Passu Intercreditor Agreement.  All communications and notices hereunder to the New Grantor shall be given to it at the address set forth under its signature hereto, which information supplements Section 5.7 of the Pari Passu Intercreditor Agreement.

IN WITNESS WHEREOF, the New Grantor has duly executed this Grantor Joinder Agreement to the Pari Passu Intercreditor Agreement as of the day and year first above written.

[_____]

By_____

   Name:

   Title:

Address for notices:

   _____

   _____

   Attention of:_____

   Telecopy: _____

Exhibit A – Page 3

**EXHIBIT I**

**FORM OF JOINDER AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

**[FORM OF] JOINDER AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS JOINDER ASSIGNMENT AND ASSUMPTION AGREEMENT (this "***Agreement***"), dated as of [___], is made by and among [Parent Entity] (the "***Parent***"), [Core Scientific Holding Co.][1], a Delaware (the "***Company***") and U.S. BANK NATIONAL ASSOCIATION, as note agent (in such capacity, the "***Agent***"), under that certain Convertible Note Purchase Agreement, dated as of August 20, 2021 (as amended, restated, supplemented and/or otherwise modified from time to time, the "***Purchase Agreement***"), by and among the Company, the Guarantors party thereto, each Purchaser party thereto and the Note Agent.

## RECITALS

WHEREAS, pursuant to the Purchase Agreement, each Purchaser has been issued by the Company one or more Notes (as defined in the Purchase Agreement), which are part of a series of Notes issued by the Company, in an aggregate principal amount of up to $300,000,000.00;

WHEREAS, pursuant to Section 10.1 of the Purchase Agreement, in the event of a SPAC, the Parent Entity shall (a) assume the Obligation of the Company to deliver Conversion Securities pursuant to Section 2 of the Note and (b) assume each other Obligation of the Company under the Note Documents by becoming a joint and several co-obligor of each such other Obligation of the Company (or its successor by merger) under the Note Documents, in each case pursuant to this Agreement; and

WHEREAS, the Company and the Parent now seek to consummate the joinder and assignment and assumption contemplated by Section 10.1 of the Purchase Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the agreements and covenants contained in the Purchase Agreement, and the agreements and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties do hereby agree as follows:

1.      **Defined Terms**.  Capitalized terms used but not defined herein shall have the meanings set forth in the Purchase Agreement.

2.      **Assignment and Assumption**.  Under the terms and subject to the conditions set forth in the Purchase Agreement, the Company hereby assigns to the Parent, and the Parent hereby accepts, the Obligation of the Company to deliver Conversion Securities pursuant to Section 2 of the Note.

3.      **Joinder**.  The Parent hereby acknowledges, agrees and confirms that, by its execution of this Agreement, the Parent will be deemed to be an issuer under the Note Documents and each reference to the "Company" in the Purchase Agreement and each other Note Document shall be deemed to be a collective reference to the Parent and the Company and the Parent shall have all of the obligations of the Company thereunder as if it had executed the Note Documents as the Company.  The Parent hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Purchase Agreement.  Notwithstanding the foregoing, the Parent shall act as representative of the Company and Parent with respect to any obligation of the Company under any Note Document to deliver a certificate or notice from the Company.

---

[1] To be updated to refer to its successor by merger, if applicable.

**4.     Continuing Validity; Waiver and Amendment; Entire Agreement**.  Except as expressly modified pursuant to Agreement, the terms of the Note Documents remain unchanged and in full force and effect.  Any provision of this Agreement may be amended, waived or modified only by an instrument signed in writing by the Parties and the Note Agent.  This Agreement and the other Note Documents constitute the entire contract among the parties hereto regarding to the subject matters addressed herein and supersede any and all previous agreements, negotiations, and discussions, oral or written, by the parties regarding the subject matters addressed herein.

**5.     Successors and Assigns**.  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties.  Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

**6.     GOVERNING LAW**.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.

**7.     Jurisdiction and Venue; Waiver of Jury Trial; Expenses and Indemnification**.  This Agreement is subject to the provisions of Section 10.3 (Jurisdiction and Venue), Section 10.4 (Waiver of Jury Trial) and Section 10.10(a) (Expenses and Indemnification) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*.

**8.     Notices**.  All communications and notices required or permitted to be given hereunder shall be delivered in accordance with Section 10.8 of the Purchase Agreement.

**9.     Headings; Interpretation**.  Paragraph headings used in this Agreement are included for convenience of reference only and will not modify the provisions that they precede or affect the interpretation of this Agreement or any other Note Document.  The term "including" shall be interpreted to mean "including but not limited to".

**10.     Counterparts**.  This Agreement may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract.  Any counterpart of a signature page to this Agreement may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.

*[Signature page follows]*

2

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

**[PARENT ENTITY]**

By:_____
Name:
Title:

**[CORE SCIENTIFIC HOLDING CO.]**

By:_____
Name:
Title:

Acknowledged and accepted:

**AGENT**:

**U.S. BANK NATIONAL ASSOCIATION,**
as Note Agent [and Collateral Agent]

By: **_____**
Name:
Title:

[Signature Page – Joinder and Assignment and Assumption Agreement]

## CONVERTIBLE NOTE PURCHASE AGREEMENT

THIS CONVERTIBLE NOTE PURCHASE AGREEMENT (this "*Agreement*") is made as of August 20, 2021, by and among Core Scientific Holding Co., a Delaware corporation (the "*Company*"), the Guarantors from time to time party hereto, the persons and entities named on the Schedule of Purchasers under the header 'Initial Purchasers' attached hereto as Schedule 2 (individually, an "*Initial Purchaser*" and collectively, the "*Initial Purchasers*"), each Additional Purchaser from time to time party hereto and U.S. Bank National Association, as note agent (in such capacity, the "*Note Agent*") and, upon the execution and delivery of the Collateral Documents pursuant to Section 6.13, as collateral agent for the Secured Parties (in such capacity, the "*Collateral Agent*" and, together with the Note Agent, the "*Agents*").

### RECITALS

WHEREAS, the Company desires (i) to issue and to sell to the Initial Purchasers, and the Initial Purchasers have agreed to purchase from the Company, on the Initial Closing Date, convertible promissory notes substantially in the form attached hereto as Exhibit A (each, an "*Initial Note*" and collectively, the "*Initial Notes*") and (ii) to issue and to sell to Additional Purchasers on Additional Closing Dates convertible promissory notes substantially in the form attached hereto as Exhibit A (each, an "*Additional Note*" and collectively, the "*Additional Notes*" and, together with the Initial Notes, individually, a "*Note*" and collectively, the "*Notes*"), in an aggregate principal amount for all such Notes of up to $300,000,000.00 on the terms, and subject to the conditions, specified herein; and

WHEREAS, to induce the Purchasers to purchase the Notes, the Note Parties have agreed to execute and deliver, contemporaneously with the issuance, sale and purchase of the Initial Notes on the Initial Closing Date, the Guaranty, pursuant to which each Guarantor will guarantee the Obligations of the Company under the Notes and, as and when required pursuant to Section 6.13, the Security Agreement, pursuant to which the Note Parties will grant to the Collateral Agent, for the ratable benefit of the Secured Parties, a security interest in the Note Parties' assets to secure the Obligations or their respective Guaranteed Obligations (as applicable).

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, and the representations, warranties, covenants and conditions set forth below, which represent integral components of the transactions contemplated hereby and shall be fully enforceable by the parties hereto, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Note Parties, the Agents and each Purchaser, intending to be legally bound, hereby agree as follows:

1.      DEFINITIONS.

As used herein, the following terms shall have the meanings set forth below.

(a)      "*Act*" means the Securities Exchange Act of 1934, as amended.

(b)      "*Additional Closing Date*" has the meaning ascribed thereto in Section 2.2.

(c)      "*Additional Note*" or "*Additional Notes*" has the meaning ascribed thereto in Section 2.2.

254153937 v7

(d)     "**Additional Purchaser**" or "**Additional Purchasers**" has the meaning ascribed thereto in <u>Section 2.2</u>.

(e)     "**Administrative Questionnaire**" means an Administrative Questionnaire substantially in the form attached hereto as <u>Exhibit G</u>.

(f)     "**Agent-Related Person**" means the Note Agent and the Collateral Agent, together with their affiliates, officers, directors, employees, agents and attorneys-in-fact of the Agents and their affiliates.

(g)     "**Agents**" has the meaning ascribed to such term in the preamble to this Agreement.

(h)     "**Asset Disposition**" means any sale, lease, license, transfer, assignment or other disposition (whether by a single transaction or through series of transactions, and including by means of a merger, consolidation, amalgamation or similar transaction) by the Company or any of its Subsidiaries of any asset or property.

(i)     "**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in the City of New York or the Principal Office are authorized or required to close.

(j)     "**Capital Lease**" means any lease of any property by such Person as lessee which would, in accordance with GAAP, be required to be accounted for as a capital lease on the balance sheet of such Person.

(k)     "**Capital Lease Obligations**" means, with respect to any Person, all obligations of such Person under Capital Leases.

(l)     "**Capital Stock**" means (a) any capital stock, partnership, membership, limited liability company, joint venture or other ownership or equity interest or other equivalent, participation or securities (whether voting or non-voting, whether preferred, common or otherwise, whether certificated or uncertificated, and however designated), and (b) any option, warrant, security, appreciation right, profits interests or other right directly or indirectly convertible into or exercisable or exchangeable for, or otherwise to acquire directly or indirectly, any capital stock, partnership, membership, limited liability company, joint venture or other ownership or equity interest, participation or security described in <u>clause (a)</u> above (excluding the Notes and any other Indebtedness convertible or exchangeable into any such capital stock, partnership, membership, limited liability company, joint venture or other ownership or equity interest, participation or security described in <u>clause (a)</u> above unless and to the extent converted or exchanged).

(m)     "**Charter Documents**" means (i) the articles or certificate of incorporation or formation (as applicable), (ii) the by-laws, operating agreement or limited liability company agreement (as applicable) and (iii) other similar organizational and governing documents of any Person, as amended, restated, supplemented or otherwise modified from time to time.

(n)     "**Closing Date**" means the Initial Closing Date or each Additional Closing Date, as the context may require.

(o)     "**Collateral**" means the "Collateral" as defined in the Security Agreement.

(p)     "*Collateral Agent*" has the meaning ascribed to such term in the preamble to this Agreement.

(q)     "*Collateral Documents*" means, collectively, the Security Agreement, the Intellectual Property Security Agreement and each other agreement or writing pursuant to which the Note Parties purport to pledge or grant a security interest in any property or assets securing the Obligations or the Guaranteed Obligations, as applicable, in each case, as amended, restated, supplemented and/or otherwise modified from time to time.

(r)     "*Company Covered Persons*" means those Persons specified in Rule 506(d)(1) promulgated under the Act; provided, however, that Company Covered Persons do not include (a) any Holder or (b) any person or entity that is deemed to be an affiliated issuer of the Company solely as a result of the relationship between the Company and any Holder.

(s)     "*Contractual Obligations*" means as to any Person, any provision of any security issued by such Person or of any agreement, undertaking, contract, indenture, mortgage, deed of trust or other instrument or arrangement (whether in writing or otherwise) to which such Person is a party or by which it or any of such Person's property is bound.

(t)     "*Conversion Event*" has the meaning ascribed to such term in the Notes.

(u)     "*Conversion Securities*" has the meaning ascribed to such term in <u>Section 5.3</u>.

(v)     "*Default*" means any condition or event which with the giving of notice or lapse of time or both would, unless cured or waived, become an Event of Default.

(w)     "*Disqualified Capital Stock*" means any Capital Stock issued by any Person that (a) matures or is mandatorily redeemable pursuant to a sinking fund obligation or otherwise, (b) is or may become redeemable or repurchaseable by such Person at the option of the holder thereof, in whole or in part (other than in connection with an asset sale, change of control or similar event) or (c) is convertible or exchangeable at the option of the holder thereof for Indebtedness or Capital Stock described in this definition, on or prior to, in the case of clause (a), (b) or (c), ninety (90) days after the Maturity Date (as defined in the Notes).

(x)     "*Environmental Laws*" means any and all federal, state, local and foreign statutes, laws, judicial decisions, regulations, ordinances, rules, judgments, orders, decrees, plans, injunctions, Licenses, concessions, grants, franchises, agreements and other governmental restrictions relating to (i) the protection of the environment, (ii) the effect of the environment on human health, (iii) emissions, discharges or releases of pollutants, contaminants, hazardous substances or wastes into surface water, ground water, air or land, or (iv) the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants, hazardous substances or wastes or the clean-up or other remediation thereof, including, without limitation, the Clean Air Act, 42 U.S.C. § 7401 et seq., the Clean Water Act, 33 U.S.C. § 1251 et seq. ("*CWA*"), the Solid Waste Disposal Act (as amended by the Resource Conservation and Recovery Act), 42 U.S.C. § 6901 et seq. ("*RCRA*") and the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq. ("*CERCLA*").

(y)     "*ERISA*" means the Employee Retirement Income Security Act of 1974.

(z)     "*ERISA Affiliate*" means, any person that for purposes of Title I or Title IV of ERISA or Section 412 of the Internal Revenue Code would be deemed at any relevant time to be a "single

employer" or otherwise aggregated with the Company or any of its Subsidiaries under Section 414(b), 414(c), 414(m) or 414(o) of the Internal Revenue Code or Section 4001 of ERISA.

(aa)     "***Event of Default***" has the meaning ascribed thereto in the Notes.

(bb)     "***Excluded Subsidiary***" means (i) any Subsidiary that is not a wholly-owned Subsidiary, (ii) any Subsidiary that is not a Material Subsidiary and (iii) any Subsidiary that is (a) a Foreign Subsidiary (as defined in the Security Agreement), (b) a CFC Holdco (as defined in the Security Agreement) or (c) a Subsidiary of a CFC or a CFC Holdco (as defined in the Security Agreement); provided that notwithstanding the foregoing clauses (i) through (iii), the Company may in its sole discretion designate any Excluded Subsidiary as a Guarantor.

(cc)     "***Existing Note Purchase Agreement***" means that certain Senior Secured Convertible Note Purchase Agreement, dated as of April 19, 2021, by and among the Company, the Guarantors from time to time party thereto, the Purchasers (as defined therein) party thereto and U.S. Bank National Association, as note agent and as collateral agent for the Secured Parties (as defined therein), as amended, restated, supplemented and/or otherwise modified from time to time.

(dd)     "***Existing Notes***" means the senior secured convertible promissory notes issued pursuant to the Existing Note Purchase Agreement.

(ee)     "***Existing Secured Note Obligations***" means all "Obligations" under and as defined in the Existing Note Purchase Agreement and any refinancing, refunding, renewal or extension thereof.

(ff)     "***GAAP***" means the United States generally accepted accounting principles in effect as of the date of determination thereof. GAAP will be deemed to treat operating leases and Capital Leases in a manner consistent with the treatment under GAAP as in effect prior to the issuance by the Financial Accounting Standards Board on February 25, 2016 of Accounting Standards Update No. 2016-02.

(gg)     "***Governmental Authority***" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

(hh)     "***Guarantee***" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly and including any obligation, direct or indirect, of the guarantor (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued in support of such Indebtedness or obligation; provided that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business. The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable

amount of the primary obligation in respect of which such Guarantee is made or, if not so stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

(ii)      "*Guaranteed Obligations*" has the meaning ascribed thereto in the Guaranty.

(jj)      "*Guarantor*" means each Subsidiary of the Company party to the Guaranty and each other Subsidiary of a Note Party that becomes a Guarantor under the Note Documents pursuant to Section 6.10..

(kk)      "*Guaranty*" means the Guaranty, dated as the date hereof, made by the Guarantors in favor of the Note Agent, substantially in the form attached hereto as Exhibit C, (as amended, restated, supplemented and/or otherwise modified from time to time).

(ll)      "*Hazardous Materials*" means (i) any "hazardous substance", as defined by CERCLA, (ii) any "hazardous waste", as defined by RCRA, (iii) any petroleum product, (iv) any "pollutant," as defined by the CWA, or (v) contaminant or hazardous, dangerous or toxic chemical, material or substance within the meaning of any other Environmental Law.

(mm)      "*Holder*" or "*Holders*" means, individually and collectively, the holders of the Notes, including the Purchasers.

(nn)      "*Indebtedness*" as applied to any Person, means, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (c) all obligations of such Person in respect of the deferred purchase price of property or services (other than trade payables and accounts payable incurred in the ordinary course of business and any deferred compensation, earn-out, purchase price adjustment or other deferred purchase price obligation which is contingently payable based on the achievement of future financial performance); (d) all obligations of such Person under any conditional sale or other title retention agreement(s) relating to property acquired by such Person, (e) all obligations in respect of Capital Leases of such Person, (f) all obligations, contingent or otherwise, of such Person in respect of letters of credit, banker's acceptances or similar extensions of credit, (g) all Guarantees of such Person of Indebtedness of other Persons that would count as a liability on the balance sheet of such Person in accordance with the GAAP, (h) all Indebtedness of a third party secured by any Lien on any property or asset owned or held by such Person, whether or not such Indebtedness has been assumed by such Person, (i) all obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Disqualified Capital Stock of such Person and (j) all monetary obligations under any receivables factoring, receivables sales, receivable securitization or similar transactions or other off-balance sheet liabilities. The Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture in which such Person is a general partner or a joint venturer, except to the extent that the terms of such Indebtedness provide that such Person is not liable therefor.

(oo)      "*Initial Closing Date*" means August 20, 2021.

(pp)      "*Initial Note*" or "*Initial Notes*" has the meaning ascribed thereto in the recitals to this Agreement.

(qq)      "*Initial Purchaser*" or "*Initial Purchasers*" has the meaning ascribed thereto in the preamble to this Agreement.

(rr)   "**_Intellectual Property_**" means all intellectual and similar property of a Person, including inventions, designs, patents, copyrights, trademarks, service marks, trade names, trade secrets, confidential or proprietary information, customer lists, know-how, software and databases.

(ss)   "**_Intellectual Property Security Agreement_**" means the Intellectual Property Security Agreement, to be made by the applicable Note Parties in favor of the Collateral Agent, substantially in the form attached hereto as <u>Exhibit E</u> (as amended, restated, supplemented and/or otherwise modified from time to time).

(tt)   "**_Intercreditor Agreement_**" has the meaning ascribed thereto in Section 7.1(a).

(uu)   "**_Ledger_**" shall have the meaning ascribed thereto in the Notes.

(vv)   "**_Licenses_**" means all licenses, permits, authorizations, determinations, and registrations issued by any Governmental Authority to the Company or any Subsidiary in connection with the conduct of its business.

(ww)   "**_Lien_**" means any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing.

(xx)   "**_Material Adverse Effect_**" means, individually or in the aggregate, (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties or financial condition of the Company and its Subsidiaries taken as a whole; (b) a material impairment of the ability of the Note Parties to perform their obligations under the Note Documents or, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, the rights and remedies of the Secured Parties under the Note Documents; (c) a material adverse effect upon the legality, validity, binding effect or enforceability against the Note Parties of any Note Document; or (d) from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, a material adverse effect on the Liens in favor of the Collateral Agent (for the benefit of the Secured Parties) on the Collateral or the priority of such Liens.

(yy)   "**_Material Subsidiary_**" mean each Subsidiary which, as of the most recent fiscal quarter of the Company, for the period of four consecutive fiscal quarters of the Company then last ended (taken as one accounting period) in respect of which financial statements were (or were required to be) delivered pursuant to <u>Sections 6.1(a)</u> or <u>(b)</u>, as applicable (a "**_Test Period_**"), had Total Assets as of the last day of such Test Period that were in excess of 10% of the Total Assets of the Company and its Subsidiaries as of such date.

(zz)   "**_Multiemployer Plan_**" means any "multiemployer plan" as defined in Section 4001(a)(3) of ERISA, which is contributed to by (or to which there is or may be an obligation to contribute of) the Company, any of its Subsidiaries or an ERISA Affiliate, and each such plan for the five-year period immediately following the latest date on which the Company, any of its Subsidiaries or an ERISA Affiliate contributed to or had an obligation to contribute to such plan.

(aaa)   "**_Note_**" or "**_Notes_**" has the meaning ascribed thereto in the recitals to this Agreement.

(bbb)   "**_Note Documents_**" means, collectively, this Agreement, each Note, the Guaranty, each Collateral Document (if applicable), the fee schedule delivered from the Agents to the Company in connection with this Agreement, the Intercreditor Agreement (if applicable), and any other document,

agreement or instrument which has or will be executed by or for the benefit of the Holders in connection with such agreements and the transactions described therein, each as may be amended, restated, supplemented/and or otherwise modified from time to time.

(ccc)    "***Note Party***" or "***Note Parties***" means, individually and collectively, the Company and the Guarantors. From and after a Parent Entity assumes or otherwise becomes a co-obligor with respect to the Company's Obligations in connection with a SPAC pursuant to Section 6.13, each reference to "Note Party" shall be deemed to include a reference to a Parent Entity.

(ddd)    "***Obligations***" means all advances to, and debts, liabilities (including without limitation (x) prepayment premiums (if any) and other premiums payable under the Notes (if any), including all or any portion of the Repayment Amount (as defined in the Notes), if applicable, (y) accrued and unpaid interest and (z) capitalized interest), obligations, fees, expenses, indemnities, covenants and duties of, the Note Parties arising under any Note Document or otherwise with respect to any Note, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against the Note Parties of any proceeding under any debtor relief laws naming any Note Party as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims or allowable in such proceeding.

(eee)    "***OFAC***" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

(fff)    "***Parent Entity***" has the meaning ascribed thereto in the definition of SPAC.

(ggg)    "***PBGC***" mean the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor thereto).

(hhh)    "***Permitted Lien***" means:

(i)    from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, Liens in favor of Collateral Agent for the benefit of Secured Parties granted pursuant to the Note Documents;

(ii)    Liens set forth on Schedule 5.17 existing as of the Initial Closing Date;

(iii)    Liens for taxes if obligations with respect to such taxes either (i) are not due and payable, (ii) are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and adequate reserves have been made in accordance with GAAP or (iii) could not reasonably be excepted to have a Material Adverse Effect;

(iv)    statutory Liens of landlords, banks (and rights of set-off), of carriers, warehousemen, mechanics, repairmen, workmen and materialmen, and other Liens imposed by law (other than any such Lien imposed pursuant to Section 401 (a)(29) or 412(n) of the Internal Revenue Code or by the Employee Retirement Income Security Act of 1974), in each case incurred in the ordinary course of business (i) for amounts not yet overdue, or (ii) for amounts that are overdue and that (in the case of any such amounts overdue for a period in excess of five (5) days) are being contested in good faith by appropriate proceedings, so long as such reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made for any such contested amounts;

7

(v)     Liens incurred in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, trade contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money or other indebtedness), so long as (x) no foreclosure, sale or similar proceedings have been commenced with respect to any portion of the Collateral on account thereof and (y) adequate reserves required by GAAP shall have been set aside therefor;

(vi)    easements, rights-of-way, restrictions, encroachments, and other minor defects or irregularities in title, in each case which do not and will not have a Material Adverse Effect;

(vii)   any interest or title of a lessor or sublessor under any lease of real estate permitted hereunder;

(viii)  Liens solely on any cash earnest money deposits made by the Company in connection with any letter of intent or purchase agreement permitted hereunder;

(ix)    purported Liens evidenced by the filing of precautionary UCC financing statements relating solely to operating leases of personal property entered into in the ordinary course of business;

(x)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods used in the ordinary course of business;

(xi)    any zoning or similar law or right reserved to or vested in any governmental office or agency to control or regulate the use of any real property;

(xii)   licenses of patents, trademarks and other Intellectual Property rights granted by the Company in the ordinary course of business;

(xiii)  Liens securing obligations of the Company incurred under leases (but not securing indebtedness for borrowed money) in the form of cash deposits made in the ordinary course of business;

(xiv)   Liens arising in favor of depository institutions as a result of set-off rights or otherwise securing obligations owed to such depository institution in connection with bank services provided to the Company or its Subsidiaries;

(xv)    Liens on cash deposits securing obligations owed to an issuer of a letter of credit at the request of the Company of any of its Subsidiaries;

(xvi)   Liens on any assets of the Note Parties securing any Indebtedness, including Capital Lease Obligations, incurred to finance the acquisition of any fixed or capital assets (including any real property assets) so long as such Liens encumber only the assets acquired or financed with the proceeds of such Indebtedness and do not attach to any other assets of any Note Party;

(xvii)  Liens on cash deposit accounts and cash and cash equivalents delivered or pledged to secure letters of credit;

(xviii)   Liens on Indebtedness permitted to be incurred in reliance on <u>Section 7.01(a)</u>;

(xix)   Liens arising from judgments for the payment of money in circumstances not constituting an Event of Default; and

(xx)   Liens on the Collateral securing the Existing Secured Note Obligations.

(iii)   "*Permitted Transferees*" means, (x) as to any Purchaser that is a limited or general partnership or a trust, to its partners (whether general or limited, including retired partners) or beneficiaries and to affiliated partnerships managed by the same management company or managing (general) partner or by an entity which directly or indirectly controls, is controlled by, or is under common control with, such management company or managing or general partner, or member (or retired member) of such Purchaser in accordance with limited liability company interests and (y) as to any other Purchaser, an entity which directly or indirectly controls, is controlled by, or is under common control with such Purchaser.

(jjj)   "*Person*" (regardless of whether capitalized) means any natural person, entity, or association, including without limitation any corporation, partnership, limited partnership, limited liability company, government (or agency or subdivision thereof), trust, joint venture, or proprietorship.

(kkk)   "*Plan*" means any "employee benefit plan" as defined in Section 3 of ERISA (other than a Multiemployer Plan) maintained or contributed to by any Note Party or any ERISA Affiliate or to which a Note Party or any ERISA Affiliate has or may have an obligation to contribute, and each such plan that is subject to Title IV of ERISA for the five-year period immediately following the latest date on which a Note Party or any ERISA Affiliate maintained, contributed to or had an obligation to contribute to (or is deemed under Section 4069 of ERISA to have maintained or contributed to or to have had an obligation to contribute to, or otherwise to have liability with respect to) such plan.

(lll)   "*Principal Office*" means the Note Agent's office, address or bank account as from time to time designated in writing by the Note Agent to the Company and each Holder, which shall initially be the office designated on the Note Agent's signature page to this Agreement.

(mmm) "*Pro Rata Share*" means, as to any Holder at any time, the ratio at such time of (x) the aggregate principal amount of the Notes held by such Holder to (y) the aggregate outstanding principal amount of all Notes issued hereunder.

(nnn)   "*Purchaser*" or "*Purchasers*" means, individually and collectively, the Initial Purchasers and the Additional Purchasers, as the context may require.

(ooo)   "*Reportable Event*" means any of the events set forth in Section 4043(c) of ERISA with respect to a Plan, other than those events as to which the thirty-day notice period is waived under subsection .22, .23, .25, .27, .28, .29, .30, .31, .32, .34, or .35 of PBGC Regulation Section 4043.

(ppp)   "*Required Holders*" means Holders representing more than fifty percent (50%) of the aggregate outstanding principal amount of the Notes (including all accrued PIK Interest) issued pursuant to this Agreement at the relevant time of reference.

(qqq)   "*Requirements of Law*" means as to any Person, provisions of the Charter Documents of such Person, or any law, treaty, code, rule, regulation, right, privilege, qualification,

9

License or franchise, or any determination of an arbitrator or a court or other Governmental Authority, in each case applicable to such Person or any of such Person's property or to which such Person or any of such Person's property is subject or pertaining to any or all of the transactions contemplated or referred to in the Note Documents, including, but not limited to the Fair Credit Reporting Act, the Gramm-Leach-Bliley Act, the Federal Trade Commission Act and comparable state laws, the Telephone Consumer Protection Act, the Telemarketing and Consumer Fraud and Abuse Prevention Act, the CAN-SPAM Act, the Electronic Fund Transfer Act, the U.S. Card Act, and any similar laws and regulations in Canada, including federal and provincial laws.

(rrr)  "**Responsible Officer**" means the chief financial officer, general counsel, secretary, controller or other authorized officer of the Note Parties set forth on an incumbency certificate delivered to the Note Agent from time to time.

(sss)  "**Restricted Payment**" means as to any Person (i) any dividend or other distribution (whether in cash, Capital Stock or other property) with respect to or on account of any shares of any Capital Stock of such Person or (ii) any payment by such Person on account of the purchase, redemption, retirement, defeasance, surrender, cancellation, termination or acquisition of any Capital Stock of such Person or any claim respecting the purchase or sale of any Capital Stock of such Person.

(ttt)  "**Sanctioned Entity**" means (a) an agency of the government of, (b) an organization directly or indirectly controlled by, or (c) a person resident in a country that is subject to a sanctions program identified on the list maintained by OFAC and available at http://www.treas.gov/offices/enforcement/ofac/programs, or as otherwise published from time to time as such program may be applicable to such agency, organization or person.

(uuu)  "**Sanctioned Person**" means a person named on the list of Specially Designated Nationals or Blocked Persons maintained by OFAC available at http://www.treas.gov/offices/enforcement/ofac/sdn/index.html, or as otherwise published from time to time.

(vvv)  "**Secured Debt Cap**" has the meaning ascribed thereto in Section 7.1(a).

(www)  "**Secured Party**" or "**Secured Parties**" means, individually and collectively, upon the execution and delivery of the Collateral Documents pursuant to Section 6.13, the Purchasers, Holders, the Agents, and their respective successors and permitted assigns.

(xxx)  "**Securities**" has the meaning ascribed thereto in Section 8.1.

(yyy)  "**Security Agreement**" means the Security Agreement, to be made by the Note Parties in favor of the Collateral Agent, for the benefit of the Secured Parties, substantially in the form attached hereto as Exhibit D (as amended, restated, supplemented and/or otherwise modified from time to time).

(zzz)  "**Single Employer Plan**" shall mean any Plan that is covered by Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, other than a Multiemployer Plan, that is maintained or contributed to by the Company or any Commonly Controlled Entity or to which the Company or a Commonly Controlled Entity has or may have an obligation to contribute, and such plan for the six-year period immediately following the latest date on which the Company or a Commonly Controlled Entity maintained, contributed to or had an obligation to contribute to (or is deemed under Section 4069 of ERISA to have maintained or contributed to or to have had an obligation to contribute to, or otherwise to have liability with respect to) such plan. For the purposes of this definition, "**Commonly**

10

*Controlled Entity*" means a person or an entity, whether or not incorporated, that is under common control with the Company within the meaning of Section 4001 of ERISA or is part of a group that includes the Company and that is treated as a single employer under Section 414 of the Code.

(aaaa)   "*Solvent*" means, with respect to any Person, that such Person (i) owns and will own assets the fair saleable value of which are greater than the amount that will be required to pay the probable liabilities of its then existing debts as they become absolute and matured considering all financing alternatives and potential asset sales reasonably available to it, (ii) has capital that is not unreasonably small in relation to its business as presently conducted or after giving effect to any contemplated transaction and (iii) does not intend to incur and does not believe that it will incur debts beyond its ability to pay such debts as they become due. In computing the amount of contingent or unliquidated liabilities at any time, such liabilities shall be computed at the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

(bbbb)   "*SPAC*" means a transaction, including, without limitation, the XPDI Transaction, involving a publicly listed special purpose acquisition company that, upon the consummation thereof, shall be the direct or indirect parent company of Core Scientific Holding Co. (or of the successor by merger to Core Scientific Holding Co.) (such parent company, a "*Parent Entity*"). The Company shall promptly notify the Agents in writing upon the occurrence of a SPAC or the XPDI Transaction.

(cccc)   "*Subsidiary*" means, with respect to any Person, any other Person of which an aggregate of more than fifty percent (50%) of the outstanding Capital Stock having ordinary voting power to elect a majority of the board of directors of such other Person is at the time, directly or indirectly, owned legally or beneficially by such Person or one or more Subsidiaries of such Person, or a combination thereof, or with respect to which any such Person has the right to vote or designate the vote of more than fifty percent (50%) of such Capital Stock whether by proxy, agreement, operation of law or otherwise. Unless the context otherwise requires, each reference to a Subsidiary shall mean a Subsidiary of the Company.

(dddd)   "*Taxes*" means any present or future United States federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp occupation, premium, windfall profits, environmental (including taxes under former Code §59A), customs duties, capital stock, franchise profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on-minimum, estimated, or other taxes, levies, assessments, fees or other charges imposed by any Governmental Authority, including any interest, penalty, or addition thereto, whether disputed or not.

(eeee)   "*Total Assets*" shall mean the total assets of the Company and its Subsidiaries on a consolidated basis, as shown on the applicable consolidated balance sheet of the Company and its Subsidiaries and computed in accordance with GAAP. Total Assets shall be calculated after giving effect to the transaction giving rise to the need to calculate Total Assets.

(ffff)   "*UCC*" means Uniform Commercial Code.

(gggg)   "*Unfunded Pension Liability*" of any Plan means the amount, if any, by which the value of the accumulated plan benefits under the Plan, determined on a plan termination basis in accordance with actuarial assumptions at such time consistent with those prescribed by the PBGC for purposes of Section 4044 of ERISA, exceeds the fair market value of all Plan assets allocable to such liabilities under Title IV of ERISA (excluding any accrued but unpaid contributions).

(hhhh) "*XPDI Transaction*" means the transactions contemplated by the Agreement and Plan of Merger and Reorganization, dated as of July 20, 2021, by and among Power & Digital Infrastructure Acquisition Corp., a Delaware corporation ("*XPDI*"), XPDI Merger Sub Inc., a Delaware corporation and wholly owned subsidiary of XPDI, XPDI Merger Sub 2, LLC, a Delaware limited liability company and wholly owned subsidiary of XPDI, and the Company, as amended, restated, supplemented and/or otherwise modified from time to time.

## 2. TERMS OF THE CONVERTIBLE PROMISSORY NOTES.

### 2.1 The Initial Notes.

Subject to the satisfaction (or waiver in accordance with Section 10.9) of the conditions precedent set forth in Section 4.1, the Company shall issue and sell to each Initial Purchaser, and each Initial Purchaser shall purchase from the Company, an Initial Note on the Initial Closing Date in a principal amount equal to the amount opposite such Initial Purchaser's name set forth in the Schedule of Purchasers under the header 'Initial Purchasers' attached hereto as Schedule 2. By no later than 11:00 a.m. (New York time) on the Initial Closing Date (i) each Initial Purchaser shall wire transfer same day funds in U.S. dollars, at the Note Agent's Principal Office, in the amount of such Initial Purchaser's Initial Note and (ii) the Company shall issue and deliver to each such Initial Purchaser an Initial Note in favor of such Initial Purchaser payable in the principal amount of such Initial Purchaser's Initial Note.

### 2.2 The Additional Notes.

(a) Subject to the satisfaction (or waiver in accordance with Section 10.9) of the conditions precedent set forth in Section 4.2, at any time and from time to time after the Initial Closing Date, the Company shall issue and sell to each Person that executes a counterpart signature page to this Agreement in the form attached hereto as Exhibit B (individually, an "*Additional Purchaser*" and collectively, the "*Additional Purchasers*"), and each such Additional Purchaser shall purchase from the Company, an Additional Note in a principal amount to be mutually agreed between such Additional Purchaser and the Company. Each additional issuance, sale and purchase of Additional Notes as provided in this Section 2.2 shall take place on a date to be mutually agreed by the Company and such Additional Purchaser (each, an "*Additional Closing Date*"); provided that (i) each Additional Closing Date shall have occurred on or prior to December 31, 2021, (ii) all issuances, sales and purchases of Additional Notes on an Additional Closing Date shall be made on substantially identical terms and conditions as the Initial Notes, shall, to the extent permitted by law, be fungible for tax purposes with the Initial Notes and may only be amended pursuant to Section 10.9; (iii) the purchase price of each Additional Note shall be increased by the PIK Interest (as defined in the Note) and Cash Interest (as defined in the Note) that has accrued since the Initial Closing Date on the Initial Notes (it being understood and agreed that interest on all the Notes shall accrue PIK Interest and be payable on the same dates) and (iv) in no event shall the initial aggregate principal amount of all Notes issued hereunder exceed $300,000,000.00.

(b) Any Additional Notes issued, sold and purchased pursuant to this Section 2.2 shall be deemed to be "Notes" for all purposes under this Agreement. By no later than 11:00 a.m. (New York time) on an Additional Closing Date (i) each Additional Purchaser shall wire transfer same day funds in U.S. dollars, at the Note Agent's Principal Office, in the amount of such Additional Purchaser's Additional Note and (ii) the Company shall issue and deliver to each such Additional Purchaser an Additional Note in favor of such Additional Purchaser payable in the principal amount of such Additional Purchaser's Additional Note. The Schedule of Purchasers may be amended by the Company without the consent of the Purchasers to include any Additional Purchasers upon the execution by such Additional Purchasers of a counterpart signature page hereto in the form attached hereto as Exhibit B.

3.     **SECURITY.**

To secure the performance and payment in full of the Obligations and the Guaranteed Obligations, as applicable, each Note Party shall grant to the Collateral Agent, for the benefit of the Secured Parties, a first-priority Lien on the Collateral (subject to Permitted Liens) pursuant to the Security Agreement, as and when required pursuant to Section 6.13.

4.     **CONDITIONS PRECEDENT TO EACH CLOSING DATE.**

4.1     **Conditions Precedent to the Initial Closing Date**.

The obligation of the Company to issue and to sell, and of each Initial Purchaser to purchase, Initial Notes on the Initial Closing Date are subject to the satisfaction (or waiver in accordance with Section 10.9) of the following conditions precedent on or prior to the Initial Closing Date:

(a)     receipt by each Initial Purchaser of counterparts to this Agreement, the Guaranty and the Initial Notes;

(b)     receipt by each Initial Purchaser of a certificate signed by a Responsible Officer of each Note Party attaching (i) true, correct and complete copies of the Charter Documents of each Note Party as in effect on the Initial Closing Date, certified, with respect to the Charter Documents set forth in clause (ii) of the definition thereof, as of a recent date by the Secretary of State of the state of incorporation or organization (as applicable) of such Note Party, (ii) a certificate of good standing of each Note Party, certified as of a recent date by the Secretary of State of the state of incorporation or organization (as applicable) of such Note Party, (iii) the names of the Responsible Officers of each Note Party authorized to sign the Note Documents and their true signatures and (iv) true, correct and complete copy of resolutions duly adopted by the board of directors or similar governing body of each Note Party authorizing the execution, delivery and performance of this Agreement and the other Note Documents;

(c)     receipt by each Initial Purchaser of a certificate of solvency, executed by the chief financial officer (or equivalent) of the Company, substantially in the form attached hereto as Exhibit F;

(d)     receipt by each Initial Purchaser of a certificate signed by a Responsible Officer of the Company certifying that the condition specified in clause (j) of this Section 4.1 has been satisfied;

(e)     the Initial Purchasers and the Agents shall have received an opinion of Cooley LLP, counsel to the Company, in form and substance reasonably satisfactory to the Initial Purchasers;

(f)     all authorizations, consents, approvals or permits, if any, of any governmental authority or regulatory body that are required in connection with the lawful issuance and sale of the Initial Notes pursuant to this Agreement shall have been duly obtained and shall be effective on and as of the Initial Closing Date;

(g)     there shall be no claim, action, suit, investigation, litigation or proceeding, pending or, to the knowledge of the Company and its Subsidiaries, threatened, in any court or before any governmental authority with respect to the Note Documents or any transactions contemplated thereby or hereby;

(h)     the representations and warranties made pursuant to Section 5 hereof shall be true and correct in all material respects (or if a representation or warranties is qualified by materiality or

material adverse effect, in all respects) on and as of the Initial Closing Date with the same effect as though made on and as of such date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects (or if a representation or warranties is qualified by materiality or material adverse effect, in all respects) on and as of such earlier date;

        (i)      immediately before and after giving effect to the issuance of the Initial Notes on the Initial Closing Date, no Event of Default shall exist;

        (j)      the Company shall have paid all outstanding fees and expenses of the Agents, Shipman & Goodwin LLP, counsel to the Agents, and as otherwise required pursuant to <u>Section 10(a)</u>;

        (k)      receipt by the Company and the Note Agent of an Administrative Questionnaire and executed copies of IRS Form W-9 or appropriate IRS Form W-8, as applicable, as well as any reasonably necessary supporting information, certifying that payments to the Initial Purchasers under the Initial Notes are exempt from U.S. federal withholding Tax; and

        (l)      the Company shall have delivered to the Initial Purchasers such other documents and instruments relating to the transactions contemplated by this Agreement as the Initial Purchasers or their counsel may reasonably request (which request shall have been made no later than 3 days prior to the Initial Closing Date).

      **4.2**     **Conditions Precedent to each Additional Closing Date**.

      The obligation of the Company to issue and to sell, and of each Additional Purchaser to purchase, Additional Notes on an Additional Closing Date are subject to the satisfaction (or waiver in accordance with <u>Section 10.8</u>) of the following conditions precedent on or prior to each such Additional Closing Date:

        (a)      each Additional Purchaser shall have received copies of each of the documents set forth in <u>clauses (a)</u> through <u>(e)</u> and <u>clause (l)</u> of <u>Section 4.1</u> delivered to the Initial Purchasers on the Initial Closing Date;

        (b)      the representations and warranties made pursuant to <u>Section 5</u> hereof shall be true and correct in all material respects (or if a representation or warranties is qualified by materiality or material adverse effect, in all respects) on and as of the applicable Additional Closing Date with the same effect as though made on and as of such date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects (or if a representation or warranties is qualified by materiality or material adverse effect, in all respects) on and as of such earlier date;

        (c)      immediately before and after giving effect to the issuance of Additional Notes on the applicable Additional Closing Date, no Event of Default (as defined in the Notes) shall exist; and

        (d)      receipt by the Company and the Note Agent of an Administrative Questionnaire and of executed copies of IRS Form W-9 or appropriate IRS Form W-8, as applicable, as well as any reasonably necessary supporting information, certifying that payments to the Additional Purchasers under Additional Notes are exempt from U.S. federal withholding Tax.

5.      **REPRESENTATIONS AND WARRANTIES OF THE NOTE PARTIES.**

Each Note Party hereby represents and warrants to each Initial Purchaser and the Agents as of the Initial Closing Date and to each Additional Purchaser and the Agents as of the applicable Additional Closing Date as follows:

**5.1      Organization, Good Standing and Qualification**.

(a)      *Organization; Good Standing; Qualification.* Each Note Party and each of its Subsidiaries: (i) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation, (ii) has all requisite corporate or limited liability company power and authority to own and operate its property, to lease the property it operates as lessee and to conduct the business in which it is currently, or is currently proposed to be, engaged; (iii) is duly qualified as a foreign entity, licensed and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification, except where the failure to be so qualified could not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect and (iv) has the corporate or limited liability company power and authority to execute, deliver and perform its obligations under each Note Document to which it is or will be a party and to borrow hereunder. Each Note Party's present name, former names within the last five (5) years (if any), owned and leased locations, place of formation, tax identification number and organizational identification number are correctly set forth in <u>Schedule 5.1</u> hereto, as may be updated by the Company from time to time in a written notice provided to the Note Agent after the Initial Closing Date.

(b)      *Collateral.* Except for the Liens granted under the Security Agreement, each Note Party shall be the sole legal and equitable owner of each item of Collateral in which it purports to grant a security interest under the Security Agreement upon the execution and delivery thereof pursuant to Section 6.13, having good and marketable title thereto, free and clear of any and all Liens except for Permitted Liens and, upon filing of UCC financing statements in the UCC filing office applicable to such Note Party, the Collateral Agent shall have a perfected security interest in the Collateral, which such security interest shall be senior to all other Liens (other than Permitted Liens) to the extent the same can be perfected by filing.

**5.2      Corporate Power; No Contravention**. The execution, delivery and performance by the Company and each Subsidiary of each Note Document to which it is or will be a party and the consummation of the transactions contemplated hereby: (a) have been duly authorized by all necessary corporate or limited liability company action; (b) do not and will not contravene or violate the terms of the Charter Documents of the Company or any of its Subsidiaries or any amendment thereto or any material Requirement of Law applicable to the Company or such Subsidiary or the Company's or such Subsidiary's assets, business or properties; (c) do not and will not (i) conflict with, contravene, result in any violation or breach of or default under any material Contractual Obligation of the Company or such Subsidiary (with or without the giving of notice or the lapse of time or both) other than any right to consent, which consents have been obtained, (ii) create in any other Person a right or claim of termination or amendment of any material Contractual Obligation of the Company or such Subsidiary, or (iii) require modification, acceleration or cancellation of any material Contractual Obligation of the Company or such Subsidiary; and (d) do not and will not result in the creation of any Lien (or obligation to create a Lien) against any property, asset or business of the Company or such Subsidiary (other than those securing the Notes from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13).

**5.3      Authorization.** All corporate action on the part of the Company, its Subsidiaries and their respective directors and stockholders necessary for the authorization, execution, delivery and performance of this Agreement by the Company and its Subsidiaries and the performance of the

15

Company's obligations hereunder, including the issuance and delivery of the Notes and the reservation of the equity securities issuable upon conversion of the Notes (collectively, the "**Conversion Securities**") has been taken or will be taken prior to the issuance of such Conversion Securities. This Agreement and the Note Documents, when executed and delivered by the Note Parties, shall constitute valid and binding obligations of the Note Parties enforceable in accordance with their terms, subject to laws of general application relating to bankruptcy, insolvency, the relief of debtors and general principles of equity and, with respect to rights to indemnity, subject to federal and state securities laws. The Conversion Securities, when issued in compliance with the provisions of this Agreement or the Notes will be validly issued, fully paid and nonassessable and free of any Liens and issued in compliance with all applicable federal and state securities laws.

5.4     **Governmental Consents**. All consents, approvals, orders, or authorizations of, or registrations, qualifications, designations, declarations, or filings with, any Governmental Authority, required on the part of the Note Parties in connection with the valid execution and delivery of this Agreement and the other Note Documents, the offer, sale or issuance of the Notes and the Conversion Securities issuable upon conversion of the Notes and the consummation of any other transaction contemplated hereby shall have been obtained and will be effective on the Initial Closing Date.

5.5     **Compliance with Laws**.

(a)     No Note Party is in violation of any Requirements of Law, any applicable statute, rule, regulation, order or restriction of any domestic government or any instrumentality or agency thereof in respect of the conduct of its business or the ownership of its properties, which violation of which would materially and adversely affect the business, assets, liabilities, financial condition or operations of the Note Parties (individually and in the aggregate).

(b)     Neither the Company nor any of its Subsidiaries is registered or required to register as an "investment company" or a company "controlled" by an "investment company" under the Investment Company Act of 1940, as amended. Neither the Company nor any of its Subsidiaries is engaged as one of its important activities in extending credit for margin stock (under Regulations X, T and U of the Federal Reserve Board of Governors). The Company and each of its Subsidiaries has complied in all material respects with applicable provisions of the Federal Fair Labor Standards Act. Neither the Company nor any of its Subsidiaries is a "holding company" or an "affiliate" of a "holding company" or a "subsidiary company" of a "holding company" as each term is defined and used in the Public Utility Holding Company Act of 2005. Neither the Company's nor any of its Subsidiaries' properties or assets has been used by the Company or such Subsidiary or, to Company's knowledge, by previous Persons, in disposing, producing, storing, treating, or transporting any hazardous substance other than in material compliance with applicable laws. The Company and each of its Subsidiaries has obtained all consents, approvals and authorizations of, made all declarations or filings with, and given all notices to, all Governmental Authorities that are necessary to continue their respective businesses as currently conducted, except to the extent that the failure to obtain, make or give any of the foregoing would not reasonably be expected to have a Material Adverse Effect.

(c)     Neither the Company nor any Subsidiary (i) is a Sanctioned Person, (ii) has any assets in Sanctioned Entities, or (iii) derives any operating income from investments in, or transactions with Sanctioned Persons or Sanctioned Entities. The proceeds of the Notes will not be used and have not been used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity.

(d)     The Company and its Subsidiaries are in compliance, in all material respects, with any United States Requirements of Law relating to terrorism, sanctions or money laundering (the "Anti-

Terrorism Laws"), including the United States Executive Order No. 13224 on Terrorist Financing (the "**Anti-Terrorism Order**") and the Patriot Act. No part of the proceeds of any Note will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended or any other Anti-Terrorism Law.

(e)     No Note Party and no Subsidiary of any Note Party (i) is listed in the annex to, or is otherwise subject to the provisions of, the Anti-Terrorism Order, (ii) is owned or controlled by, or acting for or on behalf of, any person listed in the annex to, or is otherwise subject to the provisions of, the Anti-Terrorism Order or (iii) commits, threatens or conspires to commit or supports "terrorism" as defined in the Anti-Terrorism Order.

(f)     None of the funds to be provided under this Agreement will be used, directly or indirectly, (i) for any activities in violation of any applicable anti-money laundering, economic sanctions and anti-bribery laws and regulations laws and regulations or (ii) for any payment to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

**5.6     Compliance with Other Instruments**. The Company is not in violation or default of any term of its articles of incorporation, or of any provision of any mortgage, indenture or contract to which it is a party and by which it is bound or of any judgment, decree, order or writ, other than such violation(s) that would not have a Material Adverse Effect on the Company. The execution, delivery and performance of this Agreement and the other Note Documents, and the consummation of the transactions contemplated hereby and thereby will not result in any material violation or be in conflict with, or constitute, with or without the passage of time and giving of notice, either a default under any such material provision, instrument, judgment, decree, order or writ or an event that results in the creation of any material Lien upon any assets of the Company or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization or approval applicable to the Company, its business or operations or any of its material assets or properties. Without limiting the foregoing, the Company has obtained all waivers reasonably necessary with respect to any preemptive rights, rights of first refusal or similar rights, including any notice or offering periods provided for as part of any such rights, in order for the Company to consummate the transactions contemplated hereunder without any third party obtaining any rights to cause the Company to offer or issue any securities of the Company as a result of the consummation of the transactions contemplated hereunder.

**5.7     Solvency.**  As of the Initial Closing Date both immediately before and after giving effect to the transactions contemplated by the Note Documents, the Company is individually, and the Company and its Subsidiaries on a consolidated basis are, Solvent.

**5.8     Offering**. The offer, issue, and sale of the Notes and the Conversion Securities are and will be exempt from the registration and prospectus delivery requirements of the Act, and no qualification under the Trust Indenture Act of 1939, as amended, and the rules and regulations of the Securities and Exchange Commission promulgated thereunder is required in connection with, the issuance of the Notes and the Conversion Securities.

**5.9     No "Bad Actor" Disqualification**. The Company has exercised reasonable care to determine whether any Company Covered Person (as defined below) is subject to any of the "bad actor" disqualifications described in Rule 506(d)(1)(i) through (viii), as modified by Rules 506(d)(2) and (d)(3), under the Act ("**Disqualification Events**"). To the Company's knowledge, no Company Covered Person

is subject to a Disqualification Event. The Company has complied, to the extent required, with any disclosure obligations under Rule 506(e) under the Act.

**5.10     Litigation**. There are no legal actions, suits, proceedings, claims or disputes pending or, to the knowledge of any Note Party, threatened in writing, at law, in equity, in arbitration or before any Governmental Authority against or affecting the Company or its Subsidiaries that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; (b) there is no injunction, writ, temporary restraining order, decree or any order or determination of any nature by any arbitrator, court or other Governmental Authority purporting to enjoin or restrain the execution, delivery or performance of the Note Documents or which relates to the assets or the business of the Company or its Subsidiaries; and (c) there is no litigation, claim, audit, dispute, review, proceeding or investigation currently pending or threatened in writing against the Company or its Subsidiaries for any violation or alleged violation of any Requirements of Law, and neither the Company nor any Subsidiary has received written notice of any threat of any suit, action, claim, dispute, investigation, review or other proceeding pursuant to or involving any Requirements of Law.

**5.11     Taxes**.

(a)     Except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect, the Company and each of its Subsidiaries has timely filed all United States federal and state income and other material tax returns that it was required to file, in each case with due regard for any extension of time within which to file such tax return. Except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect, all Taxes due and payable by the Company or its Subsidiaries have been paid, in each case with due regard for any extension of time within which to file such tax return, other than any Taxes the amount or validity of which is being actively contested by Company or its Subsidiaries in good faith and by appropriate proceedings and with respect to which adequate reserves or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made or provided therefor. There are no Liens, other than Permitted Liens, on any of the assets of the Company or its Subsidiaries that arose in connection with any failure (or alleged failure) to pay any Tax. To the knowledge of the Company, no claim has been made by a Governmental Authority in a jurisdiction where the Company and its Subsidiaries do not file tax returns that the Company or any of its Subsidiaries is or may be subject to taxation by that jurisdiction that could reasonably be expected to have a Material Adverse Effect.

(b)     There is no action, suit, proceeding, investigation, examination, audit, or claim now pending or, to the knowledge of the Company, threatened in writing by any Governmental Authority regarding any Taxes relating to the Company or its Subsidiaries that could reasonably be expected to have a Material Adverse Effect.

**5.12     Financial Condition**.     The Note Parties have furnished the Purchasers with true, correct and complete copies of (i) the audited consolidated balance sheets of the Company and its Subsidiaries as of December 31, 2018, 2019 and 2020 and the related consolidated statements of income or operations, shareholders' equity and cash flows for each such fiscal year and (ii) the unaudited consolidated balance sheets of the Company and its Subsidiaries as of March 31, 2021 and the related consolidated statements of income or operations and cash flows for such fiscal quarter (collectively, the "***Financial Statements***"). The Financial Statements fairly present, in all material respects, the financial position of the Company and its Subsidiaries on a consolidated basis, as of the respective dates thereof, and the results of operations and cash flows thereof, as of the respective dates or for the respective periods set forth therein, and are in conformity with the past historical practices of the Note Parties, with GAAP consistently applied during the periods involved. As of the dates of the Financial Statements, neither the Company nor any Subsidiary had any known obligation, Indebtedness or liability (whether accrued, absolute, contingent

or otherwise, and whether due or to become due), which was not reflected or reserved against in the balance sheets which are part of the Financial Statements, except for those incurred in the ordinary course of business and which are fully reflected on the books of account of the Company or its Subsidiaries, as applicable.

**5.13    Subsidiaries**.   Except as set forth on Schedule 5.13, the Company does not have any Subsidiaries.

**5.14    Capitalization**. As of the Initial Closing Date, without giving effect to the transactions contemplated hereby and in the other Note Documents, the outstanding capitalization of the Company and its Subsidiaries is as set forth on Schedule 5.14.  All of the issued and outstanding Capital Stock of the Company has been, and Capital Stock of the Company issuable upon the exercise of outstanding securities when issued will be, duly authorized and validly issued and are fully paid and nonassessable. All outstanding Capital Stock of the Company's Subsidiaries are 100% owned by the Company or one of its Subsidiaries free and clear of all Liens other than Permitted Liens. Except as set forth in the Charter Documents (as in effect on the Initial Closing Date), the issuance of the foregoing Capital Stock is not and has not been subject to preemptive rights in favor of any Person other than such rights that have been waived and will not result in the issuance of any additional Capital Stock of the Company or the triggering of any down-round or similar rights contained in any options warrants, debentures or other securities or agreements of the Company or any of its Subsidiaries. On the Initial Closing Date, except as set forth on Schedule 5.14, there are no outstanding securities convertible into or exchangeable for Capital Stock of the Company or any of its Subsidiaries or options, warrants or other rights to purchase or subscribe for Capital Stock of the Company or any of its Subsidiaries, or contracts, commitments, agreements, understandings or arrangements of any kind to which the Company or any of its Subsidiaries is a party relating to the issuance of any Capital Stock of the Company or any of its Subsidiaries, or any such convertible or exchangeable securities or any such options, warrants or rights. On the Initial Closing Date, except as set forth on Schedule 5.14, neither the Company nor any of its Subsidiaries has any obligation, whether mandatory or at the option of any other Person, at any time to redeem or repurchase any Capital Stock of the Company or any of its Subsidiaries, pursuant to the terms of their respective Charter Documents or otherwise. All securities of the Company and its Subsidiaries (including all shares of the Company's common stock, securities, options and warrants to purchase shares of the Company's common stock (both outstanding as well as those that are no longer outstanding), have been and were issued and granted pursuant to an exception from the Act and otherwise in compliance, in all material respects, with all securities and other applicable laws.

**5.15    Private Offering**. No form of general solicitation or general advertising was used by the Company or its Subsidiaries or their respective representatives in connection with the offer or sale of the Notes to the Purchasers pursuant to this Agreement.

**5.16    Broker's, Finder's or Similar Fees**.  Except as set forth in that certain Engagement Letter, dated on or about of August 20, 2021, by and between the Company and GreensLedge Capital Markets LLC, there are no brokerage commissions, finder's fees or similar fees or commissions payable by the Company or its Subsidiaries in connection with the transactions based on any agreement, arrangement or understanding with the Company or its Subsidiaries or any action taken by the Company or its Subsidiaries. Notwithstanding the foregoing or any other provision herein, no Purchaser shall be liable for any brokerage commission, finder's fees or similar fees or commissions.

**5.17    Indebtedness**. Schedule 5.17 lists the amount of all Indebtedness of the Company and its Subsidiaries (other than Indebtedness under this Agreement) that is in existence immediately before the Initial Closing Date and will remain outstanding after the Initial Closing Date.

6.    **AFFIRMATIVE COVENANTS OF THE NOTE PARTIES**

Each Note Party shall, and shall cause each of its Subsidiaries to:

6.1    **Reporting Obligations**. Deliver to the Note Agent (for prompt distribution to the Purchasers as specified in the applicable Administrative Questionnaire (or as otherwise specified by a Purchaser to the Note Agent in writing from time to time)):

(a)    as soon as available, but not later than 150 days after the end of each fiscal year of the Company, a copy of the audited consolidated balance sheets of the Company and its Subsidiaries as at the end of such fiscal year and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year, in each case, prepared in accordance with GAAP, setting forth in each case in comparative form the figures for the previous fiscal year, and accompanied by a report of any "Big Four" or, upon Required Holders' written consent (not to be unreasonably withheld), any other independent certified public accounting firm, which report shall contain an unqualified opinion (without any (A) "going concern" or like qualification or exception, (B) qualification or exception as to the scope of such audit, or (C) qualification which relates to the treatment or classification of any item and which, as a condition to the removal of such qualification, would require an adjustment to such item (except in the case of clauses (A) and (B) above as it relates to the Obligations during the last twelve months before the Maturity Date)), stating that such consolidated financial statements present fairly in all material respects the financial position for the periods indicated in conformity with GAAP applied on a basis consistent with prior years; and

(b)    as soon as available, but not later than 45 after the end of each fiscal quarter of each fiscal year (other than the fourth fiscal quarter), the unaudited consolidated balance sheets of the Company and its Subsidiaries as at the end of such fiscal quarter and the related unaudited consolidated statements of income and cash flows of the Company and its Subsidiaries for such fiscal quarter and for the period from the beginning of the then current fiscal year to the end of such fiscal quarter, all certified on behalf of the Company by a Responsible Officer of the Company as being complete and correct and fairly presenting, in all material respects, the financial position and the results of operations of the Company and its Subsidiaries, subject to normal year-end adjustments and absence of footnote disclosures.

(c)    promptly, and in any event within three (3) Business Days after the Company or any other Note Party becomes aware of or has knowledge of any event or condition that constitutes a Default or Event of Default, provide written notice of such event or condition and a statement of the curative action that the Company proposes to take with respect thereto.

Delivery of any reports, information and documents under this Section 6.2, as well as any other reports, information and documents pursuant to this Agreement, to the Note Agent is for informational purposes only and the Note Agent's receipt of the same shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of its covenants hereunder (as to which the Note Agent is entitled to rely exclusively on certificates of a Responsible Officer of the Company). The Note Agent shall have no responsibility or liability for the filing, timeliness or content of any report required under this Section 6.2 or any other reports, information and documents required under this Agreement.

6.2    **Taxes and Claims**.

(a)    Timely file complete and correct United States federal and state income and applicable foreign, state and local tax returns required by law, in each case with due regard for any extension of time

within which to file such tax returns, and pay when due all Taxes in each case, except to the extent that the failure to so file or pay could not reasonably be expected to have a Material Adverse Effect; provided that the Company and its Subsidiaries shall not be required to pay any such Taxes which are being contested in good faith by appropriate proceedings and with respect to which adequate reserves have been set aside in accordance with GAAP, which deferment of payment is permissible so long as no Lien, other than a Permitted Lien, has been entered and the Company's and its Subsidiaries' title to, and its and their right to use, its and their respective properties are not materially adversely affected thereby.

(b)      Pay all stamp, court or documentary, intangible, recording, filing or similar Taxes, if any, that arise solely in connection with the issuance of the Notes except to the extent such Taxes arise as a result of a transfer of a Note to a person other than the initial Holder of the Notes. The obligations of the Company under this Section 6.2(b) shall survive the payment of the Obligations and the termination of the Note Documents.

**6.3**     **Insurance**.

(a)      Maintain with reputable insurance companies insurance in such amounts and covering such risks as is consistent with sound business practice, including, without limitation, property and casualty insurance on all of its property, general liability insurance, workers compensation insurance and business interruption insurance. From and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, each Note Party will, and will cause each of its Subsidiaries to, furnish to the Collateral Agent, upon reasonable request, full information as to the insurance carried by it.

(b)      From and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, (i) at all times keep its property which is subject to the Lien of the Collateral Agent insured in favor of the Collateral Agent, and all policies or certificates (or certified copies thereof) with respect to such insurance and (ii) notify (and cause each of its Subsidiaries to notify) the Collateral Agent and the Purchasers, promptly, upon receipt of a notice of termination, cancellation, or non-renewal from its insurance company of any such policy.

(c)      If the Company shall fail to maintain all insurance in accordance with this Section 6.3 or to timely pay or cause to be paid the premium(s) on any such insurance, or if the Company shall fail to deliver all certificates with respect thereto, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, the Collateral Agent shall have the right (but shall be under no obligation) to procure such insurance or pay such premiums, and the Company agrees to reimburse the Purchasers, on demand, for all costs and expenses relating thereto.

**6.4**     **Compliance with Laws**. Comply with any and all Requirements of Law to which it may be subject including, without limitation, all Environmental Laws, and obtain any and all Licenses necessary to the ownership of its property or to the conduct of its businesses, except, in each case, where failure to do so could not reasonably be expected to have a Material Adverse Effect. Each Note Party will, and will cause each of its Subsidiaries to, timely satisfy all material assessments, fines, costs and penalties imposed by any Governmental Authority against such Person or any property of such Person except to the extent such assessments, fines, costs, or penalties are being contested in good faith by appropriate proceedings and for which the Company or such Subsidiary has set aside on its books adequate reserves in accordance with GAAP.

**6.5**     **Maintenance of Properties**. Do all things necessary to maintain, preserve, protect and keep its property (other than property that is obsolete, surplus, or no longer used or useful in the ordinary conduct of its business) in good repair, working order and condition (ordinary wear and tear and casualty and condemnation excepted), make all necessary and proper repairs, renewals and replacements such that

254153937 v7

its business can be carried on in connection therewith and be properly conducted at all times and pay and discharge when due the cost of repairs and maintenance to its property, and pay all rentals when due for all real estate leased by such Person.

**6.6     Employee Benefit Plans**. (a) Keep in full force and effect any and all Plans which are presently in existence or may, from time to time, come into existence under ERISA and not withdraw from any such Plans, unless such withdrawal can be effected or such Plans can be terminated without material liability to the Company or its Subsidiaries, (b) make contributions to all such Plans in a timely manner and in a sufficient amount to comply in all material respects with the standards of ERISA, including, without limitation, the minimum funding standards of ERISA, (c) comply in all material respects with all requirements of ERISA, (d) notify the Purchasers promptly upon receipt by the Company or any Subsidiary of any notice concerning the imposition of any withdrawal liability or of the institution of any proceeding or other action which may result in the termination of any such Plans by the PBGC or the appointment of a trustee to administer such Plans, (c) promptly advise the Purchasers of the occurrence of any Reportable Event or non-exempt prohibited transaction (as defined in ERISA) with respect to any such Plans of which Company becomes aware, and (f) amend any Plan that is intended to be qualified within the meaning of Section 401 of the Code to the extent necessary to keep the Plan qualified and to cause the Plan to be administered and operated in a manner that does not cause the Plan to lose its qualified status.

**6.7     Environmental**. Use and operate all of its facilities and properties in material compliance with all Environmental Laws, keep all necessary Licenses in effect and remain in material compliance therewith, and handle all Hazardous Materials in material compliance with all applicable Environmental Laws.

**6.8     Intellectual Property**.

(a)     Each Note Party will take the steps described in this Section 6.8 with respect to all new or acquired Intellectual Property to which the Company or any Guarantor is now or later becomes entitled that is necessary in the conduct of such Person's business. The Company acknowledges and agrees that the Secured Parties shall have no duties with respect to any Intellectual Property or Licenses of the Company or its Subsidiaries.

(b)     The Note Parties shall have the duty, with respect to Intellectual Property that is necessary in the conduct of such Person's business (i) to prosecute diligently any trademark application or service mark application that is part of the trademarks pending as of the date hereof or hereafter, (ii) to prosecute diligently any patent application that is part of the patents pending as of the date hereof or hereafter, and (iii) to take all reasonable and necessary action to preserve and maintain all of the Note Parties' trademarks, patents, copyrights, Licenses, and its rights therein, including paying all maintenance fees and filing of applications for renewal, affidavits of use, and affidavits of non-contestability, except in the case of clauses (i) and (ii), where the Company, in its reasonable opinion, determines that the costs for engaging in such prosecution activities exceeds the likely benefit of continued prosecution and, except in the of case (iii), where the Company, in its reasonable opinion, determines that the costs of preserving and maintaining exceeds the value the Company obtains from such preservation and maintenance. Each Note Party will require all employees, consultants, and contractors of such Note Party who were involved in the creation or development of such Intellectual Property to sign agreements containing assignment to the Company or such Guarantor of Intellectual Property rights created or developed and obligations of confidentiality. No Note Party shall abandon any Intellectual Property or License that is necessary in the conduct of the Company's or such Guarantor's business.

(c)      From and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, each Note Party will (i) promptly file, at such Note Party's sole cost and expense, any application to register any Intellectual Property with the United States Patent and Trademark Office or the United States Copyright Office if such registration is necessary in connection with the conduct of such Note Party's business, (ii) concurrently with the delivery of financial statements pursuant to <u>Sections 6.1(a)</u> or <u>(b)</u>, deliver supplements to Schedule 4(c) to the Security Agreement and any other documents reasonably necessary for the Collateral Agent to record its security interest in such Intellectual Property with the United States Patent and Trademark Office or the United States Copyright Office or such Note Party's business, (ii) concurrently with the delivery of the documents required by <u>clause (ii)</u> above, upon the reasonable request of the Collateral Agent, execute and deliver in favor of the Collateral Agent one or more Intellectual Property Security Agreements to further evidence the Purchasers' Lien on such Note Party's Intellectual Property.

6.9      **Use of Proceeds**. Use the proceeds of the Notes (i) to pay any fees and expenses incurred by the Company in connection with the transactions contemplated hereby and (ii) for general corporate purposes not in violation of any applicable laws. The Company shall not use any proceeds of the sale of the Notes hereunder to, directly or indirectly, purchase or carry any "margin stock" (as defined in Regulation U) or to extend credit to others for the purpose of purchasing or carrying any "margin stock", in either case, in violation of the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.

6.10      **Subsidiaries**.   If any Note Party creates, forms or acquires any Subsidiary (other than an Excluded Subsidiary) on or after the date of this Agreement, such Note Party will, and will cause such Subsidiary to, (a) within 30 days (which 30 days may be extended by the Note Agent at the direction of the Required Holders) of the creation, formation or acquisition of such new Subsidiary, cause such Subsidiary to join the Guaranty as a "Guarantor" thereunder and (b) from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, within 30 days (which 30 days may be extended by the Collateral Agent at the direction of the Required Holders) of the creation, formation or acquisition of such new Subsidiary, cause such Subsidiary to join the Security Agreement as a "Grantor" and take all such other actions and execute and deliver, or cause to be executed and delivered, all such documents, instruments, agreements, and certificates as are similar to those described in <u>Sections 4.1(c)</u> and, if requested by the Required Holders, <u>4.1(g)</u> or that are necessary or desirable to protect, evidence or perfect the security interest of the Collateral Agent in a manner similar to the Liens and assets granted by the existing Note parties under the existing Collateral Documents either by executing and delivering to the Collateral Agent a counterpart or supplement to the existing Collateral Documents or such new documents as are necessary or desirable to evidence, grant or perfect a first priority lien in such assets in favor of Collateral Agent, for the benefit of Secured Parties (including, without limitation, any pledges of Capital Stock (other than with respect to Excluded Property (as defined in the Security Agreement))). The Agents shall be authorized to execute and deliver such documents upon receipt of a certificate from a Responsible Officer of the Company stating that such documents are authorized or permitted under the Note Documents.

6.11      **Piggyback Registration Rights**. The Company shall provide the Holders of the Notes with customary "piggyback" registration rights (with respect to the shares of common stock issued upon conversion of the Notes) on all registration statements of the Company, subject to the right, however, of the Company and its underwriters to reduce the number of shares proposed to be registered at the underwriter's discretion.

6.12      **Further Assurances**.   Each Note Party will take any action reasonably requested by any Holder in order to effectuate the purposes and terms contained in this Agreement or any other Note Document.

**6.13** **Conversion Event**. Within 30 calendar days of the occurrence of the first Conversion Event, (i) each of the Note Parties and the Collateral Agent hereby agrees that it shall execute and deliver to each Holder a counterpart of the Security Agreement and the Intellectual Property Security Agreement and take such actions and deliver such other documents as are reasonably necessary, or reasonably required by the Required Holdings, to give effect to this Section 6.13, including, without limitation, delivering and filing (or causing to be delivered and filed) UCC-1 financing statements with respect to the security interests to be granted thereby (provided that any such actions shall not be a condition precedent to the effectiveness of the Security Agreement) and furnishing certificates of insurance issued on applicable ACORD Forms with respect to property and liability insurance for the Company and (ii) in the event that such a Conversion Event is a SPAC and the Parent Entity assumes or otherwise becomes a co-obligor with respect to the Company's Obligations pursuant to Section 10.1, Core Scientific Holding Co. (or its successor by merger) shall remain a co-obligor with such Parent Entity with respect to such Obligations (other than any such Obligation of the Company to deliver Conversion Securities pursuant to Section 2 of the Note, with respect to which delivery Obligation Core Scientific Holding Co. (or it successor by merger) hereby agrees that it shall execute and deliver to each Holder a supplement to the Guaranty, substantially in the form attached thereto as Exhibit C).

## 7. NEGATIVE COVENANTS OF THE NOTE PARTIES

Each Note Party shall not, and shall cause each of its Subsidiaries not to:

**7.1** **Liens, Restricted Payments and Dispositions**. Prior to the occurrence of a Conversion Event, so long as the Obligations remain outstanding:

(a) Liens. Create, assume or suffer to exist any Liens on any assets of the Note Parties securing debt for borrowed money in excess of an amount at any time outstanding equal to the greater of (x) the sum of (I) the aggregate principal amount of the Existing Notes at any time outstanding (disregarding, for the purposes of this clause (I) any and all PIK Interest (as defined in the Existing Notes) that has been added to the aggregate principal amount of the Existing Notes) *plus* (II) $50,000,000 and (y) $265,000,000 (such clause (y), the "***Secured Debt Cap***"); provided that (x) in no event shall the aggregate principal amount of the Existing Notes at any time outstanding (disregarding, for the purposes of this proviso any and all PIK Interest (as defined in the Existing Notes) that has been added to the aggregate principal amount of the Existing Notes) exceed at any time $215,000,000, (y) the Collateral Agent and the authorized representative with respect to any Indebtedness that is secured on a pari passu basis with the Liens on the Collateral securing the Obligations that is permitted to be secured in reliance on this clause (a) shall have entered into an intercreditor agreement providing for equal and ratable lien priority and perfection for the holders and providers of such Indebtedness at the direction of the Required Holders and substantially in the form attached hereto as Exhibit H (it being understood that the form attached as Exhibit H is acceptable to the Holders) or such other form reasonably satisfactory to the Required Holders (the "***Intercreditor Agreement***") and (z) notwithstanding the foregoing, the Note Parties shall be permitted to incur any letters of credit and any Indebtedness, including Capital Lease Obligations, incurred to finance the acquisition of any fixed or capital assets (including, for the avoidance of doubt, any real property assets) so long as such Liens shall encumber only the assets acquired or financed with the proceeds of such Indebtedness (or, in the case of any letters of credit, cash collateral) and do not attach to any other assets of any Note Party, which letters of credit and Indebtedness set forth in this clause (z) shall, for the avoidance of doubt, be excluded from the calculation of the Secured Debt Cap.

(b) Restricted Payments.

(i) Pay or make any Restricted Payment to its direct or indirect equityholders; provided that, the foregoing shall not restrict or prohibit any Subsidiary from paying or

making any Restricted Payments, directly or indirectly, to the Company, and shall not restrict or prohibit any Restricted Payments, directly or indirectly, from the Company to its direct or indirect equityholders at such times and in such amounts as are necessary to permit:

(1)     such equityholder (A) to pay general administrative costs and expenses (including audit and tax fees payable to third party auditors and tax advisors, customary compensation and reasonable costs and expenses of the board of directors or similar managing body of such entity incurred in the ordinary course of business, and franchise taxes and other fees, taxes and expenses required to maintain such entity's existence), (B) to discharge its, its Subsidiaries' and its direct and indirect owners' income tax liabilities and (C) in the case that the Company is treated as a flow-through entity for U.S. income tax purposes, its direct and indirect owners to discharge their respective U.S. federal, state and local and non-U.S. income tax obligations associated with their ownership of the Company, in each case, so long the amount of any such Restricted Payment is applied for such purpose; and

(2)     (x) purchases or cash payments in lieu of fractional shares of Capital Stock arising out of stock dividends, splits, combinations or conversions of Capital Stock in the ordinary course of business and (y) purchases or cash payments in lieu of fractional shares upon conversion of the Notes.

(ii)     From and after the occurrence of a Conversion Event, any Restricted Payments made or paid to the direct or indirect equityholders of the Company (other than the Restricted Payments of the type referred to in the proviso to clause (i) above) shall also be made or paid to the Holders in accordance with their Pro Rata Share of the Notes on an as-converted basis as if such Notes had been converted pursuant to their terms at the time of the applicable Restricted Payment.

(c)     Asset Dispositions. Consummate any Asset Dispositions; provided that the foregoing shall not restrict or prohibit (A) sales of inventory in the ordinary course of business; (B) the use of cash or cash equivalents in a manner not prohibited by the Note Documents; (C) licenses, sublicenses, leases or subleases granted to third parties in the ordinary course of business not interfering with the business of the Company and its Subsidiaries and which do not materially impair the value of the property so licensed, sublicensed, leased or subleased; (D) dispositions of obsolete, damaged, surplus or worn-out or no longer used or useful equipment; (E) the lapse, abandonment or other dispositions of Intellectual Property that is, in the reasonable business judgment of the Company, no longer economically practicable or commercially desirable to maintain; (F) dispositions by (1) any Subsidiary to the Company, (2) the Company to any Note Party, (3) any Subsidiary to any Note Party or (4) any Subsidiary that is not a Note Party to any other Subsidiary that is not a Note Party; (G) dispositions resulting from any casualty or property losses or condemnation or similar proceeding of, any property or asset of the Company or any of its Subsidiaries; (H) the sale or other disposition of any assets or property of the Company not constituting Collateral; (I) any Asset Disposition so long as such Asset Disposition is made for fair market value; (J) any individual Asset Disposition so long as the consideration therefor does not exceed $1,000,000; and (K) any other Asset Dispositions to a non-affiliated third party so long as the aggregate consideration therefor does not exceed $10,000,000 per fiscal year; provided, further, that notwithstanding the foregoing, any Asset Disposition described in the foregoing clause (K) shall be permissible notwithstanding the fact that the counterparty is an affiliate or a Subsidiary of the Company so long as such Asset Disposition is on fair and reasonable terms no less favorable to the Company or such affiliate or Subsidiary than would be obtainable on comparable arm's length transaction with a non-affiliated third party.

**7.2     Issuances of Equity**.   Except to the extent permitted by Section 7.1(c), no Subsidiary of the Company shall issue or sell Capital Stock in such Subsidiary.

       **7.3**     **Modifications of Charter Documents**. The Company will not permit, and will cause each of its Subsidiaries not to permit, such Person's Charter Documents to be amended or modified in any way that could reasonably be expected to materially or adversely affect the interests of the Holders in their capacity as Secured Parties (and not, for the avoidance of doubt, as holders of Capital Stock of the Company).

       **7.4**     **Compensation or Credit Support**. Other than (x) to consenting or approving Holders in connection with a consent or amendment in accordance with <u>Section 10.9</u> to the extent all Holders are afforded an opportunity to enter into such consent or amendment or (y) in connection with the issuance of warrants to non-consenting Holders pursuant to Section 1(b)(i)(1) of the Notes, the Company shall not enter into any arrangement with any Holder for the purposes of providing additional compensation (in the form of interest, fees or otherwise) or credit support (in the form of additional collateral or otherwise) to such Holder in connection with the Notes without providing such additional compensation or credit support for the ratable benefit of all Holders.

## 8.    REPRESENTATIONS AND WARRANTIES OF THE PURCHASERS

       Each Initial Purchaser hereby represents and warrants as of the Initial Closing Date, and each Additional Purchaser hereby represents and warrants as of the applicable Additional Closing Date as follows:

       **8.1**     **Purchase for Own Account**. Each Purchaser represents that it is acquiring a Note and the Conversion Securities (collectively, the "***Securities***") solely for its own account and beneficial interest for investment and not for sale or with a view to distribution of the Securities or any part thereof, has no present intention of selling (in connection with a distribution or otherwise), granting any participation in, or otherwise distributing the same, and does not presently have reason to anticipate a change in such intention.

       **8.2**     **Information and Sophistication**. Without lessening or obviating the representations and warranties of the Note Parties set forth in <u>Section 5</u> hereof or in any other Note Document or the right of such Purchaser to rely thereon, each Purchaser hereby: (i) acknowledges that it has received all the information it has requested from the Company and it considers necessary or appropriate for deciding whether to acquire the Securities, (ii) represents that it has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Securities and to obtain any additional information necessary to verify the accuracy of the information given the Purchaser, and (iii) further represents that it has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risk of this investment.

       **8.3**     **Ability to Bear Economic Risk**. Each Purchaser acknowledges that investment in the Securities involves a high degree of risk, and represents that it is able, without materially impairing its financial condition, to hold the Securities for an indefinite period of time and to suffer a complete loss of its investment.

       **8.4**     **Further Limitations on Disposition**. Without in any way limiting the representations set forth above, each Purchaser further agrees not to make any disposition of all or any portion of the Securities unless and until:

       (c)     there is then in effect a registration statement under the Act covering such proposed disposition and such disposition is made in accordance with such registration statement; or

(d)      the Purchaser shall have notified the Company of the proposed disposition and shall have furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and if reasonably requested by the Company, such Purchaser shall have furnished the Company with an opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration under the Act or any applicable state securities laws, provided that no such opinion shall be required for dispositions in compliance with Rule 144, except in unusual circumstances.

Notwithstanding the provisions of paragraphs (a) and (b) above, no such registration statement or opinion of counsel shall be necessary for a transfer by such Purchaser to Permitted Transferees, or transfers by gift, will or intestate succession to any spouse or lineal descendants or ancestors of any Purchaser who is an individual, if all transferees agree in writing to be subject to the terms hereof to the same extent as if they were Purchasers hereunder

**8.5      Accredited Investor Status.** Each Purchaser is an "accredited investor" as such term is defined in Rule 501 under the Act.

**8.6      No "Bad Actor" Disqualification**. Each Holder represents and warrants that neither (A) such Holder nor (B) any entity that controls such Holder or is under the control of, or under common control with, such Holder, is subject to any Disqualification Event, except for Disqualification Events covered by Rule 506(d)(2)(ii) or (iii) or (d)(3) under the Act and disclosed in writing in reasonable detail to the Company. Each Holder represents that such Holder has exercised reasonable care to determine the accuracy of the representation made by such Holder in this paragraph, and agrees to notify the Company if such Holder becomes aware of any fact that makes the representation given by such Holder hereunder inaccurate.

**8.7      Foreign Investors**. If a Holder is not a United States person (as defined by Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended (the "*Code*")), such Holder hereby represents that he, she or it has satisfied itself as to the full observance of the laws of the Holder's jurisdiction in connection with any invitation to subscribe for the Securities or any use of its Note, including (A) the legal requirements within the Holder's jurisdiction for the purchase of the Securities, (B) any foreign exchange restrictions applicable to such purchase, (C) any governmental or other consents that may need to be obtained, and (D) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale or transfer of the Securities. The Holder's subscription, payment for and continued beneficial ownership of the Securities will not violate any applicable securities or other laws of the Holder's jurisdiction.

**8.8      Forward-Looking Statements**. With respect to any forecasts, projections of results and other forward-looking statements and information provided to a Holder, such Holder acknowledges that such statements were prepared based upon assumptions deemed reasonable by the Company at the time of preparation. There is no assurance that such statements will prove accurate, and the Company has no obligation to update such statements.

**8.9      GreensLedge as Placement Agent.** Each Purchaser represents, acknowledges and agrees that: (A) GreensLedge Capital Markets LLC ("*GreensLedge*") has acted as the Company's placement agent for the Securities, (B) such Purchaser is not relying on the advice or recommendations of GreensLedge (including any affiliate, agent, advisor or representative thereof) in connection with such Purchaser's purchase of Securities, (C) GreensLedge is not acting as an underwriter or initial purchaser with respect to any Securities, (D) GreensLedge has no responsibility with respect to any marketing or other disclosure documents relating to the Securities (or the completeness of any thereof) furnished to such Purchaser, (E) GreensLedge has not made, and will not make, any representation or warranty with respect to the Company or any Securities (and such Purchaser will not rely on any statements made by

27

GreensLedge, orally or in writing, to the contrary) and (F) GreensLedge and/or any affiliate or employee thereof may purchase or otherwise invest in the Securities.

**8.10    Further Assurances.** Each Purchaser agrees and covenants that at any time and from time to time it will promptly execute and deliver to the Company such further instruments and documents and take such further action as the Company may reasonably require in order to carry out the full intent and purpose of this Agreement and to comply with state or federal securities laws or other regulatory approvals.

## 9.    THE AGENTS

**9.1    Appointment and Authorization of the Agents.** Each Purchaser hereby irrevocably appoints, designates and authorizes the Note Agent to act as the "note agent" under the Note Documents and, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, the Collateral Agent to act as the "collateral agent" under the Note Documents and to act as the agent of (and to hold any security interest created by any Note Document for and on behalf of or on trust for) such Purchaser for purposes of acquiring, holding and enforcing any and all Liens on Collateral to be granted by the Company to secure any of the Obligations, and to take such other action on its behalf in accordance with the provisions of this Agreement and each other Note Document and to exercise such powers and perform such duties, in each case as are expressly delegated to the Agents by the terms of this Agreement or any other Note Document, together with such powers and discretion as are reasonably incidental thereto. Notwithstanding any provision to the contrary contained elsewhere herein or in any other Note Document, the Agents shall have no duties or responsibilities, except those expressly set forth herein, nor shall the Agents have or be deemed to have any fiduciary relationship with any Purchaser or participant, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Note Document or otherwise exist against the Agents. Without limiting the generality of the foregoing sentence, the use of the term "agent" herein and in the other Note Documents with reference to the Agents is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used merely as a matter of market custom and is intended to create or reflect only an administrative relationship between independent contracting parties. Without limiting the generality of the foregoing, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, the Purchasers hereby expressly authorize the Collateral Agent to execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Note Documents and acknowledge and agree that any such action by Collateral Agent shall bind the Purchasers. Whether or not expressly stated in any Note Document, the rights, privileges and immunities of the Agents shall be automatically incorporated by reference therein. Whether or not a party thereto, the Agents shall be express third party beneficiaries of the Notes, including without limitation the payment waterfall set forth therein.

**9.2    Liability of Agents.** No Agent-Related Person shall (a) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Note Document or the transactions contemplated hereby, or (b) be responsible in any manner to any Purchaser for any recital, statement, representation or warranty made by the Company or any officer thereof, contained herein or in any other Note Document, or in any certificate, report, statement or other document referred to or provided for in, or received by the Agents under or in connection with, this Agreement or any other Note Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Note Document, or the creation, perfection, maintenance of perfection or priority of any Lien or security interest created or purported to be created under the Note Documents, the convertibility of the Notes and the validity or the sufficiency of the Equity Securities (as defined in the Note), or for any failure of the Company or any other party (other than Agents) to any Note Document to

28

perform its obligations hereunder or thereunder, except to the extent such loss resulted from the gross negligence or willful misconduct of such Agent-Related Person, as determined by a final nonappealable order of a court of competent jurisdiction. The Note Agent shall have no obligation to monitor the Ledger in the absence of being providing such by the Company in accordance with the terms of the Notes, and may, in its sole discretion either: (i) conclusively rely on the Ledger most-recently delivered to it, (ii) conclusively rely on a statement by a Holder as to the outstanding principal amount of Notes held by it, or (iii) refrain from taking any action until the Note Agent receives a current Ledger from the Company. No Agent-Related Person shall be under any obligation to any Purchaser or participant to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Note Document, or to inspect the properties, books or records of the Company or any affiliate thereof.

The Agents shall not have any duties or obligations except those expressly set forth in the Note Documents. Without limiting the generality of the foregoing, (i) the Agents shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing and (ii) the Agents shall not have any duty to take any discretionary action or exercise any discretionary powers, except, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, discretionary rights and powers expressly contemplated hereby that the Collateral Agent is instructed in writing to exercise by the Required Holders (or such other requisite number or percentage of Holders as provided in Section 10.9).

In no event shall the Agents be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, epidemics, pandemics, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility, it being understood that the Agents shall use reasonable best efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

**9.3** **Reliance by the Agents**. The Agents shall be entitled to rely, and shall be fully protected in relying, upon any writing, communication, signature, resolution, representation, notice, consent, certificate, affidavit, letter, facsimile or telephone message, electronic mail message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper person or persons, and upon advice and statements of legal counsel (including counsel to the Company), independent accountants and other experts selected by the Agents. The Agents shall be fully justified in failing or refusing to take any action under any Note Document unless it shall first receive such advice or concurrence of the Required Holders as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Holders against any and all loss, liability and expense which may be incurred by it by reason of taking or continuing to take any such action. The Agents shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Note Document in accordance with a request or consent of the Required Holders (or such greater number of Holders as may be expressly required hereby in any instance), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the of the same; provided that the Agents shall not be required to take any action that, in its opinion or in the opinion of its counsel, may expose the Agents to liability or that is contrary to any Note Document or applicable law.

**9.4** **Notice of Default**. The Agents shall not be deemed to have knowledge or notice of the occurrence of any Event of Default, unless the Agents shall have received written notice from a Purchaser referring to this Agreement, describing such Event of Default and stating that such notice is a "notice of event of default." The Agents shall take such action with respect to any Event of Default as may be directed by the

Required Holders in accordance with the terms of the Notes; provided that unless and until the Agents has received any such direction, the Agents may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Event of Default as it shall deem advisable or in the best interest of the Holders.

9.5    **Agent's Reimbursement.** Each of the Holders severally agrees to reimburse the Agents, in accordance with such Holder's Pro Rata Share, for any reasonable and documented out-of-pocket expenses not reimbursed by the Company (without limiting the obligation of the Company to make such reimbursement pursuant to Section 10.10): (a) for which the Agents are entitled to reimbursement by the Company under this Agreement or any Note Document and (b) after the occurrence and during the continuance of an Event of Default, for any other reasonable and documented expenses incurred by the Agents on the Holders' behalf in connection with the enforcement of the Holders' rights under this Agreement or any Note Document; provided, however, that (x) the Agents shall not be reimbursed for any such expenses arising as a result of its gross negligence or willful misconduct, as determined by a final nonappealable order of a court of competent jurisdiction and (y) in the event that the Company reimburses the Agents for any such reasonable and documented out-of-pocket expenses, any corresponding amounts previously reimbursed by the Holders to the Agents will be promptly returned to such Holders in accordance with their Pro Rata Share.

9.6    **Indemnification.** Each of the Holders shall severally indemnify the Agents and their officers, directors, employees, agents, attorneys, accountants, consultants and controlling Persons (to the extent not reimbursed by or on behalf of the Company pursuant to Section 10.10 and without limiting the obligations of the Company to do so), in accordance with their respective Pro Rata Share, from and against any and all liabilities, obligations, damages, penalties, actions, judgments, suits, losses (including accrued and unpaid Agents' fees), and reasonable and documented costs, expenses or disbursements of any kind whatsoever which may at any time be imposed on, incurred by or asserted against the Agents or such Persons relating to or arising out of this Agreement, any Note Document, the transactions contemplated hereby or thereby, or any action taken or omitted by the Agents in connection with any of the foregoing; provided, however, that the foregoing shall not extend to actions or omissions to the extent arising from gross negligence or willful misconduct of the Agents, as determined by a final nonappealable order of a court of competent jurisdiction. The Agents shall not be under any obligation to exercise any of the rights or powers vested in it by this Agreement at the request, order or direction of any of the Holders, pursuant to any provision of this Agreement, unless the Required Holders shall have offered (and, if requested, provided) to the Agents security or indemnity satisfactory to it against the costs, expenses and liabilities which may be incurred by it therein or thereby. The undertaking in this Section 9.6 shall survive the payment of all other Obligations and the resignation of the Agents.

9.7    **Collateral Matters**. The Purchasers irrevocably agree that, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, any Lien on any property granted to or held by the Collateral Agent under any Note Document for the benefit of the Secured Parties shall be automatically released (i) upon payment in full of all Obligations (it being understood and agreed that the conversion in full of a Note by the Holder thereof shall be deemed, for purposes of this Section 9.6, to be a repayment of the entire outstanding principal amount (including all capitalized interest) of such Note together with any unpaid accrued interest thereon on the date of such conversion), (ii) subject to Section 10.9, if the release of such Lien is approved, authorized or ratified in writing by the Purchasers or (iii) upon the sale, transfer or other disposition of any Collateral that is not prohibited by the Note Documents. Upon request by the Collateral Agent at any time from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, the Purchasers will confirm in writing the Collateral Agent's authority to release particular types or items of property. In each case as specified in this Section 9.7, the Collateral Agent will, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, promptly (and each Purchaser irrevocably authorizes the Collateral Agent to), at the Company's expense,

execute and deliver to the Company such documents as the Company may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Note Documents. In connection with any such release, the Collateral Agent shall be entitled to a certificate of a Responsible Officer of the Company stating that such release is authorized and permitted by the Note Documents, upon which the Collateral Agent may conclusively rely. Each party to this Agreement acknowledges and agrees that the Agents shall not have an obligation to file financing statements, amendments to financing statements, or continuation statements, or to perfect or maintain the perfection of the Collateral Agent's Lien on the Collateral.

**9.8     Successor Agents**. The Agents may resign as Agents upon fifteen (15) days' notice to the Holders. If an Agent resigns under this Agreement, the Holders shall unanimously appoint a successor representative for the Holders. If no successor representative is appointed prior to the effective date of the resignation of the Agent, the resigning Agent may appoint, after consulting with the Holders and the Company, a successor agent. Upon the acceptance of its appointment as successor representative hereunder, such successor representative shall succeed to all the rights, powers and duties of the retiring Agent, the term "Agents" shall mean such successor representative and the retiring Agent's appointment, powers and duties as Agents shall be terminated. After any retiring Agent's resignation hereunder as Agent, the provisions of this Section 9 and Section 10 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement. If no successor representative has accepted appointment as Agent by the date which is fifteen (15) days following a retiring Agent's notice of resignation, the retiring Agent's resignation shall nevertheless thereupon become effective and the Holders shall perform all of the duties of the Agents hereunder until such time, if any, as the Holders appoint a successor representative as provided for above.

**9.9     Intercreditor Agreement**. The Collateral Agent is hereby authorized to enter into the Intercreditor Agreement pursuant to Section 7.1(a) and the parties hereto acknowledge that such Intercreditor Agreement, upon execution of the same, shall be binding upon them. From and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, each Secured Party hereby (a) agrees that it will be bound by and will take no actions contrary to the provisions of the Intercreditor Agreement, (b) authorizes and instructs the Collateral Agent, without any further consent of such Secured Party, to enter into the Intercreditor Agreement provided by the Company and accompanied by the certificate specified in Section 7.1(a) and to subject the Liens on the Collateral securing the Obligations to the provisions thereof and (c) authorizes and instructs the Collateral Agent to execute and deliver on behalf of the Secured Parties any amendment (or amendment and restatement) or modification to the Intercreditor Agreement to provide for the incurrence of any Indebtedness permitted hereunder or such other amendments as the Required Holders may specify in writing to the Collateral Agent.

**10.     MISCELLANEOUS**

**10.1     Binding Agreement**. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, expressed or implied, is intended to confer upon any third party any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement. Notwithstanding anything to the contrary contained herein or in any other Note Documents, in the event of a SPAC, the Obligations of the Company to deliver Conversion Securities pursuant to Section 2 of the Note may be assigned to a Parent Entity, so long as such Parent Entity expressly assumes such Obligation of the Company and becomes a co-Obligor of each other Obligation of the Company (or its successor by merger) under the Note Documents, in each case pursuant to an joinder and assignment and assumption agreement, substantially in the form attached hereto as Exhibit I, and delivers certificates substantially identical to those delivered by the Company on the Initial Closing Date pursuant to clauses (b), (c) and (d) of Section 4.1.

**10.2    GOVERNING LAW.** THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.

**10.3    JURISDICTION AND VENUE.** EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ANY U.S. FEDERAL OR NEW YORK STATE COURT SITTING IN THE BOROUGH OF NEW YORK, NEW YORK IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR ANY OTHER NOTE DOCUMENT AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN ANY SUCH COURT AND IRREVOCABLY WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT OR THAT SUCH COURT IS AN INCONVENIENT FORUM. NOTHING HEREIN SHALL LIMIT THE RIGHT OF ANY PURCHASER, ANY HOLDER OR, FROM AND AFTER THE EXECUTION AND DELIVERY OF THE COLLATERAL DOCUMENTS PURSUANT TO SECTION 6.13, THE COLLATERAL AGENT, TO BRING PROCEEDINGS AGAINST THE COMPANY IN THE COURTS OF ANY OTHER JURISDICTION. ANY JUDICIAL PROCEEDING BY THE COMPANY AGAINST ANY PURCHASER, ANY HOLDER OR ANY OF THEIR AFFILIATES AND, FROM AND AFTER THE EXECUTION AND DELIVERY OF THE COLLATERAL DOCUMENTS PURSUANT TO SECTION 6.13, THE COLLATERAL AGENT OR ANY OF ITS AFFILIATES, INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT OR ANY OTHER NOTE DOCUMENT SHALL BE BROUGHT ONLY IN A COURT IN THE BOROUGH OF NEW YORK, NEW YORK.

**10.4    WAIVER OF JURY TRIAL.** EACH OF THE COMPANY, THE PURCHASERS, THE HOLDERS AND, FROM AND AFTER THE EXECUTION AND DELIVERY OF THE COLLATERAL DOCUMENTS PURSUANT TO SECTION 6.13, THE COLLATERAL AGENT HEREBY WAIVES TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT OR ANY OTHER NOTE DOCUMENT OR THE RELATIONSHIP ESTABLISHED THEREUNDER.

**10.5    Severability**. If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (a) such provision shall be excluded from this Agreement, (b) the balance of this Agreement shall be interpreted as if such provision were so excluded, and (c) the balance of this Agreement shall be enforceable in accordance with its terms.

**10.6    Counterparts.** This Agreement may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract. Any counterpart of a signature page to this Agreement may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the U.S. federal ESIGN Act of 2000 or the New York Electronic Signature and Records Act or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law. The Note Documents and all notices, approvals, consents, requests and any

32

communications hereunder must be in writing (provided that any such communication sent to Agents hereunder must be in the form of a document that is signed manually or by way of a digital signature provided by DocuSign (or such other digital signature provider as specified in writing to the Agents by the authorized representative)), in English. The Company agrees to assume all risks arising out of the use of using digital signatures and electronic methods to submit communications to the Note Agent, including without limitation the risk of the Note Agent acting on unauthorized instructions, and the risk of interception and misuse by third parties.

10.7    **Headings; Interpretation.** Paragraph headings used in this Agreement are included for convenience of reference only and will not modify the provisions that they precede or affect the interpretation of this Agreement or any other Note Document. The term "including" shall be interpreted to mean "including but not limited to". Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference.

10.8    **Notices.** All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient (and if not, then on the next Business Day), (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. Notices to the Agents shall be effective upon actual receipt thereof. All communications shall be sent, if to the Note Parties, at the address set forth on the signature page of the Company, if to the Agents, at the address set forth on the signature page thereof, and, if to a Purchaser, at the address(es) set forth on the Schedule of Purchasers attached hereto as Schedule 2 or at such other address(es) as the Company or Purchaser may designate by ten (10) days' advance written notice to the other parties hereto. Except where notice is specifically required by this Agreement, no notice to or demand on the Company or any of its Subsidiaries in any case shall entitle the Company or any of its Subsidiaries to any other or further notice or demand in similar or other circumstances.

10.9    **Amendments; Waiver**. Any term of the Notes and this Agreement may be amended or waived with the written consent of the Company and the Required Holders; provided, that without the consent of each Holder, no amendment, modification, termination, or consent shall be effective if the effect thereof would (a) extend the scheduled final maturity of any Note held by any non-consenting Holder, (b) waive, reduce or postpone any scheduled repayment (but not prepayment) with respect to the Note held by any non-consenting Holder; (c) reduce the rate of interest or amount of any fees payable under any Note held by any non-consenting Holder; (d) extend the time for payment of any interest or fees payable under any Note held by any non-consenting Holder; (e) reduce the principal amount of any Note held by any non-consenting Holder; (f) amend, modify, terminate or waive any provision of this Section 10.9; (g) amend the definition of "Required Holders"; (h) release all or substantially all of the Collateral securing any Note (if any) held by any non-consenting Holder except as expressly provided in the Note Documents, (i) from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, subordinate the Collateral Agent's Liens on Collateral except as expressly provided in the Note Documents; (j) release any Guarantor except as expressly provided in the Note Documents or (k) consent to the assignment or transfer by the Company of any of its rights and obligations under any Note Document held by any non-consenting Holder. No amendment affecting the rights, privileges and immunities of the Agents shall be effective without the consent of such Agent. Notwithstanding anything to the contrary contained herein or in any other Note Documents, no consent of any Holder shall be required pursuant to this Section 10.9 in connection with (i) an assignment and assumption by a Parent Entity of the Company's Obligations in connection with a SPAC, so long as the conditions set forth in Section 10.1 shall have been satisfied, and (ii) any Person (including, without limitation, a Parent Entity in connection with a SPAC) becoming a Guarantor or a co-issuer or co-obligor hereunder and under the

Notes; provided, that the Company shall deliver a certificate of a Responsible Officer to the Agents stating that any documents to be executed in connection with a SPAC are authorized and permitted pursuant to the Note Documents.

**10.10   Expenses and Indemnification.**

(a)      The Company shall not be responsible for any out-of-pocket costs or expenses incurred by such Initial Purchasers in connection with the preparation, execution and delivery of this Agreement and the other Note Documents. The Company shall pay all reasonable and documented out-of-pocket costs and expenses of the Agents (including reasonable and documented fees, expenses and disbursements of its outside counsel) relating to the negotiation, preparation and execution of the Note Documents, review of other documents (including for purposes of due diligence review) in connection with the transactions contemplated hereby and any amendments and waivers hereto or thereto. In addition, the Company agrees to promptly pay in full after the occurrence of an Event of Default, all costs and expenses (including, without limitation, reasonable and documented fees and disbursements of counsel, agents and professional advisers) incurred by the Holders or the Agents in enforcing any obligations of or in collecting any payments due hereunder or under the Notes by reason of such Event of Default or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a workout, or any insolvency or bankruptcy proceedings.

(b)      In addition to the payment of expenses pursuant to Section 10.10(a), the Company (as "***Indemnitor***") agrees to indemnify, pay and hold the Purchasers, the Holders and the Agents, and the officers, directors, employees, agents, and affiliates of the Purchasers, the Holders and the Agents (collectively called the "***Indemnitees***") harmless from and against any and all other liabilities, costs, expenses, liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for such Indemnitees) in connection with any investigative, administrative or judicial proceeding commenced or threatened (excluding claims among Indemnitees (other than claims against an Agent acting in its capacity as such) and, with the exception of claims arising out of otherwise indemnifiable matters (e.g., actions to enforce the indemnification rights provided hereunder), and excluding claims between the Company and an Indemnitee), whether or not such Indemnitee shall be designated a party thereto, which may be imposed on, incurred by, or asserted against that Indemnitee, in any manner relating to or arising out of this Agreement, the Notes, the Note Documents or the other documents related to the transactions contemplated hereby (including, without limitation, the existence or exercise of any security rights with respect to the Collateral in accordance with the Security Agreement), the Purchasers' agreement to purchase the Notes or the use or intended use of the proceeds of any of the proceeds thereof to the Company (the "***Indemnified Liabilities***"); provided, that the Indemnitor shall not have any obligation to an Indemnitee hereunder with respect to an Indemnified Liability to the extent that such Indemnified Liability arises from the gross negligence or willful misconduct of that Indemnitee as determined by a final nonappealable order of a court of competent jurisdiction. Each Indemnitee shall give the Indemnitor prompt written notice of any claim that might give rise to Indemnified Liabilities setting forth a description of those elements of such claim of which such Indemnitee has knowledge; provided, that any failure to give such notice shall not affect the obligations of the Indemnitor unless (and then solely to the extent) such Indemnitor is not aware of such claim and is materially prejudiced. The Indemnitor shall have the right at any time during which such claim is pending to select counsel to defend and control the defense thereof and settle any claims for which it is responsible for indemnification hereunder (provided that the Indemnitor will not settle any such claim without (i) the appropriate Indemnitee's prior written consent, which consent shall not be unreasonably withheld or (ii) obtaining an unconditional release of the appropriate Indemnitee from all claims arising out of or in any way relating to the circumstances involving such claim) so long as in any such event the Indemnitor shall have stated in a writing delivered to the Indemnitee that, as between the Indemnitor and the Indemnitee, the

34

Indemnitor is responsible to the Indemnitee with respect to such claim to the extent and subject to the limitations set forth herein; provided, that the Indemnitor shall not be entitled to control the defense of any claim in the event that in the reasonable opinion of counsel for the Indemnitee, there are one or more material defenses available to the Indemnitee which are not available to the Indemnitor, in which case the Indemnitee may retain separate counsel and the Company will pay the reasonable fees and expenses of such counsel (including the reasonable fees and expenses of counsel to such Indemnitee incurred in evaluating whether such a conflict exists); provided further, that with respect to any claim as to which the Indemnitee is controlling the defense, the Indemnitor will not be liable to any Indemnitee for any settlement of any claim pursuant to this Section 10.10(b) that is effected without its prior written consent, which consent shall not be unreasonably withheld. To the extent that the undertaking to indemnify, pay and hold harmless set forth in this Section 10.10(b) may be unenforceable because it is violative of any law or public policy, the Company shall contribute the maximum portion which it is permitted to pay and satisfy under applicable law, to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnitees or any of them. The obligations of each of the parties under this Section 10.10 will survive the payment or transfer of any Note, the enforcement, amendment or waiver of any provision of this Agreement, the resignation or removal of any Agent and the termination of this Agreement.

(c)      To the extent permitted by applicable law, none of the parties hereto shall assert, and each of the parties hereto hereby waives, any claim against the other parties (including their respective affiliates, partners, stockholders, members, directors, officers, agents, employees and controlling persons), on any theory of liability for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the transactions contemplated hereunder, any Note Document, the Notes or the use of the proceeds thereof; provided that nothing contained in this Section 10.10(c) shall limit the Notes Parties' indemnification and reimbursement obligations to the extent set forth in this Agreement.

**10.11   Delays or Omissions.** It is agreed that no delay or omission to exercise any right, power or remedy accruing to each Purchaser, upon any breach or default of the Company under this Agreement or any other Note Document shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. It is further agreed that any waiver, permit, consent or approval of any kind or character by a Purchaser of any breach or default under this Agreement, or any waiver by such Purchaser of any provisions or conditions of this Agreement must be in writing and shall be effective only to the extent specifically set forth in writing and that all remedies, either under this Agreement, or by law or otherwise afforded to such Purchaser, shall be cumulative and not alternative.

**10.12   Waiver of Conflicts**. Each party to this Note acknowledges that Cooley LLP ("***Cooley***"), outside general counsel to the Company, has in the past performed and is or may now or in the future represent the Holders or the Holders' affiliates in matters unrelated to the transactions contemplated by this Note (the "***Note Financing***"), including representation of the Holders or the Holders' affiliates in matters of a similar nature to the Note Financing. The applicable rules of professional conduct require that Cooley inform the parties hereunder of this representation and obtain their consent. Cooley has served as outside general counsel to the Company and has negotiated the terms of the Note Financing solely on behalf of the Company. The Company and the Holders hereby (i) acknowledge that they have had an opportunity to ask for and have obtained information relevant to such representation, including disclosure of the reasonably foreseeable adverse consequences of such representation; (ii) acknowledge that with respect to the Note Financing, Cooley has represented solely the Company, and not any Holder or any stockholder, board member or employee of the Company or director, stockholder or employee of the

35

Holder; and (iii) gives the Holder's informed consent to Cooley's representation of the Company in the Note Financing.

**10.13   Obligations Several**.   The Purchasers' obligations hereunder are several and not joint obligations and no Purchaser shall have any liability to any Person for the performance or non-performance of any obligation by any other Purchaser hereunder.

**10.14   Survival of Representations and Warranties**. All of the representations and warranties made by the Note Parties and their Subsidiaries herein shall survive the execution and delivery of this Agreement, any investigation by or on behalf of any Purchaser, acceptance of the Notes and payment therefor, or termination of this Agreement.

**10.15 Entire Agreement**. This Agreement and the other Note Documents constitute the entire contract among the parties hereto regarding to the subject matters addressed herein and supersede any and all previous agreements, negotiations, and discussions, oral or written, by the parties regarding the subject matters addressed herein.

**10.16   Withholding**. The Company shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement such amounts as it is required to deduct and withhold under the Code, or any Tax law, with respect to the making of such payment. To the extent that amounts are so withheld, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made. If a payment is payable (in whole or in part) in consideration other than cash and if the cash portion of any such payment is insufficient to satisfy all required Tax withholding obligations, the Company shall retain an amount of the non-cash consideration otherwise payable equal in value to the amount required to satisfy any applicable withholding taxes (as reasonably determined by the Company).**10.17 PATRIOT ACT**. The Agents hereby notify the Company that pursuant to the requirements of the PATRIOT Act, the Company may be required to obtain, verify and record information that identifies the Company, its subsidiaries and the Guarantors, including their respective names, addresses and other information that will allow the Agent to identify, the Company, its subsidiaries and the Guarantors in accordance with the PATRIOT Act.

*[Signature pages follow]*

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first written above.

**COMPANY:**

**CORE SCIENTIFIC HOLDING CO.**

By: _____
Name:  Michael Trzupek
Title:    Chief Financial Officer

Address for notices:
2800 Northup Way
Suite 220
Bellevue, WA 98004
Attention:  Michael Trzupek, Chief Financial Officer
Email:  mtrzupek@corescientific.com

Copy to:
Todd DuChene, General Counsel
Email:  tduchene@corescientific.com

*In each case, with a copy (which shall not constitute notice) to:*

Cooley LLP
1299 Pennsylvania AVE, NW
Suite 700
Washington, DC 20004
Attention:  Mike Tollini
Email:  mtollini@cooley.com

[Signature Page to Convertible Note Purchase Agreement]

**GUARANTORS:**

**CORE SCIENTIFIC, INC.,** a Delaware corporation

By: _____
Name: Michael Trzupek
Title:   Chief Financial Officer


**AMERICAN PROPERTY ACQUISITION, LLC,** a Delaware limited liability company

By: Core Scientific, Inc., its sole member

By: _____
Name: Michael Trzupek
Title:   Chief Financial Officer


**AMERICAN PROPERTY ACQUISITIONS I, LLC,** a North Carolina limited liability company

By: American Property Acquisition, LLC, its sole member

By: Core Scientific, Inc., its sole member

By: _____
Name: Michael Trzupek
Title:   Chief Financial Officer


[Signature Page to Convertible Note Purchase Agreement]

**AMERICAN PROPERTY ACQUISITIONS VII, LLC,** a Georgia limited liability company

By: American Property Acquisition, LLC, its sole member

By: Core Scientific, Inc., its sole member

By: _____
Name: Michael Trzupek
Title:   Chief Financial Officer

**BLOCKCAP, INC.,** a Nevada corporation

By: _____
Name: Todd DuChene
Title:   Secretary

[Signature Page to Convertible Note Purchase Agreement]

**U.S. BANK NATIONAL ASSOCIATION, AS NOTE AGENT**

By: _____
Name:  Joshua A. Hahn
Title:  Vice President

Address for notices:
U.S. Bank National Association
West Side Flats
60 Livingston Avenue
EP-MN-WS3C
St. Paul, MN 55107
Attention: Joshua Hahn (Core Sciences)


*In each case, with a copy (which shall not constitute notice) to:*

Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103
Attn: Nathan Plotkin (Core Scientific)

[Signature Page to Convertible Note Purchase Agreement]

**U.S. BANK NATIONAL ASSOCIATION,** AS **COLLATERAL AGENT**


By:_____

Name: Joshua A. Hahn
Title:  Vice President

Address for notices:
U.S. Bank National Association
West Side Flats
60 Livingston Avenue
EP-MN-WS3C
St. Paul, MN 55107
Attention: Joshua Hahn (Core Sciences)


*In each case, with a copy (which shall not
constitute notice) to:*

Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103
Attn: Nathan Plotkin (Core Scientific)


[Signature Page to Convertible Note Purchase Agreement]

PURCHASER:

MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY

By: _____
Name:   Eric Partlan
Title:   Head of Portfolio Management

[Signature Page to Convertible Note Purchase Agreement]

PURCHASER:

CRYPTONIC BLACK, LLC

By: _____

Name:  Jennifer LaFrance

Title:   Manager

[Signature Page to Convertible Note Purchase Agreement]

PURCHASER:

FIRST SUN INVESTMENTS, LLC

By:
Name:  Brent Berge
Title:   Manager

[Signature Page to Convertible Note Purchase Agreement]

PURCHASER:

_____
DOUGLAS LIPTON

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

APOLLO TACTICAL VALUE SPN
INVESTMENTS, L.P.
By: Apollo Tactical Value SPN Management, LLC, its investment manager

By: _____

Name:  Joseph D. Glatt

Title:  Vice President

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

APOLLO CENTRE STREET PARTNERSHIP, L.P.
By: Apollo Centre Street Management, LLC, its investment manager

By: _____
Name: Joseph D. Glatt
Title:    Vice President

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

APOLLO LINCOLN FIXED INCOME FUND, L.P.
By: Apollo Lincoln Fixed Income Management, LLC, its investment manager

By: _____
Name: Joseph D. Glatt
Title:    Vice President

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

APOLLO MOULTRIE CREDIT FUND, L.P.
By: Apollo Moultrie Credit Fund Management, LLC, its investment manager

By: _____
Name:   Joseph D. Glatt
Title:    Vice President

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

BLOCKFI LENDING LLC

By: _Rene van Kesteren_
        4E48656DF99C4AC...
Name:
Title:

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

WOLFSWOOD PARTNERS LP

By: _____

Name: JASON Comorchero

Title: Managing Member

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

_____

Robert Fedrock

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

TJC3 LLC

By: _____ *Thomas Coleman* _____

Name: Thomas J. Coleman

Title: Trustee of the Thomas J. Coleman Revocable Trust,
       as the Sole Member of TJC3 LLC

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

KMR CS Holdings, LLC

By: _____

Name: kamran@kmrequity.com

Title: Manager

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

The Sear Family 1996 Trust

By: _msear@EvokeAdvisors.com_____

Name: msear@EvokeAdvisors.com

Title: Mark Sear, Trustee

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

JSK Partnership LLC

By: _____

Name: sp@posnergroup.com

Title: Co managing member

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Wormser Family Partnership II, LP

By: _____
Name: Ken Wormser
Title: ptr

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

TBC 222 LLC

By: _____
    MSidman@threebayscapital.com
Name: _____
Title:  Managing partner

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

*frank@pollaro.com*

_____
Frank Polaro

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

David

_____

David Sarner

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

*James P. Pulaski*

_____
James Pulaski

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

SunnySide Consulting and Holdings, Inc.

By: _Taras Kulyk_

Name: Taras Kulyk

Title: Director / Principal

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

1994 Steinfeld Family Trust

By: _____

Name: jake@steinfeld6.com

Title: Trustee

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Better Downtown Miami, LLC

By:
Name: Marc Roberts
Title: Manager

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

_____

Jason Capello

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

*Vineet Agrawal*

_____

Vineet Agrawal

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Milos Core LLC

By: _____
Name:        Scott Packman
Title:          Partner

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Barkley Investments, LLC

By: _Jason Paul Godfrey_____

Name: Jason Paul Godfrey

Title: President, it's managing member, Godfrey Capital

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Richard Katz 2016 GST TRUST

By: _____

Name: Richard Katz

Title: Dr

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

_____ *johnquinn@quinnemanuel.com* _____
John Quinn

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Northdata Holdings Inc.

*daniel rafuse*

By: _____
Name:  daniel rafuse
Title:   Chairman

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Monbanc Inc.

*daniel rafuse*

By:_____
Name: daniel rafuse
Title:
     Chairman

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Sabby Volatility Warrant Master Fund, Ltd.

By: _rgrundstein@sabbymanagement.com_

Name: rgrundstein@sabbymanagement.com

Title: COO

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

ADDITIONAL PURCHASER:

Leon J. Simkins Non-Exempt Trust
FBO Michael Simkins

By:_____
Name: Michelle Simkins-Rubell
Title: trustee

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

FTF Diversified Holdings, LP

By: _____
Name:    Anthony Fadell
Title:   Principal

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

By:_____

Name:  Joaquin Palomo

Title:  Director   FGK Investments Ltd.

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

By: _____

Name: Ernesto Castillo Kriete    Director

Title: Neso Investment Group Ltd

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

By: _____

Name:   Marco Baldocchi Kriete

Title:   Director   Ferro Investments Ltd.

DocuSign Envelope ID: B259721A-A5C3-4B5E-A5CF-955BF64D59AA

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

> The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.
>
> **ADDITIONAL PURCHASER:**
>
> Galaxy Digital LP
> by its general partner, Galaxy Digital GP LLC
>
> By: _____
> Name:   Chris Ferraro
> Title:   Authorized Signatory

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Corbin ERISA Opportunity Fund, Ltd.

By:_____ _Cesar Bello_ _____
Name: Cesar Bello
Title: Deal Counsel

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Corbin Opportunity Fund, L.P.

By:_____
Name:  Cesar Bello
Title:  Deal Counsel

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Levbern Management LLC

By: _____
Name: Andrew Ward
Title: Member

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

JPAS - Crypto Infrastructure LLC

By: _____

Name: George Lusch

Title: Chief Financial Officer

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

JPAS - Crypto Infrastructure-A S.P.

By:_____
Name: George Lusch
Title:  Chief Financial Officer

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

JPAS - Credit-A S.P.

By: _____
Name:   George Lusch
Title:    Chief Financial Officer

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

JPAS - Credit LLC

By:_____
Name: George Lusch
Title: Chief Financial Officer

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

ADDITIONAL PURCHASER:

Cannon Investments LLC

By:_____
Name:      Andrew Rosen
Title:     Manager

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

ADDITIONAL PURCHASER:

Andrew Rosen 2004 Successor Insurance Trust

By: _____
Name:   Dan Nir
Title:    Manager

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

XMS Core Convert Holdings LLC

By: John McGarrity

Name:

Title:   John McGarrity – Managing Director

## SCHEDULE 2
## SCHEDULE OF PURCHASERS

### Initial Purchasers

| Name and Address for Notices | Principal Amount of Notes |
|---|---|
| **MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY**<br>One Marina Park Drive, MIP 1205<br>Boston, MA 02210<br>Attn:　　　Sarah Doyle; Chris Fredericks; Helder Pereira<br>Email:　　　sdoyle@massmutual.com; cfredericks54@massmutual.com;<br>　　　　　　hpereira@massmutual.com<br>Phone #:617-235-1522; 617-695-4069; 413-744-7347 | $40,000,000.00 |
| **CRYPTONIC BLACK, LLC**<br>801 S. Rampart Blvd.<br>Las Vegas, NV 89145<br>Attn:　　　Jennifer LaFrance<br>Email:　　　jlafrance@asny.com<br>Phone #:702-967-5000 | $6,000,000.00 |
| **FIRST SUN INVESTMENTS, LLC**<br>6718 E. Rovey Avenue<br>Paradise Valley, AZ 85253<br>Attn:　　　Brent Berge<br>Email:　　　brentberge@bergegroup.com<br>Phone #:1-602-430-3673 | $4,000,000.00 |
| **DOUGLAS LIPTON**<br>4701 N Meridian Ave<br>Unit 315<br>Miami Beach, FL 33140<br>Attn:　　　Douglas Lipton<br>Email:　　　dlip44@gmail.com<br>Phone #:917-887-8869 | $250,000.00 |
| **TOTAL:** | **$50,250,000.00** |

### Additional Purchasers

| Name and Address for Notices | Principal Amount of Notes |
|---|---|
| **Apollo Tactical Value SPN Investments LP**<br>9 West 57th Street<br>New York, NY 10019<br>Attn:　　　Joseph D. Glatt<br>Email:　　　jglatt@apollo.com | $4,700,000.00 |
| **Apollo Centre Street Partnership, LP**<br>9 West 57th Street<br>New York, NY 10019<br>Attn:　　　Joseph D. Glatt<br>Email:　　　jglatt@apollo.com | $2,500,000.00 |

| | |
|---|---|
| **Apollo Lincoln Fixed Income Fund, L.P.**<br>9 West 57th Street<br>New York, NY 10019<br>Attn:          Joseph D. Glatt<br>Email:          jglatt@apollo.com | $1,600,000.00 |
| **Apollo Moultrie Credit Fund, L.P.**<br>9 West 57th Street<br>New York, NY 10019<br>Attn:          Joseph D. Glatt<br>Email:          jglatt@apollo.com | $1,200,000.00 |
| **BlockFi Lending LLC**<br>201 Montgomery St #263<br>Jersey City, NJ 07302<br>Attn:          Sergey Pekarsky<br>Email:          tradingops@blockfi.com, Legal-inst@blockfi.com | $5,000,000.00 |
| **Wolfswood Partners LP**<br>140 Broadway<br>New York, NY 10005<br>Attn:          Jason Comerchero<br>Email:          jason.comerchero@wolfswoodpartners.com | $1,000,000.00 |
| **1994 Steinfeld Family Trust**<br>622 Toyota Drive<br>Pacific Palisades, CA 90272<br>Attn: Jake Steinfeld<br>Email: jake@steinfeld6.com | $500,000.00 |
| **Andrew Rosen 2004 Successor Insurance Trust**<br>810 Seventh Avenue, 7th Floor<br>New York, NY 10019<br>Attn: TAG Associates LLC<br>Email: NKim@tagassoc.com<br>Email: EWong@tagassoc.com | $250,000.00 |
| **Barkley Investments, LLC**<br>8231 Bay Colony Drive, Unit 802<br>Naples, FL<br>Attn: Jason Paul Godfrey<br>Email: jgodfrey@godfreycap.com | $2,000,000.00 |
| **Better Downtown Miami LLC**<br>4167 Main Street<br>Jupiter, FL 33458<br>Attn: Marc Roberts<br>Email: marc@marcroberts.com | $400,000.00 |
| **Cannon Investments LLC**<br>810 Seventh Avenue, 7th Floor<br>New York, NY 10019<br>Attn: TAG Associates LLC<br>Email: NKim@tagassoc.com<br>Email: EWong@tagassoc.com | $250,000.00 |
| **Corbin ERISA Opportunity Fund, Ltd.**<br>c/o Corbin Capital Partners, L.P.<br>590 Madison Ave, 31st Floor<br>New York, NY 10022<br>Attn: Corbin Operations<br>Email: corbinwso-fax@ifs.statestreet.com<br>Email: mmf-bankdebt@corbincapital.com<br>Email: corbin@viteos.com | $12,000,000.00 |

| | |
|---|---|
| **Corbin Opportunity Fund, L.P.**<br>c/o Corbin Capital Partners, L.P.<br>590 Madison Ave, 31st Floor<br>New York, NY 10022<br>Attn: Corbin Operations<br>Email: corbinwso-fax@ifs.statestreet.com<br>Email: mmf-bankdebt@corbincapital.com<br>Email: corbin@viteos.com | $2,000,000.00 |
| **David Sarner**<br>2100 S. Ocean Blvd, #506<br>Palm Beach, FL 33480<br>Email: docsarner@gmail.com | $250,000.00 |
| **Ferro Investments Ltd**<br>2 Alhambra Plaza, Suite 802<br>Coral Gables, FL 33134<br>Attn: Jennifer Kanold<br>Email: reporting@icomia.com | $1,500,000.00 |
| **FGK Investments Ltd**<br>2 Alhambra Plaza, Suite 802<br>Attn: Jennifer Kanold<br>Email: reporting@icomia.com | $500,000.00 |
| **Frank Polaro**<br>10 Douglas Road<br>Morristown, NJ 07960<br>Email: frank@pollaro.com | $250,000.00 |
| **FTF Diversified Holdings, LP**<br>121 Alhambra Plaza, Suite 1202<br>Coral Gables, FL 33134<br>Attn: Archpoint Investors<br>Email: futureholdings@archpointinvestors.com<br>Email: reports@concertomgmt.com | $2,000,000.00 |
| **Galaxy Digital LP**<br>Attn: Chris Ferraro<br>Email: compliance@galaxydigital.io | $5,000,000.00 |
| **James Pulaski**<br>3921 Alton Road #360<br>Miami Beach, FL 33140<br>Attn: James Pulaski<br>Email: jim@jpulaski.com | $1,000,000.00 |
| **Jason Capello**<br>1404 N Lake Way<br>Palm Beach, FL 33480<br>Email: jcapello@mgatecap.com | $2,000,000.00 |
| **John B. Quinn**<br>Quinn Emanuel Urquhart & Sullivan, LLP<br>865 S. Figueroa Street, 10th Floor<br>Los Angeles, CA 90017<br>Email: johnquinn@quinnemanuel.com | $500,000.00 |
| **JPAS – Credit LLC**<br>100 Pine Street, Suite 2600<br>San Francisco, VA 94111<br>Attn: George Lusch<br>Email: George.lush@jordanpark.com | $8,333,653.00 |
| **JPAS – Credit-A S.P.**<br>100 Pine Street, Suite 2600 | $4,166,347.00 |

| | |
|---|---|
| San Francisco, VA 94111<br>Attn: George Lusch<br>Email: George.lush@jordanpark.com | |
| **JPAS – Crypto Infrastructure LLC**<br>100 Pine Street, Suite 2600<br>San Francisco, VA 94111<br>Attn: George Lusch<br>Email: George.lush@jordanpark.com | $11,619,743.00 |
| **JPAS – Crypto Infrastructure-A S.P.**<br>100 Pine Street, Suite 2600<br>San Francisco, VA 94111<br>Attn: George Lusch<br>Email: George.lush@jordanpark.com | $4,380,257.00 |
| **JSK Partnership LLC**<br>1691 Michigan Ave, Suite 445<br>Miami Beach, FL 33139<br>Attn: Sean Posner<br>Email: sp@posnergroup.com | $1,000,000.00 |
| **KMR CS Holdings, LLC**<br>377 Fifth Avenue, 5th Floor<br>Attn: Kamran Yaghoubzadeh<br>Email: kamran@kmrequity.com | $820,000.00 |
| **Leon J. Simkins Non-Exempt Trust FBO Michael Simkins**<br>5080 Biscayne Boulevard, #A<br>Miami, FL 33137<br>Attn: Michelle Simkins-Rubell<br>Email: Simkinslaw@gmail.com | $750,000.00 |
| **Levbern Management LLC**<br>45625 Cielito Drive<br>Indian Wells, CA 92210<br>Attn: Melina Bernecker<br>Email: melina@levbernmanagement.com<br>Attn: Drew Ward<br>Email: drew@levbernmanagement.com | $250,000.00 |
| **Milos Core LLC**<br>Attn: Mavrides, Moyal, Packman & Sadkin, LLP<br>Attn: Scott Packman<br>Email: spackman@mmps.com | $1,000,000.00 |
| **Monbanc Inc.**<br>290 Lakeshore<br>Pointe Claire, Quebec<br>H9s 413<br>Attn: Daniel Rafuse<br>Email: daniel@monbanc.com | $100,000.00 |
| **Neso Investment Group Ltd**<br>2 Alhambra Plaza, Suite 802<br>Attn: Jennifer Kanold<br>Email: reporting@icomia.com | $500,000.00 |
| **Northdata Holdings Inc.**<br>290 Lakeshore<br>Pointe Claire, Quebec<br>H9S 413<br>Attn: Daniel Rafuse<br>Email: daniel@monbanc.com | $200,000.00 |
| **Richard Katz 2016 Trust** | $250,000.00 |

| | |
|---|---|
| 55 Farrington Avenue<br>Email: Docatz@gmail.com | |
| **Robert Fedrock**<br>736-333 Adelaide St. E.<br>Toronto, Ontario M5A 4T4<br>Email: Robert.fedrock@originmerchant.com | $400,000.00 |
| **Sabby Management, LLC**<br>10 Mountainview Road, Suite 205<br>Upper Saddle River, NJ 07458<br>Attn: Robert Grundstein<br>Email: rgrundstein@sabbymanagement.com<br>Originals to:<br>Attn: Client Settlement, Wedbush Securities<br>1000 Wiltshire Blvd., Suite 850<br>Los Angeles, CA 90017 | $2,500,000.00 |
| **SunnySide Consulting and Holdings, Inc.**<br>214 Cherryhill Road<br>Oakville, Ontario, L6L3E2, Canada<br>Attn: Taras Kulyk<br>Email: taras@sunnysideinc.ca | $110,000.00 |
| **TBC 222 LLC**<br>8 Newbury Street, 5th Floor<br>Boston, MA 02116<br>Attn: Matthew Sidman – Managing Member<br>Email: msidman@threebayscapital.com | $2,500,000.00 |
| **The Sear Family 1996 Trust**<br>457 26th Street<br>Manhattan Beach, CA 90266<br>Attn: Mark Sear<br>Email: msear@evokeadvisors.com | $500,000.00 |
| **TJC3 LLC**<br>c/o Kensico Capital Management<br>55 Railroad Avenue, 2nd Floor<br>Greenwich, CT 06830<br>Attn: Family Office (Gino Labruzzo, Li Dick, Christina Malloy)<br>Email: familyoffice@kensicocapital.com | $4,000,000.00 |
| **Vineet Agrawal**<br>2 Brantwood Terrace<br>Short Hills, NJ 07078<br>Email: vagrawal@gmail.com | $250,000.00 |
| **Wormser Family Partnership II L.P.**<br>575 Lexington Avenue, 32nd Floor<br>New York, NY 10022<br>Attn: Ken Wormser<br>Email: kwormser@greensledge.com | $500,000.00 |
| **XMS Core Convert Holdings LLC**<br>321 N. Clark Street, Suite 2440<br>Chicago, IL 60091<br>Attn: John McGarrity<br>Email: jmcgarrity@xmscapital.com | $1,000,000.00 |
| **TOTAL:** | $91,530,000.00 |

**SCHEDULE 5.1**

**NOTE PARTIES**

| Entity Name | Former Names (within last 5 years) | Jurisdiction of Organization | Taxpayer Identification Number | Organizational Number |
|---|---|---|---|---|
| Core Scientific Holding Co. | N/A | Delaware | 85-2941270 | 3377927 |
| Core Scientific Inc. | Mineco Holdings, Inc | Delaware | 82-3805526 | 6660521 |
| American Property Acquisition, LLC | N/A | Delaware | 82-540825 | 6857348 |
| American Property Acquisitions I, LLC | 155 Palmer Lane, LLC | North Carolina | 82-5469717 | 1687596 |
| American Property Acquisitions VII, LLC | N/A | Georgia | 83-1663198 | 18100016 |
| Blockcap Inc. | Block Capital, Inc. | Nevada | 85-4052367 | E10638672020-8 |

**SCHEDULE 5.13**

**SUBSIDIARIES**

| Entity Name | Owner | Ownership Percentage | Jurisdiction of Organization |
|---|---|---|---|
| Core Scientific Inc. | Core Scientific Holding Co. | 100% | Delaware |
| American Property Acquisition, LLC | Core Scientific, Inc. | 100% | Delaware |
| GPU One Holdings, LLC f/k/a IP Special Holdings, LLC | Core Scientific, Inc. | 100% | Delaware |
| American Property Acquisitions I, LLC | American Property Acquisition, LLC | 100% | North Carolina |
| American Property Acquisitions VII, LLC | American Property Acquisition, LLC | 100% | Georgia |
| Blockcap Inc. | Core Scientific Holding Co. | 100% | Nevada |
| Radar Relay, Inc. | Blockcap Inc. | 100% | Delaware |
| RADAR LLC | Blockcap Inc. | 100% | Colorado |
| Starboard Capital LLC | Blockcap Inc. | 100% | Colorado |

**SCHEDULE 5.14**

**CAPITALIZATION**

(see attached)

**SCHEDULE 5.17**

**INDEBTEDNESS**

1. Existing Notes

2. Mortgage in favor of Brown Corporation for that certain real property located at 206 Boring Drive, Dalton, GA 30721 in a principal amount of $547,733.71 as of February 1, 2021.

3. Mortgage in favor of Holiwood LLC for that certain real property located at 1035 Shar-Cal Rd, Calvert City, KY 42029 in a principal amount of $1,354,209.33 as of February 1, 2021.

4. That certain PPP Loan entered into April 2020, between Core Scientific, Inc. and City National Bank in a principal amount of $2,154,300.00 as of February 1, 2021.

5. The following Equipment Financing:

| Equipment Financing | Issue Date | Original Amount | Maturity | Interest Rate | Outstanding Principal (as of 02/01/21) |
|---|---|---|---|---|---|
| Genesis Global Capital, LLC #1 | July 2020 | $1,833,625 | March 2022 | 16.0% | $1,477,318 |
| Genesis Global Capital, LLC #2 | August 2020 | 1,569,132 | April 2022 | 16.0% | 1,369,909 |
| Genesis Global Capital, LLC #3 | September 2020 | 1,307,610 | April 2022 | 16.0% | 1,215,593 |
| Arctos Credit, LLC | October 2020 | 774,250 | October 2022 | 15.0% | 660,692 |
| Novak | January 2021 | 10,000,000 | January 2023 | 10.0% | 10,000,000 |
| **Total Equipment Financing** | | **$15,484,617** | | | **$14,723,512** |

6. The following Equipment Leases:

| Equipment Leases | Issue Date | Original Amount | Maturity | Interest Rate | Outstanding Principal (as of 02/01/21) |
|---|---|---|---|---|---|
| NEC Financial Services | July 2018 | $14,707 | July 2021 | 12.2% | $2,376 |
| Technology Finance Corporation #2 | May 2019 | 101,315 | May 2022 | 6.5% | 45,000 |
| Garic, Inc. | May 2019 | 466,379 | May 2022 | 6.5% | 179,847 |
| VFS, LLC | July 2019 | 421,576 | July 2022 | 7.3% | 210,510 |
| Advanced Business Equipment | October 2019 | 22,154 | October 2022 | 7.2% | 11,675 |
| Garic, Inc. #1 | September 2019 | 153,129 | September 2022 | 6.5% | 84,519 |
| 36th Street Capital #1 | October 2019 | 710,122 | October 2022 | 13.4% | 429,256 |
| 36th Street Capital #2 | December 2019 | 1,130,000 | December 2022 | 13.4% | 743,378 |
| 36th Street Capital #3 | December 2019 | 917,300 | June 2022 | 9.8% | 516,920 |
| 36th Street Capital #4 | December 2019 | 748,275 | December 2022 | 13.4% | 492,258 |
| Toyota Commercial Finance | January 2020 | 431,799 | June 2025 | 5.3% | 359,339 |
| Technology Finance Corporation #3 | March 2020 | 57,492 | February 2021 | 6.5% | - |
| Garic, Inc. #2 | March 2020 | 958,650 | March 2023 | 6.5% | 659,577 |
| De Lage Landen #1 | November 2020 | 290,246 | November 2023 | (5.3)% | 229,981 |

Core Scientific Cap Table - As Of August 12, 2021

| | Date | Shares | Capital Raised | $ Per Share | % of Total |
|---|---|---|---|---|---|
| **Preferred** | | | | | |
| Series A Convertible Preferred | 2019 / 2020 | 6,451,525 | $44,063,916 | $6.83 | 2.5% |
| Series B Convertible Preferred | 2020 | 314,285 | 1,100,000 | 3.50 | 0.1% |
| **Total Preferred Oustanding** | | **6,765,810** | **$45,163,916** | | **2.7%** |
| **Common Shares** | | | | | |
| Private Placement #1 | 1H 2018 | 7,505,000 | $48,032,000 | $6.40 | 3.0% |
| Private Placement #2 | 2H 2018 | 178,095 | 2,000,007 | 11.23 | 0.1% |
| **Business Combinations / Other** | | | | | |
| BCV 55, 66 & 77 | January 2018 | 88,501,449 | | | 35.0% |
| Matrix Mining Ltd. and MM Management Transaction | November 2018 | 1,250,000 | | | 0.5% |
| Stax Digital | September 2019 | 560,030 | | | 0.2% |
| Heldrick and Stuggles | September 2019 | 50,000 | | | 0.0% |
| Atrio | June 2020 | 561,938 | | | 0.2% |
| Blockcap | 7/1/2021 | 72,185,717 | | | 28.5% |
| **Total Common Shares Outstanding** | | **170,792,229** | **$50,032,007** | | **67.5%** |
| **Reserves & Other** | | | | | |
| RSUs Outstanding | | 53,937,486 | | | 21.3% |
| Options Outstanding | | 7,320,245 | | | 2.9% |
| Available for Future Issuance | | 10,088,856 | | | 4.0% |
| Warrants | | 4,284,887 | | | 1.7% |
| **Total Reserves & Other** | | **75,631,474** | | | **29.9%** |
| **Total Fully Diluted** | | **253,189,513** | **$95,195,923** | | **100.0%** |

1

| Equipment Leases | Issue Date | Original Amount | Maturity | Interest Rate | Outstanding Principal (as of 02/01/21) |
|---|---|---|---|---|---|
| De Lage Landen #2 | December 2020 | 99,650 | December 2023 | (5.5)% | 80,984 |
| De Lage Landen #3 | January 2021 | 228,180 | January 2024 | (0.5)% | 200,085 |
| De Lage Landen #4 | January 2021 | 99,950 | January 2024 | (5.5)% | 80,984 |
| Garic, Inc. #3 | February 2021 | 199,528 | February 2024 | 7.9% | 199,528 |
| **Total Equipment Leases** | | **$7,050,752** | | | **$4,526,215** |

**EXHIBIT A**

**FORM OF CONVERTIBLE PROMISSORY NOTE**

**(see attached)**

THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "*ACT*"), OR UNDER THE SECURITIES LAWS OF ANY STATES IN THE UNITED STATES. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT PURSUANT TO SECTION 5(C) HEREOF AND AS PERMITTED UNDER THE ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL IN FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER TO THE EFFECT THAT ANY PROPOSED TRANSFER OR RESALE IS IN COMPLIANCE WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

THIS NOTE HAS BEEN ISSUED WITH "ORIGINAL ISSUE DISCOUNT" (WITHIN THE MEANING OF SECTION 1273 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "*CODE*")). UPON WRITTEN REQUEST, THE COMPANY WILL PROMPTLY MAKE AVAILABLE TO ANY HOLDER OF THIS NOTE THE FOLLOWING INFORMATION:  (1) THE ISSUE PRICE AND ISSUE DATE OF THE NOTE, (2) THE AMOUNT OF ORIGINAL ISSUE DISCOUNT ON THE NOTE AND (3) THE YIELD TO MATURITY OF THE NOTE. HOLDERS SHOULD CONTACT THE CHIEF FINANCIAL OFFICER OF THE COMPANY AT 2800 NORTHUP WAY SUITE 220 BELLEVUE, WA 98004.

<p align="center">**[FORM OF] CONVERTIBLE PROMISSORY NOTE**</p>

| | |
|---|---|
| Note Series: | 2021 Convertible Promissory Notes |
| Date of Note: | [___], 2021 |
| Initial Principal Amount of Note: | $[___], plus any PIK Interest that has accrued and been capitalized pursuant to the terms of this Note |

For value received **CORE SCIENTIFIC HOLDING CO.**, a Delaware corporation (the "*Company*"), promises to pay to the undersigned holder or such party's successors or permitted assigns (the "*Holder*") the principal amount set forth above with interest to accrue on such outstanding principal amount at a rate of 10% *per annum*, 4% of which shall be payable in cash ("*Cash Interest*") and 6% of which shall be payable in kind by capitalizing such interest payment and increasing the outstanding principal amount of this Note by the amount thereof ("*PIK Interest*"). Interest shall accrue on the outstanding principal amount of this Note commencing on (and including) the date of original issuance thereof (or the most recent interest payment date) and continuing until the earlier to occur of (x) the date this Note is repaid or prepaid in full and (y) the date this Note is converted in full by the Holder pursuant to Section 2 hereof. Cash Interest shall be due and payable and PIK Interest shall be capitalized quarterly in arrears on the first day of each fiscal quarter, commencing on October 1, 2021. Interest shall be computed on the basis of a year of 365 days for the actual number of days elapsed. This Note shall be automatically deemed to include any accrued PIK Interest thereon and the Company shall not be obligated to issue any subsequent Notes reflecting PIK Interest. This Note is one of the "Notes" issued pursuant to the Purchase Agreement. All capitalized terms used but not otherwise defined in this Note will have the same meanings in this Note as in the Purchase Agreement referred to below.

The following is a statement of the rights of the Holder and the conditions to which this Note is subject, and to which the Holder, by the acceptance of this Note, agrees:

1.    **BASIC TERMS**.

(a)    **Series of Notes**. This convertible promissory note (this "***Note***") is issued as part of a series of notes designated by the Note Series above (collectively, the "***Notes***"), having an initial aggregate principal amount of up to $300,000,000.00 and issued pursuant to, and to those persons and entities (collectively, the "***Holders***") party, as Purchasers, to, that certain Convertible Note Purchase Agreement, dated as of even date herewith (as amended, restated, supplemented and/or otherwise modified from time to time, the "***Purchase Agreement***"), by and among the Company, each Purchaser party thereto, U.S. Bank National Association, as Note Agent, and, upon the execution and delivery of the Collateral Documents pursuant to Section 6.13 of the Purchase Agreement, U.S. Bank National Association, as Collateral Agent for the Secured Parties. The Company shall maintain a ledger of all Holders ("***Ledger***"), which shall include all PIK Interest accrued and capitalized, and which shall be available (i) promptly upon request to the Agents and the Holder, (ii) promptly after any transfer or assignment of any Note, (iii) promptly upon conversion of any Note and (iv) on the tenth business day prior to any interest payment date.

(b)    **Payments**.

(i)    **Voluntary Prepayments**. Subject to and following the expiration of any applicable lockup period set forth under any lockup agreement to which the Holder, the Company and the Company's underwriters are a party, and unless otherwise converted in full or in part pursuant to Section 2 hereof (including following delivery of the Company's notice referred to in this subsection (b)(i)(2)), the Company may at any time, upon ten (10) Business Days' prior written notice to the Holder and the Note Agent (which notice may be conditioned or rescinded upon such events as may be specified in such notice) prepay all or any portion of this Note in an amount equal to (x) the outstanding principal amount (including all accrued PIK Interest not already added to the principal amount of this Note) of this Note being prepaid at such time, together with all accrued unpaid Cash Interest on such outstanding principal amount at such time *multiplied* by (y) 200% (such amount, the "***Repayment Amount***").

(ii)    **Repayment**. Unless otherwise prepaid by the Company pursuant to Section 1(b)(i) or converted in full pursuant to Section 2 hereof, this Note shall be repaid in full on the earlier to occur of (x) April 19, 2025 (the "***Maturity Date***") and (y) acceleration by the Holders representing at least twenty-five percent (25%) of the aggregate outstanding principal amount of the Notes issued pursuant to the Purchase Agreement at such time after the occurrence of an Event of Default in accordance with the terms hereof, in each case, in an amount equal to the outstanding principal (including all accrued PIK Interest not already added to the principal amount of this Note) of this Note, plus all unpaid accrued Cash Interest thereon.

(iii)    **Payments Generally**.

(1)    This Note and the other Notes issued pursuant to the Purchase Agreement are *pari passu* in right of payment and all payments (other than conversion) under this Note and such other Notes shall be made in accordance with each Holder's Pro Rata Share. All payments shall be applied first, to the payment of expenses due under this Note and the other Note Documents to the Agents, second, to the payment of expenses due under this Note and the other Note Documents to the Holders, third, unpaid accrued interest of this Note and fourth, if the amount of payment exceeds the amount of all such expenses and accrued interest, to the payment of outstanding principal (including all accrued PIK Interest not already added to the principal amount of this Note) of this Note. The conversion of this Note by the Holder pursuant to the terms hereof shall be deemed to be a repayment of the full outstanding principal

2

amount (including all accrued PIK Interest not already added to the principal amount of this Note) of such Note together with any unpaid accrued Cash Interest thereon on the date of such conversion.

(2) All payments to be made by the Company shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff, except with respect to Taxes required to be deducted and/or withheld under applicable law. All payments (other than by means of conversion pursuant to the terms of the Notes), including any prepayments, of interest and principal to be made by the Company hereunder shall be made by the Company to the Note Agent, in cash, for the account of the respective Holders to which such payment is owed, at the applicable Notes Agent's Principal Office for payment and in same day funds not later than 11:00 a.m. on the date specified herein. The Notes Agent will promptly distribute to each Holder its Pro Rata Share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to each Holder at the address specified in the Holder's Administrative Questionnaire (or at such other address as the Holder may indicate in writing to the Note Agent from time to time). All payments received by the Notes Agent after 11:00 a.m. may (at the sole discretion of the Notes Agent) in each case be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(3) If any payment to be made by the Company shall come due on a day other than a Business Day, any interest shall be payable, and any PIK Interest shall be capitalized, on the next succeeding Business Day without additional interest accruing thereon.

(4) Whenever any payment received by the Notes Agent under this Agreement or any of the other Notes Documents is insufficient to pay in full all amounts due and payable to the Notes Agent and the Holders under or in respect of this Agreement and the other Notes Documents on any date, such payment shall be distributed by the Notes Agent and applied by the Notes Agent and the Holders in the order of priority set forth in <u>Section 1(b)(iii)(1)</u>. If the Notes Agent receives funds for application to the Obligations of the Company under or in respect of the Notes Documents under circumstances for which the Notes Documents do not specify the manner in which such funds are to be applied, the Notes Agent may, but shall not be obligated to, elect to distribute such funds to the Holders in accordance with the Holder's Pro Rata Share of such of the outstanding Notes or other Obligations then owing to the Holder.

(iv) **Withholding**. Notwithstanding anything to the contrary herein, the Company shall be entitled to deduct and withhold from the consideration otherwise payable under the Note such amounts as it is required to deduct and withhold under the Code, or any other tax law, with respect to the making of such payment. To the extent that amounts are so withheld, such withheld amounts shall be treated for all purposes of this Note as having been paid to the Person in respect of whom such deduction and withholding was made. If a payment is payable (in whole or in part) in consideration other than cash and if the cash portion of any such payment is insufficient to satisfy all required tax withholding obligations, the Company shall retain an amount of the non-cash consideration otherwise payable equal in value to the amount required to satisfy any applicable withholding taxes (as reasonably determined by the Company).

2. CONVERSION.

(a) **Conversion upon an Offering**. In the event that the Company (i) issues and sells shares of its equity securities ("***Equity Securities***") to investors (the "***Investors***") in a private offering or placement with total gross proceeds to the Company of at least $50,000,000 (excluding the conversion of the Notes or other convertible securities issued for capital raising purposes (*e.g.*, Simple Agreements for Future Equity)), (ii) issues and sells its common stock ("***Common Stock***") to Investors in an underwritten public offering pursuant to an effective registration statement filed with the Securities and Exchange Commission in accordance with the Act or under equivalent securities laws and regulations of any other

jurisdiction (including, for the avoidance of doubt, a SPAC), (iii) lists its Common Stock (other than shares of Common Stock not eligible for resale under Rule 144 under the Securities Act) on a national securities exchange by means of an effective registration statement on Form S-1 filed by the Company with the SEC that registers shares of existing capital stock of the Company for resale, as approved by the Company's board of directors, or (iv) lists its Common Stock on any stock exchange (the occurrence of each event set forth in clauses (i) through (iv) above, an "***Offering***" and, together with the occurrence of a Change of Control as provided in Section 2(b) below, each, a "***Conversion Event***"), in each case, while this Note remains outstanding, the Holder shall have the right at any time and from time to time during the period commencing on the date of consummation of such Offering until the Maturity Date, to convert, in whole or in part, the outstanding principal amount (including all accrued PIK Interest not already added to the principal amount of this Note) of this Note, together with all unpaid accrued Cash Interest thereon, into Equity Securities or Common Stock of the Company (as applicable) at a conversion price equal to the Applicable Conversion Price (as defined below) (which shall be determined, for the avoidance of doubt, on the date of the consummation of such Offering). The issuance of Equity Securities or Common Stock by the Company (as applicable) pursuant to the conversion of this Note shall be upon and subject to the same terms and conditions (other than as otherwise set forth herein) applicable to Equity Securities or Common Stock of the Company (as applicable), sold in the applicable Offering.

(b)     **Conversion upon a Change of Control**. In the event the Company consummates a Change of Control (as defined below) while this Note remains outstanding, the Company shall repay the outstanding principal amount of this Note in an amount equal to the Repayment Amount; provided, however, that upon the written election of the Holder made not less than five (5) days prior to the Change of Control, the Company shall convert the outstanding principal amount of this Note (including all accrued PIK Interest not already added to the principal amount of this Note) and any unpaid accrued Cash Interest into Common Stock at a conversion price equal to the Applicable Conversion Price (which shall be determined, for the avoidance of doubt, on the date of consummation of such Change of Control) (assuming conversion of all securities convertible into Common Stock and exercise of all outstanding options and warrants, but excluding the shares of equity securities of the Company issuable upon the conversion of Notes or other convertible securities issued for capital raising purposes (e.g., Simple Agreements for Future Equity)). The Company shall give the Holder and the Note Agent written notice of any Change of Control at least ten (10) Business Days prior to the consummation thereof, which notice will contain the material terms and conditions (including price and form of consideration) of the Change of Control, the identity of the parties to the Change of Control and the intended date of the Change of Control.

For purposes of this Note, (i) a "***Change of Control***" means, at any time, any Person or "group" other than the Permitted Holders (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act) shall have obtained the power (whether or not exercised) to elect a majority of the members of the board of directors of the Company; (ii) "***Permitted Holders***" means each of BCV 55 LLC, BCV 66 LLC, BCV 77 LLC and each of their respective affiliates; (iii) "***Fair Market Value Per Common Share***" means the cash and/or the value of the property, rights or securities to be paid or distributed per share of Common Stock of the Company to the holders of Common Stock of the Company pursuant to a Change of Control or a SPAC (with the value of such property, rights or securities being determined in good faith by the board of directors of the Company); (iv) the "***Applicable Conversion Price***" means a conversion price equal to (a) 80% of either (x) the cash price paid per share for Equity Securities or Common Stock of the Company (as applicable) by the Investors in an Offering (other than a SPAC) or (y) the Fair Market Value Per Common Share in a Change of Control or a SPAC, as applicable, if the Conversion Event occurs on or prior to April 19, 2022, (b) 75% of either (x) the cash price paid per share for Equity Securities or Common Stock of the Company (as applicable) by the Investors in an Offering (other than a SPAC) or (y) the Fair Market Value Per Common Share in a Change of Control or a SPAC, as applicable, if the Conversion Event occurs on or after April 19, 2022 but prior to April 19, 2023, (c) 70% of either (x) the cash price paid per share for Equity Securities or Common Stock of the Company (as applicable) by the Investors in an Offering (other than a

SPAC) or (y) the Fair Market Value Per Common Share in a Change of Control or a SPAC, as applicable, if the Conversion Event occurs on or after April 19, 2023 but prior to April 19, 2024 and (d) 65% of either (x) the cash price paid per share for Equity Securities or Common Stock of the Company (as applicable) by the Investors in an Offering (other than a SPAC) or (y) the Fair Market Value Per Common Share in a Change of Control or a SPAC, as applicable, if the Conversion Event occurs on or after April 19, 2024 but prior to April 19, 2025; (v) in connection with any SPAC, each reference to "Company" shall be deemed to also refer to a Parent Entity that has become a co-obligor with respect to the Company's Obligations hereunder (except that solely such Parent Entity, and not Core Scientific Holding Co. (or its successor by merger), shall be obligated to deliver Equity Securities or Common Stock pursuant to this Section 2); and (vi) in connection with any SPAC, each reference to "Common Stock" shall be deemed to refer to the kind and the amount of property that a holder of one share of Common Stock of the Company would be entitled to receive on account of the consummation of such SPAC.

(c)     **Procedure for Conversion**. Upon the conversion in whole or in part of this Note into Equity Securities or Common Stock of the Company (as applicable), the Holder shall surrender this Note to the Company and deliver to the Company any documentation reasonably required by the Company (including, in the case of an Offering, all financing documents executed by the Investors in connection with such Offering). The Company shall not be required to issue or deliver the Equity Securities or Common Stock of the Company (as applicable) into which this Note may convert until the Holder has surrendered this Note to the Company and delivered to the Company any such documentation. The Company shall, as soon as practicable after the surrender of this Note and delivery to the Company of such documentation deliver to the Holder (i) a certificate or certificates for the number of shares of Equity Securities or Common Stock of the Company (as applicable) into which this Note is convertible in whole or in part, rounded downward to the nearest whole share and cash for the amounts not so converted as a result of the above-referenced downward rounding, registered in the name of such Investor or registered nominee or assignee and (ii) to the extent the Holder has converted only a portion of the outstanding principal amount of this Note, a replacement Note for the outstanding principal amount of this Note not converted. Upon the conversion in full or in part of this Note into Equity Securities or Common Stock of the Company (as applicable) pursuant to the terms hereof, in lieu of any fractional shares to which the Holder would otherwise be entitled, the Company shall pay the Holder cash equal to such fraction multiplied by the price at which this Note converts. Upon conversion of this Note in full or in part and payment of cash representing any fractional share pursuant to this Section 2(c), the Company shall be forever released from all its obligations and liabilities under this Note and this Note shall be deemed of no further force or effect, whether or not the original of this Note has been delivered to the Company for cancellation.

(d)     **Taxes**. The Company shall pay any and all stamp, stock transfer, stock issuance and other similar taxes that may be payable in respect of any issuance or delivery of shares of Equity Securities or Common Stock of the Company (as applicable) upon conversion of this Note pursuant to this Section 2. The Company shall not, however, be required to pay any income, capital gains or similar tax of the recipient of Equity Securities or Common Stock of the Company (as applicable) or any tax which may be payable in respect of any transfer involved in the issuance and delivery of shares of Equity Securities or Common Stock of the Company (as applicable) in a name other than that in which this Note so converted was registered, and no such issuance or delivery shall be made unless and until the person or entity requesting such issuance has paid to the Company the amount of any such tax or has established, to the satisfaction of the Company, that such tax has been paid.

3.      SECURED NOTE.

Upon the execution and delivery of the Collateral Documents pursuant to Section 6.13 of the Purchase Agreement, this Note shall be secured by a first-priority Lien on the Collateral (subject to Permitted Liens) pursuant to the Security Agreement.

4.      EVENTS OF DEFAULT.

If there shall be any Event of Default (as defined below) hereunder, at the option and upon the declaration of the Holders representing at least twenty-five percent (25%) of the aggregate outstanding principal amount of the Notes issued pursuant to the Purchase Agreement at such time and upon written notice to the Company (which election and notice shall not be required in the case of an Event of Default under subsection (v) or (vi) below), this Note shall accelerate and all principal (including all accrued PIK Interest not already added to the principal amount of this Note) and all unpaid accrued Cash Interest shall automatically become immediately due and payable. The occurrence of any one or more of the following shall constitute an "***Event of Default***":

(i)      the Company fails to pay to the Holder (i) the principal of this Note as and when due or (ii) within five (5) Business Days after the same becomes due any Cash Interest on this Note or any fees or any other Obligations;

(ii)     any representation or warranty made or deemed made by or on behalf of the Company or any of its Subsidiaries to the Holder under or in connection with the Note Documents or any certificate or information delivered in connection therewith shall be materially false when made;

(iii)    the Company and its Subsidiaries fail to observe or perform any term, covenant, or provision contained in Section 7 of the Purchase Agreement and such non-observance or non-performance shall not have been remedied or waived within thirty (30) days after the earlier of (i) the Company becoming aware of such non-observance or non-compliance or (ii) receipt by the Company of notice from a Holder of such non-observance or non-compliance;

(iv)     the Company and its Subsidiaries fail to observe or perform any other term, covenant or provision contained in the Purchase Agreement (other than those specified elsewhere in this Section 4) or any other Note Document and such non-observance or non-performance shall not have been remedied or waived within thirty (30) days after the earlier of (i) the Company becoming aware of such non-observance or non-compliance or (ii) receipt by the Company of notice from a Holder of such non-observance or non-compliance;

(v)      the Company or any Material Subsidiary shall (i) apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (ii) admit in writing its inability to pay its debts generally as they mature, (iii) make a general assignment for the benefit of its or any of its creditors, (iv) be dissolved or liquidated, (v) commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, or (vi) take any action for the purpose of effecting any of the foregoing;

(vi)     proceedings for the appointment of a receiver, trustee, liquidator or custodian of the Company or any of its Material Subsidiaries, or of all or a substantial part of the property thereof, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with

respect to the Company or any of its Material Subsidiaries, if any, or the debts thereof under any bankruptcy, insolvency or other similar law now or hereafter in effect shall be commenced, or an order for relief shall be entered in any such proceeding, or such proceeding shall not be dismissed or discharged within 60 days of commencement;

(vii)    the Company fails to pay when due any principal of or interest on or any other amount payable in respect of, or breaches or defaults under any other term of, any mortgage, indenture, agreement or other instrument under which there may be outstanding any Indebtedness in an aggregate principal amount of in excess of $10,000,000, in each case, beyond the grace period, if any, if the effect of such non-payment, breach or default is to cause such Indebtedness to become or be declared due and payable (or subject to a compulsory repurchase or redemption) prior to its stated maturity;

(viii)    any court, government, or Governmental Authority shall condemn, seize or otherwise appropriate, or take custody or control of, all or any material portion of the property of the Company and its Subsidiaries, taken as a whole;

(ix)    one or more judgments or orders for the payment of money in excess of $10,000,000 (or the equivalent thereof in currencies other than U.S. dollars) in the aggregate shall be entered or filed against the Company or any of its Subsidiaries and shall remain undischarged, unvacated, unbonded or unstayed for a period of thirty (30) consecutive days;

(x)    (i) the occurrence of a Reportable Event with respect to any Plan, (ii) the filing of a notice of intent to terminate a Plan by the Company, any ERISA Affiliate or any Subsidiary, the institution of proceedings to terminate a Plan by the PBGC or any other Person; (iii) the withdrawal in a "complete withdrawal" or a "partial withdrawal" as defined in Sections 4203 and 4205, respectively, of ERISA by the Company, any ERISA Affiliate or any Subsidiary of the Company from any Multiemployer Plan, (iv) the incurrence of any material increase in the contingent liability of the Company or any of its Subsidiaries with respect to any "employee welfare benefit plan" as defined in Section 3(1) of ERISA which covers retired employees and its beneficiaries or (v) the Unfunded Pension Liabilities of all Single Employer Plans shall exceed (in the aggregate) $10,000,000, in each such case which, either individually or in the aggregate, would be reasonably expected to result in liability to any Note Party in excess of $10,000,000;

(xi)    the institution by the Company, any ERISA Affiliate or any Subsidiary of steps to terminate any Plan if, in order to effectuate such termination, the Company, such ERISA Affiliate or such Subsidiary, as the case may be, would be required to make a contribution to such Plan, or would incur a liability or obligation to such Plan, in excess of $10,000,000, or the institution by the PBGC of steps to terminate any Plan, which would reasonably be expected to result in material liability to any Note Party;

(xii)    the Company or any Material Subsidiary shall (i) be the subject of any proceeding pertaining to the release by the Company, any such Material Subsidiary or any other Person of any Hazardous Material into the environment or (ii) violate any Environmental Law, which, in either case could reasonably be expected to have a Material Adverse Effect;

(xiii)    from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13 of the Purchase Agreement, any Collateral Document shall for any reason fail to create a valid and perfected first priority (subject to any Permitted Liens) security interest in any collateral purported to be covered thereby, except as permitted by the terms of such Collateral Document, or any Collateral Document shall fail to remain in full force or effect (other than in accordance with the terms hereof or thereof) or any action taken by the Company or any Subsidiary shall be taken to discontinue or to assert the invalidity or unenforceability of such Collateral Document;

(xiv)     any intercreditor agreement or subordination agreement relating to any Indebtedness of any Note Party subordinated to the Obligations, or any subordination provisions of any note or other document running to the benefit of the Holders in respect of such Indebtedness, including, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13 of the Purchase Agreement, the Intercreditor Agreement, shall cease for any reason to be in full force and effect other than in accordance with the terms hereof or thereof or any Note Party or any of their Subsidiaries shall so assert in writing; or

(xv)     the Note Parties shall be enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of the business of the Note Parties, taken as a whole.

5.     MISCELLANEOUS PROVISIONS.

(a)     **Waivers**. The Company hereby waives demand, notice, presentment, protest and notice of dishonor.

(b)     **Further Assurances**. The Holder agrees and covenants that at any time and from time to time the Holder will promptly execute and deliver to the Company such further instruments and documents and take such further action as the Company may reasonably require in order to carry out the full intent and purpose of this Note and to comply with state or federal securities laws or other regulatory approvals.

(c)     **Transfers of Notes**. Subject to the Company's prior written consent (not to be unreasonably withheld or delayed) and to the extent permitted by applicable law, this Note may be transferred only upon its surrender to the Company for registration of transfer, duly endorsed, or accompanied by a duly executed written instrument of transfer in form satisfactory to the Company. Thereupon, this Note shall be reissued to, and registered in the name of, the transferee, or a new Note for like principal amount and interest shall be issued to, and registered in the name of, the transferee. Interest and principal shall be paid solely to the registered holder of this Note. Such payment shall constitute full discharge of the Company's obligation to pay such interest and principal. Upon the effectiveness of any transfer pursuant to this Section 5(c) the Company shall provide an updated Ledger to the Note Agent. Any transfer of this Note in contravention of this Section 5(c) shall be void and the Company shall be entitled to continue to treat the Holder as the holder of this Note for all purposes under the Note Documents. The Company shall at all times maintain a book-entry system, which shall reflect ownership of this Note and interests therein. This Note is intended to be in "registered form" for United States federal tax purposes.

(d)     **Market Standoff**. To the extent requested by the Company or an underwriter of securities of the Company, each Holder and any permitted transferee thereof shall not, without the prior written consent of the underwriters in an underwritten public offering pursuant to an effective registration statement filed with the Securities and Exchange Commission in accordance with the Act or under equivalent securities laws and regulations of any other jurisdiction, offer, sell, make any short sale of, grant or sell any option for the purchase of, lend, pledge, otherwise transfer or dispose of (directly or indirectly), enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership (whether any such transaction is described above or is to be settled by delivery of Securities or other securities, in cash, or otherwise), any Securities or other shares of stock of the Company then owned by such Holder or any transferee thereof, or enter into an agreement to do any of the foregoing, for up to 180 days following the consummation of any such offering. For purposes of this paragraph, "*Company*" includes the Company or any other direct or indirect parent entity of the Company into which the Company merges or consolidates. The Company may place restrictive legends on the certificates representing the shares subject to this paragraph and may impose stop transfer instructions with

respect to the Securities and such other shares of stock of each Holder and any transferee thereof (and the shares or securities of every other person subject to the foregoing restriction) until the end of such period. Each Holder and any transferee thereof shall enter into any agreement reasonably required by the underwriters for such an offering to implement the foregoing within any reasonable timeframe so requested. The underwriters for any such offering are intended third party beneficiaries of this paragraph and shall have the right, power and authority to enforce the provisions of this paragraph as though they were parties hereto. The provisions of this paragraph shall survive any conversion and/or repayment of this Note.

(e)     **Waiver of Statutory Information Rights**. Prior to the conversion in full of this Note, the Holder, on behalf of the Holder and all beneficial owners of the Securities now or hereafter owned by the Holder (a "***Beneficial Owner***"), acknowledges and agrees that that neither the Holder nor any of the Beneficial Owners will have any right to receive any information from the Company by virtue of ownership of any of the Securities. Without limiting the foregoing, prior to the conversion in full of this Note, to the fullest extent permitted by law, the Holder hereby unconditionally and irrevocably waives all rights under Section 220 of the Delaware General Corporation Law and all such similar information and/or inspection rights that may be provided under the law of any jurisdiction, or any federal, state or foreign regulation, that are, or may become, applicable to the Company or the Company's capital stock (the "***Inspection Rights***") on behalf of the Holder and all Beneficial Owners. The Holder, on behalf of the Holder and all Beneficial Owners, hereby covenants and agrees that neither the Holder nor any Beneficial Owner shall directly or indirectly commence, voluntarily aid in any way, prosecute, assign, transfer, or cause to be commenced any claim, action, cause of action, or other proceeding to pursue or exercise the Inspection Rights. The Holder hereby further warrants and represents that the Holder has reviewed this waiver with its legal counsel, and that the Holder knowingly and voluntarily waives its rights otherwise provided by Section 220 of the Delaware General Corporation Law (or under similar rights under other applicable law). Notwithstanding the foregoing, Beneficial Owners that were issued Equity Securities other than by way of a conversion in connection with an Offering will not be subject to this Section 5(e). The terms of this Section 5(e) shall survive any repayment of this Note.

(f)     **Amendment and Waiver**. This Note and any term hereof may only be amended, waived or modified in accordance with Section 10.9 of the Purchase Agreement. Upon the effectuation of such amendment, waiver or modification with the consent of the Required Holders or each Holder, as applicable, in conformance with Section 10.9 of the Purchase Agreement, such amendment, waiver or modification shall be effective as to, and binding against the Holders of, all of the Notes, and the Company shall promptly give written notice thereof to the Holder if the Holder has not previously consented to such amendment, waiver or modification in writing; provided that the failure to give such notice shall not affect the validity of such amendment, waiver or modification.

(g)     **Binding Agreement**. The terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Note, expressed or implied, is intended to confer upon any third party any rights, remedies, obligations, or liabilities under or by reason of this Note, except as expressly provided in this Note. Notwithstanding any assumption of the Company's Obligations under this Note by a Parent Entity in accordance with Section 10.1 of the Purchase Agreement, Core Scientific Holding Co. (or its successor by merger) shall remain a co-obligor with such Parent Entity with respect to such Obligations (other than any such Obligation of the Company to deliver Equity Securities or Common Stock pursuant to Section 2 of this Note, with respect to which delivery Obligation Core Scientific Holding Co. (or its successor by merger) shall be a Guarantor).

(h)     **Counterparts**. This Note may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract. Any counterpart of a signature page to this Note may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature

complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.

(i)      **Headings; Interpretation**. Paragraph headings used in this Note are included for convenience of reference only and will not modify the provisions that they precede or affect the interpretation of this Note or any other Note Document. The term "including" shall be interpreted to mean "including but not limited to".

(j)      **Notices**. All communications and notices required or permitted to be given hereunder shall be delivered in accordance with Section 10.8 of the Purchase Agreement.

(k)      **GOVERNING LAW.** THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.

(l)      **Expenses, Etc**. This Note is subject to the provisions of Section 10.3 (Jurisdiction and Venue), Section 10.4 (Waiver of Jury Trial) and Section 10.10 (Expenses and Indemnification) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*.

(m)      **Delays or Omissions**. It is agreed that no delay or omission to exercise any right, power or remedy accruing to each Holder, upon any breach or default of the Company under this Note or any Note shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. It is further agreed that any waiver, permit, consent or approval of any kind or character by a Holder of any breach or default under this Note, or any waiver by such Holder of any provisions or conditions of this Note must be in writing and shall be effective only to the extent specifically set forth in writing and that all remedies, either under this Note, or by law or otherwise afforded to such Holder, shall be cumulative and not alternative.

(n)      **Entire Agreement**. This Note and the other Note Documents constitute the entire contract among the parties hereto regarding to the subject matters addressed herein and supersede any and all previous agreements, negotiations, and discussions, oral or written, by the parties regarding the subject matters addressed herein.

(o)      **Exculpation among Holders**. The Holder acknowledges that the Holder is not relying on any person, firm or corporation, other than the Company and its officers and board members, in making its investment or decision to invest in the Company.

(p)      **Broker's Fees**. Each party hereto represents and warrants that no agent, broker, investment banker, person or firm acting on behalf of or under the authority of such party hereto is or will be entitled to any broker's or finder's fee or any other commission directly or indirectly in connection with the transactions contemplated herein. Each party hereto further agrees to indemnify each other party for any claims, losses or expenses incurred by such other party as a result of the representation in this subsection being untrue.

(q)      **Repayment Amounts**. The parties hereto hereby acknowledge and agree that

payment of any Repayment Amount hereunder constitutes liquidated damages and not a penalty, the actual amount of damages to the Holder or profits lost by the Holder as a result of a prepayment or conversion of this Note would be impracticable and extremely difficult to ascertain and the Repayment Amount hereunder is part of an arm's length transaction between sophisticated parties represented by counsel and is bargained for consideration provided for and agreed to by mutual agreement of the Company and the Holder. THE NOTE PARTIES EXPRESSLY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE REPAYMENT AMOUNT TO THE EXTENT SUCH REPAYMENT AMOUNT IS DUE AND PAYABLE IN ACCORDANCE WITH THIS NOTE. The Note Parties expressly agree that: (i) the Repayment Amount shall be payable notwithstanding the then prevailing market rates at the time payment is made; (ii) the Note Parties shall be estopped hereafter from claiming differently than as agreed to in this paragraph; and (iii) their agreement to pay the Repayment Amount is a material inducement to the Holder to purchase the Note.

(r)     **Tax Forms**. Prior to the date hereof, the Holder (and, in the event any Person becomes an assignee or participant in respect of this Note, prior to the date such Person becomes such an assignee or participant) shall have delivered to the Company executed copies of Internal Revenue Service ("***IRS***") Form W-9 or appropriate IRS Form W-8, as applicable, as well as any reasonably necessary supporting information, certifying that any payments to such Holder (or assignee or participant) under this Note are exempt from U.S. federal withholding tax. The Holder (and assignee or participant) further agrees that if any such form or certification expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Company in writing of its legal inability to do so.

(s)     **Calculations**. The Company shall be responsible for making all calculations with respect to this Note, including, without limitation, accrued interest (including PIK Interest), the Fair Market Value Per Common Share and the Applicable Conversion Price and shall forward such calculations to the Agents and the Holder upon request.

*[Signature pages follow]*

**IN WITNESS WHEREOF**, the parties hereto have executed this Note as of the date first written above.

COMPANY:

CORE SCIENTIFIC HOLDING CO.

By: _____

     Name:
     Title:

E-mail: _____

Address:

[Signature Page to Core Scientific Holding Co. Convertible Promissory Note]

**HOLDER (if an entity):**

Name of Holder: _____

By: _____

Name: _____
Title: _____

E-mail: _____

Address: _____
_____
_____

**HOLDER (if an individual):**

Name of Holder: _____

Signature: _____

E-mail: _____

Address: _____
_____
_____

[Signature Page to Core Scientific Holding Co. Convertible Promissory Note]

**EXHIBIT B**

**FORM OF COUNTERPART SIGNATURE PAGE**

  **IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

        The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

        **ADDITIONAL PURCHASER:**

        [     ]

        By:_____
        Name:
        Title:

**EXHIBIT C**

**FORM OF GUARANTY**

**(see attached)**

## GUARANTY

**THIS GUARANTY** (this "*Agreement*"), dated as of August 20, 2021, is made by and among each guarantor executing a signature page hereto and each Additional Guarantor (as defined below) that becomes a party hereto pursuant to Section 15 (each, a "*Guarantor*" and collectively, the "*Guarantors*") and U.S. Bank National Association, as note agent for the Guaranteed Parties referred to below (the "*Note Agent*") and Collateral Agent for the Secured Parties (when applicable).

## RECITALS

**WHEREAS**, the Guarantors entered into that certain Convertible Note Purchase Agreement, dated as of the date hereof (as amended, restated, supplemented and/or otherwise modified from time to time, the "*Purchase Agreement*"; capitalized terms used but not defined herein having the meanings ascribed thereto therein), by and among Core Scientific Holding Co., a Delaware corporation, the Guarantors party thereto, each Purchaser party thereto and the Note Agent; and

**WHEREAS**, to induce the Purchasers to purchase the Notes, the Guarantors have agreed to enter into this Agreement.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the foregoing, and the representations, warranties and conditions set forth herein, the parties hereto, intending to be legally bound, hereby agree as follows:

1. **Defined Terms.**

   "*Additional Guarantor*" has the meaning assigned to such term in Section 15.

   "*Aggregate Payments*" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (1) the aggregate amount of all payments and distributions made on or before such date by such Contributing Guarantor in respect of this Agreement (including in respect of Section 3), minus (2) the aggregate amount of all payments received on or before such date by such Contributing Guarantor from the other Contributing Guarantors as contributions under Section 3.

   "*Bankruptcy Code*" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

   "*Commodity Exchange Act*" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended and in effect from time to time, and any successor statute.

   "*Contributing Guarantors*" has the meaning assigned to such term in Section 3.

   "*Fair Share*" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Fair Share Contribution Amount with respect to such Contributing Guarantor to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Contributing Guarantors *multiplied* by (b) the aggregate amount paid or distributed on or before such date by all Funding Guarantors under this Agreement in respect of the obligations guaranteed.

   "*Fair Share Contribution Amount*" means, with respect to a Contributing Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Contributing Guarantor under this Agreement that would not render its obligations hereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Bankruptcy Code or any comparable

applicable provisions of state law; *provided*, solely for purposes of calculating the "Fair Share Contribution Amount" with respect to any Contributing Guarantor for purposes of Section 3, any assets or liabilities of such Contributing Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Contributing Guarantor.

"***Funding Guarantors***" has the meaning assigned to such term in Section 3.

"***Guaranteed Obligations***" has the meaning assigned to such term in Section 2.

"***Guaranteed Parties***" means the Purchasers, the Holders, the Agents, and their respective successors and permitted assigns.

"***Guarantor***" has the meaning assigned to such term in the preamble to this Agreement.

"***Qualified ECP Guarantor***" means, in respect of any Swap Obligation, each Note Party that has total assets exceeding Ten Million Dollars ($10,000,000.00) at the time the relevant Guarantee or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another Person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"***Swap Obligation***" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

**2.      Guaranty of the Obligations**.  The Guarantors jointly and severally hereby irrevocably and unconditionally guaranty to the Agent, for the ratable benefit of the Guaranteed Parties, the due and punctual payment and performance in full of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)) (collectively, the "***Guaranteed Obligations***").

**3.      Contribution by Guarantors**.  All Guarantors desire to allocate among themselves (collectively, the "***Contributing Guarantors***"), in a fair and equitable manner, their obligations arising under this Agreement.  Accordingly, in the event any payment or distribution is made on any date by a Guarantor (a "***Funding Guarantor***") under this Agreement such that its Aggregate Payments exceeds its Fair Share as of such date, such Funding Guarantor shall be entitled to a contribution from each of the other Contributing Guarantors in an amount sufficient to cause each Contributing Guarantor's Aggregate Payments to equal its Fair Share as of such date.  The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Funding Guarantor.  The allocation among Contributing Guarantors of their obligations as set forth in this Section 3 shall not be construed in any way to limit the liability of any Contributing Guarantor hereunder.  Each Guarantor is a third-party beneficiary to the contribution agreement set forth in this Section 3.

**4.      Payment by Guarantors**.  The Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Guaranteed Party may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of the Company to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)), the Guarantors will upon demand pay, or cause to be paid, in cash, to the Note Agent for the ratable benefit of

2

the Guaranteed Parties, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for the Company's becoming the subject of a case under the Bankruptcy Code, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against the Company for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to the Guaranteed Parties as aforesaid.

**5.    Liability of Guarantors Absolute**.   Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations.  In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a)    this Agreement is a guaranty of payment when due and not of collectability; this Agreement is a primary obligation of each Guarantor and not merely a contract of surety;

(b)    the Note Agent may enforce this Agreement upon the occurrence of an Event of Default notwithstanding the existence of any dispute between the Company and any Guaranteed Party with respect to the existence of such Event of Default;

(c)    the obligations of each Guarantor hereunder are independent of the obligations of the Company and the obligations of any other guarantor (including any other Guarantor) of the obligations of the Company, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against the Company or any of such other guarantors and whether or not the Company is joined in any such action or actions;

(d)    payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid; <u>provided</u> that, without limiting the generality of the foregoing, if the Note Agent is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(e)    any Guaranteed Party, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for the benefit of such Guaranteed Party in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Guaranteed Party may have against any such security, in each case as such Guaranteed Party in its discretion may determine consistent herewith and any applicable security

3

agreement, including foreclosure on any such security pursuant to one or more judicial or non-judicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against the Company or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Note Documents; and

(f)     this Agreement and the obligations of the Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full of the Guaranteed Obligations), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Note Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to Events of Default) hereof, any of the other Note Documents or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Note Document or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Note Documents or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though any Guaranteed Party might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) any Guaranteed Party's consent to the change, reorganization or termination of the corporate structure or existence of the Company or any of its Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations; (vii) any defenses, set offs or counterclaims which the Company may allege or assert against any Guaranteed Party in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

**6.     Waivers by Guarantors**. Each Guarantor hereby waives, for the benefit of the Guaranteed Parties: (a) any right to require any Guaranteed Party, as a condition of payment or performance by such Guarantor, to (i) proceed against the Company, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from the Company, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any deposit account or credit on the books of any Guaranteed Party in favor of the Company or any other Person, or (iv) pursue any other remedy in the power of any Guaranteed Party whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of the Company or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of the Company or any other Guarantor from any cause other than payment in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Guaranteed Party's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to gross negligence or willful misconduct; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the

4

terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Guaranteed Party protect, secure, perfect or insure any security interest or Lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to the Company and notices of any of the matters referred to in <u>Section 5</u> and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

7.    **Guarantors' Rights of Subrogation, Contribution, etc.**  Until the Guaranteed Obligations shall have been indefeasibly paid in full (other than contingent obligations as to which no demand has been made or claim asserted), each Guarantor hereby waives any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against the Company or any other Guarantor or any of its assets in connection with this Agreement or the performance by such Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including (a) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter have against the Company with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that any Guaranteed Party now has or may hereafter have against the Company, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by any Guaranteed Party.  In addition, until the Guaranteed Obligations shall have been indefeasibly paid in full (other than contingent obligations as to which no demand has been made or claim asserted), each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guaranteed Obligations, including any such right of contribution as contemplated by <u>Section 3</u>.  Each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against the Company or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights any Guaranteed Party may have against the Company, to all right, title and interest any Guaranteed Party may have in any such collateral or security, and to any right any Guaranteed Party may have against such other guarantor.  If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations shall not have been finally and indefeasibly paid in full (other than contingent obligations as to which no demand has been made or claim asserted), such amount shall be held in trust for the Note Agent on behalf of the Guaranteed Parties and shall forthwith be paid over to the Note Agent for the benefit of the Guaranteed Parties to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

8.    **Subordination of Other Obligations**.  Any Indebtedness of the Company or any Guarantor now or hereafter held by any Guarantor (the "***Obligee Guarantor***") is hereby subordinated in right of payment to the Guaranteed Obligations, and any such indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust for the Note Agent on behalf of the Guaranteed Parties and shall forthwith be paid over to the Note Agent for the benefit of the Guaranteed Parties to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

254153973 v5

**9.     Continuing Guaranty**.  This Agreement is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations shall have been indefeasibly paid in full (other than contingent obligations as to which no demand has been made or claim asserted).  Each Guarantor hereby irrevocably waives any right to revoke this Agreement as to future transactions giving rise to any Guaranteed Obligations.

**10.     Authority of the Guarantors or the Company**.  It is not necessary for any Guaranteed Party to inquire into the capacity or powers of any Guarantor or the Company or the officers, directors or any agents acting or purporting to act on behalf of any of them.

**11.     Financial Condition of the Company**.  Any Notes may be issued to the Company without notice to or authorization from any Guarantor regardless of the financial or other condition of the Company at the time of any such grant or continuation.  No Guaranteed Party shall have any obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of the Company.  Each Guarantor has adequate means to obtain information from the Company on a continuing basis concerning the financial condition of the Company and its ability to perform its obligations under the Note Documents and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of the Company and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations.  Each Guarantor hereby waives and relinquishes any duty on the part of any Guaranteed Party to disclose any matter, fact or thing relating to the business, operations or conditions of the Company now known or hereafter known by any Guaranteed Party.

**12.     Bankruptcy, etc.**

(a)     So long as any Guaranteed Obligations remain outstanding, no Guarantor shall, without the prior written consent of the Note Agent acting pursuant to the instructions of Required Holders, commence or join with any other Person in commencing any bankruptcy, reorganization or insolvency case or proceeding of or against the Company or any other Guarantor.  The obligations of the Guarantors hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by any case or proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of the Company or any other Guarantor or by any defense which the Company or any other Guarantor may have by reason of the order, decree or decision of any court or administrative body resulting from any such proceeding.

(b)     Each Guarantor acknowledges and agrees that any interest on any portion of the Guaranteed Obligations which accrues after the commencement of any case or proceeding referred to in clause (a) above (or, if interest on any portion of the Guaranteed Obligations ceases to accrue by operation of law by reason of the commencement of such case or proceeding, such interest as would have accrued on such portion of the Guaranteed Obligations if such case or proceeding had not been commenced) shall be included in the Guaranteed Obligations because it is the intention of the Guarantors and the Guaranteed Parties that the Guaranteed Obligations which are guaranteed by the Guarantors pursuant hereto should be determined without regard to any rule of law or order which may relieve the Company of any portion of such Guaranteed Obligations.  The Guarantors will permit any trustee in bankruptcy, receiver, debtor in possession, assignee for the benefit of creditors or similar person to pay Agent, or allow the claim of the Note Agent in respect of, any such interest accruing after the date on which such case or proceeding is commenced.

(c)     In the event that all or any portion of the Guaranteed Obligations are paid by the Company, the obligations of the Guarantors hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from any Guaranteed Party as a preference, fraudulent transfer or otherwise,

and any such payments which are so rescinded or recovered shall constitute Guaranteed Obligations for all purposes hereunder.

**13.      Discharge of Guaranty Upon Sale of a Guarantor**.  If all of the Capital Stock of any Guarantor or any of its successors in interest hereunder shall be sold or otherwise disposed of (including by merger or consolidation) in accordance with the terms and conditions of the Note Documents, the Guaranty of such Guarantor or such successor in interest, as the case may be, hereunder shall automatically be discharged and released without any further action by any Guaranteed Party or any other Person effective as of the time of such Asset Disposition.

**14.      Keepwell**.  Each Qualified ECP Guarantor hereby, jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Note Party to honor all of its obligations under this Agreement in respect of Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 14 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 14, or otherwise under this Agreement, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  The obligations of each Qualified ECP Guarantor under this Section 14 shall remain in full force and effect until all of the Guaranteed Obligations (other than contingent indemnity Obligations for which no claim has been asserted) shall have been paid in full.  Each Qualified ECP Guarantor intends that this Section 14 constitute, and this Section 14 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Note Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

**15.      Additional Guarantors.**  Each Subsidiary of the Company that is required to become a Guarantor pursuant to Section 6.10 of Purchase Agreement will become a Guarantor (each an "*Additional Guarantor*"), with the same force and effect as if such Subsidiary were originally named as a Guarantor herein, for all purposes of this Agreement upon the execution and delivery by such Subsidiary of a supplement to this Agreement substantially in the form of the supplement attached hereto as Exhibit A (each a "*Guaranty Supplement*").  Each reference to "Guarantor" (or any words of like import referring to a Guarantor) in this Agreement or any other Note Document shall also mean the Additional Guarantor and each reference in this Agreement or any other Note Document to this "Guaranty" (or words of like import referring to this Agreement) shall mean this Agreement, as supplemented by each Guaranty Supplement.  No consent of any other Guarantor hereunder will be required for the execution and delivery of any Guaranty Supplement.  The rights and obligations of each Guarantor hereunder shall remain in full force and effect notwithstanding the addition of any Additional Guarantor as a party to this Agreement.

**16.      Severability**.  If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith.  In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (a) such provision shall be excluded from this Agreement, (b) the balance of this Agreement shall be interpreted as if such provision were so excluded, and (c) the balance of this Agreement shall be enforceable in accordance with its terms.

**17.      Waiver and Amendment; Entire Agreement**.  Any provision of this Agreement may be amended, waived or modified only by an instrument signed in writing by the Guarantors and the Note Agent (with the consent of any Guaranteed Party as required by Section 10.9 of the Purchase Agreement).  This Agreement and the other Note Documents constitute the entire contract among the parties hereto regarding to the subject matters addressed herein and supersede any and all previous agreements, negotiations, and discussions, oral or written, by the parties regarding the subject matters addressed herein.

18.     **Successors and Assigns**.  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties.  Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

19.     **GOVERNING LAW**.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.

20.     **Jurisdiction and Venue; Waiver of Jury Trial; Expenses and Indemnification**.  This Agreement is subject to the provisions of Section 10.3 (Jurisdiction and Venue), Section 10.4 (Waiver of Jury Trial) and Section 10.10(a) (Expenses and Indemnification) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*.

21.     **Notices**.  All communications and notices required or permitted to be given hereunder shall be delivered in accordance with Section 10.8 of the Purchase Agreement.

22.     **Headings; Interpretation**.  Paragraph headings used in this Agreement are included for convenience of reference only and will not modify the provisions that they precede or affect the interpretation of this Agreement or any other Note Document.  The term "including" shall be interpreted to mean "including but not limited to".

23.     **Counterparts**.  This Agreement may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract.  Any counterpart of a signature page to this Agreement may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.

24.     **Concerning the Agent**.  U.S. Bank National Association is entering into this Agreement solely in its capacity as Note Agent and Collateral Agent (when applicable) under the Purchase Agreement and shall be entitled to all of the rights, privileges and immunities of the Note Agent and Collateral Agent (when applicable) in acting hereunder.

25.     **Security**.  The parties hereto acknowledge that, upon delivery of the Collateral Documents required by Section 6.13 of Purchase Agreement, the Guaranteed Obligations shall be secured by a first priority Lien on the Collateral (subject to terms contained in such Collateral Documents).

*[Signature pages follow]*

254153973 v5

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first written above.

**CORE SCIENTIFIC, INC.,** a Delaware corporation

By:_____
Name:  Michael Trzupek
Title:    Chief Executive Officer

**AMERICAN PROPERTY ACQUISITION, LLC,** a Delaware limited liability company

By: Core Scientific, Inc., its sole member

By:_____
Name:  Michael Trzupek
Title:    Chief Executive Officer

**AMERICAN PROPERTY ACQUISITIONS I, LLC,** a North Carolina limited liability company

By: American Property Acquisition, LLC, its sole member

By:  Core Scientific, Inc., its sole member

By:_____
Name:  Michael Trzupek
Title:    Chief Executive Officer

[Signature Page to Guaranty]

**AMERICAN PROPERTY ACQUISITIONS VII, LLC,** a Georgia limited liability company

By: American Property Acquisition, LLC, its sole member

By:  Core Scientific, Inc., its sole member

By:_____
Name:  Michael Trzupek
Title:    Chief Executive Officer

**BLOCKCAP, INC.,** a Nevada corporation

By:_____
Name:  Todd DuChene
Title:    Secretary

**NOTE AGENT AND COLLATERAL AGENT**:

**U.S. BANK NATIONAL ASSOCIATION**


By: _____
Name:
Title:

Exhibit A to
Guaranty Agreement

**FORM OF GUARANTY SUPPLEMENT**

THIS G U A R A N T Y  SUPPLEMENT (this "*Supplement*"), dated as of [__], is entered into by and between [__] (the "*New Guarantor*") and U.S. BANK, NATIONAL ASSOCIATION, as note agent (in such capacity, the "*Agent*") under that certain Guaranty, dated as of August 20, 2021, by and among Core Scientific, Inc., American Property Acquisition, LLC, American Property Acquisitions I, LLC, American Property Acquisitions VII, LLC, each other Guarantor from time to time party thereto and the Note Agent (the "*Guaranty*").  Capitalized terms used but not defined herein shall have the meanings given to them in the Guaranty.

The New Guarantor and the Agent, for the benefit of the Guaranteed Parties, hereby agree as follows:

The New Guarantor hereby acknowledges, agrees and confirms that, by its execution of this Supplement, the New Guarantor will be deemed to be a "Guarantor" under the Guaranty for all purposes of the Guaranty and shall have all of the obligations of a Guarantor thereunder as if it had executed the Guaranty.  The New Guarantor hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Guaranty.

This Supplement is subject to the provisions of Section 10.2 (Governing Law), Section 10.3 (Jurisdiction and Venue) and Section 10.4 (Waiver of Jury Trial) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*.

This Supplement may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract.  Any counterpart of a signature page to this Supplement may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.

U.S. Bank National Association is entering into this Supplements solely in its capacity as Note Agent and shall be entitled to all of the rights, privileges and immunities of the Note Agent under the Purchase Agreement in acting hereunder.

[*Signature page follows*]

Exhibit A to
Guaranty Agreement

**IN WITNESS WHEREOF**, the parties hereto have executed this Supplement as of the date first written above.

**[NEW GUARANTOR]**


By:_____
Name:
Title:


Acknowledged and accepted:


**AGENT**:

**U.S. BANK NATIONAL ASSOCIATION,**
as Note Agent [and Collateral Agent]


By: _____
Name:
Title:

**EXHIBIT D**

**FORM OF SECURITY AGREEMENT**

**(see attached)**

## [FORM OF] SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "*Agreement*"), dated as of [__], is made by and among each Grantor executing a signature page hereto and each Additional Grantor (as defined below) that may become a party hereto pursuant to Section 5.8(b) (each, a "*Grantor*" and collectively, the "*Grantors*"), in favor of U.S. Bank National Association, in its capacity as collateral agent on behalf of the Secured Parties (the "*Collateral Agent*").

## RECITALS

WHEREAS, the Grantors entered into that certain Convertible Note Purchase Agreement, dated as of August 20, 2021 (as amended, restated, supplemented and/or otherwise modified from time to time, the "*Purchase Agreement*"), by and among the Grantors, each Purchaser party thereto and U.S. Bank National Association, as Note Agent and, upon the execution and delivery of the Collateral Documents pursuant to Section 6.13, as Collateral Agent for the Secured Parties;

WHEREAS, pursuant to the Purchase Agreement, each Purchaser has been issued by the Company one or more Notes (as defined in the Purchase Agreement), which are part of a series of Notes issued by the Company, in an aggregate principal amount of up to $300,000,000.00; and

WHEREAS, as continuing collateral security for the Obligations of the Company under the Purchase Agreement and the Guaranteed Obligations of the Guarantors under the Guaranty, the Grantors have agreed to enter into this Security Agreement, in favor of the Collateral Agent, for purposes of granting to the Collateral Agent, for the benefit of the Secured Parties, a security interest in the Grantors' assets, on the terms and subject to the conditions set forth therein.

## AGREEMENT

NOW THEREFORE, in consideration of the foregoing, and the representations, warranties and conditions set forth herein, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      DEFINED TERMS.  When used in this Agreement the following terms shall have the meanings set forth below (such meanings being equally applicable to both the singular and plural forms of the terms defined).  Any term used in the UCC and not defined herein shall have the meaning given to such term in the UCC and any capitalized term used but not otherwise defined herein shall have the meaning given to such term in the Notes or the Purchase Agreement, as applicable.

"*Additional Grantors*" shall have the meaning assigned in Section 5.8(b).

"*CFC*" shall mean a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"*CFC Holdco*" shall mean a Subsidiary of the Company that has no material assets other than Capital Stock (or Capital Stock and Indebtedness) of one or more direct or indirect Foreign Subsidiaries of the Company that are CFCs.

"*Collateral*" shall have the meaning assigned to such term in Section 2 of this Agreement.

"*Contracts*" means all contracts (including any customer, vendor, supplier, service or maintenance contract), personal property leases, licenses, undertakings, purchase orders, permits, franchise agreements or other agreements (other than any right evidenced by Chattel Paper, Documents or

Instruments), whether in written or electronic form, in or under which the Grantors now hold or hereafter acquire any right, title or interest, including, without limitation, with respect to an Account, any agreement relating to the terms of payment or the terms of performance thereof, and all assignments, amendments, restatements, supplements, extensions, renewals, replacements or modifications of the Contracts.

"*Copyright License*" means any agreement, whether in written or electronic form, in which the Grantors now hold or hereafter acquire any interest, granting any right in or to any Copyright or Copyright registration (whether the Grantors are the licensee or the licensor thereunder) including, without limitation, licenses pursuant to which the Grantors have obtained the exclusive right to use a copyright owned by a third party.

"*Copyrights*" means all of the following now owned or hereafter acquired or created (as a work for hire for the benefit of the Grantors) by the Grantors or in which the Grantors now hold or hereafter acquire or receive any right or interest, in whole or in part: (a) all copyrights, (statutory or common law, whether established or registered in the United States or any other country or any political subdivision thereof, whether registered or unregistered and whether published or unpublished), held pursuant to the laws of the United States, any State thereof or any other country; (b) registrations, applications, recordings and proceedings in the United States Copyright Office or in any similar office or agency of the United States, any State thereof or any other country; (c) any continuations, renewals or extensions thereof; (d) any registrations to be issued in any pending applications, and shall include any right or interest in and to work protectable by any of the foregoing which are presently or in the future owned, created or authorized (as a work for hire for the benefit of the Grantors) or acquired by the Grantors, in whole or in part; (e) prior versions of works covered by copyright and all works based upon, derived from or incorporating such works; (f) income, royalties, damages, claims and payments now and hereafter due and/or payable with respect to copyrights, including, without limitation, damages, claims and recoveries for past, present or future infringement; (g) rights to sue for past, present and future infringements of any copyright; and (h) any other rights corresponding to any of the foregoing rights throughout the world.

"*Excluded Account*" means any Account (including, for the avoidance of doubt, any cash, cash equivalents or other property contained therein) to the extent, and for so long as, such Account is pledged to secure (i) performance of tenders, bids, leases, statutory or regulatory obligations, surety and appeal bonds, government contracts, performance and return-of-money bonds, and other obligations of like nature, in each case, in the ordinary course of business or (ii) liability for reimbursement or indemnification obligations in respect of letters of credit or bank guarantees for the benefit of landlords, in each case whether such pledge is by escrow or otherwise.

"*Excluded Property*" means, collectively, (i) Excluded Accounts (and any assets contained therein), (ii) the Capital Stock of any Subsidiary that is a CFC or CFC Holdco, other than 65.00% of the total outstanding voting Capital Stock and 100.00% of the total outstanding nonvoting Capital Stock of a CFC or a CFC Holdco that, in each case, is directly owned by a Grantor, (iii) "intent-to-use" trademarks at all times prior to the first use thereof, whether by the actual use thereof in commerce, the recording of a statement of use with the United States Patent and Trademark Office or otherwise, (iv) any property, right or asset held by the Grantors or any Subsidiary to the extent that a grant of a security interest therein is prohibited by any Requirements of Law of a Governmental Authority or constitutes a breach or default under or results in the termination of or requires any consent not obtained under, any contract, license, agreement, instrument or other document evidencing or giving rise to such property, except (A) to the extent that the terms in such contract, license, instrument or other document providing for such prohibition, breach, default or termination, or requiring such consent are not permitted under this Agreement or (B) to the extent that such Requirements of Law or the term in such contract, license, agreement, instrument or other document providing for such prohibition, breach, default or termination or

2

requiring such consent is ineffective under Section 9406, 9407, 9408 or 9409 of the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law (including the Bankruptcy Code of the United States) or principles of equity; provided, however, that such security interest shall attach immediately at such time as such Requirements of Law is not effective or applicable, or such prohibition, breach, default or termination is no longer applicable or is waived, and to the extent severable, shall attach immediately to any portion of the Collateral that does not result in such consequences; and (v) any assets securing Indebtedness (including Capital Lease Obligations) incurred to finance the acquisition of any fixed or capital assets (including any real property assets) so long as a security interest therein only encumbers the assets so acquired or financed with the proceeds of such Indebtedness.

"**Foreign Subsidiary**" means any Subsidiary other than a Subsidiary organized under the laws of any state within the United States.

"**Intellectual Property License**" means, collectively with respect to the Grantors, any Copyright License, Patent License, Trademark License or other license of rights or interests, whether in-bound or out-bound, whether in written or electronic form, now or hereafter owned or acquired or received by the Grantors or in which the Grantors now hold or hereafter acquire or receives any right or interest, and shall include any renewals or extensions of any of the foregoing thereof.

"**Investment Property**" shall mean, collectively, (a) all "investment property" as such term is defined in Section 9-102(a)(49) of the UCC and (b) whether or not constituting "investment property" as so defined, all Pledged Stock.

"**Issuers**" shall mean, collectively, each issuer of any Investment Property.

"**Patent License**" means any agreement, whether in written or electronic form, in which the Grantors now hold or hereafter acquire any interest, granting any right with respect to any invention on which a Patent is in existence (whether the Grantors are the licensee or the licensor thereunder).

"**Patents**" means all of the following in which the Grantors now hold or hereafter acquire any interest: (a) all letters patent of the United States or any other country, all registrations and recordings thereof and all applications for letters patent of the United States or any other country, including, without limitation, registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country; (b) all reissues, divisions, continuations, renewals, continuations-in-part or extensions thereof; (c) all petty patents, divisionals and patents of addition; (d) all patents to issue in any such applications; (e) income, royalties, damages, claims and payments now and hereafter due and/or payable with respect to patents, including, without limitation, damages, claims and recoveries for past, present or future infringement; and (f) rights to sue for past, present and future infringements of any patent.

"**Pledged Stock**" shall mean all shares of Capital Stock, together with any other shares, stock certificates, options, interests or rights of any nature whatsoever in respect of the Capital Stock of any Person that may be issued or granted to, or held by, any Grantor while this Agreement is in effect.

"**Trademark License**" means any agreement, whether in written or electronic form, in which the Grantors now hold or hereafter acquire any interest, granting any right in and to any Trademark or Trademark registration (whether the Grantors are the licensee or the licensor thereunder).

"**Trademarks**" means any of the following in which the Grantors now hold or hereafter acquire any interest: (a) any trademarks, tradenames, corporate names, company names, business names, uniform

3

resource locators (URL's), domain names, trade styles, service marks, logos, other source or business identifiers, prints and labels on which any of the foregoing have appeared or appear, designs and general intangibles of like nature, now existing or hereafter adopted or acquired, all registrations and recordings thereof and any applications in connection therewith, including, without limitation, registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country (collectively, the "*Marks*"); (b) any reissues, extensions or renewals thereof; (c) the goodwill of the business symbolized by or associated with the Marks; (d) income, royalties, damages, claims and payments now and hereafter due and/or payable with respect to the Marks, including, without limitation, damages, claims and recoveries for past, present or future infringement; and (e) rights to sue for past, present and future infringements of the Marks.

2.     **GRANT OF SECURITY INTEREST**.  As collateral security for the full, prompt, complete and final payment and performance when due (whether at stated maturity, by acceleration or otherwise) of all the Obligations and in order to induce the Holders to purchase the Notes, each Grantor hereby assigns, conveys, mortgages, pledges, hypothecates and transfers to the Collateral Agent, on behalf of the Secured Parties, and hereby grants to the Collateral Agent, on behalf of the Secured Parties, a security interest in all of such Grantor's right, title and interest in, to and under the following, whether now owned or hereafter acquired (all of which being collectively referred to herein as the "*Collateral*"):

      (a)     All Accounts of the Grantors;

      (b)     All Chattel Paper of the Grantors;

      (c)     The Commercial Tort Claims of the Grantors;

      (d)     All Commodity Accounts of the Grantors;

      (e)     All Contracts of the Grantors;

      (f)     All Deposit Accounts of the Grantors;

      (g)     All Documents of the Grantors;

      (h)     All General Intangibles of the Grantors, including, without limitation, Intellectual Property;

      (i)     All Goods of the Grantors**,** including, without limitation, Equipment, Inventory and Fixtures;

      (j)     All Instruments of the Grantors, including, without limitation, Promissory Notes;

      (k)     All Investment Property of the Grantors;

      (l)     All Letter-of-Credit Rights and Letters of Credit of the Grantors;

      (m)     All Money of the Grantors;

      (n)     All Securities Accounts of the Grantors;

      (o)     All Supporting Obligations of the Grantors;

(p)      All property of the Grantors held by any Secured Party, or any other party for whom any Secured Party is acting as agent, including, without limitation, all property of every description now or hereafter in the possession or custody of or in transit to any Secured Party or such other party for any purpose, including, without limitation, safekeeping, collection or pledge, for the account of the Grantors, or as to which the Grantors may have any right or power;

(q)      All other goods and personal property of the Grantors, wherever located, whether tangible or intangible, and whether now owned or hereafter acquired, existing, leased or consigned by or to the Grantors; and

(r)      To the extent not otherwise included, all Proceeds of each of the foregoing and all accessions to, substitutions and replacements for and rents, profits and products of each of the foregoing.

Notwithstanding the foregoing provisions of this <u>Section 2</u>, the grant, assignment and transfer of a security interest as provided herein shall not extend to, and the term "Collateral" shall not include any Excluded Property.

3.      **RIGHTS OF SECURED PARTIES; COLLECTION OF ACCOUNTS.**

(a)      Notwithstanding anything contained in this Agreement to the contrary, each Grantor expressly agrees that it shall remain liable under each of its Contracts, Chattel Paper, Documents, Instruments and Intellectual Property to observe and perform all the conditions and obligations to be observed and performed by it thereunder and that it shall perform all of its duties and obligations thereunder, all in accordance with and pursuant to the terms and provisions of each such Contract, Chattel Paper, Document, Instrument, and Intellectual Property.  The Secured Parties and the Collateral Agent shall not have any obligation or liability under any such Contract, Chattel Paper, Document, Instrument, or Intellectual Property by reason of or arising out of this Agreement or the granting to the Collateral Agent of a Lien therein or the receipt by any Secured Party or the Collateral Agent of any payment relating to any such Contract, Chattel Paper, Document, Instrument, or Intellectual Property pursuant hereto, nor shall any Secured Party or the Collateral Agent be required or obligated in any manner to perform or fulfill any of the obligations of the Grantors under or pursuant to any such Contract, Chattel Paper, Document, Instrument, or Intellectual Property, or to make any payment, or to make any inquiry as to the nature or the sufficiency of any payment received by it or the sufficiency of any performance by any party under any such Contract, Chattel Paper, Document, Instrument, or Intellectual Property, or to present or file any claim, or to take any action to collect or enforce any performance or the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

(b)      Upon the occurrence and during the continuance of any Event of Default, the Collateral Agent authorizes each Grantor to collect its Accounts and, at the request of the Collateral Agent (at the direction of the Required Holders), such Grantor shall deliver all original and other documents evidencing and relating to the performance of labor or service which created such Accounts, including, without limitation, all original orders, invoices and shipping receipts.

(c)      The Collateral Agent may at any time, upon the occurrence and during the continuance of any Event of Default, notify Account Debtors of the Grantors, parties to the Contracts of the Grantors, obligors in respect of Instruments of the Grantors, and obligors in respect of Chattel Paper of the Grantors that the Accounts and the right, title and interest of the Grantors in and under such Contracts, Instruments and Chattel Paper have been assigned to the Collateral Agent and that payments shall be made directly to the Collateral Agent for distribution to the Secured Parties.  Upon the occurrence and during the continuance of any Event of Default, upon the request of the Collateral Agent (at the

5

direction of the Required Holders), the Grantors shall so notify such Account Debtors, parties to such Contracts, obligors in respect of such Instruments and obligors in respect of such Chattel Paper. The Collateral Agent may, in its name or in the name of others, communicate with such Account Debtors, parties to such Contracts, obligors in respect of such Instruments and obligors in respect of such Chattel Paper to verify with such parties, to the Collateral Agent's satisfaction, the existence, amount and terms of any such Accounts, Contracts, Instruments or Chattel Paper.

4.    **REPRESENTATIONS AND WARRANTIES**.   The Grantors hereby represent and warrant to the Collateral Agent and the other Secured Parties that:

(a)    Except for the security interest granted under this Agreement, the Grantors are the sole legal and equitable owner of each item of Collateral in which it purports to grant a security interest hereunder, having good and marketable title thereto, free and clear of any and all Liens except for Permitted Liens and, upon filing of a UCC financing statement in the UCC filing office, the Collateral Agent shall have a perfected security interest in the Collateral, which such security interest shall be senior to all other Liens (other than Permitted Liens). None of the Collateral is owned, legally or equitably by any subsidiary or company controlled by the Grantors.

(b)    The Grantors' correct legal name is set forth on the signature page hereof. The Grantors' chief executive office, jurisdiction of incorporation and the place where the Grantors maintain their records concerning the Collateral are presently located on Schedule 4(b).

(c)    Schedule 4(c) (as such schedule may be amended or supplemented from time to time) as required pursuant to the Purchase Agreement sets forth a true and complete list of (i) all United States, state and foreign registrations of and applications for Patents, Trademarks, and Copyrights owned by each Grantor and (ii) all Patent Licenses, Trademark Licenses and Copyright Licenses material to the business of such Grantor.

(d)    Schedule 4(d) sets forth a complete and accurate list of all Pledged Stock pledged by each Grantor hereunder on the Initial Closing Date. The Pledged Stock constitutes all issued and outstanding shares of all classes of the Capital Stock of each Issuer owned by such Grantor which is Collateral (and in the case of each Issuer which is required to become a Note Party pursuant to the terms of the Purchase Agreement, all the issued and outstanding shares of all classes of the Capital Stock of each such Issuer). Each Grantor has delivered all Certificated Securities constituting Collateral held by such Grantor in a Subsidiary on the Initial Closing Date (or the date such Grantor becomes a party to this Agreement, as applicable) to the Collateral Agent, together with duly executed undated blank stock powers, or other equivalent instruments of transfer acceptable to the Collateral Agent in accordance with Section 5.08(c) below and (assuming possession by the Collateral Agent) the Collateral Agent has a first-priority Lien.

5.    **COVENANTS**.  Unless the Collateral Agent (at the direction of the Required Holders) otherwise consents (which consent shall not be unreasonably withheld), the Grantors covenant and agree with the Collateral Agent and the other Secured Parties that from and after the date of this Agreement and until the Obligations have been performed and paid in full:

5.1    **Change of Name, Jurisdiction of Organization, Relocation of Business**.  The Grantors shall not change their name or jurisdiction of organization or relocate their chief executive office, principal place of business or their records from such address(es) provided to the Collateral Agent pursuant to Section 4(b) above without at least seven (7) days prior notice to the Collateral Agent.

5.2    **Certain Restrictions on Future Agreements**.

6

(a)        Each Grantor agrees that until the Obligations have been satisfied in full, it will not sell or assign its interest in, or grant any license under, other than in the ordinary course of business or in connection with a Permitted Lien, the Collateral, or enter into any other agreement with respect to the Collateral that is inconsistent with such Grantor's obligations under this Agreement, without the prior written consent of the Required Holders, and the such Grantor further agree that it will not take any action, or permit any action to be taken by others subject to its control, including licensees, or fail to take any action, which would affect the validity or enforcement of the rights transferred to the Holders under this Agreement.

(b)        Upon any sale, lease, transfer or other disposition of any item of Collateral not prohibited by the terms of this Agreement or the other Note Documents, the Collateral Agent will, at the Grantors' sole cost and expense, execute and deliver to the Grantors such documents as the Grantors shall reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted hereby; provided, however, that (i) at the time of such request and such release no Event of Default shall have occurred and be continuing and (ii) the Grantors shall have delivered to the Collateral Agent prior to the date of the proposed release a written request for release describing the item of Collateral, together with a form of release for execution by the Collateral Agent, and such other information as the Collateral Agent may reasonably request.

**5.3        License**.  The Grantors hereby grant to the Collateral Agent a non-exclusive, worldwide and royalty-free license to use or otherwise exploit all Intellectual Property rights of the Company or Subsidiary for the purpose of: (a) completing the manufacture of any in-process materials following any Event of Default so that such materials become saleable inventory, all in accordance with the same quality standards previously adopted by the Grantors for their own manufacturing; and (b) selling, leasing or otherwise disposing of any or all collateral following any Event of Default.

**5.4        Duties of the Grantors**.  The Grantors will have the duty to preserve and maintain all rights in the Collateral and to cause the perfection of the Collateral Agent's security interest therein to the extent the same can be perfected by the filing of a UCC financing statement.  Any expenses incurred in connection with the Grantors' obligations under this Section 5.4 will be borne by the Grantors.

**5.5        Insurance**.  The Grantors shall maintain insurance policies insuring the Collateral against loss or damage from such risks and in such amounts and forms and with such companies as are customarily maintained by businesses similar to the Grantors.

**5.6        Taxes, Assessments, Etc**.  The Grantors shall pay promptly when due all property and other taxes, assessments and government charges or levies imposed upon, and all claims (including claims for labor, materials and supplies) against, the Collateral, except to the extent the validity or amount thereof is being contested in good faith and adequate reserves are being maintained in connection therewith.

**5.7        Defense of Intellectual Property**.  The Grantors shall use commercially reasonable efforts to (i) protect, defend and maintain the validity and enforceability of all Copyrights, Patents and Trademarks material to the Grantors' business and (ii) detect infringements of all Copyrights, Patents and Trademarks material to the Grantors' business.

**5.8        Further Assurances**.

(a)        At any time and from time to time, as necessary or upon the written request of the Collateral Agent (at the direction of the Required Holders), and at the sole expense of the Grantors, the Grantors shall promptly and duly execute and deliver any and all such further instruments and

documents and take such further action as is necessary or that the Collateral Agent may reasonably request to obtain the full benefits of this Agreement (including the seniority of the security interest granted hereby as described in Section 4(a)), including, without limitation, executing, delivering and causing to be filed (i) any financing or continuation statements under the UCC with respect to the security interests granted hereby and (ii) intellectual property security agreements appropriate for filing with the United States Patent and Trademark Office or United States Copyright Office (or any successor office) as may be necessary or advisable for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interests granted hereby.  The Grantors also hereby authorize the Collateral Agent to file any such financing or continuation statement without the signature of the Grantors .  Notwithstanding the foregoing authorization, the Collateral Agent shall have no obligation to perfect or maintain the perfection of the Collateral Agent's security interest, including by filing UCC financing statements or continuation statements, which shall be the sole obligation of the Grantors.

(b)        From time to time subsequent to the date hereof, additional Persons may become parties hereto as additional Grantors (each, an "*Additional Grantors*"), by executing a joinder hereto substantially in the form of Exhibit A.  Upon delivery of any such counterpart agreement to the Collateral Agent, notice of which is hereby waived by Grantors, each Additional Grantors shall be a Grantors and shall be as fully a party hereto as if Additional Grantors were an original signatory hereto .  Each Grantor expressly agrees that its obligations arising hereunder shall not be affected or diminished by the addition or release of any other Grantors hereunder, nor by any election of Collateral Agent not to cause any Subsidiary of Company to become an Additional Grantors hereunder.  This Agreement shall be fully effective as to any Grantors that is or becomes a party hereto regardless of whether any other Person becomes or fails to become or ceases to be a Grantors hereunder.

(c)        On the date hereof (or, in respect of an Additional Grantor, on the date on which such Additional Grantor executes a joinder hereto), each Grantor will deliver to the Collateral Agent all certificates representing Certificated Securities constituting Collateral then owned by such Grantor, in suitable form for transfer by delivery or accompanied by duly executed instruments of transfer or assignments in blank, sufficient to transfer title to the Collateral Agent.  Thereafter, whenever such Grantor acquires any other Certificated Security constituting Collateral, such Grantor will promptly deliver such certificate to the Collateral Agent in suitable form for transfer by delivery or accompanied by duly executed instruments of transfer or assignments in blank, sufficient to transfer title to the Collateral Agent.  Any limited liability company and any partnership controlled by any Grantor shall either (a) not include in its operative documents any provision that any equity interest in such limited liability company or such partnership be a "security" as defined under Article 8 of the UCC or (b) certificate any equity interest in any such limited liability company or such partnership.  To the extent an interest in any limited liability company or partnership controlled by any Grantor and pledged hereunder that constitutes Collateral is certificated or becomes certificated, each such certificate shall be delivered to the Collateral Agent pursuant to this Section 5.8(c).  Each Grantor that is an issuer of Investment Property constituting Collateral pledged hereunder that is an "uncertificated security" for purposes of the UCC hereby agrees, subject to Section 6, to comply with the Collateral Agent's instructions with respect to such uncertificated security without further consent by such Grantor.

6.        RIGHTS AND REMEDIES UPON DEFAULT.

6.1        **General Remedial Provisions**.  Beginning on the date which is ten (10) business days after any Event of Default shall have occurred and while such Event of Default is continuing:

(a)        The Collateral Agent, on behalf of the Secured Parties, may exercise in addition to all other rights and remedies granted to it under this Agreement or the Notes, all rights and remedies of a secured party under the UCC.  Without limiting the generality of the foregoing, the Grantors expressly

8

agree that in any such event the Collateral Agent, without demand of performance or other demand, advertisement or notice of any kind (except the notice specified below of time and place of public or private sale) to or upon the Grantors or any other person, may (i) reclaim, take possession, recover, store, maintain, finish, repair, prepare for sale or lease, shop, advertise for sale or lease and sell or lease (in the manner provided herein) the Collateral, and in connection with the liquidation of the Collateral and collection of the Accounts pledged as Collateral, use any Trademark, Copyright, or process used or owned by the Grantors and (ii) forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and may forthwith sell, lease, assign, give an option or options to purchase or sell or otherwise dispose of and deliver said Collateral (or contract to do so), or any part thereof, in one or more parcels at public or private sale or sales, at any exchange or broker's board or at the Collateral Agent's offices or elsewhere at such prices as it may deem commercially reasonable, for cash or on credit or for future delivery without assumption of any credit risk. The Grantors further agree, at the Collateral Agent's request (at the direction of the Required Holders), to assemble the Collateral and make it available to the Collateral Agent at places which the Collateral Agent shall reasonably select, whether at the Grantors' premises or elsewhere. The Collateral Agent shall apply the net proceeds of any such collection, recovery, receipt, appropriation, realization or sale as provided in Section 6(d), below, with the Grantors remaining liable for any deficiency remaining unpaid after such application. The Grantors agree that the Collateral Agent need not give more than twenty (20) days' notice of the time and place of any public sale or of the time after which a private sale may take place and that such notice is reasonable notification of such matters.

(b)      The Grantors also agree to pay all fees, costs and expenses of the Collateral Agent, including, without limitation, reasonable attorneys' fees, incurred in connection with the enforcement of any of its rights and remedies hereunder.

(c)      The Grantors hereby waive presentment, demand, protest or any notice (to the maximum extent permitted by applicable law) of any kind in connection with this Agreement or any Collateral.

(d)      The Proceeds of any sale, disposition or other realization upon all or any part of the Collateral shall be distributed by the Collateral Agent in the following order of priorities:

FIRST, to the Collateral Agent in an amount sufficient to pay in full the costs of the Collateral Agent in connection with such sale, disposition or other realization, including all fees, costs, expenses, liabilities and advances incurred or made by the Collateral Agent in connection therewith, including, without limitation, reasonable attorneys' fees;

SECOND, to the Agents in amounts proportional to such Secured Party's Pro Rata Share of the then unpaid Obligations of each such Agent;

THIRD, to the other Secured Parties (other than the Agents) in amounts proportional to such Secured Party's Pro Rata Share of the then unpaid Obligations of each such Secured Party; and

FINALLY, upon payment in full of the Obligations, to the Grantors or their respective representatives, in accordance with the UCC or as a court of competent jurisdiction may direct.

(e)      Upon the occurrence and during the continuation of an Event of Default, in addition to all other rights and remedies that may then be available to any Holder of any Note, each Holder of any Note and the Collateral Agent is hereby authorized at any time and from time to time, without notice to the Company (any such notice being expressly waived by the Company) to set off and apply any and all Indebtedness at any time owing by such Holder or the Collateral Agent to or for the

credit or the account of the Grantors against all amounts which may be owed to such Holder or the Collateral Agent by the Grantors in connection with this Agreement or any other Note Document.  If any Holder of the Notes shall obtain from the Company payment of any principal of or interest on any Note held by it or payment of any other amount under this Agreement or such Note held by it or any other Note Document through the exercise of any right of set-off, and, as a result of such payment, such Holder shall have received a greater percentage of the principal, interest or other amounts then due to such Holder under the Note Documents than the percentage received by any other Holder, the Company shall promptly make such adjustments (including without limitation purchasing risk participations) with such other Holder from time to time as shall be equitable, to the end that all the Purchasers of the Notes shall share the benefit of such excess payment (net of any expenses which may be incurred by such Holder in obtaining or preserving such excess payment) pro rata in accordance with the unpaid principal and/or interest on the Notes or other amounts (as the case may be) owing to each of the Purchasers of the Notes.  To such end, all Holders of the Notes shall make appropriate adjustments among themselves if such payment is rescinded or must otherwise be restore d.  Any Holder of the Notes taking action under this Section 6 shall promptly provide notice to the Company of any such action taken; provided that the failure of such Holder to provide such notice shall not prejudice its rights hereunder.

      **6.2**    **Pledged Stock**.

      (a)    Prior to an Event of Default each Grantor shall be permitted to receive dividends and other distributions in respect of the Pledged Stock paid in the normal course of business or otherwise as a result of the exercise of reasonable business judgment of the relevant Issuer, to the extent permitted by the Purchase Agreement, and to exercise all voting and corporate rights with respect to the Investment Property.

      (b)    If an Event of Default shall have occurred and be continuing, effective upon delivery by the Collateral Agent to the Company of a notice (which, for the avoidance of doubt, may be electronic notice delivered in accordance with Section 4 of the Notes) stating that it is exercising its rights under this Section 6.2 (an "***Enforcement Notice***") (*provided*, however, that failure by the Collateral Agent to provide such Enforcement Notice shall not limit or impair any of the Collateral Agent's rights under this Agreement), (i) the Collateral Agent shall have the right to receive any and all dividends, payments or other Proceeds paid in respect of the Investment Property and make application thereof to the Obligations in the order set forth in Section 1(b)(iii)(1) of the Notes, (ii) any or all of the Investment Property shall be registered in the name of the Collateral Agent or its nominee, and (iii) the Collateral Agent or its nominee may exercise (x) all voting, corporate and other rights pertaining to such Investment Property at any meeting of shareholders of the relevant Issuer or Issuers or otherwise and (y) any and all rights of conversion, exchange and subscription and any other rights, privileges or options pertaining to such Investment Property as if it were the absolute owner thereof (including, without limitation, the right to exchange, at its discretion, any and all of the Investment Property upon the merger, consolidation, reorganization, recapitalization or other fundamental change in the corporate structure of any Issuer, or upon the exercise by any Grantor or the Collateral Agent of any right, privilege or option pertaining to such Investment Property, and in connection therewith, the right to deposit and deliver any and all of the Investment Property with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as the Collateral Agent may determine), all without liability except to account for property actually received by it, but the Collateral Agent shall have no duty to any Grantor to exercise any such right, privilege or option and shall not be responsible for any failure to do so or delay in so doing.  Upon the Collateral Agent's request (at the direction of the Required Holders), each Grantor shall, at its sole cost and expense, execute and deliver to the Collateral Agent any and all appropriate documents and instruments as the Collateral Agent may request (at the direction of the Required Holders) in order to permit the Collateral Agent to exercise the voting and other rights which it may be entitled to exercise hereunder and to receive all distributions which it may be entitled to receive hereunder.

(c)     Each Grantor hereby authorizes and instructs each Issuer of any Investment Property pledged by such Grantor hereunder to (i) comply with any instruction received by it from the Collateral Agent in writing that (x) states that an Event of Default has occurred and is continuing and (y) is otherwise in accordance with the terms of this Agreement, without any other or further instructions from such Grantor, and each Grantor agrees that each Issuer shall be fully protected in so complying and shall have no duty or right to inquire as to the Collateral Agent's authority to give such instruction and (ii) when required hereby, pay any dividends or other payments with respect to the Investment Property directly to the Collateral Agent.

(d)     In furtherance and not in limitation of the foregoing rights of the Collateral Agent pursuant to this Section 6.02, solely during any time that an Event of Default exists in respect of which the Collateral Agent has delivered an Enforcement Notice, each Grantor hereby appoints the Collateral Agent as its true and lawful attorney-in-fact to, and grants to Collateral Agent an irrevocable proxy with full power of substitution and resubstitution (and which is coupled with an interest) to, vote the Capital Stock owned by a Note Party, and such Note Party agrees to execute such other proxies as the Collateral Agent may request (at the direction of the Required Holders) (provided, however, that failure by the Collateral Agent to provide such Enforcement Notice shall not limit or impair any of the Collateral Agent's rights under this Agreement).

(e)     In furtherance of the proxy set forth in Section 6.2(d), upon the exercise of such proxy, all prior proxies given by any Grantor with respect to the applicable Capital Stock are hereby revoked, and no subsequent proxies (other than to the Collateral Agent) will be given with respect to any such Capital Stock, (i) the Collateral Agent will be empowered and may exercise such proxy at any and all times, including but not limited to, at any meeting of shareholders, partners or members, as the case may be, however called, and at adjournment thereof, or in any action by written consent, and may waive any notice otherwise required in connection therewith, (ii) to the fullest extent permitted by applicable law, the Collateral Agent shall have no agency, fiduciary or other implied duties to any Grantor or any other Person when acting with respect to such proxy, and (iii) each Grantor waives and releases any claim that it may have against the Collateral Agent with respect to any breach or alleged breach of any such agency, fiduciary or other duty

7.     **MISCELLANEOUS.**

7.1     **Severability**.  If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith.  In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (a) such provision shall be excluded from this Agreement, (b) the balance of this Agreement shall be interpreted as if such provision were so excluded, and (c) the balance of this Agreement shall be enforceable in accordance with its terms.

7.2     **Waiver and Amendment; Entire Agreement**.  Any provision of this Agreement may be amended, waived or modified only by an instrument signed in writing by the Grantors and the Collateral Agent (with the consent of any Holder or other Secured Party as required by Section 10.9 of the Purchase Agreement).  This Agreement and the other Note Documents constitute the entire contract among the parties hereto regarding to the subject matters addressed herein and supersede any and all previous agreements, negotiations, and discussions, oral or written, by the parties regarding the subject matters addressed herein.

7.3     **Termination**.  This Agreement shall terminate upon the payment and performance in full (including, for the avoidance of doubt, by way of conversion in full of the Notes pursuant to the terms

thereof) of the Obligations (other than inchoate indemnity obligations) .  At such time, the Collateral shall be automatically released from the Liens created hereby, this Agreement and all obligations (other than those expressly stated to survive such termination) of the Collateral Agent, the other Secured Parties and the Grantors hereunder shall automatically terminate, all without delivery of any instrument or performance of any act by any party, and all rights to the Collateral shall automatically revert to the Grantors.  The Collateral Agent shall execute such documents, return any Collateral held by the Collateral Agent hereunder and take such other steps as are reasonably necessary to accomplish the foregoing, all at the Grantors' sole cost and expense.  Any such documents shall be without recourse, representation or warranty to or by the Collateral Agent.

7.4     **Successors and Assigns**.  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties.  Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

7.5     **Cumulative Remedies**.  All of the Secured Parties' rights and remedies with respect to the Collateral whether established hereby, by a Note, by any other agreements or by law will be cumulative and may be exercised singularly or concurrently.  The Grantors acknowledge and agree that this Agreement is not intended to limit or restrict in any way the rights and remedies of a Holder under a Note but rather is intended to facilitate the exercise of such rights and remedies .  Secured Parties will have, in addition to all other rights and remedies given them by the terms of this Agreement, the Notes and the other Note Documents, all rights and remedies allowed by law and the rights and remedies of a secured party under the UCC as enacted in any jurisdiction in which Collateral may be located.

7.6     **GOVERNING LAW.**  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.

7.7     **Jurisdiction and Venue; Waiver of Jury Trial; Expenses and Indemnification**.  This Agreement is subject to the provisions of Section 10.3 (Jurisdiction and Venue), Section 10.4 (Waiver of Jury Trial) and Section 10.10(a) (Expenses and Indemnification) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*.  Any amounts payable as provided hereunder shall be additional Obligations secured by this Agreement and the other Note Documents.

7.8     **Notices**.  All communications and notices required or permitted to be given hereunder shall be delivered in accordance with Section 10.8 of the Purchase Agreement.

7.9     **Headings; Interpretation**.  Paragraph headings used in this Agreement are included for convenience of reference only and will not modify the provisions that they precede or affect the interpretation of this Agreement or any other Note Document.  The term "including" shall be interpreted to mean "including but not limited to".

7.10     **Counterparts**.  This Agreement may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract.  Any counterpart of a signature page to this Agreement may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic

254221560 v4

Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law. The Grantors agree to assume all risks arising out of the use of using digital signatures and electronic methods to submit communications to the Note Agent, including without limitation the risk of the Note Agent acting on unauthorized instructions, and the risk of interception and misuse by third parties.

[*Signature page follows*]

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first written above.

[_____]

By:_____
Name:
Title:

**COLLATERAL AGENT**:

**U.S. BANK NATIONAL ASSOCIATION**

By: _____
Name:
Title:

**SCHEDULE 4(b)**

**GRANTORS**

**SCHEDULE 4(c)**

**INTELLECTUAL PROPERTY**

**SCHEDULE 4(d)**

**INVESTMENT PROPERTY**

Exhibit A to
Security Agreement

## JOINDER AGREEMENT

THIS J O I N D E R  AGREEMENT (this "***Joinder***"), dated as of [\_\_], is entered into by and between [\_\_] (the "***New Grantor***") and U.S. BANK NATIONAL ASSOCIATION, as collateral agent (in such capacity, the "***Collateral Agent***") under that certain Security Agreement, dated as of [\_\_], 2021, made by Core Scientific Holding Co., a Delaware corporation and each Guarantor from time to time party thereto, as grantors, in favor of the Collateral Agent (the "***Security Agreement***").  Capitalized terms used but not defined herein shall have the meanings given to them in the Security Agreement.

The New Grantor and the Collateral Agent, for the benefit of the Secured Parties, hereby agree as follows:

The New Grantor hereby acknowledges, agrees and confirms that, by its execution of this Joinder, the New Grantor will be deemed to be a "Grantor" under the Security Agreement for all purposes of the Security Agreement and shall have all of the obligations of a Grantor thereunder as if it had executed the Security Agreement.  The New Grantor hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Security Agreement.

This Joinder is subject to the provisions of <u>Section 10.2</u> (Governing Law), <u>Section 10.3</u> (Jurisdiction and Venue) and <u>Section 10.4</u> (Waiver of Jury Trial) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*.

This Joinder may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract.  Any counterpart of a signature page to this Joinder may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.

*[Signature page follows]*

Exhibit A to
Security Agreement

**IN WITNESS WHEREOF**, the parties hereto have executed this Joinder as of the date first written above.

**[NEW GRANTOR]**

By:_____
Name:
Title:

Acknowledged and accepted:

**COLLATERAL AGENT**:

**U.S. BANK NATIONAL ASSOCIATION**

By: _____
Name:
Title:

**EXHIBIT E**

**FORM OF INTELLECTUAL PROPERTY SECURITY AGREEMENT**

**(see attached)**

**[FORM OF] INTELLECTUAL PROPERTY SECURITY AGREEMENT**

**THIS INTELLECTUAL PROPERTY SECURITY AGREEMENT** (this "*Agreement*"), dated as of [__], is made by [__] (the "*Grantor[s]*") in favor of U.S. BANK NATIONAL ASSOCIATION, in its capacity as collateral agent (the "*Collateral Agent*") on behalf of the Secured Parties.

## RECITALS

**WHEREAS**, the Grantor[s] entered into that certain Convertible Note Purchase Agreement, dated as of August 20, 2021 (as amended, restated, supplemented and/or otherwise modified from time to time, the "*Purchase Agreement*"), by and among the Grantors, each Purchaser party thereto, and U.S. BANK NATIONAL ASSOCIATION as Note Agent and, upon the execution and delivery of the Collateral Documents pursuant to Section 6.13, as Collateral Agent for the Secured Parties;

**WHEREAS**, pursuant to the terms of the Purchase Agreement, as continuing collateral security for the Obligations of the Company under the Purchase Agreement and the Guaranteed Obligations of the Guarantors under the Guaranty, the Grantors have entered into a Security Agreement, dated as of even date herewith (as amended, restated, supplemented and/or otherwise modified from time to time, the "*Security Agreement*"; capitalized terms used but not otherwise defined herein having the meaning ascribed thereto therein), made by Grantors in favor of the Collateral Agent, for the purposes of granting to the Collateral Agent, for the benefit of the Secured Parties, a security interest in Grantors' assets, on the terms and subject to the conditions set forth herein; and

**WHEREAS**, pursuant to the Security Agreement, the Grantor is required to grant a security interest to the Collateral Agent, in all of the Grantor's Intellectual Property, including the Patents, Trademarks and Copyrights listed on Schedule 1 hereto (collectively, the "*Intellectual Property*").

## AGREEMENT

**NOW, THEREFORE**, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Grantor and the Collateral Agent hereby agree as follows:

1.      **Grant of Security Interest**.

(a)      As collateral security for the full, prompt, complete and final payment and performance when due (whether at stated maturity, by acceleration or otherwise) of all the Secured Obligations, the Grantor hereby pledges to the Collateral Agent, on behalf of the Secured Parties, and hereby grants to the Collateral Agent, on behalf of the Secured Parties, a security interest in all of the Grantor's right, title and interest in, to and under the Intellectual Property, whether now owned or hereafter acquired.

(b)      The security interest granted hereby is granted in conjunction with the security interest granted to the Collateral Agent under the Security Agreement.  The rights and remedies of the Collateral Agent with respect to the security interest granted hereby are in addition to those set forth in the Security Agreement.  In the event of any conflict between the terms of this Agreement and the terms of the Security Agreement, the terms of the Security Agreement shall control.

2.      **Termination of Security Interest**.

This Agreement shall terminate as set forth in the Security Agreement.

3.     **Modification of Agreement**.

Any provision of this Agreement may be amended, waived or modified only by an instrument signed in writing by the Grantor and the Collateral Agent (with the consents of any Holder or other Secured Party as required by Section 10.9 of the Purchase Agreement).  Notwithstanding the foregoing, upon receipt of a certificate of a Responsible Officer, the Collateral Agent may modify this Agreement, after obtaining the Grantor's approval of or signature to such modification, by amending Schedule 1 hereto to include reference to any right, title or interest in any Patents, Trademarks or Copyrights currently owned by the Grantor or any Patents, Trademarks or Copyrights acquired or developed by the Grantor after the execution hereof or to delete any reference to any right, title or interest in any Patents, Trademarks or Copyrights in which the Grantor no longer has or claims any right, title or interest.

5.     **GOVERNING LAW**.

THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.

6.     **Jurisdiction and Venue; Waiver of Jury Trial; Expenses and Indemnification**.

This Agreement is subject to the provisions of Section 10.3 (Jurisdiction and Venue), Section 10.4 (Waiver of Jury Trial) and Section 10.10(a) (Expenses and Indemnification) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*. Any amounts payable as provided hereunder shall be additional Obligations secured by this Agreement and the other Note Documents. U.S. Bank National Association is entering into this Agreement solely in its capacity as Collateral Agent under the Purchase Agreement and shall be entitled to all of the rights, privileges and immunities of the Collateral Agent in acting hereunder.

7.     **Counterparts**.

This Agreement may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract. Any counterpart of a signature page to this Agreement may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.

*[Signature page follows]*

254153964 v3

IN WITNESS WHEREOF, the Grantor and the Collateral Agent have caused this Agreement to be duly executed and delivered as of the date first above written.

**GRANTOR:**

[_____]

By:_____
Name:
Title:

**COLLATERAL AGENT:**

U.S. BANK NATIONAL ASSOCIATION

By: _____
Name:
Title:

SCHEDULE 1

INTELLECTUAL PROPERTY SECURITY AGREEMENT

**EXHIBIT F**

**FORM OF SOLVENCY CERTIFICATE**

**(see attached)**

**[FORM OF] SOLVENCY CERTIFICATE**

**CORE SCIENTIFIC HOLDING CO.**

**August 20, 2021**

This Solvency Certificate is delivered pursuant to Section 4.1(c) of that certain Convertible Note Purchase Agreement, dated as of the date hereof (the "***Purchase Agreement***"), by and among Core Scientific Holding Co., a Delaware corporation (the "***Company***"), the Guarantors party thereto, the Initial Purchasers named on the Schedule of Purchasers attached as Schedule 2 thereto and U.S. Bank National Association, as note agent and collateral agent.  Terms capitalized herein and not otherwise defined shall have the meanings assigned to them in the Purchase Agreement.

The undersigned, the Chief Financial Officer of the Company, does hereby certify, on behalf of the Company and not in his individual capacity, that as of the Initial Closing Date, both immediately before and after giving effect to the transactions contemplated by the Note Documents, the Company is individually, and the Company and its Subsidiaries on a consolidated basis are, Solvent.

*[Signature page follows]*

**IN WITNESS WHEREOF**, the undersigned has hereunto set his hand on behalf of the Company as of the date first referenced above.

_____
Name:  Michael Trzupek
Title:   Chief Financial Officer

**EXHIBIT G**

**FORM OF ADMINISTRATIVE QUESTIONNAIRE**

| **Purchaser Name** | |
|---|---|
| Name in Which to Register Note(s) | |
| Note Registration Number(s); Principal Amount(s) | |
| Payment on Account of Note(s)<br><br>Method<br><br>Account Information | |
| Accompanying Information | |
| Address / Fax # / Email for notices related to payments | |
| Address / Fax # / Email for all other notices | |
| Instructions re Delivery of Note(s) | |
| Tax Identification Number | |

**EXHIBIT H**

**FORM OF FIRST LIEN INTERCREDITOR AGREEMENT**

**[FORM OF] FIRST LIEN PARI PASSU INTERCREDITOR AGREEMENT**

THIS FIRST LIEN PARI PASSU INTERCREDITOR AGREEMENT (this "*Agreement*"), dated as of [___], by and among U.S. Bank National Association, as note agent for the Initial Note Claimholders (in such capacity, and together with its successors and permitted assigns in such capacity, the "*Initial First Lien Representative*") and as collateral agent for the Initial Note Claimholders (in such capacity, and together with its successors and permitted assigns in such capacity, the "*Initial First Lien Collateral Agent*"), U.S. Bank National Association, as note agent for the Other Note Claimholders (in such capacity, and together with its successors and permitted assigns in such capacity, the "*Other First Lien Representative*"), and as collateral agent for the Other Note Claimholders (in such capacity, and together with its successors and permitted assigns in such capacity, the "*Other First Lien Collateral Agent*"), and acknowledged and agreed to by [Parent Entity] (the "*Company*") and the other Grantors.  Capitalized terms used in this Agreement have the meanings assigned to them in <u>Section 1.1</u> below.

Reference is made to (i) that certain Senior Secured Convertible Note Purchase Agreement, dated as of April 19, 2021, by and among the [Company (as successor interest of Core Scientific Holding Co.)][1], the other Grantors from time to time party thereto, the Purchasers (as defined therein) party thereto, the Initial First Lien Representative and the Initial First Lien Collateral Agent (as amended, restated, supplemented and/or otherwise modified from time to time, the "*Initial Purchase Agreement*") and (ii) that certain Convertible Note Purchase Agreement, dated as of August 20, 2021, by and among the Company (Core Scientific Holding Co.), the other Grantors from time to time party thereto, the Purchasers (as defined therein) party thereto, the Other First Lien Representative and the Other First Lien Collateral Agent (as amended, restated, supplemented and/or otherwise modified from time to time, the "*Other Purchase Agreement*").

The obligations of the Company under the Initial Purchase Agreement and the obligations of the Guarantors (as defined therein) under the guaranty of the Initial Purchase Agreement are secured on a first-priority basis (subject to Permitted Liens (as defined therein)) by Liens on substantially all of the assets of the Grantors, pursuant to the terms of the Initial Note Collateral Documents.

The obligations of the Company under the Other Purchase Agreement and the obligations of the Guarantors (as defined therein) under the guaranty of the Other Purchase Agreement are secured on a first-priority basis (subject to Permitted Liens (as defined therein)) by Liens on substantially all of the assets of the Grantors, pursuant to the terms of the Other Note Collateral Documents.

In consideration of the foregoing, the mutual covenants and obligations herein set forth and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, each of the Initial First Lien Representative (for itself and on behalf of each other Initial Note Claimholder), the Initial First Lien Collateral Agent (for itself and on behalf of each other Initial Note Claimholder), the Other First Lien Representative (for itself and on behalf of each other Other Note Claimholder) and the Other First Lien Collateral Agent (for itself and on behalf of each other Other Note Claimholder), intending to be legally bound, hereby agrees as follows:

---

[1] To the extent the Conversion Event giving rise to execution of this Agreement is the XPDI Transaction, references to the Company herein shall be updated to refer to the Parent Entity with other confirming changes consistent therewith.

ARTICLE I.

DEFINITIONS

SECTION 1.1          Certain Defined Terms.

Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Initial Purchase Agreement or the Other Purchase Agreement (whether or not then in effect), as applicable, and the following terms which are defined in the UCC are used herein as so defined (and if defined in more than one article of the UCC shall have the meaning specified in Article 9 thereof): Certificated Security, Commodity Account, Commodity Contract, Deposit Account, Electronic Chattel Paper, Promissory Note, Instrument, Letter of Credit Right, Securities Entitlement, Securities Account and Tangible Chattel Paper.  As used in this Agreement, the following terms have the meanings specified below:

"*Agreement*" has the meaning set forth in the introductory paragraph hereto.

"*Applicable Collateral Agent*" means (i) until the earliest of (x) the Discharge of Initial Purchase Agreement and (y) the Other First Lien Representative Enforcement Date, the Initial First Lien Collateral Agent and (ii) from and after the earlier of (x) the Discharge of Initial Purchase Agreement and (y) the Other First Lien Representative Enforcement Date, the Other First Lien Collateral Agent.

"*Applicable Representative*" means (i) until the earliest of (x) the Discharge of Initial Purchase Agreement and (y) the Other First Lien Representative Enforcement Date, the Initial First Lien Representative and (ii) from and after the earlier of (y) the Discharge of Initial Purchase Agreement and (z) the Other First Lien Representative Enforcement Date, the Other First Lien Representative.

"*Bankruptcy Case*" has the meaning set forth in Section 2.5(b).

"*Bankruptcy Code*" means Title 11 of the United States Code, as amended.

"*Bankruptcy Law*" means the Bankruptcy Code and any similar Federal, state or foreign law for the relief of debtors.

"*Business Day*" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close.

"*Capital Lease*" means, as applied to any Person, any lease by that Person as lessee that has been or should be, in accordance with GAAP, recorded as a capital lease on the balance sheet of that Person.

"*Collateral*" means all assets and properties subject to, or purported to be subject to, Liens created pursuant to any First Lien Collateral Document to secure either Series of First Lien Obligations and shall include any property or assets subject to replacement Liens or adequate protection Liens in favor of any First Lien Claimholder.

"*Collateral Agent*" means, collectively, the Initial First Lien Collateral Agent and the Other First Lien Collateral Agent.

"*Company*" has the meaning set forth in the introductory paragraph to this Agreement.

"***Control***" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by agreement or otherwise.  "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"***Control Collateral***" means any Shared Collateral in the "control" (within the meaning of Section 9-104, 9-105, 9-106, 9-107 or 8-106 of the UCC) of either Collateral Agent (or its agents or bailees), to the extent that control thereof perfects a Lien thereon under the UCC.  Control Collateral includes any Deposit Accounts, Securities Accounts, Securities Entitlements, Commodity Accounts, Commodity Contracts, Letter of Credit Rights or Electronic Chattel Paper over which either Collateral Agent has "control" under the UCC.

"***Controlling Claimholders***" means (i) at any time when the Initial First Lien Collateral Agent is the Applicable Collateral Agent, the Initial Note Claimholders and (ii) at any other time, the Other Note Claimholders.

"***Default***" means a "Default" (or similarly defined term) as defined in any First Lien Document.

"***DIP Financing***" has the meaning set forth in Section 2.5(b).

"***DIP Financing Liens***" has the meaning set forth in Section 2.5(b).

"***DIP Lenders***" has the meaning set forth in Section 2.5(b).

"***Discharge***" means, with respect to either Series of First Lien Obligations, that such Series of First Lien Obligations is no longer secured by, and no longer required to be secured by, any Shared Collateral pursuant to the terms of the applicable First Lien Documents for such Series of First Lien Obligations.  The term "***Discharged***" shall have a corresponding meaning.

"***Discharge of Initial Purchase Agreement***" means, except to the extent otherwise provided in Section 2.6, the Discharge of the Initial Note Obligations.

"***Equity Release Proceeds***" has the meaning set forth in Section 2.4(a).

"***Event of Default***" means an "Event of Default" (or similarly defined term) as defined in any First Lien Document.

"***First Lien Claimholders***" means, collectively, (i) the Initial Note Claimholders and (ii) the Other Note Claimholders.

"***First Lien Collateral Documents***" means, collectively, (i) the Initial Note Collateral Documents and (ii) the Other Note Collateral Documents.

"***First Lien Documents***" means, collectively, (i) the Initial Note Documents and (ii) the Other Note Documents.

"***First Lien Obligations***" means, collectively, (i) the Initial Note Obligations and (ii) the Other Note Obligations.

"***Grantors***" means the Company and each of the Guarantors.

3

"**Guarantors**" means the "Guarantors" as defined in each of the Initial Purchase Agreement and the Other Purchase Agreement.

"**Impairment**" has the meaning set forth in Section 2.1(b)(ii).

"**Indebtedness**" means all indebtedness for borrowed money.

"**Initial First Lien Collateral Agent**" has the meaning set forth in the introductory paragraph to this Agreement.

"**Initial First Lien Representative**" has the meaning set forth in the introductory paragraph to this Agreement.

"**Initial Note Claimholders**" means the holders of any Initial Note Obligations, including the "Secured Parties", as defined in the Initial Purchase Agreement (including the Initial First Lien Representative and the Initial First Lien Collateral Agent).

"**Initial Note Collateral Documents**" means the Collateral Documents (as defined in the Initial Purchase Agreement) and any other agreement, document or instrument entered into for the purpose of granting a Lien to secure any Initial Note Obligations or to perfect such Lien (as each may be amended, restated, supplemented and/or otherwise modified from time to time).

"**Initial Note Documents**" means the Initial Purchase Agreement, each Initial Note Collateral Document and the other Note Documents (as defined in the Initial Purchase Agreement), and each of the other agreements, documents and instruments providing for or evidencing any other Initial Note Obligation, as each may be amended, restated, supplemented and/or otherwise modified from time to time.

"**Initial Note Obligations**" means:

(a)    (i) the Obligations (as defined in the Initial Purchase Agreement), (ii) all principal of and interest (including any Post-Petition Interest) and premium (if any) on all loans made pursuant to the Initial Purchase Agreement, and (iii) all guarantee obligations, fees, expenses and all other obligations under the Initial Purchase Agreement and the other Initial Note Documents, in each case whether or not allowed or allowable in an Insolvency or Liquidation Proceeding; and

(b)    to the extent any payment with respect to any Initial Note Obligation (whether by or on behalf of any Grantor, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any Other Note Claimholder, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of this Agreement and the rights and obligations of the Initial Note Claimholders and the Other Note Claimholders, be deemed to be reinstated and outstanding as if such payment had not occurred.  To the extent that any interest, fees, expenses or other charges (including Post-Petition Interest) to be paid pursuant to the Initial Note Documents are disallowed by order of any court, including by order of a court of competent jurisdiction presiding over an Insolvency or Liquidation Proceeding, such interest, fees, expenses and charges (including Post-Petition Interest) shall, as between the Initial Note Claimholders and the Other Note Claimholders, be deemed to continue to accrue and be added to the amount to be calculated as the "Initial Note Obligations".

"*Initial Purchase Agreement*" has the meaning set forth in the recitals to this Agreement.

"**Insolvency or Liquidation Proceeding**" means:

(a)     any voluntary or involuntary case or proceeding under the Bankruptcy Code with respect to any Grantor;

(b)     any other voluntary or involuntary insolvency, reorganization or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding with respect to any Grantor or with respect to a material portion of its assets;

(c)     any liquidation, dissolution, reorganization or winding up of any Grantor whether voluntary or involuntary and whether or not involving insolvency or bankruptcy; or

(d)     any assignment for the benefit of creditors or any other marshaling of assets and liabilities of any Grantor.

"*Intervening Creditor*" has the meaning set forth in <u>Section 2.1(b)(i)</u>.

"*Lien*" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Capital Lease having substantially the same economic effect as any of the foregoing), in each case, in the nature of security; <u>provided that</u> in no event shall a colocation agreement or an operating lease in and of itself be deemed a Lien.

"*Other First Lien Collateral Agent*" has the meaning set forth in the introductory paragraph to this Agreement.

"*Other First Lien Representative*" has the meaning set forth in the introductory paragraph to this Agreement.

"*Other First Lien Representative Enforcement Date*" means, with respect to the Other First Lien Representative, the date which is 180 days after the occurrence of both (i) an Event of Default (under and as defined in the Other Note Documents) and (ii) the Initial First Lien Collateral Agent's and the Initial First Lien Representative's receipt of written notice from the Other First Lien Representative certifying that (x) an Event of Default (under and as defined in the Other Note Documents) has occurred and is continuing and (y) the Other Note Obligations are currently due and payable in full (whether as a result of acceleration thereof or otherwise) in accordance with the terms of the applicable Other Note Document; <u>provided</u> that the Other First Lien Representative Enforcement Date shall be stayed and shall not occur and shall be deemed not to have occurred (1) at any time the Initial First Lien Collateral Agent acting on the instructions of the Initial First Lien Representative has commenced and is diligently pursuing any enforcement action with respect to Shared Collateral, (2) at any time the Grantor that has granted a security interest in Shared Collateral is then a debtor under or with respect to (or otherwise subject to) any Insolvency or Liquidation Proceeding or (3) if the Other First Lien Representative subsequently rescinds or withdraws the written notice provided for in clause (ii) above.

"*Other Note Claimholders*" means the holders of any Other Note Obligations, including the "Secured Parties", as defined in the Other Purchase Agreement (including the Other First Lien Representative and the Other First Lien Collateral Agent).

"*Other Note Collateral Documents*" means the Collateral Documents (as defined in the Other Purchase Agreement) and any other agreement, document or instrument entered into for the purpose

of granting a Lien to secure any Other Note Obligations or to perfect such Lien (as each may be amended, restated, supplemented and/or otherwise modified from time to time).

"**Other Note Documents**" means the Other Purchase Agreement, each Other Note Collateral Document and the other Note Documents (as defined in the Other Purchase Agreement), and each of the other agreements, documents and instruments providing for or evidencing any other Other Note Obligation, as each may be amended, restated, supplemented and/or otherwise modified from time to time.

"**Other Note Obligations**" means:

(a)      (i) the Obligations (as defined in the Other Purchase Agreement), (ii) all principal of and interest (including any Post-Petition Interest) and premium (if any) on all loans made pursuant to the Other Purchase Agreement, and (iii) all guarantee obligations, fees, expenses and all other obligations under the Other Purchase Agreement and the other Other Note Documents, in each case whether or not allowed or allowable in an Insolvency or Liquidation Proceeding; and

(b)      to the extent any payment with respect to any Other Note Obligation (whether by or on behalf of any Grantor, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any Initial Note Claimholder, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of this Agreement and the rights and obligations of the Other Note Claimholders and the Initial Note Claimholders, be deemed to be reinstated and outstanding as if such payment had not occurred.  To the extent that any interest, fees, expenses or other charges (including Post-Petition Interest) to be paid pursuant to the Other Note Documents are disallowed by order of any court, including by order of a court of competent jurisdiction presiding over an Insolvency or Liquidation Proceeding, such interest, fees, expenses and charges (including Post-Petition Interest) shall, as between the Other Note Claimholders and the Initial Note Claimholders, be deemed to continue to accrue and be added to the amount to be calculated as the "Other Note Obligations".

"*Other Purchase Agreement*" has the meaning set forth in the recitals to this Agreement.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, limited partnership, governmental authority or other entity.

"**Possessory Collateral**" means any Shared Collateral in the possession of either Collateral Agent (or its agents or bailees), to the extent that possession thereof perfects a Lien thereon under the UCC or otherwise.  Possessory Collateral includes any Certificated Securities, Promissory Notes, Instruments, and Tangible Chattel Paper, in each case, delivered to or in the possession of either Collateral Agent under the terms of the First Lien Collateral Documents.

"**Post-Petition Interest**" means interest, fees, expenses and other charges that pursuant to the Initial Note Documents or Other Note Documents, as applicable, continue to accrue after the commencement of any Insolvency or Liquidation Proceeding, whether or not such interest, fees, expenses and other charges are allowed or allowable under the Bankruptcy Law or in any such Insolvency or Liquidation Proceeding.

"**Proceeds**" has the meaning set forth in <u>Section 2.1(a)</u>.

"**Representative**" means, at any time, (i) in the case of any Initial Note Obligations or the Initial Note Claimholders, the Initial First Lien Representative and (ii) in the case of any Other Note Obligations or the Other Note Claimholders, the Other First Lien Representative.

<div align="center">6</div>

"**_Responsible Officer_**" of any Person means the chief executive officer, the president, any vice president, the chief financial officer, treasurer or assistant treasurer or other similar officer of such Person and any other individual or similar official thereof responsible for the administration of the obligations of such Person in respect of this Agreement.  Any document delivered hereunder that is signed by a Responsible Officer of a Grantor shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Grantor and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Grantor.

"**_Series_**" means (a) with respect to the First Lien Claimholders, each of (i) the Initial Note Claimholders (in their capacities as such) and (ii) the Other Note Claimholders (in their capacities as such) and (b) with respect to any First Lien Obligations, each of (i) the Initial Note Obligations and (ii) the Other Note Obligations.

"**_Shared Collateral_**" means, at any time, Collateral in which the holders of First Lien Obligations (or their respective Representatives or Collateral Agents on behalf of such holders) hold, or purport to hold, or are required to hold pursuant to their respective First Lien Documents, a valid security interest or Lien at such time.

"**_subsidiary_**" means, with respect to any Person (a) any corporation, association, or other business entity (other than a partnership, limited liability company or similar entity) of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the directors, managers or trustees thereof is at the time of determination is owned or controlled by such Person or one or more of the other subsidiaries of that Person or a combination thereof and (b) any partnership, limited liability company or similar entity which (i) more than 50% of the voting interests or general partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other subsidiaries of that Person or a combination thereof whether in the form of membership, general, special or limited partnership or otherwise and (ii) such Person or any subsidiary of such Person is a controlling general partner or otherwise controls such entity.

"**_UCC_**" means the Uniform Commercial Code as in effect from time to time in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**_Underlying Assets_**" has the meaning set forth in <u>Section 2.4(a)</u>.

SECTION 1.2        <u>Rules of Interpretation</u>.

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as amended, restated, supplemented and/or otherwise modified from time to time, however evidenced, whether in physical or electronic form and any reference herein to any statute or regulations shall include any amendment, renewal, extension or replacement thereof, (ii) any reference herein to any Person shall be construed to include such Person's permitted successors and assigns from time to time, (iii) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Articles, Sections and Annexes shall be construed to refer to Articles, Sections and Annexes

7

of this Agreement, (v) unless otherwise expressly qualified herein, the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights and (vi) the term "or" is not exclusive.

<div align="center">ARTICLE II.</div>

<div align="center">PRIORITIES AND AGREEMENTS WITH RESPECT TO SHARED COLLATERAL</div>

SECTION 2.1          Priority of Claims.

(a)          Anything contained herein or in any of the First Lien Documents to the contrary notwithstanding (but subject to Sections 2.1(b) and 2.10(b)), if an Event of Default has occurred and is continuing, and the Applicable Collateral Agent is taking action to enforce rights in respect of any Collateral, or any distribution is made in respect of any Shared Collateral in any Bankruptcy Case of any Grantor or any First Lien Claimholder receives any payment pursuant to any intercreditor agreement (other than this Agreement) or otherwise with respect to any Shared Collateral, the proceeds of any sale, collection or other liquidation of any Shared Collateral or Equity Release Proceeds received by any First Lien Claimholder or received by the Applicable Collateral Agent or any First Lien Claimholder pursuant to any such intercreditor agreement or otherwise with respect to such Collateral and proceeds of any such distribution (subject, in the case of any such distribution, to the sentence immediately following clause (iii) below) to which the First Lien Obligations are entitled under any intercreditor agreement (other than this Agreement) or otherwise (all proceeds of any sale, collection or other liquidation of any Collateral comprising either Shared Collateral or Equity Release Proceeds and all proceeds of any such distribution and any proceeds of any insurance covering the Shared Collateral received by the Applicable Collateral Agent and not returned to any Grantor under any First Lien Document being collectively referred to as "**Proceeds**"), shall be applied by the Applicable Collateral Agent in the following order:

(i)          FIRST, to the payment of all amounts owing to each Collateral Agent (in its capacity as such) and each Representative (in its capacity as such) secured by such Shared Collateral or, in the case of Equity Release Proceeds, secured by the Underlying Assets, including all reasonable costs and expenses incurred by each Collateral Agent (in its capacity as such) and each Representative (in its capacity as such) in connection with such collection or sale or otherwise in connection with this Agreement, any other First Lien Document or any of the First Lien Obligations, including all court costs and the reasonable fees and expenses of its agents and legal counsel, and any other reasonable costs or expenses incurred in connection with the exercise of any right or remedy hereunder or under any other First Lien Document and all fees and indemnities owing to such Collateral Agents and Representatives, ratably to each such Collateral Agent and Representative in accordance with the amounts payable to it pursuant to this clause (i);

(ii)          SECOND, subject to Sections 2.1(b) and 2.10(b), to the extent Proceeds remain after the application pursuant to preceding clause (i), to each Representative for the payment in full of the other First Lien Obligations of each Series secured by such Shared Collateral or, in the case of Equity Release Proceeds, secured by the Underlying Assets, and, if the amount of such Proceeds are insufficient to pay in full the First Lien Obligations of each Series so secured then such Proceeds shall be allocated among the Representatives of each Series secured by such Shared Collateral or, in the case of Equity Release Proceeds, secured by the Underlying Assets, pro rata according to the amounts of such First Lien Obligations owing to each such respective Representative and the other First Lien Claimholders represented by it for distribution by such Representative in accordance with its respective First Lien Documents; and

<div align="center">8</div>

(iii)      THIRD, any balance of such Proceeds remaining after the application pursuant to preceding clauses (i) and (ii), to the Grantors, their successors or assigns from time to time, or to whomever may be lawfully entitled to receive the same.

If, despite the provisions of this Section 2.1(a), any First Lien Claimholder shall receive any payment or other recovery in excess of its portion of payments on account of the First Lien Obligations to which it is then entitled in accordance with this Section 2.1(a), such First Lien Claimholder shall hold such payment or recovery in trust for the benefit of all First Lien Claimholders for distribution in accordance with this Section 2.1(a).

(b)      (i)      Notwithstanding the foregoing, with respect to any Shared Collateral or Equity Release Proceeds for which a third party (other than a First Lien Claimholder) has a Lien that is junior in priority to the Lien of one Series of First Lien Obligations but senior (as determined by appropriate legal proceedings in the case of any dispute) to the Lien of the other Series of First Lien Obligations (such third party an "***Intervening Creditor***"), the value of any Shared Collateral, Equity Release Proceeds or Proceeds which are allocated to such Intervening Creditor shall be deducted on a ratable basis solely from the Shared Collateral, Equity Release Proceeds or Proceeds to be distributed in respect of the Series of First Lien Obligations with respect to which such Impairment exists.

(ii)      In furtherance of the foregoing and without limiting the provisions of Section 2.3, it is the intention of the First Lien Claimholders of each Series that the holders of First Lien Obligations of such Series (and not the First Lien Claimholders of the other Series) bear the risk of (1) any determination by a court of competent jurisdiction that (x) any of the First Lien Obligations of such Series are unenforceable under applicable law or are subordinated to any other obligations (other than another Series of First Lien Obligations), (y) any of the First Lien Obligations of such Series do not have a valid and perfected security interest in any of the Collateral securing the other Series of First Lien Obligations and/or (z) any intervening security interest exists securing any other obligations (other than another Series of First Lien Obligations) on a basis ranking prior to the security interest of such Series of First Lien Obligations but junior to the security interest of the other Series of First Lien Obligations and (2) the existence of any Collateral (other than Equity Release Proceeds) for the other Series of First Lien Obligations that is not Shared Collateral (any such condition referred to in the foregoing clauses (1) or (2) with respect to either Series of First Lien Obligations, an "***Impairment***" of such Series); provided that the existence of a maximum claim with respect to any real property subject to a mortgage which applies to all First Lien Obligations shall not be deemed to be an Impairment of either Series of First Lien Obligations.  In the event of any Impairment with respect to either Series of First Lien Obligations, the results of such Impairment shall be borne solely by the holders of such Series of First Lien Obligations, and the rights of the holders of such Series of First Lien Obligations (including the right to receive distributions in respect of such Series of First Lien Obligations pursuant to Section 2.1) set forth herein shall be modified to the extent necessary so that the effects of such Impairment are borne solely by the holders of the Series of such First Lien Obligations subject to such Impairment.  Additionally, in the event the First Lien Obligations of either Series are modified pursuant to applicable law (including pursuant to Section 1129 of the Bankruptcy Code), any reference to such First Lien Obligations or the First Lien Documents governing such First Lien Obligations shall refer to such obligations or such documents as so modified.

(c)      It is acknowledged that the First Lien Obligations of either Series may, subject to the limitations set forth in the then existing First Lien Documents and subject to any limitations set forth in this Agreement, be increased, extended, renewed, replaced, restated, supplemented, restructured, repaid, refunded or otherwise amended or modified from time to time, all without affecting the priorities set forth

9

in Section 2.1(a) or the provisions of this Agreement defining the relative rights of the First Lien Claimholders of either Series.

(d)       Notwithstanding the date, time, method, manner or order of grant, attachment or perfection of any Liens securing either Series of First Lien Obligations granted on the Shared Collateral and notwithstanding any provision of the UCC or any other applicable law or the First Lien Documents or any defect or deficiencies in the Liens securing the First Lien Obligations of either Series or any other circumstance whatsoever (but, in each case, subject to Section 2.1(b)), each First Lien Claimholder hereby agrees that the Liens securing each Series of First Lien Obligations on any Shared Collateral shall be of equal priority.

SECTION 2.2          Actions with Respect to Shared Collateral; Prohibition on Contesting Liens.

(a)       Notwithstanding Section 2.1, (i) only the Applicable Collateral Agent shall act with respect to the Shared Collateral (including with respect to any other intercreditor agreement with respect to any Shared Collateral), (ii) the Applicable Collateral Agent shall act only on the instructions of the Applicable Representative and shall not follow any instructions with respect to the Shared Collateral (including with respect to any other intercreditor agreement with respect to any Shared Collateral) from the Other First Lien Representative (or any other First Lien Claimholder other than the Applicable Representative) and (iii) no Other Note Claimholder shall or shall instruct either Collateral Agent to, and the Collateral Agent that is not the Applicable Collateral Agent shall not, commence any judicial or nonjudicial foreclosure proceedings with respect to, seek to have a trustee, receiver, liquidator or similar official appointed for or over, attempt any action to take possession of, exercise any right, remedy or power with respect to, or otherwise take any action to enforce its security interest in or realize upon, or take any other action available to it in respect of, Shared Collateral (including with respect to any other intercreditor agreement with respect to Shared Collateral), whether under any First Lien Collateral Document (other than the First Lien Collateral Documents applicable to the Applicable Collateral Agent), applicable law or otherwise, it being agreed that only the Applicable Collateral Agent, acting in accordance with the First Lien Collateral Documents applicable to it, shall be entitled to take any such actions or exercise any remedies with respect to such Shared Collateral at such time.

(b)       Without limiting the provisions of Section 4.2, the Other First Lien Representative and the Other First Lien Collateral Agent hereby appoint the Applicable Collateral Agent as its agent and authorizes the Applicable Collateral Agent to exercise any and all remedies under each First Lien Collateral Document with respect to Shared Collateral and to execute releases in connection therewith.

(c)       Notwithstanding the equal priority of the Liens securing each Series of First Lien Obligations granted on the Shared Collateral, the Applicable Collateral Agent (acting on the instructions of the Applicable Representative) may deal with the Shared Collateral as if such Applicable Collateral Agent had a senior and exclusive Lien on such Shared Collateral.  Neither the Other First Lien Representative, the Other First Lien Collateral Agent nor the Other Note Claimholders will contest, protest or object to any foreclosure proceeding or action brought by the Applicable Collateral Agent, the Applicable Representative or the Controlling Claimholders or any other exercise by the Applicable Collateral Agent, the Applicable Representative or the Controlling Claimholders of any rights and remedies relating to the Shared Collateral. The foregoing shall not be construed to limit the rights and priorities of any First Lien Claimholder or either Collateral Agent or Representative with respect to any Collateral not constituting Shared Collateral.

(d)       Each of the Other First Lien Collateral Agent and the Other First Lien Representative agrees that it will not accept any Lien on any Collateral for the benefit of the Other Note Obligations (other than funds deposited for the satisfaction, discharge or defeasance of the Other Purchase

Agreement) other than pursuant to the First Lien Collateral Documents, and by executing this Agreement, each of the Other First Lien Collateral Agent and the Other First Lien Representative agrees to be bound by the provisions of this Agreement and the other First Lien Collateral Documents applicable to it.

(e)     Each of the First Lien Claimholders agrees that it will not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the perfection, priority, validity or enforceability of a Lien held by or on behalf of any of the First Lien Claimholders in all or any part of the Collateral or the provisions of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair (i) the rights of either Collateral Agent or Representative to enforce this Agreement or (ii) the rights of any First Lien Claimholder to contest or support any other Person in contesting the enforceability of any Lien purporting to secure obligations not constituting First Lien Obligations.

SECTION 2.3         No Interference; Payment Over; Exculpatory Provisions.

(a)     Each First Lien Claimholder agrees that (i) it will not challenge or question or support any other Person in challenging or questioning in any proceeding the validity or enforceability of any First Lien Obligations of either Series or any First Lien Collateral Document or the validity, attachment, perfection or priority of any Lien under any First Lien Collateral Document or the validity or enforceability of the priorities, rights or duties established by or other provisions of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair the rights of any First Lien Claimholder from challenging or questioning the validity or enforceability of any First Lien Obligations constituting unmatured interest or the validity of any Lien relating thereto pursuant to Section 502(b)(2) of the Bankruptcy Code, (ii) it will not take or cause to be taken any action the purpose or intent of which is, or could be, to interfere, hinder or delay, in any manner, whether by judicial proceedings or otherwise, any sale, transfer or other disposition of the Collateral by the Applicable Collateral Agent, (iii) except as provided in Section 2.2, it shall have no right to and shall not otherwise (A) direct the Applicable Collateral Agent or any other First Lien Claimholder to exercise any right, remedy or power with respect to any Shared Collateral (including pursuant to any other intercreditor agreement) or (B) consent to, or object to, the exercise by, or any forbearance from exercising by, the Applicable Collateral Agent or any other First Lien Claimholder represented by it of any right, remedy or power with respect to any Collateral, (iv) it will not institute any suit or assert in any suit, bankruptcy, insolvency or other proceeding any claim against the Applicable Collateral Agent or any other First Lien Claimholder represented by it seeking damages from or other relief by way of specific performance, instructions or otherwise with respect to any Collateral and (v) it will not attempt, directly or indirectly, whether by judicial proceedings or otherwise, to challenge the enforceability of any provision of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair the rights of any of the Applicable Collateral Agent or any other First Lien Claimholder to (i) enforce this Agreement or (ii) contest or support any other Person in contesting the enforceability of any Lien purporting to secure obligations not constituting First Lien Obligations.

(b)     Each First Lien Claimholder hereby agrees that if it shall obtain possession of any Shared Collateral or shall realize any proceeds or payment in respect of any Shared Collateral, pursuant to any First Lien Collateral Document or by the exercise of any rights available to it under applicable law or in any Insolvency or Liquidation Proceeding or through any other exercise of remedies (including pursuant to any intercreditor agreement), at any time prior to the Discharge of each of the First Lien Obligations, then it shall hold such Shared Collateral, proceeds or payment in trust for the other First Lien Claimholders having a security interest in such Shared Collateral and promptly transfer any such Shared Collateral, proceeds or payment, as the case may be, to the Applicable Collateral Agent, to be distributed by such Applicable Collateral Agent in accordance with the provisions of Section 2.1(a) hereof, provided, however, that the foregoing shall not apply to any Shared Collateral purchased by any First Lien Claimholder for cash pursuant to any exercise of remedies permitted hereunder.

11

(c)     None of the Applicable Collateral Agent, either Applicable Representative or any other First Lien Claimholder shall be liable for any action taken or omitted to be taken by the Applicable Collateral Agent, such Applicable Representative or any other First Lien Claimholder with respect to any Collateral in accordance with the provisions of this Agreement.

SECTION 2.4          Automatic Release of Liens.

(a)     If, at any time any Shared Collateral is transferred to a third party or otherwise disposed of, in each case, in connection with any enforcement by the Applicable Collateral Agent in accordance with the provisions of this Agreement, then (whether or not any Insolvency or Liquidation Proceeding is pending at the time) the Liens in favor of the other Collateral Agent (or in favor of such other First Lien Claimholders if directly secured by such Liens) upon such Shared Collateral will automatically be released and discharged upon final conclusion of such disposition as and when, but only to the extent, such Liens of the Applicable Collateral Agent on such Shared Collateral are released and discharged; provided that any proceeds of any Shared Collateral realized therefrom shall be applied pursuant to Section 2.1 hereof.  If in connection with any such foreclosure or other exercise of remedies by the Applicable Collateral Agent, the Applicable Collateral Agent or related Applicable Representative of such Series of First Lien Obligations releases any Guarantor from its obligation under a guarantee of the Series of First Lien Obligations for which it serves as agent prior to a Discharge of such Series of First Lien Obligations, such Guarantor also shall be released from its guarantee of all other First Lien Obligations.  If in connection with any such foreclosure or other exercise of remedies by the Applicable Collateral Agent, the equity interests of any Person are foreclosed upon or otherwise disposed of and the Applicable Collateral Agent releases its Lien on the property or assets of such Person, then the Liens of the other Collateral Agent (or in favor of such other First Lien Claimholders if directly secured by such Liens) with respect to any Collateral consisting of the property or assets of such Person will be automatically released to the same extent as the Liens of the Applicable Collateral Agent are released; provided that any proceeds of any such equity interests foreclosed upon where the Applicable Collateral Agent releases its Lien on the assets of such Person on which another Series of First Lien Obligations holds a Lien on any of the assets of such Person (any such assets, the "***Underlying Assets***") which Lien is released as provided in this sentence (any such Proceeds being referred to herein as "***Equity Release Proceeds***" regardless of whether or not such other Series of First Lien Obligations holds a Lien on such equity interests so disposed of) shall be applied pursuant to Section 2.1 hereof.

(b)     Without limiting the rights of the Applicable Collateral Agent under Section 4.2, each Collateral Agent and each Representative agrees to execute and deliver (at the sole cost and expense of the Grantors) all such authorizations and other instruments as shall reasonably be requested by the Company or the Applicable Collateral Agent to evidence and confirm any release of Shared Collateral, Underlying Assets or guarantee provided for in this Section.

SECTION 2.5          Certain Agreements with Respect to Bankruptcy or Insolvency Proceedings.

(a)     This Agreement shall continue in full force and effect notwithstanding the commencement of any proceeding under the Bankruptcy Code or any other Federal, state or foreign bankruptcy, insolvency, receivership or similar law by or against any Grantor or any of its subsidiaries.

(b)     If any Grantor shall become subject to a case (a "***Bankruptcy Case***") under the Bankruptcy Code and shall, as debtor(s)-in-possession, move for approval of financing ("***DIP Financing***") to be provided by one or more lenders (the "***DIP Lenders***") under Section 364 of the Bankruptcy Code or the use of cash collateral under Section 363 of the Bankruptcy Code, each First Lien Claimholder (other than any Controlling Claimholder or the Representative of the Controlling Claimholder) agrees that it will

12

not raise any objection to any such financing or to the Liens on the Shared Collateral securing the same ("**DIP Financing Liens**") or to any use of cash collateral that constitutes Shared Collateral, unless the Representative of the Controlling Claimholders shall then oppose or object to such DIP Financing or such DIP Financing Liens or use of cash collateral (and (i) to the extent that such DIP Financing Liens are senior to the Liens on any such Shared Collateral for the benefit of the Controlling Claimholders, each Other Note Claimholder will subordinate its Liens with respect to such Shared Collateral on the same terms as the Liens of the Controlling Claimholders (other than any Liens of any First Lien Claimholders constituting DIP Financing Liens) are subordinated thereto, and (ii) to the extent that such DIP Financing Liens rank *pari passu* with the Liens on any such Shared Collateral granted to secure the First Lien Obligations of the Controlling Claimholders, each Other Note Claimholder will confirm the priorities with respect to such Shared Collateral as set forth herein), in each case so long as (A) the First Lien Claimholders of each Series retain the benefit of their Liens on all such Shared Collateral pledged to the DIP Lenders, including proceeds thereof arising after the commencement of such proceeding, with the same priority vis-à-vis all the other First Lien Claimholders (other than any Liens of the First Lien Claimholders constituting DIP Financing Liens) as existed prior to the commencement of the Bankruptcy Case, (B) the First Lien Claimholders of each Series are granted Liens on any additional collateral pledged to any First Lien Claimholders as adequate protection or otherwise in connection with such DIP Financing or use of cash collateral, with the same priority vis-à-vis the First Lien Claimholders as set forth in this Agreement (other than any Liens of any First Lien Claimholders constituting DIP Financing Liens), (C) if any amount of such DIP Financing or cash collateral is applied to repay any of the First Lien Obligations, such amount is applied pursuant to Section 2.1(a) of this Agreement, and (D) if any First Lien Claimholders are granted adequate protection with respect to the First Lien Obligations subject hereto, including in the form of periodic payments, in connection with such use of cash collateral, the proceeds of such adequate protection are applied pursuant to Section 2.1(a) of this Agreement; provided that the First Lien Claimholders of each Series shall have a right to object to the grant of a Lien to secure the DIP Financing over any Collateral subject to Liens in favor of the First Lien Claimholders of such Series or its Representative or Collateral Agent that shall not constitute Shared Collateral; provided, further, that the First Lien Claimholders receiving adequate protection shall not object to any other First Lien Claimholder receiving adequate protection comparable to any adequate protection granted to such First Lien Claimholders in connection with a DIP Financing or use of cash collateral.

(c)     If any First Lien Claimholder is granted adequate protection (A) in the form of Liens on any additional collateral, then each other First Lien Claimholder shall be entitled to seek, and each First Lien Claimholder will consent and not object to, adequate protection in the form of Liens on such additional collateral with the same priority vis-à-vis the First Lien Claimholders as set forth in this Agreement, (B) in the form of a superpriority or other administrative claim, then each other First Lien Claimholder shall be entitled to seek, and each First Lien Claimholder will consent and not object to, adequate protection in the form of a pari passu superpriority or administrative claim or (C) in the form of periodic or other cash payments, then the proceeds of such adequate protection must be applied to all First Lien Obligations pursuant to Section 2.1.

SECTION 2.6          Reinstatement.

In the event that any of the First Lien Obligations shall be paid in full and such payment or any part thereof shall subsequently, for whatever reason (including an order or judgment for disgorgement of a preference under Title 11 of the Bankruptcy Code, or any similar law, or the settlement of any claim in respect thereof), be required to be returned or repaid, the terms and conditions of this Agreement shall be fully applicable thereto until all such First Lien Obligations shall again have been paid in full in cash. This Section 2.6 shall survive termination of this Agreement.

SECTION 2.7          Insurance and Condemnation Awards.

As among the First Lien Claimholders, the Applicable Collateral Agent (acting at the direction of the Applicable Representative), shall have the right, but not the obligation, to adjust or settle any insurance policy or claim covering or constituting Shared Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding affecting the Shared Collateral. To the extent either Collateral Agent or any other First Lien Claimholder receives proceeds of such insurance policy and such proceeds are not permitted or required to be returned to any Grantor under the applicable First Lien Documents, such proceeds shall be turned over to the Applicable Collateral Agent for application as provided in Section 2.1 hereof.

SECTION 2.8        Gratuitous Bailee/Agent for Perfection.

(a)        The Applicable Collateral Agent shall be entitled to hold any Possessory Collateral constituting Shared Collateral.

(b)        Notwithstanding the foregoing, each Collateral Agent agrees to hold any Possessory Collateral constituting Shared Collateral and any other Shared Collateral from time to time in its possession or control (or in the possession or control of its agents or bailees) as gratuitous bailee for the benefit of each other First Lien Claimholder (such bailment being intended, among other things, to satisfy the requirements of Sections 8-106(d)(3), 8-301(a)(2) and 9-313(c) of the UCC), solely for the purpose of perfecting the security interest granted in such Shared Collateral, if any, pursuant to the applicable First Lien Collateral Documents, in each case, subject to the terms and conditions of this Section 2.8. Solely with respect to any deposit accounts constituting Shared Collateral under the control (within the meaning of Section 9-104 of the UCC) of any Collateral Agent, each such Collateral Agent agrees to also hold control over such deposit accounts as gratuitous agent for each other First Lien Claimholder and any assignee solely for the purpose of perfecting the security interest in such deposit accounts, subject to the terms and conditions of this Section 2.8.

(c)        No Collateral Agent shall have any obligation whatsoever to any First Lien Claimholder to ensure that the Possessory Collateral and Control Collateral is genuine or owned by any of the Grantors or to preserve rights or benefits of any Person except as expressly set forth in this Section 2.8. The duties or responsibilities of each Collateral Agent under this Section 2.8 shall be limited solely to holding any Possessory Collateral constituting Shared Collateral or any other Shared Collateral in its possession or control as gratuitous bailee (and with respect to Deposit Accounts, as gratuitous agent) in accordance with this Section 2.8 and delivering the Possessory Collateral constituting Shared Collateral as provided in Section 2.8(e) below.

(d)        Neither Collateral Agents nor any of the First Lien Claimholders shall have by reason of the First Lien Documents, this Agreement or any other document a fiduciary relationship in respect of the other Collateral Agents or any other First Lien Claimholder, and each Collateral Agent and each First Lien Claimholder hereby waives and releases the other Collateral Agents and First Lien Claimholders from all claims and liabilities arising pursuant to either Collateral Agent's role under this Section 2.8 as gratuitous bailee with respect to the Possessory Collateral constituting Shared Collateral or any other Shared Collateral in its possession or control (and with respect to the Deposit Accounts, as gratuitous agent).

(e)        At any time the Applicable Collateral Agent is no longer the Applicable Collateral Agent, such outgoing Applicable Collateral Agent shall deliver the remaining Possessory Collateral constituting Shared Collateral in its possession (if any) together with any necessary endorsements (which endorsement shall be without recourse and without any representation or warranty), first, to the then Applicable Collateral Agent to the extent First Lien Obligations remain outstanding and second, to the applicable Grantor to the extent no First Lien Obligations remain outstanding (in each case, so as to allow

14

such Person to obtain possession or control of such Shared Collateral) or to whomever may be lawfully entitled to receive the same. The outgoing Applicable Collateral Agent further agrees to take all other action reasonably requested by the then Applicable Collateral Agent or the Company at the expense of the Company in connection with the then Applicable Collateral Agent obtaining a first-priority security interest in the Shared Collateral.

SECTION 2.9        Amendments to First Lien Collateral Documents.

(a)        Without the prior written consent of each other Collateral Agent, each Collateral Agent agrees that no First Lien Collateral Document may be amended, restated, amended and restated, supplemented, replaced or refinanced or otherwise modified from time to time or entered into to the extent such amendment, supplement, refinancing or modification, or the terms of any new First Lien Collateral Document, would be prohibited by, or would require any Grantor to act or refrain from acting in a manner that would violate, any of the terms of this Agreement.

(b)        In determining whether an amendment to any First Lien Collateral Document is permitted by this Section 2.9, each Collateral Agent may conclusively rely on an officer's certificate of the Company stating that such amendment is permitted by this Section 2.9.

SECTION 2.10        Similar Liens and Agreements.

(a)        The parties hereto agree that it is their intention that the Collateral be identical for all First Lien Claimholders. In furtherance of, but subject to, the foregoing, the parties hereto agree, subject to the other provisions of this Agreement:

(i)        upon request by either Collateral Agent, to cooperate in good faith (and to direct their counsel to cooperate in good faith) from time to time in order to determine the specific items included in the Shared Collateral and the steps taken to perfect their respective Liens thereon and the identity of the respective parties obligated under the Initial Note Documents and the Other Note Documents; and

(ii)        that the documents and agreements creating or evidencing the Liens on Shared Collateral securing the Initial Note Obligations and the Other Note Obligations shall be in all material respects the same forms of documents as one another, except that the documents and agreements creating or evidencing the Liens securing the Other Note Obligations may contain additional provisions as may be necessary or appropriate to establish the intercreditor arrangements among the various separate classes of creditors holding Other Note Obligations.

ARTICLE III.

EXISTENCE AND AMOUNTS OF LIENS AND OBLIGATIONS

Whenever an Applicable Collateral Agent or an Applicable Representative shall be required, in connection with the exercise of its rights or the performance of its obligations hereunder, to determine the existence or amount of any First Lien Obligations of either Series, or the Shared Collateral subject to any Lien securing the First Lien Obligations of either Series, it may request that such information be furnished to it in writing by the other Representative or the other Collateral Agent and shall be entitled to make such determination or not make any determination on the basis of the information so furnished; provided, however, that if such Representative or Collateral Agent shall fail or refuse reasonably promptly to provide the requested information, the requesting Applicable Collateral Agent or Applicable Representative shall be entitled to make any such determination or not make any determination by such method as it

may, in the exercise of its good faith judgment, determine, including by reliance upon a certificate of the Company. Each Applicable Collateral Agent and each Applicable Representative may rely conclusively, and shall be fully protected in so relying, on any determination made by it in accordance with the provisions of the preceding sentence (or as otherwise directed by a court of competent jurisdiction) and shall have no liability to any Grantor, any First Lien Claimholder or any other person as a result of such determination.

ARTICLE IV.

THE APPLICABLE COLLATERAL AGENT

SECTION 4.1     Authority.

(a)     Notwithstanding any other provision of this Agreement, nothing herein shall be construed to impose any fiduciary or other duty on any Applicable Collateral Agent to any Other Note Claimholder or give any Other Note Claimholder the right to direct the Applicable Collateral Agent, except that each Applicable Collateral Agent shall be obligated to distribute proceeds of any Shared Collateral in accordance with Section 2.1 hereof.

(b)     In furtherance of the foregoing, each Other Note Claimholder acknowledges and agrees that the Applicable Collateral Agent shall be entitled, for the benefit of the First Lien Claimholders, to sell, transfer or otherwise dispose of or deal with any Shared Collateral as provided herein and in the First Lien Collateral Documents, as applicable, without regard to any rights to which the Other Note Claimholder would otherwise be entitled as a result of the First Lien Obligations held by such Other Note Claimholders. Without limiting the foregoing, each Other Note Claimholder agrees that none of the Applicable Collateral Agent, the Applicable Representative or any other First Lien Claimholder shall have any duty or obligation first to marshal or realize upon any type of Shared Collateral (or any other Collateral securing any of the First Lien Obligations), or to sell, dispose of or otherwise liquidate all or any portion of such Shared Collateral (or any other Collateral securing any First Lien Obligations), in any manner that would maximize the return to the Other Note Claimholder, notwithstanding that the order and timing of any such realization, sale, disposition or liquidation may affect the amount of proceeds actually received by the Other Note Claimholders from such realization, sale, disposition or liquidation. Each of the First Lien Claimholders waives any claim it may now or hereafter have against the Collateral Agent or Representative of the other Series of First Lien Obligations or any other First Lien Claimholder of the other Series arising out of (i) any actions which any such Collateral Agent, Representative or any First Lien Claimholder represented by it take or omit to take (including actions with respect to the creation, perfection or continuation of Liens on any Collateral, actions with respect to the foreclosure upon, sale, release or depreciation of, or failure to realize upon, any of the Collateral and actions with respect to the collection of any claim for all or any part of the First Lien Obligations from any account debtor, guarantor or any other party) in accordance with the First Lien Collateral Documents or any other agreement related thereto or in connection with the collection of the First Lien Obligations or the valuation, use, protection or release of any security for the First Lien Obligations; provided that nothing in this clause (i) shall be construed to prevent or impair the rights of either Collateral Agent or Representative to enforce this Agreement, (ii) any election by the Applicable Representative or any holders of First Lien Obligations, in any proceeding instituted under the Bankruptcy Code, of the application of Section 1111(b) of the Bankruptcy Code or (iii) subject to Section 2.5, any borrowing, or grant of a security interest or administrative expense priority under Section 364 of the Bankruptcy Code or any equivalent provision of any other Bankruptcy Law, by the Company or any of its subsidiaries, as debtor-in-possession. Notwithstanding any other provision of this Agreement, the Applicable Collateral Agent shall not (i) accept any Shared Collateral in full or partial satisfaction of any First Lien Obligations pursuant to Section 9-620 of the UCC, without the consent of the Representatives representing holders of First Lien Obligations for whom such Collateral constitutes Shared Collateral or (ii) "credit bid" for or purchase (other than for cash) Shared Collateral at any public, private

16

or judicial foreclosure upon such Shared Collateral, without the consent of the Representative representing holders of First Lien Obligations for whom such Collateral constitutes Shared Collateral.

SECTION 4.2        Power-of-Attorney.

The Other First Lien Representative and the Other First Lien Collateral Agent, for itself and on behalf of the Other Note Claimholders, hereby irrevocably appoints the Applicable Collateral Agent and any officer or agent of the Applicable Collateral Agent, which appointment is coupled with an interest with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Other First Lien Representative, the Other First Lien Collateral Agent and the Other Note Claimholders, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Agreement, including the exercise of any and all remedies under each First Lien Collateral Document with respect to Shared Collateral and the execution of releases in connection therewith.

ARTICLE V.

MISCELLANEOUS

SECTION 5.1        Integration/Conflicts.

This Agreement, together with the other First Lien Documents and the First Lien Collateral Documents, represents the entire agreement of each of the Grantors and the First Lien Claimholders with respect to the subject matter hereof and thereof and supersedes any and all previous agreements and understandings, oral or written, relating to the subject matter hereof and thereof.  There are no promises, undertakings, representations or warranties by either Representative, either Collateral Agent or the First Lien Claimholder relative to the subject matter hereof and thereof not expressly set forth or referred to herein or therein.  In the event of any conflict between the provisions of this Agreement and the provisions of the First Lien Documents the provisions of this Agreement shall govern and control.

SECTION 5.2        Effectiveness; Continuing Nature of this Agreement; Severability.

This Agreement shall become effective when executed and delivered by the parties hereto. This is a continuing agreement and the First Lien Claimholders of either Series may continue, at any time and without notice to any First Lien Claimholder of the other Series, to extend credit and other financial accommodations and lend monies to or for the benefit of the Company or any Grantor constituting First Lien Obligations in reliance hereon.  Each Representative and each Collateral Agent, on behalf of itself and each other First Lien Claimholder represented by it, hereby waives any right it may have under applicable law to revoke this Agreement or any of the provisions of this Agreement.  The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency or Liquidation Proceeding.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  The parties hereto shall endeavor in good faith negotiations to replace any invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to those of the invalid, illegal or unenforceable provisions. All references to the Company or any other Grantor shall include the Company or such Grantor as debtor and debtor in possession and any receiver, trustee or similar person for the Company or any other Grantor (as the case may be) in any Insolvency or Liquidation Proceeding.  This Agreement shall terminate and be of no further force and effect with respect to the Representative or Collateral Agent and the First Lien Claimholders represented by such Representative or Collateral Agent and their First Lien Obligations, on

17

the date on which there has been a Discharge of such Series of First Lien Obligations, subject to the rights of the First Lien Claimholders under Section 2.6; provided, however, that such termination shall not relieve any such party of its obligations incurred hereunder prior to the date of such termination.

SECTION 5.3        Amendments; Waivers.

(a)        No amendment, modification or waiver of any of the provisions of this Agreement shall be deemed to be made unless the same shall be in writing signed on behalf of each party hereto or its authorized agent and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time.  Notwithstanding the foregoing, the Company and the other Grantors shall not have any right to consent to or approve any amendment, modification or waiver of any provision of this Agreement except to the extent their rights are adversely affected.

SECTION 5.4        Information Concerning Financial Condition of the Grantors and their Subsidiaries.

The Representative and Collateral Agent and the other First Lien Claimholders of each Series shall each be responsible for keeping themselves informed of (a) the financial condition of the Grantors and their subsidiaries and all endorsers and/or guarantors of the First Lien Obligations and (b) all other circumstances bearing upon the risk of nonpayment of the First Lien Obligations, provided that the foregoing shall not impose any obligation on any Representative or Collateral Agent not expressly set forth in the applicable First Lien Documents.  The Representative and Collateral Agent and the other First Lien Claimholders of each Series shall have no duty to advise the Representative, Collateral Agent or First Lien Claimholders of the other Series of information known to it or them regarding such condition or any such circumstances or otherwise.  In the event the Representative or Collateral Agent or any of the other First Lien Claimholders, in its or their sole discretion, undertakes at any time or from time to time to provide any such information to the Representative, Collateral Agent or First Lien Claimholders of the other Series, it or they shall be under no obligation:

(a)        to make, and such Representative and Collateral Agent and such other First Lien Claimholders shall not make, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided;

(b)        to provide any additional information or to provide any such information on any subsequent occasion;

(c)        to undertake any investigation; or

(d)        to disclose any information, which pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

SECTION 5.5        Submission to Jurisdiction; Certain Waivers.

Each of the Company, each other Grantor, each Collateral Agent and each Representative, on behalf of itself and each other First Lien Claimholder represented by it, hereby irrevocably and unconditionally:

(a)      submits for itself and its property in any legal action or proceeding relating to this Agreement and the First Lien Collateral Documents (whether arising in contract, tort or otherwise) to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the exclusive (subject to Section 5.5(c)) general jurisdiction of the courts of the State of New York sitting in the Borough of Manhattan, the courts of the United States for the Southern District of New York sitting in the Borough of Manhattan, and appellate courts from any thereof;

(b)      agrees that all claims in respect of any such action or proceeding shall be heard and determined in such New York state court or, to the fullest extent permitted by applicable law, in such federal court;

(c)      agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law and that nothing in this Agreement or any other First Lien Document shall affect any right that either Collateral Agent, either Representative or any other First Lien Claimholder may otherwise have to bring any action or proceeding relating to this Agreement or any other First Lien Document against such Grantor or any of its assets in the courts of any jurisdiction;

(d)      waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement or any other First Lien Collateral Document in any court referred to in Section 5.5(a) (and irrevocably waives to the fullest extent permitted by applicable law the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court); and

(e)      waives, to the maximum extent not prohibited by law, any right it may have to claim or recover any special, exemplary, punitive or consequential damages.

SECTION 5.6          WAIVER OF JURY TRIAL.

**EACH PARTY HERETO AND THE COMPANY AND THE OTHER GRANTORS HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER FIRST LIEN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT, BREACH OF DUTY, COMMON LAW, STATUTE OR ANY OTHER THEORY). EACH PARTY HERETO AND THE COMPANY AND THE OTHER GRANTORS (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT EACH SUCH PARTY HERETO AND THE COMPANY AND EACH OTHER GRANTOR HAVE BEEN INDUCED TO ENTER INTO OR ACKNOWLEDGE THIS AGREEMENT AND THE OTHER FIRST LIEN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION. EACH PARTY HERETO AND THE COMPANY AND THE OTHER GRANTORS FURTHER REPRESENTS AND WARRANTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.**

SECTION 5.7          Notices.

19

Unless otherwise specifically provided herein, any notice hereunder shall be in writing and may be personally served or sent by facsimile, electronic mail or United States mail or courier service and shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof, upon receipt of facsimile or electronic mail, or three Business Days after depositing it in the United States mail with postage prepaid and properly addressed.  For the purposes hereof, the addresses of the parties hereto shall be as set forth below each party's name on the signature pages hereto or, with respect to any Grantor that becomes a party hereto pursuant to <u>Section 5.17</u>, in the joinder agreement substantially in the form attached hereto as <u>Exhibit A</u>, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

SECTION 5.8        <u>Further Assurances</u>.

Each Representative and Collateral Agent, on behalf of itself and each other First Lien Claimholder represented by it, and the Company and each other Grantor, agree that each of them shall take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as either Representative and Collateral Agent may reasonably request to effectuate the terms of and the Lien priorities contemplated by this Agreement.

SECTION 5.9        <u>Agency Capacities</u>.

(a)        Except as expressly provided herein, (a) each of the Initial First Lien Representative and the Initial First Lien Collateral Agent is acting in the capacity of Representative and Collateral Agent, respectively, solely for the Initial Note Claimholders and pursuant to the direction set forth in the Initial Note Documents and (b) each of the Other First Lien Representative and the Other First Lien Collateral Agent is acting in the capacity of Representative and Collateral Agent, respectively, solely for the Other Note Claimholders and pursuant to the direction set forth in the Other Note Documents.  Each Representative and each Collateral Agent shall be entitled to the rights, privileges and immunities of such Representative or such Collateral Agent as set forth in the applicable First Lien Documents in acting hereunder.

(b)        Neither Representative or Collateral Agent shall be responsible for the terms or sufficiency of this Agreement for any purpose.  Neither Representative or Collateral Agent shall have any duties or obligations under or pursuant to this Agreement other than such duties as may be expressly set forth in this as duties on its part to be performed or observed.  In entering into this Agreement, or in taking (or forbearing from) any action under or pursuant to this Agreement, each Representative and Collateral Agent shall have and be protected by all of the rights, immunities, indemnities and other protections granted to it under the applicable First Lien Documents.  Neither Representative or Collateral Agent shall have any liability or responsibility for the actions or omissions of the other Collateral Agent, or for any other claimholder's or the other Collateral Agent's compliance with (or failure to comply with) the terms of this Agreement.

(c)        None of the provisions in this Agreement shall require the Representatives or the Collateral Agents to expend or risk their own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of their duties, or in the exercise of any of its rights or powers if they shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to them against such risk or liability is not assured to them.

(d)        Neither Representative or Collateral Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated by the applicable First Lien Documents that such Representative or Collateral Agent is required to exercise as directed in writing by the Required Holders (as defined in the Initial Purchase Agreement or Other Purchase Agreement, as applicable); *provided that*, either Representative and Collateral Agent shall be entitled to refrain from any act or the taking of any action hereunder under the applicable First Lien Documents or

from the exercise of any power or authority vested in it hereunder or thereunder unless and until such Representative or Collateral Agent shall have received instructions from the Required Holders (as defined in the Initial Purchase Agreement or Other Purchase Agreement, as applicable) and such Representative or Collateral Agent deems necessary, satisfactory indemnity has been provided to it, and neither such Representative nor Collateral Agent shall be liable for any such delay in acting.  Neither Representative or Collateral Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose it to liability or that is contrary to the applicable First Lien Documents or applicable law, including for the avoidance of doubt, any action that may be in violation of the automatic stay under any bankruptcy or insolvency law.  For purposes of clarity, phrases such as "satisfactory to", "approved by", "acceptable to", "as determined by", "in the discretion of", "selected by", "requested by" the Representatives or Collateral Agents and phrases of similar import authorize and permit the Representatives or Collateral Agents to approve, disapprove, determine, act or decline to act in its discretion.  Any exercise of discretion on behalf of the Other First Lien Representative or the Other First Lien Collateral Agent shall be exercised in accordance with the terms of the Other Note Documents.  Notwithstanding anything herein to the contrary, neither Representative or Collateral Agent shall have any responsibility for the preparation, filing or recording of any instrument, document or financing statement or for the perfection or maintenance of any security interest created hereunder.

SECTION 5.10        GOVERNING LAW.

**THIS AGREEMENT, AND ANY DISPUTE, CLAIM OR CONTROVERSY ARISING OUT OF OR RELATING TO THIS AGREEMENT (WHETHER ARISING IN CONTRACT, TORT OR OTHERWISE) SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAW RULES THAT WOULD RESULT IN THE APPLICATION OF A DIFFERENT GOVERNING LAW (OTHER THAN ANY MANDATORY PROVISIONS OF THE UCC RELATING TO THE LAW GOVERNING PERFECTION AND THE EFFECT OF PERFECTION OR PRIORITY OF THE SECURITY INTERESTS).**

SECTION 5.11        Binding on Successors and Assigns.

This Agreement shall be binding upon each Representative and each Collateral Agent, the First Lien Claimholders, the Company and the other Grantors, and their respective successors and assigns from time to time.  If either Representative and/or Collateral Agent resigns or is replaced pursuant to the applicable First Lien Documents its successor shall be deemed to be a party to this Agreement and shall have all the rights of, and be subject to all the obligations of, this Agreement.  No provision of this Agreement will inure to the benefit of a trustee, debtor-in-possession, creditor trust or other representative of an estate or creditor of any Grantor, including where any such trustee, debtor-in-possession, creditor trust or other representative of an estate is the beneficiary of a Lien securing Collateral by virtue of the avoidance of such Lien in an Insolvency or Liquidation Proceeding.

SECTION 5.12        Section Headings.

Section headings and the Table of Contents used in this Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

SECTION 5.13        Counterparts.

This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute

254438203 v7

one and the same instrument.  Delivery of an executed signature page of this Agreement by facsimile or other electronic transmission (e.g., "pdf" or "tif" format) shall be effective as delivery of a manually executed counterpart hereof.  The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this Agreement and/or any document to be signed in connection with this Agreement and the transactions contemplated hereby shall be deemed to include Electronic Signatures (as defined below), deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be.  "*__Electronic Signatures__*" means any electronic symbol or process attached to, or associated with, any contract or other record and adopted by a person with the intent to sign, authenticate or accept such contract or record.

SECTION 5.14     __Authorization__.

By its signature, each Person executing this Agreement, on behalf of such party or Grantor but not in his or her personal capacity as a signatory, represents and warrants to the other parties hereto that it is duly authorized to execute this Agreement.

SECTION 5.15     __No Third Party Beneficiaries/ Provisions Solely to Define Relative Rights__.

The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the First Lien Claimholders in relation to one another.  None of the Company, any other Grantor nor any other creditor thereof shall have any rights or obligations hereunder and no such Person is an intended beneficiary or third party beneficiary hereof, except, in each case, as expressly provided in this Agreement, and none of the Company or any other Grantor may rely on the terms hereof (other than __Sections 5.3__).  Nothing in this Agreement is intended to or shall impair the obligations of any Grantor, which are absolute and unconditional, to pay the First Lien Obligations as and when the same shall become due and payable in accordance with their terms.  Without limitation of any other provisions of this Agreement, the Company and each Grantor hereby (a) acknowledges that it has read this Agreement and consents hereto, (b) agrees that it will not take any action that would be contrary to the express provisions of this Agreement and (c) agrees to abide by the requirements expressly applicable to it under this Agreement.

SECTION 5.16     __No Indirect Actions__.

Unless otherwise expressly stated, if a party may not take an action under this Agreement, then it may not take that action indirectly, or support any other Person in taking that action directly or indirectly.  "Taking an action indirectly" means taking an action that is not expressly prohibited for the party but is intended to have substantially the same effects as the prohibited action.

SECTION 5.17     __Additional Grantors__.

Each of the Company and the other Grantors agrees that it shall ensure that each of its subsidiaries that is or is to become a party to any First Lien Document and which grants or purports to grant a lien on any of its assets shall either execute this Agreement on the date hereof or shall confirm that it is a Grantor hereunder pursuant to a joinder agreement substantially in the form attached hereto as __Exhibit A__ that is executed and delivered by such subsidiary prior to or concurrently with its execution and delivery of such First Lien Document.

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**U.S. BANK NATIONAL ASSOCIATION**, as Initial First Lien Representative and as Initial First Lien Collateral Agent

By: _____
Name:
Title:

Address for notices:
U.S. Bank National Association
West Side Flats
60 Livingston Avenue
EP-MN-WS3C
St. Paul, MN 55107
Attention: Joshua Hahn (Core Sciences)

**U.S. BANK NATIONAL ASSOCIATION**, as Other First Lien Representative and as Other First Lien Collateral Agent

By: _____
Name:
Title:

Address for notices:
U.S. Bank National Association
West Side Flats
60 Livingston Avenue
EP-MN-WS3C
St. Paul, MN 55107
Attention: Joshua Hahn (Core Sciences)

[Signature Page to Intercreditor Agreement]

**Acknowledged and Agreed to by:**

[_____]


By:_____
Name:
Title:

Exhibit A
to First Lien Pari Passu Intercreditor Agreement

FORM OF GRANTOR JOINDER AGREEMENT

GRANTOR JOINDER AGREEMENT NO.  [__] (this "*Grantor Joinder Agreement*"), dated as of [__], 20[__] to the PARI PASSU INTERCREDITOR AGREEMENT, dated as of [__], 2021 (the "*Pari Passu Intercreditor Agreement*"), by and among U.S. Bank National Association, as Initial First Lien Representative and Initial First Lien Collateral Agent, U.S. Bank National Association, as Other First Lien Representative and Other First Lien Collateral Agent, and acknowledged and agreed to by Core Scientific Holding Co. and the other Grantors from time to time party thereto.  Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Pari Passu Intercreditor Agreement.

The undersigned, [_____], a [_____], (the "*New Grantor*") wishes to acknowledge and agree to the Pari Passu Intercreditor Agreement and become a party thereto to the limited extent contemplated by Section 5.17 thereof and to acquire and undertake the rights and obligations of a Grantor thereunder.

Accordingly, the New Grantor agrees as follows for the benefit of the Representatives, the Collateral Agents and the First Lien Claimholders:

Section 1.       Accession to the Pari Passu Intercreditor Agreement.  The New Grantor (a) acknowledges and agrees to, and becomes a party to the Pari Passu Intercreditor Agreement as a Grantor to the limited extent contemplated by Section 5.17 thereof, (b) agrees to all the terms and provisions of the Pari Passu Intercreditor Agreement and (c) shall have all the rights and obligations of a Grantor under the Pari Passu Intercreditor Agreement.  This Grantor Joinder Agreement supplements the Pari Passu Intercreditor Agreement and is being executed and delivered by the New Grantor pursuant to Section 5.17 of the Pari Passu Intercreditor Agreement.

Section 2.       Representations, Warranties and Acknowledgement of the New Grantor.  The New Grantor represents and warrants to each Representative, each Collateral Agent and to the First Lien Claimholders that (a) it has full power and authority to enter into this Grantor Joinder Agreement, in its capacity as Grantor and (b) this Grantor Joinder Agreement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with the terms of this Grantor Joinder Agreement.

Section 3.       Counterparts.  This Grantor Joinder Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Grantor Joinder Agreement or any document or instrument delivered in connection herewith by telecopy or other electronic means shall be effective as delivery of a manually executed counterpart of this Grantor Joinder Agreement or such other document or instrument, as applicable.

Section 4.       Section Headings.  Section heading used in this Grantor Joinder Agreement are for convenience of reference only and are not to affect the construction hereof or to be taken in consideration in the interpretation hereof.

Section 5.        Benefit of Agreement.  The agreements set forth herein or undertaken pursuant hereto are for the benefit of, and may be enforced by, any party to the Pari Passu Intercreditor Agreement subject to any limitations set forth in the Pari Passu Intercreditor Agreement with respect to the Grantors.

Section 6.        Governing Law.  **THIS GRANTOR JOINDER AGREEMENT, AND ANY DISPUTE, CLAIM OR CONTROVERSY ARISING OUT OF OR RELATING TO THIS GRANTOR JOINDER AGREEMENT (WHETHER ARISING IN CONTRACT, TORT OR OTHERWISE) SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAW RULES THAT WOULD RESULT IN THE APPLICATION OF A DIFFERENT GOVERNING LAW (OTHER THAN ANY MANDATORY PROVISIONS OF THE UCC RELATING TO THE LAW GOVERNING PERFECTION AND THE EFFECT OF PERFECTION OR PRIORITY OF THE SECURITY INTERESTS IN THE COLLATERAL).**

Section 7.        Severability.  Any provision of this Grantor Joinder Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  The parties hereto shall endeavor in good faith negotiations to replace any invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to those of the invalid, illegal or unenforceable provisions.

Section 8.        Notices.  All communications and notices hereunder shall be in writing and given as provided in Section 5.7 of the Pari Passu Intercreditor Agreement.  All communications and notices hereunder to the New Grantor shall be given to it at the address set forth under its signature hereto, which information supplements Section 5.7 of the Pari Passu Intercreditor Agreement.

IN WITNESS WHEREOF, the New Grantor has duly executed this Grantor Joinder Agreement to the Pari Passu Intercreditor Agreement as of the day and year first above written.

[_____]

By_____
   Name:
   Title:

Address for notices:
_____
_____
Attention of:_____
Telecopy: _____

Exhibit A – Page 3

**EXHIBIT I**

**FORM OF JOINDER AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

**[FORM OF] JOINDER AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS JOINDER ASSIGNMENT AND ASSUMPTION AGREEMENT (this "*Agreement*"), dated as of [__], is made by and among [Parent Entity] (the "*Parent*"), [Core Scientific Holding Co.][1], a Delaware (the "*Company*") and U.S. BANK NATIONAL ASSOCIATION, as note agent (in such capacity, the "*Agent*"), under that certain Convertible Note Purchase Agreement, dated as of August 20, 2021 (as amended, restated, supplemented and/or otherwise modified from time to time, the "*Purchase Agreement*"), by and among the Company, the Guarantors party thereto, each Purchaser party thereto and the Note Agent.

## RECITALS

**WHEREAS**, pursuant to the Purchase Agreement, each Purchaser has been issued by the Company one or more Notes (as defined in the Purchase Agreement), which are part of a series of Notes issued by the Company, in an aggregate principal amount of up to $300,000,000.00;

**WHEREAS**, pursuant to Section 10.1 of the Purchase Agreement, in the event of a SPAC, the Parent Entity shall (a) assume the Obligation of the Company to deliver Conversion Securities pursuant to Section 2 of the Note and (b) assume each other Obligation of the Company under the Note Documents by becoming a joint and several co-obligor of each such other Obligation of the Company (or its successor by merger) under the Note Documents, in each case pursuant to this Agreement; and

**WHEREAS**, the Company and the Parent now seek to consummate the joinder and assignment and assumption contemplated by Section 10.1 of the Purchase Agreement.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the agreements and covenants contained in the Purchase Agreement, and the agreements and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties do hereby agree as follows:

**1.     Defined Terms**.  Capitalized terms used but not defined herein shall have the meanings set forth in the Purchase Agreement.

**2.     Assignment and Assumption**.  Under the terms and subject to the conditions set forth in the Purchase Agreement, the Company hereby assigns to the Parent, and the Parent hereby accepts, the Obligation of the Company to deliver Conversion Securities pursuant to Section 2 of the Note.

**3.     Joinder**.  The Parent hereby acknowledges, agrees and confirms that, by its execution of this Agreement, the Parent will be deemed to be an issuer under the Note Documents and each reference to the "Company" in the Purchase Agreement and each other Note Document shall be deemed to be a collective reference to the Parent and the Company and the Parent shall have all of the obligations of the Company thereunder as if it had executed the Note Documents as the Company.  The Parent hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Purchase Agreement.  Notwithstanding the foregoing, the Parent shall act as representative of the Company and Parent with respect to any obligation of the Company under any Note Document to deliver a certificate or notice from the Company.

---

[1] To be updated to refer to its successor by merger, if applicable.

4.      **Continuing Validity; Waiver and Amendment; Entire Agreement**.  Except as expressly modified pursuant to Agreement, the terms of the Note Documents remain unchanged and in full force and effect.  Any provision of this Agreement may be amended, waived or modified only by an instrument signed in writing by the Parties and the Note Agent.  This Agreement and the other Note Documents constitute the entire contract among the parties hereto regarding to the subject matters addressed herein and supersede any and all previous agreements, negotiations, and discussions, oral or written, by the parties regarding the subject matters addressed herein.

5.      **Successors and Assigns**.  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties.  Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

6.      **GOVERNING LAW**.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.

7.      **Jurisdiction and Venue; Waiver of Jury Trial; Expenses and Indemnification**.  This Agreement is subject to the provisions of Section 10.3 (Jurisdiction and Venue), Section 10.4 (Waiver of Jury Trial) and Section 10.10(a) (Expenses and Indemnification) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*.

8.      **Notices**.  All communications and notices required or permitted to be given hereunder shall be delivered in accordance with Section 10.8 of the Purchase Agreement.

9.      **Headings; Interpretation**.  Paragraph headings used in this Agreement are included for convenience of reference only and will not modify the provisions that they precede or affect the interpretation of this Agreement or any other Note Document.  The term "including" shall be interpreted to mean "including but not limited to".

10.     **Counterparts**.  This Agreement may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract.  Any counterpart of a signature page to this Agreement may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.

*[Signature page follows]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

**[PARENT ENTITY]**

By:_____
Name:
Title:

**[CORE SCIENTIFIC HOLDING CO.]**

By:_____
Name:
Title:

Acknowledged and accepted:

**AGENT**:

**U.S. BANK NATIONAL ASSOCIATION,**
as Note Agent [and Collateral Agent]

By: _____
Name:
Title:

**CONVERTIBLE NOTE PURCHASE AGREEMENT**

THIS CONVERTIBLE NOTE PURCHASE AGREEMENT (this "*Agreement*") is made as of August 20, 2021, by and among Core Scientific Holding Co., a Delaware corporation (the "*Company*"), the Guarantors from time to time party hereto, the persons and entities named on the Schedule of Purchasers under the header 'Initial Purchasers' attached hereto as <u>Schedule 2</u> (individually, an "*Initial Purchaser*" and collectively, the "*Initial Purchasers*"), each Additional Purchaser from time to time party hereto and U.S. Bank National Association, as note agent (in such capacity, the "*Note Agent*") and, upon the execution and delivery of the Collateral Documents pursuant to Section 6.13, as collateral agent for the Secured Parties (in such capacity, the "*Collateral Agent*" and, together with the Note Agent, the "*Agents*").

## RECITALS

WHEREAS, the Company desires (i) to issue and to sell to the Initial Purchasers, and the Initial Purchasers have agreed to purchase from the Company, on the Initial Closing Date, convertible promissory notes substantially in the form attached hereto as <u>Exhibit A</u> (each, an "*Initial Note*" and collectively, the "*Initial Notes*") and (ii) to issue and to sell to Additional Purchasers on Additional Closing Dates convertible promissory notes substantially in the form attached hereto as <u>Exhibit A</u> (each, an "*Additional Note*" and collectively, the "*Additional Notes*" and, together with the Initial Notes, individually, a "*Note*" and collectively, the "*Notes*"), in an aggregate principal amount for all such Notes of up to $300,000,000.00 on the terms, and subject to the conditions, specified herein; and

WHEREAS, to induce the Purchasers to purchase the Notes, the Note Parties have agreed to execute and deliver, contemporaneously with the issuance, sale and purchase of the Initial Notes on the Initial Closing Date, the Guaranty, pursuant to which each Guarantor will guarantee the Obligations of the Company under the Notes and, as and when required pursuant to Section 6.13, the Security Agreement, pursuant to which the Note Parties will grant to the Collateral Agent, for the ratable benefit of the Secured Parties, a security interest in the Note Parties' assets to secure the Obligations or their respective Guaranteed Obligations (as applicable).

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, and the representations, warranties, covenants and conditions set forth below, which represent integral components of the transactions contemplated hereby and shall be fully enforceable by the parties hereto, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Note Parties, the Agents and each Purchaser, intending to be legally bound, hereby agree as follows:

1.   **DEFINITIONS.**

As used herein, the following terms shall have the meanings set forth below.

(a)   "*Act*" means the Securities Exchange Act of 1934, as amended.

(b)   "*Additional Closing Date*" has the meaning ascribed thereto in <u>Section 2.2</u>.

(c)   "*Additional Note*" or "*Additional Notes*" has the meaning ascribed thereto in <u>Section 2.2</u>.

1

(d)     "**Additional Purchaser**" or "**Additional Purchasers**" has the meaning ascribed thereto in Section 2.2.

(e)     "**Administrative Questionnaire**" means an Administrative Questionnaire substantially in the form attached hereto as Exhibit G.

(f)     "**Agent-Related Person**" means the Note Agent and the Collateral Agent, together with their affiliates, officers, directors, employees, agents and attorneys-in-fact of the Agents and their affiliates.

(g)     "**Agents**" has the meaning ascribed to such term in the preamble to this Agreement.

(h)     "**Asset Disposition**" means any sale, lease, license, transfer, assignment or other disposition (whether by a single transaction or through series of transactions, and including by means of a merger, consolidation, amalgamation or similar transaction) by the Company or any of its Subsidiaries of any asset or property.

(i)     "**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in the City of New York or the Principal Office are authorized or required to close.

(j)     "**Capital Lease**" means any lease of any property by such Person as lessee which would, in accordance with GAAP, be required to be accounted for as a capital lease on the balance sheet of such Person.

(k)     "**Capital Lease Obligations**" means, with respect to any Person, all obligations of such Person under Capital Leases.

(l)     "**Capital Stock**" means (a) any capital stock, partnership, membership, limited liability company, joint venture or other ownership or equity interest or other equivalent, participation or securities (whether voting or non-voting, whether preferred, common or otherwise, whether certificated or uncertificated, and however designated), and (b) any option, warrant, security, appreciation right, profits interests or other right directly or indirectly convertible into or exercisable or exchangeable for, or otherwise to acquire directly or indirectly, any capital stock, partnership, membership, limited liability company, joint venture or other ownership or equity interest, participation or security described in clause (a) above (excluding the Notes and any other Indebtedness convertible or exchangeable into any such capital stock, partnership, membership, limited liability company, joint venture or other ownership or equity interest, participation or security described in clause (a) above unless and to the extent converted or exchanged).

(m)     "**Charter Documents**" means (i) the articles or certificate of incorporation or formation (as applicable), (ii) the by-laws, operating agreement or limited liability company agreement (as applicable) and (iii) other similar organizational and governing documents of any Person, as amended, restated, supplemented or otherwise modified from time to time.

(n)     "**Closing Date**" means the Initial Closing Date or each Additional Closing Date, as the context may require.

(o)     "**Collateral**" means the "Collateral" as defined in the Security Agreement.

254153937 v7

(p)     "*Collateral Agent*" has the meaning ascribed to such term in the preamble to this Agreement.

(q)     "*Collateral Documents*" means, collectively, the Security Agreement, the Intellectual Property Security Agreement and each other agreement or writing pursuant to which the Note Parties purport to pledge or grant a security interest in any property or assets securing the Obligations or the Guaranteed Obligations, as applicable, in each case, as amended, restated, supplemented and/or otherwise modified from time to time.

(r)     "*Company Covered Persons*" means those Persons specified in Rule 506(d)(1) promulgated under the Act; provided, however, that Company Covered Persons do not include (a) any Holder or (b) any person or entity that is deemed to be an affiliated issuer of the Company solely as a result of the relationship between the Company and any Holder.

(s)     "*Contractual Obligations*" means as to any Person, any provision of any security issued by such Person or of any agreement, undertaking, contract, indenture, mortgage, deed of trust or other instrument or arrangement (whether in writing or otherwise) to which such Person is a party or by which it or any of such Person's property is bound.

(t)     "*Conversion Event*" has the meaning ascribed to such term in the Notes.

(u)     "*Conversion Securities*" has the meaning ascribed to such term in Section 5.3.

(v)     "*Default*" means any condition or event which with the giving of notice or lapse of time or both would, unless cured or waived, become an Event of Default.

(w)     "*Disqualified Capital Stock*" means any Capital Stock issued by any Person that (a) matures or is mandatorily redeemable pursuant to a sinking fund obligation or otherwise, (b) is or may become redeemable or repurchaseable by such Person at the option of the holder thereof, in whole or in part (other than in connection with an asset sale, change of control or similar event) or (c) is convertible or exchangeable at the option of the holder thereof for Indebtedness or Capital Stock described in this definition, on or prior to, in the case of clause (a), (b) or (c), ninety (90) days after the Maturity Date (as defined in the Notes).

(x)     "*Environmental Laws*" means any and all federal, state, local and foreign statutes, laws, judicial decisions, regulations, ordinances, rules, judgments, orders, decrees, plans, injunctions, Licenses, concessions, grants, franchises, agreements and other governmental restrictions relating to (i) the protection of the environment, (ii) the effect of the environment on human health, (iii) emissions, discharges or releases of pollutants, contaminants, hazardous substances or wastes into surface water, ground water, air or land, or (iv) the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants, hazardous substances or wastes or the clean-up or other remediation thereof, including, without limitation, the Clean Air Act, 42 U.S.C. § 7401 et seq., the Clean Water Act, 33 U.S.C. § 1251 et seq. ("*CWA*"), the Solid Waste Disposal Act (as amended by the Resource Conservation and Recovery Act), 42 U.S.C. § 6901 et seq. ("*RCRA*") and the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq. ("*CERCLA*").

(y)     "*ERISA*" means the Employee Retirement Income Security Act of 1974.

(z)     "*ERISA Affiliate*" means, any person that for purposes of Title I or Title IV of ERISA or Section 412 of the Internal Revenue Code would be deemed at any relevant time to be a "single

employer" or otherwise aggregated with the Company or any of its Subsidiaries under Section 414(b), 414(c), 414(m) or 414(o) of the Internal Revenue Code or Section 4001 of ERISA.

(aa)     "*Event of Default*" has the meaning ascribed thereto in the Notes.

(bb)     "*Excluded Subsidiary*" means (i) any Subsidiary that is not a wholly-owned Subsidiary, (ii) any Subsidiary that is not a Material Subsidiary and (iii) any Subsidiary that is (a) a Foreign Subsidiary (as defined in the Security Agreement), (b) a CFC Holdco (as defined in the Security Agreement) or (c) a Subsidiary of a CFC or a CFC Holdco (as defined in the Security Agreement); provided that notwithstanding the foregoing clauses (i) through (iii), the Company may in its sole discretion designate any Excluded Subsidiary as a Guarantor.

(cc)     "*Existing Note Purchase Agreement*" means that certain Senior Secured Convertible Note Purchase Agreement, dated as of April 19, 2021, by and among the Company, the Guarantors from time to time party thereto, the Purchasers (as defined therein) party thereto and U.S. Bank National Association, as note agent and as collateral agent for the Secured Parties (as defined therein), as amended, restated, supplemented and/or otherwise modified from time to time.

(dd)     "*Existing Notes*" means the senior secured convertible promissory notes issued pursuant to the Existing Note Purchase Agreement.

(ee)     "*Existing Secured Note Obligations*" means all "Obligations" under and as defined in the Existing Note Purchase Agreement and any refinancing, refunding, renewal or extension thereof.

(ff)     "*GAAP*" means the United States generally accepted accounting principles in effect as of the date of determination thereof. GAAP will be deemed to treat operating leases and Capital Leases in a manner consistent with the treatment under GAAP as in effect prior to the issuance by the Financial Accounting Standards Board on February 25, 2016 of Accounting Standards Update No. 2016-02.

(gg)     "*Governmental Authority*" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

(hh)     "*Guarantee*" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly and including any obligation, direct or indirect, of the guarantor (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued in support of such Indebtedness or obligation; provided that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business. The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable

4

amount of the primary obligation in respect of which such Guarantee is made or, if not so stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

(ii)     "*Guaranteed Obligations*" has the meaning ascribed thereto in the Guaranty.

(jj)     "*Guarantor*" means each Subsidiary of the Company party to the Guaranty and each other Subsidiary of a Note Party that becomes a Guarantor under the Note Documents pursuant to Section 6.10..

(kk)     "*Guaranty*" means the Guaranty, dated as the date hereof, made by the Guarantors in favor of the Note Agent, substantially in the form attached hereto as Exhibit C, (as amended, restated, supplemented and/or otherwise modified from time to time).

(ll)     "*Hazardous Materials*" means (i) any "hazardous substance", as defined by CERCLA, (ii) any "hazardous waste", as defined by RCRA, (iii) any petroleum product, (iv) any "pollutant," as defined by the CWA, or (v) contaminant or hazardous, dangerous or toxic chemical, material or substance within the meaning of any other Environmental Law.

(mm)    "*Holder*" or "*Holders*" means, individually and collectively, the holders of the Notes, including the Purchasers.

(nn)    "*Indebtedness*" as applied to any Person, means, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (c) all obligations of such Person in respect of the deferred purchase price of property or services (other than trade payables and accounts payable incurred in the ordinary course of business and any deferred compensation, earn-out, purchase price adjustment or other deferred purchase price obligation which is contingently payable based on the achievement of future financial performance); (d) all obligations of such Person under any conditional sale or other title retention agreement(s) relating to property acquired by such Person, (e) all obligations in respect of Capital Leases of such Person, (f) all obligations, contingent or otherwise, of such Person in respect of letters of credit, banker's acceptances or similar extensions of credit, (g) all Guarantees of such Person of Indebtedness of other Persons that would count as a liability on the balance sheet of such Person in accordance with the GAAP, (h) all Indebtedness of a third party secured by any Lien on any property or asset owned or held by such Person, whether or not such Indebtedness has been assumed by such Person, (i) all obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Disqualified Capital Stock of such Person and (j) all monetary obligations under any receivables factoring, receivables sales, receivable securitization or similar transactions or other off-balance sheet liabilities. The Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture in which such Person is a general partner or a joint venturer, except to the extent that the terms of such Indebtedness provide that such Person is not liable therefor.

(oo)    "*Initial Closing Date*" means August 20, 2021.

(pp)    "*Initial Note*" or "*Initial Notes*" has the meaning ascribed thereto in the recitals to this Agreement.

(qq)    "*Initial Purchaser*" or "*Initial Purchasers*" has the meaning ascribed thereto in the preamble to this Agreement.

254153937 v7

(rr)  "***Intellectual Property***" means all intellectual and similar property of a Person, including inventions, designs, patents, copyrights, trademarks, service marks, trade names, trade secrets, confidential or proprietary information, customer lists, know-how, software and databases.

(ss)  "***Intellectual Property Security Agreement***" means the Intellectual Property Security Agreement, to be made by the applicable Note Parties in favor of the Collateral Agent, substantially in the form attached hereto as <u>Exhibit E</u> (as amended, restated, supplemented and/or otherwise modified from time to time).

(tt)  "***Intercreditor Agreement***" has the meaning ascribed thereto in Section 7.1(a).

(uu)  "***Ledger***" shall have the meaning ascribed thereto in the Notes.

(vv)  "***Licenses***" means all licenses, permits, authorizations, determinations, and registrations issued by any Governmental Authority to the Company or any Subsidiary in connection with the conduct of its business.

(ww)  "***Lien***" means any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing.

(xx)  "***Material Adverse Effect***" means, individually or in the aggregate, (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties or financial condition of the Company and its Subsidiaries taken as a whole; (b) a material impairment of the ability of the Note Parties to perform their obligations under the Note Documents or, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, the rights and remedies of the Secured Parties under the Note Documents; (c) a material adverse effect upon the legality, validity, binding effect or enforceability against the Note Parties of any Note Document; or (d) from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, a material adverse effect on the Liens in favor of the Collateral Agent (for the benefit of the Secured Parties) on the Collateral or the priority of such Liens.

(yy)  "***Material Subsidiary***" mean each Subsidiary which, as of the most recent fiscal quarter of the Company, for the period of four consecutive fiscal quarters of the Company then last ended (taken as one accounting period) in respect of which financial statements were (or were required to be) delivered pursuant to <u>Sections 6.1(a)</u> or <u>(b)</u>, as applicable (a "***Test Period***"), had Total Assets as of the last day of such Test Period that were in excess of 10% of the Total Assets of the Company and its Subsidiaries as of such date.

(zz)  "***Multiemployer Plan***" means any "multiemployer plan" as defined in Section 4001(a)(3) of ERISA, which is contributed to by (or to which there is or may be an obligation to contribute of) the Company, any of its Subsidiaries or an ERISA Affiliate, and each such plan for the five-year period immediately following the latest date on which the Company, any of its Subsidiaries or an ERISA Affiliate contributed to or had an obligation to contribute to such plan.

(aaa)  "***Note***" or "***Notes***" has the meaning ascribed thereto in the recitals to this Agreement.

(bbb)  "***Note Documents***" means, collectively, this Agreement, each Note, the Guaranty, each Collateral Document (if applicable), the fee schedule delivered from the Agents to the Company in connection with this Agreement, the Intercreditor Agreement (if applicable), and any other document,

agreement or instrument which has or will be executed by or for the benefit of the Holders in connection with such agreements and the transactions described therein, each as may be amended, restated, supplemented/and or otherwise modified from time to time.

(ccc) "**Note Party**" or "**Note Parties**" means, individually and collectively, the Company and the Guarantors. From and after a Parent Entity assumes or otherwise becomes a co-obligor with respect to the Company's Obligations in connection with a SPAC pursuant to Section 6.13, each reference to "Note Party" shall be deemed to include a reference to a Parent Entity.

(ddd) "**Obligations**" means all advances to, and debts, liabilities (including without limitation (x) prepayment premiums (if any) and other premiums payable under the Notes (if any), including all or any portion of the Repayment Amount (as defined in the Notes), if applicable, (y) accrued and unpaid interest and (z) capitalized interest), obligations, fees, expenses, indemnities, covenants and duties of, the Note Parties arising under any Note Document or otherwise with respect to any Note, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against the Note Parties of any proceeding under any debtor relief laws naming any Note Party as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims or allowable in such proceeding.

(eee) "**OFAC**" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

(fff) "**Parent Entity**" has the meaning ascribed thereto in the definition of SPAC.

(ggg) "**PBGC**" mean the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor thereto).

(hhh) "**Permitted Lien**" means:

(i) from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, Liens in favor of Collateral Agent for the benefit of Secured Parties granted pursuant to the Note Documents;

(ii) Liens set forth on Schedule 5.17 existing as of the Initial Closing Date;

(iii) Liens for taxes if obligations with respect to such taxes either (i) are not due and payable, (ii) are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and adequate reserves have been made in accordance with GAAP or (iii) could not reasonably be excepted to have a Material Adverse Effect;

(iv) statutory Liens of landlords, banks (and rights of set-off), of carriers, warehousemen, mechanics, repairmen, workmen and materialmen, and other Liens imposed by law (other than any such Lien imposed pursuant to Section 401 (a)(29) or 412(n) of the Internal Revenue Code or by the Employee Retirement Income Security Act of 1974), in each case incurred in the ordinary course of business (i) for amounts not yet overdue, or (ii) for amounts that are overdue and that (in the case of any such amounts overdue for a period in excess of five (5) days) are being contested in good faith by appropriate proceedings, so long as such reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made for any such contested amounts;

7

(v)     Liens incurred in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, trade contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money or other indebtedness), so long as (x) no foreclosure, sale or similar proceedings have been commenced with respect to any portion of the Collateral on account thereof and (y) adequate reserves required by GAAP shall have been set aside therefor;

(vi)    easements, rights-of-way, restrictions, encroachments, and other minor defects or irregularities in title, in each case which do not and will not have a Material Adverse Effect;

(vii)   any interest or title of a lessor or sublessor under any lease of real estate permitted hereunder;

(viii)  Liens solely on any cash earnest money deposits made by the Company in connection with any letter of intent or purchase agreement permitted hereunder;

(ix)    purported Liens evidenced by the filing of precautionary UCC financing statements relating solely to operating leases of personal property entered into in the ordinary course of business;

(x)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods used in the ordinary course of business;

(xi)    any zoning or similar law or right reserved to or vested in any governmental office or agency to control or regulate the use of any real property;

(xii)   licenses of patents, trademarks and other Intellectual Property rights granted by the Company in the ordinary course of business;

(xiii)  Liens securing obligations of the Company incurred under leases (but not securing indebtedness for borrowed money) in the form of cash deposits made in the ordinary course of business;

(xiv)   Liens arising in favor of depository institutions as a result of set-off rights or otherwise securing obligations owed to such depository institution in connection with bank services provided to the Company or its Subsidiaries;

(xv)    Liens on cash deposits securing obligations owed to an issuer of a letter of credit at the request of the Company of any of its Subsidiaries;

(xvi)   Liens on any assets of the Note Parties securing any Indebtedness, including Capital Lease Obligations, incurred to finance the acquisition of any fixed or capital assets (including any real property assets) so long as such Liens encumber only the assets acquired or financed with the proceeds of such Indebtedness and do not attach to any other assets of any Note Party;

(xvii)  Liens on cash deposit accounts and cash and cash equivalents delivered or pledged to secure letters of credit;

(xviii)   Liens on Indebtedness permitted to be incurred in reliance on <u>Section 7.01(a)</u>;

(xix)   Liens arising from judgments for the payment of money in circumstances not constituting an Event of Default; and

(xx)   Liens on the Collateral securing the Existing Secured Note Obligations.

(iii)   "*Permitted Transferees*" means, (x) as to any Purchaser that is a limited or general partnership or a trust, to its partners (whether general or limited, including retired partners) or beneficiaries and to affiliated partnerships managed by the same management company or managing (general) partner or by an entity which directly or indirectly controls, is controlled by, or is under common control with, such management company or managing or general partner, or member (or retired member) of such Purchaser in accordance with limited liability company interests and (y) as to any other Purchaser, an entity which directly or indirectly controls, is controlled by, or is under common control with such Purchaser.

(jjj)   "*Person*" (regardless of whether capitalized) means any natural person, entity, or association, including without limitation any corporation, partnership, limited partnership, limited liability company, government (or agency or subdivision thereof), trust, joint venture, or proprietorship.

(kkk)   "*Plan*" means any "employee benefit plan" as defined in Section 3 of ERISA (other than a Multiemployer Plan) maintained or contributed to by any Note Party or any ERISA Affiliate or to which a Note Party or any ERISA Affiliate has or may have an obligation to contribute, and each such plan that is subject to Title IV of ERISA for the five-year period immediately following the latest date on which a Note Party or any ERISA Affiliate maintained, contributed to or had an obligation to contribute to (or is deemed under Section 4069 of ERISA to have maintained or contributed to or to have had an obligation to contribute to, or otherwise to have liability with respect to) such plan.

(lll)   "*Principal Office*" means the Note Agent's office, address or bank account as from time to time designated in writing by the Note Agent to the Company and each Holder, which shall initially be the office designated on the Note Agent's signature page to this Agreement.

(mmm)   "*Pro Rata Share*" means, as to any Holder at any time, the ratio at such time of (x) the aggregate principal amount of the Notes held by such Holder to (y) the aggregate outstanding principal amount of all Notes issued hereunder.

(nnn)   "*Purchaser*" or "*Purchasers*" means, individually and collectively, the Initial Purchasers and the Additional Purchasers, as the context may require.

(ooo)   "*Reportable Event*" means any of the events set forth in Section 4043(c) of ERISA with respect to a Plan, other than those events as to which the thirty-day notice period is waived under subsection .22, .23, .25, .27, .28, .29, .30, .31, .32, .34, or .35 of PBGC Regulation Section 4043.

(ppp)   "*Required Holders*" means Holders representing more than fifty percent (50%) of the aggregate outstanding principal amount of the Notes (including all accrued PIK Interest) issued pursuant to this Agreement at the relevant time of reference.

(qqq)   "*Requirements of Law*" means as to any Person, provisions of the Charter Documents of such Person, or any law, treaty, code, rule, regulation, right, privilege, qualification,

License or franchise, or any determination of an arbitrator or a court or other Governmental Authority, in each case applicable to such Person or any of such Person's property or to which such Person or any of such Person's property is subject or pertaining to any or all of the transactions contemplated or referred to in the Note Documents, including, but not limited to the Fair Credit Reporting Act, the Gramm-Leach-Bliley Act, the Federal Trade Commission Act and comparable state laws, the Telephone Consumer Protection Act, the Telemarketing and Consumer Fraud and Abuse Prevention Act, the CAN-SPAM Act, the Electronic Fund Transfer Act, the U.S. Card Act, and any similar laws and regulations in Canada, including federal and provincial laws.

(rrr)    "**_Responsible Officer_**" means the chief financial officer, general counsel, secretary, controller or other authorized officer of the Note Parties set forth on an incumbency certificate delivered to the Note Agent from time to time.

(sss)    "**_Restricted Payment_**" means as to any Person (i) any dividend or other distribution (whether in cash, Capital Stock or other property) with respect to or on account of any shares of any Capital Stock of such Person or (ii) any payment by such Person on account of the purchase, redemption, retirement, defeasance, surrender, cancellation, termination or acquisition of any Capital Stock of such Person or any claim respecting the purchase or sale of any Capital Stock of such Person.

(ttt)    "**_Sanctioned Entity_**" means (a) an agency of the government of, (b) an organization directly or indirectly controlled by, or (c) a person resident in a country that is subject to a sanctions program identified on the list maintained by OFAC and available at http://www.treas.gov/offices/enforcement/ofac/programs, or as otherwise published from time to time as such program may be applicable to such agency, organization or person.

(uuu)    "**_Sanctioned Person_**" means a person named on the list of Specially Designated Nationals or Blocked Persons maintained by OFAC available at http://www.treas.gov/offices/enforcement/ofac/sdn/index.html, or as otherwise published from time to time.

(vvv)    "**_Secured Debt Cap_**" has the meaning ascribed thereto in Section 7.1(a).

(www)    "**_Secured Party_**" or "**_Secured Parties_**" means, individually and collectively, upon the execution and delivery of the Collateral Documents pursuant to Section 6.13, the Purchasers, Holders, the Agents, and their respective successors and permitted assigns.

(xxx)    "**_Securities_**" has the meaning ascribed thereto in Section 8.1.

(yyy)    "**_Security Agreement_**" means the Security Agreement, to be made by the Note Parties in favor of the Collateral Agent, for the benefit of the Secured Parties, substantially in the form attached hereto as Exhibit D (as amended, restated, supplemented and/or otherwise modified from time to time).

(zzz)    "**_Single Employer Plan_**" shall mean any Plan that is covered by Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, other than a Multiemployer Plan, that is maintained or contributed to by the Company or any Commonly Controlled Entity or to which the Company or a Commonly Controlled Entity has or may have an obligation to contribute, and such plan for the six-year period immediately following the latest date on which the Company or a Commonly Controlled Entity maintained, contributed to or had an obligation to contribute to (or is deemed under Section 4069 of ERISA to have maintained or contributed to or to have had an obligation to contribute to, or otherwise to have liability with respect to) such plan. For the purposes of this definition, "**_Commonly_**

10

*Controlled Entity*" means a person or an entity, whether or not incorporated, that is under common control with the Company within the meaning of Section 4001 of ERISA or is part of a group that includes the Company and that is treated as a single employer under Section 414 of the Code.

(aaaa)   "*Solvent*" means, with respect to any Person, that such Person (i) owns and will own assets the fair saleable value of which are greater than the amount that will be required to pay the probable liabilities of its then existing debts as they become absolute and matured considering all financing alternatives and potential asset sales reasonably available to it, (ii) has capital that is not unreasonably small in relation to its business as presently conducted or after giving effect to any contemplated transaction and (iii) does not intend to incur and does not believe that it will incur debts beyond its ability to pay such debts as they become due. In computing the amount of contingent or unliquidated liabilities at any time, such liabilities shall be computed at the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

(bbbb)   "*SPAC*" means a transaction, including, without limitation, the XPDI Transaction, involving a publicly listed special purpose acquisition company that, upon the consummation thereof, shall be the direct or indirect parent company of Core Scientific Holding Co. (or of the successor by merger to Core Scientific Holding Co.) (such parent company, a "*Parent Entity*"). The Company shall promptly notify the Agents in writing upon the occurrence of a SPAC or the XPDI Transaction.

(cccc)   "*Subsidiary*" means, with respect to any Person, any other Person of which an aggregate of more than fifty percent (50%) of the outstanding Capital Stock having ordinary voting power to elect a majority of the board of directors of such other Person is at the time, directly or indirectly, owned legally or beneficially by such Person or one or more Subsidiaries of such Person, or a combination thereof, or with respect to which any such Person has the right to vote or designate the vote of more than fifty percent (50%) of such Capital Stock whether by proxy, agreement, operation of law or otherwise. Unless the context otherwise requires, each reference to a Subsidiary shall mean a Subsidiary of the Company.

(dddd)   "*Taxes*" means any present or future United States federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp occupation, premium, windfall profits, environmental (including taxes under former Code §59A), customs duties, capital stock, franchise profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on-minimum, estimated, or other taxes, levies, assessments, fees or other charges imposed by any Governmental Authority, including any interest, penalty, or addition thereto, whether disputed or not.

(eeee)   "*Total Assets*" shall mean the total assets of the Company and its Subsidiaries on a consolidated basis, as shown on the applicable consolidated balance sheet of the Company and its Subsidiaries and computed in accordance with GAAP. Total Assets shall be calculated after giving effect to the transaction giving rise to the need to calculate Total Assets.

(ffff)   "*UCC*" means Uniform Commercial Code.

(gggg)   "*Unfunded Pension Liability*" of any Plan means the amount, if any, by which the value of the accumulated plan benefits under the Plan, determined on a plan termination basis in accordance with actuarial assumptions at such time consistent with those prescribed by the PBGC for purposes of Section 4044 of ERISA, exceeds the fair market value of all Plan assets allocable to such liabilities under Title IV of ERISA (excluding any accrued but unpaid contributions).

(hhhh) "*XPDI Transaction*" means the transactions contemplated by the Agreement and Plan of Merger and Reorganization, dated as of July 20, 2021, by and among Power & Digital Infrastructure Acquisition Corp., a Delaware corporation ("*XPDI*"), XPDI Merger Sub Inc., a Delaware corporation and wholly owned subsidiary of XPDI, XPDI Merger Sub 2, LLC, a Delaware limited liability company and wholly owned subsidiary of XPDI, and the Company, as amended, restated, supplemented and/or otherwise modified from time to time.

2.     TERMS OF THE CONVERTIBLE PROMISSORY NOTES.

    2.1    **The Initial Notes**.

        Subject to the satisfaction (or waiver in accordance with Section 10.9) of the conditions precedent set forth in Section 4.1, the Company shall issue and sell to each Initial Purchaser, and each Initial Purchaser shall purchase from the Company, an Initial Note on the Initial Closing Date in a principal amount equal to the amount opposite such Initial Purchaser's name set forth in the Schedule of Purchasers under the header 'Initial Purchasers' attached hereto as Schedule 2. By no later than 11:00 a.m. (New York time) on the Initial Closing Date (i) each Initial Purchaser shall wire transfer same day funds in U.S. dollars, at the Note Agent's Principal Office, in the amount of such Initial Purchaser's Initial Note and (ii) the Company shall issue and deliver to each such Initial Purchaser an Initial Note in favor of such Initial Purchaser payable in the principal amount of such Initial Purchaser's Initial Note.

    2.2    **The Additional Notes**.

        (a) Subject to the satisfaction (or waiver in accordance with Section 10.9) of the conditions precedent set forth in Section 4.2, at any time and from time to time after the Initial Closing Date, the Company shall issue and sell to each Person that executes a counterpart signature page to this Agreement in the form attached hereto as Exhibit B (individually, an "*Additional Purchaser*" and collectively, the "*Additional Purchasers*"), and each such Additional Purchaser shall purchase from the Company, an Additional Note in a principal amount to be mutually agreed between such Additional Purchaser and the Company. Each additional issuance, sale and purchase of Additional Notes as provided in this Section 2.2 shall take place on a date to be mutually agreed by the Company and such Additional Purchaser (each, an "*Additional Closing Date*"); provided that (i) each Additional Closing Date shall have occurred on or prior to December 31, 2021, (ii) all issuances, sales and purchases of Additional Notes on an Additional Closing Date shall be made on substantially identical terms and conditions as the Initial Notes, shall, to the extent permitted by law, be fungible for tax purposes with the Initial Notes and may only be amended pursuant to Section 10.9; (iii) the purchase price of each Additional Note shall be increased by the PIK Interest (as defined in the Note) and Cash Interest (as defined in the Note) that has accrued since the Initial Closing Date on the Initial Notes (it being understood and agreed that interest on all the Notes shall accrue PIK Interest and be payable on the same dates) and (iv) in no event shall the initial aggregate principal amount of all Notes issued hereunder exceed $300,000,000.00.

        (b)    Any Additional Notes issued, sold and purchased pursuant to this Section 2.2 shall be deemed to be "Notes" for all purposes under this Agreement. By no later than 11:00 a.m. (New York time) on an Additional Closing Date (i) each Additional Purchaser shall wire transfer same day funds in U.S. dollars, at the Note Agent's Principal Office, in the amount of such Additional Purchaser's Additional Note and (ii) the Company shall issue and deliver to each such Additional Purchaser an Additional Note in favor of such Additional Purchaser payable in the principal amount of such Additional Purchaser's Additional Note. The Schedule of Purchasers may be amended by the Company without the consent of the Purchasers to include any Additional Purchasers upon the execution by such Additional Purchasers of a counterpart signature page hereto in the form attached hereto as Exhibit B.

3.     **SECURITY.**

To secure the performance and payment in full of the Obligations and the Guaranteed Obligations, as applicable, each Note Party shall grant to the Collateral Agent, for the benefit of the Secured Parties, a first-priority Lien on the Collateral (subject to Permitted Liens) pursuant to the Security Agreement, as and when required pursuant to Section 6.13.

4.     **CONDITIONS PRECEDENT TO EACH CLOSING DATE.**

**4.1     Conditions Precedent to the Initial Closing Date**.

The obligation of the Company to issue and to sell, and of each Initial Purchaser to purchase, Initial Notes on the Initial Closing Date are subject to the satisfaction (or waiver in accordance with Section 10.9) of the following conditions precedent on or prior to the Initial Closing Date:

(a)     receipt by each Initial Purchaser of counterparts to this Agreement, the Guaranty and the Initial Notes;

(b)     receipt by each Initial Purchaser of a certificate signed by a Responsible Officer of each Note Party attaching (i) true, correct and complete copies of the Charter Documents of each Note Party as in effect on the Initial Closing Date, certified, with respect to the Charter Documents set forth in clause (ii) of the definition thereof, as of a recent date by the Secretary of State of the state of incorporation or organization (as applicable) of such Note Party, (ii) a certificate of good standing of each Note Party, certified as of a recent date by the Secretary of State of the state of incorporation or organization (as applicable) of such Note Party, (iii) the names of the Responsible Officers of each Note Party authorized to sign the Note Documents and their true signatures and (iv) true, correct and complete copy of resolutions duly adopted by the board of directors or similar governing body of each Note Party authorizing the execution, delivery and performance of this Agreement and the other Note Documents;

(c)     receipt by each Initial Purchaser of a certificate of solvency, executed by the chief financial officer (or equivalent) of the Company, substantially in the form attached hereto as Exhibit F;

(d)     receipt by each Initial Purchaser of a certificate signed by a Responsible Officer of the Company certifying that the condition specified in clause (j) of this Section 4.1 has been satisfied;

(e)     the Initial Purchasers and the Agents shall have received an opinion of Cooley LLP, counsel to the Company, in form and substance reasonably satisfactory to the Initial Purchasers;

(f)     all authorizations, consents, approvals or permits, if any, of any governmental authority or regulatory body that are required in connection with the lawful issuance and sale of the Initial Notes pursuant to this Agreement shall have been duly obtained and shall be effective on and as of the Initial Closing Date;

(g)     there shall be no claim, action, suit, investigation, litigation or proceeding, pending or, to the knowledge of the Company and its Subsidiaries, threatened, in any court or before any governmental authority with respect to the Note Documents or any transactions contemplated thereby or hereby;

(h)     the representations and warranties made pursuant to Section 5 hereof shall be true and correct in all material respects (or if a representation or warranties is qualified by materiality or

material adverse effect, in all respects) on and as of the Initial Closing Date with the same effect as though made on and as of such date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects (or if a representation or warranties is qualified by materiality or material adverse effect, in all respects) on and as of such earlier date;

(i)      immediately before and after giving effect to the issuance of the Initial Notes on the Initial Closing Date, no Event of Default shall exist;

(j)      the Company shall have paid all outstanding fees and expenses of the Agents, Shipman & Goodwin LLP, counsel to the Agents, and as otherwise required pursuant to Section 10(a);

(k)      receipt by the Company and the Note Agent of an Administrative Questionnaire and executed copies of IRS Form W-9 or appropriate IRS Form W-8, as applicable, as well as any reasonably necessary supporting information, certifying that payments to the Initial Purchasers under the Initial Notes are exempt from U.S. federal withholding Tax; and

(l)      the Company shall have delivered to the Initial Purchasers such other documents and instruments relating to the transactions contemplated by this Agreement as the Initial Purchasers or their counsel may reasonably request (which request shall have been made no later than 3 days prior to the Initial Closing Date).

**4.2      Conditions Precedent to each Additional Closing Date**.

The obligation of the Company to issue and to sell, and of each Additional Purchaser to purchase, Additional Notes on an Additional Closing Date are subject to the satisfaction (or waiver in accordance with Section 10.8) of the following conditions precedent on or prior to each such Additional Closing Date:

(a)      each Additional Purchaser shall have received copies of each of the documents set forth in clauses (a) through (e) and clause (l) of Section 4.1 delivered to the Initial Purchasers on the Initial Closing Date;

(b)      the representations and warranties made pursuant to Section 5 hereof shall be true and correct in all material respects (or if a representation or warranties is qualified by materiality or material adverse effect, in all respects) on and as of the applicable Additional Closing Date with the same effect as though made on and as of such date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects (or if a representation or warranties is qualified by materiality or material adverse effect, in all respects) on and as of such earlier date;

(c)      immediately before and after giving effect to the issuance of Additional Notes on the applicable Additional Closing Date, no Event of Default (as defined in the Notes) shall exist; and

(d)      receipt by the Company and the Note Agent of an Administrative Questionnaire and of executed copies of IRS Form W-9 or appropriate IRS Form W-8, as applicable, as well as any reasonably necessary supporting information, certifying that payments to the Additional Purchasers under Additional Notes are exempt from U.S. federal withholding Tax.

5.    **REPRESENTATIONS AND WARRANTIES OF THE NOTE PARTIES.**

Each Note Party hereby represents and warrants to each Initial Purchaser and the Agents as of the Initial Closing Date and to each Additional Purchaser and the Agents as of the applicable Additional Closing Date as follows:

**5.1    Organization, Good Standing and Qualification.**

(a)    *Organization; Good Standing; Qualification.* Each Note Party and each of its Subsidiaries: (i) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation, (ii) has all requisite corporate or limited liability company power and authority to own and operate its property, to lease the property it operates as lessee and to conduct the business in which it is currently, or is currently proposed to be, engaged; (iii) is duly qualified as a foreign entity, licensed and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification, except where the failure to be so qualified could not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect and (iv) has the corporate or limited liability company power and authority to execute, deliver and perform its obligations under each Note Document to which it is or will be a party and to borrow hereunder. Each Note Party's present name, former names within the last five (5) years (if any), owned and leased locations, place of formation, tax identification number and organizational identification number are correctly set forth in Schedule 5.1 hereto, as may be updated by the Company from time to time in a written notice provided to the Note Agent after the Initial Closing Date.

(b)    *Collateral.* Except for the Liens granted under the Security Agreement, each Note Party shall be the sole legal and equitable owner of each item of Collateral in which it purports to grant a security interest under the Security Agreement upon the execution and delivery thereof pursuant to Section 6.13, having good and marketable title thereto, free and clear of any and all Liens except for Permitted Liens and, upon filing of UCC financing statements in the UCC filing office applicable to such Note Party, the Collateral Agent shall have a perfected security interest in the Collateral, which such security interest shall be senior to all other Liens (other than Permitted Liens) to the extent the same can be perfected by filing.

**5.2    Corporate Power; No Contravention.** The execution, delivery and performance by the Company and each Subsidiary of each Note Document to which it is or will be a party and the consummation of the transactions contemplated hereby: (a) have been duly authorized by all necessary corporate or limited liability company action; (b) do not and will not contravene or violate the terms of the Charter Documents of the Company or any of its Subsidiaries or any amendment thereto or any material Requirement of Law applicable to the Company or such Subsidiary or the Company's or such Subsidiary's assets, business or properties; (c) do not and will not (i) conflict with, contravene, result in any violation or breach of or default under any material Contractual Obligation of the Company or such Subsidiary (with or without the giving of notice or the lapse of time or both) other than any right to consent, which consents have been obtained, (ii) create in any other Person a right or claim of termination or amendment of any material Contractual Obligation of the Company or such Subsidiary, or (iii) require modification, acceleration or cancellation of any material Contractual Obligation of the Company or such Subsidiary; and (d) do not and will not result in the creation of any Lien (or obligation to create a Lien) against any property, asset or business of the Company or such Subsidiary (other than those securing the Notes from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13).

**5.3    Authorization.** All corporate action on the part of the Company, its Subsidiaries and their respective directors and stockholders necessary for the authorization, execution, delivery and performance of this Agreement by the Company and its Subsidiaries and the performance of the

15

Company's obligations hereunder, including the issuance and delivery of the Notes and the reservation of the equity securities issuable upon conversion of the Notes (collectively, the "*Conversion Securities*") has been taken or will be taken prior to the issuance of such Conversion Securities. This Agreement and the Note Documents, when executed and delivered by the Note Parties, shall constitute valid and binding obligations of the Note Parties enforceable in accordance with their terms, subject to laws of general application relating to bankruptcy, insolvency, the relief of debtors and general principles of equity and, with respect to rights to indemnity, subject to federal and state securities laws. The Conversion Securities, when issued in compliance with the provisions of this Agreement or the Notes will be validly issued, fully paid and nonassessable and free of any Liens and issued in compliance with all applicable federal and state securities laws.

5.4 **Governmental Consents**. All consents, approvals, orders, or authorizations of, or registrations, qualifications, designations, declarations, or filings with, any Governmental Authority, required on the part of the Note Parties in connection with the valid execution and delivery of this Agreement and the other Note Documents, the offer, sale or issuance of the Notes and the Conversion Securities issuable upon conversion of the Notes and the consummation of any other transaction contemplated hereby shall have been obtained and will be effective on the Initial Closing Date.

5.5 **Compliance with Laws**.

(a) No Note Party is in violation of any Requirements of Law, any applicable statute, rule, regulation, order or restriction of any domestic government or any instrumentality or agency thereof in respect of the conduct of its business or the ownership of its properties, which violation of which would materially and adversely affect the business, assets, liabilities, financial condition or operations of the Note Parties (individually and in the aggregate).

(b) Neither the Company nor any of its Subsidiaries is registered or required to register as an "investment company" or a company "controlled" by an "investment company" under the Investment Company Act of 1940, as amended. Neither the Company nor any of its Subsidiaries is engaged as one of its important activities in extending credit for margin stock (under Regulations X, T and U of the Federal Reserve Board of Governors). The Company and each of its Subsidiaries has complied in all material respects with applicable provisions of the Federal Fair Labor Standards Act. Neither the Company nor any of its Subsidiaries is a "holding company" or an "affiliate" of a "holding company" or a "subsidiary company" of a "holding company" as each term is defined and used in the Public Utility Holding Company Act of 2005. Neither the Company's nor any of its Subsidiaries' properties or assets has been used by the Company or such Subsidiary or, to Company's knowledge, by previous Persons, in disposing, producing, storing, treating, or transporting any hazardous substance other than in material compliance with applicable laws. The Company and each of its Subsidiaries has obtained all consents, approvals and authorizations of, made all declarations or filings with, and given all notices to, all Governmental Authorities that are necessary to continue their respective businesses as currently conducted, except to the extent that the failure to obtain, make or give any of the foregoing would not reasonably be expected to have a Material Adverse Effect.

(c) Neither the Company nor any Subsidiary (i) is a Sanctioned Person, (ii) has any assets in Sanctioned Entities, or (iii) derives any operating income from investments in, or transactions with Sanctioned Persons or Sanctioned Entities. The proceeds of the Notes will not be used and have not been used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity.

(d) The Company and its Subsidiaries are in compliance, in all material respects, with any United States Requirements of Law relating to terrorism, sanctions or money laundering (the "Anti-

Terrorism Laws"), including the United States Executive Order No. 13224 on Terrorist Financing (the "***Anti-Terrorism Order***") and the Patriot Act. No part of the proceeds of any Note will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended or any other Anti-Terrorism Law.

(e)      No Note Party and no Subsidiary of any Note Party (i) is listed in the annex to, or is otherwise subject to the provisions of, the Anti-Terrorism Order, (ii) is owned or controlled by, or acting for or on behalf of, any person listed in the annex to, or is otherwise subject to the provisions of, the Anti-Terrorism Order or (iii) commits, threatens or conspires to commit or supports "terrorism" as defined in the Anti-Terrorism Order.

(f)      None of the funds to be provided under this Agreement will be used, directly or indirectly, (i) for any activities in violation of any applicable anti-money laundering, economic sanctions and anti-bribery laws and regulations laws and regulations or (ii) for any payment to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

**5.6      Compliance with Other Instruments**. The Company is not in violation or default of any term of its articles of incorporation, or of any provision of any mortgage, indenture or contract to which it is a party and by which it is bound or of any judgment, decree, order or writ, other than such violation(s) that would not have a Material Adverse Effect on the Company. The execution, delivery and performance of this Agreement and the other Note Documents, and the consummation of the transactions contemplated hereby and thereby will not result in any material violation or be in conflict with, or constitute, with or without the passage of time and giving of notice, either a default under any such material provision, instrument, judgment, decree, order or writ or an event that results in the creation of any material Lien upon any assets of the Company or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization or approval applicable to the Company, its business or operations or any of its material assets or properties. Without limiting the foregoing, the Company has obtained all waivers reasonably necessary with respect to any preemptive rights, rights of first refusal or similar rights, including any notice or offering periods provided for as part of any such rights, in order for the Company to consummate the transactions contemplated hereunder without any third party obtaining any rights to cause the Company to offer or issue any securities of the Company as a result of the consummation of the transactions contemplated hereunder.

**5.7      Solvency.**  As of the Initial Closing Date both immediately before and after giving effect to the transactions contemplated by the Note Documents, the Company is individually, and the Company and its Subsidiaries on a consolidated basis are, Solvent.

**5.8      Offering**. The offer, issue, and sale of the Notes and the Conversion Securities are and will be exempt from the registration and prospectus delivery requirements of the Act, and no qualification under the Trust Indenture Act of 1939, as amended, and the rules and regulations of the Securities and Exchange Commission promulgated thereunder is required in connection with, the issuance of the Notes and the Conversion Securities.

**5.9      No "Bad Actor" Disqualification**. The Company has exercised reasonable care to determine whether any Company Covered Person (as defined below) is subject to any of the "bad actor" disqualifications described in Rule 506(d)(1)(i) through (viii), as modified by Rules 506(d)(2) and (d)(3), under the Act ("***Disqualification Events***"). To the Company's knowledge, no Company Covered Person

is subject to a Disqualification Event. The Company has complied, to the extent required, with any disclosure obligations under Rule 506(e) under the Act.

**5.10    Litigation**. There are no legal actions, suits, proceedings, claims or disputes pending or, to the knowledge of any Note Party, threatened in writing, at law, in equity, in arbitration or before any Governmental Authority against or affecting the Company or its Subsidiaries that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; (b) there is no injunction, writ, temporary restraining order, decree or any order or determination of any nature by any arbitrator, court or other Governmental Authority purporting to enjoin or restrain the execution, delivery or performance of the Note Documents or which relates to the assets or the business of the Company or its Subsidiaries; and (c) there is no litigation, claim, audit, dispute, review, proceeding or investigation currently pending or threatened in writing against the Company or its Subsidiaries for any violation or alleged violation of any Requirements of Law, and neither the Company nor any Subsidiary has received written notice of any threat of any suit, action, claim, dispute, investigation, review or other proceeding pursuant to or involving any Requirements of Law.

**5.11    Taxes**.

(a)    Except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect, the Company and each of its Subsidiaries has timely filed all United States federal and state income and other material tax returns that it was required to file, in each case with due regard for any extension of time within which to file such tax return. Except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect, all Taxes due and payable by the Company or its Subsidiaries have been paid, in each case with due regard for any extension of time within which to file such tax return, other than any Taxes the amount or validity of which is being actively contested by Company or its Subsidiaries in good faith and by appropriate proceedings and with respect to which adequate reserves or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made or provided therefor. There are no Liens, other than Permitted Liens, on any of the assets of the Company or its Subsidiaries that arose in connection with any failure (or alleged failure) to pay any Tax. To the knowledge of the Company, no claim has been made by a Governmental Authority in a jurisdiction where the Company and its Subsidiaries do not file tax returns that the Company or any of its Subsidiaries is or may be subject to taxation by that jurisdiction that could reasonably be expected to have a Material Adverse Effect.

(b)    There is no action, suit, proceeding, investigation, examination, audit, or claim now pending or, to the knowledge of the Company, threatened in writing by any Governmental Authority regarding any Taxes relating to the Company or its Subsidiaries that could reasonably be expected to have a Material Adverse Effect.

**5.12    Financial Condition**.    The Note Parties have furnished the Purchasers with true, correct and complete copies of (i) the audited consolidated balance sheets of the Company and its Subsidiaries as of December 31, 2018, 2019 and 2020 and the related consolidated statements of income or operations, shareholders' equity and cash flows for each such fiscal year and (ii) the unaudited consolidated balance sheets of the Company and its Subsidiaries as of March 31, 2021 and the related consolidated statements of income or operations and cash flows for such fiscal quarter (collectively, the "***Financial Statements***"). The Financial Statements fairly present, in all material respects, the financial position of the Company and its Subsidiaries on a consolidated basis, as of the respective dates thereof, and the results of operations and cash flows thereof, as of the respective dates or for the respective periods set forth therein, and are in conformity with the past historical practices of the Note Parties, with GAAP consistently applied during the periods involved. As of the dates of the Financial Statements, neither the Company nor any Subsidiary had any known obligation, Indebtedness or liability (whether accrued, absolute, contingent

18

or otherwise, and whether due or to become due), which was not reflected or reserved against in the balance sheets which are part of the Financial Statements, except for those incurred in the ordinary course of business and which are fully reflected on the books of account of the Company or its Subsidiaries, as applicable.

**5.13    Subsidiaries**.   Except as set forth on Schedule 5.13, the Company does not have any Subsidiaries.

**5.14    Capitalization**. As of the Initial Closing Date, without giving effect to the transactions contemplated hereby and in the other Note Documents, the outstanding capitalization of the Company and its Subsidiaries is as set forth on Schedule 5.14.  All of the issued and outstanding Capital Stock of the Company has been, and Capital Stock of the Company issuable upon the exercise of outstanding securities when issued will be, duly authorized and validly issued and are fully paid and nonassessable. All outstanding Capital Stock of the Company's Subsidiaries are 100% owned by the Company or one of its Subsidiaries free and clear of all Liens other than Permitted Liens. Except as set forth in the Charter Documents (as in effect on the Initial Closing Date), the issuance of the foregoing Capital Stock is not and has not been subject to preemptive rights in favor of any Person other than such rights that have been waived and will not result in the issuance of any additional Capital Stock of the Company or the triggering of any down-round or similar rights contained in any options warrants, debentures or other securities or agreements of the Company or any of its Subsidiaries. On the Initial Closing Date, except as set forth on Schedule 5.14, there are no outstanding securities convertible into or exchangeable for Capital Stock of the Company or any of its Subsidiaries or options, warrants or other rights to purchase or subscribe for Capital Stock of the Company or any of its Subsidiaries, or contracts, commitments, agreements, understandings or arrangements of any kind to which the Company or any of its Subsidiaries is a party relating to the issuance of any Capital Stock of the Company or any of its Subsidiaries, or any such convertible or exchangeable securities or any such options, warrants or rights. On the Initial Closing Date, except as set forth on Schedule 5.14, neither the Company nor any of its Subsidiaries has any obligation, whether mandatory or at the option of any other Person, at any time to redeem or repurchase any Capital Stock of the Company or any of its Subsidiaries, pursuant to the terms of their respective Charter Documents or otherwise. All securities of the Company and its Subsidiaries (including all shares of the Company's common stock, securities, options and warrants to purchase shares of the Company's common stock (both outstanding as well as those that are no longer outstanding), have been and were issued and granted pursuant to an exception from the Act and otherwise in compliance, in all material respects, with all securities and other applicable laws.

**5.15    Private Offering**. No form of general solicitation or general advertising was used by the Company or its Subsidiaries or their respective representatives in connection with the offer or sale of the Notes to the Purchasers pursuant to this Agreement.

**5.16    Broker's, Finder's or Similar Fees**.  Except as set forth in that certain Engagement Letter, dated on or about of August 20, 2021, by and between the Company and GreensLedge Capital Markets LLC, there are no brokerage commissions, finder's fees or similar fees or commissions payable by the Company or its Subsidiaries in connection with the transactions based on any agreement, arrangement or understanding with the Company or its Subsidiaries or any action taken by the Company or its Subsidiaries. Notwithstanding the foregoing or any other provision herein, no Purchaser shall be liable for any brokerage commission, finder's fees or similar fees or commissions.

**5.17    Indebtedness**. Schedule 5.17 lists the amount of all Indebtedness of the Company and its Subsidiaries (other than Indebtedness under this Agreement) that is in existence immediately before the Initial Closing Date and will remain outstanding after the Initial Closing Date.

6.     **AFFIRMATIVE COVENANTS OF THE NOTE PARTIES**

Each Note Party shall, and shall cause each of its Subsidiaries to:

6.1     **Reporting Obligations**. Deliver to the Note Agent (for prompt distribution to the Purchasers as specified in the applicable Administrative Questionnaire (or as otherwise specified by a Purchaser to the Note Agent in writing from time to time)):

(a)     as soon as available, but not later than 150 days after the end of each fiscal year of the Company, a copy of the audited consolidated balance sheets of the Company and its Subsidiaries as at the end of such fiscal year and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year, in each case, prepared in accordance with GAAP, setting forth in each case in comparative form the figures for the previous fiscal year, and accompanied by a report of any "Big Four" or, upon Required Holders' written consent (not to be unreasonably withheld), any other independent certified public accounting firm, which report shall contain an unqualified opinion (without any (A) "going concern" or like qualification or exception, (B) qualification or exception as to the scope of such audit, or (C) qualification which relates to the treatment or classification of any item and which, as a condition to the removal of such qualification, would require an adjustment to such item (except in the case of clauses (A) and (B) above as it relates to the Obligations during the last twelve months before the Maturity Date)), stating that such consolidated financial statements present fairly in all material respects the financial position for the periods indicated in conformity with GAAP applied on a basis consistent with prior years; and

(b)     as soon as available, but not later than 45 after the end of each fiscal quarter of each fiscal year (other than the fourth fiscal quarter), the unaudited consolidated balance sheets of the Company and its Subsidiaries as at the end of such fiscal quarter and the related unaudited consolidated statements of income and cash flows of the Company and its Subsidiaries for such fiscal quarter and for the period from the beginning of the then current fiscal year to the end of such fiscal quarter, all certified on behalf of the Company by a Responsible Officer of the Company as being complete and correct and fairly presenting, in all material respects, the financial position and the results of operations of the Company and its Subsidiaries, subject to normal year-end adjustments and absence of footnote disclosures.

(c)     promptly, and in any event within three (3) Business Days after the Company or any other Note Party becomes aware of or has knowledge of any event or condition that constitutes a Default or Event of Default, provide written notice of such event or condition and a statement of the curative action that the Company proposes to take with respect thereto.

Delivery of any reports, information and documents under this Section 6.2, as well as any other reports, information and documents pursuant to this Agreement, to the Note Agent is for informational purposes only and the Note Agent's receipt of the same shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of its covenants hereunder (as to which the Note Agent is entitled to rely exclusively on certificates of a Responsible Officer of the Company). The Note Agent shall have no responsibility or liability for the filing, timeliness or content of any report required under this Section 6.2 or any other reports, information and documents required under this Agreement.

6.2     **Taxes and Claims**.

(a)     Timely file complete and correct United States federal and state income and applicable foreign, state and local tax returns required by law, in each case with due regard for any extension of time

within which to file such tax returns, and pay when due all Taxes in each case, except to the extent that the failure to so file or pay could not reasonably be expected to have a Material Adverse Effect; provided that the Company and its Subsidiaries shall not be required to pay any such Taxes which are being contested in good faith by appropriate proceedings and with respect to which adequate reserves have been set aside in accordance with GAAP, which deferment of payment is permissible so long as no Lien, other than a Permitted Lien, has been entered and the Company's and its Subsidiaries' title to, and its and their right to use, its and their respective properties are not materially adversely affected thereby.

(b)     Pay all stamp, court or documentary, intangible, recording, filing or similar Taxes, if any, that arise solely in connection with the issuance of the Notes except to the extent such Taxes arise as a result of a transfer of a Note to a person other than the initial Holder of the Notes. The obligations of the Company under this Section 6.2(b) shall survive the payment of the Obligations and the termination of the Note Documents.

**6.3     Insurance**.

(a)     Maintain with reputable insurance companies insurance in such amounts and covering such risks as is consistent with sound business practice, including, without limitation, property and casualty insurance on all of its property, general liability insurance, workers compensation insurance and business interruption insurance. From and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, each Note Party will, and will cause each of its Subsidiaries to, furnish to the Collateral Agent, upon reasonable request, full information as to the insurance carried by it.

(b)     From and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, (i) at all times keep its property which is subject to the Lien of the Collateral Agent insured in favor of the Collateral Agent, and all policies or certificates (or certified copies thereof) with respect to such insurance and (ii) notify (and cause each of its Subsidiaries to notify) the Collateral Agent and the Purchasers, promptly, upon receipt of a notice of termination, cancellation, or non-renewal from its insurance company of any such policy.

(c)     If the Company shall fail to maintain all insurance in accordance with this Section 6.3 or to timely pay or cause to be paid the premium(s) on any such insurance, or if the Company shall fail to deliver all certificates with respect thereto, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, the Collateral Agent shall have the right (but shall be under no obligation) to procure such insurance or pay such premiums, and the Company agrees to reimburse the Purchasers, on demand, for all costs and expenses relating thereto.

**6.4     Compliance with Laws**. Comply with any and all Requirements of Law to which it may be subject including, without limitation, all Environmental Laws, and obtain any and all Licenses necessary to the ownership of its property or to the conduct of its businesses, except, in each case, where failure to do so could not reasonably be expected to have a Material Adverse Effect. Each Note Party will, and will cause each of its Subsidiaries to, timely satisfy all material assessments, fines, costs and penalties imposed by any Governmental Authority against such Person or any property of such Person except to the extent such assessments, fines, costs, or penalties are being contested in good faith by appropriate proceedings and for which the Company or such Subsidiary has set aside on its books adequate reserves in accordance with GAAP.

**6.5     Maintenance of Properties**. Do all things necessary to maintain, preserve, protect and keep its property (other than property that is obsolete, surplus, or no longer used or useful in the ordinary conduct of its business) in good repair, working order and condition (ordinary wear and tear and casualty and condemnation excepted), make all necessary and proper repairs, renewals and replacements such that

its business can be carried on in connection therewith and be properly conducted at all times and pay and discharge when due the cost of repairs and maintenance to its property, and pay all rentals when due for all real estate leased by such Person.

**6.6      Employee Benefit Plans**. (a) Keep in full force and effect any and all Plans which are presently in existence or may, from time to time, come into existence under ERISA and not withdraw from any such Plans, unless such withdrawal can be effected or such Plans can be terminated without material liability to the Company or its Subsidiaries, (b) make contributions to all such Plans in a timely manner and in a sufficient amount to comply in all material respects with the standards of ERISA, including, without limitation, the minimum funding standards of ERISA, (c) comply in all material respects with all requirements of ERISA, (d) notify the Purchasers promptly upon receipt by the Company or any Subsidiary of any notice concerning the imposition of any withdrawal liability or of the institution of any proceeding or other action which may result in the termination of any such Plans by the PBGC or the appointment of a trustee to administer such Plans, (c) promptly advise the Purchasers of the occurrence of any Reportable Event or non-exempt prohibited transaction (as defined in ERISA) with respect to any such Plans of which Company becomes aware, and (f) amend any Plan that is intended to be qualified within the meaning of Section 401 of the Code to the extent necessary to keep the Plan qualified and to cause the Plan to be administered and operated in a manner that does not cause the Plan to lose its qualified status.

**6.7      Environmental**. Use and operate all of its facilities and properties in material compliance with all Environmental Laws, keep all necessary Licenses in effect and remain in material compliance therewith, and handle all Hazardous Materials in material compliance with all applicable Environmental Laws.

**6.8      Intellectual Property**.

(a)      Each Note Party will take the steps described in this Section 6.8 with respect to all new or acquired Intellectual Property to which the Company or any Guarantor is now or later becomes entitled that is necessary in the conduct of such Person's business. The Company acknowledges and agrees that the Secured Parties shall have no duties with respect to any Intellectual Property or Licenses of the Company or its Subsidiaries.

(b)      The Note Parties shall have the duty, with respect to Intellectual Property that is necessary in the conduct of such Person's business (i) to prosecute diligently any trademark application or service mark application that is part of the trademarks pending as of the date hereof or hereafter, (ii) to prosecute diligently any patent application that is part of the patents pending as of the date hereof or hereafter, and (iii) to take all reasonable and necessary action to preserve and maintain all of the Note Parties' trademarks, patents, copyrights, Licenses, and its rights therein, including paying all maintenance fees and filing of applications for renewal, affidavits of use, and affidavits of non-contestability, except in the case of clauses (i) and (ii), where the Company, in its reasonable opinion, determines that the costs for engaging in such prosecution activities exceeds the likely benefit of continued prosecution and, except in the of case (iii), where the Company, in its reasonable opinion, determines that the costs of preserving and maintaining exceeds the value the Company obtains from such preservation and maintenance. Each Note Party will require all employees, consultants, and contractors of such Note Party who were involved in the creation or development of such Intellectual Property to sign agreements containing assignment to the Company or such Guarantor of Intellectual Property rights created or developed and obligations of confidentiality. No Note Party shall abandon any Intellectual Property or License that is necessary in the conduct of the Company's or such Guarantor's business.

22

(c)        From and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, each Note Party will (i) promptly file, at such Note Party's sole cost and expense, any application to register any Intellectual Property with the United States Patent and Trademark Office or the United States Copyright Office if such registration is necessary in connection with the conduct of such Note Party's business, (ii) concurrently with the delivery of financial statements pursuant to Sections 6.1(a) or (b), deliver supplements to Schedule 4(c) to the Security Agreement and any other documents reasonably necessary for the Collateral Agent to record its security interest in such Intellectual Property with the United States Patent and Trademark Office or the United States Copyright Office and (iii) promptly after the delivery of the documents required by clause (ii) above, upon the reasonable request of the Collateral Agent, execute and deliver in favor of the Collateral Agent one or more Intellectual Property Security Agreements to further evidence the Purchasers' Lien on such Note Party's Intellectual Property.

6.9    **Use of Proceeds**. Use the proceeds of the Notes (i) to pay any fees and expenses incurred by the Company in connection with the transactions contemplated hereby and (ii) for general corporate purposes not in violation of any applicable laws. The Company shall not use any proceeds of the sale of the Notes hereunder to, directly or indirectly, purchase or carry any "margin stock" (as defined in Regulation U) or to extend credit to others for the purpose of purchasing or carrying any "margin stock", in either case, in violation of the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.

6.10    **Subsidiaries**.   If any Note Party creates, forms or acquires any Subsidiary (other than an Excluded Subsidiary) on or after the date of this Agreement, such Note Party will, and will cause such Subsidiary to, (a) within 30 days (which 30 days may be extended by the Note Agent at the direction of the Required Holders) of the creation, formation or acquisition of such new Subsidiary, cause such Subsidiary to join the Guaranty as a "Guarantor" thereunder and (b) from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, within 30 days (which 30 days may be extended by the Collateral Agent at the direction of the Required Holders) of the creation, formation or acquisition of such new Subsidiary, cause such Subsidiary to join the Security Agreement as a "Grantor" and take all such other actions and execute and deliver, or cause to be executed and delivered, all such documents, instruments, agreements, and certificates as are similar to those described in Sections 4.1(c) and, if requested by the Required Holders, 4.1(g) or that are necessary or desirable to protect, evidence or perfect the security interest of the Collateral Agent in a manner similar to the Liens and assets granted by the existing Note parties under the existing Collateral Documents either by executing and delivering to the Collateral Agent a counterpart or supplement to the existing Collateral Documents or such new documents as are necessary or desirable to evidence, grant or perfect a first priority lien in such assets in favor of Collateral Agent, for the benefit of Secured Parties (including, without limitation, any pledges of Capital Stock (other than with respect to Excluded Property (as defined in the Security Agreement))). The Agents shall be authorized to execute and deliver such documents upon receipt of a certificate from a Responsible Officer of the Company stating that such documents are authorized or permitted under the Note Documents.

6.11    **Piggyback Registration Rights**. The Company shall provide the Holders of the Notes with customary "piggyback" registration rights (with respect to the shares of common stock issued upon conversion of the Notes) on all registration statements of the Company, subject to the right, however, of the Company and its underwriters to reduce the number of shares proposed to be registered at the underwriter's discretion.

6.12    **Further Assurances**.   Each Note Party will take any action reasonably requested by any Holder in order to effectuate the purposes and terms contained in this Agreement or any other Note Document.

**6.13** **Conversion Event**. Within 30 calendar days of the occurrence of the first Conversion Event, (i) each of the Note Parties and the Collateral Agent hereby agrees that it shall execute and deliver to each Holder a counterpart of the Security Agreement and the Intellectual Property Security Agreement and take such actions and deliver such other documents as are reasonably necessary, or reasonably required by the Required Holdings, to give effect to this Section 6.13, including, without limitation, delivering and filing (or causing to be delivered and filed) UCC-1 financing statements with respect to the security interests to be granted thereby (provided that any such actions shall not be a condition precedent to the effectiveness of the Security Agreement) and furnishing certificates of insurance issued on applicable ACORD Forms with respect to property and liability insurance for the Company and (ii) in the event that such a Conversion Event is a SPAC and the Parent Entity assumes or otherwise becomes a co-obligor with respect to the Company's Obligations pursuant to Section 10.1, Core Scientific Holding Co. (or its successor by merger) shall remain a co-obligor with such Parent Entity with respect to such Obligations (other than any such Obligation of the Company to deliver Conversion Securities pursuant to Section 2 of the Note, with respect to which delivery Obligation Core Scientific Holding Co. (or it successor by merger) hereby agrees that it shall execute and deliver to each Holder a supplement to the Guaranty, substantially in the form attached thereto as Exhibit C).

## 7. NEGATIVE COVENANTS OF THE NOTE PARTIES

Each Note Party shall not, and shall cause each of its Subsidiaries not to:

**7.1** **Liens, Restricted Payments and Dispositions**. Prior to the occurrence of a Conversion Event, so long as the Obligations remain outstanding:

(a) Liens. Create, assume or suffer to exist any Liens on any assets of the Note Parties securing debt for borrowed money in excess of an amount at any time outstanding equal to the greater of (x) the sum of (I) the aggregate principal amount of the Existing Notes at any time outstanding (disregarding, for the purposes of this clause (I) any and all PIK Interest (as defined in the Existing Notes) that has been added to the aggregate principal amount of the Existing Notes) *plus* (II) $50,000,000 and (y) $265,000,000 (such clause (y), the "***Secured Debt Cap***"); provided that (x) in no event shall the aggregate principal amount of the Existing Notes at any time outstanding (disregarding, for the purposes of this proviso any and all PIK Interest (as defined in the Existing Notes) that has been added to the aggregate principal amount of the Existing Notes) exceed at any time $215,000,000, (y) the Collateral Agent and the authorized representative with respect to any Indebtedness that is secured on a pari passu basis with the Liens on the Collateral securing the Obligations that is permitted to be secured in reliance on this clause (a) shall have entered into an intercreditor agreement providing for equal and ratable lien priority and perfection for the holders and providers of such Indebtedness at the direction of the Required Holders and substantially in the form attached hereto as Exhibit H (it being understood that the form attached as Exhibit H is acceptable to the Holders) or such other form reasonably satisfactory to the Required Holders (the "***Intercreditor Agreement***") and (z) notwithstanding the foregoing, the Note Parties shall be permitted to incur any letters of credit and any Indebtedness, including Capital Lease Obligations, incurred to finance the acquisition of any fixed or capital assets (including, for the avoidance of doubt, any real property assets) so long as such Liens shall encumber only the assets acquired or financed with the proceeds of such Indebtedness (or, in the case of any letters of credit, cash collateral) and do not attach to any other assets of any Note Party, which letters of credit and Indebtedness set forth in this clause (z) shall, for the avoidance of doubt, be excluded from the calculation of the Secured Debt Cap.

(b) Restricted Payments.

(i) Pay or make any Restricted Payment to its direct or indirect equityholders; provided that, the foregoing shall not restrict or prohibit any Subsidiary from paying or

making any Restricted Payments, directly or indirectly, to the Company, and shall not restrict or prohibit any Restricted Payments, directly or indirectly, from the Company to its direct or indirect equityholders at such times and in such amounts as are necessary to permit:

(1) such equityholder (A) to pay general administrative costs and expenses (including audit and tax fees payable to third party auditors and tax advisors, customary compensation and reasonable costs and expenses of the board of directors or similar managing body of such entity incurred in the ordinary course of business, and franchise taxes and other fees, taxes and expenses required to maintain such entity's existence), (B) to discharge its, its Subsidiaries' and its direct and indirect owners' income tax liabilities and (C) in the case that the Company is treated as a flow-through entity for U.S. income tax purposes, its direct and indirect owners to discharge their respective U.S. federal, state and local and non-U.S. income tax obligations associated with their ownership of the Company, in each case, so long the amount of any such Restricted Payment is applied for such purpose; and

(2) (x) purchases or cash payments in lieu of fractional shares of Capital Stock arising out of stock dividends, splits, combinations or conversions of Capital Stock in the ordinary course of business and (y) purchases or cash payments in lieu of fractional shares upon conversion of the Notes.

(ii) From and after the occurrence of a Conversion Event, any Restricted Payments made or paid to the direct or indirect equityholders of the Company (other than the Restricted Payments of the type referred to in the proviso to clause (i) above) shall also be made or paid to the Holders in accordance with their Pro Rata Share of the Notes on an as-converted basis as if such Notes had been converted pursuant to their terms at the time of the applicable Restricted Payment.

(c) <u>Asset Dispositions</u>. Consummate any Asset Dispositions; <u>provided</u> that the foregoing shall not restrict or prohibit (A) sales of inventory in the ordinary course of business; (B) the use of cash or cash equivalents in a manner not prohibited by the Note Documents; (C) licenses, sublicenses, leases or subleases granted to third parties in the ordinary course of business not interfering with the business of the Company and its Subsidiaries and which do not materially impair the value of the property so licensed, sublicensed, leased or subleased; (D) dispositions of obsolete, damaged, surplus or worn-out or no longer used or useful equipment; (E) the lapse, abandonment or other dispositions of Intellectual Property that is, in the reasonable business judgment of the Company, no longer economically practicable or commercially desirable to maintain; (F) dispositions by (1) any Subsidiary to the Company, (2) the Company to any Note Party, (3) any Subsidiary to any Note Party or (4) any Subsidiary that is not a Note Party to any other Subsidiary that is not a Note Party; (G) dispositions resulting from any casualty or property losses or condemnation or similar proceeding of, any property or asset of the Company or any of its Subsidiaries; (H) the sale or other disposition of any assets or property of the Company not constituting Collateral; (I) any Asset Disposition so long as such Asset Disposition is made for fair market value; (J) any individual Asset Disposition so long as the consideration therefor does not exceed $1,000,000; and (K) any other Asset Dispositions to a non-affiliated third party so long as the aggregate consideration therefor does not exceed $10,000,000 per fiscal year; <u>provided</u>, <u>further</u>, that notwithstanding the foregoing, any Asset Disposition described in the foregoing <u>clause (K)</u> shall be permissible notwithstanding the fact that the counterparty is an affiliate or a Subsidiary of the Company so long as such Asset Disposition is on fair and reasonable terms no less favorable to the Company or such affiliate or Subsidiary than would be obtainable on comparable arm's length transaction with a non-affiliated third party.

**7.2    Issuances of Equity**.    Except to the extent permitted by <u>Section 7.1(c)</u>, no Subsidiary of the Company shall issue or sell Capital Stock in such Subsidiary.

        **7.3**     **Modifications of Charter Documents**. The Company will not permit, and will cause each of its Subsidiaries not to permit, such Person's Charter Documents to be amended or modified in any way that could reasonably be expected to materially or adversely affect the interests of the Holders in their capacity as Secured Parties (and not, for the avoidance of doubt, as holders of Capital Stock of the Company).

        **7.4**     **Compensation or Credit Support**. Other than (x) to consenting or approving Holders in connection with a consent or amendment in accordance with <u>Section 10.9</u> to the extent all Holders are afforded an opportunity to enter into such consent or amendment or (y) in connection with the issuance of warrants to non-consenting Holders pursuant to Section 1(b)(i)(1) of the Notes, the Company shall not enter into any arrangement with any Holder for the purposes of providing additional compensation (in the form of interest, fees or otherwise) or credit support (in the form of additional collateral or otherwise) to such Holder in connection with the Notes without providing such additional compensation or credit support for the ratable benefit of all Holders.

## 8. REPRESENTATIONS AND WARRANTIES OF THE PURCHASERS

        Each Initial Purchaser hereby represents and warrants as of the Initial Closing Date, and each Additional Purchaser hereby represents and warrants as of the applicable Additional Closing Date as follows:

        **8.1**     **Purchase for Own Account**. Each Purchaser represents that it is acquiring a Note and the Conversion Securities (collectively, the "***Securities***") solely for its own account and beneficial interest for investment and not for sale or with a view to distribution of the Securities or any part thereof, has no present intention of selling (in connection with a distribution or otherwise), granting any participation in, or otherwise distributing the same, and does not presently have reason to anticipate a change in such intention.

        **8.2**     **Information and Sophistication**. Without lessening or obviating the representations and warranties of the Note Parties set forth in <u>Section 5</u> hereof or in any other Note Document or the right of such Purchaser to rely thereon, each Purchaser hereby: (i) acknowledges that it has received all the information it has requested from the Company and it considers necessary or appropriate for deciding whether to acquire the Securities, (ii) represents that it has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Securities and to obtain any additional information necessary to verify the accuracy of the information given the Purchaser, and (iii) further represents that it has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risk of this investment.

        **8.3**     **Ability to Bear Economic Risk**. Each Purchaser acknowledges that investment in the Securities involves a high degree of risk, and represents that it is able, without materially impairing its financial condition, to hold the Securities for an indefinite period of time and to suffer a complete loss of its investment.

        **8.4**     **Further Limitations on Disposition**. Without in any way limiting the representations set forth above, each Purchaser further agrees not to make any disposition of all or any portion of the Securities unless and until:

        (c)     there is then in effect a registration statement under the Act covering such proposed disposition and such disposition is made in accordance with such registration statement; or

(d)    the Purchaser shall have notified the Company of the proposed disposition and shall have furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and if reasonably requested by the Company, such Purchaser shall have furnished the Company with an opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration under the Act or any applicable state securities laws, provided that no such opinion shall be required for dispositions in compliance with Rule 144, except in unusual circumstances.

Notwithstanding the provisions of paragraphs (a) and (b) above, no such registration statement or opinion of counsel shall be necessary for a transfer by such Purchaser to Permitted Transferees, or transfers by gift, will or intestate succession to any spouse or lineal descendants or ancestors of any Purchaser who is an individual, if all transferees agree in writing to be subject to the terms hereof to the same extent as if they were Purchasers hereunder

**8.5    Accredited Investor Status.** Each Purchaser is an "accredited investor" as such term is defined in Rule 501 under the Act.

**8.6    No "Bad Actor" Disqualification**. Each Holder represents and warrants that neither (A) such Holder nor (B) any entity that controls such Holder or is under the control of, or under common control with, such Holder, is subject to any Disqualification Event, except for Disqualification Events covered by Rule 506(d)(2)(ii) or (iii) or (d)(3) under the Act and disclosed in writing in reasonable detail to the Company. Each Holder represents that such Holder has exercised reasonable care to determine the accuracy of the representation made by such Holder in this paragraph, and agrees to notify the Company if such Holder becomes aware of any fact that makes the representation given by such Holder hereunder inaccurate.

**8.7    Foreign Investors**. If a Holder is not a United States person (as defined by Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended (the "*Code*")), such Holder hereby represents that he, she or it has satisfied itself as to the full observance of the laws of the Holder's jurisdiction in connection with any invitation to subscribe for the Securities or any use of its Note, including (A) the legal requirements within the Holder's jurisdiction for the purchase of the Securities, (B) any foreign exchange restrictions applicable to such purchase, (C) any governmental or other consents that may need to be obtained, and (D) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale or transfer of the Securities. The Holder's subscription, payment for and continued beneficial ownership of the Securities will not violate any applicable securities or other laws of the Holder's jurisdiction.

**8.8    Forward-Looking Statements**. With respect to any forecasts, projections of results and other forward-looking statements and information provided to a Holder, such Holder acknowledges that such statements were prepared based upon assumptions deemed reasonable by the Company at the time of preparation. There is no assurance that such statements will prove accurate, and the Company has no obligation to update such statements.

**8.9    GreensLedge as Placement Agent.** Each Purchaser represents, acknowledges and agrees that: (A) GreensLedge Capital Markets LLC ("*GreensLedge*") has acted as the Company's placement agent for the Securities, (B) such Purchaser is not relying on the advice or recommendations of GreensLedge (including any affiliate, agent, advisor or representative thereof) in connection with such Purchaser's purchase of Securities, (C) GreensLedge is not acting as an underwriter or initial purchaser with respect to any Securities, (D) GreensLedge has no responsibility with respect to any marketing or other disclosure documents relating to the Securities (or the completeness of any thereof) furnished to such Purchaser, (E) GreensLedge has not made, and will not make, any representation or warranty with respect to the Company or any Securities (and such Purchaser will not rely on any statements made by

27

GreensLedge, orally or in writing, to the contrary) and (F) GreensLedge and/or any affiliate or employee thereof may purchase or otherwise invest in the Securities.

8.10    **Further Assurances.** Each Purchaser agrees and covenants that at any time and from time to time it will promptly execute and deliver to the Company such further instruments and documents and take such further action as the Company may reasonably require in order to carry out the full intent and purpose of this Agreement and to comply with state or federal securities laws or other regulatory approvals.

9.    THE AGENTS

9.1    **Appointment and Authorization of the Agents.** Each Purchaser hereby irrevocably appoints, designates and authorizes the Note Agent to act as the "note agent" under the Note Documents and, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, the Collateral Agent to act as the "collateral agent" under the Note Documents and to act as the agent of (and to hold any security interest created by any Note Document for and on behalf of or on trust for) such Purchaser for purposes of acquiring, holding and enforcing any and all Liens on Collateral to be granted by the Company to secure any of the Obligations, and to take such other action on its behalf in accordance with the provisions of this Agreement and each other Note Document and to exercise such powers and perform such duties, in each case as are expressly delegated to the Agents by the terms of this Agreement or any other Note Document, together with such powers and discretion as are reasonably incidental thereto. Notwithstanding any provision to the contrary contained elsewhere herein or in any other Note Document, the Agents shall have no duties or responsibilities, except those expressly set forth herein, nor shall the Agents have or be deemed to have any fiduciary relationship with any Purchaser or participant, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Note Document or otherwise exist against the Agents. Without limiting the generality of the foregoing sentence, the use of the term "agent" herein and in the other Note Documents with reference to the Agents is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used merely as a matter of market custom and is intended to create or reflect only an administrative relationship between independent contracting parties. Without limiting the generality of the foregoing, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, the Purchasers hereby expressly authorize the Collateral Agent to execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Note Documents and acknowledge and agree that any such action by Collateral Agent shall bind the Purchasers. Whether or not expressly stated in any Note Document, the rights, privileges and immunities of the Agents shall be automatically incorporated by reference therein. Whether or not a party thereto, the Agents shall be express third party beneficiaries of the Notes, including without limitation the payment waterfall set forth therein.

9.2    **Liability of Agents.** No Agent-Related Person shall (a) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Note Document or the transactions contemplated hereby, or (b) be responsible in any manner to any Purchaser for any recital, statement, representation or warranty made by the Company or any officer thereof, contained herein or in any other Note Document, or in any certificate, report, statement or other document referred to or provided for in, or received by the Agents under or in connection with, this Agreement or any other Note Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Note Document, or the creation, perfection, maintenance of perfection or priority of any Lien or security interest created or purported to be created under the Note Documents, the convertibility of the Notes and the validity or the sufficiency of the Equity Securities (as defined in the Note), or for any failure of the Company or any other party (other than Agents) to any Note Document to

28

perform its obligations hereunder or thereunder, except to the extent such loss resulted from the gross negligence or willful misconduct of such Agent-Related Person, as determined by a final nonappealable order of a court of competent jurisdiction. The Note Agent shall have no obligation to monitor the Ledger in the absence of being providing such by the Company in accordance with the terms of the Notes, and may, in its sole discretion either: (i) conclusively rely on the Ledger most-recently delivered to it, (ii) conclusively rely on a statement by a Holder as to the outstanding principal amount of Notes held by it, or (iii) refrain from taking any action until the Note Agent receives a current Ledger from the Company. No Agent-Related Person shall be under any obligation to any Purchaser or participant to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Note Document, or to inspect the properties, books or records of the Company or any affiliate thereof.

The Agents shall not have any duties or obligations except those expressly set forth in the Note Documents. Without limiting the generality of the foregoing, (i) the Agents shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing and (ii) the Agents shall not have any duty to take any discretionary action or exercise any discretionary powers, except, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, discretionary rights and powers expressly contemplated hereby that the Collateral Agent is instructed in writing to exercise by the Required Holders (or such other requisite number or percentage of Holders as provided in Section 10.9).

In no event shall the Agents be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, epidemics, pandemics, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility, it being understood that the Agents shall use reasonable best efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

**9.3    Reliance by the Agents**. The Agents shall be entitled to rely, and shall be fully protected in relying, upon any writing, communication, signature, resolution, representation, notice, consent, certificate, affidavit, letter, facsimile or telephone message, electronic mail message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper person or persons, and upon advice and statements of legal counsel (including counsel to the Company), independent accountants and other experts selected by the Agents. The Agents shall be fully justified in failing or refusing to take any action under any Note Document unless it shall first receive such advice or concurrence of the Required Holders as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Holders against any and all loss, liability and expense which may be incurred by it by reason of taking or continuing to take any such action. The Agents shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Note Document in accordance with a request or consent of the Required Holders (or such greater number of Holders as may be expressly required hereby in any instance), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the of the same; provided that the Agents shall not be required to take any action that, in its opinion or in the opinion of its counsel, may expose the Agents to liability or that is contrary to any Note Document or applicable law.

**9.4    Notice of Default**. The Agents shall not be deemed to have knowledge or notice of the occurrence of any Event of Default, unless the Agents shall have received written notice from a Purchaser referring to this Agreement, describing such Event of Default and stating that such notice is a "notice of event of default." The Agents shall take such action with respect to any Event of Default as may be directed by the

Required Holders in accordance with the terms of the Notes; <u>provided</u> that unless and until the Agents has received any such direction, the Agents may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Event of Default as it shall deem advisable or in the best interest of the Holders.

      **9.5**    **Agent's Reimbursement.** Each of the Holders severally agrees to reimburse the Agents, in accordance with such Holder's Pro Rata Share, for any reasonable and documented out-of-pocket expenses not reimbursed by the Company (without limiting the obligation of the Company to make such reimbursement pursuant to <u>Section 10.10</u>): (a) for which the Agents are entitled to reimbursement by the Company under this Agreement or any Note Document and (b) after the occurrence and during the continuance of an Event of Default, for any other reasonable and documented expenses incurred by the Agents on the Holders' behalf in connection with the enforcement of the Holders' rights under this Agreement or any Note Document; <u>provided</u>, <u>however</u>, that (x) the Agents shall not be reimbursed for any such expenses arising as a result of its gross negligence or willful misconduct, as determined by a final nonappealable order of a court of competent jurisdiction and (y) in the event that the Company reimburses the Agents for any such reasonable and documented out-of-pocket expenses, any corresponding amounts previously reimbursed by the Holders to the Agents will be promptly returned to such Holders in accordance with their Pro Rata Share.

      **9.6**    **Indemnification.** Each of the Holders shall severally indemnify the Agents and their officers, directors, employees, agents, attorneys, accountants, consultants and controlling Persons (to the extent not reimbursed by or on behalf of the Company pursuant to <u>Section 10.10</u> and without limiting the obligations of the Company to do so), in accordance with their respective Pro Rata Share, from and against any and all liabilities, obligations, damages, penalties, actions, judgments, suits, losses (including accrued and unpaid Agents' fees), and reasonable and documented costs, expenses or disbursements of any kind whatsoever which may at any time be imposed on, incurred by or asserted against the Agents or such Persons relating to or arising out of this Agreement, any Note Document, the transactions contemplated hereby or thereby, or any action taken or omitted by the Agents in connection with any of the foregoing; <u>provided</u>, <u>however</u>, that the foregoing shall not extend to actions or omissions to the extent arising from gross negligence or willful misconduct of the Agents, as determined by a final nonappealable order of a court of competent jurisdiction. The Agents shall not be under any obligation to exercise any of the rights or powers vested in it by this Agreement at the request, order or direction of any of the Holders, pursuant to any provision of this Agreement, unless the Required Holders shall have offered (and, if requested, provided) to the Agents security or indemnity satisfactory to it against the costs, expenses and liabilities which may be incurred by it therein or thereby. The undertaking in this <u>Section 9.6</u> shall survive the payment of all other Obligations and the resignation of the Agents.

      **9.7**    **Collateral Matters**. The Purchasers irrevocably agree that, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, any Lien on any property granted to or held by the Collateral Agent under any Note Document for the benefit of the Secured Parties shall be automatically released (i) upon payment in full of all Obligations (it being understood and agreed that the conversion in full of a Note by the Holder thereof shall be deemed, for purposes of this <u>Section 9.6</u>, to be a repayment of the entire outstanding principal amount (including all capitalized interest) of such Note together with any unpaid accrued interest thereon on the date of such conversion), (ii) subject to <u>Section 10.9</u>, if the release of such Lien is approved, authorized or ratified in writing by the Purchasers or (iii) upon the sale, transfer or other disposition of any Collateral that is not prohibited by the Note Documents. Upon request by the Collateral Agent at any time from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, the Purchasers will confirm in writing the Collateral Agent's authority to release particular types or items of property. In each case as specified in this <u>Section 9.7</u>, the Collateral Agent will, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, promptly (and each Purchaser irrevocably authorizes the Collateral Agent to), at the Company's expense,

<div align="center">30</div>

execute and deliver to the Company such documents as the Company may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Note Documents. In connection with any such release, the Collateral Agent shall be entitled to a certificate of a Responsible Officer of the Company stating that such release is authorized and permitted by the Note Documents, upon which the Collateral Agent may conclusively rely. Each party to this Agreement acknowledges and agrees that the Agents shall not have an obligation to file financing statements, amendments to financing statements, or continuation statements, or to perfect or maintain the perfection of the Collateral Agent's Lien on the Collateral.

**9.8    Successor Agents**. The Agents may resign as Agents upon fifteen (15) days' notice to the Holders. If an Agent resigns under this Agreement, the Holders shall unanimously appoint a successor representative for the Holders. If no successor representative is appointed prior to the effective date of the resignation of the Agent, the resigning Agent may appoint, after consulting with the Holders and the Company, a successor agent. Upon the acceptance of its appointment as successor representative hereunder, such successor representative shall succeed to all the rights, powers and duties of the retiring Agent, the term "Agents" shall mean such successor representative and the retiring Agent's appointment, powers and duties as Agents shall be terminated. After any retiring Agent's resignation hereunder as Agent, the provisions of this Section 9 and Section 10 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement. If no successor representative has accepted appointment as Agent by the date which is fifteen (15) days following a retiring Agent's notice of resignation, the retiring Agent's resignation shall nevertheless thereupon become effective and the Holders shall perform all of the duties of the Agents hereunder until such time, if any, as the Holders appoint a successor representative as provided for above.

**9.9    Intercreditor Agreement**. The Collateral Agent is hereby authorized to enter into the Intercreditor Agreement pursuant to Section 7.1(a) and the parties hereto acknowledge that such Intercreditor Agreement, upon execution of the same, shall be binding upon them. From and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, each Secured Party hereby (a) agrees that it will be bound by and will take no actions contrary to the provisions of the Intercreditor Agreement, (b) authorizes and instructs the Collateral Agent, without any further consent of such Secured Party, to enter into the Intercreditor Agreement provided by the Company and accompanied by the certificate specified in Section 7.1(a) and to subject the Liens on the Collateral securing the Obligations to the provisions thereof and (c) authorizes and instructs the Collateral Agent to execute and deliver on behalf of the Secured Parties any amendment (or amendment and restatement) or modification to the Intercreditor Agreement to provide for the incurrence of any Indebtedness permitted hereunder or such other amendments as the Required Holders may specify in writing to the Collateral Agent.

**10.    MISCELLANEOUS**

**10.1    Binding Agreement**. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, expressed or implied, is intended to confer upon any third party any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement. Notwithstanding anything to the contrary contained herein or in any other Note Documents, in the event of a SPAC, the Obligations of the Company to deliver Conversion Securities pursuant to Section 2 of the Note may be assigned to a Parent Entity, so long as such Parent Entity expressly assumes such Obligation of the Company and becomes a co-Obligor of each other Obligation of the Company (or its successor by merger) under the Note Documents, in each case pursuant to an joinder and assignment and assumption agreement, substantially in the form attached hereto as Exhibit I, and delivers certificates substantially identical to those delivered by the Company on the Initial Closing Date pursuant to clauses (b), (c) and (d) of Section 4.1.

**10.2     GOVERNING LAW.** THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.

**10.3     JURISDICTION AND VENUE.** EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ANY U.S. FEDERAL OR NEW YORK STATE COURT SITTING IN THE BOROUGH OF NEW YORK, NEW YORK IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR ANY OTHER NOTE DOCUMENT AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN ANY SUCH COURT AND IRREVOCABLY WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT OR THAT SUCH COURT IS AN INCONVENIENT FORUM. NOTHING HEREIN SHALL LIMIT THE RIGHT OF ANY PURCHASER, ANY HOLDER OR, FROM AND AFTER THE EXECUTION AND DELIVERY OF THE COLLATERAL DOCUMENTS PURSUANT TO SECTION 6.13, THE COLLATERAL AGENT, TO BRING PROCEEDINGS AGAINST THE COMPANY IN THE COURTS OF ANY OTHER JURISDICTION. ANY JUDICIAL PROCEEDING BY THE COMPANY AGAINST ANY PURCHASER, ANY HOLDER OR ANY OF THEIR AFFILIATES AND, FROM AND AFTER THE EXECUTION AND DELIVERY OF THE COLLATERAL DOCUMENTS PURSUANT TO SECTION 6.13, THE COLLATERAL AGENT OR ANY OF ITS AFFILIATES, INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT OR ANY OTHER NOTE DOCUMENT SHALL BE BROUGHT ONLY IN A COURT IN THE BOROUGH OF NEW YORK, NEW YORK.

**10.4     WAIVER OF JURY TRIAL.** EACH OF THE COMPANY, THE PURCHASERS, THE HOLDERS AND, FROM AND AFTER THE EXECUTION AND DELIVERY OF THE COLLATERAL DOCUMENTS PURSUANT TO SECTION 6.13, THE COLLATERAL AGENT HEREBY WAIVES TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT OR ANY OTHER NOTE DOCUMENT OR THE RELATIONSHIP ESTABLISHED THEREUNDER.

**10.5     Severability**. If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (a) such provision shall be excluded from this Agreement, (b) the balance of this Agreement shall be interpreted as if such provision were so excluded, and (c) the balance of this Agreement shall be enforceable in accordance with its terms.

**10.6     Counterparts.** This Agreement may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract. Any counterpart of a signature page to this Agreement may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the U.S. federal ESIGN Act of 2000 or the New York Electronic Signature and Records Act or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law. The Note Documents and all notices, approvals, consents, requests and any

communications hereunder must be in writing (provided that any such communication sent to Agents hereunder must be in the form of a document that is signed manually or by way of a digital signature provided by DocuSign (or such other digital signature provider as specified in writing to the Agents by the authorized representative)), in English. The Company agrees to assume all risks arising out of the use of using digital signatures and electronic methods to submit communications to the Note Agent, including without limitation the risk of the Note Agent acting on unauthorized instructions, and the risk of interception and misuse by third parties.

10.7    **Headings; Interpretation.** Paragraph headings used in this Agreement are included for convenience of reference only and will not modify the provisions that they precede or affect the interpretation of this Agreement or any other Note Document. The term "including" shall be interpreted to mean "including but not limited to". Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference.

10.8    **Notices.** All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient (and if not, then on the next Business Day), (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. Notices to the Agents shall be effective upon actual receipt thereof. All communications shall be sent, if to the Note Parties, at the address set forth on the signature page of the Company, if to the Agents, at the address set forth on the signature page thereof, and, if to a Purchaser, at the address(es) set forth on the Schedule of Purchasers attached hereto as Schedule 2 or at such other address(es) as the Company or Purchaser may designate by ten (10) days' advance written notice to the other parties hereto. Except where notice is specifically required by this Agreement, no notice to or demand on the Company or any of its Subsidiaries in any case shall entitle the Company or any of its Subsidiaries to any other or further notice or demand in similar or other circumstances.

10.9    **Amendments; Waiver**. Any term of the Notes and this Agreement may be amended or waived with the written consent of the Company and the Required Holders; provided, that without the consent of each Holder, no amendment, modification, termination, or consent shall be effective if the effect thereof would (a) extend the scheduled final maturity of any Note held by any non-consenting Holder, (b) waive, reduce or postpone any scheduled repayment (but not prepayment) with respect to the Note held by any non-consenting Holder; (c) reduce the rate of interest or amount of any fees payable under any Note held by any non-consenting Holder; (d) extend the time for payment of any interest or fees payable under any Note held by any non-consenting Holder; (e) reduce the principal amount of any Note held by any non-consenting Holder; (f) amend, modify, terminate or waive any provision of this Section 10.9; (g) amend the definition of "Required Holders"; (h) release all or substantially all of the Collateral securing any Note (if any) held by any non-consenting Holder except as expressly provided in the Note Documents, (i) from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, subordinate the Collateral Agent's Liens on Collateral except as expressly provided in the Note Documents; (j) release any Guarantor except as expressly provided in the Note Documents or (k) consent to the assignment or transfer by the Company of any of its rights and obligations under any Note Document held by any non-consenting Holder. No amendment affecting the rights, privileges and immunities of the Agents shall be effective without the consent of such Agent. Notwithstanding anything to the contrary contained herein or in any other Note Documents, no consent of any Holder shall be required pursuant to this Section 10.9 in connection with (i) an assignment and assumption by a Parent Entity of the Company's Obligations in connection with a SPAC, so long as the conditions set forth in Section 10.1 shall have been satisfied, and (ii) any Person (including, without limitation, a Parent Entity in connection with a SPAC) becoming a Guarantor or a co-issuer or co-obligor hereunder and under the

254153937 v7

Notes; provided, that the Company shall deliver a certificate of a Responsible Officer to the Agents stating that any documents to be executed in connection with a SPAC are authorized and permitted pursuant to the Note Documents.

**10.10    Expenses and Indemnification.**

(a)    The Company shall not be responsible for any out-of-pocket costs or expenses incurred by such Initial Purchasers in connection with the preparation, execution and delivery of this Agreement and the other Note Documents. The Company shall pay all reasonable and documented out-of-pocket costs and expenses of the Agents (including reasonable and documented fees, expenses and disbursements of its outside counsel) relating to the negotiation, preparation and execution of the Note Documents, review of other documents (including for purposes of due diligence review) in connection with the transactions contemplated hereby and any amendments and waivers hereto or thereto. In addition, the Company agrees to promptly pay in full after the occurrence of an Event of Default, all costs and expenses (including, without limitation, reasonable and documented fees and disbursements of counsel, agents and professional advisers) incurred by the Holders or the Agents in enforcing any obligations of or in collecting any payments due hereunder or under the Notes by reason of such Event of Default or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a workout, or any insolvency or bankruptcy proceedings.

(b)    In addition to the payment of expenses pursuant to <u>Section 10.10(a)</u>, the Company (as "***Indemnitor***") agrees to indemnify, pay and hold the Purchasers, the Holders and the Agents, and the officers, directors, employees, agents, and affiliates of the Purchasers, the Holders and the Agents (collectively called the "***Indemnitees***") harmless from and against any and all other liabilities, costs, expenses, liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for such Indemnitees) in connection with any investigative, administrative or judicial proceeding commenced or threatened (excluding claims among Indemnitees (other than claims against an Agent acting in its capacity as such) and, with the exception of claims arising out of otherwise indemnifiable matters (e.g., actions to enforce the indemnification rights provided hereunder), and excluding claims between the Company and an Indemnitee), whether or not such Indemnitee shall be designated a party thereto, which may be imposed on, incurred by, or asserted against that Indemnitee, in any manner relating to or arising out of this Agreement, the Notes, the Note Documents or the other documents related to the transactions contemplated hereby (including, without limitation, the existence or exercise of any security rights with respect to the Collateral in accordance with the Security Agreement), the Purchasers' agreement to purchase the Notes or the use or intended use of the proceeds of any of the proceeds thereof to the Company (the "***Indemnified Liabilities***"); <u>provided</u>, that the Indemnitor shall not have any obligation to an Indemnitee hereunder with respect to an Indemnified Liability to the extent that such Indemnified Liability arises from the gross negligence or willful misconduct of that Indemnitee as determined by a final nonappealable order of a court of competent jurisdiction. Each Indemnitee shall give the Indemnitor prompt written notice of any claim that might give rise to Indemnified Liabilities setting forth a description of those elements of such claim of which such Indemnitee has knowledge; <u>provided</u>, that any failure to give such notice shall not affect the obligations of the Indemnitor unless (and then solely to the extent) such Indemnitor is not aware of such claim and is materially prejudiced. The Indemnitor shall have the right at any time during which such claim is pending to select counsel to defend and control the defense thereof and settle any claims for which it is responsible for indemnification hereunder (provided that the Indemnitor will not settle any such claim without (i) the appropriate Indemnitee's prior written consent, which consent shall not be unreasonably withheld or (ii) obtaining an unconditional release of the appropriate Indemnitee from all claims arising out of or in any way relating to the circumstances involving such claim) so long as in any such event the Indemnitor shall have stated in a writing delivered to the Indemnitee that, as between the Indemnitor and the Indemnitee, the

34

Indemnitor is responsible to the Indemnitee with respect to such claim to the extent and subject to the limitations set forth herein; provided, that the Indemnitor shall not be entitled to control the defense of any claim in the event that in the reasonable opinion of counsel for the Indemnitee, there are one or more material defenses available to the Indemnitee which are not available to the Indemnitor, in which case the Indemnitee may retain separate counsel and the Company will pay the reasonable fees and expenses of such counsel (including the reasonable fees and expenses of counsel to such Indemnitee incurred in evaluating whether such a conflict exists); provided further, that with respect to any claim as to which the Indemnitee is controlling the defense, the Indemnitor will not be liable to any Indemnitee for any settlement of any claim pursuant to this Section 10.10(b) that is effected without its prior written consent, which consent shall not be unreasonably withheld. To the extent that the undertaking to indemnify, pay and hold harmless set forth in this Section 10.10(b) may be unenforceable because it is violative of any law or public policy, the Company shall contribute the maximum portion which it is permitted to pay and satisfy under applicable law, to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnitees or any of them. The obligations of each of the parties under this Section 10.10 will survive the payment or transfer of any Note, the enforcement, amendment or waiver of any provision of this Agreement, the resignation or removal of any Agent and the termination of this Agreement.

(c)     To the extent permitted by applicable law, none of the parties hereto shall assert, and each of the parties hereto hereby waives, any claim against the other parties (including their respective affiliates, partners, stockholders, members, directors, officers, agents, employees and controlling persons), on any theory of liability for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the transactions contemplated hereunder, any Note Document, the Notes or the use of the proceeds thereof; provided that nothing contained in this Section 10.10(c) shall limit the Notes Parties' indemnification and reimbursement obligations to the extent set forth in this Agreement.

**10.11   Delays or Omissions.** It is agreed that no delay or omission to exercise any right, power or remedy accruing to each Purchaser, upon any breach or default of the Company under this Agreement or any other Note Document shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. It is further agreed that any waiver, permit, consent or approval of any kind or character by a Purchaser of any breach or default under this Agreement, or any waiver by such Purchaser of any provisions or conditions of this Agreement must be in writing and shall be effective only to the extent specifically set forth in writing and that all remedies, either under this Agreement, or by law or otherwise afforded to such Purchaser, shall be cumulative and not alternative.

**10.12   Waiver of Conflicts**. Each party to this Note acknowledges that Cooley LLP ("***Cooley***"), outside general counsel to the Company, has in the past performed and is or may now or in the future represent the Holders or the Holders' affiliates in matters unrelated to the transactions contemplated by this Note (the "***Note Financing***"), including representation of the Holders or the Holders' affiliates in matters of a similar nature to the Note Financing. The applicable rules of professional conduct require that Cooley inform the parties hereunder of this representation and obtain their consent. Cooley has served as outside general counsel to the Company and has negotiated the terms of the Note Financing solely on behalf of the Company. The Company and the Holders hereby (i) acknowledge that they have had an opportunity to ask for and have obtained information relevant to such representation, including disclosure of the reasonably foreseeable adverse consequences of such representation; (ii) acknowledge that with respect to the Note Financing, Cooley has represented solely the Company, and not any Holder or any stockholder, board member or employee of the Company or director, stockholder or employee of the

Holder; and (iii) gives the Holder's informed consent to Cooley's representation of the Company in the Note Financing.

**10.13   Obligations Several**.   The Purchasers' obligations hereunder are several and not joint obligations and no Purchaser shall have any liability to any Person for the performance or non-performance of any obligation by any other Purchaser hereunder.

**10.14   Survival of Representations and Warranties**. All of the representations and warranties made by the Note Parties and their Subsidiaries herein shall survive the execution and delivery of this Agreement, any investigation by or on behalf of any Purchaser, acceptance of the Notes and payment therefor, or termination of this Agreement.

**10.15 Entire Agreement**. This Agreement and the other Note Documents constitute the entire contract among the parties hereto regarding to the subject matters addressed herein and supersede any and all previous agreements, negotiations, and discussions, oral or written, by the parties regarding the subject matters addressed herein.

**10.16   Withholding**. The Company shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement such amounts as it is required to deduct and withhold under the Code, or any Tax law, with respect to the making of such payment. To the extent that amounts are so withheld, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made. If a payment is payable (in whole or in part) in consideration other than cash and if the cash portion of any such payment is insufficient to satisfy all required Tax withholding obligations, the Company shall retain an amount of the non-cash consideration otherwise payable equal in value to the amount required to satisfy any applicable withholding taxes (as reasonably determined by the Company).**10.17 PATRIOT ACT**. The Agents hereby notify the Company that pursuant to the requirements of the PATRIOT Act, the Company may be required to obtain, verify and record information that identifies the Company, its subsidiaries and the Guarantors, including their respective names, addresses and other information that will allow the Agent to identify, the Company, its subsidiaries and the Guarantors in accordance with the PATRIOT Act.

*[Signature pages follow]*

254153937 v7

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first written above.

**COMPANY:**

**CORE SCIENTIFIC HOLDING CO.**

By _____
Name:  Michael Trzupek
Title:    Chief Financial Officer

Address for notices:
2800 Northup Way
Suite 220
Bellevue, WA 98004
Attention:  Michael Trzupek, Chief Financial Officer
Email:  mtrzupek@corescientific.com

Copy to:
Todd DuChene, General Counsel
Email:  tduchene@corescientific.com

*In each case, with a copy (which shall not constitute notice) to:*

Cooley LLP
1299 Pennsylvania AVE, NW
Suite 700
Washington, DC 20004
Attention:  Mike Tollini
Email:  mtollini@cooley.com

[Signature Page to Convertible Note Purchase Agreement]

**GUARANTORS:**

**CORE     SCIENTIFIC,     INC.,** a     Delaware corporation

By: _____

Name: Michael Trzupek

Title:   Chief Financial Officer

**AMERICAN     PROPERTY     ACQUISITION, LLC,** a Delaware limited liability company

By: Core Scientific, Inc., its sole member

By: _____

Name: Michael Trzupek

Title:   Chief Financial Officer

**AMERICAN  PROPERTY  ACQUISITIONS  I, LLC,** a North Carolina limited liability company

By:  American  Property  Acquisition,  LLC,  its sole member

By:  Core Scientific, Inc., its sole member

By: _____

Name: Michael Trzupek

Title:   Chief Financial Officer

[Signature Page to Convertible Note Purchase Agreement]

**AMERICAN PROPERTY ACQUISITIONS VII, LLC,** a Georgia limited liability company

By:  American Property Acquisition, LLC, its sole member

By:  Core Scientific, Inc., its sole member

By: _____
Name:  Michael Trzupek
Title:   Chief Financial Officer

**BLOCKCAP, INC.,** a Nevada corporation

By: _____
Name:  Todd DuChene
Title:   Secretary

[Signature Page to Convertible Note Purchase Agreement]

**U.S. BANK NATIONAL ASSOCIATION,** AS
**NOTE AGENT**


By: _____
Name:  Joshua A. Hahn
Title:  Vice President

Address for notices:
U.S. Bank National Association
West Side Flats
60 Livingston Avenue
EP-MN-WS3C
St. Paul, MN 55107
Attention: Joshua Hahn (Core Sciences)


*In each case, with a copy (which shall not
constitute notice) to:*

Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103
Attn: Nathan Plotkin (Core Scientific)

[Signature Page to Convertible Note Purchase Agreement]

**U.S. BANK NATIONAL ASSOCIATION,** AS **COLLATERAL AGENT**


By:_____

Name: Joshua A. Hahn
Title:  Vice President

Address for notices:
U.S. Bank National Association
West Side Flats
60 Livingston Avenue
EP-MN-WS3C
St. Paul, MN 55107
Attention: Joshua Hahn (Core Sciences)


*In each case, with a copy (which shall not constitute notice) to:*

Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103
Attn: Nathan Plotkin (Core Scientific)

[Signature Page to Convertible Note Purchase Agreement]

PURCHASER:

**MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY**

By: _____

Name:  Eric Partlan

Title:   Head of Portfolio Management

PURCHASER:

CRYPTONIC BLACK, LLC

By: _____

Name:  Jennifer LaFrance
Title:    Manager

[Signature Page to Convertible Note Purchase Agreement]

PURCHASER:

FIRST SUN INVESTMENTS, LLC

By:
Name:  Brent Berge
Title:   Manager

PURCHASER:

_____

DOUGLAS LIPTON

[Signature Page to Convertible Note Purchase Agreement]

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

APOLLO TACTICAL VALUE SPN INVESTMENTS, L.P.
By: Apollo Tactical Value SPN Management, LLC, its investment manager

By: _____
Name:  Joseph D. Glatt
Title:  Vice President

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

APOLLO CENTRE STREET PARTNERSHIP, L.P.
By: Apollo Centre Street Management, LLC, its investment manager

By: _____
Name: Joseph D. Glatt
Title: Vice President

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

APOLLO LINCOLN FIXED INCOME FUND, L.P.
By: Apollo Lincoln Fixed Income Management, LLC, its investment manager

By: _____
Name: Joseph D. Glatt
Title:   Vice President

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

APOLLO MOULTRIE CREDIT FUND, L.P.
By: Apollo Moultrie Credit Fund Management, LLC, its investment manager

By: _____
Name:   Joseph D. Glatt
Title:    Vice President

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

BLOCKFI LENDING LLC

By: _Rene van Kesteren_____

Name:   4E48656DF99C4AC...

Title:

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

WOLFSWOOD PARTNERS LP

By: _____
Name:
Title:   JASON Camorchero
         Managing Member

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

_____

Robert Fedrock

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

TJC3 LLC

By: _____ *Thomas Coleman* _____
Name: Thomas J. Coleman
Title: Trustee of the Thomas J. Coleman Revocable Trust,
       as the Sole Member of TJC3 LLC

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

KMR CS Holdings, LLC

By: _____

Name:kamran@kmrequity.com

Title: Manager

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

The Sear Family 1996 Trust

By: _____
Name: msear@EvokeAdvisors.com
Title:   Mark Sear, Trustee

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

JSK Partnership LLC

By: _____

Name: sp@posnergroup.com

Title: Co managing member

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Wormser Family Partnership II, LP

By: _____
Name: Ken Wormser
Title: ptr

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

TBC 222 LLC

By: _____

Name: MSidman@threebayscapital.com

Title: Managing partner

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

*frank@pollaro.com*

_____

Frank Polaro

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

David

_____

David Sarner

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

*James P. Pulaski*

_____
James Pulaski

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

SunnySide Consulting and Holdings, Inc.

By: _____

Name: Taras Kulyk

Title: Director / Principal

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**A**DDITIONAL **P**URCHASER:

1994 Steinfeld Family Trust

By:_____

Name: jake@steinfeld6.com

Title: Trustee

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Better Downtown Miami, LLC

By: _____

Name: Marc Roberts

Title: Manager

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

_____
 Jason Capello

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

*Vineet Agrawal*

—————————————————————
Vineet Agrawal

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Milos Core LLC

By: _____

Name:        Scott Packman

Title:        Partner

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Barkley Investments, LLC

By: *Jason Paul Godfrey*

Name: Jason Paul Godfrey

Title: President, it's managing member, Godfrey Capital

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Richard Katz 2016 GST TRUST

By: _____

Name: Richard Katz

Title: Dr

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

_____ *johnquinn@quinnemanuel.com* _____
John Quinn

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Northdata Holdings Inc.

By:_____
Name: daniel rafuse
Title:  Chairman

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Monbanc Inc.

*daniel rafuse*

By:_____

Name: daniel rafuse

Title:
       Chairman

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Sabby Volatility Warrant Master Fund, Ltd.

By: _rgrundstein@sabbymanagement.com_

Name: rgrundstein@sabbymanagement.com

Title: COO

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Leon J. Simkins Non-Exempt Trust
FBO Michael Simkins

By:_____

Name: Michelle Simkins-Rubell

Title: trustee

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

FTF Diversified Holdings, LP

By: _____
Name:   Anthony Fadell
Title:   Principal

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

By:_____
Name:   Joaquin Palomo
Title:   Director   FGK Investments Ltd.

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

By: _____

Name: Ernesto Castillo Kriete    Director

Title: Neso Investment Group Ltd

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

ADDITIONAL PURCHASER:

By: _____

Name:   Marco Baldocchi Kriete

Title:   Director   Ferro Investments Ltd.

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Galaxy Digital LP
 by its general partner, Galaxy Digital GP LLC

By: _____
Name:   Chris Ferraro
Title:   Authorized Signatory

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Corbin ERISA Opportunity Fund, Ltd.

By:_____ *Cesar Bello* _____

Name: Cesar Bello

Title: Deal Counsel

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Corbin Opportunity Fund, L.P.

By:_____

Name: Cesar Bello

Title: Deal Counsel

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Levbern Management LLC

By:_____

Name: Andrew Ward

Title: Member

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

JPAS - Crypto Infrastructure LLC

By: _____
Name:  George Lusch
Title:  Chief Financial Officer

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

JPAS - Crypto Infrastructure-A S.P.

By: _____

Name: George Lusch

Title: Chief Financial Officer

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

JPAS - Credit-A S.P.

By: _____
Name:   George Lusch
Title:   Chief Financial Officer

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

JPAS - Credit LLC

By:_____
Name: George Lusch
Title:  Chief Financial Officer

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Cannon Investments LLC

By: _____
Name:   Andrew Rosen
Title:   Manager

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Andrew Rosen 2004 Successor Insurance Trust

By:_____
Name:   Dan Nir
Title:   Manager

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

XMS Core Convert Holdings LLC

By: ~~John McGarrity~~

Name:

Title:   John McGarrity - Managing Director

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Amplify Transformational Data Sharing ETF

By: _Charles A. Ragauss_
Name:   Charles A. Ragauss
Title:   Portfolio Manager

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

ADDITIONAL PURCHASER:

Marsico AXS CS LLC

By:_____
Name:   jam@marsicoenterprises.com
Title:   Manager

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Gullane Digital Asset Partners, LLC

By: _Richard A. Miller, III_____

Name: Richard A. Miller, III

Title: Managing Partner

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Gullane Capital Partners, LLC

By: _Richard A. Miller, III_____
Name:  Richard A. Miller, III
Title:  Managing Partner

## SCHEDULE 2
## SCHEDULE OF PURCHASERS

**Initial Purchasers**

| Name and Address for Notices | Principal Amount of Notes |
|---|---|
| **MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY**<br>One Marina Park Drive, MIP 1205<br>Boston, MA 02210<br>Attn:     Sarah Doyle; Chris Fredericks; Helder Pereira<br>Email:     sdoyle@massmutual.com; cfredericks54@massmutual.com; hpereira@massmutual.com<br>Phone #:617-235-1522; 617-695-4069; 413-744-7347 | $40,000,000.00 |
| **CRYPTONIC BLACK, LLC**<br>801 S. Rampart Blvd.<br>Las Vegas, NV 89145<br>Attn:     Jennifer LaFrance<br>Email:     jlafrance@asny.com<br>Phone #:702-967-5000 | $6,000,000.00 |
| **FIRST SUN INVESTMENTS, LLC**<br>6718 E. Rovey Avenue<br>Paradise Valley, AZ 85253<br>Attn:     Brent Berge<br>Email:     brentberge@bergegroup.com<br>Phone #:1-602-430-3673 | $4,000,000.00 |
| **DOUGLAS LIPTON**<br>4701 N Meridian Ave<br>Unit 315<br>Miami Beach, FL 33140<br>Attn:     Douglas Lipton<br>Email:     dlip44@gmail.com<br>Phone #:917-887-8869 | $250,000.00 |
| **TOTAL:** | **$50,250,000.00** |

**Additional Purchasers**

| Name and Address for Notices | Principal Amount of Notes |
|---|---|
| **Apollo Tactical Value SPN Investments LP**<br>9 West 57th Street<br>New York, NY 10019<br>Attn:     Joseph D. Glatt<br>Email:     jglatt@apollo.com | $4,700,000.00 |
| **Apollo Centre Street Partnership, LP**<br>9 West 57th Street<br>New York, NY 10019<br>Attn:     Joseph D. Glatt<br>Email:     jglatt@apollo.com | $2,500,000.00 |

| | |
|---|---|
| **Apollo Lincoln Fixed Income Fund, L.P.**<br>9 West 57th Street<br>New York, NY 10019<br>Attn:      Joseph D. Glatt<br>Email:      jglatt@apollo.com | $1,600,000.00 |
| **Apollo Moultrie Credit Fund, L.P.**<br>9 West 57th Street<br>New York, NY 10019<br>Attn:      Joseph D. Glatt<br>Email:      jglatt@apollo.com | $1,200,000.00 |
| **BlockFi Lending LLC**<br>201 Montgomery St #263<br>Jersey City, NJ 07302<br>Attn:      Sergey Pekarsky<br>Email:      tradingops@blockfi.com, Legal-inst@blockfi.com | $5,000,000.00 |
| **Wolfswood Partners LP**<br>140 Broadway<br>New York, NY 10005<br>Attn:      Jason Comerchero<br>Email:      jason.comerchero@wolfswoodpartners.com | $1,000,000.00 |
| **1994 Steinfeld Family Trust**<br>622 Toyota Drive<br>Pacific Palisades, CA 90272<br>Attn: Jake Steinfeld<br>Email: jake@steinfeld6.com | $500,000.00 |
| **Andrew Rosen 2004 Successor Insurance Trust**<br>810 Seventh Avenue, 7th Floor<br>New York, NY 10019<br>Attn: TAG Associates LLC<br>Email: NKim@tagassoc.com<br>Email: EWong@tagassoc.com | $250,000.00 |
| **Barkley Investments, LLC**<br>8231 Bay Colony Drive, Unit 802<br>Naples, FL<br>Attn: Jason Paul Godfrey<br>Email: jgodfrey@godfreycap.com | $2,000,000.00 |
| **Better Downtown Miami LLC**<br>4167 Main Street<br>Jupiter, FL 33458<br>Attn: Marc Roberts<br>Email: marc@marcroberts.com | $400,000.00 |
| **Cannon Investments LLC**<br>810 Seventh Avenue, 7th Floor<br>New York, NY 10019<br>Attn: TAG Associates LLC<br>Email: NKim@tagassoc.com<br>Email: EWong@tagassoc.com | $250,000.00 |
| **Corbin ERISA Opportunity Fund, Ltd.**<br>c/o Corbin Capital Partners, L.P.<br>590 Madison Ave, 31st Floor<br>New York, NY 10022<br>Attn: Corbin Operations<br>Email: corbinwso-fax@ifs.statestreet.com<br>Email: mmf-bankdebt@corbincapital.com<br>Email: corbin@viteos.com | $12,000,000.00 |

| | |
|---|---|
| **Corbin Opportunity Fund, L.P.**<br>c/o Corbin Capital Partners, L.P.<br>590 Madison Ave, 31st Floor<br>New York, NY 10022<br>Attn: Corbin Operations<br>Email: corbinwso-fax@ifs.statestreet.com<br>Email: mmf-bankdebt@corbincapital.com<br>Email: corbin@viteos.com | $2,000,000.00 |
| **David Sarner**<br>2100 S. Ocean Blvd, #506<br>Palm Beach, FL 33480<br>Email: docsarner@gmail.com | $250,000.00 |
| **Ferro Investments Ltd**<br>2 Alhambra Plaza, Suite 802<br>Coral Gables, FL 33134<br>Attn: Jennifer Kanold<br>Email: reporting@icomia.com | $1,500,000.00 |
| **FGK Investments Ltd**<br>2 Alhambra Plaza, Suite 802<br>Attn: Jennifer Kanold<br>Email: reporting@icomia.com | $500,000.00 |
| **Frank Polaro**<br>10 Douglas Road<br>Morristown, NJ 07960<br>Email: frank@pollaro.com | $250,000.00 |
| **FTF Diversified Holdings, LP**<br>121 Alhambra Plaza, Suite 1202<br>Coral Gables, FL 33134<br>Attn: Archpoint Investors<br>Email: futureholdings@archpointinvestors.com<br>Email: reports@concertomgmt.com | $2,000,000.00 |
| **Galaxy Digital LP**<br>Attn: Chris Ferraro<br>Email: compliance@galaxydigital.io | $5,000,000.00 |
| **James Pulaski**<br>3921 Alton Road #360<br>Miami Beach, FL 33140<br>Attn: James Pulaski<br>Email: jim@jpulaski.com | $1,000,000.00 |
| **Jason Capello**<br>1404 N Lake Way<br>Palm Beach, FL 33480<br>Email: jcapello@mgatecap.com | $2,000,000.00 |
| **John B. Quinn**<br>Quinn Emanuel Urquhart & Sullivan, LLP<br>865 S. Figueroa Street, 10th Floor<br>Los Angeles, CA 90017<br>Email: johnquinn@quinnemanuel.com | $500,000.00 |
| **JPAS – Credit LLC**<br>100 Pine Street, Suite 2600<br>San Francisco, VA 94111<br>Attn: George Lusch<br>Email: George.lush@jordanpark.com | $8,333,653.00 |
| **JPAS – Credit-A S.P.**<br>100 Pine Street, Suite 2600 | $4,166,347.00 |

| | |
|---|---|
| San Francisco, VA 94111<br>Attn: George Lusch<br>Email: George.lush@jordanpark.com | |
| **JPAS – Crypto Infrastructure LLC**<br>100 Pine Street, Suite 2600<br>San Francisco, VA 94111<br>Attn: George Lusch<br>Email: George.lush@jordanpark.com | $11,619,743.00 |
| **JPAS – Crypto Infrastructure-A S.P.**<br>100 Pine Street, Suite 2600<br>San Francisco, VA 94111<br>Attn: George Lusch<br>Email: George.lush@jordanpark.com | $4,380,257.00 |
| **JSK Partnership LLC**<br>1691 Michigan Ave, Suite 445<br>Miami Beach, FL 33139<br>Attn: Sean Posner<br>Email: sp@posnergroup.com | $1,000,000.00 |
| **KMR CS Holdings, LLC**<br>377 Fifth Avenue, 5th Floor<br>Attn: Kamran Yaghoubzadeh<br>Email: kamran@kmrequity.com | $820,000.00 |
| **Leon J. Simkins Non-Exempt Trust FBO Michael Simkins**<br>5080 Biscayne Boulevard, #A<br>Miami, FL 33137<br>Attn: Michelle Simkins-Rubell<br>Email: Simkinslaw@gmail.com | $750,000.00 |
| **Levbern Management LLC**<br>45625 Cielito Drive<br>Indian Wells, CA 92210<br>Attn: Melina Bernecker<br>Email: melina@levbernmanagement.com<br>Attn: Drew Ward<br>Email: drew@levbernmanagement.com | $250,000.00 |
| **Milos Core LLC**<br>Attn: Mavrides, Moyal, Packman & Sadkin, LLP<br>Attn: Scott Packman<br>Email: spackman@mmps.com | $1,000,000.00 |
| **Monbanc Inc.**<br>290 Lakeshore<br>Pointe Claire, Quebec<br>H9s 413<br>Attn: Daniel Rafuse<br>Email: daniel@monbanc.com | $100,000.00 |
| **Neso Investment Group Ltd**<br>2 Alhambra Plaza, Suite 802<br>Attn: Jennifer Kanold<br>Email: reporting@ieomia.com | $500,000.00 |
| **Northdata Holdings Inc.**<br>290 Lakeshore<br>Pointe Claire, Quebec<br>H9S 413<br>Attn: Daniel Rafuse<br>Email: daniel@monbanc.com | $200,000.00 |
| **Richard Katz 2016 Trust** | $250,000.00 |

| | |
|---|---|
| 55 Farrington Avenue<br>Email: Docatz@gmail.com | |
| **Robert Fedrock**<br>736-333 Adelaide St. E.<br>Toronto, Ontario M5A 4T4<br>Email: Robert.fedrock@originmerchant.com | $400,000.00 |
| **Sabby Management, LLC**<br>10 Mountainview Road, Suite 205<br>Upper Saddle River, NJ 07458<br>Attn: Robert Grundstein<br>Email: rgrundstein@sabbymanagement.com<br>Originals to:<br>Attn: Client Settlement, Wedbush Securities<br>1000 Wiltshire Blvd., Suite 850<br>Los Angeles, CA 90017 | $2,500,000.00 |
| **SunnySide Consulting and Holdings, Inc.**<br>214 Cherryhill Road<br>Oakville, Ontario, L6L3E2, Canada<br>Attn: Taras Kulyk<br>Email: taras@sunnysideinc.ca | $110,000.00 |
| **TBC 222 LLC**<br>8 Newbury Street, 5th Floor<br>Boston, MA 02116<br>Attn: Matthew Sidman – Managing Member<br>Email: msidman@threebayscapital.com | $2,500,000.00 |
| **The Sear Family 1996 Trust**<br>457 26th Street<br>Manhattan Beach, CA 90266<br>Attn: Mark Sear<br>Email: msear@evokeadvisors.com | $500,000.00 |
| **TJC3 LLC**<br>c/o Kensico Capital Management<br>55 Railroad Avenue, 2nd Floor<br>Greenwich, CT 06830<br>Attn: Family Office (Gino Labruzzo, Li Dick, Christina Malloy)<br>Email: familyoffice@kensicocapital.com | $4,000,000.00 |
| **Vineet Agrawal**<br>2 Brantwood Terrace<br>Short Hills, NJ 07078<br>Email: vagrawal@gmail.com | $250,000.00 |
| **Wormser Family Partnership II L.P.**<br>575 Lexington Avenue, 32nd Floor<br>New York, NY 10022<br>Attn: Ken Wormser<br>Email: kwormser@greensledge.com | $500,000.00 |
| **XMS Core Convert Holdings LLC**<br>321 N. Clark Street, Suite 2440<br>Chicago, IL 60091<br>Attn: John McGarrity<br>Email: jmcgarrity@xmscapital.com | $1,000,000.00 |
| **Marsico AXS CS LLC**<br>5251 DTC Parkway, Suite 410<br>Greenwood Village, CO 80111<br>Attn: Jonathan Marsico<br>Email: jam@marsicoenterprises.com | $19,604,095.00 |

| | |
|---|---|
| Attn: Michael Cirenza<br>Email: mac@marsicoenterprises.com | |
| **Gullane Digital Asset Partners, LLC**<br>640 S. Perkins Road<br>Memphis, TN 38117<br>Attn: Matthew R. Walker<br>Email: matt@gullanecapital.com | $22,500,00.00 |
| **Gullane Capital Partners, LLC**<br>640 S. Perkins Road<br>Memphis, TN 38117<br>Attn: Matthew R. Walker<br>Email: matt@gullanecapital.com | $2,500,000.00 |
| **Transformational Data Sharing ETF**<br>400 City Center<br>Oskhosh, WI 54901<br>Attn: Charles Ragauss<br>Email: cragauss@torosoam.com | $15,000,000.00 |
| **TOTAL:** | $151,134,095.00 |

**SCHEDULE 5.1**

**NOTE PARTIES**

| Entity Name | Former Names (within last 5 years) | Jurisdiction of Organization | Taxpayer Identification Number | Organizational Number |
|---|---|---|---|---|
| Core Scientific Holding Co. | N/A | Delaware | 85-2941270 | 3377927 |
| Core Scientific Inc. | Mineco Holdings, Inc | Delaware | 82-3805526 | 6660521 |
| American Property Acquisition, LLC | N/A | Delaware | 82-540825 | 6857348 |
| American Property Acquisitions I, LLC | 155 Palmer Lane, LLC | North Carolina | 82-5469717 | 1687596 |
| American Property Acquisitions VII, LLC | N/A | Georgia | 83-1663198 | 18100016 |
| Blockcap Inc. | Block Capital, Inc. | Nevada | 85-4052367 | E10638672020-8 |

**SCHEDULE 5.13**

**SUBSIDIARIES**

| Entity Name | Owner | Ownership Percentage | Jurisdiction of Organization |
|---|---|---|---|
| Core Scientific Inc. | Core Scientific Holding Co. | 100% | Delaware |
| American Property Acquisition, LLC | Core Scientific, Inc. | 100% | Delaware |
| GPU One Holdings, LLC f/k/a IP Special Holdings, LLC | Core Scientific, Inc. | 100% | Delaware |
| American Property Acquisitions I, LLC | American Property Acquisition, LLC | 100% | North Carolina |
| American Property Acquisitions VII, LLC | American Property Acquisition, LLC | 100% | Georgia |
| Blockcap Inc. | Core Scientific Holding Co. | 100% | Nevada |
| Radar Relay, Inc. | Blockcap Inc. | 100% | Delaware |
| RADAR LLC | Blockcap Inc. | 100% | Colorado |
| Starboard Capital LLC | Blockcap Inc. | 100% | Colorado |

**SCHEDULE 5.14**

**CAPITALIZATION**

(see attached)

**SCHEDULE 5.17**

**INDEBTEDNESS**

1. Existing Notes

2. Mortgage in favor of Brown Corporation for that certain real property located at 206 Boring Drive, Dalton, GA 30721 in a principal amount of $547,733.71 as of February 1, 2021.

3. Mortgage in favor of Holiwood LLC for that certain real property located at 1035 Shar-Cal Rd, Calvert City, KY 42029 in a principal amount of $1,354,209.33 as of February 1, 2021.

4. That certain PPP Loan entered into April 2020, between Core Scientific, Inc. and City National Bank in a principal amount of $2,154,300.00 as of February 1, 2021.

5. The following Equipment Financing:

| Equipment Financing | Issue Date | Original Amount | Maturity | Interest Rate | Outstanding Principal (as of 02/01/21) |
|---|---|---|---|---|---|
| Genesis Global Capital, LLC #1 | July 2020 | $1,833,625 | March 2022 | 16.0% | $1,477,318 |
| Genesis Global Capital, LLC #2 | August 2020 | 1,569,132 | April 2022 | 16.0% | 1,369,909 |
| Genesis Global Capital, LLC #3 | September 2020 | 1,307,610 | April 2022 | 16.0% | 1,215,593 |
| Arctos Credit, LLC | October 2020 | 774,250 | October 2022 | 15.0% | 660,692 |
| Novak | January 2021 | 10,000,000 | January 2023 | 10.0% | 10,000,000 |
| **Total Equipment Financing** | | **$15,484,617** | | | **$14,723,512** |

6. The following Equipment Leases:

| Equipment Leases | Issue Date | Original Amount | Maturity | Interest Rate | Outstanding Principal (as of 02/01/21) |
|---|---|---|---|---|---|
| NEC Financial Services | July 2018 | $14,707 | July 2021 | 12.2% | $2,376 |
| Technology Finance Corporation #2 | May 2019 | 101,315 | May 2022 | 6.5% | 45,000 |
| Garic, Inc. | May 2019 | 466,379 | May 2022 | 6.5% | 179,847 |
| VFS, LLC | July 2019 | 421,576 | July 2022 | 7.3% | 210,510 |
| Advanced Business Equipment | October 2019 | 22,154 | October 2022 | 7.2% | 11,675 |
| Garic, Inc. #1 | September 2019 | 153,129 | September 2022 | 6.5% | 84,519 |
| 36th Street Capital #1 | October 2019 | 710,122 | October 2022 | 13.4% | 429,256 |
| 36th Street Capital #2 | December 2019 | 1,130,000 | December 2022 | 13.4% | 743,378 |
| 36th Street Capital #3 | December 2019 | 917,300 | June 2022 | 9.8% | 516,920 |
| 36th Street Capital #4 | December 2019 | 748,275 | December 2022 | 13.4% | 492,258 |
| Toyota Commercial Finance | January 2020 | 431,799 | June 2025 | 5.3% | 359,339 |
| Technology Finance Corporation #3 | March 2020 | 57,492 | February 2021 | 6.5% | - |
| Garic, Inc. #2 | March 2020 | 958,650 | March 2023 | 6.5% | 659,577 |
| De Lage Landen #1 | November 2020 | 290,246 | November 2023 | (5.3)% | 229,981 |

Core Scientific Cap Table - As Of August 12, 2021

| | Date | Shares | Capital Raised | $ Per Share | % of Total |
|---|---|---|---|---|---|
| **Preferred** | | | | | |
| Series A Convertible Preferred | 2019 / 2020 | 6,451,525 | $44,063,916 | $6.83 | 2.5% |
| Series B Convertible Preferred | 2020 | 314,285 | 1,100,000 | 3.50 | 0.1% |
| **Total Preferred Outstanding** | | **6,765,810** | **$45,163,916** | | **2.7%** |
| **Common Shares** | | | | | |
| Private Placement #1 | 1H 2018 | 7,505,000 | $48,032,000 | $6.40 | 3.0% |
| Private Placement #2 | 2H 2018 | 178,095 | 2,000,007 | 11.23 | 0.1% |
| **Business Combinations / Other** | | | | | |
| BCV 55, 66 & 77 | January 2018 | 88,501,449 | | | 35.0% |
| Matrix Mining Ltd. and MM Management Transaction | November 2018 | 1,250,000 | | | 0.5% |
| Slax Digital | September 2019 | 560,030 | | | 0.2% |
| Heldrick and Stuggles | September 2019 | 50,000 | | | 0.0% |
| Atrio | June 2020 | 561,938 | | | 0.2% |
| Blockcap | 7/1/2021 | 72,185,717 | | | 28.5% |
| **Total Common Shares Outstanding** | | **170,792,229** | **$50,032,007** | | **67.5%** |
| **Reserves & Other** | | | | | |
| RSUs Outstanding | | 53,937,486 | | | 21.3% |
| Options Outstanding | | 7,320,245 | | | 2.9% |
| Available for Future Issuance | | 10,088,856 | | | 4.0% |
| Warrants | | 4,284,887 | | | 1.7% |
| **Total Reserves & Other** | | **75,631,474** | | | **29.9%** |
| **Total Fully Diluted** | | **253,189,513** | **$95,195,923** | | **100.0%** |

1

| Equipment Leases | Issue Date | Original Amount | Maturity | Interest Rate | Outstanding Principal (as of 02/01/21) |
|---|---|---|---|---|---|
| De Lage Landen #2 | December 2020 | 99,650 | December 2023 | (5.5)% | 80,984 |
| De Lage Landen #3 | January 2021 | 228,180 | January 2024 | (0.5)% | 200,085 |
| De Lage Landen #4 | January 2021 | 99,950 | January 2024 | (5.5)% | 80,984 |
| Garic, Inc. #3 | February 2021 | 199,528 | February 2024 | 7.9% | 199,528 |
| **Total Equipment Leases** | | **$7,050,752** | | | **$4,526,215** |

**EXHIBIT A**

**FORM OF CONVERTIBLE PROMISSORY NOTE**

**(see attached)**

THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "*ACT*"), OR UNDER THE SECURITIES LAWS OF ANY STATES IN THE UNITED STATES. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT PURSUANT TO SECTION 5(C) HEREOF AND AS PERMITTED UNDER THE ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL IN FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER TO THE EFFECT THAT ANY PROPOSED TRANSFER OR RESALE IS IN COMPLIANCE WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

THIS NOTE HAS BEEN ISSUED WITH "ORIGINAL ISSUE DISCOUNT" (WITHIN THE MEANING OF SECTION 1273 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "*CODE*")). UPON WRITTEN REQUEST, THE COMPANY WILL PROMPTLY MAKE AVAILABLE TO ANY HOLDER OF THIS NOTE THE FOLLOWING INFORMATION:  (1) THE ISSUE PRICE AND ISSUE DATE OF THE NOTE, (2) THE AMOUNT OF ORIGINAL ISSUE DISCOUNT ON THE NOTE AND (3) THE YIELD TO MATURITY OF THE NOTE. HOLDERS SHOULD CONTACT THE CHIEF FINANCIAL OFFICER OF THE COMPANY AT 2800 NORTHUP WAY SUITE 220 BELLEVUE, WA 98004.

## [FORM OF] CONVERTIBLE PROMISSORY NOTE

Note Series:  2021 Convertible Promissory Notes

Date of Note:  [___], 2021

Initial Principal Amount of Note:  $[___], plus any PIK Interest that has accrued and been capitalized pursuant to the terms of this Note

For value received **CORE SCIENTIFIC HOLDING CO.**, a Delaware corporation (the "*Company*"), promises to pay to the undersigned holder or such party's successors or permitted assigns (the "*Holder*") the principal amount set forth above with interest to accrue on such outstanding principal amount at a rate of 10% *per annum*, 4% of which shall be payable in cash ("*Cash Interest*") and 6% of which shall be payable in kind by capitalizing such interest payment and increasing the outstanding principal amount of this Note by the amount thereof ("*PIK Interest*"). Interest shall accrue on the outstanding principal amount of this Note commencing on (and including) the date of original issuance thereof (or the most recent interest payment date) and continuing until the earlier to occur of (x) the date this Note is repaid or prepaid in full and (y) the date this Note is converted in full by the Holder pursuant to Section 2 hereof. Cash Interest shall be due and payable and PIK Interest shall be capitalized quarterly in arrears on the first day of each fiscal quarter, commencing on October 1, 2021. Interest shall be computed on the basis of a year of 365 days for the actual number of days elapsed. This Note shall be automatically deemed to include any accrued PIK Interest thereon and the Company shall not be obligated to issue any subsequent Notes reflecting PIK Interest. This Note is one of the "Notes" issued pursuant to the Purchase Agreement. All capitalized terms used but not otherwise defined in this Note will have the same meanings in this Note as in the Purchase Agreement referred to below.

The following is a statement of the rights of the Holder and the conditions to which this Note is subject, and to which the Holder, by the acceptance of this Note, agrees:

1.      **BASIC TERMS**.

(a)      **Series of Notes**. This convertible promissory note (this "***Note***") is issued as part of a series of notes designated by the Note Series above (collectively, the "***Notes***"), having an initial aggregate principal amount of up to $300,000,000.00 and issued pursuant to, and to those persons and entities (collectively, the "***Holders***") party, as Purchasers, to, that certain Convertible Note Purchase Agreement, dated as of even date herewith (as amended, restated, supplemented and/or otherwise modified from time to time, the "***Purchase Agreement***"), by and among the Company, each Purchaser party thereto, U.S. Bank National Association, as Note Agent, and, upon the execution and delivery of the Collateral Documents pursuant to Section 6.13 of the Purchase Agreement, U.S. Bank National Association, as Collateral Agent for the Secured Parties. The Company shall maintain a ledger of all Holders ("***Ledger***"), which shall include all PIK Interest accrued and capitalized, and which shall be available (i) promptly upon request to the Agents and the Holder, (ii) promptly after any transfer or assignment of any Note, (iii) promptly upon conversion of any Note and (iv) on the tenth business day prior to any interest payment date.

(b)      **Payments**.

(i)      **Voluntary Prepayments**. Subject to and following the expiration of any applicable lockup period set forth under any lockup agreement to which the Holder, the Company and the Company's underwriters are a party, and unless otherwise converted in full or in part pursuant to Section 2 hereof (including following delivery of the Company's notice referred to in this subsection (b)(i)(2)), the Company may at any time, upon ten (10) Business Days' prior written notice to the Holder and the Note Agent (which notice may be conditioned or rescinded upon such events as may be specified in such notice) prepay all or any portion of this Note in an amount equal to (x) the outstanding principal amount (including all accrued PIK Interest not already added to the principal amount of this Note) of this Note being prepaid at such time, together with all accrued unpaid Cash Interest on such outstanding principal amount at such time *multiplied* by (y) 200% (such amount, the "***Repayment Amount***").

(ii)      **Repayment**. Unless otherwise prepaid by the Company pursuant to Section 1(b)(i) or converted in full pursuant to Section 2 hereof, this Note shall be repaid in full on the earlier to occur of (x) April 19, 2025 (the "***Maturity Date***") and (y) acceleration by the Holders representing at least twenty-five percent (25%) of the aggregate outstanding principal amount of the Notes issued pursuant to the Purchase Agreement at such time after the occurrence of an Event of Default in accordance with the terms hereof, in each case, in an amount equal to the outstanding principal (including all accrued PIK Interest not already added to the principal amount of this Note) of this Note, plus all unpaid accrued Cash Interest thereon.

(iii)      **Payments Generally**.

(1)      This Note and the other Notes issued pursuant to the Purchase Agreement are *pari passu* in right of payment and all payments (other than conversion) under this Note and such other Notes shall be made in accordance with each Holder's Pro Rata Share. All payments shall be applied first, to the payment of expenses due under this Note and the other Note Documents to the Agents, second, to the payment of expenses due under this Note and the other Note Documents to the Holders, third, unpaid accrued interest of this Note and fourth, if the amount of payment exceeds the amount of all such expenses and accrued interest, to the payment of outstanding principal (including all accrued PIK Interest not already added to the principal amount of this Note) of this Note. The conversion of this Note by the Holder pursuant to the terms hereof shall be deemed to be a repayment of the full outstanding principal

amount (including all accrued PIK Interest not already added to the principal amount of this Note) of such Note together with any unpaid accrued Cash Interest thereon on the date of such conversion.

(2)     All payments to be made by the Company shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff, except with respect to Taxes required to be deducted and/or withheld under applicable law. All payments (other than by means of conversion pursuant to the terms of the Notes), including any prepayments, of interest and principal to be made by the Company hereunder shall be made by the Company to the Note Agent, in cash, for the account of the respective Holders to which such payment is owed, at the applicable Notes Agent's Principal Office for payment and in same day funds not later than 11:00 a.m. on the date specified herein. The Notes Agent will promptly distribute to each Holder its Pro Rata Share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to each Holder at the address specified in the Holder's Administrative Questionnaire (or at such other address as the Holder may indicate in writing to the Note Agent from time to time). All payments received by the Notes Agent after 11:00 a.m. may (at the sole discretion of the Notes Agent) in each case be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(3)     If any payment to be made by the Company shall come due on a day other than a Business Day, any interest shall be payable, and any PIK Interest shall be capitalized, on the next succeeding Business Day without additional interest accruing thereon.

(4)     Whenever any payment received by the Notes Agent under this Agreement or any of the other Notes Documents is insufficient to pay in full all amounts due and payable to the Notes Agent and the Holders under or in respect of this Agreement and the other Notes Documents on any date, such payment shall be distributed by the Notes Agent and applied by the Notes Agent and the Holders in the order of priority set forth in Section 1(b)(iii)(1). If the Notes Agent receives funds for application to the Obligations of the Company under or in respect of the Notes Documents under circumstances for which the Notes Documents do not specify the manner in which such funds are to be applied, the Notes Agent may, but shall not be obligated to, elect to distribute such funds to the Holders in accordance with the Holder's Pro Rata Share of such of the outstanding Notes or other Obligations then owing to the Holder.

(iv)     **Withholding**. Notwithstanding anything to the contrary herein, the Company shall be entitled to deduct and withhold from the consideration otherwise payable under the Note such amounts as it is required to deduct and withhold under the Code, or any other tax law, with respect to the making of such payment. To the extent that amounts are so withheld, such withheld amounts shall be treated for all purposes of this Note as having been paid to the Person in respect of whom such deduction and withholding was made. If a payment is payable (in whole or in part) in consideration other than cash and if the cash portion of any such payment is insufficient to satisfy all required tax withholding obligations, the Company shall retain an amount of the non-cash consideration otherwise payable equal in value to the amount required to satisfy any applicable withholding taxes (as reasonably determined by the Company).

2.     CONVERSION.

(a)     **Conversion upon an Offering**. In the event that the Company (i) issues and sells shares of its equity securities ("***Equity Securities***") to investors (the "***Investors***") in a private offering or placement with total gross proceeds to the Company of at least $50,000,000 (excluding the conversion of the Notes or other convertible securities issued for capital raising purposes (*e.g.*, Simple Agreements for Future Equity)), (ii) issues and sells its common stock ("***Common Stock***") to Investors in an underwritten public offering pursuant to an effective registration statement filed with the Securities and Exchange Commission in accordance with the Act or under equivalent securities laws and regulations of any other

jurisdiction (including, for the avoidance of doubt, a SPAC), (iii) lists its Common Stock (other than shares of Common Stock not eligible for resale under Rule 144 under the Securities Act) on a national securities exchange by means of an effective registration statement on Form S-1 filed by the Company with the SEC that registers shares of existing capital stock of the Company for resale, as approved by the Company's board of directors, or (iv) lists its Common Stock on any stock exchange (the occurrence of each event set forth in clauses (i) through (iv) above, an "***Offering***" and, together with the occurrence of a Change of Control as provided in Section 2(b) below, each, a "***Conversion Event***"), in each case, while this Note remains outstanding, the Holder shall have the right at any time and from time to time during the period commencing on the date of consummation of such Offering until the Maturity Date, to convert, in whole or in part, the outstanding principal amount (including all accrued PIK Interest not already added to the principal amount of this Note) of this Note, together with all unpaid accrued Cash Interest thereon, into Equity Securities or Common Stock of the Company (as applicable) at a conversion price equal to the Applicable Conversion Price (as defined below) (which shall be determined, for the avoidance of doubt, on the date of the consummation of such Offering). The issuance of Equity Securities or Common Stock by the Company (as applicable) pursuant to the conversion of this Note shall be upon and subject to the same terms and conditions (other than as otherwise set forth herein) applicable to Equity Securities or Common Stock of the Company (as applicable), sold in the applicable Offering.

(b) **Conversion upon a Change of Control**. In the event the Company consummates a Change of Control (as defined below) while this Note remains outstanding, the Company shall repay the outstanding principal amount of this Note in an amount equal to the Repayment Amount; provided, however, that upon the written election of the Holder made not less than five (5) days prior to the Change of Control, the Company shall convert the outstanding principal amount of this Note (including all accrued PIK Interest not already added to the principal amount of this Note) and any unpaid accrued Cash Interest into Common Stock at a conversion price equal to the Applicable Conversion Price (which shall be determined, for the avoidance of doubt, on the date of consummation of such Change of Control) (assuming conversion of all securities convertible into Common Stock and exercise of all outstanding options and warrants, but excluding the shares of equity securities of the Company issuable upon the conversion of Notes or other convertible securities issued for capital raising purposes (e.g., Simple Agreements for Future Equity)). The Company shall give the Holder and the Note Agent written notice of any Change of Control at least ten (10) Business Days prior to the consummation thereof, which notice will contain the material terms and conditions (including price and form of consideration) of the Change of Control, the identity of the parties to the Change of Control and the intended date of the Change of Control.

For purposes of this Note, (i) a "***Change of Control***" means, at any time, any Person or "group" other than the Permitted Holders (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act) shall have obtained the power (whether or not exercised) to elect a majority of the members of the board of directors of the Company; (ii) "***Permitted Holders***" means each of BCV 55 LLC, BCV 66 LLC, BCV 77 LLC and each of their respective affiliates; (iii) "***Fair Market Value Per Common Share***" means the cash and/or the value of the property, rights or securities to be paid or distributed per share of Common Stock of the Company to the holders of Common Stock of the Company pursuant to a Change of Control or a SPAC (with the value of such property, rights or securities being determined in good faith by the board of directors of the Company); (iv) the "***Applicable Conversion Price***" means a conversion price equal to (a) 80% of either (x) the cash price paid per share for Equity Securities or Common Stock of the Company (as applicable) by the Investors in an Offering (other than a SPAC) or (y) the Fair Market Value Per Common Share in a Change of Control or a SPAC, as applicable, if the Conversion Event occurs on or prior to April 19, 2022, (b) 75% of either (x) the cash price paid per share for Equity Securities or Common Stock of the Company (as applicable) by the Investors in an Offering (other than a SPAC) or (y) the Fair Market Value Per Common Share in a Change of Control or a SPAC, as applicable, if the Conversion Event occurs on or after April 19, 2022 but prior to April 19, 2023, (c) 70% of either (x) the cash price paid per share for Equity Securities or Common Stock of the Company (as applicable) by the Investors in an Offering (other than a

SPAC) or (y) the Fair Market Value Per Common Share in a Change of Control or a SPAC, as applicable, if the Conversion Event occurs on or after April 19, 2023 but prior to April 19, 2024 and (d) 65% of either (x) the cash price paid per share for Equity Securities or Common Stock of the Company (as applicable) by the Investors in an Offering (other than a SPAC) or (y) the Fair Market Value Per Common Share in a Change of Control or a SPAC, as applicable, if the Conversion Event occurs on or after April 19, 2024 but prior to April 19, 2025; (v) in connection with any SPAC, each reference to "Company" shall be deemed to also refer to a Parent Entity that has become a co-obligor with respect to the Company's Obligations hereunder (except that solely such Parent Entity, and not Core Scientific Holding Co. (or its successor by merger), shall be obligated to deliver Equity Securities or Common Stock pursuant to this <u>Section 2</u>); and (vi) in connection with any SPAC, each reference to "Common Stock" shall be deemed to refer to the kind and the amount of property that a holder of one share of Common Stock of the Company would be entitled to receive on account of the consummation of such SPAC.

(c)     **Procedure for Conversion**. Upon the conversion in whole or in part of this Note into Equity Securities or Common Stock of the Company (as applicable), the Holder shall surrender this Note to the Company and deliver to the Company any documentation reasonably required by the Company (including, in the case of an Offering, all financing documents executed by the Investors in connection with such Offering). The Company shall not be required to issue or deliver the Equity Securities or Common Stock of the Company (as applicable) into which this Note may convert until the Holder has surrendered this Note to the Company and delivered to the Company any such documentation. The Company shall, as soon as practicable after the surrender of this Note and delivery to the Company of such documentation deliver to the Holder (i) a certificate or certificates for the number of shares of Equity Securities or Common Stock of the Company (as applicable) into which this Note is convertible in whole or in part, rounded downward to the nearest whole share and cash for the amounts not so converted as a result of the above-referenced downward rounding, registered in the name of such Investor or registered nominee or assignee and (ii) to the extent the Holder has converted only a portion of the outstanding principal amount of this Note, a replacement Note for the outstanding principal amount of this Note not converted. Upon the conversion in full or in part of this Note into Equity Securities or Common Stock of the Company (as applicable) pursuant to the terms hereof, in lieu of any fractional shares to which the Holder would otherwise be entitled, the Company shall pay the Holder cash equal to such fraction multiplied by the price at which this Note converts. Upon conversion of this Note in full or in part and payment of cash representing any fractional share pursuant to this <u>Section 2(c)</u>, the Company shall be forever released from all its obligations and liabilities under this Note and this Note shall be deemed of no further force or effect, whether or not the original of this Note has been delivered to the Company for cancellation.

(d)     **Taxes**. The Company shall pay any and all stamp, stock transfer, stock issuance and other similar taxes that may be payable in respect of any issuance or delivery of shares of Equity Securities or Common Stock of the Company (as applicable) upon conversion of this Note pursuant to this <u>Section 2</u>. The Company shall not, however, be required to pay any income, capital gains or similar tax of the recipient of Equity Securities or Common Stock of the Company (as applicable) or any tax which may be payable in respect of any transfer involved in the issuance and delivery of shares of Equity Securities or Common Stock of the Company (as applicable) in a name other than that in which this Note so converted was registered, and no such issuance or delivery shall be made unless and until the person or entity requesting such issuance has paid to the Company the amount of any such tax or has established, to the satisfaction of the Company, that such tax has been paid.

3.    **SECURED NOTE.**

Upon the execution and delivery of the Collateral Documents pursuant to Section 6.13 of the Purchase Agreement, this Note shall be secured by a first-priority Lien on the Collateral (subject to Permitted Liens) pursuant to the Security Agreement.

4.    **EVENTS OF DEFAULT.**

If there shall be any Event of Default (as defined below) hereunder, at the option and upon the declaration of the Holders representing at least twenty-five percent (25%) of the aggregate outstanding principal amount of the Notes issued pursuant to the Purchase Agreement at such time and upon written notice to the Company (which election and notice shall not be required in the case of an Event of Default under subsection (v) or (vi) below), this Note shall accelerate and all principal (including all accrued PIK Interest not already added to the principal amount of this Note) and all unpaid accrued Cash Interest shall automatically become immediately due and payable. The occurrence of any one or more of the following shall constitute an "***Event of Default***":

(i)    the Company fails to pay to the Holder (i) the principal of this Note as and when due or (ii) within five (5) Business Days after the same becomes due any Cash Interest on this Note or any fees or any other Obligations;

(ii)    any representation or warranty made or deemed made by or on behalf of the Company or any of its Subsidiaries to the Holder under or in connection with the Note Documents or any certificate or information delivered in connection therewith shall be materially false when made;

(iii)    the Company and its Subsidiaries fail to observe or perform any term, covenant, or provision contained in Section 7 of the Purchase Agreement and such non-observance or non-performance shall not have been remedied or waived within thirty (30) days after the earlier of (i) the Company becoming aware of such non-observance or non-compliance or (ii) receipt by the Company of notice from a Holder of such non-observance or non-compliance;

(iv)    the Company and its Subsidiaries fail to observe or perform any other term, covenant or provision contained in the Purchase Agreement (other than those specified elsewhere in this Section 4) or any other Note Document and such non-observance or non-performance shall not have been remedied or waived within thirty (30) days after the earlier of (i) the Company becoming aware of such non-observance or non-compliance or (ii) receipt by the Company of notice from a Holder of such non-observance or non-compliance;

(v)    the Company or any Material Subsidiary shall (i) apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (ii) admit in writing its inability to pay its debts generally as they mature, (iii) make a general assignment for the benefit of its or any of its creditors, (iv) be dissolved or liquidated, (v) commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, or (vi) take any action for the purpose of effecting any of the foregoing;

(vi)    proceedings for the appointment of a receiver, trustee, liquidator or custodian of the Company or any of its Material Subsidiaries, or of all or a substantial part of the property thereof, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with

6

respect to the Company or any of its Material Subsidiaries, if any, or the debts thereof under any bankruptcy, insolvency or other similar law now or hereafter in effect shall be commenced, or an order for relief shall be entered in any such proceeding, or such proceeding shall not be dismissed or discharged within 60 days of commencement;

(vii)    the Company fails to pay when due any principal of or interest on or any other amount payable in respect of, or breaches or defaults under any other term of, any mortgage, indenture, agreement or other instrument under which there may be outstanding any Indebtedness in an aggregate principal amount of in excess of $10,000,000, in each case, beyond the grace period, if any, if the effect of such non-payment, breach or default is to cause such Indebtedness to become or be declared due and payable (or subject to a compulsory repurchase or redemption) prior to its stated maturity;

(viii)    any court, government, or Governmental Authority shall condemn, seize or otherwise appropriate, or take custody or control of, all or any material portion of the property of the Company and its Subsidiaries, taken as a whole;

(ix)    one or more judgments or orders for the payment of money in excess of $10,000,000 (or the equivalent thereof in currencies other than U.S. dollars) in the aggregate shall be entered or filed against the Company or any of its Subsidiaries and shall remain undischarged, unvacated, unbonded or unstayed for a period of thirty (30) consecutive days;

(x)    (i) the occurrence of a Reportable Event with respect to any Plan, (ii) the filing of a notice of intent to terminate a Plan by the Company, any ERISA Affiliate or any Subsidiary, the institution of proceedings to terminate a Plan by the PBGC or any other Person; (iii) the withdrawal in a "complete withdrawal" or a "partial withdrawal" as defined in Sections 4203 and 4205, respectively, of ERISA by the Company, any ERISA Affiliate or any Subsidiary of the Company from any Multiemployer Plan, (iv) the incurrence of any material increase in the contingent liability of the Company or any of its Subsidiaries with respect to any "employee welfare benefit plan" as defined in Section 3(1) of ERISA which covers retired employees and its beneficiaries or (v) the Unfunded Pension Liabilities of all Single Employer Plans shall exceed (in the aggregate) $10,000,000, in each such case which, either individually or in the aggregate, would be reasonably expected to result in liability to any Note Party in excess of $10,000,000;

(xi)    the institution by the Company, any ERISA Affiliate or any Subsidiary of steps to terminate any Plan if, in order to effectuate such termination, the Company, such ERISA Affiliate or such Subsidiary, as the case may be, would be required to make a contribution to such Plan, or would incur a liability or obligation to such Plan, in excess of $10,000,000, or the institution by the PBGC of steps to terminate any Plan, which would reasonably be expected to result in material liability to any Note Party;

(xii)    the Company or any Material Subsidiary shall (i) be the subject of any proceeding pertaining to the release by the Company, any such Material Subsidiary or any other Person of any Hazardous Material into the environment or (ii) violate any Environmental Law, which, in either case could reasonably be expected to have a Material Adverse Effect;

(xiii)    from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13 of the Purchase Agreement, any Collateral Document shall for any reason fail to create a valid and perfected first priority (subject to any Permitted Liens) security interest in any collateral purported to be covered thereby, except as permitted by the terms of such Collateral Document, or any Collateral Document shall fail to remain in full force or effect (other than in accordance with the terms hereof or thereof) or any action taken by the Company or any Subsidiary shall be taken to discontinue or to assert the invalidity or unenforceability of such Collateral Document;

(xiv)    any intercreditor agreement or subordination agreement relating to any Indebtedness of any Note Party subordinated to the Obligations, or any subordination provisions of any note or other document running to the benefit of the Holders in respect of such Indebtedness, including, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13 of the Purchase Agreement, the Intercreditor Agreement, shall cease for any reason to be in full force and effect other than in accordance with the terms hereof or thereof or any Note Party or any of their Subsidiaries shall so assert in writing; or

(xv)    the Note Parties shall be enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of the business of the Note Parties, taken as a whole.

5.    **MISCELLANEOUS PROVISIONS.**

(a)    **Waivers**. The Company hereby waives demand, notice, presentment, protest and notice of dishonor.

(b)    **Further Assurances**. The Holder agrees and covenants that at any time and from time to time the Holder will promptly execute and deliver to the Company such further instruments and documents and take such further action as the Company may reasonably require in order to carry out the full intent and purpose of this Note and to comply with state or federal securities laws or other regulatory approvals.

(c)    **Transfers of Notes**. Subject to the Company's prior written consent (not to be unreasonably withheld or delayed) and to the extent permitted by applicable law, this Note may be transferred only upon its surrender to the Company for registration of transfer, duly endorsed, or accompanied by a duly executed written instrument of transfer in form satisfactory to the Company. Thereupon, this Note shall be reissued to, and registered in the name of, the transferee, or a new Note for like principal amount and interest shall be issued to, and registered in the name of, the transferee. Interest and principal shall be paid solely to the registered holder of this Note. Such payment shall constitute full discharge of the Company's obligation to pay such interest and principal. Upon the effectiveness of any transfer pursuant to this Section 5(c) the Company shall provide an updated Ledger to the Note Agent. Any transfer of this Note in contravention of this Section 5(c) shall be void and the Company shall be entitled to continue to treat the Holder as the holder of this Note for all purposes under the Note Documents. The Company shall at all times maintain a book-entry system, which shall reflect ownership of this Note and interests therein. This Note is intended to be in "registered form" for United States federal tax purposes.

(d)    **Market Standoff**. To the extent requested by the Company or an underwriter of securities of the Company, each Holder and any permitted transferee thereof shall not, without the prior written consent of the underwriters in an underwritten public offering pursuant to an effective registration statement filed with the Securities and Exchange Commission in accordance with the Act or under equivalent securities laws and regulations of any other jurisdiction, offer, sell, make any short sale of, grant or sell any option for the purchase of, lend, pledge, otherwise transfer or dispose of (directly or indirectly), enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership (whether any such transaction is described above or is to be settled by delivery of Securities or other securities, in cash, or otherwise), any Securities or other shares of stock of the Company then owned by such Holder or any transferee thereof, or enter into an agreement to do any of the foregoing, for up to 180 days following the consummation of any such offering. For purposes of this paragraph, "*Company*" includes the Company or any other direct or indirect parent entity of the Company into which the Company merges or consolidates. The Company may place restrictive legends on the certificates representing the shares subject to this paragraph and may impose stop transfer instructions with

respect to the Securities and such other shares of stock of each Holder and any transferee thereof (and the shares or securities of every other person subject to the foregoing restriction) until the end of such period. Each Holder and any transferee thereof shall enter into any agreement reasonably required by the underwriters for such an offering to implement the foregoing within any reasonable timeframe so requested. The underwriters for any such offering are intended third party beneficiaries of this paragraph and shall have the right, power and authority to enforce the provisions of this paragraph as though they were parties hereto. The provisions of this paragraph shall survive any conversion and/or repayment of this Note.

(e)     **Waiver of Statutory Information Rights**. Prior to the conversion in full of this Note, the Holder, on behalf of the Holder and all beneficial owners of the Securities now or hereafter owned by the Holder (a "***Beneficial Owner***"), acknowledges and agrees that that neither the Holder nor any of the Beneficial Owners will have any right to receive any information from the Company by virtue of ownership of any of the Securities. Without limiting the foregoing, prior to the conversion in full of this Note, to the fullest extent permitted by law, the Holder hereby unconditionally and irrevocably waives all rights under Section 220 of the Delaware General Corporation Law and all such similar information and/or inspection rights that may be provided under the law of any jurisdiction, or any federal, state or foreign regulation, that are, or may become, applicable to the Company or the Company's capital stock (the "***Inspection Rights***") on behalf of the Holder and all Beneficial Owners. The Holder, on behalf of the Holder and all Beneficial Owners, hereby covenants and agrees that neither the Holder nor any Beneficial Owner shall directly or indirectly commence, voluntarily aid in any way, prosecute, assign, transfer, or cause to be commenced any claim, action, cause of action, or other proceeding to pursue or exercise the Inspection Rights. The Holder hereby further warrants and represents that the Holder has reviewed this waiver with its legal counsel, and that the Holder knowingly and voluntarily waives its rights otherwise provided by Section 220 of the Delaware General Corporation Law (or under similar rights under other applicable law). Notwithstanding the foregoing, Beneficial Owners that were issued Equity Securities other than by way of a conversion in connection with an Offering will not be subject to this Section 5(e). The terms of this Section 5(e) shall survive any repayment of this Note.

(f)     **Amendment and Waiver**. This Note and any term hereof may only be amended, waived or modified in accordance with Section 10.9 of the Purchase Agreement. Upon the effectuation of such amendment, waiver or modification with the consent of the Required Holders or each Holder, as applicable, in conformance with Section 10.9 of the Purchase Agreement, such amendment, waiver or modification shall be effective as to, and binding against the Holders of, all of the Notes, and the Company shall promptly give written notice thereof to the Holder if the Holder has not previously consented to such amendment, waiver or modification in writing; provided that the failure to give such notice shall not affect the validity of such amendment, waiver or modification.

(g)     **Binding Agreement**. The terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Note, expressed or implied, is intended to confer upon any third party any rights, remedies, obligations, or liabilities under or by reason of this Note, except as expressly provided in this Note. Notwithstanding any assumption of the Company's Obligations under this Note by a Parent Entity in accordance with Section 10.1 of the Purchase Agreement, Core Scientific Holding Co. (or its successor by merger) shall remain a co-obligor with such Parent Entity with respect to such Obligations (other than any such Obligation of the Company to deliver Equity Securities or Common Stock pursuant to Section 2 of this Note, with respect to which delivery Obligation Core Scientific Holding Co. (or its successor by merger) shall be a Guarantor).

(h)     **Counterparts**. This Note may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract. Any counterpart of a signature page to this Note may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature

complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.

(i)     **Headings; Interpretation**. Paragraph headings used in this Note are included for convenience of reference only and will not modify the provisions that they precede or affect the interpretation of this Note or any other Note Document. The term "including" shall be interpreted to mean "including but not limited to".

(j)     **Notices**. All communications and notices required or permitted to be given hereunder shall be delivered in accordance with Section 10.8 of the Purchase Agreement.

(k)     **GOVERNING LAW.** THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.

(l)     **Expenses, Etc**. This Note is subject to the provisions of Section 10.3 (Jurisdiction and Venue), Section 10.4 (Waiver of Jury Trial) and Section 10.10 (Expenses and Indemnification) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*.

(m)     **Delays or Omissions**. It is agreed that no delay or omission to exercise any right, power or remedy accruing to each Holder, upon any breach or default of the Company under this Note or any Note shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. It is further agreed that any waiver, permit, consent or approval of any kind or character by a Holder of any breach or default under this Note, or any waiver by such Holder of any provisions or conditions of this Note must be in writing and shall be effective only to the extent specifically set forth in writing and that all remedies, either under this Note, or by law or otherwise afforded to such Holder, shall be cumulative and not alternative.

(n)     **Entire Agreement**. This Note and the other Note Documents constitute the entire contract among the parties hereto regarding to the subject matters addressed herein and supersede any and all previous agreements, negotiations, and discussions, oral or written, by the parties regarding the subject matters addressed herein.

(o)     **Exculpation among Holders**. The Holder acknowledges that the Holder is not relying on any person, firm or corporation, other than the Company and its officers and board members, in making its investment or decision to invest in the Company.

(p)     **Broker's Fees**. Each party hereto represents and warrants that no agent, broker, investment banker, person or firm acting on behalf of or under the authority of such party hereto is or will be entitled to any broker's or finder's fee or any other commission directly or indirectly in connection with the transactions contemplated herein. Each party hereto further agrees to indemnify each other party for any claims, losses or expenses incurred by such other party as a result of the representation in this subsection being untrue.

(q)     **Repayment Amounts**. The parties hereto hereby acknowledge and agree that

payment of any Repayment Amount hereunder constitutes liquidated damages and not a penalty, the actual amount of damages to the Holder or profits lost by the Holder as a result of a prepayment or conversion of this Note would be impracticable and extremely difficult to ascertain and the Repayment Amount hereunder is part of an arm's length transaction between sophisticated parties represented by counsel and is bargained for consideration provided for and agreed to by mutual agreement of the Company and the Holder. THE NOTE PARTIES EXPRESSLY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE REPAYMENT AMOUNT TO THE EXTENT SUCH REPAYMENT AMOUNT IS DUE AND PAYABLE IN ACCORDANCE WITH THIS NOTE. The Note Parties expressly agree that: (i) the Repayment Amount shall be payable notwithstanding the then prevailing market rates at the time payment is made; (ii) the Note Parties shall be estopped hereafter from claiming differently than as agreed to in this paragraph; and (iii) their agreement to pay the Repayment Amount is a material inducement to the Holder to purchase the Note.

(r) **Tax Forms**. Prior to the date hereof, the Holder (and, in the event any Person becomes an assignee or participant in respect of this Note, prior to the date such Person becomes such an assignee or participant) shall have delivered to the Company executed copies of Internal Revenue Service ("***IRS***") Form W-9 or appropriate IRS Form W-8, as applicable, as well as any reasonably necessary supporting information, certifying that any payments to such Holder (or assignee or participant) under this Note are exempt from U.S. federal withholding tax. The Holder (and assignee or participant) further agrees that if any such form or certification expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Company in writing of its legal inability to do so.

(s) **Calculations**. The Company shall be responsible for making all calculations with respect to this Note, including, without limitation, accrued interest (including PIK Interest), the Fair Market Value Per Common Share and the Applicable Conversion Price and shall forward such calculations to the Agents and the Holder upon request.

*[Signature pages follow]*

11

**IN WITNESS WHEREOF**, the parties hereto have executed this Note as of the date first written above.

**COMPANY:**

**CORE SCIENTIFIC HOLDING CO.**

By: _____

     Name:
     Title:

E-mail:     _____

Address:

[Signature Page to Core Scientific Holding Co. Convertible Promissory Note]

**HOLDER (if an entity):**

Name of Holder: _____

By: _____

Name: _____
Title: _____

<u>E-mail</u>: _____

<u>Address</u>: _____
_____
_____

**HOLDER (if an individual):**

Name of Holder: _____

Signature: _____

<u>E-mail</u>: _____

<u>Address</u>: _____
_____
_____

[Signature Page to Core Scientific Holding Co. Convertible Promissory Note]

**EXHIBIT B**

**FORM OF COUNTERPART SIGNATURE PAGE**

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

[                    ]

By:_____
Name:
Title:

**EXHIBIT C**

**FORM OF GUARANTY**

**(see attached)**

<div align="center">

**GUARANTY**

</div>

**THIS GUARANTY** (this "*Agreement*"), dated as of August 20, 2021, is made by and among each guarantor executing a signature page hereto and each Additional Guarantor (as defined below) that becomes a party hereto pursuant to Section 15 (each, a "*Guarantor*" and collectively, the "*Guarantors*") and U.S. Bank National Association, as note agent for the Guaranteed Parties referred to below (the "*Note Agent*") and Collateral Agent for the Secured Parties (when applicable).

<div align="center">

**RECITALS**

</div>

**WHEREAS**, the Guarantors entered into that certain Convertible Note Purchase Agreement, dated as of the date hereof (as amended, restated, supplemented and/or otherwise modified from time to time, the "*Purchase Agreement*"; capitalized terms used but not defined herein having the meanings ascribed thereto therein), by and among Core Scientific Holding Co., a Delaware corporation, the Guarantors party thereto, each Purchaser party thereto and the Note Agent; and

**WHEREAS**, to induce the Purchasers to purchase the Notes, the Guarantors have agreed to enter into this Agreement.

<div align="center">

**AGREEMENT**

</div>

**NOW, THEREFORE**, in consideration of the foregoing, and the representations, warranties and conditions set forth herein, the parties hereto, intending to be legally bound, hereby agree as follows:

1.     **Defined Terms.**

"*Additional Guarantor*" has the meaning assigned to such term in Section 15.

"*Aggregate Payments*" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (1) the aggregate amount of all payments and distributions made on or before such date by such Contributing Guarantor in respect of this Agreement (including in respect of Section 3), minus (2) the aggregate amount of all payments received on or before such date by such Contributing Guarantor from the other Contributing Guarantors as contributions under Section 3.

"*Bankruptcy Code*" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"*Commodity Exchange Act*" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended and in effect from time to time, and any successor statute.

"*Contributing Guarantors*" has the meaning assigned to such term in Section 3.

"*Fair Share*" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Fair Share Contribution Amount with respect to such Contributing Guarantor to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Contributing Guarantors *multiplied* by (b) the aggregate amount paid or distributed on or before such date by all Funding Guarantors under this Agreement in respect of the obligations guaranteed.

"*Fair Share Contribution Amount*" means, with respect to a Contributing Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Contributing Guarantor under this Agreement that would not render its obligations hereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Bankruptcy Code or any comparable

applicable provisions of state law; *provided*, solely for purposes of calculating the "Fair Share Contribution Amount" with respect to any Contributing Guarantor for purposes of Section 3, any assets or liabilities of such Contributing Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Contributing Guarantor.

"***Funding Guarantors***" has the meaning assigned to such term in Section 3.

"***Guaranteed Obligations***" has the meaning assigned to such term in Section 2.

"***Guaranteed Parties***" means the Purchasers, the Holders, the Agents, and their respective successors and permitted assigns.

"***Guarantor***" has the meaning assigned to such term in the preamble to this Agreement.

"***Qualified ECP Guarantor***" means, in respect of any Swap Obligation, each Note Party that has total assets exceeding Ten Million Dollars ($10,000,000.00) at the time the relevant Guarantee or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another Person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"***Swap Obligation***" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

**2.**     **Guaranty of the Obligations**.  The Guarantors jointly and severally hereby irrevocably and unconditionally guaranty to the Agent, for the ratable benefit of the Guaranteed Parties, the due and punctual payment and performance in full of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)) (collectively, the "***Guaranteed Obligations***").

**3.**     **Contribution by Guarantors**.  All Guarantors desire to allocate among themselves (collectively, the "***Contributing Guarantors***"), in a fair and equitable manner, their obligations arising under this Agreement.  Accordingly, in the event any payment or distribution is made on any date by a Guarantor (a "***Funding Guarantor***") under this Agreement such that its Aggregate Payments exceeds its Fair Share as of such date, such Funding Guarantor shall be entitled to a contribution from each of the other Contributing Guarantors in an amount sufficient to cause each Contributing Guarantor's Aggregate Payments to equal its Fair Share as of such date.  The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Funding Guarantor.  The allocation among Contributing Guarantors of their obligations as set forth in this Section 3 shall not be construed in any way to limit the liability of any Contributing Guarantor hereunder.  Each Guarantor is a third-party beneficiary to the contribution agreement set forth in this Section 3.

**4.**     **Payment by Guarantors**. The Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Guaranteed Party may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of the Company to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)), the Guarantors will upon demand pay, or cause to be paid, in cash, to the Note Agent for the ratable benefit of

the Guaranteed Parties, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for the Company's becoming the subject of a case under the Bankruptcy Code, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against the Company for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to the Guaranteed Parties as aforesaid.

**5.   Liability of Guarantors Absolute**.   Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations.  In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a)      this Agreement is a guaranty of payment when due and not of collectability; this Agreement is a primary obligation of each Guarantor and not merely a contract of surety;

(b)      the Note Agent may enforce this Agreement upon the occurrence of an Event of Default notwithstanding the existence of any dispute between the Company and any Guaranteed Party with respect to the existence of such Event of Default;

(c)      the obligations of each Guarantor hereunder are independent of the obligations of the Company and the obligations of any other guarantor (including any other Guarantor) of the obligations of the Company, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against the Company or any of such other guarantors and whether or not the Company is joined in any such action or actions;

(d)      payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid; <u>provided</u> that, without limiting the generality of the foregoing, if the Note Agent is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(e)      any Guaranteed Party, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for the benefit of such Guaranteed Party in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Guaranteed Party may have against any such security, in each case as such Guaranteed Party in its discretion may determine consistent herewith and any applicable security

3

agreement, including foreclosure on any such security pursuant to one or more judicial or non-judicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against the Company or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Note Documents; and

(f)     this Agreement and the obligations of the Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full of the Guaranteed Obligations), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Note Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to Events of Default) hereof, any of the other Note Documents or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Note Document or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Note Documents or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though any Guaranteed Party might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) any Guaranteed Party's consent to the change, reorganization or termination of the corporate structure or existence of the Company or any of its Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations; (vii) any defenses, set offs or counterclaims which the Company may allege or assert against any Guaranteed Party in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

**6.     Waivers by Guarantors**. Each Guarantor hereby waives, for the benefit of the Guaranteed Parties: (a) any right to require any Guaranteed Party, as a condition of payment or performance by such Guarantor, to (i) proceed against the Company, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from the Company, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any deposit account or credit on the books of any Guaranteed Party in favor of the Company or any other Person, or (iv) pursue any other remedy in the power of any Guaranteed Party whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of the Company or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of the Company or any other Guarantor from any cause other than payment in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Guaranteed Party's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to gross negligence or willful misconduct; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the

4

terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Guaranteed Party protect, secure, perfect or insure any security interest or Lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to the Company and notices of any of the matters referred to in <u>Section 5</u> and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

7.      **Guarantors' Rights of Subrogation, Contribution, etc.**  Until the Guaranteed Obligations shall have been indefeasibly paid in full (other than contingent obligations as to which no demand has been made or claim asserted), each Guarantor hereby waives any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against the Company or any other Guarantor or any of its assets in connection with this Agreement or the performance by such Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including (a) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter have against the Company with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that any Guaranteed Party now has or may hereafter have against the Company, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by any Guaranteed Party.  In addition, until the Guaranteed Obligations shall have been indefeasibly paid in full (other than contingent obligations as to which no demand has been made or claim asserted), each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guaranteed Obligations, including any such right of contribution as contemplated by <u>Section 3</u>.  Each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against the Company or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights any Guaranteed Party may have against the Company, to all right, title and interest any Guaranteed Party may have in any such collateral or security, and to any right any Guaranteed Party may have against such other guarantor.  If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations shall not have been finally and indefeasibly paid in full (other than contingent obligations as to which no demand has been made or claim asserted), such amount shall be held in trust for the Note Agent on behalf of the Guaranteed Parties and shall forthwith be paid over to the Note Agent for the benefit of the Guaranteed Parties to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

8.      **Subordination of Other Obligations**.  Any Indebtedness of the Company or any Guarantor now or hereafter held by any Guarantor (the "***Obligee Guarantor***") is hereby subordinated in right of payment to the Guaranteed Obligations, and any such indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust for the Note Agent on behalf of the Guaranteed Parties and shall forthwith be paid over to the Note Agent for the benefit of the Guaranteed Parties to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

**9.     Continuing Guaranty**.  This Agreement is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations shall have been indefeasibly paid in full (other than contingent obligations as to which no demand has been made or claim asserted).  Each Guarantor hereby irrevocably waives any right to revoke this Agreement as to future transactions giving rise to any Guaranteed Obligations.

**10.     Authority of the Guarantors or the Company**.  It is not necessary for any Guaranteed Party to inquire into the capacity or powers of any Guarantor or the Company or the officers, directors or any agents acting or purporting to act on behalf of any of them.

**11.     Financial Condition of the Company**.  Any Notes may be issued to the Company without notice to or authorization from any Guarantor regardless of the financial or other condition of the Company at the time of any such grant or continuation.  No Guaranteed Party shall have any obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of the Company.  Each Guarantor has adequate means to obtain information from the Company on a continuing basis concerning the financial condition of the Company and its ability to perform its obligations under the Note Documents and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of the Company and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations.  Each Guarantor hereby waives and relinquishes any duty on the part of any Guaranteed Party to disclose any matter, fact or thing relating to the business, operations or conditions of the Company now known or hereafter known by any Guaranteed Party.

**12.     Bankruptcy, etc.**

         (a)     So long as any Guaranteed Obligations remain outstanding, no Guarantor shall, without the prior written consent of the Note Agent acting pursuant to the instructions of Required Holders, commence or join with any other Person in commencing any bankruptcy, reorganization or insolvency case or proceeding of or against the Company or any other Guarantor.  The obligations of the Guarantors hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by any case or proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of the Company or any other Guarantor or by any defense which the Company or any other Guarantor may have by reason of the order, decree or decision of any court or administrative body resulting from any such proceeding.

         (b)     Each Guarantor acknowledges and agrees that any interest on any portion of the Guaranteed Obligations which accrues after the commencement of any case or proceeding referred to in clause (a) above (or, if interest on any portion of the Guaranteed Obligations ceases to accrue by operation of law by reason of the commencement of such case or proceeding, such interest as would have accrued on such portion of the Guaranteed Obligations if such case or proceeding had not been commenced) shall be included in the Guaranteed Obligations because it is the intention of the Guarantors and the Guaranteed Parties that the Guaranteed Obligations which are guaranteed by the Guarantors pursuant hereto should be determined without regard to any rule of law or order which may relieve the Company of any portion of such Guaranteed Obligations.  The Guarantors will permit any trustee in bankruptcy, receiver, debtor in possession, assignee for the benefit of creditors or similar person to pay Agent, or allow the claim of the Note Agent in respect of, any such interest accruing after the date on which such case or proceeding is commenced.

         (c)     In the event that all or any portion of the Guaranteed Obligations are paid by the Company, the obligations of the Guarantors hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from any Guaranteed Party as a preference, fraudulent transfer or otherwise,

and any such payments which are so rescinded or recovered shall constitute Guaranteed Obligations for all purposes hereunder.

**13.      Discharge of Guaranty Upon Sale of a Guarantor**.  If all of the Capital Stock of any Guarantor or any of its successors in interest hereunder shall be sold or otherwise disposed of (including by merger or consolidation) in accordance with the terms and conditions of the Note Documents, the Guaranty of such Guarantor or such successor in interest, as the case may be, hereunder shall automatically be discharged and released without any further action by any Guaranteed Party or any other Person effective as of the time of such Asset Disposition.

**14.      Keepwell**.  Each Qualified ECP Guarantor hereby, jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Note Party to honor all of its obligations under this Agreement in respect of Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 14 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 14, or otherwise under this Agreement, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  The obligations of each Qualified ECP Guarantor under this Section 14 shall remain in full force and effect until all of the Guaranteed Obligations (other than contingent indemnity Obligations for which no claim has been asserted) shall have been paid in full.  Each Qualified ECP Guarantor intends that this Section 14 constitute, and this Section 14 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Note Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

**15.      Additional Guarantors.**  Each Subsidiary of the Company that is required to become a Guarantor pursuant to Section 6.10 of Purchase Agreement will become a Guarantor (each an "***Additional Guarantor***"), with the same force and effect as if such Subsidiary were originally named as a Guarantor herein, for all purposes of this Agreement upon the execution and delivery by such Subsidiary of a supplement to this Agreement substantially in the form of the supplement attached hereto as Exhibit A (each a "***Guaranty Supplement***").  Each reference to "Guarantor" (or any words of like import referring to a Guarantor) in this Agreement or any other Note Document shall also mean the Additional Guarantor and each reference in this Agreement or any other Note Document to this "Guaranty" (or words of like import referring to this Agreement) shall mean this Agreement, as supplemented by each Guaranty Supplement. No consent of any other Guarantor hereunder will be required for the execution and delivery of any Guaranty Supplement.  The rights and obligations of each Guarantor hereunder shall remain in full force and effect notwithstanding the addition of any Additional Guarantor as a party to this Agreement.

**16.      Severability**.  If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith.  In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (a) such provision shall be excluded from this Agreement, (b) the balance of this Agreement shall be interpreted as if such provision were so excluded, and (c) the balance of this Agreement shall be enforceable in accordance with its terms.

**17.      Waiver and Amendment; Entire Agreement**.  Any provision of this Agreement may be amended, waived or modified only by an instrument signed in writing by the Guarantors and the Note Agent (with the consent of any Guaranteed Party as required by Section 10.9 of the Purchase Agreement).  This Agreement and the other Note Documents constitute the entire contract among the parties hereto regarding to the subject matters addressed herein and supersede any and all previous agreements, negotiations, and discussions, oral or written, by the parties regarding the subject matters addressed herein.

18.     **Successors and Assigns**.  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties.  Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

19.     **GOVERNING LAW**.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.

20.     **Jurisdiction and Venue; Waiver of Jury Trial; Expenses and Indemnification**.  This Agreement is subject to the provisions of Section 10.3 (Jurisdiction and Venue), Section 10.4 (Waiver of Jury Trial) and Section 10.10(a) (Expenses and Indemnification) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*.

21.     **Notices**.  All communications and notices required or permitted to be given hereunder shall be delivered in accordance with Section 10.8 of the Purchase Agreement.

22.     **Headings; Interpretation**.  Paragraph headings used in this Agreement are included for convenience of reference only and will not modify the provisions that they precede or affect the interpretation of this Agreement or any other Note Document.  The term "including" shall be interpreted to mean "including but not limited to".

23.     **Counterparts**.  This Agreement may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract.  Any counterpart of a signature page to this Agreement may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.

24.     **Concerning the Agent**.  U.S. Bank National Association is entering into this Agreement solely in its capacity as Note Agent and Collateral Agent (when applicable) under the Purchase Agreement and shall be entitled to all of the rights, privileges and immunities of the Note Agent and Collateral Agent (when applicable) in acting hereunder.

25.     **Security**.  The parties hereto acknowledge that, upon delivery of the Collateral Documents required by Section 6.13 of Purchase Agreement, the Guaranteed Obligations shall be secured by a first priority Lien on the Collateral (subject to terms contained in such Collateral Documents).

*[Signature pages follow]*

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first written above.

**CORE SCIENTIFIC, INC.,** a Delaware corporation

By:_____
Name:  Michael Trzupek
Title:    Chief Executive Officer


**AMERICAN PROPERTY ACQUISITION, LLC,** a Delaware limited liability company

By: Core Scientific, Inc., its sole member

By:_____
Name:  Michael Trzupek
Title:    Chief Executive Officer


**AMERICAN PROPERTY ACQUISITIONS I, LLC,** a North Carolina limited liability company

By: American Property Acquisition, LLC, its sole member

By:  Core Scientific, Inc., its sole member

By:_____
Name:  Michael Trzupek
Title:    Chief Executive Officer

[Signature Page to Guaranty]

**AMERICAN PROPERTY ACQUISITIONS VII, LLC,** a Georgia limited liability company

By: American Property Acquisition, LLC, its sole member

By: Core Scientific, Inc., its sole member

By:_____
Name:  Michael Trzupek
Title:    Chief Executive Officer

**BLOCKCAP, INC.,** a Nevada corporation

By:_____
Name:  Todd DuChene
Title:    Secretary

254153973 v5

**NOTE AGENT AND COLLATERAL AGENT**:

**U.S. BANK NATIONAL ASSOCIATION**


By: _____
Name:
Title:

Exhibit A to
Guaranty Agreement

## FORM OF GUARANTY SUPPLEMENT

THIS G U A R A N T Y  SUPPLEMENT (this "**Supplement**"), dated as of [__], is entered into by and between [__] (the "**New Guarantor**") and U.S. BANK, NATIONAL ASSOCIATION, as note agent (in such capacity, the "**Agent**") under that certain Guaranty, dated as of August 20, 2021, by and among Core Scientific, Inc., American Property Acquisition, LLC, American Property Acquisitions I, LLC, American Property Acquisitions VII, LLC, each other Guarantor from time to time party thereto and the Note Agent (the "**Guaranty**").  Capitalized terms used but not defined herein shall have the meanings given to them in the Guaranty.

The New Guarantor and the Agent, for the benefit of the Guaranteed Parties, hereby agree as follows:

The New Guarantor hereby acknowledges, agrees and confirms that, by its execution of this Supplement, the New Guarantor will be deemed to be a "Guarantor" under the Guaranty for all purposes of the Guaranty and shall have all of the obligations of a Guarantor thereunder as if it had executed the Guaranty.  The New Guarantor hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Guaranty.

This Supplement is subject to the provisions of <u>Section 10.2</u> (Governing Law), <u>Section 10.3</u> (Jurisdiction and Venue) and <u>Section 10.4</u> (Waiver of Jury Trial) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*.

This Supplement may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract.  Any counterpart of a signature page to this Supplement may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.

U.S. Bank National Association is entering into this Supplements solely in its capacity as Note Agent and shall be entitled to all of the rights, privileges and immunities of the Note Agent under the Purchase Agreement in acting hereunder.

[*Signature page follows*]

Exhibit A to
Guaranty Agreement

**IN WITNESS WHEREOF**, the parties hereto have executed this Supplement as of the date first written above.

**[NEW GUARANTOR]**

By:_____
Name:
Title:

Acknowledged and accepted:

**AGENT**:

**U.S. BANK NATIONAL ASSOCIATION,**
as Note Agent [and Collateral Agent]

By: **_____**
Name:
Title:

**EXHIBIT D**

**FORM OF SECURITY AGREEMENT**

**(see attached)**

## [FORM OF] SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** (this "***Agreement***"), dated as of [__], is made by and among each Grantor executing a signature page hereto and each Additional Grantor (as defined below) that may become a party hereto pursuant to Section 5.8(b) (each, a "***Grantor***" and collectively, the "***Grantors***"), in favor of U.S. Bank National Association, in its capacity as collateral agent on behalf of the Secured Parties (the "***Collateral Agent***").

## RECITALS

**WHEREAS**, the Grantors entered into that certain Convertible Note Purchase Agreement, dated as of August 20, 2021 (as amended, restated, supplemented and/or otherwise modified from time to time, the "***Purchase Agreement***"), by and among the Grantors, each Purchaser party thereto and U.S. Bank National Association, as Note Agent and, upon the execution and delivery of the Collateral Documents pursuant to Section 6.13, as Collateral Agent for the Secured Parties;

**WHEREAS**, pursuant to the Purchase Agreement, each Purchaser has been issued by the Company one or more Notes (as defined in the Purchase Agreement), which are part of a series of Notes issued by the Company, in an aggregate principal amount of up to $300,000,000.00; and

**WHEREAS**, as continuing collateral security for the Obligations of the Company under the Purchase Agreement and the Guaranteed Obligations of the Guarantors under the Guaranty, the Grantors have agreed to enter into this Security Agreement, in favor of the Collateral Agent, for purposes of granting to the Collateral Agent, for the benefit of the Secured Parties, a security interest in the Grantors' assets, on the terms and subject to the conditions set forth therein.

## AGREEMENT

**NOW THEREFORE**, in consideration of the foregoing, and the representations, warranties and conditions set forth herein, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      **DEFINED TERMS**.  When used in this Agreement the following terms shall have the meanings set forth below (such meanings being equally applicable to both the singular and plural forms of the terms defined).  Any term used in the UCC and not defined herein shall have the meaning given to such term in the UCC and any capitalized term used but not otherwise defined herein shall have the meaning given to such term in the Notes or the Purchase Agreement, as applicable.

"***Additional Grantors***" shall have the meaning assigned in Section 5.8(b).

"***CFC***" shall mean a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"***CFC Holdco***" shall mean a Subsidiary of the Company that has no material assets other than Capital Stock (or Capital Stock and Indebtedness) of one or more direct or indirect Foreign Subsidiaries of the Company that are CFCs.

"***Collateral***" shall have the meaning assigned to such term in Section 2 of this Agreement.

"***Contracts***" means all contracts (including any customer, vendor, supplier, service or maintenance contract), personal property leases, licenses, undertakings, purchase orders, permits, franchise agreements or other agreements (other than any right evidenced by Chattel Paper, Documents or

Instruments), whether in written or electronic form, in or under which the Grantors now hold or hereafter acquire any right, title or interest, including, without limitation, with respect to an Account, any agreement relating to the terms of payment or the terms of performance thereof, and all assignments, amendments, restatements, supplements, extensions, renewals, replacements or modifications of the Contracts.

"*Copyright License*" means any agreement, whether in written or electronic form, in which the Grantors now hold or hereafter acquire any interest, granting any right in or to any Copyright or Copyright registration (whether the Grantors are the licensee or the licensor thereunder) including, without limitation, licenses pursuant to which the Grantors have obtained the exclusive right to use a copyright owned by a third party.

"*Copyrights*" means all of the following now owned or hereafter acquired or created (as a work for hire for the benefit of the Grantors) by the Grantors or in which the Grantors now hold or hereafter acquire or receive any right or interest, in whole or in part: (a) all copyrights, (statutory or common law, whether established or registered in the United States or any other country or any political subdivision thereof, whether registered or unregistered and whether published or unpublished), held pursuant to the laws of the United States, any State thereof or any other country; (b) registrations, applications, recordings and proceedings in the United States Copyright Office or in any similar office or agency of the United States, any State thereof or any other country; (c) any continuations, renewals or extensions thereof; (d) any registrations to be issued in any pending applications, and shall include any right or interest in and to work protectable by any of the foregoing which are presently or in the future owned, created or authorized (as a work for hire for the benefit of the Grantors) or acquired by the Grantors, in whole or in part; (e) prior versions of works covered by copyright and all works based upon, derived from or incorporating such works; (f) income, royalties, damages, claims and payments now and hereafter due and/or payable with respect to copyrights, including, without limitation, damages, claims and recoveries for past, present or future infringement; (g) rights to sue for past, present and future infringements of any copyright; and (h) any other rights corresponding to any of the foregoing rights throughout the world.

"*Excluded Account*" means any Account (including, for the avoidance of doubt, any cash, cash equivalents or other property contained therein) to the extent, and for so long as, such Account is pledged to secure (i) performance of tenders, bids, leases, statutory or regulatory obligations, surety and appeal bonds, government contracts, performance and return-of-money bonds, and other obligations of like nature, in each case, in the ordinary course of business or (ii) liability for reimbursement or indemnification obligations in respect of letters of credit or bank guarantees for the benefit of landlords, in each case whether such pledge is by escrow or otherwise.

"*Excluded Property*" means, collectively, (i) Excluded Accounts (and any assets contained therein), (ii) the Capital Stock of any Subsidiary that is a CFC or CFC Holdco, other than 65.00% of the total outstanding voting Capital Stock and 100.00% of the total outstanding nonvoting Capital Stock of a CFC or a CFC Holdco that, in each case, is directly owned by a Grantor, (iii) "intent-to-use" trademarks at all times prior to the first use thereof, whether by the actual use thereof in commerce, the recording of a statement of use with the United States Patent and Trademark Office or otherwise, (iv) any property, right or asset held by the Grantors or any Subsidiary to the extent that a grant of a security interest therein is prohibited by any Requirements of Law of a Governmental Authority or constitutes a breach or default under or results in the termination of or requires any consent not obtained under, any contract, license, agreement, instrument or other document evidencing or giving rise to such property, except (A) to the extent that the terms in such contract, license, instrument or other document providing for such prohibition, breach, default or termination, or requiring such consent are not permitted under this Agreement or (B) to the extent that such Requirements of Law or the term in such contract, license, agreement, instrument or other document providing for such prohibition, breach, default or termination or

2

requiring such consent is ineffective under Section 9406, 9407, 9408 or 9409 of the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law (including the Bankruptcy Code of the United States) or principles of equity; provided, however, that such security interest shall attach immediately at such time as such Requirements of Law is not effective or applicable, or such prohibition, breach, default or termination is no longer applicable or is waived, and to the extent severable, shall attach immediately to any portion of the Collateral that does not result in such consequences; and (v) any assets securing Indebtedness (including Capital Lease Obligations) incurred to finance the acquisition of any fixed or capital assets (including any real property assets) so long as a security interest therein only encumbers the assets so acquired or financed with the proceeds of such Indebtedness.

"**Foreign Subsidiary**" means any Subsidiary other than a Subsidiary organized under the laws of any state within the United States.

"**Intellectual Property License**" means, collectively with respect to the Grantors, any Copyright License, Patent License, Trademark License or other license of rights or interests, whether in-bound or out-bound, whether in written or electronic form, now or hereafter owned or acquired or received by the Grantors or in which the Grantors now hold or hereafter acquire or receives any right or interest, and shall include any renewals or extensions of any of the foregoing thereof.

"**Investment Property**" shall mean, collectively, (a) all "investment property" as such term is defined in Section 9-102(a)(49) of the UCC and (b) whether or not constituting "investment property" as so defined, all Pledged Stock.

"**Issuers**" shall mean, collectively, each issuer of any Investment Property.

"**Patent License**" means any agreement, whether in written or electronic form, in which the Grantors now hold or hereafter acquire any interest, granting any right with respect to any invention on which a Patent is in existence (whether the Grantors are the licensee or the licensor thereunder).

"**Patents**" means all of the following in which the Grantors now hold or hereafter acquire any interest: (a) all letters patent of the United States or any other country, all registrations and recordings thereof and all applications for letters patent of the United States or any other country, including, without limitation, registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country; (b) all reissues, divisions, continuations, renewals, continuations-in-part or extensions thereof; (c) all petty patents, divisionals and patents of addition; (d) all patents to issue in any such applications; (e) income, royalties, damages, claims and payments now and hereafter due and/or payable with respect to patents, including, without limitation, damages, claims and recoveries for past, present or future infringement; and (f) rights to sue for past, present and future infringements of any patent.

"**Pledged Stock**" shall mean all shares of Capital Stock, together with any other shares, stock certificates, options, interests or rights of any nature whatsoever in respect of the Capital Stock of any Person that may be issued or granted to, or held by, any Grantor while this Agreement is in effect.

"**Trademark License**" means any agreement, whether in written or electronic form, in which the Grantors now hold or hereafter acquire any interest, granting any right in and to any Trademark or Trademark registration (whether the Grantors are the licensee or the licensor thereunder).

"**Trademarks**" means any of the following in which the Grantors now hold or hereafter acquire any interest: (a) any trademarks, tradenames, corporate names, company names, business names, uniform

3

resource locators (URL's), domain names, trade styles, service marks, logos, other source or business identifiers, prints and labels on which any of the foregoing have appeared or appear, designs and general intangibles of like nature, now existing or hereafter adopted or acquired, all registrations and recordings thereof and any applications in connection therewith, including, without limitation, registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country (collectively, the "*Marks*"); (b) any reissues, extensions or renewals thereof; (c) the goodwill of the business symbolized by or associated with the Marks; (d) income, royalties, damages, claims and payments now and hereafter due and/or payable with respect to the Marks, including, without limitation, damages, claims and recoveries for past, present or future infringement; and (e) rights to sue for past, present and future infringements of the Marks.

**2.**      **GRANT OF SECURITY INTEREST**.  As collateral security for the full, prompt, complete and final payment and performance when due (whether at stated maturity, by acceleration or otherwise) of all the Obligations and in order to induce the Holders to purchase the Notes, each Grantor hereby assigns, conveys, mortgages, pledges, hypothecates and transfers to the Collateral Agent, on behalf of the Secured Parties, and hereby grants to the Collateral Agent, on behalf of the Secured Parties, a security interest in all of such Grantor's right, title and interest in, to and under the following, whether now owned or hereafter acquired (all of which being collectively referred to herein as the "*Collateral*"):

>        (a)      All Accounts of the Grantors;

>        (b)      All Chattel Paper of the Grantors;

>        (c)      The Commercial Tort Claims of the Grantors;

>        (d)      All Commodity Accounts of the Grantors;

>        (e)      All Contracts of the Grantors;

>        (f)      All Deposit Accounts of the Grantors;

>        (g)      All Documents of the Grantors;

>        (h)      All General Intangibles of the Grantors, including, without limitation, Intellectual Property;

>        (i)      All Goods of the Grantors**,** including, without limitation, Equipment, Inventory and Fixtures;

>        (j)      All Instruments of the Grantors, including, without limitation, Promissory Notes;

>        (k)      All Investment Property of the Grantors;

>        (l)      All Letter-of-Credit Rights and Letters of Credit of the Grantors;

>        (m)      All Money of the Grantors;

>        (n)      All Securities Accounts of the Grantors;

>        (o)      All Supporting Obligations of the Grantors;

4

(p)     All property of the Grantors held by any Secured Party, or any other party for whom any Secured Party is acting as agent, including, without limitation, all property of every description now or hereafter in the possession or custody of or in transit to any Secured Party or such other party for any purpose, including, without limitation, safekeeping, collection or pledge, for the account of the Grantors, or as to which the Grantors may have any right or power;

(q)     All other goods and personal property of the Grantors, wherever located, whether tangible or intangible, and whether now owned or hereafter acquired, existing, leased or consigned by or to the Grantors; and

(r)     To the extent not otherwise included, all Proceeds of each of the foregoing and all accessions to, substitutions and replacements for and rents, profits and products of each of the foregoing.

Notwithstanding the foregoing provisions of this <u>Section 2</u>, the grant, assignment and transfer of a security interest as provided herein shall not extend to, and the term "Collateral" shall not include any Excluded Property.

3.      RIGHTS OF SECURED PARTIES; COLLECTION OF ACCOUNTS.

(a)     Notwithstanding anything contained in this Agreement to the contrary, each Grantor expressly agrees that it shall remain liable under each of its Contracts, Chattel Paper, Documents, Instruments and Intellectual Property to observe and perform all the conditions and obligations to be observed and performed by it thereunder and that it shall perform all of its duties and obligations thereunder, all in accordance with and pursuant to the terms and provisions of each such Contract, Chattel Paper, Document, Instrument, and Intellectual Property.  The Secured Parties and the Collateral Agent shall not have any obligation or liability under any such Contract, Chattel Paper, Document, Instrument, or Intellectual Property by reason of or arising out of this Agreement or the granting to the Collateral Agent of a Lien therein or the receipt by any Secured Party or the Collateral Agent of any payment relating to any such Contract, Chattel Paper, Document, Instrument, or Intellectual Property pursuant hereto, nor shall any Secured Party or the Collateral Agent be required or obligated in any manner to perform or fulfill any of the obligations of the Grantors under or pursuant to any such Contract, Chattel Paper, Document, Instrument, or Intellectual Property, or to make any payment, or to make any inquiry as to the nature or the sufficiency of any payment received by it or the sufficiency of any performance by any party under any such Contract, Chattel Paper, Document, Instrument, or Intellectual Property, or to present or file any claim, or to take any action to collect or enforce any performance or the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

(b)     Upon the occurrence and during the continuance of any Event of Default, the Collateral Agent authorizes each Grantor to collect its Accounts and, at the request of the Collateral Agent (at the direction of the Required Holders), such Grantor shall deliver all original and other documents evidencing and relating to the performance of labor or service which created such Accounts, including, without limitation, all original orders, invoices and shipping receipts.

(c)     The Collateral Agent may at any time, upon the occurrence and during the continuance of any Event of Default, notify Account Debtors of the Grantors, parties to the Contracts of the Grantors, obligors in respect of Instruments of the Grantors, and obligors in respect of Chattel Paper of the Grantors that the Accounts and the right, title and interest of the Grantors in and under such Contracts, Instruments and Chattel Paper have been assigned to the Collateral Agent and that payments shall be made directly to the Collateral Agent for distribution to the Secured Parties.  Upon the occurrence and during the continuance of any Event of Default, upon the request of the Collateral Agent (at the

5

direction of the Required Holders), the Grantors shall so notify such Account Debtors, parties to such Contracts, obligors in respect of such Instruments and obligors in respect of such Chattel Paper. The Collateral Agent may, in its name or in the name of others, communicate with such Account Debtors, parties to such Contracts, obligors in respect of such Instruments and obligors in respect of such Chattel Paper to verify with such parties, to the Collateral Agent's satisfaction, the existence, amount and terms of any such Accounts, Contracts, Instruments or Chattel Paper.

**4.** **REPRESENTATIONS AND WARRANTIES**. The Grantors hereby represent and warrant to the Collateral Agent and the other Secured Parties that:

(a) Except for the security interest granted under this Agreement, the Grantors are the sole legal and equitable owner of each item of Collateral in which it purports to grant a security interest hereunder, having good and marketable title thereto, free and clear of any and all Liens except for Permitted Liens and, upon filing of a UCC financing statement in the UCC filing office, the Collateral Agent shall have a perfected security interest in the Collateral, which such security interest shall be senior to all other Liens (other than Permitted Liens). None of the Collateral is owned, legally or equitably by any subsidiary or company controlled by the Grantors.

(b) The Grantors' correct legal name is set forth on the signature page hereof. The Grantors' chief executive office, jurisdiction of incorporation and the place where the Grantors maintain their records concerning the Collateral are presently located on Schedule 4(b).

(c) Schedule 4(c) (as such schedule may be amended or supplemented from time to time) as required pursuant to the Purchase Agreement sets forth a true and complete list of (i) all United States, state and foreign registrations of and applications for Patents, Trademarks, and Copyrights owned by each Grantor and (ii) all Patent Licenses, Trademark Licenses and Copyright Licenses material to the business of such Grantor.

(d) Schedule 4(d) sets forth a complete and accurate list of all Pledged Stock pledged by each Grantor hereunder on the Initial Closing Date. The Pledged Stock constitutes all issued and outstanding shares of all classes of the Capital Stock of each Issuer owned by such Grantor which is Collateral (and in the case of each Issuer which is required to become a Note Party pursuant to the terms of the Purchase Agreement, all the issued and outstanding shares of all classes of the Capital Stock of each such Issuer). Each Grantor has delivered all Certificated Securities constituting Collateral held by such Grantor in a Subsidiary on the Initial Closing Date (or the date such Grantor becomes a party to this Agreement, as applicable) to the Collateral Agent, together with duly executed undated blank stock powers, or other equivalent instruments of transfer acceptable to the Collateral Agent in accordance with Section 5.08(c) below and (assuming possession by the Collateral Agent) the Collateral Agent has a first-priority Lien.

**5.** **COVENANTS**. Unless the Collateral Agent (at the direction of the Required Holders) otherwise consents (which consent shall not be unreasonably withheld), the Grantors covenant and agree with the Collateral Agent and the other Secured Parties that from and after the date of this Agreement and until the Obligations have been performed and paid in full:

**5.1** **Change of Name, Jurisdiction of Organization, Relocation of Business**. The Grantors shall not change their name or jurisdiction of organization or relocate their chief executive office, principal place of business or their records from such address(es) provided to the Collateral Agent pursuant to Section 4(b) above without at least seven (7) days prior notice to the Collateral Agent.

**5.2** **Certain Restrictions on Future Agreements**.

(a)    Each Grantor agrees that until the Obligations have been satisfied in full, it will not sell or assign its interest in, or grant any license under, other than in the ordinary course of business or in connection with a Permitted Lien, the Collateral, or enter into any other agreement with respect to the Collateral that is inconsistent with such Grantor's obligations under this Agreement, without the prior written consent of the Required Holders, and the such Grantor further agree that it will not take any action, or permit any action to be taken by others subject to its control, including licensees, or fail to take any action, which would affect the validity or enforcement of the rights transferred to the Holders under this Agreement.

(b)    Upon any sale, lease, transfer or other disposition of any item of Collateral not prohibited by the terms of this Agreement or the other Note Documents, the Collateral Agent will, at the Grantors' sole cost and expense, execute and deliver to the Grantors such documents as the Grantors shall reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted hereby; provided, however, that (i) at the time of such request and such release no Event of Default shall have occurred and be continuing and (ii) the Grantors shall have delivered to the Collateral Agent prior to the date of the proposed release a written request for release describing the item of Collateral, together with a form of release for execution by the Collateral Agent, and such other information as the Collateral Agent may reasonably request.

5.3    **License**.  The Grantors hereby grant to the Collateral Agent a non-exclusive, worldwide and royalty-free license to use or otherwise exploit all Intellectual Property rights of the Company or Subsidiary for the purpose of: (a) completing the manufacture of any in-process materials following any Event of Default so that such materials become saleable inventory, all in accordance with the same quality standards previously adopted by the Grantors for their own manufacturing; and (b) selling, leasing or otherwise disposing of any or all collateral following any Event of Default.

5.4    **Duties of the Grantors**.  The Grantors will have the duty to preserve and maintain all rights in the Collateral and to cause the perfection of the Collateral Agent's security interest therein to the extent the same can be perfected by the filing of a UCC financing statement.  Any expenses incurred in connection with the Grantors' obligations under this Section 5.4 will be borne by the Grantors.

5.5    **Insurance**.  The Grantors shall maintain insurance policies insuring the Collateral against loss or damage from such risks and in such amounts and forms and with such companies as are customarily maintained by businesses similar to the Grantors.

5.6    **Taxes, Assessments, Etc**.  The Grantors shall pay promptly when due all property and other taxes, assessments and government charges or levies imposed upon, and all claims (including claims for labor, materials and supplies) against, the Collateral, except to the extent the validity or amount thereof is being contested in good faith and adequate reserves are being maintained in connection therewith.

5.7    **Defense of Intellectual Property**.  The Grantors shall use commercially reasonable efforts to (i) protect, defend and maintain the validity and enforceability of all Copyrights, Patents and Trademarks material to the Grantors' business and (ii) detect infringements of all Copyrights, Patents and Trademarks material to the Grantors' business.

5.8    **Further Assurances**.

(a)    At any time and from time to time, as necessary or upon the written request of the Collateral Agent (at the direction of the Required Holders), and at the sole expense of the Grantors, the Grantors shall promptly and duly execute and deliver any and all such further instruments and

documents and take such further action as is necessary or that the Collateral Agent may reasonably request to obtain the full benefits of this Agreement (including the seniority of the security interest granted hereby as described in Section 4(a)), including, without limitation, executing, delivering and causing to be filed (i) any financing or continuation statements under the UCC with respect to the security interests granted hereby and (ii) intellectual property security agreements appropriate for filing with the United States Patent and Trademark Office or United States Copyright Office (or any successor office) as may be necessary or advisable for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interests granted hereby.  The Grantors also hereby authorize the Collateral Agent to file any such financing or continuation statement without the signature of the Grantors . Notwithstanding the foregoing authorization, the Collateral Agent shall have no obligation to perfect or maintain the perfection of the Collateral Agent's security interest, including by filing UCC financing statements or continuation statements, which shall be the sole obligation of the Grantors.

(b)	From time to time subsequent to the date hereof, additional Persons may become parties hereto as additional Grantors (each, an "***Additional Grantors***"), by executing a joinder hereto substantially in the form of Exhibit A.  Upon delivery of any such counterpart agreement to the Collateral Agent, notice of which is hereby waived by Grantors, each Additional Grantors shall be a Grantors and shall be as fully a party hereto as if Additional Grantors were an original signatory hereto .  Each Grantor expressly agrees that its obligations arising hereunder shall not be affected or diminished by the addition or release of any other Grantors hereunder, nor by any election of Collateral Agent not to cause any Subsidiary of Company to become an Additional Grantors hereunder.  This Agreement shall be fully effective as to any Grantors that is or becomes a party hereto regardless of whether any other Person becomes or fails to become or ceases to be a Grantors hereunder.

(c)	On the date hereof (or, in respect of an Additional Grantor, on the date on which such Additional Grantor executes a joinder hereto), each Grantor will deliver to the Collateral Agent all certificates representing Certificated Securities constituting Collateral then owned by such Grantor, in suitable form for transfer by delivery or accompanied by duly executed instruments of transfer or assignments in blank, sufficient to transfer title to the Collateral Agent.  Thereafter, whenever such Grantor acquires any other Certificated Security constituting Collateral, such Grantor will promptly deliver such certificate to the Collateral Agent in suitable form for transfer by delivery or accompanied by duly executed instruments of transfer or assignments in blank, sufficient to transfer title to the Collateral Agent.  Any limited liability company and any partnership controlled by any Grantor shall either (a) not include in its operative documents any provision that any equity interest in such limited liability company or such partnership be a "security" as defined under Article 8 of the UCC or (b) certificate any equity interest in any such limited liability company or such partnership.  To the extent an interest in any limited liability company or partnership controlled by any Grantor and pledged hereunder that constitutes Collateral is certificated or becomes certificated, each such certificate shall be delivered to the Collateral Agent pursuant to this Section 5.8(c).  Each Grantor that is an issuer of Investment Property constituting Collateral pledged hereunder that is an "uncertificated security" for purposes of the UCC hereby agrees, subject to Section 6, to comply with the Collateral Agent's instructions with respect to such uncertificated security without further consent by such Grantor.

6.	**RIGHTS AND REMEDIES UPON DEFAULT.**

6.1	**General Remedial Provisions**.  Beginning on the date which is ten (10) business days after any Event of Default shall have occurred and while such Event of Default is continuing:

(a)	The Collateral Agent, on behalf of the Secured Parties, may exercise in addition to all other rights and remedies granted to it under this Agreement or the Notes, all rights and remedies of a secured party under the UCC.  Without limiting the generality of the foregoing, the Grantors expressly

agree that in any such event the Collateral Agent, without demand of performance or other demand, advertisement or notice of any kind (except the notice specified below of time and place of public or private sale) to or upon the Grantors or any other person, may (i) reclaim, take possession, recover, store, maintain, finish, repair, prepare for sale or lease, shop, advertise for sale or lease and sell or lease (in the manner provided herein) the Collateral, and in connection with the liquidation of the Collateral and collection of the Accounts pledged as Collateral, use any Trademark, Copyright, or process used or owned by the Grantors and (ii) forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and may forthwith sell, lease, assign, give an option or options to purchase or sell or otherwise dispose of and deliver said Collateral (or contract to do so), or any part thereof, in one or more parcels at public or private sale or sales, at any exchange or broker's board or at the Collateral Agent's offices or elsewhere at such prices as it may deem commercially reasonable, for cash or on credit or for future delivery without assumption of any credit risk.  The Grantors further agree, at the Collateral Agent's request (at the direction of the Required Holders), to assemble the Collateral and make it available to the Collateral Agent at places which the Collateral Agent shall reasonably select, whether at the Grantors' premises or elsewhere.  The Collateral Agent shall apply the net proceeds of any such collection, recovery, receipt, appropriation, realization or sale as provided in Section 6(d), below, with the Grantors remaining liable for any deficiency remaining unpaid after such application.  The Grantors agree that the Collateral Agent need not give more than twenty (20) days' notice of the time and place of any public sale or of the time after which a private sale may take place and that such notice is reasonable notification of such matters.

(b)     The Grantors also agree to pay all fees, costs and expenses of the Collateral Agent, including, without limitation, reasonable attorneys' fees, incurred in connection with the enforcement of any of its rights and remedies hereunder.

(c)     The Grantors hereby waive presentment, demand, protest or any notice (to the maximum extent permitted by applicable law) of any kind in connection with this Agreement or any Collateral.

(d)     The Proceeds of any sale, disposition or other realization upon all or any part of the Collateral shall be distributed by the Collateral Agent in the following order of priorities:

FIRST, to the Collateral Agent in an amount sufficient to pay in full the costs of the Collateral Agent in connection with such sale, disposition or other realization, including all fees, costs, expenses, liabilities and advances incurred or made by the Collateral Agent in connection therewith, including, without limitation, reasonable attorneys' fees;

SECOND, to the Agents in amounts proportional to such Secured Party's Pro Rata Share of the then unpaid Obligations of each such Agent;

THIRD, to the other Secured Parties (other than the Agents) in amounts proportional to such Secured Party's Pro Rata Share of the then unpaid Obligations of each such Secured Party; and

FINALLY, upon payment in full of the Obligations, to the Grantors or their respective representatives, in accordance with the UCC or as a court of competent jurisdiction may direct.

(e)     Upon the occurrence and during the continuation of an Event of Default, in addition to all other rights and remedies that may then be available to any Holder of any Note, each Holder of any Note and the Collateral Agent is hereby authorized at any time and from time to time, without notice to the Company (any such notice being expressly waived by the Company) to set off and apply any and all Indebtedness at any time owing by such Holder or the Collateral Agent to or for the

credit or the account of the Grantors against all amounts which may be owed to such Holder or the Collateral Agent by the Grantors in connection with this Agreement or any other Note Document.  If any Holder of the Notes shall obtain from the Company payment of any principal of or interest on any Note held by it or payment of any other amount under this Agreement or such Note held by it or any other Note Document through the exercise of any right of set-off, and, as a result of such payment, such Holder shall have received a greater percentage of the principal, interest or other amounts then due to such Holder under the Note Documents than the percentage received by any other Holder, the Company shall promptly make such adjustments (including without limitation purchasing risk participations) with such other Holder from time to time as shall be equitable, to the end that all the Purchasers of the Notes shall share the benefit of such excess payment (net of any expenses which may be incurred by such Holder in obtaining or preserving such excess payment) pro rata in accordance with the unpaid principal and/or interest on the Notes or other amounts (as the case may be) owing to each of the Purchasers of the Notes. To such end, all Holders of the Notes shall make appropriate adjustments among themselves if such payment is rescinded or must otherwise be restore d.  Any Holder of the Notes taking action under this Section 6 shall promptly provide notice to the Company of any such action taken; provided that the failure of such Holder to provide such notice shall not prejudice its rights hereunder.

> **6.2**    **Pledged Stock**.

>> (a)    Prior to an Event of Default each Grantor shall be permitted to receive dividends and other distributions in respect of the Pledged Stock paid in the normal course of business or otherwise as a result of the exercise of reasonable business judgment of the relevant Issuer, to the extent permitted by the Purchase Agreement, and to exercise all voting and corporate rights with respect to the Investment Property.

>> (b)    If an Event of Default shall have occurred and be continuing, effective upon delivery by the Collateral Agent to the Company of a notice (which, for the avoidance of doubt, may be electronic notice delivered in accordance with Section 4 of the Notes) stating that it is exercising its rights under this Section 6.2 (an "***Enforcement Notice***") (*provided*, however, that failure by the Collateral Agent to provide such Enforcement Notice shall not limit or impair any of the Collateral Agent's rights under this Agreement), (i) the Collateral Agent shall have the right to receive any and all dividends, payments or other Proceeds paid in respect of the Investment Property and make application thereof to the Obligations in the order set forth in Section 1(b)(iii)(1) of the Notes, (ii) any or all of the Investment Property shall be registered in the name of the Collateral Agent or its nominee, and (iii) the Collateral Agent or its nominee may exercise (x) all voting, corporate and other rights pertaining to such Investment Property at any meeting of shareholders of the relevant Issuer or Issuers or otherwise and (y) any and all rights of conversion, exchange and subscription and any other rights, privileges or options pertaining to such Investment Property as if it were the absolute owner thereof (including, without limitation, the right to exchange, at its discretion, any and all of the Investment Property upon the merger, consolidation, reorganization, recapitalization or other fundamental change in the corporate structure of any Issuer, or upon the exercise by any Grantor or the Collateral Agent of any right, privilege or option pertaining to such Investment Property, and in connection therewith, the right to deposit and deliver any and all of the Investment Property with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as the Collateral Agent may determine), all without liability except to account for property actually received by it, but the Collateral Agent shall have no duty to any Grantor to exercise any such right, privilege or option and shall not be responsible for any failure to do so or delay in so doing.  Upon the Collateral Agent's request (at the direction of the Required Holders), each Grantor shall, at its sole cost and expense, execute and deliver to the Collateral Agent any and all appropriate documents and instruments as the Collateral Agent may request (at the direction of the Required Holders) in order to permit the Collateral Agent to exercise the voting and other rights which it may be entitled to exercise hereunder and to receive all distributions which it may be entitled to receive hereunder.

(c)     Each Grantor hereby authorizes and instructs each Issuer of any Investment Property pledged by such Grantor hereunder to (i) comply with any instruction received by it from the Collateral Agent in writing that (x) states that an Event of Default has occurred and is continuing and (y) is otherwise in accordance with the terms of this Agreement, without any other or further instructions from such Grantor, and each Grantor agrees that each Issuer shall be fully protected in so complying and shall have no duty or right to inquire as to the Collateral Agent's authority to give such instruction and (ii) when required hereby, pay any dividends or other payments with respect to the Investment Property directly to the Collateral Agent.

(d)     In furtherance and not in limitation of the foregoing rights of the Collateral Agent pursuant to this Section 6.02, solely during any time that an Event of Default exists in respect of which the Collateral Agent has delivered an Enforcement Notice, each Grantor hereby appoints the Collateral Agent as its true and lawful attorney-in-fact to, and grants to Collateral Agent an irrevocable proxy with full power of substitution and resubstitution (and which is coupled with an interest) to, vote the Capital Stock owned by a Note Party, and such Note Party agrees to execute such other proxies as the Collateral Agent may request (at the direction of the Required Holders) (provided, however, that failure by the Collateral Agent to provide such Enforcement Notice shall not limit or impair any of the Collateral Agent's rights under this Agreement).

(e)     In furtherance of the proxy set forth in Section 6.2(d), upon the exercise of such proxy, all prior proxies given by any Grantor with respect to the applicable Capital Stock are hereby revoked, and no subsequent proxies (other than to the Collateral Agent) will be given with respect to any such Capital Stock, (i) the Collateral Agent will be empowered and may exercise such proxy at any and all times, including but not limited to, at any meeting of shareholders, partners or members, as the case may be, however called, and at adjournment thereof, or in any action by written consent, and may waive any notice otherwise required in connection therewith, (ii) to the fullest extent permitted by applicable law, the Collateral Agent shall have no agency, fiduciary or other implied duties to any Grantor or any other Person when acting with respect to such proxy, and (iii) each Grantor waives and releases any claim that it may have against the Collateral Agent with respect to any breach or alleged breach of any such agency, fiduciary or other duty

## 7.   MISCELLANEOUS.

7.1     **Severability**.  If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith.  In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (a) such provision shall be excluded from this Agreement, (b) the balance of this Agreement shall be interpreted as if such provision were so excluded, and (c) the balance of this Agreement shall be enforceable in accordance with its terms.

7.2     **Waiver and Amendment; Entire Agreement**.  Any provision of this Agreement may be amended, waived or modified only by an instrument signed in writing by the Grantors and the Collateral Agent (with the consent of any Holder or other Secured Party as required by Section 10.9 of the Purchase Agreement).  This Agreement and the other Note Documents constitute the entire contract among the parties hereto regarding to the subject matters addressed herein and supersede any and all previous agreements, negotiations, and discussions, oral or written, by the parties regarding the subject matters addressed herein.

7.3     **Termination**.  This Agreement shall terminate upon the payment and performance in full (including, for the avoidance of doubt, by way of conversion in full of the Notes pursuant to the terms

11

thereof) of the Obligations (other than inchoate indemnity obligations) . At such time, the Collateral shall be automatically released from the Liens created hereby, this Agreement and all obligations (other than those expressly stated to survive such termination) of the Collateral Agent, the other Secured Parties and the Grantors hereunder shall automatically terminate, all without delivery of any instrument or performance of any act by any party, and all rights to the Collateral shall automatically revert to the Grantors. The Collateral Agent shall execute such documents, return any Collateral held by the Collateral Agent hereunder and take such other steps as are reasonably necessary to accomplish the foregoing, all at the Grantors' sole cost and expense. Any such documents shall be without recourse, representation or warranty to or by the Collateral Agent.

**7.4** **Successors and Assigns**. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

**7.5** **Cumulative Remedies**. All of the Secured Parties' rights and remedies with respect to the Collateral whether established hereby, by a Note, by any other agreements or by law will be cumulative and may be exercised singularly or concurrently. The Grantors acknowledge and agree that this Agreement is not intended to limit or restrict in any way the rights and remedies of a Holder under a Note but rather is intended to facilitate the exercise of such rights and remedies . Secured Parties will have, in addition to all other rights and remedies given them by the terms of this Agreement, the Notes and the other Note Documents, all rights and remedies allowed by law and the rights and remedies of a secured party under the UCC as enacted in any jurisdiction in which Collateral may be located.

**7.6** **GOVERNING LAW.** THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.

**7.7** **Jurisdiction and Venue; Waiver of Jury Trial; Expenses and Indemnification**. This Agreement is subject to the provisions of Section 10.3 (Jurisdiction and Venue), Section 10.4 (Waiver of Jury Trial) and Section 10.10(a) (Expenses and Indemnification) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*. Any amounts payable as provided hereunder shall be additional Obligations secured by this Agreement and the other Note Documents.

**7.8** **Notices**. All communications and notices required or permitted to be given hereunder shall be delivered in accordance with Section 10.8 of the Purchase Agreement.

**7.9** **Headings; Interpretation**. Paragraph headings used in this Agreement are included for convenience of reference only and will not modify the provisions that they precede or affect the interpretation of this Agreement or any other Note Document. The term "including" shall be interpreted to mean "including but not limited to".

**7.10** **Counterparts**. This Agreement may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract. Any counterpart of a signature page to this Agreement may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic

Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.  The Grantors agree to assume all risks arising out of the use of using digital signatures and electronic methods to submit communications to the Note Agent, including without limitation the risk of the Note Agent acting on unauthorized instructions, and the risk of interception and misuse by third parties.

*[Signature page follows]*

254221560 v4

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first written above.

[_____]


By:_____
Name:
Title:

**COLLATERAL AGENT**:

**U.S. BANK NATIONAL ASSOCIATION**


By: _____
Name:
Title:

254221560 v4

**SCHEDULE 4(b)**

**GRANTORS**

**SCHEDULE 4(c)**

**INTELLECTUAL PROPERTY**

**SCHEDULE 4(d)**

**INVESTMENT PROPERTY**

Exhibit A to
Security Agreement

## JOINDER AGREEMENT

THIS J O I N D E R  AGREEMENT (this "***Joinder***"), dated as of [__], is entered into by and between [__] (the "***New Grantor***") and U.S. BANK NATIONAL ASSOCIATION, as collateral agent (in such capacity, the "***Collateral Agent***") under that certain Security Agreement, dated as of [__], 2021, made by Core Scientific Holding Co., a Delaware corporation and each Guarantor from time to time party thereto, as grantors, in favor of the Collateral Agent (the "***Security Agreement***").  Capitalized terms used but not defined herein shall have the meanings given to them in the Security Agreement.

The New Grantor and the Collateral Agent, for the benefit of the Secured Parties, hereby agree as follows:

The New Grantor hereby acknowledges, agrees and confirms that, by its execution of this Joinder, the New Grantor will be deemed to be a "Grantor" under the Security Agreement for all purposes of the Security Agreement and shall have all of the obligations of a Grantor thereunder as if it had executed the Security Agreement.  The New Grantor hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Security Agreement.

This Joinder is subject to the provisions of <u>Section 10.2</u> (Governing Law), <u>Section 10.3</u> (Jurisdiction and Venue) and <u>Section 10.4</u> (Waiver of Jury Trial) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*.

This Joinder may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract.  Any counterpart of a signature page to this Joinder may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.

*[Signature page follows]*

Exhibit A to
Security Agreement

**IN WITNESS WHEREOF**, the parties hereto have executed this Joinder as of the date first written above.

**[NEW GRANTOR]**

By: _____
Name:
Title:

Acknowledged and accepted:

**COLLATERAL AGENT**:

**U.S. BANK NATIONAL ASSOCIATION**

By: _____
Name:
Title:

**EXHIBIT E**

**FORM OF INTELLECTUAL PROPERTY SECURITY AGREEMENT**

**(see attached)**

**[FORM OF] INTELLECTUAL PROPERTY SECURITY AGREEMENT**

**THIS INTELLECTUAL PROPERTY SECURITY AGREEMENT** (this "*Agreement*"), dated as of [__], is made by [__] (the "*Grantor[s]*") in favor of U.S. BANK NATIONAL ASSOCIATION, in its capacity as collateral agent (the "*Collateral Agent*") on behalf of the Secured Parties.

**RECITALS**

**WHEREAS**, the Grantor[s] entered into that certain Convertible Note Purchase Agreement, dated as of August 20, 2021 (as amended, restated, supplemented and/or otherwise modified from time to time, the "*Purchase Agreement*"), by and among the Grantors, each Purchaser party thereto, and U.S. BANK NATIONAL ASSOCIATION as Note Agent and, upon the execution and delivery of the Collateral Documents pursuant to <u>Section 6.13</u>, as Collateral Agent for the Secured Parties;

**WHEREAS**, pursuant to the terms of the Purchase Agreement, as continuing collateral security for the Obligations of the Company under the Purchase Agreement and the Guaranteed Obligations of the Guarantors under the Guaranty, the Grantors have entered into a Security Agreement, dated as of even date herewith (as amended, restated, supplemented and/or otherwise modified from time to time, the "*Security Agreement*"; capitalized terms used but not otherwise defined herein having the meaning ascribed thereto therein), made by Grantors in favor of the Collateral Agent, for the purposes of granting to the Collateral Agent, for the benefit of the Secured Parties, a security interest in Grantors' assets, on the terms and subject to the conditions set forth herein; and

**WHEREAS**, pursuant to the Security Agreement, the Grantor is required to grant a security interest to the Collateral Agent, in all of the Grantor's Intellectual Property, including the Patents, Trademarks and Copyrights listed on <u>Schedule 1</u> hereto (collectively, the "*Intellectual Property*").

**AGREEMENT**

**NOW, THEREFORE**, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Grantor and the Collateral Agent hereby agree as follows:

1. **Grant of Security Interest**.

   (a) As collateral security for the full, prompt, complete and final payment and performance when due (whether at stated maturity, by acceleration or otherwise) of all the Secured Obligations, the Grantor hereby pledges to the Collateral Agent, on behalf of the Secured Parties, and hereby grants to the Collateral Agent, on behalf of the Secured Parties, a security interest in all of the Grantor's right, title and interest in, to and under the Intellectual Property, whether now owned or hereafter acquired.

   (b) The security interest granted hereby is granted in conjunction with the security interest granted to the Collateral Agent under the Security Agreement. The rights and remedies of the Collateral Agent with respect to the security interest granted hereby are in addition to those set forth in the Security Agreement. In the event of any conflict between the terms of this Agreement and the terms of the Security Agreement, the terms of the Security Agreement shall control.

2. **Termination of Security Interest**.

   This Agreement shall terminate as set forth in the Security Agreement.

3.      **Modification of Agreement**.

Any provision of this Agreement may be amended, waived or modified only by an instrument signed in writing by the Grantor and the Collateral Agent (with the consents of any Holder or other Secured Party as required by Section 10.9 of the Purchase Agreement).  Notwithstanding the foregoing, upon receipt of a certificate of a Responsible Officer, the Collateral Agent may modify this Agreement, after obtaining the Grantor's approval of or signature to such modification, by amending Schedule 1 hereto to include reference to any right, title or interest in any Patents, Trademarks or Copyrights currently owned by the Grantor or any Patents, Trademarks or Copyrights acquired or developed by the Grantor after the execution hereof or to delete any reference to any right, title or interest in any Patents, Trademarks or Copyrights in which the Grantor no longer has or claims any right, title or interest.

5.      **GOVERNING LAW**.

THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.

6.      **Jurisdiction and Venue; Waiver of Jury Trial; Expenses and Indemnification**.

This Agreement is subject to the provisions of Section 10.3 (Jurisdiction and Venue), Section 10.4 (Waiver of Jury Trial) and Section 10.10(a) (Expenses and Indemnification) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*. Any amounts payable as provided hereunder shall be additional Obligations secured by this Agreement and the other Note Documents. U.S. Bank National Association is entering into this Agreement solely in its capacity as Collateral Agent under the Purchase Agreement and shall be entitled to all of the rights, privileges and immunities of the Collateral Agent in acting hereunder.

7.      **Counterparts**.

This Agreement may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract. Any counterpart of a signature page to this Agreement may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.

*[Signature page follows]*

2

254153964 v3

IN WITNESS WHEREOF, the Grantor and the Collateral Agent have caused this Agreement to be duly executed and delivered as of the date first above written.

**GRANTOR:**

[_____]


By:_____
Name:
Title:

**COLLATERAL AGENT:**

U.S. BANK NATIONAL ASSOCIATION


By: _____
Name:
Title:

SCHEDULE 1

INTELLECTUAL PROPERTY SECURITY AGREEMENT

**EXHIBIT F**

**FORM OF SOLVENCY CERTIFICATE**

**(see attached)**

**[FORM OF] SOLVENCY CERTIFICATE**

**CORE SCIENTIFIC HOLDING CO.**

**August 20, 2021**

This Solvency Certificate is delivered pursuant to <u>Section 4.1(c)</u> of that certain Convertible Note Purchase Agreement, dated as of the date hereof (the "***Purchase Agreement***"), by and among Core Scientific Holding Co., a Delaware corporation (the "***Company***"), the Guarantors party thereto, the Initial Purchasers named on the Schedule of Purchasers attached as <u>Schedule 2</u> thereto and U.S. Bank National Association, as note agent and collateral agent.  Terms capitalized herein and not otherwise defined shall have the meanings assigned to them in the Purchase Agreement.

The undersigned, the Chief Financial Officer of the Company, does hereby certify, on behalf of the Company and not in his individual capacity, that as of the Initial Closing Date, both immediately before and after giving effect to the transactions contemplated by the Note Documents, the Company is individually, and the Company and its Subsidiaries on a consolidated basis are, Solvent.

*[Signature page follows]*

**IN WITNESS WHEREOF**, the undersigned has hereunto set his hand on behalf of the Company as of the date first referenced above.

_____

Name:  Michael Trzupek
Title:    Chief Financial Officer

**EXHIBIT G**

**FORM OF ADMINISTRATIVE QUESTIONNAIRE**

| **Purchaser Name** | |
|---|---|
| Name in Which to Register Note(s) | |
| Note Registration Number(s); Principal Amount(s) | |
| Payment on Account of Note(s)<br><br>Method<br><br>Account Information | |
| Accompanying Information | |
| Address / Fax # / Email for notices related to payments | |
| Address / Fax # / Email for all other notices | |
| Instructions re Delivery of Note(s) | |
| Tax Identification Number | |

**EXHIBIT H**

**FORM OF FIRST LIEN INTERCREDITOR AGREEMENT**

**[FORM OF] FIRST LIEN PARI PASSU INTERCREDITOR AGREEMENT**

THIS FIRST LIEN PARI PASSU INTERCREDITOR AGREEMENT (this "*Agreement*"), dated as of [___], by and among U.S. Bank National Association, as note agent for the Initial Note Claimholders (in such capacity, and together with its successors and permitted assigns in such capacity, the "*Initial First Lien Representative*") and as collateral agent for the Initial Note Claimholders (in such capacity, and together with its successors and permitted assigns in such capacity, the "*Initial First Lien Collateral Agent*"), U.S. Bank National Association, as note agent for the Other Note Claimholders (in such capacity, and together with its successors and permitted assigns in such capacity, the "*Other First Lien Representative*"), and as collateral agent for the Other Note Claimholders (in such capacity, and together with its successors and permitted assigns in such capacity, the "*Other First Lien Collateral Agent*"), and acknowledged and agreed to by [Parent Entity] (the "*Company*") and the other Grantors.  Capitalized terms used in this Agreement have the meanings assigned to them in <u>Section 1.1</u> below.

Reference is made to (i) that certain Senior Secured Convertible Note Purchase Agreement, dated as of April 19, 2021, by and among the [Company (as successor interest of Core Scientific Holding Co.)][1], the other Grantors from time to time party thereto, the Purchasers (as defined therein) party thereto, the Initial First Lien Representative and the Initial First Lien Collateral Agent (as amended, restated, supplemented and/or otherwise modified from time to time, the "*Initial Purchase Agreement*") and (ii) that certain Convertible Note Purchase Agreement, dated as of August 20, 2021, by and among the Company (Core Scientific Holding Co.), the other Grantors from time to time party thereto, the Purchasers (as defined therein) party thereto, the Other First Lien Representative and the Other First Lien Collateral Agent (as amended, restated, supplemented and/or otherwise modified from time to time, the "*Other Purchase Agreement*").

The obligations of the Company under the Initial Purchase Agreement and the obligations of the Guarantors (as defined therein) under the guaranty of the Initial Purchase Agreement are secured on a first-priority basis (subject to Permitted Liens (as defined therein)) by Liens on substantially all of the assets of the Grantors, pursuant to the terms of the Initial Note Collateral Documents.

The obligations of the Company under the Other Purchase Agreement and the obligations of the Guarantors (as defined therein) under the guaranty of the Other Purchase Agreement are secured on a first-priority basis (subject to Permitted Liens (as defined therein)) by Liens on substantially all of the assets of the Grantors, pursuant to the terms of the Other Note Collateral Documents.

In consideration of the foregoing, the mutual covenants and obligations herein set forth and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, each of the Initial First Lien Representative (for itself and on behalf of each other Initial Note Claimholder), the Initial First Lien Collateral Agent (for itself and on behalf of each other Initial Note Claimholder), the Other First Lien Representative (for itself and on behalf of each other Other Note Claimholder) and the Other First Lien Collateral Agent (for itself and on behalf of each other Other Note Claimholder), intending to be legally bound, hereby agrees as follows:

---

[1] To the extent the Conversion Event giving rise to execution of this Agreement is the XPDI Transaction, references to the Company herein shall be updated to refer to the Parent Entity with other confirming changes consistent therewith.

1

ARTICLE I.

DEFINITIONS

SECTION 1.1            Certain Defined Terms.

Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Initial Purchase Agreement or the Other Purchase Agreement (whether or not then in effect), as applicable, and the following terms which are defined in the UCC are used herein as so defined (and if defined in more than one article of the UCC shall have the meaning specified in Article 9 thereof): Certificated Security, Commodity Account, Commodity Contract, Deposit Account, Electronic Chattel Paper, Promissory Note, Instrument, Letter of Credit Right, Securities Entitlement, Securities Account and Tangible Chattel Paper.  As used in this Agreement, the following terms have the meanings specified below:

"*Agreement*" has the meaning set forth in the introductory paragraph hereto.

"*Applicable Collateral Agent*" means (i) until the earliest of (x) the Discharge of Initial Purchase Agreement and (y) the Other First Lien Representative Enforcement Date, the Initial First Lien Collateral Agent and (ii) from and after the earlier of (x) the Discharge of Initial Purchase Agreement and (y) the Other First Lien Representative Enforcement Date, the Other First Lien Collateral Agent.

"*Applicable Representative*" means (i) until the earliest of (x) the Discharge of Initial Purchase Agreement and (y) the Other First Lien Representative Enforcement Date, the Initial First Lien Representative and (ii) from and after the earlier of (y) the Discharge of Initial Purchase Agreement and (z) the Other First Lien Representative Enforcement Date, the Other First Lien Representative.

"*Bankruptcy Case*" has the meaning set forth in Section 2.5(b).

"*Bankruptcy Code*" means Title 11 of the United States Code, as amended.

"*Bankruptcy Law*" means the Bankruptcy Code and any similar Federal, state or foreign law for the relief of debtors.

"*Business Day*" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close.

"*Capital Lease*" means, as applied to any Person, any lease by that Person as lessee that has been or should be, in accordance with GAAP, recorded as a capital lease on the balance sheet of that Person.

"*Collateral*" means all assets and properties subject to, or purported to be subject to, Liens created pursuant to any First Lien Collateral Document to secure either Series of First Lien Obligations and shall include any property or assets subject to replacement Liens or adequate protection Liens in favor of any First Lien Claimholder.

"*Collateral Agent*" means, collectively, the Initial First Lien Collateral Agent and the Other First Lien Collateral Agent.

"*Company*" has the meaning set forth in the introductory paragraph to this Agreement.

2

"***Control***" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by agreement or otherwise.  "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"***Control Collateral***" means any Shared Collateral in the "control" (within the meaning of Section 9-104, 9-105, 9-106, 9-107 or 8-106 of the UCC) of either Collateral Agent (or its agents or bailees), to the extent that control thereof perfects a Lien thereon under the UCC.  Control Collateral includes any Deposit Accounts, Securities Accounts, Securities Entitlements, Commodity Accounts, Commodity Contracts, Letter of Credit Rights or Electronic Chattel Paper over which either Collateral Agent has "control" under the UCC.

"***Controlling Claimholders***" means (i) at any time when the Initial First Lien Collateral Agent is the Applicable Collateral Agent, the Initial Note Claimholders and (ii) at any other time, the Other Note Claimholders.

"***Default***" means a "Default" (or similarly defined term) as defined in any First Lien Document.

"***DIP Financing***" has the meaning set forth in Section 2.5(b).

"***DIP Financing Liens***" has the meaning set forth in Section 2.5(b).

"***DIP Lenders***" has the meaning set forth in Section 2.5(b).

"***Discharge***" means, with respect to either Series of First Lien Obligations, that such Series of First Lien Obligations is no longer secured by, and no longer required to be secured by, any Shared Collateral pursuant to the terms of the applicable First Lien Documents for such Series of First Lien Obligations.  The term "***Discharged***" shall have a corresponding meaning.

"***Discharge of Initial Purchase Agreement***" means, except to the extent otherwise provided in Section 2.6, the Discharge of the Initial Note Obligations.

"***Equity Release Proceeds***" has the meaning set forth in Section 2.4(a).

"***Event of Default***" means an "Event of Default" (or similarly defined term) as defined in any First Lien Document.

"***First Lien Claimholders***" means, collectively, (i) the Initial Note Claimholders and (ii) the Other Note Claimholders.

"***First Lien Collateral Documents***" means, collectively, (i) the Initial Note Collateral Documents and (ii) the Other Note Collateral Documents.

"***First Lien Documents***" means, collectively, (i) the Initial Note Documents and (ii) the Other Note Documents.

"***First Lien Obligations***" means, collectively, (i) the Initial Note Obligations and (ii) the Other Note Obligations.

"***Grantors***" means the Company and each of the Guarantors.

"***Guarantors***" means the "Guarantors" as defined in each of the Initial Purchase Agreement and the Other Purchase Agreement.

"***Impairment***" has the meaning set forth in Section 2.1(b)(ii).

"***Indebtedness***" means all indebtedness for borrowed money.

"***Initial First Lien Collateral Agent***" has the meaning set forth in the introductory paragraph to this Agreement.

"***Initial First Lien Representative***" has the meaning set forth in the introductory paragraph to this Agreement.

"***Initial Note Claimholders***" means the holders of any Initial Note Obligations, including the "Secured Parties", as defined in the Initial Purchase Agreement (including the Initial First Lien Representative and the Initial First Lien Collateral Agent).

"***Initial Note Collateral Documents***" means the Collateral Documents (as defined in the Initial Purchase Agreement) and any other agreement, document or instrument entered into for the purpose of granting a Lien to secure any Initial Note Obligations or to perfect such Lien (as each may be amended, restated, supplemented and/or otherwise modified from time to time).

"***Initial Note Documents***" means the Initial Purchase Agreement, each Initial Note Collateral Document and the other Note Documents (as defined in the Initial Purchase Agreement), and each of the other agreements, documents and instruments providing for or evidencing any other Initial Note Obligation, as each may be amended, restated, supplemented and/or otherwise modified from time to time.

"***Initial Note Obligations***" means:

(a)      (i) the Obligations (as defined in the Initial Purchase Agreement), (ii) all principal of and interest (including any Post-Petition Interest) and premium (if any) on all loans made pursuant to the Initial Purchase Agreement, and (iii) all guarantee obligations, fees, expenses and all other obligations under the Initial Purchase Agreement and the other Initial Note Documents, in each case whether or not allowed or allowable in an Insolvency or Liquidation Proceeding; and

(b)      to the extent any payment with respect to any Initial Note Obligation (whether by or on behalf of any Grantor, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any Other Note Claimholder, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of this Agreement and the rights and obligations of the Initial Note Claimholders and the Other Note Claimholders, be deemed to be reinstated and outstanding as if such payment had not occurred.  To the extent that any interest, fees, expenses or other charges (including Post-Petition Interest) to be paid pursuant to the Initial Note Documents are disallowed by order of any court, including by order of a court of competent jurisdiction presiding over an Insolvency or Liquidation Proceeding, such interest, fees, expenses and charges (including Post-Petition Interest) shall, as between the Initial Note Claimholders and the Other Note Claimholders, be deemed to continue to accrue and be added to the amount to be calculated as the "Initial Note Obligations".

"***Initial Purchase Agreement***" has the meaning set forth in the recitals to this Agreement.

"***Insolvency or Liquidation Proceeding***" means:

(a)     any voluntary or involuntary case or proceeding under the Bankruptcy Code with respect to any Grantor;

(b)     any other voluntary or involuntary insolvency, reorganization or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding with respect to any Grantor or with respect to a material portion of its assets;

(c)     any liquidation, dissolution, reorganization or winding up of any Grantor whether voluntary or involuntary and whether or not involving insolvency or bankruptcy; or

(d)     any assignment for the benefit of creditors or any other marshaling of assets and liabilities of any Grantor.

"*Intervening Creditor*" has the meaning set forth in <u>Section 2.1(b)(i)</u>.

"*Lien*" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Capital Lease having substantially the same economic effect as any of the foregoing), in each case, in the nature of security; <u>provided that</u> in no event shall a colocation agreement or an operating lease in and of itself be deemed a Lien.

"*Other First Lien Collateral Agent*" has the meaning set forth in the introductory paragraph to this Agreement.

"*Other First Lien Representative*" has the meaning set forth in the introductory paragraph to this Agreement.

"*Other First Lien Representative Enforcement Date*" means, with respect to the Other First Lien Representative, the date which is 180 days after the occurrence of both (i) an Event of Default (under and as defined in the Other Note Documents) and (ii) the Initial First Lien Collateral Agent's and the Initial First Lien Representative's receipt of written notice from the Other First Lien Representative certifying that (x) an Event of Default (under and as defined in the Other Note Documents) has occurred and is continuing and (y) the Other Note Obligations are currently due and payable in full (whether as a result of acceleration thereof or otherwise) in accordance with the terms of the applicable Other Note Document; <u>provided</u> that the Other First Lien Representative Enforcement Date shall be stayed and shall not occur and shall be deemed not to have occurred (1) at any time the Initial First Lien Collateral Agent acting on the instructions of the Initial First Lien Representative has commenced and is diligently pursuing any enforcement action with respect to Shared Collateral, (2) at any time the Grantor that has granted a security interest in Shared Collateral is then a debtor under or with respect to (or otherwise subject to) any Insolvency or Liquidation Proceeding or (3) if the Other First Lien Representative subsequently rescinds or withdraws the written notice provided for in clause (ii) above.

"*Other Note Claimholders*" means the holders of any Other Note Obligations, including the "Secured Parties", as defined in the Other Purchase Agreement (including the Other First Lien Representative and the Other First Lien Collateral Agent).

"*Other Note Collateral Documents*" means the Collateral Documents (as defined in the Other Purchase Agreement) and any other agreement, document or instrument entered into for the purpose

of granting a Lien to secure any Other Note Obligations or to perfect such Lien (as each may be amended, restated, supplemented and/or otherwise modified from time to time).

"*Other Note Documents*" means the Other Purchase Agreement, each Other Note Collateral Document and the other Note Documents (as defined in the Other Purchase Agreement), and each of the other agreements, documents and instruments providing for or evidencing any other Other Note Obligation, as each may be amended, restated, supplemented and/or otherwise modified from time to time.

"*Other Note Obligations*" means:

(a)     (i) the Obligations (as defined in the Other Purchase Agreement), (ii) all principal of and interest (including any Post-Petition Interest) and premium (if any) on all loans made pursuant to the Other Purchase Agreement, and (iii) all guarantee obligations, fees, expenses and all other obligations under the Other Purchase Agreement and the other Other Note Documents, in each case whether or not allowed or allowable in an Insolvency or Liquidation Proceeding; and

(b)     to the extent any payment with respect to any Other Note Obligation (whether by or on behalf of any Grantor, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any Initial Note Claimholder, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of this Agreement and the rights and obligations of the Other Note Claimholders and the Initial Note Claimholders, be deemed to be reinstated and outstanding as if such payment had not occurred.  To the extent that any interest, fees, expenses or other charges (including Post-Petition Interest) to be paid pursuant to the Other Note Documents are disallowed by order of any court, including by order of a court of competent jurisdiction presiding over an Insolvency or Liquidation Proceeding, such interest, fees, expenses and charges (including Post-Petition Interest) shall, as between the Other Note Claimholders and the Initial Note Claimholders, be deemed to continue to accrue and be added to the amount to be calculated as the "Other Note Obligations".

"*Other Purchase Agreement*" has the meaning set forth in the recitals to this Agreement.

"*Person*" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, limited partnership, governmental authority or other entity.

"*Possessory Collateral*" means any Shared Collateral in the possession of either Collateral Agent (or its agents or bailees), to the extent that possession thereof perfects a Lien thereon under the UCC or otherwise.  Possessory Collateral includes any Certificated Securities, Promissory Notes, Instruments, and Tangible Chattel Paper, in each case, delivered to or in the possession of either Collateral Agent under the terms of the First Lien Collateral Documents.

"*Post-Petition Interest*" means interest, fees, expenses and other charges that pursuant to the Initial Note Documents or Other Note Documents, as applicable, continue to accrue after the commencement of any Insolvency or Liquidation Proceeding, whether or not such interest, fees, expenses and other charges are allowed or allowable under the Bankruptcy Law or in any such Insolvency or Liquidation Proceeding.

"*Proceeds*" has the meaning set forth in <u>Section 2.1(a)</u>.

"*Representative*" means, at any time, (i) in the case of any Initial Note Obligations or the Initial Note Claimholders, the Initial First Lien Representative and (ii) in the case of any Other Note Obligations or the Other Note Claimholders, the Other First Lien Representative.

"***Responsible Officer***" of any Person means the chief executive officer, the president, any vice president, the chief financial officer, treasurer or assistant treasurer or other similar officer of such Person and any other individual or similar official thereof responsible for the administration of the obligations of such Person in respect of this Agreement.  Any document delivered hereunder that is signed by a Responsible Officer of a Grantor shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Grantor and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Grantor.

"***Series***" means (a) with respect to the First Lien Claimholders, each of (i) the Initial Note Claimholders (in their capacities as such) and (ii) the Other Note Claimholders (in their capacities as such) and (b) with respect to any First Lien Obligations, each of (i) the Initial Note Obligations and (ii) the Other Note Obligations.

"***Shared Collateral***" means, at any time, Collateral in which the holders of First Lien Obligations (or their respective Representatives or Collateral Agents on behalf of such holders) hold, or purport to hold, or are required to hold pursuant to their respective First Lien Documents, a valid security interest or Lien at such time.

"***subsidiary***" means, with respect to any Person (a) any corporation, association, or other business entity (other than a partnership, limited liability company or similar entity) of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the directors, managers or trustees thereof is at the time of determination is owned or controlled by such Person or one or more of the other subsidiaries of that Person or a combination thereof and (b) any partnership, limited liability company or similar entity which (i) more than 50% of the voting interests or general partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other subsidiaries of that Person or a combination thereof whether in the form of membership, general, special or limited partnership or otherwise and (ii) such Person or any subsidiary of such Person is a controlling general partner or otherwise controls such entity.

"***UCC***" means the Uniform Commercial Code as in effect from time to time in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"***Underlying Assets***" has the meaning set forth in <u>Section 2.4(a)</u>.

SECTION 1.2          <u>Rules of Interpretation</u>.

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as amended, restated, supplemented and/or otherwise modified from time to time, however evidenced, whether in physical or electronic form and any reference herein to any statute or regulations shall include any amendment, renewal, extension or replacement thereof, (ii) any reference herein to any Person shall be construed to include such Person's permitted successors and assigns from time to time, (iii) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Articles, Sections and Annexes shall be construed to refer to Articles, Sections and Annexes

of this Agreement, (v) unless otherwise expressly qualified herein, the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights and (vi) the term "or" is not exclusive.

<div align="center">ARTICLE II.</div>

<div align="center">PRIORITIES AND AGREEMENTS WITH RESPECT TO SHARED COLLATERAL</div>

SECTION 2.1          Priority of Claims.

(a)          Anything contained herein or in any of the First Lien Documents to the contrary notwithstanding (but subject to Sections 2.1(b) and 2.10(b)), if an Event of Default has occurred and is continuing, and the Applicable Collateral Agent is taking action to enforce rights in respect of any Collateral, or any distribution is made in respect of any Shared Collateral in any Bankruptcy Case of any Grantor or any First Lien Claimholder receives any payment pursuant to any intercreditor agreement (other than this Agreement) or otherwise with respect to any Shared Collateral, the proceeds of any sale, collection or other liquidation of any Shared Collateral or Equity Release Proceeds received by any First Lien Claimholder or received by the Applicable Collateral Agent or any First Lien Claimholder pursuant to any such intercreditor agreement or otherwise with respect to such Collateral and proceeds of any such distribution (subject, in the case of any such distribution, to the sentence immediately following clause (iii) below) to which the First Lien Obligations are entitled under any intercreditor agreement (other than this Agreement) or otherwise (all proceeds of any sale, collection or other liquidation of any Collateral comprising either Shared Collateral or Equity Release Proceeds and all proceeds of any such distribution and any proceeds of any insurance covering the Shared Collateral received by the Applicable Collateral Agent and not returned to any Grantor under any First Lien Document being collectively referred to as "***Proceeds***"), shall be applied by the Applicable Collateral Agent in the following order:

(i)          FIRST, to the payment of all amounts owing to each Collateral Agent (in its capacity as such) and each Representative (in its capacity as such) secured by such Shared Collateral or, in the case of Equity Release Proceeds, secured by the Underlying Assets, including all reasonable costs and expenses incurred by each Collateral Agent (in its capacity as such) and each Representative (in its capacity as such) in connection with such collection or sale or otherwise in connection with this Agreement, any other First Lien Document or any of the First Lien Obligations, including all court costs and the reasonable fees and expenses of its agents and legal counsel, and any other reasonable costs or expenses incurred in connection with the exercise of any right or remedy hereunder or under any other First Lien Document and all fees and indemnities owing to such Collateral Agents and Representatives, ratably to each such Collateral Agent and Representative in accordance with the amounts payable to it pursuant to this clause (i);

(ii)          SECOND, subject to Sections 2.1(b) and 2.10(b), to the extent Proceeds remain after the application pursuant to preceding clause (i), to each Representative for the payment in full of the other First Lien Obligations of each Series secured by such Shared Collateral or, in the case of Equity Release Proceeds, secured by the Underlying Assets, and, if the amount of such Proceeds are insufficient to pay in full the First Lien Obligations of each Series so secured then such Proceeds shall be allocated among the Representatives of each Series secured by such Shared Collateral or, in the case of Equity Release Proceeds, secured by the Underlying Assets, pro rata according to the amounts of such First Lien Obligations owing to each such respective Representative and the other First Lien Claimholders represented by it for distribution by such Representative in accordance with its respective First Lien Documents; and

<div align="center">8</div>

(iii)     THIRD, any balance of such Proceeds remaining after the application pursuant to preceding clauses (i) and (ii), to the Grantors, their successors or assigns from time to time, or to whomever may be lawfully entitled to receive the same.

If, despite the provisions of this Section 2.1(a), any First Lien Claimholder shall receive any payment or other recovery in excess of its portion of payments on account of the First Lien Obligations to which it is then entitled in accordance with this Section 2.1(a), such First Lien Claimholder shall hold such payment or recovery in trust for the benefit of all First Lien Claimholders for distribution in accordance with this Section 2.1(a).

(b)     (i)     Notwithstanding the foregoing, with respect to any Shared Collateral or Equity Release Proceeds for which a third party (other than a First Lien Claimholder) has a Lien that is junior in priority to the Lien of one Series of First Lien Obligations but senior (as determined by appropriate legal proceedings in the case of any dispute) to the Lien of the other Series of First Lien Obligations (such third party an "***Intervening Creditor***"), the value of any Shared Collateral, Equity Release Proceeds or Proceeds which are allocated to such Intervening Creditor shall be deducted on a ratable basis solely from the Shared Collateral, Equity Release Proceeds or Proceeds to be distributed in respect of the Series of First Lien Obligations with respect to which such Impairment exists.

(ii)     In furtherance of the foregoing and without limiting the provisions of Section 2.3, it is the intention of the First Lien Claimholders of each Series that the holders of First Lien Obligations of such Series (and not the First Lien Claimholders of the other Series) bear the risk of (1) any determination by a court of competent jurisdiction that (x) any of the First Lien Obligations of such Series are unenforceable under applicable law or are subordinated to any other obligations (other than another Series of First Lien Obligations), (y) any of the First Lien Obligations of such Series do not have a valid and perfected security interest in any of the Collateral securing the other Series of First Lien Obligations and/or (z) any intervening security interest exists securing any other obligations (other than another Series of First Lien Obligations) on a basis ranking prior to the security interest of such Series of First Lien Obligations but junior to the security interest of the other Series of First Lien Obligations and (2) the existence of any Collateral (other than Equity Release Proceeds) for the other Series of First Lien Obligations that is not Shared Collateral (any such condition referred to in the foregoing clauses (1) or (2) with respect to either Series of First Lien Obligations, an "***Impairment***" of such Series); provided that the existence of a maximum claim with respect to any real property subject to a mortgage which applies to all First Lien Obligations shall not be deemed to be an Impairment of either Series of First Lien Obligations.  In the event of any Impairment with respect to either Series of First Lien Obligations, the results of such Impairment shall be borne solely by the holders of such Series of First Lien Obligations, and the rights of the holders of such Series of First Lien Obligations (including the right to receive distributions in respect of such Series of First Lien Obligations pursuant to Section 2.1) set forth herein shall be modified to the extent necessary so that the effects of such Impairment are borne solely by the holders of the Series of such First Lien Obligations subject to such Impairment.  Additionally, in the event the First Lien Obligations of either Series are modified pursuant to applicable law (including pursuant to Section 1129 of the Bankruptcy Code), any reference to such First Lien Obligations or the First Lien Documents governing such First Lien Obligations shall refer to such obligations or such documents as so modified.

(c)     It is acknowledged that the First Lien Obligations of either Series may, subject to the limitations set forth in the then existing First Lien Documents and subject to any limitations set forth in this Agreement, be increased, extended, renewed, replaced, restated, supplemented, restructured, repaid, refunded or otherwise amended or modified from time to time, all without affecting the priorities set forth

9

in Section 2.1(a) or the provisions of this Agreement defining the relative rights of the First Lien Claimholders of either Series.

(d)        Notwithstanding the date, time, method, manner or order of grant, attachment or perfection of any Liens securing either Series of First Lien Obligations granted on the Shared Collateral and notwithstanding any provision of the UCC or any other applicable law or the First Lien Documents or any defect or deficiencies in the Liens securing the First Lien Obligations of either Series or any other circumstance whatsoever (but, in each case, subject to Section 2.1(b)), each First Lien Claimholder hereby agrees that the Liens securing each Series of First Lien Obligations on any Shared Collateral shall be of equal priority.

SECTION 2.2        Actions with Respect to Shared Collateral; Prohibition on Contesting Liens.

(a)        Notwithstanding Section 2.1, (i) only the Applicable Collateral Agent shall act with respect to the Shared Collateral (including with respect to any other intercreditor agreement with respect to any Shared Collateral), (ii) the Applicable Collateral Agent shall act only on the instructions of the Applicable Representative and shall not follow any instructions with respect to the Shared Collateral (including with respect to any other intercreditor agreement with respect to any Shared Collateral) from the Other First Lien Representative (or any other First Lien Claimholder other than the Applicable Representative) and (iii) no Other Note Claimholder shall or shall instruct either Collateral Agent to, and the Collateral Agent that is not the Applicable Collateral Agent shall not, commence any judicial or nonjudicial foreclosure proceedings with respect to, seek to have a trustee, receiver, liquidator or similar official appointed for or over, attempt any action to take possession of, exercise any right, remedy or power with respect to, or otherwise take any action to enforce its security interest in or realize upon, or take any other action available to it in respect of, Shared Collateral (including with respect to any other intercreditor agreement with respect to Shared Collateral), whether under any First Lien Collateral Document (other than the First Lien Collateral Documents applicable to the Applicable Collateral Agent), applicable law or otherwise, it being agreed that only the Applicable Collateral Agent, acting in accordance with the First Lien Collateral Documents applicable to it, shall be entitled to take any such actions or exercise any remedies with respect to such Shared Collateral at such time.

(b)        Without limiting the provisions of Section 4.2, the Other First Lien Representative and the Other First Lien Collateral Agent hereby appoint the Applicable Collateral Agent as its agent and authorizes the Applicable Collateral Agent to exercise any and all remedies under each First Lien Collateral Document with respect to Shared Collateral and to execute releases in connection therewith.

(c)        Notwithstanding the equal priority of the Liens securing each Series of First Lien Obligations granted on the Shared Collateral, the Applicable Collateral Agent (acting on the instructions of the Applicable Representative) may deal with the Shared Collateral as if such Applicable Collateral Agent had a senior and exclusive Lien on such Shared Collateral. Neither the Other First Lien Representative, the Other First Lien Collateral Agent nor the Other Note Claimholders will contest, protest or object to any foreclosure proceeding or action brought by the Applicable Collateral Agent, the Applicable Representative or the Controlling Claimholders or any other exercise by the Applicable Collateral Agent, the Applicable Representative or the Controlling Claimholders of any rights and remedies relating to the Shared Collateral. The foregoing shall not be construed to limit the rights and priorities of any First Lien Claimholder or either Collateral Agent or Representative with respect to any Collateral not constituting Shared Collateral.

(d)        Each of the Other First Lien Collateral Agent and the Other First Lien Representative agrees that it will not accept any Lien on any Collateral for the benefit of the Other Note Obligations (other than funds deposited for the satisfaction, discharge or defeasance of the Other Purchase

Agreement) other than pursuant to the First Lien Collateral Documents, and by executing this Agreement, each of the Other First Lien Collateral Agent and the Other First Lien Representative agrees to be bound by the provisions of this Agreement and the other First Lien Collateral Documents applicable to it.

(e)     Each of the First Lien Claimholders agrees that it will not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the perfection, priority, validity or enforceability of a Lien held by or on behalf of any of the First Lien Claimholders in all or any part of the Collateral or the provisions of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair (i) the rights of either Collateral Agent or Representative to enforce this Agreement or (ii) the rights of any First Lien Claimholder to contest or support any other Person in contesting the enforceability of any Lien purporting to secure obligations not constituting First Lien Obligations.

SECTION 2.3          No Interference; Payment Over; Exculpatory Provisions.

(a)     Each First Lien Claimholder agrees that (i) it will not challenge or question or support any other Person in challenging or questioning in any proceeding the validity or enforceability of any First Lien Obligations of either Series or any First Lien Collateral Document or the validity, attachment, perfection or priority of any Lien under any First Lien Collateral Document or the validity or enforceability of the priorities, rights or duties established by or other provisions of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair the rights of any First Lien Claimholder from challenging or questioning the validity or enforceability of any First Lien Obligations constituting unmatured interest or the validity of any Lien relating thereto pursuant to Section 502(b)(2) of the Bankruptcy Code, (ii) it will not take or cause to be taken any action the purpose or intent of which is, or could be, to interfere, hinder or delay, in any manner, whether by judicial proceedings or otherwise, any sale, transfer or other disposition of the Collateral by the Applicable Collateral Agent, (iii) except as provided in Section 2.2, it shall have no right to and shall not otherwise (A) direct the Applicable Collateral Agent or any other First Lien Claimholder to exercise any right, remedy or power with respect to any Shared Collateral (including pursuant to any other intercreditor agreement) or (B) consent to, or object to, the exercise by, or any forbearance from exercising by, the Applicable Collateral Agent or any other First Lien Claimholder represented by it of any right, remedy or power with respect to any Collateral, (iv) it will not institute any suit or assert in any suit, bankruptcy, insolvency or other proceeding any claim against the Applicable Collateral Agent or any other First Lien Claimholder represented by it seeking damages from or other relief by way of specific performance, instructions or otherwise with respect to any Collateral and (v) it will not attempt, directly or indirectly, whether by judicial proceedings or otherwise, to challenge the enforceability of any provision of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair the rights of any of the Applicable Collateral Agent or any other First Lien Claimholder to (i) enforce this Agreement or (ii) contest or support any other Person in contesting the enforceability of any Lien purporting to secure obligations not constituting First Lien Obligations.

(b)     Each First Lien Claimholder hereby agrees that if it shall obtain possession of any Shared Collateral or shall realize any proceeds or payment in respect of any Shared Collateral, pursuant to any First Lien Collateral Document or by the exercise of any rights available to it under applicable law or in any Insolvency or Liquidation Proceeding or through any other exercise of remedies (including pursuant to any intercreditor agreement), at any time prior to the Discharge of each of the First Lien Obligations, then it shall hold such Shared Collateral, proceeds or payment in trust for the other First Lien Claimholders having a security interest in such Shared Collateral and promptly transfer any such Shared Collateral, proceeds or payment, as the case may be, to the Applicable Collateral Agent, to be distributed by such Applicable Collateral Agent in accordance with the provisions of Section 2.1(a) hereof, provided, however, that the foregoing shall not apply to any Shared Collateral purchased by any First Lien Claimholder for cash pursuant to any exercise of remedies permitted hereunder.

(c)     None of the Applicable Collateral Agent, either Applicable Representative or any other First Lien Claimholder shall be liable for any action taken or omitted to be taken by the Applicable Collateral Agent, such Applicable Representative or any other First Lien Claimholder with respect to any Collateral in accordance with the provisions of this Agreement.

SECTION 2.4        Automatic Release of Liens.

(a)     If, at any time any Shared Collateral is transferred to a third party or otherwise disposed of, in each case, in connection with any enforcement by the Applicable Collateral Agent in accordance with the provisions of this Agreement, then (whether or not any Insolvency or Liquidation Proceeding is pending at the time) the Liens in favor of the other Collateral Agent (or in favor of such other First Lien Claimholders if directly secured by such Liens) upon such Shared Collateral will automatically be released and discharged upon final conclusion of such disposition as and when, but only to the extent, such Liens of the Applicable Collateral Agent on such Shared Collateral are released and discharged; provided that any proceeds of any Shared Collateral realized therefrom shall be applied pursuant to Section 2.1 hereof.  If in connection with any such foreclosure or other exercise of remedies by the Applicable Collateral Agent, the Applicable Collateral Agent or related Applicable Representative of such Series of First Lien Obligations releases any Guarantor from its obligation under a guarantee of the Series of First Lien Obligations for which it serves as agent prior to a Discharge of such Series of First Lien Obligations, such Guarantor also shall be released from its guarantee of all other First Lien Obligations.  If in connection with any such foreclosure or other exercise of remedies by the Applicable Collateral Agent, the equity interests of any Person are foreclosed upon or otherwise disposed of and the Applicable Collateral Agent releases its Lien on the property or assets of such Person, then the Liens of the other Collateral Agent (or in favor of such other First Lien Claimholders if directly secured by such Liens) with respect to any Collateral consisting of the property or assets of such Person will be automatically released to the same extent as the Liens of the Applicable Collateral Agent are released; provided that any proceeds of any such equity interests foreclosed upon where the Applicable Collateral Agent releases its Lien on the assets of such Person on which another Series of First Lien Obligations holds a Lien on any of the assets of such Person (any such assets, the "***Underlying Assets***") which Lien is released as provided in this sentence (any such Proceeds being referred to herein as "***Equity Release Proceeds***" regardless of whether or not such other Series of First Lien Obligations holds a Lien on such equity interests so disposed of) shall be applied pursuant to Section 2.1 hereof.

(b)     Without limiting the rights of the Applicable Collateral Agent under Section 4.2, each Collateral Agent and each Representative agrees to execute and deliver (at the sole cost and expense of the Grantors) all such authorizations and other instruments as shall reasonably be requested by the Company or the Applicable Collateral Agent to evidence and confirm any release of Shared Collateral, Underlying Assets or guarantee provided for in this Section.

SECTION 2.5        Certain Agreements with Respect to Bankruptcy or Insolvency Proceedings.

(a)     This Agreement shall continue in full force and effect notwithstanding the commencement of any proceeding under the Bankruptcy Code or any other Federal, state or foreign bankruptcy, insolvency, receivership or similar law by or against any Grantor or any of its subsidiaries.

(b)     If any Grantor shall become subject to a case (a "***Bankruptcy Case***") under the Bankruptcy Code and shall, as debtor(s)-in-possession, move for approval of financing ("***DIP Financing***") to be provided by one or more lenders (the "***DIP Lenders***") under Section 364 of the Bankruptcy Code or the use of cash collateral under Section 363 of the Bankruptcy Code, each First Lien Claimholder (other than any Controlling Claimholder or the Representative of the Controlling Claimholder) agrees that it will

12

not raise any objection to any such financing or to the Liens on the Shared Collateral securing the same ("**DIP Financing Liens**") or to any use of cash collateral that constitutes Shared Collateral, unless the Representative of the Controlling Claimholders shall then oppose or object to such DIP Financing or such DIP Financing Liens or use of cash collateral (and (i) to the extent that such DIP Financing Liens are senior to the Liens on any such Shared Collateral for the benefit of the Controlling Claimholders, each Other Note Claimholder will subordinate its Liens with respect to such Shared Collateral on the same terms as the Liens of the Controlling Claimholders (other than any Liens of any First Lien Claimholders constituting DIP Financing Liens) are subordinated thereto, and (ii) to the extent that such DIP Financing Liens rank *pari passu* with the Liens on any such Shared Collateral granted to secure the First Lien Obligations of the Controlling Claimholders, each Other Note Claimholder will confirm the priorities with respect to such Shared Collateral as set forth herein), in each case so long as (A) the First Lien Claimholders of each Series retain the benefit of their Liens on all such Shared Collateral pledged to the DIP Lenders, including proceeds thereof arising after the commencement of such proceeding, with the same priority vis-à-vis all the other First Lien Claimholders (other than any Liens of the First Lien Claimholders constituting DIP Financing Liens) as existed prior to the commencement of the Bankruptcy Case, (B) the First Lien Claimholders of each Series are granted Liens on any additional collateral pledged to any First Lien Claimholders as adequate protection or otherwise in connection with such DIP Financing or use of cash collateral, with the same priority vis-à-vis the First Lien Claimholders as set forth in this Agreement (other than any Liens of any First Lien Claimholders constituting DIP Financing Liens), (C) if any amount of such DIP Financing or cash collateral is applied to repay any of the First Lien Obligations, such amount is applied pursuant to Section 2.1(a) of this Agreement, and (D) if any First Lien Claimholders are granted adequate protection with respect to the First Lien Obligations subject hereto, including in the form of periodic payments, in connection with such use of cash collateral, the proceeds of such adequate protection are applied pursuant to Section 2.1(a) of this Agreement; provided that the First Lien Claimholders of each Series shall have a right to object to the grant of a Lien to secure the DIP Financing over any Collateral subject to Liens in favor of the First Lien Claimholders of such Series or its Representative or Collateral Agent that shall not constitute Shared Collateral; provided, further, that the First Lien Claimholders receiving adequate protection shall not object to any other First Lien Claimholder receiving adequate protection comparable to any adequate protection granted to such First Lien Claimholders in connection with a DIP Financing or use of cash collateral.

(c)     If any First Lien Claimholder is granted adequate protection (A) in the form of Liens on any additional collateral, then each other First Lien Claimholder shall be entitled to seek, and each First Lien Claimholder will consent and not object to, adequate protection in the form of Liens on such additional collateral with the same priority vis-à-vis the First Lien Claimholders as set forth in this Agreement, (B) in the form of a superpriority or other administrative claim, then each other First Lien Claimholder shall be entitled to seek, and each First Lien Claimholder will consent and not object to, adequate protection in the form of a pari passu superpriority or administrative claim or (C) in the form of periodic or other cash payments, then the proceeds of such adequate protection must be applied to all First Lien Obligations pursuant to Section 2.1.

SECTION 2.6     Reinstatement.

In the event that any of the First Lien Obligations shall be paid in full and such payment or any part thereof shall subsequently, for whatever reason (including an order or judgment for disgorgement of a preference under Title 11 of the Bankruptcy Code, or any similar law, or the settlement of any claim in respect thereof), be required to be returned or repaid, the terms and conditions of this Agreement shall be fully applicable thereto until all such First Lien Obligations shall again have been paid in full in cash. This Section 2.6 shall survive termination of this Agreement.

SECTION 2.7     Insurance and Condemnation Awards.

As among the First Lien Claimholders, the Applicable Collateral Agent (acting at the direction of the Applicable Representative), shall have the right, but not the obligation, to adjust or settle any insurance policy or claim covering or constituting Shared Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding affecting the Shared Collateral. To the extent either Collateral Agent or any other First Lien Claimholder receives proceeds of such insurance policy and such proceeds are not permitted or required to be returned to any Grantor under the applicable First Lien Documents, such proceeds shall be turned over to the Applicable Collateral Agent for application as provided in Section 2.1 hereof.

SECTION 2.8        Gratuitous Bailee/Agent for Perfection.

(a)        The Applicable Collateral Agent shall be entitled to hold any Possessory Collateral constituting Shared Collateral.

(b)        Notwithstanding the foregoing, each Collateral Agent agrees to hold any Possessory Collateral constituting Shared Collateral and any other Shared Collateral from time to time in its possession or control (or in the possession or control of its agents or bailees) as gratuitous bailee for the benefit of each other First Lien Claimholder (such bailment being intended, among other things, to satisfy the requirements of Sections 8-106(d)(3), 8-301(a)(2) and 9-313(c) of the UCC), solely for the purpose of perfecting the security interest granted in such Shared Collateral, if any, pursuant to the applicable First Lien Collateral Documents, in each case, subject to the terms and conditions of this Section 2.8. Solely with respect to any deposit accounts constituting Shared Collateral under the control (within the meaning of Section 9-104 of the UCC) of any Collateral Agent, each such Collateral Agent agrees to also hold control over such deposit accounts as gratuitous agent for each other First Lien Claimholder and any assignee solely for the purpose of perfecting the security interest in such deposit accounts, subject to the terms and conditions of this Section 2.8.

(c)        No Collateral Agent shall have any obligation whatsoever to any First Lien Claimholder to ensure that the Possessory Collateral and Control Collateral is genuine or owned by any of the Grantors or to preserve rights or benefits of any Person except as expressly set forth in this Section 2.8. The duties or responsibilities of each Collateral Agent under this Section 2.8 shall be limited solely to holding any Possessory Collateral constituting Shared Collateral or any other Shared Collateral in its possession or control as gratuitous bailee (and with respect to Deposit Accounts, as gratuitous agent) in accordance with this Section 2.8 and delivering the Possessory Collateral constituting Shared Collateral as provided in Section 2.8(e) below.

(d)        Neither Collateral Agents nor any of the First Lien Claimholders shall have by reason of the First Lien Documents, this Agreement or any other document a fiduciary relationship in respect of the other Collateral Agents or any other First Lien Claimholder, and each Collateral Agent and each First Lien Claimholder hereby waives and releases the other Collateral Agents and First Lien Claimholders from all claims and liabilities arising pursuant to either Collateral Agent's role under this Section 2.8 as gratuitous bailee with respect to the Possessory Collateral constituting Shared Collateral or any other Shared Collateral in its possession or control (and with respect to the Deposit Accounts, as gratuitous agent).

(e)        At any time the Applicable Collateral Agent is no longer the Applicable Collateral Agent, such outgoing Applicable Collateral Agent shall deliver the remaining Possessory Collateral constituting Shared Collateral in its possession (if any) together with any necessary endorsements (which endorsement shall be without recourse and without any representation or warranty), first, to the then Applicable Collateral Agent to the extent First Lien Obligations remain outstanding and second, to the applicable Grantor to the extent no First Lien Obligations remain outstanding (in each case, so as to allow

14

such Person to obtain possession or control of such Shared Collateral) or to whomever may be lawfully entitled to receive the same.  The outgoing Applicable Collateral Agent further agrees to take all other action reasonably requested by the then Applicable Collateral Agent or the Company at the expense of the Company in connection with the then Applicable Collateral Agent obtaining a first-priority security interest in the Shared Collateral.

SECTION 2.9          Amendments to First Lien Collateral Documents.

(a)          Without the prior written consent of each other Collateral Agent, each Collateral Agent agrees that no First Lien Collateral Document may be amended, restated, amended and restated, supplemented, replaced or refinanced or otherwise modified from time to time or entered into to the extent such amendment, supplement, refinancing or modification, or the terms of any new First Lien Collateral Document, would be prohibited by, or would require any Grantor to act or refrain from acting in a manner that would violate, any of the terms of this Agreement.

(b)          In determining whether an amendment to any First Lien Collateral Document is permitted by this Section 2.9, each Collateral Agent may conclusively rely on an officer's certificate of the Company stating that such amendment is permitted by this Section 2.9.

SECTION 2.10          Similar Liens and Agreements.

(a)          The parties hereto agree that it is their intention that the Collateral be identical for all First Lien Claimholders.  In furtherance of, but subject to, the foregoing, the parties hereto agree, subject to the other provisions of this Agreement:

(i)          upon request by either Collateral Agent, to cooperate in good faith (and to direct their counsel to cooperate in good faith) from time to time in order to determine the specific items included in the Shared Collateral and the steps taken to perfect their respective Liens thereon and the identity of the respective parties obligated under the Initial Note Documents and the Other Note Documents; and

(ii)          that the documents and agreements creating or evidencing the Liens on Shared Collateral securing the Initial Note Obligations and the Other Note Obligations shall be in all material respects the same forms of documents as one another, except that the documents and agreements creating or evidencing the Liens securing the Other Note Obligations may contain additional provisions as may be necessary or appropriate to establish the intercreditor arrangements among the various separate classes of creditors holding Other Note Obligations.

ARTICLE III.

EXISTENCE AND AMOUNTS OF LIENS AND OBLIGATIONS

Whenever an Applicable Collateral Agent or an Applicable Representative shall be required, in connection with the exercise of its rights or the performance of its obligations hereunder, to determine the existence or amount of any First Lien Obligations of either Series, or the Shared Collateral subject to any Lien securing the First Lien Obligations of either Series, it may request that such information be furnished to it in writing by the other Representative or the other Collateral Agent and shall be entitled to make such determination or not make any determination on the basis of the information so furnished; provided, however, that if such Representative or Collateral Agent shall fail or refuse reasonably promptly to provide the requested information, the requesting Applicable Collateral Agent or Applicable Representative shall be entitled to make any such determination or not make any determination by such method as it

15

may, in the exercise of its good faith judgment, determine, including by reliance upon a certificate of the Company.  Each Applicable Collateral Agent and each Applicable Representative may rely conclusively, and shall be fully protected in so relying, on any determination made by it in accordance with the provisions of the preceding sentence (or as otherwise directed by a court of competent jurisdiction) and shall have no liability to any Grantor, any First Lien Claimholder or any other person as a result of such determination.

ARTICLE IV.

THE APPLICABLE COLLATERAL AGENT

SECTION 4.1        Authority.

(a)        Notwithstanding any other provision of this Agreement, nothing herein shall be construed to impose any fiduciary or other duty on any Applicable Collateral Agent to any Other Note Claimholder or give any Other Note Claimholder the right to direct the Applicable Collateral Agent, except that each Applicable Collateral Agent shall be obligated to distribute proceeds of any Shared Collateral in accordance with Section 2.1 hereof.

(b)        In furtherance of the foregoing, each Other Note Claimholder acknowledges and agrees that the Applicable Collateral Agent shall be entitled, for the benefit of the First Lien Claimholders, to sell, transfer or otherwise dispose of or deal with any Shared Collateral as provided herein and in the First Lien Collateral Documents, as applicable, without regard to any rights to which the Other Note Claimholder would otherwise be entitled as a result of the First Lien Obligations held by such Other Note Claimholders.  Without limiting the foregoing, each Other Note Claimholder agrees that none of the Applicable Collateral Agent, the Applicable Representative or any other First Lien Claimholder shall have any duty or obligation first to marshal or realize upon any type of Shared Collateral (or any other Collateral securing any of the First Lien Obligations), or to sell, dispose of or otherwise liquidate all or any portion of such Shared Collateral (or any other Collateral securing any First Lien Obligations), in any manner that would maximize the return to the Other Note Claimholder, notwithstanding that the order and timing of any such realization, sale, disposition or liquidation may affect the amount of proceeds actually received by the Other Note Claimholders from such realization, sale, disposition or liquidation.  Each of the First Lien Claimholders waives any claim it may now or hereafter have against the Collateral Agent or Representative of the other Series of First Lien Obligations or any other First Lien Claimholder of the other Series arising out of (i) any actions which any such Collateral Agent, Representative or any First Lien Claimholder represented by it take or omit to take (including actions with respect to the creation, perfection or continuation of Liens on any Collateral, actions with respect to the foreclosure upon, sale, release or depreciation of, or failure to realize upon, any of the Collateral and actions with respect to the collection of any claim for all or any part of the First Lien Obligations from any account debtor, guarantor or any other party) in accordance with the First Lien Collateral Documents or any other agreement related thereto or in connection with the collection of the First Lien Obligations or the valuation, use, protection or release of any security for the First Lien Obligations; provided that nothing in this clause (i) shall be construed to prevent or impair the rights of either Collateral Agent or Representative to enforce this Agreement, (ii) any election by the Applicable Representative or any holders of First Lien Obligations, in any proceeding instituted under the Bankruptcy Code, of the application of Section 1111(b) of the Bankruptcy Code or (iii) subject to Section 2.5, any borrowing, or grant of a security interest or administrative expense priority under Section 364 of the Bankruptcy Code or any equivalent provision of any other Bankruptcy Law, by the Company or any of its subsidiaries, as debtor-in-possession.  Notwithstanding any other provision of this Agreement, the Applicable Collateral Agent shall not (i) accept any Shared Collateral in full or partial satisfaction of any First Lien Obligations pursuant to Section 9-620 of the UCC, without the consent of the Representatives representing holders of First Lien Obligations for whom such Collateral constitutes Shared Collateral or (ii) "credit bid" for or purchase (other than for cash) Shared Collateral at any public, private

16

or judicial foreclosure upon such Shared Collateral, without the consent of the Representative representing holders of First Lien Obligations for whom such Collateral constitutes Shared Collateral.

SECTION 4.2        Power-of-Attorney.

The Other First Lien Representative and the Other First Lien Collateral Agent, for itself and on behalf of the Other Note Claimholders, hereby irrevocably appoints the Applicable Collateral Agent and any officer or agent of the Applicable Collateral Agent, which appointment is coupled with an interest with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Other First Lien Representative, the Other First Lien Collateral Agent and the Other Note Claimholders, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Agreement, including the exercise of any and all remedies under each First Lien Collateral Document with respect to Shared Collateral and the execution of releases in connection therewith.

ARTICLE V.

MISCELLANEOUS

SECTION 5.1        Integration/Conflicts.

This Agreement, together with the other First Lien Documents and the First Lien Collateral Documents, represents the entire agreement of each of the Grantors and the First Lien Claimholders with respect to the subject matter hereof and thereof and supersedes any and all previous agreements and understandings, oral or written, relating to the subject matter hereof and thereof.  There are no promises, undertakings, representations or warranties by either Representative, either Collateral Agent or the First Lien Claimholder relative to the subject matter hereof and thereof not expressly set forth or referred to herein or therein.  In the event of any conflict between the provisions of this Agreement and the provisions of the First Lien Documents the provisions of this Agreement shall govern and control.

SECTION 5.2        Effectiveness; Continuing Nature of this Agreement; Severability.

This Agreement shall become effective when executed and delivered by the parties hereto. This is a continuing agreement and the First Lien Claimholders of either Series may continue, at any time and without notice to any First Lien Claimholder of the other Series, to extend credit and other financial accommodations and lend monies to or for the benefit of the Company or any Grantor constituting First Lien Obligations in reliance hereon.  Each Representative and each Collateral Agent, on behalf of itself and each other First Lien Claimholder represented by it, hereby waives any right it may have under applicable law to revoke this Agreement or any of the provisions of this Agreement.  The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency or Liquidation Proceeding.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  The parties hereto shall endeavor in good faith negotiations to replace any invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to those of the invalid, illegal or unenforceable provisions. All references to the Company or any other Grantor shall include the Company or such Grantor as debtor and debtor in possession and any receiver, trustee or similar person for the Company or any other Grantor (as the case may be) in any Insolvency or Liquidation Proceeding.  This Agreement shall terminate and be of no further force and effect with respect to the Representative or Collateral Agent and the First Lien Claimholders represented by such Representative or Collateral Agent and their First Lien Obligations, on

17

the date on which there has been a Discharge of such Series of First Lien Obligations, subject to the rights of the First Lien Claimholders under Section 2.6; provided, however, that such termination shall not relieve any such party of its obligations incurred hereunder prior to the date of such termination.

SECTION 5.3        Amendments; Waivers.

(a)        No amendment, modification or waiver of any of the provisions of this Agreement shall be deemed to be made unless the same shall be in writing signed on behalf of each party hereto or its authorized agent and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time.  Notwithstanding the foregoing, the Company and the other Grantors shall not have any right to consent to or approve any amendment, modification or waiver of any provision of this Agreement except to the extent their rights are adversely affected.

SECTION 5.4        Information Concerning Financial Condition of the Grantors and their Subsidiaries.

The Representative and Collateral Agent and the other First Lien Claimholders of each Series shall each be responsible for keeping themselves informed of (a) the financial condition of the Grantors and their subsidiaries and all endorsers and/or guarantors of the First Lien Obligations and (b) all other circumstances bearing upon the risk of nonpayment of the First Lien Obligations, provided that the foregoing shall not impose any obligation on any Representative or Collateral Agent not expressly set forth in the applicable First Lien Documents.  The Representative and Collateral Agent and the other First Lien Claimholders of each Series shall have no duty to advise the Representative, Collateral Agent or First Lien Claimholders of the other Series of information known to it or them regarding such condition or any such circumstances or otherwise.  In the event the Representative or Collateral Agent or any of the other First Lien Claimholders, in its or their sole discretion, undertakes at any time or from time to time to provide any such information to the Representative, Collateral Agent or First Lien Claimholders of the other Series, it or they shall be under no obligation:

(a)        to make, and such Representative and Collateral Agent and such other First Lien Claimholders shall not make, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided;

(b)        to provide any additional information or to provide any such information on any subsequent occasion;

(c)        to undertake any investigation; or

(d)        to disclose any information, which pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

SECTION 5.5        Submission to Jurisdiction; Certain Waivers.

Each of the Company, each other Grantor, each Collateral Agent and each Representative, on behalf of itself and each other First Lien Claimholder represented by it, hereby irrevocably and unconditionally:

(a)      submits for itself and its property in any legal action or proceeding relating to this Agreement and the First Lien Collateral Documents (whether arising in contract, tort or otherwise) to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the exclusive (subject to Section 5.5(c)) general jurisdiction of the courts of the State of New York sitting in the Borough of Manhattan, the courts of the United States for the Southern District of New York sitting in the Borough of Manhattan, and appellate courts from any thereof;

(b)      agrees that all claims in respect of any such action or proceeding shall be heard and determined in such New York state court or, to the fullest extent permitted by applicable law, in such federal court;

(c)      agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law and that nothing in this Agreement or any other First Lien Document shall affect any right that either Collateral Agent, either Representative or any other First Lien Claimholder may otherwise have to bring any action or proceeding relating to this Agreement or any other First Lien Document against such Grantor or any of its assets in the courts of any jurisdiction;

(d)      waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement or any other First Lien Collateral Document in any court referred to in Section 5.5(a) (and irrevocably waives to the fullest extent permitted by applicable law the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court); and

(e)      waives, to the maximum extent not prohibited by law, any right it may have to claim or recover any special, exemplary, punitive or consequential damages.

SECTION 5.6          WAIVER OF JURY TRIAL.

**EACH PARTY HERETO AND THE COMPANY AND THE OTHER GRANTORS HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER FIRST LIEN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT, BREACH OF DUTY, COMMON LAW, STATUTE OR ANY OTHER THEORY). EACH PARTY HERETO AND THE COMPANY AND THE OTHER GRANTORS (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT EACH SUCH PARTY HERETO AND THE COMPANY AND EACH OTHER GRANTOR HAVE BEEN INDUCED TO ENTER INTO OR ACKNOWLEDGE THIS AGREEMENT AND THE OTHER FIRST LIEN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION. EACH PARTY HERETO AND THE COMPANY AND THE OTHER GRANTORS FURTHER REPRESENTS AND WARRANTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.**

SECTION 5.7          Notices.

Unless otherwise specifically provided herein, any notice hereunder shall be in writing and may be personally served or sent by facsimile, electronic mail or United States mail or courier service and shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof, upon receipt of facsimile or electronic mail, or three Business Days after depositing it in the United States mail with postage prepaid and properly addressed.  For the purposes hereof, the addresses of the parties hereto shall be as set forth below each party's name on the signature pages hereto or, with respect to any Grantor that becomes a party hereto pursuant to Section 5.17, in the joinder agreement substantially in the form attached hereto as Exhibit A, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

SECTION 5.8          Further Assurances.

Each Representative and Collateral Agent, on behalf of itself and each other First Lien Claimholder represented by it, and the Company and each other Grantor, agree that each of them shall take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as either Representative and Collateral Agent may reasonably request to effectuate the terms of and the Lien priorities contemplated by this Agreement.

SECTION 5.9          Agency Capacities.

(a)     Except as expressly provided herein, (a) each of the Initial First Lien Representative and the Initial First Lien Collateral Agent is acting in the capacity of Representative and Collateral Agent, respectively, solely for the Initial Note Claimholders and pursuant to the direction set forth in the Initial Note Documents and (b) each of the Other First Lien Representative and the Other First Lien Collateral Agent is acting in the capacity of Representative and Collateral Agent, respectively, solely for the Other Note Claimholders and pursuant to the direction set forth in the Other Note Documents.  Each Representative and each Collateral Agent shall be entitled to the rights, privileges and immunities of such Representative or such Collateral Agent as set forth in the applicable First Lien Documents in acting hereunder.

(b)     Neither Representative or Collateral Agent shall be responsible for the terms or sufficiency of this Agreement for any purpose.  Neither Representative or Collateral Agent shall have any duties or obligations under or pursuant to this Agreement other than such duties as may be expressly set forth in this as duties on its part to be performed or observed.  In entering into this Agreement, or in taking (or forbearing from) any action under or pursuant to this Agreement, each Representative and Collateral Agent shall have and be protected by all of the rights, immunities, indemnities and other protections granted to it under the applicable First Lien Documents.  Neither Representative or Collateral Agent shall have any liability or responsibility for the actions or omissions of the other Collateral Agent, or for any other claimholder's or the other Collateral Agent's compliance with (or failure to comply with) the terms of this Agreement.

(c)     None of the provisions in this Agreement shall require the Representatives or the Collateral Agents to expend or risk their own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of their duties, or in the exercise of any of its rights or powers if they shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to them against such risk or liability is not assured to them.

(d)     Neither Representative or Collateral Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated by the applicable First Lien Documents that such Representative or Collateral Agent is required to exercise as directed in writing by the Required Holders (as defined in the Initial Purchase Agreement or Other Purchase Agreement, as applicable); *provided that*, either Representative and Collateral Agent shall be entitled to refrain from any act or the taking of any action hereunder under the applicable First Lien Documents or

20

from the exercise of any power or authority vested in it hereunder or thereunder unless and until such Representative or Collateral Agent shall have received instructions from the Required Holders (as defined in the Initial Purchase Agreement or Other Purchase Agreement, as applicable) and such Representative or Collateral Agent deems necessary, satisfactory indemnity has been provided to it, and neither such Representative nor Collateral Agent shall be liable for any such delay in acting.  Neither Representative or Collateral Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose it to liability or that is contrary to the applicable First Lien Documents or applicable law, including for the avoidance of doubt, any action that may be in violation of the automatic stay under any bankruptcy or insolvency law.  For purposes of clarity, phrases such as "satisfactory to", "approved by", "acceptable to", "as determined by", "in the discretion of", "selected by", "requested by" the Representatives or Collateral Agents and phrases of similar import authorize and permit the Representatives or Collateral Agents to approve, disapprove, determine, act or decline to act in its discretion.  Any exercise of discretion on behalf of the Other First Lien Representative or the Other First Lien Collateral Agent shall be exercised in accordance with the terms of the Other Note Documents.  Notwithstanding anything herein to the contrary, neither Representative or Collateral Agent shall have any responsibility for the preparation, filing or recording of any instrument, document or financing statement or for the perfection or maintenance of any security interest created hereunder.

SECTION 5.10     GOVERNING LAW.

**THIS AGREEMENT, AND ANY DISPUTE, CLAIM OR CONTROVERSY ARISING OUT OF OR RELATING TO THIS AGREEMENT (WHETHER ARISING IN CONTRACT, TORT OR OTHERWISE) SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAW RULES THAT WOULD RESULT IN THE APPLICATION OF A DIFFERENT GOVERNING LAW (OTHER THAN ANY MANDATORY PROVISIONS OF THE UCC RELATING TO THE LAW GOVERNING PERFECTION AND THE EFFECT OF PERFECTION OR PRIORITY OF THE SECURITY INTERESTS).**

SECTION 5.11     Binding on Successors and Assigns.

This Agreement shall be binding upon each Representative and each Collateral Agent, the First Lien Claimholders, the Company and the other Grantors, and their respective successors and assigns from time to time.  If either Representative and/or Collateral Agent resigns or is replaced pursuant to the applicable First Lien Documents its successor shall be deemed to be a party to this Agreement and shall have all the rights of, and be subject to all the obligations of, this Agreement.  No provision of this Agreement will inure to the benefit of a trustee, debtor-in-possession, creditor trust or other representative of an estate or creditor of any Grantor, including where any such trustee, debtor-in-possession, creditor trust or other representative of an estate is the beneficiary of a Lien securing Collateral by virtue of the avoidance of such Lien in an Insolvency or Liquidation Proceeding.

SECTION 5.12     Section Headings.

Section headings and the Table of Contents used in this Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

SECTION 5.13     Counterparts.

This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute

21

one and the same instrument. Delivery of an executed signature page of this Agreement by facsimile or other electronic transmission (e.g., "pdf" or "tif" format) shall be effective as delivery of a manually executed counterpart hereof. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this Agreement and/or any document to be signed in connection with this Agreement and the transactions contemplated hereby shall be deemed to include Electronic Signatures (as defined below), deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be. "*__Electronic Signatures__*" means any electronic symbol or process attached to, or associated with, any contract or other record and adopted by a person with the intent to sign, authenticate or accept such contract or record.

SECTION 5.14        Authorization.

By its signature, each Person executing this Agreement, on behalf of such party or Grantor but not in his or her personal capacity as a signatory, represents and warrants to the other parties hereto that it is duly authorized to execute this Agreement.

SECTION 5.15        No Third Party Beneficiaries/ Provisions Solely to Define Relative Rights.

The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the First Lien Claimholders in relation to one another. None of the Company, any other Grantor nor any other creditor thereof shall have any rights or obligations hereunder and no such Person is an intended beneficiary or third party beneficiary hereof, except, in each case, as expressly provided in this Agreement, and none of the Company or any other Grantor may rely on the terms hereof (other than Sections 5.3). Nothing in this Agreement is intended to or shall impair the obligations of any Grantor, which are absolute and unconditional, to pay the First Lien Obligations as and when the same shall become due and payable in accordance with their terms. Without limitation of any other provisions of this Agreement, the Company and each Grantor hereby (a) acknowledges that it has read this Agreement and consents hereto, (b) agrees that it will not take any action that would be contrary to the express provisions of this Agreement and (c) agrees to abide by the requirements expressly applicable to it under this Agreement.

SECTION 5.16        No Indirect Actions.

Unless otherwise expressly stated, if a party may not take an action under this Agreement, then it may not take that action indirectly, or support any other Person in taking that action directly or indirectly. "Taking an action indirectly" means taking an action that is not expressly prohibited for the party but is intended to have substantially the same effects as the prohibited action.

SECTION 5.17        Additional Grantors.

Each of the Company and the other Grantors agrees that it shall ensure that each of its subsidiaries that is or is to become a party to any First Lien Document and which grants or purports to grant a lien on any of its assets shall either execute this Agreement on the date hereof or shall confirm that it is a Grantor hereunder pursuant to a joinder agreement substantially in the form attached hereto as Exhibit A that is executed and delivered by such subsidiary prior to or concurrently with its execution and delivery of such First Lien Document.

[Signature Pages Follow]

22

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**U.S. BANK NATIONAL ASSOCIATION**, as Initial First Lien Representative and as Initial First Lien Collateral Agent

By: _____
     Name:
     Title:

Address for notices:
U.S. Bank National Association
West Side Flats
60 Livingston Avenue
EP-MN-WS3C
St. Paul, MN 55107
Attention: Joshua Hahn (Core Sciences)

**U.S. BANK NATIONAL ASSOCIATION**, as Other First Lien Representative and as Other First Lien Collateral Agent

By: _____
     Name:
     Title:

Address for notices:
U.S. Bank National Association
West Side Flats
60 Livingston Avenue
EP-MN-WS3C
St. Paul, MN 55107
Attention: Joshua Hahn (Core Sciences)

[Signature Page to Intercreditor Agreement]

**Acknowledged and Agreed to by:**

[_____]


By:_____
Name:
Title:

Exhibit A
to First Lien Pari Passu Intercreditor Agreement

FORM OF GRANTOR JOINDER AGREEMENT

GRANTOR JOINDER AGREEMENT NO.  [___] (this "*Grantor Joinder Agreement*"), dated as of [___], 20[___] to the PARI PASSU INTERCREDITOR AGREEMENT, dated as of [___], 2021 (the "*Pari Passu Intercreditor Agreement*"), by and among U.S. Bank National Association, as Initial First Lien Representative and Initial First Lien Collateral Agent, U.S. Bank National Association, as Other First Lien Representative and Other First Lien Collateral Agent, and acknowledged and agreed to by Core Scientific Holding Co. and the other Grantors from time to time party thereto.  Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Pari Passu Intercreditor Agreement.

The undersigned, [_____], a [_____], (the "*New Grantor*") wishes to acknowledge and agree to the Pari Passu Intercreditor Agreement and become a party thereto to the limited extent contemplated by Section 5.17 thereof and to acquire and undertake the rights and obligations of a Grantor thereunder.

Accordingly, the New Grantor agrees as follows for the benefit of the Representatives, the Collateral Agents and the First Lien Claimholders:

Section 1.        Accession to the Pari Passu Intercreditor Agreement.  The New Grantor (a) acknowledges and agrees to, and becomes a party to the Pari Passu Intercreditor Agreement as a Grantor to the limited extent contemplated by Section 5.17 thereof, (b) agrees to all the terms and provisions of the Pari Passu Intercreditor Agreement and (c) shall have all the rights and obligations of a Grantor under the Pari Passu Intercreditor Agreement.  This Grantor Joinder Agreement supplements the Pari Passu Intercreditor Agreement and is being executed and delivered by the New Grantor pursuant to Section 5.17 of the Pari Passu Intercreditor Agreement.

Section 2.        Representations, Warranties and Acknowledgement of the New Grantor.  The New Grantor represents and warrants to each Representative, each Collateral Agent and to the First Lien Claimholders that (a) it has full power and authority to enter into this Grantor Joinder Agreement, in its capacity as Grantor and (b) this Grantor Joinder Agreement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with the terms of this Grantor Joinder Agreement.

Section 3.        Counterparts.  This Grantor Joinder Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Grantor Joinder Agreement or any document or instrument delivered in connection herewith by telecopy or other electronic means shall be effective as delivery of a manually executed counterpart of this Grantor Joinder Agreement or such other document or instrument, as applicable.

Section 4.        Section Headings.  Section heading used in this Grantor Joinder Agreement are for convenience of reference only and are not to affect the construction hereof or to be taken in consideration in the interpretation hereof.

Section 5.       Benefit of Agreement.  The agreements set forth herein or undertaken pursuant hereto are for the benefit of, and may be enforced by, any party to the Pari Passu Intercreditor Agreement subject to any limitations set forth in the Pari Passu Intercreditor Agreement with respect to the Grantors.

Section 6.       Governing Law.  **THIS GRANTOR JOINDER AGREEMENT, AND ANY DISPUTE, CLAIM OR CONTROVERSY ARISING OUT OF OR RELATING TO THIS GRANTOR JOINDER AGREEMENT (WHETHER ARISING IN CONTRACT, TORT OR OTHERWISE) SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAW RULES THAT WOULD RESULT IN THE APPLICATION OF A DIFFERENT GOVERNING LAW (OTHER THAN ANY MANDATORY PROVISIONS OF THE UCC RELATING TO THE LAW GOVERNING PERFECTION AND THE EFFECT OF PERFECTION OR PRIORITY OF THE SECURITY INTERESTS IN THE COLLATERAL).**

Section 7.       Severability.  Any provision of this Grantor Joinder Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  The parties hereto shall endeavor in good faith negotiations to replace any invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to those of the invalid, illegal or unenforceable provisions.

Section 8.       Notices.  All communications and notices hereunder shall be in writing and given as provided in Section 5.7 of the Pari Passu Intercreditor Agreement.  All communications and notices hereunder to the New Grantor shall be given to it at the address set forth under its signature hereto, which information supplements Section 5.7 of the Pari Passu Intercreditor Agreement.

IN WITNESS WHEREOF, the New Grantor has duly executed this Grantor Joinder Agreement to the Pari Passu Intercreditor Agreement as of the day and year first above written.

[_____]

By_____
    Name:
    Title:

Address for notices:
_____
_____
Attention of:_____
Telecopy: _____

**EXHIBIT I**

**FORM OF JOINDER AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

**[FORM OF] JOINDER AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS JOINDER ASSIGNMENT AND ASSUMPTION AGREEMENT (this "*Agreement*"), dated as of [___], is made by and among [Parent Entity] (the "*Parent*"), [Core Scientific Holding Co.]¹, a Delaware (the "*Company*") and U.S. BANK NATIONAL ASSOCIATION, as note agent (in such capacity, the "*Agent*"), under that certain Convertible Note Purchase Agreement, dated as of August 20, 2021 (as amended, restated, supplemented and/or otherwise modified from time to time, the "*Purchase Agreement*"), by and among the Company, the Guarantors party thereto, each Purchaser party thereto and the Note Agent.

## RECITALS

**WHEREAS**, pursuant to the Purchase Agreement, each Purchaser has been issued by the Company one or more Notes (as defined in the Purchase Agreement), which are part of a series of Notes issued by the Company, in an aggregate principal amount of up to $300,000,000.00;

**WHEREAS**, pursuant to Section 10.1 of the Purchase Agreement, in the event of a SPAC, the Parent Entity shall (a) assume the Obligation of the Company to deliver Conversion Securities pursuant to Section 2 of the Note and (b) assume each other Obligation of the Company under the Note Documents by becoming a joint and several co-obligor of each such other Obligation of the Company (or its successor by merger) under the Note Documents, in each case pursuant to this Agreement; and

**WHEREAS**, the Company and the Parent now seek to consummate the joinder and assignment and assumption contemplated by Section 10.1 of the Purchase Agreement.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the agreements and covenants contained in the Purchase Agreement, and the agreements and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties do hereby agree as follows:

**1.     Defined Terms**.  Capitalized terms used but not defined herein shall have the meanings set forth in the Purchase Agreement.

**2.     Assignment and Assumption**.  Under the terms and subject to the conditions set forth in the Purchase Agreement, the Company hereby assigns to the Parent, and the Parent hereby accepts, the Obligation of the Company to deliver Conversion Securities pursuant to Section 2 of the Note.

**3.     Joinder**.  The Parent hereby acknowledges, agrees and confirms that, by its execution of this Agreement, the Parent will be deemed to be an issuer under the Note Documents and each reference to the "Company" in the Purchase Agreement and each other Note Document shall be deemed to be a collective reference to the Parent and the Company and the Parent shall have all of the obligations of the Company thereunder as if it had executed the Note Documents as the Company.  The Parent hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Purchase Agreement.  Notwithstanding the foregoing, the Parent shall act as representative of the Company and Parent with respect to any obligation of the Company under any Note Document to deliver a certificate or notice from the Company.

---

¹ To be updated to refer to its successor by merger, if applicable.

**4.**      **Continuing Validity; Waiver and Amendment; Entire Agreement**.  Except as expressly modified pursuant to Agreement, the terms of the Note Documents remain unchanged and in full force and effect.  Any provision of this Agreement may be amended, waived or modified only by an instrument signed in writing by the Parties and the Note Agent.  This Agreement and the other Note Documents constitute the entire contract among the parties hereto regarding to the subject matters addressed herein and supersede any and all previous agreements, negotiations, and discussions, oral or written, by the parties regarding the subject matters addressed herein.

**5.**      **Successors and Assigns**.  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties.  Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

**6.**      **GOVERNING LAW.**  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.

**7.**      **Jurisdiction and Venue; Waiver of Jury Trial; Expenses and Indemnification**.  This Agreement is subject to the provisions of Section 10.3 (Jurisdiction and Venue), Section 10.4 (Waiver of Jury Trial) and Section 10.10(a) (Expenses and Indemnification) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*.

**8.**      **Notices**.  All communications and notices required or permitted to be given hereunder shall be delivered in accordance with Section 10.8 of the Purchase Agreement.

**9.**      **Headings; Interpretation**.  Paragraph headings used in this Agreement are included for convenience of reference only and will not modify the provisions that they precede or affect the interpretation of this Agreement or any other Note Document.  The term "including" shall be interpreted to mean "including but not limited to".

**10.**    **Counterparts**.  This Agreement may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract.  Any counterpart of a signature page to this Agreement may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.

*[Signature page follows]*

254957543 v5

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

**[PARENT ENTITY]**

By:_____
Name:
Title:


**[CORE SCIENTIFIC HOLDING CO.]**


By:_____
Name:
Title:

Acknowledged and accepted:


**AGENT**:

**U.S. BANK NATIONAL ASSOCIATION,**
as Note Agent [and Collateral Agent]


By: **_____**
Name:
Title:

## CONVERTIBLE NOTE PURCHASE AGREEMENT

THIS CONVERTIBLE NOTE PURCHASE AGREEMENT (this "*Agreement*") is made as of August 20, 2021, by and among Core Scientific Holding Co., a Delaware corporation (the "*Company*"), the Guarantors from time to time party hereto, the persons and entities named on the Schedule of Purchasers under the header 'Initial Purchasers' attached hereto as Schedule 2 (individually, an "*Initial Purchaser*" and collectively, the "*Initial Purchasers*"), each Additional Purchaser from time to time party hereto and U.S. Bank National Association, as note agent (in such capacity, the "*Note Agent*") and, upon the execution and delivery of the Collateral Documents pursuant to Section 6.13, as collateral agent for the Secured Parties (in such capacity, the "*Collateral Agent*" and, together with the Note Agent, the "*Agents*").

### RECITALS

WHEREAS, the Company desires (i) to issue and to sell to the Initial Purchasers, and the Initial Purchasers have agreed to purchase from the Company, on the Initial Closing Date, convertible promissory notes substantially in the form attached hereto as Exhibit A (each, an "*Initial Note*" and collectively, the "*Initial Notes*") and (ii) to issue and to sell to Additional Purchasers on Additional Closing Dates convertible promissory notes substantially in the form attached hereto as Exhibit A (each, an "*Additional Note*" and collectively, the "*Additional Notes*" and, together with the Initial Notes, individually, a "*Note*" and collectively, the "*Notes*"), in an aggregate principal amount for all such Notes of up to $300,000,000.00 on the terms, and subject to the conditions, specified herein; and

WHEREAS, to induce the Purchasers to purchase the Notes, the Note Parties have agreed to execute and deliver, contemporaneously with the issuance, sale and purchase of the Initial Notes on the Initial Closing Date, the Guaranty, pursuant to which each Guarantor will guarantee the Obligations of the Company under the Notes and, as and when required pursuant to Section 6.13, the Security Agreement, pursuant to which the Note Parties will grant to the Collateral Agent, for the ratable benefit of the Secured Parties, a security interest in the Note Parties' assets to secure the Obligations or their respective Guaranteed Obligations (as applicable).

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, and the representations, warranties, covenants and conditions set forth below, which represent integral components of the transactions contemplated hereby and shall be fully enforceable by the parties hereto, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Note Parties, the Agents and each Purchaser, intending to be legally bound, hereby agree as follows:

1.  DEFINITIONS.

As used herein, the following terms shall have the meanings set forth below.

(a)     "*Act*" means the Securities Exchange Act of 1934, as amended.

(b)     "*Additional Closing Date*" has the meaning ascribed thereto in Section 2.2.

(c)     "*Additional Note*" or "*Additional Notes*" has the meaning ascribed thereto in Section 2.2.

(d)     "**Additional Purchaser**" or "**Additional Purchasers**" has the meaning ascribed thereto in <u>Section 2.2</u>.

(e)     "**Administrative Questionnaire**" means an Administrative Questionnaire substantially in the form attached hereto as <u>Exhibit G</u>.

(f)     "**Agent-Related Person**" means the Note Agent and the Collateral Agent, together with their affiliates, officers, directors, employees, agents and attorneys-in-fact of the Agents and their affiliates.

(g)     "**Agents**" has the meaning ascribed to such term in the preamble to this Agreement.

(h)     "**Asset Disposition**" means any sale, lease, license, transfer, assignment or other disposition (whether by a single transaction or through series of transactions, and including by means of a merger, consolidation, amalgamation or similar transaction) by the Company or any of its Subsidiaries of any asset or property.

(i)     "**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in the City of New York or the Principal Office are authorized or required to close.

(j)     "**Capital Lease**" means any lease of any property by such Person as lessee which would, in accordance with GAAP, be required to be accounted for as a capital lease on the balance sheet of such Person.

(k)     "**Capital Lease Obligations**" means, with respect to any Person, all obligations of such Person under Capital Leases.

(l)     "**Capital Stock**" means (a) any capital stock, partnership, membership, limited liability company, joint venture or other ownership or equity interest or other equivalent, participation or securities (whether voting or non-voting, whether preferred, common or otherwise, whether certificated or uncertificated, and however designated), and (b) any option, warrant, security, appreciation right, profits interests or other right directly or indirectly convertible into or exercisable or exchangeable for, or otherwise to acquire directly or indirectly, any capital stock, partnership, membership, limited liability company, joint venture or other ownership or equity interest, participation or security described in <u>clause (a)</u> above (excluding the Notes and any other Indebtedness convertible or exchangeable into any such capital stock, partnership, membership, limited liability company, joint venture or other ownership or equity interest, participation or security described in <u>clause (a)</u> above unless and to the extent converted or exchanged).

(m)     "**Charter Documents**" means (i) the articles or certificate of incorporation or formation (as applicable), (ii) the by-laws, operating agreement or limited liability company agreement (as applicable) and (iii) other similar organizational and governing documents of any Person, as amended, restated, supplemented or otherwise modified from time to time.

(n)     "**Closing Date**" means the Initial Closing Date or each Additional Closing Date, as the context may require.

(o)     "**Collateral**" means the "Collateral" as defined in the Security Agreement.

254153937 v7

(p)    "*Collateral Agent*" has the meaning ascribed to such term in the preamble to this Agreement.

(q)    "*Collateral Documents*" means, collectively, the Security Agreement, the Intellectual Property Security Agreement and each other agreement or writing pursuant to which the Note Parties purport to pledge or grant a security interest in any property or assets securing the Obligations or the Guaranteed Obligations, as applicable, in each case, as amended, restated, supplemented and/or otherwise modified from time to time.

(r)    "*Company Covered Persons*" means those Persons specified in Rule 506(d)(1) promulgated under the Act; provided, however, that Company Covered Persons do not include (a) any Holder or (b) any person or entity that is deemed to be an affiliated issuer of the Company solely as a result of the relationship between the Company and any Holder.

(s)    "*Contractual Obligations*" means as to any Person, any provision of any security issued by such Person or of any agreement, undertaking, contract, indenture, mortgage, deed of trust or other instrument or arrangement (whether in writing or otherwise) to which such Person is a party or by which it or any of such Person's property is bound.

(t)    "*Conversion Event*" has the meaning ascribed to such term in the Notes.

(u)    "*Conversion Securities*" has the meaning ascribed to such term in Section 5.3.

(v)    "*Default*" means any condition or event which with the giving of notice or lapse of time or both would, unless cured or waived, become an Event of Default.

(w)    "*Disqualified Capital Stock*" means any Capital Stock issued by any Person that (a) matures or is mandatorily redeemable pursuant to a sinking fund obligation or otherwise, (b) is or may become redeemable or repurchaseable by such Person at the option of the holder thereof, in whole or in part (other than in connection with an asset sale, change of control or similar event) or (c) is convertible or exchangeable at the option of the holder thereof for Indebtedness or Capital Stock described in this definition, on or prior to, in the case of clause (a), (b) or (c), ninety (90) days after the Maturity Date (as defined in the Notes).

(x)    "*Environmental Laws*" means any and all federal, state, local and foreign statutes, laws, judicial decisions, regulations, ordinances, rules, judgments, orders, decrees, plans, injunctions, Licenses, concessions, grants, franchises, agreements and other governmental restrictions relating to (i) the protection of the environment, (ii) the effect of the environment on human health, (iii) emissions, discharges or releases of pollutants, contaminants, hazardous substances or wastes into surface water, ground water, air or land, or (iv) the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants, hazardous substances or wastes or the clean-up or other remediation thereof, including, without limitation, the Clean Air Act, 42 U.S.C. § 7401 et seq., the Clean Water Act, 33 U.S.C. § 1251 et seq. ("*CWA*"), the Solid Waste Disposal Act (as amended by the Resource Conservation and Recovery Act), 42 U.S.C. § 6901 et seq. ("*RCRA*") and the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq. ("*CERCLA*").

(y)    "*ERISA*" means the Employee Retirement Income Security Act of 1974.

(z)    "*ERISA Affiliate*" means, any person that for purposes of Title I or Title IV of ERISA or Section 412 of the Internal Revenue Code would be deemed at any relevant time to be a "single

3

employer" or otherwise aggregated with the Company or any of its Subsidiaries under Section 414(b), 414(c), 414(m) or 414(o) of the Internal Revenue Code or Section 4001 of ERISA.

(aa)     "*Event of Default*" has the meaning ascribed thereto in the Notes.

(bb)     "*Excluded Subsidiary*" means (i) any Subsidiary that is not a wholly-owned Subsidiary, (ii) any Subsidiary that is not a Material Subsidiary and (iii) any Subsidiary that is (a) a Foreign Subsidiary (as defined in the Security Agreement), (b) a CFC Holdco (as defined in the Security Agreement) or (c) a Subsidiary of a CFC or a CFC Holdco (as defined in the Security Agreement); provided that notwithstanding the foregoing clauses (i) through (iii), the Company may in its sole discretion designate any Excluded Subsidiary as a Guarantor.

(cc)     "*Existing Note Purchase Agreement*" means that certain Senior Secured Convertible Note Purchase Agreement, dated as of April 19, 2021, by and among the Company, the Guarantors from time to time party thereto, the Purchasers (as defined therein) party thereto and U.S. Bank National Association, as note agent and as collateral agent for the Secured Parties (as defined therein), as amended, restated, supplemented and/or otherwise modified from time to time.

(dd)     "*Existing Notes*" means the senior secured convertible promissory notes issued pursuant to the Existing Note Purchase Agreement.

(ee)     "*Existing Secured Note Obligations*" means all "Obligations" under and as defined in the Existing Note Purchase Agreement and any refinancing, refunding, renewal or extension thereof.

(ff)     "*GAAP*" means the United States generally accepted accounting principles in effect as of the date of determination thereof. GAAP will be deemed to treat operating leases and Capital Leases in a manner consistent with the treatment under GAAP as in effect prior to the issuance by the Financial Accounting Standards Board on February 25, 2016 of Accounting Standards Update No. 2016-02.

(gg)     "*Governmental Authority*" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

(hh)     "*Guarantee*" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly and including any obligation, direct or indirect, of the guarantor (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued in support of such Indebtedness or obligation; provided that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business. The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable

4

amount of the primary obligation in respect of which such Guarantee is made or, if not so stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

(ii)    "*Guaranteed Obligations*" has the meaning ascribed thereto in the Guaranty.

(jj)    "*Guarantor*" means each Subsidiary of the Company party to the Guaranty and each other Subsidiary of a Note Party that becomes a Guarantor under the Note Documents pursuant to Section 6.10..

(kk)    "*Guaranty*" means the Guaranty, dated as the date hereof, made by the Guarantors in favor of the Note Agent, substantially in the form attached hereto as Exhibit C, (as amended, restated, supplemented and/or otherwise modified from time to time).

(ll)    "*Hazardous Materials*" means (i) any "hazardous substance", as defined by CERCLA, (ii) any "hazardous waste", as defined by RCRA, (iii) any petroleum product, (iv) any "pollutant," as defined by the CWA, or (v) contaminant or hazardous, dangerous or toxic chemical, material or substance within the meaning of any other Environmental Law.

(mm)    "*Holder*" or "*Holders*" means, individually and collectively, the holders of the Notes, including the Purchasers.

(nn)    "*Indebtedness*" as applied to any Person, means, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (c) all obligations of such Person in respect of the deferred purchase price of property or services (other than trade payables and accounts payable incurred in the ordinary course of business and any deferred compensation, earn-out, purchase price adjustment or other deferred purchase price obligation which is contingently payable based on the achievement of future financial performance); (d) all obligations of such Person under any conditional sale or other title retention agreement(s) relating to property acquired by such Person, (e) all obligations in respect of Capital Leases of such Person, (f) all obligations, contingent or otherwise, of such Person in respect of letters of credit, banker's acceptances or similar extensions of credit, (g) all Guarantees of such Person of Indebtedness of other Persons that would count as a liability on the balance sheet of such Person in accordance with the GAAP, (h) all Indebtedness of a third party secured by any Lien on any property or asset owned or held by such Person, whether or not such Indebtedness has been assumed by such Person, (i) all obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Disqualified Capital Stock of such Person and (j) all monetary obligations under any receivables factoring, receivables sales, receivable securitization or similar transactions or other off-balance sheet liabilities. The Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture in which such Person is a general partner or a joint venturer, except to the extent that the terms of such Indebtedness provide that such Person is not liable therefor.

(oo)    "*Initial Closing Date*" means August 20, 2021.

(pp)    "*Initial Note*" or "*Initial Notes*" has the meaning ascribed thereto in the recitals to this Agreement.

(qq)    "*Initial Purchaser*" or "*Initial Purchasers*" has the meaning ascribed thereto in the preamble to this Agreement.

(rr)   "***Intellectual Property***" means all intellectual and similar property of a Person, including inventions, designs, patents, copyrights, trademarks, service marks, trade names, trade secrets, confidential or proprietary information, customer lists, know-how, software and databases.

(ss)   "***Intellectual Property Security Agreement***" means the Intellectual Property Security Agreement, to be made by the applicable Note Parties in favor of the Collateral Agent, substantially in the form attached hereto as <u>Exhibit E</u> (as amended, restated, supplemented and/or otherwise modified from time to time).

(tt)   "***Intercreditor Agreement***" has the meaning ascribed thereto in Section 7.1(a).

(uu)   "***Ledger***" shall have the meaning ascribed thereto in the Notes.

(vv)   "***Licenses***" means all licenses, permits, authorizations, determinations, and registrations issued by any Governmental Authority to the Company or any Subsidiary in connection with the conduct of its business.

(ww)   "***Lien***" means any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing.

(xx)   "***Material Adverse Effect***" means, individually or in the aggregate, (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties or financial condition of the Company and its Subsidiaries taken as a whole; (b) a material impairment of the ability of the Note Parties to perform their obligations under the Note Documents or, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, the rights and remedies of the Secured Parties under the Note Documents; (c) a material adverse effect upon the legality, validity, binding effect or enforceability against the Note Parties of any Note Document; or (d) from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, a material adverse effect on the Liens in favor of the Collateral Agent (for the benefit of the Secured Parties) on the Collateral or the priority of such Liens.

(yy)   "***Material Subsidiary***" mean each Subsidiary which, as of the most recent fiscal quarter of the Company, for the period of four consecutive fiscal quarters of the Company then last ended (taken as one accounting period) in respect of which financial statements were (or were required to be) delivered pursuant to <u>Sections 6.1(a)</u> or <u>(b)</u>, as applicable (a "***Test Period***"), had Total Assets as of the last day of such Test Period that were in excess of 10% of the Total Assets of the Company and its Subsidiaries as of such date.

(zz)   "***Multiemployer Plan***" means any "multiemployer plan" as defined in Section 4001(a)(3) of ERISA, which is contributed to by (or to which there is or may be an obligation to contribute of) the Company, any of its Subsidiaries or an ERISA Affiliate, and each such plan for the five-year period immediately following the latest date on which the Company, any of its Subsidiaries or an ERISA Affiliate contributed to or had an obligation to contribute to such plan.

(aaa)   "***Note***" or "***Notes***" has the meaning ascribed thereto in the recitals to this Agreement.

(bbb)   "***Note Documents***" means, collectively, this Agreement, each Note, the Guaranty, each Collateral Document (if applicable), the fee schedule delivered from the Agents to the Company in connection with this Agreement, the Intercreditor Agreement (if applicable), and any other document,

agreement or instrument which has or will be executed by or for the benefit of the Holders in connection with such agreements and the transactions described therein, each as may be amended, restated, supplemented/and or otherwise modified from time to time.

(ccc)  "*Note Party*" or "*Note Parties*" means, individually and collectively, the Company and the Guarantors. From and after a Parent Entity assumes or otherwise becomes a co-obligor with respect to the Company's Obligations in connection with a SPAC pursuant to Section 6.13, each reference to "Note Party" shall be deemed to include a reference to a Parent Entity.

(ddd)  "*Obligations*" means all advances to, and debts, liabilities (including without limitation (x) prepayment premiums (if any) and other premiums payable under the Notes (if any), including all or any portion of the Repayment Amount (as defined in the Notes), if applicable, (y) accrued and unpaid interest and (z) capitalized interest), obligations, fees, expenses, indemnities, covenants and duties of, the Note Parties arising under any Note Document or otherwise with respect to any Note, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against the Note Parties of any proceeding under any debtor relief laws naming any Note Party as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims or allowable in such proceeding.

(eee)  "*OFAC*" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

(fff)  "*Parent Entity*" has the meaning ascribed thereto in the definition of SPAC.

(ggg)  "*PBGC*" mean the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor thereto).

(hhh)  "*Permitted Lien*" means:

(i)  from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, Liens in favor of Collateral Agent for the benefit of Secured Parties granted pursuant to the Note Documents;

(ii)  Liens set forth on Schedule 5.17 existing as of the Initial Closing Date;

(iii)  Liens for taxes if obligations with respect to such taxes either (i) are not due and payable, (ii) are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and adequate reserves have been made in accordance with GAAP or (iii) could not reasonably be excepted to have a Material Adverse Effect;

(iv)  statutory Liens of landlords, banks (and rights of set-off), of carriers, warehousemen, mechanics, repairmen, workmen and materialmen, and other Liens imposed by law (other than any such Lien imposed pursuant to Section 401 (a)(29) or 412(n) of the Internal Revenue Code or by the Employee Retirement Income Security Act of 1974), in each case incurred in the ordinary course of business (i) for amounts not yet overdue, or (ii) for amounts that are overdue and that (in the case of any such amounts overdue for a period in excess of five (5) days) are being contested in good faith by appropriate proceedings, so long as such reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made for any such contested amounts;

254153937 v7

(v)     Liens incurred in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, trade contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money or other indebtedness), so long as (x) no foreclosure, sale or similar proceedings have been commenced with respect to any portion of the Collateral on account thereof and (y) adequate reserves required by GAAP shall have been set aside therefor;

(vi)     easements, rights-of-way, restrictions, encroachments, and other minor defects or irregularities in title, in each case which do not and will not have a Material Adverse Effect;

(vii)     any interest or title of a lessor or sublessor under any lease of real estate permitted hereunder;

(viii)     Liens solely on any cash earnest money deposits made by the Company in connection with any letter of intent or purchase agreement permitted hereunder;

(ix)     purported Liens evidenced by the filing of precautionary UCC financing statements relating solely to operating leases of personal property entered into in the ordinary course of business;

(x)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods used in the ordinary course of business;

(xi)     any zoning or similar law or right reserved to or vested in any governmental office or agency to control or regulate the use of any real property;

(xii)     licenses of patents, trademarks and other Intellectual Property rights granted by the Company in the ordinary course of business;

(xiii)     Liens securing obligations of the Company incurred under leases (but not securing indebtedness for borrowed money) in the form of cash deposits made in the ordinary course of business;

(xiv)     Liens arising in favor of depository institutions as a result of set-off rights or otherwise securing obligations owed to such depository institution in connection with bank services provided to the Company or its Subsidiaries;

(xv)     Liens on cash deposits securing obligations owed to an issuer of a letter of credit at the request of the Company of any of its Subsidiaries;

(xvi)     Liens on any assets of the Note Parties securing any Indebtedness, including Capital Lease Obligations, incurred to finance the acquisition of any fixed or capital assets (including any real property assets) so long as such Liens encumber only the assets acquired or financed with the proceeds of such Indebtedness and do not attach to any other assets of any Note Party;

(xvii)     Liens on cash deposit accounts and cash and cash equivalents delivered or pledged to secure letters of credit;

(xviii)   Liens on Indebtedness permitted to be incurred in reliance on <u>Section 7.01(a)</u>;

(xix)   Liens arising from judgments for the payment of money in circumstances not constituting an Event of Default; and

(xx)   Liens on the Collateral securing the Existing Secured Note Obligations.

(iii)   "***Permitted Transferees***" means, (x) as to any Purchaser that is a limited or general partnership or a trust, to its partners (whether general or limited, including retired partners) or beneficiaries and to affiliated partnerships managed by the same management company or managing (general) partner or by an entity which directly or indirectly controls, is controlled by, or is under common control with, such management company or managing or general partner, or member (or retired member) of such Purchaser in accordance with limited liability company interests and (y) as to any other Purchaser, an entity which directly or indirectly controls, is controlled by, or is under common control with such Purchaser.

(jjj)   "***Person***" (regardless of whether capitalized) means any natural person, entity, or association, including without limitation any corporation, partnership, limited partnership, limited liability company, government (or agency or subdivision thereof), trust, joint venture, or proprietorship.

(kkk)   "***Plan***" means any "employee benefit plan" as defined in Section 3 of ERISA (other than a Multiemployer Plan) maintained or contributed to by any Note Party or any ERISA Affiliate or to which a Note Party or any ERISA Affiliate has or may have an obligation to contribute, and each such plan that is subject to Title IV of ERISA for the five-year period immediately following the latest date on which a Note Party or any ERISA Affiliate maintained, contributed to or had an obligation to contribute to (or is deemed under Section 4069 of ERISA to have maintained or contributed to or to have had an obligation to contribute to, or otherwise to have liability with respect to) such plan.

(lll)   "***Principal Office***" means the Note Agent's office, address or bank account as from time to time designated in writing by the Note Agent to the Company and each Holder, which shall initially be the office designated on the Note Agent's signature page to this Agreement.

(mmm)   "***Pro Rata Share***" means, as to any Holder at any time, the ratio at such time of (x) the aggregate principal amount of the Notes held by such Holder to (y) the aggregate outstanding principal amount of all Notes issued hereunder.

(nnn)   "***Purchaser***" or "***Purchasers***" means, individually and collectively, the Initial Purchasers and the Additional Purchasers, as the context may require.

(ooo)   "***Reportable Event***" means any of the events set forth in Section 4043(c) of ERISA with respect to a Plan, other than those events as to which the thirty-day notice period is waived under subsection .22, .23, .25, .27, .28, .29, .30, .31, .32, .34, or .35 of PBGC Regulation Section 4043.

(ppp)   "***Required Holders***" means Holders representing more than fifty percent (50%) of the aggregate outstanding principal amount of the Notes (including all accrued PIK Interest) issued pursuant to this Agreement at the relevant time of reference.

(qqq)   "***Requirements of Law***" means as to any Person, provisions of the Charter Documents of such Person, or any law, treaty, code, rule, regulation, right, privilege, qualification,

License or franchise, or any determination of an arbitrator or a court or other Governmental Authority, in each case applicable to such Person or any of such Person's property or to which such Person or any of such Person's property is subject or pertaining to any or all of the transactions contemplated or referred to in the Note Documents, including, but not limited to the Fair Credit Reporting Act, the Gramm-Leach-Bliley Act, the Federal Trade Commission Act and comparable state laws, the Telephone Consumer Protection Act, the Telemarketing and Consumer Fraud and Abuse Prevention Act, the CAN-SPAM Act, the Electronic Fund Transfer Act, the U.S. Card Act, and any similar laws and regulations in Canada, including federal and provincial laws.

(rrr) "**Responsible Officer**" means the chief financial officer, general counsel, secretary, controller or other authorized officer of the Note Parties set forth on an incumbency certificate delivered to the Note Agent from time to time.

(sss) "**Restricted Payment**" means as to any Person (i) any dividend or other distribution (whether in cash, Capital Stock or other property) with respect to or on account of any shares of any Capital Stock of such Person or (ii) any payment by such Person on account of the purchase, redemption, retirement, defeasance, surrender, cancellation, termination or acquisition of any Capital Stock of such Person or any claim respecting the purchase or sale of any Capital Stock of such Person.

(ttt) "**Sanctioned Entity**" means (a) an agency of the government of, (b) an organization directly or indirectly controlled by, or (c) a person resident in a country that is subject to a sanctions program identified on the list maintained by OFAC and available at http://www.treas.gov/offices/enforcement/ofac/programs, or as otherwise published from time to time as such program may be applicable to such agency, organization or person.

(uuu) "**Sanctioned Person**" means a person named on the list of Specially Designated Nationals or Blocked Persons maintained by OFAC available at http://www.treas.gov/offices/enforcement/ofac/sdn/index.html, or as otherwise published from time to time.

(vvv) "**Secured Debt Cap**" has the meaning ascribed thereto in Section 7.1(a).

(www) "**Secured Party**" or "**Secured Parties**" means, individually and collectively, upon the execution and delivery of the Collateral Documents pursuant to Section 6.13, the Purchasers, Holders, the Agents, and their respective successors and permitted assigns.

(xxx) "**Securities**" has the meaning ascribed thereto in Section 8.1.

(yyy) "**Security Agreement**" means the Security Agreement, to be made by the Note Parties in favor of the Collateral Agent, for the benefit of the Secured Parties, substantially in the form attached hereto as Exhibit D (as amended, restated, supplemented and/or otherwise modified from time to time).

(zzz) "**Single Employer Plan**" shall mean any Plan that is covered by Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, other than a Multiemployer Plan, that is maintained or contributed to by the Company or any Commonly Controlled Entity or to which the Company or a Commonly Controlled Entity has or may have an obligation to contribute, and such plan for the six-year period immediately following the latest date on which the Company or a Commonly Controlled Entity maintained, contributed to or had an obligation to contribute to (or is deemed under Section 4069 of ERISA to have maintained or contributed to or to have had an obligation to contribute to, or otherwise to have liability with respect to) such plan. For the purposes of this definition, "**Commonly**

*Controlled Entity*" means a person or an entity, whether or not incorporated, that is under common control with the Company within the meaning of Section 4001 of ERISA or is part of a group that includes the Company and that is treated as a single employer under Section 414 of the Code.

(aaaa)   "*Solvent*" means, with respect to any Person, that such Person (i) owns and will own assets the fair saleable value of which are greater than the amount that will be required to pay the probable liabilities of its then existing debts as they become absolute and matured considering all financing alternatives and potential asset sales reasonably available to it, (ii) has capital that is not unreasonably small in relation to its business as presently conducted or after giving effect to any contemplated transaction and (iii) does not intend to incur and does not believe that it will incur debts beyond its ability to pay such debts as they become due. In computing the amount of contingent or unliquidated liabilities at any time, such liabilities shall be computed at the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

(bbbb)   "*SPAC*" means a transaction, including, without limitation, the XPDI Transaction, involving a publicly listed special purpose acquisition company that, upon the consummation thereof, shall be the direct or indirect parent company of Core Scientific Holding Co. (or of the successor by merger to Core Scientific Holding Co.) (such parent company, a "*Parent Entity*"). The Company shall promptly notify the Agents in writing upon the occurrence of a SPAC or the XPDI Transaction.

(cccc)   "*Subsidiary*" means, with respect to any Person, any other Person of which an aggregate of more than fifty percent (50%) of the outstanding Capital Stock having ordinary voting power to elect a majority of the board of directors of such other Person is at the time, directly or indirectly, owned legally or beneficially by such Person or one or more Subsidiaries of such Person, or a combination thereof, or with respect to which any such Person has the right to vote or designate the vote of more than fifty percent (50%) of such Capital Stock whether by proxy, agreement, operation of law or otherwise. Unless the context otherwise requires, each reference to a Subsidiary shall mean a Subsidiary of the Company.

(dddd)   "*Taxes*" means any present or future United States federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp occupation, premium, windfall profits, environmental (including taxes under former Code §59A), customs duties, capital stock, franchise profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on-minimum, estimated, or other taxes, levies, assessments, fees or other charges imposed by any Governmental Authority, including any interest, penalty, or addition thereto, whether disputed or not.

(eeee)   "*Total Assets*" shall mean the total assets of the Company and its Subsidiaries on a consolidated basis, as shown on the applicable consolidated balance sheet of the Company and its Subsidiaries and computed in accordance with GAAP. Total Assets shall be calculated after giving effect to the transaction giving rise to the need to calculate Total Assets.

(ffff)   "*UCC*" means Uniform Commercial Code.

(gggg)   "*Unfunded Pension Liability*" of any Plan means the amount, if any, by which the value of the accumulated plan benefits under the Plan, determined on a plan termination basis in accordance with actuarial assumptions at such time consistent with those prescribed by the PBGC for purposes of Section 4044 of ERISA, exceeds the fair market value of all Plan assets allocable to such liabilities under Title IV of ERISA (excluding any accrued but unpaid contributions).

11

(hhhh) "*XPDI Transaction*" means the transactions contemplated by the Agreement and Plan of Merger and Reorganization, dated as of July 20, 2021, by and among Power & Digital Infrastructure Acquisition Corp., a Delaware corporation ("*XPDI*"), XPDI Merger Sub Inc., a Delaware corporation and wholly owned subsidiary of XPDI, XPDI Merger Sub 2, LLC, a Delaware limited liability company and wholly owned subsidiary of XPDI, and the Company, as amended, restated, supplemented and/or otherwise modified from time to time.

2.    TERMS OF THE CONVERTIBLE PROMISSORY NOTES.

2.1    **The Initial Notes**.

Subject to the satisfaction (or waiver in accordance with Section 10.9) of the conditions precedent set forth in Section 4.1, the Company shall issue and sell to each Initial Purchaser, and each Initial Purchaser shall purchase from the Company, an Initial Note on the Initial Closing Date in a principal amount equal to the amount opposite such Initial Purchaser's name set forth in the Schedule of Purchasers under the header 'Initial Purchasers' attached hereto as Schedule 2. By no later than 11:00 a.m. (New York time) on the Initial Closing Date (i) each Initial Purchaser shall wire transfer same day funds in U.S. dollars, at the Note Agent's Principal Office, in the amount of such Initial Purchaser's Initial Note and (ii) the Company shall issue and deliver to each such Initial Purchaser an Initial Note in favor of such Initial Purchaser payable in the principal amount of such Initial Purchaser's Initial Note.

2.2    **The Additional Notes**.

(a) Subject to the satisfaction (or waiver in accordance with Section 10.9) of the conditions precedent set forth in Section 4.2, at any time and from time to time after the Initial Closing Date, the Company shall issue and sell to each Person that executes a counterpart signature page to this Agreement in the form attached hereto as Exhibit B (individually, an "*Additional Purchaser*" and collectively, the "*Additional Purchasers*"), and each such Additional Purchaser shall purchase from the Company, an Additional Note in a principal amount to be mutually agreed between such Additional Purchaser and the Company. Each additional issuance, sale and purchase of Additional Notes as provided in this Section 2.2 shall take place on a date to be mutually agreed by the Company and such Additional Purchaser (each, an "*Additional Closing Date*"); provided that (i) each Additional Closing Date shall have occurred on or prior to December 31, 2021, (ii) all issuances, sales and purchases of Additional Notes on an Additional Closing Date shall be made on substantially identical terms and conditions as the Initial Notes, shall, to the extent permitted by law, be fungible for tax purposes with the Initial Notes and may only be amended pursuant to Section 10.9; (iii) the purchase price of each Additional Note shall be increased by the PIK Interest (as defined in the Note) and Cash Interest (as defined in the Note) that has accrued since the Initial Closing Date on the Initial Notes (it being understood and agreed that interest on all the Notes shall accrue PIK Interest and be payable on the same dates) and (iv) in no event shall the initial aggregate principal amount of all Notes issued hereunder exceed $300,000,000.00.

(b)    Any Additional Notes issued, sold and purchased pursuant to this Section 2.2 shall be deemed to be "Notes" for all purposes under this Agreement. By no later than 11:00 a.m. (New York time) on an Additional Closing Date (i) each Additional Purchaser shall wire transfer same day funds in U.S. dollars, at the Note Agent's Principal Office, in the amount of such Additional Purchaser's Additional Note and (ii) the Company shall issue and deliver to each such Additional Purchaser an Additional Note in favor of such Additional Purchaser payable in the principal amount of such Additional Purchaser's Additional Note. The Schedule of Purchasers may be amended by the Company without the consent of the Purchasers to include any Additional Purchasers upon the execution by such Additional Purchasers of a counterpart signature page hereto in the form attached hereto as Exhibit B.

3.    **SECURITY.**

To secure the performance and payment in full of the Obligations and the Guaranteed Obligations, as applicable, each Note Party shall grant to the Collateral Agent, for the benefit of the Secured Parties, a first-priority Lien on the Collateral (subject to Permitted Liens) pursuant to the Security Agreement, as and when required pursuant to Section 6.13.

4.    **CONDITIONS PRECEDENT TO EACH CLOSING DATE.**

   **4.1    Conditions Precedent to the Initial Closing Date**.

The obligation of the Company to issue and to sell, and of each Initial Purchaser to purchase, Initial Notes on the Initial Closing Date are subject to the satisfaction (or waiver in accordance with Section 10.9) of the following conditions precedent on or prior to the Initial Closing Date:

(a)    receipt by each Initial Purchaser of counterparts to this Agreement, the Guaranty and the Initial Notes;

(b)    receipt by each Initial Purchaser of a certificate signed by a Responsible Officer of each Note Party attaching (i) true, correct and complete copies of the Charter Documents of each Note Party as in effect on the Initial Closing Date, certified, with respect to the Charter Documents set forth in clause (ii) of the definition thereof, as of a recent date by the Secretary of State of the state of incorporation or organization (as applicable) of such Note Party, (ii) a certificate of good standing of each Note Party, certified as of a recent date by the Secretary of State of the state of incorporation or organization (as applicable) of such Note Party, (iii) the names of the Responsible Officers of each Note Party authorized to sign the Note Documents and their true signatures and (iv) true, correct and complete copy of resolutions duly adopted by the board of directors or similar governing body of each Note Party authorizing the execution, delivery and performance of this Agreement and the other Note Documents;

(c)    receipt by each Initial Purchaser of a certificate of solvency, executed by the chief financial officer (or equivalent) of the Company, substantially in the form attached hereto as Exhibit F;

(d)    receipt by each Initial Purchaser of a certificate signed by a Responsible Officer of the Company certifying that the condition specified in clause (j) of this Section 4.1 has been satisfied;

(e)    the Initial Purchasers and the Agents shall have received an opinion of Cooley LLP, counsel to the Company, in form and substance reasonably satisfactory to the Initial Purchasers;

(f)    all authorizations, consents, approvals or permits, if any, of any governmental authority or regulatory body that are required in connection with the lawful issuance and sale of the Initial Notes pursuant to this Agreement shall have been duly obtained and shall be effective on and as of the Initial Closing Date;

(g)    there shall be no claim, action, suit, investigation, litigation or proceeding, pending or, to the knowledge of the Company and its Subsidiaries, threatened, in any court or before any governmental authority with respect to the Note Documents or any transactions contemplated thereby or hereby;

(h)    the representations and warranties made pursuant to Section 5 hereof shall be true and correct in all material respects (or if a representation or warranties is qualified by materiality or

material adverse effect, in all respects) on and as of the Initial Closing Date with the same effect as though made on and as of such date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects (or if a representation or warranties is qualified by materiality or material adverse effect, in all respects) on and as of such earlier date;

> (i)      immediately before and after giving effect to the issuance of the Initial Notes on the Initial Closing Date, no Event of Default shall exist;

> (j)      the Company shall have paid all outstanding fees and expenses of the Agents, Shipman & Goodwin LLP, counsel to the Agents, and as otherwise required pursuant to Section 10(a);

> (k)      receipt by the Company and the Note Agent of an Administrative Questionnaire and executed copies of IRS Form W-9 or appropriate IRS Form W-8, as applicable, as well as any reasonably necessary supporting information, certifying that payments to the Initial Purchasers under the Initial Notes are exempt from U.S. federal withholding Tax; and

> (l)      the Company shall have delivered to the Initial Purchasers such other documents and instruments relating to the transactions contemplated by this Agreement as the Initial Purchasers or their counsel may reasonably request (which request shall have been made no later than 3 days prior to the Initial Closing Date).

**4.2      Conditions Precedent to each Additional Closing Date.**

The obligation of the Company to issue and to sell, and of each Additional Purchaser to purchase, Additional Notes on an Additional Closing Date are subject to the satisfaction (or waiver in accordance with Section 10.8) of the following conditions precedent on or prior to each such Additional Closing Date:

> (a)      each Additional Purchaser shall have received copies of each of the documents set forth in clauses (a) through (e) and clause (l) of Section 4.1 delivered to the Initial Purchasers on the Initial Closing Date;

> (b)      the representations and warranties made pursuant to Section 5 hereof shall be true and correct in all material respects (or if a representation or warranties is qualified by materiality or material adverse effect, in all respects) on and as of the applicable Additional Closing Date with the same effect as though made on and as of such date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects (or if a representation or warranties is qualified by materiality or material adverse effect, in all respects) on and as of such earlier date;

> (c)      immediately before and after giving effect to the issuance of Additional Notes on the applicable Additional Closing Date, no Event of Default (as defined in the Notes) shall exist; and

> (d)      receipt by the Company and the Note Agent of an Administrative Questionnaire and of executed copies of IRS Form W-9 or appropriate IRS Form W-8, as applicable, as well as any reasonably necessary supporting information, certifying that payments to the Additional Purchasers under Additional Notes are exempt from U.S. federal withholding Tax.

5.    **REPRESENTATIONS AND WARRANTIES OF THE NOTE PARTIES.**

Each Note Party hereby represents and warrants to each Initial Purchaser and the Agents as of the Initial Closing Date and to each Additional Purchaser and the Agents as of the applicable Additional Closing Date as follows:

5.1    **Organization, Good Standing and Qualification**.

(a)    *Organization; Good Standing; Qualification.* Each Note Party and each of its Subsidiaries: (i) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation, (ii) has all requisite corporate or limited liability company power and authority to own and operate its property, to lease the property it operates as lessee and to conduct the business in which it is currently, or is currently proposed to be, engaged; (iii) is duly qualified as a foreign entity, licensed and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification, except where the failure to be so qualified could not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect and (iv) has the corporate or limited liability company power and authority to execute, deliver and perform its obligations under each Note Document to which it is or will be a party and to borrow hereunder. Each Note Party's present name, former names within the last five (5) years (if any), owned and leased locations, place of formation, tax identification number and organizational identification number are correctly set forth in Schedule 5.1 hereto, as may be updated by the Company from time to time in a written notice provided to the Note Agent after the Initial Closing Date.

(b)    *Collateral.* Except for the Liens granted under the Security Agreement, each Note Party shall be the sole legal and equitable owner of each item of Collateral in which it purports to grant a security interest under the Security Agreement upon the execution and delivery thereof pursuant to Section 6.13, having good and marketable title thereto, free and clear of any and all Liens except for Permitted Liens and, upon filing of UCC financing statements in the UCC filing office applicable to such Note Party, the Collateral Agent shall have a perfected security interest in the Collateral, which such security interest shall be senior to all other Liens (other than Permitted Liens) to the extent the same can be perfected by filing.

5.2    **Corporate Power; No Contravention**. The execution, delivery and performance by the Company and each Subsidiary of each Note Document to which it is or will be a party and the consummation of the transactions contemplated hereby: (a) have been duly authorized by all necessary corporate or limited liability company action; (b) do not and will not contravene or violate the terms of the Charter Documents of the Company or any of its Subsidiaries or any amendment thereto or any material Requirement of Law applicable to the Company or such Subsidiary or the Company's or such Subsidiary's assets, business or properties; (c) do not and will not (i) conflict with, contravene, result in any violation or breach of or default under any material Contractual Obligation of the Company or such Subsidiary (with or without the giving of notice or the lapse of time or both) other than any right to consent, which consents have been obtained, (ii) create in any other Person a right or claim of termination or amendment of any material Contractual Obligation of the Company or such Subsidiary, or (iii) require modification, acceleration or cancellation of any material Contractual Obligation of the Company or such Subsidiary; and (d) do not and will not result in the creation of any Lien (or obligation to create a Lien) against any property, asset or business of the Company or such Subsidiary (other than those securing the Notes from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13).

5.3    **Authorization.** All corporate action on the part of the Company, its Subsidiaries and their respective directors and stockholders necessary for the authorization, execution, delivery and performance of this Agreement by the Company and its Subsidiaries and the performance of the

Company's obligations hereunder, including the issuance and delivery of the Notes and the reservation of the equity securities issuable upon conversion of the Notes (collectively, the "***Conversion Securities***") has been taken or will be taken prior to the issuance of such Conversion Securities. This Agreement and the Note Documents, when executed and delivered by the Note Parties, shall constitute valid and binding obligations of the Note Parties enforceable in accordance with their terms, subject to laws of general application relating to bankruptcy, insolvency, the relief of debtors and general principles of equity and, with respect to rights to indemnity, subject to federal and state securities laws. The Conversion Securities, when issued in compliance with the provisions of this Agreement or the Notes will be validly issued, fully paid and nonassessable and free of any Liens and issued in compliance with all applicable federal and state securities laws.

5.4    **Governmental Consents**. All consents, approvals, orders, or authorizations of, or registrations, qualifications, designations, declarations, or filings with, any Governmental Authority, required on the part of the Note Parties in connection with the valid execution and delivery of this Agreement and the other Note Documents, the offer, sale or issuance of the Notes and the Conversion Securities issuable upon conversion of the Notes and the consummation of any other transaction contemplated hereby shall have been obtained and will be effective on the Initial Closing Date.

5.5    **Compliance with Laws**.

(a)    No Note Party is in violation of any Requirements of Law, any applicable statute, rule, regulation, order or restriction of any domestic government or any instrumentality or agency thereof in respect of the conduct of its business or the ownership of its properties, which violation of which would materially and adversely affect the business, assets, liabilities, financial condition or operations of the Note Parties (individually and in the aggregate).

(b)    Neither the Company nor any of its Subsidiaries is registered or required to register as an "investment company" or a company "controlled" by an "investment company" under the Investment Company Act of 1940, as amended. Neither the Company nor any of its Subsidiaries is engaged as one of its important activities in extending credit for margin stock (under Regulations X, T and U of the Federal Reserve Board of Governors). The Company and each of its Subsidiaries has complied in all material respects with applicable provisions of the Federal Fair Labor Standards Act. Neither the Company nor any of its Subsidiaries is a "holding company" or an "affiliate" of a "holding company" or a "subsidiary company" of a "holding company" as each term is defined and used in the Public Utility Holding Company Act of 2005. Neither the Company's nor any of its Subsidiaries' properties or assets has been used by the Company or such Subsidiary or, to Company's knowledge, by previous Persons, in disposing, producing, storing, treating, or transporting any hazardous substance other than in material compliance with applicable laws. The Company and each of its Subsidiaries has obtained all consents, approvals and authorizations of, made all declarations or filings with, and given all notices to, all Governmental Authorities that are necessary to continue their respective businesses as currently conducted, except to the extent that the failure to obtain, make or give any of the foregoing would not reasonably be expected to have a Material Adverse Effect.

(c)    Neither the Company nor any Subsidiary (i) is a Sanctioned Person, (ii) has any assets in Sanctioned Entities, or (iii) derives any operating income from investments in, or transactions with Sanctioned Persons or Sanctioned Entities. The proceeds of the Notes will not be used and have not been used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity.

(d)    The Company and its Subsidiaries are in compliance, in all material respects, with any United States Requirements of Law relating to terrorism, sanctions or money laundering (the "Anti-

Terrorism Laws"), including the United States Executive Order No. 13224 on Terrorist Financing (the "***Anti-Terrorism Order***") and the Patriot Act. No part of the proceeds of any Note will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended or any other Anti-Terrorism Law.

(e)　　　No Note Party and no Subsidiary of any Note Party (i) is listed in the annex to, or is otherwise subject to the provisions of, the Anti-Terrorism Order, (ii) is owned or controlled by, or acting for or on behalf of, any person listed in the annex to, or is otherwise subject to the provisions of, the Anti-Terrorism Order or (iii) commits, threatens or conspires to commit or supports "terrorism" as defined in the Anti-Terrorism Order.

(f)　　　None of the funds to be provided under this Agreement will be used, directly or indirectly, (i) for any activities in violation of any applicable anti-money laundering, economic sanctions and anti-bribery laws and regulations laws and regulations or (ii) for any payment to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

**5.6**　　　**Compliance with Other Instruments**. The Company is not in violation or default of any term of its articles of incorporation, or of any provision of any mortgage, indenture or contract to which it is a party and by which it is bound or of any judgment, decree, order or writ, other than such violation(s) that would not have a Material Adverse Effect on the Company. The execution, delivery and performance of this Agreement and the other Note Documents, and the consummation of the transactions contemplated hereby and thereby will not result in any material violation or be in conflict with, or constitute, with or without the passage of time and giving of notice, either a default under any such material provision, instrument, judgment, decree, order or writ or an event that results in the creation of any material Lien upon any assets of the Company or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization or approval applicable to the Company, its business or operations or any of its material assets or properties. Without limiting the foregoing, the Company has obtained all waivers reasonably necessary with respect to any preemptive rights, rights of first refusal or similar rights, including any notice or offering periods provided for as part of any such rights, in order for the Company to consummate the transactions contemplated hereunder without any third party obtaining any rights to cause the Company to offer or issue any securities of the Company as a result of the consummation of the transactions contemplated hereunder.

**5.7**　　　**Solvency.**　As of the Initial Closing Date both immediately before and after giving effect to the transactions contemplated by the Note Documents, the Company is individually, and the Company and its Subsidiaries on a consolidated basis are, Solvent.

**5.8**　　　**Offering**. The offer, issue, and sale of the Notes and the Conversion Securities are and will be exempt from the registration and prospectus delivery requirements of the Act, and no qualification under the Trust Indenture Act of 1939, as amended, and the rules and regulations of the Securities and Exchange Commission promulgated thereunder is required in connection with, the issuance of the Notes and the Conversion Securities.

**5.9**　　　**No "Bad Actor" Disqualification**. The Company has exercised reasonable care to determine whether any Company Covered Person (as defined below) is subject to any of the "bad actor" disqualifications described in Rule 506(d)(1)(i) through (viii), as modified by Rules 506(d)(2) and (d)(3), under the Act ("***Disqualification Events***"). To the Company's knowledge, no Company Covered Person

254153937 v7

is subject to a Disqualification Event. The Company has complied, to the extent required, with any disclosure obligations under Rule 506(e) under the Act.

**5.10    Litigation**. There are no legal actions, suits, proceedings, claims or disputes pending or, to the knowledge of any Note Party, threatened in writing, at law, in equity, in arbitration or before any Governmental Authority against or affecting the Company or its Subsidiaries that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; (b) there is no injunction, writ, temporary restraining order, decree or any order or determination of any nature by any arbitrator, court or other Governmental Authority purporting to enjoin or restrain the execution, delivery or performance of the Note Documents or which relates to the assets or the business of the Company or its Subsidiaries; and (c) there is no litigation, claim, audit, dispute, review, proceeding or investigation currently pending or threatened in writing against the Company or its Subsidiaries for any violation or alleged violation of any Requirements of Law, and neither the Company nor any Subsidiary has received written notice of any threat of any suit, action, claim, dispute, investigation, review or other proceeding pursuant to or involving any Requirements of Law.

**5.11    Taxes**.

(a)    Except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect, the Company and each of its Subsidiaries has timely filed all United States federal and state income and other material tax returns that it was required to file, in each case with due regard for any extension of time within which to file such tax return. Except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect, all Taxes due and payable by the Company or its Subsidiaries have been paid, in each case with due regard for any extension of time within which to file such tax return, other than any Taxes the amount or validity of which is being actively contested by Company or its Subsidiaries in good faith and by appropriate proceedings and with respect to which adequate reserves or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made or provided therefor. There are no Liens, other than Permitted Liens, on any of the assets of the Company or its Subsidiaries that arose in connection with any failure (or alleged failure) to pay any Tax. To the knowledge of the Company, no claim has been made by a Governmental Authority in a jurisdiction where the Company and its Subsidiaries do not file tax returns that the Company or any of its Subsidiaries is or may be subject to taxation by that jurisdiction that could reasonably be expected to have a Material Adverse Effect.

(b)    There is no action, suit, proceeding, investigation, examination, audit, or claim now pending or, to the knowledge of the Company, threatened in writing by any Governmental Authority regarding any Taxes relating to the Company or its Subsidiaries that could reasonably be expected to have a Material Adverse Effect.

**5.12    Financial Condition**.    The Note Parties have furnished the Purchasers with true, correct and complete copies of (i) the audited consolidated balance sheets of the Company and its Subsidiaries as of December 31, 2018, 2019 and 2020 and the related consolidated statements of income or operations, shareholders' equity and cash flows for each such fiscal year and (ii) the unaudited consolidated balance sheets of the Company and its Subsidiaries as of March 31, 2021 and the related consolidated statements of income or operations and cash flows for such fiscal quarter (collectively, the "***Financial Statements***"). The Financial Statements fairly present, in all material respects, the financial position of the Company and its Subsidiaries on a consolidated basis, as of the respective dates thereof, and the results of operations and cash flows thereof, as of the respective dates or for the respective periods set forth therein, and are in conformity with the past historical practices of the Note Parties, with GAAP consistently applied during the periods involved. As of the dates of the Financial Statements, neither the Company nor any Subsidiary had any known obligation, Indebtedness or liability (whether accrued, absolute, contingent

18

or otherwise, and whether due or to become due), which was not reflected or reserved against in the balance sheets which are part of the Financial Statements, except for those incurred in the ordinary course of business and which are fully reflected on the books of account of the Company or its Subsidiaries, as applicable.

**5.13    Subsidiaries**.   Except as set forth on Schedule 5.13, the Company does not have any Subsidiaries.

**5.14    Capitalization**. As of the Initial Closing Date, without giving effect to the transactions contemplated hereby and in the other Note Documents, the outstanding capitalization of the Company and its Subsidiaries is as set forth on Schedule 5.14.  All of the issued and outstanding Capital Stock of the Company has been, and Capital Stock of the Company issuable upon the exercise of outstanding securities when issued will be, duly authorized and validly issued and are fully paid and nonassessable. All outstanding Capital Stock of the Company's Subsidiaries are 100% owned by the Company or one of its Subsidiaries free and clear of all Liens other than Permitted Liens. Except as set forth in the Charter Documents (as in effect on the Initial Closing Date), the issuance of the foregoing Capital Stock is not and has not been subject to preemptive rights in favor of any Person other than such rights that have been waived and will not result in the issuance of any additional Capital Stock of the Company or the triggering of any down-round or similar rights contained in any options warrants, debentures or other securities or agreements of the Company or any of its Subsidiaries. On the Initial Closing Date, except as set forth on Schedule 5.14, there are no outstanding securities convertible into or exchangeable for Capital Stock of the Company or any of its Subsidiaries or options, warrants or other rights to purchase or subscribe for Capital Stock of the Company or any of its Subsidiaries, or contracts, commitments, agreements, understandings or arrangements of any kind to which the Company or any of its Subsidiaries is a party relating to the issuance of any Capital Stock of the Company or any of its Subsidiaries, or any such convertible or exchangeable securities or any such options, warrants or rights. On the Initial Closing Date, except as set forth on Schedule 5.14, neither the Company nor any of its Subsidiaries has any obligation, whether mandatory or at the option of any other Person, at any time to redeem or repurchase any Capital Stock of the Company or any of its Subsidiaries, pursuant to the terms of their respective Charter Documents or otherwise. All securities of the Company and its Subsidiaries (including all shares of the Company's common stock, securities, options and warrants to purchase shares of the Company's common stock (both outstanding as well as those that are no longer outstanding), have been and were issued and granted pursuant to an exception from the Act and otherwise in compliance, in all material respects, with all securities and other applicable laws.

**5.15    Private Offering**. No form of general solicitation or general advertising was used by the Company or its Subsidiaries or their respective representatives in connection with the offer or sale of the Notes to the Purchasers pursuant to this Agreement.

**5.16    Broker's, Finder's or Similar Fees**.  Except as set forth in that certain Engagement Letter, dated on or about of August 20, 2021, by and between the Company and GreensLedge Capital Markets LLC, there are no brokerage commissions, finder's fees or similar fees or commissions payable by the Company or its Subsidiaries in connection with the transactions based on any agreement, arrangement or understanding with the Company or its Subsidiaries or any action taken by the Company or its Subsidiaries. Notwithstanding the foregoing or any other provision herein, no Purchaser shall be liable for any brokerage commission, finder's fees or similar fees or commissions.

**5.17    Indebtedness**. Schedule 5.17 lists the amount of all Indebtedness of the Company and its Subsidiaries (other than Indebtedness under this Agreement) that is in existence immediately before the Initial Closing Date and will remain outstanding after the Initial Closing Date.

6.      **AFFIRMATIVE COVENANTS OF THE NOTE PARTIES**

Each Note Party shall, and shall cause each of its Subsidiaries to:

6.1      **Reporting Obligations**. Deliver to the Note Agent (for prompt distribution to the Purchasers as specified in the applicable Administrative Questionnaire (or as otherwise specified by a Purchaser to the Note Agent in writing from time to time)):

(a)      as soon as available, but not later than 150 days after the end of each fiscal year of the Company, a copy of the audited consolidated balance sheets of the Company and its Subsidiaries as at the end of such fiscal year and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year, in each case, prepared in accordance with GAAP, setting forth in each case in comparative form the figures for the previous fiscal year, and accompanied by a report of any "Big Four" or, upon Required Holders' written consent (not to be unreasonably withheld), any other independent certified public accounting firm, which report shall contain an unqualified opinion (without any (A) "going concern" or like qualification or exception, (B) qualification or exception as to the scope of such audit, or (C) qualification which relates to the treatment or classification of any item and which, as a condition to the removal of such qualification, would require an adjustment to such item (except in the case of clauses (A) and (B) above as it relates to the Obligations during the last twelve months before the Maturity Date)), stating that such consolidated financial statements present fairly in all material respects the financial position for the periods indicated in conformity with GAAP applied on a basis consistent with prior years; and

(b)      as soon as available, but not later than 45 after the end of each fiscal quarter of each fiscal year (other than the fourth fiscal quarter), the unaudited consolidated balance sheets of the Company and its Subsidiaries as at the end of such fiscal quarter and the related unaudited consolidated statements of income and cash flows of the Company and its Subsidiaries for such fiscal quarter and for the period from the beginning of the then current fiscal year to the end of such fiscal quarter, all certified on behalf of the Company by a Responsible Officer of the Company as being complete and correct and fairly presenting, in all material respects, the financial position and the results of operations of the Company and its Subsidiaries, subject to normal year-end adjustments and absence of footnote disclosures.

(c)      promptly, and in any event within three (3) Business Days after the Company or any other Note Party becomes aware of or has knowledge of any event or condition that constitutes a Default or Event of Default, provide written notice of such event or condition and a statement of the curative action that the Company proposes to take with respect thereto.

Delivery of any reports, information and documents under this Section 6.2, as well as any other reports, information and documents pursuant to this Agreement, to the Note Agent is for informational purposes only and the Note Agent's receipt of the same shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of its covenants hereunder (as to which the Note Agent is entitled to rely exclusively on certificates of a Responsible Officer of the Company). The Note Agent shall have no responsibility or liability for the filing, timeliness or content of any report required under this Section 6.2 or any other reports, information and documents required under this Agreement.

6.2      **Taxes and Claims**.

(a)      Timely file complete and correct United States federal and state income and applicable foreign, state and local tax returns required by law, in each case with due regard for any extension of time

20

within which to file such tax returns, and pay when due all Taxes in each case, except to the extent that the failure to so file or pay could not reasonably be expected to have a Material Adverse Effect; provided that the Company and its Subsidiaries shall not be required to pay any such Taxes which are being contested in good faith by appropriate proceedings and with respect to which adequate reserves have been set aside in accordance with GAAP, which deferment of payment is permissible so long as no Lien, other than a Permitted Lien, has been entered and the Company's and its Subsidiaries' title to, and its and their right to use, its and their respective properties are not materially adversely affected thereby.

(b)     Pay all stamp, court or documentary, intangible, recording, filing or similar Taxes, if any, that arise solely in connection with the issuance of the Notes except to the extent such Taxes arise as a result of a transfer of a Note to a person other than the initial Holder of the Notes. The obligations of the Company under this Section 6.2(b) shall survive the payment of the Obligations and the termination of the Note Documents.

**6.3     Insurance**.

(a)     Maintain with reputable insurance companies insurance in such amounts and covering such risks as is consistent with sound business practice, including, without limitation, property and casualty insurance on all of its property, general liability insurance, workers compensation insurance and business interruption insurance. From and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, each Note Party will, and will cause each of its Subsidiaries to, furnish to the Collateral Agent, upon reasonable request, full information as to the insurance carried by it.

(b)     From and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, (i) at all times keep its property which is subject to the Lien of the Collateral Agent insured in favor of the Collateral Agent, and all policies or certificates (or certified copies thereof) with respect to such insurance and (ii) notify (and cause each of its Subsidiaries to notify) the Collateral Agent and the Purchasers, promptly, upon receipt of a notice of termination, cancellation, or non-renewal from its insurance company of any such policy.

(c)     If the Company shall fail to maintain all insurance in accordance with this Section 6.3 or to timely pay or cause to be paid the premium(s) on any such insurance, or if the Company shall fail to deliver all certificates with respect thereto, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, the Collateral Agent shall have the right (but shall be under no obligation) to procure such insurance or pay such premiums, and the Company agrees to reimburse the Purchasers, on demand, for all costs and expenses relating thereto.

**6.4     Compliance with Laws**. Comply with any and all Requirements of Law to which it may be subject including, without limitation, all Environmental Laws, and obtain any and all Licenses necessary to the ownership of its property or to the conduct of its businesses, except, in each case, where failure to do so could not reasonably be expected to have a Material Adverse Effect. Each Note Party will, and will cause each of its Subsidiaries to, timely satisfy all material assessments, fines, costs and penalties imposed by any Governmental Authority against such Person or any property of such Person except to the extent such assessments, fines, costs, or penalties are being contested in good faith by appropriate proceedings and for which the Company or such Subsidiary has set aside on its books adequate reserves in accordance with GAAP.

**6.5     Maintenance of Properties**. Do all things necessary to maintain, preserve, protect and keep its property (other than property that is obsolete, surplus, or no longer used or useful in the ordinary conduct of its business) in good repair, working order and condition (ordinary wear and tear and casualty and condemnation excepted), make all necessary and proper repairs, renewals and replacements such that

its business can be carried on in connection therewith and be properly conducted at all times and pay and discharge when due the cost of repairs and maintenance to its property, and pay all rentals when due for all real estate leased by such Person.

**6.6     Employee Benefit Plans**. (a) Keep in full force and effect any and all Plans which are presently in existence or may, from time to time, come into existence under ERISA and not withdraw from any such Plans, unless such withdrawal can be effected or such Plans can be terminated without material liability to the Company or its Subsidiaries, (b) make contributions to all such Plans in a timely manner and in a sufficient amount to comply in all material respects with the standards of ERISA, including, without limitation, the minimum funding standards of ERISA, (c) comply in all material respects with all requirements of ERISA, (d) notify the Purchasers promptly upon receipt by the Company or any Subsidiary of any notice concerning the imposition of any withdrawal liability or of the institution of any proceeding or other action which may result in the termination of any such Plans by the PBGC or the appointment of a trustee to administer such Plans, (c) promptly advise the Purchasers of the occurrence of any Reportable Event or non-exempt prohibited transaction (as defined in ERISA) with respect to any such Plans of which Company becomes aware, and (f) amend any Plan that is intended to be qualified within the meaning of Section 401 of the Code to the extent necessary to keep the Plan qualified and to cause the Plan to be administered and operated in a manner that does not cause the Plan to lose its qualified status.

**6.7     Environmental**. Use and operate all of its facilities and properties in material compliance with all Environmental Laws, keep all necessary Licenses in effect and remain in material compliance therewith, and handle all Hazardous Materials in material compliance with all applicable Environmental Laws.

**6.8     Intellectual Property**.

(a)     Each Note Party will take the steps described in this Section 6.8 with respect to all new or acquired Intellectual Property to which the Company or any Guarantor is now or later becomes entitled that is necessary in the conduct of such Person's business. The Company acknowledges and agrees that the Secured Parties shall have no duties with respect to any Intellectual Property or Licenses of the Company or its Subsidiaries.

(b)     The Note Parties shall have the duty, with respect to Intellectual Property that is necessary in the conduct of such Person's business (i) to prosecute diligently any trademark application or service mark application that is part of the trademarks pending as of the date hereof or hereafter, (ii) to prosecute diligently any patent application that is part of the patents pending as of the date hereof or hereafter, and (iii) to take all reasonable and necessary action to preserve and maintain all of the Note Parties' trademarks, patents, copyrights, Licenses, and its rights therein, including paying all maintenance fees and filing of applications for renewal, affidavits of use, and affidavits of non-contestability, except in the case of clauses (i) and (ii), where the Company, in its reasonable opinion, determines that the costs for engaging in such prosecution activities exceeds the likely benefit of continued prosecution and, except in the of case (iii), where the Company, in its reasonable opinion, determines that the costs of preserving and maintaining exceeds the value the Company obtains from such preservation and maintenance. Each Note Party will require all employees, consultants, and contractors of such Note Party who were involved in the creation or development of such Intellectual Property to sign agreements containing assignment to the Company or such Guarantor of Intellectual Property rights created or developed and obligations of confidentiality. No Note Party shall abandon any Intellectual Property or License that is necessary in the conduct of the Company's or such Guarantor's business.

22

(c)     From and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, each Note Party will (i) promptly file, at such Note Party's sole cost and expense, any application to register any Intellectual Property with the United States Patent and Trademark Office or the United States Copyright Office if such registration is necessary in connection with the conduct of such Note Party's business, (ii) concurrently with the delivery of financial statements pursuant to Sections 6.1(a) or (b), deliver supplements to Schedule 4(c) to the Security Agreement and any other documents reasonably necessary for the Collateral Agent to record its security interest in such Intellectual Property with the United States Patent and Trademark Office or the United States Copyright Office or such new documents as are necessary or desirable to evidence, grant or perfect a first priority lien in such assets in favor of Collateral Agent, for the benefit of Secured Parties (including, without limitation, any pledges of clause (ii) above, upon the reasonable request of the Collateral Agent, execute and deliver in favor of the Collateral Agent one or more Intellectual Property Security Agreements to further evidence the Purchasers' Lien on such Note Party's Intellectual Property.

6.9     **Use of Proceeds**. Use the proceeds of the Notes (i) to pay any fees and expenses incurred by the Company in connection with the transactions contemplated hereby and (ii) for general corporate purposes not in violation of any applicable laws. The Company shall not use any proceeds of the sale of the Notes hereunder to, directly or indirectly, purchase or carry any "margin stock" (as defined in Regulation U) or to extend credit to others for the purpose of purchasing or carrying any "margin stock", in either case, in violation of the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.

6.10     **Subsidiaries**.   If any Note Party creates, forms or acquires any Subsidiary (other than an Excluded Subsidiary) on or after the date of this Agreement, such Note Party will, and will cause such Subsidiary to, (a) within 30 days (which 30 days may be extended by the Note Agent at the direction of the Required Holders) of the creation, formation or acquisition of such new Subsidiary, cause such Subsidiary to join the Guaranty as a "Guarantor" thereunder and (b) from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, within 30 days (which 30 days may be extended by the Collateral Agent at the direction of the Required Holders) of the creation, formation or acquisition of such new Subsidiary, cause such Subsidiary to join the Security Agreement as a "Grantor" and take all such other actions and execute and deliver, or cause to be executed and delivered, all such documents, instruments, agreements, and certificates as are similar to those described in Sections 4.1(c) and, if requested by the Required Holders, 4.1(g) or that are necessary or desirable to protect, evidence or perfect the security interest of the Collateral Agent in a manner similar to the Liens and assets granted by the existing Note parties under the existing Collateral Documents either by executing and delivering to the Collateral Agent a counterpart or supplement to the existing Collateral Documents or such new documents as are necessary or desirable to evidence, grant or perfect a first priority lien in such assets in favor of Collateral Agent, for the benefit of Secured Parties (including, without limitation, any pledges of Capital Stock (other than with respect to Excluded Property (as defined in the Security Agreement))). The Agents shall be authorized to execute and deliver such documents upon receipt of a certificate from a Responsible Officer of the Company stating that such documents are authorized or permitted under the Note Documents.

6.11     **Piggyback Registration Rights**. The Company shall provide the Holders of the Notes with customary "piggyback" registration rights (with respect to the shares of common stock issued upon conversion of the Notes) on all registration statements of the Company, subject to the right, however, of the Company and its underwriters to reduce the number of shares proposed to be registered at the underwriter's discretion.

6.12     **Further Assurances**.   Each Note Party will take any action reasonably requested by any Holder in order to effectuate the purposes and terms contained in this Agreement or any other Note Document.

**6.13**     **Conversion Event**. Within 30 calendar days of the occurrence of the first Conversion Event, (i) each of the Note Parties and the Collateral Agent hereby agrees that it shall execute and deliver to each Holder a counterpart of the Security Agreement and the Intellectual Property Security Agreement and take such actions and deliver such other documents as are reasonably necessary, or reasonably required by the Required Holdings, to give effect to this Section 6.13, including, without limitation, delivering and filing (or causing to be delivered and filed) UCC-1 financing statements with respect to the security interests to be granted thereby (provided that any such actions shall not be a condition precedent to the effectiveness of the Security Agreement) and furnishing certificates of insurance issued on applicable ACORD Forms with respect to property and liability insurance for the Company and (ii) in the event that such a Conversion Event is a SPAC and the Parent Entity assumes or otherwise becomes a co-obligor with respect to the Company's Obligations pursuant to Section 10.1, Core Scientific Holding Co. (or its successor by merger) shall remain a co-obligor with such Parent Entity with respect to such Obligations (other than any such Obligation of the Company to deliver Conversion Securities pursuant to Section 2 of the Note, with respect to which delivery Obligation Core Scientific Holding Co. (or it successor by merger) hereby agrees that it shall execute and deliver to each Holder a supplement to the Guaranty, substantially in the form attached thereto as Exhibit C).

## 7.     NEGATIVE COVENANTS OF THE NOTE PARTIES

Each Note Party shall not, and shall cause each of its Subsidiaries not to:

**7.1**     **Liens, Restricted Payments and Dispositions**. Prior to the occurrence of a Conversion Event, so long as the Obligations remain outstanding:

(a)     Liens. Create, assume or suffer to exist any Liens on any assets of the Note Parties securing debt for borrowed money in excess of an amount at any time outstanding equal to the greater of (x) the sum of (I) the aggregate principal amount of the Existing Notes at any time outstanding (disregarding, for the purposes of this clause (I) any and all PIK Interest (as defined in the Existing Notes) that has been added to the aggregate principal amount of the Existing Notes) *plus* (II) $50,000,000 and (y) $265,000,000 (such clause (y), the "***Secured Debt Cap***"); provided that (x) in no event shall the aggregate principal amount of the Existing Notes at any time outstanding (disregarding, for the purposes of this proviso any and all PIK Interest (as defined in the Existing Notes) that has been added to the aggregate principal amount of the Existing Notes) exceed at any time $215,000,000, (y) the Collateral Agent and the authorized representative with respect to any Indebtedness that is secured on a pari passu basis with the Liens on the Collateral securing the Obligations that is permitted to be secured in reliance on this clause (a) shall have entered into an intercreditor agreement providing for equal and ratable lien priority and perfection for the holders and providers of such Indebtedness at the direction of the Required Holders and substantially in the form attached hereto as Exhibit H (it being understood that the form attached as Exhibit H is acceptable to the Holders) or such other form reasonably satisfactory to the Required Holders (the "***Intercreditor Agreement***") and (z) notwithstanding the foregoing, the Note Parties shall be permitted to incur any letters of credit and any Indebtedness, including Capital Lease Obligations, incurred to finance the acquisition of any fixed or capital assets (including, for the avoidance of doubt, any real property assets) so long as such Liens shall encumber only the assets acquired or financed with the proceeds of such Indebtedness (or, in the case of any letters of credit, cash collateral) and do not attach to any other assets of any Note Party, which letters of credit and Indebtedness set forth in this clause (z) shall, for the avoidance of doubt, be excluded from the calculation of the Secured Debt Cap.

(b)     Restricted Payments.

(i)     Pay or make any Restricted Payment to its direct or indirect equityholders; provided that, the foregoing shall not restrict or prohibit any Subsidiary from paying or

making any Restricted Payments, directly or indirectly, to the Company, and shall not restrict or prohibit any Restricted Payments, directly or indirectly, from the Company to its direct or indirect equityholders at such times and in such amounts as are necessary to permit:

(1)    such equityholder (A) to pay general administrative costs and expenses (including audit and tax fees payable to third party auditors and tax advisors, customary compensation and reasonable costs and expenses of the board of directors or similar managing body of such entity incurred in the ordinary course of business, and franchise taxes and other fees, taxes and expenses required to maintain such entity's existence), (B) to discharge its, its Subsidiaries' and its direct and indirect owners' income tax liabilities and (C) in the case that the Company is treated as a flow-through entity for U.S. income tax purposes, its direct and indirect owners to discharge their respective U.S. federal, state and local and non-U.S. income tax obligations associated with their ownership of the Company, in each case, so long the amount of any such Restricted Payment is applied for such purpose; and

(2)    (x) purchases or cash payments in lieu of fractional shares of Capital Stock arising out of stock dividends, splits, combinations or conversions of Capital Stock in the ordinary course of business and (y) purchases or cash payments in lieu of fractional shares upon conversion of the Notes.

(ii)    From and after the occurrence of a Conversion Event, any Restricted Payments made or paid to the direct or indirect equityholders of the Company (other than the Restricted Payments of the type referred to in the proviso to clause (i) above) shall also be made or paid to the Holders in accordance with their Pro Rata Share of the Notes on an as-converted basis as if such Notes had been converted pursuant to their terms at the time of the applicable Restricted Payment.

(c)    Asset Dispositions.  Consummate any Asset Dispositions; provided that the foregoing shall not restrict or prohibit (A) sales of inventory in the ordinary course of business; (B) the use of cash or cash equivalents in a manner not prohibited by the Note Documents; (C) licenses, sublicenses, leases or subleases granted to third parties in the ordinary course of business not interfering with the business of the Company and its Subsidiaries and which do not materially impair the value of the property so licensed, sublicensed, leased or subleased; (D) dispositions of obsolete, damaged, surplus or worn-out or no longer used or useful equipment; (E) the lapse, abandonment or other dispositions of Intellectual Property that is, in the reasonable business judgment of the Company, no longer economically practicable or commercially desirable to maintain; (F) dispositions by (1) any Subsidiary to the Company, (2) the Company to any Note Party, (3) any Subsidiary to any Note Party or (4) any Subsidiary that is not a Note Party to any other Subsidiary that is not a Note Party; (G) dispositions resulting from any casualty or property losses or condemnation or similar proceeding of, any property or asset of the Company or any of its Subsidiaries; (H) the sale or other disposition of any assets or property of the Company not constituting Collateral; (I) any Asset Disposition so long as such Asset Disposition is made for fair market value; (J) any individual Asset Disposition so long as the consideration therefor does not exceed $1,000,000; and (K) any other Asset Dispositions to a non-affiliated third party so long as the aggregate consideration therefor does not exceed $10,000,000 per fiscal year; provided, further, that notwithstanding the foregoing, any Asset Disposition described in the foregoing clause (K) shall be permissible notwithstanding the fact that the counterparty is an affiliate or a Subsidiary of the Company so long as such Asset Disposition is on fair and reasonable terms no less favorable to the Company or such affiliate or Subsidiary than would be obtainable on comparable arm's length transaction with a non-affiliated third party.

7.2    **Issuances of Equity**.   Except to the extent permitted by Section 7.1(c), no Subsidiary of the Company shall issue or sell Capital Stock in such Subsidiary.

**7.3    Modifications of Charter Documents**. The Company will not permit, and will cause each of its Subsidiaries not to permit, such Person's Charter Documents to be amended or modified in any way that could reasonably be expected to materially or adversely affect the interests of the Holders in their capacity as Secured Parties (and not, for the avoidance of doubt, as holders of Capital Stock of the Company).

**7.4    Compensation or Credit Support**. Other than (x) to consenting or approving Holders in connection with a consent or amendment in accordance with <u>Section 10.9</u> to the extent all Holders are afforded an opportunity to enter into such consent or amendment or (y) in connection with the issuance of warrants to non-consenting Holders pursuant to Section 1(b)(i)(1) of the Notes, the Company shall not enter into any arrangement with any Holder for the purposes of providing additional compensation (in the form of interest, fees or otherwise) or credit support (in the form of additional collateral or otherwise) to such Holder in connection with the Notes without providing such additional compensation or credit support for the ratable benefit of all Holders.

## 8.    REPRESENTATIONS AND WARRANTIES OF THE PURCHASERS

Each Initial Purchaser hereby represents and warrants as of the Initial Closing Date, and each Additional Purchaser hereby represents and warrants as of the applicable Additional Closing Date as follows:

**8.1    Purchase for Own Account**. Each Purchaser represents that it is acquiring a Note and the Conversion Securities (collectively, the "*Securities*") solely for its own account and beneficial interest for investment and not for sale or with a view to distribution of the Securities or any part thereof, has no present intention of selling (in connection with a distribution or otherwise), granting any participation in, or otherwise distributing the same, and does not presently have reason to anticipate a change in such intention.

**8.2    Information and Sophistication**. Without lessening or obviating the representations and warranties of the Note Parties set forth in <u>Section 5</u> hereof or in any other Note Document or the right of such Purchaser to rely thereon, each Purchaser hereby: (i) acknowledges that it has received all the information it has requested from the Company and it considers necessary or appropriate for deciding whether to acquire the Securities, (ii) represents that it has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Securities and to obtain any additional information necessary to verify the accuracy of the information given the Purchaser, and (iii) further represents that it has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risk of this investment.

**8.3    Ability to Bear Economic Risk**. Each Purchaser acknowledges that investment in the Securities involves a high degree of risk, and represents that it is able, without materially impairing its financial condition, to hold the Securities for an indefinite period of time and to suffer a complete loss of its investment.

**8.4    Further Limitations on Disposition**. Without in any way limiting the representations set forth above, each Purchaser further agrees not to make any disposition of all or any portion of the Securities unless and until:

(c)    there is then in effect a registration statement under the Act covering such proposed disposition and such disposition is made in accordance with such registration statement; or

26

(d)    the Purchaser shall have notified the Company of the proposed disposition and shall have furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and if reasonably requested by the Company, such Purchaser shall have furnished the Company with an opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration under the Act or any applicable state securities laws, provided that no such opinion shall be required for dispositions in compliance with Rule 144, except in unusual circumstances.

Notwithstanding the provisions of paragraphs (a) and (b) above, no such registration statement or opinion of counsel shall be necessary for a transfer by such Purchaser to Permitted Transferees, or transfers by gift, will or intestate succession to any spouse or lineal descendants or ancestors of any Purchaser who is an individual, if all transferees agree in writing to be subject to the terms hereof to the same extent as if they were Purchasers hereunder

**8.5    Accredited Investor Status.** Each Purchaser is an "accredited investor" as such term is defined in Rule 501 under the Act.

**8.6    No "Bad Actor" Disqualification**. Each Holder represents and warrants that neither (A) such Holder nor (B) any entity that controls such Holder or is under the control of, or under common control with, such Holder, is subject to any Disqualification Event, except for Disqualification Events covered by Rule 506(d)(2)(ii) or (iii) or (d)(3) under the Act and disclosed in writing in reasonable detail to the Company. Each Holder represents that such Holder has exercised reasonable care to determine the accuracy of the representation made by such Holder in this paragraph, and agrees to notify the Company if such Holder becomes aware of any fact that makes the representation given by such Holder hereunder inaccurate.

**8.7    Foreign Investors**. If a Holder is not a United States person (as defined by Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended (the "*Code*")), such Holder hereby represents that he, she or it has satisfied itself as to the full observance of the laws of the Holder's jurisdiction in connection with any invitation to subscribe for the Securities or any use of its Note, including (A) the legal requirements within the Holder's jurisdiction for the purchase of the Securities, (B) any foreign exchange restrictions applicable to such purchase, (C) any governmental or other consents that may need to be obtained, and (D) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale or transfer of the Securities. The Holder's subscription, payment for and continued beneficial ownership of the Securities will not violate any applicable securities or other laws of the Holder's jurisdiction.

**8.8    Forward-Looking Statements**. With respect to any forecasts, projections of results and other forward-looking statements and information provided to a Holder, such Holder acknowledges that such statements were prepared based upon assumptions deemed reasonable by the Company at the time of preparation. There is no assurance that such statements will prove accurate, and the Company has no obligation to update such statements.

**8.9    GreensLedge as Placement Agent.** Each Purchaser represents, acknowledges and agrees that: (A) GreensLedge Capital Markets LLC ("*GreensLedge*") has acted as the Company's placement agent for the Securities, (B) such Purchaser is not relying on the advice or recommendations of GreensLedge (including any affiliate, agent, advisor or representative thereof) in connection with such Purchaser's purchase of Securities, (C) GreensLedge is not acting as an underwriter or initial purchaser with respect to any Securities, (D) GreensLedge has no responsibility with respect to any marketing or other disclosure documents relating to the Securities (or the completeness of any thereof) furnished to such Purchaser, (E) GreensLedge has not made, and will not make, any representation or warranty with respect to the Company or any Securities (and such Purchaser will not rely on any statements made by

GreensLedge, orally or in writing, to the contrary) and (F) GreensLedge and/or any affiliate or employee thereof may purchase or otherwise invest in the Securities.

**8.10    Further Assurances.** Each Purchaser agrees and covenants that at any time and from time to time it will promptly execute and deliver to the Company such further instruments and documents and take such further action as the Company may reasonably require in order to carry out the full intent and purpose of this Agreement and to comply with state or federal securities laws or other regulatory approvals.

## 9.    THE AGENTS

**9.1    Appointment and Authorization of the Agents.** Each Purchaser hereby irrevocably appoints, designates and authorizes the Note Agent to act as the "note agent" under the Note Documents and, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, the Collateral Agent to act as the "collateral agent" under the Note Documents and to act as the agent of (and to hold any security interest created by any Note Document for and on behalf of or on trust for) such Purchaser for purposes of acquiring, holding and enforcing any and all Liens on Collateral to be granted by the Company to secure any of the Obligations, and to take such other action on its behalf in accordance with the provisions of this Agreement and each other Note Document and to exercise such powers and perform such duties, in each case as are expressly delegated to the Agents by the terms of this Agreement or any other Note Document, together with such powers and discretion as are reasonably incidental thereto. Notwithstanding any provision to the contrary contained elsewhere herein or in any other Note Document, the Agents shall have no duties or responsibilities, except those expressly set forth herein, nor shall the Agents have or be deemed to have any fiduciary relationship with any Purchaser or participant, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Note Document or otherwise exist against the Agents. Without limiting the generality of the foregoing sentence, the use of the term "agent" herein and in the other Note Documents with reference to the Agents is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used merely as a matter of market custom and is intended to create or reflect only an administrative relationship between independent contracting parties. Without limiting the generality of the foregoing, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, the Purchasers hereby expressly authorize the Collateral Agent to execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Note Documents and acknowledge and agree that any such action by Collateral Agent shall bind the Purchasers. Whether or not expressly stated in any Note Document, the rights, privileges and immunities of the Agents shall be automatically incorporated by reference therein. Whether or not a party thereto, the Agents shall be express third party beneficiaries of the Notes, including without limitation the payment waterfall set forth therein.

**9.2    Liability of Agents.** No Agent-Related Person shall (a) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Note Document or the transactions contemplated hereby, or (b) be responsible in any manner to any Purchaser for any recital, statement, representation or warranty made by the Company or any officer thereof, contained herein or in any other Note Document, or in any certificate, report, statement or other document referred to or provided for in, or received by the Agents under or in connection with, this Agreement or any other Note Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Note Document, or the creation, perfection, maintenance of perfection or priority of any Lien or security interest created or purported to be created under the Note Documents, the convertibility of the Notes and the validity or the sufficiency of the Equity Securities (as defined in the Note), or for any failure of the Company or any other party (other than Agents) to any Note Document to

perform its obligations hereunder or thereunder, except to the extent such loss resulted from the gross negligence or willful misconduct of such Agent-Related Person, as determined by a final nonappealable order of a court of competent jurisdiction. The Note Agent shall have no obligation to monitor the Ledger in the absence of being providing such by the Company in accordance with the terms of the Notes, and may, in its sole discretion either: (i) conclusively rely on the Ledger most-recently delivered to it, (ii) conclusively rely on a statement by a Holder as to the outstanding principal amount of Notes held by it, or (iii) refrain from taking any action until the Note Agent receives a current Ledger from the Company. No Agent-Related Person shall be under any obligation to any Purchaser or participant to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Note Document, or to inspect the properties, books or records of the Company or any affiliate thereof.

The Agents shall not have any duties or obligations except those expressly set forth in the Note Documents. Without limiting the generality of the foregoing, (i) the Agents shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing and (ii) the Agents shall not have any duty to take any discretionary action or exercise any discretionary powers, except, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, discretionary rights and powers expressly contemplated hereby that the Collateral Agent is instructed in writing to exercise by the Required Holders (or such other requisite number or percentage of Holders as provided in Section 10.9).

In no event shall the Agents be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, epidemics, pandemics, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility, it being understood that the Agents shall use reasonable best efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

**9.3** **Reliance by the Agents**. The Agents shall be entitled to rely, and shall be fully protected in relying, upon any writing, communication, signature, resolution, representation, notice, consent, certificate, affidavit, letter, facsimile or telephone message, electronic mail message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper person or persons, and upon advice and statements of legal counsel (including counsel to the Company), independent accountants and other experts selected by the Agents. The Agents shall be fully justified in failing or refusing to take any action under any Note Document unless it shall first receive such advice or concurrence of the Required Holders as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Holders against any and all loss, liability and expense which may be incurred by it by reason of taking or continuing to take any such action. The Agents shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Note Document in accordance with a request or consent of the Required Holders (or such greater number of Holders as may be expressly required hereby in any instance), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the of the same; provided that the Agents shall not be required to take any action that, in its opinion or in the opinion of its counsel, may expose the Agents to liability or that is contrary to any Note Document or applicable law.

**9.4** **Notice of Default**. The Agents shall not be deemed to have knowledge or notice of the occurrence of any Event of Default, unless the Agents shall have received written notice from a Purchaser referring to this Agreement, describing such Event of Default and stating that such notice is a "notice of event of default." The Agents shall take such action with respect to any Event of Default as may be directed by the

Required Holders in accordance with the terms of the Notes; <u>provided</u> that unless and until the Agents has received any such direction, the Agents may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Event of Default as it shall deem advisable or in the best interest of the Holders.

9.5    **Agent's Reimbursement.** Each of the Holders severally agrees to reimburse the Agents, in accordance with such Holder's Pro Rata Share, for any reasonable and documented out-of-pocket expenses not reimbursed by the Company (without limiting the obligation of the Company to make such reimbursement pursuant to <u>Section 10.10</u>): (a) for which the Agents are entitled to reimbursement by the Company under this Agreement or any Note Document and (b) after the occurrence and during the continuance of an Event of Default, for any other reasonable and documented expenses incurred by the Agents on the Holders' behalf in connection with the enforcement of the Holders' rights under this Agreement or any Note Document; <u>provided</u>, <u>however</u>, that (x) the Agents shall not be reimbursed for any such expenses arising as a result of its gross negligence or willful misconduct, as determined by a final nonappealable order of a court of competent jurisdiction and (y) in the event that the Company reimburses the Agents for any such reasonable and documented out-of-pocket expenses, any corresponding amounts previously reimbursed by the Holders to the Agents will be promptly returned to such Holders in accordance with their Pro Rata Share.

9.6    **Indemnification.** Each of the Holders shall severally indemnify the Agents and their officers, directors, employees, agents, attorneys, accountants, consultants and controlling Persons (to the extent not reimbursed by or on behalf of the Company pursuant to <u>Section 10.10</u> and without limiting the obligations of the Company to do so), in accordance with their respective Pro Rata Share, from and against any and all liabilities, obligations, damages, penalties, actions, judgments, suits, losses (including accrued and unpaid Agents' fees), and reasonable and documented costs, expenses or disbursements of any kind whatsoever which may at any time be imposed on, incurred by or asserted against the Agents or such Persons relating to or arising out of this Agreement, any Note Document, the transactions contemplated hereby or thereby, or any action taken or omitted by the Agents in connection with any of the foregoing; <u>provided</u>, <u>however</u>, that the foregoing shall not extend to actions or omissions to the extent arising from gross negligence or willful misconduct of the Agents, as determined by a final nonappealable order of a court of competent jurisdiction. The Agents shall not be under any obligation to exercise any of the rights or powers vested in it by this Agreement at the request, order or direction of any of the Holders, pursuant to any provision of this Agreement, unless the Required Holders shall have offered (and, if requested, provided) to the Agents security or indemnity satisfactory to it against the costs, expenses and liabilities which may be incurred by it therein or thereby. The undertaking in this <u>Section 9.6</u> shall survive the payment of all other Obligations and the resignation of the Agents.

9.7    **Collateral Matters.** The Purchasers irrevocably agree that, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, any Lien on any property granted to or held by the Collateral Agent under any Note Document for the benefit of the Secured Parties shall be automatically released (i) upon payment in full of all Obligations (it being understood and agreed that the conversion in full of a Note by the Holder thereof shall be deemed, for purposes of this <u>Section 9.6</u>, to be a repayment of the entire outstanding principal amount (including all capitalized interest) of such Note together with any unpaid accrued interest thereon on the date of such conversion), (ii) subject to <u>Section 10.9</u>, if the release of such Lien is approved, authorized or ratified in writing by the Purchasers or (iii) upon the sale, transfer or other disposition of any Collateral that is not prohibited by the Note Documents. Upon request by the Collateral Agent at any time from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, the Purchasers will confirm in writing the Collateral Agent's authority to release particular types or items of property. In each case as specified in this <u>Section 9.7</u>, the Collateral Agent will, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, promptly (and each Purchaser irrevocably authorizes the Collateral Agent to), at the Company's expense,

execute and deliver to the Company such documents as the Company may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Note Documents. In connection with any such release, the Collateral Agent shall be entitled to a certificate of a Responsible Officer of the Company stating that such release is authorized and permitted by the Note Documents, upon which the Collateral Agent may conclusively rely. Each party to this Agreement acknowledges and agrees that the Agents shall not have an obligation to file financing statements, amendments to financing statements, or continuation statements, or to perfect or maintain the perfection of the Collateral Agent's Lien on the Collateral.

      **9.8**    **Successor Agents**. The Agents may resign as Agents upon fifteen (15) days' notice to the Holders. If an Agent resigns under this Agreement, the Holders shall unanimously appoint a successor representative for the Holders. If no successor representative is appointed prior to the effective date of the resignation of the Agent, the resigning Agent may appoint, after consulting with the Holders and the Company, a successor agent. Upon the acceptance of its appointment as successor representative hereunder, such successor representative shall succeed to all the rights, powers and duties of the retiring Agent, the term "Agents" shall mean such successor representative and the retiring Agent's appointment, powers and duties as Agents shall be terminated. After any retiring Agent's resignation hereunder as Agent, the provisions of this Section 9 and Section 10 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement. If no successor representative has accepted appointment as Agent by the date which is fifteen (15) days following a retiring Agent's notice of resignation, the retiring Agent's resignation shall nevertheless thereupon become effective and the Holders shall perform all of the duties of the Agents hereunder until such time, if any, as the Holders appoint a successor representative as provided for above.

      **9.9**    **Intercreditor Agreement**. The Collateral Agent is hereby authorized to enter into the Intercreditor Agreement pursuant to Section 7.1(a) and the parties hereto acknowledge that such Intercreditor Agreement, upon execution of the same, shall be binding upon them. From and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, each Secured Party hereby (a) agrees that it will be bound by and will take no actions contrary to the provisions of the Intercreditor Agreement, (b) authorizes and instructs the Collateral Agent, without any further consent of such Secured Party, to enter into the Intercreditor Agreement provided by the Company and accompanied by the certificate specified in Section 7.1(a) and to subject the Liens on the Collateral securing the Obligations to the provisions thereof and (c) authorizes and instructs the Collateral Agent to execute and deliver on behalf of the Secured Parties any amendment (or amendment and restatement) or modification to the Intercreditor Agreement to provide for the incurrence of any Indebtedness permitted hereunder or such other amendments as the Required Holders may specify in writing to the Collateral Agent.

**10.**    **MISCELLANEOUS**

      **10.1**    **Binding Agreement**. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, expressed or implied, is intended to confer upon any third party any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement. Notwithstanding anything to the contrary contained herein or in any other Note Documents, in the event of a SPAC, the Obligations of the Company to deliver Conversion Securities pursuant to Section 2 of the Note may be assigned to a Parent Entity, so long as such Parent Entity expressly assumes such Obligation of the Company and becomes a co-Obligor of each other Obligation of the Company (or its successor by merger) under the Note Documents, in each case pursuant to an joinder and assignment and assumption agreement, substantially in the form attached hereto as Exhibit I, and delivers certificates substantially identical to those delivered by the Company on the Initial Closing Date pursuant to clauses (b), (c) and (d) of Section 4.1.

**10.2    GOVERNING LAW.** THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.

**10.3    JURISDICTION AND VENUE.** EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ANY U.S. FEDERAL OR NEW YORK STATE COURT SITTING IN THE BOROUGH OF NEW YORK, NEW YORK IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR ANY OTHER NOTE DOCUMENT AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN ANY SUCH COURT AND IRREVOCABLY WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT OR THAT SUCH COURT IS AN INCONVENIENT FORUM. NOTHING HEREIN SHALL LIMIT THE RIGHT OF ANY PURCHASER, ANY HOLDER OR, FROM AND AFTER THE EXECUTION AND DELIVERY OF THE COLLATERAL DOCUMENTS PURSUANT TO SECTION 6.13, THE COLLATERAL AGENT, TO BRING PROCEEDINGS AGAINST THE COMPANY IN THE COURTS OF ANY OTHER JURISDICTION. ANY JUDICIAL PROCEEDING BY THE COMPANY AGAINST ANY PURCHASER, ANY HOLDER OR ANY OF THEIR AFFILIATES AND, FROM AND AFTER THE EXECUTION AND DELIVERY OF THE COLLATERAL DOCUMENTS PURSUANT TO SECTION 6.13, THE COLLATERAL AGENT OR ANY OF ITS AFFILIATES, INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT OR ANY OTHER NOTE DOCUMENT SHALL BE BROUGHT ONLY IN A COURT IN THE BOROUGH OF NEW YORK, NEW YORK.

**10.4    WAIVER OF JURY TRIAL.** EACH OF THE COMPANY, THE PURCHASERS, THE HOLDERS AND, FROM AND AFTER THE EXECUTION AND DELIVERY OF THE COLLATERAL DOCUMENTS PURSUANT TO SECTION 6.13, THE COLLATERAL AGENT HEREBY WAIVES TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT OR ANY OTHER NOTE DOCUMENT OR THE RELATIONSHIP ESTABLISHED THEREUNDER.

**10.5    Severability**. If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (a) such provision shall be excluded from this Agreement, (b) the balance of this Agreement shall be interpreted as if such provision were so excluded, and (c) the balance of this Agreement shall be enforceable in accordance with its terms.

**10.6    Counterparts.** This Agreement may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract. Any counterpart of a signature page to this Agreement may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the U.S. federal ESIGN Act of 2000 or the New York Electronic Signature and Records Act or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law. The Note Documents and all notices, approvals, consents, requests and any

communications hereunder must be in writing (provided that any such communication sent to Agents hereunder must be in the form of a document that is signed manually or by way of a digital signature provided by DocuSign (or such other digital signature provider as specified in writing to the Agents by the authorized representative)), in English. The Company agrees to assume all risks arising out of the use of using digital signatures and electronic methods to submit communications to the Note Agent, including without limitation the risk of the Note Agent acting on unauthorized instructions, and the risk of interception and misuse by third parties.

10.7   **Headings; Interpretation.** Paragraph headings used in this Agreement are included for convenience of reference only and will not modify the provisions that they precede or affect the interpretation of this Agreement or any other Note Document. The term "including" shall be interpreted to mean "including but not limited to". Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference.

10.8   **Notices.** All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient (and if not, then on the next Business Day), (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. Notices to the Agents shall be effective upon actual receipt thereof. All communications shall be sent, if to the Note Parties, at the address set forth on the signature page of the Company, if to the Agents, at the address set forth on the signature page thereof, and, if to a Purchaser, at the address(es) set forth on the Schedule of Purchasers attached hereto as Schedule 2 or at such other address(es) as the Company or Purchaser may designate by ten (10) days' advance written notice to the other parties hereto. Except where notice is specifically required by this Agreement, no notice to or demand on the Company or any of its Subsidiaries in any case shall entitle the Company or any of its Subsidiaries to any other or further notice or demand in similar or other circumstances.

10.9   **Amendments; Waiver**. Any term of the Notes and this Agreement may be amended or waived with the written consent of the Company and the Required Holders; provided, that without the consent of each Holder, no amendment, modification, termination, or consent shall be effective if the effect thereof would (a) extend the scheduled final maturity of any Note held by any non-consenting Holder, (b) waive, reduce or postpone any scheduled repayment (but not prepayment) with respect to the Note held by any non-consenting Holder; (c) reduce the rate of interest or amount of any fees payable under any Note held by any non-consenting Holder; (d) extend the time for payment of any interest or fees payable under any Note held by any non-consenting Holder; (e) reduce the principal amount of any Note held by any non-consenting Holder; (f) amend, modify, terminate or waive any provision of this Section 10.9; (g) amend the definition of "Required Holders"; (h) release all or substantially all of the Collateral securing any Note (if any) held by any non-consenting Holder except as expressly provided in the Note Documents, (i) from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, subordinate the Collateral Agent's Liens on Collateral except as expressly provided in the Note Documents; (j) release any Guarantor except as expressly provided in the Note Documents or (k) consent to the assignment or transfer by the Company of any of its rights and obligations under any Note Document held by any non-consenting Holder. No amendment affecting the rights, privileges and immunities of the Agents shall be effective without the consent of such Agent. Notwithstanding anything to the contrary contained herein or in any other Note Documents, no consent of any Holder shall be required pursuant to this Section 10.9 in connection with (i) an assignment and assumption by a Parent Entity of the Company's Obligations in connection with a SPAC, so long as the conditions set forth in Section 10.1 shall have been satisfied, and (ii) any Person (including, without limitation, a Parent Entity in connection with a SPAC) becoming a Guarantor or a co-issuer or co-obligor hereunder and under the

33

Notes; provided, that the Company shall deliver a certificate of a Responsible Officer to the Agents stating that any documents to be executed in connection with a SPAC are authorized and permitted pursuant to the Note Documents.

### 10.10    Expenses and Indemnification.

(a)    The Company shall not be responsible for any out-of-pocket costs or expenses incurred by such Initial Purchasers in connection with the preparation, execution and delivery of this Agreement and the other Note Documents. The Company shall pay all reasonable and documented out-of-pocket costs and expenses of the Agents (including reasonable and documented fees, expenses and disbursements of its outside counsel) relating to the negotiation, preparation and execution of the Note Documents, review of other documents (including for purposes of due diligence review) in connection with the transactions contemplated hereby and any amendments and waivers hereto or thereto. In addition, the Company agrees to promptly pay in full after the occurrence of an Event of Default, all costs and expenses (including, without limitation, reasonable and documented fees and disbursements of counsel, agents and professional advisers) incurred by the Holders or the Agents in enforcing any obligations of or in collecting any payments due hereunder or under the Notes by reason of such Event of Default or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a workout, or any insolvency or bankruptcy proceedings.

(b)    In addition to the payment of expenses pursuant to Section 10.10(a), the Company (as "*Indemnitor*") agrees to indemnify, pay and hold the Purchasers, the Holders and the Agents, and the officers, directors, employees, agents, and affiliates of the Purchasers, the Holders and the Agents (collectively called the "*Indemnitees*") harmless from and against any and all other liabilities, costs, expenses, liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for such Indemnitees) in connection with any investigative, administrative or judicial proceeding commenced or threatened (excluding claims among Indemnitees (other than claims against an Agent acting in its capacity as such) and, with the exception of claims arising out of otherwise indemnifiable matters (e.g., actions to enforce the indemnification rights provided hereunder), and excluding claims between the Company and an Indemnitee), whether or not such Indemnitee shall be designated a party thereto, which may be imposed on, incurred by, or asserted against that Indemnitee, in any manner relating to or arising out of this Agreement, the Notes, the Note Documents or the other documents related to the transactions contemplated hereby (including, without limitation, the existence or exercise of any security rights with respect to the Collateral in accordance with the Security Agreement), the Purchasers' agreement to purchase the Notes or the use or intended use of the proceeds of any of the proceeds thereof to the Company (the "*Indemnified Liabilities*"); provided, that the Indemnitor shall not have any obligation to an Indemnitee hereunder with respect to an Indemnified Liability to the extent that such Indemnified Liability arises from the gross negligence or willful misconduct of that Indemnitee as determined by a final nonappealable order of a court of competent jurisdiction. Each Indemnitee shall give the Indemnitor prompt written notice of any claim that might give rise to Indemnified Liabilities setting forth a description of those elements of such claim of which such Indemnitee has knowledge; provided, that any failure to give such notice shall not affect the obligations of the Indemnitor unless (and then solely to the extent) such Indemnitor is not aware of such claim and is materially prejudiced. The Indemnitor shall have the right at any time during which such claim is pending to select counsel to defend and control the defense thereof and settle any claims for which it is responsible for indemnification hereunder (provided that the Indemnitor will not settle any such claim without (i) the appropriate Indemnitee's prior written consent, which consent shall not be unreasonably withheld or (ii) obtaining an unconditional release of the appropriate Indemnitee from all claims arising out of or in any way relating to the circumstances involving such claim) so long as in any such event the Indemnitor shall have stated in a writing delivered to the Indemnitee that, as between the Indemnitor and the Indemnitee, the

34

Indemnitor is responsible to the Indemnitee with respect to such claim to the extent and subject to the limitations set forth herein; provided, that the Indemnitor shall not be entitled to control the defense of any claim in the event that in the reasonable opinion of counsel for the Indemnitee, there are one or more material defenses available to the Indemnitee which are not available to the Indemnitor, in which case the Indemnitee may retain separate counsel and the Company will pay the reasonable fees and expenses of such counsel (including the reasonable fees and expenses of counsel to such Indemnitee incurred in evaluating whether such a conflict exists); provided further, that with respect to any claim as to which the Indemnitee is controlling the defense, the Indemnitor will not be liable to any Indemnitee for any settlement of any claim pursuant to this Section 10.10(b) that is effected without its prior written consent, which consent shall not be unreasonably withheld. To the extent that the undertaking to indemnify, pay and hold harmless set forth in this Section 10.10(b) may be unenforceable because it is violative of any law or public policy, the Company shall contribute the maximum portion which it is permitted to pay and satisfy under applicable law, to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnitees or any of them. The obligations of each of the parties under this Section 10.10 will survive the payment or transfer of any Note, the enforcement, amendment or waiver of any provision of this Agreement, the resignation or removal of any Agent and the termination of this Agreement.

(c)     To the extent permitted by applicable law, none of the parties hereto shall assert, and each of the parties hereto hereby waives, any claim against the other parties (including their respective affiliates, partners, stockholders, members, directors, officers, agents, employees and controlling persons), on any theory of liability for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the transactions contemplated hereunder, any Note Document, the Notes or the use of the proceeds thereof; provided that nothing contained in this Section 10.10(c) shall limit the Notes Parties' indemnification and reimbursement obligations to the extent set forth in this Agreement.

**10.11   Delays or Omissions.** It is agreed that no delay or omission to exercise any right, power or remedy accruing to each Purchaser, upon any breach or default of the Company under this Agreement or any other Note Document shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. It is further agreed that any waiver, permit, consent or approval of any kind or character by a Purchaser of any breach or default under this Agreement, or any waiver by such Purchaser of any provisions or conditions of this Agreement must be in writing and shall be effective only to the extent specifically set forth in writing and that all remedies, either under this Agreement, or by law or otherwise afforded to such Purchaser, shall be cumulative and not alternative.

**10.12   Waiver of Conflicts**. Each party to this Note acknowledges that Cooley LLP ("**_Cooley_**"), outside general counsel to the Company, has in the past performed and is or may now or in the future represent the Holders or the Holders' affiliates in matters unrelated to the transactions contemplated by this Note (the "**_Note Financing_**"), including representation of the Holders or the Holders' affiliates in matters of a similar nature to the Note Financing. The applicable rules of professional conduct require that Cooley inform the parties hereunder of this representation and obtain their consent. Cooley has served as outside general counsel to the Company and has negotiated the terms of the Note Financing solely on behalf of the Company. The Company and the Holders hereby (i) acknowledge that they have had an opportunity to ask for and have obtained information relevant to such representation, including disclosure of the reasonably foreseeable adverse consequences of such representation; (ii) acknowledge that with respect to the Note Financing, Cooley has represented solely the Company, and not any Holder or any stockholder, board member or employee of the Company or director, stockholder or employee of the

Holder; and (iii) gives the Holder's informed consent to Cooley's representation of the Company in the Note Financing.

**10.13    Obligations Several**.    The Purchasers' obligations hereunder are several and not joint obligations and no Purchaser shall have any liability to any Person for the performance or non-performance of any obligation by any other Purchaser hereunder.

**10.14    Survival of Representations and Warranties**. All of the representations and warranties made by the Note Parties and their Subsidiaries herein shall survive the execution and delivery of this Agreement, any investigation by or on behalf of any Purchaser, acceptance of the Notes and payment therefor, or termination of this Agreement.

**10.15 Entire Agreement**. This Agreement and the other Note Documents constitute the entire contract among the parties hereto regarding to the subject matters addressed herein and supersede any and all previous agreements, negotiations, and discussions, oral or written, by the parties regarding the subject matters addressed herein.

**10.16    Withholding**. The Company shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement such amounts as it is required to deduct and withhold under the Code, or any Tax law, with respect to the making of such payment. To the extent that amounts are so withheld, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made. If a payment is payable (in whole or in part) in consideration other than cash and if the cash portion of any such payment is insufficient to satisfy all required Tax withholding obligations, the Company shall retain an amount of the non-cash consideration otherwise payable equal in value to the amount required to satisfy any applicable withholding taxes (as reasonably determined by the Company).**10.17 PATRIOT ACT**. The Agents hereby notify the Company that pursuant to the requirements of the PATRIOT Act, the Company may be required to obtain, verify and record information that identifies the Company, its subsidiaries and the Guarantors, including their respective names, addresses and other information that will allow the Agent to identify, the Company, its subsidiaries and the Guarantors in accordance with the PATRIOT Act.

*[Signature pages follow]*

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first written above.

**COMPANY:**

**CORE SCIENTIFIC HOLDING CO.**

By:

Name:  Michael Trzupek
Title:    Chief Financial Officer

Address for notices:
2800 Northup Way
Suite 220
Bellevue, WA 98004
Attention:  Michael Trzupek, Chief Financial Officer
Email:  mtrzupek@corescientific.com

Copy to:
Todd DuChene, General Counsel
Email:  tduchene@corescientific.com

*In each case, with a copy (which shall not constitute notice) to:*

Cooley LLP
1299 Pennsylvania AVE, NW
Suite 700
Washington, DC 20004
Attention:  Mike Tollini
Email:  mtollini@cooley.com

[Signature Page to Convertible Note Purchase Agreement]

**GUARANTORS:**

**CORE SCIENTIFIC, INC.,** a Delaware corporation

By: _____
Name: Michael Trzupek
Title:   Chief Financial Officer

**AMERICAN PROPERTY ACQUISITION, LLC,** a Delaware limited liability company

By: Core Scientific, Inc., its sole member

By: _____
Name: Michael Trzupek
Title:   Chief Financial Officer

**AMERICAN PROPERTY ACQUISITIONS I, LLC,** a North Carolina limited liability company

By: American Property Acquisition, LLC, its sole member

By:  Core Scientific, Inc., its sole member

By: _____
Name: Michael Trzupek
Title:   Chief Financial Officer

[Signature Page to Convertible Note Purchase Agreement]

**AMERICAN PROPERTY ACQUISITIONS VII, LLC,** a Georgia limited liability company

By: American Property Acquisition, LLC, its sole member

By: Core Scientific, Inc., its sole member

By: _____
Name: Michael Trzupek
Title:   Chief Financial Officer

**BLOCKCAP, INC.,** a Nevada corporation

By: _____
Name: Todd DuChene
Title:   Secretary

[Signature Page to Convertible Note Purchase Agreement]

**U.S. BANK NATIONAL ASSOCIATION, AS NOTE AGENT**

By: _____
Name:  Joshua A. Hahn
Title:  Vice President

Address for notices:
U.S. Bank National Association
West Side Flats
60 Livingston Avenue
EP-MN-WS3C
St. Paul, MN 55107
Attention: Joshua Hahn (Core Sciences)


*In each case, with a copy (which shall not constitute notice) to:*

Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103
Attn: Nathan Plotkin (Core Scientific)

[Signature Page to Convertible Note Purchase Agreement]

**U.S. BANK NATIONAL ASSOCIATION, AS COLLATERAL AGENT**


By:_____

Name: Joshua A. Hahn
Title:  Vice President

Address for notices:
U.S. Bank National Association
West Side Flats
60 Livingston Avenue
EP-MN-WS3C
St. Paul, MN 55107
Attention: Joshua Hahn (Core Sciences)


*In each case, with a copy (which shall not constitute notice) to:*

Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103
Attn: Nathan Plotkin (Core Scientific)


[Signature Page to Convertible Note Purchase Agreement]

**PURCHASER:**

**MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY**

By: _____

Name:  Eric Partlan

Title:   Head of Portfolio Management

[Signature Page to Convertible Note Purchase Agreement]

PURCHASER:

CRYPTONIC BLACK, LLC

By: _____
Name:   Jennifer LaFrance
Title:   Manager

[Signature Page to Convertible Note Purchase Agreement]

PURCHASER:

FIRST SUN INVESTMENTS, LLC

By:
Name: Brent Berge
Title:  Manager

[Signature Page to Convertible Note Purchase Agreement]

PURCHASER:

_____

DOUGLAS LIPTON

[Signature Page to Convertible Note Purchase Agreement]

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

APOLLO TACTICAL VALUE SPN INVESTMENTS, L.P.
By: Apollo Tactical Value SPN Management, LLC, its investment manager

By: _____

Name:  Joseph D. Glatt

Title:  Vice President

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

APOLLO CENTRE STREET PARTNERSHIP, L.P.
By: Apollo Centre Street Management, LLC, its investment manager

By: _____
Name:  Joseph D. Glatt
Title:    Vice President

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

APOLLO LINCOLN FIXED INCOME FUND, L.P.
By: Apollo Lincoln Fixed Income Management, LLC, its investment manager

By: _____
Name: Joseph D. Glatt
Title:    Vice President

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

APOLLO MOULTRIE CREDIT FUND, L.P.
By: Apollo Moultrie Credit Fund Management, LLC, its investment manager

By: _____
Name:   Joseph D. Glatt
Title:    Vice President

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

BLOCKFI LENDING LLC

By: _Rene van Kesteren_
Name:
Title:

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

WOLFSWOOD PARTNERS LP

By: _____

Name: _____

Title: Jason Comorchero

Managing Member

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

_____

Robert Fedrock

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

TJC3 LLC

By: _____ *Thomas Coleman* _____

Name:  Thomas J. Coleman

Title:  Trustee of the Thomas J. Coleman Revocable Trust,
as the Sole Member of TJC3 LLC

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

KMR CS Holdings, LLC

By:

Name: kamran@kmrequity.com

Title: Manager

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

The Sear Family 1996 Trust

By: _msear@EvokeAdvisors.com_____

Name: msear@EvokeAdvisors.com

Title: Mark Sear, Trustee

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

JSK Partnership LLC

By:_____

Name: sp@posnergroup.com

Title: Co managing member

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Wormser Family Partnership II, LP

By: _____
Name: Ken Wormser
Title: ptr

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

TBC 222 LLC

By: _MSidman@threebayscapital.com_
Name:
Title: Managing partner

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

*frank@pollaro.com*

_____

Frank Polaro

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

David

_____

David Sarner

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

*James P. Pulaski*

—————————————————————
James Pulaski

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

SunnySide Consulting and Holdings, Inc.

By: _Taras Kulyk_
Name: Taras Kulyk
Title: Director / Principal

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

ADDITIONAL PURCHASER:

1994 Steinfeld Family Trust

By: _____

Name: jake@steinfeld6.com

Title: Trustee

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Better Downtown Miami, LLC

By: _____
Name: Marc Roberts
Title: Manager

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

_____
Jason Capello

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

*Vineet Agrawal*

———————————————————

Vineet Agrawal

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Milos Core LLC

By: _____
Name:        Scott Packman
Title:          Partner

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Barkley Investments, LLC

By: *Jason Paul Godfrey*
Name: Jason Paul Godfrey
Title: President, it's managing member, Godfrey Capital

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Richard Katz 2016 GST TRUST

By: _____
Name: Richard Katz
Title: Dr

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

_____ *johnquinn@quinnemanuel.com* _____

John Quinn

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Northdata Holdings Inc.

By: _____

Name: daniel rafuse

Title: Chairman

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Monbanc Inc.

*daniel rafuse*

By:_____
Name: daniel rafuse
Title:
      Chairman

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Sabby Volatility Warrant Master Fund, Ltd.

By: _rgrundstein@sabbymanagement.com_

Name: rgrundstein@sabbymanagement.com

Title: COO

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

ADDITIONAL PURCHASER:

Leon J. Simkins Non-Exempt Trust
FBO Michael Simkins

By:_____

Name: Michelle Simkins-Rubell

Title: trustee

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

ADDITIONAL PURCHASER:

FTF Diversified Holdings, LP

By:

Name: Anthony Fadell

Title: Principal

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

ADDITIONAL PURCHASER:

By:_____

Name:   Joaquin Palomo

Title:   Director   FGK Investments Ltd.

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

By: _____

Name: Ernesto Castillo Kriete    Director

Title: Neso Investment Group Ltd

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

ADDITIONAL PURCHASER:

By: _____

Name:  Marco Baldocchi Kriete

Title:  Director   Ferro Investments Ltd.

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Galaxy Digital LP
 by its general partner, Galaxy Digital GP LLC

By: _____
Name:   Chris Ferraro
Title:   Authorized Signatory

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Corbin ERISA Opportunity Fund, Ltd.

By:_____ _Cesar Bello_ _____

Name: Cesar Bello

Title: Deal Counsel

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Corbin Opportunity Fund, L.P.

By:_____
Name:  Cesar Bello
Title:  Deal Counsel

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Levbern Management LLC

*Andrew Ward*

By:_____

Name: Andrew Ward

Title:   Member

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

JPAS - Crypto Infrastructure LLC

By:_____
Name:  George Lusch
Title:  Chief Financial Officer

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

> The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

JPAS - Crypto Infrastructure-A S.P.

By:_____

Name: George Lusch

Title: Chief Financial Officer

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

JPAS - Credit-A S.P.

By: _____
Name:  George Lusch
Title:  Chief Financial Officer

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

JPAS - Credit LLC

By:_____

Name: George Lusch

Title: Chief Financial Officer

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Cannon Investments LLC

By: _____
Name:    Andrew Rosen
Title:    Manager

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Andrew Rosen 2004 Successor Insurance Trust

By: _____
Name:   Dan Nir
Title:   Manager

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

XMS Core Convert Holdings LLC

By: ~~John McGarrity~~

Name:

Title:     John McGarrity – Managing Director

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Amplify Transformational Data Sharing ETF

By: _____ *Charles A. Ragauss* _____
Name:   Charles A. Ragauss
Title:   Portfolio Manager

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

ADDITIONAL PURCHASER:

Marsico AXS CS LLC

By:_____
Name:   jam@marsicoenterprises.com
Title:   Manager

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Gullane Digital Asset Partners, LLC

By: _Richard A. Miller, III_

Name: Richard A. Miller, III

Title: Managing Partner

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Gullane Capital Partners, LLC

By: _____ *Richard A. Miller, III*
Name: Richard A. Miller, III
Title: Managing Partner

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Marsico AXS CS LLC

By: _____
Name:   jam@marsicoenterprises.com
Title:   Manager

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

ADDITIONAL PURCHASER:

Transatlantic Mobility Holdings II LLC

By:_____ *lorenzo@transatlanticeg.com* _____

Name: lorenzo@transatlanticeg.com

Title:    Chairman & CEO

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

OIP SPV Core Scientific, LLC

By: *michael@obsidianip.com*
Name:  michael@obsidianip.com
Title:   Manager

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

OIP SPV CS, LLC

By: _michael@obsidianip.com_____
Name:  michael@obsidianip.com
Title:
         Manager

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

> The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.
>
> **ADDITIONAL PURCHASER:**
>
> Pescadero Capital, LLC
>
> By:_____
> Name:  Mark Hickson
> Title:  Vice President

     **IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

> The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

> **ADDITIONAL PURCHASER:**

> Amplify Transformational Data Sharing ETF

> By: _Charles A. Raga_
> Name:
> Title:   Portfolio Manager

**EXHIBIT B**

**COUNTERPART SIGNATURE PAGE**

     **IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

BlackRock Credit Alpha Master Fund L.P.

By: BlackRock Financial Management Inc., in its capacity as investment advisor

By: _____

Name: Christopher Biasotti
Title:  Authorized Signatory

**EXHIBIT B**

**COUNTERPART SIGNATURE PAGE**

      **IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

      The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

HC NCBR Fund

By: BlackRock Financial Management Inc., in its capacity as investment advisor

By: _____
Name: Christopher Biasotti
Title:  Authorized Signatory

**EXHIBIT B**

**COUNTERPART SIGNATURE PAGE**

    **IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

                    The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

                    **ADDITIONAL PURCHASER:**

                    The Obsidian Master Fund

                    By: BlackRock Financial Management Inc., its Investment Advisor

                    By: _____
                    Name: Christopher Biasotti
                    Title:  Authorized Signatory

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

*John Joliet*

_____

John P. Joliet

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

ADDITIONAL PURCHASER:

Gullane Digital Asset Partners QP, LLC

By: _____
Name:   Richard Miller
Title:   Managing Member

254153937 v7

## SCHEDULE 2

## SCHEDULE OF PURCHASERS

**Initial Purchasers**

| Name and Address for Notices | Principal Amount of Notes |
|---|---|
| **MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY**<br>One Marina Park Drive, MIP 1205<br>Boston, MA 02210<br>Attn:     Sarah Doyle; Chris Fredericks; Helder Pereira<br>Email:     sdoyle@massmutual.com; cfredericks54@massmutual.com; hpereira@massmutual.com<br>Phone #:617-235-1522; 617-695-4069; 413-744-7347 | $40,000,000.00 |
| **CRYPTONIC BLACK, LLC**<br>801 S. Rampart Blvd.<br>Las Vegas, NV 89145<br>Attn:     Jennifer LaFrance<br>Email:     jlafrance@asny.com<br>Phone #:702-967-5000 | $6,000,000.00 |
| **FIRST SUN INVESTMENTS, LLC**<br>6718 E. Rovey Avenue<br>Paradise Valley, AZ 85253<br>Attn:     Brent Berge<br>Email:     brentberge@bergegroup.com<br>Phone #:1-602-430-3673 | $4,000,000.00 |
| **DOUGLAS LIPTON**<br>4701 N Meridian Ave<br>Unit 315<br>Miami Beach, FL 33140<br>Attn:     Douglas Lipton<br>Email:     dlip44@gmail.com<br>Phone #:917-887-8869 | $250,000.00 |
| **TOTAL:** | **$50,250,000.00** |

**Additional Purchasers**

| Name and Address for Notices | Principal Amount of Notes |
|---|---|
| **Apollo Tactical Value SPN Investments LP**<br>9 West 57th Street<br>New York, NY 10019<br>Attn:     Joseph D. Glatt<br>Email:     jglatt@apollo.com | $4,700,000.00 |
| **Apollo Centre Street Partnership, LP**<br>9 West 57th Street<br>New York, NY 10019<br>Attn:     Joseph D. Glatt<br>Email:     jglatt@apollo.com | $2,500,000.00 |

| | |
|---|---|
| **Apollo Lincoln Fixed Income Fund, L.P.**<br>9 West 57th Street<br>New York, NY 10019<br>Attn:            Joseph D. Glatt<br>Email:           jglatt@apollo.com | $1,600,000.00 |
| **Apollo Moultrie Credit Fund, L.P.**<br>9 West 57th Street<br>New York, NY 10019<br>Attn:            Joseph D. Glatt<br>Email:           jglatt@apollo.com | $1,200,000.00 |
| **BlockFi Lending LLC**<br>201 Montgomery St #263<br>Jersey City, NJ 07302<br>Attn:            Sergey Pekarsky<br>Email:           tradingops@blockfi.com, Legal-inst@blockfi.com | $5,000,000.00 |
| **Wolfswood Partners LP**<br>140 Broadway<br>New York, NY 10005<br>Attn:            Jason Comerchero<br>Email:           jason.comerchero@wolfswoodpartners.com | $1,000,000.00 |
| **1994 Steinfeld Family Trust**<br>622 Toyota Drive<br>Pacific Palisades, CA 90272<br>Attn: Jake Steinfeld<br>Email: jake@steinfeld6.com | $500,000.00 |
| **Andrew Rosen 2004 Successor Insurance Trust**<br>810 Seventh Avenue, 7th Floor<br>New York, NY 10019<br>Attn: TAG Associates LLC<br>Email: NKim@tagassoc.com<br>Email: EWong@tagassoc.com | $250,000.00 |
| **Barkley Investments, LLC**<br>8231 Bay Colony Drive, Unit 802<br>Naples, FL<br>Attn: Jason Paul Godfrey<br>Email: jgodfrey@godfreycap.com | $2,000,000.00 |
| **Better Downtown Miami LLC**<br>4167 Main Street<br>Jupiter, FL 33458<br>Attn: Marc Roberts<br>Email: marc@marcroberts.com | $400,000.00 |
| **Cannon Investments LLC**<br>810 Seventh Avenue, 7th Floor<br>New York, NY 10019<br>Attn: TAG Associates LLC<br>Email: NKim@tagassoc.com<br>Email: EWong@tagassoc.com | $250,000.00 |
| **Corbin ERISA Opportunity Fund, Ltd.**<br>c/o Corbin Capital Partners, L.P.<br>590 Madison Ave, 31st Floor<br>New York, NY 10022<br>Attn: Corbin Operations<br>Email: corbinwso-fax@ifs.statestreet.com<br>Email: mmf-bankdebt@corbincapital.com<br>Email: corbin@viteos.com | $12,000,000.00 |

| | |
|---|---|
| **Corbin Opportunity Fund, L.P.**<br>c/o Corbin Capital Partners, L.P.<br>590 Madison Ave, 31st Floor<br>New York, NY 10022<br>Attn: Corbin Operations<br>Email: corbinwso-fax@ifs.statestreet.com<br>Email: mmf-bankdebt@corbincapital.com<br>Email: corbin@viteos.com | $2,000,000.00 |
| **David Sarner**<br>2100 S. Ocean Blvd, #506<br>Palm Beach, FL 33480<br>Email: docsarner@gmail.com | $250,000.00 |
| **Ferro Investments Ltd**<br>2 Alhambra Plaza, Suite 802<br>Coral Gables, FL 33134<br>Attn: Jennifer Kanold<br>Email: reporting@icomia.com | $1,500,000.00 |
| **FGK Investments Ltd**<br>2 Alhambra Plaza, Suite 802<br>Attn: Jennifer Kanold<br>Email: reporting@icomia.com | $500,000.00 |
| **Frank Polaro**<br>10 Douglas Road<br>Morristown, NJ 07960<br>Email: frank@pollaro.com | $250,000.00 |
| **FTF Diversified Holdings, LP**<br>121 Alhambra Plaza, Suite 1202<br>Coral Gables, FL 33134<br>Attn: Archpoint Investors<br>Email: futureholdings@archpointinvestors.com<br>Email: reports@concertomgmt.com | $2,000,000.00 |
| **Galaxy Digital LP**<br>Attn: Chris Ferraro<br>Email: compliance@galaxydigital.io | $5,000,000.00 |
| **James Pulaski**<br>3921 Alton Road #360<br>Miami Beach, FL 33140<br>Attn: James Pulaski<br>Email: jim@jpulaski.com | $1,000,000.00 |
| **Jason Capello**<br>1404 N Lake Way<br>Palm Beach, FL 33480<br>Email: jcapello@mgatecap.com | $2,000,000.00 |
| **John B. Quinn**<br>Quinn Emanuel Urquhart & Sullivan, LLP<br>865 S. Figueroa Street, 10th Floor<br>Los Angeles, CA 90017<br>Email: johnquinn@quinnemanuel.com | $500,000.00 |
| **JPAS – Credit LLC**<br>100 Pine Street, Suite 2600<br>San Francisco, VA 94111<br>Attn: George Lusch<br>Email: George.lush@jordanpark.com | $8,333,653.00 |
| **JPAS – Credit-A S.P.**<br>100 Pine Street, Suite 2600 | $4,166,347.00 |

| | |
|---|---|
| San Francisco, VA 94111<br>Attn: George Lusch<br>Email: George.lush@jordanpark.com | |
| **JPAS – Crypto Infrastructure LLC**<br>100 Pine Street, Suite 2600<br>San Francisco, VA 94111<br>Attn: George Lusch<br>Email: George.lush@jordanpark.com | $11,619,743.00 |
| **JPAS – Crypto Infrastructure-A S.P.**<br>100 Pine Street, Suite 2600<br>San Francisco, VA 94111<br>Attn: George Lusch<br>Email: George.lush@jordanpark.com | $4,380,257.00 |
| **JSK Partnership LLC**<br>1691 Michigan Ave, Suite 445<br>Miami Beach, FL 33139<br>Attn: Sean Posner<br>Email: sp@posnergroup.com | $1,000,000.00 |
| **KMR CS Holdings, LLC**<br>377 Fifth Avenue, 5th Floor<br>Attn: Kamran Yaghoubzadeh<br>Email: kamran@kmrequity.com | $820,000.00 |
| **Leon J. Simkins Non-Exempt Trust FBO Michael Simkins**<br>5080 Biscayne Boulevard, #A<br>Miami, FL 33137<br>Attn: Michelle Simkins-Rubell<br>Email: Simkinslaw@gmail.com | $750,000.00 |
| **Levbern Management LLC**<br>45625 Cielito Drive<br>Indian Wells, CA 92210<br>Attn: Melina Bernecker<br>Email: melina@levbernmanagement.com<br>Attn: Drew Ward<br>Email: drew@levbernmanagement.com | $250,000.00 |
| **Milos Core LLC**<br>Attn: Mavrides, Moyal, Packman & Sadkin, LLP<br>Attn: Scott Packman<br>Email: spackman@mmps.com | $1,000,000.00 |
| **Monbanc Inc.**<br>290 Lakeshore<br>Pointe Claire, Quebec<br>H9s 413<br>Attn: Daniel Rafuse<br>Email: daniel@monbanc.com | $100,000.00 |
| **Neso Investment Group Ltd**<br>2 Alhambra Plaza, Suite 802<br>Attn: Jennifer Kanold<br>Email: reporting@icomia.com | $500,000.00 |
| **Northdata Holdings Inc.**<br>290 Lakeshore<br>Pointe Claire, Quebec<br>H9S 413<br>Attn: Daniel Rafuse<br>Email: daniel@monbanc.com | $200,000.00 |
| **Richard Katz 2016 Trust** | $250,000.00 |

| | |
|---|---|
| 55 Farrington Avenue<br>Email: Docatz@gmail.com | |
| **Robert Fedrock**<br>736-333 Adelaide St. E.<br>Toronto, Ontario M5A 4T4<br>Email: Robert.fedrock@originmerchant.com | $400,000.00 |
| **Sabby Management, LLC**<br>10 Mountainview Road, Suite 205<br>Upper Saddle River, NJ 07458<br>Attn: Robert Grundstein<br>Email: rgrundstein@sabbymanagement.com<br>Originals to:<br>Attn: Client Settlement, Wedbush Securities<br>1000 Wiltshire Blvd., Suite 850<br>Los Angeles, CA 90017 | $2,500,000.00 |
| **SunnySide Consulting and Holdings, Inc.**<br>214 Cherryhill Road<br>Oakville, Ontario, L6L3E2, Canada<br>Attn: Taras Kulyk<br>Email: taras@sunnysideinc.ca | $110,000.00 |
| **TBC 222 LLC**<br>8 Newbury Street, 5th Floor<br>Boston, MA 02116<br>Attn: Matthew Sidman – Managing Member<br>Email: msidman@threebayscapital.com | $2,500,000.00 |
| **The Sear Family 1996 Trust**<br>457 26th Street<br>Manhattan Beach, CA 90266<br>Attn: Mark Sear<br>Email: msear@evokeadvisors.com | $500,000.00 |
| **TJC3 LLC**<br>c/o Kensico Capital Management<br>55 Railroad Avenue, 2nd Floor<br>Greenwich, CT 06830<br>Attn: Family Office (Gino Labruzzo, Li Dick, Christina Malloy)<br>Email: familyoffice@kensicocapital.com | $4,000,000.00 |
| **Vineet Agrawal**<br>2 Brantwood Terrace<br>Short Hills, NJ 07078<br>Email: vagrawal@gmail.com | $250,000.00 |
| **Wormser Family Partnership II L.P.**<br>575 Lexington Avenue, 32nd Floor<br>New York, NY 10022<br>Attn: Ken Wormser<br>Email: kwormser@greensledge.com | $500,000.00 |
| **XMS Core Convert Holdings LLC**<br>321 N. Clark Street, Suite 2440<br>Chicago, IL 60091<br>Attn: John McGarrity<br>Email: jmcgarrity@xmscapital.com | $1,000,000.00 |
| **Marsico AXS CS LLC**<br>5251 DTC Parkway, Suite 410<br>Greenwood Village, CO 80111<br>Attn: Jonathan Marsico<br>Email: jam@marsicoenterprises.com | $19,604,095.00 |

254153937 v7

| | |
|---|---|
| Attn: Michael Cirenza<br>Email: mac@marsicoenterprises.com | |
| **Gullane Digital Asset Partners, LLC**<br>640 S. Perkins Road<br>Memphis, TN 38117<br>Attn: Matthew R. Walker<br>Email: matt@gullanecapital.com | $22,500,00.00 |
| **Gullane Capital Partners, LLC**<br>640 S. Perkins Road<br>Memphis, TN 38117<br>Attn: Matthew R. Walker<br>Email: matt@gullanecapital.com | $2,500,000.00 |
| **Amplify Transformational Data Sharing ETF**<br>1001 Woodward Avenue, Suite 500<br>Detroit, MI 48226<br>Attn: Charlie A. Ragauss<br>Email: cragauss@torosoam.com | $15,000,000.00 |
| **Marsico AXS CS LLC**<br>5251 DTC Parkway, Suite 410<br>Greenwood Village, CO 80111<br>Attn: Jonathan Marsico<br>Email: jam@marsicoenterprises.com | $1,960,774.00 |
| **BlackRock Credit Alpha Master Fund, L.P.**<br>c/o BlackRock Financial Management Inc.<br>55 East 22nd Street<br>New York, NY 10055<br>Attn: Christopher Biasotti<br>Email: christopher.biasotti@blackrock.com | $19,600,000.00 |
| **HC NCBR FUND**<br>c/o BlackRock Financial Management Inc.<br>55 East 22nd Street<br>New York, NY 10055<br>Attn: Christopher Biasotti<br>Email: christopher.biasotti@blackrock.com | $8,300,000.00 |
| **The Obsidian Master Fund**<br>c/o BlackRock Financial Management Inc.<br>55 East 22nd Street<br>New York, NY 10055<br>Attn: Christopher Biasotti<br>Email: christopher.biasotti@blackrock.com | $7,100,000.00 |
| **John P. Joliet**<br>503 Dalehurst Ave<br>Los Angeles, CA 90024<br>Email: john.joliet@americandiscoverycapital.com | $200,000.00 |
| **OIP SPV Core Scientific, LLC**<br>2250 Lucien Way, Suite 140<br>Maitland, FL 32751<br>Attn: Michael Lythcott<br>Email: michael@obsidianip.com | $993,033.00 |
| **OIP SPV CS, LLC**<br>325 Hudson Street<br>New York, NY 10013<br>Attn: Michael Lythcott<br>Email: michael@obsidianip.com | $873,869.00 |
| **Pescadero Capital, LLC** | $5,000,000.00 |

| | |
|---|---|
| 700 Universe Blvd.<br>June Beach, FL 33408<br>Attn: Mark Hickson, VP<br>Email: mark.hickson@nextenergy.com, kevin.norman@nextenergy.com,<br>paul.euseppi@nextenergy.com, alan.liu@nextenergy.com | |
| **Transatlantic Mobility Holdings II LLC**<br>601 13th St. NW, 11th Floor<br>Washington DC, 2005<br>Attn: Abel Navarro Homet<br>Email: abel@transatlanticeg.com | $1,000,000.00 |
| **Amplify Transformational Data Sharing ETF**<br>1001 Woodward Avenue, Suite 500<br>Detroit, MI 48226<br>Attn: Charlie A. Ragauss<br>Email: cragauss@torosoam.com | $11,500,000.00 |
| **Gullane Digital Asset Partners QP, LLC**<br>640 S. Perkins Road<br>Memphis, TN 38117<br>Attn: Matthew R. Walker<br>Email: matt@gullanecapital.com, trip@gullanecapital.com | $32,088,229.00 |
| **TOTAL:** | $239,750,000.00 |

**SCHEDULE 5.1**

**NOTE PARTIES**

| Entity Name | Former Names (within last 5 years) | Jurisdiction of Organization | Taxpayer Identification Number | Organizational Number |
|---|---|---|---|---|
| Core Scientific Holding Co. | N/A | Delaware | 85-2941270 | 3377927 |
| Core Scientific Inc. | Mineco Holdings, Inc | Delaware | 82-3805526 | 6660521 |
| American Property Acquisition, LLC | N/A | Delaware | 82-540825 | 6857348 |
| American Property Acquisitions I, LLC | 155 Palmer Lane, LLC | North Carolina | 82-5469717 | 1687596 |
| American Property Acquisitions VII, LLC | N/A | Georgia | 83-1663198 | 18100016 |
| Blockcap Inc. | Block Capital, Inc. | Nevada | 85-4052367 | E10638672020-8 |

**SCHEDULE 5.13**

**SUBSIDIARIES**

| Entity Name | Owner | Ownership Percentage | Jurisdiction of Organization |
|---|---|---|---|
| Core Scientific Inc. | Core Scientific Holding Co. | 100% | Delaware |
| American Property Acquisition, LLC | Core Scientific, Inc. | 100% | Delaware |
| GPU One Holdings, LLC f/k/a IP Special Holdings, LLC | Core Scientific, Inc. | 100% | Delaware |
| American Property Acquisitions I, LLC | American Property Acquisition, LLC | 100% | North Carolina |
| American Property Acquisitions VII, LLC | American Property Acquisition, LLC | 100% | Georgia |
| Blockcap Inc. | Core Scientific Holding Co. | 100% | Nevada |
| Radar Relay, Inc. | Blockcap Inc. | 100% | Delaware |
| RADAR LLC | Blockcap Inc. | 100% | Colorado |
| Starboard Capital LLC | Blockcap Inc. | 100% | Colorado |

**SCHEDULE 5.14**

**CAPITALIZATION**

(see attached)

**SCHEDULE 5.17**

**INDEBTEDNESS**

1. Existing Notes

2. Mortgage in favor of Brown Corporation for that certain real property located at 206 Boring Drive, Dalton, GA 30721 in a principal amount of $547,733.71 as of February 1, 2021.

3. Mortgage in favor of Holiwood LLC for that certain real property located at 1035 Shar-Cal Rd, Calvert City, KY 42029 in a principal amount of $1,354,209.33 as of February 1, 2021.

4. That certain PPP Loan entered into April 2020, between Core Scientific, Inc. and City National Bank in a principal amount of $2,154,300.00 as of February 1, 2021.

5. The following Equipment Financing:

| Equipment Financing | Issue Date | Original Amount | Maturity | Interest Rate | Outstanding Principal (as of 02/01/21) |
|---|---|---|---|---|---|
| Genesis Global Capital, LLC #1 | July 2020 | $1,833,625 | March 2022 | 16.0% | $1,477,318 |
| Genesis Global Capital, LLC #2 | August 2020 | 1,569,132 | April 2022 | 16.0% | 1,369,909 |
| Genesis Global Capital, LLC #3 | September 2020 | 1,307,610 | April 2022 | 16.0% | 1,215,593 |
| Arctos Credit, LLC | October 2020 | 774,250 | October 2022 | 15.0% | 660,692 |
| Novak | January 2021 | 10,000,000 | January 2023 | 10.0% | 10,000,000 |
| **Total Equipment Financing** | | **$15,484,617** | | | **$14,723,512** |

6. The following Equipment Leases:

| Equipment Leases | Issue Date | Original Amount | Maturity | Interest Rate | Outstanding Principal (as of 02/01/21) |
|---|---|---|---|---|---|
| NEC Financial Services | July 2018 | $14,707 | July 2021 | 12.2% | $2,376 |
| Technology Finance Corporation #2 | May 2019 | 101,315 | May 2022 | 6.5% | 45,000 |
| Garic, Inc. | May 2019 | 466,379 | May 2022 | 6.5% | 179,847 |
| VFS, LLC | July 2019 | 421,576 | July 2022 | 7.3% | 210,510 |
| Advanced Business Equipment | October 2019 | 22,154 | October 2022 | 7.2% | 11,675 |
| Garic, Inc. #1 | September 2019 | 153,129 | September 2022 | 6.5% | 84,519 |
| 36th Street Capital #1 | October 2019 | 710,122 | October 2022 | 13.4% | 429,256 |
| 36th Street Capital #2 | December 2019 | 1,130,000 | December 2022 | 13.4% | 743,378 |
| 36th Street Capital #3 | December 2019 | 917,300 | June 2022 | 9.8% | 516,920 |
| 36th Street Capital #4 | December 2019 | 748,275 | December 2022 | 13.4% | 492,258 |
| Toyota Commercial Finance | January 2020 | 431,799 | June 2025 | 5.3% | 359,339 |
| Technology Finance Corporation #3 | March 2020 | 57,492 | February 2021 | 6.5% | - |
| Garic, Inc. #2 | March 2020 | 958,650 | March 2023 | 6.5% | 659,577 |
| De Lage Landen #1 | November 2020 | 290,246 | November 2023 | (5.3)% | 229,981 |

Core Scientific Cap Table - As Of August 12, 2021

| | Date | Shares | Capital Raised | $ Per Share | % of Total |
|---|---|---|---|---|---|
| **Preferred** | | | | | |
| Series A Convertible Preferred | 2019 / 2020 | 6,451,525 | $44,063,916 | $6.83 | 2.5% |
| Series B Convertible Preferred | 2020 | 314,285 | 1,100,000 | 3.50 | 0.1% |
| **Total Preferred Outstanding** | | **6,765,810** | **$45,163,916** | | **2.7%** |
| | | | | | |
| **Common Shares** | | | | | |
| Private Placement #1 | 1H 2018 | 7,505,000 | $48,032,000 | $6.40 | 3.0% |
| Private Placement #2 | 2H 2018 | 178,095 | 2,000,007 | 11.23 | 0.1% |
| | | | | | |
| **Business Combinations / Other** | | | | | |
| BCV 55, 66 & 77 | January 2018 | 88,501,449 | | | 35.0% |
| Matrix Mining Ltd. and MM Management Transaction | November 2018 | 1,250,000 | | | 0.5% |
| Slax Digital | September 2019 | 560,030 | | | 0.2% |
| Heldrick and Stuggles | September 2019 | 50,000 | | | 0.0% |
| Atrio | June 2020 | 561,938 | | | 0.2% |
| Blockcap | 7/1/2021 | 72,185,717 | | | 28.5% |
| **Total Common Shares Outstanding** | | **170,792,229** | **$50,032,007** | | **67.5%** |
| | | | | | |
| **Reserves & Other** | | | | | |
| RSUs Outstanding | | 53,937,486 | | | 21.3% |
| Options Outstanding | | 7,320,245 | | | 2.9% |
| Available for Future Issuance | | 10,088,856 | | | 4.0% |
| Warrants | | 4,284,887 | | | 1.7% |
| **Total Reserves & Other** | | **75,631,474** | | | **29.9%** |
| | | | | | |
| **Total Fully Diluted** | | **253,189,513** | **$95,195,923** | | **100.0%** |

1

| Equipment Leases | Issue Date | Original Amount | Maturity | Interest Rate | Outstanding Principal (as of 02/01/21) |
|---|---|---|---|---|---|
| De Lage Landen #2 | December 2020 | 99,650 | December 2023 | (5.5)% | 80,984 |
| De Lage Landen #3 | January 2021 | 228,180 | January 2024 | (0.5)% | 200,085 |
| De Lage Landen #4 | January 2021 | 99,950 | January 2024 | (5.5)% | 80,984 |
| Garic, Inc. #3 | February 2021 | 199,528 | February 2024 | 7.9% | 199,528 |
| **Total Equipment Leases** | | **$7,050,752** | | | **$4,526,215** |

254153937 v7

**EXHIBIT A**

**FORM OF CONVERTIBLE PROMISSORY NOTE**

**(see attached)**

THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "***ACT***"), OR UNDER THE SECURITIES LAWS OF ANY STATES IN THE UNITED STATES. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT PURSUANT TO SECTION 5(C) HEREOF AND AS PERMITTED UNDER THE ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL IN FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER TO THE EFFECT THAT ANY PROPOSED TRANSFER OR RESALE IS IN COMPLIANCE WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

THIS NOTE HAS BEEN ISSUED WITH "ORIGINAL ISSUE DISCOUNT" (WITHIN THE MEANING OF SECTION 1273 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "***CODE***")). UPON WRITTEN REQUEST, THE COMPANY WILL PROMPTLY MAKE AVAILABLE TO ANY HOLDER OF THIS NOTE THE FOLLOWING INFORMATION:  (1) THE ISSUE PRICE AND ISSUE DATE OF THE NOTE, (2) THE AMOUNT OF ORIGINAL ISSUE DISCOUNT ON THE NOTE AND (3) THE YIELD TO MATURITY OF THE NOTE. HOLDERS SHOULD CONTACT THE CHIEF FINANCIAL OFFICER OF THE COMPANY AT 2800 NORTHUP WAY SUITE 220 BELLEVUE, WA 98004.

## [FORM OF] CONVERTIBLE PROMISSORY NOTE

| | |
|---|---|
| Note Series: | 2021 Convertible Promissory Notes |
| Date of Note: | [__], 2021 |
| Initial Principal Amount of Note: | $[__], plus any PIK Interest that has accrued and been capitalized pursuant to the terms of this Note |

For value received **CORE SCIENTIFIC HOLDING CO.**, a Delaware corporation (the "***Company***"), promises to pay to the undersigned holder or such party's successors or permitted assigns (the "***Holder***") the principal amount set forth above with interest to accrue on such outstanding principal amount at a rate of 10% *per annum*, 4% of which shall be payable in cash ("***Cash Interest***") and 6% of which shall be payable in kind by capitalizing such interest payment and increasing the outstanding principal amount of this Note by the amount thereof ("***PIK Interest***"). Interest shall accrue on the outstanding principal amount of this Note commencing on (and including) the date of original issuance thereof (or the most recent interest payment date) and continuing until the earlier to occur of (x) the date this Note is repaid or prepaid in full and (y) the date this Note is converted in full by the Holder pursuant to Section 2 hereof. Cash Interest shall be due and payable and PIK Interest shall be capitalized quarterly in arrears on the first day of each fiscal quarter, commencing on October 1, 2021. Interest shall be computed on the basis of a year of 365 days for the actual number of days elapsed. This Note shall be automatically deemed to include any accrued PIK Interest thereon and the Company shall not be obligated to issue any subsequent Notes reflecting PIK Interest. This Note is one of the "Notes" issued pursuant to the Purchase Agreement. All capitalized terms used but not otherwise defined in this Note will have the same meanings in this Note as in the Purchase Agreement referred to below.

The following is a statement of the rights of the Holder and the conditions to which this Note is subject, and to which the Holder, by the acceptance of this Note, agrees:

1. **BASIC TERMS**.

(a)    **Series of Notes**. This convertible promissory note (this "***Note***") is issued as part of a series of notes designated by the Note Series above (collectively, the "***Notes***"), having an initial aggregate principal amount of up to $300,000,000.00 and issued pursuant to, and to those persons and entities (collectively, the "***Holders***") party, as Purchasers, to, that certain Convertible Note Purchase Agreement, dated as of even date herewith (as amended, restated, supplemented and/or otherwise modified from time to time, the "***Purchase Agreement***"), by and among the Company, each Purchaser party thereto, U.S. Bank National Association, as Note Agent, and, upon the execution and delivery of the Collateral Documents pursuant to Section 6.13 of the Purchase Agreement, U.S. Bank National Association, as Collateral Agent for the Secured Parties. The Company shall maintain a ledger of all Holders ("***Ledger***"), which shall include all PIK Interest accrued and capitalized, and which shall be available (i) promptly upon request to the Agents and the Holder, (ii) promptly after any transfer or assignment of any Note, (iii) promptly upon conversion of any Note and (iv) on the tenth business day prior to any interest payment date.

(b)    **Payments**.

(i)    **Voluntary Prepayments**. Subject to and following the expiration of any applicable lockup period set forth under any lockup agreement to which the Holder, the Company and the Company's underwriters are a party, and unless otherwise converted in full or in part pursuant to Section 2 hereof (including following delivery of the Company's notice referred to in this subsection (b)(i)(2)), the Company may at any time, upon ten (10) Business Days' prior written notice to the Holder and the Note Agent (which notice may be conditioned or rescinded upon such events as may be specified in such notice) prepay all or any portion of this Note in an amount equal to (x) the outstanding principal amount (including all accrued PIK Interest not already added to the principal amount of this Note) of this Note being prepaid at such time, together with all accrued unpaid Cash Interest on such outstanding principal amount at such time *multiplied* by (y) 200% (such amount, the "***Repayment Amount***").

(ii)    **Repayment**. Unless otherwise prepaid by the Company pursuant to Section 1(b)(i) or converted in full pursuant to Section 2 hereof, this Note shall be repaid in full on the earlier to occur of (x) April 19, 2025 (the "***Maturity Date***") and (y) acceleration by the Holders representing at least twenty-five percent (25%) of the aggregate outstanding principal amount of the Notes issued pursuant to the Purchase Agreement at such time after the occurrence of an Event of Default in accordance with the terms hereof, in each case, in an amount equal to the outstanding principal (including all accrued PIK Interest not already added to the principal amount of this Note) of this Note, plus all unpaid accrued Cash Interest thereon.

(iii)    **Payments Generally**.

(1)    This Note and the other Notes issued pursuant to the Purchase Agreement are *pari passu* in right of payment and all payments (other than conversion) under this Note and such other Notes shall be made in accordance with each Holder's Pro Rata Share. All payments shall be applied first, to the payment of expenses due under this Note and the other Note Documents to the Agents, second, to the payment of expenses due under this Note and the other Note Documents to the Holders, third, unpaid accrued interest of this Note and fourth, if the amount of payment exceeds the amount of all such expenses and accrued interest, to the payment of outstanding principal (including all accrued PIK Interest not already added to the principal amount of this Note) of this Note. The conversion of this Note by the Holder pursuant to the terms hereof shall be deemed to be a repayment of the full outstanding principal

2

amount (including all accrued PIK Interest not already added to the principal amount of this Note) of such Note together with any unpaid accrued Cash Interest thereon on the date of such conversion.

(2) All payments to be made by the Company shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff, except with respect to Taxes required to be deducted and/or withheld under applicable law. All payments (other than by means of conversion pursuant to the terms of the Notes), including any prepayments, of interest and principal to be made by the Company hereunder shall be made by the Company to the Note Agent, in cash, for the account of the respective Holders to which such payment is owed, at the applicable Notes Agent's Principal Office for payment and in same day funds not later than 11:00 a.m. on the date specified herein. The Notes Agent will promptly distribute to each Holder its Pro Rata Share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to each Holder at the address specified in the Holder's Administrative Questionnaire (or at such other address as the Holder may indicate in writing to the Note Agent from time to time). All payments received by the Notes Agent after 11:00 a.m. may (at the sole discretion of the Notes Agent) in each case be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(3) If any payment to be made by the Company shall come due on a day other than a Business Day, any interest shall be payable, and any PIK Interest shall be capitalized, on the next succeeding Business Day without additional interest accruing thereon.

(4) Whenever any payment received by the Notes Agent under this Agreement or any of the other Notes Documents is insufficient to pay in full all amounts due and payable to the Notes Agent and the Holders under or in respect of this Agreement and the other Notes Documents on any date, such payment shall be distributed by the Notes Agent and applied by the Notes Agent and the Holders in the order of priority set forth in Section 1(b)(iii)(1). If the Notes Agent receives funds for application to the Obligations of the Company under or in respect of the Notes Documents under circumstances for which the Notes Documents do not specify the manner in which such funds are to be applied, the Notes Agent may, but shall not be obligated to, elect to distribute such funds to the Holders in accordance with the Holder's Pro Rata Share of such of the outstanding Notes or other Obligations then owing to the Holder.

(iv) **Withholding**.  Notwithstanding anything to the contrary herein, the Company shall be entitled to deduct and withhold from the consideration otherwise payable under the Note such amounts as it is required to deduct and withhold under the Code, or any other tax law, with respect to the making of such payment. To the extent that amounts are so withheld, such withheld amounts shall be treated for all purposes of this Note as having been paid to the Person in respect of whom such deduction and withholding was made. If a payment is payable (in whole or in part) in consideration other than cash and if the cash portion of any such payment is insufficient to satisfy all required tax withholding obligations, the Company shall retain an amount of the non-cash consideration otherwise payable equal in value to the amount required to satisfy any applicable withholding taxes (as reasonably determined by the Company).

2. CONVERSION.

(a) **Conversion upon an Offering**. In the event that the Company (i) issues and sells shares of its equity securities ("***Equity Securities***") to investors (the "***Investors***") in a private offering or placement with total gross proceeds to the Company of at least $50,000,000 (excluding the conversion of the Notes or other convertible securities issued for capital raising purposes (*e.g.*, Simple Agreements for Future Equity)), (ii) issues and sells its common stock ("***Common Stock***") to Investors in an underwritten public offering pursuant to an effective registration statement filed with the Securities and Exchange Commission in accordance with the Act or under equivalent securities laws and regulations of any other

jurisdiction (including, for the avoidance of doubt, a SPAC), (iii) lists its Common Stock (other than shares of Common Stock not eligible for resale under Rule 144 under the Securities Act) on a national securities exchange by means of an effective registration statement on Form S-1 filed by the Company with the SEC that registers shares of existing capital stock of the Company for resale, as approved by the Company's board of directors, or (iv) lists its Common Stock on any stock exchange (the occurrence of each event set forth in clauses (i) through (iv) above, an "***Offering***" and, together with the occurrence of a Change of Control as provided in Section 2(b) below, each, a "***Conversion Event***"), in each case, while this Note remains outstanding, the Holder shall have the right at any time and from time to time during the period commencing on the date of consummation of such Offering until the Maturity Date, to convert, in whole or in part, the outstanding principal amount (including all accrued PIK Interest not already added to the principal amount of this Note) of this Note, together with all unpaid accrued Cash Interest thereon, into Equity Securities or Common Stock of the Company (as applicable) at a conversion price equal to the Applicable Conversion Price (as defined below) (which shall be determined, for the avoidance of doubt, on the date of the consummation of such Offering). The issuance of Equity Securities or Common Stock by the Company (as applicable) pursuant to the conversion of this Note shall be upon and subject to the same terms and conditions (other than as otherwise set forth herein) applicable to Equity Securities or Common Stock of the Company (as applicable), sold in the applicable Offering.

(b)     **Conversion upon a Change of Control**. In the event the Company consummates a Change of Control (as defined below) while this Note remains outstanding, the Company shall repay the outstanding principal amount of this Note in an amount equal to the Repayment Amount; provided, however, that upon the written election of the Holder made not less than five (5) days prior to the Change of Control, the Company shall convert the outstanding principal amount of this Note (including all accrued PIK Interest not already added to the principal amount of this Note) and any unpaid accrued Cash Interest into Common Stock at a conversion price equal to the Applicable Conversion Price (which shall be determined, for the avoidance of doubt, on the date of consummation of such Change of Control) (assuming conversion of all securities convertible into Common Stock and exercise of all outstanding options and warrants, but excluding the shares of equity securities of the Company issuable upon the conversion of Notes or other convertible securities issued for capital raising purposes (e.g., Simple Agreements for Future Equity)). The Company shall give the Holder and the Note Agent written notice of any Change of Control at least ten (10) Business Days prior to the consummation thereof, which notice will contain the material terms and conditions (including price and form of consideration) of the Change of Control, the identity of the parties to the Change of Control and the intended date of the Change of Control.

For purposes of this Note, (i) a "***Change of Control***" means, at any time, any Person or "group" other than the Permitted Holders (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act) shall have obtained the power (whether or not exercised) to elect a majority of the members of the board of directors of the Company; (ii) "***Permitted Holders***" means each of BCV 55 LLC, BCV 66 LLC, BCV 77 LLC and each of their respective affiliates; (iii) "***Fair Market Value Per Common Share***" means the cash and/or the value of the property, rights or securities to be paid or distributed per share of Common Stock of the Company to the holders of Common Stock of the Company pursuant to a Change of Control or a SPAC (with the value of such property, rights or securities being determined in good faith by the board of directors of the Company); (iv) the "***Applicable Conversion Price***" means a conversion price equal to (a) 80% of either (x) the cash price paid per share for Equity Securities or Common Stock of the Company (as applicable) by the Investors in an Offering (other than a SPAC) or (y) the Fair Market Value Per Common Share in a Change of Control or a SPAC, as applicable, if the Conversion Event occurs on or prior to April 19, 2022, (b) 75% of either (x) the cash price paid per share for Equity Securities or Common Stock of the Company (as applicable) by the Investors in an Offering (other than a SPAC) or (y) the Fair Market Value Per Common Share in a Change of Control or a SPAC, as applicable, if the Conversion Event occurs on or after April 19, 2022 but prior to April 19, 2023, (c) 70% of either (x) the cash price paid per share for Equity Securities or Common Stock of the Company (as applicable) by the Investors in an Offering (other than a

SPAC) or (y) the Fair Market Value Per Common Share in a Change of Control or a SPAC, as applicable, if the Conversion Event occurs on or after April 19, 2023 but prior to April 19, 2024 and (d) 65% of either (x) the cash price paid per share for Equity Securities or Common Stock of the Company (as applicable) by the Investors in an Offering (other than a SPAC) or (y) the Fair Market Value Per Common Share in a Change of Control or a SPAC, as applicable, if the Conversion Event occurs on or after April 19, 2024 but prior to April 19, 2025; (v) in connection with any SPAC, each reference to "Company" shall be deemed to also refer to a Parent Entity that has become a co-obligor with respect to the Company's Obligations hereunder (except that solely such Parent Entity, and not Core Scientific Holding Co. (or its successor by merger), shall be obligated to deliver Equity Securities or Common Stock pursuant to this <u>Section 2</u>); and (vi) in connection with any SPAC, each reference to "Common Stock" shall be deemed to refer to the kind and the amount of property that a holder of one share of Common Stock of the Company would be entitled to receive on account of the consummation of such SPAC.

(c)     **Procedure for Conversion**. Upon the conversion in whole or in part of this Note into Equity Securities or Common Stock of the Company (as applicable), the Holder shall surrender this Note to the Company and deliver to the Company any documentation reasonably required by the Company (including, in the case of an Offering, all financing documents executed by the Investors in connection with such Offering). The Company shall not be required to issue or deliver the Equity Securities or Common Stock of the Company (as applicable) into which this Note may convert until the Holder has surrendered this Note to the Company and delivered to the Company any such documentation. The Company shall, as soon as practicable after the surrender of this Note and delivery to the Company of such documentation deliver to the Holder (i) a certificate or certificates for the number of shares of Equity Securities or Common Stock of the Company (as applicable) into which this Note is convertible in whole or in part, rounded downward to the nearest whole share and cash for the amounts not so converted as a result of the above-referenced downward rounding, registered in the name of such Investor or registered nominee or assignee and (ii) to the extent the Holder has converted only a portion of the outstanding principal amount of this Note, a replacement Note for the outstanding principal amount of this Note not converted. Upon the conversion in full or in part of this Note into Equity Securities or Common Stock of the Company (as applicable) pursuant to the terms hereof, in lieu of any fractional shares to which the Holder would otherwise be entitled, the Company shall pay the Holder cash equal to such fraction multiplied by the price at which this Note converts. Upon conversion of this Note in full or in part and payment of cash representing any fractional share pursuant to this <u>Section 2(c)</u>, the Company shall be forever released from all its obligations and liabilities under this Note and this Note shall be deemed of no further force or effect, whether or not the original of this Note has been delivered to the Company for cancellation.

(d)     **Taxes**. The Company shall pay any and all stamp, stock transfer, stock issuance and other similar taxes that may be payable in respect of any issuance or delivery of shares of Equity Securities or Common Stock of the Company (as applicable) upon conversion of this Note pursuant to this <u>Section 2</u>. The Company shall not, however, be required to pay any income, capital gains or similar tax of the recipient of Equity Securities or Common Stock of the Company (as applicable) or any tax which may be payable in respect of any transfer involved in the issuance and delivery of shares of Equity Securities or Common Stock of the Company (as applicable) in a name other than that in which this Note so converted was registered, and no such issuance or delivery shall be made unless and until the person or entity requesting such issuance has paid to the Company the amount of any such tax or has established, to the satisfaction of the Company, that such tax has been paid.

3.      **SECURED NOTE.**

Upon the execution and delivery of the Collateral Documents pursuant to Section 6.13 of the Purchase Agreement, this Note shall be secured by a first-priority Lien on the Collateral (subject to Permitted Liens) pursuant to the Security Agreement.

4.      **EVENTS OF DEFAULT.**

If there shall be any Event of Default (as defined below) hereunder, at the option and upon the declaration of the Holders representing at least twenty-five percent (25%) of the aggregate outstanding principal amount of the Notes issued pursuant to the Purchase Agreement at such time and upon written notice to the Company (which election and notice shall not be required in the case of an Event of Default under subsection (v) or (vi) below), this Note shall accelerate and all principal (including all accrued PIK Interest not already added to the principal amount of this Note) and all unpaid accrued Cash Interest shall automatically become immediately due and payable. The occurrence of any one or more of the following shall constitute an "***Event of Default***":

(i)      the Company fails to pay to the Holder (i) the principal of this Note as and when due or (ii) within five (5) Business Days after the same becomes due any Cash Interest on this Note or any fees or any other Obligations;

(ii)      any representation or warranty made or deemed made by or on behalf of the Company or any of its Subsidiaries to the Holder under or in connection with the Note Documents or any certificate or information delivered in connection therewith shall be materially false when made;

(iii)      the Company and its Subsidiaries fail to observe or perform any term, covenant, or provision contained in Section 7 of the Purchase Agreement and such non-observance or non-performance shall not have been remedied or waived within thirty (30) days after the earlier of (i) the Company becoming aware of such non-observance or non-compliance or (ii) receipt by the Company of notice from a Holder of such non-observance or non-compliance;

(iv)      the Company and its Subsidiaries fail to observe or perform any other term, covenant or provision contained in the Purchase Agreement (other than those specified elsewhere in this Section 4) or any other Note Document and such non-observance or non-performance shall not have been remedied or waived within thirty (30) days after the earlier of (i) the Company becoming aware of such non-observance or non-compliance or (ii) receipt by the Company of notice from a Holder of such non-observance or non-compliance;

(v)      the Company or any Material Subsidiary shall (i) apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (ii) admit in writing its inability to pay its debts generally as they mature, (iii) make a general assignment for the benefit of its or any of its creditors, (iv) be dissolved or liquidated, (v) commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, or (vi) take any action for the purpose of effecting any of the foregoing;

(vi)      proceedings for the appointment of a receiver, trustee, liquidator or custodian of the Company or any of its Material Subsidiaries, or of all or a substantial part of the property thereof, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with

respect to the Company or any of its Material Subsidiaries, if any, or the debts thereof under any bankruptcy, insolvency or other similar law now or hereafter in effect shall be commenced, or an order for relief shall be entered in any such proceeding, or such proceeding shall not be dismissed or discharged within 60 days of commencement;

(vii)    the Company fails to pay when due any principal of or interest on or any other amount payable in respect of, or breaches or defaults under any other term of, any mortgage, indenture, agreement or other instrument under which there may be outstanding any Indebtedness in an aggregate principal amount of in excess of $10,000,000, in each case, beyond the grace period, if any, if the effect of such non-payment, breach or default is to cause such Indebtedness to become or be declared due and payable (or subject to a compulsory repurchase or redemption) prior to its stated maturity;

(viii)    any court, government, or Governmental Authority shall condemn, seize or otherwise appropriate, or take custody or control of, all or any material portion of the property of the Company and its Subsidiaries, taken as a whole;

(ix)    one or more judgments or orders for the payment of money in excess of $10,000,000 (or the equivalent thereof in currencies other than U.S. dollars) in the aggregate shall be entered or filed against the Company or any of its Subsidiaries and shall remain undischarged, unvacated, unbonded or unstayed for a period of thirty (30) consecutive days;

(x)    (i) the occurrence of a Reportable Event with respect to any Plan, (ii) the filing of a notice of intent to terminate a Plan by the Company, any ERISA Affiliate or any Subsidiary, the institution of proceedings to terminate a Plan by the PBGC or any other Person; (iii) the withdrawal in a "complete withdrawal" or a "partial withdrawal" as defined in Sections 4203 and 4205, respectively, of ERISA by the Company, any ERISA Affiliate or any Subsidiary of the Company from any Multiemployer Plan, (iv) the incurrence of any material increase in the contingent liability of the Company or any of its Subsidiaries with respect to any "employee welfare benefit plan" as defined in Section 3(1) of ERISA which covers retired employees and its beneficiaries or (v) the Unfunded Pension Liabilities of all Single Employer Plans shall exceed (in the aggregate) $10,000,000, in each such case which, either individually or in the aggregate, would be reasonably expected to result in liability to any Note Party in excess of $10,000,000;

(xi)    the institution by the Company, any ERISA Affiliate or any Subsidiary of steps to terminate any Plan if, in order to effectuate such termination, the Company, such ERISA Affiliate or such Subsidiary, as the case may be, would be required to make a contribution to such Plan, or would incur a liability or obligation to such Plan, in excess of $10,000,000, or the institution by the PBGC of steps to terminate any Plan, which would reasonably be expected to result in material liability to any Note Party;

(xii)    the Company or any Material Subsidiary shall (i) be the subject of any proceeding pertaining to the release by the Company, any such Material Subsidiary or any other Person of any Hazardous Material into the environment or (ii) violate any Environmental Law, which, in either case could reasonably be expected to have a Material Adverse Effect;

(xiii)    from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13 of the Purchase Agreement, any Collateral Document shall for any reason fail to create a valid and perfected first priority (subject to any Permitted Liens) security interest in any collateral purported to be covered thereby, except as permitted by the terms of such Collateral Document, or any Collateral Document shall fail to remain in full force or effect (other than in accordance with the terms hereof or thereof) or any action taken by the Company or any Subsidiary shall be taken to discontinue or to assert the invalidity or unenforceability of such Collateral Document;

(xiv)    any intercreditor agreement or subordination agreement relating to any Indebtedness of any Note Party subordinated to the Obligations, or any subordination provisions of any note or other document running to the benefit of the Holders in respect of such Indebtedness, including, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13 of the Purchase Agreement, the Intercreditor Agreement, shall cease for any reason to be in full force and effect other than in accordance with the terms hereof or thereof or any Note Party or any of their Subsidiaries shall so assert in writing; or

(xv)    the Note Parties shall be enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of the business of the Note Parties, taken as a whole.

5.    **MISCELLANEOUS PROVISIONS.**

(a)    **Waivers**. The Company hereby waives demand, notice, presentment, protest and notice of dishonor.

(b)    **Further Assurances**. The Holder agrees and covenants that at any time and from time to time the Holder will promptly execute and deliver to the Company such further instruments and documents and take such further action as the Company may reasonably require in order to carry out the full intent and purpose of this Note and to comply with state or federal securities laws or other regulatory approvals.

(c)    **Transfers of Notes**. Subject to the Company's prior written consent (not to be unreasonably withheld or delayed) and to the extent permitted by applicable law, this Note may be transferred only upon its surrender to the Company for registration of transfer, duly endorsed, or accompanied by a duly executed written instrument of transfer in form satisfactory to the Company. Thereupon, this Note shall be reissued to, and registered in the name of, the transferee, or a new Note for like principal amount and interest shall be issued to, and registered in the name of, the transferee. Interest and principal shall be paid solely to the registered holder of this Note. Such payment shall constitute full discharge of the Company's obligation to pay such interest and principal. Upon the effectiveness of any transfer pursuant to this Section 5(c) the Company shall provide an updated Ledger to the Note Agent. Any transfer of this Note in contravention of this Section 5(c) shall be void and the Company shall be entitled to continue to treat the Holder as the holder of this Note for all purposes under the Note Documents. The Company shall at all times maintain a book-entry system, which shall reflect ownership of this Note and interests therein. This Note is intended to be in "registered form" for United States federal tax purposes.

(d)    **Market Standoff**. To the extent requested by the Company or an underwriter of securities of the Company, each Holder and any permitted transferee thereof shall not, without the prior written consent of the underwriters in an underwritten public offering pursuant to an effective registration statement filed with the Securities and Exchange Commission in accordance with the Act or under equivalent securities laws and regulations of any other jurisdiction, offer, sell, make any short sale of, grant or sell any option for the purchase of, lend, pledge, otherwise transfer or dispose of (directly or indirectly), enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership (whether any such transaction is described above or is to be settled by delivery of Securities or other securities, in cash, or otherwise), any Securities or other shares of stock of the Company then owned by such Holder or any transferee thereof, or enter into an agreement to do any of the foregoing, for up to 180 days following the consummation of any such offering. For purposes of this paragraph, "*Company*" includes the Company or any other direct or indirect parent entity of the Company into which the Company merges or consolidates. The Company may place restrictive legends on the certificates representing the shares subject to this paragraph and may impose stop transfer instructions with

respect to the Securities and such other shares of stock of each Holder and any transferee thereof (and the shares or securities of every other person subject to the foregoing restriction) until the end of such period. Each Holder and any transferee thereof shall enter into any agreement reasonably required by the underwriters for such an offering to implement the foregoing within any reasonable timeframe so requested. The underwriters for any such offering are intended third party beneficiaries of this paragraph and shall have the right, power and authority to enforce the provisions of this paragraph as though they were parties hereto. The provisions of this paragraph shall survive any conversion and/or repayment of this Note.

(e) **Waiver of Statutory Information Rights**. Prior to the conversion in full of this Note, the Holder, on behalf of the Holder and all beneficial owners of the Securities now or hereafter owned by the Holder (a "***Beneficial Owner***"), acknowledges and agrees that that neither the Holder nor any of the Beneficial Owners will have any right to receive any information from the Company by virtue of ownership of any of the Securities. Without limiting the foregoing, prior to the conversion in full of this Note, to the fullest extent permitted by law, the Holder hereby unconditionally and irrevocably waives all rights under Section 220 of the Delaware General Corporation Law and all such similar information and/or inspection rights that may be provided under the law of any jurisdiction, or any federal, state or foreign regulation, that are, or may become, applicable to the Company or the Company's capital stock (the "***Inspection Rights***") on behalf of the Holder and all Beneficial Owners. The Holder, on behalf of the Holder and all Beneficial Owners, hereby covenants and agrees that neither the Holder nor any Beneficial Owner shall directly or indirectly commence, voluntarily aid in any way, prosecute, assign, transfer, or cause to be commenced any claim, action, cause of action, or other proceeding to pursue or exercise the Inspection Rights. The Holder hereby further warrants and represents that the Holder has reviewed this waiver with its legal counsel, and that the Holder knowingly and voluntarily waives its rights otherwise provided by Section 220 of the Delaware General Corporation Law (or under similar rights under other applicable law). Notwithstanding the foregoing, Beneficial Owners that were issued Equity Securities other than by way of a conversion in connection with an Offering will not be subject to this <u>Section 5(e)</u>. The terms of this <u>Section 5(e)</u> shall survive any repayment of this Note.

(f) **Amendment and Waiver**. This Note and any term hereof may only be amended, waived or modified in accordance with Section 10.9 of the Purchase Agreement. Upon the effectuation of such amendment, waiver or modification with the consent of the Required Holders or each Holder, as applicable, in conformance with Section 10.9 of the Purchase Agreement, such amendment, waiver or modification shall be effective as to, and binding against the Holders of, all of the Notes, and the Company shall promptly give written notice thereof to the Holder if the Holder has not previously consented to such amendment, waiver or modification in writing; <u>provided</u> that the failure to give such notice shall not affect the validity of such amendment, waiver or modification.

(g) **Binding Agreement**. The terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Note, expressed or implied, is intended to confer upon any third party any rights, remedies, obligations, or liabilities under or by reason of this Note, except as expressly provided in this Note. Notwithstanding any assumption of the Company's Obligations under this Note by a Parent Entity in accordance with Section 10.1 of the Purchase Agreement, Core Scientific Holding Co. (or its successor by merger) shall remain a co-obligor with such Parent Entity with respect to such Obligations (other than any such Obligation of the Company to deliver Equity Securities or Common Stock pursuant to <u>Section 2</u> of this Note, with respect to which delivery Obligation Core Scientific Holding Co. (or its successor by merger) shall be a Guarantor).

(h) **Counterparts**. This Note may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract. Any counterpart of a signature page to this Note may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature

complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.

(i)     **Headings; Interpretation**. Paragraph headings used in this Note are included for convenience of reference only and will not modify the provisions that they precede or affect the interpretation of this Note or any other Note Document. The term "including" shall be interpreted to mean "including but not limited to".

(j)     **Notices**. All communications and notices required or permitted to be given hereunder shall be delivered in accordance with Section 10.8 of the Purchase Agreement.

(k)     **GOVERNING LAW.** THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.

(l)     **Expenses, Etc**. This Note is subject to the provisions of Section 10.3 (Jurisdiction and Venue), Section 10.4 (Waiver of Jury Trial) and Section 10.10 (Expenses and Indemnification) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*.

(m)     **Delays or Omissions**. It is agreed that no delay or omission to exercise any right, power or remedy accruing to each Holder, upon any breach or default of the Company under this Note or any Note shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. It is further agreed that any waiver, permit, consent or approval of any kind or character by a Holder of any breach or default under this Note, or any waiver by such Holder of any provisions or conditions of this Note must be in writing and shall be effective only to the extent specifically set forth in writing and that all remedies, either under this Note, or by law or otherwise afforded to such Holder, shall be cumulative and not alternative.

(n)     **Entire Agreement**. This Note and the other Note Documents constitute the entire contract among the parties hereto regarding to the subject matters addressed herein and supersede any and all previous agreements, negotiations, and discussions, oral or written, by the parties regarding the subject matters addressed herein.

(o)     **Exculpation among Holders**. The Holder acknowledges that the Holder is not relying on any person, firm or corporation, other than the Company and its officers and board members, in making its investment or decision to invest in the Company.

(p)     **Broker's Fees**. Each party hereto represents and warrants that no agent, broker, investment banker, person or firm acting on behalf of or under the authority of such party hereto is or will be entitled to any broker's or finder's fee or any other commission directly or indirectly in connection with the transactions contemplated herein. Each party hereto further agrees to indemnify each other party for any claims, losses or expenses incurred by such other party as a result of the representation in this subsection being untrue.

(q)     **Repayment Amounts**. The parties hereto hereby acknowledge and agree that

payment of any Repayment Amount hereunder constitutes liquidated damages and not a penalty, the actual amount of damages to the Holder or profits lost by the Holder as a result of a prepayment or conversion of this Note would be impracticable and extremely difficult to ascertain and the Repayment Amount hereunder is part of an arm's length transaction between sophisticated parties represented by counsel and is bargained for consideration provided for and agreed to by mutual agreement of the Company and the Holder. THE NOTE PARTIES EXPRESSLY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE REPAYMENT AMOUNT TO THE EXTENT SUCH REPAYMENT AMOUNT IS DUE AND PAYABLE IN ACCORDANCE WITH THIS NOTE. The Note Parties expressly agree that: (i) the Repayment Amount shall be payable notwithstanding the then prevailing market rates at the time payment is made; (ii) the Note Parties shall be estopped hereafter from claiming differently than as agreed to in this paragraph; and (iii) their agreement to pay the Repayment Amount is a material inducement to the Holder to purchase the Note.

(r)     **Tax Forms**. Prior to the date hereof, the Holder (and, in the event any Person becomes an assignee or participant in respect of this Note, prior to the date such Person becomes such an assignee or participant) shall have delivered to the Company executed copies of Internal Revenue Service ("***IRS***") Form W-9 or appropriate IRS Form W-8, as applicable, as well as any reasonably necessary supporting information, certifying that any payments to such Holder (or assignee or participant) under this Note are exempt from U.S. federal withholding tax. The Holder (and assignee or participant) further agrees that if any such form or certification expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Company in writing of its legal inability to do so.

(s)     **Calculations**. The Company shall be responsible for making all calculations with respect to this Note, including, without limitation, accrued interest (including PIK Interest), the Fair Market Value Per Common Share and the Applicable Conversion Price and shall forward such calculations to the Agents and the Holder upon request.

*[Signature pages follow]*

11

**IN WITNESS WHEREOF**, the parties hereto have executed this Note as of the date first written above.

**COMPANY:**

**CORE SCIENTIFIC HOLDING CO.**

By: _____

     Name:
     Title:

E-mail: _____

Address:

[Signature Page to Core Scientific Holding Co. Convertible Promissory Note]

**HOLDER (if an entity):**

Name of Holder: _____

By: _____

Name: _____
Title: _____

E-mail: _____

Address: _____
_____
_____

**HOLDER (if an individual):**

Name of Holder: _____

Signature: _____

E-mail: _____

Address: _____
_____
_____

[Signature Page to Core Scientific Holding Co. Convertible Promissory Note]

**EXHIBIT B**

**FORM OF COUNTERPART SIGNATURE PAGE**

       **IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

       The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

       **ADDITIONAL PURCHASER:**

[            ]

By:_____
Name:
Title:

**EXHIBIT C**

**FORM OF GUARANTY**

**(see attached)**

## GUARANTY

**THIS GUARANTY** (this "*Agreement*"), dated as of August 20, 2021, is made by and among each guarantor executing a signature page hereto and each Additional Guarantor (as defined below) that becomes a party hereto pursuant to Section 15 (each, a "*Guarantor*" and collectively, the "*Guarantors*") and U.S. Bank National Association, as note agent for the Guaranteed Parties referred to below (the "*Note Agent*") and Collateral Agent for the Secured Parties (when applicable).

## RECITALS

**WHEREAS**, the Guarantors entered into that certain Convertible Note Purchase Agreement, dated as of the date hereof (as amended, restated, supplemented and/or otherwise modified from time to time, the "*Purchase Agreement*"; capitalized terms used but not defined herein having the meanings ascribed thereto therein), by and among Core Scientific Holding Co., a Delaware corporation, the Guarantors party thereto, each Purchaser party thereto and the Note Agent; and

**WHEREAS**, to induce the Purchasers to purchase the Notes, the Guarantors have agreed to enter into this Agreement.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the foregoing, and the representations, warranties and conditions set forth herein, the parties hereto, intending to be legally bound, hereby agree as follows:

1. **Defined Terms.**

"*Additional Guarantor*" has the meaning assigned to such term in Section 15.

"*Aggregate Payments*" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (1) the aggregate amount of all payments and distributions made on or before such date by such Contributing Guarantor in respect of this Agreement (including in respect of Section 3), minus (2) the aggregate amount of all payments received on or before such date by such Contributing Guarantor from the other Contributing Guarantors as contributions under Section 3.

"*Bankruptcy Code*" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"*Commodity Exchange Act*" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended and in effect from time to time, and any successor statute.

"*Contributing Guarantors*" has the meaning assigned to such term in Section 3.

"*Fair Share*" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Fair Share Contribution Amount with respect to such Contributing Guarantor to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Contributing Guarantors *multiplied* by (b) the aggregate amount paid or distributed on or before such date by all Funding Guarantors under this Agreement in respect of the obligations guaranteed.

"*Fair Share Contribution Amount*" means, with respect to a Contributing Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Contributing Guarantor under this Agreement that would not render its obligations hereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Bankruptcy Code or any comparable

applicable provisions of state law; _provided_, solely for purposes of calculating the "Fair Share Contribution Amount" with respect to any Contributing Guarantor for purposes of Section 3, any assets or liabilities of such Contributing Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Contributing Guarantor.

"***Funding Guarantors***" has the meaning assigned to such term in Section 3.

"***Guaranteed Obligations***" has the meaning assigned to such term in Section 2.

"***Guaranteed Parties***" means the Purchasers, the Holders, the Agents, and their respective successors and permitted assigns.

"***Guarantor***" has the meaning assigned to such term in the preamble to this Agreement.

"***Qualified ECP Guarantor***" means, in respect of any Swap Obligation, each Note Party that has total assets exceeding Ten Million Dollars ($10,000,000.00) at the time the relevant Guarantee or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another Person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"***Swap Obligation***" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

**2.     Guaranty of the Obligations**.  The Guarantors jointly and severally hereby irrevocably and unconditionally guaranty to the Agent, for the ratable benefit of the Guaranteed Parties, the due and punctual payment and performance in full of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)) (collectively, the "***Guaranteed Obligations***").

**3.     Contribution by Guarantors**.  All Guarantors desire to allocate among themselves (collectively, the "***Contributing Guarantors***"), in a fair and equitable manner, their obligations arising under this Agreement.  Accordingly, in the event any payment or distribution is made on any date by a Guarantor (a "***Funding Guarantor***") under this Agreement such that its Aggregate Payments exceeds its Fair Share as of such date, such Funding Guarantor shall be entitled to a contribution from each of the other Contributing Guarantors in an amount sufficient to cause each Contributing Guarantor's Aggregate Payments to equal its Fair Share as of such date.  The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Funding Guarantor.  The allocation among Contributing Guarantors of their obligations as set forth in this Section 3 shall not be construed in any way to limit the liability of any Contributing Guarantor hereunder.  Each Guarantor is a third-party beneficiary to the contribution agreement set forth in this Section 3.

**4.     Payment by Guarantors**.  The Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Guaranteed Party may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of the Company to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)), the Guarantors will upon demand pay, or cause to be paid, in cash, to the Note Agent for the ratable benefit of

2

the Guaranteed Parties, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for the Company's becoming the subject of a case under the Bankruptcy Code, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against the Company for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to the Guaranteed Parties as aforesaid.

**5.   Liability of Guarantors Absolute**.   Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations.   In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a)      this Agreement is a guaranty of payment when due and not of collectability; this Agreement is a primary obligation of each Guarantor and not merely a contract of surety;

(b)      the Note Agent may enforce this Agreement upon the occurrence of an Event of Default notwithstanding the existence of any dispute between the Company and any Guaranteed Party with respect to the existence of such Event of Default;

(c)      the obligations of each Guarantor hereunder are independent of the obligations of the Company and the obligations of any other guarantor (including any other Guarantor) of the obligations of the Company, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against the Company or any of such other guarantors and whether or not the Company is joined in any such action or actions;

(d)      payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid; provided that, without limiting the generality of the foregoing, if the Note Agent is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(e)      any Guaranteed Party, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for the benefit of such Guaranteed Party in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Guaranteed Party may have against any such security, in each case as such Guaranteed Party in its discretion may determine consistent herewith and any applicable security

3

agreement, including foreclosure on any such security pursuant to one or more judicial or non-judicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against the Company or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Note Documents; and

(f)    this Agreement and the obligations of the Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full of the Guaranteed Obligations), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Note Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to Events of Default) hereof, any of the other Note Documents or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Note Document or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Note Documents or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though any Guaranteed Party might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) any Guaranteed Party's consent to the change, reorganization or termination of the corporate structure or existence of the Company or any of its Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations; (vii) any defenses, set offs or counterclaims which the Company may allege or assert against any Guaranteed Party in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

**6.**    **Waivers by Guarantors**. Each Guarantor hereby waives, for the benefit of the Guaranteed Parties: (a) any right to require any Guaranteed Party, as a condition of payment or performance by such Guarantor, to (i) proceed against the Company, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from the Company, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any deposit account or credit on the books of any Guaranteed Party in favor of the Company or any other Person, or (iv) pursue any other remedy in the power of any Guaranteed Party whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of the Company or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of the Company or any other Guarantor from any cause other than payment in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Guaranteed Party's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to gross negligence or willful misconduct; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the

4

terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Guaranteed Party protect, secure, perfect or insure any security interest or Lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to the Company and notices of any of the matters referred to in Section 5 and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

7.      **Guarantors' Rights of Subrogation, Contribution, etc.**  Until the Guaranteed Obligations shall have been indefeasibly paid in full (other than contingent obligations as to which no demand has been made or claim asserted), each Guarantor hereby waives any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against the Company or any other Guarantor or any of its assets in connection with this Agreement or the performance by such Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including (a) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter have against the Company with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that any Guaranteed Party now has or may hereafter have against the Company, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by any Guaranteed Party.  In addition, until the Guaranteed Obligations shall have been indefeasibly paid in full (other than contingent obligations as to which no demand has been made or claim asserted), each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guaranteed Obligations, including any such right of contribution as contemplated by Section 3.  Each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against the Company or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights any Guaranteed Party may have against the Company, to all right, title and interest any Guaranteed Party may have in any such collateral or security, and to any right any Guaranteed Party may have against such other guarantor.  If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations shall not have been finally and indefeasibly paid in full (other than contingent obligations as to which no demand has been made or claim asserted), such amount shall be held in trust for the Note Agent on behalf of the Guaranteed Parties and shall forthwith be paid over to the Note Agent for the benefit of the Guaranteed Parties to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

8.      **Subordination of Other Obligations**.  Any Indebtedness of the Company or any Guarantor now or hereafter held by any Guarantor (the "***Obligee Guarantor***") is hereby subordinated in right of payment to the Guaranteed Obligations, and any such indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust for the Note Agent on behalf of the Guaranteed Parties and shall forthwith be paid over to the Note Agent for the benefit of the Guaranteed Parties to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

**9.     Continuing Guaranty**.  This Agreement is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations shall have been indefeasibly paid in full (other than contingent obligations as to which no demand has been made or claim asserted).  Each Guarantor hereby irrevocably waives any right to revoke this Agreement as to future transactions giving rise to any Guaranteed Obligations.

**10.     Authority of the Guarantors or the Company**.  It is not necessary for any Guaranteed Party to inquire into the capacity or powers of any Guarantor or the Company or the officers, directors or any agents acting or purporting to act on behalf of any of them.

**11.     Financial Condition of the Company**.  Any Notes may be issued to the Company without notice to or authorization from any Guarantor regardless of the financial or other condition of the Company at the time of any such grant or continuation.  No Guaranteed Party shall have any obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of the Company.  Each Guarantor has adequate means to obtain information from the Company on a continuing basis concerning the financial condition of the Company and its ability to perform its obligations under the Note Documents and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of the Company and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations.  Each Guarantor hereby waives and relinquishes any duty on the part of any Guaranteed Party to disclose any matter, fact or thing relating to the business, operations or conditions of the Company now known or hereafter known by any Guaranteed Party.

**12.     Bankruptcy, etc.**

(a)     So long as any Guaranteed Obligations remain outstanding, no Guarantor shall, without the prior written consent of the Note Agent acting pursuant to the instructions of Required Holders, commence or join with any other Person in commencing any bankruptcy, reorganization or insolvency case or proceeding of or against the Company or any other Guarantor.  The obligations of the Guarantors hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by any case or proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of the Company or any other Guarantor or by any defense which the Company or any other Guarantor may have by reason of the order, decree or decision of any court or administrative body resulting from any such proceeding.

(b)     Each Guarantor acknowledges and agrees that any interest on any portion of the Guaranteed Obligations which accrues after the commencement of any case or proceeding referred to in clause (a) above (or, if interest on any portion of the Guaranteed Obligations ceases to accrue by operation of law by reason of the commencement of such case or proceeding, such interest as would have accrued on such portion of the Guaranteed Obligations if such case or proceeding had not been commenced) shall be included in the Guaranteed Obligations because it is the intention of the Guarantors and the Guaranteed Parties that the Guaranteed Obligations which are guaranteed by the Guarantors pursuant hereto should be determined without regard to any rule of law or order which may relieve the Company of any portion of such Guaranteed Obligations.  The Guarantors will permit any trustee in bankruptcy, receiver, debtor in possession, assignee for the benefit of creditors or similar person to pay Agent, or allow the claim of the Note Agent in respect of, any such interest accruing after the date on which such case or proceeding is commenced.

(c)     In the event that all or any portion of the Guaranteed Obligations are paid by the Company, the obligations of the Guarantors hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from any Guaranteed Party as a preference, fraudulent transfer or otherwise,

6

and any such payments which are so rescinded or recovered shall constitute Guaranteed Obligations for all purposes hereunder.

**13.      Discharge of Guaranty Upon Sale of a Guarantor**.  If all of the Capital Stock of any Guarantor or any of its successors in interest hereunder shall be sold or otherwise disposed of (including by merger or consolidation) in accordance with the terms and conditions of the Note Documents, the Guaranty of such Guarantor or such successor in interest, as the case may be, hereunder shall automatically be discharged and released without any further action by any Guaranteed Party or any other Person effective as of the time of such Asset Disposition.

**14.      Keepwell**.    Each Qualified ECP Guarantor hereby, jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Note Party to honor all of its obligations under this Agreement in respect of Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 14 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 14, or otherwise under this Agreement, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  The obligations of each Qualified ECP Guarantor under this Section 14 shall remain in full force and effect until all of the Guaranteed Obligations (other than contingent indemnity Obligations for which no claim has been asserted) shall have been paid in full.  Each Qualified ECP Guarantor intends that this Section 14 constitute, and this Section 14 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Note Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

**15.      Additional Guarantors.**  Each Subsidiary of the Company that is required to become a Guarantor pursuant to Section 6.10 of Purchase Agreement will become a Guarantor (each an "***Additional Guarantor***"), with the same force and effect as if such Subsidiary were originally named as a Guarantor herein, for all purposes of this Agreement upon the execution and delivery by such Subsidiary of a supplement to this Agreement substantially in the form of the supplement attached hereto as Exhibit A (each a "***Guaranty Supplement***").  Each reference to "Guarantor" (or any words of like import referring to a Guarantor) in this Agreement or any other Note Document shall also mean the Additional Guarantor and each reference in this Agreement or any other Note Document to this "Guaranty" (or words of like import referring to this Agreement) shall mean this Agreement, as supplemented by each Guaranty Supplement. No consent of any other Guarantor hereunder will be required for the execution and delivery of any Guaranty Supplement.  The rights and obligations of each Guarantor hereunder shall remain in full force and effect notwithstanding the addition of any Additional Guarantor as a party to this Agreement.

**16.      Severability**.  If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith.  In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (a) such provision shall be excluded from this Agreement, (b) the balance of this Agreement shall be interpreted as if such provision were so excluded, and (c) the balance of this Agreement shall be enforceable in accordance with its terms.

**17.      Waiver and Amendment; Entire Agreement**.  Any provision of this Agreement may be amended, waived or modified only by an instrument signed in writing by the Guarantors and the Note Agent (with the consent of any Guaranteed Party as required by Section 10.9 of the Purchase Agreement).  This Agreement and the other Note Documents constitute the entire contract among the parties hereto regarding to the subject matters addressed herein and supersede any and all previous agreements, negotiations, and discussions, oral or written, by the parties regarding the subject matters addressed herein.

18.     **Successors and Assigns**.  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties.  Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

19.     **GOVERNING LAW**.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.

20.     **Jurisdiction and Venue; Waiver of Jury Trial; Expenses and Indemnification**.  This Agreement is subject to the provisions of Section 10.3 (Jurisdiction and Venue), Section 10.4 (Waiver of Jury Trial) and Section 10.10(a) (Expenses and Indemnification) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*.

21.     **Notices**.  All communications and notices required or permitted to be given hereunder shall be delivered in accordance with Section 10.8 of the Purchase Agreement.

22.     **Headings; Interpretation**.  Paragraph headings used in this Agreement are included for convenience of reference only and will not modify the provisions that they precede or affect the interpretation of this Agreement or any other Note Document.  The term "including" shall be interpreted to mean "including but not limited to".

23.     **Counterparts**.  This Agreement may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract.  Any counterpart of a signature page to this Agreement may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.

24.     **Concerning the Agent**.  U.S. Bank National Association is entering into this Agreement solely in its capacity as Note Agent and Collateral Agent (when applicable) under the Purchase Agreement and shall be entitled to all of the rights, privileges and immunities of the Note Agent and Collateral Agent (when applicable) in acting hereunder.

25.     **Security**.  The parties hereto acknowledge that, upon delivery of the Collateral Documents required by Section 6.13 of Purchase Agreement, the Guaranteed Obligations shall be secured by a first priority Lien on the Collateral (subject to terms contained in such Collateral Documents).

*[Signature pages follow]*

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first written above.

**CORE SCIENTIFIC, INC.,** a Delaware corporation

By:_____
Name:  Michael Trzupek
Title:    Chief Executive Officer

**AMERICAN PROPERTY ACQUISITION, LLC,** a Delaware limited liability company

By: Core Scientific, Inc., its sole member

By:_____
Name:  Michael Trzupek
Title:    Chief Executive Officer

**AMERICAN PROPERTY ACQUISITIONS I, LLC,** a North Carolina limited liability company

By: American Property Acquisition, LLC, its sole member

By:  Core Scientific, Inc., its sole member

By:_____
Name:  Michael Trzupek
Title:    Chief Executive Officer

[Signature Page to Guaranty]

**AMERICAN PROPERTY ACQUISITIONS VII, LLC,** a Georgia limited liability company

By: American Property Acquisition, LLC, its sole member

    By:  Core Scientific, Inc., its sole member


By:_____
Name:  Michael Trzupek
Title:    Chief Executive Officer



**BLOCKCAP, INC.,** a Nevada corporation


By:_____
Name:  Todd DuChene
Title:    Secretary

**NOTE AGENT AND COLLATERAL AGENT**:

**U.S. BANK NATIONAL ASSOCIATION**


By: _____
Name:
Title:

Exhibit A to
Guaranty Agreement

### FORM OF GUARANTY SUPPLEMENT

THIS G U A R A N T Y  SUPPLEMENT (this "*Supplement*"), dated as of [__], is entered into by and between [__] (the "*New Guarantor*") and U.S. BANK, NATIONAL ASSOCIATION, as note agent (in such capacity, the "*Agent*") under that certain Guaranty, dated as of August 20, 2021, by and among Core Scientific, Inc., American Property Acquisition, LLC, American Property Acquisitions I, LLC, American Property Acquisitions VII, LLC, each other Guarantor from time to time party thereto and the Note Agent (the "*Guaranty*").  Capitalized terms used but not defined herein shall have the meanings given to them in the Guaranty.

The New Guarantor and the Agent, for the benefit of the Guaranteed Parties, hereby agree as follows:

The New Guarantor hereby acknowledges, agrees and confirms that, by its execution of this Supplement, the New Guarantor will be deemed to be a "Guarantor" under the Guaranty for all purposes of the Guaranty and shall have all of the obligations of a Guarantor thereunder as if it had executed the Guaranty.  The New Guarantor hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Guaranty.

This Supplement is subject to the provisions of <u>Section 10.2</u> (Governing Law), <u>Section 10.3</u> (Jurisdiction and Venue) and <u>Section 10.4</u> (Waiver of Jury Trial) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*.

This Supplement may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract.  Any counterpart of a signature page to this Supplement may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.

U.S. Bank National Association is entering into this Supplements solely in its capacity as Note Agent and shall be entitled to all of the rights, privileges and immunities of the Note Agent under the Purchase Agreement in acting hereunder.

*[Signature page follows]*

<div align="right">
Exhibit A to
Guaranty Agreement
</div>

      **IN WITNESS WHEREOF**, the parties hereto have executed this Supplement as of the date first written above.

<div align="right" style="width:60%; margin-left:auto;">

**[NEW GUARANTOR]**

By:_____
Name:
Title:
</div>

Acknowledged and accepted:

  **AGENT**:

  **U.S. BANK NATIONAL ASSOCIATION,**
  as Note Agent [and Collateral Agent]

  By: _____
  Name:
  Title:

**EXHIBIT D**

**FORM OF SECURITY AGREEMENT**

**(see attached)**

**[FORM OF] SECURITY AGREEMENT**

THIS SECURITY AGREEMENT (this "*Agreement*"), dated as of [__], is made by and among each Grantor executing a signature page hereto and each Additional Grantor (as defined below) that may become a party hereto pursuant to Section 5.8(b) (each, a "*Grantor*" and collectively, the "*Grantors*"), in favor of U.S. Bank National Association, in its capacity as collateral agent on behalf of the Secured Parties (the "*Collateral Agent*").

**RECITALS**

WHEREAS, the Grantors entered into that certain Convertible Note Purchase Agreement, dated as of August 20, 2021 (as amended, restated, supplemented and/or otherwise modified from time to time, the "*Purchase Agreement*"), by and among the Grantors, each Purchaser party thereto and U.S. Bank National Association, as Note Agent and, upon the execution and delivery of the Collateral Documents pursuant to Section 6.13, as Collateral Agent for the Secured Parties;

WHEREAS, pursuant to the Purchase Agreement, each Purchaser has been issued by the Company one or more Notes (as defined in the Purchase Agreement), which are part of a series of Notes issued by the Company, in an aggregate principal amount of up to $300,000,000.00; and

WHEREAS, as continuing collateral security for the Obligations of the Company under the Purchase Agreement and the Guaranteed Obligations of the Guarantors under the Guaranty, the Grantors have agreed to enter into this Security Agreement, in favor of the Collateral Agent, for purposes of granting to the Collateral Agent, for the benefit of the Secured Parties, a security interest in the Grantors' assets, on the terms and subject to the conditions set forth therein.

**AGREEMENT**

NOW THEREFORE, in consideration of the foregoing, and the representations, warranties and conditions set forth herein, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      **DEFINED TERMS.**  When used in this Agreement the following terms shall have the meanings set forth below (such meanings being equally applicable to both the singular and plural forms of the terms defined).  Any term used in the UCC and not defined herein shall have the meaning given to such term in the UCC and any capitalized term used but not otherwise defined herein shall have the meaning given to such term in the Notes or the Purchase Agreement, as applicable.

"*Additional Grantors*" shall have the meaning assigned in Section 5.8(b).

"*CFC*" shall mean a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"*CFC Holdco*" shall mean a Subsidiary of the Company that has no material assets other than Capital Stock (or Capital Stock and Indebtedness) of one or more direct or indirect Foreign Subsidiaries of the Company that are CFCs.

"*Collateral*" shall have the meaning assigned to such term in Section 2 of this Agreement.

"*Contracts*" means all contracts (including any customer, vendor, supplier, service or maintenance contract), personal property leases, licenses, undertakings, purchase orders, permits, franchise agreements or other agreements (other than any right evidenced by Chattel Paper, Documents or

Instruments), whether in written or electronic form, in or under which the Grantors now hold or hereafter acquire any right, title or interest, including, without limitation, with respect to an Account, any agreement relating to the terms of payment or the terms of performance thereof, and all assignments, amendments, restatements, supplements, extensions, renewals, replacements or modifications of the Contracts.

"*Copyright License*" means any agreement, whether in written or electronic form, in which the Grantors now hold or hereafter acquire any interest, granting any right in or to any Copyright or Copyright registration (whether the Grantors are the licensee or the licensor thereunder) including, without limitation, licenses pursuant to which the Grantors have obtained the exclusive right to use a copyright owned by a third party.

"*Copyrights*" means all of the following now owned or hereafter acquired or created (as a work for hire for the benefit of the Grantors) by the Grantors or in which the Grantors now hold or hereafter acquire or receive any right or interest, in whole or in part: (a) all copyrights, (statutory or common law, whether established or registered in the United States or any other country or any political subdivision thereof, whether registered or unregistered and whether published or unpublished), held pursuant to the laws of the United States, any State thereof or any other country; (b) registrations, applications, recordings and proceedings in the United States Copyright Office or in any similar office or agency of the United States, any State thereof or any other country; (c) any continuations, renewals or extensions thereof; (d) any registrations to be issued in any pending applications, and shall include any right or interest in and to work protectable by any of the foregoing which are presently or in the future owned, created or authorized (as a work for hire for the benefit of the Grantors) or acquired by the Grantors, in whole or in part; (e) prior versions of works covered by copyright and all works based upon, derived from or incorporating such works; (f) income, royalties, damages, claims and payments now and hereafter due and/or payable with respect to copyrights, including, without limitation, damages, claims and recoveries for past, present or future infringement; (g) rights to sue for past, present and future infringements of any copyright; and (h) any other rights corresponding to any of the foregoing rights throughout the world.

"*Excluded Account*" means any Account (including, for the avoidance of doubt, any cash, cash equivalents or other property contained therein) to the extent, and for so long as, such Account is pledged to secure (i) performance of tenders, bids, leases, statutory or regulatory obligations, surety and appeal bonds, government contracts, performance and return-of-money bonds, and other obligations of like nature, in each case, in the ordinary course of business or (ii) liability for reimbursement or indemnification obligations in respect of letters of credit or bank guarantees for the benefit of landlords, in each case whether such pledge is by escrow or otherwise.

"*Excluded Property*" means, collectively, (i) Excluded Accounts (and any assets contained therein), (ii) the Capital Stock of any Subsidiary that is a CFC or CFC Holdco, other than 65.00% of the total outstanding voting Capital Stock and 100.00% of the total outstanding nonvoting Capital Stock of a CFC or a CFC Holdco that, in each case, is directly owned by a Grantor, (iii) "intent-to-use" trademarks at all times prior to the first use thereof, whether by the actual use thereof in commerce, the recording of a statement of use with the United States Patent and Trademark Office or otherwise, (iv) any property, right or asset held by the Grantors or any Subsidiary to the extent that a grant of a security interest therein is prohibited by any Requirements of Law of a Governmental Authority or constitutes a breach or default under or results in the termination of or requires any consent not obtained under, any contract, license, agreement, instrument or other document evidencing or giving rise to such property, except (A) to the extent that the terms in such contract, license, instrument or other document providing for such prohibition, breach, default or termination, or requiring such consent are not permitted under this Agreement or (B) to the extent that such Requirements of Law or the term in such contract, license, agreement, instrument or other document providing for such prohibition, breach, default or termination or

requiring such consent is ineffective under Section 9406, 9407, 9408 or 9409 of the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law (including the Bankruptcy Code of the United States) or principles of equity; provided, however, that such security interest shall attach immediately at such time as such Requirements of Law is not effective or applicable, or such prohibition, breach, default or termination is no longer applicable or is waived, and to the extent severable, shall attach immediately to any portion of the Collateral that does not result in such consequences; and (v) any assets securing Indebtedness (including Capital Lease Obligations) incurred to finance the acquisition of any fixed or capital assets (including any real property assets) so long as a security interest therein only encumbers the assets so acquired or financed with the proceeds of such Indebtedness.

"**Foreign Subsidiary**" means any Subsidiary other than a Subsidiary organized under the laws of any state within the United States.

"**Intellectual Property License**" means, collectively with respect to the Grantors, any Copyright License, Patent License, Trademark License or other license of rights or interests, whether in-bound or out-bound, whether in written or electronic form, now or hereafter owned or acquired or received by the Grantors or in which the Grantors now hold or hereafter acquire or receives any right or interest, and shall include any renewals or extensions of any of the foregoing thereof.

"**Investment Property**" shall mean, collectively, (a) all "investment property" as such term is defined in Section 9-102(a)(49) of the UCC and (b) whether or not constituting "investment property" as so defined, all Pledged Stock.

"**Issuers**" shall mean, collectively, each issuer of any Investment Property.

"**Patent License**" means any agreement, whether in written or electronic form, in which the Grantors now hold or hereafter acquire any interest, granting any right with respect to any invention on which a Patent is in existence (whether the Grantors are the licensee or the licensor thereunder).

"**Patents**" means all of the following in which the Grantors now hold or hereafter acquire any interest: (a) all letters patent of the United States or any other country, all registrations and recordings thereof and all applications for letters patent of the United States or any other country, including, without limitation, registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country; (b) all reissues, divisions, continuations, renewals, continuations-in-part or extensions thereof; (c) all petty patents, divisionals and patents of addition; (d) all patents to issue in any such applications; (e) income, royalties, damages, claims and payments now and hereafter due and/or payable with respect to patents, including, without limitation, damages, claims and recoveries for past, present or future infringement; and (f) rights to sue for past, present and future infringements of any patent.

"**Pledged Stock**" shall mean all shares of Capital Stock, together with any other shares, stock certificates, options, interests or rights of any nature whatsoever in respect of the Capital Stock of any Person that may be issued or granted to, or held by, any Grantor while this Agreement is in effect.

"**Trademark License**" means any agreement, whether in written or electronic form, in which the Grantors now hold or hereafter acquire any interest, granting any right in and to any Trademark or Trademark registration (whether the Grantors are the licensee or the licensor thereunder).

"**Trademarks**" means any of the following in which the Grantors now hold or hereafter acquire any interest: (a) any trademarks, tradenames, corporate names, company names, business names, uniform

3

resource locators (URL's), domain names, trade styles, service marks, logos, other source or business identifiers, prints and labels on which any of the foregoing have appeared or appear, designs and general intangibles of like nature, now existing or hereafter adopted or acquired, all registrations and recordings thereof and any applications in connection therewith, including, without limitation, registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country (collectively, the "***Marks***"); (b) any reissues, extensions or renewals thereof; (c) the goodwill of the business symbolized by or associated with the Marks; (d) income, royalties, damages, claims and payments now and hereafter due and/or payable with respect to the Marks, including, without limitation, damages, claims and recoveries for past, present or future infringement; and (e) rights to sue for past, present and future infringements of the Marks.

**2.     GRANT OF SECURITY INTEREST**.  As collateral security for the full, prompt, complete and final payment and performance when due (whether at stated maturity, by acceleration or otherwise) of all the Obligations and in order to induce the Holders to purchase the Notes, each Grantor hereby assigns, conveys, mortgages, pledges, hypothecates and transfers to the Collateral Agent, on behalf of the Secured Parties, and hereby grants to the Collateral Agent, on behalf of the Secured Parties, a security interest in all of such Grantor's right, title and interest in, to and under the following, whether now owned or hereafter acquired (all of which being collectively referred to herein as the "***Collateral***"):

    (a)     All Accounts of the Grantors;

    (b)     All Chattel Paper of the Grantors;

    (c)     The Commercial Tort Claims of the Grantors;

    (d)     All Commodity Accounts of the Grantors;

    (e)     All Contracts of the Grantors;

    (f)     All Deposit Accounts of the Grantors;

    (g)     All Documents of the Grantors;

    (h)     All General Intangibles of the Grantors, including, without limitation, Intellectual Property;

    (i)     All Goods of the Grantors, including, without limitation, Equipment, Inventory and Fixtures;

    (j)     All Instruments of the Grantors, including, without limitation, Promissory Notes;

    (k)     All Investment Property of the Grantors;

    (l)     All Letter-of-Credit Rights and Letters of Credit of the Grantors;

    (m)     All Money of the Grantors;

    (n)     All Securities Accounts of the Grantors;

    (o)     All Supporting Obligations of the Grantors;

(p)     All property of the Grantors held by any Secured Party, or any other party for whom any Secured Party is acting as agent, including, without limitation, all property of every description now or hereafter in the possession or custody of or in transit to any Secured Party or such other party for any purpose, including, without limitation, safekeeping, collection or pledge, for the account of the Grantors, or as to which the Grantors may have any right or power;

(q)     All other goods and personal property of the Grantors, wherever located, whether tangible or intangible, and whether now owned or hereafter acquired, existing, leased or consigned by or to the Grantors; and

(r)     To the extent not otherwise included, all Proceeds of each of the foregoing and all accessions to, substitutions and replacements for and rents, profits and products of each of the foregoing.

Notwithstanding the foregoing provisions of this Section 2, the grant, assignment and transfer of a security interest as provided herein shall not extend to, and the term "Collateral" shall not include any Excluded Property.

3.     **RIGHTS OF SECURED PARTIES; COLLECTION OF ACCOUNTS.**

(a)     Notwithstanding anything contained in this Agreement to the contrary, each Grantor expressly agrees that it shall remain liable under each of its Contracts, Chattel Paper, Documents, Instruments and Intellectual Property to observe and perform all the conditions and obligations to be observed and performed by it thereunder and that it shall perform all of its duties and obligations thereunder, all in accordance with and pursuant to the terms and provisions of each such Contract, Chattel Paper, Document, Instrument, and Intellectual Property.  The Secured Parties and the Collateral Agent shall not have any obligation or liability under any such Contract, Chattel Paper, Document, Instrument, or Intellectual Property by reason of or arising out of this Agreement or the granting to the Collateral Agent of a Lien therein or the receipt by any Secured Party or the Collateral Agent of any payment relating to any such Contract, Chattel Paper, Document, Instrument, or Intellectual Property pursuant hereto, nor shall any Secured Party or the Collateral Agent be required or obligated in any manner to perform or fulfill any of the obligations of the Grantors under or pursuant to any such Contract, Chattel Paper, Document, Instrument, or Intellectual Property, or to make any payment, or to make any inquiry as to the nature or the sufficiency of any payment received by it or the sufficiency of any performance by any party under any such Contract, Chattel Paper, Document, Instrument, or Intellectual Property, or to present or file any claim, or to take any action to collect or enforce any performance or the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

(b)     Upon the occurrence and during the continuance of any Event of Default, the Collateral Agent authorizes each Grantor to collect its Accounts and, at the request of the Collateral Agent (at the direction of the Required Holders), such Grantor shall deliver all original and other documents evidencing and relating to the performance of labor or service which created such Accounts, including, without limitation, all original orders, invoices and shipping receipts.

(c)     The Collateral Agent may at any time, upon the occurrence and during the continuance of any Event of Default, notify Account Debtors of the Grantors, parties to the Contracts of the Grantors, obligors in respect of Instruments of the Grantors, and obligors in respect of Chattel Paper of the Grantors that the Accounts and the right, title and interest of the Grantors in and under such Contracts, Instruments and Chattel Paper have been assigned to the Collateral Agent and that payments shall be made directly to the Collateral Agent for distribution to the Secured Parties.  Upon the occurrence and during the continuance of any Event of Default, upon the request of the Collateral Agent (at the

direction of the Required Holders), the Grantors shall so notify such Account Debtors, parties to such Contracts, obligors in respect of such Instruments and obligors in respect of such Chattel Paper. The Collateral Agent may, in its name or in the name of others, communicate with such Account Debtors, parties to such Contracts, obligors in respect of such Instruments and obligors in respect of such Chattel Paper to verify with such parties, to the Collateral Agent's satisfaction, the existence, amount and terms of any such Accounts, Contracts, Instruments or Chattel Paper.

**4.    REPRESENTATIONS AND WARRANTIES**.   The Grantors hereby represent and warrant to the Collateral Agent and the other Secured Parties that:

(a)     Except for the security interest granted under this Agreement, the Grantors are the sole legal and equitable owner of each item of Collateral in which it purports to grant a security interest hereunder, having good and marketable title thereto, free and clear of any and all Liens except for Permitted Liens and, upon filing of a UCC financing statement in the UCC filing office, the Collateral Agent shall have a perfected security interest in the Collateral, which such security interest shall be senior to all other Liens (other than Permitted Liens).  None of the Collateral is owned, legally or equitably by any subsidiary or company controlled by the Grantors.

(b)     The Grantors' correct legal name is set forth on the signature page hereof.  The Grantors' chief executive office, jurisdiction of incorporation and the place where the Grantors maintain their records concerning the Collateral are presently located on Schedule 4(b).

(c)     Schedule 4(c) (as such schedule may be amended or supplemented from time to time) as required pursuant to the Purchase Agreement sets forth a true and complete list of (i) all United States, state and foreign registrations of and applications for Patents, Trademarks, and Copyrights owned by each Grantor and (ii) all Patent Licenses, Trademark Licenses and Copyright Licenses material to the business of such Grantor.

(d)     Schedule 4(d) sets forth a complete and accurate list of all Pledged Stock pledged by each Grantor hereunder on the Initial Closing Date. The Pledged Stock constitutes all issued and outstanding shares of all classes of the Capital Stock of each Issuer owned by such Grantor which is Collateral (and in the case of each Issuer which is required to become a Note Party pursuant to the terms of the Purchase Agreement, all the issued and outstanding shares of all classes of the Capital Stock of each such Issuer).  Each Grantor has delivered all Certificated Securities constituting Collateral held by such Grantor in a Subsidiary on the Initial Closing Date (or the date such Grantor becomes a party to this Agreement, as applicable) to the Collateral Agent, together with duly executed undated blank stock powers, or other equivalent instruments of transfer acceptable to the Collateral Agent in accordance with Section 5.08(c) below and (assuming possession by the Collateral Agent) the Collateral Agent has a first-priority Lien.

**5.    COVENANTS**.   Unless the Collateral Agent (at the direction of the Required Holders) otherwise consents (which consent shall not be unreasonably withheld), the Grantors covenant and agree with the Collateral Agent and the other Secured Parties that from and after the date of this Agreement and until the Obligations have been performed and paid in full:

**5.1    Change of Name, Jurisdiction of Organization, Relocation of Business**.  The Grantors shall not change their name or jurisdiction of organization or relocate their chief executive office, principal place of business or their records from such address(es) provided to the Collateral Agent pursuant to Section 4(b) above without at least seven (7) days prior notice to the Collateral Agent.

**5.2    Certain Restrictions on Future Agreements**.

6

(a)      Each Grantor agrees that until the Obligations have been satisfied in full, it will not sell or assign its interest in, or grant any license under, other than in the ordinary course of business or in connection with a Permitted Lien, the Collateral, or enter into any other agreement with respect to the Collateral that is inconsistent with such Grantor's obligations under this Agreement, without the prior written consent of the Required Holders, and the such Grantor further agree that it will not take any action, or permit any action to be taken by others subject to its control, including licensees, or fail to take any action, which would affect the validity or enforcement of the rights transferred to the Holders under this Agreement.

(b)      Upon any sale, lease, transfer or other disposition of any item of Collateral not prohibited by the terms of this Agreement or the other Note Documents, the Collateral Agent will, at the Grantors' sole cost and expense, execute and deliver to the Grantors such documents as the Grantors shall reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted hereby; provided, however, that (i) at the time of such request and such release no Event of Default shall have occurred and be continuing and (ii) the Grantors shall have delivered to the Collateral Agent prior to the date of the proposed release a written request for release describing the item of Collateral, together with a form of release for execution by the Collateral Agent, and such other information as the Collateral Agent may reasonably request.

**5.3      License**.  The Grantors hereby grant to the Collateral Agent a non-exclusive, worldwide and royalty-free license to use or otherwise exploit all Intellectual Property rights of the Company or Subsidiary for the purpose of: (a) completing the manufacture of any in-process materials following any Event of Default so that such materials become saleable inventory, all in accordance with the same quality standards previously adopted by the Grantors for their own manufacturing; and (b) selling, leasing or otherwise disposing of any or all collateral following any Event of Default.

**5.4      Duties of the Grantors**.  The Grantors will have the duty to preserve and maintain all rights in the Collateral and to cause the perfection of the Collateral Agent's security interest therein to the extent the same can be perfected by the filing of a UCC financing statement.  Any expenses incurred in connection with the Grantors' obligations under this Section 5.4 will be borne by the Grantors.

**5.5      Insurance**.  The Grantors shall maintain insurance policies insuring the Collateral against loss or damage from such risks and in such amounts and forms and with such companies as are customarily maintained by businesses similar to the Grantors.

**5.6      Taxes, Assessments, Etc**.  The Grantors shall pay promptly when due all property and other taxes, assessments and government charges or levies imposed upon, and all claims (including claims for labor, materials and supplies) against, the Collateral, except to the extent the validity or amount thereof is being contested in good faith and adequate reserves are being maintained in connection therewith.

**5.7      Defense of Intellectual Property**.  The Grantors shall use commercially reasonable efforts to (i) protect, defend and maintain the validity and enforceability of all Copyrights, Patents and Trademarks material to the Grantors' business and (ii) detect infringements of all Copyrights, Patents and Trademarks material to the Grantors' business.

**5.8      Further Assurances**.

(a)      At any time and from time to time, as necessary or upon the written request of the Collateral Agent (at the direction of the Required Holders), and at the sole expense of the Grantors, the Grantors shall promptly and duly execute and deliver any and all such further instruments and

7

documents and take such further action as is necessary or that the Collateral Agent may reasonably request to obtain the full benefits of this Agreement (including the seniority of the security interest granted hereby as described in Section 4(a)), including, without limitation, executing, delivering and causing to be filed (i) any financing or continuation statements under the UCC with respect to the security interests granted hereby and (ii) intellectual property security agreements appropriate for filing with the United States Patent and Trademark Office or United States Copyright Office (or any successor office) as may be necessary or advisable for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interests granted hereby. The Grantors also hereby authorize the Collateral Agent to file any such financing or continuation statement without the signature of the Grantors . Notwithstanding the foregoing authorization, the Collateral Agent shall have no obligation to perfect or maintain the perfection of the Collateral Agent's security interest, including by filing UCC financing statements or continuation statements, which shall be the sole obligation of the Grantors.

(b)      From time to time subsequent to the date hereof, additional Persons may become parties hereto as additional Grantors (each, an "**Additional Grantors**"), by executing a joinder hereto substantially in the form of Exhibit A. Upon delivery of any such counterpart agreement to the Collateral Agent, notice of which is hereby waived by Grantors, each Additional Grantors shall be a Grantors and shall be as fully a party hereto as if Additional Grantors were an original signatory hereto . Each Grantor expressly agrees that its obligations arising hereunder shall not be affected or diminished by the addition or release of any other Grantors hereunder, nor by any election of Collateral Agent not to cause any Subsidiary of Company to become an Additional Grantors hereunder. This Agreement shall be fully effective as to any Grantors that is or becomes a party hereto regardless of whether any other Person becomes or fails to become or ceases to be a Grantors hereunder.

(c)      On the date hereof (or, in respect of an Additional Grantor, on the date on which such Additional Grantor executes a joinder hereto), each Grantor will deliver to the Collateral Agent all certificates representing Certificated Securities constituting Collateral then owned by such Grantor, in suitable form for transfer by delivery or accompanied by duly executed instruments of transfer or assignments in blank, sufficient to transfer title to the Collateral Agent. Thereafter, whenever such Grantor acquires any other Certificated Security constituting Collateral, such Grantor will promptly deliver such certificate to the Collateral Agent in suitable form for transfer by delivery or accompanied by duly executed instruments of transfer or assignments in blank, sufficient to transfer title to the Collateral Agent. Any limited liability company and any partnership controlled by any Grantor shall either (a) not include in its operative documents any provision that any equity interest in such limited liability company or such partnership be a "security" as defined under Article 8 of the UCC or (b) certificate any equity interest in any such limited liability company or such partnership. To the extent an interest in any limited liability company or partnership controlled by any Grantor and pledged hereunder that constitutes Collateral is certificated or becomes certificated, each such certificate shall be delivered to the Collateral Agent pursuant to this Section 5.8(c). Each Grantor that is an issuer of Investment Property constituting Collateral pledged hereunder that is an "uncertificated security" for purposes of the UCC hereby agrees, subject to Section 6, to comply with the Collateral Agent's instructions with respect to such uncertificated security without further consent by such Grantor.

6.      **RIGHTS AND REMEDIES UPON DEFAULT.**

6.1      **General Remedial Provisions**. Beginning on the date which is ten (10) business days after any Event of Default shall have occurred and while such Event of Default is continuing:

(a)      The Collateral Agent, on behalf of the Secured Parties, may exercise in addition to all other rights and remedies granted to it under this Agreement or the Notes, all rights and remedies of a secured party under the UCC. Without limiting the generality of the foregoing, the Grantors expressly

8

agree that in any such event the Collateral Agent, without demand of performance or other demand, advertisement or notice of any kind (except the notice specified below of time and place of public or private sale) to or upon the Grantors or any other person, may (i) reclaim, take possession, recover, store, maintain, finish, repair, prepare for sale or lease, shop, advertise for sale or lease and sell or lease (in the manner provided herein) the Collateral, and in connection with the liquidation of the Collateral and collection of the Accounts pledged as Collateral, use any Trademark, Copyright, or process used or owned by the Grantors and (ii) forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and may forthwith sell, lease, assign, give an option or options to purchase or sell or otherwise dispose of and deliver said Collateral (or contract to do so), or any part thereof, in one or more parcels at public or private sale or sales, at any exchange or broker's board or at the Collateral Agent's offices or elsewhere at such prices as it may deem commercially reasonable, for cash or on credit or for future delivery without assumption of any credit risk.  The Grantors further agree, at the Collateral Agent's request (at the direction of the Required Holders), to assemble the Collateral and make it available to the Collateral Agent at places which the Collateral Agent shall reasonably select, whether at the Grantors' premises or elsewhere.  The Collateral Agent shall apply the net proceeds of any such collection, recovery, receipt, appropriation, realization or sale as provided in Section 6(d), below, with the Grantors remaining liable for any deficiency remaining unpaid after such application.  The Grantors agree that the Collateral Agent need not give more than twenty (20) days' notice of the time and place of any public sale or of the time after which a private sale may take place and that such notice is reasonable notification of such matters.

(b)     The Grantors also agree to pay all fees, costs and expenses of the Collateral Agent, including, without limitation, reasonable attorneys' fees, incurred in connection with the enforcement of any of its rights and remedies hereunder.

(c)     The Grantors hereby waive presentment, demand, protest or any notice (to the maximum extent permitted by applicable law) of any kind in connection with this Agreement or any Collateral.

(d)     The Proceeds of any sale, disposition or other realization upon all or any part of the Collateral shall be distributed by the Collateral Agent in the following order of priorities:

FIRST, to the Collateral Agent in an amount sufficient to pay in full the costs of the Collateral Agent in connection with such sale, disposition or other realization, including all fees, costs, expenses, liabilities and advances incurred or made by the Collateral Agent in connection therewith, including, without limitation, reasonable attorneys' fees;

SECOND, to the Agents in amounts proportional to such Secured Party's Pro Rata Share of the then unpaid Obligations of each such Agent;

THIRD, to the other Secured Parties (other than the Agents) in amounts proportional to such Secured Party's Pro Rata Share of the then unpaid Obligations of each such Secured Party; and

FINALLY, upon payment in full of the Obligations, to the Grantors or their respective representatives, in accordance with the UCC or as a court of competent jurisdiction may direct.

(e)     Upon the occurrence and during the continuation of an Event of Default, in addition to all other rights and remedies that may then be available to any Holder of any Note, each Holder of any Note and the Collateral Agent is hereby authorized at any time and from time to time, without notice to the Company (any such notice being expressly waived by the Company) to set off and apply any and all Indebtedness at any time owing by such Holder or the Collateral Agent to or for the

credit or the account of the Grantors against all amounts which may be owed to such Holder or the Collateral Agent by the Grantors in connection with this Agreement or any other Note Document.  If any Holder of the Notes shall obtain from the Company payment of any principal of or interest on any Note held by it or payment of any other amount under this Agreement or such Note held by it or any other Note Document through the exercise of any right of set-off, and, as a result of such payment, such Holder shall have received a greater percentage of the principal, interest or other amounts then due to such Holder under the Note Documents than the percentage received by any other Holder, the Company shall promptly make such adjustments (including without limitation purchasing risk participations) with such other Holder from time to time as shall be equitable, to the end that all the Purchasers of the Notes shall share the benefit of such excess payment (net of any expenses which may be incurred by such Holder in obtaining or preserving such excess payment) pro rata in accordance with the unpaid principal and/or interest on the Notes or other amounts (as the case may be) owing to each of the Purchasers of the Notes. To such end, all Holders of the Notes shall make appropriate adjustments among themselves if such payment is rescinded or must otherwise be restore d.  Any Holder of the Notes taking action under this <u>Section 6</u> shall promptly provide notice to the Company of any such action taken; <u>provided</u> that the failure of such Holder to provide such notice shall not prejudice its rights hereunder.

> 6.2    **Pledged Stock**.

> > (a)    Prior to an Event of Default each Grantor shall be permitted to receive dividends and other distributions in respect of the Pledged Stock paid in the normal course of business or otherwise as a result of the exercise of reasonable business judgment of the relevant Issuer, to the extent permitted by the Purchase Agreement, and to exercise all voting and corporate rights with respect to the Investment Property.

> > (b)    If an Event of Default shall have occurred and be continuing, effective upon delivery by the Collateral Agent to the Company of a notice (which, for the avoidance of doubt, may be electronic notice delivered in accordance with Section 4 of the Notes) stating that it is exercising its rights under this <u>Section 6.2</u> (an "***Enforcement Notice***") (*provided*, however, that failure by the Collateral Agent to provide such Enforcement Notice shall not limit or impair any of the Collateral Agent's rights under this Agreement), (i) the Collateral Agent shall have the right to receive any and all dividends, payments or other Proceeds paid in respect of the Investment Property and make application thereof to the Obligations in the order set forth in Section 1(b)(iii)(1) of the Notes, (ii) any or all of the Investment Property shall be registered in the name of the Collateral Agent or its nominee, and (iii) the Collateral Agent or its nominee may exercise (x) all voting, corporate and other rights pertaining to such Investment Property at any meeting of shareholders of the relevant Issuer or Issuers or otherwise and (y) any and all rights of conversion, exchange and subscription and any other rights, privileges or options pertaining to such Investment Property as if it were the absolute owner thereof (including, without limitation, the right to exchange, at its discretion, any and all of the Investment Property upon the merger, consolidation, reorganization, recapitalization or other fundamental change in the corporate structure of any Issuer, or upon the exercise by any Grantor or the Collateral Agent of any right, privilege or option pertaining to such Investment Property, and in connection therewith, the right to deposit and deliver any and all of the Investment Property with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as the Collateral Agent may determine), all without liability except to account for property actually received by it, but the Collateral Agent shall have no duty to any Grantor to exercise any such right, privilege or option and shall not be responsible for any failure to do so or delay in so doing.  Upon the Collateral Agent's request (at the direction of the Required Holders), each Grantor shall, at its sole cost and expense, execute and deliver to the Collateral Agent any and all appropriate documents and instruments as the Collateral Agent may request (at the direction of the Required Holders) in order to permit the Collateral Agent to exercise the voting and other rights which it may be entitled to exercise hereunder and to receive all distributions which it may be entitled to receive hereunder.

(c)      Each Grantor hereby authorizes and instructs each Issuer of any Investment Property pledged by such Grantor hereunder to (i) comply with any instruction received by it from the Collateral Agent in writing that (x) states that an Event of Default has occurred and is continuing and (y) is otherwise in accordance with the terms of this Agreement, without any other or further instructions from such Grantor, and each Grantor agrees that each Issuer shall be fully protected in so complying and shall have no duty or right to inquire as to the Collateral Agent's authority to give such instruction and (ii) when required hereby, pay any dividends or other payments with respect to the Investment Property directly to the Collateral Agent.

(d)      In furtherance and not in limitation of the foregoing rights of the Collateral Agent pursuant to this Section 6.02, solely during any time that an Event of Default exists in respect of which the Collateral Agent has delivered an Enforcement Notice, each Grantor hereby appoints the Collateral Agent as its true and lawful attorney-in-fact to, and grants to Collateral Agent an irrevocable proxy with full power of substitution and resubstitution (and which is coupled with an interest) to, vote the Capital Stock owned by a Note Party, and such Note Party agrees to execute such other proxies as the Collateral Agent may request (at the direction of the Required Holders) (provided, however, that failure by the Collateral Agent to provide such Enforcement Notice shall not limit or impair any of the Collateral Agent's rights under this Agreement).

(e)      In furtherance of the proxy set forth in Section 6.2(d), upon the exercise of such proxy, all prior proxies given by any Grantor with respect to the applicable Capital Stock are hereby revoked, and no subsequent proxies (other than to the Collateral Agent) will be given with respect to any such Capital Stock, (i) the Collateral Agent will be empowered and may exercise such proxy at any and all times, including but not limited to, at any meeting of shareholders, partners or members, as the case may be, however called, and at adjournment thereof, or in any action by written consent, and may waive any notice otherwise required in connection therewith, (ii) to the fullest extent permitted by applicable law, the Collateral Agent shall have no agency, fiduciary or other implied duties to any Grantor or any other Person when acting with respect to such proxy, and (iii) each Grantor waives and releases any claim that it may have against the Collateral Agent with respect to any breach or alleged breach of any such agency, fiduciary or other duty

7.      MISCELLANEOUS.

7.1      **Severability**.  If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith.  In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (a) such provision shall be excluded from this Agreement, (b) the balance of this Agreement shall be interpreted as if such provision were so excluded, and (c) the balance of this Agreement shall be enforceable in accordance with its terms.

7.2      **Waiver and Amendment; Entire Agreement**.  Any provision of this Agreement may be amended, waived or modified only by an instrument signed in writing by the Grantors and the Collateral Agent (with the consent of any Holder or other Secured Party as required by Section 10.9 of the Purchase Agreement).  This Agreement and the other Note Documents constitute the entire contract among the parties hereto regarding to the subject matters addressed herein and supersede any and all previous agreements, negotiations, and discussions, oral or written, by the parties regarding the subject matters addressed herein.

7.3      **Termination**.  This Agreement shall terminate upon the payment and performance in full (including, for the avoidance of doubt, by way of conversion in full of the Notes pursuant to the terms

thereof) of the Obligations (other than inchoate indemnity obligations) . At such time, the Collateral shall be automatically released from the Liens created hereby, this Agreement and all obligations (other than those expressly stated to survive such termination) of the Collateral Agent, the other Secured Parties and the Grantors hereunder shall automatically terminate, all without delivery of any instrument or performance of any act by any party, and all rights to the Collateral shall automatically revert to the Grantors. The Collateral Agent shall execute such documents, return any Collateral held by the Collateral Agent hereunder and take such other steps as are reasonably necessary to accomplish the foregoing, all at the Grantors' sole cost and expense. Any such documents shall be without recourse, representation or warranty to or by the Collateral Agent.

**7.4     Successors and Assigns**. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

**7.5     Cumulative Remedies**. All of the Secured Parties' rights and remedies with respect to the Collateral whether established hereby, by a Note, by any other agreements or by law will be cumulative and may be exercised singularly or concurrently. The Grantors acknowledge and agree that this Agreement is not intended to limit or restrict in any way the rights and remedies of a Holder under a Note but rather is intended to facilitate the exercise of such rights and remedies . Secured Parties will have, in addition to all other rights and remedies given them by the terms of this Agreement, the Notes and the other Note Documents, all rights and remedies allowed by law and the rights and remedies of a secured party under the UCC as enacted in any jurisdiction in which Collateral may be located.

**7.6     GOVERNING LAW.** THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.

**7.7     Jurisdiction and Venue; Waiver of Jury Trial; Expenses and Indemnification**. This Agreement is subject to the provisions of Section 10.3 (Jurisdiction and Venue), Section 10.4 (Waiver of Jury Trial) and Section 10.10(a) (Expenses and Indemnification) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*. Any amounts payable as provided hereunder shall be additional Obligations secured by this Agreement and the other Note Documents.

**7.8     Notices**. All communications and notices required or permitted to be given hereunder shall be delivered in accordance with Section 10.8 of the Purchase Agreement.

**7.9     Headings; Interpretation**. Paragraph headings used in this Agreement are included for convenience of reference only and will not modify the provisions that they precede or affect the interpretation of this Agreement or any other Note Document. The term "including" shall be interpreted to mean "including but not limited to".

**7.10     Counterparts**. This Agreement may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract. Any counterpart of a signature page to this Agreement may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic

Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.  The Grantors agree to assume all risks arising out of the use of using digital signatures and electronic methods to submit communications to the Note Agent, including without limitation the risk of the Note Agent acting on unauthorized instructions, and the risk of interception and misuse by third parties.

<p align="center">[<em>Signature page follows</em>]</p>

      **IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first written above.

[_____]


By:_____
Name:
Title:

254221560 v4

**COLLATERAL AGENT**:

**U.S. BANK NATIONAL ASSOCIATION**

By: _____
Name:
Title:

**SCHEDULE 4(b)**

**GRANTORS**

**SCHEDULE 4(c)**

**INTELLECTUAL PROPERTY**

**SCHEDULE 4(d)**

**INVESTMENT PROPERTY**

Exhibit A to
Security Agreement

## JOINDER AGREEMENT

THIS J O I N D E R  AGREEMENT (this "***Joinder***"), dated as of [__], is entered into by and between [__] (the "***New Grantor***") and U.S. BANK NATIONAL ASSOCIATION, as collateral agent (in such capacity, the "***Collateral Agent***") under that certain Security Agreement, dated as of [__], 2021, made by Core Scientific Holding Co., a Delaware corporation and each Guarantor from time to time party thereto, as grantors, in favor of the Collateral Agent (the "***Security Agreement***").  Capitalized terms used but not defined herein shall have the meanings given to them in the Security Agreement.

The New Grantor and the Collateral Agent, for the benefit of the Secured Parties, hereby agree as follows:

The New Grantor hereby acknowledges, agrees and confirms that, by its execution of this Joinder, the New Grantor will be deemed to be a "Grantor" under the Security Agreement for all purposes of the Security Agreement and shall have all of the obligations of a Grantor thereunder as if it had executed the Security Agreement.  The New Grantor hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Security Agreement.

This Joinder is subject to the provisions of <u>Section 10.2</u> (Governing Law), <u>Section 10.3</u> (Jurisdiction and Venue) and <u>Section 10.4</u> (Waiver of Jury Trial) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*.

This Joinder may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract.  Any counterpart of a signature page to this Joinder may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.

*[Signature page follows]*

Exhibit A to
Security Agreement

**IN WITNESS WHEREOF**, the parties hereto have executed this Joinder as of the date first written above.

[NEW GRANTOR]

By: _____
Name:
Title:

Acknowledged and accepted:

**COLLATERAL AGENT**:

**U.S. BANK NATIONAL ASSOCIATION**

By: _____
Name:
Title:

**EXHIBIT E**

**FORM OF INTELLECTUAL PROPERTY SECURITY AGREEMENT**

**(see attached)**

**[FORM OF] INTELLECTUAL PROPERTY SECURITY AGREEMENT**

**THIS INTELLECTUAL PROPERTY SECURITY AGREEMENT** (this "*Agreement*"), dated as of [__], is made by [__] (the "*Grantor[s]*") in favor of U.S. BANK NATIONAL ASSOCIATION, in its capacity as collateral agent (the "*Collateral Agent*") on behalf of the Secured Parties.

**RECITALS**

**WHEREAS**, the Grantor[s] entered into that certain Convertible Note Purchase Agreement, dated as of August 20, 2021 (as amended, restated, supplemented and/or otherwise modified from time to time, the "*Purchase Agreement*"), by and among the Grantors, each Purchaser party thereto, and U.S. BANK NATIONAL ASSOCIATION as Note Agent and, upon the execution and delivery of the Collateral Documents pursuant to Section 6.13, as Collateral Agent for the Secured Parties;

**WHEREAS**, pursuant to the terms of the Purchase Agreement, as continuing collateral security for the Obligations of the Company under the Purchase Agreement and the Guaranteed Obligations of the Guarantors under the Guaranty, the Grantors have entered into a Security Agreement, dated as of even date herewith (as amended, restated, supplemented and/or otherwise modified from time to time, the "*Security Agreement*"; capitalized terms used but not otherwise defined herein having the meaning ascribed thereto therein), made by Grantors in favor of the Collateral Agent, for the purposes of granting to the Collateral Agent, for the benefit of the Secured Parties, a security interest in Grantors' assets, on the terms and subject to the conditions set forth herein; and

**WHEREAS**, pursuant to the Security Agreement, the Grantor is required to grant a security interest to the Collateral Agent, in all of the Grantor's Intellectual Property, including the Patents, Trademarks and Copyrights listed on Schedule 1 hereto (collectively, the "*Intellectual Property*").

**AGREEMENT**

**NOW, THEREFORE**, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Grantor and the Collateral Agent hereby agree as follows:

1.      **Grant of Security Interest**.

(a)      As collateral security for the full, prompt, complete and final payment and performance when due (whether at stated maturity, by acceleration or otherwise) of all the Secured Obligations, the Grantor hereby pledges to the Collateral Agent, on behalf of the Secured Parties, and hereby grants to the Collateral Agent, on behalf of the Secured Parties, a security interest in all of the Grantor's right, title and interest in, to and under the Intellectual Property, whether now owned or hereafter acquired.

(b)      The security interest granted hereby is granted in conjunction with the security interest granted to the Collateral Agent under the Security Agreement.  The rights and remedies of the Collateral Agent with respect to the security interest granted hereby are in addition to those set forth in the Security Agreement.  In the event of any conflict between the terms of this Agreement and the terms of the Security Agreement, the terms of the Security Agreement shall control.

2.      **Termination of Security Interest**.

This Agreement shall terminate as set forth in the Security Agreement.

3.     **Modification of Agreement**.

Any provision of this Agreement may be amended, waived or modified only by an instrument signed in writing by the Grantor and the Collateral Agent (with the consents of any Holder or other Secured Party as required by Section 10.9 of the Purchase Agreement).  Notwithstanding the foregoing, upon receipt of a certificate of a Responsible Officer, the Collateral Agent may modify this Agreement, after obtaining the Grantor's approval of or signature to such modification, by amending Schedule 1 hereto to include reference to any right, title or interest in any Patents, Trademarks or Copyrights currently owned by the Grantor or any Patents, Trademarks or Copyrights acquired or developed by the Grantor after the execution hereof or to delete any reference to any right, title or interest in any Patents, Trademarks or Copyrights in which the Grantor no longer has or claims any right, title or interest.

5.     **GOVERNING LAW**.

THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.

6.     **Jurisdiction and Venue; Waiver of Jury Trial; Expenses and Indemnification**.

This Agreement is subject to the provisions of Section 10.3 (Jurisdiction and Venue), Section 10.4 (Waiver of Jury Trial) and Section 10.10(a) (Expenses and Indemnification) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*. Any amounts payable as provided hereunder shall be additional Obligations secured by this Agreement and the other Note Documents. U.S. Bank National Association is entering into this Agreement solely in its capacity as Collateral Agent under the Purchase Agreement and shall be entitled to all of the rights, privileges and immunities of the Collateral Agent in acting hereunder.

7.     **Counterparts**.

This Agreement may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract. Any counterpart of a signature page to this Agreement may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.

*[Signature page follows]*

IN WITNESS WHEREOF, the Grantor and the Collateral Agent have caused this Agreement to be duly executed and delivered as of the date first above written.

**GRANTOR:**

[_____]


By:_____
Name:
Title:

**COLLATERAL AGENT:**

U.S. BANK NATIONAL ASSOCIATION

By: _____
Name:
Title:

SCHEDULE 1

INTELLECTUAL PROPERTY SECURITY AGREEMENT

**EXHIBIT F**

**FORM OF SOLVENCY CERTIFICATE**

**(see attached)**

**[FORM OF] SOLVENCY CERTIFICATE**

**CORE SCIENTIFIC HOLDING CO.**

**August 20, 2021**

This Solvency Certificate is delivered pursuant to <u>Section 4.1(c)</u> of that certain Convertible Note Purchase Agreement, dated as of the date hereof (the "***Purchase Agreement***"), by and among Core Scientific Holding Co., a Delaware corporation (the "***Company***"), the Guarantors party thereto, the Initial Purchasers named on the Schedule of Purchasers attached as <u>Schedule 2</u> thereto and U.S. Bank National Association, as note agent and collateral agent.  Terms capitalized herein and not otherwise defined shall have the meanings assigned to them in the Purchase Agreement.

The undersigned, the Chief Financial Officer of the Company, does hereby certify, on behalf of the Company and not in his individual capacity, that as of the Initial Closing Date, both immediately before and after giving effect to the transactions contemplated by the Note Documents, the Company is individually, and the Company and its Subsidiaries on a consolidated basis are, Solvent.

*[Signature page follows]*

**IN WITNESS WHEREOF**, the undersigned has hereunto set his hand on behalf of the Company as of the date first referenced above.

_____
Name:  Michael Trzupek
Title:   Chief Financial Officer

[Signature Page to Solvency Certificate]

**EXHIBIT G**

**FORM OF ADMINISTRATIVE QUESTIONNAIRE**

| **Purchaser Name** | |
|---|---|
| Name in Which to Register Note(s) | |
| Note Registration Number(s); Principal Amount(s) | |
| Payment on Account of Note(s)<br><br>Method<br><br>Account Information | |
| Accompanying Information | |
| Address / Fax # / Email for notices related to payments | |
| Address / Fax # / Email for all other notices | |
| Instructions re Delivery of Note(s) | |
| Tax Identification Number | |

**EXHIBIT H**

**FORM OF FIRST LIEN INTERCREDITOR AGREEMENT**

**[FORM OF] FIRST LIEN PARI PASSU INTERCREDITOR AGREEMENT**

THIS FIRST LIEN PARI PASSU INTERCREDITOR AGREEMENT (this "*Agreement*"), dated as of [___], by and among U.S. Bank National Association, as note agent for the Initial Note Claimholders (in such capacity, and together with its successors and permitted assigns in such capacity, the "*Initial First Lien Representative*") and as collateral agent for the Initial Note Claimholders (in such capacity, and together with its successors and permitted assigns in such capacity, the "*Initial First Lien Collateral Agent*"), U.S. Bank National Association, as note agent for the Other Note Claimholders (in such capacity, and together with its successors and permitted assigns in such capacity, the "*Other First Lien Representative*"), and as collateral agent for the Other Note Claimholders (in such capacity, and together with its successors and permitted assigns in such capacity, the "*Other First Lien Collateral Agent*"), and acknowledged and agreed to by [Parent Entity] (the "*Company*") and the other Grantors.  Capitalized terms used in this Agreement have the meanings assigned to them in Section 1.1 below.

Reference is made to (i) that certain Senior Secured Convertible Note Purchase Agreement, dated as of April 19, 2021, by and among the [Company (as successor interest of Core Scientific Holding Co.)][1], the other Grantors from time to time party thereto, the Purchasers (as defined therein) party thereto, the Initial First Lien Representative and the Initial First Lien Collateral Agent (as amended, restated, supplemented and/or otherwise modified from time to time, the "*Initial Purchase Agreement*") and (ii) that certain Convertible Note Purchase Agreement, dated as of August 20, 2021, by and among the Company (Core Scientific Holding Co.), the other Grantors from time to time party thereto, the Purchasers (as defined therein) party thereto, the Other First Lien Representative and the Other First Lien Collateral Agent (as amended, restated, supplemented and/or otherwise modified from time to time, the "*Other Purchase Agreement*").

The obligations of the Company under the Initial Purchase Agreement and the obligations of the Guarantors (as defined therein) under the guaranty of the Initial Purchase Agreement are secured on a first-priority basis (subject to Permitted Liens (as defined therein)) by Liens on substantially all of the assets of the Grantors, pursuant to the terms of the Initial Note Collateral Documents.

The obligations of the Company under the Other Purchase Agreement and the obligations of the Guarantors (as defined therein) under the guaranty of the Other Purchase Agreement are secured on a first-priority basis (subject to Permitted Liens (as defined therein)) by Liens on substantially all of the assets of the Grantors, pursuant to the terms of the Other Note Collateral Documents.

In consideration of the foregoing, the mutual covenants and obligations herein set forth and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, each of the Initial First Lien Representative (for itself and on behalf of each other Initial Note Claimholder), the Initial First Lien Collateral Agent (for itself and on behalf of each other Initial Note Claimholder), the Other First Lien Representative (for itself and on behalf of each other Other Note Claimholder) and the Other First Lien Collateral Agent (for itself and on behalf of each other Other Note Claimholder), intending to be legally bound, hereby agrees as follows:

---

[1] To the extent the Conversion Event giving rise to execution of this Agreement is the XPDI Transaction, references to the Company herein shall be updated to refer to the Parent Entity with other confirming changes consistent therewith.

1

ARTICLE I.

DEFINITIONS

SECTION 1.1          <u>Certain Defined Terms</u>.

Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Initial Purchase Agreement or the Other Purchase Agreement (whether or not then in effect), as applicable, and the following terms which are defined in the UCC are used herein as so defined (and if defined in more than one article of the UCC shall have the meaning specified in Article 9 thereof): Certificated Security, Commodity Account, Commodity Contract, Deposit Account, Electronic Chattel Paper, Promissory Note, Instrument, Letter of Credit Right, Securities Entitlement, Securities Account and Tangible Chattel Paper.  As used in this Agreement, the following terms have the meanings specified below:

"***Agreement***" has the meaning set forth in the introductory paragraph hereto.

"***Applicable Collateral Agent***" means (i) until the earliest of (x) the Discharge of Initial Purchase Agreement and (y) the Other First Lien Representative Enforcement Date, the Initial First Lien Collateral Agent and (ii) from and after the earlier of (x) the Discharge of Initial Purchase Agreement and (y) the Other First Lien Representative Enforcement Date, the Other First Lien Collateral Agent.

"***Applicable Representative***" means (i) until the earliest of (x) the Discharge of Initial Purchase Agreement and (y) the Other First Lien Representative Enforcement Date, the Initial First Lien Representative and (ii) from and after the earlier of (y) the Discharge of Initial Purchase Agreement and (z) the Other First Lien Representative Enforcement Date, the Other First Lien Representative.

"***Bankruptcy Case***" has the meaning set forth in <u>Section 2.5(b)</u>.

"***Bankruptcy Code***" means Title 11 of the United States Code, as amended.

"***Bankruptcy Law***" means the Bankruptcy Code and any similar Federal, state or foreign law for the relief of debtors.

"***Business Day***" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close.

"***Capital Lease***" means, as applied to any Person, any lease by that Person as lessee that has been or should be, in accordance with GAAP, recorded as a capital lease on the balance sheet of that Person.

"***Collateral***" means all assets and properties subject to, or purported to be subject to, Liens created pursuant to any First Lien Collateral Document to secure either Series of First Lien Obligations and shall include any property or assets subject to replacement Liens or adequate protection Liens in favor of any First Lien Claimholder.

"***Collateral Agent***" means, collectively, the Initial First Lien Collateral Agent and the Other First Lien Collateral Agent.

"***Company***" has the meaning set forth in the introductory paragraph to this Agreement.

"***Control***" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by agreement or otherwise.  "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"***Control Collateral***" means any Shared Collateral in the "control" (within the meaning of Section 9-104, 9-105, 9-106, 9-107 or 8-106 of the UCC) of either Collateral Agent (or its agents or bailees), to the extent that control thereof perfects a Lien thereon under the UCC.  Control Collateral includes any Deposit Accounts, Securities Accounts, Securities Entitlements, Commodity Accounts, Commodity Contracts, Letter of Credit Rights or Electronic Chattel Paper over which either Collateral Agent has "control" under the UCC.

"***Controlling Claimholders***" means (i) at any time when the Initial First Lien Collateral Agent is the Applicable Collateral Agent, the Initial Note Claimholders and (ii) at any other time, the Other Note Claimholders.

"***Default***" means a "Default" (or similarly defined term) as defined in any First Lien Document.

"***DIP Financing***" has the meaning set forth in Section 2.5(b).

"***DIP Financing Liens***" has the meaning set forth in Section 2.5(b).

"***DIP Lenders***" has the meaning set forth in Section 2.5(b).

"***Discharge***" means, with respect to either Series of First Lien Obligations, that such Series of First Lien Obligations is no longer secured by, and no longer required to be secured by, any Shared Collateral pursuant to the terms of the applicable First Lien Documents for such Series of First Lien Obligations.  The term "***Discharged***" shall have a corresponding meaning.

"***Discharge of Initial Purchase Agreement***" means, except to the extent otherwise provided in Section 2.6, the Discharge of the Initial Note Obligations.

"***Equity Release Proceeds***" has the meaning set forth in Section 2.4(a).

"***Event of Default***" means an "Event of Default" (or similarly defined term) as defined in any First Lien Document.

"***First Lien Claimholders***" means, collectively, (i) the Initial Note Claimholders and (ii) the Other Note Claimholders.

"***First Lien Collateral Documents***" means, collectively, (i) the Initial Note Collateral Documents and (ii) the Other Note Collateral Documents.

"***First Lien Documents***" means, collectively, (i) the Initial Note Documents and (ii) the Other Note Documents.

"***First Lien Obligations***" means, collectively, (i) the Initial Note Obligations and (ii) the Other Note Obligations.

"***Grantors***" means the Company and each of the Guarantors.

"**Guarantors**" means the "Guarantors" as defined in each of the Initial Purchase Agreement and the Other Purchase Agreement.

"**Impairment**" has the meaning set forth in Section 2.1(b)(ii).

"**Indebtedness**" means all indebtedness for borrowed money.

"**Initial First Lien Collateral Agent**" has the meaning set forth in the introductory paragraph to this Agreement.

"**Initial First Lien Representative**" has the meaning set forth in the introductory paragraph to this Agreement.

"**Initial Note Claimholders**" means the holders of any Initial Note Obligations, including the "Secured Parties", as defined in the Initial Purchase Agreement (including the Initial First Lien Representative and the Initial First Lien Collateral Agent).

"**Initial Note Collateral Documents**" means the Collateral Documents (as defined in the Initial Purchase Agreement) and any other agreement, document or instrument entered into for the purpose of granting a Lien to secure any Initial Note Obligations or to perfect such Lien (as each may be amended, restated, supplemented and/or otherwise modified from time to time).

"**Initial Note Documents**" means the Initial Purchase Agreement, each Initial Note Collateral Document and the other Note Documents (as defined in the Initial Purchase Agreement), and each of the other agreements, documents and instruments providing for or evidencing any other Initial Note Obligation, as each may be amended, restated, supplemented and/or otherwise modified from time to time.

"**Initial Note Obligations**" means:

(a)     (i) the Obligations (as defined in the Initial Purchase Agreement), (ii) all principal of and interest (including any Post-Petition Interest) and premium (if any) on all loans made pursuant to the Initial Purchase Agreement, and (iii) all guarantee obligations, fees, expenses and all other obligations under the Initial Purchase Agreement and the other Initial Note Documents, in each case whether or not allowed or allowable in an Insolvency or Liquidation Proceeding; and

(b)     to the extent any payment with respect to any Initial Note Obligation (whether by or on behalf of any Grantor, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any Other Note Claimholder, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of this Agreement and the rights and obligations of the Initial Note Claimholders and the Other Note Claimholders, be deemed to be reinstated and outstanding as if such payment had not occurred.  To the extent that any interest, fees, expenses or other charges (including Post-Petition Interest) to be paid pursuant to the Initial Note Documents are disallowed by order of any court, including by order of a court of competent jurisdiction presiding over an Insolvency or Liquidation Proceeding, such interest, fees, expenses and charges (including Post-Petition Interest) shall, as between the Initial Note Claimholders and the Other Note Claimholders, be deemed to continue to accrue and be added to the amount to be calculated as the "Initial Note Obligations".

"*Initial Purchase Agreement*" has the meaning set forth in the recitals to this Agreement.

"**Insolvency or Liquidation Proceeding**" means:

(a)     any voluntary or involuntary case or proceeding under the Bankruptcy Code with respect to any Grantor;

(b)     any other voluntary or involuntary insolvency, reorganization or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding with respect to any Grantor or with respect to a material portion of its assets;

(c)     any liquidation, dissolution, reorganization or winding up of any Grantor whether voluntary or involuntary and whether or not involving insolvency or bankruptcy; or

(d)     any assignment for the benefit of creditors or any other marshaling of assets and liabilities of any Grantor.

"*Intervening Creditor*" has the meaning set forth in <u>Section 2.1(b)(i)</u>.

"*Lien*" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Capital Lease having substantially the same economic effect as any of the foregoing), in each case, in the nature of security; <u>provided that</u> in no event shall a colocation agreement or an operating lease in and of itself be deemed a Lien.

"*Other First Lien Collateral Agent*" has the meaning set forth in the introductory paragraph to this Agreement.

"*Other First Lien Representative*" has the meaning set forth in the introductory paragraph to this Agreement.

"*Other First Lien Representative Enforcement Date*" means, with respect to the Other First Lien Representative, the date which is 180 days after the occurrence of both (i) an Event of Default (under and as defined in the Other Note Documents) and (ii) the Initial First Lien Collateral Agent's and the Initial First Lien Representative's receipt of written notice from the Other First Lien Representative certifying that (x) an Event of Default (under and as defined in the Other Note Documents) has occurred and is continuing and (y) the Other Note Obligations are currently due and payable in full (whether as a result of acceleration thereof or otherwise) in accordance with the terms of the applicable Other Note Document; <u>provided</u> that the Other First Lien Representative Enforcement Date shall be stayed and shall not occur and shall be deemed not to have occurred (1) at any time the Initial First Lien Collateral Agent acting on the instructions of the Initial First Lien Representative has commenced and is diligently pursuing any enforcement action with respect to Shared Collateral, (2) at any time the Grantor that has granted a security interest in Shared Collateral is then a debtor under or with respect to (or otherwise subject to) any Insolvency or Liquidation Proceeding or (3) if the Other First Lien Representative subsequently rescinds or withdraws the written notice provided for in clause (ii) above.

"*Other Note Claimholders*" means the holders of any Other Note Obligations, including the "Secured Parties", as defined in the Other Purchase Agreement (including the Other First Lien Representative and the Other First Lien Collateral Agent).

"*Other Note Collateral Documents*" means the Collateral Documents (as defined in the Other Purchase Agreement) and any other agreement, document or instrument entered into for the purpose

of granting a Lien to secure any Other Note Obligations or to perfect such Lien (as each may be amended, restated, supplemented and/or otherwise modified from time to time).

"***Other Note Documents***" means the Other Purchase Agreement, each Other Note Collateral Document and the other Note Documents (as defined in the Other Purchase Agreement), and each of the other agreements, documents and instruments providing for or evidencing any other Other Note Obligation, as each may be amended, restated, supplemented and/or otherwise modified from time to time.

"***Other Note Obligations***" means:

(a)      (i) the Obligations (as defined in the Other Purchase Agreement), (ii) all principal of and interest (including any Post-Petition Interest) and premium (if any) on all loans made pursuant to the Other Purchase Agreement, and (iii) all guarantee obligations, fees, expenses and all other obligations under the Other Purchase Agreement and the other Other Note Documents, in each case whether or not allowed or allowable in an Insolvency or Liquidation Proceeding; and

(b)      to the extent any payment with respect to any Other Note Obligation (whether by or on behalf of any Grantor, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any Initial Note Claimholder, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of this Agreement and the rights and obligations of the Other Note Claimholders and the Initial Note Claimholders, be deemed to be reinstated and outstanding as if such payment had not occurred.  To the extent that any interest, fees, expenses or other charges (including Post-Petition Interest) to be paid pursuant to the Other Note Documents are disallowed by order of any court, including by order of a court of competent jurisdiction presiding over an Insolvency or Liquidation Proceeding, such interest, fees, expenses and charges (including Post-Petition Interest) shall, as between the Other Note Claimholders and the Initial Note Claimholders, be deemed to continue to accrue and be added to the amount to be calculated as the "Other Note Obligations".

"***Other Purchase Agreement***" has the meaning set forth in the recitals to this Agreement.

"***Person***" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, limited partnership, governmental authority or other entity.

"***Possessory Collateral***" means any Shared Collateral in the possession of either Collateral Agent (or its agents or bailees), to the extent that possession thereof perfects a Lien thereon under the UCC or otherwise.  Possessory Collateral includes any Certificated Securities, Promissory Notes, Instruments, and Tangible Chattel Paper, in each case, delivered to or in the possession of either Collateral Agent under the terms of the First Lien Collateral Documents.

"***Post-Petition Interest***" means interest, fees, expenses and other charges that pursuant to the Initial Note Documents or Other Note Documents, as applicable, continue to accrue after the commencement of any Insolvency or Liquidation Proceeding, whether or not such interest, fees, expenses and other charges are allowed or allowable under the Bankruptcy Law or in any such Insolvency or Liquidation Proceeding.

"***Proceeds***" has the meaning set forth in <u>Section 2.1(a)</u>.

"***Representative***" means, at any time, (i) in the case of any Initial Note Obligations or the Initial Note Claimholders, the Initial First Lien Representative and (ii) in the case of any Other Note Obligations or the Other Note Claimholders, the Other First Lien Representative.

"***Responsible Officer***" of any Person means the chief executive officer, the president, any vice president, the chief financial officer, treasurer or assistant treasurer or other similar officer of such Person and any other individual or similar official thereof responsible for the administration of the obligations of such Person in respect of this Agreement. Any document delivered hereunder that is signed by a Responsible Officer of a Grantor shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Grantor and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Grantor.

"***Series***" means (a) with respect to the First Lien Claimholders, each of (i) the Initial Note Claimholders (in their capacities as such) and (ii) the Other Note Claimholders (in their capacities as such) and (b) with respect to any First Lien Obligations, each of (i) the Initial Note Obligations and (ii) the Other Note Obligations.

"***Shared Collateral***" means, at any time, Collateral in which the holders of First Lien Obligations (or their respective Representatives or Collateral Agents on behalf of such holders) hold, or purport to hold, or are required to hold pursuant to their respective First Lien Documents, a valid security interest or Lien at such time.

"***subsidiary***" means, with respect to any Person (a) any corporation, association, or other business entity (other than a partnership, limited liability company or similar entity) of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the directors, managers or trustees thereof is at the time of determination is owned or controlled by such Person or one or more of the other subsidiaries of that Person or a combination thereof and (b) any partnership, limited liability company or similar entity which (i) more than 50% of the voting interests or general partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other subsidiaries of that Person or a combination thereof whether in the form of membership, general, special or limited partnership or otherwise and (ii) such Person or any subsidiary of such Person is a controlling general partner or otherwise controls such entity.

"***UCC***" means the Uniform Commercial Code as in effect from time to time in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"***Underlying Assets***" has the meaning set forth in <u>Section 2.4(a)</u>.

SECTION 1.2          <u>Rules of Interpretation</u>.

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as amended, restated, supplemented and/or otherwise modified from time to time, however evidenced, whether in physical or electronic form and any reference herein to any statute or regulations shall include any amendment, renewal, extension or replacement thereof, (ii) any reference herein to any Person shall be construed to include such Person's permitted successors and assigns from time to time, (iii) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Articles, Sections and Annexes shall be construed to refer to Articles, Sections and Annexes

of this Agreement, (v) unless otherwise expressly qualified herein, the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights and (vi) the term "or" is not exclusive.

<div align="center">ARTICLE II.</div>

<div align="center">PRIORITIES AND AGREEMENTS WITH RESPECT TO SHARED COLLATERAL</div>

SECTION 2.1          Priority of Claims.

(a)          Anything contained herein or in any of the First Lien Documents to the contrary notwithstanding (but subject to Sections 2.1(b) and 2.10(b)), if an Event of Default has occurred and is continuing, and the Applicable Collateral Agent is taking action to enforce rights in respect of any Collateral, or any distribution is made in respect of any Shared Collateral in any Bankruptcy Case of any Grantor or any First Lien Claimholder receives any payment pursuant to any intercreditor agreement (other than this Agreement) or otherwise with respect to any Shared Collateral, the proceeds of any sale, collection or other liquidation of any Shared Collateral or Equity Release Proceeds received by any First Lien Claimholder or received by the Applicable Collateral Agent or any First Lien Claimholder pursuant to any such intercreditor agreement or otherwise with respect to such Collateral and proceeds of any such distribution (subject, in the case of any such distribution, to the sentence immediately following clause (iii) below) to which the First Lien Obligations are entitled under any intercreditor agreement (other than this Agreement) or otherwise (all proceeds of any sale, collection or other liquidation of any Collateral comprising either Shared Collateral or Equity Release Proceeds and all proceeds of any such distribution and any proceeds of any insurance covering the Shared Collateral received by the Applicable Collateral Agent and not returned to any Grantor under any First Lien Document being collectively referred to as "**_Proceeds_**"), shall be applied by the Applicable Collateral Agent in the following order:

(i)          FIRST, to the payment of all amounts owing to each Collateral Agent (in its capacity as such) and each Representative (in its capacity as such) secured by such Shared Collateral or, in the case of Equity Release Proceeds, secured by the Underlying Assets, including all reasonable costs and expenses incurred by each Collateral Agent (in its capacity as such) and each Representative (in its capacity as such) in connection with such collection or sale or otherwise in connection with this Agreement, any other First Lien Document or any of the First Lien Obligations, including all court costs and the reasonable fees and expenses of its agents and legal counsel, and any other reasonable costs or expenses incurred in connection with the exercise of any right or remedy hereunder or under any other First Lien Document and all fees and indemnities owing to such Collateral Agents and Representatives, ratably to each such Collateral Agent and Representative in accordance with the amounts payable to it pursuant to this clause (i);

(ii)          SECOND, subject to Sections 2.1(b) and 2.10(b), to the extent Proceeds remain after the application pursuant to preceding clause (i), to each Representative for the payment in full of the other First Lien Obligations of each Series secured by such Shared Collateral or, in the case of Equity Release Proceeds, secured by the Underlying Assets, and, if the amount of such Proceeds are insufficient to pay in full the First Lien Obligations of each Series so secured then such Proceeds shall be allocated among the Representatives of each Series secured by such Shared Collateral or, in the case of Equity Release Proceeds, secured by the Underlying Assets, pro rata according to the amounts of such First Lien Obligations owing to each such respective Representative and the other First Lien Claimholders represented by it for distribution by such Representative in accordance with its respective First Lien Documents; and

<div align="center">8</div>

(iii)    THIRD, any balance of such Proceeds remaining after the application pursuant to preceding <u>clauses (i)</u> and <u>(ii)</u>, to the Grantors, their successors or assigns from time to time, or to whomever may be lawfully entitled to receive the same.

If, despite the provisions of this <u>Section 2.1(a)</u>, any First Lien Claimholder shall receive any payment or other recovery in excess of its portion of payments on account of the First Lien Obligations to which it is then entitled in accordance with this <u>Section 2.1(a)</u>, such First Lien Claimholder shall hold such payment or recovery in trust for the benefit of all First Lien Claimholders for distribution in accordance with this <u>Section 2.1(a)</u>.

(b)    (i)    Notwithstanding the foregoing, with respect to any Shared Collateral or Equity Release Proceeds for which a third party (other than a First Lien Claimholder) has a Lien that is junior in priority to the Lien of one Series of First Lien Obligations but senior (as determined by appropriate legal proceedings in the case of any dispute) to the Lien of the other Series of First Lien Obligations (such third party an "***Intervening Creditor***"), the value of any Shared Collateral, Equity Release Proceeds or Proceeds which are allocated to such Intervening Creditor shall be deducted on a ratable basis solely from the Shared Collateral, Equity Release Proceeds or Proceeds to be distributed in respect of the Series of First Lien Obligations with respect to which such Impairment exists.

(ii)    In furtherance of the foregoing and without limiting the provisions of <u>Section 2.3</u>, it is the intention of the First Lien Claimholders of each Series that the holders of First Lien Obligations of such Series (and not the First Lien Claimholders of the other Series) bear the risk of (1) any determination by a court of competent jurisdiction that (x) any of the First Lien Obligations of such Series are unenforceable under applicable law or are subordinated to any other obligations (other than another Series of First Lien Obligations), (y) any of the First Lien Obligations of such Series do not have a valid and perfected security interest in any of the Collateral securing the other Series of First Lien Obligations and/or (z) any intervening security interest exists securing any other obligations (other than another Series of First Lien Obligations) on a basis ranking prior to the security interest of such Series of First Lien Obligations but junior to the security interest of the other Series of First Lien Obligations and (2) the existence of any Collateral (other than Equity Release Proceeds) for the other Series of First Lien Obligations that is not Shared Collateral (any such condition referred to in the foregoing clauses (1) or (2) with respect to either Series of First Lien Obligations, an "***Impairment***" of such Series); <u>provided</u> that the existence of a maximum claim with respect to any real property subject to a mortgage which applies to all First Lien Obligations shall not be deemed to be an Impairment of either Series of First Lien Obligations.  In the event of any Impairment with respect to either Series of First Lien Obligations, the results of such Impairment shall be borne solely by the holders of such Series of First Lien Obligations, and the rights of the holders of such Series of First Lien Obligations (including the right to receive distributions in respect of such Series of First Lien Obligations pursuant to <u>Section 2.1</u>) set forth herein shall be modified to the extent necessary so that the effects of such Impairment are borne solely by the holders of the Series of such First Lien Obligations subject to such Impairment.  Additionally, in the event the First Lien Obligations of either Series are modified pursuant to applicable law (including pursuant to Section 1129 of the Bankruptcy Code), any reference to such First Lien Obligations or the First Lien Documents governing such First Lien Obligations shall refer to such obligations or such documents as so modified.

(c)    It is acknowledged that the First Lien Obligations of either Series may, subject to the limitations set forth in the then existing First Lien Documents and subject to any limitations set forth in this Agreement, be increased, extended, renewed, replaced, restated, supplemented, restructured, repaid, refunded or otherwise amended or modified from time to time, all without affecting the priorities set forth

in Section 2.1(a) or the provisions of this Agreement defining the relative rights of the First Lien Claimholders of either Series.

(d)    Notwithstanding the date, time, method, manner or order of grant, attachment or perfection of any Liens securing either Series of First Lien Obligations granted on the Shared Collateral and notwithstanding any provision of the UCC or any other applicable law or the First Lien Documents or any defect or deficiencies in the Liens securing the First Lien Obligations of either Series or any other circumstance whatsoever (but, in each case, subject to Section 2.1(b)), each First Lien Claimholder hereby agrees that the Liens securing each Series of First Lien Obligations on any Shared Collateral shall be of equal priority.

SECTION 2.2          Actions with Respect to Shared Collateral; Prohibition on Contesting Liens.

(a)    Notwithstanding Section 2.1, (i) only the Applicable Collateral Agent shall act with respect to the Shared Collateral (including with respect to any other intercreditor agreement with respect to any Shared Collateral), (ii) the Applicable Collateral Agent shall act only on the instructions of the Applicable Representative and shall not follow any instructions with respect to the Shared Collateral (including with respect to any other intercreditor agreement with respect to any Shared Collateral) from the Other First Lien Representative (or any other First Lien Claimholder other than the Applicable Representative) and (iii) no Other Note Claimholder shall or shall instruct either Collateral Agent to, and the Collateral Agent that is not the Applicable Collateral Agent shall not, commence any judicial or nonjudicial foreclosure proceedings with respect to, seek to have a trustee, receiver, liquidator or similar official appointed for or over, attempt any action to take possession of, exercise any right, remedy or power with respect to, or otherwise take any action to enforce its security interest in or realize upon, or take any other action available to it in respect of, Shared Collateral (including with respect to any other intercreditor agreement with respect to Shared Collateral), whether under any First Lien Collateral Document (other than the First Lien Collateral Documents applicable to the Applicable Collateral Agent), applicable law or otherwise, it being agreed that only the Applicable Collateral Agent, acting in accordance with the First Lien Collateral Documents applicable to it, shall be entitled to take any such actions or exercise any remedies with respect to such Shared Collateral at such time.

(b)    Without limiting the provisions of Section 4.2, the Other First Lien Representative and the Other First Lien Collateral Agent hereby appoint the Applicable Collateral Agent as its agent and authorizes the Applicable Collateral Agent to exercise any and all remedies under each First Lien Collateral Document with respect to Shared Collateral and to execute releases in connection therewith.

(c)    Notwithstanding the equal priority of the Liens securing each Series of First Lien Obligations granted on the Shared Collateral, the Applicable Collateral Agent (acting on the instructions of the Applicable Representative) may deal with the Shared Collateral as if such Applicable Collateral Agent had a senior and exclusive Lien on such Shared Collateral. Neither the Other First Lien Representative, the Other First Lien Collateral Agent nor the Other Note Claimholders will contest, protest or object to any foreclosure proceeding or action brought by the Applicable Collateral Agent, the Applicable Representative or the Controlling Claimholders or any other exercise by the Applicable Collateral Agent, the Applicable Representative or the Controlling Claimholders of any rights and remedies relating to the Shared Collateral. The foregoing shall not be construed to limit the rights and priorities of any First Lien Claimholder or either Collateral Agent or Representative with respect to any Collateral not constituting Shared Collateral.

(d)    Each of the Other First Lien Collateral Agent and the Other First Lien Representative agrees that it will not accept any Lien on any Collateral for the benefit of the Other Note Obligations (other than funds deposited for the satisfaction, discharge or defeasance of the Other Purchase

10

Agreement) other than pursuant to the First Lien Collateral Documents, and by executing this Agreement, each of the Other First Lien Collateral Agent and the Other First Lien Representative agrees to be bound by the provisions of this Agreement and the other First Lien Collateral Documents applicable to it.

(e)     Each of the First Lien Claimholders agrees that it will not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the perfection, priority, validity or enforceability of a Lien held by or on behalf of any of the First Lien Claimholders in all or any part of the Collateral or the provisions of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair (i) the rights of either Collateral Agent or Representative to enforce this Agreement or (ii) the rights of any First Lien Claimholder to contest or support any other Person in contesting the enforceability of any Lien purporting to secure obligations not constituting First Lien Obligations.

SECTION 2.3          No Interference; Payment Over; Exculpatory Provisions.

(a)     Each First Lien Claimholder agrees that (i) it will not challenge or question or support any other Person in challenging or questioning in any proceeding the validity or enforceability of any First Lien Obligations of either Series or any First Lien Collateral Document or the validity, attachment, perfection or priority of any Lien under any First Lien Collateral Document or the validity or enforceability of the priorities, rights or duties established by or other provisions of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair the rights of any First Lien Claimholder from challenging or questioning the validity or enforceability of any First Lien Obligations constituting unmatured interest or the validity of any Lien relating thereto pursuant to Section 502(b)(2) of the Bankruptcy Code, (ii) it will not take or cause to be taken any action the purpose or intent of which is, or could be, to interfere, hinder or delay, in any manner, whether by judicial proceedings or otherwise, any sale, transfer or other disposition of the Collateral by the Applicable Collateral Agent, (iii) except as provided in Section 2.2, it shall have no right to and shall not otherwise (A) direct the Applicable Collateral Agent or any other First Lien Claimholder to exercise any right, remedy or power with respect to any Shared Collateral (including pursuant to any other intercreditor agreement) or (B) consent to, or object to, the exercise by, or any forbearance from exercising by, the Applicable Collateral Agent or any other First Lien Claimholder represented by it of any right, remedy or power with respect to any Collateral, (iv) it will not institute any suit or assert in any suit, bankruptcy, insolvency or other proceeding any claim against the Applicable Collateral Agent or any other First Lien Claimholder represented by it seeking damages from or other relief by way of specific performance, instructions or otherwise with respect to any Collateral and (v) it will not attempt, directly or indirectly, whether by judicial proceedings or otherwise, to challenge the enforceability of any provision of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair the rights of any of the Applicable Collateral Agent or any other First Lien Claimholder to (i) enforce this Agreement or (ii) contest or support any other Person in contesting the enforceability of any Lien purporting to secure obligations not constituting First Lien Obligations.

(b)     Each First Lien Claimholder hereby agrees that if it shall obtain possession of any Shared Collateral or shall realize any proceeds or payment in respect of any Shared Collateral, pursuant to any First Lien Collateral Document or by the exercise of any rights available to it under applicable law or in any Insolvency or Liquidation Proceeding or through any other exercise of remedies (including pursuant to any intercreditor agreement), at any time prior to the Discharge of each of the First Lien Obligations, then it shall hold such Shared Collateral, proceeds or payment in trust for the other First Lien Claimholders having a security interest in such Shared Collateral and promptly transfer any such Shared Collateral, proceeds or payment, as the case may be, to the Applicable Collateral Agent, to be distributed by such Applicable Collateral Agent in accordance with the provisions of Section 2.1(a) hereof, provided, however, that the foregoing shall not apply to any Shared Collateral purchased by any First Lien Claimholder for cash pursuant to any exercise of remedies permitted hereunder.

(c)     None of the Applicable Collateral Agent, either Applicable Representative or any other First Lien Claimholder shall be liable for any action taken or omitted to be taken by the Applicable Collateral Agent, such Applicable Representative or any other First Lien Claimholder with respect to any Collateral in accordance with the provisions of this Agreement.

SECTION 2.4          Automatic Release of Liens.

(a)     If, at any time any Shared Collateral is transferred to a third party or otherwise disposed of, in each case, in connection with any enforcement by the Applicable Collateral Agent in accordance with the provisions of this Agreement, then (whether or not any Insolvency or Liquidation Proceeding is pending at the time) the Liens in favor of the other Collateral Agent (or in favor of such other First Lien Claimholders if directly secured by such Liens) upon such Shared Collateral will automatically be released and discharged upon final conclusion of such disposition as and when, but only to the extent, such Liens of the Applicable Collateral Agent on such Shared Collateral are released and discharged; provided that any proceeds of any Shared Collateral realized therefrom shall be applied pursuant to Section 2.1 hereof.  If in connection with any such foreclosure or other exercise of remedies by the Applicable Collateral Agent, the Applicable Collateral Agent or related Applicable Representative of such Series of First Lien Obligations releases any Guarantor from its obligation under a guarantee of the Series of First Lien Obligations for which it serves as agent prior to a Discharge of such Series of First Lien Obligations, such Guarantor also shall be released from its guarantee of all other First Lien Obligations.  If in connection with any such foreclosure or other exercise of remedies by the Applicable Collateral Agent, the equity interests of any Person are foreclosed upon or otherwise disposed of and the Applicable Collateral Agent releases its Lien on the property or assets of such Person, then the Liens of the other Collateral Agent (or in favor of such other First Lien Claimholders if directly secured by such Liens) with respect to any Collateral consisting of the property or assets of such Person will be automatically released to the same extent as the Liens of the Applicable Collateral Agent are released; provided that any proceeds of any such equity interests foreclosed upon where the Applicable Collateral Agent releases its Lien on the assets of such Person on which another Series of First Lien Obligations holds a Lien on any of the assets of such Person (any such assets, the "*Underlying Assets*") which Lien is released as provided in this sentence (any such Proceeds being referred to herein as "*Equity Release Proceeds*" regardless of whether or not such other Series of First Lien Obligations holds a Lien on such equity interests so disposed of) shall be applied pursuant to Section 2.1 hereof.

(b)     Without limiting the rights of the Applicable Collateral Agent under Section 4.2, each Collateral Agent and each Representative agrees to execute and deliver (at the sole cost and expense of the Grantors) all such authorizations and other instruments as shall reasonably be requested by the Company or the Applicable Collateral Agent to evidence and confirm any release of Shared Collateral, Underlying Assets or guarantee provided for in this Section.

SECTION 2.5          Certain Agreements with Respect to Bankruptcy or Insolvency Proceedings.

(a)     This Agreement shall continue in full force and effect notwithstanding the commencement of any proceeding under the Bankruptcy Code or any other Federal, state or foreign bankruptcy, insolvency, receivership or similar law by or against any Grantor or any of its subsidiaries.

(b)     If any Grantor shall become subject to a case (a "*Bankruptcy Case*") under the Bankruptcy Code and shall, as debtor(s)-in-possession, move for approval of financing ("*DIP Financing*") to be provided by one or more lenders (the "*DIP Lenders*") under Section 364 of the Bankruptcy Code or the use of cash collateral under Section 363 of the Bankruptcy Code, each First Lien Claimholder (other than any Controlling Claimholder or the Representative of the Controlling Claimholder) agrees that it will

12

not raise any objection to any such financing or to the Liens on the Shared Collateral securing the same ("**DIP Financing Liens**") or to any use of cash collateral that constitutes Shared Collateral, unless the Representative of the Controlling Claimholders shall then oppose or object to such DIP Financing or such DIP Financing Liens or use of cash collateral (and (i) to the extent that such DIP Financing Liens are senior to the Liens on any such Shared Collateral for the benefit of the Controlling Claimholders, each Other Note Claimholder will subordinate its Liens with respect to such Shared Collateral on the same terms as the Liens of the Controlling Claimholders (other than any Liens of any First Lien Claimholders constituting DIP Financing Liens) are subordinated thereto, and (ii) to the extent that such DIP Financing Liens rank *pari passu* with the Liens on any such Shared Collateral granted to secure the First Lien Obligations of the Controlling Claimholders, each Other Note Claimholder will confirm the priorities with respect to such Shared Collateral as set forth herein), in each case so long as (A) the First Lien Claimholders of each Series retain the benefit of their Liens on all such Shared Collateral pledged to the DIP Lenders, including proceeds thereof arising after the commencement of such proceeding, with the same priority vis-à-vis all the other First Lien Claimholders (other than any Liens of the First Lien Claimholders constituting DIP Financing Liens) as existed prior to the commencement of the Bankruptcy Case, (B) the First Lien Claimholders of each Series are granted Liens on any additional collateral pledged to any First Lien Claimholders as adequate protection or otherwise in connection with such DIP Financing or use of cash collateral, with the same priority vis-à-vis the First Lien Claimholders as set forth in this Agreement (other than any Liens of any First Lien Claimholders constituting DIP Financing Liens), (C) if any amount of such DIP Financing or cash collateral is applied to repay any of the First Lien Obligations, such amount is applied pursuant to Section 2.1(a) of this Agreement, and (D) if any First Lien Claimholders are granted adequate protection with respect to the First Lien Obligations subject hereto, including in the form of periodic payments, in connection with such use of cash collateral, the proceeds of such adequate protection are applied pursuant to Section 2.1(a) of this Agreement; provided that the First Lien Claimholders of each Series shall have a right to object to the grant of a Lien to secure the DIP Financing over any Collateral subject to Liens in favor of the First Lien Claimholders of such Series or its Representative or Collateral Agent that shall not constitute Shared Collateral; provided, further, that the First Lien Claimholders receiving adequate protection shall not object to any other First Lien Claimholder receiving adequate protection comparable to any adequate protection granted to such First Lien Claimholders in connection with a DIP Financing or use of cash collateral.

(c)     If any First Lien Claimholder is granted adequate protection (A) in the form of Liens on any additional collateral, then each other First Lien Claimholder shall be entitled to seek, and each First Lien Claimholder will consent and not object to, adequate protection in the form of Liens on such additional collateral with the same priority vis-à-vis the First Lien Claimholders as set forth in this Agreement, (B) in the form of a superpriority or other administrative claim, then each other First Lien Claimholder shall be entitled to seek, and each First Lien Claimholder will consent and not object to, adequate protection in the form of a pari passu superpriority or administrative claim or (C) in the form of periodic or other cash payments, then the proceeds of such adequate protection must be applied to all First Lien Obligations pursuant to Section 2.1.

SECTION 2.6          Reinstatement.

In the event that any of the First Lien Obligations shall be paid in full and such payment or any part thereof shall subsequently, for whatever reason (including an order or judgment for disgorgement of a preference under Title 11 of the Bankruptcy Code, or any similar law, or the settlement of any claim in respect thereof), be required to be returned or repaid, the terms and conditions of this Agreement shall be fully applicable thereto until all such First Lien Obligations shall again have been paid in full in cash. This Section 2.6 shall survive termination of this Agreement.

SECTION 2.7          Insurance and Condemnation Awards.

As among the First Lien Claimholders, the Applicable Collateral Agent (acting at the direction of the Applicable Representative), shall have the right, but not the obligation, to adjust or settle any insurance policy or claim covering or constituting Shared Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding affecting the Shared Collateral. To the extent either Collateral Agent or any other First Lien Claimholder receives proceeds of such insurance policy and such proceeds are not permitted or required to be returned to any Grantor under the applicable First Lien Documents, such proceeds shall be turned over to the Applicable Collateral Agent for application as provided in Section 2.1 hereof.

SECTION 2.8          Gratuitous Bailee/Agent for Perfection.

(a)      The Applicable Collateral Agent shall be entitled to hold any Possessory Collateral constituting Shared Collateral.

(b)      Notwithstanding the foregoing, each Collateral Agent agrees to hold any Possessory Collateral constituting Shared Collateral and any other Shared Collateral from time to time in its possession or control (or in the possession or control of its agents or bailees) as gratuitous bailee for the benefit of each other First Lien Claimholder (such bailment being intended, among other things, to satisfy the requirements of Sections 8-106(d)(3), 8-301(a)(2) and 9-313(c) of the UCC), solely for the purpose of perfecting the security interest granted in such Shared Collateral, if any, pursuant to the applicable First Lien Collateral Documents, in each case, subject to the terms and conditions of this Section 2.8. Solely with respect to any deposit accounts constituting Shared Collateral under the control (within the meaning of Section 9-104 of the UCC) of any Collateral Agent, each such Collateral Agent agrees to also hold control over such deposit accounts as gratuitous agent for each other First Lien Claimholder and any assignee solely for the purpose of perfecting the security interest in such deposit accounts, subject to the terms and conditions of this Section 2.8.

(c)      No Collateral Agent shall have any obligation whatsoever to any First Lien Claimholder to ensure that the Possessory Collateral and Control Collateral is genuine or owned by any of the Grantors or to preserve rights or benefits of any Person except as expressly set forth in this Section 2.8. The duties or responsibilities of each Collateral Agent under this Section 2.8 shall be limited solely to holding any Possessory Collateral constituting Shared Collateral or any other Shared Collateral in its possession or control as gratuitous bailee (and with respect to Deposit Accounts, as gratuitous agent) in accordance with this Section 2.8 and delivering the Possessory Collateral constituting Shared Collateral as provided in Section 2.8(e) below.

(d)      Neither Collateral Agents nor any of the First Lien Claimholders shall have by reason of the First Lien Documents, this Agreement or any other document a fiduciary relationship in respect of the other Collateral Agents or any other First Lien Claimholder, and each Collateral Agent and each First Lien Claimholder hereby waives and releases the other Collateral Agents and First Lien Claimholders from all claims and liabilities arising pursuant to either Collateral Agent's role under this Section 2.8 as gratuitous bailee with respect to the Possessory Collateral constituting Shared Collateral or any other Shared Collateral in its possession or control (and with respect to the Deposit Accounts, as gratuitous agent).

(e)      At any time the Applicable Collateral Agent is no longer the Applicable Collateral Agent, such outgoing Applicable Collateral Agent shall deliver the remaining Possessory Collateral constituting Shared Collateral in its possession (if any) together with any necessary endorsements (which endorsement shall be without recourse and without any representation or warranty), first, to the then Applicable Collateral Agent to the extent First Lien Obligations remain outstanding and second, to the applicable Grantor to the extent no First Lien Obligations remain outstanding (in each case, so as to allow

14

such Person to obtain possession or control of such Shared Collateral) or to whomever may be lawfully entitled to receive the same.  The outgoing Applicable Collateral Agent further agrees to take all other action reasonably requested by the then Applicable Collateral Agent or the Company at the expense of the Company in connection with the then Applicable Collateral Agent obtaining a first-priority security interest in the Shared Collateral.

SECTION 2.9        Amendments to First Lien Collateral Documents.

(a)        Without the prior written consent of each other Collateral Agent, each Collateral Agent agrees that no First Lien Collateral Document may be amended, restated, amended and restated, supplemented, replaced or refinanced or otherwise modified from time to time or entered into to the extent such amendment, supplement, refinancing or modification, or the terms of any new First Lien Collateral Document, would be prohibited by, or would require any Grantor to act or refrain from acting in a manner that would violate, any of the terms of this Agreement.

(b)        In determining whether an amendment to any First Lien Collateral Document is permitted by this Section 2.9, each Collateral Agent may conclusively rely on an officer's certificate of the Company stating that such amendment is permitted by this Section 2.9.

SECTION 2.10        Similar Liens and Agreements.

(a)        The parties hereto agree that it is their intention that the Collateral be identical for all First Lien Claimholders.  In furtherance of, but subject to, the foregoing, the parties hereto agree, subject to the other provisions of this Agreement:

(i)        upon request by either Collateral Agent, to cooperate in good faith (and to direct their counsel to cooperate in good faith) from time to time in order to determine the specific items included in the Shared Collateral and the steps taken to perfect their respective Liens thereon and the identity of the respective parties obligated under the Initial Note Documents and the Other Note Documents; and

(ii)        that the documents and agreements creating or evidencing the Liens on Shared Collateral securing the Initial Note Obligations and the Other Note Obligations shall be in all material respects the same forms of documents as one another, except that the documents and agreements creating or evidencing the Liens securing the Other Note Obligations may contain additional provisions as may be necessary or appropriate to establish the intercreditor arrangements among the various separate classes of creditors holding Other Note Obligations.

ARTICLE III.

EXISTENCE AND AMOUNTS OF LIENS AND OBLIGATIONS

Whenever an Applicable Collateral Agent or an Applicable Representative shall be required, in connection with the exercise of its rights or the performance of its obligations hereunder, to determine the existence or amount of any First Lien Obligations of either Series, or the Shared Collateral subject to any Lien securing the First Lien Obligations of either Series, it may request that such information be furnished to it in writing by the other Representative or the other Collateral Agent and shall be entitled to make such determination or not make any determination on the basis of the information so furnished; provided, however, that if such Representative or Collateral Agent shall fail or refuse reasonably promptly to provide the requested information, the requesting Applicable Collateral Agent or Applicable Representative shall be entitled to make any such determination or not make any determination by such method as it

15

may, in the exercise of its good faith judgment, determine, including by reliance upon a certificate of the Company. Each Applicable Collateral Agent and each Applicable Representative may rely conclusively, and shall be fully protected in so relying, on any determination made by it in accordance with the provisions of the preceding sentence (or as otherwise directed by a court of competent jurisdiction) and shall have no liability to any Grantor, any First Lien Claimholder or any other person as a result of such determination.

ARTICLE IV.

THE APPLICABLE COLLATERAL AGENT

SECTION 4.1        Authority.

(a)        Notwithstanding any other provision of this Agreement, nothing herein shall be construed to impose any fiduciary or other duty on any Applicable Collateral Agent to any Other Note Claimholder or give any Other Note Claimholder the right to direct the Applicable Collateral Agent, except that each Applicable Collateral Agent shall be obligated to distribute proceeds of any Shared Collateral in accordance with Section 2.1 hereof.

(b)        In furtherance of the foregoing, each Other Note Claimholder acknowledges and agrees that the Applicable Collateral Agent shall be entitled, for the benefit of the First Lien Claimholders, to sell, transfer or otherwise dispose of or deal with any Shared Collateral as provided herein and in the First Lien Collateral Documents, as applicable, without regard to any rights to which the Other Note Claimholder would otherwise be entitled as a result of the First Lien Obligations held by such Other Note Claimholders. Without limiting the foregoing, each Other Note Claimholder agrees that none of the Applicable Collateral Agent, the Applicable Representative or any other First Lien Claimholder shall have any duty or obligation first to marshal or realize upon any type of Shared Collateral (or any other Collateral securing any of the First Lien Obligations), or to sell, dispose of or otherwise liquidate all or any portion of such Shared Collateral (or any other Collateral securing any First Lien Obligations), in any manner that would maximize the return to the Other Note Claimholder, notwithstanding that the order and timing of any such realization, sale, disposition or liquidation may affect the amount of proceeds actually received by the Other Note Claimholders from such realization, sale, disposition or liquidation. Each of the First Lien Claimholders waives any claim it may now or hereafter have against the Collateral Agent or Representative of the other Series of First Lien Obligations or any other First Lien Claimholder of the other Series arising out of (i) any actions which any such Collateral Agent, Representative or any First Lien Claimholder represented by it take or omit to take (including actions with respect to the creation, perfection or continuation of Liens on any Collateral, actions with respect to the foreclosure upon, sale, release or depreciation of, or failure to realize upon, any of the Collateral and actions with respect to the collection of any claim for all or any part of the First Lien Obligations from any account debtor, guarantor or any other party) in accordance with the First Lien Collateral Documents or any other agreement related thereto or in connection with the collection of the First Lien Obligations or the valuation, use, protection or release of any security for the First Lien Obligations; provided that nothing in this clause (i) shall be construed to prevent or impair the rights of either Collateral Agent or Representative to enforce this Agreement, (ii) any election by the Applicable Representative or any holders of First Lien Obligations, in any proceeding instituted under the Bankruptcy Code, of the application of Section 1111(b) of the Bankruptcy Code or (iii) subject to Section 2.5, any borrowing, or grant of a security interest or administrative expense priority under Section 364 of the Bankruptcy Code or any equivalent provision of any other Bankruptcy Law, by the Company or any of its subsidiaries, as debtor-in-possession. Notwithstanding any other provision of this Agreement, the Applicable Collateral Agent shall not (i) accept any Shared Collateral in full or partial satisfaction of any First Lien Obligations pursuant to Section 9-620 of the UCC, without the consent of the Representatives representing holders of First Lien Obligations for whom such Collateral constitutes Shared Collateral or (ii) "credit bid" for or purchase (other than for cash) Shared Collateral at any public, private

16

or judicial foreclosure upon such Shared Collateral, without the consent of the Representative representing holders of First Lien Obligations for whom such Collateral constitutes Shared Collateral.

SECTION 4.2     Power-of-Attorney.

The Other First Lien Representative and the Other First Lien Collateral Agent, for itself and on behalf of the Other Note Claimholders, hereby irrevocably appoints the Applicable Collateral Agent and any officer or agent of the Applicable Collateral Agent, which appointment is coupled with an interest with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Other First Lien Representative, the Other First Lien Collateral Agent and the Other Note Claimholders, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Agreement, including the exercise of any and all remedies under each First Lien Collateral Document with respect to Shared Collateral and the execution of releases in connection therewith.

ARTICLE V.

MISCELLANEOUS

SECTION 5.1     Integration/Conflicts.

This Agreement, together with the other First Lien Documents and the First Lien Collateral Documents, represents the entire agreement of each of the Grantors and the First Lien Claimholders with respect to the subject matter hereof and thereof and supersedes any and all previous agreements and understandings, oral or written, relating to the subject matter hereof and thereof.  There are no promises, undertakings, representations or warranties by either Representative, either Collateral Agent or the First Lien Claimholder relative to the subject matter hereof and thereof not expressly set forth or referred to herein or therein.  In the event of any conflict between the provisions of this Agreement and the provisions of the First Lien Documents the provisions of this Agreement shall govern and control.

SECTION 5.2     Effectiveness; Continuing Nature of this Agreement; Severability.

This Agreement shall become effective when executed and delivered by the parties hereto. This is a continuing agreement and the First Lien Claimholders of either Series may continue, at any time and without notice to any First Lien Claimholder of the other Series, to extend credit and other financial accommodations and lend monies to or for the benefit of the Company or any Grantor constituting First Lien Obligations in reliance hereon.  Each Representative and each Collateral Agent, on behalf of itself and each other First Lien Claimholder represented by it, hereby waives any right it may have under applicable law to revoke this Agreement or any of the provisions of this Agreement.  The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency or Liquidation Proceeding.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  The parties hereto shall endeavor in good faith negotiations to replace any invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to those of the invalid, illegal or unenforceable provisions. All references to the Company or any other Grantor shall include the Company or such Grantor as debtor and debtor in possession and any receiver, trustee or similar person for the Company or any other Grantor (as the case may be) in any Insolvency or Liquidation Proceeding.  This Agreement shall terminate and be of no further force and effect with respect to the Representative or Collateral Agent and the First Lien Claimholders represented by such Representative or Collateral Agent and their First Lien Obligations, on

17

the date on which there has been a Discharge of such Series of First Lien Obligations, subject to the rights of the First Lien Claimholders under Section 2.6; provided, however, that such termination shall not relieve any such party of its obligations incurred hereunder prior to the date of such termination.

SECTION 5.3       Amendments; Waivers.

(a)       No amendment, modification or waiver of any of the provisions of this Agreement shall be deemed to be made unless the same shall be in writing signed on behalf of each party hereto or its authorized agent and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time.  Notwithstanding the foregoing, the Company and the other Grantors shall not have any right to consent to or approve any amendment, modification or waiver of any provision of this Agreement except to the extent their rights are adversely affected.

SECTION 5.4       Information Concerning Financial Condition of the Grantors and their Subsidiaries.

The Representative and Collateral Agent and the other First Lien Claimholders of each Series shall each be responsible for keeping themselves informed of (a) the financial condition of the Grantors and their subsidiaries and all endorsers and/or guarantors of the First Lien Obligations and (b) all other circumstances bearing upon the risk of nonpayment of the First Lien Obligations, provided that the foregoing shall not impose any obligation on any Representative or Collateral Agent not expressly set forth in the applicable First Lien Documents.  The Representative and Collateral Agent and the other First Lien Claimholders of each Series shall have no duty to advise the Representative, Collateral Agent or First Lien Claimholders of the other Series of information known to it or them regarding such condition or any such circumstances or otherwise.  In the event the Representative or Collateral Agent or any of the other First Lien Claimholders, in its or their sole discretion, undertakes at any time or from time to time to provide any such information to the Representative, Collateral Agent or First Lien Claimholders of the other Series, it or they shall be under no obligation:

(a)       to make, and such Representative and Collateral Agent and such other First Lien Claimholders shall not make, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided;

(b)       to provide any additional information or to provide any such information on any subsequent occasion;

(c)       to undertake any investigation; or

(d)       to disclose any information, which pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

SECTION 5.5       Submission to Jurisdiction; Certain Waivers.

Each of the Company, each other Grantor, each Collateral Agent and each Representative, on behalf of itself and each other First Lien Claimholder represented by it, hereby irrevocably and unconditionally:

(a)       submits for itself and its property in any legal action or proceeding relating to this Agreement and the First Lien Collateral Documents (whether arising in contract, tort or otherwise) to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the exclusive (subject to Section 5.5(c)) general jurisdiction of the courts of the State of New York sitting in the Borough of Manhattan, the courts of the United States for the Southern District of New York sitting in the Borough of Manhattan, and appellate courts from any thereof;

(b)       agrees that all claims in respect of any such action or proceeding shall be heard and determined in such New York state court or, to the fullest extent permitted by applicable law, in such federal court;

(c)       agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law and that nothing in this Agreement or any other First Lien Document shall affect any right that either Collateral Agent, either Representative or any other First Lien Claimholder may otherwise have to bring any action or proceeding relating to this Agreement or any other First Lien Document against such Grantor or any of its assets in the courts of any jurisdiction;

(d)       waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement or any other First Lien Collateral Document in any court referred to in Section 5.5(a) (and irrevocably waives to the fullest extent permitted by applicable law the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court); and

(e)       waives, to the maximum extent not prohibited by law, any right it may have to claim or recover any special, exemplary, punitive or consequential damages.

SECTION 5.6        WAIVER OF JURY TRIAL.

**EACH PARTY HERETO AND THE COMPANY AND THE OTHER GRANTORS HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER FIRST LIEN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT, BREACH OF DUTY, COMMON LAW, STATUTE OR ANY OTHER THEORY). EACH PARTY HERETO AND THE COMPANY AND THE OTHER GRANTORS (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT EACH SUCH PARTY HERETO AND THE COMPANY AND EACH OTHER GRANTOR HAVE BEEN INDUCED TO ENTER INTO OR ACKNOWLEDGE THIS AGREEMENT AND THE OTHER FIRST LIEN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION. EACH PARTY HERETO AND THE COMPANY AND THE OTHER GRANTORS FURTHER REPRESENTS AND WARRANTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.**

SECTION 5.7        Notices.

Unless otherwise specifically provided herein, any notice hereunder shall be in writing and may be personally served or sent by facsimile, electronic mail or United States mail or courier service and shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof, upon receipt of facsimile or electronic mail, or three Business Days after depositing it in the United States mail with postage prepaid and properly addressed. For the purposes hereof, the addresses of the parties hereto shall be as set forth below each party's name on the signature pages hereto or, with respect to any Grantor that becomes a party hereto pursuant to <u>Section 5.17</u>, in the joinder agreement substantially in the form attached hereto as <u>Exhibit A</u>, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

SECTION 5.8        <u>Further Assurances</u>.

Each Representative and Collateral Agent, on behalf of itself and each other First Lien Claimholder represented by it, and the Company and each other Grantor, agree that each of them shall take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as either Representative and Collateral Agent may reasonably request to effectuate the terms of and the Lien priorities contemplated by this Agreement.

SECTION 5.9        <u>Agency Capacities</u>.

(a)        Except as expressly provided herein, (a) each of the Initial First Lien Representative and the Initial First Lien Collateral Agent is acting in the capacity of Representative and Collateral Agent, respectively, solely for the Initial Note Claimholders and pursuant to the direction set forth in the Initial Note Documents and (b) each of the Other First Lien Representative and the Other First Lien Collateral Agent is acting in the capacity of Representative and Collateral Agent, respectively, solely for the Other Note Claimholders and pursuant to the direction set forth in the Other Note Documents. Each Representative and each Collateral Agent shall be entitled to the rights, privileges and immunities of such Representative or such Collateral Agent as set forth in the applicable First Lien Documents in acting hereunder.

(b)        Neither Representative or Collateral Agent shall be responsible for the terms or sufficiency of this Agreement for any purpose. Neither Representative or Collateral Agent shall have any duties or obligations under or pursuant to this Agreement other than such duties as may be expressly set forth in this as duties on its part to be performed or observed. In entering into this Agreement, or in taking (or forbearing from) any action under or pursuant to this Agreement, each Representative and Collateral Agent shall have and be protected by all of the rights, immunities, indemnities and other protections granted to it under the applicable First Lien Documents. Neither Representative or Collateral Agent shall have any liability or responsibility for the actions or omissions of the other Collateral Agent, or for any other claimholder's or the other Collateral Agent's compliance with (or failure to comply with) the terms of this Agreement.

(c)        None of the provisions in this Agreement shall require the Representatives or the Collateral Agents to expend or risk their own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of their duties, or in the exercise of any of its rights or powers if they shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to them against such risk or liability is not assured to them.

(d)        Neither Representative or Collateral Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated by the applicable First Lien Documents that such Representative or Collateral Agent is required to exercise as directed in writing by the Required Holders (as defined in the Initial Purchase Agreement or Other Purchase Agreement, as applicable); *provided that*, either Representative and Collateral Agent shall be entitled to refrain from any act or the taking of any action hereunder under the applicable First Lien Documents or

from the exercise of any power or authority vested in it hereunder or thereunder unless and until such Representative or Collateral Agent shall have received instructions from the Required Holders (as defined in the Initial Purchase Agreement or Other Purchase Agreement, as applicable) and such Representative or Collateral Agent deems necessary, satisfactory indemnity has been provided to it, and neither such Representative nor Collateral Agent shall be liable for any such delay in acting. Neither Representative or Collateral Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose it to liability or that is contrary to the applicable First Lien Documents or applicable law, including for the avoidance of doubt, any action that may be in violation of the automatic stay under any bankruptcy or insolvency law. For purposes of clarity, phrases such as "satisfactory to", "approved by", "acceptable to", "as determined by", "in the discretion of", "selected by", "requested by" the Representatives or Collateral Agents and phrases of similar import authorize and permit the Representatives or Collateral Agents to approve, disapprove, determine, act or decline to act in its discretion. Any exercise of discretion on behalf of the Other First Lien Representative or the Other First Lien Collateral Agent shall be exercised in accordance with the terms of the Other Note Documents. Notwithstanding anything herein to the contrary, neither Representative or Collateral Agent shall have any responsibility for the preparation, filing or recording of any instrument, document or financing statement or for the perfection or maintenance of any security interest created hereunder.

SECTION 5.10      GOVERNING LAW.

**THIS AGREEMENT, AND ANY DISPUTE, CLAIM OR CONTROVERSY ARISING OUT OF OR RELATING TO THIS AGREEMENT (WHETHER ARISING IN CONTRACT, TORT OR OTHERWISE) SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAW RULES THAT WOULD RESULT IN THE APPLICATION OF A DIFFERENT GOVERNING LAW (OTHER THAN ANY MANDATORY PROVISIONS OF THE UCC RELATING TO THE LAW GOVERNING PERFECTION AND THE EFFECT OF PERFECTION OR PRIORITY OF THE SECURITY INTERESTS).**

SECTION 5.11      Binding on Successors and Assigns.

This Agreement shall be binding upon each Representative and each Collateral Agent, the First Lien Claimholders, the Company and the other Grantors, and their respective successors and assigns from time to time. If either Representative and/or Collateral Agent resigns or is replaced pursuant to the applicable First Lien Documents its successor shall be deemed to be a party to this Agreement and shall have all the rights of, and be subject to all the obligations of, this Agreement. No provision of this Agreement will inure to the benefit of a trustee, debtor-in-possession, creditor trust or other representative of an estate or creditor of any Grantor, including where any such trustee, debtor-in-possession, creditor trust or other representative of an estate is the beneficiary of a Lien securing Collateral by virtue of the avoidance of such Lien in an Insolvency or Liquidation Proceeding.

SECTION 5.12      Section Headings.

Section headings and the Table of Contents used in this Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

SECTION 5.13      Counterparts.

This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute

one and the same instrument.  Delivery of an executed signature page of this Agreement by facsimile or other electronic transmission (e.g., "pdf" or "tif" format) shall be effective as delivery of a manually executed counterpart hereof.  The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this Agreement and/or any document to be signed in connection with this Agreement and the transactions contemplated hereby shall be deemed to include Electronic Signatures (as defined below), deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be.  "***Electronic Signatures***" means any electronic symbol or process attached to, or associated with, any contract or other record and adopted by a person with the intent to sign, authenticate or accept such contract or record.

SECTION 5.14        Authorization.

By its signature, each Person executing this Agreement, on behalf of such party or Grantor but not in his or her personal capacity as a signatory, represents and warrants to the other parties hereto that it is duly authorized to execute this Agreement.

SECTION 5.15        No Third Party Beneficiaries/ Provisions Solely to Define Relative Rights.

The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the First Lien Claimholders in relation to one another.  None of the Company, any other Grantor nor any other creditor thereof shall have any rights or obligations hereunder and no such Person is an intended beneficiary or third party beneficiary hereof, except, in each case, as expressly provided in this Agreement, and none of the Company or any other Grantor may rely on the terms hereof (other than Sections 5.3).  Nothing in this Agreement is intended to or shall impair the obligations of any Grantor, which are absolute and unconditional, to pay the First Lien Obligations as and when the same shall become due and payable in accordance with their terms.  Without limitation of any other provisions of this Agreement, the Company and each Grantor hereby (a) acknowledges that it has read this Agreement and consents hereto, (b) agrees that it will not take any action that would be contrary to the express provisions of this Agreement and (c) agrees to abide by the requirements expressly applicable to it under this Agreement.

SECTION 5.16        No Indirect Actions.

Unless otherwise expressly stated, if a party may not take an action under this Agreement, then it may not take that action indirectly, or support any other Person in taking that action directly or indirectly.  "Taking an action indirectly" means taking an action that is not expressly prohibited for the party but is intended to have substantially the same effects as the prohibited action.

SECTION 5.17        Additional Grantors.

Each of the Company and the other Grantors agrees that it shall ensure that each of its subsidiaries that is or is to become a party to any First Lien Document and which grants or purports to grant a lien on any of its assets shall either execute this Agreement on the date hereof or shall confirm that it is a Grantor hereunder pursuant to a joinder agreement substantially in the form attached hereto as Exhibit A that is executed and delivered by such subsidiary prior to or concurrently with its execution and delivery of such First Lien Document.

[Signature Pages Follow]

254438203 v7

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**U.S. BANK NATIONAL ASSOCIATION**, as Initial First Lien Representative and as Initial First Lien Collateral Agent

By: _____

Name:
Title:


Address for notices:
U.S. Bank National Association
West Side Flats
60 Livingston Avenue
EP-MN-WS3C
St. Paul, MN 55107
Attention: Joshua Hahn (Core Sciences)


**U.S. BANK NATIONAL ASSOCIATION**, as Other First Lien Representative and as Other First Lien Collateral Agent

By: _____

Name:
Title:


Address for notices:
U.S. Bank National Association
West Side Flats
60 Livingston Avenue
EP-MN-WS3C
St. Paul, MN 55107
Attention: Joshua Hahn (Core Sciences)

[Signature Page to Intercreditor Agreement]

**Acknowledged and Agreed to by:**

[_____]

By:_____
Name:
Title:

Exhibit A
to First Lien Pari Passu Intercreditor Agreement

FORM OF GRANTOR JOINDER AGREEMENT

GRANTOR JOINDER AGREEMENT NO.   [__] (this "***Grantor Joinder Agreement***"), dated as of [__], 20[__] to the PARI PASSU INTERCREDITOR AGREEMENT, dated as of [__], 2021 (the "***Pari Passu Intercreditor Agreement***"), by and among U.S. Bank National Association, as Initial First Lien Representative and Initial First Lien Collateral Agent, U.S. Bank National Association, as Other First Lien Representative and Other First Lien Collateral Agent, and acknowledged and agreed to by Core Scientific Holding Co. and the other Grantors from time to time party thereto.  Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Pari Passu Intercreditor Agreement.

The undersigned, [_____], a [_____], (the "***New Grantor***") wishes to acknowledge and agree to the Pari Passu Intercreditor Agreement and become a party thereto to the limited extent contemplated by Section 5.17 thereof and to acquire and undertake the rights and obligations of a Grantor thereunder.

Accordingly, the New Grantor agrees as follows for the benefit of the Representatives, the Collateral Agents and the First Lien Claimholders:

Section 1.    Accession to the Pari Passu Intercreditor Agreement.  The New Grantor (a) acknowledges and agrees to, and becomes a party to the Pari Passu Intercreditor Agreement as a Grantor to the limited extent contemplated by Section 5.17 thereof, (b) agrees to all the terms and provisions of the Pari Passu Intercreditor Agreement and (c) shall have all the rights and obligations of a Grantor under the Pari Passu Intercreditor Agreement.  This Grantor Joinder Agreement supplements the Pari Passu Intercreditor Agreement and is being executed and delivered by the New Grantor pursuant to Section 5.17 of the Pari Passu Intercreditor Agreement.

Section 2.    Representations, Warranties and Acknowledgement of the New Grantor.  The New Grantor represents and warrants to each Representative, each Collateral Agent and to the First Lien Claimholders that (a) it has full power and authority to enter into this Grantor Joinder Agreement, in its capacity as Grantor and (b) this Grantor Joinder Agreement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with the terms of this Grantor Joinder Agreement.

Section 3.    Counterparts.  This Grantor Joinder Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Grantor Joinder Agreement or any document or instrument delivered in connection herewith by telecopy or other electronic means shall be effective as delivery of a manually executed counterpart of this Grantor Joinder Agreement or such other document or instrument, as applicable.

Section 4.    Section Headings.  Section heading used in this Grantor Joinder Agreement are for convenience of reference only and are not to affect the construction hereof or to be taken in consideration in the interpretation hereof.

Section 5.        Benefit of Agreement.  The agreements set forth herein or undertaken pursuant hereto are for the benefit of, and may be enforced by, any party to the Pari Passu Intercreditor Agreement subject to any limitations set forth in the Pari Passu Intercreditor Agreement with respect to the Grantors.

Section 6.        Governing Law.  **THIS GRANTOR JOINDER AGREEMENT, AND ANY DISPUTE, CLAIM OR CONTROVERSY ARISING OUT OF OR RELATING TO THIS GRANTOR JOINDER AGREEMENT (WHETHER ARISING IN CONTRACT, TORT OR OTHERWISE) SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAW RULES THAT WOULD RESULT IN THE APPLICATION OF A DIFFERENT GOVERNING LAW (OTHER THAN ANY MANDATORY PROVISIONS OF THE UCC RELATING TO THE LAW GOVERNING PERFECTION AND THE EFFECT OF PERFECTION OR PRIORITY OF THE SECURITY INTERESTS IN THE COLLATERAL).**

Section 7.        Severability.  Any provision of this Grantor Joinder Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  The parties hereto shall endeavor in good faith negotiations to replace any invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to those of the invalid, illegal or unenforceable provisions.

Section 8.        Notices.  All communications and notices hereunder shall be in writing and given as provided in Section 5.7 of the Pari Passu Intercreditor Agreement.  All communications and notices hereunder to the New Grantor shall be given to it at the address set forth under its signature hereto, which information supplements Section 5.7 of the Pari Passu Intercreditor Agreement.

IN WITNESS WHEREOF, the New Grantor has duly executed this Grantor Joinder Agreement to the Pari Passu Intercreditor Agreement as of the day and year first above written.

[_____]

By_____
   Name:
   Title:

Address for notices:
    _____
    _____
    Attention of:_____
    Telecopy: _____

Exhibit A – Page 3

**EXHIBIT I**

**FORM OF JOINDER AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

## [FORM OF] JOINDER AND ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS JOINDER ASSIGNMENT AND ASSUMPTION AGREEMENT (this "*Agreement*"), dated as of [___], is made by and among [Parent Entity] (the "*Parent*"), [Core Scientific Holding Co.][1], a Delaware (the "*Company*") and U.S. BANK NATIONAL ASSOCIATION, as note agent (in such capacity, the "*Agent*"), under that certain Convertible Note Purchase Agreement, dated as of August 20, 2021 (as amended, restated, supplemented and/or otherwise modified from time to time, the "*Purchase Agreement*"), by and among the Company, the Guarantors party thereto, each Purchaser party thereto and the Note Agent.

## RECITALS

WHEREAS, pursuant to the Purchase Agreement, each Purchaser has been issued by the Company one or more Notes (as defined in the Purchase Agreement), which are part of a series of Notes issued by the Company, in an aggregate principal amount of up to $300,000,000.00;

WHEREAS, pursuant to Section 10.1 of the Purchase Agreement, in the event of a SPAC, the Parent Entity shall (a) assume the Obligation of the Company to deliver Conversion Securities pursuant to Section 2 of the Note and (b) assume each other Obligation of the Company under the Note Documents by becoming a joint and several co-obligor of each such other Obligation of the Company (or its successor by merger) under the Note Documents, in each case pursuant to this Agreement; and

WHEREAS, the Company and the Parent now seek to consummate the joinder and assignment and assumption contemplated by Section 10.1 of the Purchase Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the agreements and covenants contained in the Purchase Agreement, and the agreements and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties do hereby agree as follows:

1.      **Defined Terms**.  Capitalized terms used but not defined herein shall have the meanings set forth in the Purchase Agreement.

2.      **Assignment and Assumption**.  Under the terms and subject to the conditions set forth in the Purchase Agreement, the Company hereby assigns to the Parent, and the Parent hereby accepts, the Obligation of the Company to deliver Conversion Securities pursuant to Section 2 of the Note.

3.      **Joinder**.  The Parent hereby acknowledges, agrees and confirms that, by its execution of this Agreement, the Parent will be deemed to be an issuer under the Note Documents and each reference to the "Company" in the Purchase Agreement and each other Note Document shall be deemed to be a collective reference to the Parent and the Company and the Parent shall have all of the obligations of the Company thereunder as if it had executed the Note Documents as the Company.  The Parent hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Purchase Agreement.  Notwithstanding the foregoing, the Parent shall act as representative of the Company and Parent with respect to any obligation of the Company under any Note Document to deliver a certificate or notice from the Company.

---

[1] To be updated to refer to its successor by merger, if applicable.

4. **Continuing Validity; Waiver and Amendment; Entire Agreement**. Except as expressly modified pursuant to Agreement, the terms of the Note Documents remain unchanged and in full force and effect. Any provision of this Agreement may be amended, waived or modified only by an instrument signed in writing by the Parties and the Note Agent. This Agreement and the other Note Documents constitute the entire contract among the parties hereto regarding to the subject matters addressed herein and supersede any and all previous agreements, negotiations, and discussions, oral or written, by the parties regarding the subject matters addressed herein.

5. **Successors and Assigns**. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

6. **GOVERNING LAW**. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.

7. **Jurisdiction and Venue; Waiver of Jury Trial; Expenses and Indemnification**. This Agreement is subject to the provisions of Section 10.3 (Jurisdiction and Venue), Section 10.4 (Waiver of Jury Trial) and Section 10.10(a) (Expenses and Indemnification) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*.

8. **Notices**. All communications and notices required or permitted to be given hereunder shall be delivered in accordance with Section 10.8 of the Purchase Agreement.

9. **Headings; Interpretation**. Paragraph headings used in this Agreement are included for convenience of reference only and will not modify the provisions that they precede or affect the interpretation of this Agreement or any other Note Document. The term "including" shall be interpreted to mean "including but not limited to".

10. **Counterparts**. This Agreement may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract. Any counterpart of a signature page to this Agreement may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.

*[Signature page follows]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

**[PARENT ENTITY]**

By:_____
Name:
Title:

**[CORE SCIENTIFIC HOLDING CO.]**

By:_____
Name:
Title:

Acknowledged and accepted:

**AGENT**:

**U.S. BANK NATIONAL ASSOCIATION,**
as Note Agent [and Collateral Agent]

By: **_____**
Name:
Title:

## CONVERTIBLE NOTE PURCHASE AGREEMENT

THIS CONVERTIBLE NOTE PURCHASE AGREEMENT (this "*Agreement*") is made as of August 20, 2021, by and among Core Scientific Holding Co., a Delaware corporation (the "*Company*"), the Guarantors from time to time party hereto, the persons and entities named on the Schedule of Purchasers under the header 'Initial Purchasers' attached hereto as Schedule 2 (individually, an "*Initial Purchaser*" and collectively, the "*Initial Purchasers*"), each Additional Purchaser from time to time party hereto and U.S. Bank National Association, as note agent (in such capacity, the "*Note Agent*") and, upon the execution and delivery of the Collateral Documents pursuant to Section 6.13, as collateral agent for the Secured Parties (in such capacity, the "*Collateral Agent*" and, together with the Note Agent, the "*Agents*").

### RECITALS

WHEREAS, the Company desires (i) to issue and to sell to the Initial Purchasers, and the Initial Purchasers have agreed to purchase from the Company, on the Initial Closing Date, convertible promissory notes substantially in the form attached hereto as Exhibit A (each, an "*Initial Note*" and collectively, the "*Initial Notes*") and (ii) to issue and to sell to Additional Purchasers on Additional Closing Dates convertible promissory notes substantially in the form attached hereto as Exhibit A (each, an "*Additional Note*" and collectively, the "*Additional Notes*" and, together with the Initial Notes, individually, a "*Note*" and collectively, the "*Notes*"), in an aggregate principal amount for all such Notes of up to $300,000,000.00 on the terms, and subject to the conditions, specified herein; and

WHEREAS, to induce the Purchasers to purchase the Notes, the Note Parties have agreed to execute and deliver, contemporaneously with the issuance, sale and purchase of the Initial Notes on the Initial Closing Date, the Guaranty, pursuant to which each Guarantor will guarantee the Obligations of the Company under the Notes and, as and when required pursuant to Section 6.13, the Security Agreement, pursuant to which the Note Parties will grant to the Collateral Agent, for the ratable benefit of the Secured Parties, a security interest in the Note Parties' assets to secure the Obligations or their respective Guaranteed Obligations (as applicable).

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, and the representations, warranties, covenants and conditions set forth below, which represent integral components of the transactions contemplated hereby and shall be fully enforceable by the parties hereto, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Note Parties, the Agents and each Purchaser, intending to be legally bound, hereby agree as follows:

1.  **DEFINITIONS.**

    As used herein, the following terms shall have the meanings set forth below.

    (a)     "*Act*" means the Securities Exchange Act of 1934, as amended.

    (b)     "*Additional Closing Date*" has the meaning ascribed thereto in Section 2.2.

    (c)     "*Additional Note*" or "*Additional Notes*" has the meaning ascribed thereto in Section 2.2.

(d)     "**Additional Purchaser**" or "**Additional Purchasers**" has the meaning ascribed thereto in Section 2.2.

(e)     "**Administrative Questionnaire**" means an Administrative Questionnaire substantially in the form attached hereto as Exhibit G.

(f)     "**Agent-Related Person**" means the Note Agent and the Collateral Agent, together with their affiliates, officers, directors, employees, agents and attorneys-in-fact of the Agents and their affiliates.

(g)     "**Agents**" has the meaning ascribed to such term in the preamble to this Agreement.

(h)     "**Asset Disposition**" means any sale, lease, license, transfer, assignment or other disposition (whether by a single transaction or through series of transactions, and including by means of a merger, consolidation, amalgamation or similar transaction) by the Company or any of its Subsidiaries of any asset or property.

(i)     "**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in the City of New York or the Principal Office are authorized or required to close.

(j)     "**Capital Lease**" means any lease of any property by such Person as lessee which would, in accordance with GAAP, be required to be accounted for as a capital lease on the balance sheet of such Person.

(k)     "**Capital Lease Obligations**" means, with respect to any Person, all obligations of such Person under Capital Leases.

(l)     "**Capital Stock**" means (a) any capital stock, partnership, membership, limited liability company, joint venture or other ownership or equity interest or other equivalent, participation or securities (whether voting or non-voting, whether preferred, common or otherwise, whether certificated or uncertificated, and however designated), and (b) any option, warrant, security, appreciation right, profits interests or other right directly or indirectly convertible into or exercisable or exchangeable for, or otherwise to acquire directly or indirectly, any capital stock, partnership, membership, limited liability company, joint venture or other ownership or equity interest, participation or security described in clause (a) above (excluding the Notes and any other Indebtedness convertible or exchangeable into any such capital stock, partnership, membership, limited liability company, joint venture or other ownership or equity interest, participation or security described in clause (a) above unless and to the extent converted or exchanged).

(m)     "**Charter Documents**" means (i) the articles or certificate of incorporation or formation (as applicable), (ii) the by-laws, operating agreement or limited liability company agreement (as applicable) and (iii) other similar organizational and governing documents of any Person, as amended, restated, supplemented or otherwise modified from time to time.

(n)     "**Closing Date**" means the Initial Closing Date or each Additional Closing Date, as the context may require.

(o)     "**Collateral**" means the "Collateral" as defined in the Security Agreement.

(p)     "**Collateral Agent**" has the meaning ascribed to such term in the preamble to this Agreement.

(q)     "**Collateral Documents**" means, collectively, the Security Agreement, the Intellectual Property Security Agreement and each other agreement or writing pursuant to which the Note Parties purport to pledge or grant a security interest in any property or assets securing the Obligations or the Guaranteed Obligations, as applicable, in each case, as amended, restated, supplemented and/or otherwise modified from time to time.

(r)     "**Company Covered Persons**" means those Persons specified in Rule 506(d)(1) promulgated under the Act; provided, however, that Company Covered Persons do not include (a) any Holder or (b) any person or entity that is deemed to be an affiliated issuer of the Company solely as a result of the relationship between the Company and any Holder.

(s)     "**Contractual Obligations**" means as to any Person, any provision of any security issued by such Person or of any agreement, undertaking, contract, indenture, mortgage, deed of trust or other instrument or arrangement (whether in writing or otherwise) to which such Person is a party or by which it or any of such Person's property is bound.

(t)     "**Conversion Event**" has the meaning ascribed to such term in the Notes.

(u)     "**Conversion Securities**" has the meaning ascribed to such term in <u>Section 5.3</u>.

(v)     "**Default**" means any condition or event which with the giving of notice or lapse of time or both would, unless cured or waived, become an Event of Default.

(w)     "**Disqualified Capital Stock**" means any Capital Stock issued by any Person that (a) matures or is mandatorily redeemable pursuant to a sinking fund obligation or otherwise, (b) is or may become redeemable or repurchaseable by such Person at the option of the holder thereof, in whole or in part (other than in connection with an asset sale, change of control or similar event) or (c) is convertible or exchangeable at the option of the holder thereof for Indebtedness or Capital Stock described in this definition, on or prior to, in the case of clause (a), (b) or (c), ninety (90) days after the Maturity Date (as defined in the Notes).

(x)     "**Environmental Laws**" means any and all federal, state, local and foreign statutes, laws, judicial decisions, regulations, ordinances, rules, judgments, orders, decrees, plans, injunctions, Licenses, concessions, grants, franchises, agreements and other governmental restrictions relating to (i) the protection of the environment, (ii) the effect of the environment on human health, (iii) emissions, discharges or releases of pollutants, contaminants, hazardous substances or wastes into surface water, ground water, air or land, or (iv) the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants, hazardous substances or wastes or the clean-up or other remediation thereof, including, without limitation, the Clean Air Act, 42 U.S.C. § 7401 et seq., the Clean Water Act, 33 U.S.C. § 1251 et seq. ("**CWA**"), the Solid Waste Disposal Act (as amended by the Resource Conservation and Recovery Act), 42 U.S.C. § 6901 et seq. ("**RCRA**") and the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq. ("**CERCLA**").

(y)     "**ERISA**" means the Employee Retirement Income Security Act of 1974.

(z)     "**ERISA Affiliate**" means, any person that for purposes of Title I or Title IV of ERISA or Section 412 of the Internal Revenue Code would be deemed at any relevant time to be a "single

3

employer" or otherwise aggregated with the Company or any of its Subsidiaries under Section 414(b), 414(c), 414(m) or 414(o) of the Internal Revenue Code or Section 4001 of ERISA.

(aa)     "*Event of Default*" has the meaning ascribed thereto in the Notes.

(bb)     "*Excluded Subsidiary*" means (i) any Subsidiary that is not a wholly-owned Subsidiary, (ii) any Subsidiary that is not a Material Subsidiary and (iii) any Subsidiary that is (a) a Foreign Subsidiary (as defined in the Security Agreement), (b) a CFC Holdco (as defined in the Security Agreement) or (c) a Subsidiary of a CFC or a CFC Holdco (as defined in the Security Agreement); provided that notwithstanding the foregoing clauses (i) through (iii), the Company may in its sole discretion designate any Excluded Subsidiary as a Guarantor.

(cc)     "*Existing Note Purchase Agreement*" means that certain Senior Secured Convertible Note Purchase Agreement, dated as of April 19, 2021, by and among the Company, the Guarantors from time to time party thereto, the Purchasers (as defined therein) party thereto and U.S. Bank National Association, as note agent and as collateral agent for the Secured Parties (as defined therein), as amended, restated, supplemented and/or otherwise modified from time to time.

(dd)     "*Existing Notes*" means the senior secured convertible promissory notes issued pursuant to the Existing Note Purchase Agreement.

(ee)     "*Existing Secured Note Obligations*" means all "Obligations" under and as defined in the Existing Note Purchase Agreement and any refinancing, refunding, renewal or extension thereof.

(ff)     "*GAAP*" means the United States generally accepted accounting principles in effect as of the date of determination thereof. GAAP will be deemed to treat operating leases and Capital Leases in a manner consistent with the treatment under GAAP as in effect prior to the issuance by the Financial Accounting Standards Board on February 25, 2016 of Accounting Standards Update No. 2016-02.

(gg)     "*Governmental Authority*" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

(hh)     "*Guarantee*" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly and including any obligation, direct or indirect, of the guarantor (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued in support of such Indebtedness or obligation; provided that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business. The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable

4

amount of the primary obligation in respect of which such Guarantee is made or, if not so stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

(ii)     "*Guaranteed Obligations*" has the meaning ascribed thereto in the Guaranty.

(jj)     "*Guarantor*" means each Subsidiary of the Company party to the Guaranty and each other Subsidiary of a Note Party that becomes a Guarantor under the Note Documents pursuant to Section 6.10..

(kk)     "*Guaranty*" means the Guaranty, dated as the date hereof, made by the Guarantors in favor of the Note Agent, substantially in the form attached hereto as Exhibit C, (as amended, restated, supplemented and/or otherwise modified from time to time).

(ll)     "*Hazardous Materials*" means (i) any "hazardous substance", as defined by CERCLA, (ii) any "hazardous waste", as defined by RCRA, (iii) any petroleum product, (iv) any "pollutant," as defined by the CWA, or (v) contaminant or hazardous, dangerous or toxic chemical, material or substance within the meaning of any other Environmental Law.

(mm)    "*Holder*" or "*Holders*" means, individually and collectively, the holders of the Notes, including the Purchasers.

(nn)    "*Indebtedness*" as applied to any Person, means, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (c) all obligations of such Person in respect of the deferred purchase price of property or services (other than trade payables and accounts payable incurred in the ordinary course of business and any deferred compensation, earn-out, purchase price adjustment or other deferred purchase price obligation which is contingently payable based on the achievement of future financial performance); (d) all obligations of such Person under any conditional sale or other title retention agreement(s) relating to property acquired by such Person, (e) all obligations in respect of Capital Leases of such Person, (f) all obligations, contingent or otherwise, of such Person in respect of letters of credit, banker's acceptances or similar extensions of credit, (g) all Guarantees of such Person of Indebtedness of other Persons that would count as a liability on the balance sheet of such Person in accordance with the GAAP, (h) all Indebtedness of a third party secured by any Lien on any property or asset owned or held by such Person, whether or not such Indebtedness has been assumed by such Person, (i) all obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Disqualified Capital Stock of such Person and (j) all monetary obligations under any receivables factoring, receivables sales, receivable securitization or similar transactions or other off-balance sheet liabilities. The Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture in which such Person is a general partner or a joint venturer, except to the extent that the terms of such Indebtedness provide that such Person is not liable therefor.

(oo)    "*Initial Closing Date*" means August 20, 2021.

(pp)    "*Initial Note*" or "*Initial Notes*" has the meaning ascribed thereto in the recitals to this Agreement.

(qq)    "*Initial Purchaser*" or "*Initial Purchasers*" has the meaning ascribed thereto in the preamble to this Agreement.

5

(rr)    "**Intellectual Property**" means all intellectual and similar property of a Person, including inventions, designs, patents, copyrights, trademarks, service marks, trade names, trade secrets, confidential or proprietary information, customer lists, know-how, software and databases.

(ss)    "**Intellectual Property Security Agreement**" means the Intellectual Property Security Agreement, to be made by the applicable Note Parties in favor of the Collateral Agent, substantially in the form attached hereto as <u>Exhibit E</u> (as amended, restated, supplemented and/or otherwise modified from time to time).

(tt)    "**Intercreditor Agreement**" has the meaning ascribed thereto in Section 7.1(a).

(uu)    "**Ledger**" shall have the meaning ascribed thereto in the Notes.

(vv)    "**Licenses**" means all licenses, permits, authorizations, determinations, and registrations issued by any Governmental Authority to the Company or any Subsidiary in connection with the conduct of its business.

(ww)    "**Lien**" means any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing.

(xx)    "**Material Adverse Effect**" means, individually or in the aggregate, (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties or financial condition of the Company and its Subsidiaries taken as a whole; (b) a material impairment of the ability of the Note Parties to perform their obligations under the Note Documents or, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, the rights and remedies of the Secured Parties under the Note Documents; (c) a material adverse effect upon the legality, validity, binding effect or enforceability against the Note Parties of any Note Document; or (d) from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, a material adverse effect on the Liens in favor of the Collateral Agent (for the benefit of the Secured Parties) on the Collateral or the priority of such Liens.

(yy)    "**Material Subsidiary**" mean each Subsidiary which, as of the most recent fiscal quarter of the Company, for the period of four consecutive fiscal quarters of the Company then last ended (taken as one accounting period) in respect of which financial statements were (or were required to be) delivered pursuant to <u>Sections 6.1(a)</u> or <u>(b)</u>, as applicable (a "**Test Period**"), had Total Assets as of the last day of such Test Period that were in excess of 10% of the Total Assets of the Company and its Subsidiaries as of such date.

(zz)    "**Multiemployer Plan**" means any "multiemployer plan" as defined in Section 4001(a)(3) of ERISA, which is contributed to by (or to which there is or may be an obligation to contribute of) the Company, any of its Subsidiaries or an ERISA Affiliate, and each such plan for the five-year period immediately following the latest date on which the Company, any of its Subsidiaries or an ERISA Affiliate contributed to or had an obligation to contribute to such plan.

(aaa)    "**Note**" or "**Notes**" has the meaning ascribed thereto in the recitals to this Agreement.

(bbb)    "**Note Documents**" means, collectively, this Agreement, each Note, the Guaranty, each Collateral Document (if applicable), the fee schedule delivered from the Agents to the Company in connection with this Agreement, the Intercreditor Agreement (if applicable), and any other document,

agreement or instrument which has or will be executed by or for the benefit of the Holders in connection with such agreements and the transactions described therein, each as may be amended, restated, supplemented/and or otherwise modified from time to time.

(ccc)  "*Note Party*" or "*Note Parties*" means, individually and collectively, the Company and the Guarantors. From and after a Parent Entity assumes or otherwise becomes a co-obligor with respect to the Company's Obligations in connection with a SPAC pursuant to Section 6.13, each reference to "Note Party" shall be deemed to include a reference to a Parent Entity.

(ddd)  "*Obligations*" means all advances to, and debts, liabilities (including without limitation (x) prepayment premiums (if any) and other premiums payable under the Notes (if any), including all or any portion of the Repayment Amount (as defined in the Notes), if applicable, (y) accrued and unpaid interest and (z) capitalized interest), obligations, fees, expenses, indemnities, covenants and duties of, the Note Parties arising under any Note Document or otherwise with respect to any Note, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against the Note Parties of any proceeding under any debtor relief laws naming any Note Party as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims or allowable in such proceeding.

(eee)  "*OFAC*" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

(fff)  "*Parent Entity*" has the meaning ascribed thereto in the definition of SPAC.

(ggg)  "*PBGC*" mean the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor thereto).

(hhh)  "*Permitted Lien*" means:

(i)  from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, Liens in favor of Collateral Agent for the benefit of Secured Parties granted pursuant to the Note Documents;

(ii)  Liens set forth on Schedule 5.17 existing as of the Initial Closing Date;

(iii)  Liens for taxes if obligations with respect to such taxes either (i) are not due and payable, (ii) are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and adequate reserves have been made in accordance with GAAP or (iii) could not reasonably be excepted to have a Material Adverse Effect;

(iv)  statutory Liens of landlords, banks (and rights of set-off), of carriers, warehousemen, mechanics, repairmen, workmen and materialmen, and other Liens imposed by law (other than any such Lien imposed pursuant to Section 401 (a)(29) or 412(n) of the Internal Revenue Code or by the Employee Retirement Income Security Act of 1974), in each case incurred in the ordinary course of business (i) for amounts not yet overdue, or (ii) for amounts that are overdue and that (in the case of any such amounts overdue for a period in excess of five (5) days) are being contested in good faith by appropriate proceedings, so long as such reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made for any such contested amounts;

(v)      Liens incurred in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, trade contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money or other indebtedness), so long as (x) no foreclosure, sale or similar proceedings have been commenced with respect to any portion of the Collateral on account thereof and (y) adequate reserves required by GAAP shall have been set aside therefor;

(vi)      easements, rights-of-way, restrictions, encroachments, and other minor defects or irregularities in title, in each case which do not and will not have a Material Adverse Effect;

(vii)      any interest or title of a lessor or sublessor under any lease of real estate permitted hereunder;

(viii)      Liens solely on any cash earnest money deposits made by the Company in connection with any letter of intent or purchase agreement permitted hereunder;

(ix)      purported Liens evidenced by the filing of precautionary UCC financing statements relating solely to operating leases of personal property entered into in the ordinary course of business;

(x)      Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods used in the ordinary course of business;

(xi)      any zoning or similar law or right reserved to or vested in any governmental office or agency to control or regulate the use of any real property;

(xii)      licenses of patents, trademarks and other Intellectual Property rights granted by the Company in the ordinary course of business;

(xiii)      Liens securing obligations of the Company incurred under leases (but not securing indebtedness for borrowed money) in the form of cash deposits made in the ordinary course of business;

(xiv)      Liens arising in favor of depository institutions as a result of set-off rights or otherwise securing obligations owed to such depository institution in connection with bank services provided to the Company or its Subsidiaries;

(xv)      Liens on cash deposits securing obligations owed to an issuer of a letter of credit at the request of the Company of any of its Subsidiaries;

(xvi)      Liens on any assets of the Note Parties securing any Indebtedness, including Capital Lease Obligations, incurred to finance the acquisition of any fixed or capital assets (including any real property assets) so long as such Liens encumber only the assets acquired or financed with the proceeds of such Indebtedness and do not attach to any other assets of any Note Party;

(xvii)      Liens on cash deposit accounts and cash and cash equivalents delivered or pledged to secure letters of credit;

8

(xviii)  Liens on Indebtedness permitted to be incurred in reliance on <u>Section 7.01(a)</u>;

(xix)  Liens arising from judgments for the payment of money in circumstances not constituting an Event of Default; and

(xx)  Liens on the Collateral securing the Existing Secured Note Obligations.

(iii)  "*Permitted Transferees*" means, (x) as to any Purchaser that is a limited or general partnership or a trust, to its partners (whether general or limited, including retired partners) or beneficiaries and to affiliated partnerships managed by the same management company or managing (general) partner or by an entity which directly or indirectly controls, is controlled by, or is under common control with, such management company or managing or general partner, or member (or retired member) of such Purchaser in accordance with limited liability company interests and (y) as to any other Purchaser, an entity which directly or indirectly controls, is controlled by, or is under common control with such Purchaser.

(jjj)  "*Person*" (regardless of whether capitalized) means any natural person, entity, or association, including without limitation any corporation, partnership, limited partnership, limited liability company, government (or agency or subdivision thereof), trust, joint venture, or proprietorship.

(kkk)  "*Plan*" means any "employee benefit plan" as defined in Section 3 of ERISA (other than a Multiemployer Plan) maintained or contributed to by any Note Party or any ERISA Affiliate or to which a Note Party or any ERISA Affiliate has or may have an obligation to contribute, and each such plan that is subject to Title IV of ERISA for the five-year period immediately following the latest date on which a Note Party or any ERISA Affiliate maintained, contributed to or had an obligation to contribute to (or is deemed under Section 4069 of ERISA to have maintained or contributed to or to have had an obligation to contribute to, or otherwise to have liability with respect to) such plan.

(lll)  "*Principal Office*" means the Note Agent's office, address or bank account as from time to time designated in writing by the Note Agent to the Company and each Holder, which shall initially be the office designated on the Note Agent's signature page to this Agreement.

(mmm) "*Pro Rata Share*" means, as to any Holder at any time, the ratio at such time of (x) the aggregate principal amount of the Notes held by such Holder to (y) the aggregate outstanding principal amount of all Notes issued hereunder.

(nnn)  "*Purchaser*" or "*Purchasers*" means, individually and collectively, the Initial Purchasers and the Additional Purchasers, as the context may require.

(ooo)  "*Reportable Event*" means any of the events set forth in Section 4043(c) of ERISA with respect to a Plan, other than those events as to which the thirty-day notice period is waived under subsection .22, .23, .25, .27, .28, .29, .30, .31, .32, .34, or .35 of PBGC Regulation Section 4043.

(ppp)  "*Required Holders*" means Holders representing more than fifty percent (50%) of the aggregate outstanding principal amount of the Notes (including all accrued PIK Interest) issued pursuant to this Agreement at the relevant time of reference.

(qqq)  "*Requirements of Law*" means as to any Person, provisions of the Charter Documents of such Person, or any law, treaty, code, rule, regulation, right, privilege, qualification,

License or franchise, or any determination of an arbitrator or a court or other Governmental Authority, in each case applicable to such Person or any of such Person's property or to which such Person or any of such Person's property is subject or pertaining to any or all of the transactions contemplated or referred to in the Note Documents, including, but not limited to the Fair Credit Reporting Act, the Gramm-Leach-Bliley Act, the Federal Trade Commission Act and comparable state laws, the Telephone Consumer Protection Act, the Telemarketing and Consumer Fraud and Abuse Prevention Act, the CAN-SPAM Act, the Electronic Fund Transfer Act, the U.S. Card Act, and any similar laws and regulations in Canada, including federal and provincial laws.

(rrr)     "***Responsible Officer***" means the chief financial officer, general counsel, secretary, controller or other authorized officer of the Note Parties set forth on an incumbency certificate delivered to the Note Agent from time to time.

(sss)     "***Restricted Payment***" means as to any Person (i) any dividend or other distribution (whether in cash, Capital Stock or other property) with respect to or on account of any shares of any Capital Stock of such Person or (ii) any payment by such Person on account of the purchase, redemption, retirement, defeasance, surrender, cancellation, termination or acquisition of any Capital Stock of such Person or any claim respecting the purchase or sale of any Capital Stock of such Person.

(ttt)     "***Sanctioned Entity***" means (a) an agency of the government of, (b) an organization directly or indirectly controlled by, or (c) a person resident in a country that is subject to a sanctions program identified on the list maintained by OFAC and available at http://www.treas.gov/offices/enforcement/ofac/programs, or as otherwise published from time to time as such program may be applicable to such agency, organization or person.

(uuu)     "***Sanctioned Person***" means a person named on the list of Specially Designated Nationals or Blocked Persons maintained by OFAC available at http://www.treas.gov/offices/enforcement/ofac/sdn/index.html, or as otherwise published from time to time.

(vvv)     "***Secured Debt Cap***" has the meaning ascribed thereto in Section 7.1(a).

(www)     "***Secured Party***" or "***Secured Parties***" means, individually and collectively, upon the execution and delivery of the Collateral Documents pursuant to Section 6.13, the Purchasers, Holders, the Agents, and their respective successors and permitted assigns.

(xxx)     "***Securities***" has the meaning ascribed thereto in Section 8.1.

(yyy)     "***Security Agreement***" means the Security Agreement, to be made by the Note Parties in favor of the Collateral Agent, for the benefit of the Secured Parties, substantially in the form attached hereto as Exhibit D (as amended, restated, supplemented and/or otherwise modified from time to time).

(zzz)     "***Single Employer Plan***" shall mean any Plan that is covered by Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, other than a Multiemployer Plan, that is maintained or contributed to by the Company or any Commonly Controlled Entity or to which the Company or a Commonly Controlled Entity has or may have an obligation to contribute, and such plan for the six-year period immediately following the latest date on which the Company or a Commonly Controlled Entity maintained, contributed to or had an obligation to contribute to (or is deemed under Section 4069 of ERISA to have maintained or contributed to or to have had an obligation to contribute to, or otherwise to have liability with respect to) such plan. For the purposes of this definition, "***Commonly***

*Controlled Entity*" means a person or an entity, whether or not incorporated, that is under common control with the Company within the meaning of Section 4001 of ERISA or is part of a group that includes the Company and that is treated as a single employer under Section 414 of the Code.

(aaaa) "*Solvent*" means, with respect to any Person, that such Person (i) owns and will own assets the fair saleable value of which are greater than the amount that will be required to pay the probable liabilities of its then existing debts as they become absolute and matured considering all financing alternatives and potential asset sales reasonably available to it, (ii) has capital that is not unreasonably small in relation to its business as presently conducted or after giving effect to any contemplated transaction and (iii) does not intend to incur and does not believe that it will incur debts beyond its ability to pay such debts as they become due. In computing the amount of contingent or unliquidated liabilities at any time, such liabilities shall be computed at the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

(bbbb) "*SPAC*" means a transaction, including, without limitation, the XPDI Transaction, involving a publicly listed special purpose acquisition company that, upon the consummation thereof, shall be the direct or indirect parent company of Core Scientific Holding Co. (or of the successor by merger to Core Scientific Holding Co.) (such parent company, a "*Parent Entity*"). The Company shall promptly notify the Agents in writing upon the occurrence of a SPAC or the XPDI Transaction.

(cccc) "*Subsidiary*" means, with respect to any Person, any other Person of which an aggregate of more than fifty percent (50%) of the outstanding Capital Stock having ordinary voting power to elect a majority of the board of directors of such other Person is at the time, directly or indirectly, owned legally or beneficially by such Person or one or more Subsidiaries of such Person, or a combination thereof, or with respect to which any such Person has the right to vote or designate the vote of more than fifty percent (50%) of such Capital Stock whether by proxy, agreement, operation of law or otherwise. Unless the context otherwise requires, each reference to a Subsidiary shall mean a Subsidiary of the Company.

(dddd) "*Taxes*" means any present or future United States federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp occupation, premium, windfall profits, environmental (including taxes under former Code §59A), customs duties, capital stock, franchise profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on-minimum, estimated, or other taxes, levies, assessments, fees or other charges imposed by any Governmental Authority, including any interest, penalty, or addition thereto, whether disputed or not.

(eeee) "*Total Assets*" shall mean the total assets of the Company and its Subsidiaries on a consolidated basis, as shown on the applicable consolidated balance sheet of the Company and its Subsidiaries and computed in accordance with GAAP. Total Assets shall be calculated after giving effect to the transaction giving rise to the need to calculate Total Assets.

(ffff) "*UCC*" means Uniform Commercial Code.

(gggg) "*Unfunded Pension Liability*" of any Plan means the amount, if any, by which the value of the accumulated plan benefits under the Plan, determined on a plan termination basis in accordance with actuarial assumptions at such time consistent with those prescribed by the PBGC for purposes of Section 4044 of ERISA, exceeds the fair market value of all Plan assets allocable to such liabilities under Title IV of ERISA (excluding any accrued but unpaid contributions).

11

(hhhh) "*XPDI Transaction*" means the transactions contemplated by the Agreement and Plan of Merger and Reorganization, dated as of July 20, 2021, by and among Power & Digital Infrastructure Acquisition Corp., a Delaware corporation ("*XPDI*"), XPDI Merger Sub Inc., a Delaware corporation and wholly owned subsidiary of XPDI, XPDI Merger Sub 2, LLC, a Delaware limited liability company and wholly owned subsidiary of XPDI, and the Company, as amended, restated, supplemented and/or otherwise modified from time to time.

## 2. TERMS OF THE CONVERTIBLE PROMISSORY NOTES.

### 2.1 The Initial Notes.

Subject to the satisfaction (or waiver in accordance with Section 10.9) of the conditions precedent set forth in Section 4.1, the Company shall issue and sell to each Initial Purchaser, and each Initial Purchaser shall purchase from the Company, an Initial Note on the Initial Closing Date in a principal amount equal to the amount opposite such Initial Purchaser's name set forth in the Schedule of Purchasers under the header 'Initial Purchasers' attached hereto as Schedule 2. By no later than 11:00 a.m. (New York time) on the Initial Closing Date (i) each Initial Purchaser shall wire transfer same day funds in U.S. dollars, at the Note Agent's Principal Office, in the amount of such Initial Purchaser's Initial Note and (ii) the Company shall issue and deliver to each such Initial Purchaser an Initial Note in favor of such Initial Purchaser payable in the principal amount of such Initial Purchaser's Initial Note.

### 2.2 The Additional Notes.

(a) Subject to the satisfaction (or waiver in accordance with Section 10.9) of the conditions precedent set forth in Section 4.2, at any time and from time to time after the Initial Closing Date, the Company shall issue and sell to each Person that executes a counterpart signature page to this Agreement in the form attached hereto as Exhibit B (individually, an "*Additional Purchaser*" and collectively, the "*Additional Purchasers*"), and each such Additional Purchaser shall purchase from the Company, an Additional Note in a principal amount to be mutually agreed between such Additional Purchaser and the Company. Each additional issuance, sale and purchase of Additional Notes as provided in this Section 2.2 shall take place on a date to be mutually agreed by the Company and such Additional Purchaser (each, an "*Additional Closing Date*"); provided that (i) each Additional Closing Date shall have occurred on or prior to December 31, 2021, (ii) all issuances, sales and purchases of Additional Notes on an Additional Closing Date shall be made on substantially identical terms and conditions as the Initial Notes, shall, to the extent permitted by law, be fungible for tax purposes with the Initial Notes and may only be amended pursuant to Section 10.9; (iii) the purchase price of each Additional Note shall be increased by the PIK Interest (as defined in the Note) and Cash Interest (as defined in the Note) that has accrued since the Initial Closing Date on the Initial Notes (it being understood and agreed that interest on all the Notes shall accrue PIK Interest and be payable on the same dates) and (iv) in no event shall the initial aggregate principal amount of all Notes issued hereunder exceed $300,000,000.00.

(b) Any Additional Notes issued, sold and purchased pursuant to this Section 2.2 shall be deemed to be "Notes" for all purposes under this Agreement. By no later than 11:00 a.m. (New York time) on an Additional Closing Date (i) each Additional Purchaser shall wire transfer same day funds in U.S. dollars, at the Note Agent's Principal Office, in the amount of such Additional Purchaser's Additional Note and (ii) the Company shall issue and deliver to each such Additional Purchaser an Additional Note in favor of such Additional Purchaser payable in the principal amount of such Additional Purchaser's Additional Note. The Schedule of Purchasers may be amended by the Company without the consent of the Purchasers to include any Additional Purchasers upon the execution by such Additional Purchasers of a counterpart signature page hereto in the form attached hereto as Exhibit B.

3.      **SECURITY.**

To secure the performance and payment in full of the Obligations and the Guaranteed Obligations, as applicable, each Note Party shall grant to the Collateral Agent, for the benefit of the Secured Parties, a first-priority Lien on the Collateral (subject to Permitted Liens) pursuant to the Security Agreement, as and when required pursuant to Section 6.13.

4.      **CONDITIONS PRECEDENT TO EACH CLOSING DATE.**

**4.1      Conditions Precedent to the Initial Closing Date**.

The obligation of the Company to issue and to sell, and of each Initial Purchaser to purchase, Initial Notes on the Initial Closing Date are subject to the satisfaction (or waiver in accordance with Section 10.9) of the following conditions precedent on or prior to the Initial Closing Date:

(a)      receipt by each Initial Purchaser of counterparts to this Agreement, the Guaranty and the Initial Notes;

(b)      receipt by each Initial Purchaser of a certificate signed by a Responsible Officer of each Note Party attaching (i) true, correct and complete copies of the Charter Documents of each Note Party as in effect on the Initial Closing Date, certified, with respect to the Charter Documents set forth in clause (ii) of the definition thereof, as of a recent date by the Secretary of State of the state of incorporation or organization (as applicable) of such Note Party, (ii) a certificate of good standing of each Note Party, certified as of a recent date by the Secretary of State of the state of incorporation or organization (as applicable) of such Note Party, (iii) the names of the Responsible Officers of each Note Party authorized to sign the Note Documents and their true signatures and (iv) true, correct and complete copy of resolutions duly adopted by the board of directors or similar governing body of each Note Party authorizing the execution, delivery and performance of this Agreement and the other Note Documents;

(c)      receipt by each Initial Purchaser of a certificate of solvency, executed by the chief financial officer (or equivalent) of the Company, substantially in the form attached hereto as Exhibit F;

(d)      receipt by each Initial Purchaser of a certificate signed by a Responsible Officer of the Company certifying that the condition specified in clause (j) of this Section 4.1 has been satisfied;

(e)      the Initial Purchasers and the Agents shall have received an opinion of Cooley LLP, counsel to the Company, in form and substance reasonably satisfactory to the Initial Purchasers;

(f)      all authorizations, consents, approvals or permits, if any, of any governmental authority or regulatory body that are required in connection with the lawful issuance and sale of the Initial Notes pursuant to this Agreement shall have been duly obtained and shall be effective on and as of the Initial Closing Date;

(g)      there shall be no claim, action, suit, investigation, litigation or proceeding, pending or, to the knowledge of the Company and its Subsidiaries, threatened, in any court or before any governmental authority with respect to the Note Documents or any transactions contemplated thereby or hereby;

(h)      the representations and warranties made pursuant to Section 5 hereof shall be true and correct in all material respects (or if a representation or warranties is qualified by materiality or

material adverse effect, in all respects) on and as of the Initial Closing Date with the same effect as though made on and as of such date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects (or if a representation or warranties is qualified by materiality or material adverse effect, in all respects) on and as of such earlier date;

(i)       immediately before and after giving effect to the issuance of the Initial Notes on the Initial Closing Date, no Event of Default shall exist;

(j)       the Company shall have paid all outstanding fees and expenses of the Agents, Shipman & Goodwin LLP, counsel to the Agents, and as otherwise required pursuant to Section 10(a);

(k)       receipt by the Company and the Note Agent of an Administrative Questionnaire and executed copies of IRS Form W-9 or appropriate IRS Form W-8, as applicable, as well as any reasonably necessary supporting information, certifying that payments to the Initial Purchasers under the Initial Notes are exempt from U.S. federal withholding Tax; and

(l)       the Company shall have delivered to the Initial Purchasers such other documents and instruments relating to the transactions contemplated by this Agreement as the Initial Purchasers or their counsel may reasonably request (which request shall have been made no later than 3 days prior to the Initial Closing Date).

**4.2      Conditions Precedent to each Additional Closing Date**.

The obligation of the Company to issue and to sell, and of each Additional Purchaser to purchase, Additional Notes on an Additional Closing Date are subject to the satisfaction (or waiver in accordance with Section 10.8) of the following conditions precedent on or prior to each such Additional Closing Date:

(a)       each Additional Purchaser shall have received copies of each of the documents set forth in clauses (a) through (e) and clause (l) of Section 4.1 delivered to the Initial Purchasers on the Initial Closing Date;

(b)       the representations and warranties made pursuant to Section 5 hereof shall be true and correct in all material respects (or if a representation or warranties is qualified by materiality or material adverse effect, in all respects) on and as of the applicable Additional Closing Date with the same effect as though made on and as of such date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects (or if a representation or warranties is qualified by materiality or material adverse effect, in all respects) on and as of such earlier date;

(c)       immediately before and after giving effect to the issuance of Additional Notes on the applicable Additional Closing Date, no Event of Default (as defined in the Notes) shall exist; and

(d)       receipt by the Company and the Note Agent of an Administrative Questionnaire and of executed copies of IRS Form W-9 or appropriate IRS Form W-8, as applicable, as well as any reasonably necessary supporting information, certifying that payments to the Additional Purchasers under Additional Notes are exempt from U.S. federal withholding Tax.

14

5.    **REPRESENTATIONS AND WARRANTIES OF THE NOTE PARTIES.**

Each Note Party hereby represents and warrants to each Initial Purchaser and the Agents as of the Initial Closing Date and to each Additional Purchaser and the Agents as of the applicable Additional Closing Date as follows:

**5.1    Organization, Good Standing and Qualification**.

(a)    *Organization; Good Standing; Qualification.* Each Note Party and each of its Subsidiaries: (i) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation, (ii) has all requisite corporate or limited liability company power and authority to own and operate its property, to lease the property it operates as lessee and to conduct the business in which it is currently, or is currently proposed to be, engaged; (iii) is duly qualified as a foreign entity, licensed and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification, except where the failure to be so qualified could not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect and (iv) has the corporate or limited liability company power and authority to execute, deliver and perform its obligations under each Note Document to which it is or will be a party and to borrow hereunder. Each Note Party's present name, former names within the last five (5) years (if any), owned and leased locations, place of formation, tax identification number and organizational identification number are correctly set forth in Schedule 5.1 hereto, as may be updated by the Company from time to time in a written notice provided to the Note Agent after the Initial Closing Date.

(b)    *Collateral.* Except for the Liens granted under the Security Agreement, each Note Party shall be the sole legal and equitable owner of each item of Collateral in which it purports to grant a security interest under the Security Agreement upon the execution and delivery thereof pursuant to Section 6.13, having good and marketable title thereto, free and clear of any and all Liens except for Permitted Liens and, upon filing of UCC financing statements in the UCC filing office applicable to such Note Party, the Collateral Agent shall have a perfected security interest in the Collateral, which such security interest shall be senior to all other Liens (other than Permitted Liens) to the extent the same can be perfected by filing.

**5.2    Corporate Power; No Contravention**. The execution, delivery and performance by the Company and each Subsidiary of each Note Document to which it is or will be a party and the consummation of the transactions contemplated hereby: (a) have been duly authorized by all necessary corporate or limited liability company action; (b) do not and will not contravene or violate the terms of the Charter Documents of the Company or any of its Subsidiaries or any amendment thereto or any material Requirement of Law applicable to the Company or such Subsidiary or the Company's or such Subsidiary's assets, business or properties; (c) do not and will not (i) conflict with, contravene, result in any violation or breach of or default under any material Contractual Obligation of the Company or such Subsidiary (with or without the giving of notice or the lapse of time or both) other than any right to consent, which consents have been obtained, (ii) create in any other Person a right or claim of termination or amendment of any material Contractual Obligation of the Company or such Subsidiary, or (iii) require modification, acceleration or cancellation of any material Contractual Obligation of the Company or such Subsidiary; and (d) do not and will not result in the creation of any Lien (or obligation to create a Lien) against any property, asset or business of the Company or such Subsidiary (other than those securing the Notes from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13).

**5.3    Authorization.** All corporate action on the part of the Company, its Subsidiaries and their respective directors and stockholders necessary for the authorization, execution, delivery and performance of this Agreement by the Company and its Subsidiaries and the performance of the

15

Company's obligations hereunder, including the issuance and delivery of the Notes and the reservation of the equity securities issuable upon conversion of the Notes (collectively, the "**Conversion Securities**") has been taken or will be taken prior to the issuance of such Conversion Securities. This Agreement and the Note Documents, when executed and delivered by the Note Parties, shall constitute valid and binding obligations of the Note Parties enforceable in accordance with their terms, subject to laws of general application relating to bankruptcy, insolvency, the relief of debtors and general principles of equity and, with respect to rights to indemnity, subject to federal and state securities laws. The Conversion Securities, when issued in compliance with the provisions of this Agreement or the Notes will be validly issued, fully paid and nonassessable and free of any Liens and issued in compliance with all applicable federal and state securities laws.

5.4     **Governmental Consents**. All consents, approvals, orders, or authorizations of, or registrations, qualifications, designations, declarations, or filings with, any Governmental Authority, required on the part of the Note Parties in connection with the valid execution and delivery of this Agreement and the other Note Documents, the offer, sale or issuance of the Notes and the Conversion Securities issuable upon conversion of the Notes and the consummation of any other transaction contemplated hereby shall have been obtained and will be effective on the Initial Closing Date.

5.5     **Compliance with Laws**.

(a)     No Note Party is in violation of any Requirements of Law, any applicable statute, rule, regulation, order or restriction of any domestic government or any instrumentality or agency thereof in respect of the conduct of its business or the ownership of its properties, which violation of which would materially and adversely affect the business, assets, liabilities, financial condition or operations of the Note Parties (individually and in the aggregate).

(b)     Neither the Company nor any of its Subsidiaries is registered or required to register as an "investment company" or a company "controlled" by an "investment company" under the Investment Company Act of 1940, as amended. Neither the Company nor any of its Subsidiaries is engaged as one of its important activities in extending credit for margin stock (under Regulations X, T and U of the Federal Reserve Board of Governors). The Company and each of its Subsidiaries has complied in all material respects with applicable provisions of the Federal Fair Labor Standards Act. Neither the Company nor any of its Subsidiaries is a "holding company" or an "affiliate" of a "holding company" or a "subsidiary company" of a "holding company" as each term is defined and used in the Public Utility Holding Company Act of 2005. Neither the Company's nor any of its Subsidiaries' properties or assets has been used by the Company or such Subsidiary or, to Company's knowledge, by previous Persons, in disposing, producing, storing, treating, or transporting any hazardous substance other than in material compliance with applicable laws. The Company and each of its Subsidiaries has obtained all consents, approvals and authorizations of, made all declarations or filings with, and given all notices to, all Governmental Authorities that are necessary to continue their respective businesses as currently conducted, except to the extent that the failure to obtain, make or give any of the foregoing would not reasonably be expected to have a Material Adverse Effect.

(c)     Neither the Company nor any Subsidiary (i) is a Sanctioned Person, (ii) has any assets in Sanctioned Entities, or (iii) derives any operating income from investments in, or transactions with Sanctioned Persons or Sanctioned Entities. The proceeds of the Notes will not be used and have not been used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity.

(d)     The Company and its Subsidiaries are in compliance, in all material respects, with any United States Requirements of Law relating to terrorism, sanctions or money laundering (the "Anti-

16

Terrorism Laws"), including the United States Executive Order No. 13224 on Terrorist Financing (the "**Anti-Terrorism Order**") and the Patriot Act. No part of the proceeds of any Note will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended or any other Anti-Terrorism Law.

(e)     No Note Party and no Subsidiary of any Note Party (i) is listed in the annex to, or is otherwise subject to the provisions of, the Anti-Terrorism Order, (ii) is owned or controlled by, or acting for or on behalf of, any person listed in the annex to, or is otherwise subject to the provisions of, the Anti-Terrorism Order or (iii) commits, threatens or conspires to commit or supports "terrorism" as defined in the Anti-Terrorism Order.

(f)     None of the funds to be provided under this Agreement will be used, directly or indirectly, (i) for any activities in violation of any applicable anti-money laundering, economic sanctions and anti-bribery laws and regulations laws and regulations or (ii) for any payment to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

**5.6     Compliance with Other Instruments**. The Company is not in violation or default of any term of its articles of incorporation, or of any provision of any mortgage, indenture or contract to which it is a party and by which it is bound or of any judgment, decree, order or writ, other than such violation(s) that would not have a Material Adverse Effect on the Company. The execution, delivery and performance of this Agreement and the other Note Documents, and the consummation of the transactions contemplated hereby and thereby will not result in any material violation or be in conflict with, or constitute, with or without the passage of time and giving of notice, either a default under any such material provision, instrument, judgment, decree, order or writ or an event that results in the creation of any material Lien upon any assets of the Company or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization or approval applicable to the Company, its business or operations or any of its material assets or properties. Without limiting the foregoing, the Company has obtained all waivers reasonably necessary with respect to any preemptive rights, rights of first refusal or similar rights, including any notice or offering periods provided for as part of any such rights, in order for the Company to consummate the transactions contemplated hereunder without any third party obtaining any rights to cause the Company to offer or issue any securities of the Company as a result of the consummation of the transactions contemplated hereunder.

**5.7     Solvency.**  As of the Initial Closing Date both immediately before and after giving effect to the transactions contemplated by the Note Documents, the Company is individually, and the Company and its Subsidiaries on a consolidated basis are, Solvent.

**5.8     Offering**. The offer, issue, and sale of the Notes and the Conversion Securities are and will be exempt from the registration and prospectus delivery requirements of the Act, and no qualification under the Trust Indenture Act of 1939, as amended, and the rules and regulations of the Securities and Exchange Commission promulgated thereunder is required in connection with, the issuance of the Notes and the Conversion Securities.

**5.9     No "Bad Actor" Disqualification**. The Company has exercised reasonable care to determine whether any Company Covered Person (as defined below) is subject to any of the "bad actor" disqualifications described in Rule 506(d)(1)(i) through (viii), as modified by Rules 506(d)(2) and (d)(3), under the Act ("**Disqualification Events**"). To the Company's knowledge, no Company Covered Person

254153937 v7

is subject to a Disqualification Event. The Company has complied, to the extent required, with any disclosure obligations under Rule 506(e) under the Act.

**5.10    Litigation**. There are no legal actions, suits, proceedings, claims or disputes pending or, to the knowledge of any Note Party, threatened in writing, at law, in equity, in arbitration or before any Governmental Authority against or affecting the Company or its Subsidiaries that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; (b) there is no injunction, writ, temporary restraining order, decree or any order or determination of any nature by any arbitrator, court or other Governmental Authority purporting to enjoin or restrain the execution, delivery or performance of the Note Documents or which relates to the assets or the business of the Company or its Subsidiaries; and (c) there is no litigation, claim, audit, dispute, review, proceeding or investigation currently pending or threatened in writing against the Company or its Subsidiaries for any violation or alleged violation of any Requirements of Law, and neither the Company nor any Subsidiary has received written notice of any threat of any suit, action, claim, dispute, investigation, review or other proceeding pursuant to or involving any Requirements of Law.

**5.11    Taxes**.

(a)    Except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect, the Company and each of its Subsidiaries has timely filed all United States federal and state income and other material tax returns that it was required to file, in each case with due regard for any extension of time within which to file such tax return. Except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect, all Taxes due and payable by the Company or its Subsidiaries have been paid, in each case with due regard for any extension of time within which to file such tax return, other than any Taxes the amount or validity of which is being actively contested by Company or its Subsidiaries in good faith and by appropriate proceedings and with respect to which adequate reserves or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made or provided therefor. There are no Liens, other than Permitted Liens, on any of the assets of the Company or its Subsidiaries that arose in connection with any failure (or alleged failure) to pay any Tax. To the knowledge of the Company, no claim has been made by a Governmental Authority in a jurisdiction where the Company and its Subsidiaries do not file tax returns that the Company or any of its Subsidiaries is or may be subject to taxation by that jurisdiction that could reasonably be expected to have a Material Adverse Effect.

(b)    There is no action, suit, proceeding, investigation, examination, audit, or claim now pending or, to the knowledge of the Company, threatened in writing by any Governmental Authority regarding any Taxes relating to the Company or its Subsidiaries that could reasonably be expected to have a Material Adverse Effect.

**5.12    Financial Condition**.    The Note Parties have furnished the Purchasers with true, correct and complete copies of (i) the audited consolidated balance sheets of the Company and its Subsidiaries as of December 31, 2018, 2019 and 2020 and the related consolidated statements of income or operations, shareholders' equity and cash flows for each such fiscal year and (ii) the unaudited consolidated balance sheets of the Company and its Subsidiaries as of March 31, 2021 and the related consolidated statements of income or operations and cash flows for such fiscal quarter (collectively, the "***Financial Statements***"). The Financial Statements fairly present, in all material respects, the financial position of the Company and its Subsidiaries on a consolidated basis, as of the respective dates thereof, and the results of operations and cash flows thereof, as of the respective dates or for the respective periods set forth therein, and are in conformity with the past historical practices of the Note Parties, with GAAP consistently applied during the periods involved. As of the dates of the Financial Statements, neither the Company nor any Subsidiary had any known obligation, Indebtedness or liability (whether accrued, absolute, contingent

or otherwise, and whether due or to become due), which was not reflected or reserved against in the balance sheets which are part of the Financial Statements, except for those incurred in the ordinary course of business and which are fully reflected on the books of account of the Company or its Subsidiaries, as applicable.

**5.13    Subsidiaries**.   Except as set forth on Schedule 5.13, the Company does not have any Subsidiaries.

**5.14    Capitalization**. As of the Initial Closing Date, without giving effect to the transactions contemplated hereby and in the other Note Documents, the outstanding capitalization of the Company and its Subsidiaries is as set forth on Schedule 5.14.  All of the issued and outstanding Capital Stock of the Company has been, and Capital Stock of the Company issuable upon the exercise of outstanding securities when issued will be, duly authorized and validly issued and are fully paid and nonassessable. All outstanding Capital Stock of the Company's Subsidiaries are 100% owned by the Company or one of its Subsidiaries free and clear of all Liens other than Permitted Liens. Except as set forth in the Charter Documents (as in effect on the Initial Closing Date), the issuance of the foregoing Capital Stock is not and has not been subject to preemptive rights in favor of any Person other than such rights that have been waived and will not result in the issuance of any additional Capital Stock of the Company or the triggering of any down-round or similar rights contained in any options warrants, debentures or other securities or agreements of the Company or any of its Subsidiaries. On the Initial Closing Date, except as set forth on Schedule 5.14, there are no outstanding securities convertible into or exchangeable for Capital Stock of the Company or any of its Subsidiaries or options, warrants or other rights to purchase or subscribe for Capital Stock of the Company or any of its Subsidiaries, or contracts, commitments, agreements, understandings or arrangements of any kind to which the Company or any of its Subsidiaries is a party relating to the issuance of any Capital Stock of the Company or any of its Subsidiaries, or any such convertible or exchangeable securities or any such options, warrants or rights. On the Initial Closing Date, except as set forth on Schedule 5.14, neither the Company nor any of its Subsidiaries has any obligation, whether mandatory or at the option of any other Person, at any time to redeem or repurchase any Capital Stock of the Company or any of its Subsidiaries, pursuant to the terms of their respective Charter Documents or otherwise. All securities of the Company and its Subsidiaries (including all shares of the Company's common stock, securities, options and warrants to purchase shares of the Company's common stock (both outstanding as well as those that are no longer outstanding), have been and were issued and granted pursuant to an exception from the Act and otherwise in compliance, in all material respects, with all securities and other applicable laws.

**5.15    Private Offering**. No form of general solicitation or general advertising was used by the Company or its Subsidiaries or their respective representatives in connection with the offer or sale of the Notes to the Purchasers pursuant to this Agreement.

**5.16    Broker's, Finder's or Similar Fees**.  Except as set forth in that certain Engagement Letter, dated on or about of August 20, 2021, by and between the Company and GreensLedge Capital Markets LLC, there are no brokerage commissions, finder's fees or similar fees or commissions payable by the Company or its Subsidiaries in connection with the transactions based on any agreement, arrangement or understanding with the Company or its Subsidiaries or any action taken by the Company or its Subsidiaries. Notwithstanding the foregoing or any other provision herein, no Purchaser shall be liable for any brokerage commission, finder's fees or similar fees or commissions.

**5.17    Indebtedness**. Schedule 5.17 lists the amount of all Indebtedness of the Company and its Subsidiaries (other than Indebtedness under this Agreement) that is in existence immediately before the Initial Closing Date and will remain outstanding after the Initial Closing Date.

19

6.     **AFFIRMATIVE COVENANTS OF THE NOTE PARTIES**

Each Note Party shall, and shall cause each of its Subsidiaries to:

**6.1     Reporting Obligations**. Deliver to the Note Agent (for prompt distribution to the Purchasers as specified in the applicable Administrative Questionnaire (or as otherwise specified by a Purchaser to the Note Agent in writing from time to time)):

(a)     as soon as available, but not later than 150 days after the end of each fiscal year of the Company, a copy of the audited consolidated balance sheets of the Company and its Subsidiaries as at the end of such fiscal year and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year, in each case, prepared in accordance with GAAP, setting forth in each case in comparative form the figures for the previous fiscal year, and accompanied by a report of any "Big Four" or, upon Required Holders' written consent (not to be unreasonably withheld), any other independent certified public accounting firm, which report shall contain an unqualified opinion (without any (A) "going concern" or like qualification or exception, (B) qualification or exception as to the scope of such audit, or (C) qualification which relates to the treatment or classification of any item and which, as a condition to the removal of such qualification, would require an adjustment to such item (except in the case of clauses (A) and (B) above as it relates to the Obligations during the last twelve months before the Maturity Date)), stating that such consolidated financial statements present fairly in all material respects the financial position for the periods indicated in conformity with GAAP applied on a basis consistent with prior years; and

(b)     as soon as available, but not later than 45 after the end of each fiscal quarter of each fiscal year (other than the fourth fiscal quarter), the unaudited consolidated balance sheets of the Company and its Subsidiaries as at the end of such fiscal quarter and the related unaudited consolidated statements of income and cash flows of the Company and its Subsidiaries for such fiscal quarter and for the period from the beginning of the then current fiscal year to the end of such fiscal quarter, all certified on behalf of the Company by a Responsible Officer of the Company as being complete and correct and fairly presenting, in all material respects, the financial position and the results of operations of the Company and its Subsidiaries, subject to normal year-end adjustments and absence of footnote disclosures.

(c)     promptly, and in any event within three (3) Business Days after the Company or any other Note Party becomes aware of or has knowledge of any event or condition that constitutes a Default or Event of Default, provide written notice of such event or condition and a statement of the curative action that the Company proposes to take with respect thereto.

Delivery of any reports, information and documents under this Section 6.2, as well as any other reports, information and documents pursuant to this Agreement, to the Note Agent is for informational purposes only and the Note Agent's receipt of the same shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of its covenants hereunder (as to which the Note Agent is entitled to rely exclusively on certificates of a Responsible Officer of the Company). The Note Agent shall have no responsibility or liability for the filing, timeliness or content of any report required under this Section 6.2 or any other reports, information and documents required under this Agreement.

**6.2     Taxes and Claims**.

(a)     Timely file complete and correct United States federal and state income and applicable foreign, state and local tax returns required by law, in each case with due regard for any extension of time

within which to file such tax returns, and pay when due all Taxes in each case, except to the extent that the failure to so file or pay could not reasonably be expected to have a Material Adverse Effect; <u>provided</u> that the Company and its Subsidiaries shall not be required to pay any such Taxes which are being contested in good faith by appropriate proceedings and with respect to which adequate reserves have been set aside in accordance with GAAP, which deferment of payment is permissible so long as no Lien, other than a Permitted Lien, has been entered and the Company's and its Subsidiaries' title to, and its and their right to use, its and their respective properties are not materially adversely affected thereby.

(b)     Pay all stamp, court or documentary, intangible, recording, filing or similar Taxes, if any, that arise solely in connection with the issuance of the Notes except to the extent such Taxes arise as a result of a transfer of a Note to a person other than the initial Holder of the Notes. The obligations of the Company under this Section 6.2(b) shall survive the payment of the Obligations and the termination of the Note Documents.

**6.3     Insurance**.

(a)     Maintain with reputable insurance companies insurance in such amounts and covering such risks as is consistent with sound business practice, including, without limitation, property and casualty insurance on all of its property, general liability insurance, workers compensation insurance and business interruption insurance. From and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, each Note Party will, and will cause each of its Subsidiaries to, furnish to the Collateral Agent, upon reasonable request, full information as to the insurance carried by it.

(b)     From and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, (i) at all times keep its property which is subject to the Lien of the Collateral Agent insured in favor of the Collateral Agent, and all policies or certificates (or certified copies thereof) with respect to such insurance and (ii) notify (and cause each of its Subsidiaries to notify) the Collateral Agent and the Purchasers, promptly, upon receipt of a notice of termination, cancellation, or non-renewal from its insurance company of any such policy.

(c)     If the Company shall fail to maintain all insurance in accordance with this <u>Section 6.3</u> or to timely pay or cause to be paid the premium(s) on any such insurance, or if the Company shall fail to deliver all certificates with respect thereto, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, the Collateral Agent shall have the right (but shall be under no obligation) to procure such insurance or pay such premiums, and the Company agrees to reimburse the Purchasers, on demand, for all costs and expenses relating thereto.

**6.4     Compliance with Laws**. Comply with any and all Requirements of Law to which it may be subject including, without limitation, all Environmental Laws, and obtain any and all Licenses necessary to the ownership of its property or to the conduct of its businesses, except, in each case, where failure to do so could not reasonably be expected to have a Material Adverse Effect. Each Note Party will, and will cause each of its Subsidiaries to, timely satisfy all material assessments, fines, costs and penalties imposed by any Governmental Authority against such Person or any property of such Person except to the extent such assessments, fines, costs, or penalties are being contested in good faith by appropriate proceedings and for which the Company or such Subsidiary has set aside on its books adequate reserves in accordance with GAAP.

**6.5     Maintenance of Properties**. Do all things necessary to maintain, preserve, protect and keep its property (other than property that is obsolete, surplus, or no longer used or useful in the ordinary conduct of its business) in good repair, working order and condition (ordinary wear and tear and casualty and condemnation excepted), make all necessary and proper repairs, renewals and replacements such that

its business can be carried on in connection therewith and be properly conducted at all times and pay and discharge when due the cost of repairs and maintenance to its property, and pay all rentals when due for all real estate leased by such Person.

**6.6     Employee Benefit Plans**. (a) Keep in full force and effect any and all Plans which are presently in existence or may, from time to time, come into existence under ERISA and not withdraw from any such Plans, unless such withdrawal can be effected or such Plans can be terminated without material liability to the Company or its Subsidiaries, (b) make contributions to all such Plans in a timely manner and in a sufficient amount to comply in all material respects with the standards of ERISA, including, without limitation, the minimum funding standards of ERISA, (c) comply in all material respects with all requirements of ERISA, (d) notify the Purchasers promptly upon receipt by the Company or any Subsidiary of any notice concerning the imposition of any withdrawal liability or of the institution of any proceeding or other action which may result in the termination of any such Plans by the PBGC or the appointment of a trustee to administer such Plans, (c) promptly advise the Purchasers of the occurrence of any Reportable Event or non-exempt prohibited transaction (as defined in ERISA) with respect to any such Plans of which Company becomes aware, and (f) amend any Plan that is intended to be qualified within the meaning of Section 401 of the Code to the extent necessary to keep the Plan qualified and to cause the Plan to be administered and operated in a manner that does not cause the Plan to lose its qualified status.

**6.7     Environmental**. Use and operate all of its facilities and properties in material compliance with all Environmental Laws, keep all necessary Licenses in effect and remain in material compliance therewith, and handle all Hazardous Materials in material compliance with all applicable Environmental Laws.

**6.8     Intellectual Property**.

(a)     Each Note Party will take the steps described in this Section 6.8 with respect to all new or acquired Intellectual Property to which the Company or any Guarantor is now or later becomes entitled that is necessary in the conduct of such Person's business. The Company acknowledges and agrees that the Secured Parties shall have no duties with respect to any Intellectual Property or Licenses of the Company or its Subsidiaries.

(b)     The Note Parties shall have the duty, with respect to Intellectual Property that is necessary in the conduct of such Person's business (i) to prosecute diligently any trademark application or service mark application that is part of the trademarks pending as of the date hereof or hereafter, (ii) to prosecute diligently any patent application that is part of the patents pending as of the date hereof or hereafter, and (iii) to take all reasonable and necessary action to preserve and maintain all of the Note Parties' trademarks, patents, copyrights, Licenses, and its rights therein, including paying all maintenance fees and filing of applications for renewal, affidavits of use, and affidavits of non-contestability, except in the case of clauses (i) and (ii), where the Company, in its reasonable opinion, determines that the costs for engaging in such prosecution activities exceeds the likely benefit of continued prosecution and, except in the of case (iii), where the Company, in its reasonable opinion, determines that the costs of preserving and maintaining exceeds the value the Company obtains from such preservation and maintenance. Each Note Party will require all employees, consultants, and contractors of such Note Party who were involved in the creation or development of such Intellectual Property to sign agreements containing assignment to the Company or such Guarantor of Intellectual Property rights created or developed and obligations of confidentiality. No Note Party shall abandon any Intellectual Property or License that is necessary in the conduct of the Company's or such Guarantor's business.

(c)      From and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, each Note Party will (i) promptly file, at such Note Party's sole cost and expense, any application to register any Intellectual Property with the United States Patent and Trademark Office or the United States Copyright Office if such registration is necessary in connection with the conduct of such Note Party's business, (ii) concurrently with the delivery of financial statements pursuant to Sections 6.1(a) or (b), deliver supplements to Schedule 4(c) to the Security Agreement and any other documents reasonably necessary for the Collateral Agent to record its security interest in such Intellectual Property with the United States Patent and Trademark Office or the United States Copyright Office or such Note Party's business, (iii) promptly after the delivery of the documents required by clause (ii) above, upon the reasonable request of the Collateral Agent, execute and deliver in favor of the Collateral Agent one or more Intellectual Property Security Agreements to further evidence the Purchasers' Lien on such Note Party's Intellectual Property.

6.9     **Use of Proceeds**. Use the proceeds of the Notes (i) to pay any fees and expenses incurred by the Company in connection with the transactions contemplated hereby and (ii) for general corporate purposes not in violation of any applicable laws. The Company shall not use any proceeds of the sale of the Notes hereunder to, directly or indirectly, purchase or carry any "margin stock" (as defined in Regulation U) or to extend credit to others for the purpose of purchasing or carrying any "margin stock", in either case, in violation of the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.

6.10    **Subsidiaries**.   If any Note Party creates, forms or acquires any Subsidiary (other than an Excluded Subsidiary) on or after the date of this Agreement, such Note Party will, and will cause such Subsidiary to, (a) within 30 days (which 30 days may be extended by the Note Agent at the direction of the Required Holders) of the creation, formation or acquisition of such new Subsidiary, cause such Subsidiary to join the Guaranty as a "Guarantor" thereunder and (b) from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, within 30 days (which 30 days may be extended by the Collateral Agent at the direction of the Required Holders) of the creation, formation or acquisition of such new Subsidiary, cause such Subsidiary to join the Security Agreement as a "Grantor" and take all such other actions and execute and deliver, or cause to be executed and delivered, all such documents, instruments, agreements, and certificates as are similar to those described in Sections 4.1(c) and, if requested by the Required Holders, 4.1(g) or that are necessary or desirable to protect, evidence or perfect the security interest of the Collateral Agent in a manner similar to the Liens and assets granted by the existing Note parties under the existing Collateral Documents either by executing and delivering to the Collateral Agent a counterpart or supplement to the existing Collateral Documents or such new documents as are necessary or desirable to evidence, grant or perfect a first priority lien in such assets in favor of Collateral Agent, for the benefit of Secured Parties (including, without limitation, any pledges of Capital Stock (other than with respect to Excluded Property (as defined in the Security Agreement))). The Agents shall be authorized to execute and deliver such documents upon receipt of a certificate from a Responsible Officer of the Company stating that such documents are authorized or permitted under the Note Documents.

6.11    **Piggyback Registration Rights**. The Company shall provide the Holders of the Notes with customary "piggyback" registration rights (with respect to the shares of common stock issued upon conversion of the Notes) on all registration statements of the Company, subject to the right, however, of the Company and its underwriters to reduce the number of shares proposed to be registered at the underwriter's discretion.

6.12    **Further Assurances**.   Each Note Party will take any action reasonably requested by any Holder in order to effectuate the purposes and terms contained in this Agreement or any other Note Document.

**6.13**     **Conversion Event**. Within 30 calendar days of the occurrence of the first Conversion Event, (i) each of the Note Parties and the Collateral Agent hereby agrees that it shall execute and deliver to each Holder a counterpart of the Security Agreement and the Intellectual Property Security Agreement and take such actions and deliver such other documents as are reasonably necessary, or reasonably required by the Required Holdings, to give effect to this Section 6.13, including, without limitation, delivering and filing (or causing to be delivered and filed) UCC-1 financing statements with respect to the security interests to be granted thereby (provided that any such actions shall not be a condition precedent to the effectiveness of the Security Agreement) and furnishing certificates of insurance issued on applicable ACORD Forms with respect to property and liability insurance for the Company and (ii) in the event that such a Conversion Event is a SPAC and the Parent Entity assumes or otherwise becomes a co-obligor with respect to the Company's Obligations pursuant to Section 10.1, Core Scientific Holding Co. (or its successor by merger) shall remain a co-obligor with such Parent Entity with respect to such Obligations (other than any such Obligation of the Company to deliver Conversion Securities pursuant to Section 2 of the Note, with respect to which delivery Obligation Core Scientific Holding Co. (or it successor by merger) hereby agrees that it shall execute and deliver to each Holder a supplement to the Guaranty, substantially in the form attached thereto as Exhibit C).

## 7.     NEGATIVE COVENANTS OF THE NOTE PARTIES

Each Note Party shall not, and shall cause each of its Subsidiaries not to:

**7.1**     **Liens, Restricted Payments and Dispositions**. Prior to the occurrence of a Conversion Event, so long as the Obligations remain outstanding:

(a)     Liens. Create, assume or suffer to exist any Liens on any assets of the Note Parties securing debt for borrowed money in excess of an amount at any time outstanding equal to the greater of (x) the sum of (I) the aggregate principal amount of the Existing Notes at any time outstanding (disregarding, for the purposes of this clause (I) any and all PIK Interest (as defined in the Existing Notes) that has been added to the aggregate principal amount of the Existing Notes) *plus* (II) $50,000,000 and (y) $265,000,000 (such clause (y), the "***Secured Debt Cap***"); provided that (x) in no event shall the aggregate principal amount of the Existing Notes at any time outstanding (disregarding, for the purposes of this proviso any and all PIK Interest (as defined in the Existing Notes) that has been added to the aggregate principal amount of the Existing Notes) exceed at any time $215,000,000, (y) the Collateral Agent and the authorized representative with respect to any Indebtedness that is secured on a pari passu basis with the Liens on the Collateral securing the Obligations that is permitted to be secured in reliance on this clause (a) shall have entered into an intercreditor agreement providing for equal and ratable lien priority and perfection for the holders and providers of such Indebtedness at the direction of the Required Holders and substantially in the form attached hereto as Exhibit H (it being understood that the form attached as Exhibit H is acceptable to the Holders) or such other form reasonably satisfactory to the Required Holders (the "***Intercreditor Agreement***") and (z) notwithstanding the foregoing, the Note Parties shall be permitted to incur any letters of credit and any Indebtedness, including Capital Lease Obligations, incurred to finance the acquisition of any fixed or capital assets (including, for the avoidance of doubt, any real property assets) so long as such Liens shall encumber only the assets acquired or financed with the proceeds of such Indebtedness (or, in the case of any letters of credit, cash collateral) and do not attach to any other assets of any Note Party, which letters of credit and Indebtedness set forth in this clause (z) shall, for the avoidance of doubt, be excluded from the calculation of the Secured Debt Cap.

(b)     Restricted Payments.

(i)     Pay or make any Restricted Payment to its direct or indirect equityholders; provided that, the foregoing shall not restrict or prohibit any Subsidiary from paying or

making any Restricted Payments, directly or indirectly, to the Company, and shall not restrict or prohibit any Restricted Payments, directly or indirectly, from the Company to its direct or indirect equityholders at such times and in such amounts as are necessary to permit:

(1) such equityholder (A) to pay general administrative costs and expenses (including audit and tax fees payable to third party auditors and tax advisors, customary compensation and reasonable costs and expenses of the board of directors or similar managing body of such entity incurred in the ordinary course of business, and franchise taxes and other fees, taxes and expenses required to maintain such entity's existence), (B) to discharge its, its Subsidiaries' and its direct and indirect owners' income tax liabilities and (C) in the case that the Company is treated as a flow-through entity for U.S. income tax purposes, its direct and indirect owners to discharge their respective U.S. federal, state and local and non-U.S. income tax obligations associated with their ownership of the Company, in each case, so long the amount of any such Restricted Payment is applied for such purpose; and

(2) (x) purchases or cash payments in lieu of fractional shares of Capital Stock arising out of stock dividends, splits, combinations or conversions of Capital Stock in the ordinary course of business and (y) purchases or cash payments in lieu of fractional shares upon conversion of the Notes.

(ii) From and after the occurrence of a Conversion Event, any Restricted Payments made or paid to the direct or indirect equityholders of the Company (other than the Restricted Payments of the type referred to in the proviso to clause (i) above) shall also be made or paid to the Holders in accordance with their Pro Rata Share of the Notes on an as-converted basis as if such Notes had been converted pursuant to their terms at the time of the applicable Restricted Payment.

(c) Asset Dispositions. Consummate any Asset Dispositions; provided that the foregoing shall not restrict or prohibit (A) sales of inventory in the ordinary course of business; (B) the use of cash or cash equivalents in a manner not prohibited by the Note Documents; (C) licenses, sublicenses, leases or subleases granted to third parties in the ordinary course of business not interfering with the business of the Company and its Subsidiaries and which do not materially impair the value of the property so licensed, sublicensed, leased or subleased; (D) dispositions of obsolete, damaged, surplus or worn-out or no longer used or useful equipment; (E) the lapse, abandonment or other dispositions of Intellectual Property that is, in the reasonable business judgment of the Company, no longer economically practicable or commercially desirable to maintain; (F) dispositions by (1) any Subsidiary to the Company, (2) the Company to any Note Party, (3) any Subsidiary to any Note Party or (4) any Subsidiary that is not a Note Party to any other Subsidiary that is not a Note Party; (G) dispositions resulting from any casualty or property losses or condemnation or similar proceeding of, any property or asset of the Company or any of its Subsidiaries; (H) the sale or other disposition of any assets or property of the Company not constituting Collateral; (I) any Asset Disposition so long as such Asset Disposition is made for fair market value; (J) any individual Asset Disposition so long as the consideration therefor does not exceed $1,000,000; and (K) any other Asset Dispositions to a non-affiliated third party so long as the aggregate consideration therefor does not exceed $10,000,000 per fiscal year; provided, further, that notwithstanding the foregoing, any Asset Disposition described in the foregoing clause (K) shall be permissible notwithstanding the fact that the counterparty is an affiliate or a Subsidiary of the Company so long as such Asset Disposition is on fair and reasonable terms no less favorable to the Company or such affiliate or Subsidiary than would be obtainable on comparable arm's length transaction with a non-affiliated third party.

**7.2    Issuances of Equity**.   Except to the extent permitted by Section 7.1(c), no Subsidiary of the Company shall issue or sell Capital Stock in such Subsidiary.

**7.3     Modifications of Charter Documents**. The Company will not permit, and will cause each of its Subsidiaries not to permit, such Person's Charter Documents to be amended or modified in any way that could reasonably be expected to materially or adversely affect the interests of the Holders in their capacity as Secured Parties (and not, for the avoidance of doubt, as holders of Capital Stock of the Company).

**7.4     Compensation or Credit Support**. Other than (x) to consenting or approving Holders in connection with a consent or amendment in accordance with <u>Section 10.9</u> to the extent all Holders are afforded an opportunity to enter into such consent or amendment or (y) in connection with the issuance of warrants to non-consenting Holders pursuant to Section 1(b)(i)(1) of the Notes, the Company shall not enter into any arrangement with any Holder for the purposes of providing additional compensation (in the form of interest, fees or otherwise) or credit support (in the form of additional collateral or otherwise) to such Holder in connection with the Notes without providing such additional compensation or credit support for the ratable benefit of all Holders.

## 8.     REPRESENTATIONS AND WARRANTIES OF THE PURCHASERS

Each Initial Purchaser hereby represents and warrants as of the Initial Closing Date, and each Additional Purchaser hereby represents and warrants as of the applicable Additional Closing Date as follows:

**8.1     Purchase for Own Account**. Each Purchaser represents that it is acquiring a Note and the Conversion Securities (collectively, the "*Securities*") solely for its own account and beneficial interest for investment and not for sale or with a view to distribution of the Securities or any part thereof, has no present intention of selling (in connection with a distribution or otherwise), granting any participation in, or otherwise distributing the same, and does not presently have reason to anticipate a change in such intention.

**8.2     Information and Sophistication**. Without lessening or obviating the representations and warranties of the Note Parties set forth in <u>Section 5</u> hereof or in any other Note Document or the right of such Purchaser to rely thereon, each Purchaser hereby: (i) acknowledges that it has received all the information it has requested from the Company and it considers necessary or appropriate for deciding whether to acquire the Securities, (ii) represents that it has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Securities and to obtain any additional information necessary to verify the accuracy of the information given the Purchaser, and (iii) further represents that it has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risk of this investment.

**8.3     Ability to Bear Economic Risk**. Each Purchaser acknowledges that investment in the Securities involves a high degree of risk, and represents that it is able, without materially impairing its financial condition, to hold the Securities for an indefinite period of time and to suffer a complete loss of its investment.

**8.4     Further Limitations on Disposition**. Without in any way limiting the representations set forth above, each Purchaser further agrees not to make any disposition of all or any portion of the Securities unless and until:

(c)     there is then in effect a registration statement under the Act covering such proposed disposition and such disposition is made in accordance with such registration statement; or

(d)      the Purchaser shall have notified the Company of the proposed disposition and shall have furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and if reasonably requested by the Company, such Purchaser shall have furnished the Company with an opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration under the Act or any applicable state securities laws, provided that no such opinion shall be required for dispositions in compliance with Rule 144, except in unusual circumstances.

Notwithstanding the provisions of paragraphs (a) and (b) above, no such registration statement or opinion of counsel shall be necessary for a transfer by such Purchaser to Permitted Transferees, or transfers by gift, will or intestate succession to any spouse or lineal descendants or ancestors of any Purchaser who is an individual, if all transferees agree in writing to be subject to the terms hereof to the same extent as if they were Purchasers hereunder

**8.5      Accredited Investor Status.** Each Purchaser is an "accredited investor" as such term is defined in Rule 501 under the Act.

**8.6      No "Bad Actor" Disqualification**. Each Holder represents and warrants that neither (A) such Holder nor (B) any entity that controls such Holder or is under the control of, or under common control with, such Holder, is subject to any Disqualification Event, except for Disqualification Events covered by Rule 506(d)(2)(ii) or (iii) or (d)(3) under the Act and disclosed in writing in reasonable detail to the Company. Each Holder represents that such Holder has exercised reasonable care to determine the accuracy of the representation made by such Holder in this paragraph, and agrees to notify the Company if such Holder becomes aware of any fact that makes the representation given by such Holder hereunder inaccurate.

**8.7      Foreign Investors**. If a Holder is not a United States person (as defined by Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended (the "*Code*")), such Holder hereby represents that he, she or it has satisfied itself as to the full observance of the laws of the Holder's jurisdiction in connection with any invitation to subscribe for the Securities or any use of its Note, including (A) the legal requirements within the Holder's jurisdiction for the purchase of the Securities, (B) any foreign exchange restrictions applicable to such purchase, (C) any governmental or other consents that may need to be obtained, and (D) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale or transfer of the Securities. The Holder's subscription, payment for and continued beneficial ownership of the Securities will not violate any applicable securities or other laws of the Holder's jurisdiction.

**8.8      Forward-Looking Statements**. With respect to any forecasts, projections of results and other forward-looking statements and information provided to a Holder, such Holder acknowledges that such statements were prepared based upon assumptions deemed reasonable by the Company at the time of preparation. There is no assurance that such statements will prove accurate, and the Company has no obligation to update such statements.

**8.9      GreensLedge as Placement Agent.** Each Purchaser represents, acknowledges and agrees that: (A) GreensLedge Capital Markets LLC ("*GreensLedge*") has acted as the Company's placement agent for the Securities, (B) such Purchaser is not relying on the advice or recommendations of GreensLedge (including any affiliate, agent, advisor or representative thereof) in connection with such Purchaser's purchase of Securities, (C) GreensLedge is not acting as an underwriter or initial purchaser with respect to any Securities, (D) GreensLedge has no responsibility with respect to any marketing or other disclosure documents relating to the Securities (or the completeness of any thereof) furnished to such Purchaser, (E) GreensLedge has not made, and will not make, any representation or warranty with respect to the Company or any Securities (and such Purchaser will not rely on any statements made by

27

GreensLedge, orally or in writing, to the contrary) and (F) GreensLedge and/or any affiliate or employee thereof may purchase or otherwise invest in the Securities.

**8.10    Further Assurances.** Each Purchaser agrees and covenants that at any time and from time to time it will promptly execute and deliver to the Company such further instruments and documents and take such further action as the Company may reasonably require in order to carry out the full intent and purpose of this Agreement and to comply with state or federal securities laws or other regulatory approvals.

## 9.    THE AGENTS

**9.1    Appointment and Authorization of the Agents.** Each Purchaser hereby irrevocably appoints, designates and authorizes the Note Agent to act as the "note agent" under the Note Documents and, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, the Collateral Agent to act as the "collateral agent" under the Note Documents and to act as the agent of (and to hold any security interest created by any Note Document for and on behalf of or on trust for) such Purchaser for purposes of acquiring, holding and enforcing any and all Liens on Collateral to be granted by the Company to secure any of the Obligations, and to take such other action on its behalf in accordance with the provisions of this Agreement and each other Note Document and to exercise such powers and perform such duties, in each case as are expressly delegated to the Agents by the terms of this Agreement or any other Note Document, together with such powers and discretion as are reasonably incidental thereto. Notwithstanding any provision to the contrary contained elsewhere herein or in any other Note Document, the Agents shall have no duties or responsibilities, except those expressly set forth herein, nor shall the Agents have or be deemed to have any fiduciary relationship with any Purchaser or participant, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Note Document or otherwise exist against the Agents. Without limiting the generality of the foregoing sentence, the use of the term "agent" herein and in the other Note Documents with reference to the Agents is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used merely as a matter of market custom and is intended to create or reflect only an administrative relationship between independent contracting parties. Without limiting the generality of the foregoing, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, the Purchasers hereby expressly authorize the Collateral Agent to execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Note Documents and acknowledge and agree that any such action by Collateral Agent shall bind the Purchasers. Whether or not expressly stated in any Note Document, the rights, privileges and immunities of the Agents shall be automatically incorporated by reference therein. Whether or not a party thereto, the Agents shall be express third party beneficiaries of the Notes, including without limitation the payment waterfall set forth therein.

**9.2    Liability of Agents.** No Agent-Related Person shall (a) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Note Document or the transactions contemplated hereby, or (b) be responsible in any manner to any Purchaser for any recital, statement, representation or warranty made by the Company or any officer thereof, contained herein or in any other Note Document, or in any certificate, report, statement or other document referred to or provided for in, or received by the Agents under or in connection with, this Agreement or any other Note Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Note Document, or the creation, perfection, maintenance of perfection or priority of any Lien or security interest created or purported to be created under the Note Documents, the convertibility of the Notes and the validity or the sufficiency of the Equity Securities (as defined in the Note), or for any failure of the Company or any other party (other than Agents) to any Note Document to

perform its obligations hereunder or thereunder, except to the extent such loss resulted from the gross negligence or willful misconduct of such Agent-Related Person, as determined by a final nonappealable order of a court of competent jurisdiction. The Note Agent shall have no obligation to monitor the Ledger in the absence of being providing such by the Company in accordance with the terms of the Notes, and may, in its sole discretion either: (i) conclusively rely on the Ledger most-recently delivered to it, (ii) conclusively rely on a statement by a Holder as to the outstanding principal amount of Notes held by it, or (iii) refrain from taking any action until the Note Agent receives a current Ledger from the Company. No Agent-Related Person shall be under any obligation to any Purchaser or participant to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Note Document, or to inspect the properties, books or records of the Company or any affiliate thereof.

The Agents shall not have any duties or obligations except those expressly set forth in the Note Documents. Without limiting the generality of the foregoing, (i) the Agents shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing and (ii) the Agents shall not have any duty to take any discretionary action or exercise any discretionary powers, except, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, discretionary rights and powers expressly contemplated hereby that the Collateral Agent is instructed in writing to exercise by the Required Holders (or such other requisite number or percentage of Holders as provided in <u>Section 10.9</u>).

In no event shall the Agents be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, epidemics, pandemics, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility, it being understood that the Agents shall use reasonable best efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

**9.3    Reliance by the Agents**. The Agents shall be entitled to rely, and shall be fully protected in relying, upon any writing, communication, signature, resolution, representation, notice, consent, certificate, affidavit, letter, facsimile or telephone message, electronic mail message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper person or persons, and upon advice and statements of legal counsel (including counsel to the Company), independent accountants and other experts selected by the Agents. The Agents shall be fully justified in failing or refusing to take any action under any Note Document unless it shall first receive such advice or concurrence of the Required Holders as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Holders against any and all loss, liability and expense which may be incurred by it by reason of taking or continuing to take any such action. The Agents shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Note Document in accordance with a request or consent of the Required Holders (or such greater number of Holders as may be expressly required hereby in any instance), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the of the same; <u>provided</u> that the Agents shall not be required to take any action that, in its opinion or in the opinion of its counsel, may expose the Agents to liability or that is contrary to any Note Document or applicable law.

**9.4    Notice of Default**. The Agents shall not be deemed to have knowledge or notice of the occurrence of any Event of Default, unless the Agents shall have received written notice from a Purchaser referring to this Agreement, describing such Event of Default and stating that such notice is a "notice of event of default." The Agents shall take such action with respect to any Event of Default as may be directed by the

Required Holders in accordance with the terms of the Notes; provided that unless and until the Agents has received any such direction, the Agents may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Event of Default as it shall deem advisable or in the best interest of the Holders.

      **9.5**     **Agent's Reimbursement.** Each of the Holders severally agrees to reimburse the Agents, in accordance with such Holder's Pro Rata Share, for any reasonable and documented out-of-pocket expenses not reimbursed by the Company (without limiting the obligation of the Company to make such reimbursement pursuant to Section 10.10): (a) for which the Agents are entitled to reimbursement by the Company under this Agreement or any Note Document and (b) after the occurrence and during the continuance of an Event of Default, for any other reasonable and documented expenses incurred by the Agents on the Holders' behalf in connection with the enforcement of the Holders' rights under this Agreement or any Note Document; provided, however, that (x) the Agents shall not be reimbursed for any such expenses arising as a result of its gross negligence or willful misconduct, as determined by a final nonappealable order of a court of competent jurisdiction and (y) in the event that the Company reimburses the Agents for any such reasonable and documented out-of-pocket expenses, any corresponding amounts previously reimbursed by the Holders to the Agents will be promptly returned to such Holders in accordance with their Pro Rata Share.

      **9.6**     **Indemnification.** Each of the Holders shall severally indemnify the Agents and their officers, directors, employees, agents, attorneys, accountants, consultants and controlling Persons (to the extent not reimbursed by or on behalf of the Company pursuant to Section 10.10 and without limiting the obligations of the Company to do so), in accordance with their respective Pro Rata Share, from and against any and all liabilities, obligations, damages, penalties, actions, judgments, suits, losses (including accrued and unpaid Agents' fees), and reasonable and documented costs, expenses or disbursements of any kind whatsoever which may at any time be imposed on, incurred by or asserted against the Agents or such Persons relating to or arising out of this Agreement, any Note Document, the transactions contemplated hereby or thereby, or any action taken or omitted by the Agents in connection with any of the foregoing; provided, however, that the foregoing shall not extend to actions or omissions to the extent arising from gross negligence or willful misconduct of the Agents, as determined by a final nonappealable order of a court of competent jurisdiction. The Agents shall not be under any obligation to exercise any of the rights or powers vested in it by this Agreement at the request, order or direction of any of the Holders, pursuant to any provision of this Agreement, unless the Required Holders shall have offered (and, if requested, provided) to the Agents security or indemnity satisfactory to it against the costs, expenses and liabilities which may be incurred by it therein or thereby. The undertaking in this Section 9.6 shall survive the payment of all other Obligations and the resignation of the Agents.

      **9.7**     **Collateral Matters**. The Purchasers irrevocably agree that, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, any Lien on any property granted to or held by the Collateral Agent under any Note Document for the benefit of the Secured Parties shall be automatically released (i) upon payment in full of all Obligations (it being understood and agreed that the conversion in full of a Note by the Holder thereof shall be deemed, for purposes of this Section 9.6, to be a repayment of the entire outstanding principal amount (including all capitalized interest) of such Note together with any unpaid accrued interest thereon on the date of such conversion), (ii) subject to Section 10.9, if the release of such Lien is approved, authorized or ratified in writing by the Purchasers or (iii) upon the sale, transfer or other disposition of any Collateral that is not prohibited by the Note Documents. Upon request by the Collateral Agent at any time from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, the Purchasers will confirm in writing the Collateral Agent's authority to release particular types or items of property. In each case as specified in this Section 9.7, the Collateral Agent will, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, promptly (and each Purchaser irrevocably authorizes the Collateral Agent to), at the Company's expense,

execute and deliver to the Company such documents as the Company may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Note Documents. In connection with any such release, the Collateral Agent shall be entitled to a certificate of a Responsible Officer of the Company stating that such release is authorized and permitted by the Note Documents, upon which the Collateral Agent may conclusively rely. Each party to this Agreement acknowledges and agrees that the Agents shall not have an obligation to file financing statements, amendments to financing statements, or continuation statements, or to perfect or maintain the perfection of the Collateral Agent's Lien on the Collateral.

**9.8    Successor Agents**. The Agents may resign as Agents upon fifteen (15) days' notice to the Holders. If an Agent resigns under this Agreement, the Holders shall unanimously appoint a successor representative for the Holders. If no successor representative is appointed prior to the effective date of the resignation of the Agent, the resigning Agent may appoint, after consulting with the Holders and the Company, a successor agent. Upon the acceptance of its appointment as successor representative hereunder, such successor representative shall succeed to all the rights, powers and duties of the retiring Agent, the term "Agents" shall mean such successor representative and the retiring Agent's appointment, powers and duties as Agents shall be terminated. After any retiring Agent's resignation hereunder as Agent, the provisions of this Section 9 and Section 10 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement. If no successor representative has accepted appointment as Agent by the date which is fifteen (15) days following a retiring Agent's notice of resignation, the retiring Agent's resignation shall nevertheless thereupon become effective and the Holders shall perform all of the duties of the Agents hereunder until such time, if any, as the Holders appoint a successor representative as provided for above.

**9.9    Intercreditor Agreement**. The Collateral Agent is hereby authorized to enter into the Intercreditor Agreement pursuant to Section 7.1(a) and the parties hereto acknowledge that such Intercreditor Agreement, upon execution of the same, shall be binding upon them. From and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, each Secured Party hereby (a) agrees that it will be bound by and will take no actions contrary to the provisions of the Intercreditor Agreement, (b) authorizes and instructs the Collateral Agent, without any further consent of such Secured Party, to enter into the Intercreditor Agreement provided by the Company and accompanied by the certificate specified in Section 7.1(a) and to subject the Liens on the Collateral securing the Obligations to the provisions thereof and (c) authorizes and instructs the Collateral Agent to execute and deliver on behalf of the Secured Parties any amendment (or amendment and restatement) or modification to the Intercreditor Agreement to provide for the incurrence of any Indebtedness permitted hereunder or such other amendments as the Required Holders may specify in writing to the Collateral Agent.

**10.    MISCELLANEOUS**

**10.1    Binding Agreement**. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, expressed or implied, is intended to confer upon any third party any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement. Notwithstanding anything to the contrary contained herein or in any other Note Documents, in the event of a SPAC, the Obligations of the Company to deliver Conversion Securities pursuant to Section 2 of the Note may be assigned to a Parent Entity, so long as such Parent Entity expressly assumes such Obligation of the Company and becomes a co-Obligor of each other Obligation of the Company (or its successor by merger) under the Note Documents, in each case pursuant to an joinder and assignment and assumption agreement, substantially in the form attached hereto as Exhibit I, and delivers certificates substantially identical to those delivered by the Company on the Initial Closing Date pursuant to clauses (b), (c) and (d) of Section 4.1.

**10.2** **GOVERNING LAW.** THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.

**10.3** **JURISDICTION AND VENUE.** EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ANY U.S. FEDERAL OR NEW YORK STATE COURT SITTING IN THE BOROUGH OF NEW YORK, NEW YORK IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR ANY OTHER NOTE DOCUMENT AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN ANY SUCH COURT AND IRREVOCABLY WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT OR THAT SUCH COURT IS AN INCONVENIENT FORUM. NOTHING HEREIN SHALL LIMIT THE RIGHT OF ANY PURCHASER, ANY HOLDER OR, FROM AND AFTER THE EXECUTION AND DELIVERY OF THE COLLATERAL DOCUMENTS PURSUANT TO SECTION 6.13, THE COLLATERAL AGENT, TO BRING PROCEEDINGS AGAINST THE COMPANY IN THE COURTS OF ANY OTHER JURISDICTION. ANY JUDICIAL PROCEEDING BY THE COMPANY AGAINST ANY PURCHASER, ANY HOLDER OR ANY OF THEIR AFFILIATES AND, FROM AND AFTER THE EXECUTION AND DELIVERY OF THE COLLATERAL DOCUMENTS PURSUANT TO SECTION 6.13, THE COLLATERAL AGENT OR ANY OF ITS AFFILIATES, INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT OR ANY OTHER NOTE DOCUMENT SHALL BE BROUGHT ONLY IN A COURT IN THE BOROUGH OF NEW YORK, NEW YORK.

**10.4** **WAIVER OF JURY TRIAL.** EACH OF THE COMPANY, THE PURCHASERS, THE HOLDERS AND, FROM AND AFTER THE EXECUTION AND DELIVERY OF THE COLLATERAL DOCUMENTS PURSUANT TO SECTION 6.13, THE COLLATERAL AGENT HEREBY WAIVES TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT OR ANY OTHER NOTE DOCUMENT OR THE RELATIONSHIP ESTABLISHED THEREUNDER.

**10.5** **Severability**. If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (a) such provision shall be excluded from this Agreement, (b) the balance of this Agreement shall be interpreted as if such provision were so excluded, and (c) the balance of this Agreement shall be enforceable in accordance with its terms.

**10.6** **Counterparts.** This Agreement may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract. Any counterpart of a signature page to this Agreement may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the U.S. federal ESIGN Act of 2000 or the New York Electronic Signature and Records Act or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law. The Note Documents and all notices, approvals, consents, requests and any

communications hereunder must be in writing (provided that any such communication sent to Agents hereunder must be in the form of a document that is signed manually or by way of a digital signature provided by DocuSign (or such other digital signature provider as specified in writing to the Agents by the authorized representative)), in English. The Company agrees to assume all risks arising out of the use of using digital signatures and electronic methods to submit communications to the Note Agent, including without limitation the risk of the Note Agent acting on unauthorized instructions, and the risk of interception and misuse by third parties.

     **10.7**    **Headings; Interpretation.** Paragraph headings used in this Agreement are included for convenience of reference only and will not modify the provisions that they precede or affect the interpretation of this Agreement or any other Note Document. The term "including" shall be interpreted to mean "including but not limited to". Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference.

     **10.8**    **Notices.** All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient (and if not, then on the next Business Day), (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. Notices to the Agents shall be effective upon actual receipt thereof. All communications shall be sent, if to the Note Parties, at the address set forth on the signature page of the Company, if to the Agents, at the address set forth on the signature page thereof, and, if to a Purchaser, at the address(es) set forth on the Schedule of Purchasers attached hereto as <u>Schedule 2</u> or at such other address(es) as the Company or Purchaser may designate by ten (10) days' advance written notice to the other parties hereto. Except where notice is specifically required by this Agreement, no notice to or demand on the Company or any of its Subsidiaries in any case shall entitle the Company or any of its Subsidiaries to any other or further notice or demand in similar or other circumstances.

     **10.9**    **Amendments; Waiver**. Any term of the Notes and this Agreement may be amended or waived with the written consent of the Company and the Required Holders; <u>provided</u>, that without the consent of each Holder, no amendment, modification, termination, or consent shall be effective if the effect thereof would (a) extend the scheduled final maturity of any Note held by any non-consenting Holder, (b) waive, reduce or postpone any scheduled repayment (but not prepayment) with respect to the Note held by any non-consenting Holder; (c) reduce the rate of interest or amount of any fees payable under any Note held by any non-consenting Holder; (d) extend the time for payment of any interest or fees payable under any Note held by any non-consenting Holder; (e) reduce the principal amount of any Note held by any non-consenting Holder; (f) amend, modify, terminate or waive any provision of this <u>Section 10.9</u>; (g) amend the definition of "Required Holders"; (h) release all or substantially all of the Collateral securing any Note (if any) held by any non-consenting Holder except as expressly provided in the Note Documents, (i) from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13, subordinate the Collateral Agent's Liens on Collateral except as expressly provided in the Note Documents; (j) release any Guarantor except as expressly provided in the Note Documents or (k) consent to the assignment or transfer by the Company of any of its rights and obligations under any Note Document held by any non-consenting Holder. No amendment affecting the rights, privileges and immunities of the Agents shall be effective without the consent of such Agent. Notwithstanding anything to the contrary contained herein or in any other Note Documents, no consent of any Holder shall be required pursuant to this <u>Section 10.9</u> in connection with (i) an assignment and assumption by a Parent Entity of the Company's Obligations in connection with a SPAC, so long as the conditions set forth in Section 10.1 shall have been satisfied, and (ii) any Person (including, without limitation, a Parent Entity in connection with a SPAC) becoming a Guarantor or a co-issuer or co-obligor hereunder and under the

33

Notes; provided, that the Company shall deliver a certificate of a Responsible Officer to the Agents stating that any documents to be executed in connection with a SPAC are authorized and permitted pursuant to the Note Documents.

**10.10    Expenses and Indemnification.**

(a)    The Company shall not be responsible for any out-of-pocket costs or expenses incurred by such Initial Purchasers in connection with the preparation, execution and delivery of this Agreement and the other Note Documents. The Company shall pay all reasonable and documented out-of-pocket costs and expenses of the Agents (including reasonable and documented fees, expenses and disbursements of its outside counsel) relating to the negotiation, preparation and execution of the Note Documents, review of other documents (including for purposes of due diligence review) in connection with the transactions contemplated hereby and any amendments and waivers hereto or thereto. In addition, the Company agrees to promptly pay in full after the occurrence of an Event of Default, all costs and expenses (including, without limitation, reasonable and documented fees and disbursements of counsel, agents and professional advisers) incurred by the Holders or the Agents in enforcing any obligations of or in collecting any payments due hereunder or under the Notes by reason of such Event of Default or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a workout, or any insolvency or bankruptcy proceedings.

(b)    In addition to the payment of expenses pursuant to Section 10.10(a), the Company (as "**Indemnitor**") agrees to indemnify, pay and hold the Purchasers, the Holders and the Agents, and the officers, directors, employees, agents, and affiliates of the Purchasers, the Holders and the Agents (collectively called the "**Indemnitees**") harmless from and against any and all other liabilities, costs, expenses, liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for such Indemnitees) in connection with any investigative, administrative or judicial proceeding commenced or threatened (excluding claims among Indemnitees (other than claims against an Agent acting in its capacity as such) and, with the exception of claims arising out of otherwise indemnifiable matters (e.g., actions to enforce the indemnification rights provided hereunder), and excluding claims between the Company and an Indemnitee), whether or not such Indemnitee shall be designated a party thereto, which may be imposed on, incurred by, or asserted against that Indemnitee, in any manner relating to or arising out of this Agreement, the Notes, the Note Documents or the other documents related to the transactions contemplated hereby (including, without limitation, the existence or exercise of any security rights with respect to the Collateral in accordance with the Security Agreement), the Purchasers' agreement to purchase the Notes or the use or intended use of the proceeds of any of the proceeds thereof to the Company (the "**Indemnified Liabilities**"); provided, that the Indemnitor shall not have any obligation to an Indemnitee hereunder with respect to an Indemnified Liability to the extent that such Indemnified Liability arises from the gross negligence or willful misconduct of that Indemnitee as determined by a final nonappealable order of a court of competent jurisdiction. Each Indemnitee shall give the Indemnitor prompt written notice of any claim that might give rise to Indemnified Liabilities setting forth a description of those elements of such claim of which such Indemnitee has knowledge; provided, that any failure to give such notice shall not affect the obligations of the Indemnitor unless (and then solely to the extent) such Indemnitor is not aware of such claim and is materially prejudiced. The Indemnitor shall have the right at any time during which such claim is pending to select counsel to defend and control the defense thereof and settle any claims for which it is responsible for indemnification hereunder (provided that the Indemnitor will not settle any such claim without (i) the appropriate Indemnitee's prior written consent, which consent shall not be unreasonably withheld or (ii) obtaining an unconditional release of the appropriate Indemnitee from all claims arising out of or in any way relating to the circumstances involving such claim) so long as in any such event the Indemnitor shall have stated in a writing delivered to the Indemnitee that, as between the Indemnitor and the Indemnitee, the

34

Indemnitor is responsible to the Indemnitee with respect to such claim to the extent and subject to the limitations set forth herein; provided, that the Indemnitor shall not be entitled to control the defense of any claim in the event that in the reasonable opinion of counsel for the Indemnitee, there are one or more material defenses available to the Indemnitee which are not available to the Indemnitor, in which case the Indemnitee may retain separate counsel and the Company will pay the reasonable fees and expenses of such counsel (including the reasonable fees and expenses of counsel to such Indemnitee incurred in evaluating whether such a conflict exists); provided further, that with respect to any claim as to which the Indemnitee is controlling the defense, the Indemnitor will not be liable to any Indemnitee for any settlement of any claim pursuant to this Section 10.10(b) that is effected without its prior written consent, which consent shall not be unreasonably withheld. To the extent that the undertaking to indemnify, pay and hold harmless set forth in this Section 10.10(b) may be unenforceable because it is violative of any law or public policy, the Company shall contribute the maximum portion which it is permitted to pay and satisfy under applicable law, to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnitees or any of them. The obligations of each of the parties under this Section 10.10 will survive the payment or transfer of any Note, the enforcement, amendment or waiver of any provision of this Agreement, the resignation or removal of any Agent and the termination of this Agreement.

(c)     To the extent permitted by applicable law, none of the parties hereto shall assert, and each of the parties hereto hereby waives, any claim against the other parties (including their respective affiliates, partners, stockholders, members, directors, officers, agents, employees and controlling persons), on any theory of liability for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the transactions contemplated hereunder, any Note Document, the Notes or the use of the proceeds thereof; provided that nothing contained in this Section 10.10(c) shall limit the Notes Parties' indemnification and reimbursement obligations to the extent set forth in this Agreement.

**10.11   Delays or Omissions.** It is agreed that no delay or omission to exercise any right, power or remedy accruing to each Purchaser, upon any breach or default of the Company under this Agreement or any other Note Document shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. It is further agreed that any waiver, permit, consent or approval of any kind or character by a Purchaser of any breach or default under this Agreement, or any waiver by such Purchaser of any provisions or conditions of this Agreement must be in writing and shall be effective only to the extent specifically set forth in writing and that all remedies, either under this Agreement, or by law or otherwise afforded to such Purchaser, shall be cumulative and not alternative.

**10.12   Waiver of Conflicts**. Each party to this Note acknowledges that Cooley LLP ("***Cooley***"), outside general counsel to the Company, has in the past performed and is or may now or in the future represent the Holders or the Holders' affiliates in matters unrelated to the transactions contemplated by this Note (the "***Note Financing***"), including representation of the Holders or the Holders' affiliates in matters of a similar nature to the Note Financing. The applicable rules of professional conduct require that Cooley inform the parties hereunder of this representation and obtain their consent. Cooley has served as outside general counsel to the Company and has negotiated the terms of the Note Financing solely on behalf of the Company. The Company and the Holders hereby (i) acknowledge that they have had an opportunity to ask for and have obtained information relevant to such representation, including disclosure of the reasonably foreseeable adverse consequences of such representation; (ii) acknowledge that with respect to the Note Financing, Cooley has represented solely the Company, and not any Holder or any stockholder, board member or employee of the Company or director, stockholder or employee of the

35

Holder; and (iii) gives the Holder's informed consent to Cooley's representation of the Company in the Note Financing.

**10.13   Obligations Several**.   The Purchasers' obligations hereunder are several and not joint obligations and no Purchaser shall have any liability to any Person for the performance or non-performance of any obligation by any other Purchaser hereunder.

**10.14   Survival of Representations and Warranties**. All of the representations and warranties made by the Note Parties and their Subsidiaries herein shall survive the execution and delivery of this Agreement, any investigation by or on behalf of any Purchaser, acceptance of the Notes and payment therefor, or termination of this Agreement.

**10.15 Entire Agreement**. This Agreement and the other Note Documents constitute the entire contract among the parties hereto regarding to the subject matters addressed herein and supersede any and all previous agreements, negotiations, and discussions, oral or written, by the parties regarding the subject matters addressed herein.

**10.16   Withholding**. The Company shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement such amounts as it is required to deduct and withhold under the Code, or any Tax law, with respect to the making of such payment. To the extent that amounts are so withheld, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made. If a payment is payable (in whole or in part) in consideration other than cash and if the cash portion of any such payment is insufficient to satisfy all required Tax withholding obligations, the Company shall retain an amount of the non-cash consideration otherwise payable equal in value to the amount required to satisfy any applicable withholding taxes (as reasonably determined by the Company).**10.17 PATRIOT ACT**. The Agents hereby notify the Company that pursuant to the requirements of the PATRIOT Act, the Company may be required to obtain, verify and record information that identifies the Company, its subsidiaries and the Guarantors, including their respective names, addresses and other information that will allow the Agent to identify, the Company, its subsidiaries and the Guarantors in accordance with the PATRIOT Act.

*[Signature pages follow]*

36

DocuSign Envelope ID: CF294530-E2C8-44E0-AB70-D9EEA682D4D9C

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first written above.

**COMPANY:**

**CORE SCIENTIFIC HOLDING CO.**

By:
Name:  Michael Trzupek
Title:    Chief Financial Officer

Address for notices:
2800 Northup Way
Suite 220
Bellevue, WA 98004
Attention:  Michael Trzupek, Chief Financial Officer
Email:  mtrzupek@corescientific.com

Copy to:
Todd DuChene, General Counsel
Email:  tduchene@corescientific.com

*In each case, with a copy (which shall not constitute notice) to:*

Cooley LLP
1299 Pennsylvania AVE, NW
Suite 700
Washington, DC 20004
Attention:  Mike Tollini
Email:  mtollini@cooley.com

[Signature Page to Convertible Note Purchase Agreement]

**GUARANTORS:**

**CORE SCIENTIFIC, INC.,** a Delaware corporation

By: _____
Name: Michael Trzupek
Title:   Chief Financial Officer

**AMERICAN PROPERTY ACQUISITION, LLC,** a Delaware limited liability company

By: Core Scientific, Inc., its sole member

By: _____
Name: Michael Trzupek
Title:   Chief Financial Officer

**AMERICAN PROPERTY ACQUISITIONS I, LLC,** a North Carolina limited liability company

By: American Property Acquisition, LLC, its sole member

By:  Core Scientific, Inc., its sole member

By: _____
Name: Michael Trzupek
Title:   Chief Financial Officer

[Signature Page to Convertible Note Purchase Agreement]

**AMERICAN PROPERTY ACQUISITIONS VII, LLC,** a Georgia limited liability company

By:  American Property Acquisition, LLC, its sole member

By:  Core Scientific, Inc., its sole member

By: _____
Name:  Michael Trzupek
Title:   Chief Financial Officer


**BLOCKCAP, INC.,** a Nevada corporation

By: _____
Name:  Todd DuChene
Title:   Secretary

[Signature Page to Convertible Note Purchase Agreement]

**U.S. BANK NATIONAL ASSOCIATION, AS NOTE AGENT**

By: _____
Name:  Joshua A. Hahn
Title:  Vice President

Address for notices:
U.S. Bank National Association
West Side Flats
60 Livingston Avenue
EP-MN-WS3C
St. Paul, MN 55107
Attention: Joshua Hahn (Core Sciences)


*In each case, with a copy (which shall not constitute notice) to:*

Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103
Attn: Nathan Plotkin (Core Scientific)

[Signature Page to Convertible Note Purchase Agreement]

**U.S. BANK NATIONAL ASSOCIATION, AS COLLATERAL AGENT**

By: _____

Name: Joshua A. Hahn
Title:  Vice President

Address for notices:
U.S. Bank National Association
West Side Flats
60 Livingston Avenue
EP-MN-WS3C
St. Paul, MN 55107
Attention: Joshua Hahn (Core Sciences)

*In each case, with a copy (which shall not constitute notice) to:*

Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103
Attn: Nathan Plotkin (Core Scientific)

[Signature Page to Convertible Note Purchase Agreement]

**PURCHASER:**

**MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY**

By: _____

Name:   Eric Partlan

Title:   Head of Portfolio Management

[Signature Page to Convertible Note Purchase Agreement]

PURCHASER:

CRYPTONIC BLACK, LLC

By: _____

Name:  Jennifer LaFrance
Title:   Manager

[Signature Page to Convertible Note Purchase Agreement]

PURCHASER:

FIRST SUN INVESTMENTS, LLC

By:
Name:  Brent Berge
Title:   Manager

[Signature Page to Convertible Note Purchase Agreement]

PURCHASER:

DOUGLAS LIPTON

[Signature Page to Convertible Note Purchase Agreement]

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

APOLLO TACTICAL VALUE SPN
INVESTMENTS, L.P.
By: Apollo Tactical Value SPN Management, LLC, its investment manager

By: _____
Name:  Joseph D. Glatt
Title:  Vice President

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

APOLLO CENTRE STREET PARTNERSHIP, L.P.
By: Apollo Centre Street Management, LLC, its investment manager

By: _____
Name: Joseph D. Glatt
Title:   Vice President

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

APOLLO LINCOLN FIXED INCOME FUND, L.P.
By: Apollo Lincoln Fixed Income Management, LLC, its investment manager

By: _____
Name: Joseph D. Glatt
Title:   Vice President

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

APOLLO MOULTRIE CREDIT FUND, L.P.
By: Apollo Moultrie Credit Fund Management, LLC, its investment manager

By: _____
Name:   Joseph D. Glatt
Title:   Vice President

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

BLOCKFI LENDING LLC

By: _Rene van Kesteren_ _____

      4E48656DF99C4AC...

Name:

Title:

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

WOLFSWOOD PARTNERS LP

By: _____
Name: _____
Title:   JASON Comorchen
         Managing Member

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

_____

Robert Fedrock

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

TJC3 LLC

By: _____ *Thomas Coleman* _____

Name: Thomas J. Coleman

Title: Trustee of the Thomas J. Coleman Revocable Trust,
       as the Sole Member of TJC3 LLC

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

KMR CS Holdings, LLC

By: _____

Name: kamran@kmrequity.com

Title: Manager

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

The Sear Family 1996 Trust

By: _msear@EvokeAdvisors.com_____
Name: msear@EvokeAdvisors.com
Title: Mark Sear, Trustee

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

JSK Partnership LLC

By: _____

Name: sp@posnergroup.com

Title: Co managing member

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Wormser Family Partnership II, LP

By: _____

Name: Ken Wormser

Title: ptr

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

TBC 222 LLC

By: _____

Name: MSidman@threebayscapital.com

Title: Managing partner

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

*frank@pollaro.com*

_____

Frank Polaro

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

David

_____

David Sarner

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

*James P. Pulaski*

_____

James Pulaski

254153937 v7

      **IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

SunnySide Consulting and Holdings, Inc.

By: _____

Name: Taras Kulyk

Title: Director / Principal

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

1994 Steinfeld Family Trust

By: _____

Name: jake@steinfeld6.com

Title: Trustee

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Better Downtown Miami, LLC

By: _____

Name: Marc Roberts

Title: Manager

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

_____

Jason Capello

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

*Vineet Agrawal*
_____
Vineet Agrawal

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Milos Core LLC

By: _____

Name:    Scott Packman

Title:    Partner

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Barkley Investments, LLC

By: _Jason Paul Godfrey_____

Name: Jason Paul Godfrey

Title: President, it's managing member, Godfrey Capital

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

ADDITIONAL PURCHASER:

Richard Katz 2016 GST TRUST

By: _____
Name: Richard Katz
Title: Dr

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

_____ *johnquinn@quinnemanuel.com* _____
John Quinn

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Northdata Holdings Inc.

*daniel rafuse*

By:_____
Name: daniel rafuse
Title:   Chairman

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Monbanc Inc.

By:_____
Name: daniel rafuse
Title:
     Chairman

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Sabby Volatility Warrant Master Fund, Ltd.

By: _rgrundstein@sabbymanagement.com_

Name: rgrundstein@sabbymanagement.com

Title: COO

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

ADDITIONAL PURCHASER:

Leon J. Simkins Non-Exempt Trust
FBO Michael Simkins

By:_____
Name: Michelle Simkins-Rubell
Title: trustee

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

FTF Diversified Holdings, LP

By: _____
Name: Anthony Fadell
Title: Principal

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

By:_____

Name:    Joaquin Palomo

Title:    Director    FGK Investments Ltd.

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

By: _____

Name:
Title:   Ernesto Castillo Kriete    Director

Neso Investment Group Ltd

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

By: _____

17550EF2D070478...

Name:   Marco Baldocchi Kriete
Title:    Director   Ferro Investments Ltd.

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Galaxy Digital LP
 by its general partner, Galaxy Digital GP LLC

By: _____

Name:   Chris Ferraro

Title:   Authorized Signatory

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Corbin ERISA Opportunity Fund, Ltd.

By:_____    _____
Name: Cesar Bello
Title:  Deal Counsel

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Corbin Opportunity Fund, L.P.

By:_____

Name:  Cesar Bello

Title:   Deal Counsel

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

 Levbern Management LLC

By:_____

Name: Andrew Ward

Title:  Member

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

JPAS - Crypto Infrastructure LLC

By: _____
Name: George Lusch
Title: Chief Financial Officer

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

JPAS - Crypto Infrastructure-A S.P.

By:_____

Name: George Lusch

Title:  Chief Financial Officer

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

JPAS - Credit-A S.P.

By: _____
Name:  George Lusch
Title:  Chief Financial Officer

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

JPAS - Credit LLC

By:_____
Name: George Lusch
Title:  Chief Financial Officer

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Cannon Investments LLC

By: _____
Name:     Andrew Rosen
Title:     Manager

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

ADDITIONAL PURCHASER:

Andrew Rosen 2004 Successor Insurance Trust

By:_____

Name:   Dan Nir

Title:   Manager

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

XMS Core Convert Holdings LLC

By: _John McGarrity_____

Name:

Title:   John McGarrity – Managing Director

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Amplify Transformational Data Sharing ETF

By: _____ *Charles A. Ragauss* _____
Name:    Charles A. Ragauss
Title:    Portfolio Manager

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Marsico AXS CS LLC

By: _____
Name:   jam@marsicoenterprises.com
Title:    Manager

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Gullane Digital Asset Partners, LLC

By: _____*Richard A. Miller, III*_____
Name: Richard A. Miller, III
Title: Managing Partner

254153937 v7

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Gullane Capital Partners, LLC

By: _____
Name:   Richard A. Miller, III
Title:   Managing Partner

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Marsico AXS CS LLC

By:_____
Name:   jam@marsicoenterprises.com
Title:   Manager

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

ADDITIONAL PURCHASER:

Transatlantic Mobility Holdings II LLC

By: _lorenzo@transatlanticeg.com_____

Name: _lorenzo@transatlanticeg.com_

Title: _Chairman & CEO_

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

ADDITIONAL PURCHASER:

OIP SPV Core Scientific, LLC

By: _michael@obsidianip.com_____

Name: michael@obsidianip.com

Title: Manager

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

OIP SPV CS, LLC

By: *michael@obsidianip.com*
Name: michael@obsidianip.com
Title: Manager

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

> The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.
>
> **ADDITIONAL PURCHASER:**
>
> Pescadero Capital, LLC
>
> By:_____
>
> Name:  Mark Hickson
> Title:  Vice President

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Amplify Transformational Data Sharing ETF

By: ~~Charles A. Raga~~

Name:

Title:   Portfolio Manager

**EXHIBIT B**

**COUNTERPART SIGNATURE PAGE**

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

BlackRock Credit Alpha Master Fund L.P.

By: BlackRock Financial Management Inc., in its capacity as investment advisor

By: _____
Name: Christopher Biasotti
Title:  Authorized Signatory

**EXHIBIT B**

**COUNTERPART SIGNATURE PAGE**

    **IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

        The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

        **ADDITIONAL PURCHASER:**

        HC NCBR Fund

        By: BlackRock Financial Management Inc., in its capacity as investment advisor

        By: _____
        Name: Christopher Biasotti
        Title:  Authorized Signatory

**EXHIBIT B**

**COUNTERPART SIGNATURE PAGE**

      **IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

The Obsidian Master Fund

By: BlackRock Financial Management Inc., its Investment Advisor

By: _____

Name: Christopher Biasotti

Title:  Authorized Signatory

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

*John Joliet*

_____

John P. Joliet

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

Gullane Digital Asset Partners QP, LLC

By: _____
Name:   Richard Miller
Title:   Managing Member

IN WITNESS WHEREOF, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

ADDITIONAL PURCHASER:

OMEGA INTERCEPTOR RESTRICTED LTD

By: _____

Name: BADHAR AL ROSAN

Title: AUTHORISED Signatory

## SCHEDULE 2

## SCHEDULE OF PURCHASERS

### Initial Purchasers

| Name and Address for Notices | Principal Amount of Notes |
|---|---|
| **MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY**<br>One Marina Park Drive, MIP 1205<br>Boston, MA 02210<br>Attn:    Sarah Doyle; Chris Fredericks; Helder Pereira<br>Email:    sdoyle@massmutual.com; cfredericks54@massmutual.com; hpereira@massmutual.com<br>Phone #:617-235-1522; 617-695-4069; 413-744-7347 | $40,000,000.00 |
| **CRYPTONIC BLACK, LLC**<br>801 S. Rampart Blvd.<br>Las Vegas, NV 89145<br>Attn:    Jennifer LaFrance<br>Email:    jlafrance@asny.com<br>Phone #:702-967-5000 | $6,000,000.00 |
| **FIRST SUN INVESTMENTS, LLC**<br>6718 E. Rovey Avenue<br>Paradise Valley, AZ 85253<br>Attn:    Brent Berge<br>Email:    brentberge@bergegroup.com<br>Phone #:1-602-430-3673 | $4,000,000.00 |
| **DOUGLAS LIPTON**<br>4701 N Meridian Ave<br>Unit 315<br>Miami Beach, FL 33140<br>Attn:    Douglas Lipton<br>Email:    dlip44@gmail.com<br>Phone #:917-887-8869 | $250,000.00 |
| **TOTAL:** | **$50,250,000.00** |

### Additional Purchasers

| Name and Address for Notices | Principal Amount of Notes |
|---|---|
| **Apollo Tactical Value SPN Investments LP**<br>9 West 57th Street<br>New York, NY 10019<br>Attn:    Joseph D. Glatt<br>Email:    jglatt@apollo.com | $4,700,000.00 |
| **Apollo Centre Street Partnership, LP**<br>9 West 57th Street<br>New York, NY 10019<br>Attn:    Joseph D. Glatt<br>Email:    jglatt@apollo.com | $2,500,000.00 |

| | |
|---|---|
| **Apollo Lincoln Fixed Income Fund, L.P.**<br>9 West 57th Street<br>New York, NY 10019<br>Attn:          Joseph D. Glatt<br>Email:          jglatt@apollo.com | $1,600,000.00 |
| **Apollo Moultrie Credit Fund, L.P.**<br>9 West 57th Street<br>New York, NY 10019<br>Attn:          Joseph D. Glatt<br>Email:          jglatt@apollo.com | $1,200,000.00 |
| **BlockFi Lending LLC**<br>201 Montgomery St #263<br>Jersey City, NJ 07302<br>Attn:          Sergey Pekarsky<br>Email:          tradingops@blockfi.com, Legal-inst@blockfi.com | $5,000,000.00 |
| **Wolfswood Partners LP**<br>140 Broadway<br>New York, NY 10005<br>Attn:          Jason Comerchero<br>Email:          jason.comerchero@wolfswoodpartners.com | $1,000,000.00 |
| **1994 Steinfeld Family Trust**<br>622 Toyota Drive<br>Pacific Palisades, CA 90272<br>Attn: Jake Steinfeld<br>Email: jake@steinfeld6.com | $500,000.00 |
| **Andrew Rosen 2004 Successor Insurance Trust**<br>810 Seventh Avenue, 7th Floor<br>New York, NY 10019<br>Attn: TAG Associates LLC<br>Email: NKim@tagassoc.com<br>Email: EWong@tagassoc.com | $250,000.00 |
| **Barkley Investments, LLC**<br>8231 Bay Colony Drive, Unit 802<br>Naples, FL<br>Attn: Jason Paul Godfrey<br>Email: jgodfrey@godfreycap.com | $2,000,000.00 |
| **Better Downtown Miami LLC**<br>4167 Main Street<br>Jupiter, FL 33458<br>Attn: Marc Roberts<br>Email: marc@marcroberts.com | $400,000.00 |
| **Cannon Investments LLC**<br>810 Seventh Avenue, 7th Floor<br>New York, NY 10019<br>Attn: TAG Associates LLC<br>Email: NKim@tagassoc.com<br>Email: EWong@tagassoc.com | $250,000.00 |
| **Corbin ERISA Opportunity Fund, Ltd.**<br>c/o Corbin Capital Partners, L.P.<br>590 Madison Ave, 31st Floor<br>New York, NY 10022<br>Attn: Corbin Operations<br>Email: corbinwso-fax@ifs.statestreet.com<br>Email: mmf-bankdebt@corbincapital.com<br>Email: corbin@viteos.com | $12,000,000.00 |

| | |
|---|---|
| **Corbin Opportunity Fund, L.P.**<br>c/o Corbin Capital Partners, L.P.<br>590 Madison Ave, 31st Floor<br>New York, NY 10022<br>Attn: Corbin Operations<br>Email: corbinwso-fax@ifs.statestreet.com<br>Email: mmf-bankdebt@corbincapital.com<br>Email: corbin@viteos.com | $2,000,000.00 |
| **David Sarner**<br>2100 S. Ocean Blvd, #506<br>Palm Beach, FL 33480<br>Email: docsarner@gmail.com | $250,000.00 |
| **Ferro Investments Ltd**<br>2 Alhambra Plaza, Suite 802<br>Coral Gables, FL 33134<br>Attn: Jennifer Kanold<br>Email: reporting@icomia.com | $1,500,000.00 |
| **FGK Investments Ltd**<br>2 Alhambra Plaza, Suite 802<br>Attn: Jennifer Kanold<br>Email: reporting@icomia.com | $500,000.00 |
| **Frank Polaro**<br>10 Douglas Road<br>Morristown, NJ 07960<br>Email: frank@pollaro.com | $250,000.00 |
| **FTF Diversified Holdings, LP**<br>121 Alhambra Plaza, Suite 1202<br>Coral Gables, FL 33134<br>Attn: Archpoint Investors<br>Email: futureholdings@archpointinvestors.com<br>Email: reports@concertomgmt.com | $2,000,000.00 |
| **Galaxy Digital LP**<br>Attn: Chris Ferraro<br>Email: compliance@galaxydigital.io | $5,000,000.00 |
| **James Pulaski**<br>3921 Alton Road #360<br>Miami Beach, FL 33140<br>Attn: James Pulaski<br>Email: jim@jpulaski.com | $1,000,000.00 |
| **Jason Capello**<br>1404 N Lake Way<br>Palm Beach, FL 33480<br>Email: jcapello@mgatecap.com | $2,000,000.00 |
| **John B. Quinn**<br>Quinn Emanuel Urquhart & Sullivan, LLP<br>865 S. Figueroa Street, 10th Floor<br>Los Angeles, CA 90017<br>Email: johnquinn@quinnemanuel.com | $500,000.00 |
| **JPAS – Credit LLC**<br>100 Pine Street, Suite 2600<br>San Francisco, VA 94111<br>Attn: George Lusch<br>Email: George.lush@jordanpark.com | $8,333,653.00 |
| **JPAS – Credit-A S.P.**<br>100 Pine Street, Suite 2600 | $4,166,347.00 |

| | |
|---|---|
| San Francisco, VA 94111<br>Attn: George Lusch<br>Email: George.lush@jordanpark.com | |
| **JPAS – Crypto Infrastructure LLC**<br>100 Pine Street, Suite 2600<br>San Francisco, VA 94111<br>Attn: George Lusch<br>Email: George.lush@jordanpark.com | $11,619,743.00 |
| **JPAS – Crypto Infrastructure-A S.P.**<br>100 Pine Street, Suite 2600<br>San Francisco, VA 94111<br>Attn: George Lusch<br>Email: George.lush@jordanpark.com | $4,380,257.00 |
| **JSK Partnership LLC**<br>1691 Michigan Ave, Suite 445<br>Miami Beach, FL 33139<br>Attn: Sean Posner<br>Email: sp@posnergroup.com | $1,000,000.00 |
| **KMR CS Holdings, LLC**<br>377 Fifth Avenue, 5th Floor<br>Attn: Kamran Yaghoubzadeh<br>Email: kamran@kmrequity.com | $820,000.00 |
| **Leon J. Simkins Non-Exempt Trust FBO Michael Simkins**<br>5080 Biscayne Boulevard, #A<br>Miami, FL 33137<br>Attn: Michelle Simkins-Rubell<br>Email: Simkinslaw@gmail.com | $750,000.00 |
| **Levbern Management LLC**<br>45625 Cielito Drive<br>Indian Wells, CA 92210<br>Attn: Melina Bernecker<br>Email: melina@levbernmanagement.com<br>Attn: Drew Ward<br>Email: drew@levbernmanagement.com | $250,000.00 |
| **Milos Core LLC**<br>Attn: Mavrides, Moyal, Packman & Sadkin, LLP<br>Attn: Scott Packman<br>Email: spackman@mmps.com | $1,000,000.00 |
| **Monbanc Inc.**<br>290 Lakeshore<br>Pointe Claire, Quebec<br>H9s 413<br>Attn: Daniel Rafuse<br>Email: daniel@monbanc.com | $100,000.00 |
| **Neso Investment Group Ltd**<br>2 Alhambra Plaza, Suite 802<br>Attn: Jennifer Kanold<br>Email: reporting@icomia.com | $500,000.00 |
| **Northdata Holdings Inc.**<br>290 Lakeshore<br>Pointe Claire, Quebec<br>H9S 413<br>Attn: Daniel Rafuse<br>Email: daniel@monbanc.com | $200,000.00 |
| **Richard Katz 2016 Trust** | $250,000.00 |

| | |
|---|---|
| 55 Farrington Avenue<br>Email: Docatz@gmail.com | |
| **Robert Fedrock**<br>736-333 Adelaide St. E.<br>Toronto, Ontario M5A 4T4<br>Email: Robert.fedrock@originmerchant.com | $400,000.00 |
| **Sabby Management, LLC**<br>10 Mountainview Road, Suite 205<br>Upper Saddle River, NJ 07458<br>Attn: Robert Grundstein<br>Email: rgrundstein@sabbymanagement.com<br>Originals to:<br>Attn: Client Settlement, Wedbush Securities<br>1000 Wiltshire Blvd., Suite 850<br>Los Angeles, CA 90017 | $2,500,000.00 |
| **SunnySide Consulting and Holdings, Inc.**<br>214 Cherryhill Road<br>Oakville, Ontario, L6L3E2, Canada<br>Attn: Taras Kulyk<br>Email: taras@sunnysideinc.ca | $110,000.00 |
| **TBC 222 LLC**<br>8 Newbury Street, 5th Floor<br>Boston, MA 02116<br>Attn: Matthew Sidman – Managing Member<br>Email: msidman@threebayscapital.com | $2,500,000.00 |
| **The Sear Family 1996 Trust**<br>457 26th Street<br>Manhattan Beach, CA 90266<br>Attn: Mark Sear<br>Email: msear@evokeadvisors.com | $500,000.00 |
| **TJC3 LLC**<br>c/o Kensico Capital Management<br>55 Railroad Avenue, 2nd Floor<br>Greenwich, CT 06830<br>Attn: Family Office (Gino Labruzzo, Li Dick, Christina Malloy)<br>Email: familyoffice@kensicocapital.com | $4,000,000.00 |
| **Vineet Agrawal**<br>2 Brantwood Terrace<br>Short Hills, NJ 07078<br>Email: vagrawal@gmail.com | $250,000.00 |
| **Wormser Family Partnership II L.P.**<br>575 Lexington Avenue, 32nd Floor<br>New York, NY 10022<br>Attn: Ken Wormser<br>Email: kwormser@greensledge.com | $500,000.00 |
| **XMS Core Convert Holdings LLC**<br>321 N. Clark Street, Suite 2440<br>Chicago, IL 60091<br>Attn: John McGarrity<br>Email: jmcgarrity@xmscapital.com | $1,000,000.00 |
| **Marsico AXS CS LLC**<br>5251 DTC Parkway, Suite 410<br>Greenwood Village, CO 80111<br>Attn: Jonathan Marsico<br>Email: jam@marsicoenterprises.com | $19,604,095.00 |

| | |
|---|---|
| Attn: Michael Cirenza<br>Email: mac@marsicoenterprises.com | |
| **Gullane Digital Asset Partners, LLC**<br>640 S. Perkins Road<br>Memphis, TN 38117<br>Attn: Matthew R. Walker<br>Email: matt@gullanecapital.com | $22,500,00.00 |
| **Gullane Capital Partners, LLC**<br>640 S. Perkins Road<br>Memphis, TN 38117<br>Attn: Matthew R. Walker<br>Email: matt@gullanecapital.com | $2,500,000.00 |
| **Amplify Transformational Data Sharing ETF**<br>1001 Woodward Avenue, Suite 500<br>Detroit, MI 48226<br>Attn: Charlie A. Ragauss<br>Email: cragauss@torosoam.com | $15,000,000.00 |
| **Marsico AXS CS LLC**<br>5251 DTC Parkway, Suite 410<br>Greenwood Village, CO 80111<br>Attn: Jonathan Marsico<br>Email: jam@marsicoenterprises.com | $1,960,774.00 |
| **BlackRock Credit Alpha Master Fund, L.P.**<br>c/o BlackRock Financial Management Inc.<br>55 East 22nd Street<br>New York, NY 10055<br>Attn: Christopher Biasotti<br>Email: christopher.biasotti@blackrock.com | $19,600,000.00 |
| **HC NCBR FUND**<br>c/o BlackRock Financial Management Inc.<br>55 East 22nd Street<br>New York, NY 10055<br>Attn: Christopher Biasotti<br>Email: christopher.biasotti@blackrock.com | $8,300,000.00 |
| **The Obsidian Master Fund**<br>c/o BlackRock Financial Management Inc.<br>55 East 22nd Street<br>New York, NY 10055<br>Attn: Christopher Biasotti<br>Email: christopher.biasotti@blackrock.com | $7,100,000.00 |
| **John P. Joliet**<br>503 Dalehurst Ave<br>Los Angeles, CA 90024<br>Email: john.joliet@americandiscoverycapital.com | $200,000.00 |
| **OIP SPV Core Scientific, LLC**<br>2250 Lucien Way, Suite 140<br>Maitland, FL 32751<br>Attn: Michael Lythcott<br>Email: michael@obsidianip.com | $993,033.00 |
| **OIP SPV CS, LLC**<br>325 Hudson Street<br>New York, NY 10013<br>Attn: Michael Lythcott<br>Email: michael@obsidianip.com | $873,869.00 |
| **Pescadero Capital, LLC** | $5,000,000.00 |

| | |
|---|---|
| 700 Universe Blvd.<br>June Beach, FL 33408<br>Attn: Mark Hickson, VP<br>Email: mark.hickson@nextenergy.com, kevin.norman@nextenergy.com,<br>paul.euseppi@nextenergy.com, alan.liu@nextenergy.com | |
| **Transatlantic Mobility Holdings II LLC**<br>601 13th St. NW, 11th Floor<br>Washington DC, 2005<br>Attn: Abel Navarro Homet<br>Email: abel@transatlanticeg.com | $1,000,000.00 |
| **Amplify Transformational Data Sharing ETF**<br>1001 Woodward Avenue, Suite 500<br>Detroit, MI 48226<br>Attn: Charlie A. Ragauss<br>Email: cragauss@torosoam.com | $11,500,000.00 |
| **Gullane Digital Asset Partners QP, LLC**<br>640 S. Perkins Road<br>Memphis, TN 38117<br>Attn: Matthew R. Walker<br>Email: matt@gullanecapital.com, trip@gullanecapital.com | $32,088,229.00 |
| **Omega Interceptor Restricted Ltd**<br>3408, 34, Al Maqam Tower, Abu Dhabi Global Market, Al Maryah Island<br>Abu Dhabi, United Arab Emirates<br>Attn: Chris Harran<br>Email: charran@adq.ae | $9,822,717.00 |
| **TOTAL:** | $249,572,717.00 |

**SCHEDULE 5.1**

**NOTE PARTIES**

| Entity Name | Former Names (within last 5 years) | Jurisdiction of Organization | Taxpayer Identification Number | Organizational Number |
|---|---|---|---|---|
| Core Scientific Holding Co. | N/A | Delaware | 85-2941270 | 3377927 |
| Core Scientific Inc. | Mineco Holdings, Inc | Delaware | 82-3805526 | 6660521 |
| American Property Acquisition, LLC | N/A | Delaware | 82-540825 | 6857348 |
| American Property Acquisitions I, LLC | 155 Palmer Lane, LLC | North Carolina | 82-5469717 | 1687596 |
| American Property Acquisitions VII, LLC | N/A | Georgia | 83-1663198 | 18100016 |
| Blockcap Inc. | Block Capital, Inc. | Nevada | 85-4052367 | E10638672020-8 |

**SCHEDULE 5.13**

**SUBSIDIARIES**

| Entity Name | Owner | Ownership Percentage | Jurisdiction of Organization |
|---|---|---|---|
| Core Scientific Inc. | Core Scientific Holding Co. | 100% | Delaware |
| American Property Acquisition, LLC | Core Scientific, Inc. | 100% | Delaware |
| GPU One Holdings, LLC f/k/a IP Special Holdings, LLC | Core Scientific, Inc. | 100% | Delaware |
| American Property Acquisitions I, LLC | American Property Acquisition, LLC | 100% | North Carolina |
| American Property Acquisitions VII, LLC | American Property Acquisition, LLC | 100% | Georgia |
| Blockcap Inc. | Core Scientific Holding Co. | 100% | Nevada |
| Radar Relay, Inc. | Blockcap Inc. | 100% | Delaware |
| RADAR LLC | Blockcap Inc. | 100% | Colorado |
| Starboard Capital LLC | Blockcap Inc. | 100% | Colorado |

**SCHEDULE 5.14**

**CAPITALIZATION**

(see attached)

**SCHEDULE 5.17**

**INDEBTEDNESS**

1. Existing Notes

2. Mortgage in favor of Brown Corporation for that certain real property located at 206 Boring Drive, Dalton, GA 30721 in a principal amount of $547,733.71 as of February 1, 2021.

3. Mortgage in favor of Holiwood LLC for that certain real property located at 1035 Shar-Cal Rd, Calvert City, KY 42029 in a principal amount of $1,354,209.33 as of February 1, 2021.

4. That certain PPP Loan entered into April 2020, between Core Scientific, Inc. and City National Bank in a principal amount of $2,154,300.00 as of February 1, 2021.

5. The following Equipment Financing:

| Equipment Financing | Issue Date | Original Amount | Maturity | Interest Rate | Outstanding Principal (as of 02/01/21) |
|---|---|---|---|---|---|
| Genesis Global Capital, LLC #1 | July 2020 | $1,833,625 | March 2022 | 16.0% | $1,477,318 |
| Genesis Global Capital, LLC #2 | August 2020 | 1,569,132 | April 2022 | 16.0% | 1,369,909 |
| Genesis Global Capital, LLC #3 | September 2020 | 1,307,610 | April 2022 | 16.0% | 1,215,593 |
| Arctos Credit, LLC | October 2020 | 774,250 | October 2022 | 15.0% | 660,692 |
| Novak | January 2021 | 10,000,000 | January 2023 | 10.0% | 10,000,000 |
| **Total Equipment Financing** | | **$15,484,617** | | | **$14,723,512** |

6. The following Equipment Leases:

| Equipment Leases | Issue Date | Original Amount | Maturity | Interest Rate | Outstanding Principal (as of 02/01/21) |
|---|---|---|---|---|---|
| NEC Financial Services | July 2018 | $14,707 | July 2021 | 12.2% | $2,376 |
| Technology Finance Corporation #2 | May 2019 | 101,315 | May 2022 | 6.5% | 45,000 |
| Garic, Inc. | May 2019 | 466,379 | May 2022 | 6.5% | 179,847 |
| VFS, LLC | July 2019 | 421,576 | July 2022 | 7.3% | 210,510 |
| Advanced Business Equipment | October 2019 | 22,154 | October 2022 | 7.2% | 11,675 |
| Garic, Inc. #1 | September 2019 | 153,129 | September 2022 | 6.5% | 84,519 |
| 36th Street Capital #1 | October 2019 | 710,122 | October 2022 | 13.4% | 429,256 |
| 36th Street Capital #2 | December 2019 | 1,130,000 | December 2022 | 13.4% | 743,378 |
| 36th Street Capital #3 | December 2019 | 917,300 | June 2022 | 9.8% | 516,920 |
| 36th Street Capital #4 | December 2019 | 748,275 | December 2022 | 13.4% | 492,258 |
| Toyota Commercial Finance | January 2020 | 431,799 | June 2025 | 5.3% | 359,339 |
| Technology Finance Corporation #3 | March 2020 | 57,492 | February 2021 | 6.5% | - |
| Garic, Inc. #2 | March 2020 | 958,650 | March 2023 | 6.5% | 659,577 |
| De Lage Landen #1 | November 2020 | 290,246 | November 2023 | (5.3)% | 229,981 |

Core Scientific Cap Table - As Of August 12, 2021

| | Date | Shares | Capital Raised | $ Per Share | % of Total |
|---|---|---|---|---|---|
| **Preferred** | | | | | |
| Series A Convertible Preferred | 2019 / 2020 | 6,451,525 | $44,063,916 | $6.83 | 2.5% |
| Series B Convertible Preferred | 2020 | 314,285 | 1,100,000 | 3.50 | 0.1% |
| **Total Preferred Outstanding** | | **6,765,810** | **$45,163,916** | | **2.7%** |
| **Common Shares** | | | | | |
| Private Placement #1 | 1H 2018 | 7,505,000 | $48,032,000 | $6.40 | 3.0% |
| Private Placement #2 | 2H 2018 | 178,095 | 2,000,007 | 11.23 | 0.1% |
| **Business Combinations / Other** | | | | | |
| BCV 55, 66 & 77 | January 2018 | 88,501,449 | | | 35.0% |
| Matrix Mining Ltd. and MM Management Transaction | November 2018 | 1,250,000 | | | 0.5% |
| Stax Digital | September 2019 | 560,030 | | | 0.2% |
| Heldrick and Stuggles | September 2019 | 50,000 | | | 0.0% |
| Atrio | June 2020 | 561,938 | | | 0.2% |
| Blockcap | 7/1/2021 | 72,185,717 | | | 28.5% |
| **Total Common Shares Outstanding** | | **170,792,229** | **$50,032,007** | | **67.5%** |
| **Reserves & Other** | | | | | |
| RSUs Outstanding | | 53,937,486 | | | 21.3% |
| Options Outstanding | | 7,320,245 | | | 2.9% |
| Available for Future Issuance | | 10,088,856 | | | 4.0% |
| Warrants | | 4,284,887 | | | 1.7% |
| **Total Reserves & Other** | | **75,631,474** | | | **29.9%** |
| **Total Fully Diluted** | | **253,189,513** | **$95,195,923** | | **100.0%** |

1

| Equipment Leases | Issue Date | Original Amount | Maturity | Interest Rate | Outstanding Principal (as of 02/01/21) |
|---|---|---|---|---|---|
| De Lage Landen #2 | December 2020 | 99,650 | December 2023 | (5.5)% | 80,984 |
| De Lage Landen #3 | January 2021 | 228,180 | January 2024 | (0.5)% | 200,085 |
| De Lage Landen #4 | January 2021 | 99,950 | January 2024 | (5.5)% | 80,984 |
| Garic, Inc. #3 | February 2021 | 199,528 | February 2024 | 7.9% | 199,528 |
| **Total Equipment Leases** | | **$7,050,752** | | | **$4,526,215** |

**EXHIBIT A**

**FORM OF CONVERTIBLE PROMISSORY NOTE**

**(see attached)**

THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "*ACT*"), OR UNDER THE SECURITIES LAWS OF ANY STATES IN THE UNITED STATES. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT PURSUANT TO SECTION 5(C) HEREOF AND AS PERMITTED UNDER THE ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL IN FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER TO THE EFFECT THAT ANY PROPOSED TRANSFER OR RESALE IS IN COMPLIANCE WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

THIS NOTE HAS BEEN ISSUED WITH "ORIGINAL ISSUE DISCOUNT" (WITHIN THE MEANING OF SECTION 1273 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "*CODE*")). UPON WRITTEN REQUEST, THE COMPANY WILL PROMPTLY MAKE AVAILABLE TO ANY HOLDER OF THIS NOTE THE FOLLOWING INFORMATION:  (1) THE ISSUE PRICE AND ISSUE DATE OF THE NOTE, (2) THE AMOUNT OF ORIGINAL ISSUE DISCOUNT ON THE NOTE AND (3) THE YIELD TO MATURITY OF THE NOTE. HOLDERS SHOULD CONTACT THE CHIEF FINANCIAL OFFICER OF THE COMPANY AT 2800 NORTHUP WAY SUITE 220 BELLEVUE, WA 98004.

## [FORM OF] CONVERTIBLE PROMISSORY NOTE

|  |  |
|---|---|
| Note Series: | 2021 Convertible Promissory Notes |
| Date of Note: | [__], 2021 |
| Initial Principal Amount of Note: | $[__], plus any PIK Interest that has accrued and been capitalized pursuant to the terms of this Note |

For value received **CORE SCIENTIFIC HOLDING CO.**, a Delaware corporation (the "*Company*"), promises to pay to the undersigned holder or such party's successors or permitted assigns (the "*Holder*") the principal amount set forth above with interest to accrue on such outstanding principal amount at a rate of 10% *per annum*, 4% of which shall be payable in cash ("*Cash Interest*") and 6% of which shall be payable in kind by capitalizing such interest payment and increasing the outstanding principal amount of this Note by the amount thereof ("*PIK Interest*"). Interest shall accrue on the outstanding principal amount of this Note commencing on (and including) the date of original issuance thereof (or the most recent interest payment date) and continuing until the earlier to occur of (x) the date this Note is repaid or prepaid in full and (y) the date this Note is converted in full by the Holder pursuant to Section 2 hereof. Cash Interest shall be due and payable and PIK Interest shall be capitalized quarterly in arrears on the first day of each fiscal quarter, commencing on October 1, 2021. Interest shall be computed on the basis of a year of 365 days for the actual number of days elapsed. This Note shall be automatically deemed to include any accrued PIK Interest thereon and the Company shall not be obligated to issue any subsequent Notes reflecting PIK Interest. This Note is one of the "Notes" issued pursuant to the Purchase Agreement. All capitalized terms used but not otherwise defined in this Note will have the same meanings in this Note as in the Purchase Agreement referred to below.

The following is a statement of the rights of the Holder and the conditions to which this Note is subject, and to which the Holder, by the acceptance of this Note, agrees:

1.    **BASIC TERMS**.

(a)    **Series of Notes**. This convertible promissory note (this "***Note***") is issued as part of a series of notes designated by the Note Series above (collectively, the "***Notes***"), having an initial aggregate principal amount of up to $300,000,000.00 and issued pursuant to, and to those persons and entities (collectively, the "***Holders***") party, as Purchasers, to, that certain Convertible Note Purchase Agreement, dated as of even date herewith (as amended, restated, supplemented and/or otherwise modified from time to time, the "***Purchase Agreement***"), by and among the Company, each Purchaser party thereto, U.S. Bank National Association, as Note Agent, and, upon the execution and delivery of the Collateral Documents pursuant to Section 6.13 of the Purchase Agreement, U.S. Bank National Association, as Collateral Agent for the Secured Parties. The Company shall maintain a ledger of all Holders ("***Ledger***"), which shall include all PIK Interest accrued and capitalized, and which shall be available (i) promptly upon request to the Agents and the Holder, (ii) promptly after any transfer or assignment of any Note, (iii) promptly upon conversion of any Note and (iv) on the tenth business day prior to any interest payment date.

(b)    **Payments**.

(i)    **Voluntary Prepayments**. Subject to and following the expiration of any applicable lockup period set forth under any lockup agreement to which the Holder, the Company and the Company's underwriters are a party, and unless otherwise converted in full or in part pursuant to Section 2 hereof (including following delivery of the Company's notice referred to in this subsection (b)(i)(2)), the Company may at any time, upon ten (10) Business Days' prior written notice to the Holder and the Note Agent (which notice may be conditioned or rescinded upon such events as may be specified in such notice) prepay all or any portion of this Note in an amount equal to (x) the outstanding principal amount (including all accrued PIK Interest not already added to the principal amount of this Note) of this Note being prepaid at such time, together with all accrued unpaid Cash Interest on such outstanding principal amount at such time *multiplied* by (y) 200% (such amount, the "***Repayment Amount***").

(ii)    **Repayment**. Unless otherwise prepaid by the Company pursuant to Section 1(b)(i) or converted in full pursuant to Section 2 hereof, this Note shall be repaid in full on the earlier to occur of (x) April 19, 2025 (the "***Maturity Date***") and (y) acceleration by the Holders representing at least twenty-five percent (25%) of the aggregate outstanding principal amount of the Notes issued pursuant to the Purchase Agreement at such time after the occurrence of an Event of Default in accordance with the terms hereof, in each case, in an amount equal to the outstanding principal (including all accrued PIK Interest not already added to the principal amount of this Note) of this Note, plus all unpaid accrued Cash Interest thereon.

(iii)    **Payments Generally**.

(1)    This Note and the other Notes issued pursuant to the Purchase Agreement are *pari passu* in right of payment and all payments (other than conversion) under this Note and such other Notes shall be made in accordance with each Holder's Pro Rata Share. All payments shall be applied first, to the payment of expenses due under this Note and the other Note Documents to the Agents, second, to the payment of expenses due under this Note and the other Note Documents to the Holders, third, unpaid accrued interest of this Note and fourth, if the amount of payment exceeds the amount of all such expenses and accrued interest, to the payment of outstanding principal (including all accrued PIK Interest not already added to the principal amount of this Note) of this Note. The conversion of this Note by the Holder pursuant to the terms hereof shall be deemed to be a repayment of the full outstanding principal

amount (including all accrued PIK Interest not already added to the principal amount of this Note) of such Note together with any unpaid accrued Cash Interest thereon on the date of such conversion.

(2)     All payments to be made by the Company shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff, except with respect to Taxes required to be deducted and/or withheld under applicable law. All payments (other than by means of conversion pursuant to the terms of the Notes), including any prepayments, of interest and principal to be made by the Company hereunder shall be made by the Company to the Note Agent, in cash, for the account of the respective Holders to which such payment is owed, at the applicable Notes Agent's Principal Office for payment and in same day funds not later than 11:00 a.m. on the date specified herein. The Notes Agent will promptly distribute to each Holder its Pro Rata Share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to each Holder at the address specified in the Holder's Administrative Questionnaire (or at such other address as the Holder may indicate in writing to the Note Agent from time to time). All payments received by the Notes Agent after 11:00 a.m. may (at the sole discretion of the Notes Agent) in each case be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(3)     If any payment to be made by the Company shall come due on a day other than a Business Day, any interest shall be payable, and any PIK Interest shall be capitalized, on the next succeeding Business Day without additional interest accruing thereon.

(4)     Whenever any payment received by the Notes Agent under this Agreement or any of the other Notes Documents is insufficient to pay in full all amounts due and payable to the Notes Agent and the Holders under or in respect of this Agreement and the other Notes Documents on any date, such payment shall be distributed by the Notes Agent and applied by the Notes Agent and the Holders in the order of priority set forth in Section 1(b)(iii)(1). If the Notes Agent receives funds for application to the Obligations of the Company under or in respect of the Notes Documents under circumstances for which the Notes Documents do not specify the manner in which such funds are to be applied, the Notes Agent may, but shall not be obligated to, elect to distribute such funds to the Holders in accordance with the Holder's Pro Rata Share of such of the outstanding Notes or other Obligations then owing to the Holder.

(iv)     **Withholding**.  Notwithstanding anything to the contrary herein, the Company shall be entitled to deduct and withhold from the consideration otherwise payable under the Note such amounts as it is required to deduct and withhold under the Code, or any other tax law, with respect to the making of such payment. To the extent that amounts are so withheld, such withheld amounts shall be treated for all purposes of this Note as having been paid to the Person in respect of whom such deduction and withholding was made. If a payment is payable (in whole or in part) in consideration other than cash and if the cash portion of any such payment is insufficient to satisfy all required tax withholding obligations, the Company shall retain an amount of the non-cash consideration otherwise payable equal in value to the amount required to satisfy any applicable withholding taxes (as reasonably determined by the Company).

2.     CONVERSION.

(a)     **Conversion upon an Offering**. In the event that the Company (i) issues and sells shares of its equity securities ("*Equity Securities*") to investors (the "*Investors*") in a private offering or placement with total gross proceeds to the Company of at least $50,000,000 (excluding the conversion of the Notes or other convertible securities issued for capital raising purposes (*e.g.*, Simple Agreements for Future Equity)), (ii) issues and sells its common stock ("*Common Stock*") to Investors in an underwritten public offering pursuant to an effective registration statement filed with the Securities and Exchange Commission in accordance with the Act or under equivalent securities laws and regulations of any other

3

jurisdiction (including, for the avoidance of doubt, a SPAC), (iii) lists its Common Stock (other than shares of Common Stock not eligible for resale under Rule 144 under the Securities Act) on a national securities exchange by means of an effective registration statement on Form S-1 filed by the Company with the SEC that registers shares of existing capital stock of the Company for resale, as approved by the Company's board of directors, or (iv) lists its Common Stock on any stock exchange (the occurrence of each event set forth in clauses (i) through (iv) above, an "***Offering***" and, together with the occurrence of a Change of Control as provided in Section 2(b) below, each, a "***Conversion Event***"), in each case, while this Note remains outstanding, the Holder shall have the right at any time and from time to time during the period commencing on the date of consummation of such Offering until the Maturity Date, to convert, in whole or in part, the outstanding principal amount (including all accrued PIK Interest not already added to the principal amount of this Note) of this Note, together with all unpaid accrued Cash Interest thereon, into Equity Securities or Common Stock of the Company (as applicable) at a conversion price equal to the Applicable Conversion Price (as defined below) (which shall be determined, for the avoidance of doubt, on the date of the consummation of such Offering). The issuance of Equity Securities or Common Stock by the Company (as applicable) pursuant to the conversion of this Note shall be upon and subject to the same terms and conditions (other than as otherwise set forth herein) applicable to Equity Securities or Common Stock of the Company (as applicable), sold in the applicable Offering.

(b) **Conversion upon a Change of Control**. In the event the Company consummates a Change of Control (as defined below) while this Note remains outstanding, the Company shall repay the outstanding principal amount of this Note in an amount equal to the Repayment Amount; provided, however, that upon the written election of the Holder made not less than five (5) days prior to the Change of Control, the Company shall convert the outstanding principal amount of this Note (including all accrued PIK Interest not already added to the principal amount of this Note) and any unpaid accrued Cash Interest into Common Stock at a conversion price equal to the Applicable Conversion Price (which shall be determined, for the avoidance of doubt, on the date of consummation of such Change of Control) (assuming conversion of all securities convertible into Common Stock and exercise of all outstanding options and warrants, but excluding the shares of equity securities of the Company issuable upon the conversion of Notes or other convertible securities issued for capital raising purposes (e.g., Simple Agreements for Future Equity)). The Company shall give the Holder and the Note Agent written notice of any Change of Control at least ten (10) Business Days prior to the consummation thereof, which notice will contain the material terms and conditions (including price and form of consideration) of the Change of Control, the identity of the parties to the Change of Control and the intended date of the Change of Control.

For purposes of this Note, (i) a "***Change of Control***" means, at any time, any Person or "group" other than the Permitted Holders (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act) shall have obtained the power (whether or not exercised) to elect a majority of the members of the board of directors of the Company; (ii) "***Permitted Holders***" means each of BCV 55 LLC, BCV 66 LLC, BCV 77 LLC and each of their respective affiliates; (iii) "***Fair Market Value Per Common Share***" means the cash and/or the value of the property, rights or securities to be paid or distributed per share of Common Stock of the Company to the holders of Common Stock of the Company pursuant to a Change of Control or a SPAC (with the value of such property, rights or securities being determined in good faith by the board of directors of the Company); (iv) the "***Applicable Conversion Price***" means a conversion price equal to (a) 80% of either (x) the cash price paid per share for Equity Securities or Common Stock of the Company (as applicable) by the Investors in an Offering (other than a SPAC) or (y) the Fair Market Value Per Common Share in a Change of Control or a SPAC, as applicable, if the Conversion Event occurs on or prior to April 19, 2022, (b) 75% of either (x) the cash price paid per share for Equity Securities or Common Stock of the Company (as applicable) by the Investors in an Offering (other than a SPAC) or (y) the Fair Market Value Per Common Share in a Change of Control or a SPAC, as applicable, if the Conversion Event occurs on or after April 19, 2022 but prior to April 19, 2023, (c) 70% of either (x) the cash price paid per share for Equity Securities or Common Stock of the Company (as applicable) by the Investors in an Offering (other than a

4

SPAC) or (y) the Fair Market Value Per Common Share in a Change of Control or a SPAC, as applicable, if the Conversion Event occurs on or after April 19, 2023 but prior to April 19, 2024 and (d) 65% of either (x) the cash price paid per share for Equity Securities or Common Stock of the Company (as applicable) by the Investors in an Offering (other than a SPAC) or (y) the Fair Market Value Per Common Share in a Change of Control or a SPAC, as applicable, if the Conversion Event occurs on or after April 19, 2024 but prior to April 19, 2025; (v) in connection with any SPAC, each reference to "Company" shall be deemed to also refer to a Parent Entity that has become a co-obligor with respect to the Company's Obligations hereunder (except that solely such Parent Entity, and not Core Scientific Holding Co. (or its successor by merger), shall be obligated to deliver Equity Securities or Common Stock pursuant to this <u>Section 2</u>); and (vi) in connection with any SPAC, each reference to "Common Stock" shall be deemed to refer to the kind and the amount of property that a holder of one share of Common Stock of the Company would be entitled to receive on account of the consummation of such SPAC.

(c)    **Procedure for Conversion**. Upon the conversion in whole or in part of this Note into Equity Securities or Common Stock of the Company (as applicable), the Holder shall surrender this Note to the Company and deliver to the Company any documentation reasonably required by the Company (including, in the case of an Offering, all financing documents executed by the Investors in connection with such Offering). The Company shall not be required to issue or deliver the Equity Securities or Common Stock of the Company (as applicable) into which this Note may convert until the Holder has surrendered this Note to the Company and delivered to the Company any such documentation. The Company shall, as soon as practicable after the surrender of this Note and delivery to the Company of such documentation deliver to the Holder (i) a certificate or certificates for the number of shares of Equity Securities or Common Stock of the Company (as applicable) into which this Note is convertible in whole or in part, rounded downward to the nearest whole share and cash for the amounts not so converted as a result of the above-referenced downward rounding, registered in the name of such Investor or registered nominee or assignee and (ii) to the extent the Holder has converted only a portion of the outstanding principal amount of this Note, a replacement Note for the outstanding principal amount of this Note not converted. Upon the conversion in full or in part of this Note into Equity Securities or Common Stock of the Company (as applicable) pursuant to the terms hereof, in lieu of any fractional shares to which the Holder would otherwise be entitled, the Company shall pay the Holder cash equal to such fraction multiplied by the price at which this Note converts. Upon conversion of this Note in full or in part and payment of cash representing any fractional share pursuant to this <u>Section 2(c)</u>, the Company shall be forever released from all its obligations and liabilities under this Note and this Note shall be deemed of no further force or effect, whether or not the original of this Note has been delivered to the Company for cancellation.

(d)    **Taxes**. The Company shall pay any and all stamp, stock transfer, stock issuance and other similar taxes that may be payable in respect of any issuance or delivery of shares of Equity Securities or Common Stock of the Company (as applicable) upon conversion of this Note pursuant to this <u>Section 2</u>. The Company shall not, however, be required to pay any income, capital gains or similar tax of the recipient of Equity Securities or Common Stock of the Company (as applicable) or any tax which may be payable in respect of any transfer involved in the issuance and delivery of shares of Equity Securities or Common Stock of the Company (as applicable) in a name other than that in which this Note so converted was registered, and no such issuance or delivery shall be made unless and until the person or entity requesting such issuance has paid to the Company the amount of any such tax or has established, to the satisfaction of the Company, that such tax has been paid.

**3.**     **SECURED NOTE.**

Upon the execution and delivery of the Collateral Documents pursuant to Section 6.13 of the Purchase Agreement, this Note shall be secured by a first-priority Lien on the Collateral (subject to Permitted Liens) pursuant to the Security Agreement.

**4.**     **EVENTS OF DEFAULT.**

If there shall be any Event of Default (as defined below) hereunder, at the option and upon the declaration of the Holders representing at least twenty-five percent (25%) of the aggregate outstanding principal amount of the Notes issued pursuant to the Purchase Agreement at such time and upon written notice to the Company (which election and notice shall not be required in the case of an Event of Default under subsection (v) or (vi) below), this Note shall accelerate and all principal (including all accrued PIK Interest not already added to the principal amount of this Note) and all unpaid accrued Cash Interest shall automatically become immediately due and payable. The occurrence of any one or more of the following shall constitute an "***Event of Default***":

(i)     the Company fails to pay to the Holder (i) the principal of this Note as and when due or (ii) within five (5) Business Days after the same becomes due any Cash Interest on this Note or any fees or any other Obligations;

(ii)     any representation or warranty made or deemed made by or on behalf of the Company or any of its Subsidiaries to the Holder under or in connection with the Note Documents or any certificate or information delivered in connection therewith shall be materially false when made;

(iii)     the Company and its Subsidiaries fail to observe or perform any term, covenant, or provision contained in Section 7 of the Purchase Agreement and such non-observance or non-performance shall not have been remedied or waived within thirty (30) days after the earlier of (i) the Company becoming aware of such non-observance or non-compliance or (ii) receipt by the Company of notice from a Holder of such non-observance or non-compliance;

(iv)     the Company and its Subsidiaries fail to observe or perform any other term, covenant or provision contained in the Purchase Agreement (other than those specified elsewhere in this Section 4) or any other Note Document and such non-observance or non-performance shall not have been remedied or waived within thirty (30) days after the earlier of (i) the Company becoming aware of such non-observance or non-compliance or (ii) receipt by the Company of notice from a Holder of such non-observance or non-compliance;

(v)     the Company or any Material Subsidiary shall (i) apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (ii) admit in writing its inability to pay its debts generally as they mature, (iii) make a general assignment for the benefit of its or any of its creditors, (iv) be dissolved or liquidated, (v) commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, or (vi) take any action for the purpose of effecting any of the foregoing;

(vi)     proceedings for the appointment of a receiver, trustee, liquidator or custodian of the Company or any of its Material Subsidiaries, or of all or a substantial part of the property thereof, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with

respect to the Company or any of its Material Subsidiaries, if any, or the debts thereof under any bankruptcy, insolvency or other similar law now or hereafter in effect shall be commenced, or an order for relief shall be entered in any such proceeding, or such proceeding shall not be dismissed or discharged within 60 days of commencement;

(vii)     the Company fails to pay when due any principal of or interest on or any other amount payable in respect of, or breaches or defaults under any other term of, any mortgage, indenture, agreement or other instrument under which there may be outstanding any Indebtedness in an aggregate principal amount of in excess of $10,000,000, in each case, beyond the grace period, if any, if the effect of such non-payment, breach or default is to cause such Indebtedness to become or be declared due and payable (or subject to a compulsory repurchase or redemption) prior to its stated maturity;

(viii)    any court, government, or Governmental Authority shall condemn, seize or otherwise appropriate, or take custody or control of, all or any material portion of the property of the Company and its Subsidiaries, taken as a whole;

(ix)     one or more judgments or orders for the payment of money in excess of $10,000,000 (or the equivalent thereof in currencies other than U.S. dollars) in the aggregate shall be entered or filed against the Company or any of its Subsidiaries and shall remain undischarged, unvacated, unbonded or unstayed for a period of thirty (30) consecutive days;

(x)     (i) the occurrence of a Reportable Event with respect to any Plan, (ii) the filing of a notice of intent to terminate a Plan by the Company, any ERISA Affiliate or any Subsidiary, the institution of proceedings to terminate a Plan by the PBGC or any other Person; (iii) the withdrawal in a "complete withdrawal" or a "partial withdrawal" as defined in Sections 4203 and 4205, respectively, of ERISA by the Company, any ERISA Affiliate or any Subsidiary of the Company from any Multiemployer Plan, (iv) the incurrence of any material increase in the contingent liability of the Company or any of its Subsidiaries with respect to any "employee welfare benefit plan" as defined in Section 3(1) of ERISA which covers retired employees and its beneficiaries or (v) the Unfunded Pension Liabilities of all Single Employer Plans shall exceed (in the aggregate) $10,000,000, in each such case which, either individually or in the aggregate, would be reasonably expected to result in liability to any Note Party in excess of $10,000,000;

(xi)     the institution by the Company, any ERISA Affiliate or any Subsidiary of steps to terminate any Plan if, in order to effectuate such termination, the Company, such ERISA Affiliate or such Subsidiary, as the case may be, would be required to make a contribution to such Plan, or would incur a liability or obligation to such Plan, in excess of $10,000,000, or the institution by the PBGC of steps to terminate any Plan, which would reasonably be expected to result in material liability to any Note Party;

(xii)    the Company or any Material Subsidiary shall (i) be the subject of any proceeding pertaining to the release by the Company, any such Material Subsidiary or any other Person of any Hazardous Material into the environment or (ii) violate any Environmental Law, which, in either case could reasonably be expected to have a Material Adverse Effect;

(xiii)   from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13 of the Purchase Agreement, any Collateral Document shall for any reason fail to create a valid and perfected first priority (subject to any Permitted Liens) security interest in any collateral purported to be covered thereby, except as permitted by the terms of such Collateral Document, or any Collateral Document shall fail to remain in full force or effect (other than in accordance with the terms hereof or thereof) or any action taken by the Company or any Subsidiary shall be taken to discontinue or to assert the invalidity or unenforceability of such Collateral Document;

(xiv)    any intercreditor agreement or subordination agreement relating to any Indebtedness of any Note Party subordinated to the Obligations, or any subordination provisions of any note or other document running to the benefit of the Holders in respect of such Indebtedness, including, from and after the execution and delivery of the Collateral Documents pursuant to Section 6.13 of the Purchase Agreement, the Intercreditor Agreement, shall cease for any reason to be in full force and effect other than in accordance with the terms hereof or thereof or any Note Party or any of their Subsidiaries shall so assert in writing; or

(xv)    the Note Parties shall be enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of the business of the Note Parties, taken as a whole.

5.    MISCELLANEOUS PROVISIONS.

(a)    **Waivers**. The Company hereby waives demand, notice, presentment, protest and notice of dishonor.

(b)    **Further Assurances**. The Holder agrees and covenants that at any time and from time to time the Holder will promptly execute and deliver to the Company such further instruments and documents and take such further action as the Company may reasonably require in order to carry out the full intent and purpose of this Note and to comply with state or federal securities laws or other regulatory approvals.

(c)    **Transfers of Notes**. Subject to the Company's prior written consent (not to be unreasonably withheld or delayed) and to the extent permitted by applicable law, this Note may be transferred only upon its surrender to the Company for registration of transfer, duly endorsed, or accompanied by a duly executed written instrument of transfer in form satisfactory to the Company. Thereupon, this Note shall be reissued to, and registered in the name of, the transferee, or a new Note for like principal amount and interest shall be issued to, and registered in the name of, the transferee. Interest and principal shall be paid solely to the registered holder of this Note. Such payment shall constitute full discharge of the Company's obligation to pay such interest and principal. Upon the effectiveness of any transfer pursuant to this Section 5(c) the Company shall provide an updated Ledger to the Note Agent. Any transfer of this Note in contravention of this Section 5(c) shall be void and the Company shall be entitled to continue to treat the Holder as the holder of this Note for all purposes under the Note Documents. The Company shall at all times maintain a book-entry system, which shall reflect ownership of this Note and interests therein. This Note is intended to be in "registered form" for United States federal tax purposes.

(d)    **Market Standoff**. To the extent requested by the Company or an underwriter of securities of the Company, each Holder and any permitted transferee thereof shall not, without the prior written consent of the underwriters in an underwritten public offering pursuant to an effective registration statement filed with the Securities and Exchange Commission in accordance with the Act or under equivalent securities laws and regulations of any other jurisdiction, offer, sell, make any short sale of, grant or sell any option for the purchase of, lend, pledge, otherwise transfer or dispose of (directly or indirectly), enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership (whether any such transaction is described above or is to be settled by delivery of Securities or other securities, in cash, or otherwise), any Securities or other shares of stock of the Company then owned by such Holder or any transferee thereof, or enter into an agreement to do any of the foregoing, for up to 180 days following the consummation of any such offering. For purposes of this paragraph, "*Company*" includes the Company or any other direct or indirect parent entity of the Company into which the Company merges or consolidates. The Company may place restrictive legends on the certificates representing the shares subject to this paragraph and may impose stop transfer instructions with

respect to the Securities and such other shares of stock of each Holder and any transferee thereof (and the shares or securities of every other person subject to the foregoing restriction) until the end of such period. Each Holder and any transferee thereof shall enter into any agreement reasonably required by the underwriters for such an offering to implement the foregoing within any reasonable timeframe so requested. The underwriters for any such offering are intended third party beneficiaries of this paragraph and shall have the right, power and authority to enforce the provisions of this paragraph as though they were parties hereto. The provisions of this paragraph shall survive any conversion and/or repayment of this Note.

(e)     **Waiver of Statutory Information Rights**. Prior to the conversion in full of this Note, the Holder, on behalf of the Holder and all beneficial owners of the Securities now or hereafter owned by the Holder (a "***Beneficial Owner***"), acknowledges and agrees that that neither the Holder nor any of the Beneficial Owners will have any right to receive any information from the Company by virtue of ownership of any of the Securities. Without limiting the foregoing, prior to the conversion in full of this Note, to the fullest extent permitted by law, the Holder hereby unconditionally and irrevocably waives all rights under Section 220 of the Delaware General Corporation Law and all such similar information and/or inspection rights that may be provided under the law of any jurisdiction, or any federal, state or foreign regulation, that are, or may become, applicable to the Company or the Company's capital stock (the "***Inspection Rights***") on behalf of the Holder and all Beneficial Owners. The Holder, on behalf of the Holder and all Beneficial Owners, hereby covenants and agrees that neither the Holder nor any Beneficial Owner shall directly or indirectly commence, voluntarily aid in any way, prosecute, assign, transfer, or cause to be commenced any claim, action, cause of action, or other proceeding to pursue or exercise the Inspection Rights. The Holder hereby further warrants and represents that the Holder has reviewed this waiver with its legal counsel, and that the Holder knowingly and voluntarily waives its rights otherwise provided by Section 220 of the Delaware General Corporation Law (or under similar rights under other applicable law). Notwithstanding the foregoing, Beneficial Owners that were issued Equity Securities other than by way of a conversion in connection with an Offering will not be subject to this <u>Section 5(e)</u>. The terms of this <u>Section 5(e)</u> shall survive any repayment of this Note.

(f)     **Amendment and Waiver**. This Note and any term hereof may only be amended, waived or modified in accordance with Section 10.9 of the Purchase Agreement. Upon the effectuation of such amendment, waiver or modification with the consent of the Required Holders or each Holder, as applicable, in conformance with Section 10.9 of the Purchase Agreement, such amendment, waiver or modification shall be effective as to, and binding against the Holders of, all of the Notes, and the Company shall promptly give written notice thereof to the Holder if the Holder has not previously consented to such amendment, waiver or modification in writing; <u>provided</u> that the failure to give such notice shall not affect the validity of such amendment, waiver or modification.

(g)     **Binding Agreement**. The terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Note, expressed or implied, is intended to confer upon any third party any rights, remedies, obligations, or liabilities under or by reason of this Note, except as expressly provided in this Note. Notwithstanding any assumption of the Company's Obligations under this Note by a Parent Entity in accordance with Section 10.1 of the Purchase Agreement, Core Scientific Holding Co. (or its successor by merger) shall remain a co-obligor with such Parent Entity with respect to such Obligations (other than any such Obligation of the Company to deliver Equity Securities or Common Stock pursuant to <u>Section 2</u> of this Note, with respect to which delivery Obligation Core Scientific Holding Co. (or its successor by merger) shall be a Guarantor).

(h)     **Counterparts**. This Note may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract. Any counterpart of a signature page to this Note may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature

complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.

(i)  **Headings; Interpretation**. Paragraph headings used in this Note are included for convenience of reference only and will not modify the provisions that they precede or affect the interpretation of this Note or any other Note Document. The term "including" shall be interpreted to mean "including but not limited to".

(j)  **Notices**. All communications and notices required or permitted to be given hereunder shall be delivered in accordance with Section 10.8 of the Purchase Agreement.

(k)  **GOVERNING LAW.** THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.

(l)  **Expenses, Etc**. This Note is subject to the provisions of Section 10.3 (Jurisdiction and Venue), Section 10.4 (Waiver of Jury Trial) and Section 10.10 (Expenses and Indemnification) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*.

(m)  **Delays or Omissions**. It is agreed that no delay or omission to exercise any right, power or remedy accruing to each Holder, upon any breach or default of the Company under this Note or any Note shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. It is further agreed that any waiver, permit, consent or approval of any kind or character by a Holder of any breach or default under this Note, or any waiver by such Holder of any provisions or conditions of this Note must be in writing and shall be effective only to the extent specifically set forth in writing and that all remedies, either under this Note, or by law or otherwise afforded to such Holder, shall be cumulative and not alternative.

(n)  **Entire Agreement**. This Note and the other Note Documents constitute the entire contract among the parties hereto regarding to the subject matters addressed herein and supersede any and all previous agreements, negotiations, and discussions, oral or written, by the parties regarding the subject matters addressed herein.

(o)  **Exculpation among Holders**. The Holder acknowledges that the Holder is not relying on any person, firm or corporation, other than the Company and its officers and board members, in making its investment or decision to invest in the Company.

(p)  **Broker's Fees**. Each party hereto represents and warrants that no agent, broker, investment banker, person or firm acting on behalf of or under the authority of such party hereto is or will be entitled to any broker's or finder's fee or any other commission directly or indirectly in connection with the transactions contemplated herein. Each party hereto further agrees to indemnify each other party for any claims, losses or expenses incurred by such other party as a result of the representation in this subsection being untrue.

(q)  **Repayment Amounts**. The parties hereto hereby acknowledge and agree that

payment of any Repayment Amount hereunder constitutes liquidated damages and not a penalty, the actual amount of damages to the Holder or profits lost by the Holder as a result of a prepayment or conversion of this Note would be impracticable and extremely difficult to ascertain and the Repayment Amount hereunder is part of an arm's length transaction between sophisticated parties represented by counsel and is bargained for consideration provided for and agreed to by mutual agreement of the Company and the Holder. THE NOTE PARTIES EXPRESSLY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE REPAYMENT AMOUNT TO THE EXTENT SUCH REPAYMENT AMOUNT IS DUE AND PAYABLE IN ACCORDANCE WITH THIS NOTE. The Note Parties expressly agree that: (i) the Repayment Amount shall be payable notwithstanding the then prevailing market rates at the time payment is made; (ii) the Note Parties shall be estopped hereafter from claiming differently than as agreed to in this paragraph; and (iii) their agreement to pay the Repayment Amount is a material inducement to the Holder to purchase the Note.

(r)     **Tax Forms**. Prior to the date hereof, the Holder (and, in the event any Person becomes an assignee or participant in respect of this Note, prior to the date such Person becomes such an assignee or participant) shall have delivered to the Company executed copies of Internal Revenue Service ("**IRS**") Form W-9 or appropriate IRS Form W-8, as applicable, as well as any reasonably necessary supporting information, certifying that any payments to such Holder (or assignee or participant) under this Note are exempt from U.S. federal withholding tax. The Holder (and assignee or participant) further agrees that if any such form or certification expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Company in writing of its legal inability to do so.

(s)     **Calculations**. The Company shall be responsible for making all calculations with respect to this Note, including, without limitation, accrued interest (including PIK Interest), the Fair Market Value Per Common Share and the Applicable Conversion Price and shall forward such calculations to the Agents and the Holder upon request.

*[Signature pages follow]*

11

**IN WITNESS WHEREOF**, the parties hereto have executed this Note as of the date first written above.

**COMPANY:**

**CORE SCIENTIFIC HOLDING CO.**

By: _____

     Name:
     Title:

E-mail:     _____

Address:

[Signature Page to Core Scientific Holding Co. Convertible Promissory Note]

**HOLDER (if an entity):**

Name of Holder: _____

By: _____

Name: _____
Title: _____

<u>E-mail</u>: _____

<u>Address</u>: _____
_____
_____

**HOLDER (if an individual):**

Name of Holder: _____

Signature: _____

<u>E-mail</u>: _____

<u>Address</u>: _____
_____
_____

[Signature Page to Core Scientific Holding Co. Convertible Promissory Note]

**EXHIBIT B**

**FORM OF COUNTERPART SIGNATURE PAGE**

      **IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the date first written above.

The undersigned hereby confirms that, upon execution of this signature page, it hereby agrees to be bound by all of the terms, provisions and conditions contained herein and is hereby joined as an "Additional Purchaser", a "Purchaser" and a "Holder" hereunder.

**ADDITIONAL PURCHASER:**

[                ]

By:_____
Name:
Title:

**EXHIBIT C**

**FORM OF GUARANTY**

**(see attached)**

<center>**GUARANTY**</center>

THIS GUARANTY (this "*Agreement*"), dated as of August 20, 2021, is made by and among each guarantor executing a signature page hereto and each Additional Guarantor (as defined below) that becomes a party hereto pursuant to <u>Section 15</u> (each, a "*Guarantor*" and collectively, the "*Guarantors*") and U.S. Bank National Association, as note agent for the Guaranteed Parties referred to below (the "*Note Agent*") and Collateral Agent for the Secured Parties (when applicable).

<center>**RECITALS**</center>

WHEREAS, the Guarantors entered into that certain Convertible Note Purchase Agreement, dated as of the date hereof (as amended, restated, supplemented and/or otherwise modified from time to time, the "*Purchase Agreement*"; capitalized terms used but not defined herein having the meanings ascribed thereto therein), by and among Core Scientific Holding Co., a Delaware corporation, the Guarantors party thereto, each Purchaser party thereto and the Note Agent; and

WHEREAS, to induce the Purchasers to purchase the Notes, the Guarantors have agreed to enter into this Agreement.

<center>**AGREEMENT**</center>

NOW, THEREFORE, in consideration of the foregoing, and the representations, warranties and conditions set forth herein, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      **Defined Terms.**

"*Additional Guarantor*" has the meaning assigned to such term in <u>Section 15</u>.

"*Aggregate Payments*" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (1) the aggregate amount of all payments and distributions made on or before such date by such Contributing Guarantor in respect of this Agreement (including in respect of <u>Section 3</u>), minus (2) the aggregate amount of all payments received on or before such date by such Contributing Guarantor from the other Contributing Guarantors as contributions under <u>Section 3</u>.

"*Bankruptcy Code*" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"*Commodity Exchange Act*" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended and in effect from time to time, and any successor statute.

"*Contributing Guarantors*" has the meaning assigned to such term in <u>Section 3</u>.

"*Fair Share*" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Fair Share Contribution Amount with respect to such Contributing Guarantor to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Contributing Guarantors *multiplied* by (b) the aggregate amount paid or distributed on or before such date by all Funding Guarantors under this Agreement in respect of the obligations guaranteed.

"*Fair Share Contribution Amount*" means, with respect to a Contributing Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Contributing Guarantor under this Agreement that would not render its obligations hereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Bankruptcy Code or any comparable

applicable provisions of state law; <u>provided</u>, solely for purposes of calculating the "Fair Share Contribution Amount" with respect to any Contributing Guarantor for purposes of <u>Section 3</u>, any assets or liabilities of such Contributing Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Contributing Guarantor.

"***Funding Guarantors***" has the meaning assigned to such term in <u>Section 3</u>.

"***Guaranteed Obligations***" has the meaning assigned to such term in <u>Section 2</u>.

"***Guaranteed Parties***" means the Purchasers, the Holders, the Agents, and their respective successors and permitted assigns.

"***Guarantor***" has the meaning assigned to such term in the preamble to this Agreement.

"***Qualified ECP Guarantor***" means, in respect of any Swap Obligation, each Note Party that has total assets exceeding Ten Million Dollars ($10,000,000.00) at the time the relevant Guarantee or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another Person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"***Swap Obligation***" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

**2.     Guaranty of the Obligations**.  The Guarantors jointly and severally hereby irrevocably and unconditionally guaranty to the Agent, for the ratable benefit of the Guaranteed Parties, the due and punctual payment and performance in full of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)) (collectively, the "***Guaranteed Obligations***").

**3.     Contribution by Guarantors**.  All Guarantors desire to allocate among themselves (collectively, the "***Contributing Guarantors***"), in a fair and equitable manner, their obligations arising under this Agreement.  Accordingly, in the event any payment or distribution is made on any date by a Guarantor (a "***Funding Guarantor***") under this Agreement such that its Aggregate Payments exceeds its Fair Share as of such date, such Funding Guarantor shall be entitled to a contribution from each of the other Contributing Guarantors in an amount sufficient to cause each Contributing Guarantor's Aggregate Payments to equal its Fair Share as of such date.  The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Funding Guarantor.  The allocation among Contributing Guarantors of their obligations as set forth in this <u>Section 3</u> shall not be construed in any way to limit the liability of any Contributing Guarantor hereunder.  Each Guarantor is a third-party beneficiary to the contribution agreement set forth in this <u>Section 3</u>.

**4.     Payment by Guarantors**.  The Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Guaranteed Party may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of the Company to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)), the Guarantors will upon demand pay, or cause to be paid, in cash, to the Note Agent for the ratable benefit of

2

the Guaranteed Parties, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for the Company's becoming the subject of a case under the Bankruptcy Code, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against the Company for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to the Guaranteed Parties as aforesaid.

**5. Liability of Guarantors Absolute**.   Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations.  In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a)     this Agreement is a guaranty of payment when due and not of collectability; this Agreement is a primary obligation of each Guarantor and not merely a contract of surety;

(b)     the Note Agent may enforce this Agreement upon the occurrence of an Event of Default notwithstanding the existence of any dispute between the Company and any Guaranteed Party with respect to the existence of such Event of Default;

(c)     the obligations of each Guarantor hereunder are independent of the obligations of the Company and the obligations of any other guarantor (including any other Guarantor) of the obligations of the Company, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against the Company or any of such other guarantors and whether or not the Company is joined in any such action or actions;

(d)     payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid; underlined provided that, without limiting the generality of the foregoing, if the Note Agent is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(e)     any Guaranteed Party, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for the benefit of such Guaranteed Party in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Guaranteed Party may have against any such security, in each case as such Guaranteed Party in its discretion may determine consistent herewith and any applicable security

3

agreement, including foreclosure on any such security pursuant to one or more judicial or non-judicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against the Company or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Note Documents; and

(f)       this Agreement and the obligations of the Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full of the Guaranteed Obligations), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Note Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to Events of Default) hereof, any of the other Note Documents or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Note Document or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Note Documents or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though any Guaranteed Party might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) any Guaranteed Party's consent to the change, reorganization or termination of the corporate structure or existence of the Company or any of its Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations; (vii) any defenses, set offs or counterclaims which the Company may allege or assert against any Guaranteed Party in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

**6.      Waivers by Guarantors**. Each Guarantor hereby waives, for the benefit of the Guaranteed Parties: (a) any right to require any Guaranteed Party, as a condition of payment or performance by such Guarantor, to (i) proceed against the Company, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from the Company, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any deposit account or credit on the books of any Guaranteed Party in favor of the Company or any other Person, or (iv) pursue any other remedy in the power of any Guaranteed Party whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of the Company or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of the Company or any other Guarantor from any cause other than payment in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Guaranteed Party's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to gross negligence or willful misconduct; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the

4

terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Guaranteed Party protect, secure, perfect or insure any security interest or Lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to the Company and notices of any of the matters referred to in Section 5 and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

7.     **Guarantors' Rights of Subrogation, Contribution, etc.**  Until the Guaranteed Obligations shall have been indefeasibly paid in full (other than contingent obligations as to which no demand has been made or claim asserted), each Guarantor hereby waives any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against the Company or any other Guarantor or any of its assets in connection with this Agreement or the performance by such Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including (a) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter have against the Company with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that any Guaranteed Party now has or may hereafter have against the Company, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by any Guaranteed Party.  In addition, until the Guaranteed Obligations shall have been indefeasibly paid in full (other than contingent obligations as to which no demand has been made or claim asserted), each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guaranteed Obligations, including any such right of contribution as contemplated by Section 3.  Each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against the Company or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights any Guaranteed Party may have against the Company, to all right, title and interest any Guaranteed Party may have in any such collateral or security, and to any right any Guaranteed Party may have against such other guarantor.  If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations shall not have been finally and indefeasibly paid in full (other than contingent obligations as to which no demand has been made or claim asserted), such amount shall be held in trust for the Note Agent on behalf of the Guaranteed Parties and shall forthwith be paid over to the Note Agent for the benefit of the Guaranteed Parties to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

8.     **Subordination of Other Obligations**.  Any Indebtedness of the Company or any Guarantor now or hereafter held by any Guarantor (the "***Obligee Guarantor***") is hereby subordinated in right of payment to the Guaranteed Obligations, and any such indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust for the Note Agent on behalf of the Guaranteed Parties and shall forthwith be paid over to the Note Agent for the benefit of the Guaranteed Parties to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

254153973 v5

**9.**     **Continuing Guaranty**.  This Agreement is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations shall have been indefeasibly paid in full (other than contingent obligations as to which no demand has been made or claim asserted).  Each Guarantor hereby irrevocably waives any right to revoke this Agreement as to future transactions giving rise to any Guaranteed Obligations.

**10.**     **Authority of the Guarantors or the Company**.  It is not necessary for any Guaranteed Party to inquire into the capacity or powers of any Guarantor or the Company or the officers, directors or any agents acting or purporting to act on behalf of any of them.

**11.**     **Financial Condition of the Company**.  Any Notes may be issued to the Company without notice to or authorization from any Guarantor regardless of the financial or other condition of the Company at the time of any such grant or continuation.  No Guaranteed Party shall have any obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of the Company.  Each Guarantor has adequate means to obtain information from the Company on a continuing basis concerning the financial condition of the Company and its ability to perform its obligations under the Note Documents and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of the Company and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations.  Each Guarantor hereby waives and relinquishes any duty on the part of any Guaranteed Party to disclose any matter, fact or thing relating to the business, operations or conditions of the Company now known or hereafter known by any Guaranteed Party.

**12.**     **Bankruptcy, etc.**

        (a)     So long as any Guaranteed Obligations remain outstanding, no Guarantor shall, without the prior written consent of the Note Agent acting pursuant to the instructions of Required Holders, commence or join with any other Person in commencing any bankruptcy, reorganization or insolvency case or proceeding of or against the Company or any other Guarantor.  The obligations of the Guarantors hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by any case or proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of the Company or any other Guarantor or by any defense which the Company or any other Guarantor may have by reason of the order, decree or decision of any court or administrative body resulting from any such proceeding.

        (b)     Each Guarantor acknowledges and agrees that any interest on any portion of the Guaranteed Obligations which accrues after the commencement of any case or proceeding referred to in clause (a) above (or, if interest on any portion of the Guaranteed Obligations ceases to accrue by operation of law by reason of the commencement of such case or proceeding, such interest as would have accrued on such portion of the Guaranteed Obligations if such case or proceeding had not been commenced) shall be included in the Guaranteed Obligations because it is the intention of the Guarantors and the Guaranteed Parties that the Guaranteed Obligations which are guaranteed by the Guarantors pursuant hereto should be determined without regard to any rule of law or order which may relieve the Company of any portion of such Guaranteed Obligations.  The Guarantors will permit any trustee in bankruptcy, receiver, debtor in possession, assignee for the benefit of creditors or similar person to pay Agent, or allow the claim of the Note Agent in respect of, any such interest accruing after the date on which such case or proceeding is commenced.

        (c)     In the event that all or any portion of the Guaranteed Obligations are paid by the Company, the obligations of the Guarantors hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from any Guaranteed Party as a preference, fraudulent transfer or otherwise,

254153973 v5

and any such payments which are so rescinded or recovered shall constitute Guaranteed Obligations for all purposes hereunder.

**13.     Discharge of Guaranty Upon Sale of a Guarantor**.  If all of the Capital Stock of any Guarantor or any of its successors in interest hereunder shall be sold or otherwise disposed of (including by merger or consolidation) in accordance with the terms and conditions of the Note Documents, the Guaranty of such Guarantor or such successor in interest, as the case may be, hereunder shall automatically be discharged and released without any further action by any Guaranteed Party or any other Person effective as of the time of such Asset Disposition.

**14.     Keepwell**.     Each Qualified ECP Guarantor hereby, jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Note Party to honor all of its obligations under this Agreement in respect of Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 14 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 14, or otherwise under this Agreement, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  The obligations of each Qualified ECP Guarantor under this Section 14 shall remain in full force and effect until all of the Guaranteed Obligations (other than contingent indemnity Obligations for which no claim has been asserted) shall have been paid in full.  Each Qualified ECP Guarantor intends that this Section 14 constitute, and this Section 14 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Note Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

**15.     Additional Guarantors.**  Each Subsidiary of the Company that is required to become a Guarantor pursuant to Section 6.10 of Purchase Agreement will become a Guarantor (each an "***Additional Guarantor***"), with the same force and effect as if such Subsidiary were originally named as a Guarantor herein, for all purposes of this Agreement upon the execution and delivery by such Subsidiary of a supplement to this Agreement substantially in the form of the supplement attached hereto as Exhibit A (each a "***Guaranty Supplement***").  Each reference to "Guarantor" (or any words of like import referring to a Guarantor) in this Agreement or any other Note Document shall also mean the Additional Guarantor and each reference in this Agreement or any other Note Document to this "Guaranty" (or words of like import referring to this Agreement) shall mean this Agreement, as supplemented by each Guaranty Supplement. No consent of any other Guarantor hereunder will be required for the execution and delivery of any Guaranty Supplement.  The rights and obligations of each Guarantor hereunder shall remain in full force and effect notwithstanding the addition of any Additional Guarantor as a party to this Agreement.

**16.     Severability**.  If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith.  In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (a) such provision shall be excluded from this Agreement, (b) the balance of this Agreement shall be interpreted as if such provision were so excluded, and (c) the balance of this Agreement shall be enforceable in accordance with its terms.

**17.     Waiver and Amendment; Entire Agreement**.  Any provision of this Agreement may be amended, waived or modified only by an instrument signed in writing by the Guarantors and the Note Agent (with the consent of any Guaranteed Party as required by Section 10.9 of the Purchase Agreement).  This Agreement and the other Note Documents constitute the entire contract among the parties hereto regarding to the subject matters addressed herein and supersede any and all previous agreements, negotiations, and discussions, oral or written, by the parties regarding the subject matters addressed herein.

18.     **Successors and Assigns**.  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties.  Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

19.     **GOVERNING LAW**.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.

20.     **Jurisdiction and Venue; Waiver of Jury Trial; Expenses and Indemnification**.  This Agreement is subject to the provisions of Section 10.3 (Jurisdiction and Venue), Section 10.4 (Waiver of Jury Trial) and Section 10.10(a) (Expenses and Indemnification) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*.

21.     **Notices**.  All communications and notices required or permitted to be given hereunder shall be delivered in accordance with Section 10.8 of the Purchase Agreement.

22.     **Headings; Interpretation**.  Paragraph headings used in this Agreement are included for convenience of reference only and will not modify the provisions that they precede or affect the interpretation of this Agreement or any other Note Document.  The term "including" shall be interpreted to mean "including but not limited to".

23.     **Counterparts**.  This Agreement may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract.  Any counterpart of a signature page to this Agreement may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.

24.     **Concerning the Agent**.  U.S. Bank National Association is entering into this Agreement solely in its capacity as Note Agent and Collateral Agent (when applicable) under the Purchase Agreement and shall be entitled to all of the rights, privileges and immunities of the Note Agent and Collateral Agent (when applicable) in acting hereunder.

25.     **Security**.  The parties hereto acknowledge that, upon delivery of the Collateral Documents required by Section 6.13 of Purchase Agreement, the Guaranteed Obligations shall be secured by a first priority Lien on the Collateral (subject to terms contained in such Collateral Documents).

*[Signature pages follow]*

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first written above.

**CORE SCIENTIFIC, INC.,** a Delaware corporation

By:_____
Name:  Michael Trzupek
Title:    Chief Executive Officer

**AMERICAN PROPERTY ACQUISITION, LLC,** a Delaware limited liability company

By: Core Scientific, Inc., its sole member

By:_____
Name:  Michael Trzupek
Title:    Chief Executive Officer

**AMERICAN PROPERTY ACQUISITIONS I, LLC,** a North Carolina limited liability company

By: American Property Acquisition, LLC, its sole member

By:  Core Scientific, Inc., its sole member

By:_____
Name:  Michael Trzupek
Title:    Chief Executive Officer

**AMERICAN PROPERTY ACQUISITIONS VII, LLC,** a Georgia limited liability company

By: American Property Acquisition, LLC, its sole member

By:  Core Scientific, Inc., its sole member

By:_____
Name:  Michael Trzupek
Title:    Chief Executive Officer

**BLOCKCAP, INC.,** a Nevada corporation

By:_____
Name:  Todd DuChene
Title:    Secretary

254153973 v5

**NOTE AGENT AND COLLATERAL AGENT**:

**U.S. BANK NATIONAL ASSOCIATION**

By: _____
Name:
Title:

Exhibit A to
Guaranty Agreement

**FORM OF GUARANTY SUPPLEMENT**

THIS G U A R A N T Y SUPPLEMENT (this "***Supplement***"), dated as of [__], is entered into by and between [__] (the "***New Guarantor***") and U.S. BANK, NATIONAL ASSOCIATION, as note agent (in such capacity, the "***Agent***") under that certain Guaranty, dated as of August 20, 2021, by and among Core Scientific, Inc., American Property Acquisition, LLC, American Property Acquisitions I, LLC, American Property Acquisitions VII, LLC, each other Guarantor from time to time party thereto and the Note Agent (the "***Guaranty***").  Capitalized terms used but not defined herein shall have the meanings given to them in the Guaranty.

The New Guarantor and the Agent, for the benefit of the Guaranteed Parties, hereby agree as follows:

The New Guarantor hereby acknowledges, agrees and confirms that, by its execution of this Supplement, the New Guarantor will be deemed to be a "Guarantor" under the Guaranty for all purposes of the Guaranty and shall have all of the obligations of a Guarantor thereunder as if it had executed the Guaranty.  The New Guarantor hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Guaranty.

This Supplement is subject to the provisions of Section 10.2 (Governing Law), Section 10.3 (Jurisdiction and Venue) and Section 10.4 (Waiver of Jury Trial) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*.

This Supplement may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract.  Any counterpart of a signature page to this Supplement may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.

U.S. Bank National Association is entering into this Supplements solely in its capacity as Note Agent and shall be entitled to all of the rights, privileges and immunities of the Note Agent under the Purchase Agreement in acting hereunder.

[*Signature page follows*]

Exhibit A to
Guaranty Agreement

**IN WITNESS WHEREOF**, the parties hereto have executed this Supplement as of the date first written above.

**[NEW GUARANTOR]**

By:_____
Name:
Title:

Acknowledged and accepted:

**AGENT**:

**U.S. BANK NATIONAL ASSOCIATION,**
as Note Agent [and Collateral Agent]

By: **_____**
Name:
Title:

**EXHIBIT D**

**FORM OF SECURITY AGREEMENT**

**(see attached)**

### [FORM OF] SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** (this "***Agreement***"), dated as of [__], is made by and among each Grantor executing a signature page hereto and each Additional Grantor (as defined below) that may become a party hereto pursuant to Section 5.8(b) (each, a "***Grantor***" and collectively, the "***Grantors***"), in favor of U.S. Bank National Association, in its capacity as collateral agent on behalf of the Secured Parties (the "***Collateral Agent***").

### RECITALS

**WHEREAS**, the Grantors entered into that certain Convertible Note Purchase Agreement, dated as of August 20, 2021 (as amended, restated, supplemented and/or otherwise modified from time to time, the "***Purchase Agreement***"), by and among the Grantors, each Purchaser party thereto and U.S. Bank National Association, as Note Agent and, upon the execution and delivery of the Collateral Documents pursuant to Section 6.13, as Collateral Agent for the Secured Parties;

**WHEREAS**, pursuant to the Purchase Agreement, each Purchaser has been issued by the Company one or more Notes (as defined in the Purchase Agreement), which are part of a series of Notes issued by the Company, in an aggregate principal amount of up to $300,000,000.00; and

**WHEREAS**, as continuing collateral security for the Obligations of the Company under the Purchase Agreement and the Guaranteed Obligations of the Guarantors under the Guaranty, the Grantors have agreed to enter into this Security Agreement, in favor of the Collateral Agent, for purposes of granting to the Collateral Agent, for the benefit of the Secured Parties, a security interest in the Grantors' assets, on the terms and subject to the conditions set forth therein.

### AGREEMENT

**NOW THEREFORE**, in consideration of the foregoing, and the representations, warranties and conditions set forth herein, the parties hereto, intending to be legally bound, hereby agree as follows:

1. **DEFINED TERMS**.  When used in this Agreement the following terms shall have the meanings set forth below (such meanings being equally applicable to both the singular and plural forms of the terms defined).  Any term used in the UCC and not defined herein shall have the meaning given to such term in the UCC and any capitalized term used but not otherwise defined herein shall have the meaning given to such term in the Notes or the Purchase Agreement, as applicable.

"***Additional Grantors***" shall have the meaning assigned in Section 5.8(b).

"***CFC***" shall mean a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"***CFC Holdco***" shall mean a Subsidiary of the Company that has no material assets other than Capital Stock (or Capital Stock and Indebtedness) of one or more direct or indirect Foreign Subsidiaries of the Company that are CFCs.

"***Collateral***" shall have the meaning assigned to such term in Section 2 of this Agreement.

"***Contracts***" means all contracts (including any customer, vendor, supplier, service or maintenance contract), personal property leases, licenses, undertakings, purchase orders, permits, franchise agreements or other agreements (other than any right evidenced by Chattel Paper, Documents or

Instruments), whether in written or electronic form, in or under which the Grantors now hold or hereafter acquire any right, title or interest, including, without limitation, with respect to an Account, any agreement relating to the terms of payment or the terms of performance thereof, and all assignments, amendments, restatements, supplements, extensions, renewals, replacements or modifications of the Contracts.

"*Copyright License*" means any agreement, whether in written or electronic form, in which the Grantors now hold or hereafter acquire any interest, granting any right in or to any Copyright or Copyright registration (whether the Grantors are the licensee or the licensor thereunder) including, without limitation, licenses pursuant to which the Grantors have obtained the exclusive right to use a copyright owned by a third party.

"*Copyrights*" means all of the following now owned or hereafter acquired or created (as a work for hire for the benefit of the Grantors) by the Grantors or in which the Grantors now hold or hereafter acquire or receive any right or interest, in whole or in part: (a) all copyrights, (statutory or common law, whether established or registered in the United States or any other country or any political subdivision thereof, whether registered or unregistered and whether published or unpublished), held pursuant to the laws of the United States, any State thereof or any other country; (b) registrations, applications, recordings and proceedings in the United States Copyright Office or in any similar office or agency of the United States, any State thereof or any other country; (c) any continuations, renewals or extensions thereof; (d) any registrations to be issued in any pending applications, and shall include any right or interest in and to work protectable by any of the foregoing which are presently or in the future owned, created or authorized (as a work for hire for the benefit of the Grantors) or acquired by the Grantors, in whole or in part; (e) prior versions of works covered by copyright and all works based upon, derived from or incorporating such works; (f) income, royalties, damages, claims and payments now and hereafter due and/or payable with respect to copyrights, including, without limitation, damages, claims and recoveries for past, present or future infringement; (g) rights to sue for past, present and future infringements of any copyright; and (h) any other rights corresponding to any of the foregoing rights throughout the world.

"*Excluded Account*" means any Account (including, for the avoidance of doubt, any cash, cash equivalents or other property contained therein) to the extent, and for so long as, such Account is pledged to secure (i) performance of tenders, bids, leases, statutory or regulatory obligations, surety and appeal bonds, government contracts, performance and return-of-money bonds, and other obligations of like nature, in each case, in the ordinary course of business or (ii) liability for reimbursement or indemnification obligations in respect of letters of credit or bank guarantees for the benefit of landlords, in each case whether such pledge is by escrow or otherwise.

"*Excluded Property*" means, collectively, (i) Excluded Accounts (and any assets contained therein), (ii) the Capital Stock of any Subsidiary that is a CFC or CFC Holdco, other than 65.00% of the total outstanding voting Capital Stock and 100.00% of the total outstanding nonvoting Capital Stock of a CFC or a CFC Holdco that, in each case, is directly owned by a Grantor, (iii) "intent-to-use" trademarks at all times prior to the first use thereof, whether by the actual use thereof in commerce, the recording of a statement of use with the United States Patent and Trademark Office or otherwise, (iv) any property, right or asset held by the Grantors or any Subsidiary to the extent that a grant of a security interest therein is prohibited by any Requirements of Law of a Governmental Authority or constitutes a breach or default under or results in the termination of or requires any consent not obtained under, any contract, license, agreement, instrument or other document evidencing or giving rise to such property, except (A) to the extent that the terms in such contract, license, instrument or other document providing for such prohibition, breach, default or termination, or requiring such consent are not permitted under this Agreement or (B) to the extent that such Requirements of Law or the term in such contract, license, agreement, instrument or other document providing for such prohibition, breach, default or termination or

2

requiring such consent is ineffective under Section 9406, 9407, 9408 or 9409 of the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law (including the Bankruptcy Code of the United States) or principles of equity; provided, however, that such security interest shall attach immediately at such time as such Requirements of Law is not effective or applicable, or such prohibition, breach, default or termination is no longer applicable or is waived, and to the extent severable, shall attach immediately to any portion of the Collateral that does not result in such consequences; and (v) any assets securing Indebtedness (including Capital Lease Obligations) incurred to finance the acquisition of any fixed or capital assets (including any real property assets) so long as a security interest therein only encumbers the assets so acquired or financed with the proceeds of such Indebtedness.

"*Foreign Subsidiary*" means any Subsidiary other than a Subsidiary organized under the laws of any state within the United States.

"*Intellectual Property License*" means, collectively with respect to the Grantors, any Copyright License, Patent License, Trademark License or other license of rights or interests, whether in-bound or out-bound, whether in written or electronic form, now or hereafter owned or acquired or received by the Grantors or in which the Grantors now hold or hereafter acquire or receives any right or interest, and shall include any renewals or extensions of any of the foregoing thereof.

"*Investment Property*" shall mean, collectively, (a) all "investment property" as such term is defined in Section 9-102(a)(49) of the UCC and (b) whether or not constituting "investment property" as so defined, all Pledged Stock.

"*Issuers*" shall mean, collectively, each issuer of any Investment Property.

"*Patent License*" means any agreement, whether in written or electronic form, in which the Grantors now hold or hereafter acquire any interest, granting any right with respect to any invention on which a Patent is in existence (whether the Grantors are the licensee or the licensor thereunder).

"*Patents*" means all of the following in which the Grantors now hold or hereafter acquire any interest: (a) all letters patent of the United States or any other country, all registrations and recordings thereof and all applications for letters patent of the United States or any other country, including, without limitation, registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country; (b) all reissues, divisions, continuations, renewals, continuations-in-part or extensions thereof; (c) all petty patents, divisionals and patents of addition; (d) all patents to issue in any such applications; (e) income, royalties, damages, claims and payments now and hereafter due and/or payable with respect to patents, including, without limitation, damages, claims and recoveries for past, present or future infringement; and (f) rights to sue for past, present and future infringements of any patent.

"*Pledged Stock*" shall mean all shares of Capital Stock, together with any other shares, stock certificates, options, interests or rights of any nature whatsoever in respect of the Capital Stock of any Person that may be issued or granted to, or held by, any Grantor while this Agreement is in effect.

"*Trademark License*" means any agreement, whether in written or electronic form, in which the Grantors now hold or hereafter acquire any interest, granting any right in and to any Trademark or Trademark registration (whether the Grantors are the licensee or the licensor thereunder).

"*Trademarks*" means any of the following in which the Grantors now hold or hereafter acquire any interest: (a) any trademarks, tradenames, corporate names, company names, business names, uniform

3

resource locators (URL's), domain names, trade styles, service marks, logos, other source or business identifiers, prints and labels on which any of the foregoing have appeared or appear, designs and general intangibles of like nature, now existing or hereafter adopted or acquired, all registrations and recordings thereof and any applications in connection therewith, including, without limitation, registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country (collectively, the "***Marks***"); (b) any reissues, extensions or renewals thereof; (c) the goodwill of the business symbolized by or associated with the Marks; (d) income, royalties, damages, claims and payments now and hereafter due and/or payable with respect to the Marks, including, without limitation, damages, claims and recoveries for past, present or future infringement; and (e) rights to sue for past, present and future infringements of the Marks.

**2.** **GRANT OF SECURITY INTEREST**. As collateral security for the full, prompt, complete and final payment and performance when due (whether at stated maturity, by acceleration or otherwise) of all the Obligations and in order to induce the Holders to purchase the Notes, each Grantor hereby assigns, conveys, mortgages, pledges, hypothecates and transfers to the Collateral Agent, on behalf of the Secured Parties, and hereby grants to the Collateral Agent, on behalf of the Secured Parties, a security interest in all of such Grantor's right, title and interest in, to and under the following, whether now owned or hereafter acquired (all of which being collectively referred to herein as the "***Collateral***"):

(a) All Accounts of the Grantors;

(b) All Chattel Paper of the Grantors;

(c) The Commercial Tort Claims of the Grantors;

(d) All Commodity Accounts of the Grantors;

(e) All Contracts of the Grantors;

(f) All Deposit Accounts of the Grantors;

(g) All Documents of the Grantors;

(h) All General Intangibles of the Grantors, including, without limitation, Intellectual Property;

(i) All Goods of the Grantors**,** including, without limitation, Equipment, Inventory and Fixtures;

(j) All Instruments of the Grantors, including, without limitation, Promissory Notes;

(k) All Investment Property of the Grantors;

(l) All Letter-of-Credit Rights and Letters of Credit of the Grantors;

(m) All Money of the Grantors;

(n) All Securities Accounts of the Grantors;

(o) All Supporting Obligations of the Grantors;

4

(p)     All property of the Grantors held by any Secured Party, or any other party for whom any Secured Party is acting as agent, including, without limitation, all property of every description now or hereafter in the possession or custody of or in transit to any Secured Party or such other party for any purpose, including, without limitation, safekeeping, collection or pledge, for the account of the Grantors, or as to which the Grantors may have any right or power;

(q)     All other goods and personal property of the Grantors, wherever located, whether tangible or intangible, and whether now owned or hereafter acquired, existing, leased or consigned by or to the Grantors; and

(r)     To the extent not otherwise included, all Proceeds of each of the foregoing and all accessions to, substitutions and replacements for and rents, profits and products of each of the foregoing.

Notwithstanding the foregoing provisions of this <u>Section 2</u>, the grant, assignment and transfer of a security interest as provided herein shall not extend to, and the term "Collateral" shall not include any Excluded Property.

3.     **RIGHTS OF SECURED PARTIES; COLLECTION OF ACCOUNTS.**

(a)     Notwithstanding anything contained in this Agreement to the contrary, each Grantor expressly agrees that it shall remain liable under each of its Contracts, Chattel Paper, Documents, Instruments and Intellectual Property to observe and perform all the conditions and obligations to be observed and performed by it thereunder and that it shall perform all of its duties and obligations thereunder, all in accordance with and pursuant to the terms and provisions of each such Contract, Chattel Paper, Document, Instrument, and Intellectual Property.  The Secured Parties and the Collateral Agent shall not have any obligation or liability under any such Contract, Chattel Paper, Document, Instrument, or Intellectual Property by reason of or arising out of this Agreement or the granting to the Collateral Agent of a Lien therein or the receipt by any Secured Party or the Collateral Agent of any payment relating to any such Contract, Chattel Paper, Document, Instrument, or Intellectual Property pursuant hereto, nor shall any Secured Party or the Collateral Agent be required or obligated in any manner to perform or fulfill any of the obligations of the Grantors under or pursuant to any such Contract, Chattel Paper, Document, Instrument, or Intellectual Property, or to make any payment, or to make any inquiry as to the nature or the sufficiency of any payment received by it or the sufficiency of any performance by any party under any such Contract, Chattel Paper, Document, Instrument, or Intellectual Property, or to present or file any claim, or to take any action to collect or enforce any performance or the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

(b)     Upon the occurrence and during the continuance of any Event of Default, the Collateral Agent authorizes each Grantor to collect its Accounts and, at the request of the Collateral Agent (at the direction of the Required Holders), such Grantor shall deliver all original and other documents evidencing and relating to the performance of labor or service which created such Accounts, including, without limitation, all original orders, invoices and shipping receipts.

(c)     The Collateral Agent may at any time, upon the occurrence and during the continuance of any Event of Default, notify Account Debtors of the Grantors, parties to the Contracts of the Grantors, obligors in respect of Instruments of the Grantors, and obligors in respect of Chattel Paper of the Grantors that the Accounts and the right, title and interest of the Grantors in and under such Contracts, Instruments and Chattel Paper have been assigned to the Collateral Agent and that payments shall be made directly to the Collateral Agent for distribution to the Secured Parties.  Upon the occurrence and during the continuance of any Event of Default, upon the request of the Collateral Agent (at the

direction of the Required Holders), the Grantors shall so notify such Account Debtors, parties to such Contracts, obligors in respect of such Instruments and obligors in respect of such Chattel Paper.  The Collateral Agent may, in its name or in the name of others, communicate with such Account Debtors, parties to such Contracts, obligors in respect of such Instruments and obligors in respect of such Chattel Paper to verify with such parties, to the Collateral Agent's satisfaction, the existence, amount and terms of any such Accounts, Contracts, Instruments or Chattel Paper.

4.    **REPRESENTATIONS AND WARRANTIES**.    The Grantors hereby represent and warrant to the Collateral Agent and the other Secured Parties that:

(a)    Except for the security interest granted under this Agreement, the Grantors are the sole legal and equitable owner of each item of Collateral in which it purports to grant a security interest hereunder, having good and marketable title thereto, free and clear of any and all Liens except for Permitted Liens and, upon filing of a UCC financing statement in the UCC filing office, the Collateral Agent shall have a perfected security interest in the Collateral, which such security interest shall be senior to all other Liens (other than Permitted Liens).  None of the Collateral is owned, legally or equitably by any subsidiary or company controlled by the Grantors.

(b)    The Grantors' correct legal name is set forth on the signature page hereof.  The Grantors' chief executive office, jurisdiction of incorporation and the place where the Grantors maintain their records concerning the Collateral are presently located on Schedule 4(b).

(c)    Schedule 4(c) (as such schedule may be amended or supplemented from time to time) as required pursuant to the Purchase Agreement sets forth a true and complete list of (i) all United States, state and foreign registrations of and applications for Patents, Trademarks, and Copyrights owned by each Grantor and (ii) all Patent Licenses, Trademark Licenses and Copyright Licenses material to the business of such Grantor.

(d)    Schedule 4(d) sets forth a complete and accurate list of all Pledged Stock pledged by each Grantor hereunder on the Initial Closing Date. The Pledged Stock constitutes all issued and outstanding shares of all classes of the Capital Stock of each Issuer owned by such Grantor which is Collateral (and in the case of each Issuer which is required to become a Note Party pursuant to the terms of the Purchase Agreement, all the issued and outstanding shares of all classes of the Capital Stock of each such Issuer).  Each Grantor has delivered all Certificated Securities constituting Collateral held by such Grantor in a Subsidiary on the Initial Closing Date (or the date such Grantor becomes a party to this Agreement, as applicable) to the Collateral Agent, together with duly executed undated blank stock powers, or other equivalent instruments of transfer acceptable to the Collateral Agent in accordance with Section 5.08(c) below and (assuming possession by the Collateral Agent) the Collateral Agent has a first-priority Lien.

5.    **COVENANTS**.  Unless the Collateral Agent (at the direction of the Required Holders) otherwise consents (which consent shall not be unreasonably withheld), the Grantors covenant and agree with the Collateral Agent and the other Secured Parties that from and after the date of this Agreement and until the Obligations have been performed and paid in full:

5.1    **Change of Name, Jurisdiction of Organization, Relocation of Business**.  The Grantors shall not change their name or jurisdiction of organization or relocate their chief executive office, principal place of business or their records from such address(es) provided to the Collateral Agent pursuant to Section 4(b) above without at least seven (7) days prior notice to the Collateral Agent.

5.2    **Certain Restrictions on Future Agreements**.

(a)    Each Grantor agrees that until the Obligations have been satisfied in full, it will not sell or assign its interest in, or grant any license under, other than in the ordinary course of business or in connection with a Permitted Lien, the Collateral, or enter into any other agreement with respect to the Collateral that is inconsistent with such Grantor's obligations under this Agreement, without the prior written consent of the Required Holders, and the such Grantor further agree that it will not take any action, or permit any action to be taken by others subject to its control, including licensees, or fail to take any action, which would affect the validity or enforcement of the rights transferred to the Holders under this Agreement.

(b)    Upon any sale, lease, transfer or other disposition of any item of Collateral not prohibited by the terms of this Agreement or the other Note Documents, the Collateral Agent will, at the Grantors' sole cost and expense, execute and deliver to the Grantors such documents as the Grantors shall reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted hereby; provided, however, that (i) at the time of such request and such release no Event of Default shall have occurred and be continuing and (ii) the Grantors shall have delivered to the Collateral Agent prior to the date of the proposed release a written request for release describing the item of Collateral, together with a form of release for execution by the Collateral Agent, and such other information as the Collateral Agent may reasonably request.

5.3    **License**.  The Grantors hereby grant to the Collateral Agent a non-exclusive, worldwide and royalty-free license to use or otherwise exploit all Intellectual Property rights of the Company or Subsidiary for the purpose of: (a) completing the manufacture of any in-process materials following any Event of Default so that such materials become saleable inventory, all in accordance with the same quality standards previously adopted by the Grantors for their own manufacturing; and (b) selling, leasing or otherwise disposing of any or all collateral following any Event of Default.

5.4    **Duties of the Grantors**.  The Grantors will have the duty to preserve and maintain all rights in the Collateral and to cause the perfection of the Collateral Agent's security interest therein to the extent the same can be perfected by the filing of a UCC financing statement.  Any expenses incurred in connection with the Grantors' obligations under this Section 5.4 will be borne by the Grantors.

5.5    **Insurance**.  The Grantors shall maintain insurance policies insuring the Collateral against loss or damage from such risks and in such amounts and forms and with such companies as are customarily maintained by businesses similar to the Grantors.

5.6    **Taxes, Assessments, Etc**.  The Grantors shall pay promptly when due all property and other taxes, assessments and government charges or levies imposed upon, and all claims (including claims for labor, materials and supplies) against, the Collateral, except to the extent the validity or amount thereof is being contested in good faith and adequate reserves are being maintained in connection therewith.

5.7    **Defense of Intellectual Property**.  The Grantors shall use commercially reasonable efforts to (i) protect, defend and maintain the validity and enforceability of all Copyrights, Patents and Trademarks material to the Grantors' business and (ii) detect infringements of all Copyrights, Patents and Trademarks material to the Grantors' business.

5.8    **Further Assurances**.

(a)    At any time and from time to time, as necessary or upon the written request of the Collateral Agent (at the direction of the Required Holders), and at the sole expense of the Grantors, the Grantors shall promptly and duly execute and deliver any and all such further instruments and

documents and take such further action as is necessary or that the Collateral Agent may reasonably request to obtain the full benefits of this Agreement (including the seniority of the security interest granted hereby as described in Section 4(a)), including, without limitation, executing, delivering and causing to be filed (i) any financing or continuation statements under the UCC with respect to the security interests granted hereby and (ii) intellectual property security agreements appropriate for filing with the United States Patent and Trademark Office or United States Copyright Office (or any successor office) as may be necessary or advisable for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interests granted hereby. The Grantors also hereby authorize the Collateral Agent to file any such financing or continuation statement without the signature of the Grantors . Notwithstanding the foregoing authorization, the Collateral Agent shall have no obligation to perfect or maintain the perfection of the Collateral Agent's security interest, including by filing UCC financing statements or continuation statements, which shall be the sole obligation of the Grantors.

(b)       From time to time subsequent to the date hereof, additional Persons may become parties hereto as additional Grantors (each, an "***Additional Grantors***"), by executing a joinder hereto substantially in the form of Exhibit A.  Upon delivery of any such counterpart agreement to the Collateral Agent, notice of which is hereby waived by Grantors, each Additional Grantors shall be a Grantors and shall be as fully a party hereto as if Additional Grantors were an original signatory hereto . Each Grantor expressly agrees that its obligations arising hereunder shall not be affected or diminished by the addition or release of any other Grantors hereunder, nor by any election of Collateral Agent not to cause any Subsidiary of Company to become an Additional Grantors hereunder.  This Agreement shall be fully effective as to any Grantors that is or becomes a party hereto regardless of whether any other Person becomes or fails to become or ceases to be a Grantors hereunder.

(c)       On the date hereof (or, in respect of an Additional Grantor, on the date on which such Additional Grantor executes a joinder hereto), each Grantor will deliver to the Collateral Agent all certificates representing Certificated Securities constituting Collateral then owned by such Grantor, in suitable form for transfer by delivery or accompanied by duly executed instruments of transfer or assignments in blank, sufficient to transfer title to the Collateral Agent.  Thereafter, whenever such Grantor acquires any other Certificated Security constituting Collateral, such Grantor will promptly deliver such certificate to the Collateral Agent in suitable form for transfer by delivery or accompanied by duly executed instruments of transfer or assignments in blank, sufficient to transfer title to the Collateral Agent.  Any limited liability company and any partnership controlled by any Grantor shall either (a) not include in its operative documents any provision that any equity interest in such limited liability company or such partnership be a "security" as defined under Article 8 of the UCC or (b) certificate any equity interest in any such limited liability company or such partnership.  To the extent an interest in any limited liability company or partnership controlled by any Grantor and pledged hereunder that constitutes Collateral is certificated or becomes certificated, each such certificate shall be delivered to the Collateral Agent pursuant to this Section 5.8(c).  Each Grantor that is an issuer of Investment Property constituting Collateral pledged hereunder that is an "uncertificated security" for purposes of the UCC hereby agrees, subject to Section 6, to comply with the Collateral Agent's instructions with respect to such uncertificated security without further consent by such Grantor.

6.       **RIGHTS AND REMEDIES UPON DEFAULT.**

6.1       **General Remedial Provisions**.  Beginning on the date which is ten (10) business days after any Event of Default shall have occurred and while such Event of Default is continuing:

(a)       The Collateral Agent, on behalf of the Secured Parties, may exercise in addition to all other rights and remedies granted to it under this Agreement or the Notes, all rights and remedies of a secured party under the UCC.  Without limiting the generality of the foregoing, the Grantors expressly

agree that in any such event the Collateral Agent, without demand of performance or other demand, advertisement or notice of any kind (except the notice specified below of time and place of public or private sale) to or upon the Grantors or any other person, may (i) reclaim, take possession, recover, store, maintain, finish, repair, prepare for sale or lease, shop, advertise for sale or lease and sell or lease (in the manner provided herein) the Collateral, and in connection with the liquidation of the Collateral and collection of the Accounts pledged as Collateral, use any Trademark, Copyright, or process used or owned by the Grantors and (ii) forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and may forthwith sell, lease, assign, give an option or options to purchase or sell or otherwise dispose of and deliver said Collateral (or contract to do so), or any part thereof, in one or more parcels at public or private sale or sales, at any exchange or broker's board or at the Collateral Agent's offices or elsewhere at such prices as it may deem commercially reasonable, for cash or on credit or for future delivery without assumption of any credit risk.  The Grantors further agree, at the Collateral Agent's request (at the direction of the Required Holders), to assemble the Collateral and make it available to the Collateral Agent at places which the Collateral Agent shall reasonably select, whether at the Grantors' premises or elsewhere.  The Collateral Agent shall apply the net proceeds of any such collection, recovery, receipt, appropriation, realization or sale as provided in Section 6(d), below, with the Grantors remaining liable for any deficiency remaining unpaid after such application.  The Grantors agree that the Collateral Agent need not give more than twenty (20) days' notice of the time and place of any public sale or of the time after which a private sale may take place and that such notice is reasonable notification of such matters.

(b)     The Grantors also agree to pay all fees, costs and expenses of the Collateral Agent, including, without limitation, reasonable attorneys' fees, incurred in connection with the enforcement of any of its rights and remedies hereunder.

(c)     The Grantors hereby waive presentment, demand, protest or any notice (to the maximum extent permitted by applicable law) of any kind in connection with this Agreement or any Collateral.

(d)     The Proceeds of any sale, disposition or other realization upon all or any part of the Collateral shall be distributed by the Collateral Agent in the following order of priorities:

FIRST, to the Collateral Agent in an amount sufficient to pay in full the costs of the Collateral Agent in connection with such sale, disposition or other realization, including all fees, costs, expenses, liabilities and advances incurred or made by the Collateral Agent in connection therewith, including, without limitation, reasonable attorneys' fees;

SECOND, to the Agents in amounts proportional to such Secured Party's Pro Rata Share of the then unpaid Obligations of each such Agent;

THIRD, to the other Secured Parties (other than the Agents) in amounts proportional to such Secured Party's Pro Rata Share of the then unpaid Obligations of each such Secured Party; and

FINALLY, upon payment in full of the Obligations, to the Grantors or their respective representatives, in accordance with the UCC or as a court of competent jurisdiction may direct.

(e)     Upon the occurrence and during the continuation of an Event of Default, in addition to all other rights and remedies that may then be available to any Holder of any Note, each Holder of any Note and the Collateral Agent is hereby authorized at any time and from time to time, without notice to the Company (any such notice being expressly waived by the Company) to set off and apply any and all Indebtedness at any time owing by such Holder or the Collateral Agent to or for the

credit or the account of the Grantors against all amounts which may be owed to such Holder or the Collateral Agent by the Grantors in connection with this Agreement or any other Note Document.  If any Holder of the Notes shall obtain from the Company payment of any principal of or interest on any Note held by it or payment of any other amount under this Agreement or such Note held by it or any other Note Document through the exercise of any right of set-off, and, as a result of such payment, such Holder shall have received a greater percentage of the principal, interest or other amounts then due to such Holder under the Note Documents than the percentage received by any other Holder, the Company shall promptly make such adjustments (including without limitation purchasing risk participations) with such other Holder from time to time as shall be equitable, to the end that all the Purchasers of the Notes shall share the benefit of such excess payment (net of any expenses which may be incurred by such Holder in obtaining or preserving such excess payment) pro rata in accordance with the unpaid principal and/or interest on the Notes or other amounts (as the case may be) owing to each of the Purchasers of the Notes. To such end, all Holders of the Notes shall make appropriate adjustments among themselves if such payment is rescinded or must otherwise be restore d.  Any Holder of the Notes taking action under this Section 6 shall promptly provide notice to the Company of any such action taken; provided that the failure of such Holder to provide such notice shall not prejudice its rights hereunder.

> **6.2    Pledged Stock.**

>> (a)      Prior to an Event of Default each Grantor shall be permitted to receive dividends and other distributions in respect of the Pledged Stock paid in the normal course of business or otherwise as a result of the exercise of reasonable business judgment of the relevant Issuer, to the extent permitted by the Purchase Agreement, and to exercise all voting and corporate rights with respect to the Investment Property.

>> (b)      If an Event of Default shall have occurred and be continuing, effective upon delivery by the Collateral Agent to the Company of a notice (which, for the avoidance of doubt, may be electronic notice delivered in accordance with Section 4 of the Notes) stating that it is exercising its rights under this Section 6.2 (an "***Enforcement Notice***") (*provided*, however, that failure by the Collateral Agent to provide such Enforcement Notice shall not limit or impair any of the Collateral Agent's rights under this Agreement), (i) the Collateral Agent shall have the right to receive any and all dividends, payments or other Proceeds paid in respect of the Investment Property and make application thereof to the Obligations in the order set forth in Section 1(b)(iii)(1) of the Notes, (ii) any or all of the Investment Property shall be registered in the name of the Collateral Agent or its nominee, and (iii) the Collateral Agent or its nominee may exercise (x) all voting, corporate and other rights pertaining to such Investment Property at any meeting of shareholders of the relevant Issuer or Issuers or otherwise and (y) any and all rights of conversion, exchange and subscription and any other rights, privileges or options pertaining to such Investment Property as if it were the absolute owner thereof (including, without limitation, the right to exchange, at its discretion, any and all of the Investment Property upon the merger, consolidation, reorganization, recapitalization or other fundamental change in the corporate structure of any Issuer, or upon the exercise by any Grantor or the Collateral Agent of any right, privilege or option pertaining to such Investment Property, and in connection therewith, the right to deposit and deliver any and all of the Investment Property with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as the Collateral Agent may determine), all without liability except to account for property actually received by it, but the Collateral Agent shall have no duty to any Grantor to exercise any such right, privilege or option and shall not be responsible for any failure to do so or delay in so doing.  Upon the Collateral Agent's request (at the direction of the Required Holders), each Grantor shall, at its sole cost and expense, execute and deliver to the Collateral Agent any and all appropriate documents and instruments as the Collateral Agent may request (at the direction of the Required Holders) in order to permit the Collateral Agent to exercise the voting and other rights which it may be entitled to exercise hereunder and to receive all distributions which it may be entitled to receive hereunder.

254221560 v4

(c)     Each Grantor hereby authorizes and instructs each Issuer of any Investment Property pledged by such Grantor hereunder to (i) comply with any instruction received by it from the Collateral Agent in writing that (x) states that an Event of Default has occurred and is continuing and (y) is otherwise in accordance with the terms of this Agreement, without any other or further instructions from such Grantor, and each Grantor agrees that each Issuer shall be fully protected in so complying and shall have no duty or right to inquire as to the Collateral Agent's authority to give such instruction and (ii) when required hereby, pay any dividends or other payments with respect to the Investment Property directly to the Collateral Agent.

(d)     In furtherance and not in limitation of the foregoing rights of the Collateral Agent pursuant to this Section 6.02, solely during any time that an Event of Default exists in respect of which the Collateral Agent has delivered an Enforcement Notice, each Grantor hereby appoints the Collateral Agent as its true and lawful attorney-in-fact to, and grants to Collateral Agent an irrevocable proxy with full power of substitution and resubstitution (and which is coupled with an interest) to, vote the Capital Stock owned by a Note Party, and such Note Party agrees to execute such other proxies as the Collateral Agent may request (at the direction of the Required Holders) (provided, however, that failure by the Collateral Agent to provide such Enforcement Notice shall not limit or impair any of the Collateral Agent's rights under this Agreement).

(e)     In furtherance of the proxy set forth in Section 6.2(d), upon the exercise of such proxy, all prior proxies given by any Grantor with respect to the applicable Capital Stock are hereby revoked, and no subsequent proxies (other than to the Collateral Agent) will be given with respect to any such Capital Stock, (i) the Collateral Agent will be empowered and may exercise such proxy at any and all times, including but not limited to, at any meeting of shareholders, partners or members, as the case may be, however called, and at adjournment thereof, or in any action by written consent, and may waive any notice otherwise required in connection therewith, (ii) to the fullest extent permitted by applicable law, the Collateral Agent shall have no agency, fiduciary or other implied duties to any Grantor or any other Person when acting with respect to such proxy, and (iii) each Grantor waives and releases any claim that it may have against the Collateral Agent with respect to any breach or alleged breach of any such agency, fiduciary or other duty

## 7.     MISCELLANEOUS.

7.1     **Severability**.  If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith.  In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (a) such provision shall be excluded from this Agreement, (b) the balance of this Agreement shall be interpreted as if such provision were so excluded, and (c) the balance of this Agreement shall be enforceable in accordance with its terms.

7.2     **Waiver and Amendment; Entire Agreement**.  Any provision of this Agreement may be amended, waived or modified only by an instrument signed in writing by the Grantors and the Collateral Agent (with the consent of any Holder or other Secured Party as required by Section 10.9 of the Purchase Agreement).  This Agreement and the other Note Documents constitute the entire contract among the parties hereto regarding to the subject matters addressed herein and supersede any and all previous agreements, negotiations, and discussions, oral or written, by the parties regarding the subject matters addressed herein.

7.3     **Termination**.  This Agreement shall terminate upon the payment and performance in full (including, for the avoidance of doubt, by way of conversion in full of the Notes pursuant to the terms

thereof) of the Obligations (other than inchoate indemnity obligations) . At such time, the Collateral shall be automatically released from the Liens created hereby, this Agreement and all obligations (other than those expressly stated to survive such termination) of the Collateral Agent, the other Secured Parties and the Grantors hereunder shall automatically terminate, all without delivery of any instrument or performance of any act by any party, and all rights to the Collateral shall automatically revert to the Grantors. The Collateral Agent shall execute such documents, return any Collateral held by the Collateral Agent hereunder and take such other steps as are reasonably necessary to accomplish the foregoing, all at the Grantors' sole cost and expense. Any such documents shall be without recourse, representation or warranty to or by the Collateral Agent.

**7.4     Successors and Assigns**. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

**7.5     Cumulative Remedies**. All of the Secured Parties' rights and remedies with respect to the Collateral whether established hereby, by a Note, by any other agreements or by law will be cumulative and may be exercised singularly or concurrently. The Grantors acknowledge and agree that this Agreement is not intended to limit or restrict in any way the rights and remedies of a Holder under a Note but rather is intended to facilitate the exercise of such rights and remedies . Secured Parties will have, in addition to all other rights and remedies given them by the terms of this Agreement, the Notes and the other Note Documents, all rights and remedies allowed by law and the rights and remedies of a secured party under the UCC as enacted in any jurisdiction in which Collateral may be located.

**7.6     GOVERNING LAW.**     THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.

**7.7     Jurisdiction and Venue; Waiver of Jury Trial; Expenses and Indemnification**. This Agreement is subject to the provisions of Section 10.3 (Jurisdiction and Venue), Section 10.4 (Waiver of Jury Trial) and Section 10.10(a) (Expenses and Indemnification) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*. Any amounts payable as provided hereunder shall be additional Obligations secured by this Agreement and the other Note Documents.

**7.8     Notices**. All communications and notices required or permitted to be given hereunder shall be delivered in accordance with Section 10.8 of the Purchase Agreement.

**7.9     Headings; Interpretation**. Paragraph headings used in this Agreement are included for convenience of reference only and will not modify the provisions that they precede or affect the interpretation of this Agreement or any other Note Document. The term "including" shall be interpreted to mean "including but not limited to".

**7.10     Counterparts**. This Agreement may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract. Any counterpart of a signature page to this Agreement may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic

254221560 v4

Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.  The Grantors agree to assume all risks arising out of the use of using digital signatures and electronic methods to submit communications to the Note Agent, including without limitation the risk of the Note Agent acting on unauthorized instructions, and the risk of interception and misuse by third parties.

[*Signature page follows*]

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first written above.

[_____]

By:_____
Name:
Title:

**COLLATERAL AGENT**:

**U.S. BANK NATIONAL ASSOCIATION**

By: _____
Name:
Title:

**SCHEDULE 4(b)**

**GRANTORS**

**SCHEDULE 4(c)**

**INTELLECTUAL PROPERTY**

**SCHEDULE 4(d)**

**INVESTMENT PROPERTY**

Exhibit A to
Security Agreement

## JOINDER AGREEMENT

THIS J O I N D E R  AGREEMENT (this "***Joinder***"), dated as of [__], is entered into by and between [__] (the "***New Grantor***") and U.S. BANK NATIONAL ASSOCIATION, as collateral agent (in such capacity, the "***Collateral Agent***") under that certain Security Agreement, dated as of [__], 2021, made by Core Scientific Holding Co., a Delaware corporation and each Guarantor from time to time party thereto, as grantors, in favor of the Collateral Agent (the "***Security Agreement***").  Capitalized terms used but not defined herein shall have the meanings given to them in the Security Agreement.

The New Grantor and the Collateral Agent, for the benefit of the Secured Parties, hereby agree as follows:

The New Grantor hereby acknowledges, agrees and confirms that, by its execution of this Joinder, the New Grantor will be deemed to be a "Grantor" under the Security Agreement for all purposes of the Security Agreement and shall have all of the obligations of a Grantor thereunder as if it had executed the Security Agreement.  The New Grantor hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Security Agreement.

This Joinder is subject to the provisions of <u>Section 10.2</u> (Governing Law), <u>Section 10.3</u> (Jurisdiction and Venue) and <u>Section 10.4</u> (Waiver of Jury Trial) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*.

This Joinder may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract.  Any counterpart of a signature page to this Joinder may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.

*[Signature page follows]*

Exhibit A to
Security Agreement

**IN WITNESS WHEREOF**, the parties hereto have executed this Joinder as of the date first written above.

[NEW GRANTOR]

By:_____

Name:

Title:

Acknowledged and accepted:

**COLLATERAL AGENT**:

**U.S. BANK NATIONAL ASSOCIATION**

By: _____

Name:

Title:

**EXHIBIT E**

**FORM OF INTELLECTUAL PROPERTY SECURITY AGREEMENT**

**(see attached)**

**[FORM OF] INTELLECTUAL PROPERTY SECURITY AGREEMENT**

**THIS INTELLECTUAL PROPERTY SECURITY AGREEMENT** (this "***Agreement***"), dated as of [__], is made by [__] (the "***Grantor[s]***") in favor of U.S. BANK NATIONAL ASSOCIATION, in its capacity as collateral agent (the "***Collateral Agent***") on behalf of the Secured Parties.

**RECITALS**

**WHEREAS**, the Grantor[s] entered into that certain Convertible Note Purchase Agreement, dated as of August 20, 2021 (as amended, restated, supplemented and/or otherwise modified from time to time, the "***Purchase Agreement***"), by and among the Grantors, each Purchaser party thereto, and U.S. BANK NATIONAL ASSOCIATION as Note Agent and, upon the execution and delivery of the Collateral Documents pursuant to <u>Section 6.13</u>, as Collateral Agent for the Secured Parties;

**WHEREAS**, pursuant to the terms of the Purchase Agreement, as continuing collateral security for the Obligations of the Company under the Purchase Agreement and the Guaranteed Obligations of the Guarantors under the Guaranty, the Grantors have entered into a Security Agreement, dated as of even date herewith (as amended, restated, supplemented and/or otherwise modified from time to time, the "***Security Agreement***"; capitalized terms used but not otherwise defined herein having the meaning ascribed thereto therein), made by Grantors in favor of the Collateral Agent, for the purposes of granting to the Collateral Agent, for the benefit of the Secured Parties, a security interest in Grantors' assets, on the terms and subject to the conditions set forth herein; and

**WHEREAS**, pursuant to the Security Agreement, the Grantor is required to grant a security interest to the Collateral Agent, in all of the Grantor's Intellectual Property, including the Patents, Trademarks and Copyrights listed on <u>Schedule 1</u> hereto (collectively, the "***Intellectual Property***").

**AGREEMENT**

**NOW, THEREFORE**, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Grantor and the Collateral Agent hereby agree as follows:

1. **Grant of Security Interest**.

(a)     As collateral security for the full, prompt, complete and final payment and performance when due (whether at stated maturity, by acceleration or otherwise) of all the Secured Obligations, the Grantor hereby pledges to the Collateral Agent, on behalf of the Secured Parties, and hereby grants to the Collateral Agent, on behalf of the Secured Parties, a security interest in all of the Grantor's right, title and interest in, to and under the Intellectual Property, whether now owned or hereafter acquired.

(b)     The security interest granted hereby is granted in conjunction with the security interest granted to the Collateral Agent under the Security Agreement.  The rights and remedies of the Collateral Agent with respect to the security interest granted hereby are in addition to those set forth in the Security Agreement.  In the event of any conflict between the terms of this Agreement and the terms of the Security Agreement, the terms of the Security Agreement shall control.

2. **Termination of Security Interest**.

This Agreement shall terminate as set forth in the Security Agreement.

3.    **Modification of Agreement**.

Any provision of this Agreement may be amended, waived or modified only by an instrument signed in writing by the Grantor and the Collateral Agent (with the consents of any Holder or other Secured Party as required by Section 10.9 of the Purchase Agreement). Notwithstanding the foregoing, upon receipt of a certificate of a Responsible Officer, the Collateral Agent may modify this Agreement, after obtaining the Grantor's approval of or signature to such modification, by amending Schedule 1 hereto to include reference to any right, title or interest in any Patents, Trademarks or Copyrights currently owned by the Grantor or any Patents, Trademarks or Copyrights acquired or developed by the Grantor after the execution hereof or to delete any reference to any right, title or interest in any Patents, Trademarks or Copyrights in which the Grantor no longer has or claims any right, title or interest.

5.    **GOVERNING LAW**.

THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.

6.    **Jurisdiction and Venue; Waiver of Jury Trial; Expenses and Indemnification**.

This Agreement is subject to the provisions of Section 10.3 (Jurisdiction and Venue), Section 10.4 (Waiver of Jury Trial) and Section 10.10(a) (Expenses and Indemnification) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*. Any amounts payable as provided hereunder shall be additional Obligations secured by this Agreement and the other Note Documents. U.S. Bank National Association is entering into this Agreement solely in its capacity as Collateral Agent under the Purchase Agreement and shall be entitled to all of the rights, privileges and immunities of the Collateral Agent in acting hereunder.

7.    **Counterparts**.

This Agreement may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract. Any counterpart of a signature page to this Agreement may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.

*[Signature page follows]*

2

IN WITNESS WHEREOF, the Grantor and the Collateral Agent have caused this Agreement to be duly executed and delivered as of the date first above written.

**GRANTOR:**

[_____]


By:_____
Name:
Title:

**COLLATERAL AGENT:**

U.S. BANK NATIONAL ASSOCIATION


By:  _____
Name:
Title:

SCHEDULE 1

INTELLECTUAL PROPERTY SECURITY AGREEMENT

**EXHIBIT F**

**FORM OF SOLVENCY CERTIFICATE**

**(see attached)**

**[FORM OF] SOLVENCY CERTIFICATE**

**CORE SCIENTIFIC HOLDING CO.**

**August 20, 2021**

This Solvency Certificate is delivered pursuant to <u>Section 4.1(c)</u> of that certain Convertible Note Purchase Agreement, dated as of the date hereof (the "***Purchase Agreement***"), by and among Core Scientific Holding Co., a Delaware corporation (the "***Company***"), the Guarantors party thereto, the Initial Purchasers named on the Schedule of Purchasers attached as <u>Schedule 2</u> thereto and U.S. Bank National Association, as note agent and collateral agent.  Terms capitalized herein and not otherwise defined shall have the meanings assigned to them in the Purchase Agreement.

The undersigned, the Chief Financial Officer of the Company, does hereby certify, on behalf of the Company and not in his individual capacity, that as of the Initial Closing Date, both immediately before and after giving effect to the transactions contemplated by the Note Documents, the Company is individually, and the Company and its Subsidiaries on a consolidated basis are, Solvent.

*[Signature page follows]*

**IN WITNESS WHEREOF**, the undersigned has hereunto set his hand on behalf of the Company as of the date first referenced above.

_____
Name:  Michael Trzupek
Title:   Chief Financial Officer

**EXHIBIT G**

**FORM OF ADMINISTRATIVE QUESTIONNAIRE**

| **Purchaser Name** | |
|---|---|
| Name in Which to Register Note(s) | |
| Note Registration Number(s); Principal Amount(s) | |
| Payment on Account of Note(s)<br><br>Method<br><br>Account Information | |
| Accompanying Information | |
| Address / Fax # / Email for notices related to payments | |
| Address / Fax # / Email for all other notices | |
| Instructions re Delivery of Note(s) | |
| Tax Identification Number | |

254153937 v7

**EXHIBIT H**

**FORM OF FIRST LIEN INTERCREDITOR AGREEMENT**

**[FORM OF] FIRST LIEN PARI PASSU INTERCREDITOR AGREEMENT**

THIS FIRST LIEN PARI PASSU INTERCREDITOR AGREEMENT (this "*Agreement*"), dated as of [__], by and among U.S. Bank National Association, as note agent for the Initial Note Claimholders (in such capacity, and together with its successors and permitted assigns in such capacity, the "*Initial First Lien Representative*") and as collateral agent for the Initial Note Claimholders (in such capacity, and together with its successors and permitted assigns in such capacity, the "*Initial First Lien Collateral Agent*"), U.S. Bank National Association, as note agent for the Other Note Claimholders (in such capacity, and together with its successors and permitted assigns in such capacity, the "*Other First Lien Representative*"), and as collateral agent for the Other Note Claimholders (in such capacity, and together with its successors and permitted assigns in such capacity, the "*Other First Lien Collateral Agent*"), and acknowledged and agreed to by [Parent Entity] (the "*Company*") and the other Grantors. Capitalized terms used in this Agreement have the meanings assigned to them in Section 1.1 below.

Reference is made to (i) that certain Senior Secured Convertible Note Purchase Agreement, dated as of April 19, 2021, by and among the [Company (as successor interest of Core Scientific Holding Co.)][1], the other Grantors from time to time party thereto, the Purchasers (as defined therein) party thereto, the Initial First Lien Representative and the Initial First Lien Collateral Agent (as amended, restated, supplemented and/or otherwise modified from time to time, the "*Initial Purchase Agreement*") and (ii) that certain Convertible Note Purchase Agreement, dated as of August 20, 2021, by and among the Company (Core Scientific Holding Co.), the other Grantors from time to time party thereto, the Purchasers (as defined therein) party thereto, the Other First Lien Representative and the Other First Lien Collateral Agent (as amended, restated, supplemented and/or otherwise modified from time to time, the "*Other Purchase Agreement*").

The obligations of the Company under the Initial Purchase Agreement and the obligations of the Guarantors (as defined therein) under the guaranty of the Initial Purchase Agreement are secured on a first-priority basis (subject to Permitted Liens (as defined therein)) by Liens on substantially all of the assets of the Grantors, pursuant to the terms of the Initial Note Collateral Documents.

The obligations of the Company under the Other Purchase Agreement and the obligations of the Guarantors (as defined therein) under the guaranty of the Other Purchase Agreement are secured on a first-priority basis (subject to Permitted Liens (as defined therein)) by Liens on substantially all of the assets of the Grantors, pursuant to the terms of the Other Note Collateral Documents.

In consideration of the foregoing, the mutual covenants and obligations herein set forth and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, each of the Initial First Lien Representative (for itself and on behalf of each other Initial Note Claimholder), the Initial First Lien Collateral Agent (for itself and on behalf of each other Initial Note Claimholder), the Other First Lien Representative (for itself and on behalf of each other Other Note Claimholder) and the Other First Lien Collateral Agent (for itself and on behalf of each other Other Note Claimholder), intending to be legally bound, hereby agrees as follows:

---

[1] To the extent the Conversion Event giving rise to execution of this Agreement is the XPDI Transaction, references to the Company herein shall be updated to refer to the Parent Entity with other confirming changes consistent therewith.

ARTICLE I.

DEFINITIONS

SECTION 1.1          Certain Defined Terms.

Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Initial Purchase Agreement or the Other Purchase Agreement (whether or not then in effect), as applicable, and the following terms which are defined in the UCC are used herein as so defined (and if defined in more than one article of the UCC shall have the meaning specified in Article 9 thereof): Certificated Security, Commodity Account, Commodity Contract, Deposit Account, Electronic Chattel Paper, Promissory Note, Instrument, Letter of Credit Right, Securities Entitlement, Securities Account and Tangible Chattel Paper.  As used in this Agreement, the following terms have the meanings specified below:

"*Agreement*" has the meaning set forth in the introductory paragraph hereto.

"*Applicable Collateral Agent*" means (i) until the earliest of (x) the Discharge of Initial Purchase Agreement and (y) the Other First Lien Representative Enforcement Date, the Initial First Lien Collateral Agent and (ii) from and after the earlier of (x) the Discharge of Initial Purchase Agreement and (y) the Other First Lien Representative Enforcement Date, the Other First Lien Collateral Agent.

"*Applicable Representative*" means (i) until the earliest of (x) the Discharge of Initial Purchase Agreement and (y) the Other First Lien Representative Enforcement Date, the Initial First Lien Representative and (ii) from and after the earlier of (y) the Discharge of Initial Purchase Agreement and (z) the Other First Lien Representative Enforcement Date, the Other First Lien Representative.

"*Bankruptcy Case*" has the meaning set forth in Section 2.5(b).

"*Bankruptcy Code*" means Title 11 of the United States Code, as amended.

"*Bankruptcy Law*" means the Bankruptcy Code and any similar Federal, state or foreign law for the relief of debtors.

"*Business Day*" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close.

"*Capital Lease*" means, as applied to any Person, any lease by that Person as lessee that has been or should be, in accordance with GAAP, recorded as a capital lease on the balance sheet of that Person.

"*Collateral*" means all assets and properties subject to, or purported to be subject to, Liens created pursuant to any First Lien Collateral Document to secure either Series of First Lien Obligations and shall include any property or assets subject to replacement Liens or adequate protection Liens in favor of any First Lien Claimholder.

"*Collateral Agent*" means, collectively, the Initial First Lien Collateral Agent and the Other First Lien Collateral Agent.

"*Company*" has the meaning set forth in the introductory paragraph to this Agreement.

"***Control***" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by agreement or otherwise. "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"***Control Collateral***" means any Shared Collateral in the "control" (within the meaning of Section 9-104, 9-105, 9-106, 9-107 or 8-106 of the UCC) of either Collateral Agent (or its agents or bailees), to the extent that control thereof perfects a Lien thereon under the UCC. Control Collateral includes any Deposit Accounts, Securities Accounts, Securities Entitlements, Commodity Accounts, Commodity Contracts, Letter of Credit Rights or Electronic Chattel Paper over which either Collateral Agent has "control" under the UCC.

"***Controlling Claimholders***" means (i) at any time when the Initial First Lien Collateral Agent is the Applicable Collateral Agent, the Initial Note Claimholders and (ii) at any other time, the Other Note Claimholders.

"***Default***" means a "Default" (or similarly defined term) as defined in any First Lien Document.

"***DIP Financing***" has the meaning set forth in Section 2.5(b).

"***DIP Financing Liens***" has the meaning set forth in Section 2.5(b).

"***DIP Lenders***" has the meaning set forth in Section 2.5(b).

"***Discharge***" means, with respect to either Series of First Lien Obligations, that such Series of First Lien Obligations is no longer secured by, and no longer required to be secured by, any Shared Collateral pursuant to the terms of the applicable First Lien Documents for such Series of First Lien Obligations. The term "***Discharged***" shall have a corresponding meaning.

"***Discharge of Initial Purchase Agreement***" means, except to the extent otherwise provided in Section 2.6, the Discharge of the Initial Note Obligations.

"***Equity Release Proceeds***" has the meaning set forth in Section 2.4(a).

"***Event of Default***" means an "Event of Default" (or similarly defined term) as defined in any First Lien Document.

"***First Lien Claimholders***" means, collectively, (i) the Initial Note Claimholders and (ii) the Other Note Claimholders.

"***First Lien Collateral Documents***" means, collectively, (i) the Initial Note Collateral Documents and (ii) the Other Note Collateral Documents.

"***First Lien Documents***" means, collectively, (i) the Initial Note Documents and (ii) the Other Note Documents.

"***First Lien Obligations***" means, collectively, (i) the Initial Note Obligations and (ii) the Other Note Obligations.

"***Grantors***" means the Company and each of the Guarantors.

3

"***Guarantors***" means the "Guarantors" as defined in each of the Initial Purchase Agreement and the Other Purchase Agreement.

"***Impairment***" has the meaning set forth in Section 2.1(b)(ii).

"***Indebtedness***" means all indebtedness for borrowed money.

"***Initial First Lien Collateral Agent***" has the meaning set forth in the introductory paragraph to this Agreement.

"***Initial First Lien Representative***" has the meaning set forth in the introductory paragraph to this Agreement.

"***Initial Note Claimholders***" means the holders of any Initial Note Obligations, including the "Secured Parties", as defined in the Initial Purchase Agreement (including the Initial First Lien Representative and the Initial First Lien Collateral Agent).

"***Initial Note Collateral Documents***" means the Collateral Documents (as defined in the Initial Purchase Agreement) and any other agreement, document or instrument entered into for the purpose of granting a Lien to secure any Initial Note Obligations or to perfect such Lien (as each may be amended, restated, supplemented and/or otherwise modified from time to time).

"***Initial Note Documents***" means the Initial Purchase Agreement, each Initial Note Collateral Document and the other Note Documents (as defined in the Initial Purchase Agreement), and each of the other agreements, documents and instruments providing for or evidencing any other Initial Note Obligation, as each may be amended, restated, supplemented and/or otherwise modified from time to time.

"***Initial Note Obligations***" means:

(a)      (i) the Obligations (as defined in the Initial Purchase Agreement), (ii) all principal of and interest (including any Post-Petition Interest) and premium (if any) on all loans made pursuant to the Initial Purchase Agreement, and (iii) all guarantee obligations, fees, expenses and all other obligations under the Initial Purchase Agreement and the other Initial Note Documents, in each case whether or not allowed or allowable in an Insolvency or Liquidation Proceeding; and

(b)      to the extent any payment with respect to any Initial Note Obligation (whether by or on behalf of any Grantor, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any Other Note Claimholder, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of this Agreement and the rights and obligations of the Initial Note Claimholders and the Other Note Claimholders, be deemed to be reinstated and outstanding as if such payment had not occurred.  To the extent that any interest, fees, expenses or other charges (including Post-Petition Interest) to be paid pursuant to the Initial Note Documents are disallowed by order of any court, including by order of a court of competent jurisdiction presiding over an Insolvency or Liquidation Proceeding, such interest, fees, expenses and charges (including Post-Petition Interest) shall, as between the Initial Note Claimholders and the Other Note Claimholders, be deemed to continue to accrue and be added to the amount to be calculated as the "Initial Note Obligations".

"***Initial Purchase Agreement***" has the meaning set forth in the recitals to this Agreement.

"***Insolvency or Liquidation Proceeding***" means:

(a)      any voluntary or involuntary case or proceeding under the Bankruptcy Code with respect to any Grantor;

(b)      any other voluntary or involuntary insolvency, reorganization or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding with respect to any Grantor or with respect to a material portion of its assets;

(c)      any liquidation, dissolution, reorganization or winding up of any Grantor whether voluntary or involuntary and whether or not involving insolvency or bankruptcy; or

(d)      any assignment for the benefit of creditors or any other marshaling of assets and liabilities of any Grantor.

"*Intervening Creditor*" has the meaning set forth in <u>Section 2.1(b)(i)</u>.

"*Lien*" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Capital Lease having substantially the same economic effect as any of the foregoing), in each case, in the nature of security; <u>provided that</u> in no event shall a colocation agreement or an operating lease in and of itself be deemed a Lien.

"*Other First Lien Collateral Agent*" has the meaning set forth in the introductory paragraph to this Agreement.

"*Other First Lien Representative*" has the meaning set forth in the introductory paragraph to this Agreement.

"*Other First Lien Representative Enforcement Date*" means, with respect to the Other First Lien Representative, the date which is 180 days after the occurrence of both (i) an Event of Default (under and as defined in the Other Note Documents) and (ii) the Initial First Lien Collateral Agent's and the Initial First Lien Representative's receipt of written notice from the Other First Lien Representative certifying that (x) an Event of Default (under and as defined in the Other Note Documents) has occurred and is continuing and (y) the Other Note Obligations are currently due and payable in full (whether as a result of acceleration thereof or otherwise) in accordance with the terms of the applicable Other Note Document; <u>provided</u> that the Other First Lien Representative Enforcement Date shall be stayed and shall not occur and shall be deemed not to have occurred (1) at any time the Initial First Lien Collateral Agent acting on the instructions of the Initial First Lien Representative has commenced and is diligently pursuing any enforcement action with respect to Shared Collateral, (2) at any time the Grantor that has granted a security interest in Shared Collateral is then a debtor under or with respect to (or otherwise subject to) any Insolvency or Liquidation Proceeding or (3) if the Other First Lien Representative subsequently rescinds or withdraws the written notice provided for in clause (ii) above.

"*Other Note Claimholders*" means the holders of any Other Note Obligations, including the "Secured Parties", as defined in the Other Purchase Agreement (including the Other First Lien Representative and the Other First Lien Collateral Agent).

"*Other Note Collateral Documents*" means the Collateral Documents (as defined in the Other Purchase Agreement) and any other agreement, document or instrument entered into for the purpose

of granting a Lien to secure any Other Note Obligations or to perfect such Lien (as each may be amended, restated, supplemented and/or otherwise modified from time to time).

"***Other Note Documents***" means the Other Purchase Agreement, each Other Note Collateral Document and the other Note Documents (as defined in the Other Purchase Agreement), and each of the other agreements, documents and instruments providing for or evidencing any other Other Note Obligation, as each may be amended, restated, supplemented and/or otherwise modified from time to time.

"***Other Note Obligations***" means:

(a)      (i) the Obligations (as defined in the Other Purchase Agreement), (ii) all principal of and interest (including any Post-Petition Interest) and premium (if any) on all loans made pursuant to the Other Purchase Agreement, and (iii) all guarantee obligations, fees, expenses and all other obligations under the Other Purchase Agreement and the other Other Note Documents, in each case whether or not allowed or allowable in an Insolvency or Liquidation Proceeding; and

(b)      to the extent any payment with respect to any Other Note Obligation (whether by or on behalf of any Grantor, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any Initial Note Claimholder, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of this Agreement and the rights and obligations of the Other Note Claimholders and the Initial Note Claimholders, be deemed to be reinstated and outstanding as if such payment had not occurred.  To the extent that any interest, fees, expenses or other charges (including Post-Petition Interest) to be paid pursuant to the Other Note Documents are disallowed by order of any court, including by order of a court of competent jurisdiction presiding over an Insolvency or Liquidation Proceeding, such interest, fees, expenses and charges (including Post-Petition Interest) shall, as between the Other Note Claimholders and the Initial Note Claimholders, be deemed to continue to accrue and be added to the amount to be calculated as the "Other Note Obligations".

"***Other Purchase Agreement***" has the meaning set forth in the recitals to this Agreement.

"***Person***" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, limited partnership, governmental authority or other entity.

"***Possessory Collateral***" means any Shared Collateral in the possession of either Collateral Agent (or its agents or bailees), to the extent that possession thereof perfects a Lien thereon under the UCC or otherwise.  Possessory Collateral includes any Certificated Securities, Promissory Notes, Instruments, and Tangible Chattel Paper, in each case, delivered to or in the possession of either Collateral Agent under the terms of the First Lien Collateral Documents.

"***Post-Petition Interest***" means interest, fees, expenses and other charges that pursuant to the Initial Note Documents or Other Note Documents, as applicable, continue to accrue after the commencement of any Insolvency or Liquidation Proceeding, whether or not such interest, fees, expenses and other charges are allowed or allowable under the Bankruptcy Law or in any such Insolvency or Liquidation Proceeding.

"***Proceeds***" has the meaning set forth in Section 2.1(a).

"***Representative***" means, at any time, (i) in the case of any Initial Note Obligations or the Initial Note Claimholders, the Initial First Lien Representative and (ii) in the case of any Other Note Obligations or the Other Note Claimholders, the Other First Lien Representative.

6

"**_Responsible Officer_**" of any Person means the chief executive officer, the president, any vice president, the chief financial officer, treasurer or assistant treasurer or other similar officer of such Person and any other individual or similar official thereof responsible for the administration of the obligations of such Person in respect of this Agreement.  Any document delivered hereunder that is signed by a Responsible Officer of a Grantor shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Grantor and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Grantor.

"**_Series_**" means (a) with respect to the First Lien Claimholders, each of (i) the Initial Note Claimholders (in their capacities as such) and (ii) the Other Note Claimholders (in their capacities as such) and (b) with respect to any First Lien Obligations, each of (i) the Initial Note Obligations and (ii) the Other Note Obligations.

"**_Shared Collateral_**" means, at any time, Collateral in which the holders of First Lien Obligations (or their respective Representatives or Collateral Agents on behalf of such holders) hold, or purport to hold, or are required to hold pursuant to their respective First Lien Documents, a valid security interest or Lien at such time.

"**_subsidiary_**" means, with respect to any Person (a) any corporation, association, or other business entity (other than a partnership, limited liability company or similar entity) of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the directors, managers or trustees thereof is at the time of determination is owned or controlled by such Person or one or more of the other subsidiaries of that Person or a combination thereof and (b) any partnership, limited liability company or similar entity which (i) more than 50% of the voting interests or general partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other subsidiaries of that Person or a combination thereof whether in the form of membership, general, special or limited partnership or otherwise and (ii) such Person or any subsidiary of such Person is a controlling general partner or otherwise controls such entity.

"**_UCC_**" means the Uniform Commercial Code as in effect from time to time in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**_Underlying Assets_**" has the meaning set forth in <u>Section 2.4(a)</u>.

SECTION 1.2        <u>Rules of Interpretation</u>.

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as amended, restated, supplemented and/or otherwise modified from time to time, however evidenced, whether in physical or electronic form and any reference herein to any statute or regulations shall include any amendment, renewal, extension or replacement thereof, (ii) any reference herein to any Person shall be construed to include such Person's permitted successors and assigns from time to time, (iii) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Articles, Sections and Annexes shall be construed to refer to Articles, Sections and Annexes

of this Agreement, (v) unless otherwise expressly qualified herein, the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights and (vi) the term "or" is not exclusive.

<p style="text-align:center">ARTICLE II.</p>

<p style="text-align:center">PRIORITIES AND AGREEMENTS WITH RESPECT TO SHARED COLLATERAL</p>

SECTION 2.1        Priority of Claims.

(a)        Anything contained herein or in any of the First Lien Documents to the contrary notwithstanding (but subject to Sections 2.1(b) and 2.10(b)), if an Event of Default has occurred and is continuing, and the Applicable Collateral Agent is taking action to enforce rights in respect of any Collateral, or any distribution is made in respect of any Shared Collateral in any Bankruptcy Case of any Grantor or any First Lien Claimholder receives any payment pursuant to any intercreditor agreement (other than this Agreement) or otherwise with respect to any Shared Collateral, the proceeds of any sale, collection or other liquidation of any Shared Collateral or Equity Release Proceeds received by any First Lien Claimholder or received by the Applicable Collateral Agent or any First Lien Claimholder pursuant to any such intercreditor agreement or otherwise with respect to such Collateral and proceeds of any such distribution (subject, in the case of any such distribution, to the sentence immediately following clause (iii) below) to which the First Lien Obligations are entitled under any intercreditor agreement (other than this Agreement) or otherwise (all proceeds of any sale, collection or other liquidation of any Collateral comprising either Shared Collateral or Equity Release Proceeds and all proceeds of any such distribution and any proceeds of any insurance covering the Shared Collateral received by the Applicable Collateral Agent and not returned to any Grantor under any First Lien Document being collectively referred to as "**Proceeds**"), shall be applied by the Applicable Collateral Agent in the following order:

(i)        FIRST, to the payment of all amounts owing to each Collateral Agent (in its capacity as such) and each Representative (in its capacity as such) secured by such Shared Collateral or, in the case of Equity Release Proceeds, secured by the Underlying Assets, including all reasonable costs and expenses incurred by each Collateral Agent (in its capacity as such) and each Representative (in its capacity as such) in connection with such collection or sale or otherwise in connection with this Agreement, any other First Lien Document or any of the First Lien Obligations, including all court costs and the reasonable fees and expenses of its agents and legal counsel, and any other reasonable costs or expenses incurred in connection with the exercise of any right or remedy hereunder or under any other First Lien Document and all fees and indemnities owing to such Collateral Agents and Representatives, ratably to each such Collateral Agent and Representative in accordance with the amounts payable to it pursuant to this clause (i);

(ii)        SECOND, subject to Sections 2.1(b) and 2.10(b), to the extent Proceeds remain after the application pursuant to preceding clause (i), to each Representative for the payment in full of the other First Lien Obligations of each Series secured by such Shared Collateral or, in the case of Equity Release Proceeds, secured by the Underlying Assets, and, if the amount of such Proceeds are insufficient to pay in full the First Lien Obligations of each Series so secured then such Proceeds shall be allocated among the Representatives of each Series secured by such Shared Collateral or, in the case of Equity Release Proceeds, secured by the Underlying Assets, pro rata according to the amounts of such First Lien Obligations owing to each such respective Representative and the other First Lien Claimholders represented by it for distribution by such Representative in accordance with its respective First Lien Documents; and

<p style="text-align:center">8</p>

(iii)     THIRD, any balance of such Proceeds remaining after the application pursuant to preceding <u>clauses (i)</u> and <u>(ii)</u>, to the Grantors, their successors or assigns from time to time, or to whomever may be lawfully entitled to receive the same.

If, despite the provisions of this <u>Section 2.1(a)</u>, any First Lien Claimholder shall receive any payment or other recovery in excess of its portion of payments on account of the First Lien Obligations to which it is then entitled in accordance with this <u>Section 2.1(a)</u>, such First Lien Claimholder shall hold such payment or recovery in trust for the benefit of all First Lien Claimholders for distribution in accordance with this <u>Section 2.1(a)</u>.

(b)     (i)     Notwithstanding the foregoing, with respect to any Shared Collateral or Equity Release Proceeds for which a third party (other than a First Lien Claimholder) has a Lien that is junior in priority to the Lien of one Series of First Lien Obligations but senior (as determined by appropriate legal proceedings in the case of any dispute) to the Lien of the other Series of First Lien Obligations (such third party an "***Intervening Creditor***"), the value of any Shared Collateral, Equity Release Proceeds or Proceeds which are allocated to such Intervening Creditor shall be deducted on a ratable basis solely from the Shared Collateral, Equity Release Proceeds or Proceeds to be distributed in respect of the Series of First Lien Obligations with respect to which such Impairment exists.

(ii)     In furtherance of the foregoing and without limiting the provisions of <u>Section 2.3</u>, it is the intention of the First Lien Claimholders of each Series that the holders of First Lien Obligations of such Series (and not the First Lien Claimholders of the other Series) bear the risk of (1) any determination by a court of competent jurisdiction that (x) any of the First Lien Obligations of such Series are unenforceable under applicable law or are subordinated to any other obligations (other than another Series of First Lien Obligations), (y) any of the First Lien Obligations of such Series do not have a valid and perfected security interest in any of the Collateral securing the other Series of First Lien Obligations and/or (z) any intervening security interest exists securing any other obligations (other than another Series of First Lien Obligations) on a basis ranking prior to the security interest of such Series of First Lien Obligations but junior to the security interest of the other Series of First Lien Obligations and (2) the existence of any Collateral (other than Equity Release Proceeds) for the other Series of First Lien Obligations that is not Shared Collateral (any such condition referred to in the foregoing clauses (1) or (2) with respect to either Series of First Lien Obligations, an "***Impairment***" of such Series); <u>provided</u> that the existence of a maximum claim with respect to any real property subject to a mortgage which applies to all First Lien Obligations shall not be deemed to be an Impairment of either Series of First Lien Obligations.  In the event of any Impairment with respect to either Series of First Lien Obligations, the results of such Impairment shall be borne solely by the holders of such Series of First Lien Obligations, and the rights of the holders of such Series of First Lien Obligations (including the right to receive distributions in respect of such Series of First Lien Obligations pursuant to <u>Section 2.1</u>) set forth herein shall be modified to the extent necessary so that the effects of such Impairment are borne solely by the holders of the Series of such First Lien Obligations subject to such Impairment.  Additionally, in the event the First Lien Obligations of either Series are modified pursuant to applicable law (including pursuant to Section 1129 of the Bankruptcy Code), any reference to such First Lien Obligations or the First Lien Documents governing such First Lien Obligations shall refer to such obligations or such documents as so modified.

(c)     It is acknowledged that the First Lien Obligations of either Series may, subject to the limitations set forth in the then existing First Lien Documents and subject to any limitations set forth in this Agreement, be increased, extended, renewed, replaced, restated, supplemented, restructured, repaid, refunded or otherwise amended or modified from time to time, all without affecting the priorities set forth

in Section 2.1(a) or the provisions of this Agreement defining the relative rights of the First Lien Claimholders of either Series.

(d)     Notwithstanding the date, time, method, manner or order of grant, attachment or perfection of any Liens securing either Series of First Lien Obligations granted on the Shared Collateral and notwithstanding any provision of the UCC or any other applicable law or the First Lien Documents or any defect or deficiencies in the Liens securing the First Lien Obligations of either Series or any other circumstance whatsoever (but, in each case, subject to Section 2.1(b)), each First Lien Claimholder hereby agrees that the Liens securing each Series of First Lien Obligations on any Shared Collateral shall be of equal priority.

SECTION 2.2          Actions with Respect to Shared Collateral; Prohibition on Contesting Liens.

(a)     Notwithstanding Section 2.1, (i) only the Applicable Collateral Agent shall act with respect to the Shared Collateral (including with respect to any other intercreditor agreement with respect to any Shared Collateral), (ii) the Applicable Collateral Agent shall act only on the instructions of the Applicable Collateral Agent and shall not follow any instructions with respect to the Shared Collateral (including with respect to any other intercreditor agreement with respect to any Shared Collateral) from the Other First Lien Representative (or any other First Lien Claimholder other than the Applicable Representative) and (iii) no Other Note Claimholder shall or shall instruct either Collateral Agent to, and the Collateral Agent that is not the Applicable Collateral Agent shall not, commence any judicial or nonjudicial foreclosure proceedings with respect to, seek to have a trustee, receiver, liquidator or similar official appointed for or over, attempt any action to take possession of, exercise any right, remedy or power with respect to, or otherwise take any action to enforce its security interest in or realize upon, or take any other action available to it in respect of, Shared Collateral (including with respect to any other intercreditor agreement with respect to Shared Collateral), whether under any First Lien Collateral Document (other than the First Lien Collateral Documents applicable to the Applicable Collateral Agent), applicable law or otherwise, it being agreed that only the Applicable Collateral Agent, acting in accordance with the First Lien Collateral Documents applicable to it, shall be entitled to take any such actions or exercise any remedies with respect to such Shared Collateral at such time.

(b)     Without limiting the provisions of Section 4.2, the Other First Lien Representative and the Other First Lien Collateral Agent hereby appoint the Applicable Collateral Agent as its agent and authorizes the Applicable Collateral Agent to exercise any and all remedies under each First Lien Collateral Document with respect to Shared Collateral and to execute releases in connection therewith.

(c)     Notwithstanding the equal priority of the Liens securing each Series of First Lien Obligations granted on the Shared Collateral, the Applicable Collateral Agent (acting on the instructions of the Applicable Representative) may deal with the Shared Collateral as if such Applicable Collateral Agent had a senior and exclusive Lien on such Shared Collateral. Neither the Other First Lien Representative, the Other First Lien Collateral Agent nor the Other Note Claimholders will contest, protest or object to any foreclosure proceeding or action brought by the Applicable Collateral Agent, the Applicable Representative or the Controlling Claimholders or any other exercise by the Applicable Collateral Agent, the Applicable Representative or the Controlling Claimholders of any rights and remedies relating to the Shared Collateral. The foregoing shall not be construed to limit the rights and priorities of any First Lien Claimholder or either Collateral Agent or Representative with respect to any Collateral not constituting Shared Collateral.

(d)     Each of the Other First Lien Collateral Agent and the Other First Lien Representative agrees that it will not accept any Lien on any Collateral for the benefit of the Other Note Obligations (other than funds deposited for the satisfaction, discharge or defeasance of the Other Purchase

Agreement) other than pursuant to the First Lien Collateral Documents, and by executing this Agreement, each of the Other First Lien Collateral Agent and the Other First Lien Representative agrees to be bound by the provisions of this Agreement and the other First Lien Collateral Documents applicable to it.

(e)     Each of the First Lien Claimholders agrees that it will not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the perfection, priority, validity or enforceability of a Lien held by or on behalf of any of the First Lien Claimholders in all or any part of the Collateral or the provisions of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair (i) the rights of either Collateral Agent or Representative to enforce this Agreement or (ii) the rights of any First Lien Claimholder to contest or support any other Person in contesting the enforceability of any Lien purporting to secure obligations not constituting First Lien Obligations.

SECTION 2.3          No Interference; Payment Over; Exculpatory Provisions.

(a)     Each First Lien Claimholder agrees that (i) it will not challenge or question or support any other Person in challenging or questioning in any proceeding the validity or enforceability of any First Lien Obligations of either Series or any First Lien Collateral Document or the validity or enforceability, attachment, perfection or priority of any Lien under any First Lien Collateral Document or the validity or enforceability of the priorities, rights or duties established by or other provisions of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair the rights of any First Lien Claimholder from challenging or questioning the validity or enforceability of any First Lien Obligations constituting unmatured interest or the validity of any Lien relating thereto pursuant to Section 502(b)(2) of the Bankruptcy Code, (ii) it will not take or cause to be taken any action the purpose or intent of which is, or could be, to interfere, hinder or delay, in any manner, whether by judicial proceedings or otherwise, any sale, transfer or other disposition of the Collateral by the Applicable Collateral Agent, (iii) except as provided in Section 2.2, it shall have no right to and shall not otherwise (A) direct the Applicable Collateral Agent or any other First Lien Claimholder to exercise any right, remedy or power with respect to any Shared Collateral (including pursuant to any other intercreditor agreement) or (B) consent to, or object to, the exercise by, or any forbearance from exercising by, the Applicable Collateral Agent or any other First Lien Claimholder represented by it of any right, remedy or power with respect to any Collateral, (iv) it will not institute any suit or assert in any suit, bankruptcy, insolvency or other proceeding any claim against the Applicable Collateral Agent or any other First Lien Claimholder represented by it seeking damages from or other relief by way of specific performance, instructions or otherwise with respect to any Collateral and (v) it will not attempt, directly or indirectly, whether by judicial proceedings or otherwise, to challenge the enforceability of any provision of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair the rights of any of the Applicable Collateral Agent or any other First Lien Claimholder to (i) enforce this Agreement or (ii) contest or support any other Person in contesting the enforceability of any Lien purporting to secure obligations not constituting First Lien Obligations.

(b)     Each First Lien Claimholder hereby agrees that if it shall obtain possession of any Shared Collateral or shall realize any proceeds or payment in respect of any Shared Collateral, pursuant to any First Lien Collateral Document or by the exercise of any rights available to it under applicable law or in any Insolvency or Liquidation Proceeding or through any other exercise of remedies (including pursuant to any intercreditor agreement), at any time prior to the Discharge of each of the First Lien Obligations, then it shall hold such Shared Collateral, proceeds or payment in trust for the other First Lien Claimholders having a security interest in such Shared Collateral and promptly transfer any such Shared Collateral, proceeds or payment, as the case may be, to the Applicable Collateral Agent, to be distributed by such Applicable Collateral Agent in accordance with the provisions of Section 2.1(a) hereof, provided, however, that the foregoing shall not apply to any Shared Collateral purchased by any First Lien Claimholder for cash pursuant to any exercise of remedies permitted hereunder.

11

(c)     None of the Applicable Collateral Agent, either Applicable Representative or any other First Lien Claimholder shall be liable for any action taken or omitted to be taken by the Applicable Collateral Agent, such Applicable Representative or any other First Lien Claimholder with respect to any Collateral in accordance with the provisions of this Agreement.

SECTION 2.4     Automatic Release of Liens.

(a)     If, at any time any Shared Collateral is transferred to a third party or otherwise disposed of, in each case, in connection with any enforcement by the Applicable Collateral Agent in accordance with the provisions of this Agreement, then (whether or not any Insolvency or Liquidation Proceeding is pending at the time) the Liens in favor of the other Collateral Agent (or in favor of such other First Lien Claimholders if directly secured by such Liens) upon such Shared Collateral will automatically be released and discharged upon final conclusion of such disposition as and when, but only to the extent, such Liens of the Applicable Collateral Agent on such Shared Collateral are released and discharged; provided that any proceeds of any Shared Collateral realized therefrom shall be applied pursuant to Section 2.1 hereof.  If in connection with any such foreclosure or other exercise of remedies by the Applicable Collateral Agent, the Applicable Collateral Agent or related Applicable Representative of such Series of First Lien Obligations releases any Guarantor from its obligation under a guarantee of the Series of First Lien Obligations for which it serves as agent prior to a Discharge of such Series of First Lien Obligations, such Guarantor also shall be released from its guarantee of all other First Lien Obligations.  If in connection with any such foreclosure or other exercise of remedies by the Applicable Collateral Agent, the equity interests of any Person are foreclosed upon or otherwise disposed of and the Applicable Collateral Agent releases its Lien on the property or assets of such Person, then the Liens of the other Collateral Agent (or in favor of such other First Lien Claimholders if directly secured by such Liens) with respect to any Collateral consisting of the property or assets of such Person will be automatically released to the same extent as the Liens of the Applicable Collateral Agent are released; provided that any proceeds of any such equity interests foreclosed upon where the Applicable Collateral Agent releases its Lien on the assets of such Person on which another Series of First Lien Obligations holds a Lien on any of the assets of such Person (any such assets, the "***Underlying Assets***") which Lien is released as provided in this sentence (any such Proceeds being referred to herein as "***Equity Release Proceeds***" regardless of whether or not such other Series of First Lien Obligations holds a Lien on such equity interests so disposed of) shall be applied pursuant to Section 2.1 hereof.

(b)     Without limiting the rights of the Applicable Collateral Agent under Section 4.2, each Collateral Agent and each Representative agrees to execute and deliver (at the sole cost and expense of the Grantors) all such authorizations and other instruments as shall reasonably be requested by the Company or the Applicable Collateral Agent to evidence and confirm any release of Shared Collateral, Underlying Assets or guarantee provided for in this Section.

SECTION 2.5     Certain Agreements with Respect to Bankruptcy or Insolvency Proceedings.

(a)     This Agreement shall continue in full force and effect notwithstanding the commencement of any proceeding under the Bankruptcy Code or any other Federal, state or foreign bankruptcy, insolvency, receivership or similar law by or against any Grantor or any of its subsidiaries.

(b)     If any Grantor shall become subject to a case (a "***Bankruptcy Case***") under the Bankruptcy Code and shall, as debtor(s)-in-possession, move for approval of financing ("***DIP Financing***") to be provided by one or more lenders (the "***DIP Lenders***") under Section 364 of the Bankruptcy Code or the use of cash collateral under Section 363 of the Bankruptcy Code, each First Lien Claimholder (other than any Controlling Claimholder or the Representative of the Controlling Claimholder) agrees that it will

not raise any objection to any such financing or to the Liens on the Shared Collateral securing the same ("**DIP Financing Liens**") or to any use of cash collateral that constitutes Shared Collateral, unless the Representative of the Controlling Claimholders shall then oppose or object to such DIP Financing or such DIP Financing Liens or use of cash collateral (and (i) to the extent that such DIP Financing Liens are senior to the Liens on any such Shared Collateral for the benefit of the Controlling Claimholders, each Other Note Claimholder will subordinate its Liens with respect to such Shared Collateral on the same terms as the Liens of the Controlling Claimholders (other than any Liens of any First Lien Claimholders constituting DIP Financing Liens) are subordinated thereto, and (ii) to the extent that such DIP Financing Liens rank *pari passu* with the Liens on any such Shared Collateral granted to secure the First Lien Obligations of the Controlling Claimholders, each Other Note Claimholder will confirm the priorities with respect to such Shared Collateral as set forth herein), in each case so long as (A) the First Lien Claimholders of each Series retain the benefit of their Liens on all such Shared Collateral pledged to the DIP Lenders, including proceeds thereof arising after the commencement of such proceeding, with the same priority vis-à-vis all the other First Lien Claimholders (other than any Liens of the First Lien Claimholders constituting DIP Financing Liens) as existed prior to the commencement of the Bankruptcy Case, (B) the First Lien Claimholders of each Series are granted Liens on any additional collateral pledged to any First Lien Claimholders as adequate protection or otherwise in connection with such DIP Financing or use of cash collateral, with the same priority vis-à-vis the First Lien Claimholders as set forth in this Agreement (other than any Liens of any First Lien Claimholders constituting DIP Financing Liens), (C) if any amount of such DIP Financing or cash collateral is applied to repay any of the First Lien Obligations, such amount is applied pursuant to Section 2.1(a) of this Agreement, and (D) if any First Lien Claimholders are granted adequate protection with respect to the First Lien Obligations subject hereto, including in the form of periodic payments, in connection with such use of cash collateral, the proceeds of such adequate protection are applied pursuant to Section 2.1(a) of this Agreement; provided that the First Lien Claimholders of each Series shall have a right to object to the grant of a Lien to secure the DIP Financing over any Collateral subject to Liens in favor of the First Lien Claimholders of such Series or its Representative or Collateral Agent that shall not constitute Shared Collateral; provided, further, that the First Lien Claimholders receiving adequate protection shall not object to any other First Lien Claimholder receiving adequate protection comparable to any adequate protection granted to such First Lien Claimholders in connection with a DIP Financing or use of cash collateral.

(c)      If any First Lien Claimholder is granted adequate protection (A) in the form of Liens on any additional collateral, then each other First Lien Claimholder shall be entitled to seek, and each First Lien Claimholder will consent and not object to, adequate protection in the form of Liens on such additional collateral with the same priority vis-à-vis the First Lien Claimholders as set forth in this Agreement, (B) in the form of a superpriority or other administrative claim, then each other First Lien Claimholder shall be entitled to seek, and each First Lien Claimholder will consent and not object to, adequate protection in the form of a pari passu superpriority or administrative claim or (C) in the form of periodic or other cash payments, then the proceeds of such adequate protection must be applied to all First Lien Obligations pursuant to Section 2.1.

SECTION 2.6        Reinstatement.

In the event that any of the First Lien Obligations shall be paid in full and such payment or any part thereof shall subsequently, for whatever reason (including an order or judgment for disgorgement of a preference under Title 11 of the Bankruptcy Code, or any similar law, or the settlement of any claim in respect thereof), be required to be returned or repaid, the terms and conditions of this Agreement shall be fully applicable thereto until all such First Lien Obligations shall again have been paid in full in cash. This Section 2.6 shall survive termination of this Agreement.

SECTION 2.7        Insurance and Condemnation Awards.

254438203 v7

As among the First Lien Claimholders, the Applicable Collateral Agent (acting at the direction of the Applicable Representative), shall have the right, but not the obligation, to adjust or settle any insurance policy or claim covering or constituting Shared Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding affecting the Shared Collateral. To the extent either Collateral Agent or any other First Lien Claimholder receives proceeds of such insurance policy and such proceeds are not permitted or required to be returned to any Grantor under the applicable First Lien Documents, such proceeds shall be turned over to the Applicable Collateral Agent for application as provided in Section 2.1 hereof.

SECTION 2.8          Gratuitous Bailee/Agent for Perfection.

(a)     The Applicable Collateral Agent shall be entitled to hold any Possessory Collateral constituting Shared Collateral.

(b)     Notwithstanding the foregoing, each Collateral Agent agrees to hold any Possessory Collateral constituting Shared Collateral and any other Shared Collateral from time to time in its possession or control (or in the possession or control of its agents or bailees) as gratuitous bailee for the benefit of each other First Lien Claimholder (such bailment being intended, among other things, to satisfy the requirements of Sections 8-106(d)(3), 8-301(a)(2) and 9-313(c) of the UCC), solely for the purpose of perfecting the security interest granted in such Shared Collateral, if any, pursuant to the applicable First Lien Collateral Documents, in each case, subject to the terms and conditions of this Section 2.8. Solely with respect to any deposit accounts constituting Shared Collateral under the control (within the meaning of Section 9-104 of the UCC) of any Collateral Agent, each such Collateral Agent agrees to also hold control over such deposit accounts as gratuitous agent for each other First Lien Claimholder and any assignee solely for the purpose of perfecting the security interest in such deposit accounts, subject to the terms and conditions of this Section 2.8.

(c)     No Collateral Agent shall have any obligation whatsoever to any First Lien Claimholder to ensure that the Possessory Collateral and Control Collateral is genuine or owned by any of the Grantors or to preserve rights or benefits of any Person except as expressly set forth in this Section 2.8. The duties or responsibilities of each Collateral Agent under this Section 2.8 shall be limited solely to holding any Possessory Collateral constituting Shared Collateral or any other Shared Collateral in its possession or control as gratuitous bailee (and with respect to Deposit Accounts, as gratuitous agent) in accordance with this Section 2.8 and delivering the Possessory Collateral constituting Shared Collateral as provided in Section 2.8(e) below.

(d)     Neither Collateral Agents nor any of the First Lien Claimholders shall have by reason of the First Lien Documents, this Agreement or any other document a fiduciary relationship in respect of the other Collateral Agents or any other First Lien Claimholder, and each Collateral Agent and each First Lien Claimholder hereby waives and releases the other Collateral Agents and First Lien Claimholders from all claims and liabilities arising pursuant to either Collateral Agent's role under this Section 2.8 as gratuitous bailee with respect to the Possessory Collateral constituting Shared Collateral or any other Shared Collateral in its possession or control (and with respect to the Deposit Accounts, as gratuitous agent).

(e)     At any time the Applicable Collateral Agent is no longer the Applicable Collateral Agent, such outgoing Applicable Collateral Agent shall deliver the remaining Possessory Collateral constituting Shared Collateral in its possession (if any) together with any necessary endorsements (which endorsement shall be without recourse and without any representation or warranty), first, to the then Applicable Collateral Agent to the extent First Lien Obligations remain outstanding and second, to the applicable Grantor to the extent no First Lien Obligations remain outstanding (in each case, so as to allow

14

such Person to obtain possession or control of such Shared Collateral) or to whomever may be lawfully entitled to receive the same.  The outgoing Applicable Collateral Agent further agrees to take all other action reasonably requested by the then Applicable Collateral Agent or the Company at the expense of the Company in connection with the then Applicable Collateral Agent obtaining a first-priority security interest in the Shared Collateral.

SECTION 2.9        Amendments to First Lien Collateral Documents.

(a)        Without the prior written consent of each other Collateral Agent, each Collateral Agent agrees that no First Lien Collateral Document may be amended, restated, amended and restated, supplemented, replaced or refinanced or otherwise modified from time to time or entered into to the extent such amendment, supplement, refinancing or modification, or the terms of any new First Lien Collateral Document, would be prohibited by, or would require any Grantor to act or refrain from acting in a manner that would violate, any of the terms of this Agreement.

(b)        In determining whether an amendment to any First Lien Collateral Document is permitted by this Section 2.9, each Collateral Agent may conclusively rely on an officer's certificate of the Company stating that such amendment is permitted by this Section 2.9.

SECTION 2.10        Similar Liens and Agreements.

(a)        The parties hereto agree that it is their intention that the Collateral be identical for all First Lien Claimholders.  In furtherance of, but subject to, the foregoing, the parties hereto agree, subject to the other provisions of this Agreement:

(i)        upon request by either Collateral Agent, to cooperate in good faith (and to direct their counsel to cooperate in good faith) from time to time in order to determine the specific items included in the Shared Collateral and the steps taken to perfect their respective Liens thereon and the identity of the respective parties obligated under the Initial Note Documents and the Other Note Documents; and

(ii)        that the documents and agreements creating or evidencing the Liens on Shared Collateral securing the Initial Note Obligations and the Other Note Obligations shall be in all material respects the same forms of documents as one another, except that the documents and agreements creating or evidencing the Liens securing the Other Note Obligations may contain additional provisions as may be necessary or appropriate to establish the intercreditor arrangements among the various separate classes of creditors holding Other Note Obligations.

ARTICLE III.

EXISTENCE AND AMOUNTS OF LIENS AND OBLIGATIONS

Whenever an Applicable Collateral Agent or an Applicable Representative shall be required, in connection with the exercise of its rights or the performance of its obligations hereunder, to determine the existence or amount of any First Lien Obligations of either Series, or the Shared Collateral subject to any Lien securing the First Lien Obligations of either Series, it may request that such information be furnished to it in writing by the other Representative or the other Collateral Agent and shall be entitled to make such determination or not make any determination on the basis of the information so furnished; provided, however, that if such Representative or Collateral Agent shall fail or refuse reasonably promptly to provide the requested information, the requesting Applicable Collateral Agent or Applicable Representative shall be entitled to make any such determination or not make any determination by such method as it

15

may, in the exercise of its good faith judgment, determine, including by reliance upon a certificate of the Company.  Each Applicable Collateral Agent and each Applicable Representative may rely conclusively, and shall be fully protected in so relying, on any determination made by it in accordance with the provisions of the preceding sentence (or as otherwise directed by a court of competent jurisdiction) and shall have no liability to any Grantor, any First Lien Claimholder or any other person as a result of such determination.

ARTICLE IV.

THE APPLICABLE COLLATERAL AGENT

SECTION 4.1          Authority.

(a)          Notwithstanding any other provision of this Agreement, nothing herein shall be construed to impose any fiduciary or other duty on any Applicable Collateral Agent to any Other Note Claimholder or give any Other Note Claimholder the right to direct the Applicable Collateral Agent, except that each Applicable Collateral Agent shall be obligated to distribute proceeds of any Shared Collateral in accordance with Section 2.1 hereof.

(b)          In furtherance of the foregoing, each Other Note Claimholder acknowledges and agrees that the Applicable Collateral Agent shall be entitled, for the benefit of the First Lien Claimholders, to sell, transfer or otherwise dispose of or deal with any Shared Collateral as provided herein and in the First Lien Collateral Documents, as applicable, without regard to any rights to which the Other Note Claimholder would otherwise be entitled as a result of the First Lien Obligations held by such Other Note Claimholders.  Without limiting the foregoing, each Other Note Claimholder agrees that none of the Applicable Collateral Agent, the Applicable Representative or any other First Lien Claimholder shall have any duty or obligation first to marshal or realize upon any type of Shared Collateral (or any other Collateral securing any of the First Lien Obligations), or to sell, dispose of or otherwise liquidate all or any portion of such Shared Collateral (or any other Collateral securing any First Lien Obligations), in any manner that would maximize the return to the Other Note Claimholder, notwithstanding that the order and timing of any such realization, sale, disposition or liquidation may affect the amount of proceeds actually received by the Other Note Claimholders from such realization, sale, disposition or liquidation.  Each of the First Lien Claimholders waives any claim it may now or hereafter have against the Collateral Agent or Representative of the other Series of First Lien Obligations or any other First Lien Claimholder of the other Series arising out of (i) any actions which any such Collateral Agent, Representative or any First Lien Claimholder represented by it take or omit to take (including actions with respect to the creation, perfection or continuation of Liens on any Collateral, actions with respect to the foreclosure upon, sale, release or depreciation of, or failure to realize upon, any of the Collateral and actions with respect to the collection of any claim for all or any part of the First Lien Obligations from any account debtor, guarantor or any other party) in accordance with the First Lien Collateral Documents or any other agreement related thereto or in connection with the collection of the First Lien Obligations or the valuation, use, protection or release of any security for the First Lien Obligations; provided that nothing in this clause (i) shall be construed to prevent or impair the rights of either Collateral Agent or Representative to enforce this Agreement, (ii) any election by the Applicable Representative or any holders of First Lien Obligations, in any proceeding instituted under the Bankruptcy Code, of the application of Section 1111(b) of the Bankruptcy Code or (iii) subject to Section 2.5, any borrowing, or grant of a security interest or administrative expense priority under Section 364 of the Bankruptcy Code or any equivalent provision of any other Bankruptcy Law, by the Company or any of its subsidiaries, as debtor-in-possession.  Notwithstanding any other provision of this Agreement, the Applicable Collateral Agent shall not (i) accept any Shared Collateral in full or partial satisfaction of any First Lien Obligations pursuant to Section 9-620 of the UCC, without the consent of the Representatives representing holders of First Lien Obligations for whom such Collateral constitutes Shared Collateral or (ii) "credit bid" for or purchase (other than for cash) Shared Collateral at any public, private

or judicial foreclosure upon such Shared Collateral, without the consent of the Representative representing holders of First Lien Obligations for whom such Collateral constitutes Shared Collateral.

SECTION 4.2        Power-of-Attorney.

The Other First Lien Representative and the Other First Lien Collateral Agent, for itself and on behalf of the Other Note Claimholders, hereby irrevocably appoints the Applicable Collateral Agent and any officer or agent of the Applicable Collateral Agent, which appointment is coupled with an interest with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Other First Lien Representative, the Other First Lien Collateral Agent and the Other Note Claimholders, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Agreement, including the exercise of any and all remedies under each First Lien Collateral Document with respect to Shared Collateral and the execution of releases in connection therewith.

ARTICLE V.

MISCELLANEOUS

SECTION 5.1        Integration/Conflicts.

This Agreement, together with the other First Lien Documents and the First Lien Collateral Documents, represents the entire agreement of each of the Grantors and the First Lien Claimholders with respect to the subject matter hereof and thereof and supersedes any and all previous agreements and understandings, oral or written, relating to the subject matter hereof and thereof. There are no promises, undertakings, representations or warranties by either Representative, either Collateral Agent or the First Lien Claimholder relative to the subject matter hereof and thereof not expressly set forth or referred to herein or therein. In the event of any conflict between the provisions of this Agreement and the provisions of the First Lien Documents the provisions of this Agreement shall govern and control.

SECTION 5.2        Effectiveness; Continuing Nature of this Agreement; Severability.

This Agreement shall become effective when executed and delivered by the parties hereto. This is a continuing agreement and the First Lien Claimholders of either Series may continue, at any time and without notice to any First Lien Claimholder of the other Series, to extend credit and other financial accommodations and lend monies to or for the benefit of the Company or any Grantor constituting First Lien Obligations in reliance hereon. Each Representative and each Collateral Agent, on behalf of itself and each other First Lien Claimholder represented by it, hereby waives any right it may have under applicable law to revoke this Agreement or any of the provisions of this Agreement. The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency or Liquidation Proceeding. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. The parties hereto shall endeavor in good faith negotiations to replace any invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to those of the invalid, illegal or unenforceable provisions. All references to the Company or any other Grantor shall include the Company or such Grantor as debtor and debtor in possession and any receiver, trustee or similar person for the Company or any other Grantor (as the case may be) in any Insolvency or Liquidation Proceeding. This Agreement shall terminate and be of no further force and effect with respect to the Representative or Collateral Agent and the First Lien Claimholders represented by such Representative or Collateral Agent and their First Lien Obligations, on

17

the date on which there has been a Discharge of such Series of First Lien Obligations, subject to the rights of the First Lien Claimholders under Section 2.6; provided, however, that such termination shall not relieve any such party of its obligations incurred hereunder prior to the date of such termination.

SECTION 5.3    Amendments; Waivers.

(a)    No amendment, modification or waiver of any of the provisions of this Agreement shall be deemed to be made unless the same shall be in writing signed on behalf of each party hereto or its authorized agent and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time. Notwithstanding the foregoing, the Company and the other Grantors shall not have any right to consent to or approve any amendment, modification or waiver of any provision of this Agreement except to the extent their rights are adversely affected.

SECTION 5.4    Information Concerning Financial Condition of the Grantors and their Subsidiaries.

The Representative and Collateral Agent and the other First Lien Claimholders of each Series shall each be responsible for keeping themselves informed of (a) the financial condition of the Grantors and their subsidiaries and all endorsers and/or guarantors of the First Lien Obligations and (b) all other circumstances bearing upon the risk of nonpayment of the First Lien Obligations, provided that the foregoing shall not impose any obligation on any Representative or Collateral Agent not expressly set forth in the applicable First Lien Documents. The Representative and Collateral Agent and the other First Lien Claimholders of each Series shall have no duty to advise the Representative, Collateral Agent or First Lien Claimholders of the other Series of information known to it or them regarding such condition or any such circumstances or otherwise. In the event the Representative or Collateral Agent or any of the other First Lien Claimholders, in its or their sole discretion, undertakes at any time or from time to time to provide any such information to the Representative, Collateral Agent or First Lien Claimholders of the other Series, it or they shall be under no obligation:

(a)    to make, and such Representative and Collateral Agent and such other First Lien Claimholders shall not make, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided;

(b)    to provide any additional information or to provide any such information on any subsequent occasion;

(c)    to undertake any investigation; or

(d)    to disclose any information, which pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

SECTION 5.5    Submission to Jurisdiction; Certain Waivers.

Each of the Company, each other Grantor, each Collateral Agent and each Representative, on behalf of itself and each other First Lien Claimholder represented by it, hereby irrevocably and unconditionally:

(a)      submits for itself and its property in any legal action or proceeding relating to this Agreement and the First Lien Collateral Documents (whether arising in contract, tort or otherwise) to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the exclusive (subject to Section 5.5(c)) general jurisdiction of the courts of the State of New York sitting in the Borough of Manhattan, the courts of the United States for the Southern District of New York sitting in the Borough of Manhattan, and appellate courts from any thereof;

(b)      agrees that all claims in respect of any such action or proceeding shall be heard and determined in such New York state court or, to the fullest extent permitted by applicable law, in such federal court;

(c)      agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law and that nothing in this Agreement or any other First Lien Document shall affect any right that either Collateral Agent, either Representative or any other First Lien Claimholder may otherwise have to bring any action or proceeding relating to this Agreement or any other First Lien Document against such Grantor or any of its assets in the courts of any jurisdiction;

(d)      waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement or any other First Lien Collateral Document in any court referred to in Section 5.5(a) (and irrevocably waives to the fullest extent permitted by applicable law the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court); and

(e)      waives, to the maximum extent not prohibited by law, any right it may have to claim or recover any special, exemplary, punitive or consequential damages.

SECTION 5.6          WAIVER OF JURY TRIAL.

**EACH PARTY HERETO AND THE COMPANY AND THE OTHER GRANTORS HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER FIRST LIEN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT, BREACH OF DUTY, COMMON LAW, STATUTE OR ANY OTHER THEORY). EACH PARTY HERETO AND THE COMPANY AND THE OTHER GRANTORS (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT EACH SUCH PARTY HERETO AND THE COMPANY AND EACH OTHER GRANTOR HAVE BEEN INDUCED TO ENTER INTO OR ACKNOWLEDGE THIS AGREEMENT AND THE OTHER FIRST LIEN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION. EACH PARTY HERETO AND THE COMPANY AND THE OTHER GRANTORS FURTHER REPRESENTS AND WARRANTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.**

SECTION 5.7          Notices.

Unless otherwise specifically provided herein, any notice hereunder shall be in writing and may be personally served or sent by facsimile, electronic mail or United States mail or courier service and shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof, upon receipt of facsimile or electronic mail, or three Business Days after depositing it in the United States mail with postage prepaid and properly addressed. For the purposes hereof, the addresses of the parties hereto shall be as set forth below each party's name on the signature pages hereto or, with respect to any Grantor that becomes a party hereto pursuant to <u>Section 5.17</u>, in the joinder agreement substantially in the form attached hereto as <u>Exhibit A</u>, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

SECTION 5.8        <u>Further Assurances</u>.

Each Representative and Collateral Agent, on behalf of itself and each other First Lien Claimholder represented by it, and the Company and each other Grantor, agree that each of them shall take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as either Representative and Collateral Agent may reasonably request to effectuate the terms of and the Lien priorities contemplated by this Agreement.

SECTION 5.9        <u>Agency Capacities</u>.

(a)        Except as expressly provided herein, (a) each of the Initial First Lien Representative and the Initial First Lien Collateral Agent is acting in the capacity of Representative and Collateral Agent, respectively, solely for the Initial Note Claimholders and pursuant to the direction set forth in the Initial Note Documents and (b) each of the Other First Lien Representative and the Other First Lien Collateral Agent is acting in the capacity of Representative and Collateral Agent, respectively, solely for the Other Note Claimholders and pursuant to the direction set forth in the Other Note Documents. Each Representative and each Collateral Agent shall be entitled to the rights, privileges and immunities of such Representative or such Collateral Agent as set forth in the applicable First Lien Documents in acting hereunder.

(b)        Neither Representative or Collateral Agent shall be responsible for the terms or sufficiency of this Agreement for any purpose. Neither Representative or Collateral Agent shall have any duties or obligations under or pursuant to this Agreement other than such duties as may be expressly set forth in this as duties on its part to be performed or observed. In entering into this Agreement, or in taking (or forbearing from) any action under or pursuant to this Agreement, each Representative and Collateral Agent shall have and be protected by all of the rights, immunities, indemnities and other protections granted to it under the applicable First Lien Documents. Neither Representative or Collateral Agent shall have any liability or responsibility for the actions or omissions of the other Collateral Agent, or for any other claimholder's or the other Collateral Agent's compliance with (or failure to comply with) the terms of this Agreement.

(c)        None of the provisions in this Agreement shall require the Representatives or the Collateral Agents to expend or risk their own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of their duties, or in the exercise of any of its rights or powers if they shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to them against such risk or liability is not assured to them.

(d)        Neither Representative or Collateral Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated by the applicable First Lien Documents that such Representative or Collateral Agent is required to exercise as directed in writing by the Required Holders (as defined in the Initial Purchase Agreement or Other Purchase Agreement, as applicable); *provided that*, either Representative and Collateral Agent shall be entitled to refrain from any act or the taking of any action hereunder under the applicable First Lien Documents or

20

from the exercise of any power or authority vested in it hereunder or thereunder unless and until such Representative or Collateral Agent shall have received instructions from the Required Holders (as defined in the Initial Purchase Agreement or Other Purchase Agreement, as applicable) and such Representative or Collateral Agent deems necessary, satisfactory indemnity has been provided to it, and neither such Representative nor Collateral Agent shall be liable for any such delay in acting.  Neither Representative or Collateral Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose it to liability or that is contrary to the applicable First Lien Documents or applicable law, including for the avoidance of doubt, any action that may be in violation of the automatic stay under any bankruptcy or insolvency law.  For purposes of clarity, phrases such as "satisfactory to", "approved by", "acceptable to", "as determined by", "in the discretion of", "selected by", "requested by" the Representatives or Collateral Agents and phrases of similar import authorize and permit the Representatives or Collateral Agents to approve, disapprove, determine, act or decline to act in its discretion.  Any exercise of discretion on behalf of the Other First Lien Representative or the Other First Lien Collateral Agent shall be exercised in accordance with the terms of the Other Note Documents.  Notwithstanding anything herein to the contrary, neither Representative or Collateral Agent shall have any responsibility for the preparation, filing or recording of any instrument, document or financing statement or for the perfection or maintenance of any security interest created hereunder.

SECTION 5.10        GOVERNING LAW.

**THIS AGREEMENT, AND ANY DISPUTE, CLAIM OR CONTROVERSY ARISING OUT OF OR RELATING TO THIS AGREEMENT (WHETHER ARISING IN CONTRACT, TORT OR OTHERWISE) SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAW RULES THAT WOULD RESULT IN THE APPLICATION OF A DIFFERENT GOVERNING LAW (OTHER THAN ANY MANDATORY PROVISIONS OF THE UCC RELATING TO THE LAW GOVERNING PERFECTION AND THE EFFECT OF PERFECTION OR PRIORITY OF THE SECURITY INTERESTS).**

SECTION 5.11        Binding on Successors and Assigns.

This Agreement shall be binding upon each Representative and each Collateral Agent, the First Lien Claimholders, the Company and the other Grantors, and their respective successors and assigns from time to time.  If either Representative and/or Collateral Agent resigns or is replaced pursuant to the applicable First Lien Documents its successor shall be deemed to be a party to this Agreement and shall have all the rights of, and be subject to all the obligations of, this Agreement.  No provision of this Agreement will inure to the benefit of a trustee, debtor-in-possession, creditor trust or other representative of an estate or creditor of any Grantor, including where any such trustee, debtor-in-possession, creditor trust or other representative of an estate is the beneficiary of a Lien securing Collateral by virtue of the avoidance of such Lien in an Insolvency or Liquidation Proceeding.

SECTION 5.12        Section Headings.

Section headings and the Table of Contents used in this Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

SECTION 5.13        Counterparts.

This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute

21

one and the same instrument.  Delivery of an executed signature page of this Agreement by facsimile or other electronic transmission (e.g., "pdf" or "tif" format) shall be effective as delivery of a manually executed counterpart hereof.  The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this Agreement and/or any document to be signed in connection with this Agreement and the transactions contemplated hereby shall be deemed to include Electronic Signatures (as defined below), deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be.  "***Electronic Signatures***" means any electronic symbol or process attached to, or associated with, any contract or other record and adopted by a person with the intent to sign, authenticate or accept such contract or record.

SECTION 5.14       Authorization.

By its signature, each Person executing this Agreement, on behalf of such party or Grantor but not in his or her personal capacity as a signatory, represents and warrants to the other parties hereto that it is duly authorized to execute this Agreement.

SECTION 5.15       No Third Party Beneficiaries/ Provisions Solely to Define Relative Rights.

The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the First Lien Claimholders in relation to one another.  None of the Company, any other Grantor nor any other creditor thereof shall have any rights or obligations hereunder and no such Person is an intended beneficiary or third party beneficiary hereof, except, in each case, as expressly provided in this Agreement, and none of the Company or any other Grantor may rely on the terms hereof (other than Sections 5.3).  Nothing in this Agreement is intended to or shall impair the obligations of any Grantor, which are absolute and unconditional, to pay the First Lien Obligations as and when the same shall become due and payable in accordance with their terms.  Without limitation of any other provisions of this Agreement, the Company and each Grantor hereby (a) acknowledges that it has read this Agreement and consents hereto, (b) agrees that it will not take any action that would be contrary to the express provisions of this Agreement and (c) agrees to abide by the requirements expressly applicable to it under this Agreement.

SECTION 5.16       No Indirect Actions.

Unless otherwise expressly stated, if a party may not take an action under this Agreement, then it may not take that action indirectly, or support any other Person in taking that action directly or indirectly.  "Taking an action indirectly" means taking an action that is not expressly prohibited for the party but is intended to have substantially the same effects as the prohibited action.

SECTION 5.17       Additional Grantors.

Each of the Company and the other Grantors agrees that it shall ensure that each of its subsidiaries that is or is to become a party to any First Lien Document and which grants or purports to grant a lien on any of its assets shall either execute this Agreement on the date hereof or shall confirm that it is a Grantor hereunder pursuant to a joinder agreement substantially in the form attached hereto as Exhibit A that is executed and delivered by such subsidiary prior to or concurrently with its execution and delivery of such First Lien Document.

[Signature Pages Follow]

254438203 v7

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**U.S. BANK NATIONAL ASSOCIATION**, as Initial First Lien Representative and as Initial First Lien Collateral Agent

By: _____
   Name:
   Title:

Address for notices:
U.S. Bank National Association
West Side Flats
60 Livingston Avenue
EP-MN-WS3C
St. Paul, MN 55107
Attention: Joshua Hahn (Core Sciences)

**U.S. BANK NATIONAL ASSOCIATION**, as Other First Lien Representative and as Other First Lien Collateral Agent

By: _____
   Name:
   Title:

Address for notices:
U.S. Bank National Association
West Side Flats
60 Livingston Avenue
EP-MN-WS3C
St. Paul, MN 55107
Attention: Joshua Hahn (Core Sciences)

[Signature Page to Intercreditor Agreement]

**Acknowledged and Agreed to by:**

[_____]


By:_____
Name:
Title:

Exhibit A
to First Lien Pari Passu Intercreditor Agreement

FORM OF GRANTOR JOINDER AGREEMENT

GRANTOR JOINDER AGREEMENT NO.  [__] (this "***Grantor Joinder Agreement***"), dated as of [__], 20[__] to the PARI PASSU INTERCREDITOR AGREEMENT, dated as of [__], 2021 (the "***Pari Passu Intercreditor Agreement***"), by and among U.S. Bank National Association, as Initial First Lien Representative and Initial First Lien Collateral Agent, U.S. Bank National Association, as Other First Lien Representative and Other First Lien Collateral Agent, and acknowledged and agreed to by Core Scientific Holding Co. and the other Grantors from time to time party thereto.  Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Pari Passu Intercreditor Agreement.

The undersigned, [_____], a [_____], (the "***New Grantor***") wishes to acknowledge and agree to the Pari Passu Intercreditor Agreement and become a party thereto to the limited extent contemplated by Section 5.17 thereof and to acquire and undertake the rights and obligations of a Grantor thereunder.

Accordingly, the New Grantor agrees as follows for the benefit of the Representatives, the Collateral Agents and the First Lien Claimholders:

Section 1.    Accession to the Pari Passu Intercreditor Agreement.  The New Grantor (a) acknowledges and agrees to, and becomes a party to the Pari Passu Intercreditor Agreement as a Grantor to the limited extent contemplated by Section 5.17 thereof, (b) agrees to all the terms and provisions of the Pari Passu Intercreditor Agreement and (c) shall have all the rights and obligations of a Grantor under the Pari Passu Intercreditor Agreement.  This Grantor Joinder Agreement supplements the Pari Passu Intercreditor Agreement and is being executed and delivered by the New Grantor pursuant to Section 5.17 of the Pari Passu Intercreditor Agreement.

Section 2.    Representations, Warranties and Acknowledgement of the New Grantor.  The New Grantor represents and warrants to each Representative, each Collateral Agent and to the First Lien Claimholders that (a) it has full power and authority to enter into this Grantor Joinder Agreement, in its capacity as Grantor and (b) this Grantor Joinder Agreement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with the terms of this Grantor Joinder Agreement.

Section 3.    Counterparts.  This Grantor Joinder Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Grantor Joinder Agreement or any document or instrument delivered in connection herewith by telecopy or other electronic means shall be effective as delivery of a manually executed counterpart of this Grantor Joinder Agreement or such other document or instrument, as applicable.

Section 4.    Section Headings.  Section heading used in this Grantor Joinder Agreement are for convenience of reference only and are not to affect the construction hereof or to be taken in consideration in the interpretation hereof.

Section 5.          Benefit of Agreement.  The agreements set forth herein or undertaken pursuant hereto are for the benefit of, and may be enforced by, any party to the Pari Passu Intercreditor Agreement subject to any limitations set forth in the Pari Passu Intercreditor Agreement with respect to the Grantors.

Section 6.          Governing Law.  **THIS GRANTOR JOINDER AGREEMENT, AND ANY DISPUTE, CLAIM OR CONTROVERSY ARISING OUT OF OR RELATING TO THIS GRANTOR JOINDER AGREEMENT (WHETHER ARISING IN CONTRACT, TORT OR OTHERWISE) SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAW RULES THAT WOULD RESULT IN THE APPLICATION OF A DIFFERENT GOVERNING LAW (OTHER THAN ANY MANDATORY PROVISIONS OF THE UCC RELATING TO THE LAW GOVERNING PERFECTION AND THE EFFECT OF PERFECTION OR PRIORITY OF THE SECURITY INTERESTS IN THE COLLATERAL).**

Section 7.          Severability.  Any provision of this Grantor Joinder Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  The parties hereto shall endeavor in good faith negotiations to replace any invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to those of the invalid, illegal or unenforceable provisions.

Section 8.          Notices.  All communications and notices hereunder shall be in writing and given as provided in Section 5.7 of the Pari Passu Intercreditor Agreement.  All communications and notices hereunder to the New Grantor shall be given to it at the address set forth under its signature hereto, which information supplements Section 5.7 of the Pari Passu Intercreditor Agreement.

Exhibit A – Page 2

IN WITNESS WHEREOF, the New Grantor has duly executed this Grantor Joinder Agreement to the Pari Passu Intercreditor Agreement as of the day and year first above written.

[_____]

By_____
  Name:
  Title:

Address for notices:
  _____
  _____
  Attention of:_____
  Telecopy: _____

Exhibit A – Page 3

**EXHIBIT I**

**FORM OF JOINDER AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

**[FORM OF] JOINDER AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS JOINDER ASSIGNMENT AND ASSUMPTION AGREEMENT (this "*Agreement*"), dated as of [   ], is made by and among [Parent Entity] (the "*Parent*"), [Core Scientific Holding Co.][1], a Delaware (the "*Company*") and U.S. BANK NATIONAL ASSOCIATION, as note agent (in such capacity, the "*Agent*"), under that certain Convertible Note Purchase Agreement, dated as of August 20, 2021 (as amended, restated, supplemented and/or otherwise modified from time to time, the "*Purchase Agreement*"), by and among the Company, the Guarantors party thereto, each Purchaser party thereto and the Note Agent.

## RECITALS

WHEREAS, pursuant to the Purchase Agreement, each Purchaser has been issued by the Company one or more Notes (as defined in the Purchase Agreement), which are part of a series of Notes issued by the Company, in an aggregate principal amount of up to $300,000,000.00;

WHEREAS, pursuant to Section 10.1 of the Purchase Agreement, in the event of a SPAC, the Parent Entity shall (a) assume the Obligation of the Company to deliver Conversion Securities pursuant to Section 2 of the Note and (b) assume each other Obligation of the Company under the Note Documents by becoming a joint and several co-obligor of each such other Obligation of the Company (or its successor by merger) under the Note Documents, in each case pursuant to this Agreement; and

WHEREAS, the Company and the Parent now seek to consummate the joinder and assignment and assumption contemplated by Section 10.1 of the Purchase Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the agreements and covenants contained in the Purchase Agreement, and the agreements and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties do hereby agree as follows:

1.      **Defined Terms**.  Capitalized terms used but not defined herein shall have the meanings set forth in the Purchase Agreement.

2.      **Assignment and Assumption**.  Under the terms and subject to the conditions set forth in the Purchase Agreement, the Company hereby assigns to the Parent, and the Parent hereby accepts, the Obligation of the Company to deliver Conversion Securities pursuant to Section 2 of the Note.

3.      **Joinder**.  The Parent hereby acknowledges, agrees and confirms that, by its execution of this Agreement, the Parent will be deemed to be an issuer under the Note Documents and each reference to the "Company" in the Purchase Agreement and each other Note Document shall be deemed to be a collective reference to the Parent and the Company and the Parent shall have all of the obligations of the Company thereunder as if it had executed the Note Documents as the Company.  The Parent hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Purchase Agreement.  Notwithstanding the foregoing, the Parent shall act as representative of the Company and Parent with respect to any obligation of the Company under any Note Document to deliver a certificate or notice from the Company.

---

[1] To be updated to refer to its successor by merger, if applicable.

**4.      Continuing Validity; Waiver and Amendment; Entire Agreement**.  Except as expressly modified pursuant to Agreement, the terms of the Note Documents remain unchanged and in full force and effect.  Any provision of this Agreement may be amended, waived or modified only by an instrument signed in writing by the Parties and the Note Agent.  This Agreement and the other Note Documents constitute the entire contract among the parties hereto regarding to the subject matters addressed herein and supersede any and all previous agreements, negotiations, and discussions, oral or written, by the parties regarding the subject matters addressed herein.

**5.      Successors and Assigns**.  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties.  Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

**6.      GOVERNING LAW**.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) THEREOF.

**7.      Jurisdiction and Venue; Waiver of Jury Trial; Expenses and Indemnification**.  This Agreement is subject to the provisions of Section 10.3 (Jurisdiction and Venue), Section 10.4 (Waiver of Jury Trial) and Section 10.10(a) (Expenses and Indemnification) of the Purchase Agreement, which are by this reference incorporated herein in full, *mutatis mutandis*.

**8.      Notices**.  All communications and notices required or permitted to be given hereunder shall be delivered in accordance with Section 10.8 of the Purchase Agreement.

**9.      Headings; Interpretation**.  Paragraph headings used in this Agreement are included for convenience of reference only and will not modify the provisions that they precede or affect the interpretation of this Agreement or any other Note Document.  The term "including" shall be interpreted to mean "including but not limited to".

**10.      Counterparts**.  This Agreement may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute a single contract.  Any counterpart of a signature page to this Agreement may be delivered by facsimile, electronic mail (including ".pdf" or ".tif") or by means of an electronic signature complying with the Electronic Signatures in Global and National Commerce Act, the New York Electronic Signature and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.

*[Signature page follows]*

254957543 v5

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

**[PARENT ENTITY]**

By:_____
Name:
Title:

**[CORE SCIENTIFIC HOLDING CO.]**

By:_____
Name:
Title:

Acknowledged and accepted:

**AGENT**:

**U.S. BANK NATIONAL ASSOCIATION,**
as Note Agent [and Collateral Agent]

By: **_____**
Name:
Title: