# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **CORE SCIENTIFIC, INC.,** *et al.,* | § | **Case No. 22-90341 (DRJ)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | **(Emergency Hearing Requested)** |
| | § | |

**EMERGENCY MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN REPLACEMENT SENIOR SECURED NON-PRIMING SUPERPRIORITY POSTPETITION FINANCING, (B) USE CASH COLLATERAL, AND (C) PAY OFF EXISTING POSTPETITION FINANCING FACILITY (II) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

---

**EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN 11:30 A.M. (CENTRAL PREVAILING TIME) ON WEDNESDAY, FEBRUARY 1, 2023.**

**IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**YOU MAY PARTICIPATE IN THE HEARING EITHER IN PERSON OR BY AN AUDIO AND VIDEO CONNECTION.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT 832-917-1510. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE JONES' CONFERENCE ROOM NUMBER IS 205691. VIDEO**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

**Ad Hoc Equity Group Exhibit 7**

1

> **COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE JONES' HOME PAGE. THE MEETING CODE IS "JUDGEJONES". CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**
>
> **HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF BOTH ELECTRONIC AND IN-PERSON HEARINGS. TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE JONES' HOME PAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

Core Scientific, Inc. and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**" or "**Borrower**"), respectfully move and represent as follows in support of this motion (the "**Motion**"):

## Preliminary Statement[2]

1.     On January 30, 2023, the Debtors filed a notice with the Court [Docket No. 378] informing all parties that they reached an agreement with a lender on the terms of a replacement post-petition financing facility and intend to pay off their existing DIP financing loan. By this Motion, the Debtors seek authorization to obtain approval of their entry into a superpriority non-priming replacement senior secured debtor-in-possession credit facility in an aggregate principal amount of up to $70 million (the "**Replacement DIP Facility**"), provided by B. Riley Commercial Capital, LLC ("**B. Riley**" and solely in such capacity, the "**Replacement DIP Lender**") and agented by B. Riley Commercial Capital, LLC (solely in such capacity, the "**Replacement DIP Agent**"). The Replacement DIP Facility consists of a new money multiple draw term loan facility in an aggregate principal amount of up to $70 million (and the loans made under the Replacement DIP Facility, the "**Replacement DIP Loans**"). Details of the terms of the

---

[2]  Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the First Day Declaration and the Proposed Replacement Interim DIP Order (each, as defined herein), as applicable.

**Ad Hoc Equity Group Exhibit 7**

2

WEIL:\98991236\11\39031.0011

Replacement DIP Facility can be found in the "**Replacement DIP Term Sheet**" attached as **Exhibit 2** to the Proposed Replacement Interim DIP Order (as defined below).

2. The Replacement DIP Facility will provide an aggregate principal amount of $35 million on an interim basis, which shall be borrowed in a single borrowing (the "**Interim DIP Borrowing**") on the Closing Date (as defined in the Replacement DIP Term Sheet) upon entry of the *Interim Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Non-priming Superpriority Replacement Postpetition Financing, (B) Use Cash Collateral, and (C) Pay Off Existing Postpetition Financing Facility, (II) Granting Liens and Providing Claims with Superpriority Administrative* (the "**Proposed Replacement Interim DIP Order**") attached hereto as **Exhibit A**. Following entry of the Replacement Final DIP Order (as defined below), the remaining aggregate principal amount under the Replacement DIP Facility ($70 million total) shall be available, in one or more borrowings.

3. By this Motion, the Debtors also seek the authority to pay off the Original DIP Facility and to use the Cash Collateral of their Prepetition Secured Noteholders. As of the time of the filing of this Motion, the Debtors are in the process of negotiating the terms for the consensual use of Cash Collateral with the Ad Hoc Group and are hopeful that an agreement will be reached shortly. If an agreement cannot be reached, the Debtors intend to seek the non-consensual use of cash collateral. The Debtors continue to work with the Replacement DIP Lender, the Committee, and the Ad Hoc Group on the terms of the Proposed Replacement Interim DIP Order and will file revised documents prior to the hearing, which the Debtors seek to schedule for February 1, 2023 (the time for the hearing originally scheduled as the final hearing on the Original DIP Facility (as defined herein)).

3

**Ad Hoc Equity Group Exhibit 7**

3

4.      The Debtors announced a the outset these Chapter 11 Cases that they would seek to replace the Original DIP Facility with a replacement DIP facility with better terms and more flexibility than the Original DIP Facility.  They successfully achieved this goal with the Replacement DIP Facility.

5.      The Replacement DIP Facility is the result of extensive marketing and hard-fought negotiations with numerous potential lenders.  The Debtors kept both the Ad Hoc Group and the Committee fully informed throughout the marketing and negotiation process, and the Debtors understand that both the Committee and an ad hoc committee of shareholders are supportive of the Debtors' entry into the Replacement DIP Facility and the payoff of the Original DIP Facility prior to final approval thereof.  The Replacement DIP Facility provides the Debtors with up to 15 months of runway and significant flexibility, particularly as the Replacement DIP Facility has no plan-related milestones and is not conditioned on seeking approval of any specific chapter 11 plan.  It also contains economic terms that are reasonable and generally superior to those provided under the Original DIP Facility.  Its terms were also better than any alternative proposal the Debtors received.  The Replacement DIP Facility lays the foundation on which the Debtors will seek to negotiate a consensual chapter 11 plan with all of their key constituents and maximize value for all stakeholders.

6.      Approval of the DIP orders (the "**Replacement DIP Orders**") on an interim and ultimately final basis, will enable the Debtors to pay off the Original DIP Facility and is the best source of postpetition financing currently available to the Debtors.  Absent paying off the Original DIP Facility or obtaining a final order approving the Original DIP Facility (including the roll-up contemplated thereby) by February 2, 2023, the Debtors would be in default under the Original DIP Facility.  The Debtors do not believe it is prudent to proceed with approval of the

4

**Ad Hoc Equity Group Exhibit 7**

**4**

Original DIP Facility on a final basis given the availability of the superior Replacement DIP Facility. As the Debtors do not have the cash on hand to pay off the Original DIP Facility and still have liquidity to operate their business, the Debtors need authority to enter into the Replacement DIP Facility on an interim basis to avoid immediate and irreparable harm.

7.    Additional information regarding the Replacement DIP Facility is set forth in the *Declaration of John Singh in Support of Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Replacement Senior Secured Non-priming Replacement Superpriority Postpetition Financing, (B) Use Cash Collateral, and (C) Pay Off Existing Postpetition Financing Facility, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to The Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief*, sworn to the date hereof (the "**Second Singh Declaration**"), the *Declaration of Rodi Blokh in Support of Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Replacement Senior Secured Non-priming Superpriority Postpetition Financing, (B) Use Cash Collateral, and (C) Pay Off Existing Postpetition Financing Facility, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief*, sworn to on the date hereof (the "**Blokh Declaration**"), and *Declaration of Russell Cann in Support of Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Replacement Senior Secured Non-priming Replacement Superpriority Postpetition Financing, (B) Use Cash Collateral, and (C) Pay Off Existing Postpetition Financing Facility, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III)*

**Ad Hoc Equity Group Exhibit 7**

**5**

*Granting Adequate Protection to The Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief*, sworn to on the date hereof (the "**Cann Declaration**").[3]

## Relief Requested

8.      By this Motion, pursuant to sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014, the Bankruptcy Local Rules, and the Complex Case Procedures, the Debtors request entry of the Proposed Replacement Interim DIP Order, as attached hereto as **Exhibit A**:

(a)      authorizing the Debtors to obtain postpetition financing on a superpriority, non-priming, senior secured basis and the loans made, advanced or deemed advanced in the form of a non-amortizing multiple-draw term-loan Replacement DIP Facility, pursuant to which (i) an aggregate principal amount of $35 million shall be borrowed in a single borrowing on the Closing Date (as defined in the Replacement DIP Term Sheet (as defined below)), and (ii) following entry of the Replacement Final DIP Order (as defined below), the remaining aggregate principal amount under the Replacement DIP Facility shall be available, in one or more borrowings (each such borrowing, including the Interim DIP Borrowing, a "**Replacement DIP Borrowing**," and, collectively, the "**Replacement DIP Borrowings**"), and, in each case, in accordance with and subject to the terms and conditions (including any conditions precedent to each of the Replacement DIP Borrowings) set forth in the term sheet attached to the Proposed Replacement Interim DIP Order as **Exhibit 1** (the "**Replacement DIP Term Sheet**"), that certain *Commitment Letter*, dated as of January 29, 2023, by and between Core Scientific and the Replacement DIP Lender attached to the Proposed Replacement Interim DIP Order as **Exhibit 2** (the "**Commitment Letter**"), and, subject to entry of the Replacement Final DIP Order, on a final basis pursuant to a loan agreement (the "**Replacement DIP Credit Agreement**," and, together with all other agreements, guarantees, pledge, collateral and security agreements, mortgages, deeds, charges, control agreements, instruments, certificates, notes, any separate fee letter agreements between any of the Debtors, on the one hand, and the Replacement DIP Agent and/or the Replacement DIP Lender, on the other hand, and other documents executed, filed and/or delivered in connection therewith, including the

---

[3]  The Debtors have been in communication with the equipment lenders that filed objections to the Original DIP Facility to determine if they would continue to assert similar objections to the Replacement DIP Facility. The Debtors believe that most, if not all, of the equipment lenders will be supportive of interim approval of the Replacement DIP Facility to replace the Original DIP Facility. However, given the lack of finality on this point, the Debtors submit the Cann Declaration as evidence against the equipment lenders' assertions (without evidence) that the mining equipment is likely to decline in value.

**Ad Hoc Equity Group Exhibit 7**

Replacement DIP Term Sheet, collectively, the "**Replacement DIP Loan Documents**"), by and among Core Scientific, Inc., and its debtor affiliates as borrowers (the "**Replacement DIP Borrowers**"), each of the direct and indirect subsidiaries of Core Scientific, Inc. that are or become debtors in the Chapter 11 Cases, as guarantors (collectively, the "**Replacement DIP Guarantors**," and together with the Replacement DIP Borrowers, the "**Replacement DIP Loan Parties**"), B. Riley, as administrative agent and collateral agent (in such capacities, together with its successors and permitted assigns, the "**Replacement DIP Agent**"), and the lender party thereto (the "**Replacement DIP Lender**," and together with the Replacement DIP Agent, the "**Replacement DIP Secured Parties**") and the Proposed Replacement Interim DIP Order;

(b)     authorizing the Replacement DIP Loan Parties to (i) perform under the Replacement DIP Term Sheet and execute, deliver, and perform each of the Replacement DIP Loan Documents, (ii) incur all loans, advances, extensions of credit, financial accommodations, indemnification and reimbursement obligations and other obligations, and pay all principal, interest, premiums, fees, costs, expenses, charges and all other amounts payable under the Replacement DIP Loan Documents, whenever the same shall become due or payable, whether at stated maturity, by prepayment, declaration, acceleration or otherwise, in each case, in accordance with the Replacement DIP Loan Documents and the Proposed Replacement Interim DIP Order (collectively, the "**Replacement DIP Obligations**"), and (iii) perform such other and further acts as may be necessary, required or desirable to implement and effectuate the terms of this Interim Order, the Replacement DIP Loan Documents and the transactions contemplated hereunder and thereunder;

(c)     authorizing the Replacement DIP Borrowers to incur, and the Replacement DIP Guarantors to jointly and severally guarantee, all Replacement DIP Obligations, in accordance with the Proposed Replacement Interim DIP Order and the Replacement DIP Loan Documents;

(d)     granting to the Replacement DIP Agent, for the benefit of itself and the other Replacement DIP Secured Parties, the Replacement DIP Liens (as defined below) in all Replacement DIP Collateral (as defined below), as set forth in the Proposed Replacement Interim DIP Order, subject to the Carve-Out and subject to the relative priorities set forth in the Proposed Replacement Interim DIP Order;

(e)     granting to the Replacement DIP Agent, for the benefit of itself and the other Replacement DIP Secured Parties, allowed super-priority administrative expense claims against each of the Debtors, on a joint and several basis, in respect of all Replacement DIP Obligations, subject in each case to the Carve-Out, as set forth in the Proposed Replacement Interim DIP Order;

(f)     authorizing the Debtors to use the proceeds of the Replacement DIP Facility, the Replacement DIP Collateral and the Prepetition Secured Notes Collateral (as defined below), including Cash Collateral (as defined below), solely in accordance

7

**Ad Hoc Equity Group Exhibit 7**

with the terms and conditions set forth in the Proposed Replacement Interim DIP Order and the Replacement DIP Loan Documents, including the Approved Budget (as defined below), subject to any variances expressly permitted under the Replacement DIP Term Sheet (the "**Permitted Variances**");

(g) authorizing the Debtors to irrevocably repay in full all obligations outstanding under that certain *Senior Secured Super-Priority Debtor in Possession Loan and Security Agreement*, dated as of December 22, 2022, as filed with the Court on December 28, 2022 (Docket No. 188) (as modified, the "**Original DIP Credit Agreement**" by and among the lenders from time to time party thereto (the "**Original DIP Lenders**"), the Administrative Agent (as defined therein) (the "**Original DIP Agent**"), and the postpetition financing facility provided thereby (the "**Original DIP Facility**")) with the proceeds from the Replacement DIP Facility as soon as practicable upon funding and terminating all liens granted to the Original DIP Agent and the Original DIP Lenders;

(h) granting adequate protection, as and to the extent set forth in the Proposed Replacement Interim DIP Order, to the Prepetition Secured Parties (as in the Proposed Replacement Interim DIP Order) to protect against any Diminution in Value (as defined in the Proposed Replacement Interim DIP Order) of their respective Prepetition Notes Liens (as in the Proposed Replacement Interim DIP Order) in the Prepetition Secured Notes Collateral (including Cash Collateral);

(i) approving certain stipulations, waivers, and releases by the Debtors with respect to, *inter alia*, the Replacement DIP Secured Parties, the Replacement DIP Loan Documents, the Replacement DIP Liens, the Replacement DIP Obligations and the Replacement DIP Collateral, in each case, subject to the terms and provisions of the Proposed Replacement Interim DIP Order;

(j) approving the Debtors' waiver of the right to surcharge the Replacement DIP Collateral as to the Replacement DIP Secured Parties, pursuant to section 506(c) of the Bankruptcy Code or otherwise, upon the terms set forth in the Proposed Replacement Interim DIP Order;

(k) approving the Debtors' waiver of the equitable doctrine of "marshaling" and other similar doctrines with respect to the Replacement DIP Collateral as to the Replacement DIP Secured Parties;

(l) modifying or vacating the automatic stay imposed by sections 105(a) and 362 of the Bankruptcy Code or otherwise, to the extent necessary, required or desirable to implement and effectuate the terms and provisions of the Proposed Replacement Interim DIP Order and the Replacement DIP Loan Documents, as set forth herein, waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the Proposed Replacement Interim DIP Order, providing for the immediate effectiveness of the Proposed Replacement Interim DIP Order, and granting related relief; and

**Ad Hoc Equity Group Exhibit 7**
8

WEIL:\98991236\11\39031.0011

(m)    scheduling a final hearing (the "**Final Hearing**") on the Motion to consider entry of an order (the "**Replacement Final DIP Order**") authorizing the relief requested in the Motion on a final basis, which order shall be in form and substance and on terms and conditions reasonably acceptable in all respects to the Replacement DIP Lender and Replacement DIP Agent in accordance with the Replacement DIP Term Sheet, and approving the form of notice with respect to such Final Hearing.

## Summary of Terms of Replacement DIP Facility[4]

9.    In accordance with Rules 4001(b)-(d) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and the *Procedures for Complex Cases in the Southern District of Texas* (the "**Complex Case Procedures**"), as incorporated by Rule 1075-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "**Bankruptcy Local Rules**"), the below chart summarizes the significant terms of the Proposed Replacement Interim DIP Order and the Replacement DIP Facility.  Any capitalized terms used herein but not defined shall be used as defined in the Commitment Letter or the Replacement DIP Term Sheet, as applicable.

| MATERIAL TERMS | | LOCATION |
|---|---|---|
| **Borrower** Bankruptcy Rule 4001(c)(1)(B) | Core Scientific, Inc., Core Scientific Acquired Mining LLC, Core Scientific Operating Company, Core Scientific Specialty Mining (Oklahoma) LLC, American Property Acquisition, LLC, American Property Acquisitions I, LLC, American Property Acquisition VII, LLC, Radar Relay, Inc., Starboard Capital LLC, RADAR LLC and Core Scientific Mining LLC. (the "**Borrowers**") | Proposed Replacement Interim DIP Order Preamble

Replacement DIP Term Sheet - #1. |
| **Guarantors** Bankruptcy Rule 4001(c)(1)(B) | Core Scientific Acquired Mining LLC, Core Scientific Operating Company, Core Scientific Specialty Mining (Oklahoma) LLC, American Property Acquisition, LLC, American Property Acquisitions I, LLC, American Property Acquisition VII, LLC, Radar Relay, Inc., Starboard | Proposed Replacement Interim DIP |

---

[4] This summary is qualified in its entirety by reference to the applicable provisions of the Replacement DIP Documents.  To the extent there exists any inconsistency between this summary and the provisions of the Replacement DIP Documents or the Replacement DIP Orders, the provisions of the Replacement DIP Documents or the Replacement DIP Orders, as applicable, shall control.  Any capitalized terms used but not otherwise defined in these summaries shall have the respective meanings ascribed to such terms in the Replacement DIP Documents and/or the Replacement Interim DIP Order, as applicable.  The Debtors reserve the right to supplement the statements made pursuant to Bankruptcy Rule 4001 and Local Rule 4001–2 herein.

Furthermore, certain Replacement DIP Documents have not yet been finalized as of the time of filing of this Motion. Accordingly, the summaries reflect the current state of the relevant provisions and are subject to change.

9

**Ad Hoc Equity Group Exhibit 7**

| MATERIAL TERMS | | LOCATION |
|---|---|---|
| | Capital LLC, RADAR LLC and Core Scientific Mining LLC. and any future subsidiaries of Core Scientific, Inc. that become debtors in the Chapter 11 Cases (the "**DIP Guarantors**") | Order, Preamble.<br><br>Replacement DIP Term Sheet - #2 |
| **Initial DIP Lender** Bankruptcy Rule 4001(c)(1)(B) | B. Riley Commercial Capital, LLC | Replacement DIP Term Sheet - #3 |
| **DIP Agent** Bankruptcy Rule 4001(c)(1)(B) | B. Riley Commercial Capital, LLC | Replacement DIP Term Sheet - #3 |
| **DIP Facility and Borrowing Limits** Bankruptcy Rule 4001(c)(1)(B) | Replacement DIP Facility to include a non-amortizing super-priority senior secured term loan facility in an aggregate principal amount not to exceed $70 million consisting of up to $70 million in term loan commitments, of which (1) $35 million will be available to the Borrowers in a single draw of Replacement DIP Loans following the entry of the Proposed Replacement Interim DIP Order and prior to the entry of the Replacement Final DIP Order (the "**Initial Draw**") and (2) following entry of the Replacement Final DIP Order, the remaining amount of the then undrawn Replacement DIP Facility shall be available to the Debtors (the "**Other Draws**"), in each case in accordance with and ssubject to compliance with the terms, conditions and covenants described in Replacement DIP Term Sheet and in the DIP Documents (the Replacement DIP Lender's commitments under the Replacement DIP Facility being the "**Replacement DIP Commitments**" and the loans under the Replacement DIP Facility being the "**Replacement DIP Loans**").<br><br>The Replacement DIP Facility shall be used to permanently decrease the Replacement DIP Commitments and Replacement DIP Loans repaid (for any reason) may not be reborrowed unless (and solely to the extent that) they are repaid prior to the entry of the Replacement Final DIP Order. | Proposed Replacement Interim DIP Order, Preamble.<br><br>Replacement DIP Term Sheet - #4-6 |
| **Budget** Bankruptcy Rule 4001(c)(1)(B) | The Debtors have prepared and delivered to the Replacement DIP Secured Parties the initial itemized cash flow forecast set forth on Exhibit 4 attached hereto, which has been approved by the Replacement DIP Lender (the "Initial Budget," as amended, supplemented or updated by the Debtors, and approved by the Replacement DIP Lender, from time to time in accordance with the terms of the Proposed Replacement Interim DIP Order and the Replacement DIP Term Sheet or Replacement DIP Credit Agreement, as applicable, the "**Approved Budget**"), reflecting, on a line item, cumulative and aggregate basis, the Debtors' projected cash receipts expected to be collected, and necessary disbursements and expenditures (including debt service costs) expected to be incurred or made, by the Debtors for each calendar week during the period from the calendar week ending on the Friday of the week in which the Court enters the Proposed Replacement Interim DIP Order through and including the week ending June 30, 2023. The Initial Budget is an integral part of the Proposed Replacement Interim DIP Order, and the Replacement DIP Secured Parties are relying, in part, upon the Debtors' agreement to comply with the Approved Budget (subject to Permitted Variances) in determining to enter | Proposed Replacement Interim DIP Order, ¶ H,<br><br>Replacement DIP Term Sheet #13, 22 |

**Ad Hoc Equity Group Exhibit 7**

WEIL:\98991236\11\39031.0011

| MATERIAL TERMS | LOCATION |
|---|---|
| | into the Replacement DIP Facility and to allow the Debtors' use of proceeds of the Replacement DIP Facility in accordance with the terms of the Proposed Replacement Interim DIP Order and the Replacement DIP Loan Documents.<br><br>The Initial Budget is attached to the Proposed Replacement Interim DIP Order as **Exhibit 4**. | |
| **Interest Rate**<br>Bankruptcy Rule 4001(c)(1)(B) | The "Applicable Rate" on the Replacement DIP Facility is 10% per annum, payable in kind in arrears on the first day of each month.<br><br>The Default Rate with respect to the Replacement DIP Loans is the Applicable Rate plus 2.00% per annum.<br><br>As of the occurrence of, and at all times during the continuance of, any Insolvency Proceeding with respect to any Obligor, or any other Event of Default (including if any Loans or other Obligations (or portion thereof) shall remain unpaid as of the Termination Date), all outstanding Loans and overdue Obligations shall automatically accrue interest at the Default Rate (whether before or after any judgment), until Full Payment thereof. | Replacement DIP Term Sheet - #9 |
| **Expenses and Fees**<br>Bankruptcy Rule 4001(c)(1)(B) | *Monthly Replacement DIP Agent Fee.* $75,000 per month payable, in cash advance, to the Replacement DIP Agent for its sole account and benefit, on the Closing Date and the first business day of each calendar month thereafter.<br><br>*Upfront Premium.* 3.50% (paid-in-kind) of Replacement DIP Loans under the Replacement DIP Facility, accrued and earned on the date upon entry of the Proposed Replacement Interim DIP Order.<br><br>*Extension Fee.* 3.50% in cash of the aggregate loans outstanding on the date the Borrowers extend the Maturity Date of all obligations under the Replacement DIP Facility by an additional three (3) months.<br><br>*Exit Premium.* Following the entry of the Proposed Replacement Interim DIP Order, upon and concurrently with the repayment or satisfaction of the Replacement DIP Loans in whole or in part, the Borrowers shall pay to the Replacement DIP Agent, in cash, 5.00% of the amount of the Replacement DIP Loans being repaid, reduced or satisfied.<br><br>In addition to the above fees, the Proposed Replacement Interim DIP Order provides that the Replacement DIP Loan Parties are authorized and directed to pay any and all (i) amounts due (or that may become due) in respect of any and all indemnification obligations under the Replacement DIP Loan Documents, and (ii) any other amounts payable in connection with the Replacement DIP Facility and the Prepetition Secured Notes, including the payment of all out-of-pocket costs, expenses and disbursements of the Replacement DIP Secured Parties and Prepetition Secured Parties, including the reasonable and documented fees and expenses of (A)(1) Choate, Hall & Stewart LLP ("**Choate**"), as counsel to the Replacement DIP Secured Parties and (2) any other professionals that | Proposed Replacement Interim DIP Order, ¶ 2.<br><br>Replacement DIP Term Sheet - #10 - 11 |

**Ad Hoc Equity Group Exhibit 7**

WEIL:\98991236\11\39031.0011

| MATERIAL TERMS | LOCATION |
|---|---|
| | |

| | | MATERIAL TERMS | LOCATION |
|---|---|---|---|

|  | may be retained by the Replacement DIP Lender (with the consent of the Replacement DIP Borrowers, such consent not to be unreasonably withheld or delayed, which consent of the Replacement DIP Borrowers shall not be required after the occurrence of a DIP Termination Event (as defined below) (collectively, the "**DIP Professional Fees and Expenses**")) and (B) the Noteholder Professional Fees and Expenses (as defined in the section "Liens, Cash Payments or Adequate Protection Provided for Use of Cash Collateral" below). |  |
| **Maturity Date; Duration for Use of Replacement DIP Collateral** Bankruptcy Rule 4001(c)(1)(B) | The Maturity Date shall be the earliest of: <br><br> i. the date that is twelve (12) months after the Petition Date; *provided*, that the Borrowers shall be permitted to extend such date by three (3) months upon paying the DIP Agent the Extension Fee, in cash (any such date being the "**Scheduled Maturity Date**") <br><br> ii. the effective date of any chapter 11 plan of reorganization with respect to the Borrowers or any other Debtor (a "**Plan**"); <br><br> iii. the consummation of any sale or other disposition of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code; <br><br> iv. the date of the acceleration of the DIP Loans and the termination of the DIP Commitments in accordance herewith or with the DIP Documents; <br><br> v. the date of the DIP Agent's written notice to the Borrowers of the occurrence of an Event of Default (as defined below) under the DIP Facility; <br><br> vi. dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code; and <br><br> vii. 30 days after the date on which the Motion is filed (or such later date as agreed to by the DIP Agent), unless the Replacement Final DIP Order has been entered by the Bankruptcy Court on or prior to such date (such earliest date, the "**DIP Termination Date**"). | Replacement DIP Term Sheet - #7 |
| **Prepayments** Bankruptcy Rule 4001(c)(1)(B) | <u>Voluntary Prepayments</u>: The Replacement DIP Loans may be prepaid at any time, after entry of the Replacement Final DIP Order, subject to payment of the Exit Premium <u>provided</u>, that, any Replacement DIP Loans voluntarily prepaid prior to the Final Order may be re-drawn after entry into the Final Order. <br><br> <u>Mandatory Prepayments</u>: Mandatory prepayment of the Replacement DIP Loans together with all previously uncapitalized interest then accrued and owing on such portion of the Replacement DIP Loan then being prepaid, including any Exit Premium shall be required from: <br><br> 1. Net proceeds from any sale, sale/leaseback, sublease of any real estate (or interests therein) identified in the Replacement DIP Term Sheet; and | Replacement DIP Term Sheet - #15 |

**Ad Hoc Equity Group Exhibit 7**

**12**

WEIL:\98991236\11\39031.0011

| MATERIAL TERMS | LOCATION |
|---|---|
| 2.  Any Excess Cash (meaning any cash on hand (other than in the Carve-out Account)) in excess of $50 million as at the last day of each month, such prepayment being required on the fifth (5th) Business Days of each calendar month.<br><br>Such prepayments, in each case, shall be applied first to any previously uncapitalized interest then accrued and owing on such portion of the Replacement DIP Loan then being prepaid, second, to payment of any Exit Premium, third, to any accrued and unpaid fees and expenses owing to the Replacement DIP Agent or the Replacement DIP Lenders which are then due and owing and fourth, to the unpaid principal amount of the Replacement DIP Loans then outstanding. | |

| | MATERIAL TERMS | LOCATION |
|---|---|---|
| **Conditions to Closing**<br>Bankruptcy Rule 4001(c)(1)(B) | The closing and the obligation of the Replacement DIP Lender to make the Initial Draw includes usual and customary for financings of this type, including, among other things:<br><br>(a)  entry of the Interim Order, which order shall not be stayed or subject to appeal;<br><br>(b)  delivery of the Initial Budget and any subsequent Budget as applicable;<br><br>(c)  the payment in full of the obligations under, and the termination of, the Existing DIP Credit Agreement (as defined below) and the inclusion in the Interim Order of provisions terminating all liens granted to the agent and lenders thereunder effective as of the date of the Proposed Replacement Interim DIP Order;<br><br>(d)  customary stipulations by the Debtors and their estates disclaiming the existence of any claims or causes of action against each of the DIP Agent and DIP Lender, subject to a customary challenge period by the official committee of unsecured creditors; and<br><br>(e)  delivery by the Debtors of the notice of intent to terminate referenced in section 6(b)(ii) of the Restructuring Support Agreement dated as of December 22, 2022 entered into between the Debtors and the Consenting Creditors (as defined therein) (the "**RSA**") to the Ad Hoc Group Advisors (as defined in the RSA) (it being agreed that a copy of such notice shall have been provided to the Replacement DIP Agent for its review and reasonable comment prior to the Debtors' delivery thereof, as well as a final copy of such notice as so delivered by the Debtors).<br><br>The right of the Loan Parties to request, and the obligation of the DIP Lenders to advance, any Other Draws, shall also be subject to certain closing conditions, including, but not limited to:<br><br>(a)  execution and delivery of a credit agreement (the "**DIP Credit Agreement**") and other Replacement DIP Documents evidencing the Replacement DIP Facility, in each case, which shall be in form and substance substantially consistent with the Term Sheet and otherwise in form and substance acceptable to | Replacement DIP Term Sheet - #17, 18 |

**Ad Hoc Equity Group Exhibit 7**

WEIL:\98991236\11\39031.0011

| MATERIAL TERMS | LOCATION |
|---|---|

| | | |
|---|---|---|
| | the Replacement DIP Agent and the Replacement DIP Lender and the Borrowers and the Guarantors;<br><br>(b)  not later than 30 days following the date on which a motion to approve the Replacement DIP Facility is filed, the Proposed Replacement Final DIP Order as to the Replacement DIP Facility shall have been entered by the Bankruptcy Court, which the Proposed Replacement Final DIP Order shall be in the form of the Interim Order with such changes as are customary for a final order and such other changes as the DIP Agent may reasonably require and/or the parties may mutually agree, in all cases, to be acceptable to the Replacement DIP Agent; and<br><br>(c)  The RSA shall have been fully terminated and shall be of no further force or effect. | |
| **Superpriority Expense Claims**<br>Bankruptcy Rule 4001(c)(1)(B)(i) | Subject to the Carve Out, the Replacement DIP Agent and Replacement DIP Lenders are granted DIP Superpriority Claims granted on account of all Replacement DIP Obligations | Proposed Replacement Interim DIP Order, ¶ 7.<br><br>Replacement DIP Term Sheet - #23 |
| **Collateral and Priority**<br>Bankruptcy Rule 4001(c)(1)(B)(i), 4001(c)(1)(B)(ii) | Subject to the Carve-Out, all Replacement DIP Obligations in respect of the Replacement DIP Facility shall be:<br><br>1.  secured, pursuant to Section 364(c)(2) of the Bankruptcy Code, by a valid, enforceable, fully perfected and automatic first priority lien on all property and assets (or interests therein) of the Borrowers' and the Guarantors' estates (whether tangible, intangible, real, personal or mixed and wherever located) as of the Petition Date that, as of the Petition Date, was unencumbered (the "**First Priority DIP Collateral**"); including, without limitation, all real property and the facility located in Marble, North Carolina; and<br><br>2.  secured, pursuant to Section 364(c)(3) of the Bankruptcy Code, by a valid, enforceable, fully perfected and automatic junior priority lien on all property (or interest therein) of the Borrowers' and Guarantors' estates (whether tangible, intangible, real, personal or mixed and wherever located) as of the Petition Date that (and subject and junior only to that):<br><br>    a.  is subject to valid, perfected, and nonavoidable liens in existence as of the Petition Date (including mortgages, mechanics' liens and fixture filings disclosed to the Replacement DIP Agent and the Replacement DIP Lender); limited, with respect to all real property and the facilities, to those located in:<br><br>        i.  Calvert City, Kentucky; | Proposed Replacement Interim DIP Order, ¶ 6.<br><br>Replacement DIP Term Sheet - #16 |

14

**Ad Hoc Equity Group Exhibit 7**

WEIL:\98991236\11\39031.0011

| MATERIAL TERMS | LOCATION |
|---|---|

<table>
<tr><td></td><td>

      ii.   Grand Forks, North Dakota;

     iii.   Muskogee, Oklahoma;

     iv.   Barstow, Texas (Cedarvale);

     v.   Pecos, Texas (Cottonwood); and

     vi.   Dalton, Georgia; and

    b.   is subject to valid liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code (this clause (2) being collectively, the "**Second Priority DIP Collateral**" and together with the First Priority DIP Collateral, the "**Replacement DIP Collateral**"); provided, however, that any Replacement DIP Liens (as defined below) in already encumbered collateral shall be junior to any adequate protection liens granted to existing creditors secured by such collateral.

    3.   upon entry of the Final Order, the proceeds of any causes of actions for preferences, fraudulent conveyances, and other avoidance power claims under sections 502(d), 544, 545, 547, 548, and 550 of the Bankruptcy Code (the "**Avoidance Actions**") (but not, for the avoidance of doubt, the Avoidance Actions themselves), and

    4.   any and all rents, issues, products, offspring, proceeds, and profits generated by any item of DIP Collateral, without the necessity of any further action of any kind or nature by the Replacement DIP Agent or the Replacement DIP Lender in order to claim or perfect such rents, issues, products, offspring, proceeds, and/or profits.

The DIP Liens shall be subject to the following priorities (subject in each case to the Carve-Out):

    1.   <u>First-Priority Liens on Unencumbered Property</u>.  Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected first-priority liens and security interests in all First-Priority DIP Collateral (the "Frist-Priority DIP Liens"), which First-Priority DIP Liens shall be junior and subordinated only to the Carve-Out.

    2.   <u>Liens Junior to Certain Other Liens</u>.  Pursuant to sections 364(c)(3) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected liens and security interests in all Junior-Priority DIP Collateral (the "Junior-Priority DIP Liens"), which Junior-Priority DIP Liens in such Junior Priority DIP Collateral shall be subject only to the (a) Carve-Out, in all respects, and, as applicable (b)(1) the Prior Senior Liens, (2) the Equipment

</td><td></td></tr>
</table>

15

WEIL:\98991236\11\39031.0011

| MATERIAL TERMS | LOCATION |
|---|---|
| | Lender Adequate Protection Liens, (3) the Prepetition Notes Liens, and (4) the Noteholder Adequate Protection Liens.<br><br>The liens securing the Replacement DIP Facility (the "**Replacement DIP Liens**") shall mean the liens described above.  The Replacement DIP Liens described herein shall, to the fullest extent permitted by applicable law, be effected and perfected upon entry of the Proposed Replacement Interim DIP Order and without the necessity of the execution of mortgages, landlord agreements, security agreements, pledge agreements, control agreements, financing statements or other agreements. | |
| **Covenants**<br>Bankruptcy Rule 4001(c)(1)(B) | Affirmative Covenants: Usual and customary affirmative covenants for financings of this type including stipulations to, among other things:<br><br>1.  Permitting Administrative Agent to inspect properties of the Debtor;<br><br>2.  Keep adequate records and books of account with respect to its business activities and furnish same to Administrative Agent;<br><br>3.  Provide notice of certain legal and pending legal actions against the Debtors;<br><br>4.  Comply will all Applicable Laws;<br><br>5.  Continue paying obligations and taxes and comply with applicable law in all material respects;<br><br>6.  Maintain satisfactory insurance;<br><br>7.  Keep each License affecting any collateral;<br><br>8.  Deliver updated budgets, cash flow forecasts, and variance reports;<br><br>9.  the Loan Parties and the Replacement DIP Agent agree to discuss in good faith with potential providers thereof and the Replacement DIP Agent an agreement to provide for forward sales or hedging agreements with respect to the Loan Parties' Bitcoin present and anticipated Bitcoin inventory; and<br><br>10. the Loan Parties shall covenant and agree to timely and diligently pursue and prosecute the termination of the RSA and to take such actions as are required pursuant to the terms of the RSA to effect the such termination by a date no later than the date the Replacement Final DIP Order is entered.<br><br>Negative Covenants: Usual and customary negative covenants for financings of this type including stipulations to not, among other things, other than in accordance with the Replacement DIP Loan Agreement:<br><br>1.  Incur, create, assume, or permit indebtedness generally except Permitted Debt; | Replacement DIP Term Sheet - #20, 21 |

16

**Ad Hoc Equity Group Exhibit 7**

16

| MATERIAL TERMS | LOCATION |
|---|---|
|    2. Create, incur, assume, or permit existence of any liens on any property or assets, except for Permitted Liens;<br><br>   3. Declare or make any Distributions, except as permitted under the Replacement DIP Loan Agreement;<br><br>   4. Make any Restricted Investment;<br><br>   5. Make any Asset Disposition, except a Permitted Asset Disposition;<br><br>   6. Make any payment or any Creditor Distribution with respect to any Debt, except payments to the extent permitted by, and made in accordance with, the Approved Budget or Replacement DIP Order;<br><br>   7. The Loan Parties shall not take, participate or support any action, motion or claim to rescind its termination of, or to continue or reinstate the RSA, or shall cease or fail to take the actions specified in Affirmative Covenant 10 above; and<br><br>   8. It is agreed that such covenants will permit (a) sales of (i) Bitcoin in the ordinary course and (ii) non-core assets (it being agreed that non-core assets shall NOT include the Debtors' real estate listed in Section 16 of the Replacement DIP Term Sheet) and, with the Replacement DIP Agent's prior consent, the Debtors' real estate listed in Section 16 of the Replacement DIP Term Sheet, so long as, in each case, net proceeds (including reductions to satisfy claims of other lienholders with respect to such assets including amounts to be escrowed or otherwise required to be held back or segregated by the Bankruptcy Court) thereof are used to repay the Replacement DIP Obligations (including any applicable Exit Premium) and (b) (i) transactions with respect to miners and equipment in the ordinary course of business and (ii) subject to the consent of the Replacement DIP Agent (subject to thresholds to be agreed) (x) the ability to reject or modify contracts, and (y) settlements of litigation.<br><br>Usual and customary financial covenants for financings of this type including stipulations to, among other things:<br><br>   (a) Comply with budget and variance covenants; and<br><br>   (b) Not incur payment obligations or make payment disbursement unless in compliance with the Approved Budget, in compliance with the liquidity and budget covenants, and no Event of Default exists or arises at such time. | |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(1)(B) | Usual and customary events of default for financings of this type, including but not limited to:<br><br>   (a) the entry of the Replacement Final DIP Order shall have not occurred within 30 days after the date the Motion is filed; | Replacement DIP Term Sheet - #26 |

17

**Ad Hoc Equity Group Exhibit 7**

17

| MATERIAL TERMS | LOCATION |
|---|---|
| (b) The failure to pay principal, interest and other amounts when and as required by the Replacement DIP Loan Agreement, subject to certain grace periods, as applicable;<br><br>(c) Any representation or warranty being incorrect when made by or on behalf of any Obligor in connection with any Loan Document in a material respect;<br><br>(d) the entry of an order in any of the Chapter 11 Cases granting relief from any stay or proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed with foreclosure against any material assets of the Loan Parties to which the fair market value of which exceeds $20,000,000; provided, however, that any such order with respect to the assets of either (x) BlockFi Lending LLC ("**BlockFi**") or (y) NYDIG or their affiliates (so long as (i) relating solely to such equipment provided by such party, or in the case of BlockFi, the debt owing to BlockFi pursuant to its agreements as in effect prior to the Petition Date and (ii) such arrangement shall not result in the improvement or enhancement of such party's claims in the Chapter 11 Cases or security or priority position with respect to any of the Debtors' collateral) shall not be an Event of Default; and<br><br>(e) The RSA is not fully and finally terminated and/or has not ceased to be in full force and effect on or prior to the date upon which the Final Order is to be entered; | |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)(vi) | None.<br><br>The Final Replacement DIP Order must be entered into by no later than 30 days following the filing of the Motion. | Replacement DIP Term Sheet - #18, 27 |
| **Carve Out**<br>Bankruptcy Rule 4001(b)(1)(B)(iii) | Equal to the sum of:<br><br>(i) all fees required to be paid to the clerk of the Court and to the U.S. Trustee plus interest at the statutory rate;<br><br>(ii) all reasonable and documented fees and expenses, in an aggregate amount not to exceed $50,000, incurred by a trustee;<br><br>(iii) to the extent allowed at any time, whether by interim order, final order, or other order, all accrued but unpaid fees and expenses (excluding any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors) (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "**Debtor Professionals**") and the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**", and together with the Debtor Professionals, the "**Professional Persons**") at any time on or before the date of delivery by the Replacement DIP Agent (at the instruction of the Replacement DIP Lender) of a Carve Out Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Notice (the amounts set | Proposed Replacement Interim DIP Order, ¶ 22.<br><br>Replacement DIP Term Sheet - #25 |

**Ad Hoc Equity Group Exhibit 7**

WEIL:\98991236\11\39031.0011

| MATERIAL TERMS | | LOCATION |
|---|---|---|
| | forth in the foregoing clauses (i), (ii) and (iii), the "**Pre-Carve Out Notice Amount**"); and<br><br>(iv) Allowed Professional Fees of Professional Persons incurred after the date of delivery by the Replacement DIP Agent (at the instruction of the Replacement DIP Lender) of the Carve Out Notice, to the extent allowed at any time, whether by interim order, final order, or other court order, in an aggregate amount not to exceed $2.0 million (the amount set forth in this clause (iv) being the "**Post-Carve Out Notice Amount**", and together with the Pre-Carve Out Notice Amount, the "**Carve Out Amount**"). | |
| **Terms of Use and Purposes for Use of DIP Proceeds and Cash Collateral**<br>Bankruptcy Rule 4001(c)(1)(B) | The proceeds of the Replacement DIP Facility shall be used only for the following purposes and, in the case of payments pursuant to clauses (ii), (iii), and (iv) below, subject to the Budget, the Carve-Out and any permitted variances as set forth below<br><br>i.      Payment in full of the obligations under that certain senior secured super-priority debtor-in-possession loan and security agreement, dated as of December 22, 2022 (the "Existing DIP Credit Agreement"), among the Borrowers, the lenders party thereto from time to time and Wilmington Savings Fund Society, FSB, as administrative agent, including, without limitation, any fees, premiums, costs or expenses related thereto; it being agreed that such amounts shall be payable from the Borrowers' existing cash at such time (including the Initial Draw);<br><br>ii.      working capital and other general corporate purposes of the Borrowers and the Guarantors and certain subsidiaries;<br><br>iii.      any adequate protection payments in accordance with the Proposed DIP Orders;<br><br>iv.      professional fees and expenses of administering the Chapter 11 Cases, to the extent the Bankruptcy Court authorizes payment (including fees incurred prior to the Closing Date);<br><br>v.      fees and expenses payable under the DIP Facility;<br><br>vi.      interest and other amounts payable under the DIP Facility; and<br><br>vii.      funding of the Carve-out Account.<br><br>Proceeds of the Replacement DIP Loans and Cash Collateral may not be used for certain enumerated purposes that are contrary to the rights and interests of the Prepetition Secured Parties and Replacement DIP Secured Parties (e.g., for investigations and litigation against such parties, incurring indebtedness without prior consent of the Replacement DIP Agent, etc.). | Replacement DIP Term Sheet - #13<br><br>Proposed Replacement Interim DIP Order, ¶ 24. |
| **Parties with an Interest in Cash Collateral**<br>Bankruptcy Rule 4001(b)(1)(B)(i) | Prepetition Secured Parties | Proposed Replacement Interim DIP Order, ¶ 12. |

19

**Ad Hoc Equity Group Exhibit 7**

19

| MATERIAL TERMS | LOCATION |
|---|---|
| **Liens, Cash Payments or Adequate Protection Provided for Use of Collateral and Cash Collateral** Bankruptcy Rule 4001(b)(1)(B)(iv) | <u>Adequate Protection to Prepetition Secured Parties.</u> The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their Prepetition Liens in Prepetition Collateral (including Cash Collateral), as follows (the liens, security interests, payments and other obligations set forth in paragraph **Error! Reference source not found.** of the Proposed Replacement Interim DIP Order are collectively referred to herein as the "**Noteholder Adequate Protection Obligations**"): <br><br> a) *Noteholder Adequate Protection Claims.* The Prepetition Agents, for their own benefit and for the benefit of the Prepetition Secured Noteholders, are hereby granted, in the amount of any aggregate Diminution in Value of the Prepetition Liens in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, superpriority administrative expense claims contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors (the "**Noteholder Adequate Protection Claims**"), which shall be payable by each of the Debtors on a joint and several basis, and shall have recourse to all Replacement DIP Collateral. The Noteholder Adequate Protection Claims shall be (a) subject and subordinate only to the Carve Out and the DIP Superpriority Claims, (b) *pari passu* with the Equipment Lender Adequate Protection Claims (as defined below), and (c) senior to any and all other administrative expense claims and all other claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever. <br><br> b) *Noteholder Adequate Protection Liens.* The Prepetition Agents, for the benefit of themselves and for the benefit of the Prepetition Secured Noteholders, are hereby granted, effective and perfected as of the entry of the Proposed Replacement Interim DIP Order, and without the necessity of the execution, recordation or filing by any of the Prepetition Secured Parties of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title for titled goods, or any similar document or instrument, or the taking of any other action (including entering into any control agreements or taking possession or control of any Prepetition Secured Notes Collateral), in the amount of any aggregate Diminution in Value of the Prepetition Notes Liens in the Prepetition Secured Notes Collateral (including Cash Collateral) from and after the Petition Date, valid, binding, enforceable and automatically perfected postpetition liens and security interests in all DIP Collateral (the "Noteholder Adequate Protection Liens"). The Noteholder Adequate Protection Liens shall be (i) junior and subordinated only to (A) the Carve-Out, (B) the First-Priority DIP Liens, (C) the Prior Senior Liens, and (D) the Equipment Lender Adequate Protection Liens in the Prepetition Equipment Financing Collateral, (ii) *pari passu* with the Equipment Lender Adequate Protection Liens in First-Priority DIP Liens, and (iii) senior to any and all other liens and security | Proposed Replacement Interim DIP Order, ¶ 10, 11, 42. |

20

**Ad Hoc Equity Group Exhibit 7**

20

| MATERIAL TERMS | LOCATION |
|---|---|
| interests in the DIP Collateral, including the Equipment Lender Adequate Protection Liens.<br><br>c) *Noteholder Professional Fees and Expenses.* The Replacement DIP Loan Parties are authorized and directed to pay, without the necessity of filing fee applications with the Court or compliance with the U.S. Trustee's fee guidelines, all of the out of pocket fees, costs and expenses of (i) the Prepetition Agents, including, the reasonable and documented fees and expenses of Shipman & Goodwin LLP, counsel to the Prepetition Agents, and (ii) the fees and expenses of the Ad Hoc Group, including, the reasonable and documented fees and expenses of (A)Paul Hastings LLP, as counsel to the Original DIP Lenders and the Ad Hoc Group and (B) Moelis & Company, LLC ("**Moelis**"), as investment banker and financial advisor to the Original DIP Lenders and the Ad Hoc Group, pursuant to the terms of that certain letter agreement by and among Core Scientific and Moelis (collectively, the "**Noteholder Professional Fees and Expenses**")<br><br>d) *Reporting.* The Debtors shall contemporaneously provide the Prepetition Agents and the Ad Hoc Group (and their respective advisors) with all reports, documents and other information required to be delivered to the Replacement DIP Secured Parties under the Replacement DIP Loan Documents and the Proposed Replacement Interim DIP Order.<br><br>e) *Cash Management Covenant.* The Replacement DIP Loan Parties shall maintain their cash management arrangements in a manner consistent with those described in the applicable "first day" order, which shall be in form and substance reasonably acceptable to the Replacement DIP Lender and the Ad Hoc Group.<br><br>Adequate Protection to Prepetition Equipment Lenders. Pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, as adequate protection of their purported Prepetition Equipment Liens in Prepetition Equipment Collateral, the Prepetition Equipment Lenders shall be entitled to the following:<br><br>a) Equipment Lender Adequate Protection Claims. The Prepetition Equipment Lenders are each hereby granted, in the amount of any aggregate Diminution in Value of the respective purported Prepetition Equipment Liens in Prepetition Equipment Collateral (as applicable) from and after the Petition Date, superpriority administrative expense claims contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors (the "**Equipment Lender Adequate Protection Claims**," together with the Noteholder Adequate Protection Claims, the "**Adequate Protection Claims**"), which shall be payable by each of the Debtors on a joint and several basis, and shall have recourse to all DIP Collateral. The Equipment Lender Adequate Protection Claims shall be (i) subject and subordinate | |

**Ad Hoc Equity Group Exhibit 7**

WEIL:\98991236\11\39031.0011

| MATERIAL TERMS | LOCATION |
|---|---|
| only to the Carve-Out, the DIP Superpriority Claims, and the Noteholder Adequate Protection Claims and (ii) senior to any and all other administrative expense claims and all other claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever.<br><br>b) Equipment Lender Adequate Protection Liens. The Prepetition Equipment Lenders are each hereby granted, effective and perfected as of the entry of the Proposed Replacement Interim DIP Order, and without the necessity of the execution, recordation or filing by the Replacement DIP Loan Parties or any of the Prepetition Equipment Lenders of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title for titled goods, or any similar document or instrument, or the taking of any other action (including entering into any control agreements or taking possession or control of any DIP Collateral), in the amount of any aggregate Diminution in Value of the purported Prepetition Equipment Liens in the Prepetition Equipment Financing Collateral (as applicable) from and after the Petition Date, valid, binding, enforceable and automatically perfected post-petition liens and security interests in all DIP Collateral (the "Equipment Lender Adequate Protection Liens," and together with the Noteholder Adequate Protection Liens, the "Adequate Protection Liens"). The Equipment Lender Adequate Protection Liens shall be (i) junior and subordinated to (A) the Carve-Out, (B) the First-Priority DIP Liens in First-Priority DIP Collateral, (C) the Noteholder Adequate Protection Liens in Prepetition Secured Notes Collateral, and (D) the Prior Senior Liens (other than the Prepetition Equipment Liens that constitute Prior Senior Liens), (ii) *pari passu* with the Noteholder Adequate Protection Liens in the First-Priority DIP Collateral, and (iii) senior to the DIP Liens in Prepetition Equipment Financing Collateral (as applicable) and the Noteholder Adequate Protection Liens in Prepetition Equipment Financing Collateral (as applicable). | |
| **Determination Regarding Prepetition Claims**<br>Bankruptcy Rule 4001(c)(1)(B)(iii) | The Proposed Replacement Interim DIP Order contains stipulations of fact by the Debtors, including those related to the validity and enforceability of the Debtors' prepetition unsecured obligations with the Replacement DIP Lender and secured obligations with respect to the Prepetition Secured Parties. | Proposed Replacement Interim DIP Order, ¶ E, F. |
| **Liens on Avoidance Actions**<br>Bankruptcy Rule 4001(c)(1)(B)(xi) | Subject to entry of the Replacement Final DIP Order, the Replacement DIP Agent and the Replacement DIP Lender will receive a lien on the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code. | Proposed Replacement Interim DIP Order, ¶ 6. |
| **Effect of Debtors' Stipulations on Third Parties**<br>Bankruptcy Rule 4001(c)(1)(B)(iii), (viii) | Subject to the Challenge Period, the stipulations, admissions, agreements, and releases contained in the Proposed Replacement Interim DIP Order shall be binding upon the Debtors, any statutory or non-statutory committees, and all other parties in interest. The "**Challenge Period**", collectively, means the date that is (i) sixty (60) calendar days from the date of entry of the Proposed Replacement Interim DIP Order, (ii) such | Proposed Replacement Interim DIP Order, ¶ 23. |

**Ad Hoc Equity Group Exhibit 7**

| MATERIAL TERMS | LOCATION |
|---|---|
| | later date as has been agreed to in writing by the Replacement DIP Agent (acting at the instruction of the Replacement DIP Lender) and the affected Prepetition Agent (acting at the instruction of the requisite Prepetition Secured Parties under the affected Prepetition Notes Documents), or (iii) such later date as has been ordered by the Court, for cause shown, upon a motion filed with the Court prior to the Initial Challenge Deadline. | |
| **Waiver or Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby vacated and modified, without application to or further order of this Court, to permit: (a) the Replacement DIP Loan Parties to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the Replacement DIP Secured Parties may request to assure the perfection and priority of the DIP Liens, (b) the Replacement DIP Loan Parties to incur all liabilities and obligations to the Replacement DIP Secured Parties as contemplated under the Proposed Replacement Interim DIP Order and the Replacement DIP Loan Documents, (c) the Debtors to grant the Adequate Protection Liens and the Adequate Protection Claims, and to perform such reasonable acts as the Prepetition Agents may reasonably request to assure the perfection and priority of the Adequate Protection Liens, (d) the DIP Loan Parties to incur liabilities and obligations to the Prepetition Secured Parties related to the Adequate Protection Obligations, as contemplated under the Proposed Replacement Interim DIP Order, (e) the Replacement DIP Loan Parties to pay all amounts required hereunder and under the Replacement DIP Loan Documents, (f) the Replacement DIP Secured Parties and the Prepetition Secured Parties to retain and apply payments made in accordance with the terms of the Proposed Replacement Interim DIP Order and the DIP Loan Documents (as applicable), (g) subject to paragraph 20(b) of the Proposed Replacement Interim DIP Order, the Replacement DIP Secured Parties to exercise, upon the occurrence of any DIP Termination Event (as defined below), all rights and remedies provided for in the Proposed Replacement Interim DIP Order, the Replacement DIP Loan Documents, or applicable law, (h) the Replacement DIP Loan Parties to perform under the Proposed Replacement Interim DIP Order and the Replacement DIP Loan Documents, and to take any and all other actions that may be necessary, required or desirable for the performance by the Replacement DIP Loan Parties under the Proposed Replacement Interim DIP Order and the Replacement DIP Loan Documents and the implementation of the transactions contemplated hereunder and thereunder, and (i) the implementation of all of the terms, rights, benefits, privileges, remedies, and provisions of the Proposed Replacement Interim DIP Order and the Replacement DIP Loan Documents.<br><br>The automatic stay shall be modified to the extent necessary to permit the Replacement DIP Agent or the Prepetition Agents to take all actions, as applicable, regarding perfection of Replacement DIP Liens and Adequate Protection Liens.<br><br>The Replacement DIP Loan Parties shall immediately provide notice to counsel to the Replacement DIP Agent, the Replacement DIP Lender, the Prepetition Agents, and the Ad Hoc Group of the occurrence of any DIP Termination Event. Upon the occurrence of a DIP Termination Event, | Proposed Replacement Interim DIP Order Preamble ¶ (f), 15, 16(c), 20(b). |

**Ad Hoc Equity Group Exhibit 7**

WEIL:\98991236\11\39031.0011

| MATERIAL TERMS | LOCATION |
|---|---|
| without further application to or order from the Court, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the Replacement DIP Agent (acting at the instruction of the Replacement DIP Lender) and/or, with respect to clause (vi) below, the Prepetition Agents (acting at the instruction of the requisite Prepetition Secured Parties under the applicable Prepetition Notes Documents), as applicable, to take any of the following actions, at the same or different time: (i) deliver a written notice (which may be via electronic mail) to lead restructuring counsel for the Debtors, the U.S. Trustee and lead restructuring counsel for the Official Committee (the "**Remedies Notice**") declaring the occurrence of a DIP Termination Event (such date, the "**DIP Termination Declaration Date**") and/or deliver a Carve-Out Notice, (ii) declare the termination, reduction or restriction of the commitments under the Replacement DIP Facility (to the extent any such commitment remains), (iii) declare all Replacement DIP Obligations to be immediately due and payable, without presentment, demand or protest or other notice of any kind, all of which are expressly waived by the Replacement DIP Loan Parties, (iv) declare the termination of the Replacement DIP Facility and the Replacement DIP Loan Documents as to any further liability or obligation thereunder, but without affecting the DIP Liens, the DIP Superpriority Claims or the Replacement DIP Obligations, (v) declare the reduction or restriction on the Replacement DIP Facility or the Replacement DIP Loan Documents, (vi) declare the termination, restriction or revocation of the ability of the Debtors to use Cash Collateral, (vii) invoke a Cash Dominion Period and/or sweep all cash or other amounts contained in the DIP Funding Account, and (viii) charge interest at the default rate set forth in the Replacement DIP Credit Agreement; provided that following the occurrence of a DIP Termination Event, prior to the exercise or enforcement of any rights against DIP Collateral or Prepetition Secured Notes Collateral (as the case may be), the Replacement DIP Agent (acting at the instruction of the Replacement DIP Lender) and/or the Prepetition Agents (acting at the instruction of the requisite Prepetition Secured Parties under the applicable Prepetition Notes Documents), as applicable, shall be required to file a motion with the Court on five (5) Business Days' notice (subject to the Court's availability) seeking an emergency hearing (the "**Stay Relief Hearing**") to determine whether a DIP Termination Event has occurred (and the Replacement DIP Loan Parties and the Official Committee shall not object to the shortened notice with respect to such Stay Relief Hearing). In the event the Court determines during a Stay Relief Hearing that a DIP Termination Event has occurred, the Court may fashion an appropriate remedy, which may include, inter alia, the exercise of any and all rights or remedies available to the Replacement DIP Secured Parties under the Proposed Replacement Interim DIP Order, the Replacement DIP Loan Documents or applicable law against the DIP Collateral; provided that the Debtors' rights to contest such relief are expressly preserved. | |
| **Waiver or Modification of Authority to File a Plan, Extend Time to File Plan,** | The limitations on parties' abilities to file a plan, request cash collateral, or request authority to obtain credit without the consent of the Replacement DIP Loan Parties or the Prepetition Loan Parties are still being negotiated. At a minimum, the Debtors may be prohibited from |

24

**Ad Hoc Equity Group Exhibit 7**

24

| MATERIAL TERMS | | LOCATION |
|---|---|---|
| **Request Use of Cash Collateral, or Request Authority to Obtain Credit**<br>Bankruptcy Rule 4001(c)(1)(B)(v) | doing so unless they seek financing that will result in Full Payment of all Replacement DIP Obligations. | |
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien**<br>Bankruptcy Rule 4001(c)(1)(B)(vii) | **DIP Liens.** As security for the prompt and complete payment and performance of all Replacement DIP Obligations when due (whether upon stated maturity, prepayment, acceleration, declaration or otherwise), effective and perfected as of the entry of the Proposed Replacement Interim DIP Order, and without the necessity of the execution, recordation or filing by any of the Replacement DIP Loan Parties or the Replacement DIP Secured Parties of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title, or any similar document or instrument, or the taking of any other action (including entering into any control agreements or taking any other action to take possession or control of any DIP Collateral), the Replacement DIP Agent, for the benefit of itself and the Replacement DIP Lender, is hereby granted valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens and security interests (collectively, the "**DIP Liens**") in all DIP Collateral, in each case, subject and subordinate to the Carve-Out, and subject to the relative priorities set forth in the Proposed Replacement Interim DIP Order.<br><br>**Noteholder Adequate Protection Liens.** The Prepetition Agents, for the benefit of themselves and for the benefit of the Prepetition Secured Noteholders, are hereby granted, effective and perfected as of the entry of the Proposed Replacement Interim DIP Order, and without the necessity of the execution, recordation or filing by any of the Prepetition Secured Parties of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title for titled goods, or any similar document or instrument, or the taking of any other action (including entering into any control agreements or taking possession or control of any Prepetition Secured Notes Collateral), in the amount of any aggregate Diminution in Value of the Prepetition Notes Liens in the Prepetition Secured Notes Collateral (including Cash Collateral) from and after the Petition Date, valid, binding, enforceable and automatically perfected post-petition liens and security interests in all DIP Collateral (the "**Noteholder Adequate Protection Liens**").<br><br>**Equipment Lender Adequate Protection Liens.** The Prepetition Equipment Lenders are each hereby granted, effective and perfected as of the entry of the Proposed Replacement Interim DIP Order, and without the necessity of the execution, recordation or filing by the Replacement DIP Loan Parties or any of the Prepetition Equipment Lenders of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title for titled goods, or any similar document or instrument, or the taking of any other action (including entering into any control agreements or taking possession or control of any DIP Collateral), in the amount of any aggregate Diminution in Value of the purported Prepetition Equipment Liens in the Prepetition Equipment Financing Collateral (as applicable) from and after the Petition Date, valid, | Proposed Replacement Interim DIP Order, ¶ 6(a); 10(b); 42(b) |

25

**Ad Hoc Equity Group Exhibit 7**

WEIL:\98991236\11\39031.0011

| MATERIAL TERMS | | LOCATION |
|---|---|---|
| | binding, enforceable and automatically perfected post-petition liens and security interests in all DIP Collateral (the "**Equipment Lender Adequate Protection Liens**," and together with the Noteholder Adequate Protection Liens, the "**Adequate Protection Liens**"). | |
| **Release, Waivers or Limitation on any Claim or Cause of Action** Bankruptcy Rule 4001(c)(1)(B)(viii) | Effective as of entry of the Proposed Replacement Interim DIP Order and subject to paragraph 23 thereof, the Debtors waive and release, *inter alia*, (i) the Prepetition Secured Parties, and (ii) the Replacement DIP Secured Parties, in each case, subject to the terms and provisions of the Proposed Replacement Interim DIP Order. | Proposed Replacement Interim DIP Order, Preamble ¶¶ E(d); F(e) 34. |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | The Replacement DIP Documents and Proposed Replacement Interim DIP Order contain indemnification provisions ordinary and customary for debtor-in-possession financings of this type. | Proposed Replacement Interim DIP Order, ¶ (2)(c). |
| **Section 506(c) Waiver** Bankruptcy Rule 4001(c)(1)(B)(x) | Except to the extent of the Carve Out, no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases (or any future proceedings that may result therefrom) at any time, including any costs and expenses incurred in connection with the preservation, protection, or enhancement of realization by the Replacement DIP Secured Parties upon the DIP Collateral, respectively, shall be charged against or recovered from the DIP Collateral as to Replacement DIP Secured Parties, whether pursuant to section 506(c) of the Bankruptcy Code or other similar legal or equitable doctrine or otherwise, without the prior written consent of the Replacement DIP Lender with respect to the DIP Collateral, and no such consent shall be implied, directly or indirectly, from anything contained in the Proposed Replacement Interim DIP Order (including consent to the Carve-Out or the approval of any budget hereunder) or from any other action, inaction, or acquiescence by any of the Replacement DIP Secured Parties to any charge, lien, assessment or claim against the Replacement DIP Secured Parties with respect to the DIP Collateral, whether under section 506(c) of the Bankruptcy Code or otherwise. | Proposed Replacement Interim DIP Order, ¶ 26 |
| **Section 552(b) Waiver** Bankruptcy Rule 4001(c)(1)(B) | In no event shall the Replacement DIP Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Replacement DIP Obligations, and all proceeds of DIP Collateral shall be received and applied in accordance with the Proposed Replacement Interim DIP Order, the Replacement DIP Loan Documents, as applicable; provided that the Replacement DIP Secured Parties shall use commercially reasonable efforts to first apply all DIP Collateral (other than any proceeds from Avoidance Action), to the extent such collateral may promptly be monetized in a commercially reasonable manner, before applying any proceeds from Avoidance Actions to satisfy the DIP Obligations and the Adequate Protection Obligations, as applicable | Proposed Replacement Interim DIP Order, ¶ 27. |

**Ad Hoc Equity Group Exhibit 7**

WEIL:\98991236\11\39031.0011

## Statement Regarding Significant Provisions

10. Pursuant to paragraph 8 of the Complex Case Procedures, the Replacement DIP Loan Agreement and/or Replacement DIP Orders contain the following provisions ("**Significant Provisions**"):

| DIP Facility Term | Relief Requested |
|---|---|
| **Sale or Plan Confirmation Milestones** <br> Complex Case Procedures ¶ 8(a) | None. |
| **Cross-Collateralization** <br> Complex Case Procedures ¶ 8(b) | The Proposed Replacement Interim DIP Order does not provide for cross collateralization. |
| **Liens on Avoidance Actions or Proceeds of Avoidance Actions** <br> Complex Case Procedures ¶ 8(d) | The Replacement DIP Collateral includes, upon entry of the Replacement Final DIP Order, any proceeds or property recovered, unencumbered or otherwise from Avoidance Actions under Chapter 5 of the Bankruptcy Code. Proposed Replacement Interim DIP Order ¶ 6(b). <br><br> <u>Justification</u>. The Debtors submit that granting Replacement DIP Liens and DIP Superpriority Claims on proceeds and property recovered in respect of Avoidance Actions is appropriate because the Replacement DIP Facility and use of Cash Collateral provide the Debtors with new money to fund the Debtors' reorganization and ensure the Debtors are able to maximize value for their estates. Moreover, the liens were required by the Replacement DIP Lenders as a condition to extending credit, and by the Prepetition Secured Parties as a condition to permitting use of cash collateral. The Debtors respectfully submit that granting liens on Avoidance Proceeds is an appropriate under these circumstances because it is subject to a final order and will allow parties in interest the opportunity to object. |
| **Default Provisions and Remedies** <br> Complex Case Procedures ¶ 8(e) | The Proposed Replacement Interim DIP Order provides for certain Events of Default and remedies upon Events of Default, including customary termination events for, among other things, any material default, violation, or breach of the terms of the Proposed Replacement Interim DIP Order by the Debtors, the entry of the Final Order shall have not occurred within 30 days after the date on which a motion to approve the DIP Facility is filed, the RSA not being fully and finally terminated and/or has not ceased to be in full force and effect on or prior to the date upon which the Final Order is to be entered, or noncompliance, subject to any applicable grace and/or cure periods under the Motion, the Proposed Replacement Interim DIP Order or the Replacement DIP Documents. Replacement Interim DIP Term Sheet ¶ 26. <br><br> <u>Justification</u>. These Events of Default appropriately balance, in the Debtors' view, the Replacement DIP Lenders' need for protection and the Debtors' need for debtor-in-possession financing and continued access to Cash Collateral. In addition, the Replacement DIP Agent must provide 5 calendar days' notice prior to exercising its rights under the |

27

Ad Hoc Equity Group Exhibit 7

| DIP Facility Term | Relief Requested |
|---|---|
| | Replacement DIP Documents and file a motion (the "**Stay Relief Motion**") seeking emergency relief from the automatic stay. Until such time as the Stay Relief Motion has been adjudicated by the Court, the Debtors may use Cash Collateral solely to fund (i) payroll and other critical operating expenses included in (and subject to) the Approved Budget that are critically necessary to keep the Debtors' businesses operating or that have been consented to by the Replacement DIP Lenders (which consent shall not be unreasonably withheld or delayed), and (ii) the Professional Fees Escrow Amount. Therefore, the Proposed Replacement Interim DIP Order does ***not*** provide for the automatic lifting of the stay upon an Event of Default. |
| **Releases of Claim Against Lender or Others**<br>Complex Case Procedures ¶ 8(f) | Effective as of the date of entry of the Proposed Replacement Interim DIP Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of its past, present and future predecessors, successors, heirs, subsidiaries, and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits:<br><br>a) Each of the Prepetition Secured Parties and each of their respective Representatives (in their capacities as such) from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, cross-claims, demands, defenses, objections, challenges, offsets or setoff, debts, accounts, contracts, liabilities, remedies, suits, controversies, actions, causes of action, losses, damages, indemnities, reimbursement obligations, attorneys' fees, costs, expenses or judgments, of every kind or nature whatsoever, whether matured or unmatured, known or unknown, asserted or unasserted, suspected or unsuspected, foreseen or unforeseen, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, pending or threatened, arising in law or equity, upon contract or tort, under the Bankruptcy Code, any state or federal common law, statute, rule, regulation or otherwise, in each case, that may be asserted by any of the Debtors, their respective estates, predecessors, successors or assigns, against the Prepetition Secured Parties or their respective Representatives (in their capacities as such) for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time prior to the date of the Proposed Replacement Interim DIP Order, in each case, arising under, in connection with, or related to the Proposed Replacement Interim DIP Order, the Prepetition Notes, the Prepetition Liens, the Prepetition Secured Notes Collateral, the Prepetition Secured Obligations, the Prepetition Notes Documents, the Adequate Protection Obligations, the transactions contemplated thereunder or hereunder, or the negotiation thereof or hereof, including any claim or cause of action seeking (i) any so-called lender liability, (ii) any and all claims arising under the Bankruptcy Code, whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or (iii) reduction, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, |

Ad Hoc Equity Group Exhibit 7

| DIP Facility Term | Relief Requested |
|---|---|
| | marshalling, surcharge or recovery, or any other related claim or cause of action with respect to the validity, enforceability, priority, scope, extent or perfection of the Prepetition Liens, the Prepetition Secured Obligations, or the Prepetition Notes Documents (as relevant); and<br><br>(b) each of the Replacement DIP Secured Parties and each of their respective Representatives (in their capacities as such) from any and all obligations and liabilities to the Replacement DIP Loan Parties (and their successors and assigns) and from any and all claims, counterclaims, cross-claims, demands, defenses, objections, challenges, offsets or setoff, debts, accounts, contracts, liabilities, remedies, suits, controversies, actions, causes of action, losses, damages, indemnities, reimbursement obligations, attorneys' fees, costs, expenses or judgments, of every kind or nature whatsoever, whether matured or unmatured, known or unknown, asserted or unasserted, suspected or unsuspected, foreseen or unforeseen, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, pending or threatened, arising in law or equity, upon contract or tort, under the Bankruptcy Code, any state or federal common law, statute, rule, regulation or otherwise, including any claim or cause of action seeking (i) any so-called lender liability, (ii) any and all claims arising under the Bankruptcy Code, whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), or otherwise, (iii) reduction, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge or recovery, in each case, that may be asserted by any of the Replacement DIP Loan Parties, their respective estates, predecessors, successors and assigns, in each case, against any of the Replacement DIP Secured Parties or their respective Representatives (in their capacities as such) for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time prior to the date of the Proposed Replacement Interim DIP Order, in connection with, arising under or related to the Proposed Replacement Interim DIP Order, the Replacement DIP Facility, the Replacement DIP Liens, the Replacement DIP Obligations, the Replacement DIP Collateral, the transactions contemplated thereunder or hereunder, or the negotiation thereof or hereof, including any claim or cause action with respect to the validity, enforceability, priority, scope, extent or perfection of the Replacement DIP Liens, the Replacement DIP Obligations or the Replacement DIP Loan Documents; *provided* that subject to the occurrence of the Closing Date, nothing contained in the foregoing shall release the Replacement DIP Secured Parties from their obligations under the Replacement DIP Facility from and after the date hereof.<br><br>Proposed Replacement Interim DIP Order ¶¶ E(d); F(e), 34. |

29

**Ad Hoc Equity Group Exhibit 7**

| DIP Facility Term | Relief Requested |
|---|---|
| | Justification. The release is appropriate because (i) the Debtors are being provided consideration in the form of the Replacement DIP Facility and the and the Prepetition Secured Parties' consent to the Debtors' use of Cash Collateral, which is essential to the Debtors' ability to maximize value for their estates, and (ii) the release complies with the requirements of paragraph 8 of the Complex Case Procedures because the release is subject to the Challenge Period (i.e., no later than (i) a date that is the later of 60 days after entry of the Replacement Final DIP Order, (ii) any such later date as has been agreed to, in writing, by the applicable Prepetition Agent and the Replacement DIP Agent, and (iii) any such later date as has been ordered by the Court for cause upon a motion filed and served within any applicable period of time set forth in paragraph 33 of the Proposed Replacement Interim DIP Order). *See* Proposed Replacement Interim DIP Order, ¶ **23**. |
| **Limitations on the Use of Cash Collateral**<br>Complex Case Procedures ¶ 8(g) | Cash Collateral may not be used for certain enumerated purposes that are contrary to the rights and interests of the Lenders, the Replacement DIP Agent, and Prepetition Secured Parties (*e.g.*, for investigations and litigation against such parties). Proposed Replacement Interim DIP Order ¶ 24.<br><br>Justification. These limitations are usual and customary. The Debtors, having engaged in arm's length negotiations with the Replacement DIP Lenders, Replacement DIP Agent, Prepetition Secured Parties, agreed to limit the Debtors' use of Cash Collateral as consideration for, among other things, the provision of new money within the broader context the Debtors' value-maximizing restructuring process. The limitation is reasonable given the facts and circumstances of these Chapter 11 cases. |

### Comparison of Original DIP Facility and Replacement DIP Facility

11.     As set forth in more detail in the Second Singh Declaration, the table below summarizes certain key features of both the Replacement DIP Facility and the Original DIP Facility in a side-by-side comparison.

| DIP Facility Term | Original DIP Facility | Replacement DIP Facility | Improvement vs. Original DIP Facility |
|---|---|---|---|
| **Annualized Cost of Capital on New Money** | Greater than 60% | Approximately 20% | Yes |
| **Maturity** | 6-month, with 3-month extension | 12-month, with 3-month extension | Yes |

30

Ad Hoc Equity Group Exhibit 7

| | | | |
|---|---|---|---|
| **Roll-up** | 1-to-1 roll-up, in full commitment amount upon entry of Final Order (*i.e.*, no creeping mechanism) | None | Yes |
| **RSA** | Linked | No link | Yes |
| **Refinancing Exit Treatment** | Exit: 115% of then-outstanding debt amount in cash | Exit: 105% of then-outstanding debt amount in cash | Yes |
| **Access to Incremental Liquidity** | Up to ~$28 million of incremental draws limited to schedule in approved budget, which requires consent from DIP Lender | Up to $35 million of incremental draws available at any time after Final Order, so long as cash balance is below $30 million | Yes |
| **Milestones** | Multiple, including regarding case timing as it relates to RSA | None, other than related to DIP documentation and Final DIP Order | Yes |
| **Potential for Challenges and Litigation** | Objections filed by the Committee and the ad hoc group of equity holders | Potentially Ad Hoc Group, regarding use of cash collateral | Yes |
| **Payment to Take Out Original DIP Facility** | No payment needed now to continue DIP Facility | Immediate payment of approximately $9 million to Original DIP Lenders for accrued interest, fees, and termination payments | No |
| **Asset Sales** | Limited to $10 million to the extent needed to fund shortfall of DIP commitments | Permitted; net proceeds used to repay Replacement DIP Facility | Yes |

## Jurisdiction

12.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

### A.  General Background

13.     On December 21, 2022 (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under the Bankruptcy Code.  The Debtors are authorized to continue to operate their business and manage their properties as debtors in

31

**Ad Hoc Equity Group Exhibit 7**

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Bankruptcy Rules and Rule 1015-1 of the Bankruptcy Local Rules.

14. On January 9, 2023, the United States Trustee for Region 7 (the "**U.S. Trustee**") appointed an official committee of unsecured creditors (the "**Committee**"). No trustee or examiner has been appointed in these chapter 11 cases.

15. On December 23 2022, the Court entered the *Interim Order (A) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (Docket No. 130) (the "**Original Interim DIP Order**").

16. Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Michael Bros in Support of the Debtors' Chapter 11 Petitions* (Docket No. 5) (the "**First Day Declaration**").

### B. Significant Secured Prepetition Indebtedness

17. The following table provides a summary of the Debtors' prepetition funded debt obligations and lease arrangements (the "**Prepetition Secured Obligations**") under their prepetition s(the "**Prepetition Secured Facilities**"):[5]

| Name | Principal Amount (approximate) | Lien Priority and Collateral |
|------|-------------------------------|------------------------------|
| Prepetition April NPA | $239.6 million | First priority lien on substantially all assets of the Debtors as of the Petition |

---

[5] The Debtors reserve the right to assert that any of the debt is not secured due to invalidly perfected liens or otherwise.

**Ad Hoc Equity Group Exhibit 7**

**32**

| Name | Principal Amount (approximate) | Lien Priority and Collateral |
|---|---|---|
| | | Date (except equipment subject to other liens and real estate) |
| Prepetition August NPA | $320.7 million | Second priority lien on substantially all assets of the Debtors as of the Petition Date (except equipment subject to other liens and real estate) |
| Secured Mining Equipment Financing and Leases | $284 million | First lien on the ASIC Miners set forth in each lender's agreement |
| Secured Non-Mining Financings and Leases | $20.8 million | First lien on non-mining equipment (and real estate facilities) set forth in each lender's agreement |
| Facility Mortgages | $0.8 million | Real estate facilities set forth in each lender's agreement |
| Asserted Mechanics' Liens | Over $65 million (non-duplicative) | Real estate; priority and perfection under review |

18.     Additional details for each of the Debtors' debt instruments is provided in the First Day Declaration.  A summary of the secured debt instruments is provided below.

**1.     April and August Convertible Notes.**

19.     The Debtors have two sets of convertible secured notes with nearly identical terms (the "**Prepetition April NPA**" and the "**Prepetition August NPA**", together, the "**Prepetition NPAs**").  The Prepetition April NPA is dated April 19, 2021, and the Prepetition August NPA is dated August 20, 2021.  The Prepetition NPAs maturity date is April 19, 2025. The Prepetition NPAs carry the same interest rate and are convertible into shares of common stock of Core Scientific at a conversion price of $8.00 per share.

20.     The obligations under the Prepetition April NPA are secured pursuant to (i) that certain Security Agreement, dated as of April 19, 2021 (the "**April Convertible Notes Security Agreement**"), by and among Core Scientific Holding Co., the NPA Guarantors, as guarantors, and the Note Agent (in its capacity as collateral agent), and (ii) that certain Intellectual

**Ad Hoc Equity Group Exhibit 7**

WEIL:\98991236\11\39031.0011

Property Security Agreement, dated as of April 19, 2021 (the "**April Convertible Notes IP Security Agreement**").

21.     The obligations of the Debtors under the Prepetition August NPA are secured pursuant to (i) that certain Security Agreement, dated as of August 7, 2022 (the "**August Convertible Notes Security Agreement**"), by and among Core Parent, the NPA Guarantors, as guarantors, and the Note Agent (in its capacity as collateral agent for the August Convertible Notes), and (ii) that certain Intellectual Property Security Agreement, dated as of August 7, 2022 (the "**August Convertible Notes IP Security Agreement**" and collectively with the April Convertible Notes Security Agreement, the April Convertible Notes IP Security Agreement, and the August Convertible Notes Security Agreement, the "**Convertible Notes Security Agreements**")

**2.     Secured Mining Equipment Financing and Leases.**

22.     The Debtors utilized equipment leases or secured financing or arrangements to finance application-specific equipment for the mining of bitcoin (the "**ASIC Miners**").  As of the Petition Date, the Debtors have an aggregate of approximately $284 million of equipment leases and secured financing outstanding under different facilities with respective first lien security interests against approximately 91,000 of the Debtors' ASIC Miners.  The ASIC Miners are Excluded Property under such that they are not collateral for the NPA.

**3.     Secured Non-Mining Equipment Financing and Leases.**

23.     In addition to financing secured against mining equipment, the Debtors utilize secured financing and leases against non-mining assets to finance and utilize various infrastructure needs of the Debtors for their day-to-day operations.  As of the Petition Date, the Debtors have approximately $800,000 of facility mortgages, $20.8 million of non-mining equipment financing, and $9.3 million of non-mining equipment leases, each secured by various

Ad Hoc Equity Group Exhibit 7

assets. Like the ASIC Miners, the assets that secure the non-mining financing and leases are considered Excluded Property under the NPA.

### C. Need for Replacement DIP Facility and Use of Cash Collateral

24.     As discussed in the Second Singh Declaration, the Debtors have an immediate and critical need to obtain replacement DIP financing to pay the Original DIP Facility and enter into a DIP financing with more favorable terms to maximize recoveries for all creditors.

25.     Further, the Debtors are seeking to reach an agreement with Ad Hoc Group that permits the Debtors to use Prepetition Secured Noteholders' Cash Collateral, in exchange for which the Debtors will provide adequate protection to the Prepetition Secured Noteholders. At this time, the Debtors do not have an agreement with the Ad Hoc Group on this issue, but are continuing to work with the Ad Hoc Group to obtain consent. If the Debtors do not obtain such consent, they will seek to use the cash collateral on a non-consensual basis. The Approved Budget under the Replacement DIP Facility assumes access to Cash Collateral, and, absent the authority to use Cash Collateral, the Debtors' funding and operational needs are not anticipated to be met and the Debtors will likely not be able to continue operations in the ordinary course of business, which would have a detrimental impact on the value of the enterprise.

### D. Efforts to Obtain Postpetition Financing

26.     As set forth in the Second Singh Declaration, beginning in December 2022, the Debtors, through PJT, launched a broad marketing process designed to maximize competition and solicit proposals from a wide range of prospective lenders, including (i) creditors already in the Debtors' capital structure, (ii) banks outside of the Debtors' capital structure, (iii) institutional and alternative lenders outside the Debtors' capital structure, and (iv) strategic parties.

27.     Prior to the Petition Date, PJT contacted 24 potential lenders it believed may have been interested in providing the Debtors with postpetition financing, including an ad hoc

35

WEIL:\98991236\11\39031.0011

group of the Prepetition Secured Parties, B. Riley, and several alternative lenders outside of the Debtors' capital structure. Nine (9) parties signed non-disclosure agreements, and the Debtors received two (2) initial proposals, including one from the Ad Hoc Group and one from a third party that ceased negotiations prior to reaching an agreement with the Debtors.

28.     Subsequent to the entry of the Original Interim DIP Order, PJT contacted 48 potential lenders that it believed may have been interested in providing the Debtors with postpetition financing, seven (7) of which PJT had previously contacted prepetition and a number of which the financial advisors to the Committee recommended that PJT contact. Twenty (20) new parties signed non-disclosure agreements, and the Debtors received four (4) initial proposals for the Replacement DIP Facility. The Debtors negotiated with three of the four potential Replacement DIP Lenders, as the fourth proposal was received too late to be actionable in a timely manner, including trading multiple term sheets. All four potential lenders engaged in significant diligence during the postpetition DIP marketing process. The Replacement DIP Lender ultimately provided the Debtors with the best terms—as a whole—for a postpetition financing facility. Over the course of the past few days, the Debtors also provided the Ad Hoc Group with ample opportunity to improve their DIP Facility terms. Specifically, the Debtors requested that the Ad Hoc Group agree to several changes to the DIP Facility, including eliminating the Roll-Up, eliminating the default based on termination of the Restructuring Support Agreement, permitting asset sale proceeds to be used to pay off the DIP Facility, and improved economics. In addition, the Debtors shared the term sheets received from potential DIP lenders on a timely basis with both the Ad Hoc Group and the Committee. The Ad Hoc Group indicated an unwillingness to make the significant changes that would have been required to make its DIP Facility competitive with the other proposals the Debtors received.

**Ad Hoc Equity Group Exhibit 7**

**36**

WEIL:\98991236\11\39031.0011

29. The negotiations with the Replacement DIP Lender were rigorous, marked by hard bargaining, and resulted in significant concessions by the Replacement DIP Lender and additional benefits to the Debtors. It is unlikely that the Debtors would be unable to obtain this level of credit on more attractive terms, taken as a whole, within the timeframe required.

30. Accordingly, the Replacement DIP Facility, taken as a whole, is the Debtors' best postpetition financing option and is reasonable under the facts and circumstances of Debtors' chapter 11 cases.

**Terms of Replacement DIP Facility Are Reasonable Under the Circumstances**

31. As discussed in the Second Singh Declaration, the obligations, interest rate, fees, maturity, covenants, and lack of milestones under the Replacement DIP Facility are reasonable, taken as a whole, under the circumstances and are generally consistent with market terms for companies facing similar circumstances as the Debtors and provides the best financing option currently available to the Debtors under the circumstances. Accordingly, the Replacement DIP Lender has acted in good faith and has agreed to provide the Replacement DIP Facility to the Debtors on terms, that are fair and reasonable under the current circumstances and market conditions.

32. ***Junior Liens***. A substantial portion of the Debtors' assets consists of equipment that is encumbered by secured financing arrangements other than under the Prepetition NPAs, as well as some real estate encumbered by mortgages, fixture filings and mechanics' liens. Rather than insisting on a non-consensual priming lien on such encumbered property, the Replacement DIP Lender has agreed to receive junior liens on such assets, with the goal of enhancing the collateral securing the Replacement DIP Facility and avoiding objections from these other secured parties. While much of the Debtors' equipment and real estate assets are encumbered by equipment financing, mortgages, fixture filings and mechanics' liens, as applicable, the

37

**Ad Hoc Equity Group Exhibit 7**

**37**

Replacement DIP Lender would not provide capital without receiving liens that are junior to the liens securing these assets.

33.     ***Liens on Unencumbered Assets.***  In addition, the Replacement DIP Lender requires a perfected first priority security interest and lien on substantially all of the Debtors' unencumbered assets.  Absent such protections, the Replacement DIP Lender would not have agreed to provide the Replacement DIP Facility to the Debtors.

34.     The terms of Replacement DIP Facility, including the liens being granted, are an important part of the Replacement DIP Facility that will allow the Debtors to maintain sufficient liquidity while they strive to achieve a comprehensive restructuring solution for their creditors and other stakeholders.

## Fees in Connection with Replacement DIP Facility Are Fair and Reasonable

35.     The Replacement DIP Lender has committed to provide a substantial amount of capital to ensure successful execution of the Replacement DIP Facility.  As discussed in the Second Singh Declaration, in view of those commitments and the circumstances of these cases, including the magnitude of the Debtors' Chapter 11 Cases and the tangible benefit to the estates of a substantial committed postpetition financing, the consideration being provided to the Replacement DIP Lender, taken as a whole, in exchange for providing such commitment, is reasonable in amount, appropriately compensates the Replacement DIP Lender for its costs and the assurances it is providing to the process, and is necessary to obtain the Replacement DIP Facility, which will permit the Debtors to both (i) continue operating their business and (ii) maximize the value of their estates.

**A.  DIP Fees**

36.     In consideration for the Replacement DIP Agent's and Replacement DIP Lender's respective commitments in connection with the Replacement DIP facility, the Debtors

**Ad Hoc Equity Group Exhibit 7**

**38**

have agreed to, among other things, (i) pay certain fees (the "**Replacement DIP Fees**"), as discussed in the table above, (ii) pay reasonable and documented out-of-pocket fees and expenses for the Replacement DIP Lender (including reasonable and documented fees and expenses of outside counsel) (the "**Out-of-Pocket Expenses**" and, together with the Replacement DIP Fees, the "**Replacement DIP Fees and Expenses**"), and (iii) indemnify the Replacement DIP Lender in accordance with the Replacement DIP Loan Agreement. Notwithstanding the foregoing, the Replacement DIP Loan Parties shall be authorized to make the foregoing payments whether or not the Replacement DIP Facility is consummated unless the Court rules that any Replacement DIP Lender has (x) materially breached its obligations under any Replacement DIP Loan Document or (y) failed to fund the Replacement DIP Loans as required under the Replacement DIP Loan Documents.

### B. Replacement DIP Fees Are Reasonable

37.     The Replacement DIP Fees were the subject of arm's-length and good-faith negotiations between the Debtors and the Replacement DIP Lender, are integral components of the overall terms of the Replacement DIP Facility, and were required by the Replacement DIP Lender as consideration for the extension of postpetition financing. As discussed in the Second Singh Declaration, it is unlikely that a financing commitment with terms similar to those in the Replacement DIP Facility was available to the Debtors for lower fees given the existing liens against the Debtors' assets, the Debtors' liquidity position, and the overall depression in bitcoin prices that has resulted in stress within the cryptocurrency industry.

### Relief Requested Should be Granted

38.     The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances. As set forth in the Second Singh Declaration, the Debtors were unable to

WEIL:\98991236\11\39031.0011

**Ad Hoc Equity Group Exhibit 7**

**39**

procure sufficient financing in the form of unsecured credit, which would be allowable under section 503(b)(1) or as an administrative expense, in accordance with sections 364(a) or (b) of the Bankruptcy Code.  *See* 11 U.S.C. §§ 364(a)-(b), 503(b)(1).  Having determined that postpetition financing was only available pursuant to sections 364(c) of the Bankruptcy Code, the Debtors negotiated with the Replacement DIP Lender to secure the Replacement DIP Facility on the terms described herein.  For these reasons, as discussed further below, the Debtors satisfy the necessary conditions under sections 364(c) for authority to enter into the Replacement DIP Facility.

### A.  The Refinancing DIP Facility Should be Approved

39.     The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances.  The Debtors would be unable to procure sufficient financing in the form of unsecured credit, which would be allowable under section 503(b)(1) or as an administrative expense, in accordance with sections 364(a) or (b) of the Bankruptcy Code. *See* 11 U.S.C. §§ 364(a)-(b), 503(b)(1).  Having determined that postpetition financing was only available pursuant to sections 364(c) and (d) of the Bankruptcy Code, the Debtors negotiated with B. Riley to secure the Replacement DIP Facility on the terms described herein.  For these reasons, and as discussed further below, the Debtors satisfy the necessary conditions under section 364 for authority to enter into the Replacement DIP Facility.

### 1.     Entry into the Replacement DIP Facility and Repayment of the Original DIP Facility is an Exercise of the Debtors' Sound Business Judgment

40.     Several reasons justify the relief requested herein:

i.     The Debtors expect that vendors, customers, and their employees will be highly focused on whether these chapter 11 cases are appropriately funded.

ii.     The terms of the Replacement DIP Facility, taken as a whole, are superior to the terms of the Original DIP Facility.

40

Ad Hoc Equity Group Exhibit 7

iii.    The Debtors are required to have their Original DIP Facility entered on a final basis or paid off by February 1, 2023. Immediate access to Replacement DIP Facility is therefore critical to repay the Original DIP Facility and ensure sufficient working capital to operate their business and to administer their estates.

iv.    The Debtors' proposed interim draw of up to $35 million under the Replacement DIP Facility is necessary for the Debtors to avoid immediate and irreparable harm to their estates.

v.    Negotiations with the proposed Replacement DIP Lender were conducted in good faith and at arms' length. As confirmed by the Debtors' prepetition process to solicit proposals for third-party debtor-in-possession financing, there is no better alternative financing available to the Debtors in the market. The Replacement DIP Facility, taken as a whole, is reasonable under the facts and circumstances and is the Debtors' best available option.

For those reasons and the reasons set forth below, the Debtors respectfully request that the Court grant the relief requested herein.

41.    If an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts give debtors considerable deference in acting in accordance with their sound business judgment in obtaining such credit. *See, e.g.*, *In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (Docket No. 21) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

**Ad Hoc Equity Group Exhibit 7**

**41**

42.     Courts generally will not second-guess a debtor's business decisions when those decisions involve the appropriate level of care in arriving at the decision on an informed basis, in good faith, and in the honest belief that the action was taken in the best interest of the debtor. *See In re Los Angeles Dodgers LLC*, 457 B.R. at 313.  To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys. Inc.*, No. 06-11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted). Further, in considering whether the terms of postpetition financings are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855—86 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Tr. Co. of Escanaba (In re Ellingsen MacLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

43.     The Debtors' determination to move forward with the Replacement DIP Facility is a sound exercise of their business judgment following a thorough process conducted with the guidance of experienced advisors, and after careful evaluation of alternatives.  Given the nature of the Debtors' relatively limited unencumbered asset pool, the Replacement DIP Lender is the best available financing source that could commit to a facility on the most favorable terms, and is a better financing source than that of the previous Original DIP Facility.  The Debtors negotiated the Replacement DIP Loan Agreement with the Replacement DIP Lender in good faith, at arm's length, and with the assistance of their advisors, and the Debtors believe that they have obtained the best financing available in an amount sufficient to fund operations and the costs of these chapter 11 cases, and on reasonable terms.

**Ad Hoc Equity Group Exhibit 7**

**42**

44. Additionally, the removal of (i) the Roll-Up, (ii) the linking of DIP financings to the RSA, and (iii) significant milestones contained the Original DIP Facility allows the Debtors the flexibility in pursuit of a potential chapter 11 plan. Further, the lower overall cost of capital provided under the Replacement DIP Facility will allow for more value to be allocated to the Debtors' stakeholders. Accordingly, the Court should authorize the Debtors' entry into the Replacement DIP Documents as a reasonable exercise of the Debtors' business judgment.

### 2. Debtors Should Be Authorized to Obtain Replacement DIP Financing on a Secured and Superpriority Basis

45. The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances. Specifically, section 364(c) of the Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien[.]

11 U.S.C. § 364(c).

46. To satisfy the requirements of section 364(c) of the Bankruptcy Code, Courts will consider whether (a) the debtor made reasonable effort, but failed, to obtain unsecured credit under sections 364(a) and 364(b) of the Bankruptcy Code, (b) the credit transaction benefits the debtor as necessary to preserve estate assets, and (c) the terms of the credit transaction are fair, reasonable, and adequate, given the circumstances of the debtor and proposed lender. *See In re Republic Airways Holdings Inc.*, No. 16-10429(SHL) 2016 WL 2616717, at *11 (Bankr. S.D.N.Y.

43

**Ad Hoc Equity Group Exhibit 7**

**43**

May 4, 2016); *In re Los Angeles Dodgers LLC*, 457 B.R. at 312–13; *In re Ames Dep't Stores, Inc.*, 115 B.R. at 40. However, section 364 "imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986).

47. <u>First</u>, subsequent to the entry of the Original Interim DIP Order, PJT contacted dozens of parties, received four new proposals, and negotiated with three parties before determining that the Replacement DIP Facility was the best option and superior to the Original DIP Facility for the reasons stated above. The Court should, therefore, authorize the Debtors to provide the Replacement DIP Agent and the Replacement DIP Lenders with superpriority administrative expense status for any Replacement DIP Obligations as provided for in section 364(c)(1) of the Bankruptcy Code, with (i) first priority senior liens on the Debtors' unencumbered property pursuant to section 364(c)(2) of the Bankruptcy Code, and (ii) junior liens on all property subject to valid, perfected and non-avoidable liens in existence as of the Petition Date or perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code (other than the Primed Liens) pursuant to section 364(c)(3) of the Bankruptcy Code.

48. <u>Second</u>, the Replacement DIP Facility is necessary to preserve the Debtors' estates. The Debtors require access to the Replacement DIP Facility to pay off the Original DIP Facility and to ensure they have sufficient liquidity to operate their businesses and administer their estates in the ordinary course for the duration of these chapter 11 cases. As discussed in the Blokh Declaration, the Interim DIP Borrowing of $35 million, along with cash on balance sheet, is projected to provide the Debtors with sufficient liquidity to repay the Original DIP Facility and fund the Debtors' operations and the Chapter 11 Cases until the final hearing. After the final hearing, the Replacement DIP Facility will provide the Debtors with significant flexibility to

**Ad Hoc Equity Group Exhibit 7**

**44**

WEIL:\98991236\11\39031.0011

operate their business, including the option to draw—at their sole discretion—up to an additional $35 million, for an aggregate principal amount of up to $70 million.

49.     <u>Third</u>, the terms of the Replacement DIP Facility are fair, reasonable, and adequate under the circumstances.  The Replacement DIP Facility represents the most favorable source of postpetition financing and is designed to provide the Debtors with sufficient liquidity for the duration of these chapter 11 cases.

**B.  Debtors Should Be Authorized to Use Cash Collateral**

50.     For the reasons set forth herein, the Debtors require use of the Cash Collateral for working capital and to fund their chapter 11 cases.  Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral.  Section 363(c) provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).  Further, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

51.     The Debtors have satisfied the requirements of sections 363(c)(2) and (e), and should be authorized to use Cash Collateral.  The Debtors expect that the Prepetition Agent will consent to the Adequate Protection to be provided pursuant to the Proposed Replacement Interim DIP Order.

Ad Hoc Equity Group Exhibit 7
WEIL:\98991236\11\39031.0011

52. In the event the Prepetition Agent does not consent, the Debtors will demonstrate at the hearing that they are providing the Prepetition Secured Parties with adequate protection for the use of Cash Collateral. Accordingly, the Court should grant the Debtors the authority to use Cash Collateral under section 363(c) of the Bankruptcy Code.

### C. Debtors Should Be Authorized to Pay Fees Required by Replacement DIP Documents

53. As described herein, the Debtors have agreed, subject to Court approval, to pay the Replacement DIP Fees in exchange for their providing the Replacement DIP Facility. As set forth in the Second Singh Declaration, taken as a whole, the terms of the Replacement DIP Documents, including the fees imposed thereunder, are reasonable under the facts and circumstances and are the Debtors' best currently available option to maintain their ongoing business operations and to fund their chapter 11 cases.

54. The Debtors considered the Replacement DIP Fees when determining in their sound business judgment whether entry into the Replacement DIP Facility constituted the best path forward, and the Debtors determined that paying these fees in order to obtain the Replacement DIP Facility is in the best interests of the Debtors' estates. Accordingly, the Court should authorize the Debtors to pay the Replacement DIP Fees.

### D. Carve-Out Is Appropriate

55. The Replacement DIP subjects the Replacement DIP Lenders' security interests, superpriority administrative expense claims, and the adequate protection claims and liens to the Carve Out. Without the Carve Out, the Debtors' estates or other parties in interest could be harmed because the services professionals might otherwise provide in these chapter 11 cases could be restricted. *See In re Ames Dep't Stores*, 115 B.R. at 38 (observing that courts insist on Carve Outs for professionals representing parties in interest because "[a]bsent such protection, the

46

Ad Hoc Equity Group Exhibit 7

collective rights and expectations of all parties in interest are sorely prejudiced"). Additionally, the Carve Out protects against administrative insolvency during the pendency of the chapter 11 cases by ensuring that assets are available to pay U.S. Trustee's fees and professional fees of the Debtors and any statutory committee. Accordingly, the Debtors submit that the Carve Out is appropriate.

56. In addition, the Carve Out enables the Debtors to pay the Original DIP Facility, enabling the Debtors to enter into the Replacement DIP Facility, which provides more favorable terms for the Debtors which will inure to the benefit of all parties in interest during these chapter 11 cases.

### E. Replacement DIP Lenders Should Be Deemed Good Faith Lenders under Section 364(e)

57. Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or to grant such liens is later reversed or modified on appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

58. Here, the Debtors believe the Replacement DIP Facility embodies the most favorable terms on which the Debtors could obtain postpetition financing. As described in the Second Singh Declaration, the negotiations of the terms of the Replacement DIP Facility with the Replacement DIP Lenders were conducted at arms' length. Under the circumstances, the terms

**Ad Hoc Equity Group Exhibit 7**

**47**

WEIL:\98991236\11\39031.0011

and conditions of the Replacement DIP Documents are reasonable, and the proceeds of the Replacement DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code, in accordance with the Replacement DIP Orders and the Replacement DIP Documents and in accordance with the Budget (subject to any Permitted Variance). Further, no consideration is being provided to any party to the Replacement DIP Documents other than as described herein. Accordingly, the Court should find that the Replacement DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and that the Replacement DIP Lenders thus are entitled to all of the protections afforded by that section.

### F. Modification of Automatic Stay is Warranted

59. The relief requested herein contemplates a modification of the automatic stay (if applicable) to (a) permit the Debtors to grant the security interests, liens, and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens, and (b) permit the Replacement DIP Agent, Replacement DIP Lenders, and the Prepetition Secured Parties to exercise rights and remedies under certain circumstances. These provisions were part of the quid pro quo for the Debtors' ability to obtain the Replacement DIP Facility and use Cash Collateral as provided therein and in the Proposed Replacement Interim DIP Order. Notably, the exercise of remedies (including remedies with respect to prepetition claims and collateral) will be subject to five calendar days' notice to allow the Debtors to cure or seek other relief. Moreover, following the delivery of such notice, the Replacement DIP Agent may file a Stay Relief Motion seeking emergency relief from the automatic stay and until such time as the Stay Relief Motion has been adjudicated by the Court, the Debtors may use the proceeds of the Replacement DIP Facilities (to the extent drawn prior to the occurrence of the Event of Default (as defined in the Replacement DIP Loan Agreement)) or Cash Collateral to fund operations in accordance with the Replacement DIP Loan Agreement.

48

**Ad Hoc Equity Group Exhibit 7**

**48**

Under these circumstances, the Debtors believe that the extent of the modifications to the automatic stay under the Proposed Replacement Interim DIP Order is reasonable and should be approved.

60.      Stay modifications of this kind are ordinary and standard features of postpetition financing facilities and, in the Debtors' business judgment, are appropriate under the present circumstances.  *See, e.g.*, *In re Sheridan Holding Company II, LLC*, No. 19-35198 (MI) (Bankr. S.D. Tex. October 21, 2019) (Docket No. 178) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Vanguard Natural Resources, Inc.*, No. 19-31786 (DRJ) (Bankr. S.D. Tex. April 3, 2019) (Docket No. 118) (same); *In re Southcross Holdings LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. Apr. 11, 2016) (Docket No. 183) (same); *In re Autoseis, Inc.*, No. 14-20130 (RSS) (Bankr. S.D. Tex. Mar. 27, 2014) (Docket No. 64) (same); *In re ATP Oil & Gas Corp.*, No. 12-36187 (MI) (Bankr. S.D. Tex. Aug. 21, 2012) (Docket No. 135) (same).

### G.  Debtors Require Immediate Access to Cash Collateral and DIP Financing

61.      The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code if, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Fed. R. Bankr. P. 4001(b)(2), (c)(2).  In examining requests for interim relief under this rule, Courts generally apply the same business judgment standard applicable to other business decisions.  *See Ames Dep't Stores*, 115 B.R. at 36.

62.      As described in the Second Singh Declaration, the Debtors will use the Replacement DIP Facility and their cash on hand to pay off the Original DIP Facility, including approximately $9 million of take-out costs, consisting of approximately $0.5 million in accrued PIK interest, approximately $0.8 million of upfront fees, approximately $1.6 million in backstop fees, and approximately $6 million in termination fees, which were approved by the Court in the

49

**Ad Hoc Equity Group Exhibit 7**

**49**

Original Interim DIP Order.  Absent authority to enter into and access the proceeds of the Replacement DIP Facility, the Debtors will be either in default or subject to the inferior and burdensome terms of Original DIP Facility.  The Debtors require immediate access to the proceeds of the Replacement DIP Facility, as well as access to Cash Collateral, to repay the Original DIP Facility, finance their operations, and continue operating as a going concern during the pendency of these chapter 11 cases.  In addition, access to the Replacement DIP Facility will provide the Debtors with financial stability in the event of unforeseen circumstances attendant to the uncertain and volatile bitcoin market.  Accordingly, for the reasons set forth above, prompt entry of the Proposed Replacement Interim DIP Order is necessary to provide more flexible DIP financing that would lead to immediate benefit to the Debtors' estates.

**H. Interests of Prepetition Secured Parties Are Adequately Protected**

63.    Parties with an interest in cash collateral are entitled to adequate protection. *See* 11 U.S.C. § 363(e).  Adequate protection may be provided in various forms, including, among other things, payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims.  Thus, what constitutes adequate protection is decided on a case-by-case basis.  *See, e.g., In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

**Ad Hoc Equity Group Exhibit 7**

**50**

WEIL:\98991236\11\39031.0011

64.     The adequate protection package provided to the requisite Prepetition Secured Parties, as described above, is consensual and appropriately safeguards the Prepetition Secured Parties from the diminution in the value (if any) of their interests in the Prepetition Collateral.  The Debtors submit that their provision of adequate protection to the Prepetition Secured Parties is fair and reasonable and is sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

### Request for Final Hearing

65.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for consideration of entry of the Replacement Final DIP Order. The Debtors request that they be authorized to serve a copy of the signed Proposed Replacement Interim DIP Order, which fixes the time and date for the filing of any objections by first class mail upon the notice parties listed below.  The Debtors further request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

### Compliance with Bankruptcy Rule 6004(a) and Waiver of Bankruptcy Rule 6004(h)

66.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion satisfies Bankruptcy Rule 6004(a) and that the Court waive the 14-day period under Bankruptcy Rule 6004(h).

### Reservation of Rights

67.     Nothing contained herein is intended to be or shall be deemed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver or limitation of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (iv) an agreement or obligation to pay any

**Ad Hoc Equity Group Exhibit 7**

**51**

claims, (v) a waiver of any claims or causes of action which may exist against any creditor or interest holder, (vi) an admission as to the validity of any liens satisfied pursuant to this Motion, or (vii) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to dispute such claim subsequently.

### Notice

68.    Notice of this Motion will be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

### No Previous Request

69.    No previous request for the relief sought herein has been made by the Debtors to this or any other court.

[*Remainder of Page Intentionally Left Blank*]

52

**Ad Hoc Equity Group Exhibit 7**

**52**

WHEREFORE the Debtors respectfully request entry of the Proposed Replacement Interim DIP Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:  January 31, 2023

Houston, Texas

Respectfully submitted,

   /s/  Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:      Alfredo.Perez@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock (admitted *pro hac vice*)
Ronit J. Berkovich (admitted *pro hac vice*)
Moshe A. Fink (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:   Ray.Schrock@weil.com
         Ronit.Berkovich@weil.com
         Moshe.Fink@weil.com

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**<u>Certificate of Service</u>**

I hereby certify that on January 31, 2023, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.


 */s/ Alfredo R. Pérez*
Alfredo R. Pérez

**Ad Hoc Equity Group Exhibit 7**
**54**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | ) | |
|---|---|---|
| *In re:* | ) | Chapter 11 |
| | ) | |
| Core Scientific, Inc., *et al.*,[1] | ) | Case No. 22-90341 (DRJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | Re: Docket Nos. 130, [●] |

**INTERIM ORDER
(I) AUTHORIZING THE DEBTORS TO
(A) OBTAIN SENIOR SECURED NON-PRIMING
SUPERPRIORITY REPLACEMENT POSTPETITION
FINANCING, (B) USE CASH COLLATERAL,[2] AND
(C) PAY OFFEXISTING POSTPETITION FINANCING
FACILITY, (II) GRANTING LIENS AND PROVIDING CLAIMS
WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS,
(III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION
SECURED PARTIES, (IV) MODIFYING THE AUTOMATIC STAY,
(V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

Upon the motion (the "***Motion***") of Core Scientific, Inc. ("***Core Scientific***") and each of

its affiliates that are debtors and debtors in possession (collectively, the "***Debtors***") in the

above-captioned chapter 11 cases (the "***Chapter 11 Cases***"), pursuant to sections 105, 361, 362,

363, 364, 503, 506, 507 and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*

(the "***Bankruptcy Code***"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR, LLC (5106); American Property Acquisition I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

[2] The adequate protection terms for the Prepetition Secured Parties assumes the Ad Hoc Group's consent to the use of Cash Collateral. The Debtors reserve the right to change the adequate protection package set forth in this Interim Order if the Ad Hoc Group does not provide such consent.

Procedure (the "***Bankruptcy Rules***"), and Rules 2002-1, 4001-1(b), 4002-1 and 9013-1 of the

Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas

and the Procedures for Complex Chapter 11 Bankruptcy Cases (together, the "***Local Bankruptcy***

***Rules***") promulgated by the United States Bankruptcy Court for the Southern District of Texas,

Houston Division (the "***Court***"), seeking entry of an interim order (this "***Interim Order***"), among

other things:

      (a)      authorizing the Debtors to obtain replacement postpetition financing on a superpriority, non-priming, senior secured basis (the "***Replacement DIP Facility***," and the loans made, advanced or deemed advanced thereunder, the "***Replacement DIP Loans***") in the form of a multiple-draw term-loan facility in an aggregate principal amount of up to $70 million (the "***Replacement DIP Facility***"), pursuant to which (i) an aggregate principal amount of $35 million shall be borrowed (the "***Interim DIP Borrowing***") in a single borrowing on the Closing Date (as defined in the DIP Term Sheet (as defined below)), and (ii) following entry of the Final Order (as defined below), the remaining aggregate principal amount under the Replacement DIP Facility shall be available, in one or more borrowings (each such borrowing, including the Interim DIP Borrowing, a "***DIP Borrowing***," and, collectively, the "***DIP Borrowings***"), and, in each case, in accordance with and subject to the terms and conditions (including any conditions precedent to each of the DIP Borrowings) set forth in the term sheet attached hereto as **Exhibit 1** (the "***Replacement DIP Term Sheet***"),  the terms of which are incorporated herein in their entirety and are deemed to be a part of this Interim Order, that certain *Commitment Letter*, dated as of January 29, 2023, by and between Core Scientific and the Replacement DIP Lender attached hereto as **Exhibit 2** (the "***Commitment Letter***"), and, subject to entry of the Final Order, on a final basis pursuant to a loan agreement (the "***Replacement DIP Credit Agreement***," and, together with all other agreements, guarantees, pledge, collateral and security agreements, mortgages, deeds, charges, control agreements, instruments, certificates, notes, any separate fee letter agreements between any of the Debtors, on the one hand, and the Replacement DIP Agent and/or the Replacement DIP Lender, on the other hand, and other documents executed, filed and/or delivered in connection therewith, including the Replacement DIP Term Sheet, collectively, the "***Replacement DIP Loan Documents***"),[3] by and among each of the Debtors, as borrowers (the

---

[3]    The Replacement DIP Lender is lending to the Replacement DIP Borrowers under the terms of the Replacement DIP Term Sheet.  Subject to the terms and conditions set forth herein, the Replacement DIP Secured Parties and the Replacement DIP Borrowers will negotiate in good faith to document and execute formal credit and other security agreements consistent with the terms of this Interim Order and the Replacement DIP Term Sheet. Prior to the execution and delivery of such documentation, all references to the Replacement DIP Loan Agreement, the Replacement DIP Loan Documents and similar terms shall be deemed to be references to the Replacement DIP Term Sheet.

**Ad Hoc Equity Group Exhibit 7**

**56**

"**Replacement DIP Borrowers**"), each of the direct and indirect subsidiaries of Core Scientific that are or become debtors in the Chapter 11 Cases, as guarantors (collectively, the "**Replacement DIP Guarantors**," and together with the Replacement DIP Borrowers, the "**Replacement DIP Loan Parties**"), B. Riley Commercial Capital, LLC, as administrative agent and collateral agent (in such capacities, together with its successors and permitted assigns, the "**Replacement DIP Agent**"), and the lender party thereto (the "**Replacement DIP Lender**," and together with the DIP Agent, the "**Replacement DIP Secured Parties**") and this Interim Order;

(b) authorizing the Replacement DIP Loan Parties to (i) execute, deliver, and perform under the Replacement DIP Term Sheet and each of the Replacement DIP Loan Documents, (ii) incur all loans, advances, extensions of credit, financial accommodations, indemnification and reimbursement obligations and other obligations, and pay all principal, interest, premiums, fees, costs, expenses, charges and all other amounts payable under the Replacement DIP Loan Documents, whenever the same shall become due or payable, whether at stated maturity, by prepayment, declaration, acceleration or otherwise, in each case, in accordance with the Replacement DIP Loan Documents and this Interim Order (collectively, the "**Replacement DIP Obligations**"), and (iii) perform such other and further acts as may be necessary, required or desirable to implement and effectuate the terms of this Interim Order, the Replacement DIP Loan Documents and the transactions contemplated hereunder and thereunder;

(c) authorizing the Replacement DIP Borrowers to incur, and the Replacement DIP Guarantors to jointly and severally guarantee, all DIP Obligations, in accordance with this Interim Order and the Replacement DIP Loan Documents;

(d) granting to the Replacement DIP Agent, for the benefit of itself and the other Replacement DIP Secured Parties, the DIP Liens (as defined below) in all DIP Collateral (as defined below), as set forth in this Interim Order, subject to the Carve-Out and subject to the relative priorities set forth in this Interim Order;

(e) granting to the Replacement DIP Agent, for the benefit of itself and the other Replacement DIP Secured Parties, allowed super-priority administrative expense claims against each of the Debtors, on a joint and several basis, in respect of all Replacement DIP Obligations, subject in each case to the Carve-Out, as set forth in this Interim Order;

(f) authorizing the Debtors to use the proceeds of the Replacement DIP Facility, the DIP Collateral and the Prepetition Secured Notes Collateral (as defined below), including Cash Collateral (as defined below), solely in accordance with the terms and conditions set forth in this Interim Order and the Replacement DIP Loan Documents, including the Approved Budget (as defined below), subject to any variances expressly permitted under the Replacement DIP Term Sheet (the "**Permitted Variances**");

(g)      authorizing the Debtors to irrevocably repay in full all obligations outstanding under that certain *Senior Secured Super-Priority Debtor in Possession Loan and Security Agreement*, dated as of December 22, 2022, as filed with the Court on December 28, 2022 [Docket No. 188] (as modified, the "***Original DIP Credit Agreement***")[4] the lenders from time to time party thereto, the "***Original DIP Lenders***," the Administrative Agent (as defined therein) thereunder, the "***Original DIP Agent***," the postpetition financing facility provided thereby, the "***Original DIP Facility***," and the order from this Court approving, among other things, the Debtors' entry into the Original DIP Credit Agreement on an interim basis, the "***Original Interim DIP Order***") with the proceeds from the Replacement DIP Facility as soon as practicable upon funding;

(h)      granting adequate protection, as and to the extent set forth in this Interim Order, to the Prepetition Secured Parties (as defined below) to protect against any Diminution in Value (as defined below) of their respective Prepetition Notes Liens (as defined below) in the Prepetition Secured Notes Collateral (including Cash Collateral);

(i)      approving certain stipulations, waivers, and releases by the Debtors with respect to, *inter alia*, the Replacement DIP Secured Parties, the Replacement DIP Loan Documents, the DIP Liens, the Replacement DIP Obligations and the Replacement DIP Collateral, in each case, subject to the terms and provisions of this Interim Order;

(j)      approving the Debtors' waiver of the right to surcharge the DIP Collateral as to the DIP Secured Parties, pursuant to section 506(c) of the Bankruptcy Code or otherwise, upon the terms set forth in this Interim Order;

(k)      approving the Debtors' waiver of the equitable doctrine of "marshaling" and other similar doctrines with respect to the DIP Collateral as to the Replacement DIP Secured Parties;

(l)      modifying or vacating the automatic stay imposed by sections 105(a) and 362 of the Bankruptcy Code or otherwise, to the extent necessary, required or desirable to implement and effectuate the terms and provisions of this Interim Order and the Replacement DIP Loan Documents, as set forth herein, waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of this Interim Order, providing for the immediate effectiveness of this Interim Order, and granting related relief; and

(m)     scheduling a final hearing (the "***Final Hearing***") on the Motion to consider entry of a final order (the "***Final Order***") authorizing the relief requested in the Motion on a final basis, which order shall be in form and substance and on terms and conditions acceptable in all respects to the Replacement DIP Lender and

---

[4]    Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion, the Replacement DIP Term Sheet, or the Original DIP Credit Agreement, as applicable.

**Ad Hoc Equity Group Exhibit 7**

**58**

Replacement DIP Agent in accordance with the Replacement DIP Term Sheet, and approving the form of notice with respect to such Final Hearing.

The Court, having considered the Motion, the Replacement DIP Term Sheet, the Commitment Letter, the *Declaration of Michael Bros in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 5] (the "**First Day Declaration**"), the *Declaration of John Singh in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Non-Priming Superpriority Replacement Postpetition Financing, (B) Use Cash Collateral, and (C) Pay Off Existing Postpetition Financing Facility, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. [●]] (the "**Singh Declaration**"), and the *Declaration of Rodi Blokh in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Non-Priming Superpriority Replacement Postpetition Financing, (B) Use Cash Collateral, and (C) Pay Off Existing Postpetition Financing Facility, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. [●]](the "**Blokh Declaration**" and together with the Singh Declaration, the "**DIP Declarations**") the evidence submitted and arguments proffered or adduced at the interim hearing held before this Court on February 1, 2023 (the "**Interim Hearing**"), and upon the record of the Chapter 11 Cases; and due and proper notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 4001 and 9014 and all applicable Local Bankruptcy Rules; and it appearing that no other or further notice need be provided; and all objections, if any, to the relief requested in the Motion having been withdrawn,

Ad Hoc Equity Group Exhibit 7

resolved, or overruled by the Court; the Court having determined that the legal and factual bases set forth in the Motion and at the Interim Hearing established just cause for the relief granted herein; and it appearing to the Court that granting the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, their creditors, and all other parties in interest, represents a sound exercise of the Debtors' business judgment, is necessary for the continued operation of the Debtors' businesses and is necessary to preserve and maximize the value of the Debtors and their estates; and the Debtors having provided notice of the Motion as set forth in the Motion; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[5]**

A.      *Petition Date.* On December 21, 2022 (the "***Petition Date***"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court commencing these Chapter 11 Cases.

B.      *Debtors in Possession.* The Debtors continue to manage and operate their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in any of the Chapter 11 Cases.

C.      *Committee Formation.* On January 9, 2023, the Office of the United States Trustee (the "***U.S. Trustee***") appointed the Official Committee of Unsecured Creditors (the "***Official Committee***") pursuant to section 1102 of the Bankruptcy Code [Docket No. 256].

---

[5]     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

Ad Hoc Equity Group Exhibit 7

D.      *Jurisdiction and Venue.* This Court has jurisdiction over the Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334. This Court's consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b). Venue for these Chapter 11 Cases and the proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The predicates for the relief set forth herein are sections 105, 361, 362, 363, 364, 503, 506, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Bankruptcy Rule 4001-2.

E.      *Debtors' Stipulations, Releases and Acknowledgements with Respect to Replacement DIP Lenders.* In exchange for and as a material inducement to the Replacement DIP Secured Parties to provide the Replacement DIP Facility, after consultation with their attorneys and advisors, the Debtors, on behalf of themselves and their estates, hereby admit, stipulate, acknowledge and agree as follows (without prejudice to the rights of the Official Committee and other parties in interest in paragraph 23 of this Interim Order (subject to the limitations set forth therein)):

(a)      ***Prepetition Unsecured Bridge Notes.***

(i)      *Bridge Notes.* Core Scientific has issued, to B. Riley Commercial Capital, LLC (the "***Bridge Noteholder***") as holder, (x) that certain $60,000,000 Bridge Promissory Note dated April 7, 2022 (the "***$60M Bridge Note***") and (y) that certain $15,000,000 Bridge Promissory Note also dated April 7 2022, (the "***$15M Bridge Note***", and together, with the $60M Bridge Note, collectively, as amended, restated or otherwise modified from time to time, the "***Bridge Notes***"). In connection with the Bridge Notes, Core Scientific and the Bridge Noteholder executed that certain Fee Letter, dated as of April 7, 2022 (the "***Fee Letter***," and together with all other agreements, instruments, certificates, and other documents executed and/or delivered in connection the Bridge Notes, the "***Bridge Note Documents***").

(ii)      *Bridge Note Obligations.* As of the Petition Date, Core Scientific was justly and lawfully indebted to the Bridge Noteholder, without defense, claim, counterclaim, challenge or offset of any kind, in the aggregate amount of approximately $42,000,000 on account of principal amounts outstanding under the Bridge Note Documents, plus accrued but unpaid interest thereon, plus all fees, costs, expenses (including attorneys', financial advisors' and other professionals' fees and expenses, as

relevant), charges, disbursements, indemnification and reimbursement obligations (contingent or otherwise), and all other amounts that may be due or owing under the Bridge Note Documents (collectively, the "**Bridge Note Obligations**").

(b)     *Validity and Enforceability of the Bridge Note Obligations.* As of the date hereof, (i) the Bridge Note Obligations constitute legal, valid, binding and non-avoidable obligations of Core Scientific, enforceable in accordance with the terms of the Bridge Note Documents; (ii) no challenges, objections, defenses, claims or counterclaims of any kind or nature whatsoever with respect to any of Bridge Note Obligations exist, and no portion of the Bridge Note Obligations is subject to any challenge, defense or claim (as defined in section 101(5) of the Bankruptcy Code) of any kind or nature whatsoever, including, without limitation, avoidance (whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, or recovery, in each case, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise; (iii) the Debtors waive, discharge, and release any right to challenge the enforceability or validity of any of the Bridge Note Obligations; and (iv) the Bridge Note Obligations constitute allowed claims within the meaning of section 502 of the Bankruptcy Code against Core Scientific and its respective estate.

(c)     *No Claims, Defenses, or Causes of Action against Replacement DIP Secured Parties*. As of the date hereof, there exists no challenge, objection, defense, claim, counterclaim, or other cause of action, of any kind or nature whatsoever, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise, against any of the Replacement DIP Secured Parties or any of their respective officers, directors, members, managers, partners, equity holders, subsidiaries, affiliates, related parties, employees, investment advisors or managers, agents, attorneys, advisors, professionals (collectively, together with each of their successors and assigns, the "**Representatives**") (in their capacities as such) arising from, in connection with, or relating to this Interim Order.

(d)     *Releases*. Subject to paragraph 23 of this Interim Order, effective as of the date of entry of this Interim Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of its predecessors, successors and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits each of the Replacement DIP Secured Parties and each of their respective Representatives (in their capacities as such) from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, cross-claims, demands, defenses, objections, challenges, offsets or setoff, debts, accounts, contracts, liabilities, remedies, suits, controversies, actions, causes of action, losses, damages, indemnities, reimbursement obligations, attorneys' fees, costs, expenses or judgments, of every kind or nature whatsoever, whether matured or unmatured, known or unknown, asserted or unasserted, suspected or unsuspected, foreseen or unforeseen, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, pending or threatened, arising in law or equity, upon contract or tort, under the Bankruptcy Code, any state or federal common law, statute, rule, regulation or otherwise, in each case, that may be asserted by any of the

**Ad Hoc Equity Group Exhibit 7**

Debtors, their respective estates, predecessors, successors or assigns, against the Replacement DIP Secured Parties or their respective Representatives (in their capacities as such) for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time prior to the date of this Interim Order, in each case, arising under, in connection with, or related to this Interim Order the transactions contemplated thereunder or hereunder, or the negotiation thereof or hereof, including any claim or cause of action seeking (i) any so-called lender liability, (ii) any and all claims arising under the Bankruptcy Code, whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or (iii) reduction, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge or recovery, or any other related claim or cause of action with respect to the validity, enforceability, priority, scope, extent or perfection of the DIP Liens, the Replacement DIP Obligations, or the Replacement DIP Loan Documents (as relevant).

F.      *Debtors' Stipulations, Releases and Acknowledgements with Respect to Prepetition Secured Parties.* In exchange for and as a material inducement to the use of Cash Collateral that constitutes Prepetition Secured Notes Collateral, after consultation with their attorneys and advisors, the Debtors, on behalf of themselves and their estates, hereby admit, stipulate, acknowledge and agree as follows (without prejudice to the rights of the Official Committee and other parties in interest in paragraph 23 of this Interim Order (subject to the limitations set forth therein)) (collectively, the admissions, stipulations, and acknowledgments and agreements set forth in paragraphs E and F of this Interim Order, the "***Debtors' Stipulations***"):

(a)      *Prepetition April NPA Secured Notes.*

(i)      *Prepetition April NPA.* Pursuant to (x) that certain Secured Convertible Note Purchase Agreement, dated as of April 19, 2021 (as amended, amended and restated, supplement or otherwise modified from time to time prior to the Petition Date, the "***Prepetition April NPA***"), by and among Core Scientific (f/k/a Core Scientific Holding Co.), the guarantors party thereto from time to time (the "***Prepetition April NPA Guarantors***," and together with Core Scientific, the "***Prepetition April NPA Notes Obligors***"), the "Initial Purchasers" and any "Additional Purchasers" party thereto from time to time (collectively, the "***Prepetition April NPA Secured Noteholders***") and U.S. Bank National Association, as note agent and collateral agent (in such capacities, the "***Prepetition April NPA Agent***," and together with the Prepetition April NPA Secured Noteholders, the "***Prepetition April NPA Secured Parties***"), and (y) all other agreements, guarantees, pledge, collateral and security documents, instruments, certificates, promissory notes and other documents executed and/or delivered in connection therewith, including,

**Ad Hoc Equity Group Exhibit 7**

without limitation, all "Note Documents" (as defined in the Prepetition April NPA) (collectively, together with the Prepetition April NPA, the "***Prepetition April NPA Documents***"), Core Scientific issued secured convertible notes (the "***Prepetition April NPA Secured Notes***"), and each of the Prepetition April NPA Guarantors, among other things, jointly and severally, irrevocably and unconditionally guaranteed the due and punctual payment and performance in full in cash of all Prepetition April NPA Secured Notes Obligations (as defined below).

(ii)     *Prepetition April NPA Secured Notes Obligations*. As of the Petition Date, the Prepetition April NPA Notes Obligors were justly and lawfully indebted to the Prepetition April NPA Secured Parties, on a joint and several basis, without defense, claim, counterclaim, challenge or offset of any kind, in the aggregate amount of approximately $239.6 million on account of principal amounts outstanding[6] under the Prepetition April NPA Secured Notes, plus accrued but unpaid interest thereon, plus all fees, costs, expenses (including attorneys', financial advisors' and other professionals' fees and expenses), charges, disbursements, indemnification and reimbursement obligations (contingent or otherwise), including all "Obligations" (as defined in the Prepetition April NPA) and all other amounts that may be due or owing under the Prepetition April NPA Documents (collectively, the "***Prepetition April NPA Secured Notes Obligations***").

(b)     *Prepetition August NPA Secured Notes*.

(i)     *Prepetition August NPA*. Pursuant to (x) that certain Secured Convertible Note Purchase Agreement, dated as of August 20, 2021 (as amended, amended and restated, supplement or otherwise modified from time to time prior to the Petition Date, the "***Prepetition August NPA***"), by and among Core Scientific (f/k/a Core Scientific Holding Co.), the guarantors party thereto from time to time (the "***Prepetition August NPA Guarantors***," and together with Core Scientific, the "***Prepetition August NPA Notes Obligors***"), the "Initial Purchasers" and any "Additional Purchasers" party thereto from time to time (collectively, the "***Prepetition August NPA Secured Noteholders***") and U.S. Bank National Association, as note agent and collateral agent (in such capacities, the "***Prepetition August NPA Agent***," and together with the Prepetition August NPA Secured Noteholders, the "***Prepetition August NPA Secured Parties***"), and (y) all other agreements, guarantees, pledge, collateral and security documents, instruments, certificates, promissory notes and other documents executed and/or delivered in connection therewith, including, without limitation, all "Note Documents" (as defined in the Prepetition August NPA) (collectively, together with the Prepetition August NPA, the "***Prepetition August NPA Documents***"), Core Scientific issued convertible notes (the "***Prepetition August NPA Secured Notes***"), and each of the Prepetition August NPA Guarantors, among other things, jointly and severally, irrevocably and unconditionally guaranteed the due and punctual payment and performance in full in cash of all Prepetition August NPA Secured Notes Obligations (as defined below).

---

[6]     The Prepetition April NPA Secured Parties assert an additional $80 million in Prepetition April NPA Secured Notes Obligations in accreted amounts. The Official Committee disputes such entitlement.

**Ad Hoc Equity Group Exhibit 7**

(ii)    *Prepetition August NPA Secured Notes Obligations*. As of the Petition Date, the Prepetition August NPA Notes Obligors were justly and lawfully indebted to the Prepetition August NPA Secured Parties, on a joint and several basis, without defense, claim, counterclaim, challenge or offset of any kind, in the aggregate amount of approximately $320.7 million on account of principal amounts outstanding under the Prepetition August NPA Secured Notes, plus accrued but unpaid interest thereon, plus all fees, costs, expenses (including attorneys', financial advisors' and other professionals' fees and expenses), charges, disbursements, indemnification and reimbursement obligations (contingent or otherwise), including all "Obligations" (as defined in the Prepetition August NPA) and all other amounts that may be due or owing under the Prepetition August NPA Documents (collectively, the "***Prepetition August NPA Secured Notes Obligations***").

(c)    *Validity and Enforceability of Prepetition Secured Obligations and Prepetition Liens*. As of the Petition Date, (i) the Prepetition Notes Liens in the Prepetition Secured Notes Collateral (A) are legal, valid, binding, enforceable, non-avoidable and fully perfected liens and security interests in the Prepetition Secured Notes Collateral (except with respect to the deposit accounts), (B) were granted to or for the benefit of the Prepetition Secured Parties for fair consideration and reasonably equivalent value, and (C) are senior with priority over any and all other liens or security interests in the Prepetition Secured Notes Collateral, subject only to certain liens and security interests that were valid, non-avoidable and properly perfected as of the Petition Date (or were properly perfected subsequent to the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code) and senior in priority by operation of law to the Prepetition Liens in the Prepetition Secured Notes Collateral as of the Petition Date (the "***Existing Senior Liens***"));[7] (ii) the Prepetition Secured Notes Obligations constitute legal, valid, binding and non-avoidable obligations of each of the Prepetition Notes Obligors, enforceable in accordance with the terms of the applicable Prepetition Notes Documents; (iii) no challenges, objections, defenses, claims or counterclaims of any kind or nature whatsoever with respect to any of the Prepetition Notes Liens or the Prepetition Secured Notes Obligations exist, and no portion of the Prepetition Liens or the Prepetition Secured Obligations is subject to any challenge, defense or claim (as defined in section 101(5) of the Bankruptcy Code) of any kind or nature whatsoever, including, without limitation, avoidance (whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge or recovery, in each case, whether arising under the Bankruptcy Code, applicable non-

---

[7]    Nothing contained herein shall constitute a finding or ruling by this Court that any alleged Existing Senior Lien is valid, senior, enforceable, prior, perfected or non-avoidable. Moreover, nothing contained herein shall prejudice the rights of any party in interest, including, but not limited to the Debtors, the Replacement DIP Secured Parties, the Prepetition Secured Parties, or the Official Committee, in each case, to the extent such party has standing to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any alleged Existing Senior Lien (subject to the terms of this Interim Order). For the purposes hereof, any alleged claim arising or asserted as a right of reclamation or return (whether asserted under section 546(c) of the Bankruptcy Code or otherwise) is not an Existing Senior Lien.

**Ad Hoc Equity Group Exhibit 7**

bankruptcy law or otherwise; (iv) the Debtors waive, discharge, and release any right to challenge the enforceability, validity, priority or perfection of any of the Prepetition Secured Notes Obligations or the Prepetition Notes Liens; and (v) the Prepetition Secured Notes Obligations constitute allowed secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code against each of the Prepetition Notes Obligors and their respective estates.

(d)     *No Claims, Defenses, or Causes of Action against Prepetition Secured Parties*. As of the date hereof, there exists no challenge, objection, defense, claim, counterclaim, or other cause of action, of any kind or nature whatsoever, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise, against any of the Prepetition Secured Parties or any of their Representatives (in their capacities as such) arising from, in connection with, or relating to this Interim Order, the Prepetition Notes Liens, the Prepetition Secured Notes Obligations, the Prepetition Notes Documents or the Prepetition Secured Notes Collateral.

(e)     *Releases*. Subject to paragraph 23 of this Interim Order, effective as of the date of entry of this Interim Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of its predecessors, successors and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits each of the Prepetition Secured Parties and each of their respective Representatives (in their capacities as such) from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, cross-claims, demands, defenses, objections, challenges, offsets or setoff, debts, accounts, contracts, liabilities, remedies, suits, controversies, actions, causes of action, losses, damages, indemnities, reimbursement obligations, attorneys' fees, costs, expenses or judgments, of every kind or nature whatsoever, whether matured or unmatured, known or unknown, asserted or unasserted, suspected or unsuspected, foreseen or unforeseen, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, pending or threatened, arising in law or equity, upon contract or tort, under the Bankruptcy Code, any state or federal common law, statute, rule, regulation or otherwise, in each case, that may be asserted by any of the Debtors, their respective estates, predecessors, successors or assigns, against the Prepetition Secured Parties or their respective Representatives (in their capacities as such) for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time prior to the date of this Interim Order, in each case, arising under, in connection with, or related to this Interim Order, the Prepetition Notes, the Prepetition Liens, the Prepetition Secured Notes Collateral, the Prepetition Secured Obligations, the Prepetition Notes Documents, the Adequate Protection Obligations, the transactions contemplated thereunder or hereunder, or the negotiation thereof or hereof, including any claim or cause of action seeking (i) any so-called lender liability, (ii) any and all claims arising under the Bankruptcy Code, whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or (iii) reduction, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge or recovery, or any other related claim or cause of action with respect to the validity, enforceability, priority, scope,

Ad Hoc Equity Group Exhibit 7

extent or perfection of the Prepetition Liens, the Prepetition Secured Obligations, or the Prepetition Notes Documents (as relevant).

(f)     *Certain Definitions*

(i)     "**Cash Collateral**" means the Debtors' cash (except for cash held in any "Excluded Accounts" (as defined in the Prepetition NPAs) that does not otherwise constitute identifiable proceeds of Prepetition Secured Notes Collateral), as of the Petition Date, wherever located and held, including all cash and cash equivalents deposited or maintained by the Debtors in any accounts, whether as original collateral or proceeds of Prepetition Secured Notes Collateral, and the Debtors' cash after the Petition Date that constitutes proceeds of the Prepetition Secured Notes Collateral within the meaning of section 363(a) of the Bankruptcy Code.

(ii)     "**Prepetition Agents**" means the Prepetition April NPA Agent and the Prepetition August NPA Agent.

(iii)     "**Prepetition Equipment Financings**" means loans or indebtedness incurred by Core Scientific or Core Scientific Operating Company (f/k/a Core Scientific, Inc.) to finance the acquisition of machines or equipment or otherwise incurred under any of the agreements or documents listed on the Schedule of Existing Liens attached hereto as **Exhibit 3**.

(iv)     "**Prepetition Equipment Financing Collateral**" means the property and assets of any Debtor (and proceeds thereof), in each case, as and to the extent a lien or security interest is granted or purported to be granted in such property, assets and/or proceeds thereof, as security for the respective Prepetition Equipment Financings, as more particularly set forth in the applicable Prepetition Equipment Loan Documents.

(v)     "**Prepetition Equipment Financing Liens**" means the liens and security interests of, or asserted by, each of the Prepetition Equipment Lenders in the Prepetition Equipment Financing Collateral purportedly securing the respective Prepetition Equipment Financings to the extent such liens are valid, properly perfected, and non-avoidable. For the avoidance of doubt and notwithstanding anything contrary herein or in the Replacement DIP Loan Documents, the DIP Liens shall not prime the Prepetition Equipment Financing Liens that are Prior Senior Liens.

(vi)     "**Prepetition Equipment Lenders**" means the lenders under the Prepetition Equipment Financings.

(vii)     "**Prepetition Equipment Loan Documents**" means loan documents, and all security, collateral and other agreements, statements, instruments and other documents executed and/or delivered by the Debtors and the Prepetition Equipment Lenders in connection with the Prepetition Equipment Financings.

(viii)     "**Prepetition Notes Liens**" means those liens granted to the Prepetition Agents, for the benefit of themselves and the applicable Prepetition Secured Noteholders, arising from the Prepetition Notes Documents (including, among other

**Ad Hoc Equity Group Exhibit 7**
**67**

Prepetition Notes Documents, (a) the Security Agreement, dated as of April 19, 2021, in respect of the Prepetition April NPA Secured Notes, and (b) following the occurrence of a Conversion Event (as defined in the Prepetition August NPA), the Security Agreement, dated as of February 7, 2022, in respect of the Prepetition August NPA Secured Notes), to secure the Prepetition Secured Notes Obligations to the extent such liens are valid, properly perfected, and non-avoidable.

(ix)   "*Prepetition Notes Documents*" means the Prepetition April NPA Documents and the Prepetition August NPA Documents.

(x)   "*Prepetition Notes Obligors*" means the Prepetition April NPA Notes Obligors and the Prepetition August NPA Notes Obligors.

(xi)   "*Prepetition NPAs*" means the Prepetition April NPA and the Prepetition August NPA.

(xii)   "*Prepetition Secured Noteholders*" means the Prepetition April NPA Secured Noteholders and the Prepetition August NPA Secured Noteholders.

(xiii)   "*Prepetition Secured Notes*" means the Prepetition April NPA Secured Notes and the Prepetition August NPA Secured Notes.

(xiv)   "*Prepetition Secured Notes Collateral*" means all "Collateral" as defined in the Prepetition Notes Documents.

(xv)   "*Prepetition Secured Notes Obligations*" means the Prepetition April NPA Secured Notes Obligations and the Prepetition August NPA Secured Notes Obligations.

(xvi)   "*Prepetition Secured Parties*" means the Prepetition April NPA Secured Parties and the Prepetition August NPA Secured Parties.

(xvii)   "*Prior Senior Liens*" means all liens and security interests on DIP Collateral, including those listed on the Schedule of Existing Liens attached hereto as **Exhibit 3**, in each case, solely to the extent such liens and security interests were existing, valid, fully perfected and non-avoidable as of the Petition Date (or were properly perfected subsequent to the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code).

G.   *Findings Regarding Corporate Authority.* Each of the Replacement DIP Loan Parties has all requisite power and authority to execute and deliver the Replacement DIP Loan Documents to which it is a party and to perform its obligations thereunder.

Ad Hoc Equity Group Exhibit 7

H.     *Findings Regarding Replacement DIP Facility and Use of Cash Collateral.*

(a)     *Good Cause*. Good and sufficient cause has been shown for the entry of this Interim Order and for the Debtors to obtain postpetition financing pursuant to the terms hereof and the Replacement DIP Loan Documents.

(b)     *Need for Postpetition Financing and Use of Cash Collateral*. The Debtors have an immediate and critical need to obtain the Replacement DIP Facility and use Cash Collateral in order to, among other things, (i) repay the Original DIP Facility to avoid an event of default thereunder and the exercise of remedies by the Original DIP Lenders, (ii) permit the orderly continuation and operation of their businesses, (iii) maintain business relationships with customers, vendors and suppliers, (iv) make payroll, (v) make capital expenditures, (vi) pay the expenses of the Chapter 11 Cases (including by funding the Carve-Out), (vii) satisfy working capital and operational needs of the Debtors, and (viii) for general corporate purposes, in each case, in accordance with and subject to the terms and conditions of this Interim Order and the Replacement DIP Loan Documents, including the Approved Budget (subject to Permitted Variances). The Debtors require immediate access to sufficient working capital and liquidity through the incurrence of loans and other financial accommodations under the Replacement DIP Facility and the use of the Prepetition Secured Parties' Cash Collateral in order to preserve, maintain and maximize the going concern value of the Debtors and to facilitate an orderly and successful reorganization of the Debtors. Without access to the DIP Facility and the authorized use of Cash Collateral upon the terms set forth herein, the Debtors and their estates will be immediately and irreparably harmed.

(c)     *No Credit Available on More Favorable Terms.* The Debtors are unable to obtain financing or other financial accommodations on more favorable terms from sources other

Ad Hoc Equity Group Exhibit 7

than the Replacement DIP Secured Parties. The Debtors are unable to obtain adequate unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code. The Debtors are also unable to obtain adequate secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without (a) granting to the Replacement DIP Secured Parties the rights, benefits, remedies and protections set forth herein and the Replacement DIP Loan Documents, including the DIP Liens in all DIP Collateral and the DIP Superpriority Claims, and (b) granting to the Prepetition Secured Parties the rights, benefits remedies and protections set forth herein, including the Noteholder Adequate Protection Liens, the Noteholder Adequate Protection Claims and all other Noteholder Adequate Protection Obligations (each as defined below), in each case, upon the terms set forth herein.

(d)    *Use of Proceeds of Replacement DIP Facility and Cash Collateral.* As a condition to providing the Replacement DIP Facility and their consent to the use of Prepetition Secured Notes Collateral (including Cash Collateral), each of the Replacement DIP Secured Parties and the Prepetition Secured Parties (as applicable) require, and the Debtors have agreed, that all proceeds of the DIP Loans and all Cash Collateral shall be used and/or applied solely for the purposes expressly permitted in, and in a manner consistent with, the Approved Budget (subject to Permitted Variances) including (i) to pay the costs of administration of the Chapter 11 Cases, (ii) for general corporate and working capital purposes, (iii) to pay adequate protection payments to the extent set forth in this Interim Order, (iv) to repay the Debtors' outstanding obligations under the Original DIP Credit Agreement, and (v) to pay professional fees and expenses in accordance with this Interim Order, in each case, subject to the terms and conditions of this Interim Order and the Replacement DIP Loan Documents.

Ad Hoc Equity Group Exhibit 7

(e) *Approved Budget*. The Debtors have prepared and delivered to the Replacement DIP Secured Parties the initial itemized cash flow forecast set forth on **Exhibit 4** attached hereto, which has been approved by the Replacement DIP Lender (the "***Initial Budget***," as amended, supplemented or updated by the Debtors, and approved by the Replacement DIP Lender, from time to time in accordance with the terms of this Interim Order and the Replacement DIP Term Sheet or Replacement DIP Credit Agreement, as applicable, the "***Approved Budget***"), reflecting, on a line item, cumulative and aggregate basis, the Debtors' projected cash receipts expected to be collected, and necessary disbursements and expenditures (including debt service costs) expected to be incurred or made, by the Debtors for each calendar week during the period from the calendar week ending on the Friday of the week in which the Court enters this Interim Order through and including the week ending June 30, 2023. The Initial Budget is an integral part of this Interim Order, and the Replacement DIP Secured Parties are relying, in part, upon the Debtors' agreement to comply with the Approved Budget (subject to Permitted Variances) in determining to enter into the Replacement DIP Facility and to allow the Debtors' use of proceeds of the Replacement DIP Facility in accordance with the terms of this Interim Order and the Replacement DIP Loan Documents.

(f) *Adequate Protection*. Pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code, the Prepetition Secured Parties are entitled to adequate protection against any post-petition diminution in value of the Prepetition Secured Parties' respective liens and interests in the Prepetition Secured Notes Collateral (including Cash Collateral) resulting from, among other things, (i) the use, sale or lease by the Debtors of Prepetition Secured Notes Collateral (including Cash Collateral), (ii) the imposition of the automatic stay, (iii) the imposition of the Carve-Out, and (iv) any other cause or reason to the maximum extent provided under the Bankruptcy Code

and applicable law (collectively, the "***Diminution in Value***"), as set forth in this Interim Order. Based on the Motion, the DIP Declarations, the First Day Declaration, and the other evidence filed in support of the Motion, and the record presented to the Court in connection with the Interim Hearing, the terms of the adequate protection arrangements and the use of Prepetition Secured Notes Collateral (including Cash Collateral) set forth herein are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of Prepetition Secured Notes Collateral (including Cash Collateral) and provide adequate protection to the Prepetition Secured Parties within the meaning of sections 361, 363(c), and 363(e) of the Bankruptcy Code; *provided* that nothing in this Interim Order shall (x) be construed as the affirmative consent by any of the Prepetition Secured Parties for the use of Cash Collateral or other Prepetition Secured Notes Collateral other than on the terms expressly set forth in this Interim Order, (y) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the DIP Collateral or the Prepetition Secured Notes Collateral (whether senior, *pari passu* or junior) other than on the terms expressly set forth in this Interim Order, or (z) prejudice, limit or otherwise impair the rights of any of the Prepetition Secured Parties to seek new, different or additional adequate protection after the date hereof or assert the interests of any of the Prepetition Secured Parties (and the rights of all parties-in-interest to object to any such relief are expressly preserved).

(g)     *Consent by the Prepetition Secured Parties*. The requisite Prepetition Secured Parties have consented (or are deemed to have consented) to the Debtors' use of Prepetition Secured Notes Collateral (including Cash Collateral), to the Debtors' entry into the Replacement DIP Facility, and to the granting of the DIP Liens, the DIP Superpriority Claims, the Noteholder Adequate Protection Liens, the Noteholder Adequate Protection Obligations and the

-18-

Ad Hoc Equity Group Exhibit 7

other liens and claims granted hereunder, in each case, upon the terms set forth in this Interim Order.

(h)     *Section 506(c) and Marshalling Waivers*. As a material inducement to the Replacement DIP Secured Parties to provide the Replacement DIP Facility, and in consideration of (i) the Replacement DIP Secured Parties' agreement to subordinate their DIP Liens to the Carve-Out, as set forth herein and (ii) the DIP Secured Parties' agreement to the payment of expenses of the administration of these cases, subject to the Approved Budget (subject to Permitted Variances), in accordance with the terms of this Interim Order and the Replacement DIP Loan Documents, the Replacement DIP Loan Parties waive their right to surcharge any costs or expenses incurred in connection with the preservation, protection or enhancement of, or realization by the Replacement DIP Secured Parties or the DIP Collateral, whether pursuant to section 506(c) of the Bankruptcy Code or otherwise, and the Replacement DIP Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral.

(i)     *No Control*. None of the Replacement DIP Secured Parties control (or have in the past controlled) the Replacement DIP Loan Parties, their properties or operations, have authority to determine the manner in which any Replacement DIP Loan Parties' operations are conducted or are control persons or insiders of the Replacement DIP Loan Parties by virtue of any of the actions taken in connection with, arising under, or related to the Replacement DIP Loan Documents.

(j)     *Good Faith*. The terms of the Replacement DIP Facility and the Replacement DIP Loan Documents, the terms of adequate protection granted to the Prepetition Secured Parties hereunder, and the terms upon which the Debtors may continue to use Prepetition Secured Notes Collateral (including Cash Collateral) pursuant to the terms of this Interim Order

-19-

Ad Hoc Equity Group Exhibit 7

and the Replacement DIP Loan Documents (as applicable), were negotiated in good faith and at arm's length among the Replacement DIP Loan Parties, the Replacement DIP Secured Parties, the Prepetition Secured Parties, and their respective Representatives, and all of the Replacement DIP Loan Parties' obligations and indebtedness arising under, in respect of, or in connection with, the Replacement DIP Facility, the Replacement DIP Loan Documents and this Interim Order, including all loans, advances, extensions of credit and other financial accommodations made to and guarantees issued by the Replacement DIP Loan Parties pursuant to the Replacement DIP Loan Documents, shall each be deemed to have been extended by the Replacement DIP Secured Parties and each of their respective affiliates, in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by sections 364(e) of the Bankruptcy Code, and each of the claims, liens and security interests, rights, remedies, benefits and protections granted to the Replacement DIP Secured Parties and the Prepetition Secured Parties (and their successors and assigns) pursuant to this Interim Order and the Replacement DIP Loan Documents (including the DIP Liens, the DIP Superpriority Claims, the DIP Obligations and the Noteholder Adequate Protection Obligations) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise. The Prepetition Secured Parties have acted in good faith, and each of the claims, liens and security interests, rights, remedies, benefits and protections granted to the Prepetition Secured Parties (and their successors and assigns) pursuant to this Interim Order (including, without limitation, all Noteholder Adequate Protection Liens, Noteholder Adequate Protection Claims, and Noteholder Adequate Protection Obligations) shall be entitled to the full protection of section 363(m) of the Bankruptcy Code in

**Ad Hoc Equity Group Exhibit 7**

the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

(k)     *Proper Exercise of Business Judgment.* Based on the Motion, the Replacement DIP Declarations, the record presented to the Court at the Interim Hearing and the Chapter 11 Cases, the terms of the Replacement DIP Facility and the Replacement DIP Loan Documents, the terms of adequate protection granted to the Prepetition Secured Parties as set forth in this Interim Order, and the terms upon which the Debtors may continue to use Prepetition Secured Notes Collateral (including Cash Collateral) pursuant to the terms of this Interim Order and the Replacement DIP Loan Documents (as applicable) (i) were negotiated in good faith and at arm's length among the Replacement DIP Loan Parties, the Replacement DIP Secured Parties and the Prepetition Secured Parties, (ii) are fair, reasonable, and the best available to the Debtors under the circumstances, (iii) reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and (iv) are supported by reasonably equivalent value and fair consideration.

(l)     *Notice.* Proper, timely, sufficient and appropriate notice of the Motion and the Interim Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, and no other or further notice of the Motion, the Interim Hearing or the entry of this Interim Order shall be required.

(m)     *Immediate Entry; Relief Essential.* The Debtors have requested, and the Court hereby finds that sufficient cause exists for, the immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Bankruptcy Rules. Unless the relief set forth in this Interim Order is granted, the Debtors' estates will be immediately and irreparably harmed. Consummation of the Replacement DIP Facility and the use of Prepetition Secured Notes Collateral (including Cash Collateral) upon the terms set forth in this Interim Order

Ad Hoc Equity Group Exhibit 7

and the Replacement DIP Loan Documents (as applicable) are necessary to preserve and maximize the value of the Debtors, are in the best interests of the Debtors and their estates, and are consistent with the Debtors' exercise of their fiduciary duties.

NOW THEREFORE, based upon the foregoing findings and conclusions, the Motion, the First Day Declaration, the Replacement DIP Declaration, the evidence adduced at the Interim Hearing and the record before the Court, and after due consideration, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1.    *Motion Granted.* The Motion is hereby granted on an interim basis, and the Replacement DIP Facility and the use of Cash Collateral is hereby authorized and approved on an interim basis, in each case, upon the terms and conditions set forth in this Interim Order, including as set forth in the Replacement DIP Term Sheet, (which is incorporated into this Interim Order in its entirety and is deemed to be a part of this Interim Order) and the Replacement DIP Loan Documents. Any objections to any of the relief set forth in this Interim Order that have not been withdrawn, waived, or settled, and all reservations of rights or other statements inconsistent with this Interim Order, are hereby denied and overruled. This Interim Order shall become effective and enforceable immediately upon its entry.

2.    *Authorization of Replacement DIP Facility and Replacement DIP Loan Documents.*

(a)    *Authorization of Replacement DIP Loan Documents.* The Replacement DIP Loan Parties are hereby authorized to (i) execute, deliver, enter into and perform all of their obligations, and to calculate and pay all fees, costs, expenses, indemnities and other amounts contemplated, under the Replacement DIP Loan Documents and this Interim Order, and

Ad Hoc Equity Group Exhibit 7

(ii) perform all acts, to make, execute, deliver, enter into and perform under any and all other agreements, instruments, certificates, and other documents (including the execution and/or recordation of any collateral, pledge and security documents, mortgages, deeds of trust, control agreements, financing statements or other documents), and to perform all such other and further acts, that may be necessary, required or desirable for the Replacement DIP Loan Parties to perform their obligations under the Replacement DIP Facility, the Replacement DIP Loan Documents and this Interim Order and to implement the transactions contemplated thereunder and hereunder.

(b)     *Authorization to Borrow.* The Replacement DIP Borrowers are hereby authorized to borrow, and the Replacement DIP Guarantors are hereby authorized to jointly and severally guarantee the payment in full in cash of such borrowing with respect to, the principal amount of $35 million (plus applicable interest (including interest and other amounts payable-in-kind), premiums, payments, fees (including professional fees and expenses), costs, expenses, charges and other amounts payable under this Interim Order and the Replacement DIP Loan Documents in connection with such borrowing), under the Replacement DIP Facility, subject to the terms and conditions (including any conditions precedent to such borrowing) set forth in the Replacement DIP Loan Documents and this Interim Order. The Debtors are hereby authorized to use the proceeds of the Replacement DIP Facility and all Cash Collateral solely in the manner and for the purposes expressly permitted in the Approved Budget (subject to Permitted Variances), the Replacement DIP Loan Documents and this Interim Order. All actions taken prior to the date hereof by the Debtors, the Replacement DIP Secured Parties and the Prepetition Secured Parties in accordance with or reliance upon the Interim Order are hereby ratified and approved.

(c)     *Payment of Fees and Expenses.* The Replacement DIP Loan Parties are authorized and directed to pay any and all (i) fees payable under the Replacement DIP Loan

Ad Hoc Equity Group Exhibit 7

Documents, including the Upfront Premium, the Exit Premium, the Extension Fee and the Monthly DIP Agent Fee (each as defined in the Replacement DIP Term Sheet), and each shall not be subject to reduction, setoff or recoupment, and each of which shall be deemed fully earned upon the occurrence of the Closing Date following entry of this Interim Order, (ii) amounts due (or that may become due) in respect of any and all indemnification obligations under the Replacement DIP Loan Documents, and (iii) any other amounts payable in connection with the Replacement DIP Facility and the Prepetition Secured Notes, including the payment of all out-of-pocket costs, expenses and disbursements of the Replacement DIP Secured Parties and Prepetition Secured Parties, including the reasonable and documented fees and expenses of (A)(1) Choate, Hall & Stewart LLP ("*Choate*"), as counsel to the Replacement DIP Secured Parties and (2) any other professionals that may be retained by the Replacement DIP Lender (with the consent of the Replacement DIP Borrowers, such consent not to be unreasonably withheld or delayed, which consent of the Replacement DIP Borrowers shall not be required after the occurrence of a DIP Termination Event (as defined below) (collectively, the "***DIP Professional Fees and Expenses***")) and (B)(1) the Prepetition Agents, including the reasonable and documented fees and expenses of Shipman & Goodwin LLP, counsel to the Prepetition Agents, and (2) the fees and expenses of the ad hoc group of certain Prepetition Secured Noteholders (the "***Ad Hoc Group***"), including (x) Paul Hastings LLP, as counsel to the Original DIP Lenders and the Ad Hoc Group and (y) Moelis & Company, LLC ("*Moelis*"), as investment banker and financial advisor to the Original DIP Lenders and the Ad Hoc Group, pursuant to the terms of that certain letter agreement by and among Core Scientific and Moelis (collectively, the "***Noteholder Professional Fees and Expenses***"). Notwithstanding the foregoing, the Replacement DIP Loan Parties shall be authorized to make the foregoing payments whether or not the Replacement DIP Facility is consummated unless the Court

Ad Hoc Equity Group Exhibit 7

78

rules that any Replacement DIP Lender has (x) materially breached its obligations under any Replacement DIP Loan Document or (y) failed to fund the Replacement DIP Loans as required under the Replacement DIP Loan Documents.

(d)   *Modification of Replacement DIP Loan Documents.* The Replacement DIP Loan Parties are hereby authorized to execute, deliver and perform under one or more amendments, waivers, consents, or other modifications (including, for the avoidance of doubt, the payment of any amendment fee, consent fee, waiver fee or similar fee paid or payable in connection therewith) to and under the Replacement DIP Loan Documents, in each case, in accordance with the provisions thereof governing amendments thereto, each without further application to or order of the Court; *provided* that any amendment to the Replacement DIP Credit Agreement shall require, at a minimum, the prior written consent of the Replacement DIP Lender; *provided*, *further*, that any amendment that (a) shortens the maturity of the extensions of credit thereunder, (b) increases the aggregate commitments thereunder, (c) increases the rate of interest payable with respect thereto, or (d) that is otherwise material to the Replacement DIP Facility or adversely impacts the interests of unsecured creditors (each, a "***Material DIP Amendment***"), shall be provided (which may be by electronic mail) to the U.S. Trustee and lead restructuring counsel to the Official Committee and filed with the Court no later than three (3) Business Days prior to the anticipated date of effectiveness of any such Material DIP Amendment, and if no objection to the Material DIP Amendment is made by the U.S. Trustee or the Official Committee within such three (3) Business Day period, then, without further application to or order of the Court, such Material DIP Amendment shall automatically be deemed approved and effective; *provided*, *further*, that, if an objection is made by the U.S. Trustee or the Official Committee within such three (3) Business Day period, then such Material DIP Amendment shall be subject to a hearing and approval of the

Ad Hoc Equity Group Exhibit 7

Court.  Any amendment to the Replacement DIP Facility that does not constitute a Material DIP Amendment shall be provided as soon as reasonably practical prior to execution to lead restructuring counsel to the Official Committee.

(e)     *DIP Funding Account*. Upon entry of this Interim Order, the Replacement DIP Borrower is hereby authorized and directed to establish a new bank account or use an existing bank account (the "***Replacement DIP Funding Account***"), which shall be subject to a control agreement in form and substance acceptable to the Replacement DIP Agent, and shall at all times be subject to the exclusive dominion and control of the Replacement DIP Agent. Subject to the Carve-Out, until all Replacement DIP Obligations are Paid in Full, the proceeds of all DIP Borrowings under the Replacement DIP Facility, and all cash receipts, and all proceeds from the sale or other disposition of, or other revenue of any kind attributable to, any DIP Collateral that is now in, or shall hereafter come into, the possession or control of any of the Replacement DIP Loan Parties, or to which any of the Replacement DIP Loan Parties is now or shall hereafter become entitled, shall be deposited into the DIP Funding Account, and all cash and other amounts held in or credited to the DIP Funding Account may not be withdrawn or used by the Replacement DIP Loan Parties other than as expressly permitted hereunder or in the Replacement DIP Loan Documents.

(f)     *Perfection in Cash*. Subject to the Carve-Out, and subject to the terms of this Interim Order and the Replacement DIP Loan Documents, all financial institutions with which the Replacement DIP Loan Parties maintain accounts containing any of the Replacement DIP Loan Parties' cash that constitutes DIP Collateral are authorized and directed to comply with any request of the Replacement DIP Agent to turn over to the Replacement DIP Agent all cash therein without offset or deduction of any kind. The Replacement DIP Agent shall be entitled to all of the rights

-26-

Ad Hoc Equity Group Exhibit 7

and benefits of all deposit account control agreements, blocked account control agreements, securities account control agreements, and similar agreements to which any of the Replacement DIP Loan Parties may be a party, without the need to enter into any such agreements. Notwithstanding (and without limiting) the foregoing, the Replacement DIP Loan Parties are authorized to enter into, and cause the financial institutions servicing or maintaining the Replacement DIP Loan Parties' deposit accounts (or other accounts) to enter into, such deposit account control agreements and other collateral agreements with the Replacement DIP Agent and such financial institutions as the Replacement DIP Agent may reasonably request.

   3.   *Replacement DIP Obligations.*

   (a)   Upon execution and delivery of the Replacement DIP Loan Documents, the Replacement DIP Loan Documents shall constitute valid, binding, enforceable, and non-avoidable obligations of each of the Replacement DIP Loan Parties, and shall be fully enforceable against each of the Replacement DIP Loan Parties, their estates, and any successors thereto, including any estate representative or trustee appointed in any of the Chapter 11 Cases or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or relating to any of the foregoing, and/or upon the dismissal of any of the Chapter 11 Cases or any such successor cases (collectively, the "***Successor Cases***"), in each case, in accordance with the terms of the Replacement DIP Loan Documents and this Interim Order.

   (b)   Upon execution and delivery of the Replacement DIP Loan Documents, the Replacement DIP Loan Parties shall be jointly and severally liable for all Replacement DIP Obligations, including all loans, advances, indebtedness, obligations, extensions of credit, financial accommodations, principal, interest, payments, premiums or similar amounts, fees, costs,

-27-

expenses, charges, indemnification and reimbursement obligations (whether contingent or absolute), and all other amounts, whenever the same shall become due and payable, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, to the Replacement DIP Agent or the Replacement DIP Lender under the Replacement DIP Loan Documents or this Interim Order. The Replacement DIP Obligations shall be due and payable, without notice or demand on the DIP Termination Declaration Date (as defined below) (subject to paragraph 20(b) hereof).

(c)     All obligations incurred, payments made, and transfers or grants of liens and security interests set forth in this Interim Order and the Replacement DIP Loan Documents by the Replacement DIP Loan Parties are granted to or for the benefit of the Replacement DIP Loan Parties for fair consideration and reasonably equivalent value and are granted contemporaneously with the making of the loans and commitments and other financial accommodations secured thereby. No obligation, payment, transfer, or grant of liens or security interests under this Interim Order or the Replacement DIP Loan Documents to the Replacement DIP Secured Parties shall be limited, stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law, or subject to any challenge, objection, defense or claim, including avoidance (whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge, recovery or other cause of action of any kind or nature whatsoever, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise (subject, solely in the case of the DIP Professional Fees and Expenses and the

-28-

Noteholder Professional Fees and Expenses, only to the procedures set forth in paragraph 11 of this Interim Order).

4.      *No Obligation to Extend Credit.* The Replacement DIP Secured Parties shall have no obligation to make any loan or advance available under the Replacement DIP Loan Documents unless all of the conditions precedent to the making of such loan or advance by the Replacement DIP Secured Parties have been satisfied in full (or waived) in accordance with the terms of the Replacement DIP Loan Documents and this Interim Order..

5.      *No Duty to Monitor Compliance.* None of the Replacement DIP Secured Parties nor the Prepetition Secured Parties shall have any obligation or responsibility to monitor the Debtors' use of DIP Collateral, the Prepetition Secured Notes Collateral, or Cash Collateral, and each of the DIP Secured Parties and the Prepetition Secured Parties may rely upon the Debtors' representations that the use of DIP Collateral, Prepetition Secured Notes Collateral, and Cash Collateral complies with and is in accordance with the requirements of this Interim Order and the Replacement DIP Loan Documents (as applicable).

6.      *DIP Liens.*

(a)      As security for the prompt and complete payment and performance of all Replacement DIP Obligations when due (whether upon stated maturity, prepayment, acceleration, declaration or otherwise), effective and perfected as of the entry of this Interim Order, and without the necessity of the execution, recordation or filing by any of the Replacement DIP Loan Parties or the Replacement DIP Secured Parties of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title, or any similar document or instrument, or the taking of any other action (including entering into any control agreements or taking any other action to take possession or control of any DIP Collateral), the

Replacement DIP Agent, for the benefit of itself and the Replacement DIP Lender, is hereby granted valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens and security interests (collectively, the "**DIP Liens**") in all DIP Collateral, in each case, subject and subordinate to the Carve-Out, and subject to the relative priorities set forth in this Interim Order.

(b)     The term "**DIP Collateral**" means (i) all assets and properties (or interest therein) of each of the Replacement DIP Loan Parties and their estates, of any kind or nature whatsoever, wherever located, whether tangible or intangible, real, personal or mixed, whether now owned or consigned by or to, or leased from or to, or hereafter acquired by, or arising in favor of, each of the Replacement DIP Loan Parties (including under any trade names, styles or derivations thereof), whether prior to or after the Petition Date, that is not subject to any liens and security interests that were valid, non-avoidable and properly perfected as of the Petition Date (or that were properly perfected subsequent to the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code), limited, with respect to all real property and the facilities, to the facility located in Marble, North Carolina, and not including Avoidance Actions (as defined below) (the "**First-Priority DIP Collateral**"), (ii) all assets and properties (or interest therein) of the Replacement DIP Loan Parties' estates (whether tangible, intangible, real, personal or mixed and wherever located) as of the Petition Date that (and subject only to that) (A) is subject to valid, perfected, and non-avoidable liens in existence as of the Petition Date (including mortgages, mechanics' liens and fixture filings); limited, with respect to all real property and the facilities, to those located in Calvert City, Kentucky; Grand Forks, North Dakota; Muskogee, Oklahoma; Barstow, Texas (Cedarvale); Pecos, Texas (Cottonwood); and Dalton, Georgia, or (B) is subject to valid liens in existence on the Petition Date that are perfected subsequent to the Petition Date as

**Ad Hoc Equity Group Exhibit 7**
**84**

permitted by section 546(b) of the Bankruptcy Code (collectively, the "***Junior-Priority DIP Collateral***"), (iii) upon entry of the Final Order, the proceeds of any causes of actions for preferences, fraudulent conveyances, and other avoidance power claims under sections 502(d), 544, 545, 547, 548, and 550 of the Bankruptcy Code (the "***Avoidance Actions***") (but not, for the avoidance of doubt, the Avoidance Actions themselves), and (iv) any and all rents, issues, products, offspring, proceeds, and profits generated by any item of DIP Collateral, without the necessity of any further action of any kind or nature by the Replacement DIP Agent or the Replacement DIP Lender in order to claim or perfect such rents, issues, products, offspring, proceeds, and/or profits.

        (c)      The DIP Liens shall be subject to the following priorities (subject in each case to the Carve-Out):

        (i)      *First-Priority Liens on Unencumbered Property.* Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected first-priority liens and security interests in all First-Priority DIP Collateral (the "***Frist-Priority DIP Liens***"), which First-Priority DIP Liens shall be junior and subordinated only to the Carve-Out.

        (ii)      *Liens Junior to Certain Other Liens.* Pursuant to sections 364(c)(3) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected liens and security interests in all Junior-Priority DIP Collateral (the "***Junior-Priority DIP Liens***"), which Junior-Priority DIP Liens in such Junior Priority DIP Collateral shall be subject only to the (a) Carve-Out, in all respects, and, as applicable (b)(1) the Prior Senior Liens, (2) the Equipment Lender Adequate Protection Liens, (3) the Prepetition Notes Liens, and (4) the Noteholder Adequate Protection Liens.

        (d)      To the maximum extent permitted by the Bankruptcy Code, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document or other agreement that requires the consent or approval of one or more landlords, licensors or other parties, or requires the payment of any fees or obligations to any governmental entity, non-governmental entity or any other person or entity, in order for any Debtor

Ad Hoc Equity Group Exhibit 7

to pledge, grant, mortgage, sell, assign, or otherwise transfer any interest therein (including any fee or leasehold interest), any proceeds thereof or other DIP Collateral, shall be deemed inconsistent with the provisions of the Bankruptcy Code and shall have no force or effect with respect to the granting of the DIP Liens or Adequate Protection Liens (as defined below) in any such interest therein or other DIP Collateral, or in the proceeds of any assignment and/or sale thereof by any Debtor in favor of the Replacement DIP Secured Parties in accordance with the DIP Loan Documents and this Interim Order.

(e)     For the avoidance of doubt and notwithstanding anything contrary herein or in the Replacement DIP Credit Agreement, the DIP Liens shall not prime the Prepetition Equipment Financing Liens that are Prior Senior Liens.

7.     *DIP Superpriority Claims.* Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the Replacement DIP Obligations shall constitute allowed superpriority administrative expense claims against each of the Debtors, with priority over any and all other claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including any and all other administrative expense claims of the kind specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, or 1114 of the Bankruptcy Code, or any other provision of the Bankruptcy Code (including the Adequate Protection Claims and any other Adequate Protection Obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment (the "***DIP Superpriority Claims***"), subject only to the Carve-Out. The DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code. The DIP Superpriority Claims shall be payable by each of the Debtors, on a joint and several basis, and shall have recourse to all DIP

Ad Hoc Equity Group Exhibit 7

Collateral, subject only to the Carve-Out. The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code, including in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

8.    *Use of DIP Collateral and Cash Collateral.*

(a)    The Debtors are hereby authorized to use the proceeds of DIP Loans and all Cash Collateral solely to the extent expressly permitted under the Approved Budget (subject to Permitted Variances) and subject to the terms and conditions set forth in the Replacement DIP Loan Documents and this Interim Order.

(b)    Without the prior written consent of the Replacement DIP Lender, the Replacement DIP Loan Parties shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral (or enter into any binding agreement to do so), except as may be expressly permitted by the Replacement DIP Loan Documents and this Interim Order. All collection and proceeds of DIP Collateral, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnation, or otherwise, will be deposited and applied as required by this Interim Order and the Replacement DIP Loan Documents. The Debtors shall not transfer any cash, assets, properties or other DIP Collateral to any Replacement DIP Loan Party or other affiliate of the Debtors that is not a Debtor in the Chapter 11 Cases without the prior written consent of the Replacement DIP Lender, in their discretion.

(c)    The Debtors are hereby authorized to use the proceeds of all Cash Collateral as set forth in this Interim Order.

(d)    Except as may be provided in the Replacement DIP Loan Documents, the Debtors are authorized and directed, upon the closing of a sale of any of the First-Priority DIP Collateral, to immediately pay all proceeds of any such sale to the Replacement DIP Agent, for

Ad Hoc Equity Group Exhibit 7

the benefit of itself and the Replacement DIP Lender, to satisfy the Replacement DIP Obligations in accordance with this Interim Order and the Replacement DIP Loan Documents until Paid in Full,[8] and any order approving the sale of such First-Priority DIP Collateral shall provide that the sale is conditioned upon the payment of such Replacement DIP Obligations (except to the extent otherwise agreed in writing by the Replacement DIP Lender); *provided* that notwithstanding anything to the contrary in the Replacement DIP Loan Documents or this Interim Order, the proceeds of any disposition of assets subject to one or more Prior Senior Liens or Prepetition Notes Liens shall be payable on account of Replacement DIP Obligations only after the obligations secured by such Prior Senior Liens or Prepetition Notes Liens (as the case may be) have been satisfied.

9.     *Approved Budget.* The DIP Loan Parties shall comply at all times with the Approved Budget then in effect (subject to Permitted Variances). Any amendments, supplements or updates to the Initial Budget (or any subsequent Approved Budget) (each, a "**Budget Supplement**") shall be subject to the prior approval of the Replacement DIP Lender in accordance with the Replacement DIP Loan Documents, and any such Budget Supplement shall not constitute an "Approved Budget" unless and until it is so approved by the Replacement DIP Lender (and until any such Budget Supplement is approved by the Replacement DIP Lender, the prior Approved Budget shall remain in effect).

10.     *Adequate Protection.* The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of

---

[8]     For purposes hereof, the term "***Paid in Full***" or "***Payment in Full***" means, with respect to the Replacement DIP Obligations or the Prepetition Secured Notes Obligations (as the case may be), the irrevocable and indefeasible payment in full in cash of all DIP Obligations or Prepetition Secured Notes Obligations (as the case may be), other than contingent indemnification and expense reimbursement obligations for which no claim or demand has been asserted, and all commitments thereunder shall have irrevocably, permanently and finally expired or shall have been terminated, cancelled and discharged.

their Prepetition Notes Liens in Prepetition Secured Notes Collateral (including Cash Collateral), as follows (the liens, security interests, payments and other obligations set forth in this paragraph 10 are collectively referred to herein as the "***Noteholder Adequate Protection Obligations***"):

      (a)    *Noteholder Adequate Protection Claims.* The Prepetition Agents, for their own benefit and for the benefit of the Prepetition Secured Noteholders, are hereby granted, in the amount of any aggregate Diminution in Value of the Prepetition Notes Liens in the Prepetition Secured Notes Collateral (including Cash Collateral) from and after the Petition Date, superpriority administrative expense claims contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors (the "***Noteholder Adequate Protection Claims***"), which shall be payable by each of the Debtors on a joint and several basis, and shall have recourse to all DIP Collateral, subject to the terms hereof and priorities set forth herein. The Noteholder Adequate Protection Claims shall be (a) subject and subordinate only to the Carve-Out and the DIP Superpriority Claims, (b) *pari passu* with the Equipment Lender Adequate Protection Claims (as defined below), and (c) senior to any and all other administrative expense claims and all other claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever.

      (b)    *Noteholder Adequate Protection Liens.* The Prepetition Agents, for the benefit of themselves and for the benefit of the Prepetition Secured Noteholders, are hereby granted, effective and perfected as of the entry of this Interim Order, and without the necessity of the execution, recordation or filing by any of the Prepetition Secured Parties of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title for titled goods, or any similar document or instrument, or the taking of any other action (including entering into any control agreements or taking possession or control of any

Ad Hoc Equity Group Exhibit 7

Prepetition Secured Notes Collateral), in the amount of any aggregate Diminution in Value of the Prepetition Notes Liens in the Prepetition Secured Notes Collateral (including Cash Collateral) from and after the Petition Date, valid, binding, enforceable and automatically perfected post-petition liens and security interests in all DIP Collateral (the "***Noteholder Adequate Protection Liens***"). The Noteholder Adequate Protection Liens shall be (i) junior and subordinated only to (A) the Carve-Out, (B) the First-Priority DIP Liens, (C) the Prior Senior Liens, and (D) the Equipment Lender Adequate Protection Liens in the Prepetition Equipment Financing Collateral, (ii) *pari passu* with the Equipment Lender Adequate Protection Liens in First-Priority DIP Liens, and (iii) senior to any and all other liens and security interests in the DIP Collateral, including the Equipment Lender Adequate Protection Liens.

(c)     *Reporting.* The Debtors shall contemporaneously provide the Prepetition Agents, the Ad Hoc Group (and their respective advisors) with all reports, documents and other information required to be delivered to the Replacement DIP Secured Parties under the Replacement DIP Loan Documents and this Interim Order.

(d)     *Cash Management.* The Replacement DIP Loan Parties shall maintain their cash management arrangements in a manner consistent with those described in the applicable "first-day" order, which shall be in form and substance reasonably acceptable to the Replacement DIP Lender and the Ad Hoc Group.  The DIP Loan Parties shall not open any new deposit or securities account that is not subject to the liens and security interests of each of the Replacement DIP Secured Parties (in which case they shall be subject to the lien priorities and other provisions set forth in this Interim Order).

Ad Hoc Equity Group Exhibit 7

11.    *Fees and Expenses; Payments.*

(a)    The payment of all DIP Professional Fees and Expenses and Noteholder Professional Fees and Expenses hereunder shall not be subject to further application to or approval of the Court, and shall not be subject to allowance or review by the Court or subject to the U.S. Trustee's fee guidelines, and no attorney or advisor to the Replacement DIP Secured Parties shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court; *provided* that any time such professionals seek payment of fees and expenses from the Debtors from and after the Closing Date but prior to the effective date of any chapter 11 plan, each such professional shall provide summary copies of its invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of their invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine) to lead restructuring counsel to the Debtors, the U.S. Trustee, and lead restructuring counsel to the Official Committee (collectively, the "***Review Parties***"); *provided* that the U.S. Trustee and the Official Committee reserve their rights to reasonably request additional detail regarding the services rendered and expenses incurred by such professionals. Any objections raised by any Review Party with respect to such invoices must be in writing and state with particularity the grounds therefor and must be submitted to the affected professional within ten (10) calendar days after delivery of such invoices to the Review Parties (such ten (10) day calendar period, the "***Review Period***"). If no written objection is received prior to the expiration of the Review Period from the Review Parties, the Debtors shall pay such invoices within three (3) Business Days following the expiration of the Review Period. If an objection is received within

Ad Hoc Equity Group Exhibit 7

the Review Period from the Review Parties, the Debtors shall promptly pay the undisputed amount of the invoice, and the disputed portion of such invoice shall not be paid until such dispute is resolved by agreement between the affected professional and the objecting party or by order of this Court. Any hearing to consider such an objection to the payment of any fees, costs or expenses set forth in a professional fee invoice hereunder shall be limited to the reasonableness of the fees, costs and expenses that are the subject of such objection.

   (b) Notwithstanding anything contained in this paragraph 11 to the contrary, the Replacement DIP Loan Parties are authorized and directed to pay the following:  (i) promptly following the entry of this Interim Order, the Replacement DIP Loan Parties shall pay in full in cash all DIP Professional Fees and Expenses and Noteholder Professional Fees and Expenses, in each case, whether arising on or after the Petition Date, through the date of payment, (ii) upon the Closing Date (as defined in the Replacement DIP Term Sheet), the Replacement DIP Loan Parties shall pay in full in cash all DIP Professional Fees and Expenses arising through and including the Closing Date, in each case, without the need for any professional engaged by or on behalf of the Replacement DIP Secured Parties to first deliver a copy of its invoice to any of the Review Parties (other than the Replacement DIP Loan Parties), and (iii) following the Closing Date, the Replacement DIP Loan Parties shall pay in full in cash all DIP Professional Fees and Expenses incurred after the Closing Date in accordance with and subject to the procedures set forth above in this paragraph 11 of this Interim Order.

   (c) Notwithstanding anything contained in this paragraph 11 to the contrary, to the extent any chapter 11 plan filed in the Chapter 11 Cases and confirmed by an order of this Court provides for different procedures for the submission of invoices and payment of professional fees of any professional persons that the Debtors are authorized to pay pursuant to this Interim

-38-

**Ad Hoc Equity Group Exhibit 7**

**92**

Order, then the procedures set forth in such confirmed chapter 11 plan shall control, provided that no such professional person shall be subject to more onerous procedures for compensation than are set forth herein.

(d)     Notwithstanding anything contained in this Interim Order to the contrary, any and all payments, premiums, fees, costs, expenses and other amounts paid at any time by any of the Replacement DIP Loan Parties to the Replacement DIP Secured Parties pursuant to the requirements of this Interim Order or the DIP Loan Documents, whether prior to, on or after the Petition Date, shall be non-refundable and irrevocable, are hereby approved (and to the extent paid prior to entry of the Interim Order, ratified in full), and shall not be subject to any challenge, objection, defense, claim or cause of action of any kind or nature whatsoever, including avoidance (whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), reclassification, disgorgement, disallowance, impairment, marshaling, surcharge or recovery or any other cause of action, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise, by any person or entity (subject, solely in the case of the DIP Professional Fees and Expenses, to paragraphs 11(a), (b) and (c) of this Interim Order).

12.     *Adequate Protection Reservation of Rights of Prepetition Secured Parties/Prepetition Equipment Lenders.* Notwithstanding any other provision hereof, the grant of adequate protection to the Prepetition Secured Parties and the Prepetition Equipment Lenders pursuant to this Interim Order shall not be deemed an admission that the interests of such Prepetition Secured Parties or the Prepetition Equipment Lenders are indeed adequately protected,

Ad Hoc Equity Group Exhibit 7

and is without prejudice to the rights of (a) the Prepetition Secured Parties or the Prepetition Equipment Lenders to seek additional relief with respect to the use of Prepetition Secured Notes Collateral (including Cash Collateral), and (b) the Prepetition Equipment Lenders to seek additional relief with respect to the use of Prepetition Equipment Financing Collateral, or to seek modification of the grant of adequate protection provided hereby so as to provide different or additional adequate protection (including, among other things, debt service payments), and without prejudice to the right of the Debtors or any other party in interest to contest any such modification. Nothing herein shall be deemed to waive, modify or otherwise impair the respective rights of the Prepetition Secured Parties or the Prepetition Equipment Lenders under the Prepetition Notes Documents and the Prepetition Equipment Loan Document, respectively, or under applicable law, and the Prepetition Secured Parties and the Prepetition Equipment Lenders expressly reserve all of their respective rights and remedies whether now existing or hereafter arising under the Prepetition Notes Documents or the Prepetition Equipment Loan Documents and applicable law. Without limiting the foregoing, and subject only to the Carve-Out, nothing contained in this Interim Order shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided hereunder is insufficient to compensate the Prepetition Secured Parties or the Prepetition Equipment Lenders for any Diminution in Value during the Chapter 11 Cases.

13. *Refinancing of the Original DIP Credit Agreement.* The Replacement DIP Loan Parties are hereby authorized to (a) execute and deliver, and to perform all of their obligations (including contingent expense reimbursement and indemnification obligations) under a payoff letter that is reasonably satisfactory to the Debtors, the Original DIP Agent, the Replacement DIP Agent, and the Official Committee (the "**Payoff Letter**"), (b) use available cash on hand and

Ad Hoc Equity Group Exhibit 7

proceeds of the Interim DIP Borrowing, at the closing of the Replacement DIP Facility, to (i) indefeasibly repay in full in cash and discharge all obligations owed under the Original DIP Facility in accordance with the Payoff Letter, and (ii) indefeasibly pay in full in cash all fees and expenses set forth in the Payoff Letter, and (c) in connection with such repayment, terminate the Original DIP Facility documents, execute, deliver, enter into and, as applicable, perform all actions under such documents as reasonably required in furtherance of such repayment of the Original DIP Facility and termination of the Original DIP Facility Documents, and take such other and further acts as may be necessary, appropriate or desirable in connection therewith. The liens securing the obligations under the Original DIP Facility shall be automatically released and terminated upon the repayment in full of all such obligations in accordance with this paragraph 13 and the Payoff Letter. In furtherance of the foregoing and without further approval of this Court, each Replacement DIP Loan Party is authorized to make, execute and deliver all instruments, certificates, agreements, charges, deeds and documents necessary to evidence the repayment of the Original DIP Facility and the release of all security interests, liens, and claims related thereto (including, without limitation, the execution or recordation of documents necessary to release, cancel, or otherwise withdraw and pledge and security agreements, mortgages, financing statements and other similar documents), and to pay all fees and expenses in connection therewith.

14.    *Reservation of Rights.* Except as otherwise expressly provided herein or in the Replacement DIP Loan Documents, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the rights of the Replacement DIP Secured Parties, the Prepetition Equipment Lenders, or the Prepetition Secured Parties to seek any other or supplemental relief in respect of the Replacement DIP Loan Parties, (b) the rights of the Replacement DIP Secured Parties, the Prepetition Equipment Lenders, or the Prepetition Secured

-41-

Parties under the Replacement DIP Loan Documents, the Prepetition Equipment Financing Documents or the Prepetition Notes Documents, the Bankruptcy Code or applicable non-bankruptcy law (as applicable), including the right to request modification of the automatic stay of section 362 of the Bankruptcy Code, or (c) any other rights, claims, or privileges (whether legal, equitable or otherwise) of the Replacement DIP Secured Parties, the Prepetition Equipment Lenders, or the Prepetition Secured Parties.

15. *Modification of Automatic Stay.* The automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby vacated and modified, without application to or further order of this Court, to permit: (a) the Replacement DIP Loan Parties to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the Replacement DIP Secured Parties may request to assure the perfection and priority of the DIP Liens, (b) the Replacement DIP Loan Parties to incur all liabilities and obligations to the Replacement DIP Secured Parties as contemplated under this Interim Order and the Replacement DIP Loan Documents, (c) the Debtors to grant the Adequate Protection Liens and the Adequate Protection Claims, and to perform such reasonable acts as the Prepetition Agents may reasonably request to assure the perfection and priority of the Adequate Protection Liens, (d) the DIP Loan Parties to incur liabilities and obligations to the Prepetition Secured Parties related to the Adequate Protection Obligations, as contemplated under this Interim Order, (e) the Replacement DIP Loan Parties to pay all amounts required hereunder and under the Replacement DIP Loan Documents, (f) the Replacement DIP Secured Parties and the Prepetition Secured Parties to retain and apply payments made in accordance with the terms of this Interim Order and the DIP Loan Documents (as applicable), (g) subject to paragraph 20(b) of this Interim Order, the Replacement DIP Secured Parties to exercise, upon the occurrence of any DIP Termination Event (as defined below), all rights and

Ad Hoc Equity Group Exhibit 7

remedies provided for in this Interim Order, the Replacement DIP Loan Documents, or applicable law, (h) the Replacement DIP Loan Parties to perform under this Interim Order and the Replacement DIP Loan Documents, and to take any and all other actions that may be necessary, required or desirable for the performance by the Replacement DIP Loan Parties under this Interim Order and the Replacement DIP Loan Documents and the implementation of the transactions contemplated hereunder and thereunder, and (i) the implementation of all of the terms, rights, benefits, privileges, remedies, and provisions of this Interim Order and the Replacement DIP Loan Documents.

      16.    *Perfection of DIP Liens and Adequate Protection Liens.*

      (a)    This Interim Order shall be sufficient and conclusive evidence of the attachment, validity, perfection, and priority of all liens and security interests granted hereunder and under the Replacement DIP Loan Documents, including the DIP Liens and the Adequate Protection Liens, without the necessity of the execution, recordation or filing of any pledge, collateral or security agreements, mortgages, deeds of trust, lockbox or control agreements, financing statements, notations of certificates of title for titled goods, or any other document or instrument, or the taking of any other action (including entering into any deposit account control agreement or other act to take possession or control of any DIP Collateral), to attach, validate, perfect or prioritize such liens and security interests, or to entitle the DIP Secured Parties and the Prepetition Secured Parties to the priorities granted herein (other than, to the extent applicable, any such filings required under applicable non-U.S. law to attach, validate, perfect or prioritize such liens).

      (b)    Without in any way limiting the automatically effective perfection of the liens and security interests granted under this Interim Order and the Replacement DIP Loan

Ad Hoc Equity Group Exhibit 7

Documents, the Replacement DIP Agent is hereby authorized, but not required, as they in their sole discretion may determine for any reason, to execute, file and record (and to execute in the name of the Replacement DIP Loan Parties, as their true and lawful attorneys, with full power of submission, to the maximum extent permitted under applicable law) financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession or control over cash or securities (to the extent authorized by this Interim Order and the Replacement DIP Loan Documents), or to amend or modify security documents, or to subordinate existing liens and any other similar action or action in connection therewith or take any other action in order to validate, perfect, preserve and enforce the liens and security interests granted to them hereunder or under the Replacement DIP Loan Documents or to otherwise evidence such liens and security interests in all DIP Collateral (each, a "**Perfection Action**"); *provided* that, whether or not the Replacement DIP Agent determines to take any Perfection Action with respect to any liens or security interests granted hereunder, such liens and security interests shall nonetheless be deemed valid, perfected, allowed, enforceable, non-avoidable as of the entry of this Interim Order. Upon the reasonable request of the Replacement DIP Agent, the Replacement DIP Loan Parties and each of the Prepetition Secured Parties, without any further consent of any party, are authorized to take, execute, deliver and file such instruments (in each case, without representation or warranty of any kind) to enable the Replacement DIP Agent to further validate, perfect, preserve and enforce the DIP Liens. All such documents will be deemed to have been recorded and filed as of the date of this Interim Order.

(c)     A certified copy of this Interim Order may, as the Replacement DIP Agent may reasonably determine in their discretion, be filed with or recorded in filing or recording offices in addition to or in lieu of any financing statements, trademark filings, copyright filings,

-44-

mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept such certified copy of this Interim Order for filing and/or recording, as applicable. The automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the Replacement DIP Agent to take all actions, as applicable, referenced in this paragraph 16.

      17.    *Protection of Lenders' Rights.*

      (a)    Until the Replacement DIP Obligations are Paid in Full, the Prepetition Secured Parties shall: (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens or security interests granted to the Prepetition Secured Parties pursuant to the Prepetition Notes Documents or this Interim Order, or otherwise seek to exercise or enforce any rights or remedies against any DIP Collateral, including in connection with the Adequate Protection Liens, (ii) be deemed to have consented to any transfer, disposition or sale of, or release of liens or claims on, such DIP Collateral or the proceeds thereof (but not any such proceeds remaining after Payment in Full of all DIP Obligations) to the extent such transfer, disposition, sale, or release is authorized by the Replacement DIP Secured Parties in accordance with the Replacement DIP Loan Documents and this Interim Order, or (iii) not file any further financing statements, patent filings, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral other than, solely as to this <u>clause (iii)</u>, the Prepetition Agents filing financing statements or other documents or instruments to perfect the liens granted pursuant to this Interim Order or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests existing as of the Petition Date, or (iv) deliver or cause to be delivered, at the Replacement DIP Loan Parties' cost and expenses, any termination statements, releases and/or

Ad Hoc Equity Group Exhibit 7

assignments in favor of the Replacement DIP Agent and the Replacement DIP Lender or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of liens or security interests on any portion of DIP Collateral subject to any sale or disposition authorized hereunder and under the Replacement DIP Loan Documents.

(b)     No Prepetition Secured Party may, directly or indirectly, (i) contest, or support any other Person in contesting, in any proceeding, the extent, validity, attachment, priority, or enforceability of any DIP Lien held by or on behalf of any of the Replacement DIP Secured Parties in the DIP Collateral (or the extent, validity, allowability, or enforceability of any Replacement DIP Obligations secured thereby or purported to be secured thereby) or the provisions of the Replacement DIP Loan Documents or this Interim Order, (ii) take any action that would restrain, hinder, limit, delay or otherwise interfere with the exercise of any rights or remedies by any of the DIP Secured Parties, or (iii) contest, object to, or support any other Person in contesting or objecting to, the manner in which any Replacement DIP Secured Party seeks to enforce or collect the DIP Obligations, the DIP Superpriority Claims or the DIP Liens or any amendment, waiver or modification of any Replacement DIP Loan Document or this Interim Order.

18.     *Maintenance of DIP Collateral.*

(a)     Until such time as all Replacement DIP Obligations are Paid in Full (or as otherwise agreed in writing by the Replacement DIP Agent), the Replacement DIP Loan Parties shall continue to maintain all property, operational, and other insurance as required and as specified in the Replacement DIP Loan Documents. Upon the entry of this Interim Order, the Replacement DIP Agent, for the benefit of itself and the Replacement DIP Secured Parties, shall automatically be deemed to be named as additional insured and lender loss payee under each insurance policy

Ad Hoc Equity Group Exhibit 7

maintained by the Replacement DIP Loan Parties (including all property damage and business interruption insurance policies of the Replacement DIP Loan Parties, whether expired, currently in place, or to be put in place in the future), and shall act in that capacity and distribute any proceeds recovered or received in respect of any such insurance policies in accordance with the terms of this Interim Order and the Replacement DIP Loan Documents.

(b)     The Debtors shall maintain or continue to maintain all property, operational, and other insurance as required and specified in the Prepetition Equipment Loan Documents. The Debtors shall also timely pay all property taxes on the Prepetition Equipment Financing Collateral, as and when due and payable.

19.     *Reporting.* Without limiting the requirements contained herein or in the Replacement DIP Loan Documents, the Replacement DIP Loan Parties and their Representatives shall (a) provide the Replacement DIP Agent, the Replacement DIP Lender, the Ad Hoc Group (solely with respect to <u>clause (a)(i)</u>), and the Official Committee (and each of their respective advisors) with (i) all reports, documents, and information required to be delivered to each such party under the Replacement DIP Loan Documents (contemporaneously when the same is required to be delivered thereunder) and this Interim Order (as applicable), and (ii) reasonable access, upon reasonable notice and during regular business hours, to the Replacement DIP Loan Parties' books and records, assets and properties, for purposes of monitoring the Replacement DIP Loan Parties' businesses and operations and the value of the DIP Collateral, and (b) cooperate and consult with, and provide information reasonably requested by the Replacement DIP Agent, the Replacement DIP Lender, the Ad Hoc Group, or the Official Committee (and their respective advisors) concerning the Replacement DIP Loan Parties' businesses, financial condition, properties, business operations and assets, and the Replacement DIP Loan Parties hereby authorize their

Ad Hoc Equity Group Exhibit 7
101

Representatives to cooperate and consult with, and promptly provide to the such parties (in each case, together with their respective advisors) such information.

20.  *DIP Termination Event; Exercise of Remedies.*

(a)  *DIP Termination Events.* The occurrence of any of the following shall constitute a "DIP Termination Event" under this Interim Order (each a "***DIP Termination Event***"), unless waived in writing by the Replacement DIP Lender: (i) the occurrence of an "Event of Default" under and as defined in the Replacement DIP Credit Agreement, (ii) the occurrence of the "Termination Date" (as defined in the Replacement DIP Loan Documents), (iii) 11:59 p.m. New York City time on the date that is thirty (30) calendar days (and if such 30th calendar day is not a Business Day, the first succeeding Business Day thereafter) after the filing of the Motion (or such later date determined in writing (which may be via electronic mail) by counsel to the Replacement DIP Lenders), if the Final Order, in form and substance acceptable to the Required DIP Lenders in their discretion, has not been entered by the Court by such date and time, (iv) the substantial consummation (as defined in section 1101(2) of the Bankruptcy Code) of a chapter 11 plan of any of the Debtors, (v) any of the Replacement DIP Loan Parties seeks authorization from the Court for (or the Court enters an order authorizing or approving) any amendment, modification, or extension of this Interim Order or the Replacement DIP Loan Documents without the prior written consent of the Replacement DIP Lender (and no such consent shall be implied by any other action, inaction, or acquiescence of any of the Replacement DIP Secured Parties), (vi) the failure of the Replacement DIP Loan Parties to make any payment required under this Interim Order or the Replacement DIP Loan Documents to any of the Replacement DIP Secured Parties as and when due and payable hereunder or thereunder, or (vii) the failure by any of the Replacement DIP

Ad Hoc Equity Group Exhibit 7

Loan Parties to timely perform or comply with any of the other terms, provisions, conditions or other obligations under this Interim Order.

(b)     *Exercise of Remedies.* The Replacement DIP Loan Parties shall immediately provide notice to counsel to the Replacement DIP Agent, the Replacement DIP Lender, the Prepetition Agents, and the Ad Hoc Group of the occurrence of any DIP Termination Event. Upon the occurrence of a DIP Termination Event, without further application to or order from the Court, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the Replacement DIP Agent (acting at the instruction of the Replacement DIP Lender) and/or, with respect to underline clause (vi) below, the Prepetition Agents (acting at the instruction of the requisite Prepetition Secured Parties under the applicable Prepetition Notes Documents), as applicable, to take any of the following actions, at the same or different time: (i) deliver a written notice (which may be via electronic mail) to lead restructuring counsel for the Debtors, the U.S. Trustee and lead restructuring counsel for the Official Committee (the "***Remedies Notice***")[9] declaring the occurrence of a DIP Termination Event (such date, the "***DIP Termination Declaration Date***") and/or deliver a Carve-Out Notice (as defined below), (ii) declare the termination, reduction or restriction of the commitments under the Replacement DIP Facility (to the extent any such commitment remains), (iii) declare all Replacement DIP Obligations to be immediately due and payable, without presentment, demand or protest or other notice of any kind, all of which are expressly waived by the Replacement DIP Loan Parties, (iv) declare the termination of the Replacement DIP Facility and the Replacement DIP Loan Documents as to any further liability or obligation thereunder, but without affecting the

---

[9]     For the avoidance of doubt, with respect to the Replacement DIP Agent (acting on behalf of the Replacement DIP Lender), the Carve-Out Notice and the Remedies Notice may be included in the same notice.

**Ad Hoc Equity Group Exhibit 7**
**103**

DIP Liens, the DIP Superpriority Claims or the Replacement DIP Obligations, (v) declare the reduction or restriction on the Replacement DIP Facility or the Replacement DIP Loan Documents, (vi) declare the termination, restriction or revocation of the ability of the Debtors to use Cash Collateral, (vii) invoke a Cash Dominion Period and/or sweep all cash or other amounts contained in the DIP Funding Account, and (viii) charge interest at the default rate set forth in the Replacement DIP Credit Agreement; *provided* that following the occurrence of a DIP Termination Event, prior to the exercise or enforcement of any rights against DIP Collateral or Prepetition Secured Notes Collateral (as the case may be), the Replacement DIP Agent (acting at the instruction of the Replacement DIP Lender) and/or the Prepetition Agents (acting at the instruction of the requisite Prepetition Secured Parties under the applicable Prepetition Notes Documents), as applicable, shall be required to file a motion with the Court on five (5) Business Days' notice (subject to the Court's availability) seeking an emergency hearing (the "***Stay Relief Hearing***") to determine whether a DIP Termination Event has occurred (and the Replacement DIP Loan Parties and the Official Committee shall not object to the shortened notice with respect to such Stay Relief Hearing). In the event the Court determines during a Stay Relief Hearing that a DIP Termination Event has occurred, the Court may fashion an appropriate remedy, which may include, *inter alia*, the exercise of any and all rights or remedies available to the Replacement DIP Secured Parties under this Interim Order, the Replacement DIP Loan Documents or applicable law against the DIP Collateral; *provided* that the Debtors' rights to contest such relief are expressly preserved.

(c)     *Remedies Notice Period.* During the period from and after the DIP Termination Declaration Date through the date of the Stay Relief Hearing (the "***Remedies Notice Period***"), the Debtors shall be permitted to use Cash Collateral solely to fund (i) payroll and other critical operating expenses included in (and subject to) the Approved Budget that the Debtors

believe are critically necessary to keep the Debtors' businesses operating or that have been consented to by the Replacement DIP Lender or the Prepetition Agent (as applicable) (in each case, which consent shall not be unreasonably withheld or delayed), and (ii) the Professional Fees Escrow Amount; *provided* that any fees or expenses incurred by the Replacement DIP Loan Parties or the Official Committee during the Remedies Notice Period shall permanently reduce the Carve-Out Amount (as defined below). For the avoidance of doubt, during the Remedies Notice Period, the Replacement DIP Lender shall not be obligated to provide any DIP Loans or advance any credit at any time from and after the occurrence of a DIP Termination Event.

(d)      *Leased Premises.* On or after a DIP Termination Declaration Date, the Replacement DIP Secured Parties shall be entitled to enter upon any leased premises in accordance with (i) a separate agreement with the landlord by and between the Replacement DIP Agent and the applicable landlord, (ii) consent of the landlord, (iii) upon entry of an order of this Court, upon notice to the landlord and a hearing, or (iv) in accordance with the rights of the Replacement DIP Agent under applicable non-bankruptcy law and the Replacement DIP Loan Documents.

(e)      *Cooperation.* The Replacement DIP Loan Parties shall reasonably cooperate with the Replacement DIP Secured Parties in their efforts to enforce their liens and security interests in the DIP Collateral and (other than the right to contest whether a DIP Termination Event has occurred and is continuing) the Replacement DIP Loan Parties shall not take or direct any entity to take any action designed or intended to hinder or restrict in any respect such party from enforcing its rights or remedies in the DIP Collateral.

(f)      For the avoidance of doubt, upon delivery of a Remedies Notice, all rights and remedies available to the Prepetition Equipment Lenders under this Interim Order, the Prepetition Equipment Loan Documents or applicable law, including, among other things, the right

**Ad Hoc Equity Group Exhibit 7**

to file a motion with the Court seeking relief from the automatic stay to enforce rights and remedies against the Prepetition Equipment Financing Collateral, are hereby expressly preserved.

21. *No Waiver by Failure to Seek Relief.* The rights and remedies of the Replacement DIP Secured Parties specified herein are cumulative and not exclusive of any rights or remedies that the Replacement DIP Secured Parties may have under this Interim Order, the Replacement DIP Loan Documents, applicable law or otherwise. The failure or delay on the part of any of the Replacement DIP Secured Parties or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the Replacement DIP Loan Documents, the Prepetition Notes Documents or applicable law, as the case may be, shall not constitute a waiver of any of their respective rights hereunder, thereunder or otherwise. Except as expressly set forth herein, none of the rights or remedies of the Replacement DIP Secured Parties or the Prepetition Secured Parties under this Interim Order, the Replacement DIP Loan Documents and the Prepetition Notes Documents shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing and signed by the requisite parties under the Replacement DIP Loan Documents and the requisite parties under the Prepetition Notes Documents, as applicable. No consents required hereunder by any of the Replacement DIP Secured Parties or the Prepetition Secured Parties shall be implied by any inaction or acquiescence by any of the Replacement DIP Secured Parties or the Prepetition Secured Parties (as applicable).

22. *Carve-Out.*

(a) *Priority of Carve-Out.* Each of the DIP Liens, the DIP Superiority Claims, the Prepetition Notes Liens, the Adequate Protection Liens, and the Adequate Protection Claims shall be subject and subordinate to payment of the Carve-Out. The Carve-Out shall be senior to all

Ad Hoc Equity Group Exhibit 7

claims and liens over all assets of the Debtors, including any DIP Collateral and Prepetition Secured Notes Collateral, as set forth in this Interim Order. For the avoidance of doubt, after the occurrence of the DIP Termination Declaration Date and the date upon which the DIP Obligations are Paid in Full, the Carve-Out shall remain in effect as to the Prepetition Secured Notes Obligations and the Adequate Protection Obligations, and the Debtors shall be permitted and required to continue to fund amounts in relation to the Carve-Out in accordance with the terms of this Interim Order.

(b)    *Carve-Out.* As used in this Interim Order, the term "**Carve-Out**" means the sum of (i) all unpaid fees required to be paid to the Clerk of the Court and to the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest at the statutory rate pursuant to 31 U.S.C. § 3717, (ii) all unpaid reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code, (iii) to the extent allowed at any time, whether by interim order, final order, or other order, all accrued but unpaid fees and expenses (excluding any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors) (the "***Allowed Professional Fees***") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "***Debtor Professionals***") and the Official Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "***Committee Professionals***," and together with the Debtor Professionals, the "***Professional Persons***") at any time on or before the date of delivery by the Replacement DIP Agent (at the instruction of the Replacement DIP Lender) of a Carve-Out Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve-Out Notice (the amounts set forth in the foregoing underline clauses (i), underline (ii), and underline (iii), the "***Pre-Carve-Out Notice Amount***"), and (iv) Allowed Professional Fees of Professional Persons incurred after the date of delivery by the Replacement DIP Agent (at the instruction of the Replacement

Ad Hoc Equity Group Exhibit 7

DIP Lender) of the Carve-Out Notice, to the extent allowed at any time, whether by interim order, final order, or other court order, in an aggregate amount not to exceed $2.0 million (the amount set forth in this <u>clause (iv)</u> being the "***Post-Carve-Out Notice Amount***," and together with the Pre-Carve-Out Notice Amount, the "***Carve-Out Amount***"); *provided* that nothing herein shall be construed to impair the ability of any party in interest to object to the fees, expenses, reimbursement, or compensation described herein on any grounds. For purposes of this Interim Order, the "***Carve-Out Notice***" shall mean a written notice (which may be via electronic mail) delivered by the Replacement DIP Agent (acting at the instruction of the Replacement DIP Lender) to lead restructuring counsel to the Debtors, the U.S. Trustee and lead restructuring counsel to the Official Committee, which notice may be delivered following the occurrence of a DIP Termination Event, stating that the Carve-Out has been invoked.

(c) *Closing Date Funding of Carve-out Account*. On the Closing Date, in accordance with the Replacement DIP Term Sheet, the Debtors shall transfer cash in an amount equal to the Post-Carve-out Notice Amount into that certain professional fees escrow account utilized with respect to the Original DIP Facility, which shall continue to function as a segregated account held in trust for and exclusively available for the payment of fees and expenses of Professional Persons (the "***Professional Fees Escrow Account***").

(d) *Pre-Carve-Out Notice.* Prior to the delivery of a Carve-Out Notice, starting with the first full calendar week following the date of this Interim Order, each Professional Person shall deliver to the Debtors, the Replacement DIP Agent, the Replacement DIP Lender, and their respective advisors a weekly statement (each, a "***Weekly Statement***") setting forth a good-faith estimate of the amount of accrued but unpaid fees and expenses incurred by such Professional Person during the preceding week (the "***Weekly Estimated Fees and Expenses***"), and the Debtors

Ad Hoc Equity Group Exhibit 7
108

shall, on a weekly basis, transfer cash proceeds from amounts previously drawn under the DIP Facility or cash on hand into the Professional Fees Escrow Account in an amount equal to the aggregate amount of Weekly Estimated Fees and Expenses based on the Weekly Fee Estimates submitted by each Professional Person (and if no such estimate is provided in a given week, then the amount forecasted for such Professional Person in the Approved Budget) that remain unpaid (and that were not previously funded to the Professional Fees Escrow Account). The Debtors shall use funds held in the Professional Fees Escrow Account exclusively to pay Allowed Professional Fees as they become allowed and payable pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, in accordance with any interim or final orders of the Court; *provided* that the Debtors' obligations to pay Allowed Professional Fees shall not be limited or be deemed limited to funds held in the Professional Fees Escrow Account. For the avoidance of doubt, the Professional Fee Escrow may be the same account established under the Original Interim DIP Order, and the Debtors are authorized to continue to use such account in accordance with the terms of this Interim Order.

(e) *Post-Carve-Out Notice.* On the date on which a Carve-Out Notice is delivered in accordance with this paragraph 22 of this Interim Order, (the "***Carve-Out Trigger Date***"), the Carve-Out Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date (net of any retainers) and any available cash thereafter held by any Debtor to fund into the Professional Fees Escrow Account an amount equal to (i) the Pre-Carve-Out Notice Amount and (ii) the Post-Carve-Out Notice Amount ((i) and (ii), each to the extent not previously funded to the Professional Fees Escrow Account). No later than one (1) Business Day after the delivery of a Carve-Out Notice, each Professional Person shall deliver one (1) additional statement to the Debtors, the Replacement DIP Agent, the Replacement DIP Lender and their respective

**Ad Hoc Equity Group Exhibit 7**
**109**

advisors setting forth a good-faith estimate of the amount of accrued but unpaid fees and expenses incurred by such Professional Person during the period following the period covered by the most recent Weekly Statement previously delivered by such Professional Person through and including the Carve-Out Trigger Date (as defined below), and the Debtors shall transfer such amounts to the Professional Fees Escrow Account (as defined herein).

(f)     Notwithstanding anything to the contrary in this Interim Order, the Replacement DIP Loan Documents or the Prepetition Notes Documents, following delivery of a Carve-Out Notice, the Replacement DIP Agent and the Prepetition Agents shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Professional Fees Escrow Account has been fully funded in an amount equal to all respective obligations benefitting from the Carve-Out as set forth herein. The Professional Fees Escrow Account shall not be subject to the control of the Replacement DIP Agent, any Replacement DIP Lender or any of the Prepetition Secured Parties, and the funds transferred to the Professional Fees Escrow Account shall not be subject to the DIP Liens or the Adequate Protection Liens, nor constitute DIP Collateral; *provided* that the DIP Liens and the Adequate Protection Liens shall automatically attach to any residual interest in the Professional Fees Escrow Account (which liens shall be deemed automatically perfected senior first-priority liens as of entry of this Interim Order), with any excess paid to the Replacement DIP Agent for application to the Replacement DIP Obligations in accordance with the Replacement DIP Loan Documents until the Replacement DIP Obligations are Paid in Full (unless the Replacement DIP Lender have otherwise agreed to in writing), and any excess remaining thereafter shall be applied in accordance with this Interim Order.

Ad Hoc Equity Group Exhibit 7
110

(g)     Notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Professional Fees Escrow Account shall not constitute loans or indebtedness under the Replacement DIP Loan Documents or the Prepetition Notes Documents or otherwise increase or reduce the Replacement DIP Obligations or the Prepetition Secured Notes Obligations, (ii) the failure of the Professional Fees Escrow Account to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve-Out, and (iii) nothing contained herein shall constitute a cap or limitation on the amount that the Professional Persons may assert as administrative expense claims against the Debtors on account of Allowed Professional Fees incurred by such Professional Persons.

(h)     *Payment of Carve-Out on or After the Carve-Out Trigger Date.* Any payment or reimbursement made on or after the occurrence of the Carve-Out Trigger Date in respect of any Allowed Professional Fees incurred after the occurrence of the Carve-Out Trigger Date shall permanently reduce the Carve-Out Amount on a dollar-for-dollar basis.

(i)     *No Direct Obligation to Pay Allowed Professional Fees.* None of the Replacement DIP Secured Parties or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code, regardless of whether such fees or expenses have been allowed by the Court. Nothing in this Interim Order or otherwise shall be construed to obligate the Replacement DIP Secured Parties or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

23.     *Effect of the Debtors' Stipulations on Third Parties.*

Ad Hoc Equity Group Exhibit 7
111

(a)      The Debtors' stipulations, admission, agreements and releases contained in this Interim Order shall be binding upon the Debtors and any successor thereto in all circumstances and for all purposes immediately upon entry of this Interim Order.

(b)      The Debtors' Stipulations in paragraphs E and F of this Interim Order shall be binding upon all parties in interest (other than the Debtors and their successors), including the Official Committee, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, and any other person or entity seeking to act on behalf of the Debtors' estates, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors in the Chapter 11 Cases or any Successor Cases, and each of their respective successors and assigns, in all circumstances and for all purposes, unless the Official Committee or such other party-in-interest (i) obtains requisite standing (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so), to the extent standing is required, pursuant to an order of the Court entered prior to the Challenge Deadline (as defined below), (ii) timely and properly commences and serves an adversary proceeding or contested matter (subject to the limitations contained herein) (each, a "***Challenge Proceeding***") by no later than the Challenge Deadline (as defined below) as against the Replacement DIP Secured Parties (solely with respect to clauses (ii)(C)–(E)) and/or the Prepetition Secured Parties, as the case may be, (A) objecting to or alleging any basis to impair, restrict, deny or otherwise challenge the right of any of the Prepetition Secured Parties to credit bid, in whole or in part, the Prepetition Notes Liens or the Prepetition Secured Notes Obligations under section 363(k) of the Bankruptcy Code or otherwise, (B) objecting to or challenging the amount, validity, perfection, enforceability, priority, scope or extent of the Prepetition Secured Notes Obligations, the Prepetition Notes Liens, the Prepetition Secured Notes Collateral or the Prepetition Notes Documents, (C) otherwise objecting to or

Ad Hoc Equity Group Exhibit 7
112

challenging any of the admissions, stipulations, findings or releases included in the Prepetition Notes Documents or in the Debtors' Stipulations (as applicable), (D) asserting or prosecuting any claim or cause of action of any kind or nature whatsoever, including any claim or cause of action seeking reduction, setoff, offset, recoupment, avoidance (whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge or recovery, whether under the Bankruptcy Code, applicable non-bankruptcy law or otherwise, including, vis-à-vis the Prepetition Secured Parties, the Prepetition Secured Notes Obligations, the Prepetition Notes Liens, the Prepetition Secured Notes Collateral or the Prepetition Notes Documents, or (E) asserting or prosecuting any so-called "lender liability" claims, Avoidance Actions or any other claim, counterclaim, cause of action, objection, contest or defense, of any kind or nature whatsoever, whether arising under the Bankruptcy Code, applicable law or otherwise, against any of the Replacement DIP Secured Parties, Prepetition Secured Parties, or their respective Representatives (clauses (ii)(A)–(E), collectively, the "***Challenges***," and each, a "***Challenge***"), and (iii) obtains a final non-appealable order by a court of competent jurisdiction in favor of the plaintiff sustaining any such Challenge in any timely and duly-filed Challenge Proceeding; *provided* that any pleadings filed in connection with any Challenge Proceeding, including any motion served and filed with the Court seeking requisite standing (to the extent standing is required) and authority to pursue a Challenge, shall include a draft complaint attached thereto and shall otherwise set forth with specificity the basis for each such Challenge, and any Challenge not so specified in a

**Ad Hoc Equity Group Exhibit 7**
**113**

Challenge Proceeding timely and properly filed prior to the Challenge Deadline shall be deemed forever, waived, released and barred.

(c)     If no such Challenge Proceeding is timely and properly filed by the Challenge Deadline, or if the Court rules does not rule in favor of plaintiff in any such timely and properly filed Challenge Proceeding, then, without application to or further order of the Court, (i) each of the admissions, stipulations, findings and releases contained in the Debtors' Stipulations shall be binding on all parties-in-interest, including the Official Committee, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, or any other party in interest (including any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors in the Chapter 11 Cases or any Successor Cases), and (ii) any and all claims, counterclaims, cross-claims, causes of action, or other Challenges, of any kind or nature whatsoever, whether under the Bankruptcy Code, applicable non-bankruptcy law or otherwise, against the Replacement DIP Lender or any of its  Representatives (in their capacities as such) shall be deemed forever waived, released and barred.

(d)     If any such Challenge Proceeding is timely filed by the Challenge Deadline, the Debtors' Stipulations shall nonetheless remain binding and preclusive on any Official Committee, any non-statutory committees appointed or formed in the Chapter 11 Cases, or any other party in interest (including any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors in the Chapter 11 Cases or any Successor Cases), except to the extent that any of the admissions, stipulations, findings or releases contained in the Debtors' Stipulations were expressly challenged in such Challenge Proceeding (and solely as to the plaintiff party that timely filed such Challenge Proceeding and *not*, for the avoidance of doubt, any other party in interest).

**Ad Hoc Equity Group Exhibit 7**

(e)     For purposes of this Interim Order, the "**Challenge Deadline**" means the date that is sixty (60) calendar days from the date of entry of the Interim Order (the "**Initial Challenge Deadline**"), (ii) such later date as has been agreed to in writing by the Replacement DIP Agent (acting at the instruction of the Replacement DIP Lender), or (iii) such later date as has been ordered by the Court, for cause shown, upon a motion filed with the Court prior to the Initial Challenge Deadline (the time period established by <u>clauses (i)</u>, <u>(ii)</u>, and <u>(iii)</u> of this paragraph 23(e), the "**Challenge Period**"); *provided* that (x) if the Chapter 11 Cases are converted to chapter 7 and a chapter 7 trustee or a chapter 11 trustee is appointed or elected prior to the Challenge Deadline, then the Challenge Deadline for any such chapter 7 trustee or chapter 11 trustee shall be extended (solely as to such chapter 7 trustee or chapter 11 trustee) to the date that is the later of (1) the Challenge Deadline then in effect at the time of its appointment or election, or (2) the date that is thirty (30) calendar days after its appointment or election, and (y) the filing of a motion by the Official Committee prior to the Initial Challenge Deadline seeking requisite standing with respect to a Challenge, attaching a draft complaint setting forth such Challenge, shall toll the Challenge Deadline for the Official Committee solely in respect of such Challenge until the date that is one Business Day after the entry of an order of the Bankruptcy Court ruling on such motion (or such later date as agreed in writing by the Replacement DIP Agent (acting at the instruction of the Replacement DIP Lender); *provided*, *however*, that the Challenge Deadline for the Official Committee (and solely for the Official Committee) to assert any Challenge with respect to the amount of the Prepetition April NPA Secured Notes Obligations arising under the Prepetition April NPA Secured Notes, and for the Official Committee to dispute the valuation of the Prepetition Secured Notes Collateral, shall, in each case, be the objection deadline (as fixed by the Court) with respect to the Debtors' chapter 11 plan

Ad Hoc Equity Group Exhibit 7

(f)      Nothing in this Interim Order vests or confers on any person or entity, including any Official Committee or any statutory or non-statutory committee appointed or formed in the Chapter 11 Cases, or any other party-in-interest standing or authority to pursue any Challenge belonging to the Debtors or their estates, and all rights to object to any request for such standing are expressly reserved.

24.      *Limitations on Use of Replacement DIP Loan Parties' Interest in DIP Collateral, Cash Collateral, Carve-Out or Other Funds.* Notwithstanding anything contained in this Interim Order or any other order of the Court to the contrary, no DIP Collateral, DIP Loans, Cash Collateral, proceeds of any of the foregoing, any portion of the Carve-Out may be used (including to pay professional fees) by any of the Replacement DIP Loan Parties, the Official Committee, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any Successor Cases, or any other party-in-interest (including any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors in the Chapter 11 Cases or any Successor Cases), directly or indirectly, to:

(a)      investigate (including by way of examinations or discovery proceedings, whether formal or informal), prepare, initiate, commence, support or prosecute (or finance the preparation, initiation, commencement, support or prosecution of) any claim, counterclaim, cross-claim, cause of action, suit, arbitration, application, motion, contested matter, objection, defense, adversary proceeding, litigation or other proceeding of any kind or nature (whether for monetary, injunctive, affirmative relief or otherwise) (i) against any of the Replacement DIP Secured Parties or their respective Representatives (each in their capacities as such), (ii) objecting to, challenging, contesting, or raising any defense to, the amount, validity, enforceability, perfection, priority, extent or scope of the claims, liens and security interests granted under this Interim Order, the Replacement DIP Loan Documents, (iii) asserting avoidance (whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), any so-called "lender liability" claims, or any other any claim or cause of action seeking reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharging or recovery, in

Ad Hoc Equity Group Exhibit 7

each case, with respect to the DIP Liens, the DIP Obligations, the Replacement DIP Loan Documents, or the DIP Collateral, (vi) any claim or cause of action of any kind or nature whatsoever, whether arising under the Bankruptcy Code or applicable non-bankruptcy law, against any of the Replacement DIP Secured Parties or their respective Representatives;

(b)    object to or seek to impair, modify or interfere with any of the rights, remedies, priorities, privileges, protections or benefits granted to the Replacement DIP Secured Parties under this Interim Order, the Replacement DIP Loan Documents (other than to contest whether a DIP Termination Event has occurred); *provided* that this provision shall not apply to an objection filed by the Official Committee with the Court to the relief sought at the Final Hearing;

(c)    object to or seek to prevent, hinder, interfere with or otherwise delay any of the Replacement DIP Secured Parties' assertion, enforcement, exercise of remedies or realization upon any DIP Collateral in accordance with this Interim Order, or the Replacement DIP Loan Documents (other than to contest whether a DIP Termination Event has occurred);

(d)    seek or request authorization from the Court to obtain postpetition financing (whether equity or debt) or other financial accommodations pursuant to sections 364(c) or (d) of the Bankruptcy Code or otherwise, unless such financing is sufficient to cause the Payment in Full of all Replacement DIP Obligations contemporaneously with the consummation of such financing (or as otherwise agreed in writing by the Replacement DIP Lender);

(e)    seek or request authorization from the Court to obtain superpriority claims or liens or security interests (other than liens or security interests expressly permitted under this Interim Order or the Replacement DIP Loan Documents) in any portion of the DIP Collateral that are senior to or *pari passu* with the DIP Liens, the DIP Superpriority Claims, unless all Replacement DIP Obligations have been Paid in Full (or as otherwise agreed in writing by the Replacement DIP Lender);

(f)    use, request authorization to sell, or otherwise dispose of DIP Collateral or Cash Collateral (without the prior written consent of the Replacement DIP Lender and of the Prepetition Secured Parties, respectively) other than as expressly permitted in this Interim Order and in the Replacement DIP Loan Documents (as applicable); or

(g)    pay or seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are agreed to in writing by the Replacement DIP Lender (or are otherwise expressly included in the Approved Budget and do not violate any of the terms of the Replacement DIP Loan Documents).

25.    *Limitations on Use of Prepetition Secured Parties' Interest in Cash Collateral, Carve-Out or Other Funds.* Notwithstanding anything contained in this Interim Order or any other

Ad Hoc Equity Group Exhibit 7

order of the Court to the contrary, no Prepetition Secured Notes Collateral may be used (including to pay professional fees) by any of the Replacement DIP Loan Parties, the Official Committee, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any Successor Cases, or any other party-in-interest (including any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors in the Chapter 11 Cases or any Successor Cases), directly or indirectly, to:

(a)     investigate (including by way of examinations or discovery proceedings, whether formal or informal), prepare, initiate, commence, support or prosecute (or finance the preparation, initiation, commencement, support or prosecution of) any claim, counterclaim, cross-claim, cause of action, suit, arbitration, application, motion, contested matter, objection, defense, adversary proceeding, litigation or other proceeding of any kind or nature (whether for monetary, injunctive, affirmative relief or otherwise) (i) against the Prepetition Secured Parties, or their respective Representatives (each in their capacities as such), (ii) objecting to, challenging, contesting, or raising any defense to, the amount, validity, enforceability, perfection, priority, extent or scope of the claims, liens and security interests granted under the Prepetition Notes Documents, (iii) asserting avoidance (whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), any so-called "lender liability" claims, or any other any claim or cause of action seeking reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharging or recovery, in each case, with respect to the the Adequate Protection Liens, the Adequate Protection Claims, and the other Adequate Protection Obligations, the Prepetition Notes Liens, the Prepetition Secured Obligations, the Prepetition Notes Documents, or the Prepetition Secured Notes Collateral, (vi) any claim or cause of action of any kind or nature whatsoever, whether arising under the Bankruptcy Code or applicable non-bankruptcy law, against any of the Prepetition Secured Parties or their respective Representatives;

(b)     object to or seek to impair, modify or interfere with any of the rights, remedies, priorities, privileges, protections or benefits granted to the Prepetition Secured Parties under this Interim Order or the Prepetition Notes Documents; *provided* that this provision shall not apply to an objection filed by the Official Committee with the Court to the relief sought at the Final Hearing;

(c)     seek or request authorization from the Court to obtain superpriority claims or liens or security interests (other than liens or security interests expressly permitted under this Interim Order or the Replacement DIP Loan Documents or any refinancing the Replacement DIP Facility) in any portion of the DIP Collateral that are senior to or

**Ad Hoc Equity Group Exhibit 7**
**118**

*pari passu* with the Adequate Protection Liens, the Adequate Protection Claims, the Prepetition Liens, or the Prepetition Secured Obligations;

*provided* that nothing herein shall limit the Official Committee from using the DIP Collateral, DIP Loans, or any other funds of the Debtors that does not constitute Prepetition Secured Notes Collateral from investigating, prosecuting, litigating, commencing or supporting any Challenge in any way whatsoever against the Prepetition Secured Parties.

26. *Limitation on Charging Expenses.* Except to the extent of the Carve Out, no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases (or any future proceedings that may result therefrom) at any time, including any costs and expenses incurred in connection with the preservation, protection, or enhancement of realization by the Replacement DIP Secured Parties upon the DIP Collateral, respectively, shall be charged against or recovered from the DIP Collateral as to Replacement DIP Secured Parties, whether pursuant to section 506(c) of the Bankruptcy Code or other similar legal or equitable doctrine or otherwise, without the prior written consent of the Replacement DIP Lender with respect to the DIP Collateral, and no such consent shall be implied, directly or indirectly, from anything contained in this Interim Order (including consent to the Carve-Out or the approval of any budget hereunder) or from any other action, inaction, or acquiescence by any of the Replacement DIP Secured Parties to any charge, lien, assessment or claim against the Replacement DIP Secured Parties with respect to the DIP Collateral, whether under section 506(c) of the Bankruptcy Code or otherwise.

27. *No Marshalling.* In no event shall the Replacement DIP Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Replacement DIP Obligations, and all proceeds of DIP Collateral shall be received and applied in accordance with this Interim Order, the Replacement DIP Loan Documents, as applicable; *provided* that the Replacement DIP Secured Parties shall use commercially reasonable

Ad Hoc Equity Group Exhibit 7

efforts to first apply all DIP Collateral (other than any proceeds from Avoidance Action), to the extent such collateral may promptly be monetized in a commercially reasonable manner, before applying any proceeds from Avoidance Actions to satisfy the DIP Obligations and the Adequate Protection Obligations, as applicable

28.      *Right to Credit Bid.* The Replacement DIP Agent or its designee (in each case, acting at the instruction of the Replacement DIP Lender), shall have the unqualified right to credit bid all or any portion of the First-Priority DIP Collateral in accordance with the Replacement DIP Loan Documents up to the full amount of any Replacement DIP Obligations in the sale of any of the Replacement DIP Loan Parties' assets, whether in a sale under or pursuant to section 363 of the Bankruptcy Code, a chapter 11 plan subject to confirmation under section 1129(b)(2)(A) of the Bankruptcy Code, a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code, or otherwise. The Replacement DIP Agent (acting at the instruction of the Replacement DIP Lender) shall have the absolute right to assign, transfer, sell, or otherwise dispose of its rights to credit bid (subject to this Interim Order) to any acquisition vehicle formed in connection with such bid or other designee by or on behalf of the Replacement DIP Agent (acting at the instruction of the Replacement DIP Lender).

29.      *Binding Effect; Successors and Assigns.* Immediately upon entry of this Interim Order, subject to paragraph 23 of this Interim Order, the Replacement DIP Loan Documents and this Interim Order, including all findings and conclusions of law herein, shall be binding upon all parties in interest in the Chapter 11 Cases and any Successor Cases, including the Replacement DIP Secured Parties, the Prepetition Secured Parties, the Official Committee or any other statutory or non-statutory committee appointed or formed in the Chapter 11 Cases and any Successor Cases, and their respective successors and assigns (including any chapter 11 trustee or chapter 7 trustee

Ad Hoc Equity Group Exhibit 7

or examiner appointed or elected in the Chapter 11 Cases or any Successor Cases, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), and shall inure to the benefit of each of the Debtors, the Replacement DIP Secured Parties, the Prepetition Secured Parties, and their respective successors and assigns; *provided* that the Replacement DIP Secured Parties and the Prepetition Secured Parties shall have no obligation to make any loan, permit the use of DIP Collateral or Prepetition Secured Notes Collateral (including Cash Collateral) or extend any financing to any chapter 11 trustee or chapter 7 trustee or similar responsible person appointed for the estate of any Debtor in the Chapter 11 Cases or any Successor Cases.

30. *No Modification of Interim Order.*

(a) The Replacement DIP Loan Parties irrevocably waive the right to seek, and shall not seek or consent to, directly or indirectly: without the prior written consent of the Replacement DIP Lender (unless and until the Replacement DIP Obligations have been Paid in Full), (i) any modification, stay, vacatur or amendment to this Interim Order, (ii) the allowance of any claim against any Debtor in the Chapter 11 Cases or any Successor Cases equal or superior to the DIP Superpriority Claims (other than the Carve-Out), (iii) the grant of any lien or security interest on any DIP Collateral with priority equal to or superior to the DIP Liens, except as expressly permitted hereunder or under the Replacement DIP Loan Documents, or (iv) the entry of any order authorizing the use of DIP Collateral (including Cash Collateral) that is inconsistent with this Interim Order (except in connection with a request for approval of financing sufficient to cause the Payment in Full of all Replacement DIP Obligations contemporaneously with the consummation of such financing).

Ad Hoc Equity Group Exhibit 7
121

(b)     Without limiting the provisions of the immediately preceding paragraph, if at any time prior to the Payment in Full of all Replacement DIP Obligations, either the Replacement DIP Loan Parties, the Replacement DIP Loan Parties' estates, any chapter 11 trustee, chapter 7 trustee or examiner with enlarged powers, or any responsible officer subsequently appointed in any of the Chapter 11 Cases or any Successor Cases, shall obtain credit or incur debt pursuant to sections 364(b), (c), or (d) of the Bankruptcy Code in violation of this Interim Order or the Replacement DIP Loan Documents, then, unless otherwise agreed in writing by the Replacement DIP Lender (with respect to the Replacement DIP Obligations), all of the cash proceeds derived from such credit or debt shall immediately be turned over to the Replacement DIP Agent, for further distribution to the applicable Replacement DIP Secured Parties on account of their applicable Replacement DIP Obligations pursuant to the Replacement DIP Loan Documents.

(c)     For the avoidance of doubt, from and after the Payment in Full of all Prepetition Secured Notes Obligations, or following the occurrence of the DIP Termination Declaration Date, the Debtors shall not be prohibited from seeking relief to use Cash Collateral on a non-consensual basis and the Prepetition Secured Parties' rights to object to such relief (and/or the right to seek relief, including without limitation, the right to seek additional adequate protection and/or seek to lift the automatic stay in order to exercise rights and against Prepetition Secured Notes Collateral) are expressly preserved.

31.     *Preservation of Rights Granted Under Interim Order.*

(a)     *Senior to Other Liens.* Other than the Carve-Out and the Prior Senior Liens, no claim (including any intercompany claim) or lien having a priority superior to or *pari passu* with those granted by the Interim Order to the Replacement DIP Secured Parties shall be permitted

Ad Hoc Equity Group Exhibit 7

while any of the Replacement DIP Obligations remain outstanding, and, except as otherwise expressly provided in this Interim Order. The DIP Superpriority Claims and the Noteholder Adequate Protection Claims shall not be subject or junior to any intercompany or affiliate claims of the Debtors. The DIP Liens and the Noteholder Adequate Protection Liens shall not be: (A) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code; (B) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise; (C) unless the Replacement DIP Obligations have been Paid in Full, subordinated to or made *pari passu* with any liens arising after the Petition Date, including any liens or security interests granted in favor of any federal, state, municipal, or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors; or (D) subject or junior to any intercompany or affiliate lies or security interests of the Debtors.

(b) *Payment in Full.* Until Payment in Full of all Replacement DIP Obligations, none of the Replacement DIP Loan Parties shall propose or support any chapter 11 plan or sale of all or substantially all of the Replacement DIP Loan Parties' equity or assets, or any order confirming such plan or approving such sale, that is not conditioned upon the Payment in Full (unless otherwise agreed in writing by the Replacement DIP Lender) of all Replacement DIP Obligations on or prior to the earlier to occur of the effective date of such chapter 11 plan or sale.

(c) *Dismissal/Conversion.* Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code: (i) all of the claims, liens and security interests, rights, priorities, privileges, remedies, benefits and protections granted to the Replacement DIP Secured Parties and the Prepetition Secured Parties hereunder and under

Ad Hoc Equity Group Exhibit 7

the Replacement DIP Loan Documents (as applicable) (including the DIP Superpriority Claims, the Noteholder Adequate Protection Claims, the DIP Liens, and the Noteholder Adequate Protection Liens), shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all Replacement DIP Obligations and Noteholder Adequate Protection Obligations shall have been Paid in Full, and all such claims, liens and security interests, rights, priorities, privileges, remedies, benefits and protections shall, notwithstanding such dismissal or conversion, remain unaffected and shall remain binding on all parties in interest (and any such order shall, in accordance with sections 105 and 349 of the Bankruptcy Code, so provide), and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal or conversion, for the purposes of enforcing all such claims, liens and security interests, rights, priorities, privileges, remedies, benefits and protections granted to the Replacement DIP Secured Parties and the Prepetition Secured Parties hereunder and under the Replacement DIP Loan Documents (as applicable).

(d) *Reversal/Modification.* Based on the findings set forth in this Interim Order and the record presented during the Interim Hearing and the Chapter 11 Cases, and in accordance with section 364(e) of the Bankruptcy Code, in the event that any or all of the provisions of this Interim Order or the Replacement DIP Loan Documents are hereafter reversed, modified, vacated or stayed by a subsequent judgment or order of this Court or any other court, any such reversal, stay, modification or vacatur shall not affect (i) the validity or enforceability of advances previously made hereunder or under the Replacement DIP Loan Documents by the Replacement DIP Secured Parties to the Debtors, (ii) the validity or enforceability of any obligation, indebtedness or liability incurred under this Interim Order or the Replacement DIP Loan Documents (including the Replacement DIP Obligations and the Noteholder Adequate Protection

Ad Hoc Equity Group Exhibit 7

Obligations) by the Replacement DIP Loan Parties to the Replacement DIP Secured Parties and the Prepetition Secured Parties, (iii) the validity, enforceability, or perfection of any of the claims, liens, security interests, rights, privileges or benefits granted hereunder or under the Replacement DIP Loan Documents to the Replacement DIP Secured Parties and the Prepetition Secured Parties, or (iv) the payment of any fees, costs, expenses or other amounts to the Replacement DIP Secured Parties and the Prepetition Secured Parties under this Interim Order and the Replacement DIP Loan Documents, in each case, prior to the actual receipt of written notice by any of the Replacement DIP Agent and/or the Prepetition Agents (as applicable) of the effective date of such reversal, stay, modification, or vacatur. Notwithstanding any such reversal, stay, modification or vacatur, the claims, liens, security interests, rights, privileges, remedies and benefits set forth in the Interim Order shall be governed in all respects by the original provisions of this Interim Order and the Replacement DIP Loan Documents.

(e)    *Survival*. Except as expressly provided in this Interim Order, until all of the Replacement DIP Obligations have been Paid in Full (unless the Replacement DIP Lender have otherwise agreed in writing in respect of the Replacement DIP Obligations), all claims, liens and security interests, rights, priorities, privileges, remedies, benefits, and protections granted to the Replacement DIP Secured Parties under this Interim Order and the Replacement DIP Loan Documents shall survive and shall not be modified, impaired, or discharged by: (i) the entry of an order confirming any chapter 11 plan in any of the Chapter 11 Cases (and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors hereby waive any discharge as to any remaining Replacement DIP Obligations), (ii) the entry of an order converting any or all of the Chapter 11 Cases to a case (or cases) under chapter 7 of the Bankruptcy Code, dismissing any or all of the Chapter 11 Cases, or terminating the joint administration of the Chapter 11 Cases or by any other

Ad Hoc Equity Group Exhibit 7
125

act or omission, or (iii) the entry of an order approving the sale or disposition of any DIP Collateral (except to the extent expressly permitted in the DIP Loan Documents and this Interim Order).

32.     *Proofs of Claim.*

(a)     The Replacement DIP Agent and Replacement DIP Lender shall not be required to file proofs of claim with respect to their Replacement DIP Obligations under the Replacement DIP Documents, and the evidence presented with the Motion and the record established at the Interim Hearing and the Final Hearing are deemed sufficient to, and do, constitute proofs of claim with respect to their obligations, senior secured status, and super-priority.

(b)     The Prepetition Secured Parties shall not be required to file proofs of claim in any of the Chapter 11 Cases or any of the Successor Cases in order to assert claims for payment of the Adequate Protection Obligations or the Prepetition Secured Notes Obligations. The Debtors' Stipulations, acknowledgments and provisions of this Interim Order, together with the evidence accompanying the Motion and presented at the Interim Hearing, are deemed sufficient to and do constitute timely filed proofs of claim in respect of such claims arising under the Adequate Protection Obligations and the Prepetition Secured Notes Obligations against each of the applicable Debtors.

(c)     Any order entered by the Court establishing a bar date in any of the Chapter 11 Cases or any Successor Chapter 11 Cases shall not apply to the Replacement DIP Secured Parties, the Prepetition Secured Parties, the Replacement DIP Obligations, the Adequate Protection Obligations or the Prepetition Secured Notes Obligations; *provided* that, notwithstanding any order entered by the Court establishing a bar date in any of the Chapter 11 Cases or any Successor Cases to the contrary, the Prepetition Agents (on behalf of themselves and the applicable Prepetition

Ad Hoc Equity Group Exhibit 7

Secured Parties), in their discretion, may (but are not required to) file (and amend and/or supplement) in the Debtors' lead Chapter 11 Case, *In re Core Scientific, Inc.*, Case No. 22-90341 (DRJ), a consolidated master proof of claim on behalf of the Prepetition Secured Parties (as applicable) (the "***Master Proof of Claim***") against each of the Debtors. Upon the filing of the Master Proof of Claim by any of the Prepetition Agents, such Prepetition Agent shall be deemed to have filed a proof of claim in the amount set forth opposite its name therein in respect of its claims against each of the Debtors and shall be treated as if it had filed a separate proof of claim in each of the Chapter 11 Cases. Such Master Proof of Claim shall not be required to (x) identify whether any Prepetition Secured Party acquired its claim from another party, the identity of any such party, or reflect a change in the holders of the claims set forth therein or a reallocation among the holders of the claims asserted therein resulting from the transfer of all or any portion of such claims, or (y) attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable party, which instruments, agreements or other documents will be provided upon reasonable written request to the applicable Prepetition Agent, as the case may be. The provisions of this paragraph 32 and each Master Proof of Claim are intended solely for the purpose of administrative convenience and shall not (i) affect the right of each Prepetition Secured Party (or its successors in interest) to vote separately on any chapter 11 plan proposed in these Chapter 11 Cases (or any Successor Cases), or (ii) any substantive rights of the Prepetition Secured Parties or any party in interest or their respective successors in interest.

33.    *Limitation of Liability.*

(a)    Nothing in this Interim Order, the Replacement DIP Loan Documents or any documents related thereto shall in any way be construed or interpreted to impose or allow the imposition upon any of the Replacement DIP Secured Parties or the Prepetition Secured Parties of

**Ad Hoc Equity Group Exhibit 7**

any liability for any claim arising from, in connection with or related to the prepetition or postpetition activities of the Replacement DIP Loan Parties or their respective affiliates (as defined in section 101(2) of the Bankruptcy Code) in the operation of their businesses, their restructuring efforts or the administration of these Chapter 11 Cases.

(b)     In determining to make any loan or extension of credit under the Replacement DIP Loan Documents, to permit the use of Prepetition Secured Notes Collateral (including Cash Collateral), or in exercising any rights or remedies under this Interim Order, the Replacement DIP Loan Documents or the Prepetition Notes Documents, none of the Replacement DIP Secured Parties or Prepetition Secured Parties shall (i) have any liability to any third party or be deemed to be in control of the operations of any of the Replacement DIP Loan Parties, (ii) owe any fiduciary duty to any of the Replacement DIP Loan Parties, their respective creditors, shareholders or estates, or (iii) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of any of the Replacement DIP Loan Parties (as such terms or any similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42, U.S.C. §§ 9601 *et seq*., as amended, or any other federal or state statute, including the Internal Revenue Code).

(c)     The Replacement DIP Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person, and all risk of loss, damage, or destruction of the DIP Collateral shall be borne solely by the Replacement DIP Loan Parties; *provided* that nothing contained in this paragraph 33(c)

Ad Hoc Equity Group Exhibit 7

shall release the Replacement DIP Secured Parties from their obligations under the Replacement DIP Loan Documents (subject to the occurrence of the Closing Date).

34.    *Release of Replacement DIP Secured Parties*. Effective as of entry of the Interim Order and subject to paragraph 23 hereof, each of the Replacement DIP Loan Parties and its respective estate, on its own behalf and on behalf of its predecessors, successors and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits each of the Replacement DIP Secured Parties and each of their respective Representatives (in their capacities as such) from any and all obligations and liabilities to the Replacement DIP Loan Parties (and their successors and assigns) and from any and all claims, counterclaims, cross-claims, demands, defenses, objections, challenges, offsets or setoff, debts, accounts, contracts, liabilities, remedies, suits, controversies, actions, causes of action, losses, damages, indemnities, reimbursement obligations, attorneys' fees, costs, expenses or judgments, of every kind or nature whatsoever, whether matured or unmatured, known or unknown, asserted or unasserted, suspected or unsuspected, foreseen or unforeseen, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, pending or threatened, arising in law or equity, upon contract or tort, under the Bankruptcy Code, any state or federal common law, statute, rule, regulation or otherwise, including any claim or cause of action seeking (i) any so-called lender liability, (ii) any and all claims arising under the Bankruptcy Code, whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), or otherwise, (iii) reduction, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge or recovery, in each case, that may be asserted by any of the Replacement DIP Loan Parties, their

Ad Hoc Equity Group Exhibit 7
129

respective estates, predecessors, successors and assigns, in each case, against any of the Replacement DIP Secured Parties or their respective Representatives (in their capacities as such) for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time prior to the date of this Interim Order, in connection with, arising under or related to this Interim Order, the Replacement DIP Facility, the DIP Liens, the Replacement DIP Obligations, the DIP Collateral, the transactions contemplated thereunder or hereunder, or the negotiation thereof or hereof, including any claim or cause action with respect to the validity, enforceability, priority, scope, extent or perfection of the DIP Liens, the Replacement DIP Obligations or the Replacement DIP Loan Documents; *provided* that subject to the occurrence of the Closing Date, nothing contained in the foregoing shall release the Replacement DIP Secured Parties from their obligations under the Replacement DIP Facility from and after the date hereof.

35. *Payments Free and Clear.* Any and all payments or proceeds required to be remitted to the Replacement DIP Secured Parties pursuant to the Replacement DIP Loan Documents, this Interim Order, the Final Order (if and when entered) or any subsequent order of this Court shall be irrevocable (subject, solely in the case of the DIP Professional Fees, only to the procedures set forth in paragraph 11 of this Interim Order), and shall be received free and clear of any claim, charge, assessment or other liability, including any claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code (whether asserted or assessed by, through or on behalf of the Replacement DIP Loan Parties), or otherwise.

36. *Joint and Several Liability.* Nothing in this Interim Order shall be construed to constitute or authorize a substantive consolidation of any of the DIP Loan Parties' estates, it being understood, however, that the DIP Loan Parties shall be jointly and severally liable for all

Ad Hoc Equity Group Exhibit 7
130

obligations (including all DIP Obligations and all Adequate Protection Obligations) under this Interim Order and the DIP Loan Documents.

37. *Third-Party Beneficiary.* Except as expressly set forth herein, no rights are created hereunder for the benefit of any third party, any creditor, equity holder, or any direct, indirect or incidental beneficiary.

38. *Interim Order Controls.* In the event of any direct conflict between or among the terms or provisions of this Interim Order and any of the Replacement DIP Loan Documents, including the Replacement DIP Term Sheet (in accordance with the rules of interpretation therefor, as set forth in the Replacement DIP Term Sheet in the section titled "Documentation Principles"), unless such term or provision in this Interim Order is phrased in terms of "defined in" or "as set forth in" the Replacement DIP Credit Agreement or Replacement DIP Loan Documents, or in the event of any conflict or inconsistency between the terms of this Interim Order and any other order of the Court, the terms and provisions of this Interim Order shall govern and control. Notwithstanding anything contained in any other order entered by this Court to the contrary, any payment made pursuant to, or authorization contained in, any other order entered by this Court shall be consistent with and subject to the requirements set forth in this Interim Order and the Replacement DIP Loan Documents, including the Approved Budget (subject to Permitted Variances).

39. *Effectiveness.* This Interim Order shall constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052 and shall take effect and be fully enforceable immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 7062, or 9014, any Local Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this

Ad Hoc Equity Group Exhibit 7

Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

40. *Bankruptcy Rules.* The requirements of Bankruptcy Rules 4001, and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

41. *Headings.* Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order. When used in this Interim Order, the word "including" shall not imply limitation.

42. *Adequate Protection to Prepetition Equipment Lenders.* Pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, as adequate protection of their purported Prepetition Equipment Liens in Prepetition Equipment Collateral, the Prepetition Equipment Lenders shall be entitled to the following (collectively, the obligations under this paragraph 42, together with the Noteholder Adequate Protection Obligations, the "***Adequate Protection Obligations***"):

(a) *Equipment Lender Adequate Protection Claims.* The Prepetition Equipment Lenders are each hereby granted, in the amount of any aggregate Diminution in Value of the respective purported Prepetition Equipment Liens in Prepetition Equipment Collateral (as applicable) from and after the Petition Date, superpriority administrative expense claims contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors (the "***Equipment Lender Adequate Protection Claims***," together with the Noteholder Adequate Protection Claims, the "***Adequate Protection Claims***"), which shall be payable by each of the Debtors on a joint and several basis, and shall have recourse to all DIP Collateral. The Equipment Lender Adequate Protection Claims shall be (i) subject and subordinate only to the Carve-Out, the DIP Superpriority Claims, and the Noteholder Adequate Protection Claims and (ii) senior to any

Ad Hoc Equity Group Exhibit 7

and all other administrative expense claims and all other claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever.

(b)    *Equipment Lender Adequate Protection Liens.* The Prepetition Equipment Lenders are each hereby granted, effective and perfected as of the entry of this Interim Order, and without the necessity of the execution, recordation or filing by the Replacement DIP Loan Parties or any of the Prepetition Equipment Lenders of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title for titled goods, or any similar document or instrument, or the taking of any other action (including entering into any control agreements or taking possession or control of any DIP Collateral), in the amount of any aggregate Diminution in Value of the purported Prepetition Equipment Liens in the Prepetition Equipment Financing Collateral (as applicable) from and after the Petition Date, valid, binding, enforceable and automatically perfected post-petition liens and security interests in all DIP Collateral (the "**Equipment Lender Adequate Protection Liens**," and together with the Noteholder Adequate Protection Liens, the "**Adequate Protection Liens**"). The Equipment Lender Adequate Protection Liens shall be (i) junior and subordinated to (A) the Carve-Out, (B) the First-Priority DIP Liens in First-Priority DIP Collateral, (C) the Noteholder Adequate Protection Liens in Prepetition Secured Notes Collateral, and (D) the Prior Senior Liens (other than the Prepetition Equipment Liens that constitute Prior Senior Liens), (ii) *pari passu* with the Noteholder Adequate Protection Liens in the First-Priority DIP Collateral, and (iii) senior to the DIP Liens in Prepetition Equipment Financing Collateral (as applicable) and the Noteholder Adequate Protection Liens in Prepetition Equipment Financing Collateral (as applicable).

43.    *Necessary Action.* The Replacement DIP Loan Parties, the Replacement DIP Secured Parties are authorized to take any and all such actions as are necessary, required or

Ad Hoc Equity Group Exhibit 7

appropriate to implement and effectuate the terms of this Interim Order, the Replacement DIP Loan Documents and the transactions contemplated hereunder and thereunder.

44. *Retention of Jurisdiction.* The Court retains jurisdiction to hear, determine and enforce the terms of any and all matters arising from or related to the Replacement DIP Facility, the Replacement DIP Loan Documents and this Interim Order, and the Court's jurisdiction shall survive confirmation and consummation of any chapter 11 plan for any of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

45. *Final Hearing.* The Final Hearing shall be held on February [●], 2023, at [●]:[●] [●].m. (prevailing Central Time), and any objections to the final relief sought in the Motion shall be filed with the Court no later than January 31, 2023 at 4:00 p.m. (prevailing Central Time), and served upon the following: (a)(i) Weil, Gotshal & Manges LLP, 700 Louisiana, Suite 1700, Houston, Texas, Attn: Alfredo Perez (alfredo.perez@weil.com), and (ii) Weil, Gotshal & Manges LLP, 767 Fifth Avenue New York, New York 10153, Attn: Ray Schrock (ray.schrock@weil.com) and Ronit Berkovich (ronit.berkovich@weil.com), counsel to the Debtors, (b) Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110, Attn: John F. Ventola (jventola@choate.com) and Douglas R. Gooding (dgooding@choate.com), counsel to the Replacement DIP Secured Parties, (c) Paul Hastings, LLP, 200 Park Avenue, New York, New York 10166, Attn: Kristopher Hansen (krishansen@paulhastings.com), Erez Gilad (erezgilad@paulhastings.com), and Sayan Bhattacharyya (sayanbhattacharyya @paulhastings.com), counsel to the Original DIP Lenders and the Ad Hoc Group.

Dated: _____, 2023
     Houston, Texas

_____
UNITED STATES BANKRUPTCY JUDGE

Ad Hoc Equity Group Exhibit 7

**Exhibit 1**

**Replacement DIP Term Sheet**

**Core Scientific, Inc.**
**Up to $70,000,000**
**Debtor-in-Possession Term Loan Facility**
**Summary of Terms and Conditions**

**THIS TERM SHEET IS PROVIDED FOR DISCUSSION PURPOSES ONLY AND DOES NOT CONSTITUTE AN OFFER, AGREEMENT OR COMMITMENT TO ENTER INTO THE DEFINITIVE DIP DOCUMENTS (AS DEFINED BELOW). NOTHING IN THIS TERM SHEET IS INTENDED TO REPRESENT A COMMITMENT ON THE PART OF THE PROSPECTIVE DIP AGENT OR DIP LENDER TO ENTER INTO THE DIP FACILITY OR ANY OTHER DEFINITIVE AGREEMENT WITH ANY PERSON**.

*The statements contained in this Term Sheet and all discussions between and among the parties in connection herewith constitute privileged communications that shall not be disclosed or introduced pursuant to Federal Rule of Evidence 408 and/or other applicable law, unless otherwise required by judicial order or applicable law. All assumptions, principles and numbers are based upon and subject to continuing due diligence and are subject to change as the parties' positions develop further.*

| 1. | ***Borrowers:*** | • Core Scientific, Inc., Core Scientific Acquired Mining LLC, Core Scientific Operating Company, Core Scientific Specialty Mining (Oklahoma) LLC, American Property Acquisition, LLC, American Property Acquisitions I, LLC, American Property Acquisition VII, LLC, Radar Relay, Inc., Starboard Capital LLC, RADAR LLC and Core Scientific Mining LLC (the "**Borrowers**"), as debtors and debtors-in-possession in Case **No. 22-90341 (DRJ) (Jointly Administered)** (together with the cases of certain of its affiliated debtors and debtors-in-possession, the "**Chapter 11 Cases**", and such affiliated debtors, together with the Borrowers, the "**Debtors**") under chapter 11 of title 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") commenced in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") on December 21, 2022 (the "**Petition Date")**. |
| | | • The Borrowers shall, in all cases, be jointly and severally liable for all DIP Obligations (as defined below). |
| 2. | ***Guarantors:*** | • Each of Core Scientific, Inc.'s existing and future, direct and indirect domestic or foreign subsidiaries that are debtors and debtors-in-possession in the Chapter 11 Cases, including all existing obligors under the Existing DIP Credit Agreement (as defined below) (collectively, the "**Guarantors**" and together with the Borrower, the "**Loan Parties**"). |
| | | • The DIP Obligations of the Borrowers shall be unconditionally guaranteed, on a joint and several basis, by the Guarantors. |
| 3. | ***DIP Agent and Initial DIP Lender:*** | • B. Riley Commercial Capital, LLC . |

| 4. | *Type and Amount of the DIP Facility:* | • A non-amortizing super-priority senior secured term loan facility in an aggregate principal amount not to exceed $70,000,000 (the "**Maximum DIP Commitment Amount**") consisting of up to $70,000,000 in term loan commitments (the "**DIP Facility**"; the definitive documentation evidencing the DIP Facility being the "**DIP Documents**"; the DIP Lender's commitments under the DIP Facility being the "**DIP Commitments**"; and the loans under the DIP Facility being the "**DIP Loans**"). |
|    |                                       | • The borrowing of DIP Loans shall permanently decrease the DIP Commitments and DIP Loans repaid (for any reason) may not be reborrowed unless (and solely to the extent that) they are repaid prior to the entry of the Final Order (as defined below). |
|    |                                       | • Loan proceeds to be funded into newly established (or, in the case of the Carve-out Account referred to below, a previously established (expressly for such purpose pursuant to Existing DIP Credit Agreement)) funding accounts, including a carve-out account (to be fully funded (to the extent of any deficiency) in the amount of the Post-Carve-out Notice Amount (as such term shall be defined in the Orders) from the Initial Draw) (the "**Carve-out Account**"), each to be initially maintained at Bank of America, N.A. |
| 5. | *Initial Availability:* | • Upon the Bankruptcy Court's entry of the Interim Order (as defined below), and satisfaction of all applicable conditions precedent described herein (the "**Closing Date**"), the Borrowers shall be entitled to make a single draw of DIP Loans in an amount of up to $35,000,000 prior to the entry of the Final Order (the "**Initial Draw**"). |
| 6. | *Full Availability:* | • Upon the Bankruptcy Court's entry of the Final Order, and satisfaction of all applicable conditions precedent described herein, following the Initial Draw, the full remaining amount of the then undrawn DIP Facility (after giving effect to any repayments of the Initial Draw prior to the entry of the Final Order) shall be available to the Debtors, subject to compliance with the terms, conditions and covenants described herein and in the DIP Documents in additional draws ("**Other Draws**"). Other Draws shall only be permitted when the Debtors' cash on hand (other than cash in the Carve-out Account) prior to giving effect to such draw is less than $30,000,000. In addition, Other Draws shall be made (x) only in a principal amount of not less than $5,000,000, per draw and (y) in no more than five (5) draws and (z) no more frequently than once every three (3) weeks. In addition, a final single draw (which shall also be deemed to be an "Other Draw" for purposes hereof (other than requiring satisfaction of the conditions set forth in clauses (x) and (y) above)) in an amount not to exceed the amount of the then undrawn DIP Commitment, as then in effect, may be requested; *provided* that at the time of (and prior to giving effect to) such final draw, the Debtors' cash then on hand (other than cash in the Carve-out Account) is less than $30,000,000 (the "**Final Draw**"). |

**Ad Hoc Equity Group Exhibit 7**

| 7. | *Maturity and Termination* | • All DIP Obligations (including, without limitation, all capitalized interest and fees) shall be due and payable in full in cash (or such other form of consideration as the DIP Agent and the DIP Lender may agree in their sole discretion) on the earliest of: |
|---|---|---|
| | | i. the date that is twelve (12) months after the Petition Date; *provided*, that the Borrowers shall be permitted to extend such date by three (3) months upon paying the DIP Agent an extension fee (the "**Extension Fee**"), in cash, in an amount equal to three and one-half percent (3.50%) of the aggregate amount of all DIP Obligations drawn and outstanding as of the effective date of the extension (after giving effect to the Final Draw) (any such date being the "**Scheduled Maturity Date**") |
| | | ii. the effective date of any chapter 11 plan of reorganization with respect to the Borrowers or any other Debtor (a "**Plan**"); |
| | | iii. the consummation of any sale or other disposition of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code; |
| | | iv. the date of the acceleration of the DIP Loans and the termination of the DIP Commitments in accordance herewith or with the DIP Documents; |
| | | v. the date of the DIP Agent's written notice to the Borrowers of the occurrence of an Event of Default (as defined below) under the DIP Facility; |
| | | vi. dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code; and |
| | | vii. 30 days after the date on which a motion to approve the DIP Facility is filed (or such later date as agreed to by the DIP Agent), unless the Final Order has been entered by the Bankruptcy Court on or prior to such date (such earliest date, the "**DIP Termination Date**"). |
| | | • The occurrence of the DIP Termination Date shall terminate the ability of the Borrowers to make the Other Draws or the Final Draw. |
| 9. | *Interest Rate:* | • The DIP Loans shall bear interest at a per annum rate equal to ten percent (10.00%), in each case payable in kind in arrears on the first day of each month (the "**Non-Default Interest**"). |
| | | • Notwithstanding the foregoing, after the occurrence and during the continuance of an Event of Default, the DIP Loans shall bear interest at an additional per annum rate of two percent (2.00%), in each case payable in kind, together with the Non-Default Interest, on the first day of each month. |

3

**Ad Hoc Equity Group Exhibit 7**

**138**

| 10. | *Monthly DIP Agent Fee:* | • $75,000 per month payable, in cash in advance, to DIP Agent for its sole account and benefit, on the Closing Date and the first business day of each calendar month thereafter (the "**Monthly DIP Agent Fee**"). |
|---|---|---|
| 11. | *Upfront & Exit Premium; Approvals:* | • An upfront premium of three and one-half percent (3.50%) of the Maximum DIP Commitment Amount (the "**Upfront Premium**"), payable in kind to the DIP Lenders and added to the total amount of the DIP Obligations. |
| | | • The Upfront Premium shall be approved by the Bankruptcy Court in the Interim Order and shall be deemed fully earned and payable upon entry of the Interim Order. |
| | | • Following entry of the Interim Order, upon and concurrently with the repayment or satisfaction of the DIP Loans in whole or in part (including any scheduled, mandatory or voluntary prepayment thereof, including upon the acceleration thereof and the final payment at maturity), the Borrowers shall pay to the DIP Agent, in cash, an exit premium equal to five percent (5.00%) of the amount of the DIP Loans being repaid, reduced or satisfied (the "**Exit Premium**"). |
| | | • The Upfront Premium, the Exit Premium, the Extension Fee and the Monthly DIP Agent Fee shall be approved by the Bankruptcy Court as part of the Interim Order and reaffirmed in the Final Order. |
| 13. | *Use of Proceeds:* | • The proceeds of the DIP Facility shall be used only for the following purposes and, in the case of payments pursuant to clauses (ii), (iii), and (iv) below, subject to the Budget, the Carve-Out and any permitted variances as set forth below |
| | |     i.  Payment in full of the obligations under that certain senior secured super-priority debtor-in-possession loan and security agreement, dated as of December 22, 2022 (the "**Existing DIP Credit Agreement**"), among the Borrowers, the lenders party thereto from time to time and Wilmington Savings Fund Society, FSB, as administrative agent, including, without limitation, any fees, premiums, costs or expenses related thereto; it being agreed that such amounts shall be payable from the Borrowers' existing cash at such time (including the Initial Draw); |
| | |     ii.  working capital and other general corporate purposes of the Borrowers and the Guarantors and certain subsidiaries; |
| | |     iii.  any adequate protection payments in accordance with the Orders (as defined below); |
| | |     iv.  professional fees and expenses of administering the Chapter 11 Cases, to the extent the Bankruptcy Court authorizes payment (including fees incurred prior to the Closing Date); |

4

v.   fees and expenses payable under the DIP Facility;

vi.   interest and other amounts payable under the DIP Facility; and

vii.   funding of the Carve-out Account.

- Notwithstanding any other provision of this Term Sheet, from and after the Closing Date, no DIP Loans or DIP Collateral (as defined below), or any portion of the Carve-Out may be used directly or indirectly by any Debtor, any Guarantor, any official committee appointed in the Chapter 11 Cases, or any trustee appointed in the Chapter 11 Cases or any successor cases, including any chapter 7 cases, or any other person, party or entity:

i.   in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation

a.   against the DIP Agent or the DIP Lender, or their respective predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors, or any action purporting to do the foregoing in respect of the DIP Obligations, DIP Liens (as defined below), DIP Claims (as defined below), or

b.   challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the DIP Obligations and/or the liens, claims, rights, or security interests granted under the Orders, the DIP Documents, including, in each case, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise;

ii.   to prevent, hinder, or otherwise delay the DIP Agent's or the DIP Lender's, as applicable, enforcement or realization on the DIP Obligations, DIP Collateral, and the liens, claims and rights granted to such parties under the Orders, each in accordance with the DIP Documents and the Orders; *provided, however,* this shall not apply to objections by the official committee of the unsecured creditors to the Final Order;

iii.   to seek to modify any of the rights and remedies granted to the DIP Agent or the DIP Lender under the Orders (other than with the consents contemplated thereunder), or the DIP Documents, as applicable;

iv.   to apply to the Bankruptcy Court for authority to approve superpriority claims or grant liens (other than the liens permitted pursuant to the DIP Documents) or

5

**Ad Hoc Equity Group Exhibit 7**

**140**

| | | |
|---|---|---|
| | | security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Claims, unless (x) permitted hereunder or under the DIP Documents or unless all DIP Obligations, and claims granted to the DIP Agent or DIP Lender under the Interim Order or the Final Order, as applicable, have been refinanced or paid in full in cash and the DIP Facility terminated or (y) otherwise agreed to in writing by the DIP Agent and the DIP Lender; or<br><br>v. to pay any amount on account of any claims arising prior to the Petition Date unless such payments are permitted hereunder or under the DIP Documents or otherwise agreed to in writing by the DIP Agent and the DIP Lender, and in each case, included in the Budget, or otherwise approved pursuant to an order of the Bankruptcy Court. |
| 15. | ***Voluntary Prepayments/Mandatory Repayments:*** | • Voluntary prepayments of the DIP Loans shall be permitted at any time, subject to, after entry into the Final Order, payment of the Exit Premium; <u>provided</u>, that, any DIP Loans voluntarily prepaid prior to the Final Order may be re-drawn after entry into the Final Order (subject to Section 6 above).<br><br>• Mandatory prepayment of the DIP Loans, together with all previously uncapitalized interest then accrued and owing on such portion of the DIP Loan then being prepaid, including any Exit Premium shall be required from:<br><br>(i) net proceeds from sale, sale/leaseback, sublease of any real estate (or interests therein) identified in Section 16 below; and<br><br>(ii) any Excess Cash (meaning any cash on hand (other cash than in the Carve-out Account), in excess of $50,000,000 as at the last day of each month, such prepayment being required on the fifth (5th) Business Days of each calendar month).<br><br>• Such prepayments shall be applied first, to any previously uncapitalized interest then accrued and owing on such portion of the DIP Loan then being prepaid, second, to payment of any Exit Premium, third, to any accrued and unpaid fees and expenses owing to the DIP Agent or the DIP Lenders which are then due and owing and fourth, to the unpaid principal amount of the DIP Loans then outstanding. |
| 16. | ***Priority and Security:*** | • Subject to the Carve-Out, all obligations of the Borrowers and the Guarantors under the DIP Documents (or hereunder), including, without limitation, all principal, accrued interest, costs, fees, indemnities, reimbursements and premiums provided for herein and herein, and all obligations of the Debtors under the DIP Facility (the "***DIP Obligations***") shall be entitled to super priority claim status pursuant to section 364(c)(1) of the Bankruptcy Code, with priority |

11226390v13

**Ad Hoc Equity Group Exhibit 7**
**141**

over any and all administrative expense claims and unsecured claims, of any kind or nature whatsoever, now existing or hereafter arising under the Bankruptcy Code (the "**DIP Claims**")

- Subject to the Carve-Out, all DIP Obligations in respect of the DIP Facility shall be:

    i. secured, pursuant to Section 364(c)(2) of the Bankruptcy Code, by a valid, enforceable, fully perfected and automatic first priority lien on all property and assets (or interests therein) of the Borrowers' and the Guarantors' estates (whether tangible, intangible, real, personal or mixed and wherever located) as of the Petition Date that, as of the Petition Date, was unencumbered (the "**First Priority DIP Collateral**"); including, without limitation, all real property and the facility located in Marble, North Carolina; and

    ii. secured, pursuant to Section 364(c)(3) of the Bankruptcy Code, by a valid, enforceable, fully perfected and automatic junior priority lien on all property (or interest therein) of the Borrowers' and Guarantors' estates (whether tangible, intangible, real, personal or mixed and wherever located) as of the Petition Date that (and subject and junior only to that):

        a. is subject to valid, perfected, and nonavoidable liens in existence as of the Petition Date (including mortgages, mechanics' liens and fixture filings disclosed to the DIP Agent and the DIP Lender); limited, with respect to all real property and the facilities, to those located in:

            i. Calvert City, Kentucky;

            ii. Grand Forks, North Dakota;

            iii. Muskogee, Oklahoma;

            iv. Barstow, Texas (Cedarvale);

            v. Pecos, Texas (Cottonwood); and

            vi. Dalton, Georgia; and

        b. is subject to valid liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code (this clause (ii) being collectively, the "**Second Priority DIP Collateral**" and together with the First Priority DIP Collateral, the "**DIP Collateral**"); provided, however, that any DIP Liens in already encumbered collateral shall be junior to any adequate protection liens granted to existing creditors secured by such collateral.

**Ad Hoc Equity Group Exhibit 7**

**142**

| | | |
|---|---|---|
| | | • The liens securing the DIP Facility (the "**DIP Liens**") shall mean the liens described above. The DIP Liens described herein shall, to the fullest extent permitted by applicable law, be effected and perfected upon entry of the Interim Order and without the necessity of the execution of mortgages, landlord agreements, security agreements, pledge agreements, control agreements, financing statements or other agreements. |
| | | • DIP Collateral shall also include any and all rents, issues, products, offspring, proceeds, and profits generated by any item of DIP Collateral, without the necessity of any further action by the DIP Agent or the DIP Lender in order to claim or perfect such rents, issues, products, offspring, proceeds, and/or profits. |
| 17. | *Conditions Precedent to Closing:* | • The Closing and the obligation of the DIP Lender to make the Initial Draw (and the right of the Borrowers to request such Initial Draw) shall be subject to the satisfaction of the conditions precedent set forth below and such other conditions set forth in the Interim Order:<br><br>    i.   entry of the Interim Order, which order shall not be stayed or subject to appeal;<br><br>    ii.   delivery of the Initial Budget and any subsequent Budget as applicable;<br><br>    iii.   the payment in full of the obligations under, and the termination of, the Existing DIP Credit Agreement and the inclusion in the Interim Order of provisions terminating all liens granted to the agent and lenders thereunder effective as of the date of the Interim Order;<br><br>    iv.   in addition to the release set forth in Section 30 hereof, the Interim Order shall include customary stipulations by the Debtors and their estates disclaiming the existence of any claims or causes of action against each of the DIP Agent and DIP Lender, subject to a customary challenge period by the official committee of unsecured creditors;<br><br>    v.   delivery by the Debtors of the notice of intent to terminate referenced in section 6(b)(ii) of the Restructuring Support Agreement dated as of December 22, 2022 entered into between the Debtors and the Consenting Creditors (as defined therein) (the "**RSA**") to the Ad Hoc Group Advisors (as defined in the RSA) (it being agreed that a copy of such notice shall have been provided to the DIP Agent for its review and reasonable comment prior to the Debtors' delivery thereof, as well as a final copy of such notice as so delivered by the Debtors);<br><br>    vi.   The DIP Agent shall have received Monthly DIP Agent Fee due and owing on the initial funding date (as set forth above); |

8

**Ad Hoc Equity Group Exhibit 7**

**143**

|    |    |    |
|----|----|----|
|    |    | vii.   no trustee, examiner, or receiver shall have been appointed or designated with respect to the Loan Parties' business, properties or assets and no motion shall be pending seeking similar relief or any other relief, which, if granted, would result in a person other than the Loan Parties exercising control over their assets; |
|    |    | viii.   no Event of Default or event or condition which with the giving of notice or lapse of time, or both, would constitute an Event of Default (a "**Default**") shall have occurred and be continuing (the requesting and acceptance of any such draw being deemed to be a representation and warranty by the Borrowers as to the satisfaction of this condition); and |
|    |    | ix.   accuracy of representations and warranties of the Debtors in all material respects (or, if such representation and warranty is qualified as to materiality, in all respects) as of the Closing Date and the date of the Initial Draw (or if such representation or warranty expressly speaks to an earlier date, as of such earlier date) (the requesting and acceptance of any such draw being deemed to be a representation and warranty by the Borrowers as to the satisfaction of this condition). |
| 18. | ***Conditions Precedent to Full Availability of DIP Loans:*** | •   The right of the Loan Parties to request, and the obligation of the DIP Lenders to advance, any Other Draws and/or the Final Draw shall be subject to the conditions precedent set forth below, in the Final Order, in the DIP Documents and as otherwise deemed incorporated herein (and/or to be included in the DIP Documents), in each case, in accordance with the Documentation Principles (all to be in form and substance satisfactory to the DIP Agent and DIP Lender), and shall include, without limitation: |
|    |    | i.   execution and delivery of a credit agreement (the "**DIP Credit Agreement**") and other DIP Documents evidencing the DIP Facility, in each case, which shall be in form and substance substantially consistent with this Term Sheet and otherwise in form and substance acceptable to the DIP Agent and the DIP Lender and the Borrowers and the Guarantors (it being agreed that the Initial Draw may be advanced based on the terms set forth in this Term Sheet and the Interim Order); |
|    |    | ii.   not later than 30 days following the date on which a motion to approve the DIP Facility is filed, the Final Order as to the DIP Facility shall have been entered by the Bankruptcy Court, which Final Order shall be in the form of the Interim Order with such changes as are customary for a final order and such other changes as the DIP Agent may reasonably require and/or the |

9

**Ad Hoc Equity Group Exhibit 7**

**144**

|  |  | parties may mutually agree, in all cases, to be acceptable to the DIP Agent; |
|  | iii. | in addition to the release set forth in Section 30 hereof, the Final Order shall include customary stipulations by the Debtors and their estates disclaiming the existence of any claims or causes of action against each of the DIP Agent and the DIP Lender, subject to a customary challenge period by the official committee of unsecured creditors; |
|  | iv. | the Final Order shall be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed, or subject to a stay pending appeal; |
|  | v. | the DIP Agent, the DIP Lenders and the Loan Parties shall have finalized and entered into the DIP Documents relating to the facilities contemplated hereby (and all of which have been approved by Bankruptcy Court); |
|  | vi. | the Debtors shall be in compliance in all respects with the Interim Order and the Final Order and the Loan Parties shall be in compliance in all respects with the DIP Documents; |
|  | vii. | at the time of each draw, no Default or Event of Default shall have occurred and be continuing (the requesting and acceptance of any such draw being deemed to be a representation and warranty by the Borrowers as to the satisfaction of this condition); |
|  | viii. | at the time of each draw, accuracy of representations and warranties of the Debtors in all material respects (or if such representation and warranty is qualified as to materiality, in all respects) as of such date (or, if such representation or warranty expressly speaks to an earlier date, as of such earlier date) (the requesting and acceptance of any such draw being deemed to be a representation and warranty by the Borrowers as to the satisfaction of this condition); |
|  | ix. | no order has been entered reversing, amending, staying, vacating, terminating or otherwise modifying in any manner adverse to the DIP Agent and DIP Lender the Interim Order or the Final Order, as applicable; |
|  | x. | delivery of a notice of borrowing, including a certification as to the satisfaction of the condition to the making of any Other Draws; |
|  | xi. | all costs, fees, expenses (including, without limitation, legal fees and expenses) set forth in the DIP Documents or otherwise to be paid to the DIP Agent or the DIP |

10

**Ad Hoc Equity Group Exhibit 7**

**145**

| | | |
|---|---|---|
| | | Lender on or before the Final Draw shall have been paid; and |
| | | xii.    The RSA shall have been fully terminated and shall be of no further force or effect. |
| 19. | *Representations and Warranties:* | • The Loan Parties shall make and be subject to (and are hereby deemed to agree to and make) the representations and warranties set forth herein, in the Orders, in the DIP Documents and as otherwise deemed incorporated herein (and/or to be included in the DIP Documents), in each case, in accordance with the Documentation Principles (all to be in form and substance satisfactory to the DIP Agent and DIP Lender) |
| 20. | *Affirmative Covenants:* | • The Loan Parties shall be subject to (and are hereby deemed to agree to and make) the covenants and undertakings set forth below, in the Orders, in the DIP Documents and as otherwise deemed incorporated herein (and/or to be included in the DIP Documents), in each case, in accordance with the Documentation Principles (all to be in form and substance satisfactory to the DIP Agent and DIP Lender), including, without limitation:<br><br>i.    the Loan Parties and the DIP Agent agree to discuss in good faith with potential providers thereof and the DIP Agent an agreement to provide for forward sales or hedging arrangements with respect to the Loan Parties' Bitcoin present and anticipated Bitcoin inventory; and<br><br>ii.    the Loan Parties shall covenant and agree to timely and diligently pursue and prosecute the termination of the RSA and to take such actions as are required pursuant to the terms of the RSA to effect the such termination by a date no later than the date the Final Order is entered. |
| 21. | *Negative Covenants:* | • The Loan Parties shall be subject to (and are hereby deemed to agree to and make) the covenants and undertakings set forth below, in the Orders, in the DIP Documents and as otherwise deemed incorporated herein (and/or to be included in the DIP Documents), in each case, in accordance with the Documentation Principles (all to be in form and substance satisfactory to the DIP Agent and DIP Lender), including, without limitation:<br><br>i.    The Loan Parties shall not take, participate or support any action, motion or claim to rescind its termination of, or to continue or reinstate the RSA, or shall cease or fail to take the actions specified in clause (ii) of Section 20 above.<br><br>ii.    It is agreed that such covenants will permit (a) sales of (i) Bitcoin in the ordinary course and (ii) non-core assets (it being agreed that non-core assets shall NOT include the Debtors' real estate listed in Section 16 above) and, with the DIP Agent's prior consent, the Debtors' real estate listed in Section 16 above, so long as, in each case, net proceeds (including reductions to satisfy claims of |

11226390v13

**Ad Hoc Equity Group Exhibit 7**

**146**

| | | |
|---|---|---|
| | | other lienholders with respect to such assets including amounts to be escrowed or otherwise required to be held back or segregated by the Bankruptcy Court) thereof are used to repay the DIP Obligations (including any applicable Exit Premium) and (b) (i) transactions with respect to miners and equipment in the ordinary course of business and (ii) subject to the consent of the DIP Agent (subject to thresholds to be agreed) (x) the ability to reject or modify contracts, and (y) settlements of litigation. |
| 22. | ***DIP Budget / Variance Reporting:*** | • On or prior to the Closing Date, the Loan Parties shall deliver to the DIP Agent and the DIP Lender an extended weekly budget commencing with the week during which the Interim Order is entered, containing line items of sufficient detail to reflect the consolidated operating cash flow of the Debtors through projected emergence (the "**Initial Budget**") (the Initial Budget, as modified from time to time in accordance herewith, shall be the "**Budget**"). |
| | | • The Budget shall be updated and provided to the DIP Agent and the DIP Lender on the fourth Wednesday following the prior Budget's approval and every fourth Wednesday thereafter, or more frequently at the reasonable discretion of either the Borrowers or the DIP Agent, with such updated Budget extending the term thereof and the DIP Agent, in its reasonable discretion, shall have the right to approve or reject any such updates (or any amendments) by providing the Borrowers specific notice thereof within such four (4) business days after the delivery by the Borrowers of any such update or amendment; provided that, (i) to the extent the DIP Agent does not provide notice of approval or rejection within such four (4) business day period, such update or amendment shall be deemed approved and consented to by the DIP Lender and shall be deemed to constitute the updated approved Budget ("**Updated Budget**") upon the expiration of such 4 business day objection period and, (ii) to the extent the DIP Lender provides notice rejecting the updates (or any amendments), the then existing Budget shall continue to constitute the applicable Budget until such time as an update or amendment is approved by the DIP Agent. |
| | | • On a weekly basis thereafter, the Borrowers shall deliver to the DIP Agent and DIP Lender a variance report for the four-week period ending the prior Friday comparing the difference/variance, expressed as a percentage (each, a "**Budget Variance**"), between: (x) total receipts for such period to total receipts for such period as set forth in the Budget on a cumulative 4 week rolling basis; (y) total disbursements for such period to total disbursements for such period as set forth in the Budget on a cumulative 4 week rolling basis (each a "**Measuring Period**") and explaining in reasonable detail all material variances, it being understood that any variance exceeding twenty percent (20%) shall be material (each such report, a |

12

**Ad Hoc Equity Group Exhibit 7**

**147**

"**Variance Report**," which shall be in a form satisfactory to the DIP Agent).

- For purposes of each Measuring Period, the Debtors shall calculate: (x) the numerical difference between total net receipts (with respect to self-mining and hosted miners) for such period to total net receipts (with respect to self-mining and hosted miners) for such period as set forth in the Budget on a cumulative 4 week rolling basis, and to the extent the difference is a negative number, the percentage such difference (as an absolute amount) is of the cumulative budgeted amount for receipts for such period (the "**Receipts Variance**"); and (y) the numerical difference between "net operating disbursements" plus "net capital expenditures" (such terms reflecting those line items illustrated in the Budget) for such period to "net operating disbursements" plus "net capital expenditures" for such period as set forth in the Budget on a cumulative 4 week rolling basis, and to the extent the difference is a positive number, the percentage such difference is of the cumulative budgeted amount for disbursements for such period (the "**Disbursements and Capital Expenditure Variance**"). For the avoidance of doubt, the Disbursements Variance shall not include any amounts in the Budget related to professional fees, utility deposits or adequate assurance payments.

- For purposes herein, a "Permitted Variance" shall be limited to not greater than (a) twenty-five percent (25%) for budget variances with respect to the Receipts Variance and (b) twenty percent (20%) for budget variances with respect to the Disbursements and Capital Expenditure Variance, each as set forth in the applicable Variance Report.

| 23. | *Interim Order:* | |
|---|---|---|

- The interim order approving the DIP Facility, which shall include the terms hereof and shall otherwise be in form and substance reasonably acceptable to the DIP Agent and the DIP Lender (the "**Interim Order**"), shall, among other things, authorize and approve:

  i.   the terms set forth in this Term Sheet and the entry into the Commitment Letter to which this Term Sheet is attached;

  ii.  the Initial Draw;

  iii. the making of the DIP Loans;

  iv.  the granting of the superpriority claims and liens against the Debtors and their assets in accordance with this Term Sheet and the DIP Documents with respect to the DIP Collateral;

  v.   the payment of all fees and expenses (including the fees and expenses of outside counsel and financial advisors) required to be paid to the DIP Agent and the DIP Lender as described herein under the heading "*Indemnification and Reimbursement of Expenses*" by the Debtors; it

11226390v13

**Ad Hoc Equity Group Exhibit 7**
**148**

|   |   | being acknowledged and agreed that all such fees and expenses may and will be withheld from the Initial Draw for direct payment thereof (to the DIP Agent, the DIP Lenders or such counsel and financial advisors) from such Initial Draw (without reducing the obligations of the Debtor to repay the entire amount of the Initial Draw); *provided, however,* notwithstanding anything to the contrary, fees and expenses incurred by the DIP Agent and the DIP Lender prior to the Interim Order and reimbursable pursuant to this clause (v) shall be limited to the fees and expenses of Choate, Hall & Stewart LLP, as counsel to the DIP Agent and the DIP Lender. |
|---|---|---|
|   |   | vi.    the termination of the Existing DIP Credit Agreement and related documents and all liens granted thereunder (and/or the interim order approving such Existing DIP Credit Agreement) as security therefor; and |
|   |   | vii.    the calculations and payment of the Monthly DIP Agent Fee, the Upfront Premium, the Extension Fee and the Exit Premium, which fee payments shall not be subject to reduction, setoff or recoupment, and shall be fully earned upon entry of the Interim Order. |
| 24. | ***Final Order:*** | • The final order approving the DIP Facility, which shall be substantially in the same form as the Interim Order (with such modifications as are necessary to convert the Interim Order into a final order), with such modifications or additions thereto as may reasonably be required by the DIP Agent or as mutually agreed to by the parties, but in any event, to be in form and substance acceptable to the DIP Agent and the DIP Lender (the "**Final Order**" and together with the Interim Order, the "**Orders**"), shall, among other things, authorize and approve the DIP Facility on a final basis, and the Final Draw. |
| 25. | ***Carve out***: | • The "**Carve-Out**" shall, except as otherwise set forth herein, be consistent with the Existing DIP Credit Agreement. |
| 26. | ***Events of Default:*** | • The DIP Facility and the Loan Parties shall be subject to (and the Loan Parties hereby acknowledge and agree that the occurrence or existence thereof will constitute an Event of Default hereunder, under the Orders and under the DIP Documents) the Events of Default set forth below, in the Orders, in the DIP Documents and as otherwise deemed incorporated herein (and/or to be included in the DIP Documents), in each case, in accordance with the Documentation Principles (the "**Event of Default**"), including, without limitation: |
|   |   | i.    the entry of the Final Order shall have not occurred within 30 days after the date on which a motion to approve the DIP Facility is filed; |

14

**Ad Hoc Equity Group Exhibit 7**

**149**

ii. the dismissal of any of the Chapter 11 Cases or the conversion of any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code;

iii. noncompliance, subject to any applicable grace and/or cure periods (other than in the case, among others pursuant the Documentation Principles, of any negative covenant (none of which shall be subject to any grace or cure period, except to the extent incorporated within any such covenant)), by any Loan Party or any of its subsidiaries with the terms of hereof (as giving effect to the Documentation Principles), the DIP Documents, the Interim Order or the Final Order;

iv. the entry of an order staying, reversing, vacating or otherwise modifying the Interim Order or the Final Order, in each case, without the prior written consent of the DIP Agent and the DIP Lender;

v. the entry of an order appointing a trustee, responsible officer, or an examiner having expanded powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Bankruptcy Code section 1104 (other than a fee examiner) in the Chapter 11 Cases, or the Bankruptcy Court shall have entered an order providing for such appointment, in each case without the prior written consent of the DIP Agent in its sole discretion;

vi. the entry of an order in any of the Chapter 11 Cases granting relief from any stay or proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed with foreclosure against any material assets of the Loan Parties to which the fair market value of which exceeds $20,000,000; provided, however, that any such order with respect to the assets of either (x) Blockfi Lending LLC ("**BlockFi**") or (y) NYDIG or their affiliates (so long as (i) relating solely to such equipment provided by such party, or in the case of Blockfi, the debt owing to Blockfi pursuant to its agreements as in effect prior to the Petition Date and (ii) such arrangement shall not result in the improvement or enhancement of such party's claims in the Chapter 11 Cases or security or priority position with respect to any of the Debtors' collateral) shall not be an Event of Default;

vii. the entry of an order (a) surcharging any of the DIP Collateral under Sections 105, 506(c), or any other section of the Bankruptcy Code, (b) allowing any administrative expense claim having priority over or ranking in parity with the DIP Claims or the rights of the

11226390v13

**Ad Hoc Equity Group Exhibit 7**
**150**

DIP Agent, or (c) resulting in the marshaling of any DIP Collateral;

viii. any action by any Debtor to (a) challenge the rights and remedies of the DIP Agent or the DIP Lender under the DIP Facility in any of the Chapter 11 Cases or acting in a manner inconsistent with the DIP Documents or (b) avoid or require disgorgement by the DIP Agent or the DIP Lender of any amounts received in respect of the obligations under the DIP Facility;

ix. any Debtor files a motion in the Chapter 11 Cases without the express written consent of DIP Agent to obtain additional financing from a party other than the DIP Lender under Section 364(d) of the Bankruptcy Code except if such financing contemplates payment in full of the DIP Facility and all DIP Obligations (including the Exit Premium);

x. the making of any material payments in respect of prepetition obligations other than (a) as permitted by the Interim Order or the Final Order, (b) as permitted by any "first day" or "second day" orders reasonably satisfactory to the DIP Agent, (c) as permitted by any other order of the Bankruptcy Court reasonably satisfactory to the DIP Agent, (d) as permitted under the DIP Documents, or (e) as otherwise agreed to by the DIP Agent;

xi. entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Debtor to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the DIP Agent and the DIP Lender;

xii. the Debtors shall seek to, or support any other person's motion to, (a) disallow in whole or in part the DIP Obligations, (b) challenge the validity and enforceability of the DIP Liens or the DIP Claims, (c) contest any material provision of any DIP Document;

xiii. any Debtor shall fail to execute and deliver to the DIP Agent any agreement, financing statement, trademark filing, copyright filing, mortgages, notices of lien or similar instruments or other documents that the DIP Agent may reasonably request from time to time to more fully evidence, confirm, validate, perfect, preserve and enforce the DIP Liens created in favor of the DIP Agent or the DIP Claims;

xiv. The Borrowers, DIP Agent and DIP Lenders do not agree upon the terms of and execute the final DIP Documents (which DIP Documents shall be subject to Bankruptcy Court approval in the Final Order), prior to

16

**Ad Hoc Equity Group Exhibit 7**

**151**

|    |    | twenty (20) days after the Closing Date (or such later date to which the DIP Agent may otherwise agree), unless such failure is attributable to the DIP Agent's or the DIP Lender's bad faith in negotiating such documents (as determined in a final, non-appealable determination by a court of competent jurisdiction), or the Bankruptcy Court does not approve the Debtors' entry into the final DIP Documents; |
|    |    | xv. The RSA is not fully and finally terminated and/or has not ceased to be in full force and effect on or prior to the date upon which the Final Order is to be entered; and/or |
|    |    | xvi. Any Budget Variance exceeds the applicable Permitted Variance as set forth in the last bullet point in Section 22 above. |
| 27. | *Milestone:* | • None. |
| 28. | *Remedies:* | • The remedies exercisable by the DIP Agent and the DIP Lender following the occurrence of an Event of Default as set forth above shall be as set forth herein, in the Orders, in the DIP Documents, as deemed incorporated herein pursuant to the Documentation Principles and otherwise as are usual and customary in loan documents for similar debtor-in-possession financings and, in each case, as are acceptable to the DIP Agent and the DIP Lender. |
| 29. | *Indemnification and Reimbursement of Expenses:* | • The Loan Parties shall be subject to and liable for the customary indemnifications in favor of the DIP Agent, the DIP Lenders and their related parties as are included herein, in the Orders, in the DIP Documents and as otherwise deemed incorporated herein (and/or to be included in the DIP Documents), in each case, in accordance with the Documentation Principles (all to be in form and substance satisfactory to the DIP Agent and DIP Lender). |
|    |    | • Subject to the DIP Documents and in accordance with the Documentation Principles, all reasonable and documented out-of-pocket accrued and unpaid fees, costs, disbursements, and expenses of (i) the DIP Agent and (ii) the DIP Lender, including the fees and expenses of Choate, Hall & Stewart LLP, as counsel to the DIP Agent and the DIP Lender, and as necessary, other local counsel in their capacity as counsel to the DIP Agent and the DIP Lender, incurred in connection with, the preparation, analysis, negotiation, documentation, execution and enforcement of, or actions or suits relating to, this Term Sheet, the related commitment letter, the DIP Documents, the Orders and/or otherwise in connection with the DIP Facility and the Chapter 11 Cases and/or the transactions contemplated thereby, shall be paid on a current basis <u>provided</u>, however, notwithstanding anything to the contrary, fees and expenses incurred prior to the Interim Order and reimbursable hereunder shall be limited to those of Choate, Hall & Stewart LLP, as counsel to the DIP Lender. |

17

**Ad Hoc Equity Group Exhibit 7**

**152**

| 30. | *Release:* | • The Orders shall include a customary release of the DIP Agent and DIP Lender, each in their capacity as such, with respect to any and all claims and causes of action arising from or related to the DIP Facility. |
|---|---|---|
| 31. | *Waivers:* | • The Orders shall include, in addition to those set forth herein, terms and conditions customary for final DIP financing orders or which shall otherwise be acceptable to the DIP Agent and DIP Lender (in their discretion), including, without limitation, waiver of the automatic stay, credit-bidding rights, "no marshaling" provisions, and waivers of the imposition of costs pursuant to Section 506(c) of the Bankruptcy code and the "equities of the case" exception in Section 552(b) of the Bankruptcy Code, in each case, to the extent applicable. |
| 32. | *Governing Law:* | • New York (and to the extent applicable, the Bankruptcy Code). |
| 33. | *Documentation Principles:* | • Without limiting and with the exception of any of the express provisions in this term sheet and/or in the Interim DIP Order or the Final Order, (x) until such time as definitive DIP Documents have been negotiated and executed by the Debtors, the DIP Agent and the DIP Lenders and approved by the Bankruptcy Court, the undertakings, restrictions, duties and obligations of the Debtors and the rights, remedies, protections, privileges, exculpations, and rights of reimbursement and indemnity of the DIP Agent and the DIP Lenders hereunder shall, in each case, be deemed to be governed by the terms of the Existing DIP Credit Agreement (unless and to the extent otherwise agreed to by the DIP Agent its discretion) as if the DIP Agent and the DIP Lenders were making the DIP Loans and the Debtors were incurring the DIP Obligations, in each case, under and pursuant to such Existing DIP Credit Agreement (and such agreement were among the Debtors, the DIP Agent and the DIP Lender), including as relating to the conditions precedent to lending, representations and warranties of the Debtors, affirmative and negative covenants and undertakings of the Debtors, events of default and the consequences thereof and the rights and remedies of the DIP Agent and the DIP Lender relating thereto, the agreements in Sections 3.4 through 3.7 and Sections 12 through Section14 of the Existing DIP Credit Agreement, together in each case with the related definitions (to the extent relevant) and (y) the DIP Documents shall be based on the Existing DIP Credit Agreement, with such additions and modifications thereto as the DIP Agent deems reasonably appropriate to reflect the terms of this Term Sheet or which are usual and customary for similar debtor-in-possession financings or which the DIP Agent and the Borrowers deem reasonably appropriate in light of the transactions contemplated hereby (collectively, the "**Documentation Principles**"). Until such time as the DIP Documents are fully-executed and approved by the Bankruptcy Court, in the event of a conflict between the terms of the Existing DIP Credit Agreement and the terms set forth in this term sheet or the Interim Orders, the terms of this term sheet and the Interim Order shall control. Notwithstanding anything to the contrary |

18

**Ad Hoc Equity Group Exhibit 7**

**153**

|  |  | herein, in the event of (and solely to the extent of) any direct conflict between the provisions of the Interim Order and this Term Sheet (as so interpreted to incorporate the terms of the Existing DIP Credit Agreement), the terms of the Interim Order shall control. |

19

**Ad Hoc Equity Group Exhibit 7**

**154**

**<u>Exhibit 2</u>**

**Commitment Letter**

**EXECUTION VERSION**

**B. Riley Commercial Capital, LLC**
299 Park Avenue
New York, NY 10171

January 29, 2023

Core Scientific, Inc.
210 Barton Springs Road, Suite 300
Austin, TX 78704
Attn: Todd DuChene; President, Chief Legal Officer and Secretary

**Commitment Letter**

Dear Ladies and Gentleman:

You have informed **B. Riley Commercial Capital, LLC** (the "***DIP Lender***") that Core Scientific, Inc., a Delaware corporation (the "***Company***") and certain of the Company's direct and indirect subsidiaries (collectively and together with the Company, the "***Debtors***" and "***you***") referred to in the DIP Term Sheet attached hereto as ***Annex A*** (including[1] all exhibits and schedules thereto, the "***DIP Term Sheet***"; capitalized terms used but not defined herein shall have the meanings given to them in the DIP Term Sheet) have commenced cases under chapter 11 (the "***Chapter 11 Cases***") of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***") under Case No. ***22-90341 (DRJ) (Jointly Administered)***, and wish to obtain the up to $70,000,000 DIP Facility referenced in the DIP Term Sheet, substantially on the terms set forth in this letter, as well as the DIP Term Sheet (such letter and the DIP Term Sheet, collectively, the "***Commitment Letter***"). The transactions contemplated by the DIP Term Sheet and this Commitment Letter are hereinafter collectively referred to as, the "***Transactions***".

1.  Upon the terms and subject only to the conditions set forth in this Commitment Letter (including paragraph 3 hereof) and the DIP Term Sheet (including the "Conditions Precedent to Closing and Funding the Initial Draw" set forth in the DIP Term Sheet), the DIP Lender is pleased to inform you of its commitment to provide up to $70,000,000 of the DIP Commitments (as defined in the DIP Term Sheet).  You hereby agree that, effective upon your acceptance of this Commitment Letter, you shall not solicit any other bank, investment bank, financial institution, person or entity to provide, structure, arrange or syndicate any component of the DIP Facility or any other senior financing similar to or as a replacement of any component of the DIP Facility.

2.  In consideration of the DIP Lender's commitments hereunder, the Company agrees to pay the fees described in the DIP Term Sheet on the terms and subject to the conditions (including as to timing and amount) set forth therein, including, without limitation the fees required to be paid to the DIP Agent and the DIP Lender by the Debtors as described therein under the heading "Interim Order".

3. The DIP Lender's commitments and agreements hereunder in respect of the DIP Facility are subject to the satisfaction or waiver in writing (by the DIP Lender) of all conditions precedent set forth in this Commitment Letter and the DIP Term Sheet, including those conditions precedent set forth across the heading "Conditions Precedent to Closing" and, in the case of the borrowing of any DIP Loans after the Closing Date, also the conditions precedent set forth across from the heading "Conditions Precedent to Full Availability of DIP Loans", in each case, in the DIP Term Sheet.

4.  The Company, on behalf of itself and the other Debtors, represents and covenants that (i) all information, other

---

[1] For the avoidance of doubt, the terms "include", "includes" and "including" as used in this Commitment Letter are by way of example and not limitation, and shall be deemed to be followed by the words "without limitation" whether or not they are in fact followed by such words.

1

**Ad Hoc Equity Group Exhibit 7**

than Projections and Lien Information, which has been or is hereafter provided directly or indirectly by the Company or any of its affiliates, advisors or representatives to the DIP Lender or its affiliates in connection with the Transactions (the "*Information*") is and will be complete and correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not misleading and (ii) all financial projections concerning the Debtors and their subsidiaries that have been or will be made available to DIP Lender or its affiliates by the Company or any of its affiliates, advisors or representatives (the "*Projections*") and all information related to all outstanding liens (including, without limitation, mechanics' liens), the amount thereof, the validity of such liens, any claims or counterclaims with respect to such liens and any materials available to offset such liens, in each case, which has been or is hereafter provided directly or indirectly by the Company or any of its affiliates, advisors or representatives to the DIP Lender or its affiliates (the "*Lien Information*") have been and will be prepared in good faith based upon assumptions that are believed by the preparer thereof to be reasonable at the time made. You agree that if at any time prior to the Closing Date, any of the representations in the preceding sentence would be incorrect in any material respect if the Information, Projections and Lien Information were being furnished, and such representations were being made, at such time, then you will promptly supplement, or cause to be supplemented, the Information, Projections and Lien Information so that such representations will be correct in all material respects under those circumstances.

5. [Reserved].

6. [Reserved].

7. In addition, please note that the DIP Lender and its affiliates do not provide accounting, tax or legal advice. Notwithstanding anything herein to the contrary, DIP Lender (and each of its partners, officers, directors, employees, affiliates, agents, advisors and attorneys) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the Transactions and all materials of any kind (including tax opinions or other tax analyses) that are provided to DIP Lender relating to such tax treatment and tax structure. However, the foregoing sentence shall not apply to any information relating to the tax treatment or tax structure to the extent reasonably necessary to enable any person to comply with applicable securities laws.  For this purpose, "*tax treatment*" means U.S. federal income tax treatment, and "*tax structure*" is limited to any facts relevant to the U.S. federal income tax treatment of the Transactions.

8. The DIP Lender hereby notifies you that consistent with the USA PATRIOT ACT (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "*PATRIOT ACT*") and 31 C.F.R. § 1010.230 (the "*Beneficial Ownership Regulation*"), it may be required to obtain, verify and record information that identifies you and each Guarantor, which information includes the name and address of you and each Guarantor and other information that will allow the DIP Lender to identify you and each Guarantor, including the delivery of the certification regarding beneficial ownership in relation to you, in accordance with, or as otherwise required by, the PATRIOT ACT and the Beneficial Ownership Regulation.  In addition, the DIP Lender may also request corporate formation documents, or other forms of identification, to verify information provided.  This notice is given in accordance with the requirements of the PATRIOT ACT and the Beneficial Ownership Regulation and is effective for the DIP Lender, any other lender and agent (including the DIP Agent) in respect of the DIP Facility.

9. As you know, DIP Lender and/or its affiliates may from time to time effect transactions, for their own account or the account of customers, and hold positions in loans or options on loans of the Company and other companies that may be the subject of this Commitment Letter.  In addition, DIP Lender and/or its affiliates may from time to time effect transactions and hold positions in securities or options on securities of the Company and other companies that may be the subject of this Commitment Letter.  In addition, DIP Lender may employ the services of its affiliates in providing certain services hereunder and may exchange with such affiliates information concerning the Company and other companies that may be the subject of this Commitment Letter, and such affiliates shall be entitled to the benefits afforded to DIP Lender (subject to any limitations thereof) hereunder.

10.  The DIP Lender and its affiliates may have economic interests that conflict with those of the Company.  You agree that the DIP Lender will act under this Commitment Letter as an independent contractor and that nothing in this Commitment Letter or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between the DIP Lender and the Company, its stockholders or their affiliates. You acknowledge and agree that (i) the Transactions are arm's-length commercial transactions between the DIP Lender, on the one hand, and the Company and their affiliates, on the other, (ii) in connection therewith and with the process leading to such Transactions the DIP Lender is acting solely as a principal and not the agent or fiduciary of the Company, its management, stockholders, affiliates, creditors, or any other person, (iii) the DIP Lender has not assumed an advisory or fiduciary responsibility in favor of the Company and their affiliates with respect to the Transactions contemplated hereby or the process leading thereto (irrespective of whether the DIP Lender or any of its affiliates has advised or is currently advising the Company and their affiliates on other matters) or any other obligation to the Company and their affiliates except the obligations expressly set forth in this Commitment Letter and (iv) the Company has consulted its own legal and financial advisors to the extent it deemed appropriate.  The Company further acknowledges and agrees that it is responsible for making its own independent judgment with respect to such Transactions and the process leading thereto.  The Company, on behalf of itself and their affiliates, agrees that it will not claim that the DIP Lender has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to the Company and their affiliates, in connection with such Transaction or the process leading thereto.

11. This Commitment Letter (including the DIP Term Sheet) may not be amended or waived except by an instrument in writing signed by the DIP Lender and the Company.  This Commitment Letter may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.  Delivery of an executed signature page of this Commitment Letter by facsimile or email transmission shall be effective as delivery of a manually executed counterpart thereof.

12. This Commitment Letter (i) supersedes all prior discussions, agreements, commitments, arrangements, negotiations and understandings, whether oral or written, of the parties with respect thereto (other than the Interim Order), (ii) SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS, and (iii) may not be assigned by the Company or the DIP Lender without the DIP Lender's or the Company's prior written consent, respectively, and any purported assignment without such consent shall be null and void, (iv) shall be binding upon the parties and their respective successors and assigns, and (v) may not be relied upon or enforced by any other person or entity and is not intended to confer any benefit upon, or create any right in favor of, any person other than the parties hereto except hereto except the entities and persons described in the definition of Indemnified Person.  ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY ACTION OR PROCEEDING ARISING IN CONNECTION WITH OR AS A RESULT OF EITHER THE TRANSACTIONS OR ANY MATTER REFERRED TO IN THE COMMITMENT LETTER OR THE DIP TERM SHEET IS HEREBY WAIVED BY THE PARTIES HERETO.  EACH OF THE COMPANY AND THE DIP LENDER AGREE THAT ANY SUIT OR PROCEEDING ARISING IN RESPECT OF THE TRANSACTIONS OR ANY MATTER REFERRED TO IN THE COMMITMENT LETTER OR THE DIP TERM SHEET WILL BE TRIED EXCLUSIVELY IN THE BANKRUPTCY COURT AND THE COMPANY AND THE DIP LENDER EACH AGREE TO SUBMIT TO THE JURISDICTION OF, AND TO VENUE IN, SUCH COURT.

13.  If any term, provision, covenant or restriction contained in this Commitment Letter is held by a court of competent jurisdiction to be invalid, void or unenforceable or against public policy, the remainder of the terms, provisions, covenants and restrictions contained herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated. The DIP Lender and the Company shall endeavor in good faith negotiations to replace the invalid, void or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, void or unenforceable provisions.

14. [Reserved].

**Ad Hoc Equity Group Exhibit 7**

**158**

15.  If you accept the terms and conditions of this Commitment Letter in accordance with, and by the deadline specified in, paragraph 18 hereof, the DIP Lender's commitments and other obligations hereunder will remain effective and terminate on February 2, 2023 at 11:59 p.m. (New York City time) unless prior to such time the Court has entered the Interim Order (the "Termination Date"); provided, that this Commitment Letter may otherwise be terminated by (x) mutual consent of the DIP Lender and the Company, (y) by the DIP Lender by written notice (i) prior to the Company's acceptance hereof or (ii) material breach by the Company of any of the conditions, representations, or its respective obligations or undertakings under this Commitment Letter or the DIP Sheet, as applicable, or (z) by the Company, in its reasonable discretion, to the extent that (i) it determines doing so would be required by its fiduciary duties and (ii) the Company promptly reimburses the DIP Lender, in full in cash, for all of its then-outstanding reasonable and documented fees and expenses (including, without limitation, the reasonable and documented fees and expenses of Choate, Hall & Stewart LLP, as counsel to the DIP Lender).

16. Paragraphs 2, 4, 7, 9, 10, 12 and 17 hereof shall remain in full force and effect regardless of whether any DIP Loans are funded or the DIP Documents shall be executed and delivered and notwithstanding the termination or expiration of this Commitment Letter or the DIP Lender's commitments hereunder; provided, that your obligations under this Commitment Letter (other than your obligations set forth in paragraphs 4, 5 and 14) shall automatically terminate and be superseded by the Interim Order and/or corresponding provisions of the DIP Documents upon the execution and delivery thereof, as applicable, in each case, solely to the extent such paragraphs (and the content thereof) are covered thereby with retroactive application to the date hereof.

17.  Subject to the Bankruptcy Court's approval of the Interim Order, you agree to indemnify and hold harmless the DIP Lender, its respective affiliates and its officers, directors, employees, agents, advisors, consultants, representatives, controlling persons, members and successors and assigns (each, an "*Indemnified Person*") from and against any and all losses, claims, damages, liabilities and expenses, joint or several ("*Losses*") to which any such Indemnified Person may become subject arising out of or in connection with this Commitment Letter, the DIP Facility, the use of proceeds thereof, the Transactions, to reimburse each such Indemnified Person from time to time upon their reasonable demand upon presentation of a summary statement, for any reasonable and documented out-of-pocket legal expenses (including one outside local counsel in each relevant jurisdiction) or other expenses incurred in connection with the DIP Facility, the enforcement of this Commitment Letter, the DIP Documents and any ancillary documents and security arrangements in connection therewith; provided, that the foregoing indemnity will not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or related expenses to the extent they are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted from such Indemnified Person's (x) gross negligence or willful misconduct or (y) material breach of obligations under this Commitment Letter, in each case, whether or not such investigation, litigation or proceeding is brought by you, your equityholders or creditors or an Indemnified Party, whether or not an Indemnified Party is otherwise a party thereto and whether or not any aspect of the Transaction is consummated. You agree that, notwithstanding any other provision of this Commitment Letter, no Indemnified Person shall have any liability (whether direct or indirect, in contract or tort or otherwise) to you or your respective equity holders or creditors or any other person or entity arising out of, related to or in connection with any aspect of the Transactions, the DIP Facility, the enforcement of this Commitment Letter, the DIP Documents and any ancillary documents and security arrangements in connection therewith, except to the extent of direct, as opposed to special, indirect, consequential or punitive, damages determined in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's (a) gross negligence or willful misconduct or (b) breach of obligations under this Commitment Letter.

18.  If the foregoing correctly sets forth the DIP Lender's agreement with you, please indicate your acceptance of the terms and conditions of this Commitment Letter (including the DIP Term Sheet) by returning an executed counterpart to this Commitment Letter to the Company's counsel Weil, Gotshal & Manges LLP (by electronic (pdf) transmission to Maximilien.Pucci-SistiMaisonrouge@weil.com, Claudia.Stantzyk-Guzek@weil.com and Kate.Waterman@weil.com) on or before 11:59 p.m. (New York City time) on January 29, 2023.

4

**Ad Hoc Equity Group Exhibit 7**

## Exhibit 3

**Schedule of Existing Liens**

| | Document | Date Recorded | Document Number | County | Claimant | Amount Claimed | Property Site |
|---|---|---|---|---|---|---|---|
| 1. | Affidavit for Mechanic's Lien | 8/19/2022 | 2022-3219 | Ward | Priority Power Management, LLC | $16,319,916 | 3013 FM 516 North, Barstow, TX 79777<br><br>Property Ownership is unclear from the document, but may be Core Scientific. |
| | Partial Release of Lien | 9/27/2022 | 2022 - 3741 | Ward | Priority Power Management, LLC | Amount Released - $6,250,096<br><br>Amount Remaining - $10,069,820 | 3013 FM 516 North, Barstow, TX 79777 |
| 2. | Amended Affidavit for Mechanic's Lien | 12/15/2022 | 2022-4794 | Ward | Priority Power Management, LLC | $8,920,490 | 3013 FM 516 North, Barstow, TX 79777 |
| 3. | Affidavit Claiming Mechanic's and Materialman's Lien | 9/9/2022 | 2022-3542 | Ward | Graybar Electric Company, Inc. | $839,883.12 | 3013 FM 516 North, Barstow, TX 79777<br><br>Cedarvale Project, located at 3015 ranch Road 516, Barstow, Texas - Property Ownership is unclear from the document, but may be Core Scientific. |
| 4. | Affidavit Claiming Mechanic's and Materialman's Lien | 11/14/2022 | 2022-4334 | Ward | Huband-Mantor Construction | $4,155,739.72 total ($2,949,813.67 due and the remainder in retainage) | 3013 FM 516 North, Barstow, TX 79777<br><br>Property Ownership is unclear from the document, but may be Core Scientific. |
| 5. | Affidavit Claiming Mechanic's and Materialman's Lien | 1/19/2023 | 2023-0202 | Ward | Huband-Mantor Construction | $10,297,562.23 | 3013 FM 516 North, Barstow, TX 79777 |

| | Document | Date Recorded | Document Number | County | Claimant | Amount Claimed | Property Site |
|---|---|---|---|---|---|---|---|
| 6. | Mechanic's Lien dated October 11, 2022 | 10/14/2022 | 2022-3951 | Ward | Wessely-Thompson Hardware, Inc. | $54,016.75 | 3013 FM 516 North, Barstow, TX 79777 |
| 7. | Affidavit for Mechanic's Lien | 11/15/2022 | 2022007947 | Ward | MK Marlow Company, LLC | $536,728.57 | 3013 FM 516 North, Barstow, TX 79777<br><br>Property Ownership is unclear from the document, but may be Core Scientific. |
| 8. | Affidavit for Mechanic's and Materialman's Lien | 11/16/2022 | 2022-4371 | Ward | ComNet Communications, LLC | $31,875.00 | 3013 FM 516 North, Barstow, TX 79777<br><br>Core Scientific Texas 2 Cedarvale CVL I project. Property Ownership is unclear from the document, but may be Core Scientific. |
| 9. | Affidavit Claiming Mechanic's and Materialman's Lien | 11/21/2022 | 2022-4431 | Ward | Coonrod Electric Co., LLC | $1,547,802.40 | 3013 FM 516 North, Barstow, TX 79777<br><br>Property Ownership is unclear from the document, but may be Core Scientific. |
| 10. | Affidavit of Mechanics Lien by Tiered Contractor or Supplier | 11/28/2022 | 2022-4495 | Ward | Summit Electric Supply Co. | $309,162.20 | 3013 FM 516 North, Barstow, TX 79777 |
| 11. | Affidavit of Mechanics Lien by Tiered Contractor of Supplier | 11/30/2022 | 2022-4527 | Ward | Morsco Supply LLC DBA Morrison Supply Company | $4,466.68 | 3013 FM 516 North, Barstow, TX 79777 |

| | Document | Date Recorded | Document Number | County | Claimant | Amount Claimed | Property Site |
|---|---|---|---|---|---|---|---|
| 12. | Mechanic's and Materialman's Lien | 12/30/2022 | 22-90341 | Ward | Condair Inc. | $1,319,788.93 | 3013 FM 516 North, Barstow, TX 79777 |
| 13. | Affidavit for Mechanic's Lien | 8/18/2022 | 2022005550 | Reeves | Priority Power Management, LLC | $14,442,661 | 1851 FM 2119, Pecos, TX 79772 and/or 1939 FM 2119, Pecos, TX 79772 Property Owned by Jobe Ranch Family Limited Partnership |
| | Partial Release of Lien | 9/27/2022 | 202200662 | Reeves | Priority Power Management, LLC | Amount Released - $3,023,269 Amount Remaining - $11,419,392 | 1851 FM 2119, Pecos, TX 79772 and/or 1939 FM 2119, Pecos, TX 79772 Property Owned by Jobe Ranch Family Limited Partnership |
| 14. | Amended Affidavit for Mechanic's Lien | 12/15/2022 | 2022008754 | Reeves | Priority Power Management, LLC | $12,162,237.00 | 1851 FM 2119, Pecos, TX 79772 and/or 1939 FM 2119, Pecos, TX 79772 |
| 15. | Notice of Claim for Unpaid Labor and/or Materials | 9/9/2022 | 2022006200 | Reeves | Graybar Electric Company, Inc. | $1,153,226.72 | 1851 FM 2119, Pecos, TX 79772 Appears to be property owned by JRC/RGC34 Trade Tracts, LTD. |

| | Document | Date Recorded | Document Number | County | Claimant | Amount Claimed | Property Site |
|---|---|---|---|---|---|---|---|
| | Unconditional Waiver and Partial Release dated September 23, 2022 | No recording information provided. | No recording information provided. | Reeves | Graybar Electric Company, Inc. | Released Amount: $279,961.04 Remaining Amount: $873,265.68 | 1851 FM 2119, Pecos, TX 79772 |
| 16. | Affidavit for Mechanic's Lien dated November 11, 2022 | 11/15/2022 | 2022007946 | Reeves | MK Marlow Company, LLC | $83,744.45 (including $24,157.65 in retainage) | 1851 FM 2119, Pecos, TX 79772 and/or |
| 17. | Affidavit for Mechanic's Lien | Date of recording not provided. | 202211150000 03 | Reeves | MK Marlow Company, LLC | $978,127.96 | 1851 FM 2119, Pecos, TX 79772 and/or |
| 18. | Affidavit Claiming Mechanic's and Materialman's Lien | 11/14/2022 | 2022007951 | Reeves | Huband-Mantor Construction | $9,007,945.01 total ($7,310,708.27 due and the remainder in retainage) | 1851 FM 2119, Pecos, TX 79772 and/or 1939 FM 2119, Pecos, TX 79772 Property Owned by Jobe Ranch Family Limited Partnership |
| 19. | Affidavit Claiming Mechanic's and Materialman's Lien | 11/14/2022 | 2022007953 | Reeves | Huband-Mantor Construction | $1,699,939.21 | 1851 FM 2119, Pecos, TX 79772 and/or 1939 FM 2119, Pecos, TX 79772 Core Scientific Cottonwood Data Center #2 Pecos Project in Reeves County – Appears to be property owned by Jobe Ranch |

| | Document | Date Recorded | Document Number | County | Claimant | Amount Claimed | Property Site |
|---|---|---|---|---|---|---|---|
| | | | | | | | Limited Partnership and Hawkins Investments, Inc. |
| 20. | Affidavit Claiming Mechanic's and Materialman's Lien | 1/18/2023 | 2023000447 | Reeves | Huband-Mantor Construction | $15,603,889.45 | 1851 FM 2119, Pecos, TX 79772 and/or<br><br>1939 FM 2119, Pecos, TX 79772<br><br>Core Scientific Cottonwood Data Center Pecos Project in Reeves County, Texas |
| 21. | Affidavit Claiming Mechanic's and Materialman's Lien | 1/18/2023 | 2023000448 | Reeves | Huband-Mantor Construction | $1,967,676.93 | 1851 FM 2119, Pecos, TX 79772 and/or<br><br>1939 FM 2119, Pecos, TX 79772<br><br>Core Scientific Cottonwood Data Center #2 Pecos Project in Reeves County |
| 22. | Affidavit Claiming Mechanic's and Materialman's Lien | 11/15/2022 | 2022007983 | Reeves | Coonrod Electric Co., LLC | $4,083,704.13 | 1851 FM 2119, Pecos, TX 79772 and/or<br><br>1939 FM 2119, Pecos, TX 79772<br><br>Cottonwood #1 Data Processing Center – Ownership of the Property is unclear |
| 23. | Affidavit Claiming Mechanic's and Materialman's Lien | 11/15/2022 | 2022007984 | Reeves | Coonrod Electric Co., LLC | $677,993.88 | 1851 FM 2119, Pecos, TX 79772 and/or |

| | Document | Date Recorded | Document Number | County | Claimant | Amount Claimed | Property Site |
|---|---|---|---|---|---|---|---|
| | | | | | | | 1939 FM 2119, Pecos, TX 79772<br><br>Cottonwood #2 Data Processing Center – Ownership of the Property is unclear |
| 24. | Affidavit of Mechanic's Lien by Tiered Contractor or Supplier | 11/30/2022 | 2022008322 | Reeves | Summit Electric Supply Co. | $821,433.16 | 1851 FM 2119, Pecos, TX 79772 and/or<br><br>1939 FM 2119, Pecos, TX 79772<br><br>60 acre surface lease property |
| 25. | Affidavit of Mechanic's Lien by Tiered Contractor or Supplier | 12/2/2022 | 2022008384 | Reeves | Summit Electric Supply Co. | $22,558.14 | 1851 FM 2119, Pecos, TX 79772 and/or<br><br>1939 FM 2119, Pecos, TX 79772<br><br>60 acre surface lease property |
| 26. | Affidavit for Mechanic's Lien | 12/15/2022 | 2022008777 | Reeves | T&D Moravits & Co., LLC | $305,769.50 | 1851 FM 2119, Pecos, TX 79772 |
| 27. | Affidavit for Mechanic's Lien | 12/15/2022 | 2022008778 | Reeves | T&D Moravits & Co., LLC | $82,240.00 | 1851 FM 2119, Pecos, TX 79772 |
| 28. | Affidavit for Mechanic's Lien | 12/15/2022 | 2022008779 | Reeves | T&D Moravits & Co., LLC | $96,192.50 | 1851 FM 2119, Pecos, TX 79772 |
| 29. | Affidavit for Mechanic's and Materialman's Lien | 12/16/2022 | 2022008811 | Reeves | Condair Inc. | $2,566,892.93 | 1851 FM 2119, Pecos, TX 79772 |

| | Document | Date Recorded | Document Number | County | Claimant | Amount Claimed | Property Site |
|---|---|---|---|---|---|---|---|
| 30. | Unrecorded Mechanic's and Materialman's Lien (documentation to be confirmed) | Not recorded. | Not recorded. | Multiple | Trilogy | $6,170,853.24 | 1851 FM 2119, Pecos, TX 79772 |
| 31. | Affidavit for Mechanic's and Materialman's Lien | 10/28/2022 | 152295 | Denton | Sure Steel – Texas, L.P. | $1,237,031.22 | 8171 Jim Christal Road, Denton, TX 76207<br><br>DENTON DATA CENTER/ 8161 JIM CHRISTAL ROAD, DENTON, TEXAS; DESCRIBED IN DOCUMENT NUMBER 216662; PERMIT # 2202-0339; PARCEL ID 984633 |
| 32. | Affidavit for Mechanic's and Materialman's Lien - Leasehold | 11/1/2022 | 153496 | Denton | Way Mechanical | $151,316.10 | 8171 Jim Christal Road, Denton, TX 76207<br><br>Ownership of the Property is unclear, but appears to be in connection with a Core Scientific lease. |
| 33. | Affidavit for Mechanic's and Materialman's Lien - Leasehold | 11/1/2022 | 153498 | Denton | Way Mechanical | $284,712.90 | 8171 Jim Christal Road, Denton, TX 76207<br><br>Ownership of the Property is unclear, but appears to be in connection with a Core Scientific lease. |
| 34. | Affidavit for Mechanic's and Materialman's Lien - Leasehold | 11/1/2022 | 153497 | Denton | McCorvey Sheet Metal Works, LP | $20,895.50 | 8171 Jim Christal Road, Denton, TX 76207 |

| | Document | Date Recorded | Document Number | County | Claimant | Amount Claimed | Property Site |
|---|---|---|---|---|---|---|---|
| | | | | | | | Ownership of the Property is unclear, but appears to be in connection with a Core Scientific lease. |
| 35. | Affidavit for Mechanic's and Materialman's Lien | 11/3/2022 | 154942 | Denton | McCarthy Building Companies, Inc. | $3,685,631.28 | 8171 Jim Christal Road, Denton, TX 76207 <br><br> Ownership of the Property is unclear, but appears to be in connection with a Core Scientific lease. |
| 36. | Amended Affidavit of Lien by McCarthy Building Companies Inc. | 11/14/2022 | 158011 | Denton | McCarthy Building Companies, Inc. | $17,052,583.65 | 8171 Jim Christal Road, Denton, TX 76207 |
| 37. | Mechanic's Lien Affidavit | 11/14/2022 | 157743 | Denton | BEAM Concrete Construction, Inc. | $878,306.82 | 8171 Jim Christal Road, Denton, TX 76207 <br><br> Ownership of the Property is unclear, but appears to be in connection with a Core Scientific lease. |
| 38. | Lien Affidavit and Claim | 11/15/2022 | 158075 | Denton | Humphrey & Associates, Inc. | $9,365,366.20 | 8171 Jim Christal Road, Denton, TX 76207 <br><br> leasehold interest in the Core Scientific Denton Data Center Project located at 8151 Jim Christal Road, Denton, Texas 76207, 8161 Jim Christal Road, Denton, Texas 76207, and/or |

| | Document | Date Recorded | Document Number | County | Claimant | Amount Claimed | Property Site |
|---|---|---|---|---|---|---|---|
| | | | | | | | 8171 Jim Christal Road, Denton, Texas<br><br>76207 |
| 39. | Affidavit Claiming Mechanic's and Materialman's Lien Including for Retainage | 12/1/2022 | 164584 | Denton | Housley Communications | $53,883.90 | 8171 Jim Christal Road, Denton, TX 76207 and/or<br><br>8151 Jim Christal Road, Denton, Texas 76207 |
| 40. | Lien Affidavit | 12/12/2022 | 168014 | Denton | Imperial Fire Protection, LLC | $209,210.00 | 8171 Jim Christal Road, Denton, TX 76207 and/or<br><br>8161 Jim Christal Road, Denton, Texas 79207 |
| 41. | Affidavit for Mechanic's and Materialman's Lien | 12/13/2022 | 168734 | Denton | ABLe Communications, Inc. | $1,228,932.14 total ($268,053.12 unpaid retainage) | leasehold interest in the Core Scientific Denton Data Center Project located at 8151 Jim Christal Road, Denton, Texas 76207 and/or<br><br>8171 Jim Christal Road, Denton, Texas 76207 |
| 42. | Affidavit for Mechanic's Lien | 12/15/2022 | 169545 | Denton | Pillar Electric Group, LP | $28,266.49 | leasehold interest located at 8151 Jim Christal Road, Denton, Texas 76207 and/or<br><br>8161 Jim Christal Road, Denton, Texas 76207 |

| | Document | Date Recorded | Document Number | County | Claimant | Amount Claimed | Property Site |
|---|---|---|---|---|---|---|---|
| 43. | Affidavit for Mechanic's Lien | 12/16/22 | 170453 | Denton | Power Engineering Services, Inc. | $98,440.00 | 8151 Jim Christal Road, Denton, Texas 76207 |
| 44. | Unrecorded Mechanic's and Materialman's Lien (documentation to be confirmed) | Not recorded. | Not recorded. | Denton | Maddox Transformers | $7,000,000 | 8151 Jim Christal Road, Denton, Texas 76207 |
| 45. | Mechanic's and Materialman's Lien Statement | 10/31/2022 | 2022-013536 | Muskogee | Harper Construction Company, Inc. | $7,500,000.00 | 1525 W Smith Ferry Rd, Muskogee, OK 74401 |
| 46. | Mechanic's and Materialman's Lien Statement | 11/02/2022 | 2022-013616 | Muskogee | Contech, Inc. | $602,556.08 | 1525 W Smith Ferry Rd, Muskogee, OK 74401 |
| 47. | Mechanic's and Materialman's Lien Statement | 11/28/2022 | 2022-014455 | Muskogee | Gaylor Electric, Inc. DBA Gaylor, Inc. | $5,245,601.81 | 1525 W Smith Ferry Rd, Muskogee, OK 74401 |
| 48. | Unrecorded Mechanic's and Materialman's Lien (documentation to be confirmed) | Not recorded. | Not recorded. | Muskogee | J.W. Didado | $6,000,000 | 1525 W Smith Ferry Rd, Muskogee, OK 74401 |

**Ad Hoc Equity Group Exhibit 7**

## Exhibit 4

**Initial Budget**

# Detailed DIP Budget

| | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst |
| **Week Starting** | 1/28/2023 | 2/4/2023 | 2/11/2023 | 2/18/2023 | 2/25/2023 | 3/4/2023 | 3/11/2023 | 3/18/2023 | 3/25/2023 | 4/1/2023 | 4/8/2023 |
| **Week Ending** | 2/3/2023 | 2/10/2023 | 2/17/2023 | 2/24/2023 | 3/3/2023 | 3/10/2023 | 3/17/2023 | 3/24/2023 | 3/31/2023 | 4/7/2023 | 4/14/2023 |
| **Operating Cash Flows** | | | | | | | | | | | |
| Self-Mined BTC Sale Proceeds | 7.4 | 6.9 | 6.1 | 6.1 | 6.7 | 7.4 | 7.5 | 7.5 | 7.5 | 7.8 | 7.9 |
| Hosting Payments | 1.3 | - | - | - | 3.2 | - | - | - | 7.3 | - | - |
| **Net Receipts** | **8.8** | **6.9** | **6.1** | **6.1** | **9.9** | **7.4** | **7.5** | **7.5** | **14.7** | **7.8** | **7.9** |
| Power Costs | (7.1) | (9.4) | (5.4) | (5.5) | (12.1) | (5.3) | (5.3) | (5.4) | (4.0) | (10.5) | (5.0) |
| Operating Costs | (2.2) | (1.3) | (3.1) | (1.4) | (2.5) | (1.3) | (2.5) | (1.3) | (2.5) | (1.1) | (2.1) |
| Tax Payments | (0.0) | (0.0) | (0.0) | (0.0) | (0.7) | - | - | - | - | - | - |
| **Net Operating Disbursements** | **(9.3)** | **(10.8)** | **(8.5)** | **(6.9)** | **(15.3)** | **(6.6)** | **(7.7)** | **(6.6)** | **(6.5)** | **(11.7)** | **(7.1)** |
| Construction & Infrastructure Capex | - | - | - | (1.1) | (0.5) | - | - | - | (1.2) | - | - |
| Miner Capex (inc. Customs) | - | - | - | - | - | - | - | - | - | - | - |
| PP&E Sale Proceeds | - | - | - | - | - | - | - | - | - | - | - |
| **Net Capital Expenditures** | **-** | **-** | **-** | **(1.1)** | **(0.5)** | **-** | **-** | **-** | **(1.2)** | **-** | **-** |
| **Total Operating Cash Flows** | **(0.6)** | **(3.9)** | **(2.3)** | **(1.9)** | **(5.9)** | **0.8** | **(0.3)** | **0.9** | **7.0** | **(3.8)** | **0.8** |
| **Non-Operating Cash Flows** | | | | | | | | | | | |
| Professional Fees | (5.0) | (1.6) | (1.7) | (1.7) | (4.6) | (1.5) | (1.3) | (1.3) | (2.8) | (1.5) | (1.2) |
| Utility Deposits | - | - | - | - | - | - | - | - | - | - | - |
| Debt Service Costs | - | - | - | - | (0.1) | - | - | - | (0.1) | - | - |
| Other (TBD) | - | - | - | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) |
| **Net Non-Operating Cash Flows** | **(5.0)** | **(1.6)** | **(1.7)** | **(2.4)** | **(5.4)** | **(2.2)** | **(2.0)** | **(2.0)** | **(3.6)** | **(2.2)** | **(1.9)** |
| **Liquidity Balances** | | | | | | | | | | | |
| Starting Cash Balance | 46.5 | 29.6 | 24.1 | 20.1 | 15.8 | 24.5 | 23.1 | 20.8 | 19.7 | 23.2 | 22.1 |
| New Money / DIP Financing | 35.0 | - | - | - | 20.0 | - | - | - | - | 5.0 | - |
| Existing DIP Repayment and Fees | (46.4) | - | - | - | - | - | - | - | - | - | - |
| Net Cash Flow | (5.6) | (5.5) | (4.0) | (4.3) | (11.3) | (1.4) | (2.3) | (1.1) | 3.5 | (6.1) | (1.1) |
| **Ending Cash Balance** | **29.6** | **24.1** | **20.1** | **15.8** | **24.5** | **23.1** | **20.8** | **19.7** | **23.2** | **22.1** | **21.0** |
| BTC Held & In Transit | 1.1 | 1.0 | 0.9 | 0.9 | 1.0 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 |
| **Ending Liquidity** | **30.6** | **25.1** | **20.9** | **16.7** | **25.5** | **24.2** | **21.9** | **20.8** | **24.2** | **23.2** | **22.2** |

**Ad Hoc Equity Group Exhibit 7**

# Detailed DIP Budget (Continued)

| | Week 12 Fcst | Week 13 Fcst | Week 14 Fcst | Week 15 Fcst | Week 16 Fcst | Week 17 Fcst | Week 18 Fcst | Week 19 Fcst | Week 20 Fcst | Week 21 Fcst | Week 22 Fcst | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Starting | 4/15/2023 | 4/22/2023 | 4/29/2023 | 5/6/2023 | 5/13/2023 | 5/20/2023 | 5/27/2023 | 6/3/2023 | 6/10/2023 | 6/17/2023 | 6/24/2023 | 01/28-06/30 |
| Week Ending | 4/21/2023 | 4/28/2023 | 5/5/2023 | 5/12/2023 | 5/19/2023 | 5/26/2023 | 6/2/2023 | 6/9/2023 | 6/16/2023 | 6/23/2023 | 6/30/2023 | |
| **Operating Cash Flows** | | | | | | | | | | | | |
| Self-Mined BTC Sale Proceeds | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 165.8 |
| Hosting Payments | - | - | 6.9 | - | - | - | 7.6 | - | - | - | 9.2 | 35.6 |
| **Net Receipts** | **7.9** | **7.9** | **14.8** | **7.9** | **7.9** | **7.9** | **15.5** | **7.9** | **7.9** | **7.9** | **17.1** | **201.4** |
| Power Costs | (4.8) | (5.0) | (10.6) | (4.8) | (4.7) | (4.8) | (8.7) | (5.1) | (4.9) | (5.0) | (5.6) | (139.0) |
| Operating Costs | (0.8) | (2.1) | (0.9) | (2.1) | (1.3) | (2.1) | (0.9) | (2.6) | (1.2) | (2.5) | (1.2) | (39.1) |
| Tax Payments | - | - | - | - | - | - | - | - | - | - | - | (0.8) |
| **Net Operating Disbursements** | **(5.7)** | **(7.1)** | **(11.5)** | **(6.9)** | **(6.0)** | **(6.9)** | **(9.6)** | **(7.7)** | **(6.1)** | **(7.5)** | **(6.9)** | **(178.8)** |
| Construction & Infrastructure Capex | - | - | (0.9) | - | - | - | (0.9) | - | - | - | (0.9) | (5.6) |
| Miner Capex (inc. Customs) | - | - | - | - | - | - | - | - | - | - | - | - |
| PP&E Sale Proceeds | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net Capital Expenditures** | **-** | **-** | **(0.9)** | **-** | **-** | **-** | **(0.9)** | **-** | **-** | **-** | **(0.9)** | **(5.6)** |
| **Total Operating Cash Flows** | **2.3** | **0.8** | **2.4** | **1.0** | **1.9** | **1.0** | **5.0** | **0.3** | **1.8** | **0.4** | **9.3** | **16.9** |
| **Non-Operating Cash Flows** | | | | | | | | | | | | |
| Professional Fees | (1.2) | (1.2) | (2.8) | (1.2) | (1.2) | (1.2) | (2.2) | (1.1) | (1.1) | (1.1) | (16.5) | (54.8) |
| Utility Deposits | - | - | - | - | - | - | - | - | - | - | 6.3 | 6.3 |
| Debt Service Costs | - | - | (0.1) | - | - | - | (0.1) | - | - | - | (0.1) | (0.4) |
| Other (TBD) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (9.5) |
| **Net Non-Operating Cash Flows** | **(1.5)** | **(1.5)** | **(3.2)** | **(1.5)** | **(1.5)** | **(1.5)** | **(2.6)** | **(1.5)** | **(1.5)** | **(1.5)** | **(10.6)** | **(58.3)** |
| **Liquidity Balances** | | | | | | | | | | | | |
| Starting Cash Balance | 21.0 | 21.8 | 21.1 | 20.3 | 19.9 | 20.2 | 19.7 | 22.1 | 20.9 | 21.2 | 20.0 | 46.5 |
| New Money / DIP Financing | - | - | - | - | - | - | - | - | - | - | - | 60.0 |
| Existing DIP Repayment and Fees | - | - | - | - | - | - | - | - | - | - | - | (46.4) |
| Net Cash Flow | 0.7 | (0.7) | (0.8) | (0.5) | 0.4 | (0.5) | 2.4 | (1.2) | 0.3 | (1.1) | (1.3) | (41.4) |
| **Ending Cash Balance** | **21.8** | **21.1** | **20.3** | **19.9** | **20.2** | **19.7** | **22.1** | **20.9** | **21.2** | **20.0** | **18.7** | **18.7** |
| BTC Held & In Transit | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 |
| **Ending Liquidity** | **22.9** | **22.2** | **21.5** | **21.0** | **21.4** | **20.8** | **23.2** | **22.0** | **22.3** | **21.2** | **19.9** | **19.9** |