

DATE DOWNLOADED: Sun Feb 26 18:29:28 2023
SOURCE: Content Downloaded from HeinOnline

Citations:

Bluebook 21st ed.
Alan N.; Wypyski Resnick, Eugene M. Bankruptcy Reform Act of 1978: A Legislative
History (1979).

ALWD 7th ed.
Resnick, Alan N.; Wypyski, Eugene M. Bankruptcy Reform Act of 1978: A Legislative
History (1979).

APA 7th ed.
Resnick, A. (1979). Bankruptcy Reform Act of 1978: Legislative History. Buffalo, NY,
William S. Hein & Co.

Chicago 17th ed.
Resnick Alan N.; Wypyski, Eugene M. Bankruptcy Reform Act of 1978: A Legislative
History. Buffalo, NY, William S. Hein & Co.

McGill Guide 9th ed.
Alan N.; Wypyski Resnick, Eugene M., Bankruptcy Reform Act of 1978: A Legislative
History (Buffalo, NY: William S. Hein & Co., 1979)

AGLC 4th ed.
Alan N.; Wypyski Resnick, Eugene M., Bankruptcy Reform Act of 1978: A Legislative
History (William S. Hein & Co., 1979

MLA 9th ed.
Resnick, Alan N., and Eugene M. Wypyski. Bankruptcy Reform Act of 1978: A Legislative
History. Buffalo, NY, William S. Hein & Co. HeinOnline.

OSCOLA 4th ed.
Resnick, Alan N.; Wypyski, Eugene M. Bankruptcy Reform Act of 1978: A Legislative
History. Buffalo, NY, William S. Hein & Co.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   https://heinonline.org/HOL/License
-- The search text of this PDF is generated from  uncorrected OCR text.

**Ad Hoc Equity Group Exhibit 9**

1

*Bankruptcy Reform Act of 1978* . . . . . . . . . . . . . . . . . . Document 52
Senate, 95th Congress, 2nd Session, Report No. 95-989
(to accompany S. 2266), July 14 (legislative day, May 17), 1978.

**Ad Hoc Equity Group Exhibit 9**

2

DOCUMENT 52

| 95TH CONGRESS 2d Session | SENATE | REPORT No. 95-989 |
|---|---|---|

## BANKRUPTCY REFORM ACT OF 1978

JULY 14 (legislative day, MAY 17), 1978.—Ordered to be printed

Mr. DeConcini, from the Committee on the Judiciary,
submitted the following

# REPORT

[To accompany S. 2266]

The Committee on the Judiciary, to which was referred the bill, S. 2266. to establish a uniform law on the subject of bankruptcies, having considered the same, reports favorably thereon and recommends that the bill in the nature of a substitute do pass. The committee amendment strikes out all after the enacting clause and inserts a new text, which appears in italic type in the reported bill.

### PURPOSE OF THE BILL

The purpose of the bill is to modernize the bankruptcy law by codifying a new title 11 that will embody the substantive law of bankruptcy and to make extensive amendments to title 28, Judiciary and Judicial Procedure, that will encompass the structure of the revised bankruptcy courts.

### PURPOSE OF THE AMENDMENT

The amendment in the nature of a substitute reflects, testimony received by the committee and the changes that resulted. The purpose of the revised bill remains to modernize the bankruptcy law.

### INTRODUCTION

In 1970. Congress created the Commission on the Bankruptcy Laws of the United States to study and recommend changes in bankruptcy laws. The Commission became operational in June 1971, and filed its final report with Congress on July 30, 1973. Its report was in two parts. Part I contained the Commission's findings and recommendations.

2

Part II contained a draft of a bill to implement those recommendations. Senator Quentin Burdick, Chairman of the Subcommittee on Improvements in Judicial Machinery and a member of the Commission, and Senator Marlow Cook, a member of the Commission, introduced that bill in the 93d Congress as S. 4026. No action was taken on the bill during the 93d Congress.

In the 94th Congress the Commission bill was again introduced by Senator Burdick as S. 236. Senator Burdick also introduced an alternative to the Commission bill that had been drafted by representatives of the National Conference of Bankruptcy Judges. The Judge's bill, S. 235, which differed in several major aspects from the Commission bill.

Hearings on both bills commenced in late February of 1975 and continued through November of 1975. All interested parties were invited to give testimony on the bills. The Subcommittee on Improvements in Judicial Machinery heard from several hundred interested parties and had nearly 80 witnesses personally testify over 24 days of hearings. The hearings covered all aspects of bankruptcy law. Testimony was heard on the structure of the new bankruptcy courts, the relationships of laws to bankruptcies, tax aspects, consumer bankruptcies, business reorganizations, railroad reorganizations, and the effect and interaction of the securities laws in bankruptcy cases.

Throughout the remainder of 1975 and all of 1976 the subcommittee continued to gather information and to begin work on a draft bill; however, no bill was reported to the full Judiciary Committee during the 94th Congress. Introduced in the House at this time were parallel bills to S. 235 and S. 236 entitled H.R. 31 and 32, and during the 94th Congress the House also held extensive hearings on the bankruptcy reform bills. The House culminated its actions with the introduction early in the 95th Congress of H.R. 6 which was amended and reintroduced as H.R. 8200. That bill was passed by the House of February 1, 1978.

S. 2266, a bill, the analogous bill to H.R. 8200, was introduced by Senators DeConcini and Wallop on November 1, 1977. The Subcommittee on Improvements in Judicial Machinery conducted further hearings in late November and early December, receiving testimony from nearly 60 witnesses and again receiving several hundred written statements and comments with regard to the bill. Subcommittee amendments as a result of the hearings, statements, and comments were made to the bill over the next five months and these efforts culminated in the reporting, by the subcommittee, on May 17, 1978, of a bill in the nature of a substitute offered. The report of the vote of the subcommittee was three in favor, none opposed, and one not voting.

The major purpose of this bill is the modernization of the bankruptcy laws. The substantive law of bankruptcy and the current bankruptcy system were designed in 1898, and underwent the last significant overhaul in 1938, nearly 40 years ago. Since that time there have been vast changes in the law of debtor-creditor relations, including the widespread adoption of the Uniform Commercial Code in the early 1960's and the vast spread of consumer credit. There has been a steady growth in the number of bankruptcies, both consumer and the more complicated business reorganization cases, over the last 20 years, and this

DOCUMENT 52

3

steady growth has led to great stresses and strains in the bankruptcy system. The bankruptcy referee has gradually taken over the prime responsibility for the operation of the system from the Federal district judges.

The hearings before the Subcommittee on Improvements in Judicial Machinery confirmed that revision was necessary, and the bill is the attempt to upgrade and modernize our bankruptcy courts and also the law which they must apply in the bankruptcy area.

The bankruptcy bill is divided into four titles. Title I, consisting only of Section 101, codifies and enacts Title 11 of the United States Code entitled "Bankruptcy." Title 11 of the code will contain the substantive, and much of the procedural, law of bankruptcy.

Title II of the bill is a series of amendments to title 28 of the United States Code, entitled "Judicial Code and Judiciary," and it is to this title that a series of amendments are made establishing the bankruptcy courts, giving them their jurisdiction and providing them with staff, the appellate route, and setting out other integral portions of the bankruptcy system.

Title III of the bill contains amendments to other laws of the United States. Many of these amendments are technical and conforming in nature. Some, however, rationalize the status of liens in bankruptcy cases, to eliminate special priorities for various creditors, and to prevent discrimination against former bankrupts. All priorities will, under the bill, be contained in Title 11 of the United States Code itself, instead of being scattered throughout Federal law. The transition provisions are found in title IV. These include a repeal of the Bankruptcy Act, rules for the governance of the bankruptcy system during a period of transition to the new court system, and provisions for a study during transition to determine the number of bankruptcy judges needed under the new system.

The proposed title II of the United States Code is divided into seven chapters: 1, 3, 5, 7, 9, 11, and 13. Chapter 1 (General Provisions), chapter 3 (Case Administration), and chapter 5 (Creditors, the Debtor and the Estate), apply generally to all cases under chapter 7 (Liquidation), chapter 11 (Reorganization), and chapter 13 (Adjustment of Debts of an Individual with Regular Income). Limited portions of chapters 1, 3, and 5 apply to cases under chapter 9 (Adjustment of Debts of a Municipality).

Cases are filed in only one of the four operative chapters, 7, 9, 11, or 13, though the bill does provide for the conversion of a case from one chapter to another. In addition, there are special subchapters in chapters 7 and 11 for certain kinds of debtors. Chapter 7 contains two subchapters to handle the unique problems of stock brokers and commodity brokers. Chapter 11 contains one subchapter for railroad reorganizations. The remainder of those chapters, 7 and 11, apply in the special cases as well. Special subchapters provide supplementary rules and procedures.

Chapter 11, Reorganization, is primarily designed for businesses, although individuals are eligible for relief under the chapter. The procedures of chapter 11, however, are sufficiently complex that they will be used only in a business case and not in the consumer context. Chapter 13, Adjustment of Debts for Individuals with Regular In-

**Ad Hoc Equity Group Exhibit 9**

4

come, is limited exclusively to individuals, but permits small sole proprietorships to use the chapter. The bill places a debt ceiling on individuals seeking to use chapter 13.

Similarly, the provisions in the generally applicable chapters, 1, 3, and 5 are not divided along consumer business lines. Specific provisions do have more frequent applicability in consumer or business cases, however, and some provisions are limited only to use by individuals.

## TITLE I

### CHAPTER 1—GENERAL PROVISIONS

Chapter 1 is the General Provision chapter. It contains sections such as definitions, rules of construction, guidelines as to the applicability and interrelationship of the various chapters and subchapters, and identification of who may be debtors under each chapter. It also sets out the ground rules for applicability of the later chapters and is really more a procedural chapter than one setting out substantive rights of the parties.

### CHAPTER 3—CASE ADMINISTRATION

Voluntary cases are commenced by the filing of a petition in the office of a bankruptcy judge. Current law is charged to allow for a joint petition in the instance of a husband and wife who both wish to file. Involuntary cases may be filed only under chapter 7 or 11 of the title.

An involuntary case may be filed by three or more creditors having claims aggregating at least $5,000 unless there are fewer than twelve creditors, in which case one creditor holding a claim of at least $5,000 may file. The requirement for filing an involuntary petition is that the debtor is generally unable to pay, or has failed to pay a major portion of, his debts as they become due or, that, within 90 days before the filing of a petition, a custodian has been appointed for the debtor's property. The inability or failure to pay debts test is a change from current law which requires "balance sheet" insolvency.

Trustees in cases under title 11 will continue as in present law to be private individuals qualified for the performance of such duties.

As under present law, within a reasonable time after the order for relief in a bankruptcy case, there shall be a meeting of creditors at which the court will preside. The court's presence is necessary to impress upon the debtor the seriousness of the proceedings and to rule upon questions that may arise at such meetings.

The filing of a bankruptcy petition or any other petition commencing a case under this title automatically stays the enforcement of any lien against the debtor's property or to recover any claim owed by the debtor. The automatic stay, by its nature, seriously affects the rights of all of the debtor's creditors. As a result, certain limitations are placed upon the continuance of the stay. Adequate protection in the form of either cash payments or a replacement lien must be provided the creditor whose collateral is decreasing in value or is being consumed during the stay. Moreover, any creditor may request the court for relief from

**Ad Hoc Equity Group Exhibit 9**

DOCUMENT 52

5

such stay, which request shall be given calendar priority by the court. In cases where the single asset of the debtor is real property, the court shall grant relief from the stay if the debtor has no equity in the collateral. thereby allowing the creditor to proceed with his foreclosure. If equity is present in property that is not needed for a reorganization, the court must order the property sold, so that the creditor can be paid.

A troubling concept, and the subject of much litigation in recent chapter cases. has been the use by the debtor of collateral during the reorganization. Under the bill, the debtor may use inventory or accounts receivable collateral during the ordinary course of the business without court approval. However, before the debtor may use cash collateral. defined as cash, negotiable instruments. documents of title, securities. deposit accounts, or a cash equivalent, there must be a hearing and finding by the court. Such a finding may be conditioned upon the providing of adequate protection by periodic cash payments or a replacement lien.

An important exception to the trustee's rights to use, sell, or lease property of the estate is in the instance of joint ownership of public utilities. The trustee is unable to sell the interest of a co-owner in a bankruptcy case, if the nonbankrupt co-owner's interest is related to the service of a public utility.

Provisions are made under the bill for a trustee to obtain credit while he operates the business of the debtor. The trustee may be authorized to incur debts having priority over existing liens on the property of the estate. Such a debt may be incurred, however, only after notice and hearing by the court and only if adequate protection is provided to the other holders of security interests in that property of the debtor.

The rights of the trustee to reject executory contracts and unexpired leases provided by current law is continued in the bill. In a liquidation case. if the trustee does not assume or reject such a contract or a lease within sixty days after the order of relief, such contract is deemed rejected. Under chapters 9, 11, or 13 of this title, the court, upon request of any party to such contract or lease, may order the trustee to set a time in which to assume or reject such contract or lease. The right of a trustee to assume or reject executory contracts does not include the right to assume a loan commitment.

CHAPTER 5—CREDITORS, DEBTOR, AND THE ESTATE

Chapter 5 reflects the policy of the revision of the Bankruptcy Act to include all of the property of the debtor in the bankruptcy case and to allow the trustee more easily to recover property that may have been transferred by the debtor. As a result of these changes the amounts that will be returned to all creditors can be greater.

A new section requires secured creditors to file claims, allowing an early evaluation to determine the secured and unsecured portion of the claim.

The priority section is greatly broadened for employees and consumers and reduced for Government claims. Under current law, employees currently are allowed a $600 priority for unpaid wages, which does not include any claims for contributions to employee benefit plans such as pension. health, and life insurance plans. The bill's priority

Ad Hoc Equity Group Exhibit 9

6

section will raise the $600 limit to $1800 and create an additional, separate priority of up to $1800 for fringe benefits. Any one employee's combined priority for wages and fringe benefits, however, cannot exceed $1800. A new priority for consumer creditors who had deposited money in connection with the purchase, lease, or rental of property is also created. The Government's general priority for nontax claims, currently the fifth priority in section 64 of the Bankruptcy Act, is abolished.

Current law is retained in the area of exempt property, which is property that the debtor may retain after bankruptcy for a fresh start. For this purpose, current law adopts the exemption law of the State in which the debtor is a resident. H.R. 8200, the House version of this bill, contains a provision for exemptions that would allow the debtor to choose between State law or Federal exemptions as set by the bill, whichever is higher. H.R. 8200 would establish 11 categories of property for the Federal exemption, among which is a homestead exemption of $10,000. Such a provision in joint cases would result in a husband choosing State exemptions while a wife might choose Federal exemptions. Together, they could thus retain after bankruptcy, very substantial amounts of property, while their debts would have been discharged. The committee feels that the policy of the bankruptcy law is to provide a fresh start, but not instant affluence, as would be possible under the provisions of H.R. 8200. Moreover, current law has allowed the several State legislatures flexibility to meet the needs and fresh-start requirements of the debtors of their particular States.

As with current law, certain debts, particularly those obtained by false pretenses, false representations, or actual fraud, are excepted from discharge. However, the committee received considerable testimony that creditors have used these exceptions to threaten debtors into settlements which the debtors agree to in order to save attorneys' fees that would be incurred in litigating the issue of dischargeability. The committee opposes this practice and has included a provision that in such a case where the court finds that the objection to the discharge of the debt by the creditor was frivolous, or not brought in good faith, the court may award attorneys' fees and costs to the debtor.

Trustees have had great difficulty in recovering preferences that have been made to creditors prior to the bankruptcy proceeding because of the current requirement that the creditor have reasonable cause to believe that the debtor was insolvent at the time the preference was received. Extensive litigation is often required to prove the basis for such belief. The preference section is changed from current law to solve this problem by the addition of a presumption that during the 90 days preceding bankruptcy the debtor will be presumed to have been insolvent. The preference period is reduced from 4 months to 90 days.

### Chapter 7—Liquidation

The liquidation procedures of the bill track much of current law. A change from current law requires the appointment of an interim trustee promptly after the order for relief. Presently, trustees are not elected until the first meeting of creditors. Provision is made for the election by the creditors, or appointment by the court, of a trustee to succeed the interim trustee at the first meeting of creditors. A creditors' committee may be elected by the creditors at the first meeting of

DOCUMENT 52

7

creditors, which committee may have not fewer than three members and not more than eleven members.

The trustee is authorized to operate the business of the debtor for a limited period if the operation is in the best interest of the estate and consistent with the order and liquidation of the estate.

A new section is added to aid the consumer debtor in making a fresh start after bankruptcy. The provision allows the debtor to redeem tangible personal property from a creditor's nonpurchase money security interest by paying the creditor the fair market value of the property for the claim or the amount of the claim whichever is less. This provision will aid debtors in retaining property such as household goods that would otherwise be turned over to creditors.

At the heart of the fresh start provisions of the bankruptcy law is section 727 covering discharge. The discharge provisions require the court to grant the debtor a discharge of all his debts except for very specific and serious infractions on his part. A change from current law will prevent corporations from being discharged in liquidation cases. Corporations are not in the same situation as individual debtors, and the discharge of a corporation promotes trafficking in corporate shells, a form of bankruptcy fraud.

Special provisions are made for the liquidation of stockbrokerage firms. The Securities Investor Protection Corporation (SIPC) is charged by law with the protection of customers in such cases. If SIPC wishes to take charge of the liquidation, the bankruptcy case is suspended, and if SIPC completes the liquidation, the bankruptcy case is dismissed.

Special provision is also made for the bankruptcy of commodity futures brokers. Since the first comprehensive bankruptcy legislation was enacted in 1800, bankruptcy laws have never specifically addressed the unique problems raised by commodity broker bankruptcies. With no cohesive policy for guidance, courts dealing with commodity broker bankrutcies have applied existing laws which are not necessarily consistent with the structure of, and may be potentially disruptive of, commodity futures, options, and leverage markets. The rapid growth of the commodity futures markets in recent years has made the development of statutory guidelines for commodity broker insolvencies all the more imperative. According to the Commodity Futures Trading Commission (the "Commission" or "CFTC"), "[t]he Commission now regulates an industry where the value of commodities for which contracts were traded in 1977 exceeds one trillion dollars. Currently, there are 62 active futures contracts trading 37 commodities on 10 exchanges. The volume of exchange trading in 1977 was nearly 43 million contracts, reflecting an overall growth rate of 55 percent since the Commission's inception [in 1974] and 16 percent growth rate in 1977 alone." Likewise, leverage contract markets have grown rapidly during the past few years. Further, according to the CFTC, from 1973 through 1977, at least 11 leverage contract firms have failed, resulting in at least $17.5 million in customer losses. Although commodity options trading has been suspended by the CFTC, there has been some indication that exchange-traded options may be permitted in the future.

There are several fundamental principles established by the commodity broker subchapter that deserve attention. First, customer

8

claims are granted the highest priority against the bankrupt's estate. This policy maintains consistency with the Commodity Exchange Act, which establishes customer protection as a primary objective[2] and should promote customer confidence in commodity markets generally.

A second basic objective of this subchapter is the protection of commodity market stability. Protection of market stability during a commodity broker insolvency is more difficult in the commodities markets than in other markets. Commodity futures, options, and leverage contracts all have limited duration. In addition, gains and losses on open positions in the futures markets are paid out on a daily basis through variation margin payments. Thus, the trustee of an insolvent commodity broker does not have the luxury of an extended period within which to analyze the debtor's business and determine the best course of action. Delay by the trustee can result in default in making the daily variation margin payments, or default on delivery, either of which could have a ripple effect that disrupts the entire market. Further, abrupt actions by the trustee could seriously disrupt orderly trading, resulting in substantial losses to the bankrupt, its customers, and other market participants.

For these reasons the commodity broker subchapter strongly encourages the immediate transfer of customer accounts from the bankrupt to a solvent commodity broker. Such transfers should have no immediate adverse impact on the market, yet they minimize the possibility of default on margin payments and on delivery.

Another policy established by this subchapter is that margin payments made to clearing organizations are not voidable by the trustee in bankruptcy. In addition, margin payments made by commodity brokers (but not by clearing organizations) to some entity other than a clearing organization are not voidale unless the trustee can establish certain conditions have been met.

The commodity broker subchapter provides only a framework within which commodity broker liquidations are to be administered. Due to the germinal state of regulation of the commodities industry, the subchapter does not provide detailed rules to cover every contingency. Instead, general rulemaking authority has been delegated to the CFTC with respect to the contents and determination of net equity; definition of "customer property," "member property," "commodity options dealer," "commodity contract," and "clearing organization": the question of which property or contracts will be specifically identifiable to a particular customer in a specific capacity: the method by which the business of the debtor is to be conducted or liquidated; and the parties to which customer property and contracts may be transferred. This rulemaking authority is to be exercised within the bounds of the policies and framework established by this subchapter.

CHAPTER 9—ADJUSTMENT OF DEBTS OF A MUNICIPALITY

Chapter 9, providing for the adjustment of debts of a municipality, was considered at great length by the Congress during 1975–76, primarily because of the New York City fiscal crisis. Both Houses of

---

[2] *See, e.g.,* Commodity Exchange Act sec. 4d(2), 7 U.S.C. sec. 6d(2) (1977).

DOCUMENT 52

9

Congress held extensive hearings on the chapter resulting in Public Law 94–260, which was signed into law on April 8, 1976.

Since that time, there have been no developments in municipal arrangement proceedings to require any new revision of the law. Thus, the bill tracks the provisions of Public Law 94–260 with stylistic changes to conform to the title.

The creditor protection provision, requiring a municipality to attempt a good faith negotiation with its creditors before a petition is filed, is retained. The only deviation from current law is in the area of setoffs where the provisions of chapter 9 conform to the setoff provisions generally applicable to the title.

### Chapter 11—Reorganization

Chapter 11 deals with the reorganization of a financially distressed business enterprise, providing for its rehabilitation by adjustment of its debt obligations and equity interests. It should be distinguished from the bankruptcy liquidation under chapter 7 or the adjustment of the debts of an individual with regular income under chapter 13.

Chapter 11 replaces chapters X, XI and XII of the Bankruptcy Act, Chapter 11 also includes special provisions for railroads in view of the impact of regulatory laws on railroad debtors and replaces section 77 of the Bankrupcy Act. A single chapter for all business reorganizations will simplify the law by eliminating unnecessary differences in detail that are inevitable under separately administered statutes.

Business reorganizations have been governed principally by chapters X and XI, both of which have been adopted by the Congress as part of the bankruptcy reforms in 1938. These chapters were not intended to be alternate paths of reorganization; they were to be mutually exclusive. Chapter X was meant for the reorganization of public companies and chapter XI for the rehabilitation of small and privately owned businesses.

That schematic design was well conceived, but flawed somewhat by the failure to include a definition of a "public company." As a result, considerable litigation developed, mostly on the initiative of the Securities and Exchange Commission, over whether a case belonged in chapter X or chapter XI. This issue came to the Supreme Court in three cases, the last one in *SEC* v. *American Trailer Rentals, Inc.*, 379 U.S. 594 (1965), but the Court did not enunciate a hard-and-fast rule for all cases. Although it announced some guidelines, management and creditors of large public companies have continued to resort to chapter XI.

The single chapter for business reorganization, which the bill provides, will eliminate unprofitable litigation over the preliminary issue as to which of the two chapters apply. In addition, the bill provides in section 1101(3) a definition of "public company," and to that definition are related a few provisions expressly designed for the public company, such as the mandatory appointment of a trustee, the advisory role of the Securities and Exchange Commission, the fair and equitable standard for plans of reorganization, and special requirements for solicitation of acceptance by security holders. These provisions constitute the basic safeguards for public investors that for 40 years have been part of chapter X, and are incorporated in the bill to

10

serve the same essential purpose. The differentiating standard is not whether the debtor is large or small. It is rather whether the debtor is a public company, as defined.

Reorganization, in its fundamental aspects, involves the thankless task of determining who should share the losses incurred by an unsuccessful business and how the values of the estate should be apportioned among creditors and stockholders. In a large public company, whose interests are diverse and complex, the most vulnerable today are public investors who own subordinated debt or equity securities. The bill, like chapter X, is designed to counteract the natural tendency of a debtor in distress to pacify large creditors, with whom the debtor would expect to do business, at the expense of small and scattered public investors.

Statistical information provided by the SEC (Hearings before Subcommittee on Improvements in Judicial Machinery of the Committee on the Judiciary, U.S. Senate, on S. 2266 and H.R. 8200, 95th Cong., 1st Session, hereinafter (Senate hearings, pp. 623, 632)), indicates that the overwhelming majority of reorganization cases would not involve public companies as defined in section 1101(3) of the bill. Reorganization of such companies would be governed by procedures and standards that are drawn and adapted from what is now chapter XI. But the few exceptions—the public companies—are of vast importance. As the SEC noted (Senate hearings, supra) public companies, as defined in section 1101(3), represented only between one-half and one percent of the business reorganization cases in chapters X and XI in the years 1975-77. But these cases, though few in number, represented over 90 percent of the total assets and liabilities of all cases with a substantial public investor interest. It is only for such public companies that the bill reenacts the few basic safeguards of chapter X. In all other respects, the administration of debtor estates for public companies will be governed by the provisions in chapters 3, 5 and 11 that are intended for all cases, public and non-public companies alike.

The Committee believes that it should be emphasized that investor protection is most critical when the company in which the public invested is in financial difficulties and is forced to seek relief under the bankruptcy laws. A fair and equitable reorganization, as provided in the bill, is literally the last clear chance to conserve for them values that corporate financial stress or insolvency have placed in jeopardy. As public investors are likely to be junior or subordinated creditors or stockholders, it is essential for them to have legislative assurance that their interests will be protected. Such assurance should not be left to a plan negotiated by a debtor in distress and senior or institutional creditors who will have their own best interest to look after. Commenting on the need and importance of a disinterested trustee in public cases. Harold J. Tyler, Jr., a distinguished former Federal judge experienced in bankruptcy reorganization, said (Senate Hearings, supra, p. 900) that only the trustee "can be expected to look out for the debt and equity holds. Creditors and their lawyers usually do not do so, and debtors in possession are inclined to think first of satisfying their big creditors."

DOCUMENT 52

11

The pre-chapter-X system of reorganization failed to serve the needs of public investors and for that reason such failure was decisively rejected by the 75th Congress. Such a system all too often resulted in reorganizations that were unfair to public investors, who lacked essential bargaining power, and that frequently perpetuated an unsound financial structure and, perhaps, an unworthy management. A single chapter, without the special standards for the public company, would not serve the public interest. As the SEC said in its report on the bill, "Our experience with both chapters X and XI leaves no doubt that the abusive practices prevailing prior to 1938 in committee-dominated reorganization are as attractive today as they were then." (Senate Hearings, *supra*, p. 622).

Subchapter IV of chapter II deals with the reorganization of railroads. Under present law, railroad reorganizations are conducted under section 77 of the Bankruptcy Act, a statute enacted under the pressure of widespread railroad receiverships in the 1930's and essentially unchanged since 1935. Under the bill, the often complex and time consuming dichotomy between railroad and other business reorganizations is eliminated by incorporating railroad reorganizations into the pattern of business reorganizations generally, and including in subchapter IV only those additional provisions which are necessary to reflect the special characteristics of railroad reorganizations.

The incorporation of railroad reorganizations into the general reorganization provisions of the bill eliminates the cumbersome and duplicative procedure of section 77 under which plans of reorganization shuttled back and forth between the Interstate Commerce Commission (the "Commission") and the courts and proceedings were inevitably more time consuming and expensive. Under the bill, the bankruptcy court, rather than the Commission, assumes the primary responsibility for the reorganization proceeding. However, since a plan of reorganization for a railroad may propose changes in transportation patterns or operation by, among other things, granting operating rights over, or transferring, the debtor's rail lines, the bill retains the Commission's jurisdiction with respect to such proposals. The subchapter requires that such proposals be referred to the Commission for its approval, disapproval, or modification and requires the reorganization court to give binding effect to the Commission's findings on such aspects of a plan. The subchapter also specifies that the trustee is subject to the Interstate Commerce Act, and to lawful orders of the Interstate Commerce Commission, the Department of Transportation, and State or local regulatory bodies, with court approval required if the orders require the expenditure of money, except for the payment of interline freight and passenger accounts and per diem accounts (including incentive per diem) for which no court approval is required.

Special provisions are also included dealing with equipment financing, limiting the extent to which the trustee may disaffirm collective bargaining contracts, and specifying the consequences of the rejection by the trustee of a lease of a line of railroad. The judicial panel on multidistrict litigation is authorized to transfer or consolidate cases pending in different courts.

**Ad Hoc Equity Group Exhibit 9**

12

The subchapter emphasizes that the trustee in a railroad reorganization, in carrying out his responsibilities, must take into consideration the "public interest" in the preservation of rail service. At the same time, the subchapter recognizes, as section 77 does not, that there may be cases in which a railroad cannot be reorganized, and should be liquidated. The subchapter does not create a mandatory deadline within which a reorganization must be accomplished, but it requires the court to consider liquidation if no reorganization plan has been confirmed within 5 years from the date when the original petition was filed. It is expected that in most such cases the court will order liquidation which will prevent repetition of the lengthy proceedings that have occurred to date.

In the case of a railroad being administered under title 11 the necessity to stem the bankrupt carrier's cash drain requires expeditious treatment of abandonment applications. The subchapter provides that the court rather than the Commission has the authority to authorize abandonments or discontinuances of rail service. After filing of the applications by the trustee with the Commission, the court establishes a time period within which the Commission must report its findings to the court. The Commission in its advisory role before the court represents the "public interest," while the trustee and creditors represent the interest of the debtor's investors. The court may authorize abandonments if it finds the abandonment is consistent with the "public interest" and in the best interest of the estate, or essential to formulation of the plan.

### CHAPTER 13—ADJUSTMENT OF DEBTS OF AN INDIVIDUAL WITH REGULAR INCOME

Chapter XIII of the present Bankruptcy Act has been one of the least understood and most erratically applied of all federal statutes dealing with bankruptcy or social welfare. In theory, the basic purpose of Chapter XIII has been to permit an individual to pay his debts and avoid bankruptcy by making periodic payments to a trustee under bankruptcy court protection, with the trustee fairly distributing the funds deposited to creditors until all debts have been paid. The hearings record and the bankruptcy literature show uniform support for this principle. In practice however, the results have been less than satisfactory, even though chapter XIII has been available since 1938.

The credit community does not view chapter XIII with universal esteem, understandably so because any extended delay or reduction in payment to a creditor represents a measurable loss, particularly during the inflation of recent years. However, most credit grantors nevertheless strongly support the concept of chapter XIII as an alternative to ordinary bankruptcy. A greater difficulty has been the diversity of the individuals involved. The problems which caused financial distress to begin with, such as large families, underemployment, heavy medical expenses without adequate health insurance or simple overpurchasing, do not magically disappear on the filing of a petition under chapter XIII. These factors among others often make performance of chapter XIII plans very difficult, and in many cases are eventually dismissed or converted to ordinary bankruptcy after some payments have been made.

**Ad Hoc Equity Group Exhibit 9**

DOCUMENT 52

13

In addition, chapter XIII cases can require considerable time and effort from both bankruptcy judges and debtor attorneys. Where the initiative to undertake such public service work has been lacking, the use of chapter XIII has been very limited. Certainly related to these difficulties are the lack of national uniformity in handling such cases, the length of time such cases must necessarily remain pending and the differences in state exemption and garnishment laws. Such factors among others have caused the bankruptcy bench and bar in each judicial district to carefully measure their responses to and uses of chapter XIII based upon local practices and circumstances.

Finally, the existing chapter 13 statute is basically and seriously defective at this time in five respects. First, it does not permit some individuals with regular income to qualify, such as small business owners or social welfare program recipients, because their principal incomes do not come from wages, salary, or commissions. Second, while the court can grant a hardship discharge, where for example the debtor becomes totally disabled, three years must elapse first. Third, secured creditors are dealt with erratically, tediously, and uncertainly, resulting from a hodgepodge of state and federal statutory provisions, bankruptcy and local rules, many conflicting reported cases and varied local customs. Fourth, accommodation codebtors in consumer finance are usually inexperienced relatives or coworkers, and present law does not provide a reasonable restraint on collection from the while the debtor's case is pending. Fifth, formal creditor voting by literally counting written acceptances has unnecessarily imposed substantial expense for time, paper and uncertainty upon all concerned with only doubtful or marginal benefits.

The new chapter 13 undertakes to solve these problems insofar as bankruptcy law can provide a simple yet precise and effective system for individuals to pay debts under bankruptcy court protection and supervision. The new chapter 13 will permit almost any individual with regular income to propose and have approved a reasonable plan for debt repayment based on that individual's exact circumstances. As in current law, 100 percent payment plans will be encouraged by the limitation on availability of a subsequent discharge in section 727(a)(8). This kind of plan has provided great self-satisfaction and pride to those debtors who complete them and at the same time effect a maximum return to creditors. The limitation of § 727(a)(8) will also provide a slight brake on the wholesale filings of chapter 13's by small businessmen who wish to avoid some of the restrictions of chapter 11. It is also necessary to prevent chapter 13 plans from turning into mere offers of composition plans under which payments would equal only the non-exempt assets of the debtor.

SUMMARY AND DESCRIPTION OF PROVISIONS AFFECTING COLLECTION OF TAXES

The bill contains a series of provisions dealing with the priority, discharge, and collection of tax claims in bankruptcy. The writing of provisions dealing with the collection of taxes, at Federal, State, and local levels has presented one of the most difficult problems for the committee.

In a broad sense, the goals of rehabilitating debtors and giving equal treatment to private voluntary creditors must be balanced with

**Ad Hoc Equity Group Exhibit 9**

14

the interests of governmental tax authorities who, if unpaid taxes exist, are also creditors in the proceeding.

Since tax authorities are creditors of practically every taxpayer, another important element is that tax collection rules for bankruptcy cases have a direct impact on the integrity of the Federal, State and local tax systems. These tax systems, generally based on voluntary assessment, works to the extent that the majority of taxpayers think they are fair. This presumption of fairness is an asset which should be protected and not jeopardized by permitting taxpayers to use bankruptcy as a means of improperly avoiding their tax debts. To the extent that debtors in a bankruptcy are freed from paying their tax liabilities, the burden of making up the revenues thus lost must be shifted to other taxpayers.

A three-way tension thus exists among (1) general creditors, who should not have the funds available for payment of debts exhausted by an excessive accumulation of taxes for past years; (2) the debtor, whose "fresh start" should likewise not be burdened with such an accumulation; and (3) the tax collector, who should not lose taxes which he has not had reasonable time to collect or which the law has restrained him from collecting.

In balancing these interests, the committee bill gives governmental units a priority claim on assets of a debtor's estate for certain taxes which have not grown so "stale" as to constitute an unjustifiable burden on general unsecured creditors who may have extended new credit to the debtor since the tax liabilities arose. To avoid unduly burdening the debtor's fresh start, the bill continues the basic coordination of priority and discharge provisions that apply to taxes, so that unpaid taxes accorded priority are nondischargeable, and tax claims which are not given priority are with some exceptions not collectible from the debtor's post-bankruptcy assets.

In general, the bill retains two important priority rules of present law: first that priority and nondischarge are recognized for tax claims, for which the tax return was due not more than three years before the title 11 petition was filed, and for withheld income taxes and the employees' shares of social security taxes (the "trust fund" taxes) reeive priority and are nondischargeable regardless of the due date of the return.

S. 2266 contains a longer list of tax priorities than is found in present law. The new priorities which have no counterpart in the Bankruptcy Act are included in part to cover a number of complex situations in which tax collection issues arise, but which are not dealt with by the Bankruptcy Act. The new categories are also designed to deal with some uncertainties and ambiguities in the tax rules of present bankruptcy law as well as certain loopholes under which some debtors have been able to exploit the administrative processes of a governmental unit so as to escape taxes unfairly.

In general, tax claims which are nondischargeable, despite a lack of priority, are those to whose staleness the debtor contributed by some wrong-doing or serious fault as, for example, taxes with respect to which the debtor filed a fraudulent return.

The bill also contains several provisions designed to minimize the administrative problems governmental tax authorities face, or may

15

face, in collecting taxes in bankruptcy proceedings. For example, section 108(c) of the bill extends or suspends the running of the statute of limitations on collection of debts outside of bankruptcy, thereby protect the right of governmental units (and other creditors) to collect debts which are not discharged in the bankruptcy proceeding. Section 501(e) of the bill gives governmental tax units a minimum period of time within which to file proof of their claims in a title 11 proceeding. Section 502 of the bill eliminates a requirement included in H.R. 8200 as § 502(i) that a tax authority file a proof of claim for taxes arising out of taxable sales made by the trustee since. in these situations, the trustee has better knowledge than the tax authority of the existence of such a liability for taxes.

The bill also contains several safeguards to assure normal administrative procedures and to prevent tax avoidance. Section 1130(d) provides that a plan of reorganization cannot be confirmed if its principal purpose is the avoidance of taxes. The bill also requires the proponent of a plan of reorganization of a debtor to exhaust administrative processes (in the form of a request for an advance ruling from the Internal Revenue Service) before the bankruptcy court can declare the tax effects of the plan (sec. 1146(d)).

Section 547(b)(2) provides that preferential transfers made by the debtor which may be avoided by the trustee are not to include tax payments, and section 547(c)(6) provides that the fixing of a tax lien is not to be considered a preferential transfer, provided notice of the lien has been duly filed.

## TITLE II—AMENDMENTS TO TITLE 28 UNITED STATES CODE AND TO THE FEDERAL RULES OF EVIDENCE

### ESTABLISHMENT OF BANKRUPTCY COURT, APPOINTMENT OF BANKRUPTCY JUDGES, AND JURISDICTION

The need for a functionally independent bankruptcy court has been demonstrated beyond question, first by the study and recommendations of the Commission on the Bankruptcy Laws of the United States,[1] by knowledgeable witnesses before the Subcommittee,[2] in published commentary,[3] as well as through long practical experience under the present referee system. A considerable body of opinion has developed in support of the establishment of a bankruptcy court separate from

[1] H. Doc. 93–137, pt. I, 93d Cong., 1st sess., Report of the Commission on the Bankruptcy Laws of the United States (July 1973), at 85 et seq.
[2] E.g., Statement of Robert B. Chatz, president, Commercial Law League of America, Hearings before Subcommittee on Improvements in Judicial Machinery of the Committee on the Judiciary, U.S. Senate, on S. 2266 and H.R. 8200, 95th Cong., 1st sess. [hereinafter Senate hearings], 601, 601–603, statement of Robert J. Grimmig, member, American Bankers Association Bankruptcy Task Force, Senate hearings, at 573–574; statement of Charles A. Horsky, chairman, National Bankruptcy Conference, Senate hearings, at 831–832; statement of Hon. David A. Kline, president, National Conference of Bankruptcy Judges, Senate hearings, at 436, 437–439; statement of Harold Marsh, chairman, Commission on the Bankruptcy Laws of the United States, Senate hearings, at 480–481.
[3] E.g. Broude, "Jurisdiction and Venue Under the Bankruptcy Act of 1973," 48 Am. Bankr. L.J. 231 (1974); Cyr, "Setting the Record Straight for a Comprehensive Revision of the Bankruptcy Act of 1898," 49 Am. Bankr. L.J. 99 (1975); Cyr, "Structuring a New Bankruptcy Act: A Comparative Analysis," 52 Am. Bankr. L.J. 141 (1978); King, "Bankruptcy Code—Specialized Court Supported," 52 Am. Bankr. L.J. 193 (1978); Lee, "A Critical Comparison of the Commission Bill and the Judges' Bill for the Amendment of the Bankruptcy Act," 49 Am. Bankr. L.J. 1 (1975). But see Rifkind, "Bankruptcy Code—Specialized Court Opposed," 52 Am. Bankr. L.J. 137 (1978).

**Ad Hoc Equity Group Exhibit 9**

the United States district court, either as an article III court modeled after the present district court,[4] as a separate article I court patterned after the U.S. Tax Court,[5] or as a hybrid court consisting of an article I bankruptcy trial court appended to an article III court of bankruptcy appeals.[6]

The justifications for each proposal have been fully aired and considered. It is the view of the subcommittee that the establishment of the new bankruptcy court as an adjunct of the U.S. district court offers several important advantages:

(1) The presently established U.S. district courts can serve as article III repositories for the broadened jurisdiction essential to efficient judicial administration in bankruptcy cases.

(2) The expanded jurisdiction vested in the U.S. district courts may be delegated by statute for exercise exclusively by bankruptcy judges, subject always to review, as under present law, by the district courts. Certain perceived constitutional impediments[7] to the exercise of the judicial power of the United States by non-tenured judges are thus eliminated.

(3) The dislocations associated with continued evolution of the present referee system into a functionally independent adjunct of the district court are minimal in comparison to those attendant upon the establishment of a separate bankruptcy court system.

(4) The fragmentation of Federal court jurisdiction envisioned by some is thus avoided.

(5) The convenience and economy of district court appeals are preserved.

The court of appeals of each circuit will appoint bankruptcy judges for its circuit. Compensation will be at the current annual rate of $48,500, an income level believed by the committee to be commensurate with the duties of the office.

Qualifications for bankruptcy judges include bar membership in good standing for at least five years at the time of appointment and competence as determined by the judicial council of the circuit. Additional qualification standards may be prescribed by the Judicial Conference of the United States.

The appointment of bankruptcy judges by the district court has contributed significantly (1) to a real and apparent dependency on the part of the bankruptcy court and its judges upon the district courts which appoint and review the decisions of bankruptcy judges, and (2) to the image of the bankruptcy court as the stepchild of the district court.[8] This bill is designed to eliminate both the real and apparent dependency and subservience of the bankruptcy court, in part by vesting the power to appoint bankruptcy judges in the courts of appeals, rather than in the district courts. The change is further warranted by the need to do away with the unseemly appellate practice

---

[4] Report of the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 95th Cong., 2d sess., (committee print 13, Jan. 1978). See note 3 supra.
[5] See Commission report note 1 supra.
[6] See Cyr, "Structuring a New Banruptcy Court: A Comparative Analysis," 52 Am. Bankr. L.J. 141 (1978).
[7] See note 4 supra.
[8] See, e.g., Statement of Charles A. Horsky, chairman, National Bankruptcy Conference, Senate hearings at 832.

**Ad Hoc Equity Group Exhibit 9**

DOCUMENT 52

17

whereby the district judge or judges who appoint the bankruptcy judge often rule on appeals from the orders of their own appointees.

There will be a twelve-year term of office for bankruptcy judges appointed under new 28 U.S.C. § 152. The present six-year term is insufficient to attract the calibre of individual needed to perform the highly demanding and important functions of the office of bankruptcy judge. By doubling the term of office for future bankruptcy judges it is anticipated that a major goal of this reform legislation, the establishment of a functionally independent bankruptcy court, can be further advanced.

Subsection (c) prescribes a twelve-year term of office for bankruptcy judges appointed under new 28 U.S.C. § 152.

A bankruptcy judge whose term expires is permitted to continue to serve until a successor is appointed and qualifies. With specific exceptions for retired or reserve military personnel, a bankruptcy judge may not hold employment with the United States Government. An individual may not continue to serve as a bankruptcy judge after reaching seventy years of age without the unanimous approval of the judges of the judicial council of the circuit.

Subsection (d) prescribes the same oath of office for bankruptcy judges as for district court judges.

Subsection (e) requires each bankruptcy judge to maintain residence in a district for which he is appointed, or in the case of the District of Columbia, within 20 miles.

Subsection (f) authorizes the chief judge of the circuit to require a bankruptcy judge to maintain his abode in or near a particular place in the district, unless the bankruptcy judges are able to agree among themselves which of them shall do so.

A bankruptcy judge whose term expires is permitted to continue to serve until a successor is appointed and qualifies.

The bill provides grounds upon which and prescribes the procedures by which the removal of a bankruptcy judge may be accomplished. Incompetence, misconduct, neglect of duty, and disability, as determined by the judicial council of the circuit, are the sole grounds for removal. The bankruptcy judge is entitled to be heard on the charges against him.

A major impetus underlying this reform legislation has been the need to enlarge the jurisdiction of the bankruptcy court in order to eliminate the serious delays, expense and duplications associated with the current dichotomy between summary and plenary jurisdiction, a wasteful remnant of the referee system left over from the pre-Chandler Act era. For fully four decades, and more notably during the present decade, referees in bankruptcy have served as trial judges of the bankruptcy court whose orders are final unless a timely appeal is taken to the district court. Yet the jurisdictional limitations presently imposed on the bankruptcy courts have embroiled the court and the parties in voluminous litigation whose sole function is to determine whether the court possesses the requisite summary jurisdiction to determine the merits of issues often necessarily heard by the court in determining its jurisdictional question. Upon a finding that it lacks summary jurisdiction, the bankruptcy court is required to dismiss the action, whereupon it is necessary for the parties to proceed anew with a

18

plenary action in either the U.S. district court or an appropriate state court to try issues already substantially tried in the summary proceedings before the bankruptcy court. Frequently, the liquidation of bankrupt estates and the rehabilitation of debtors are significantly prejudiced thereby.

The advent of the Rules of Bankruptcy Procedure, with their automatic reference of most bankruptcy matters to the referee in bankruptcy and their scrupulous insistence upon procedural due process, have underscored the absurdity of perpetuating these jurisdictional limitations in bankruptcy cases arising under title 11 and civil actions and proceedings arising under or related to cases under title 11.

It is the purpose of new section 164 of title 28, United States Code, in conjunction with 28 U.S.C. section 1334, as amended by section 216 of this act, to eliminate entirely the present jurisdictional dichotomy between summary and plenary jurisdiction. Therefore, except where the bankruptcy court abstains from hearing an action or proceeding arising under or related to a case under title 11, all cases under title 11 and all civil actions and proceedings arising under or related to cases under title 11 are to be before the bankruptcy judge.

Jurisdiction in bankruptcy cases and in civil actions and proceedings arising under or related to bankruptcy cases is vested directly in the district courts by 28 U.S.C. section 1334, as amended by section 216 of this act, consistent with the establishment of new bankruptcy courts as adjuncts of the United States district courts, pursuant to 28 U.S.C. section 151. Sections 164 and 1334 of title 28, United States Code, as enacted and amended by sections 201 and 216 of this bill, while conferring expanded jurisdiction in bankruptcy cases and related civil actions and proceedings directly upon the district courts, delegate the exclusive exercise of that jurisdiction at the trial level to bankruptcy judges, except as provided in subsection (d)(2) of section 1334, as amended.

Appeals from judgments and orders of a bankruptcy judge will go initially to the U.S. district court for the district in which the case, action, or proceeding in which the order or judgment appealed from, was entered is pending. Appeals may be taken by writ of certiorari from the district court to the United States court of appeals for the circuit in which the bankruptcy court is located, 28 U.S.C. § 1291. The initial appeals to the district court will aid in the expeditious processing of appeals and will not increase the costs to litigants. It will also prevent the overburdening of the appellate courts. *See* testimony of Judge Ruggero J. Aldisert, Senate hearings at page 414.

### RETIREMENT PROVISIONS

Under existing law, referees (also designated "bankruptcy judges" by Bankruptcy Rule 901) are classified as ordinary civil service employees for retirement purposes [9] and their annuities are computed by the same formula that applies to the many other groups in the same classification, i.e., the average of the consecutive three highest yearly

[9] Title 5 U.S.C. § 8331. Federal judges are expressly excluded and separate treatment is given congressional employees. See n. 2, infra.

DOCUMENT 52

19

salaries multiplied by 1.5 percent for each of the first 5 years of serv-
ice; by 1.75 percent for each of the second 5 years; and, by 2.0 percent
for each of all succeeding years.[10] For those retirement benefits each
sitting bankruptcy judge (referee) is paying 7 percent of his before-
tax salary.[11]

Since 1960 the Judicial Conference has been on record in support
of introduced legislation to improve referees' retirement.[12] The com-
mittee also agrees that bankruptcy judges are entitled to increased
retirement benefits commensurate with their duties and responsibili-
ties. The bill would provide that bankrupty judges receive the aver-
age of their "high-three" consecutive yearly salaries multiplied by 2.5
percent. For these retirement benefits, the bankruptcy judge would
pay 8 percent of his before tax salary. This retirement program is
tailored after that given to Members of Congress and congressional
staff. It also represents for a one term bankruptcy judge (12 years)
nearly a fifty precent increase in the annuity he would receive as con-
trasted to his current level of annuity.

A bankruptcy judge who is appointed at age 46 could serve two full
terms and retire at 60 percent of his average high 3-year salary which
in present dollars would amount to a retirement annuity of $29.100 per
annum. The committee feels that this annuity combined with other
retirement plans, civil service or private plans, that the bankruptcy
judges may have participated in prior to ascending to the bench, will
assure the financial security and the concomitant integrity and inde-
pendence that goes hand in hand with that security.

Incumbents' civil service retirement status is unchanged by the bill.[13]
However, there are provisions that if an incumbent should stay·on
after enactment he would be accorded a new and separate civil service
classification from October 1, 1979 forward.[14] Thenceforth, until Sep-
tember 30. 1982,[15] the incumbent would accrue retirement annuity
benefits at 2.5 percent per year of the average "high-three" salary.[16]
That same formula will apply for those judges who are appointed to
regular 12-year terms under section 201,[17] but incumbents with prior
service will remain under the lesser percentage to which they are now
subject[18] for all service before October 1, 1979.

TITLE III—AMENDMENTS TO OTHER ACTS

Title III makes conforming amendments to other acts and provi-
sions of the United Stataes Code. These amendments are primarily
technical in nature to conform cross references in other provisions of
the U.S.C. to the new provisions and designations of Titles I and II
of the bill.

---

[10] Title 5 U.S.C. § 8339 (a) (1).  Congressional employees' annuities are set at 2.5 percent
of the "high-3" average for each year of creditable service. Title 5 U.S.C. § 8339 (b).
[11] Title 5 U.S.C. § 8334. A congressional employee contributes 7.5 percent. Ibid.
[12] Reports of Proceedings of Judicial Conference, Mar. 10–11, 1960.
[13] Sec. 403(b).
[14] Sec. 225(a).
[15] The end of transition as contemplated by the bill. Sec. 402(b). There is, however, pro-
vision for an extension until a successor is appointed and qualified. Sec. 402(d).
[16] Sec. 225(a). After Oct. 30, 1979 the contribution would increase to 8 percent. Sec.
225(b).
[17] This is identical with congressional employees' annuities. See n. 2 supra.
[18] See n. 2 supra and accompanying text.

**Ad Hoc Equity Group Exhibit 9**

22

20

## TITLE IV—TRANSITION

In order to accomplish a smooth transition between the old bankruptcy law and procedures and the new law, the committee felt it necessary to have special provisions for a transition period. These provisions are contained in Title IV. The basic provision of this title calls for a 3-year transition period beyond the effective date of October 1, 1979. This is intended to ensure the availability of a cadre of experienced bankruptcy judges for service on the bankruptcy bench between the enactment of the act and October 1, 1982. It is in the public interest that bankruptcy judges in office on the date of enactment be continued in service, since the attraction of replacement judges from the private sector to serve a 3-year term would be extremely difficult. The acquired experience of the incumbent bankruptcy judges is a public resource which cannot be replaced until such time as their successors have seen equivalent service on the bankruptcy bench. Thus, the terms of bankruptcy judges serving at the date of enactment are extended through September 30, 1982, and a bankruptcy judge in office on the enactment date of this Act whose regular term extends beyond September 30, 1982, is permitted to complete the term for which he was originally appointed even though it may extend beyond September 30, 1982.

To help assure that only qualified bankruptcy judges shall serve during the transition period, a merit screening committee is created to evaluate the qualifications of each incumbent referee whose term of appointment expired prior to October 1, 1982. Bankruptcy judges serving between the enactment of this bill and October 1, 1982, are conferred with the powers of a judge appointed under section 201 of the bill, which include "the powers conferred upon the bankruptcy courts by this act."

The provisions of the bill are not to affect cases commenced under prior law, which are to proceed, with respect to both substantive and procedural matters, in the same fashion as though this act was not in effect. The bill provides that rules of bankruptcy procedure and various fees and charges in effect on October 1, 1979 (the effective date of the bill), shall continue in effect until superseded by new rules or fees promulgated in accordance with the act. However, the rules shall apply only if not inconsistent with the act.

To help the Congress and the Judicial Conference evaluate the impact of the new bankruptcy law, the Director of the Administrative Office of U.S. Courts will conduct a survey to determine the number of judges needed to implement the provisions of the act and report the results of the study to Congress and to the Conference by or before July 1, 1982. The committee feels that the 33-month period between the effective date and the date the report is due will be sufficient time for meaningful data and workload patterns to have evolved upon which to base judgement on the needs of the bankruptcy courts for numbers and distribution of personnel.

DOCUMENT 52

21

SECTION-BY-SECTION ANALYSIS

TITLE I—ENACTMENT OF TITLE 11 OF THE UNITED STATES CODE

*Section 101*

Section 101 codifies and enacts title 11 of the United States Code, entitled "Bankruptcy." It is the only section in title I of the bill. What follows is a description of each of the sections of proposed title 11; the bankruptcy code:

# TITLE II—BANKRUPTCY

## CHAPTER 1—GENERAL PROVISIONS

§ *101. Definitions*

Section 101 of title 11 contains 40 definitions:

Paragraph (1) defines "accountant" as an accountant authorized under applicable law to practice accounting. The term includes a professional accounting association, corporation, or partnership if applicable law authorizes such a unit to practice accounting.

Paragraph (2) defines "affiliate." An affiliate is an entity with a close relationship to the debtor. In includes a 20 percent parent or subsidiary of the debtor, whether a corporate, partnership, individual, or estate parent.

The use of "directly or indirectly" in subparagraphs (A) and (B) is intended to cover situations in which there is an opportunity to control, and where the existence of that opportunity operates as indirect control.

"Affiliate" is defined primarily for use in the definition of insider, *infra*, and for use in the chapter 11 reorganization cases. The definition of "affiliate" does not include an entity acting in a fiduciary or agency capacity if the entity does not have the sole discretionary power to vote 20 percent of the voting securities but hold them solely as security and have not exercised the power to vote. This restriction applies to a corporate affiliate under subparagraph (B) of paragraph (2).

Subsections (C) and (D) of paragraph (2) define affiliate also as those persons and entities whose business or substantially all of whose property is operated under a lease or operating agreement by a debtor and whose business or property is more than 50 percent under the control of the debtor.

The definition of "attorney" in paragraph (3) is similar to the definition of accountant.

Paragraph (4) defines "claim." The effect of the definition is a significant departure from present law. Under present law, "claim" is not defined in straight bankruptcy. Instead it is simply used, along with the concept of provability in section 63 of the Bankruptcy Act, to limit the kinds of obligations that are payable in a bankruptcy case. The term is defined in the debtor rehabilitation chapters of present law far more broadly. The definition in paragraph (4) adopts an even

**Ad Hoc Equity Group Exhibit 9**

24

22

broader definition of claim than is found in the present debtor rehabilitation chapters. The definition is any right to payment, whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured. The definition also includes as a claim an equitable right to performance that does not give rise to a right to payment. By this broadest possible definition and by the use of the term throughout the title 11, especially in subchapter I of chapter 5, the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case. It permits the broadest possible relief in the bankruptcy court.

Paragraph (5) defines "commodity broker" by reference to various terms used and defined in subchapter IV of chapter 7, Commodity Broker Liquidation. The terms are described in conection with section 761, *infra*.

Paragraph (6) defines "community claim" for those eight States that have community property laws. The definition is keyed to the liability of the debtor's property for a claim against either the debtor or the debtor's spouse. If the debtor's property is liable for a claim against either, that claim is a community claim.

Paragraph (7) defines "consumer debt". The definition is adapted from the definition used in various consumer protection laws. It encompasses only a debt incurred by an individual primarily for a personal, family, or household purpose.

The definition of "corporation" in paragraph (8) is similar to the definition in current law, section 1(8). The term encompasses any association having the power or privilege that a private corporation, but not an individual or partnership, has; partnership associations organized under a law that makes only the capital subscribed responsible for the debts of the partnership; joint-stock company; unincorporated company or association; and business trust. "Unincorporated association" is intended specifically to include a labor union, as well as other bodies that come under that phrase as used under current law. The exclusion of limited partnerships is explicit, and not left to the case law.

Paragraph (g) defines "court" as the bankruptcy judge in the district in which the case is pending except in municipal adjustment and railroad reorganization cases, where "court" means the Federal district judge.

Paragraph (10) defines "creditor" to include holders of prepetition claims against the debtor. However, it also encompasses certain holders of claims that are deemed to arise before the date of the filing of the petition, such as those injured by the rejection of an executory contract or unexpired lease, certain investment tax credit recapture claim holders, "involuntary gap" creditors, and certain holders of the right of setoff. The term also includes the holder of a prepetition community claim. A guarantor of or surety for a claim against the debtor is also a creditor, because he holds a contingent claim against the debtor that becomes fixed when he pays the creditor whose claim he has guaranteed or insured.

DOCUMENT 52

23

Paragraph (11) defines "custodian." There is no similar definition is current law. It is defined to facilitate drafting, and means a pre-petition liquidator of the debtor's property, such as an assignee for the benefit of creditors, a receiver of the debtor's property, or administrator of the debtor's property. The definition of custodian to include a receiver or trustee is descriptive, and not meant to be limited to court officers with those titles. The definition is intended to include other officers of the court if their functions are substantially similar to those of a receiver or trustee.

"Debt" is defined in paragraph (12) as a liability on a claim. The terms "debt" and "claim" are coextensive: a creditor has a "claim" against the debtor; the debtor owes a "debt" to the creditor. This definition of "debt" and the definition of "claim" on which it is based, proposed 11 U.S.C. 101(4), does not include a transaction such as a policy loan on an insurance policy. Under that kind of transaction, the debtor is not liable to the insurance company for repayment; the amount owed is merely available to the company for setoff against any benefits that become payable under the policy. As such, the loan is not a claim (it is not a right to payment) that the company can assert against the estate; nor is the debtor's obligation a debt (a liability on a claim) that will be discharged under proposed 11 U.S.C. 523 or 524.

Paragraph (13) defines "debtor." Debtor means person or municipality concerning which a case under title II has been commenced. This is a change in terminology from present law, which identifies the person by or against whom a petition is filed in a straight bankruptcy liquidation case as the "bankrupt", and a person or municipality that is proceeding under a debtor rehabilitation chapter (chapters VIII through XIII of the Bankruptcy Act) as a "debtor." The term "debtor" is used for both kinds of cases in this bill, for ease of reference in chapters 1, 3, and 5 (which apply to straight bankruptcy and reorganization cases).

Paragraph (14) defines "disinterested person." The definition is adapted from section 158 of chapter X of current law, though it is expanded and modified in some respects. A person is a disinterested person if the person is not a creditor, equity security holder, or insider; is not and was not an investment banker of the debtor for any outstanding security of the debtor (the change from underwriter in current law to investment banker is to make the term more descriptive and to avoid conflict with the definition of underwriter in section 2(11) of the Securities Act of 1933 (15 U.S.C. 77b(11)); has not been an investment banker for a security of the debtor within 3 years before the date of the filing of the petition (the change from five years to three years here conforms the definition with the statute of limitations in the Securities Act of 1933), or an attorney for such an investment banker; is not an insider of the debtor or of such an investment banker; and does not have an interest materially adverse to the estate.

**Ad Hoc Equity Group Exhibit 9**

24

"Entity" is defined, for convenience, in paragraph (15), to include person, estate, trust, and governmental unit. It is the most inclusive of the various defined terms relating to bodies or units.

Paragraph (16) defines "equity security." The term includes a share or stock in a corporation, a limited partner's interest in a limited partnership, and a warrant or right to subscribe to an equity security. The term does not include a security, such as a convertible debenture, that is convertible into equity security, but has not been converted.

Paragraph (17) defines "equity security holder" for convenience as the holder of an equity securing of the debtor.

Paragraph (18) defines "farmer". It encompasses only those persons for whom farming operations contribute 75 percent or more of their total income.

Paragraphs (19) and (20) define "foreign proceeding" and "foreign representative". A foreign proceeding is a proceeding in another country in which the debtor has some substantial connection for the purpose of liquidating the estate of the debtor or the purpose of financial rehabilitation of the debtor. A foreign representative is the representative of the estate in a foreign proceeding, such as a trustee or administrator.

Paragraph (21) defines "governmental unit" in the broadest sense. The definition encompasses the United States, a State, Commonwealth, District, Territory, municipality, or foreign state, and a department, agency, or instrumentality of any of those entities. "Department, agency, or instrumentality" does not include an entity that owes its existence to State action, such as the granting of a charter or a license but that has no other connection with a State or local government or the Federal Government. The relationship must be an active one in which the department, agency, or instrumentality is actually carrying out some governmental function.

Paragraph (22) defines "indenture." It is similar to the definition of indenture in the Trust Indenture Act of 1939. An indenture is the instrument under which securities, either debt or equity, of the debtor are outstanding.

Paragraph (23) defines "indenture trustee" as the trustee under an indenture.

Paragraph (24) defines "individual with regular income." The effect of this definition, and of its use in section 109(e), is to expand substantially the kinds of individuals that are eligible for relief under chapter 13, Adjustment of Debts of an Individual with Regular Income. Chapter XIII is now available only for wage earners. The definition encompasses all individuals with incomes that are sufficiently stable and regular to enable them to make payments under a chapter 13 plan. Thus, individuals on welfare, social security, fixed pension incomes, or who live on investment incomes, will be able to work out repayment plans with their creditors rather than being forced into straight bankruptcy. Also, self-employed individuals will be eligible to use chapter 13 if they have regular incomes.

However, the definition excludes certain stockbrokers and commodity brokers, in order to prohibit them from proceeding under chapter 13 and avoiding the customer protection provisions of chapter 7.

**Ad Hoc Equity Group Exhibit 9**

DOCUMENT 52

25

"Insider", defined in paragraph (25), is a new term. An insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor. If the debtor is an individual, then a relative of the debtor, a partnership in which the debtor is a general partner, a general partner of the debtor, and a corporation controlled by the debtor are all insiders. If the debtor is a corporation, then a controlling person, a relative of a controlling person, a partnership in which the debtor is a general partner, and a general partner of the debtor are all insiders. If the debtor is a partnership, then a general partner of or in the debtor, a relative of a general partner in the debtor, and a person in control are all insiders. If the debtor is a municipality, then an elected official of the debtor is an insider. In addition, affiliates of the debtor and managing agents are insiders.

The definition of "insolvent" in paragraph (26) is adopted from section 1(19) of current law. An entity is insolvent if its debts are greater than its assets, at a fair valuation, exclusive of property exempted or fraudulently transferred. It is the traditional bankruptcy balance sheet test of insolvency. For a partnership, the definition is modified to account for the liability of a general partner for the partnership's debts. The difference in this definition from that in current law is in the exclusion of exempt property for all purposes in the definition of insolvent.

Paragraph (27) defines "judicial lien." It is one of three kinds of liens defined in this section. A judicial lien is a lien obtained by judgment, levy, sequestration, or other legal or equitable process or proceeding.

Paragraph (28) defines "lien." The definition is new and is very broad. A lien is defined as a charge against or interest in property to secure payment of a debt or performance of an obligation. It includes inchoate liens. In general, the concept of lien is divided into three kinds of liens: judicial liens, security interests, and statutory liens. Those three categories are mutually exclusive and are exhausetive except for certain common law liens.

Paragraph (29) defines "municipality." The definition is adapted from the terms used in the chapter IX (municipal bankruptcy) amendment to the Bankruptcy Act enacted in 1976 (Pub. L. 94-260). That amendment spoke in terms of "political subdivision or public agency or instrumentality of a State". Bankruptcy Act Sec. 84. The term municipality is defined by those three terms for convenience. It does not include the District of Columbia or any territories of the United States.

"Person" is defined in paragraph (30). The definition is a change in wording, but not in substance, from the definition in section 1(23) of the Bankruptcy Act. The definition is also similar to the one contained in 1 U.S.C. sec. 1, but is repeated here for convenience and ease of reference. Person includes individual partnership, and corporation. The exclusion of governmental units is made explicit in order to avoid any confusion that may arise if, for example, a municipality is incorporated and thus is legally a corporation as well s governmentl unit. The definition does not include an estate or a trust, which are included only in the definition of "entity" in proposed 11 U.S.C. 101(14).

**Ad Hoc Equity Group Exhibit 9**

"Petition" is defined for convenience in paragraph (31). Petition is a petition under section 301, 302, 303, or 304 of the bankruptcy code—that is, a petition that commences a case under title 11.

Paragraph (32) defines purchaser as a transferre of a voluntary transfer, such as a sale or gift, and includes an immediate or mediate transferee of a purchaser.

The definition of "railroad" in paragraph (33) is derived from section 77 of the Bankruptcy Act. A railroad is a common carrier by railroad engaged in the transportation of individuals or property, or an owner of trackage facilities leased by such a common carrier. The effect of the definition and the use of the term in section 109(d) is to eliminate the limitation now found in section 77 of the Bankruptcy Act that only railroads engaged in interstate commerce may proceed under the railroad reorganization provisions. The limitation may have been inserted because of a doubt that the commerce power could not reach intrastate railroads. Be that as it may, this bill is enacted under the bankruptcy power.

Paragraph (34) defines "relative" as an individual related by affinity or consanguinity within the third degree as determined by the common law, and includes individuals in a step or adoptive relationship. The definition is similar to current law, but adds the latter phrase. This definition should be applied as of the time when the transaction that it concerns took place. Thus, a former spouse is not a relative, but if, for example, for purposes of the preference section, proposed 11 U.S.C. 547(b)(4)(B), the transferee was a spouse of the debtor at the time of the transfer sought to be avoided, then the transferee would be relative and subject to the insider rules, even if the transferee was no longer married to the debtor at the time of the commencement of the case or at the time of the commencement of the preference recovery proceeding.

Paragraph (35) defines "security." The definition is new and is modeled on the most recent draft of the American Law Institute's proposed securities code, with some exceptions. The interest of a limited partner in a limited partnership is included in order to make sure that everything that is defined as an equity security is also a "security." The definition, as with the definition of "entity", "insider", and "person", is open-ended because the term is not susceptible of precise specification. Thus the courts will be able to use the characterization provided in this definition to treat with new kinds of documents on a flexible basis.

Paragraphs (36) and (37) define "security agreement" and "security interest." A security interest is one of the kinds of liens. It is a lien created by an agreement. Security agreement is defined as the agreement creating the security interest. Though these terms are similar to the same terms in the Uniform Commercial Code, article IX, they are broader. For example, the U.C.C. does not cover real property mortgages. Under this definition, such a mortgage is included, as are all other liens created by agreement, even though not covered by the U.C.C. All U.C.C. security interests and security agreements are, however, security interests and security agreements under this definition. Whether a consignment or a lease constitutes a security interest under the bankruptcy code will depend on whether it constitutes a security interest under applicable State or local law.

**Ad Hoc Equity Group Exhibit 9**

DOCUMENT 52

27

Paragraph (38) defines another kind of lien, "statutory lien." The definition, derived from current law, states that a statutory lien is a lien arising solely by force of statute on specified circumstances or conditions and includes a lien of distress for rent (whether statutory, common law, or otherwise). The definition excludes judicial liens and security interests, whether or not they are provided for or are dependent on a statute, and whether or not they are made fully effective by statute. A statutory lien is only one that arises automatically, and is not based on an agreement to give a lien or on judicial action. Mechanics', materialmen's, and warehousemen's liens are examples. Tax liens are also included in the defintion of statutory lien.

"Stockbroker" is defined in paragraph (39) as a person engaged in the business of effecting transactions in securities for the account of others or with members of the general public from or for such person's own account, if the person has a customer, as defined. Thus, the definition, derived from a combination of the definitions of "broker" and "dealer" in the Securities Exchange Act of 1934, encompasses both brokers and dealers. The definition is used in section 109 and in subchapter III of chapter 7, Stockholder Liquidation. The term does not encompass an employee who acts for a principal that "effects" transaction or deals with the public, because such an employee will not have a "customer".

Paragraph (40) defines "transfer." It is derived and adapted, with stylistic changes, from section 1(30) of the Bankruptcy Act. A transfer is a disposition of an interest in property. The definition of transfer is as broad as possible. Many of the potentially limiting words in current law are deleted, and the language is simplified. Under this definition, any transfer of an interest in property is a transfer, including a transfer of possession, custody, or control even if there is no transfer of title, because possession, custody, and control are interests in property. A deposit in a bank account or similar account is a transfer.

§ *102. Rules of construction*

Section 102 provides seven rules of construction. Some are derived from current law; others are derived from 1 U.S.C. 1; a few are new. They apply generally throughout proposed title 11. These are terms that are not appropriate for definition, but that require an explanation.

Paragraph (1) defines the concept of "after notice and a hearing." The concept is central to the bill and to the separation of the administrative and judicial functions of bankruptcy judges. The phrase means after such notice as is appropriate in the particular circumstances (to be prescribed by either the Rules of Bankruptcy Procedure or by the court in individual circumstances that the Rules do not cover. In many cases, the Rules will provide for combined notice of several proceedings), and such opportunity for a hearing as is appropriate in the particular circumstances. Thus, a hearing will not be necessary in every instance. If there is no objection to the proposed action, the action may go ahead without court action. This is a significant change from present law, which requires the affirmative approval of the bankruptcy judge for almost every action. The change will permit the bankruptcy judge to stay removed from the administration of the

**Ad Hoc Equity Group Exhibit 9**

28

bankruptcy or reorganization case, and to become involved only when there is a dispute about a proposed action, that is, only when there is an objection. The phrase "such opportunity for a hearing as is appropriate in the particular circumstances" is designed to permit the Rules and the courts to expedite or dispense with hearings when speed is essential. The language "or similar phrase" is intended to cover the few instances in the bill where "after notice and a hearing" is interrupted by another phrase, such as "after notice to the debtor and a hearing."

Paragraph (2) specifies that "claim against the debtor" includes claim against property of the debtor. This paragraph is intended to cover nonrecourse loan agreements where the creditor's only rights are against property of the debtor, and not against the debtor personally. Thus, such an agreement would give rise to a claim that would be treated as a claim against the debtor personally, for the purposes of the bankruptcy code.

Paragraph (3) is a codification of *American Surety Co.* v. *Marotta*, 287 U.S. 513 (1933). It specifies that "includes" and "including" are not limiting.

Paragraph (4) specifies that "may not" is prohibitive and not permissive (such as in "might not").

Paragraph (5) specifies that "or" is not exclusive. Thus, if a party "may do (a) or (b)", then the party may do either or both. The party is not limited to a mutually exclusive choice between the two alternatives.

Paragraph (6) makes clear that "order for relief" means entry of an order for relief. If the court orally orders relief, but the order is not entered until a later time, then any time measurements in the bill are from entry, not from the oral order. In a voluntary case, the entry of the order for relief is the filing of the petition commencing the voluntary case.

Paragraph (7) specifies that the singular includes the plural. The plural, however, generally does not include the singular. The bill uses only the singular, even when the item in question most often is found in plural quantities, in order to avoid the confusion possible if both rules of construction applied. When an item is specified in the plural, the plural is intended.

## § 103 Applicability of chapters

Section 103 prescribes which chapters of the proposed bankruptcy code apply in various cases. All cases, other than cases ancillary to foreign proceedings, are filed under chapter 7, 9, 11, or 13, the operative chapters of the proposed bankruptcy code. The general provisions that apply no matter which chapter a case is filed under are found in chapters 1, 3, and 5. Subsection (a) makes this explicit, with an exception for chapter 9. The other provisions, which are self-explanatory, provide the special rules for Stockbroker Liquidations, Commodity Broker Liquidations, Municipal Debt Adjustments, and Railroad Reorganizations.

## § 104. Adjustment of dollar amounts

This section requires that the Director of the Administrative Office of the U.S. Courts report to Congress and the President before Oct. 1,

1985, and before May 1 every 6 years thereafter a recommendation for adjustment in dollar amounts found in this title. The Committee feels that regular adjustment of the dollar amounts by the Director will conserve congressional time and yet assure that the relative dollar amounts used in the bill are maintained. Changes in the cost of living should be a significant, but not necessarily the only, factor considered by the Director. The fact that there has been an increase in the cost of living does not necessarily mean that an adjustment of dollar amounts would be needed or warranted.

§ 105. *Power of court*

Section 105 is derived from section 2a(15) of present law, with two changes. First, the limitation on the power of a bankruptcy judge (the power to enjoin a court being reserved to the district judge) is removed as inconsistent with the increased powers and jurisdiction of the new bankruptcy court. Second, the bankruptcy judge is prohibited from appointing a receiver in a case under title 11 under any circumstances. The bankruptcy code has ample provision for the appointment of a trustee when needed. Appointment of a receiver would simply circumvent the established procedures.

This section is also anauthorization, as required under 28 U.S.C. 2283, for a court of the United States to stay the action of a State court. As such, *Toucey* v. *New York Life Insurance Company*, 314 U.S. 118 (1941), is overruled.

§ 106. *Waiver of sovereign immunity*

Section 106 provides for a limited waiver of sovereign immunity in bankruptcy cases. Though Congress has the power to waive sovereign immunity for the Federal government completely in bankruptcy cases, the policy followed here is designed to achieve approximately the same result that would prevail outside of bankruptcy. Congress does not, however, have the power to waive sovereign immunity completely with respect to claims of a bankrupt estate against a State, though it may exercise its bankruptcy power through the supremacy clause to prevent or prohibit State action that is contrary to bankruptcy policy.

There is, however, a limited change from the result that would prevail in the absence of bankruptcy; the change is two-fold and is within Congress' power vis-a-vis both the Federal Government and the States. First, the filing of a proof of claim against the estate by a governmental unit is a waiver by that governmental unit of sovereign immunity with respect to compulsory counterclaims, as defined in the Federal Rules of Civil Procedure, that is, counterclaims arising out of the same transaction or occurrence. The governmental unit cannot receive a distribution from the estate without subjecting itself to any liability it has to the estate within the confines of a compulsory counterclaim rule. Any other result would be one-sided. The counterclaim by the estate against the governmental unit is without limit.

Second, the estate may offset against the allowed claim of a governmental unit, up to the amount of the governmental unit's claim, any claim that the debtor, and thus the estate, has against the government-

al unit, without regard to whether the estate's claim arose out of the same transaction or occurrence as the government's claim. Under this provision, the setoff permitted is only to the extent of the governmental unit's claim. No affirmative recovery is permitted. Subsection (a) governs affirmative recovery.

Though this subsection creates a partial waiver of immunity when the governmental unit files a proof of claim, it does not waive immunity if the debtor or trustee, and not the governmental unit, files proof of a governmental unit's claim under proposed 11 U.S.C. 501(c).

This section does not confer sovereign immunity on any governmental unit that does not already have immunity. It simply recognizes any immunity that exists and prescribes the proper treatment of claims by and against that sovereign.

### § 107. Public access to papers

Subsection (a) of this section makes all papers filed in a bankruptcy case and the dockets of the bankruptcy court public and open to examination at reasonable times without charge. "Docket" includes the claims docket, the proceedings docket, and all papers filed in a case.

Subsection (b) permits the court, on its own motion, and requires the court, on the request of a party in interest, to protect trade secrets, confidential research, development, or commercial information, and to protect persons against scandalous or defamatory matter.

### § 108. Extension of time

Subsections (a) and (b), derived from Bankruptcy Act section 11, permit the trustee, when he steps into the shoes of the debtor, an extension of time for filing an action or doing some other act that is required to preserve the debtor's rights. Subsection (a) extends any statute of limitation for commencing or continuing an action by the debtor for two years after the date of the order for relief, unless it would expire later. Subsection (b) gives the trustee 60 days to take other actions not covered under subsection (a), such as filing a pleading, demand, notice, or proof of claim or loss (such as an insurance claim), unless the period for doing the relevant act expires later than 60 days after the date of the order for relief.

Subsection (c) extends the statute of limitations for creditors. Thus, if a creditor is stayed from commencing or continuing an action against the debtor because of the bankruptcy case, then the creditor is permitted an additional 30 days after notice of the event by which the stay is terminated, whether that event be relief from the automatic stay under proposed 11 U.S.C. 362 or 1301, the closing of the bankruptcy case (which terminates the stay), or the exception from discharge of the debts on which the creditor claims.

In the case of Federal tax liabilities, the Internal Revenue Code suspends the statute of limitations on a tax liability of a taxpayer from running while his assets are in the control or custody of a court and for 6 months thereafter (sec. 6503(b) of the Code). The amendment applies this rule in a title 11 proceeding. Accordingly, the statute of limitations on collection of a nondischargeable Federal tax liability of a debtor will resume running after 6 months following the end of

DOCUMENT 52

31

the period during which the debtor's assets are in the control or custody of the bankruptcy court. This rule will provide the Internal Revenue Service adequate time to collect nondischargeable taxes following the end of the title 11 proceedings.

## § 109. Who may be a debtor

This section specifies eligibility to be a debtor under the bankruptcy laws. The first criterion, found in the current Bankruptcy Act section 2a(1) requires that the debtor reside or have a domicile, a place of business, or property in the United States.

Subsection (b) defines eligibility for liquidation under chapter 7. All persons are eligible except insurance companies, and certain banking institutions. These exclusions are contained in current law. However, the banking institution exception is expanded in light of changes in various banking laws since the current law was last amended on this point. A change is also made to clarify that the bankruptcy laws cover foreign banks and insurance companies not engaged in the banking or insurance business in the United States but having assets in the United States. Banking institutions and insurance companies engaged in business in this country are excluded from liquidation under the bankruptcy laws because they are bodies for which alternate provision is made for their liquidation under various State or Federal regulatory laws. Conversely, when a foreign bank or insurance company is not engaged in the banking or insurance business in the United States, then those regulatory laws do not apply, and the bankruptcy laws are the only ones available for administration of any assets found in United States.

The first clause of subsection (b) provides that a railroad is not a debtor except where the requirements of section 1174 are met.

Subsection (c) provides that only a person who may be a debtor under chapter 7 and a railroad may also be a debtor under chapter 11, but a stockbroker or commodity broker is eligible for relief only under chapter 7. Subsection (d) establishes dollar limitations on the amount of indebtedness that an individual with regular income can incur and yet file under chapter 13.

### CHAPTER 3—CASE ADMINISTRATION .

#### SUBCHAPTER I—COMMENCEMENT OF A CASE

## § 301. Voluntary cases

Section 301 specifies the manner in which a voluntary bankruptcy case is commenced. The debtor files a petition under this section under the particular operative chapter of the bankruptcy code under which he wishes to proceed. The filing of the petition constitutes an order for relief in the case under that chapter. The section contains no change from current law, except for the use of the phrase "order for relief" instead of "adjudication." The term adjudication is replaced by a less pejorative phrase in light of the clear power of Congress to permit voluntary bankruptcy without the necessity for an adjudication, as under the 1898 act, which was adopted when voluntary bankruptcy was a concept not thoroughly tested.

**Ad Hoc Equity Group Exhibit 9**

32

## § 302. Joint cases

A joint case is a voluntary bankruptcy case concerning a wife and husband. Under current law, there is no explicit provision for joint cases. Very often, however, in the consumer debtor context, a husband and wife are jointly liable on their debts, and jointly hold most of their property. A joint case will facilitate consolidation of their estates, to the benefit of both the debtors and their creditors, because the cost of administration will be reduced, and there will be only one filing fee.

Section 302 specifies that a joint case is commenced by the filing of a petition under an appropriate chapter by an individual and that individual's spouse. Thus, one spouse cannot take the other into bankruptcy without the other's knowledge or consent. The filing of the petition constitutes an order for relief under the chapter selected.

Subsection (b) requires the court to determine the extent, if any, to which the estates of the two debtors will be consolidaed; that is, assets and liabilities combined in a single pool to pay creditors. Factors that will be relevant in the court's determination include the extent of jointly held property and the amount of jointly-owned debts. The section, of course, is not license to consolidate in order to avoid other provisions of the title to the detriment of either the debtors or their creditors. It is designed mainly for ease of administration.

## § 303. Involuntary cases

Section 303 governs the commencement of involuntary cases under title 11. An involuntary case may be commenced only under chapter 7, Liquidation, or chapter 11, Reorganization. Involuntary cases are not permitted for municipalities, because to do so may constitute an invasion of State sovereignty contrary to the 10th amendment, and would constitute bad policy, by permitting the fate of a municipality, governed by officials elected by the people of the municipality, to be determined by a small number of creditors of the municipality. Involuntary chapter 13 cases are not permitted either. To do so would constitute bad policy, because chapter 13 only works when there is a willing debtor that wants to repay his creditors. Short of involuntary servitude, it is difficult to keep a debtor working for his creditors when he does not want to pay them back. See chapter 3, supra.

The exceptions contained in current law that prohibit involuntary cases against farmers, ranchers and eleemosynary institutions are continued. Farmers and ranchers are excepted because of the cyclical nature of their business. One drought year or one year of low prices, as a result of which a farmer is temporarily unable to pay his creditors, should not subject him to involuntary bankruptcy. Eleeymosynary institutions, such as churches, schools, and charitable organizations and foundations, likewise are exempt from involuntary bankruptcy.

The provisions for involuntary chapter 11 cases is a slight change from present law, based on the proposed consolidation of the reorganization chapters. Currently, involuntary cases are permitted under chapters X and XII but not under chapter XI. The consolidation requires a single rule for all kinds of reorganization proceedings. Because the assets of an insolvent debtor belong equitably to his credi-

DOCUMENT 52

33

tors, the bill permits involuntary cases in order that creditors may realize on their assets through reorganization as well as through liquidation.

Subsection (b) of the section specifies who may file an involuntary petition. As under current law, if the debtor has more than 12 creditors, three creditors must join in the involuntary petition. The dollar amount limitation is changed from current law to $5,000. The new amount applies both to liquidation and reorganization cases in order that there not be an artificial difference between the two chapters that would provide an incentive for one or the other. Subsection (b)(1) makes explicit the right of an indenture trustee to be one of the three petitioning creditors on behalf of the creditors the trustee represents under the indenture. If all of the general partners in a partnership are in bankruptcy, then the trustee of a single general partner may file an involuntary petition against the partnership. Finally, a foreign representative may file an involuntary case concerning the debtor in the foreign proceeding, in order to administer assets in this country. This subsection is not intended to overrule Bankruptcy Rule 104(d), which places certain restrictions on the transfer of claims for the purpose of commencing an involuntary case. That Rule will be continued under section 405(d) of this bill.

Subsection (c) permits creditors other than the original petitioning creditors to join in the petition with the same effect as if the joining creditor had been one of the original petitioning creditors. Thus, if the claim of one of the original petitioning creditors is disallowed, the case will not be dismissed for want of three creditors or want of $5,000 in petitioning claims if the joining creditor suffices to fulfill the statutory requirements.

Subsection (d) permits the debtor to file an answer to an involuntary petition. The subsection also permits a general partner in a partnership debtor to answer an involuntary petition against the partnership if he did not join in the petition. Thus, a partnership petition by less than all of the general partners is treated as an involuntary, not a voluntary, petition.

The court may, under subsection (e), require the petitioners to file a bond to indemnify the debtor for such amounts as the court may later allow under subsection (i). Subsection (i) provides for costs, attorneys fees. and damages in certain circumstances. The bonding requirement will discourage frivolous petitions as well as spiteful petitions based on a desire to embarrass the debtor (who may be a competitor of a petitioning creditor) or to put the debtor out of business without good cause. An involuntary petition may put a debtor out of business even if it is without foundation and is later dismissed.

Subsection (f) is both a clarification and a change from existing law. It permits the debtor to continue to operate any business of the debtor and to dispose of property as if the case had not been commenced. The court is permitted, however, to control the debtor's powers under this subsection by appropriate orders, such as where there is a fear that the debtor may attempt to abscond with assets. dispose of them at less than their fair value, or dismantle his business, all to the detriment of the debtor's creditors.

**Ad Hoc Equity Group Exhibit 9**

34

The court may also, under subsection (g), appoint an interim trustee to take possession of the debtor's property and to operate any business of the debtor, pending trial on the involuntary petition. The court may make such an order only on the request of a party in interest, and after notice to the debtor and a hearing. There must be a showing that a trustee is necessary to preserve the property of the estate or to prevent loss to the estate. The debtor may regain possession by posting a sufficient bond.

Subsection (h) provides the standard for an order for relief on an involuntary petition. If the petition is not timely controverted (the Rules of Bankruptcy Procedure will fix time limits), the court orders relief after a trial, only if the debtor is generally unable to pay its debts as they mature, or if the debtor has failed to pay a major portion of his debts as they become due, or if a custodian was appointed during the 90-day period preceding the filing of the petition. The first two tests are variations of the equity insolvency test. They represent the most significant departure from present law concerning the grounds for involuntary bankruptcy, which requires an act of bankruptcy. Proof of the commission of an act of bankruptcy has frequently required a showing that the debtor was insolvent on a "balance-sheet" test when the act was committed. This bill abolishes the concept of acts of bankruptcy.

The equity insolvency test has been in equity jurisprudence for hundreds of years, and though it is new in the bankruptcy context (except in chapter X), the bankruptcy courts should have no difficulty in applying it. The third test, appointment of a custodian within ninety days before the petition, is provided for simplicity. It is not a partial re-enactment of acts of bankruptcy. If a custodian of all or substantially all of the property of the debtor has been appointed, this paragraph creates an irrebuttable presumption that the debtor is unable to pay its debts as they mature. Moreover, once a proceeding to liquidate assets has been commenced, the debtor's creditors have an absolute right to have the liquidation (or reorganization) proceed in the bankruptcy court and under the bankruptcy laws with all of the appropriate creditor and debtor protections that those laws provide. Ninety days gives creditors ample time in which to seek bankruptcy liquidation after the appointment of a custodian. If they wait beyond the ninety day period, they are not precluded from filing an involuntary petition. They are simply required to prove equity insolvency rather than the more easily provable custodian test.

Subsection (i) permits the court to award costs, reasonable attorney's fees, or damages if an involuntary petition is dismissed other than by consent of all petitioning creditors and the debtor. The damages that the court may award are those that may be caused by the taking of possession of the debtor's property under subsection (g) or section 1104 of the bankruptcy code. In addition, if a petitioning creditor filed the petition in bad faith, the court may award the debtor any damages proximately caused by the filing of the petition. These damages may include such items as loss of business during and after the pendency of the case, and so on. "Or" is not exclusive in this paragraph. The court may grant any or all of the damages provided for under the provision. Dismissal in the best interests of credits under section 305 (a) (1) would not give rise to a damages claim.

DOCUMENT 52

35

Under subsection (j), the court may dismiss the petition by consent only after giving notice to all creditors. The purpose of the subsection is to prevent collusive settlements among the debtor and the petitioning creditors while other creditors, that wish to see relief ordered with respect to the debtor but that did not participate in the case, are left without sufficient protection.

Subsection (k) governs involuntary cases against foreign banks that are not engaged in business in the United States but that have assets located here. The subsection prevents a foreign bank from being placed into bankruptcy in this country unless a foreign proceeding against the bank is pending. The special protection afforded by this section is needed to prevent creditors from effectively closing down a foreign bank by the commencement of an involuntary bankruptcy case in this country unless that bank is involved in a proceeding under foreign law. An involuntary case commenced under this subsection gives the foreign representative an alternative to commencing a case ancillary to a foreign proceeding under section 304.

§ 304. *Cases ancillary to foreign proceedings*

This section governs cases filed in the bankruptcy courts that are ancillary to foreign proceedings. That is, where a foreign bankruptcy case is pending concerning a particular debtor and that debtor has assets in this country, the foreign representative may file a petition under this section, which does not commence a full bankruptcy case, in order to administer assets located in this country, to prevent dismemberment by local creditors of assets located here, or for other appropirate relief. The debtor is given the opportunity to controvert the petition.

Subsection (c) requires the court to consider several factors in determining what relief, if any, to grant. The court is to be guided by what will best assure an economical and expeditious administration of the estate, consistent with just treatment of all creditors and equity security holders; protection of local creditors and equity security holders against prejudice and inconvenience in processing claims and interests in the foreign proceeding; prevention of preferential or fraudulent disposition of property of the estate; distribution of the proceeds of the estate substantially in conformity with the distribution provisions of the bankruptcy code; and, if the debtor is an individual, the provision of an opportunity for a fresh start. These guidelines are designed to give the court the maximum flexibility in handling ancillary cases. Principles of international comity and respect for the judgments and laws of other nations suggest that the court be permitted to make the appropriate orders under all of the circumstances of each case, rather than being provided with inflexible rules.

§ 305. *Abstention*

A principle of the common law requires a court with jurisdiction over a particular matter to take jurisdiction. This section recognizes that there are cases in which it would be appropriate for the court to decline jurisdiction. Abstention under this section, however, is of jurisdiction over the entire case. Abstention from jurisdiction over a particular proceeding in a case is governed by proposed 28 U.S.C. 1471(c). Thus, the court is permitted, if the interests of creditors

. 36 .

and the debtor would be better served by dismissal of the case or suspension of all proceedings in the case, to so order. The court may dismiss or suspend under the first paragraph, for example, if an arrangement is being worked out by creditors and the debtor out of court, there is no prejudice to the results of creditors in that arrangement, and an involuntary case has been commenced by a fed recalcitrant creditors to provide a basis for future threats to extract full payment. The less expensive out-of-court workout may better serve the interests in the case. Likewise, if there is pending a foreign proceeding concerning the debtor and the factors specified in proposed 11 U.S.C. 304(c) warrant dismissal or suspension, the court may so act.

Subsection (b) gives a foreign representative authority to appear in the bankruptcy court to request dismissal or suspension. Subsection (c) makes the dismissal or suspension order nonreviewable by appeal or otherwise. The bankruptcy court, based on its experience and discretion is vested with the power of decision.

§ *306. Limited appearance*

Section 306 permits a foreign representative that is seeking dismissal or suspension under section 305 of an ancillary case or that is appearing in connection with a petition under section 303 or 304 to appear without subjecting himself to the jurisdiction of any other court in the United States, including State courts. The protection is necessary to allow the foreign representative to present his case and the case of the foreign estate, without waiving the normal jurisdictional rules of the foreign country. That is, creditors in this country will still have to seek redress against the foreign estate according to the host country's jurisdictional rules. Any other result would permit local creditors to obtain unfair advantage by filing an involuntary case, thus requiring the foreign representative to appear, and then obtaining local jurisdiction over the representative in connection with his appearance in this country. That kind of bankruptcy law would legalize an ambush technique that has frequently been rejected by the common law in other contexts.

However, the bankruptcy court is permitted under section 306 to condition any relief under section 303, 304, or 305 on the compliance by the foreign representative with the orders of the bankruptcy court. The last provision is not carte blanche to the bankruptcy court to require the foreign representative to submit to jurisdiction in other courts contrary to the general policy of the section. It is designed to enable the bankruptcy court to enforce its own orders that are necessary to the appropriate relief granted under section 303, 304, or 305.

SUBCHAPTER II—OFFICERS

§ *321. Eligibility to serve as trustee*

Section 321 is adapted from current Bankruptcy Act § 45 and Bankruptcy Rule 209. Subsection (a) specifies that an individual may serve as trustee in a bankruptcy case only if he is competent to perform the duties of trustee and resides or has an office in the judicial district within which the case is pending, or in an adjacent judicial district. A corporation must be authorized by its charter or bylaws to act as

DOCUMENT 52

37

trustee, and, for chapter 7 or 13 cases, must have an office in any of the above mentioned judicial districts.

### § 322 Qualification of trustee

A trustee qualifies in a case by filing, within five days after selection, a bond in favor of the United States, conditioned on the faithful performance of his official duties. This section is derived from the Bankruptcy Act section 50b. The court is required to determine the amount of the bond and the sufficiency of the surety on the bond. Subsection (c) derived from Bankruptcy Act section 50i, relieves the trustee from personal liability and from liability on his bond for any penalty or forfeiture incurred by the debtor. Subsection (d), derived from section 50m, fixes a two-year statute of limitations on any action on a trustee's bond. Finally, subsection (e) dispenses with the bonding requirement for the United States trustee.

### § 323. Role and capacity of trustee

Subsection (a) of this section makes the trustee the representative of the estate. Subsection (b) grants the trustee the capacity to sue and to be sued. If the debtor remains in possession in a chapter 11 case, section 1107 gives the debtor in possession these rights of the trustee: the debtor in possession becomes the representative of the estate, and may sue and be used. The same applies in a chapter 13 case.

### § 324. Removal of trustee

This section permits the court, after notice and a hearing, to remove a trustee for cause.

### § 325. Effect of vacancy

Section 325, derived from Bankruptcy Act section 46 and Bankruptcy Rule 221(b), specifies that a vacancy in the office of trustee during a case does not abate any pending action or proceeding. The successor trustee, when selected and qualified, is substituted as a party in any pending action or proceeding.

### § 326. Limitation on compensation of trustee

This section is derived in part from section 48c of the Bankruptcy Act. It must be emphasized that this section does not authorize compensation of trustees. This section simply fixes the maximum compensation of a trustee. Proposed 11 U.S.C. 330 authorizes and fixes the standard of compensation. Under section 48c of current law, the maximum limits have tended to become minimums in many cases. This section is not intended to be so interpreted. The limits in this section, together with the limitations found in section 330, are to be applied as outer limits, and not as grants or entitlements to the maximum fees specified.

The maximum fee schedule is derived from section 48c(1) of the present act, but with a change relating to the bases on which the percentage maxima are computed. The maximum fee schedule is based on decreasing percentages of increasing amounts. The amounts are the amounts of money distributed by the trustee to parties in interest, excluding the debtor, but including secured creditors. These amounts were last amended in 1952. Since then, the cost of living has approximately doubled. Thus, the bases were doubled.

**Ad Hoc Equity Group Exhibit 9**

38

It should be noted that the bases on which the maximum fee is computed includes moneys turned over to secured creditors, to cover the situation where the trustee liquidates property subject to a lien and distributes the proceeds. It does not cover cases in which the trustee simply turns over the property to the secured creditor, nor where the trustee abandons the property and the secured creditor is permitted to foreclose. The provision is also subject to the rights of the secured creditor generally under proposed section 506, especially 506(c). The $150 discretionary fee provision of current law is retained.

Subsection (b) of this section entitles an operating trustee to a reasonable fee, without any limitation based on the maximum provided for a liquidating trustee as in current law, Bankruptcy Act § 48c(2).

Subsection (c) permits a maximum fee of five percent on all payments to creditors under a chapter 13 plan to the trustee appointed in the case.

Subsection (d) provides a limitation not found in current law. Even if more than one trustee serves in the case, the maximum payable to all trustees does not change. For example, if an interim trustee is appointed and an elected trustee replaces him, the combined total of the fees payable to the interim trustee and the permanent trustee may not exceed the amount specified in this section. Under current law, very often a receiver receives a full fee and a subsequent trustee also receives a full fee. The resultant "double-dipping", especially in cases in which the receiver and the trustee are the same individual, is detrimental to the interests of creditors, by needlessly increasing the cost of administering bankruptcy estates.

Subsection (e) permits the court to deny compensation to a trustee if the trustee has been derelict in his duty by employing counsel, who is not disinterested.

### § 327. Employment of professional persons

This section authorizes the trustee, subject to the court's approval, to employ professional persons, such as attorneys, accountants, appraisers, and auctioneers, to represent or perform services for the estate. The trustee may employ only disinterested persons that do not hold or represent an interest adverse to the estate.

Subsection (b) is an exception, and authorizes the trustee to retain or replace professional persons that the debtor has employed if necessary in the operation of the debtor's business.

Subsection (c) provides a professional person is not disqualified for employment solely because of the person's prior employment by or representation of a secured or unsecured creditor.

Subsection (d) permits the court to authorize the trustee, if qualified to act as his own counsel or accountant.

Subsection (e) permits the trustee, subject to the court's approval, to employ for a specified special purpose an attorney that has represented the debtor, if such employment is in the best interest of the estate and if the attorney does not hold or represent an interest adverse to the debtor of the estate with respect to the matter on which he is to be employed. This subsection does not authorize the employment of the debtor's attorney to represent the estate generally or to represent the trustee in the conduct of the bankruptcy case. The subsection will most

DOCUMENT 52

39

likely be used when the debtor is involved in complex litigation, and changing attorneys in the middle of the case after the bankruptcy case has commenced would be detrimental to the progress of that other litigation.

§ 328. *Limitation of compensation of professional persons*

This section, which is parallel to section 326, fixes the maximum compensation allowable to a professional person employed under section 327. It authorizes the trustee, with the court's approval, to employ professional persons on any reasonable terms, including on a retainer, on an hourly, or on a contingent fee basis. Subsection (a) further permits the court to allow compensation different from the compensation provided under the trustee's agreement if the prior agreement proves to have been improvident in light of development unanticipatable at the time of the agreement. The court's power includes the power to increase as well as decrease the agreed upon compensation. This provision is permissive, not mandatory, and should not be used by the court if to do so would violate the code of ethics of the professional involved.

Subsection (b) limits a trustee that has been authorized to serve as his own counsel to only one fee for each service. The purpose of permitting the trustee to serve as his own counsel is to reduce costs. It is not included to provide the trustee with a bonus by permitting him to receive two fees for the same service or to avoid the maxima fixed in section 326. Thus, this subsection requires the court to differentiate between the trustee's services as trustee, and his services as trustee's counsel, and to fix compensation accordingly. Services that a trustee normally performs for an estate without assistance of counsel are to be compensated under the limits fixed in section 326. Only services that he performs that are normally performed by trustee's counsel may be compensated under the maxima imposed by this section.

Subsection (c) permits the court to deny compensation for services and reimbursement of expenses if the professional person is not disinterested of if he represents or holds an interst adverse to the estate on the matter on which he is employed. The subsection provides a penalty for conflicts of interest.

§ 329. *Debtor's transactions with attorneys*

This section, derived in large part from current Bankruptcy Act section 60d, requires the debtor's attorney to file with the court a statement of the compensation paid or agreed to be paid to the attorney for services in contemplation of and in connection with the case, and the source of the compensation. Payments to a debtor's attorney provide serious potential for evasion of creditor protection provisions of the bankruptcy laws, and serious potential for overreaching by the debtor's attorney, and should be subject to careful scrutiny.

Subsection (b) permits the court to deny compensation to the attorney, to cancel an agreement to pay compensation, or to order the return of compensation paid, if the compensation exceeds the reasonable value of the services provided. The return of payments already made are generally to the trustee for the benefit of the estate. However, if the property would not have come into the estate in any

**Ad Hoc Equity Group Exhibit 9**

40

event, the court will order it returned to the entity that made the payment.

The Bankruptcy Commission recommended a provision similar to this that would have also permitted an examination of the debtor's transactions with insiders. S. 236, 94th Cong., 1st sess. sec. 4–311(b) (1975). Its exclusion here is to permit it to be dealt with by the Rules of Bankruptcy Procedure. It is not intended that the provision be deleted entirely, only that the flexibility of the rules is more appropriate for such evidentiary matters.

§ *330. Compensation of officers*

Section 330 authorizes the court to award compensation for services and reimbursement of expenses of officers of the estate, and other professionals. The compensation is to be reasonable, for economy in administration is the basic objective. Compensation is to be for actual necessary services, based on the time spent, the nature, the extent and the value of the services rendered, and the cost of comparable services in nonbankruptcy cases. There are the criteria that have been applied by the courts as analytic aids in defining "reasonable" compensation.

The reference to "the cost of comparable services" in a nonbankruptcy case is not intended as a change of existing law. In a bankruptcy case fees are not a matter for private agreement. There is inherent a "public interest" that "must be considered in awarding fees," *Massachusetts Mutual Life Insurance Co.* v. *Brock*, 405 F. 2d 429, 432 (C.A. 5, 1968), cert. denied, 395 U.S. 906 (      ). An allowance is the result of a balance struck between moderation in the interest of the estate and its security holders and the need to be "generous enough to encourage" lawyers and others to render the necessary and exacting services that bankruptcy cases often require. *In re Yale Express System, Inc.*, 366 F. Supp. 1376, 1381 (S.D.N.Y. 1973).[19] The rates for similar kinds of services in private employment is one element, among others, in that balance. Compensation in private employment noted in subsection·(a) is a point of reference, not a controlling determinant of what shall be allowed·in·bankruptcy cases.

One of the·major reforms in 1938, especially for reorganization cases, was centralized control over fees in the bankruptcy courts. See *Brown* v. *Gerdes*, 321 U.S. 178, 182–184 (1944) ; *Leiman* v. *Guttman*, 336 U.S. 1, 4–9 (1949). It was intended to guard against a recurrence of "the many sordid chapters" in "the history of fees in corporate reorganizations." *Dickinson Industrial Site, Inc.* v. *Cowan*, 309 U.S. 382, 388 (1940). In the years since then the bankruptcy bar has flourished and prospered, and persons of merit and quality have not eschewed public service in bankruptcy cases merely because bankruptcy courts, in the interest of economy in administration, have not allowed them compensation that may be earned in the private economy of business or the professions. There is no reason to believe that, in generations to come, their successors will be less persuaded by the need to serve in the public interest because of stronger allures of private gain elsewhere.

---

[19] See also *In re Delta Food Processing Corp.*, 374 F. Supp. 76, 82 (N.D. Miss. 1974). *Brock, supra; In re Bemporad Carpet Mills, Inc.*, 434 F. 2d 988, 989–90 (C.A. 5, 1970).

**Ad Hoc Equity Group Exhibit 9**

DOCUMENT 52

41

Subsection (a) provides for compensation of paraprofessionals in order to reduce the cost of administering bankruptcy cases. Paraprofessionals can be employed to perform duties which do not require the full range of skills of a qualified professional. Some courts have not hesitated to recognize paraprofessional services as compensable under existing law. An explicit provision to that effect is useful and constructive.

The last sentence of subsection (a) provides that in the case of a public company—defined in section 1101(3)—the court shall refer, after a hearing, all applications to the Securities and Exchange Commission for a report, which shall be advisory only. In Chapter X cases in which the Commission has appeared, it generally filed reports on fee applications. Usually, courts have accorded the SEC's views substantial weight, as representing the opinion of a disinterested agency skilled and experienced in reorganization affairs. The last sentence intends for the advisory assistance of the Commission to be sought only in case of a public company in reorganization under chapter 11.

Subsection (b) reenacts section 249 of Chapter X of the Bankruptcy Act (11 U.S.C. 649). It is a codification of equitable principles designed to prevent fiduciaries in the case from engaging in the specified transactions since they are in a position to gain inside information or to shape or influence the course of the reorganization. *Wolf* v. *Weinstein*, 372 U.S. 633 (1963). The statutory bar of compensation and reimbursement is based on the principle that such transactions involve conflicts of interest. Private gain undoubtedly prompts the purchase or sale of claims or stock interests, while the fiduciary's obligation is to render loyal and disinterested service which his position of trust has imposed upon him. Subsection (b) extends to a trustee, his attorney, committees and their attorneys, or any other persons "acting in the case in a representative or fiduciary capacity." It bars compensation to any of the foregoing, who after assuming to act in such capacity has purchased or sold, directly or indirectly, claims against, or stock in the debtor. The bar is absolute. It makes no difference whether the transaction brought a gain or loss, or neither, and the court is not authorized to approve a purchase or sale, before or after the transaction. The exception is for an acquisition or transfer "otherwise" than by a voluntary purchase or sale, such as an acquistion by bequest. See *Otis & Co.* v. *Insurance Bldg. Corp.*, 110 F.2d 333, 335 (C.A. 1, 1940).

Subsection (c) is intended for no asset liquidation cases where minimal compensation for trustees is needed. The sum of $20 will be allowed in each case, which is double the amount provided under current law.

§ *331. Interim compensation*

Section 331 permits trustees and professional persons to apply to the court not more than once every 120 days for interim compensation and reimbursement payments. The court may permit more frequent applications if the circumstances warrant, such as in very large cases where the legal work is extensive and merits more frequent payments. The court is authorized to allow and order disbursement to the applicant of compensation and reimbursement that is otherwise allowable

42

under section 330. The only effect of this section is to remove any doubt that officers of the estate may apply for, and the court may approve, compensation and reimbursement during the case, instead of being required to wait until the end of the case, which in some instances, may be years. The practice of interim compensation is followed in some courts today, but has been subject to some question. This section explicitly authorizes it.

This section will apply to professionals such as auctioneers and appraisers only if they are not paid on a per job basis.

§ 341. *Meetings of creditors and equity security holders*

Section (a) of this section requires that there be a meeting of creditors within a reasonable time after the order for relief in the case. The Bankruptcy Act and the current Rules of Bankruptcy Procedure provide for a meeting of creditors, and specify the time and manner of the meeting, and the business to be conducted. This bill leaves those matters to the rules. Under section 405(d) of the bill, the present rules will continue to govern until new rules are promulgated. Thus, pending the adoption of different rules, the present procedure for the meeting will continue.

Subsection (b) authorizes the court to order a meeting of equity security holders in cases where such a meeting would be beneficial or useful, for example, in a chapter 11 reorganization case where it may be necessary for the equity security holders to organize in order to be able to participate in the negotiation of a plan of reorganization.

Subsection (c) makes clear that the bankruptcy judge is to preside at the meeting of creditors.

§ 342. *Notice*

Subsection (a) of section 342 requires the clerk of the bankruptcy court to give notice of the order for relief. The rules will prescribe to whom the notice should be sent and in what manner notice will be given. The rules already prescribe such things, and they will continue to govern unless changed as provided in section 404(a) of the bill. Due process will certainly require notice to all creditors and equity security holders. State and Federal governmental representatives responsible for collecting taxes will also receive notice. In cases where the debtor is subject to regulation, the regulatory agency with jurisdiction will receive notice. In order to insure maximum notice to all parties in interest, the Rules will include notice by publication in appropriate cases and for appropriate issues. Other notices will be given as appropriate.

Subsections (b) and (c) are derived from section 21g of the Bankruptcy Act. They specify that the trustee may file notice of the commencement of the case in land recording offices in order to give notice of the pendency of the case to potential transferees of the debtor's real property. Such filing is unnecessary in the county in which the bankruptcy case is commenced. If notice is properly filed, a subsequent purchaser of the property will not be a bona fide purchaser. Otherwise, a purchaser, including a purchaser at a judicial sale, that has no knowledge of the case, is not prevented from obtaining the status of a bona fide purchaser by the mere commencement of the case. "County" is defined in title 1 of the United States Code to include other political subdivisions where counties are not used.

**Ad Hoc Equity Group Exhibit 9**

DOCUMENT 52

43

### § 343. *Examination of the debtor*

This section, derived from section 21a of the Bankruptcy Act, requires the debtor to appear at the meeting of creditors and submit to examination under oath. The purpose of the examination is to enable creditors and the trustee to determine if assets have improperly been disposed of or concealed or if there are grounds for objection to discharge. The scope of the examination under this section will be governed by the Rules of Bankruptcy Procedure, as it is today. *See* rules 205(d), 10–213(c), and 11–26. It is expected that the scope prescribed by these rules for liquidation cases, that is, "only the debtor's acts, conduct, or property, or any matter that may affect the administration of the estate, or the debtor's right to discharge" will remain substantially unchanged. In reorganization cases the examination would be broader, including inquiry into the liabilities and financial condition of the debtor, the operation of his business, and the desirability of the continuance thereof, and other matters relevant to the case and to the formulation of the plan. Examination of other persons in connection with the bankruptcy case is left completely to the rules, just as examination of witnesses in civil cases is governed by the Federal Rules of Civil Procedure.

### § 344. *Self-incrimination; immunity*

Part V of title 18 of the United States Code governs the granting of immunity to witnesses before Federal tribunals. The immunity provided under part V is only use immunity, not transactional immunity. Part V applies to all proceedings before Federal courts, before Federal grand juries, before administrative agencies, and before Congressional committees. It requires the Attorney General or the U.S. attorney to request or to approve any grant of immunity, whether before a court, grand jury, agency, or congressional committee.

This section carries part V over into bankruptcy cases. Thus, for a witness to be ordered to testify before a bankruptcy court in spite of a claim of privilege, the U.S. attorney for the district in which the court sits would have to request from the district court for that district the immunity order. The rule would apply to both debtors, creditors, and any other witnesses in a bankruptcy case. If the immunity were granted, the witness would be required to testify. If not, he could claim the privilege against self-incrimination.

Part V is a significant departure from current law. Under section 7a(10) of the Bankruptcy Act, a debtor is required to testify in all circumstances, but any testimony he gives may not be used against him in any criminal proceeding, except testimony given in any hearing on objections to discharge. With that exception, section 7a(10) amounts to a blanket grant of use immunity to all debtors. Immunity for other witnesses in bankruptcy courts today is governed by part V of title 18.

The consequences of a claim of privileges by a debtor under proposed law and under current law differ as well. Under section 14c(6) of current law, any refusal to answer a material question approved by the court will result in the denial of a discharge, even if the refusal is based on the privilege against self incrimination. Thus, the debtor is confronted with the choice between losing his discharge and opening himself up to possible criminal prosecution.

**Ad Hoc Equity Group Exhibit 9**

44

Under section 727(a)(6) of the proposed title 11, a debtor is only denied a discharge if he refuses to tesify after having been granted immunity. If the debtor claims the privilege and the U.S. attorney does not request immunity from the district courts, then the debtor may refuse to testify and still retain his right to a discharge. It removes the Scylla and Charibdis choice for debtors that exists under the Bankruptcy Act.

*§ 345. Money of estates .*

This section is a significant departure from section 61 of the Bankruptcy Act. It permits a trustee in a bankruptcy case to make such deposit of investment of the money of the estate for which he serves as will yield the maximum reasonable net return on the money, taking into account the safety of such deposit or investment. Under current law, the trustee is permitted to deposit money only with banking institions. Thus, the trustee is generally unable to secure a high rate of return on money of estates pending distribution, to the detriment of creditors. Under this section, the trustee may make deposits in savings and loans, may purchase government bonds, or make such other deposit or investment as is appropriate. Under proposed 11 U.S.C. 541 (a)(6), and except as provided in subsection (c) of this section, any interest or gain realized on the deposit or investment of funds under this section will become property of the estate, and will thus enhance the recovery of creditors.

In order to protect the creditors, subsection (b) requires certain precautions against loss of the money so deposited or invested. The trustee must require from a person with which he deposits or invests money of an estate a bond in favor of the United States secured by approved corporate surety and conditioned on a proper accounting for all money deposited or invested and for any return on such money. Alternately, the trustee may require the deposit of securities of the kind specified in section 15 of title 6 of the United States Code, which governs the posting of security by banks that receive public moneys on deposit. These bonding requirements do not apply to deposits or investments that are insured or guaranteed the United States or a department, agency, or intrumentality of the United States, or that are backed by the full faith and credit of the United States.

These provisions do not address the question of aggregation of funds by a private chapter 13 trustee and are not to be construed as excluding such possibility. The Rules of Bankruptcy Procedure may provide for aggregation under appropriate circumstances and adequate safeguards in cases where there is a significant need, such as in districts in which there is a standing chapter 13 trustee. In such case, the interest or return on the funds would help defray the cost of administering the cases in which the standing trustee serves.

*§ 346. Special tax provisions*

Subsection (a) indicates that subsections (b), (c), (d), (e), (g), (h), (i), and (j) apply notwithstanding any State or local tax law, but are subject to Federal tax law.

Subsection (b)(1) provides that in a case concerning an individual under chapter 7 or 11 of title 11, income of the estate is taxable only to the estate and not to the debtor. The second sentence of the para-

DOCUMENT 52

45

graph provides that if such individual is a partner, the tax attributes of the partnership are distributable to the partner's estate rather than to the partner, except to the extent that section 728 of title 11 provides otherwise.

Subsection (b) (2) states a general rule that the estate of an individual is to be taxed as an estate. The paragraph is made subject to the remainder of section 346 and section 728 of title 11.

Subsection (b) (3) requires the accounting method, but not necessarily the accounting period, of the estate to be the same as the method used by the individual debtor.

Subsection (c) (1) states a general rule that the estate of a partnership or a corporated debtor is not a separate entity for tax purposes. The income of the debtor is to be taxed as if the case were not commenced, except as provided in the remainder of section 346 and section 728.

Subsection (c) (2) requires the trustee, except as provided in section 728 of title 11, to file all tax returns on behalf of the partnership or corporation during the case.

Subsection (d) indicates that the estate in a chapter 13 case is not a separate taxable entity and that all income of the estate is to be taxed to the debtor.

Subsection (e) establishes a business deduction consisting of allowed expenses of administration except for tax or capital expenses that are not otherwise deductible. The deduction may be used by the estate when it is a separate taxable entity or by the entity to which the income of the estate is taxed when it is not.

Subsection (f) imposes a duty on the trustee to comply with any Federal, State, or local tax law requiring withholding or collection of taxes from any payment of wages, salaries, commissions, dividends, interest, or other payments. Any amount withheld is to be paid to the taxing authority at the same time and with the same prioriy as the claim from which such amount withheld was paid.

Subsection (g) (1) (A) indicates that neither gain nor loss is recognized on the transfer by law of property from the debtor or a creditor to the estate. Subparagraph (B) provides a similar policy if the property of the estate is returned from the estate to the debtor other than by a sale of property to debtor. Subparagraph (C) also provides for nonrecognition of gain or loss in a case under chapter 11 if a corporate debtor transfers property to a successor corporation or to an affiliate under a joint plan. An exception is made to enable a taxing authority to cause recognition of gain or loss to the extent provided in IRC section 371 (as amended by section 109 of this bill).

Subsection (g) (2) provides that any of the three kinds of transferees specified in paragraph (1) take the property with the same character, holding period, and basis in the hands of the transferor at the time of such transfer. The transferor's basis may be adjusted under section 346(j) (5) even if the discharge of indebtedness occurs after the transfer of property. Of course, no adjustment will occur if the transfer is from the debtor to the estate or if the transfer is from an entity that is not discharged.

Subsection (h) provides that the creation of the estate of an individual under chapters 7 or 11 of title 11 as a separate taxable entity

46

does not affect the number of taxable years for purposes of computing loss carryovers or carrybacks. The section applies with respect to carryovers or carrybacks of the debtor transferred into the estate under section 346(i)(1) of title 11 or back to the debtor under section 346(i)(2) of title 11.

Subsection (i)(1) states a general rule that an estate that is a separate taxable entity nevertheless succeeds to all tax attributes of the debtor. The six enumerated attributes are illustrative and not exhaustive.

Subsection (i)(2) indicates that attributes passing from the debtor into an estate that is a separate taxable entity will return to the debtor if unused by the estate. The debtor is permitted to use any such attribute as though the case had not been comenced.

Subsection (i)(3) permits an estate that is a separate taxable entity to carryback losses of the estate to a taxable period of the debtor that ended before the case was filed. The estate is treated as if it were the debtor with respect to time limitations and other restrictions. The section makes clear that the debtor may not carryback any loss of his own from a tax year during the pendency of the case to such a period until the case is closed. No tolling of any period of limitation is provided with respect to carrybacks by the debtor of post-petition losses.

Subsection (j) sets forth seven special rules treating with the tax effects of forgiveness or discharge of indebtedness. The terms "forgiveness" and "discharge" are redundant, but are used to clarify that "discharge" in the context of a special tax provision in title 11 includes forgiveness of indebtedness whether or not such indebtedness is "discharged" in the bankruptcy sense.

Paragraph (1) states the general rule that forgiveness of indebtedness is not taxable except as otherwise provided in paragraphs (2)–(7). The paragraph is patterned after sections 268, 395, and 520 of the Bankruptcy Act.

Paragraph (2) disallows deductions for liabilities of a deductible nature in any year during or after the year of cancellation of such liabilities. For the purposes of this paragraph, "a deduction with respect to a liability" includes a capital loss incurred on the disposition of a capital asset with respect to a liability that was incurred in connection with the acquisition of such asset.

Paragraph (3) causes any net operating loss of a debtor that is an individual or corporation to be reduced by any discharge of indebtedness except as provided in paragraphs (2) or (4). If a deduction is disallowed under paragraph (2), then no double counting occurs. Thus, paragraph (3) will reflect the reduction of losses by liabilities that have been forgiven, including deductible liabilities or nondeductible liabilities such as repayment of principal on borrowed funds.

Paragraph (4) specifically excludes two kinds of indebtedness from reduction of net operating losses under paragraph (3) or from reduction of basis under paragraph (5). Subparagraph (A) excludes items of a deductible nature that were not deducted or that could not be deducted such as gambling losses or liabilities for interest owed to a relative of the debtor. Subparagraph (B) excludes indebtedness of a debtor that is an individual or corporation that resulted in deductions which did not offset income and that did not contribute to an unex-

DOCUMENT 52

47

pired net operating loss or loss carryover. In these situations, the debtor has derived no tax benefit so there is no need to incur an offsetting reduction.

Paragraph (5) provides a two-point test for reduction of basis. The paragraph replaces sections 270, 396, and 522 of the Bankruptcy Act. Subparagraph (A) sets out the maximum amount by which basis may be reduced—the total indebtedness forgiven less adjustments made under paragraphs (2) and (3). This avoids double counting. If a deduction is disallowed under paragraph (2) or a carryover is reduced under paragraph (3) then the tax benefit is neutralized, and there is no need to reduce basis. Subparagraph (B) reduces basis to the extent the debtor's total basis of assets before the discharge exceeds total preexisting liabilities still remaining after discharge of indebtedness. This is a "basis solvency" limitation which differs from the usual test of solvency because it measures against the remaining liabilities the benefit aspect of assets, their basis, rather than their value. Paragraph (5) applies so that any transferee of the debtor's property who is required to use the debtor's basis takes the debtor's basis reduced by the lesser of (A) and (B). Thus, basis will be reduced, but never below a level equal to undischarged liabilities.

Paragraph (6) specifies that basis need not be reduced under paragraph (5) to the extent the debtor treats discharged indebtedness as taxable income. This permits the debtor to elect whether to recognize income, which may be advantageous if the debtor anticipates subsequent net operating losses, rather than to reduce basis.

Paragraph (7) establishes two rules excluding from the category of discharged indebtedness certain indebtedness that is exchanged for an equity security issued under a plan or that is forgiven as a contribution to capital by an equity security holder. Subparagraph (A) creates the first exclusion to the extent indebtedness consisting of items not of a deductible nature is exchanged for an equity security, other than the interests of a limited partner in a limited partnership, issued by the debtor or is forgiven as a contribution to capital by an equity security holder. Subparagraph (B) excludes indebtedness consisting of items of a deductible nature, if the exchange of stock for debts has the same effect as a cash payment equal to the value of the equity security, in the amount of the fair market value of the equity security or, if less, the extent to which such exchange has such effect. The two provisions treat the debtor as if it had originally issued stock instead of debt. Subparagraph (B) rectifies the inequity under current law between a cash basis and accrual basis debtor concerning the issuance of stock in exchange for previous services rendered that were of a greater value than the stock. Subparagraph (B) also changes current law by taxing forgiveness of indebtedness to the extent that stock is exchanged for the accrued interest component of a security, because the recipient of such stock would not be regarded as having received money under the *Carman* doctrine.

### § 347. Unclaimed property

Section 347 is derived from Bankruptcy Act § 66. Subsection (a) requires the trustee to stop payment on any distribution check that is unpaid 90 days after the final distribution in a case under chapter

**Ad Hoc Equity Group Exhibit 9**

48

7 or 13. The unclaimed funds, and any other property of the estate are paid into the court and disposed of under chapter 129 of title 28, which requires the clerk of court to hold the funds for their owner for 5 years, after which they escheat to the Treasury.

Subsection (b) specifies that any property remaining unclaimed at the expiration of the time allowed in a chapter 9 or 11 case for presentation (exchange) of securities or the performance of any other act as a condition to participation in the plan reverts to the debtor or the entity acquiring the assets of the debtor under the plan. Conditions to participation under a plan include such acts as cashing a check, surrendering securities for cancellation, and so on. Similar provisions are found in section 96(d) and 205 of current law.

### § 348. Effect of conversion

This section governs the effect of the conversion of a case from one chapter of the bankruptcy code to another chapter. Subsection (a) specifies that the date of the filing of the petition, the commencement of the case, or the order for relief are unaffected by conversion, with some exceptions specified in subsections (b) and (c).

Subsection (b) lists certain sections in the operative chapters of the bankruptcy code in which there is a reference to "the order for relief under this chapter." In those sections, the reference is to be read as a reference to the conversion order if the case has been converted into the particular chapter. Subsection (c) specifies that notice is to be given of the conversion order the same as notice was given of the order for relief, and that the time the trustee (or debtor in possession) has for assuming or rejecting executory contracts recommences, thus giving an opportunity for a newly appointed trustee to familiarize himself with the case.

Subsection (d) provides for special treatment of claims that arise during chapter 11 or 13 cases before the case is converted to a liquidation case. With the exception of claims specified in proposed 11 U.S.C. 503(b) (administrative expenses), preconversion claims are treated the same as prepetition claims.

Subsection (e) provides that conversion of a case terminates the service of any trustee serving in the case prior to conversion.

### § 349. Effect of dismissal

Subsection (a) specifies that unless the court for cause orders otherwise, the dismissal of a case is without prejudice. The debtor is not barred from receiving a discharge in a later case of debts that were dischargeable in the case dismissed. Of course, this subsection refers only to pre-discharge dismissals. If the debtor has already received a discharge and it is not revoked, then the debtor would be barred under section 727(a) from receiving a discharge in a subsequent liquidation case for six years. Dismissal of an involuntary on the merits will generally not give rise to adequate cause so as to bar the debtor from further relief.

Subsection (b) specifies that the dismissal reinstates proceedings or custodianships that were superseded by the bankruptcy case, reinstates avoided transfers, reinstates voided liens, vacates any order, judgment, or transfer ordered as a result of the avoidance of a trans-

**Ad Hoc Equity Group Exhibit 9**

DOCUMENT 52

49

fer, and revests the property of the estate in the entity in which the property was vested at the commencement of the case. The court is permitted to order a different result for cause. The basic purpose of the subsection is to undo the bankruptcy case, as far as practicable, and to restore all property rights to the position in which they were found at the commencement of the case. This does not necessarily encompass undoing sales of property from the estate to a good faith purchaser. Where there is a question over the scope of the subsection, the court will make the appropriate orders to protect rights acquired in reliance on the bankruptcy case.

### § 350. Closing and reopening cases

Subsection (a) requires the court to close a bankruptcy case after the estate is fully administered and the trustee discharged. The Rules of Bankruptcy Procedure will provide the procedure for case closing. Subsection (b) permits reopening of the case to administer assets, to accord relief to the debtor, or for other cause. Though the court may permit reopening of a case so that the trustee may exercise an avoiding power, laches may constitute a bar to an action that has been delayed too long. The case may be reopened in the court in which it was closed. The rules will prescribe the procedure by which a case is reopened and how it will be conducted after reopening.

### § 361. Adequate protection

Sections 362, 363, and 364 require, in certain circumstances, that the court determine in noticed hearings whether the interest of a secured creditor or co-owner of property with the debtor is adequately protected in connection with the sale or use of property. The interests of which the court may provide protection in the ways described in this section include equitable as well as legal interests. For example, a right to enforce a pledge and a right to recover property delivered to a debtor under a consignment agreement or an agreement of sale or return are interests that may be entitled to protection. This section specifies means by which adequate protection may be provided but, to avoid placing the court in an administrative role, does not require the court to provide it. Instead, the trustee or debtor in possession or the creditor will provide or propose a protection method. If the party that is affected by the proposed action objects, the court will determine whether the protection provided is adequate. The purpose of this section is to illustrate means by which it may be provided and to define the limits of the concept.

The concept of adequate protection is derived from the fifth amendment protection of property interests as enunciated by the Supreme Court. See *Wright v. Union Central Life Ins. Co.*, 311 U.S. 273 (1940); *Louisville Joint Stock Land Bank* v. *Radford*, 295 U.S. 555 (1935).

The automatic stay also provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors. Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally. A race of diligence by creditors for the debtor's assets prevents that.

**Ad Hoc Equity Group Exhibit 9**

50

Subsection (a) defines the scope of the automatic stay, by listing the acts that are stayed by the commencement of the case. The commencement or continuation, including the issuance of process, of a judicial, administrative, or other proceeding against the debtor that was or could have been commenced before the commencement of the bankruptcy case is stayed under paragraph (1). The scope of this paragraph is broad. All proceedings are stayed, including arbitration, administrative, and judicial proceedings. Proceeding in this sense encompasses civil actions and all proceedings even if they are not before governmental tribunals.

The stay is not permanent. There is adequate provision for relief from the stay elsewhere in the section. However, it is important that the trustee have an opportunity to inventory the debtor's position before proceeding with the administration of the case. Undoubtedly the court will lift the stay for proceedings before specialized or nongovernmental tribunals to allow those proceedings to come to a conclusion. Any party desiring to enforce an order in such a proceeding would thereafter have to come before the bankruptcy court to collect assets. Nevertheless, it will often be more appropriate to permit proceedings to continue in their place of origin, when no great prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen forum and to relieve the bankruptcy court from many duties that may be handled elsewhere.

Paragraph (2) stays the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the bankruptcy case. Thus, execution and levy against the debtors' prepetition property are stayed, and attempts to collect a judgment from the debtor personally are stayed.

Paragraph (3) stays any act to obtain possession of property of the estate (that is, property of the debtor as of the date of the filing of the petition) or property from the estate (property over which the estate has control or possession). The purpose of this provision is to prevent dismemberment of the estate. Liquidation must proceed in an orderly fashion. Any distribution of property must be by the trustee after he has had an opportunity to familiarize himself with the various rights and interests involved and with the property available for distribution.

Paragraph (4) stays lien creation against property of the estate. Thus, taking possession to perfect a lien or obtaining court process is prohibited. To permit lien creation after bankruptcy would give certain creditors preferential treatment by making them secured instead of unsecured.

Paragraph (5) stays any act to create or enforce a lien against property of the debtor, that is, most property that is acquired after the date of the filing of the petition, property that is exempted, or property that does not pass to the estate, to the extent that the lien secures a prepetition claim. Again, to permit postbankruptcy lien creation or enforcement would permit certain creditors to receive preferential treatment. It may also circumvent the debtors' discharge.

Paragraph (6) prevents creditors from attempting in any way to collect a prepetition debt. Creditors in consumer cases occasionally telephone debtors to encourage repayment in spite of bankruptcy. Inexperienced, frightened, or ill-counseled debtors may succumb to sug-

**Ad Hoc Equity Group Exhibit 9**

DOCUMENT 52

51

gestions to repay notwithstanding their bankruptcy. This provision prevents evasion of the purpose of the bankruptcy laws by sophisticated creditors.

Paragraph (7) stays setoffs of mutual debts and credits between the debtor and creditors. As with all other paragraphs of subsection (a), this paragraph does not affect the right of creditors. It simply stays its enforcement pending an orderly examination of the debtor's and creditors' rights.

Subsection (b) lists seven exceptions to the automatic stay. The effect of an exception is not to make the action immune from injunction.

The court has ample other powers to stay actions not covered by the automatic stay. Section 105, of proposed title 11, derived from Bankruptcy Act § 2a(15), grants the power to issue orders necessary or appropriate to carry out the provisions of title 11. The district court and the bankruptcy court as its adjunct have all the traditional injunctive powers of a court of equity, 28 U.S.C. §§ 151 and 164 as proposed in S. 2266, § 201, and 28 U.S.C. § 1334, as proposed in S. 2266, § 216. Stays or injunctions issued under these other sections will not be automatic upon the commencement of the case, but will be granted or issued under the usual rules for the issuance of injunctions. By excepting an act or action from the automatic stay, the bill simply requires that the trustee move the court into action, rather than requiring the stayed party to request relief from the stay. There are some actions, enumerated in the exceptions, that generally should not be stayed automatically upon the commencement of the case, for reasons of either policy or practicality. Thus, the court will have to determine on a case-by-case basis whether a particular action which may be harming the estate should be stayed.

With respect to stays issued under other powers, or the application of the automatic stay, to governmental actions, this section and the other sections mentioned are intended to be an express waiver of sovereign immunity of the Federal Government, and an assertion of the bankruptcy power over State governments under the supremacy clause notwithstanding a State's sovereign immunity.

The first exception is of criminal proceedings against the debtor. The bankruptcy laws are not a haven for criminal offenders, but are designed to give relief from financial overextension. Thus, criminal actions and proceedings may proceed in spite of bankruptcy.

Paragraph (2) excepts from the stay the collection of alimony, maintenance or support from property that is not property of the estate. This will include property acquired after the commencement of the case, exempted property, and property that does not pass to the estate. The automatic stay is one means of protecting the debtor's discharge. Alimony, maintenance and support obligations are excepted from discharge. Staying collection of them, when not to the detriment of other creditors (because the collection effort is against property that is not property of the estate), does not further that goal. Moreover, it could lead to hardship on the part of the protected spouse or children.

Paragraph (3) excepts any act to perfect an interest in property to the extent that the trustee's rights and powers are limited under section 546(a) of the bankruptcy code. That section permits postpetition perfection of certain liens to be effective against the trustee. If

**Ad Hoc Equity Group Exhibit 9**

· 52

the act of perfection, such as filing, were stayed, the section would be nullified.

Paragraph (4) excepts commencement or continuation of actions and proceedings by governmental units to enforce police or regulatory powers. Thus, where a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws, or attempting to fix damages for violation of such a law, the action or proceeding is not stayed under the automatic stay.

Paragraph (5) makes clear that the exception extends to permit an injunction and enforcement of an injunction, and to permit the entry of a money judgment, but does not extend to permit enforcement of a money judgment. Since the assets of the debtor are in the possession and control of the bankruptcy court, and since they constitute a fund out of which all creditors are entitled to share, enforcement by a governmental unit of a money judgment would give it preferential treatment to the detriment of all other creditors.

Paragraph (6) excepts the setoff of any mutual debt and claim for commodity transactions.

Paragraph (7) excepts actions by the Secretary of Housing and Urban Development to foreclose or take possession in a case of a loan insured under the National Housing Act. A general exception for such loans is found in current sections 263 and 517, the exception allowed by this paragraph is much more limited.

Subsection (c) of section 362 specifies the duration of the automatic stay. Paragraph (1) terminates a stay of an act against property of the estate when the property ceases to be property of the estate, such as by sale, abandonment, or exemption. It does not terminate the stay against property of the debtor if the property leaves the estate and goes to the debtor. Paragraph (2) terminates the stay of any other act on the earliest of the time the case is closed, the time the case is dismissed, or the time a discharge is granted or denied (unless the debtor is a corporation or partnership in a chapter 7 case).

Subsection (c) governs automatic termination of the stay. Subsections (d) through (g) govern termination of the stay by the court on the request of a party in interest.

Subsection (d) requires the court, upon motion of a party in interest, to grant relief from the stay for cause, such as by terminating, annulling, modifying, or conditioning the stay. The lack of adequate protection of an interest in property is one cause for relief, but is not the only cause. Other causes might include the lack of any connection with or interference with the pending bankruptcy case. Generally, proceedings in which the debtor is a fiduciary, or involving postpetition activities of the debtor, need not be stayed because they bear no relationship to the purpose of the automatic stay, which is protection of the debtor and his estate from his creditors.

Upon the court's finding that the debtor has no equity in the property subject to the stay and that the property is not necessary to an effective reorganization of the debtor, the subsection requires the court grant relief from the stay. To aid in this determination, guidelines are established where the property subject to the stay is real

DOCUMENT 52

53

property. An exception to "the necessary to an effective reorganization" requirement is made for real property on which no business is being conducted other than operating the real property and activities incident thereto. The intent of this exception is to reach the single-asset apartment type cases which involve primarily tax-shelter investments and for which the bankruptcy laws have provided a too facile method to relay conditions, but not the operating shopping center and hotel cases where attempts at reorganization should be permitted. Property in which the debtor has equity but which is not necessary to an effective reorganization of the debtor should be sold under section 363. Hearings under this subsection are given calendar priority to ensure that court congestion will not unduly prejudice the rights of creditors who may be obviously entitled to relief from the operation of the automatic stay.

Subsection (e) provides protection that is not always available under present law. The subsection sets a time certain within which the bankruptcy court must rule on the adequacy of protection provided for the secured creditor's interest. If the court does not rule within 30 days from a request by motion for relief from the stay, the stay is automatically terminated with respect to the property in question. To accommodate more complex cases, the subsection permits the court to make a preliminary ruling after a preliminary hearing. After a preliminary hearing, the court may continue the stay only if there is a reasonable likelihood that the party opposing relief from the stay will prevail at the final hearing. Because the stay is essentially an injunction, the three stages of the stay may be analogized to the three stages of an injunction. The filing of the petition which gives rise to the automatic stay is similar to a temporary restraining order. The preliminary hearing is similar to the hearing on a preliminary injunction, and the final hearing and order are similar to the hearing and issuance or denial of a permanent injunction. The main difference lies in which party must bring the issue before the court. While in the injunction setting, the party seeking the injunction must prosecute the action, in proceedings for relief from the automatic stay, the enjoined party must move. The difference does not, however, shift the burden of proof. Subsection (g) leaves that burden on the party opposing relief from the stay (that is, on the party seeking continuance of the injunction) on the issue of adequate protection and existence of an equity. It is not, however, intended to be confined strictly to the constitutional requirement. This section and the concept of adequate protection are based as much on policy grounds as on constitutional grounds. Secured creditors should not be deprived of the benefit of their bargain. There may be situations in bankruptcy where giving a secured creditor an absolute right to his bargain may be impossible or seriously detrimental to the policy of the bankruptcy laws. Thus, this section recognizes the availability of alternate means of protecting a secured creditor's interest where such steps are a necessary part of the rehabilitative process. Though the creditor might not be able to retain his lien upon the specific collateral held at the time of filing, the purpose of the section is to insure that the secured creditor receives the value for which he bargained.

**Ad Hoc Equity Group Exhibit 9**

The section specifies two exclusive means of providing adequate protection, both of which may require an approximate determination of the value of the protected entity's interest in the property involved. The section does not specify how value is to be determined, nor does it specify when it is to be determined. These matters are left to case-by-case interpretation and development. In light of the restrictive approach of the section to the availability of means of providing adequate protection, this flexibility is important to permit the courts to adapt to varying circumstances and changing modes of financing.

Neither is it expected that the courts will construe the term value to mean, in every case, forced sale liquidation value or full going concern value. There is wide latitude between those two extremes although forced sale liquidation value will be a minimum.

In any particular case, especially a reorganization case, the determination of which entity should be entitled to the difference between the going concern value and the liquidation value must be based on equitable considerations arising from the facts of the case. Finally, the determination of value is binding only for the purposes of the specific hearing and is not to have a res judicata effect.

The first method of adequate protection outlined is the making of cash payments to compensate for the expected decrease in value of the opposing entity's interest. This provision is derived from *In re Bermec Corporation*, 445 F.2d 367 (2d Cir. 1971), though in that case it is not clear whether the payments offered were adequate to compensate the secured creditors for their loss. The use of periodic payments may be appropriate where, for example, the property in question is depreciating at a relatively fixed rate. The periodic payments would be to compensate for the depreciation and might, but need not necessarily, be in the same amount as payments due on the secured obligation.

The second method is the fixing of an additional or replacement lien on other property of the debtor to the extent of the decrease in value or actual consumption of the property involved. The purpose of this method is to provide the protected entity with an alternative means of realizing the value of the original property, if it should decline during the case, by granting an interest in additional property from whose value the entity may realize its loss. This is consistent with the view expressed in *Wright* v. *Union Central Life Ins. Co.*, 311 U.S. 273 (1940), where the Court suggested that it was the value of the secured creditor's collateral, and not necessarily his rights in specific collateral, that was entitled to protection.

The section makes no provision for the granting of an administrative priority as a method of providing adequate protection to an entity as was suggested in *In re Yale Express System, Inc.*, 384 F.2d 990 (2d Cir. 1967), because such protection is too uncertain to be meaningful.

### § 362. Automatic stay

The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment

DOCUMENT 52

55

or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.

The action commenced by the party seeking relief from the stay is referred to as a motion to make it clear that at the expedited hearing under subsection (e), and at hearings on relief from the stay, the only issue will be the lack of adequate protection, the debtor's equity in the property, and the necessity of the property to an effective reorganization of the debtor, or the existence of other cause for relief from the stay. This hearing will not be the appropriate time at which to bring in other issues, such as counterclaims against the creditor, which, although relevant to the question of the amount of the debt, concern largely collateral or unrelated matters. This approach is consistent with that taken in cases such as *In re Essex Properties, Ltd.*, 430 F. Supp. 1112 (N.D.Cal. 1977), that an action seeking relief from the stay is not the assertion of a claim which would give rise to the right or obligation to assert counterclaims. Those counterclaims are not to be handled in the summary fashion that the preliminary hearing under this provision will be. Rather, they will be the subject of more complete proceedings by the trustee to recover property of the estate or to object to the allowance of a claim. However, this would not preclude the party seeking continuance of the stay from presenting evidence on the existence of claims which the court may consider in exercising its discretion. What is precluded is a determination of such collateral claims on the merits at the hearing.

*§ 363. Use, sale, or lease of property*

This section defines the right and powers of the trustee with respect to the use, sale, or lease of property and the rights of other parties that have interests in the property involved. It applies in both liquidation and reorganization cases.

Subsection (a) defines "cash collateral" as cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents in which the estate and an entity other than the estate have an interest, such as a lien or a co-ownership interest. The definition is not restricted to property of the estate that is cash collateral on the date of the filing of the petition. Thus, if "non-cash" collateral is disposed of and the proceeds come within the definition of "cash collateral" as set forth in this subsection, the proceeds would be cash collateral as long as they remain subject to the original lien on the "non-cash" collateral under section 552(b). To illustrate, rents received from real property before or after the commencement of the case would be cash collateral to the extent that they are subject to a lien.

Subsection (b) permits the trustees to use, sell, or lease, other than in the ordinary course of business, property of the estate upon notice and opportunity for objections and hearing thereon.

Subsection (c) governs use, sale, or lease in the ordinary course of business. If the business of the debtor is authorized to be operated under § 721, 1108, or 1304 of the bankruptcy code, then the trustee may use, sell, or lease property in the ordinary course of business or enter

**Ad Hoc Equity Group Exhibit 9**

56

into ordinary course transactions without need for notice and hearing. This power is subject to several limitations. First, the court may restrict the trustee's powers in the order authorizing operation of the business. Second, with respect to cash collateral, the trustee may not use, sell, or lease cash collateral except upon court authorization after notice and a hearing, or with the consent of each entity that has an interest in such cash collateral. The same preliminary hearing procedure in the automatic stay section applies to a hearing under this subsection. In addition, the trustee is required to segregate and account for any cash collateral in the trustee's possession, custody, or control.

Under subsections (d) and (e), the use, sale, or lease of property is further limited by the concept of adequate protection. Sale, use, or lease of property in which an entity other than the estate has an interest may be effected only to the extent not inconsistent with any relief from the stay granted to that interest's holder. Moreover, the court may prohibit or condition the use, sale, or lease as is necessary to provide adequate protection of that interest. Again, the trustee has the burden of proof on the issue of adequate protection. Subsection (e) also provides that where a sale of the property is proposed, an entity that has an interest in such property may bid at the sale thereof and set off against the purchase price up to the amount of such entity's claim. No prior valuation under section 506(a) would limit this bidding right, since the bid at the sale would be determinative of value.

Subsection (f) permits sale of property free and clear of any interest in the property of an entity other than the estate. The trustee may sell free and clear if applicable nonbankruptcy law permits it, if the other entity consents, if the interest is a lien and the sale price of the property is greater than the amount secured by the lien, if the interest is in bona fide dispute, or if the other entity could be compelled to accept a money satisfaction of the interest in a legal or equitable proceeding. Sale under this subsection is subject to the adequate protection requirement. Most often, adequate protection in connection with a sale free and clear of other interests will be to have those interests attach to the proceeds of the sale.

At a sale free and clear of other interests, any holder of any interest in the property being sold will be permitted to bid. If that holder is the high bidder, he will be permitted to offset the value of his interest against the purchase price of the property. Thus, in the most common situation, a holder of a lien on property being sold may bid at the sale and, if successful, may offset the amount owed to him that is secured by the lien on the property (but may not offset other amounts owed to him) against the purchase price, and be liable to the trustee for the balance of the sale price, if any.

Subsection (g) permits the trustee to sell free and clear of any vested or contingent right in the nature of dower or curtesy.

Subsection (h) permits sale of a co-owner's interest in property in which the debtor had an undivided ownership interest such as a joint tenancy, a tenancy in common, or a tenancy by the entirety. Such a sale is permissible only if partition is impracticable, if sale of the estate's interest would realize significantly less for the estate that sale of the property free of the interests of the co-owners, and if the benefit to

DOCUMENT 52

57

the estate of such a sale outweighs any detriment to the co-owners. This subsection does not apply to a co-owner's interest in a public utility when a disruption of the utilities services could result.

Subsection (i) provides protections for co-owners and spouses with dower, curtesy, or community property rights. It gives a right of first refusal to the co-owner or spouse at the price at which the sale is to be consummated. Subsection (j) requires the trustee to distribute to the spouse or co-owner the appropriate portion of the proceeds of the sale, less certain administrative expenses.

Subsection (k) permits the trustee to use, sell, or lease property notwithstanding certain bankruptcy or ipso facto clauses that terminate the debtor's interest in the property or that work a forfeiture or modification of that interest. This subsection is not as broad as the anti-ipso facto provision in proposed 11 U.S.C. 541(c)(1).

Subsection (l) protects good faith purchasers of property sold under this section from a reversal on appeal of the sale authorization, unless the authorization for the sale and the sale itself were stayed pending appeal. The purchaser's knowledge of the appeal is irrelevant to the issue of good faith.

Subsection (m) is directed at collusive bidding on property sold under this section. It permits the trustee to void a sale if the price of the sale was controlled by an agreement among potential bidders. The trustees may also recover the excess of the value of the property over the purchase price, and may recover any costs, attorney's fees, or expenses incurred in voiding the sale or recovering the difference. In addition, the court is authorized to grant judgment in favor of the estate and against the collusive bidder if the agreement controlling the sale price was entered into in willful disregard of this subsection. The subsection does not specify the precise measure of damages, but simply provides for punitive damages, to be fixed in light of the circumstances.

§ 364.  Obtaining credit

This section is derived from provisions in current law governing certificates of indebtedness, but is much broader. It governs all obtaining of credit and incurring of debt by the estate.

Subsection (a) authorizes the obtaining of unsecured credit and the incurring of unsecured debt in the ordinary course of business if the business of the debtor is authorized to be operated under section 721, 1108, or 1304. The debts so incurred are allowable as administrative expenses under section 503(b)(1). The court may limit the estate's ability to incur debt under this subsection.

Subsection (b) permits the court to authorize the trustee to obtain unsecured credit and incur unsecured debts other than in the ordinary course of business, such as in order to wind up a liquidation case, or to obtain a substantial loan in an operating case. Debt incurred under this subsection is allowable as an administrative expense under section 503(b)(1).

Subsection (c) is closer to the concept of certificates of indebtedness in current law. It authorizes the obtaining of credit and the incurring of debt with some special priority, if the trustee is unable to obtain unsecured credit under subsection (a) or (b). The various priorities

Ad Hoc Equity Group Exhibit 9

58

are (1) with priority over any or all administrative expenses; (2) secured by a lien on unencumbered property of the estate; or (3) secured by a junior lien on encumbered property. The priorities granted under this subsection do not interfer with existing property rights.

Subsection (d) grants the court the authority to authorize the obtaining of credit and the incurring of debt with a superiority, that is a lien on encumbered property that is senior or equal to the existing lien on the property. The court may authorize such a super-priority only if the trustee is otherwise unable to obtain credit, and if there is adequate protection of the original lien holder's interest. Again, the trustee has the burden of proof on the issue of adequate protection.

Subsection (e) provides the same protection for credit extenders pending an appeal of an authorization to incur debt as is provided under section 363(l) for purchasers: the credit is not affected on appeal by reversal of the authorization unless the authorization and the incurring of the debt were stayed pending appeal. The protection runs to a good faith lender, whether or not he knew of the pendency of the appeal.

A claim arising as a result of lending or borrowing under this section will be a priority claim, as defined in proposed section 507(a)(1), even if the claim is granted a super-priority over administrative expenses and is to be paid in advance of other first priority claims.

### § 365. Executory contracts and unexpired leases

Subsection (a) of this section authorizes the trustee, subject to the court's approval, to assume or reject an executory contract or unexpired lease. Though there is no precise definition of what contracts are executory, it generally includes contracts on which performance remains due to some extent on both sides. A note is not usually an executory contract if the only performance that remains is repayment. Performance on one side of the contract would have been completed and the contract is no longer executory.

Because of the volatile nature of the commodities markets and the special provisions governing commodity broker liquidations in subchapter IV of chapter 7, the provisions governing distribution in section 765(a) will govern if any conflict between those provisions and the provisions of this section arise.

Subsections (b), (c), and (d) provide limitations on the trustee's powers. Subsection (b) requires the trustee to cure any default in the contract or lease and to provide adequate assurance of future performance if there has been a default, before he may assume. This provision does not apply to defaults under ipso facto or bankruptcy clauses, which is a significant departure from present law.

Subsection (b)(3) permits termination of leases entered into prior to the effective date of this title in liquidation cases if certain other conditions are met.

Subsection (b)(4) prohibits the trustee's assumption of an executory contract requiring the other party to make a loan or deliver equipment to or to issue a security of the debtor. The purpose of this subsection is to make it clear that a party to a transaction which is based upon the

DOCUMENT 52

59

financial strength of a debtor should not be required to extend new credit to the debtor whether in the form of loans, lease financing, or the purchase or discount of notes.

Subsection (b) (5) provides that in lease situations common to shopping centers, protections must be provided for the lessor if the trustee assumes the lease, including protection against decline in percentage rents, breach of agreements with other tenants, and preservation of the tenant mix. Protection for tenant mix will not be required in the office building situation.

Subsection (c) prohibits the trustee from assuming or assigning a contract or lease if applicable nonbankruptcy law excuses the other party from performance to someone other than the debtor, unless the other party consents. This prohibition applies only in the situation in which applicable law excuses the other party from performance independent of any restrictive language in the contract or lease itself.

Subsection (d) places time limits on assumption and rejection. In a liquidation case, the trustee must assume within 60 days (or within an additional 60 days, if the court, for cause, extends the time). If not assumed, the contract or lease is deemed rejected. In a rehabilitation case, the time limit is not fixed in the bill. However, if the other party to the contract or lease requests the court to fix a time, the court may specify a time within which the trustee must act. This provision will prevent parties in contractual or lease relationships with the debtor from being left in doubt concerning their status vis-a-vis the estate.

Subsection (e) invalidates ipso facto or bankruptcy clauses. These clauses, protected under present law, automatically terminate the contract or lease, or permit the other contracting party to terminate the contract or lease, in the event of bankruptcy. This frequently hampers rehabilitation efforts. If the trustee may assume or assign the contract under the limitations imposed by the remainder of the section, the contract or lease may be utilized to assist in the debtor's rehabilitation or liquidation.

The unenforcibility of ipso facto or bankruptcy clauses proposed under this section will require the courts to be sensitive to the rights of the nondebtor party to executory contracts and unexpired leases. If the trustee is to assume a contract or lease, the court will have to insure that the trustee's performance under the contract or lease gives the other contracting party the full benefit of his bargain.

This subsection does not limit the application of an ipso facto or bankruptcy clause if a new insolvency or receivership occurs after the bankruptcy case is closed. That is, the clause is not invalidated in toto, but merely made inapplicable during the case for the purposes of disposition of the executory contract or unexpired lease.

Subsection (f) partially invalidates restrictions on assignment of contracts or leases by the trustee to a third party. The subsection imposes two restrictions on the trustee: he must first assume the contract or lease, subject to all the restrictions on assumption found in the section, and adequate assurance of future performance must be provided to the other contracting party. Paragraph (3) of the subsection invalidates contractual provisions that permit termination or modification in the event of an assignment, as contrary to the policy of this subsection.

Ad Hoc Equity Group Exhibit 9

60

Subsection (g) defines the time as of which a rejection of an executory contract or unexpired lease constitutes a breach of the contract or lease. Generally, the breach is as of the date immediately preceding the date of the petition. The purpose is to treat rejection claims as prepetition claims. The remainder of the subsection specifies different times for cases that are converted from one chapter to another. The provisions of this subsection are not a substantive authorization to breach or reject an assumed contract. Rather, they prescribe the rules for the allowance of claims in case an assumed contract is breached, or if a case under chapter 11 in which a contract has been assumed is converted to a case under chapter 7 in which the contract is rejected.

Subsection (h) protects real property lessees of the debtor if the trustee rejects an unexpired lease under which the debtor is the lessor (or sublessor). The subsection permits the lessee to remain in possession of the leased property or to treat the lease as terminated by the rejection. The balance of the term of the lease referred to in paragraph (1) will include any renewal terms that are enforceable by the tenant, but not renewal terms if the landlord had an option to terminate. Thus, the tenant will not be deprived of his estate for the term for which he bargained. If the lessee remains in possession, he may offset the rent reserved under the lease against damages caused by the rejection, but does not have any affirmative rights against the estate for any damages after the rejection that result from the rejection.

Subsection (i) gives a purchaser of real property under a land installment sales contract similar protection. The purchaser, if the contract is rejected, may remain in possession or may treat the contract as terminated. If the purchaser remains in possession, he is required to continue to make the payments due, but may offset damages that occur after rejection. The trustee is required to deliver title, but is relieved of all other obligations to perform.

A purchaser that treats the contract as terminated is granted a lien on the property to the extent of the purchase price paid. A party with a contract to purchase land from the debtor has a lien on the property to secure the price already paid, if the contract is rejected and the purchaser is not yet in possession.

Subsection (k) relieves the trustee and the estate of liability for a breach of an assigned contract or lease that occurs after the assignment.

*§ 366. Utility service*

This section gives debtors protection from a cut-off of service by a utility because of the filing of a bankruptcy case. This section is intended to cover utilities that have some special position with respect to the debtor, such as an electric company, gas supplier, or telephone company that is a monopoly in the area so that the debtor cannot easily obtain comparable service from another utility. The utility may not alter, refuse, or discontinue service because of the nonpayment of a bill that would be discharged in the the bankruptcy case. Subsection (b) protects the utility company by requiring the trustee or the debtor to provide, within ten days, adequate assurance of payment for service provided after the date of the petition.

**Ad Hoc Equity Group Exhibit 9**

DOCUMENT 52

61

CHAPTER 5—CREDITORS, THE DEBTOR, AND THE ESTATE

SUBCHAPTER I—CREDITORS AND CLAIMS

*§ 501. Filing of proofs of claims or interests*

This section governs the means by which creditors and equity security holders present their claims or interests to the court. Subsection (a) permits a creditor to file a proof of claim or interest. An indenture trustee representing creditors may file a proof of claim on behalf of the creditors he represents.

This subsection is permissive only, and does not require filing of a proof of claim by any creditor. It permits filing where some purpose would be served, such as where a claim that appears on a list filed under proposed 11 U.S.C. 924 or 1111 was incorrectly stated or listed as disputed, contingent, or unliquidated, where a creditor with a lien is undersecured and asserts a claim for the balance of the debt owed him (his unsecured claim, as determined under proposed 11 U.S.C. 506(a)), or in a liquidation case where there will be a distribution of assets to the holders of allowed claims. In other instances, such as in no-asset liquidation cases, in situations where a secured creditor does not assert any claim against the estate and a determination of his claim is not made under proposed 11 U.S.C. 506, or in situations where the claim asserted would be subordinated and the creditor would not recover from the estate in any event, filing of a proof of claim may simply not be necessary. The Rules of Bankruptcy Procedure and practice under the law will guide creditors as to when filing is necessary and when it may be dispensed with. In general, however, unless a claim is listed in a chapter 9 or chapter 11 case and allowed as a result of the list, a proof of claim will be a prerequisite to allowance for unsecured claims, including priority claims and the unsecured portion of a claim asserted by the holder of a lien.

The Rules of Bankruptcy Procedure will set the time limits, the form, and the procedure for filing, which will determine whether claims are timely or tardily filed. The rules governing time limits for filing proofs of claims will continue to apply under section 405(d) of the bill. These previde a 6-month-bar date for the filing of tax claims.

Subsection (b) permits a codebtor, surety, or guarantor to file a proof of claim on behalf of the creditor to which he is liable if the creditor does not timely file a proof of claim.

In liquidation and individual repayment plan cases, the trustee or the debtor may file a proof of claim under subsection (c) if the creditor does not timely file. The purpose of this subsection is mainly to protect the debtor if the creditor's claim is nondischargeable. If the creditor does not file, there would be no distribution on the claim, and the debtor would have a greater debt to repay after the case is closed than if the claim were paid in part or in full in the case or under the plan.

Subsection (d) governs the filing of claims of the kinds specified in subsections (f), (g), (h), (i), or (j) of proposed 11 U.S.C. 502. The separation of this provision from the other claim-filing provisions in this section is intended to indicate that claims of the kind specified, which do not become fixed or do not arise until after the commence-

**Ad Hoc Equity Group Exhibit 9**

ment of the case, must be treated differently for filing purposes such as the bar date for filing claims. The rules will provide for later filing of claims of these kinds.

Subsection (e) gives governmental units (including tax authorities) at least six months following the date for the first meeting of creditors in a chapter 7 or chapter 13 case within which to file proof of claims.

### § 502. Allowance of claims or interests

A proof of claim or interest is prima facie evidence of the claim or interest. Thus, it is allowed under subsection (a) unless a party in interest objects. The rules and case law will determine who is a party in interest for purposes of objection to allowance. The case law is well developed on this subject today. As a result of the change in the liability of a general partner's estate for the debts of this partnership, see proposed 11 U.S.C. 723, the category of persons that are parties in interest in the partnership case will be expanded to include a creditor of a partner against whose estate the trustee of the partnership estate may proceed under proposed 11 U.S.C. 723(c).

Subsection (b) prescribes the grounds on which a claim may be disallowed. The court will apply these standards if there is an objection to a proof of claim. The burden of proof on the issue of allowance is left to the Rules of Bankruptcy Procedure. Under the current chapter XIII rules, a creditor is required to prove that his claim is free from usury, rule 13–301. It is expected that the rules will make similar provision for both liquidation and individual repayment plan cases. See Bankruptcy Act § 656(b); H.R. 31, 94th Cong., 1st sess., sec. 6–104(a) (1975).

Paragraph (1) requires disallowance if the claim is unenforceable against the debtor for any reason (such as usury, unconscionability, or failure of consideration) other than because it is contingent or unmatured. All such contingent or unmatured claims are to be liquidated by the bankruptcy court in order to afford the debtor complete bankruptcy relief; these claims are generally not provable under present law.

Paragraph (2) requires disallowance to the extent that the claim is for unmatured interest as of the date of the petition. Whether interest is matured or unmatured on the date of bankruptcy is to be determined without reference to any ipso facto or bankruptcy clause in the agreement creating the claim. Interest disallowed under this paragraph includes postpetition interest that is not yet due and payable, and any portion of prepaid interest that represents an original discounting of the claim, yet that would not have been earned on the date of bankruptcy. For example, a claim on a $1,000 note issued the day before bankruptcy would only be allowed to the extent of the cash actually advanced. If the original discount was 10 percent so that the cash advanced was only $900, then notwithstanding the face amount of note, only $900 would be allowed. If $900 was advanced under the note some time before bankruptcy, the interest component of the note would have to be prorated and disallowed to the extent it was for interest after the commencement of the case.

**Ad Hoc Equity Group Exhibit 9**

# DOCUMENT 52

63

Section 502(b) thus contains two principles of present law. First, interest stops accruing at the date of the filing of the petition, because any claim for unmatured interest is disallowed under this paragraph. Second, bankruptcy operates as the acceleration of the principal amount of all claims against the debtor. One unarticulated reason for this is that the discounting factor for claims after the commencement of the case is equivalent to contractual interest rate on the claim. Thus, this paragraph does not cause disallowance of claims that have not been discounted to a present value because of the irrebutable presumption that the discounting rate and the contractual interest rate (even a zero interest rate) are equivalent.

Paragraph (3) requires disallowance of a claim to the extent that the creditor may offset the claim against a debt owing to the debtor. This will prevent double recovery, and permit the claim to be filed only for the balance due. This follows section 68 of the Bankruptcy Act.

Paragraph (4) requires disallowance of a property tax claim to the extent that the tax due exceeds the value of the property. This too follows current law to the extent the property tax is ad valorem.

Paragraph (5) prevents overreaching by the debtor's attorneys and concealing of assets by debtors. It permits the court to examine the claim of a debtor's attorney independently of any other provision of this subsection, and to disallow it to the extent that it exceeds the reasonable value of the attorneys' services.

Postpetition alimony, maintenance or support claims are disallowed under paragraph (6). They are to be paid from the debtor's postpetition property, because the claims are nondischargeable.

Paragraph (7), derived from current law, limits the damages allowable to a landlord of the debtor. The history of this provision is set out at length in *Oldden v. Tonto Realty Co.*, 143 F.2d 916 (2d Cir. 1944). It is designed to compensate the landlord for his loss while not permitting a claim so large (based on a long-term lease) as to prevent other general unsecured creditors from recovering a dividend from the estate. The damages a landlord may assert from termination of a lease are limited to the rent reserved for the greater of one year or ten percent of the remaining lease term, not to exceed three years, after the earlier of the date of the filing of the petition and the date of surrender or repossession in a chapter 7 case and 3 years lease payments in a chapter 9, 11, or 13 case. The sliding scale formula for chapter 7 cases is new and designed to protect the long-term lessor. This subsection does not apply to limit administrative expense claims for use of the leased premises to which the landlord is otherwise entitled.

This paragraph will not overrule *Oldden*, or the proposition for which it has been read to stand: To the extent that a landlord has a security deposit in excess of the amount of his claim allowed under this paragraph, the excess comes into the estate. Moreover, his allowed claim is for his total damages, as limited by this paragraph. By virtue of proposed 11 U.S.C. 506(a) and 506(d), the claim will be divided into a secured portion and an unsecured portion in those cases in which the deposit that the landlord holds is less than his damages. As under *Oldden*, he will not be permitted to offset his actual damages against

64

his security deposit and then claim for the balance under this paragraph. Rather, his security deposit will be applied in satisfaction of the claim that is allowed under this paragraph.

As used in section 502(b)(7), the phrase "lease of real property" applies only to a "true" or "bona fide" lease and does not apply to financing leases of real property or interests therein, or to leases of such property which are intended as security.

Historically, the limitation on allowable claims of lessors of real property was based on two considerations. First, the amount of the lessor's damages on breach of a real estate lease was considered contingent and difficult to prove. Partly for this reason, claims of a lessor of real estate were not provable prior to the 1934 amendments to the Bankruptcy Act. Second, in a true lease of real property, the lessor retains all risk and benefits as to the value of the real estate at the termination of the lease. Historically, it was, therefore, considered equitable to limit the claims of a real estate lessor.

However, these considerations are not present in "lease financing" transactions where, in substance, the "lease" involves a sale of the real estate and the rental payments are in substance the payment of principal and interest on a secured loan or sale. In a financing lease the lessor is essentially a secured or unsecured creditor (depending upon whether his interest is perfected or not) of the debtor, and the lessor's claim should not be subject to the 502(b)(7) limitation. Financing "leases" are in substance installment sales or loans. The "lessors" are essentially sellers or lenders and should be treated as such for purposes of the bankruptcy law.

Whether a "lease" is true or bona fide lease or, in the alternative, a financing "lease" or a lease intended as security, depends upon the circumstances of each case. The distinction between a true lease and a financing transaction is based upon the economic substance of the transaction and not, for example, upon the locus of title, the form of the transaction or the fact that the transaction is denominated as a "lease". The fact that the lessee, upon compliance with the terms of the lease, becomes or has the option to become the owner of the leased property for no additional consideration or for nominal consideration indicates that the transaction is a financing lease or lease intended as security. In such cases, the lessor has no substantial interest in the leased property at the expiration of the lease term. In addition, the fact that the lessee assumes and discharges substantially all the risks and obligations ordinarily attributed to the outright ownership of the property is more indicative of a financing transaction than of a true lease. The rental payments in such cases are in substance payments of principal and interest either on a loan secured by the leased real property or on the purchase of the leased real property. See, e.g., Financial Accounting Standards Board Statement No. 13 and SEC Reg. S–X, 17 C.F.R. sec. 210.3–16(q) (1977) ; cf. *First National Bank of Chicago* v. *Irving Trust Co.*, 74 F. 2d 263 (2nd Cir. 1934) ; and Albenda and Lief, "Net Lease Financing Transactions Under the Proposed Bankruptcy Act of 1973," 30 Business Lawyer, 713 (1975).

Paragraph (8) is new. It tracks the landlord limitation on damages provision in paragraph (7) for damages resulting from the breach by the debtor of an employment contract, but limits the recovery to the

DOCUMENT 52

65

compensation reserved under an employment contract for the year following the earlier of the date of the petition and the termination of employment.

Subsection (c) requires the estimation of any claim liquidation of which would unduly delay the closing of the estate, such as a contingent claim. or any claim for which applicable law provides only an equitable remedy. such as specific performance. This subsection requires that all claims against the debtor be converted into dollar amounts.

Subsection (d) is derived from present law. It requires disallowance of a claim of a transferee of a voidable transfer in toto if the transferee has not paid the amount or turned over the property received as required under the sections under which the transferee's liability arises.

Subsection (e), also derived from present law, requires disallowance of the claim for reimbursement or contribution of a codebtor, surety or guarantor of an obligation of the debtor, unless the claim of the creditor on such obligation has been paid in full. The provision prevents competition between a creditor and his guarantor for the limited proceeds in the estate.

Subsection (f) specifies that "involuntary gap" creditors receive the same treatment as prepetition creditors. Under the allowance provisions of this subsection, knowledge of the commencement of the case will be irrelevant. The claim is to be allowed "the same as if such claim had arisen before the date of the filing of the petition." Under voluntary petition, proposed 11 U.S.C. 303(f), creditors must be permitted to deal with the debtor and be assured that their claims will be paid. For purposes of this subsection, "creditors" include governmental units holding claims for tax liabilities incurred during the period after the petition is filed and before the earlier of the order for relief or appointment of a trustee.

Subsection (g) gives entities injured by the rejection of an executory contract or unexpired lease, either under section 365 or under a plan or reorganization, a prepetition claim for any resulting damages, and requires that the injured entity be treated as a prepetition creditor with respect to that claim.

Subsection (h) gives a transferee of a setoff that is recovered by one trustee a prepetition claim for the amount recovered.

Subsection (i) answers the nonrecourse loan problem and gives the creditor an unsecured claim for the difference between the value of the collateral and the debt in response to the decision in *Great National Life Ins. Co.* v. *Pine Gate Associates, Ltd.*, Bankruptcy Case No. B75-4345A (N.D. Ga. Sept. 16, 1977).

The bill, as reported, deletes a provision in the bill as originally introduced (former sec. 502(i)) requiring a tax authority to file a proof of claim for recapture of an investment credit where, during title 11 proceedings, the trustee sells or otherwise disposes of property before the title 11 case began. The tax authority should not be required to submit a formal claim for a taxable event (a sale or other disposition of the asset) of whose occurrence the trustee necessarily knows better than the taxing authority. For procedural purposes, the recapture of investment credit is to be treated as an administrative expense, as to which only a request for payment is required.

**Ad Hoc Equity Group Exhibit 9**

66

### § 503. *Allowance of administrative expenses*

Subsection (a) of this section permits administrative expense claimants to file with the court a request for payment of an administrative expense. The Rules of Bankruptcy Procedure will specify the time, the form, and the method of such a filing.

Subsection (b) specifies the kinds of administrative expenses that are allowable in a case under the bankruptcy code. The subsection is derived mainly from section 64a(1) of the Bankruptcy Act, with some changes. The actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the order for relief, and any taxes on, measured by, or withheld from such wages, salaries, or commissions, are allowable as administrative expenses.

In general, administrative expenses include taxes which the trustee incurs in administering the debtor's estate, including taxes on capital gains from sales of property by the trustee and taxes on income earned by the estate during the case. Interest on tax liabilities and certain tax penalties incurred by the trustee are also included in this first priority.

Taxes which the Internal Revenue Service may find due after giving the trustee a so-called "quickie" tax refund and later doing an audit of the refund are also payable as administrative expenses. The tax code permits the trustee of an estate which suffers a net operating loss to carry back the loss against an earlier profit year of the estate or of the debtor and to obtain a tentative refund for the earlier year, subject, however, to a later full audit of the loss which led to the refund. The bill, in effect, requires the Internal Revenue Service to issue a tentative refund to the trustee (whether the refund was applied for by the debtor or by the trustee), but if the refund later proves to have been erroneous in amount, the Service can request that the tax attributable to the erroneous refund be payable by the estate as an administrative expense.

Postpetition payments to an individual debtor for services rendered to the estate are administrative expenses, and are not property of the estate when received by the debtor. This situation would most likely arise when the individual was a sole proprietor and was employed by the estate to run the business after the commencement of the case. An individual debtor in possession would be so employed, for example. *See Local Loan v. Hunt*, 292 U.S. 234, 243 (1943).

Compensation and reimbursement awarded officers of the estate under section 330 are allowable as administrative expenses. Actual, necessary expenses, other than compensation of a professional person, incurred by a creditor that files an involuntary petition, by a creditor that recovers property for the benefit of the estate, by a creditor that acts in connection with the prosecution of a criminal offense relating to the case, by a creditor, indenture, trustee, equity security holder, or committee of creditors or equity security holders (other than official committees) that makes a substantial contribution to a reorganization or municipal debt adjustment case, or by a superseded custodian, are all allowable administrative expenses. The phrase "substantial contribution in the case" is derived from Bankruptcy Act §§ 242 and 243. It does not require a contribution that leads to confirmation of a plan,

**Ad Hoc Equity Group Exhibit 9**

DOCUMENT 52

67

for in many cases, it will be a substantial contribution if the person involved uncovers facts that would lead to a denial of confirmation, such as fraud in connection with the case.

Paragraph (4) permits reasonable compensation for professional services rendered by an attorney or an accountant of an equity whose expense is compensable under the previous paragraph. Paragraph (5) permits reasonable compensation for an indenture trustee in making a substantial contribution in a reorganization or municipal debt adjustment case. Finally, paragraph (6) permits witness fees and mileage as prescribed under chapter 119 of title 28.

*Section 504. Sharing of compensation*

Section 504 prohibits the sharing of compensation, or fee splitting, among attorneys, other professionals, or trustees. The section provides only two exceptions: partners or associates in the same professional association, partnership, or corporation may share compensation inter se; and attorneys for petitioning creditors that join in a petition commencing an involuntary case may share compensation.

*Section 505. Determination of tax liability*

Subsections (a) and (b) are derived, with only stylistic changes, from section 2a (2A) of the Bankruptcy Act. They permit determination by the bankruptcy court of any unpaid tax liability of the debtor that has not been contested before or adjudicated by a judicial or administrative tribunal of competent jurisdiction before the bankruptcy case, and the prosecution by the trustee of an appeal from an order of such a body if the time for review or appeal has not expired before the commencement of the bankruptcy case. As under current Bankruptcy Act § 2a(2A), *Arkansas Corporation Commissioner* v. *Thompson*, 313 U.S. 132 (1941), remains good law to permit abstention where uniformity of assessment is of significant importance.

Section (c) deals with procedures for obtaining a prompt audit of tax returns filed by the trustee in a liquidation or reorganization case. Under the bill as originally introduced, a trustee who is "in doubt" concerning tax liabilities of the estate incurred during a title 11 proceeding could obtain a discharge from personal liability for himself and the debtor (but not for the debtor or the debtor's successor in a reorganization), provided that certain administrative procedures were followed. The trustee could request a prompt tax audit by the local, State, or Federal governmental unit. The taxing authority would have to notify the trustee and the court within sixty days whether it accepted the return or desired to audit the returns more fully. If an audit were conducted, the tax office would have to notify the trustee of any tax deficiency within 4 months (subject to an extension of time if the court approved). These procedures would apply only to tax years completed on or before the case was closed and for which the trustee had filed a tax return.

The committee bill eliminates the "in doubt" rule and makes mandatory (rather than optional) the trustee's request for a prompt audit of the estate's tax returns. In many cases, the trustee could not be certain that his returns raised no doubt about possible tax issues. In

**Ad Hoc Equity Group Exhibit 9**

68

addition, it is desirable not to create a situation where the taxing authority asserts a tax liability against the debtor (as transferee of surplus assets, if any, returned to him) after the case is over; in any such situation, the debtor would be called on to defend a tax return which he did not prepare. Under the amendment, all disputes concerning these returns are to be resolved by the bankruptcy court, and both the trustee and the debtor himself do not then face potential post-bankruptcy tax liabilities based on these returns. This result would occur as to the debtor, however, only in a liquidation case.

In a reorganization in which the debtor or a successor to the debtor continues in existence, the trustee could obtain a discharge from personal liability through the prompt audit procedure, but the Treasury could still claim a deficiency against the debtor (or his successor) for additional taxes due on returns filed during the title 11 proceedings.

*Section 506. Determination of secured status*

Subsection (a) of this section separates an undersecured creditor's claim into two parts: He has a secured claim to the extent of the value of his collateral; and he has an unsecured claim for the balance of his claim. The subsection also provides for the valuation of claims which involve setoffs under section 553. While courts will have to determine value on a case-by-case basis, the subsection makes it clear that valuation is to be determined in light of the purpose of the valuation and the proposed disposition or use of the subject property. This determination shall be made in conjunction with any hearing on such disposition or use of property or on a plan affecting the creditor's interest. To illustrate, a valuation early in the case in a proceeding under sections 361–363 would not be binding upon the debtor or creditor at the time of confirmation of the plan. Throughout the bill, references to secured claims are only to the claim determined to be secured under this subsection, and not to the full amount of the creditor's claim. This provision abolishes the use of the terms "secured creditor" and "unsecured creditor" and substitutes in their places the terms "secured claim" and "unsecured claim."

Subsection (b) codifies current law by entitling a creditor with an oversecured claim to any reasonable fees (including attorney's fees), costs, or charges provided under the agreement under which the claim arose. These fees, costs, and charges aare secured claims to the extent that the value of the collateral exceeds the amount of the underlying claim.

Subsection (c) also codifies current law by permitting the trustee to recover from property the value of which is greater than the sum of the claims secured by a lien on that property the reasonable. necessary costs and expenses of preserving, or disposing of, the property. The recovery is limited to the extent of any benefit to the holder of such claim.

Subsection (d) provides that to the extent a secured claim is not allowed. its lien is void unless the holder had neither actual notice nor knowledge of the case, the lien was not listed by the debtor in a chapter 9 or 11 case or such claim was disallowed only under section 502(e).

*Section 507. Priorities*

Section 507 specifies the kinds of claims that are entitled to priority in distribution, and the order of their priority. Paragraph (1) grants first priority to allowed administrative expenses and to fees and

DOCUMENT 52

69

charges assessed against the estate under chapter 123 of title 28. Taxes included as administrative expenses under section 503(b)(1) of the bill generally receive the first priority, but the bill makes certain qualifications: Examples of these specially treated claims are the estate's liability for recapture of an investment tax credit claimed by the debtor before the title 11 case (this liability receives sixth priority) and the estate's employment tax liabilities on wages earned before, but paid after, the petition was filed (this liability generally receives the same priority as the wages).

"Involuntary gap" creditors, granted first priority under current law, are granted second priority by paragraph (2). This priority, covering claims arising in the ordinary course of the debtor's business or financial affairs after a title 11 case has begun but before a trustee is appointed or before the order for relief, includes taxes incurred during the conduct of such activities.

Paragraph (3) expands and increases the wage priority found in current section 64a(2). The amount entitled to priority is raised from $600 to $1800. The former figure was last adjusted in 1926. Inflation has made it nearly meaningless, and the bill brings it more than up to date. The three month limit of current law is retained, but is modified to run from the earlier of the date of the filing of the petition or the date of the cessation of the debtor's business. The priority is expanded to cover vacation, severance, and sick leave pay. The bill adds to the third priority so-called "trust fund" taxes, that is, withheld income taxes and the employees' share of the social security or railroad retirement taxes, but only to the extent that the wages on which taxes are imposed are themselves entitled to third priority.

The employer's share, the employment tax and the employer's share of the social security or railroad retirement tax on third priority compensation, is also included in the third priority category, but only if, and to the extent that the wages and related trust fund taxes have first been paid in full. Because of the claimants urgent need for their wages in the typical cases, the employer's taxes should not be paid before the wage claims entitled to priority, as well as the related trust fund taxes, are fully paid.

Paragraph (4) overrules *United States* v. *Embassy Restaurant*, 359 U.S. 29 (1958), which held that fringe benefits were not entitled to wage priority status. The bill recognizes the realities of labor contract negotiations, where fringe benefits may be substituted for wage demands. The priority granted is limited to claims for contributions to employee benefit plans such as pension plans, health or life insurance plans, and others, arising from services rendered within 120 days before the commencement of the case or the date of cessation of the debtor's business, whichever occurs first. The dollar limit placed on the total of all contributions payable under this paragraph is equal to the difference between the maximum allowable priority under paragraph (3), $1,800, times the number of employees covered by the plan less the actual distributions under paragraph (3) with respect to these employees.

Paragraph (5) is a new priority for consumer creditors—those who have deposited money in connection with the purchase, lease, or rental of property, or the purchase of services, for their personal, family, or

**Ad Hoc Equity Group Exhibit 9**

70

household use, that were not delivered or provided. The priority amount is not to exceed $600. In order to reach only those persons most deserving of this special priority, it is limited to individuals whose adjustable gross income from all sources derived does not exceed $20,-000. See *Senate Hearings*, testimony of Prof. Vern Countryman, at pp. 848–849. The income of the husband and wife should be aggregated for the purposes of the $20,000 limit if either or both spouses assert such a priority claim.

The sixth priority is for certain taxes. Priority is given to income taxes for a taxable year that ended on or before the date of the filing of the petition, if the last due date of the return for such year occurred not more than 3 years immediately before the date on which the petition was filed (§ 507(a)(6)(A)(i)). For the purposes of this rule, the last due date of the return is the last date under any extension of time to file the return which the taxing authority may have granted the debtor.

Employment taxes and transfer taxes (including gift, estate, sales, use and other excise taxes) are also given sixth priority if the transaction or event which gave rise to the tax occurred before the petition date, provided that the required return or report of such tax liabilities was last due within 3 years before the petition was filed or was last due after the petition date (§ 507(a)(6)(A)(ii).) The employment taxes covered under this rule are the employer's share of the social security and railroad retirement taxes and required employer payments toward unemployment insurance.

Priority is given to income taxes and other taxes of a kind described in section 507(a)(6)(A) (i) and (ii) which the Federal, State, or local tax authority had assessed within 3 years after the last due date of the return, that is, including any extension of time to file the return, if the debtor filed in title 11 within 240 days after the assessment was made (§ 507(a)(6)(B)(i)). This rule may bring into the sixth priority the debtor's tax liability for some taxable years which would not qualify for priority under the general three-year rule of section 507(a)(6)(A).

The sixth priority category also includes taxes which the tax authority was barred by law from assessing or collecting at any time during the 300 days before the petition under title 11 was filed (§ 507 (a)(6)(B)(ii)). In the case of certain Federal taxes, this preserves a priority for tax liabilities for years more than three years before the filing of the petition where the debtor and the Internal Revenue Service were negotiating over an audit of the debtor's returns or were engaged in litigation in the Tax Court. In such situations, the tax law prohibits the service's right to assess a tax deficiency until ninety days after the service sends the taxpayer a deficiency letter or, if the taxpayer files a petition in the Tax Court during that 90-day period, until the outcome of the litigation. A similar priority exists in present law, except that the taxing authority is allowed no time to assess and collect the taxes after the restrictions on assessment (discussed above) are lifted. Some taxpayers have exploited this loophole by filing in bankruptcy immediately after the end of the 90-day period or immediately after the close of Tax Court proceedings. The bill remedies this defect by preserving a priority for taxes the assessment of which was barred by law by giving the tax authority 300 days within

**Ad Hoc Equity Group Exhibit 9**

DOCUMENT 52

71

which to make the assessment after the lifting of the bar and then to collect or file public notice of its tax lien. Thus, if a taxpayer files a title 11 petition at any time during that 300-day period, the tax deficiency will be entitled to priority. If the petition is filed more than 300 days after the restriction on assessment was lifted, the taxing authority will not have priority for the tax deficiency.

Taxes for which an offer in compromise was withdrawn by the debtor, or rejected by a governmental unit, within 240 days before the petition date (§ 507(a)(6)(B)(iii)) will also receive sixth priority. This rule closes a loophole under present law under which, following an assessment of tax, some taxpayers have submitted a formal offer in compromise, dragged out negotiations with the taxing authority until the tax liability would lose priority under the three-year priority period of present law, and then filed in bankruptcy before the governmental unit could take collection steps.

Also included are certain taxes for which no return or report is required by law (§ 507(a)(6)(C)), if the taxable transaction occurred within three years before the petition was filed.

Taxes (not covered by the third priority) which the debtor was required by law to withhold or collect from others and for which he is liable in any capacity, regardless of the age of the tax claims (§ 507 (a)(6)(D)) are included. This category covers the so-called "trust fund" taxes, that is, income taxes which an employer is required to withhold from the pay of his employees, the employees' shares of social security and railroad retirement taxes, and also Federal unemployment insurance. This category also includes excise taxes which a seller of goods or services is required to collect from a buyer and pay over to a taxing authority.

This category also covers the liability of a responsible corporate officer under the Internal Revenue Code for income taxes or for the employees' share of employment taxes which, under the tax law, the employer was required to withhold from the wages of employees. This priority will operate where a person found to be a responsible officer has himself filed a petition under title 11, and the priority covers the debtor's liability as an officer under the Internal Revenue Code, regardless of the age of the tax year to which the tax relates.

The priority rules under the bill governing employment taxes can be summarized as follows: In the case of wages earned and actually paid before the petition under title 11 was filed, the liability for the employees' share of the employment taxes, regardless of the prepetition year in which the wages were earned and paid. The employer's share of the employment taxes on all wages earned and paid before the petition receive sixth priority; generally, these taxes will be those for which a return was due within three years before the petition. With respect to wages earned by employees before the petition but actually paid by the trustee after the title 11 case commenced, taxes required to be withheld receives the same priority as the wages themselves. Thus, the employees' share of taxes on third priority wages also receives third priority. Taxes on the balance of such wages receive no priority and are collectible only as general claims because the wages themselves are payable only as general claims and liability for the taxes arises only to the extent the wages are actually paid. The em-

**Ad Hoc Equity Group Exhibit 9**

72

ployer's share of employment taxes on third priority wages earned before the petition but paid after the petition was filed receives third priority, but only if the wages in this category have first been paid in full. Assuming there are sufficient funds to pay third priority wages and the related employer taxes in full, the employer's share of taxes on the balance of wage payments becomes a general claim (because the wages themselves are payable as general claims). Both the employees' and the employer's share of employment taxes on wages earned and paid after the petition was filed receive first priority as administrative expenses.

Also covered by this sixth priority are property taxes required to be assessed within 3 years before the filing of the petition (§ 507(a)(6)(E)).

Taxes attributable to a tentative carryback adjustment received by the debtor before the petition was filed, such as a "quickie refund" received under section 6411 of the Internal Revenue Code (§ 507(a)(6)(F)) are included. However, the tax claim against the debtor will re-in a prepetition loss year for which the tax return was last due, including extensions, within 3 years before the petition was filed.

Taxes resulting from a recapture, occasioned by a transfer during bankruptcy, of a tax credit or deduction taken during an earlier tax year (§ 507(a)(6)(G)) are included. A typical example occurs when there is a sale by the trustee of depreciable property during the case and depreciation deductions taken in prepetition years are subject to recapture under section 1250 of the Code.

Taxes owed by the debtor as a transferee of assets from another person who is liable for a tax, if the tax claim against the transferor would have received priority in a chapter 11 case commenced by the transferor within 1 year before the date of the petition filed by the transferee (§507(a)(6)(H)), are included.

Also included are certain tax payments required to have been made during the 1 year immediately before the petition was filed, where the debtor had previously entered into a deferred payment agreement (including an offer in compromise) to pay an agreed liability in periodic installments but had become delinquent in one or more installments before the petition was filed (§507(a)(6)(I)). This priority covers all types of deferred or part payment agreements. The priority covers only installments which first became due during the 1 year before the petition but which remained unpaid at the date of the petition. The priority does not come into play, however, if before the case began or during the case, the debtor and the taxing authority agree to a further extension of time to pay the delinquent amounts.

Certain tax-related liabilities which are not true taxes or which are not collected by regular assessment procedures (§ 507(a)(6)(J)) are included. One type of liability covered in this category is the liability under section 3505 of the Internal Revenue Code of a lender who pays wages directly to employees of another employer or who supplies funds to an employer for the payment of wages. Another is the liability under section 6332 of the Internal Revenue Code, of a person who fails to turn over money or property of the taxpayer in response to a levy. Since the taxing authority must collect such a liability from the third

party by suit rather than normal assessment procedures, an extra year is added to the normal 3-year priority periods. If a suit was commenced by the taxing authority within the four-year period and before the petition was filed, the priority is also preserved, provided that the suit had not terminated more than 1 year before the date of the filing of the petition.

Also included are certain unpaid customs duties which have not grown unreasonably "stale" (§ 507(a)(6)(K)). These include duties on imports entered for consumption with 3 years before the filing of the petition if the duties are still unliquidated on the petition date. If an import entry has been liquidated (in general, liquidation is in an administrative determination of the value and tariff rate of the item) or reliquidated, within two years of the filing of the petition the customs liability is given priority. If the Secretary of the Treasury certifies that customs duties were not liquidated because of an investigation into possible assessment of anti-dumping or countervailing duties, or because of fraud penalties, duties not liquidated for this reason during the five years before the importer filed under title 11 also will receive priority.

Subsection (a) of this section also provides specifically that interest on sixth priority tax claims accrued before the filing of the petition is also entitled to sixth priority.

Subsection (b) of this section provides that any fine or penalty which represents compensation for actual pecuniary loss of a governmental unit, and which involves a tax liability entitled to sixth priority, is to receive the same priority.

Subsection (b) also provides that a claim arising from an erroneous refund or credit of tax is to be given the same priority as the tax to which the refund or credit relates.

*Section 508. Effect of distribution in a foreign proceeding*

This section prohibits a creditor from receiving any distribution in the bankruptcy case if he has received payment of a portion of his claim in a foreign proceeding, until the other creditors in the bankruptcy case in this country that are entitled to share equally with that creditor have received as much as he has in the foreign proceeding.

*Section 509. Claims of codebtors*

Section 509 deals with codebtors generally, and is in addition to the disallowance provision in section 502(e). This section is based on the notion that the only rights available to a surety, guarantor, or comaker are contribution, reimbursement, and subrogation. The right that applies in a particular situation will depend on the agreement between the debtor and the codebtor, and on whether and how payment was made by the codebtor to the creditor. The claim of a surety or codebtor for contribution or reimbursement is discharged even if the claim is never filed, as is any claim for subrogation even if the surety or codebtor chooses to file a claim for contribution or reimbursement instead.

Subsection (a) subrogates the codebtor (whether as a codebtor, surety, or guarantor) to the rights of the creditor, to the extent of any payment made by the codebtor to the creditor. Whether the creditor's claim was filed under section 501(a) or 501(b) is irrelevant. The right

74

of subrogation will exist even if the primary creditor's claim is allowed by virtue of being listed under proposed 11 U.S.C. 924 or 1111, and not by reason of a proof of claim.

Subsection (b) permits a subrogated codebtor to receive payments in the bankruptcy case only if the creditor has been paid in full, either through payments under the bankruptcy code or otherwise.

## Section 510. *Subordination or disallowance of claims*

Subsection (a) requires the court to enforce subordination agreements. A subordination agreement will not be enforced, however, in a reorganization case in which the class that is the beneficiary of the agreement has accepted, as specified in proposed 11 U.S.C. 1126, a plan that waives their rights under the agreement. Otherwise, the agreement would prevent just what chapter 11 contemplates: that seniors may give up rights to juniors in the interest of confirmation of a plan and rehabilitation of the debtor. The subsection also requires the court to subordinate in payment any claim for rescission of a purchase or sale of a security of the debtor or of an affiliate, or for damages arising from the purchase or sale of such a security, to all claims and interests that are senior to the claim or interest represented by the security. Thus, the later subordination varies with the claim or interest involved: If the security is a debt instrument, the damages or rescission claim will be granted the status of a general unsecured claim. If the security is an equity security, the damages or rescission claim is subordinated to all creditors and treated the same as the equity security itself.

Subsection (b) authorizes the bankruptcy court, in ordering distribution of assets, to subordinate all or any part of any claim to all or any part of another claim, regardless of the priority ranking of either claim. In addition, any lien securing such a subordinated claim may be transferred to the estate. The bill provides, however, that any subordination ordered under this provision must be based on principles of equitable subordination. These principles are defined by case law, and have generally indicated that a claim may normally be subordinated only if its holder is guilty of misconduct. As originally introduced, the bill provided specifically that a tax claim may not be subordinated on equitable grounds. The bill deletes this express exception, but the effect under the amendment should be much the same in most situations since, under the judicial doctrine of equitable subordination, a tax claim would rarely be subordinated.

## § 511. *Certain employment tax credits*

This section prevents any reduction of the Federal tax credit against the Federal unemployment tax in a situation where the trustee makes a late payment of a contribution to a State unemployment compensation fund. Section 3302 of the Internal Revenue Code normally requires a reduction in the Federal credit for late contributions to a State fund (§ 3302). This reduction is, in substance, a penalty. However, it is inappropriate to impose the penalty on a trustee who may be barred from making a timely payment of the State contribution before the pendency of a title 11 case. The amendment made by the bill applies where the State and Federal unemployment tax contributions were paid by the trustee before or after the petition, regardless of whether the wages were earned before or after the petition.

**Ad Hoc Equity Group Exhibit 9**

DOCUMENT 52

75

*Section 521. Debtor's duties*

This section lists three duties of the debtor in a bankruptcy case. The Rules of Bankruptcy Procedure will specify the means of carrying out these duties. The first duty is to file with the court a list of creditors and. unless the court orders otherwise, a schedule of assets and liabilities and a statement of his financial affairs. Second, the debtor is required to cooperate with the trustee as necessary to enable the trustee to perform the trustee's duties. Finally, the debtor must surrender to the trustee all property of the estate, and any recorded information, including books, documents, records, and papers, relating to property of the estate. This phrase "recorded information, including books, documents, records, and papers," has been used here and throughout the bill as a more general term, and includes such other forms of recorded information as data in computer storage or in other machine readable forms.

The list in this section is not exhaustive of the debtor's duties. Others are listed elsewhere in proposed title 11, such as in section 343, which requires the debtor to submit to examination, or in the Rules of Bankruptcy Procedure, as continued by § 404(a) of S. 2266, such as the duty to attend any hearing on discharge, Rule 402(2).

*Section 522. Exemptions*

Subsection (a) of this section defines two terms: "dependent" includes the debtor's spouse, whether or not actually dependent; and "value" means fair market value as of the date of the filing of the petition.

Subsection (b) tracks current law. It permits a debtor the exemptions to which he is entitled under other Federal law and the law of the State of his domicile. Some of the items that may be exempted under Federal laws other than title 11 include:

Foreign Service Retirement and Disability payments, 22 U.S.C. 1104;

Social security payments, 42 U.S.C. 407;

Injury or death compensation payments from war risk hazards, 42 U.S.C. 1717;

Wages of fishermen, seamen, and apprentices, 46 U.S.C. 601;

Civil service retirement benefits, 5 U.S.C. 729, 2265;

Longshoremen's and Harbor Workers' Compensation Act death and disability benefits, 33 U.S.C. 916;

Railroad Retirement Act annuities and pensions, 45 U.S.C. 228 (L);

Veterans benefits, 45 U.S.C. 352(E);

Special pensions paid to winners of the Congressional Medal of Honor, 38 U.S.C. 3101; and

Federal homestead lands on debts contracted before issuance of the patent, 43 U.S.C. 175.

He may also exempt an interest in property in which the debtor had an interest as a tenant by the entirety or joint tenant to the extent that interest would have been exempt from process under applicable nonbankruptcy law.

Under proposed section 541, all property of the debtor becomes property of the estate, but the debtor is permitted to exempt certain

**Ad Hoc Equity Group Exhibit 9**

76

property from property of the estate under this section. Property may be exempted even if it is subject to a lien, but only the unencumbered portion of the property is to be counted in computing the "value" of the property for the purposes of exemption.

As under current law, the debtor will be permitted to convert non-exempt property into exempt property before filing a bankruptcy petition. The practice is not fraudulent as to creditors, and permits the debtor to make full use of the exemptions to which he is entitled under the law.

Subsection (c) insulates exempt property from prepetition claims other than tax claims (whether or not dischargeable), and other than alimony, maintenance, or support claims that are excepted from discharge. The bankruptcy discharge does not prevent enforcement of valid liens. The rule of *Long* v. *Bullard*, 117 U.S. 617 (1886), is accepted with respect to the enforcement of valid liens on nonexempt property as well as on exempt property. *Cf. Louisville Joint Stock Land Bank* v. *Radford*, 295 U.S. 555, 583 (1935).

Subsection (c)(3) permits the collection of dischargeable taxes from exempt assets Only assets exempted from levy under Section 6334 of the Internal Revenue Code or under applicable state or local tax law cannot be applied to satisfy these tax claims. This rule applies to prepetition tax claims against the debtor regardless of whether the claims do or do not receive priority and whether they are dischargeable or nondischargeable. Thus, even if a tax is dischargeable vis-a-vis the debtor's after-acquired assets, it may nevertheless be collectible from exempt property held by the estate. (Taxes incurred by the debtor's estate which are collectible as first priority administrative expenses are not collectible from the debtor's estate which are collectible as first priority administrative expenses are not collectible from the debtor's exempt assets.)

Subsection (d) protects the debtor's exemptions, either Federal or State, by making unenforceable in a bankruptcy case a waiver of exemptions or a waiver of the debtor's avoiding powers under the following subsections.

Subsection (e) protects the debtor's exemptions, his discharge, and thus his fresh start by permitting him to avoid certain liens on exempt property. The debtor may avoid a judicial lien on any property to the extent that the property could have been exempted in the absence of the lien, and may similarly avoid a nonpurchase-money security interest in certain household and personal goods. The avoiding power is independent of any waiver of exemptions.

Subsection (f) gives the debtor the ability to exempt property that the trustee recovers under one of the trustee's avoiding powers if the property was involuntarily transferred away from the debtor (such as by the fixing of a judicial lien) and if the debtor did not conceal the property. The debtor is also permitted to exempt property that the trustee recovers as the result of the avoiding of the fixing of certain security interests to the extent that the debtor could otherwise have exempted the property.

Subsection (g) provides that if the trustee does not exercise an avoiding power to recover a transfer of property that would be exempt, the debtor may exercise it and exempt the property, if the trans-

## DOCUMENT 52

77

fer was involuntary and the debtor did not conceal the property. If the debtor wishes to preserve his right to pursue any action under this provision, then he must intervene in any action brought by the trustee based on the same cause of action. It is not intended that the debtor be given an additional opportunity to avoid a transfer or that the transferee should have to defend the same action twice. Rather, the section is primarily designed to give the debtor the rights the trustee could have, but has not, pursued. The debtor is given no greater rights under this provision than the trustee, and thus, the debtor's avoiding powers under proposed sections 544, 545, 547, and 548, are subject to proposed 546, as are the trustee's powers.

These subsections are cumulative. The debtor is not required to choose which he will use to gain an exemption. Instead, he may use more than one in any particular instance, just as the trustee's avoiding powers are cumulative.

Subsection (h) permits recovery by the debtor of property transferred by an avoided transfer from either the initial or subsequent transferees. It also permits preserving a transfer for the benefit of the debtor. In either event, the debtor may exempt the property recovered or preserved.

Subsection (i) makes clear that the debtor may exempt property under the avoiding subsections (f) and (h) only to the extent he has exempted less property than allowed under subsection (b).

Subsection (j) makes clear that the liability of the debtor's exempt property is limited to the debtor's aliquot share of the costs and expenses recovery of property that the trustee recovers and the debtor later exempts, and any costs and expenses of avoiding a transfer by the debtor that the debtor has not already paid.

Subsection (k) requires the debtor to file a list of property that he claims as exempt from property of the estate. Absent an objection to the list, the property is exempted. A dependent of the debtor may file it and thus be protected if the debtor fails to file the list.

Subsection (l) provides the rule for a joint case.

*Section 523. Exceptions to discharge*

This section specifies which of the debtor's debts are not discharged in a bankruptcy case, and certain procedures for effectuating the section. The provision in Bankruptcy Act § 17c granting the bankruptcy courts jurisdiction to determine dischargeability is deleted as unnecessary, in view of the comprehensive grant of jurisdiction prescribed in proposed 28 U.S.C. 1334(b), which is adequate to cover the full jurisdiction that the bankruptcy courts have today over dischargeability and related issues under Bankruptcy Act § 17c. The Rules of Bankruptcy Procedure will specify, as they do today, who may request determinations of dischargeability, subject, of course, to proposed 11 U.S.C. 523(c), and when such a request may be made. Proposed 11 U.S.C. 350, providing for reopening of cases, provides one possible procedure for a determination of dischargeability and related issues after a case is closed.

Subsection (a) lists nine kinds of debts excepted from discharge. Taxes that are excepted from discharge are set forth in paragraph (1). These include claims against the debtor which receive priority in the second, third and sixth categories (§ 507(a)(3)(B) and (C) and (6).

78

These categories include taxes for which the tax authority failed to file a claim against the estate or filed its claim late. Whether or not the taxing authority's claim is secured will also not affect the claim's nondischargability if the tax liability in question is otherwise entitled to priority.

Also included in the nondischargable debts are taxes for which the debtor had not filed a required return as of the petition date, or for which a return had been filed beyond its last permitted due date (§ 523 (a)(1)(B)). For this purpose, the date of the tax year to which the return relates is immaterial. The late return rule applies, however, only to the late returns filed within three years before the petition was filed, and to late returns filed after the petition in title 11 was filed. For this purpose, the taxable year in question need not be one or more of the three years immediately preceding the filing of the petition.

Tax claims with respect to which the debtor filed a fraudulent return, entry or invoice, or fraudulently attempted to evade or defeat any tax (§ 523(a)(1)(C)) are included. The date of the taxable year with regard to which the fraud occurred is immaterial.

Also included are tax payments due under an agreement for deferred payment of taxes, which a debtor had entered into with the Internal Revenue Service (or State or local tax authority) before the filing of the petition and which relate to a prepetition tax liability §523(a)(1)(D)) are also nondischargeable. This classification applies only to tax claims which would have received priority under section 507(a) if the taxpayer had filed a title 11 petition on the date on which the deferred payment agreement was entered into. This rule also applies only to installment payments which become due during and after the commencement of the title 11 case. Payments which had become due within one year before the filing of the petition receive sixth priority, and will be nondischargeable under the general rule of section 523(a)(1)(A)).

The above categories of nondischargeability apply to customs duties as well as to taxes.

Paragraph (2) provides that as under Bankruptcy Act § 17a(2), a debt for obtaining money, property, services, or a refinancing extension or renewal of credit by false pretenses, a false representation, or actual fraud, or by use of a statement in writing respecting the debtor's financial condition that is materially false, on which the creditor reasonably relied, and which the debtor made or published with intent to deceive, is excepted from discharge. This provision is modified only slightly from current section 17a(2). First, "actual fraud" is added as a ground for exception from discharge. Second, the creditor must not only have relied on a false statement in writing, but the reliance must have been reasonable. This codifies case law construing present section 17a(2). Third, the phrase "in any manner whatsoever" that appears in current law after "made or published" is deleted as unnecessary, the word "published" is used in the same sense that it is used in defamation cases.

Unscheduled debts are excepted from discharge under paragraph (3). The provision, derived from section 17a(3), follows current law, but clarifies some uncertainties generated by the case law construing 17a(3). The debt is excepted from discharge if it was not scheduled in

DOCUMENT 52

79

time to permit timely action by the creditor to protect his rights, unless the creditor had notice or actual knowledge of the case.

Paragraph (4) excepts debts for fraud incurred by the debtor while acting in a fiduciary capacity or for defalcation, embezzlement, or misappropriation.

Paragraph (5) provides that debts for willful and malicious conversion or injury by the debtor to another entity or the property of another entity are nondischargeable. Under this paragraph "willful" means deliberate or intentional. To the extent that *Tinker* v. *Colwell*, 139 U.S. 473 (1902), held that a less strict standard is intended, and to the extent that other cases have relied on *Tinker* to apply a "reckless disregard" standard, they are overruled.

Paragraph (6) excepts from discharge debts to a spouse, former spouse, or child of the debtor for alimony to, maintenance for, or support of the spouse or child. This language, in combination with the repeal of section 456(b) of the Social Security Act (42 U.S.C. 656(b)) by section 326 of the bill, will apply to make nondischargeable only alimony, maintenance, or support owed directly to a spouse or dependent. What constitutes alimony, maintenance, or support, will be determined under the bankruptcy law, not State law. Thus, cases such as *In re Waller*, 494 F.2d 447 (6th Cir. 1974), are overruled, and the result in cases such as *Fife* v. *Fife*, 1 Utah 2d 281, 265 P.2d 642 (1952) is followed. The proviso, however, makes nondischargeable any debts resulting from an agreement by the debtor to hold the debtor's spouse harmless on joint debts, to the extent that the agreement is in payment of alimony, maintenance, or support of the spouse, as determined under bankruptcy law considerations as to whether a particular agreement to pay money to a spouse is actually alimony or a property settlement.

Paragraph (7) makes nondischargeable certain liabilities for penalties including tax penalties if the underlying tax with respect to which the penalty was imposed is also nondischargeable (sec. 523(a)(7)). These latter liabilities cover those which, but are penal in nature, as distinct from so-called "pecuniary loss" penalties which, in the case of taxes, involve basically the collection of a tax under the label of a "penalty." This provision differs from the bill as introduced, which did not link the nondischarge of a tax penalty with the treatment of the underlying tax. The amended provision reflects the existing position of the Internal Revenue Service as to tax penalties imposed by the Internal Revenue Code (Rev. Rul. 68–574, 1968–2 C.B. 595).

Paragraph (8) follows generally current law and excerpts from discharge student loans until such loans have been due and owing for five years. Such loans include direct student loans as well as insured and guaranteed loans. This provision is intended to be self-executing and the lender or institution is not required to file a complaint to determine the nondischargeability of any student loan.

Paragraph (9) excepts from discharge debts that the debtor owed before a previous bankruptcy case concerning the debtor in which the debtor was denied a discharge other than on the basis of the six-year bar.

Subsection (b) of this section permits discharge in a bankruptcy case of an unscheduled debt from a prior case. This provision is carried over from Bankruptcy Act § 17b. The result dictated by the sub-

80

section would probably not be different if the subsection were not included. It is included nevertheless for clarity.

Subsection (c) requires a creditor who is owed a debt that may be excepted from discharge under paragraph (2), (4), or (5), (false statements, defalcation or larceny misappropriation, or willful and malicious injury) to initiate proceedings in the bankruptcy court for an exception to discharge. If the creditor does not act, the debt is discharged. This provision does not change current law.

Subsection (d) is new. It provides protection to a consumer debtor that dealt honestly with a creditor who sought to have a debt excepted from discharge on the ground of falsity in the incurring of the debt. The debtor may be awarded costs and a reasonable attorney's fee for the proceeding to determine the dischargeability of a debt under subsection (a)(2), if the court finds that the proceeding was frivolous or not brought by its creditor in good faith.

The purpose of the provision is to discourage creditors from initiating proceedings to obtaining a false financial statement exception to discharge in the hope of obtaining a settlement from an honest debtor anxious to save attorney's fees. Such practices impair the debtor's fresh start and are contrary to the spirit of the bankruptcy laws.

*Section 524. Effect of discharge*

Subsection (a) specifies that a discharge in a bankruptcy case voids any judgment to the extent that it is a determination of the personal liability of the debtor with respect to a prepetition debt, and operates as an injunction against the commencement or continuation of an action, the employment of process, or any act, including telephone calls, letters, and personal contacts, to collect, recover, or offset any discharged debt as a personal liability of the debtor, or from property of the debtor, whether or not the debtor has waived discharge of the debt involved. The injunction is to give complete effect to the discharge and to eliminate any doubt concerning the effect of the discharge as a total prohibition on debt collection efforts. This paragraph has been expanded over a comparable provision in Bankruptcy Act § 14f to cover any act to collect, such as dunning by telephone or letter, or indirectly through friends, relatives, or employers, harassment, threats of repossession, and the like. The change is consonant with the new policy forbidding binding reaffirmation agreements under proposed 11 U.S.C. 524(b), and is intended to insure that once a debt is discharged, the debtor will not be pressured in any way to repay it. In effect, the discharge extinguishes the debt, and creditors may not attempt to avoid that. The language "whether or not discharge of such debt is waived" is intended to prevent waiver of discharge of a particular debt from defeating the purposes of this section. It is directed at waiver of discharge of a particular debt, not waiver of discharge in toto as permitted under section 727(a)(9).

Subsection (a) also codifies the split discharge for debtors in community property states. If community property was in the estate and community claims were discharged, the discharge is effective against community creditors of the nondebtor spouse as well as of the debtor spouse.

Subsection (b) gives further effect to the discharge. It limits reaffirmation and allows the debtor a 30-day cooling off period after the

DOCUMENT 52

81

execution of the reaffirmation during which time he can change his mind and rescind the reaffirmation.

Subsection (c) grants an exception to the anti-reaffirmation provision. It permits reaffirmation in connection with the settlement of a proceeding to determine the dischargeability of the debt being reaffirmed, or in connection with a redemption agreement permitted under section 722. In either case, the reaffirmation agreement must be entered into in good faith and must be approved by the court.

Subsection (d) provides the discharge of the debtor does not affect co-debtors or guarantors.

*Section 525. Protection against discriminatory treatment*

This section is additional debtor protection. It codifies the result of *Perez v. Campbell*, 402 U.S. 637 (1971), which held that a State would frustrate the Congressional policy of a fresh start for a debtor if it were permitted to refuse to renew a drivers license because a tort judgment resulting from an automobile accident had been unpaid as a result of a discharge in bankruptcy.

Notwithstanding any other laws, section 525 prohibits a governmental unit from denying, revoking, suspending, or refusing to renew a license, permit, charter, franchise, or other similar grant to, from conditioning such a grant to, from discrimination with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor or that is or has been associated with a debtor. The prohibition extends only to discrimination or other action based solely on the basis of the bankruptcy, on the basis of insolvency before or during bankruptcy prior to a determination of discharge, or on the basis of nonpayment of a debt discharged in the bankruptcy case (the *Perez* situation). It does not prohibit consideration of other factors, such as future financial responsibility or ability, and does not prohibit imposition of requirements such as net capital rules, if applied nondiscriminatorily.

In addition, the section is not exhaustive. The enumeration of various forms of discrimination against former bankrupts is not intended to permit other forms of discrimination. The courts have been developing the *Perez* rule. This section permits further development to prohibit actions by governmental or quasi-governmental organizations that perform licensing functions, such as a State bar association or a medical society, or by other organizations that can seriously affect the debtors' livelihood or fresh start, such as exclusion from a union on the basis of discharge of a debt to the union's credit union.

The effect of the section, and of further interpretations of the *Perez* rule, is to strengthen the anti-reaffirmation policy found in section 524(b). Discrimination based solely on nonpayment could encourage reaffirmations, contrary to the expressed policy.

The section is not so broad as a comparable section proposed by the Bankruptcy Commission, S. 236, 94th Cong., 1st Sess. § 4–508 (1975), which would have extended the prohibition to any discrimination, even by private parties. Nevertheless, it is not limiting either, as noted. The courts will continue to mark the contours of the anti-discrimination provision in pursuit of sound bankruptcy policy.

**Ad Hoc Equity Group Exhibit 9**

## SUBCHAPTER III—THE ESTATE

*Section 541. Property of the estate*

This section defines property of the estate, and specifies what property becomes property of the estate. The commencement of a bankruptcy case creates an estate. Under paragraph (1) of subsection (a), the estate is comprised of all legal or equitable interest of the debtor in property, wherever located, as of the commencement of the case. The scope of this paragraph is broad. It includes all kinds of property, including tangible or intangible property, causes of action (see Bankruptcy Act § 70a(6)), and all other forms of property currently specified in section 70a of the Bankruptcy Act § 70a, as well as property recovered by the trustee under section 542 of proposed title 11, if the property recovered was merely out of the possession of the debtor, yet remained "property of the debtor." The debtor's interest in property also includes "title" to property, which is an interest, just as are a possessory interest, or leasehold interest, for example. The result of *Segal* v. *Rochelle*, 382 U.S. 375 (1966), is followed, and the right to a refund is property of the estate.

Though this paragraph will include choses in action and claims by the debtor against others, it is not intended to expand the debtor's rights against others more than they exist at the commencement of the case. For example, if the debtor has a claim that is barred at the time of the commencement of the case by the statute of limitations, then the trustee would not be able to pursue that claim, because he too would be barred. He could take no greater rights than the debtor himself had. But *see* proposed 11 U.S.C. 108, which would permit the trustee a tolling of the statute of limitations if it had not run before the date of the filing of the petition.

Paragraph (1) has the effect of overruling *Lockwood* v. *Exchange Bank*, 190 U.S. 294 (1903), because it includes as property of the estate all property of the debtor, even that needed for a fresh start. After the property comes into the estate, then the debtor is permitted to exempt it under proposed 11 U.S.C. 522, and the court will have jurisdiction to determine what property may be exempted and what remains as property of the estate. The broad jurisdictional grant in proposed 28 U.S.C. 1334 would have the effect of overruling *Lockwood* independently of the change made by this provision.

Paragraph (1) also has the effect of overruling *Lines* v. *Frederick*, 400 U.S. 18 (1970).

Situations occasionally arise where property ostensibly belonging to the debtor will actually not be property of the debtor, but will be held in trust for another. For example, if the debtor has incurred medical bills that were covered by insurance, and the insurance company had sent the payment of the bills to the debtor before the debtor had paid the bill for which the payment was reimbursement, the payment would actually be held in a constructive trust for the person to whom the bill was owed. This section and proposed 11 U.S.C. 545 also will not affect various statutory provisions that give a creditor of the debtor a lien that is valid outside as well as inside bankruptcy, or that creates a trust fund for the benefit of a creditor of the debtor. *See* Packers and Stockyards Act § 206, 7 U.S.C. 196.

## DOCUMENT 52

83

Bankruptcy Act § 8 has been deleted as unnecessary. Once the estate is created, no interests in property of the estate remain in the debtor. Consequently, if the debtor dies during the case, only property exempted from property of the estate or acquired by the debtor after the commencement of the case and not included as property of the estate will be available to the representative of the debtor's probate estate. The bankruptcy proceeding will continue in rem with respect to property of the state, and the discharge will apply in personam to relieve the debtor, and thus his probate representative, of liability for dischargeable debts.

The estate also includes the interests of the debtor and the debtor's spouse in community property, subject to certain limitations; property that the trustee recovers under the avoiding powers; property that the debtor acquires by bequest, devise, inheritance, a property settlement agreement with the debtor's spouse, or as the beneficiary of a life insurance policy within 180 days after the petition; and proceeds, product, offspring, rents, and profits of or from property of the estate, except such as are earning from services performed by an individual debtor after the commencement of the case. Proceeds here is not used in a confining sense, as defined in the Uniform Commercial Code, but is intended to be a broad term to encompass all proceeds of property of the estate. The conversion in form of property of the estate does not change its character as property of the estate.

Subsection (b) excludes from property of the estate any power, such as a power of appointment, that the debtor may exercise solely for the benefit of an entity other than the debtor. This changes present law which excludes powers solely benefiting other persons but not other entities.

Subsection (c) invalidates restrictions on the transfer of property of the debtor, in order that all of the interests of the debtor in property will become property of the estate. The provisions invalidated are those that restrict or condition transfer of the debtor's interest, and those that are conditioned on the insolvency or financial condition of the debtor, on the commencement of a bankruptcy case, or on the appointment of a custodian of the debtor's property. Paragraph (2) of subsection (c), however, preserves restrictions on a transfer of a spendthrift trust that the restriction is enforceable nonbankruptcy law to the extent of the income reasonably necessary for the support of a debtor and his dependents.

Subsection (d), derived from section 70c of the Bankruptcy Act, gives the estate the benefit of all defenses available to the debtor as against an entity other than the estate, including such defenses as statutes of limitations, statutes of frauds, usury, and other personal defenses, and makes waiver by the debtor after the commencement of the case ineffective to bind the estate.

Section 541(e) confirms the current status under the Bankruptcy Act of bona fide secondary mortgage market transactions as the purchase and sale of assets. Mortgages or interests in mortgages sold in the secondary market should not be considered as part of the debtor's estate. To permit the efficient servicing of mortgages or interests in mortgages the seller often retains the original mortgage notes and related documents, and the purchaser records under State recording

statutes the purchaser's ownership of the mortgages or interests in mortgages purchased. Section 541(e) makes clear that the seller's retention of the mortgage documents and the purchaser's decision not to record do not impair the asset sale character of secondary mortgage market transactions. The committee notes that in secondary mortgage market transactions the parties may characterize their relationship as one of trust, agency, or independent contractor. The characterization adopted by the parties should not affect the statutes in bankruptcy of bona fide secondary mortgage market purchases and sales.

### Section 542. Turnover of property to the estate

Subsection (a) of this section requires anyone holding property of the estate on the date of the filing of the petition, or property that the trustee may use, sell, or lease under section 363, to deliver it to the trustee. The subsection also requires an accounting. The holder of property of the estate is excused from the turnover requirement of this subsection if the property held is of inconsequential value to the estate. However, this provision must be read in conjunction with the remainder of the subsection, so that if the property is of inconsequential monetary value, yet has a significant use value for the estate, the holder of the property would not be excused from turnover.

Subsection (b) requires an entity that owes money to the debtor as of the date of the petition, or that holds money payable on demand or payable on order, to pay the money to the order of the trustee. An exception is made to the extent that the entity has a valid right of setoff, as recognized by section 553.

Subsection (c) provides an exception to subsections (a) and (b). It protects an entity that has neither actual notice nor actual knowledge of the case and that transfers, in good faith, property that is deliverable or payable to the trustee to someone other than to the estate or on order of the estate. This subsection codifies the result of *Bank of Marin* v. *England*, 385 U.S. 99 (1966), but does not go so far as to permit bank setoff in violation of the automatic stay, proposed 11 U.S.C. 362(a)(7), even if the bank offsetting the debtor's balance has no knowledge of the case.

Subsection (d) protects life insurance companies that are required by contract to make automatic premium loans from property that might otherwise be property of the estate.

Subsection (e) requires an attorney, accountant, or other professional that holds recorded information relating to the debtor's property or financial affairs, to surrender it to the trustee. This duty is subject to any applicable claim of privilege, such as attorney-client privilege. It is a new provision that deprives accountants and attorneys of the leverage that they have today, under State law lien provisions, to receive payment in full ahead of other creditors when the information they hold is necessary to the administration of the estate.

### Section 543. Turnover of property by a custodian

This section requires a custodian appointed before the bankruptcy case to deliver to the trustee and to account for property that has come into his possession, custody, or control as a custodian. "Property

DOCUMENT 52

85

of the debtor" in section (a) includes property that was property of the debtor at the time the custodian took the property, but the title to which passed to the custodian. The section requires the court to protect any obligations incurred by the custodian, provide for the payment of reasonable compensation for services rendered and costs and expenses incurred by the custodian, and to surcharge the custodian for any improper or excessive disbursement, unless it has been approved by a court of competent jurisdiction. Subsection (d) reinforces the general abstention policy in section 305 by permitting the bankruptcy court to authorize the custodianship to proceed notwithstanding this section.

*Section 544. Trustee as lien creditor and as successor to certain creditors and purchasers*

Subsection (a) is the "strong arm clause" of current law, now found in Bankruptcy Act § 70c. It gives the trustee the rights of a creditor on a simple contract with a judicial lien on the property of the debtor as of the date of the petition; of a creditor with a writ of execution against the property of the debtor unsatisfied as of the date of the petition; and a bona fide purchaser of the real property of the debtor as of the date of the petition. "Simple contract" as used here is derived from Bankruptcy Act § 60a(4). The third status, that of a bona fide purchaser of real property, is new.

Subsection (b) is derived from current section 70e. It gives the trustee the rights of actual unsecured creditors under applicable law to void transfers. It follows *Moore* v. *Bay*, 284 U.S. 4 (1931), and overrules those cases that hold section 70e gives the trustee the rights of secured creditors.

*Section 545. Statutory liens*

This section permits the trustee to avoid the fixing of certain statutory liens. It is derived from subsections 67b and 67c of present law. Liens that first become effective on the bankruptcy or insolvency of the debtor are voidable by the trustee. Liens that are not perfected or enforceable on the date of the petition against a bona fide purchaser are voidable. If a transferee is able to perfect under section 546(a) and that perfection relates back to an earlier date, then in spite of the filing of the bankruptcy petition, the trustee would not be able to defeat the lien, because the lien would be perfected and enforceable against a bona fide purchaser that purchased the property on the date of the filing of the petition. Finally, a lien for rent or of distress for rent is voidable, whether the lien is a statutory lien or a common law lien of distress for rent. *See* proposed 11 U.S.C. 101(37); Bankruptcy Act § 67(c)(1)(C). The trustee may avoid a lien under this section even if the lien has been enforced by sale before the commencement of the case. To that extent, Bankruptcy Act § 67c(5) is not followed.

Subsection (b) limits the trustee's power to avoid tax liens under Federal, state, or local law. For example, under § 6323 of the Internal Revenue Code. Once public notice of a tax lien has been filed, the Government is generally entitled to priority over subsequent lienholders. However, certain purchasers who acquire an interest in certain specific kinds of personal property will take free of

**Ad Hoc Equity Group Exhibit 9**

86

an existing filed tax lien attaching to such property. Among the specific kinds of personal property which a purchaser can acquire free of an existing tax lien (unless the buyer knows of the existence of the lien) are stocks and securities, motor vehicles, inventory, and certain household goods. Under the present Bankruptcy Act (§ 67(c)(1)), the trustee may be viewed as a bona fide purchaser, so that he can take over any such designated items free of tax liens even if the tax authority has perfected its lien. However, the reasons for enabling a bona fide purchaser to take these kinds of assets free of an unfiled tax lien, that is, to encourage free movement of these assets in general commerce, do not apply to a trustee in a title 11 case, who is not in the same position as an ordinary bona fide purchaser as to such property. The bill accordingly adds a new subsection (b) to sec. 545 providing, in effect, that a trustee in bankruptcy does not have the right under this section to take otherwise specially treated items of personal property free of a tax lien filed before the filing of the petition.

*Section 546. Limitations on avoiding powers*

The trustee's rights and powers under certain of the avoiding powers are limited by section 546. First, if an interest holder against whom the trustee would have rights still has, under applicable nonbankruptcy law, and as of the date of the petition, the opportunity to perfect his lien against an intervening interest holder, then he may perfect his interest against the trustee. If applicable law requires seizure for perfection, then perfection is by notice to the trustee instead. The rights granted to a creditor under this subsection prevail over the trustee only if the transferee has perfected the transfer in accordance with applicable law, and that perfection relates back to a date that is before the commencement of the case.

The phrase "generally applicable law" relates to those provisions of applicable law that apply both in bankruptcy cases and outside of bankruptcy cases. For example, many State laws, under the Uniform Commercial Code, permit perfection of a purchase-money security interest to relate back to defeat an earlier levy by another creditor if the former was perfected within ten days of delivery of the property. U.C.C. §9–301(2). Such perfection would then be able to defeat an intervening hypothetical judicial lien creditor on the date of the filing of the petition. The purpose of the subsection is to protect, in spite of the surprise intervention of a bankruptcy petition, those whom State law protects by allowing them to perfect their liens or interests as of an effective date that is earlier than the date of perfection. It is not designed to give the States an opportunity to enact disguised priorities in the form of liens that apply only in bankruptcy case.

Subsection (b) specifies that the trustee's rights and powers under the strong arm clause, the successor to creditors provision, the preference section, and the postpetition transaction section are all subject to any statutory or common-law right of a seller, in the ordinary course of business, of goods to the debtor to reclaim the goods if the debtor received the goods on credit while insolvent. The seller must demand reclamation within ten days after receipt of the goods by the debtor. As under nonbankruptcy law, the right is subject to any superior rights of secured creditors. The purpose of the provision

**Ad Hoc Equity Group Exhibit 9**

DOCUMENT 52

87

is to recognize, in part, the validity of section 2–702 of the Uniform Commercial Code, which has generated much litigation, confusion, and divergent decisions in different circuits. The right is subject, however, to the power of the court to deny reclamation and protect the seller by granting him a priority as an administrative expense for his claim arising out of the sale of the goods.

Subsection (c) adds a statute of limitations to the use by the trustee of the avoiding powers. The limitation is two years after his appointment, or the time the case is closed or dismissed, whichever occurs later.

*Section 547. Preferences*

This section is a substantial modification of present law. It modernizes the preference provisions and brings them more into conformity with commercial practice and the Uniform Commercial Code.

Subsection (a) contains three definitions. Inventory, new value, and receivable are defined in their ordinary senses, but are defined to avoid any confusion or uncertainty surrounding the terms.

Subsection (b) is the operative provision of the section. It authorizes the trustee to avoid a transfer if five conditions are met. These are the five elements of a preference action. First, the transfer must be to or for the benefit of a creditor. Second, the transfer must be for or on account of an antecedent debt owed by the debtor before the transfer was made. Third, the transfer must have been made when the debtor was insolvent. Fourth, the transfer must have been made during the 90 days immediately preceding the commencement of the case. If the transfer was to an insider, the trustee may avoid the transfer if it was made during the period that begins one year before the filing of the petition and ends 90 days before the filing, if the insider to whom the transfer was made had reasonable cause to believe the debtor was insolvent at the time the transfer was made.

Finally, the transfer must enable the creditor to whom or for whose benefit it was made to receive a greater percentage of his claim than he would receive under the distributive provisions of the bankruptcy code. Specifically, the creditor must receive more than he would if the case were a liquidation case, if the transfer had not been made, and if the creditor received payment of the debt to the extent provided by the provisions of the code.

The phrasing of the final element changes the application of the greater percentage test from that employed under current law. Under this language, the court must focus on the relative distribution between classes as well as the amount that will be received by the members of the class of which the creditor is a member. The language also requires the court to focus on the allowability of the claim for which the preference was made. If the claim would have been entirely disallowed, for example, then the test of paragraph (5) will be met, because the creditor would have received nothing under the distributive provisions of the bankruptcy code.

The trustee may avoid a transfer of a lien under this section even if the lien has been enforced by sale before the commencement of the case.

Subsection (b)(2) of this section in effect exempts from the preference rules payments by the debtor of tax liabilities, regardless of their priority status.

**Ad Hoc Equity Group Exhibit 9**

88

Subsection (c) contains exceptions to the trustee's avoiding power. If a creditor can qualify under any one of the exceptions, then he is protected to that extent. If he can qualify under several, he is protected by each to the extent that he can qualify under each.

The first exception is for a transfer that was intended by all parties to be a contemporaneous exchange for new value, and was in fact substantially contemporaneous. Normally, a check is a credit transaction. However, for the purposes of this paragraph, a transfer involving a check is considered to be "intended to be contemporaneous", and if the check is presented for payment in the normal course of affairs, which the Uniform Commercial Code specifies as 30 days, U.C.C. § 3–503 (2) (a), that will amount to a transfer that is "in fact substantially contemporaneous."

The second exception protects transfers in the ordinary course of business (or of financial affairs, where a business is not involved) tranfers. For the case of a consumer, the paragraph uses the phrase "financial affairs" to include such nonbusiness activities as payment of monthly utility bills. If the debt on account of which the transfer was made was incurred in the ordinary course of both the debtor and the transferee, if the transfer was made not later than 45 days after the debt was incurred, if the transfer itself was made in the ordinary course of both the debtor and the transferee, and if the transfer was made according to ordinary business terms, then the transfer is protected. The purpose of this exception is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy.

The third exception is for enabling loans in connection with which the debtor acquires the property that the loan enabled him to purchase after the loan is actually made.

The fourth exception codifies the net result rule in section 60c of current law. If the creditor and the debtor have more than one exchange during the 90-day period, the exchanges are netted out according to the formula in paragraph (4). Any new value that the creditor advances must be unsecured in order for it to qualify under this exception.

Paragraph (5) codifies the improvement in position test, and thereby overrules such cases as *DuBay* v. *Williams*, 417 F.2d 1277 (C.A. 9, 1966), and *Grain Merchants of Indiana, Inc.* v. *Union Bank and Savings Co.*, 408 F.2d 209 (C.A. 7, 1969). A creditor with a security interest in a floating mass, such as inventory or accounts receivable, is subject to preference attack to the extent he improves his position during the 90-day period before bankruptcy. The test is a two-point test, and requires determination of the secured creditor's position 90 days before the petition and on the date of the petition. If new value was first given after 90 days before the case, the date on which it was first given substitutes for the 90-day point.

Paragraph (6) excepts statutory liens validated under section 545 from preference attack. It also protects transfers in satisfaction of such liens, and the fixing of a lien under section 365 (j), which protects a vendee whose contract to purchase real property from the debtor is rejected.

Subsection (d), derived from section 67a of the Bankruptcy Act, permits the trustee to avoid a transfer to reimburse a surety that posts

DOCUMENT 52

89

a bond to dissolve a judicial lien that would have been avoidable under this section. The second sentence protects the surety from double liability.

Subsection (e) determines when a transfer is made for the purposes of the preference section. Paragraph (1) defines when a transfer is perfected. For real property, a transfer is perfected when it is valid against a bona fide purchasers. For personal property and fixtures, a transfer is perfected when it is valid against a creditor on a simple contract that obtains a judicial lien after the transfer is perfected. "Simple contract" as used here is derived from Bankruptcy Act § 60a(4). Paragraph (2) specifies that a transfer is made when it takes effect between the transferor and the transferee if it is perfected at or within 10 days after that time. Otherwise, it is made when the transfer is perfected. If it is not perfected before the commencement of the case, it is made immediately before the commencement of the case. Paragraph (3) specifies that a transfer is not made until the debtor has acquired rights in the property transferred. This provision, more than any other in the section, overrules *DuBay* and *Grain Merchants*, and in combination with subsection (b)(2), overrules *In re King-Porter Co.*, 446 F.2d 722 (5th Cir. 1971).

Subsection (e) is designed to reach the different results under the 1962 version of Article 9 of the U.C.C. and under the 1972 version because different actions are required under each version in order to make a security agreement effective between the parties.

Subsection (f) creates a presumption of insolvency for the 90 days preceding the bankruptcy case. The presumption is as defined in Rule 301 of the Federal Rules of Evidence, made applicable in bankruptcy cases by sections 224 and 225 of the bill. The presumption requires the party against whom the presumption exists to come forward with some evidence to rebut the presumption, but the burden of proof remains on the party in whose favor the presumption exists.

*Section 548. Fraudulent transfers*

This section is derived in large part from section 67d of the Bankruptcy Act. It permits the trustee to avoid transfers by the debtor in fraud of his creditors. Its history dates from the statute of 13 Eliz. c. 5 (1570).

The trustee may avoid fraudulent transfers or obligations if made with actual intent to hinder, delay, or defraud a past or future creditor. Transfers made for less than a reasonably equivalent consideration are also vulnerable if the debtor was or thereby becomes insolvent, was engaged in business with an unreasonably small capital, or intended to incur debts that would be beyond his ability to repay.

The trustee of a partnership debtor may avoid any transfer of partnership property to a partner in the debtor if the debtor was or thereby became insolvent.

If a transferee's only liability to the trustee is under this section, and if he takes for value and in good faith, then subsection (c) grants him a lien on the property transferred, or other similar protection.

Subsection (d) specifies that for the purposes of the fraudulent transfer section, a transfer is made when it is valid against a subsequent bona fide purchaser. If not made before the commencement of

Ad Hoc Equity Group Exhibit 9

the case. it is considered made immediately before then. Subsection (d) also defines "value" to mean property, or the satisfaction or securing of a present or antecedent debt, but does not include an unperformed promise to furnish support to the debtor or a relative of the debtor.

### Section 549. Postpetition transactions

This section modifies section 70d of current law. It permits the trustee to avoid transfers of property that occur after the commencement of the case. The transfer must either have been unauthorized, or authorized under a section that protects only the transferor. Subsection (b) protects "involuntary gap" transferees to the extent of any value (including services, but not including satisfaction of a debt that arose before the commencement of the case), given after commencement in exchange for the transfer. Notice or knowledge of the transferee is irrelevant in determining whether he is protected under this provision.

### Section 550. Liability of transferee of avoided transfer

Section 550 prescribes the liability of a transferee of an avoided transfer, and enunciates the separation between the concepts of avoiding a transfer and recovering from the transferee. Subsection (a) permits the trustee to recover from the initial transferee of an avoided transfer or from any immediate or mediate transferee of the initial transferee. The words "to the extent that" in the lead in to this subsection are designed to incorporate the protection of transferees found in proposed 11 U.S.C. 549(b) and 548(c). Subsection (b) limits the liability of an immediate or mediate transferee of the initial transferee if such secondary transferee takes for value, in good faith and without knowledge of the voidability of the transfer. An immediate or mediate good faith transferee of a protected secondary transferee is also shielded from liability. This subsection is limited to the trustee's right to recover from subsequent transferees under subsection (a)(2). It does not limit the trustee's rights against the initial transferee under subsection (a)(1). The phrase "good faith" in this paragraph is intended to prevent a transferee from whom the trustee could recover from transfering the recoverable property to an innocent transferee, and receiving a retransfer from him, that is, "washing" the transaction through an innocent third party. In order for the transferee to be excepted from liability under this paragraph, he himself must be a good faith transferee. Subsection (c) is a further limitation on recovery. It specifies that the trustee is entitled to only one satisfactory, under subsection (a), even if more than one transferee is liable.

Subsection (d) protects good faith transferees, either initial or subsequent. to the extent of the lesser of the cost of any improvement the transferee makes in the transferred property and the increase in value of the property as a result of the improvement. Paragraph (2) of the subsection defines improvement to include physical additions or changes to the property, repairs, payment of taxes on the property, payment of a debt secured by a lien on the property, discharge of a lien on the property, and preservation of the property.

Subsection (e) establishes a statute of limitations on avoidance by the Trustee. The limitation is one year after the avoidance of the transfer or the time the case is closed or dismissed, whichever is earlier.

DOCUMENT  52

91

*Section 551. Automatic preservation of avoided transfer*

This section is a change from present law. It specifies that any avoided transfer is automatically preserved for the benefit of the estate. Under current law, the court must determine whether or not the transfer should be preserved. The operation of the section is automatic, unlike current law, even though preservation may not benefit the estate in every instance. A preserved lien may be abandoned by the trustee under proposed 11 U.S.C. 554 if the preservation does not benefit the estate. The section as a whole prevents junior lienors from improving their position at the expense of the estate when a senior lien is avoided.

*Section 552. Postpetition effect of security interest*

Under the Uniform Commercial Code, article 9, creditors may take security interests in after-acquired property. Section 552 governs the effect of such a prepetition security interest in postpetition property. It applies to all security interests as defined in section 101(37) of the bankruptcy code, not only to U.C.C. security interests.

As a general rule, if a security agreement is entered into before the commencement of the case, then property that the estate acquires is not subject to the security interest created by a provision in the security agreement extending the security interest to after-acquired property. Subsection (b) provides an important exception consistent with the Uniform Commercial Code. If the security agreement extends to proceeds, product, offspring, rents, or profits of the property in question, then the proceeds would continue to be subject to the security interest pursuant to the terms of the security agreement and provisions of applicable law, except to the extent that where the estate acquires the proceeds at the expense of other creditors holding unsecured claims, the expenditure resulted in an improvement in the position of the secured party.

The exception covers the situation where raw materials, for example, are converted into inventory, or inventory into accounts, at some expense to the estate, thus depleting the fund available for general unsecured creditors, but is limited to the benefit inuring to the secured party thereby. Situations in which the estate incurs expense in simply protecting collateral are governed by 11 U.S.C. 506(c). In ordinary circumstances, the risk of loss in continued operations will remain with the estate.

*Section 553. Setoff*

This section preserves, with some changes, the right of setoff in bankruptcy cases now found in section 68 of the Bankruptcy Act. One exception to the right is the automatic stay, discussed in connection with proposed 11 U.S.C. 362. Another is the right of the trustee to use property under section 363 that is subject to a right of setoff.

The section states that the right of setoff is unaffected by the bankruptcy code except to the extent that the creditor's claim is disallowed, the creditor acquired (other than from the debtor) the claim during the 90 days preceding the case while the debtor was insolvent, the debt being offset was incurred for the purpose of obtaining a right of setoff, while the debtor was insolvent and during the 90-day prebankruptcy

**Ad Hoc Equity Group Exhibit 9**

92

period, or the creditor improved his position in the 90-day period (similar to the improvement in position test found in the preference section 547(c)(5)). Only the last exception is an addition to current law.

As under section 547(f), the debtor is presumed to have been insolvent during the 90 days before the case.

*Section 554. Abandonment of property of the estate*

Under this section the court may authorize the trustee to abandon any property of the estate that is burdensome to the estate or that is of inconsequential value to the estate. Abandonment may be to any party with a possessory interest in the property abandoned. In order to aid administration of the case, subsection (b) deems the court to have authorized abandonment of any property that is scheduled under section 521(1) and that is not administered before the case is closed. That property is deemed abandoned to the debtor. Subsection (c) specifies that if property is neither abandoned nor administered it remains property of the estate.

Chapter 7—Liquidation

Subchapter I—Officers and Administration

*Section 701. Interim trustee*

This section requires the court to appoint an interim trustee. The appointment must be made from the panel of private trustees established and maintained by the Director of the Administrative Office under proposed 28 U.S.C. 604(e).

Subsection (a) requires the appointment of an interim trustee to be made promptly after the order for relief, unless a trustee is already serving in the case, such as before a conversion from a reorganization to a liquidation case.

Subsection (b) specifies that the appointment of an interim trustee expires when the permanent trustee is elected or designated under section 702.

Subsection (c) makes clear that an interim trustee is a trustee in a case under the bankruptcy code.

Subsection (d) provides that in a commodity broker case where speed is essential the interim trustee must be appointed by noon of the business day immediately following the order for relief.

*Section 702. Election of trustee*

Subsection (a) of this section specifies which creditors may vote for a trustee. Only a creditor that holds an allowable, undisputed, fixed, liquidated, unsecured claim that is not entitled to priority, that does not have an interest materially adverse to the interest of general unsecured creditors, and that is not an insider may vote for a trustee. The phrase "materially adverse" is currently used in the Rules of Bankruptcy Procedure, rule 207(d). The application of the standard requires a balancing of various factors, such as the nature of the adversity. A creditor with a very small equity position would not be excluded from voting solely because he holds a small equity in the debtor. The Rules of Bankruptcy Procedure also currently provide

**Ad Hoc Equity Group Exhibit 9**

DOCUMENT 52

93

for temporary allowance of claims, and will continue to do so for the purposes of determining who is eligible to vote under this provision.

Subsection (b) permits creditors at the meeting of creditors to elect one person to serve as trustee in the case. Creditors holding at least 20 percent in amount of the claims specified in the preceding paragraph must request election before creditors may elect a trustee. Subsection (c) specifies that a candidate for trustee is elected trustee if creditors holding at least 20 percent in amount of those claims actually vote, and if the candidate receives a majority in amount of votes actually cast.

Subsection (d) specifies that if a trustee is not elected, then the interim trustee becomes the permanent trustee and serves in the case permanently.

*Section 703. Successor trustee*

If the office of trustee becomes vacant during the case, this section makes provision for the selection of a successor trustee. The office might become vacant through death, resignation, removal, failure to qualify under section 322 by posting bond, or the reopening of a case. If it does, creditors may elect a successor in the same manner as they may elect a trustee under the previous section. Pending the election of a successor, the court may appoint an interim trustee in the usual manner if necessary to preserve or prevent loss to the estate. If creditors do not elect a successor, or if a trustee is needed in a reopened case, then the court appoints a disinterested member of the panel of private trustees to serve.

*Section 704. Duties of trustee*

The essential duties of the trustee are enumerated in this section. Others, or elaborations on these, may be prescribed by the Rules of Bankruptcy Procedure to the extent not inconsistent with those prescribed by this section. The duties are derived from section 47a of the Bankruptcy Act.

The trustee's principal duty is to collect and reduce to money the property of the estate for which he serves, and to close up the estate as expeditiously as is compatible with the best interests of parties in interest. He must be accountable for all property received, and must investigate the financial affairs of the debtor. If a purpose would be served (such as if there are assets that will be distributed), the trustee is required to examine proofs of claims and object to the allowance of any claim that is improper. If advisable, the trustee must oppose the discharge of the debtor, which is for the benefit of general unsecured creditors whom the trustee represents.

The trustee is responsible to furnish such information concerning the estate and its administration as is requested by a party in interest. If the business of the debtor is authorized to be operated, then the trustee is required to file with governmental units charged with the responsibility for collection or determination of any tax arising out of the operation of the business periodic reports and summaries of the operation, including a statement of receipts and disbursements, and such other information as the court requires. He is required to give constructive notice of the commencement of the case in the manner specified under section 342(b).

**Ad Hoc Equity Group Exhibit 9**

94

*Section 705. Creditors' committee*

This section is derived from section 44b of the Bankruptcy Act without substantial change. It permits election by general unsecured creditors of a committee of not fewer than 3 members and not more than 11 members to consult with the trustee in connection with the administration of the estate, to make recommendations to the trustee respecting the performance of his duties, and to submit to the court any question affecting the administration of the estate. There is no provision for compensation or reimbursement of its counsel.

*Section 706. Conversion*

Subsection (a) of this section gives the debtor the one-time absolute right of conversion of a liquidation case to a reorganization or individual repayment plan case. If the case has already once been converted from chapter 11 or 13 to chapter 7, then the debtor does not have that right. The policy of the provision is that the debtor should always be given the opportunity to repay his debts, and a waiver of the right to convert a case is unenforceable.

Subsection (b) permits the court, on request of a party in interest and after notice and a hearing, to convert the case to chapter 11 at any time. The decision whether to convert is left in the sound discretion of the court, based on what will most inure to the benefit of all parties in interest.

Subsection (c) is part of the prohibition against involuntary chapter 13 cases, and prohibits the court from converting a case to chapter 13 without the debtor's consent.

Subsection (d) reinforces section 109 by prohibiting conversion to a chapter unless the debtor is eligible to be a debtor under that chapter.

*Section 707. Dismissal*

This section authorizes the court to dismiss a liquidation case only for cause, such as unreasonable delay by the debtor that is prejudicial to creditors or nonpayment of any fees and charges required under chapter 123 of title 28. These causes are not exhaustive, but merely illustrative. The section does not contemplate, however, that the ability of the debtor to repay his debts in whole or in part constitutes adequate cause for dismissal. To permit dismissal on that ground would be to enact a non-uniform mandatory chapter 13, in lieu of the remedy of bankruptcy.

SUBCHAPTER II—COLLECTION, LIQUIDATION, AND DISTRIBUTION
OF THE ESTATE

*Section 721. Authorization to operate business*

This section is derived from section 2a(5) of the Bankruptcy Act. It permits the court to authorize the operation of any business of the debtor for a limited period, if the operation is in the best interest of the estate and consistent with orderly liquidation of the estate. An example is the operation of a watch company to convert watch movements and cases into completed watches which will bring much higher prices than the component parts would have brought.

**Ad Hoc Equity Group Exhibit 9**

DOCUMENT 52

95

*Section 722. Redemption*

This section is new and is broader than rights of redemption under the Uniform Commercial Code. It authorizes an individual debtor to redeem tangible personal property intended primarily for personal, family, or household use, from a lien securing a nonpurchase money dischargeable consumer debt. It applies only if the debtor's interest in the property is exempt or has been abandoned.

This right to redeem is a very substantial change from current law. To prevent abuses such as may occur when the debtor deliberately allows the property to depreciate in value, the debtor will be required to pay the fair market value of the goods or the amount of the claim if the claim is less. The right is personal to the debtor and not assignable.

*Section 723. Rights of partnership trustee against general partners*

This section is a significant departure from present law. It repeals the jingle rule, which, for ease of administration, denied partnership creditors their rights against general partners by permitting general partners' individual creditors to share in their estates first to the exclusion of partnership creditors. The result under this section more closely tracks generally applicable partnership law, without a significant administrative burden.

Subsection (a) specifies that each general partner in a partnership debtor is liable to the partnership's trustee for any deficiency of partnership property to pay in full all administrative expenses and all claims against the partnership.

Subsection (b) requires the trustee to seek recovery of the deficiency from any general partner that is not a debtor in a bankruptcy case. The court is empowered to order that partner to indemnify the estate or not to dispose of property pending a determination of the deficiency. The language of the subsection is directed to cases under the bankruptcy code. However, if, during the early stages of the transition period, a partner in a partnership is proceeding under the Bankruptcy Act while the partnership is proceeding under the bankruptcy code, the trustee should not first seek recovery against the Bankruptcy Act partner. Rather, the Bankruptcy Act partner should be deemed for the purposes of this section and the rights of the trustee to be proceeding under title 11.

Subsection (c) requires the partnership trustee to seek recovery of the full amount of the deficiency from the estate of each general partner that is a debtor in a bankruptcy case. The trustee will share equally with the partners' individual creditors in the assets of the partners' estates. Claims of partnership creditors who may have filed against the partner will be disallowed to avoid double counting.

Subsection (d) provides for the case where the total recovery from all of the bankrupt general partners is greater than the deficiency of which the trustee sought recovery. This case would most likely occur for a partnership with a large number of general partners. If the situation arises, the court is required to determine an equitable redistribution of the surplus to the estate of the general partners. The determination will be based on factors such as the relative liability of each of the general partners under the partnership agreement and

the relative rights of each of the general partners in the profits of the enterprise under the partnership agreement.

### Section 724. Treatment of certain liens

Subsection (a) of section 724 permits the trustee to avoid a lien that secures a fine, penalty, forfeiture, or multiple, punitive, or exemplary damages claim to the extent that the claim is not compensation for actual pecuniary loss. The subsection follows the policy found in section 57j of the Bankruptcy Act of protecting unsecured creditors from the debtor's wrongdoing, but expands the protection afforded. The lien is made voidable rather than void in chapter 7, in order to permit the lien to be revived if the case is converted to chapter 11, under which penalty liens are not voidable. To make the lien void would be to permit the filing of a chapter 7, the voiding of the lien, and the conversion to a chapter 11, simply to avoid a penalty lien, which should be valid in a reorganization case.

Subsection (b) governs tax liens. This provision retains the rule of present bankruptcy law (§ 67(C)(3) of the Bankruptcy Act) that a tax lien on personal property, if not avoidable by the trustee, is subordinated in payment to unsecured claims having a higher priority than unsecured tax claims. Those other claims may be satisfied from the amount that would otherwise be applied to the tax lien, and any excess of the amount of the lien is then applied to the tax. Any personal property (or sale proceeds) remaining is to be used to satisfy claims secured by liens which are junior to the tax lien. Any proceeds remaining are next applied to pay any unpaid balance of the tax lien.

Subsection (d) specifies that any statutory lien whose priority is determined in the same manner as a tax lien is to be treated as a tax lien under this section, even if the lien does not secure a claim for taxes. An example is the ERISA lien.

### Section 725. Disposition of certain property

This section requires the court to determine the appropriate disposition of property in which the estate and an entity other than the estate have an interest. It would apply, for example, to property subject to a lien or property co-owned by the estate and another entity. The court must make the determination with respect to property that is not disposed of under another section of the bankruptcy code, such as by abandonment under section 554, by sale or distribution under 363, or by allowing foreclosure by a secured creditor by lifting the stay under section 362. The purpose of the section is to give the court appropriate authority to ensure that collateral or its proceeds is returned to the proper secured creditor, that consigned or bailed goods are returned to the consignor or bailor, and so on. Current law is curiously silent on this point, though case law has grown to fill the void. The section is in lieu of a section that would direct a certain distribution to secured creditors. It gives the court greater flexibility to meet the circumstances, and it is broader, permitting disposition of property subject to a co-ownership interest.

### Section 726. Distribution of property of the estate

This section is the general distribution section for liquidation cases. It dictates the order in which distribution of property of the estate,

DOCUMENT  52

97

which has usually been reduced to money by the trustee under the requirements of section 704(1).

First, property is distributed among priority claimants, as determined by section 507, and in the order prescribed by section 507. Second, distribution is to general unsecured creditors. This class excludes priority creditors and the two classes of subordinated creditors specified below. The provision is written to permit distribution to creditors that tardily file claims if their tardiness was due to lack of notice or knowledge of the case. Though it is in the interest of the estate to encourage timely filing, when tardy filing is not the result of a failure to act by the creditor, the normal subordination penalty should not apply. Third distribution is to general unsecured creditors who tardily file. Fourth distribution is to holders of fine, penalty, forfeiture, or multiple, punitive, or exemplary damage claims. More of these claims are disallowed entirely under present law. They are simply subordinated here.

Paragraph (4) provides that punitive penalties, including prepetition tax penalties, are subordinated to the payment of all other classes of claims, except claims for interest accruing during the case. In effect, these penalties are payable out of the estate's assets only if and to the extent that a surplus of assets would otherwise remain at the close of the case for distribution back to the debtor.

Paragraph (5) provides that postpetition interest on prepetition claims is also to be paid to the creditor in a subordinated position. Like prepetition penalties, such interest will be paid from the estate only if and to the extent that a surplus of assets would otherwise remain for return to the debtor at the close of the case.

This section also specifies that interest accrued on all claims (including priority and nonpriority tax claims) which accrued before the date of the filing of the title 11 petition is to be paid in the same order of distribution of the estate's assets as the principal amount of the related claims.

Any surplus is paid to the debtor under paragraph (6).

Subsection (b) follows current law. It specifies that claims within a particular class are to be paid pro rata. This provision will apply, of course, only when there are inadequate funds to pay the holders of claims of a particular class in full. The exception found in the section, which also follows current law, specifies that liquidation administrative expenses are to be paid ahead of reorganization administrative expenses if the case has been converted from a reorganization case to a liquidation case, or from an individual repayment plan case to a liquidation case.

Subsection (c) governs distributions in cases in which there is community property and other property of the estate. The section requires the two kinds of property to be segregated. The distribution is as follows: First, administrative expenses are to be paid, as the court determines on any reasonable equitable basis, from both kinds of property. The court will divide administrative expenses according to such factors as the amount of each kind of property in the estate, the cost of preservation and liquidation of each kind of property, and whether any particular administrative expenses are attributable to one kind of property or the other. Second, claims are to be paid as provided

**Ad Hoc Equity Group Exhibit 9**

98

under subsection (a) (the normal liquidation case distribution rules) in the following order and manner: First, community claims against the debtor or the debtor's spouse are paid from community property, except such as is liable solely for the debts of the debtor.

Second, community claims against the debtor, to the extent not paid under the first provision, are paid from community property that is solely liable for the debts of the debtor. Third, community claims, to the extent they remain unpaid, and all other claims against the debtor, are paid from noncommunity property. Fourth, if any community claims against the debtor or the debtor's spouse remain unpaid, they are paid from whatever property remains in the estate. This would occur if community claims against the debtor's spouse are large in amount and most of the estate's property is property solely liable, under nonbankruptcy law, for debts of the debtor.

The marshalling rules in this section apply only to property of the estate. However, they will provide a guide to the courts in the interpretation of proposed 11 U.S.C. 725, relating to distribution of collateral, in cases in which there is community property. If a secured creditor has a lien on both community and non-community property, the marshalling rules here—by analogy would dictate that the creditor be satisfied first out of community property, and then out of separate property.

*Section 727. Discharge*

This section is the heart of the fresh start provisions of the bankruptcy law. Subsection (a) requires the court to grant a debtor a discharge unless one of nine conditions is met. The first condition is that the debtor is not an individual. This is a change from present law, under which corporations and partnerships may be discharged in liquidation cases, though they rarely are. The change in policy will avoid trafficking in corporate shells and in bankrupt partnerships. "Individual" includes a deceased individual, so that if the debtor dies during the bankruptcy case, he will nevertheless be released from his debts, and his estate will not be liable for them. Creditors will be entitled to only one satisfaction—from the bankruptcy estate and not from the probate estate.

The next three grounds for denial of discharge center on the debtor's wrongdoing in or in connection with the bankruptcy case. They are derived from Bankruptcy Act § 14c. If the debtor, with intent to hinder, delay, or defraud his creditors or an officer of the estate, has transferred, removed, destroyed, mutilated, or concealed, or has permitted any such action with respect to, property of the debtor within the year preceding the case, or property of the estate after the commencement of the case, then the debtor is denied discharge. The debtor is also denied discharge if he has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any books and records from which his financial condition might be ascertained, unless the act or failure to act was justified under all the circumstances of the case. The fourth ground for denial of discharge is the commission of a bankruptcy crime, although the standard of proof is preponderance of the evidence rather than proof beyond a reasonable doubt. These crimes include the making of a false oath or account, the use or presentation of a false

DOCUMENT 52

99

claim, the giving or receiving of money for acting or forbearing to act, and the withholding from an officer of the estate entitled to possession of books and records relating to the debtor's financial affairs.

The fifth ground for denial of discharge is the failure of the debtor to explain satisfactorily any loss of assets or deficiency of assets to meet the debtor's liabilities. The sixth ground concerns refusal to testify. It is a change from present law, under which the debtor may be denied discharge for legitimately exercising his right against self-incrimination. Under this provision, the debtor may be denied discharge if he refuses to obey any lawful order of the court, or if he refuses to testify after having been granted immunity or after improperly invoking the constitutional privilege against self-incrimination.

The seventh ground for denial of discharge is the commission of an act specified in grounds two through six during the year before the debtor's case in connection with another bankruptcy case concerning an insider.

The eighth ground for denial of discharge is derived from § 14c(5) of the Bankruptcy Act. If the debtor has been granted a discharge in a case commenced within 6 years preceding the present bankruptcy case, he is denied discharge. This provision, which is no change from current law with respect to straight bankruptcy, is the 6-year bar to discharge. Discharge under chapter 11 will bar a discharge for 6 years. As under current law, confirmation of a composition wage earner plan under chapter 13 is a basis for invoking the 6-year bar.

The ninth ground is approval by the court of a waiver of discharge.

Subsection (b) specifies that the discharge granted under this section discharges the debtor from all debts that arose before the date of the order for relief. It is irrelevant whether or not a proof of claim was filed with respect to the debt, and whether or not the claim based on the debt was allowed.

Subsection (c) permits the trustee, or a creditor, to object to discharge. It also permits the court, on request of a party in interest, to order the trustee to examine the acts and conduct of the debtor to determine whether a ground for denial of discharge exists.

Subsection (d) requires the court to revoke a discharge already granted in certain circumstances. If the debtor obtained the discharge through fraud, if he acquired and concealed property of the estate, or if he refused to obey a court order or to testify, the discharge is to be revoked.

Subsection (e) permits the trustee or a creditor to request revocation of a discharge within 1 year after the discharge is granted, on the grounds of fraud, and within one year of discharge or the date of the closing of the case, whichever is later, on other grounds.

*Section 728. Special tax provisions*

Section 728 of title 11 applies only to state and local taxation. This provision contains four subsections which embody special tax provisions that apply in a case under chapter 7. Subsection (a) terminates the taxable year of an individual debtor on the date of the order for relief under chapter 7 of title 11. The date of termination of the individual's taxable year is the date on which the estate first becomes a separate taxable entity. If the case was originally filed under

100 .

chapter 11 of title 11, then the estate would have been made a separate taxable entity on the date of the order for relief under that chapter. In the rare case of a multiple conversion, then the date of the order for relief under the first chapter under which the estate was a separate taxable entity is controlling.

Subsection (b) permits the trustee of the estate of an individual debtor or a corporation in a case under chapter 7 of title 11 to make a tax return only if the estate or corporation has net taxable income for the entire case. If the estate or corporation has net taxable income at the close of the case, then the trustee files an income tax return for each tax year during which the case was pending. The trustee of a partnership debtor must always file returns for each such taxable period.

Subsection (c) sets forth a marshalling rule pertaining to tax claims against a partner and a partnership in a case under chapter 7 of title 11. To the extent that the income tax liability arose from the inclusion of undistributed earnings in the partner's taxable income, the court is required to disallow the tax claim against the partner's estate and to allow such claim against the partnership estate. No burden is placed on the taxing authority; the taxing authority should file a complete proof of claim in each case and the court will execute the marshalling. If the partnership's assets are insufficient to satisfy partnership creditors in full, then section 723(c) of title 11 will apply, notwithstanding this subsection, to allow any unsatisfied tax claims to be asserted by the partnership trustee against the estate of the partner. The marshalling rule under this subsection applies only for purposes of allowance and distribution. Thus the tax claim may be nondischargeable with respect to an individual partner.

Subsection (d) requires the court to apportion any tax refund or reduction of tax between the estate of a partner and the estate of his partnership. The standard of apportionment entitles the partnership estate to receive that part of the tax refund or reduction that is attributable to losses sustained by the partnership that were deducted by the partner but for which the partner never reimbursed the partnership. The partner's estate receives any part not allocated to the partnership estate. The section applies notwithstanding section 541 of title 11, which includes the partner's right to a tax refund or to reduction of tax as property of the partner's estate.

SUBCHAPTER III—STOCKBROKER LIQUIDATION

### Section 741. Definitions for this subchapter

Section 741 sets forth definitions for subchapter III of chapter 7.

Paragraph (1) defines "Commission" to mean the Securities and Exchange Commission.

Paragraph (2) defines "customer" to include anybody that interacts with the debtor in a capacity that concerns securities transactions. The term embraces cash or margin customers of a broker or dealer in the broadest sense.

Paragraph (3) defines "customer name security" in a restrictive fashion to include only non-transferrable securities that are registered, or in the process of being registered in a customer's own name. The

DOCUMENT 52

101

securities must not be endorsed by the customer and the stockbroker must not be able to legally transfer the securities by delivery, by a power of attorney, or otherwise.

Paragraph (4) defines "customer property" to include all property of the debtor that has been segregated for customers or property that should have been segregated but was unlawfully converted. Clause (i) refers to customer property not properly segregated by the debtor or customer property converted and then recovered so as to become property of the estate. Unlawfully converted property that has been transferred to a third party is excluded until it is recovered as property of the estate by virtue of the avoiding powers. The concept excludes customer name securities that have been delivered to or reclaimed by a customer and any property properly belonging to the stockholder, such as money deposited by a customer to pay for securities that the stockholder has distributed to such customer.

Paragraph (5) defines "net equity" to establish the extent to which a customer will be entitled to share in the single and separate fund. Accounts of a customer are aggregated and offset only to the extent the accounts are held by the customer in the same capacity. Thus, a personal account is separate from an account held as trustee. In a community property state an account held for the community is distinct from an account held as separate property.

The net equity is computed by liquidating all securities positions in the accounts and crediting the account with any amount due to the customer. Regardless of the actual dates, if any, of liquidation, the customer is only entitled to the liquidation value at the time of the filing of the petition. To avoid double counting, the liquidation value of customer name securities belonging to a customer is excluded from net equity. Thus, clause (ii) includes claims against a customer resulting from the liquidation of a security under clause (i). The value of a security on which trading has been suspended at the time of the filing of the petition will be estimated. Once the net liquidation value is computed, any amount that the customer owes to the stockbroker is subtracted including any amount that would be owing after the hypothetical liquidation, such as brokerage fees. Debts owed by the customer to the debtor, other than in a securities related transaction, will not reduce the net equity of the customer. Finally, net equity is increased by any payment by the customer to the debtor actually paid within 60 days after notice. The principal reason a customer would make such a payment is to reclaim customer name securities under §751.

Paragraph (6) defines "1934 Act" to mean the Securities Exchange Act of 1934.

Paragraph (7) defines "SIPC" to mean the Securities Investor Protection Corporation.

*Section 742. Effect of section 362 of this subchapter*

Section 742 indicates that the automatic stay does not prevent SIPC from filing an application for a protective decree under SIPA. If SIPA does file such an application, then all bankruptcy proceedings are suspended until the SIPC action is completed. If SIPC completes liquidation of the stockbroker then the bankruptcy case is dismissed.

**Ad Hoc Equity Group Exhibit 9**

102

## Section 743. Notice

Section 743 requires that notice of the order for relief be given to SIPC and to the SEC in every stockbroker case.

## Section 744. Executory contracts

Section 744 instructs the court to give the trustee a reasonable time, not to exceed 30 days, to assume or reject any executory contract of the stockbroker to buy or sell securities. Any contract not assumed within the time fixed by the court is considered to be rejected.

## Section 745. Treatment of accounts

Section 745 (a) indicates that each account held by a customer in a separate capacity is to be considered a separate account. This prevents the offset of accounts held in different capacities.

Subsection (b) indicates that a bank or another stockbroker that is a customer of a debtor is considered to hold its customers accounts in separate capacities. Thus a bank or other stockbroker is not treated as a mutual fund for purposes of bulk investment. This protects unrelated customers of a bank or other stockholder from having their accounts offset.

Subsection (c) effects the same result with respect to a trust so that each beneficiary is treated as the customer of the debtor rather than the trust itself. This eliminates any doubt whether a trustee holds a personal account in a separate capacity from his trustee's account.

## Section 746. Extent of customer claim

Section 746 (a) protects entities who deal in good faith with the debtor after the filing of the petition and before a trustee is appointed by deeming such entities to be customers. The principal application of this section will be in an involuntary case before the order for relief, because § 701 (b) requires prompt appointment of an interim trustee after the order for relief.

Subsection (b) indicates that an entity who holds securities that are either part of the capital of the debtor or that are subordinated to the claims of any creditor of the debtor is not a customer with respect to those securities. This subsection will apply when the stockbroker has sold securities in itself to the customer or when the customer has otherwise placed such securities in an account with the stockbroker.

## Section 747. Subordination of certain customer claims

Section 747 subordinates to other customer claims, all claims of a customer who is an insider, a five percent owner of the debtor, or otherwise in control of the debtor.

## Section 748. Reduction of securities to money

Section 748 requires the trustee to liquidate all securities, except for customer name securities, of the estate in a manner consistent with good market practice. The trustee should refrain from flooding a thin market with a large percentage of shares in any one issue. If the trustee holds restricted securities or securities in which trading has been suspended, then the trustee must arrange to liquidate such securities in accordance with the securities laws. A private placement may be the only exemption available with the customer of the debtor the best

DOCUMENT 52

103

prospect for such a placement. The subsection does not permit such a customer to bid in his net equity as part of the purchase price; a contrary result would permit a customer to receive a greater percentage on his net equity claim than other customers.

### Section 749. Voidable transfers

Section 749 indicates that if the trustee avoids a transfer, property recovered is customer property to any extent it would have been customer property but for the transfer. The section clarifies that a customer who receives a transfer of property of the debtor is a creditor and that property in a customer's account is property of a creditor for purposes of the avoiding powers.

### Section 750. Distribution of securities

Section 750 forbids the trustee from distributing a security other than a customer name security. The term "distribution" refers to a distribution to customers in satisfaction of net equity claims and is not intended to preclude the trustee from liquidating securities under proposed 11 U.S.C. 748.

### Section 751. Customer name securities

Section 751 requires the trustee to deliver a customer name security to the customer entitled to such security unless the customer has a negative net equity. The customer's net equity will be negative when the amount owed by the customer to the stockboker exceeds the liquidation value of the non-customer name securities in the customer's account. If the customer is a net debtor of the stockbroker, then the trustee may permit the customer to repay debts to the stockbroker so that the customer will not longer be in debt to the stockbroker. If the customer refuses to pay such amount, then the court may order the customer to endorse the security in order that the trustee may liquidate such property.

### Section 752. Customer property

Section 752(a) requires the trustee to distribute customer property to customers based on the amount of their net equity claims. Customer property is to be distributed in priority to all claims except expenses of administration entitled to priority under § 507(1). It is anticipated that the court will apportion such administrative claims on an equitable basis between the general estate and the customer property of the debtor.

Subsection (b)(1) indicates that in the event customer property exceeds customers net equity claims and administrative expenses, the excess pours over into the general estate. This event would occur if the value of securities increased dramatically after the order for relief but before liquidation by the trustee. Subsection (b)(2) indicates that the unpaid portion of a customer's net equity claim is entitled to share in the general estate as an unsecured claim unless subordinated by the court under proposed 11 U.S.C. 501. A net equity claim of a customer that is subordinated under section 747 is entitled to share in distribution under section 726(a)(2) unless subordinated under section 510 independently of the subordination under section 747.

Ad Hoc Equity Group Exhibit 9

104

Subsection (c) provides for apportionment between customer property and the general estate of any equity of the debtor in property remaining after a secured creditor liquidates a security interest. This might occur if a stockbroker hypothecates securities of his own and of his customers if the value of the hypothecated securities exceeds the debt owed to the secured party. The apportionment is to be made according to the ratio of customer property and general property of the debtor that comprised the collateral. The subsection refers to cash and securities of customers to include any customer property unlawfully converted by the stockbroker in the course of such a transaction. The apportionment is made subject to section 741(4)(B) to insure that property in a customer's account that is owed to the stockbroker will not be considered customer property. This recognizes the right of the stockbroker to withdraw money that has been erroneously placed in a customer's account or that is otherwise owing to the stockbroker.

*Section 761. Definitions for this subchapter*

Paragraph (1) defines "Act" to mean the Commodity Exchange Act.

Paragraph (2) defines "clearing organization" to mean an organization that clear (*i.e.*, matches purchases and sales) commodity futures contracts made on or subject to the rules of a contract market or commodity options transactions made on or subject to the rules of a commodity option exchange. Although commodity option trading on exchanges is currently prohibited, it is anticipated that CFTC may permit such trading in the future.

Paragraphs (3) and (4) define terms "Commission" and "commodity futures contract".

Paragraph (5) defines "commodity contract" to mean a commodity futures contract (§ 761(4)), a commodity option (§ 761(6)), or a leverage contract (§ 761(15)).

Paragraph (6) defines "commodity option" by reference to section 4c(b) of the Commodity Exchange Act.

Paragraphs (7), (8), and (9) define "commodity options dealer," "contract market," "contract of sale," "commodity," "future delivery," "board of trade," and "futures commission merchant."

Paragraph (10) defines the term "customer" to mean with respect to a futures commission merchant or a foreign futures commission merchant, the entity for whom the debtor carries a commodity futures contract or foreign future, or with whom such a contract is carried (such as another commodity broker), or from whom the debtor has received, acquired, or holds cash, securities, or other property arising out of or connected with specified transactions involving commodity futures contracts or foreign futures. This section also defines "customer" in the context of leverage transaction merchants, clearing organizations, and commodity options dealers. Persons associated with a commodity broker, such as its employees, officers, or partners, may be customers under this definition.

The definition of "customer" serves to isolate that class of persons entitled to the protection subchapter IV provides to customers. In addition, section 101(5) defines "commodity broker" to mean a futures commission merchant, foreign futures commission merchant, clearing organization, leverage transaction merchant, or commodity options dealer, with respect to which there is a customer. Accordingly, the

DOCUMENT 52

105

definition of customer also serves to designate those entities which must utilize chapter 7 and are precluded from reorganizing under chapter 11.

Paragraph (11) defines "customer property" to mean virtually all property or proceeds thereof, received, acquired, or held by or for the account of the debtor for a customer arising of or in connection with a transaction involving a commodity contract.

Paragrap (12) defines "distribution share" to mean the amount to which a customer is entitled under section 765(a).

Paragraphs (13), (14), (15), and (16) define "foreign future," "foreign futures commission merchant," "leverage transaction," and "leverage transaction merchant."

Paragraph (17) defines "margin payment" to mean a payment or deposit commonly known to the commodities trade as original margin, initial margin, or variation margin.[21]

Paragraph (18) defines "member property."

Paragraph (19) defines "net equity" to be the sum of (A) the value of all customer property remaining in a customer's account[22] immediately after all commodity contracts of such customer have been transferred, liquidated, or become identified for delivery and all obligations of such customer to the debtor have been offset (such as margin payments, whether or not called, and brokerage commissions) plus (B) the value of specifically identifiable customer property previously returned to the customer by the trustee, plus (C) if the trustee has transferred any commodity contract to which the customer is entitled or any margin or security for such contract, the value of such contract and margain or security. Net equity, therefore, will be the total amount of customer property to which a customer is entitled as of the date of the filing of the bankruptcy petition, although valued at subsequent dates. The Commission is given authority to promulgate rules and regulations to further refine this definition.

*Section 762. Notice to and intervention by the Commission*

Section 762 provides that the Commission shall be given such notice as is appropriate of an order for relief in a bankruptcy case and that the Commission may raise and may appear and may be heard on any issue in case involving a commodity broker liquidation.

*Section 763. Treatment of accounts*

Section 763 provides for separate treatment of accounts held in separate capacities. A deficit in one account held for a customer may not be offset against the net equity in another account held by the same customer in a separate capacity or held by another customer.

*Section 764. Voidable transfers*

Section 764 permits the trustee to void any transfer of property that, except for such transfer, would have been customer property, to the extent permitted under section 544, 545, 547, 548, 549, or 724(a).

*Section 765. Customer property*

Subsection (a) of this section provides that with respect to liquidation of commodity brokers which are not clearing organizations, the trustee shall distribute customer property to customers on the basis

---

[21] *See* S. Rep. No. 95–850, 95th Cong., 2d Sess. 130, 138 (1978).
[22] The amount remaining in such customers accounts would include any customer property that was unlawfully converted. *See* section 761(11)(A).

**Ad Hoc Equity Group Exhibit 9**

106

and to the extent of such customers' allowed net equity claims, and in priority to all other claims. This section grants customers' claims first priority in the distribution of the estate. Subsection (b) grants the same priority to member property and other customer property in the liquidation of a clearing organization. A fundamental purpose of these provisions is to ensure that the property entrusted by customers to their brokers will not be subject to the risks of the broker's business and will be available for disbursement to customers if the broker becomes bankrupt.

As a result of section 765, a customer need not trace any funds in order to avoid treatment as a general creditor as was required by the Seventh Circuit in *In re Rosenbaum Grain Corporation.*[23]

*Section 766. Nonvoidable transfers*

Section 766 lists certain transfers which are not voidable by the trustee of a commodity broker. Subsection (a) exempts transfers approved by the Commission by rule or order, either before or after the transfer. It is expected that the Commission will use this power sparingly and only when necessary to effectuate the remedial purposes of this legislation, bearing in mind that the immediate transfer of customer accounts from bankrupt commodity brokers to solvent commodity brokers is one of the primary goals of this subchapter. The committee considered and rejected a provision in subsection (b) that would have exempted payments made to a commodity broker. The Commission may not by rule exempt such transfers. The Commission's prompt attention to the promulgation of such rules and regulations is expected.

Subsection (b) provides for the nonavoidability of margin payments made by a commodity broker, other than a clearing organization. If such payments are made by or to a clearing organization, they are nonavoidable pursuant to subsection (c). All other margin payments made by a commodity broker, other than a clearing organization, are nonavoidable if they meet the conditions set forth in subsection (b). Subsections (b)(1) and (b)(2) parallel the requirements for avoidance of fraudulent transfers and obligations under section 548. Subsection (b)(3) adds a requirement that there be collusion between the transferee and transferor in order for such payments to be voidable. It would be unfair to permit recovery from an innocent commodity broker since such brokers are, for the most part, simply conduits for margin payments and do not retain margin for use in their operations. Subsection (b)(4) would permit recovery of a subsequent transferee only if it had actual knowledge at the time of that subsequent transfer of the scheme to defraud. Again it should be noted that if the transfer is a margin payment and the subsequent transferee is a clearing organization, the transfer is nonavoidable under section 766(c).

Subsection (c) overrules *Seligson* v. *New York Produce Exchange,*[24] and provides as a matter of law that margin payments made by or to a clearing organization are not voidable.

*Section 767. Specific powers and duties of trustee*

Section 767 sets forth the procedures to be followed by the trustee. It should be emphasized that many of the duties imposed on the trustee are required to be discharged by the trustee immediately upon his appointment. The earlier these duties are discharged the less potential market disruption can result.

[23] 112 F.2d 315 (7th Cir. 1940).
[24] 394 F. Supp. 125 (S.D.N.Y. 1975).

**Ad Hoc Equity Group Exhibit 9**

DOCUMENT 52

107

The initial duty of the trustee is to endeavor to transfer to another commodity broker or brokers all identified customer accounts together with the customer property margining such accounts, to the extent the trustee deems appropriate. Although it is preferable for all such accounts to be transferred, exigencies may dictate a partial transfer. The requirement that the value of the accounts and property transferred not exceed the customer's distribution share may necessitate a slight delay until the trustee can submit to the court, for its disapproval, an estimate of each customer's distribution share pursuant to section 768.

Subsection (c) provides that contemporaneously with the estimate of the distribution share and the transfer of identified customer accounts and property, subsection (c) provides that the trustee should make arrangements for the liquidation of all commodity contracts maintained by the debtor that are not identifiable to specific customers. These contracts would, of course, include all such contracts held in the debtor's proprietory account.

At approximately the same time, the trustee should notify each customer of the debtor's bankruptcy and instruct each customer immediately to submit a claim including any claim to a specifically identifiable security or other property, and advise the trustee as to the desired disposition of commodity contracts carried by the debtor for the customer.

This requirement is placed upon the trustee to insure that producers who have hedged their production in the commodities market are allowed the opportunity to preserve their positions. The theory of the commodity market is that it exists for producers and buyers of commodities and not for the benefit of the speculators whose transactions now comprise the overwhelming majority of trades. Maintenance of positions by hedges may require them to put up additional margin payments in the hours and days following the commodity broker bankruptcy, which they may be unable or unwilling to do. In such cases, their positions will be quickly liquidated by the trustee, but they must have the opportunity to make those margin payments before they are summarily liquidated out of the market to the detriment of their growing crop. The failure of the customer to advise the trustee as to disposition of the customer's commodity contract will not delay a transfer of a contract pursuant to subsection (b) so long -as the contract can otherwise be identified to the customer. Nor will the failure of the customer to submit a claim prevent the customer from recovering the net equity in that customer's account, absent a claim the customer cannot participate in the determination of the net equity in the account.

If the customer submits instructions pursuant to subsection (a) after the customer's commodity contracts are transferred to another commodity broker, the trustee must transmit the instruction to the transferee. If the customer's commodity contracts are not transferred before he customer's instructions are received, the trustee must attempt to comply with the instruction, subject to the provisions of section 767(d).

Under subsection (d), the trustee has discretion to liquidate any commodity contract carried by the debtor at any time. This discretion must be exercised with restraint in such cases, consistent with the purposes of this subchapter and good business practices. The com-

108

mittee intends that hedged accounts will be given special consideration before liquidation as discussed in connection with subsection (c).

Subsection (e) instructs the trustee as to the disposition of any security or other property, not disposed of pursuant to subsection (b) or (d), that is specifically identifiable to a customer and to which the customer is entitled. Such security or other property must be returned to the customer or promptly transferred to another commodity broker for the benefit of the customer. If the value of the security or other property retained or transferred, together with any other distribution made by the trustee to or on behalf of the customer, exceeds the customer's distribution share the customer must deposit cash with the trustee equal to that difference before the return or transfer of the security or other property.

Subsection (f) requires the trustee to answer margin calls on specifically identifiable customer commodity contracts, but only to the extent that the margin payment, together with any other distribution made by the trustee to or on behalf of the customer, does not exceed the customer's distribution share.

Subsection (g) requires the trustee to liquidate all commodity futures contracts prior to the close of trading in that contract, or the first day on which notice of intent to deliver on that contract may be tendered, whichever occurs first. If the customer desires that the contract be kept open for delivery, the contract should be transferred to another commodity broker pursuant to subsection (b).

If for some reason the trustee is unable to transfer a contract on which delivery must be made or accepted and is unable to close out such contract, the trustee is authorized to operate the business of the debtor for the purpose of accepting or making tender of notice of intent to deliver the physical commodity underlying the contract, facilitating delivery of the physical commodity, or disposing of the physical commodity in the event of a default. Any property received, not previously held, by the trustee in connection with its operation of the business of the debtor for these purposes, is not by the terms of this subchapter specifically included in the definition of customer property.

Finally, subsection (h) requires the trustee to liquidate the debtor's estate as soon as practicable and consistent with good market practice, except for specifically identifiable securities or other property distributable under subsection (e).

*Section 768. Estimate of distribution share*

Section 768 is an integral part of the commodity broker liquidation procedures outlined in section 767. Prompt action by the trustee to transfer or liquidate customer commodity contracts is necessary to protect customers, the debtor's estate, and the marketplace generally. However, transfers of customer accounts and property valued in excess of the customer's distribution share are prohibited. Since a determination of the customer's distribution share requires a determination of the customer's net equity and the total dollar value of customer property held by or for the account of the debtor, it is possible that the customer's distribution share will not be determined, and thus the customer's contracts and property will not be transferred, on a

DOCUMENT 52

109

timely basis. To avoid this problem, and to expedite transfers of customer property, section 768 permits the trustee to make distributions to customers in accordance with a preliminary estimate of the debtor's customer property and each customer's distribution share.

It is acknowledged that the necessity for prompt action may not allow the trustee to assemble all relevant facts before such an estimate is made. However, the trustee is expected to develop as accurate an estimate as possible based on the available facts. Further, in order to permit expeditious action, section 768 does not require that notice be given to customers or other creditors before the court approves or disapproves the estimate. Nor does section 768 require that customer claims be received pursuant to section 767(a) before the trustee may act upon and in accordance with the estimate. If the estimate is inaccurate, the trustee is absolved of liability for a distribution which exceeds the customer's actual distribution share so long as the distribution did not exceed the customer's estimated distribution share. However, a trustee may have a claim back against a customer who received more than its actual distribution share.

*Section 769. Proceeds from sale of membership*

Section 769 codifies the holding in *Board of Trade* v. *Johnson*,[25] by validating the bylaws, rules, or regulations of a contract market or clearing organization regarding the application of the proceeds derived from the sale of the debtor's membership in the contract market or clearing organization.

*Section 770. Contractual rights to liquidate or transfer*

This section is designed to preclude any court from issuing any order preventing, staying, or otherwise prohibiting the exercise by a commodity broker of a contractual right to liquidate or transfer a commodity contract. The committee is particularly concerned that clearing organizations not be restricted in their power to close out undermargined accounts.

*Section 902. Definitions*

There are six definitions for use in chapter 9. Paragraph (1) defines what claims are included in a chapter 9 case and adopts the definition now found in section 81(1). All claims against the petitioner generally will be included, with one significant exception. Municipalities are authorized, under section 103(c) of the Internal Revenue Code of 1954, as amended, to issue tax-exempt industrial development revenue bonds to provide for the financing of certain projects for privately owned companies. The bonds are sold on the basis of the credit of the company on whose behalf they are issued, and the principal, interest, and premium, if any, are payable solely from payments made by the company to the trustee under the bond indenture and do not constitute claims on the tax revenues or other funds of the issuing municipalities. The municipality merely acts as the vehicle to enable the bonds to be issued on a tax-exempt basis. Claims that arise by virtue of these bonds are not among the claims defined by this paragraph and amounts owed by private companies to the holders of industrial development revenue bonds are not to be included among the assets of the municipality

---

[25] 264 U.S. 1 (1924).

**Ad Hoc Equity Group Exhibit 9**

110

that would be affected by the plan. See Cong. Record, 94th Cong., 1st Sess. H.R. 12073 (statement by Mr. Don Edwards, floor manager of the bill in the House). Paragraph (2) defines the court which means the federal district court or federal district judge before which the case is pending. Paragraph (3) specifies that when the term "property of the estate" is used in a section in another chapter made applicable in chapter 9 cases, the term means "property of the debtor". Paragraphs (4) and (5) adopt the definition of "special taxpayer affected by the plan" that appears in current sections 81(10) and 81(11) of the Bankruptcy Act. Paragraph (6) provides that "trustee" means "debtor" when used in conjunction with chapter 9.

### Section 903. Reservation of State power to control municipalities

Section 903 is derived, with stylistic changes, from section 83 of current Chapter IX. It sets forth the primary authority of a State, through its constitution, laws, and other powers, over its municipalities. The proviso in section 83, prohibiting State composition procedures for municipalities, is retained. Deletion of the provision would "permit all States to enact their own versions of Chapter IX", *Municipal Insolvency*, 50 Am. Bankr. L.J. 55, 65, which would frustrate the constitutional mandate of uniform bankruptcy laws. *Constitution of the United States.* Art. I, Sec. 8.

This section provides that the municipality can consent to the court's orders in regard to use of its income or property. It is contemplated that such consent will be required by the court for the issuance of certificates of indebtedness under section 364(c) Such consent could extend to enforcement of the conditions attached to the certificates or the municipal services to be provided during the proceedings.

### Section 904. Limitations of jurisdiction and powers of court

This section adopts the policy of section 82(c) of current law. The only change in this section from section 82(c) is to conform the section to the style and cross-references of S. 2266.

### Section 905. Designation of judge

Section 905 adopts the procedures for selection of the judge for the chapter 9 case as found in current section 82(d). It is expected that the large chapter 9 case might take up almost all the judicial time of the presiding judge and involve very complex legal questions. Selection should not be left to chance or the luck of the draw. This provision will insure that calendar demands and levels of experience can be considered in the selection of the judge in a Chapter 9 case.

### Section 906. Eligibility for relief

Section 906 adopts the current law of section 84 of the Bankruptcy Act. It requires general authorization by the State legislature, or by a governmental officer (which includes the chief executive) or governmental organization (such as a municipal finance commission), empowered by State law to authorize filing.

Absent such a requirement for affirmative action by the state, a serious constitutional question would be raised in connection with the 10th amendment. See *New Power of the Chapter IX Bankruptcy Court to Authorize the Issuance of Certificates of Indebtedness: Con-*

DOCUMENT 52

111

*gressional Relief or Congressional Overreaching*, 51 Am. Bankr. L.J.1. (   ).

An additional eligibility requirement is contained in this section. It requires that the petitioner meet one of four conditions before it may seek relief under the chapter. The purpose of the provision is to limit accessibility to the bankruptcy court somewhat, as does current law, without making the accessibility requirement so stringent as to preclude relief in a situation in which the petitioner is confronted with stubborn or aggressive creditors or creditors whose identities are unknown because of the existence of a large number of bonds in bearer form.

*Section 924. List of creditors*

This section adopts the provision presently contained in section 85 (b) of Chapter IX. A list of creditors, as complete and accurate as practicable, must be filed with the court.

*Section 925. Venue and fees*

This section adopts current section 85 (c). If a debtor is located in more than one judicial district, it may select as its filing place either of the districts in which it is located.

*Section 926. Effect of list of claims*

Section 926 follows the policy contained in section 88(a) of the present Act, though certain details are left to the Rules. The language of section 926 is the same as that of proposed 11 U.S.C. 1111, which applies in chapter 11 cases. The list of creditors filed under section 924 is given weight as prima facie evidence of the claims listed (except claims that are listed as disputed, contingent, or unliquidated), which are deemed filed under section 501, obviating the need for listed creditors to file proofs of claim.

*Section 927. Dismissal*

Section 927 conforms to section 98 of current law. The Section permits dismissal by the court for unreasonable delay by the debtor, failure to propose a plan, failure of acceptance of a plan, or default by the debtor under a conformed plan. Mandatory dismissal is required if confirmation is refused.

*Section 928. Avoiding powers*

This section adopts current section 85(h) which provides for a trustee to be appointed for the purpose of pursuing an action under an avoiding power, if the debtor refuses to do so. This section is necessary because a municipality might, by reason of political pressure or desire for future good relations with a particular creditor or class of creditors, make payments to such creditors in the days preceding the petition to the detriment of all other creditors. No change in the elected officials of such a city would automatically occur upon filing of the petition, and it might be very awkward for those same officials to turn around and demand the return of the payments following the filing of the petition. Hence, the need for a trustee for such purpose.

The general avoiding powers are incorporated by reference in section 901 and are broader than under current law. Preferences, fraudulent conveyances, and other kinds of transfers will thus be voidable.

**Ad Hoc Equity Group Exhibit 9**

112

Incorporated by reference also is the power to accept or reject executory contracts and leases (section 365). Within the definition of executory contracts are collective bargaining agreements between the city and its employees. Such contracts may be rejected despite contrary State laws. Courts should readily allow the rejection of such contracts where they are burdensome, the rejection will aid in the municipality's reorganization and in consideration of the equities of each case. On the last point, "[e]quities in favor of the city in chapter 9 will be far more compelling than the equities in favor of the employer in chapter 11. Onerous employment obligations may prevent a city from balancing its budget for some time. The prospect of an unbalanced budget may preclude judicial confirmation of the plan. Unless a city can reject its labor contracts, lack of funds may force cutbacks in police, fire, sanitation, and welfare services, imposing hardships on many citizens. In addition, because cities in the past have often seemed immune to the constraint of "profitability" faced by private businesses, their wage contracts may be relatively more onerous than those in the private sector." *Executory Contracts and Municipal Bankruptcy*, 85 Yale L.J. 957, 965 (1976) (footnote omitted). Rejection of the contracts may require the municipalities to renegotiate such contracts by state collective bargaining laws. It is intended that the power to reject collective bargaining agreements will pre-empt state termination provisions, but not state collective bargaining laws. Thus, a city would not be required to maintain existing employment terms during the renegotiation period.

*Section 929. Reference*

Section 929 adopts current law as found in section 87(a) and allows reference to be made by the Federal district judge handling the case to a bankruptcy judge for consideration of a special issue of fact. Such reference shall be the exception and not the rule.

*Section 930. Priorities*

Section 930 adopts section 89 of current law. The priorities are those traditional to municipal arrangements. The second priority is necessary to insure that the suppliers of the municipality will continue to provide needed supplies prior to the filing of a petition under chapter 9. Without such a priority, because of the notoriety that will probably accompany the pre-petition negotiations and the decision to file, suppliers would cut off deliveries on credit, and the city would be unduly rushed to the courthouse door.

*Section 941. Filing of plan*

Section 941 gives the debtor the exclusive right to propose a plan, and directs that the debtor propose one either with the petition or within such time as the court directs. The section follows section 90(a) of current law.

*Section 942. Transmission of Plan*

Section 942 adopts current section 90(b) and provides that the plan, or a summary thereof, will be transmitted by the petitioner or such other person as the court directs, to each creditor whose claim is affected by the plan, to each special taxpayer affected by the plan and to any party in interest that the court designates.

**Ad Hoc Equity Group Exhibit 9**

DOCUMENT 52

113

### Section 943. Modification of plan

Section 942 permits the debtor to modify the plan at any time before confirmation, as does section 90(a) of current law.

### Section 944. Provisions of plan

Section 944 adopts current section 91, which provides that a plan may modify or alter the rights of all creditors, including those secured or unsecured. The concept of a "secured" creditor has a different meaning in chapter 9 since in most jurisdictions, municipalities are prohibited from giving traditional types of secured interests such as real estate mortgages, because of the public nature of property of the municipality. Secured creditors will be more likely secured because of the pledge of a particular stream of the city revenues. These persons are so-called revenue bondholders in contrast to general obligation bondholders, who will be treated as unsecured creditors.

### Section 945. Acceptance

Section 945 is adopted from current section 92. Generally, at least two-thirds by amounts and one-half by number of the creditors voting on the plan and affected by the plan must accept for confirmation.

### Section 946. Confirmation

Section 946 is adopted from current section 94. The test for confirmation is whether or not the plan is fair and equitable and feasible. The fair and equitable test tracts current chapter X and is known as the strict priority rule. Creditors must be provided, under the plan, the going concern value of their claims. The going concern value contemplates a "comparison of revenues and expenditures taking into account the taxing power and the extent to which tax increases are both necessary and feasible" *Municipal Insolvency, supra,* at p. 64, and is intended to provide more of a return to creditors than the liquidation value if the city's assets could be liquidated like those of a private corporation.

### Section 947. Effect of confirmation

Subsection (a) makes the provisions of a confirmed plan binding on the debtor and creditors. It is derived from section 95(a) of chapter 9.

Subsections (b) and (c) provide for the discharge of a municipality. The discharge is essentially the same as that granted under section 95(b) of the Bankruptcy Act.

### Section 948. Continuing jurisdiction

Section 948 permits the court to retain jurisdiction over the case to ensure successful execution of the plan. The provision is the same as that found in section 96(e) of Chapter 9 of present Act.

### Section 949. Effect of exchange of securities before the date of filing of the petition

This section, which follows section 97 of current law, permits an exchange of a security before the case is filed to constitute an acceptance of the plan if the exchange was under a proposal that later becomes the plan.

### Section 950. Unconstitutionality, revival

This section ensures the existence of a municipal debt adjustment chapter of Chapter 9 is found unconstitutional.

114

*Section 1101. Definitions*

This section contains definitions of three terms that are used in chapter 11. Paragraph (1) defines debtor in possession to mean the debtor, except when a trustee who has qualified is serving in the case.

Paragraph (2), derived from section 229a of current law, defines substantial consummation. Substantial consummation of a plan occurs when transfer of all or substantially all of the property proposed by the plan to be transferred is actually transferred; when the debtor (or its successor) has assumed the business of the debtor or the management of all or substantially all of the property dealt with by the plan; and when distribution under the plan has commenced.

Paragraph (3) defines for purposes of Chapter 11 a public company to mean "a debtor who, within 12 months prior to the filing of a petition for relief under this chapter, had outstanding liabilities of $5 million or more, exclusive of liabilities for goods, services, or taxes and not less than 1,000 security holders." There are, as noted, special safeguards for public investors related to the reorganization of a public company, as so defined.

Both requirements must be met: liabilities, excluding tax obligations and trade liabilities, must be $5 million or more; and (2) the number of holders of securities, debt or equity, or both, must be not less than 1,000. The amount and number are to be determined as of any time within 12 months prior to the filing of the petition for reorganization.

*Section 1102. Creditors' and equity security holders' committees*

This section provides for the election and appointment of committees. Subsection (c) provides that this section does not apply in case of a public company, as to which a trustee, appointed under section 1104(a) will have responsibility to administer the estate and to formulate a plan as provided in section 1106(a).

There is no need for the election or appointment of committees for which the appointment of a trustee is mandatory. In the case of a public company there are likely to be several committees, each representing a different class of security holders and seeking authority to retain accountants, lawyers, and other experts, who will expect to be paid. If in the case of a public company creditors or stockholders wish to organize committees, they may do so, as authorized under section 1109(a). Compensation and reimbursement will be allowed for contributions to the reorganization pursuant to section 503(b) (3) and (4).

*Section 1103. Powers and duties of committees*

This section defines the powers and duties of a committee elected or appointed under section 1102.

Under subsection (a) the committee may, if authorized by the court, employ one or more attorneys, accountants, or other agents to represent or perform services for the committee. Normally one attorney should suffice; more than one may be authorized for good cause. The same considerations apply to the services of others, if the need for any at all is demonstrated.

**Ad Hoc Equity Group Exhibit 9**

DOCUMENT 52

115

Under subsections (c) and (d) the committee, like any party in interest, may confer with the trustee or debtor regarding the administration of the estate; may advise the court on the need for a trustee under section 1104(b). The committee may investigate matters specified in paragraph (2) of subsection (c), but only if authorized by the court and if no trustee or examiner is appointed.

*Section 1104. Appointment of trustee or examiner*

Subsection (a) provides for the mandatory appointment of a disinterested trustee in the case of a public company, as defined in section 1101(3), within 10 days of the order for relief, or of a successor, in the event of a vacancy, as soon as practicable.

Section 156 of chapter X (11 U.S.C. 516) requires the appointment of a disinterested trustee if the debtor's liabilities are $250,000 or over. Section 1104(a) marks a substantial change. The appointment of a trustee is mandatory only for a public company, which under section 1101(3), has $5 million in liabilities, excluding tax and trade obligations, and 1,000 security holders. In view of past experience, cases involving public companies will under normal circumstances probably be relatively few in number but of vast importance in terms of public investor interest.

In case of a nonpublic company, the appointment or election of a trustee is discretionary if the interests of the estate and its security holders would be served thereby. A test based on probable costs and benefits of a trusteeship is not practical. The appointment may be made at any time prior to confirmation of the plan.

In case of a nonpublic company, if no trustee is appointed, the court may under subsection (c) appoint an examiner, if the appointment would serve the interests of the estate and security holders. The purpose of his appointment is specified in section 1106(b).

*Section 1105. Termination of trustee's appointment*

This section authorizes the court to terminate the trustee's appointment and to restore the debtor to possession and management of the property of the estate and to operation of the debtor's business. Section 1104(a) provides that this section does not apply in the case of a public company, for which the appointment of a trustee is mandatory.

*Section 1106. Duties of trustee and examiner*

Subsection (a) of this section prescribes the trustee's duties. He is required to perform the duties of a trustee in a liquidation case specified in section 704(2), (4), (6), (7), (8), and (9). These include reporting and informational duties, and accountability for all property received. Paragraph (2) of this subsection requires the trustee to file with the court, if the debtor has not done so, the list of creditors, schedule of assets and liabilities, and statement of affairs required under section 521(1).

Paragraph (3) of S. 1106 requires the trustee to investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business, and the desirability of the continuance of the business, and any other matter relevant to the case or to the formulation of a plan. Paragraph (4) requires the trustee to report

116

the results of his investigation to the court and to creditors' committees, equity security holders' committees, indenture trustees and any other entity the court designates.

Paragraph (5) requires the trustee to file a plan or to report why a plan cannot be formulated, or to recommend conversion to liquidation or to an individual repayment plan case, or dismissal. It is anticipated that the trustee will consult with creditors and other parties in interest in the formulation of a plan, just as the debtor in possession would.

Paragraph (6) requires final reports by the trustee, as the court orders.

Subsection (b) gives the trustee's investigative duties to an examiner, if one is appointed. The court is authorized to give the examiner additional duties as the circumstances warrant.

Paragraphs (3), (4), and (5) of subsection (a) are derived from sections 165 and 169 of chapter X (11 U.S.C. 565, 569).

*Section 1107. Rights, powers, and duties of debtor in possession*

This section places a debtor in possession in the shoes of a trustee in every way. The debtor is given the rights and powers of a chapter 11 trustee. He is required to perform the functions and duties of a chapter 11 trustee (except the investigative duties). He is also subject to any limitations on a chapter 11 trustee, and to such other limitations and conditions as the court prescribes cf. *Wolf v. Weinstein*, 372 U.S. 633, 649–650 (1963).

*Section 1108. Authorization to operate business*

This section permits the debtor's business to continue to be operated, unless the court orders otherwise. Thus, in a reorganization case, operation of the business will be the rule, and it will not be necessary to go to the court to obtain an order authorizing operation.

*Section 1109. Right to be heard*

Subsection (a) provides, in unqualified terms, that any creditor, equity security holder, or an indenture trustee shall have the right to be heard as a party in interest under this chapter in person, by an attorney, or by a committee. It is derived from section 206 of chapter X (11 U.S.C. 606).

Subsection (b) provides that the Securities and Exchange Commission may appear by filing an appearance in a case of a public company and may appear in other cases if authorized or requested by the court. As a party in interest in either case, the Commission may raise and be heard on any issue. The Commission may not appeal from a judgment, order, or decree in a case, but may participate in any appeal by any other party in interest. This is the present law under section 208 of chapter X (11 U.S.C. 608).

*Section 1110. Aircraft equipment and vessels*

This section, to a large degree, preserves the protection given lessors and conditional vendors of aircraft to a certificated air carrier or of vessels to a certificated water carrier under section 116(5) and 116(6) of present Chapter X. It is modified to conform with the consolidation of Chapters X and XI and with the new chapter 11 generally. It is also modified to give the trustee in a reorganization case an oppor-

DOCUMENT  52

117

tunity to continue in possession of the equipment in question by curing defaults and by making the required lease or purchase payments. This removes the absolute veto power over a reorganization that lessors and conditional vendors have under present law, while entitling them to protection of their investment.

The section overrides the automatic stay or any power of the court to enjoin taking of possession of certain leased, conditionally sold, or liened equipment, unless, the trustee agrees to perform the debtor's obligations and cures all prior defaults (other than defaults under ipso facto or bankruptcy clauses) within 60 days after the order for relief. The trustee and the equipment financer are permitted to extend the 60-day period by agreement. During the first 60 days, the automatic stay will apply to prevent foreclosure unless the creditor gets relief from the stay.

The effect of this section will be the same if the debtor has granted the security interest to the financer or if the debtor is leasing equipment from a financer that has leveraged the lease and leased the equipment subject to a security interest of a third party.

*Section 1111. Effect of schedule of claims and interests*

This section dispenses with the need for every creditor and equity security holder to file a proof of claim or interest in a reorganization case. Usually the debtor's schedules are accurate enough that they will suffice to determine the claims or interests allowable in the case. Thus, the section specifies that any claim or interest included on the debtor's schedules is deemed filed under section 501. This does not apply to claims or interests that are scheduled as disputed, contingent, or unliquidated.

*Section 1112. Conversion or dismissal*

This section brings together all of the conversion and dismissal rules for chapter 11 cases. Subsection (a) gives the debtor an absolute right to convert a voluntarily commenced chapter 11 case in which the debtor remains in possession to a liquidation case.

Subsection (b) gives wide discretion to the court to make an appropriate disposition of the case *sua sponte* or upon motion of a party in interest, or the court is permitted to convert a reorganization case to a liquidation case or to dismiss the case, whichever is in the best interest of creditors and the estate, but only for cause. Cause may include the continuing loss to or diminution of the estate of an insolvent debtor, the absence of a reasonable likelihood of rehabilitation, the inability to effectuate a plan, unreasonable delay by the debtor that is prejudicial to creditors, failure to file a plan within the appropriate time limits, denial of confirmation and any opportunity to modify or propose a new plan, revocation of confirmation and denial of confirmation of a modified plan, inability to effectuate substantial consummation of a confirmed plan, material default by the debtor under the plan, and termination of the plan by reason of the occurrence of a condition specified in the plan. This list is not exhaustive. The court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases. The power of the court to act *sua sponte* should be used sparingly and only in emergency situations.

Subsection (c) prohibits the court from converting a case concerning a farmer or an eleemosynary institution to a liquidation case unless the debtor consents.

Subsection (d) prohibits conversion of a reorganization case to a chapter 13 case unless the debtor requests conversion and his discharge has not been granted or has been revoked.

Subsection (e) reinforces section 109 by prohibiting conversion of a chapter 11 case to a case under another chapter proceedings under which the debtor is not permitted to proceed.

SUBCHAPTER II—THE PLAN

## Section 1121. Who may propose a plan

Subsection (a) permits the debtor to file a reorganization plan with a petition commencing a voluntary case or at any time during a voluntary or involuntary case.

Subsection (b) gives the debtor the exclusive right to file a plan during the first 120 days of the case. There are exceptions, however, enumerated in subsection (c). If a trustee has been appointed, if the debtor does not meet the 120-day deadline, or if the debtor fails to obtain the required consent within 180 days after the filing of the petition, any party in interest may propose a plan. This includes the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, and an indenture trustee. The list is not exhaustive. In the case of a public company, a trustee is appointed within 10 days of the petition. In such a case, for all practical purposes, any party in interest may file a plan.

Subsection (d) permits the court, for cause, to increase or reduce the 120-day and 180-day periods specified. Since, the debtor has an exclusive privilege for 6 months during which others may not file a plan, the granted extension should be based on a showing of some promise of probable success. An extension should not be employed as a tactical device to put pressure on parties in interest to yield to a plan they consider unsatisfactory.

## Section 1122. Classification of claims and equity securities

This section codifies current case law surrounding the classification of claims [26] and equity securities. It requires classification based on the nature of the claims or interests classified, and permits inclusion of claims or interests in a particular class only if the claim or interest being included is substantially similar to the other claims or interests of the class.

Subsection (b), also a codification of existing practice, contains an exception. The plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

## Section 1123. Contents of plan

Subsection (a) specifies what a plan of reorganization must contain. The plan must designate classes of claims and interests, and specify,

---

[26] Payment in cash of small claims in full is common practice in reorganization. *Brockett v. Winkle Terra Cotta Co.*, 81 F. 2d 949, 952 (C.A. 8, 1936) ; *In re New Rochelle Coal & Lumber Co.*, 77 F. 2d 881, 882–83 (C.A. 2, 1935) ; *In re Realty Associates Security Corp.*, 53 F. Supp. 1010, 1011 (E.D.N.Y., 1943).

DOCUMENT 52

119

by class, the claims or interests that are unimpaired under the plan. Priority claims are not required to be classified because they may not have arisen when the plan is filed. The plan must provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a different, but not better, treatment of his claim or interest.

Paragraph (3) applies to claims, not creditors. Thus, if a creditor is undersecured, and thus has a secured claim and an unsecured claim, this paragraph will be applied independently to each of his claims.

Paragraph (4) of subsection (a) is derived from section 216 of chapter X with some modifications. It requires the plan to provide adequate means for the plans execution. These means may include retention by the debtor of all or any part of the property of the estate, transfer of all or any part of the property of the estate to one or more entities, whether organized pre- or postconfirmation, merger or consolidation of the debtor with one or more persons, sale and distribution of all or any part of the property of the estate, satisfaction or modification of any lien, cancellation or modification of any indenture or similar instrument, curing or waiving of any default, extension of maturity dates or change in interest rates of securities, amendment of the debtor's charter, and issuance of securities.

Subparagraph (C), as it applies in railroad cases, has the effect of overruling *St. Joe Paper Co.* v. *Atlantic Coast Line R.R.*, 347 U.S. 298 (1954). It will allow the trustee or creditors to propose a plan of merger with another railroad without the consent of the debtor, and the debtor will be bound under proposed 11 U.S.C. 1141(a). *See Hearings*, pt. 3, at 1616. "Similar instrument" referred to in subparagraph (F) might include a deposit with an agent for distribution, other than an indenture trustee, such as an agent under an agreement in a railroad conditional sale or lease financing agreement.

Paragraphs (5) and (6) and subsection (b) are derived substantially from Section 216 of Chapter X (11 U.S.C. 616). Paragraph (5) requires the plan to prohibit the issuance of nonvoting equity securities, and to provide for an appropriate distribution of voting power among the various classes of equity securities. Paragraph (6) requires that the plan contain only provisions that are consistent with the interests of creditors and equity security holders, and with public policy with respect to the selection of officers, directors, and trustees, and their successors.

Subsection (b) specifies the matters that the plan may propose. The plan may impair or leave unimpaired any claim or interest. The plan may provide for the assumption or rejection of executory contracts or unexpired leases not previously rejected under section 365. The plan may also provide for the treatment of claims by the debtor against other entities that are not settled before the confirmation of the plan. The plan may propose settlement or adjustment of any claim or equity security belonging to the estate, or may propose retention and enforcement of such claim or interest by the debtor or by an agent appointed for that purpose.

The plan may also propose the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of the sale among creditors and equity security holders. This would be a liquidating plan. The subsection permits the plan to include any other appro-

**Ad Hoc Equity Group Exhibit 9**

priate provision not inconsistent with the applicable provisions of the bankruptcy code.

Subsection (c) protects an individual debtor's exempt property by prohibiting its use, sale, or lease under a plan proposed by someone other than the debtor, unless the debtor consents.

*Section 1124. Impairment of claims or interests*

The basic concept underlying this section is not new. It rests essentially on Section 107 of Chapter X (11 U.S.C. 507), which states that creditors or stockholders or any class thereof "shall be deemed to be 'affected' by a plan only if their or its interest shall be materially and adversely affected thereby."

This section is designed to indicate when contractual rights of creditors or interest holders are not materially affected. It specifies three ways in which the plan may leave a claim or interest unimpaired.

First, the plan may propose not to alter the legal, equitable, or contractual rights to which the claim or interest entitled its holder.

Second, a claim or interest is unimpaired by curing the effect of a default and reinstating the original terms of an obligation when maturity was brought on or accelerated by the default. The intervention of bankruptcy and the defaults represent a temporary crisis which the plan of reorganization is intended to clear away. The holder of a claim or interest who under the plan is restored to his original position, when others receive less or get nothing at all, is fortunate indeed and has no cause to complain. Curing of the default and the assumption of the debt in accordance with its terms is an important reorganization technique for dealing with a particular class of claims, especially secured claims.

Third, a claim or interest is unimpaired if the plan provides for their payment in cash. In the case of a debt liability, the cash payment is for the allowed amount of the claim, which does not include a redemption premium. If it is an equity security with a fixed liquidation preference, such as a preferred stock, the allowed amount is such liquidation preference, with no redemption premium. With respect to any other equity security, such as a common stock, cash payment must be equal to the "value of such holder's interest in the debtor."

Section 1124 does not include payment "in property" other than cash. Except for a rare case, claims or interests are not by their terms payable in property, but a plan may so provide and those affected thereby may accept or reject the proposed plan. They may not be forced to accept a plan declaring the holders' claims or interests to be "unimpaired."

*Section 1125. Postpetition disclosure and solicitation*

This section extends disclosure requirements in connection with solicitations to all cases under chapter 11. Heretofore this subject was dealt with by the Bankruptcy Act mainly in the special contexts of railroad reorganizations and chapter X cases.

Subsection (a) defines (1) the subject matter of disclosure as "adequate information" and relates the standard of adequacy to an (2) "investor typical of holders or claims or interests of the relevant class." "Investor" is used broadly here, for it will almost always in-

DOCUMENT 52

121

clude a trade creditor or other creditors who orginally had no investment intent or interest. It refers to the investment-type decision by those called upon to accept a plan to modify their claims or interests, which typically will involve acceptance of new securities or of a cash payment in lieu thereof.

Both the kind and form of information are left essentially to the judicial discretion of the court, guided by the specification in subparagraph (a)(1) that it be of a kind and in sufficient detail that a reasonable and typical investor can make an informed judgment about the plan. The information required will necessarily be governed by the circumstances of the case.

Reporting and audit standards devised for solvent and continuing businesses do not necessarily fit a debtor in reorganization. Subsection (a)(1) expressly incorporates consideration of the nature and history of the debtor and the condition of its books and records into the determination of what is reasonably practicable to supply. These factors are particularly pertinent to historical data and to discontinued operations of no future relevance.

A plan is necessarily predicated on knowledge of the assets and liabilities being dealt with an on factually supported expectations as to the future course of the business sufficient to meet the feasibility standard in section 1130(a)(11) of ths title. It may thus be necessasry to provide estimates or judgments for that purpose. Yet it remains practicable to describe, in such detail as may be relevant and needed, the basis for the plan and the data on which supporters of the plan rely.

Subsection (b) establishes the jurisdiction of the court over this subject by prohibiting solicitation of acceptance or rejection of a plan after the commencement of the case, unless the person solicited receives, before or at the time of the solicitation, a written disclosure statement approved by the court, after notice and hearing, as containing adequate information. As under present law, determinations of value, by appraisal or otherwise, are not required if not needed to accomplish the purpose specified in subsection (a)(1).

Subsection (c) requires that the same disclosure statement be transmitted to each member of a class. It recognizes that the information needed for an informed judgment about the plan may differ among classes. A class whose rights under the plan center on a particular fund or asset would have no use for an extensive description of other matters that could not affect them.

Subsection (d) relieves the court of the need to follow any otherwise applicable Federal or state law in determining the adequacy of the information contained in the disclosure statement submitted for its approval. It authorizes an agency or official, Federal or state, charged with administering cognate laws so preempted to advise the court on the adequacy of proposed disclosure statement. But they are not authorized to appeal the court's decision.

Solicitations with respect to a plan do not involve just mere requests for opinions. Acceptance of the plan vitally affects creditors and shareholders, and most frequently the solicitation involves an offering of securities in exchange for claims or interests. The present bank-

122

ruptcy statute has exempted such offerings under each of its chapters from the registration and disclosure requirements of the Securities Act of 1933. an exemption also continued by section 1145(a)(2) of this title. The extension of the disclosure requirements to all chapter 11 cases justifies the cordinate extension of these exemptions. By the same token, no valid purpose is served not to exempt from the requirements of similar state laws in a matter under the exclusive jurisdiction of the Federal bankruptcy laws.

Subsection (e) exonerates any person who, in good faith and in compliance with this title, solicits or participates in the offer, issuance, sale or purchase, under the plan, of a security from any liability, on account of such solicitation or participation, for violation of any law, rule, or regulation governing the offer, issuance, sale, or purchase of securities. This exoneration is coordinate with the exemption from Federal or State registration or licensing requirements provided by section 1145 of this title.

In the nonpublic case, the court, when approving the disclosure statement, has before it the texts of the plan, a proposed disclosure document, and such other information the plan proponents and other interested parties may present at the hearing. In the final analysis the exoneration which subsection (e) grants must depend on the good faith of the plan proponents and of those who participate in the preparation of the disclosure statement and in the solicitation. Subsection (e) does not affect civil or criminal liability for defects and inadequacies that are beyond the limits of the exoneration that good faith provides.

Section 1125 applies to public companies as well. subject to the qualifications of subsection (f). In case of a public company no solicitations of acceptance is permitted unless authorized by the court upon or after approval of the plan pursuant to section 1128(c). In addition to the documents specified in subsection (b). subsection (f) requires transmission of the opinion and order of the court approving the plan and, if filed, the advisory report of the Securities and Exchange Commission or a summary thereof prepared by the Commission.

*Section 1126. Acceptance of plan*

Subsection (a) of this section permits the holder of a claim or interest allowed under section 502 to accept or reject a proposed plan of reorganization. The subsection also incorporates a provision now found in section 199 of chapter X that authorizes the Secretary of the Treasury to accept or reject a plan on behalf of the United States when the United States is a creditor or equity security holder.

Subsection (b) governs acceptances and rejections of plans obtained before commencement of a reorganization for a nonpublic company. Paragraph (3) expressly states that subsection (b) does not apply to a public company.

Prepetition solicitation is a common practice under chapter XI today. and chapter IX current makes explicit provision for it. Section 1126(b) counts a prepetition acceptance or rejection toward the required amounts and number of acceptances only if the solicitation of the acceptance or rejection was in compliance with any applicable

DOCUMENT 52

123

nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation. If there is not any such applicable law, rule, or regulation, then the acceptance or rejection is counted only if it was solicited after disclosure of adequate information, to the holder, as defined in section 1125(a)(1). This permits the court to ensure that the requirements of section 1125 are not avoided by prepetition solicitation.

Subsection (c) specifies the required amount and number of acceptances for a class of creditors. A class of creditors has accepted a plan if at least two-thirds in amount and more than one-half in number of the allowed claims of the class that are voted are cast in favor of the plan. The amount and number are computed on the basis of claims actually voted for or against the plan, not as under chapter X on the basis of the allowed claims in the class. Subsection (f) excludes from all these calculations claims not voted in good faith, and claims procured or solicited not in good faith or not in accordance with the provisions of this title.

Subsection (c) requires that the same disclosure statement be transmitted to each member of a class. It recognizes that the information needed for an informed judgment about the plan may differ among classes. A class whose rights under the plan center on a particular fund or asset would have no use for an extensive description of other matters that could not affect them.

Subsection (d) relieves the court of the need to follow any otherwise applicable Federal or state law in determining the adequacy of the information contained in the disclosure statement submitted for its approval. It authorizes an agency or official, Federal or state, charged with administering cognate laws so pre-empted to advise the court on the adequacy of proposed disclosure statement. But they are not authorized to appeal the court's decision.

Solicitations with respect to a plan do not involve just mere requests for opinions. Acceptance of the plan vitally affects creditors and shareholders, and most frequently the solicitation involves an offering of securities in exchange for claims or interests. The present Bankruptcy Act has exempted such offerings under each of its chapters from the registration and disclosure requirements of the Securities Act of 1933, an exemption also continued by section 1145 of this title. The extension of the disclosure requirements to all chapter 11 cases is justified by the integration of the separate chapters into the single chapter 11. By the same token, no valid purpose is served by failing to provide exemption from the requirements of similar state laws in a matter under the exclusive jurisdiction of the Federal bankruptcy laws.

Under subsection (d), with respect to a class of equity securities, it is sufficient for acceptance of the plan if the amount of securities voting for the plan is at least two-thirds of the total actually voted.

Subsection (e) provides that no acceptances are required from any class whose claims or interests are unimpaired under the plan or in the order confirming the plan.

Subsection (g) provides that any class denied participation under the plan is conclusively deemed to have rejected the plan. There is obviously no need to submit a plan for a vote by a class that is to re-

124

ceive nothing. But under subsection (g) the excluded class is like a class that has not accepted, and is a dissenting class for purposes of confirmation under section 1130.

*Section 1127. Modification of plan*

Under subsection (a) the proponent may file a proposal to modify a plan prior to confirmation. In the case of a public company the modifying proposal may be filed prior to approval.

Subsection (b) provides that a party in interest eligible to file a plan may file instead of a plan a proposal to modify a plan filed by another. Under subsection (c) a party in interest objecting to some feature of a plan may submit a proposal to modify the plan to meet the objection.

After a plan has been confirmed, but before its substantial consummation, a plan may be modified by leave of court, which subsection (d) provides shall be granted for good cause. Subsection (e) provides that a proposal to modify a plan is subject to the disclosure requirements of section 1125 and as provided in subsection (f). It provides that a creditor or stockholder who voted for or against a plan is deemed to have accepted or rejected the modifying proposal. But if the modification materially and adversely affects any of their interests, they must be afforded an opportunity to change their vote in accordance with the disclosure and solicitation requirements of section 1125.

Under subsection (g) a plan, if modified prior to confirmation, shall be confirmed if it meets the requirements of section 1130.

*Section 1128. Hearing and approval of plan for a public company*

This section applies only to a public company. It continues, as to public companies, the requirement that the plan, which the court approves and later confirms, shall be "fair and equitable." First developed in equity receivership, this standard has been applied for the past 40 years under chapter X. A fair and equitable plan, developed under the direction of a disinterested trustee as the focal point in the reorganization, and an affirmative and active judicial role, throughout the hearing approval, and confirmation procedures to assure that the plan is fair and equitable, are vital safeguards for public investors. The alternative, a plan negotiated by management and committees likely to be dominated by senior and institutional creditors—essentially a composition would not serve the reorganization needs of a public company.

The procedure for hearing and approval, including the advisory function of the Securities and Exchange Commission with repect to the plan, are derived from chapter X. The hearing under subsection (a) shall be on the trustee's plan and any other plan that may be filed. If he files no plan of his own, the trustee may support or oppose such other plan in light of his duties specified in section 1106(a). The time for hearing is within the discretion of the court.

At the hearing, evidence may be produced regarding the assets and business which are the subject of the plan, and the fairness and feasibility of the plan, including the character and quality of the securities to be issued. Witnesses may be examined and cross-examined at the hearing. The duration of the hearing depends on the nature of the case and the matters and issues in dispute. The hearing provides a means of

DOCUMENT 52

125

establishing a firm factual foundation for the plan of reorganization; the exploration of divergent views in a forum open to all interests; and a judicial decision on the fairness of the plan to all affected thereby. It also ensures that the order authorizing solicitation of acceptances under section 1125 is based on an independent judicial evaluation of the relevant facts and on a searching inquiry into the merits of the plan approved by the court prior to the solicitation.

Subsection (b) requires that the court, prior to approval, refer any plan or plans worthy of consideration for an advisory report to the Securities and Exchange Commission. This provision is derived from section 172 of chapter X (11 U.S.C. 572). In chapter X the reference is mandatory if scheduled indebtedness exceeds $3 million. Under subsection (b) the reference is required only for a public company as defined in section 1101(3), under which total indebtedness must be $5 million or more, but exclusive of trade debt and tax liabilities, and security holders must be in number not less than 1,000. The SEC is required to report within a fixed time set by the court. It is expected that this time will be sufficiently brief so that the report requirement does not delay the confirmation of the plan.

Subsection (c) provides that after the SEC report is filed, upon the expiration of the time allowed, the SEC, or on receipt of information from the SEC that no report is filed, the court shall, after a hearing, approve a plan or plans that it finds fair and equitable and otherwise in compliance with the pertinent statutory provisions. This hearing is ordinarily in the nature of oral argument, with or without briefs. It affords all parties an opportunity to submit to the court their views in light of the evidence and the report of the Securities and Exchange Commission. However, the court is not precluded at this or another hearing from receiving additional evidence, as circumstances may require.

The hearings provided in subsections (a) and (c) avoid postponing to the hearing on confirmation the kind of complex issues to be expected in the case of public companies. After these hearings and with all controversial issues out of the way, the hearing on confirmation of a plan for a public company should be relatively uneventful, calling for a report on acceptances and dissenting classes, if any, and for considering unusual and anticipated developments.

Subsection (d) provides that for purposes of subsection (c) and section 1130 governing confirmation, a plan is not deemed to be not fair and equitable as to particular creditors or security holders who consent to a modification of their participation in favor of junior claims or interests.

Subsection (e) provides that the order of approval is not appealable. Under section 1129(b) any party in interest may object to confirmation of the plan and may appeal from the confirmation order. A right to one appeal is sufficient. An appeal from the order of approval as well could be a source of tactical obstruction.

*Section 1129. Confirmation hearing*

Subsection (a) requires that there be a hearing in every case on the confirmation of the plan. Notice is required.

Subsection (b) permits any party in interest to object to the confirmation of the plan. The Securities and Exchange Commission and

**Ad Hoc Equity Group Exhibit 9**

126

indenture trustees, as parties in interest under section 1109, may object to confirmation of the plan.

*Section 1130. Confirmation of plan*

Subsection (a) enumerates the requirement governing confirmation of a plan. The court is required to confirm a plan if and only if all of the requirements are met.

Paragraph (1) requires that the plan comply with the applicable provisions of chapter 11, such as section 1122 and 1123, governing classification and contents of plan.

Paragraph (2) requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure.

Paragraph (3) requires that the plan have been proposed in good faith, and not by any means forbidden by law.

Paragraph (4) is derived from section 221 of chapter X. It requires that any payment made or promised by the proponent, the debtor, or person issuing securities or acquiring property under the plan, for services or for costs and expenses in, or in connection with the case, or in connection with the plan and incident to the case, be disclosed to the court. In addition, any payment made before confirmation must have been reasonable, and any payment to be fixed after confirmation must be subject to the approval of the court as reasonable.

Paragraph (5) is also derived from section 221 of chapter X. It requires the plan to disclose the identity and affiliations of any individual proposed to serve, after confirmation, as a director, officer, or voting trustee of the reorganized debtor. The appointment to or continuance in one of these offices by the individual must be consistent with the interests of creditors and equity security holders and with public policy. The plan must also disclose the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation to be paid to the insider.

Paragraph (6) permits confirmation only if any regulatory commission that will have jurisdiction over the debtor after confirmation of the plan has approved any rate change provided for in the plan. As an alternative, the rate change may be conditioned on such approval.

Paragraph (7) provides that in the case of a public company the court shall confirm the plan if it finds the plan to be fair and equitable and the plan either (1) has been accepted by classes of claims or interests as provided in section 1126, or (2), if not so accepted, satisfies the requirements of subsection (b) of this section.

Paragraphs (8) and (9) apply only in nonpublic cases. Paragraph (8) does not apply the fair and equitable standards in two situations. The first occurs if there is unanimous consent of all affected holders of claims and interests. It is also sufficient for purposes of confirmation if each holder of a claim or interest receives or retains consideration of a value, as of the effective date of the plan, that is not less than each would have or receive if the debtor were liquidated under chapter 7 of this title. This standard adapts the test of "best interest of creditors" as interpreted by the courts under chapter XI. It is given broader application in chapter 11 of this title since a

## DOCUMENT 52

plan under chapter 11 may affect not only unsecured claims but secured claims and stock as well.

Under paragraph (9)(A), if a class of claims or interests has not accepted the plan, the court will confirm the plan if, for the dissenting class and any class of equal rank, the negotiated plan provides in value no less than under a plan that is fair and equitable. Such review and determination are not required for any other classes that accepted the plan.

Paragraph 9(A) would permit a senior creditor to adjust his participation for the benefit of stockholders. In such a case, junior creditors, who have not been satisfied in full, may not object if, absent the "give-up", they are receiving all that a fair and equitable plan would give them. To illustrate, suppose the estate is valued at $1.5 million and claims and stock are:

|  | Claims and stock (millions) | Equity (millions) |
|---|---|---|
| (1) Senior debt | $1.2 | $1.2 |
| (2) Junior debt | .5 | .3 |
| (3) Stock | (¹) | — |
| Total | 1.7 | 1.5 |

Under the plan, the senior creditor gives up $100,000 in value for the benefit of stockholders as follows:

|  | Millions |
|---|---|
| (1) Senior debt | $1.1 |
| (2) Junior debt | .3 |
| (3) Stock | .1 |
| Total | 1.5 |

¹ No value.

If the junior creditors dissent, the court may nevertheless confirm the plan since under the fair and equitable standard they had an equity of only $300,000 and the allocation to equity security holders did not affect them.

Paragraph 9(A) provides a special alternative with respect to secured claims. A plan may be confirmed against a dissenting class of secured claims if the plan or order of confirmation provides for the realization of their security (1) by the retention of the property subject to such security; (2) by a sale of the property and transfer of the claim to the proceeds of sale if the secured creditors were permitted to bid at the sale and set off against the purchase price up to the allowed amount of their claims; or (3) by such other method that will assure them the realization of the indubitable equivalent of the allowed amount of their secured claims. The indubitable equivalent language is intended to follow the strict approach taken by Judge Learned Hand in *In Re Murel Holding Corp* 75 F.2d 941 (2nd Cir. 1935).

Paragraph (9)(B) provides that, if a class of claims or interests is excluded from participation under the plan, the court may nevertheless confirm the plan if it determines that no class on a parity with or junior to such participates under the plan. In the previous illustration, no confirmation would be permitted if the negotiated plan would grant a participation to stockholders but nothing for junior creditors.

128

As noted elsewhere, by reason of section 1126(g), an excluded class is a dissenting class under section 1130.

Paragraph (10) states that, to be confirmed, the plan must provide that each holder of a claim under section 507 will receive property, as therein noted, of a value equal to the allowed amount of the claim. There are two exceptions: (A) The holder thereof may agree to a different settlement in part or in whole; (B) where a debtor's business is reorganized under chapter 11, this provision requires that taxes entitles to priority (including administrative claims or taxes) must be paid in cash not later than 120 days after the plan is confirmed, unless the Secretary of the Treasury agrees to other terms or kinds of payment. The bill, as introduced, required full payment in cash within 60 days after the plan is confirmed.

Paragraph (11) requires a determination regarding feasibility of the plan. It is a slight elaboration of the law that has developed in the application of the word "feasible" in Chapter X of the present Act.

Paragraph (12) requires that at least one class must accept the plan, but any claims or interests held by insiders are not to be included for purposes of determining the number and amount of acceptances.

Subsection (b) provides that if, in the case of a public company, the plan meets the requirements of subsection (a) (except paragraphs (8) and (9) which do not apply to such a company), the court is to confirm the plan if the plan or the order of confirmation provides adequate protection for the realization of the value of the claims or interests of each class not accepting the plan. The intent is to incorporate inclusively, as a guide to the meaning of subsection (a) the provisions of section 216(7) (11 U.S.C. 616(7)) with respect to claims and section 216(8) (11 U.S.C. 616(8)) with respect to equity security interests.

Under subsection (c) the court may confirm only one plan, unless the order of confirmation has been revoked under section 1144. If the requirements for confirmation are met with respect to more than one plan, the court shall consider the preferences of creditors and stockholders in deciding which plan to confirm.

Subsection (d) provides that the bankruptcy court may not confirm a plan of reorganization if its principal purpose is the avoidance of taxes or the avoidance of section 5 of the Securities Act of 1933 (15 U.S.C. 77e). This rule modifies a similar provision of present law (section 269 of the Bankruptcy Act).

*Section 1131. Real estate liens*

This section restricts the ability of a debtor in possession or trustee to modify or alter the rights of a creditor holding a claim or interest secured by a lien upon or security interest in property of the estate which is real estate, chattels real, leasehold estates in real property, or fixtures to the extent that such claim or interest was incurred for the purchase or improvement of such property. The section is designed to afford greater protection from the operation of the cram-down provisions to the more significant real estate financing interests by creating a "safe harbor" that will facilitate, rather than discourage, that type of financing, which will often by law or contract be on a nonrecourse basis. The precise determination of the extent to which a claim or interest was incurred for the purchase or improvement of realty is left

Ad Hoc Equity Group Exhibit 9

DOCUMENT 52

129

to the courts. There exists ample case law on the question in other areas of commercial and real property law.

Subsection (a) provides two means by which such claims or interests may be altered. First, where a default exists in payment of an installment claim or interest, reinstatement is permitted with defaulted payments of principal and interest to be amortized equally over the life of the reinstated loan at the same rate of interest. Second, and alternatively, repayment of the claim or interest may be extended on a reasonable, equitable, and practicable basis, so long as the value of the interest or claim as extended is the indubitable equivalent of the claim or interest if reinstated under the first alternative. A determination of indubitable equivalence of a debt instrument would in most circumstances be by reference to its present money value.

Subsection (b) specifies that claims or interests held by sellers of such property, by creditors who gave value to permit the acquisition of such property, and by direct or indirect successors in interest to the holders of such claims or interests are included within the coverage of the section.

Subsection (c) specifically excludes liens upon or security interests in the property of a farmer, as well as any claim or interest which is a consumer debt, from the section's coverage.

SUBCHAPTER III—POSTCONFIRMATION MATTERS

*Section 1141. Effect of confirmation*

Subsection (a) of this section makes the provisions of a confirmed plan binding on the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of the creditor, equity security holder, or partner is impaired under the plan and whether or not he has accepted the plan. There are two exceptions, enumerated in paragraph (2) and (3) of subsection (d).

Unless the plan or the order confirming the plan provides otherwise, the confirmation of a plan vests all of the property of the estate in the debtor and releases it from all claims and interests of creditors, equity security holders and general partners.

Subsection (d) contains the discharge for a reorganized debtor. Paragraph (1) specifies that the confirmation of a plan discharges the debtor from any debt that arose before the date of the order for relief unless the plan or the order confirming the plan provides otherwise. The discharge is effective against those claims whether or not proof of the claim is filed (or deemed filed), and whether or not the claim is allowed. The discharge also terminates all rights and interests of equity security holders and general partners provided for by the plan. The paragraph permits the plan or the order confirming the plan to provide otherwise, and excepts certain debts from the discharge as provided in paragraphs (2) and (3).

Paragraph (2) of subsection (d) makes clear what taxes remain nondischargeable in the case of a corporate debtor emerging from a reorganization under chapter 11. Nondischargeable taxes in such a reorganization are the priority taxes (under section 507) and tax pay-

130

ments which come due during and after the proceeding under a deferred or part-payment agreement which the debtor had entered into with the tax authority before the bankruptcy proceedings began. On the other hand, a corporation which is taken over by its creditors through a plan of reorganization will not continue to be liable for nonpriority taxes arising from the corporation's prepetition fraud, failure to file a return, or failure to file a timely return, since the creditors who take over the reorganized company should not bear the burden of acts for which the creditors were not at fault.

Paragraph (3) specifies that the debtor is not discharged by the confirmation of a plan if the plan is a liquidating plan and if the debtor would be denied discharge in a liquidation case under section 727. Specifically, if all or substatially all of the distribution under the plan is of all or substantially all of the property of the estate or the proceeds of it, if the business, if any, of the debtor does not continue, and if the debtor would be denied a discharge under section 727 (such as if the debtor were not an individual or if he had committed an act that would lead to a denial of discharge), the chapter 11 discharge is not granted.

Paragraph (4) authorizes the court to approve a waiver of discharge by the debtor.

*Section 1143. Distribution*

Section 1143 fixes a 5-year limitation on presentment or surrender of securities or the performance of any other act that is a condition to participation in distribution under the plan. The 5 years runs from the date of the entry of the order of confirmation. Any entity that does not take the appropriate action with the 5-year period is barred from participation in the distribution under the plan.

*Section 1144. Revocation of an order of confirmation*

If an order of confirmation was procured by fraud, then the court may revoke the order on request of a party in interest if the request is made before 180 days after the date of the entry of the order of confirmation. The order revoking the order of confirmation must revoke the discharge of the debtor, and contain such provisions as are necessary to protect any entity acquiring rights in good faith reliance on the order of confirmation.

*Section 1145. Exemption from securities laws*

This section, derived from similar provisions found in sections 264, 393, and 518 of the Bankruptcy Act, provides a limited exemption from the securities laws for securities issued under a plan of reorganization and for certain other securities. Subsection (a) exempts from the requirements of section 5 of the Securities Act of 1933 and from any State or local law requiring registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security, the offer or sale of certain securities.

Paragraph (1) of subsection (a) exempts the offer or sale under section 364 of any security that is not an equity security or convertible into an equity security. This paragraph is designed to facilitate the issuance of certificates of indebtedness, and should be read in light of the amendment made in section 306 of title III to section 3(a) (7) of the 1933 act.

DOCUMENT 52

131

Paragraph (2) of subsection (a) exempts the offer or sale of any security of the debtor, a successor to the debtor, or an affiliate in a joint plan, distributed under a plan if such security is exchanged in principal part for securities of the debtor or for allowed claims or administrative expenses. This exemption is carried over from present law, except as to administrative claims, but is limited to prevent distribution of securities to other than claim holders or equity security holders of the debtor or the estate.

Paragraph (3) of subsection (a) exempts the offer or sale of any security that arises from the exercise of a subscription right or from the exercise of a conversion privilege when such subscription right or conversion privilege was issued under a plan. This exemption is necessary in order to enhance the marketability of subscription rights or conversion privileges, including warrants, offered or sold under a plan. This is present law.

Paragraph (4) of subsection (a) exempts sales of portfolio securities, excluding securities of the debtor or its affiliate, owned by the debtor on the date of the filing of the petition. The purpose of this exemption is to allow the debtor or trustee to sell or distribute, without allowing manipulation schemes, restricted portfolio securities held or acquired by the debtor. Subparagraph (B) of section 1145(a)(4) limits the exemption to securities of a company that is required to file reports under section 13 of the Securities Act and that is in compliance with all requirements for the continuance of trading those securities. This limitation effectively prevents selling into the market "cats and dogs" of a nonreporting company. Subparagraph (C) places a limitation on the amount of restricted securities that may be distributed. During the case, the trustee may sell up to 4 percent of each class of restricted securities at any time during the first 2 years and 1 percent during any 180-day period thereafter. This relaxation of the resale rules for debtors in holding restricted securities is similar to but less extensive than the relaxation in SEC Rule 114(c)(3)(v) for the estates of deceased holders of securities.

Paragraph (5) contains an exemption for brokers and dealers (stockbrokers, as defined in title 11) akin to the exemption provided by section 4(3)(A) of the Securities Act of 1933. Instead of being required to supply a prospectus, however, the stockbroker is required to supply the approved disclosure statement, and if the court orders, information supplementing the disclosure statement. Under present law, the stockholder is not required to supply anything.

Subsection (b) is new. The subsection should be read in light of the amendment in section 306 of title III to the 1933 act. It specifies the standards under which a creditor, equity security holder, or other entity acquiring securities under the plan may resell them. The Securities Act places limitations on sales by underwriters. This subsection defines who is an underwriter, and thus restricted, and who is free to resell. Paragraph (1) enumerates real underwriters that participate in a classical underwriting. A person is an underwriter if he purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, with a view to distribution or interest. This provision covers the purchase of a certificate of indebtedness issued under proposed 11 U.S.C. 364 and purchased from the debtor, if the purchase of the certificate was with a view to distribution.

**Ad Hoc Equity Group Exhibit 9**

132

A person is also an underwriter if he offers to sell securities offered or sold under the plan for the holders of such securities, or offers to buy securities offered or sold under the plan from the holders of such securities, if the offer to buy is with a view to distribution of the securities and under an agreement made in connection with the plan, with the consummation of the plan or with the offer or sale of securities under the plan. Finally, a person is an underwriter if he is an issuer, as used in section 2(11) of the Securities Act of 1933.

Paragraph (2) of subsection (b) exempts from the definition of underwriter any entity to the extent that any agreement that would bring the entity under the definition in paragraph (1) provides only for the matching combination of fractional interests in the covered securities or the purchase or sale of fractional interests. This paragraph and paragraph (1) are modeled after former rule 133 of the Securities and Exchange Commission.

Paragraph (3) specifies that if an entity is not an underwriter under the provisions of paragraph (1), as limited by paragraph (2), then the entity is not an underwriter for the purposes of the Securities Act of 1933 with respect to the covered securities, that is, those offered or sold in an exempt transaction specified in subsection (a)(2). This makes clear that the current definition of underwriter in section (2)(11) of the Securities Act of 1933 does not apply to such a creditor. The definition in that section technically applies to any person that purchases securities with "a view to distribution." If literally applied, it would prevent any creditor in a bankruptcy case from selling securities received without filing a registration statement or finding another exemption.

Subsection (b) is a first run transaction exemption and does not exempt a creditor that, for example, some years later becomes an underwriter by reacquiring securities originally issued under a plan.

Subsection (c) makes an offer or sale of securities under the plan in an exempt transaction (as specified in subsection (a)(2)) a public offering, in order to prevent characterization of the distribution as a "private placement" which would result in restrictions, under rule 144 of the SEC, on the resale of the securities.

*Section 1146. Special tax provisions*

Section 1146 provides special tax rules applicable to title 11 reorganizations. Subsection (a) provides that the taxable period of an individual debtor terminates on the date of the order for relief, unless the case has been converted into a reorganization from a liquidation proceeding.

Subsection (b) requires the trustee of the estate of an individual debtor in a reorganization to file a tax return for each taxable period while the case is pending after the order for relief. For corporations in chapter 11, the trustee is required to file the tax returns due while the case is pending (sec. 346(c)(2)).

Subsection (c) exempts from Federal, State, or local stamp taxes the issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under a plan. This subsection is derived from section 267 of the present Bankruptcy Act.

**Ad Hoc Equity Group Exhibit 9**

DOCUMENT  52

133

Subsection (d) permits the court to authorize the proponent of a reorganization plan to request from the Internal Revenue Service (or State or local tax authority) an advance ruling on the tax effects of the proposed plan. If a ruling is not obtained within 270 days after the request was made, or if a ruling is obtained but the proponent of the plan disagrees with the ruling, the bankruptcy court may resolve the dispute and determine the tax effects of the proposed plan.

Subsection (e) provides that prepetition taxes which are nondischargeable in a reorganization, and all taxes arising during the administration period of the case, may be assessed and collected from the debtor or the debtor's successor in a reorganization (see sec. 505(c) of the bill).

RAILROAD REORGANIZATIONS

### Section 1161. Inapplicability of other sections

This section makes inapplicable sections of the bill which are either inappropriate in railroad reorganizations, or relate to matters which are otherwise dealt with in subchapter IV.

### Section 1162. Definitions

Two definitions are provided: That Commission means the Interstate Commerce Commission, and that "person" includes a governmental unit for purposes of the subchapter. The latter definition is made necessary because governmental unit is excluded from the definition of person in section 101(30).

### Section 1163. Debtors eligible for relief

Debtors eligible for relief under subchapter IV include any common carrier by railroad engaged in either freight or passenger service in either interstate or foreign commerce, as well as any owner of trackage facilities leased by such a carrier. The exclusion in present section 77(m) of street or suburban electric railways is omitted as unnecessary.

### Section 1164. Notice to the Commission

Section 1164 requires a copy of every petition initiating a case under this subchapter to be filed with the Interstate Commerce Commission, as does present section 77(a).

### Section 1165. Disposition of an involuntary petition; protection

Section 1165 requires the court, in consideration of the relief to be granted upon the filing of an involuntary petition, to take into account the "public interest" in the preservation of the debtor's rail service. This is an important factor in railroad reorganization, which distinguishes them from other business reorganizations. Hence, this section modifies the provisions in sections 303 and 305 that govern generally when the business of a debtor may continue to operate, when relief under the Act sought should be granted, and when the petition should be dismissed.

### Section 1166. Appointment of trustee

Requires the court to appoint a trustee in every case. Since the trustee may employ whatever help he needs, multiple trusteeships are unnecessary and add to the cost of administration. The present requirement of section 77(c)(1) that the trustee be approved by the In-

**Ad Hoc Equity Group Exhibit 9**

134

terstate Commerce Commission is unnecessary, since the trustee will be selected either from the panel established under section 606(f) of title 28, or someone certified by the Director of the Administrative Office of the United States Courts as qualified to become a member of that panel.

*Section 1167. Duties of trustee*

Section 1167 imposes on the trustee the obligations, in addition to his other duties and responsibilities, to take into account the "public interest" in the preservation of the debtor's rail service.

*Section 1168. Effect of other laws and regulations*

Section 1168 makes the trustee subject to the Interstate Commerce Act and to lawful orders of the Interstate Commerce Commission, the U.S. Department of Transportation, and State and regulatory bodies. The approval of the court is required, however, if the order requires the expenditure of money or the incurring of an expenditure other than the payment of certain interline accounts. The limitation of "lawful orders" of State commissions to those involving "safety, location of tracks, and terminal facilities," which is contained in present section 77(c)(2), is eliminated.

Subsection (1) further provides that the debtor must pay in cash all amounts owed other carriers for current balances owed for interline freight, passenger and per diem, including incentive per diem, for periods both prior and subsequent to the filing of the petition, without the necessity of court approval.

Subsection (2) makes the provisions of the chapter subject to section 601(b) of the Regional Rail Reorganization Act, which excludes the Interstate Commerce Commission from any participation in the reorganization of certain northeast railroads that have transferred their rail properties to Consolidated Rail Corporation (Conrail).

*Section 1169. Transfer and consolidation of cases*

Section 1169 vests the judicial panel on multidistrict litigation with authority to transfer cases pending in more than one court to a single court when the cases involve disputes regarding the abandonment of property which would affect the service of, or involve a possible merger or common reorganization plan of, two or more debtors. There is no comparable provision in section 77.

*Section 1170. Provisions of the plan*

Section 1170 adds to the general provisions required or permitted in reorganization plans by section 1123. Subsection (1) requires that a reorganization plan under the railroad subchapter specify the means by which the value of the claims of creditors and the interests of equity holders which are materially and adversely affected by the plan are to be realized. Subsection (2) permits a plan to include provisions for the issuance of warrants. Subsection (3) requires that the plan provide for fixed charges by probable earnings for their payment. Subsection (4) requires that the plan specify the means by which, and the extent to which, the debtor's rail service is to be continued, and shall identify any rail service to be terminated. Subsection (5) permits other appropriate provisions not inconsistent with the chapter. With the exception of subsection (4), the requirements are com-

DOCUMENT 52

135

parable to those of present section 77(b); subsection (4) emphasizes the public interest in the preservation of rail transportation.

*Section 1171. Consideration of a plan by the Commission*

Section 1171 imposes on the court, rather than the Interstate Commerce Commission, as in present section 77, the responsibility for the plan of reorganization. The Commission is empowered to make final decisions subject only to review by the court under the standards of the Administrative Procedure Act as to any part of the plan which deals with transportation matters, such as the grant of operating rights of or over, or transfer of, the debtor's rail lines to other carriers.

Subsection (a) requires the trustee to file a plan of reorganization within 18 months after the petition is filed, and permits the court, for good cause shown, to extend such time limit. Subsection (b) permits a plan to be proposed by any interested person, and permits the trustee to revise his plan at any time before it is approved by the court.

Subsections (c), (d) and (e) require the court, when a plan is submitted by the trustee or, if the court deems it worthy of consideration, a plan submitted is proposed by any other person proposes the transfer of, or operation of or over, any of the debtor's lines by other carriers, to refer to such provisions of the plan to the Interstate Commerce Commission. The Commission, within 240 days, and after a hearing if the Commission so determines, is to report to the court the effects of such provisions of the plan in the light of national transportation policy and sections 5(3)(f) (A), (B), and (D), (F)-(I) of the Interstate Commerce Act. The report of the Commission is conclusive in all further hearings on the plan by the court, subject only to review pursuant to 5 U.S.C.S. 706(2) (A)-(D).

*Section 1172. Approval of the plan*

Section 1172 requires, as does present law, a hearing by the court, on at least 20 days' notice, on approval of a plan. The section permits the court to revise the plan—a power which the court lacks under section 77, and which has resulted in unnecessary references back to the Commission with consequent delays in the approval of a plan that would be acceptable as amended. The report of the Interstate Commerce Commission on any provisions respecting transportation matters is conclusive and may be revised by the court only as provided in section 1171.

*Section 1173. Confirmation of plan*

Section 1173 adapts the provisions dealing with reorganization plans generally contained in section 1130 to the particular requirements of railroad reorganization plans, as set out in present section 77(e). Subsection (a) specifies the findings which the court must make before approving a plan: (1) The plan complies with the applicable provisions of the chapter; (2) the proponent of the plan complies with the applicable provisions of the chapter; (3) the plan has been proposed in good faith; (4) any payments for services or for costs or expenses in connection with the case or the plan are disclosed to the court and are reasonable, or, if to be paid later, are subject to the approval of the court as reasonable; (5) the proponent of the

**Ad Hoc Equity Group Exhibit 9**

136

plan has disclosed the identity and affiliations of the individuals who will serve as directors, officers, or voting trustees, such appointments or continuations in office are consistent with the interests of creditors, equity security holders, and the proponent the public, and has disclosed the identity and compensation of any insider who will be employed or retained under the plan; (6) that rate changes proposed in the plan have been approved by the appropriate regulatory commission, or that the plan is contingent on such approval; (7) that confirmation of the plan is not likely to be followed by further reorganization or liquidation, unless it is contemplated by the plan; (8) that the plan, if there is more than one, is the one most likely to maintain adequate rail service and (9) that the plan provides the priority traditionally accorded by section 77(b) to claims by rail creditors for necessary services rendered during the 6 months preceding the filing of the petition in bankruptcy.

Subsection (b) continues the present power of the court in section 77(e) to confirm a plan over the objections of creditors or equity security holders who are materially and adversely affected. The subsection also confirms the authority of the court to approve a transfer of all or part of a debtor's property or its merger over the objections of equity security holders if it finds (1) that the "public interest" in continued rail transportation otuweighs any adverse effect on creditors and equity security holders, and (2) that the plan is fair and equitable, affords due recognition to the rights of each class, and does not discriminate unfairly against any class.

Subsection (c) permits modification of a plan confirmed by a final order only for fraud.

*Section 1174. Conversion to liquidation*

Section 1174 permits the court to convert the case to a liquidation under chapter 7 if the court finds that the debtor cannot be reorganized, or if various time limits specified in the subchapter are not met. Section 77 does not authorize a liquidation of a railroad under the Bankruptcy Act. If the railroad is not reorganizable, the only action open to the court is to dismiss the petition, which would in all likelihood be followed by a State court receivership, with all of its attendant disadvantages. If reorganization is impossible, the debtor should be liquidated under the Bankruptcy Act.

*Section 1175. Rolling stock equipment*

Section 1175 continues the protection accorded in present section 77(j) to the rights of holders of purchase-money equipment security, and of lessors or conditional vendors of railroad rolling stock, but accords to the trustee a limited period within which to assume the debtor's obligation and to cure any defaults. The rights of such lenders are not affected by the auomatic stay and related provisions of sections 362 and 363, or by any power of the court, unless (1) within 60 days after the commencement of the case (or such longer period as may be agreed to by the secured party, lessor or conditional vendor) the trustees, with the approval of the court, agrees to perform all of the debtor's obligations under the security agreement, lease or conditional sale contract, and (2) all defaults are cured within the 60-day period.

**Ad Hoc Equity Group Exhibit 9**

139

DOCUMENT 52

137

Defaults described in section 365(b)(2)—defaults which are breaches of provisions relating to the insolvency or financial condition of the debtor, or the commencement of a case under this title, or the appointment of a trustee—are, for obvious reasons, excepted.

*Section 1176. Collective bargaining agreements*

Section 1176 is derived from present section 77(n). It provides that notwithstanding the general section governing the rejection of executory contracts (section 365), neither the court nor the trustee may change the wages or working conditions of employees of the debtor established by a collective bargaining agreement that is subject to the Railway Labor Act, except in accordance with section 6 of that Act. As reported by the subcommittee this section provided that wages and salaries of rail employees could not be affected by the trustee, but that work rules could be rejected by the trustee. The reorganization court was given the authority to review the trustee's decisions and to settle any disputes arising from the rejection. This provision was withdrawn by the full committee, and hearings will be conducted next year by the Human Resources Committee in the area of rail labor contracts and the trustee's ability to reject them in a bankruptcy situation.

*Section 1177. Effect of rejection of lease of railroad line*

Section 1177 continues, essentially without change, the provisions relating to the rejection by the trustee of a lease of a line of railroad now contained in section 77(c)(6). Subsection (a) requires the lessor of a line of railroad to operate it if the lease is rejected by the trustee and the trustee, with the approval of the court, elects not to operate the leased line. Subsection (b), however, further provides that if operation by the lessor is impractical or contrary to the public interest, the court shall require the trustee to operate the line for the account of the lessor until the operation is lawfully terminated. Subsection (c) provides that during such operation, the lessor is a carrier subject to the Interstate Commerce Act.

*Section 1178. Abandonment of railroad line*

Subsection (a) of section 1178 permits the court to authorize the abandonment of a railroad line if the abandonment is consistent with the public interest and either in the best interest of the estate or essential to the formulation of a plan. This avoids the normal abandonment requirements of generally applicable railroad regulatory law.

Subsection (b) permits some participation by the Interstate Commerce Commission in the abandonment process. The Commission's role, however, is only advisory. The Commission will represent the public interest, while the trustee and various creditors and equity security holders will represent the interests of those who have invested money in the enterprise. The court will balance the various interests and make an appropriate decision. The subsection specifies that if, except for the pendency of the railroad reorganization case, the proposed abandonment would require Commission approval, then the trustee, with the approval of the court, must initiate an application for the abandonment with the Commission. The court may then fix a time within which the Commission must report to the court on the application.

Ad Hoc Equity Group Exhibit 9

Subsection (c) permits the court to act after it has received the report of the Commission or the time fixed under subsection (b) has expired, whichever occurs first. The court may then authorize the abandonment after notice and a hearing. The notice must go to the Commission, the Secretary of Transportation, the trustee, and party in interest that has requested notice, any affected shipper or community, and any other entity that the court specifies.

Subsection (d) stays the enforcement of an abandonment until the time for taking an appeal has expired, or if an appeal has been taken, until the order has become final. However, the court may, and after notice and a hearing, on request of a party in interest authorize termination of service on the line or a portion of the line pending the determination of the appeal. The notice required is the same as that required under subsection (c). If the court authorizes termination of service pending determination of the appeal, an appellant may not obtain a stay of the enforcement of the order authorizing termination, either by the giving of a supersedeas bond or otherwise, during the pendency of the appeal.

### CHAPTER 13—ADJUSTMENT OF DEBTS OF AN INDIVIDUAL WITH REGULAR INCOME

#### SUBCHAPTER I—OFFICERS, ADMINISTRATION AND THE ESTATE

*Section 1301. Stay of action against codebtor*

Subsection (a) automatically stays the holder of a claim based on a consumer debt of the chapter 13 debtor from acting or proceeding in any way, except as authorized pursuant to subsections (b) and (c), against an individual or the property of an individual liable with the chapter 13 debtor, unless such codebtor became liable in the ordinary course of his business, or unless the case is closed, dismissed, or converted to another chapter.

Under the terms of the agreement with the codebtor who is not in bankruptcy, the creditor has a right to collect all payments to the extent they are not made by the debtor at the time they are due. To the extent to which a chapter 13 plan does not propose to pay a creditor his claims, the creditor may obtain relief from the court from the automatic stay and collect such claims from the codebtor. Conversely, a codebtor obtains the benefit of any payments made to the creditor under the plan. If a debtor defaults on scheduled payments under the plan, then the codebtor would be liable for the remaining deficiency; otherwise, payments not made under the plan may never be made by the codebtor. The obligation of the codebtor to make the creditor whole at the time payments are due remains.

The automatic stay under this section pertains only to the collection of a consumer debt, defined by section 101(7) of this title to mean a debt incurred by an individual primarily for a personal, family, or household purpose. Therefore, not all debts owed by a chapter 13 debtor will be subject to the stay of the codebtor, particularly those business debts incurred by an individual with regular income, as defined by section 101(24) of this title, engaged in business, that is permitted by virtue of section 109(b) and section 1304 to obtain chapter 13 relief.

**Ad Hoc Equity Group Exhibit 9**

DOCUMENT 52

139

Subsection (b) excepts the giving of notice of dishonor of a negotiable instrument from the reach of the codebtor stay.

Under subsection (c), if the codebtor has property out of which the creditor's claim can be satisfied, the court can grant relief from the stay absent the transfer of a security interest in that property by the codebtor to the creditor. Correspondingly, if there is reasonable cause to believe that property is about to be disposed of by the codebtor which could be used to satisfy his obligation to the creditor, the court should lift the stay to allow the creditor to perfect his rights against such property. Likewise, if property is subject to rapid depreciation or decrease in value the stay should be lifted to allow the creditor to protect his rights to reach such property. Otherwise, the creditor's interest would be irreparably harmed by such stay. Property which could be used to satisfy the claim could be disposed of or encumbered and placed beyond the reach of the creditor. The creditor should be allowed to protect his rights to reach property which could satisfy his claim and prevent its erosion in value, disposal, or encumbrance.

*Section 1302. Trustee*

The principal administrator in a chapter 13 case is the chapter 13 trustee. Experience under chapter XIII of the Bankruptcy Act has shown that the more efficient and effective wage earner programs have been conducted by standing chapter XIII trustees who exercise a broad range of responsibilities in both the design and the effectuation of debtor plans.

Subsection (a) provides administrative flexibility by permitting the bankruptcy judge to appoint an individual from the panel of trustees established pursuant to 28 U.S.C. § 604(f) and qualified under section 322 of title 11, either to serve as a standing trustee in all chapter 13 cases filed in the district or a portion thereof, or to serve in a single case.

Subsection (b)(1) makes it clear that the chapter 13 trustee is no mere disbursing agent of the monies paid to him by the debtor under the plan [section 1322(a)(1)], by imposing upon him certain relevant duties of a liquidation trustee prescribed by section 704 of this title.

Subsection (b)(2) requires the chapter 13 trustee to appear before and be heard by the bankruptcy court whenever the value of property secured by a lien or the confirmation or modification of a plan after confirmation as provided by sections 1323–1325 is considered by the court.

Subsection (b)(3) requires the chapter 13 trustee to advise and counsel the debtor while under chapter 13, except on matters more appropriately left to the attorney for the debtor. The chapter 13 trustee must also assist the debtor in performance under the plan by attempting to tailor the requirements of the plan to the changing needs and circumstances of the debtor during the extension period.

Subsection (c) imposes on the trustee in a chapter 13 case filed by a debtor engaged in business the investigative and reporting duties normally required of a chapter 11 debtor or trustee as prescribed by section 1106(a)(3) and (4).

**Ad Hoc Equity Group Exhibit 9**

140

*Section 1303. Rights and powers of debtor*

A chapter 13 debtor is vested with the identical rights and powers, and is subject to the same limitations in regard to their exercise, as those given a liquidation trustee by virtue of section 363(b), (d), (e), (f), and (h) of title 11, relating to the sale, use or lease of property.

*Section 1304. Debtor engaged in business*

Increased access to the simpler, speedier, and less expensive debtor relief provisions of chapter 13 is accomplished by permitting debtors engaged in business to proceed under chapter 13, provided their income is sufficiently stable and regular to permit compliance with a chapter 13 plan [section 101(24)] and that the debtor (or the debtor and spouse) do not owe liquidated, noncontingent unsecured debts of $50,000, or liquidated, noncontingent secured debts of $200,000 (§ 109(d)).

Section 1304(a) states that a self-employed individual who incurs trade credit in the production of income is a debtor engaged in business.

Subsection (b) empowers a chapter 13 debtor engaged in business to operate his business, subject to the rights, powers and limitations that pertain to a trustee under section 363(c) and 364 of title 11, and subject to such further limitations and conditions as the court may prescribe.

Subsection (c) requires a chapter 13 debtor engaged in business to file with the court certain financial statements relating to the operation of the business.

*Section 1305. Filing of claims; allowance of postpetition claims*

Section 1305, exclusively applicable in chapter 13 cases, supplements the provisions of sections 501–511 of title 11, dealing with the filing and allowance of claims. Sections 501–511 apply in chapter 13 cases by virtue of section 103(a) of this title. Section 1305(a) provides for the filing of a proof of claim for taxes and other obligations incurred after the filing of the chapter 13 case. Subsection (b) prescribes that section 502 of title 11 governs the allowance of section 1305(a) claims, except that its standards shall be applied as of the date of allowance of the claim, rather than the date of filing of the petition. Subsection (c) requires the disallowance of a postpetition claim for property or services necessary for the debtor's performance under the plan, if the holder of the claim knew or should have known that prior approval by the trustee of the debtor's incurring of the obligation was practicable and was not obtained.

Subsection (d) is the successor to section 656(b) of the Bankruptcy Act. Section 1305(d) recognizes the inequity to chapter 13 debtors and their creditors alike of permitting a usurious or other invalid claim to share in distributions under the chapter 13 plan. It is envisioned that appropriate rules will be adopted mandating procedures for assuring the provision of proof by a chapter 13 creditor that the claim is free from any charge forbidden by applicable law, including usury.

*Section 1306. Property of the estate*

Section 541 is expressly made applicable to chapter 13 cases by section 103(a). Section 1306 broadens the definition of property of the

DOCUMENT 52

141

estate for chapter 13 purposes to include all property acquired and all earnings from services performed by the debtor after the commencement of the case.

Subsection (b) nullifies the effect of section 521(3), otherwise applicable, by providing that a chapter 13 debtor need not surrender possession of property of the estate, unless required by the plan or order of confirmation.

### Section 1307. Conversion or dismissal

Subsections (a) and (b) confirm, without qualification, the rights of a chapter 13 debtor to convert the case to a liquidating bankruptcy case under chapter 7 of title 11, at any time, or to have the chapter 13 case dismissed. Waiver of any such right is unenforceable. Subsection (c) specifies various conditions for the exercise of the power of the court to convert a chapter 13 case to one under chapter 7 or to dismiss the case. Subsection (d) deals with the conversion of a chapter 13 case to one under chapter 11. Subsection (e) prohibits conversion of the chapter 13 case filed by a farmer to chapter 7 or 11 except at the request of the debtor. No case is to be converted from chapter 13 to any other chapter, unless the debtor is an eligible debtor under the new chapter.

#### SUBCHAPTER II—THE PLAN

### Section 1321. Filing of plan

Chapter 13 contemplates the filing of a plan only by the debtor.

### Section 1322. Contents of plan

Chapter 13 is designed to serve as a flexible vehicle for the repayment of part or all of the allowed claims of the debtor. Section 1322 emphasizes that purpose by fixing a minimum of mandatory plan provisions.

Subsection (a) requires that the plan submit whatever portion of the future income of the debtor is necessary to implemnt the plan to the control of the trustee, mandates payment in full of all section 507 priority claims, and requires identical treatment for all claims of a particular class.

Subsection (b) permits a chapter 13 plan to (1) divide unsecured claims not entitled to priority under section 507 into classes in the manner authorized for chapter 11 claims; (2) modify the rights of holders of secured and unsecured claims, except claims wholly secured by real estate mortgages; (3) cure or waive any default; (4) propose payments on unsecured claims concurrently with payments on any secured claim or any other class of unsecured claims; (5) provide for curing any default on any secured or unsecured claim on which the final payment is due after the proposed final payment under the plan; (6) provide for payment of any allowed postpetition claim; (7) assume or reject any previously unrejected executory contract or unexpired lease of the debtor; (8) propose the payment of all or any part of any claim from property of the estate or of the debtor; (9) provide for the vesting of property of the estate; and (10) include any other provision not inconsistent with other provisions of title 11.

Subsection (c) limits the payment period under the plan to 3 years, except that a 4-year payment period may be permitted by the court.

### Section 1323. Modification of plan before confirmation

The debtor is permitted to modify the plan before confirmation without court approval so long as the modified plan, which becomes the plan on filing, complies with the requirements of section 1322.

The original acceptance or rejection of a plan by the holder of a secured claim remains binding unless the modified plan changes the rights of the holder and the holder withdraws or alters its earlier acceptance or rejection.

### Section 1324. Confirmation hearing

Any party in interest may object to the confirmation of a plan, as distinguished from merely rejecting a plan. An objection to confirmation is predicated on failure of the plan or the procedures employed prior to confirmation to conform with the requirements of chapter 13. The bankruptcy judge is required to provide notice and an opportunity for hearing any such objection to confirmation.

### Section 1325. Confirmation of plan

The bankruptcy court must confirm a plan if (1) the plan satisfies the provisions of chapter 13 and other applicable provisions of title 11; (2) it is proposed in good faith; (3) it is in the best interests of creditors, and defined by subsection (a) (4) of Section 1325; (4) it has been accepted by the holder of each allowed secured claim provided for the plan or where the holder of any such secured claim is to receive value under the plan not less than the amount of the allowed secured claim, or where the debtor surrenders to the holder the collateral securing any such allowed secured claim; (5) the plan is feasible; and (6) the requisite fees and charges have been paid.

Subsection (b) authorizes the court to order an entity, as defined by Section 101(15), to pay any income of the debtor to the trustee. Any governmental unit is an entity subject to such an order.

### Section 1326. Payments

Section 1326 supplements the priorities provisions of section 507. Subsection (a) requires accrued costs of administration and filing fees, as well as fees due the chapter 13 trustee, to be disbursed before payments to creditors under the plan. Subsection (b) makes it clear that the chapter 13 trustee is normally to make distribution to creditors of the payments made under the plan by the debtor.

### Section 1327. Effect of confirmation

Subsection (a) binds the debtor and each creditor to the provisions of a confirmed plan, whether or not the claim of the creditor is provided for by the plan and whether or not the creditor has accepted, rejected, or objected to the plan. Unless the plan itself or the order confirming the plan otherwise provides, confirmation is deemed to vest all property of the estate in the debtor, free and clear of any claim or interest of any creditor provided for by the plan.

### Section 1328. Discharge

The court is to enter a discharge, unless waived, as soon as practicable after completion of payments under the plan. The debtor is to be discharged of all debts provided for by the plan or disallowed under section 502, except a debt provided for under the plan the last

DOCUMENT 52

143

payment on which was not due until after the completion of the plan, or a debt incurred for willful and malicious conversion of or injury to the property or person of another.

Subsection (b) is the successor to Bankruptcy Act Section 661. This subsection permits the bankruptcy judge to grant the debtor a discharge at any time after confirmation of a plan, if the court determines, after notice and hearing, that the failure to complete payments under the plan is due to circumstances for which the debtor should not justly be held accountable, the distributions made to each creditor under the plan equal in value the amount that would have been paid to the creditor had the estate been liquidated under chapter 7 of title 11 at the date of the hearing under this subsection, and that modification of the plan is impracticable. The discharge granted under subsection (b) relieves the debtor from all unsecured debts provided for by the plan or disallowed under section 502, except nondischargeable debts described in section 523(a) of title 11 or debts of the type covered by section 1322(b)(5).

Subsection (d) excepts from any chapter 13 discharge a debt based on an allowed section 1305(a)(2) postpetition claim, if prior trustee approval of the incurring of the debt was practicable but was not obtained.

A chapter 13 discharge obtained through fraud and before the moving party gained knowledge of the fraud may be revoked by the court under subsection (e), after notice and hearing, at the request of any party in interest made within 1 year after the discharge was granted.

*Section 1329. Modification of plan after confirmation*

At any time prior to the completion of payments under a confirmed plan, the plan may be modified, after notice and hearing, to change the amount of payments to creditors or a particular class of creditors and to extend or reduce the payment period. A modified plan may not contain any provision which could not be included in an original plan as prescribed by section 1322. A modified plan may not call for payments to be made beyond four years as measured from the date of the commencement of payments under the original plan.

*Section 1330. Revocation of an order of confirmation*

The court may revoke an order of confirmation procured by fraud, after notice and hearing, on application of a party in interest filed within 180 days after the entry of the order. Thereafter, unless a modified plan is confirmed, the court is to convert or dismiss the chapter 13 case as provided in section 1307.

*Section 1331. Special tax provision*

This special tax provision is parallel to subsection 1146(e) in allowing assessment and collection of nondischargeable taxes, as well as administrative period taxes, against the debtor in a chapter 13 case. The taxing authority, however, may accept provisions of the plan in a particular case dealing with the assumption, settlement, or payment of any such taxes.

Section 1331 does not include a provision of the bill as introduced, which limited tax assessments against the debtor, including assessments for a nondischargeable tax liability, to the period of 1 year following the date of the filing of the petition.

144

## TITLE II—AMENDMENTS TO TITLE 28 UNITED STATES CODE AND TO THE FEDERAL RULES OF EVIDENCE

*Section 201. Establishment of bankruptcy court; bankruptcy judges*

Section 201 amends Title 28, United States Code, by adding a new chapter 6, providing for the establishment, jurisdiction and powers, staffing, organization and administration of independent bankruptcy courts. Chapter 6 comprises 16 sections (§§ 151–166) made effective October 1, 1979, by virtue of section 402(a) of this Act.

*Section 151. Creation and composition of bankruptcy courts*

Subsection (a) establishes in each judicial district a court of record, as an adjunct of the U.S. district court, to be known as the bankruptcy court for such district.

Subsection (b) specifies that the bankruptcy court for each judicial district is comprised of the active bankruptcy judges appointed for the district.

Subsection (c) permits exercise of the judicial power of the bankruptcy court by a single bankruptcy judge.

*Section 152. Appointment; qualifications; tenure; oath; removal*

Subsection (a) empowers each court of appeals to appoint bankruptcy judges, in such numbers and at such locations within the circuit as are determined by the Judicial Conference pursuant to section 153 of title 28, United States Code, as enacted by section 201 of this act. The chief judge of the circuit is to make the appointment in case the concurrence of a majority of the active circuit judges cannot be obtained.

The Judicial Conference of the United States may authorize the appointment of a bankruptcy judge to serve in more than one circuit. Where a majority vote of the active judges of each circuit in which the bankruptcy judge is to serve has not been obtained, the appointment is to be made by the chief circuit judge senior in service.

Subsection (b) prescribes the professional and other qualifications of individuals to serve as bankruptcy judges. Qualifications include bar membership in good standing for at least 5 years at the time of appointment and competence as determined by the judicial council of the circuit. Additional qualification standards may be prescribed by the Judicial Conference of the United States, as provided by subsection (b)(4). Other qualifications are set forth in subsections (c) and (e) of this section.

Subsection (c) prescribes a 12-year term of office for bankruptcy judges appointed under new 28 U.S.C. § 152. The present 6-year term is insufficient to attract the calibre of individual needed to perform the highly demanding and important functions of the office of bankruptcy judge. By doubling the term of office for future bankruptcy judges it is anticipated that a major goal of this reform legislation, the establishment of a functionally independent bankruptcy court, can be further advanced.

A bankruptcy judge whose term expires is permitted to continue to serve until a successor is appointed and qualifies. With specific ex-

**Ad Hoc Equity Group Exhibit 9**

DOCUMENT 52

145

ceptions for retired or reserve military personnel, a bankruptcy judge may not hold employment with the U.S. Government. An individual may not continue to serve as a bankruptcy judge after reaching 70 years of age without the unanimous approval of the judges of the judicial council of the circuit.

Subsection (d) prescribes the same oath of office for bankruptcy judges as for district court judges.

Subsection (e) requires each bankruptcy judge to maintain residence in a district for which he is appointed, or, in the case of the District of Columbia, within 20 miles. Subsection (f) authorizes the chief judge of the circuit to require a bankruptcy judge to maintain his abode in or near a particular place in the district, unless the bankruptcy judges are able to agree among themselves which of them shall do so.

Subsection (g) sets forth the grounds upon which and prescribes the procedures by which the removal of a bankruptcy judge may be accomplished. Incompetence, misconduct, neglect of duty and disability, as determined by the judicial council of the circuit, are the sole grounds for removal. The bankruptcy judge is entitled to be heard on the charges against him.

The restrictive nature of the grounds for removal of a bankruptcy judge requires that they construed since they are intended to insulate the bankruptcy court from improper challenges to its judicial independence.

*Section 153. Numbers and locations of bankruptcy judges*

Subsection (a) requires the Director of the Administrative Office of U.S. Courts to make continuing studies to determine the numbers and locations of bankruptcy judges necessary to provide effective and expeditious bankruptcy administration. The Director is instructed to take local conditions and suggestions into account before making recommendations to the various bodies specified in subsection (b).

Subsections (b) and (c) authorize the Judicial Conference of the United States, acting on the recommendations of the Director, the district courts, and the judicial councils of the circuits, to determine and, from time to time, alter the numbers and locations of bankruptcy judgeships. It is envisioned that the recommendations of the district courts will represent the views of the bankruptcy courts, which can be expected to possess the requisite familiarity and expertise.

Subsection (d) authorizes the filling of a vacancy in the office of bankruptcy judge by the circuit court, as provided by 28 U.S.C. § 152, unless the position is discontinued by the Judicial Conference, after such vacancy occurs, in the manner prescribed by subsection (c).

*Section 154. Chief judge; precedence of bankruptcy judges*

The internal organization of the bankruptcy courts is patterned after that of the district courts as concerns the precedence of bankruptcy judges (§ 154), the division of business among bankruptcy judges (§ 155), the times for holding sessions of court (§ 156), adjournment of court (§ 157), special sessions (§ 158), accommodations (§ 159), vacancy in judgeships as affecting proceedings (§ 160) and temporary assignments of bankruptcy judges (§ 165).

**Ad Hoc Equity Group Exhibit 9**

146

Subsection (a) of section 154 of title 28, United States Code, as amended by section 201 of this act, declares that whichever bankruptcy judge is senior in service, but under 70 years of age, shall serve as the chief judge of the bankruptcy court of the district. A bankruptcy judge must have served at least 1 year on the bankruptcy bench before he may serve as chief judge of the bankruptcy court.

Subsection (b) gives the chief judge precedence and the right to preside at any session of the court or judges that he attends. Bankruptcy judges junior in service to the chief judge have precedence according to the seniority of their commissions.

Subsection (c) states that a bankruptcy judge appointed to serve in more than one district is the junior judge in all districts, except that in which he resided upon appointment to the bankruptcy bench.

Subsection (d) authorizes the Chief Justice of the United States to designate the bankruptcy judge next in precedence who is willing to serve as chief bankruptcy judge to replace a bankruptcy judge who resigns as chief judge but remains in active service.

Subsection (e) authorizes the active bankruptcy judge next in service who is present and able to serve as chief judge in the event of the temporary inability of the chief judge to perform his duties.

Subsection (f) provides that service as a referee in bankruptcy and service as a bankruptcy judge are to be taken into account in determining seniority of commissions under section 154.

*Section 155. Division of business among bankruptcy judges*

Section 155 prescribes that the business of the bankruptcy court for each district is to be divided among the active bankruptcy judges of the district as provided by the rules and orders of the bankruptcy court. The chief judge of the bankruptcy court is responsible for securing compliance with such rules and orders, and for dividing the business and assigning cases among the active bankruptcy judges of the district where rules and orders of the bankruptcy court fail to do so. The district court of the district wherein the bankruptcy court sits is to make necessary orders for the division of business among bankruptcy judges where such bankruptcy court rules and orders are not in existence, action by the chief judge of the bankruptcy court is not forthcoming within a reasonable time and the concurrence of the bankruptcy judges of the district cannot be obtained.

*Section 156. Times for holding regular sessions*

Section 156 authorizes regular sessions, including continuous sessions, of the bankruptcy court as determined by the rules or orders of the bankruptcy court.

*Section 157. Adjournment*

Subsection (a) authorizes the bankruptcy court to adjourn or, with the consent of the chief judge of the bankruptcy court of the district, to pretermit any regular session for cause.

Subsection (b) enables the clerk of the bankruptcy court to adjourn court where no bankruptcy judge is able to do so.

*Section 158. Special sessions; places; notice*

Special sessions of the bankruptcy court may be held anywhere in the district and on such notice as is ordered by the bankruptcy court, for the purpose of transacting whatever business is required.

**Ad Hoc Equity Group Exhibit 9**

DOCUMENT 52

147

*Section 159. Accommodations at places for holding court*

Court may be held at any location within the district where suitable quarters and accommodations are furnished without cost to the United States. The General Service Administration may provide quarters and accommodations for the bankruptcy court, at cost to the United States, with the approval of the judicial council of the circuit.

*Section 160. Vacant judgeship as affecting proceedings*

The clerk of the bankruptcy court shall continue all pending process, pleadings, and proceedings until a successor or replacement judge is appointed or designated, whenever the office of a bankruptcy judge becomes vacant.

*Section 161. Bias or prejudice of bankruptcy judge*

Section 161 requires that the bankruptcy judge against whom an affidavit of bias or prejudice is filed proceed no further in the pending matter and that it be heard, by another bankruptcy judge. The affidavit must be filed at least 10 days before the pending matter is to be heard or good cause must be shown for later filing. It must state facts and reasons for the belief that bias or prejudice exists and be accompanied by a certificate of counsel of record that it is made in good faith.

*Section 162. Practice of law*

An active bankruptcy judge may not engage in any business occupation, or employment, including the practice of law, inconsistent with the expeditious, proper, and impartial performance of the duties of a bankruptcy judge.

*Section 163. Compensation; benefits*

Subsection (a) provides for compensation for a bankruptcy judge at the current annual rate of $48,500, subject to adjustment under section 225 of the Federal Employees Salary Act and 28 U.S.C. § 461.

Subsection (b) provides that all bankruptcy judges and their employees are officers and employees in the judicial branch of the Government within the meaning of chapter 83 (subchapter III) (civil service retirement), chapter 87 (Federal employees' group life insurance), and chapter 89 (Federal employees' health benefits) of title 5, United States Code.

*Section 164. Powers of bankruptcy judges*

Subsection (a) generally confers upon bankruptcy judges in active service the exclusive power to perform all judicial functions arising in cases and proceedings under title 11 and in actions and proceedings brought under 28 U.S.C. § 1334, as amended by section 216 of this Act except in municipal adjustment and railroad reorganization cases. Subsection (a) (3) empowers bankruptcy judges to administer oaths and affirmations.

Subsection (b) of section 164 of title 28, United States Code, vests jurisdiction to determine appeals from judgments and orders of a bankruptcy judge with the U.S. district court for the district in which the case, action, or proceeding in which the order or judgment appealed from was entered is pending. Unless a notice of appeal is filed with the bankruptcy judge within 10 days, or within any extended period granted within the 10 day period by the bankruptcy

148

court, the order of judgment is final. In the event the bankruptcy court refuses to suspend the execution or enforcement of any order or judgment from which a timely appeal is taken, the district court may do so on the application of any party in interest on such terms as will protect the rights of all parties in interest.

Subsection (c), like section 1334(d)(2)(A) of title 28, United States Code, as amended by section 216 of this act, prohibits the enjoining of a court by a bankruptcy judge.

Subsection (d) constitutes certain conduct in bankruptcy proceedings a contempt of the U.S. district court for the district in which the case or proceeding out of which the contempt arises is pending. Any conduct which would constitute a contempt if committed before a judge of a district court constitues a contempt when committed before a bankruptcy judge. A bankruptcy judge may impose a fine of not more than $1,000 for contempt of court and is to certify the facts to a judge of the district court when the contempt warrants imprisonment or a fine in excess of $1,000.

*Section 165. Temporary assignment of bankruptcy judges*

Subsection (a) permits the chief judge of the circuit to make temporary intracircuit assignments of bankruptcy judges to perform judicial duties in other districts.

Subsection (b) permits the chief judge of a circuit, with the consent of the chief judge of the other circuit, to make temporary intercircuit assignments of bankruptcy judges to perform duties in any district within a circuit other than that in which is located the district in which the bankruptcy judge was appointed to serve.

Subsection (c) permits the temporary assignment of a retired bankruptcy judge by the chief judge of the circuit, with the consent of both the Director of the Administrative Office of the U.S. Courts and the retired bankruptcy judge, to serve in any judicial district where there is a vacancy in the office of a bankruptcy judge or the expeditious transaction of the business of the court so requires. While actually engaged in such service, the retired bankruptcy judge is to be considered a reemployed annuitant within the meaning of the civil service laws and may not engage, during such service, in any activity inconsistent with the performance of the duties of the office of bankruptcy judge. See section 162, title 28, United States Code, as enacted by section 201 of this act. The provisions of subsection (c) are designed to make clear that the practice of law and similar activities are not permitted by retired bankruptcy judges during any period that they are in active service on the bankruptcy bench pursuant to subsection (c) of this section.

Subsection (d) requires the bankruptcy judge to discharge all the judicial duties for which he is designated and assigned.

*Section 166. Expenses; facilities*

Section 166 authorizes and mandates the provision and payment by the Director of the Administrative Office of U.S. Courts of all necessary secretarial and other supporting personnel, courtrooms, office space, furniture and facilities reasonably required for the performance of the duties of bankruptcy judge. It is elsewhere made clear that a clerk of the bankruptcy court, deputy clerks and clerical assistants

DOCUMENT 52

149

(§ 757), secretaries and law clerks (§ 758) and court reporters (§ 759) are reasonably required and therefore to to be made available to bankruptcy judges.

It is envisioned that the bankruptcy judge or judges shall appoint and direct all employees in the performance of bankruptcy court duties, without any involvement on the part of the district court, including the district judge himself and the clerk of the district court. Individuals in the employ of the bankruptcy court may be removed at the pleasure of the bankruptcy judge or judges, as provided by section 760, title 28, United States Code, as enacted by section 214(a) of this act.

*Section 202*

This section amends section 331 of title 28 of the United States Code to create an additional position on the Judicial Conference of the United States to be filled by a bankruptcy judge. The representative of the bankruptcy judges on the Judicial Conference will be selected by the bankruptcy judges. In the event the bankruptcy judge so selected is unable to attend, the Chief Justice may designate a bankruptcy judge to attend the Conference. The representation of bankruptcy judges in the Conference is similar to the participation on the Judicial Conference by judges of the Court of Claims and Court of Customs and Patent Appeals.

During the past decade the number of bankruptcy cases and controversies arising within bankruptcy cases handled by bankruptcy judges has far exceeded the combined number of civil and criminal cases filed in the district courts. The failure of the Judicial Conference to adapt to this phenomenon is indicated by the fact that bankruptcy judges have been systematically excluded from membership on the Bankruptcy Committee of the Judicial Conference. Testimony at the hearings indicates the Judicial Conference has not at all times given adequate consideration to the needs of the bankruptcy courts. Representation on the Conference should insure adequate representation and consideration of the views of bankruptcy judges.

*Section 203*

This section amends section 332(d) of title 28 of the United States Code to place bankruptcy judges under the direction of the judicial council of the circuit. Section 332(d) of title 28 of the United States Code authorizes each judicial council to make all necessary orders for the effective and expeditious administration of the business of the courts within the circuit and, as amended, provides that bankruptcy judges as well as district judges shall promptly carry into effect all orders of the judicial council. This is a conforming amendment.

*Section 204*

This section amends section 333 of title 28 of the United States Code to include bankruptcy judges as participants in circuit conferences which are held annually for the purpose of considering the business of the courts and advising means of improving the administration of justice within the circuit. As amended, the section will require the chief judge of the circuit to summon the chief judge of each bankruptcy court within the circuit to the conference. In view of the fact

**Ad Hoc Equity Group Exhibit 9**

150

that bankruptcy cases constitute a major portion of the caseload of the Federal courts, it seems appropriate that bankruptcy judges should participate in conferences called for the purpose of considering the business of the courts.

*Section 205*

This section makes a conforming change to section 455 of title 28 of the United States Code by substituting the term "bankruptcy judge" for "referee in bankruptcy."

*Section 206*

This section amends the catchline of 28 U.S.C. 460 to repeal an obsolete reference to Alaska as a territory. References to Alaska in the body of the section were eliminated by Public Law 85-508.

*Section 207*

This section makes a conforming change to 28 U.S.C. 526(a)(2) substituting the term "bankruptcy judge" for "referee in bankruptcy" and deleting a reference to receivers in bankruptcy. Section 105(b) of title I of the bill precludes the appointment of a receiver in a case under title II.

*Section 208*

This section amends section 604(a) of title 28 of the United States Code relating to the powers of the Director of the Administrative Office of the U.S. Courts. It requires the Director to lay before Congress, annually, statistical tables that will accurately reflect the business transacted in cases and proceedings under title 11.

*Section 209*

This section adds a new subsection (f) to 28 U.S.C. 604 relating to the duties of the Director of the Administrative Office of the U.S. Courts. The Director is empowered to establish a panel of trustees for each bankruptcy court and to name qualified persons to membership on the panel. The number and qualifications of persons named to membership on the panel of private trustees shall be determined by rules and regulations adopted by the Director. It is intended that these rules and regulations will upgrade the caliber of private trustees and insure that any favoritism, real or apparent, is prevented. Persons and corporations named to membership on the panel of trustees must meet certain residency requirements. A corporation named to membership on the panel of trustees must be authorized by its charter to act as trustee. The Director may remove a person from the panel of trustees. Promptly upon the entry of an order of relief (which occurs concurrently with the filing of a petition in a voluntary case) the court must appoint an interim trustee from the panel of trustees to serve until he is replaced by a trustee elected by creditors. If the creditors fail to elect a trustee, the trustee appointed by the court continues to serve until the case is concluded.

*Section 210*

This section adds bankruptcy courts to the definition of "courts" found in section 610 of chapter 41, relating to the Administrative Office of the U.S. Courts.

DOCUMENT 52

151

*Section 211*

This section makes a conforming amendment to 28 U.S.C. 620(b) (3) by substituting the term "bankruptcy judges" for the term "referees."

*Section 212*

This section amends 28 U.S.C. 621 which establishes the Board of the Federal Judical Center. A proposal that was considered by the Committee but not deemed necessary for adoption at this time. The amendment requires the Board of the Federal Judical Center to consult with a representative of the bankruptcy judges and the representative of the magistrates on matters directly affecting bankruptcy judges and magistrates. The representative of the bankruptcy judges and the representative of the magistrates, who are to act as liaison with the Board of the Federal Judical Center, are to be selected by the bankruptcy judges and the magistrates in any manner they see fit. The amendment does not place a bankruptcy judge on the Board of the Federal Judical Center.

*Section 213*

This section makes a conforming amendment in 28 U.S.C. 634(a) relating to the salaries of magistrates. Language which pegs the salaries of full-time and part-time magistrates to the salaries of full-time and part-time referees in bankruptcy is deleted and the maximum salary figure allowable to a magistrate under current law is inserted. This change will not affect the maximum salaries now allowable for magistrates. The amendment, along with the amendment to the Federal Salary Act of 1967 made by section 301 of title III of this bill, does place the maximum salary allowable to magistrates in the future under the auspices of the Quadrennial Salary Commission.

*Section 214*

Subsection (a) of this section amends chapter 49 of title 28 of the United States Code, providing for the staffing of the district courts, by adding at the end thereof four new sections relating to clerks, court reporters and other employees of the bankruptcy courts. The four new sections are as follows:

*Section 757. Clerk of bankruptcy courts*

Subsection (a) permits each bankruptcy court to appoint a clerk. The clerk is subject to removal by the court.

Subsection (b) permits the clerk, with the approval of the court, to appoint necessary deputies, clerical assistants and employees in such number as may be approved by the Director of the Administrative Office of the U.S. Courts. Such deputies, clerical assistants, and employees are subject to removal by the clerk, with the approval of the bankruptcy court.

Subsection (c) specifies that the clerk of the bankruptcy court must reside in the district for which he is appointed. The bankruptcy court is permitted to designate places within the district for the offices of the clerk and his deputies, and their official stations.

Subsection (d) prohibits the clerk, his deputy, or assistant from receiving any compensation or emolument through any office or position to which he is appointed by the court, other than that received as

152

clerk, deputy, or assistant, whether from the United States or from private litigants.

Subsection (e) requires the clerk of each bankruptcy court to pay into the Treasury all fees, costs, and other moneys collected by him, except uncollected fees not required by Act of Congress to be prepaid. The clerk is also required to make returns of the money collected to the Director of the Administrative Office of the U.S. Courts under regulations prescribed by the Director.

*Section 758. Other employees of bankruptcy courts*

This section is designed to provide the bankruptcy court with adequate staff. Bankruptcy judges are authorized to appoint law clerks, secretaries, and other necessary employees, subject to any limitation on the aggregate salaries of such employees which may be imposed by law. The employees which the bankruptcy judges are authorized to appoint under this section are in addition to those authorized under section 757.

*Section 759. Records of proceedings in bankruptcy courts; reporters*

Subsection (a) requires the bankruptcy court to have a record made, whenever practicable, of all proceedings in cases had in open court. The Director of the Administrative Office of the U.S. Courts is authorized to prescribe that the record be taken by electronic sound recording, by a court reported appointed or employed by the bankruptcy court to take a verbatim record by shorthand or mechanical means, or by an employee of the court designated by the court to take such a verbatim record. Flexibility is allowed in the use of electronic sound recording devices because of the technological development of sound recording devices which are in wide use today and are adequate for the purpose. It shall be left to the discretion of the Director to authorize the appropriate mode of recordation of bankruptcy court proceedings.

Subsection (b) requires that a transcript of the original record of a proceeding that has been recorded be made and delivered promptly to any party to a proceeding or the judge on request. A certified transcript is deemed prima facie a correct statement of the testimony taken and the proceedings had. Transcripts made from other than the certified records of the court are not to be considered official transcripts.

Subsection (c) governs fees for transcripts in proceedings to persons permitted to appeal in forma pauperis.

*Section 760. Power to appoint and remove employees of bankruptcy courts*

This section gives bankruptcy judges the power to appoint and remove employees. Whenever the majority of the bankruptcy judges of any bankruptcy court cannot agree upon the appointment of any employee of such court, the chief judge shall make the appointment. Even though the bankruptcy court is an adjunct of the district court, the district judges are not given any power over the appointment or removal of employees of the bankruptcy court. Moreover, this section is written to make it clear that the district courts have no authority to order employees of the bankruptcy court merged into the office of the clerk of the district court and placed under the supervision of the clerk of the district court. The office of the clerk of the bankruptcy court is

DOCUMENT 52

153

to be maintained as separate from the office of the district court clerk. The clerk of the bankruptcy court and the clerical employees of the office are to function under the direct supervision of the bankruptcy judge.

Subsection (b) of this section amends the table of sections for chapter 49 of title 28 of the United States Code by adding at the end thereof the numbers and headings of sections relating to the staff of the bankruptcy courts.

*Section 215*

This section makes a conforming change to 28 U.S.C. 957(a), extending certain restrictions on clerks of court to clerks of bankruptcy courts.

*Section 216*

This section amends 28 U.S.C. 1334 relating to the jurisdiction of the U.S. district courts over bankruptcy proceedings. In deference to concern over the splintering of the jurisdiction of the district courts, original and exclusive jurisdiction of all bankruptcy cases shall remain in the district court, and the jurisdiction of the district courts over bankruptcy matters is expanded to include all controversies arising out of or related to a case under title 11. However, a statutory scheme has been adopted whereby the totality of this jurisdiction, subject only to the exceptions set forth in subsection (d) of this section, shall be exercised by the bankruptcy court, which is created as an adjunct of each U.S. district court.

Subsection (a) of this section gives the U.S. district courts original and exclusive jurisdiction of all cases under title 11. To facilitate the exercise of this jurisdiction by the bankruptcy court provision is made elsewhere for the case to be filed directly with the clerk of the bankruptcy court. See section 220 of title II of this bill.

Subsection (b) grants to the U.S. district courts original, but not exclusive, jurisdiction of all civil proceedings arising under title 11 or arising under or related to cases under title 11. This broad grant of jurisdiction will enable the bankruptcy courts, which are created as adjuncts of the district court for the purpose of exercising the jurisdiction, to dispose of controversies that arise in bankruptcy cases or under the bankruptcy code. Actions that formerly had to be tried in the State court or in the Federal district court, at great cost and delay to the estate, may now be tried in the bankruptcy court. The idea of possession and consent as bases for jurisdiction is eliminated. The adjunct bankruptcy courts will exercise in personam jurisdiction as well as in rem jurisdiction in order that they may handle everything that arises in a bankruptcy case.

The jurisdiction to be exercised by the bankruptcy courts is of all proceedings arising under title 11 or arising under or related to a case under title 11. The term "proceeding" is used instead of "matters and proceedings," the terminology currently used in the Bankruptcy Act and Rules. As used in this section everything that occurs in a bankruptcy case is a proceeding. Thus, proceeding here is used in its broadest sense, and would encompass what are now called contested matters, adversary proceedings, and plenary actions under current bankruptcy law. It also includes and disputes related to administrative matters in

154

a bankruptcy case. Likewise, the term proceeding includes issues which may arise after a case is closed, such as in a controversy over a reaffirmation agreement under section 524(b) of title I of the bill.

The phrase "arising under title 11" will enable the bankruptcy court to hear any matter under which a claim is made under a provision of title 11. The combination of the three bases for jurisdiction, "arising under title 11," "arising under a case under title 11," and "related to a case under title 11," will leave no doubt as to the scope of the jurisdiction over disputes to be exercised by the bankruptcy court.

Subsection (c) permits the bankruptcy court, in the interest of justice, to abstain from hearing a particular proceeding arising under title 11 or arising under or related to a case under title 11, and makes the abstention, or a decision not to abstain, nonreviewable. The subsection recognizes there may be cases in which it is more appropriate to have a State court hear a particular matter of State law.

Subsection (d), when read in conjunction with section 164 of chapter 6 of title 28, as enacted by section 201 of this bill, restricts the power of the bankruptcy judge in only two areas which have traditionally been reserved to district judges, (1) the enjoining of another court, and (2) the imposition of punishment for contempt of court. District judges are to conduct cases under chapter 9 and railroad reorganization cases under chapter 11. Otherwise, bankruptcy judges shall have full and complete responsibility for cases under title 11 and all litigation arising out of such cases. The use of the term "may" in this section is not intended to imply that the district court has any discretion whatsoever in withholding bankruptcy cases or civil proceedings arising under title 11 or arising under or related to a case under title 11 from the bankruptcy court. The powers of the bankruptcy judge enumerated in section 164 include the power to conduct all proceedings under title 11 except in municipal adjustment and railroad reorganization cases, and the power to conduct trials and all other proceedings in actions under section 1334(b) of this title. It is the intent of these provisions that the bankruptcy court will receive and the bankruptcy judge will handle cases and proceedings under title 11, and that all actions filed under section 1334(b) except those arising in connection with municipal adjustment and railroad reorganization cases will be automatically referred to the bankruptcy judge. It is contemplated that rules of Bankruptcy Procedure will be adopted to carry out this intent in order that the bankruptcy judge shall exercise the full range of jurisdiction in bankruptcy cases and proceedings. Except for municipal adjustment and railroad reorganization cases, the district judge will be expected to act in title 11 cases only in limited instances (1) where it is necessary to enjoin a State or Federal court or (2) to punish a person for contempt by imprisonment or by a fine of more than $1,000. Otherwise, the district judge will function only as an appellate judge in bankruptcy matters, as provided in subsection (e) of this section.

Subsection (e)(1) confers upon the district court for each judicial district jurisdiction of appeals from (A) final decisions and interlocutory orders of the bankruptcy court in bankruptcy cases, and (B) final judgments, orders, and decrees of the bankruptcy court for such district in proceedings arising under title 11 or arising under or

**Ad Hoc Equity Group Exhibit 9**

DOCUMENT 52

155

related to cases under title 11. Subsection (e)(2) provides that the decisions of the bankruptcy court shall be final unless a notice of appeal to a district judge is timely filed. It is contemplated that the manner and time for filing a notice of appeal will be set forth in Rules of Bankruptcy Procedure.

*Section 217.*

This section makes a technical amendment to 28 U.S.C. 1360(a) relating to the status of Alaska as a territory.

*Section 218.*

Subsection (a) of this section amends chapter 87 of title 28 of the United States Code relating to venue of civil actions in the U.S. district courts by adding at the end thereof three new sections specifying venue requirements in bankruptcy cases and proceedings. These new sections are as follows:

*Section 1408. Venue of proceedings under title 11*

This section governs the venue for commencement of a bankruptcy case. The section permits the commencement of a bankruptcy case in the judicial district in which the domicile, residence, principal place of business, or principal assets of the debtor have been located for 180 days preceding the bankruptcy, or for the greater part of that 180-day period than in any other judicial district. An affiliate, general partner, or partnership of a debtor may commence a case in the judicial district in which the debtor's case is pending. This section is derived from section 2a(1) of the Bankruptcy Act and rule 116 of the Rules of Bankruptcy Procedure. The section does not apply to cases ancillary to foreign proceedings.

*Section 1409. Venue of proceedings arising under or related to cases title 11*

Subsection (a) of this section specifies that the court in which the bankruptcy case is pending is always proper venue for proceedings arising under title 11 or arising under or related to a case under title 11, with two exceptions as enumerated in subsections (b) and (d) of this section.

Subsection (b) creates an exception which prevents unfairness to distant debtors of the estate, when the cost of defending might be greater than paying the debt owed. This section specifies that a proceeding by a trustee to recover a money judgment of less than $1,000 or a consumer debt of less than $5,000 must be commenced in the district in which the defendant resides. For example, if a store doing a major part of its business through catalog sales took bankruptcy, the trustee could not file suit in the bankruptcy court in which the case is pending to collect from customers owing for merchandise ordered from catalogs. The debts owed by such customers generally speaking would be consumer debts. This subsection (b) requires a suit to collect a consumer debt of less than $5,000 to be filed in the judicial district in which the defendant resides.

Subsection (b) creates an exception which prevents unfairness to successor to the debtor or creditors under section 541 or 544(b) of title I of this bill. The proper venue for such actions is the district where the debtor or the creditors, as the case may be, could have brought the action to which the trustee succeeds.

**Ad Hoc Equity Group Exhibit 9**

156

Subsection (d) relates to claims in favor of the debtor arising out of the operation of the debtor's business after the commencement of the case. The trustee may commence a proceeding on such a claim only in the judicial district in which the debtor could have sued on the claim in the absence of bankruptcy.

Subsection (e) relates to claims against the debtor arising out of the operation of the debtor's business after commencement of the case. A party adverse to the estate may sue the representative of the estate (either the debtor in possession or the trustee) on such a claim in the district where the adverse party could have sued on the claim in the absence of bankruptcy.

*Section 1410. Venue of cases ancillary to foreign proceedings*

Subsection (a) prescribes the proper venue for a case commenced under section 304 of title I of this bill. Cases to enjoin the commencement or continuation of an action or proceeding in a State or Federal court or the enforcement of a judgment may be commenced only in the district where that court sits.

Subsection (b) permits cases ancillary to foreign proceedings to enjoin lien enforcement or to require turnover of property to be commenced only in the district where the property is located.

Subsection (c) permits other cases ancillary to foreign proceedings to be commenced only in the judicial district in which is located the principal place of business in the United States, or the principal assets in the United States, of the estate which is the subject of the case.

Subsection (d) amends the table of sections for chapter 87 of title 28 of the United States Code by adding sections relating to the venue of bankruptcy cases and proceedings.

*Section 219*

Subsection (a) amends chapter 89 of title 28 of the United States Code relating to removal of cases from State courts, by adding a new section covering removal of bankruptcy matters and proceedings.

*Section 1451. Removal of bankruptcy matters and proceedings*

Subsection (a) of this section permits removal of any claim or cause or cause of action to the district court for the district where such a case or proceeding is pending, if the district courts have jurisdiction over such claim or cause of action. The application for removal shall be presented to and acted upon by the bankruptcy judge and if removal is granted the claim or cause of action shall be tried by the bankruptcy judge. Only a proceeding before the U.S. Tax Court or a civil action by a governmental unit to enforce such governmental unit's police or regulatory power is nonremovable.

Subsection (b) permits the court to which a claim or cause of action has been removed to remand the claim or cause of action on any equitable ground. An order of the bankruptcy judge remanding a claim or cause of action is not reviewable by appeal or otherwise.

Subsection (c) amends the table of sections for chapter 89 of title 28 of the United States Code by inserting the number and heading of the new section relating to removal of bankruptcy matters and proceedings.

DOCUMENT  52

157

*Section 220*

Subsection (a) of this section amends chapter 121 of title 28 of the United States Code relating to trial by jury by adding at the end thereof a new section dealing with jury trials in cases and proceedings under title 11.

*Section 1875. Jury trials in cases and proceedings under title 11*

Subsection (a) continues any current right of a litigant in a case or proceeding under title 11 or related to such a case, to a jury trial.

Subsection (b) permits the issues arising on the trial of an involuntary petition in bankruptcy to be tried without a jury.

Subsection (b) amends the table of sections of chapter 121 of title 28 of the United States Code by adding at the end thereof the number and heading of the new section dealing with jury trials in cases and proceedings under title 11.

*Section 221*

Subsection (a) of this section amends chapter 123 of title 28 of the United States Code relating to fees and costs by inserting at the end thereof a new section dealing with bankruptcy fees.

*Section 1930. Bankruptcy fees*

Subsection (a) of this section fixes the filing fee for a bankruptcy case at $80. Under current law the filing fee is $30, not including an additional $15 confirmation fee, for a chapter XIII case and $50 for a straight bankruptcy, chapter XI, or chapter XII case. The filing fee is somewhat higher for cases under chapters IX, X, and section 77. An individual instituting a voluntary bankruptcy case may pay the filing fee in installments.

Subsection (b) permits the Director of the Administrative Office of the U.S. Courts, with approval of the Judicial Conference, to prescribe additional fees, including fees to be assessed against bankrupt estates similar to the fees currently assessed pursuant to section 40c of the Bankruptcy Act. A proviso limits the maximum assessment against an estate to $100,000. The Director, with the approval of the Conference, is authorized to promulgate rules and regulations governing assessment of these fees.

Subsection (c), copied from 28 U.S.C. 1917, governs fees upon the filing of a notice of appeal or application for appeal.

Subsection (d) governs the payment of costs in instances where a case or proceeding is dismissed for want of jurisdiction.

Subsection (e) prohibits the clerk of the bankruptcy court from collecting any fees other than those prescribed under this section.

Subsection (b) of section 220 amends the table of sections of chapter 123 of title 28 of the United States Code by adding at the end thereof the number and heading of the new section relating to bankruptcy fees.

*Section 222*

This section makes a conforming change and a major change in 28 U.S.C. 2075 which authorizes the Supreme Court to prescribe rules of practice and procedure for the bankruptcy courts. The first change is

**Ad Hoc Equity Group Exhibit 9**

158

a conforming change which merely deletes a reference to the Bankruptcy Act and inserts in lieu thereof a reference to title 11. The second change repeals the last sentence of 28 U.S.C. 2075 which provides that rules supersede provisions of the Bankruptcy Act in conflict with the rules. This bill extensively revises the bankruptcy law. Nearly all procedural matters have been removed and left to the Rules of Bankruptcy Procedure. Consequently, the need to permit the Supreme Court's rules to supersede the statute no longer exists. To the extent a rule is inconsistent, the statute will govern.

*Section 223*

This section amends 28 U.S.C. 2201 relating to declaratory judgments, to except from the prohibition on declaratory judgment on tax matters, the two instances provided for under the bankruptcy code, relating to relief of a trustee from personal liability for taxes owing by the estate [11 U.S.C. 505(c)] and the tax effects of a reorganization [11 U.S.C. 1146(d)].

*Section 224*

Subsection (a) of this section adds a new section 2256 to chapter 153 of title 28, relating to writ of habeas corpus:

§ *2256. Habeas corpus from bankruptcy courts*

Under this section, the bankruptcy court is authorized to issue the writ of habeas corpus when appropriate to bring a person before the court for examination, to testify, or to perform a duty imposed on him under title 28. The court may also issue the writ to release a debtor in custody under the judgment of a State or Federal court if the debtor was arrested or imprisoned on process in a civil action, if the process was issued for the collection of a debt that is dischargeable in bankruptcy or that is or will be provided for in a reorganization or individual repayment plan, and if the person holding the debtor in custody is given notice and a hearing in order to contest the issuance of the writ.

Subsection (b) of section 223 of the bill adds a reference to new section 2256 to the table of sections of chapter 153 of title 28.

*Section 225*

This section amends rule 1101(a) of the Federal Rules of Evidence to delete a reference to referees in bankruptcy and insert a reference to bankruptcy judges in lieu thereof. The section further amends rule 1101(b) to delete a reference to the Bankruptcy Act and to substitute a reference to title 11 of the United States Code in lieu thereof.

*Section 226*

Subsection (a) of this section amends section 8339 of Title 5 of the United States Code relating to the computation of the annuity payable to persons retiring under the civil service law. The significant amendment provides for computation of the annuity payable to a bankruptcy judge at the same rate used in computing the annuity for Members of Congress or congressional employees. The other amendments are conforming amendments.

Subsection (b) amends section 8334(c) of title 5 of the United States Code relating to the deductions, contributions and deposits

DOCUMENT 52

159

required to be withheld from the pay of an employee or Member for credit to the civil service retirement fund. The contribution of a bankruptcy judge is increased to 8 percent after June 30, 1979, which is the same contribution now made by a Member of Congress, or employees of Members.

Subsection (c) amends section 8341 of Title 5 of the United States Code relating to survivor annuities to provide for survivors of bankruptcy judges the same annuity provided for employees or Members of Congress.

Subsection (d) makes a conforming amendment to section 8344 (a)(A) of Title 5 of the United States Code relating to annuities and payments of reemployed annuitants.

Subsection (e) amends section 8331 of title 5 of the United States Code containing definitions for purposes of Civil Service retirement so as to insert at the end thereof a definition of "bankruptcy judge." Bankruptcy judge is defined as a judge who is appointed or serves after October 1, 1979, the effective date of this act. This definition precludes inclusion of prior service as a referee in bankruptcy, or bankruptcy judge when computing the annuity payable to a bankruptcy judge at the increased rate provided for by this act.

## TITLE III—AMENDMENTS TO OTHER ACTS

*Section 301*

This section makes a conforming amendment to the Federal Salary Act of 1967. It deletes the cross-reference to referees in bankruptcy in section 402(d) of the Federal Judiciary Salary Act of 1964 and inserts a reference to magistrates, needed because magistrates' salaries are currently based on referees' salaries (28 U.S.C. 634(a)).

*Section 302*

This section adds to the Commodity Exchange Act a section that gives the Commodity Futures Trading Commission (CFTC) rulemaking authority in connection with commodity broker bankruptcies. It was recommended by the Chairman of the CFTC, William Bagley. The CFTC is given the authority to provide that certain cash, securities, other property, or open contractual commitments are to be included in or excluded from customer property or member property (as defined in 11 U.S.C. 761), or to be specifically identifiable to a particular customer in a specific capacity; the method by which the business of the commodity broker debtor is to be conducted or liquidated after the case is commenced: and how the net equity of a customer is to be determined; and indicate the persons to which customer property and commodity contracts may be transferred under section 770 of title 11 of the U.S. Code.

Subsection (b) provides that terms used in the section added to the Commodity Exchange Act are to be construed in pari materia with the Commodity Broker Liquidation subchapter of the bankruptcy code, with the exception that the terms "commodity options dealer", "commodity contract", and "clearing organization" may be altered by rule or order of the Commission.

**Ad Hoc Equity Group Exhibit 9**

160

*Section 303*

This section amends section 4 of the Perishable Agricultural Commodities Act by conforming it with policy contained in section 525 of the proposed bankruptcy code. It is amended to prohibit denial or revocation of a license solely on the basis of the filing of bankruptcy petition, without consideration of the factors that may have led to the bankruptcy. Under subsection (e), a license may be revoked in the event of bankruptcy if the circumstances surrounding the bankruptcy warrant. The section as amended does not prohibit consideration of financial responsibility in licensing determinations, but simply requires a deeper look than the fact of bankruptcy.

*Section 304*

This section deletes references to bankruptcy found in section 21(a) of the Agricultural Adjustment Act (7 U.S.C. 623(a)). That section, as written, prohibits the institution of a suit, action, or proceeding, including a bankruptcy case, that has the effect of restraining the collection of any tax imposed under that Act. That language amounts to a near absolute prohibition on bankruptcy, because the filing of a petition in bankruptcy operates as an automatic stay of collection efforts against the debtor. The treatment of taxes and their payment in bankruptcy cases is handled exhaustively in the proposed bankruptcy code. The reference to bankruptcy is proposed to be deleted for that reason.

*Section 305*

Section 305 makes a conforming amendment to the first section of the Act entitled "An Act to authorize the Secretary of Agriculture to compromise, adjust, or cancel certain indebtedness, and for other purposes," approved December 20, 1944 (58 Stat. 837; 12 U.S.C. 1150). The "Bankruptcy Act or under title 11 of the United States Code" is substituted for the former long title of the Bankruptcy Act.

*Section 306*

This section makes two changes in the Securities Act of 1933, that conform it to proposed 11 U.S.C. 1145 (Exemption from securities laws). First, the provision in paragraph (7) of section 3(a) is amended to remove exempt status from a bankruptcy trustee's certificates. This is covered by 11 U.S.C. 1145(a)(1). Second, exempt status is denied for securities issued in a bankruptcy case (primarily reorganizations) in exchange for other securities of the same issuer. Paragraphs (9) and (10) of section 3(a) of the Securities Act now appear to grant exempt status though the SEC has enforced the exemption as transactional rather than as an exempt security. Section 306 of this bill inserts at the beginning of each of those paragraphs the phrase "Except with respect to a security exchanged in a case under title 11 of the United States Code." These kinds of securities are dealt with by 11 U.S.C. 1145(a)(2) and (3).

*Section 307*

This section makes a conforming amendment to the Trust Indenture Act of 1939, striking out the former long title of the Bankruptcy Act and inserting "Bankruptcy Act or title 11 of the United States Code".

**Ad Hoc Equity Group Exhibit 9**

DOCUMENT 52

161

*Section 308*

The Securities Investor Protection Act of 1970 presently contains numerous cross-references to the Bankruptcy Act. This section changes those cross-references to conform with proposed title 11 of the United States Code.

Subsection (a) conforms the cross-reference to the definition of "insolvent" in the Bankruptcy Act, and deletes reference to acts of bankruptcy, which are eliminated under the proposed bankruptcy code.

Subsection (b) changes the cross-reference to the courts presently handling bankruptcy cases to the courts that will have jurisdiction of bankruptcy cases under the proposed bankruptcy code.

Subsection (c) changes the cross-reference to the definition of "disinterested" in the Bankruptcy Act.

Subsection (d) adds a reference to title 11 of the United States Code immediately after a reference to the Bankruptcy Act.

Subsection (e) is a conforming amendment to section 6(b)(1) of SIPA, changing a reference to a trustee in a Chapter X case to a trustee in a case under title 11.

Subsection (f) amends section 6(c)(2) of SIPA, which makes inapplicable the stockholder liquidation provisions in 60e of the Bankruptcy Act. The references will now be to subchapter III of chapter 7 of title 11.

Subsection (g) amends section 6(c)(1) of SIPA, which now incorporates by reference the bulk of the substantive law provisions of Chapter X of the Bankruptcy Act. The amendment cross-references the new title 11 instead.

Subsection (h) amends section 6(c)(2) of SIPA, which makes inapplicable the stockbroker liquidation provisions in 60e of the Bankruptcy Act. The references will now be to subchapter III of chapter 7 of title 11.

Subsection (i) changes a cross-reference to the Bankruptcy Act to one to title 11 of the United States Code.

Subsection (j) changes a cross-reference to the definition of "securities" in the Bankruptcy Act to one in the bankruptcy code.

Subsection (k) changes the cross-reference to priority claims to conform to the proposed bankruptcy code.

Subsection (l) changes a reference to the Bankruptcy Act to a reference to title 11 of the United States Code.

Subsection (m) changes a cross-reference to the notice provisions of the Bankruptcy Act.

Subsection (n) changes a cross-reference to the trustee's investigative duties under the Bankruptcy Act.

*Section 309*

This section amends the Public Utility Holding Company Act of 1935 by changing a cross-reference to bankruptcy to one to a case under title 11 of the United States Code.

*Section 310*

Subsection (a) changes a cross-reference in section 2(a)(8) of the Investment Company Act of 1940 to bankruptcy to one to a case under title 11.

**Ad Hoc Equity Group Exhibit 9**

162

Subsection (b) does the same in section 6(a)(2) of that Act.

Subsection (c) changes the reference to the Bankruptcy Act in section 25(d) of the Investment Company Act to a reference to title 11 of the United States Code.

### Section 311

This section amends the Investment Advisers Act of 1940 by striking out a reference to bankruptcy in section 202(a)(5) and inserting a reference to a case under title 11 of the United States Code in its place.

### Section 312

Subsection (a) amends section 302(b)(2) of the Consumer Credit Protection Act by changing the cross-reference to a court of bankruptcy under Chapter XIII of the Bankruptcy Act to a cross-reference to the court of the United States having jurisdiction over cases under chapter 13 of title 11 of the United States Code.

Subsection (b) amends section 605(a)(1) of the Fair Credit Reporting Act by changing a reference to a bankruptcy adjudication to include a reference to the order for relief under the proposed bankruptcy code.

### Section 313

Section 313 makes conforming amendments to chapter 9 of title 18 of the United States Code, the chapter dealing with bankruptcy crimes in the criminal code. Subsection (a) changes references to bankrupts to references to debtors, references to bankruptcy proceeding to references to cases under title 11, and references to bankruptcy law to references to the provisions of title 11.

Subsection (b) makes a conforming amendment to the definitions in section 151 of the 18. Subsection (c) deletes references to receivers in bankruptcy, and makes a stylistic change to conform to the new style of title 11, relating to books and records.

Subsection (d) deletes references to receiver in bankruptcy in section 153.

Subsection (e) deletes references to referees in bankruptcy and receivers. The term "bankruptcy judge" replaces the term referee."

Subsection (f) changes references to bankruptcy proceeding in section 155 to references to cases under title 11 of the United States Code.

Subsection (g) changes a reference in section 1961 of the criminal code to bankruptcy fraud to a reference to fraud connected with a case under title 11.

Subsection (h) makes the same change in section 2516(1)(e) of the criminal code.

Subsection (i) deletes reference to referee in bankruptcy and inserts bankruptcy judge in lieu thereof in section 3057 of the criminal code, and changes a reference to violations of the bankruptcy laws to a reference to violation under chapter 9 of title 18. These changes conform this section with the revision of the Bankruptcy Act and criminal code under which bankruptcy crimes were removed from the Bankruptcy Act and placed in title 18.

Subsection (j) changes a reference in section 3284 to bankrupt to a reference to debtor in a case under title 11.

**Ad Hoc Equity Group Exhibit 9**

DOCUMENT 52

163

Subsection (k) inserts in section 6001(4) a reference to a United States bankruptcy court established under chapter 6 of title 28 of the United States Code. This amendment, which enlarges the definition of court in Part V of the criminal code, relating to immunity for witnesses, conforms with the provision found in section 344 of proposed title 11.

*Section 314*

This section deletes a reference to receiver in bankruptcy found in section 485(f) of the Tariff Act of 1930.

*Section 315*

This section changes a reference in section 302(1)(3) of the Automotive Products Trade Act of 1965 to bankruptcy to a reference to cases under title 11 of the United States Code.

*Section 316*

This section repeals a provision of the Higher Education Act of 1965, section 439A, which excepts certain guaranteed student loan and Federally insured student loans from bankruptcy discharge for a five-year period. This exception to the discharge is found in section 523(a)(8) of the proposed bankruptcy code.

*Section 317*

This section makes a conforming amendment to section 239(d) of the Foreign Assistance Act of 1969 relating to the priority of the Government in insolvency situations. It conforms to the amendment made by section 321 of the bill to the Government's priority.

*Section 318*

This section changes a cross-reference in the National Labor Relations Act, section 2(1). The present cross-reference is to bankruptcy; the new one is to cases under title 11 of the United States Code.

*Section 319*

This section changes a reference to bankruptcy in section 3(d) of the Labor-Management Reporting and Disclosure Act of 1959 to a reference to cases under title 11 of the United States Code.

*Section 320*

Section 320 changes a cross-reference in subsection (f) of the same section from court of bankruptcy to court having jurisdiction over cases under title 11 of the United States Code.

Subsection (b) makes two changes in section 4062(c)(2) of ERISA, changing cross-references to conform to the new terminology.

Subsection (c) does the same in section 4068(c)(2) of ERISA.

*Section 321*

Subsection (a) of this section amends section 3466 of the Revised Statutes of the United States to make the Government's general priority in insolvency cases inapplicable in cases under title 11 of the United States Code. This conforms section 3466 with the change made to section 64a of the Bankruptcy Act by section 507 of title 11, eliminating the Government's non-tax priority.

**Ad Hoc Equity Group Exhibit 9**

164

The amendment to Revised Statutes 3466 applies to claims or liens that are given the priority of the United States under other laws of the United States.

Subsection (b) makes a conforming change in section 3467 of the Revised Statutes, by relieving a bankruptcy trustee from personal liability for nonpayment of Government claims in bankruptcy cases. where the Government is not entitled to priority.

Subsections (c), (d), and (e) repeal deadwood in the Revised Statutes, specifically, sections 3469, 3473, and 3474, relating to compromise of claims by the United States and to payment of Government claims in gold or silver coin. Subsection (f) makes a conforming change in the table of contents of that title of the Revised Statutes.

Subsection (g) repeals an archaic provision in the Revised Statutes making inapplicable the bankruptcy laws of the United States with respect to the Union Pacific Railroad Company.

### Section 322

This section changes a reference to bankruptcy in the Act entitled "An Act to provide for the alteration of certain bridges over navigable waters of the United States, for the apportionment of the cost of such alterations between the United States and the owners of such bridges, and for other purposes", approved June 21, 1940 (54 Stat. 497; 33 U.S.C. 511).

### Section 323

This section repeals section 17(a) of the Longshoremen's and Harbor Workers' Compensation Act of 1927, which provides a special priority and super-priority lien to the holder of a workmen's compensation claim when the employer of the worker or the insurance carrier involved files under the bankruptcy laws.

Bankruptcy policy strongly favors equality of treatment of all creditors, and strongly disfavors the creation of property rights upon the filing of a bankruptcy case. The purpose of bankruptcy is to enforce rights that have arisen before bankruptcy, and to enforce them in an orderly liquidation process. Springing interests unfairly defeat legitimate expectations of other creditors who may have relied on the absence of any such prior interests in extending credit. Section 67 of the present Bankruptcy Act and section 545 of proposed title 11 of the United States Code implement this important bankruptcy policy.

Accordingly, in order to avoid a potential conflict between section 17(a) and section 545, the bill proposes deletion of section 17(a). The section may already be ineffective under present law. because the prohibition of springing interests was enacted in the 1930's, after the enactment of section 17(a). The amendment proposed would conform the two laws and delete what may already be deadwood.

### Section 324

This section makes a conforming change in section 213 of the Transportation Act. 1920, by changing "bankruptcy" to "case under title 11 of the United States Code."

### Section 325

This section amends section 7 of the Act entitled "An Act to provide conditions for the purchase of supplies and the making of contracts

DOCUMENT 52

165

by the United States, and for other purposes", approved June 30, 1936 (49 Stat. 2036; 41 U.S.C. 41). The reference to trustees in bankruptcy is changed to read trustees in cases under title 11 of the United States Code.

*Section 326*

This section repeals section 733(g) of the Public Health Service Act, which excepts from discharge for a period of five years certain educational loans. This exception to discharge is found in section 523 (a)(8) of the proposed bankruptcy code.

*Section 327*

This section amends section 503 of the Housing Act of 1949, entitled "Potentially adequate farms," to make a nonassignability provision inapplicable in cases under proposed title 11.

*Section 328*

This section changes a reference in section 701 of the Civil Rights Act of 1964 from trustee in bankruptcy to trustee in a case under title 11 of the United States Code.

*Section 329*

This section changes a reference in section 802 of the Act entitled "An Act to prescribe penalties for certain acts of violence or intimidation, and for other purposes", approved April 11, 1968 (82 Stat. 81; 42 U.S.C. 3602(d)), from trustee in bankruptcy to trustee in a case under title 11 of the United States Code.

*Section 330*

Section 17 of the Boulder Canyon Project Act provides for superpriority for claims of the United States arising out of any contract authorized by that Act. Section 331 of the bill makes the priority inapplicable in cases under title 11 of the United States Code, in conformity with the amendment to section 3466 of the Revised Statutes (section 321(a) of the bill) and the general bankruptcy policy against special priorities for the Government.

*Section 331*

This section adds a new section to Title IX of the Merchant Marine Act, 1936. The provision added is presently Chapter XIV of the Bankruptcy Act. It does not govern bankruptcy proceedings, and is more properly placed in the Merchant Marine Act than in proposed title 11 of the United States Code. It is inserted with only minor stylistic changes from present law.

*Section 332*

This section makes a change in section 22(b) of the Organic Act of Guam. It changes a cross-reference to the Rules of Bankruptcy Procedure to conform it to the present enabling provision in title 28 governing the rules.

*Section 333*

This section makes the same changes in section 25 of the Revised Organic Act of the Virgin Islands as section 332 of the bill makes in the Organic Act of Guam.

**Ad Hoc Equity Group Exhibit 9**

166

*Section 334*

This section makes three amendments to the Interstate Commerce Act. The amendments are conforming amendments. changing references in sections 20c, 213(a)(3), and 323 of that Act to bankruptcy to references to title 11 of the United States Code.

## TITLE IV—TRANSITION

*Section 401; repealer*

Section 401 provides for the repeal of the existing Bankruptcy Act and all relevant provisions of other laws amending the Bankruptcy Act.

*Section 402; effective date of new act; incumbents*

Subsection (a) of section 402 makes all provisions of this act effective October 1, 1979.

Subsection (b) authorizes the completion of their regular terms of office by referees in bankruptcy serving on the date of the enactment of the act. Subsection (b) extends through September 30, 1982, the term of office of any referee in bankruptcy which would otherwise expire before that date, unless the incumbent is found unqualified by a merit screening committee established pursuant to section 402(c).

Subsection (c) establishes for each State a merit screening committee to evaluate the qualifications of each incumbent referee in bankruptcy to serve during the extended transition term prescribed in the proviso to subsection (b) of this section. Each State screening committee is to be constituted and organized as specified in subsection (c) prior to the expiration of the term of any referee in bankruptcy serving in that State whose term was extended as provided by subsection (b). Merit screening is not required on the part of a bankruptcy judge serving the balance of the regular term for which he was appointed prior to the enactment of this act.

Subsection (d) authorizes an incumbent referee in bankruptcy, upon the expiration of a regular or an extended term of office. to continue to serve until a successor is appointed and qualified as provided in section 201 of the act. This provision safeguards against possible delays in the replacement of bankruptcy judges in service at the end of the transition period.

Subsection (e) confers upon each referee in bankruptcy serving on the date of the enactment of this act. the title of bankruptcy judge and vests in him all of the rights and powers vested in a bankruptcy judge appointed under section 201 of the act. Therefore. the broadened jurisdiction conferred by 28 U.S.C. § 1334. as amended by section 216 of this act. is exercisable by incumbent bankruptcy judges serving on and after the date of the enactment of this act, except to the extent such exercise would be inconsistent with the provisions of section 403 of this act.

*Section 403. Saving provisions*

Subsection (a) makes it clear that the provisions of this act are not to affect cases commenced under prior law. which are to proceed, with respect to both substantive and procedural matters. in the same fashion as though this act were not in effect. Fiduciaries serving in cases pend-

**Ad Hoc Equity Group Exhibit 9**

DOCUMENT 52

167

ing on the date of the enactment of this act are permitted to continue in office.

Subsection (b) preserves the rights of incumbent referees in bankruptcy and their survivors to whatever pension and survivor benefits may have accrued before the repeal of section 40(d) of the Bankruptcy Act, by section 401 of this act.

Notwithstanding section 313 of this act, section 403(c) provides for the continuing application of chapters 9 and 96 and sections 2516, 3057, and 3284 of title 18, United States Code, to the act of any person committed before October 1, 1979, or in connection with a case commenced before that date.

Subsection (d) empowers the bankruptcy judge in a case confirmed after enactment, to reduce a fee in excess of $100,000 charged under section 40c(2)(b) of the Bankruptcy Act, as the interests of justice may require. It is elsewhere provided (section 404(b)) that fees assessed following the effective date of this act are not to exceed $100,000 in any one chapter XI case.

*Section 404. Rules of bankruptcy procedures; fees and charges*

Under subsection (a), rules of bankruptcy procedure in force on September 30, 1979, unless inconsistent with this act, are continued in effect during the transition period until either repealed or superseded pursuant to 28 U.S.C. section 2075, as amended by section 221 of this act.

Subsection (b) continues the fees and charges in effect on October 1, 1979, pending the promulgation of new fees and charges in accordance with 28 U.S.C. § 1930. The fees chargeable in any one case may not exceed $100,000.

*Section 405. Transition study*

Section 405 requires the Director of the Administrative Office of the U.S. Courts (1) to complete a study to determine the number of bankruptcy judges needed to implement the provisions of this act and (2) to report the results of that study to the Congress and to the Judicial Conference before July 1, 1982.

The transition period prescribed by section 402(a) and (b) is necessary in view of the time required to acquire meaningful empirical data under the vastly enlarged jurisdiction and altered structure of the new bankruptcy court.

The broadened jurisdiction and powers of the new bankruptcy courts pertain only to cases commenced after October 1, 1979. The transition study report by the Director is to be made to the Judicial Conference by July 1, 1982. The committee feels a 3-year transition period should be sufficient to enable the Director to conduct a meaningful survey on which to base his report to the Congress. However, the committee also recognizes the magnitude and importance of the survey may dictate that the Director require more time to assemble and evaluate decisive data in which case the committee expects the Director to notify the Congress of his needs and request a suitable extension.

The provisions of section 405 are to be read with section 153(b) of this act, which vests in the Judicial Conference of the United States the power to determine the number of bankruptcy courts and their locations.

**Ad Hoc Equity Group Exhibit 9**

168

Since implementation of the approved changes may be infeasible within the allotted time, section 402(d), authorizing bankruptcy judges serving on September 30, 1982, to continue to serve until their successors are appointed and qualified, permits the bankruptcy courts to continue to function under the direction of incumbent transition bankruptcy judges until the numbers and locations of bankruptcy court judgeships can be established under this section.

### ESTIMATED COSTS

Cost estimates were prepared for the bill in May 1978 by the Administrative Office of the United States Courts and on July 13, 1978, by the Congressional Budget Office.

The cost estimate by the Administrative Office compared the costs for S. 2266 and the analogous House bill, H.R. 8200, and it is attached as appendix I. It shows that S. 2266 would cost, annually, approximately $62.8 million more than current costs.

The cost estimate of the Congressional Budget Office for S. 2266 which follows indicates an approximate annual increase of $14 million per year beginning in fiscal year 1980. This is substantially less than the $62.8 million annual increase estimated for H.R. 8200.

CONGRESSIONAL BUDGET OFFICE,
U.S. CONGRESS,
*Washington, D.C., July 13, 1978.*

Hon. JAMES O. EASTLAND,
*Chairman, Committee on the Judiciary, U.S. Senate, Dirksen Senate Office Building, Washington, D.C.*

DEAR MR. CHAIRMAN: Pursuant to section 403 of the Congressional Budget Act of 1974, the Congressional Budget Office has prepared the attached cost estimate for S. 2266, a bill to establish a uniform law on the subject of bankruptcies.

Should the committee so desire, we would be pleased to provide further details on the attached cost estimate.

Sincerely,

ALICE M. RIVLIN,
*Director.*

### CONGRESSIONAL BUDGET OFFICE—COST ESTIMATE

JULY 13, 1978.

1. Bill number: S. 2266.

2. Bill title: A bill to establish a uniform law on the subject of bankruptcies.

3. Bill status: As ordered reported by the Senate Committee on the Judiciary, July 12, 1978.

4. Bill purpose: The purpose of this bill is to establish a modern uniform law on the subject of bankruptcies. The bill provides for substantive changes in the current bankruptcy law and in judicial administration of the law. The jurisdiction of the district court is expanded to include all bankruptcy cases commenced under Title 11 of the U.S. Code, and bankruptcy judges may exercise all powers and jurisdiction conferred on the district courts.

**Ad Hoc Equity Group Exhibit 9**

DOCUMENT 52

169

The bill authorizes the appointment of additional personnel for the bankruptcy courts and it requires that the Director of the Administrative Office of the U.S. Courts conduct continuing studies to determine the number of additional judgeships which may be required to provide expeditious administration of the revised bankruptcy law. The Director is also to name qualified persons eligible to membership on the panel of trustees for each bankruptcy court.

The bill also increases bankruptcy court filing fees from the current $50 to $60 per filing.

5. Cost estimate:

| | Millions |
|---|---|
| Fiscal year 1979: Estimated cost | $0.2 |
| Fiscal year 1980: Estimated cost | 14.1 |
| Fiscal year 1981: Estimated cost | 14.2 |
| Fiscal year 1982: Estimated cost | 15.1 |
| Fiscal year 1983: Estimated cost | 16.0 |

The costs of this bill fall within budget function 750.

6. Basis of estimate: Based on information from the Administrative Office of the U.S. Courts, the expansion of the jurisdiction of the district courts is expected to result in bringing before bankruptcy courts approximately 6,000 to 8,000 plenary actions previously adjudicated in state courts. Based on current workload statistics, approximately 20 additional bankruptcy judges will be required to handle the increased caseload. However, the final number of additional judgeships will ultimately be dependent upon further analysis by the Administrative Office of the U.S. Courts of the types of plenary proceedings which will be brought into the district courts.

Assuming 20 additional judgeships will be needed, the fiscal year 1980 cost is estimated to be $2.8 million. This includes lump-sum costs for space, facilities, furnishings, fixtures, and recurring costs for each judge's salary, benefits, expenses, and supporting staff.

This bill requires that records be maintained of proceedings in bankruptcy courts. It is estimated that implementation of this requirement will require approximately 123 court reporters to be employed by the bankruptcy courts. This is based on one court reporter position for each two full-time bankruptcy judges. Costs for salaries benefits and overhead for these positions are estimated to be $3.5 million in fiscal year 1980.

This estimate also includes the cost of one law clerk per bankruptcy judge to provide him with the necessary research and legal assistance to fulfill the responsibilities under this bill. The cost for salaries, benefits and overhead for 246 law clerks is estimated to be $7.3 million in fiscal year 1980.

The Administrative Office of the U.S. Courts will require additional staff to perform several functions necessitated by this bill. First, a staff of three attorneys along with two clerks will be needed to prepare the transitional study to be transmitted to the Congress in 1982, as required by this bill. Second, a staff of three attorneys and two clerks will be needed to establish and maintain information on persons qualified for membership on the panel of trustees for each district court. These positions will have to be established during fiscal year 1979 in order to have trustee panels in operation by the effective date of this bill, October 1, 1979.

**Ad Hoc Equity Group Exhibit 9**

172

170

In addition, as a function of maintaining the panel of trustees, additional staff is estimated to be required to review and audit the work performed by trustees in each district court and to maintain information and statistics on the trustees. The fiscal year 1979 cost is estimated to be approximately $200,000. Costs are estimated to be approximately $500,000 for each of fiscal years 1980, 1981 and 1982, with a slight drop in costs in fiscal year 1983 after the transitional study is completed.

This bill has an effective date of October 1, 1979. All costs are estimated to begin in fiscal year 1980, with the exception referred to above.

All costs are inflated through fiscal year 1983 based on CBO projections of federal salary increases and the cost of federal purchases or services.

7. Estimate comparison: None.

8. Previous CBO estimate: On September 6, 1977, CBO prepared an estimate on H.R. 8200, the corresponding bill reported by the House Committee on the Judiciary, July 19, 1977. The estimated cost of S. 2266 is lower, primarily because it does not provide for a complete upgrading of the status of bankruptcy courts and because H.R. 8200 contains several provisions which are not in S. 2266.

9. Estimate prepared by: Thomas J. Elzey.

10. Estimate approved by:

C. J. NUCKOLS,
(For James L. Blum, Assistant Director for Budget Analysis).

**Ad Hoc Equity Group Exhibit 9**

DOCUMENT 52

# APPENDIX I

Cost Estimates for Proposed Bankruptcy Legislation Prepared by the Administrative Office of the United States Courts

## GENERAL

The following estimates reflect the differences between current costs of the bankruptcy system and the proposed legislation: S. 2266, S. 2266—with modifications proposed by the Judicial Conference, and H.R. 8200.

(a) *S. 2266.*—Cost differences between this proposal and the current law includes the addition of a court reporter for each two-bankruptcy judges, liberalized retirement benefits for the bankruptcy judge, and 20 additional bankruptcy judges to handle increased workload created by an estimated 8,000 plenary actions.

(b) *S. 2266—modified.*—This proposal differs from S. 2266 by the addition of bankruptcy administrators and their staff. No provision has been made for additional referees above the current level based on the assumption that the addition of bankruptcy administrators will assume some of the administrative workload and offset some of the added workload created by the 8,000 plenary actions.

(c) *H.R. 8200.*—This proposed legislation would upgrade the status and salary of referees in bankruptcy to that Article III judges. Each bankruptcy judge would be authorized a law clerk, secretary, court reporter and courtroom deputy. In addition, separate bankruptcy courts would be established, requiring additional supporting personnel and reclassification of some positions. The bill also creates the office of the U.S. Trustees and staff who would be supervised by an Assistant Attorney General. This cost estimate is based on the assumption of a reduction from the current level to 200 full-time bankruptcy judges.

There are 214 full-time and 24 part-time bankruptcy judgeships authorized at this time. The 24 part-time referees currently authorized are working half-time and for purpose of cost estimates, therefore, represent the equivalent of 12 full-time positions.

The attached statements describe in some detail the budgetary impact of each bill on current expenditures. In addition to these statements, an object classification statement compares current costs by major object class with each proposed bill and a personnel summary statement compares current numbers of personnel and total salaries by each major category of position with each bill. Estimated costs by State based on numbers of bankruptcy referees are also provided. All estimates are based on the current level of bankruptcy filings with the exception of 8,000 plenary actions. Costs are also based on current salary rates and without taking into consideration inflation or other possible cost increases.

(171)

**Ad Hoc Equity Group Exhibit 9**

**174**

172

## COMPARATIVE COST BY OBJECT CLASS

[In thousands of dollars]

| | Current | S. 2266 | S. 2266 (modified) | H.R. 8200 |
|---|---|---|---|---|
| Personnel compensation [1] | $27,295 | $31,534 | $37,409 | $54,438 |
| Personnel benefits | 6,399 | 8,228 | 9,538 | 16,428 |
| Travel and transportation of persons | 484 | 615 | 893 | 1,470 |
| Transportation of things | 2 | 2 | 2 | 2 |
| Space and facilities: | | | | |
| Standard level user charges | 5,269 | 5,799 | 6,651 | 12,809 |
| Space renovations | | | | [2]85,000 |
| Communications, utilities, and other rent | 2,771 | 2,998 | 3,189 | 3,346 |
| Printing and reproduction | 407 | 449 | 506 | 537 |
| Security investigations: | | | | |
| Nonrecurring | | [2]80 | [3]440 | [2]970 |
| Recurring | 20 | 20 | 20 | 20 |
| Other services | 197 | 725 | 770 | 294 |
| Supplies and materials | 565 | 639 | 762 | 825 |
| Equipment: | | | | |
| General office, initial | | [2]252 | [2]262 | [2]1,961 |
| Lawbooks: | | | | |
| Initial | | [2]221 | [2]171 | [2]6,000 |
| Recurring | 141 | (154) | (141) | (1,200) |
| Furniture and furnishings: | | | | |
| Initial | | [2]841 | [2]1,500 | [2]5,273 |
| Recurring | 223 | (247) | (299) | (546) |
| Cost of general administration: | | | | |
| Administrative Office of the U.S. Courts (Administrative Support Services) | 1,000 | 1,040 | 1,081 | 1,081 |
| Federal Judicial Center (education and training) | 129 | 242 | 292 | 433 |
| Assistant Attorney General (supervising U.S. Trustees) | | | | [2]473 |
| | | | | |
| Budgetary impact: | | | | |
| 1st yr | | 53,675 | -63,486 | 191,360 |
| Succeeding years | 44,902 | 52,682 | 61,553 | -93,887 |
| Change in revenue: | | | | |
| Loss (+) | | | | [4]14,000 |
| Gain (−) | | [5]−120 | [5]−120 | [5]−120 |
| | | | | |
| Total cost: | | | | |
| 1st yr | | 53,555 | 63,366 | 205,240 |
| Succeeding years | 44,902 | 52,562 | 61,433 | 107,767 |

[1] Personnel compensation takes into account normal lapses (savings due to vacancies).
[2] Nonrecurring expenses.
[3] Includes nonrecurring of $15,000 for security investigations.
[4] Revenue loss due to elimination of contributions to referee salary and expense fund from net proceeds realized from liquidations and reorganizations.
[5] A $15 filing fee will be received for each of the estimated 8,000 plenary actions.

## PERSONNEL SUMMARY [1]

[Dollar amounts in thousands]

| | Current | | S. 2266 | | S. 2266 (modified) | | H.R. 8200 | |
|---|---|---|---|---|---|---|---|---|
| | Number of positions | Total salaries | Number of positions | Total salaries | Number of positions | Total salaries | Number of positions | Total salaries |
| Bankruptcy judges: | | | | | | | | |
| Full time | 214 | $10,379 | 246 | $11,883 | 226 | $10,961 | 200 | $10,900 |
| Part time (equivalent full-time positions) | 12 | 582 | | | | | | |
| Personal staff: | | | | | | | | |
| Secretaries | 226 | 3,088 | 246 | 3,347 | 226 | 3,088 | 200 | 3,324 |
| Law clerks | | | | | | | 200 | 4,158 |
| Court reporters | | | 123 | 2,730 | 113 | 2,519 | 200 | 4,434 |
| Courtroom deputies | | | | | | | 200 | 3,652 |
| Clerical staff | 1,097 | 13,246 | 1,112 | 13,574 | 1,097 | 13,246 | | |
| Bankruptcy administrators: | | | | | | | | |
| Bankruptcy administrators | | | | | 164 | 5,667 | | |
| Staff | | | | | 164 | 1,928 | | |
| U.S. trustees: | | | | | | | | |
| Trustees | | | | | | | 188 | 5,980 |
| Staff | | | | | | | 470 | 6,259 |
| Clerk of the bankruptcy court: | | | | | | | | |
| Clerks | | | | | | | 94 | 3,508 |
| Staff | | | | | | | 871 | 12,323 |
| Total | 1,549 | 27,295 | 1,727 | 31,534 | 1,980 | 37,509 | 2,623 | [1]54,438 |

[1] Excluding personnel in the Administrative Office of the U.S. Courts, the Federal Judicial Center, and the Department of Justice.

Ad Hoc Equity Group Exhibit 9

DOCUMENT 52

173

S. 2266—BUDGETARY IMPACT

| Increase | Permanent positions | Amount (thousands) |
|---|---|---|
| 1. Bankruptcy judges—S. 2266 will result in an estimated 8,000 plenary actions to be handled by bankruptcy judges. The increased workload will require 20 additional bankruptcy judges over the current equivalent of 226 full-time positions (214 full-time and 24 part-time positions): | | |
| Personnel compensation | 20 | $922 |
| Personnel benefits | | 93 |
| Unfunded cost of retirement | | 120 |
| Secretaries: | | |
| Personnel compensation | 20 | 259 |
| Personnel benefits | | 26 |
| Unfunded cost of retirement | | 35 |
| 2. Court reporters—An average of 1 court reporter will be required for each 2 bankruptcy judges: | | |
| Personnel compensation | 123 | 2,730 |
| Personnel benefits | | 273 |
| Unfunded cost of retirement | | 366 |
| 3. Chief deputy clerks—Deconsolidation of clerk's offices requires addition of middle level management personnel: | | |
| Personnel compensation | 15 | 328 |
| Personnel benefits | | 33 |
| Unfunded cost of retirement | | 44 |
| 4. Liberalized retirement benefits for 246 bankruptcy judges | | 839 |
| 5. Travel and miscellaneous: | | |
| Bankruptcy judges and staff | | 148 |
| Court reporters | | 320 |
| Chief deputy clerks | | 24 |
| 6. Security investigations for 32 bankruptcy judges | | ¹ 80 |
| 7. Contractual services for court reporters for those locations where full-time reporters are not available | | 500 |
| 8. New libraries for 32 bankruptcy judges | | ¹ 80 |
| Annual cost of maintaining libraries | | (13) |
| 9. General office equipment: | | |
| Bankruptcy judges and staff (32) | | ¹ 240 |
| Chief deputy clerks (15) | | ¹ 12 |
| 10. Space rental: | | |
| Bankruptcy judges and staff (20) | | 306 |
| Court reporters (123) | | 200 |
| Chief deputy clerks (15) | | 24 |
| 11. Furniture and furnishings: | | |
| New personnel: | | |
| Bankruptcy judges (32) | | ¹ 480 |
| Court reporters (123) | | ¹ 123 |
| Chief deputy clerks (15) | | ¹ 15 |
| Recurring requirements: | | |
| Bankruptcy judges and staff (20) | | (10) |
| Court reporters and chief deputy clerks | | (14) |
| 12. General administration: | | |
| Federal Judicial Center (education and training) | | 113 |
| Administrative Office of the U.S. Courts (Administrative Support Services) | 2 | 40 |
| 13. Revenue gain (represents filing fees of $15 for 8,000 plenary actions) | | −120 |
| Budgetary impact: | | |
| 1st yr | 180 | 8,653 |
| Succeeding years | 180 | 7,660 |

¹ Nonrecurring expenses.
Note: All amounts included for salaries and benefits of new personnel take into account normal lapses (savings due to vacancies) of 5 percent.
In addition to the 20 additional bankruptcy judges required for plenary actions, it is anticipated that the 24 part-time judges will be replaced by 12 full-time bankruptcy judges.

**Ad Hoc Equity Group Exhibit 9**

174

S. 2266—MODIFIED BUDGETARY IMPACT

| Increase | Permanent positions | Amount (thousands) |
|---|---|---|
| 1. Court reporters—an average of 1 court reporter will be required for each 2 referees: | | |
| Personnel compensation | 113 | $2,519 |
| Personnel benefits | | 252 |
| Unfunded cost of retirement | | 338 |
| 2. Bankruptcy administrators—S. 2266 (modified) provides for the establishment of the Office of Bankruptcy Administrator: | | |
| Personnel compensation | 164 | 5,667 |
| Personnel benefits | | 566 |
| Unfunded cost of retirement | | 759 |
| Secretaries to bankruptcy administrators: | | |
| Personnel compensation | 164 | 1,928 |
| Personnel benefits | | 193 |
| Unfunded cost of retirement | | 259 |
| 3. Liberalized retirement benefits for 226 referees in bankruptcy | | 772 |
| 4. Travel and miscellaneous expenses: | | |
| Court reporters | | 294 |
| Bankruptcy administrators and staff | | 902 |
| 5. Security investigations: | | |
| Referees in bankruptcy (12) | | ¹30 |
| Bankruptcy administrators (164) | | ¹410 |
| 6. Contractual service for court reporters for those locations where full-time reporters are not available | | 500 |
| 7. New libraries for 21 referees in bankruptcy | | ¹30 |
| Annual cost of maintaining libraries | | |
| 8. General office equipment: Bankruptcy administrators and staff (328) | | ¹262 |
| 9. Space rental: | | |
| Court reporters (113) | | 184 |
| Bankruptcy administrators and staff (328) | | 1,198 |
| 10. Furniture and furnishings: | | |
| New personnel: | | |
| Referees in bankruptcy (12) | | ¹180 |
| Court reporters (113) | | ¹113 |
| Bankruptcy administrators and staff (328) | | ----- |
| Recurring requirements: | | |
| Referees in bankruptcy and staff | | |
| Court reporters | | (11) |
| Bankruptcy administrators and staff | | (65) |
| 11. General administration: | | |
| Federal Judicial Center (education and training) | | 163 |
| Administrative Office of the U.S. Courts (Administrative Support Services) | 4 | 81 |
| 12. Revenue gain (represents filing fees of $15 for 8,000 plenary actions) | | −120 |
| Budgetary impact: | | |
| 1st yr | 455 | 18,464 |
| Annual recurring | 445 | 16,531 |

¹ Nonrecurring expenses.

Note: Although S. 2266 (modified) will result in additional plenary actions, it is believed that the number of referees in bankruptcy will remain the same as currently (226) because the bankruptcy administrators will assume some of the present administrative workload of the referees. All amounts included for salaries and benefits of new personnel take into account normal lapses (savings due to vacancies) of 5 percent. It is anticipated under S. 2266 (modified) that the 24 part-time referees will be replaced by 12 full-time referees.

**Ad Hoc Equity Group Exhibit 9**

## DOCUMENT 52

### 175

#### H.R. 8200—BUDGETARY IMPACT

| Increase [1] | Permanent positions | Amount (thousands) |
|---|---|---|
| 1. Salary adjustment for bankruptcy judges. H.R. 8200 raises bankruptcy referees to art. III judges with salaries increasing from $48,500 to $54,500 | | $1,200 |
| 2. Life tenure, noncontributing retirement system increase in cost over the present civil service retirement system and other personnel benefits | | 3,519 |
| 3. Participation in judicial survivors' annuities system with agency contributions at 4½ percent | | 491 |
| 4. Additional staff for bankruptcy judges: | | |
| Law clerk, JSP-12: | | |
| Personnel compensation | 200 | 4,158 |
| Personnel benefits | | 416 |
| Unfunded cost of retirement | | 558 |
| Court reporters, ungraded: | | |
| Personnel compensation | 200 | 4,434 |
| Personnel benefits | | 444 |
| Unfunded cost of retirement | | 594 |
| Reclassification of secretaries from JSP-8 to JSP-10 and courtroom deputies from JSP-6 to JSP-11 | | 2,496 |
| 5. U.S. trustees and staff: The cost is based on 94 U.S. trustees, 94 assistant trustees with a staff of 2 secretaries and 3 clerks for each office. | | |
| Personnel compensation | 658 | 12,238 |
| Personnel benefits | | 1,225 |
| Unfunded cost of retirement | | 1,641 |
| 6. The clerical staff of the bankruptcy court will be upgraded with grade levels of the clerk and chief deputy commensurate with those of district courts and an addi- tional position for middle level management. | | |
| Personnel compensation | 94 | 4,995 |
| Personnel benefits | | 500 |
| Unfunded cost of retirement | | 669 |
| 7. Travel and miscellaneous: | | |
| Judges and staff | | 974 |
| U.S. trustee and staff | | 724 |
| Clerical staff | | 350 |
| 8. Security investigations: | | |
| Judges (200) | | [2] 500 |
| U.S. trustees and assistant trustees (188) | | [2] 470 |
| 9. New libraries for 200 bankruptcy judges | | [2] 5,859 |
| Annual cost of maintaining libraries | | (1,059) |
| 10. General office equipment: | | |
| Bankruptcy judges and staff (200) | | [2] 1,360 |
| U.S. trustees and staff (658) | | [2] 526 |
| Clerks of bankruptcy court (94) | | [2] 75 |
| 11. Space rental: | | |
| Bankruptcy judges and staff (1,000) | | 5,403 |
| U.S. trustees and staff (658) | | 1,603 |
| Clerks of bankruptcy court (965) | | 534 |
| Space renovations | | [2] 85,000 |
| 12. Furniture and furnishings: | | |
| New personnel: | | |
| Bankruptcy judges and staff (1,000) | | [2] 3,264 |
| U.S. trustees and staff (658) | | [2] 1,222 |
| Clerks of bankruptcy court (965) | | [2] 564 |
| Recurring requirements: | | |
| Bankruptcy judges and staff (1,000) | | (224) |
| U.S. trustees and staff (658) | | (85) |
| Clerks of bankruptcy court (965) | | (14) |
| 13. General administration: | | |
| Assistant Attorney General (supervising U.S. trustees) | 10 | [4] 473 |
| Administrative Office of the U.S. Courts (Administrative Support Services) | 4 | 81 |
| Federal Judicial Center (education and training) | | 304 |
| Less— | | |
| 14 full-time and the equivalent of 24 part-time referees | —26 | —1,261 |
| 52 secretaries and clerical assistants | —52 | —644 |
| Benefits (funded and unfunded cost) | | —501 |
| Revenue loss [5] | | 14,000 |
| Revenue gain | | —120 |
| Budgetary impact: | | |
| 1st yr. | 1,088 | 160,338 |
| Succeeding yr. | 1,088 | 62,865 |

[1] The cost estimate for H.R. 8200 is based on 200 judges.
[2] All amounts included for salaries and benefits of new personnel takes into account normal lapses (savings due to vacancies) of 5 percent.
[3] Nonrecurring expenses.
[4] Includes nonrecurring of $15,000 for security investigations.
[5] Revenue loss due to elimination of contributions to referee salary and expense fund from net proceeds realized from liquidations and reorganizations.

**Ad Hoc Equity Group Exhibit 9**

176

### PROPOSED BANKRUPTCY LEGISLATION—COMPARATIVE COST BY STATE[1]

[Dollar amounts in thousands]

| | Current cost | S. 2266 | | S. 2266 (modified) | | H.R. 8200 | |
|---|---|---|---|---|---|---|---|
| | | 1st yr cost | Annual recurring | 1st yr cost | Annual recurring | 1st yr cost | Annual recurring |
| Total | $44,902 | $53,555 | $52,562 | $63,365 | $61,433 | $205,240 | $107,767 |
| **District of Columbia circuit: District of Columbia** | 199 | 216 | 214 | 280 | 272 | | |
| **1st circuit:** | | | | | | | |
| Maine | 397 | 435 | 427 | 561 | 544 | 2,052 | 1,078 |
| Massachusetts | 795 | 1,088 | 1,068 | 1,122 | 1,086 | 4,105 | 2,155 |
| New Hampshire | 99 | 218 | 214 | 140 | 136 | | |
| Rhode Island | 199 | 218 | 214 | 280 | 272 | 1,026 | 539 |
| Puerto Rico | 397 | 218 | 214 | 561 | 544 | 1,026 | 539 |
| **2d circuit:** | | | | | | | |
| Connecticut | 397 | 435 | 437 | 561 | 544 | 2,052 | 1,078 |
| New York | 3,577 | 4,789 | 4,701 | 5,047 | 4,892 | 15,394 | 8,082 |
| Vermont | 99 | 218 | 214 | 140 | 136 | 1,026 | 539 |
| **3d circuit:** | | | | | | | |
| Delaware | 99 | 218 | 214 | 140 | 136 | | |
| New Jersey | 894 | 1,306 | 1,282 | 1,402 | 1,359 | 5,131 | 2,694 |
| Pennsylvania | 1,590 | 1,959 | 1,923 | 2,243 | 2,175 | 6,157 | 3,233 |
| Virgin Islands | 99 | | | 140 | 136 | | |
| **4th circuit:** | | | | | | | |
| Maryland | 298 | 435 | 427 | 420 | 408 | 2,052 | 1,078 |
| North Carolina | 795 | 1,089 | 1,068 | 1,122 | 1,087 | 3,079 | 1,616 |
| South Carolina | 199 | 218 | 214 | 280 | 272 | 1,026 | 539 |
| Virginia | 993 | 1,524 | 1,496 | 1,402 | 1,359 | 5,132 | 2,694 |
| West Virginia | 397 | 435 | 427 | 561 | 544 | 2,052 | 1,078 |
| **5th circuit:** | | | | | | | |
| Alabama | 1,788 | 1,524 | 1,496 | 2,523 | 2,447 | 6,157 | 3,233 |
| Florida | 1,195 | 1,959 | 1,923 | 1,682 | 1,631 | 6,157 | 3,233 |
| Georgia | 1,391 | 1,742 | 1,709 | 1,963 | 1,903 | 7,183 | 3,772 |
| Louisiana | 497 | 871 | 854 | 701 | 680 | 3,079 | 1,616 |
| Mississippi | 695 | 653 | 641 | 981 | 951 | 3,079 | 1,616 |
| Texas | 1,788 | 2,830 | 2,778 | 2,524 | 2,446 | 9,236 | 4,850 |
| Canal Zone | | | | | | | |
| **6th circuit:** | | | | | | | |
| Kentucky | 596 | 653 | 641 | 841 | 815 | 3,079 | 1,616 |
| Michigan | 1,391 | 1,524 | 1,496 | 1,963 | 1,903 | 5,131 | 2,694 |
| Ohio | 2,880 | 3,266 | 3,205 | 4,205 | 4,077 | 13,340 | 7,005 |
| Tennessee | 1,391 | 1,306 | 1,282 | 1,963 | 1,903 | 5,131 | 2,695 |
| **7th circuit:** | | | | | | | |
| Illinois | 2,285 | 2,613 | 2,564 | 3,225 | 3,126 | 10,262 | 5,389 |
| Indiana | 1,192 | 1,524 | 1,496 | 1,682 | 1,631 | 5,131 | 2,694 |
| Wisconsin | 894 | 1,088 | 1,068 | 1,262 | 1,223 | 4,105 | 2,155 |
| **8th circuit:** | | | | | | | |
| Arkansas | 397 | 435 | 427 | 561 | 544 | 2,052 | 1,078 |
| Iowa | 397 | 435 | 427 | 561 | 544 | 2,052 | 1,078 |
| Minnesota | 894 | 1,306 | 1,282 | 1,262 | 1,223 | 5,132 | 2,693 |
| Missouri | 1,193 | 871 | 854 | 1,683 | 1,630 | 4,105 | 2,155 |
| Nebraska | 199 | 218 | 214 | 280 | 272 | 1,026 | 539 |
| North Dakota | 199 | 218 | 214 | 280 | 272 | 1,026 | 539 |
| South Dakota | 99 | 218 | 214 | 140 | 136 | 1,026 | 539 |
| **9th circuit:** | | | | | | | |
| Alaska | 199 | 218 | 214 | 280 | 272 | 1,026 | 539 |
| Arizona | 795 | 871 | 854 | 1,122 | 1,087 | 4,105 | 2,155 |
| California | 5,165 | 5,878 | 5,769 | 7,290 | 7,068 | 23,603 | 12,393 |
| Hawaii | 199 | 218 | 214 | 280 | 272 | 1,026 | 539 |
| Idaho | 199 | 218 | 214 | 280 | 272 | 1,026 | 539 |
| Montana | 199 | 435 | 427 | 280 | 272 | 1,026 | 539 |
| Nevada | 397 | 435 | 427 | 561 | 544 | 2,052 | 1,078 |
| Oregon | 894 | 871 | 854 | 1,262 | 1,223 | 4,105 | 2,155 |
| Washington | 993 | 1,088 | 1,059 | 1,402 | 1,358 | 5,131 | 2,694 |
| Guam | | | | | | | |
| **10th circuit:** | | | | | | | |
| Colorado | 794 | 871 | 854 | 1,122 | 1,087 | 4,105 | 2,156 |
| Kansas | 596 | 653 | 641 | 841 | 816 | 3,079 | 1,616 |
| New Mexico | 199 | 435 | 427 | 280 | 272 | 1,026 | 539 |
| Oklahoma | 794 | 653 | 641 | 1,122 | 1,087 | 3,079 | 1,616 |
| Utah | 199 | 218 | 214 | 280 | 272 | 1,026 | 539 |
| Wyoming | 199 | 218 | 214 | 280 | 272 | 1,026 | 539 |

[1] Represents estimates based on average unit cost of establishing or maintaining each bankruptcy referee (judge) position.

**Ad Hoc Equity Group Exhibit 9**

DOCUMENT 52

177

### CHANGES IN EXISTING LAWS

In the opinion of the Committee on the Judiciary, it is necessary in order to expedite the business of the Senate to dispense with the requirements of subsection 4 of rule XXIX of the Standing Rules of the Senate (relating to the showing of changes in existing laws made by the bill, as reported). The Committee felt this was justified since the Committee on Finance has a 30-day sequential referral following the date the bill is reported from the Judiciary Committee and further changes could be expected from the Committee on Finance. It is anticipated that completed changes in the existing law section will be available following termination of the referral to the Committee on Finance.

O

**Ad Hoc Equity Group Exhibit 9**

**Ad Hoc Equity Group Exhibit 9**
**181**