**EXHIBIT B**

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

155 NORTH WACKER DRIVE

CHICAGO, ILLINOIS 60606-1720

———

TEL: (312) 407-0700
FAX: (312) 407-0411
www.skadden.com

FIRM/AFFILIATE OFFICES
———
BOSTON
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
WASHINGTON, D.C.
WILMINGTON
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MUNICH
PARIS
SÃO PAULO
SEOUL
SHANGHAI
SINGAPORE
TOKYO
TORONTO

DIRECT DIAL
+1 (312) 407-0549
DIRECT FAX
+1 (312) 407-8641
EMAIL ADDRESS
RON.MEISLER@SKADDEN.COM

January 6, 2023

*Via First-Class Mail and Email*

Jayson B. Ruff, Esquire
Trial Attorney
Office of the United States Trustee
515 Rusk Street, Suite 3516
Houston, TX 77002

           RE:    Core Scientific, Inc., et al., Case No. 22-90341 (DRJ) (the "**Chapter 11 Cases**") – Request for Appointment of an Official Committee of Equity Security Holders

Dear Mr. Ruff:

      We write on behalf of an ad hoc group of equity security holders (the "**Ad Hoc Group**") of Core Scientific Inc. ("**Core Scientific**" or the "**Company**," and together with its subsidiaries and affiliates in the Chapter 11 Cases, the "**Debtors**"). The members of the Ad Hoc Group collectively own 12,322,419 shares of the Company's common stock (representing approximately 3.29% of all issued and outstanding common stock of the Company and approximately 4.61% of issued and outstanding common stock of the Company not held by insiders).[1] The current members of the Ad Hoc Group are identified on **Exhibit A** attached hereto.

---

[1] Based on public filings, we believe approximately 107.03 million shares of the Company's common stock are currently held by insiders, representing approximately 28.58% of all issued and outstanding shares of common stock of the Company.

Jayson B. Ruff, Esq.
Trial Attorney
Office of the United States Trustee
January 6, 2023
Page 2

By this letter, the Ad Hoc Group respectfully requests that the United States Trustee promptly appoint an official committee of equity security holders in these Chapter 11 Cases. As detailed below, the circumstances underlying the Debtors' bankruptcy filing, the terms of their proposed restructuring plan, and their own statements provide substantial reason to believe that equity is "in the money." As such, the Company's stockholders have a substantial stake in the outcome of the Chapter 11 Cases and deserve meaningful representation in these proceedings. Unfortunately, no other fiduciary can adequately fill this role. In these circumstances, prompt appointment of an official committee is necessary to safeguard stockholders' legitimate interests, facilitate their meaningful participation in the Chapter 11 Cases, and maximize value for all stakeholders.

## BASIS FOR REQUESTED APPOINTMENT

As you know, Section 1102(a)(1) of the Bankruptcy Code entrusts to the United States Trustee's discretion the decision to appoint an official committee of equity security holders as the United States Trustee "deems appropriate."[2] As set forth herein, there are compelling reasons to appoint an official committee of equity security holders in these Chapter 11 Cases, including:

(1) The Company's stockholders have an important economic stake in the outcome of these Chapter 11 Cases because there is a substantial likelihood that the Debtors are solvent.

(2) An official equity committee is necessary to assure adequate representation of the equity holders in the Chapter 11 Cases.

(3) The appointment of an official equity committee adds value to the Chapter 11 Cases that outweighs any additional cost.

(4) The request is timely, and the prompt appointment of an official equity committee is essential to allow the equity holders to participate meaningfully in the Chapter 11 Cases.[3]

---

[2] 11 U.S.C. § 1102(a)(1).

[3] Although Section 1102(a)(1) leaves to your client's discretion the propriety of appointing a committee of equity holders, case precedent focuses on the foregoing factors in considering whether appointment of an official equity committee is appropriate. *See*, *e.g.*, *In re Pilgrim's Pride Corp.*, 407 B.R. 211, 216 (Bankr. N.D. Tex. 2009); *In re Williams Commc'ns Grp. Inc.*, 281 B.R. 216, 220 (Bankr. S.D.N.Y. 2002); *In re Kalver Microfilm Inc.*, 195 B.R. 599 (Bankr. D. Del. 1996); *In re Sandridge Energy Inc.*, No. 16-32488 (Bankr. S.D. Tex. Aug. 1, 2016), Hr'g Tr. at 94:10-12.

Jayson B. Ruff, Esq.
Trial Attorney
Office of the United States Trustee
January 6, 2023
Page 3

## I. There is a substantial likelihood that the Debtors are solvent and that stockholders are entitled to a distribution.

Case law addressing the appointment of equity committees in chapter 11 cases accords great importance to the debtor's likely solvency, or lack thereof.[4] The significance of this factor is straightforward. Equity holders of a "hopelessly insolvent" debtor are entitled to no distribution under a chapter 11 plan; the appointment of a committee to represent them therefore accomplishes little more than to burden the estate with incremental expenses. Conversely, equity holders of a solvent debtor retain a substantial legal and economic interest entitled to adequate representation during the chapter 11 process. Of course, the debtor's solvency—and, by extension, its equity holders' entitlement to a distribution—need not be conclusively established in connection with a request to appoint an equity committee. Rather, appointment of an equity committee may rest on preliminary indicia of value that suggest a "substantial likelihood" that equity security holders are entitled to a "meaningful distribution" under the absolute priority rule.[5]

---

[4] *See, e.g.*, *Pilgrim's Pride*, 407 B.R. at 217 n. 15 ("Much of the authority suggests—and the court agrees—that appointment of an equity committee should be denied in cases where there is no doubt about the debtor's insolvency." (citing *Williams Commc'ns*, 281 B.R. 216; *In re Wang Labs., Inc.*, 149 B.R. 1, 4 (Bankr. D. Mass. 1992))); *Williams Commc'ns*, 281 B.R. at 220 (describing solvency as a "major factor"); *Exide Techs. v. Wis. Inv. Bd*., No. 02-11125-KJC, 2002 WL 32332000, at *1-2 (D. Del. Dec. 23, 2002) (noting that courts only "consider . . . additional factors in determining whether equity holders are adequately represented without the appointment of an official committee" when a debtor is *not* deemed to be "hopelessly insolvent"); *In re Kalvar Microfilm, Inc.*, 195 B.R. 599, 601 (Bankr. D. Del. 1996); *In re Emons Indus., Inc.*, 50 B.R. 692, 694 (Bankr. S.D.N.Y. 1985) ("[G]enerally no equity committee should be appointed when it appears that a debtor is hopelessly insolvent[.]").

[5] *See, e.g., In re Spansion, Inc.*, 421 B.R. 151, 156 (Bankr. D. Del. 2009) (quoting *Exide Techs. v. Wis. Inv. Bd.*, Case No. 02-1572–SLR, 2002 WL 32332000, at *1 (D. Del. Dec. 23, 2002)); *see also In re SunEdison, Inc.*, 556 B.R. 94, 103–04 (Bankr. S.D.N.Y. 2016) (denying a motion to appoint an equity committee where "it is substantially unlikely that equity will receive a distribution"); *In re Eastman Kodak Co.*, No. 12-10202 ALG, 2012 WL 2501071, at *4 (Bankr. S.D.N.Y. June 28, 2012) (denying a motion to appoint an equity committee because, "based on the instant record, there is no substantial evidence that equity will be entitled to a meaningful distribution in this case"); *In re Nat'l R.V. Holdings, Inc.*, 390 B.R. 690, 698 (Bankr. C.D. Cal. 2008) (denying motion to appoint equity committee based, *inter alia*, on the fact that equity security holders will not receive a meaningful distribution); *In re Leap Wireless Int'l, Inc.*, 295 B.R. 135, 140 (Bankr. S.D. Cal. 2003) ("Shareholders committees should be appointed when equity holders establish there is a substantial likelihood that they will receive a meaningful distribution in the case [.]"); *In re Williams Commc'ns Grp., Inc.*, 281 B.R. 216, 223 (Bankr. S.D.N.Y. 2002) (An equity committee "should not be appointed unless equity holders establish

**Ad Hoc Equity Group Exhibit 35**

4

Jayson B. Ruff, Esq.
Trial Attorney
Office of the United States Trustee
January 6, 2023
Page 4

Here, even at this early stage, there is ample evidence—including the Debtors' own papers and statements—to suggest that the Company is solvent and that its stockholders therefore are entitled to a meaningful distribution.

Support for this conclusion begins with the Debtors' first-day papers, which indicate that the Company's assets exceed its liabilities. Specifically, Core Scientific's petition and First-Day Declaration[6] indicate that the Company had approximately $1.4 billion in total assets compared to approximately $1.3 billion in total liabilities, as of the end of third quarter 2022.[7]

Consistent with these representations, the Debtors have unilaterally proposed what they characterize as a "meaningful recover[y]" for the Company's stockholders.[8] Specifically, the proposed chapter 11 plan contemplated by the Debtors' Restructuring Support Agreement[9] provides that if both the class of general unsecured claims and the class of equity interests in the Company vote to accept the plan, general unsecured creditors and stockholders will share (in portions to be determined) (1) three percent[10] of the reorganized Company's common stock (subject to dilution by warrants and the management incentive plan) and

---

that . . . there is a substantial likelihood that they will receive a meaningful distribution in the case under a strict application of the absolute priority rule[.]").

[6] The "**First-Day Declaration**" (or "**First-Day Decl.**") refers to the *Declaration of Michael Bros in Support of the Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 5].

[7] Attachment to Voluntary Pet. of Core Scientific, Inc., ¶ 2, Docket No. 1; First-Day Decl. ¶ 63; *see also* Core Scientific, Inc., Quarterly Report (Form 10-Q) at 4 (Nov. 22, 2022) (balance sheet as of September 30, 2022, reporting stockholders' equity of approximately $73 million).

[8] First-Day Decl. ¶ 15.

[9] The "**Restructuring Support Agreement**" (or "**RSA**") refers to that certain Restructuring Support Agreement between the Debtors and certain holders of the Debtors' convertible notes, the form of which was appended to a Notice of Filing dated December 21, 2022 [Docket No. 72] and incorporated into the First-Day Declaration as Exhibit B thereto. It is unclear whether the RSA has been executed and whether the Support Effective Date (as defined therein) has occurred. The form of RSA filed on the docket is undated and includes no signature pages; the Notice of Filing to which the form of RSA was appended states only that "the Debtors have agreed to the form of Restructuring Support Agreement." Notice of Filing 1. The term sheet attached as Exhibit A to the RSA is referred to as the "**Plan Term Sheet**."

[10] *See* RSA Ex. A, at 11–12.

Jayson B. Ruff, Esq.
Trial Attorney
Office of the United States Trustee
January 6, 2023
Page 5

(2) additional contingent value in the form of warrants exercisable at certain enterprise value thresholds.[11]

      In this regard, the United States Trustee need not look beyond the Debtors' own representations and proposals to ascertain a "substantial likelihood" of a "meaningful distribution" to stockholders. The Debtors surely will insist that their proposed plan provides stockholders more than they are legally entitled; the Ad Hoc Group will argue, conversely, that stockholders are entitled to a great deal more. Indeed, the Ad Hoc Group submits that conditioning stockholders' retention of even a small fraction of the value of the Company on value hurdles that imply a double or triple recovery for the senior secured creditors (who are only entitled to par plus accrued) is, in these circumstances, inequitable and suggests an improper transfer of value to senior secured creditors to the detriment of equity holders. Nevertheless, the imminent dispute over the adequacy of the Debtors' proposed treatment of stockholders need not, and cannot, be conclusively resolved now. For present purposes, it suffices that the Debtors' papers and proposed plan raise a substantial and colorable issue concerning the Debtors' solvency—and, by extension, stockholders' entitlement to a distribution. Stockholders deserve an independent and empowered fiduciary to represent their interests in this impending dispute.

      The fact that the Debtors reported positive stockholder equity in their most recent balance sheet and have proposed a distribution to stockholders in these cases is reason enough to conclude that there is a substantial likelihood that the Debtors are solvent. But even a more searching inquiry into the circumstances surrounding the Debtor's chapter 11 filing would yield the same conclusion. The Debtors commenced the Chapter 11 Cases amid a pronounced, but likely transitory, market dislocation. Less than one year ago, the Company consummated a deSPAC transaction, premised on a pre-transaction equity valuation of $4 billion,[12] and thereafter experienced "tremendous growth, as measured by cash flow increases."[13] As of March 31, 2022, the Company's market capitalization stood at approximately

---

[11] Specifically, general unsecured creditors and stockholders would share three tranches of warrants: (1) Tranche I warrants exercisable when the enterprise value implies a 100% recovery to the secured convertible notes; (2) Tranche II warrants exercisable when the enterprise value implies a 200% recovery to the secured convertible notes; and (3) Tranche III warrants exercisable when the enterprise value implies a 300% recovery to the secured convertible notes. *See* RSA Ex. A, at 28–29.

[12] First-Day Decl. ¶ 31; *Power & Digital Infrastructure Acquisition Corp.*, Amendment No. 6 to Registration Statement (Form S-4) at 5–6, 223 (Dec. 30, 2021).

[13] First-Day Decl. ¶ 32.

Jayson B. Ruff, Esq.
Trial Attorney
Office of the United States Trustee
January 6, 2023
Page 6

$2.67 billion.[14] But, beginning in Spring 2022, a confluence of headwinds—including the decline in the price of cryptocurrency, an increase in interest rates, an increase in power prices, and a number of companies in the cryptocurrency sector, including one of the Debtors' largest hosting customers, filing for chapter 11 protection—precipitated a "crypto winter"[15] and interrupted the Company's high-growth phase.

But there is good reason to believe that the dynamics underlying the crypto winter are temporary. Indeed, many of the factors the Debtors blame for their recent difficulties are now trending in a favorable direction. Among other things, reports establish that inflation rates are falling and the cost of power is moderating.[16] In short, this is not a company that has endured long-term operational struggles, but rather a company enduring temporary turbulence.

Notably, this bullish sentiment is not confined to the Ad Hoc Group. Even as recently as November 30, 2022, well into the so-called "crypto winter," the Company was projecting adjusted EBITDA of $130 million in 2023, $142 million in 2024, and $141 million in 2025.[17] At the First-Day Hearing, counsel to the ad hoc

---

[14] *See Core Scientific, Inc.*, Yahoo! Finance, https://finance.yahoo.com/quote/CORZ/key-statistics/ (last visited Jan. 2, 2023).

[15] First-Day Decl. ¶¶ 6, 65–78.

[16] *See* Associated Press, *U.S. Inflation Slowed Sharply to 7.1 Percent Over Past 12 Months*, POLITICO (Dec. 13, 2022, 8:56 a.m. EST), https://www.politico.com/news/2022/12/13/us-inflation-slowed-sharply-past-12-months-00073646 ("Inflation in the United States slowed again last month in the latest sign that price increases are gradually cooling despite the pressures they continue to inflict on American households."); Abha Bhattarai, *What's Next for the Economy? 10 Charts That Show Where Things Stand.*, Wash. Post (Dec. 29, 2022, 6:00 a.m. EST), https://www.washingtonpost.com/business/2022/12/29/economy-2023-outlook-inflation-prices/ (observing that "[o]verall inflation has fallen for five straight months and is expected to continue its descent in 2023" and "[g]as prices are coming back down"); Austin Hufford, *Prices for Used Cars, Plane Tickets and Electricity Eased in November*, Wall St. J. (Dec. 13, 2022, 12:37 p.m. ET), https://www.wsj.com/articles/prices-for-used-cars-plane-tickets-and-electricity-eased-in-november-11670949912 ("[P]rices have started to ease on a monthly basis in a potential sign that price pressures are easing . . . Prices for gasoline, electricity and natural gas declined in the month, in welcome news for consumers who need to heat their homes as the colder months approach."); *see also See* Andrea Shalal and David Lawder, *World Bank Projects 11% Energy Price Decline by 2023*, Reuters (Oct. 26, 2022, 10:31 a.m. EDT), https://www.reuters.com/business/energy/world-bank-projects-energy-prices-decline-11-2023-after-60-jump-2022-2022-10-26/ (reporting World Bank projection that energy prices will decline by 11% in 2023).

[17] *See* Core Scientific Inc., Current Report (Form 8-K) (December 15, 2022), Ex. 99.1, at 2.

Jayson B. Ruff, Esq.
Trial Attorney
Office of the United States Trustee
January 6, 2023
Page 7

convertible noteholder group likewise reaffirmed his clients' "belief in the future of the company."[18]

Certainly, any uptick in the market will have a materially accretive effect on the enterprise value of the Debtors. As noted in open letter from B. Riley Financial ("**B. Riley**") to the Company's shareholders and lenders, dated December 14, 2022, every $1,000 increase in the price of bitcoin would likely increase EBITDA by $20 million.[19] Additional investments and right-sizing of operations could further improve EBITDA. For example, B. Riley suggests that building out the Company's Denton, Texas facility could provide an incremental $25 million of EBITDA.[20]

As described in greater detail below, the Company has not engaged in any meaningful market check on the proposed plan and DIP financing and has restricted itself from doing so on a go-forward basis. A competitive market process could establish a greater enterprise value, and therefore greater recoveries for equity and other stakeholders.

The appointment of an equity committee is crucial to ensuring adequate value is allocated to stockholders and is not unfairly diverted to senior secured creditors or other stakeholders.

## II. An official committee is necessary to assure adequate representation of stockholders in the Chapter 11 Cases.

Only an official committee of equity security holders can protect stockholders' substantial legal and economic interests and ensure their meaningful

---

[18] *See In re Core Scientific, Inc*., No. 22-90341-11 (Bankr. S.D. Tex. Dec. 22, 2022), Hr'g Tr. at 31:19-25, 32:1-4 ("[P]eople believed in this business, they invested in this business as original holders, and they still hold those notes. And so it's not been fun for them to see where the price of the coin is right now, and to see what happened with respect to the company. And so for them to come together and not only support this restructuring, but also be prepared to write a money check into it from a DIP lending perspective because they're also serving in the capacity of DIP lenders, is a real testament to their desire to stick to this process, and their belief in the future of the company."); *Id.*at 32:5-10 ("However, they also know that this company has sustained an extraordinarily volatile larger universe. You only need to look at the price of bitcoin and where it's been and where it is now. There's lots of hopeful people that hope it'll go back in the other direction.").

[19] Press Release, B. Riley Financial, *B. Riley Financial Issues Open Letter to Core Scientific Investors* (Dec. 14, 2022), https://www.prnewswire.com/news-releases/b-riley-financial-issues-open-letter-to-core-scientific-investors-301703337.html.

[20] *Id.*

Jayson B. Ruff, Esq.
Trial Attorney
Office of the United States Trustee
January 6, 2023
Page 8

participation in these Chapter 11 Cases. Stockholders can count on neither the Debtors nor an unsecured creditors' committee to adequately represent their interests.

Although, by law, the Company's board of directors has a fiduciary duty to the Company and its stockholders, a board is not necessarily an adequate representative of stockholders' interests in a chapter 11 proceeding. This is so because the directors of a corporation in bankruptcy must advance the interests of the estate generally, rather than the specific interests of stockholders.[21]

That concern is particularly acute here. The Debtors apparently have committed themselves to a restructuring transaction that would award nearly the entire value of their enterprise to their convertible secured noteholders, without having engaged in any rigorous, prepetition marketing process and on terms that tightly constrain their ability to seek out and exploit potentially superior alternatives postpetition. Notably, this course was established by a black-box "Special Committee" that seemingly has supplanted the Company's full board as the ultimate decision-maker concerning restructuring matters, but whose genesis and purpose is not meaningfully explained in the Company's SEC filings or first-day papers.

The RSA and Plan Term Sheet are structured to ensure the outcome of these cases and preclude stockholders' meaningful participation. The proposed plan would not simply compensate the convertible secured noteholders' for their prepetition claims; it would dramatically augment their entitlements, thus awarding them a windfall at the expense of other stakeholders.

The Debtors' DIP facility, provided by members of the ad hoc group of convertible noteholders, is the principal culprit in this respect. The DIP facility inappropriately diverts value to the convertible secured noteholders in numerous ways. Noteholders that agree to participate in the DIP facility will earn handsome fees,[22] plus warrants to obtain 30% of the common stock of the reorganized

---

[21] *See, e.g., In re Pilgrim's Pride Corp.*, 407 B.R. 211, 218 (Bankr. N.D. Tex. 2009) ("While it is unquestionably true that Debtors' officers and directors have a duty to maximize Debtors' estates to the benefit of shareholders as well as creditors, the reorganization process is not so simple that that ensures shareholders are adequately represented by even equity-owning management. The principal concern of Debtors and their managers . . . must be preservation of Debtors' going concern value and their successful emergence from chapter 11.")

[22] The proposed fees include a 2% commitment fee; a $1.6 million backstop fee; a termination fee equal to (x) 2% of outstanding roll-up loans plus (y) 3% of all other outstanding loans (and interest thereon) (if the DIP facility rolls into an exit facility) or 15% of such other outstanding

Jayson B. Ruff, Esq.
Trial Attorney
Office of the United States Trustee
January 6, 2023
Page 9

Company in the event that they choose to roll over the DIP facility into exit facility.[23] More significantly, the Debtors have agreed to roll up the DIP lenders' prepetition notes on a one-to-one basis and to secure the roll-up portion of the DIP facility with liens on substantially all of Debtors' previously unencumbered assets, including nearly all of the Debtors' valuable real estate portfolio. Viewed in its totality, the DIP facility channels nearly all of the Debtors' residual value to the convertible secured noteholders in exchange for just $75 million in new funding, leaving other stakeholders to fight for scraps. Even the value ostensibly allocated to equity holders may prove illusory, as the proposed plan includes a double death trap that would strip equity holders of any recovery if either the general unsecured creditors *or* the equity holders vote to reject the proposed plan.

Moreover, the RSA and proposed DIP financing significantly hamstring the Debtors' ability to explore, consider, or negotiate any alternative. Specifically, the RSA affords the Debtors only 14 days from the Support Effective Date to solicit or discuss alternative restructuring proposals.[24] Thereafter, the Debtors are forbidden from participating in *any* discussions regarding any alternative restructuring proposals with any party not contacted prior to the end of that 14-day period unless and until a party submits a *bona fide* offer *and* the boards (or similar governing bodies) of the Debtors determine, but only after counsel has so advised, that failure to engage in discussions would violate their fiduciary duties.[25] If the Special Committee of Core Scientific's board makes such a determination, the Debtors may exercise a "fiduciary out" and terminate the RSA.[26] But termination of the RSA constitutes an event of default under the DIP Credit Agreement.[27] Accordingly, any alternative proposal would require a competing bidder or plan sponsor to put up an amount that may exceed $165 million to refinance the DIP facility (including the roll-up loans and exorbitant economics) before it would even know if the alternative

---

loans and interest (upon the termination of the DIP facility in any other circumstance); a 2% fee for a three-month extension of the scheduled maturity date; and other administrative agency and other fees. *See* Notice of Corrections to DIP Credit Agreement Ex. A §§ 1.1, 2.1.4, 2.1.5, 3.2 [Docket No. 188] (the "**DIP Credit Agreement**"). In other words, in order to refinance the DIP facility following entry of the final order, the Debtors would need to pay an amount that could exceed $165 million (depending on when the refinancing is effected).

[23] RSA Ex. A, at 6–7.

[24] RSA § 4(b)(xii).

[25] *Id.*

[26] *Id.* § 6(b)(ii).

[27] DIP Credit Agreement § 11.1(p)(xxii).

Jayson B. Ruff, Esq.
Trial Attorney
Office of the United States Trustee
January 6, 2023
Page 10

transaction would close. The RSA also requires the Company to timely file a formal objection to any motion that seeks approval of any alternative restructuring or otherwise frustrates the purposes of the proposed plan or challenges the proposed DIP financing.[28] In the event that the Debtors receive any outreach regarding an alternative proposal, the Debtors must share the terms with the Consenting Creditors within two business days of receipt.[29]

       The Debtors' acquiescence to these constraints is particularly troubling given they have not yet taken any comprehensive efforts to market check either their proposed plan or the DIP financing. The only restructuring alternative that the Special Committee appears to have considered was a proposal from B. Riley, which on its face seemed reasonable and appropriate. The First-Day Declaration provides no coherent explanation for the Special Committee's conclusion that the B. Riley proposal was inferior to the plan and DIP financing proposed by the ad hoc convertible noteholder group. Indeed, the proposed plan and DIP financing suffer, in equal (if not greater) measure, from the same putative deficiencies that apparently prompted the Special Committee to reject the B. Riley proposal. For example, the Debtors contend that the B. Riley proposal would have required "the conversion of B. Riley's unsecured claim into secured debt with liens on certain of the Debtors' assets."[30] But, as discussed above, the convertible secured noteholders similarly insisted that the Debtors roll up a significant portion of the prepetition notes into DIP loans secured by liens on substantial additional collateral, including mining equipment and real estate, thereby "restricting the Company's ability to provide collateral to other potential lenders."[31] Indeed, there is no indication that the Debtors properly marketed their previously unencumbered assets in connection to obtain DIP financing. A proper marketing process may have supported a non-priming, cheaper DIP financing facility without a roll-up.

       Similarly, the Debtors complain that B. Riley's proposal required consensual agreements with equipment lenders; however, the equipment financing parties have not agreed to the plan outlined in the RSA, and the Debtors have outlined no credible basis to confirm the proposed plan over the equipment financing parties'

---

[28] RSA §4 (a)(ii).

[29] RSA § 4(a)(viii).

[30] First-Day Decl. ¶ 84.

[31] *Id.* ¶ 85.

Jayson B. Ruff, Esq.
Trial Attorney
Office of the United States Trustee
January 6, 2023
Page 11

objections.[32] Thus, the plan outlined in the RSA, just like the B. Riley proposal, will require active negotiations with those constituents.

Moreover, the governance processes that set the Debtors on their present course are obscure and potentially troubling. The First-Day Declaration suggests that the board has delegated all decision-making authority with respect to the restructuring to the Special Committee, which determined to support a proposed restructuring that allocates a disproportionate share of the available value to the prepetition secured noteholders.[33]

In sum, the Company's board cannot zealously represent the interests of the equity holders in these Chapter 11 Cases. Its objectives span multiple constituencies (e.g., equity holders and creditors), and its ability to pursue more attractive alternatives is tightly constrained by the RSA and DIP Credit Agreement.

Nor can the official committee of unsecured creditors, once appointed, adequately represent the interests of stockholder. The creditors' committee's role will be limited to ensuring that general unsecured creditors achieve maximum value for their claims. As noted above, the general unsecured creditors and equity holders have already been pitted against each other in several ways: (1) the proposed double death trap built into the Plan Term Sheet (any vote to reject the plan by the unsecured creditors strips all value from the unsecured creditors *and* equity holders) and (2) the fact that the allocation of the 3% of the reorganized Company's common stock and the warrants as between the equity holders and unsecured creditors remains open. Accordingly, the equity holders require a seat at the table as to how to allocate the value between the equity holders and unsecured creditors. Moreover, although general unsecured creditors and equity holders are currently being treated similarly under the plan, the creditors' committee may seek to decouple general

---

[32] The Debtors' apparent belief that they can "cram up" the equipment financing parties, thus obviating the need to consensually resolve their claims, is tendentious at best. The Debtors' strategy is premised on a judicial valuation of the mining equipment in an aggregate amount no greater than $90 million. *See* RSA Ex. A, at 10. This alone is a highly uncertain proposition, given the vagaries inherent in judicial valuations. And, even if the Debtors' valuation case succeeds, they likely will face substantial additional legal objections to the contemplated cram-up of the equipment financing debt.

[33] *See* First-Day Declaration, ¶¶ 13, 17, 80, 85, 87; *see also In re Core Scientific, Inc.*, Case No. 22-90341 (DRJ), Docket No. 1, p. 7 (resolutions suggesting that from November 14, 2022, when Special Committee was formed, until December 12, 2022, Special Committee served in an advisory role; as of December 12, 2022, Special Committee was designated exclusive decision-making authority with respect to "the evaluation, negotiations, and execution of any potential transaction").

Jayson B. Ruff, Esq.
Trial Attorney
Office of the United States Trustee
January 6, 2023
Page 12

unsecured recoveries from equity recoveries or trade higher general unsecured claim recoveries for little or no equity recoveries. For the foregoing reasons, the creditors' committee cannot adequately represent the interests of the equity holders.

Without the appointment of an official equity committee, the equity holders lack a seat at the table to negotiate, or even evaluate, critical case milestones, and no one will be standing up to the Company, the secured noteholders, or the well-represented general unsecured creditors to ensure that equity holders receive the value to which they are entitled.

### III. The appointment of an official equity committee adds value to the Chapter 11 Cases.

In light of all the facts and circumstances described above, the Ad Hoc Group believes it is clear that the appointment of an official equity committee will ensure that all stakeholders entitled to a recovery are able to meaningfully participate in the Chapter 11 Cases. Giving the equity holders a meaningful role in the process is the only way to ensure that the bankruptcy process works fairly and justly to maximize value for all stakeholders, not only the secured creditors. The added value of giving the equity holders a seat at the table outweighs the costs to the Debtors' estates of appointing an additional committee.

### IV. The request is timely, and the prompt appointment of an official equity committee is essential to allowing the equity holders meaningful participation in the Chapter 11 Proceedings.

The equity holders are seeking the appointment of an equity committee at the nascency of these Chapter 11 Cases, when they can most effectively ensure maximum value for equity holders and before the terms of the DIP financing and plan of reorganization that strip the equity holders of value are set in stone. The Ad Hoc Group's request for appointment of a committee is therefore timely.

The Debtors have committed themselves to a quick timeline for obtaining final approval of the proposed DIP financing and filing and confirming a plan of reorganization. The final hearing on the proposed DIP financing is currently scheduled for January 23, 2022, with objections due by January 17, 2022. It is essential that the equity committee be constituted and begin its work quickly so that it can adequately protect the interests of the Company's equity holders before the Debtors are able to force stakeholders into accepting DIP financing and a plan that does not maximize value for all stakeholders. Time is particularly of the essence in a

Jayson B. Ruff, Esq.
Trial Attorney
Office of the United States Trustee
January 6, 2023
Page 13

complex case like this one, involving eleven debtors with operations across several states in a highly technical industry.

      The Ad Hoc Group respectfully requests that, in light of all the facts and circumstances, the United States Trustee promptly appoint an official committee of equity security holders so that the substantial interests of the Company's stockholders are fairly represented in these cases.

      Thank you for your prompt consideration.

                              Sincerely,

                              Ron E. Meisler

cc:

*Counsel to the Debtors*

Alfredo R. Pérez (alfredo.perez@weil.com)
Ray C. Schrock, P.C. (ray.schrock@weil.com)
Ronit J. Berkovich (ronit.berkovich@weil.com)
Moshe A. Fink (moshe.fink@weil.com)

**Ad Hoc Equity Group Exhibit 35**
**14**

## EXHIBIT A

## Ad Hoc Group of Equity Holders

| Shareholder | Number Holdings of Common Stock | Percent Holdings of Common Stock (all holders) | Percent Holdings of Common Stock (excl. insiders) |
|---|---|---|---|
| The Rudolph Family Trust | 6,940,704 | 1.85% | 2.59% |
| Two Trees Capital Limited BVI Custodian CSPB | 2,040,000 | 0.54% | 0.76% |
| Lukasz Gottwald | 1,720,296 | 0.46% | 0.64% |
| Todd Deutsch | 900,000 | 0.24% | 0.34% |
| Douglas Abrams | 475,000 | 0.13% | 0.18% |
| Jay Deutsch | 100,000 | 0.03% | 0.04% |
| Mark Beaven | 88,000 | 0.02% | 0.03% |
| Eddie Griffin | 58,419 | 0.02% | 0.02% |
| **Total** | **12,322,419** | **3.29%** | **4.61%** |

**Ad Hoc Equity Group Exhibit 35**

**15**