**Exhibit 5**

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

BANKRUPTCY DIVISION

| | |
|---|---|
| IN RE: | § CASE NO. 22-90341-11 |
| | § JOINTLY ADMINISTERED |
| | § HOUSTON, TEXAS |
| CORE SCIENTIFIC, INC., | § THURSDAY, |
| | § DECEMBER 22, 2022 |
| DEBTOR. | § 9:15 A.M. TO 11:34 A.M. |

**FIRST DAY HEARINGS (VIA ZOOM)**

BEFORE THE HONORABLE DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

| | |
|---|---|
| APPEARANCES: | SEE NEXT PAGE |
| COURTROOM DEPUTY: | ALBERT ALONZO |

(Recorded via CourtSpeak; Not all callers could be heard clearly.)

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

APPEARANCES (VIA ZOOM):

For the Debtor:                     WEIL GOTSHAL & MANGES, LLP
                                    Alfredo Perez, Esq.
                                    Ray C, Schrock, PC
                                    Ronit Berkovich, Esq.
                                    Destiny Reyes, Esq.
                                    Alex Kane, Esq.
                                    Moshe Fink, Esq.
                                    700 Louisiana, Ste. 1700
                                    Houston, TX  77002


For the Interested Parties:

                                    TJC PARTNERS
                                    John Singh, Esq.

                                    PAUL HASTINGS, LLP
                                    Kris Hansen, Esq.
                                    Erez Giland, Esq.

                                    WILLKIE FARR & GALLAGHER, LLP
                                    Jennifer Hardy, Esq.

                                    PRYOR CASHMAN, LLP
                                    Matthew Silverman, Esq.

                                    HAYNES AND BOONE, LLP
                                    Matt Ferris, Esq.

                                    KIRKLAND & ELLIS, LLP
                                    Chris Koenig, Esq.

                                    SIDLEY AUSTIN, LLP
                                    Dennis Twomey, Esq.

                                    ARNOLD & PORTER
                                    Brian Lohan, Esq.

                                    US DEPARTMENT OF JUSTICE
                                    Jayson Ruff, Esq.



(Please also see Electronic Appearances.)

1  THE COURT: -- to give presentation control to?
2  MR. SCHROCK: I believe that would be Austin
3  Crabtree should be getting that control, Your Honor.
4  THE COURT: Okay. Hold on a second.
5  (Pause in the proceedings.)
6  THE COURT: All right. Mr. Crabtree --
7  MR. SCHROCK: Great.
8  THE COURT: -- should have control.
9  MR. SCHROCK: Okay. Great. All right. Looks like
10 we're getting the full screen mode. Let's go ahead and flip
11 the page, please, Austin, and the next page.
12 So Your Honor, just a little bit of background about
13 the company.
14 I know a lot of this is covered in the First Day
15 Declaration. The company was founded in 2017, and the
16 company's revenue stream was from bitcoin that it mined from
17 film account and for variety hosting services to third party
18 customers.
19 They -- you know, since its inception, the Debtors
20 have built a considerable asset base of approximately 180,000
21 miners, or computers. They've gained market trust.
22 I believe they're one of the, if not the leading
23 miner here in the United States. And this company unlike, you
24 know, I would say, you know, some of the companies that we
25 have the pleasure of working with, it is cashflow positive

1  before debt service.

2  It mines bitcoin. It converts that bitcoin into
3  cash. And it has been, you know, in the past, in the very
4  recent past very significantly cashflow positive. It's just
5  had a cascading series of events that have hit it over the
6  very recent past.

7  Its most profitable business segment comes from
8  mining bitcoin with machines that it owns that they're self-
9  mining. It also has posting for many other companies and it
10  sold wholesale computers. The miners take care of them and
11  will be provided a fixed case.

12  We have eight fully operational data centers, all
13  located in the U.S. Those are in Texas, Georgia, Kentucky,
14  North Carolina and North Dakota.

15  We've got a couple of large transactions that were
16  undertaken prior to commencing these cases, including
17  acquiring one of our largest customers, Block Cat. And that's
18  significantly increased the number of miners.

19  We also entered into a spec merger during which the
20  company merged with a company and changed its name to Core
21  Scientific. And after going public at the start of 2022, we
22  experienced tremendous growth.

23  You know, market conditions and the price of
24  bitcoin, the price of power and many other things went to the
25  company to refocus our efforts in resource and self-mining.

1    There's some peculiar aspects of those private notes
2    that we don't have to get into today, but I'm sure will be
3    discussed further on in the future.  We have a lot of miner
4    equipment financing, and a lot of those already -- you know,
5    we were extremely active with -- in the weeks leading up to,
6    and month leading up to these cases.
7    There's, you know, various interest rates behind
8    these.  You know, it depends on -- you know, if you can
9    imagine with computers, it really depends on the type of
10   computer, how new they are, how fast they are as to how much
11   they're going to be worth.
12   We've been working with them cooperatively and in
13   fact, we were trying to negotiate a couple of different
14   transactions leading up to these cases.  But there was a high
15   degree of dialogue with those parties.
16   We also have some non-miner financing, relatively
17   small amounts.  There's an unsecured note owed to B. Riley,
18   and you know, there was certainly a lot of interaction with
19   Mr. Riley, and it was being -- leading up to these cases.
20   We have an unsecured loan, which is called the Novak
21   loan.  And just to look -- give you an impression just how
22   profitable this company was in the recent past.  The EBITDA
23   was 358 million, as of just six months ago.  We think that,
24   you know, as of the recent past, and lowers, you know,
25   significantly.

1  management incentive plan for up to 10 percent of new common
2  shares.
3          And then we do have the opportunity at various value
4  levels for significant warrant packages for value to be shared
5  with existing common stakeholders.  That was also something
6  that we were fighting very strongly for, and we are looking
7  forward to see if we can try and improve those terms should
8  the situation (indiscernible).
9          Flip, please.
10          The milestones are set forth here.  One thing is
11 certain about the milestones, I'm certain they'll change.
12 They're always going to be subject to what the Court believes,
13 and we'll have to see how the circumstances fold out, or
14 unfold in these cases.
15          Right now, we're contemplating a six-month case.
16 And you know, with any commodity based case, I think it's
17 worth just emphasizing, you know, a lot of the value of this
18 company is dependent on the price of bitcoin.
19          So I don't think anybody can predict at the moment,
20 at least nobody I know, of what the price of bitcoin is going
21 to be, you know, a month out, let alone six months out.  So
22 we're going to have to be flexible moving forward.
23          We certainly hope the price of the bitcoin goes up
24 significantly, and it gives, you know, the company a chance to
25 distribute further value.  But we'll frankly -- we're just

1  going to have to see how that goes as we move forward.

2  And then looks like -- flip to the next one.

3  So you know, what's our path forward?  We want to
4  pursue the Restructure Support Agreement.  I think that there
5  were any altered (indiscernible) if they present themselves.
6  We are also going to pursue the sale in cooperation with our
7  convertible noteholder partners the sales of non-Core assets.

8  We'll address (indiscernible) the stakeholder
9  disputes and related settlements, I think including the
10 Celsius and other parties.  And frankly just proceed with a
11 Plan of Reorganization and emergence.

12 So it's a relatively straightforward path forward.
13 We'll see how easy it becomes, or how hard it becomes as we
14 move forward, but Your Honor, I'm happy to answer any
15 questions, or I'm prepared to try to move the evidence in, in
16 support of the relief we're seeking today.

17 THE COURT:  Thank you, Mr. Schrock.

18 I do have just one question, and it just sort of --
19 as I look at the timing and I try to get a general feel for
20 things.  This -- oh, I agree with you.

21 This all seems relatively straightforward with the
22 exception of, you know, dealing with the valuation issues with
23 the equipment financiers.  Are you contemplating some sort of
24 expedited process, you want to try to wait?

25 I don't know how you'd do that, but are you trying

1  even prior to the negotiation with them -- we do give them
2  adequate protection claim for any diminution in value of their
3  equipment and adequate protection replacement liens that are,
4  with respect to their existing collateral, senior to all other
5  liens including DIP liens and liens of the prepetition secured
6  noteholders.
7  And then with respect to the noteholder prepetition
8  collateral, the equipment lender adequate protection liens are
9  junior (indiscernible) and these are junior to DIP liens, but
10 *pari passu* with the noteholder adequate protection liens on
11 assets that are currently unencumbered.  And all of this is
12 subject to those lenders having valid and properly perfectly
13 liens.
14 We'll go through the language in the Order in a
15 minute and I'm sure if I didn't get it exactly right,
16 Mr. Gilad will come in and (indiscernible) that, but
17 everything's, of course, just language in the Order.
18 There's also a standard carve-out for professional
19 fees.
20 So I will pause there because this is a little more
21 complex than normal and I don't know if this is the issue that
22 the Court had questions on.
23 THE COURT:  So let me -- now is a great breaking
24 point.
25 So with respect to -- number one, I appreciate the

1  redline. When I was listening to the opening presentation, I
2  had the opportunity to review the redline that is attached to
3  108. I don't have any questions. If you want to highlight a
4  certain provision for me, I'm happy to go there, but I've also
5  had the opportunity to look at and I'm relatively comfortable
6  with what's there and more focused on the changes that were
7  made. None of the changes caused me any heartburn at all.
8  　　　　　I do have just a couple of issues that I want to
9  highlight and maybe this will help others, maybe it won't.
10 With respect to the avoidance action issue on the liens that
11 are granted, conceptually I don't have a problem with it. I
12 do generally ask that there be a last-look provision added
13 with respect to avoidance proceeds and just given the way that
14 this is, I don't see any harm and it takes a strategic concern
15 out of play for me.
16 　　　　　So I would ask that as you work toward a final
17 because I know that this isn't coming today is that you look
18 at other Orders that the other parties talk about some last-
19 look language for avoidance proceeds.
20 　　　　　With respect to the roll up, again I got what's
21 being done. I do really, really like the dollar-for-dollar
22 creep because it protects interests in case something we all
23 don't anticipate occurring, that it just protects everybody's
24 rights and so actually it stops a lot of the jockeying or at
25 least it's been my experience. So I would ask that as you

1  look at that roll up is that you think about the dollar-for-
2  dollar creep.
3      And perhaps that's just -- maybe I should explain
4  that because now that I'm listening to myself, that sounds a
5  little weird but it just simply, as advances are made, that
6  the roll up creeps up with the total advances that have been
7  made so I just ask that you think about that.
8      With respect to the exercising of remedies, you
9  covered all of my concerns. I appreciate your pulling that
10 from somewhere else because again I think that that's just the
11 right balance.
12     I think other than that, again I -- this is
13 expensive money. I don't think anybody's to say that this is
14 just a bargain. It's expensive money. Lending into this type
15 of situation is going to be expensive because I don't know how
16 you assess the risk. And given the PIC feature, I mean, PIC
17 loans are always expensive and I got that issue too. It's
18 just part of the risk assessment. So I understand it.
19 Obviously if Ms. Hardy comes up with something that's better,
20 faster, stronger, cheaper, we're all going to applaud her and
21 have another conversation, but I got it. It's not out of the
22 range of what I expected to see.
23     I think those are my general comments with
24 respect -- again this is just -- it's an interim request. I
25 don't know if there are other comments or arguments the