**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **CORE SCIENTIFIC, INC.,** *et al.*, | § | **Case No. 22-90341 (DRJ)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | |
| | § | Related Docket Nos. 389, 390, 391, 392, |
| | § | 447, 573, 579 |

**LIMITED OBJECTION OF AD HOC GROUP OF
EQUITY HOLDERS TO THE EMERGENCY MOTION OF
DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO (A) OBTAIN REPLACEMENT
SENIOR SECURED NON-PRIMING SUPERPRIORITY POSTPETITION
FINANCING, (B) USE CASH COLLATERAL, AND (C) PAY OFF
EXISTING POSTPETITION FINANCING FACILITY, (II) GRANTING
LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS, (III) GRANTING ADEQUATE
PROTECTION TO THE PREPETITION SECURED PARTIES,
(IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A
FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

An ad hoc group (the "**Ad Hoc Equity Group**") of beneficial holders of the

common stock of Core Scientific, Inc. ("**Core Scientific**" or the "**Company**" and, together with

its affiliated debtors and debtors in possession, the "**Debtors**"), by and through their undersigned

counsel, hereby submits this limited objection (the "**Limited Objection**") to the *Emergency*

*Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors To (A) Obtain*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6074); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

*Replacement Senior Secured Non-Priming Superpriority Postpetition Financing, (B) Use Cash Collateral, and (C) Pay Off Existing Postpetition Financing Facility, (II) Granting Liens and Providing Claims With Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 389] (the "**Replacement DIP Motion**").[2] In support of this Limited Objection, the Ad Hoc Equity Group respectfully states as follows:*

## PRELIMINARY STATEMENT

1.      The Ad Hoc Equity Group supports the Debtors' decision to replace the Original DIP Facility. By freeing the Debtors from the from onerous case controls and burdensome economics imposed the Original DIP Facility, the Replacement DIP Facility affords the Debtors appropriate latitude to evaluate a range of alternatives and administer a fair, inclusive, and value-maximizing restructuring process. As the Debtors now recognize,[3] stockholders have an important

---

[2]     Capitalized terms used but not defined herein have the meanings ascribed to them in the Replacement DIP Motion; the *Order (I) Authorizing the Debtors on an Interim Basis To (A) Obtain Senior Secured Non-Priming Superpriority Replacement Postpetition Financing and (B) Use Cash Collateral, (II) Authorizing the Debtors To Refinance Existing Postpetition Financing on a Final Basis, (III) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Secured Parties on a Final Basis (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 447] (the "**Interim Order**"); or the Replacement DIP Credit Agreement (as defined in the Interim Order), a copy of which was filed on February 27, 2023 [Docket No. 579]. The *Motion of the Ad Hoc Group of Equity Holders of Core Scientific for Entry of an Order Directing the Appointment of an Official Committee of Equity Security Holders* [Docket No. 458] is referred to as the "**Appointment Motion**."

[3]     The Debtors observe that "principles of fairness support equity holders, like other constituents in these cases, receiving representation from estate-paid professionals with respect to the two issues most important to them: valuation and plan negotiation." *Debtors' Response to Mot. for Appointment of an Official Comm. of Equity Sec. Holders* ¶ 2[Docket No. 570] ("**Debtors' Appointment Mot. Response**"). As discussed in greater detail in the Ad Hoc Equity Group's forthcoming *Reply of Ad Hoc Group of Equity Holders (A) to Objection of the Ad Hoc Noteholder Group and (B) in Further Support of the Motion of the Ad Hoc Group of Equity Holders of Core Scientific For Entry of an Order Directing the Appointment of an Official Committee of Equity Security Holders* (the "**Appointment Motion Reply**"), the Ad Hoc Equity Group has accepted the Debtors' proposal to (among other things) (1) limit the scope of an Official Equity Committee's mandate to these two categories and (2) establish a $4.75 million budget for an Official Equity Committee's work and urges the Court to appoint an Official Equity Committee subject to those qualifications.

(if circumscribed) role in that process—one meriting appointment of an official committee of equity security holders (an "**Official Equity Committee**").

2.     To ensure that an Official Equity Committee, if appointed, can effectively discharge its statutory responsibility to its constituents, the Ad Hoc Equity Group requested changes to the proposed Final Order[4] tailored to afford any other official committee appointed in these Chapter 11 Cases (include an Official Equity Committee) rights similar to those of the official committee of unsecured creditors (the "**UCC**") as to three discrete matters:

- *Information Reporting and Consultation*. Any other official committee should enjoy the same information reporting and consultation rights as the UCC and the ad hoc group of holders of the Debtors' convertible secured notes (the "**Ad Hoc Noteholder Group**");

- *Notice of, and Right to Be Heard on, Exercise of Remedies*
  - The Debtors, the Replacement DIP Agent, and/or the Prepetition Agents, as applicable, should deliver any notice of the occurrence of a DIP Termination Event or Cash Collateral Termination Event and any Remedies Notice to counsel to any other official committee at the same time any such notice is delivered to the UCC, the Ad Hoc Noteholder Group, and the other parties entitled to receive such notices;
  - Any other official committee should have the same right as the UCC to contest the Replacement DIP Lender's or the Prepetition Secured Parties' proposed exercise of remedies following a DIP Termination Event or Cash Collateral Termination Event, respectively; and

- *Carve-Out*. The allowed fees and expenses of counsel and any other retained professionals of any other official committee should be included in the professional-fee Carve-Out, up to any applicable budget for such other official committee or professionals.

To be sure, the Ad Hoc Equity Group does *not* seek parity between an Official Equity Committee and the UCC in all respects. Numerous other provisions of the proposed Final Order grant substantial rights to the UCC that are not afforded to other official committees. For example, only

---

[4]     The Debtors filed their proposed form of Final Order on February 26, 2023 [Docket No. 573].

the UCC enjoys an investigation budget. *See* Final Order ¶ 24.[5] Although the Ad Hoc Equity Group would of course prefer that all official committees have equal rights, it accepts that any Official Equity Committee appointed in these cases will have a focused mandate and limited budget. It therefore limited its comments to the three points its considers most critical.

3.       After transmitting these comments, the Ad Hoc Equity Group learned that the Replacement DIP Lender has apparently refused to include *any* fees and expenses of an Official Equity Committee in the Approved Budget. As noted, the Ad Hoc Equity Group, after good-faith negotiations with the Debtors and the UCC, agreed to a modest $4.75 million budget for an Official Equity Committee. To the extent an Official Equity Committee is appointed, its limited budget— a mere fraction of the $54.8 million in professional fees and expenses currently budgeted through June 30, 2023, *see* Interim Order, Ex. 4—should be included in the Approved Budget.

4.       The Ad Hoc Equity Group's limited comments to the proposed Final Order, and its request that the budgeted professional fees and expenses of an Official Equity Committee be included in the Approved Budget, should not be controversial. Sharing information and consulting with official committees is a basic responsibility of a debtor in possession. Notice of, and a right to be heard on, a proposed exercise of secured creditor remedies following a DIP Termination Event or Cash Collateral Termination Event are fundamental elements of due process in chapter 11 cases and are enshrined in the Bankruptcy Code. The debtor's responsibility for paying the reasonable professional fees and expenses of official committees is, likewise, an elementary tenet of the chapter 11 system. The Ad Hoc Equity Group does not expect the Debtors or their creditors to tolerate an Official Equity Committee that generates unwarranted professional fees. But the

---

[5]      The Ad Hoc Equity Group disputes the 200% Repayment Premium that the Ad Hoc Noteholder Group alleges is payable pursuant to the April Secured Convertible Notes. The Repayment Premium will likely be the subject of significant litigation. The Ad Hoc Equity Group expects that the UCC will handle this litigation.

Debtors are rightly responsible for the reasonable fees incurred by a disciplined committee pursuing a focused mandate. Thus, if an Official Equity Committee is appointed, its limited budget should be included in the Approved Budget and the Carve-Out. These accommodations are essential to "the adversary system in reorganization [cases]," *In re Evanston Beauty Supply, Inc.*, 136 B.R. 171, 177 (Bankr. N.D. Ill. 1992), and an appropriate *quid pro quo* for secured creditors that insist on a financing order embellished with a wide array of stipulations, findings, releases, waivers, and other perquisites beyond their enumerated secured-creditor rights.

5.      In fact, none of this was controversial to the Debtors, who have no objection to the proposed changes. But the Replacement DIP Lender and the Ad Hoc Noteholder Group objected to those changes. The Ad Hoc Noteholder Group's motivations are clear: it opposes the appointment of an Official Equity Committee[6] and thus seeks to inhibit its participation in the Chapter 11 Cases even as bounded by the substantial constraints negotiated among the Ad Hoc Equity Group, the Debtors, and the UCC. The Ad Hoc Noteholder Group is entitled to press its objection to the appointment of an Official Equity Committee. But the Court should not countenance the Ad Hoc Noteholder Group's attempt to leverage the Final Order to neuter an Official Equity Committee if this Court determines one is appropriate.

6.      This Court should therefore ensure that the Final Order appropriately address the discrete but important concerns identified by the Ad Hoc Equity Group. An Official Equity Committee should, within the limited scope of its mandate, enjoy the same information reporting and consultation rights as the UCC and the Ad Hoc Noteholder Group; receive notice of, and be

---

[6]      *See Obj. of the Ad Hoc Group to the Mot. of the Ad Hoc Group of Equity Holders of Core Scientific for Entry of an Order Directing the Appointment of an Official Comm. of Equity Sec. Holders* [Docket No. 572] (the "**Ad Hoc Noteholder Group's Obj.**"). The Replacement DIP Lender did not object to the Appointment Motion, and the reasons for its rejection of the Ad Hoc Equity Group's comments and refusal to include the fees and expenses of an Official Equity Committee in the Approved Budget are not entirely clear.

heard on, a case-dispositive exercise of secured creditor remedies; and have its allowed professional fees and expenses included in the Approved Budget and the Carve-Out to the extent of its budget. The Ad Hoc Equity Group shares the Debtors' desire that "an Official Equity Committee . . . be a constructive partner in the Debtors' goal of negotiating a consensual and value-maximizing chapter 11 plan with all of their major constituents." Debtors' Appointment Mot. Response ¶ 3. The Ad Hoc Equity Group's modest proposed changes to the Final Order are fundamental to this shared objective.

## BACKGROUND

7.      On January 31, 2023, the Debtors filed the Replacement DIP Motion, seeking authority to refinance the Original DIP Facility provided by members of the Ad Hoc Noteholder Group. At the hearing held on February 1, 2023, the Court granted interim approval of the Replacement DIP Facility, remarking that it represents "a better deal, . . . a more commercial deal" than the Original DIP Facility. Feb. 1 Hr'g Tr. at 71:24–72:1 [Docket No. 459]. Shortly thereafter, the Debtors terminated their Restructuring Support Agreement with the members of the Ad Hoc Noteholder Group. *See Notice of RSA Termination* [Docket No. 517]. In connection with the refinancing of the Original DIP Facility, the Court allowed, and the Debtors paid to the Original DIP Lenders, a termination fee equal to 15% of all outstanding obligations (other than "roll-up" loans) under the Original DIP Facility, or approximately $6 million. *See* Feb. 1 Hr'g Tr. at 71:11–18.

8.      On February 23, 2023, shortly after the Debtors and the Ad Hoc Equity Group reached a consensual resolution of the Appointment Motion, the Debtors sent the Ad Hoc Equity Group a draft of the proposed Final Order. The Ad Hoc Equity Group responded with its limited comments that same day.

9.      Specifically, the Ad Hoc Equity Group proposed that references to "any other official committee appointed in these Chapter 11 Cases" be added to several discrete provisions of the proposed Final Order, as excerpted below:

(a)     **Information (Final Order ¶ 19(a))**:

[T]he Replacement DIP Loan Parties and their Representatives shall (i) provide the Replacement DIP Agent, the Replacement DIP Lender, the Ad Hoc Group, ~~and~~ the Official Committee**, and any other official committee appointed in these Chapter 11 Cases** (and each of their respective advisors) with (A) all reports, documents, and information required to be delivered to each such party under the Replacement DIP Loan Documents (contemporaneously when the same is required to be delivered thereunder) and this Final Order (as applicable), and (B) reasonable access, upon reasonable notice and during regular business hours, to the Replacement DIP Loan Parties' books and records, assets and properties, for purposes of monitoring the Replacement DIP Loan Parties' businesses and operations and the value of the DIP Collateral, and (ii) cooperate and consult with, and provide information reasonably requested by the Replacement DIP Agent, the Replacement DIP Lender, the Ad Hoc Group, ~~or~~ the Official Committee**, or any other official committee appointed in these Chapter 11 Cases** (and their respective advisors) concerning the Replacement DIP Loan Parties' businesses, financial condition, properties, business operations and assets . . . .

(b)     **Notice of, and Right to be Heard on, Exercise of Remedies (Final Order ¶¶ 20(b), (d), (e))**:

The Replacement DIP Loan Parties shall immediately provide notice to counsel to the Replacement DIP Agent, the Replacement DIP Lender, the Prepetition Agents, the Ad Hoc Group, the Official Committee, **any other official committee appointed in these Chapter 11 Cases**, and the Prepetition Equipment Lenders . . . of the occurrence of any DIP Termination Event . . . .

Upon the occurrence of a DIP Termination Event, . . . the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the Replacement DIP Agent (acting at the instruction of the Replacement DIP Lender) to take any of the following actions, at the same or different time: (i) deliver a written notice (which may be via electronic mail) to lead restructuring counsel for the Debtors, the U.S. Trustee and lead restructuring counsel for the Official Committee**, any other official committee appointed in these Chapter 11 Cases,** and the Ad Hoc Group (the "***Remedies Notice***") declaring the occurrence of a DIP Termination Event (such date, the "***DIP Termination Declaration Date***") and/or deliver a Carve-Out Notice (as defined below) . . . .

In the event the Court determines during a Stay Relief Hearing that a DIP Termination Event has occurred, . . . the Court may fashion an appropriate remedy,

which may include, inter alia, the exercise of any and all rights or remedies available to the Replacement DIP Secured Parties under this Final Order, the Replacement DIP Loan Documents or applicable law against the DIP Collateral; *provided* that the rights of the Debtors, the Ad Hoc Group, and the Official Committee**,** ~~and~~ **any other official committee appointed in these Chapter 11 Cases** to contest such relief are expressly preserved.

Upon the occurrence of a Cash Collateral Termination Event, . . . the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the Prepetition Agents (acting at the instruction of the requisite Prepetition Secured Parties under the applicable Prepetition Secured Notes Documents), as applicable, to take any of the following actions, at the same or different time: (i) deliver a written notice (which may be via electronic mail) to lead restructuring counsel for the Debtors, the U.S. Trustee and lead restructuring counsel for Replacement DIP Agent, ~~and~~ the Official Committee, **and any other official committee appointed in these Chapter 11 Cases** (the "*Cash Collateral Remedies Notice*") declaring the occurrence of a Cash Collateral Termination Event . . . .

In the event the Court determines during a Stay Relief Hearing that a Cash Collateral Termination Event has occurred, . . . the Court may fashion an appropriate remedy, which may include, *inter alia*, the exercise of any and all rights or remedies available to the Prepetition Secured Parties under this Final Order or applicable law against the DIP Collateral; *provided*, *further*, that the rights of the Official Committee, **any other official committee appointed in these Chapter 11 Cases**, the Debtors and the Replacement DIP Agent to contest such relief are expressly preserved.

During the period from and after the DIP Termination Declaration Date or the Cash Collateral Termination Declaration Date (as the case may be) through the date of the Stay Relief Hearing (the "*Remedies Notice Period*"), the Debtors shall be permitted to use Cash Collateral solely to fund . . . (ii) the Professional Fees Escrow Amount; *provided* that any fees or expenses incurred by the Replacement DIP Loan Parties ~~or,~~ the Official Committee, **or any other official committee appointed in these Chapter 11 Cases** during the Remedies Notice Period shall permanently reduce the Carve-Out Amount . . . .

(c)     **Carve-Out (Final Order ¶ 22(b))**

As used in this Final Order, the term "**Carve-Out**" means the sum of . . . (iii) to the extent allowed at any time, whether by interim order, final order, or other order, all accrued but unpaid fees and expenses (excluding any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors) (the "*Allowed Professional Fees*") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "*Debtor Professionals*")**,** ~~and~~ the Official Committee, **and any other official committee**

**appointed in these Chapter 11 Cases** pursuant to section 328 or 1103 of the Bankruptcy Code (**collectively**, the "*Committee Professionals*," . . . .

The Debtors replied that they had no objection to these comments. But the next day, February 24, 2023, the Debtors informed the Ad Hoc Equity Group that the Replacement DIP Lender and the Ad Hoc Noteholder Group had rejected the proposed changes in their entirety.

10.     On February 26, 2023, the Debtors filed a proposed form of Final Order, which, as anticipated, incorporates none of these proposed edits. The Ad Hoc Equity Group also learned that the Replacement DIP Lender has refused to include any professional fees and expenses an Official Equity Committee's in the Approved Budget. Accordingly, the Ad Hoc Equity Group files this Limited Objection to the Replacement DIP Motion.

**LIMITED OBJECTION**

11.     As noted, the Ad Hoc Equity Group generally shares the Debtors' and the Court's assessment of the Replacement DIP Facility: it "will likely result in greater recoveries than provided by the RSA for all stakeholders, including equity holders," Debtors' Appoint Mot. Response ¶ 12, and is generally "a better deal" and a "more commercial deal," Feb. 1 Hr'g Tr. at 71:24–72:1 (Court's observation). At the same time, the Ad Hoc Equity Group identified a few discrete provisions of concern in the proposed form of Final Order and proposed limited, surgical revisions to remedy them. The proposed revisions do not materially affect the substantive terms of the Replacement DIP Facility. But they are critical to stockholders, as they address matters essential to an Official Equity Committee's discharge of its statutory responsibility—namely, information reporting and consultation; notice and an opportunity to be heard upon a DIP Termination Event or Cash Collateral Termination Event; and the inclusion of an Official Equity Committee's professional fees and expenses in the Approved Budget and the Carve-Out. These modest changes represent the minimum an Official Equity Committee would require to adequately

9

represent its constituents. This Court should ensure that the Final Order and the Approved Budget reflect them.

**I.      The Final Order Should Give an Official Equity Committee the Same Reporting and Consultation Rights as Other Parties.**

12.      A debtor in possession need not always agree with its official committees but must nonetheless work cooperatively with them—including by regularly consulting and sharing information with them. *See* 7 *Collier on Bankruptcy* ¶ 1103.05[1][b] (Richard Levin & Henry J. Sommer, eds.,16th ed. 2022) ("For the chapter 11 process to function as it [*sic*] supposed to, it is necessary for the debtor and the official committees, despite whatever disagreements they may have, to work together to accomplish this goal. Frequent and regular communication and consultation is essential to achieve the purposes of chapter 11."). Indeed, an official committee's statutory mandate expressly includes "consult[ing] with the . . . debtor in possession concerning the administration of the case." 11 U.S.C. § 1103(c).

13.      The Debtors themselves understand these obligations. They profess a desire to work with an Official Equity Committee, if appointed, as a "constructive partner" in "negotiating a consensual and value-maximizing chapter 11 plan." Debtors' Appointment Mot. Response ¶ 3. And, as noted, the Debtors do not object to including any other official committee as an additional party entitled to receive information from, and consult with, the Debtors pursuant to the "Reporting" provisions of the proposed Final Order. *See* Final Order ¶ 19.

14.      But the Replacement DIP Lender and the Ad Hoc Noteholder Group effectively overruled the Debtors; thus, the information-reporting and consultation provisions of the proposed Final Order exclude other official committees. The Replacement DIP Lender and the Ad Hoc Noteholder Group have articulated no principled justification of their position. Nor could they. As it stands, the proposed Final Order affords reporting and consultation rights to four separate parties,

including the UCC and the Ad Hoc Noteholder Group. Adding another official committee to the list imposes no material burden on any other party.

15.     Indeed, extending the "Reporting" provision of the proposed Final Order to other official committees would impose no obligation whatsoever on the Replacement DIP Lender, the Ad Hoc Noteholder Group, or any other non-Debtor party. And the Debtors—the only parties that bear any obligations under the "Reporting" provisions—do not object to the proposed change. The only conceivable explanation for the Replacement DIP Lender's and the Ad Hoc Noteholder Group's position is that they would rather no other official committees be appointed at all and thus seek to frustrate the activities of any committees appointed over their objection. The Court should not permit the Final Order to be manipulated toward these ends.

16.     Ultimately, neither the Replacement DIP Lender nor the Ad Hoc Noteholder Group can entirely prevent an Official Equity Committee from obtaining information from, and consulting with, the Debtors. They can merely make the process less efficient and more costly. Excluding other official committees from the Final Order's "Reporting" provisions would likely force an Official Equity Committee, if appointed, to resort to other, more burdensome methods— such as standalone information requests or motions pursuant to Bankruptcy Rule 2004—to obtain the same information that is provided to other key parties as a matter of course. This would benefit no one.

## II.     The Final Order Should Preserve an Official Equity Committee's Right to Receive Notice of, and Be Heard on, a Case-Dispositive Exercise of Remedies.

17.     The Replacement DIP Lender's and the Ad Hoc Noteholder Group's refusal to include other official committees among the parties entitled to notice of, and an opportunity to be heard on, a proposed exercise of remedies following a DIP Termination Event or Cash Collateral Termination Event is equally unwarranted. A DIP Termination Event or Cash Collateral

11

Termination Event is an event of great significance, as it triggers remedy provisions of the proposed Final Order that entitle the Replacement DIP Lender and the Prepetition Secured Parties to seek effectively case-ending relief on five-business-days' notice. To elaborate, the proposed Final Order permits the DIP Agent or the Prepetition Secured Parties, upon a DIP Termination Event or Cash Collateral Termination Event, respectively, to initiate a five business day Remedies Notice Period. Final Order ¶ 20(e). Following the Remedies Notice Period, the Court will conduct an emergency Stay Relief Hearing, at which the Court will determine whether a DIP Termination Event or Cash Collateral Termination Event has, in fact, occurred. *Id.* ¶ 20(b), (d). If so, the Court may "fashion an appropriate remedy," potentially including "the exercise of any and all rights available" to the Replacement DIP Secured Parties or the Prepetition Secured Parties, as applicable. *Id.*

18.     Although the availability of this remedies mechanism is not inherently objectionable, an Official Equity Committee (or any other official committee) has a manifest interest in knowing promptly when it is invoked and being heard at any subsequent Stay Relief Hearing. The Bankruptcy Code entitles it to nothing less. *See* 11 U.S.C. §§ 362(d) (stay relief requires "notice and a hearing"); 1109 ("[A]n equity security holders' committee . . . may raise and may appear and be heard on any issue in a case under this chapter [11] . . . ."). The Court should require that the Final Order preserve at least these minimal safeguards.

**III.     The Professional Fees and Expenses of an Official Equity Committee Should Be Included in the Approved Budget and Carve-Out, and, if They Are Not, the Final Order Should Not Waive Surcharge Rights or the "Equities of the Case" Exception.**

19.     The Bankruptcy Code assigns official committees a central role in reorganization cases and thus requires the debtor to bear their reasonable professional fees and expenses. *See* 11 U.S.C. §§ 330, 1103. The Replacement DIP Lender's and Ad Hoc Noteholder Group's refusal to

make allowance for *any* professional fees and expenses of other official committees in the Approved Budget or the Carve-Out is inimical to this basic precept of the chapter 11 system.

20.      At the same time Ad Hoc Equity Group recognizes that the reasonableness of an Official Equity Committee's fees and expenses is closely linked with the scope of its responsibilities. Thus, it has agreed to limit an Official Equity Committee to an important but narrow mandate and a modest budget "commensurately tailored to these responsibilities." Debtors' Appointment Mot. Response ¶ 1. The Ad Hoc Noteholder Group is wrong to think that the $4.75 million budget agreed between the Ad Hoc Equity Group and the Debtors is too high[7]—but it is entitled to advance that argument, just as it is entitled to argue that no Official Equity Committee should be appointed at all. But the Replacement DIP Lender and the Ad Hoc Noteholder Group should not be permitted to effectively thwart an appointment order entered against their wishes by excluding the Official Equity Committee's professionals from the Approved Budget and the Carve-Out. Thus, to the extent the Court grants the Appointment Motion, it should condition approval of the Replacement DIP Facility on the reasonable accommodation of the Official Equity Committee's professional fees and expenses in the Approved Budget and the Carve-Out.

   A.      **The Professional Fees and Expenses of Other Official Committees Should Be Included in the Approved Budget.**

21.      The Replacement DIP Lender's apparent refusal to permit any professional fees of an Official Equity Committee in the Approved Budget is untenable. The appointment of an Official Equity Committee does not require the consent of the Debtors' secured creditors; an Official Equity Committee should be appointed if the standards established by case law are met (as the Ad Hoc Equity Group submits they are). Similarly, the Court is not constrained by the Approved

---

[7]      The reasonableness of the proposed budget is explained in greater detail in the Appointment Motion Reply.

Budget in allowing the fees and expenses of an Official Equity Committee's retained professionals; here, again, the Bankruptcy Code, not terms of the proposed Final Order, supplies the relevant standard. *See In re Molycorp, Inc.*, 562 B.R. 67, 75–82 (Bankr. D. Del. 2017).

22.      But while the Replacement DIP Lender cannot dictate the Court's disposition of the Appointment Motion, its refusal to include the fees of an Official Equity Committee's professionals in the Approved Budget threatens to render any order granting that motion a dead letter. An array of troubling consequences could ensue. At minimum, the exclusion of an Official Equity Committee's professionals from the Approved Budget would chill, if not entirely thwart, the committee's ability to fulfill its statutory responsibilities. Moreover, the Replacement DIP Lender's stance may impose on the Debtors a Hobson's choice: either comply with the Approved Budget by refusing to pay the allowed fees of an Official Equity Committee's professionals[8] or comply with the Interim Compensation Order by paying such fees in violation of the Approved Budget.[9] And even if, *arguendo*, the Debtors could avoid paying the professional fees incurred by an Official Equity Committee for a time, the Debtors ultimately must pay such fees in full to confirm a plan. *See* 11 U.S.C. § 1129(a)(9)(A).

23.      The Court, of course, cannot force the Replacement DIP Lender to lend. But it can make clear that the Replacement DIP Lender's choice is binary: to the extent the Court appoints

---

[8]      A breach of the Approved Budget would (subject to Permitted Variances) constitute a DIP Termination Event or Cash Collateral Termination Event entitling the Replacement DIP Lender and/or the Prepetition Secured Parties to invoke the remedies provisions discussed above. *See* Final Order ¶¶ 9–10, 20.

[9]      "**Interim Compensation Order**" refers to the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 541]. Under that order, the Debtors are "authorized *and directed*" to pay (subject to a customary holdback) the monthly fees and expenses of retained professionals— including retained professionals of other official committees—not subject to an unresolved objection. Interim Compensation Order ¶ 1(ii)–(iii) (emphasis added). As noted above, the Replacement DIP Lender's refusal to include the fees of an Official Equity Committee's professionals in the Approved Budget is not a cognizable basis to object to such fees.

an Official Equity Committee and establishes its budget, the Replacement DIP Lender must either

accommodate the Official Equity Committee in the Approved Budget or not lend at all.

**B.      The Professional Fees and Expenses of an Official Equity Committee Should Be Included in the Carve-Out.**

24.      For the same reasons, the Final Order should ensure that the Carve-Out includes

the allowed fees and expenses incurred by retained professionals of all official committees

appointed in the Chapter 11 Cases—not just the UCC. Carve-outs for professional fees of the

debtors' and committees' advisors are necessary to "preserve the balance of the adversary system"

and are "designed to accommodate all classes of creditors *and equity interests*, rather than one

especially crafted for the benefit of the pre-petition lender." *In re Evanston Beauty Supply, Inc.*,

136 B.R. 171, 176 (Bankr. N.D. Ill. 1992) (emphasis added); *see also In re Ames Dep't Stores,

Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (observing that "[a]bsent such protection, the

collective rights and expectations of all parties-in-interest are sorely prejudiced"). The

asymmetrical treatment of the Debtors' and UCC's professionals, on the one hand, and the

professionals of other official committees, on the other, places the latter at a distinct disadvantage,

undermining the "balance of the adversary system," *Evanston Beauty Supply*, 136 B.R. at 176, just

as surely as if there were no carve-out at all.

25.      Although the Ad Hoc Equity Group believes the overriding need to "assure

adequate representation of . . . equity security holders," 11 U.S.C. § 1102(1)(2), justifies the cost

of an Official Equity Committee, it acknowledges the Debtors' and other stakeholders' legitimate

interest in managing case expenses. Hence the Ad Hoc Equity Group's agreement to limit an

Official Equity Committee to a focused mandate and a limited budget (less than $5 million)

commensurate with its circumscribed scope. The Ad Hoc Noteholder Group complains that even

this is too much. *See* AHNG Appointment Mot. Obj. ¶¶ 27–29. Having just extracted a $6 million

termination fee on less than $40 million in new-money loans lent for approximately six weeks, the Ad Hoc Noteholder Group's newfound frugality merits skepticism. Regardless, it is entitled to press its objection, and, ultimately, this Court will determine whether to appoint an Official Equity Committee and, if so, what its budget should be.

26.     But what matters for the fundamental chapter 11 policy discussed above—"preserv[ing] the balance of the adversary system in reorganization" and "accomodat[ing] all classes of creditors and equity interests"—is not just the headline number; equally important is that an Official Equity Committee have access to its ostensible budget on substantially the same terms as the Debtors and the UCC. Thus, whatever budget the Court may ultimately approve should prevail not only as these cases proceed in the ordinary course but also if the Carve-Out is triggered.

27.     At minimum, the Final Order should preserve the right of the Debtors' estates to surcharge collateral under Bankruptcy Code section 506(c) absent an appropriate Carve-Out. Courts recognize that surcharge waivers and professional fee carve-outs are "both sides of the same coin." *In re Exide Holdings, Inc.*, Case No. 20-11157 (Bankr. D. Del. May 21, 2020), Hr'g Tr. at 125:14–18 ("[Y]ou always have 506(c) until you negotiate it away, which happens—one of the reasons you can negotiate away 506(c) is because you have the professional fee carveouts. So it's sort of both sides of the same coin."). The secured creditors should not benefit from a section 506(c) waiver to which they have no statutory entitlement while simultaneously refusing to maintain an adequate professional fee Carve-Out for all official committees. To do so would be to permit these Chapter 11 Cases to be run for the secured creditors' benefit to the detriment of the Debtors' other stakeholders—a result that section 506(c) is designed to prevent. *See Sw. Sec., FSB v. Segner (In re Domistyle, Inc.)*, 811 F.3d 691, 696–97 (5th Cir. 2015) (explaining that "the

purpose of . . . 506(c) . . . is to prevent a windfall to the secured creditor at the expense of the estate" and that "[Fifth Circuit] case law administering Section 506(c) has emphasized the unfairness of requiring 'the general estate and unsecured creditors . . . to bear the cost of protecting what is not theirs'"); *In re Visual Indus., Inc.*, 57 F.3d 321, 325 (3d Cir. 1995) ("[Section] 506(c) is designed to prevent a windfall to the secured creditor."); *see also In re Codesco, Inc.*, 18 B.R. 225, 230 (Bankr. S.D.N.Y. 1982) ("The underlying rationale for charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that the general estate and unsecured creditors should not be required to bear the cost of protecting what is not theirs.").

28.     The same logic applies to the proposed waiver of the "equities of the case" exception set forth in Bankruptcy Code section 552(b). *See* Final Order ¶ 27. The "equities of the case" exception is an important limit on the rights of prepetition secured parties that prevents prepetition secured parties from receiving an inequitable windfall to the detriment of other stakeholders. *See In re Toso*, BAP Nos. EC–05–1290–PaBuMo, 2007 WL 7540985, at *14 (9th Cir. B.A.P. Jan. 10, 2007); *see also In re Cafeteria Operators, L.P.*, 299 B.R. 400, 409–10 (Bankr. N.D. Tex. 2003) (section 552(b) "is intended to prevent secured creditors from receiving windfalls and to allow bankruptcy courts broad discretion in balancing the interests of secured creditors against the general policy of the Bankruptcy Code, which favors giving debtors a 'fresh start'"). In particular, it aims to "prevent a secured creditor from reaping benefits from collateral that has appreciated in value as a result of the trustee's/debtor-in-possession's use of assets in the estate (which would normally go to general creditors) to cause the appreciated value." *In re Muma Servs.*, 322 B.R. 541, 558–59 (Bankr. D. Del. 2005).

29.     That concern is particularly acute here. The Prepetition Secured Notes Collateral does *not* comprise substantially all of the Debtors' assets. The application of Bankruptcy Code

section 552(b), unmoderated by the "equities of the case exception," could allow the Prepetition Secured Parties to expropriate substantial value generated postpetition from the Debtors' investment or use of assets outside of the Prepetition Secured Parties' collateral package. That risk might be tolerable as an element of a fair compromise, including the Prepetition Secured Parties' agreement to provide a reasonable carve-out. But if the Prepetition Secured Parties will not offer an Official Equity Committee an equitable carve-out, the Court should not preemptively preclude the Official Equity Committee (or any other parties-in-interest) from invoking the "equities of the case" exception where it applies.

## RESERVATION OF RIGHTS

30.     This Limited Objection is submitted without prejudice to, and with full reservation of, the Ad Hoc Equity Group's rights, claims, defenses, and remedies, including the right to amend, modify, or supplement this Limited Objection, to seek discovery, to raise additional objections and to introduce evidence at any hearing related to this Objection, and without in any way limiting any other rights of the Ad Hoc Equity Group to object to the Replacement DIP Motion, on any grounds, as may be appropriate. The Ad Hoc Equity Group reserves the right to amend or supplement this Limited Objection.

Dated: Houston, Texas
February 28, 2023

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/ Noelle M. Reed*
Noelle M. Reed
Attorney-in-Charge
State Bar No. 24044211
Federal Bar No. 27139
1000 Louisiana Street
Suite 6800
Houston, Texas 77002
Tel: (713) 655-5122
Fax: (713) 483-9122
Email: Noelle.Reed@skadden.com

-and-

George N. Panagakis
(*Admitted pro hac vice*)
Ron E. Meisler
(*Admitted pro hac vice*)
Jennifer Madden
(*Application for pro hac vice admission forthcoming*)
Christopher M. Dressel
(*Application for pro hac vice admission forthcoming*)
155 North Wacker Drive
Chicago, Illinois 60606-1720
Tel.: (312) 407-0700
Fax: (312) 407-0411
Email: George.Panagakis@skadden.com
Email: Ron.Meisler@skadden.com
Email: Jennifer.Madden@skadden.com
Email: Christopher.Dressel@skadden.com

*Attorneys for the Ad Hoc Equity Group*

**CERTIFICATE PURSUANT TO**
**BANKRUPTCY LOCAL RULE 9013-1(g)(1)**

   I hereby certify that counsel to the Ad Hoc Equity Group conferred with counsel to

the Debtors, the Replacement DIP Lender, and the Ad Hoc Noteholder Group prior to the filing of

this Limited Objection to attempt to resolve the relief requested in the Limited Objection without

the necessity of a hearing. The parties were not able to resolve the dispute.

                  */s/ Noelle M. Reed*
                  Noelle M. Reed

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing document to be served by electronic transmission via the Court's ECF system to all parties registered to receive electronic notice in this case.

*/s/ Noelle M. Reed*
Noelle M. Reed