**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **CORE SCIENTIFIC, INC.,** *et al.*, | § | **Case No. 22-90341 (DRJ)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | |
| | § | Related Docket Nos. 458, 568, 569, 570, 571, 572 |

**REPLY OF AD HOC GROUP OF EQUITY HOLDERS (A) TO OBJECTION OF THE
AD HOC NOTEHOLDER GROUP AND (B) IN FURTHER SUPPORT OF THE
MOTION OF THE AD HOC GROUP OF EQUITY HOLDERS OF CORE
SCIENTIFIC FOR ENTRY OF AN ORDER DIRECTING THE APPOINTMENT OF
AN OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS**

An ad hoc group (the "**Ad Hoc Equity Group**") of beneficial holders of the common stock of Core Scientific, Inc. ("**Core Scientific**" or the "**Company**" and, together with its affiliated debtors and debtors in possession, the "**Debtors**"), by and through their undersigned counsel, hereby submit this reply (the "**Reply**") to the *Objection of the Ad Hoc Group to the Motion of the Ad Hoc Group of Equity Holders of Core Scientific for Entry of an Order Directing the Appointment of an Official Equity Committee of Equity Security Holders* [Docket No. 572] (the "**Objection**") and in further support of the *Motion of the Ad Hoc Group of Equity Holders of Core Scientific for Entry of an Order Directing the Appointment of an Official Committee of Equity*

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6073); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

*Security Holders* [Docket No. 458] (the "**Motion**"). In reply to the Objection and in further support of the Motion, the Ad Hoc Equity Group respectfully states as follows:

## PRELIMINARY STATEMENT

1.      In response to the commencement of the Debtors' Chapter 11 Cases, the terms of the initial proposed DIP financing, and the proposed RSA, among other things, a group of stockholders—comprised largely of individuals and their family trusts—pooled their individual resources to hire counsel to assist them in securing the appointment of an Official Equity Committee to protect stockholder interests in the Chapter 11 Cases. This group of individuals had conviction in the temporary nature of the "crypto winter," and the long-term value of the Debtors' business. Recent market trends and the Debtors' strong performance since the Petition Date have only strengthened that confidence. In fact, the transitory market dislocation has turned around in the Debtors' and stakeholders' favor. The price of Bitcoin has rebounded, rising 37% since the Petition Date and has stabilized, trading over $23,000 for twelve consecutive days and over $20,000 for the past six weeks; energy prices are materially lower; the capital markets are opening to the digital asset space; and other economic conditions are generally trending favorably. All these factors point to significant value for stakeholders and indicate a material increase in the Company's value since the commencement of these Chapter 11 Cases.

2.      In light of the significant additional value that has accreted to the estate since the Petition Date, the Debtors and Creditors' Committee have agreed to support the appointment of an Official Equity Committee, subject to the terms reflected in the proposed order approving the formation of an Official Equity Committee (the "**Proposed Order**")[2]—namely: (a) the Official

---

[2]      *See* Exhibit A to the *Notice of Rescheduled Hearing Regarding Mot. of the Ad Hoc Group of Equity Holders of Core Scientific for Entry of an Order Directing the Appointment of an Official Comm. of Equity Sec. Holders* [Docket No. 568].

Equity Committee has a $4.75 million budget, (b) the scope of the Official Equity Committee is limited to issues involving valuation and the negotiation of a chapter 11 plan, (c) the Official Equity Committee can seek an increase to the budget and/or expansion of the scope, but any such increase in budget or expansion in scope requires the consent of both the Debtors and Creditors' Committee *or* relief from this Court, and (d) the Debtors and Creditors' Committee have the right to request that the Court disband the Official Equity Committee in the event that the Official Equity Committee is no longer necessary to assure adequate representation of equity holders in these Chapter 11 Cases. This agreement was meant to balance, among other things, the needs of stockholders, some of whom are currently coming out of pocket to fund the expenses of engaging in these Chapter 11 Cases, with the risk that the Debtors' performance weakens to such an extent that the Debtors become hopelessly insolvent, in which case the five-factor test would no longer be satisfied.

3.       Notwithstanding the support of the estate fiduciaries—the Debtors and Creditors' Committee—and the protections they have negotiated, the Ad Hoc Noteholder Group objects to the Motion. The Objection focuses on four of the five factors in the five-factor analysis, arguing that (1) the Ad Hoc Equity Group has not offered evidence of the Debtors' solvency; (2) stockholders are already adequately represented in light of their participation thus far in the Chapter 11 Cases, as well as by the Debtors' insider stockholders and the Creditors' Committee; (3) the estates and creditors (including the Ad Hoc Noteholder Group, which represents prepetition secured noteholders that are squarely "in the money") should not be required to bear the cost of an Official Equity Committee "gambl[ing]" with *their* money; and (4) appointment of the Official Equity Committee is premature. The Ad Hoc Noteholder Group appears to concede that these

Chapter 11 Cases are complex—it does not meaningfully analyze this factor and acknowledges the impact of the volatility and complexity of Bitcoin pricing on the Debtors' valuation.

4.        The Ad Hoc Noteholder Group's arguments fail. ***First***, the Ad Hoc Noteholder Group spends a significant portion of the Objection attempting to undermine the significance of data points and other indicia of value highlighted in the Motion. The Ad Hoc Noteholder Group's argument is not that these indicia do not exist, but that they do not *establish* solvency. However, there is no requirement that the Debtors or stockholders prove definitively the Debtors' solvency or undertake an expert valuation before an Official Equity Committee is appointed. Nor does the Ad Hoc Noteholder Group provide any authority for its apparent position that the Ad Hoc Equity Group must establish solvency. If that were the test, an Official Equity Committee could likely never be appointed until well into the Chapter 11 process—well past the time period where it could add meaningful value for its constituents. Rather, the relevant inquiry is whether the debtor is "hopelessly insolvent" and whether there is a substantial *likelihood* of a meaningful distribution to stockholders.

5.        The Debtors themselves have stated that, given current market conditions, they are *not* hopelessly insolvent and may well be solvent,[3] and the Ad Hoc Noteholder Group cannot deny that the market data continues to support the position that the Debtors are likely solvent. And it is telling that the Creditors' Committee, which represents the general unsecured creditors, supports the appointment of an Official Equity Committee, subject to the terms set forth in the Proposed Order. Moreover, the Ad Hoc Noteholder Group's attempt to distinguish the Debtors' peer group in a comparable company analysis based on debt-load defies conventional financial and valuation

---

[3]    *Debtors Response to Mot. for Appointment of an Official Comm. of Equity Sec. Holders* [Docket No. 570] (the "**Debtors' Reply**"), ¶¶ 7-11.

methodologies, including the common practice of using EBITDA—a metric that explicitly excludes debt service.

6.      **Second**, the Ad Hoc Noteholder Group's arguments that stockholders are already adequately represented do not withstand scrutiny. The Ad Hoc Equity Group consists of individuals and family trusts with limited resources. Their ability to organize and fund counsel to represent them in seeking appointment of an Official Equity Committee does not constitute adequate representation. In addition, the insider management and board members that hold approximately 30% of the Company's common stock are fiduciaries of the estate[4]—not only stockholders—and have delegated decision-making authority with respect to these Chapter 11 Cases to the independent Special Committee members who do not own equity. Finally, the Creditors' Committee's efforts to ensure general unsecured creditors are paid in full in no way guarantees that it will pursue maximum value for stockholders; in fact, its fiduciary duties may compel it to take positions opposed to the interests of stockholders.

7.      **Third**, the Ad Hoc Noteholder Group largely ignores the agreed-upon budget and limited scope of the Official Equity Committee in arguing that the costs of an Official Equity Committee are unjustified. Its position is ironic in light of the $6 million termination fee it received

---

[4]   The Ad Hoc Noteholder Group questions the Debtors' agreement to the terms of the Proposed Order, arguing that the Debtors are not exercising their "fiduciary duties to maximize recoveries for its creditors **ahead of** its [sic] equity holders." Objection at 3 n. 4. (emphasis added). There is no such duty, nor has the Ad Hoc Noteholder Group offered any authority for this position. Rather the Debtors' fiduciary duties are to maximize value of the estate for the benefit of all stakeholders. *See In re Pilgrim's Pride*, 407 B.R. 211, 218 (Bankr. N.D. Tex. 2009) ("[I]t is unquestionably true that Debtors' officers and directors have a duty to maximize Debtors' estates to the benefit of shareholders as well as creditors."); *Quadrant Structured Prods. Co. v. Vertin*, 115 A.3d 535, 546–48, 554–55 (Del. Ch. 2015) (observing that directors of a Delaware corporation "do not owe any particular duties to creditors" and should instead seek maximize "the value of the firm as a whole"); *cf. Sol. Tr. v. 2100 Grand LLC (In re AWTR Liquidation Inc.)*, 548 B.R. 300, 327–30 (Bankr. C.D. Cal. 2016) (observing, with respect to a California corporation, that "[s]tockholders and creditors are likely to have different approaches to risk" and that the "only . . . rational approach to resolve those differences . . . is for the directors to exercise their business judgment in a good faith attempt to weigh the likely value of each proposed course of action, taking into account both the risks and the potential rewards, and then choose whichever has the best chance to preserve and increase value *of the corporation as a whole*, for the benefit of all constituent groups").

in connection with the refinancing of the original DIP and the fees and expenses that the Ad Hoc Noteholder Group asks the estate to bear in connection with the unnecessary eleventh-hour discovery it is now demanding in connection with the Motion. The Official Equity Committee will necessarily be highly efficient in light of the budget, and the risk of duplication of effort is low given the limited nature of the Official Equity Committee's proposed mandate.

8.     **Fourth**, the Ad Hoc Noteholder Group relies on the uncertainty of value to argue that appointment of an Official Equity Committee is premature. But uncertainty is not a basis to deny the appointment of an Official Equity Committee. Indeed, it is that very uncertainty that demonstrates that stockholders need a voice *now* as parties begin discussing and negotiating matters related to the Debtors' path forward and valuation. Waiting to appoint an Official Equity Committee until there is certainty would render its appointment largely perfunctory, as most case-critical issues are likely to be substantially determined at that point.

9.     For the reasons set forth herein and in the Motion, the Court should overrule the Objection and grant the relief requested in the Motion.

<strong>REPLY</strong>

## I.     The Debtors and Creditors' Committee Support the Appointment of an Official Equity Committee and No Other Party Has Objected.

10.     The Debtors and the Creditors' Committee agree that the appointment of an Official Equity Committee is warranted in these Chapter 11 Cases under the terms negotiated by them and reflected in the Proposed Order, including:

- a defined scope of the Official Equity Committee limited to (i) valuation and (ii) plan negotiations (subject to expansion only if consented to by the Debtors and Creditors' Committee or by relief from this Court);

- a budget of $4.75 million for the professional fees of the Official Equity Committee, inclusive of legal and financial advisors (subject to increase only if consented to by the Debtors and Creditors' Committee or by relief from this Court); and

6

- the right for the Debtors and the Creditors' Committee to request that the Court disband the Official Equity Committee in the event that the Official Equity Committee is no longer necessary to assure adequate representation of equity holders in these Chapter 11 Cases.

11.     Furthermore, no other constituents have objected to the formation of an Official Equity Committee. Counsel to the Ad Hoc Equity Group spoke to the U.S. Trustee, who indicated the U.S. Trustee was pleased to hear of the agreement and does not oppose the appointment of an Official Equity Committee. Moreover, when the U.S. Trustee declined to appoint an Official Equity Committee in January, the U.S. Trustee indicated to counsel to the Ad Hoc Equity Group that it was a close call that might be revisited during the course of the Chapter 11 Cases. The U.S. Trustee has taken an active role in the administration of these Chapter 11 Cases and has opposed motions to appoint an official equity committee in other cases before this Court.[5]

## II.     The Court Should Overrule the Ad Hoc Noteholder Group's Objections.

### A.     Core Scientific Is Not Hopelessly Insolvent.

12.     The Ad Hoc Noteholder Group improperly implies that the Ad Hoc Equity Group must establish definitively that the Debtors *are* solvent. Not so. Rather, the applicable standard requires the Ad Hoc Equity Group to show that the Debtors are *not* "hopelessly insolvent" and that there is a likelihood of meaningful distribution to stockholders. *In re Williams Commc'ns Grp., Inc.*, 281 B.R. 216, 220-21, 223 (Bankr. S.D.N.Y. 2002) (applicable legal standard on a motion requesting appointment of an official equity committee is whether the debtor "appears to be

---

[5]     *See, e.g.*, *In re Azure Midstream Partners LP*, Case No. 17-30461 (DRJ), *Statement of U.S. Tr. Regarding Emergency Mot. and Request to Appoint an Equity Comm.* (Bankr. S.D. Tex. Apr. 27, 2017) [Docket No. 238]; *In re Ion Geophysical Corp.*, Case No. 22-30987 (mi), *Statement of U.S. Tr. Regarding Requests to Appoint an Equity Comm.* (Bankr. S.D. Tex. June 28, 2022) [Docket No. 350]; *see also All Am. Oil & Gas Inc.*, Case No. 18-52695-RBK, *Response of the U.S. Tr. to Expedited Mot. of the Ad Hoc Equity Comm. to Appoint an Equity Comm. of Equity Sec. Holders for Debtor All Am. Oil & Gas Inc.* (Bankr. W.D. Tex., Feb. 4, 2019) [Docket No. 342].

hopelessly insolvent"); *see also In re Emons Indus.*, 50 B.R. 692, 694 (Bankr. S.D.N.Y. 1985). And the Ad Hoc Equity Group has carried its burden.

13.     On the other hand, the Ad Hoc Noteholder Group's attempts to undermine each of the indicia of value discussed in the Motion do not establish that the Debtors are insolvent. First, the Ad Hoc Noteholder Group criticizes the Ad Hoc Equity Group for referencing the Debtors' balance sheet and public filings, noting that these documents do not provide a measure of fair market valuation. But assessing a debtor's likely solvency or insolvency does not require a full-blown fair market valuation; it requires a practical analysis based on a review of available information. *See, e.g., In re Pilgrim's Pride Corp.*, 407 B.R. 211, 217 (Bankr. N.D. Tex. 2009) ("The court does have available to it values provided in Debtors' schedules and in Debtors' public filings with the SEC and may deduce a value for Debtors from the operating reports filed with the UST. While these values may prove illusory, except for Debtors' most recent operating report they all indicate that Debtors are solvent."); *see also Williams Commc'ns Grp.*, 281 B.R. at 221 (considering the balance sheet and a "host of other indicia" in considering whether the Debtors appeared hopelessly insolvent). Indeed, in *Williams Commc'ns Grp.*, the court noted that "Valuation is a proper issue for confirmation[.] . . . In short this Court has not made a valuation, nor is one necessary at this stage. Instead, it has reached a practical conclusion, based on a confluence of factors[.]" *Id.*

14.     Nor does the solvency analysis require a business plan. *See, e.g., Pilgrim's Pride.*, 407 B.R. at 217. Indeed, developing the business plan itself is generally an iterative process between the Debtors and their key stakeholders. The business plan must be satisfactory to the Debtors' DIP Lender, and no doubt the Creditors' Committee and its advisors will scrutinize the business plan, run their own analyses, and discuss the same with the Debtors. If equity holders are

forced to wait until a definitive business plan blessed by the stakeholders or valuation is certain, they are likely to be served a business plan and valuation analysis without any ability to provide meaningful input.

15.    Having first argued that the balance sheet is an unreliable measure of value, the Ad Hoc Noteholder Group then goes on to use its own view of the Debtors' balance sheet to argue insolvency; however, in contradiction to all of the Debtors' filings in these Chapter 11 Cases, the Ad Hoc Noteholder Group grossly overstates the Debtors' liabilities by adding approximately $400-$500 million to the face amount of the prepetition secured notes as a result of an alleged 200% Repayment Premium that will be the subject of significant litigation.[6]

16.    Moreover, in connection with the Debtors' funded indebtedness, at the time of the Debtors' Q2 2022 Earnings Presentation on August 11, 2022 (the "**Earnings Presentation**")— when Bitcoin was trading at approximately $24,402—the Debtors' business plan provided for satisfaction of $900 million in debt over three years.[7] In the Earnings Presentation, the Debtors

---

[6]    While arguing that the Debtors are likely insolvent, the Ad Hoc Noteholder Group simultaneously asserts that under *Ultra Petroleum*, the full amount of bargained for contractual payments must be paid before there can be any recovery to equity holders. Obj. at 7-8 n. 6 (citing *In re Ultra Petroleum Corp.*, 51 F. 4th 138, 145 (5th Cir. 2022)). *Ultra Petroleum* is not dispositive regarding the treatment of the Repayment Amount and is likely distinguishable. Even under *Ultra Petroleum*, the allowance of the Repayment Premium requires an analysis under state law. *Ultra Petroleum*, 51 F.4th at 156-157. If the Repayment Premium "is unenforceable under governing state law, the Bankruptcy Code would still disallow it–the solvent-debtor exception notwithstanding." *Id*. at 156. *Ultra Petroleum* is likely distinguishable on other grounds as well. In addition, a *certiorari* petition with respect to the *Ultra Petroleum* decision is currently pending before the Supreme Court.

The 200% Repayment Premium may also be challenged on other grounds. For example, given the equity-like rate of return and the convertible feature of the prepetition secured notes, it is equally plausible that the prepetition secured notes may be recharacterized as equity, in which case value breaks deeply into equity.

In any case, these are issues that should be litigated at a different time. It is the Ad Hoc Equity Group's expectation that the Creditors' Committee will handle this litigation, but the parties can confirm allocations of responsibilities at a later date.

[7]    Core Scientific Second Quarter Fiscal Year 2022 Earnings Presentation (Aug. 11, 2022), available at https://investors.corescientific.com/investors/events-and-presentations/default.aspx (depicting repayment plans for $536.3 million of convertible notes "in April 2025" and $348.9 million of equipment financing "over approximately 2 years") and attached as **Exhibit A**.

stated they were comfortable with their ability to service and satisfy this debt.[8] At that time, energy costs were at their highest point in fourteen years.[9] In fact, that presentation reflected that the cost of mining one Bitcoin at that time was $10,200, consisting of $8,500 in energy costs and $1,700 in operational costs.[10] Today, Bitcoin prices have rebounded from the temporary low that followed the chapter 11 filing of industry leader FTX, and have stabilized at approximately the same prices as in August 2022, when those statements were made.[11]

---

[8]   They made the following statements:

- "We are *very comfortable* with the maturity in 2025 . . . and the likelihood that our stock will be hopefully soon at a level where this debt converts to equity . . ."

- "We owe B. Riley approximately $57 million payable monthly over the course of the next 11 months. The loan was originally $75 million, but we have paid down $18 million already this year. Again, we are *very comfortable with our obligations* to B. Riley."

- "Through the end of July, we have paid $75 million in principal [sic] amortization this year and are comfortable with our ability to continue to service our equipment debt. We have multiple options for creating and maintaining liquidity."

Transcript of Core Scientific, Inc. (CORZ) Q2 2022 Earning Conference Call (Aug. 11, 2022), available at https://seekingalpha.com/article/4533335-core-scientific-inc-s-corz-ceo-mike-levitt-on-q2-2022-results-earnings-call-transcript and attached as **Exhibit B**.

[9]   *See, e.g., Natural Gas*, U.S. Energy Information Administration, https://www.eia.gov/dnav/ng/hist/rngwhhdm.htm (last visited Feb. 26, 2023) (showing that in August 2022 Henry Hub natural gas spot prices reached highest costs since July 2008).

[10]   Core Scientific Second Quarter Fiscal Year 2022 Earnings Presentation 13 (Aug. 11, 2022), available at https://investors.corescientific.com/investors/events-and-presentations/default.asp.

[11]   The average of Bitcoin trading prices at market close throughout August 2022 was $22,366.27. The average of Bitcoin trading prices at market close from February 1, 2023, to February 27, 2023, was $23,301.20. *Bitcoin-USD*, Yahoo! Finance, https://finance.yahoo.com/quote/BTC-USD/ (last visited Feb. 27, 2023).



17.     In addition, during the same period, energy prices have declined materially, with natural gas prices down approximately 60%[12] and the World Bank's metric on energy prices down approximately 30%.[13] And as discussed below, the Debtors are mining more Bitcoin per day today than they were in August 2022.

18.     Furthermore, the Ad Hoc Equity Group expects that the amount of mechanics' liens will likely end up materially lower than the amount set forth in the Objection, as is customary following claim reconciliation, negotiation, and settlement.

19.     The Ad Hoc Noteholder Group also critiques the other market evidence cited in the Motion. Objection ¶ 18. For example, the Ad Hoc Noteholder Group tries to distinguish the comparable company analysis by focusing on the amount of debt (or alleged lack thereof) on the balance sheets of Riot, Hut8, and HIVE. *Id.* But, as this sophisticated group of financial institutions

---

[12]     *Natural Gas*, U.S. Energy Information Administration, https://www.eia.gov/dnav/ng/hist/rngwhhdm.htm (last visited Feb. 26, 2023); *see also Electricity Prices Surged 14.3% in 2022, Double Overall Inflation: US Report*, Utility Dive (Jan. 19, 2023), https://www.utilitydive.com/news/electricity-prices-inflation-consumer-price-index/640656/.

[13]     *Energy Price Index,* World Bank, available at https://ycharts.com/indicators/energy_index_world_bank (last visited Feb. 26, 2023).

and their well-regarded financial advisor know, this argument is inconsistent with standard valuation methodologies. Valuation models are designed to look past differing capital structures to arrive at a fair value of a company. A company's capital structure is wholly irrelevant to whether these three peers are comparable.[14]

20.     If the Ad Hoc Noteholder Group is suggesting something about the Reorganized Debtors' projected debt capacity, that question is one that will be tested and negotiated as the parties, with the help of their financial advisors, determine the Company's appropriate debt capacity and capital structure upon exit from the Chapter 11 Cases. Notably, the Ad Hoc Noteholder Group has not suggested any *other* companies are more comparable, nor has it explained why the businesses themselves are not comparable.[15]

21.     The Ad Hoc Noteholder Group also downplays the significant value accretion to the Debtors' estates as a result of increase in Bitcoin pricing, arguing that "[s]peculation on future bitcoin pricing is not a business plan." Objection ¶ 1. This is an incongruous position: as

---

[14]   The Ad Hoc Equity Group has not asserted that this market evidence provides a complete analysis of the Company's value. The Ad Hoc Equity Group lacks sufficient resources to engage a financial advisor and an expert to undertake a full valuation analysis at this time. Nor is now the time to undertake a full valuation.

[15]   The Ad Hoc Noteholder Group also critiques the Motion's use of data from September 30, 2022. But, as the Ad Hoc Noteholder Group knows well, year-end data is not yet publicly available. The data set was not used in an attempt to "disregard" events leading to the Debtors' bankruptcy. Moreover, as described in the First Day Declaration, many of the "Significant Events Leading to the Chapter 11 Filing" discuss events and factors that occurred prior to September 30, 2022. First-Day Decl. ¶ 64 ("Although the Debtors' operating performance has been, and remains, strong, a number of factors have rendered the Debtors' balance sheet unsustainable. These primary factors include, among other things: (i) the recent decline in bitcoin prices; (ii) increased energy costs; and (iii) ongoing litigation costs, including litigation with Celsius."); *id.* ¶ 67 ("[O]n May 5, 2022, the Federal Reserve raised interest rates by 0.5%, triggering another round of market selloff. Thereafter, Bitcoin fell 27% during an eight-day period. By July 2022, multiple companies in the cryptocurrency sector commenced chapter 11 proceedings, each one affecting and further pushing the next to the same conclusion as a result of significant interconnectedness and contagion within the industry."); *id.* ¶ 71 ("Between July 2022 and September 2022, significantly higher energy prices, inflation, and supply chain disruptions increased the Company's electricity costs, and together with delays in facility development and miner deployments reduced profits."); *id.* ¶¶ 73-77 (describing the impact of the Celsius chapter 11 filing on the Debtors' business, including losing $900,000 each month since the Celsius chapter 11 petition date on July 13, 2022, to cover increased electricity tariffs that would have been paid by Celsius.).

noteholders, they chose to invest in a Company whose valuation is in fact inextricably tied to the price of Bitcoin. In other words, their own investment decision was tied to speculation on the pricing of Bitcoin. Moreover, many companies in commodities industries, such as oil and gas companies and various metal mining companies, face volatility in pricing. That volatility does not preclude the preparation of a business plan; it merely requires measured analyses and assumptions. And contrary to the Ad Hoc Noteholder Group's claim that it is "impossible" to predict Bitcoin prices, just as with other commodities, one can look at the forward curve to understand the collective expectations of market participants concerning future pricing. With respect to Bitcoin, there is an established CME futures market that reflects anticipated pricing for Bitcoin in the $24,000 range throughout this calendar year and into next year. *Bitcoin \Futures and Options*, CME                Group                (Feb. 27,                2023,                8:20 a.m.                CT), https://www.cmegroup.com/markets/cryptocurrencies/bitcoin/bitcoin.quotes.html.

22.    Moreover, the Ad Hoc Noteholder Group places undue emphasis on the "speculative" and "volatile" nature of price of Bitcoin. The Debtors filed these Chapter 11 Cases when Bitcoin pricing was at one of its lowest points in the wake of digital asset industry leader FTX filing for chapter 11 bankruptcy on November 11, 2022. Between December 2020 and November 8, 2022, the price of Bitcoin was consistently between $19,000 and 63,000.[16] The trading price of Bitcoin dipped below $19,000 on only five days in those two years, and it never dipped below $18,500.[17] A holistic look at the historical pricing of Bitcoin, including its recent rebound and stabilization, suggests that the Bitcoin pricing at the time of the Debtors' chapter 11

---

[16]    *Bitcoin-USD*, Yahoo! Finance, https://finance.yahoo.com/quote/BTC-USD/ (last visited Feb. 27, 2023).

[17]    *Id.*

filing was at a temporary low, likely related to the industry's short-term reaction to the FTX bankruptcy.



23.     In its attempt to downplay the significance of the stabilized price of Bitcoin, the Ad Hoc Noteholder Group tries to emphasize the "global bitcoin network hash rate," also known as the "difficulty level," increasing over time. But this is a red herring. The Ad Hoc Noteholder Group fails to support its attempted "gotcha" moment with any evidence that participants in the digital asset industry don't already incorporate the well-known difficulty level into their projections. Moreover, notwithstanding the generally increasing difficulty level, Core Scientific produces more Bitcoin per day today than it did last year, increasing from an average of approximately 35 Bitcoin

per day in January 2022[18] to approximately 50 Bitcoin per day in January 2023.[19] The math is simpler than the Ad Hoc Noteholder Group tries to suggest: the Debtors' costs have gone down because of materially lower energy prices, while their production has gone up as it is mining more Bitcoin per day at a higher Bitcoin price.[20] The real arithmetic is indisputable: the Debtors make more money today than they did at the end of last year.

24.     The Ad Hoc Equity Group has demonstrated—and the Debtors agree—that market factors indicate that the Debtors are not hopelessly insolvent. *See* Debtor's Response ¶ 8. Indeed, the available data still suggests that the value of the Company is much higher than it was on the Petition Date:

- As of close of business on February 26, 2023, Bitcoin was trading at $23,561, a 40% increase since the Petition Date.[21]

---

[18]   Press Release, Core Scientific, *Core Scientific Announces January 2022 Updates* (Feb. 7, 2022), https://investors.corescientific.com/investors/news/news-details/2022/Core-Scientific-Announces-January-2022-Updates/default.aspx (reporting the production of 1,077 self-mined Bitcoin in January 2022, or approximately 35 per day).

[19]   Press Release, Core Scientific, *Core Scientific Announces January 2023 Production and Operational Updates* (Feb. 6, 2023), https://investors.corescientific.com/investors/news/news-details/2023/Core-Scientific-Announces-January-2023-Production-and-Operational-Updates/default.aspx (reporting the production of 1,527 self-mined Bitcoin in January 2023, or approximately 50 per day). Notably, the Company's production in 2023 has also increased from production in November and December 2022. *See* Press Release, Core Scientific, *Core Scientific Announces November and December 2022 Updates* (January. 9, 2023), https://investors.corescientific.com/investors/news/news-details/2023/Core-Scientific-Announces-November-and-December-2022-Updates/default.aspx (reporting the production of 1,356 self-mined Bitcoin in November 2023, or approximately 45 per day, and 1,425 self-minded Bitcoin in December 2023, or approximately 46 per day).

[20]   *See* Debtor's Response ¶ 10 ("[[O]ne of the Debtors' most significant operating costs—utilization of power to operate their mining facilities—has declined steadily since the Petition Date as underlying fuel costs have generally decreased."); *Energy Price Index*, World Bank, available at https://ycharts.com/indicators/energy_index_world_bank (last visited Feb. 26, 2023) (reporting the World Bank's Energy Price Index data that shows a 30% decrease from August 31, 2022 ($172.77) to January 31, 2023 ($119.29)).

[21]   *See Bitcoin-USD*, Yahoo! Finance, https://finance.yahoo.com/quote/BTC-USD/ (last visited Feb. 26, 2023); *see also* Debtor's Response ¶ 8 ("The price of bitcoin has remained well-above $20,000 for more than a month.").

- The share prices of comparable competitor companies are likewise higher than at the beginning of the year.[22]

- The macroeconomic conditions that the Debtors were facing on the Petition Date continue to moderate. Energy prices are going down[23] and interest rate hikes have slowed.[24]

- Capital markets are opening for the digital asset space, as evidenced by several recent developments, including:

  o After the Petition Date, multiple potential lenders submitted proposals for a replacement facility in these Chapter 11 Cases.[25]

  o Digital asset mining companies Hut 8 Mining Corp. and US Bitcoin Corp announced an all-stock merger to create a new company that will have approximately 825 MW of gross energy across six mining sites. The aggregate value of the merger based on combined market capitalization is $990 million.[26]

  o Taurus SA, a Swiss crypto firm that develops infrastructure for digital assets, announced that it raised $65 million in an equity round led by Credit Suisse.[27]

---

[22] For example, the trading prices of competitor companies HIVE Blockchain Technologies Ltd., Riot Platforms, Inc., and Marathon Digital Holdings, Inc. have increased by 81%, 78%, and 109%, respectively, since the first day of trading in 2023.

[23] *See Natural Gas*, U.S. Energy Information Administration, https://www.eia.gov/dnav/ng/hist/rngwhhdm.htm (last visited Feb. 28, 2023) (reflecting a drop in price for gas spot prices by more than 60% from August 2022 to January 2023); *see also Electricity Prices Surged 14.3% in 2022, Double Overall Inflation: US Report*, UTILITY DIVE (Jan. 19, 2023), https://www.utilitydive.com/news/electricity-prices-inflation-consumer-price-index/640656 (reporting that gas and energy prices are expected to decrease throughout 2023 and 2024 after natural gas consumption "broke records" in 2022); Press Release, U.S. Bureau of Labor Statistics, Consumer Price Index Summary (Jan. 12, 2023, 8:30 a.m. ET), available at https://www.bls.gov/news.release/cpi.nr0.htm (reporting that the energy index declined 4.5% in December 2022). *See also* Debtor's Response ¶ 10.

[24] *See* Chair Powell, Transcript of Chair Powell's Press Conference, at 9 (February 1, 2023), available at https://www.federalreserve.gov/mediacenter/files/FOMCpresconf20230201.pdf ("[T]he Committee decided to raise interest rates by 25 basis points today, continuing the step-down from last year's rapid pace of increases. Shifting to a slower pace . . . .").

[25] See *Declaration of John Singh in Support of Replacement DIP Motion* [Docket No. 390] ¶ 13.

[26] *See* Press Release, Hut 8 Mining Corp., *Hut 8 and US Bitcoin Announce Merger of Equals to Create a Preeminent Digital Asset Mining, Hosting, Managed Infrastructure Operations, and High Performance Computing Organization* (Feb. 7, 2023, 6:30 a.m. ET), https://www.prnewswire.com/news-releases/hut-8-and-us-bitcoin-announce-merger-of-equals-to-create-a-preeminent-digital-asset-mining-hosting-managed-infrastructure-operations-and-high-performance-computing-organization-301740441.html.

[27] *See* Yogita Khatri, *Credit Suisse Leads $65 Million Series B in Digital Asset Firm Taurus*, THE BLOCK (Feb. 14, 2023, 2:00 a.m. EST), https://www.theblock.co/post/211162/taurus-crypto-series-b-credit-Suisse.

    o   Bitcoin mining consulting firm Sabre56 announced a private financing of $35 million to build out its hosting business.[28]

- Certain large companies are accepting Bitcoin as a form of payment, including Microsoft, AT&T, and Overstock.com.[29]

**B.**    **No Other Party Is Adequately Representing Equity Holder Interests.**

25.    The Objection argues that the stockholders' interests are adequately represented because (a) the Ad Hoc Equity Group is represented by prominent counsel and has, at its own expense, already participated in the Chapter 11 Cases; (b) the insiders hold approximately 30% of the stock and are therefore aligned with equity holder interests; and (c) the Creditors' Committee is capable of advancing the equity holder interests. Objection ¶¶ 23-25. These facts do not establish adequate representation, nor is the Ad Hoc Noteholder Group's suggestion that the Ad Hoc Equity Group can apply for administrative expense status at the conclusion of the Chapter 11 Cases if it establishes that it has made a substantial contribution an answer.

**(i)**    **Participation Does Not Indicate Adequate Representation.**

26.    The Ad Hoc Equity Group's engagement of counsel to assist in establishing an Official Equity Committee is not indicative of access to adequate resources to continue actively participating in these Chapter 11 Cases. Rather, it engaged counsel out of necessity. The Ad Hoc Equity Group was quick to realize that if it sat by and did nothing, nearly all value of the Company would be handed over to the prepetition secured noteholders notwithstanding the Company's significant value. Its individual members understood that to preserve value for stockholders and ensure a fair process, prompt retention of counsel was of paramount importance. Accordingly, the

---

[28]    *See* Eliza Gkritsi, *Bitcoin Mining Consulting Firm Sabre56 Raises $35M to Build 150MW of Hosting Sites*, Coindesk (Feb. 23, 2023, 8:00 a.m. EST), https://www.coindesk.com/business/2023/02/23/bitcoin-mining-consulting-firm-sabre56-raises-35m-to-build-150mw-of-hosting-sites/.

[29]    Ofir Beigel, *Who Accepts Bitcoin as Payment?*, 99 Bitcoins (Jan. 15, 2023), https://99bitcoins.com/bitcoin/who-accepts/.

individuals that compose Ad Hoc Equity Group pooled their resources to hire Skadden to assist them in this endeavor. The Ad Hoc Equity Group members are not sophisticated financial institutions with deep pockets like the Ad Hoc Noteholder Group whose fees and expenses *are* being borne by the estate. Rather, the Ad Hoc Equity Group consists largely of individuals and family trusts. Unlike large financial institutions, the individual members of the Ad Hoc Equity Group do not have access to—and should not have to expend—the requisite financial resources to properly represent equity throughout the entirety of the Chapter 11 Cases. The Ad Hoc Equity Group members should not be punished for effectively organizing and hiring counsel to preserve their rights and have a seat at the table.

27.     Moreover, to date, the Ad Hoc Equity Group's participation has not given stockholders the same access to the Debtors as those whose fees are being borne by the estate regarding financial reporting, business diligence, other matters related to valuation, and plan negotiations.[30] Notwithstanding the Ad Hoc Equity Group's successes to date, an estate fiduciary with official committee status is needed and warranted to give stockholders a meaningful voice on matters related to valuation and plan negotiations.

### (ii)     Neither The Debtors Nor The Creditors' Committee Adequately Represents Stockholders With Respect To Valuation And Plan Negotiations.

28.     The Objection seems to ignore the circumscribed mandate reflected in the agreed Proposed Order. The scope of the Official Equity Committee's activity would be limited to matters related to valuation and plan negotiations. Proposed Order ¶ 6. Accordingly, the stockholders *will* have to rely on the Debtors and the Creditors' Committee to advance their interests with respect

---

[30]   For example, the DIP Lender, Ad Hoc Noteholder Group, and Creditors' Committee have access to more robust financial reporting, whereas the Ad Hoc Equity Group must wait for and rely upon monthly operating reports and press releases.

to all other issues. But, as detailed in the Motion, neither the Debtors nor the Creditors' Committee are positioned to adequately represent the stockholders on matters related to valuation and plan negotiations.

29.     Legislative history reflects that Congress understood the important role an official equity committee serves in chapter 11 cases:

> Investor protection is most critical when the company in which the public invested is in financial difficulties and is forced to seek relief under the bankruptcy laws . . . [I]t is essential for [public investors] to have legislative assurance that their interests will be protected. . . .

> Such assurance should not be left to a plan negotiated by a debtor in distress and senior or institutional [creditors] who will have their own best interest to look after.

S. Rep. No. 95-989, at 10 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5796. An equity committee plays an essential and unique role: "to counteract the natural tendency of a debtor in distress to pacify large creditors, with whom the debtor would expect to do business, at the expense of small and scattered investors." *Id.*

30.     The Debtors' role in these Chapter 11 Cases requires them to maximize value for all stakeholders—many of whom have already demonstrated that they have divergent interests. Indeed, at the outset of these cases, the Debtors accepted an RSA that favored the secured convertible noteholders at the expense of unsecured creditors and equity holders. As the *Pilgrim's Pride* court aptly notes, the principal concern of debtors and their board must be "preservation of the Debtors' going concern value and their successful emergence from chapter 11." *Pilgrim's Pride*, 407 B.R. at 218. "While it is unquestionably true that a debtor's officers and directors have a duty to maximize a debtor's estate to the benefit of shareholders as well as creditors . . ., the reorganization process is not so simple that that ensures shareholders are adequately represented by even equity owning management." *Id.* at 218–19. A debtor's success in bankruptcy heavily depends on reaching accord with all constituents, some of whom—namely, the Creditors'

Committee and the Ad Hoc Noteholder Group—are not incentivized to advocate a value that would facilitate an equitable recovery for stockholders. *Id.* at 218 ("[W]hen it comes to valuation and determination of future capital structures for plan purposes, [the] agendas [of the creditors committee and the equity holders] are likely to be very much at odds."). In other words, the Debtors' duty to maximize value for *all* stakeholders—not just stockholders—requires the Debtors to act as an intermediary to attempt to reach consensus. An Official Equity Committee will provide a counterbalance with a single-minded focus on maximizing value.

31.     The Ad Hoc Noteholder Group also argues that because the Debtors' insiders hold approximately 30% of the aggregate outstanding common stock, the management team and board members who hold these shares are "at the table" on behalf of equity. Objection ¶ 24. First, this argument ignores the fact that all decision-making authority with respect to these Chapter 11 Cases has been delegated to a Special Committee of disinterested non-stockholder directors. Second, this also ignores that the insiders, in their capacity as directors or officers, should be acting as estate fiduciaries and not in their own self-interest. As fiduciaries, they are obligated to maximize value for *all* stakeholders (not only stockholders), which gives rise to the same concerns set forth above.

32.     The Creditors' Committee is likewise not adequately aligned with the stockholders to serve as an effective representative. Certainly, there will be times when the Creditors' Committee and equity holders will be aligned. They will both pursue what they believe to be "value-maximizing" transactions; they both opposed the RSA and the original DIP. And they both dispute the alleged 200% repayment penalty asserted by the Ad Hoc Noteholder Group. But a shared interest in some key matters does not equate to adequate representation for all matters. Indeed, the sole purpose (and duty) of the Creditors' Committee is to maximize recoveries and value for its constituents alone: the general unsecured creditors. The Ad Hoc Noteholder Group

argues that general unsecured creditors are not entitled to recover more than the allowed amount

of their claims, and that the Creditors' Committee's efforts to maximize value will inure to the

benefit of stockholders, who will receive any residual value once creditors are paid in full.[31]

Objection ¶ 25. But that is precisely the point: because general unsecured creditors are entitled

only to the full satisfaction of their claims, they have neither the incentive nor the obligation to

pursue or support alternatives that, on a risk-adjusted basis, are value-maximizing for the company,

taken as a whole, but potentially disadvantageous for unsecured creditors. *Cf. Quadrant Structured*

*Prods. Co. v. Vertin*, 115 A.3d 535, 546–48, 54–55 (Del. Ch. 2015) (discussing at length the

divergence of interests between creditors and stockholders of a Delaware corporation). Their

argument also ignores differing views on valuation. Accordingly, the Creditors' Committee is not

the appropriate fiduciary to represent equity holders in negotiating the terms of a plan, establishing

valuation, or undertaking any other strategy to truly maximize value for stockholders.[32]

### C.   The Budgeted Costs Are Justified.

33.   The Ad Hoc Noteholder Group speculates that there will likely be duplication of

effort and that the creditors should not bear the additional costs associated with an Official Equity

Committee. These alleged fears are unwarranted. The Ad Hoc Equity Group takes seriously the

need to manage the costs of these cases. The Debtors negotiated, and the Ad Hoc Equity Group

agreed to support, a budget of $4.75 million and a narrow mandate limited to negotiating the terms

---

[31]   The Ad Hoc Equity Group agrees that creditors are not entitled to recover more than the allowed amount of their claims. Yet, the RSA that the Ad Hoc Noteholder Group sponsored contemplated a double or triple recovery for the prepetition secured noteholders, which magnanimously would have triggered an incremental tiered recovery for junior stakeholders.

[32]   The Debtors make many of the same statements in their Response in support of the appointment of an Official Equity Committee and tout their ability to serve as adequate representatives. The Ad Hoc Equity Group does not doubt that the directors and management team believe they are adequate representatives, but it respectfully disagrees that they are adequate representatives with respect to valuation and plan negotiations, given their competing priorities and obligations.

of a chapter 11 plan that provide a fair recovery to equity holders and ensuring input on valuation. The risk of duplication of effort is low in light of this limited scope, the budget, and the inherent oversight process in any chapter 11 case with respect to professional fees. Moreover, the budget may be increased, or the scope expanded, only with the consent of the Debtors and Creditors' Committee or by orders of this Court. Finally, the Debtors and the Creditors' Committee have negotiated the right to request that the Court disband the Official Equity Committee in the event it is no longer necessary to assure adequate representation of equity holders in these Chapter 11 Cases.

34.     Notably, the $4.75 million budget is significantly lower than the approximately $6 million fee that certain of the Ad Hoc Noteholder Group members earned in connection with a $37.5 million, 41-day DIP, which resulted in a more-than-550% internal rate of return to them. And it is worth noting that the Ad Hoc Noteholder Group itself—whose fees are being borne by the estate—are not subject to *any* budget. The Ad Hoc Noteholder Group's position on this matter is particularly paradoxical in light of their last-minute discovery and emergency motion to adjourn. Undoubtedly, it will ask the Debtors to reimburse any money it spends on engaging the Debtors and other stakeholders in unnecessary, expensive, last-minute discovery in connection with this Motion, yet it contends that the Ad Hoc Equity Group must continue to pay its own fees to participate in the Chapter 11 Cases.

**D.     The Appointment of the Official Equity Committee Is Not Premature.**

35.     The Ad Hoc Noteholder Group Objection asserts that it is premature for the Court to order the appointment of an Official Equity Committee and that the Ad Hoc Equity Group should instead seek payment of its fees and expenses under section 503(b) of the Bankruptcy Code at the conclusion of the case. Objection ¶ 30. The Court should decline the Ad Hoc Noteholder

Group's invitation to deny stockholders a seat at the table until after the table has been set and the meal has been served.

36. In *Pilgrim's Pride*, parties also objected to the request for appointment of an official equity committee and urged the bankruptcy court to defer appointment until the debtors had completed their business plan, when it allegedly would be "clearer" that such a committee was necessary. 407 B.R. 211. The court rejected that suggestion, finding that "[r]ather than presenting a basis for delaying appointment of an equity committee, the state of [the] Debtors' cases is such that establishment of an advocate for shareholders is urgent." *Id.* at 220. "[A] debtor's business plan, which projects future cash flows, is a critical element in the valuation equation." *Id.* at 219–20 (citing *In re Mirant Corp.*, 334 B.R. 800, 823 (Bankr. N.D. Tex. 2005)). "Denying equity owners the means to analyze and critique [the] Debtors' projections in their business plan is likely to hinder if not hopelessly cripple any later effort to show that [the] Debtors' value is sufficient to justify participation." *Id.* at 220. Here, as in *Pilgrim's Pride*, it is "imperative" that stockholders have an "adequate opportunity to participate in the critical stages" of the Debtors' valuation and restricting process. *Id.*; *see also In re Delphi Corp.*, No. 05-44481(RDD) (Bankr. S.D.N.Y. Mar. 22, 2006), Hr'g Tr. at 182-83 [Docket No. 3262] ("It seems to me, again, that given the important transformative events that will be taking place in this company through this bankruptcy case over the next few months, it's important to give [stockholders] representation[.]")[33]

37. Equity holders need a seat at the table *now*, with the ability to hire advisors and prepare before discussions regarding a chapter 11 plan and valuation are significantly, if not completely, determined.

---

[33] A excerpt of the *Delphi Corporation* transcript is attached as **Exhibit C**.

## CONCLUSION

38.     For these reasons and those set forth in the Motion, the Ad Hoc Equity Group respectfully requests that the Court overrule the Objection, grant the relief requested in the Motion, and grant any other relief that is just.


Dated: Houston, Texas
        February 28, 2023

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/ Noelle M. Reed*
Noelle M. Reed
Attorney-in-Charge
State Bar No. 24044211
Federal Bar No. 27139
1000 Louisiana Street, Suite 6800
Houston, Texas 77002
Tel: (713) 655-5122
Fax: (713) 483-9122
Email: Noelle.Reed@skadden.com

-and-

George N. Panagakis (*Admitted pro hac vice*)
Ron E. Meisler (*Admitted pro hac vice*)
Jennifer Madden
(*Application for pro hac vice admission forthcoming*)
155 North Wacker Drive
Chicago, Illinois 60606-1720
Tel: (312) 407-0700
Fax: (312) 407-0411
Email: George.Panagakis@skadden.com
Email: Ron.Meisler@skadden.com
Email: Jennifer.Madden@skadden.com

*Attorneys for the Ad Hoc Equity Group*

**CERTIFICATE PURSUANT TO**
**BANKRUPTCY LOCAL RULE 9013-1(g)(1)**

I hereby certify that counsel to the Ad Hoc Equity Group conferred with counsel to the Ad Hoc Noteholders Group prior to the filing of this Reply to attempt to resolve their objections, including a telephonic conference on February 28, 2023. The parties were not able to resolve the dispute.

*/s/ Noelle M. Reed*
Noelle M. Reed

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing document to be served by electronic transmission via the Court's ECF system to all parties registered to receive electronic notice in this case.

/s/ Noelle M. Reed
Noelle M. Reed