**<u>EXHIBIT C</u>**

Closing Argument - Leonhard and Court Decision        156

1    I think others involved in this matter will have an

2    opportunity to weigh in after the fact and Appaloosa, as Mr.

3    Rosenberg pointed out, will have that opportunity, too, as

4    would Brandes, given its substantial resources.

5           I think with that, Your Honor, I'll step down and

6    let Ms. Leonhard make her remarks.  Again, I would propose

7    granting the motion.

8           THE COURT:  Okay.

9           **CLOSING ARGUMENT FOR THE U.S. TRUSTEE**

10          MS. LEONHARD:  Good evening, Your Honor.  Alicia

11   Leonhard for the United States Trustee.

12          Last, but not least, Your Honor, the United States

13   Trustee joins in the comments and the arguments of the

14   objectors and requests that the Court deny the motion.  Thank

15   you very much.

16          THE COURT:  Okay.  All right.  I'll take a five-

17   minute break and then I'll be back.  Well, I'll be back at

18   6:15.

19      (Recess taken at 6:01 p.m.)

20          THE COURT:  Please be seated.

21          I have in front of me a motion by Appaloosa

22   Management, LP, a substantial shareholder of the parent

23   Delphi entity, for the appointment of an official committee

24   of equity security-holders under Section 1102(a)(2) of the

25   Bankruptcy Code.

1          The motion is opposed by the debtors, the Official

2    Unsecured Creditors' Committee, the agent for the pre-

3    petition lenders, and the United States Trustee.

4          It has been joined in by another large and

5    sophisticated management company, Brandes, which unlike

6    Appaloosa, was a pre-petition holder of the debtor's equity

7    interests and represents to the Court that it has, under

8    management with authority to vote, again, a substantial stake

9    in the debtor's equity interests.  I believe, if you add the

10   two of them together, they own or control approximately

11   fifteen or sixteen percent of the outstanding shares.

12         Those shares are widely held.  There was no

13   testimony on this point, but I believe the record is clear

14   that there are approximately 300,000 shareholders of the

15   publicly traded equity interests.  In light of that fact, I

16   believe that it is relevant that the SEC has not taken a

17   position on this motion.  There were perhaps contrary

18   representations made to the Court as to why the SEC had not

19   done that, made by counsel to the U.S. Trustee on the one

20   hand, saying that the SEC did not support the motion; and by

21   counsel for Appaloosa, saying the SEC did not support the

22   motion, absent a showing, which it was not taking a position

23   on -- that is, that the SEC was not taking a position on,

24   with regard to whether the debtors at this point are

25   insolvent.

Court Decision                                                    158

1          This is an important motion because it affects the

2     cost of this case, both directly--that is, the cost of an

3     equity committee and its professionals if I grant the motion-

4     -as well as indirectly, in connection with both the cost of

5     the estate and other estate-compensated professionals,

6     including the Creditors' Committee, in dealing with

7     litigation and other matters raised by an equity committee;

8     and then, in addition, also indirectly, in respect of

9     potential delay that the existence of an equity committee

10    might cause at various stages in the case.

11         Because of its importance, and because of the desire

12    by all parties, at least as initially expressed by all

13    parties, including Appaloosa, to have this matter heard and

14    decided by me quickly, so that if I rule in favor of an

15    equity committee, an equity committee could be appointed

16    quickly before passage of much more time in this case, I have

17    decided to rule from the bench.

18         As I often do with long bench rulings, however,

19    particularly where I cite extensive case law, I reserve the

20    right to correct the ruling based on my review of the

21    transcript.

22         This is a core proceeding under the Bankruptcy Code,

23    as it deals with a committee's appointment under the Code.

24    And one begins, as one must, with the statute, which provides

25    at Section 1102(a)(2) that:

1          "On request of a party in interest, the Court may

2          order the appointment of additional committees of

3          creditors or of equity security-holders, if

4          necessary to assure adequate representation of

5          creditors or of equity security-holders.  The United

6          States Trustee shall appoint any such committee once

7          the Court has ordered the appointment."

8          It's well recognized that there is no statutory test

9     for "adequacy of representation," as used in Section

10    1102(a)(2).  See, for example, In Re:  Johns Manville

11    Corporation, 68 B.R. 155 (SDNY 1986), appeal dismissed 824

12    F.2d 176 (2d Cir. 1987).

13         In light of the absence of a statutory definition of

14    "adequacy of representation," and in light further of the

15    fact that the statute says the Court "may" order the

16    appointment of an additional committee besides the Official

17    Creditors' Committee, the courts have made such

18    determinations on a case-by-case basis in the exercise of the

19    Bankruptcy Court's discretion.  See, again, In Re:  Johns

20    Manville, 68 B.R. 155, as well as In Re:  Becker Industries

21    Corporation, 55 B.R. 945, 948, (Bankruptcy, SDNY 1985), for

22    lists of the factors that the courts have employed in

23    exercising their discretion on a case-by-case basis.

24         I should further note that the case law is clear

25    that the burden of showing a lack of adequacy of

Court Decision                                                    160

1   representation is upon the movant.  Again, see <u>In Re:  Johns</u>

2   <u>Manville Corporation</u>, 68 B.R. 155.

3            The factors that the Court is to consider on a case-

4   by-case basis are, by this time, fairly well established,

5   although I should say first and foremost, again, they are

6   merely factors informing the Court's discretion.  It is not a

7   litmus test, and no particular factor's absence precludes the

8   appointment of a committee; and, conversely, although if all

9   the factors were present, one would assume a committee would

10  be appointment, the Court still has discretion under the

11  statute, in light of other factors that might be present and

12  relevant, not to appoint a committee.  The case law has in

13  large measure developed out of cases decided in the Southern

14  District of New York, but the factors are employed throughout

15  the country.  They are laid out in the <u>Becker Industries</u>

16  case, and in the <u>Johns Manville</u> case that I have cited.

17  They're also discussed in, for example, <u>In Re:  Kalvar</u>

18  <u>Microfilm, Inc.</u>, 195 B.R. 599 (Bankruptcy, District Court of

19  Delaware 1996), and numerous other cases throughout the

20  country.  They include:

21           Whether the shares are widely held and publicly

22  traded.

23           The size and complexity of the Chapter 11 case.

24           The delay and additional cost that would result if

25  the Court grants the motion.

1              The likelihood of whether the debtors are insolvent.

2              The timing of the motion relative to the status of

3    the Chapter 11 case.

4              And other factors relevant to the issue of adequate

5    representation, including:

6              The role of the board and management acting on

7    behalf of shareholders.

8              The role of other estate-compensated parties,

9    including the Official Creditors' Committee, and whether they

10   can be said in large measure to be acting on behalf of

11   shareholders, at least insofar as maximizing the value of the

12   estate.

13             And according to some courts, the sophistication of

14   the shareholders, particularly those who have made the

15   motion, and their ability to retain counsel and other

16   advisors.

17             And according to some courts, the right of such

18   parties, if they do make a substantial contribution in the

19   case, to be compensated under Section 503(b) of the

20   Bankruptcy Code.

21             Before discussing those factors in more detail,

22   however, and particularly focusing upon the factor dealing

23   with the debtors' financial condition, which has occupied a

24   great deal of the hearing in front of me, I believe it's

25   relevant and significant also to quote the legislative

Court Decision                                          162

1  history of Section 1102(a)(2), because, given the lack of a

2  statutory definition of "adequacy of representation," I

3  believe congressional intent is relevant.

4          The relevant legislative history on the section is

5  not only quoted, but astutely critiqued in Johns Manville at

6  68 B.R. 155 at 160.  As noted in that case, one of the

7  purposes of the legislation was, quote:

8          "-- to counteract the natural tendency of a debtor

9           in distress to pacify large creditors with whom the

10          debtor would expect to do business at the expense of

11          small and scattered public investors."

12         That's from S. Rep. No. 989, 95th Congress, Second

13  Session at 10 (1978).

14         The Congressional Report went on to state:

15         "The committee believes that it should be emphasized

16          that investor protection is most critical when the

17          company in which the public invested is in financial

18          difficulties and is forced to seek relief under the

19          bankruptcy laws.  A fair and equitable

20          reorganization as provided in the bill is literally

21          the last clear chance to conserve for them values

22          that corporate financial stress or insolvency have

23          placed in jeopardy.  As public investors are likely

24          to be junior or subordinated creditors or debt-

25          holders, it is essential for them to have

1   legislative assurance that their interests will be

2   protected.  Such assurance should not be left to a

3   plan negotiated by a debtor in distress and senior

4   or institutional debtors who will have their own

5   best interests to look after." <u>Id</u>.

6   The Court in <u>Manville</u> noted, however, that because

7 Congress made the appointment discretionary in the Bankruptcy

8 Court, finding that the Court "may" appoint a committee if

9 necessary to assure adequate representation, it obviously did

10 not take this principle beyond the meaning of the statute.

11   I believe there has been a development in the case

12 law since the Congressional Report was issued, and, frankly,

13 since the <u>Becker Industries</u> case, which was one of the first

14 cases to deal with the appointment of a committee under

15 1102(a)(2), although starting, frankly, with an earlier case,

16 Judge Beatty's case in <u>Emons Industries</u>.

17   The Courts have recognized that even where a Chapter

18 11 case involves a substantial number of public shareholders

19 and is large and complex, the Court should not appoint an

20 equity committee if the debtor appears to be clearly

21 insolvent.  That is because, in the words of Judge Beatty in

22 <u>Emons</u>, which appears at 50 B.R. 692 (Bankruptcy SDNY 1985):

23 to do so would, in effect, give the equity committee and the

24 shareholders a gift.  And that is because the cost of the

25 committee is borne by the estate.

1              And if it appears, in the words of <u>Emons</u>, that

2    the debtor is hopelessly insolvent, that cost should not be

3    borne.

4              Courts, I believe, because of their experience of

5    cases where equity committees were formed, where equity

6    committees were inordinately litigious and active in such

7    cases and ultimately obtained for their constituents what

8    might charitably be described as a gift, that is, an

9    inducement to go away through a plan, have come to emphasize

10   the point.  It's discussed in some detail and with some

11   candor in the <u>Wang Laboratories</u> decision by Judge Hillman at

12   149 B.R. 1 (Bankruptcy, District of Massachusetts 1992), in

13   which Judge Hillman recognized the need not to legitimize

14   what he called the, quote, "blackmail factor" inherent in the

15   presence of an equity committee where, in fact, it appears

16   that the debtor is hopelessly insolvent.

17             The Bankruptcy Code gives parties in interest

18   considerable access to the Court and considerable issues to

19   raise, if they choose, in front of the Court, which obviously

20   has the effect potentially of delaying the prosecution of a

21   Chapter 11 case and causing other parties to incur

22   substantial costs.  The benefit to a litigant of controlling

23   an equity committee, or any other official committee, is

24   that, subject of course to Court review, the cost of such

25   litigation is borne by the estate, which raises the stakes

Court Decision                                                    165

1   and makes it tempting to implement the "blackmail factor"

2   strategy.

3         I believe these are legitimate concerns in this area

4   and they have been recognized by numerous courts, and

5   specifically, in what I believe today to be the leading

6   decision in this area, they were recognized by Judge Lifland

7   in In Re:  Williams Communications Group, Inc., 281 B.R. 216

8   (Bankruptcy SDNY 2002), in which he repeated Judge Beatty's

9   concern that an equity committee where the debtor appears to

10  be hopelessly insolvent should not be warranted because, this

11  is a quote:

12         "-- because neither the debtor nor the creditor

13          should have to bear the expense of negotiating over

14          the terms of what is in essence a gift."

15         Judge Lifland used in that quote Judge Beatty's

16  phrase, "appears to be hopelessly insolvent."  He also used

17  it at Page 222 -- I'm sorry, at 221 of his opinion.

18         Interestingly, in his conclusion, however, he

19  provides for a somewhat different test than "hopelessly

20  insolvent."  He states:

21         "The appointment of official equity committees

22          should be the rare exception.  Such committees

23          should not be appointed unless equityholders

24          establish that (i) there is a substantial likelihood

25          that they will receive a meaningful distribution in

1           the case under a strict application of the absolute

2           priority rule, and (ii) they are unable to represent

3           their interests in the bankruptcy case without an

4           official committee."  Id. at 223.

5       That is, as to the first prong of his test, it

6    requires more of the movant for an official equity committee

7    to establish than that there are signs of hope of solvency,

8    at least in the general run of such applications.

9       That formulation has since been picked up by another

10   court.  Judge Case, whom I certainly respect as a very astute

11   scholar of bankruptcy law, applied the same test in In Re:

12   Northwestern Corporation, 2004 Westlaw 1077913 (Bankruptcy,

13   District of Delaware, May 13, 2004).

14      Now I say that without necessarily accepting it as

15   an ironclad test myself because I believe that all of the

16   courts that look at these issues, including Judge Lifland and

17   Judge Case, would say first and foremost that the various

18   factors enunciated by the Courts are to be applied on a case-

19   by-case basis, in light of the statute and the congressional

20   policy.  And that's what I have done in my balancing analysis

21   of all of the factors; that is, I have not imposed upon the

22   movant here the burden of showing "a substantial likelihood

23   that it will receive a meaningful distribution in the case."

24      I do that because this motion is filed early in the

25   case, as opposed to at the time a plan is to be negotiated

1  and/or litigated at confirmation.  And I believe that it is,

2  as a result, important for me to give the benefit of the

3  doubt to the movants here.

4        As the debtors have acknowledged candidly, it is too

5  early to formulate a business plan.  It is, consequently, too

6  early to formulate a going concern valuation with any

7  credibility; and, finally, it is too early to negotiate a

8  chapter 11 plan.  Consequently, all of the analysis of

9  solvency or insolvency here has around it a substantial

10 amount of speculation and doubt.  And I believe it would be

11 unfair to impose upon a movant in that context the burden of

12 doing a full-scale going-concern valuation to show a

13 "substantial likelihood of a meaningful distribution."

14        Moreover, I believe that such a full-blown valuation

15 at this time is not what is called for in connection with a

16 motion for the appointment of an equity committee.  As Judge

17 Lifland made quite clear in <u>Williams</u>, this is a summary

18 proceeding.  The valuation that the Court performs in

19 connection with the proceeding is not binding in any respect

20 on any party with respect to any future valuation of the

21 debtor or its assets, including, most importantly of course,

22 a valuation for chapter 11 plan confirmation purposes.

23        There's an obvious reason for that.  It's tied into

24 both the strengths of Congressional policy in permitting

25 equity committees to be appointed under the proper

1    circumstances as well as the potential for abuse of that

2    right; that is, on the one hand, it's unfair to impose the

3    burden of a full-scale valuation on public shareholders in

4    all circumstances, although the burden may be increased in

5    certain circumstances.  It is also unfair to the debtor and

6    the other parties whose money is very clearly at risk in the

7    bankruptcy case, namely the creditors, and in this case the

8    workers, of, in essence, causing the motion for the

9    appointment of an equity committee to take over the entire

10   case so that under the rubric of "valuation" the movant for an

11   equity committee can use all of the cost and delay leverage

12   that an equity committee might have even before the equity

13   committee is appointed, to engage the parties in litigation

14   on the merits of the key issues in the case.

15        That would be an absurd result.  I believe, frankly,

16   that's why I was so angry at Appaloosa's attempt repeatedly

17   to turn this matter into such a proceeding and why the case

18   law is crystal-clear that that is not what the Court is to

19   consider.

20        Now let me -- before that, let me note that although

21   Judge Lifland makes that crystal-clear in his opinion, he's

22   not the only judge to have done so.  In fact, Judge Case in

23   Northwestern didn't have an evidentiary hearing at all.  He

24   did not believe it was appropriate.  The Court in Leap

25   Wireless, 295 B.R. 135 (Bankr. S.D. Cal. 2003) was frustrated

1  as to the lack of substance behind the debtors' schedules,

2  but, again, only treated the matter as a summary proceeding

3  and took whatever evidence she had and weighed that into her

4  analysis with respect to whether a committee should be

5  appointed.

6        So I believe, both logically and under the case law,

7  there is no basis to expand the inquiry that I need to

8  undertake here to force parties to conduct full-blown

9  valuations on either side of the solvency issue.

10       Now, to apply the various factors.  As I noted

11  before, this is a large public company.  There's over 500

12  million of issued and outstanding common shares and over

13  300,000 public shareholders.  This is obviously also a large

14  and complex bankruptcy case.  The docket is already

15  substantial, and it is clear to me that far more than is

16  reflected in the docket is being done by the debtor and other

17  parties behind the scenes in respect to resolving the key

18  issues in this case.

19       Those issues are complex, both in terms of the

20  negotiating and human dynamics, as well as the qualitative

21  and quantitative analysis in regard to the underlying

22  documentation, the parties' rights under the Bankruptcy Code

23  and other law, including labor law and ERISA; and they

24  ultimately involve numerous important judgment calls that in

25  the first instance the debtor must make in consultation with

1    key constituencies in the case, and that ultimately I must

2    make when the debtor goes to seek approval of what it has

3    negotiated.  So those factors clearly call for the

4    appointment of an equity committee.

5          It is also argued that the debtors' management and

6    board is not actually representing the interests of the

7    shareholders as well as those of all of the other

8    constituencies for which they are fiduciaries; and, to some

9    extent, it is argued that they cannot represent those

10   interests.

11         As to the latter point, to the extent it's made, I

12   do not accept that analysis.  Clearly, the board of a public

13   company and its management owes a duty in a bankruptcy case

14   not only to the creditors, assuming that the debtor is

15   insolvent, but also to the shareholders.  And there is no

16   built-in bias there against shareholders.  As noted by Judge

17   Robinson in Edison Brothers Stores, 1996 Westlaw 534, 853

18   (District Court of Delaware, 1996), a movant needs to show

19   more than simply speculation as to such a conflict.

20         It's additionally argued that the very fact of the

21   complexity of this case and the debtors' natural desire to

22   resolve the case may lead the debtor to give short shrift to

23   shareholders' views.  That, I believe, has some merit to it;

24   and, frankly, the argument is, I believe, consistent with the

25   legislative history that I quoted earlier.

1        That's particularly the case here where there truly

2   are extremely difficult negotiations that the debtors must go

3   through.  And I believe that it is important for the debtors

4   to be fortified in those negotiations by the views of key

5   constituencies.  I believe that has occurred with regard to

6   the Creditors' Committee, as is reflected, I believe, by the

7   constructive relationship between the Creditors' Committee

8   and the debtors that I've viewed in this case.  I say

9   "constructive," rather than "hand-in-glove" because it is very

10  clear to me that the Creditors' Committee is nobody's patsy

11  by any means and makes its views known to the debtor very

12  clearly and forcefully, even if those views are unwelcome.

13        It's not particularly clear to me that that same

14  voice has been expressed by the shareholders.  Partly, that

15  is the fault of the shareholders, at least the sophisticated

16  ones.  For example, I am shocked that Appaloosa made this

17  motion and sent the threatening letter to the board that it

18  sent asserting the allegations that it made without once

19  communicating with the debtor.  And I'll return to that

20  later.

21        But Appaloosa, as Mr. Lauria stated, should not

22  really be the focus of a motion to appoint an official equity

23  committee, although Appaloosa's problems may be the focus of

24  who the U.S. Trustee appoints to a committee.

25        Now Appaloosa also alleges that there are actual

Court Decision                                                    172

1   conflicts over and above the debtor's tendency in a very

2   large and difficult case not to reach out to a constituency

3   that has not reached out to it.  Again, I have a hard time

4   seeing that.  I certainly do not see a level of actual

5   conflict at the level alleged by Appaloosa in what I again

6   believe was irresponsibly loose language.

7            There are really two bases for Appaloosa's

8   allegation.

9            The first is that because at the start of these

10  cases the debtors proposed what I feel free in calling a

11  generous KECP package that included an allocation of post-

12  reorganization equity to post-reorganization management,the

13  debtors' management--and to the extent the board approved the

14  KECP, the board--believes that management's interests are

15  different than shareholder interests.  I note, however, and

16  this, frankly, was obvious to Appaloosa, or at least should

17  have been, that that motion has been repeatedly adjourned and

18  tabled pending further negotiations with the creditors

19  committee, which as I said is nobody's patsy, and secondly,

20  is subject ultimately to my approval.

21           I also note that, traditionally, provisions for

22  allocation of post-reorganization equity for management are

23  dealt with in a plan that is voted upon by those entitled to

24  vote, and, generally, that is done because those entitled to

25  vote then see how they're being diluted.  Generally,

Court Decision                                                            173

1   notwithstanding some cases where shareholders recover

2   something in respect of their old equity, the major issuance

3   of post-reorganization equity in chapter 11 cases goes to the

4   creditors, and they are the ones who are usually most diluted

5   by such management incentive plans in respect of post-

6   reorganization equity.  In other words, I believe Appaloosa's

7   argument on this point is miscast and at best irrelevant and

8   I believe, again, almost willfully so.

9            Secondly, Appaloosa argues that the debtors' very

10  opposition to this motion shows that the debtors' management

11  and board have an actual conflict in representing the

12  interests of the shareholders, primarily because the debtors

13  have stated that for purposes of this motion, at this time,

14  they are clearly or hopelessly insolvent.  The debtors'

15  objection to the motion, to the contrary, is clearly in good

16  faith.  As Mr. Sheehan and Mr. Resnick testifed, the

17  debtors' goal is to maximize value for all constituencies.  I

18  might understand why an unsophisticated shareholder who did

19  not understand the limited issues and inquiries relevant to a

20  motion under section 1102(a)(2) might make the argument, but,

21  knowing Appaloosa's sophistication, I find this "actual

22  conflict" argument to be rhetoric.

23           As to the timing factor, because of the very serious

24  issues that the debtors are dealing with in these cases,

25  going to the heart of their business, this is to me obviously

1   not a simple balance sheet restructuring where the capital

2   structure simply needs to be adjusted because there's too

3   much funded debt on the books.

4           There are serious -- to use the debtors' phrase

5   "transformational issues" that have to be resolved here.

6   Because of that, I believe that this is the appropriate time

7   to move for an equity committee, and not to wait until later

8   in the day when a plan is actually being negotiated.

9           I also believe as a corollary to that, the function

10  of the equity committee and the makeup of its professional

11  advisors should be reflected by this timing.  As I'll say

12  later, again, I think this leads to the conclusion that

13  although it's not before me, except in my need to weigh the

14  cost of an equity committee's appointment, that it's unlikely

15  that I would approve the retention of investment bankers and

16  accountants or even actuaries at this time for an equity

17  committee, since those functions are not really the functions

18  that need to be performed at this time by an equity

19  committee.

20          So that in contrast, while in the Loral case I

21  believe that it was incumbent to have an equity committee, if

22  at all, towards the end of the case, here, I believe if it is

23  incumbent on there being an equity committee, this is the

24  time to have one formed.

25          It is even conceivable to me that if I did form an

1   equity committee now and it turned out that ultimately I

2   approved interim transformational solutions --

3   transformational solutions to the labor and related pension

4   and GM problems that the debtors face--it might be

5   appropriate to disband the equity committee because, in light

6   of those solutions, it might appear clearly at that time that

7   the debtor was hopelessly insolvent or at least that it was

8   likely that there would be no distribution to shareholders.

9           But because of the importance of those pending

10  issues, one could at least see a rationale for having an

11  equity committee with counsel in the near future to deal at

12  least with those transformational issues on behalf of the

13  shareholders.

14          Now, as far as whether the debtor is insolvent or

15  hopelessly insolvent or there is a likelihood of a meaningful

16  distribution to shareholders, I am at this time on this

17  record frankly skeptical that there will be a meaningful

18  distribution, but I'm not prepared to rule it out.  I say

19  that for a number of reasons.

20          First of all, it's undisputed that on a balance-

21  sheet basis, and it is correct that the movants' experts did

22  not disagree that on a balance sheet basis, the debtors'

23  operating -- most recent operating numbers comply with GAAP,

24  there is roughly a 6.3-billion-dollar hole, or insolvency.

25          The question, obviously, is how does one fill that

1    hole or bridge that gap?

2           Although Appaloosa's experts made some effort to do

3    it on the asset side, my review of their analysis is that

4    they have not in any meaningful respect convinced me on the

5    asset side of the balance sheet or in their going-concern

6    value, their enterprise value before deductions, that they

7    have -- they have established a credible case to do so.

8           When you really boil it down, giving the benefit of

9    the doubt to why and how the admitted one-billion-two-dollar

10   -- two-hundred-million-dollar error was corrected by Eureka,

11   what Eureka did was essentially look at the debtors' 2005

12   actual performance and annualize the debtors' actual

13   performance for the first 115 days of 2006 for an EBITDA

14   figure that they then multiplied by two different multiples.

15          I believe Mr. Sheehan's testimony as to why,

16   particularly in respect of the annualization of the first

17   quarter of 2006, Eureka's process was materially if not

18   perhaps fatally flawed, in respect of the Eureka expert's

19   analysis of why the debtors did better in the first quarter

20   of 2006 and what the debtors' properly projected earnings

21   should be.

22          Clearly, to me, Mr. Sheehan's explanation of the

23   debtors' analysis of their projected business with GM and the

24   reason for the potential front-loading of income in 2006 was

25   credible and accounted for the difference between the

1    bottoms-up projections that the debtors did and the

2    effectively back-of-the-envelope calculation that Eureka did

3    in respect of EBITDA, and I say "back of the envelope"

4    because,  frankly, given the billion-two error on its March

5    10th report, that's all Eureka was really left with: applying

6    a multiple to 2005 and the first quarter actual numbers of

7    2006 without proper analysis of why those figures can be

8    relied upon as the basis for projected EBITDA.

9          I do recognize, however, that Mr. Sheehan

10   acknowledged that it is possible that the debtor's balance-

11   sheet numbers on the asset side might be higher.  It's my

12   experience, and I think most people's experience who've dealt

13   with Chapter 11 debtors for a lengthy period, that that's

14   hardly ever the case.  Almost invariably, the balance sheet

15   overstates the assets, but that's Mr. Sheehan's belief, and

16   he has clearly been through an intensive analysis of the

17   business on a bottoms-up basis and I accept his statement.

18         Now, on the balance sheet liability side, which is

19   most -- where most of the dispute arises, I've considered the

20   testimony of Messrs. Reese and Williams.  And, frankly, I

21   believe that it's very hard on the record to find any exact

22   number as far as what would be the appropriate net savings in

23   respect of OPEB liabilities after the debtors resolve their

24   transformational issues.

25         Clearly, Appaloosa's argument that the OPEB

1   liabilities go away because the collective bargaining

2   agreements go away in 2007 is -- well, it's almost laughable.

3   The unions aren't going away, and the employees aren't going

4   away without being paid for giving up those rights or having

5   them reinstated in some form.

6          So all the parties recognize that there is a price

7   to resolve those liabilities, including Appaloosa.  The issue

8   is how much of a price has to be paid and how much of a

9   savings can the debtors generate.  I find it hard to believe

10  that despite all of their efforts and all of an equity

11  committee's efforts, there will be a material recovery for

12  shareholders in light of those OPEB negotiations, but the

13  company doesn't preclude it as a possibility.  There are

14  scenarios in which it could occur.  That's agreed to by both

15  sides in this proceeding.

16         And, therefore, while Eureka's March 10th report, as

17  corrected for the billion-two error, still shows on even the

18  most optimistic basis a two-hundred-and-thirty-four-million-

19  dollar insolvency hole, given the huge amounts at stake here

20  in respect of the labor negotiations--and we're talking about

21  potential savings of billions of dollars, I know it's hard to

22  believe it, but $234 million may not be that big of a gap, at

23  least on today's record.

24         I also looked, of course, as Judge Lifland did and

25  Judge Hillman did and other courts have done in connection

Court Decision                                                    179

1   with motions under 1102(a)(2), at the trading prices of the

2   debtors' securities when evaluating the debtors' solvency.

3          It's common knowledge that the market in distressed

4   debt and to some extent distressed stock, but more -- more

5   the case of distressed debt, is large, indeed, huge, and

6   active, particularly with respect to public companies such as

7   Delphi.  That is reflected among other things by the numerous

8   Wall Street analysts' reports covering the debt introduced

9   here.

10         There's uncontroverted evidence that Delphi's public

11  debt has consistently traded since the petition date at or

12  below sixty cents on the dollar.  The courts at times have,

13  although not accepting as controlling the trading prices of

14  debt securities, consistently looked at trading prices in the

15  debtors' securities as a indication in this type of summary

16  proceeding of value.

17         Courts obviously know, at least this Court knows,

18  that people engage in a market because they're making various

19  bets on the value of securities.  Some are betting that it's

20  a good idea to sell, and some are betting it's a good idea to

21  buy.  Generally, it's an active market; and, generally,

22  active markets are a good indication of value because there

23  are both buyers and sellers at reasonably arm's length

24  bargaining positions.

25         However, of course, those markets are not guarantees

1   of value.  That's why some analysts get fired and some get

2   promoted.  Market security trading price indicators are most

3   telling where they're quite low, where they're in my

4   experience below or well below fifty cents on the dollar,

5   particularly in respect of cases that are in all likelihood

6   going to be resolved one way or another in a fairly short

7   term, and, in the life of a chapter 11 case of a large

8   company, fairly short term is around a year.

9         It's clear to me and it's been clear from the start

10  of these cases that although the debtors are pushing these

11  cases, appropriately so, as fast as they can, this is a

12  longer term process.  They project emergence from bankruptcy

13  in 2007, although they are doing everything they can to

14  emerge sooner than that.

15        Given that, I am not particularly moved either way

16  by the trading ratios or prices.  Mr. Lauria is correct that

17  anyone buying distressed debt is looking for a large return

18  to make up for the risk, particularly where the debt is

19  unsecured, and so it's conceivable that a sixty-percent-on-

20  the-dollar level, while obviously not suggesting solvency,

21  may indicate at least a hope of solvency.

22        This is, for example, different than the trading

23  levels in Loral, which were considerably lower, or in

24  Williams, which were at 15% to 6% of face value.

25        So, all things considered, in respect of the

1   solvency analysis, at this point in the case, I cannot find

2   that appointing an equity committee would be a gift.  On the

3   other hand, I am very mindful of the cost to these estates of

4   an equity committee.

5           Some cost clearly is legitimate.  The whole reason

6   you have an equity committee is that the estate bears the

7   cost.  On the other hand, the way that this litigation has

8   been conducted, I mean this litigation in front of me right

9   now, by Appaloosa, gives me very serious pause as to whether

10  the cost ultimately will be appropriate in this case.

11          Now, Appaloosa says I can regulate that by looking

12  at fee applications and the like, but, to some extent, once

13  an equity committee is appointed the cat is out of the bag,

14  and so I have thought very long and hard about whether the

15  cost factor here should lead me not to appoint a committee.

16          I can say this, that I will look very carefully at

17  fee applications of any counsel that is chosen to represent a

18  committee.  I also will look very carefully at whether the

19  continued incurrence of fees is appropriate at various stages

20  in the case where the picture on valuation becomes clearer.

21          But, ultimately, standing alone, as I do believe

22  that I can perhaps with the help of the United States Trustee

23  control costs, the costs alone are not in my mind

24  dispositive, although they are a major factor here calling --

25  arguing that I should not appoint a committee.

1          The last point which is raised by some courts, it's

2      specifically raised by Judge Case in the <u>Northwestern</u>

3      opinion, is that at least Appaloosa went into this bankruptcy

4      case with its eyes wide open.  Judge Case thought that was a

5      clear factor calling for denial of the motion.  And of course

6      the ability of certain shareholders to fund their own

7      professionals also is clearly a factor arguing against a

8      committee.  See <u>Williams</u>, 281 B.R. at 223.

9          If this were a relatively small pool of

10     shareholders, I would -- I would obviously do the same.  I

11     don't think the fact that Brandes has joined in the motion

12     particularly helps Appaloosa's cause, because Brandes is

13     obviously very well-heeled, very sophisticated and is well

14     represented by another large national firm with a bankruptcy

15     practice.

16         However, I go back to the first point I made.  There

17     are over 300,000 shareholders here.  Given the rapid change

18     in their fortunes from June of 2005 to today, it's fair for

19     me, I think, to assume that some of them may be in the

20     investor equivalent of a state of shock or disbelief and that

21     that's why they're not showing up here today.

22         It seems to me, again, that given the important

23     transformative events that will be taking place in this

24     company through this bankruptcy case over the next few

25     months, it's important to give those people representation,

1    and if a committee is formed that adequately represents them,

2    then I think that they're entitled to it within the

3    parameters that I've already described.

4           Now, in discussing or mentioning the abrupt changes

5    that have taken place in the fortunes of this company, I do

6    not want to suggest, as Appaloosa, I think, has, that the

7    company has done something over the last several months

8    between June of 2005 and today or even between June of 2005

9    and October when it filed for bankruptcy that is somehow

10   nefarious or improper in respect of its business or its

11   shareholders.

12          I think it's irresponsible to suggest that.

13   Clearly, this company has extremely difficult problems to

14   resolve.  To suggest that it should have spent all of its

15   cash on hand before filing to resolve those problems, to

16   suggest that it should continue with the steady-state

17   projections, which even Appaloosa recognized would lead to

18   the destruction of the debtors' business is absurd and was

19   truly a waste of this Court's time, and, frankly, for those

20   who are not particularly sophisticated and read such

21   allegations in the press, again, Appaloosa's argument or

22   insinuation in this regard was a truly irresponsible attack

23   on the company.

24          So I will order the appointment of an official

25   equity committee.  I'm going to be very clear as to the -- my

Court Decision                                                    184

1    expectation as to at least the -- my initial reaction to a

2    request by that committee for retention of professionals.

3           I do not believe that the proper functioning of a

4    committee of equityholders at this time calls for the

5    appointment and retention of investment bankers, accountants

6    or actuaries, and a premise -- a fundamental premise of my

7    ruling is that I would not appoint such parties,

8    professionals at this time.

9           What an equity committee needs to do is to

10   understand through its own members' expertise, and I trust

11   that there will be sophisticated parties like Brandes on the

12   committee, and through the assistance of its counsel, the

13   pressing issues of this case in respect of labor, pension,

14   other benefits and GM.

15          It needs to be informed, it needs to give the debtor

16   its views so that they can be taken into account as the

17   debtor proceeds.

18          To the extent that it feels it needs to do due

19   diligence on actuarial assumptions, I believe an appropriate

20   arrangement can be worked out with regard to using the

21   creditors committee's actuaries.

22          I do not expect an equity committee or its

23   professionals to try to inject themselves into the extremely

24   sensitive negotiations that are ongoing between the debtors,

25   the unions, GM and other parties in the labor transformation

1    issue process.

2            They should be able, however, again, to communicate

3    their views to the debtor and be able to be reasonably

4    informed as to the process so that they can make a

5    determination as to whether to oppose or support it whenever

6    an agreement is brought to the Court.

7            It's very clear that one function of a committee may

8    require the committee at times to take an adversarial role in

9    a case.  However, I believe that consistent with all the case

10   law that I've just cited, it is not proper for an equity

11   committee to view its job as one to create leverage by being

12   a thorn in everyone's side.

13           If the equity committee is not engaged in a two-way

14   dialogue with the debtor, I will believe, and I will act on a

15   motion that contends that, the committee is dysfunctional and

16   disband it.

17           I will also look very closely, and I know that the

18   United States Trustee will look very closely, at any

19   suggestion that the equity committee is taking action in

20   court or otherwise not to maximize recoveries for all

21   committee constituents, but instead to artificially pump up

22   the value of the current stock on a trading basis.

23           I am very concerned about the potential that that

24   has already happened in this case--not by an official

25   committee and obviously not by an equity committee, because

1  one has not been appointed, but by parties involved in this

2  litigation, and I will look at the facts closely, and I've

3  already looked closely at the facts of the apparent release

4  of confidential information.

5        And, having looked at those facts, I continue to

6  have serious questions about that apparent release, and if,

7  in fact, Appaloosa applies to be a member of this committee,

8  I direct the U.S. Trustee to investigate those facts.

9        In short, the equity committee needs to be

10  responsible in looking after the interests of the equity-

11  holders as a group, and I trust it will do so.

12        So, Mr. Lauria, you can submit an order to that

13  effect.

14        COUNSEL:  Thank you, Your Honor.  Thank you, Your

15  Honor.

16        THE COURT:  Thank you.

17     (Proceedings concluded at 7:17 p.m.)

18                        CERTIFICATION

19        We certify that the foregoing is a correct

20  transcript from the electronic sound recording of the

21  proceedings in the above-entitled matter to the best of our

22  knowledge and ability, except where, as indicated, the Court

23  has modified its bench ruling.

24  _____                March 23, 2006
    Coleen Rand
25  Certified Court Transcriptionist/Agency Director
    Rand Transcript Service, Inc.

1   _____              March 23, 2006
    Jennifer Linnartz
2   Certified Court Transcriptionist
    For Rand Transcript Service, Inc.

3
                                               March 23, 2006
    _____
4   Cathryn Lynch
    Certified Court Transcriptionist
5   For Rand Transcript Service, Inc.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25