United States Bankruptcy Court
Southern District of Texas

**ENTERED**

March 01, 2023

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| *In re:* | ) | Chapter 11 |
|  | ) |  |
| Core Scientific, Inc., *et al.*,[1] | ) | Case No. 22-90341 (DRJ) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | Re: Docket Nos. 130, 389, 390, 391, 447, 573 and 579 |

**FINAL ORDER (I) AUTHORIZING THE DEBTORS TO
(A) OBTAIN SENIOR SECURED NON-PRIMING SUPERPRIORITY
REPLACEMENT POSTPETITION FINANCING AND
(B) USE CASH COLLATERAL, (II) GRANTING LIENS AND
PROVIDING CLAIMS WITH SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS, (III) MODIFYING
THE AUTOMATIC STAY AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "***Motion***")[2] of Core Scientific, Inc. ("***Core Scientific***") and each of its affiliates that are debtors and debtors in possession (collectively, the "***Debtors***") in the above-captioned chapter 11 cases (the "***Chapter 11 Cases***"), pursuant to sections 105, 361, 362, 363, 364, 503, 506, 507 and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "***Bankruptcy Code***"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR, LLC (5106); American Property Acquisition I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion, the Interim Order (as defined herein) and the Replacement DIP Loan Documents (as defined herein), as relevant.

Procedure (the "**Bankruptcy Rules**"), and Rules 2002-1, 4001-1(b), 4002-1 and 9013-1 of the

Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas

and the Procedures for Complex Chapter 11 Bankruptcy Cases (together, the "**Local Bankruptcy**

**Rules**") promulgated by the United States Bankruptcy Court for the Southern District of Texas,

Houston Division (the "**Court**"), seeking entry of this final order (this "**Final Order**"), among

other things:

> (a)     authorizing the Debtors to obtain replacement postpetition financing on a
> superpriority, non-priming, senior secured basis (the "**Replacement DIP Facility**,"
> and the loans made or advanced thereunder, the "**Replacement DIP Loans**") in the
> form of a multiple-draw term-loan facility in an aggregate principal amount of up
> to $70 million (the "**Replacement DIP Facility**"), pursuant to which (i) an
> aggregate principal amount of $35 million was borrowed (the "**Interim DIP**
> **Borrowing**") in a single borrowing on the Closing Date, and (ii) following entry of
> this Final Order, the remaining aggregate principal amount under the Replacement
> DIP Facility shall be available, in one or more borrowings (each such borrowing,
> including the Interim DIP Borrowing, a "**DIP Borrowing**," and, collectively, the
> "**DIP Borrowings**"), and, in each case, in accordance with and subject to the terms
> and conditions (including any conditions precedent to each of the DIP Borrowings)
> set forth in that certain *Senior Secured Super-Priority Replacement Debtor-in-*
> *Possession Loan and Security Agreement* substantially in the form attached hereto
> as <u>Exhibit 1</u> (as may be amended, amended and restated, supplemented, or
> otherwise modified from time to time in accordance with the terms hereof and
> thereof, the "**Replacement DIP Credit Agreement**") and together with all other
> agreements, guarantees, pledge, collateral and security agreements, mortgages,
> deeds, charges, control agreements, instruments, certificates, notes, any separate
> fee letter agreements between any of the Debtors, on the one hand, and the
> Replacement DIP Agent and/or the Replacement DIP Lender, on the other hand,
> and other documents executed, filed and/or delivered in connection therewith,
> including the "**Loan Documents**" (as defined in the DIP Loan Agreement) (each as
> amended, amended and restated, supplemented, or otherwise modified from time
> to time in accordance with the terms hereof and thereof, together with the DIP Loan
> Agreement, collectively, the "**Replacement DIP Loan Documents**"), by and
> among each of the Debtors, as borrowers (the "**Replacement DIP Borrowers**"),
> each of the direct and indirect subsidiaries of Core Scientific that are or become
> debtors in the Chapter 11 Cases, as guarantors (collectively, the "**Replacement DIP**
> **Guarantors**," and together with the Replacement DIP Borrowers, the
> "**Replacement DIP Loan Parties**"), B. Riley Commercial Capital, LLC, as
> administrative agent and collateral agent (in such capacities, together with its
> successors and permitted assigns, the "**Replacement DIP Agent**"), and the lender

party thereto (the "**_Replacement DIP Lender_**," and together with the Replacement DIP Agent, the "**_Replacement DIP Secured Parties_**") and this Final Order.

(b)     authorizing the Replacement DIP Loan Parties to (i) execute, deliver, and perform under the Replacement DIP Credit Agreement and each of the Replacement DIP Loan Documents, (ii) incur all loans (including, for the avoidance of doubt, the accrual of interest paid-in-kind), advances, extensions of credit, financial accommodations, indemnification and reimbursement obligations and other obligations, and pay all principal, interest, premiums, fees, costs, expenses, charges and all other amounts payable under the Replacement DIP Loan Documents, whenever the same shall become due or payable, whether at stated maturity, by prepayment, declaration, acceleration or otherwise, in each case, in accordance with the Replacement DIP Loan Documents and this Final Order (collectively, the "**_Replacement DIP Obligations_**"), and (iii) perform such other and further acts as may be necessary, required or desirable to implement and effectuate the terms of this Final Order, the Replacement DIP Loan Documents and the transactions contemplated hereunder and thereunder;

(c)     authorizing the Replacement DIP Borrowers to incur, and the Replacement DIP Guarantors to jointly and severally guarantee, all DIP Obligations, in accordance with this Final Order and the Replacement DIP Loan Documents;

(d)     granting to the Replacement DIP Agent, for the benefit of itself and the other Replacement DIP Secured Parties, the DIP Liens (as defined below) in all DIP Collateral (as defined below), as set forth in this Final Order, subject to the Carve-Out and subject to the relative priorities set forth in this Final Order;

(e)     granting to the Replacement DIP Agent, for the benefit of itself and the other Replacement DIP Secured Parties, allowed super-priority administrative expense claims against each of the Debtors, on a joint and several basis, in respect of all Replacement DIP Obligations, subject in each case to the Carve-Out, as set forth in this Final Order;

(f)     authorizing the Debtors to use the proceeds of the Replacement DIP Facility, the DIP Collateral and the Prepetition Secured Notes Collateral (as defined below), including Cash Collateral (as defined below), solely in accordance with the terms and conditions set forth in this Final Order and the Replacement DIP Loan Documents, including the Approved Budget (as defined below), subject to any variances expressly permitted under Replacement DIP Loan Documents (the "**_Permitted Variances_**");

(g)     granting adequate protection to the extent set forth in this Final Order to the Prepetition Secured Parties (as defined below) to protect against any Diminution in Value (as defined below) of their respective Prepetition Secured Notes Liens (as defined below) in the Prepetition Secured Notes Collateral (including Cash Collateral);

-3-

(h)     approving certain stipulations, waivers, and releases by the Debtors with respect to, *inter alia*, (i) the Replacement DIP Secured Parties, the Replacement DIP Loan Documents, the DIP Liens, the Replacement DIP Obligations and the DIP Collateral, (ii) the Original DIP Agent, the Original DIP Lenders, the Original DIP Loan Documents and the Original DIP Obligations, and (iii) the Prepetition Secured Parties, the Prepetition Secured Notes Documents, the Prepetition Secured Notes Liens, the Prepetition Secured Notes Obligations (each as defined below), in each case, subject to the terms and provisions of this Final Order;

(i)     approving the Debtors' waiver of the right to surcharge the DIP Collateral as to the DIP Secured Parties, and the Prepetition Secured Notes Collateral as to the Prepetition Secured Parties, pursuant to section 506(c) of the Bankruptcy Code or otherwise, in each case, upon the terms set forth in this Final Order;

(j)     approving the Debtors' waiver of the (i) equitable doctrine of "marshaling" and other similar doctrines with respect to the DIP Collateral as to the Original DIP Agent and the Original DIP Lenders and the Replacement DIP Secured Parties, and (ii) equitable doctrine of "marshaling" and other similar doctrines, and the Debtors waiver of any "equities of the case exception" under section 552(b) of the Bankruptcy Code, with respect to the Prepetition Secured Notes Collateral as to the Prepetition Secured Parties, in each case, upon the terms set forth in this Final Order; and

(k)     modifying or vacating the automatic stay imposed by sections 105(a) and 362 of the Bankruptcy Code or otherwise, to the extent necessary, required or desirable to implement and effectuate the terms and provisions of this Final Order and the Replacement DIP Loan Documents, as set forth herein, waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of this Final Order, providing for the immediate effectiveness of this Final Order, and granting related relief.

The Court, having considered the evidence submitted and arguments proffered or adduced at the interim hearing held before this Court on December 22, 2022, and the Court having entered the *Interim Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims With Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 130] on December 23, 2022 (the "**Original Interim Order**") authorizing and approving the Original DIP Facility on an interim basis.

-4-

The Court further having considered the Motion, the Replacement DIP Term Sheet (as defined therein), the Commitment Letter, the *Declaration of Michael Bros in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 5] (the "**First Day Declaration**"), the *Declaration of John Singh in Support of Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Replacement Senior Secured Non-Priming Replacement Superpriority Postpetition Financing, (B) Use Cash Collateral, and (C) Pay Off Existing Postpetition Financing Facility, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 390] (the "**Singh Declaration**"), and the *Declaration of Rodi Blokh in Support of the Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Replacement Senior Secured Non-Priming Superpriority Postpetition Financing, (B) Use Cash Collateral, and (C) Pay Off Existing Postpetition Financing Facility, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 391] (the "**Blokh Declaration**" and together with the Singh Declaration, the "**DIP Declarations**") the evidence submitted and arguments proffered or adduced at the interim hearing held before this Court on February 1, 2023 (the "**Interim Hearing**"), and the Court having entered the *Order (I) Authorizing the Debtors on an Interim Basis to (A) Obtain Senior Secured Non-Priming Superpriority Replacement Postpetition Financing and (B) Use Cash Collateral, (II) Authorizing the Debtors to Refinance Existing Postpetition Financing on a Final Basis, (III) Granting Liens and Providing Claims with Superpriority Administrative*

-5-

*Expense Status, (IV) Granting Adequate Protection to the Prepetition Secured Parties on a Final Basis, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (Docket No. 447) (the "***Interim Order***") and upon the record of the Chapter 11 Cases; and due and proper notice of the Final Hearing having been given in accordance with Bankruptcy Rules 4001 and 9014 and all applicable Local Bankruptcy Rules; and it appearing that no other or further notice need be provided; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; the Court having determined that the legal and factual bases set forth in the Motion and at the Interim Hearing and at the Final Hearing established just cause for the relief granted herein; and it appearing to the Court that granting the final relief requested in the Motion, as provided in and modified by this Final Order is necessary to avoid irreparable harm to the Debtors and their estates and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, their creditors, and all other parties in interest, represents a sound exercise of the Debtors' business judgment, is necessary for the continued operation of the Debtors' businesses and is necessary to preserve and maximize the value of the Debtors and their estates; and the Debtors having provided notice of the Motion as set forth in the Motion; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

-6-

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]**

A.       *Petition Date.* On December 21, 2022 (the "***Petition Date***"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court commencing these Chapter 11 Cases.

B.       *Debtors in Possession.* The Debtors continue to manage and operate their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in any of the Chapter 11 Cases.

C.       *Committee Formation.* On January 9, 2023, the Office of the United States Trustee (the "***U.S. Trustee***") appointed the Official Committee of Unsecured Creditors (the "***Official Committee***") pursuant to section 1102 of the Bankruptcy Code [Docket No. 256].

D.       *Jurisdiction and Venue.* This Court has jurisdiction over the Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334. This Court's consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b). Venue for these Chapter 11 Cases and the proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The predicates for the relief set forth herein are sections 105, 361, 362, 363, 364, 503, 506, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Bankruptcy Rule 4001-2.

E.       *Debtors' Stipulations, Releases and Acknowledgements with Respect to Replacement DIP Lender.* In exchange for and as a material inducement to the Replacement DIP

---

[3]       The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

Secured Parties to provide the Replacement DIP Facility, after consultation with their attorneys and advisors, the Debtors, on behalf of themselves and their estates, hereby admit, stipulate, acknowledge and agree as follows (without prejudice to the rights of the Official Committee and other parties in interest in paragraph 23 of this Final Order (subject to the limitations set forth therein)):

      (a)     *Prepetition Unsecured Bridge Notes*.

      (i)     *Bridge Notes*. Core Scientific has issued, (x) to BRF Finance Co, LLC, as holder (the "*$60M Bridge Noteholder*") of that certain $60,000,000 Bridge Promissory Note dated April 7, 2022 (the "*$60M Bridge Note*") and (y) to B. Riley Commercial Capital, LLC, as holder (the "*$15M Bridge Noteholder*", and together with the $60M Bridge Noteholder, the "**Bridge Noteholders**") of that certain $15,000,000 Bridge Promissory Note dated April 7 2022, (the "*$15M Bridge Note*," and together, with the $60M Bridge Note, collectively, as amended, restated or otherwise modified from time to time, the "**Bridge Notes**"). In connection with the Bridge Notes, Core Scientific and B. Riley Securities, Inc. executed that certain Fee Letter, dated as of April 7, 2022 (the "*Fee Letter*," and together with all other agreements, instruments, certificates, and other documents executed and/or delivered in connection the Bridge Notes, the "**Bridge Note Documents**").

      (ii)     *Bridge Note Obligations*. As of the Petition Date, Core Scientific was justly and lawfully indebted to (x) the $60M Bridge Noteholder in the aggregate amount of approximately $33,661,657 on account of principal amounts outstanding under the Bridge Note Documents and to (y) the $15M Bridge Noteholder in the aggregate amount of approximately $8,415,414 on account of principal amounts outstanding under the Bridge Note Documents, each of the foregoing items (x) and (y) respectively, without defense, claim, counterclaim, challenge or offset of any kind, plus accrued but unpaid interest thereon, plus all fees, costs, expenses (including attorneys', financial advisors' and other professionals' fees and expenses, as relevant), charges, disbursements, indemnification and reimbursement obligations (contingent or otherwise), and all other amounts that may be due or owing under the Bridge Note Documents (collectively, the "**Bridge Note Obligations**").

      (b)     *Validity and Enforceability of the Bridge Note Obligations*. As of the date hereof, (i) the Bridge Note Obligations constitute legal, valid, binding and non-avoidable obligations of Core Scientific, enforceable in accordance with the terms of the Bridge Note Documents; (ii) no challenges, objections, defenses, claims or counterclaims of any kind or nature whatsoever with respect to any of Bridge Note Obligations exist, and no portion of the Bridge Note Obligations is subject to any challenge, defense or claim (as defined in section 101(5) of the Bankruptcy Code) of any kind or nature whatsoever, including, without limitation, avoidance (whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act,

WEIL:\99035730\3\39031.0014

Uniform Fraudulent Conveyance Act or similar statute or common law)), reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, or recovery, in each case, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise; (iii) the Debtors waive, discharge, and release any right to challenge the enforceability or validity of any of the Bridge Note Obligations; and (iv) the Bridge Note Obligations constitute allowed claims within the meaning of section 502 of the Bankruptcy Code against Core Scientific and its respective estate.

(c)     *No Claims, Defenses, or Causes of Action against Replacement DIP Secured Parties*. As of the date hereof, there exists no challenge, objection, defense, claim, counterclaim, or other cause of action, of any kind or nature whatsoever, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise, against any of the Replacement DIP Secured Parties or any of their respective officers, directors, members, managers, partners, equity holders, subsidiaries, affiliates, related parties, employees, investment advisors or managers, agents, attorneys, advisors, professionals (collectively, together with each of their successors and assigns, the "**Representatives**") (in their capacities as such) arising from, in connection with, or relating to the Interim Order or this Final Order.

(d)     *Releases*. Subject to paragraph 23 of this Final Order, effective as of the date of entry of this Final Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of its predecessors, successors and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits each of the Replacement DIP Secured Parties and each of their respective Representatives (in their capacities as such) from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, cross-claims, demands, defenses, objections, challenges, offsets or setoff, debts, accounts, contracts, liabilities, remedies, suits, controversies, actions, causes of action, losses, damages, indemnities, reimbursement obligations, attorneys' fees, costs, expenses or judgments, of every kind or nature whatsoever, whether matured or unmatured, known or unknown, asserted or unasserted, suspected or unsuspected, foreseen or unforeseen, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, pending or threatened, arising in law or equity, upon contract or tort, under the Bankruptcy Code, any state or federal common law, statute, rule, regulation or otherwise, in each case, that may be asserted by any of the Debtors, their respective estates, predecessors, successors or assigns, against the Replacement DIP Secured Parties or their respective Representatives (in their capacities as such) for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time prior to the date of this Final Order, in each case, arising under, in connection with, or related to the Interim Order, this Final Order, the transactions contemplated thereunder or hereunder, or the negotiation thereof or hereof, including any claim or cause of action seeking (i) any so-called lender liability, (ii) any and all claims arising under the Bankruptcy Code, whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or (iii) reduction, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling,

-9-

surcharge or recovery, or any other related claim or cause of action with respect to the validity, enforceability, priority, scope, extent or perfection of the DIP Liens, the Replacement DIP Obligations, or the Replacement DIP Loan Documents (as relevant).

F. *Debtors' Stipulations, Releases and Acknowledgements with Respect to Prepetition Secured Parties.* In exchange for and as a material inducement to the use of Cash Collateral that constitutes Prepetition Secured Notes Collateral, after consultation with their attorneys and advisors, the Debtors, on behalf of themselves and their estates, hereby admit, stipulate, acknowledge and agree as follows (without prejudice to the rights of the Official Committee and other parties in interest in paragraph 23 of this Final Order (subject to the limitations set forth therein)) (collectively, the admissions, stipulations, and acknowledgments and agreements set forth in paragraphs E and F of this Final Order, the "**Debtors' Stipulations**"):

(a) *Prepetition April NPA Secured Notes.*

(i) *Prepetition April NPA.* Pursuant to (x) that certain Secured Convertible Note Purchase Agreement, dated as of April 19, 2021 (as amended, amended and restated, supplement or otherwise modified from time to time prior to the Petition Date, the "**Prepetition April NPA**"), by and among Core Scientific (f/k/a Core Scientific Holding Co.), the guarantors party thereto from time to time (the "**Prepetition April NPA Guarantors**," and together with Core Scientific, the "**Prepetition April NPA Notes Obligors**"), the "Initial Purchasers" and any "Additional Purchasers" party thereto from time to time (collectively, the "**Prepetition April NPA Secured Noteholders**") and U.S. Bank National Association, as note agent and collateral agent (in such capacities, the "**Prepetition April NPA Agent**," and together with the Prepetition April NPA Secured Noteholders, the "**Prepetition April NPA Secured Parties**"), and (y) all other agreements, guarantees, pledge, collateral and security documents, instruments, certificates, promissory notes and other documents executed and/or delivered in connection therewith, including, without limitation, all "Note Documents" (as defined in the Prepetition April NPA) (collectively, together with the Prepetition April NPA, the "**Prepetition April NPA Documents**"), Core Scientific issued secured convertible notes (the "**Prepetition April NPA Secured Notes**"), and each of the Prepetition April NPA Guarantors, among other things, jointly and severally, irrevocably and unconditionally guaranteed the due and punctual payment and performance in full in cash of all Prepetition April NPA Secured Notes Obligations (as defined below).

(ii) *Prepetition April NPA Secured Notes Obligations.* As of the Petition Date, the Prepetition April NPA Notes Obligors were justly and lawfully indebted to the Prepetition April NPA Secured Parties, on a joint and several basis, without defense, claim, counterclaim, challenge or offset of any kind, in the aggregate amount of approximately

-10-

$239.6 million on account of principal amounts outstanding[4] under the Prepetition April NPA Secured Notes, plus accrued but unpaid interest thereon, plus all fees, costs, expenses (including attorneys', financial advisors' and other professionals' fees and expenses), charges, disbursements, indemnification and reimbursement obligations (contingent or otherwise), including all "Obligations" (as defined in the Prepetition April NPA) and all other amounts that may be due or owing under the Prepetition April NPA Documents (collectively, the "***Prepetition April NPA Secured Notes Obligations***").

        (b)    *Prepetition August NPA Secured Notes*.

        (i)    *Prepetition August NPA*. Pursuant to (x) that certain Secured Convertible Note Purchase Agreement, dated as of August 20, 2021 (as amended, amended and restated, supplement or otherwise modified from time to time prior to the Petition Date, the "***Prepetition August NPA***"), by and among Core Scientific (f/k/a Core Scientific Holding Co.), the guarantors party thereto from time to time (the "***Prepetition August NPA Guarantors***," and together with Core Scientific, the "***Prepetition August NPA Notes Obligors***"), the "Initial Purchasers" and any "Additional Purchasers" party thereto from time to time (collectively, the "***Prepetition August NPA Secured Noteholders***") and U.S. Bank National Association, as note agent and collateral agent (in such capacities, the "***Prepetition August NPA Agent***," and together with the Prepetition August NPA Secured Noteholders, the "***Prepetition August NPA Secured Parties***"), and (y) all other agreements, guarantees, pledge, collateral and security documents, instruments, certificates, promissory notes and other documents executed and/or delivered in connection therewith, including, without limitation, all "Note Documents" (as defined in the Prepetition August NPA) (collectively, together with the Prepetition August NPA, the "***Prepetition August NPA Documents***"), Core Scientific issued convertible notes (the "***Prepetition August NPA Secured Notes***"), and each of the Prepetition August NPA Guarantors, among other things, jointly and severally, irrevocably and unconditionally guaranteed the due and punctual payment and performance in full in cash of all Prepetition August NPA Secured Notes Obligations (as defined below).

        (ii)    *Prepetition August NPA Secured Notes Obligations*. As of the Petition Date, the Prepetition August NPA Notes Obligors were justly and lawfully indebted to the Prepetition August NPA Secured Parties, on a joint and several basis, without defense, claim, counterclaim, challenge or offset of any kind, in the aggregate amount of approximately $325.9 million on account of principal amounts outstanding under the Prepetition August NPA Secured Notes, plus accrued but unpaid interest thereon, plus all fees, costs, expenses (including attorneys', financial advisors' and other professionals' fees and expenses), charges, disbursements, indemnification and reimbursement obligations (contingent or otherwise), including all "Obligations" (as defined in the Prepetition August NPA) and all other amounts that may be due or owing

---

[4]    The Prepetition April NPA Secured Parties assert an additional $84.2 million in Prepetition April NPA Secured Notes Obligations in accreted amounts. The Official Committee and the ad hoc group of equity holders dispute such entitlement.

WEIL:\99035730\3\39031.0014

under the Prepetition August NPA Documents (collectively, the "***Prepetition August NPA Secured Notes Obligations***").

(c)     *Validity and Enforceability of Prepetition Secured Notes Obligations and Prepetition Secured Notes Liens*. As of the Petition Date, (i) the Prepetition Secured Notes Liens in the Prepetition Secured Notes Collateral (A) are legal, valid, binding, enforceable, non-avoidable and fully perfected liens and security interests in the Prepetition Secured Notes Collateral (except with respect to cash held in the Debtors' deposit accounts that do not otherwise represent identifiable proceeds of Prepetition Secured Notes Collateral), (B) were granted to or for the benefit of the Prepetition Secured Parties for fair consideration and reasonably equivalent value, and (C) are senior with priority over any and all other liens or security interests in the Prepetition Secured Notes Collateral, subject only to certain liens and security interests that were valid, non-avoidable and properly perfected as of the Petition Date (or were properly perfected subsequent to the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code) and senior in priority by operation of law to the Prepetition Liens in the Prepetition Secured Notes Collateral as of the Petition Date (the "***Existing Senior Liens***");[5] (ii) the Prepetition Secured Notes Obligations constitute legal, valid, binding and non-avoidable obligations of each of the Prepetition Secured Notes Obligors, enforceable in accordance with the terms of the applicable Prepetition Secured Notes Documents; (iii) no challenges, objections, defenses, claims or counterclaims of any kind or nature whatsoever with respect to any of the Prepetition Secured Notes Liens or the Prepetition Secured Notes Obligations exist, and no portion of the Prepetition Secured Notes Liens or the Prepetition Secured Notes Obligations is subject to any challenge, defense or claim (as defined in section 101(5) of the Bankruptcy Code) of any kind or nature whatsoever, including, without limitation, avoidance (whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge or recovery, in each case, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise; (iv) the Debtors waive, discharge, and release any right to challenge the enforceability, validity, priority or perfection of any of the Prepetition Secured Notes Obligations or the Prepetition Secured Notes Liens; and (v) the Prepetition Secured Notes Obligations constitute allowed secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code against each of the Prepetition Secured Notes Obligors and their respective estates.

---

[5]     Nothing contained herein shall constitute a finding or ruling by this Court that any alleged Existing Senior Lien is valid, senior, enforceable, prior, perfected or non-avoidable. Moreover, nothing contained herein shall prejudice the rights of any party in interest, including, but not limited to the Debtors, the Replacement DIP Secured Parties, the Prepetition Secured Parties, or the Official Committee, in each case, to the extent such party has standing to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any alleged Existing Senior Lien (subject to the terms of this Final Order). For the purposes hereof, any alleged claim arising or asserted as a right of reclamation or return (whether asserted under section 546(c) of the Bankruptcy Code or otherwise) is not an Existing Senior Lien.

-12-

(d) *No Claims, Defenses, or Causes of Action against Prepetition Secured Parties*. As of the date hereof, there exists no challenge, objection, defense, claim, counterclaim, or other cause of action, of any kind or nature whatsoever, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise, against any of the Prepetition Secured Parties or any of their Representatives (in their capacities as such) arising from, in connection with, or relating to the Interim Order, this Final Order, the Original Interim Order, the Prepetition Secured Notes Liens, the Prepetition Secured Notes Obligations, the Prepetition Secured Notes Documents or the Prepetition Secured Notes Collateral.

(e) *Releases*. Subject to paragraph 23 of this Final Order, effective as of the date of entry of the Interim Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of its predecessors, successors and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits each of the Prepetition Secured Parties and each of their respective Representatives (in their respective capacities as such) from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, cross-claims, demands, defenses, objections, challenges, offsets or setoff, debts, accounts, contracts, liabilities, remedies, suits, controversies, actions, causes of action, losses, damages, indemnities, reimbursement obligations, attorneys' fees, costs, expenses or judgments, of every kind or nature whatsoever, whether matured or unmatured, known or unknown, asserted or unasserted, suspected or unsuspected, foreseen or unforeseen, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, pending or threatened, arising in law or equity, upon contract or tort, under the Bankruptcy Code, any state or federal common law, statute, rule, regulation or otherwise, in each case, that may be asserted by any of the Debtors, their respective estates, predecessors, successors or assigns, against the Prepetition Secured Parties or their respective Representatives (in their capacities as such) for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time prior to the date of this Final Order, in each case, arising under, in connection with, or related to the Interim Order, this Final Order, the Original Interim Order, the Prepetition Secured Notes, the Prepetition Secured Notes Liens, the Prepetition Secured Notes Collateral, the Prepetition Secured Notes Obligations, the Prepetition Secured Notes Documents, the Adequate Protection Obligations, the transactions contemplated thereunder or hereunder, or the negotiation thereof or hereof, including any claim or cause of action seeking (i) any so-called lender liability, (ii) any and all claims arising under the Bankruptcy Code, whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or (iii) reduction, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge or recovery, or any other related claim or cause of action with respect to the validity, enforceability, priority, scope, extent or perfection of the Prepetition Secured Notes Liens, the Prepetition Secured Notes Obligations, or the Prepetition Secured Notes Documents (as relevant).

(f) *Cash Collateral*. All of the Debtors' cash (except for cash held in any "Excluded Accounts" (as defined in the Prepetition NPAs) that did not otherwise constitute

-13-

identifiable proceeds of Prepetition Secured Notes Collateral), (i) as of the Petition Date, wherever located and held, including all cash and cash equivalents deposited or maintained by the Debtors in any accounts, whether as original Prepetition Secured Notes Collateral or proceeds of Prepetition Secured Notes Collateral, and (ii) after the Petition Date that constitutes proceeds, products, offspring or profits of the Prepetition Secured Notes Collateral, constitutes "cash collateral" within the meaning of section 363(a) of the Bankruptcy Code ("***Cash Collateral***"). For the avoidance of doubt, "Cash Collateral" shall not include the proceeds, products, offspring or profits of the First-Priority DIP Collateral.

(g)     *Certain Definitions*

(i)     "***Prepetition Agents***" means the Prepetition April NPA Agent and the Prepetition August NPA Agent.

(ii)     "***Prepetition Equipment Financings***" means loans or indebtedness incurred by Core Scientific or Core Scientific Operating Company (f/k/a Core Scientific, Inc.) to finance the acquisition of machines or equipment or which otherwise pledge machines or equipment as collateral for the loans or indebtedness (other than the Prepetition Secured Notes), including those incurred under any of the agreements or documents listed on the Schedule of Existing Liens attached to the Interim Order as **Exhibit 3**.

(iii)     "***Prepetition Equipment Financing Collateral***" means the property and assets of any Debtor (and proceeds thereof), in each case, as and to the extent a lien or security interest is granted or purported to be granted in such property, assets and/or proceeds thereof, as security for the respective Prepetition Equipment Financings, as more particularly set forth in the applicable Prepetition Equipment Loan Documents.

(iv)     "***Prepetition Equipment Financing Liens***" means the liens and security interests of, or asserted by, each of the Prepetition Equipment Lenders in the Prepetition Equipment Financing Collateral purportedly securing the respective Prepetition Equipment Financings to the extent such liens are valid, properly perfected, and non-avoidable. For the avoidance of doubt and notwithstanding anything contrary herein or in the Replacement DIP Loan Documents, the DIP Liens shall not prime the Prepetition Equipment Financing Liens that are Prior Senior Liens.

(v)     "***Prepetition Equipment Lenders***" means the lenders under the Prepetition Equipment Financings.

(vi)     "***Prepetition Equipment Loan Documents***" means loan documents, and all security, collateral and other agreements, statements, instruments and other documents executed and/or delivered by the Debtors and the Prepetition Equipment Lenders in connection with the Prepetition Equipment Financings.

(vii)     "***Prepetition NPAs***" means the Prepetition April NPA and the Prepetition August NPA.

-14-

(viii)    "***Prepetition Secured Notes Documents***" means the Prepetition April NPA Documents and the Prepetition August NPA Documents.

(ix)    "***Prepetition Secured Notes Liens***" means those liens granted to the Prepetition Agents, for the benefit of themselves and the applicable Prepetition Secured Noteholders, arising from the Prepetition Secured Notes Documents (including, among other Prepetition Secured Notes Documents, (a) the Security Agreement, dated as of April 19, 2021, in respect of the Prepetition April NPA Secured Notes, and (b) following the occurrence of a Conversion Event (as defined in the Prepetition August NPA), the Security Agreement, dated as of February 7, 2022, in respect of the Prepetition August NPA Secured Notes), to secure the Prepetition Secured Notes Obligations.

(x)    "***Prepetition Secured Noteholders***" means the Prepetition April NPA Secured Noteholders and the Prepetition August NPA Secured Noteholders.

(xi)    "***Prepetition Secured Notes***" means the Prepetition April NPA Secured Notes and the Prepetition August NPA Secured Notes.

(xii)    "***Prepetition Secured Notes Collateral***" means all "Collateral" as defined in the Prepetition Secured Notes Documents.

(xiii)    "***Prepetition Secured Notes Obligations***" means the Prepetition April NPA Secured Notes Obligations and the Prepetition August NPA Secured Notes Obligations.

(xiv)    "***Prepetition Secured Notes Obligors***" means the Prepetition April NPA Notes Obligors and the Prepetition August NPA Notes Obligors.

(xv)    "***Prepetition Secured Parties***" means the Prepetition April NPA Secured Parties and the Prepetition August NPA Secured Parties.

(xvi)    "***Prior Senior Liens***" means all liens and security interests on DIP Collateral, including those listed on the Schedule of Existing Liens attached to the Interim Order as **Exhibit 3**, in each case, solely to the extent such liens and security interests were existing, valid, fully perfected and non-avoidable as of the Petition Date (or are properly perfected subsequent to the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code).

G.    *Findings Regarding Corporate Authority.* Each of the Replacement DIP Loan Parties has all requisite power and authority to execute and deliver the Replacement DIP Loan Documents to which it is a party and to perform its obligations thereunder.

-15-

H.     *Findings Regarding Replacement DIP Facility and Use of Cash Collateral.*

(a)     *Good Cause*. Good and sufficient cause has been shown for the entry of this Final Order and for the Debtors to obtain postpetition financing pursuant to the terms hereof and the Replacement DIP Loan Documents.

(b)     *Need for Postpetition Financing and Use of Cash Collateral*. The Debtors had an immediate and critical need to repay the Original DIP Facility, which occurred subsequent to the entry of the Interim Order. The Debtors further have a critical need to obtain the Replacement DIP Facility and use Cash Collateral in order to, among other things, (i) permit the orderly continuation and operation of their businesses, (ii) maintain business relationships with customers, vendors and suppliers, (ii) make payroll, (iv) make capital expenditures, (v) pay the expenses of the Chapter 11 Cases (including by funding the Carve-Out), (vi) satisfy working capital and operational needs of the Debtors, and (vii) for general corporate purposes, in each case, in accordance with and subject to the terms and conditions of this Final Order and the Replacement DIP Loan Documents, including the Approved Budget (subject to Permitted Variances). The Debtors require access to sufficient working capital and liquidity through the incurrence of loans and other financial accommodations under the Replacement DIP Facility and the use of the Prepetition Secured Parties' Cash Collateral in order to preserve, maintain and maximize the going concern value of the Debtors and to facilitate an orderly and successful reorganization of the Debtors. Without access to the DIP Facility and the authorized use of Cash Collateral upon the terms set forth herein, the Debtors and their estates will be irreparably harmed.

(c)     *No Credit Available on More Favorable Terms.* The Debtors are unable to obtain financing or other financial accommodations on more favorable terms from sources other than the Replacement DIP Secured Parties. The Debtors are unable to obtain adequate unsecured

-16-

credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code. The Debtors are also unable to obtain adequate secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without granting to the Replacement DIP Secured Parties the rights, benefits, remedies and protections set forth herein and the Replacement DIP Loan Documents, including the DIP Liens in all DIP Collateral and the DIP Superpriority Claims.

(d)    *Use of Proceeds of Replacement DIP Facility and Cash Collateral.* As a condition to providing the Replacement DIP Facility and their consent to the use of Prepetition Secured Notes Collateral (including Cash Collateral), each of the Replacement DIP Secured Parties and the Prepetition Secured Parties (as applicable) require, and the Debtors have agreed, that all proceeds of the Replacement DIP Loans and all Cash Collateral shall be used and/or applied solely for the purposes expressly permitted in, and in a manner consistent with, the Approved Budget (subject to Permitted Variances) including (i) to pay the costs of administration of the Chapter 11 Cases, (ii) for general corporate and working capital purposes, (iii) to pay adequate protection payments to the extent set forth in the Interim Order and this Final Order, and (iv) to pay professional fees and expenses in accordance with the Original Interim Order and this Final Order, in each case, subject to the terms and conditions of this Final Order and the Replacement DIP Loan Documents.

(e)    *Approved Budget.* The Debtors have prepared and delivered to the Replacement DIP Secured Parties the initial itemized cash flow forecast set forth on **Exhibit 4** attached to the Interim Order, which has been approved by the Replacement DIP Lender and the Ad Hoc Group (the "***Initial Budget***," as amended, supplemented or updated by the Debtors, and approved by the Replacement DIP Lender and the Ad Hoc Group, from time to time in accordance with the terms of this Final Order and the Replacement DIP Credit Agreement, the "***Approved***

-17-

**Budget**"), reflecting, on a line item, cumulative and aggregate basis, the Debtors' projected cash receipts expected to be collected, and necessary disbursements and expenditures (including debt service costs) expected to be incurred or made, by the Debtors for each calendar week during the period from the calendar week ending on the Friday of the week in which the Court enters this Final Order through and including the week ending June 30, 2023. The Initial Budget is an integral part of the Interim Order (for purposes of the interim period) and this Final Order, and the Replacement DIP Secured Parties are relying, in part, upon the Debtors' agreement to comply with the Approved Budget (subject to Permitted Variances) in determining to enter into the Replacement DIP Facility and to allow the Debtors' use of proceeds of the Replacement DIP Facility in accordance with the terms of this Final Order and the Replacement DIP Loan Documents. In the event of a disagreement between the Replacement DIP Lender and the Ad Hoc Group with respect to whether a proposed budget constitutes an Approved Budget, the determination of the Replacement DIP Lender shall prevail; *provided* that, in such event, the Ad Hoc Group shall be entitled to object and seek relief from the Court (and the Replacement DIP Loan Parties and the Replacement DIP Secured Parties shall not object to such relief being heard on an emergency basis) (the respective rights in this final sentence of paragraph H(e), the "**Budget Resolution Right**").

(f)     *Adequate Protection*. Pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code, the Prepetition Secured Parties are entitled to adequate protection against any post-petition diminution in value of the Prepetition Secured Parties' respective liens and interests in the Prepetition Secured Notes Collateral (including Cash Collateral) resulting from, among other things, (i) the use, sale or lease by the Debtors of Prepetition Secured Notes Collateral (including Cash Collateral), (ii) the imposition of the automatic stay, (iii) the imposition of the Carve-Out,

-18-

and (iv) any other cause or reason to the maximum extent provided under the Bankruptcy Code and applicable law (collectively, the "**Diminution in Value**"), as set forth in this Final Order. Based on the Motion, the DIP Declarations, the First Day Declaration, and the other evidence filed in support of the Motion, and the record presented to the Court in connection with the Interim Hearing and the Final Hearing, the terms of the adequate protection arrangements and the use of Prepetition Secured Notes Collateral (including Cash Collateral) set forth herein are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of Prepetition Secured Notes Collateral (including Cash Collateral); *provided* that nothing in this Final Order shall (x) be construed as the affirmative consent by any of the Prepetition Secured Parties for the use of Cash Collateral or other Prepetition Secured Notes Collateral other than on the terms expressly set forth in this Final Order, (y) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the DIP Collateral or the Prepetition Secured Notes Collateral (whether senior, *pari passu* or junior) other than on the terms expressly set forth in this Final Order, or (z) prejudice, limit or otherwise impair the rights of any of the Prepetition Secured Parties to seek new, different or additional adequate protection after the date hereof or assert the interests of any of the Prepetition Secured Parties (and the rights of all parties-in-interest to object to any such relief are expressly preserved).

(g)     *Consent by the Prepetition Secured Parties*. The requisite Prepetition Secured Parties have consented (or are deemed to have consented) to the Debtors' use of Prepetition Secured Notes Collateral (including Cash Collateral), to the Debtors' entry into the Replacement DIP Facility, and to the granting of the DIP Liens, the DIP Superpriority Claims, the Noteholder Adequate Protection Liens, the Noteholder Adequate Protection Obligations and the

-19-

other liens and claims granted hereunder, in each case, upon the terms set forth in the Interim Order and this Final Order.

(h)     *Section 506(c), Section 552(b), and Marshalling Waivers*. Subject to paragraph 43, as a material inducement to the Replacement DIP Secured Parties and Prepetition Secured Parties to provide the Replacement DIP Facility and consent (or deemed consent) to use Cash Collateral, respectively, and in consideration of (i) the Replacement DIP Secured Parties' agreement to subordinate their DIP Liens to the Carve-Out, as set forth herein, (ii) the Prepetition Secured Parties' consent (or deemed consent) to the use of Prepetition Secured Notes Collateral (including Cash Collateral) as and to the extent expressly set forth herein, and (iii) the DIP Secured Parties' and the Prepetition Secured Parties' agreement to the payment of expenses of the administration of these cases, subject to the Approved Budget (subject to Permitted Variances), in accordance with the terms of this Final Order and the Replacement DIP Loan Documents, (A) the Replacement DIP Loan Parties waive their right to surcharge any costs or expenses incurred in connection with the preservation, protection or enhancement of, or realization by the Replacement DIP Secured Parties or the DIP Collateral, whether pursuant to section 506(c) of the Bankruptcy Code or otherwise, and the Replacement DIP Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, and (B)(1) the Replacement DIP Loan Parties waive their right to surcharge any costs or expenses incurred in connection with the preservation, protection or engagement of, or realization by the Prepetition Secured Parties or the Prepetition Secured Notes Collateral, whether under section 506(c) of the Bankruptcy Code or otherwise, (2) the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition Secured

-20-

Parties or the Prepetition Secured Notes Collateral, and (3) the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Prepetition Secured Notes Collateral.

        (i)    *No Control*. None of the Replacement DIP Secured Parties or the Prepetition Secured Parties control (or have in the past controlled) the Replacement DIP Loan Parties, their properties or operations, have authority to determine the manner in which any Replacement DIP Loan Parties' operations are conducted or are control persons or insiders of the Replacement DIP Loan Parties by virtue of any of the actions taken in connection with, arising under, or related to the Replacement DIP Loan Documents or the Prepetition Secured Notes Documents.

        (j)    *Good Faith*. The terms of the Replacement DIP Facility and the Replacement DIP Loan Documents, the terms of adequate protection granted to the Prepetition Secured Parties under the Interim Order, and the terms upon which the Debtors may continue to use Prepetition Secured Notes Collateral (including Cash Collateral) pursuant to the terms of the Original Interim Order (as it relates to the Prepetition Secured Parties), the Interim Order, this Final Order, and the Replacement DIP Loan Documents (as applicable), were negotiated in good faith and at arm's length among the Replacement DIP Loan Parties, the Replacement DIP Secured Parties, the Prepetition Secured Parties, and their respective Representatives, and all of the Replacement DIP Loan Parties' obligations and indebtedness arising under, in respect of, or in connection with, the Replacement DIP Facility, the Replacement DIP Loan Documents, the Original Interim Order (as it relates to the Prepetition Secured Parties), the Interim Order and this Final Order, including all loans, advances, extensions of credit and other financial accommodations made to and guarantees issued by the Replacement DIP Loan Parties pursuant to

-21-

the Replacement DIP Loan Documents, shall each be deemed to have been extended by the Replacement DIP Secured Parties and each of their respective affiliates, in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by sections 364(e) of the Bankruptcy Code, and each of the claims, liens and security interests, rights, remedies, benefits and protections granted to the Replacement DIP Secured Parties and the Prepetition Secured Parties (and their successors and assigns) pursuant to the Original Interim Order (as it relates to the Prepetition Secured Parties), the Interim Order, this Final Order and the Replacement DIP Loan Documents (including the DIP Liens, the DIP Superpriority Claims, the DIP Obligations and the Noteholder Adequate Protection Obligations) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Original Interim Order (as it relates to the Prepetition Secured Parties), the Interim Order or this Final Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise. The Prepetition Secured Parties have acted in good faith, and each of the claims, liens and security interests, rights, remedies, benefits and protections granted to the Prepetition Secured Parties (and their successors and assigns) pursuant to the Original Interim Order, the Interim Order and this Final Order (including, without limitation, all Noteholder Adequate Protection Liens, Noteholder Adequate Protection Claims, and Noteholder Adequate Protection Obligations) shall be entitled to the full protection of section 363(m) of the Bankruptcy Code in the event that this Final Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

(k)     *Proper Exercise of Business Judgment.* Based on the Motion, the Replacement DIP Declarations, the record presented to the Court at the Interim Hearing, the Final Hearing and the Chapter 11 Cases, the terms of the Replacement DIP Facility and the Replacement DIP Loan Documents, the terms of adequate protection granted to the Prepetition Secured Parties

-22-

as set forth in the Original Interim Order and the Interim Order, and the terms upon which the Debtors may continue to use Prepetition Secured Notes Collateral (including Cash Collateral) pursuant to the terms of the Original Interim Order, the Interim Order and this Final Order and the Replacement DIP Loan Documents (as applicable) (i) were negotiated in good faith and at arm's length among the Replacement DIP Loan Parties, the Replacement DIP Secured Parties and the Prepetition Secured Parties, (ii) are fair, reasonable, and the best available to the Debtors under the circumstances, (iii) reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and (iv) are supported by reasonably equivalent value and fair consideration.

(l)     *Notice.* Proper, timely, sufficient and appropriate notice of the Motion and the Interim Hearing and the Final Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, and no other or further notice of the Motion, the Interim Hearing, the Final Hearing or the entry of this Final Order shall be required.

(m)     *Immediate Entry; Relief Essential.* The Debtors have requested, and the Court hereby finds that sufficient cause exists for, the immediate entry of this Final Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Bankruptcy Rules. Unless the relief set forth in this Final Order is granted, the Debtors' estates will be irreparably harmed. Consummation of the Replacement DIP Facility and the use of Prepetition Secured Notes Collateral (including Cash Collateral) upon the terms set forth in the Original Interim Order, this Final Order and the Replacement DIP Loan Documents (as applicable) are necessary to preserve and maximize the value of the Debtors, are in the best interests of the Debtors and their estates, and are consistent with the Debtors' exercise of their fiduciary duties.

**NOW THEREFORE**, based upon the foregoing findings and conclusions, the Motion, the First Day Declaration, the Replacement DIP Declaration, the evidence adduced at the Interim

-23-

WEIL:\99035730\3\39031.0004

Hearing and the Final Hearing and the record before the Court, and after due consideration, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1. *Motion Granted.* The Motion is hereby granted on a final basis, and the Replacement DIP Facility and the use of Cash Collateral are hereby authorized and approved on a final basis, in each case, upon the terms and conditions set forth in this Final Order, including as set forth in the Replacement DIP Loan Documents. Any objections to any of the relief set forth in this Final Order that have not been withdrawn, waived, or settled, and all reservations of rights or other statements inconsistent with this Final Order, are hereby denied and overruled. This Final Order shall become effective and enforceable immediately upon its entry.

2. *Authorization of Replacement DIP Facility and Replacement DIP Loan Documents.*

    (a) *Authorization of Replacement DIP Loan Documents.* The Replacement DIP Loan Parties were authorized upon the entry of the Interim Order, and are hereby authorized on a final basis, to (i) execute, deliver, enter into and perform all of their obligations, and to calculate and pay all fees, costs, expenses, indemnities and other amounts contemplated, under the Replacement DIP Loan Documents and this Final Order, and (ii) perform all acts, to make, execute, deliver, enter into and perform under any and all other agreements, instruments, certificates, and other documents (including the execution and/or recordation of any collateral, pledge and security documents, mortgages, deeds of trust, control agreements, financing statements or other documents), and to perform all such other and further acts, that may be necessary, required or desirable for the Replacement DIP Loan Parties to perform their obligations

-24-

under the Replacement DIP Facility, the Replacement DIP Loan Documents and this Final Order and to implement the transactions contemplated thereunder and hereunder.

(b)     *Authorization to Borrow.* The Replacement DIP Borrowers were, pursuant to the Interim Order, and are hereby authorized to borrow on a final basis, and the Replacement DIP Guarantors were, pursuant to the Interim Order, and are hereby authorized to jointly and severally guarantee the payment in full in cash of such borrowing with respect to, the principal amount of $70 million (inclusive of amounts borrowed pursuant to the Interim Order), plus applicable interest (including interest and other amounts payable-in-kind), premiums, payments, fees (including professional fees and expenses), costs, expenses, charges and other amounts payable under this Final Order and the Replacement DIP Loan Documents in connection with such borrowing), under the Replacement DIP Facility, subject to the terms and conditions (including any conditions precedent to such borrowing) set forth in the Replacement DIP Loan Documents and this Final Order. The Debtors are hereby authorized to use the proceeds of the Replacement DIP Facility and all Cash Collateral solely in the manner and for the purposes expressly permitted in the Approved Budget (subject to Permitted Variances), the Replacement DIP Loan Documents and this Final Order. All actions taken prior to the date hereof by the Debtors, the Replacement DIP Secured Parties, the Original DIP Agent, the Original DIP Lenders and the Prepetition Secured Parties in accordance with or reliance upon the Original Interim Order, the Interim Order and/or this Final Order are hereby ratified and approved.

(c)     *Payment of Fees and Expenses.* The Replacement DIP Loan Parties were, pursuant to the Interim Order, and are hereby authorized and directed to pay any and all (i) fees payable under the Replacement DIP Loan Documents, including the Upfront Payment, the Exit Premium, the Extension Fee and the Monthly DIP Agent Fee (each as defined in the Replacement

-25-

DIP Loan Documents), and each shall not be subject to reduction, setoff or recoupment, and each of which was deemed fully earned upon the occurrence of the Closing Date following entry of the Interim Order, (ii) amounts due (or that may become due) in respect of any and all indemnification obligations under the Replacement DIP Loan Documents, and (iii) from and after the entry of the Interim Order, any other amounts payable in connection with the Replacement DIP Facility and the Prepetition Secured Notes, including the payment of all out-of-pocket costs, expenses and disbursements of the Replacement DIP Secured Parties and Prepetition Secured Parties, including (A) the reasonable and documented fees and expenses of (1) Choate, Hall & Stewart LLP ("***Choate***"), as counsel to the Replacement DIP Secured Parties and (2) any other professionals that may be retained by the Replacement DIP Lender (with the consent of the Replacement DIP Borrowers, such consent not to be unreasonably withheld or delayed, which consent of the Replacement DIP Borrowers shall not be required after the occurrence of a DIP Termination Event (as defined below) (collectively, the "***DIP Professional Fees and Expenses***")), and (B) the reasonable and documented fees and expenses (whether or not such costs, fees and expenses arose before, on or after the Petition Date or the date of the Interim Order or this Final Order, and whether or not the Replacement DIP Facility closes or the Replacement DIP Facility is subsequently terminated or repaid) of (1) the Prepetition Agents, including the reasonable and documented fees and expenses of Shipman & Goodwin LLP, counsel to the Prepetition Agents, and (2) the fees and expenses of the ad hoc group of certain Prepetition Secured Noteholders (the "***Ad Hoc Group***"), including (x) Paul Hastings LLP, as counsel to the Original DIP Lenders and the Ad Hoc Group and (y) Moelis & Company, LLC ("***Moelis***"), as investment banker and financial advisor to the Original DIP Lenders and the Ad Hoc Group, pursuant to the terms of that certain letter agreement by and among Core Scientific and Moelis (collectively, the "***Noteholder Professional Fees and***

-26-

*Expenses*"). Notwithstanding the foregoing, the Replacement DIP Loan Parties shall be authorized to make the foregoing payments whether or not the Replacement DIP Facility is consummated unless the Court rules that, with respect to <u>clause (iii)(A)</u> only, the Replacement DIP Lender has (x) materially breached its obligations under any Replacement DIP Loan Document or (y) failed to fund the Replacement DIP Loans as required under the Replacement DIP Loan Documents.

(d)     *Modification of Replacement DIP Loan Documents.* The Replacement DIP Loan Parties are hereby authorized to execute, deliver and perform under one or more amendments, waivers, consents, or other modifications (including, for the avoidance of doubt, the payment of any amendment fee, consent fee, waiver fee or similar fee paid or payable in connection therewith) to and under the Replacement DIP Loan Documents, in each case, in accordance with the provisions thereof governing amendments thereto, each without further application to or order of the Court; *provided* that any amendment to the Replacement DIP Credit Agreement shall require, at a minimum, the prior written consent of the Replacement DIP Lender; *provided, further*, that any amendment that (a) shortens the maturity of the extensions of credit thereunder, (b) increases the aggregate commitments thereunder, (c) increases the rate of interest payable with respect thereto, or (d) any other material amendment, modification or waiver (each, a "***Material DIP Amendment***"), shall be provided (which may be by electronic mail) to the U.S. Trustee and lead restructuring counsel to the Official Committee and the Ad Hoc Group and filed with the Court no later than three (3) Business Days prior to the anticipated date of effectiveness of any such Material DIP Amendment, and if no objection to the Material DIP Amendment is made by the U.S. Trustee, the Ad Hoc Group or the Official Committee within such three (3) Business Day period, then, without further application to or order of the Court, such Material DIP Amendment shall automatically be deemed approved and effective; *provided, further*, that, if an objection is made

-27-

by the U.S. Trustee, the Ad Hoc Group or the Official Committee within such three (3) Business Day period, then such Material DIP Amendment shall be subject to a hearing and approval of the Court. Any amendment to the Replacement DIP Facility that does not constitute a Material DIP Amendment shall be provided as soon as reasonably practical prior to execution to lead restructuring counsel to the Official Committee and the Ad Hoc Group. Notwithstanding the foregoing or anything contained in the Replacement DIP Loan Documents or this Final Order to the contrary, in no event shall the Replacement DIP Loan Documents or this Final Order be amended, modified or supplemented in a manner that adversely affects the rights, liens, security interests, claims, benefits and protections of the Prepetition Secured Parties hereunder or under the Prepetition Secured Notes Documents without the prior written consent of the Ad Hoc Group or approval from this Court (upon notice to the Ad Hoc Group and a hearing).

(e)     *DIP Funding Account.* Upon entry of the Interim Order, the Replacement DIP Borrower was (and hereby is) authorized and directed to establish a new bank account or use an existing bank account (the "***Replacement DIP Funding Account***"), which shall be subject to a control agreement put in place by the Replacement DIP Borrower promptly after the entry of this Final Order (and in any event, within ten (10) Business Days of entry of this Final Order), in form and substance acceptable to the Replacement DIP Agent, and shall at all times be and remain subject to the control of the Replacement DIP Agent. Subject to the Carve-Out, and subject in all respects to paragraph 44 of this Final Order, the proceeds of all DIP Borrowings under the Replacement DIP Facility, and all cash receipts, and all proceeds from the sale or other disposition of, or other revenue of any kind attributable to, any DIP Collateral that is now in, or shall hereafter come into, the possession or control of any of the Replacement DIP Loan Parties, or to which any of the Replacement DIP Loan Parties is now or shall hereafter become entitled, shall be deposited

-28-

into the DIP Funding Account, and all cash and other amounts held in or credited to the DIP Funding Account may not be withdrawn or used by the Replacement DIP Loan Parties other than as expressly permitted hereunder or in the Replacement DIP Loan Documents (subject in all respects to paragraph 44 of this Final Order).

(f) *Perfection in Cash*. Subject to the Carve-Out, and subject to the terms of this Final Order and the Replacement DIP Loan Documents, all financial institutions with which the Replacement DIP Loan Parties maintain accounts containing any of the Replacement DIP Loan Parties' cash that constitutes DIP Collateral are authorized and directed to comply with any request of the Replacement DIP Agent to turn over to the Replacement DIP Agent all cash therein without offset or deduction of any kind; *provided* that the foregoing shall be subject in all respects to paragraph 44 of this Final Order. The Replacement DIP Agent shall be entitled to all of the rights and benefits of all deposit account control agreements, blocked account control agreements, securities account control agreements, and similar agreements to which any of the Replacement DIP Loan Parties may be a party, without the need to enter into any such agreements. Notwithstanding (and without limiting) the foregoing, the Replacement DIP Loan Parties are authorized to enter into, and cause the financial institutions servicing or maintaining the Replacement DIP Loan Parties' deposit accounts (or other accounts) to enter into, such deposit account control agreements and other collateral agreements with the Replacement DIP Agent and such financial institutions as the Replacement DIP Agent may reasonably request.

3. *Replacement DIP Obligations.*

(a) Upon execution and delivery of the Replacement DIP Loan Documents, the Replacement DIP Loan Documents shall constitute valid, binding, enforceable, and non-avoidable obligations of each of the Replacement DIP Loan Parties, and shall be fully enforceable against

-29-

each of the Replacement DIP Loan Parties, their estates, and any successors thereto, including any estate representative or trustee appointed in any of the Chapter 11 Cases or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or relating to any of the foregoing, and/or upon the dismissal of any of the Chapter 11 Cases or any such successor cases (collectively, the "*Successor Cases*"), in each case, in accordance with the terms of the Replacement DIP Loan Documents and this Final Order.

(b) Upon execution and delivery of the Replacement DIP Loan Documents, the Replacement DIP Loan Parties shall continue to be jointly and severally liable for all Replacement DIP Obligations, including all loans, advances, indebtedness, obligations, extensions of credit, financial accommodations, principal, interest, payments, premiums or similar amounts, fees, costs, expenses, charges, indemnification and reimbursement obligations (whether contingent or absolute), and all other amounts, whenever the same shall become due and payable, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, to the Replacement DIP Agent or the Replacement DIP Lender under the Replacement DIP Loan Documents or this Final Order. The Replacement DIP Obligations shall be due and payable, without notice or demand on the DIP Termination Declaration Date (as defined below) (subject to paragraph 20(b) hereof).

(c) All obligations incurred, payments made, and transfers or grants of liens and security interests set forth in the Original Interim Order, the Interim Order, this Final Order and the Replacement DIP Loan Documents by the Replacement DIP Loan Parties, were, pursuant to the Interim Order, and hereby are granted to or for the benefit of the Replacement DIP Loan Parties for fair consideration and reasonably equivalent value and are granted contemporaneously with the making of the loans and commitments and other financial accommodations secured

-30-

thereby. No obligation, payment, transfer, or grant of liens or security interests under the Original Interim Order, the Interim Order, this Final Order or the Replacement DIP Loan Documents to the Replacement DIP Secured Parties or the Prepetition Secured Parties shall be limited, stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law, or subject to any challenge, objection, defense or claim, including avoidance (whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge, recovery or other cause of action of any kind or nature whatsoever, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise (subject, solely in the case of the DIP Professional Fees and Expenses and the Noteholder Professional Fees and Expenses, only to the procedures set forth in paragraph 11 of this Final Order).

4.    *No Obligation to Extend Credit.* The Replacement DIP Secured Parties shall have no obligation to make any loan or advance available under the Replacement DIP Loan Documents unless all of the conditions precedent to the making of such loan or advance by the Replacement DIP Secured Parties have been satisfied in full (or waived) in accordance with the terms of the Replacement DIP Loan Documents and this Final Order.

5.    *No Duty to Monitor Compliance.* None of the Replacement DIP Secured Parties nor the Prepetition Secured Parties shall have any obligation or responsibility to monitor the Debtors' use of DIP Collateral, the Prepetition Secured Notes Collateral, or Cash Collateral, and each of the DIP Secured Parties and the Prepetition Secured Parties may rely upon the Debtors' representations that the use of DIP Collateral, Prepetition Secured Notes Collateral, and Cash

-31-

Collateral complies with and is in accordance with the requirements of this Final Order and the Replacement DIP Loan Documents (as applicable).

6.     *DIP Liens.*

        (a)     As security for the prompt and complete payment and performance of all Replacement DIP Obligations when due (whether upon stated maturity, prepayment, acceleration, declaration or otherwise), effective and perfected as of the entry of the Interim Order, and without the necessity of the execution, recordation or filing by any of the Replacement DIP Loan Parties or the Replacement DIP Secured Parties of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title, or any similar document or instrument, or the taking of any other action (including entering into any control agreements or taking any other action to take possession or control of any DIP Collateral), the Replacement DIP Agent, for the benefit of itself and the Replacement DIP Lender, was, pursuant to the Interim Order, and hereby is granted, on a final basis, valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens and security interests (collectively, the "**DIP Liens**") in all DIP Collateral, in each case, subject and subordinate to the Carve-Out, and subject to the relative priorities set forth in this Final Order.

        (b)     The term "**DIP Collateral**" means (i) all assets and properties (or interest therein) of each of the Replacement DIP Loan Parties and their estates, of any kind or nature whatsoever, wherever located, whether tangible or intangible, real, personal or mixed, whether now owned or consigned by or to, or leased from or to, or hereafter acquired by, or arising in favor of, each of the Replacement DIP Loan Parties (including under any trade names, styles or derivations thereof), whether prior to or after the Petition Date, that is not subject to any liens and security interests that were valid, non-avoidable and properly perfected as of the Petition Date (or

-32-

that were properly perfected subsequent to the Petition Date to the extent permitted by section

546(b) of the Bankruptcy Code), limited, with respect to all real property and the facilities, to the

facility located in Marble, North Carolina, and not including Avoidance Actions (as defined below)

(the "***First-Priority DIP Collateral***"), (ii) all assets and properties (or interest therein) of the

Replacement DIP Loan Parties' estates (whether tangible, intangible, real, personal or mixed and

wherever located) as of the Petition Date that (A) are subject to the Prepetition Secured Notes

Liens, (B) are subject to the Prepetition Equipment Financing Liens, (C) are subject to other valid,

perfected, and non-avoidable liens in existence as of the Petition Date (including mortgages,

mechanics' liens and fixture filings), limited, with respect to all real property and the facilities, to

those located in Calvert City, Kentucky; Grand Forks, North Dakota; Muskogee, Oklahoma;

Barstow, Texas (Cedarvale); Pecos, Texas (Cottonwood); and Dalton, Georgia, or (D) are subject

to other valid liens in existence on the Petition Date that are perfected subsequent to the Petition

Date as permitted by section 546(b) of the Bankruptcy Code (collectively, the "***Junior-Priority***

***DIP Collateral***"), (iii) upon entry of this Final Order, the proceeds of any causes of actions for

preferences, fraudulent conveyances, and other avoidance power claims under sections 502(d),

544, 545, 547, 548, and 550 of the Bankruptcy Code (the "***Avoidance Actions***") (but not, for the

avoidance of doubt, the Avoidance Actions themselves), and (iv) any and all rents, issues,

products, offspring, proceeds, and profits generated by any item of DIP Collateral, without the

necessity of any further action of any kind or nature by the Replacement DIP Agent or the

Replacement DIP Lender in order to claim or perfect such rents, issues, products, offspring,

proceeds, and/or profits. For the avoidance of doubt, the Replacement DIP Secured Parties shall

not have a lien on and the DIP Collateral shall not include (A) any cash or certificate of deposit in

the deposit account at City National Bank ending in account number 7589 that secures credit card

obligations pursuant to the *Final Order (I) Authorizing Debtors to (A) Continue Their Existing Cash Management System, (B) Maintain Existing Business Forms and Intercompany Arrangements, (C) Continue Intercompany Transactions, and (D) Continue Utilizing Employee Credit Cards; and (II) Granting Related Relief* [Docket No. 332] or (B) any cash held as collateral for the benefit for the Debtors' surety providers, International Fidelity Insurance Company, Harco National Insurance Company, and/or Allegheny Casualty Company in connection with the Debtors' customs bonds, as authorized pursuant to the *Final Order (I) Authorizing Debtors to (A) Continue Insurance Programs and Surety Bond, and (B) Pay Certain Obligations with Respect thereto; (II) Granting Relief from Automatic Stay with Respect to Workers' Compensation Claims; and (III) Granting Related Relief* [Docket No. 118].

(c)     The DIP Liens shall be subject to the following priorities (subject in each case to the Carve-Out):

(i)     *First-Priority Liens on Unencumbered Property.* Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected first-priority liens and security interests in all First-Priority DIP Collateral (the "**Frist-Priority DIP Liens**"), which First-Priority DIP Liens shall be junior and subordinated only to the Carve-Out.

(ii)     *Liens Junior to Certain Other Liens.* Pursuant to sections 364(c)(3) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected liens and security interests in all Junior-Priority DIP Collateral (the "**Junior-Priority DIP Liens**"), which Junior-Priority DIP Liens in such Junior Priority DIP Collateral shall be subject only to the (a) Carve-Out, in all respects, and, as applicable (b)(1) the Prior Senior Liens, (2) the Equipment Lender Adequate Protection Liens and the Prepetition Equipment Financing Liens in Prepetition Equipment Financing Collateral, and (3) the Prepetition Secured Notes Liens and the Noteholder Adequate Protection Liens in the Prepetition Secured Notes Collateral.

(d)     To the maximum extent permitted by the Bankruptcy Code, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document or other agreement that requires the consent or approval of one or more landlords, licensors or other parties, or requires the payment of any fees or obligations to any

-34-

governmental entity, non-governmental entity or any other person or entity, in order for any Debtor to pledge, grant, mortgage, sell, assign, or otherwise transfer any interest therein (including any fee or leasehold interest), any proceeds thereof or other DIP Collateral, shall be deemed inconsistent with the provisions of the Bankruptcy Code and shall have no force or effect with respect to the granting of the DIP Liens or Adequate Protection Liens (as defined below) in any such interest therein or other DIP Collateral, or in the proceeds of any assignment and/or sale thereof by any Debtor in favor of the Replacement DIP Secured Parties in accordance with the DIP Loan Documents and this Final Order.

(e) For the avoidance of doubt and notwithstanding anything contrary herein or in the Replacement DIP Credit Agreement, the DIP Liens shall not prime or rank *pari passu* with (i) the Prepetition Secured Notes Liens in the Prepetition Secured Notes Collateral, or (ii) the Prepetition Equipment Financing Liens that are Prior Senior Liens.

7. *DIP Superpriority Claims.* Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the Replacement DIP Obligations shall constitute allowed superpriority administrative expense claims against each of the Debtors, with priority over any and all other claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including any and all other administrative expense claims of the kind specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, or 1114 of the Bankruptcy Code, or any other provision of the Bankruptcy Code (including the Adequate Protection Claims and any other Adequate Protection Obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment (the "***DIP Superpriority Claims***"), subject only to the Carve-Out. The DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses

-35-

allowed under section 503(b) of the Bankruptcy Code. The DIP Superpriority Claims shall be payable by each of the Debtors, on a joint and several basis, and shall have recourse to all DIP Collateral, subject only to the Carve-Out and Prior Senior Liens. The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code, including in the event that this Final Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

8.      *Use of DIP Collateral and Cash Collateral.*

(a)      The Debtors were, pursuant to the Interim Order, and are hereby authorized on a final basis, to use the proceeds of the Replacement DIP Loans and all Cash Collateral solely to the extent expressly permitted under the Approved Budget (subject to Permitted Variances) and subject to the terms and conditions set forth in the Replacement DIP Loan Documents and this Final Order; *provided* that the Prepetition Secured Parties are granted adequate protection as set forth herein.

(b)      Without the prior written consent of the Replacement DIP Lender, the Replacement DIP Loan Parties shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral (or enter into any binding agreement to do so), except as may be expressly permitted by the Replacement DIP Loan Documents and this Final Order.

(c)      Without either (i) the prior written consent of the Ad Hoc Group or (ii) a further order of this Court, the Replacement DIP Loan Parties shall not sell, transfer, lease, encumber, or otherwise dispose of DIP Collateral that constitutes Prepetition Secured Notes Collateral and/or proceeds, products, offspring, or profits thereof; *provided* that any such order shall provide that the Prepetition Secured Notes Liens shall attach to the proceeds of such disposition with the same rights and priorities in existence as of immediately prior to such

-36-

disposition; *provided*, *further*, that nothing in this paragraph 8(c) shall restrict the disposition by the Replacement DIP Loan Parties of DIP Collateral that constitutes Prepetition Secured Notes Collateral and/or proceeds, products, offspring, or profits thereof in the ordinary course of business.

(d)    All collection and proceeds of DIP Collateral, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnation, or otherwise, will be deposited and applied as required by this Final Order and the Replacement DIP Loan Documents; *provided* that the foregoing shall be subject in all respects to paragraph 44 of this Final Order. The Debtors shall not transfer any cash, assets, properties or other DIP Collateral to any Replacement DIP Loan Party or other affiliate of the Debtors that is not a Debtor in the Chapter 11 Cases without the prior written consent of the Replacement DIP Lender and the Ad Hoc Group, each in their discretion.

(e)    The Debtors were, pursuant to the Interim Order, and are hereby authorized to use the proceeds of all Cash Collateral as set forth in and subject to the terms and conditions set forth in this Final Order; *provided* that the Prepetition Secured Parties are granted adequate protection as set forth herein.

(f)    Except as may be provided in the Replacement DIP Loan Documents, the Debtors were, pursuant to the Interim Order, and are authorized and directed, upon the closing of a sale of any of the First-Priority DIP Collateral, to immediately pay all proceeds of any such sale to the Replacement DIP Agent, for the benefit of itself and the Replacement DIP Lender, to satisfy the Replacement DIP Obligations in accordance with this Final Order and the Replacement DIP

-37-

Loan Documents until Paid in Full,[6] and any order approving the sale of such First-Priority DIP Collateral shall provide that the sale is conditioned upon the payment of such Replacement DIP Obligations (except to the extent otherwise agreed in writing by the Replacement DIP Lender); *provided* that notwithstanding the foregoing, and notwithstanding anything to the contrary in the Replacement DIP Loan Documents or this Final Order, the proceeds of any disposition of assets subject to one or more Prior Senior Liens or Prepetition Secured Notes Liens shall be payable on account of Replacement DIP Obligations only after the obligations secured by such Prior Senior Liens or Prepetition Secured Notes Liens (as the case may be) have been Paid in Full or sufficient funds have been segregated to provide for such Payment in Full in an account for the sole benefit of the Prepetition Secured Noteholders or holders of Prior Senior Liens (as the case may be).

9. *Approved Budget.* The DIP Loan Parties shall comply at all times with the Approved Budget then in effect (subject to Permitted Variances). Any amendments, supplements or updates to the Initial Budget (or any subsequent Approved Budget) (each, a "**Budget Supplement**") shall be subject to the prior approval of (a) the Replacement DIP Lender in accordance with the Replacement DIP Loan Documents) and (b) subject to the Budget Resolution Right, the Ad Hoc Group, at the same times and upon the same conditions applicable to the Replacement DIP Agent or Replacement DIP Lender as set forth in the Replacement DIP Loan Documents (as currently in effect, without giving effect to any amendments or modifications thereto), and, in each case, any such Budget Supplement shall not constitute an "Approved Budget" unless and until it is so approved by the Replacement DIP Lender and, subject to the Budget

---

[6] For purposes hereof, the term "**Paid in Full**" or "**Payment in Full**" means, with respect to the Replacement DIP Obligations or the Prepetition Secured Notes Obligations (as the case may be), the irrevocable and indefeasible payment in full in cash of all Replacement DIP Obligations or Prepetition Secured Notes Obligations (as the case may be), other than contingent indemnification and expense reimbursement obligations for which no claim or demand has been asserted, and all commitments thereunder shall have irrevocably, permanently and finally expired or shall have been terminated, cancelled and discharged.

WEIL:\99035730\3\39031.0014

Resolution Right, the Ad Hoc Group (and until any such Budget Supplement is approved by the Replacement DIP Lender and, subject to the Budget Resolution Right, the Ad Hoc Group, the prior Approved Budget shall remain in effect). Notwithstanding anything contained herein to the contrary, the Debtors are hereby authorized and directed to pay all Replacement DIP Obligations as such obligations become due under this Final Order and the Replacement DIP Loan Documents, including all DIP Professional Fees and Expenses, regardless of whether payment of such amounts is authorized under the Approved Budget, and, notwithstanding anything contained in this Final Order to the contrary, (i) such Replacement DIP Obligations and such DIP Professional Fees and Expenses shall not be tested for variance purposes related to the Approved Budget and (ii) the payment of the Replacement DIP Obligations in accordance with the terms thereof shall not, in and of itself, be the basis for a Cash Collateral Termination Event.

10. *Adequate Protection.* The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, whether or not the Replacement DIP Facility is consummated or is subsequently terminated or repaid, to adequate protection of their Prepetition Secured Notes Liens in Prepetition Secured Notes Collateral (including Cash Collateral), as follows (the liens, security interests, payments and other obligations set forth in this paragraph 10, and the payment obligations with respect to the Noteholder Professional Fees and Expenses under the Original Interim Order, the Interim Order and hereunder, are collectively referred to herein as the "***Noteholder Adequate Protection Obligations***"):

(a) *Noteholder Adequate Protection Claims.* The Prepetition Agents, for their own benefit and for the benefit of the Prepetition Secured Noteholders, were, by the Original Interim Order and the Interim Order, and are hereby granted, on a final basis, in the amount of any aggregate Diminution in Value of the Prepetition Secured Notes Liens in the Prepetition Secured

-39-

Notes Collateral (including Cash Collateral) from and after the Petition Date, superpriority administrative expense claims contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors (the "**Noteholder Adequate Protection Claims**"), which shall be payable by each of the Debtors on a joint and several basis, and shall have recourse to all DIP Collateral, subject to the terms hereof and priorities set forth herein. The Noteholder Adequate Protection Claims shall be (a) subject and subordinate only to the Carve-Out and the DIP Superpriority Claims, (b) *pari passu* with the Equipment Lender Adequate Protection Claims (as defined below), and (c) senior to any and all other administrative expense claims and all other claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever.

        (b)    *Noteholder Adequate Protection Liens.* The Prepetition Agents, for the benefit of themselves and for the benefit of the Prepetition Secured Noteholders, were, by the Original Interim Order and the Interim Order, and are hereby granted, on a final basis, effective and perfected as of the entry of the Original Interim Order, and without the necessity of the execution, recordation or filing by any of the Prepetition Secured Parties of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title for titled goods, or any similar document or instrument, or the taking of any other action (including entering into any control agreements or taking possession or control of any DIP Collateral or Prepetition Secured Notes Collateral), in the amount of any aggregate Diminution in Value of the Prepetition Secured Notes Liens in the Prepetition Secured Notes Collateral (including Cash Collateral) from and after the Petition Date, valid, binding, enforceable and automatically perfected post-petition liens and security interests in all DIP Collateral (the "**Noteholder Adequate Protection Liens**"). The Noteholder Adequate Protection Liens shall be (i) junior and subordinated only to (A) the Carve-Out, (B) the Prior Senior Liens, (C) the First-

-40-

Priority DIP Liens in First-Priority DIP Collateral, (D) the Junior-Priority DIP Liens in Junior-Priority DIP Collateral (other than the Prepetition Secured Notes Collateral), and (E) the Equipment Lender Adequate Protection Liens in the Prepetition Equipment Financing Collateral, (ii) *pari passu* with the Equipment Lender Adequate Protection Liens in the First-Priority DIP Collateral and *pari passu* with the Equipment Lender Adequate Protection Liens in the Junior-Priority DIP Collateral (other than Prepetition Equipment Financing Collateral and the Prepetition Secured Notes Collateral), and (iii) senior to any and all other liens and security interests in the DIP Collateral, including the Equipment Lender Adequate Protection Liens in the Prepetition Secured Notes Collateral.

(c)    *Reporting.* The Debtors shall contemporaneously provide the Prepetition Agents, the Ad Hoc Group (and their respective advisors) with all reports, documents and other information required to be delivered to the Replacement DIP Secured Parties under the Replacement DIP Loan Documents (as currently in effect, or pursuant to any additional requirements that may be added after the date hereof, whether or not the Replacement DIP Facility is subsequently terminated or repaid, unless the Court orders otherwise) and this Final Order.

(d)    *Cash Management*. The Replacement DIP Loan Parties shall maintain their cash management arrangements in a manner consistent with those described in the applicable "first-day" order, which shall be in form and substance reasonably acceptable to the Replacement DIP Lender and the Ad Hoc Group.  The DIP Loan Parties shall not open any new deposit or securities account that is not subject to the liens and security interests of each of the Replacement DIP Secured Parties (in which case they shall be subject to the lien priorities and other provisions set forth in this final Order).

-41-

(e)     *Compliance with Approved Budget*. The Replacement DIP Loan Parties shall comply with the Approved Budget, subject to Permitted Variances, as set forth in the Replacement DIP Loan Documents.

(f)     *Survival of Adequate Protection Obligations*. Notwithstanding anything contained in this Final Order or the Replacement DIP Loan Documents to the contrary, the Adequate Protection Obligations to the Prepetition Secured Parties and the Prepetition Equipment Lenders shall survive termination or repayment of the Replacement DIP Facility.

11.     *Fees and Expenses; Payments.*

(a)     The payment of all DIP Professional Fees and Expenses and Noteholder Professional Fees and Expenses hereunder shall not be subject to further application to or approval of the Court, and shall not be subject to allowance or review by the Court or subject to the U.S. Trustee's fee guidelines, and no attorney or advisor to the Replacement DIP Secured Parties shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court; *provided* that any time such professionals seek payment of fees and expenses from the Debtors prior to the effective date of any chapter 11 plan, each such professional shall provide summary copies of its invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of their invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine) to lead restructuring counsel to the Debtors, the U.S. Trustee, and lead restructuring counsel to the Official Committee and Ad Hoc Group (collectively, the "**Review Parties**"); *provided* that the U.S. Trustee and the Official Committee and Ad Hoc Group reserve their rights to reasonably request additional detail

-42-

regarding the services rendered and expenses incurred by such professionals. Any objections raised by any Review Party with respect to such invoices must be in writing and state with particularity the grounds therefor and must be submitted to the affected professional within ten (10) calendar days after delivery of such invoices to the Review Parties (such ten (10) day calendar period, the "***Review Period***"). If no written objection is received prior to the expiration of the Review Period from the Review Parties, the Debtors shall pay such invoices within three (3) Business Days following the expiration of the Review Period. If an objection is received within the Review Period from the Review Parties, the Debtors shall promptly pay the undisputed amount of the invoice, and the disputed portion of such invoice shall not be paid until such dispute is resolved by agreement between the affected professional and the objecting party or by order of this Court. Any hearing to consider such an objection to the payment of any fees, costs or expenses set forth in a professional fee invoice hereunder shall be limited to the reasonableness of the fees, costs and expenses that are the subject of such objection.

(b)    Notwithstanding anything contained in this paragraph 11 to the contrary, the Replacement DIP Loan Parties shall pay in full in cash all DIP Professional Fees and Expenses and all Noteholder Professional Fees and Expenses incurred after the Closing Date in accordance with and subject to the procedures set forth above in this paragraph 11 of this Final Order.

(c)    Notwithstanding anything contained in this paragraph 11 to the contrary, to the extent any chapter 11 plan filed in the Chapter 11 Cases and confirmed by an order of this Court provides for different procedures for the submission of invoices and payment of professional fees of any professional persons that the Debtors are authorized to pay pursuant to this Final Order, then the procedures set forth in such confirmed chapter 11 plan shall control, provided that no such

-43-

professional person shall be subject to more onerous procedures for compensation than are set forth herein.

(d)     Notwithstanding anything contained in this Final Order to the contrary, any and all payments, premiums, fees, costs, expenses and other amounts paid at any time by any of the Replacement DIP Loan Parties to the Original DIP Agent, the Original DIP Lenders, the Replacement DIP Secured Parties or the Prepetition Secured Parties pursuant to the requirements of the Original DIP Loan Documents, the Original Interim Order, the Payoff Letter, the Interim Order, this Final Order or the DIP Loan Documents (as applicable), whether prior to, on or after the Petition Date, shall be non-refundable and irrevocable, are hereby approved (and to the extent paid prior to entry of the Interim Order or this Final Order, ratified in full), and shall not be subject to any challenge, objection, defense, claim or cause of action of any kind or nature whatsoever, including avoidance (whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), reclassification, disgorgement, disallowance, impairment, marshaling, surcharge or recovery or any other cause of action, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise, by any person or entity (subject, solely in the case of the DIP Professional Fees and Expenses and the Noteholder Professional Fees and Expenses, to paragraphs 11(a), (b) and (c) of this Final Order).

(e)     Notwithstanding anything contained in this Final Order to the contrary, all DIP Professional Fees and Expenses and Noteholder Professional Fees and Expenses incurred prior to the entry of this Final Order shall be paid by the Debtors no later than one (1) Business

-44-

day after entry of the Final Order, so long as summary invoices of such DIP Professional Fees and Expenses and the Noteholder Professional Fees and Expenses are provided to the to lead restructuring counsel to the Debtors and to counsel to the Official Committee prior to the entry of the Final Order, and such invoices shall not be subject to the review procedures set forth above in paragraphs 11(a) and 11(b) of this Final Order.

12.     *Adequate Protection Reservation of Rights of Prepetition Secured Parties/Prepetition Equipment Lenders.* Notwithstanding any other provision hereof, the grant of adequate protection to the Prepetition Secured Parties and the Prepetition Equipment Lenders pursuant to the Original Interim Order, the Interim Order, and affirmed by this Final Order, shall not be deemed an admission that the interests of such Prepetition Secured Parties or the Prepetition Equipment Lenders are indeed adequately protected, and is without prejudice to the rights of (a) the Prepetition Secured Parties or the Prepetition Equipment Lenders to seek additional relief with respect to the use of Prepetition Secured Notes Collateral (including Cash Collateral), and (b) the Prepetition Equipment Lenders to seek additional relief with respect to the use of Prepetition Equipment Financing Collateral, or to seek modification of the grant of adequate protection provided hereby so as to provide different or additional adequate protection (including, among other things, debt service payments), and without prejudice to the right of the Debtors or any other party in interest to contest any such modification. Nothing in the Original Interim Order, the Interim Order or this Final Order shall be deemed to waive, modify or otherwise impair the respective rights of the Prepetition Secured Parties or the Prepetition Equipment Lenders under the Prepetition Secured Notes Documents and the Prepetition Equipment Loan Document, respectively, or under applicable law, and the Prepetition Secured Parties and the Prepetition Equipment Lenders expressly reserve all of their respective rights and remedies whether now

-45-

existing or hereafter arising under the Prepetition Secured Notes Documents or the Prepetition Equipment Loan Documents and applicable law. Without limiting the foregoing, and subject only to the Carve-Out, nothing contained in this Final Order shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided hereunder is insufficient to compensate the Prepetition Secured Parties or the Prepetition Equipment Lenders for any Diminution in Value during the Chapter 11 Cases.

13.  *Refinancing of the Original DIP Credit Agreement*.

(a)     The Refinancing is hereby affirmed on a final basis as having been approved on a final basis. The Replacement DIP Loan Parties were (pursuant to the Interim Order) authorized and directed (with such authorization and direction hereby affirmed and approved on a final basis) to (i) execute and deliver, and to perform all of their obligations (including contingent expense reimbursement and indemnification obligations) under the Payoff Letter, (ii)(a) indefeasibly repay in full in cash and discharge all Original DIP Obligations owed under the Original DIP Facility in accordance with the Payoff Letter, and (b) indefeasibly pay in full in cash all Original DIP Obligations set forth in the Payoff Letter, in each case, upon the closing of the Replacement DIP Facility (in no event later than five (5) business days following the entry of the Interim Order), and (iii) upon the payment in full in cash of all Original DIP Obligations and the satisfaction of all other conditions set forth in the Payoff Letter, terminate the Original DIP Facility documents, execute, deliver, enter into and, as applicable, perform all actions under such documents as necessary or required (or reasonably requested by the Original DIP Agent) in furtherance of such repayment of the Original DIP Facility and termination of the Original DIP Facility Documents, and take such other and further acts as may be necessary, appropriate or desirable in connection therewith. The liens securing the obligations under the Original DIP

-46-

Facility shall be (and, as applicable, were) automatically released and terminated upon the indefeasible and irrevocable repayment in full in cash of all Original DIP Obligations and the satisfaction of all other conditions set forth in the Payoff Letter. The terms and provisions of the Payoff Letter, including the releases set forth therein, were (pursuant to the Interim Order) and are, hereby authorized and approved on a final basis.

(b)     In furtherance of the foregoing and without further approval of this Court, each Replacement DIP Loan Party was (pursuant to the Interim Order) and is authorized to make, execute and deliver all instruments, certificates, agreements, charges, deeds and documents necessary to evidence the repayment of the Original DIP Facility and the release of all security interests, liens, and claims related thereto (including, without limitation, the execution or recordation of documents necessary to release, cancel, or otherwise withdraw and pledge and security agreements, mortgages, financing statements and other similar documents), and to pay all fees and expenses required under the Original DIP Loan Documents in connection therewith in accordance with the Interim Order.

(c)     Notwithstanding anything in the Original Interim Order, the Interim Order, this Final Order, or the Replacement DIP Loan Documents to the contrary, the Refinancing was (pursuant to the Interim Order) and is hereby approved on a final basis, shall be non-refundable and irrevocable, and shall not be subject to any challenge, objection, defense, claim or cause of action of any kind or nature whatsoever, including avoidance (whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), reclassification, disgorgement, disallowance, impairment, marshaling, surcharge or

-47-

recovery or any other cause of action, whether arising under the Bankruptcy Code, applicable non-bankruptcy law, or otherwise, by any person or entity.

14.    *Reservation of Rights.* Except as otherwise expressly provided herein or in the Replacement DIP Loan Documents, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the rights of the Replacement DIP Secured Parties, the Prepetition Equipment Lenders, or the Prepetition Secured Parties to seek any other or supplemental relief in respect of the Replacement DIP Loan Parties, (b) the rights of the Replacement DIP Secured Parties, the Prepetition Equipment Lenders, or the Prepetition Secured Parties under the Replacement DIP Loan Documents, the Prepetition Equipment Financing Documents or the Prepetition Secured Notes Documents, the Bankruptcy Code or applicable non-bankruptcy law (as applicable), including the right to request modification of the automatic stay of section 362 of the Bankruptcy Code, or (c) any other rights, claims, or privileges (whether legal, equitable or otherwise) of the Replacement DIP Secured Parties, the Prepetition Equipment Lenders, or the Prepetition Secured Parties.

15.    *Modification of Automatic Stay.* The automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby vacated and modified, without application to or further order of this Court, to permit: (a) the Replacement DIP Loan Parties to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the Replacement DIP Secured Parties may request to assure the perfection and priority of the DIP Liens, (b) the Replacement DIP Loan Parties to incur all liabilities and obligations to the Replacement DIP Secured Parties as contemplated under this Final Order and the Replacement DIP Loan Documents, (c) the Debtors to grant the Adequate Protection Liens and the Adequate Protection Claims, and to perform such reasonable acts as the Prepetition Agents may reasonably request to assure the perfection and

WEIL:\99035730\3\39031.0014

priority of the Adequate Protection Liens, (d) the DIP Loan Parties to incur liabilities and obligations to the Prepetition Secured Parties related to the Adequate Protection Obligations, as contemplated under the Interim Order, (e) the Replacement DIP Secured Parties and the Prepetition Secured Parties to retain and apply payments made in accordance with the terms of this Final Order and the DIP Loan Documents (as applicable), (f) subject to paragraph 20(b) of this Final Order, (i) the Replacement DIP Secured Parties to exercise, upon the occurrence of any DIP Termination Event (as defined below), all rights and remedies provided for in this Final Order, the Replacement DIP Loan Documents, or applicable law and (ii) the Prepetition Secured Parties to exercise, upon the occurrence of any Cash Collateral Termination Event (as defined below), all rights and remedies provided for in this Final Order and applicable law, (g) the Replacement DIP Loan Parties to perform under this Final Order and the Replacement DIP Loan Documents, and to take any and all other actions that may be necessary, required or desirable for the performance by the Replacement DIP Loan Parties under this Final Order and the Replacement DIP Loan Documents and the implementation of the transactions contemplated hereunder and thereunder, and (i) the implementation of all of the terms, rights, benefits, privileges, remedies, and provisions of this Final Order and the Replacement DIP Loan Documents.

16. *Perfection of DIP Liens and Adequate Protection Liens*.

(a) This Final Order shall be sufficient and conclusive evidence of the attachment, validity, perfection, and priority of all liens and security interests granted under this Final Order and under the Replacement DIP Loan Documents, including the DIP Liens and the Adequate Protection Liens, without the necessity of the execution, recordation or filing of any pledge, collateral or security agreements, mortgages, deeds of trust, lockbox or control agreements, financing statements, notations of certificates of title for titled goods, or any other document or

-49-

instrument, or the taking of any other action (including entering into any deposit account control agreement or other act to take possession or control of any DIP Collateral), to attach, validate, perfect or prioritize such liens and security interests, or to entitle the DIP Secured Parties and the Prepetition Secured Parties to the priorities granted herein (other than, to the extent applicable, any such filings required under applicable non-U.S. law to attach, validate, perfect or prioritize such liens).

(b)     Without in any way limiting the automatically effective perfection of the liens and security interests granted under the Interim Order, this Final Order and the Replacement DIP Loan Documents, the Replacement DIP Agent is hereby authorized, but not required, as they in their sole discretion may determine for any reason, to execute, file and record (and to execute in the name of the Replacement DIP Loan Parties, as their true and lawful attorneys, with full power of submission, to the maximum extent permitted under applicable law) financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession or control over cash or securities (to the extent authorized by this Final Order and the Replacement DIP Loan Documents), or to amend or modify security documents, or to subordinate existing liens and any other similar action or action in connection therewith or take any other action in order to validate, perfect, preserve and enforce the liens and security interests granted to them under the Interim Order and this Final Order or under the Replacement DIP Loan Documents or to otherwise evidence such liens and security interests in all DIP Collateral (each, a "***Perfection Action***"); *provided* that, whether or not the Replacement DIP Agent determines to take any Perfection Action with respect to any liens or security interests granted under the Interim Order or this Final Order, such liens and security interests shall nonetheless be deemed valid, perfected, allowed, enforceable, non-avoidable as of the entry of the

-50-

Interim Order. Upon the reasonable request of the Replacement DIP Agent, the Replacement DIP Loan Parties and each of the Prepetition Secured Parties, without any further consent of any party, are authorized to take, execute, deliver and file such instruments (in each case, without representation or warranty of any kind) to enable the Replacement DIP Agent to further validate, perfect, preserve and enforce the DIP Liens. All such documents will be deemed to have been recorded and filed as of the date of the Interim Order.

(c)     A certified copy of this Final Order may, as the Replacement DIP Agent may reasonably determine in their discretion, be filed with or recorded in filing or recording offices in addition to or in lieu of any financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept such certified copy for filing and/or recording, as applicable. The automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the Replacement DIP Agent to take all actions, as applicable, referenced in this paragraph 16.

17.     *Protection of Lenders' Rights.*

(a)     Until the Replacement DIP Obligations are Paid in Full, the Prepetition Secured Parties shall: (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens or security interests granted to the Prepetition Secured Parties in the First Priority DIP Collateral under this Final Order, or otherwise seek to exercise or enforce any rights or remedies against any First Priority DIP Collateral, (ii) subject in all respects to paragraph 44 of this Final Order, be deemed to have consented to any transfer, disposition or sale of, or release of liens or claims on such First Priority DIP Collateral (it being understood that such liens or claims shall attach to the proceeds thereof in the same priorities as of immediately prior to such sale) to the extent such transfer, disposition, sale, or release is authorized by the Replacement DIP

-51-

Secured Parties in accordance with the Replacement DIP Loan Documents (as currently in effect, without giving effect to any amendment or modification thereto) and this Final Order, or (iii) not file any further financing statements, patent filings, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral other than, solely as to this clause (iii), the Prepetition Agents filing financing statements or other documents or instruments to perfect the liens granted pursuant to the Original Interim Order (to the extent not canceled as part of the Refinancing), the Interim Order or this Final Order or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests existing as of the Petition Date, or (iv) subject in all respects to paragraph 44 of this Final Order, deliver or cause to be delivered, at the Replacement DIP Loan Parties' cost and expenses, any termination statements, releases and/or assignments in favor of the Replacement DIP Agent and the Replacement DIP Lender or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of liens or security interests on any portion of DIP Collateral subject to any sale or disposition authorized hereunder and under the Replacement DIP Loan Documents.

(b)     Subject in all respects to paragraph 44 of this Final Order, no Prepetition Secured Party may, directly or indirectly, (i) contest, or support any other Person in contesting, in any proceeding, the extent, validity, attachment, priority, or enforceability of any DIP Lien held by or on behalf of any of the Replacement DIP Secured Parties in the DIP Collateral (or the extent, validity, allowability, or enforceability of any Replacement DIP Obligations secured thereby or purported to be secured thereby) or the provisions of the Replacement DIP Loan Documents, the Interim Order or this Final Order, (ii) take any action that would restrain, hinder, limit, delay or otherwise interfere with the exercise of any rights or remedies by any of the DIP Secured Parties,

WEIL:\99035730\3\39031.0014

or (iii) contest, object to, or support any other Person in contesting or objecting to, the manner in which any Replacement DIP Secured Party seeks to enforce or collect the DIP Obligations, the DIP Superpriority Claims or the DIP Liens or any amendment, waiver or modification of any Replacement DIP Loan Document, the Interim Order or this Final Order.

        18.    *Maintenance of DIP Collateral.*

        (a)    Until such time as all Replacement DIP Obligations are Paid in Full (or as otherwise agreed in writing by the Replacement DIP Agent), the Replacement DIP Loan Parties shall continue to maintain all property, operational, and other insurance as required and as specified in the Replacement DIP Loan Documents. Upon the entry of the Interim Order (and approved on a final basis pursuant to this Final Order), the Replacement DIP Agent, for the benefit of itself and the Replacement DIP Secured Parties, shall automatically be deemed to be named as additional insured and lender loss payee under each insurance policy maintained by the Replacement DIP Loan Parties (including all property damage and business interruption insurance policies of the Replacement DIP Loan Parties, whether expired, currently in place, or to be put in place in the future), and shall act in that capacity and distribute any proceeds recovered or received in respect of any such insurance policies in accordance with the terms of this Final Order and the Replacement DIP Loan Documents, *provided that*, notwithstanding anything to the contrary in the Replacement DIP Loan Documents or this Final Order, any portion of insurance proceeds arising from damage or loss of value to assets subject to one or more Prior Senior Liens or Prepetition Secured Notes Liens shall be payable on account of Replacement DIP Obligations, Prepetition Secured Notes Obligations, or any other obligations of the Debtors, only after the obligations secured by such Prior Senior Liens or Prepetition Secured Notes Liens, as applicable, have been Paid in Full or sufficient funds have been segregated from such insurance proceeds to provide for

WEIL:\99035730\3\39031.0014

such Payment in Full in an account for the sole benefit of the holders of such Prior Senior Liens or Prepetition Secured Notes Liens, as applicable.

(b)     The Debtors shall maintain or continue to maintain all property, operational, and other insurance as required and specified in the Prepetition Equipment Loan Documents. The Debtors shall also timely pay all property taxes on the Prepetition Equipment Financing Collateral, as and when due and payable.

19.     *Reporting.*

(a)     Without limiting the requirements contained herein or in the Replacement DIP Loan Documents, the Replacement DIP Loan Parties and their Representatives shall (i) provide the Replacement DIP Agent, the Replacement DIP Lender, the Ad Hoc Group, the Official Committee, and any other official committee appointed in these Chapter 11 Cases (and each of their respective advisors) with (A) all reports, documents, and information required to be delivered to each such party under the Replacement DIP Loan Documents (contemporaneously when the same is required to be delivered thereunder) and this Final Order (as applicable), and (B) reasonable access, upon reasonable notice and during regular business hours, to the Replacement DIP Loan Parties' books and records, assets and properties, for purposes of monitoring the Replacement DIP Loan Parties' businesses and operations and the value of the DIP Collateral, and (ii) cooperate and consult with, and provide information reasonably requested by the Replacement DIP Agent, the Replacement DIP Lender, the Ad Hoc Group, the Official Committee, or any other official committee appointed in these Chapter 11 Cases (and their respective advisors) concerning the Replacement DIP Loan Parties' businesses, financial condition, properties, business operations and assets, and the Replacement DIP Loan Parties

-54-

hereby authorize their Representatives to cooperate and consult with, and promptly provide to the such parties (in each case, together with their respective advisors) such information.

(b)    The Replacement DIP Loan Parties and their Representatives shall provide the Prepetition Equipment Lenders' advisors: (i) variance reports on a weekly basis and (ii) the Approved Budget every four weeks. Further, the Replacement DIP Loan Parties and their Representatives shall make themselves available to the Prepetition Equipment Lenders' advisors for reasonably requested calls to discuss the materials provided and to provide updates on general case status.  For the avoidance of doubt, neither the Prepetition Equipment Lenders nor their advisors shall have consent rights with respect to the Approved Budget.

20.    *Termination Events; Exercise of Remedies.*

(a)    *DIP Termination Events.* The occurrence of any of the following shall constitute a "DIP Termination Event" under this Final Order (each a "***DIP Termination Event***"), unless waived in writing by the Replacement DIP Lender: (i) the occurrence of an "Event of Default" under and as defined in the Replacement DIP Credit Agreement, (ii) the occurrence of the "Termination Date" (as defined in the Replacement DIP Loan Documents), (iii)  the substantial consummation (as defined in section 1101(2) of the Bankruptcy Code) of a chapter 11 plan of any of the Debtors, (iv) any of the Replacement DIP Loan Parties seeks authorization from the Court for (or the Court enters an order authorizing or approving) any amendment, modification, or extension of this Final Order or the Replacement DIP Loan Documents without the prior written consent of the Replacement DIP Lender (and no such consent shall be implied by any other action, inaction, or acquiescence of any of the Replacement DIP Secured Parties), (v) the failure of the Replacement DIP Loan Parties to make any payment required under this Final Order or the Replacement DIP Loan Documents to any of the Replacement DIP Secured Parties as and when

-55-

due and payable hereunder or thereunder, or (vi) the failure by any of the Replacement DIP Loan Parties to timely perform or comply with any of the other terms, provisions, conditions or other obligations under this Final Order.

(b) *Exercise of Remedies.* The Replacement DIP Loan Parties shall immediately provide notice to counsel to the Replacement DIP Agent, the Replacement DIP Lender, the Prepetition Agents, the Ad Hoc Group, the Official Committee, any other official committee appointed in these Chapter 11 Cases, and the Prepetition Equipment Lenders (to the extent such Prepetition Equipment Lenders have provided the Debtors' lead restructuring counsel with an email asking to be included for purposes of this paragraph 20(b) of this Final Order) of the occurrence of any DIP Termination Event. Upon the occurrence of a DIP Termination Event, without further application to or order from the Court, and subject in all respects to paragraph 44 of this Final Order, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the Replacement DIP Agent (acting at the instruction of the Replacement DIP Lender) to take any of the following actions, at the same or different time: (i) deliver a written notice (which may be via electronic mail) to lead restructuring counsel for the Debtors, the U.S. Trustee and lead restructuring counsel for the Official Committee, any other official committee appointed in these Chapter 11 Cases, and the Ad Hoc Group (the "***Remedies Notice***")[7] declaring the occurrence of a DIP Termination Event (such date, the "***DIP Termination Declaration Date***") and/or deliver a Carve-Out Notice (as defined below), (ii) declare the termination, reduction or restriction of the commitments under the Replacement DIP Facility (to the extent any such commitment remains), (iii) declare all Replacement DIP

---

[7] For the avoidance of doubt, with respect to the Replacement DIP Agent (acting on behalf of the Replacement DIP Lender), the Carve-Out Notice and the Remedies Notice may be included in the same notice.

-56-

WEIL:\99035730\3\39031.0014

Obligations to be immediately due and payable, without presentment, demand or protest or other notice of any kind, all of which are expressly waived by the Replacement DIP Loan Parties, (iv) declare the termination of the Replacement DIP Facility and the Replacement DIP Loan Documents as to any further liability or obligation thereunder, but without affecting the DIP Liens, the DIP Superpriority Claims or the Replacement DIP Obligations, (v) declare the reduction or restriction on the Replacement DIP Facility or the Replacement DIP Loan Documents, (vi) invoke a Cash Dominion Period and/or sweep all cash or other amounts contained in the DIP Funding Account, and (vii) charge interest at the default rate set forth in the Replacement DIP Credit Agreement; *provided* that following the occurrence of a DIP Termination Event, prior to the exercise or enforcement of any rights against DIP Collateral (subject in all respects to paragraph 44 of this Final Order), the Replacement DIP Agent (acting at the instruction of the Replacement DIP Lender) shall be required to file a motion with the Court on five (5) Business Days' notice (subject to the Court's availability) seeking an emergency hearing (the "***Stay Relief Hearing***") to determine whether a DIP Termination Event has occurred (and the Replacement DIP Loan Parties, the Ad Hoc Group and the Official Committee shall not object to the shortened notice with respect to such Stay Relief Hearing). In the event the Court determines during a Stay Relief Hearing that a DIP Termination Event has occurred, subject in all respects to paragraph 44 of this Final Order, the Court may fashion an appropriate remedy, which may include, *inter alia*, the exercise of any and all rights or remedies available to the Replacement DIP Secured Parties under this Final Order, the Replacement DIP Loan Documents or applicable law against the DIP Collateral; *provided* that the rights of the Debtors, the Ad Hoc Group, the Official Committee, and any other official committee appointed in these Chapter 11 Cases to contest such relief are expressly preserved.

-57-

(c)     *Cash Collateral Termination Events.* The occurrence of any of the following shall constitute a "Cash Collateral Termination Event" under this Final Order (each a "***Cash Collateral Termination Event***"), unless waived in writing by the Ad Hoc Group:

(i)     the occurrence of the DIP Termination Declaration Date;

(ii)     the substantial consummation (as defined in section 1101(2) of the Bankruptcy Code) of a chapter 11 plan of any of the Debtors;

(iii)     following notice to lead restructuring counsel to each of the Debtors and the Replacement DIP Agent and a 5 calendar day cure period from the date of delivery of such notice, the failure of the Replacement DIP Loan Parties to make any undisputed payment (with such disputed payments to be resolved as set forth in paragraph 11 of this Final Order) required under the Interim Order or this Final Order to any of the Prepetition Secured Parties as and when due and payable hereunder or thereunder;

(iv)     following notice to lead restructuring counsel to each of the Debtors and the Replacement DIP Agent and a 10 business day cure period from the date of delivery of such notice, the failure by any of the Replacement DIP Loan Parties to timely perform or comply with any of their obligations to the Prepetition Secured Parties under this Final Order;

(v)     the entry of an order in the Chapter 11 Cases amending, supplementing, staying or vacating or otherwise modifying this Final Order in a manner that is adverse to the interests of the Prepetition Secured Parties without the prior consent of the Ad Hoc Group;

(vi)     the Noteholder Adequate Protection Liens or the Noteholder Adequate Protection Claims cease at any time to be valid, binding, enforceable and non-avoidable, and (as applicable), fully and properly perfected, and enforceable in all respects against each of the Replacement DIP Loan Parties;

(vii)     (A) the Debtors shall initiate or commence any, challenge, proceeding or investigation (1) challenging the validity, enforceability, perfection or priority of the Prepetition Secured Notes Liens or the Prepetition Secured Notes Obligations, (2) seeking the avoidance, subordination, disgorgement, set off, or surcharge of all or any portion of the Prepetition Secured Notes Obligations (or any payments made on account thereof) or any Adequate Protection Obligations; or (B) the Debtors support any challenge, proceeding, or investigation initiated or commenced by any person or entity, or (C) the Court enters an order granting or sustaining any such relief;

(viii)     (A) the entry of an order by the Court appointing an interim or permanent trustee, a receiver or an examiner under section 1104 of the Bankruptcy

-58-

Code, in each case, in any of the Chapter 11 Cases; or (B) the dismissal of any of the Chapter 11 Cases, or (C) the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code; or (D) the termination or modification of any of the Debtors' exclusive right to file and/or solicit acceptances of a chapter 11 plan; or (E) the Replacement DIP Loan Parties seek (or publicly support or join a third party that seeks) the foregoing relief;

(ix)     the entry of an order of this Court (A) authorizing the Debtors to obtain additional financing under section 364(c) or (d) of the Bankruptcy Code secured by a lien that is senior to or *pari passu* with the Noteholder Adequate Protection Liens or the Prepetition Secured Notes Liens, or (B) granting a lien that is senior to or *pari passu* with the Noteholder Adequate Protection Liens or the Prepetition Secured Notes Liens, or (C) granting a superpriority administrative expense claim that is senior to or *pari passu* with the Noteholder Adequate Protection Claims, in each case, except to the extent permitted under this Final Order;

(x)     the remittance, use or application of Cash Collateral by the DIP Loan Replacement Parties other than in accordance with this Final Order and the Approved Budget (subject to Permitted Variances);

(xi)     absent further order of the Court (upon notice to the Ad Hoc Group and a hearing), any of the Replacement DIP Loan Documents are amended, supplemented, waived, stayed, vacated or otherwise modified in a manner that adversely affects any of the rights, privileges, benefits, protections or consent rights of any of the Prepetition Secured Parties hereunder;

(xii)     absent further order of the Court (upon notice to the Ad Hoc Group and a hearing), the sale of any portion of the Prepetition Secured Notes Collateral outside of the ordinary course of business; or

(xiii)     the Court enters an order granting relief from the automatic stay arising under section 362 of the Bankruptcy Code to allow any creditor to execute upon or enforce a lien, interest or remedy in any Prepetition Secured Notes Collateral with a fair market value in excess of $1,000,000.

(d)     *Exercise of Remedies.* The Prepetition Secured Parties shall immediately provide notice to counsel to lead restructuring counsel to the Debtors and the Replacement DIP Agent of the occurrence of any Cash Collateral Termination Event. Upon the occurrence of a Cash Collateral Termination Event, without further application to or order from the Court, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the Prepetition Agents (acting at the instruction of the requisite Prepetition

-59-

Secured Parties under the applicable Prepetition Secured Notes Documents), as applicable, to take any of the following actions, at the same or different time: (i) deliver a written notice (which may be via electronic mail) to lead restructuring counsel for the Debtors, the U.S. Trustee and lead restructuring counsel for Replacement DIP Agent, the Official Committee, and any other official committee appointed in these Chapter 11 Cases (the "***Cash Collateral Remedies Notice***")[8] declaring the occurrence of a Cash Collateral Termination Event (such date, the "***Cash Collateral Termination Declaration Date***") and/or deliver a Carve-Out Notice (as defined below), or (ii) declare the termination, restriction or revocation of the ability of the Debtors to use Prepetition Secured Notes Collateral (including Cash Collateral); *provided* that following the occurrence of a Cash Collateral Termination Event, prior to the exercise or enforcement of any rights against DIP Collateral (in respect of any Adequate Protection Obligations) or Prepetition Secured Notes Collateral (as the case may be), the Prepetition Agents (acting at the instruction of the requisite Prepetition Secured Parties under the applicable Prepetition Secured Notes Documents), as applicable, shall be required to file a motion with the Court on five (5) Business Days' notice (subject to the Court's availability) seeking an emergency Stay Relief Hearing to determine whether a Cash Collateral Termination Event has occurred (and the Replacement DIP Loan Parties and the Official Committee shall not object to the shortened notice with respect to such Stay Relief Hearing). In the event the Court determines during a Stay Relief Hearing that a Cash Collateral Termination Event has occurred, subject to paragraph 44 of this Final Order, the Court may fashion an appropriate remedy, which may include, *inter alia*, the exercise of any and all rights or remedies available to the Prepetition Secured Parties under this Final Order or applicable law against the

---

[8] For the avoidance of doubt, the Carve-Out Notice and the Cash Collateral Remedies Notice may be included in the same notice.

-60-

DIP Collateral; *provided*, *further*, that the rights of the Official Committee, any other official committee appointed in these Chapter 11 Cases, the Debtors and the Replacement DIP Agent to contest such relief are expressly preserved.

(e) *Remedies Notice Period.* During the period from and after the DIP Termination Declaration Date or the Cash Collateral Termination Declaration Date (as the case may be) through the date of the Stay Relief Hearing (the "***Remedies Notice Period***"), the Debtors shall be permitted to use Cash Collateral solely to fund (i) payroll and other critical operating expenses included in (and subject to) the Approved Budget that the Debtors believe are critically necessary to keep the Debtors' businesses operating or that have been consented to by the Replacement DIP Lender or the Prepetition Agent (as applicable) (in each case, which consent shall not be unreasonably withheld or delayed), and (ii) the Professional Fees Escrow Amount; *provided* that any fees or expenses incurred by the Replacement DIP Loan Parties or the Official Committee during the Remedies Notice Period shall permanently reduce the Carve-Out Amount (as defined below). For the avoidance of doubt, during the Remedies Notice Period, the Replacement DIP Lender shall not be obligated to provide any Replacement DIP Loans or advance any credit at any time from and after the occurrence of a DIP Termination Event.

(f) *Leased Premises.* On or after a DIP Termination Declaration Date, the Replacement DIP Secured Parties shall be entitled to enter upon any leased premises in accordance with (i) a separate agreement with the landlord by and between the Replacement DIP Agent and the applicable landlord, (ii) consent of the landlord, (iii) upon entry of an order of this Court, upon notice to the landlord and a hearing, or (iv) in accordance with the rights of the Replacement DIP Agent under applicable non-bankruptcy law and the Replacement DIP Loan Documents.

-61-

(g)     *Cooperation.* The Replacement DIP Loan Parties shall reasonably cooperate with the Replacement DIP Secured Parties and the Prepetition Secured Parties (as the case may be) in their efforts to enforce their liens and security interests in the DIP Collateral and (other than the right to contest whether a DIP Termination Event or Cash Collateral Termination Event has occurred and is continuing) the Replacement DIP Loan Parties shall not take or direct any entity to take any action designed or intended to hinder or restrict in any respect such party from enforcing its rights or remedies in the DIP Collateral.

(h)     For the avoidance of doubt, upon delivery of a Remedies Notice, all rights and remedies available to the Prepetition Equipment Lenders under this Final Order, the Prepetition Equipment Loan Documents or applicable law, including, among other things, the right to file a motion with the Court seeking relief from the automatic stay to enforce rights and remedies against the Prepetition Equipment Financing Collateral, are hereby expressly preserved.

21.     *No Waiver by Failure to Seek Relief.* The rights and remedies of the Replacement DIP Secured Parties and the Prepetition Secured Parties specified herein are cumulative and not exclusive of any rights or remedies that the Replacement DIP Secured Parties or Prepetition Secured Parties may have under the Interim Order, this Final Order, the Replacement DIP Loan Documents, the Prepetition Secured Notes Documents, applicable law or otherwise. The failure or delay on the part of any of the Replacement DIP Secured Parties or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under the Interim Order, this Final Order, the Replacement DIP Loan Documents, the Prepetition Secured Notes Documents or applicable law, as the case may be, shall not constitute a waiver of any of their respective rights hereunder, thereunder or otherwise. Except as expressly set forth herein, none of the rights or remedies of the Replacement DIP Secured Parties or the Prepetition Secured Parties under the

-62-

Interim Order, this Final Order, the Replacement DIP Loan Documents and the Prepetition Secured Notes Documents shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing and signed by the requisite parties under the Replacement DIP Loan Documents and the requisite parties under the Prepetition Secured Notes Documents, as applicable. No consents required hereunder by any of the Replacement DIP Secured Parties or the Prepetition Secured Parties shall be implied by any inaction or acquiescence by any of the Replacement DIP Secured Parties or the Prepetition Secured Parties (as applicable).

22.    *Carve-Out.*

(a)    *Priority of Carve-Out.* Each of the DIP Liens, the DIP Superpriority Claims, the Prepetition Secured Notes Liens, the Adequate Protection Liens, and the Adequate Protection Claims shall be subject and subordinate to payment of the Carve-Out. The Carve-Out shall be senior to all claims and liens over all assets of the Debtors, including any DIP Collateral and Prepetition Secured Notes Collateral, as set forth in this Final Order. For the avoidance of doubt, after the occurrence of the DIP Termination Declaration Date and the date upon which the DIP Obligations are Paid in Full, the Carve-Out shall remain in effect as to the Prepetition Secured Notes Obligations and the Adequate Protection Obligations, and the Debtors shall be permitted and required to continue to fund amounts in relation to the Carve-Out in accordance with the terms of this Final Order.

(b)    *Carve-Out.* As used in this Final Order, the term "**Carve-Out**" means the sum of (i) all unpaid fees required to be paid to the Clerk of the Court and to the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest at the statutory rate pursuant to 31 U.S.C. § 3717, (ii) all unpaid reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the

-63-

Bankruptcy Code, (iii) to the extent allowed at any time, whether by interim order, final order, or other order, all accrued but unpaid fees and expenses (excluding any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors) (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "**Debtor Professionals**"), the Official Committee, and any other official committee appointed in these Chapter 11 Cases pursuant to section 328 or 1103 of the Bankruptcy Code (collectively, the "**Committee Professionals**," and together with the Debtor Professionals, the "**Professional Persons**") at any time on or before the date of delivery by the Replacement DIP Agent (at the instruction of the Replacement DIP Lender) of a Carve-Out Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve-Out Notice (the amounts set forth in the foregoing clauses (i), (ii), and (iii), the "**Pre-Carve-Out Notice Amount**"), and (iv) Allowed Professional Fees of Professional Persons incurred after the date of delivery by the Replacement DIP Agent (at the instruction of the Replacement DIP Lender) of the Carve-Out Notice, to the extent allowed at any time, whether by interim order, final order, or other court order, in an aggregate amount not to exceed $2.0 million (the amount set forth in this clause (iv) being the "**Post-Carve-Out Notice Amount**," and together with the Pre-Carve-Out Notice Amount, the "**Carve-Out Amount**"); *provided* that the Post-Carve-Out Notice Amount shall not be used to pay professional fees or expenses of any official committee appointed in these Chapter 11 Cases other than those of the Official Committee; *provided further* that nothing herein shall be construed to impair the ability of any party in interest to object to the fees, expenses, reimbursement, or compensation described herein on any grounds. For purposes of this Final Order, the "**Carve-Out Notice**" shall mean a written notice (which may be via electronic mail) delivered by the Replacement DIP Agent (acting at the instruction of the Replacement DIP Lender)

-64-

to lead restructuring counsel to the Debtors, the U.S. Trustee, counsel to the Ad Hoc Group, and the lead restructuring counsel to the Official Committee and any other official committee appointed in the Chapter 11 Cases, which notice may be delivered following the occurrence of a DIP Termination Event, stating that the Carve-Out has been invoked.

(c)     *Funding of Carve Out Account.*  The Professional Fees Escrow Account, shall continue to function as a segregated account held in trust for and exclusively available for the payment of fees and expenses of Professional Persons pursuant to this Final Order. Notwithstanding anything to the contrary in the Interim Order, the Post-Carve-Out Notice Amount shall promptly be funded into the Professional Fees Escrow Account on the Carve-Out Trigger Date (as defined below) and shall first be funded utilizing the Debtors' cash on hand and then from proceeds of non-cash assets that do not serve as collateral securing Prior Senior Liens or Prepetition Secured Notes Liens, to the extent reasonably possible, before the Debtors exercise recourse to any other assets. All rights of holders of Prior Senior Liens and Prepetition Secured Notes Liens are reserved with respect to the allocation, as between collateral securing Prior Senior Liens and collateral securing Prepetition Secured Notes Liens, of any amounts of the Post-Carve-Out Notice Amount proposed to be funded from the proceeds of such collateral, to the extent the Post-Carve-Out Notice Amount is not otherwise fully funded in accordance with the foregoing sentence.

(d)     *Pre-Carve-Out Notice.* Prior to the delivery of a Carve-Out Notice, starting with the first full calendar week following the date of the Original Interim Order, each Professional Person shall deliver to the Debtors, the Replacement DIP Agent, the Ad Hoc Group, the Replacement DIP Lender, and their respective advisors a weekly statement (each, a "***Weekly Statement***") setting forth a good-faith estimate of the amount of accrued but unpaid fees and

-65-

expenses incurred by such Professional Person during the preceding week (the "***Weekly Estimated Fees and Expenses***"), and the Debtors shall, on a weekly basis, transfer cash proceeds from amounts previously drawn under the DIP Facility or cash on hand into the Professional Fees Escrow Account in an amount equal to the aggregate amount of Weekly Estimated Fees and Expenses based on the Weekly Fee Estimates submitted by each Professional Person (and if no such estimate is provided in a given week, then the amount forecasted for such Professional Person in the Approved Budget) that remain unpaid (and that were not previously funded to the Professional Fees Escrow Account). The Debtors shall use funds held in the Professional Fees Escrow Account exclusively to pay Allowed Professional Fees as they become allowed and payable pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, in accordance with any interim or final orders of the Court; *provided* that the Debtors' obligations to pay Allowed Professional Fees shall not be limited or be deemed limited to funds held in the Professional Fees Escrow Account. For the avoidance of doubt, the Professional Fee Escrow may be the same account established under the Original Interim Order, and the Debtors are authorized to continue to use such account in accordance with the terms of this Final Order.

(e)    *Post-Carve-Out Notice.* On the date on which a Carve-Out Notice is delivered in accordance with this paragraph 22 of this Final Order, (the "***Carve-Out Trigger Date***"), the Carve-Out Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date (net of any retainers) and any available cash thereafter held by any Debtor to fund into the Professional Fees Escrow Account an amount equal to (i) the Pre-Carve-Out Notice Amount and (ii) the Post-Carve-Out Notice Amount ((i) and (ii), each to the extent not previously funded to the Professional Fees Escrow Account). No later than one (1) Business Day after the delivery of a Carve-Out Notice, each Professional Person shall deliver one (1) additional statement

-66-

to the Debtors, the Replacement DIP Agent, the Replacement DIP Lender, the Ad Hoc Group, and their respective advisors setting forth a good-faith estimate of the amount of accrued but unpaid fees and expenses incurred by such Professional Person during the period following the period covered by the most recent Weekly Statement previously delivered by such Professional Person through and including the Carve-Out Trigger Date (as defined below), and the Debtors shall transfer such amounts to the Professional Fees Escrow Account (as defined herein).

(f) Notwithstanding anything to the contrary in this Final Order, the Replacement DIP Loan Documents or the Prepetition Secured Notes Documents, following delivery of a Carve-Out Notice, the Replacement DIP Agent and the Prepetition Agents shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Professional Fees Escrow Account has been fully funded in an amount equal to all respective obligations benefitting from the Carve-Out as set forth herein. The Professional Fees Escrow Account shall not be subject to the control of the Replacement DIP Agent, any Replacement DIP Lender or any of the Prepetition Secured Parties, and the funds transferred to the Professional Fees Escrow Account shall not be subject to the DIP Liens or the Adequate Protection Liens, nor constitute DIP Collateral; *provided* that the DIP Liens and the Adequate Protection Liens shall automatically attach to any residual interest in the Professional Fees Escrow Account (which liens were deemed automatically perfected senior first-priority liens as of entry of the Interim Order), with (i) any excess that was initially funded directly from borrowings under the Replacement DIP Facility shall be paid to the Replacement DIP Agent for application to the Replacement DIP Obligations in accordance with the Replacement DIP Loan Documents until the Replacement DIP Obligations are Paid in Full (unless the Replacement DIP

-67-

Lender has otherwise agreed in writing), and (ii) any other excess amounts shall be applied in accordance with paragraph 44 of this Final Order.

(g)     Notwithstanding anything to the contrary in this Final Order, (i) disbursements by the Debtors from the Professional Fees Escrow Account shall not constitute loans or indebtedness under the Replacement DIP Loan Documents or the Prepetition Secured Notes Documents or otherwise increase or reduce the Replacement DIP Obligations or the Prepetition Secured Notes Obligations, (ii) the failure of the Professional Fees Escrow Account to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve-Out, and (iii) nothing contained herein shall constitute a cap or limitation on the amount that the Professional Persons may assert as administrative expense claims against the Debtors on account of Allowed Professional Fees incurred by such Professional Persons.

(h)     *Payment of Carve-Out on or After the Carve-Out Trigger Date.* Any payment or reimbursement made on or after the occurrence of the Carve-Out Trigger Date in respect of any Allowed Professional Fees incurred after the occurrence of the Carve-Out Trigger Date shall permanently reduce the Carve-Out Amount on a dollar-for-dollar basis.

(i)     *No Direct Obligation to Pay Allowed Professional Fees.* None of the Replacement DIP Secured Parties or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code, regardless of whether such fees or expenses have been allowed by the Court. Nothing in this Final Order or otherwise shall be construed to obligate the Replacement DIP Secured Parties or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of,

-68-

any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

23.     *Effect of the Debtors' Stipulations on Third Parties.*

(a)     The Debtors' stipulations, admission, agreements and releases contained in this Final Order shall be binding upon the Debtors and any successor thereto in all circumstances and for all purposes immediately upon entry of this Final Order.

(b)     The Debtors' Stipulations in paragraphs E and F of this Final Order shall be binding upon all parties in interest (other than the Debtors and their successors), including the Official Committee, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, and any other person or entity seeking to act on behalf of the Debtors' estates, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors in the Chapter 11 Cases or any Successor Cases, and each of their respective successors and assigns, in all circumstances and for all purposes, unless the Official Committee or such other party in interest (i) obtains requisite standing (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so), to the extent standing is required, pursuant to an order of the Court entered prior to the Challenge Deadline (as defined below), (ii) timely and properly commences and serves an adversary proceeding or contested matter (subject to the limitations contained herein) (each, a "***Challenge Proceeding***") by no later than the Challenge Deadline (as defined below) as against the Replacement DIP Secured Parties (solely with respect to clauses (ii)(C)–(E)) and/or the Prepetition Secured Parties, as the case may be, (A) objecting to or alleging any basis to impair, restrict, deny or otherwise challenge the right of any of the Prepetition Secured Parties to credit bid, in whole or in part, the Prepetition Secured Notes Liens or the Prepetition Secured Notes Obligations under section 363(k) of the Bankruptcy Code or

-69-

otherwise, (B) objecting to or challenging the amount, validity, perfection, enforceability, priority, scope or extent of the Prepetition Secured Notes Obligations, the Prepetition Secured Notes Liens, the Prepetition Secured Notes Collateral or the Prepetition Secured Notes Documents, (C) otherwise objecting to or challenging any of the admissions, stipulations, findings or releases included in the Debtors' Stipulations (as applicable), (D) asserting or prosecuting any claim or cause of action of any kind or nature whatsoever, including any claim or cause of action seeking reduction, setoff, offset, recoupment, avoidance (whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge or recovery, whether under the Bankruptcy Code, applicable non-bankruptcy law or otherwise, including, with respect to the Prepetition Secured Parties, the Prepetition Secured Notes Obligations, the Prepetition Secured Notes Liens, the Prepetition Secured Notes Collateral or the Prepetition Secured Notes Documents, or (E) asserting or prosecuting any so-called "lender liability" claims, Avoidance Actions or any other claim, counterclaim, cause of action, objection, contest or defense, of any kind or nature whatsoever, whether arising under the Bankruptcy Code, applicable law or otherwise, against any of the Replacement DIP Secured Parties, Prepetition Secured Parties, or their respective Representatives (clauses (ii)(A)–(E), collectively, the "*Challenges*," and each, a "*Challenge*"), and (iii) obtains a final non-appealable order by a court of competent jurisdiction in favor of the plaintiff sustaining any such Challenge in any timely and duly-filed Challenge Proceeding; *provided* that any pleadings filed in connection with any Challenge Proceeding, including any motion served and filed with the Court seeking requisite standing (to the extent standing is

-70-

required) and authority to pursue a Challenge, shall include a draft complaint attached thereto and shall otherwise set forth with specificity the basis for each such Challenge, and any Challenge not so specified in a Challenge Proceeding timely and properly filed prior to the Challenge Deadline shall be deemed forever, waived, released and barred.

(c)      If no such Challenge Proceeding is timely and properly filed by the Challenge Deadline, or if the Court rules does not rule in favor of plaintiff in any such timely and properly filed Challenge Proceeding, then, without application to or further order of the Court, (i) each of the admissions, stipulations, findings and releases contained in the Debtors' Stipulations shall be binding on all parties-in-interest, including the Official Committee, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, or any other party in interest (including any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors in the Chapter 11 Cases or any Successor Cases), (ii) the Prepetition Secured Notes Obligations shall constitute allowed claims against each of the Debtors in the Chapter 11 Cases and any Successor Cases, and the Prepetition Secured Notes Liens shall forever be deemed to be legal, valid, binding, continuing, perfected and enforceable, as of the Petition Date, against each of the Debtors in the Chapter 11 Cases and any Successor Cases, (iii) the Prepetition Secured Notes Obligations and the Prepetition Secured Notes Liens shall not be subject to any other or further contest, cause of action, attack, objection, challenge, defense, claim, counterclaim, reduction, setoff, offset, recoupment, avoidance (whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge or recovery or any other Challenge, of any kind or nature

-71-

whatsoever, whether under the Bankruptcy Code, applicable non-bankruptcy law or otherwise, by any person or entity, and (iii) any and all claims, counterclaims, cross-claims, causes of action, or other Challenges, of any kind or nature whatsoever, whether under the Bankruptcy Code, applicable non-bankruptcy law or otherwise, against the Replacement DIP Lender, the Prepetition Secured Parties or any of its or their Representatives (as the case may be) (in their capacities as such) shall be deemed forever waived, released and barred.

(d)     If any such Challenge Proceeding is timely filed by the Challenge Deadline, the Debtors' Stipulations shall nonetheless remain binding and preclusive on any Official Committee, any non-statutory committees appointed or formed in the Chapter 11 Cases, or any other party in interest (including any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors in the Chapter 11 Cases or any Successor Cases), except to the extent that any of the admissions, stipulations, findings or releases contained in the Debtors' Stipulations were expressly challenged in such Challenge Proceeding (and solely as to the plaintiff party that timely filed such Challenge Proceeding and ***not***, for the avoidance of doubt, any other party in interest).

(e)     For purposes of this Final Order, the "***Challenge Deadline***" means the date that is sixty (60) calendar days from the date of entry of the Interim Order (the "***Initial Challenge Deadline***"), (ii) such later date as has been agreed to in writing by the Replacement DIP Agent (acting at the instruction of the Replacement DIP Lender) and the affected Prepetition Agent (acting at the instruction of the requisite Prepetition Secured Parties under the affected Prepetition Secured Notes Documents), or (iii) such later date as has been ordered by the Court, for cause shown, upon a motion filed with the Court prior to the Initial Challenge Deadline (the time period established by clauses (i), (ii), and (iii) of this paragraph 23(e), the "***Challenge Period***"); *provided*

-72-

WEIL:\99035730\3\39031.0014

that (x) if the Chapter 11 Cases are converted to chapter 7 and a chapter 7 trustee or a chapter 11 trustee is appointed or elected prior to the Challenge Deadline, then the Challenge Deadline for any such chapter 7 trustee or chapter 11 trustee shall be extended (solely as to such chapter 7 trustee or chapter 11 trustee) to the date that is the later of (1) the Challenge Deadline then in effect at the time of its appointment or election, or (2) the date that is thirty (30) calendar days after its appointment or election, and (y) the filing of a motion by the Official Committee prior to the Initial Challenge Deadline seeking requisite standing with respect to a Challenge, attaching a draft complaint setting forth such Challenge, shall toll the Challenge Deadline for the Official Committee solely in respect of such Challenge until the date that is one Business Day after the entry of an order of the Bankruptcy Court ruling on such motion (or such later date as agreed in writing by the Replacement DIP Agent (acting at the instruction of the Replacement DIP Lender); *provided*, *however*, that (x) the Challenge Deadline for the Official Committee and the Replacement DIP Secured Parties (and solely for the Official Committee and the Replacement DIP Secured Parties) to assert any Challenge with respect to the amount of the Prepetition April NPA Secured Notes Obligations arising under the Prepetition April NPA Secured Notes or to dispute the valuation of the Prepetition Secured Notes Collateral shall be the objection deadline (as fixed by the Court) with respect to confirmation of the Debtors' chapter 11 plan and (y) the Challenge Deadline for the Official Committee or the Ad Hoc Group to assert any Challenge with respect to the Bridge Note Obligations or dispute the valuation of the Bridge Note Obligations, shall, with respect to the Official Committee, be the date that is that is forty-five (45) calendar days from the date of entry of this Final Order and, with respect to the Ad Hoc Group, be the objection deadline (as fixed by the Court) with respect to confirmation of the Debtors' chapter 11 plan.

-73-

(f)     Nothing in this Final Order vests or confers on any person or entity, including any Official Committee or any statutory or non-statutory committee appointed or formed in the Chapter 11 Cases, or any other party in interest standing or authority to pursue any Challenge belonging to the Debtors or their estates, and all rights to object to any request for such standing are expressly reserved.

24.     *Limitations on Use of Replacement DIP Loan Parties' Interest in DIP Collateral, Cash Collateral, Carve-Out or Other Funds.* Notwithstanding anything contained in this Final Order or any other order of the Court to the contrary, no DIP Collateral, Replacement DIP Loans, Cash Collateral, proceeds of any of the foregoing, any portion of the Carve-Out may be used (including to pay professional fees) by any of the Replacement DIP Loan Parties, the Official Committee, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any Successor Cases, or any other party in interest (including any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors in the Chapter 11 Cases or any Successor Cases), directly or indirectly, to:

(a)     investigate (including by way of examinations or discovery proceedings, whether formal or informal), prepare, initiate, commence, support or prosecute (or finance the preparation, initiation, commencement, support or prosecution of) any claim, counterclaim, cross-claim, cause of action, suit, arbitration, application, motion, contested matter, objection, defense, adversary proceeding, litigation or other proceeding of any kind or nature (whether for monetary, injunctive, affirmative relief or otherwise) (i) against any of the Replacement DIP Secured Parties or their respective Representatives (each in their capacities as such), (ii) objecting to, challenging, contesting, or raising any defense to, the amount, validity, enforceability, perfection, priority, extent or scope of the claims, liens and security interests granted under the Interim Order or this Final Order, the Replacement DIP Loan Documents, (iii) asserting avoidance (whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), any so-called "lender liability" claims, or any other any claim or cause of action seeking reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharging

-74-

or recovery, in each case, with respect to the DIP Liens, the DIP Obligations, the Replacement DIP Loan Documents, or the DIP Collateral, (vi) any claim or cause of action of any kind or nature whatsoever, whether arising under the Bankruptcy Code or applicable non-bankruptcy law, against any of the Replacement DIP Secured Parties or their respective Representatives;

(b) object to or seek to impair, modify or interfere with any of the rights, remedies, priorities, privileges, protections or benefits granted to the Replacement DIP Secured Parties under this Final Order, the Replacement DIP Loan Documents (other than to contest whether a DIP Termination Event has occurred);

(c) object to or seek to prevent, hinder, interfere with or otherwise delay any of the Replacement DIP Secured Parties' assertion, enforcement, exercise of remedies or realization upon any DIP Collateral in accordance with this Final Order, or the Replacement DIP Loan Documents (other than to contest whether a DIP Termination Event has occurred);

(d) seek or request authorization from the Court to obtain postpetition financing (whether equity or debt) or other financial accommodations pursuant to sections 364(c) or (d) of the Bankruptcy Code or otherwise, unless such financing is sufficient to cause the Payment in Full of all Replacement DIP Obligations contemporaneously with the consummation of such financing (or as otherwise agreed in writing by the Replacement DIP Lender);

(e) seek or request authorization from the Court to obtain superpriority claims or liens or security interests (other than liens or security interests expressly permitted under this Final Order or the Replacement DIP Loan Documents) in any portion of the DIP Collateral that are senior to or *pari passu* with the DIP Liens, the DIP Superpriority Claims, unless all Replacement DIP Obligations have been Paid in Full (or as otherwise agreed in writing by the Replacement DIP Lender);

(f) use, request authorization to sell, or otherwise dispose of DIP Collateral or Cash Collateral (without the prior written consent of the Replacement DIP Lender and of the Prepetition Secured Parties, respectively) other than as expressly permitted in this Final Order and in the Replacement DIP Loan Documents (as applicable); or

(g) pay or seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are agreed to in writing by the Replacement DIP Lender (or are otherwise expressly included in the Approved Budget and do not violate any of the terms of the Replacement DIP Loan Documents);

*provided* that none of the Prepetition Secured Notes Collateral (including Cash Collateral) and no more than an aggregate amount of $250,000 of the DIP Collateral, the Replacement DIP Loans, proceeds of any of the foregoing DIP Collateral or Replacement DIP Loans, any portion of the

-75-

Carve-Out or any other funds may be used by the Official Committee during the Challenge Period
to investigate (but not to prosecute, litigate, commence or support any Challenge, or prepare any
complaint or motion in respect of any Challenge, including by way of discovery), the Debtors'
Stipulations in paragraph E of this Final Order.

25.     *Limitations on Use of Prepetition Secured Parties' Interest in Cash Collateral,*
*Carve-Out or Other Funds.* Notwithstanding anything contained in this Final Order or any other
order of the Court to the contrary, no Prepetition Secured Notes Collateral (including Cash
Collateral) may be used (including to pay professional fees) by any of the Replacement DIP Loan
Parties, the Official Committee, any statutory or non-statutory committees appointed or formed in
the Chapter 11 Cases or any Successor Cases, or any other party in interest (including any chapter
7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors in the
Chapter 11 Cases or any Successor Cases), directly or indirectly, to:

(a)     investigate (including by way of examinations or discovery proceedings, whether
formal or informal), prepare, initiate, commence, support or prosecute (or finance
the preparation, initiation, commencement, support or prosecution of) any claim,
counterclaim, cross-claim, cause of action, suit, arbitration, application, motion,
contested matter, objection, defense, adversary proceeding, litigation or other
proceeding of any kind or nature (whether for monetary, injunctive, affirmative
relief or otherwise) (i) against the Prepetition Secured Parties, or their respective
Representatives (each in their capacities as such), (ii) objecting to, challenging,
contesting, or raising any defense to, the amount, validity, enforceability,
perfection, priority, extent or scope of the claims, liens and security interests
granted under the Prepetition Secured Notes Documents, (iii) asserting avoidance
(whether under chapter 5 of the Bankruptcy Code or under applicable law
(including any applicable state law Uniform Fraudulent Transfer Act, Uniform
Fraudulent Conveyance Act or similar statute or common law)), any so-called
"lender liability" claims, or any other any claim or cause of action seeking
reduction, setoff, offset, recoupment, recharacterization, subordination (whether
equitable, contractual or otherwise), reclassification, disgorgement, disallowance,
impairment, marshalling, surcharging or recovery, in each case, with respect to the
Adequate Protection Liens, the Adequate Protection Claims, and the other
Adequate Protection Obligations, the Prepetition Secured Notes Liens, the
Prepetition Secured Notes Obligations, the Prepetition Secured Notes Documents,
or the Prepetition Secured Notes Collateral, (vi) any claim or cause of action of any

-76-

kind or nature whatsoever, whether arising under the Bankruptcy Code or applicable non-bankruptcy law, against any of the Prepetition Secured Parties or their respective Representatives;

(b)     object to or seek to impair, modify or interfere with any of the rights, remedies, priorities, privileges, protections or benefits granted to the Prepetition Secured Parties under the Interim Order, this Final Order or the Prepetition Secured Notes Documents;

(c)     object to or seek to prevent, hinder, interfere with or otherwise delay any of the Prepetition Secured Parties' assertion, enforcement, exercise of remedies or realization upon any DIP Collateral (in the case of Adequate Protection Liens) or Prepetition Secured Notes Collateral (in the case of Prepetition Notes Liens) in accordance with the Interim Order, this Final Order or the Prepetition Notes Documents (other than to contest whether a Cash Collateral Termination Event has occurred);

(d)     seek or request authorization from the Court to obtain superpriority claims or liens or security interests (other than liens or security interests expressly permitted under this Final Order) in any portion of the DIP Collateral that are senior to or *pari passu* with the Adequate Protection Liens, the Adequate Protection Claims, the Prepetition Liens, or the Prepetition Secured Obligations;

*provided* that nothing herein shall limit the Official Committee from using the DIP Collateral, Replacement DIP Loans, or any other funds of the Debtors that does not constitute Prepetition Secured Notes Collateral (including Cash Collateral) from investigating, prosecuting, litigating, commencing or supporting any Challenge in any way whatsoever against the Prepetition Secured Parties.

26.     *Limitation on Charging Expenses.* Except to the extent of the Carve-Out and subject to paragraph 43 hereof, no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases (or any future proceedings that may result therefrom) at any time, including any costs and expenses incurred in connection with the preservation, protection, or enhancement of realization by the Replacement DIP Secured Parties upon the DIP Collateral or the Prepetition Secured Parties upon the Prepetition Secured Notes Collateral, respectively, shall be charged against or recovered from the DIP Collateral as to Replacement DIP Secured Parties or the

-77-

Prepetition Secured Notes Collateral as to the Prepetition Secured Parties, whether pursuant to section 506(c) of the Bankruptcy Code or other similar legal or equitable doctrine or otherwise, without the prior written consent of the Replacement DIP Lender with respect to the DIP Collateral or the requisite Prepetition Secured Parties under the applicable Prepetition Secured Notes Documents with respect to the Prepetition Secured Notes Collateral, each in their sole discretion, and no such consent shall be implied, directly or indirectly, from anything contained in the Interim Order or this Final Order (including consent to the Carve-Out or the approval of any budget hereunder) or from any other action, inaction, or acquiescence by any of the Replacement DIP Secured Parties or Prepetition Secured Parties to any charge, lien, assessment or claim against the Replacement DIP Secured Parties with respect to the DIP Collateral or the Prepetition Secured Parties with respect to the Prepetition Secured Notes Collateral, whether under section 506(c) of the Bankruptcy Code or otherwise. Nothing contained in the Interim Order or this Final Order shall be deemed to be consent by any of the Prepetition Equipment Lenders to any charge, lien, assessment or claim against assets subject to their respective Prepetition Equipment Financing Liens or Equipment Lender Adequate Protection Liens under section 506(c) of the Bankruptcy Code or otherwise, and no such consent shall be implied from any other action, inaction, or acquiescence by the Prepetition Equipment Lenders. All of the Prepetition Equipment Lenders' rights, claims and defenses with respect to any charge, lien, assessment or claim asserted against assets subject to their respective Prepetition Equipment Financing Liens or Equipment Lender Adequate Protection Liens, under section 506(c) of the Bankruptcy Code or other similar legal or equitable doctrine, are hereby expressly reserved.

27.     *No Marshalling; Section 552(b) Waiver.* Subject to paragraph 43 hereof, in no event shall the Replacement DIP Secured Parties or the Prepetition Secured Parties be subject to the

-78-

equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Replacement DIP Obligations, the Prepetition Secured Notes Collateral or the Prepetition Secured Notes Obligations (as applicable), and all proceeds of DIP Collateral shall be received and applied in accordance with this Final Order; *provided* that the Replacement DIP Secured Parties shall use commercially reasonable efforts to first apply all DIP Collateral (other than any proceeds from Avoidance Actions), to the extent such collateral may promptly be monetized in a commercially reasonable manner, before applying any proceeds from Avoidance Actions to satisfy the DIP Obligations and the Adequate Protection Obligations, as applicable. Subject to paragraph 43 hereof, each of the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition Secured Parties or the Prepetition Secured Notes Collateral.

28.     *Right to Credit Bid.* Subject in all respects to paragraph 44 of this Final Order, (a) the Replacement DIP Agent or its designee (in each case, acting at the instruction of the Replacement DIP Lender), shall have the right pursuant to section 363(k) of the Bankruptcy Code to credit bid all or any portion of the First-Priority DIP Collateral in accordance with the Replacement DIP Loan Documents up to the full amount of any Replacement DIP Obligations, (b) the Prepetition Agents or their designee (in each case, acting at the instruction of the requisite Prepetition Secured Parties under the applicable Prepetition Secured Notes Documents), shall have the right pursuant to section 363(k) of the Bankruptcy Code to credit bid all or any portion of the Prepetition Secured Notes Collateral up to the full amount of any applicable Prepetition Secured Notes Obligations, and (c) the Prepetition Equipment Lenders or their respective designees (in each case, acting at the instruction of such Prepetition Equipment Lender), shall have the right

-79-

pursuant to section 363(k) of the Bankruptcy Code to credit bid all or any portion of their respective Prepetition Equipment Financing Collateral up to the full amount of such Prepetition Equipment Lender's Prepetition Equipment Financing, but only to the extent that such Prepetition Equipment Lender's Prepetition Equipment Financing Lien is properly perfected and not subject to avoidance or challenge, in each case, in the sale of any of the Replacement DIP Loan Parties' assets, whether in a sale under or pursuant to section 363 of the Bankruptcy Code, a chapter 11 plan subject to confirmation under section 1129(b)(2)(A) of the Bankruptcy Code, a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code, or otherwise. The Replacement DIP Agent (acting at the instruction of the Replacement DIP Lender), the Prepetition Agents or their designee (in each case, acting at the instruction of the requisite Prepetition Secured Parties under the applicable Prepetition Secured Notes Documents), and the Prepetition Equipment Lenders or their respective designees, shall have the absolute right to assign, transfer, sell, or otherwise dispose of its rights to credit bid (subject to this Final Order) to any acquisition vehicle formed in connection with such bid or other designee by or on behalf of the Replacement DIP Agent (acting at the instruction of the Replacement DIP Lender) the Prepetition Agents or their designee (in each case, acting at the instruction of the requisite Prepetition Secured Parties under the applicable Prepetition Secured Notes Documents), or any of the Prepetition Equipment Lenders or any of their respective designees, as applicable.

29. *Binding Effect; Successors and Assigns.* Subject to paragraph 23 of this Final Order, the Replacement DIP Loan Documents and this Final Order, including all findings and conclusions of law herein, shall be binding upon all parties in interest in the Chapter 11 Cases and any Successor Cases, including the Replacement DIP Secured Parties, the Prepetition Secured Parties, the Official Committee or any other statutory or non-statutory committee appointed or formed in

-80-

the Chapter 11 Cases and any Successor Cases, and their respective successors and assigns (including any chapter 11 trustee or chapter 7 trustee or examiner appointed or elected in the Chapter 11 Cases or any Successor Cases, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), and shall inure to the benefit of each of the Debtors, the Replacement DIP Secured Parties, the Prepetition Secured Parties, and their respective successors and assigns; *provided* that the Replacement DIP Secured Parties and the Prepetition Secured Parties shall have no obligation to make any loan, permit the use of DIP Collateral or Prepetition Secured Notes Collateral (including Cash Collateral) or extend any financing to any chapter 11 trustee or chapter 7 trustee or similar responsible person appointed for the estate of any Debtor in the Chapter 11 Cases or any Successor Cases.

30. *No Modification of Final Order.*

(a) The Replacement DIP Loan Parties irrevocably waive the right to seek, and shall not seek or consent to, directly or indirectly: (A) without the prior written consent of the Replacement DIP Lender (unless and until the Replacement DIP Obligations have been Paid in Full), (i) any modification, stay, vacatur or amendment to this Final Order, (ii) the allowance of any claim against any Debtor in the Chapter 11 Cases or any Successor Cases equal or superior to the DIP Superpriority Claims (other than the Carve-Out), (iii) the grant of any lien or security interest on any DIP Collateral with priority equal to or superior to the DIP Liens, except as expressly permitted hereunder or under the Replacement DIP Loan Documents, or (iv) the entry of any order authorizing the use of DIP Collateral (including Cash Collateral) that is inconsistent with this Final Order (except in connection with a request for approval of financing sufficient to cause the Payment in Full of all Replacement DIP Obligations contemporaneously with the

-81-

consummation of such financing), or (B) without the prior written consent of the Prepetition Agents (acting at the instruction of the requisite Prepetition Secured Parties) (unless and until the Prepetition Secured Notes Obligations have been Paid in Full), except as expressly permitted under this Final Order, (i) any modification, stay, vacatur, or amendment to this Final Order that materially adversely affects the applicable Prepetition Secured Parties' rights, remedies, benefits, or protections provided for in this Final Order, (ii) the allowance of any claim against any Debtor in the Chapter 11 Cases or any Successor Cases equal or superior to the Noteholder Adequate Protection Claims, or (C) except as expressly permitted hereunder, the grant of any lien or security interest on any DIP Collateral with priority equal to or superior to the Noteholder Adequate Protection Liens.

(b)     Without limiting the provisions of the immediately preceding paragraph, if at any time prior to the Payment in Full of all Replacement DIP Obligations, either the Replacement DIP Loan Parties, the Replacement DIP Loan Parties' estates, any chapter 11 trustee, chapter 7 trustee or examiner with enlarged powers, or any responsible officer subsequently appointed in any of the Chapter 11 Cases or any Successor Cases, shall obtain credit or incur debt pursuant to sections 364(b), (c), or (d) of the Bankruptcy Code in violation of this Final Order or the Replacement DIP Loan Documents, then, unless otherwise agreed in writing by the Replacement DIP Lender (with respect to the Replacement DIP Obligations), all of the cash proceeds derived from such credit or debt shall immediately be turned over to the Replacement DIP Agent, for further distribution to the applicable Replacement DIP Secured Parties on account of their applicable Replacement DIP Obligations pursuant to the Replacement DIP Loan Documents.

WEIL:\99035730\3\39031.0014

(c)     For the avoidance of doubt, from and after the Payment in Full of all Prepetition Secured Notes Obligations, or following the occurrence of the DIP Termination Declaration Date or Cash Collateral Termination Declaration Date, the Debtors shall not be prohibited from seeking relief to use Cash Collateral on a non-consensual basis and the Prepetition Secured Parties' rights to object to such relief (and/or the right to seek relief, including without limitation, the right to seek additional adequate protection and/or seek to lift the automatic stay in order to exercise rights and against Prepetition Secured Notes Collateral) are expressly preserved.

31.     *Preservation of Rights Granted Under Final Order.*

(a)     *Senior to Other Liens.* Other than the Carve-Out and the Prior Senior Liens, no claim (including any intercompany claim) or lien having a priority superior to or *pari passu* with those granted by the Interim Order to the Replacement DIP Secured Parties shall be permitted while any of the Replacement DIP Obligations remain outstanding, and, except as otherwise expressly provided in this Final Order. The DIP Superpriority Claims and the Noteholder Adequate Protection Claims shall not be subject or junior to any intercompany or affiliate claims of the Debtors. The DIP Liens and the Noteholder Adequate Protection Liens shall not be: (A) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code; (B) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise; (C) subordinated to or made *pari passu* with any liens arising after the Petition Date, including any liens or security interests granted in favor of any federal, state, municipal, or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors; or (D) subject or junior to any intercompany or affiliate lies or security interests of the Debtors.

-83-

(b)     *Payment in Full.* Until Payment in Full of all Replacement DIP Obligations, none of the Replacement DIP Loan Parties shall propose or support any chapter 11 plan or sale of all or substantially all of the Replacement DIP Loan Parties' equity or assets, or any order confirming such plan or approving such sale, that is not conditioned upon the Payment in Full (unless otherwise agreed in writing by the Replacement DIP Lender) of all Replacement DIP Obligations on or prior to the earlier to occur of the effective date of such chapter 11 plan or sale.

(c)     *Dismissal/Conversion.* Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code: (i) all of the claims, liens and security interests, rights, priorities, privileges, remedies, benefits and protections granted to the Replacement DIP Secured Parties and the Prepetition Secured Parties hereunder and under the Replacement DIP Loan Documents (as applicable) (including the DIP Superpriority Claims, the Noteholder Adequate Protection Claims, the DIP Liens, and the Noteholder Adequate Protection Liens), shall continue in full force and effect and shall maintain their priorities as provided in the Interim Order and this Final Order until all Replacement DIP Obligations and Noteholder Adequate Protection Obligations shall have been Paid in Full, and all such claims, liens and security interests, rights, priorities, privileges, remedies, benefits and protections shall, notwithstanding such dismissal or conversion, remain unaffected and shall remain binding on all parties in interest (and any such order shall, in accordance with sections 105 and 349 of the Bankruptcy Code, so provide), and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal or conversion, for the purposes of enforcing all such claims, liens and security interests, rights, priorities, privileges, remedies, benefits and protections granted to the Replacement DIP

-84-

Secured Parties and the Prepetition Secured Parties hereunder and under the Replacement DIP Loan Documents (as applicable).

(d)     *Reversal/Modification.* Based on the findings set forth in this Final Order and the record presented during the Interim Hearing, the Final Hearing and the Chapter 11 Cases, and in accordance with section 364(e) of the Bankruptcy Code, in the event that any or all of the provisions of this Final Order or the Replacement DIP Loan Documents are hereafter reversed, modified, vacated or stayed by a subsequent judgment or order of this Court or any other court, any such reversal, stay, modification or vacatur shall not affect (i) the validity or enforceability of advances previously made hereunder or under the Replacement DIP Loan Documents by the Replacement DIP Secured Parties to the Debtors, (ii) the validity or enforceability of any obligation, indebtedness or liability incurred under the Interim Order, this Final Order or the Replacement DIP Loan Documents (including the Replacement DIP Obligations and the Noteholder Adequate Protection Obligations) by the Replacement DIP Loan Parties to the Replacement DIP Secured Parties and the Prepetition Secured Parties, (iii) the validity, enforceability, or perfection of any of the claims, liens, security interests, rights, privileges or benefits granted hereunder or under the Replacement DIP Loan Documents to the Replacement DIP Secured Parties and the Prepetition Secured Parties, or (iv) the payment of any fees, costs, expenses or other amounts to the Replacement DIP Secured Parties and the Prepetition Secured Parties under the Interim Order, this Final Order and the Replacement DIP Loan Documents, in each case, prior to the actual receipt of written notice by any of the Replacement DIP Agent and/or the Prepetition Agents (as applicable) of the effective date of such reversal, stay, modification, or vacatur. Notwithstanding any such reversal, stay, modification or vacatur, the claims, liens, security interests, rights, privileges, remedies and benefits set forth in the Interim Order or this

-85-

Final Order shall be governed in all respects by the original provisions of the Interim Order, this Final Order and the Replacement DIP Loan Documents.

(e)     *Survival.* Except as expressly provided in this Final Order, until all of the Replacement DIP Obligations have been Paid in Full (unless the Replacement DIP Lender have otherwise agreed in writing in respect of the Replacement DIP Obligations), all claims, liens and security interests, rights, priorities, privileges, remedies, benefits, and protections granted to the Replacement DIP Secured Parties under the Interim Order, this Final Order and the Replacement DIP Loan Documents shall survive and shall not be modified, impaired, or discharged by: (i) the entry of an order confirming any chapter 11 plan in any of the Chapter 11 Cases (and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors hereby waive any discharge as to any remaining Replacement DIP Obligations), (ii) the entry of an order converting any or all of the Chapter 11 Cases to a case (or cases) under chapter 7 of the Bankruptcy Code, dismissing any or all of the Chapter 11 Cases, or terminating the joint administration of the Chapter 11 Cases or by any other act or omission, or (iii) the entry of an order approving the sale or disposition of any DIP Collateral (except to the extent expressly permitted in the DIP Loan Documents and this Final Order).

32.     *Proofs of Claim.*

(a)     The Replacement DIP Agent and Replacement DIP Lender shall not be required to file proofs of claim with respect to their Replacement DIP Obligations under the Replacement DIP Documents, and the evidence presented with the Motion and the record established at the Interim Hearing and the Final Hearing are deemed sufficient to, and do, constitute proofs of claim with respect to their obligations, senior secured status, and super-priority.  Additionally, the Bridge Noteholders shall not be required to file proofs of claim in any

-86-

of Chapter 11 Cases or any of the Successor Cases in order to assert claims for payment of the Bridge Note Obligations.

(b)     The Prepetition Secured Parties shall not be required to file proofs of claim in any of the Chapter 11 Cases or any of the Successor Cases in order to assert claims for payment of the Adequate Protection Obligations.

(c)     Any order entered by the Court establishing a bar date in any of the Chapter 11 Cases or any Successor Chapter 11 Cases shall not apply to the Replacement DIP Secured Parties, the Bridge Noteholders, the Replacement DIP Obligations, the Adequate Protection Obligations, or the Bridge Note Obligations; *provided* that, notwithstanding any order entered by the Court establishing a bar date in any of the Chapter 11 Cases or any Successor Cases to the contrary, the Prepetition Agents (on behalf of themselves and the applicable Prepetition Secured Parties), the Replacement DIP Agent (on behalf of itself and the Replacement DIP Secured Parties) and the Bridge Noteholders, in their respective discretion, may (but are not required to) file (and amend and/or supplement) in the Debtors' lead Chapter 11 Case, *In re Core Scientific, Inc.*, Case No. 22-90341 (DRJ), a consolidated master proof of claim on behalf of the Prepetition Secured Parties, the Replacement DIP Secured Parties or the Bridge Noteholders (as applicable) (the "**Master Proof of Claim**") against each of the Debtors. Upon the filing of the Master Proof of Claim by any of the Prepetition Agents, the Replacement DIP Agent or the Bridge Noteholders, such party shall be deemed to have filed a proof of claim in the amount set forth opposite its name therein in respect of its claims against each of the Debtors and shall be treated as if it had filed a separate proof of claim in each of the Chapter 11 Cases. Such Master Proof of Claim shall not be required to attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable party, which instruments, agreements or other

-87-

documents will be provided upon reasonable written request to the applicable Prepetition Agent, Replacement DIP Agent, or Bridge Noteholder, as the case may be. With respect to the Prepetition Secured Parties, such Master Proof of Claim shall further not be required to identify whether any Prepetition Secured Party acquired its claim from another party, the identity of any such party, or reflect a change in the holders of the claims set forth therein or a reallocation among the holders of the claims asserted therein resulting from the transfer of all or any portion of such claims.

(d)     The provisions of this paragraph 32 and each Master Proof of Claim are intended solely for the purpose of administrative convenience and shall not (i) affect the right of each Replacement DIP Secured Party, Bridge Noteholder or Prepetition Secured Party (or its successors in interest) to vote separately on any chapter 11 plan proposed in these Chapter 11 Cases (or any Successor Cases), or (ii) any substantive rights of the Prepetition Secured Parties, the Replacement DIP Secured Parties, or the Bridge Noteholders or any party in interest or their respective successors in interest.

33.     *Limitation of Liability.*

(a)     Nothing in the Original Interim Order, the Interim Order, this Final Order, the Replacement DIP Loan Documents or any documents related thereto shall in any way be construed or interpreted to impose or allow the imposition upon any of the Replacement DIP Secured Parties or the Prepetition Secured Parties of any liability for any claim arising from, in connection with or related to the prepetition or postpetition activities of the Replacement DIP Loan Parties or their respective affiliates (as defined in section 101(2) of the Bankruptcy Code) in the operation of their businesses, their restructuring efforts or the administration of these Chapter 11 Cases.

-88-

(b)     In determining to make any loan or extension of credit under the Replacement DIP Loan Documents or permit the use of Prepetition Secured Notes Collateral (including Cash Collateral), or in exercising any rights or remedies under this Final Order, the Replacement DIP Loan Documents or the Prepetition Secured Notes Documents, none of the Replacement DIP Secured Parties or the Prepetition Secured Parties shall (i) have any liability to any third party or be deemed to be in control of the operations of any of the Replacement DIP Loan Parties, (ii) owe any fiduciary duty to any of the Replacement DIP Loan Parties, their respective creditors, shareholders or estates, or (iii) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of any of the Replacement DIP Loan Parties (as such terms or any similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42, U.S.C. §§ 9601 *et seq*., as amended, or any other federal or state statute, including the Internal Revenue Code).

(c)     The Replacement DIP Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person, and all risk of loss, damage, or destruction of the DIP Collateral shall be borne solely by the Replacement DIP Loan Parties; *provided* that nothing contained in this paragraph 33(c) shall release the Replacement DIP Secured Parties from their obligations under the Replacement DIP Loan Documents.

34.     *Release of Replacement DIP Secured Parties*. Effective as of entry of the Interim Order and subject to paragraph 23 hereof, each of the Replacement DIP Loan Parties and its respective estate, on its own behalf and on behalf of its predecessors, successors and assigns,

-89-

hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits each of the Replacement DIP Secured Parties and each of their respective Representatives (in their capacities as such) from any and all obligations and liabilities to the Replacement DIP Loan Parties (and their successors and assigns) and from any and all claims, counterclaims, cross-claims, demands, defenses, objections, challenges, offsets or setoff, debts, accounts, contracts, liabilities, remedies, suits, controversies, actions, causes of action, losses, damages, indemnities, reimbursement obligations, attorneys' fees, costs, expenses or judgments, of every kind or nature whatsoever, whether matured or unmatured, known or unknown, asserted or unasserted, suspected or unsuspected, foreseen or unforeseen, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, pending or threatened, arising in law or equity, upon contract or tort, under the Bankruptcy Code, any state or federal common law, statute, rule, regulation or otherwise, including any claim or cause of action seeking (i) any so-called lender liability, (ii) any and all claims arising under the Bankruptcy Code, whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), or otherwise, (iii) reduction, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge or recovery, in each case, that may be asserted by any of the Replacement DIP Loan Parties, their respective estates, predecessors, successors and assigns, in each case, against any of the Replacement DIP Secured Parties or their respective Representatives (in their capacities as such) for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time prior to the date of this Final Order, in connection with, arising under or related to this Final Order, the Replacement DIP Facility, the DIP Liens, the Replacement DIP Obligations, the DIP Collateral,

-90-

the transactions contemplated thereunder or hereunder, or the negotiation thereof or hereof, including any claim or cause action with respect to the validity, enforceability, priority, scope, extent or perfection of the DIP Liens, the Replacement DIP Obligations or the Replacement DIP Loan Documents; *provided* that nothing contained in the foregoing shall release the Replacement DIP Secured Parties from their obligations under the Replacement DIP Facility from and after the date hereof.

35.     *Payments Free and Clear.* Any and all payments or proceeds required to be remitted to the Replacement DIP Secured Parties or the Prepetition Secured Parties pursuant to the Replacement DIP Loan Documents, the Original Interim Order, the Interim Order, this Final Order or any subsequent order of this Court shall be irrevocable (subject, solely in the case of the DIP Professional Fees and the Noteholder Professional Fees, only to the procedures set forth in paragraph 11 of this Final Order), and shall be received free and clear of any claim, charge, assessment or other liability, including any claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code (whether asserted or assessed by, through or on behalf of the Replacement DIP Loan Parties), or otherwise.

36.     *Joint and Several Liability.* Nothing in this Final Order shall be construed to constitute or authorize a substantive consolidation of any of the DIP Loan Parties' estates, it being understood, however, that the DIP Loan Parties shall be jointly and severally liable for all obligations (including all DIP Obligations and all Adequate Protection Obligations) under the Interim Order, this Final Order and the DIP Loan Documents.

37.     *Third-Party Beneficiary.* Except as expressly set forth herein, no rights are created hereunder for the benefit of any third party, any creditor, equity holder, or any direct, indirect or incidental beneficiary.

38.    *Final Order Controls.* In the event of any express conflict between or among the terms or provisions of this Final Order and any of the Replacement DIP Loan Documents, unless such term or provision in this Final Order is phrased in terms of "defined in" or "as set forth in" the Replacement DIP Credit Agreement or Replacement DIP Loan Documents, or in the event of any conflict or inconsistency between the terms of this Final Order and any other order of the Court, the terms and provisions of this Final Order shall govern and control. Notwithstanding anything contained in any other order entered by this Court to the contrary, any payment made pursuant to, or authorization contained in, any other order entered by this Court shall be consistent with and subject to the requirements set forth in this Final Order and the Replacement DIP Loan Documents, including the Approved Budget (subject to Permitted Variances).

39.    *Effectiveness.* This Final Order shall constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052 and shall take effect and be fully enforceable (in the case of the Adequate Protection Obligations and all liens, security interests, benefits and protections afforded to the Prepetition Secured Parties hereunder, *nunc pro tunc* to the Petition Date) immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 7062, or 9014, any Local Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

40.    *Bankruptcy Rules.* The requirements of Bankruptcy Rules 4001 and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

41.    *Headings.* Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Final Order. When used in this Final Order, the word "including" shall not imply limitation.

-92-

42. *Adequate Protection to Prepetition Equipment Lenders*. Pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, as adequate protection of their purported Prepetition Equipment Liens in Prepetition Equipment Collateral, the Prepetition Equipment Lenders shall be entitled to the following (collectively, the obligations under this paragraph 42, together with the Noteholder Adequate Protection Obligations, the "***Adequate Protection Obligations***"):

(a)     *Equipment Lender Adequate Protection Claims.* The Prepetition Equipment Lenders were, by the Original Interim Order and the Interim Order, and are each hereby granted on a final basis in the amount of any aggregate Diminution in Value of the respective purported Prepetition Equipment Liens in Prepetition Equipment Collateral (as applicable) from and after the Petition Date, superpriority administrative expense claims contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors (the "***Equipment Lender Adequate Protection Claims***," together with the Noteholder Adequate Protection Claims, the "***Adequate Protection Claims***"), which shall be payable by each of the Debtors on a joint and several basis, and shall have recourse to all DIP Collateral. The Equipment Lender Adequate Protection Claims shall be (i) subject and subordinate only to the Carve-Out and the DIP Superpriority Claims, (ii) *pari passu* with the Noteholder Adequate Protection Claims, and (iii) senior to any and all other administrative expense claims and all other claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever.

(b)     *Equipment Lender Adequate Protection Liens.* The Prepetition Equipment Lenders were, by the Original Interim Order and the Interim Order, and are each hereby granted on a final basis, effective and perfected as of the entry of the Original Interim Order, and without the necessity of the execution, recordation or filing by the Replacement DIP Loan Parties or any

-93-

of the Prepetition Equipment Lenders of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title for titled goods, or any similar document or instrument, or the taking of any other action (including entering into any control agreements or taking possession or control of any DIP Collateral), in the amount of any aggregate Diminution in Value of the purported Prepetition Equipment Liens in the Prepetition Equipment Financing Collateral (as applicable) from and after the Petition Date, valid, binding, enforceable and automatically perfected post-petition liens and security interests in all DIP Collateral (the "*Equipment Lender Adequate Protection Liens*," and together with the Noteholder Adequate Protection Liens, the "*Adequate Protection Liens*"). The Equipment Lender Adequate Protection Liens shall be (i) junior and subordinated to (A) the Carve-Out, (B) the First-Priority DIP Liens in First-Priority DIP Collateral, (C) the Noteholder Adequate Protection Liens in Prepetition Secured Notes Collateral, and (D) the Prior Senior Liens (other than the Prepetition Equipment Liens that constitute Prior Senior Liens), (ii) *pari passu* with the Noteholder Adequate Protection Liens in the First-Priority DIP Collateral and *pari passu* with the Noteholder Adequate Protection Liens in the Junior-Priority DIP Collateral (other than Prepetition Equipment Financing Collateral and the Prepetition Secured Notes Collateral), (iii) senior to the DIP Liens in Prepetition Equipment Financing Collateral (as applicable) and the Noteholder Adequate Protection Liens in Prepetition Equipment Financing Collateral (as applicable), and (iv) senior to any and all other liens and security interests in the DIP Collateral, including the Noteholder Adequate Protection Liens in the Prepetition Equipment Financing Collateral.

43. *Limitations of Certain Waivers.* Notwithstanding anything in this Final Order to the contrary, solely from and after the Cash Collateral Termination Declaration Date, (i) the waiver of the right to surcharge the Prepetition Secured Notes Collateral as to the Prepetition Secured Parties

-94-

pursuant to section 506(c) of the Bankruptcy Code shall not apply to costs and expenses of administering the Chapter 11 Cases incurred after the Cash Collateral Termination Declaration Date, and (ii) the waiver of any "equities of the case exception" under section 552(b) of the Bankruptcy Code with respect to the Prepetition Secured Notes Collateral as to the Prepetition Secured Parties shall not apply with respect to proceeds of Prepetition Secured Notes Collateral received by the Debtors after the Cash Collateral Termination Declaration Date, and, in the case of each of the foregoing, the rights of all parties in connection therewith are reserved.

44.    *Intercreditor Provisions.*

(a)    Notwithstanding anything set forth in this Final Order or the Replacement DIP Loan Documents to the contrary, until the Replacement DIP Obligations have been Paid in Full, the Replacement DIP Agent (acting at the direction of the DIP Replacement Lender) shall have the sole and exclusive right to enforce rights, exercise remedies, and make determinations regarding the sale, release, or other disposition of all (1) First-Priority DIP Collateral, and (2) Junior-Priority DIP Collateral (other than Prepetition Equipment Financing Collateral and Prepetition Secured Notes Collateral), and each of the Prepetition Secured Parties and the Prepetition Equipment Lenders (x) will not exercise any right or remedies with respect to any such collateral or seek relief from the automatic stay in order to commence any action with respect to such rights and remedies, and (y) will not contest, protest or object to or otherwise interfere with any action or proceeding brought by the Replacement DIP Agent to enforce its rights and remedies relating to such collateral. Following the Payment in Full of the Replacement DIP Obligations, until the Prepetition Secured Notes Obligations have been indefeasibly Paid in Full, (A) the Prepetition Agents (acting at the direction of the requisite Prepetition Secured Parties under the applicable Prepetition Secured Notes Documents) shall have the sole and exclusive right to enforce

-95-

rights, exercise remedies, and make determinations regarding the sale, release, or other disposition of any such collateral, and (B) the Prepetition Equipment Lenders (x) will not exercise any right or remedies with respect to any such collateral or seek relief from the automatic stay in order to commence any action with respect to such rights and remedies, and (y) except as permitted in paragraph 20(d) hereof, will not contest, protest or object to or otherwise interfere with any action or proceeding brought by Prepetition Agents (acting at the instruction of the requisite Prepetition Secured Parties under the applicable Prepetition Secured Notes Documents) to enforce their rights and remedies relating to such collateral. Following the Payment in Full of the Prepetition Secured Notes Obligations, the respective Prepetition Equipment Lenders shall have the sole and exclusive right to enforce rights, exercise remedies, and make determinations regarding the sale, release, or other disposition of any of such collateral.

(b)       Notwithstanding anything set forth in this Final Order or the Replacement DIP Loan Documents to the contrary, until the Prepetition Secured Notes Obligations are Paid in Full, the Prepetition Agents (acting at the instruction of the requisite Prepetition Secured Parties under the applicable Prepetition Secured Notes Documents) shall have the sole and exclusive right to enforce rights, exercise remedies, and make determinations regarding the sale, release, or other disposition of the Prepetition Secured Notes Collateral (including, for the avoidance of doubt, any Cash Collateral, whether on deposit in the Replacement DIP Funding Account or otherwise), and each of the Replacement DIP Agent, the Replacement DIP Lender and the Prepetition Equipment Lenders (x) will not exercise any rights or remedies with respect to any such Prepetition Secured Notes Collateral or seek relief from the automatic stay in order to commence any action with respect to such rights and remedies, and (y) will not contest, protest or object to or otherwise interfere with any action or proceeding brought by the Prepetition Agents (acting at the instruction

-96-

of the requisite Prepetition Secured Parties under the applicable Prepetition Secured Notes Documents) to enforce their rights and remedies relating to such Prepetition Secured Notes Collateral. Following the Payment in Full of the Prepetition Secured Notes Obligations, until the Replacement DIP Obligations have been indefeasibly Paid in Full, (A) the Replacement DIP Agent (acting at the instruction of the Replacement DIP Lender) shall have the sole and exclusive right to enforce rights, exercise remedies, and make determinations regarding the sale, release, or other disposition of any of such Prepetition Secured Notes Collateral, and (B) the Prepetition Equipment Lenders (x) will not exercise any right or remedies with respect to any such Prepetition Secured Notes Collateral or seek relief from the automatic stay in order to commence any action with respect to such rights and remedies, and (y) will not contest, protest or object to or otherwise interfere with any action or proceeding brought by the Replacement DIP Agent to enforce its rights and remedies relating to such Prepetition Secured Notes Collateral. Following the Payment in Full of the Replacement DIP Obligations, the respective Prepetition Equipment Lenders shall have the sole and exclusive right to enforce rights, exercise remedies, and make determinations regarding the sale, release, or other disposition of any of such Prepetition Secured Notes Collateral.

(c)     Notwithstanding anything set forth in this Final Order or the Replacement DIP Loan Documents to the contrary, each Prepetition Equipment Lender shall have the sole and exclusive right to enforce rights, exercise remedies, and make determinations regarding the sale, release, or other disposition of its Prepetition Equipment Financing Collateral until the obligations under such Prepetition Equipment Lender's Prepetition Equipment Financings are Paid in Full, and each of the Replacement DIP Agent, the Replacement DIP Lender, the Prepetition Secured Parties and the Prepetition Agents (x) will not exercise any rights or remedies with respect to any such Prepetition Equipment Financing Collateral or seek relief from the automatic stay in order to

-97-

commence any action with respect to such rights and remedies, and (y) will not contest, protest or object to or otherwise interfere with any action or proceeding brought by any Prepetition Equipment Lender to enforce their rights and remedies relating to such Prepetition Equipment Financing Collateral. Following the Payment in Full of any Prepetition Equipment Financing, until the Replacement DIP Obligations have been indefeasibly Paid in Full, (A) the Replacement DIP Agent (acting at the instruction of the Replacement DIP Lender) shall have the sole and exclusive right to enforce rights, exercise remedies, and make determinations regarding the sale, release, or other disposition of any such Prepetition Equipment Financing Collateral, and (B) the Prepetition Agents (acting at the instruction of the requisite Prepetition Secured Parties under the applicable Prepetition Secured Notes Documents) (x) will not exercise any right or remedies with respect to any such Prepetition Equipment Financing Collateral or seek relief from the automatic stay in order to commence any action with respect to such rights and remedies, and (y) will not contest, protest or object to or otherwise interfere with any action or proceeding brought by the Replacement DIP Agent to enforce its rights and remedies relating to such Prepetition Equipment Financing Collateral.

(d)     Unless and until the applicable "senior" debt obligations described in paragraphs 44(a)-(c) of this Final Order are Paid in Full, any DIP Collateral or proceeds thereof received by the applicable "junior" agent or any "junior" debt holder described in paragraphs 44(a)-(c) of this Final Order, in connection with the exercise of any remedies hereunder or in connection with the receipt of any payment or distribution from the Replacement DIP Loan Parties, shall be segregated and held in trust and forthwith paid over to the applicable "senior" agent for

-98-

the benefit of the applicable "senior" debt holders in the same form as received, with any necessary endorsements or as the applicable "senior" agent may otherwise direct.[9]

     (e)    Nothing in this paragraph 44 shall be read to provide any creditor any right to exercise any remedies not otherwise permitted in this Final Order, to permit the payment of any prepetition debt (absent further order of the Court), or to prevent the Debtors from seeking any relief from this Court or from operating their business in the ordinary course.

45.    *Reservation of Rights With Respect to Post-Petition Bitcoin.* Nothing in this Final Order or in the Replacement DIP Loan Documents shall impair, prejudice or waive the assertion by the Prepetition Secured Parties and the Prepetition Equipment Lenders, respectively, that the Prepetition Secured Notes Liens and the Prepetition Equipment Financing Liens (as applicable), extend to the Debtors' post-petition Bitcoin (as applicable), and all rights and remedies of the Prepetition Secured Parties and the Prepetition Equipment Lenders in connection therewith (and all rights and remedies of the Debtors, the Replacement DIP Lender, and the Official Committee to contest such assertions) are hereby expressly preserved.

46.    *Necessary Action.* The Replacement DIP Loan Parties, the Replacement DIP Secured Parties are authorized to take any and all such actions as are necessary, required or appropriate to implement and effectuate the terms of this Final Order, the Replacement DIP Loan Documents and the transactions contemplated hereunder and thereunder.

47.    *Fees and Scope of Other Committees.* Nothing in this Final Order shall be deemed to expand the scope of any official committee appointed in these cases, or authorize payment of any fees to any such committee, beyond the scope and budget set forth in the order appointing such committee; *provided*, *however*, this paragraph shall not apply to the Official Committee.

---

[9] A chart reflecting the relative priorities of each of the liens and security interests described in this Interim Order is attached hereto as **Exhibit 2**.

-99-

48. *Retention of Jurisdiction.* The Court retains jurisdiction to hear, determine and enforce the terms of any and all matters arising from or related to the Replacement DIP Facility, the Replacement DIP Loan Documents and this Final Order, and the Court's jurisdiction shall survive confirmation and consummation of any chapter 11 plan for any of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

**Signed:  March 01, 2023.**

_____

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

## Exhibit 1

*Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement*

EXECUTION VERSION

**SENIOR SECURED SUPER-PRIORITY REPLACEMENT DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT**

Dated as of February 27, 2023

among

**CORE SCIENTIFIC, INC.,**
as Borrower, as an Obligor, as a Debtor and Debtor-in-Possession
under Chapter 11 of the Bankruptcy Code, and as Obligor Representative

**CERTAIN SUBSIDIARIES OF CORE SCIENTIFIC, INC.,**
as Guarantor, as an Obligor, and as Debtor and Debtor-in-Possession
under Chapter 11 of the Bankruptcy Code,

**THE LENDERS PARTY HERETO,**

and

**B. RILEY COMMERCIAL CAPITAL, LLC**
as the Administrative Agent

11231624v19

# TABLE OF CONTENTS

**Page**

SECTION 1.    DEFINITIONS; RULES OF CONSTRUCTION ........................................... 3
    1.1.    Definitions ............................................................................................ 3
    1.2.    Accounting Terms ............................................................................... 41
    1.3.    Uniform Commercial Code .................................................................. 41
    1.4.    Certain Matters of Construction ........................................................... 42

SECTION 2.    CREDIT FACILITIES ........................................................................... 42

SECTION 3.    INTEREST, FEES AND CHARGES ...................................................... 47
    3.1.    Interest ................................................................................................. 47
    3.2.    Fees and Commitment Payments .......................................................... 47
    3.3.    Computation of Interest, Fees, Yield Protection .................................. 49
    3.4.    Reimbursement Obligations ................................................................. 49
    3.5.    [Reserved] ........................................................................................... 49
    3.6.    [Reserved] ........................................................................................... 49
    3.7.    Increased Costs; Capital Adequacy ...................................................... 49
    3.8.    Mitigation ............................................................................................ 50
    3.9.    [Reserved] ........................................................................................... 50
    3.10.   Maximum Interest ................................................................................ 51

SECTION 4.    LOAN ADMINISTRATION ................................................................. 51
    4.1.    Manner of Borrowing and Funding Loans ............................................ 51
    4.2.    Defaulting Lender ................................................................................ 52
    4.3.    [Reserved] ........................................................................................... 53
    4.4.    [Reserved] ........................................................................................... 53
    4.5.    [Reserved] ........................................................................................... 53
    4.6.    Effect of Termination .......................................................................... 53

SECTION 5.    PAYMENTS ......................................................................................... 53
    5.1.    General Payment Provisions ................................................................ 53
    5.2.    Voluntary Prepayments ....................................................................... 54
    5.3.    Mandatory Prepayments ...................................................................... 54
    5.4.    Payment of Other Obligations ............................................................. 55
    5.5.    Marshaling; Payments Set Aside ......................................................... 55
    5.6.    Application and Allocation of Payments .............................................. 55
    5.7.    [Reserved] ........................................................................................... 57
    5.8.    [Reserved] ........................................................................................... 57
    5.9.    Taxes ................................................................................................... 57
    5.10.   Lender Tax Information ........................................................................ 59
    5.11.   Obligor Representative ......................................................................... 61

11231624v19

SECTION 6.      CONDITIONS PRECEDENT .................................................... 61

    6.1.    Conditions Precedent to Initial Draw .................................. 61
    6.2.    Conditions Precedent to Closing Date and all other Borrowings ....................... 61
    6.3.    Conditions Subsequent ..................................................... 66

SECTION 7.      COLLATERAL .......................................................................... 66

    7.1.    Grant of Security Interest .................................................. 66
    7.2.    Lien on Accounts; Liens on Real Property .......................... 68
    7.3.    Pledged Collateral ............................................................ 69
    7.4.    Intellectual Property Matters ............................................. 72
    7.5.    Other Collateral ............................................................... 74
    7.6.    No Assumption of Liability ............................................... 74
    7.7.    Further Assurances ........................................................... 74

SECTION 8.      COLLATERAL ADMINISTRATION ..................................... 75

    8.1.    [Reserved] ........................................................................ 75
    8.2.    Administration of Accounts ............................................... 75
    8.3.    [Reserved] ........................................................................ 76
    8.4.    [Reserved] ........................................................................ 76
    8.5.    Administration of Deposit Accounts .................................. 76
    8.6.    General Provisions ........................................................... 76
    8.7.    Power of Attorney ............................................................ 77

SECTION 9.      REPRESENTATIONS AND WARRANTIES ........................... 78

    9.1.    General Representations and Warranties ............................. 78
    9.2.    Disclosure ........................................................................ 83

SECTION 10.    COVENANTS AND CONTINUING AGREEMENTS ............... 84

    10.1.   Affirmative Covenants ..................................................... 84
    10.2.   Negative Covenants ......................................................... 92
    10.3.   Financial Covenants ......................................................... 102
    10.4.   Chapter 11 Cases .............................................................. 102

SECTION 11.    EVENTS OF DEFAULT; REMEDIES ON DEFAULT ............... 103

    11.1.   Events of Default .............................................................. 103
    11.2.   Remedies upon Default ..................................................... 109
    11.3.   Setoff .............................................................................. 113
    11.4.   Remedies Cumulative; No Waiver ..................................... 113

SECTION 12.    THE ADMINISTRATIVE AGENT ......................................... 114

    12.1.   Appointment, Authority and Duties of the Administrative Agent .................... 114
    12.2.   Agreements Regarding Collateral and Borrower Materials ............................. 117
    12.3.   Reliance By the Administrative Agent ................................ 118
    12.4.   Action Upon Default ........................................................ 118

| | | |
|---|---|---|
| 12.5. | Ratable Sharing | 119 |
| 12.6. | Indemnification | 119 |
| 12.7. | Limitation on Responsibilities of the Administrative Agent | 119 |
| 12.8. | Successor Agent and Co-Agents | 120 |
| 12.9. | Non-Reliance on the Administrative Agent and the Other Lenders | 121 |
| 12.10. | Remittance of Payments and Collections | 122 |
| 12.11. | Individual Capacities | 122 |
| 12.12. | Erroneous Payments | 123 |
| 12.13. | [Reserved] | 123 |
| 12.14. | No Third Party Beneficiaries | 123 |
| 12.15. | Withholding Tax | 124 |
| 12.16. | The Administrative Agent May File Proofs of Claim; Credit Bidding | 124 |
| 12.17. | Certain ERISA Matters | 127 |
| 12.18. | Successors By Merger, Etc | 128 |

**SECTION 13. BENEFIT OF AGREEMENT; ASSIGNMENTS ........... 128**

| | | |
|---|---|---|
| 13.1. | Successors and Assigns | 128 |
| 13.2. | Participations | 128 |
| 13.3. | Assignments | 130 |
| 13.4. | Replacement of Certain Lenders | 131 |

**SECTION 14. MISCELLANEOUS ........... 131**

| | | |
|---|---|---|
| 14.1. | Consents, Amendments and Waivers | 131 |
| 14.2. | Indemnity | 132 |
| 14.3. | Notices and Communications | 133 |
| 14.4. | Performance of Borrower's Obligations | 135 |
| 14.5. | Credit Inquiries | 136 |
| 14.6. | Severability | 136 |
| 14.7. | Cumulative Effect; Conflict of Terms | 136 |
| 14.8. | Counterparts; Execution | 136 |
| 14.9. | Entire Agreement | 136 |
| 14.10. | Relationship with Lenders | 136 |
| 14.11. | No Advisory or Fiduciary Responsibility | 137 |
| 14.12. | Confidentiality | 137 |
| 14.13. | GOVERNING LAW | 138 |
| 14.14. | Consent to Forum | 138 |
| 14.15. | Waivers by Obligors | 138 |
| 14.16. | Patriot Act Notice | 139 |
| 14.17. | NO ORAL AGREEMENT | 139 |
| 14.18. | Acknowledgement and Consent to Bail-In of Affected Financial Institutions | 139 |
| 14.19. | DIP Orders | 140 |
| 14.20. | Acknowledgment Regarding any Supported QFCs | 140 |

## LIST OF EXHIBITS AND SCHEDULES

| | |
|---|---|
| Exhibit A | Assignment and Acceptance |
| Exhibit B | Assignment Notice |
| Exhibit C | Form of Notice of Borrowing |
| Exhibit D | Form of Guaranty |
| Exhibit E | Form of Compliance Certificate |
| Exhibit F | Form of U.S. Tax Compliance Certificate |
| Exhibit G | Form of Joinder |
| Exhibit H | Initial Budget |
| Exhibit I | Form of Global Intercompany Note |
| Exhibit J | Form of Variance Report Certificate |
| | |
| Schedule 1.1 | Commitments of Lenders |
| Schedule 1.1(a) | Subject Real Property |
| Schedule 1.1(b) | Commitment Letter |
| Schedule 6.2.1 | List of Closing Documents |
| Schedule 6.3 | Conditions Subsequent |
| Schedule 7.1(c) | Commercial Tort Claims |
| Schedule 7.3(a) | Equity Interests and Debt Securities |
| Schedule 8.5 | Deposit Accounts, Security Accounts, Commodity Accounts |
| Schedule 9.1.4 | Names and Capital Structure |
| Schedule 9.1.10 | Patents, Trademarks, Copyrights and Licenses |
| Schedule 9.1.15 | Litigation |
| Schedule 9.1.18 | Labor Relations |
| Schedule 10.1.16 | Immaterial Subsidiaries |
| Schedule 10.2.1 | Existing Debt |
| Schedule 10.2.2 | Existing Liens |
| Schedule 10.2.4 | Existing Investments |
| Schedule 10.2.16 | Existing Affiliate Transactions |

11231624v19

# SENIOR SECURED SUPER-PRIORITY REPLACEMENT DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

THIS SENIOR SECURED SUPER-PRIORITY REPLACEMENT DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT is dated as of February 27, 2023 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "Agreement"), by and among (a) CORE SCIENTIFIC, INC., a Delaware corporation and a debtor and debtor-in-possession in the Chapter 11 Cases ("Core Scientific" or "Borrower") and as authorized representative for all Obligors hereunder (in such capacity, the "Obligor Representative"), (b) each SUBSIDIARY GUARANTOR, as a Guarantor, an Obligor, and a debtor and debtor-in-possession in the Chapter 11 Cases, (c) each Person party hereto from time to time as a LENDER, and (d) B. RILEY COMMERCIAL CAPITAL, LLC, as Administrative Agent (the "Administrative Agent").

## R E C I T A L S:

WHEREAS, on December 21, 2022 (the "Petition Date"), each of Core Scientific and certain direct and indirect Subsidiaries of Core Scientific (each a "Debtor" and collectively, the "Debtors") filed voluntary petitions with the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") initiating their respective jointly administered cases under Chapter 11 of the Bankruptcy Code (Case No. 22-90341 (DRJ)) (collectively, the "Chapter 11 Cases"), and each Debtor has continued and is continuing in the possession of its assets and management of its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, in order to provide the Debtors with financing during the pendency of the Chapter 11 Cases, the Debtors, certain Persons parties from time to time party thereto as lenders (the "Original DIP Lenders"), and Wilmington Savings Fund Society, FSB, as administrative agent thereunder (the "Original DIP Agent") entered into a certain Senior Secured Super-Priority Debtor-in-Possession Loan and Security Agreement dated as of December 22, 2022 (the "Original DIP Credit Agreement"), pursuant to which the Original DIP Lenders made certain loans and provided certain other accommodations to the Debtors after the Petition Date, on an interim basis pursuant to authorization under that certain *Interim Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims With Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* Docket No. 130 approved and entered by the Bankruptcy Court on December 23, 2022;

WHEREAS, the Debtors desire to replace and refinance the financing contemplated by the Original DIP Credit Agreement;

WHEREAS, in furtherance thereof, pursuant to (i) the terms of that certain Commitment Letter dated as of January 29, 2023 provided to Borrower by the Administrative Agent and the Lenders party thereto and the Term Sheet attached as Annex A thereto (collectively, the "Commitment Letter") and (ii) that certain *Order (I) Authorizing The Debtors On An Interim Basis To (A) Obtain Senior Secured Non-Priming Superpriority Replacement Postpetition Financing*

11231624v19

*And (B) Use Cash Collateral, (II) Authorizing The Debtors To Refinance Existing Postpetition Financing On A Final Basis, (III) Granting Liens And Providing Claims With Superpriority Administrative Expense Status, (IV) Granting Adequate Protection To The Prepetition Secured Parties On A Final Basis, (V) Modifying The Automatic Stay, (V) Scheduling A Final Hearing, And (VI) Granting Related Relief* (Docket No. 447) which was approved and entered by the Bankruptcy Court on February 2, 2023 (as more fully defined below, the "<u>Interim DIP Order</u>"), the Administrative Agent and the Lenders agreed (x) to provide Borrower a senior secured super-priority debtor-in-possession term loan credit facility (the "<u>DIP Facility</u>") and (y) to fund the Initial Draw under the DIP Facility in the amount of $35,000,000 to Borrower on February 3, 2023 in order to, among other things, (i) repay and refinance the obligations and liabilities owing by the Debtors under the Original DIP Agreement and the related instruments, documents and agreements, (ii) to pay certain fees and expenses owing to the Lenders and the Administrative Agent, (iii) to fund the Carve-Out Account in accordance with the Approved Budget and (iv) to fund ongoing working capital requirements during the pendency of the Chapter 11 Cases in accordance with the Approved Budget (subject to Permitted Variances);

WHEREAS, to ensure timely repayment and satisfaction of, and to provide security for the repayment and satisfaction of, the Loans and all other Obligations owing to the Administrative Agent and the Lenders by Borrower under the DIP Facility, (x) each Guarantor has agreed to irrevocably and unconditionally guaranty the full, complete and timely repayment of the Obligations and (y) Borrower and Guarantor have each agreed to grant in favor of the Administrative Agent (for the benefit of the Secured Parties) Liens on the Collateral, in each case, as further set forth in, and subject to, the DIP Orders;

WHEREAS, pursuant to the Commitment Letter, it is a condition to the ongoing financing under the DIP Facility that Borrower, Guarantor, the Administrative Agent and Lenders (x) enter into definitive loan documentation, including this Agreement, to more fully set forth the terms and conditions of the DIP Facility and the grant of Liens in connection therewith and (y) obtain Bankruptcy Court approval of the DIP Facility, this Agreement and the other Loan Documents, in each case, on a final basis by no later than thirty (30) days after the Interim DIP Order Date;

WHEREAS, the entry by the parties into this Agreement and the other Loan Documents and the financings and grants of Liens contemplated hereby and thereby are anticipated to be approved by the Bankruptcy Court pursuant to the Final DIP Order to be entered by the Bankruptcy Court by March 4, 2023 (as more fully defined below, the "<u>Final DIP Order</u>" and together with the Interim DIP Order, being the "<u>DIP Orders</u>"), with this Agreement constituting the "<u>Replacement DIP Credit Agreement</u>", the Loan Documents constituting the "<u>Replacement DIP Loan Documents</u>", and the DIP Facility and the Loans constituting the "<u>Replacement DIP Facility</u>," in each case, as referred to in the Final DIP Order;

WHEREAS, subject to the terms and conditions set forth herein and in the DIP Orders, it is hereby agreed that (i) the Lenders are willing to continue and to make available the existing and new Loans as contemplated hereby and by the DIP Orders to Borrower and (ii) the Administrative Agent is willing to serve as the Administrative Agent for the Lenders; and

WHEREAS, that certain Restructuring Support Agreement dated as of December 22, 2022 (the "<u>Restructuring Support Agreement</u>"), by and among the Obligors, certain prepetition creditors

11231624v19

of the Obligors party thereto and the Original DIP Lenders was terminated pursuant to a termination letter dated as of February 9, 2023.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby covenant and agree as follows:

## SECTION 1. DEFINITIONS; RULES OF CONSTRUCTION

**1.1.** **Definitions**. As used herein (including in the recitals hereto), the following terms have the meanings set forth below:

"Acceptable Chapter 11 Plan" : a plan of reorganization for each of the Debtors in the Chapter 11 Cases (including all related schedules, supplements, exhibits and orders, as applicable) on terms that provides for the Full Payment (or such other treatment acceptable to the Administrative Agent and the Required Lenders in their sole discretion) of all Obligations outstanding pursuant to this Agreement on the Chapter 11 Plan Effective Date.

"Account": as defined in the UCC, including all rights to payment for goods sold or leased, or for services rendered.

"Account Debtor": a Person obligated under an Account, Chattel Paper or General Intangible.

"Acquisition": a transaction or series of transactions resulting in (a) acquisition of a business, division, or all or substantially all assets of a Person; (b) record or beneficial ownership of more than 50% of the Equity Interests of a Person; or (c) merger, consolidation or combination of a Subsidiary with another Person.

"Adequate Assurance Deposit": as defined in that certain Emergency Motion of Debtors for Entry of an Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies; (II) Establishing Procedures for Resolving Objections by Utility Companies; (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service; and (IV) Granting Related Relief entered by the Bankruptcy Court on or about the Petition Date, which such deposits are made and maintained in accordance with the terms of such motion and the Approved Budget.

"Administrative Agent": as of any time of determination, the Person appointed in accordance with this Agreement (including pursuant to the successor agency provisions of **Section 12.8.1**) to act as administrative agent for the Lenders and as collateral agent for the Secured Parties. As of the Interim DIP Closing Date and the Closing Date, the Administrative Agent shall be B. Riley Commercial Capital, LLC.

"Affected Financial Institution": (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate": with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the

11231624v19

Person specified. For the avoidance of doubt, each of the Permitted Holders shall be an Affiliate of the Obligors and their Subsidiaries.

"Agent Indemnitees": the Administrative Agent and its officers, directors, employees, Affiliates, agents and attorneys.

"Agent Professionals": attorneys, accountants, appraisers, auditors, business valuation experts, environmental engineers or consultants, turnaround consultants, and other professionals and experts retained by the Administrative Agent (including Choate, Hall & Stewart LLP and any applicable local or special counsel (the appointment of any such special counsel to be subject to the reasonable consent of Obligors, so long as not unreasonably withheld, conditioned or delayed).

"Agreement": as defined in the preamble hereto.

"Anti-Corruption Law": the Foreign Corrupt Practices Act of 1977, as amended, or any similar Applicable Law.

"Anti-Terrorism Law": any law primarily relating to terrorism or money laundering, including the Patriot Act.

"Applicable Law": with respect to any Person, conduct, transaction, agreement or matter, as the case may be, all laws, rules, regulations and governmental guidelines applicable to such Person, conduct, transaction, agreement or matter in question, including all applicable statutory law, common law and equitable principles, and all provisions of constitutions, treaties, statutes, rules, regulations, orders and decrees of Governmental Authorities (including, with reference to the Debtors, any order of the Bankruptcy Court, pursuant to the Bankruptcy Code or otherwise in connection with the Chapter 11 Cases).

"Applicable Rate": in the case of the Loans, 10% per annum.

"Approved Budget": (a) the Initial Budget, at all times, until superseded by an Updated Budget in accordance with (and subject to receipt of all approvals required pursuant to) **Section 10.1.12(a)** and (b) as of any time of determination thereafter, the most recent Budget Supplement (if any) that constitutes the Updated Budget in effect as of such time in accordance with (and subject to) receipt of all approvals required pursuant to **Section 10.1.12(a)**.

"Approved Fund": any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in its ordinary course of activities, and is administered or managed by a Lender, an entity that administers or manages a Lender, or an Affiliate of either.

"Asset Disposition": a sale, lease (as lessor), license, consignment, transfer or other disposition of assets or property (real or personal) (including any Equity Interests) of an Obligor, unwinding of any Hedging Agreement, any discounting or selling of (with or without recourse) any notes receivable or accounts receivable, a disposition of property in connection with a sale-leaseback transaction or synthetic lease, and including any disposition of property pursuant to a Division.

-4-

"Assignment and Acceptance": an assignment agreement between a Lender and Eligible Assignee, in the form of **Exhibit A** or otherwise reasonably acceptable to the Administrative Agent.

"Bail-In Action": the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation": (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, rule, regulation or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Code": Title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

"Bankruptcy Court": as defined in the recitals to this Agreement.

"Beneficial Ownership Certification": a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation": 31 C.F.R. § 1010.230.

"Benefit Plan": any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"Bitcoin": the digital currency referred to as such by market practice and transacted via a payment system using peer-to-peer transactions verified by network nodes and recording in a public distributed ledger called the Blockchain.

"Bitcoin Disposition": any disposition of Bitcoin by Borrower or Subsidiary thereof for Fair Market Value (to be determined as of the date such disposition is agreed to) in the Ordinary Course of Business or pursuant to the terms of any Permitted BTC Hedging Agreement.

"Board of Governors": the Board of Governors of the Federal Reserve System.

"Borrowed Money": with respect to any Obligor or Subsidiary, without duplication, its (a) Debt that (i) arises from the lending of money by any Person to such Obligor, (ii) is evidenced by notes, drafts, bonds, debentures, credit documents or similar instruments, (iii) accrues interest or is a type upon which interest charges are customarily paid (excluding trade payables owing in the Ordinary Course of Business), or (iv) was issued or assumed as full or partial payment for property; (b) Capital Leases; (c) reimbursement obligations with respect to drawn amounts under letters of

11231624v19

credit; and (d) Guarantee Obligations with respect to any Debt of the foregoing types owing by another Person.

"Borrower": as defined in the preamble hereto.

"Borrower Materials": reports, financial statements and other materials delivered by Borrower hereunder, as well as other Reports and information provided by the Administrative Agent to Lenders.

"Borrowing": a group of Loans that are made (or deemed made) on the same day.

"Borrowing Date": as defined in **Section 4.1.1.**

"Budget Covenant": as defined in **Section 10.3.1.**

"Budget Reporting Deadline": as defined in **Section 10.1.12.**

"Budget Supplement": as defined in **Section 10.1.12**.

"Budget Variance": as defined in **Section 10.1.12**.

"Business Day": any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the State of Texas, California or New York.

"Capital Expenditures": all liabilities incurred or expenditures made by any Obligor or a Subsidiary for the acquisition of fixed assets, or any improvements, replacements, substitutions or additions thereto with a useful life of more than one year.

"Capital Lease": any lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Capital Lease Obligations": as applied to any Person, all obligations under Capital Leases of such Person or any of its Subsidiaries, in each case taken at the amount thereof accounted for as liabilities in accordance with GAAP.

"Carve-Out": has the meaning assigned to such term in the Interim DIP Order (with respect to the period prior to the entry of the Final DIP Order) or the Final DIP Order (from and after the date on which the Final DIP Order is entered).

"Carve-Out Account": Borrower's deposit account ending –x6786 at Bank of America, N.A. in which all amounts therein shall be held in trust for and exclusively available for the payment of fees and expenses of Professional Persons (as defined in the DIP Order) and designated as the "Professional Fees Escrow Account" pursuant to the DIP Orders.

"Cash Collateral": cash, Cash Equivalents, and any interest or other income earned thereon, that collateralizes, or is security for the payment of, any Obligations.

-6-

"Cash Dominion Period": shall be in effect at the election of the Administrative Agent or the Required Lenders, as of the time that any Event of Default occurs or arises, and at all times until such Event of Default shall have been cured or shall cease to exist, so long as no other Default or Event of Default exists or be continuing at such time.

"Cash Equivalents": (a) marketable obligations issued or unconditionally guaranteed by, and backed by the full faith and credit of, the United States government, maturing within 12 months of the date of acquisition; (b) certificates of deposit, time deposits and bankers' acceptances maturing within 12 months of the date of acquisition, and overnight bank deposits, in each case which are issued by a Lender or a commercial bank organized under the laws of the United States or any state or district thereof, rated A-1 (or better) by S&P or P-1 (or better) by Moody's at the time of acquisition, and (unless issued by a Lender) not subject to offset rights; (c) repurchase obligations with a term of not more than 30 days for underlying investments of the types described in clauses (a) and (b) entered into with any bank described in clause (b); (d) commercial paper issued by any financial institution or other Person acceptable to the Administrative Agent or rated A-1 (or better) by S&P or P-1 (or better) by Moody's, and maturing within nine months of the date of acquisition; (e) shares of any money market fund that has substantially all of its assets invested continuously in the types of investments referred to above, has net assets of at least $500,000,000 and has the highest rating obtainable from either Moody's or S&P; and (f) any money market fund of which the assets are comprised of not less than 90% of the items specified in clauses (a) through (e) above. For the avoidance of doubt, Cryptocurrency shall not constitute "Cash Equivalents".

"CERCLA": the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9601 et seq.).

"Change in Law": the occurrence, after the Interim DIP Closing Date, of (a) the adoption, taking effect or phasing in of any law, rule, regulation or treaty; (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof; or (c) the making, issuance or application of any request, guideline, requirement or directive (whether or not having the force of law) by any Governmental Authority; provided, however, that "Change in Law" shall include, regardless of the date enacted, adopted or issued, all requests, guidelines, requirements or directives (i) under or relating to the Dodd-Frank Wall Street Reform and Consumer Protection Act, or (ii) promulgated pursuant to Basel III by the Bank of International Settlements, the Basel Committee on Banking Supervision (or any similar authority) or any other Governmental Authority.

"Change of Control": any of the following:

(a)     at any time, and for any reason whatsoever, any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act), excluding the Permitted Holders, (i) shall obtain the power (whether or not exercised) to elect a majority of the members of the board of directors of Borrower, or (ii) shall become the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act), directly or indirectly, of Equity Interests of Borrower representing more than the greater of (x) twenty-five percent (25%) of the voting power of the then outstanding Voting Equity Interests of Borrower and (y) the percentage of the voting power of the then outstanding Voting Equity

-7-

Interests of Borrower owned, directly or indirectly, beneficially by the Permitted Holders (in the aggregate);

(b)     Persons serving as directors of Borrower as of the Petition Date have ceased to represent a majority of the directors of Borrower unless each such new director was approved by the majority of the board of directors of Borrower as of the Petition Date;

(c)     the sale or transfer of all or substantially all of Borrower's or the Obligors' assets, in each case, on a consolidated basis;

(d)     at any time, and for any reason whatsoever (other than in connection with a Permitted Asset Disposition), Borrower ceases to directly or indirectly own and control one hundred percent (100%) of the Equity Interests of each of the other Obligors in existence on the Interim DIP Closing Date; or

(e)     a "change of control" or any comparable term under, and as defined in, any agreement governing Debt for Borrowed Money in an aggregate principal amount exceeding $5,000,000.

"Chapter 5 Claims and Causes of Action": the Obligors' claims and causes of action arising under chapter 5 of the Bankruptcy Code, including sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code or similar state law.

"Chapter 11 Approvals": as defined in **Section 10.2.21**.

"Chapter 11 Cases": as defined in the recitals to this Agreement.

"Chapter 11 Order": any order of the Bankruptcy Court in the Chapter 11 Cases in form and substance, and on terms and conditions, satisfactory to the Administrative Agent and the Required Lenders (including, as applicable, the Interim DIP Order and the Final DIP Order).

"Chapter 11 Plan": any plan of reorganization or liquidation (as the case may be) (including any Acceptable Chapter 11 Plan).

"Chapter 11 Plan Effective Date": (a) with respect to the Acceptable Chapter 11 Plan, the date upon which all of the conditions to the effectiveness of the Acceptable Chapter 11 Plan set forth therein have been satisfied (or waived) in accordance with its terms, and (b) with respect to any Chapter 11 Plan that is not the Acceptable Chapter 11 Plan, the date of "substantial consummation" (as such term is defined in Section 1101 of the Bankruptcy Code) of any Chapter 11 Plan; *provided*, that, for purposes of this Agreement, "substantial consummation" shall in any event be deemed to occur no later than the effective date of such Chapter 11 Plan.

"Chapter 11 Unsecured Creditors Committee": the official committee of unsecured creditors appointed in the Chapter 11 Cases, pursuant to Section 1102 of the Bankruptcy Code, if any.

"Claims": all claims, liabilities, obligations, losses, damages, penalties, judgments, proceedings, interest, costs and expenses of any kind (including remedial response costs,

reasonable attorneys' fees (which shall be limited to the fees, disbursements and other charges of one primary counsel and one local counsel in each relevant jurisdiction for the Indemnitees (unless there is an actual or perceived conflict of interest in which case each such Indemnitee may retain its own counsel), and Extraordinary Expenses) at any time (including after Full Payment of the Obligations or replacement of the Administrative Agent or any Lender) incurred by any Indemnitee or asserted against any Indemnitee by any Obligor or other Person, to the extent relating to (a) any Loans, Loan Documents, Borrower Materials, or the use thereof or transactions relating thereto, (b) any action taken or omitted in connection with any Loan Documents, (c) the existence or perfection of any Liens, or realization upon any Collateral, (d) exercise of any rights or remedies under any Loan Documents or Applicable Law in connection with the Loan Documents, or (e) failure by any Obligor to perform or observe any terms of any Loan Document, in each case including all costs and expenses relating to any investigation, litigation, arbitration, settlement or other proceeding (including an Insolvency Proceeding or appellate proceedings), whether or not the applicable Indemnitee is a party thereto.

"Closing Date": the date upon which all conditions precedent to the effectiveness of this Agreement set forth in **Section 6.2.1** are satisfied or waived in accordance with the terms hereof. For the avoidance of doubt, February 27, 2023 constitutes the Closing Date.

"Code": the Internal Revenue Code of 1986, as amended.

"Collateral": collectively, (a) all property described in **Section 7.1**, (b) all property (including Real Estate, personal property, mixed, owned, leased or operated by an Obligor) that is described in any DIP Order or any Security Document as security for any Obligations, and (c) all other property (including, without limitation, Real Estate, personal property, mixed, owned, leased or operated by an Obligor) of an Obligor that now or hereafter secures (or is intended to secure) any Obligations; but, in all cases, excluding Excluded Assets (unless a Lien thereon is granted pursuant to the DIP Orders or any other Chapter 11 Order).

"Commitments": the DIP Term Loan Commitments.

"Commitment Letter": as defined in the recital to this Agreement.  A copy of the Commitment Letter is attached as **Schedule 1.1(b)**.

"Commodity Exchange Act": the Commodity Exchange Act (7 U.S.C. § 1 *et seq.*).

"Compliance Certificate": a certificate (substantially in the form of **Exhibit E** hereto or in such other form acceptable to the Administrative Agent) signed by a Senior Officer of each of the Obligors and delivered on behalf of the Obligors to certify compliance with the matters set forth in **Section 7.5.2, Section 10.1.2(a), (b)** or **(c),** as applicable, and **Section 10.3.2.**

"Contingent Obligation": any obligation of a Person arising from any guaranty (including all Guarantee Obligations), indemnity or other assurance of payment or performance of any Debt, lease, dividend or other obligation ("primary obligations") of another obligor ("primary obligor") in any manner, whether directly or indirectly, including any obligation of such Person under any (a) guaranty, endorsement, co-making or sale with recourse of an obligation of a primary obligor; (b) obligation to make take-or-pay or similar payments regardless of nonperformance by any other party to an agreement; and (c) arrangement (i) to purchase any primary obligation or security

-9-

therefor, (ii) to supply funds for the purchase or payment of any primary obligation, (iii) to maintain or assure working capital, equity capital, net worth or solvency of the primary obligor, (iv) to purchase property or services for the purpose of assuring the ability of the primary obligor to perform a primary obligation, or (v) otherwise to assure or hold harmless the holder of any primary obligation against loss in respect thereof. The amount of any Contingent Obligation shall be deemed to be the stated or determinable amount of the primary obligation (or, if less, the maximum amount for which such Person may be liable under the instrument evidencing the Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability with respect thereto as determined by such Person in good faith.

"Control": the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Control Agreement": an agreement with respect to any Deposit Account, Security Account or Commodity Account (including any DIP Funding Account) entered into by and among the Obligor in whose name such Deposit Account, Security Account or Commodity Account (including any DIP Funding Account) is maintained, the institution(s) maintaining such Deposit Account, Security Account or Commodity Account (including any DIP Funding Account), and the Administrative Agent, which agreement shall be in form and substance reasonably acceptable to the Administrative Agent and effective to establish "control" (within the meaning set forth in Sections 9-104 and 9-106 of the Uniform Commercial Code) of such Deposit Account, Security Account or Commodity Account (including any DIP Funding Account) in favor of the Administrative Agent to the extent required to perfect the Administrative Agent's Lien on such Deposit Account, Security Account or Commodity Account (including any DIP Funding Account).

"Copyrights": all copyrights (whether statutory or common law, whether established or registered in the United States or any other country or any political subdivision thereof, whether registered or unregistered and whether published or unpublished) and all copyright registrations and applications, together with any and all (i) rights and privileges arising under Applicable Law with respect to the foregoing, (ii) renewals, supplements and extensions thereof and amendments thereto, (iii) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect thereto, including damages and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present or future infringements thereof.

"Covered Party": as defined in **Section 14.20(a)**.

"Cryptocurrency": any digital or electronic asset or currency (including Bitcoin and Ethereum) transacted, exchanged or otherwise subsisting on the blockchain or other decentralized or distributed ledger or similar digital platform.

"CWA": the Clean Water Act (33 U.S.C. §§ 1251 et seq.).

-10-

"Debt": as applied to any Person, without duplication, (a) all indebtedness and obligations of such Person for Borrowed Money; (b) the deferred purchase price of assets or services that in accordance with GAAP would be included as liabilities on the balance sheet of such Person; (c) all obligations of such Person arising with respect to non-contingent earnout or similar non-contingent obligations incurred in connection with an Acquisition; (d) all Disqualified Equity Interests; (e) all reimbursement obligations in respect of letters of credit issued for the account of such Person; (f) all Debt of a second Person secured by any Lien on any property owned by such first Person, whether or not such Debt has been assumed; (g) all Capital Lease Obligations of such Person; (h) all obligations of such Person under Hedging Agreements (but taking into account only the mark-to-market value or, if any actual amount is due as a result of the termination or close-out of such transaction, that amount) and (i) without duplication, all Contingent Obligations of such Person with respect to Debt described in (a) through (h) above; *provided*, that Debt shall not include (i) trade payables and accrued expenses, in each case arising in the Ordinary Course of Business, (ii) deferred or prepaid revenue, (iii) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller or (iv) any obligations or liabilities under any agreement relating to transactions of the type described in any Permitted Asset Disposition, Permitted Employment Arrangement (whether or not such transactions meet the requirements for being classified as Permitted Asset Dispositions or Permitted Employment Arrangements, as applicable), power purchase agreements or hosting agreements. The Debt of a Person shall include any recourse Debt of any partnership in which such Person is a general partner or joint venturer. The amount of Debt of any Person for purposes of clause (iii) shall be deemed to be equal to the lesser of (1) the aggregate unpaid amount of such Debt and (2) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"Debt Issuance": the incurrence by any Obligor or any Subsidiary of any Debt, other than Debt permitted under **Section 10.2.1.**

"Debtor": as defined in the preamble to this Agreement.

"Default": an event or condition that, with the lapse of time or giving of notice, would constitute an Event of Default.

"Default Rate": the Applicable Rate *plus* 2.00% per annum.

"Defaulting Lender": without limiting **Section 4.2.1(b),** (a) any Lender that has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Obligor Representative in writing that such failure is the result of such Lender's good faith determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) any Lender that has notified the Obligor Representative or the Administrative Agent (or any of their respective counsel) that it does not intend to comply with its funding obligations hereunder, or that has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's good

faith determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) any Lender that has failed, within three (3) Business Days after written request by the Administrative Agent or the Obligor Representative , to confirm in writing to the Administrative Agent and the Obligor Representative  that it is able to, intends to, and shall, comply with its prospective funding obligations hereunder at the time, in the manner, and as otherwise required hereby (*provided*, that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Obligor Representative ), or (d) any Lender (or any Person seeking to become a Lender) that has, or whose direct or indirect parent company has, (i) become the subject of any Insolvency Proceeding, (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity, or (iii) become the subject of a Bail-In Action; *provided*, that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Administrative Agent or the Required Lenders that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to **Section 4.2**) upon delivery of written notice of such determination to the Obligor Representative and each Lender.

"Designated Jurisdiction": a country or territory that is the subject of a Sanction  (as of the date of this Agreement, Cuba, Iran, Syria, North Korea, the Crimea region of Ukraine, the Donetsk People's Republic, and the Luhansk People's Republic).

"DIP Facility": as defined in the recitals to this Agreement.

"DIP Funding Account": each Deposit Account set forth on **Schedule 8.5** and maintained in the name of Borrower at Bank of America or another bank reasonably acceptable to the Administrative Agent over which the Administrative Agent has control and the ability to take actions during any Cash Dominion Period, pursuant to the applicable DIP Order and such other arrangements reasonably acceptable to the Administrative Agent, including, without limitation, a Control Agreement, as applicable.

"DIP Motion" means the motion filed by the Obligors with the Bankruptcy Court on January 31, 2023 seeking approval, on an interim basis, of (among other things) the DIP Facility, and authorization for the use of cash collateral (including such terms and conditions relating to adequate protection in connection therewith), in each case, in form and substance acceptable to the Administrative Agent and the Required Lenders.

"DIP Orders": collectively, the Interim DIP Order and the Final DIP Order and separately, the Interim DIP Order or the Final DIP Order, as the context requires.

"<u>DIP Superpriority Claims</u>": as defined in the DIP Orders.

"<u>DIP Term Loan Cap</u>": an amount equal to $70,000,000 (or, if less, the amount authorized as such DIP Term Loan Cap pursuant to the Final DIP Order); it being agreed that such DIP Term Loan Cap shall in no event be deemed to constitute a limit on capitalized PIK Interest or the Upfront Payment.

"<u>DIP Term Loan Commitment</u>": the commitment and obligation of the Lenders to fund their Pro Rata shares of DIP Term Loans pursuant to **Section 2.1.2** (including the Initial Draw funded on the Interim DIP Closing Date) in an aggregate principal amount outstanding at any time equal to (a) the DIP Term Loan Cap, *minus* (b) the aggregate principal amount of DIP Term Loans made to Borrower as of such date of determination (excluding Loans made under the Initial Draw which have been repaid pursuant to any Initial Draw Voluntary Prepayment as of such date). The DIP Term Loan Commitment as of the Closing Date shall be set forth on the DIP Term Loan Commitment Schedule. For the avoidance of doubt, if applicable from time to time, the DIP Term Loan Commitment shall be adjusted to reflect any reduction resulting from the operation of the provisions hereof (including pursuant to **Section 2.1.4**); provided, that the aggregate amount of the DIP Term Loan Commitment shall not exceed the DIP Term Loan Cap.

"<u>DIP Term Loan Commitment Schedule</u>": means **Schedule 1.1**.

"<u>DIP Term Loans</u>": Loans made pursuant to **Section 2.1.2** hereunder by Lenders having DIP Term Loan Commitments. For the avoidance of doubt, the principal balance of outstanding DIP Term Loans, as determined from time to time, shall include all capitalized PIK Interest and the Upfront Payment which has been Paid in Kind on the Interim DIP Closing Date, as applicable.

"<u>Disbursements Variance</u>": as defined in **Section 10.1.12**.

"<u>Disqualified Equity Interests</u>": any Equity Interest that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case, at the option of the holder of the Equity Interest), or upon the happening of any event, matures or is mandatorily redeemable (other than (i) solely for Equity Interests that are not Disqualified Equity Interests and cash in lieu of fractional shares or (ii) solely at the discretion of the issuer), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control, asset sale or similar event so long as any rights of the holders thereof upon the occurrence of a change of control, initial public offering, asset sale or similar event shall be subject to Full Payment of the Obligations), or redeemable at the option of the holder of the Equity Interest, in whole or in part, on or prior to the date that is 91 days after the Maturity Date. Notwithstanding the preceding sentence, any Equity Interest that would constitute Disqualified Equity Interests solely because the holders of the Equity Interests have the right to require Borrower or any Subsidiary to repurchase such Equity Interest upon the occurrence of a change of control will not constitute Disqualified Equity Interests if the terms of such Equity Interests provide that Borrower or such Subsidiary, as applicable, may not repurchase or redeem any such Equity Interests pursuant to such provisions unless such repurchase or redemption complies with **Section 10.2.3**.

"<u>Disqualified Lender</u>": (a) any Person that constitutes a competitor of any Obligor, (b) any Person identified in writing by any Obligor in writing on or prior to the Closing Date, and (c) any

Affiliate of any Person described in clauses (a) and (b) above that is either (i) identified in writing to the Administrative Agent in advance of any relevant transaction or (ii) reasonably identifiable on the basis of such Affiliate's name.

"<u>Distribution</u>": any declaration or payment of a distribution, interest or dividend on any Equity Interest (other than payment-in-kind); or any purchase, redemption, or other acquisition or retirement for value of any Equity Interest.

"<u>Dividing Person</u>": has the meaning assigned to it in the definition of "<u>Division</u>."

"<u>Division</u>": the division of the assets, liabilities and/or obligations of a Person (the "<u>Dividing Person</u>") among two or more Persons (whether pursuant to a "plan of division" or similar arrangement), which may or may not include the Dividing Person and pursuant to which the Dividing Person may or may not survive.

"<u>Dollars</u>": lawful money of the United States.

"<u>EEA Financial Institution</u>": (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"<u>EEA Member Country</u>": any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"<u>EEA Resolution Authority</u>": any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"<u>Eligible Assignee</u>": each and any of the following Persons: (a) each Lender, (b) each Affiliate of a Lender, (c) each Approved Fund, and (d) each other Person approved in writing by the Administrative Agent (except (i) any natural person, (ii) any Obligor or any of the Obligor's Affiliates or Subsidiaries or (iii) unless consented to in writing by the Administrative Agent and the Required Lenders, any holder (or affiliate of any such holder) of Prepetition NPA Facility Debt); *provided, however*, that each assignment to an Eligible Assignee shall be made in accordance with **Section 13.3**.

"<u>Eligible Cash</u>": with respect to cash or Cash Equivalents from time to time on deposit in the Carve-Out Account, such cash or Cash Equivalents to the extent not exceeding the sum of (x) the amount of accrued and unpaid professional fees and expenses of the Obligors of administering the Chapter 11 Cases which are to be deposited therein in accordance with the DIP Orders and the Approved Budget plus (y) the Post-Carve-Out Notice Amount.

"<u>Enforcement Action</u>": any action to enforce any Obligations or Loan Documents or to exercise any rights or remedies relating to any Collateral (whether by judicial action, self-help, notification of Account Debtors, exercise of setoff or recoupment, exercise of any right to act in

-14-

an Obligor's Insolvency Proceeding or to credit bid Obligations, or otherwise, including in the Chapter 11 Cases, pursuant to any order of the Bankruptcy Court, or otherwise).

"Environment": ambient air, indoor air, surface water, groundwater, drinking water, soil, surface and subsurface strata, and natural resources such as wetland, flora and fauna.

"Environmental Laws": all Applicable Laws (including all programs, permits and guidance promulgated by regulatory agencies), relating to public health (but excluding occupational safety and health, to the extent regulated by OSHA) or the protection or pollution of the environment, including CERCLA, RCRA and CWA.

"Environmental Liability": any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities) whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law, directly or indirectly relating to (a) any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Environmental Notice": a notice (whether written or oral) from any Governmental Authority or other Person of any possible noncompliance with, investigation of a possible violation of, litigation relating to, or potential fine or liability under any Environmental Law, or with respect to any Environmental Release, environmental pollution or hazardous materials, including any complaint, summons, citation, order, claim, demand or request for correction, remediation or otherwise.

"Environmental Release": a release as defined in CERCLA or under any other Environmental Law.

"Equity Interest": the interest of any (a) shareholder in a corporation; (b) partner in a partnership (whether general, limited, limited liability or joint venture); (c) member in a limited liability company; or (d) Person having any other form of equity security or ownership interest in another Person, including common stock and preferred stock, and including all of the warrants, options or other rights for the purchase or acquisition from such Person of such Equity Interests in such Person.

"ERISA": the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate": any trade or business (whether or not incorporated) under common control with an Obligor within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event": (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Obligor or ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c)

-15-

a complete or partial withdrawal by any Obligor or ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) the determination that any Pension Plan or Multiemployer Plan is considered an at risk plan or a plan in critical or endangered status under the Code, ERISA or the Pension Protection Act of 2006; (f) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (g) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Obligor or ERISA Affiliate; or (h) with respect to any Pension Plan, a failure to satisfy the minimum funding standard under Section 412 of the Code or Section 302 of ERISA, whether or not waived, or a failure to make a required contribution to a Multiemployer Plan.

"EU Bail-In Legislation Schedule": the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Excess Cash": as defined in **Section 5.3.3**.

"Event of Default": as defined in **Section 11.1**.

"Exchange Act": Securities Exchange Act of 1934.

"Excluded Account": any Deposit Account in the name of any Obligor (a) that is used exclusively for payroll, payroll taxes and other employee wage and benefit payments in the Ordinary Course of Business; (b) that is a trust, fiduciary, or withholding tax payment account or (c) accounts set forth on **Schedule 8.5** which are listed as Excluded accounts; *provided*, that, no other Deposit Accounts shall constitute an Excluded Account.

"Excluded Assets": Except in each case to the maximum extent overridden by the Bankruptcy Code, each of the following:

> (a)    any lease, license, contract, or agreement (including, with respect to any Purchase Money Debt or similar arrangement, in each case, permitted hereunder, the assets subject thereto) to which any Obligor is a party or any of its rights or interests thereunder and its interest in any Real Estate (other than any Subject Real Property) which is demised thereby and any improvements thereon, in each case, if and only for so long as the grant of a security interest or Lien under this Agreement (i) is prohibited by Applicable Law during the Chapter 11 Cases, or would constitute or result in the abandonment, invalidation or unenforceability of any right, title or interest of such Obligor therein pursuant to Applicable Law during the Chapter 11 Cases, (ii) would require the consent of third parties (and such consent requirement is enforceable during the Chapter 11 Cases), and such consent shall have not been obtained notwithstanding (if so reasonably requested by the Administrative Agent) the Obligors' commercially reasonable efforts to obtain the same (other than with respect to Real Estate existing as of the Closing Date, for which no such efforts shall be required), or (iii) would constitute or result in a breach, termination or default under any such lease, license, contract or agreement (in each case other than to the extent that any

-16-

such prohibition, limitation, consent requirement or other term thereof is rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC of any relevant jurisdiction, the Bankruptcy Code or any other Applicable Law or any principles of equity); *provided*, that any such lease, license, contract or agreement (including, with respect to any Purchase Money Debt or similar arrangement, in each case, permitted hereunder, the assets subject thereto), the rights and interests of any Obligor thereunder and/or such Obligor's interest in any such Real Estate which is demised thereby and any improvements thereon will, in any case, be an Excluded Asset only to the extent and for so long as the consequences specified above will result and will cease to be an Excluded Asset, and will become Collateral, immediately and automatically, at such time as such consequences will no longer result;

    (b)    Excluded Accounts;

    (c)    [reserved];

    (d)    any United States intent-to-use trademark applications to the extent the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark application under applicable federal law notwithstanding the DIP Orders; and

    (e)    Margin Stock;

*provided*, that "Excluded Assets" shall not include any proceeds, products, substitutions or replacements of Excluded Assets (unless such proceeds, products, substitutions or replacements would otherwise constitute Excluded Assets); *provided, further*, that upon the occurrence of an event that renders property to no longer constitute Excluded Assets, including submission and acceptance by the United States Patent and Trademark Office of an amendment to allege use pursuant to 15 U.S.C. Section 1060(a) (or any successor provision) with respect to an intent-to-use trademark application, a security interest in such property shall be automatically and simultaneously be granted under the Security Documents and such property shall be automatically and immediately included as Collateral hereunder.

"Excluded Taxes": with respect to the Administrative Agent, any Lender or any other recipient of a payment to be made by or on account of any Obligation, (a) Taxes imposed on or measured by its net income (however denominated), branch profits Taxes and franchise Taxes, in each case, as a result of (i) such recipient being organized or having its principal office, or, in the case of any Lender, having its applicable Lending Office located, in such jurisdiction, or (ii) a present or former connection between such recipient and the taxing jurisdiction (other than connections arising from the Administrative Agent, such Lender or such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document); (b) any Tax imposed on such recipient as a result of such recipient's failure to comply with **Section 5.10**; (c) in the case of a Lender, any U.S. federal withholding tax imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to laws in force at the time such Lender acquires such interest in the Loan or Commitment

-17-

(other than pursuant to an assignment request by the Obligor Representative under **Section 13.4**) or designates a new Lending Office hereunder, except to the extent that, pursuant to **Section 5.9**, additional amounts were payable with respect to such U.S. federal withholding tax to such Lender (or its assignor, if any), immediately prior to designation of a new Lending Office (or assignment) and (d) withholding Taxes imposed by FATCA.

"Exit Premium": as defined in **Section 3.2.5**.

"Extension": as defined in **Section 2.1.5(a).**

"Extension Fee": as defined in **Section 2.1.5(b)**.

"Extraordinary Expenses": all reasonable and out-of-pocket costs or expenses that the Administrative Agent in accordance with the terms hereof incurs during an Event of Default relating to (a) any audit, inspection, repossession, storage, repair, appraisal, insurance, manufacture, preparation or advertising for sale, sale, collection, or other preservation of or realization upon any Collateral; (b) any action, arbitration or other proceeding (whether instituted by or against the Administrative Agent, any Lender, any Obligor, any representative of creditors of an Obligor or any other Person) in any way relating to any Collateral (including the validity, perfection, priority or avoidability of the Administrative Agent's Liens with respect to any Collateral), the Loan Documents, the Obligations, or the transactions contemplated thereby, including any lender liability or other Claims; (c) the exercise, protection or enforcement of any rights or remedies of the Administrative Agent in, or the monitoring of, any Insolvency Proceeding; (d) settlement or satisfaction of any taxes, charges or Liens with respect to any Collateral; (e) any Enforcement Action; (f) negotiation and documentation of any modification, waiver, workout, restructuring or forbearance with respect to any Loan Documents or Obligations; and (g) Protective Advances. Such costs, expenses and advances include transfer fees, storage fees, insurance costs, permit fees, utility reservation and standby fees, reasonable, documented, and out-of-pocket legal fees, appraisal fees, brokers' fees and commissions, auctioneers' fees and commissions, accountants' fees, environmental study fees, wages and salaries paid to employees of any Obligor or independent contractors in liquidating any Collateral, and travel expenses of any Obligor or independent contractors in liquidating any Collateral, and travel expenses.

"Fair Market Value": with respect to any asset or item of property, the sale value that would be obtained therefor in an arm's-length, free market transaction between an informed and willing seller under no compulsion to sell, and an informed and willing buyer under no compulsion to buy, as determined in good faith.

"FATCA": Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"Final Availability Period" has the meaning set forth in **Section 2.1.2(a)**.

-18-

"Final DIP Order": an order of the Bankruptcy Court in the Chapter 11 Cases, which order (a) shall be in form and substance, and on terms and conditions, reasonably satisfactory to the Administrative Agent and the Required Lenders, (b) shall, subject to the foregoing, authorize and approve, on a final basis, among other things, the DIP Facility, this Agreement, the other Loan Documents and the transactions related hereto and thereto (including the making of the Loans and the incurrence of the Obligations and the grant and perfection of Liens), the Debtors' use of cash collateral, the Carve-Out, payment of the fees hereunder to the Administrative Agent and the grant of adequate protection (consistent with the adequate protection contemplated by the Interim DIP Order), (c) shall be in full force and effect, and (d) (i) shall not have been reversed, vacated, or stayed and (ii) shall not have been amended, supplemented or otherwise modified since entry thereof by the Bankruptcy Court (unless the Administrative Agent and the Required Lenders shall have previously consented thereto in writing).

"Final DIP Order Date": the date on which the Final DIP Order is approved and entered by the Bankruptcy Court.

"Final Draw": as defined in **Section 2.1.2(a)**.

"Financial Covenant": as defined in **Section 10.3.2.**

"First-Priority DIP Collateral": the "First-Priority DIP Collateral" as defined in the DIP Orders, limited with respect to all Real Estate existing as of the Closing Date to the Subject Real Property located in Marble, North Carolina (the "Marble Real Property"), all of which First-Priority DIP Collateral, subject to the Carve-Out, is encumbered by Liens held by the Administrative Agent that are senior to all other Liens.

"Fiscal Quarter": each period of three months, commencing on the first day of a Fiscal Year.

"Fiscal Year": the fiscal year of Borrower and its Subsidiaries for accounting and tax purposes, ending on December 31 of each year.

"FLSA": the Fair Labor Standards Act of 1938.

"Flood Insurance Laws": means, collectively, (i) the National Flood Insurance Reform Act of 1994 (which comprehensively revised the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973) as now or hereinafter in effect or any successor statute thereto, (ii) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (iii) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereinafter in effect or any successor statute thereto.

"Foreign Lender": any Lender that is not a U.S. Person.

"Foreign Plan": any employee benefit plan or arrangement (a) maintained or contributed to by any Obligor or Subsidiary that is not subject to the laws of the United States; or (b) mandated by a government other than the United States for employees of any Obligor or Subsidiary.

-19-

"<u>Full Payment</u>": with respect to the Loans and all other Obligations (other than Remaining Obligations) the indefeasible payment thereof in full in Cash in accordance with the Loan Documents, including with respect to all interest, fees and other amounts and charges (including Post-Petition Interest) owing hereunder and/or accruing during the Chapter 11 Cases (whether or not allowed during the proceeding); *provided*, that, notwithstanding the foregoing, Full Payment shall not be deemed to occur, and no Loans shall be deemed to have been paid in full, unless and until such time as all Commitments shall have irrevocably, permanently and finally expired, or shall have been so terminated, cancelled and discharged and all related loan documents in respect thereof have been terminated

"<u>GAAP</u>": generally accepted accounting principles in effect in the United States from time to time.

"<u>Global Intercompany Note</u>" means a subordinated intercompany promissory note to be dated on or about the Closing Date and executed by all Obligors and all other Subsidiaries of Borrower (other than Immaterial Subsidiaries which are not Debtors in the Chapter 11 Cases), to be substantially in the form of that attached hereto as **Exhibit I** or otherwise in form and substance satisfactory to the Administrative Agent.

"<u>Governmental Approvals</u>": all authorizations, consents, approvals, licenses and exemptions of, registrations and filings with, and required reports to, all Governmental Authorities.

"<u>Governmental Authority</u>": any federal, state, local, foreign or other agency, authority, body, commission, court, instrumentality, political subdivision, or other entity or officer exercising executive, legislative, judicial, regulatory or administrative functions for any governmental, judicial, investigative, regulatory or self-regulatory authority.

"<u>Guarantee Obligation</u>": as to any Person (the "<u>guaranteeing person</u>") any obligation, including a reimbursement, counterindemnity or similar obligation, of the guaranteeing person that guarantees or in effect guarantees, or which is given to induce the creation of a separate obligation by another Person (including any bank under any letter of credit) that guarantees or in effect guarantees, any Debt, leases, dividends or other obligations (the "<u>primary obligations</u>") of any other third Person (the "<u>primary obligor</u>") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; *provided*, *however*, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the Ordinary Course of Business. The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the

-20-

maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof, as determined by Borrower in good faith.

"Guarantor": individually or collectively, each Person that is, or at any time becomes, a party to (or otherwise agrees to be bound by) any Guaranty, or that otherwise guarantees payment or performance of any Obligations or owes any Guarantee Obligations to the Secured Parties. As of the Closing Date, each Subsidiary Guarantor is a Guarantor.

"Guaranty": each guaranty agreement executed by a Guarantor in favor of the Administrative Agent, substantially in the form of **Exhibit D** or otherwise in form reasonably acceptable to the Administrative Agent.

"Hazardous Materials": all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants including petroleum or petroleum distillates, natural gas, natural gas liquids, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, toxic mold, infectious or medical wastes and all other substances, wastes, chemicals, pollutants, contaminants or compounds of any nature in any form regulated pursuant to any Environmental Law.

"Hedging Agreement": any "swap agreement" as defined in Section 101(53B)(A) of the Bankruptcy Code.

"Immaterial Subsidiary" means each Subsidiary of Borrower set forth on **Schedule 10.1.16** (as such schedule may only be updated to add additional Subsidiaries of Borrower with the prior written consent of the Administrative Agent).

"Indemnified Taxes": (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Obligor under any Loan Document, and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Indemnitees": Agent Indemnitees and Lender Indemnitees.

"Initial Budget": the cash flow forecast that (a) sets forth, on a line-item, cumulative and aggregate basis, the Obligors' projections for all weekly receipts and disbursements/expenditures (including debt service costs) expected to be collected, incurred or made (as the case may be) by the Obligors and their Subsidiaries, in each case, during the period beginning with the calendar week ending on Friday of the week in which the Petition Date occurs, and continuing through the week of projected emergence upon confirmation of an Acceptable Plan of Reorganization, and (b) was approved by the Administrative Agent prior to the Interim DIP Closing Date. For the avoidance of doubt, Exhibit 4 to the Interim DIP Order shall constitute the Initial Budget (and a copy thereof is attached as **Exhibit H** hereto).

"Initial Draw": as defined in **Section 2.1.2(a)**.

"Initial Draw Voluntary Prepayment": as defined in **Section 2.1.2(a)**.

-21-

"Insolvency Proceeding": any case or proceeding commenced by or against a Person under any state, federal or foreign law, rule or regulation for, or any agreement of such Person to any or a combination of the following (each, a "Bankruptcy Law"): (a) the entry of an order for relief under the Bankruptcy Code, or any other insolvency, debtor relief or debt adjustment or reorganization law (including any moratorium or any other marshalling of the assets and liabilities of any Person and any similar laws, rules or regulations relating to or affecting the enforcement of creditors' rights generally); (b) the appointment of a receiver, trustee, liquidator, administrator, conservator or other custodian for such Person or all or substantially all of its property; or (c) an assignment or trust mortgage for the benefit of creditors.

"Intellectual Property": all intellectual and similar property of a Person, including: Patents, Trademarks, Copyrights and Technology; all embodiments or fixations thereof and all related documentation, applications, registrations and franchises; and all intellectual property rights in all books and records relating to the foregoing.

"Intellectual Property Claim": any claim or assertion (whether in writing, by suit or otherwise) that Holding's or a Subsidiary's ownership, use, marketing, sale or distribution of any Intellectual Property or other property or methods, processes or services violates, infringes, dilutes or misappropriates another Person's Intellectual Property.

"Intellectual Property Collateral": all Intellectual Property and Licenses of each Obligor, whether now or hereafter owned, licensed or acquired, in each case, excluding any Excluded Assets.

"Intercompany Subordination Agreement": that certain Intercompany Subordination Agreement dated as of the Closing Date among the Obligors, all Subsidiaries of Borrower (other than Immaterial Subsidiaries which are not Debtors in the Chapter 11 Cases), and the Administrative Agent.

"Interest Payment Date": (a) the first day of each calendar month until Full Payment (whether or not the Termination Date shall have occurred, and whether or not such day is a Business Day), (b) to the extent set forth herein, each date when any principal of any Loan shall be paid (or shall be required to be paid, if earlier) whether pursuant to any prepayment, repayment, or other payment (including at maturity), (c) without duplication of the foregoing, the Termination Date (and each day thereafter until Full Payment, and (d) each and any other date, if any, that any interest shall be payable hereunder.

"Interim Availability Period": as defined in **Section 2.1.2(a)**.

"Interim DIP Closing Date": the date upon which the Initial Draw was advanced by the Lenders to Borrower pursuant to the Interim DIP Order and the Commitment Letter, which date was February 3, 2023.

"Interim DIP Order": as defined in the recitals to this Agreement and which shall (a) be in full force and effect, and (b) not have been reversed, vacated, stayed or amended, supplemented or otherwise modified (unless the Required Lenders shall have previously consented thereto in writing, including with respect to the Final DIP Order).

-22-

"<u>Interim DIP Order Date</u>": the date the Interim DIP Order was entered by the Bankruptcy Court, which date was February 2, 2023.

"<u>Inventory</u>": as defined in the UCC, including all goods intended for sale, lease, display or demonstration; all work in process; and all raw materials, and other materials and supplies of any kind that are or could be used in connection with the manufacture, printing, packing, shipping, advertising, sale, lease or furnishing of such goods, or otherwise used or consumed in a Person's business (but excluding Equipment).

"<u>Investment</u>": an Acquisition; an acquisition of record or beneficial ownership of any Equity Interests of a Person; or a loan advance or capital contribution to or other debt or equity investment in a Person or any guaranty or other assurance of payment of any loan advance or other Debt owing by any such other Person.

"<u>IRS</u>": the United States Internal Revenue Service.

"<u>Junior-Priority DIP Collateral</u>": the "Junior-Priority DIP Collateral" as defined in the DIP Orders.

"<u>Lender</u>": as of any time of determination, each Person that has a Commitment and/or holds any Loan at such time (including any Person that has become a Lender pursuant to an Assignment and Acceptance) (the foregoing Persons, collectively, the "<u>Lenders</u>"). As of the Closing Date, the Lenders shall be the Persons whose name is set forth on **Schedule 1.1** (as amended from time to time) hereto under the heading "Lenders".

"<u>Lender Indemnitees</u>": Lenders and their officers, directors, employees, Affiliates, agents and attorneys.

"<u>Lending Office</u>": the office designated as such by the applicable Lender at the time it becomes party to this Agreement or thereafter by notice to the Administrative Agent and Borrower.

"<u>License</u>": all license agreements with, and covenants not to sue, any other party with respect to any Intellectual Property or Intellectual Property Collateral, whether such Obligor is a licensor or licensee under any such license agreement, together with any and all (i) renewals, extensions, supplements, amendments and continuations thereof, (ii) income, fees, royalties, damages, claims and payments now and hereafter due and/or payable thereunder and with respect thereto including damages and payments for past, present or future infringements, breaches or violations thereof, (iii) rights to sue for past, present and future infringements, breaches or violations thereof and (iv) other rights to use, exploit or practice any or all of the Intellectual Property or Intellectual Property Collateral.

"<u>Lien</u>": any Person's interest in real or personal property securing an obligation owed to, or a claim by, such Person, including any mortgage, deed of trust, lien, security interest, pledge, hypothecation, trust, reservation, encroachment, easement, right-of-way, encumbrance or other title exception.

"<u>Liquidity</u>": as of any date of determination, the sum of each of (each to be separately listed and calculated on any certification thereof) (i) unrestricted cash and Cash Equivalents (based on

-23-

the book balance thereof) of Borrower and the other Obligors, in either case, held in a Deposit Account subject to a Control Agreement in favor of the Administrative Agent and (ii) subject to the definition of Unrestricted Bitcoin, the aggregate value in U.S. Dollars of the Unrestricted Bitcoin owned by Borrower and the other Obligors on such date of determination, as such value shall be determined based on the BTCUSD Coinbase spot price as of 5:00 p.m. as of the immediately preceding Business Day (or, if applicable with respect to any Bitcoin, the value thereof, if any, as determined in accordance with any applicable Permitted BTC Hedging Agreement with respect thereto); provided that, (1) solely for purposes of determining compliance with the Financial Covenant, any amount held in any Deposit Account shall be "Liquidity" regardless of whether it is subject to a Control Agreement in favor of the Administrative Agent until the date on which Control Agreements must be put in place pursuant to **Section 6.3** and (2) in no event, shall (x) cash or Cash Equivalents in the Carve-Out Account or (y) any cash held or deposited in respect of utility deposits, including any Adequate Assurance Deposits, be included in the calculation of Liquidity.

"Liquidity Covenant": as defined in **Section 10.3.2.**

"Loan": each and any DIP Term Loan made to or for the account of Borrower pursuant to **Section 2.1.2** hereof.

"Loan Documents": the Commitment Letter, this Agreement, the Other Agreements and the Security Documents.

"Loan Year": each 12 month period commencing on the Closing Date and ending on each anniversary of the Closing Date.

"Marble Real Property": as defined in the definition of "First-Priority DIP Collateral."

"Margin Stock": as defined in Regulation U of the Board of Governors.

"Material Adverse Effect": the effect of any event or circumstance that, taken alone or in conjunction with other events or circumstances (other than as a result of (x) the events and conditions related and/or leading up to the commencement of the Chapter 11 Cases, (y) any defaults under agreements that have no effect under the terms of the Bankruptcy Code as a result of the commencement of a proceeding under chapter 11 of the Bankruptcy Code and the Chapter 11 Cases, or (z) any liabilities disclosed in any DIP Order or arising out of any litigation described in **Schedule 9.1.15**, (a) has had or could be reasonably expected to have a material adverse effect (i) on the business, operations, properties, or financial condition of Borrower and its Subsidiaries, taken as a whole, (ii) on the value of Collateral, taken as a whole, (iii) on the enforceability of any Loan Documents, or (iv) on the validity or priority of the Administrative Agent's Liens on a material portion of the Collateral); (b) materially impairs or has a material adverse effect on the ability of the Obligors, taken as a whole, to perform their obligations under the Loan Documents, including repayment of any Obligations; or (c) otherwise impairs or has a material adverse effect on the ability of the Administrative Agent to enforce or collect any Obligations or to realize upon a material portion of the Collateral.

"Material Contract": any written agreement or arrangement to which an Obligor or a Subsidiary is party (other than the Loan Documents or Prepetition Note Purchase Agreements) for

-24-

which breach, termination, nonperformance or failure to renew could reasonably be expected to have a Material Adverse Effect or which involves property, expenditures, revenue or obligations in excess of $2,500,000.

"Maturity Date": December 22, 2023, the date that is twelve (12) months after the Petition Date; as such date as may be extended in accordance with and pursuant to **Section 2.1.5**.

"Moody's": Moody's Investors Service, Inc., and its successors.

"Monthly DIP Agent Fee":  as defined in **Section 3.2.1**.

"Mortgages": means mortgages, deeds of trust, leasehold mortgages and such other similar agreements to be executed by an Obligor in favor of the Administrative Agent conveying liens and security interests in the real property, fixtures and personal property (or such Obligor's interest) comprising the Subject Real Property (or, to the extent relevant, any after-acquired real property (or interests therein) of the Obligors).

"Multiemployer Plan": any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which any Obligor or ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"Net Cash Proceeds": means, as applicable, (a) with respect to any Asset Disposition by any Person, cash and Cash Equivalents received by or for such Person's account with respect to, or in connection with, such Asset Disposition, net of (i) reasonable direct costs and expenses relating to, and payable as a condition to consummating, such Asset Disposition (including investment banking fees, consultant fees, survey costs, title insurance premiums, and related search and recording charges, legal fees and reasonable broker's fees or sales commissions and similar costs and expenses paid or payable in connection with such Asset Disposition), in each case, solely to the extent that the payment thereof is in accordance with the Approved Budget and, giving pro forma effect to the payment thereof, the Obligors shall be in compliance with the Financial Covenant, (ii) Taxes paid, or reasonably expected to be payable, by such Person, the Obligor or any of its Subsidiaries as a result of, or in connection with, such Asset Disposition, and (iii) (x) the repayment of any Debt secured by such Collateral (which is the subject of any such Asset Disposition) on a senior priority basis to the Obligations and solely by the asset or property subject to such Asset Disposition, if such repayment is required as a condition to consummating such Asset Disposition, and (y) in the case of Real Estate, the repayment of any mortgages secured by or obligations secured by mechanics', construction or similar liens on such property having senior priority to the Obligations, if such repayment is required as a condition to consummating such Asset Disposition; and (b) with respect to any Debt Issuance or issuance of any Equity Interests, the cash proceeds thereof, net of all taxes and customary fees, commissions, costs and other expenses (including reasonable broker's fees or commissions, legal fees, accounting fees, investment banking fees and other professional fees, and discounts and commissions) incurred in connection therewith.

-25-

"Non-Core Assets": Obligors' assets which are not essential or material to, and are not used in, the conduct of the businesses of the Obligors in the Ordinary Course of Business. "Non-Core Assets" shall not include any of the Subject Real Property.

"Notice of Borrowing": a Notice of Borrowing to be provided by Borrower to request a Borrowing of Loans, substantially in the form of **Exhibit C** hereto or such other form as may be approved in writing by the Administrative Agent (including any form on an electronic platform or electronic transmission system as shall be approved in writing by the Administrative Agent), appropriately completed and signed by a Senior Officer of Borrower.

"Obligations": all (a) principal of, and premium, if any, on the Loans (including principal of DIP Term Loans resulting from and/or deemed made in connection with payment of PIK Interest, the Upfront Payment which was Paid in Kind, and any other obligations or liabilities Paid in Kind hereunder, as applicable), and, without limiting the foregoing, all obligations and indebtedness with respect to the Upfront Payment, Exit Premium, the Monthly DIP Agent Fee and any Extension Fee, (b) interest (including interest accruing after the Termination Date or other maturity of the Loans, and Post-Petition Interest), expenses, fees, indemnification and reimbursement obligations, Extraordinary Expenses and other amounts payable by Obligors under Loan Documents (including, without limitation, all amounts pursuant to **Sections 3, 5, 10, 12.6,** and **14.1.2**), and all charges accruing during the Chapter 11 Cases, and (c) other Debts, obligations and liabilities of any kind owing by Obligors pursuant to the Loan Documents, whether now existing or hereafter arising, whether evidenced by a note or other writing, whether allowed in any Insolvency Proceeding, whether arising from an extension of credit, issuance of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, and whether direct or indirect, absolute or contingent, due or to become due, primary or secondary, or joint or several.

"Obligor": Borrower, each Guarantor, or other Person that has granted a Lien in favor of the Administrative Agent on its assets to secure any Obligations.

"Obligor Representative": as defined in **Section 5.12**. The initial Obligor Representative shall be Core Scientific.

"Ordinary Course of Business": in respect of any obligation of, any transaction involving, entered into, or consummated by, or any action taken by, or any agreement or arrangement entered into by (each, an "Applicable Transaction"), any Obligor or any other Person (including any Asset Disposition), that such Applicable Transaction shall be consummated, conducted, effectuated, or otherwise take place in the ordinary course of such Person's business, and in accordance with such Person's past practice, and, in each case, in good faith and not for purposes of evading any covenant or restriction in, or any requirement of, any Loan Document or Applicable Law; *provided*, that, (i) any Applicable Transaction that occurs on or at any time after the Petition Date shall only be deemed to be in the Ordinary Course of Business if and to the extent that the same constitutes "Ordinary Course of Business" or would be deemed to be in the ordinary course pursuant to section 363 of the Bankruptcy Code, (ii) any payment, disbursement or liability made or arising as of the Petition Date shall only be deemed to be in the Ordinary Course of Business if, in addition to satisfying the foregoing requirements, the same shall be in accordance with the Approved Budget, and (iii) any Applicable Transaction involving Cryptocurrency (including any Asset Disposition or any other sale, transfer or other disposition of any Cryptocurrency) shall, in

11231624v19

each case, only be considered to be in the Ordinary Course of Business if consummated at Fair Market Value.

"Organic Documents": with respect to any Person, its charter, certificate or articles of incorporation, bylaws, articles of organization, limited liability agreement, operating agreement, members agreement, shareholders agreement, partnership agreement, certificate of partnership, certificate of formation, voting trust agreement, or similar agreement or instrument governing the formation or operation of such Person.

"Original DIP Agent" as defined in the recitals to this Agreement.

"Original DIP Credit Agreement" as defined in the recitals to this Agreement.

"Original DIP Lenders" as defined in the recitals to this Agreement.

"OSHA": the Occupational Safety and Hazard Act of 1970.

"Other Agreement": any fee letter, any Guaranty, any Compliance Certificate, any Variance Report, any Variance Report Certificate, the Perfection Certificate, the Global Intercompany Note (together with any allonge relating thereto), the Intercompany Subordination Agreement, any notes, the Side Letter, and any other document, instrument or agreement (other than this Agreement or a Security Document) now or hereafter delivered by an Obligor to the Administrative Agent or a Lender in connection with this Agreement (together with any updates, amendments or modifications thereto.

"Other Connection Taxes": with respect to the Administrative Agent, any Lender or any other recipient, Taxes imposed as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (other than connections arising from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Draw": as defined in **Section 2.1.2(a)**.

"Other Taxes": all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes arising from any payment made under any Loan Document or from the execution, delivery, performance, registration or enforcement of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than any assignment pursuant to **Section 13.4**).

"Paid in Kind": as used with respect to payment of any accrued interest on any Loan, or the payment of any fee or any other amount hereunder that is expressly specified as being required to be Paid in Kind (or payable in kind, capitalized or similar) (including PIK Interest and the Upfront Payment) (the applicable interest, fee or other amount, the "Reference Obligation"), shall mean that such Reference Obligation shall (automatically, by operation of the terms hereof, without the requirement for any Person to take any action or cause anything to be done in order to effectuate such payment), be deemed paid at 12:01 a.m. (New York City time) on due date therefor,

by deeming the equivalent Dollar amount of such Reference Obligation (calculated in accordance with **Section 3** and as otherwise provided in this Agreement) to be automatically capitalized as an equivalent principal amount of the Loans due in respect of (as determined in accordance with this Agreement), and, accordingly, such amount shall be compounded onto, and added to the aggregate principal amount of the Loans outstanding immediately prior to such payment, such that, immediately after giving effect to the payment of the applicable Reference Obligation as described herein, the aggregate outstanding principal amount of the Loans shall include the amount of such Reference Obligation.

For the avoidance of doubt, without limiting the foregoing, (i) with respect to any Reference Obligation owing with respect to any DIP Term Loans, once such Reference Obligation has been Paid in Kind in accordance with the foregoing, the amount of such Reference Obligation shall constitute, for all purposes hereunder, DIP Term Loans incurred as of such time, which shall thereupon accrue interest in accordance with **Section 3** and (ii) the aggregate principal amount of DIP Term Loans outstanding as of any time shall be calculated to include (x) the original principal amount thereof, (y) the aggregate amount of PIK Interest through the time of determination and the amount of the Upfront Payment and (z) any other amounts Paid in Kind hereunder.

"Participant": as defined in **Section 13.2**.

"Participant Register": as defined in **Section 13.2.4.**

"Patents": all patents and all patent applications (whether issued, applied for or allowed in the United States or any other country or any political subdivision thereof), together with any and all (i) rights and privileges arising under Applicable Law with respect to the foregoing, (ii) inventions, discoveries, designs and improvements described or claimed therein, (iii) reissues, divisions, continuations, reexaminations, extensions and continuations-in-part thereof and amendments thereto, (iv) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable thereunder and with respect thereto including damages and payments for past, present or future infringements thereof, (v) rights corresponding thereto throughout the world and (vi) rights to sue for past, present or future infringements thereof.

"Patriot Act": the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001).

"Payment Item": each check, draft or other item of payment payable to Borrower or any Subsidiary, including those constituting proceeds of any Collateral.

"PBGC": the Pension Benefit Guaranty Corporation.

"Pension Plan": any employee pension benefit plan (as defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by any Obligor or ERISA Affiliate or to which the Obligor or ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the preceding five plan years.

-28-

"Performance Period": as defined in **Section 10.1.12**.

"Permitted Asset Disposition": any of the following Asset Dispositions, but, in each case, only if, and so long as, such Asset Disposition is in accordance with the Approved Budget (subject to the Permitted Variance):

        (a)     any sale of property or any disposition of property not otherwise described pursuant to any other clause of this definition; *provided*, that the aggregate Fair Market Value or book value (whichever is more) of property disposed of in reliance on this clause (a) since the Petition Date (taken as a whole, and determined in the aggregate and on a cumulative basis) shall not exceed $1,000,000;

        (b)     subject to compliance with **Section 5.3.4,** a disposition of Non-Core Assets or property that is obsolete, surplus, unmerchantable or otherwise unsalable, including the abandonment or other disposition of immaterial Intellectual Property, in the Ordinary Course of Business;

        (c)     the sale or discount (or forgiveness), in each case without recourse and in the Ordinary Course of Business, of accounts receivable or notes receivable arising in the Ordinary Course of Business, but only in connection with the compromise or collection thereof or in connection with the bankruptcy or reorganization of the applicable account debtors and dispositions of any securities received in any such bankruptcy or reorganization;

        (d)     dispositions resulting from any casualty or other insured damage to, or any taking under any power of eminent domain or by condemnation or similar proceeding of, any real or personal property of any Obligor;

        (e)     any transactions permitted by **Sections 10.2.2** or **10.2.4**;

        (f)     non-exclusive Licenses for any Intellectual Property, in each case in the Ordinary Course of Business;

        (g)     approved in writing by the Administrative Agent;

        (h)     a disposition of property (including mining equipment but excluding Subject Real Property) in the Ordinary Course of Business to the extent that (i) such property is immediately exchanged for credit against the purchase price of similar replacement property (and such purchase is (x) permitted hereunder and (y) consummated promptly thereafter), (ii) the proceeds of such disposition are applied or contractually committed to be applied to the purchase price of replacement property useful in the Ordinary Course of Business of Borrower within ninety (90) days of the receipt of such proceeds (so long as (x) such purchase is otherwise permitted hereunder and (y) pending such application, such proceeds are held in a Deposit Account subject to a Control Agreement in favor of the Administrative Agent), provided that any such proceeds are so applied by no later than 90 days after such disposition (notwithstanding that such replacement property may not be received within such 90 day period) or (iii) to the extent neither clause (i) or (ii) is applicable, the Administrative Agent shall have consented in

-29-

writing to such disposition and the Net Cash Proceeds thereof shall be applied to the Obligations pursuant to **Section 5.3.4** upon the receipt thereof; *provided*, that, any property acquired hereunder shall constitute Collateral, and the Administrative Agent shall be granted a fully perfected Lien thereon in accordance with the requirements hereof and having the same priority as all other Liens granted to secure the Obligations;

(i)      a lease, sublease, license or sublicense of any real or personal property which is entered into in good faith and does not materially interfere with the business of the Obligors, taken as a whole, or which is entered into in the Ordinary Course of Business; *provided*, that any payments by any Obligor with respect thereto shall be set forth in the Approved Budget and shall be in accordance with the Financial Covenant and the DIP Orders;

(j)      the unwinding of Hedging Agreements (other than any Permitted BTC Hedging Agreement if requiring any Bitcoin Disposition not permitted hereunder);

(k)      Asset Dispositions among Obligors in the Ordinary Course of Business, so long as any property subject to the same shall remain subject to a fully perfected, first priority Lien in favor of the Administrative Agent to the extent provided hereunder and pursuant to the DIP Orders;

(l)      the liquidation or other disposition of cash and Cash Equivalents in the Ordinary Course of Business for equivalent value and in accordance with the Approved Budget;

(m)      the surrender or waiver of contractual rights and/or the settlement or waiver of contractual or litigation claims in the Ordinary Course of Business or in the commercially reasonable judgment of the Obligors, and, in each case, solely if and to the extent permitted in the Chapter 11 Cases; provided, that, the aggregate value of such effected claims shall not exceed $1,000,000 or are otherwise consented to in writing by the Administrative Agent;

(n)      Bitcoin Dispositions; and

(o)      the sale or other Disposition (in each case, at Fair Market Value) of one or more of the Subject Real Properties for cash at closing (subject to reasonable holdbacks in respect of potential indemnity obligations, required reimbursements, allowances or purchase price adjustments); provided, that (w) such sale would not have and could not reasonably be expected to have a Material Adverse Effect or materially impair the Obligor's ability to conduct business and meet the Approved Budget and Financial Covenant, (x) no Default or Event of Default then exists or would result therefrom (unless the Administrative Agent otherwise consents in writing thereto), (y) the Administrative Agent shall have consented in writing thereto, and (z) the Net Cash Proceeds from any such Disposition shall be applied to the repayment of the Obligations as set forth in **Section 5.3.4** promptly, but in any event, within three (3) Business Day after such Obligor's receipt thereof (which receipt shall in any event be into a DIP Funding Account);

-30-

*provided*, that, notwithstanding anything to the contrary, neither Borrower nor any Subsidiary shall make any Asset Disposition in connection with a sale-leaseback transaction without the prior written consent of the Administrative Agent (at the direction of the Required Lenders).

"Permitted BTC Hedging Agreement": any forward sales or hedging arrangement with respect to the Obligors' present or anticipated Bitcoin inventory (in form and substance, and the entry by a Loan Party into which has been, in each case, approved by the Administrative Agent in writing) entered into as contemplated by **Section 10.1.13**.

"Permitted Contingent Obligations": Contingent Obligations (a) arising from endorsements of Payment Items for collection or deposit in the Ordinary Course of Business; (b) arising from Hedging Agreements entered into prior to the Petition Date in accordance with the Prepetition Loan Agreements and not prohibited hereunder, or any Hedging Agreements entered into after the Petition Date in accordance herewith in the Ordinary Course of Business for non-speculative purposes; (c) incurred or arising in the Ordinary Course of Business prior to the Petition Date (to the extent then permitted by the Prepetition Loan Agreements), and existing on the Interim DIP Closing Date (other than any such Contingent Obligations in respect of the "Obligations" under and as defined in the Original DIP Agreement), and any extension or renewal thereof permitted pursuant to the DIP Orders that does not increase the amount of such Contingent Obligation when extended or renewed; (d) incurred in the Ordinary Course of Business with respect to surety, appeal or performance bonds, or other similar obligations; (e) arising from customary indemnification obligations in favor of purchasers in connection with Asset Dispositions not prohibited hereunder; (f) arising under the Loan Documents or the DIP Orders or otherwise in favor of the Secured Parties and/or their Related Parties (including the Guarantee Obligations of the Guarantors); (g) in an aggregate amount of $500,000 or less at any time incurred or arising by operation of law, or in the Ordinary Course of Business pursuant to a transaction not otherwise prohibited hereunder; (h) in respect of Debt (other than the Obligations) of the Obligors permitted pursuant to **Section 10.2.1** (but not exceeding the amount of such Debt, and if such Debt is pari passu or subordinated to the Obligations, such Contingent Obligation shall also be subordinated or made pari passu to the same extent, and in all cases, such Contingent Obligation shall be unsecured (unless otherwise permitted pursuant to **Section 10.2.2**), unless, in each case, otherwise acceptable to the Administrative Agent or (j) arising in connection with any contingent indemnity or contingent payment obligation agreed to in any Permitted Asset Disposition; *provided*, that, notwithstanding the foregoing, any Contingent Obligation incurred or arising (or extended or renewed) at any time after the Petition Date shall only constitute a Permitted Contingent Obligation if and to the extent that the same is permitted during the Chapter 11 Cases and is not in breach of, or inconsistent with, the DIP Orders or any Chapter 11 Order.

"Permitted Discretion": a determination made in the exercise, in good faith, of reasonable credit judgment (from the perspective of a secured lender, or any administrative or collateral agent in connection with any secured financing transaction).

"Permitted Employment Arrangements": any employment arrangements approved by the Bankruptcy Court pursuant to any Chapter 11 Order and, if entered into after the Interim DIP Order Date, approved by the Administrative Agent.

-31-

"Permitted Holders": any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act), that, as of the time immediately prior to the Petition Date collectively, had the power to elect a majority of the members of the board of directors of Borrower.

"Permitted Lien": as defined in **Section 10.2.2**.

"Permitted Prior Lien": as defined in **Section 10.2.2(j)**.

"Permitted Restrictions": prohibitions, restrictions, or conditions under or with respect to any of the following: (a) the Loan Documents or the DIP Orders, (b) any agreement entered into prior to the Petition Date and in effect on the Interim DIP Closing Date, (c) any Purchase Money Debt or Purchase Money Lien permitted by **Section 10.2.1** or **10.2.2** solely to the extent that the agreement or instrument governing such Debt prohibits a Lien on the property subject thereto, (d) by reason of customary provisions restricting pledges, assignments, subletting or other transfers contained in leases, licenses, contracts and similar agreements entered into in the Ordinary Course of Business (*provided*, that such restrictions are limited to the property or assets subject to such leases, licenses, contracts or similar agreements, as the case may be) to the extent the enforceability of any such restrictions would be upheld under applicable Bankruptcy Law, (e) any prohibition or limitation that consists of customary restrictions and conditions contained in any agreement relating to the sale of any real or personal property permitted under this Agreement, (f) under any Debt or Lien permitted to be outstanding on the date after the Petition Date upon which any Person first becomes a Subsidiary (so long as such agreement was not entered into solely in contemplation of such Person becoming a Subsidiary, and such Person is permitted hereunder to become a Subsidiary), (g) Liens that are negative pledges and restrictions on Liens in favor of any holder of Debt permitted under **Section 10.2.1** but solely to the extent any negative pledge relates to (A) the property financed by such Debt and the proceeds, accessions and products thereof or (B) the property secured by such Debt and the proceeds, accessions and products thereof so long as the agreements governing such Debt permit the Liens on Collateral securing the Obligations; (h) Liens that are restrictions on cash or other deposits imposed by customers under contracts entered into in the Ordinary Course of Business and permitted during the Chapter 11 Cases; (i) Liens that arise with respect to cash or other deposits permitted under **Sections 10.2.1** or **10.2.2** and limited to such cash or deposit or customary bank set-off rights; (j) Liens that are non-exclusive Licenses or restrictions regarding licensing or sublicensing by the Obligors and its Subsidiaries of Intellectual Property in the Ordinary Course of Business, if permitted during the Chapter 11 Cases; (k) Liens that are restrictions on cash earnest money deposits in favor of sellers in connection with acquisitions not prohibited hereunder; and (l) Applicable Law during the Chapter 11 Cases. It being acknowledged and agreed that the permitting of such Permitted Restrictions and the entry into any Restrictive Agreement containing such Permitted Restrictions pursuant to **Section 10.2.13**, shall not be deemed an acknowledgement and/or agreement by the Administrative Agent to be bound by any such provision in connection with its rights in and to the Collateral pursuant to the DIP Orders.

"Permitted Variance": shall mean, with respect to either the Receipts Variance or the Disbursements Variance, a variance that would not result in a default under the Budget Covenant.

"<u>Person</u>": any individual, corporation, limited liability company, partnership, joint venture, association, trust, unincorporated organization, Governmental Authority or other entity.

"<u>Petition Date</u>": as defined in the recitals to this Agreement.

"<u>PIK Interest</u>": interest Paid in Kind. Unless otherwise specified, references herein to PIK Interest shall be deemed to refer to PIK Interest on the Obligations.

"<u>Plan</u>": any employee benefit plan (as defined in Section 3(3) of ERISA) established or maintained by an Obligor or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, an ERISA Affiliate.

"<u>Platform</u>": as defined in **Section 14.3.3**.

"<u>Pledged Collateral</u>": as defined in **Section 7.3.1.**

"<u>Pledged Debt Securities</u>": as defined in **Section 7.3.1.**

"<u>Pledged Equity Interests</u>": as defined in **Section 7.3.1.**

"<u>Post-Carve-Out Notice Amount</u>": as defined in the Final DIP Order.

"<u>Post-Petition Interest</u>": with respect to any Loans or other Obligations hereunder, all interest, fees, expenses and other charges accruing after the filing of any petition under the Bankruptcy Law, or the commencement of any Insolvency Proceeding relating to any Obligor and/or any of its Subsidiaries (including, as applicable, the Chapter 11 Cases), whether or not a claim for post-filing or post-petition interest is allowed or allowable under the Bankruptcy Law or in any such Insolvency Proceeding.

"<u>Prepetition</u>": with respect to the Obligors, means any time prior to the commencement of the Chapter 11 Cases.

"<u>Prepetition April NPA</u>": the Secured Convertible Note Purchase Agreement, dated as of April 19, 2021 (as amended or otherwise modified from time to time prior to, and as in effect on, the Petition Date), among Borrower, the purchasers party thereto from time to time and the Prepetition April NPA Agent.

"<u>Prepetition April NPA Agent</u>": U.S. Bank, National Association, as note agent and as collateral agent under the Prepetition April NPA, and each of its successors and permitted assigns.

"<u>Prepetition April NPA Debt</u>": all Debt, obligations, liabilities and indebtedness of every kind, nature and description owing by the Obligors to the Prepetition April NPA Agent and Prepetition April NPA Lenders, including principal, interest, charges, fees, premiums, indemnities, letter of credit obligations, costs and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise arising under the Prepetition April NPA Documents (including, without duplication, all "Obligations" as defined thereunder).

-33-

"<u>Prepetition April NPA Documents</u>": collectively, the following (as the same now exist or may hereunder be amended, modified, supplemented, extended, renewed, restated or replaced): (a) the Prepetition April NPA; and (b) all other Note Documents (as defined in the Prepetition April NPA).

"<u>Prepetition April NPA Lenders</u>": the purchasers under the Prepetition April NPA and their respective successors and assigns.

"<u>Prepetition April NPA Secured Parties</u>": collectively, the Prepetition April NPA Lenders, the Prepetition April NPA Agent and the other Secured Parties (as such term is defined under the Prepetition April NPA Documents).

"<u>Prepetition August NPA</u>": the Convertible Note Purchase Agreement, dated as of August 20, 2021 (as amended or otherwise modified from time to time prior to, and as in effect on, the Petition Date), among Borrower, the purchasers party thereto from time to time and the Prepetition August NPA Agent.

"<u>Prepetition August NPA Agent</u>": U.S. Bank, National Association, as note agent and as collateral agent under the Prepetition August NPA, and each of its successors and permitted assigns.

"<u>Prepetition August NPA Debt</u>": all Debt, obligations, liabilities and indebtedness of every kind, nature and description owing by the Obligors to the Prepetition August NPA Agent and Prepetition August NPA Lenders, including principal, interest, charges, fees, premiums, indemnities, costs and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise arising under the Prepetition August NPA Documents (including, without duplication, all "Obligations" as defined thereunder).

"<u>Prepetition August NPA Documents</u>": collectively, the following (as the same now exist or may hereunder be amended, modified, supplemented, extended, renewed, restated or replaced): (a) the Prepetition August NPA; and (b) all other Note Documents (as defined in the Prepetition August NPA).

"<u>Prepetition August NPA Lenders</u>": the purchasers under the Prepetition August NPA and their respective successors and assigns.

"<u>Prepetition August NPA Secured Parties</u>": collectively, the Prepetition August NPA Lenders, the Prepetition August NPA Agent and the other Secured Parties (as such term is defined under the Prepetition August NPA Documents).

"<u>Prepetition Debt</u>": (a) all Prepetition NPA Facility Debt, and (b) to extent permitted pursuant to **Section 10.2.1**, all other Debt incurred prior to, and outstanding as of, the Petition Date.

"<u>Prepetition Loan Documents</u>": the Prepetition April NPA Documents and the Prepetition August NPA Documents, collectively, and each of them individually, as the context may require.

-34-

"Prepetition Note Purchase Agreements": the Prepetition April NPA and the Prepetition August NPA, collectively, and each of them individually, as the context may require.

"Prepetition NPA Facility Debt": the Prepetition April NPA Debt and the Prepetition August NPA Debt.

"Prepetition Secured Parties": collectively, the Prepetition April NPA Secured Parties and the Prepetition August NPA Secured Parties (and each of them individually, a "Prepetition Secured Party").

"Primary Operating Account": a Deposit Account of Borrower designated by Borrower in writing to the Administrative Agent from time to time as Borrower's Primary Operating Account.

"Pro Rata": with respect to any Lender, such Lender's share, expressed as a percentage, obtained by dividing (a) the aggregate principal amount of outstanding Loans held by such Lender *plus* such Lender's unfunded Commitments by (b) the aggregate principal amount of outstanding Loans and unfunded Commitments of all Lenders.

"Properly Contested": with respect to any obligation of an Obligor, (a) the obligation is subject to a bona fide dispute regarding amount or the Obligor's liability to pay; (b) the obligation is being properly contested in good faith by appropriate proceedings promptly (or to be promptly) instituted and diligently pursued; (c) appropriate reserves have been established in accordance with GAAP; (d) non-payment would not have and could not reasonably be expected to have a Material Adverse Effect; (e) no Lien other than a Permitted Lien is imposed on assets of the Obligor, unless bonded and stayed to the reasonable satisfaction of the Administrative Agent; and (f) if the obligation results from entry of a judgment or other order, such judgment or order is stayed pending appeal or other judicial review.

"Protective Advances": as defined in **Section 2.1.6.**

"PTE": a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Purchase Money Debt": (a) Debt (other than the Obligations) for payment of any of the purchase price of fixed assets (including Equipment); (b) Debt (other than the Obligations) incurred within 270 days before or after acquisition of any fixed assets (including Equipment), for the purpose of financing any of the purchase price thereof; and (c) any renewals, extensions or refinancings (but not increases) thereof, in each case, solely to the extent effectuated prior to the Petition Date.

"Purchase Money Lien": a Lien that secures Purchase Money Debt, encumbering only the fixed assets acquired with such Debt and constituting a Capital Lease or a purchase money security interest under the UCC.

"QFC Credit Support": as defined in **Section 14.20.**

"RCRA": the Resource Conservation and Recovery Act (42 U.S.C. §§ 6991-6991i).

-35-

"<u>Real Estate</u>": an Obligor's interest in all real estate leases and all land, tenements, hereditaments and any estate or interest therein, together with the buildings, structures, parking areas and other improvements thereon (including all fixtures), now or hereafter owned or leased by any Obligor, together with all easements, rights of way, and similar rights relating thereto and all leases, licenses, tenancies and occupancies thereof.

"<u>Receipts Variance</u>": as defined in **Section 10.1.12**.

"<u>Register</u>": as defined in **Section 13.3.4**.

"<u>Related Parties</u>": with respect to any Person, (a) such Person's Affiliates and (b) the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors, consultants, service providers and representatives of such Person and of such Person's Affiliates.

"<u>Release</u>": any release, spill, emission, discharge, deposit, disposal, leaking, pumping, pouring, dumping, emptying, injection or leaching into the Environment, or into, from or through any building, structure or facility.

"<u>Remaining Obligations</u>": as of any date of determination, Obligations that as of such date of determination are inchoate or contingent indemnification and reimbursement obligations under the Loan Documents that survive termination of the Loan Documents, but as of such date of determination are not due and payable and for which no claims have been made.

"<u>Report</u>": as defined in **Section 12.2.3**.

"<u>Reportable Event</u>": any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

"<u>Required Lenders</u>": at any time, one or more Lenders (subject to **Section 4.2**) having at such time (on an aggregate basis) Total Credit Exposures in excess of 50% of the Total Credit Exposures of all Lenders at such time; *provided*, *however*, that the Commitments and Loans of any Defaulting Lender shall be excluded from such calculation.

"<u>Resolution Authority</u>": an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"<u>Restricted Bitcoin</u>": Bitcoin owned by any of the Obligors the sale, Disposition, use or realization upon which (or the proceeds of any such actions) by any Obligor (other than restrictions in favor of the Secured Parties) or the Secured Parties is subject to any restriction or prohibition.

"<u>Restricted Investment</u>": any Investment by an Obligor or Subsidiary, other than any Investment made pursuant to clauses (a) through (k) below:

        (a)      Investments existing on the Closing Date and set forth on Schedule 10.2.4;

        (b)      Investments in cash and Cash Equivalents (and assets that were Cash Equivalents when such Investment was made); *provided*, that the cash and Cash Equivalents subject to such Investment shall be held in a Deposit Account that constitutes

Collateral and is either subject to a Control Agreement in favor of the Administrative Agent, in an Excluded Account or a perfected Lien pursuant to the DIP Order;

(c)     advances to a director, officer, or employee for salary, travel expenses, relocation, commissions and other business-related expenses in the Ordinary Course of Business and in accordance with the Approved Budget;

(d)     prepaid expenses and extensions of trade credit made in the Ordinary Course of Business and in accordance with the Approved Budget;

(e)     deposits with financial institutions permitted hereunder;

(f)     Investments in any Obligor;

(g)     Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the Ordinary Course of Business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the Ordinary Course of Business;

(h)     promissory notes, securities and other non-cash consideration received in connection with Permitted Asset Dispositions, so long as the same shall constitute Collateral and be subject to the Administrative Agent's Lien hereunder in accordance with the requirements hereof;

(i)     Investments in Hedging Agreements permitted under **Section 10.2.14**;

(j)     Contingent Obligations in respect of leases (other than Capital Leases) or other obligations that do not constitute Debt, in each case entered into in the Ordinary Course of Business and constituting Permitted Contingent Obligations; and

(k)     other Investments, so long as the aggregate amount of such Investments shall not exceed $1,000,000, in aggregate, at any time outstanding and such Investments shall be in accordance with the Approved Budget.

"Restrictive Agreement": an agreement that conditions or restricts the right of any Obligor to grant Liens on any assets to secure the Obligations, to declare or make Distributions, or to repay any intercompany Debt.

"Restructuring Support Agreement": as defined in the recitals to this Agreement.

"Royalties": all royalties, fees, expense reimbursement and other amounts payable by Borrower under a License.

"S&P": Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business, and its successors.

-37-

"<u>Sanction</u>": any sanction administered or enforced by the U.S. Government (including OFAC), United Nations Security Council, European Union, His Majesty's Treasury or other sanctions authority.

"<u>Secured Parties</u>": collectively, the Administrative Agent and Lenders.

"<u>Securities Act</u>": the Securities Act of 1933.

"<u>Security Documents</u>": the Guaranties, the Mortgages, the Control Agreements, the DIP Orders, any intellectual property security agreements, the UCC financing statements and all other documents, instruments and agreements now or hereafter securing (or given with the intent to secure) any Obligations.

"<u>Senior Officer</u>": the chairman of the board, president, chief executive officer, chief financial officer or treasurer of Borrower or, if the context requires, of another Obligor (or any other officer or employee of the applicable Obligor designated in or pursuant to an agreement between the applicable Obligor and the Administrative Agent).

"<u>Side Letter</u>": that certain Permitted Holder Side Letter, dated as of the Closing Date, from the Administrative Agent to the Obligor Representative.

"<u>Subject Real Property</u>": the Real Estate of the Obligors at the following locations as more fully-described on **Schedule 1.1(a)**:

a. the Marble Real Property;
b. Calvert City, Kentucky;
c. Grand Forks, North Dakota;
d. Muskogee, Oklahoma;
e. Barstow, Texas (Cedarvale);
f. Pecos, Texas; and
g. Dalton, Georgia.

It is hereby agreed that in no event shall the Subject Real Property be deemed to be Non-Core Assets.

"<u>Subordinated Debt</u>": Debt incurred by the Obligors or its Subsidiaries that is expressly contractually subordinate and junior in right of payment to Full Payment of all Obligations (other than Remaining Obligations) on terms in accordance with **Section 10.2.1(g)** and **Section 10.2.7.**

"<u>Subsidiary</u>": with respect to any Person, any entity more than 50% of whose voting securities or Equity Interests is owned by such Person (including indirect ownership by such Person through other entities in which such Person directly or indirectly owns more than 50% of the voting securities or Equity Interests). Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of Borrower.

"<u>Subsidiary Guarantor</u>": each direct and indirect Subsidiary of Borrower which is a Debtor in the Chapter 11 Cases, other than an Immaterial Subsidiary.

-38-

11231624v19

"Supported QFC": as defined in **Section 14.20.**

"Swap Obligations": with respect to an Obligor, its obligations under a Hedging Agreement that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"Taxes": all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Technology": all trade secrets, know how, technology (whether patented or not), rights in software (including source code and object code), rights in data and databases, rights in Internet web sites, customer and supplier lists, proprietary information, methods, procedures, formulae, descriptions, compositions, technical data, drawings, specifications, name plates, catalogs, confidential information and the right to limit the use or disclosure thereof by any person, pricing and cost information, business and marketing plans and proposals, together with any and all (i) rights and privileges arising under Applicable Law with respect to the foregoing, (ii) income, fees, royalties, damages and payments now and hereafter due and/or payable thereunder and with respect thereto, including damages, claims and payments for past, present or future misappropriations or violations thereof, (iii) rights corresponding thereto throughout the world and (iv) rights to sue for past, present and future misappropriations or violations thereof.

"Termination Date": the earliest of the following: (a) the date that is thirty (30) days after the date upon which the DIP Motion was filed (or such longer period as may be agreed by the Administrative Agent) unless the Final DIP Order Date has occurred on or prior to such date, (b) the date of consummation of any transaction pursuant to which all or substantially all of the Debtors' property and assets are sold, transferred or otherwise disposed of (including pursuant to Section 363 of the Bankruptcy Code), (c) the Chapter 11 Plan Effective Date, (d) the conversion of any Chapter 11 Case from a case under chapter 11 of the Bankruptcy Code to a case under chapter 7 of the Bankruptcy Code, (e) the Maturity Date, and (f) the date on which the Obligations are accelerated or otherwise declared (or become) due and payable in accordance with the terms of this Agreement (whether automatically, or upon any Event of Default or as otherwise provided hereunder).

"Total Credit Exposure": as to any Lender at any time, the unused Commitments and outstanding amount of all Loans of such Lender at such time.

"Trademarks": all trademarks (including service marks), slogans, logos, certification marks, trade dress, uniform resource locators (URL's), domain names, corporate names, brand names, and trade names and other identifiers of source, and all goodwill of the business connected with the use of and symbolized by any of the foregoing, whether registered or unregistered, and all registrations and applications for the foregoing (whether statutory or common law and whether established or registered or applied for in the United States or any other country or any political subdivision thereof), together with any and all (i) rights and privileges arising under Applicable Law with respect to any of the foregoing, (ii) extensions and renewals thereof and amendments thereto, (iii) income, fees, royalties, damages and payments now and hereafter due and/or payable thereunder and with respect thereto, including damages, claims and payments for past, present or future infringements, dilutions or violations thereof, (iv) rights corresponding thereto throughout

-39-

the world and (v) rights to sue for past, present and future infringements, dilutions or violations thereof.

"Transactions": (a) the execution and delivery by (i) Borrower of the Commitment Letter and (ii) the Obligors of this Agreement and the other Loan Documents to which they are a party on the Closing Date, and the performance of the obligations and transactions hereunder and thereunder, (b) the other transactions related to or entered into in connection with any of the foregoing, and (c) the payment of fees, premiums, charges, costs and expenses in connection with any of the foregoing.

"Transferee": any actual or potential Eligible Assignee, Participant or other Person acquiring an interest in any Obligations.

"UCC": the Uniform Commercial Code as in effect in the State of New York or, when the laws of any other jurisdiction govern the perfection, priority or enforcement of any Lien, the Uniform Commercial Code of such jurisdiction.

"UK Financial Institution": any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person subject to IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority": the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unfunded Pension Liability": the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to the Code, ERISA or the Pension Protection Act of 2006 for the applicable plan year.

"Unrestricted Bitcoin": any of Obligor's Bitcoin that is not Restricted Bitcoin.

"Updated Budget": as defined in **Section 10.1.12(a)**.

"Upfront Payment": as defined in **Section 3.2.4**, which payment was required to be made by Borrower on the Interim DIP Closing Date, as further provided in **Section 2.1.2(c)** hereof, and which fee was Paid in Kind and is deemed added to the outstanding balance of the DIP Term Loans.

"Upstream Payment": a Distribution by a Subsidiary of Borrower to Borrower or to another Obligor that holds Equity Interests in such Subsidiary so long as each Obligor that holds Equity Interests in such Subsidiary received at least its pro rata share of such Distribution based on its relative ownership of such Subsidiary.

"U.S. Person": "United States person" as defined in Section 7701(a)(30) of the Code.

-40-

"U.S. Special Resolution Regimes": as defined in **Section 14.20.**

"U.S. Tax Compliance Certificate": as defined in **Section 5.10.2(b)(iii).**

"Variance Report": as defined in **Section 10.1.12(b)(i).**

"Variance Report Certificate": as defined in **Section 10.1.12(b)(ii)**, to be substantially in the form of **Exhibit J** or in such other form as shall be consented to by the Administrative Agent in writing.

"Variance Reporting Deadline": as defined in **Section 10.1.12(b)**.

"Voting Equity Interests": with respect to any Person, any class or classes of Equity Interests pursuant to which the holders thereof have the general voting power under ordinary circumstances to elect at least a majority of the board of directors (or equivalent governing body) of such Person.

"Write-Down and Conversion Powers": (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that Person or any other Person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

**1.2.    Accounting Terms**.  Under the Loan Documents (except as otherwise specified herein), all accounting terms shall be interpreted, all accounting determinations shall be made, and all financial statements shall be prepared, in accordance with GAAP applied on a basis consistent with the most recent audited financial statements of Borrower and its Subsidiaries delivered to the Administrative Agent before the Interim DIP Closing Date and using the same inventory valuation method as used in such financial statements, except for any change required or permitted by GAAP if Borrower's certified public accountants concur in such change, the change is disclosed to the Administrative Agent, and **Section 10.2.3** is amended in a manner satisfactory to the Administrative Agent to take into account the effects of the change.  Any change in GAAP occurring after the date hereof that would require operating leases to be treated as capital leases shall be disregarded for the purposes of determining Debt and any financial ratio or compliance requirement contained in any Loan Document.

**1.3.    Uniform Commercial Code**.  As used herein, the following terms are defined in accordance with the UCC in effect in the State of New York from time to time: "Chattel Paper," "Commercial Tort Claim," "Deposit Account," "Document," "Equipment," "General Intangibles," "Goods," "Instrument," "Investment Property," "Letter-of-Credit Right", "Supporting Obligation", "Security Account" and "Commodity Account".

-41-

**1.4.    Certain Matters of Construction**.  The terms "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision.  Any pronoun used shall be deemed to cover all genders.  In the computation of periods of time from a specified date to a later specified date, "from" means "from and including," and "to" and "until" each mean "to but excluding."  The terms "including" and "include" shall mean "including, without limitation" and, for purposes of each Loan Document, the parties agree that the rule of *ejusdem generis* shall not be applicable to limit any provision. Section titles appear as a matter of convenience only and shall not affect the interpretation of any Loan Document.  All references to (a) laws or statutes include all related rules, regulations, interpretations, amendments and successor provisions; (b) any document, instrument or agreement include any amendments, waivers and other modifications, extensions or renewals (to the extent permitted by the Loan Documents); (c) any section mean, unless the context otherwise requires, a section of this Agreement; (d) any exhibits or schedules mean, unless the context otherwise requires, exhibits and schedules attached hereto, which are hereby incorporated by reference; (e) any Person include successors and assigns; (f) time of day means time of day at the Administrative Agent's notice address under **Section 14.3.1**; or (g) discretion of the Administrative Agent or any Lender means the sole and absolute (unless otherwise qualified) discretion of such Person exercised in a manner consistent with its duties of good faith and fair dealing.  All references to Loans, Obligations and other amounts herein shall be denominated in Dollars, unless expressly provided otherwise, and all determinations (including calculations of financial covenants) made from time to time under the Loan Documents shall be made in light of the circumstances existing at such time.  No provision of any Loan Documents shall be construed against any party by reason of such party having, or being deemed to have, drafted the provision.  A reference to Borrower's or Obligor's "knowledge" or similar concept means actual knowledge of a Senior Officer, or knowledge that a Senior Officer would have obtained if he or she had exercised reasonable diligence and good faith.  Any reference herein to a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a limited liability company, or an allocation of assets to a series of a limited liability company (or the unwinding of such a division or allocation), as if it were a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, as applicable, to, of or with a separate Person.  Any division of a limited liability company shall constitute a separate Person hereunder (and each division of any limited liability company that is a Subsidiary, joint venture or any other like term shall also constitute such a Person or entity). References to 'in accordance with' or 'subject to' the Approved Budget will be subject to (i) with respect to expenditures and payments, Permitted Variances and (ii) with respect to any excess receipts, revenue or other similar items in excess of the Approved Budget will not be deemed a breach of the Agreement.  Except as otherwise expressly stated, if this Agreement or any other Loan Document requires a cash payment or wire transfer to be made on a day that is not a Business Day, such payment or transfer shall instead be deemed to be required to be made on the immediately succeeding Business Day.  Except to the extent a reference is expressly made to Business Days, each reference to a certain number of "days" shall be a reference to such number of calendar days. Any reference to any approval or consent by the Administrative Agent, the Lenders or the Required Lenders shall be a reference to "prior" approval or consent.

## SECTION 2.   CREDIT FACILITIES

2.1.1    [Reserved].

-42-

2.1.2 <u>DIP Term Loans</u>.

(a)     Subject to the satisfaction of the conditions precedent set forth in **Section 6**, and subject further to the other terms and conditions hereof, and relying upon the representations and warranties set forth herein, the Lenders agree to severally, but not jointly, make the following DIP Term Loans to Borrower (unless the Termination Date shall have occurred):

(i)     In accordance with the Commitment Letter and the Interim DIP Order, during the period commencing on or after entry of the Interim DIP Order to but excluding the Final DIP Order Date (such period, the "<u>Interim Availability Period</u>"), Borrower, subject to the terms and conditions herein, may request a single draw of DIP Term Loans up to a maximum aggregate amount not exceed $35,000,000 (the "<u>Initial Draw</u>").    It is hereby acknowledged and agreed that on February 3, 2023, Borrower requested and Lenders, in fact, advanced to Borrower the Initial Draw in the original principal amount of $35,000,000 (such Initial Draw being deemed a DIP Term Loan for all purposes hereunder).   Pursuant to the Commitment Letter and the Interim DIP Order, at any time prior to the Final DIP Order Date, Borrower was permitted to voluntarily prepay outstanding principal amounts of the Initial Draw without premium or penalty (any such voluntary prepayment (but not any mandatory prepayment thereof) prior to the Final DIP Order Date being an "<u>Initial Draw Voluntary Prepayment</u>"). All DIP Term Loans advanced pursuant to this **Section 2.1.2** (other than in respect of the Upfront Payment as set forth in **Section 2.1.2(c)** below) shall permanently reduce each Lender's DIP Term Loan Commitment; provided that (and solely to the extent permitted pursuant to the Commitment Letter), Borrower was permitted to (x) reinstate previously borrowed DIP Term Loan Commitments by the amount of all Initial Draw Voluntary Prepayments made prior to the Final DIP Order Date and (y) reborrow such reinstated amounts after the Final DIP Order Date (but prior to the Termination Date) as Other Draws or a Final Draw in accordance with, and subject to, the terms hereof.   It is hereby acknowledged and agreed that the remaining aggregate DIP Term Loan Commitments as of the Final DIP Order Date are $35,000,000 (after giving effect to the Initial Draw and the Initial Draw Voluntary Prepayments, if any, prior to such date); and

(ii)     During the period commencing on the Final DIP Order Date up to but excluding the Termination Date (such period, the "<u>Final Availability Period</u>"), Borrower may, subject to the terms and conditions herein, request DIP Term Loans in up to no more than five Borrowings (each an "<u>Other Draw</u>") and one final additional Borrowing (the "<u>Final Draw</u>"); *provided*, that, the aggregate amount of DIP Term Loans that shall be made during the Final Availability Period shall not exceed the remaining DIP Term Loan Commitments on the Final DIP Order Date; *provided*, *further*, for any Borrowing of any Other Draw or any Final Draw, such Borrowings shall only be permitted to the extent set forth in the following paragraph.

Notwithstanding the foregoing or anything else in this Agreement or in any other Loan Document to the contrary, (A) Borrower shall not be permitted to request and no Lender shall be required to fund any Other Drawing or the Final Drawing if, in either case, the sum of (each to be separately calculated and identified in any calculation or certification thereof) (x) Obligors' cash and Cash Equivalents on hand (excluding any of Obligors' Eligible Cash in the Carve-Out Account and any Adequate Assurance Deposits) and (y) subject to the definition of Unrestricted Bitcoin, the aggregate value in U.S. Dollars of the Unrestricted Bitcoin owned by Borrower and the other Obligors on such date as determined based on the BTCUSD Coinbase spot price as of 5:00 p.m.

-43-

as of the immediately preceding Business Day (or, if applicable with respect to any Bitcoin, the value thereof, if any, as determined in accordance with any Permitted BTC Hedging Agreement then in effect with respect thereto) at such time equals or exceeds $30,000,000 immediately prior to giving effect to any such Borrowing, (B) no Lender shall be required to fund any Other Draw on more than one (1) Borrowing Date in any three-week period (unless consented to in writing by such Lender), (C) no Lender shall be required to fund any Other Draw in a principal amount of less than $5,000,000, (D) no Lender shall be required to fund more than five (5) Other Draws and one (1) Final Draw and (E) no Lender shall be obligated to make any DIP Term Loans that exceeds its then-outstanding unfunded DIP Term Loan Commitment or exceeds the aggregate DIP Term Loan Cap at such time.

(b)      Each Lender's DIP Term Loan Commitment shall, concurrently with the funding of the above DIP Term Loans by it to the Administrative Agent, be automatically reduced, on a dollar-for-dollar basis, by the principal amount of DIP Term Loans made by it at such time, subject to reinstatement solely as and to the extent provided in of **Section 2.1.2** with respect to any Initial Draw Voluntary Prepayment; underline provided, that, notwithstanding anything else herein, each Lender's DIP Term Loan Commitment shall in any event terminate (and shall be reduced to zero), and shall be deemed permanently discharged, extinguished and cancelled in full, and shall cease to be binding on, or enforceable against, such Lender, in each case, automatically on, and immediately upon the occurrence of, the Termination Date.  For the avoidance of doubt, in no event shall the Lenders be required to fund any Loans if such funding would cause the aggregate principal amount of Loans outstanding hereunder to exceed the aggregate amount authorized pursuant to the pursuant to the Interim DIP Order (in the case of DIP Term Loans made prior to the Final DIP Order Date) or the Final DIP Order (in the case of DIP Term Loans made from and after the Interim DIP Closing Date).

(c)      In furtherance of **Section 3.2.4**, pursuant to the Commitment Letter and the Interim DIP Order, Borrower was required to pay the Upfront Payment to the Administrative Agent on the Interim DIP Closing Date.  The Upfront Payment is deemed fully earned on the Interim DIP Closing Date and was Paid in Kind on the Interim DIP Closing Date. Such payment of the Upfront Payment was effected pursuant to a deemed addition to the outstanding principal amount of DIP Term Loans (without reducing the Lenders' DIP Term Loan Commitments or the available Initial Draw or being counted against the DIP Term Loan Cap) on the Interim DIP Closing Date in the aggregate principal amount equal to the amount of the Upfront Payment, which additional Loan has the same pricing, rights, privileges, restrictions and other terms as otherwise attach to all other DIP Term Loans (whether or not any DIP Term Loans are outstanding as of such time), and was made automatically and immediately upon and concurrently with the occurrence of the Interim DIP Closing Date, without requirement for any cash to be advanced by any Lender.  Borrower hereby agrees that it shall be deemed to have incurred DIP Term Loans in such amount automatically as of the Interim DIP Closing Date by operation of the provisions hereof, without any further action by any Person, and that all DIP Term Loans and Obligations in respect thereof shall be deemed outstanding from such date, and interest shall accrue thereon from such date in the same manner as interest would accrue on the other DIP Term Loans made on such date.

-44-

(d)    Except as and to the extent expressly provided **Section 2.1.2(a)** with respect to the Initial Draw Voluntary Prepayments, once repaid, no Loan (or portion thereof) may be reborrowed.

2.1.3    <u>Use of Proceeds</u>.  The proceeds of DIP Term Loans, and cash and Cash Equivalents of the Obligors, shall, in each case, only be permitted to be used by the Obligors or their Subsidiaries in accordance with the Approved Budget (in the cases of clauses (b)-(d) and (g) below) (subject to Permitted Variances), this Agreement and the DIP Orders for the following:

(a)    for payment in full and termination of the obligations under the Original DIP Credit Agreement with the proceeds of the DIP Term Loans and Borrower's cash on hand;

(b)    for working capital and other general corporate purposes of Obligors and the Guarantors and other items, in each case as set forth in the Approved Budget;

(c)    for any adequate protection payments in accordance with the DIP Orders;

(d)    for professional fees and expenses of administering the Chapter 11 Cases, to the extent the Bankruptcy Court authorizes payment thereof (including fees incurred prior to the Closing Date);

(e)    for fees and expenses payable under the DIP Facility;

(f)    for interest and other amounts payable under the DIP Facility; and

(g)    for funding of the Carve-Out Account as provided for in the DIP Orders and the Approved Budget.

2.1.4    <u>Termination of Commitments; Voluntary Reduction of Commitments</u>.

(a)    All Commitments shall automatically terminate on the Termination Date.

(b)    Obligor Representative may permanently reduce the unused DIP Term Loan Commitments, on a Pro Rata basis for each Lender, upon at least five (5) Business Days (or such shorter period as the Administrative Agent may agree) prior written notice to the Administrative Agent.  Any such notice shall specify the amount of the reduction and shall be irrevocable once given.  Each reduction shall be in a minimum amount of $5,000,000, or an increment of $1,000,000 in excess thereof.  No Lender shall be required to fund any Loan or provide any credit extension or other accommodation pursuant to any DIP Term Loan Commitment amount sought to be so reduced pending any payment owing hereunder). Any notice of reduction of any Commitment shall be irrevocable unless expressly contingent on the occurrence of a transaction or confirmation of an Acceptable Chapter 11 Plan.

2.1.5    <u>Extension of Maturity Date</u>.

(a)    Notwithstanding anything to the contrary in this Agreement, upon at least ten (10) Business Day's (or such shorter period as may be agreed by the Administrative Agent) prior written notice to the Administrative Agent after having made all permitted Borrowings hereunder (including the Final Draw), the Obligor Representative is hereby permitted to extend the scheduled Maturity Date of all obligations by three (3) months (the "Extension"), so long as the following terms are satisfied:

(i)    the representations and warranties of each Obligor set forth in this Agreement and the other Loan Documents are true and correct in all material respects (without duplication of any materiality qualifiers) with the same effect as if then made (except to the extent stated to relate to a specific earlier date, in which case such representations and warranties shall be true and correct in all material respects (without duplication of any materiality qualifiers) as of such earlier date);

(ii)    no Event of Default or Default shall have then occurred and be continuing; and

(iii)    Borrower shall have paid to the Administrative Agent, for the pro rata benefit of each Lender, a fee (the "Extension Fee"), in cash, in an amount equal to 3.50% of the aggregate DIP Term Loans outstanding (including all capitalized PIK Interest and all fees previously Paid in Kind, including the Upfront Payment ) as of the date of such extension.

(b)    No Borrowings shall be permitted during such Extension.  No consent of any Lender shall be required to effectuate any Extension.  The Lenders hereby irrevocably authorize the Administrative Agent to enter into amendments to this Agreement and the other Loan Documents with the Obligor Representative as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the in connection with such Extension.

(c)    This **Section 2.1.5** shall supersede any provisions of **Section 14.1** to the contrary.

2.1.6    Protective Advances.  The Administrative Agent shall be authorized, in its discretion, at any time that any conditions in **Section 6** are not satisfied, to make DIP Term Loans ("Protective Advances") (a) up to an aggregate amount outstanding at any time of up to ten percent (10%) of the aggregate Commitments, if the Administrative Agent deems such Loans necessary or desirable to preserve or protect Collateral, or to enhance the collectability or repayment of Obligations, as long as such DIP Term Loans do not cause the outstanding Loans to exceed the aggregate Commitments; or (b) to pay any other amounts chargeable to Obligors under any Loan Documents, including interest, costs, fees and expenses.  Each Lender shall participate in each Protective Advance on a Pro Rata basis.  Required Lenders may at any time revoke the Administrative Agent's authority to make further Protective Advances under clause (a) by written notice to the Administrative Agent.  Absent such revocation, the Administrative Agent's determination that funding of a Protective Advance is appropriate shall be conclusive.

-46-

### SECTION 3.   INTEREST, FEES AND CHARGES

**3.1.    Interest**.

3.1.1   Rates and Payment of Interest.

(a)      The outstanding principal amount of each Loan shall bear interest at the Applicable Rate (subject to clause (b) below), and such interest shall accrue on such Loan daily from (and including) the day such Loan is made until Full Payment.  Subject to clause (b) below, accrued interest on each Loan shall be due and payable by Borrower in arrears on each Interest Payment Date, and such interest shall be Paid in Kind and otherwise in accordance with the terms of this Agreement.

(b)      As of (and including the day of) the occurrence of, and at all times on each day during the continuance of, any Event of Default (including if any Loans or other Obligations (or portion thereof) shall remain unpaid as of the Termination Date), all outstanding Loans, and all overdue interest, fees and other Obligations (as applicable), shall, in each case, automatically bear interest at the Default Rate (whether before or after any judgment), and such interest shall accrue thereon until Full Payment.  Accrued Default Rate interest shall be payable Paid in Kind on each Interest Payment Date (unless a demand for Payment in Kind thereof is made by the Administrative Agent on the Obligor Representative sooner or on a more frequent basis, as determined by the Administrative Agent, in which case payment shall be made when specified by the Administrative Agent to the Obligor Representative).  Borrower hereby acknowledges that the cost and expense to the Administrative Agent and Lenders due to an Event of Default are difficult to ascertain and that the Default Rate is fair and reasonable compensation for this.

(c)      Interest hereunder shall be due and payable in accordance with, and at the times, and as otherwise provided for by, the terms of this Agreement, both before and after judgment, and before and after the commencement of any Insolvency Proceeding.

**3.2.    Fees and Commitment Payments**.

3.2.1   Monthly Agent DIP Fee.  Borrower agrees to pay to the Administrative Agent, for its own account, the administrative and collateral agency fee in the amount of $75,000 per month, payable in cash, on the Interim DIP Closing Date and the first day of each calendar month thereafter until Full Payment (the "Monthly DIP Agent Fee").  For the avoidance of doubt, the Monthly DIP Agent Fee shall be payable in addition to, and nothing herein shall be construed as limiting the Obligors' obligations with respect to payment of, any other fees, expenses, indemnities and other amounts payable to the Administrative Agent pursuant to the Loan Documents (including Extraordinary Expenses, and amounts payable pursuant to **Section 3.4** and **Section 14.4**) or otherwise.

3.2.2   Fees.  Without limiting anything else herein, Borrower shall pay all fees set forth in all engagement letters, fee letters and other similar agreements, if any, executed in connection with the Loan Documents with any other Person (if permitted by the Administrative Agent and the Required Lenders).

-47-

3.2.3    No Refunds.  No fees or other amounts payable hereunder (including the Upfront Payment , Extension Fee, the Exit Premium, and the Monthly DIP Agent Fee) shall be refundable under any circumstances.

3.2.4    Upfront Payment .  As consideration for structuring and arranging the DIP Facility, for providing the DIP Term Loan Commitments and such other accommodations that have been or may be made available to Borrower by the Lenders hereunder, and otherwise in connection with the transactions occurring on or about the Interim DIP Closing Date, Borrower shall pay to the Administrative Agent (for the ratable benefit of each Lender) a fee (the "Upfront Payment") (such fee being payable, in kind, on the Interim DIP Closing Date) in an amount equal to 3.50% of the aggregate DIP Term Loan Commitments ($70,000,000) as of the Interim DIP Closing Date, to be Paid in Kind, pursuant to, and as further set forth in, **Section 2.1.2**; it being acknowledged and agreed that pursuant to the Commitment Letter and the Interim DIP Order such fee was so Paid in Kind on the Interim DIP Closing Date

3.2.5    Exit Premium.  Concurrently with any and all repayments of any principal of any Loan (including any portion thereof constituting capitalized PIK Interest and/or any fees Paid in Kind, including the Upfront Payment), whether pursuant to any scheduled (including on the Maturity Date or the Termination Date), voluntary (other than an Initial Draw Voluntary Prepayment) or mandatory (including as required pursuant to **Section 5.3** or  upon the acceleration of the Obligations pursuant to the occurrence of a Termination Event) payment or prepayment of the Loans, such payment or prepayment shall, in all cases, be accompanied by the payment, in cash, of a fee (the "Exit Premium") in an amount equal to 5.00% of the amount of any such principal payment or prepayment on such date.  Borrower and each Obligor expressly agree (to the fullest extent that it may lawfully do so) that: (A) the Exit Premium is reasonable and is the product of an arm's-length transaction between sophisticated business people, ably represented by counsel; (B) the Exit Premium shall be payable notwithstanding the then prevailing market rates at the time payment is made; (C) the Exit Premium shall be deemed fully earned as of the Interim DIP Closing Date; and (D) Borrower and each Obligor shall each be estopped hereafter from claiming differently than as agreed to in this paragraph.  Borrower and the Obligors expressly acknowledge that their agreement to pay the Exit Premium hereunder is a material inducement to the Lenders to provide the DIP Facility and the Commitments, and to make the Loans and enter into this Agreement.

3.2.6    Certain Payments. Each of the parties hereto agree to treat, and consistently report, the Upfront Payment, the Extension Fee and the Exit Premium, as not subject to U.S. federal income tax withholding – whether (as reasonably determined by Borrower in consultation with the Lenders) by reason of being a "put premium" paid to the commitment parties, original issue discount or interest, a payment in respect of the termination of a right or obligation with respect to a capital asset, or otherwise (but not, for the avoidance of doubt, as payment for services) – unless otherwise required by a "determination" within the meaning of Section 1313(a) of the Code; provided that, Borrower receives the documentation described in **Section 5.10**; provided further, for the avoidance of doubt, to the extent any such payment is taxable as original issue discount or interest for U.S. federal income tax purposes, such payment shall be subject to the provisions of **Section 5.9**.

**3.3.** **Computation of Interest, Fees, Yield Protection**. All interest, as well as fees and other charges expressed to be calculated on a per annum basis, shall be computed for the actual days elapsed, based on a year of 360 days. Each determination by the Administrative Agent of any interest, fees or interest rate hereunder shall be final, conclusive and binding for all purposes, absent manifest error.

**3.4.** **Reimbursement Obligations**. Borrower shall reimburse the Administrative Agent for all Extraordinary Expenses. Borrower shall also reimburse the Administrative Agent for all reasonable and documented legal, accounting, examination, consulting, and other reasonable and documented fees, costs and expenses incurred by it in connection with (a) negotiation and preparation of any Loan Documents, including any amendment or other modification thereof; (b) administration of and actions relating to any Collateral, Loan Documents and transactions contemplated thereby, including any actions taken to perfect or maintain priority of the Administrative Agent's Liens on any Collateral, to maintain any insurance required hereunder or to verify Collateral; and (c) subject to the limits of **Section 10.1.1(b)**, each inspection, audit or examination with respect to any Obligor or Collateral, whether prepared by the Administrative Agent's personnel or a third party (in the case of legal fees and expenses, subject to the immediate following sentence). All legal and accounting fees incurred by Agent Professionals shall be charged to Borrower at the actual rate charged by such Agent Professionals; *provided*, that Borrower's obligation to reimburse the Administrative Agent for legal fees and expenses shall be limited to the reasonable and documented legal fees and expenses of one primary counsel, and one local counsel in each relevant jurisdiction, and one special counsel (the appointment of any such special counsel to be subject to the reasonable consent of Obligors, so long as not unreasonably withheld, conditioned or delayed) for each relevant specialization for which the Administrative Agent deems necessary or appropriate. In addition to the Extraordinary Expenses of the Administrative Agent, upon the occurrence and during the continuance of an Event of Default, Borrower shall reimburse each Lender for any reasonable out-of-pocket fees, charges and disbursements (including without limitation, the reasonable, documented, and out-of-pocket fees, charges and disbursement of one primary outside legal counsel for all of the Lenders) incurred by it in connection with the enforcement, collection or protection of its rights under the Loan Documents, including all such expenses incurred during any workout, restructuring or Insolvency Proceeding. All amounts payable by Borrower under this Section shall be due on demand.

**3.5.** **[Reserved]**.

**3.6.** **[Reserved]**.

**3.7.** **Increased Costs; Capital Adequacy**.

3.7.1    <u>Increased Costs Generally</u>. If any Change in Law shall:

(a)    impose, modify or deem applicable any reserve, liquidity, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

11231624v19

(b)      subject any recipient to Taxes (other than Indemnified Taxes and Excluded Taxes) with respect to any Loan, Commitment or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(c)      impose on any Lender or interbank market any other condition, cost or expense affecting any Loan, Commitment or Loan Document;

and the result thereof shall be to increase the cost to such Lender of making or maintaining any Loan or Commitment, or converting to or continuing any interest option for a Loan, or to reduce the amount of any sum received or receivable by a Lender hereunder (whether of principal, interest or any other amount) then, upon request of such Lender, Borrower will pay to it such additional amount(s) as will compensate it for the additional costs incurred or reduction suffered; provided, that such additional amounts are also being assessed by such Lender generally against similarly situated borrowers under similar credit facilities.

3.7.2   Capital Requirements.  If a Lender determines that a Change in Law affecting such Lender or its holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's or holding company's capital as a consequence of this Agreement, or such Lender's Commitments, Loans, or participations in Loans, to a level below that which such Lender or holding company could have achieved but for such Change in Law (taking into consideration its policies with respect to capital adequacy), then from time to time Borrower will pay to such Lender, as the case may be, such additional amounts as will compensate it or its holding company for the reduction suffered; provided, that such additional amounts are also being assessed by such Lender against similarly situated borrowers under similar credit facilities.

3.7.3   [Reserved].

3.7.4   Compensation.  Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of its right to demand such compensation, but Borrower shall not be required to compensate a Lender for any increased costs incurred or reductions suffered more than nine months prior to the date that the Lender notifies Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

**3.8.     Mitigation**.  If any Lender requests compensation under **Section 3.7**, or if Borrower is required to pay additional amounts with respect to a Lender under **Section 5.9**, then such Lender shall (at the request of Borrower) use reasonable efforts to designate a different Lending Office or to assign its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the judgment of such Lender, such designation or assignment (a) would reduce amounts payable in the future; and (b) would not subject the Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to it or unlawful.  Borrower shall pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

**3.9.     [Reserved]**.

-50-

11231624v19

**3.10.  Maximum Interest**.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by Applicable Law ("maximum rate").  If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the maximum rate, the excess interest shall be applied to the principal of the Obligations or, if it exceeds such unpaid principal, refunded to Borrower.  In determining whether the interest contracted for, charged or received by the Administrative Agent or a Lender exceeds the maximum rate, such Person may, to the extent permitted by Applicable Law, (a) characterize any payment that is not principal as an expense, fee or premium rather than interest; (b) exclude voluntary prepayments and the effects thereof; and (c) amortize, prorate, allocate and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

## SECTION 4.  **LOAN ADMINISTRATION**

### 4.1.  **Manner of Borrowing and Funding Loans**.

4.1.1  Notice of Borrowing.  Whenever Borrower desires funding of a Borrowing of DIP Term Loans in accordance with **Section 2.1.2(a)**, Borrower shall give notice to the Administrative Agent in the form of a Notice of Borrowing.  Each such Notice of Borrowing must be received by the Administrative Agent no later than 11:00 a.m. (New York City time) five (5) Business Days prior to the requested Borrowing Date (unless the Lenders consent in writing to any other time of day or any shorter time period), it being agreed that any Notice of Borrowing received by the Administrative Agent after the requisite time required shall be deemed received on the next Business Day.  Each Notice of Borrowing shall be irrevocable and shall specify (A) the amount of the Borrowing and (B) the requested funding date (which must be a Business Day) (each, a "Borrowing Date").

4.1.2  Funding by Lenders.  Each Lender shall timely honor its Commitment by funding its Pro Rata share of each Borrowing of Loans that is properly requested hereunder to the Administrative Agent.  In furtherance of the foregoing, the Administrative Agent shall notify Lenders of its receipt of any Notice of Borrowing on the same Business Day when such Notice of Borrowing shall have been received by it, and each Lender shall thereupon make its Loan by funding such Lender's Pro Rata share of the Borrowing requested pursuant to such Notice of Borrowing in immediately available funds to the account specified by the Administrative Agent no later than 2:00 p.m. (New York City time) on the requested funding date (it being agreed that such Loan shall be deemed made as of the time when such funding shall occur, and shall be deemed outstanding at all times thereafter until Full Payment).  Subject to its receipt of such amounts from Lenders, the Administrative Agent shall disburse the proceeds of the Loans as directed by Borrower in the applicable Notice of Borrowing (it being agreed that any such disbursement of Loans to fund the Carve-Out shall be directed by Borrower for direct deposit to the Carve-Out Account and all other disbursements of Loans for other purposes shall be directed by Borrower for direct deposit to the DIP Funding Account (as defined in the DIP Orders) approved in writing by the Administrative Agent).  Unless the Administrative Agent shall have received (in sufficient time to act) written notice from a Lender that it does not intend to fund its Pro Rata share of a Borrowing, the Administrative Agent may assume that such Lender has deposited or promptly will deposit its share with the Administrative Agent, and the Administrative Agent may (but shall not be obligated to) disburse a corresponding amount to Borrower.  If a Lender's share of any Borrowing or of any

-51-

settlement pursuant to **Section 4.1.2** is not received by the Administrative Agent, then Borrower agrees to repay to the Administrative Agent **on demand** the amount of such share, together with interest thereon from the date disbursed until repaid, at the rate applicable to the Borrowing.

       4.1.3  <u>Notices</u>.  Neither the Administrative Agent nor any Lender shall have any liability for any loss suffered by Borrower as a result of the Administrative Agent or any Lender acting upon its understanding of telephonic or e-mailed instructions from a person believed in good faith by the Administrative Agent or any Lender to be a person authorized to give such instructions on Borrower's behalf.

    **4.2.**  **Defaulting Lender**.

       4.2.1  <u>Defaulting Lender Adjustments</u>.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by Applicable Law:

       (a)  <u>Waivers and Amendments</u>.  Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definitions of Required Lenders.

       (b)  <u>Defaulting Lender Waterfall</u>.  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to **Section 11** or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to **Section 11.3** shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; *second*, as Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *third*, if so determined by the Administrative Agent and Borrower, to be held in a Deposit Account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; *fourth*, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *fifth*, so long as no Default or Event of Default exists, to the payment of any amounts owing to Borrower as a result of any judgment of a court of competent jurisdiction obtained by Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *sixth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided*, that if (x) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made at a time when the conditions set forth in **Section 6.2.2** were satisfied or waived, such payment shall be applied solely to pay the Loans of all non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with their Commitments.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting

-52-

Lender pursuant to this **Section 4.2.1(b)** shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

        (c)     Notwithstanding anything to the contrary herein, no Termination Payments shall be due or payable to any Defaulting Lender, until such time as such Lender ceases to be a Defaulting Lender.

        4.2.2   <u>Cure</u>.  If Borrower and the Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held pro rata by the Lenders in accordance with their Commitments (without giving effect to **Section 4.2.1(b)**), whereupon such Lender will cease to be a Defaulting Lender; *provided*, that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of Borrower while that Lender was a Defaulting Lender; and *provided*, *further*, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

        4.2.3   <u>Loans</u>.  So long as any Lender is a Defaulting Lender,  the Administrative Agent shall not be required to fund any Loans unless it will have no exposure after giving effect to such Loan.

    **4.3.**    **[Reserved]**.

    **4.4.**    **[Reserved]**.

    **4.5.**    **[Reserved]**.

    **4.6.**    **Effect of Termination**.  Notwithstanding anything contained to the contrary herein, on the Termination Date (howsoever occurring), all Commitments shall be immediately terminated  and all Obligations (other than Remaining Obligations) shall be immediately due and payable.  Until Full Payment of the Obligations, all undertakings of Borrower contained in the Loan Documents shall continue, and the Administrative Agent shall retain its Liens in the Collateral and all of its rights and remedies under the Loan Documents.  **Sections 3.7**, **5.5**, **5.9**, **5.10**, **12**, **14.1.3**, this Section, and each indemnity or waiver given by an Obligor or Lender in any Loan Document, shall survive Full Payment of the Obligations.

## SECTION 5.  <u>PAYMENTS</u>

    **5.1.**    **General Payment Provisions**.  Except in the case of any amounts that are expressly permitted to be Paid in Kind hereunder, all payments of Obligations shall be made in Dollars in cash, without offset, counterclaim or defense of any kind and in immediately available funds, not later than 12:00 noon (New York City time) on the due date.  Any payment after such time may be deemed by the Administrative Agent made on the next Business Day.  Borrower and Obligors agree that, during the continuation of an Event of Default, the Administrative Agent shall

-53-

have the continuing, exclusive right to apply and reapply payments and proceeds of Collateral against the Obligations, in such manner as the Administrative Agent deems advisable.

**5.2.** **Voluntary Prepayments**.  Loans may be prepaid from time to time, subject (other than with respect to the Initial Draw Voluntary Prepayment) to the concurrent payment, in cash, of the Exit Premium, and compliance with **Section 5.3.6**.  Such voluntary prepayments shall be allocated as set forth in **Section 5.6.2(a)**.

**5.3.** **Mandatory Prepayments**.

5.3.1 [Reserved].

5.3.2 Termination Date.  On the Termination Date (howsoever occurring), Borrower shall immediately repay all outstanding Loans and other Obligations, including, without limitation, all Loans, capitalized interest and fees (including the Upfront Payment) and the Exit Premium, in full in cash to effect Full Payment hereunder.  Such mandatory prepayments pursuant to this Section shall be allocated as set forth in **Section 5.6.2(b)**.

5.3.3 Excess Cash.  If, as of the last day of any calendar month, the sum of (each to be separately calculated and identified in each monthly calculation thereof) (i) Borrower's and Obligors' cash and Cash Equivalents (other than Obligors' Eligible Cash on deposit in the Carve-Out Account and any Adequate Assurance Deposits) and (ii) subject to the definition of Unrestricted Bitcoin, the aggregate value in U.S. Dollars of the Unrestricted Bitcoin owned by Borrower and the other Obligors on such date, shall exceed $50,000,000 (such excess being "Excess Cash"), then Borrower shall, by no later than the fifth (5th) Business Day of the following month, prepay, or cause to be prepaid, the Obligations by the amount of such Excess Cash (together with the Exit Premium owing in respect thereof); *provided*, that, pending prepayment of the Loans in accordance herewith, all cash, Cash Equivalents and other funds and proceeds thereof shall be held in a Deposit Account subject to a Control Agreement in favor of the Administrative Agent, and no payments, withdrawals, transfers or disbursements shall be made or permitted to be made therefrom at any time (whether or not such payment, withdrawal, transfer or disbursement is otherwise in accordance with the Approved Budget or otherwise permitted hereunder).  Borrower shall certify, in writing (in reasonable detail), and deliver to the Administrative Agent the calculations of Excess Cash as of the last day of each calendar month.  For purposes of the calculations pursuant to this Section, the value in U.S. Dollars of the Bitcoin owned by Borrower and other Obligors on such date of determination shall be based on the BTCUSD Coinbase spot price as of 5:00 p.m. as of the immediately preceding Business Day (or, if applicable with respect to any Bitcoin, the value thereof, if any, as determined in accordance with any Permitted BTC Hedging Agreement then in effect with respect thereto).  Such mandatory prepayments pursuant to this Section shall be allocated as set forth in **Section 5.6.2(a)**.  Borrower shall provide the Administrative Agent a written calculation of the existence or non-existence of "Excess Cash" in reasonable detail for each month by no later than third (3rd) day of each calendar month.

5.3.4 Real Property Sales; Other Sales.  Within three (3) Business Days (or such later time as expressly provided in the definition of "Permitted Assets Disposition") of its receipt of the Net Cash Proceeds ("receipt" to include any receipt, including the initial payment, any subsequent payment (including installments, earnouts or similar payment) and upon release and

-54-

receipt of any escrow, indemnity or holdback) for the sale, sale/leaseback, lease or sublease of (x) any of the Subject Real Property or any of any Obligor's interest therein or (y) any Permitted Asset Disposition pursuant to clause (b) or (h) of the definition thereof, then Borrower shall prepay, or cause to be prepaid, the Obligations (together with the Exit Premium to the extent owing in respect thereof) with the amount of such Net Cash Proceeds so received from time to time; *provided*, that pending application of such amounts towards prepayment of the Loans or other application as permitted hereunder, in each case, in accordance herewith, all funds shall be deposited to and held in a Deposit Account subject to a Control Agreement in favor of the Administrative Agent. Such mandatory prepayments pursuant to this Section shall be allocated as set forth in **Section 5.6.2(a)**.

5.3.5 <u>Debt or Equity Issuance</u>. Within one (1) Business Day of the receipt by any Obligor or Subsidiary thereof of the Net Cash Proceeds of (x) any Debt Issuance not permitted by **Section 10.2.1**, or (y) unless otherwise agreed to by the Administrative Agent and the Required Lenders, in writing, any sale of any Equity Interest, Borrower shall prepay the Loans (together with the Exit Premium thereon) as hereinafter provided in an aggregate amount equal to 100% of the Net Cash Proceeds therefrom; *provided*, that pending application of such amounts towards prepayment of the Loans in accordance herewith, all funds shall be held in a Deposit Account subject to a Control Agreement in favor of the Administrative Agent. Such mandatory prepayments pursuant to this Section shall be allocated as set forth in **Section 5.6.2(a)**.

5.3.6 <u>Effect of Prepayments</u>. No prepayments or repayments of any Loans (including pursuant to **Section 5.2** (other than as set forth in **Section 2.1.2(a)** as it relates to Initial Draw Voluntary Prepayments made prior to the Final DIP Order Date) or this **Section 5.3**) shall (or shall be deemed to), cause or result in any increase to, or replenish or give rise to any increase to, any Commitment, and Borrower shall not be permitted to request to borrow additional Loans as a result of any such prepayment or repayment.

**5.4. Payment of Other Obligations**. Extraordinary Expenses and other Obligations (except the Loans (including interest thereon) and other Obligations payable as otherwise expressly required hereby) shall be paid in cash by Borrower as provided in the Loan Documents or, if no payment date is specified, within three (3) Business Days after written demand from the Administrative Agent (which may be via e-mail).

**5.5. Marshaling; Payments Set Aside**. None of the Administrative Agent or Lenders shall be under any obligation to marshal any assets in favor of any Obligor or against any Obligations. If any payment by or on behalf of Borrower or any other Obligor is made to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises a right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other Person, then to the extent of such recovery, the Obligation originally intended to be satisfied, and all Liens, rights and remedies relating thereto, shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred.

**5.6. Application and Allocation of Payments**.

-55-

5.6.1 <u>Application</u>. Payments made by Borrower hereunder shall be applied (i) first, as specifically required by the terms of this Agreement; (ii) second (to the extent clause (i) is inapplicable), to Obligations then due and owing; (iii) third (to the extent clauses (i) and (ii) are inapplicable), as determined by the Administrative Agent in its good faith reasonable discretion; and (iv) fourth (to the extent clauses (i), (ii) and (iii) are inapplicable), to other Obligations specified by Borrower.

5.6.2 <u>Voluntary and Mandatory Prepayment; Post-Default/Termination Date Allocations</u>.

(a)    Subject to **Section 5.6.2 (b)** (which, if applicable at such time, then all such payments shall be applied in accordance with the terms of such **Section 5.6.2(b)**), voluntary or mandatory prepayments pursuant to **Section 5.2** or **5.3** which are stated to be allocated pursuant to the terms of this **Section 5.6.2(a)** shall be allocated as follows:

(i)    <u>first</u>, to any previously non-capitalized accrued interest on that portion of the outstanding Loans then being prepaid

(ii)    <u>second</u>, to the payment of the Exit Premium required to paid in respect of such Loan repayment;

(iii)    <u>third</u>, to all Obligations constituting fees, indemnification, costs or expenses (including Extraordinary Expenses) then due and owing to the Secured Parties;

(iv)    <u>fourth</u>, to the outstanding principal balance of the Loans (including all capitalized PIK Interest and the Upfront Payment which was Paid in Kind);

(v)    <u>fifth</u>, to all remaining Obligations until Full Payment of such Obligations; and

(vi)    <u>sixth</u>, to the extent of any remaining proceeds, to Borrower or as otherwise required by law.

(b)    Notwithstanding anything in any Loan Document to the contrary, (x) if elected by the Administrative Agent and the Required Lenders during an Event of Default or (y) at all times following the Termination Date, monies to be applied to the Obligations, whether arising from payments by Obligors, realization on Collateral, setoff or otherwise, shall be allocated as follows:

(i)    <u>first</u>, to all fees, indemnification, costs and expenses, including Extraordinary Expenses, owing to the Administrative Agent;

(ii)    <u>second</u>, to all amounts owing to the Administrative Agent on any Loans fronted by it for the benefit of a Lender, Protective Advances, and Loans and participations that a Defaulting Lender has failed to settle or fund;

-56-

(iii) <u>third</u>, to all Obligations constituting fees (including the Exit Premium in respect of any such Loan payment), indemnification, costs or expenses owing to Lenders;

(iv) <u>fourth,</u> the outstanding principal of the Loans, including capitalized PIK Interest and the Upfront Payment Paid in Kind;

(v) <u>fifth</u>, to all remaining Obligations until Full Payment of such Obligations; and

(vi) <u>sixth</u>, to the extent of any remaining proceeds, to Borrower or as otherwise required by law.

Amounts shall be applied pursuant to **Section 5.6.2(a)** or **5.6.2(b)**, as applicable, to payment of each category of Obligations set forth therein only after full payment of all preceding categories. If amounts are insufficient to satisfy a category, Obligations in the category shall be paid on a pro rata basis. The allocations set forth in this Section are solely to determine the rights and priorities among Secured Parties, and may be changed by agreement among them without the consent of any Obligor. This Section is not for the benefit of or enforceable by any Obligor, and Borrower and Obligor irrevocably waives the right to direct the application of any payments or Collateral proceeds subject to this Section.

5.6.3 <u>Erroneous Application</u>. The Administrative Agent shall not be liable for any application of amounts made by it in good faith and, if any such application is subsequently determined to have been made in error, the sole recourse of any Lender or other Person to which such amount should have been made shall be to recover the amount from the Person that actually received it (and, if such amount was received by any Lender, such Lender hereby agrees to return it).

**5.7.** **[Reserved]**.

**5.8.** **[Reserved]**.

**5.9.** **Taxes**.

5.9.1 <u>Payments Free of Taxes</u>. All payments by any Obligor under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by Applicable Law. If Applicable Law (as determined by the applicable withholding agent in its good faith discretion) requires the deduction or withholding of any Tax from any such payment, then (i) the applicable withholding agent shall be entitled to make such deduction or withholding, (ii) the applicable withholding agent shall pay the full amount deducted or withheld to the relevant Governmental Authority pursuant to Applicable Law, and (iii) to the extent such deduction or withholding is made on account of Indemnified Taxes, the sum payable by the applicable Obligor (including amounts payable under this **Section 5.9**) shall be increased as necessary so that the Lender (or the Administrative Agent in the case where the Administrative Agent receives the payment for its own account) receives an amount equal to the sum it would have received had no such withholding or deduction been made.

-57-

5.9.2   <u>Payment of Other Taxes</u>.  Without limiting or duplicating the foregoing, Borrower shall timely pay to the relevant Governmental Authority in accordance with Applicable Law, or at the Administrative Agent's option, timely reimburse the Administrative Agent for payment of, any Other Taxes.

5.9.3   <u>Tax Indemnification</u>.  Borrower shall indemnify the Administrative Agent or any Lender for any Indemnified Taxes (including those imposed or asserted on or attributable to amounts payable under this **Section 5.9.3**) payable or paid by a recipient or required to be withheld or deducted from a payment to a recipient, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  Borrower shall make payment within 10 days after demand for any amount or liability payable under this Section.  A certificate as to the amount of such payment or liability delivered to Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

5.9.4   <u>Evidence of Payments</u>.  If the Administrative Agent or an Obligor pays any Taxes pursuant to a Governmental Authority pursuant to this Section, then upon request, the Administrative Agent shall deliver to Borrower or Borrower shall deliver to the Administrative Agent, respectively, a copy of a receipt issued by the appropriate Governmental Authority evidencing the payment, a copy of any return required by Applicable Law to report the payment, or other evidence of payment reasonably satisfactory to the Administrative Agent.

5.9.5   <u>Treatment of Certain Refunds</u>.  Unless required by Applicable Law, at no time shall the Administrative Agent have any obligation to file for or otherwise pursue on behalf of a Lender, nor have any obligation to pay to any Lender, any refund of Taxes withheld or deducted from funds paid for the account of a Lender.  If a Lender or other recipient of payments from an Obligor under any Loan Document determines in its discretion that it has received a refund of any Taxes as to which it has been indemnified by an Obligor or with respect to which an Obligor has paid additional amounts pursuant to this Section, it shall pay such Obligor an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by such Obligor with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) incurred by such recipient, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), *provided*, that such Obligor agree, upon request by the recipient, to repay the amount paid over to such Obligor (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the recipient if the recipient is required to repay such refund to the Governmental Authority.  Notwithstanding anything herein to the contrary, no recipient shall be required to pay any amount to Borrower if such payment would place the recipient in a less favorable net after-Tax position than it would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  In no event shall the Administrative Agent or any recipient be required to make its tax returns (or any other information relating to its taxes that it deems confidential) available to any Obligor or other Person.

5.9.6   <u>Survival</u>.  Each party's obligations under **Sections 5.9** and **5.10** shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by or

-58-

replacement of a Lender, the termination of the Commitments, and the repayment, satisfaction, discharge or Full Payment of any Obligations.

**5.10.    Lender Tax Information**.

5.10.1 <u>Status of Lenders</u>.  Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document or of Obligations shall deliver to the Obligor Representative and the Administrative Agent, at the time or times reasonably requested by the Obligor Representative or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Obligor Representative or the Administrative Agent or prescribed by Applicable Law as will permit such payments to be made without or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Obligor Representative or the Administrative Agent, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by the Obligor Representative or the Administrative Agent to enable them to determine whether such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding the foregoing, the completion, execution and submission of such documentation (other than documentation described in **Sections 5.10.2(a), (b)** and **(d)**) shall not be required if a Lender reasonably believes delivery of the documentation would subject it to any material unreimbursed cost or expense or would materially prejudice its legal or commercial position.

5.10.2 <u>Documentation</u>.  Without limiting the generality of the foregoing, if any Borrower is a U.S. Person,

(a)    Any Lender that is a U.S. Person shall deliver to the Obligor Representative and the Administrative Agent on or prior to the date on which such Lender becomes a Lender hereunder (and from time to time thereafter upon reasonable request of the Obligor Representative or the Administrative Agent), executed copies of IRS Form W-9, certifying that such Lender is exempt from U.S. federal backup withholding Tax;

(b)    Any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Obligor Representative and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender hereunder (and from time to time thereafter upon reasonable request of the Obligor Representative or the Administrative Agent), whichever of the following is applicable:

(i)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party, (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN-E or W-8BEN (as applicable) establishing an exemption from or reduction of U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty, and (y) with respect to other payments under the Loan Documents, IRS Form W-8BEN-E or IRS Form W-8BEN (as applicable) establishing an exemption from or reduction of U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(ii)    executed copies of IRS Form W-8ECI;

-59-

(iii)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of **Exhibit F** hereto, to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10-percent shareholder" of Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to Borrower, as described in Section 881(c)(3)(C) of the Code ("U.S. Tax Compliance Certificate"), and (y) executed copies of IRS Form W-8BEN-E or W-8BEN (as applicable); or

(iv)    to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W- 8BEN-E or W8-BEN, a U.S. Tax Compliance Certificate substantially in the form of **Exhibit F** hereto, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; *provided*, that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in form of **Exhibit F** hereto, on behalf of each such direct and indirect partner;

(c)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Obligor Representative and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender hereunder (and from time to time thereafter upon the reasonable request of the Obligor Representative or the Administrative Agent), executed copies of any other form prescribed by Applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by Applicable Law to permit the Obligors or the Administrative Agent to determine the withholding or deduction required to be made; and

(d)    if payment of an Obligation to a Lender would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code), such Lender shall deliver to the Obligor Representative and the Administrative Agent at the time(s) prescribed by law and otherwise as reasonably requested by the Obligor Representative or the Administrative Agent such documentation prescribed by Applicable Law (including Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Obligor Representative or the Administrative Agent as may be necessary for them to comply with their obligations under FATCA and to determine whether such Lender has complied with its obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this clause (d), "FATCA" shall include any amendments made to FATCA after the date hereof.

5.10.3 Redelivery of Documentation.  If any form or certification previously delivered by a Lender pursuant to this Section expires or becomes obsolete or inaccurate in any respect, such Lender shall promptly update the form or certification or promptly notify the Obligor Representative and the Administrative Agent in writing of its inability to do so.

-60-

5.10.4 <u>Lenders' Authorization</u>. Each Lender hereby authorizes the Administrative Agent to deliver to the Obligors and to any successor Administrative Agent any documentation provided by such Lender to the Administrative Agent pursuant to **Section 5.10**.

**5.11.** **Obligor Representative**. Each Obligor hereby designates Core Scientific as its representative and agent (in such capacity, the "<u>Obligor Representative</u>") for all purposes under the Loan Documents, including requests for and receipt of Loans, delivery or receipt of notices, consents, waivers, amendments, consents, acquitances, payment of Obligations, requests for waivers, amendments or other accommodations, actions under the Loan Documents (including in respect of compliance with covenants), and all other dealings with the Administrative Agent or any Lender. Obligor Representative hereby accepts such appointment. The Administrative Agent and Lenders shall be entitled to rely upon any communication, consent, notice, amendment, waiver or other agreement, instrument, or document delivered by or to Obligor Representative on behalf of any Borrower or other Obligor. Each of the Administrative Agent and the Lenders shall have the right, in its discretion, to deal exclusively with Obligor Representative for all purposes under the Loan Documents. Each Obligor agrees that any communication, delivery, action, omission or undertaking by the Obligor Representative on its behalf shall be binding upon and enforceable against such Obligor as if such Obligor were a party thereto.

## SECTION 6. <u>CONDITIONS PRECEDENT</u>

**6.1.** **Conditions Precedent to Initial Draw**. The making of the Initial Draw was subject to the conditions precedent thereto set forth in the Commitment Letter and such Loan was funded on February 3, 2023.

**6.2.** **Conditions Precedent to Closing Date and all other Borrowings**. The occurrence of the Closing Date and the effectiveness of this Agreement and the Lenders' obligations to make any Other Draws or the Final Draw at the time so requested from time to time hereunder, are subject to the satisfaction (or waiver by the Administrative Agent and the Required Lenders) of the following conditions precedent:

6.2.1 <u>General</u>. As of the Closing Date:

(a)     each Obligor shall be a debtor and debtor-in-possession in the Chapter 11 Cases;

(b)     the Obligors shall have established a cash management system subject to the entry of the DIP Orders reasonably satisfactory to the Obligors and the Required Lenders;

(c)     the Obligors shall have made no payments after the Petition Date on account of any Debt or other obligations arising prior to the Petition Date unless such payment is made pursuant to a Chapter 11 Order and subject to Permitted Variances, in accordance with the Approved Budget;

(d)     the Interim DIP Order as entered by the Bankruptcy Court in the Chapter 11 Cases on February 2, 2023 shall be in full force and effect on the Closing Date, (i) shall not have been vacated or reversed, (ii) shall not be subject to a stay or an appeal, and (iii) shall not

-61-

have been modified or amended in any respect without the prior written consent of the Required Lenders, in each case, except by the Final DIP Order;

          (e)    the Final DIP Order is in form and substance reasonably satisfactory to the Administrative Agent;

          (f)    the DIP Orders shall be effective to create, in favor of the Administrative Agent, for the benefit of the Secured Parties, a valid, binding, enforceable and fully and automatically perfected Lien on the Collateral, on the basis and with the priority set forth therein;

          (g)    the Restructuring Support Agreement shall have been terminated and shall no longer be of any further force or effect;

          (h)    no Default or Event of Default has occurred, is existing, or would result from the entry of the Final DIP Order, the entry by the Obligors into the Loan Documents, or the consummation of the transactions contemplated by the Loan Documents, including the making of the Loans hereunder;

          (i)    The Administrative Agent shall have received (in each case, to be in form and substance satisfactory to the Administrative Agent and the Lenders and, where applicable, duly and fully-executed by all parties thereto):

          (i)    a copy of this Agreement and each other Loan Document (including those set forth on the List of Closing Documents attached hereto as **Schedule 6.2.1**, including, without limitation and subject, where applicable, to **Section 6.3**), the Security Documents, including the Control Agreements, in each case, duly executed and delivered to the Administrative Agent by each of the signatories thereto, and each of the foregoing shall be in full force and effect on the Closing Date.

          (ii)    Subject to **Section 6.3** (if applicable), solely with respect to the Obligors' Marble Real Property, a Mortgage, executed and delivered by a duly authorized officer of each party thereto, together with any consents or estoppels reasonably deemed necessary by the Administrative Agent in connection therewith, each in form and substance reasonably satisfactory to the Administrative Agent;

          (iii)    the Initial Budget (as previously delivered pursuant to the terms of the Commitment Letter) and such budget has not been amended, updated, rescinded or modified except in accordance with requirements and procedures set forth in the Commitment Letter and **Section 2** below;

          (iv)    certificates from a Senior Officer of Borrower (individually and in its capacity as Obligor Representative) certifying that, immediately after giving effect to the incurrence of the Loans and the consummation of the transactions hereunder on the Closing Date, (i) no Default or Event of Default exists; (ii) the representations and warranties set forth in **Section 9** are true and correct in all material respects (or with respect to representations qualified by materiality, in all respects) on and as of the Closing Date (or if such representation or warranty

-62-

is as of an earlier date, as of such earlier date) and (iii) the conditions set forth in this **Section 6.2.1** and in **Section 6.2.2** are satisfied.

(v)        a certificate of a duly authorized officer of Borrower (individually and in its capacity as Obligor Representative), certifying (i) that the copies of each Obligor's Organic Documents attached thereto (which copies of are true and complete, and are in full force and effect, without amendment except as shown; (ii) that an attached copy of resolutions authorizing execution and delivery of the Loan Documents is true and complete, and that such resolutions are in full force and effect, were duly adopted, have not been amended, modified or revoked, and constitute all resolutions adopted with respect to this credit facility; and (iii) to the title, name and signature of each officer of each Obligor authorized to sign the Loan Documents; it being agreed that the Administrative Agent may conclusively rely on this certificate until it is otherwise notified by the applicable Obligor or the Obligor Representative in writing.

(vi)        (a) copies of the charter documents of each Obligor, certified by the Secretary of State or other appropriate official of such Obligor's jurisdiction of organization as of a date no earlier than 30 days prior to the Closing Date by the Secretary of State of the state of the applicable Obligor's organization (which may be attached to the certificates described in clause (v) above), and (b) good standing certificates for each Obligor, issued by the Secretary of State or other appropriate official (no more than 10 days prior to the Closing Date) of such Obligor's jurisdiction of organization;

(vii)        (a) satisfactory results of searches of the UCC filings (or equivalent filings) made with respect to the Obligors in the states or other jurisdictions of formation of such Person, together with copies of the financing statements (or similar documents) disclosed by such searches and (b) evidence of the completion of all other actions, recordings and filings of or with respect to any Loan Document (or evidence that such actions, recordings or filings will be completed substantially concurrently with the effectiveness of this Agreement) that the Administrative Agent may deem reasonably necessary in order to effectuate the provisions of **Section 7**, including UCC-1 financing statements to be filed against each Obligor in its jurisdiction of organization naming the Administrative Agent as secured party and terminations of any Liens which are not Permitted Liens;

(viii)        certificates of insurance for the insurance policies carried by the Obligors (other than D&O insurance), all in compliance with the Loan Documents, each of which, subject, where applicable, to **Section 6.3**, shall have been endorsed or otherwise amended to include a customary lender's loss payable endorsement and to name the Administrative Agent as additional insured, in each case, as may reasonably be requested by the Administrative Agent and  in form and substance reasonably satisfactory to the Required Lenders, including as required pursuant to **Section 8.6.1**;

(j)        [reserved];

(k)        all governmental and third party approvals necessary in connection with the Transactions and the DIP Facility and financing contemplated hereby (including shareholder approvals, if any) shall have been obtained on reasonably satisfactory terms and shall be in full force and effect, and all applicable waiting periods shall have expired without any action

-63-

being taken or threatened by any competent authority that would restrain, prevent or otherwise impose adverse conditions on the Transactions or the financing thereof or any of the transactions contemplated hereby;

(l)     the Obligors and their Subsidiaries shall have (A) no outstanding Debt except as permitted pursuant to **Section 10.2.1,** and (B) no outstanding preferred stock except as set forth on **Schedule 9.1.4**;

(m)    The Administrative Agent and the Lenders shall have received, at least five (5) Business Days prior to the Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act;

(n)     all legal (including tax implications) and regulatory matters shall be reasonably satisfactory to the Administrative Agent and Lenders, including but not limited to compliance with all applicable requirements of Regulations U, T and X of the Board of Governors of the Federal Reserve System; and

(o)     subject, where applicable, to **Section 6.3**, (i) all documents and instruments, including UCC financing statements, required by law or reasonably requested by the Administrative Agent to be filed, registered or recorded to create the Liens intended to be created by the Loan Documents and perfect such Liens to the extent required by, and with the priority required by, this Agreement and the other applicable Loan Documents, shall have been filed, registered or recorded or delivered to the Administrative Agent for filing, registration or recording or (ii) the Administrative Agent shall have been provided with all authorizations, consents and approvals from each Obligor, Governmental Authority and other Person reasonably requested by it to file, record or register all documents and instruments referred to in the immediately preceding clause (i) of this clause (o).

6.2.2    <u>Conditions Precedent to All Other Borrowings</u>.  No Loans (including any Other Draws or the Final Draw) shall be made at any time after the Interim DIP Closing Date, and the Lenders shall not be required to fund any such Loans requested by Borrower after the Interim DIP Closing Date, unless, in each case, the following conditions (in addition to those set forth in **Section 6.1.1**) are satisfied (or waived by the Administrative Agent and the Required Lenders) prior to (or concurrently with) the making of such Loan on the Borrowing Date relating thereto:

(a)     the Closing Date shall have occurred;

(b)     the Final DIP Order (i) has been entered by the Bankruptcy Court, (ii) is in full force and effect, (iii) shall not have been reversed, vacated or stayed, (iv) shall not have become the subject of any appeal or challenge, (v) shall not have been amended, supplemented or otherwise modified in any way without the prior written consent of the Required Lenders and (vi) fully approves, among other things, the execution, delivery and performance by the Obligors of the Loan Documents, the incurrence of the Obligations, the payment of all fees hereunder and thereunder and grant and the perfection of the Liens contemplated herein and therein;

(c)     no Default or Event of Default shall exist at the time of, or immediately result from, the making of such Loan;

(d)     the representations and warranties of each Obligor in the Loan Documents shall be true and correct in all material respects (or, with respect to representations and warranties qualified by materiality, in all respects) on the date of, and upon giving effect to, the making of such Loan (except for representations and warranties that expressly relate to an earlier date, in which case such representation and warranty shall be true and correct in all material respect (or all respects, as applicable) as of such date);

(e)     there shall be an Approved Budget in full force and effect on and as of each of (a) the Borrowing Date for such Loan and (b) the time that such Loan is funded;

(f)     the Interim DIP Order (in the case of Loans made prior to the entry of the Final DIP Order) or the Final DIP Order (in the case of Loans made after the entry of the Final DIP Order) (a) shall be in full force and effect, (b) shall not have been reversed, vacated or stayed, (c) shall not have become the subject of any appeal or challenge, and (d) shall not have been amended, supplemented or otherwise modified without the prior written consent of the Required Lenders;

(g)     the absence of any injunction or temporary restraining order which, in the judgment of the Administrative Agent exercising Permitted Discretion, would prohibit the making of the Loans or the consummation of the Transactions; and the absence of any litigation which would have or could reasonably be expected to result in a Material Adverse Effect (except to the extent relating to the Chapter 11 Cases);

(h)     the making of such Loan shall not violate any Applicable Laws and shall not be enjoined, temporarily, preliminarily or permanently;

(i)     there shall not have occurred since the Petition Date any development or event which, individually or in the aggregate with other such circumstances, has had or could reasonably be expected to have, a Material Adverse Effect (except to the extent relating to the Chapter 11 Cases); and

(j)     In the case of a Borrowing of any DIP Term Loan, in addition to the above, the following shall be satisfied (or waived as provided herein):

(i)     the aggregate principal amount of all DIP Term Loans requested by Borrower on such Borrowing Date shall not exceed the amount identified in the Approved Budget as being required by the Obligors and their Subsidiaries to finance disbursements due and payable within the full four week period following such Borrowing Date as set forth in the Approved Budget (unless the Administrative Agent and the Required Lenders consent in writing thereto);

(ii)     the making of such DIP Term Loans, and the use of proceeds therefrom, shall comply with the Approved Budget and with this Agreement in all respects;

-65-

(iii)     the requesting and making of such DIP Term Loan comply with the provisions of **Section 2.1.2(a)**;

(iv)     the Administrative Agent shall have received a Notice of Borrowing in connection with the applicable DIP Term Loans in accordance with the requirements of this Agreement; and

(v)     the Administrative Agent shall have received evidence (which may be included in the applicable Notice of Borrowing, or delivered separately in writing) demonstrating that on and as of the time of delivery of the Notice of Borrowing for the applicable DIP Term Loan, and immediately prior to the incurrence thereof, Liquidity satisfies the Liquidity Covenant.

Each Notice of Borrowing shall constitute a representation by Borrower that the foregoing conditions in this **Section 6.2** are satisfied on and as of each of (i) the date of such Notice of Borrowing, (ii) the requested Borrowing Date, and (iii) the date on which such Loan is funded or made (or deemed funded or made, as applicable).

**6.3.     Conditions Subsequent**.  The Obligors shall deliver to the Administrative Agent each of the items set forth on **Schedule 6.3** on or prior to the date set forth thereon (or such later date as may be agreed to by the Administrative Agent).

## SECTION 7.  COLLATERAL

**7.1.     Grant of Security Interest**.  Without limiting in any way the grant to the Administrative Agent of the Liens and security interests in the "<u>DIP Collateral</u>" pursuant to (and as defined in) the DIP Orders (all of which are hereby reaffirmed and regranted and none of which shall be deemed limited, diminished or otherwise affected hereby), to secure the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of all Obligations to the full extent required hereunder, each Obligor hereby grants to the Administrative Agent, for the benefit of the Secured Parties, a continuing security interest in, and Lien upon, all property and assets of such Obligor, whether tangible or intangible, real or personal, wherever located, and whether now owned by or owing to such Obligor, or at any time hereafter coming into existence, whether prior to or after the Petition Date, whether acquired or obtained by, or arising in favor of, such Obligor, or in which such Obligor now has or at any time in the future may acquire any right, title or interest, and, including, without limitation, all of the following:

(a)     all Accounts;

(b)     all Chattel Paper, including electronic chattel paper;

(c)     all claims and causes of action, including all Commercial Tort Claims (including those shown on **Schedule 7.1(c)** or described in any notice or other instrument delivered to the Administrative Agent at any time), and subject to the entry of the Final DIP Order, all proceeds of or property recovered, whether by judgment, settlement or otherwise, arising from Chapter 5 Claims and Causes of Action;

-66-

(d)     all Deposit Accounts, Securities Accounts and Commodities Accounts (including the DIP Funding Accounts) and all "wallets" or custodial accounts in which any Cryptocurrencies are maintained or registered;

(e)     all Documents;

(f)     all General Intangibles, including Intellectual Property Collateral and Payment Intangibles;

(g)     all Goods, including Inventory, Equipment and fixtures;

(h)     all Real Estate and interests therein (including all leasehold interests);

(i)     all Instruments;

(j)     all Investment Property and Financial Assets;

(k)     all Letter-of-Credit Rights (whether or not the letter of credit is evidenced by a writing);

(l)     all Supporting Obligations;

(m)     all cash, Cash Equivalents, Cryptocurrency, monies and other funds (whether or not in the possession or under the control of the Administrative Agent, a Lender, or a bailee or Affiliate of the Administrative Agent or a Lender, and including any Cash Collateral);

(n)     all other assets and properties of the Grantors, whether tangible, intangible, real, personal or mixed;

(o)     all accessions to, substitutions for, and all replacements, products, and cash and non-cash proceeds of the foregoing, including proceeds of and unearned premiums with respect to insurance policies, and claims against any Person for loss, damage or destruction of any Collateral;

(p)     all "Collateral" under and as defined in the Prepetition Loan Documents;

(q)     all assets and property held by any Secured Party, including all property of every description, in the custody of or in transit to such Secured Party for any purpose, including safekeeping, collection or pledge, for the account of such Grantor or as to which such Grantor may have any right or power, including but not limited to cash;

(r)     all books and records (including customer lists, files, correspondence, tapes, computer programs, print-outs and computer records) pertaining to the foregoing;

-67-

11231624v19

(s)     any and all claims, rights and interests in any of the above and all substitutions for, additions, attachments, accessories, accessions and improvements to and replacements, products, cash and non-cash proceeds and insurance proceeds any or all of the foregoing; and

(t)     upon entry of the Final DIP Order, the proceeds of any causes of actions for preferences, fraudulent conveyances, and other avoidance power claims under Sections 502(d), 544, 545, 547, 548, and 550 of the Bankruptcy Code (the "Avoidance Actions").

Notwithstanding anything contained herein to the contrary, in no event shall the security interest granted under this **Section 7.1** include any Excluded Assets.

**7.2.    Lien on Accounts; Liens on Real Property.**

7.2.1    Deposit Accounts; Security Accounts; Commodity Accounts.  To further secure the prompt payment and performance of all Obligations, each Obligor hereby grants to the Administrative Agent for the benefit of Secured Parties a continuing security interest in and Lien upon all amounts credited to any Deposit Account, Security Account and Commodity Account (including the DIP Funding Accounts) of such Obligor (other than any Excluded Accounts and the Carve-Out Account), including any sums in any blocked or lockbox accounts or in any accounts into which such sums are swept.  Without limiting the foregoing or the Administrative Agent's Lien on and rights with respect to such account (all of which are hereby ratified and confirmed by Borrower), it is hereby acknowledged that Bank of America, N.A. will not agree to enter into a Control Agreement with respect to Borrower's account at Bank of America, N.A. ending x8262. Borrower agrees (x) not to change the arrangement with Bank of America, N.A. with respect to the account ending x8262 (which currently requires all remittances and withdrawals from such account to be deposited to Borrower's account at Bank of America, N.A. ending x7817 (or any such other account of Borrower's) which in either case is subject to a Control Agreement in favor of the Administrative Agent) without the prior written consent of the Administrative Agent and (y) in the event that the Administrative Agent requests at any time after the occurrence and during the continuance of an Event of Default, to promptly (and in any event, within 10 days after such request) cause all funds in Borrower's account at Bank of America, N.A. ending x8262 to be moved and deposited into a Deposit Account which is then subject to a Control Agreement in favor of the Administrative Agent and close such account ending x8262. Each Obligor hereby authorizes and directs each bank or other depository/custodian to deliver to the Administrative Agent, upon request, all statements of balances in any Deposit Account, Security Account and Commodity Account (including the DIP Funding Accounts) maintained by such Obligor, without inquiry into the authority or right of the Administrative Agent to make such request.

7.2.2    Real Property.  In accordance with the terms of the DIP Orders, the Obligors hereby grant to, and hereby reaffirm the grant pursuant to the DIP Orders, to the Administrative Agent of first-priority Liens and security interests (subject, solely in the case of the Junior-Priority DIP Collateral, to only those Permitted Prior Liens explicitly set forth in the DIP Orders as being senior to the Administrative Agent's Liens in the Junior-Priority DIP Collateral) in the Obligors' Subject Real Property (and interests therein).  Borrower agrees to deliver or cause to be delivered to the Administrative Agent the Mortgage relating to the Obligors' Marble Real Property as set forth in and as required by **Section 6.2** and **Section 6.3**.

-68-

### 7.3.   Pledged Collateral.

7.3.1   <u>Pledged Equity Interests and Debt Securities</u>.  As security for the payment or performance, as the case may be, in full of the Obligations, each Obligor hereby assigns and pledges to the Administrative Agent, its successors and assigns, for the benefit of the Secured Parties, and hereby grants to the Administrative Agent, its successors and assigns, for the benefit of Secured Parties, a security interest in, all of such Obligor's right, title and interest in, to and under (a) the Equity Interests now owned or at any time hereafter acquired by such Obligor, including the Equity Interests set forth opposite the name of such Obligor on **Schedule 7.3(a)**, and all certificates and other instruments representing such Equity Interests (collectively, the "<u>Pledged Equity Interests</u>"); (b) the debt securities now owned or at any time hereafter acquired by such Obligor, including the debt securities set forth opposite the name of such Obligor on **Schedule 7.3(a)**, and all promissory notes and other instruments (collectively, the "<u>Pledged Debt Securities</u>"); (c) all other property that may be delivered to and held by the Administrative Agent pursuant to the terms of this Section; (b) subject to **Section 7.3.6**, all payments of principal or interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of, in exchange for or upon the conversion of, and all other proceeds received in respect of, the Equity Interests, securities and instruments referred to in clauses (a) and (b) above; (e) subject to **Section 7.3.6**, all rights and privileges of such Obligor with respect to the securities, instruments and other property referred to in clauses (a), (b), (c) and (d) above; and (f) all proceeds of any and all of the foregoing (the items referred to in clauses (a) through (f) above being collectively referred to as the "<u>Pledged Collateral</u>").

7.3.2   <u>Delivery of the Pledged Collateral</u>.

(a)      Each Obligor agrees to deliver or cause to be delivered to the Administrative Agent any and all certificates representing the Pledged Equity Interests of Subsidiaries and all other certificated Pledged Collateral at any time owned by such Obligor with a value in excess of $500,000 promptly (and in any event, within 15 days (or such longer period as the Administrative Agent may agree)) following the acquisition thereof by such Obligor, together with instruments of transfer executed in blank by a duly authorized officer of such Obligor.

(b)      Upon delivery to the Administrative Agent, (i) any Pledged Equity Interests shall be accompanied by undated stock powers duly executed by the applicable Obligor in blank or other instruments of transfer reasonably satisfactory to the Administrative Agent and by such other instruments and documents as the Administrative Agent may reasonably request and (ii) the certificated Pledged Collateral shall be accompanied by undated proper instruments of assignment duly executed by the applicable Obligor in blank and by such other instruments and documents as the Administrative Agent may reasonably request.  In connection with any delivery of possessory Pledged Collateral after the date hereof to the Administrative Agent, Borrower shall deliver a schedule to the Administrative Agent describing the possessory Pledged Collateral so delivered, which schedule shall be attached to **Schedule 7.3(a)** and made a part hereof; *provided*, that failure to deliver any such schedule hereto or any error in a schedule so attached shall not affect the validity of the pledge of any Pledged Collateral.

-69-

7.3.3   Pledge Related Representatives, Warranties and Covenants.  Each Obligor hereby represents, warrants and covenants to the Administrative Agent and the Secured Parties that:

(a)      **Schedule 7.3(a)** sets forth a true and complete list, as of the Closing Date, with respect to such Obligor, of (i) all the Equity Interests owned by such Obligor and the percentage of the issued and outstanding units of each class of the Equity Interests of the issuer thereof represented by the Pledged Equity Interests owned by such Obligor and (ii) all debt securities owned by such Obligor, and all promissory notes and other instruments evidencing such debt securities.  **Schedule 7.3(a)** sets forth, as of the Closing Date, all Equity Interests, debt securities and promissory notes required to be pledged hereunder.

(b)      The Pledged Equity Interests and Pledged Debt Securities have (to the knowledge of the Obligors in the case of any of the foregoing that are not issued by an Obligor or Subsidiary) been duly and validly authorized and issued by the issuers thereof and (i) in the case of Pledged Equity Interests, are fully paid and nonassessable and (ii) in the case of Pledged Debt Securities, are legal, valid and binding obligations of the issuers thereof (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(c)      Except for the security interests granted hereunder, such Obligor (i) is and, subject to any transfers or dispositions not prohibited by this Agreement, will continue to be the direct owner, beneficially and of record, of the Pledged Collateral indicated on **Schedule 7.3(a)** as owned by such Obligor, (ii) holds the same free and clear of all Liens (other than Permitted Liens), (iii) will make no assignment, pledge, hypothecation or transfer of, or create or permit to exist any security interest in or other Lien on, the Pledged Collateral (other than Permitted Liens and transfers or dispositions not prohibited by this Agreement) and (iv) will defend its title or interest thereto or therein against any and all Liens (other than Permitted Liens), however arising, of all persons whomsoever.

(d)      Such Obligor has the corporate or company power and authority to pledge the Pledged Collateral pledged by it hereunder in the manner hereby done or contemplated.

(e)      No Governmental Approval or any other action by any Governmental Authority and no consent or approval of any securities exchange or any other person (including stockholders, partners, members or creditors of such Obligor) is or will be required for the validity of the pledge effected hereby (other than such as have been obtained and are in full force and effect).

(f)      By virtue of the execution and delivery by such Obligor of this Agreement, when any Pledged Collateral are delivered to the Administrative Agent in accordance with this Agreement, the Administrative Agent will obtain a legal, valid and perfected lien upon and security interest in such Pledged Collateral as security for the payment and performance of the Obligations.

-70-

7.3.4 <u>Limited Liability Company and Limited Partnership Matters; Certification of Limited Liability Company and Limited Partnership Interests</u>.  With respect to any Pledged Equity Interest representing any membership interest in any limited liability company or a limited partnership, each Obligor hereby (x) represents and warrants that no such membership interest or partnership is or shall be deemed to be (and, except as set forth in the following sentence, no Obligor shall or permit any of its Subsidiaries to take any action to permit any such membership or partnership interest to become or be deemed to be) a security within the meaning of Article 8 of the UCC or shall ever be certificated and (y) hereby covenants and agrees that upon the Administrative Agent or any successor, assign or transferee thereof acquiring ownership of any such Pledged Equity Interest, such acquisition or transfer thereof shall be deemed permitted under the Organic Documents of such pledged entity without any consent of any kind (including of any other members or partners), and any such Person acquiring such interests shall be deemed admitted to full membership or partnership status and privilege with full voting rights and authority, in each case, without any further consent or approval of any Loan Party or any other Person, all of which such necessary consents shall be deemed granted in full as of the Initial DIP Order Date. Notwithstanding the foregoing, if reasonably requested by the Administrative Agent at a time when an Event of Default has occurred and is continuing, each Obligor shall use commercially reasonable efforts to cause each interest in any limited liability company or limited partnership controlled by such Obligor and pledged hereunder to be a "security" within the meaning of Article 8 of the New York UCC and be certificated.

7.3.5 <u>Registration in Nominee Name; Denominations</u>.  Subject to the DIP Orders, at any time when an Event of Default has occurred and is continuing, the Administrative Agent shall have the right (in its sole and absolute discretion) to hold the Pledged Collateral in its own name as pledgee, in the name of its nominee (as pledgee or as sub-agent) or in the name of the applicable Obligor, endorsed or assigned in blank or in favor of the Administrative Agent.  The Administrative Agent shall at a time when an Event of Default has occurred and is continuing have the right to exchange the certificates representing Pledged Equity Interests for certificates of smaller or larger denominations for any purpose consistent with this Agreement.

7.3.6 <u>Voting Rights; Dividends and Interest</u>.

(a)    Unless and until an Event of Default shall have occurred and be continuing:

(i)    Each Obligor shall be entitled to exercise any and all voting and other consensual rights and powers inuring to an owner of Pledged Collateral or any part thereof for any purpose consistent with the terms of this Agreement and the other Loan Documents; *provided*, that such rights and powers shall not be exercised in any manner that could adversely affect the rights inuring to a holder of any Pledged Collateral or the rights and remedies of the Administrative Agent or any other Secured Party under this Agreement or any other Loan Document or the ability of the Secured Parties to exercise the same.

(ii)    [Reserved].

(iii)    Without limiting the Administrative Agent's Liens thereon, each Obligor shall be entitled to receive and retain any and all dividends, interest, principal and

-71-

other distributions paid on or distributed in respect of the Pledged Collateral to the extent and only to the extent that such dividends, interest, principal and other distributions are not prohibited by, the terms and conditions of this Agreement, the other Loan Documents and applicable laws; *provided*, that any noncash dividends, interest, principal or other distributions that would constitute Pledged Equity Interests or Pledged Debt Securities, whether resulting from a subdivision, combination or reclassification of the outstanding Equity Interests of the issuer of any Pledged Collateral or received in exchange for Pledged Collateral or any part thereof, or in redemption thereof, or as a result of any merger, consolidation, acquisition or other exchange of assets to which such issuer may be a party or otherwise, shall be and become part of the Pledged Collateral and, if received by any Obligor, shall be held in trust for the benefit of the Administrative Agent, shall be segregated from other property or funds of such Obligor and shall be forthwith delivered to the Administrative Agent upon demand in the same form as so received (with any necessary endorsement).

(b)     Subject to the DIP Orders, upon the occurrence and during the continuance of an Event of Default, concurrent with the Administrative Agent's notice to the Obligors of the suspension of their rights under paragraph (a)(iii) of this Section, all rights of Obligors to dividends, interest, principal or other distributions that such Obligor is authorized to receive pursuant to paragraph (a)(iii) of this Section shall cease, and all such rights shall thereupon become vested in the Administrative Agent, which shall have the sole and exclusive right and authority to receive and retain such dividends, interest, principal or other distributions.  All dividends, interest, principal or other distributions received by any Obligor contrary to the provisions of this Section shall be held in trust for the benefit of the Administrative Agent, shall be segregated from other property or funds of such Obligor and shall be forthwith delivered to the Administrative Agent upon demand in the same form as so received (with any necessary endorsement).  Any and all money and other property paid over to or received by the Administrative Agent pursuant to the provisions of this paragraph shall be retained by the Administrative Agent in an account to be established by the Administrative Agent upon receipt of such money or other property, shall be held as security for the Obligations and shall be applied in accordance with the provisions of **Section 5.6**.

(c)     Subject to the DIP Orders, upon the occurrence and during the continuance of an Event of Default, concurrent with the Administrative Agent's notice to the Obligors of the suspension of their rights under and in accordance with paragraph (a)(i) of this Section, all rights of any Obligor to exercise the voting and other consensual rights and powers it is entitled to exercise pursuant to paragraph (a)(i) of this Section, and the obligations of the Administrative Agent under paragraph (a)(ii) of this Section, shall cease, and all such rights shall thereupon become vested in the Administrative Agent, which shall have the sole and exclusive right and authority to exercise such voting and other consensual rights and powers; *provided*, that, unless otherwise directed by the Required Lenders, the Administrative Agent shall have the right from time to, in its sole discretion, notwithstanding the continuance of an Event of Default, to permit any Obligor to exercise such rights and powers.

### 7.4.    Intellectual Property Matters.

7.4.1   For the purpose of enabling the Administrative Agent, during the continuance of an Event of Default, to exercise rights and remedies hereunder at such time as the

11231624v19

Administrative Agent shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, each Obligor hereby grants to the Administrative Agent, an irrevocable (until the termination of this Agreement), non-exclusive, worldwide, royalty-free (and free of any other obligation of payment) license to use, assign, license or sublicense any of the Intellectual Property Collateral now owned, licensed or hereafter acquired by such Obligor, wherever the same may be located; *provided* that such license (i) shall automatically terminate upon the repayment, satisfaction or discharge of all Obligations and (ii) may only be exercised by the Administrative Agent, at the option of the Administrative Agent, upon the occurrence and during the continuation of an Event of Default. Such license shall include access to all media in which any of the licensed items may be recorded or stored and to all computer programs used for the compilation or printout hereof, and shall, for the Licenses, be within the scope of and to the extent allowed under such Licenses. While the Administrative Agent exercises its lawful rights and remedies under this Agreement, in order to preserve the inherent value of the Trademarks included in the Intellectual Property Collateral, the Administrative Agent agrees use such Trademarks only in accordance with such quality standards as may be reasonably established by the Obligors and communicated to the Administrative Agent from time to time in writing; provided that nothing herein shall be deemed to limit the rights of the Administrative Agent to realize upon such Trademarks in such manner as it in its reasonable judgment determines is appropriate.

7.4.2    On a continuing basis, each Obligor shall, at its sole cost and expense, (i) other than prosecution of Intellectual Property in the Ordinary Course of Business, promptly following its becoming aware thereof, notify the Administrative Agent of any adverse determination in any proceeding or the institution of any proceeding in any federal, state or local court or administrative body or in the United States Patent and Trademark Office or the United States Copyright Office regarding any material Intellectual Property Collateral, such Obligor's right to register such material Intellectual Property Collateral or its right to keep and maintain such registration and prosecute applications in full force and effect, (ii) prosecute, maintain, protect and enforce all material Intellectual Property Collateral in the Ordinary Course of Business, (iii) not permit to lapse or become abandoned any material Intellectual Property Collateral, and not settle or compromise any pending or future litigation or administrative proceeding with respect to any such material Intellectual Property Collateral, in either case except as shall be consistent with commercially reasonable business judgment, (iv) other than prosecution of Intellectual Property in the Ordinary Course of Business, upon such Obligor obtaining knowledge thereof, promptly notify the Administrative Agent in writing of any event which may be reasonably expected to materially and adversely affect the validity, enforceability, value or utility of any material Intellectual Property Collateral or the rights and remedies of the Administrative Agent in relation thereto including a levy or threat of levy or any legal process against any material Intellectual Property Collateral, (v) not license any Intellectual Property Collateral, or otherwise disclose any confidential Technology or source code other than non-exclusive licenses entered into by such Obligor in, or incidental to, the Ordinary Course of Business, or amend or permit the amendment of any of the licenses in a manner that materially and adversely affects the right to receive payments thereunder, or in any manner that would materially impair the value of any Intellectual Property Collateral or the Lien on and security interest in the Intellectual Property Collateral created therein hereby, without the prior written consent of the Administrative Agent, and (vi) furnish to the Administrative Agent from time to time upon the Administrative Agent's request therefor reasonably detailed schedules further identifying the Intellectual Property Collateral.

7.4.3    If any Obligor shall at any time after the date hereof (i) obtain any rights to any additional Intellectual Property Collateral (other than any Intellectual Property that would constitute Excluded Assets) or (ii) become entitled to the benefit of any additional Intellectual Property Collateral or any renewal or extension thereof, including any reissue, division, continuation, or continuation-in-part of any Intellectual Property Collateral, or any improvement on any Intellectual Property Collateral, or if any intent-to use Trademark application (or foreign equivalent) is no longer subject to clause (h) of the definition of Excluded Assets, the provisions hereof shall automatically apply thereto and any such item enumerated in the preceding clause (i) or (ii) shall automatically constitute Intellectual Property Collateral as if such would have constituted Intellectual Property Collateral at the time of execution hereof and be subject to the Lien and security interest created by this Agreement without further action by any party.

**7.5.    Other Collateral**.

7.5.1    <u>Commercial Tort Claims</u>.  After the Petition Date, Obligors shall promptly take such actions as the Administrative Agent reasonably requests from time to time to subject any Commercial Tort Claim with a claim value in excess of $500,000 to a fully and properly perfected Lien in favor of the Administrative Agent to secure the Obligations to the fullest extent required hereunder; which Lien shall rank super senior and prior to, and shall have first priority over, all other Liens thereon (including Permitted Liens).

7.5.2    <u>Certain After-Acquired Collateral</u>.  Obligors shall notify the Administrative Agent in the next Compliance Certificate delivered pursuant to this Agreement in accordance with **Section 10.1.2(c)** (or with respect to clause (a), within 10 days thereof) if, after the Closing Date, any Obligor obtains any interest in any Collateral (in which it did not have such an interest as of the Interim DIP Order Date) consisting of (a) Deposit Accounts, Security Accounts and Commodity Accounts (including the DIP Funding Accounts) (other than Excluded Accounts), (b) Chattel Paper and Instruments, in each case with a face amount in excess of $500,000, (c) Investment Property with a value in excess of $500,000 or consisting of Equity Interests in a Subsidiary, or (d) Letter-of-Credit Rights with a value in excess of $500,000 and, upon the Administrative Agent's request, shall promptly take such actions as the Administrative Agent may reasonably request to a fully and properly perfected Lien in favor of the Administrative Agent to secure the Obligations to the fullest extent required hereunder, which Lien shall rank super senior and prior to, and shall have first priority over, all other Liens thereon (including Permitted Liens) upon such Collateral, including obtaining any appropriate possession or Control Agreement.

**7.6.    No Assumption of Liability**.  The Lien on Collateral granted hereunder is given as security only and shall not subject the Administrative Agent or any Lender to, or in any way modify, any obligation or liability of Obligors relating to any Collateral.

**7.7.    Further Assurances**.  All Liens granted to the Administrative Agent under the Loan Documents are for the benefit of Secured Parties. Promptly upon request, Obligors shall deliver such instruments and agreements, and shall take such actions, as the Administrative Agent shall reasonably request under Applicable Law to evidence or perfect its Lien on any Collateral. Each Obligor authorizes the Administrative Agent to file any financing statement that describes the Collateral as "all assets" or "all personal property" of such Obligor, or words to similar effect,

-74-

and ratifies any action taken by the Administrative Agent before the Closing Date to effect or perfect its Lien on any Collateral.

## SECTION 8.  COLLATERAL ADMINISTRATION

**8.1.**    **[Reserved]**.

**8.2.**    **Administration of Accounts**.

8.2.1    <u>Records and Schedules of Accounts</u>.  Each Obligor shall keep materially accurate and complete records of its Accounts, including all payments and collections thereon, and shall submit to the Administrative Agent sales, collection, reconciliation and other reports in form reasonably satisfactory to the Administrative Agent, on such periodic basis as the Administrative Agent may reasonably request.  Each Obligor shall also provide to the Administrative Agent, on or before the 25th day of each month, a detailed aged trial balance of all Accounts as of the end of the preceding month, specifying each Account's Account Debtor name and address, amount, invoice date and due date, and net of any discount, allowance, credit, authorized return or dispute, and such other information as the Administrative Agent may reasonably request.

8.2.2    <u>Taxes</u>.  Without duplication of any amounts covered by **Section 5.9**, if an Account of any Obligor includes a charge for any Other Taxes, the Administrative Agent is authorized, in its Permitted Discretion, to pay the amount thereof to the proper taxing authority for the account of such Obligor, and to charge such Obligor therefor; *provided*, however, neither the Administrative Agent nor Lenders shall be liable for any Other Taxes (including any that may be due from Obligors, or any Other Taxes with respect to any Collateral).

8.2.3    <u>Account Verification</u>.  The Administrative Agent shall have the right, (x) in the name of any Obligor (or any designee of an Obligor), once per Fiscal Quarter when there is no Event of Default that has occurred and is continuing or (y) at any time when an Event of Default has occurred and is continuing, in the name of the Administrative Agent (or any designee of the Administrative Agent), to verify the validity, amount or any other matter relating to any Accounts of any Obligor, whether by mail, telephone or otherwise, and the Obligors shall cooperate fully with the Administrative Agent in an effort to facilitate and promptly conclude any such verification process.

8.2.4    <u>Maintenance of DIP Funding Account</u>.  Borrower shall ensure that the Administrative Agent has, at all times, pursuant to the DIP Orders and such other arrangements acceptable to the Administrative Agent, rights to the DIP Funding Accounts and control thereof to the extent necessary to enable the Administrative Agent to establish dominion and control over the DIP Funding Accounts, and exercise all rights associated therewith during any Cash Dominion Period (including the right to sweep cash, and require immediate deposit of all remittances received in the lockbox to a DIP Funding Account).  If requested by the Administrative Agent, Borrower shall use commercially reasonable efforts to obtain a Control Agreement (or other agreement in form and substance reasonably satisfactory to the Administrative Agent) from each lockbox servicer and DIP Funding Account bank, establishing the Administrative Agent's control over and Lien in the lockbox or DIP Funding Account, which may be exercised by the Administrative Agent during any Cash Dominion Period.  The Administrative Agent and Lenders assume no

-75-

responsibility to Borrower for any lockbox arrangement or DIP Funding Account, including any claim of accord and satisfaction or release with respect to any Payment Items accepted by any bank.

8.2.5    Proceeds of Collateral.  Subject to the applicable DIP Order, Obligors shall ensure that all payments on Accounts or otherwise relating to Collateral are at all times made directly to a DIP Funding Account (or a lockbox relating to a DIP Funding Account).  If Borrower or any Subsidiary receives cash or Payment Items with respect to any Collateral, it shall hold same in trust for the Administrative Agent and promptly (not later than the second Business Day (or if such cash or Payment Item is with respect to a material amount, the next Business Day) or such later date as is acceptable to the Administrative Agent) deposit same into a DIP Funding Account.

**8.3.    [Reserved]**.

**8.4.    [Reserved]**.

**8.5.    Administration of Deposit Accounts**.  **Schedule 8.5** sets forth all Deposit Accounts, Security Accounts and Commodity Accounts maintained by Obligors, including all DIP Funding Accounts, as of the Closing Date.  Obligors shall ensure that the Administrative Agent has a fully perfected first-priority Lien on each Deposit Account, Security Account and Commodity Account (including all DIP Funding Accounts) (other than Excluded Accounts) at all times until Full Payment, and shall use commercially reasonable efforts necessary to maintain such Lien in effect.  Each Obligor shall be the sole account holder of each Deposit Account, Security Account and Commodity Account (including all DIP Funding Accounts) and shall not allow any other Person (other than the Administrative Agent or, solely by operation of Applicable Law, the depositary bank, custodian or other financial institution at which such account is held, or pursuant to the DIP Order) to have control over a Deposit Account, Security Account and Commodity Account (including all DIP Funding Accounts) or any property deposited therein.  Each Obligor shall promptly notify the Administrative Agent in writing of any intention to (or notice in connection with any other Person's intention to) open or close any Deposit Account, Security Account and Commodity Account (including all DIP Funding Accounts and Excluded Accounts), and shall enter into a Control Agreement or other arrangements reasonably satisfactory to the Administrative Agent, and use commercially reasonable efforts to obtain such Chapter 11 Approvals as required by the Administrative Agent in connection with the same, in each case, prior to any funds being transferred to any such newly opened Deposit Account, Security Account and Commodity Account, and, with the prior written consent of the Administrative Agent, will amend **Schedule 8.5** to reflect same.  The Obligors will not allow the proceeds or collections of Collateral, any remittances by customers or other cash proceeds or receipts to be deposited directly into any Excluded Account.  Notwithstanding anything contained herein to the contrary, the Obligors shall not deposit any amounts in the Carve-Out Account other than in respect of the Carve-Out (including in respect of the Post-Carve-Out Notice Amount) in the manner prescribed in the DIP Orders.

**8.6.    General Provisions**.

8.6.1    Insurance of Collateral; Condemnation Proceeds.  Each Obligor shall maintain insurance with respect to the Collateral (subject to exceptions to be agreed upon by the

-76-

Administrative Agent in its Permitted Discretion), covering casualty, hazard, theft, malicious mischief, flood and other risks, in amounts, with endorsements and with insurers (with a Best's Financial Strength Rating of at least A-VII, unless otherwise approved in writing by the Administrative Agent) consistent with industry practice for similarly situated companies or otherwise reasonably satisfactory to the Administrative Agent; *provided*, however, that any required flood insurance shall only be required to be in compliance with any applicable Flood Insurance Laws. All proceeds under each property policy shall be payable to the Administrative Agent as lender loss payee. From time to time upon reasonable request of the Administrative Agent, Obligors shall deliver to the Administrative Agent copies of its insurance policies. Unless the Administrative Agent shall agree otherwise, each property policy and general liability policy shall include customary endorsements (i) showing the Administrative Agent as lender loss payee (in the case of the property policies) and additional insured, as applicable; (ii) requiring (A) ten (10) days prior written notice to the Administrative Agent in the event of cancellation of the policy for reason of non-payment of premium, and (B) thirty (30) days prior written notice to the Administrative Agent in the event of cancellation of the policy for any other reason; and (iii) with respect to property policies, specifying that the interest of the Administrative Agent shall not be impaired or invalidated by any act or neglect of any Obligor or the owner of the property, nor by the occupation of the premises for purposes more hazardous than are permitted by the policy. If any Obligor fails to provide and pay for any insurance, the Administrative Agent may, at its option, but shall not be required to, procure the insurance and charge Obligors therefor. While no Event of Default exists, Obligors may settle, adjust or compromise any insurance claim, as long as the proceeds are delivered to the Administrative Agent. If an Event of Default exists, only the Administrative Agent shall be authorized to settle, adjust and compromise such claims.

8.6.2 <u>Protection of Collateral</u>. All expenses of protecting, storing, warehousing, insuring, handling, maintaining and shipping any Collateral, all Taxes payable with respect to any Collateral (including any sale thereof), and all other payments required to be made by the Administrative Agent to any Person to realize upon any Collateral, shall be borne and paid by Borrower. The Administrative Agent shall not be liable or responsible in any way for the safekeeping of any Collateral, for any loss or damage thereto (except for reasonable care in its custody while Collateral is in the Administrative Agent's actual possession), for any diminution in the value thereof, or for any act or default of any warehouseman, carrier, forwarding agency or other Person whatsoever, but the same shall be at Borrower' sole risk.

8.6.3 <u>Defense of Title</u>. Each Obligor shall defend its title to Collateral and the Administrative Agent's Liens therein against all Persons, claims and demands, except Permitted Liens.

**8.7. Power of Attorney**. Each Obligor hereby irrevocably constitutes and appoints the Administrative Agent (and all Persons designated by the Administrative Agent) as such Obligor's true and lawful attorney (and agent-in-fact) for the purposes provided in this Section. The Administrative Agent, or the Administrative Agent's designee, may, without notice and in either its or any Obligor's name, but at the cost and expense of Borrower:

(a) Endorse any Obligor's name on any Payment Item or other proceeds of Collateral (including proceeds of insurance) that come into the Administrative Agent's possession or control; and

-77-

(b)     During the continuation of an Event of Default, (i) notify any Account Debtors of the assignment of their Accounts, demand and enforce payment of Accounts by legal proceedings or otherwise, and generally exercise any rights and remedies with respect to Accounts; (ii) settle, adjust, modify, compromise, discharge or release any Accounts or other Collateral, or any legal proceedings brought to collect Accounts or Collateral; (iii) sell or assign any Accounts and other Collateral upon such terms, for such amounts and at such times as the Administrative Agent deems advisable in its Permitted Discretion; (iv) collect, liquidate and receive balances in Deposit Accounts, Security Accounts, Commodity Accounts (including DIP Funding Accounts) or investment accounts, and take control, in any manner, of proceeds of Collateral; (v) prepare, file and sign Obligor's name to a proof of claim or other document in a bankruptcy of an Account Debtor, or to any notice, assignment or satisfaction of Lien or similar document; (vi) receive, open and dispose of mail addressed to any Obligor, and notify postal authorities to deliver any such mail to an address designated by the Administrative Agent; (vii) endorse any Chattel Paper, Document, Instrument, bill of lading, or other document or agreement relating to any Accounts, Inventory or other Collateral; (viii) use any Obligor's stationery and sign its name to verifications of Accounts and notices to Account Debtors; (ix) use information contained in any data processing, electronic or information systems relating to Collateral; (x) make and adjust claims under insurance policies; (xi) take any action as may be necessary or appropriate to obtain payment under any letter of credit, banker's acceptance or other instrument for which any Obligor is a beneficiary; and (xii) take all other actions as the Administrative Agent deems, in its Permitted Discretion, appropriate to fulfill any Obligor's obligations under the Loan Documents.

## SECTION 9.   REPRESENTATIONS AND WARRANTIES

**9.1.     General Representations and Warranties**.  To induce the Administrative Agent and Lenders to enter into this Agreement, and to induce the Lenders to make available the Commitments and extend any Loans, each Obligor represents and warrants that, on and as of the Closing Date and each Borrowing Date:

9.1.1   Organization and Qualification.   Borrower and each of its Subsidiaries (including all of the Obligors) are duly organized, validly existing and in good standing (to the extent such concepts are applicable) under the laws of the jurisdiction of its organization.  Each Obligor is duly qualified, authorized to do business and in good standing (to the extent such concepts are applicable) in each other jurisdiction where failure to be so qualified would have or could reasonably be expected to have a Material Adverse Effect.  Each Obligor is a debtor and debtor-in-possession in the Chapter 11 Cases.

9.1.2   Power and Authority.   Borrower and the other Obligors are each duly authorized to execute, deliver and perform the  Loan Documents to which it is a party (subject to the DIP Orders).  The execution, delivery and performance of the Loan Documents have been duly authorized by all necessary corporate or company, as applicable, action by or on behalf of the Obligors, and do not (a) require any consent or approval of any holders of Equity Interests of any Obligor, except those already obtained; (b) contravene the Organic Documents of any Obligor; (c) violate or cause a default under any Applicable Law or Material Contract; or (d) result in or require the imposition of any Lien (other than Permitted Liens) on any Obligor's real or personal property.

-78-

9.1.3    Enforceability.  Subject to the entry of the applicable DIP Order and the terms thereof, each Loan Document is a legal, valid and binding obligation of each Obligor party thereto, enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally.

9.1.4    Capital Structure.  Each direct or indirect Subsidiary of Borrower, other than the Immaterial Subsidiaries, is an Obligor, and **Schedule 9.1.4** shows for each Obligor and each direct Subsidiary thereof, its name, jurisdiction of organization, authorized and issued Equity Interests, holders of its Equity Interests, and agreements binding on such holders with respect to such Equity Interests.  Except as disclosed on **Schedule 9.1.4**, in the five years preceding the Closing Date, no Obligor has acquired any substantial assets from any other Person nor been the surviving entity in a merger or combination.  Each Obligor has good title to its Equity Interests in its Subsidiaries, subject only to Permitted Liens, and all such Equity Interests are duly issued, fully paid and non-assessable (in each case to the extent such concepts are applicable).  Other than as set forth on **Schedule 9.1.4**, there are no outstanding purchase options, warrants, subscription rights, agreements to issue or sell, convertible interests, phantom rights or powers of attorney relating to Equity Interests of any Obligor or Subsidiary.

9.1.5    Title to Properties; Real Estate.  Each Obligor has good title to (or valid leasehold interests in) each Subject Real Property and good title to all of its material personal property, including all property reflected in any financial statements delivered to the Administrative Agent or Lenders, in each case free of Liens except Permitted Liens.  No Obligor owns or shall acquire any fee interest in any Real Estate other than the Subject Real Property.

9.1.6    [Reserved].

9.1.7    Financial Statements.  The historical balance sheets, and related statements of income, cash flow and shareholder's equity, of Borrower and its Subsidiaries that have been delivered to the Administrative Agent on or prior to the Closing Date, and, following the Closing Date, the consolidated financial statements that have been delivered in accordance with **Section 10.1.2**, are prepared in accordance with GAAP, except as otherwise expressly noted therein, and fairly present in all material respects the financial positions and results of operations of Borrower and its Subsidiaries at the dates and for the periods indicated, and, for unaudited financial statements, subject to normal year-end and audit adjustments and the absence of footnotes.  All projections delivered from time to time to the Administrative Agent and Lenders have been prepared in good faith, based on assumptions believed by Borrower to be reasonable in light of the circumstances at such time; *provided*, that projections, estimates, and forward-looking statements are not to be viewed as facts or a guaranty of performance or achievement of a certain result, and the actual results during the period or periods covered may differ from such projections, estimates, and forward-looking statements, and such differences may be material.  Since December 31, 2021, there has been no change in the condition, financial or otherwise, of Borrower and its Subsidiaries that has had or could reasonably be expected to have a Material Adverse Effect.

9.1.8    Taxes.  Each Obligor and Subsidiary has filed all Tax returns and other reports that it is required by Applicable Law to file, and has paid all Taxes (including in a capacity as a withholding agent) that are due and payable, whether or not shown on a Tax return or report, except in each case (i) to the extent being Properly Contested or (ii) to the extent failure to file

such Tax return or report or pay such Taxes would not have and could not reasonably be expected to have a Material Adverse Effect.

9.1.9   Brokers.  There are no brokerage commissions, finder's fees or investment banking fees payable in connection with any transactions contemplated by the Loan Documents.

9.1.10   Intellectual Property.  Each Obligor and Subsidiary exclusively owns or has the lawful right to use all Intellectual Property used or held for use in or otherwise necessary for the conduct of its business, without conflict with any rights of others except to the extent the failure of the foregoing to be true would not have and could not reasonably be expected to have a Material Adverse Effect.  The conduct of the business of Borrower and each Subsidiary does not infringe or misappropriate any Intellectual Property rights of any third party, and there is no pending or, to any Obligor's knowledge, threatened (in writing), Intellectual Property Claim with respect to Borrower, any Subsidiary or any of their product, service, or property (including any Intellectual Property), and to any Obligor's knowledge, no third party is infringing or misappropriating any material Intellectual Property rights of Borrower or any Subsidiary, in each case, except to the extent the failure of the foregoing to be true would not have and could not reasonably be expected to have a Material Adverse Effect. As of the Interim DIP Closing Date, all registered and applied for Intellectual Property owned by Borrower or any Subsidiary ("Registered IP") and all material Licenses granted by Borrower or any Subsidiary are, in each case, set forth on **Schedule 9.1.10**.  To Borrower's knowledge, and except to the extent the failure of the foregoing to be true would not have and could not reasonably be expected to have a Material Adverse Effect, all Registered IP are valid and enforceable and in compliance with all legal requirements, filings, and payments and other actions that are required to maintain such Registered IP in full force and effect.  Except to the extent the failure of the foregoing to be true would not have and could not reasonably be expected to have a Material Adverse Effect, Borrower and its Subsidiaries have taken reasonable steps to maintain the confidentiality of and otherwise protect and enforce its rights in all trade secrets owned by Borrower and/or any of  its Subsidiaries that are necessary in or material to the conduct of the business of Borrower and its Subsidiaries.

9.1.11   Governmental Approvals.  Subject to the DIP Orders, as applicable, each Obligor and Subsidiary is in compliance with, and is in good standing with respect to, all Governmental Approvals necessary to conduct its business and to own, lease and operate its properties except to the extent failure to be in compliance and good standing would not have and could not reasonably be expected to have a Material Adverse Effect.  All necessary import, export or other licenses, permits or certificates for the import or handling of any goods or other Collateral have been procured and are in effect, and each Obligor and Subsidiary has complied with all foreign and domestic laws with respect to the shipment and importation of any goods or Collateral, except where the failure to procure, maintain in effect or noncompliance would not have and could not reasonably be expected to have a Material Adverse Effect.

9.1.12   Compliance with Laws.  Each Obligor and Subsidiary has duly complied, and its properties and business operations are in compliance, in all material respects with all Applicable Law, except where noncompliance would not have and could not reasonably be expected to have a Material Adverse Effect.  There have been no citations, notices or orders of noncompliance issued to Borrower or any Subsidiary under any Applicable Law except where

-80-

noncompliance would not have and could not reasonably be expected to have a Material Adverse Effect. No Inventory has been produced in violation of the FLSA.

9.1.13 <u>Compliance with Environmental Laws</u>. No Obligor or Subsidiary's past or present operations, any Subject Real Property or other properties are subject to any federal, state or local investigation to determine whether any remedial action is needed to address any Environmental Release, Hazardous Material or clean-up of the Environment that would have or could reasonably be expected to have a Material Adverse Effect. No Obligor or Subsidiary has received any Environmental Notice that would have or could reasonably be expected to have a Material Adverse Effect. No Borrower or Subsidiary has any contingent liability with respect to any Environmental Release, environmental pollution or Hazardous Material on any Real Estate now or previously owned, leased or operated by it that would have or could reasonably be expected to have a Material Adverse Effect.

9.1.14 <u>Burdensome Contracts</u>. No Restrictive Agreement to which any Obligor is a party prohibits the execution, delivery or performance of any Loan Document by an Obligor.

9.1.15 <u>Litigation</u>. Other than the commencement of the Chapter 11 Cases and except as shown on **Schedule 9.1.15**, there are no proceedings or investigations pending or, to any Obligor's knowledge, threatened against any Obligor or Subsidiary, or any of its operations or properties, that (a) as of the Closing Date, relate to any Loan Documents or transactions contemplated thereby; or (b) would have or could reasonably be expected to have a Material Adverse Effect. No Obligor or Subsidiary is in default with respect to any order, injunction or judgment of any Governmental Authority to the extent such default would have or could reasonably be expected to have a Material Adverse Effect.

9.1.16 <u>No Defaults</u>. No event or circumstance has occurred or exists that constitutes a Default or Event of Default.

9.1.17 <u>ERISA</u>. Except to the extent the failure of the following to be true would not have and could not reasonably be expected to have a Material Adverse Effect:

(a) Each Plan is in compliance with the applicable provisions of ERISA, the Code, and other federal and state laws. Each Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the IRS or an application for such a letter is currently being processed by the IRS with respect thereto and, to the knowledge of Borrower, nothing has occurred which would prevent, or cause the loss of, such qualification. Each Obligor and ERISA Affiliate has met all applicable requirements under the Code, ERISA and the Pension Protection Act of 2006, and no application for a waiver of the minimum funding standards or an extension of any amortization period has been made with respect to any Plan.

(b) There are no pending or, to the knowledge of Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan.

(c) (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; (iii) no Obligor or ERISA Affiliate has

-81-

incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) no Obligor or ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 or 4243 of ERISA with respect to a Multiemployer Plan; (v) no Obligor or ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA; and (vi) as of the most recent valuation date for any Pension Plan or Multiemployer Plan, the funding target attainment percentage (as defined in Section 430(d)(2) of the Code) is at least 60%, and no Obligor or ERISA Affiliate knows of any fact or circumstance that could reasonably be expected to cause the funding target attainment percentage for any such plan to drop below 60% as of such date.

(d)     With respect to any Foreign Plan, (i) all employer and employee contributions required by law or by the terms of the Foreign Plan have been made, or, if applicable, accrued, in accordance with normal accounting practices; (ii) the Fair Market Value of the assets of each funded Foreign Plan, the liability of each insurer for any Foreign Plan funded through insurance, or the book reserve established for any Foreign Plan, together with any accrued contributions, is sufficient to procure or provide for the accrued benefit obligations with respect to all current and former participants in such Foreign Plan according to the actuarial assumptions and valuations most recently used to account for such obligations in accordance with applicable generally accepted accounting principles; and (iii) it has been registered as required and has been maintained in good standing with applicable regulatory authorities.

9.1.18  <u>Labor Relations</u>.  Except as described on **Schedule 9.1.18**, as of the Interim DIP Closing Date, no Borrower or Subsidiary is party to or bound by any collective bargaining agreement, material management agreement or material consulting agreement.  There are no grievances, disputes or controversies with any union or other organization of Borrower's or Subsidiary's employees, or, to any Obligor's knowledge, any asserted or threatened strikes, work stoppages or demands for collective bargaining, in each case, the effect of which would have or could reasonably be expected to have a Material Adverse Effect.

9.1.19  <u>Not a Regulated Entity</u>.  No Obligor is an "investment company" or a "person directly or indirectly controlled by or acting on behalf of an investment company" within the meaning of the Investment Company Act of 1940.

9.1.20  <u>Margin Stock</u>.  No Obligor is engaged, principally or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.  No Loan proceeds will be used by Borrower or any of its Subsidiaries to purchase or carry, or to reduce or refinance any Debt incurred to purchase or carry, any Margin Stock or for any related purpose governed by Regulations T, U or X of the Board of Governors.

9.1.21  <u>OFAC</u>.  No Obligor, Subsidiary, director, officer, employee, or, to the knowledge of any Obligor, agent, affiliate or representative thereof, is or is owned or controlled by any individual or entity that is currently the subject or target of any Sanction, or is located, organized or resident in a Designated Jurisdiction.

11231624v19

9.1.22 <u>Anti-Corruption Laws</u>. Each Obligor and Subsidiary has conducted its business in accordance with applicable anti-corruption laws in all material respects and has instituted and maintained policies and procedures designed to promote and achieve compliance with such laws.

9.1.23 <u>Affected Financial Institution</u>. None of the Obligors is an Affected Financial Institution.

9.1.24 <u>Security Interests</u>. This Agreement and the DIP Orders are effective to create, in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid, binding, enforceable first-priority Lien on and security interest in all right, title and interest of the Obligors in the Collateral, in each case, subject to the Carve Out and junior only to any Permitted Prior Liens (solely to the extent explicitly set forth as junior and other than as expressly provided in the DIP Orders). Pursuant to the terms of the DIP Orders, no filings or other action (including the taking of possession or control) are or shall at any time be necessary to perfect, preserve or protect such Liens and security interests; *provided*, that, notwithstanding the foregoing, the Obligors shall have executed and delivered all other Security Documents, and made (or authorized the making by the Administrative Agent of) all filings, in each case, to the extent deemed reasonably necessary and/or appropriate, and requested, by the Administrative or the Required Lenders.

9.1.25 <u>Beneficial Ownership Certificate</u>. The information included in the Beneficial Ownership Certification, if applicable, is true and correct in all respects.

9.1.26 <u>Covered Entities</u>. No Obligor is a Covered Entity.

9.1.27 <u>Budget</u>. Each of (w) the Initial Budget, as attached as **Exhibit H** and which was delivered to the Administrative Agent and the Lenders on or prior to the Interim DIP Closing Date, and which is in effect as of the Closing Date, (x) each Approved Budget, (y) each Budget Supplement and (z) each Updated Budget, in each case, is based upon good faith estimates and assumptions believed by management of Borrower to be reasonable at the time made, in light of the circumstances under which they were made. The Initial Budget, was prepared in good faith based upon assumptions Borrower believes to be reasonable assumptions on the date of delivery thereof

9.1.28 <u>Immaterial Subsidiaries</u>. **Schedule 10.1.16** sets forth a complete and accurate list of each Immaterial Subsidiary. No Immaterial Subsidiary has (i) engaged in any business activities or owns any property (real or personal) or assets (in each case, of whatever nature), (ii) created, incurred, assumed or suffered to exist any Debt, (iii) created or permitted to exist any Lien on any of its real or personal properties, assets or rights of whatever nature (whether now owned or hereafter acquired), (iv) received, directly or indirectly, any Investment or Distribution from any Obligor or (v) entered into any transaction of any nature with any Obligor.

**9.2.** **Disclosure**. As of the Closing Date, there are no agreements, instruments and corporate or other restrictions to which any Obligor is subject, that, individually or in the aggregate, would have or could reasonably be expected to result in a Material Adverse Effect. None of the written reports, financial statements, certificates or other written information furnished by or on

-83-

behalf of any Obligor to the Administrative Agent in connection with the negotiation of this Agreement or any other Loan Document (as modified or supplemented by other information so furnished), taken as a whole, contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading in any material respect; *provided*, that, with respect to projected financial information, Borrower represents only that such information was prepared in good faith based upon assumptions believed by it to be reasonable at the time delivered and, if such projected financial information was delivered prior to the Closing Date, as of the Closing Date.

## SECTION 10.    <u>COVENANTS AND CONTINUING AGREEMENTS</u>

**10.1.    Affirmative Covenants**.  From and after the Interim DIP Order Date to and until Full Payment, each Obligor shall, and shall cause each Subsidiary thereof to:

10.1.1 <u>Inspections</u>.

(a)     Permit the Administrative Agent from time to time, subject (except when an Event of Default exists) to reasonable notice and normal business hours, to visit and inspect the properties of Borrower or any Subsidiary, inspect, audit and make extracts from Borrower's or Subsidiary's books and records, and discuss with its officers, employees, agents, advisors and independent accountants Borrower's or Subsidiary's business, financial condition, assets and results of operations, subject to any express limits in clause (b) below.  Neither the Administrative Agent nor any Lender shall have any duty to any Obligor to make any inspection, nor to share any results of any inspection, examination or report with any Obligor.  Obligors acknowledge that all inspections, examinations and reports are prepared by the Administrative Agent and Lenders for their purposes, and Obligors shall not be entitled to rely upon them.

(b)     Reimburse the Administrative Agent for reasonable charges, costs and expenses of the Administrative Agent in connection with examinations of any Obligor's books and records or any other financial or Collateral matters (including for the avoidance of doubt, field examinations) as the Administrative Agent deems appropriate, up to two times per Loan Year (but no more than once in any six-month period); *provided*, *however*, that a second examination during any six month period will be permitted at the Obligors' expense during a Cash Dominion Period; *provided further* that (i) if an examination is initiated during an Event of Default, all charges, costs and expenses therefor shall be reimbursed by Borrower without regard to any of the foregoing limits and such examination shall not reduce or count against any of the foregoing limits; and (ii) any additional number of examinations may be performed by the Administrative Agent at Lenders' expense in the absence of any Default.  Borrower agrees to pay the Administrative Agent's then standard charges for examination activities, including the standard charges of the Administrative Agent's internal examination groups, as well as the reasonable charges of any third party used for such purposes.

-84-

10.1.2 <u>Financial and Other Information</u>.  Keep adequate records and books of account with respect to its business activities, in which proper entries are made in accordance with GAAP reflecting all financial transactions; and furnish to the Administrative Agent and Lenders:

(a)        within 120 days after the close of each Fiscal Year, balance sheets as of the end of such Fiscal Year after the close of each Fiscal Year, balance sheets as of the end of such Fiscal Year and the related statements of income, cash flow and shareholders' equity for such Fiscal Year, on consolidated basis for Borrower and Subsidiaries, which consolidated statements shall be audited and certified (without a "going concern" or like qualification or exception, other than a "going concern" qualification or exception solely as a result of the Chapter 11 Cases or Debt maturing thereafter) by the independent certified public accountants of Borrower, and shall set forth in comparative form corresponding figures for the preceding Fiscal Year;

(b)        within 60 days after the end of each Fiscal Quarter, unaudited balance sheets as of the end of such Fiscal Quarter and the related statements of income and cash flow for such Fiscal Quarter and for the portion of the Fiscal Year then elapsed, on consolidated basis for Borrower and Subsidiaries, setting forth in comparative form corresponding figures for the preceding Fiscal Year and certified by a Senior Officer of Borrower as prepared in accordance with GAAP and fairly presenting the financial position and results of operations for such Fiscal Quarter and period, subject only to normal year-end and audit adjustments and the absence of footnotes;

(c)        within 30 days after the end of each calendar month, a consolidated balance sheet of Borrower and its Subsidiaries as at the end of such month, and the related consolidated statements of operations for such month and for the portion of the Fiscal Year then ended, and consolidated statements of cash flows for such month and the portion of the Fiscal Year then ended, setting forth in each case in comparative form the figures for the corresponding month of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail and certified by a Senior Officer of Borrower as fairly presenting in all material respects the financial condition, results of operations and cash flows of Borrower and its Subsidiaries in accordance with GAAP;

(d)        concurrently with delivery of financial statements pursuant to clauses (a), (b) and (c) above, a Compliance Certificate, which Compliance Certificate shall be substantially in the form of **Exhibit E** attached hereto;

(e)        concurrently with delivery of financial statements under clause (a) above, copies of all management letters and other material reports submitted to Borrower by their accountants in connection with such financial statements;

(f)        [reserved];

(g)        [reserved];

(h)        promptly after the sending or filing thereof, copies of any regular, periodic and special reports or registration statements or prospectuses that any Obligor files with the Securities and Exchange Commission or any other Governmental Authority, or any securities

exchange; and copies of any press releases or other statements made available by any Obligor to the public concerning material changes to or developments in the business of such Obligor;

(i) promptly after request, such other reports and information (financial or otherwise) as the Administrative Agent may reasonably request from time to time in connection with any Collateral or any Obligor's or its Subsidiary's financial condition or business; and

(j) promptly following any request therefor, information and documentation reasonably requested by the Administrative Agent or any Lender (through the Administrative Agent) for purposes of compliance with applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act and the Beneficial Ownership Regulation.

10.1.3 <u>Notices</u>. Notify the Administrative Agent in writing, promptly after any Obligor's obtaining knowledge thereof, of any of the following in respect of an Obligor (without limiting any requirements of **Section 10.1.13**): (a) except with respect to the Chapter 11 Cases, the written threat or commencement of any proceeding or investigation, whether or not covered by insurance, which would have or could reasonably be expected to have a Material Adverse Effect; (b) any pending or threatened in writing labor dispute, strike or walkout, or the expiration of any labor contract, which would have or could reasonably be expected to have a Material Adverse Effect; (c) any uncured default by an Obligor under a Material Contract; (d) the existence of any Default or Event of Default; (e) any judgment not covered by insurance in an amount exceeding $250,000; (f) the assertion of any Intellectual Property Claim, which would have or could reasonably be expected to have a Material Adverse Effect; (g) any violation or asserted violation of any Applicable Law (including ERISA, OSHA, FLSA, or any Environmental Laws) which would have or could reasonably be expected to have a Material Adverse Effect; (h) any Environmental Release by an Obligor or on any Real Estate owned, leased or occupied by an Obligor, or receipt of any Environmental Notice, which, in each case, would have or could reasonably be expected to have a Material Adverse Effect; (i) the occurrence of any ERISA Event which would have or could reasonably be expected to have a Material Adverse Effect; or (j) the discharge of or any withdrawal or resignation by Borrower's independent accountants.

10.1.4 <u>Compliance with Laws</u>. Comply with all Applicable Laws, including ERISA, Environmental Laws, FLSA, OSHA, Anti-Terrorism Laws and Anti-Corruption Laws, and maintain all Governmental Approvals necessary to the ownership of its properties or conduct of its business unless failure to comply or maintain would not have or could not reasonably be expected to have a Material Adverse Effect. Without limiting the generality of the foregoing, if any Environmental Release occurs at or on any properties of any Obligor or of a Subsidiary thereof, it shall act promptly and diligently to investigate and report to the Administrative Agent and all appropriate Governmental Authorities the extent of, and to make appropriate remedial action to eliminate, such Environmental Release to the extent required by Environmental Laws, whether or not directed to do so by any Governmental Authority.

10.1.5 <u>Taxes</u>. Pay and discharge all Taxes prior to the date on which they become delinquent or penalties attach, unless such Taxes are being Properly Contested or the failure to pay or discharge such Taxes would not have and could not reasonably be expected to have a Material Adverse Effect.

11231624v19

10.1.6 <u>Insurance</u>. Maintain insurance with insurers with respect to the properties and business of Borrower and its Subsidiaries of such type (including workers' compensation, larceny, embezzlement, or other criminal misappropriation insurance), in such amounts, and with such coverages and deductibles as are customary for companies similarly situated.

10.1.7 <u>Licenses</u>. Keep each License affecting any Collateral (including the manufacture, distribution or disposition of Inventory) or any other material real or personal property of Obligors and Subsidiaries in full force and effect except to the extent the failure to do so would not have and could not reasonably be expected to have a Material Adverse Effect; promptly notify the Administrative Agent of any proposed modification to any such License, or entry into any new material License, in each case at least 15 days prior to its effective date; pay all material Royalties when due; and notify the Administrative Agent of any default or breach asserted by any Person to have occurred under any material License.

10.1.8 <u>Further Assurances; etc</u>.

(a) Subject to clause (c) below, each Obligor will, and will cause each of the other Obligors to, grant to the Administrative Agent, for the benefit of the Secured Parties, security interests in such assets (other than Excluded Assets) of such Obligor and such other Obligors as are not covered by the grant and perfection requirements of **Section 7** hereof, the DIP Orders or any other Security Document as of the Closing Date (other than Excluded Assets), and as may be reasonably requested from time to time by the Administrative Agent or the Required Lenders.

(b) Subject to the limitations set forth herein or any other Loan Document, promptly upon the reasonable request by the Administrative Agent the Obligors shall (i) assist in correcting any jointly identified material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Security Document or other document or instrument relating to any Collateral, and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances, and other instruments as the Administrative Agent may reasonably request from time to time in order to carry out more effectively the purposes of **Section 7**, the DIP Orders and the Security Documents.

(c) With respect to any Person that is or becomes a Subsidiary after the Interim DIP Closing Date, other than an Immaterial Subsidiary, promptly (and in any event, by the time required by the Administrative Agent) (i) deliver to the Administrative Agent or its bailee the certificates, if any, representing all (or such lesser amount as is required) of the Equity Interests of any such Subsidiary that is a direct Subsidiary of an Obligor, together with undated stock powers or other appropriate instruments of transfer executed and delivered in blank by a duly authorized officer of the holder(s) of such Equity Interests, and all intercompany notes owing from such Subsidiary to any Obligor together with instruments of transfer executed in blank by a duly authorized officer of such Obligor, (ii) cause such new Subsidiary (A) to execute a joinder agreement, substantially in the form of **Exhibit G** hereto, and (B) to take all actions reasonably necessary or advisable in the reasonable opinion of the Administrative Agent to cause the Lien on the Collateral of such Subsidiary created hereunder, under the DIP Orders or the applicable Security Document to be duly perfected in accordance with all Applicable Law, including the

-87-

11231624v19

filing of financing statements in such jurisdictions as may be reasonably requested by the Administrative Agent, and (iii) at the request of the Administrative Agent, deliver to the Administrative Agent a signed copy of an opinion, addressed to the Administrative Agent and the other Lenders, of counsel to the Obligors reasonably acceptable to the Administrative Agent as to such matters set forth in this **Section 10.1.8** as the Administrative Agent may reasonably request.

(d)     Each Obligor agrees that each action required by clauses (a) or (b) of this **Section 10.1.8** shall be completed no event later than 10 calendar days after such action is required to be taken pursuant to such clauses or requested to be taken by the Administrative Agent or the Required Lenders (or such longer period as the Administrative Agent shall otherwise agree), as the case may be; *provided,* that in no event will Borrower or any of its Subsidiaries be required to take any action, other than using its commercially reasonable efforts (which shall in any event include filing any applicable petition, motion, request or similar with the Bankruptcy Court), to obtain consents from third parties with respect to compliance with clause (a) or (b) of this **Section 10.1.8.**

10.1.9  Designation of Subsidiaries.  Each Person that is a Subsidiary of Borrower at any time, other than an Immaterial Subsidiary, shall be required to be an Obligor and shall be subject to all terms and conditions hereof applicable to Obligors.  For the avoidance of doubt, no Investment shall be made by Borrower or any Subsidiary thereof in any Person other than an Obligor.

10.1.10     Sales of Bitcoin.   Unless otherwise consented to by the Administrative Agent, sell all Bitcoin in the Ordinary Course of Business within five (5) Business Days after receipt of any such Bitcoin; *provided* that any such Bitcoin may also be sold or retained to the extent required in accordance with the terms of any applicable Permitted BTC Hedging Agreement.

10.1.11     [Reserved].

10.1.12     Other Reporting.

(a)     On the sixth Wednesday after the Interim DIP Closing Date (March 15, 2023) and continuing every fourth Wednesday thereafter (or more frequently at either Borrower's or the Administrative Agent's reasonable discretion and upon reasonable prior notice to the other) (the "Budget Reporting Deadline"), the Obligors shall deliver to the Administrative Agent (for the benefit of it and the Lenders) a prospective supplement to the Approved Budget then in effect (each, a "Budget Supplement").  The Budget Supplement's form, scope and level of detail shall be consistent with the Initial Budget (each Budget Supplement, if, but solely if and upon being, approved in writing by the Administrative Agent in accordance with the following sentence, an "Updated Budget") and shall extend the period covered thereby to the earlier of (x) twelve (12) weeks or more (at Borrower's discretion) from the applicable Budget Reporting Deadline or (y) the current estimated date of the Chapter 11 Plan Effective Date (as such estimated date is reasonably agreed to between Borrower and the Administrative Agent).  For the avoidance of doubt, no Updated Budget shall become the Approved Budget unless and until approved by the Administrative Agent (with the consent of the Required Lenders), which approval shall be deemed granted if, after the Budget Supplement's submission to the Administrative Agent and the Lenders

-88-

for approval, the Administrative Agent either (x) expressly approves such Updated Budget in writing or (y) neither rejects nor approves such Updated Budget within four (4) Business Days after the day it receives such Updated Budget (assuming it is received by it by 11:00 a.m. (New York City time) on such date of delivery, otherwise such Updated Budget shall be deemed received on the following Business Day) (such approval or consent in accordance with the foregoing being the "Lender Consent"), and in the event that such Updated Budget is not so approved by the Administrative Agent and the Required Lenders, the prior Approved Budget shall remain in effect; *provided*, *however*, that neither the Administrative Agent nor any of the Lenders shall have any obligation to approve any Budget Supplement or any Updated Budget, and no modification to any Updated Budget or any Approved Budget, or any reforecasting of any information relating to any period covered by any other Updated Budget or any Approved Budget, as the case may be, shall in any event be effective without the Administrative Agent's prior written consent; and *provided; further* that if any such Updated Budget is being contested by the Ad Hoc Group (as defined in the DIP Orders) with the Bankruptcy Court in accordance with the Final DIP Order, no such Updated Budget (even if approved by the Administrative Agent as set forth above) shall be deemed to be an Approved Budget until such time as such contest is resolved by the Bankruptcy Court (and any required modifications, if any, to such Updated Budget are made and approved as set forth above) or withdrawn (and until such time, the prior Approved Budget shall remain in effect).

(b)     Every Wednesday (commencing with Wednesday of the calendar week immediately after the Interim DIP Closing Date, i.e., February 8, 2023) (each, a "Variance Reporting Deadline"), and on each Wednesday thereafter, the Obligors shall deliver to the Administrative Agent (for the benefit of it and the Lenders) for the rolling four week period ending on the Friday immediately preceding such Variance Reporting Deadline (the "Performance Period"):

(i)     a variance report, in each case, in form, scope and detail consistent with the Approved Budget (each, a "Variance Report"), which Variance Report shall set forth, with respect to the applicable Performance Period, the difference/variance, expressed as a percentage or whole dollar amount (for each of the line items and other amounts set for the below) (each, a "Budget Variance"), between each of:

(x) (1) the aggregate budgeted amounts for the line item identified in the Approved Budget for (and during) such Performance Period as "net receipts" to (2) the aggregate actual total "net receipts" (as calculated consistently with the Approved Budget) for (and during) such Performance Period (with any negative difference  (shortfall) between the actual results for such Performance Period minus the budgeted amounts for such Performance Period being a "Receipts Variance");

(y) each (to be calculated and reported separately) of (1) (A) the aggregate of the budgeted amount in the Approved Budget for (and during) such Performance Period as set forth in the line item identified in the Approved Budget as "net operating disbursements" to (B) the aggregate actual "net operating disbursements" (as calculated consistently with the Approved Budget) for (and during) such Performance Period, (2) (A) the aggregate of the budgeted amounts in the Approved Budget for (and during) such Performance Period as set forth in the line item identified in the Approved Budget as "net capital expenditures" to (B) the aggregate actual "net capital expenditures" (as calculated consistently with the

-89-

Approved Budget) for (and during) such Performance Period, and (3) (A) the sum of the aggregate budgeted "net operating disbursements" plus "net capital expenditures" (as derived by adding the budgeted amounts in (1)(A) and (2)(A) immediately above together) for such Performance Period to (B) the actual aggregate sum of "net operating disbursement" plus "net capital expenditures" (as derived by adding the amounts in (1)(B) and (2)(B) immediately above together) for such Performance Period, with any positive difference (excess) between the respective actual aggregate results minus the respective budgeted (or derived) amounts for clause (3) above being the "Disbursements Variance") (For the avoidance of doubt, the values used to calculate the Disbursements Variances shall not include any amounts related to permitted professional fees, permitted utility deposits or permitted adequate protection payments); and

(z) a comprehensive line item comparison for all other line items in the Approved Budget of actual results versus budgeted amounts for (and during) each such line item for such Performance Period; and

(ii) a certificate of a Senior Officer of Borrower prepared in respect of each Variance Report, which shall (A) set forth a reasonably detailed explanation of each Budget Variance identified in such Variance Report that is "material", whether on a qualitative or a quantitative basis (it being agreed that any Budget Variance, in each case, exceeding 20% shall be material on a quantitative basis), and (B) certify compliance (or non-compliance) by Borrower and its Subsidiaries with **Section 10.3.1**, and confirm that no Default or Event of Default shall exist or be continuing as of such time, or be reasonably expected to occur or arise (provided, that, if such certification and confirmation cannot be provided for any reason, such certificate shall specifically identify and describe the instance of any non-compliance or default, and the facts, circumstances, extent/amount of, reason for, and other information relevant to, such non-compliance or default; provided, however, that, the compliance with the foregoing shall in any event not be deemed to cure or negate any non-compliance with **Section 10.3** or any Default or Event of Default) (a certificate that complies with the foregoing requirements, a "Variance Report Certificate").

(c) The Obligors shall arrange for a teleconference with the Administrative Agent and the Lenders wishing to participate to take place prior to 6:00 p.m. (New York City time) (or at such other time as is reasonably satisfactory to the Administrative Agent) every Thursday (commencing with Thursday, February 9, 2023) (or such other day as is reasonably satisfactory to the Administrative Agent) until Full Payment occurs, which teleconference shall (i) require participation by at least one Senior Officer of Borrower's management team and/or professional advisors to Borrower, and (ii) be intended for purposes of discussing Borrower and its Subsidiaries' financials (including any budget proposed to be the Approved Budget, Variance Reports and any projections), performance and such other information and matters reasonably related thereto or requested by the Administrative Agent and/or any Lender; provided, that such teleconference shall not be required in any week if and to the extent that the Administrative Agent shall have previously waived or postponed the same by written notice to Borrower.

10.1.13 Other Agreements. The Obligors agree to discuss in good faith with the Administrative Agent and potential counterparties an agreement to provide for the forward sales of or other hedging arrangement relating to the Obligors' present and anticipated Bitcoin

-90-

11231624v19

inventory; *provided*, that it is understood that any Asset Disposition of Bitcoin for the Fair Market Value at the time thereof will be permitted hereunder.

10.1.14     Bankruptcy Related Matters.

(a)     Cause all proposed (i) orders related to or affecting the Obligations and/or the Loan Documents, the Prepetition Debt and applicable loan documents, any other financing or use of Cash Collateral, any sale or other disposition of Collateral outside the ordinary course or adequate protection, (ii) any Acceptable Chapter 11 Plan and/or any disclosure statement related thereto, (iii) orders concerning the financial condition of the Debtors, or other Debt of the Debtors and (iv) orders establishing procedures for administration of the Chapter 11 Cases or approving significant transactions submitted to the Bankruptcy Court, in each case, proposed by the Debtors, to be in accordance with the terms of this Agreement, to the extent applicable.

(b)     Comply in all respects with each order entered by the Bankruptcy Court in connection with the Chapter 11 Cases.

(c)     Deliver to the Administrative Agent and the Lenders, to the extent practicable (absent exigent circumstances), not less than one (1) Business Day's prior to any filing, copies of all proposed pleadings, motions, applications, orders, financial information and other documents to be filed by or on behalf of the Obligors with the Bankruptcy Court in the Chapter 11 Cases that affect or may affect any of the Secured Parties, and shall consult in good faith with the Administrative Agent and the Lenders regarding the form and substance of any such document.

(d)     If not otherwise provided through the Bankruptcy Court's electronic docketing system, deliver to the Administrative Agent and to the Lenders promptly, copies of all final pleadings, motions, applications, orders, financial information and other documents distributed by or on behalf of the Obligors to the Chapter 11 Unsecured Creditors Committee (or any other official or unofficial committee appointed or appearing in the Chapter 11 Cases or any other party in interest).

(e)     Provide the Administrative Agent and the Lenders not less than two (2) Business Days' prior written notice, where practicable, of any assumption or rejection of any Debtor's or any Subsidiary's Material Contracts, or of any material non-residential real property leases pursuant to Section 365 of the Bankruptcy Code, and procure that no such contract or lease, as applicable, shall be assumed or rejected if the Administrative Agent (acting at the direction of the Required Lenders) informs Borrower in writing, within one (1) Business Day of receipt of the notice from Borrower referenced above, that it objects to such assumption or rejection, as applicable, or needs additional time to make the decision.

10.1.15     Priority of Liens and Claims.     Cause the Obligations to, upon and at all times after entry of the Interim DIP Order (i) constitute DIP Superpriority Claims having the priority and rights set forth in the DIP Orders and (ii) be secured by a valid, binding, continuing, enforceable and fully and properly perfected Lien in favor of the Administrative Agent to secure the Obligations to the fullest extent required hereunder, which Lien, subject to the terms of the DIP Orders, shall rank super senior and prior to, and shall have first priority over, all other Liens thereon (subject only to the Carve-Out and, solely in the case of the Junior-Priority DIP Collateral,

11231624v19

to only those Permitted Prior Liens explicitly set forth in the DIP Order as being senior to the Administrative Agent's Liens in the Collateral). In furtherance thereof, the Obligors hereby agree to execute, deliver to the Administrative Agent and/or (where applicable) file or authorize the filing of, such Security Documents, UCC financings, intellectual property security agreements, Control Agreements, Mortgages (to the extent required hereunder) and such other instruments, documents and agreements as the Administrative Agent may reasonably request in order to grant, evidence, confirm, validate, perfect or preserve the Liens granted to the Administrative Agent hereunder and pursuant to the DIP Orders or the Obligations.

**10.2.   Negative Covenants**.  From and after the Interim DIP Order Date to and until Full Payment, each Obligor shall not, and shall cause each Subsidiary not to:

10.2.1   <u>Permitted Debt</u>.  Create, incur, guarantee or suffer to exist any Debt, except Debt incurred or arising pursuant to clauses (a) through (x) below (<u>provided</u>, that, in the case of any such Debt incurred or arising at any time on or after the Petition Date, such Debt shall only be permitted hereunder if no Default or Event of Default shall exist or be continuing as of the time that such Debt is to be incurred or to arise, or shall occur upon, or as a result of, such Debt being incurred or arising):

(a)      the Obligations;

(b)      the Prepetition NPA Facility Debt;

(c)      any (i) Debt incurred to finance the acquisition, construction, or improvement of any fixed or capital assets (whether or not constituting Purchase Money Debt), including Capital Lease Obligations and (ii) Debt assumed in connection with the acquisition of any of the foregoing assets or secured by a Lien on any such assets prior to the acquisition thereof; <u>provided</u>, that no Debt shall be incurred pursuant hereto at any time after the Petition Date unless permitted pursuant to the applicable Chapter 11 Approvals, and no payments in respect thereof shall be made except to the extent in accordance with the Financial Covenants; and <u>provided</u>, <u>further</u>, that the aggregate principal amount of Debt incurred in reliance on this clause (c) after the Petition Date and the creditor payments related thereto are set forth in, and made pursuant to and in accordance with, the Approved Budget;

(d)      Debt incurred prior to the Petition Date; provided, that if any such Debt exceeds an aggregate principal amount of $100,000, a description of such Debt is set forth on **Schedule 10.2.1** hereof;

(e)      Debt with respect to Debt in respect of netting services, automatic clearinghouse arrangements, overdraft protections, treasury, depository, corporate purchasing cards and other credit cards, cash management, and similar arrangements, in each case incurred in the Ordinary Course of Business;

(f)      [reserved];

(g)      Permitted Contingent Obligations;

-92-

(h)      intercompany Debt solely among the Obligors; *provided*, that any such Debt shall be subordinated on terms reasonably satisfactory to the Administrative Agent to the Obligations hereunder (including pursuant to the terms of the Intercompany Subordination Agreement);

(i)      Debt incurred in connection with the financing of insurance premiums in the Ordinary Course of Business;

(j)      Debt owed to any Person providing workers' compensation, unemployment insurance, health, disability or other employee benefits or property, casualty or liability insurance, pursuant to reimbursement or indemnification obligations to such Person, in each case incurred in the Ordinary Course of Business;

(k)      Debt in respect of performance bonds, completion guarantees, bid bonds, appeal bonds, surety bonds and similar obligations, in each case provided in the Ordinary Course of Business;

(l)      [reserved];

(m)      [reserved];

(n)      [reserved];

(o)      preferred stock of Borrower issued prior to the Petition Date and that does not constitute Disqualified Equity Interests, as set forth on **Schedule 9.1.4**;

(p)      Debt consisting of take or pay obligations contained in supply arrangements entered into in the Ordinary Course of Business; *provided*, that the aggregate amount of all such obligations incurred or arising and outstanding at any time shall not exceed $500,000; *provided, further*, that no such obligations shall be incurred at any time as of the Petition Date unless permitted by the DIP Orders or other Chapter 11 Order (in each case, in accordance with the Approved Budget);

(q)      guarantees required by Governmental Authorities in the Ordinary Course of Business;

(r)      [reserved];

(s)      Debt arising under Permitted Employment Arrangements in accordance with the Approved Budget, all of which Debt (other than to the extent relating to KEIP/KERP payments approved by the Bankruptcy Court) shall be subordinated on terms acceptable to the Administrative Agent to the Full Payment of the Obligations;

(t)      endorsements for collection, deposit, or negotiation and warranties of products or services, in each case incurred in the Ordinary Course of Business;

(u)      rental obligations incurred in the Ordinary Course of Business; *provided*, that the aggregate amount thereof incurred or arising at any time following the Petition

-93-

Date shall not exceed $1,500,000 unless previously approved in writing by the Administrative Agent;

        (v)    [reserved];

        (w)    trade payables and other current liabilities incurred in the Ordinary Course of Business and in accordance with the Approved Budget;

        (x)    all interest accruing on (including capitalized interest), and all reasonable and documented fees and expenses payable in connection with, the obligations described in the foregoing clauses (in the case of (1) clause (a) of this **Section 10.2.1**, without limiting the amounts otherwise included pursuant to the definition of Obligations or as provided elsewhere in this Agreement and (2) clause (b) of this **Section 10.2.1**, without limiting the amounts otherwise included pursuant to the definition of Prepetition April NPA Debt or Prepetition August NPA Debt)); and

        (y)    to the extent constituting Debt, obligations under Permitted BTC Hedging Agreement.

Notwithstanding anything to the contrary in this **Section 10.2.1**, no payment shall be made in respect of any Debt (whether or not such Debt is permitted hereunder) at any time after the Interim DIP Closing Date except in accordance with the Approved Budget.

        10.2.2   _Permitted Liens_.  Create or suffer to exist any Lien upon any of its property or assets, except the following Liens (_provided_, that, in the case of any Liens created or arising at any time on or after the Petition Date, such Liens shall only be permitted hereunder if no Default or Event of Default shall exist or be continuing as of the time that such Lien is to be created or to arise, or shall occur upon, or as a result of, such Lien being created or arising) (collectively, "_Permitted Liens_"):

        (a)    Liens in favor of the Administrative Agent (for the benefit of the Secured Parties) granted pursuant to the Loan Documents and the DIP Orders to secure the Obligations;

        (b)    Liens in favor of the Prepetition Secured Parties securing the Debt permitted pursuant to **Section 10.2.1(b)**, so long as any such Lien pursuant to this clause (b) on any First-Priority DIP Collateral shall be subordinate to the Administrative Agent's and the Secured Parties' Liens thereon as set forth in the DIP Orders;

        (c)    Liens for Taxes (including real estate taxes) not yet due or being Properly Contested;

        (d)    statutory or common law Liens of landlords, sub-landlords, carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors or other like Liens (other than Liens for Taxes or imposed under ERISA) arising in the Ordinary Course of Business, but, with respect to any of the foregoing arising after the Petition Date, only if (i) payment of the obligations secured thereby is not yet due or is being Properly Contested, and (ii) such Liens do

not materially impair the value or use of the real or personal property or materially impair operation of the business of any Borrower or Subsidiary;

(e)     customary Liens incurred or deposits made in the Ordinary Course of Business to secure the performance of tenders, bids, leases, contracts (except those relating to Borrowed Money), statutory obligations, surety, stay, customs, and appeal bonds, performance bonds, and other similar obligations, or arising as a result of progress payments under government contracts;

(f)     pledges, deposits, or Liens in the Ordinary Course of Business in connection with (i) workers' compensation, payroll taxes, unemployment insurance, and other social security legislation and (ii) securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to Borrower, the Obligors, or any of the Subsidiaries;

(g)     Liens arising by virtue of a judgment or judicial order against any Obligor, or any real or personal property of an Obligor, as long as such judgment does not otherwise result in an Event of Default under **Section 11.1(h)**;

(h)     easements, rights-of-way, restrictions, encroachments, other survey defects or matters that would be shown by a current, accurate survey of physical inspection, and covenants, building codes, restrictions (including zoning restrictions), encroachments, licenses, protrusions, or other agreements of record, and other similar charges, encumbrances or irregularities in title on any Subject Real Property imposed by law or arising in the Ordinary Course of Business that do not or could not reasonably be expected to materially detract from the value of the affected property nor secure any monetary obligation and do not interfere with the business of the Obligors in any material respect;

(i)     normal and customary rights of setoff upon deposits in favor of depository institutions, and Liens of a collecting bank on Payment Items in the course of collection;

(j)     without duplication of any other Liens set forth in this **Section 10.2.2**, Liens that are listed on **Schedule 10.2.2** hereto, to the extent such Liens are existing, valid, fully perfected and non-avoidable as of the Petition Date (or were properly perfected subsequent to the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code) (the "Permitted Prior Liens"), which such Permitted Prior Liens shall be subject to the priority set forth in the DIP Orders;

(k)     leases, non-exclusive licenses, subleases or non-exclusive sublicenses granted to others that do not (i) interfere in any material respect with the business of Borrower or the Subsidiaries or (ii) secure any Debt;

(l)     Liens arising from UCC financing statements filed regarding operating leases entered into by an Obligor;

(m)     Liens in favor of customs or revenue authorities to secure payment of customs duties in connection with the importation of goods;

-95-

(n)     Liens solely on any cash earnest money deposits made by any Obligor or any Subsidiary in connection with any letter of intent or purchase agreement not prohibited by this Agreement;

(o)     Post-Petition Liens on the DIP Collateral in favor of the Prepetition Secured Parties and the Prepetition secured equipment lenders, in each case, granted as adequate protection liens pursuant to the DIP Orders, but only to the extent such Liens are expressly permitted pursuant to the DIP Orders and, in the case of the First-Priority DIP Collateral, are junior in priority to the Administrative Agent's Liens securing the Obligations hereunder;

(p)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by any Obligor in the Ordinary Course of Business permitted by this Agreement;

(q)     Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the Ordinary Course of Business and not for speculative purposes;

(r)     Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment permitted hereunder to be applied against the purchase price for such Investment and (ii) consisting of an agreement to dispose of any property in an Asset Disposition permitted hereunder, to the extent that such Asset Disposition would have been permitted on the date of the creation of such Lien;

(s)     ground leases in respect of any Real Estate (other than (x) any ground leases demised by an Obligor or Subsidiary, as the lessor thereunder, of any Subject Real Property and (y) any ground leases demised to any Obligor, as the lessee thereunder, in each case, unless otherwise consented to in writing by the Administrative Agent) on which facilities owned or leased by any of the Obligors are located; provided that with respect to any Real Estate owned by any of the Obligors and demised pursuant to a ground lease by an Obligor or Subsidiary as the lessor thereunder, such ground leases are fully subordinate to the Administrative Agent's Lien thereon (if any);

(t)     Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto not to exceed the amount of such premiums in the Ordinary Course of Business;

(u)     Liens on specific items of inventory or other goods (in each case, other than any Obligor's Bitcoin and other Cryptocurrencies) and the proceeds thereof securing such Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods in the Ordinary Course of Business;

(v)     deposits of cash with the owner or lessor of premises leased and operated by any Obligor to secure the performance of such Obligor's obligations under the terms of the lease for such premises in the Ordinary Course of Business and if occurring after the Petition Date, such deposits are permitted pursuant to the Approved Budget;

-96-

(w)    Purchase Money Liens in respect of Purchase Money Debt permitted to be incurred under **Section 10.2.1(c)**;

(x)    other than with respect to any First-Priority DIP Collateral, Liens on property subject to any sale-leaseback transaction not prohibited hereunder and the general intangibles related thereto, in each case, solely to the extent securing any obligations owing under such transaction;

(y)    Liens arising by operation of law in the United States under Article 2 of the UCC in favor of a reclaiming seller of goods or buyer of goods;

(z)    Liens existing on property at the time of its acquisition by an Obligor in accordance herewith, or existing on the property of any Person at the time such Person becomes an Obligor in accordance herewith, in either case, after the Closing Date, so long as such Lien is limited to such property so acquired and, in all cases, excluding Liens on the Equity Interests of any Person that becomes a Subsidiary;

(aa)    Liens granted or arising prior to the Petition Date, to the extent such Liens are existing, valid, fully perfected and non-avoidable as of the Petition Date; *provided* that the aggregate amount of Debt secured by such Liens at any time shall not exceed $100,000 at any time outstanding without the Required Lenders' consent;

(bb)    Liens (which shall rank junior to the Liens securing the Obligations) upon the specific real or personal property leased under operating leases in the Ordinary Course of Business by Borrower or any of its Subsidiaries in favor of the lessor created at the inception of the lease transaction, securing obligations of Borrower or any of its Subsidiaries under or in respect of such lease and extending to or covering only the property subject to such lease and improvements thereon;

(cc)    Liens that are contractual rights of set-off or rights of pledge (i) relating to the establishment of depository relations with banks or other deposit-taking financial institutions and not given in connection with the issuance of Debt, (ii) relating to pooled deposit or sweep accounts of Borrower or any of the other Obligors to permit partial satisfaction of overdraft or similar obligations incurred in the in the Ordinary Course of Business of Borrower or any of the other Obligors or (iii) relating to purchase orders and other agreements entered into with customers of any Subsidiary in the Ordinary Course of Business;

(dd)    Liens on cash and Cash Equivalents securing reimbursement obligations under letters of credit permitted hereunder;

(ee)    Liens in connection with any zoning, building or similar requirement of law or right reserved to or vested in any Governmental Authority to control or regulate the use of any or dimensions of any Subject Real Property or the structure thereon; and

(ff)    Liens, if any, on affected Bitcoin securing any Permitted BTC Hedging Agreement.

-97-

For the avoidance of doubt, notwithstanding anything else herein to the contrary, no Lien on any property or assets of any Obligor (including any Permitted Lien or Permitted Prior Lien (except, other than with respect to the First-Priority DIP Collateral, any Prior Senior Lien (as defined in the DIP Orders), if and solely to the extent provided pursuant to the DIP Order) shall rank pari passu with, or senior to, any Lien thereon granted in favor of the Administrative Agent or otherwise securing any of the Obligations.

10.2.3  <u>Distributions; Upstream Payments</u>.  Declare or make any Distributions, except for the following Distributions, if no Default or Event of Default shall exist or be continuing as of the time that such Distribution is made, or shall occur upon, or as a result of, such Distribution:

(a)  Upstream Payments;

(b)  Any Distribution or payment, the proceeds of which are contemporaneously used solely to pay Taxes imposed on or incurred by Borrower or any Obligor (so long as such Distribution or payment is accounted for as expenditures for purposes of **Section 10.1.12** and **Section 10.3.1**, in each case, to the same extent as if the Obligors had paid such amounts themselves);

(c)  Distributions, the proceeds of which are contemporaneously used solely to pay franchise and excise taxes attributable to Borrower and its Subsidiaries and reasonable and customary operating or overhead expenses required to maintain Borrower's and any Subsidiary's corporate or organizational existence during the Chapter 11 Cases, in each case, to the extent such Distributions are made in accordance with the Approved Budget and are accounted for as an expenditures for purposes of **Section 10.1.12** and **Section 10.3.1**, in each case, to the same extent as if Borrower or such Subsidiary had paid such amounts themselves; and

(d)  Any Distribution or payment in order to pay a Permitted Employment Arrangements, specifically identified in, and made in accordance with, the Approved Budget and the DIP Orders.

Borrower shall not create or permit to exist any encumbrance or restriction on the ability of a Subsidiary to make any Upstream Payment, except any Permitted Restriction or as otherwise consented to by the Administrative Agent.  Notwithstanding anything to the contrary, no Distribution or other payment shall be made (whether or not permitted hereunder) at any time from and after the Interim DIP Closing Date except in accordance with the Approved Budget, subject to the Permitted Variance.

10.2.4  <u>Restricted Investments</u>.  Make any Restricted Investment.

10.2.5  <u>Disposition of Assets</u>.  Make any Asset Disposition, except a Permitted Asset Disposition; <u>provided</u>, that, any proceeds thereof received at any time by Borrower or any Subsidiary thereof shall be maintained by them in accordance with this Agreement (it being agreed that, in the case of any proceeds in the form of cash or Cash Equivalents, the same shall at all times be held in a Deposit Account subject to a Control Agreement; provided, that, if any such cash or Cash Equivalents are initially received by Borrower or applicable Subsidiary in any other account, Borrower or applicable Subsidiary shall procure that such cash or Cash Equivalents shall be

transferred and deposited into a Deposit Account subject to a Control Agreement within one (1) Business Day of initial receipt); *provided*, *further*, that, no cash or Cash Equivalents shall be transferred out of any Deposit Account except if, and solely in the amount, required to (x) make a payment that constitutes a disbursement permitted pursuant to, and made in accordance with, the Approved Budget and in compliance with the Budget Covenant, or (y) make a prepayment or repayment of Obligations in accordance with **Section 5**. For the avoidance of doubt, the foregoing shall not be construed as permitting, and shall not operate as a consent or waiver with respect to, the consummation of any Asset Disposition, or the payment of any disbursement, in each case, that would not otherwise be permitted hereunder, or any Default or Event of Default resulting from the same, or any consequence thereof.

10.2.6  [Reserved].

10.2.7  Restrictions on Payment of Debt.  Make any payment (whether in cash, kind or consisting of any assets or interests or otherwise, including on account of or in respect of any principal payments, and whether voluntary or mandatory, or a prepayment, redemption, retirement, defeasance or acquisition), in each case, with respect to any Debt, except payments to the extent permitted by, and made in accordance with, the Approved Budget or the DIP Orders; provided that no such payment shall be permitted to be made on account of any Subordinated Debt (other than payments to be paid in kind), without the prior written consent of the Administrative Agent or as otherwise agreed to by the Administrative Agent in any applicable subordination agreement (with respect to any such payments being made in accordance with the terms of such subordination agreement).

10.2.8  Fundamental Changes.  Change its legal name; change its tax, charter or other organizational identification number; change its form or state of organization; liquidate, wind up its affairs or dissolve itself; or effect a Division, merge, combine or consolidate with any Person, whether in a single transaction or in a series of related transactions.

10.2.9  Subsidiaries.  Form or acquire any Subsidiary after the Petition Date; or permit any existing Subsidiary to issue any Equity Interests.

10.2.10  Organic Documents and Material Contracts.  Amend, modify or otherwise change (or in the case of Material Contracts, accept or reject) any of its Organic Documents or any Material Contract other than in the Ordinary Course of Business, in a manner that is not adverse to the Lenders or the Administrative Agent, and in each case, with prior written consent of the Administrative Agent and, if applicable, if the Obligors are permitted to reject any such Material Contracts pursuant to the Bankruptcy Code so long as it has been permitted in an approved Chapter 11 Order.

10.2.11  [Reserved].

10.2.12  Accounting Changes.  Make any material change in accounting treatment or reporting practices, except as required by GAAP and in accordance with **Section 1.2**; or change its Fiscal Year.

10.2.13  Restrictive Agreements.  Become a party to any Restrictive Agreement other than agreements containing solely Permitted Restrictions.

-99-

10.2.14    Hedging Agreements.  Enter into, amend or modify any Hedging Agreement (including, directly or indirectly, with respect to any notional amount, or any Swap Obligation or other obligation or exposure thereunder) at any time without the prior written consent of the Administrative Agent, or make any payment pursuant to, or in connection with, any Hedging Agreement (or any Swap Obligation or other obligation thereunder) except to the extent set forth in, and made in accordance with, the Approved Budget.  In no event shall any Obligor enter into any Hedging Agreement for speculative purposes. Notwithstanding the foregoing, this **Section 10.2.14** shall not restrict or otherwise limit any (i) sale of Bitcoin pursuant to clause (n) of the definition of Permitted Asset Disposition and **Section 10.2.5** or (ii) to the extent reviewed and approved in writing by the Administrative Agent prior to the entry into any such arrangement, Permitted BTC Hedging Agreement.

10.2.15    Conduct of Business.  Engage in any line of business other than lines of business substantially related to that conducted by it on the Interim DIP Order Date and any activities related, similar or incidental thereto or synergistic therewith.  No Obligor shall acquire any fee interest in any Real Estate other than the Subject Real Property.

10.2.16    Affiliate Transactions.  Enter into or be party to, or consummate any transaction with an Affiliate except (a) transactions expressly permitted by the Loan Documents, (b) payment of reasonable compensation to officers and employees for services actually rendered, and payment of customary directors' fees and indemnities (solely to the extent that payment thereof is in accordance with the Approved Budget), (c) the payment of reasonable fees to independent directors of Borrower or any Subsidiary, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers or employees of Borrower or their Subsidiaries in the Ordinary Course of Business, subject to the Approved Budget, (d) transactions solely among Obligors, (e) ongoing transactions with Affiliates that were entered into prior to the Petition Date and are set forth on **Schedule 10.2.16**, (f) transactions with Affiliates, which would otherwise permitted hereunder with any non-Affiliates, which are consummated in good faith upon approval thereof by such Obligor's board of directors (*provided*, that a copy of the resolution adopted by the majority of such board of directors approving such transaction and a certificate of a Senior Officer thereof certifying that such transaction complies with this sub-clause (f)), and on terms and pricing no less favorable than would be obtained in a comparable arm's-length transaction with a non-Affiliate; *provided*, that, without the Administrative Agent's prior written consent, the aggregate amount of payments or other obligation made pursuant to this clause (f) by any Obligor shall not exceed $500,000 per Fiscal Year, (g) Permitted Employment Arrangements and (h) transactions between or among Obligors; *provided*, that such transactions are intercompany transactions entered into in the Ordinary Course of Business as part of tax, accounting, pension, cash management and other administrative activities and not for the purpose of circumventing any covenant hereunder; *provided*, that, if such any transaction that shall otherwise be permitted under this **Section 10.2.16** gives rise to any payment or other obligation of the Obligors or any of their Subsidiaries in excess of $500,000 per Fiscal Year, the Administrative Agent's prior written approval shall be required notwithstanding that such transaction shall otherwise comply with the terms hereof.

10.2.17    Plans.  Become party to any Multiemployer Plan or Foreign Plan, other than any in existence on the Interim DIP Order Date.

-100-

10.2.18    Amendments to Subordinated Debt.  Amend, supplement or otherwise modify any document, instrument or agreement relating to any Subordinated Debt.

10.2.19    [Reserved].

10.2.20    Classification.  Borrower shall not take any action (or permit any parent entity or other Person Controlling Borrower to take any action at any time (including, but not limited to, an election under Treasury Regulations Section 301.7701-3)) that would result in a change in the tax classification of Borrower for U.S. federal income tax purposes.

10.2.21    Restricted Actions.  Notwithstanding anything else herein, the Obligors shall not (and shall not permit any of their respective Subsidiaries to) (i) incur any Debt, grant or permit to arise any Lien, make any Investment or Distribution, or (ii) undertake any Asset Disposition, Affiliate transaction or any other transaction, enter into or modify any Hedging Agreement, or take any other action or exercise any right or power, in each case, that is subject to the covenants contained in **Sections 10.2.1** through **10.2.20** (each, an "Applicable Transaction") except, in each case, solely if and to the extent that, no Default or Event of Default shall exist or be continuing prior to (or after giving effect to) such Applicable Transaction, and such Applicable Transaction (and any action in connection therewith) (x) does not violate any Applicable Law, and is in accordance with any applicable Chapter 11 Order (and, if any approval, authorization or consent, or any notice, motion, filing or other action, as the case may be, is required to cause such Applicable Transaction to be permitted during the pendency of the Chapter 11 Cases (each of the foregoing, a "Chapter 11 Approval"), the Debtors shall have obtained all such Chapter 11 Approvals prior to consummating such Applicable Transaction and shall consummate the same in accordance with the requirements thereof), (y) is undertaken by the applicable Obligor (or by the Subsidiaries of the Obligors involved therein) acting in good faith, and (z) is effectuated or consummated in the Ordinary Course of Business and in accordance with prudent business practices of the Obligors; *provided*, that, except in connection with making a payment not in violation of the foregoing, the Obligors shall not (and shall not permit any of their respective Subsidiaries to) transfer any funds (other than such funds to pay payroll) from any account that is (or is required to be) subject to a Control Agreement in favor of the Administrative Agent into any account that is not subject to a Control Agreement in favor of the Administrative Agent.

10.2.22    Immaterial Subsidiaries.

(a)    permit any Immaterial Subsidiary to (i) engage in any business activities or own any property (real or personal) or assets (in each case, of whatever nature), (ii) create, incur, assume or suffer to exist any Debt or (iii) create or permit to exist any Lien on any of its real or personal properties, assets or rights of whatever nature (whether now owned or hereafter acquired).

(b)    Shall not, and shall not permit any other Obligor to, make any Investment, Distribution or enter into any other transaction of any nature whatsoever with any Immaterial Subsidiary.

10.2.23    Use of Proceeds.  Permit any Loan, Collateral or any portion of the Carve-Out or Carve-Out Account to be used directly or indirectly by any Obligor, any official

-101-

committee appointed in the Chapter 11 Cases, or any trustee appointed in the Chapter 11 Cases or any successor cases, including any chapter 7 cases, or any other person, party or entity for any purpose other than as permitted hereby and pursuant to the Final Orders.

**10.3. Financial Covenants**.

From and after the Interim DIP Order Date to and until Full Payment hereunder:

10.3.1 <u>Permitted Variances</u>. Obligors shall not permit or cause, for any Performance Period, (i) the Receipts Variance to exceed twenty-five percent (25%) (as compared to budget) or (ii) the Disbursements Variance to exceed 20% (as compared to budget). The covenants and requirements set forth in this **Section 10.3.1** being, the "<u>Budget Covenant</u>".

10.3.2 <u>Minimum Liquidity</u>. Obligors shall not permit or cause the aggregate amount of Liquidity to be less than $5,000,000 at any time (the requirements hereof, the "<u>Liquidity Covenant</u>", and, the Liquidity Covenant, together with the Budget Covenant, the "<u>Financial Covenant</u>").

10.3.3 <u>Permitted Obligations and Disbursements</u>. Obligors shall not incur any payment obligation, or make any payment or disbursement (whether voluntary or on account of any obligation, Investment, Distribution or otherwise), unless, in each case, (a) the applicable payment or disbursement is identified in, and made in accordance with, the Approved Budget, (b) pro forma for such payment or disbursement, the Obligors shall be in compliance with the Financial Covenant, and (c) no Default or Event of Default shall exist or be continuing at the time of, or shall arise or result from, such payment or disbursement.

For the avoidance of doubt, any incurrence of any obligation, or any payment or distribution or disbursement or (as relating to clause (y) below) the existence of such other condition, as applicable, by or with respect to any of Borrower and its Subsidiaries (x) other than as set forth in the Approved Budget and (y) results in an applicable Budget Variance in excess of the Permitted Variances permitted by the Budget Covenant shall, in each case, constitute a default under **Section 10.3**, and an immediate Event of Default under **Section 11.1(d).** Notwithstanding anything in any Loan Document or in any Approved Budget to the contrary, Borrower may make deposits into, and allow disbursements from, the Carve-Out Account to fund professional fees and expenses to the extent permitted by the DIP Orders.

**10.4. Chapter 11 Cases**.

From and after the Interim DIP Order Date to and until Full Payment, Obligors shall not:

(a) Other than the claims and Liens of the Administrative Agent arising from this Agreement, and other than the adequate protection claims or Liens provided in the DIP Orders, as applicable, and except for the Carve-Out, incur, create, assume, suffer to exist or permit, or file any motion seeking, any other DIP Superpriority Claim which is pari passu with, or senior to the claims and Liens of, the Administrative Agent and Lenders.

-102-

(b)     Make or permit to be made any amendment or change to the DIP Orders, as applicable, without the prior written consent of the Administrative Agent and the Required Lenders.

(c)     Commence any adversary proceeding, contested matter or other action asserting any claims or defenses or otherwise against the Administrative Agent or any Lender with respect to any Loan Document, or any of the liens, claims, rights, benefits or protections granted hereunder or thereunder, or any of the transactions contemplated hereby or thereby.

(d)     Make (i) any Prepetition "critical vendor" payments or other payments on account of any creditor's Prepetition unsecured claim, (ii) payments on account of claims or expenses arising under section 503(b)(9) of the Bankruptcy Code or (iii) payments under any management incentive plan or on account of claims or expenses arising under section 503(c) of the Bankruptcy Code, except in amounts and on terms and conditions that (a) are approved by the Bankruptcy Court after notice and a hearing, and (b) are expressly permitted by, and in compliance with, the terms of the Loan Documents (including the Budget Covenant and the Approved Budget, subject to any Permitted Variance), or otherwise with the prior written consent of the Administrative Agent and the Required Lenders.

(e)     File any material motion or application with the Bankruptcy Court with regard to actions taken outside the Ordinary Course of Business of the Debtors without consulting with the Administrative Agent and providing the Administrative Agent and the Lenders prior (in any case, not less than two (2) Business Days' (or as soon as reasonably practicable if two (2) Business Days in advance is not reasonably practicable)) notice and the opportunity to review and comment on each such motion.

(f)     Subject to the applicable DIP Order, object to, contest, delay, prevent, or interfere in any manner with, the exercise of any rights and remedies by the Administrative Agent or the Lenders with respect to the Collateral following the occurrence and during the continuance of an Event of Default.

## SECTION 11.     **EVENTS OF DEFAULT; REMEDIES ON DEFAULT**

**11.1.   Events of Default**.  Each and any one or more of the following shall be an "Event of Default" if it occurs or exists for any reason whatsoever, whether voluntary or involuntary, by operation of law or otherwise, in each case, at any time from and after the Interim DIP Order Date to and until Full Payment:

(a)     Borrower or any Obligor shall fail to pay any principal of any Loan, or any Exit Premium (or portion thereof) when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)     Borrower or any Obligor shall fail to pay any interest on any Loan or any fee or any other Obligation (other than an amount referred to in clause (a) above) payable under any Loan Document, within three (3) Business Days after the same shall become due and payable;

-103-

(c)      any representation or warranty of an Obligor made in any Loan Document shall be false or misleading in any material respect when given;

(d)      any Obligor or Subsidiary shall breach, or fail to perform, or default under, any covenant applicable to it contained in **Section 6.3, 7.2, 7.3, 8.2.4, 8.2.5, 8.5, 8.6.1, 10.1.1, 10.1.12, 10.1.14, 10.1.15, 10.2, 10.3** or **10.4;**

(e)      any Obligor shall breach, or fail to perform, or default under, any other covenant contained herein or in any Loan Documents, and such breach, failure or default is not cured within 30 days (or 10 days in the case of a breach of **Section 10.1.2**) after a Senior Officer of such Obligor or Subsidiary has knowledge thereof or receives notice thereof from the Administrative Agent, whichever is sooner; *provided, however*, that such notice and opportunity to cure shall not apply if the breach, failure to perform or default is not capable of being cured within such period;

(f)      any Guarantor repudiates, revokes or attempts to revoke its Guaranty; an Obligor denies or contests the validity or enforceability of any Loan Documents or Obligations, or the perfection or priority of any Lien granted to the Administrative Agent; any Loan Document ceases to be in full force or effect for any reason (other than a waiver or release by the Administrative Agent and Lenders and other than in accordance with the terms of this Agreement); any lien created hereunder or under the Security Documents ceases to be a valid and perfected lien (other than as a result of any action or inaction by the Administrative Agent and other than by reason of a release of Collateral in accordance with the terms hereof or thereof or Full Payment) or the Obligations cease to be DIP Superpriority Claim;

(g)      any "Event of Default" (in each case, as defined in the Prepetition Note Purchase Agreements) occurs under any Prepetition Note Purchase Agreement, or any breach or default of an Obligor or Subsidiary occurs under any Hedging Agreement or under any instrument or agreement to which it is a party or by which it or any of its properties is bound, in each case, relating to any Debt (other than the Obligations) or other payment obligation in excess of $5,000,000 (in the case of any Hedging Agreement, determined on a net basis), and as a result thereof the maturity of or any payment with respect to such Debt or other payment obligation is or may be accelerated or demanded due or otherwise required to be paid prior to its stated maturity, in each case, due to such breach;

(h)      any judgment or order is entered against an Obligor or Subsidiary for the payment of money in an amount that exceeds, individually or cumulatively with all unsatisfied judgments or orders against all Obligors and Subsidiaries, $5,000,000 (excluding amounts of insurance coverage therefor that has not been denied by the insurer, or subject to another contractual indemnity arrangement reasonably acceptable to the Administrative Agent, and available to the Obligors for payment of such liabilities), and shall remain undischarged, unvacated, unbonded or unstayed for a period of sixty consecutive days;

(i)      an Obligor or Subsidiary is enjoined, restrained or in any way prevented by any Governmental Authority from conducting any part of its business which would have or could reasonably be expected to have a Material Adverse Effect; there is a cessation of any part of an Obligor's or Subsidiary's business which would have or which could reasonably be expected to

-104-

have a Material Adverse Effect; a material portion of the Collateral or real or personal property of an Obligor or Subsidiary is taken or impaired through condemnation the effect of which would have or which could reasonably be expected to have a Material Adverse Effect;

(j)      an Insolvency Proceeding is commenced by (including by joining any such proceeding) an Obligor; an Obligor makes an offer of settlement, extension or composition to its unsecured creditors generally; a trustee is appointed to take possession of any substantial real or personal property of or to operate any of the business of an Obligor; or an Insolvency Proceeding is commenced against an Obligor, and the Obligor consents to institution of the proceeding, the petition commencing the proceeding is not timely contested by the Obligor, the petition is not dismissed within 60 days after filing, or an order for relief approving such Insolvency Proceeding is entered in the proceeding; *provided*, *however*, that the Chapter 11 Cases shall not constitute an Event of Default pursuant to this clause (j);

(k)      an ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan that has resulted or could reasonably be expected to result in liability of an Obligor to a Pension Plan, Multiemployer Plan or PBGC, or that constitutes grounds for appointment of a trustee for or termination by the PBGC of any Pension Plan or Multiemployer Plan to the extent the foregoing would have or could reasonably be expected to have a Material Adverse Effect; an Obligor or ERISA Affiliate fails to pay when due any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan to the extent the foregoing would have or could reasonably be expected to have a Material Adverse Effect; or any event similar to the foregoing occurs or exists with respect to a Foreign Plan to the extent the foregoing would have or could reasonably be expected to have a Material Adverse Effect;

(l)      any Obligor is criminally convicted for (i) a felony committed in the conduct of the Obligor's business, or (ii) violating any state or federal law (including the Controlled Substances Act, Money Laundering Control Act of 1986 and Illegal Exportation of War Materials Act) that would have or that could reasonably be expected to have a Material Adverse Effect;

(m)      Borrower does not immediately (i) prepay, or cause to be prepaid, the Loans, and (ii) terminate, or cause to be terminated, the Commitments upon the occurrence of a Change of Control pursuant to **Section 5.3.3** hereof or in any amount less than as set forth thereunder;

(n)      [reserved];

(o)      [reserved];

(p)      there shall have occurred any of the following in the Chapter 11 Cases:

(i)      the bringing of a motion by any Obligor in the Chapter 11 Cases, or the entry of any order by the Bankruptcy Court in the Chapter 11 Cases: (A) obtaining additional financing under section 364(c) or (d) of the Bankruptcy Code that does not provide for the repayment of all Obligations under this Agreement in full in cash (including the Exit Premium); (B) granting any Lien other than Liens expressly permitted under this Agreement upon or affecting any Collateral; (C) except as provided in this Agreement, the Interim DIP Order or the Final DIP

Order, as the case may be, authorizing use of cash collateral of the Administrative Agent under section 363(c) of the Bankruptcy Code without the prior written consent of the Administrative Agent and the Required Lenders; or (D) that (in the case of any Obligor) requests or seeks authority for or that (in the case of an order entered by the Bankruptcy Court on account of a request by any Obligor) approves or provides authority to take any other action or actions adverse to the rights and remedies of the Administrative Agent and the Lenders hereunder or their interest in the Collateral;

(ii)    the filing by any Obligor of (A) any disclosure statement or other document or instrument relating to any Chapter 11 Plan that is not an Acceptable Chapter 11 Plan, or (B) any direct or indirect amendment to any disclosure statement or other document or instrument relating to any Acceptable Chapter 11 Plan that would cause the same to cease to constitute an Acceptable Chapter 11 Plan;

(iii)    the modification, expiry or termination of any Obligor's exclusive right to file and solicit acceptances of a Chapter 11 Plan without the prior written consent of the Administrative Agent and the Lenders;

(iv)    the entry of an order in any of the Chapter 11 Cases confirming a Plan that does not constitute an Acceptable Chapter 11 Plan;

(v)    any Obligor seeks authorization from the Bankruptcy Court for the entry in the Chapter 11 Cases of any order, or the entry of an order in the Chapter 11 Cases, in either case, amending, supplementing, staying, vacating or otherwise modifying any Loan Document or the DIP Orders or impairing the rights, privileges, benefits or protections of the Administrative Agent and the Lenders under the DIP Orders or the Loan Documents, in each case, without the prior written consent of the Administrative Agent and the Required Lenders;

(vi)    the payment of, or application by any Obligor for authority to pay, any Prepetition Debt or other Prepetition claim without the Required Lenders' prior written consent other than (A) as provided in any "first day order", (B) as permitted by any order of the Bankruptcy Court reasonably satisfactory to the Administrative Agent, or (C) to the extent such payment is expressly permitted pursuant to this Agreement or consented to by the Administrative Agent and the Required Lenders in writing;

(vii)    the entry of an order by the Bankruptcy Court appointing, or the filing of an application by any Obligor for an order seeking the appointment of, in either case, without the prior written consent of the Administrative Agent and the Required Lenders, an interim or permanent trustee in any of the Chapter 11 Cases or the appointment of a receiver or an examiner under section 1104 of the Bankruptcy Code in the Chapter 11 Cases, with expanded powers (including any powers beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) to operate or manage the financial affairs, the business, or reorganization of Borrower or with the power to conduct an investigation of (or compel discovery from) any of the Secured Parties or against any of the Prepetition Secured Parties; or the sale without the Required Lenders' prior written consent, of any Obligor's assets (including through a sale under section 363 of the Bankruptcy Code), except to the extent expressly permitted hereunder and the DIP Orders;

(viii)    the dismissal of the Chapter 11 Cases which does not contain a provision for Full Payment, or any Obligor shall file a motion or other pleading seeking the dismissal of the Chapter 11 Cases that does not contain a provision for Full Payment;

(ix)    the conversion of any Chapter 11 Case from a case under chapter 11 of the Bankruptcy Code to a case under chapter 7 of the Bankruptcy Code, or into any other bankruptcy proceeding under any Bankruptcy Law, as applicable, or any Obligor shall file a motion or other pleading seeking the conversion of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise;

(x)    the entry of an order by the Bankruptcy Court, as applicable, granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any Collateral of which the Fair Market Value exceeds (when aggregated with any Collateral of any other creditor granted relief from the automatic stay as contemplated by this clause (x)) $20,000,000, in the aggregate; provided however that any such order with respect the assets of either (i) Blockfi Lending LLC ("Blockfi") or (ii) NYDIG ABL LLC or either of their affiliates (so long as (1) relating solely to such equipment financed and sold to the Obligors by such party or, in the case of Blockfi, relating to the debt owing to Blockfi pursuant to its agreements with the Obligors as in effect prior to the Petition Date and (2) such arrangement shall not result in the improvement of enhancement of such party's claims in the Chapter 11 Cases or its Lien or priority position with respect to any of the DIP Collateral) shall not constitute an Event of Default pursuant to this provision, or (y) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority having priority over the Liens in favor of the Administrative Agent, subject to any Permitted Liens;

(xi)    the entry of an order in the Chapter 11 Case, avoiding, recharacterizing, subordinating, disgorging or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents, or the making, institution or commencement of any filing, action or suit by any Debtor seeking the taking of any such action;

(xii)    the failure of any Obligor to perform any of its obligations under the Interim DIP Order or the Final DIP Order or any violation of any of the terms of the Interim DIP Order or the Final DIP Order, subject to any applicable grace or cure periods;

(xiii)    the challenge (or support) in writing by any Obligor to (and/or the entry of an order of the Court impairing or modifying in any manner) the validity, enforceability, extent, perfection or priority of any liens or claims granted under the Prepetition Loan Documents, the DIP Orders or the Loan Documents;

(xiv)    the entry of an order in any of the Chapter 11 Cases granting any super priority administrative claim or Lien equal or superior to that granted to the Administrative Agent, on behalf of itself and the Lenders, without the consent in writing of the Administrative Agent and the Required Lenders, except (A) in respect of the Carve-Out in accordance with the DIP Orders and (B) as expressly provided in the DIP Orders;

(xv)     the filing of a motion by any Obligor requesting, or the entry of any order granting, any super-priority administrative expense claim which is senior to or pari passu with the Lenders' claims or with the claims of the Prepetition Secured Parties without the consent in writing of the Administrative Agent and the Required Lenders, except (A) in respect of the Carve-Out and (B) as expressly provided in the DIP Orders;

(xvi)     the entry of an order precluding the Administrative Agent from having the right to or being permitted to "credit bid" with respect to the assets of the Obligors;

(xvii)  any attempt by any Obligor (including by joining any other party in any such attempt or supporting any motion by any other party) to (i) reduce (other than a reduction in accordance with the terms of this Agreement), avoid, set off or subordinate the Obligations or the Liens securing such Obligations to any other debt, (ii) to disallow all or any party of the Obligations, (iii) to contest any provision of any Loan Documents or the DIP Order, or (iv) challenging the rights and remedies of the Administrative Agent or the Lenders under the Loan Documents or the DIP Orders or otherwise acting in a manner inconsistent with the Loan Documents and the DIP Orders;

(xviii)  the reversal, vacatur, or stay of the effectiveness of either the Interim DIP Order or the Final DIP Order or any provision thereof without the written consent of the Administrative Agent and the Required Lenders;

(xix)    the payment of, or granting adequate protection (except as expressly contemplated by the DIP Orders) with respect to, any Prepetition NPA Facility Debt or other Prepetition Debt;

(xx)     an application for any of the orders described in this **Section 11.1(p)** shall be (a) made, joined in or supported by any of the Obligors or (b) made by any other Person (other than the Administrative Agent or the Lenders) and such application is not, to the extent requested by the Administrative Agent or the Lenders, contested by the Obligors in good faith, and the relief requested is granted in an order that is not stayed pending appeal;

(xxi)    cessation of the Administrative Agent's Liens or super-priority claims granted with respect to this Agreement and the DIP Orders to be valid, perfected (in the case of any Liens) and enforceable in all respects or to have the priority as specified in the herein and in the DIP Orders;

(xxii)  the entry of an order (a) surcharging any of the Collateral under Section 105, Section 506(c) or any other section of the Bankruptcy Code, (b) allowing any administrative expenses claim having priority over or ranking in equal priority with the Obligations or the rights of the Administrative Agent and the Lenders or (c) resulting in the marshaling of any Collateral; or

(xxiii) the Bankruptcy Court shall cease to have exclusive jurisdiction with respect to all matters relating to the exercise of rights and remedies under the Loan Documents, the DIP Orders, the Liens granted under the Security Documents and the Collateral.

      **11.2.**   **Remedies upon Default**.

      11.2.1 <u>Remedies Generally</u>.  If an Event of Default described in **Section 11.1(j)** occurs with respect to any Obligor, then to the extent permitted by Applicable Law, all Obligations shall become automatically due and payable, and all Commitments shall terminate, without any action by the Administrative Agent or notice of any kind.  In addition, if, when and as permitted by the DIP Orders or if any other Event of Default has occurred and exists, the Administrative Agent may in its discretion (and shall upon written direction of Required Lenders) do any one or more of the following from time to time (in addition to any and all other things as provided elsewhere in **Section 11.2**):

      (a)     declare any Obligations (including the Exit Premium and all premiums thereon) to be immediately due and payable, whereupon they shall be due and payable without diligence, presentment, demand, protest or notice of any kind, all of which are hereby waived by Borrower to the fullest extent permitted by law;

      (b)     terminate, reduce or condition any Commitment;

      (c)     require the Obligors to cash collateralize then outstanding Obligations; and

      (d)     exercise any other rights, remedies, powers and privileges afforded under the Loan Documents or any other agreement, pursuant to the DIP Orders and any other Chapter 11 Order, by law (including under the Bankruptcy Code and other Applicable Law), at equity and otherwise, including the rights and remedies of a secured party under the UCC.

      11.2.2 <u>Disposition of Collateral</u>.  Without limiting the generality of the foregoing, the Administrative Agent may, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by the Interim DIP Order or the Final DIP Order, as applicable) to or upon any Obligor or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived (except as required by the Interim DIP Order or the Final DIP Order, as applicable)), during the continuance of any Event of Default (personally or through its agents or attorneys), to the maximum extent permitted under the Bankruptcy Code and other Applicable Law (including the DIP Orders): (i) enter upon the premises where any Collateral is located, without any obligation to pay rent, through self-help, without judicial process, without first obtaining a final judgment or giving any Obligor or any other Person notice or opportunity for a hearing on the Administrative Agent's claim or action, (ii) collect, receive, appropriate and realize upon any Collateral, (iii) sell, grant any option to purchase, and/or deliver any Collateral (in its then condition, or after any further manufacturing or processing thereof) (and enter into contractual obligations to do any of the foregoing), in lots or in bulk, in one or more parcels, at public or private sale or sales, at any exchange, broker's board or office of any Secured Party or elsewhere, upon such terms and conditions, and at such prices, as it may deem necessary, prudent or advisable, for cash or on credit or for future delivery (or any combination thereof), or without charge, and/or without assumption of any credit risk, and any of the foregoing may be adjourned from time to time in accordance with Applicable Law, and the Administrative Agent shall have the right to purchase all or any portion of the Collateral free of any right or equity of redemption of any Obligor, which right or equity is hereby waived and

released, at any public or, if permitted by law, private sale and, in lieu of actual payment of the purchase price, may credit bid and set off the amount of such price against the Obligations, (iv) withdraw all cash and Cash Equivalents in any Deposit Account, Commodity Account or Securities Account (including any DIP Funding Account) of a Obligor and apply such cash and Cash Equivalents and other cash, if any, and other securities, then held by it as Collateral in satisfaction of the Obligations, and (v) give notice and take sole possession and control of all amounts on deposit in or credited to any Deposit Account, Commodity Account or Securities Account pursuant to the related Control Agreement.

        11.2.3 <u>Management of Collateral</u>.  Each Obligor further agrees that, during the continuance of any Event of Default, (i) at the Administrative Agent's request, it shall assemble the Collateral and make it available to the Administrative Agent at places that the Administrative Agent shall reasonably select, whether at such Obligor's premises or elsewhere, (ii) without limiting the foregoing, the Administrative Agent also has the right to require that each Obligor store and keep any Collateral pending further action by the Administrative Agent and, while any such Collateral is so stored or kept, provide such guards and maintenance services as shall be necessary to protect the same and to preserve and maintain such Collateral in good condition, (iii) until the Administrative Agent is able to sell any Collateral, the Administrative Agent shall have the right to hold or use such Collateral to the extent that it deems appropriate for the purpose of preserving the Collateral or its value or for any other purpose deemed appropriate by the Administrative Agent, and (iv) the Administrative Agent may, if it so elects, seek the appointment of a receiver or keeper to take possession of any Collateral and to enforce any of the Administrative Agent's remedies (for the benefit of the Lenders), with respect to such appointment without prior notice or hearing as to such appointment.  The Administrative Agent shall not have any obligation to any Obligor to maintain or preserve the rights of any Obligor as against third parties with respect to any Collateral while such Collateral is in the possession of the Administrative Agent.

        11.2.4 <u>Direct Obligation</u>.  Neither the Administrative Agent nor any other Secured Party shall be required, subject to the DIP Orders, to make any demand upon, or pursue or exhaust any right or remedy against, any Obligor or any other Person with respect to the payment of the Obligations or to pursue or exhaust any right or remedy with respect to any Collateral therefor or any direct or indirect guaranty thereof.  All of the rights and remedies of the Administrative Agent and any other Secured Party under any Loan Document shall be cumulative, may be exercised individually or concurrently and not exclusive of any other rights or remedies provided by any Applicable Law.  To the extent it may lawfully do so, each Obligor absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against the Administrative Agent or any Lender or other Secured Party, any valuation, stay, appraisement, extension, redemption or similar laws and any and all rights or defenses it may have as a surety, now or hereafter existing, arising out of the exercise by them of any rights hereunder.  If any notice of a proposed sale or other disposition of any Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least 10 calendar days before such Sale or other disposition.

        11.2.5 <u>Commercially Reasonable</u>.  To the extent that any Applicable Law imposes duties on the Administrative Agent to exercise remedies in a commercially reasonable manner, each Obligor acknowledges and agrees that the Administrative Agent shall be deemed to have complied with such duties even if it shall:

-110-

(i)      fail to incur significant costs, expenses or other liabilities reasonably deemed as such by the Administrative Agent to prepare any Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition;

(ii)      fail to obtain permits, or other consents, for access to any Collateral to sell or for the collection or sale of any Collateral, or, if not required by other Applicable Law, fail to obtain permits or other consents for the collection or disposition of any Collateral;

(iii)      fail to exercise remedies against account debtors or other Persons obligated on any Collateral or to remove Liens on any Collateral or to remove any adverse claims against any Collateral;

(iv)      advertise dispositions of any Collateral through publications or media of general circulation, whether or not such Collateral is of a specialized nature or to contact other Persons, whether or not in the same business as any Obligor, for expressions of interest in acquiring any such Collateral;

(v)      exercise collection remedies against account debtors and other Persons obligated on any Collateral, directly or through the use of collection agencies or other collection specialists, hire one or more professional auctioneers to assist in the disposition of any Collateral, whether or not such Collateral is of a specialized nature or, to the extent deemed appropriate by the Administrative Agent, obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Administrative Agent in the collection or disposition of any Collateral, or utilize Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets to dispose of any Collateral;

(vi)      dispose of assets in wholesale rather than retail markets;

(vii)      disclaim disposition warranties, such as title, possession or quiet enjoyment; or

(viii)      purchase insurance or credit enhancements to insure the Administrative Agent against risks of loss, collection or disposition of any Collateral or to provide to the Administrative Agent a guaranteed return from the collection or disposition of any Collateral.

### 11.2.6 <u>Accounts and Payments in Respect of General Intangibles</u>.

(a)      In addition to, and not in substitution for, any other provision in this Agreement, if required by the Administrative Agent at any time during the continuance of an Event of Default, on and after the date on which at least one deposit account or securities account has been established, any payment of accounts or payment in respect of general intangibles, when collected by any Obligor, shall be promptly (and, in any event, within two (2) Business Days) deposited by such Obligor in the exact form received, duly indorsed by such Obligor to the Administrative Agent, in the DIP Funding Account or such other account, subject to withdrawal

-111-

by the Administrative Agent as provided herein. Until so turned over, such payment shall be held by such Obligor in trust for the Administrative Agent, segregated from other funds of such Obligor. Each such deposit of proceeds of accounts and payments in respect of general intangibles shall be accompanied by a report identifying in reasonable detail the nature and source of the payments included in the deposit.

(b)     At any time during the continuance of an Event of Default:

(i)     each Obligor shall, upon the Administrative Agent's written request, deliver to the Administrative Agent all original and other documents evidencing, and relating to, the contractual obligations and transactions that gave rise to any account or any payment in respect of general intangibles, including all original orders, invokes and shipping receipts and notify account debtors that the accounts or general intangibles have been collaterally assigned to the Administrative Agent and that payments in respect thereof shall be made directly to the Administrative Agent;

(ii)     the Administrative Agent may, without notice, at any time during the continuance of an Event of Default, limit or terminate the authority of an Obligor to collect its accounts or amounts due under general intangibles or any thereof and, in its own name or in the name of others, communicate with account debtors to verify with them to the Administrative Agent's reasonable satisfaction the existence, amount and terms of any account or amounts due under any general intangible. In addition, the Administrative Agent may at any lime enforce such Obligor's rights against such account debtors and obligors of general intangibles; and

(iii)     each Obligor shall take all actions, deliver all documents and provide all information necessary or reasonably requested by the Administrative Agent to ensure any Internet domain name is registered.

(c)     Anything herein to the contrary notwithstanding, each Obligor shall remain liable under each account and each payment in respect of general intangibles to observe and perform all the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise thereto. No Secured Party shall have any obligation or liability under any agreement giving rise to an account or a payment in respect of a general intangible by reason of or arising out of any Loan Document or the receipt by any Secured Party of any payment relating thereto, nor shall any Secured Party be obligated in any manner to perform any obligation of any Obligor under or pursuant to any agreement giving rise to an account or a payment in respect of a general intangible, to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party thereunder, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts that may have been assigned to it or to which it may be entitled at any time or times.

11.2.7 <u>Proceeds to be Turned over to and Held by the Administrative Agent</u>. Unless otherwise expressly provided in this Agreement, upon the occurrence and during the continuance of an Event of Default, all proceeds of any Collateral received by any Obligor hereunder in cash or Cash Equivalents shall be held by such Obligor in trust for the Administrative Agent and the Lenders, segregated from other funds of such Obligor, and shall, promptly upon

11231624v19

receipt by any Obligor, be turned over to the Administrative Agent in the exact form received (with any necessary endorsement).

11.2.8 <u>Deficiency</u>. Each Obligor shall remain liable for any deficiency if the proceeds of any sale or other disposition of any Collateral are insufficient to pay the Obligations and the fees and disbursements of any attorney employed by the Administrative Agent or any other Lender Party to collect such deficiency.

**11.3. Setoff**. At any time during an Event of Default, the Administrative Agent, Lenders, and any of their Affiliates are authorized, to the fullest extent permitted by Applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by the Administrative Agent, such Lender or such Affiliate to or for the credit or the account of an Obligor against any Obligations, irrespective of whether or not the Administrative Agent, such Lender or such Affiliate shall have made any demand under this Agreement or any other Loan Document and although such Obligations may be contingent or unmatured or are owed to a branch or office of the Administrative Agent, such Lender or such Affiliate different from the branch or office holding such deposit or obligated on such indebtedness, *provided*, that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of **Section 4.2.1(b)** and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent, and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of the Administrative Agent, each Lender and each such Affiliate under this Section are in addition to other rights and remedies (including other rights of setoff) that such Person may have. NOTWITHSTANDING THE FOREGOING, NO LENDER AND NO PARTICIPANT SHALL EXERCISE ANY RIGHT OF SETOFF, BANKER'S LIEN, OR THE LIKE AGAINST ANY DEPOSIT ACCOUNT OR PROPERTY OF ANY OBLIGOR HELD OR MAINTAINED BY SUCH PERSON WITHOUT THE WRITTEN CONSENT OF THE ADMINISTRATIVE AGENT.

**11.4. Remedies Cumulative; No Waiver**.

11.4.1 <u>Cumulative Rights and Remedies</u>. All agreements, warranties, guaranties, indemnities and other undertakings of the Obligors under the Loan Documents are cumulative and not in derogation of each other. The rights and remedies of the Administrative Agent and Lenders are cumulative, may be exercised at any time and from time to time, concurrently or in any order, and are not exclusive of any other rights or remedies available by agreement, by law, at equity or otherwise. All such rights and remedies shall continue in full force and effect until Full Payment of all Obligations. Each Obligor acknowledges that the purpose of **Section 11.2** is, among other things, to provide a non-exhaustive list of actions or omissions that are commercially reasonable when exercising remedies against any Collateral and that other actions or omissions by the Secured Parties shall not be deemed commercially unreasonable solely on account of not being indicated in such clauses.

11.4.1 <u>Waivers</u>. No waiver or course of dealing shall be established by (a) the failure or delay of the Administrative Agent or any Lender to require strict performance by Borrower or any other Obligor with any terms of the Loan Documents, or to exercise any rights or remedies with respect to Collateral or otherwise; (b) the making of any Loan during a Default, Event of Default or other failure to satisfy any conditions precedent; or (c) acceptance by the Administrative Agent or any Lender of any payment or performance by an Obligor under any Loan Documents in a manner other than that specified therein. It is expressly acknowledged by Borrower that any failure to satisfy a financial covenant on a measurement date shall not be cured or remedied by satisfaction of such covenant on a subsequent date; *provided*, *however*, that notwithstanding anything in any Loan Document to the contrary, the exercise of rights and remedies following an Event of Default by the Administrative Agent and Lenders shall be subject to the DIP Orders.

## SECTION 12.    THE ADMINISTRATIVE AGENT

### 12.1.    Appointment, Authority and Duties of the Administrative Agent.

12.1.1 <u>Appointment and Authority</u>. Each Secured Party appoints and designates B. Riley Commercial Capital, LLC, as the Administrative Agent under all Loan Documents. The Administrative Agent may, and each Secured Party authorizes the Administrative Agent to, enter into all Loan Documents to which the Administrative Agent is intended to be a party and accept all Security Documents, for the benefit of Secured Parties. Any action taken by the Administrative Agent in accordance with the provisions of the Loan Documents, and the exercise by the Administrative Agent of any rights or remedies set forth therein, together with all other powers reasonably incidental thereto, shall be authorized by and binding upon all Secured Parties. Without limiting the generality of the foregoing, the Administrative Agent shall have the sole and exclusive authority to (a) act as the disbursing and collecting agent for Lenders with respect to all payments and collections arising in connection with the Loan Documents; (b) execute and deliver as the Administrative Agent each Loan Document, including any intercreditor or subordination agreement, and accept delivery of each Loan Document; (c) to execute, deliver and perform any intercreditor agreement in respect of this Facility or the Liens granted pursuant to the Security Documents or the DIP Orders, in each case under this clause (c) to the extent such agreement, amendment or restatement has been approved in writing by the Required Lenders; (d) act as collateral agent for Secured Parties for purposes of perfecting and administering Liens under the Loan Documents, and for all other purposes stated therein; (e) manage, supervise or otherwise deal with Collateral; and (f) take any Enforcement Action or otherwise exercise any rights or remedies with respect to any Collateral or under any Loan Documents, Applicable Law or otherwise. The duties of the Administrative Agent are ministerial and administrative in nature only, and the Administrative Agent shall not have a fiduciary relationship with any Secured Party, Participant or other Person, by reason of any Loan Document or any transaction relating thereto.

12.1.2 <u>Duties</u>. The Administrative Agent shall not have any duties except those expressly set forth in the Loan Documents. The conferral upon the Administrative Agent of any right shall not imply a duty to exercise such right, unless instructed to do so by Lenders in accordance with this Agreement.

-114-

11231624v19

12.1.3 <u>Agent Professionals</u>. The Administrative Agent may perform its duties through agents and employees. The Administrative Agent may consult with and employ Agent Professionals, and shall be entitled to act upon, and shall be fully protected in any action taken in good faith reliance upon, any advice given by an Agent Professional. The Administrative Agent shall not be responsible for the negligence or misconduct of any agents, employees or Agent Professionals selected by it with reasonable care.

12.1.4 <u>Instructions of Required Lenders; Action by the Administrative Agent</u>. The rights and remedies conferred upon the Administrative Agent under the Loan Documents may be exercised without the necessity of joinder of any other party, unless required by Applicable Law. In determining compliance with a condition for any action hereunder, including satisfaction of any condition in **Section 6**, the Administrative Agent may presume that the condition is satisfactory to a Secured Party unless the Administrative Agent has received notice to the contrary from such Secured Party before the Administrative Agent takes the action. The Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by any other Loan Document that it is required to exercise in writing as directed by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in **Section 14.1**) and in all cases it shall be fully justified in failing or refusing to act hereunder or under any other Loan Documents unless it shall (a) receive written instructions from the Required Lenders or the Lenders, as applicable, (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in **Section 14.1**) specifying the action to be taken and (b) be indemnified to its satisfaction by the Lenders against any and all liability and expenses that may be incurred by it by reason of taking or continuing to take any such action. The instructions as aforesaid and any action taken or failure to act pursuant thereto shall be binding on all of the Lenders. Notwithstanding the foregoing, the Administrative Agent may request instructions from Required Lenders or other Secured Parties with respect to any act (including the failure to act) in connection with any Loan Documents or Collateral, and may seek assurances to its satisfaction from Secured Parties of their indemnification obligations against Claims that could be incurred by the Administrative Agent. The Administrative Agent may refrain from any act until it has received such instructions or assurances, and shall not incur liability to any Person by reason of so refraining. Instructions of Required Lenders shall be binding upon all Secured Parties, and no Secured Party shall have any right of action whatsoever against the Administrative Agent as a result of the Administrative Agent acting or refraining from acting pursuant to instructions of Required Lenders. Notwithstanding the foregoing, instructions by and consent of specific parties shall be required to the extent provided in **Section 14.1.1**. If a Default or Event of Default has occurred and is continuing, then the Administrative Agent shall take such action with respect to such Default or Event of Default as shall be directed by the requisite Lenders in the written instructions (with indemnities) described in this **Section 12.1.4**; *provided* that, unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders. In no event shall the Administrative Agent be required to take any action that, in its opinion, is contrary to Applicable Law or any Loan Documents or could subject any Agent Indemnitee to personal liability (as the terms thereof may be modified by the DIP Orders). In any case, where the consent of the Administrative Agent is expressly required under this Agreement, the other Loan Documents or the DIP Orders, the withholding or giving of such consent may be conditioned by

-115-

the Administrative Agent upon the receipt of the approval of the Required Lenders, and the Administrative Agent shall be fully protected and not liable to the Lenders or any other Person in relying upon such approval or failing to act in the absence of such approval. The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders or the Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in **Section 14.1**), and otherwise the Administrative Agent shall not be liable for any action taken or not taken by it hereunder or under any other Loan Document or under any other document or instrument referred to or provided for herein or therein or in connection herewith or therewith INCLUDING ITS OWN ORDINARY NEGLIGENCE, except for its own gross negligence or willful misconduct as determined by a final, nonappealable order of a court of competent jurisdiction. No provision of this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby shall require the Administrative Agent to: (i) expend or risk its own funds or provide indemnities in the performance of any of its duties hereunder or the exercise of any of its rights or power or (ii) otherwise incur any financial liability in the performance of its duties or the exercise of any of its rights or powers, in each case, other than as resulting from its gross negligence or willful misconduct, as determined by a nonappealable order of a court of competent jurisdiction. Anything herein to the contrary notwithstanding, whenever reference is made in this Agreement or any other Loan Document to any action by, consent, designation, specification, requirement or approval of, notice, request or other communication from, or other direction given or action to be undertaken or to be (or not to be) suffered or omitted by the Administrative Agent or to any election, decision, opinion, acceptance, use of judgment, expression of satisfaction or other exercise of discretion, rights or remedies to be made (or not to be made) by the Administrative Agent hereunder or thereunder, it is understood that in all cases the Administrative Agent shall be acting, giving, withholding, suffering, omitting, taking or otherwise undertaking and exercising the same (or shall not be undertaking and exercising the same) as directed by the Required Lenders or the Lenders, as applicable, (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in **Section 14.1**). Beyond the exercise of reasonable care in the custody of the Collateral in the possession or control of the Administrative Agent, it will not have any duty as to any other Collateral or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto. The Administrative Agent will be deemed to have exercised reasonable care in the custody of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords its own property, and the Administrative Agent will not be liable or responsible for any loss or diminution in the value of any of the Collateral by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Administrative Agent in good faith.

The Administrative Agent shall not be responsible or liable for any failure or delay in the performance of its obligations under this Agreement and the other Loan Documents arising out of or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; pandemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other

-116-

wire or communication facility, in each case, other than as resulting from its gross negligence or willful misconduct, as determined by a nonappealable order of a court of competent jurisdiction.

**12.2.** **Agreements Regarding Collateral and Borrower Materials**.

12.2.1 <u>Lien Releases; Care of Collateral</u>. Secured Parties authorize the Administrative Agent to, and the Administrative Agent shall, (1) release any Lien with respect to any Collateral (a) upon Full Payment of the Obligations; (b) that is the subject of a Permitted Asset Disposition to a Person that is not an Obligor (and the Administrative Agent may request that the Obligors certify that such disposition is a Permitted Asset Disposition and may rely conclusively on any such certificate without further inquiry); it being agreed that such release shall not extend to the Net Cash Proceeds thereof; (c) subject to **Section 14.1**, with the prior written consent of the Required Lenders; and (d) if the Collateral subject to such Lien is owned by an Obligor, upon release of such Obligor from its obligations under the Loan Documents pursuant to the following clause (2) and (2) upon request of an Obligor, release any Obligor from its obligations under the Loan Documents if such Person ceases to be a Subsidiary as a result of a transaction permitted under the Loan Documents. Secured Parties authorize the Administrative Agent to subordinate its Liens only to any Purchase Money Lien or other Permitted Lien expressly entitled to senior priority hereunder. The Administrative Agent shall have no obligation to assure that any Collateral exists or is owned by an Obligor, or is cared for, protected or insured, nor to assure that the Administrative Agent's Liens have been properly created, perfected or enforced, or are entitled to any particular priority, nor to exercise any duty of care with respect to any Collateral. Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this **Section 12.2.1**. If any Collateral is disposed pursuant to a Permitted Asset Disposition to any Person other than an Obligor, such Collateral (but not the proceeds thereof, which will continue to be subject to the Liens of the Administrative Agent) shall be sold free and clear of the Liens created by the Loan Documents and the Administrative Agent shall, at the expense of the Obligors, take any and all actions reasonably requested by the Obligors to effect the foregoing (*provided*, that if requested by the Administrative Agent, the Obligors shall provide a certification that such disposition is permitted by this Agreement).

12.2.2 <u>Possession of Collateral</u>. The Administrative Agent and Secured Parties appoint each Lender as agent (for the benefit of Secured Parties) for the purpose of perfecting Liens in any Collateral held or controlled by such Lender, to the extent such Liens are perfected by possession or control. If any Lender obtains possession or control of any Collateral, it shall notify the Administrative Agent thereof and, promptly upon the Administrative Agent's request, deliver such Collateral to the Administrative Agent or otherwise deal with it in accordance with the Administrative Agent's instructions.

12.2.3 <u>Reports</u>. The Administrative Agent shall promptly provide to Lenders, when complete, any field audit or examination report prepared for the Administrative Agent with respect to any Obligor or Collateral ("<u>Report</u>"). Reports and other Borrower Materials may be made available to Lenders by providing access to them on the Platform, but the Administrative Agent shall not be responsible for system failures or access issues that may occur from time to time. Each Lender agrees (a) that Reports are not intended to be comprehensive audits or

-117-

examinations, and that the Administrative Agent or any other Person performing an audit or examination will inspect only specific information regarding the Obligations or Collateral and will rely significantly upon the Obligors' books, records and representations; (b) that the Administrative Agent makes no representation or warranty as to the accuracy or completeness of any Borrower Materials and shall not be liable for any information contained in or omitted from any Borrower Materials, including any Report; and (c) to keep all Borrower Materials confidential and strictly for such Lender's internal use, not to distribute any Report or other Borrower Materials (or the contents thereof) to any Person (except to other Lenders, such Lender's Participants, its officers, directors and employees, and its attorneys and accountants provided such Persons are informed of the confidential nature of such Reports and Borrower Materials and instructed to keep them confidential and strictly for such Lender's use and as otherwise permitted herein), and to use all Borrower Materials solely for administration of the Obligations. Each Lender shall severally and not jointly indemnify and hold harmless the Administrative Agent and any other Person preparing a Report from any action such Lender may take as a result of or any conclusion it may draw from any Borrower Materials, as well as from any Claims arising as a direct or indirect result of the Administrative Agent furnishing same to such Lender, via the Platform or otherwise.

**12.3. Reliance By the Administrative Agent**.  The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any certification, notice or other communication (including those by telephone, telex, telegram, telecopy or e-mail) believed by it to be genuine and correct and to have been signed, sent or made by the proper Person except to the extent such reliance is the result of the gross negligence or willful misconduct of the Administrative Agent.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon except to the extent such reliance is the result of the gross negligence or willful misconduct of the Administrative Agent, as determined in a final, non-appealable judgment by a court of competent jurisdiction.  In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.  The Administrative Agent may consult with legal counsel (who may be counsel for Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.  The Administrative Agent shall have a reasonable and practicable amount of time to act upon any instruction, notice or other communication under any Loan Document, and shall not be liable for any delay in acting.

**12.4. Action Upon Default**.  The Administrative Agent shall not be deemed to have knowledge of any Default or Event of Default, or of any failure to satisfy any conditions in **Section 6,** unless it has received written notice from Borrower or Required Lenders specifying the occurrence and nature thereof.  If any Lender acquires knowledge of a Default, Event of Default or failure of such conditions, it shall promptly notify the Administrative Agent and the other Lenders thereof in writing.  Each Secured Party (other than the Administrative Agent) agrees that, except as otherwise expressly provided in any Loan Documents or with the written consent of the Administrative Agent and Required Lenders, it will not take any Enforcement Action, accelerate Obligations, or exercise any right that it might otherwise have under Applicable Law to credit bid

-118-

at foreclosure sales, UCC sales or other dispositions of Collateral, or to assert any rights relating to any Collateral.

**12.5. Ratable Sharing**. If any Lender obtains any payment or reduction of any Obligation, whether through set-off or otherwise, in excess of its share of such Obligation, determined on a Pro Rata basis or in accordance with **Section 5.6.2**, as applicable, such Lender shall forthwith purchase from the Administrative Agent and the other Lenders such participations in the affected Obligation as are necessary to share the excess payment or reduction on a Pro Rata basis or in accordance with **Section 5.6.2**, as applicable. If any of such payment or reduction is thereafter recovered from the purchasing Lender, the purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest. Notwithstanding the foregoing, if a Defaulting Lender obtains a payment or reduction of any Obligation, it shall immediately turn over the amount thereof to the Administrative Agent for application under **Section 4.2.1(b)** and it shall provide a written statement to the Administrative Agent describing the Obligation affected by such payment or reduction. No Lender shall set off against any DIP Funding Account without the Administrative Agent's prior written consent.

**12.6. Indemnification**. EACH LENDER SHALL SEVERALLY AND NOT JOINTLY INDEMNIFY AND HOLD HARMLESS AGENT INDEMNITEES, TO THE EXTENT NOT REIMBURSED BY OBLIGORS, ON A PRO RATA BASIS, AGAINST ALL CLAIMS THAT MAY BE INCURRED BY OR ASSERTED AGAINST ANY SUCH AGENT INDEMNITEE, PROVIDED, THAT ANY CLAIM AGAINST AN AGENT INDEMNITEE RELATES TO OR ARISES FROM ITS ACTING AS OR FOR THE ADMINISTRATIVE AGENT (IN THE CAPACITY OF AGENT). In no event shall any Lender have any obligation hereunder to indemnify or hold harmless an Agent Indemnitee with respect to a Claim that is determined in a final, non-appealable judgment by a court of competent jurisdiction to result from the gross negligence or willful misconduct of such Agent Indemnitee. In the Administrative Agent's discretion, it may reserve for any Claims made against an Agent Indemnitee, and may satisfy any judgment, order or settlement relating thereto, from proceeds of Collateral prior to making any distribution of Collateral proceeds to Secured Parties. If the Administrative Agent is sued by any receiver, trustee or other Person for any alleged preference or fraudulent transfer, then any monies paid by the Administrative Agent in settlement or satisfaction of such proceeding, together with all interest, costs and expenses (including attorneys' fees) incurred in the defense of same, shall be promptly reimbursed to the Administrative Agent by each Lender to the extent of its Pro Rata share.

**12.7. Limitation on Responsibilities of the Administrative Agent**. The Administrative Agent shall not be liable to any Secured Party for any action taken or omitted to be taken under the Loan Documents, except for losses to the extent caused by the Administrative Agent's gross negligence or willful misconduct as determined in a final, non-appealable judgment by a court of competent jurisdiction. The Administrative Agent does not assume any responsibility for any failure or delay in performance or any breach by any Obligor, Lender or other Secured Party of any obligations under the Loan Documents. The Administrative Agent does not make any express or implied representation, warranty or guarantee to Secured Parties with respect to any Obligations, Collateral, Loan Documents or Obligor. No Agent Indemnitee shall be responsible to Secured Parties for any recitals, statements, information, representations or warranties contained in any Loan Documents or Borrower Materials; the execution, validity, genuineness, effectiveness or

-119-

enforceability of any Loan Documents; the genuineness, enforceability, collectability, value, sufficiency, location or existence of any Collateral, or the validity, extent, perfection or priority of any Lien therein; the validity, enforceability or collectability of any Obligations; or the assets, liabilities, financial condition, results of operations, business, creditworthiness or legal status of any Obligor or Account Debtor. No Agent Indemnitee shall have any obligation to any Secured Party to ascertain or inquire into the existence of any Default or Event of Default, the observance by any Obligor of any terms of the Loan Documents, or the satisfaction of any conditions precedent contained in any Loan Documents.

### 12.8. Successor Agent and Co-Agents.

12.8.1 <u>Resignation; Successor Agent</u>. The Administrative Agent may resign at any time by giving at least 5 days written notice thereof to Lenders and Obligor Representative (or such shorter time period as agreed to by the Required Lenders). Upon receipt of such notice, Required Lenders shall have the right to appoint a successor Administrative Agent which shall be (a) a Lender or an Affiliate of a Lender; or (b) a financial institution reasonably acceptable to Required Lenders. If no successor agent is appointed prior to the effective date of the Administrative Agent's resignation, then the Administrative Agent may (but shall not be obligated to) appoint a successor agent that is a financial institution acceptable to it, which shall be a Lender unless no Lender accepts the role. Whether or not a successor has been appointed, such resignation shall become effective. Upon acceptance by a successor Administrative Agent of its appointment hereunder, such successor Administrative Agent shall thereupon succeed to and become vested with all the powers and duties of the retiring Administrative Agent without further act, and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder but shall continue to have the benefits of the indemnification set forth in **Sections 12.6** and **14.2**. Notwithstanding any Administrative Agent's resignation, the provisions of this **Section 12** shall continue in effect for its benefit with respect to any actions taken or omitted to be taken by it while the Administrative Agent. The resigning Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Secured Parties under any of the Loan Documents, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and except for any indemnity payments or other amounts then owed to the resigning Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided for above. Any successor to B. Riley Commercial Capital, LLC by merger or acquisition of stock or this loan shall continue to be the Administrative Agent hereunder without further act on the part of any Secured Party or Obligor.

12.8.2 <u>Co-Collateral Agent</u>. If necessary or appropriate under Applicable Law, the Administrative Agent may appoint a Person to serve as a co-collateral agent or separate collateral agent under any Loan Document. Each right and remedy intended to be available to the Administrative Agent under the Loan Document shall also be vested in such agent. Secured Parties shall execute and deliver any instrument or agreement that the Administrative Agent may request to effect such appointment. If any such agent shall die, dissolve, become incapable of acting, resign or be removed, then all the rights and remedies of such agent, to the extent permitted by

-120-

Applicable Law, shall vest in and be exercised by the Administrative Agent until appointment of a new agent.

12.8.3 <u>Delegation of Duties</u>. The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates. The exculpatory provisions of this **Section 12** shall apply to any such sub-agent and to the Affiliates of the Administrative Agent and any such sub-agent, and shall apply to their respective activities as the Administrative Agent. The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

**12.9.    Non-Reliance on the Administrative Agent and the Other Lenders**.  Each Lender expressly acknowledges that neither the Administrative Agent nor the Arranger has made any representation or warranty to it, and that no act by the Administrative Agent hereafter taken, including any consent to, and acceptance of any assignment or review of the affairs of any Obligor or any Affiliate thereof, shall be deemed to constitute any representation or warranty by the Administrative Agent to any Lender as to any matter, including whether the Administrative Agent has disclosed material information in its (or its Related Parties') possession. Each Lender represents to the Administrative Agent that it has, independently and without reliance upon the Administrative Agent, the Arranger, any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis of, appraisal of, and investigation into, the business, prospects, operations, property, financial and other condition and creditworthiness of the Obligors and their Subsidiaries, and all applicable bank or other regulatory laws relating to the transactions contemplated hereby, and made its own decision to enter into, or consent to, this Agreement and the other Loan Documents and to extend credit to Borrower hereunder. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent, any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Obligors. Each Lender represents and warrants that (i) the Loan Documents set forth the terms of a commercial lending facility and (ii) it is engaged in making, acquiring or holding commercial loans in the ordinary course and is entering into this Agreement as a Lender for the purpose of making, acquiring or holding commercial loans and providing other facilities set forth herein as may be applicable to such Lender, and not for the purpose of purchasing, acquiring or holding any other type of financial instrument, and each Lender agrees not to assert a claim in contravention of the foregoing. Each Lender represents and warrants that it is sophisticated with respect to decisions to make, acquire and/or hold commercial loans and to provide other facilities set forth herein, as may be applicable to such Lender, and either it, or the Person exercising discretion in making its decision to make, acquire and/or hold

-121-

such commercial loans or to provide such other facilities, is experienced in making, acquiring or holding such commercial loans or providing such other facilities.

**12.10. Remittance of Payments and Collections**.

12.10.1    Remittances Generally.    All payments by any Lender to the Administrative Agent shall be made by the time and on the day set forth in this Agreement, in immediately available funds.  If no time for payment is specified or if payment is due on demand by the Administrative Agent and request for payment is made by the Administrative Agent by 11:00 a.m. on a Business Day, payment shall be made by Lender not later than 2:00 p.m. on such day, and if request is made after 11:00 a.m., then payment shall be made by 11:00 a.m. on the next Business Day.  Payment by the Administrative Agent to any Secured Party shall be made by wire transfer, in the type of funds received by the Administrative Agent.  Any such payment shall be subject to the Administrative Agent's right of offset for any amounts due from such payee under the Loan Documents.

12.10.2    Failure to Pay.  If any Secured Party fails to pay any amount when due by it to the Administrative Agent pursuant to the terms hereof, such amount shall bear interest, from the due date until paid in full, at the rate determined by the Administrative Agent as customary for interbank compensation for two Business Days and thereafter at the Default Rate. In no event shall Borrower be entitled to receive credit for any interest paid by a Secured Party to the Administrative Agent, nor shall any Defaulting Lender be entitled to interest on any amounts held by the Administrative Agent pursuant to **Section 4.2**.

12.10.3    Recovery of Payments.  If the Administrative Agent pays an amount to a Secured Party in the expectation that a related payment will be received by the Administrative Agent from an Obligor and such related payment is not received, then the Administrative Agent may recover such amount from the Secured Party.  If the Administrative Agent determines that an amount received by it must be returned or paid to an Obligor or other Person pursuant to Applicable Law or otherwise, then, notwithstanding any other term of any Loan Document, the Administrative Agent shall not be required to distribute such amount to any Secured Party.  If any amounts received and applied by the Administrative Agent to any Obligations are later required to be returned by the Administrative Agent pursuant to Applicable Law, each Lender shall pay to the Administrative Agent, **on demand**, such Lender's Pro Rata share of the amounts required to be returned.

**12.11.  Individual Capacities**.  As a Lender, the Administrative Agent shall have the same rights and remedies under the Loan Documents as any other Lender, and the terms "Lenders," "Required Lenders" or any similar term shall include the Administrative Agent in its capacity as a Lender, to the extent applicable.  The Administrative Agent, Lenders and their Affiliates may accept deposits from, lend money to, provide bank products to, act as financial or other advisor to, and generally engage in any kind of business with, Obligors and their Affiliates, as if they were not the Administrative Agent or Lenders hereunder, without any duty to account therefor to any Secured Party.  In their individual capacities, the Administrative Agent, Lenders and their Affiliates may receive information regarding Obligors, their Affiliates and their Account Debtors (including information subject to confidentiality obligations), and shall have no obligation to provide such information to any Secured Party.

-122-

**12.12. Erroneous Payments**.

12.12.1     Each Lender hereby agrees that (i) if the Administrative Agent notifies any Lender that the Administrative Agent has determined in its sole discretion that any funds received by such Lender from the Administrative Agent were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Lender (whether or not known to such Lender) (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, an "Erroneous Payment") and demands the return of such Erroneous Payment (or a portion thereof), such Lender shall promptly, but in no event later than one Business Day thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received) and (ii) to the extent permitted by Applicable Law, such Lender shall not assert any right or claim to the Erroneous Payment, and hereby waives any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand claim or counterclaim by the Administrative Agent for the return of any Erroneous Payments received, including without limitation a waiver of any defense based on "discharge for value" or any similar doctrine. A notice of the Administrative Agent to any Lender under this clause shall be conclusive absent manifest error.

12.12.2     Without limiting the immediately preceding clause, each Lender hereby further agrees that if it receives an Erroneous Payment from the Administrative Agent (x) that is in a different amount than, or on a different date from, that specified in a notice of payment sent by the Administrative Agent with respect to such Erroneous Payment (an "Erroneous Payment Notice"), (y) that was not preceded or accompanied by an Erroneous Payment Notice, or (z) that the Lender otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), in each case, an error has been made (and that it is deemed to have knowledge of such error at the time of receipt of such Erroneous Payment) with respect to such Erroneous Payment, and to the extent permitted by Applicable Law, the Lender shall not assert any right or claim to the Erroneous Payment, and hereby waives, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payments received, including without limitation, waiver of any defense based on "discharge for value" or any similar doctrine. Each Lender agrees that, in each such case, it shall promptly (and, in all events, within one Business Day of its knowledge (or deemed knowledge) of such error) notify the Administrative Agent of such occurrence and, upon demand from the Administrative Agent, it shall promptly, but in all events no later than one Business Day thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made in same day funds (in the currency so received).

**12.13. [Reserved]**.

**12.14. No Third Party Beneficiaries**.  This **Section 12** is an agreement solely among Secured Parties and the Administrative Agent, and shall survive Full Payment of the Obligations. This **Section 12** does not confer any rights or benefits upon Borrower, any Obligor or any other Person.  As between Borrower and Obligors, on the one hand, and the Administrative Agent, on the other hand, any action that the Administrative Agent may take under any Loan Documents or with respect to any Obligations shall be conclusively presumed to have been authorized and directed by Secured Parties.

-123-

**12.15. Withholding Tax**.   To the extent required by any Applicable Law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax.  If the IRS or any other Governmental Authority asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify the Administrative Agent of a change in circumstance which rendered the exemption from, or reduction of, withholding Tax ineffective or for any other reason, such Lender shall severally and not jointly indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as tax or otherwise, including any penalties or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this Section.  The agreements in this paragraph shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the commitments and the repayment, satisfaction or discharge of all other Obligations.

**12.16.  The Administrative Agent May File Proofs of Claim; Credit Bidding**.

12.16.1    Proofs of Claim.   In case of the pendency of any Insolvency Proceeding or any other judicial proceeding relative to any Obligor, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, if the Administrative Agent shall consent in writing to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent.

-124-

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender to authorize the Administrative Agent to vote in respect of the claim of any Lender or in any such proceeding.

12.16.2      Credit Bidding.  The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to take all actions and exercise all rights described in **Section 11.2,** including to credit bid all or any portion of the Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Secured Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code of the United States, including under Sections 363, 1123 or 1129 of the Bankruptcy Code of the United States, or any similar Laws in any other jurisdictions to which an Obligor is subject, (b) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable Law.  In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Equity Interests or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase).  In connection with any such bid (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles to make a bid, (ii) to adopt documents providing for the governance of the acquisition vehicle or vehicles (*provided*, that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or Equity Interests thereof shall be governed, directly or indirectly, by the vote of the Required Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in clauses (a) through (g) of **Section 14.1.1** of this Agreement), (iii) the Administrative Agent shall be authorized to assign the relevant Obligations to any such acquisition vehicle pro rata by the Lenders, as a result of which each of the Lenders shall be deemed to have received a pro rata portion of any Equity Interests and/or debt instruments issued by such an acquisition vehicle on account of the assignment of the Obligations to be credit bid, all without the need for any Secured Party or acquisition vehicle to take any further action, and (iv) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders pro rata and the Equity Interests and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.

12.16.3      Exculpatory Provisions.  The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents,

-125-

and its duties hereunder shall be administrative in nature. Without limiting the generality of the foregoing, the Administrative Agent:

(a)     shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)     shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), *provided*, that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or Applicable Law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Bankruptcy Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Bankruptcy Law;

(c)     shall not have any duty or responsibility to disclose, and shall not be liable for the failure to disclose, to any Lender, any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Obligors or any of their Affiliates, that is communicated to, obtained or in the possession of, the Administrative Agent or any of their Related Parties in any capacity, except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent herein;

(d)     shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in **Sections 11.2** and **14.1**) or (ii) in the absence of its own gross negligence or willful misconduct, as determined by a court of competent jurisdiction by a final and nonappealable judgment. The Administrative Agent shall be deemed not to have knowledge of any Default or Event of Default unless and until notice describing such Default or Event of Default is given to the Administrative Agent by any Obligor, the Obligor Representative or a Lender;

(e)     shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in **Section 6** or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

Notwithstanding anything to the contrary in this Agreement or in any other Loan Document, but, in each case, subject at all times to the DIP Orders, in the event that any controversy arises between or among any of the Secured Parties or any other Person in respect of any Collateral or proceeds thereof in the possession or control of the Administrative Agent, the Administrative Agent shall, to the extent directed by the Required Lenders, have the right to initiate proceedings in the Bankruptcy Court (or to the extent the Bankruptcy Court does not have (or abstains from exercising) jurisdiction over such matter, to any other court of competent jurisdiction permitted under **Section 14.14**) for a declaratory judgment to determine the rights of such Secured Parties or other Persons with respect to such Collateral or any proceeds thereof. The provisions of this paragraph are in addition to and not in limitation of any right of resignation or other rights or protections afforded to the Administrative Agent pursuant to the terms of this Agreement.

### 12.17. Certain ERISA Matters.

(a)     Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of Borrower or any other Obligor, that at least one of the following is and will be true:

(i)     such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments or this Agreement,

(ii)     the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement,

(iii)     (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement, or

(iv)     such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

-127-

(b)     In addition, unless either (1) sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of Borrower or any other Obligor, that the Administrative Agent is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related hereto or thereto).

**12.18. Successors By Merger, Etc.**.  Any corporation or association into which the Administrative Agent may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which the Administrative Agent is a party, will be and become the successor Administrative Agent under this Agreement and will have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, without the execution or filing of any instrument or paper or the performance of any further act.

## SECTION 13.        BENEFIT OF AGREEMENT; ASSIGNMENTS

**13.1.    Successors and Assigns**.  This Agreement shall be binding upon and inure to the benefit of Borrower, Obligors, the Administrative Agent, Lenders, Secured Parties, and their respective successors and assigns, except that (a) no Borrower or Obligor shall have the right to assign its rights or delegate its obligations under any Loan Documents; (b) any assignment by a Lender must be made in compliance with **Section 13.3**; and (c) any assignment by the Administrative Agent of its role as such must be made in compliance with **Section 13.3**.  The Administrative Agent may treat the Person which made any Loan as the owner thereof for all purposes until such Person makes an assignment in accordance with **Section 13.3**.  Any authorization or consent of a Lender shall be conclusive and binding on any subsequent transferee or assignee of such Lender.

**13.2.    Participations**.

13.2.1 <u>Permitted Participants; Effect</u>.  Subject to **Section 13.3.3**, any Lender may sell to a financial institution ("<u>Participant</u>") a participating interest in the rights and obligations of such Lender under any Loan Documents.  Despite any sale by a Lender of participating interests to a Participant, such Lender's obligations under the Loan Documents shall remain unchanged, it shall remain solely responsible to the other parties hereto for performance of such obligations, it shall remain the holder of its Loans and Commitments for all purposes, all amounts payable by Borrower shall be determined as if it had not sold such participating interests, and Borrower, the other Obligors and the Administrative Agent shall continue to deal solely and directly with such Lender in connection with the Loan Documents.  Each Lender shall be solely responsible for notifying its Participants of any matters under the Loan Documents, and the Administrative Agent

and the other Lenders shall not have any obligation or liability to any such Participant. Borrower agrees that each Participant shall be entitled to the benefits of **Sections 3.7** and **5.9** (subject to the requirements and limitations of such Sections and **Section 5.10**; *provided*, that any documentation required under **Section 5.10** shall be delivered solely to the applicable participating Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to **Section 13.1**. A Participant shall not be entitled to receive any greater payment under **Section 3.7** or **5.9** than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, except to the extent such entitlement to a greater payment results from a Change in Law occurring after the sale of the participation. Each Lender that sells a participation agrees, at Borrower's request and expense, to use reasonable efforts to cooperate with Borrower to effectuate the provisions of **Sections 3.8 and 13.4** with respect to any Participant.

13.2.2 <u>Voting Rights</u>. Each Lender shall retain the sole right to approve, without the consent of any Participant, any amendment, waiver or other modification of a Loan Document other than that which forgives principal, interest or fees, reduces the stated interest rate or fees payable with respect to any Loan or Commitment in which such Participant has an interest, postpones the Termination Date (other than pursuant to **Section 2.1.5**) or any date fixed for any regularly scheduled payment of principal, interest or fees on such Loan or Commitment (other than pursuant to **Section 2.1.5**), or releases Borrower, substantially all Guarantors or substantially all Collateral.

13.2.3 <u>Benefit of Set-Off</u>. Borrower agrees that each Participant shall have a right of set-off in respect of its participating interest to the same extent as if such interest were owing directly to a Lender, and each Lender shall also retain the right of set-off with respect to any participating interests sold by it. By exercising any right of set-off, a Participant agrees to share with Lenders all amounts received through its set-off, in accordance with **Section 12.5** as if such Participant were a Lender.

13.2.4 <u>Participant Register</u>. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "<u>Participant Register</u>"); *provided*, that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans, or its other Obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations and Section 1.163-5(b) of the Proposed United States Treasury Regulations (or, in each case, any amended or successor version). The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as the Administrative Agent) shall have no responsibility for maintaining a Participant Register.

**13.3.** **Assignments**.

13.3.1 <u>Permitted Assignments</u>.  A Lender may assign to an Eligible Assignee any of its rights and obligations under the Loan Documents, as long as (a) each assignment is of a constant, and not a varying, percentage of the transferor Lender's rights and obligations under the Loan Documents and, in the case of a partial assignment (except to an affiliated fund of such Lender), is in a minimum principal amount of $1,000,000 (unless otherwise agreed by the Administrative Agent in its discretion) and integral multiples of $500,000 in excess of that amount; (b) except in the case of an assignment in whole of a Lender's rights and obligations, the aggregate amount of the Commitments retained by the transferor Lender is at least $1,000,000 (unless otherwise agreed by the Administrative Agent in its discretion) and (c) the parties to each such assignment shall execute and deliver to the Administrative Agent, for its acceptance and recording, an Assignment and Acceptance.  Nothing herein shall limit the right of a Lender to pledge or assign any rights under the Loan Documents to secure obligations of such Lender, including a pledge or assignment to a Federal Reserve Bank; *provided*, *however*, that no such pledge or assignment shall release the Lender from its obligations hereunder nor substitute the pledge or assignee for such Lender as a party hereto.

13.3.2 <u>Effect; Effective Date</u>.  Upon delivery to the Administrative Agent of an assignment notice in the form of **Exhibit B** and a processing fee of $3,500 (unless otherwise agreed by the Administrative Agent in its discretion), the assignment shall become effective as specified in the notice, if it complies with this **Section 13.3.**  From such effective date, the Eligible Assignee shall for all purposes be a Lender under the Loan Documents, and shall have all rights and obligations of a Lender thereunder.  Upon consummation of an assignment, the transferor Lender, the Administrative Agent and Borrower shall make appropriate arrangements for issuance of replacement and/or new notes, if applicable.  The transferee Lender shall comply with **Section 5.10** and deliver, upon request, an administrative questionnaire satisfactory to the Administrative Agent.

13.3.3 <u>Certain Assignees</u>.  Without the Administrative Agent's prior written consent, no assignment or participation may be made to Borrower, an Obligor, an Affiliate of Borrower or an Obligor, a Defaulting Lender or natural person.  Any assignment by a Defaulting Lender shall be effective only upon payment by the Eligible Assignee or Defaulting Lender to the Administrative Agent of an aggregate amount sufficient, upon distribution (through direct payment, purchases of participations or other compensating actions as the Administrative Agent deems appropriate), to satisfy all funding and payment liabilities then owing by the Defaulting Lender hereunder.  If an assignment by a Defaulting Lender shall become effective under Applicable Law for any reason without compliance with the foregoing sentence, then the assignee shall be deemed a Defaulting Lender for all purposes until such compliance occurs.

13.3.4 <u>Register</u>.  The Administrative Agent, acting as a non-fiduciary agent of Borrower, shall maintain (a) a copy of each Assignment and Acceptance delivered to it, and (b) a register for recordation of the names, addresses and Commitments of, and the principal amounts of the Loans (and stated interest) owing to, each Lender (the "<u>Register</u>").  Entries in the Register shall be conclusive, absent manifest error, and Borrower, the Administrative Agent and Lenders shall treat each lender recorded in such Register as a Lender for all purposes under the Loan Documents, notwithstanding any notice to the contrary.  The Register shall be available for

inspection by Borrower and any Lender (but, in the case of any Lender, only with respect to its holdings (unless consented to otherwise in writing by the Administrative Agent)), from time to time upon reasonable notice.

**13.4.     Replacement of Certain Lenders**.  If (a) a Lender (i) fails to give its consent to any amendment, waiver or action for which consent of all Lenders was required and the Required Lenders consented or (ii) is a Defaulting Lender, then, in addition to any other rights and remedies that any Person may have, the Administrative Agent or Borrower may, by notice to such Lender within 120 days after such event, require such Lender to assign all of its rights and obligations under the Loan Documents to Eligible Assignee(s), pursuant to appropriate Assignment and Acceptance(s), within 20 days after the notice, *provided*, that a Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling Borrower to require such assignment and delegation cease to apply.  The Administrative Agent is irrevocably appointed as attorney-in-fact to execute any such Assignment and Acceptance if the Lender fails to execute it.  Such Lender shall be entitled to receive, in cash, concurrently with such assignment, all amounts owed to it under the Loan Documents through the date of assignment.

# SECTION 14.          <u>MISCELLANEOUS</u>

**14.1.     Consents, Amendments and Waivers**.

14.1.1 <u>Amendment</u>.   No modification of any Loan Document, including any extension (other than in accordance with **Section 2.1.5**) or amendment of a Loan Document or any waiver of a Default or Event of Default, shall be effective without the prior written agreement of the Administrative Agent (with the consent of Required Lenders) (which, for the avoidance of doubt, may be provided via email in accordance with **Section 14.3.6**) and each Obligor party to such Loan Document; *provided*, *however*, that

(a)      without the prior written consent of the Administrative Agent (which, for the avoidance of doubt, may be provided via email in accordance with **Section 14.3.6**), no modification shall be effective with respect to any provision in a Loan Document that relates to any rights, duties or discretion of the Administrative Agent;

(b)      [reserved];

(c)      without the prior written consent of each affected Lender (which, for the avoidance of doubt, may be provided via email in accordance with **Section 14.3.6**), including a Defaulting Lender, no modification shall be effective that would (i) increase the Commitment of such Lender (it being understood that a waiver of any condition precedent set forth in **Section 6** or the waiver of any Default shall not constitute an extension or increase of any Commitment of any Lender); (ii) reduce the amount of, or rate of, or waive or delay payment of, any principal, reimbursement obligation, interest, fees or other amounts payable to such Lender hereunder or under any Loan Document (except as provided in **Section 4.2** and any waiver of interest accruing at the Default Rate; provided that only the consent of the Required Lenders shall be necessary to amend the definition of "<u>Default Rate</u>"); (iii) extend the Termination Date or the

-131-

Maturity Date (except, as relating to the Maturity Date, in accordance with **Section 2.1.5**); or (iv) amend this clause (c);

(d)      without the prior written consent of all Lenders (which, for the avoidance of doubt, may be provided via email in accordance with **Section 14.3.6**) (except any Defaulting Lender), no modification shall be effective that would (i) alter **Section 5.6.2**, **7.1** (except to add Collateral) or **14.1.1**; (ii) amend the definition of Pro Rata or Required Lenders, (iii) amend any payment provision in a manner that would alter the pro rata sharing of payments required thereby (iii) release all or substantially all Collateral; or (iv) except in connection with a merger, disposition or similar transaction expressly permitted hereby, release any Obligor from liability for any Obligations (as measured by value not number);

(e)      without the written consent of each Lender directly and adversely affected thereby (which, for the avoidance of doubt, may be provided via email in accordance with **Section 14.3.6**), no modification shall postpone any date scheduled for any payment of principal of, or interest on, any Loan, or any fees or other amounts payable hereunder or under any other Loan Document, or reduce the amount of, waive or excuse any such payment;

(f)      [reserved]; and

(g)      without the prior written consent of each affected Lender (which, for the avoidance of doubt, may be provided via email in accordance with **Section 14.3.6**), including a Defaulting Lender, no modification shall be effective that would alter **Section 12.5** or **14.3.1**.

14.1.2 <u>Limitations</u>.  Only the consent of the parties to any agreement relating to fees shall be required for modification of such agreement.  Any waiver or consent granted by the Administrative Agent or Lenders hereunder shall be effective only if in writing and only for the matter specified.  Further, notwithstanding anything to the contrary contained in this **Section 14.1**, if following the Closing Date, the Administrative Agent and Obligor Representative shall have jointly identified an obvious error or any error or omission of a technical or immaterial nature, in each case, in any provision of the Loan Documents, then the Administrative Agent and the Obligor Representative shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Loan Documents if the same is not objected to in writing by the Required Lenders within five (5) Business Days following receipt of notice thereof.

14.1.3 [Reserved].

**14.2.   Indemnity**.  Borrower and each other Obligor, jointly and severally, shall indemnify the Administrative Agent (and any sub-agent thereof), each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "<u>Lender Related Person</u>") against, and hold each Lender Related Person harmless from, any and all losses, claims, damages, liabilities and related expenses (limited, in the case of legal fees and expenses, to the reasonable and documented fees, charges and disbursements of one primary counsel, one local counsel in each relevant jurisdiction, and one special counsel (the appointment of any such special counsel to be subject to the reasonable consent of Obligors, so long as not unreasonably withheld, conditioned

or delayed) for each relevant specialization deemed necessary or appropriate by the Administrative Agent, for all Lender Related Persons and, in the case of an actual or reasonably perceived conflict of interest, one additional primary counsel (and one additional local counsel in each relevant jurisdiction) per group of similarly situated affected parties), to the extent incurred by any Lender Related Person or asserted against any Lender Related Person by any Person (including Borrower or any other Obligor) arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder, the consummation of the transactions contemplated hereby or thereby, or, in the case of the Administrative Agent (and any sub agent thereof) and its Related Parties only, the administration of this Agreement and the other Loan Documents (including in respect of any matters addressed in **Section 5.9**), (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or Environmental Release of Hazardous Materials on or from any property owned or operated by Borrower or any of its Subsidiaries or any other Obligor, or any Environmental Liability related in any way to Borrower or any of its Subsidiaries or any other Obligor, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, in all cases, whether based on contract, tort or any other theory, whether brought by a third party or by Borrower, any of its Subsidiaries or any other Obligor, and regardless of whether any Lender Related Person is a party thereto, IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF THE LENDER RELATED PERSON; *provided*, that such indemnity shall not, as to any Lender Related Person, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence, bad faith or willful misconduct of such Lender Related Person or (y) result from a claim brought by Borrower or any other Obligor against a Lender Related Person for a material breach of such Lender Related Person's obligations hereunder or under any other Loan Document, if Borrower or such Obligor has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction. Without limiting the provisions of **Section 5.9.2**, this **Section 14.2** shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

## 14.3. Notices and Communications.

14.3.1 <u>Notice Address</u>.  Subject to **Section 4.1.3**, all notices and other communications by or to a party hereto shall be in writing and shall be given to (x) any Borrower or Obligor, to the Obligor Representative to the attention of Kristen Carnevali, Denise Sterling and Todd DuChene at 210 Barton Springs Road, Suite 300, Austin, Texas 78704, (y) to any other Person at its address shown on the signature pages hereof (or, in the case of a Person who becomes a Lender after the Closing Date, at the address shown on its Assignment and Acceptance), or (z) at such other address as any such party may hereafter specify by notice in accordance with this **Section 14.3**. Each communication shall be effective only (a) if given by facsimile transmission, when transmitted to the applicable facsimile number, if confirmation of receipt is received or when received by electronic mail; (b) if given by mail, three Business Days after deposit in the U.S. mail, with first-class postage pre-paid, addressed to the applicable address; or (c) if given by personal delivery, when duly delivered to the notice address with receipt acknowledged. Notwithstanding the foregoing, no notice to the Administrative Agent pursuant to **Sections 2.1.4**

or **4.1.1** shall be effective until actually received by the individual to whose attention at the Administrative Agent such notice is required to be sent. Any written communication that is not sent in conformity with the foregoing provisions shall nevertheless be effective on the date actually received by the noticed party. Any notice received by Borrower shall be deemed received by Borrower.

        14.3.2 <u>Communications</u>. Secured Parties make no assurance as to the privacy or security of electronic communications. E-mail and voice mail shall not be effective notices from the Obligors under the Loan Documents, unless otherwise expressly agreed.

        14.3.3 <u>Platform</u>. Borrower Materials shall be delivered pursuant to procedures approved by the Administrative Agent, including via e-mail and other electronic delivery (if possible) upon request by the Administrative Agent to an electronic system maintained by the Administrative Agent ("<u>Platform</u>"). Obligor Representative shall notify the Administrative Agent of each posting of Borrower Materials on the Platform and the materials shall be deemed received by the Administrative Agent only upon its receipt of such notice. Borrower Materials and other information relating to this credit facility may be made available to Lenders on the Platform. The Platform is provided "as is" and "as available." The Administrative Agent does not warrant the accuracy or completeness of any information on the Platform nor the adequacy or functioning of the Platform, and expressly disclaims liability for any errors or omissions in Borrower Materials or any issues involving the Platform. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS, OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE ADMINISTRATIVE AGENT WITH RESPECT TO BORROWER MATERIALS OR THE PLATFORM. Lenders acknowledge that Borrower Materials may include material non-public information of Obligors and should not be made available to any personnel who do not wish to receive such information or who may be engaged in investment or other market-related activities with respect to any Obligor's securities. No Agent Indemnitee shall have any liability to Borrower, any Obligor, any Lenders or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) relating to use by any Person of the Platform or delivery of Borrower Materials, notices and other information through the Platform, any other electronic platform or electronic messaging service, or through the Internet.

        14.3.4 <u>Public Information</u>. Obligors and Secured Parties acknowledge that "public" information may not be segregated from material non-public information on the Platform. Secured Parties acknowledge that Borrower Materials may include Obligors' material non-public information, and should not be made available to personnel who do not wish to receive such information or may be engaged in investment or other market-related activities with respect to an Obligor's securities.

        14.3.5 <u>Non-Conforming Communications</u>. The Administrative Agent and Lenders may rely upon any communications purportedly given by or on behalf of Borrower even if they were not made in a manner specified herein, were incomplete or were not confirmed, or if the terms thereof, as understood by the recipient, varied from a later confirmation. Borrower shall indemnify and hold harmless each Indemnitee from any liabilities, losses, costs and expenses

11231624v19

arising from any electronic or telephonic communication purportedly given by or on behalf of Borrower.

14.3.6 <u>Electronic Mail</u>. Notwithstanding the foregoing, or anything else to the contrary contained herein or in any other Loan Document, the parties hereto agree that (i) if the Administrative Agent requires or seeks consent and/or direction of any Lender in connection with exercising any of its rights or powers, or otherwise taking any action, under this Agreement or any other Loan Document (including in connection with providing any consent or waiver that this Agreement or such other Loan Document expressly permits the Administrative Agent to provide), the Administrative Agent shall be entitled to rely on any such consent and/or direction delivered to it by electronic mail ("<u>e- mail</u>") by or on behalf of the applicable Lender (including by any investment advisor, manager or similar Person holding itself out as authorized to act on behalf of such Lender or by any counsel thereto or to such Lender), (ii) with respect to (a) any provision of this Agreement or any other Loan Document that permits any date by which any Obligor is required to comply with any obligation hereunder or under such other Loan Document to be extended and (b) any amendment, consent, waiver, modification or otherwise of this Agreement or any other Loan Document, in each case, that requires the consent and/or the direction of one or more of the Lenders, each Lender shall be permitted to provide its consent and/or direction via its counsel and, in such case, such consent and/or direction shall be deemed to have been validly provided to the extent that such counsel confirms the same by electronic mail ("<u>e-mail</u>") to Borrower's counsel or the Administrative Agent's counsel, as applicable, (it being agreed that, in connection with delivering such e-mail, such counsel shall be permitted to rely on any corresponding consent or direction delivered to such counsel by or on behalf of the applicable Lender (including by any investment advisor, manager or similar entity holding itself out as authorized to act on behalf of such Lender)) and (iii) with respect to (a) any provision of this Agreement or any other Loan Document that permits any date by which any Obligor is required to comply with any obligation hereunder (including any date set forth on **Schedule 10.1.13**) or under such other Loan Document to be extended and (b) any amendment, consent, waiver, modification or otherwise of this Agreement or any other Loan Document, in each case, that requires the consent and/or direction of the Administrative Agent, the Administrative Agent shall be permitted to provide its consent and/or direction via its counsel and, in such case, such consent and/or direction shall be deemed to have been validly provided to the extent that such counsel confirms the same by electronic mail ("<u>e-mail</u>") to Borrower's counsel or Lender's counsel, as applicable, (it being agreed that, in connection with delivering such e-mail, such counsel shall be permitted to rely on any corresponding consent or direction delivered to such counsel by or on behalf of the Administrative Agent.

**14.4.    Performance of Borrower's Obligations**. The Administrative Agent may (but shall not be obligated to), in its discretion at any time and from time to time, at Borrower's expense, pay any amount or do any act required of Borrower or any Obligor under any Loan Documents or otherwise lawfully requested by the Administrative Agent to (a) enforce any Loan Documents or collect any Obligations; (b) protect, insure, maintain or realize upon any Collateral; or (c) defend or maintain the validity or priority of the Administrative Agent's Liens in any Collateral, including any payment of a judgment, insurance premium, warehouse charge, finishing or processing charge, or landlord claim, or any discharge of a Lien.  All payments, costs and expenses (including Extraordinary Expenses) of the Administrative Agent under this Section shall be reimbursed to the Administrative Agent by Borrower, within 10 Business Days after demand, with interest from the

-135-

11231624v19

date incurred until paid in full, at the Default Rate. Any payment made or action taken by the Administrative Agent under this Section shall be without prejudice to any right to assert an Event of Default or to exercise any other rights or remedies under the Loan Documents.

**14.5.    Credit Inquiries**.  The Administrative Agent and Lenders may (but shall have no obligation) to respond to usual and customary credit inquiries from third parties concerning any Obligor or Subsidiary.

**14.6.    Severability**.  Wherever possible, each provision of the Loan Documents shall be interpreted in such manner as to be valid under Applicable Law.  If any provision is found to be invalid under Applicable Law, it shall be ineffective only to the extent of such invalidity and the remaining provisions of the Loan Documents shall remain in full force and effect.

**14.7.    Cumulative Effect; Conflict of Terms**.  The provisions of the Loan Documents are cumulative.  The parties acknowledge that the Loan Documents may use several limitations or measurements to regulate similar matters, and they agree that these are cumulative and that each must be performed as provided.  Except as otherwise provided in another Loan Document (by specific reference to the applicable provision of this Agreement), if any provision contained herein is in direct conflict with any provision in another Loan Document, the provision herein shall govern and control.

**14.8.    Counterparts; Execution**.  Any Loan Document may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  The words "execute," "execution," "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement and the transactions contemplated hereby (including without limitation Assignment and Acceptances, amendments or other modifications, Notices of Borrowing, waivers and consents) shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved in writing by the Administrative Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper- based recordkeeping system, as the case may be, to the extent and as provided for in any Applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; *provided*, that notwithstanding anything contained herein to the contrary the Administrative Agent is under no obligation to agree to accept electronic signatures in any form or in any format unless expressly agreed to by the Administrative Agent pursuant to procedures approved in writing by it.

**14.9.    Entire Agreement**.  Time is of the essence with respect to all Loan Documents and Obligations.  The Loan Documents constitute the entire agreement, and supersede all prior understandings and agreements, among the parties relating to the subject matter thereof.

**14.10.  Relationship with Lenders**.  The obligations of each Lender hereunder are several, and no Lender shall be responsible for the obligations or Commitments of any other Lender. Amounts payable hereunder to each Lender shall be a separate and independent debt.  It shall not be necessary for the Administrative Agent or any other Lender to be joined as an additional party in any proceeding for such purposes.  Nothing in this Agreement and no action of the

-136-

Administrative Agent, Lenders or any other Secured Party pursuant to the Loan Documents or otherwise shall be deemed to constitute the Administrative Agent and any Secured Party to be a partnership, joint venture or similar arrangement, nor to constitute control of any Obligor.

**14.11. No Advisory or Fiduciary Responsibility**. In connection with all aspects of each transaction contemplated by any Loan Document, Borrower and Obligors acknowledge and agree that (a)(i) this credit facility and any related arranging or other services by the Administrative Agent, any Lender, any of their Affiliates or any arranger are arm's-length commercial transactions between Borrower or such Obligor and such Person; (ii) Borrower and the Obligors have consulted its own legal, accounting, regulatory and tax advisors to the extent they have deemed appropriate; and (iii) Borrower and the Obligors are capable of evaluating, and understand and accept, the terms, risks and conditions of the transactions contemplated by the Loan Documents; (b) each of the Administrative Agent, Lenders, their Affiliates and any arranger is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for Borrower, any Obligor, any of its or their Affiliates or any other Person, and has no obligation with respect to the transactions contemplated by the Loan Documents except as expressly set forth therein; and (c) the Administrative Agent, Lenders, their Affiliates and any arranger may be engaged in a broad range of transactions that involve interests that differ from those of Borrower, Obligors and their Affiliates, and have no obligation to disclose any of such interests to Borrower, Obligors or their Affiliates. To the fullest extent permitted by Applicable Law, Borrower and Obligors each hereby waives and releases any claims that it may have against the Administrative Agent, Lenders, their Affiliates and any arranger with respect to any breach of agency or fiduciary duty in connection with any transaction contemplated by a Loan Document.

**14.12. Confidentiality**. Each of the Administrative Agent and Lenders shall maintain the confidentiality of all Information (as defined below), except that Information may be disclosed (a) to its Affiliates, and to its and their partners, directors, officers, employees, agents, advisors and representatives, as well as financing sources and prospective investors (*provided* such Persons are informed of the confidential nature of the Information and instructed to keep it confidential); (b) to the extent requested by any governmental, regulatory or self-regulatory authority purporting to have jurisdiction over it or its Affiliates; (c) to the extent required by Applicable Law or by any subpoena or other legal process; (d) to any other party hereto; (e) in connection with any action or proceeding relating to any Loan Documents or Obligations; (f) subject to an agreement containing provisions substantially the same as this Section, to any Transferee or any actual or prospective party (or its advisors) to any bank product; (g) with the consent of Obligor Representative; or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section, or (ii) is available to the Administrative Agent, any Lender or any of their Affiliates on a nonconfidential basis from a source other than Borrower and Obligors. Notwithstanding the foregoing, the Administrative Agent and Lenders may publish or disseminate general information concerning this credit facility for league table, tombstone and advertising purposes, and may use Borrower's and Obligors' logos, trademarks or product photographs in advertising materials. As used herein, "Information" means all information received from an Obligor or Subsidiary relating to it or its business. Any Person required to maintain the confidentiality of Information pursuant to this Section shall be deemed to have complied if it exercises a degree of care similar to that which it accords its own confidential information. Each of the Administrative Agent and Lenders acknowledges that (i) Information may include material non-public information; (ii) it has

-137-

developed compliance procedures regarding the use of material non-public information; and (iii) it will handle such material non-public information in accordance with Applicable Law.

**14.13. GOVERNING LAW. THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, UNLESS OTHERWISE SPECIFIED, SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO CONFLICT OF LAW PRINCIPLES TO THE EXTENT SUCH PRINCIPLES WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.**

**14.14. Consent to Forum. BORROWER AND OBLIGORS HEREBY CONSENT TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND, SOLELY TO THE EXTENT THAT THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM EXERCISING) JURISDICTION OVER ANY MATTER, ANY STATE COURT SITTING IN THE CITY OF NEW YORK IN THE BOROUGH OF MANHATTAN OR THE UNITED STATES DISTRICT COURT IN THE SOUTHERN DISTRICT OF NEW YORK IN THE BOROUGH OF MANHATTAN, IN ANY DISPUTE, ACTION, LITIGATION OR OTHER PROCEEDING RELATING IN ANY WAY TO ANY LOAN DOCUMENTS, AND AGREES THAT ANY DISPUTE, ACTION, LITIGATION OR OTHER PROCEEDING SHALL BE BROUGHT BY IT SOLELY IN ANY SUCH COURT. BORROWER AND OBLIGOR IRREVOCABLY AND UNCONDITIONALLY WAIVES ALL CLAIMS, OBJECTIONS AND DEFENSES THAT IT MAY HAVE REGARDING ANY SUCH COURT'S PERSONAL OR SUBJECT MATTER JURISDICTION, VENUE OR INCONVENIENT FORUM. EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 14.3.1. A final judgment in any proceeding of any such court shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or any other manner provided by Applicable Law.**

**14.15. Waivers by Obligors**. To the fullest extent permitted by Applicable Law, Borrower and each other Obligor waives (a) the right to trial by jury (which the Administrative Agent and each Lender hereby also waives) in any proceeding or dispute of any kind relating in any way to any Loan Documents, Obligations or Collateral; (b) presentment, demand, protest, notice of presentment, default, non- payment, maturity, release, compromise, settlement, extension or renewal of any commercial paper, accounts, documents, instruments, chattel paper and guaranties at any time held by the Administrative Agent on which Borrower or any such Obligor may in any way be liable, and hereby ratifies anything the Administrative Agent may do in this regard; (c) notice prior to taking possession or control of any Collateral; (d) any bond or security that might be required by a court prior to allowing the Administrative Agent to exercise any rights or remedies; (e) the benefit of all valuation, appraisement and exemption laws; (f) any claim against the Administrative Agent or any Lender, on any theory of liability, for special, indirect, consequential, exemplary or punitive damages (as opposed to direct or actual damages) in any way relating to any Enforcement Action, Obligations, Loan Documents or transactions relating thereto; and (g) notice of acceptance hereof. Borrower and each other Obligor acknowledge that the foregoing waivers are a material inducement to the Administrative Agent and Lenders entering into this Agreement and that they are relying upon the foregoing in their dealings with Borrower

-138-

and the Obligors.  Borrower and Obligors have each reviewed the foregoing waivers with its legal counsel and has knowingly and voluntarily waived its jury trial and other rights following consultation with legal counsel.  In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

**14.16. Patriot Act Notice**.  The Administrative Agent and Lenders hereby notify Borrower and Obligors that pursuant to the Patriot Act, the Administrative Agent and Lenders are required to obtain, verify and record information that identifies Borrower and each Obligor, including its legal name, address, tax ID number and other information that will allow the Administrative Agent and Lenders to identify it in accordance with the Patriot Act.  The Administrative Agent and Lenders will also require information regarding each guarantor, if any, and may require information regarding Borrower's and Obligors' management and owners, such as legal name, address, social security number and date of birth.  Borrower and each other Obligor shall, promptly upon request, provide all documentation and other information as the Administrative Agent or any Lender may request from time to time in order to comply with any obligations under any "know your customer," anti-money laundering or other requirements of Applicable Law.

**14.17.  NO ORAL AGREEMENT.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS BETWEEN THE PARTIES.  THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES.**

**14.18.  Acknowledgement and Consent to Bail-In of Affected Financial Institutions**.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by an Affected Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender that is an Affected Financial Institution; and

(b)     the effects of any Bail-In Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

-139-

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any Affected Resolution Authority.

**14.19.  DIP Orders**.  Borrower, the Obligors, the Administrative Agent and the Lenders hereby expressly agree that, in the event of any conflict or inconsistency between this Agreement (or any other Loan Document), on the one hand, and any DIP Order, on the other hand, the applicable DIP Order then in effect shall control.  Notwithstanding anything to the contrary herein, the provisions of this Agreement are subject to the terms, covenants, conditions and provisions of, the DIP Orders, as applicable.  This Agreement is subject in all respects (including with respect to all obligations and agreements of the Obligors provided for hereunder) to the terms of the Interim DIP Order (and, when applicable, the Final DIP Order) and, notwithstanding anything in the foregoing, the Obligors shall not be required to undertake any obligation, make any agreement or take any action that is prohibited by the terms of the Interim DIP Order (and, when applicable, the Final DIP Order).

**14.20.  Acknowledgment Regarding any Supported QFCs**.  To the extent that the Loan Documents provide support, through a guarantee or otherwise, for any agreement or instrument that is a QFC (such support, "QFC Credit Support" and each such QFC a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States).

(a)    In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States.  Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(b)    As used in this **Section 14.20,** the following terms have the following meanings:

"<u>BHC Act Affiliate</u>" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"<u>Covered Entity</u>" means any of the following:

(i)     a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(ii)     a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(iii)     a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"<u>Default Right</u>" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"<u>QFC</u>" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

[*Remainder of page intentionally left blank*]

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be duly executed as of the day and year first above written.

**THE ADMINISTRATIVE AGENT**

**B. RILEY COMMERCIAL CAPITAL, LLC**, as the Administrative Agent and as the sole initial Lender

By: _Phil Ahn_
8F3ED3A59BDF4B9...

Name:  Phil Ahn
Title:    Chief Financial Officer

**Notice to Administrative Agent:**

B. Riley Commercial Capital, LLC
11100 Santa Monica Blvd., Suite 800
Los Angeles, CA 90025
Attention:       Perry Mandarino
Telephone:     646-367-2402
E-mail:            pmandarino@brileyfin.com

**With a copy to:**

Choate, Hall & Stewart LLP
Two International Place
Boston, MA 02110
Attention:       John Ventola
Telephone:     617-248-5085
E-mail:            jventola@choate.com

**BORROWER**

**CORE SCIENTIFIC, INC.**, as Borrower

By: _Todd DuChene_
Name: Todd DuChene
Title: President, Chief Legal Officer and Secretary

**GUARANTORS**

**CORE SCIENTIFIC MINING LLC**, as a Guarantor

By: _Todd DuChene_
Name: Todd DuChene
Title: President and Chief Legal Officer

**RADAR RELAY, INC.**, as a Guarantor

By: _Todd DuChene_
Name: Todd DuChene
Title: President

**AMERICAN PROPERTY ACQUISITION, LLC**, as a Guarantor
    By its sole member, Core Scientific Operating Company

By: _Todd DuChene_
Name: Todd DuChene
Title: EVP, General Counsel, Chief Compliance Officer and Secretary

**STARBOARD CAPITAL LLC**, as a Guarantor
    By its sole member, Radar Relay, Inc.

By: _Todd DuChene_
Name: Todd DuChene
Title: President

[Senior Secured Super-Priority Replacement Debtor-in-Possession
Loan and Security Agreement]

**RADAR LLC**, as a Guarantor
      By its sole member, Radar Relay, Inc.

By: _Todd DuChene_____
Name: Todd DuChene
Title: President


**AMERICAN PROPERTY ACQUISITIONS I LLC**,
as a Guarantor
      By its sole member, American Property
      Acquisition, LLC
          By its sole member, Core Scientific
          Operating Company

By: _Todd DuChene_____
Name: Todd DuChene
Title: EVP, General Counsel, Chief Compliance Officer
and Secretary


**AMERICAN PROPERTY ACQUISITIONS VII,
LLC**, as a Guarantor
      By its sole member, American Property
      Acquisition, LLC
          By its sole member, Core Scientific
          Operating Company

By: _Todd DuChene_____
Name: Todd DuChene
Title: EVP, General Counsel, Chief Compliance Officer
and Secretary


[Senior Secured Super-Priority Replacement Debtor-in-Possession
Loan and Security Agreement]

DocuSign Envelope ID: 3A1B955B4D4D-456B-B520-FDBE66E36597

**CORE SCIENTIFIC ACQUIRED MINING LLC**, as a Guarantor

By: _Michael Levitt_

Name: Michael Levitt
Title: President

**CORE SCIENTIFIC OPERATING COMPANY**, as a Guarantor

By: _Michael Levitt_

Name: Michael Levitt
Title: Chief Executive Officer

**CORE SCIENTIFIC SPECIALTY MINING (OKLAHOMA) LLC**, as a Guarantor

By: _Michael Levitt_

Name: Michael Levitt
Title: Chief Executive Officer

[Senior Secured Super-Priority Replacement Debtor-in-Possession
Loan and Security Agreement]

**Schedule 1.1**

**DIP Term Loan Commitment Schedule**

| Lender | DIP Term Loan Commitment | Interim Availability Period Draw Amount |
|---|---|---|
| B. Riley Commercial Capital, LLC | $70,000,000 | $35,000,000 |
| **Total** | $70,000,000 | $35,000,000 |

11273420v8

**Schedule 1.1(a)**

**Subject Real Properties**

| Facility | Owner | Ownership | Property Address | Legal Description |
|---|---|---|---|---|
| Marble, North Carolina | American Property Acquisitions I, LLC | Fee | 155 Palmer Lane, Marble, NC 28905 | That certain tract or parcel of land situated, lying and being in the city of Marble, Cherokee County, North Carolina and being more particularly described as follows:<br><br>Beginning at an existing nail in the intersection of Airport Road having an apparent 50' public right-of-way and Palmer Road (60' public right-of-way), said nail also being located South 68°26'33" W, a distance of 1596.35 feet from NCGS Monument "CHE 7" having NAD 83 grid coordinates last updated in 2011 of N=558373.51, E=533753.95 with a combined grid factor of 0.99979819; and runs thence with the center of Airport Road South 62°27'04" West a distance of 482.24 feet to a new nail; thence leaving Airport Road and with the line of Nancy H Martin as described in Deed Book 1482, Page 201 of the Cherokee County Public Registry North 27°44'25" West passing through an existing 1" iron pipe on the northerly right-of-way of Airport Road at 23.30 feet; an existing 1" iron pipe at 288.19 a total distance of 337.00 feet to a new #4 iron rebar; thence South 56°06'57" West a distance of 525.04 feet to an existing 1" iron pipe being the southeast corner of Henry Lane Young Trustee property as described in Deed Book 1453, Page 609 of said Registry; thence along and with the line of Henry Lane Young Trustee the following six (6) courses and distances: (1) North 23°25'54" West a distance of 486.76 feet to the following iron rod with cap; (2) North 65°23'16" East a distance of 43.93 feet to an existing an existing iron rod with cap; (3) North 14°24'22" West a distance of 227.94 feet to a new #4 iron rebar; (4) North 44°26'47" East a distance of 50.00 feet to an existing 2" bolt; (5) North 18°22'30" West a distance of 436.13 feet to an existing 1" iron pipe; (6) South 82°34'23" West passing through an existing 1" iron pipe at 804.86 feet a total distance of 839.50 feet to an existing 48" sycamore tree being a northeast corner of Joseph Benjamin Chastain and Dorothy Chastain property as described in Deed Book 1373, Page 123 of said Registry; thence along and with the line of Joseph Benjamin Chastain and Dorothy Chastain and continuing with the line of Hazel Arlene Mclean property as described in Deed Book 1205, Page 135 of said Registry North 00°21'26" East a distance of 94.79 feet to a computed point in creek; thence leaving creek and along and |

11273420v8

with the line of Hazel Arlene Mclean property as described in Deed Book 1205, Page 135 of said Registry and Henry Lane Young Trustee property as described in Deed Book 1453, Page 609 of said Registry North 82°09'20" East passing through an existing iron with cap at 23.26 feet a total distance of 839.50 feet to an existing iron with cap; thence with another line of Henry Lane Young Trustee North 00°08'15" West a distance of 600.31 feet to an existing 1" iron pipe being the southeast corner of Gale B Jenkins and Elaine Jenkins property as described in Deed Book 676, Page 57 of said Registry; thence along and with the line of Gale B Jenkins and Elaine Jenkins North 00°32'51" West a distance of 309.32 feet to an existing 2" pipe being the southwest corner of the Tennessee Valley Authority property (no deed found); thence along and with the line of the Tennessee Valley Authority the following two (2) courses and distances: (1) North 82°23'27" East a distance of 675.91 feet to an existing 2" pipe; (2) North 00°19'51" East a distance of 119.65 feet to an existing concrete monument being the southwest corner of Nantahala Power & Light Company property as described in Deed Book 662, Page 102 of said Registry; thence along and with the line of Nantahala Power & Light Company the following two (2) courses and distances: (1) North 82°26'26" East a distance of 599.89 feet to an existing concrete monument; (2) South 81°30'32" East a distance of 344.17 feet to an existing nail in the center of Palmer Road (60' public right-of-way), said nail being a common corner of Dewey William Stiles property as described in Deed Book 1398, Page 73 of said Registry; thence along and with the line of Dewey William Stiles and continuing with the line of Larry R Martin and Vickie T Martin as described in Deed Book 479, Page 52 of said Registry and with the line of Larry R Martin and Vickie T Martin as described in Deed Book 611, Page 198 of said Registry the following four (4) courses and distances: (1) South 28°20'42" East a distance of 129.43 feet to a computed point in right-of-way of Palmer Road; (2) South 23°24'18" West a distance of 58.63 feet to a computed point in right-of-way of Palmer Road; (3) South 13°10'18" West a distance of 338.30 feet to a computed point in right-of-way of Palmer Road; (4) South 09°05'24" West a distance of 367.78 feet to a computed point in right-of-way of Palmer Road being the northwest corner of Trudy T Evans property as described in Deed Book 1004, Page 148 of said Registry; thence along and with the line of Trudy T Evans South 10°32'13" West a distance of 139.00 feet to a computed point in right-of-way of Palmer Road being the northwest corner of Larry R Martin and Vickie T Martin property as described in Deed Book 1004, Page 145 of said Registry; thence along and with the line of Larry R Martin and Vickie T Martin South 10°32'13" West a distance of 160.68 feet to a computed point in right-of-way of Palmer Road being on line of Marvin Leroy Moss and Carolyn Moss as described in Deed Book 1447, Page 1030 of said Registry; thence along and with the line of Marvin Leroy Moss and Carolyn Moss the following four (4) courses and distances: (1) South 83°14'34" West a distance of 20.94 feet to a computed point in right-of-way of Palmer Road; (2) with an arc of a circular curve to the left having a radius of 772.58 feet, an arc length of 36.03 feet, chord:(South 07°23'07" West 36.03 feet) to a computed point in right-of-way of Palmer Road; (3) with an arc of a circular curve to the left having a radius of 935.59 feet, an arc length of 99.73 feet, chord:(South 02°59'44" West 99.68 feet) to a computed point in right-of-way of Palmer Road; (4) with an arc of a circular curve to the left having a radius of 57140.41 feet, an arc length of 101.55 feet, chord:(South 00°06'33" East 101.55 feet) to a computed point in right-of-way of Palmer Road; thence with another line of Marvin Leroy Moss and Carolyn Moss and continuing with the line of Shyland Clark Moss as described in Deed Book 1447, Page 1026 of said Registry the following two (2) courses and distances: (1) with an arc of a circular curve to the right having a radius of 1060.22 feet, an arc

11273420v8

| Calvert City, Kentucky | American Property Acquisition, LLC | Fee | 1035 Shar Cal Rd., Calvert City, KY 42029 | length of 105.22 feet, chord:(South 02°4'0'58" West 105.17 feet) to a computed point in right-of-way of Palmer Road; (2) with an arc of a circular curve to the right having a radius of 5377.31 feet, an arc length of 222.20 feet, chord:(South 06°4'2'34" West 222.18 feet) to an existing nail in Palmer Road, said nail being the northwest corner of Martha W Peacock property as described in Deed Book 928, Page 125 of said Registry; thence along and with the line of Martha W Peacock South 06°4'8'40" West a distance of 448.83 feet to an existing nail being the point or place of BEGINNING, containing 3,163,469 Sq. Ft or 72.623 acres more or less, as shown on a survey by James H Mauney, Jr., PLS # L-3885, with James Mauney & Associates, P.A., Dated December 21, 2017, bearing file No. F1799

That certain tract of land located in Marshall County, Kentucky containing 35.6193 acres identified as Tract "A" on that certain Plat of Survey of Tract "A" of the Holliwood, LLC Property prepared by Ricky A. Tosh, PLS 2900 of the firm of Dummer Surveying & Engineering Services, Inc. of Paducah, Kentucky on October 24, 2018 (the "Survey"). A copy of the Survey is attached hereto as Exhibit A-1 and the Property is more particularly described as follows:

Bearings described herein are based on a record bearing of North 69 Degrees 49 Minutes 16 Seconds East along the south right of way of Shar-Cal Road as recorded in Deed Book 455, Page 649.

All rebars and caps (set) are 1/2" diameter by 18" long rebar with a plastic cap stamped "R. TOSH KYPLS 2900".

Beginning at a rebar and cap (set), 40.00 feet south at right angles to the road centerline, said rebar being located North 69 Degrees 19 Minutes 13 Seconds East for a distance of 1143.89 feet from the northwest corner of the parent tract, said rebar also being located at Kentucky State Plane Coordinate North: 1912546.019 East: 867551.183; Latitude: 37°03'03.62520" Longitude: 88°23'55.44549";

Thence North 69 Degrees 49 Minutes 16 Seconds East for a distance of 766.20 feet to a 1/2" diameter rebar and cap stamped "FMT ENGRS KRLS 1842" (found) 40.00 feet south of the road centerline;

Thence with a curve turning to the right with an arc length of 78.12 feet, with a radius of 1,902.23 feet, with a chord bearing of North 70 Degrees 59 Minutes 43 Seconds East, with a chord length of 78.11 feet, to a rebar and cap (set) 40.00 feet south of the road centerline; |

Thence South 17 Degrees 49 Minutes 42 Seconds East for a distance of 15.00 feet to a rebar and cap (set) 55.00 feet south of the road centerline;

Thence with a curve turning to the right with an arc length of 76.76 feet, with a radius of 1,887.23 feet, with a chord bearing of North 73 Degrees 20 Minutes 13 Seconds East, with a chord length of 76.76 feet, to a rebar and cap (set) 55.00 feet south of the road centerline;

Thence with a compound curve turning to the right with an arc length of 483.67 feet, with a radius of 1,637.02 feet, with a chord bearing of North 80 Degrees 02 Minutes 09 Seconds East, with a chord length of 481.91 feet, to a rebar and cap (set) 40.00 feet south of the road centerline;

Thence with a compound curve turning to the right with an arc length of 108.83 feet, with a radius of 1,902.23 feet, with a chord bearing of South 89 Degrees 15 Minutes 12 Seconds East, with a chord length of 108.81 feet, to a 1/2" diameter rebar and cap stamped "TMT ENGRS KRLS 1842" (found) 40.00 feet south of the road centerline;

Thence South 87 Degrees 36 Minutes 47 Seconds East for a distance of 345.40 feet to a rebar and cap (set) 40.00 feet south of the road centerline;

Thence severing the lands of Holliwood, LLC described in Tract 1 of Deed Book 455, Page 649 the following (6) six courses:

1.  South 02 Degrees 36 Minutes 01 Seconds West for a distance of 858.39 feet to a rebar and cap (set);
2.  North 88 Degrees 18 Minutes 57 Seconds West for a distance of 1,284.90 feet to a rebar and cap (set);
3.  South 02 Degrees 33 Minutes 49 Seconds West for a distance of 600.57 feet to a rebar and cap (set);
4.  North 87 Degrees 22 Minutes 33 Seconds West for a distance of 189.74 feet to a rebar and cap (set);
5.  North 42 Degrees 27 Minutes 43 Seconds West for a distance of 431.81 feet to a rebar and cap (set);
6.  North 02 Degrees 28 Minutes 45 Seconds East for a distance of 728.09 feet to the point of beginning and being a part of the Tract 1 described in Deed Book 455, Page 649.

11273420v8

| | | | | |
|---|---|---|---|---|
| Muskogee, Oklahoma | Core Scientific | Fee | 1525 W Smith Ferry Rd, Muskogee, OK 74401 | **The east half of the east half of the NW¼ AND the east half of the west half of the NW¼ of Section 15, Township 14 North, Range 18 East of the Indian Base and Meridian, Muskogee County, Oklahoma.**<br><br>**and**<br><br>**A tract of land in the NW/4 of Section 15, Township 14 North, Range 18 East of the Indian Meridian, Muskogee County, Oklahoma, more particularly described as follows:**<br><br>**Beginning at the northeast corner of the west half of the west half of the SE/4 of the NW/4; thence S01°37'08"E along the east line thereof 180.00 feet; thence S88°45'27"W 400.00 feet; thence N01°37'08"W 180.00 feet to the north line of said SW/4 of the NW/4; thence continuing N01°37'08"W 276.45 feet; thence N88°48'27"E 400.00 feet to a point on the east line of the west half of the west half of the NW/4 at 1043.58 feet south of the northeast corner thereof; thence S01°37'08"E along said line 276.45 feet to the point of beginning** |

TOGETHER WITH:

Any and all rights and easements to which the Property is benefited by reason of that certain Declaration of Easements recorded in Deed Book _105_, Page _596_ in the Marshall County Clerk's Office.

Being a portion of the same property acquired by Holliwood LLC, a Kentucky limited liability company, by Deed dated November 6, 2017, of record in Deed Book 455, Page 649 in the Marshall County Clerk's Office.

| Barstow, Texas (Cedarvale) | Core Scientific, Inc. | Fee | 303 FM 516 N. Barstow, TX 79777 | BEING A 43.41 ACRE TRACT OF LAND SITUATED IN SECTION 229, BLOCK 34, H. & T.C. RR. CO. SURVEY, ABSTRACT NO. 292, WARD COUNTY, TEXAS, BEING A PART OF A CALLED 135 ACRE TRACT OF LAND CONVEYED TO C. S. MAJORS, AS RECORDED IN VOLUME 33, PAGE 592, OFFICIAL PUBLIC RECORDS, WARD COUNTY, TEXAS. SAID 43.41 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:<br><br>BEGINNING AT A 1/2" CAPPED IRON ROD STAMPED "TRANSGLOBAL SERVICES" SET FOR THE SOUTHEAST CORNER OF SAID 43.41 ACRE TRACT, FROM SAID CORNER A 1/2" CAPPED IRON ROD FOUND FOR THE SOUTHEAST CORNER OF SAID SECTION 229 BEARS S 07°25'59"W, A DISTANCE OF 2395.13 FEET (TIE). SAID SET 1/2" CAPPED IRON ROD STAMPED "TRANSGLOBAL SERVICES" BEING CALLED THE POINT OF BEGINNING AND HAVING A TEXAS COORDINATE SYSTEM OF 1983, CENTRAL ZONE (4203), STATE PLANE COORDINATE OF N. 10528546.63, E: 1326591.79 FEET, FOR REFERENCE.<br><br>THENCE N 59°29'33" W, A DISTANCE OF 567.34 FEET TO A 1/2" CAPPED IRON ROD STAMPED "TRANSGLOBAL SERVICES" SET FOR THE SOUTHWEST CORNER OF SAID 43.41 ACRE TRACT FROM WHICH A FOUND 1" IRON ROD BEARS S 42°42'20" W, A DISTANCE OF 1840.32 FEET (TIE);<br><br>THENCE N 42°42'20" E, A DISTANCE OF 3483.15 FEET TO A 1/2" CAPPED IRON ROD STAMPED "TRANSGLOBAL SERVICES" SET FOR THE NORTHWEST CORNER OF SAID 43.41 ACRE TRACT, FROM WHICH A FOUND 60D NAIL BEARS S 30°18'49" E, A DISTANCE OF 70.14 FEET (TIE);<br><br>THENCE S 47°19'55" E, A DISTANCE OF 550.09 FEET TO A 1/2" CAPPED IRON ROD STAMPED "TRANSGLOBAL SERVICES" SET FOR THE NORTHEAST CORNER OF SAID 43.41 ACRE TRACT, FROM WHICH A MONUMENT FOUND FOR THE NORTHEAST CORNER OF SAID SECTION 229 BEARS S 47°19'55" E, A DISTANCE OF 1443.13 FEET (TIE);<br><br>THENCE S 42°37'48" W, A DISTANCE OF 3363.64 FEET TO THE POINT OF BEGINNING, CONTAINING 43.41 ACRES OR 1,890,906 SQUARE FEET OF LAND, MORE OR LESS. |

| Location | Landlord/Tenant | Leasehold | Address | Legal Description |
|---|---|---|---|---|
| Pecos, Texas | **Landlord:** Jobe Ranch Family Limited Partnership<br><br>**Tenant:** Core Scientific, Inc. | Leasehold estate | 1851 FM 2119, Pecos Texas 79772 | Being a 60.00-acre surface lease located in the T. & P. RR. Co. Survey, Section 6, Block 55, Abstract 3149 and the T. & P. RR. Co. Survey, Section 6, Block 55, Abstract 3148, Reeves County, Texas, being part of a tract of land described in Deed to Jobe Ranch Family Limited Partnership as recorded in Volume 937, Page 328 of the Official Public Records of Reeves County Texas; said surface lease being more particularly described as follows:<br><br>**BEGINNING** at a 3-inch iron pipe found for the Northwest corner of said Section 6;<br><br>**THENCE** N 01°42'45" E, a distance of 642.18 feet, to a 1/2-inch capped iron rod stamped "DATAPOINT 10194585" set for corner;<br><br>**THENCE** S 67°55'34" E, a distance of 2,748.78 feet, to a 1/2-inch capped iron rod stamped "DATAPOINT 10194585" set for corner;<br><br>**THENCE** S 01°38'17" W, a distance of 780.09 feet, to a 1/2-inch capped iron rod stamped "DATAPOINT 10194585" set for corner;<br><br>**THENCE** N 88°21'43" W, a distance of 2,058.77 feet, to a 1/2-inch capped iron rod stamped "DATAPOINT 10194585" set for corner, from which a 1/2-inch capped iron rod found for the Northwest corner of Public School Lands Survey, Section 48, Block 57, Abstract 5055 bears S 01°44'36" W a distance of 2,354.38 feet;<br><br>**THENCE** N 01°38'17" E, a distance of 1,116.65 feet, to the **POINT OF BEGINNING**, in all containing 2,613,600 square feet or 60.00 acres, more or less. |
| Dalton, Georgia | Dalton-Whitfield County Joint Development Authority | Leasehold estate Leased (obligation to purchase for $10 following the expiration (i.e., December 1, 2030) or sooner termination of the Lease) | 206 Boring Drive, Dalton, GA 30721 | All that tract or parcel of land lying and being in Land Lot No. 48 in the 13th District and 3rd Section of Whitfield County, Georgia, being Lot Nos. 8, 9, 10, and 11, as shown on Final Subdivision Plat for Whitfield Properties Industrial Park South, Phase 2, as prepared by Whitfield Engineering Company, dated October 4, 2000, revised November 2, 2000, as more particularly depicted on a plat recorded in Plat Cabinet C, Slides 2198 and 2199, Records of Whitfield County, Georgia, which plat is incorporated herein by reference hereto. |
| Grand Forks, | **Landlord:** Minnkota | Leasehold estate | 5601 11th | Lot 2, Block 1, Prairie Power Addition, Grand Forks County, North Dakota Parcel No. 44-2626-00002-000 |

11273420v8

| North Dakota | Power Cooperative<br><br>**Tenant:** Core Scientific, Inc. | | Avenue South, Grand Forks, ND 58201 | |

11273420v8

**<u>Schedule 1.1 (b)</u>**

**Commitment Letter**

*See attached.*

**B. Riley Commercial Capital, LLC**
299 Park Avenue
New York, NY 10171

<u>**PRIVILEGED AND CONFIDENTIAL**</u>
<u>**SUBJECT TO FRE RULE 408 & EQUIVALENTS**</u>

January 29, 2023

Core Scientific, Inc.
210 Barton Springs Road, Suite 300
Austin, TX 78704
Attn: Todd DuChene; President, Chief Legal Officer and Secretary

<u>**Commitment Letter**</u>

Dear Ladies and Gentleman:

You have informed **B. Riley Commercial Capital, LLC** (the "***DIP Lender***") that Core Scientific, Inc., a Delaware corporation (the "***Company***") and certain of the Company's direct and indirect subsidiaries (collectively and together with the Company, the "***Debtors***" and "***you***") referred to in the DIP Term Sheet attached hereto as ***Annex A*** (including[1] all exhibits and schedules thereto, the "***DIP Term Sheet***"; capitalized terms used but not defined herein shall have the meanings given to them in the DIP Term Sheet) have commenced cases under chapter 11 (the "***Chapter 11 Cases***") of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***") under Case No. ***22-90341 (DRJ) (Jointly Administered)***, and wish to obtain the up to $70,000,000 DIP Facility referenced in the DIP Term Sheet, substantially on the terms set forth in this letter, as well as the DIP Term Sheet (such letter and the DIP Term Sheet, collectively, the "***Commitment Letter***"). The transactions contemplated by the DIP Term Sheet and this Commitment Letter are hereinafter collectively referred to as, the "***Transactions***".

1. Upon the terms and subject only to the conditions set forth in this Commitment Letter (including paragraph 3 hereof) and the DIP Term Sheet (including the "Conditions Precedent to Closing and Funding the Initial Draw" set forth in the DIP Term Sheet), the DIP Lender is pleased to inform you of its commitment to provide up to $70,000,000 of the DIP Commitments (as defined in the DIP Term Sheet). You hereby agree that, effective upon your acceptance of this Commitment Letter, you shall not solicit any other bank, investment bank, financial institution, person or entity to provide, structure, arrange or syndicate any component of the DIP Facility or any other senior financing similar to or as a replacement of any component of the DIP Facility.

2. In consideration of the DIP Lender's commitments hereunder, the Company agrees to pay the fees described in the DIP Term Sheet on the terms and subject to the conditions (including as to timing and amount) set forth therein, including, without limitation the fees required to be paid to the DIP Agent and the DIP Lender by the Debtors as described therein under the heading "Interim Order".

3. The DIP Lender's commitments and agreements hereunder in respect of the DIP Facility are subject to the satisfaction or waiver in writing (by the DIP Lender) of all conditions precedent set forth in this Commitment Letter and the DIP Term Sheet, including those conditions precedent set forth across the heading "Conditions Precedent to Closing" and, in the case of the borrowing of any DIP Loans after the Closing Date, also the conditions precedent set forth across from the heading "Conditions Precedent to Full Availability of DIP Loans", in each case, in the DIP Term Sheet.

---

[1] For the avoidance of doubt, the terms "include", "includes" and "including" as used in this Commitment Letter are by way of example and not limitation, and shall be deemed to be followed by the words "without limitation" whether or not they are in fact followed by such words.

1

4. The Company, on behalf of itself and the other Debtors, represents and covenants that (i) all information, other than Projections and Lien Information, which has been or is hereafter provided directly or indirectly by the Company or any of its affiliates, advisors or representatives to the DIP Lender or its affiliates in connection with the Transactions (the "*Information*") is and will be complete and correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not misleading and (ii) all financial projections concerning the Debtors and their subsidiaries that have been or will be made available to DIP Lender or its affiliates by the Company or any of its affiliates, advisors or representatives (the "*Projections*") and all information related to all outstanding liens (including, without limitation, mechanics' liens), the amount thereof, the validity of such liens, any claims or counterclaims with respect to such liens and any materials available to offset such liens, in each case, which has been or is hereafter provided directly or indirectly by the Company or any of its affiliates, advisors or representatives to the DIP Lender or its affiliates (the "*Lien Information*") have been and will be prepared in good faith based upon assumptions that are believed by the preparer thereof to be reasonable at the time made. You agree that if at any time prior to the Closing Date, any of the representations in the preceding sentence would be incorrect in any material respect if the Information, Projections and Lien Information were being furnished, and such representations were being made, at such time, then you will promptly supplement, or cause to be supplemented, the Information, Projections and Lien Information so that such representations will be correct in all material respects under those circumstances.

5. [Reserved].

6. [Reserved].

7. In addition, please note that the DIP Lender and its affiliates do not provide accounting, tax or legal advice. Notwithstanding anything herein to the contrary, DIP Lender (and each of its partners, officers, directors, employees, affiliates, agents, advisors and attorneys) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the Transactions and all materials of any kind (including tax opinions or other tax analyses) that are provided to DIP Lender relating to such tax treatment and tax structure. However, the foregoing sentence shall not apply to any information relating to the tax treatment or tax structure to the extent reasonably necessary to enable any person to comply with applicable securities laws. For this purpose, "*tax treatment*" means U.S. federal income tax treatment, and "*tax structure*" is limited to any facts relevant to the U.S. federal income tax treatment of the Transactions.

8. The DIP Lender hereby notifies you that consistent with the USA PATRIOT ACT (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "*PATRIOT ACT*") and 31 C.F.R. § 1010.230 (the "*Beneficial Ownership Regulation*"), it may be required to obtain, verify and record information that identifies you and each Guarantor, which information includes the name and address of you and each Guarantor and other information that will allow the DIP Lender to identify you and each Guarantor, including the delivery of the certification regarding beneficial ownership in relation to you, in accordance with, or as otherwise required by, the PATRIOT ACT and the Beneficial Ownership Regulation. In addition, the DIP Lender may also request corporate formation documents, or other forms of identification, to verify information provided. This notice is given in accordance with the requirements of the PATRIOT ACT and the Beneficial Ownership Regulation and is effective for the DIP Lender, any other lender and agent (including the DIP Agent) in respect of the DIP Facility.

9. As you know, DIP Lender and/or its affiliates may from time to time effect transactions, for their own account or the account of customers, and hold positions in loans or options on loans of the Company and other companies that may be the subject of this Commitment Letter. In addition, DIP Lender and/or its affiliates may from time to time effect transactions and hold positions in securities or options on securities of the Company and other companies that may be the subject of this Commitment Letter. In addition, DIP Lender may employ the services of its affiliates in providing certain services hereunder and may exchange with such affiliates information

2

concerning the Company and other companies that may be the subject of this Commitment Letter, and such affiliates shall be entitled to the benefits afforded to DIP Lender (subject to any limitations thereof) hereunder.

10. The DIP Lender and its affiliates may have economic interests that conflict with those of the Company. You agree that the DIP Lender will act under this Commitment Letter as an independent contractor and that nothing in this Commitment Letter or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between the DIP Lender and the Company, its stockholders or their affiliates. You acknowledge and agree that (i) the Transactions are arm's-length commercial transactions between the DIP Lender, on the one hand, and the Company and their affiliates, on the other, (ii) in connection therewith and with the process leading to such Transactions the DIP Lender is acting solely as a principal and not the agent or fiduciary of the Company, its management, stockholders, affiliates, creditors, or any other person, (iii) the DIP Lender has not assumed an advisory or fiduciary responsibility in favor of the Company and their affiliates with respect to the Transactions contemplated hereby or the process leading thereto (irrespective of whether the DIP Lender or any of its affiliates has advised or is currently advising the Company and their affiliates on other matters) or any other obligation to the Company and their affiliates except the obligations expressly set forth in this Commitment Letter and (iv) the Company has consulted its own legal and financial advisors to the extent it deemed appropriate. The Company further acknowledges and agrees that it is responsible for making its own independent judgment with respect to such Transactions and the process leading thereto. The Company, on behalf of itself and their affiliates, agrees that it will not claim that the DIP Lender has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to the Company and their affiliates, in connection with such Transaction or the process leading thereto.

11. This Commitment Letter (including the DIP Term Sheet) may not be amended or waived except by an instrument in writing signed by the DIP Lender and the Company. This Commitment Letter may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument. Delivery of an executed signature page of this Commitment Letter by facsimile or email transmission shall be effective as delivery of a manually executed counterpart thereof.

12. This Commitment Letter (i) supersedes all prior discussions, agreements, commitments, arrangements, negotiations and understandings, whether oral or written, of the parties with respect thereto (other than the Interim Order), (ii) SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS, and (iii) may not be assigned by the Company or the DIP Lender without the DIP Lender's or the Company's prior written consent, respectively, and any purported assignment without such consent shall be null and void, (iv) shall be binding upon the parties and their respective successors and assigns, and (v) may not be relied upon or enforced by any other person or entity and is not intended to confer any benefit upon, or create any right in favor of, any person other than the parties hereto except hereto except the entities and persons described in the definition of Indemnified Person. ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY ACTION OR PROCEEDING ARISING IN CONNECTION WITH OR AS A RESULT OF EITHER THE TRANSACTIONS OR ANY MATTER REFERRED TO IN THE COMMITMENT LETTER OR THE DIP TERM SHEET IS HEREBY WAIVED BY THE PARTIES HERETO. EACH OF THE COMPANY AND THE DIP LENDER AGREE THAT ANY SUIT OR PROCEEDING ARISING IN RESPECT OF THE TRANSACTIONS OR ANY MATTER REFERRED TO IN THE COMMITMENT LETTER OR THE DIP TERM SHEET WILL BE TRIED EXCLUSIVELY IN THE BANKRUPTCY COURT AND THE COMPANY AND THE DIP LENDER EACH AGREE TO SUBMIT TO THE JURISDICTION OF, AND TO VENUE IN, SUCH COURT.

13. If any term, provision, covenant or restriction contained in this Commitment Letter is held by a court of competent jurisdiction to be invalid, void or unenforceable or against public policy, the remainder of the terms, provisions, covenants and restrictions contained herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated. The DIP Lender and the Company shall endeavor in good faith negotiations to replace the invalid, void or unenforceable provisions with valid provisions the economic effect of which comes

3

as close as possible to that of the invalid, void or unenforceable provisions.

14. [Reserved].

15.  If you accept the terms and conditions of this Commitment Letter in accordance with, and by the deadline specified in, paragraph 18 hereof, the DIP Lender's commitments and other obligations hereunder will remain effective and terminate on February 2, 2023 at 11:59 p.m. (New York City time) unless prior to such time the Court has entered the Interim Order (the "Termination Date"); provided, that this Commitment Letter may otherwise be terminated by (x) mutual consent of the DIP Lender and the Company, (y) by the DIP Lender by written notice (i) prior to the Company's acceptance hereof or (ii) material breach by the Company of any of the conditions, representations, or its respective obligations or undertakings under this Commitment Letter or the DIP Sheet, as applicable, or (z) by the Company, in its reasonable discretion, to the extent that (i) it determines doing so would be required by its fiduciary duties and (ii) the Company promptly reimburses the DIP Lender, in full in cash, for all of its then-outstanding reasonable and documented fees and expenses (including, without limitation, the reasonable and documented fees and expenses of Choate, Hall & Stewart LLP, as counsel to the DIP Lender).

16. Paragraphs 2, 4, 7, 9, 10, 12 and 17 hereof shall remain in full force and effect regardless of whether any DIP Loans are funded or the DIP Documents shall be executed and delivered and notwithstanding the termination or expiration of this Commitment Letter or the DIP Lender's commitments hereunder; provided, that your obligations under this Commitment Letter (other than your obligations set forth in paragraphs 4, 5 and 14) shall automatically terminate and be superseded by the Interim Order and/or corresponding provisions of the DIP Documents upon the execution and delivery thereof, as applicable, in each case, solely to the extent such paragraphs (and the content thereof) are covered thereby with retroactive application to the date hereof.

17.  Subject to the Bankruptcy Court's approval of the Interim Order, you agree to indemnify and hold harmless the DIP Lender, its respective affiliates and its officers, directors, employees, agents, advisors, consultants, representatives, controlling persons, members and successors and assigns (each, an "**Indemnified Person**") from and against any and all losses, claims, damages, liabilities and expenses, joint or several ("**Losses**") to which any such Indemnified Person may become subject arising out of or in connection with this Commitment Letter, the DIP Facility, the use of proceeds thereof, the Transactions, to reimburse each such Indemnified Person from time to time upon their reasonable demand upon presentation of a summary statement, for any reasonable and documented out-of-pocket legal expenses (including one outside local counsel in each relevant jurisdiction) or other expenses incurred in connection with the DIP Facility, the enforcement of this Commitment Letter, the DIP Documents and any ancillary documents and security arrangements in connection therewith; provided, that the foregoing indemnity will not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or related expenses to the extent they are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted from such Indemnified Person's (x) gross negligence or willful misconduct or (y) material breach of obligations under this Commitment Letter, in each case, whether or not such investigation, litigation or proceeding is brought by you, your equityholders or creditors or an Indemnified Party, whether or not an Indemnified Party is otherwise a party thereto and whether or not any aspect of the Transaction is consummated. You agree that, notwithstanding any other provision of this Commitment Letter, no Indemnified Person shall have any liability (whether direct or indirect, in contract or tort or otherwise) to you or your respective equity holders or creditors or any other person or entity arising out of, related to or in connection with any aspect of the Transactions, the DIP Facility, the enforcement of this Commitment Letter, the DIP Documents and any ancillary documents and security arrangements in connection therewith, except to the extent of direct, as opposed to special, indirect, consequential or punitive, damages determined in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's (a) gross negligence or willful misconduct or (b) breach of obligations under this Commitment Letter.

18.  If the foregoing correctly sets forth the DIP Lender's agreement with you, please indicate your acceptance of the terms and conditions of this Commitment Letter (including the DIP Term Sheet) by returning an executed counterpart to this Commitment Letter to the Company's counsel Weil, Gotshal & Manges LLP (by electronic

(pdf) transmission to Maximilien.Pucci-SistiMaisonrouge@weil.com, Claudia.Stantzyk-Guzek@weil.com and Kate.Waterman@weil.com) on or before 11:59 p.m. (New York City time) on January 29, 2023.

11230215v4

DocuSign Envelope ID: 0CAC89C9-05C8-44A1-95CB-13E39E44B7E2

We look forward to working with you.

Very truly yours,

**B. RILEY COMMERCIAL CAPITAL, LLC**, as DIP Lender

By: _Bryant Riley_

Name:  Bryant R. Riley

Title:   Co-Chief Executive Officer

[Signature Page to Core DIP Commitment Letter]

ACCEPTED AND AGREED AS OF THE DATE ABOVE:

**CORE SCIENTIFIC, INC.**

By: *Todd DuChene*

Name: Todd DuChene
Title: President, Chief Legal Officer and Secretary

Case 22-90341 Document 637 Filed in TXSB on 05/04/23 Page 269 of 396

**_Annex A_**

*(see attached)*

**PRIVILEGED & CONFIDENTIAL**
**SUBJECT TO FRE 408 & EQUIVALENTS**

**Core Scientific, Inc.**
**Up to $70,000,000**
**Debtor-in-Possession Term Loan Facility**
**Summary of Terms and Conditions**

THIS TERM SHEET IS PROVIDED FOR DISCUSSION PURPOSES ONLY AND DOES NOT CONSTITUTE AN OFFER, AGREEMENT OR COMMITMENT TO ENTER INTO THE DEFINITIVE DIP DOCUMENTS (AS DEFINED BELOW). NOTHING IN THIS TERM SHEET IS INTENDED TO REPRESENT A COMMITMENT ON THE PART OF THE PROSPECTIVE DIP AGENT OR DIP LENDER TO ENTER INTO THE DIP FACILITY OR ANY OTHER DEFINITIVE AGREEMENT WITH ANY PERSON.

*The statements contained in this Term Sheet and all discussions between and among the parties in connection herewith constitute privileged communications that shall not be disclosed or introduced pursuant to Federal Rule of Evidence 408 and/or other applicable law, unless otherwise required by judicial order or applicable law. All assumptions, principles and numbers are based upon and subject to continuing due diligence and are subject to change as the parties' positions develop further.*

| 1. | *Borrowers:* | • Core Scientific, Inc., Core Scientific Acquired Mining LLC, Core Scientific Operating Company, Core Scientific Specialty Mining (Oklahoma) LLC, American Property Acquisition, LLC, American Property Acquisitions I, LLC, American Property Acquisition VII, LLC, Radar Relay, Inc., Starboard Capital LLC, RADAR LLC and Core Scientific Mining LLC (the "**Borrowers**"), as debtors and debtors-in-possession in Case **No. 22-90341 (DRJ) (Jointly Administered)** (together with the cases of certain of its affiliated debtors and debtors-in-possession, the "**Chapter 11 Cases**", and such affiliated debtors, together with the Borrowers, the "**Debtors**") under chapter 11 of title 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") commenced in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") on December 21, 2022 (the "**Petition Date**"). <br><br> • The Borrowers shall, in all cases, be jointly and severally liable for all DIP Obligations (as defined below). |
| --- | --- | --- |
| 2. | *Guarantors:* | • Each of Core Scientific, Inc.'s existing and future, direct and indirect domestic or foreign subsidiaries that are debtors and debtors-in-possession in the Chapter 11 Cases, including all existing obligors under the Existing DIP Credit Agreement (as defined below) (collectively, the "**Guarantors**" and together with the Borrower, the "**Loan Parties**"). <br><br> • The DIP Obligations of the Borrowers shall be unconditionally guaranteed, on a joint and several basis, by the Guarantors. |
| 3. | *DIP Agent and Initial DIP Lender:* | • B. Riley Commercial Capital, LLC . |

| 4. | *Type and Amount of the DIP Facility:* | • A non-amortizing super-priority senior secured term loan facility in an aggregate principal amount not to exceed $70,000,000 (the "**Maximum DIP Commitment Amount**") consisting of up to $70,000,000 in term loan commitments (the "**DIP Facility**"; the definitive documentation evidencing the DIP Facility being the "**DIP Documents**"; the DIP Lender's commitments under the DIP Facility being the "**DIP Commitments**"; and the loans under the DIP Facility being the "**DIP Loans**"). |
|---|---|---|
| | | • The borrowing of DIP Loans shall permanently decrease the DIP Commitments and DIP Loans repaid (for any reason) may not be reborrowed unless (and solely to the extent that) they are repaid prior to the entry of the Final Order (as defined below). |
| | | • Loan proceeds to be funded into newly established (or, in the case of the Carve-out Account referred to below, a previously established (expressly for such purpose pursuant to Existing DIP Credit Agreement)) funding accounts, including a carve-out account (to be fully funded (to the extent of any deficiency) in the amount of the Post-Carve-out Notice Amount (as such term shall be defined in the Orders) from the Initial Draw) (the "**Carve-out Account**"), each to be initially maintained at Bank of America, N.A. |
| 5. | *Initial Availability:* | • Upon the Bankruptcy Court's entry of the Interim Order (as defined below), and satisfaction of all applicable conditions precedent described herein (the "**Closing Date**"), the Borrowers shall be entitled to make a single draw of DIP Loans in an amount of up to $35,000,000 prior to the entry of the Final Order (the "**Initial Draw**"). |
| 6. | *Full Availability:* | • Upon the Bankruptcy Court's entry of the Final Order, and satisfaction of all applicable conditions precedent described herein, following the Initial Draw, the full remaining amount of the then undrawn DIP Facility (after giving effect to any repayments of the Initial Draw prior to the entry of the Final Order) shall be available to the Debtors, subject to compliance with the terms, conditions and covenants described herein and in the DIP Documents in additional draws ("**Other Draws**"). Other Draws shall only be permitted when the Debtors' cash on hand (other than cash in the Carve-out Account) prior to giving effect to such draw is less than $30,000,000. In addition, Other Draws shall be made (x) only in a principal amount of not less than $5,000,000, per draw and (y) in no more than five (5) draws and (z) no more frequently than once every three (3) weeks. In addition, a final single draw (which shall also be deemed to be an "Other Draw" for purposes hereof (other than requiring satisfaction of the conditions set forth in clauses (x) and (y) above)) in an amount not to exceed the amount of the then undrawn DIP Commitment, as then in effect, may be requested; *provided* that at the time of (and prior to giving effect to) such final draw, the Debtors' cash then on hand (other than cash in the Carve-out Account) is less than $30,000,000 (the "**Final Draw**"). |

2

| 7. | *Maturity and Termination* | • All DIP Obligations (including, without limitation, all capitalized interest and fees) shall be due and payable in full in cash (or such other form of consideration as the DIP Agent and the DIP Lender may agree in their sole discretion) on the earliest of: |
|---|---|---|
| | | i. the date that is twelve (12) months after the Petition Date; *provided*, that the Borrowers shall be permitted to extend such date by three (3) months upon paying the DIP Agent an extension fee (the "**Extension Fee**"), in cash, in an amount equal to three and one-half percent (3.50%) of the aggregate amount of all DIP Obligations drawn and outstanding as of the effective date of the extension (after giving effect to the Final Draw) (any such date being the "**Scheduled Maturity Date**") |
| | | ii. the effective date of any chapter 11 plan of reorganization with respect to the Borrowers or any other Debtor (a "**Plan**"); |
| | | iii. the consummation of any sale or other disposition of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code; |
| | | iv. the date of the acceleration of the DIP Loans and the termination of the DIP Commitments in accordance herewith or with the DIP Documents; |
| | | v. the date of the DIP Agent's written notice to the Borrowers of the occurrence of an Event of Default (as defined below) under the DIP Facility; |
| | | vi. dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code; and |
| | | vii. 30 days after the date on which a motion to approve the DIP Facility is filed (or such later date as agreed to by the DIP Agent), unless the Final Order has been entered by the Bankruptcy Court on or prior to such date (such earliest date, the "**DIP Termination Date**"). |
| | | • The occurrence of the DIP Termination Date shall terminate the ability of the Borrowers to make the Other Draws or the Final Draw. |
| 9. | *Interest Rate:* | • The DIP Loans shall bear interest at a per annum rate equal to ten percent (10.00%), in each case payable in kind in arrears on the first day of each month (the "**Non-Default Interest**"). |
| | | • Notwithstanding the foregoing, after the occurrence and during the continuance of an Event of Default, the DIP Loans shall bear interest at an additional per annum rate of two percent (2.00%), in each case payable in kind, together with the Non-Default Interest, on the first day of each month. |

3

| 10. | *Monthly DIP Agent Fee:* | • $75,000 per month payable, in cash in advance, to DIP Agent for its sole account and benefit, on the Closing Date and the first business day of each calendar month thereafter (the "**Monthly DIP Agent Fee**"). |
|---|---|---|
| 11. | *Upfront & Exit Premium; Approvals:* | • An upfront premium of three and one-half percent (3.50%) of the Maximum DIP Commitment Amount (the "**Upfront Premium**"), payable in kind to the DIP Lenders and added to the total amount of the DIP Obligations. |
| | | • The Upfront Premium shall be approved by the Bankruptcy Court in the Interim Order and shall be deemed fully earned and payable upon entry of the Interim Order. |
| | | • Following entry of the Interim Order, upon and concurrently with the repayment or satisfaction of the DIP Loans in whole or in part (including any scheduled, mandatory or voluntary prepayment thereof, including upon the acceleration thereof and the final payment at maturity), the Borrowers shall pay to the DIP Agent, in cash, an exit premium equal to five percent (5.00%) of the amount of the DIP Loans being repaid, reduced or satisfied (the "**Exit Premium**"). |
| | | • The Upfront Premium, the Exit Premium, the Extension Fee and the Monthly DIP Agent Fee shall be approved by the Bankruptcy Court as part of the Interim Order and reaffirmed in the Final Order. |
| 13. | *Use of Proceeds:* | • The proceeds of the DIP Facility shall be used only for the following purposes and, in the case of payments pursuant to clauses (ii), (iii), and (iv) below, subject to the Budget, the Carve-Out and any permitted variances as set forth below |
| | |     i.    Payment in full of the obligations under that certain senior secured super-priority debtor-in-possession loan and security agreement, dated as of December 22, 2022 (the "**Existing DIP Credit Agreement**"), among the Borrowers, the lenders party thereto from time to time and Wilmington Savings Fund Society, FSB, as administrative agent, including, without limitation, any fees, premiums, costs or expenses related thereto; it being agreed that such amounts shall be payable from the Borrowers' existing cash at such time (including the Initial Draw); |
| | |     ii.    working capital and other general corporate purposes of the Borrowers and the Guarantors and certain subsidiaries; |
| | |     iii.    any adequate protection payments in accordance with the Orders (as defined below); |
| | |     iv.    professional fees and expenses of administering the Chapter 11 Cases, to the extent the Bankruptcy Court authorizes payment (including fees incurred prior to the Closing Date); |

4

> v. fees and expenses payable under the DIP Facility;
>
> vi. interest and other amounts payable under the DIP Facility; and
>
> vii. funding of the Carve-out Account.

- Notwithstanding any other provision of this Term Sheet, from and after the Closing Date, no DIP Loans or DIP Collateral (as defined below), or any portion of the Carve-Out may be used directly or indirectly by any Debtor, any Guarantor, any official committee appointed in the Chapter 11 Cases, or any trustee appointed in the Chapter 11 Cases or any successor cases, including any chapter 7 cases, or any other person, party or entity:

>> i. in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation

>>> a. against the DIP Agent or the DIP Lender, or their respective predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors, or any action purporting to do the foregoing in respect of the DIP Obligations, DIP Liens (as defined below), DIP Claims (as defined below), or

>>> b. challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the DIP Obligations and/or the liens, claims, rights, or security interests granted under the Orders, the DIP Documents, including, in each case, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise;

>> ii. to prevent, hinder, or otherwise delay the DIP Agent's or the DIP Lender's, as applicable, enforcement or realization on the DIP Obligations, DIP Collateral, and the liens, claims and rights granted to such parties under the Orders, each in accordance with the DIP Documents and the Orders; *provided, however,* this shall not apply to objections by the official committee of the unsecured creditors to the Final Order;

>> iii. to seek to modify any of the rights and remedies granted to the DIP Agent or the DIP Lender under the Orders (other than with the consents contemplated thereunder), or the DIP Documents, as applicable;

>> iv. to apply to the Bankruptcy Court for authority to approve superpriority claims or grant liens (other than the liens permitted pursuant to the DIP Documents) or

5

| | | security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Claims, unless (x) permitted hereunder or under the DIP Documents or unless all DIP Obligations, and claims granted to the DIP Agent or DIP Lender under the Interim Order or the Final Order, as applicable, have been refinanced or paid in full in cash and the DIP Facility terminated or (y) otherwise agreed to in writing by the DIP Agent and the DIP Lender; or |
|---|---|---|
| | | v. to pay any amount on account of any claims arising prior to the Petition Date unless such payments are permitted hereunder or under the DIP Documents or otherwise agreed to in writing by the DIP Agent and the DIP Lender, and in each case, included in the Budget, or otherwise approved pursuant to an order of the Bankruptcy Court. |
| 15. | ***Voluntary Prepayments/Mandatory Repayments:*** | • Voluntary prepayments of the DIP Loans shall be permitted at any time, subject to, after entry into the Final Order, payment of the Exit Premium; underline provided, that, any DIP Loans voluntarily prepaid prior to the Final Order may be re-drawn after entry into the Final Order (subject to Section 6 above). <br><br>• Mandatory prepayment of the DIP Loans, together with all previously uncapitalized interest then accrued and owing on such portion of the DIP Loan then being prepaid, including any Exit Premium shall be required from: <br><br>(i) net proceeds from sale, sale/leaseback, sublease of any real estate (or interests therein) identified in Section 16 below; and <br><br>(ii) any Excess Cash (meaning any cash on hand (other cash than in the Carve-out Account), in excess of \$50,000,000 as at the last day of each month, such prepayment being required on the fifth (5th) Business Days of each calendar month). <br><br>• Such prepayments shall be applied first, to any previously uncapitalized interest then accrued and owing on such portion of the DIP Loan then being prepaid, second, to payment of any Exit Premium, third, to any accrued and unpaid fees and expenses owing to the DIP Agent or the DIP Lenders which are then due and owing and fourth, to the unpaid principal amount of the DIP Loans then outstanding. |
| 16. | ***Priority and Security:*** | • Subject to the Carve-Out, all obligations of the Borrowers and the Guarantors under the DIP Documents (or hereunder), including, without limitation, all principal, accrued interest, costs, fees, indemnities, reimbursements and premiums provided for herein and herein, and all obligations of the Debtors under the DIP Facility (the "***DIP Obligations***") shall be entitled to super priority claim status pursuant to section 364(c)(1) of the Bankruptcy Code, with priority |

6

11226390v13

over any and all administrative expense claims and unsecured claims, of any kind or nature whatsoever, now existing or hereafter arising under the Bankruptcy Code (the "***DIP Claims***")

- Subject to the Carve-Out, all DIP Obligations in respect of the DIP Facility shall be:

  i. secured, pursuant to Section 364(c)(2) of the Bankruptcy Code, by a valid, enforceable, fully perfected and automatic first priority lien on all property and assets (or interests therein) of the Borrowers' and the Guarantors' estates (whether tangible, intangible, real, personal or mixed and wherever located) as of the Petition Date that, as of the Petition Date, was unencumbered (the "**First Priority DIP Collateral**"); including, without limitation, all real property and the facility located in Marble, North Carolina; and

  ii. secured, pursuant to Section 364(c)(3) of the Bankruptcy Code, by a valid, enforceable, fully perfected and automatic junior priority lien on all property (or interest therein) of the Borrowers' and Guarantors' estates (whether tangible, intangible, real, personal or mixed and wherever located) as of the Petition Date that (and subject and junior only to that):

     a. is subject to valid, perfected, and nonavoidable liens in existence as of the Petition Date (including mortgages, mechanics' liens and fixture filings disclosed to the DIP Agent and the DIP Lender); limited, with respect to all real property and the facilities, to those located in:

        i. Calvert City, Kentucky;

        ii. Grand Forks, North Dakota;

        iii. Muskogee, Oklahoma;

        iv. Barstow, Texas (Cedarvale);

        v. Pecos, Texas (Cottonwood); and

        vi. Dalton, Georgia; and

     b. is subject to valid liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code (this clause (ii) being collectively, the "**Second Priority DIP Collateral**" and together with the First Priority DIP Collateral, the "**DIP Collateral**"); provided, however, that any DIP Liens in already encumbered collateral shall be junior to any adequate protection liens granted to existing creditors secured by such collateral.

7

| | | |
|---|---|---|
| | | • The liens securing the DIP Facility (the "**DIP Liens**") shall mean the liens described above. The DIP Liens described herein shall, to the fullest extent permitted by applicable law, be effected and perfected upon entry of the Interim Order and without the necessity of the execution of mortgages, landlord agreements, security agreements, pledge agreements, control agreements, financing statements or other agreements. |
| | | • DIP Collateral shall also include any and all rents, issues, products, offspring, proceeds, and profits generated by any item of DIP Collateral, without the necessity of any further action of any kind or nature by the DIP Agent or the DIP Lender in order to claim or perfect such rents, issues, products, offspring, proceeds, and/or profits. |
| 17. | *Conditions Precedent to Closing:* | • The Closing and the obligation of the DIP Lender to make the Initial Draw (and the right of the Borrowers to request such Initial Draw) shall be subject to the satisfaction of the conditions precedent set forth below and such other conditions set forth in the Interim Order: <br><br> i. entry of the Interim Order, which order shall not be stayed or subject to appeal; <br><br> ii. delivery of the Initial Budget and any subsequent Budget as applicable; <br><br> iii. the payment in full of the obligations under, and the termination of, the Existing DIP Credit Agreement and the inclusion in the Interim Order of provisions terminating all liens granted to the agent and lenders thereunder effective as of the date of the Interim Order; <br><br> iv. in addition to the release set forth in Section 30 hereof, the Interim Order shall include customary stipulations by the Debtors and their estates disclaiming the existence of any claims or causes of action against each of the DIP Agent and DIP Lender, subject to a customary challenge period by the official committee of unsecured creditors; <br><br> v. delivery by the Debtors of the notice of intent to terminate referenced in section 6(b)(ii) of the Restructuring Support Agreement dated as of December 22, 2022 entered into between the Debtors and the Consenting Creditors (as defined therein) (the "**RSA**") to the Ad Hoc Group Advisors (as defined in the RSA) (it being agreed that a copy of such notice shall have been provided to the DIP Agent for its review and reasonable comment prior to the Debtors' delivery thereof, as well as a final copy of such notice as so delivered by the Debtors); <br><br> vi. The DIP Agent shall have received Monthly DIP Agent Fee due and owing on the initial funding date (as set forth above); |

8

| | | |
|---|---|---|
| | | vii. no trustee, examiner, or receiver shall have been appointed or designated with respect to the Loan Parties' business, properties or assets and no motion shall be pending seeking similar relief or any other relief, which, if granted, would result in a person other than the Loan Parties exercising control over their assets; |
| | | viii. no Event of Default or event or condition which with the giving of notice or lapse of time, or both, would constitute an Event of Default (a "**Default**") shall have occurred and be continuing (the requesting and acceptance of any such draw being deemed to be a representation and warranty by the Borrowers as to the satisfaction of this condition); and |
| | | ix. accuracy of representations and warranties of the Debtors in all material respects (or, if such representation and warranty is qualified as to materiality, in all respects) as of the Closing Date and the date of the Initial Draw (or if such representation or warranty expressly speaks to an earlier date, as of such earlier date) (the requesting and acceptance of any such draw being deemed to be a representation and warranty by the Borrowers as to the satisfaction of this condition). |
| 18. | ***Conditions Precedent to Full Availability of DIP Loans:*** | • The right of the Loan Parties to request, and the obligation of the DIP Lenders to advance, any Other Draws and/or the Final Draw shall be subject to the conditions precedent set forth below, in the Final Order, in the DIP Documents and as otherwise deemed incorporated herein (and/or to be included in the DIP Documents), in each case, in accordance with the Documentation Principles (all to be in form and substance satisfactory to the DIP Agent and DIP Lender), and shall include, without limitation: |
| | | i. execution and delivery of a credit agreement (the "**DIP Credit Agreement**") and other DIP Documents evidencing the DIP Facility, in each case, which shall be in form and substance substantially consistent with this Term Sheet and otherwise in form and substance acceptable to the DIP Agent and the DIP Lender and the Borrowers and the Guarantors (it being agreed that the Initial Draw may be advanced based on the terms set forth in this Term Sheet and the Interim Order); |
| | | ii. not later than 30 days following the date on which a motion to approve the DIP Facility is filed, the Final Order as to the DIP Facility shall have been entered by the Bankruptcy Court, which Final Order shall be in the form of the Interim Order with such changes as are customary for a final order and such other changes as the DIP Agent may reasonably require and/or the |

9

<table>
<tr><td></td><td></td><td></td><td>parties may mutually agree, in all cases, to be acceptable to the DIP Agent;</td></tr>
<tr><td></td><td></td><td>iii.</td><td>in addition to the release set forth in Section 30 hereof, the Final Order shall include customary stipulations by the Debtors and their estates disclaiming the existence of any claims or causes of action against each of the DIP Agent and the DIP Lender, subject to a customary challenge period by the official committee of unsecured creditors;</td></tr>
<tr><td></td><td></td><td>iv.</td><td>the Final Order shall be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed, or subject to a stay pending appeal;</td></tr>
<tr><td></td><td></td><td>v.</td><td>the DIP Agent, the DIP Lenders and the Loan Parties shall have finalized and entered into the DIP Documents relating to the facilities contemplated hereby (and all of which have been approved by Bankruptcy Court);</td></tr>
<tr><td></td><td></td><td>vi.</td><td>the Debtors shall be in compliance in all respects with the Interim Order and the Final Order and the Loan Parties shall be in compliance in all respects with the DIP Documents;</td></tr>
<tr><td></td><td></td><td>vii.</td><td>at the time of each draw, no Default or Event of Default shall have occurred and be continuing (the requesting and acceptance of any such draw being deemed to be a representation and warranty by the Borrowers as to the satisfaction of this condition);</td></tr>
<tr><td></td><td></td><td>viii.</td><td>at the time of each draw, accuracy of representations and warranties of the Debtors in all material respects (or if such representation and warranty is qualified as to materiality, in all respects) as of such date (or, if such representation or warranty expressly speaks to an earlier date, as of such earlier date) (the requesting and acceptance of any such draw being deemed to be a representation and warranty by the Borrowers as to the satisfaction of this condition);</td></tr>
<tr><td></td><td></td><td>ix.</td><td>no order has been entered reversing, amending, staying, vacating, terminating or otherwise modifying in any manner adverse to the DIP Agent and DIP Lender the Interim Order or the Final Order, as applicable;</td></tr>
<tr><td></td><td></td><td>x.</td><td>delivery of a notice of borrowing, including a certification as to the satisfaction of the condition to the making of any Other Draws;</td></tr>
<tr><td></td><td></td><td>xi.</td><td>all costs, fees, expenses (including, without limitation, legal fees and expenses) set forth in the DIP Documents or otherwise to be paid to the DIP Agent or the DIP</td></tr>
</table>

10

| | | |
|---|---|---|
| | | Lender on or before the Final Draw shall have been paid; and |
| | | xii. The RSA shall have been fully terminated and shall be of no further force or effect. |
| 19. | ***Representations and Warranties:*** | • The Loan Parties shall make and be subject to (and are hereby deemed to agree to and make) the representations and warranties set forth herein, in the Orders, in the DIP Documents and as otherwise deemed incorporated herein (and/or to be included in the DIP Documents), in each case, in accordance with the Documentation Principles (all to be in form and substance satisfactory to the DIP Agent and DIP Lender). |
| 20. | ***Affirmative Covenants:*** | • The Loan Parties shall be subject to (and are hereby deemed to agree to and make) the covenants and undertakings set forth below, in the Orders, in the DIP Documents and as otherwise deemed incorporated herein (and/or to be included in the DIP Documents), in each case, in accordance with the Documentation Principles (all to be in form and substance satisfactory to the DIP Agent and DIP Lender), including, without limitation:<br><br>i. the Loan Parties and the DIP Agent agree to discuss in good faith with potential providers thereof and the DIP Agent an agreement to provide for forward sales or hedging arrangements with respect to the Loan Parties' Bitcoin present and anticipated Bitcoin inventory; and<br><br>ii. the Loan Parties shall covenant and agree to timely and diligently pursue and prosecute the termination of the RSA and to take such actions as are required pursuant to the terms of the RSA to effect the such termination by a date no later than the date the Final Order is entered. |
| 21. | ***Negative Covenants:*** | • The Loan Parties shall be subject to (and are hereby deemed to agree to and make) the covenants and undertakings set forth below, in the Orders, in the DIP Documents and as otherwise deemed incorporated herein (and/or to be included in the DIP Documents), in each case, in accordance with the Documentation Principles (all to be in form and substance satisfactory to the DIP Agent and DIP Lender), including, without limitation:<br><br>i. The Loan Parties shall not take, participate or support any action, motion or claim to rescind its termination of, or to continue or reinstate the RSA, or shall cease or fail to take the actions specified in clause (ii) of Section 20 above.<br><br>ii. It is agreed that such covenants will permit (a) sales of (i) Bitcoin in the ordinary course and (ii) non-core assets (it being agreed that non-core assets shall NOT include the Debtors' real estate listed in Section 16 above) and, with the DIP Agent's prior consent, the Debtors' real estate listed in Section 16 above, so long as, in each case, net proceeds (including reductions to satisfy claims of |

11

11226390v13

| | | |
|---|---|---|
| | | other lienholders with respect to such assets including amounts to be escrowed or otherwise required to be held back or segregated by the Bankruptcy Court) thereof are used to repay the DIP Obligations (including any applicable Exit Premium) and (b) (i) transactions with respect to miners and equipment in the ordinary course of business and (ii) subject to the consent of the DIP Agent (subject to thresholds to be agreed) (x) the ability to reject or modify contracts, and (y) settlements of litigation. |
| 22. | *DIP Budget / Variance Reporting:* | • On or prior to the Closing Date, the Loan Parties shall deliver to the DIP Agent and the DIP Lender an extended weekly budget commencing with the week during which the Interim Order is entered, containing line items of sufficient detail to reflect the consolidated operating cash flow of the Debtors through projected emergence (the "**Initial Budget**") (the Initial Budget, as modified from time to time in accordance herewith, shall be the "**Budget**"). |
| | | • The Budget shall be updated and provided to the DIP Agent and the DIP Lender on the fourth Wednesday following the prior Budget's approval and every fourth Wednesday thereafter, or more frequently at the reasonable discretion of either the Borrowers or the DIP Agent, with such updated Budget extending the term thereof and the DIP Agent, in its reasonable discretion, shall have the right to approve or reject any such updates (or any amendments) by providing the Borrowers specific notice thereof within such four (4) business days after the delivery by the Borrowers of any such update or amendment; provided that, (i) to the extent the DIP Agent does not provide notice of approval or rejection within such four (4) business day period, such update or amendment shall be deemed approved and consented to by the DIP Lender and shall be deemed to constitute the updated approved Budget ("**Updated Budget**") upon the expiration of such 4 business day objection period and, (ii) to the extent the DIP Lender provides notice rejecting the updates (or any amendments), the then existing Budget shall continue to constitute the applicable Budget until such time as an update or amendment is approved by the DIP Agent. |
| | | • On a weekly basis thereafter, the Borrowers shall deliver to the DIP Agent and DIP Lender a variance report for the four-week period ending the prior Friday comparing the difference/variance, expressed as a percentage (each, a "**Budget Variance**"), between: (x) total receipts for such period to total receipts for such period as set forth in the Budget on a cumulative 4 week rolling basis; (y) total disbursements for such period to total disbursements for such period as set forth in the Budget on a cumulative 4 week rolling basis (each a "**Measuring Period**") and explaining in reasonable detail all material variances, it being understood that any variance exceeding twenty percent (20%) shall be material (each such report, a |

11226390v13

<table>
<tr>
<td></td>
<td></td>
<td>

"**Variance Report**," which shall be in a form satisfactory to the DIP Agent).

- For purposes of each Measuring Period, the Debtors shall calculate: (x) the numerical difference between total net receipts (with respect to self-mining and hosted miners) for such period to total net receipts (with respect to self-mining and hosted miners) for such period as set forth in the Budget on a cumulative 4 week rolling basis, and to the extent the difference is a negative number, the percentage such difference (as an absolute amount) is of the cumulative budgeted amount for receipts for such period (the "**Receipts Variance**"); and (y) the numerical difference between "net operating disbursements" plus "net capital expenditures" (such terms reflecting those line items illustrated in the Budget) for such period to "net operating disbursements" plus "net capital expenditures" for such period as set forth in the Budget on a cumulative 4 week rolling basis, and to the extent the difference is a positive number, the percentage such difference is of the cumulative budgeted amount for disbursements for such period (the "**Disbursements and Capital Expenditure Variance**"). For the avoidance of doubt, the Disbursements Variance shall not include any amounts in the Budget related to professional fees, utility deposits or adequate assurance payments.

- For purposes herein, a "Permitted Variance" shall be limited to not greater than (a) twenty-five percent (25%) for budget variances with respect to the Receipts Variance and (b) twenty percent (20%) for budget variances with respect to the Disbursements and Capital Expenditure Variance, each as set forth in the applicable Variance Report.

</td>
</tr>
<tr>
<td>23.</td>
<td>*Interim Order:*</td>
<td>

- The interim order approving the DIP Facility, which shall include the terms hereof and shall otherwise be in form and substance reasonably acceptable to the DIP Agent and the DIP Lender (the "**Interim Order**"), shall, among other things, authorize and approve:

    i.    the terms set forth in this Term Sheet and the entry into the Commitment Letter to which this Term Sheet is attached;

    ii.    the Initial Draw;

    iii.    the making of the DIP Loans;

    iv.    the granting of the superpriority claims and liens against the Debtors and their assets in accordance with this Term Sheet and the DIP Documents with respect to the DIP Collateral;

    v.    the payment of all fees and expenses (including the fees and expenses of outside counsel and financial advisors) required to be paid to the DIP Agent and the DIP Lender as described herein under the heading "*Indemnification and Reimbursement of Expenses*" by the Debtors; it

</td>
</tr>
</table>

13

| | | |
|---|---|---|
| | | being acknowledged and agreed that all such fees and expenses may and will be withheld from the Initial Draw for direct payment thereof (to the DIP Agent, the DIP Lenders or such counsel and financial advisors) from such Initial Draw (without reducing the obligations of the Debtor to repay the entire amount of the Initial Draw); *provided, however,* notwithstanding anything to the contrary, fees and expenses incurred by the DIP Agent and the DIP Lender prior to the Interim Order and reimbursable pursuant to this clause (v) shall be limited to the fees and expenses of Choate, Hall & Stewart LLP, as counsel to the DIP Agent and the DIP Lender. |
| | | vi.  the termination of the Existing DIP Credit Agreement and related documents and all liens granted thereunder (and/or the interim order approving such Existing DIP Credit Agreement) as security therefor; and |
| | | vii.  the calculations and payment of the Monthly DIP Agent Fee, the Upfront Premium, the Extension Fee and the Exit Premium, which fee payments shall not be subject to reduction, setoff or recoupment, and shall be fully earned upon entry of the Interim Order. |
| 24. | *Final Order:* | • The final order approving the DIP Facility, which shall be substantially in the same form as the Interim Order (with such modifications as are necessary to convert the Interim Order into a final order), with such modifications or additions thereto as may reasonably be required by the DIP Agent or as mutually agreed to by the parties, but in any event, to be in form and substance acceptable to the DIP Agent and the DIP Lender (the "**Final Order**" and together with the Interim Order, the "**Orders**"), shall, among other things, authorize and approve the DIP Facility on a final basis, and the Final Draw. |
| 25. | *Carve out:* | • The "**Carve-Out**" shall, except as otherwise set forth herein, be consistent with the Existing DIP Credit Agreement. |
| 26. | *Events of Default:* | • The DIP Facility and the Loan Parties shall be subject to (and the Loan Parties hereby acknowledge and agree that the occurrence or existence thereof will constitute an Event of Default hereunder, under the Orders and under the DIP Documents) the Events of Default set forth below, in the Orders, in the DIP Documents and as otherwise deemed incorporated herein (and/or to be included in the DIP Documents), in each case, in accordance with the Documentation Principles (the "**Event of Default**"), including, without limitation: |
| | | i.  the entry of the Final Order shall have not occurred within 30 days after the date on which a motion to approve the DIP Facility is filed; |

| | | ii. | the dismissal of any of the Chapter 11 Cases or the conversion of any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; |
| | | iii. | noncompliance, subject to any applicable grace and/or cure periods (other than in the case, among others pursuant the Documentation Principles, of any negative covenant (none of which shall be subject to any grace or cure period, except to the extent incorporated within any such covenant)), by any Loan Party or any of its subsidiaries with the terms of hereof (as giving effect to the Documentation Principles), the DIP Documents, the Interim Order or the Final Order; |
| | | iv. | the entry of an order staying, reversing, vacating or otherwise modifying the Interim Order or the Final Order, in each case, without the prior written consent of the DIP Agent and the DIP Lender; |
| | | v. | the entry of an order appointing a trustee, responsible officer, or an examiner having expanded powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Bankruptcy Code section 1104 (other than a fee examiner) in the Chapter 11 Cases, or the Bankruptcy Court shall have entered an order providing for such appointment, in each case without the prior written consent of the DIP Agent in its sole discretion; |
| | | vi. | the entry of an order in any of the Chapter 11 Cases granting relief from any stay or proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed with foreclosure against any material assets of the Loan Parties to which the fair market value of which exceeds $20,000,000; provided, however, that any such order with respect to the assets of either (x) Blockfi Lending LLC ("**BlockFi**") or (y) NYDIG or their affiliates (so long as (i) relating solely to such equipment provided by such party, or in the case of Blockfi, the debt owing to Blockfi pursuant to its agreements as in effect prior to the Petition Date and (ii) such arrangement shall not result in the improvement or enhancement of such party's claims in the Chapter 11 Cases or security or priority position with respect to any of the Debtors' collateral) shall not be an Event of Default; |
| | | vii. | the entry of an order (a) surcharging any of the DIP Collateral under Sections 105, 506(c), or any other section of the Bankruptcy Code, (b) allowing any administrative expense claim having priority over or ranking in parity with the DIP Claims or the rights of the |

11226390v13

DIP Agent, or (c) resulting in the marshaling of any DIP Collateral;

viii. any action by any Debtor to (a) challenge the rights and remedies of the DIP Agent or the DIP Lender under the DIP Facility in any of the Chapter 11 Cases or acting in a manner inconsistent with the DIP Documents or (b) avoid or require disgorgement by the DIP Agent or the DIP Lender of any amounts received in respect of the obligations under the DIP Facility;

ix. any Debtor files a motion in the Chapter 11 Cases without the express written consent of DIP Agent to obtain additional financing from a party other than the DIP Lender under Section 364(d) of the Bankruptcy Code except if such financing contemplates payment in full of the DIP Facility and all DIP Obligations (including the Exit Premium);

x. the making of any material payments in respect of prepetition obligations other than (a) as permitted by the Interim Order or the Final Order, (b) as permitted by any "first day" or "second day" orders reasonably satisfactory to the DIP Agent, (c) as permitted by any other order of the Bankruptcy Court reasonably satisfactory to the DIP Agent, (d) as permitted under the DIP Documents, or (e) as otherwise agreed to by the DIP Agent;

xi. entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Debtor to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the DIP Agent and the DIP Lender;

xii. the Debtors shall seek to, or support any other person's motion to, (a) disallow in whole or in part the DIP Obligations, (b) challenge the validity and enforceability of the DIP Liens or the DIP Claims, (c) contest any material provision of any DIP Document;

xiii. any Debtor shall fail to execute and deliver to the DIP Agent any agreement, financing statement, trademark filing, copyright filing, mortgages, notices of lien or similar instruments or other documents that the DIP Agent may reasonably request from time to time to more fully evidence, confirm, validate, perfect, preserve and enforce the DIP Liens created in favor of the DIP Agent or the DIP Claims;

xiv. The Borrowers, DIP Agent and DIP Lenders do not agree upon the terms of and execute the final DIP Documents (which DIP Documents shall be subject to Bankruptcy Court approval in the Final Order), prior to

16

| | | |
|---|---|---|
| | | twenty (20) days after the Closing Date (or such later date to which the DIP Agent may otherwise agree), unless such failure is attributable to the DIP Agent's or the DIP Lender's bad faith in negotiating such documents (as determined in a final, non-appealable determination by a court of competent jurisdiction), or the Bankruptcy Court does not approve the Debtors' entry into the final DIP Documents; |
| | | xv. The RSA is not fully and finally terminated and/or has not ceased to be in full force and effect on or prior to the date upon which the Final Order is to be entered; and/or |
| | | xvi. Any Budget Variance exceeds the applicable Permitted Variance as set forth in the last bullet point in Section 22 above. |
| 27. | *Milestone:* | • None. |
| 28. | *Remedies:* | • The remedies exercisable by the DIP Agent and the DIP Lender following the occurrence of an Event of Default as set forth above shall be as set forth herein, in the Orders, in the DIP Documents, as deemed incorporated herein pursuant to the Documentation Principles and otherwise as are usual and customary in loan documents for similar debtor-in-possession financings and, in each case, as are acceptable to the DIP Agent and the DIP Lender. |
| 29. | *Indemnification and Reimbursement of Expenses:* | • The Loan Parties shall be subject to and liable for the customary indemnifications in favor of the DIP Agent, the DIP Lenders and their related parties as are included herein, in the Orders, in the DIP Documents and as otherwise deemed incorporated herein (and/or to be included in the DIP Documents), in each case, in accordance with the Documentation Principles (all to be in form and substance satisfactory to the DIP Agent and DIP Lender). |
| | | • Subject to the DIP Documents and in accordance with the Documentation Principles, all reasonable and documented out-of-pocket accrued and unpaid fees, costs, disbursements, and expenses of (i) the DIP Agent and (ii) the DIP Lender, including the fees and expenses of Choate, Hall & Stewart LLP, as counsel to the DIP Agent and the DIP Lender, and as necessary, other local counsel in their capacity as counsel to the DIP Agent and the DIP Lender, incurred in connection with, the preparation, analysis, negotiation, documentation, execution and enforcement of, or actions or suits relating to, this Term Sheet, the related commitment letter, the DIP Documents, the Orders and/or otherwise in connection with the DIP Facility and the Chapter 11 Cases and/or the transactions contemplated thereby, shall be paid on a current basis <u>provided</u>, however, notwithstanding anything to the contrary, fees and expenses incurred prior to the Interim Order and reimbursable hereunder shall be limited to those of Choate, Hall & Stewart LLP, as counsel to the DIP Lender. |

17

| 30. | *Release:* | • The Orders shall include a customary release of the DIP Agent and DIP Lender, each in their capacity as such, with respect to any and all claims and causes of action arising from or related to the DIP Facility. |
|---|---|---|
| 31. | *Waivers:* | • The Orders shall include, in addition to those set forth herein, terms and conditions customary for final DIP financing orders or which shall otherwise be acceptable to the DIP Agent and DIP Lender (in their discretion), including, without limitation, waiver of the automatic stay, credit-bidding rights, "no marshaling" provisions, and waivers of the imposition of costs pursuant to Section 506(c) of the Bankruptcy code and the "equities of the case" exception in Section 552(b) of the Bankruptcy Code, in each case, to the extent applicable. |
| 32. | *Governing Law:* | • New York (and to the extent applicable, the Bankruptcy Code). |
| 33. | *Documentation Principles:* | • Without limiting and with the exception of any of the express provisions in this term sheet and/or in the Interim DIP Order or the Final Order, (x) until such time as definitive DIP Documents have been negotiated and executed by the Debtors, the DIP Agent and the DIP Lenders and approved by the Bankruptcy Court, the undertakings, restrictions, duties and obligations of the Debtors and the rights, remedies, protections, privileges, exculpations, and rights of reimbursement and indemnity of the DIP Agent and the DIP Lenders hereunder shall, in each case, be deemed to be governed by the terms of the Existing DIP Credit Agreement (unless and to the extent otherwise agreed to by the DIP Agent its discretion) as if the DIP Agent and the DIP Lenders were making the DIP Loans and the Debtors were incurring the DIP Obligations, in each case, under and pursuant to such Existing DIP Credit Agreement (and such agreement were among the Debtors, the DIP Agent and the DIP Lender), including as relating to the conditions precedent to lending, representations and warranties of the Debtors, affirmative and negative covenants and undertakings of the Debtors, events of default and the consequences thereof and the rights and remedies of the DIP Agent and the DIP Lender relating thereto, the agreements in Sections 3.4 through 3.7 and Sections 12 through Section14 of the Existing DIP Credit Agreement, together in each case with the related definitions (to the extent relevant) and (y) the DIP Documents shall be based on the Existing DIP Credit Agreement, with such additions and modifications thereto as the DIP Agent deems reasonably appropriate to reflect the terms of this Term Sheet or which are usual and customary for similar debtor-in-possession financings or which the DIP Agent and the Borrowers deem reasonably appropriate in light of the transactions contemplated hereby (collectively, the "**Documentation Principles**"). Until such time as the DIP Documents are fully-executed and approved by the Bankruptcy Court, in the event of a conflict between the terms of the Existing DIP Credit Agreement and the terms set forth in this term sheet or the Interim Orders, the terms of this term sheet and the Interim Order shall control. Notwithstanding anything to the contrary |

18

|  |  | herein, in the event of (and solely to the extent of) any direct conflict between the provisions of the Interim Order and this Term Sheet (as so interpreted to incorporate the terms of the Existing DIP Credit Agreement), the terms of the Interim Order shall control. |

19

**Schedule 6.2.1**

**List of Closing Documents**

1. Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement, dated as of the Closing Date, by and among, among others, the Obligors, the Administrative Agent, and the Lenders.

2. Commitment Letter, dated as of January 29, 2023, by and between the Obligor Representative and the Administrative Agent.

3. Guaranty Agreement, dated as of the Closing Date, by and among the Guarantors and the Administrative Agent.

4. Perfection Certificate, dated as of the Closing Date, delivered by the Obligors.

5. Global Intercompany Note and Allonge thereto, each dated as of the Closing Date, executed by the Obligors.

6. Intercompany Subordination Agreement, dated as of the Closing Date, by and among the Obligors and the Administrative Agent.

7. Side Letter Agreement, dated as of the Closing Date, by and between the Obligor Representative and the Administrative Agent.

8. Trademark Security Agreement, dated as of the Closing Date, by and between each Grantor noted therein and the Administrative Agent.

9. Patent Security Agreement, dated as of the Closing Date, by and between each Grantor noted therein and the Administrative Agent.

10. UCC-1 financing statements in favor of the Administrative Agent covering all assets of Core Scientific, Inc.; Core Scientific Operating Company; American Property Acquisition, LLC; American Property Acquisitions I, LLC; American Property Acquisitions VII, LLC; Core Scientific Acquired Mining LLC; CORE SCIENTIFIC SPECIALTY MINING (OKLAHOMA) LLC; Radar Relay, Inc.; Starboard Capital LLC; RADAR LLC; and Core Scientific Mining LLC and in each case, filed in the appropriate filing office for each Obligor.

11. Subject to Schedule 6.3, Deed of Trust, Assignment of Leases and Rents, Security Agreement, and Fixture Financing Statement, to be entered into after the Closing Date, by American Property Acquisitions I, LLC in favor of the Administrative Agent with respect to the Marble Real Property.

12. Subject to Schedule 6.3, each of the Control Agreements set forth therein.

## Schedule 6.3

### Conditions Subsequent

(a)    Within one (1) day after the entry of the Final DIP Order by the Bankruptcy Court, so long as summary invoices of such DIP Professional Fees and Expenses and the Noteholder Professional Fees and Expenses are provided to the lead restructuring counsel to the Debtors and to counsel to the Official Committee (as defined in the Final DIP Order) prior to the entry of the Final DIP Order, and such invoices shall not be subject to the review procedures set forth in paragraphs 11(a) and 11 (b) of the Final DIP Order, the Obligors shall pay or cause to be paid, all reasonable and documented fees, costs, expenses and disbursements of the Administrative Agent and Lenders, including, without limitation, the fees, costs and expenses of counsel and other advisors engaged by the Administrative Agent and the Lenders in connection with the negotiation, preparation, documentation and execution of the Commitment Letter, the Credit Agreement, the other Loan Documents, the DIP Orders, the participation in the Chapter 11 Cases and the consummation of the transactions contemplated hereby and thereby, in each case, subject to the limitations thereon set forth in the Credit Agreement.

(b)    As soon as reasonably practicable, but in no event later than ten (10) Business Days after the Closing Date (or such later date as may be agreed to by the Administrative Agent), the Obligors shall deliver or cause to be delivered, to the Administrative Agent, the original signatures of each of the parties to the Global Intercompany Note and the Allonge thereto.

(c)    As soon as reasonably practicable, but in no event later than ten (10) Business Days after the Closing Date (or such later date as may be agreed to by the Administrative Agent), the Obligors shall deliver or cause to be delivered, to the Administrative Agent, evidence that the account holder of Bank of America, N.A. Deposit Account ending –x7616 has been transferred from Blockcap, Inc. to Core Scientific Acquired Mining LLC, which evidence shall be in form and substance reasonably satisfactory to the Administrative Agent (such requirement the "Account Holder Change").

(d)    As soon as reasonably practicable, but in no event later than ten (10) Business Days after the satisfaction of the Account Holder Change (or such later date as may be agreed to by the Administrative Agent), the Obligors shall deliver or cause to be delivered, to the Administrative Agent, a Control Agreement with respect to Core Scientific and Core Scientific Acquired Mining LLC's respective Bank of America, N.A. Deposit Accounts ending –x6773, -x7616, -x7360 and –x7817, duly executed by and among each of the applicable parties thereto and in form and substance reasonably satisfactory to the Administrative Agent.

(e)    As soon as reasonably practicable, but in no event later than fifteen (15) Business Days after the Closing Date (or such later date as may be agreed to by the Administrative Agent), the Obligors shall deliver or cause to be delivered, to the Administrative Agent, (x) amendments to the bylaws of Core Scientific Operating Company and Radar Relay, Inc. or (y) to the extent the Obligors do not elect to amend such bylaws pursuant to the preceding clause, stock certificates and corresponding stock powers (executed in blank) with respect to all issued, outstanding and certificated Equity Interests of Core Scientific Operating Company and Radar Relay, Inc., in

each case in the foregoing clauses (x) and (y), in form and substance reasonably satisfactory to the Administrative Agent.

(f)     As soon as reasonably practicable, but in no event later than twenty (20) calendar days after the Closing Date (or such later date as may be agreed to by the Administrative Agent), the Obligors shall deliver or cause to be delivered, to the Administrative Agent, the insurance endorsements required by Section 8.6.1 of the Credit Agreement, in each case, in form and substance reasonably satisfactory to the Administrative Agent.

(g)     As soon as reasonably practical, but in no event less than thirty (30) calendar days after the Closing Date (or such later date as may be agreed to by the Administrative Agent), the Obligors shall deliver, or cause to be delivered, to the Administrative Agent, with respect to the Marble Real Property, a Deed of Trust, Assignment of Leases and Rents, Security Agreement, and Fixture Financing Statement, duly executed by and between the applicable parties thereto, in connection with the Marble Real Property.

**Schedule 7.1(c)**

**Commercial Tort Claims**

None.

**Schedule 7.3(a)**

**Equity Interests and Debt Securities**

| Owner | Issuer | % of Ownership | Certificated? |
|---|---|---|---|
| Core Scientific, Inc. | Core Scientific Operating Company | 100% | No[1] |
| Core Scientific, Inc. | Core Scientific Acquired Mining LLC | 100% | N/A |
| Core Scientific, Inc. | Core Scientific Mining LLC | 100% | N/A |
| Core Scientific Acquired Mining LLC | Radar Relay, Inc. | 100% | No[2] |
| Radar Relay, Inc. | Starboard Capital LLC | 100% | N/A |
| Radar Relay, Inc. | RADAR LLC | 100% | N/A |
| Core Scientific Operating Company | CORE SCIENTIFIC SPECIALTY MINING (OKLAHOMA) LLC | 100% | N/A |

---

[1] To the extent the interests of Core Scientific Operating Company become certificated, share certificates and stock transfer powers will be delivered to the Administrative Agent in accordance with Schedule 6.3 of the DIP Credit Agreement.

[2] To the extent the interests of Radar Relay, Inc. become certificated, share certificates and stock transfer powers will be delivered to the Administrative Agent in accordance with Schedule 6.3 of the DIP Credit Agreement.

11273420v8

| Core Scientific Operating Company | American Property Acquisition, LLC | 100% | N/A |
|---|---|---|---|
| American Property Acquisition, LLC | American Property Acquisitions I, LLC | 100% | N/A |
| American Property Acquisition, LLC | American Property Acquisitions VII, LLC | 100% | N/A |
| Core Scientific, Inc. (99% owner) Core Scientific Partners GP, LLC (1% owner) | Core Scientific Partners, LP | Core Scientific, Inc. (99% owner) Core Scientific Partners GP, LLC (1% owner) | N/A |
| Core Scientific, Inc. | Core Scientific Partners GP, LLC | 100% | N/A |
| Core Scientific Partners, LP | CSP Advisors, LLC (SMLLC) | 100% | N/A |
| Core Scientific Partners, LP (99% owner) and Core Scientific Partners GP, LLC (1% owner) | CSP Liquid Opportunities GP, LP | Core Scientific Partners, LP (99% owner) and Core Scientific Partners GP, LLC (1% owner) | N/A |
| CSP Liquid Opportunities GP, LP | CSP Liquid Opportunities Fund, LP | 100% | N/A |

| CSP Liquid Opportunities GP, LP | CSP Liquid Opportunities Master Fund, LP | 100% | N/A |
| --- | --- | --- | --- |

## **Debt Securities**

None.

**Schedule 8.5**

**Deposit Accounts, Security Accounts, Commodity Accounts**

| Name of Entity on the Account | Name and Address of Bank | Account Number | Type of Account |
|---|---|---|---|
| Core Scientific, Inc. | Bank of America 800 5th Ave Seattle, WA | 501014796773[1] | Deposits Account |
| Core Scientific, Inc. | Bank of America 800 5th Ave Seattle, WA | 501014796786[2] | Deposits Account |
| Core Scientific, Inc. | Bank of America 800 5th Ave Seattle WA | 501014717817 | Concentration |
| Core Scientific, Inc. | Bank of America 800 5th Ave Seattle WA | 501014727713[3] | Disbursement |
| Core Scientific, Inc. | Bank of America 800 5th Ave Seattle WA | 501014837360 | Utilities Deposits |
| Core Scientific, Inc. | Bank of America 800 5th Ave Seattle WA | 5S404Z19-438262 | Overnight Deposits |
| Core Scientific Acquired Mining LLC (f/k/a BlockCap, Inc.) | Bank of America 800 5th Ave Seattle WA | 501014837616 | General |
| Core Scientific, Inc. | City National Bank 555 South Flower St Los Angeles CA | 433007395 | General |

[1] Dip Funding Account

[2] Excluded Account

[3] Excluded account

11273420v8

| Name of Entity on the Account | Name and Address of Bank | Account Number | Type of Account |
|---|---|---|---|
| Core Scientific, Inc. | City National Bank<br>555 South Flower St<br>Los Angeles CA | 433057589[4] | Credit Card |
| Core Scientific, Inc. | Bremer Bank<br>3100 S Columbia Road<br>Grand Forks ND | 41531154[5] | General |

---

[4] Excluded Account

[5] Excluded Account

## Schedule 9.1.4[1]

### Names and Capital Structure

| Legal Name | Jurisdiction of Organization | Authorized and Issued Equity Interest | Holder of Equity Interest | Agreements Binding on Holder of Equity Interests | Preferred Stock |
|---|---|---|---|---|---|
| Core Scientific, Inc. | Delaware | Authorized: 12,000,000,000 Issued: 373,799,959 | | Warrant Agreement dated March 19, 2020, by and between Michael Levitt and Core Scientific, Inc. (expires March 10, 2023)<br><br>Warrant Agreement dated January 30, 2021, by and between Jack Novak and Core Scientific, Inc. (expires January 30, 2023)<br><br>Bridge Promissory Note dated April 7, 2022, by and between B. Riley Commercial Capital, LLC and Core Scientific, Inc. | 0 |

---

[1] This schedule does not include RSU grants and outstanding options granted to employees.

11273420v8

| Legal Name | Jurisdiction of Organization | Authorized and Issued Equity Interest | Holder of Equity Interest | Agreements Binding on Holder of Equity Interests | Preferred Stock |
|---|---|---|---|---|---|
| | | | | Bridge Promissory Note dated April 7, 2022, by and between BRF Finance Co, LLC and Core Scientific, Inc. | |
| Core Scientific Operating Company | Delaware | Authorized: 250,000,000.00 Issued: 100 | Core Scientific, Inc. | Agreement and Plan of Merger of Core Scientific and Core Scientific Acquisition Co. dated August 14, 2020[2] | 0 |
| American Property Acquisition, LLC | Delaware | 100% | Core Scientific Operating Company | Operating Agreement dated May 17, 2018 and amended on December 14, 2022 | 0 |
| American Property Acquisitions I, LLC | North Carolina | 100% | American Property Acquisition, LLC | A&R Operating Agreement dated May 19, 2020 and amended on December 14, 2022 | 0 |
| American Property Acquisitions VII, LLC | Georgia | 100% | American Property Acquisition, LLC | A&R Operating Agreement dated May 17, 2020 and | 0 |

---

[2] Core Scientific, Inc. was the surviving entity.

11273420v8

| Legal Name | Jurisdiction of Organization | Authorized and Issued Equity Interest | Holder of Equity Interest | Agreements Binding on Holder of Equity Interests | Preferred Stock |
|---|---|---|---|---|---|
| | | | | amended on December 14, 2022 | |
| Core Scientific Acquired Mining LLC | Delaware | 100% | Core Scientific, Inc | A&R LLC Agreement as amended on December 14, 2022<br><br>Common Stock Purchaser Agreement dated July 14, 2021 by and between Block Merger Sub, Inc and Core Scientific Holdings Co.[3] | 0 |
| CORE SCIENTIFIC SPECIALTY MINING (OKLAHOMA) LLC | Delaware | 100% | Core Scientific Operating Company | A&R Operating Agreement dated May 19, 2020 | 0 |
| Radar Relay, Inc. | Delaware | Authorized: 1000<br>Issued: 1 | Core Scientific Acquired Mining LLC | 2nd Amended and Restated Certificate of Radar Relay, Inc.<br><br>Agreement and Plan of Merger dated June 4, 2021 by and between Radar Relay, Inc., Blockcap, Inc | 0 |

---

[3] Core Scientific, Inc. was the surviving entity

| Legal Name | Jurisdiction of Organization | Authorized and Issued Equity Interest | Holder of Equity Interest | Agreements Binding on Holder of Equity Interests | Preferred Stock |
|---|---|---|---|---|---|
| | | | | and Rdr Luv, Inc.[4] | |
| Starboard Capital LLC | Colorado | 100% | Radar Relay, Inc. | Operating Agreement dated July 20, 2022 and amended on December 14, 2022 | 0 |
| RADAR LLC | Colorado | 100% | RADAR LLC | Operating Agreement dated December 23, 2019 and amended on December 14, 2022 | 0 |
| Core Scientific Mining LLC | Texas | 100% | Core Scientific, Inc. | Limited Liability Company Agreement dated as of December 14, 2022 | 0 |

---

[4] Radar Relay, Inc. was the surviving entity.

11273420v8

## Schedule 9.1.10

### Patents, Trademarks, Copyrights and Licenses

(i)    United States Patents:

| Title | Type | Application Filed | Application Number / Patent Number | Issued Date | Owner |
|---|---|---|---|---|---|
| SYSTEM AND METHOD FOR COOLING COMPUTING DEVICES WITHIN A FACILITY | Granted | 2/5/2019 | 10,701,835 | 6/30/2020 | Core Scientific Inc. |
| SYSTEM AND METHOD FOR COOLING COMPUTING DEVICES WITHIN A FACILITY HAVING A PLURALITY OF SUPPLY AIR SPACES | Granted | 2/5/2019 | 10,806,055 | 10/13/2020 | Core Scientific Inc. |
| COMPUTING DEVICE COOLING FACILITY INCLUDING A MIXING CHAMBER | Granted | 2/5/2019 | 10,694,642 | 6/23/2020 | Core Scientific Inc. |
| SYSTEM FOR PASSIVELY COOLING COMPUTING DEVICES | Granted | 2/5/2019 | 10,701,837 | 6/30/2020 | Core Scientific Inc. |
| SYSTEM FOR COOLING COMPUTING DEVICES OF A PLURALITY OF FACILITIES | Granted | 2/5/2019 | 10,701,836 | 6/30/2020 | Core Scientific Inc. |
| SYSTEM AND METHOD FOR COOLING COMPUTING DEVICES WITHIN A FACILITY | Granted | 8/2/2018 | 10,299,412 | 5/21/2019 | Core Scientific Inc. |
| COMPUTING SYSTEM AND METHOD | Patent App | 1/30/2020 | 16/777503 | | Core Scientific Inc. |
| LOAD CENTER WITH INTEGRATED RECEPTACLES | Patent App | 11/8/2019 | D968,336 | 11/1/2022 | Core Scientific Inc. |
| SYSTEM AND METHOD FOR COOLING COMPUTING DEVICES WITHIN A FACILITY | Granted | 8/1/2019 | 10,908,658 | 2/2/2021 | Core Scientific Inc. |
| HARVESTING REMNANT CYCLES IN SMART DEVICES | Patent App | 9/30/2019 | 16/587860 | | Core Scientific Inc. |

11273420v8

| Title | Type | Application Filed | Application Number / Patent Number | Issued Date | Owner |
|-------|------|-------------------|------------------------------------|-------------|-------|
| COMPUTING SYSTEM TRANSLATION TO PROMOTE EFFICIENCY | Granted | 9/30/2019 | 11,068,292 | 7/20/2021 | Core Scientific Inc. |
| EFFICIENT COMPUTING IN VEHICLES | Granted | 10/21/2019 | 11,485,241 | 11/1/2022 | Core Scientific Inc. |
| SYSTEM AND METHOD FOR VISUALLY MANAGING COMPUTING DEVICES IN A DATA CENTER | Granted | 12/9/2019 | 11,178,021 | 11/16/2021 | Core Scientific Inc. |
| SYSTEM AND METHOD FOR MANAGING COMPUTING DEVICES | Granted | 12/9/2019 | 11,489,736 | 11/1/2022 | Core Scientific Inc. |
| SYSTEM AND METHOD FOR HEALTH REPORTING IN A DATA CENTER | Patent App | 12/9/2019 | 16/707964 | | Core Scientific Operating Company |
| AUTOMATIC REPAIR OF COMPUTING DEVICES IN A DATA CENTER | Granted | 1/29/2020 | 10,691,528 | 6/23/2020 | Core Scientific Inc. |
| COMMUNICATION NETWORK FOR GAMING REWARDS | Patent App | 4/6/2020 | 16/841659 | | Core Scientific Inc. |
| SYSTEM AND METHOD FOR IDENTIFYING COMPUTING DEVICES IN A DATA CENTE | Granted | 1/31/2020 | 10,783,410 | 9/22/2020 | Core Scientific Inc. |
| WORK PROVENANCE IN COMPUTING TOOLS | Patent App | 6/12/2020 | 16/900860 | | Core Scientific Inc. |
| AUTOMATIC REPAIR OF COMPUTING DEVICES IN A DATA CENTER | Granted | 5/20/2020 | 11,249,835 | 2/15/2022 | Core Scientific Inc. |
| SYSTEM AND METHOD FOR COOLING COMPUTING DEVICES | Granted | 5/20/2020 | 11,237,605 | 2/1/2022 | Core Scientific Inc. |
| SYSTEM AND METHOD FOR VISUALLY MANAGING COMPUTING DEVICES IN A DATA CENTER | PCT | 7/22/2020 | PCT/US2020/43086 | | Core Scientific Inc. |
| SYSTEM AND METHOD FOR MANAGING COMPUTING DEVICES | PCT | 7/22/2020 | PCT/US2020/43088 | | Core Scientific Operating Company |

11273420v8

| Title | Type | Application Filed | Application Number / Patent Number | Issued Date | Owner |
|---|---|---|---|---|---|
| HEALTH REPORTING FOR COMPUTING DEVICES | Granted | 7/22/2020 | 11,567,821 | 1/31/2023 | Core Scientific Operating Company |
| MEASURING AIRFLOW FOR COMPUTING DEVICES | Granted | 7/24/2020 | 10,942,195 | 3/9/2021 | Core Scientific Inc. |
| RACK FOR COOLING COMPUTING DEVICES | Patent App | 7/24/2020 | 11,363,743 | 6/14/2022 | Core Scientific Inc. |
| SYSTEM AND METHOD FOR IDENTIFYING COMPUTING DEVICES IN A DATA CENTER | Granted | 8/12/2020 | 11,403,476 | 8/2/2022 | Core Scientific Inc. |
| MEASURING AIRFLOW FOR COMPUTING DEVICES | Granted | 10/21/2020 | 11,092,614 | 8/17/2021 | Core Scientific Inc. |
| COMPUTING DEVICE SYSTEM AND METHOD | Patent App | 11/24/2020 | 17/102604 | | Core Scientific Operating Company |
| CONTAINER-BASED DATA CENTER | Patent App | 10/27/2020 | 17/081393 | | Core Scientific Operating Company |
| MANAGING AIRFLOW FOR COMPUTING DEVICES | Patent App | 11/11/2020 | 17/095310 | | Core Scientific Operating Company |
| DYNAMIC AISLES FOR COMPUTING DEVICES | Granted | 11/11/2020 | 10,959,349 | 3/23/2021 | Core Scientific Operating Company |
| THERMAL MANAGEMENT FOR CONTAINER-BASED DATA CENTERS | Patent App | 11/11/2020 | 17/095335 | | Core Scientific Inc. |
| HELICAL-CONFIGURED SHELVING FOR COOLING COMPUTING DEVICES | Granted | 12/18/2020 | 11,516,942 | 11/29/2022 | Core Scientific Inc. |
| DYNAMIC AISLES FOR COMPUTING DEVICES | Granted | 1/15/2021 | 11,153,988 | 10/19/2021 | Core Scientific Inc. |
| RACK FOR COOLING COMPUTING DEVICES IN A CYLINDRICAL CONFIGURATION | Granted | 1/28/2021 | 11,540,415 | 12/27/2022 | Core Scientific Inc. |
| SYSTEM AND METHOD FOR COOLING COMPUTING DEVICES | EP | 2/26/2021 | EP/19752872.2 | | Core Scientific Operating Company |

11273420v8

| Title | Type | Application Filed | Application Number / Patent Number | Issued Date | Owner |
|-------|------|-------------------|-----------------------------------|-------------|-------|
| WITHIN A FACILITY (EP of 0036) | | | | | |
| SYSTEM AND METHOD FOR COOLING COMPUTING DEVICES WITHIN A FACILITY (CA of 0036) | CA | 1/29/2021 | CA/3108291 | | Core Scientific Operating Company |
| SYSTEM AND METHOD FOR COOLING COMPUTING DEVICES WITHIN A FACILITY (CN of 0036) | CN | 4/1/2021 | 201980064992.5 | | Core Scientific Operating Company |
| hardware for full node (real-time processing service for blockchain) | Trade Secret | N/A | | | Core Scientific Operating Company |
| Stratum update | TBD | | | | Core Scientific Operating Company |
| SYSTEM AND METHOD FOR COOLING COMPUTING DEVICES | PCT | 5/14/2021 | PCT/US21/32559 | | Core Scientific Operating Company |
| RACK FOR COOLING COMPUTING DEVICES | PCT | 5/14/2021 | PCT/US21/32564 | | Core Scientific Inc. |
| AUTOMATED SWITCHING OF WORKLOADS (W2M - NP of 0065) | Patent App | 7/23/2021 | 17/383,004 | | Core Scientific Operating Company |
| ENVIRONMENT-BASED TUNING FOR COMPUTING DEVICES (NP of 0091) | Patent App | 9/16/2021 | 17/476,766 | | Core Scientific Operating Company |
| DATA CENTER COOLING (with tubes) (NP of 0092) | Patent App | 9/16/2021 | 17/476,786 | | Core Scientific Operating Company |
| AIR DEFLECTOR FOR COOLING COMPUTING DEVICES (NP of 0093) | Patent App | 9/16/2021 | 17/476,796 | | Core Scientific Operating Company |
| ADJUSTABLE DUCTS FOR COOLING COMPUTING DEVICES (NP of 0094) | Patent App | 9/16/2021 | 17/476,836 | | Core Scientific Operating Company |
| AUTOMATIC REPAIR OF COMPUTING DEVICES IN A DATA CENTER (CA of -0053, -0063) | CA | 9/14/2021 | CA3133672 | | Core Scientific Operating Company |

11273420v8

| Title | Type | Application Filed | Application Number / Patent Number | Issued Date | Owner |
|---|---|---|---|---|---|
| AUTOMATIC REPAIR OF COMPUTING DEVICES IN A DATA CENTER (CN of -0053, -0063) | CN | 11/9/2021 | 202080034743.4 | | Core Scientific Operating Company |
| AUTOMATIC REPAIR OF COMPUTING DEVICES IN A DATA CENTER (EP of -0053, -0063) | EP | 2/22/2022 | EP/20844143.6 | | Core Scientific Operating Company |
| SYSTEM AND METHOD FOR VISUALLY MANAGING COMPUTING DEVICES IN A DATA CENTER (CA of PCT 066) | CA | 1/14/2022 | CA/3147648 | | Core Scientific Operating Company |
| SYSTEM AND METHOD FOR VISUALLY MANAGING COMPUTING DEVICES IN A DATA CENTER (EP of PCT 066) | EP | 2/10/2022 | EP/20843361.5 | | Core Scientific Operating Company |
| SYSTEM AND METHOD FOR MANAGING COMPUTING DEVICES (CA of PCT 067, US 050) | CA | 1/14/2022 | CA/3147650 | | Core Scientific Operating Company |
| SYSTEM AND METHOD FOR MANAGING COMPUTING DEVICES (EU of PCT 067, US 050) | EP | 2/7/2022 | 843872.1 | | Core Scientific Operating Company |
| RACK FOR COOLING COMPUTING DEVICES IN A HYPERBOLOID CONFIGURATION | Patent App | 1/13/2022 | 17/575,184 | | Core Scientific Operating Company |
| SYSTEM AND METHOD FOR VISUALLY MANAGING COMPUTING DEVICES IN A DATA CENTER | CN | instr 2/7/2022 | 202080066225.0 | | Core Scientific Operating Company |
| SYSTEM AND METHOD FOR MANAGING COMPUTING DEVICES | CN | 4/13/2020 | 202080066226.5 | | Core Scientific Operating Company |
| IDENTIFYING COMPUTING DEVICES IN A DATA CENTER | PCT | 2/28/2022 | PCT/US22/18163 | | Core Scientific Operating Company |

11273420v8

| Title | Type | Application Filed | Application Number / Patent Number | Issued Date | Owner |
|---|---|---|---|---|---|
| SYSTEM FOR COOLING COMPUTING DEVICES IN AN ARRAY | PCT | 3/9/2022 | PCT/US22/19519 | | Core Scientific Operating Company |
| SYSTEM FOR COOLING CIRCUIT BOARDS | PCT | 3/9/2022 | PCT/US22/19521 | | Core Scientific Operating Company |
| TURBULENT AIRFLOW FOR COOLING COMPUTING DEVICES (NP of -0123) | Patent App | 3/10/2022 | 17/691,562 | | Core Scientific Operating Company |
| POWER DISTRIBUTION SYSTEM AND METHOD (NP of -0131) (using PDUs to balance power) | Patent App | 5/5/2022 | 17/737,491 | | Core Scientific Operating Company |
| SYSTEM AND METHOD FOR OPERATING COMPUTING DEVICES (smart PDU measures power for optimization) (NP of 132) | Patent App | | 17/744,004 | | Core Scientific Operating Company |
| COMPUTING SYSTEM AND METHOD (NP of -0133) ( (#4 proxy for pool - parsing headers, pre-reject and audit hashrate) | Patent App | 5/13/2022 | 17/744,017 | | Core Scientific Operating Company |
| SYSTEM AND METHOD FOR OPERATING COMPUTERS (NP of -0134) (switching pools) | Patent App | 5/5/2022 | 17/737,505 | | Core Scientific Operating Company |
| HEAT SINK THAT VARIES IN HEIGHT (NP of -0136) | Patent App | 5/6/2022 | 17/738,646 | | Core Scientific Operating Company |
| SYSTEM FOR RECAPTURING WASTE HEAT FROM COMPUTING DEVICES (NP of -0137) | Patent App | 5/6/2022 | 17/738,654 | | Core Scientific Operating Company |
| WASTE ENERGY RECLAMATION WITH DAMPERS (NP of 0138) | Patent App | 5/11/2022 | 17/741,544 | | Core Scientific Operating Company |
| COMPUTER SYSTEM AND METHOD (Optihash) (NP of 0140) | Patent App | 5/13/2022 | 17/744,023 | | Core Scientific Operating Company |
| MULTI-ORACLE (NP of 0141) | Patent App | 5/16/2022 | 17/744,915 | | Core Scientific Operating Company |

11273420v8

| Title | Type | Application Filed | Application Number / Patent Number | Issued Date | Owner |
|---|---|---|---|---|---|
| THERMAL MANAGEMENT FOR CONTAINER-BASED DATA CENTERS (NP of 0145) | Patent App | 5/20/2022 | 17/749,550 | | Core Scientific Operating Company |
| SYSTEM AND METHOD FOR USING WASTE HEAT FROM COMPUTING DEVICES (crypto dehydrator) | Patent App | 7/14/2022 | 63/221,750 | | Core Scientific Operating Company |
| SYSTEM AND METHOD FOR IDENTIFYING COMPUTING DEVICES IN A DATA CENTER | PCT | 1/29/2021 | PCT/US21/15799 | | Core Scientific Operating Company |
| SYSTEM AND METHOD FOR MANAGING COMPUTING DEVICES | Patent App | 9/27/2022 | 17/953,932 | | Core Scientific Operating Company |
| DYNAMIC COMPUTER MARKETPLACE SYSTEM AND METHOD | Granted | 11/9/2018 | 11,017,455 | 5/25/2021 | Core Scientific Operating Company |
| DYNAMIC COMPUTER MARKETPLACE SYSTEM AND METHOD | Patent App | 4/23/2021 | 17/239537 | | Core Scientific Operating Company |
| APPLICATION MAPPING TO SYSTEM RESOURCES FOR INSTANCE CREATION | PCT | 8/3/2021 | PCT/US2021/044347 | | Core Scientific Operating Company |
| APPLICATION MAPPING TO SYSTEM RESOURCES FOR INSTANCE CREATION | Granted | 1/18/2021 | 11,150,957 | 10/19/2021 | Core Scientific Operating Company |
| INSTANCE CREATION IN A COMPUTING SYSTEM | Granted | 1/18/2021 | 11,409,574 | 8/9/2022 | Core Scientific Operating Company |
| SCALABILITY ADVISOR | Patent App | 8/12/2021 | 17/400579 | | Core Scientific Operating Company |
| RANKING COMPUTING RESOURCES | Patent App | 8/18/2021 | 17/405979 | | Core Scientific Operating Company |
| SYSTEM AND METHOD FOR SCALING PROVISIONED RESOURCES | Patent App | 11/9/2018 | 16/185762 | | Core Scientific Operating Company |

11273420v8

| Title | Type | Application Filed | Application Number / Patent Number | Issued Date | Owner |
|---|---|---|---|---|---|
| DYNAMIC NETWORK OF SUPERCOMPUTING RESOURCES WITH UNIFIED MANAGEMENT INTERFACE | Patent App | 1/6/2021 | 17/143111 | | Core Scientific Operating Company |
| LOW OVERHEAD PERFORMANCE DATA COLLECTION | Patent App | 8/12/2021 | 17/400584 | | Core Scientific Operating Company |
| APPLICATION PERFORMANCE CHARACTERIZATION AND PROFILING AS A SERVICE | Granted | 3/17/2021 | 11,347,621 | 5/31/2022 | Core Scientific Operating Company |
| JOB PERFORMANCE BREAKDOWN | Patent App | 8/17/2021 | 17/404401 | | Core Scientific Operating Company |
| BUILD PROCESS FOR APPLICATION PERFORMANCE | Patent App | 8/17/2021 | 17/404166 | | Core Scientific Operating Company |
| APPLICATION PERFORMANCE DATA PROCESSING | Patent App | 8/13/2021 | 17/402359 | | Core Scientific Operating Company |
| JOB BASED BIDDING | Patent App | 8/18/2021 | 17/405370 | | Core Scientific Operating Company |
| SYSTEM AND METHOD FOR SCHEDULING IN A COMPUTING SYSTEM | Patent App | 1/18/2022 | 17/578066 | | Core Scientific Operating Company |
| AUTONOMOUS ORGANIZATION AND ROLE SELECTION OF HOMOGENOUS WORKERS | Patent App | 1/25/2022 | 17/583737 | | Core Scientific Operating Company |
| MULTI-CLOUD SPOT INSTANCE MARKET | Patent App | 4/7/2022 | 17/715567 | | Core Scientific Operating Company |
| SYNCHRONIZATION SYSTEM AND METHOD | Patent App | 4/18/2022 | 17/723202 | | Core Scientific Operating Company |
| SYSTEM AND METHOD FOR EDGE INFERENCE | Patent App | 4/22/2022 | 17/727192 | | Core Scientific Operating Company |
| CONTAINER CREATION IN A COMPUTING SYSTEM | Patent App | 5/6/2022 | 17/738635 | | Core Scientific, Inc. |

11273420v8

| Title | Type | Application Filed | Application Number / Patent Number | Issued Date | Owner |
|---|---|---|---|---|---|
| WORKLOAD DATA TRANSFER SYSTEM AND METHOD | Patent App | 5/5/2022 | 17/737463 | | Core Scientific, Inc. and Core Scientific Operating Company |
| COST MANAGEMENT IN DISTRIBUTED COMPUTING TEAMS | Patent App | 5/9/2022 | 17/739473 | | Core Scientific, Inc. |
| SYSTEM AND METHOD FOR RECOMMENDING COMPUTING RESOURCES | PCT | 7/20/2021 | PCT/US2021/042439 | | Core Scientific Operating Company |
| FINGERPRINTING DATA TO DETECT VARIANCES | Patent App | 7/14/2022 | 17/864885 | | Core Scientific Operating Company |
| | Patent App | | 17/388503 | | Core Scientific Operating Company |
| | Patent App | | 17/393730 | | Core Scientific Operating Company |
| | Patent App | | 17/495221 | | Core Scientific Operating Company |
| AUTOMATIC REPAIR OF COMPUTING DEVICES IN A DATA CENTER | PCT | 7/22/2020 | PCT/US20/43078 | | Core Scientific, Inc. |
| SYSTEM AND METHOD FOR COOLING COMPUTING DEVICES WITHIN A FACILITY | PCT | 8/01/2019 | PCT/US19/44673 | | Core Scientific, Inc. |

(ii)     **Trademarks**:

| Name | Jurisdiction | Serial No | Filing Date | Status | Grant Date | Registration No. |
|---|---|---|---|---|---|---|
| **CORE SCIENTIFIC OPERATING COMPANY** | | | | | | |
| C Core Scientific Side-By-Side Logo (inline) | U.S. | 87944149 | 31-May-18 | Registered | 9-Feb-21 | 6267073 |

| Name | Jurisdiction | Serial No | Filing Date | Status | Grant Date | Registration No. |
|---|---|---|---|---|---|---|
| Core Scientific Infrastructure & Technology (w/Design) | U.S. | 87944148 | 31-May-18 | Registered | 1-Jan-21 | 6257539 |
| Born of the Blockchain, Inspired by AI | U.S. | 88191911 | 13-Nov-18 | Registered | 25-May-21 | 6364865 |
| Honeyminer (from Stax Digital) | U.S. | 87870683 | 10-Apr-18 | Registered | 10-Dec-19 | 5929809 |
| CORE SCIENTIFIC (Child of 0007) (CL 42) | U.S. | 87983532 | 31-May-18 | Registered | 8-Dec-20 | 6217131 |
| C LOGO (Child of 0008) (CL 37, 42) | U.S. | 87983834 | 31-May-18 | Registered | 1-Jun-21 | 6373351 |
| C CORE SCIENTIFIC (CL 37, 42) | U.S. | 87983841 | 31-May-18 | Registered | 1-Jun-21 | 6373353 |
| CORE SCIENTIFIC (CL 9,37, 42) | CA | 2110256 | 27-May-21 | Pending | | |
| CORE SCIENTIFIC (CL 9, 37, 42) | EU | 18481356 | 28-May-21 | Registered | 1-Oct-21 | 18481356 |
| CORE SCIENTIFIC (CL 9, 37, 42) | UK | UK00003648548 | 28-May-21 | Registered | 3-Dec-21 | UK00003648548 |
| MINDER (CL 42) | CA | 2114725 | 16-Jun-21 | Pending | | |
| MINDER (CL 42) | U.S. | 90778545 | 16-Jun-21 | Registered | 18-Jan-22 | 6622643 |
| MINDERSHELL (CL 42)[1] | U.S. | 88531490 | 23-Jul-19 | Allowed | | |
| MINDER SATELLITE (CL 9)[2] | U.S. | 88613142 | 11-Sep-19 | Allowed | | |

---

[1] Intent to Use mark. Only disclosed for informational purposes and constitutes an Excluded Asset.

[2] Intent to Use mark. Only disclosed for informational purposes and constitutes an Excluded Asset.

11273420v8

| Name | Jurisdiction | Serial No | Filing Date | Status | Grant Date | Registration No. |
|---|---|---|---|---|---|---|
| MINDER DEEPMINE (CL 42)[3] | U.S. | 88698839 | 19-Nov-19 | Allowed | | |
| MINDER TERMINAL (CL 42)[4] | U.S. | 88698829 | 19-Nov-19 | Allowed | | |
| MINDEROS (CL 9)[5] | U.S. | 97440247 | 02-Jun-22 | Pending | | |
| MINDER (CL 9)[6] | U.S. | 97440128 | 02-Jun-22 | Pending | | |
| CORE SCIENTIFIC (CL 9)[7] | U.S. | 97379997 | 25-Apr-22 | Pending | | |
| C LOGO (CL 9)[8] | U.S. | 97379971 | 25-Apr-22 | Pending | | |
| **RADAR RELAY, INC.** | | | | | | |
| R Logo (CL 36, 41, 42) | U.S. | 88364439 | 30-Mar-19 | Registered | 26-May-20 | 6061787 |
| R Logo (CL 36, 41, 42) | WIPO IR | | | Registered | 9-Sep-19 | 1516684 |
| R Logo (CL 36, 41, 42) | CA | 2014062 | 30-Sep-19 | Registered | 20-Oct-21 | TMA1112035 |
| Ion (CL 41) | U.S. | 88364421 | 30-Mar-19 | Registered | 2-Jun-20 | 6066791 |
| Ion (CL 41) | WIPO IR | | | Registered | 30-Sep-19 | 1516609 |

---

[3] Intent to Use mark. Only disclosed for informational purposes and constitutes an Excluded Asset.
[4] Intent to Use mark. Only disclosed for informational purposes and constitutes an Excluded Asset.
[5] Intent to Use mark. Only disclosed for informational purposes and constitutes an Excluded Asset.
[6] Intent to Use mark. Only disclosed for informational purposes and constitutes an Excluded Asset.

[7] Intent to Use mark. Only disclosed for informational purposes and constitutes an Excluded Asset.
[8] Intent to Use mark. Only disclosed for informational purposes and constitutes an Excluded Asset.

| Name | Jurisdiction | Serial No | Filing Date | Status | Grant Date | Registration No. |
|---|---|---|---|---|---|---|
| Radar (CL 36, 42) | U.S. | 88364418 | 30-Mar-19 | Pending | | |
| Radar (CL 36) | WIPO IR | | | Registered | 30-Sep-19 | 1516643 |
| Radar (CL 36) | CA | 2014063 | 30-Sep-19 | Registered | 20-Oct-21 | TMA1112036 |
| RADAR RELAY (CL 42) | U.S. | 87831579 | 13-Mar-18 | Registered | 5-Feb-19 | 5668823 |
| REDSHIFT (CL 36, 42) | U.S. | 88749316 | 7-Jan-20 | Registered | 20-Jul-21 | 6429223 |

**Copyrights - None**

**Licenses**

Irrevocable Intellectual Property License Agreement dated August 23, 2018 by and between Kristy-Leigh Minehan, The Mineority Group LLC and Core Scientific, Inc.

License Agreement for the unlocking-SSH Firmware by and between Bitmain Technology Inc and Core Scientific, Inc.

11273420v8

**Schedule 9.1.15**

**Litigation**

1. In November 2022, plaintiff Mei Peng filed a putative class action in the United States District Court, Western District of Texas, Austin Division, asserting that the Company violated the Securities Exchange Act by failing to disclose to investors, among other things, that the Company was vulnerable to litigation, that certain clients had breached their agreements, and that this impacted the Company's profitability and ability to continue as a going concern. The Company denies the allegations contained in the complaint and intends to vigorously defend its interests.

2. One of the Company's largest customers, Celsius Mining LLC ("Celsius"), along with its parent company and certain affiliates, filed for voluntary relief under Chapter 11 of the United States Bankruptcy Code in July 2022 in the Bankruptcy Court for the Southern District of New York. On September 28, 2022, Celsius filed a motion in the chapter 11 case alleging that the Company is violating the automatic stay with respect to the Master Services Agreement between Celsius and the Company (the "Agreement"). Celsius is also using its chapter 11 proceeding to withhold payment of certain charges billed to Celsius pursuant to the Agreement. The Company strongly disagrees with the allegations made in the Celsius motion and the interpretation of the Agreement espoused therein and is vigorously defending its interests, including seeking resolution from the bankruptcy court and payment of any outstanding amounts owed under the Agreement (subject to applicable bankruptcy law in the Celsius chapter 11 case). The parties have agreed to stay the proceedings, including the evidentiary hearing scheduled for November 18, 2022. There can be no guarantee that the bankruptcy court will rule in the Company's favor in a timely manner or that Celsius will honor the terms of the Agreement. An adverse ruling by the bankruptcy court that provides Celsius the benefits of the Company's hosting services without Celsius fully paying the costs of such services would have a material effect on the Company's business, financial condition, results of operations and cash flows.

3. On June 17, 2022, the Company received a request to provide information voluntarily from the U.S. Securities and Exchange Commission ("SEC"). The request seeks, inter alia, information relating to the business combinations between the Company on the one hand, and Power Digital Infrastructure Acquisition Corp. ("XPDI") on the other, as well as between the Company and Blockcap, Inc. In addition, the SEC seeks documents related to the investor presentation mentioned in XPDI's July 21, 2021 Form 8-K, documents related to the Company's assessment of costs, stock holdings by certain entities and individuals, and documents related to the decision by the Company's Board of Directors to accelerate the 180-day lock-up as announced in the Company's Form 8-K filed on March 7, 2022. The Company is cooperating with the SEC in its investigation. The Company is nearing completion of its production of documents responsive to the request.

**Schedule 9.1.18**

**Labor Relations**

None.

**Schedule 10.1.16**

**Immaterial Subsidiaries**

1. Core Scientific Partners, LP
2. Core Scientific Partners GP, LLC (SMLLC)
3. CSP Advisors, LLC (SMLLC)
4. CSP Liquid Opportunities GP, LP
5. CSP Liquid Opportunities Master Fund, LP
6. CSP Liquid Opportunities Fund, LP
7. CSP Liquid Opportunities Offshore Fund (Exempted LTD)

**Schedule 10.2.1**

**Existing Debt**

*See attached.*

**Core Scientific Debt & Equipment Lease Summary - Nov 30th, 2022**

| | Issue Date | Original Amount | Maturity | Outstanding Principal |
|---|---|---|---|---|
| **Convertible Notes** | | | | |
| Ibex Partners (Core) LP | April 2021 | 65,000,000 | April 2025 | 70,872,347 |
| Celsius Core LLC | April 2021 | 54,000,000 | April 2025 | 58,878,565 |
| ICG CoreSci Holdings, LP | April 2021 | 41,000,000 | April 2025 | 44,704,096 |
| Kensico Associates, L.P. | April 2021 | 17,129,000 | April 2025 | 18,676,499 |
| Kensico Offshore Fund Master, LTD | April 2021 | 7,871,000 | April 2025 | 8,582,096 |
| Apollo Tactical Value SPN Investments LP 1 | April 2021 | 7,122,000 | April 2025 | 7,765,429 |
| The William R. Guthy Separate Property Trust | April 2021 | 5,000,000 | April 2025 | 5,451,719 |
| Apollo Centre Street Partnership, LP 1 | April 2021 | 3,675,000 | April 2025 | 4,007,013 |
| Birch Grove Credit Strategies Master Fund LP | April 2021 | 3,000,000 | April 2025 | 3,271,031 |
| Ken Wormser | April 2021 | 2,500,000 | April 2025 | 2,725,859 |
| Apollo Lincoln Fixed Income Fund, L.P. 1 | April 2021 | 2,340,000 | April 2025 | 2,551,404 |
| GreensLedge Merchant Holdings LLC | April 2021 | 2,000,000 | April 2025 | 2,180,688 |
| Apollo Moultrie Credit Fund, L.P. 1 | April 2021 | 1,863,000 | April 2025 | 2,031,310 |
| The Kimmel Family Foundation | April 2021 | 1,500,000 | April 2025 | 1,635,516 |
| Michael O. Johnson Revocable Trust | April 2021 | 1,000,000 | April 2025 | 1,090,344 |
| Doug Lipton | August 2021 | 250,000 | April 2025 | 267,173 |
| Cyrptonic Black, LLC | August 2021 | 6,000,000 | April 2025 | 6,412,148 |
| First Sun Investments, LLC | August 2021 | 4,000,000 | April 2025 | 4,274,765 |
| Mass Mutual | August 2021 | 40,000,000 | April 2025 | 42,747,651 |
| Apollo Tactical Value SPN Investments, L.P. | August 2021 | 4,700,000 | April 2025 | 5,022,849 |
| Apollo Centre Street Partnership, L.P. | August 2021 | 2,500,000 | April 2025 | 2,671,728 |
| Apollo Lincoln Fixed Income Fund, L.P. | August 2021 | 1,600,000 | April 2025 | 1,709,906 |
| Apollo Moultrie Credit Fund, L.P. | August 2021 | 1,200,000 | April 2025 | 1,282,430 |
| BlockFi | August 2021 | 5,000,000 | April 2025 | 5,343,456 |
| Corbin ERISA Opportunity Fund, Ltd. | August 2021 | 12,000,000 | April 2025 | 12,824,295 |
| Corbin Opportunity Fund, L.P. | August 2021 | 2,000,000 | April 2025 | 2,137,383 |
| Galaxy Digital LP | August 2021 | 5,000,000 | April 2025 | 5,343,456 |
| JPAS - Crypto Infrastructure LLC | August 2021 | 11,619,743 | April 2025 | 12,417,918 |
| JPAS - Crypto Infrastructure-A S.P. | August 2021 | 4,380,257 | April 2025 | 4,681,142 |
| JPAS - Credit LLC | August 2021 | 8,333,653 | April 2025 | 8,906,102 |
| JPAS - Credit-A S.P. | August 2021 | 4,166,347 | April 2025 | 4,452,539 |
| TJC3 LLC | August 2021 | 4,000,000 | April 2025 | 4,274,765 |
| Sabby Volatility Warrant Master Fund, Ltd. | August 2021 | 2,500,000 | April 2025 | 2,671,728 |
| XMS Core Convert Holdings LLC | August 2021 | 1,000,000 | April 2025 | 1,068,691 |
| Andrew Rosen 2004 Successor Insurance Tru | August 2021 | 250,000 | April 2025 | 267,173 |
| Cannon Investments LLC | August 2021 | 250,000 | April 2025 | 267,173 |
| FGK Investments Ltd. | August 2021 | 500,000 | April 2025 | 534,346 |
| Ferro Investments Ltd. | August 2021 | 1,500,000 | April 2025 | 1,603,037 |
| Neso Investment Group Ltd | August 2021 | 500,000 | April 2025 | 534,346 |
| Milos Core LLC | August 2021 | 1,000,000 | April 2025 | 1,068,691 |
| Barkley Investments, LLC | August 2021 | 2,000,000 | April 2025 | 2,137,383 |
| FTF Diversified Holdings, LP | August 2021 | 2,000,000 | April 2025 | 2,137,383 |
| David Sarner | August 2021 | 250,000 | April 2025 | 267,173 |
| Northdata Holdings Inc. | August 2021 | 200,000 | April 2025 | 213,738 |
| Monbanc Inc. | August 2021 | 100,000 | April 2025 | 106,869 |
| Levbern Management LLC | August 2021 | 250,000 | April 2025 | 267,173 |
| Frank Polaro | August 2021 | 250,000 | April 2025 | 267,173 |
| 1994 Steinfeld Family Trust | August 2021 | 500,000 | April 2025 | 534,346 |
| John Badger Quinn | August 2021 | 500,000 | April 2025 | 534,346 |
| KMR CS Holdings, LLC | August 2021 | 820,000 | April 2025 | 876,327 |
| TBC 222 LLC | August 2021 | 2,500,000 | April 2025 | 2,671,728 |

| | | | | |
|---|---|---|---|---|
| Jason Capello | August 2021 | 2,000,000 | April 2025 | 2,137,383 |
| Richard Katz 2016 GST TRUST | August 2021 | 250,000 | April 2025 | 267,173 |
| Robert Fedrock | August 2021 | 400,000 | April 2025 | 427,477 |
| JSK Partnership LLC | August 2021 | 1,000,000 | April 2025 | 1,068,691 |
| James Pulaski | August 2021 | 1,000,000 | April 2025 | 1,068,691 |
| Leon J. Simkins Non-Exempt Trust FBO Mich | August 2021 | 750,000 | April 2025 | 801,518 |
| Better Downtown Miami LLC | August 2021 | 400,000 | April 2025 | 427,477 |
| SunnySide Consulting and Holdings, Inc. | August 2021 | 110,000 | April 2025 | 117,556 |
| Vineet Agrawal | August 2021 | 250,000 | April 2025 | 267,173 |
| Wormser Family Partnership II, LP | August 2021 | 500,000 | April 2025 | 534,346 |
| Marsico AXS CS LLC | August 2021 | 21,564,869 | April 2025 | 23,046,188 |
| Gullane Digital Asset Partners, LLC | August 2021 | 22,500,000 | April 2025 | 24,045,554 |
| Gullane Digital Asset Partners QP, LLC | August 2021 | 32,088,229 | April 2025 | 34,057,275 |
| Gullane Capital Partners, LLC | August 2021 | 2,500,000 | April 2025 | 2,671,728 |
| Amplify Transformational Data Sharing ETF | August 2021 | 26,500,000 | April 2025 | 28,236,050 |
| BlackRock Credit Alpha Master Fund, L.P | August 2021 | 19,600,000 | April 2025 | 20,802,725 |
| HC NCBR FUND | August 2021 | 8,300,000 | April 2025 | 8,809,317 |
| The Obsidian Master Fund | August 2021 | 7,100,000 | April 2025 | 7,535,681 |
| OIP SPV Core Scientific, LLC | August 2021 | 993,033 | April 2025 | 1,053,969 |
| OIP SPV CS, LLC | August 2021 | 873,869 | April 2025 | 927,493 |
| John P. Joliet | August 2021 | 200,000 | April 2025 | 212,273 |
| Pescadero Capital, LLC | August 2021 | 5,000,000 | April 2025 | 5,306,818 |
| Transatlantic Mobility Holdings II LLC | August 2021 | 1,000,000 | April 2025 | 1,061,364 |
| Omega Interceptor Restricted Ltd | August 2021 | 9,822,717 | April 2025 | 10,425,473 |
| **Total Senior Secured** | | **$514,822,717** | | **$552,531,836** |
| | | | | |
| **Unsecured** | | | | |
| B. Riley Bridge Loan | April 2022 | 75,000,000 | June 2023 | 41,777,174 |
| **Total Unsecured** | | **$75,000,000** | | **$41,777,174** |
| | | | | |
| **Facility Mortgages** | | | | |
| Facility Mortgage - Brown | September 2018 | $1,000,000 | September 2023 | $184,459 |
| Facility Mortgage - Holliwood | December 2018 | 2,400,000 | December 2023 | $571,962 |
| **Total Facility Mortgages** | | **$3,400,000** | | **$756,421** |
| | | | | |
| **Equipment Financing** | | | | |
| Arctos Credit, LLC #2 | March 2021 | 1,512,654 | March 2023 | 353,357 |
| Arctos Credit, LLC #3 | March 2021 | 2,295,612 | March 2023 | 536,256 |
| Arctos Credit, LLC #4 | May 2021 | 5,457,000 | May 2023 | 2,239,748 |
| Arctos Credit, LLC #5 | May 2021 | 7,989,097 | May 2023 | 3,279,011 |
| Arctos Credit, LLC #6 | July 2021 | 26,129,258 | July 2023 | 11,792,462 |
| Arctos Credit, LLC #7 | November 2021 | 11,136,533 | November 2023 | 6,790,614 |
| Arctos Credit, LLC #8 | November 2021 | 11,136,533 | November 2023 | 6,790,614 |
| Arctos Credit, LLC #9 | November 2021 | 11,136,533 | November 2023 | 6,790,614 |
| Novak | January 2021 | 10,000,000 | January 2023 | 10,000,000 |
| Dell Financial | March 2021 | 238,278 | March 2026 | 162,158 |
| Bank of the West | March 2021 | 115,139 | January 2024 | 49,187 |
| Trinity Loan Sch. 1 | September 2021 | 1,000,000 | September 2024 | 673,896 |
| Trinity Loan Sch. 2 | November 2021 | 14,000,000 | November 2024 | 10,170,436 |
| Trinity Loan Sch. 3 | December 2021 | 5,000,000 | December 2024 | 3,762,029 |
| Bremer Loan A | October 2021 | 6,800,000 | April 2027 | 6,101,656 |
| Bremer Loan B | October 2021 | 6,156,365 | April 2027 | 5,089,031 |
| Bremer Loan C | December 2021 | 6,945,839 | June 2027 | 7,442,944 |
| Blockfi A | December 2021 | 10,000,000 | December 2023 | 6,666,667 |
| Blockfi B | December 2021 | 70,000,000 | December 2023 | 47,246,377 |
| Trinity Loan Sch. 4 | February 2022 | 10,000,000 | February 2025 | 8,036,361 |
| Anchor Labs #1 (Anchorage Lending) | March 2022 | 20,000,000 | March 2024 | 15,000,002 |

| | | | | |
|---|---|---|---|---|
| Mass Mutual Barings Sch. 1 | March 2022 | 20,000,000 | March 2025 | 18,055,809 |
| Mass Mutual Barings Sch. 2 | March 2022 | 9,003,021 | March 2025 | 8,127,841 |
| Mass Mutual Barings Sch. 3 | March 2022 | 996,979 | March 2025 | 900,063 |
| Mass Mutual Barings Sch. 4 | April 2022 | 12,499,116 | April 2025 | 11,591,557 |
| Mass Mutual Barings Sch. 5 | April 2022 | 9,997,020 | April 2025 | 9,271,137 |
| Mass Mutual Barings Sch. 6 | April 2022 | 17,142,656 | April 2025 | 15,897,930 |
| Liberty Stonebriar | April 2022 | 11,001,717 | March 2024 | 6,968,255 |
| VFS, LLC #4 | January 2022 | 894,240 | January 2025 | 638,407 |
| VFS, LLC #5 | May 2022 | 845,595 | April 2025 | 691,620 |
| Anchor Labs #2 (Anchorage Lending) | May 2022 | 11,682,916 | May 2024 | 10,159,057 |
| Flow TX | January 2023 | 1,463,811 | December 2024 | 1,263,811 |
| **Total Equipment Financing** | | **$338,060,528** | | **$242,538,905** |
| **Total Debt** | | **$931,283,245** | | **$837,604,336** |
| **Equipment Leases** | | | | |
| Garic, Inc. #2 | March 2020 | 958,650 | March 2023 | 87,196 |
| 36th Street Capital #2 | December 2019 | 1,130,000 | December 2022 | 37,883 |
| 36th Street Capital #4 | December 2019 | 748,275 | December 2022 | 25,086 |
| Toyota Commercial Finance Schedules 1-9 | January 2020 | 431,799 | June 2025 | 229,966 |
| Fidelity Capital | May 2021 | 180,500 | October 2023 | 78,540 |
| VFS, LLC #2 | June 2021 | 485,100 | April 2024 | 260,883 |
| Meridian Equipment Finance, LLC | June 2021 | 149,350 | April 2025 | 96,018 |
| Marco | September 2021 | 17,838 | August 2026 | 13,818 |
| Technology Finance Corporation - 2540-05 | October 2021 | 517,500 | October 2024 | 335,626 |
| VFS, LLC #3 | November 2021 | 956,340 | October 2024 | 632,049 |
| Liberty Commercial Finance #1 | December 2021 | 3,108,795 | December 2025 | 2,287,516 |
| Liberty Commercial Finance #2 | December 2021 | 535,724 | November 2025 | 386,403 |
| Liberty Commercial Finance #3 | December 2021 | 565,000 | November 2025 | 404,701 |
| Liberty Commercial Finance #4 | December 2021 | 878,250 | November 2025 | 634,278 |
| Liberty Commercial Finance #5 | December 2021 | 389,300 | November 2025 | 278,521 |
| Liberty Commercial Finance #6 | December 2021 | 610,050 | November 2024 | 382,852 |
| Liberty Commercial Finance #7 | December 2021 | 362,250 | November 2024 | 224,516 |
| Liberty Commercial Finance #8 | December 2021 | 1,875,000 | November 2025 | 1,378,565 |
| Liberty Commercial Finance #9 | December 2021 | 807,164 | November 2025 | 596,099 |
| Liberty Commercial Finance #10 | December 2021 | 10,111,194 | November 2024 | 6,924,129 |
| Liberty Commercial Finance #11 | December 2021 | 5,384,527 | December 2024 | 3,686,877 |
| Liberty Commercial Finance #12 | December 2021 | 5,674,191 | December 2024 | 3,885,265 |
| Liberty Commercial Finance #13 | December 2021 | 5,656,986 | December 2024 | 3,659,252 |
| Liberty Commercial Finance #14 | December 2021 | 487,500 | December 2024 | 314,557 |
| Liberty Commercial Finance #15 | December 2021 | 690,833 | December 2024 | 446,114 |
| Liberty Commercial Finance #16 | December 2021 | 3,727,110 | December 2024 | 2,410,588 |
| Mass Mutual Sch.1-5 | December 2021 | 50,000,000 | December 2024 | 41,667,320 |
| **Total Equipment Leases** | | **$109,904,959** | | **$71,364,620** |
| **Total Debt & Leases** | | **$1,041,188,204** | | **$908,968,955** |

Case 22-90341 Document 607-4 Filed in TXSB on 03/01/23 Page 322 of 396

*Note: As of 11/30/2022. Does not include Accounting-tracked Convertible Note Fair Value Adjustment and Trinity Loans End of Term Payment Accrual*

**<u>Schedule 10.2.2</u>**

**Existing Liens**

*See attached.*

## Equipment Leases and Equipment
## Financings[1]

1.  Master Equipment Financing Agreement, dated as of October 27, 2020, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as borrower, and Arctos Credit, LLC, as lender, and any and all schedules thereto.

2.  Equipment Financing Agreement, dated as of March 15, 2021, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as borrower, and Bank of the West, as lender.

3.  Master Equipment Financing Agreement, dated as of August 31, 2021, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as borrower, and Trinity Capital Inc., as lender, and any and all amendments, modifications and schedules thereto, including, without limitation, Equipment Financing Schedule Nos. 1 - 4 executed from time to time and any and all amendments and modifications thereto.

4.  Liens and security interests securing the payment and performance of Loan Agreement, dated as of October 4, 2021, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as borrower, and Bremer Bank, National Association, as lender.

5.  Liens and security interests securing the payment and performance of Promissory Note – Pace Equipment Term Loan, dated as of October 4, 2021, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as borrower, and Bremer Bank, National Association, as lender.

6.  Liens and security interests securing the payment and performance of Promissory Note – Improvement/Equipment Term Loan, dated as of October 4, 2021, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as borrower, and Bremer Bank, National Association, as lender.

7.  Liens and security interests securing the payment and performance of Promissory Note – Construction Real Estate Term Loan, dated as of October 10, 2021, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as borrower, and Bremer Bank, National Association, as lender.

8.  Payment Agreement, dated as of February 25, 2021, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as borrower, and Dell Financial Services L.L.C., as lender.

9.  Facility and Security Agreement, dated as of December 30, 2021, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as borrower, and BlockFi Lending LLC, as lender (and any and all amendments, modifications and collateral schedules thereto, including, without limitation, Schedule 2 thereto, and any and all amendments or modifications thereto).

10. Facility and Security Agreement, dated as of December 30, 2021, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as borrower, and BlockFi

---

[1] This schedule is not intended to acknowledge or otherwise constitute consent with respect to (i) the amount or nature of any claims of any Debt or obligations set forth herein or (ii) the validity, perfection or priority of any liens or security interests with respect to such Debt or other obligations.

Lending LLC, as lender (and any and all amendments, modifications and collateral schedules thereto, including, without limitation, Schedule 2 thereto, and any and all amendments or modifications thereto) .

11. Equipment Loan and Security Agreement, dated as of March 11, 2022, by and between the Company, as borrower, and Anchorage Lending CA, LLC, as lender.

12. Equipment Loan and Security Agreement, dated as of May 23, 2022, by and between Company, as borrower, and Anchorage Lending CA, LLC, as lender.

13. Promissory Note, dated as of March 11, 2022, by and between Company, as borrower, and Anchorage Lending CA, LLC, as lender.

14. Promissory Note, dated as of May 23, 2022, by and between Company, as borrower, and Anchorage Lending CA, LLC, as lender.

15. Equipment Finance Agreement, dated as of March 22, 2022, by and between the Company, as borrower, and Liberty Commercial Finance LLC, as lender.

16. Master Security Agreement, dated as of March 24, 2022, by and between the Company, as borrower, and Barings Private Credit Corp., Barings Capital Investment Corporation and Barings BDC, Inc. as lenders (and any and all amendments, modifications and collateral schedules thereto, including, without limitation, Collateral Schedules 1 - 6 executed from time to time and any and all amendments and modifications thereto).

17. Term Loan and Purchase Money Security Agreement, dated as of January 30, 2021, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as borrower, and Jack Novak, as lender.

18. Promissory Note, dated as of January 30, 2021, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as maker, and Jack Novak, as payee.

19. Master Equipment Lease Agreement #32109 dated as of June 3, 2021 between Liberty Commercial Finance LLC (now known as Wingspire Equipment Finance LLC) and Core Scientific, Inc. and Core Scientific Holding Co. and Equipment Schedules thereto, including all amendments thereto.

20. Master Lease Agreement dated December 3, 2021, between MassMutual Asset Finance LLC ("**MMAF**") and Core Scientific Operating Company, Inc. f/k/a Core Scientific, Inc. ("**Core**"), and Schedules 1-5 dated December 15, 2021, with respect thereto, as amended, (the Master Lease Agreement, Schedules, and amendments to the Schedules together, the "**Financing Agreements**").

## Mortgages

| Document | Date Recorded | Recording Information | County | Claimant | Amount Claimed | Property Site |
|---|---|---|---|---|---|---|
| 1. Leasehold Mortgage and Security Agreement with Fixture Financing Statement dated October 4, 2021 and recorded on October 7, 2021 by and between Core Scientific, Inc., as Borrower, and Bremer Bank, National Association, as Lender ("Leasehold Mortgage"), as modified by that certain Leasehold Mortgage Modification Agreement and Extension Affidavit dated December 6, 2021 and recorded on December 16, 2021 by and between Borrower and Lender ("Extension Agreement"), as modified by that certain 2021 Amendment to Loan Agreement, dated December 10, 2021 between Borrower and Lender ("Amendment"). | Leasehold Mortgage: October 7, 2021  Extension Agreement: December 16, 2021  Amendment: No recording information provided | Leasehold Mortgage: 819576  Extension Agreement: 821738  Amendment: No recording information provided | Grand Forks | Bremer Bank, National Association | 1. PACE/Equipment Term Loan: $6,800,000.00  2. Improvement/Equipment Term Loan: $9,359,000.00  3. Construction Real Estate Term Loan: $9,567,000.00 | 5601 11th Avenue South, Grand Forks, ND 58201 |
| 2. Purchase Money Mortgage dated December 19, 2018 and recorded on December 21, 2018, by and between American Property Acquisition, LLC, as Borrower, and Holliwood LLC, as | December 21, 2018 | Book 897, Page 386 | Marshall | Holliwood LLC | $2,400,000.00 | 1035 Shar Cal Rd., Calvert City, KY 42029 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | Lender. |
| 3. | Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated June 9, 2020 and recorded on June 11, 2020, by and between American Property Acquisition, LLC, as Mortgagor, and Silverpeak Credit Partners LP, as Mortgagee. | June 11, 2020 | Book 936, Page 561 | Marshall | Silverpeak Credit Partners LP | $21,000,000.00 | 1035 Shar Cal Rd., Calvert City, KY 42029 |

# Mechanic's Liens[23]

[See Below]

---

[2] All mechanic's liens arising by operation of law that are valid, non-avoidable and properly perfected as of the Petition Date (or were properly perfected subsequent to the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code).

[3] For the avoidance of doubt, in addition to the mechanic's liens specified in this Schedule, any lien of Priority Power Management, LLC that is properly perfected postpetition in accordance with section 546(b) of the Bankruptcy Code is also deemed to be listed in this Schedule, and all parties' rights as to the ability of Priority Power Management, LLC to perfect a lien postpetition are preserved.

| | Document | Date Recorded | Document Number | County | Claimant | Amount Claimed | Property Site |
|---|---|---|---|---|---|---|---|
| 1. | Affidavit for Mechanic's Lien | 8/19/2022 | 2022-3219 | Ward | Priority Power Management, LLC | $16,319,916 | 3013 FM 516 North, Barstow, TX 79777<br><br>Property Ownership is unclear from the document, but may be Core Scientific. |
| | Partial Release of Lien | 9/27/2022 | 2022 - 3741 | Ward | Priority Power Management, LLC | Amount Released - $6,250,096 Amount Remaining - $10,069,820 | 3013 FM 516 North, Barstow, TX 79777 |
| 2. | Affidavit Claiming Mechanic's and Materialman's Lien | 9/9/2022 | 2022-3542 | Ward | Graybar Electric Company, Inc. | $839,883.12 | 3013 FM 516 North, Barstow, TX 79777<br><br>Cedarvale Project, located at 3015 ranch Road 516, Barstow, Texas – Property Ownership is unclear from the document, but may be Core Scientific. |
| 3. | Affidavit Claiming Mechanic's and Materialman's Lien | 11/14/2022 | 2022-4434 | Ward | Huband-Mantor Construction | $4,155,739.72 total ($2,949,813.67 due and the remainder in retainage) | 3013 FM 516 North, Barstow, TX 79777<br><br>Property Ownership is unclear from the document, but may be Core Scientific. |
| 4. | Mechanic's Lien dated October 11, 2022 | 10/14/2022 | 2022-3951 | Ward | Wessely-Thompson Hardware, Inc. | $54,016.75 | 3013 FM 516 North, Barstow, TX 79777 |
| 5. | Affidavit for Mechanic's Lien | 11/15/2022 | 2022-4351 | Ward | MK Marlow Company, LLC | $536,728.57 | 3013 FM 516 North, Barstow, TX 79777<br><br>Property Ownership is unclear from the document, but may be Core Scientific. |

| # | Document Type | Date | Number | County | Creditor | Amount | Property |
|---|---|---|---|---|---|---|---|
| 6. | Affidavit for Mechanic's and Materialman's Lien | 11/16/2022 | 2022-4371 | Ward | ComNet Communications, LLC | $31,875.00 | 3013 FM 516 North, Barstow, TX 79777<br><br>Core Scientific Texas 2 Cedarvale CVL I project. Property Ownership is unclear from the document, but may be Core Scientific. |
| 7. | Affidavit Claiming Mechanic's and Materialman's Lien | 11/21/2022 | 2022-4431 | Ward | Coonrod Electric Co., LLC | $1,547,802.40 | 3013 FM 516 North, Barstow, TX 79777<br><br>Property Ownership is unclear from the document, but may be Core Scientific. |
| 8. | Affidavit of Mechanics Lien by Tiered Contractor or Supplier | 11/28/2022 | 2022-4495 | Ward | Summit Electric Supply Co. | $309,162.20 | 3013 FM 516 North, Barstow, TX 79777 |
| 9. | Affidavit of Mechanics Lien by Tiered Contractor or Supplier | 11/30/2022 | 2022-4527 | Ward | Morsco Supply LLC DBA Morrison Supply Company | $4,466.68 | 3013 FM 516 North, Barstow, TX 79777 |
| 10. | Affidavit for Mechanic's Lien | 8/18/2022 | 2022005550 | Reeves | Priority Power Management, LLC | $14,442,661 | 1851 FM 2119, Pecos, TX 79772 and/or 1939 FM 2119, Pecos, TX 79772<br><br>Property Owned by Jobe Ranch Family Limited Partnership |
| | Partial Release of Lien | 9/27/2022 | 202200662 | Reeves | Priority Power Management, LLC | Amount Released - $3,023,269 Amount Remaining - $11,419,392 | 1851 FM 2119, Pecos, TX 79772 and/or 1939 FM 2119, Pecos, TX 79772<br><br>Property Owned by Jobe Ranch Family Limited Partnership |

| | | | | | | |
|---|---|---|---|---|---|---|
| | Amended Affidavit for Mechanic's Lien | 12/15/2022 | 2022008754 | Reeves | Priority Power Management, LLC | $12,162,237.00 | 1851 FM 2119, Pecos, TX 79772 and/or 1939 FM 2119, Pecos, TX 79772 |
| 11. | Notice of Claim for Unpaid Labor and/or Materials | 9/9/2022 | 2022006200 | Reeves | Graybar Electric Company, Inc. | $1,153,226.72 | 1851 FM 2119, Pecos, TX 79772<br><br>Appears to be property owned by JRC/RGC34 Trade Tracts, LTD. |
| | Unconditional Waiver and Partial Release dated September 23, 2022 | No recording information provided | No recording information provided | Reeves | Graybar Electric Company, Inc. | Released Amount: $279,961.04<br><br>Remaining Amount: $873,265.68 | 1851 FM 2119, Pecos, TX 79772 |
| | | | | | | | |
| | | | | | | | |
| 12. | Affidavit for Mechanic's Lien dated November 11, 2022 | 11/15/2022 | 2022-4351 | Reeves | MK Marlow Company, LLC | $83,744.45 (including $24,157.65 in retainage) | 1851 FM 2119, Pecos, TX 79772 and/or 1939 FM 2119, Pecos, TX 79772 |
| 13. | Affidavit Claiming Mechanic's and Materialman's Lien | 11/14/2022 | 2022007951 | Reeves | Huband-Mantor Construction | $9,007,945.01 total ($7,310,708.27 due and the remainder in retainage) | 1851 FM 2119, Pecos, TX 79772 and/or 1939 FM 2119, Pecos, TX 79772<br><br>Property Owned by Jobe Ranch Family Limited Partnership |

| # | Document | Date | Instrument No. | County | Claimant | Amount | Property Description |
|---|----------|------|----------------|--------|----------|--------|----------------------|
| 14. | Affidavit Claiming Mechanic's and Materialman's Lien | 11/14/2022 | 2022007953 | Reeves | Huband-Mantor Construction | $1,699,939.21 | 1851 FM 2119, Pecos, TX 79772 and/or 1939 FM 2119, Pecos, TX 79772<br><br>Core Scientific Cottonwood Data Center #2 Pecos Project in Reeves County – Appears to be property owned by Jobe Ranch Limited Partnership and Hawkins Investments, Inc. |
| 15. | Affidavit Claiming Mechanic's and Materialman's Lien | 11/15/2022 | 2022007983 | Reeves | Coonrod Electric Co., LLC | $4,083,704.13 | 1851 FM 2119, Pecos, TX 79772 and/or 1939 FM 2119, Pecos, TX 79772<br><br>Cottonwood #1 Data Processing Center – Ownership of the Property is unclear |
| 16. | Affidavit Claiming Mechanic's and Materialman's Lien | 11/15/2022 | 2022007984 | Reeves | Coonrod Electric Co., LLC | $677,993.88 | 1851 FM 2119, Pecos, TX 79772 and/or 1939 FM 2119, Pecos, TX 79772<br><br>Cottonwood #2 Data Processing Center – Ownership of the Property is unclear |
| 17. | Affidavit of Mechanic's Lien by Tiered Contractor or Supplier | 11/30/2022 | 202200 8322 | Reeves | Summit Electric Supply Co. | $821,433.16 | 1851 FM 2119, Pecos, TX 79772 and/or 1939 FM 2119, Pecos, TX 79772<br><br>60 acre surface lease property |

| | | | | | | |
|---|---|---|---|---|---|---|
| 18. | Affidavit of Mechanic's Lien by Tiered Contractor or Supplier | 12/2/2022 | 2022008384 | Reeves | Summit Electric Supply Co. | $22,558.14 | 1851 FM 2119, Pecos, TX 79772 and/or 1939 FM 2119, Pecos, TX 79772<br><br>60 acre surface lease property |
| 19. | Affidavit for Mechanic's Lien | 12/15/2022 | 2022008777 | Reeves | T&D Moravits & Co., LLC | $305,769.50 | 1851 FM 2119, Pecos, TX 79772 |
| 20. | Affidavit for Mechanic's Lien | 12/15/2022 | 2022008778 | Reeves | T&D Moravits & Co., LLC | $82,240.00 | 1851 FM 2119, Pecos, TX 79772 |
| 21. | Affidavit for Mechanic's Lien | 12/15/2022 | 2022008779 | Reeves | T&D Moravits & Co., LLC | $96,192.50 | 1851 FM 2119, Pecos, TX 79772 |
| 22. | Affidavit for Mechanic's and Materialman's Lien | 12/16/2022 | 2022008811 | Reeves | Condair Inc. | $2,566,892.93 | 1851 FM 2119, Pecos, |
| 23.. | Affidavit for Mechanic's and Materialman's Lien | 10/28/2022 | 152295 | Denton | Sure Steel – Texas, L.P. | $1,237,031.22 | 8171 Jim Christal Road, Denton, TX 76207<br><br>DENTON DATA CENTER/8161 JIM CHRISTAL ROAD, DENTON, TEXAS; DESCRIBED IN DOCUMENT NUMBER 216662; PERMIT # 2202-0339; PARCEL ID 984633 |
| 24. | Affidavit for Mechanic's and Materialman's Lien - Leasehold | 11/1/2022 | 153496 | Denton | Way Mechanical | $151,316.10 | 8171 Jim Christal Road, Denton, TX 76207<br><br>Ownership of the Property is unclear, but appears to be in connection with a Core Scientific lease. |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 25. | Affidavit for Mechanic's and Materialman's Lien - Leasehold | 11/1/2022 | 153498 | Denton | Way Mechanical | $284,712.90 | 8171 Jim Christal Road, Denton, TX 76207<br><br>Ownership of the Property is unclear, but appears to be in connection with a Core Scientific lease. |
| 26. | Affidavit for Mechanic's and Materialman's Lien - Leasehold | 11/1/2022 | 153497 | Denton | McCorvey Sheet Metal Works, LP | $20,895.50 | 8171 Jim Christal Road, Denton, TX 76207<br><br>Ownership of the Property is unclear, but appears to be in connection with a Core Scientific lease. |
| 27. | Affidavit for Mechanic's and Materialman's Lien | 11/3/2022 | 154942 | Denton | McCarthy Building Companies, Inc. | $3,685,631.28 | 8171 Jim Christal Road, Denton, TX 76207<br><br>Ownership of the Property is unclear, but appears to be in connection with a Core Scientific lease. |
| | Amended Affidavit of Lien by McCarthy Building Companies Inc. | 11/14/2022 | 158011 | Denton | McCarthy Building Companies, Inc. | $17,052,583.65 | 8171 Jim Christal Road, Denton, TX 76207 |

| # | Document | Date | Number | County | Claimant | Amount | Property |
|---|---|---|---|---|---|---|---|
| 28. | Mechanic's Lien Affidavit | 11/14/2022 | 157743 | Denton | BEAM Concrete Construction, Inc. | $878,306.82 | 8171 Jim Christal Road, Denton, TX 76207<br><br>Ownership of the Property is unclear, but appears to be in connection with a Core Scientific lease. |
| 29. | Lien Affidavit and Claim | 11/15/2022 | 158075 | Denton | Humphrey & Associates, Inc. | $9,365,366.20 | 8171 Jim Christal Road, Denton, TX 76207<br><br>leasehold interest in the Core Scientific Denton Data Center Project located at 8151 Jim Christal Road, Denton, Texas 76207, 8161 Jim Christal Road, Denton, Texas 76207, and/or 8171 Jim Christal Road, Denton, Texas 76207 |
| 30. | Affidavit Claiming Mechanic's and Materialman's Lien Including for Retainage | 12/1/2022 | 164584 | Denton | Housley Communications | $53,883.90 | 8171 Jim Christal Road, Denton, TX 76207 and/or<br><br>8151 Jim Christal Road, Denton, Texas 76207 |
| 31. | Lien Affidavit | 12/12/2022 | 168014 | Denton | Imperial Fire Protection, LLC | $209,210.00 | 8171 Jim Christal Road, Denton, TX 76207 and/or<br><br>8161 Jim Christal Road, Denton, Texas 79207 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 32. | Affidavit for Mechanic's and Materialman's Lien | 12/13/2022 | 168734 | Denton | ABLe Communications, Inc. | $1,228,932.14 total ($268,053.12 unpaid retainage) | leasehold interest in the Core Scientific Denton Data Center Project located at 8151 Jim Christal Road, Denton, Texas 76207 and/or 8171 Jim Christal Road, Denton, Texas 76207 |
| 33. | Affidavit for Mechanic's Lien | 12/15/2022 | 169545 | Denton | Pillar Electric Group, LP | $28,266.49 | leasehold interest located at 8151 Jim Christal Road, Denton, Texas 76207 and/or 8161 Jim Christal Road, Denton, Texas 76207 |
| 34. | Affidavit for Mechanic's Lien | 12/16/22 | 170453 | Denton | Power Engineering Services, Inc. | $98,440.00 | 8151 Jim Christal Road, Denton, Texas 76207 |
| 35. | Unrecorded Mechanic's and Materialman's Lien (documentation to be confirmed) | Not recorded | Not recorded | Denton | Maddox Transformers | $7,000,000 | 8151 Jim Christal Road, Denton, Texas 76207 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 36. | Mechanic's and Materialman's Lien Statement | 10/31/2022 | 2022-013536 | Muskogee | Harper Construction Company, Inc. | $7,500,000.00 | 1525 W Smith Ferry Rd, Muskogee, OK 74401 |
| 37. | Mechanic's and Materialman's Lien Statement | 11/02/2022 | 2022-013616 | Muskogee | Contech, Inc. | $602,556.08 | 1525 W Smith Ferry Rd, Muskogee, OK 74401 |
| 38. | Mechanic's and Materialman's Lien Statement | 11/28/2022 | 2022-014455 | Muskogee | Gaylor Electric, Inc. DBA Gaylor, Inc. | $5,245,601.81 | 1525 W Smith Ferry Rd, Muskogee, OK 74401 |
| 39. | Unrecorded Mechanic's and Materialman's Lien (documentation to be confirmed) | Not recorded | Not recorded | Muskogee | J.W. Didado | $6,000,000 | 1525 W Smith Ferry Rd, Muskogee, OK 74401 |

**<u>Schedule 10.2.4</u>**

**Existing Investments**

None.

## Schedule 10.2.16

### Existing Affiliate Transactions

1.  Master Services Agreement, dated as of February 5, 2021, by and among Core Scientific, Inc. and GEM Mining 1 LLC (the "Gem Mining 1 MSA").

    a.  Master Services Agreement Order #3 to the Gem Mining 1 MSA, dated as of February 5, 2021, by and among Core Scientific, Inc. and GEM Mining 1 LLC.

    b.  Master Services Agreement Order #5 to the Gem Mining 1 MSA, dated as of February 5, 2021, by and among Core Scientific, Inc. and GEM Mining 1 LLC.

    c.  Amended and Restated Order #8 to the Gem Mining 1 MSA, dated as of February 5, 2021, by and among Core Scientific, Inc. and GEM Mining 1 LLC.

2.  Master Services Agreement, dated as of July 9, 2021, by and among Core Scientific, Inc. and GEM Mining 4 LLC (the "Gem Mining 4 MSA").

    a.  Master Services Agreement Order #1 to the Gem Mining 4 MSA, dated as of July 9, 2021, by and among Core Scientific, Inc. and Gem Mining 4, LLC.

3.  Amended and Restated Employment Agreement, dated as of October 10, 2021, by and among Michael J. Levitt and Core Scientific Holding Co.

4.  Employment Agreement, dated as of October 10, 2021, by and among Darin Feinstein and Core Scientific Holding Co.

EXHIBIT A

to

Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement

## [FORM OF] ASSIGNMENT AND ACCEPTANCE

Reference is made to the Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement, dated as of February 27, 2023, (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement"), among Core Scientific, Inc., a Delaware corporation (the "Borrower"), each other Obligor party thereto, B. Riley Commercial Capital, LLC, as the administrative agent (the "Administrative Agent") for each Person party to the DIP Credit Agreement from time to time as a Lender (collectively, the "Lenders"), and such Lenders. Terms are used herein as defined in the DIP Credit Agreement.

_____ ("Assignor") and _____ ("Assignee") agree as follows:

1.      Assignor hereby assigns to Assignee and Assignee hereby purchases and assumes from Assignor (a) a principal amount of $_____ of Assignor's outstanding Loan and (b) the amount of $_____ of Assignor's Commitment (which represents _____% of the total Commitments) (the foregoing items being, collectively, the "Assigned Interest"), together with an interest in the Loan Documents corresponding to the Assigned Interest. This Assignment and Acceptance shall be effective as of the date ("Effective Date") indicated in the corresponding Assignment Notice delivered to the Administrative Agent, provided such Assignment Notice is executed by Assignor, Assignee and the Administrative Agent, if applicable. From and after the Effective Date, Assignee hereby expressly assumes, and undertakes to perform, all of Assignor's obligations in respect of the Assigned Interest, and all principal, interest, fees and other amounts which would otherwise be payable to or for Assignor's account in respect of the Assigned Interest shall be payable to or for Assignee's account, to the extent such amounts accrue on or after the Effective Date.

2.      Assignor (a) represents that (i) as of the date hereof, prior to giving effect to this assignment, its Commitment is $_____, and the outstanding balance of its Loan is $_____; (ii) it is the legal and beneficial owner of the Assigned Interest, (iii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, and (iv) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Acceptance and to consummate the transactions contemplated hereby; (b) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the DIP Credit Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the DIP Credit Agreement or any other instrument or document furnished pursuant thereto, other than that Assignor is the legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any adverse claim; and (c) makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrower or the performance by the Borrower of their obligations under the Loan Documents.

3.      Assignee (a) represents and warrants that it is legally authorized to enter into this Assignment and Acceptance; (b) confirms that it has received copies of the DIP Credit Agreement and such other Loan Documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance; (c) agrees that it shall, independently and without reliance upon Assignor and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents; (d) confirms that it is an Eligible Assignee; (e) appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers under the DIP

Exhibit A-1

Credit Agreement as are delegated to the Administrative Agent by the terms thereof, together with such powers as are incidental thereto; (f) agrees that it will observe and perform all obligations that are required to be performed by it as a "Lender" under the Loan Documents; (g) represents and warrants that the assignment evidenced hereby will not result in a non-exempt "prohibited transaction" under Section 406 of ERISA; and (h) represents and warrants that, if it is a Foreign Lender, attached hereto is any documentation required to be delivered by it pursuant to the terms of the DIP Credit Agreement, duly completed and executed by the Assignee.

    4.    THIS AGREEMENT, UNLESS OTHERWISE SPECIFIED, SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO CONFLICT OF LAW PRINCIPLES TO THE EXTENT SUCH PRINCIPLES WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.

    5.    Each notice or other communication hereunder shall be in writing, shall be sent by messenger, by telecopy or facsimile transmission, or by first-class mail, shall be deemed given when sent and shall be sent as follows:

    (a)    If to Assignee, to the following address (or to such other address as Assignee may designate from time to time):

_____
_____
_____

    (b)    If to Assignor, to the following address (or to such other address as Assignor may designate from time to time):

_____
_____
_____

Payments hereunder shall be made by wire transfer of immediately available Dollars as follows:

If to Assignee, to the following account (or to such other account as Assignee may designate from time to time):

_____
_____
ABA No. _____
_____
Account No. _____
Reference: _____

If to Assignor, to the following account (or to such other account as Assignor may designate

from time to time):

_____

_____
ABA No. _____

_____
Account No. _____
Reference: _____

**IN WITNESS WHEREOF**, this Assignment and Acceptance is executed as of _____.

_____
("<u>Assignee</u>")

By:_____
   Title:

_____
("<u>Assignee</u>")

By:_____
   Title:

EXHIBIT B
to
Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement

## [FORM OF] ASSIGNMENT NOTICE

Reference is made to (1) the Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement, dated as of February 27, 2023, (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement"), among Core Scientific, Inc., a Delaware corporation (the "Borrower"), each other Obligor party thereto, B. Riley Commercial Capital, LLC, as the administrative agent (the "Administrative Agent") for each Person party to the DIP Credit Agreement from time to time as a Lender (collectively, the "Lenders"), and such Lenders; and (2) the Assignment and Acceptance dated as of _____, 20__ (the "Assignment Agreement"), between _____ ("Assignor") and _____ ("Assignee"). Terms are used herein as defined in the DIP Credit Agreement.

Assignor hereby notifies the Administrative Agent of Assignor's intent to assign to Assignee pursuant to the Assignment Agreement (a) a principal amount of $_____ of Assignor's outstanding Loans and $_____ of Assignor's participations in the Obligations and (b) the amount of $_____ of Assignor's Commitment (which represents _____% of the total Commitments) (the foregoing items being, collectively, the "Assigned Interest"), together with an interest in the Loan Documents corresponding to the Assigned Interest. This Agreement shall be effective as of the date ("Effective Date") indicated below, provided this Assignment Notice is executed by Assignor, Assignee and the Administrative Agent, if applicable. Pursuant to the Assignment Agreement, Assignee has expressly assumed all of Assignor's obligations under the DIP Credit Agreement to the extent of the Assigned Interest, as of the Effective Date.

For purposes of the DIP Credit Agreement, the Administrative Agent shall deem Assignor's Commitment to be reduced by $_____, and Assignee's Commitment to be increased by $_____.

The address of Assignee to which notices and information are to be sent under the terms of the DIP Credit Agreement is:

_____
_____
_____
_____

The address of Assignee to which payments are to be sent under the terms of the DIP Credit Agreement is shown in the Assignment and Acceptance.

This Notice is being delivered to the Administrative Agent pursuant to Section 13.3 of the DIP Credit Agreement. Please acknowledge your acceptance of this Notice by executing and returning to Assignee and Assignor a copy of this Notice.

**IN WITNESS WHEREOF**, this Assignment Notice is executed as of _____.

_____
("Assignee")

By:_____
   Title:

_____
(Assignee")

By:_____
   Title:

B. Riley Commercial Capital, LLC,*
as the Administrative Agent

By:_____
   Title:

* No signature required if Assignee is a Lender or an Affiliate of a Lender.

Exhibit B-2

EXHIBIT C

to

Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement

**[FORM OF] NOTICE OF BORROWING**

[Date]

B. Riley Commercial Capital, LLC, as the administrative agent
(the "<u>Administrative Agent</u>") for the Lenders
party to the DIP Credit Agreement referred to below
11100 Santa Monica Blvd., Suite 800
Los Angeles, CA 90025
Attention:

Perry Mandarino

Ladies and Gentlemen:

The undersigned, Core Scientific, Inc., a Delaware corporation (the "<u>Borrower</u>"), (a) refers to the Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement, dated as of February 27, 2023 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "<u>DIP Credit Agreement</u>", the terms defined therein being used herein as therein defined), among the Borrower, each other Obligor party thereto, the Lenders party thereto from time to time as a Lenders (collectively, the "<u>Lenders</u>"), and B. Riley Commercial Capital, LLC, as the Administrative Agent (the "<u>Administrative Agent</u>"); (b) hereby gives you irrevocable notice pursuant to Section 4.1.1 of the DIP Credit Agreement that the undersigned hereby requests a Borrowing under the DIP Credit Agreement; and (c) sets forth below the information relating to such Borrowing (the "<u>Proposed Borrowing</u>") as required by Section 4.1.1 of the DIP Credit Agreement:

(i)    The Business Day of the Proposed Borrowing is _____ , _____ [1]

(ii)    The aggregate principal amount of the Proposed Borrowing is $.................. [2]

(iii)    The location and number of the account to which funds shall be disbursed is as follows: [_____].

The undersigned hereby certifies that the following statements are true on the date hereof, and will be true on the date of the Proposed Borrowing and on the date on which such Loan is funded or made (or deemed to be made):

(A)    No Default or Event of Default shall exist at the time of, or immediately result

---

[1] Shall be at least five (5) Business Days prior to the requested Borrowing Date (unless the Lenders consent in writing to any shorter time period); <u>provided</u> that (in each case) any such notice shall be deemed to have been given on a certain day only if given before 11:00 am (New York City time) on such day.

[2] This request shall be for a Proposed Borrowing of no less than $5,000,000.

Exhibit C-1

11255122v17

from the funding of such Loan, and

      (B)     The representations and warranties of each Obligor in the Loan Documents shall be true and correct in all material respects (or, with respect to representations and warranties qualified by materiality, in all respects) on the date of, and upon giving effect to, the making of such Loan (except for representations and warranties that expressly relate to an earlier date, in which case such representation and warranty shall be true and correct in all material respect (or all respects, as applicable) as of such date;

      (C)     The sum of (x) Obligors' cash and Cash Equivalents on hand (excluding any of Obligors' Eligible Cash in the Carve-Out Account and any Adequate Assurance Deposits) and (y) subject to the definition of Unrestricted Bitcoin, the aggregate value in U.S. Dollars of the Unrestricted Bitcoin owned by Borrower and the other Obligors on the date of the Proposed Borrowing as determined based on the BTCUSD Coinbase spot price as of 5:00 p.m. as of the immediately preceding Business Day of the date of the Proposed Borrowing (or, if applicable with respect to any Bitcoin, the value thereof, if any, as determined in accordance with any Permitted BTC Hedging Agreement then in effect with respect thereto), at such time is less than $30,000,000 immediately prior to giving effect to any such Borrowing, and attached hereto as <u>ANNEX I</u> sets forth a calculation of each of the foregoing clauses (x) and (y); and

      (D)     All conditions as set forth in Section 6.2.2 of the DIP Credit Agreement are satisfied (or waived by the Administrative Agent and the Required Lenders) prior to (or concurrently with) the making of such Loan on the Borrowing Date relating thereto.

The undersigned hereby agrees that the payments made in accordance with this Notice of Borrowing are made for the administrative convenience of the Borrower and that the legal effect thereof is the same as if the proceeds of the Proposed Borrowing were transferred directly to the Borrower by the Administrative Agent and distributed by the Borrower. The Borrower hereby acknowledges and agrees that the disbursements are being made strictly on the basis of the information set forth in this Notice of Borrowing, and in the event such information is inaccurate, the Borrower shall be liable for any and all losses, costs, taxes, fees and expenses incurred by the Administrative Agent arising out of or as a result of the Administrative Agent's compliance with the information set forth in this Notice of Borrowing; <u>provided</u> that such indemnity shall not be available to the extent such losses, costs, taxes, fees and expenses have resulted from the gross negligence or willful misconduct of the Administrative Agent as determined by a final and nonappealable decision of a court of competent jurisdiction.

                             Very truly yours,

                             CORE SCIENTIFIC, INC., as the Borrower

                             By:_____
                               Name:
                               Title:

Exhibit C-2

ANNEX I

A.  Obligors' cash and Cash Equivalents on hand (excluding any of Obligors'
    Eligible Cash in the Carve-Out Account and any Adequate Assurance Deposits):   $_____

B.  Subject to the definition of Unrestricted Bitcoin, the aggregate value in U.S.
    Dollars of the Unrestricted Bitcoin owned by Borrower and the other Obligors
    on the date of the Proposed Borrowing as determined based on the BTCUSD
    Coinbase spot price as of 5:00 p.m. as of the immediately preceding Business
    Day (or, if applicable with respect to any Bitcoin, the value thereof, if any, as
    determined in accordance with any Permitted BTC Hedging Agreement then in
    effect with respect thereto):                                                   $_____

C.  <u>Sum</u> of line A and line B:                                                       $_____

D.  Line C less than $30,000,000?                                               <u>Yes/No</u>

EXHIBIT D
to
Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and
Security Agreement

**[FORM OF] GUARANTY**

(See attached)

11255122v17

## GUARANTY

THIS GUARANTY (this "Guaranty") is executed as of the twenty-seventh day of February, 2023, by each of the entities listed on the signature pages hereto (collectively, "Guarantors" and individually, each a "Guarantor"), in favor of **B. RILEY COMMERCIAL CAPITAL, LLC**, as administrative agent, and the other Persons party to the DIP Credit Agreement from time to time (as hereinafter defined) as Lenders. Unless otherwise defined herein, or unless the context otherwise requires, each term used herein with its initial letter capitalized shall have the meaning given such term in the DIP Credit Agreement (as hereinafter defined).

## W I T N E S S E T H :

WHEREAS, Core Scientific, Inc., a Delaware corporation (the "Borrower"), Guarantors and certain other parties, the Lenders, and B. Riley Commercial Capital, LLC, as administrative agent for the Lenders (in such capacity, the "Administrative Agent"), are parties to that certain Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement, dated as of the date hereof (as such agreement may be amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement"), pursuant to which the Lenders have agreed to make certain loans available to the Borrower;

WHEREAS, on December 21, 2022 (the "Petition Date") the Borrower and Guarantors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas;

WHEREAS, the Lenders have required, as a condition to making advances of the proceeds of the loans under the DIP Credit Agreement, that Guarantors execute and deliver this Guaranty subject to the terms set forth in the DIP Credit Agreement, the other Loan Documents and the DIP Orders;

WHEREAS, each Guarantor has determined that valuable benefits will be derived by it as a result of the DIP Credit Agreement and the Borrowings to be made by the Borrower thereunder; and

WHEREAS, each Guarantor has further determined that the benefits accruing to it from the DIP Credit Agreement exceed such Guarantor's anticipated liability under this Guaranty.

NOW, THEREFORE, for valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, Guarantors hereby covenant and agree as follows:

1. **Guaranty**. (a) Guarantors hereby, jointly and severally, absolutely, irrevocably and unconditionally guarantee to the Administrative Agent, for the ratable benefit of the Secured Parties, the prompt, complete and Full Payment when due (whether at stated maturity, by acceleration, by required prepayment, declaration, demand or otherwise) of the Obligations of the Borrower now or hereafter existing under the DIP Credit Agreement or any Loan Document, whether for principal, interest, fees, costs, disbursements, commissions, expense reimbursements, indemnifications or otherwise, and further guarantee that the Borrower will timely perform the

11248496v4

Obligations in accordance with the terms and provisions of the DIP Credit Agreement and the DIP Orders.

(b)     If and to the extent required in order for the obligations of any Guarantor to be enforceable under applicable federal, state and other laws relating to the insolvency of debtors, the maximum liability of such Guarantor hereunder shall be limited to the maximum amount which can be guaranteed by such Guarantor under such laws.  Each Guarantor acknowledges and agrees that, to the extent not prohibited by Applicable Law, (i) such Guarantor (as opposed to its creditors, representatives of creditors or bankruptcy trustee, including such Guarantor in its capacity as debtor in possession exercising any powers of a bankruptcy trustee) has no personal right under such laws to reduce, or request any judicial relief that has the effect of reducing, the amount of its liability under this Guaranty, (ii) such Guarantor (as opposed to its creditors, representatives of creditors or bankruptcy trustee, including such Guarantor in its capacity as debtor in possession exercising any powers of a bankruptcy trustee) has no personal right to enforce the limitation set forth in this Section 1(b) or to reduce, or request judicial relief reducing, the amount of its liability under this Guaranty, and (iii) the limitation set forth in this Section 1(b) may be enforced only to the extent required under such laws in order for the obligations of such Guarantor under this Guaranty to be enforceable under such laws and only by or for the benefit of a creditor, representative of creditors or bankruptcy trustee of such Guarantor or other Person entitled, under such laws, to enforce the provisions thereof.

(c)     Each Guarantor agrees that the Obligations may at any time and from time to time be incurred or permitted in an amount exceeding the maximum liability of such Guarantor under Section 1(b) without impairing the guarantee contained in this Section 1 or affecting the rights and remedies of any Secured Party hereunder.

2.     **Payment by Guarantors**.  (a) All Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Secured Party may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of the Borrower to pay any of the Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, Guarantors will promptly upon demand pay, or cause to be paid, in cash, to the Administrative Agent for the ratable benefit of the Secured Parties, an amount equal to the sum of the unpaid principal amount of all Obligations then due as aforesaid, accrued and unpaid interest on such Obligations (including interest which, but for the Borrower's becoming the subject of the Chapter 11 Cases, would have accrued on such Obligations, whether or not a claim is allowed against the Borrower for such interest in the related bankruptcy case) and all other Obligations then owed to Secured Parties as aforesaid.

(b)     If any Guarantor is or becomes liable for any indebtedness owing by the Borrower to the Administrative Agent or the Lenders by endorsement or otherwise, other than under this Guaranty, such liability shall not be in any manner impaired or affected hereby, and the rights of the Lenders hereunder shall be cumulative of any and all other rights that the Administrative Agent and the Lenders may ever have against such Guarantor.  The exercise by the Administrative Agent and the Lenders of any right or remedy hereunder or under any other instrument, at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy.

11248496v4

(c)     In the event of default by the Borrower in payment of the Obligations, or any part thereof, when such Obligations, or any part thereof, become due, either by their terms or as the result of the exercise of any power to accelerate, Guarantors shall, on demand, and without further notice of dishonor and without any notice having been given to Guarantors previous to such demand of the acceptance by the Lenders of this Guaranty, and without any notice having been given to Guarantors previous to such demand of the creation or incurrence of such Obligations, promptly pay the amount due thereon to the Administrative Agent and the Lenders at the Administrative Agent's notice address pursuant to Section 14.3.1 of the DIP Credit Agreement, and it shall not be necessary for the Administrative Agent or any Lender, in order to enforce such payment by any Guarantor, first, to institute suit or exhaust its remedies against the Borrower or others liable on such Obligations, to have the Borrower joined with such Guarantor in any suit brought under this Guaranty or to enforce their rights against any security which shall ever have been given to secure such Obligations; provided, however, that if the Administrative Agent or the Lenders elect to enforce and/or exercise any remedies they may possess with respect to any security for the Obligations prior to demanding payment from any Guarantor, such Guarantor shall nevertheless be obligated hereunder for any and all sums still owing the Administrative Agent and the Lenders on the Obligations and not repaid or recovered incident to the exercise of such remedies.

3.     **Liability of Guarantors Absolute**.  Subject to the entry of and terms of the DIP Orders, and except as otherwise provided for herein, each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than Full Payment of the Obligations.  In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a)     this Guaranty is a guaranty of payment when due and not of collectability. This Guaranty is a primary obligation of each Guarantor and not merely a contract of surety;

(b)     the Administrative Agent may enforce this Guaranty upon the occurrence and during the existence of an Event of Default notwithstanding the existence of any dispute between the Borrower and any Secured Party with respect to the existence of any other such Event of Default;

(c)     the obligations of each Guarantor hereunder are independent of the obligations of the Borrower and the obligations of any other guarantor (including any other Guarantor) of the obligations of the Borrower, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against the Borrower or any of such other Guarantors and whether or not the Borrower is joined in any such action or actions;

(d)     payment by any Guarantor of a portion, but not all, of the Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Obligations which has not been paid; and without limiting the generality of the foregoing, if the Administrative Agent is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Obligations that is not the subject of such

3

suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Obligations;

(e)     any Secured Party, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may, (i) renew, extend, accelerate, increase the principal amount of or the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Obligations or otherwise amend the Loan Documents; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Obligations and take and hold security for the payment hereof or the Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Obligations, any other guaranties of the Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Obligations; (v) enforce and apply any security now or hereafter held by or for the benefit of such Secured Party in respect hereof or the Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Secured Party may have against any such security, in each case such Secured Party in its discretion may determine as consistent herewith and the DIP Credit Agreement and any other applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against any Borrower or any security for the Obligations; and (vi) exercise any other rights available to it under the Loan Documents; and

(f)     this Guaranty and the obligations of Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than Full Payment of the Obligations), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Loan Documents, at law, in equity or otherwise) with respect to the Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to Events of Default) hereof, any of the other Loan Documents or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Obligations, in each case whether or not in accordance with the terms hereof or such Loan Document or any agreement relating to such other guaranty or security; (iii) the Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Loan Documents or from the proceeds of any security for the Obligations, except to the extent such security also serves as collateral for Indebtedness other than the Obligations) to the payment of Indebtedness other than the Obligations, even though any Secured Party might have elected to apply such payment to any part

4

11248496v4

or all of the Obligations; (v) any Secured Party's consent to the change, reorganization or termination of the corporate structure or existence of the Borrower or any of its Subsidiaries and to any corresponding restructuring of the Obligations; (vi) any failure to perfect or continue perfection of a security interest in any Collateral which secures any of the Obligations; (vii) any defenses, set offs or counterclaims which the Borrower may allege or assert against any Secured Party in respect of the Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Obligations.

4. **Waivers by Guarantors**. (a) Each Guarantor hereby further waives, for the benefit of the Secured Parties: (a) any right to require any Secured Party, as a condition of payment or performance by such Guarantor, to (i) proceed against the Borrower, any other guarantor (including any other Guarantor) of the Obligations or any other Person, (ii) proceed against or exhaust any security held from the Borrower, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any deposit account or credit on the books of any Secured Party in favor of the Borrower or any other Person, or (iv) pursue any other remedy in the power of any Secured Party whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of the Borrower or any Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of the Borrower or any Guarantor from any cause other than Full Payment of the Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Secured Party's errors or omissions in the administration of the Obligations, except behavior which amounts to bad faith; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Secured Party protect, secure, perfect or insure any security interest or lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Obligations or any agreement related thereto and notices of any extension of credit to the Borrower; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof. Notice to Guarantors of the acceptance of this Guaranty and of the making, renewing or assignment of the Obligations and each item thereof, are hereby expressly waived by Guarantors.

(b) Each Guarantor agrees that Administrative Agent and Lenders may at any time and from time to time, at their discretion and with or without valuable consideration, allow substitution or withdrawal of collateral or other security and release collateral or other security or compromise or settle any amount due or owing under the DIP Credit Agreement or amend or modify in whole or in part the DIP Credit Agreement or any Loan Document executed in connection with same without impairing or diminishing the obligations of such Guarantor hereunder. Each Guarantor further agrees that if the Borrower executes in favor of Administrative

5

Agent or Lenders any collateral agreement, mortgage or other security instrument, the exercise by Administrative Agent or Lenders of any right or remedy thereby conferred on Administrative Agent and Lenders shall be wholly discretionary with them, and that the exercise or failure to exercise any such right or remedy shall in no way impair or diminish the obligations of such Guarantor hereunder. Each Guarantor hereby further agrees that the Lenders and Administrative Agent shall not be liable for their failure to use diligence in the collection of the Obligations or in preserving the liability of any Person liable for the Obligations, and each Guarantor hereby waives presentment for payment, notice of nonpayment, protest and notice thereof (including notice of acceleration and notice of intent to accelerate), and diligence in bringing suits against any Person liable on the Obligations, or any part thereof.

(c)     Each Guarantor agrees that Administrative Agent and Lenders, in their discretion, may (i) bring suit against all guarantors (including, without limitation, any Guarantor hereunder) of the Obligations jointly and severally or against any one or more of them, (ii) compound or settle with any one or more of such guarantors for such consideration as Administrative Agent and Lenders may deem proper, and (iii) release one or more of such guarantors from liability, and that no such action shall impair the rights of Administrative Agent and Lenders to collect the Obligations (or the unpaid balance thereof) from other guarantors of the Obligations, or any of them, not so sued, settled with or released.

5.     **Assignments**.  This Guaranty is for the benefit of Administrative Agent and Lenders, their successors and assigns, and in the event of an assignment by Lenders (or their successors or permitted assigns) made in accordance with the terms of the DIP Credit Agreement and the DIP Orders of the Obligations, or any part thereof, the rights and benefits hereunder, to the extent applicable to the Obligations so assigned, shall be transferred with such Obligations.  No Guarantor may assign its obligations under this Guaranty without the prior written consent of the Administrative Agent.  This Guaranty is binding, not only on each Guarantor, but on the successors and assigns of each Guarantor.

6.     **Continuing Guaranty**.  This Guaranty is a continuing guaranty and shall remain in effect until all of the Guarantee Obligations (other than contingent indemnification obligations that by their express terms survive termination of the Loan Documents) shall have been paid in full and Full Payment shall have otherwise occurred in accordance with and pursuant to the DIP Credit Agreement and the other Loan Documents. Each Guarantor hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Guarantee Obligations. No modification, consent, amendment or waiver of any provision of this Guaranty, nor consent to any departure by any Guarantor therefrom, shall be effective unless the same shall be in writing and signed by Administrative Agent, and then shall be effective only in the specific instance and for the purpose for which given.  No notice to or demand on any Guarantor in any case shall, in itself, entitle such Guarantor to any other or further notice or demand in similar or other circumstances. No delay or omission by Administrative Agent or Lenders in exercising any power or right hereunder shall impair any such right or power or be construed as a waiver thereof or any acquiescence therein, nor shall any single or partial exercise of any such power preclude other or further exercise thereof, or the exercise of any other right or power hereunder.  All rights and remedies of Administrative Agent and Lenders hereunder are cumulative of each other and of every other right or remedy which they may otherwise have at law or in equity or under any other contract or document (including the Loan Documents), and the exercise of one or more rights or

6

11248496v4

remedies shall not prejudice or impair the concurrent or subsequent exercise of other rights or remedies.

7. **Chapter 11 Cases**. The liability of each Guarantor under this Guaranty shall in no manner be reduced, impaired, discharged, affected, suspended, terminated or released by the Chapter 11 Cases, or any proceedings affecting the status, existence or assets of the Borrower or any Guarantor or other similar proceedings instituted by or against the Borrower or any Guarantor and affecting the assets of the Borrower or any Guarantor. In the event that all or any portion of the Obligations are paid by the Borrower, the obligations of Guarantors hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the vent that all or any part of such payment(s) are rescinded or recovered directly or indirectly from any Secured Party as a preference, fraudulent transfer or otherwise, and any such payments which are so rescinded or recovered shall constitute obligations of Guarantors for all purposes hereunder.

8. **Interest**. No provision herein or in any promissory note, instrument or any other Loan Document executed by the Borrower or any Guarantor evidencing the Obligations shall require the payment or permit the collection of interest in excess of the maximum lawful rate. If any excess of interest in such respect is provided for herein or in any such promissory note, instrument, or any other Loan Document, the provisions of this paragraph shall govern, and neither Guarantors nor the Borrower shall be obligated to pay the amount of such interest to the extent that it is in excess of the maximum lawful rate. The intention of the parties being to conform strictly to any applicable federal or state usury laws now in force, all promissory notes, instruments and other Loan Documents (any such rate of interest payable under any such document is referred to herein as a "Subject Rate") executed by the Borrower or Guarantors evidencing the Obligations shall be held subject to reduction to the amount allowed under said usury laws as now or hereafter construed by the courts having jurisdiction; provided, that any subsequent reductions in any Subject Rate shall not reduce the rate of interest payable in connection with such promissory note, instrument or other Loan Document below the maximum lawful rate until the total amount of interest accrued equals the amount of interest which would have accrued if the Subject Rate had at all times been in effect.

9. **Miscellaneous**. (a) Each Guarantor understands and agrees that any amounts of such Guarantor on account with any of the Lenders may be offset to satisfy the obligations of such Guarantor hereunder, subject to and in accordance with the provisions of Section 11.3 of the DIP Credit Agreement, *mutatis mutandi*.

(b) If and to the extent any Guarantor makes any payment to the Secured Parties or any of them pursuant to or in respect of this Guaranty, any claim which such Guarantor may have against the Borrower by reason thereof shall be subject and subordinate to Full Payment (including, without limitation, in respect of subrogation, contribution, indemnity, reimbursement or other similar rights). Each Guarantor hereby waives any and all rights of subrogation to which such Guarantor may otherwise be entitled against the Borrower as a result of any payment made by such Guarantor pursuant to this Guaranty unless and until Full Payment has occurred.

(c) If any payment made by or on behalf of any Guarantor to Administrative Agent or any Lender is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by Administrative Agent or such

7

11248496v4

Lender in its discretion) to be repaid to a trustee, receiver or any other Person, then to the extent of such payment, the Obligation originally intended to be satisfied, and all rights and remedies relating thereto, shall be revived and continued in full force and effect as if such payment had not been made.

(d)     If any provision of this Guaranty is held to be illegal, invalid, or unenforceable, such provision shall be fully severable, this Guaranty shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part hereof, and the remaining provisions hereof shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance herefrom.  Furthermore, in lieu of such illegal, invalid, or unenforceable provision there shall be added automatically as a part of this Guaranty a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid and enforceable.

(e)     EACH PARTY HERETO HEREBY CONSENTS TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND, SOLELY TO THE EXTENT THAT THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM EXERCISING) JURISDICTION OVER ANY MATTER, ANY STATE COURT SITTING IN THE CITY OF NEW YORK IN THE BOROUGH OF MANHATTAN OR THE UNITED STATES DISTRICT COURT IN THE SOUTHERN DISTRICT OF NEW YORK IN THE BOROUGH OF MANHATTAN, IN ANY DISPUTE, ACTION, LITIGATION OR OTHER PROCEEDING RELATING IN ANY WAY TO THIS GUARANTY, AND AGREES THAT ANY SUCH DISPUTE, ACTION, LITIGATION OR OTHER PROCEEDING SHALL BE BROUGHT BY IT SOLELY IN ANY SUCH COURT.   EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES ALL CLAIMS, OBJECTIONS AND DEFENSES THAT IT MAY HAVE REGARDING ANY SUCH COURT'S PERSONAL OR SUBJECT MATTER JURISDICTION, VENUE OR INCONVENIENT FORUM AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 14.3.1 OF THE DIP CREDIT AGREEMENT  A final judgment in any proceeding of any such court shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Applicable Law.

(f)     THIS GUARANTY REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS BETWEEN THE PARTIES.  THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES.

(g)     EACH GUARANTOR, FOR ITSELF, ITS SUCCESSORS AND ASSIGNS, HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ITS RIGHT TO A JURY TRIAL IN ANY LITIGATION ARISING OUT OF OR IN CONNECTION WITH THIS GUARANTY OR ANY OF THE OTHER LOAN DOCUMENTS.

(h)     THIS GUARANTY SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO CONFLICT OF LAW PRINCIPLES TO THE

11248496v4

EXTENT SUCH PRINCIPLES WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.

(i)     Notwithstanding anything to the contrary herein, the provisions of this Guaranty are subject to the terms, covenants, conditions and provisions of, the DIP Orders, as applicable.  In the event of a conflict between the terms of the DIP Orders and this Guaranty, the terms of the DIP Orders shall govern and control.

(j)     This Guaranty may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Guaranty shall become effective when Administrative Agent has received counterparts bearing the signatures of all parties hereto.  The words "execute," "execution," "signed," "signature," and words of like import in or related to any document to be signed in connection with this Guaranty shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Administrative Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any Applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**[Signature Pages to Follow]**

11248496v4

EXECUTED as of the date first above written.

GUARANTORS:

**RADAR RELAY, INC.**, a Delaware corporation

By: *Todd DuChene*
Name: Todd DuChene
Title: President

**AMERICAN PROPERTY ACQUISITION, LLC**, a Delaware limited liability company
    By its sole member, Core Scientific Operating Company

By: *Todd DuChene*
Name: Todd DuChene
Title: EVP, General Counsel, Chief Compliance Officer and Secretary

**STARBOARD CAPITAL LLC**, a Colorado limited liability company
    By its sole member, Radar Relay, Inc.

By: *Todd DuChene*
Name: Todd DuChene
Title: President

**RADAR LLC**, a Colorado limited liability company
    By its sole member, Radar Relay, Inc.

By: *Todd DuChene*
Name: Todd DuChene
Title: President

[Core Scientific– DIP Guaranty Agreement]

**AMERICAN PROPERTY ACQUISITIONS I, LLC**, a North Carolina limited liability company

By its sole member, American Property
Acquisition, LLC
By its sole member, Core Scientific
Operating Company

By: *Todd DuChene*

DocuSigned by:
43048BB7D89C4FE...

Name: Todd DuChene
Title: EVP, General Counsel, Chief Compliance Officer and Secretary


**AMERICAN PROPERTY ACQUISITIONS VII, LLC**, a Georgia limited liability company

By its sole member, American Property
Acquisition, LLC
By its sole member, Core Scientific
Operating Company

By: *Todd DuChene*

DocuSigned by:
43048BB7D89C4FE...

Name: Todd DuChene
Title: EVP, General Counsel, Chief Compliance Officer and Secretary


**CORE SCIENTIFIC MINING LLC**, a Texas limited liability company

By: *Todd DuChene*

DocuSigned by:
43048BB7D89C4FE...

Name: Todd DuChene
Title: President and Chief Legal Officer

[Core Scientific– DIP Guaranty Agreement]

**CORE SCIENTIFIC SPECIALTY MINING (OKLAHOMA) LLC**, a Delaware limited liability company

By _Michael Levitt_
Name: Michael Levitt
Title: Chief Executive Officer

**CORE SCIENTIFIC ACQUIRED MINING LLC**, a Delaware limited liability company

By: _Michael Levitt_
Name: Michael Levitt
Title: President

**CORE SCIENTIFIC OPERATING COMPANY**, a Delaware company

By: _Michael Levitt_
Name: Michael Levitt
Title: Chief Executive Officer

**B. RILEY COMMERCIAL CAPITAL, LLC,**
as Administrative Agent

By: _____

Name:   Phil Ahn

Title:   Chief Financial Officer

EXHIBIT E

to

Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and
Security Agreement

**[FORM OF] COMPLIANCE CERTIFICATE**

This Compliance Certificate (this "<u>Compliance Certificate</u>") is delivered to you pursuant to Section 10.1.2(d) of the Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement, dated as of February 27, 2023 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "<u>DIP Credit Agreement</u>"), among Core Scientific, Inc., a Delaware corporation (the "<u>Borrower</u>"), each other Obligor party thereto and B. Riley Commercial Capital, LLC, as the administrative agent (the "<u>Administrative Agent</u>") for each Person party to the DIP Credit Agreement from time to time as a Lender (collectively, the "Lenders"), and such Lenders. Terms defined in the DIP Credit Agreement and not otherwise defined herein are used herein as therein defined.

The undersigned does hereby certify, in [his/her] capacity as a Senior Officer and not in any individual capacity, to the Administrative Agent and each Lender as follows:

1. I am a duly elected, qualified and acting Senior Officer of the Borrower.

2. I have reviewed and am familiar with the contents of this Compliance Certificate. I am providing this Compliance Certificate solely in my capacity as a Senior Officer of the Borrower. The matters set forth herein are true to the best of my knowledge after due inquiry.

[Use the following paragraph 3 for Fiscal Year-end financial statements of Borrower and Subsidiaries:]

[3. Attached hereto as <u>ANNEX I</u> are the audited Fiscal Year-end balance sheets required by Section 10.1.2(a) of the DIP Credit Agreement for the Fiscal Year of Borrower and Subsidiaries ended [_____], 20[__], together with the related statements of income, cash flow and shareholders' equity for such Fiscal Year, on a consolidated basis for Borrower and Subsidiaries, which consolidated statements are in the form required pursuant to Section 10.1.2(a) of the DIP Credit Agreement and are certified (without a "going concern" or like qualification or exception, other than a "going concern" qualification or exception solely as a result of the Chapter 11 Cases or Debt maturing thereafter) by the independent certified public accountants of Borrower.]

[Use the following paragraph 3 for Fiscal Quarter-end financial statements of Borrowers and Subsidiaries:]

[3. Attached hereto as <u>ANNEX I</u> are the Fiscal Quarter-end unaudited balance sheets required by Section 10.1.2(b) of the DIP Credit Agreement for the Fiscal Quarter of Borrower and Subsidiaries ended [_____], 20[__], together with the related statements of income and cash flow for such Fiscal Quarter and for the portion of the Fiscal Year then elapsed, on a consolidated basis for Borrower and Subsidiaries, setting forth in comparative form corresponding figures for the preceding Fiscal Year which were prepared in accordance with GAAP and fairly present the financial position and results of operations for such Fiscal Quarter and period, subject only to normal year-end and audit adjustments and the absence of footnotes.]

11255122v17

[Use the following paragraph 3 for calendar month-end financial statements of Borrowers and Subsidiaries:]

[3.  Attached hereto as <u>ANNEX I</u> is the calendar month-end consolidated balance sheet required by Section 10.1.2(c) of the DIP Credit Agreement for the calendar month of Borrower and Subsidiaries ended [_____], 20[__], together with the related consolidated statements of operations for such month and for the portion of the Fiscal Year then ended, and consolidated statements of cash flows for such month and the portion of the Fiscal Year then ended, setting forth in each case in comparative form the figures for the corresponding month of the previous fiscal year and the corresponding portion of the previous fiscal year, which are in reasonable detail and fairly present in all material respects the financial condition, results of operations and cash flows of Borrower and its Subsidiaries in accordance with GAAP.]

4.  <u>ANNEX 2</u> attached hereto sets forth a detailed calculation of Liquidity and certificate of compliance with such covenant, as of the date hereof.

5.  No Default or Event of Default is in existence[, except as set forth below and describing in reasonable detail the nature and extent thereof and what actions the Borrower have taken and proposes to take with respect thereto].

[6.  Attached hereto as <u>ANNEX 2</u> is information regarding any previously undisclosed [Deposit Accounts]³ [Security Accounts][Commodity Accounts][Chattel Paper and Instruments]⁴ [Investment Property]⁵ [Letter-of-Credit Rights]⁶.]⁷

IN WITNESS WHEREOF, I have executed this Compliance Certificate this _____ day of _____ 202_ .

CORE SCIENTIFIC, INC., as the Borrower

By: _____
Name:
Title: [•]⁸

---

³ Including the DIP Funding Accounts, but not including Excluded Accounts.
⁴ In each case, with a face amount in excess of $500,000.
⁵ To the extent in excess of $500,000 or consisting of Equity Interests in a Subsidiary.
⁶ To the extent in excess of $500,000.
⁷ To be included to the extent applicable pursuant to Section 7.5.2 of the DIP Credit Agreement.
⁸ Must be a Senior Officer.

11255122v17

Exhibit E
<u>ANNEX 1</u>

Financial Statements

(See attached)

Exhibit E
ANNEX 2

## Liquidity Covenant

**Liquidity**:

A.    Unrestricted cash and Cash Equivalents (based on the book balance thereof) of Borrower and the other Obligors, in either case, held in a Deposit Account subject to a Control Agreement in favor of the Administrative Agent:[9]    $_____

B.    Subject to the definition of Unrestricted Bitcoin, the aggregate value in U.S. Dollars of Unrestricted Bitcoin owned by Borrower and the other Obligors as of the date of this Compliance Certificate, as such value shall be determined based on the BTCUSD Coinbase spot price as of 5:00 p.m. as of the immediately preceding Business Day (or, if applicable with respect to any Bitcoin, the value thereof, if any, as determined in accordance with any applicable Permitted BTC Hedging Agreement with respect thereto):    $_____

C.    <u>Sum</u> of line A and line B:

D.    Minimum required Liquidity:    <u>$5,000,000.00</u>

E.    In Compliance with Section 10.3.2 of the DIP Credit Agreement?    <u>Yes/No</u>

---

[9] Provided that, (1) solely for purposes of determining compliance with the Financial Covenant set forth above, any amount held in any Deposit Account shall be "Liquidity" regardless of whether it is subject to a Control Agreement in favor of the Administrative Agent until the date on which Control Agreements must be put in place pursuant to Section 6.3 of the DIP Credit Agreement and (2) in no event, shall (x) cash or Cash Equivalents in the Carve-Out Account or (y) any cash held or deposited in respect of utility deposits, including any Adequate Assurance Deposits, be included in the calculation of Liquidity.

11255122v17

Exhibit E
<u>ANNEX 3</u>

[Deposit Accounts][Security Accounts][Commodity Accounts][Chattel Paper
and Instruments][Investment Property][Letter-of-Credit Rights]

EXHIBIT F-1

to

Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement

**[FORM OF] U.S. TAX COMPLIANCE CERTIFICATE**

(FOR FOREIGN LENDERS THAT ARE NOT PARTNERSHIPS FOR U.S. FEDERAL INCOME TAX PURPOSES)

Reference is hereby made to the Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement, dated as of February 27, 2023 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement"), among Core Scientific, Inc., a Delaware corporation (the "Borrower"), each other Obligor party thereto and B. Riley Commercial Capital, LLC, as the administrative agent (the "Administrative Agent") for each Person party to the DIP Credit Agreement from time to time as a Lender (collectively, the "Lenders"), and such Lenders.

Pursuant to the provisions of Section 5.10.2(b) of the DIP Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of a Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a controlled foreign corporation related to a Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Obligor Representative with a certificate of its non-U.S. person status on IRS Form W-8BEN-E or IRS Form W-8BEN, as applicable. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Obligor Representative and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Obligor Representative and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the DIP Credit Agreement and used herein shall have the meanings given to them in the DIP Credit Agreement.

[NAME OF LENDER]

By: _____
Name:
Title:

Date: _____, 20 [_]

Exhibit F-1-1

EXHIBIT F-2
to
Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement

**[FORM OF] U.S. TAX COMPLIANCE CERTIFICATE**

(FOR FOREIGN PARTICIPANTS THAT ARE NOT PARTNERSHIPS FOR U.S. FEDERAL INCOME TAX PURPOSES)

Reference is hereby made to the Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement, dated as of February 27, 2023 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement"), among Core Scientific, Inc., a Delaware corporation (the "Borrower"), each other Obligor party thereto and B. Riley Commercial Capital, LLC as the administrative agent (the "Administrative Agent") for each Person party to the DIP Credit Agreement from time to time as a Lender (collectively, the "Lenders"), and such Lenders.

Pursuant to the provisions of Section 5.10.2(b) of the DIP Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. person status on IRS Form W-8BEN-E or IRS Form W-8BEN, as applicable. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the DIP Credit Agreement and used herein shall have the meanings given to them in the DIP Credit Agreement.

[NAME OF PARTICIPANT]

By: _____

Name:

Title:

Date: _____, 20 _

11255122v17

EXHIBIT F-3
to
Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement

**[FORM OF] U.S. TAX COMPLIANCE CERTIFICATE**

(FOR FOREIGN PARTICIPANTS THAT ARE PARTNERSHIPS FOR U.S. FEDERAL INCOME TAX PURPOSES)

       Reference is hereby made to the Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement, dated as of February 27, 2023 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement"), among Core Scientific, Inc., a Delaware corporation (the "Borrower"), each other Obligor party thereto and B. Riley Commercial Capital, LLC, as the administrative agent (the "Administrative Agent") for each Person party to the DIP Credit Agreement from time to time as a Lender (collectively, the "Lenders"), and such Lenders.

       Pursuant to the provisions of Section 5.10.2(b) of the DIP Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect to such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

       The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN-E or IRS Form W-8BEN, as applicable or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BENE or IRS Form W-8BEN, as applicable from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

       Unless otherwise defined herein, terms defined in the DIP Credit Agreement and used herein shall have the meanings given to them in the DIP Credit Agreement.

[NAME OF PARTICIPANT]

By: _____
Name:
Title:

Date: _____, 20 [_]

11255122v17

EXHIBIT F-4

to

Senior Secured Super-Priority Replacement Debtor-In-Possession Loan and Security Agreement

**[FORM OF] U.S. TAX COMPLIANCE CERTIFICATE**

(FOR FOREIGN LENDERS THAT ARE PARTNERSHIPS FOR U.S. FEDERAL INCOME TAX PURPOSES)

Reference is hereby made to the Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement, dated as of February 27, 2023 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement"), among Core Scientific, Inc., a Delaware corporation (the "Borrower"), each other Obligor party thereto and B. Riley Commercial Capital, LLC, as the administrative agent (the "Administrative Agent") for each Person party to the DIP Credit Agreement from time to time as a Lender (collectively, the "Lenders"), and such Lenders.

Pursuant to the provisions of Section 5.10.2(b) of the DIP Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s), (iii) with respect to the extension of credit pursuant to this DIP Credit Agreement, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Obligor Representative with IRS Form W- 8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN-E or IRS Form W-8BEN, as applicable or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN-E or IRS Form W-8BEN, as applicable from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Obligor Representative and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the DIP Credit Agreement and used herein shall have the meanings given to them in the DIP Credit Agreement.

[NAME OF PARTICIPANT]

By: _____
Name:
Title:

Date: _____, 20 _

11255122v17

EXHIBIT G

to

Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement

**[FORM OF] JOINDER**

This Joinder and Assumption Agreement (this "<u>Joinder</u>") is made on the day of _____, 20____, by _____, a(n) _____ (the "<u>New Guarantor</u>").

<u>Background</u>

Reference is hereby made to the Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement, dated as of February 27, 2023 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "<u>DIP Credit Agreement</u>"), among Core Scientific, Inc., a Delaware corporation (the "<u>Borrower</u>"), each other Obligor party thereto and B. Riley Commercial Capital, LLC, as the administrative agent (the "<u>Administrative Agent</u>") for each Person party to the DIP Credit Agreement from time to time as a Lender (collectively, the "Lenders"), and such Lenders; and (ii) the other Loan Documents referred to in the DIP Credit Agreement, as the same may be amended, restated, modified or supplemented from time to time.

<u>Agreement</u>

Capitalized terms defined in the DIP Credit Agreement are used herein as defined therein. The undersigned (the "<u>New Guarantor</u>") is a subsidiary of an Obligor that was [acquired/formed] subsequent to the Closing Date. Pursuant to Section 7 and 10.1.8(c) of the DIP Credit Agreement, it is a condition to the [acquisition/formation] of the New Guarantor that the New Guarantor, effective as of the date hereof: (i) become a party to the DIP Credit Agreement and the other Loan Documents to which the Guarantors are party (collectively, the "<u>Joinder Documents</u>"), and (ii) assume the obligations of a Guarantor under the Joinder Documents pursuant to the terms and conditions of this Joinder. In consideration of the Obligations and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the New Guarantor and the Guarantors, and as a condition to the [acquisition/formation] of the New Guarantor by [_____], the New Guarantor hereby agrees that effective as of the date hereof, (i) it hereby is, and shall be deemed to be a Guarantor under the Joinder Documents, (ii) the New Guarantor has assumed the obligations of a Guarantor under the Joinder Documents, and (iii) the New Guarantor shall perform, comply with and be subject to and bound by, jointly and severally, with each of the other Guarantors, each of the terms, provisions and waivers of the Joinder Documents and any other documents that are stated to apply to or are made by a Guarantor.

Without limiting the generality of the foregoing, the New Guarantor hereby represents and warrants that each of the representations and warranties with respect to the Guarantors set forth in the Joinder Documents is true and correct in all material respects as to the New Guarantor (or, with respect to representations and warranties qualified by materiality, in all respects) on and as of the date hereof as if made on and as of the date hereof by the New Guarantor (except for representations and warranties that expressly relate to an earlier date); <u>provided</u> that any such representation or warranty solely as to such New Guarantor and the applicable Collateral (a) relates to an earlier date shall be deemed to be made on and as of the date hereof and (b) refers to a schedule to the DIP Credit Agreement, shall be deemed to refer to such schedules as supplemented hereby, (ii) the New Guarantor has heretofore received a true and correct copy of the DIP Credit Agreement and each of the other Loan Documents (including any modifications thereof or supplements or waivers thereto) as in effect on the date hereof and (iii) attached

Exhibit G-1

hereto are true and complete supplements, with respect to such New Guarantor, to the schedules to the DIP Credit Agreement and perfection certificate.

When executed and delivered, this Joinder may be attached to each of the Joinder Documents as evidence of the joinder of the undersigned in and to each such Joinder Document.

The New Guarantor hereby makes, affirms, and ratifies in favor of the Lenders and the Administrative Agent, the Joinder Documents given by New Guarantor to the Administrative Agent and any of the Lenders and, without limitation of the foregoing, to secure the prompt payment and performance in full of the Obligations, the New Guarantor hereby collaterally assigns, and further pledges and grants to the Administrative Agent for the benefit of the Secured Parties a continuing first-priority security interest in and to and Lien on, all of its Collateral, whether now owned or existing or hereafter acquired or arising and wheresoever located.

In furtherance of the foregoing, the New Guarantor shall execute and deliver or cause to be executed and delivered at any time and from time to time such further instruments and documents and do or cause to be done such further acts as may be reasonably necessary or proper in the opinion of the Administrative Agent to carry out more effectively the provisions and purposes of this Joinder, the DIP Credit Agreement and the Loan Documents.

[INTENTIONALLY LEFT BLANK]

11255122v17

IN WITNESS WHEREOF, the New Guarantor has duly executed this Joinder and delivered the same to the Administrative Agent for its benefit and for the benefit of the Lenders, on the date and year first above written.

_____,
a(n) _____

By: _____
Name: _____
Title: _____

Notice Address:

**Core Scientific, Inc.**
210 Barton Springs Road, Suite 300
Austin, TX 78704
Attention: Kristen Carnevali; Denise
Sterling; and Todd DuChene

Acknowledged and accepted:

**B. Riley Commercial Capital, LLC**
as the Administrative Agent

By: _____
Name: _____
Title: _____

Exhibit G-3

EXHIBIT H

**<u>INITIAL BUDGET</u>**

[See Attached]

11255122v17

# Detailed DIP Budget

Case 22-90341   Document 447   Filed in TXSB on 02/02/23   Page 138 of 146

| | Week 1 Fcst | Week 2 Fcst | Week 3 Fcst | Week 4 Fcst | Week 5 Fcst | Week 6 Fcst | Week 7 Fcst | Week 8 Fcst | Week 9 Fcst | Week 10 Fcst | Week 11 Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week Starting** | 1/28/2023 | 2/4/2023 | 2/11/2023 | 2/18/2023 | 2/25/2023 | 3/4/2023 | 3/11/2023 | 3/18/2023 | 3/25/2023 | 4/1/2023 | 4/8/2023 |
| **Week Ending** | 2/3/2023 | 2/10/2023 | 2/17/2023 | 2/24/2023 | 3/3/2023 | 3/10/2023 | 3/17/2023 | 3/24/2023 | 3/31/2023 | 4/7/2023 | 4/14/2023 |
| **Operating Cash Flows** | | | | | | | | | | | |
| Self-Mined BTC Sale Proceeds | 7.4 | 6.9 | 6.1 | 6.1 | 6.7 | 7.4 | 7.5 | 7.5 | 7.5 | 7.8 | 7.9 |
| Hosting Payments | 1.3 | - | - | - | 3.2 | - | - | - | 7.3 | - | - |
| **Net Receipts** | **8.8** | **6.9** | **6.1** | **6.1** | **9.9** | **7.4** | **7.5** | **7.5** | **14.7** | **7.8** | **7.9** |
| Power Costs | (7.1) | (9.4) | (5.4) | (5.5) | (12.1) | (5.3) | (5.3) | (5.4) | (4.0) | (10.5) | (5.0) |
| Operating Costs | (2.2) | (1.3) | (3.1) | (1.4) | (2.5) | (1.3) | (2.5) | (1.3) | (2.5) | (1.1) | (2.1) |
| Tax Payments | (0.0) | (0.0) | (0.0) | (0.0) | (0.7) | - | - | - | - | - | - |
| **Net Operating Disbursements** | **(9.3)** | **(10.8)** | **(8.5)** | **(6.9)** | **(15.3)** | **(6.6)** | **(7.7)** | **(6.6)** | **(6.5)** | **(11.7)** | **(7.1)** |
| Construction & Infrastructure Capex | - | - | - | (1.1) | (0.5) | - | - | - | (1.2) | - | - |
| Miner Capex (inc. Customs) | - | - | - | - | - | - | - | - | - | - | - |
| PP&E Sale Proceeds | - | - | - | - | - | - | - | - | - | - | - |
| **Net Capital Expenditures** | **-** | **-** | **-** | **(1.1)** | **(0.5)** | **-** | **-** | **-** | **(1.2)** | **-** | **-** |
| **Total Operating Cash Flows** | **(0.6)** | **(3.9)** | **(2.3)** | **(1.9)** | **(5.9)** | **0.8** | **(0.3)** | **0.9** | **7.0** | **(3.8)** | **0.8** |
| **Non-Operating Cash Flows** | | | | | | | | | | | |
| Professional Fees | (5.0) | (1.6) | (1.7) | (1.7) | (4.6) | (1.5) | (1.3) | (1.3) | (2.8) | (1.5) | (1.2) |
| Utility Deposits | - | - | - | - | 20.0 | - | - | - | - | - | - |
| Debt Service Costs | - | - | - | - | - | - | - | - | (0.1) | - | - |
| Other (TBD) | - | - | - | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) |
| **Net Non-Operating Cash Flows** | **(5.0)** | **(1.6)** | **(1.7)** | **(2.4)** | **(5.4)** | **(2.2)** | **(2.0)** | **(2.0)** | **(3.6)** | **(2.2)** | **(1.9)** |
| **Liquidity Balances** | | | | | | | | | | | |
| Starting Cash Balance | 46.5 | 29.6 | 24.1 | 20.1 | 15.8 | 24.5 | 23.1 | 20.8 | 19.7 | 23.2 | 22.1 |
| New Money / DIP Financing | 35.0 | - | - | - | 20.0 | - | - | - | - | 5.0 | - |
| Existing DIP Repayment and Fees | (46.4) | - | - | - | - | - | - | - | - | - | - |
| Net Cash Flow | (5.6) | (5.5) | (4.0) | (4.3) | (11.3) | (1.4) | (2.3) | (1.1) | 3.5 | (6.1) | (1.1) |
| **Ending Cash Balance** | **29.6** | **24.1** | **20.1** | **15.8** | **24.5** | **23.1** | **20.8** | **19.7** | **23.2** | **22.1** | **21.0** |
| BTC Held & In Transit | 1.1 | 1.0 | 0.9 | 0.9 | 1.0 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 |
| **Ending Liquidity** | **30.6** | **25.1** | **20.9** | **16.7** | **25.5** | **24.2** | **21.9** | **20.8** | **24.2** | **23.2** | **22.2** |

# Detailed DIP Budget (Continued)

| | Week 12 Fcst | Week 13 Fcst | Week 14 Fcst | Week 15 Fcst | Week 16 Fcst | Week 17 Fcst | Week 18 Fcst | Week 19 Fcst | Week 20 Fcst | Week 21 Fcst | Week 22 Fcst | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Starting | 4/15/2023 | 4/22/2023 | 4/29/2023 | 5/6/2023 | 5/13/2023 | 5/20/2023 | 5/27/2023 | 6/3/2023 | 6/10/2023 | 6/17/2023 | 6/24/2023 | 01/28-06/30 |
| Week Ending | 4/21/2023 | 4/28/2023 | 5/5/2023 | 5/12/2023 | 5/19/2023 | 5/26/2023 | 6/2/2023 | 6/9/2023 | 6/16/2023 | 6/23/2023 | 6/30/2023 | |
| **Operating Cash Flows** | | | | | | | | | | | | |
| Self-Mined BTC Sale Proceeds | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 165.8 |
| Hosting Payments | - | - | 6.9 | - | - | - | 7.6 | - | - | - | 9.2 | 35.6 |
| **Net Receipts** | 7.9 | 7.9 | 14.8 | 7.9 | 7.9 | 7.9 | 15.5 | 7.9 | 7.9 | 7.9 | 17.1 | 201.4 |
| Power Costs | (4.8) | (5.0) | (10.6) | (4.8) | (4.7) | (4.8) | (8.7) | (5.1) | (4.9) | (5.0) | (5.6) | (139.0) |
| Operating Costs | (0.8) | (2.1) | (0.9) | (2.1) | (1.3) | (2.1) | (0.9) | (2.6) | (1.2) | (2.5) | (1.2) | (39.1) |
| Tax Payments | - | - | - | - | - | - | - | - | - | - | - | (0.8) |
| **Net Operating Disbursements** | (5.7) | (7.1) | (11.5) | (6.9) | (6.0) | (6.9) | (9.6) | (7.7) | (6.1) | (7.5) | (6.9) | (178.8) |
| Construction & Infrastructure Capex | - | - | (0.9) | - | - | - | (0.9) | - | - | - | (0.9) | (5.6) |
| Miner Capex (inc. Customs) | - | - | - | - | - | - | - | - | - | - | - | - |
| PP&E Sale Proceeds | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net Capital Expenditures** | - | - | (0.9) | - | - | - | (0.9) | - | - | - | (0.9) | (5.6) |
| **Total Operating Cash Flows** | 2.3 | 0.8 | 2.4 | 1.0 | 1.9 | 1.0 | 5.0 | 0.3 | 1.8 | 0.4 | 9.3 | 16.9 |
| **Non-Operating Cash Flows** | | | | | | | | | | | | |
| Professional Fees | (1.2) | (1.2) | (2.8) | (1.2) | (1.2) | (1.2) | (2.2) | (1.1) | (1.1) | (1.1) | (16.5) | (54.8) |
| Utility Deposits | - | - | - | - | - | - | - | - | - | - | 6.3 | 6.3 |
| Debt Service Costs | - | - | (0.1) | - | - | - | (0.1) | - | - | - | (0.1) | (0.4) |
| Other (TBD) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (9.5) |
| **Net Non-Operating Cash Flows** | (1.5) | (1.5) | (3.2) | (1.5) | (1.5) | (1.5) | (2.6) | (1.5) | (1.5) | (1.5) | (10.6) | (58.3) |
| **Liquidity Balances** | | | | | | | | | | | | |
| Starting Cash Balance | 21.0 | 21.8 | 21.1 | 20.3 | 19.9 | 20.2 | 19.7 | 22.1 | 20.9 | 21.2 | 20.0 | 46.5 |
| New Money / DIP Financing | - | - | - | - | - | - | - | - | - | - | - | 60.0 |
| Existing DIP Repayment and Fees | - | - | - | - | - | - | - | - | - | - | - | (46.4) |
| Net Cash Flow | 0.7 | (0.7) | (0.8) | (0.5) | 0.4 | (0.5) | 2.4 | (1.2) | 0.3 | (1.1) | (1.3) | (41.4) |
| **Ending Cash Balance** | 21.8 | 21.1 | 20.3 | 19.9 | 20.2 | 19.7 | 22.1 | 20.9 | 21.2 | 20.0 | 18.7 | 18.7 |
| BTC Held & In Transit | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 |
| **Ending Liquidity** | 22.9 | 22.2 | 21.5 | 21.0 | 21.4 | 20.8 | 23.2 | 22.0 | 22.3 | 21.2 | 19.9 | 19.9 |

EXHIBIT I
to
Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement

**[FORM OF] GLOBAL INTERCOMPANY NOTE**

(See attached)

Exhibit I-1

EXECUTION VERSION

# GLOBAL INTERCOMPANY NOTE

February 27, 2023

  FOR VALUE RECEIVED, each of the undersigned, to the extent a borrower from time to time from any other Person listed on the signature pages hereto (each, in such capacity, a "**Payor**"), hereby promises to pay to such other Person listed below (each, in such capacity, a "**Payee**"), in lawful money of the United States of America, or in such other currency as agreed to by such Payor and such Payee, in immediately available funds, at such location as such Payee shall from time to time designate, the unpaid principal amount of all Debt owed by such Payor to such Payee on such date or dates as shall be agreed upon from time to time by such Payor and such Payee (or, if no such dates are specified, on demand). Each Payor promises also to pay interest on the unpaid principal amount of all such loans and advances (the "**Debt**") in like money at said location from the date that such Debt was incurred until it is paid at such rate per annum as shall be agreed upon from time to time by such Payor and such Payee. Prior to demand, a Payor shall be entitled to prepay all or any portion of the Debt owed by such Payor without notice, premium or penalty. Notwithstanding anything to the contrary contained herein or in any other promissory note, instrument, or other agreement, this Intercompany Note shall evidence all loans and advances from each Payee to each Payor, regardless of whether evidenced by another note, instrument or writing.

  Reference is made to that certain Senior Secured Super-Priority Debtor-in-Possession Replacement Loan and Security Agreement, dated as of February 27, 2023 (as amended, restated, supplemented or otherwise modified from time to time, the "**DIP Credit Agreement**"), by and among (a) Core Scientific, Inc., a Delaware corporation and a debtor and debtor-in-possession in the Chapter 11 Cases, as the borrower thereunder (the "**Borrower**"), (b) each Guarantor, each as an Obligor and a debtor and debtor-in-possession in the Chapter 11 Cases party thereto from time to time, (c) each Lender party thereto from time to time, and (d) B. Riley Commercial Capital, LLC, as Administrative Agent (the "**Administrative Agent**"). Capitalized terms used in this Global Intercompany Note (this "**Note**") but not otherwise defined herein shall have the meanings given to them in the DIP Credit Agreement.

  This Note is subject to the terms of the DIP Credit Agreement, and shall be pledged by each Payee that is an Obligor to the Administrative Agent, for the benefit of the Secured Parties, pursuant to the related Loan Documents as security for the payment and performance in full of the Obligations under the DIP Credit Agreement and the related other Loan Documents, to the extent required pursuant to the terms thereof. Each Payee hereby acknowledges and agrees that upon the occurrence and during the continuance of an Event of Default under the DIP Credit Agreement, (a) the Administrative Agent may exercise any and all rights of any Obligor with respect to this Note and (b) upon demand of the Administrative Agent, all amounts evidenced by this Note that are owed by any Payor to any Obligor shall become immediately due and payable, without presentment, demand, protest or notice of any kind (it being understood that the Administrative Agent may make any such demand for all or any subset of the amounts owing to such Obligor and upon any or all Payors obligated to such Obligor, all without the consent or permission of any Payor or Payee). Each Payor also hereby acknowledges and agrees that this Note constitutes notice of assignment for security, pursuant to

the relevant Loan Documents, of the Debt and all other amounts evidenced by this Note and further acknowledges the receipt of such notice of assignment for security.

Upon the commencement of any insolvency or bankruptcy proceeding, other than the Chapter 11 Cases, or any receivership, liquidation, reorganization or other similar proceeding in connection therewith, in respect of any Payor owing any amounts evidenced by this Note to any Obligor, or in respect of all or a substantial part of any such Payor's property, or upon the commencement of any proceeding for voluntary liquidation, dissolution or other winding up of any such Payor, all amounts evidenced by this Note owing by such Payor to any and all Obligors shall become immediately due and payable, without presentment, demand, protest or notice of any kind.

Each Payee is hereby authorized to record all loans and advances made by it to any Payor (all of which shall be evidenced by this Note), and all repayments or prepayments thereof, in its books and records, such books and records constituting prima facie evidence of the accuracy of the information contained therein; provided, however, that the failure of any such Payee to so record any such information in accordance with this clause shall not affect any such Payor's obligations hereunder.

Each Payor hereby waives diligence, presentment, demand, protest or notice of any kind whatsoever in connection with this Note. All payments under this Note shall be made without set-off, counterclaim or deduction of any kind.

This Note shall be binding upon each Payor and its successors and assigns, and the terms and provisions of this Note shall inure to the benefit of each Payee and its successors and assigns, including subsequent holders hereof.

From time to time after the date hereof, additional Subsidiaries of the Borrower may become parties hereto (as a Payor and/or a Payee, as the case may be) by executing a counterpart signature page to this Note (each additional Subsidiary, an "**Additional Party**"). Upon delivery of such counterpart signature page to the Payees, notice of which is hereby waived by the other Payors, each Additional Party shall be a Payor and/or a Payee, as the case may be, and shall be as fully a party hereto as if such Additional Party were an original signatory hereof. Each Payor expressly agrees that its obligations arising hereunder shall not be affected or diminished by the addition or release of any other Payor or Payee hereunder. This Note shall be fully effective as to any Payor or Payee that is or becomes a party hereto regardless of whether any other Person becomes or fails to become or ceases to be a Payor or Payee hereunder.

No amendment, modification or waiver of, or consent with respect to, any provisions of this Note shall be effective unless the same shall be in writing and signed and delivered by each Payor and Payee whose rights or obligations shall be affected thereby; provided that, until such time as (a) all the Obligations (other than contingent obligations as to which no claim has been made) under the DIP Credit Agreement and the related other Loan Documents have been paid in full in cash or immediately available funds and (b) all Commitments have terminated, as applicable, the Administrative Agent shall have provided its prior written consent to such amendment, modification, waiver or consent of the subordination provisions hereof (which consent shall not be unreasonably withheld or delayed).

2

THIS NOTE AND ALL DEBT EVIDENCED HEREBY ARE SUBJECT TO THE SUBORDINATION PROVISIONS OF THE INTERCOMPANY SUBORDINATION AGREEMENT, DATED AS OF FEBRUARY 27, 2023 (AS AMENDED, RESTATED, SUPPLEMENTED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "**INTERCOMPANY SUBORDINATION AGREEMENT**"), AMONG THE BORROWER, SUBSIDIARIES OF THE BORROWER PARTY THERETO AND B. RILEY COMMERCIAL CAPITAL, LLC, AS ADMINISTRATIVE AGENT UNDER THE DIP CREDIT AGREEMENT. NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, NEITHER THE PRINCIPAL OF NOR THE INTEREST ON, NOR ANY OTHER AMOUNTS PAYABLE IN RESPECT OF, ANY DEBT CREATED OR EVIDENCED BY THIS NOTE SHALL BE PAID OR PAYABLE, EXCEPT TO THE EXTENT PERMITTED UNDER THE INTERCOMPANY SUBORDINATION AGREEMENT, WHICH IS INCORPORATED HEREIN BY REFERENCE WITH THE SAME FORCE AND EFFECT AS IF FULLY SET FORTH HEREIN.

THIS GLOBAL INTERCOMPANY NOTE SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO CONFLICT OF LAW PRINCIPLES TO THE EXTENT SUCH PRINCIPLES WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.

This Global Intercompany Note may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Global Intercompany Note shall become effective when the Administrative Agent has received counterparts bearing the signatures of all parties hereto. The words "execute," "execution," "signed," "signature," and words of like import in or related to any document to be signed in connection with this Global Intercompany Note shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Administrative Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any Applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

The parties hereto hereby consent to the forum and various waivers set forth in Sections 14.14 and 14.15 of the DIP Credit Agreement.

*[Remainder of Page Intentionally Left Blank]*

3

11247706v5

**PAYORS & PAYEES:**

**CORE SCIENTIFIC, INC.**

By: _____
Name: Todd DuChene
Title: President, Chief Legal Officer and Secretary


**CORE SCIENTIFIC MINING LLC**

By: _____
Name: Todd DuChene
Title: President and Chief Legal Officer


**RADAR RELAY, INC.**

By: _____
Name: Todd DuChene
Title: President


**AMERICAN PROPERTY ACQUISITION, LLC**
By its sole member, Core Scientific Operating Company

By: _____
Name: Todd DuChene
Title: EVP, General Counsel, Chief Compliance Officer and Secretary


**STARBOARD CAPITAL LLC**
By its sole member, Radar Relay, Inc.

By: _____
Name: Todd DuChene
Title: President


[Signature Page to Global Intercompany Note]

**RADAR LLC**
          By its sole member, Radar Relay, Inc.

By:_____

Name: Todd DuChene
Title: President

**AMERICAN PROPERTY ACQUISITIONS I, LLC**
          By its sole member, American Property
          Acquisition, LLC
               By its sole member, Core Scientific
               Operating Company

By:_____

Name: Todd DuChene
Title: EVP, General Counsel, Chief Compliance Officer
and Secretary

**AMERICAN PROPERTY ACQUISITIONS VII, LLC**
          By its sole member, American Property
          Acquisition, LLC
               By its sole member, Core Scientific
               Operating Company

By:_____

Name: Todd DuChene
Title: EVP, General Counsel, Chief Compliance Officer
and Secretary

[Signature Page to Global Intercompany Note]

**CORE SCIENTIFIC ACQUIRED MINING LLC**

By: _____

Name: Michael Levitt

Title: President


**CORE SCIENTIFIC OPERATING COMPANY**

By: _____

Name: Michael Levitt

Title: Chief Executive Officer


**CORE SCIENTIFIC SPECIALTY MINING
(OKLAHOMA) LLC**

By: _____

Name: Michael Levitt

Title: Chief Executive Officer


[Signature Page to Global Intercompany Note]

## ALLONGE TO GLOBAL INTERCOMPANY NOTE

The undersigned ("Assignor"), for good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, hereby absolutely assigns, transfers, endorses, negotiates and sets over to and makes payable to the order of _____, ("Assignee"), that certain Global Intercompany Note dated as of _____ (the "Note") made by _____, in favor of Assignor, and all interest, principal and other sums due or to become due under the Note, and all other rights of any nature accrued or to accrue under the Note, without recourse, representation or warranty, express or implied.

The foregoing endorsement shall have the same effect as though it were written directly on the Note itself.

Dated: _____

11247706v5

**PAYORS & PAYEES:**

CORE SCIENTIFIC, INC.

By:_____
Name: Todd DuChene
Title: President, Chief Legal Officer and Secretary

CORE SCIENTIFIC MINING LLC

By:_____
Name: Todd DuChene
Title: President and Chief Legal Officer

RADAR RELAY, INC.

By:_____
Name: Todd DuChene
Title: President

AMERICAN PROPERTY ACQUISITION, LLC
    By its sole member, Core Scientific Operating
    Company

By:_____
Name: Todd DuChene
Title: EVP, General Counsel, Chief Compliance Officer and
Secretary

STARBOARD CAPITAL LLC
    By its sole member, Radar Relay, Inc.

By:_____
Name: Todd DuChene
Title: President

[Signature Page to Allonge]

**RADAR LLC**
By its sole member, Radar Relay, Inc.

By: _____
Name: Todd DuChene
Title: President


**AMERICAN PROPERTY ACQUISITIONS I, LLC**
By its sole member, American Property Acquisition, LLC
By its sole member, Core Scientific Operating Company

By: _____
Name: Todd DuChene
Title: EVP, General Counsel, Chief Compliance Officer and Secretary


**AMERICAN PROPERTY ACQUISITIONS VII, LLC**
By its sole member, American Property Acquisition, LLC
By its sole member, Core Scientific Operating Company

By: _____
Name: Todd DuChene
Title: EVP, General Counsel, Chief Compliance Officer and Secretary


[Signature Page to Allonge]

**CORE SCIENTIFIC ACQUIRED MINING LLC**

By: _____
Name: Michael Levitt
Title: President


**CORE SCIENTIFIC OPERATING COMPANY**

By: _____
Name: Michael Levitt
Title: Chief Executive Officer


**CORE SCIENTIFIC SPECIALTY MINING
(OKLAHOMA) LLC**

By: _____
Name: Michael Levitt
Title: Chief Executive Officer


[Signature Page to Allonge]

EXHIBIT J

to

Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement

**[FORM OF] VARIANCE REPORT CERTIFICATE**

Reference is made to that certain Senior Secured Super-Priority Replacement Debtor-In Possession Loan and Security Agreement, dated as of February 27, 2023 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Agreement"), by and among (a) **CORE SCIENTIFIC, INC.**, a Delaware corporation and a debtor and debtor-in-possession in the Chapter 11 Cases, as the borrower of the Loans thereunder (the "Borrower"), (b) each **SUBSIDIARY GUARANTOR**, as a Guarantor, an Obligor, and a debtor and debtor-in-possession in the Chapter 11 Cases, (c) each Person party hereto from time to time as a **LENDER**, and (d) **B. RILEY COMMERCIAL CAPITAL, LLC**, as Administrative Agent. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

Pursuant to **Section 10.1.12(b)** of the Agreement, the undersigned hereby certifies on behalf of the Borrower, solely in such undersigned's capacity as a Senior Officer of the Borrower, and not individually, as follows:

(a) Attached hereto as Exhibit A is a copy of the Variance Report with respect to the calendar week ending as of (and including) the Friday of the week immediately preceding the date hereof. Exhibit A also provides a reasonably detailed explanation of each Budget Variance identified that is "material", whether on a qualitative or quantitative basis;

(b) The Company is in compliance with **Section 10.3** of the Agreement; and

(c) No Default or Event of Default has occurred or is continuing as of the date hereof, or is reasonably expected to occur or arise.

IN WITNESS WHEREOF, I have executed this Variance Report Certificate this _____ day of _____ 202_.

CORE SCIENTIFIC, INC., as the Borrower

By: _____
    Name:
    Title: [•][10]

---

[10] Must be a Senior Officer.

11255122v17

**<u>Exhibit A</u>**

**Variance Report**

[See Attached]

# Weekly Variance Report

Preliminary Draft Subject to Material Change; Privileged and Confidential; Attorney-Work Product

| | DIP Budget | Actuals | Variance | Comments |
|---|---|---|---|---|
| Week Starting | | | | |
| Week Ending | | | | |
| **4 Weeks Ended** | | | | |
| **Operating Statistics** | | | | |
| Avg BTC Price Sold | | | | |
| **Operating Cash Flows** | | | | |
| Self-Mined BTC Sale Proceeds | | | | |
| Hosting Payments | | | | |
| **Net Receipts** | | | | |
| **Net Operating Disbursements** | | | | |
| **Net Capital Expenditures** | | | | |
| **Total Operating Cash Flows** | | | | |
| **Non-Operating Cash Flows** | | | | |
| Professional Fees | | | | |
| Utility Deposits | | | | |
| Debt Service Costs | | | | |
| Other (TBD) | | | | |
| **Net Non-Operating Cash Flows** | | | | |
| **Liquidity Balances** | | | | |
| Starting Cash Balance | | | | |
| New Money / DIP Financing | | | | |
| Existing DIP Repayment and Fees | | | | |
| Net Cash Flow | | | | |
| **Ending Cash Balance** | | | | |
| BTC Held & In Transit | | | | |
| **Ending Liquidity** | | | | |
| **Covenants** | | | | |
| Projected Four Week Net Receipts | | | | |
| **Budget Covenant Net Receipts** | | | | |
| Projected Four Week Net Disbursements | | | | |
| **Budget Covenant Net Disbursements** | | | | |

*Preliminary Draft Subject to Material Change; Privileged and Confidential; Attorney-Work Product*

# Weekly Variance Report – Continued

| | Actuals | | | Variance vs. Approved DIP Budget | | | |
|---|---|---|---|---|---|---|---|
| Week Starting | 1/14/2023 | 1/21/2023 | 1/28/2023 | 2/4/2023 | 1/14/2023 | 1/21/2023 | 1/28/2023 | 2/4/2023 |
| Week Ending | 1/20/2023 | 1/27/2023 | 2/3/2023 | 2/10/2023 | 1/20/2023 | 1/27/2023 | 2/3/2023 | 2/10/2023 |
| **Operating Statistics** | | | | | | | | |
| Avg BTC Price Sold | | | | | | | | |
| **Operating Cash Flows** | | | | | | | | |
| Self-Mined BTC Sale Proceeds | | | | | | | | |
| Hosting Payments | | | | | | | | |
| **Net Receipts** | | | | | | | | |
| **Net Operating Disbursements** | | | | | | | | |
| **Net Capital Expenditures** | | | | | | | | |
| **Total Operating Cash Flows** | | | | | | | | |
| **Non-Operating Cash Flows** | | | | | | | | |
| Professional Fees | | | | | | | | |
| Utility Deposits | | | | | | | | |
| Debt Service Costs | | | | | | | | |
| Other (TBD) | | | | | | | | |
| **Net Non-Operating Cash Flows** | | | | | | | | |
| **Liquidity Balances** | | | | | | | | |
| Starting Cash Balance | | | | | | | | |
| New Money / DIP Financing | | | | | | | | |
| Existing DIP Repayment and Fees | | | | | | | | |
| Net Cash Flow | | | | | | | | |
| **Ending Cash Balance** | | | | | | | | |
| BTC Held & In Transit | | | | | | | | |
| **Ending Liquidity** | | | | | | | | |

**Exhibit 2**

**Lien Priorities Following Refinancing Effective Date (For Illustrative Purposes Only)**

| Rank | First-Priority DIP Collateral | Junior-Priority DIP Collateral | | |
|---|---|---|---|---|
| | | Junior-Priority DIP Collateral (other than Prepetition Equipment Financing Collateral or Prepetition Secured Notes Collateral) | Prepetition Equipment Financing Collateral | Prepetition Secured Notes Collateral |
| *First* | Carve-Out | Carve-Out | Carve-Out | Carve-Out |
| *Second* | DIP Liens | Prior Senior Liens | Prior Senior Liens | Prior Senior Liens |
| *Third* | Noteholder Adequate Protection Liens and Equipment Lender Adequate Protection Liens | DIP Liens | Equipment Lender Adequate Protection Liens | Noteholder Adequate Protection Liens |
| *Fourth* | | Noteholder Adequate Protection Liens and Equipment Lender Adequate Protection Liens | Prepetition Equipment Financing Liens | Prepetition Secured Notes Liens |
| *Fifth* | | | DIP Liens | DIP Liens |
| *Sixth* | | | Noteholder Adequate Protection Liens | Equipment Lender Adequate Protection Liens |

United States Bankruptcy Court
Southern District of Texas

In re:                                                                              Case No. 22-90341-drj

Core Scientific, Inc.                                                               Chapter 11

Official Committee of Unsecured Creditor
    Debtors

# CERTIFICATE OF NOTICE

District/off: 0541-4                          User: ADIuser                         Page 1 of 3

Date Rcvd: Mar 02, 2023                       Form ID: pdf002                        Total Noticed: 34

The following symbols are used throughout this certificate:

| Symbol | Definition |
|---|---|
| + | Addresses marked '+' were corrected by inserting the ZIP, adding the last four digits to complete the zip +4, or replacing an incorrect ZIP. USPS regulations require that automation-compatible mail display the correct ZIP. |

**Notice by first class mail was sent to the following persons/entities by the Bankruptcy Noticing Center on Mar 04, 2023:**

| Recip ID | | Recipient Name and Address |
|---|---|---|
| db | + | American Property Acquisition, LLC, 210 Barton Springs Road, Suite 300, Austin, TX 78704-1251 |
| db | + | American Property Acquisitions I, LLC, 210 Barton Springs Road, Suite 300, Austin, TX 78704-1251 |
| db | + | American Property Acquisitions VII, LLC, 210 Barton Springs Road, Suite 300, Austiin, TX 78704-1251 |
| db | + | Core Scientific Acquired Mining LLC, 210 Barton Springs Road, Suite 300, Austin, TX 78704-1251 |
| db | + | Core Scientific Mining LLC, 210 Barton Springs Road, Suite 300, Austin, TX 78704-1251 |
| db | + | Core Scientific Operating Company, 210 Barton Springs Road, Suite 300, Austin, TX 78704-1251 |
| db | + | Core Scientific Specialty Mining (Oklahoma) LLC, 210 Barton Springs Road, Suite 300, Austin, TX 78704-1251 |
| db | + | Core Scientific, Inc., 210 Barton Springs Road, Suite 300, Austin, TX 78704-1251 |
| db | + | RADAR LLC, 210 Barton Springs Road, Suite 300, Austin, TX 78704-1251 |
| db | + | Radar Relay, Inc., 210 Barton Springs Road, Suite 300, Austin, TX 78704-1251 |
| db | + | Starboard Capital LLC, 210 Barton Springs Road, Suite 300, Austiin, TX 78704-1251 |
| cr | + | AmTrust North America, Inc. on behalf of Associate, c/o Maurice Wutscher LLP, 23611 Chagrin Blvd. Suite 207, Beachwood, OH 44122-5540 |
| intp | + | Board of Directors of Core Scientific, Inc., c/o Peter C. Lewis, Scheef & Stone, L.L.P., 500 North Akard Street, Suite 2700, Dallas, TX 75201-3306 |
| intp | + | Condair Inc., c/o John S. Collins, Vorys, Sater, Seymour and Pease LLP, 909 Fannin, Suite 2700, Houston, TX 77010-1009 |
| cr | + | Dalton Utilities, Howley Law PLLC, 711 Louisiana Street, Ste. 1850, Houston, TX 77002-2790 |
| cr | + | GEM Mining 1, LLC, c/o Evan N. Parrott, 11 North Water Street, Suite 24290, Mobile, AL 36602-5024 |
| cr | + | GEM Mining 2, LLC, c/o Evan N. Parrott, 11 North Water Street, Suite 24290, Mobile, AL 36602-5024 |
| cr | + | GEM Mining 2B, LLC, c/o Evan N. Parrott, 11 North Water Street, Suite 24290, Mobile, AL 36602-5024 |
| cr | + | GEM Mining 3, LLC, c/o Evan N. Parrott, 11 North Water Street, Suite 24290, Mobile, AL 36602-5024 |
| cr | + | GEM Mining 4, LLC, c/o Evan N. Parrott, 11 North Water Street, Suite 24290, Mobile, AL 36602-5024 |
| cr | + | Indigo Direct Lending, LLC, c/o Ross, Smith & Binford, PC, Attn: Frances A. Smith, 700 N. Pearl Street, Suite 1610 Dallas, TX 75201-7459 |
| cr | + | J.W. Didado Electric, LLC, c/o Leonard I. Pataki, Quanta Services, 4500 S. Garnett Road, Suite 100, Tulsa, OK 74146-5221 |
| cr | + | Maddox Industrial Transformer, LLC, c/o Mary M. Caskey, Esq., Haynsworth Sinkler Boyd, PA, PO Box 11889, Columbia, SC 29211-1889 |
| intp | + | McCarthy Building Companies, Inc., c/o Watt, Tieder, Hoffar & Fitzgerald, L, 1765 Greensboro Station Place, Suite 1000, McLean, VA 22102-3468 |
| cr | + | NextEra Energy Resources, LAW/JB, 700 Universe Blvd., Juno Beach, FL 33408, UNITED STATES 33408-2657 |
| cr | + | Pescadero Capital, LLC, Building LAW/JB, 700 Universe Blvd, Juno Beach, FL 33408, UNITED STATES 33408-2657 |
| cr | + | Tenaska Power Services Co., c/o Ross & Smith, P.C., Attn: Jason Binford, 2003 N. Lamar Blvd., Suite 100 Austin, TX 78705-4932 |
| cr | + | Travis County, c/o Jason A. Starks, P.O. Box 1748, Austin, TX 78767-1748 |
| intp | + | U.S. Bank National Association, as Prepetition Not, c/o Shipman & Goodwin LLP, One Constitution Plaza, Hartford, CT 06103-1803 |
| cr | + | c/o James Bailey Esq Gaylor Electric, Inc., d/b/a, Bradley Arant Boult Cummings LLP, One Federal Place, 1819 5th Ave. N, Birmingham, AL 35203-2119 |

TOTAL: 30

**Notice by electronic transmission was sent to the following persons/entities by the Bankruptcy Noticing Center.**
Electronic transmission includes sending notices via email (Email/text and Email/PDF), and electronic data interchange (EDI). Electronic transmission is in Eastern Standard Time.

| Recip ID | | Notice Type: Email Address | Date/Time | Recipient Name and Address |
|---|---|---|---|---|
| cr | + | Email/Text: ahochheiser@mauricewutscher.com | | |
| | | | Mar 02 2023 20:08:00 | AmTrust North America, Inc. on behalf of Associate, c/o Maurice Wutscher LLP, 23611 Chagrin Blvd. Suite 207, Beachwood, OH 44122-5540 |
| cr | + | Email/Text: beanland@mssattorneys.com | | |
| | | | Mar 02 2023 20:08:00 | BEAM Concrete Construction, Inc., c/o Misti L. |

|  |  |  | Beanland, 8131 LBJ Freeway, Suite 700, Dallas, TX 75251-1352 |
|---|---|---|---|
| cr | + Email/Text: dallas.bankruptcy@LGBS.com | | |
|  | | Mar 02 2023 20:08:00 | Dallas County, Linebarger Goggan Blair & Sampson, LLP, c/o John K. Turner, 2777 N. Stemmons Freeway, Suite 1000, Dallas, TX 75207-2328 |
| cr | + Email/Text: schristianson@buchalter.com | | |
|  | | Mar 02 2023 20:08:00 | Oracle America, Inc., Buchalter PC, c/o Shawn M. Christianson, 425 Market St., Suite 2900, San Francisco, Ca 94105-2491 |
| cr | + Email/Text: neil.orleans@judithwross.com | | |
|  | | Mar 02 2023 20:08:00 | Tenaska Power Services Co., c/o Ross & Smith, P.C., Attn: Judith W. Ross, 700 N. Pearl Street, Suite 1610, Dallas, TX 75201-7459 |

TOTAL: 5

# BYPASSED RECIPIENTS

**The following addresses were not sent this bankruptcy notice due to an undeliverable address, *duplicate of an address listed above, *P duplicate of a preferred address, or ## out of date forwarding orders with USPS.**

| Recip ID | Bypass Reason | Name and Address |
|---|---|---|
| cr | | 36th Street Capital Partners, LLC |
| cr | | ABLe Communications, Inc. |
| cr | | Ad Hoc Group of Secured Convertible Noteholders |
| cr | | Anchorage Lending CA, LLC |
| intp | | B. Riley Commercial Capital, LLC |
| cr | | Barings BDC, Inc. |
| cr | | Barings Capital Investment Corporation |
| cr | | Barings Private Credit Corp. |
| cr | | BlockFi Lending LLC |
| cr | | BlockFi, Inc. and its affiliated entities |
| cr | | Bremer Bank |
| cr | | CEC Energy Services LLC |
| cr | | Celsius Mining, LLC |
| cr | | Charles Basil |
| cr | | City of Denton |
| cr | | Coonrod Electric Co. LLC |
| intp | | Foundry Digital LLC |
| cr | | General Casualty Company of Wisconsin |
| intp | | Harper Construction Company, Inc. |
| cr | | Huband-Mantor Construction, Inc. |
| cr | | Humphrey & Associates, Inc. |
| cr | | MK Marlow Company, LLC |
| cr | | MP2 Energy Texas LLC d/b/a Shell Energy Solutions |
| cr | | Marnoy Interests, Ltd. d/b/a Office Pavilion |
| cr | | MassMutual Asset Finance, LLC |
| cr | | Mitch Edwards |
| cr | | NYDIG ABL LLC |
| crcm | | Official Committee of Unsecured Creditors |
| cr | | Prime Alliance Bank, Inc. |
| cr | | Priority Power Management, LLC |
| intp | | SRPF A QR Riversouth LLC |
| cr | | Sphere 3D Corp. |
| cr | | TOYOTA INDUSTRIES COMMERCIAL FINANCE INC. |
| cr | | Texas Capitalization Resource Group, Inc., 5201 Camp Bowie Blvd. Suite 200, Fort Worth |
| intp | | The Ad Hoc Equity Group |
| intp | | Trinity Capital Inc. |
| cr | | Wingspire Equipment Finance, LLC |

TOTAL: 37 Undeliverable, 0 Duplicate, 0 Out of date forwarding address

# NOTICE CERTIFICATION

District/off: 0541-4                          User: ADIuser                                    Page 3 of 3
Date Rcvd: Mar 02, 2023                       Form ID: pdf002                                   Total Noticed: 34

**I, Gustava Winters, declare under the penalty of perjury that I have sent the attached document to the above listed entities in the manner shown, and prepared the Certificate of Notice and that it is true and correct to the best of my information and belief.**

**Meeting of Creditor Notices only (Official Form 309): Pursuant to Fed .R. Bank. P.2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed. This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.**

Date: Mar 04, 2023                    Signature:        /s/Gustava Winters