IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 22-90341-11 |
| | § | JOINTLY ADMINISTERED |
| | § | HOUSTON, TEXAS |
| CORE SCIENTIFIC, INC, ET AL, | § | WEDNESDAY, |
| | § | MARCH 1, 2023 |
| DEBTORS. | § | 3:47 P.M. TO 5:13 P.M. |

**MOTION HEARING**

BEFORE THE HONORABLE DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                    SEE NEXT PAGE

(Recorded via CourtSpeak)

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES:

For the Debtor:                        WEIL GOTSHAL & MANGES, LLP
                                       Ray C. Schrock, PC
                                       Ronit Berkovich, Esq.
                                       Theodore E. Tsekerides, Esq.
                                       Austin B. Crabtree, Esq.
                                       700 Louisiana, Ste. 1700
                                       Houston, TX  77002

For the Ad Hoc Committee of
Secured Convertible
Noteholders:                           PAUL HASTINGS, LLP
                                       Kris Hansen, Esq.
                                       200 Park Avenue
                                       New York, NY  10166
                                       212-318-6000

For Ad Hoc Group of
Equity Holders:                        SKADDEN ARPS SLATE MEAGHER
                                       & FLOM, LLP
                                       Noelle M. Reed, Esq.
                                       1000 Louisiana Street
                                       Suite 6800
                                       Houston, TX  77002
                                       713-655-5100

For B. Riley Commercial
Capital, LLC:                          CHOATE HALL & STEWART, LLP
                                       John F. Ventola, Esq.
                                       Two International Place
                                       Boston, MA  02110
                                       617-248-5000


ALSO PRESENT:                          Mr. Miser


(Please also see Electronic Appearances.)

1          **HOUSTON, TEXAS; WEDNESDAY, MARCH 1, 2023; 3:47 P.M.**

2          THE COURT:  Then good afternoon, everyone.  This is

3     Judge Jones.  The time is 3:47 Central.  I apologize for the

4     slight delay.  Today is March the 1st, 2023.  And this is the

5     docket for Houston, Texas.

6          On the 3:30 docket, we have the jointly administered

7     cases under Case Number 22-90341, Core Scientific, Inc.

8          Folks, please don't forget to record your electronic

9     appearance.  If this is new for you, it's a quick trip to my

10    website.  Follow the link, a couple of mouse clicks.  You can

11    do that at any time prior to the conclusion of the hearing.

12          The first time that you speak, if you would please

13    state your name and who you represent, that serves as a

14    benchmark for the court reporters in the event that a

15    transcript request is made.

16          If you are in the courtroom, please come to the

17    lectern.  It's the only place you can both be heard and be

18    seen.

19          Finally, we are recording this afternoon using

20    CourtSpeak.  We'll get the audio up on the docket shortly

21    after the conclusion of today's hearing.

22          All right.  I have read everything that's been filed

23    and I have a couple of comments that I'm going to make that I

24    don't like to make, but I'm going to.

25          Anything I should know before we get started?

1           MS. BERKOVICH:  We have resolved -- good afternoon,

2     Your Honor.  Ronit Berkovich of Weil Gotshal for the Debtors.

3           THE COURT:  Yes, ma'am.

4           MS. BERKOVICH:  Just for the Record, I have with me

5     at counsel table my partners, Mr. Schrock and Mr. Tsekerides.

6     And we have my associate, Austin Crabtree.  He's been a member

7     of the team from the beginning, but he just moved from

8     New York to Houston, so you'll see him in here more often.

9           THE COURT:  I like the identification of your

10     associates.  So you have ownership rights?  Is that what that

11     it?

12          (Laughter.)

13          THE COURT:  I am just having fun with you.  He's

14     certainly welcome.  I'm glad that he's here.

15          Has he been licensed in the Southern District yet?

16          MS. BERKOVICH:  Yes.

17          THE COURT:  Terrific, welcome.

18          MS. BERKOVICH:  Yes.  Your Honor, the update is we

19     haven't resolved anything relating to the motion to adjourn or

20     to the Equity Committee motion.  However, we have resolved

21     about half of the Equity Group's objection to the DIP.

22          THE COURT:  Okay.

23          MS. BERKOVICH:  That's the update.

24          THE COURT:  All right.  So let me make a couple of

25     comments and then -- yes, ma'am, Ms. Reed?

1          MS. REED:  Your Honor, Noelle Reed for the Ad Hoc
2     Committee Group.

3          THE COURT:  Yes, ma'am.

4          MS. REED:  I would say this:  We have in some sense
5     resolved a portion of the motion to adjourn in the sense that
6     the Debtors and the Ad Hoc Equity Group did produce documents
7     to the Ad Hoc Noteholder Group, and that was a portion of
8     their objection.

9          THE COURT:  All right.

10          MS. REED:  We produced the exchanges regarding the
11     negotiation of the proposed Order.

12          THE COURT:  All fine.  Thank you.

13          All right.  So let me make a couple of comments to
14     everybody.  You have, at least in my view, a very fragile
15     Debtor.  And I say that because everyone wants to say, you
16     know, short winter, bitcoins going into the spring time/summer
17     time, you know, I challenge anyone to show me any correlation
18     that exists between crypto and any other measure of financial
19     success in the market.

20          I have read every paper I can get my hands on and to
21     the extent that you-all have some crystal ball that says we
22     are back on a path of strength, it's going to be a hard sell
23     in this courtroom.  It is difficult.

24          I can -- I asked this question in a room full of
25     financial professionals and lawyers last week, but what is

1     crypto?  And nobody can answer that question when I start to

2     press them on it, and I only say that because it's the nature

3     of what exists.  It doesn't mean that it's not legitimate.

4     I'm not suggesting that at all.

5           I just simply mean that everything that we might

6     look to to get comfort that we are on the right track and we

7     don't have forward curves, as we might in energy.  We don't

8     have correlations to consumer confidence or any -- we don't

9     have any of those things that we can rely on in an effort to

10    try and figure out where this is headed, which is a long way

11    of saying, everybody needs to take a deep breath.

12          So let me tell everyone, making snippy comments in

13    pleadings is not persuasive to me.  I know how to be snippy

14    and I know how to be snippy sitting right here.  You don't

15    want to engage in that.  So stop it.  It's not persuasive.

16    It's not constructive.  Stop it.

17          The last thing that you want me to do is to start

18    looking through your invoices, which I very much detest to

19    begin with, and trying to make assessments for what

20    constitutes a non-productive, non-attributing time entry.

21          I hope everybody understands what I just said.  Stop

22    it.  Focus on the Debtor.

23          Now, that all being said, with respect to the Equity

24    Committee, if we need to have a trial, I'm very aware of the

25    standards that the Circuit has said have to be met in order to

1      have an Equity Committee.  And even then, I have an awful lot

2      of discretion.

3              The Debtor has made a business decision.  The

4      Committee has not objected to that business decision.  I want

5      everyone to know, that doesn't mean I have to accept it.

6              I appreciate that you've negotiated a fee cap.  I

7      don't have to accept it.

8              My inclination is this -- and if we need -- if

9      people have questions, want to talk, want to talk amongst

10     yourselves, want to ask me questions, perfectly happy to

11     entertain that.

12             The measure of success in my mind for an Equity

13     Committee is:  Do they contribute anything to the process and

14     is there something to be gained for the constituency that they

15     represent?  At the same time, other classes of creditors

16     should not bear the risk of that exercise.

17             My inclination, you know, happy to hear arguments to

18     the contrary.

19             Mr. Hansen, I'm going to especially be interested in

20     your reaction to this.

21             My inclination is to accept the Debtors' decision

22     with the following caveats:  I'm going to reserve for myself

23     the benefit of hindsight and if I determine that the interest

24     of equity security holders has not been advanced or if I

25     decide that it has, but at the expense of other creditors, I

1    have a number of tools available to me  and I'm reserving them

2    all.

3            Number one, you have a cap.  That doesn't mean I

4    have to agree to the cap.  It means that it's somewhere

5    between zero and the cap.  It also means I have the ability to

6    assess whatever the costs of the Committee are to the

7    recoveries of equity, and I know how to do that.

8            That is my inclination and I'm certainly happy to

9    hear questions, comments, and again, I'm particularly

10   interested, Mr. Hansen, of your reaction to this, is I want to

11   get us all focused on trying to figure out if this is a

12   business worth saving and if it is, how we go about saving the

13   business?

14           That's my focus.  And I'm going to do whatever I

15   have to do to get everybody else focused on what I think is

16   important.

17           So let me first ask -- no one knew this was coming.

18   I've been thinking about it for a while now.  Folks want a

19   chance to have some privacy and talk with your own team to

20   figure out how you want to respond, if at all.

21           And again, Mr. Hansen, I want to make it very clear.

22   You're going to get your day in court if you want it.  I'm

23   just not sure that this isn't the better result because you

24   get the benefit to argue to me later on with the benefit of

25   time and performance.

1        Because again -- I'm going to say it for the third

2   time, then I'll be quiet -- we're all going to get refocused

3   on saving this business.  We're going to stop filing pleadings

4   that are -- I'm just going to call them snippy.  It just

5   doesn't do anything, but it's going to stop.

6        So with that, let me ask -- I'm happy to hear from

7   folks, I'm happy to give you a couple of minutes to just level

8   set with your team members.  I'm also happy for Choice C,

9   which I can't really think of right now.

10       (Laughter.)

11       MS. BERKOVICH:  Your Honor, we think it makes sense

12   to take a few minutes for everybody to consider what you've

13   just said.

14       THE COURT:  All fine.  Let me do this:  Albert, if

15   you're in chambers, if you can make sure -- the attorney

16   lounge is available if you need privacy.  That lock -- I think

17   it's still 1, 2, 3.  And the room next to it is actually mine

18   and I think I unlocked it for the last hearing, but we'll make

19   sure it's unlocked, if again, if you need privacy.

20       If I need to find another room, you know, I'll get

21   somebody else's conference room if I need it.

22       That all make sense?

23       (No audible response.)

24       THE COURT:  So let's do this:  It's -- I'm going to

25   call that it's 4:00 o'clock.  I have this -- we're not going

1    anywhere until we get all of these issues resolved today.  So
2    if you've got flights, you know, please tell me.  I want to be
3    accommodating.
4          But we're not leaving until we get all of these
5    issues resolved.  But I'm thinking 4:15.  If you need more
6    time, just send somebody back in to tell me.  I'm not going
7    anywhere.  I'm going to sit right here because evidently if I
8    walk away with our new security, all of my computers shut
9    down.  So I'm just going to sit right here.
10         Any other questions, comments, before we break?
11     (No audible response.)
12         THE COURT:  All right, terrific.  Thank you.
13         I'll see you back at 4:15.
14         MS. BERKOVICH:  Thank you, Your Honor.
15     (Recess taken from 3:57 p.m. to 4:30 p.m.)
16                       AFTER RECESS
17         THE COURT:  All right.  Good afternoon again,
18    everyone.  This is Judge Jones.  The time is 4:30 Central.  I
19    appreciate the emails that have indicated that some of the
20    folks online were having difficulty hearing me.  Again, I'm
21    having to -- and I'm still learning how to do this -- to
22    bounce back and forth between people in the courtroom that I
23    haven't had for three years, as well as people on video.  I
24    will endeavor to keep the microphone in front of me so that
25    everyone can hear.

1        Mr. Schrock?

2        MR. SCHROCK:  Thanks very much, Your Honor.  For the

3    Record, Ray Schrock, Weil Gotshal & Manges, counsel for the

4    Debtors.

5        Your Honor, we did have an opportunity -- I think

6    everybody took a break and went back and considered it.  From

7    the Debtors' perspective, we think that Your Honor has a very

8    constructive solution that would avoid a lot of cost and

9    expense and the need for a trial, a potential, you know,

10   discovery fight around the scope of what's necessary.

11       Our suggestion -- and I'm going to make a suggestion

12   and I think Mr. Hansen has a few things he wants to say.  I

13   think Mr. Miser for the Ad Hoc Equity Group has a few things

14   that they'd like to just get clarified.

15       But our suggestion is that the parties forego having

16   a fight on this issue today.  Work, use, 24 hours, or when the

17   Court's next available, to work on language.  If we could have

18   the accommodation to appear by Zoom or something tomorrow

19   afternoon to reconvene, we think that that would be, you know,

20   a good use of everyone's time and frankly a wise use of estate

21   resources, rather than moving forward on this particular topic

22   today.

23       But I don't want to speak for the other parties.

24   That's our suggestion.  We think it makes a lot of sense and

25   it's the right thing to do, but we'll let the other parties

1    say their piece on it.

2            THE COURT:  Of course.

3            Mr. Hansen, do you want to go first because it

4    primarily concerns you more than anybody?

5            MR. HANSEN:  Yes.  Thank you, Your Honor.  Kris

6    Hansen with Paul Hastings on behalf of the Ad Hoc Committee of

7    Secured Convertible Noteholders.

8            First of all, Your Honor, we appreciated your

9    perspective when we arrived here.  As an advisor to my

10   clients, I would say that I like your suggestion.  So I was

11   out in the hall and only had an opportunity to speak with a

12   handful of the clients.  We have a larger group and I do need

13   to speak with all of them --

14           THE COURT:  Of course.

15           MR. HANSEN:  -- to get their agreement.

16           One thought I had, which was part of our adjournment

17   motion, was really whether we all wanted to just pause on the

18   formation of the Equity Committee and the implementation of

19   this type of order until the Debtor actually has a business

20   plan because they don't have one.  And then we could all come

21   back to it then.

22           I know that the Ad Hoc Equity Committee is not in

23   favor of that type of a result for many reasons, which they

24   can espouse, but from our perspective, we think that brings

25   some clarity to the situation because we share your view that

1       it's very hard to come up with independent views of valuation

2       associated with this business.

3              So -- and in the absence of you authorizing

4       adjournment until the Debtor has a business plan to deal with

5       this, we support the Debtors' perspective, which would be take

6       a day, let's all go talk to our respective clients and see if,

7       in fact, your suggestion makes sense and how we translate that

8       into the language in an Order that makes sense for everyone.

9              But I, again, just really appreciate the Court's

10      view because the hindsight look is very important here.

11             THE COURT:  I agree.

12             MR. HANSEN:  All right.  Thank you, Your Honor.

13             THE COURT:  And let me -- and I certainly want to

14      hear Ms. Reed or Mr. Miser, and just to give you some idea of

15      what I have available just so because it would seem to me that

16      that would be important.

17             I kind of anticipated that there might be something

18      along those lines, so I have a Laredo Panel tomorrow at 2:30

19      that I can't move.  I mean, it's not very big.  It's 150

20      cases, give or take.  It'll take me an hour, maybe an hour and

21      a half.  But I've cleared the rest of the day, both before and

22      after.  So if that's helpful in terms of when you would have

23      access, if you needed it.  You can have before and you can

24      have after.

25             And of course, procedures always allow video.  You

1    don't need -- that's not an ask.  You always have that option.

2            MR. HANSEN:  Perfect.  That was going to be the

3    question I had for Your Honor.

4            THE COURT:  Certainly.

5            Ms. Reed?

6            MS. REED:  Certainly, Your Honor.  I think from our

7    perspective --

8            THE COURT:  Can I -- just no one will be able to

9    hear you.

10           MS. REED:  In order to have time to confer, we

11   suggest the afternoon.

12           THE COURT:  Sure.

13           MS. REED:  So the after, rather than the before.

14           THE COURT:  All right.  You want to just -- I mean,

15   do you want to just say 4:00 o'clock Central Time?  Is that

16   enough time?

17           MS. REED:  That works for us, if it works for

18   everyone else.

19           THE COURT:  I can also tell you, if it's helpful --

20   because again, I want to be -- I'm happy to make the call, I

21   just am.  But I really want to get focused on the business.

22           If it's helpful, just because folks are -- you know,

23   they want to get on a plane tonight and I certainly understand

24   that.  You know, I can clear time Friday morning if that would

25   be more helpful?

1      I mean, you-all tell me.

2      MS. REED:  Friday morning may be better.  We have a

3 large group of people potentially to gather.

4      THE COURT:  All right.  Do you want to just say

5 9:30 Friday morning?

6      MS. REED:  That's fine for the Ad Hoc Equity Group.

7      THE COURT:  And --

8      MR. SCHROCK:  That's fine, Judge.

9      THE COURT:  All right.  Thank you.

10      Mr. Hansen?

11      MR. HANSEN:  Yeah, that's fine, Your Honor.

12      THE COURT:  Thank you.

13      And any other questions or?

14      MS. REED:  Yes.

15      THE COURT:  Okay.  Fire away.

16      MS. REED:  We have a few clarifying questions.

17      THE COURT:  Sure.

18      MS. REED:  We just want to make sure as we're

19 conferring with the client base, because part of the reason we

20 need some time is -- as the Court can appreciate -- the actual

21 client doesn't exist yet and so the formation --

22      THE COURT:  Go talk to your group.

23      MS. REED:  Right.  But we just have to see.

24      THE COURT:  I got that.

25      MS. REED:  So we want to make sure we understand

1       what it is that they would be consenting to here.

2              Is the Court talking about a true hindsight, not a

3       reasonableness at the time of the expenditures?

4              THE COURT:  Yes.

5              MS. REED:  Okay.

6              THE COURT:  And I will tell you I'm probably going

7       to do that anyway because I want -- you know, this is the

8       creation of a -- and mind you, you have to somewhat trust me

9       and this is -- I'm not on a vendetta, I'm not trying to make a

10      point on this.  I'm about as apolitical as it can possibly be.

11      I generally offend everybody.

12          (Laughter.)

13             THE COURT:  But Mr. Hansen's point really catches me

14      and there's always a cost involved in the process.  It's a

15      cost that everybody bears.  It has to be a ratable sharing of

16      that cost and, mind you -- and I want to try to give you a

17      ridiculous example.

18             If you charged for a phone call because you were

19      trying to figure something out, you don't have to demonstrate

20      to me that that phone call led to a tangible benefit.  I got

21      that.

22             But if you embark on a piece of litigation and I

23      conclude that it was a path taken because there was no risk to

24      the cost -- as I see a lot -- then I am going to re-evaluate

25      that hindsight using my own judgment of what was available at

1    the time and what a -- you know, what a rational, reasonable

2    lawyer who would be considering everything, including the cost

3    of taking a particular path would consider.

4             And again, I'm not suggesting this would be the

5    case, but I see folks all the time go, you know,

6    Mr. Tsekerides is paying for it.  I'm just going to take my

7    spin at the wheel.  I don't care because he's going to pay for

8    it at the end.  That, I am going to look at with a hindsight

9    approach.

10            But again, what I want -- if your clients are in the

11   money, I get the argument and I want them to be as in the

12   money as they can possibly be.  If they are not in the money,

13   think about that, too, and what should have been done, could

14   have been done, and I fully realize you don't control the

15   market.  I'm not -- I'm certainly not holding you to the

16   market.

17            You know, the best success I ever had was being

18   involved in the *Asarko* case because we delayed everything long

19   enough that we became solvent.  That is the best decision I

20   was ever involved in -- I'm joking, sort of.

21        (Laughter.)

22            THE COURT:  I got all of that.  I do.

23            But this is an unusual thing and I often question

24   the role.  You know, this is not an opportunity to sit on the

25   sideline and simply be another party throwing bombs in an

1    effort to try and get something.  I will shut that down really
2    quickly.  I want it to be constructive.  You know, part of
3    what I think your job is, is to provide unbiased, good
4    information to shareholders because, number one, they, as a
5    group, tend to be less sophisticated about the bankruptcy
6    process than, say, a group of commercial noteholders.
7            And so I -- you know, that's a big deal to me.  I
8    want these folks to be able to ask the questions that are
9    important to them and I want them to have the ability to get
10   those answers from somebody that is perceived to be not
11   biased.
12           So, I mean, there's a whole bunch that gets wrapped
13   up in there and when you undertake to do this, that's, you
14   know, I'm trying to talk to you and give you sort of what I'm
15   expecting out of this.  And again, to the extent that you're
16   at the table in plan negotiations, you know, the fact that you
17   argue for something and don't get it, that's not my viewpoint.
18           It's whether or not you were trying to hold
19   something hostage using someone else's money that I am going
20   to look at.
21           Does that make sense?
22           MS. REED:  It does, and to me, that's -- it's not
23   truly a hindsight test.  To me that is an assessment of
24   whether the course of action was reasonable when it was
25   undertaken and it was undertaken in good faith.  It's not a

1       pure results based review.  I mean, what you just described to

2       me is perfectly reasonable when motions are filed that didn't

3       need to be filed that had no chance of success, that weren't

4       reasonably aimed toward creating value for the Debtor or

5       assessing value for the Debtor or weren't part of the mandate

6       of the Committee.

7              So -- and this is just important for our client

8       obviously to understand.  I've known you a long time.  I have

9       a lot of faith in the Court and then the Court, you know, not

10      being vindictive toward any party in this court.  And we

11      perfectly understand.  I hope the Court recognizes that we

12      worked quite hard to reach agreement, to reach accord with

13      folks and that's our aim.  It's not our aim to throw blocks.

14             THE COURT:  I get the pull and the tug in all this.

15      I just want, again, you know, I'm not going to say it again,

16      but I haven't been happy with the tone of a lot of the

17      pleadings that have been filed lately.  I want it

18      constructive.  I want us to focus on how to maximize value and

19      you know, everyone says that, but I know what it means because

20      it means that people have security in their jobs.  It means

21      that vendors get paid on time.  It means that everyone has a

22      shot.  That's what I want.

23             MS. REED:  Understood, Your Honor.

24             And it was our understanding, as well, I mean, we

25      would obviously disagree with Mr. Hansen's suggestion that we

1    wait for a Plan, in part just because of the practical reality

2    of forming the Committee.

3              THE COURT:  Yeah, I --

4              MS. REED:  It will take --

5              THE COURT:  You filed a motion.  I rule on things

6    that get filed before me.  I'm not waiting.

7              MS. REED:  Understood, Your Honor.

8              THE COURT:  You may not like the answer, but I rule

9    quickly.

10             MS. REED:  Understood, Your Honor.

11             And the other piece is we understood we have an

12   agreement with the noteholders that between now and, I

13   suppose, Friday morning, we wouldn't use that time for any

14   discovery.  I think we have that agreement.

15             THE COURT:  Mr. Hansen?

16             MR. HANSEN:  Yeah, Your Honor.  That's fine from our

17   perspective.  We're not going to seek additional discovery,

18   but however, if we don't -- let's advance tomorrow.  Friday

19   morning if we come back and we say, yeah, our clients are not

20   interested in this deal and we want to actually have a hearing

21   on Friday morning --

22             THE COURT:  Sure.

23             MR. HANSEN:  -- we're going to reserve our rights to

24   talk about the discovery that we don't have and what's missing

25   from a record perspective because we think that's important.

1          THE COURT:  And I hope at some point that --

2    because, mind you, I mean, I've stood where you're standing

3    before.  I know what cross is going to look like.  I assume

4    that what you would do is you'd say, you know, Ms. Reed, I

5    want you to have -- would you agree to have the following

6    people present, and if they go, nope, you've got to catch them

7    and subpoena them, well then, you're probably going to get

8    your continuance.

9          If she says, absolutely we'll have that person, then

10   more likely I'm going to look at you and go, you are three

11   times the lawyer I ever was and I stood before many a judges

12   without any discovery at all and conducted cross.  And I go,

13   let me see your "A" game.  Let me see what you've got.

14         MR. HANSEN:  Understood, Your Honor.

15         And just so we're on the same page, it's more than

16   the discovery with respect to the Debtor because it's -- that

17   was an issue for us.

18         THE COURT:  I only picked Ms. Reed because she's

19   standing there.  I got that.

20         MR. HANSEN:  Agreed.  All right.  Thank you, Your

21   Honor.

22         THE COURT:  All right.  Thank you.

23         All right.

24         MS. REED:  Thank you, Your Honor.

25         I don't have anything further.

1          THE COURT:  All right.  Thank you.

2          So we're going to take all that to Friday morning at

3     9:30.

4          And obviously if you guys get an Agreed Order, just

5     upload it.  And I will also tell you I'm perfectly happy if

6     you get down to the point where we have an Agreed Order A and

7     an Agreed Order B.  We're all down to one sentence, one

8     paragraph.  You know I like those because you can either get

9     Choice A or Choice B or mostly likely, Choice C.

10         Perfectly happy to take those up.

11         All right.  Ready to go to the DIP?

12         MS. REED:  Yes.  Your Honor, I was going to start

13    the hearing with a brief update on the business.  I'm happy to

14    give that now, or I can skip ahead given the hour.

15         THE COURT:  That's -- no, that's the most important

16    thing and it's the thing that I'm most interested in hearing,

17    so absolutely.

18         MS. BERKOVICH:  All right.  So Your Honor, the

19    Debtors have been in Chapter 11 now for a little over two

20    months and we're happy to say the company is adjusting well to

21    life in Chapter 11.  The business is operating normally and

22    due to various factors, the company is ahead of budget on our

23    cash.

24         So four weeks after the initial DIP hearing -- or

25    the second interim DIP hearing, we are 26 million ahead of

1    budget.  As to --

2            THE COURT:  I'm sorry I interrupted you.  My

3    apologies.

4            MS. BERKOVICH:  That's okay.  You're permitted to

5    interrupt me.

6            THE COURT:  No, I'm really not.

7            Is that due primarily just to commodity change?  And

8    I don't mean anything by calling it -- but I got into an

9    argument earlier this week about currency versus commodity.

10    You can obviously tell which one I think it is.

11            Is that just due to a change in the price?  Is it

12    due to accelerating expense cuts?  What's that driven by?

13            MS. BERKOVICH:  Sure.  I can answer that.

14            A small portion of it is just due to timing

15    differences, but most of it is a permanent benefit from the

16    budget and it's due to three main factors.  One is the

17    increase in bitcoin prices.

18            THE COURT:  Okay.

19            MS. BERKOVICH:  Two is the decrease -- as compared

20    to budget.

21            THE COURT:  Sure.

22            MS. BERKOVICH:  Two is the decrease in power prices,

23    as compared to budget.

24            And three is miscellaneous other Debtors.  So for

25    example, at the last hearing, Your Honor approved our motion

1     to sell the bit name coupon.  That wasn't in our budget and we

2     actually ended up getting around $3 million for that, which is

3     more than anticipated.  So a variety of factors.

4              THE COURT:  And so that's interesting.  So what is

5     -- I know you're not going to know this, it's a rhetorical

6     question almost.

7              What is a 10-cent kilowatt drop do for your bottom

8     line?

9              MS. BERKOVICH:  We do have -- we can get that input

10    for you.  I don't have --

11             THE COURT:  No, no, I'm just --

12             MS. BERKOVICH:  -- that on me right now, but it's

13    significant.  The power of prices in particular is a very

14    significant impact on our EBITDA and it was -- the power

15    prices were very high during much of 2022 due, among other

16    things, the war in Ukraine.

17             THE COURT:  Sure.

18             MS. BERKOVICH:  And those prices have come down

19    significantly in the last --

20             THE COURT:  And is the Debtor just on a pure -- I'm

21    going to call it a "pure spot market" or is none of it hedge?

22    You know, supply contracts?  Very little spot market?

23             MS. BERKOVICH:  Most of it is spot contract.

24             THE COURT:  Okay.  All right.  Got it.  Okay.

25             MS. BERKOVICH:  Okay.  So in the last few weeks, the

1    Debtors' primary focus has been in finalizing the DIP credit

2    agreement and getting DIP approved today on a final basis.

3    And the last is expense.  We've been focused on the

4    Equity Committee decision and litigation.  We have made

5    progress on the business plan and after today, with our final

6    DIP in place, we should -- the Debtor should be able to devote

7    more attention to finalizing that and getting into

8    negotiations with our various stakeholders over a

9    reorganization plan.

10   We also continue to consider opportunist asset sales

11   of our non-core facilities.

12   THE COURT:  And employee retention been what you

13   hoped it would be?

14   MS. BERKOVICH:  It's been fine.  You might see a

15   motion in that regard coming sometime soon.

16   THE COURT:  Okay.

17   MS. BERKOVICH:  But the employees have been doing an

18   excellent job on keeping the company afloat during this

19   difficult time.

20   THE COURT:  And all of your interactions with

21   customers and perhaps other folks that are in similar

22   situations been working okay?

23   MS. BERKOVICH:  Everything has been -- yes.

24   THE COURT:  Okay.

25   MS. BERKOVICH:  Everything has been going well.  I

1     mean, most of our revenue was from self-mining, just the

2     machines.

3               THE COURT:  Sure.

4               MS. BERKOVICH:  And the bitcoin that it produces, so

5     we're -- in that sense we don't have customers, but we do have

6     a host in customers.

7               THE COURT:  Got it.  All right.

8               So we get to a confirmation hearing, you stand up

9     and make your presentation.  I'm going to want to see a

10    bitcoin around a gold chain.

11        (Laughter.)

12              THE COURT:  Just -- you know, just --

13              MS. BERKOVICH:  Understood, Your Honor.

14              THE COURT:  Thank you for the report.

15              MS. BERKOVICH:  We'll see what we can do.

16              THE COURT:  All right.

17              MS. BERKOVICH:  So unless Your Honor has any

18    questions, we do get to the final hearing on the replacement

19    DIP motion.  That was Docket 389.

20              So I'm pleased to announce that we've resolved all

21    creditor objections to the Final DIP Order, including the two

22    that were filed.  We also worked separate from the ones that

23    were filed, we worked quite a bit with various equipment

24    lenders and purported mechanics' lienholders, on their issues,

25    and as a result, we uploaded a blackline of a Final DIP Order

1    against the Interim DIP Order at Docket 573.  That was

2    uploaded -- or filed, I should say, on Sunday night.  So it's

3    been more than 48 hours, and we haven't heard anything from

4    creditors arguing -- telling us that that's not appropriate.

5        So I think we're all set on that with the exception

6    of the one objection we did receive from the Equity Group.

7            THE COURT:  All right.

8            MS. BERKOVICH:  And that was filed at 584.

9        But before that, I did want to point out that we did

10   file the proposed Final Credit Agreement at Docket 579.  Of

11   course, drawing under that credit agreement is subject to

12   entry of the Final Order.  Again, we received no comments on

13   that.

14           THE COURT:  Okay.

15           MS. BERKOVICH:  Before I go further, I'd like to

16   move the Court to enter into evidence two of the three

17   Declarations in support of the replacement DIP that were filed

18   on January 31st.  That is the Second Singh Declaration at

19   Docket No. 390.  And a Blokh Declaration at Docket 391.

20       Because we resolved all issues relating to their

21   testimony, we did not have Mr. Singh and Mr. Blokh join us in

22   Houston today, but they are available virtually for

23   cross-examination.

24       And also joining us, I should say, via Zoom, is

25   Michael Bros, the Debtor's Senior Vice President of Capital

1          Markets and Acquisitions, who was our First Day Declarant.

2                    THE COURT:  All right.  Thank you.

3                    Let me ask:  Any objection to the admissions of the

4          Blokh Declaration at 391, the Singh Declaration at 390?

5               (No audible response.)

6                    THE COURT:  No?  Yes?

7                    MS. REED:  No, Your Honor.

8                    THE COURT:  All right.  Thank you.

9                    Then they are admitted.

10              (Declarations of Singh and Blokh at Docket 390 and 391

11         received in evidence.)

12                   THE COURT:  Do you wish to cross-examine either one

13         of them?

14                   MS. REED:  Mr. Miser is handling the DIP, so.

15                   THE COURT:  Oh, okay.  I'm sorry.

16                   MS. REED:  I agreed to that, Your Honor, but that's

17         why I keep looking at him.

18                   THE COURT:  Ah, it's just fine.

19                   Mr. Miser, do you wish to cross-examine either

20         witness?

21                   MR. MISER:  No, Your Honor.

22                   THE COURT:  All right.  Thank you.

23                   Then I will accept their Declarations.  They are

24         excused as witnesses.

25                   MS. BERKOVICH:  Thank you, Your Honor.

1          Okay.  So moving on to the objection, we've been

2     able to resolve a portion of it.  In their objection, I would

3     point you to paragraph 9.  They ask for three categories of

4     changes to the DIP Order.  The first is information rights.

5     Just that additional information be provided to them.

6          The Debtors are fine with that, as are the DIP

7     Lenders and the Ad Hoc Group, so this would be the changes in

8     paragraph 19(a).

9          I can -- we can also work off of the Order, but it's

10    easier.

11         THE COURT:  I want to hear -- I want to hear you get

12    through the rest of this, then we'll talk about where we go.

13         MS. BERKOVICH:  Okay.  The next category is 9(b) of

14    their objection, which relates to notice of the exercise of

15    remedies and a right to be heard at a remedies hearing.

16         Those changes are also acceptable to the Debtors and

17    to the DIP Lenders and the Ad Hoc Group.

18         THE COURT:  Okay.

19         MS. BERKOVICH:  We did want to add additional

20    language into the DIP Order that would say nothing in the

21    Final DIP Order shall be deemed to expand the scope of any

22    Official Committee appointed in these cases, or authorize

23    payments of any fees to any such Committee beyond the scope

24    and budget set forth in the Order appointing the Committee.

25         THE COURT:  This is just if they want to object, I'm

1    certainly -- and I'm going to hear them whether they're an

2    Official Committee or an Ad Hoc Committee.  I'm going to still

3    give them the opportunity to speak.

4            So -- and I agree.  That's not pre-approval of

5    anything.

6            MS. BERKOVICH:  Thank you, Your Honor.

7            So that really leaves the change requested in 9(c),

8    which is also the last change in 9(b), which relates to the

9    inclusion of the professional fees of an Equity Committee into

10   the carveout.  They also want the approved budget to include

11   the Equity Committee professional fees.

12           Your Honor, the Debtors are sympathetic to these

13   requests.  If an Equity Committee is appointed and would

14   consent to these, but the DIP Lenders and the pre-petition

15   secured noteholders, whose cash collateral we're using, have

16   refused these changes and they've refused to include the

17   Equity Committee professional fees in either the carveout or

18   the budget.

19           So the equity holders' response to that is the Court

20   should not approve the DIP financing.  We do not agree with

21   that.  The Debtors require DIP financing and the use of cash

22   collateral, and we cannot force the DIP Lenders or the

23   pre-petition secured noteholders to agree to these requests

24   from the Equity Group.  So our position is that the Court

25   should overruled the limited DIP objection.

1          THE COURT:  So let me ask.  So the carveout is

2     actually divided into two pieces, right?  A

3     pre-notice/post-notice?

4          MS. BERKOVICH:  Yes, Your Honor.

5          THE COURT:  All right.  And Mr. Hansen, which part

6     of that are you really focused -- you can't really be focused

7     on the post-notice piece, right?  It's a gross number, so that

8     wouldn't change?

9          MR. HANSEN:  Your Honor, counsel for B. Riley

10    probably wants to be heard on this, as well.  But since I'm

11    closer to the podium, I'll go first.

12         Your Honor, I think that the perspective that we

13    both have on this, both from the DIP Lender and from the party

14    allowing cash collateral usages, in the situation where the

15    carveout kicks in, we're talking about a post-default,

16    remedial-type situation, right?  And so our view is if an

17    Equity Committee is effectively saying, "Well, we're here."

18    And if we wind up with language like you've suggested, right?

19    We're essentially saying you're proceeding at your own risk

20    here.

21         THE COURT:  Right.

22         MR. HANSEN:  And we're in a situation where we have

23    a DIP default and/or a cash collateral default.  That's a

24    pretty tragic situation for the company, right?  And so our

25    view of that is, within that window, you really are -- we're

1    not really in a solvency situation and so our view is:  Why
2    are we paying out of our collateral Equity Committee fees in a
3    situation where we're seeking to exercise remedies after the
4    Debtors defaulted on our cash collateral provisions or on the
5    DIP provisions.
6              THE COURT:  Are you saying it's both pieces?
7              MR. HANSEN:  It is.
8              THE COURT:  Great.  So help me out.  I got -- I
9    understand the argument with respect to the pre-notice piece.
10             MR. HANSEN:  Uh-huh.
11             THE COURT:  I don't understand the argument with
12   respect to the post-notice piece because you agreed to a
13   number of -- I think it was $2 million; is that right?
14             MR. HANSEN:  Yeah.
15             THE COURT:  And so you've made -- you've already
16   factored that in.  Why do you care who it goes to?
17             MR. HANSEN:  Yeah, well, I was about to say that's a
18   fair point, Judge.  I'd like to see what the Debtors' advisors
19   and the Committee's advisors have to say about that.  You
20   know, that's kind of -- it's a --
21             THE COURT:  I mean, no, they take on some of the
22   risk, but they're also the ones who actually consented to this
23   in the first place.
24             MR. HANSEN:  That's a fair point, Your Honor.
25   That's a fair point.  But I hear you that we have agreed with

1      respect to the gross number, it's a fair point that you make.

2      I think our objection rests on that point of in that type of

3      post-default remedies period, I don't think things are looking

4      pretty for the Debtor at that point.

5              THE COURT:  I got that.

6              MR. HANSEN:  But I understand your point about the

7      bucket and it's really a question of who shares the bucket

8      because we've already agreed to give up the bucket.

9              THE COURT:  Right.

10             MR. HANSEN:  Well, I guess what I would say is in

11     the miraculous situation where the Debtor and the Committee's

12     fees didn't fill up the full amount in that bucket, I still

13     have an objection because if it's the Equity Committee --

14     pretend for a second that of that 2 million, the Debtor and

15     the Official Committee are a million of it and now we have a

16     million over, for example.

17             Again, for an Equity Committee to step in and say

18     they should be able to soak up that post-period bucketed

19     amount, we still think that's unfair because you're in a

20     situation that by definition is probably an insolvency

21     situation for the Debtor.

22             THE COURT:  Right.  It's not the argument I thought

23     you were going to make.

24             Okay.  Got it.

25             Let me hear from B. Riley.  Good afternoon.

1          MR. VENTOLA:  Good afternoon, Your Honor.  John

2    Ventola of Choate Holt Stewart on behalf of B. Riley

3    Commercial Capital, the DIP Lender.  Thank you for the

4    opportunity to be heard, Your Honor.

5          So we have a similar view and cover as a whole.

6    Conceptually we really struggle with this.  There just seems

7    to be an inherent and irreconcilable conflict from the

8    proposed Equity Committee's view is that they should be

9    appointed immediately, but they are flipping all of the risk

10   of an administrative insolvency onto my client.

11         THE COURT:  I'm going to slightly disagree because

12   I've told everybody where I'm going.

13         MR. VENTOLA:  Yes, Your Honor.

14         THE COURT:  And I would think that if we got to that

15   point, your argument gets a lot stronger.  And so, let me tell

16   you where I'm headed 'cause I'm --

17         MR. VENTOLA:  Okay.  Thank you, Your Honor.

18         THE COURT:  -- is with -- I'm going to -- it's split

19   in the Order, pre-notice/post-notice.  I think that's

20   division.

21         The post-notice, I agree, and I wouldn't include

22   them in the 2 million.  I just want to see if I can get

23   Mr. Hansen to bite on that.

24         (Laughter.)

25         THE COURT:  Because I agree with the one statement

1    he says.  At that point, the argument that you are in the

2    money at that point is really out the window.  I mean, I'm

3    going to hear what Mr. Miser has to say, but I get it.

4         But with respect to the pre- -- so, well, let me,

5    let's start first.  So let's assume that I approve the -- I

6    approve the Equity Committee along the lines of what I've told

7    everybody I'm really thinking hard about doing.

8         So they're going to be a part of the interim comp

9    Order, like any other professional.  And so, they're going to

10   be going along and why shouldn't they -- why wouldn't you want

11   them in the budget?  I mean, you have to have them in the

12   budget, again, subject to the rights that I've already told

13   everyone I'm going to reserve, because, I mean, you know, if

14   they get money, I have absolutely no doubt that Staten

15   (phonetic) can get it back.

16        That's where we got to, and I'm not suggesting

17   anything by making that comment.  It's just today I'm not

18   really worried about that aspect of it, but I mean, we have to

19   have an accurate budget because that's what people are going

20   to rely on and talk about and so, I got it that you don't want

21   them to exist at all.  I got that.

22        But if they do exist, then whatever their fees and

23   expenses are have to be in the budget.  I mean, we just can't

24   ignore it 'cause then it's not a budget, right?

25             MR. VENTOLA:  Yeah, understood, Your Honor.  And of

1      course, your comments have been very instructive to me today

2      with everything you said today, so.

3              THE COURT:  And thank you.  I mean, I'm just trying

4      to -- again, I've told everybody what I want.  I want people

5      focused on this business.  I want to see if saved, if it can

6      be saved.

7              MR. VENTOLA:  Correct.

8              THE COURT:  And I want to know if it should be

9      saved.  I mean, I'm not re-ordained to anything, but I want to

10     stop the procedure and I want to get focused on the substance

11     is what I really want.

12             MR. VENTOLA:  I would just say, Your Honor, briefly,

13     we very much agree with that.  I mean, my client really wants

14     to focus on the Debtors' reorganization efforts.  They have

15     come in, funded new money, taken on new risks to help support

16     these reorganization efforts.

17             I would just note, Your Honor, and I have to -- if I

18     could hear the rest of the arguments, then confer with my

19     client briefly.  This does effectively increase the carveout,

20     though, because if the fixed party is grown, even if they

21     don't share in it, this does -- it grows the pre- --

22             THE COURT:  The pre- does, I totally got it, which

23     is really important for everybody on that interim comp Order

24     to make sure that everybody stays up-to-date, right?  Because

25     that's going to be the way to minimize it.  I mean, if they're

1      going to exist, they have to be in the budget, because

2      otherwise, it's not a budget.

3              MR. VENTOLA:  I understand, Your Honor.  So thank

4      you.

5              THE COURT:  Okay.  But keep walking with me for just

6      a second.  So we're going to have an interim comp Order and

7      any Order is going to absolutely provide -- I mean, I know

8      everyone says -- they give lip service to it, oh, an interim

9      Order.  No one is ever going to really re-evaluate it to

10     final.

11             The answer is:  Yes, we are.  We absolutely are.

12             And this will be one where I don't sit and wait for

13     someone to do something because no one ever does.  This is one

14     that I'm going to be -- I mean, obviously I'm going to depend

15     on you, I'm going to depend on Mr. Hansen, but I'm going to be

16     looking at this, too.  I want to make sure -- I mean, if I do

17     this, I mean, I got it that the Debtor is taking the path of

18     least resistance to try and get to an end result.  I got that,

19     but you know, US Trustee has said no, and it's not -- you

20     know, that means something to me.

21             And again, two committees in a case is a huge

22     burden.  I mean, we all know -- I mean, not that you're worth

23     it, but lawyers are expensive.  And if I'm going to do this,

24     you know, I'm accepting the responsibility for trying to make

25     sure that it was right.

1        And so, and again, I'm just talking so you hear me

2    when you talk to your client about what's floating around

3    inside my head.  So my view of it is, is that with respect to

4    the pre-notice part, I mean, it's in the budget.  Everybody

5    should be focused on the budget 'cause we ought to live by a

6    budget.  We ought to -- you know, budget shouldn't be just

7    because we have to get one.  Budget should be that's how we're

8    going to measure performance of the entity, and people ought

9    to be watching the professional fees.  And if something gets

10    out-of-whack, then, you know, I expect somebody to tell me.

11        I got it that it's driving up the carveout.  I got

12    that, but in my mind it's not that much because it shouldn't

13    be -- I mean, it shouldn't be more than at worst 60 days of

14    Committee fees and expenses?  And I don't think it ought to be

15    that much if everybody is really watching it.

16        Am I wrong in that?

17            MR. VENTOLA:  I hope not, Your Honor.

18            THE COURT:  I'm actually -- I'm counting on you to

19    make sure it's not.

20            MR. VENTOLA:  Well, we certainly will be attentive

21    to it, Your Honor.  I can assure you my client will be.

22        So thank you for the comments.  I would like to

23    confer with my client, you know, given the approach the Court

24    has taken here.

25        And again, just want to reiterate, we really do want

1       to get this DIP finalized.  We had very spirited discussions

2       with the Debtors' professionals, but very good faith

3       negotiating.  We were very happy to get to where we were

4       today.

5              As Ms. Berkovich said, they have no creditors

6       opposed to the DIP in a case this large.

7              THE COURT:  I got it.  And so, I mean, we're not

8       done yet.  I mean, what I want you to do, if you need to go

9       talk to your client, I got it.  I'm assuming they're watching.

10             MR. VENTOLA:  I believe so, yes.  I know they were

11      earlier.  So I hope they are.

12             THE COURT:  I'm hoping will happen is that you

13      can -- that we can take another short break and you can step

14      out in the hall, and you can say, okay, we heard what Jones is

15      saying.  We can either live with it, or if you can't live with

16      it, then we have a much bigger problem and you tell them not

17      to go home because none of us are going home.

18             MR. VENTOLA:  Thank you, Your Honor.  I will try to

19      reach them as soon as we have a break.

20             THE COURT:  Okay.  Mr. Hansen?

21             MR. VENTOLA:  Thank you, Your Honor.

22             MR. HANSEN:  Kris Hansen on behalf of the Ad Hoc

23      Secured Convert Noteholders.

24             Your Honor, I guess it's an interesting point you

25      make.  I just want to point out for everybody's benefit in the

1  courtroom, the DIP budget will probably have to be adjusted

2  obviously with respect to the appointment of the Equity

3  Committee because --

4  THE COURT:  Right.

5  MR. HANSEN:  -- it will be, you know, a projected

6  fee, assume it's capped at 4.75 for purposes of the Order, or

7  whatever it might be.  But it's an increase in the budget.  So

8  I think you're right when you talk about, like, it's at

9  post-budget default period, the fee is in transit.

10  It's like -- for lack of a better way to describe

11  it, is really the issue.

12  THE COURT:  Right.

13  MR. HANSEN:  And you know, that Ms. Berkovich

14  pointed out before, that the Debtors are ahead on their cash.

15  You know, you asked why?  Part of it obviously is because

16  they're continuing not to pay debt service.

17  THE COURT:  Right.

18  MR. HANSEN:  Any of their secured debt, right?  So

19  cash coming in is not going back out the door to pay the

20  secured noteholders, it's not going back to pay the equipment

21  lenders or anyone else.

22  And so -- but part of that budget then, again, has

23  to adjust for the potential incurrence of these fees for the

24  Equity Committee on a regular basis.  And I just wanted to

25  point out for the Court, too, that the budget does

1   demonstrate, I think two draws right now.  There's a

2   $20 million draw, and then another $5 million draw, so in

3   theory you'd have to put in another $5 million draw on that.

4   So just to make sure the Court understood.  It's like part of

5   the status update that you understood there are continuing DIP

6   draws along the way notwithstanding the fact that the company

7   is sitting on cash.

8           THE COURT:  No, I got it.  And so let me ask you

9   this:  I mean, if you really wanted certainty, I mean, why not

10  just lock up -- if you're $26 million ahead, why not just lock

11  up 4.75 now because you know it can't ever be any worse than

12  that and that way, you don't have to worry about the what if?

13          MR. HANSEN:  Yeah, we were going to try to do that

14  in the context of the Order that we hope to submit to you

15  together on a consensus basis.

16          THE COURT:  Okay.

17          MR. HANSEN:  Of course.  Understood.  Thank you,

18  Your Honor.

19          THE COURT:  So let's do this -- and I don't know,

20  Mr. Hansen, if you need to talk to your folks, as well, but it

21  seems to me that maybe what we ought to do is take another

22  quick break -- hopefully not too long -- and again, I just

23  want to make it very clear is that, number one, the assertion

24  that it shouldn't be in a budget, that just practically

25  doesn't work, you know, whatever they are, and you know, I'm

1    perfectly happy if we come back and acknowledge, yes, we need

2    to redo -- you know, we need to do the DIP.  And we need to

3    get it approved tonight, but we need to work on the budget and

4    we also need to get to Friday.

5         Perfectly happy to approve the DIP, if you're

6    comfortable with a to-be-submitted budget, perfectly happy

7    with that.  I mean, you may have to make some interim -- well,

8    I don't know if you have to make interim accommodations

9    between now and Friday or not, but I'm perfectly happy if that

10   works because you want to see what happens and how all that

11   unfolds.

12        Again, I'm not trying to put you in a box -- you've

13   seen me when I've tried to put you in a box.  I am not trying

14   to put you in a box tonight.

15        But if you decide that you want to just wait and see

16   that unfold, I'm more than happy, but needs to be in the

17   budget and you know, the -- and I like your term.  The fee is

18   in transit.  That's just fair.  I got your point, although you

19   got me there in a roundabout way.

20        I got your point with respect to the post-notice and

21   again, so long as the Equity Committee knows, then they can

22   react accordingly.  I got that.

23        Do you need to go talk to your folks?

24        MR. HANSEN:  I was going to suggest, Your Honor,

25   it's the Debtor's -- the Debtor in the -- you know, --

1           THE COURT:  Well, the Debtor needs to know that --

2    the Debtor needs to know this is done because everyone, every

3    media reporter is on the line listening and this will go out

4    all over the --

5           MR. HANSEN:  Agreed.

6           THE COURT:  -- things, so we're not ending the

7    hearing until we have this issue resolve.  The question is?

8           MR. HANSEN:  I like the -- what I was going to say,

9    Your Honor, is I like the idea of trying to sort things out

10   right now.

11          THE COURT:  Yeah.

12          MR. HANSEN:  And then waiting to either enter the

13   Order until Friday when we work out the rest of this, or do it

14   on a subject to the agreed-upon-budget that we all work on.

15          But that's -- I think, let's go out and talk in the

16   hallway and come back.

17          THE COURT:  Oh, okay.  That's perfectly fine.

18          Mr. Miser and -- I keep looking -- Ms. Reed, I'm not

19   trying to pick one over the other.  I promise you.  She's just

20   right here and I know her, so Mr. Miser, I apologize.  Come on

21   up.

22          MR. MISER:  Thank you, Your Honor.  You're welcome

23   to call me Ms. Reed, too.

24          (Laughter.)

25          THE COURT:  I agree with you.  She's far smarter and

1    eloquent than I ever hope to be.

2              MR. MISER:  And me, too, Your Honor.

3              Your Honor, you did all the work for me.  Your

4    Honor, we're fine with your suggestion on the DIP carveout.

5              We agree, if that notice is triggered, there's very

6    little left for us to do.

7              Your Honor, we also obviously agree with you on the

8    budget.  And ultimately our fees are subject to your court

9    allowing those fees.

10             So Your Honor, I think we're in like step with this

11   Court.

12             THE COURT:  You're okay.

13             Okay.  Then we just need to figure out -- we need to

14   figure out, sort of, logistics, but again, I want to make sure

15   that the Debtor has the comfort that it needs and -- because

16   there's going to be vendors who are watching this, as well,

17   who need to know that there is certainty going forward.

18             And I want to make sure that certainty gets conveyed

19   tonight.  So --

20             MR. MISER:  And --

21             THE COURT:  -- I'm sorry.

22             MR. MISER:  And Your Honor, one other point --

23             THE COURT:  Sure.

24             MR. MISER:  -- to the extent that it's helpful, it's

25   going to take two weeks -- maybe three weeks for the Committee

1    to be up and running -- for the US Trustee to accept

2    applications and to interview members, and et cetera.

3           So there's not change to the budget for at least the

4    next couple of weeks.

5           THE COURT:  I hadn't thought about that.

6           MR. MISER:  With that, Your Honor, I can sit.

7           THE COURT:  No, I got -- well, let's see.  What --

8    again, I want to make sure that people have ample time to talk

9    to creditor representatives.  I also, again, I want the world

10   to understand that the Debtor is here.  It's adequately funded

11   and is conducting business and making best possible use of the

12   process.

13          MS. BERKOVICH:  Your Honor, I spoke to Counsel to

14   both the DIP Lender and the Ad Hoc Noteholder Group.

15          THE COURT:  How could you possibly do that?  You

16   were just -- I'm joking.

17          MS. BERKOVICH:  I was thinking.  We don't -- I don't

18   think we need a break.  We're okay getting the Order entered

19   with the language that the Equity Group wanted -- subject --

20   as modified by what I said earlier on changing the post-notice

21   carveout amount not to include them, and we'll work in good

22   faith on the budget.

23          It's absolutely true that even if they were

24   appointed under the interim comp order, the first they would

25   even be paid if they started work tomorrow is in May and

1      there's time --

2                   THE COURT:  Right.

3                   MS. BERKOVICH:  -- for that.

4                   THE COURT:  So let me ask:  Do you have the Order

5      here in the courtroom?  And somebody with a computer?

6                   MS. BERKOVICH:  Yes.  I have a computer, so.

7                   THE COURT:  So can -- if I step down -- I mean, I'm

8      happy to sit right here, but if I step down, can you-all just

9      work out the terms of the Order?  If there is a problem, then

10     I'm happy to come back out -- and at which point I'm going to

11     start typing -- magic fingers.

12                  But if not, you can just upload it from here and

13     once it's been uploaded, everybody can go and I'll just sign

14     it before I go home.

15                  Does that work for everybody?

16                  MS. BERKOVICH:  Yes, Your Honor.  That works.

17                  THE COURT:  Everybody okay with that?

18                  Mr. Hansen?

19                  MR. HANSEN:  Yes, Your Honor.

20                  THE COURT:  Am I making you nervous again?

21                  MR. HANSEN:  No, Your Honor.

22                  THE COURT:  Okay.

23                  MS. BERKOVICH:  Before we break, Your Honor, three

24     quick points for the Record.  One is because we're ahead on

25     budget, we don't plan to make those draws that Mr. Hansen

1      mentioned, right?  We don't need those draws anymore and the

2      next budget would not include those draws?  That's number one.

3              Number two, for every one cent decrease in the price

4      of power per kilowatt hour, that is an extra $15 million of

5      cost --

6              THE COURT:  Really?

7              MS. BERKOVICH:  -- savings for the Debtors, which

8      directly translates into $50 million in additional EBITDA.

9              So the business is very sensitive to price changes.

10             THE COURT:  So one percent drop on an annualized

11     basis, is that where that's coming from?

12             MS. BERKOVICH:  One cent -- one cent.

13             THE COURT:  Right, on an annualized basis, right?

14             MS. BERKOVICH:  On an annualized --

15             THE COURT:  So it's not like it had dropped one

16     penny for a day you make that money, right?

17             MS. BERKOVICH:  Correct, correct.  Over a year, yes.

18     One cent --

19             THE COURT:  On an annualized basis.

20             MS. BERKOVICH:  -- but an annualized --

21             THE COURT:  I was going to get in business then if

22     that were the case.

23         (Laughter.)

24             MS. BERKOVICH:  And then the other point is our

25     power is a combination of the spot market, the tariff market,

1     and we do have one power agreement.  So I did want to clarify

2     the Record on that point.

3              THE COURT:  I was just surprised if they were all

4     just day -- day purchase, I was going to be shocked.

5              Well, okay, I got it.

6              MS. BERKOVICH:  We will take the time to fix the

7     Order.  I don't think it will take a lot of time.  The

8     directions were pretty clear.

9              THE COURT:  I got it.  All right.  Then I'm going to

10    let you-all do what you do so well.  I appreciate you working

11    through the issues.

12             Again, I'm happy to come back out, but if everybody

13    signs off on it, you know, upload it.  I'd ask you to either

14    send Mr. Alonzo a text or buzz on the door, and you know,

15    we'll get it done before we go home, okay?

16             MS. BERKOVICH:  Thank you, Your Honor.

17             I mean, the milestone expires tomorrow, so if it's

18    going to take more than just a few minutes, we will let the

19    courtroom know so that people don't leave.

20             THE COURT:  Yeah, nobody can go until it's uploaded.

21             How about that?

22             MS. BERKOVICH:  Oh, okay.  I like that.

23             THE COURT:  Okay.  All right.  All right.

24             MS. BERKOVICH:  I got that.

25             THE COURT:  All right.

1          MS. BERKOVICH:  Thank you, Your Honor.

2          THE COURT:  With that, everyone, safe travels home.

3          We'll be adjourned.

4          THE CLERK:  All rise.

5       (Proceedings concluded at 5:13 p.m.)

6                    *  *  *  *  *

7          *I certify that the foregoing is a correct transcript*

8    *to the best of my ability produced from the electronic sound*

9    *recording of the proceedings in the above-entitled matter.*

10      */S./  MARY D. HENRY*

11   *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

12   *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

13   *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

14   *JTT TRANSCRIPT #66899*

15   *DATE FILED:  MARCH 5, 2023*