IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 22-90341-11 |
| | § | JOINTLY ADMINISTERED |
| | § | HOUSTON, TEXAS |
| CORE SCIENTIFIC, INC, ET AL, | § | FRIDAY, |
| | § | MARCH 3, 2023 |
| DEBTORS. | § | 9:30 A.M. TO 9:51 A.M. |

**<u>MOTION HEARING (VIA ZOOM)</u>**

BEFORE THE HONORABLE DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:            SEE NEXT PAGE

**(Recorded via CourtSpeak)**

<u>TRANSCRIPTION SERVICE BY</u>:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES (VIA ZOOM):

For the Debtor:                    WEIL GOTSHAL & MANGES, LLP
                                   Ronit Berkovich, Esq.
                                   700 Louisiana, Ste. 1700
                                   Houston, TX  77002
                                   713-546-5000


For the Ad Hoc Committee of
Secured Convertible
Noteholders:                       PAUL HASTINGS, LLP
                                   Kris Hansen, Esq.
                                   200 Park Avenue
                                   New York, NY  10166
                                   212-318-6000


For Ad Hoc Group of
Equity Holders:                    SKADDEN ARPS SLATE MEAGHER
                                   & FLOM, LLP
                                   Ron E. Meisler, Esq.
                                   155 N. Wacker Drive
                                   Chicago, IL  60606
                                   312-407-0700

                                   SKADDEN ARPS SLATE MEAGHER
                                   & FLOM, LLP
                                   Noelle M. Reed, Esq.
                                   1000 Louisiana Street
                                   Suite 6800
                                   Houston, TX  77002
                                   713-655-5100




(Please also see Electronic Appearances.)

**HOUSTON, TEXAS; FRIDAY, MARCH 3, 2023; 9:30 A.M.**

THE COURT: Good morning, everyone. This is Judge Jones. The time is 9:30 Central. Today is March the 3rd, 2023. This is the docket for Houston, Texas.

First on the docket this morning, we have the jointly administered cases under Case Number 22-90341, Core Scientific.

Folks, please don't forget to record your electronic appearance. That's a quick trip to my website, a couple of mouse clicks. You can do that at any time prior to the conclusion of the hearing, but that is how we record your appearance.

First time that you speak, if you would, please state your name and who you represent, that really does serve as a good point of reference for the court reporters in the event that a transcript request is made.

We are recording this morning using CourtSpeak. We'll have the audio up on the docket available for your download shortly after the conclusion of the hearing.

There was some odd noise, so I went ahead and activated the hand-raising feature. If you know you're going to be speaking, if you'd go ahead and give me a five star and let me get you unmuted now. Obviously you can change -- or you can make that decision at any time.

(Pause in the proceedings.)

1  THE COURT: All right. Ms. Berkovich, good morning
2  to you. You want to start us off and give me an update as to
3  where we are?
4  MS. BERKOVICH: Yes. Good morning, Your Honor.
5  Can you hear me?
6  THE COURT: Loud and clear. Thank you for asking.
7  MS. BERKOVICH: Okay. I'm Ronit Berkovich from Weil
8  Gotshal for the Record.
9  I understand, although they will confirm for
10  themselves, that both the Ad Hoc Group of Equity Holders and
11  the Ad Hoc Group of Convertible Noteholders have agreed to the
12  construct that the Court suggested on Wednesday in relation to
13  the appointment of an Equity Committee.
14  We've all gone back and forth a few rounds on a
15  proposed Order and have made some progress. However, there is
16  still not agreement on the proposed terms.
17  Primarily, the disagreement is between the Ad Hoc
18  Equity Group and the Ad Hoc Convertible Noteholder Group, and
19  we did just get a revised version of it right before the
20  hearing started that we're going through, but I will -- if it
21  makes sense to the Court, I will turn it over to Mr. Meisler,
22  to advise the Court on what the open points are.
23  THE COURT: Certainly, thank you.
24  Mr. Meisler, good morning to you.
25  MR. MEISLER: (No audible response.)

1  THE COURT: Ah, Mr. Meisler, do you perhaps have me
2  muted from your side? I can see you talking, but we can't
3  hear you and have you hit five star? I guess I should have
4  started there.
5  MS. REED: And Your Honor, just for the Record,
6  Noelle Reed is on, as well, for the Ad Hoc Equity Group. I
7  don't seem to be able to get the video. It's just sitting on
8  joining session for me, but I am on the audio.
9  THE COURT: So I will tell you this, if you're
10 seeing the spinning, that tells you that you don't have a
11 sufficient internet connection, that it will pass the video.
12 What I have seen other folks do -- and it tends to work -- is
13 that disconnect, try to reconnect. Sometimes that fixes it.
14 Sometimes it doesn't. But it is an internet connection issue.
15 MS. REED: Got it, Your Honor.
16 And just very quickly, I was prepared to at least
17 start for the Ad Hoc Equity Group.
18 Ms. Berkovich stated it correctly. I think we're in
19 agreement on the concept. I think we're close on the Order
20 and I think from our perspective, while Mr. Meisler can talk
21 through the details of the few remaining open items, you know,
22 I think the parties are trying to effect your intent, and so
23 it probably just makes sense for you to simply resolve what
24 that intent is.
25 THE COURT: Certainly. First, let's see if we've

1  got Mr. Meisler unmuted.

2  Mr. Meisler, do you want to try that again?  Just
3  say something.

4  MR. MEISLER:  Yes, Your Honor.

5  THE COURT:  Ah, loud and clear.

6  MR. MEISLER:  Your Honor, can you hear me?

7  THE COURT:  Yes, sir.  Thank you.

8  MR. MEISLER:  Oh, perfect, great.

9  I did fail Skadden's test course several times, so
10 I'm glad this was working this morning.

11 Your Honor, what Ms. Reed said is 100 percent
12 correct.  You should hear also from Mr. Hansen, but that is
13 Core's -- we're in agreement on the proposed resolution
14 suggested by Your Honor.  We did have a meeting with our
15 client group yesterday and then we have overwhelming support
16 by the group to move forward on the terms that you suggested.

17 I think we just have some details on emergence where
18 Mr. Hansen and I haven't yet resolved the Order, and I'm happy
19 -- if Mr. Hansen is okay, I'm happy to go through what I think
20 are the areas of dispute.  But I don't want to get ahead of
21 Mr. Hansen, so if Mr. Hansen wants to jump in, he is very
22 welcome to do so.

23 THE COURT:  So let me -- and again, I'm certainly
24 going to hear from Mr. Hansen, but let me propose a different
25 way of proceeding.  It just generally tends to work, is that

1   you take today -- weekend, if you wish -- see if you can
2   hammer it out between yourselves.  If you can't -- and I'll
3   pick a deadline.  If you can't get it done by 10:00 o'clock on
4   Monday, upload competing forms of the Order.  Just understand
5   that you may get Form A, you may get Form B.  More likely, you
6   get Form C.
7               MR. MEISLER:  Your Honor, that would be fine with
8   us, although I would ask -- and especially in light of
9   previous comments that you've made, I would ask that we submit
10  an Order by close of business today.
11              THE COURT:  All fine by me.  All fine by me.  I was
12  just trying to recognize that you folks have other things to
13  do, other than work on this Order.  I was just trying to give
14  folks flexibility.
15              Mr. Hansen, didn't mean to not give you an
16  opportunity.
17              MR. HANSEN:  No.  Thank you, Your Honor.
18              Can you hear me okay?
19              THE COURT:  Loud and clear.  Thank you.
20              MR. HANSEN:  Great.  Kris Hansen with Paul Hastings
21  on behalf of the Ad Hoc Secured Noteholder Committee.
22              Your Honor, we're fine to try to upload either an
23  agreed upon Order or two forms of Order by end of today.
24              THE COURT:  Okay.
25              MR. HANSEN:  That's fine.  I do think it would

1  benefit us in the process of trying to get an Agreed Order, if
2  Mr. Meisler and I can explain just a couple of the things that
3  we're struggling with so what you can give us a little
4  guidance on that?
5           THE COURT: More than happy to do that. I was just
6  trying to keep my finger off the scale, but happy to do that.
7           MR. HANSEN: So I would defer to Mr. Meisler, just,
8  you know, I always want the mic and I'd like to go, but he
9  started. So from a courtroom corner perspective, I'll let him
10 start. It's his motion and then I'll respond.
11          THE COURT: All right. Mr. Meisler?
12          MR. MEISLER: Thank you, Your Honor.
13          I think there's really two areas of dispute. One
14 is, Your Honor, we have put in the assumption that were the
15 factors that got us to arrive at our $4.75 million budget.
16 And to be sure, our original budget was higher than that. The
17 Debtors could negotiate -- negotiating with us led to a lower
18 budget, but those factors are what led to the budget.
19          If we were to bust those assumptions, it doesn't
20 give us automatic license to increase the budget, but we would
21 want all parties to be aware that if those assumptions that
22 led to the budget, why if a party propounds needless discovery
23 upon us, then Your Honor, we're going to bust the budget.
24          Now I think that goes into some of the factors that
25 you were thinking about that as someone launches discovery, it

1  was really aimed at us.  So if we're launching tactics that
2  are really meant to be -- using my own words -- extortionist
3  tactics, rather than value or creative tactics, then we
4  wouldn't get compensated.
5       But I think that that litmus test in some ways would
6  also apply if the shoe is on the other foot and some other
7  party-in-interest were to launch needless value destructive
8  discovery upon us is discovery is labor-intensive and it could
9  lead us to bust the budget.
10      So the factors are out there and in response to
11 educate all parties-in-interest how we arrived at the budget,
12 but not meant to be a test for Your Honor on the question of
13 whether the budget can be increased.
14      And we would pause there just for one moment, in
15 case Your Honor has any questions to that principle.
16      THE COURT:  So obviously I haven't seen anything.
17      And Mr. Hansen, what is your client's view?
18      MR. HANSEN:  Your Honor, so our clients are still
19 not happy with the appointment of an Equity Committee, but
20 they appreciated the way that you described things at the
21 hearing the other day.
22      THE COURT:  All right.
23      MR. HANSEN:  So as Ms. Berkovich noted, we're going
24 to try to proceed to get an Order settled.
25      With respect to the assumptions, our only point was

in the form of Order that we've been working on, that Mr. Meisler had included a schedule, which had assumptions in it, and I don't think that's bad. I don't think that's appropriate, and B, the point on the assumptions is that, you know, and this really translates to the bigger question, which is: Is this a budget or is this the cap?

And our view is, it's a fee cap. That cap isonly subject to increase by further Order of the Court and as the Court noted at the hearing the other day, this Court might not even agree that they can go to the caps, based upon your analysis later, if people choose to object.

And so my point that I was engaging with Mr. Meisler, was, you know, we don't -- whatever basis upon which you agreed to cap yourself at $4.75 million for all the professionals or the Equity Committee, fees, expenses, and expenses of the members themselves, that's your business. We don't need to have an Order that notes what the assumptions were that went into that because that would give some information that if those assumptions were no longer valid for some reason, there's a better reason to increase the cap.

That's something that you can consider at a later time.

THE COURT: So this is really -- this one is really easy for me, if it's helpful, is that the Equity Committee and the Debtor agreed to a cap of 4.75 million and that cap can't

1  be exceeded absent further Order from me.  And I'm not going
2  to be constrained by any consideration because I don't know --
3  I don't know what I don't know.
4              And so if there's a request that's filed to exceed
5  the cap, I'll take it up based upon what I know at the time
6  that the request is made -- hopefully that helps move that
7  issue along.
8              MR. MEISLER:  Your Honor, on that --
9              THE COURT:  Yes, sir.
10             MR. MEISLER:  Ron Meisler.  On the fee cap, while we
11 understand that if we exceed the 4.75 million -- "we," being
12 the Equity Committee -- for advisor expenses, then we can't
13 get paid by the estate unless Your Honor orders otherwise.
14             THE COURT:  Right.
15             MR. MEISLER:  There's a reason why -- and it may be
16 just semantics.  The reason why we use the word but as opposed
17 to cap is our concern is that it could limit the pool of
18 advisors that are willing to be hired by the Equity Committee.
19 We'd, of course, make it --
20             THE COURT:  Absolutely.  Absolutely could.
21             MR. MEISLER:  So we'd, of course, make it --
22             THE COURT:  Absolutely could.
23             MR. MEISLER:  Exactly.  We want to enable the best
24 advisors to pitch and be retained by the Equity Committee,
25 understanding that they will not get paid if the budget is

1   exceeded and Your Honor doesn't order otherwise that they
2   could get paid.  But that semantic difference could be the
3   reason why a senior management team of a law firm or a
4   financial advisor may choose simply not to pitch.
5           And again, our principle motivation here is we would
6   like the best advisors to be able to represent this group --
7           THE COURT:  Totally agree.
8           MR. MEISLER:  -- understanding the risk.
9           THE COURT:  Totally agree and I can't imagine that
10  you're going to talk to someone and ask them to make a pitch
11  of a group that doesn't know me and I would think that, alone,
12  would give them a degree of comfort.  If not, then they're
13  just going to have to make a business decision.
14          It's just easy for me, so what's next?
15          MR. MEISLER:  Your Honor, I think that's all,
16  although I do not have -- so clearly the word capital "B" in
17  that Order, but I don't have clarity on the assumption that
18  built up that number, which we'd like because, again, it
19  doesn't bind the Court in any way.
20          THE COURT:  Yeah, I don't --
21          MR. MEISLER:  It just puts other property --
22          THE COURT:  So take the decision making process out
23  if it.  It's an agreement between the Ad Hoc Equity Committee
24  and the Debtors.  It's 4.75.  I'm not going to look behind it.
25  And again, if there's a request to increase it, I'm going to

1  base it on what is important to me and what I know at the
2  time, not today.  I'm not going to consider anything on a list
3  that exists today, or I'm going to say I'm not going to be
4  bound anything on a list today.
5  I'm going to hear what the arguments are at the
6  time.  So let's get rid of the list.  Let's move on.
7  MR. MEISLER:  Thank you, Your Honor.
8  THE COURT:  Uh-huh.
9  MR. MEISLER:  Unless Mr. Hansen has something else,
10  I think those are the principle areas of dispute.
11  THE COURT:  Okay.  Mr. Hansen, anything else?
12  MR. HANSEN:  Yeah, Your Honor.  I had one other
13  point on the Order and then just a general comment before we
14  part that I wanted to make.
15  So with respect to the Order, I think where the
16  parties are going to land is that we are going to rely on Your
17  Honor's comment as the standard by which the fees get
18  penalized, as opposed to trying to come up with language
19  between us which we may have a disagreement on and which we
20  may have to ask you to resolve, right?
21  So for example, instead of having a decretal
22  paragraph that says, you know, the fees for the Equity
23  Committee shall be viewed, you know, in hindsight based upon
24  -- you know, like instead of getting really choppy with the
25  words, but I think you gave us a bunch of examples.  You went

1  through them at the hearing the other day, but we wanted to
2  just make sure if we are relying on that language that we have
3  this discussion with you today, so that we have a little bit
4  of a supplement to the Record the other day.
5      And you know, you were clear that you want to be
6  able to have the discretion to view the fees that are
7  generated by the Equity Committee in hindsight. And what we
8  understand hindsight to mean is by whatever period you're
9  looking back, sure, you're going to assess whether the fees
10 were reasonable at the time that they were incurred, but
11 you're also going to assess them having the benefit of the
12 result that was produced as a result of the acts that were
13 taking, as well as the factors that are existing in the case
14 at the time that you're looking at them, and you're not going
15 to be constrained by saying you had to go back in time to look
16 at it then.
17     So we're -- in our minds, while you didn't go all
18 the way to say I'm going to look at it on a substantial
19 contribution-type standard, effectively what you're saying is
20 you always have the discretion to look back across these fees,
21 whenever it is, based upon where you are and you're really
22 guided by the fifth factor that you added to the *Pilgrim Pride*
23 analysis, which is what difference did they make?
24     And so we wanted to just make sure that we're all
25 clear there so that then we'll be saying we're relying on

whatever you had told us was going to be the standard, rather than try to describe your words ourselves, that we are clear on what that standard is.

THE COURT: No, I think that's right. And I think if you look back, I've been entirely consistent when I added that additional requirement to *Pilgrim's*, I think that's actually in another case and in another Order, but that shouldn't be a mystery to anybody.

I mean, look, as I -- and you're just going to have to accept a little bit of this on faith. You know, I spent 20-plus years as a professional. I understand that you like to -- you like to be paid for the services that you provide. I am certainly not out to make a point with any professional, but we're in a unique situation here and my focus is exactly as I said at the hearing. It's on the Debtor and the business and the employees and whether or not there is a path forward here.

And just to be entirely transparent, I'm simply reserving the right to exert leverage on everybody to move this forward. You know, everybody does their job, I can't imagine there's a problem. People don't do their job, and, you know, for instance, if I ever have to revisit the snippiness issue that I raised at the prior hearing, okay. I mean, everybody had fair warning at that point.

But this is not an "I got you," this is not a "I

1  want to make a point about rates." I'm not. I think I've
2  said a thousand times, you know, rates are driven by the
3  market. I'm a big believer in the market. Just do what
4  you-all -- do what you know what you're supposed to doing and
5  I can't imagine there's an issue.
6       But I am reserving the right to come back and
7  revisit this if, in fact, my assumptions about any or all of
8  you turn out not to be correct. I don't know how I could be
9  any more transparent than that.
10      MS. REED: And Your Honor, this is Noelle Reed.
11      We thought you were perfectly transparent and that
12  was the basis on which we advised our client and secured their
13  support and we're very comfortable with the guidance that the
14  Court gave previously.
15      THE COURT: Okay. Mr. Hansen, did I say something
16  that was any different than what I said the other day or that
17  I've previously said in other cases?
18      MR. HANSEN: No, Your Honor. I think we're --
19  again, we're good with what you said the other day. I just
20  wanted to make sure that we were all clear because, again, I
21  think that's a better stance. I did suggest that we agree
22  with it that it's better to do that than to try to describe,
23  you know, in our own words.
24      And to your point about moving this case forward,
25  there's just -- I wanted to touch on this, right?

1       Ms. Berkovich gave you an update the other day that,
2  you know, they're now a few months into the case.  I made the
3  point that perhaps we should wait to see what happens here,
4  until we have the business plan, but clearly the exclusivity
5  clock is ticking, and we currently have no progress towards
6  the Plan of Reorganization at all.  We had an RSA that's been
7  torn up, right?
8       And so one of the major standards here -- and you've
9  highlighted it a few times is we don't want to hang out in
10 bankruptcy.  We want to move this case as quickly as possible
11 and get out and moving fast, of course, keeps fees down.
12      But it also helps us get an entity out of bankruptcy
13 where it shouldn't be hiding.  And so we want to just point
14 out to the Court that clearly there may be an exclusivity
15 extension coming.  We hope to see significant progress on a
16 Plan by that point in time.  But we can't do that without the
17 Debtors having a business plan and the Debtor is getting
18 around and trying to negotiate with everybody.
19      So we look forward to that happening and we hope it
20 happens soon, and I'd also just note for the Record, Judge, to
21 your point about the fragileness of this business, that
22 bitcoins are up to almost 5 percent overnight, last night.
23      And so it's --
24      THE COURT:  For whatever reason, I now look at it
25 everyday.

MS. BERKOVICH: Welcome to the club.

Your Honor, I agree with what Mr. Hansen said in terms of the -- as I mentioned the other day -- are finalizing our business plan and then we intend to sit down with all our major stakeholders, including Mr. Hansen's large client group, and negotiate a Plan of Reorganization.

THE COURT: Got it. And again, if it's helpful -- and I mean this sincerely, if anyone -- you know, it doesn't take a lot to get a status conference if there's an issue that you believe I can be helpful on. I want to be helpful to the process. I'm here to resolve disputes, but I also want to be helpful to the process.

And again, I want to get you-all focused on the next part of this, which is why I've kind of been a little pushy with respect to this issue. You know, if it turns out that, you know, Isgur can help, I -- you know, I had to go eat the most god-awful cheeseburger in my life yesterday, so he now owes me another one.

You know, I'm more than happy to get him involved, if that's helpful. I'm -- if Judge Lopez can be helpful, I'm -- I think he owes me a couple. I'm happy to use all of those -- all of those favors to help move this along because I really do want to -- I'm looking at this a whole lot like I would a RICO case. This really has to move quickly if it's going to have a chance of succeeding.

1    So again, I trust you-all. I'm going to sit here
2    and expect everyone to do what I know you can do so well. But
3    if it turns out that we need, you know, a nudge in one
4    direction or another, all of you know how to ask. It's not
5    going to bother me one bit.
6    MS. BERKOVICH: That is very helpful, Your Honor.
7    Thank you.
8    THE COURT: All right. So Order by the end of the
9    day. Somebody will shoot Mr. Alonzo an email once it's been
10   uploaded and I'll turn it promptly around.
11   If it turns out that there is a -- if it turns out
12   that there's just a log jam, number one, I'm going to be here
13   all day. I mean, if folks think it would be helpful to jump
14   back on, I'm happy to do it. Also, if you want to just
15   submit, again, Version A, Version B, you know, I'm happy for
16   you to do that. Just always with the caveat that you could
17   get Order C. Okay?
18   MR. HANSEN: Thank you, Your Honor.
19   MR. MEISLER: Thank you, Your Honor.
20   THE COURT: All right. Terrific. Everyone have a
21   wonderful weekend. I don't know what the weather is like your
22   way, but it's just beautiful here today, but have a wonderful
23   weekend and I'll see everybody soon.
24   We'll be adjourned.
25   MS. BERKOVICH: Thank you, Your Honor.

MR. HANSEN:  Thank you, Your Honor.

MR. MEISLER:  Thank you, Your Honor.

(Proceedings concluded at 9:51 a.m.)

*  *  *  *  *

*I certify that the foregoing is a correct transcript to the best of my ability produced from the electronic sound recording of the proceedings in the above-entitled matter.*

*/S./  MARY D. HENRY*

*CERTIFIED BY THE AMERICAN ASSOCIATION OF*

*ELECTRONIC REPORTERS AND TRANSCRIBERS, CET\*\*337*

*JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

*JTT TRANSCRIPT #66914*

*DATE FILED:  MARCH 5, 2023*