IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § | Chapter 11 |
| CORE SCIENTIFIC, INC., *et al.*, | § § § | Case No. 22-90341 (DRJ) |
| Debtors.[1] | § § § § | (Jointly Administered) (Emergency Hearing Requested) |

**DEBTORS' EMERGENCY MOTION FOR ORDER APPROVING
(I) GLOBAL SETTLEMENT BETWEEN DEBTORS AND PRIORITY POWER
MANAGEMENT, LLC, (II) ASSUMPTION OF THE EMCSA, (III) ENTRY
INTO THE NEW AGREEMENTS AND (IV) GRANTING RELATED RELIEF**

> EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN 1:00 P.M. (CENTRAL PREVAILING TIME) ON MONDAY, MARCH 20, 2023.
>
> IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.
>
> A HEARING WILL BE CONDUCTED ON THIS MATTER ON MONDAY, MARCH 20, 2023 AT 1:00 P.M. (CENTRAL PREVAILING TIME) IN COURTROOM 400, 4TH FLOOR, 515 RUSK AVENUE, HOUSTON, TX 77002.
>
> YOU MAY PARTICIPATE IN THE HEARING EITHER IN PERSON OR BY AN AUDIO AND VIDEO CONNECTION.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6074); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

> **AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT 832-917-1510. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE JONES'S CONFERENCE ROOM NUMBER IS 205691. VIDEO COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE JONES'S HOME PAGE. THE MEETING CODE IS "JUDGEJONES". CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**
>
> **HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF BOTH ELECTRONIC AND IN-PERSON HEARINGS. TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE JONE'S HOME PAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

Core Scientific, Inc. ("**Core**") and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), hereby submit this motion (the "**Motion**"), pursuant to 363(b), 365(a), and 105(a) of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and rule 9013 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**"), the Debtors request entry of an order, substantially in the form annexed hereto as **Exhibit 1** (the "**Proposed Order**"), approving (i) a global settlement between the Debtors and Priority Power Management, LLC ("**PPM**" and together with the Debtors, the "**Parties**"), on the terms set forth on the term sheet (the "**Term Sheet**") attached to this Motion as **Exhibit 2**, (ii) assumption of the EMCSA (as defined below), as amended and restated as set forth herein, (iii) entry into the New Agreements (as defined below), and (iv) granting related relief.

## Jurisdiction

1. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2

**Background**

2. On December 21, 2022 (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under the Bankruptcy Code. The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

**I.    The Parties' Business Relationship**

3. The Debtors are one of the largest blockchain infrastructure, hosting provider, and digital asset mining companies in North America, with fully operational data centers in Texas, Kentucky, North Carolina, North Dakota, and Georgia. The Debtors provide hosting solutions for third parties and also operate their own digital asset mining machines.

4. PPM is an energy management services procurement and infrastructure development firm that provides third parties with consulting and energy procurement services. PPM has extensive experience in the Texas power industry, providing various energy services to large-volume power users in the Texas market for over two decades.

5. The Debtors operate two data-center facilities in West Texas, one in Barstow, Texas (the "**Cottonwood Facility**") and one in Pecos, Texas (the "**Cedarvale Facility**" and, together with the Cottonwood Facility, the "**Facilities**"). Since 2021, the Debtors have contracted with PPM to perform various consulting, energy management, and energy infrastructure development services in connection with power at the Facilities, including the build out and construction of certain electrical infrastructure at the Facilities and the procurement of electricity from a retail electric provider ("**REP**") to provide power to the Facilities.

6. Prior to the Petition Date, certain of the Debtors and PPM entered into that certain Energy Management and Consulting Services Agreement, dated June 29, 2021 (as amended, restated, modified, or supplemented from time to time, together with all schedules,

3

exhibits supplements, annexes, and attachments thereto, the "**EMCSA**"), pursuant to which PPM is engaged as the Debtors' exclusive energy manager and consultant (the "**EMCSA Services**"). Under the EMCSA, PPM is responsible for a variety of energy management and consulting services, including serving as the Debtors' exclusive negotiator of electricity supply contracts with a REP in exchange for a variable monthly management fee based on the Debtors' electricity usage at the Facilities.[2]

7. Certain of the Debtors and PPM also executed the Energy Services Agreement, dated August 6, 2021, as amended on August 24, 2021 (as amended, restated, modified, or supplemented from time to time, together with all schedules, exhibits supplements, annexes, and attachments thereto, the "**ESA**"), under which PPM provided engineering, procurement, and construction services to develop the electrical infrastructure at the Facilities.

8. The Debtors and PPM also negotiated two other agreements, which were unexecuted prior to the Petition Date.

9. First, the Parties negotiated a draft Electric Asset Management Services Agreement (the "**EAMSA**"), which would provide: (a) that PPM would manage certain assets at the Facilities in exchange for a monthly asset management services fee; and (b) the Debtors would agree to reimburse PPM for materials or services related to maintenance and repairs required to manage the relevant assets.

10. Second, the Parties negotiated a draft Energy Management Services Agreement (the "**EMSA**" and, together with the EMCSA and the EAMSA, collectively, the "**Priority Power Contracts**"), which would provide for PPM's participation in demand side management programs for the Debtors as their qualified scheduling entity ("**QSE**") in exchange

---

[2] Although PPM negotiates the material terms of the Debtors electricity contracts for the Facilities, the Debtors contract directly with REPs for the delivery of such PPM-brokered electricity.

4

for a certain percent of the revenue from those programs. Although the EMSA was never executed, PPM has been participating in demand side management programs on behalf of the Debtors largely consistent with the draft EMSA. PPM has retained approximately $514,000 in revenue generated from those programs that the Debtors contend is owed to them (the "**Retained DR Revenues**").[3]

## II. The Disputes Between the Parties

11. In approximately May 2022, after it became clear the Facilities would not receive the anticipated power load, the Debtors stopped making payments for various services and goods provided by PPM to the Debtors under the ESA. Thereafter, PPM and the Debtors began engaging in discussions related to the failure to receive the anticipated power load and such nonpayment.

12. As discussions continued, in connection with services previously provided at the Facilities, including, without limitation, the construction thereof pursuant to the ESA, PPM asserted, and/or may assert, mechanics' liens against the Debtors relating to work performed at the Facilities and goods, labor and materials supplied to, for or in connection with the Debtors or the Facilities (collectively, as may be amended, restated, supplemented, superseded or otherwise modified, the "**PPM Liens**"), which PPM Liens are evidenced by, among other things, that certain *Notice of Perfection of Mechanic's Lien of Priority Power Management, LLC* (Docket No. 412) and that certain *Notice of Perfection of Mechanic's Lien of Priority Power Management, LLC* (Docket No. 413). The Debtors scheduled the PPM Liens in their debtor-in-possession creditor agreements. *See* Docket No. 447 at pp. 34, 127, 140. PPM has represented to the Debtors that, other than any subcontractors who have been paid in full, PPM did not engage any subcontractors

---

[3] The Retained DR Revenues reflect proceeds retained by PPM prior to the Petition Date exclusively on account of prepetition transactions. The Debtors have not accrued and PPM has not retained any amount postpetition.

to perform any work at the Facilities or supply any goods, labor or materials to, for or in connection with the Debtors or the Facilities.

13. Additionally, the Debtors contend that they have potential claims and causes of action which they may assert against PPM arising from, among other things, PPM's representation that the Debtors could anticipate receiving 1,000MW across the Facilities on a short ramp-up schedule.  Given that the anticipated power was ultimately not allocated to the Facilities as anticipated, the Debtors suffered significant losses and believe that they may have claims against PPM for damages arising from, among other things, the inability to energize the Facilities to the represented power load (the "**Debtors' Claims**").  PPM, on the other hand, contends that any such anticipated energy profile or power-supply expectations of the Debtors arose pursuant to the contracts entered into between the Debtors and their power delivery utility supplier (and not PPM). PPM continues to hold title to certain of the assets listed on Annex A to the Proposed Order that PPM will retain under the PPM Settlement.

14. The Debtors and PPM continued intermittent settlement discussions both prepetition and postpetition.  The Parties' discussions in recent weeks ultimately led to agreement on the Term Sheet.

**III.     The PPM Settlement**

15. After extensive and good faith negotiations, the Debtors and PPM have reached a global settlement (the "**PPM Settlement**"), memorialized in the Term Sheet and set forth in the Proposed Order, resolving all issues and amounts owed between the Debtors and PPM. For the avoidance of doubt, pursuant to the PPM Settlement, PPM agrees to release any and all liens and claims against the Debtors, including, without limitation, for any and all obligations, liabilities, duties and damages of the Debtors, whether or not expressly memorialized in the PPM Settlement.

16. The principal terms of the PPM Settlement are as follows:

- PPM shall have a single, allowed claim in the aggregate amount of $20,800,674[4] against the Debtors (the "**PPM Claim**"). The PPM Claim shall be deemed paid in full upon entry of the Proposed Order. All of the Debtors' interest, if any, in the equipment described in Annex A to the Proposed Order shall be transferred to PPM on a "free and clear" basis pursuant to section 363(f) of the Bankruptcy Code and, with respect to the portion of such equipment which is noted on Annex A to the Proposed Order as having been installed or staged on site at the Debtors' Cottonwood site or the Debtors' Cedarvale site, PPM shall have the right, at PPM's sole cost and expense, to retrieve the such equipment.

- The Debtors will assume the EMCSA, which shall be amended and restated to:

    o Extend the term through the earlier of March 2025 or the date on which Core or its affiliates no longer owns each Facility (the "**Initial Term**")[5];

    o Provide that the Debtors will pay to PPM a monthly volumetric fee (the "**Fee**") ███████████████████████████████████ for the lifetime of any new electricity supply agreement with a REP that the Debtors enter into during the Initial Term, regardless of whether the Debtors or PPM negotiate that REP agreement; and

    o PPM shall have the sole and exclusive right to provide the Services (defined in the EMCSA, as amended and restated) to the Debtors; provided that, notwithstanding anything to contrary in the EMCSA, as amended and restated, with respect to the Facilities, (a) the Debtors shall have the right to seek, solicit, or accept any offers for or contract with any third party for the provision of the Services (other than the portion of the Services listed under Section 4 (Procurement) on Attachment A to the EMCSA, as amended and restated), (b) the Debtors shall have the right directly or indirectly to perform the Services for itself by contracting with a REP, or wholesale energy supplier as may be applicable, for the Facilities and (c) the Debtors shall not hire another third party broker to act as an intermediary between the Debtors and a REP or other wholesale energy provider.

- The Debtors and PPM will enter into the "**EAMSA**" and "**EMSA**" (together, the "**New Agreements**"), each through the earlier of March 2025 or the sale of each Facility.

---

[4] This represents the total amount in the amended mechanics lien filed with the court under Docket Nos. 412 and 413.

[5] In the event that Core sells only one of the Facilities, the EMCSA (as amended and restated) will terminate as to the Facility that Core sold, but will remain in place for the Facility that Core retains until the earlier of March 2025 or the date on which Core sells that facility.

- o  Pursuant to the EAMSA, the Debtors will pay PPM a monthly fee to manage assets at the Facilities.

- o  Pursuant to the EMSA, PPM will act as a Level 4 Qualified Scheduling Entity ("**QSE**") and manage the Debtors' participation in demand side management programs with respect to the Facilities that generate revenue for the Debtors. Of the revenue generated, PPM will be entitled to retain 8% for its services.

- The ESA shall be deemed to terminate upon satisfaction of the conditions contained in the order approving this Motion.

- PPM will be entitled to retain all of the Retained DR Revenues. In addition to PPM retaining the Retained DR Revenues, the Debtors will reimburse PPM for legal fees and out-of-pocket expenses up to $85,000.

- PPM will provide information to the Debtors during the pendency of the chapter 11 cases to assist with the marketing and/or sale of the Cedarvale Facility and the Cottonwood Facility.

- The Debtors will introduce PPM to any acquirer of the Cottonwood Facility and/or Cedarvale Facility so PPM may discuss with such acquirer the possibility of entering into an (i) exclusive energy management and consulting services agreement with PPM and (ii) an exclusive energy management services agreement with PPM.

- Mutual release of all claims and causes of action as of the entry of the Proposed Order, as set forth in the Proposed Order.

**Relief Requested Should Be Granted**

I. **The PPM Settlement Is Fair, Reasonable, and in the Best Interest of the Debtors' Estates**

17. Bankruptcy Rule 9019(a) provides that "[o]n motion by the [debtors in possession] and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). Further, pursuant to Bankruptcy Rule 9019(a), a bankruptcy court may approve a compromise or settlement so long as the proposed settlement is fair, reasonable, and in the best interests of the estate. *See Off. Comm. of Unsecured Creditors v. Moeller (In re Age Refin.,Inc.)*, 801 F.3d 530, 540 (5th Cir. 2015). Ultimately, approval of a compromise is within the discretion of the bankruptcy court. *See United States v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984); *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599,

8

602 (5th Cir. 1980) (citations omitted) (decided under the Bankruptcy Act). Settlements are considered a "normal part of the process of reorganization" and a "desirable and wise method[] of bringing to a close proceedings otherwise lengthy, complicated, and costly." *Rivercity*, 624 F.2d at 602–03 (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424–25 (1968)).

18. The Fifth Circuit has established a three-factor balancing test under which bankruptcy courts analyze proposed settlements. *Id.* The factors courts consider are: "(1) the probability of success in litigating the claim subject to settlement, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay; and (3) all other factors bearing on the wisdom of the compromise." *See Age Refin.*, 801 F.3d at 540 (internal citations omitted).

19. Under the rubric of the third factor, the Fifth Circuit has specified two additional factors that bear on a decision to approve a proposed settlement. First, the Court should consider "the paramount interest of creditors with proper deference to their reasonable views." *Id.*; *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995). Second, the Court should consider the "extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Age Refin.*, 801 F.3d at 540; *Foster Mortg.*, 68 F.3d at 918 (citations omitted).

20. Generally, the role of the bankruptcy court is not to decide the issues in dispute when evaluating a settlement. *Watts v. Williams*, 154 B.R. 56, 59 (S.D. Tex. 1993). Rather, the court should determine whether the settlement as a whole is fair and equitable. *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).

21. The Debtors bear the burden of establishing that the balance of the above factors leads to a fair and equitable compromise vis-à-vis the PPM Settlement. *In re Allied*

9

*Properties, LLC*, 2007 WL 1849017, at *4 (Bankr. S.D. Tex. June 25, 2007) (citing *In re Lawrence & Erausquin, Inc.*, 124 B.R. 37, 38 (Bankr. N.D. Ohio 1990)); *see also In re GHR Companies, Inc.*, 50 B.R. 925, 931 (Bankr. D. Mass. 1985). "The burden is not high"; rather, the Debtors "***need only show that [their] decision falls within the 'range of reasonable litigation alternatives.'***" *In re Allied Properties, LLC*, 2007 WL 1849017, at *4 (emphasis added) (citing *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983)); *see also Cook v. Waldron*, 2006 WL 1007489 at *4 (S.D. Tex. Apr. 18, 2006).

22. Here, weighing the foregoing factors demonstrates that the PPM Settlement is reasonable and supports finding that the Debtors' entry into and performance under the PPM Settlement is in the best interest of creditors and other stakeholders.

23. First, the likelihood of success of litigating the Debtor Claims is uncertain. What is not uncertain, however, is that the litigation would likely require the expenditure of significant funds and cause substantial, detrimental impact to the Debtors. The complexity of the ongoing disputes among the Settling Parties is substantially greater than in commonplace litigation because of the Parties' intertwined relationship. Further, in the absence of settlement, litigation of the Debtors' Claims, the PPM Claim, and the PPM Liens will potentially take years to reach a final resolution. Such delay may subject the Debtors to the economic overhang of these disputes and hamper pursuit of strategic business opportunities (such as pursuing the sale of the Facilities free and clear of the PPM Liens) and generate significant legal expenses. Such negative impact would be felt even if the Debtors were successful in the litigation. Having the benefit of certainty and prior agreement between the Debtors and PPM is preferable to what could otherwise be costly, time-consuming and distracting litigation that would harm the Debtors' estates.

24. Second, the Settlement Agreement is also the product of good-faith, arm's-length bargaining between the Debtors and PPM, each of which were represented by counsel, and

no party has asserted that the PPM Settlement was the product of fraud or collusion. Further, prior to filing the Motion, the Debtors previewed the PPM Settlement with counsel to the Creditors' Committee, counsel to the ad hoc group of the Debtors' convertible noteholders, and counsel to the Debtors' debtor-in-possession financing lender.

25. Third, the PPM Settlement is reasonable and is in the best interests of the Debtors' estates. First, pursuant to the PPM Settlement, the Debtors will satisfy the PPM Claim, a large secured claim against the Debtors' estates, without making any cash payments on account of such claim. Instead, the Debtors will largely satisfy the PPM Claim with equipment, much of which is surplus equipment from the prior build-out of the Facilities, which the Debtors no longer need or utilize. Second, the PPM Settlement provides the Debtors with the ability to negotiate a contract directly with a REP, which the Debtors believe provides them with valuable optionality. Third, the Agreement will stabilize the relationship between the Debtors and PPM while the Debtors operate the Facilities, while enabling the Debtors to sever the relationship with PPM in the event that the Facilities are sold. The Debtors are hopeful that a stable relationship with PPM will result in an increase in power capacity at the Facilities in the long run, which, in turn, will enhance the value of the Facilities.

26. Accordingly, the Debtors respectfully submit that the PPM Settlement should be approved based upon the factors considered by courts in the Fifth Circuit.

**II.     The Debtors Assumption of the EMCSA, as Amended and Restated, Pursuant to the PPM Settlement, Is a Reasonable Exercise of Debtors' Sound Business Judgment and in the Best Interests of Estates**

27. The Court should authorize the Debtors to assume the EMCSA, as amended and restated, pursuant to section 365 of the Bankruptcy Code. Pursuant to section 365(a), a debtor in possession, "subject to the court's approval, may assume or reject any . . . executory contract or unexpired lease of the debtor." Although the Bankruptcy Code does not define the term "executory

contract," the Supreme Court has noted that an executory contract is "a contract where neither party has finished performing." *In re Avianca Holdings S.A.*, 618 B.R. 684, 695 (Bankr. S.D.N.Y. 2020) (citing *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1657 (2019)); *Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir. 1996) ("Although the Bankruptcy Code does not define 'executory contract,' generally an agreement is considered executory 'if at the time of the bankruptcy filing, the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the performance of the other party.'") (quoting *In re Murexco Petorleum, Inc.*, 15 F. 3d 60, 62 (5th Cir. 1994))). This allows the debtor in possession to maximize the value of its estate by assuming executory contracts or unexpired leases that benefit the estate and by rejecting those that do not. *In re Nat'l Gypsum Co.*, 208 F.3d 498, 504–05 (5th Cir. 2000).

28. Additionally, section 365(b)(1) of the Bankruptcy Code establishes certain conditions that must be satisfied before the assumption of an executory contract:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . .
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

29. Once the statutory predicates to assumption are satisfied, courts apply the "business judgment" standard to determine whether to authorize the rejection of an executory contract. *See Matter of J.C. Penney Direct Marketing Servs., LLC*, 50 F.4th 532, 534 (5th Cir. 2022) ("A bankruptcy court reviews a debtor's decision to . . . reject an executory contract under

the deferential 'business judgment' standard.") (citing *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, —U.S.—, 139 S. Ct. 1652, 1658 (2019)); *see also In re Pilgrim's Pride Corp.*, 403 B.R. 413, 422 (Bankr. N.D. Tex. 2009) ("The general rule is that the decision to reject a given contract should be left to the trustee's (or debtor in possession's) sound business judgment.").

30. The "business judgment" standard requires only a showing that either assumption or rejection of the executory contract or unexpired lease will benefit the debtor's estate. *See In re Idearc Inc.*, 423 B.R. 138, 162 (Bankr. N.D. Tex. 2009) (stating that the business judgment standard only "requires a showing that the proposed course of action will be advantageous to the estate." (citation omitted)). In applying the business judgment standard, bankruptcy courts give deference to a debtor's decision to assume or reject executory contracts. *See, e.g.*, *In re Pisces Energy, LLC*, Case No. 09-36591-H5-11, 2009 WL 7227880, at *6 (Bankr. S.D. Tex. Dec. 21, 2009) ("Courts apply the 'business judgment test,' which requires a showing that the proposed course of action will be advantageous to the estate and the decision be based on sound business judgment."). Further, under the business judgment standard, "[a] debtor's decision to reject an executory contract must be summarily affirmed unless it is the product of 'bad faith, or whim or caprice.'" *In re Pilgrim's Pride Corp.*, 403 B.R. at 422 (citing *Wheeling–Pittsburgh Steel Corp. v. W. Penn Power Co.* (*In re Wheeling–Pittsburgh Steel Corp.*), 72 B.R. 845, 849–50 (Bankr. W.D. Pa. 1987)).

31. Here, all statutory predicates to assumption under section 365 are satisfied. First, the EMCSA is an "executory contract" within the meaning of section 365 of the Bankruptcy Code because all parties involved have material ongoing obligations under the EMCSA as of the Petition Date. Specifically, PPM is required to continue providing the EMCSA Services on an ongoing basis, and the Debtors are required to compensate PPM for the EMCSA Services. Second, through the PPM Settlement, cure costs, to the extent there are any, are fully released and

13

discharged. Third, the Debtors have also provided adequate assurance of future performance as they project having sufficient liquidity to satisfy their postpetition operating expenses as set forth in the Debtors' most recent budget for their debtor-in-possession financing.

32. Additionally, the assumption of the EMCSA, as amended and restated, is a proper exercise of the Debtors' business judgment. The Debtors still use PPM for a variety of energy management and consulting services at the Facilities. PPM can also still negotiate electricity supply contracts with a REP on the Debtors' behalf. The amendments to the EMCSA, however, enable the Debtors to negotiate with a REP directly if they so choose, giving the Debtors additional flexibility to procure power on the most favorable terms possible. As discussed above, the amendments to the EMCSA also enable the Debtors to stabilize the relationship with PPM while the Debtors operate the Facilities, but sever the relationship with PPM if the Facilities are sold.

33. For the foregoing reasons, the Court should authorize the Debtors to assume the EMCSA, as amended and restated.

### III. The Debtors' Entry into the New Agreements Is a Reasonable Exercise of Debtors' Sound Business Judgment

34. Section 363(b)(1) of the Bankruptcy Code authorizes a debtor in possession to "use, sell, or lease, other than in the ordinary course of business, property of the estate," after notice and a hearing. It is well-established in this jurisdiction that a debtor may use property of the estate outside the ordinary course of business under this provision if there is a good business reason for doing so. *See, e.g.*, *ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors, and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (quoting *In re Cont'l Air Lines, Inc.*, 780 F.3d 1223, 1226 (5th Cir. 1986)); *GBL Holding Co., Inc. v.*

*Blackburn/Travis/Cole, Ltd. (In re State Park Bldg. Grp., Ltd.)*, 331 B.R. 251, 254 (Bankr. N.D. Tex. 2005); *In re Filene's Basement, LLC*, No. 11-13511 (KJC) (Bankr. D. Del. Apr. 29, 2014) (stating that, under the business judgment standard, once the debtor presents "a reasonable basis for is business decisions … courts will generally not entertain objections to the debtor's conduct").

35. Here, the Debtors' entry into the New Agreements represents a valid exercise of the Debtors' business judgment and should be approved. The Debtors still require the services to be provided by PPM under the New Agreements. With respect to the EAMSA, PPM, with its prior knowledge of the Facilities, is best positioned to provide these asset-management services and the Debtors believe that the terms of the New Agreements are reasonable. Moreover, the Debtors believe that options for alternative service providers in West Texas are limited.

36. Accordingly, the Debtors submit that entry into the New Agreements is a reasonable exercise of the Debtors' business judgment and should be approved.

**Emergency Consideration**

37. The Debtors request emergency consideration of this Motion pursuant to Bankruptcy Rule 9013, Bankruptcy Local Rule 9013-1(i), and paragraph G17 of this Court's Procedures for Complex Cases in the Southern District of Texas. PPM has represented to the Debtors that, as an operating business seeking to maximize the value of the assets that are the subject of the PPM Settlement, it believes that the value of the assets may deteriorate if relief is not granted on or prior to March 20, 2023. Specifically, PPM has represented to the Debtors that it has an urgent business need to take possession of the assets and deploy them elsewhere in its business and that its ability to use the assets may be substantially diminished in the event of any delay, which could result in PPM being forced to hold the assets in inventory for an indefinite period of time and incur costs associated therewith. As a result, PPM has informed the Debtors that it would not be willing to enter into the PPM Settlement on these terms after March 20, 2023.

Accordingly, the Debtors believe that emergency consideration of this Motion is appropriate and request that the Court approve the relief requested in this Motion on an emergency basis.

## Reservation of Rights

38. Except to the extent that this Motion is granted, nothing contained in this Motion or any actions taken by the Debtors pursuant to the relief granted is intended or should be construed as: (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law, (iii) a waiver or limitation of the Debtors' right to assert, at a later date, that the Priority Power Contracts are not executory contracts, or (iv) a concession or evidence that the Priority Power Contracts have not expired, been terminated, or are otherwise currently not in full force and effect.

## Request for Bankruptcy Rule 6004 Waivers

39. The Debtors request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h). As explained above, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors. Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such stay applies.

## No Previous Request

40. No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: March 9, 2023
      Houston, Texas

Respectfully submitted,

 /s/ Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Email: Alfredo.Perez@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock (admitted *pro hac vice*)
Ronit J. Berkovich (admitted *pro hac vice*)
Moshe A. Fink (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Email:  Ray.Schrock@weil.com
         Ronit.Berkovich@weil.com
         Moshe.Fink@weil.com

*Attorneys for Debtors
and Debtors in Possession*

**Certificate of Service**

I hereby certify that on March 9, 2023, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

                                                                                               /s/ *Alfredo R. Pérez*
                                                                                                Alfredo R. Pérez