IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| CORE SCIENTIFIC, INC., *et al.,* | § § § | Case No. 22-90341 (DRJ) |
| Debtors.[1] | § § § § | (Jointly Administered) (Emergency Hearing Requested) |

**DECLARATION OF MICHAEL BROS IN SUPPORT OF
DEBTORS' EMERGENCY MOTION FOR ORDER APPROVING
(I) GLOBAL SETTLEMENT BETWEEN DEBTORS AND PRIORITY POWER
MANAGEMENT, LLC, (II) ASSUMPTION OF THE EMCSA, (III) ENTRY
INTO THE NEW AGREEMENTS AND (IV) GRANTING RELATED RELIEF**

I, Michael Bros, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1. I am the Senior Vice President of Capital Markets & Acquisitions at Core Scientific, Inc. ("**Core**", and together with its subsidiaries and affiliates, the "**Company**"). I have served in this capacity since January 2022. Before that, starting in December 2018, I was the Debtors' Vice President of Corporate Development. Prior to joining the Company, I held various positions at Kayne Anderson from 2014 to 2018 and Merrill Lynch from 2011 to 2014. I hold a Bachelor's of Arts from the University of Saint Thomas and a Master's in Business Administration from the University of California, Los Angeles Anderson School of Management.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6074); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

2. I make this declaration in support of the *Emergency Motion of Debtors for Order Approving (I) Global Settlement Between Debtors and Priority Power Management, LLC, (II) Assumption of the EMCSA, (III) Entry into the New Agreements and (IV) Granting Related Relief* (Dkt. No. 655) (the "**PPM Settlement Motion**").[2] Except as otherwise indicated herein, all facts set forth in this declaration are based on my experience and personal knowledge of the Debtors' operations and finances and information learned during the course of my employment. I have also reviewed relevant documents and have received information from conversations with the Debtors' management team, the Debtors' advisors, or employees of the Debtors working directly with me or under my supervision, direction, or control.

3. I am familiar with PPM (defined below) and believe that the contemplated settlement agreement between the Debtors (as defined below) and PPM is in the Debtors' best interest.

### The Debtors' Relationship With PPM

4. Core and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**") are one of the largest blockchain infrastructure, hosting provider, and digital asset mining companies in North America, with fully operational data centers in Texas, Kentucky, North Carolina, North Dakota, and Georgia. The Debtors provide hosting solutions for third parties and also operate their own digital asset mining machines.

5. Priority Power Management, LLC ("**PPM**") is an energy management services procurement and infrastructure development firm that provides third parties with consulting and energy procurement services. PPM has extensive experience in the Texas power

---

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the PPM Settlement Motion.

2

industry, providing various energy services to large-volume power users in the Texas market for over two decades.

6.  The Debtors operate two data-center facilities in West Texas, one in Barstow, Texas (the "**Cottonwood Facility**") and one in Pecos, Texas (the "**Cedarvale Facility**" and, together with the Cottonwood Facility, the "**Facilities**"). Since 2021, Core has contracted with PPM to perform various consulting, energy management, and energy infrastructure development services in connection with power at the Facilities, including the build out and construction of certain electrical infrastructure at the Facilities and the procurement of electricity from a retail electric provider ("**REP**") to provide power to the Facilities.

7.  Prior to the Petition Date, Core and PPM entered into the Energy Management and Consulting Services Agreement, June 29, 2021 (the "**EMCSA**" or the "**Power Procurement Agreement**"), pursuant to which PPM is engaged as the Company's exclusive energy manager and consultant. Under the Power Procurement Agreement, PPM is responsible for a variety of energy management and consulting services, including serving as Core's exclusive negotiator of electricity supply contracts with a REP in exchange for a variable monthly management fee based on Core's electricity usage at the Facilities.[3]

8.  Core and PPM also executed the Energy Services Agreement, August 6, 2021, amended August 24, 2021 (the "**ESA**" or the "**Construction Agreement**"), under which PPM provided engineering, procurement, and construction services to develop the electrical infrastructure at the Facilities.

9.  Core and PPM also negotiated two other agreements, which were unexecuted prior to the Petition Date.

---

[3] Although PPM negotiates the material terms of Core's electricity contracts for the Facilities, the Debtors contract directly with REPs for the delivery of such PPM-brokered electricity.

3

10.     First, Core and PPM negotiated an Electric Asset Management Services Agreement, (the "**EAMSA**" or the "**Asset Management Agreement**"), which would provide: (a) that PPM would manage certain assets at the Facilities in exchange for a monthly asset management services fee; and (b) Core would agree to reimburse PPM for materials or services related to maintenance and repairs required to manage the relevant assets.

11.     Second, Core and PPM negotiated an Energy Management Services Agreement, (the "**EMSA**" or the "**Curtailment Agreement**"), which would provide for PPM's participation in demand side management programs for Core as their qualified scheduling entity ("**QSE**") in exchange for a certain percent of the revenue from those programs.  Although the Curtailment Agreement was never executed, PPM has been participating in demand side management programs on behalf of Core largely consistent with the draft Curtailment Agreement. PPM has retained approximately $514,000 in revenue generated from those programs that I believe belongs to Core (the "**Retained DR Revenues**").[4]

12.     In approximately May 2022, after it became clear that the Facilities would not receive the anticipated power load, Core stopped making payments for various services and goods provided by PPM to Core under the Construction Agreement.  Thereafter, PPM and the Debtors began engaging in discussions related to the failure to receive the anticipated power load and such nonpayment.

13.     As discussions continued, in connection with services previously provided at the Facilities, including, without limitation, the construction thereof pursuant to the Construction Agreement, PPM asserted, and/or may assert, mechanics' liens against Core relating to work performed at the Facilities and goods, labor and materials supplied to, for or in connection with

---

[4] The Retained DR Revenues reflect proceeds retained by PPM prior to the Petition Date exclusively on account of prepetition transactions.  The Debtors have not accrued and PPM has not retained any amount postpetition.

4

Core or the Facilities (collectively, as may be amended, restated, supplemented, superseded or otherwise modified, the "**PPM Liens**"), which PPM Liens are evidenced by, among other things, that certain *Notice of Perfection of Mechanic's Lien of Priority Power Management, LLC* (Docket No. 412) and that certain *Notice of Perfection of Mechanic's Lien of Priority Power Management, LLC* (Docket No. 413).

14. Additionally, the Debtors have potential claims and causes of action against PPM arising from, among other things, Core's contention that PPM represented that Core could anticipate receiving 1,000MW across the Facilities on a short ramp-up schedule. Given that the anticipated power was ultimately not allocated to the Facilities as anticipated, Core suffered significant losses and could assert claims against PPM for damages arising from, among other things, the inability to energize the Facilities to the represented power load (the "**Debtors' Claims**").

## The PPM Settlement

15. After extensive and good faith negotiations, both prepetition and postpetition, the Debtors and PPM have reached a global settlement (the "**PPM Settlement**") resolving all issues and amounts owed between the Debtors and PPM. The principal terms of the PPM Settlement are as follows:

- PPM shall have a single, allowed claim in the aggregate amount of $20,800,674[5] against the Debtors (the "**PPM Claim**"). The PPM Claim shall be deemed paid in full upon entry of the Proposed Order. All of the Debtors' interest, if any, in the equipment described in Annex A to the Proposed Order[6] shall be transferred to PPM on a "free and clear" basis pursuant to section 363(f) of the Bankruptcy Code and, with respect to the portion of such equipment which is noted on Annex A to the Proposed Order as having been installed or staged on site at the Debtors' Cottonwood site or the Debtors' Cedarvale site, PPM shall have the right, at PPM's sole cost and expense, to retrieve the such equipment.

---

[5] This represents the total amount in the amended mechanics lien filed with the court under Docket Nos. 412 and 413.

[6] Attached hereto as Exhibit 1.

5

- The Debtors will assume the Power Procurement Agreement, which shall be amended and restated to:

    - Extend the term through the earlier of March 2025 or the date on which Core or its affiliates no longer owns each Facility (the "**Initial Term**")[7];

    - Provide that Debtors will pay PPM a monthly volumetric fee (the "**Fee**")—as set forth in the Power Procurement Agreement—for the lifetime of any new electricity supply agreement with a REP that the Debtors enter into during the Initial Term, regardless of whether the Debtors or PPM negotiate that REP agreement; and

    - Provide that PPM shall have the sole and exclusive right to provide the Services (defined in the Power Procurement Agreement, as amended and restated) to the Debtors; provided that, notwithstanding anything to contrary in the Power Procurement Agreement, as amended and restated, with respect to the Facilities, (a) the Debtors shall have the right to seek, solicit, or accept any offers for or contract with any third party for the provision of the Services (other than the portion of the Services listed under Section 4 (Procurement) on Attachment A to the Power Procurement Agreement, as amended and restated), (b) the Debtors shall have the right directly or indirectly to perform the Services for itself by contracting with a REP, or wholesale energy supplier as may be applicable, for the Facilities and (c) the Debtors shall not hire another third party broker to act as an intermediary between the Debtors and a REP or other wholesale energy provider.

- The Debtors and PPM will enter into the Asset Management Agreement and "Curtailment Agreement" (together, the "**New Agreements**"), each through the earlier of March 2025 or the sale of each Facility.

    - Pursuant to the Asset Management Agreement, the Debtors will pay PPM a monthly fee to manage assets at the Facilities.

    - Pursuant to the Curtailment Agreement, PPM will act as a Level 4 Qualified Scheduling Entity ("**QSE**") and manage the Debtors' participation in demand side management programs with respect to the Facilities that generate revenue for the Debtors. Of the revenue generated, PPM will be entitled to retain 8% for its services.

- The Construction Agreement shall be deemed to terminate upon satisfaction of the conditions contained in the order approving this Motion.

---

[7] In the event that Core sells only one of the Facilities, the Power Procurement Agreement (as amended and restated) will terminate as to the Facility that Core sold, but will remain in place for the Facility that Core retains until the earlier of March 2025 or the date on which Core sells that facility.

- PPM will be entitled to retain all of the Retained DR Revenues. In addition to PPM retaining the Retained DR Revenues, the Debtors will reimburse PPM for legal fees and out-of-pocket expenses up to $85,000.

- PPM will provide information to the Debtors during the pendency of the chapter 11 cases to assist with the marketing and/or sale of the Cedarvale Facility and the Cottonwood Facility.

- The Debtors will introduce PPM to any acquirer of the Cottonwood Facility and/or Cedarvale Facility so PPM may discuss with such acquirer the possibility of entering into an (i) exclusive energy management and consulting services agreement with PPM and (ii) an exclusive energy management services agreement with PPM.

- Mutual release of all claims and causes of action as of the entry of the Proposed Order, as set forth in the Proposed Order.

16. It is my belief that the foregoing factors demonstrate that the PPM Settlement is reasonable and supports finding that the Debtors' entry into and performance under the PPM Settlement is in the best interest of creditors and other stakeholders.

17. First, it is my understanding that litigating the Debtors' Claims would likely require the expenditure of significant funds and cause substantial, detrimental impact to the Debtors. Further, in the absence of settlement, litigation of the Debtors' Claims, the PPM Claim, and the PPM Liens will potentially take years to reach a final resolution. Such delay may subject the Debtors to the economic overhang of these disputes and hamper pursuit of strategic business opportunities (such as pursuing the sale of the Facilities free and clear of the PPM Liens) and generate significant legal expenses. Such negative impact would be felt even if the Debtors were successful in the litigation. Having the benefit of certainty and prior agreement between the Debtors and PPM is preferable to what could otherwise be costly, time-consuming and distracting litigation that I believe would harm the Debtors' estates.

18. Second, the PPM Settlement is also the product of good-faith, arm's-length bargaining between the Debtors and PPM, each of which were represented by counsel, and no party has asserted that the PPM Settlement was the product of fraud or collusion.

19. Third, I believe the PPM Settlement is reasonable and in the best interests of the Debtors' estates. First, pursuant to the PPM Settlement, the Debtors will satisfy the PPM Claim, a large secured claim against the Debtors' estates, without making any cash payments on account of such claim. Instead, the Debtors will largely satisfy the PPM Claim with equipment, much of which is surplus equipment from the prior build-out of the Facilities, which the Debtors no longer need or utilize. Second, the PPM Settlement provides the Debtors with the ability to negotiate a contract directly with a REP, which I believe provides the Debtors with valuable optionality. Third, the PPM Settlement will stabilize the relationship between the Debtors and PPM while the Debtors operate the Facilities, while enabling the Debtors to sever the relationship with PPM in the event that the Facilities are sold. I believe that a stable relationship between the Debtors and PPM will result in an increase in power capacity at the Facilities in the long run, which, in turn, will enhance the value of the Facilities.

20. Additionally, I believe that the Debtors' assumption of the Power Procurement Agreement, as amended and restated, is in the best interests of the Debtors' estates. The Debtors still use PPM for a variety of energy management and consulting services at the Facilities. PPM can also still negotiate electricity supply contracts with a REP on the Debtors' behalf. The amendments to the Power Procurement Agreement, however, enable Core to negotiate with a REP directly if they so choose, affording additional flexibility to procure power on the most favorable terms possible. As discussed above, the amendments to the Power Procurement Agreement also enable Core to stabilize its relationship with PPM while the Debtors continue to operate the Facilities, but sever the relationship with PPM if the Facilities are sold.

21. I also believe that, entering into the New Agreements is in the best interests of the Debtors' estates and should be approved. Core still requires the services to be provided by PPM under the New Agreements. With respect to the Asset Management Agreement, PPM, with

its prior knowledge of the Facilities, is best positioned to provide these asset-management services and I believe that the terms of the New Agreements are reasonable. I believe that options for Core to obtain alternative service providers in West Texas are limited.

22. PPM has represented to the Debtors that, as an operating business seeking to maximize the value of the assets that are the subject of the PPM Settlement, PPM believes that the value of the assets may deteriorate if relief is not granted on or prior to March 20, 2023. Specifically, PPM has represented to the Debtors that it has an urgent business need to take possession of the assets and deploy them elsewhere in its business and that its ability to use the assets may be substantially diminished in the event of any delay, which could result in PPM being forced to hold the assets in inventory for an indefinite period of time and incur costs associated therewith. As a result, PPM has informed the Debtors that it would not be willing to enter into the PPM Settlement on these terms after March 20, 2023.

23. For the foregoing reasons, I believe that, no later than March 20, 2023, the Court should (i) approve the PPM Settlement, (ii) authorize the Debtors to assume the Power Procurement Agreement, as amended and restated, and (iii) approve the Debtors' entry into the New Agreements.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: March 19, 2023
Mercer Island, Washington

Respectfully submitted,

By: _____
Michael Bros
Senior Vice President of Capital Markets & Acquisitions