UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

```
IN RE:                         .  CASE NO. 22-BK-90341
                               .
  CORE SCIENTIFIC, INC.        .  HOUSTON, TEXAS
                               .  MONDAY, MARCH 20, 2023
                DEBTOR.        .  01:11 P.M. TO 01:43 P.M.
                               .
. . . . . . . . . . . . . . . .
```

MOTION HEARING

(SOME PARTIES APPEARING TELEPHONICALLY)

BEFORE THE HONORABLE DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:                        SEE NEXT PAGE

ELECTRONIC RECORDING OPERATOR:      BRANDIS ISOM

CASE MANAGER:                       ALBERT ALONZO




TRANSCRIPTION SERVICE BY:

**TRINITY TRANSCRIPTION SERVICES**
**1081 Main Street**
**Surgoinsville, TN 37873**
**281-782-0802**
trinitytranscripts@aol.com


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

**TRINITY TRANSCRIPTION SERVICES**

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | . | CASE NO. 22-BK-90341 |
| | . | |
| CORE SCIENTIFIC, INC. | . | HOUSTON, TEXAS |
| | . | MONDAY, MARCH 20, 2023 |
| DEBTOR. | . | 01:11 P.M. TO 01:43 P.M. |
| | . | |

. . . . . . . . . . . . . . . . . .

MOTION HEARING

(SOME PARTIES APPEARING TELEPHONICALLY)

BEFORE THE HONORABLE DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

For **DEBTORS:**                    **ALFRED R. PEREZ, ESQ.**
                                    **CHRISTINE CALABRESE, ESQ.**
                                    Weil Gotshal et al
                                    700 Louisiana, Suite 1700
                                    Houston, TX 77002

Declarant for the Debtor:          **MICHAEL BROS**

For **AD HOC GROUP OF SECURED**     **KRIS HANSEN, ESQ.**
  **CONVERTIBLE NOTEHOLDERS:**      Paul Hastings LLP
                                    600 Travis Street, 58th Floor
                                    Houston, TC 77002

For **PRIORITY POWER MANAGE-**      **SCOTT BOWLING, ESQ.**
  **MENT, LLC:**                    **DANNY DAVID, ESQ.**
                                    Baker Botts L.L.P.
                                    2001 Ross Avenue, Suite 900
                                    Dallas, TX 75201

Transcriber:                       Cheryl Battaglia
                                    Trinity Transcription Services
                                    1081 Main Street
                                    Surgoinsville, TN 37873
                                    281-782-0802

1      **Houston, Texas; Monday, March 20, 2023; 01:11 p.m.**

2          **(All Parties Appearing Telephonically)**

3          **THE COURT:**  Good afternoon, everyone.  This is Judge

4  Jones.  The time is 1:12 Central.  Today is March the 20th,

5  2023.  This is the docket for Houston, Texas.

6          Next on the 1 o'clock docket we have the jointly

7  administered cases under *Case Number 22-90341, Core Scientific,*

8  *Inc.*  Folks, please don't forget to record your electronic

9  appearance.  That's a quick trip to the website.  Couple of

10  mouse clicks.  You can do that at any time prior to the

11  conclusion of the hearing.

12          First time that you speak, if you would please state

13  your name and who you represent.  That really does give the

14  court reporters a good point of reference to do what is now a

15  very difficult job.  We are recording this afternoon using

16  Court Speak.  We'll have the audio up on the docket shortly

17  after the conclusion of the hearing this afternoon.

18          For folks in the courtroom, if you would make sure

19  you speak from the lectern, since that's the only place we have

20  a camera.  That way you can both be seen and be heard.

21          All right.  Mr. Perez?  Good afternoon.

22          **MR. PEREZ:**  Good afternoon, your Honor.  Alfredo

23  Perez on behalf of the Debtors.  Your Honor with me and who

24  will be presenting the motion is Miss Christine Calabrese.

25          And, your Honor, I think I'm happy to report that, as

1   a result of the good work done by all of the other people at

2   the firm, not me, that we were able to come to a form of order

3   that we have agreed -- that is agreed among the parties.  And

4   that is filed at Docket 702.  And it has two redlines, one from

5   what we filed originally about a week ago, and then an -- and

6   then one from what we filed last night.

7          **THE COURT:**  Right.

8          **MR. PEREZ:**  It think with that, your Honor,

9   and -- and -- and the goal of the language that was put in

10  there, I don't think anybody actually is complaining about the

11  deal.  The goal is to make sure we preserve everyone's rights.

12  And that's just been further refined.

13         One other thing, your Honor.  We are working on

14  a -- on a more detailed schedule of the actual equipment going

15  back.  And that's just going to take a little bit of time.  But

16  we will file that schedule with the Court at the appropriate

17  time.  It doesn't hold up anything.  But just so if anybody

18  wants to go back and look at it -- it eventually --

19         **THE COURT:**  That -- and -- and so that'll actually

20  delineate the equipment which has been delivered and is on

21  site, versus equipment that hasn't been delivered.

22         I -- cause I understand that makes a huge difference.

23         **MR. PEREZ:**  And -- and we have an idea.  And most of

24  it is that one picture that we showed you --

25         **THE COURT:**  Okay.

1          **MR. PEREZ:**  -- of -- of the transformer.

2     That's -- that's most of, you know, that's the biggest single

3     component.

4          But -- but we're just going to do that just so

5     there's no confusion.  It's not -- it's -- we don't want

6     to -- we don't want to hold up anything.  But it's just -- just

7     for good form.

8          **THE COURT:**  No. I got it.  And I looked at the

9     redline to the last redline.  I -- the approach just makes

10    sense to me.

11         I -- I agree with you.  I think everybody understands

12    it's a good deal all the way around.  And just everyone wants

13    to make sure that they aren't the one that's paying for it.

14    I -- I totally got that.  All right.

15         **MR. PEREZ:**  Thank you, your Honor.

16         **THE COURT:**  All right.  Miss Calabrese?

17      **(Pause in the proceeding.)**

18         **MS CALABRESE:**  Thank you.

19         **THE COURT:**  Thank you.  No pressure.  But I want your

20    A plus game today.

21         **MS CALABRESE:**  All right.  I will bring my A plus

22    game.

23         All right.  So thank you very much, your Honor.  We

24    have Michael Bros here.  He's joining remotely.  He's a

25    declarant for the Debtors on the 9019 factors.  His declaration

1    is docketed at 699-9.  And I'd like to move that declaration

2    into evidence if that so pleases the Court.

3            **THE COURT:**  All right.  Thank you.

4            Any objection not the admission of Mr. Bros'

5    declaration found pursuant to the protocol at Docket Number

6    699-9?

7        **(No response.)**

8            **THE COURT:**  All right.  And it's admitted.

9        **(Debtor's Exhibit Number 699-9 was received into**

10   **evidence.)**

11           **THE COURT:**  Anyone wish to cross examination

12   Mr. Bros?

13       **(No response.)**

14           **THE COURT:**  You sure you don't want to take a shot.

15       **(Laughter.)**

16           **THE COURT:**  All right.  Then Mr. Bros I excused as a

17   witness.

18           Thank you.  And I've read the declaration.

19           **MS CALABRESE:**  Thank you, your Honor.

20           We've also prepared a presentation for the Court.

21   It's brief.  And the purpose is to set the stage from a factual

22   perspective and also walk the Court through some of the key

23   terms from the settlement and the bases for approval.

24           **THE COURT:**  All right.

25           **MS. CALABRESE:**  The presentation is docketed at 699-

1    10.   I'd also like to move that demonstrative into evidence.

2          **THE COURT:**  All right.  Thank you.

3          Any objection for purposes of today only?

4       **(No response.)**

5          **THE COURT:**  All right.  Then it's admitted as a

6    demonstrative.

7       **(Debtors Demonstrative Exhibit Number 699-10 was received**

8    **into evidence.)**

9          **THE COURT:**  Are you going to walk me through it?

10         **MS CALABRESE:**  Yes.

11         So if you could give control to my colleague, Austin

12   Crabtree.

13      **(Pause in the proceeding.)**

14         **THE COURT:**  He has control.

15         **MS CALABRESE:**  Thank you, your Honor.

16         So if you could please pull up first page of the

17   document.

18      **(Pause in the proceeding.)**

19         **MS CALABRESE:**  Let's give him a minute.

20   Mr. Crabtree's also bringing his A plus game today --

21         **THE COURT:**  You got it.

22         **MS CALABRESE:**  -- on -- on the controls.

23         **MR. PEREZ:**  I think he's related to Mr. Carlson.

24      **(Laughter.)**

25         **MS CALABRESE:**  Okay.  Austin, next slide, please.

1          Okay.  So like I said, your Honor.  This is really

2   for purposes of table setting.  The two data center facilities

3   that are relevant here are the Cedarville and the Cottonwood

4   data center facilities.  We'll go through those briefly.  Talk

5   through the Debtor's relationship with PPM, disputes between

6   the Debtors and Priority Power, walk through the key terms of

7   the settlement, and then the bases for approval.

8          Okay.  Next slide, Austin.

9          So the Cottonwood and Cedarville facilities are in

10  west Texas.  This was Core's entry into the west Texas space.

11  You can see the Cottonwood facility on the map.  It's in

12  Barstowe (phonetic) and Cedarville is in Pecos, which I, you

13  know, googled.  And it looks like they're 26 miles apart.  So

14  pretty -- pretty nearby.

15         Next slide, please, Austin.

16         Okay.  So this is the Cottonwood data center

17  facility.  You can see that it's mostly a large -- large part

18  of land that's partially constructed.  So there are

19  some -- there's some infrastructure on that site.  And

20  construction has halted.

21         And as you, I'm sure, know from our motion, the

22  reason construction halted is that Core was anticipating a

23  larger amount of energy across the Cottonwood and Cedarville

24  facilities.  When Core realized those facilities would not

25  energize up to that amount, Core halted construction on the

1   facilities.

2          So Cottonwood is partially constructed.  And if we

3   look at the next slide, you'll see that Cedarville is a

4   similarly partially constructed facility that would be hosting

5   miners.

6          Currently the Cedarville facility is not operational.

7   It was anticipated to energize up to 720 megawatts.  But Core

8   is not currently operating that facility.

9          The Cottonwood facility is partially operational, but

10  significantly under-energized.  The Debtors were anticipating

11  300 megawatts for that facility.

12          **THE COURT:**  Okay.

13          **MS CALABRESE:**  Okay.  Next slide, please.

14          So in 2021, Core decided to enter the west Texas

15  space and wanted to build data center facilities in west Texas.

16  And that's when Core contracted with PPM.  Priority Power is an

17  energy management services procurement and infrastructure

18  development firm.  So here's we'll talk through a little bit

19  how -- what that means for the Debtors, that provides third-

20  parties like Core with consulting and energy procurement

21  services.

22          So here there are four agreements that are relevant

23  to the settlement; two executed and two agreements that were

24  unexecuted pre-petition.  But Priority Power has been -- has

25  been operating under it in any event.

1        So the first, your Honor, all of these agreements

2   have very similar names.  So we've given them some user-

3   friendly nicknames that I'm going to use for this presentation.

4   So the first agreement that was executed was the power

5   procurement agreement.  It was executed in June of 2021.

6        And under that agreement, Priority Power provides a

7   host of different consulting and power procurement services for

8   Core.  The most relevant of which, is negotiating Core's

9   electricity supply agreement with its retail electric provider.

10        Here Core's retail electric provider, or REP

11   (phonetic) with Shell.  So Priority Power, under this power

12   procurement agreement, has the exclusive right to negotiate

13   Core's REP agreement with Shell or any other REP.

14        Under this agreement, Priority Power is paid a

15   monthly fee based on kilowatt consumption.

16        **THE COURT:**  Okay.

17        **MS CALABRESE:**  The next relevant agreement was

18   executed in August of 2021.  We call it the construction

19   agreement.

20        Under this agreement, Priority Power agreed to build

21   out the electrical infrastructure at the Cedarville and

22   Cottonwood sites.  And under this agreement, Priority Power was

23   paid actual costs plus a certain percentage on top.

24      **(Pause in the proceeding.)**

25        **MS CALABRESE:**  There are also two draft agreements

**TRINITY TRANSCRIPTION SERVICES**

1    between Core and Priority Power that were in draft form as of

2    August, 2021, but were never executed.  Priority Power has

3    anyway been performing under them.  And the services under

4    these agreements are very help for -- for the Debtors.

5              THE COURT:  Okay.

6              MS. CALABRESE:  The first agreement is an asset

7    management agreement.  So as I understand it, sometimes at the

8    facilities, like a fuse will blow, or they'll be some sort of

9    maintenance that's required.  And Priority Power will perform

10   that maintenance, which is very helpful to Core because there's

11   not a lot of providers in the west Texas space.  And Priority

12   Power is familiar with the facilities as the company that

13   engineered them and built them out.

14             The other is a curtailment agreement.  This one's a

15   bit more complicated to explain.  But there's basically a day

16   ahead energy trading program.  And Priority Power, as Core's

17   qualified scheduling entity or QSE (phonetic), participates in

18   that program.  So if Core, for example, decides -- or the

19   Debtors decide to curtail or not use energy during a high use

20   period --

21             THE COURT:  Yeah.

22             MS. CALABRESE:  -- they'll get revenue back.  So it

23   incentivizes the reduction of using energy during really high

24   usage times.

25             So the revenue that's generated through that program,

1  of that revenue that's generated, Priority Power retains a

2  certain percentage and passes the remainder along to Core.

3      **(Pause in the proceeding.)**

4          **MS CALABRESE:**   So far Priority Power has been

5  performing under that agreement but has retained 514,000 or so

6  approximately of revenue that was generated under that program.

7          **THE COURT:**   And that -- that's Core's share?

8          **MS CALABRESE:**   That is -- Core's position is that

9  that's Core's share and that Priority Power should have passed

10  it along to Core.

11          **THE COURT:**   Got it.

12          **MS CALABRESE:**   In the motion we call that the

13  retained DR (phonetic) revenue.

14          Next slide, please, Austin.

15          Okay.  So I've already teed this up.  But there are

16  really two primary disputes between the Debtors and Priority

17  Power.  On the one hand, Core says that we have potential

18  claims and causes of action against Priority Power arising from

19  the anticipated amount of energy the Debtors were anticipating

20  at the Cedarville and Cottonwood facilities.  We have potential

21  claims and causes of action that we could pursue.

22          On the other hand, Priority Power has two

23  primary -- primary points.  The first is that they are entitled

24  to the retained DR revenues, that 514,000 under the curtailment

25  agreement.  And the other are certain mechanics liens relating

1    to the work performed at the Cedarville and Cottonwood

2    facilities, goods, labor, materials.  So they have an asserted

3    lien for approximately 20.8 million.  That's the landscape of

4    the dispute.

5            Austin, next slide, please?

6        **(Pause in the proceeding.)**

7            **MS CALABRESE:**  Okay.  So it's against the backdrop

8    that Core -- that the Debtors and PPM started negotiating and

9    ultimately executed a global settlement agreement before your

10   Honor today.

11           This agreement would resolve all issues, both between

12   the Debtors and Priority Power.  So it's structured as a walk

13   away to restructure a positive go-forward relationship between

14   the Debtors and Priority Power.

15       **(Pause in the proceeding.)**

16           **MS CALABRESE:**  So the principle terms of the PPM

17   settlement.

18           The first is that Priority Power would have a single

19   allowed claim for the approximately 20.8 million.  And that

20   would be deemed paid in full.

21           **THE COURT:**  And so when it's a single allowed claim,

22   what type of claim?

23       **(Pause in the proceeding.)**

24           **MS CALABRESE:**  It would be a complete claim that

25   would be extinguished by the transfer of assets to the party.

1   And my --

2           **THE COURT:**  Okay.  We're going to work our way

3   through this.  So --

4           **MS CALABRESE:**  Okay.

5           **THE COURT:**  -- what -- what kind of claims are there?

6           **MS CALABRESE:**  There are secured claims.

7           **THE COURT:**  Right.  And they're asserting an M and M

8   lien claim, aren't they?

9           **MS CALABRESE:**  Yeah.  So that would be a secured

10  claim.

11          **THE COURT:**  A secured claim.  Okay.  Got it.

12          So they're going to get a -- they're going to get an

13  allowed secured claim for 20.8 million, which is going to be

14  deemed paid in full by the transfer of all the Debtor's

15  interest in the equipment back, whatever that is.

16          **MS CALABRESE:**  Yes.

17          **THE COURT:**  Okay.

18          **MS CALABRESE:**  Any -- the Debtor's interest, to the

19  extent they have any, in the equipment as listed in

20  (indiscernible).

21          **THE COURT:**  Got it.

22          **MS CALABRESE:**  And that would be free and clear.

23      **(Pause in the proceeding.)**

24          **THE COURT:**  And how are you going to meet 363(f)

25  requirement?

1          **MS CALABRESE:**  So, your Honor, first my understanding

2   is that because of the proposed order that we submitted today

3   that Mr. Perez mentioned at the outset, my understanding is

4   that we actually don't have any -- that we -- that we do have

5   the consent we need to move forward with -- with this deal.

6          **THE COURT:**  Cause that's one of the requirements.

7          **MS CALABRESE:**  Yes.

8          **THE COURT:**  Or one of the options, right?

9          **MS CALABRESE:**  So, our -- our best option for meeting

10  363(f) would be consent.  And I believe we have it.

11         **THE COURT:**  Always.  What was going to be your Plan

12  B?

13         **MS CALABRESE:**  Plan B would be 363(f)(3), your Honor.

14         So, that would be a little bit of a trickier

15  question.  But we could discuss in more detail the value of the

16  assets and whether we could satisfy 363(f)(3).

17         **THE COURT:**  Did you have a Plan C?

18         **MS CALABRESE:**  Mr. Perez might have a Plan C, your

19  Honor.

20      **(Laughter.)**

21         **MS CALABRESE:**  But I just have Plan A and B.

22         **THE COURT:**  That's a nice pivot.  All right.  Go

23  ahead.

24      **(Pause in the proceeding.)**

25         **MS CALABRESE:**  Okay.  So in addition to that transfer

1  and extinguishing of the 20.8 million, the Debtors would assume

2  the power procurement agreement with some terms amended.

3            **THE COURT:**  And the parties have agreed to the

4  language?

5            **MS CALABRESE:**  Yes.

6            **THE COURT:**  Okay.

7            **MS CALABRESE:**  The parties have agreed to the

8  language on the amendment.  The most important of which is that

9  the Debtors will have the optionality to negotiate a tolling

10 REP agreement.

11           **THE COURT:**  Okay.

12           **MS CALABRESE:**  We would also enter into those two

13 other agreements I mentioned, the asset management and

14 curtailment agreements.  So those would be executed.  The

15 purpose there is just to really give some clarity and execute

16 agreement that Priority Power has been performing under a PPM.

17           **THE COURT:**  Yeah.  And so you're going to let them

18 keep what's been generated to date.  And then going forward,

19 there's -- the split will then occur per the terms of the

20 agreement?

21           **MS CALABRESE:**  That's right, your Honor.

22            So they can keep the retained DR revenue.  Obviously,

23 we reserve all -- all arguments that we were entitled to in the

24 first place.  But as part of the settlement, Priority Power

25 keeps the 514,000 and will also pay an additional 85,000 for

1   their legal and out-of-pocket expenses.

2        **THE COURT:**  Okay.

3        **MS CALABRESE:**  Okay.  And then there's some other

4   terms.

5        The Debtors would agree to introduce Priority Power

6   to any acquirer of the facility.  That Priority Power has the

7   option to potentially with that acquirer moving forward.  And a

8   mutual release of all claims and potential causes of action.

9        **THE COURT:**  Okay.

10      **(Pause in the proceeding.)**

11      **MS CALABRESE:**  Okay.  So the equipment that's listed

12  on Annex A, that the Debtors will be transferring to Priority

13  Power, really splits up into three large buckets as we see it.

14      Well, let's start all the way on the right.  The

15  largest bucket of equipment is the -- is currently in Priority

16  Power's possession and was never delivered or shipped to Core.

17  And that's about $17 million.

18      **THE COURT:**  And why is that important?

19      **MS CALABRESE:**  It's important because we would say

20  that Priority Power's lien is controlling.  And that title

21  never shifted to the Debtors, which would have an impact on

22  Core's other -- the Debtor's other constituents and their

23  interest in that -- those assets.

24      **THE COURT:**  So it's not your -- it's not yours.

25      **MS CALABRESE:**  It's theirs.

1          **THE COURT:**  Got it.  Okay.

2          **MS CALABRESE:**  Priority Power's.

3          And that's a -- that's the bulk of this, your Honor.

4  So that' 17 million, never transfer to Core.  So Priority Power

5  is retaining that equipment.

6          **THE COURT:**  Free of any claims by the Debtor.

7          **MS CALABRESE:**  Yes.

8          **THE COURT:**  I got it.  Okay.

9          **MS CALABRESE:**  Then the next bucket I'd like to talk

10  about is the equipment that was delivered to Core, but never

11  installed.  That's 5.8 million worth of equipment.

12          And Core has that equipment currently staged at the

13  facilities.

14          Austin, if you could go to the next slide quickly.

15          So here's -- here's one piece of equipment that's

16  been delivered and staged.  It's an uninstalled and unassembled

17  substation power transformer at the Cottonwood facility.  This

18  is listed on Annex A.  And it will transfer back to PPM.

19          **(Pause in the proceeding.)**

20          **THE COURT:**  So, you hadn't hooked up the wires.

21  You're just going to go out, put it on the truck, and take it.

22          **MS CALABRESE:**  Well, I'm -- I'm not going to do that,

23  your Honor.

24          **THE COURT:**  All right.

25          **MS CALABRESE:**  But it -- that will happen.  Yes.

1          **THE COURT:**  Okay.

2          **MS CALABRESE:**  It'll happen.

3          Austin, if you could flip back?  Okay.

4          Then we have the equipment that was delivered and

5     installed.  That's a much smaller amount.  It's 340,000 or so,

6     give or take.

7          **THE COURT:**  All right.  And what has to happen there?

8          **MS CALABRESE:**  So there I believe the -- that -- I'm

9     a little bit out of my depth here.  But I believe that's a

10    fixture.

11         **THE COURT:**  I know.  And it's -- and it's fun.  So

12    keep going.

13         **(Laughter.)**

14         **MS CALABRESE:**  Yes.  So we'll just go with it.  We'll

15    go with it.

16         So it's a fixture.  And I believe that Priority

17    Power's mechanics lien is -- is the priority lien on that

18    340,000 as well.

19         **THE COURT:**  All right.  So if the M and M lien

20    attaches where?

21         **MS CALABRESE:**  The M and M lien attaches to the

22    equipment.  And it stays with it -- I'm sorry.  It -- it stays

23    with the equipment.

24         So Priority Power, now that it's a fixture, is it

25    when affixed, I believe?  But it -- I've -- I remember.  It

1    attaches to the land improvements and fixtures.

2         **THE COURT:**  There you go.  Okay.

3         And so, who's responsible?  Cause this is where wires

4    have been hooked up, right?

5         **MS CALABRESE:**  Wires have been hooked up to the

6    extent.

7         **THE COURT:**  Have you ever seen one of these things in

8    real life?

9         **MS CALABRESE:**  I have not seen one of these things --

10        **THE COURT:**  Got it.

11        **MS CALABRESE:**  -- in real life.

12        **THE COURT:**  So you know, it's -- I grew up an

13   engineer, electrical as a matter of fact.

14        So, you know, this is -- this has got some -- this

15   has got some work involved.

16        **MS. CALABRESE:**  Uh-huh.

17        **THE COURT:**  And actually doing this stuff --

18        **MS CALABRESE:**  Yes.

19        **THE COURT:**  Who's -- who's responsible for

20   disconnecting it?

21        **MS CALABRESE:**  I believe Priority Power is to pick up

22   the equipment that's being transferred back to them.

23        **THE COURT:**  All right.  So they're responsible for

24   safely disconnecting the equipment and removing it.

25        **MS CALABRESE:**  I can't say, your Honor, that I

1    remember speaking about that specific term.  But I'm sure that

2    the Debtors and Priority Power could reach some mutually-

3    acceptable.

4            **THE COURT:**  Of course.  But, you know, you're going

5    to do these for the next 40 years, right?

6            **MS CALABRESE:**  Yes.

7            **THE COURT:**  So as you're looking at them, you want to

8    make sure you understand how that's going to be accomplished.

9    Cause that's not free.

10            **MS CALABRESE:**  Uh-huh.

11            **THE COURT:**  And you also want to make sure as a

12    fiduciary that you have appropriate oversight.  And that may

13    mean that somebody's just standing out there watching.

14            **MS CALABRESE:**  Uh-huh.

15            **THE COURT:**  It may mean that you have to have an

16    expert.  But you always want to make sure as you're working

17    through this.  Cause you want to be able to get this done and

18    move on.  You don't want to have to look back over your

19    shoulder.

20            Make sense?

21            **MS CALABRESE:**  Yes.

22            **THE COURT:**  Okay.

23            **MS CALABRESE:**  Absolutely?

24            **THE COURT:**  All right.

25            **(Pause in the proceeding.)**

1          **THE COURT:**  Keep going.

2          **MS. CALABRESE:**  So those are the three big categories

3    that the equipment divides into.

4          Austin, if we can go to the next slide, please.

5          This is the substation.

6          Austin, next slide, please?

7          **THE COURT:**  Which very cool picture by the way.

8      **(Pause in the proceeding.)**

9          **MS CALABRESE:**  Your Honor, I see the -- I see the

10   slide on -- on Mr. Crabtree's computer, but it's not -- there

11   we go.

12     **(Pause in the proceeding.)**

13         **MS CALABRESE:**  So against that backdrop, you know,

14   from the Debtor's perspective approve of the PPM settlement is

15   warranted.  This is a good deal for the Debtor's estate.

16   Litigating the Debtor's potential claims, you know, success is

17   uncertain.  It will be expensive.  It will be costly.  The

18   Priority Power settlement is a product of good faith, arms'

19   length negotiation.  We've been heavily negotiating this

20   agreement since middle of February, but have been in talks, you

21   know, since a little -- dating a little earlier than that.

22         And it's also, you know, reasonable and in the

23   Debtor's best interest.  This will satisfy Priority Power's

24   claim and the PPM liens with surplus equipment.  I did not

25   mention that.  This is surplus equipment that the Debtors

1   cannot utilize because they're not going to continue building

2   out those facilities.

3            **THE COURT:**  Right.

4            **MS CALABRESE:**  So it's just excess.

5           The Debtors will also have the flexibility to

6   negotiate.  That electricity supply agreement I mentioned with

7   the REP, which will provide valuable optionality to the

8   Debtors.

9           My understanding is that the Debtors believe they

10   might be able to negotiate a better agreement.  But if they

11   can't, Priority Power is still there to negotiate an agreement.

12           So the Debtors and the choice of the Debtors whether

13   it does its own or it goes with Priority Power.  And then it

14   will -- this is important as well.  It will stabilize the

15   relationship between the Debtors and Priority Power moving

16   forward.

17           Priority Power is important to the Debtors.  This is

18   a key relationship for them in the context of the Cedarville

19   and Cottonwood sites.  And the settlement agreement will

20   provide some much needed priority going forward.

21            **THE COURT:**  All right.  Makes sense to me.  What

22   else?

23            **MS CALABRESE:**  Thank you, your Honor.

24   That's -- that's all I have on the motion.  Unless -- I'm happy

25   to address any additional questions from your Honor.

1        **THE COURT:**  And so, what -- what do you want me to

2  do.

3        **MS CALABRESE:**  Oh, yeah.

4        So we would like you to please approve the 9019

5  motion.  Allow the Debtors to assume the power procurement

6  agreement, and also enter into the new agreement that I

7  mentioned, the curtailment agreement and the asset management

8  agreement.

9        **THE COURT:**  Got it.  And the latest form of order is

10  what?

11       **MS CALABRESE:**  It's docketed at 702.

12       **THE COURT:**  There are a bunch of things docketed at

13  702, right?

14       **MS CALABRESE:**  There are.

15       The latest form of order is the proposed order

16  docketed at 702, along with additional redlines that reflect

17  changes.

18       **THE COURT:**  Okay.  So 702-1?

19       **MS CALABRESE:**  Seven oh two dash one.

20       **THE COURT:**  Okay.

21       **MS CALABRESE:**  Yes.

22       **THE COURT:**  Got it.  Thank you.  Nice job.

23       **MS CALABRESE:**  Appreciate it, your Honor.

24       **THE COURT:**  All right.  Mr. Hansen, any comment that

25  you want to make on behalf of your clients?

1          I think I understand the business decision that got

2    made.  And I think you got -- I think you got the right

3    balance.  But obviously, I didn't want to take away your

4    ability to -- to make any statements you thought were

5    appropriate.

6          **(Pause in the proceeding.)**

7          **THE COURT:**  Oh, Mr. Hansen, I'm sorry.  We can't hear

8    you.  Can you hit five, star for me?

9          **(Pause in the proceeding.)**

10         **THE COURT:**  There we go.

11         **MR. HANSEN:**  Can you hear me okay, your Honor?

12         **THE COURT:**  Yes, sir.  Loud and clear.  Thank you.

13         **MR. HANSEN:**  All right.  Great.

14         Yes, your Honor, I -- I did want to make a couple of

15   remarks on behalf of the Ad Hoc Committee of Secured

16   Convertible Noteholders.

17         The first of which we're obviously withdrawing our

18   objection in connection with the consent that we're rendering

19   with the entry of the order.  But I did want to give just a

20   little bit of history to how we arrived at having to file our

21   objection of reservation of rights last night.  Cause I think

22   it's helpful for the Court not only on this issue, but context

23   as we move forward as they are.  There may be others that come

24   up.

25         So, your Honor, we obviously -- we appreciate that

1  the Debtors came to us early and identified these issues for

2  us, talked to us about the context of the settlement.  Of

3  course, with a lien through UCC law and what the Debtors

4  stipulated to on the Debtor's equipment, which includes the

5  fixtures, we were a bit concerned that they were not going to

6  be able to satisfy §363 because there -- there are not cash

7  proceeds from the settlement.

8       So from a, you know, from an (f)(3) perspective, it

9  didn't look like anything was coming in that obviously would

10 have exceeded the value (indiscernible) of the equipment.

11      So it was really a question of consent at that point.

12 And there are other liens on the equipment as well that may be

13 junior in nature, given the depth and others, but they're out

14 there.  And so we had that concern.  And you had discussed the

15 previous situation where it is a -- a settlement but it's also

16 a transfer of collateral free and clear of the interest, or the

17 lien interest, in that collateral for no active consideration,

18 right?

19      There is consideration in the form of relief of a

20 claim, which doesn't necessarily benefit our parties, because

21 we believe that we have a senior lien.  But we nevertheless

22 understood that it was important for the Debtors to try to move

23 through.  And we wanted to be constructive here.

24      So the suggestion that we made was to incorporate it

25 into the order was that we receive effectively an equivalent

1  lien in value on something that we don't currently a lien in,

2  so effectively a trade if you will.

3          And the Debtors were amendable to that.  And the

4  reason we had to file the objection to their order last night

5  is because we were working through it with the Debtors and all

6  the other parties.  And people had not agreed on the punt

7  concept that's contained in the order.

8          I think we and the Debtors obviously.  It took a

9  little bit of time for others to get there.  And that punt

10  concept is, instead of trying to litigate today what the value

11  of this equipment is and the Debtors' interest in it as

12  (indiscernible) on the lien.

13          Let's push that off a little bit.  Because it may or

14  may not be important in the context of what's to come from a

15  plan negotiation, which is where we all need to get to.  We

16  were prepared, obviously, to come before the Court and make all

17  kinds of arguments about whose interests were in what and what

18  the value might be.  But it didn't make sense to do that today.

19          So that was the idea behind the punt.  And I'm glad

20  that other parties agreed on that this morning before the

21  Debtors and noteholders thought that that was the right

22  approach.

23          It is important to look at those three buckets of

24  assets, though.  Because and -- and I did want to just point

25  out that while you have the Q and A with Debtor's counsel,

1   the -- the whole point is we have the equipment at PPM's

2   facility.

3            I didn't think that there should be -- there's

4   obviously no finding in the record yet.  It was more just

5   colloquy between you and counsel.  But -- but the point that

6   the equipment being at PPM's facility means that it is not the

7   Debtor's equipment.

8            We've -- none of this established that for us.  We've

9   ask for whether or not the Debtors have actually paid -- paid

10  for that equipment, whether there was a purchase order which

11  demonstrates ones title to that property would transfer.  Who

12  knows the result of a title opinion.  And just because it's at

13  their facility, it doesn't mean that they -- it belongs to

14  them.

15           So that's an issue.  But if we have to get to it in

16  the future, we'll get to it.  The other two, would it be in the

17  Debtor's property a little bit easier, you know, to deal with.

18           But that's pretty important.  And obviously to assist

19  us in -- in dealing with the issue going forward, the Debtors

20  are still trying to determine whether or not they have paid for

21  that equipment and where those purchase orders are.  So we need

22  to determine title transfer.

23           And then lastly, your Honor, I just wanted to say for

24  the record that it's really important to the Ad Hoc Group of

25  Secured Convertible Noteholders that nothing in connection with

1   the order entered today sets any precedent for any future

2   transaction, whether or not the settlement was other mechanic

3   lien holders, other secured parties, et cetera.

4            Our view is the (phonetic) situation.  We are happy

5   to support it.  But we don't want to have any kind of

6   methodology in here fighting anybody for in terms of whose

7   property belongs to who and what the value of those liens are,

8   what the value of other property may be, et cetera.

9            And we'll cross that bridge when we get to it.  On

10   this one, and what we hope, is that we have a business plan

11   from the Debtors here and a plan negotiation to try to bring

12   some consent to the Court.

13            But again, we're reserving all of our rights,

14   obviously, on future settlements.

15            **THE COURT:**  Got it.  Thank you.

16            Anyone else have any comments?

17       **(Pause in the proceeding.)**

18            **THE COURT:**  Yes, sir.

19            **MR. BOWLING:**  Good afternoon, your Honor.  Scott

20   Bowling with Baker Botts on behalf of Priority Power.  With me

21   in the courtroom today is my partner, Danny David, together

22   with --

23            **THE COURT:**  Good afternoon, both of you.

24            **MR. BOWLING:**  -- two members of Priority's senior

25   management team, Mr. John Bick (phonetic), the Chairman and

1   Chief Commercial Officer.

2           **THE COURT:**  Afternoon.

3           **MR. BOWLING:**  As well as Mr. Brooks-Antweil

4   (phonetic), the Chief Legal Officer.

5           **THE COURT:**  Got it.  Good afternoon to you.

6           **MR. BOWLING:**  Your Honor, we obviously support the

7   settlement.  We'd only like to thank the Court for your time

8   today.  We thank the Debtors, the Weil team, and the other

9   parties for their constructive work towards the settlement.

10          **THE COURT:**  All right.  Thank you.

11          So first, Mr. Hansen, let me -- let me go back and

12  deal with the issues that you've raised.  Number one, I very

13  much appreciate the business approach that -- that your client

14  took.  I -- I think that the right balance has been struck.

15          You are right.  I was really just having a little fun

16  with counsel.  I -- I agree that title is going to -- can be

17  driven by many things, including contracts, including the

18  documentary evidence.  And again, not trying to get too far in

19  that, but I do think that it is an evidentiary issue that will

20  have to be flushed out if as and when necessary.

21          So again, just having some fun with the young lawyer

22  just to see what she read, and see what she hadn't read.  So

23  did not intend for that to in any way be binding on -- on your

24  clients.

25          Likewise, again, every situation exists on its own

1   merits.  And this is not indicative of a -- a -- a path forward

2   for any particular transaction other than the one that is

3   before me.  And so hopefully, that will give your client some

4   comfort that they can make business decisions and -- and not

5   inadvertently stub their toe along the way with respect of the

6   next one.

7          With respect to the motion that I have before me, I

8   do find that I have jurisdiction over the matter, pursuant to

9   28 U.S.C. §1334.  Do find that the approval of a compromise

10   constitutes a core proceeding under 28 U.S.C. §157.  Further

11   find that I have the requisite Constitutional authority to

12   enter a final order.

13          I am comfortable, based upon the uncontested record

14   that the Debtor has prudently exercised its business judgment.

15   And again in those cases, which we all know and recite all the

16   time, that the Fifth Circuit has said I'm not to substitute my

17   own judgment for that of the Debtor.  I'm simply to look at the

18   range of business judgment and see that it falls within the

19   reasonable range.

20          This is prudent business judgment.  It's at the top.

21   I, again, I think it's just the right balance.  I understand

22   the economics from the Debtor's point of view, from PPM's point

23   of view.  I -- I got the transaction that has been proposed.

24   It just makes good sense to me.

25          To the extent that the compromise includes a transfer

1   of property, not something that doesn't happen on a regular

2   basis.  Again, all of the issues that might have been issues

3   have been resolved with the consent by the noteholders.  Don't

4   have any concerns whatsoever.

5          I will grant the motion used in the order at 702-1.

6   We will get that on the docket promptly.  So it'll show up this

7   afternoon.

8          Anything else we need to address?

9          **MR. PEREZ:**  Nothing further, your Honor.  May we be

10  excused.

11         **THE COURT:**  Absolutely.

12         **MR. PEREZ:**  Thank you.

13         **THE COURT:**  Thank you all.  Be well.

14         And folks who are on for the 1:15 --

15         **MR. HANSEN:**  Thank you, your Honor.

16         **THE COURT:**  -- give me just a moment.

17     **(This proceeding was adjourned at 01:43 p.m.)**

18                    CERTIFICATION

19  I certify that the foregoing is a correct transcript from the

20  electronic sound recording of the proceedings in the above-

21  entitled matter.

22    /s/Cheryl L. Battaglia                 March 23, 2023

23         Transcriber                          Date

24  22-BK-90341

25  03/20/22 - 03/23/23