**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **CORE SCIENTIFIC, INC.,** *et al.,* | § | **Case No. 22-90341 (DRJ)** |
| | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | |
| | § | |

**MOTION OF THE DEBTORS FOR ORDER EXTENDING EXCLUSIVE**
**PERIODS PURSUANT TO SECTION 1121(D) OF THE BANKRUPTCY CODE**

---

**IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING, SPECIFICALLY ANSWERING EACH PARAGRAPH OF THIS PLEADING.  UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT WITHIN TWENTY-ONE (21) DAYS FROM THE DATE YOU WERE SERVED WITH THIS PLEADING.  YOU MUST SERVE A COPY OF YOUR RESPONSE ON THE PERSON WHO SENT YOU THE NOTICE; OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

---

Core Scientific, Inc. and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**" or the "**Company**"), respectfully represent as follows in support of this motion (the "**Motion**"):

**Preliminary Statement**

1.     The Court should extend the Exclusive Periods (as defined below), in each case, by 90-days to afford the Debtors the time they need to finalize an updated business plan (the "**Business Plan**") that aligns with market and industry conditions that have changed

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6074); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198).  The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

dramatically over the last few months.  The Business Plan will, in turn, form the basis for the Debtors' plan of reorganization and strategy for emergence from these chapter 11 cases.  The Debtors anticipate finalizing the Business Plan by mid to late April and intend to use the extension of the Exclusive Periods to negotiate a chapter 11 plan of reorganization, informed by a viable Business Plan, with their key constituents.

2.       The change in industry conditions since the Debtors filed these cases on December 21, 2022 (the "**Petition Date**") cannot be disputed.  The Debtors' financial condition and the health of the cryptocurrency industry are significantly improved entering spring 2023 as compared to six months ago.  During fall 2022, with the price of bitcoin in free fall and facing additional pressure from a dislocated energy market creating unusually high power prices, the Debtors were struggling to satisfy their debt obligations.[2]  The Debtors considered various strategic alternatives, searched for financing that would enable them to stay out of chapter 11, and began negotiations with a group of holders of the Debtors' Convertible Notes (the "**Ad Hoc Noteholder Group**" and the holders of the Convertible Notes, the "**Convertible Noteholders**") and other stakeholders on potential restructuring options, including on an out-of-court basis.  The collapse of FTX Ltd. in early November 2022 put additional downward pressure on the price of bitcoin which struggled to stay within the $16,000 range during November and December, 2022 and further weakened the Debtors' financial position and outlook.

3.       With this backdrop of an industry in turmoil, the Debtors faced limited options in December 2022.  They received no actionable out-of-court proposals.  Moreover, after searching extensively for postpetition financing, the only proposal the Debtors received was from

---

[2]  *See generally Declaration of Michael Bros in Support of the Debtors' Chapter 11 Petitions and First Day Relief*, dated December 21, 2022 (Docket No. 5) (the "**First Day Declaration**").  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

the Ad Hoc Noteholder Group.  Although the Debtors were grateful the Ad Hoc Noteholder Group was willing to provide necessary funding when no one else would, the Debtors believed the terms of the loan (the "**Original DIP Facility**") were unfavorable for two primary reasons.  First, the Original DIP Facility was expensive from an economic perspective.  Second, it required the Debtors to enter into a Restructuring Support Agreement (together with all exhibits and schedules thereto, the "**RSA**") for a chapter 11 plan that would provide the holders of Convertible Notes more than 97% of the equity in the reorganized company, with the remaining stakeholders to share the rest of the equity.  The RSA included restrictive milestones, including a requirement that the Debtors file a chapter 11 plan of reorganization by March 6, 2023.  Nevertheless, the Debtors agreed to the RSA because they needed the financing.  *See generally* the First Day Declaration.

4.     These chapter 11 cases were unusual from the beginning.  The Debtors did not celebrate their RSA.  Rather, they were clear with the Court and all constituents that they preferred an alternate plan that was better for all stakeholders, but such a plan was only possible if they could procure replacement postpetition financing that provided the time and flexibility needed to develop such a plan.  And such financing would likely only be available if the price and outlook for bitcoin improved.  Thus, the Debtors and their advisors began the search for a replacement DIP facility within days of the chapter 11 filing.

5.     The new year brought good news for the Company and its constituents.  The price of bitcoin started climbing in January 2023, improving the attractiveness and prospects of the cryptocurrency industry, as well as the Debtors' financial position.  As a result, by late January 2023, the Debtors' renewed marketing effort for postpetition financing and yielded several promising proposals for a replacement DIP facility.  The Debtors and their advisors worked around

the clock to finalize a replacement DIP loan before the early February milestone to obtain a final order on the existing DIP facility.[3]

6.      The Debtors ultimately chose B. Riley Commercial Capital, LLC (the "**Replacement DIP Lender**") to provide replacement postpetition financing (the "**Replacement DIP Facility**").  The Replacement DIP Facility enabled the Debtors to terminate the RSA and provided a sufficient runway to finalize a Business Plan and pursue a chapter 11 plan that will reflect a longer term view of bitcoin prices and be beneficial to all stakeholders.  All the Debtors' key constituents, other than the Ad Hoc Noteholder Group, applauded the Replacement DIP Facility, including the Official Committee of Unsecured Creditors (the "**UCC**"), the Debtors' primary equipment lenders (the "**Equipment Lenders**"), and an ad hoc group of equity holders (the "**Ad Hoc Equity Group**"), and the Court approved the Replacement DIP Facility on an interim basis on February 2, 2023.[4]  The Debtors used the proceeds of the interim draw under the Replacement DIP Facility to pay off the Original DIP Facility on February 3, 2023 and terminated the RSA on February 9, 2023.[5]  The Court approved the Replacement DIP Facility on a final basis on March 1, 2023.[6]

7.      Having obtained more favorable DIP financing providing ample time and liquidity to execute a value-maximizing restructuring strategy, the Debtors and their advisors have

---

[3]  The Original DIP Facility required the final order to approve a roll-up of the Convertible Noteholders' prepetition debt that would have made replacing the Original DIP Facility much more expensive.

[4]  *Order (I) Authorizing the Debtors on an Interim Basis to (A) Obtain Senior Secured Non-Priming Superpriority Replacement Postpetition Financing and (B) Use Cash Collateral, (II) Authorizing the Debtors to Refinance Existing Postpetition Financing on a Final Basis, (III) Granting Liens and Providing Claims With Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Secured Parties on a Final Basis, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (Docket No. 447).

[5]  *Notice of RSA Termination* (Docket No. 517).

[6]  *Final Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Non-Priming Superpriority Replacement Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims With Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay and (IV) Granting Related Relief* (Docket No. 607).

turned their attention to developing the revised Business Plan.  Developing a viable Business Plan in the cryptocurrency industry and volatile market environment in which the Debtors operate, however, is no simple task.  As discussed further below, the Business Plan is built upon numerous interconnected variables and assumptions—both macroeconomic and operational—each of which the Debtors and their advisors must consider carefully.

8.      First, the Debtors' financial performance is inextricably linked to bitcoin prices, network hashrates, and power prices, all of which can be volatile and have changed dramatically in the few months following the Petition Date.  Indeed, as depicted on the below graphic, bitcoin prices have increased by approximately 66% and the network hash rate increased by approximately 39% between the Petition Date and April 2023.



9.      Similarly, as depicted on the below graphic, power curves—at ERCOT North Hub, which is a proxy for the power prices paid by the Company—for the comparable period of months remaining in 2023 have moved down by 23%.



10.      Second, the Debtors must make decisions regarding their capacity plan, which entails analyzing the expected price of bitcoin, network hashrate, availability and cost of mining equipment, availability and cost of electrical power, energy generation markets, costs of construction, availability of raw materials, political considerations regarding bitcoin, cryptocurrency generally, and environmental considerations.  Each of these factors is impacted by and in turn impact the allocation of Debtor resources for self-mining or third party hosting, the number, size, and location of Debtor facilities, and the long-term plan for their facilities.

11.      The Debtors and their advisors have been working diligently on the Business Plan and anticipate finalizing the Business Plan by mid to late April with plans to share it with their key constituents shortly thereafter.  Informed by the new Business Plan, the Debtors

intend to use the extension of the Exclusive Periods to negotiate a plan of reorganization with their creditor and shareholder constituents.

12.     To be sure, in the first few months of these chapter 11 cases, the Debtors have not been idle.  Rather, they have taken important actions to maximize value and lay the groundwork to be able to execute on a restructuring strategy efficiently.  Among other things, the Debtors:

- leveraged the favorable terms of their hosting agreements to negotiate consensual early termination of unprofitable hosting agreements and rejected their hosting agreement with Celsius Mining LLC ("**Celsius**"), through which the Debtors were losing millions of dollars, obtained Court approval thereof on January 4, 2023,[7] and ensured the timely return of Celsius' 37,536 miners in accordance therewith;

- entered into a Court-approved stipulation with NYDIG ABL LLC ("**NYDIG**") on February 26, 2023, settling NDYIG's approximately $38.6 million claim against the Debtors by transferring to NYDIG the 27,403 miners that served as collateral for NYDIG's debt;[8]

- obtained Court approval of a non-insider key employee retention plan (the "**KERP**"), designed to retain employees and avoid unnecessary costs associated with employee attrition and departures;[9]

- negotiated and received Court approval on March 20, 2023, of a global settlement with Priority Power Management, LLC ("**PPM**") to, among other things, resolve significant secured claims asserted by PPM, stabilize the Debtors' relationship with PPM, and potentially increase the value of the Debtors' Cottonwood and Cedarvale facilities (the "**PPM Global Settlement**");[10]

- obtained Court approval to sell certain coupons from original mining equipment manufacturer Bitmain Technologies Ltd. ("**Bitmain**") the

---

[7]  *Order Authorizing Rejection of Executory Contracts with Celsius Mining, LLC* (Docket No. 232).

[8]  *Stipulation and Agreed Order By and Among the Debtors and NYDIG ABL LLC Authorizing the Debtors to Transfer Certain ASICS Collateral to NYDIG Pursuant to 11 U.S.C. § 363 Free and Clear of All Liens, Claims, and Encumbrances* (Docket No. 574) (the "**NYDIG Stipulation and Order**").

[9]  *Order Approving and Authorizing Payments Under Non-Insider Key Employee Retention Plan* (Docket No. 741) (the "**KERP Order**").

[10]  *Order Approving (I) Global Settlement Between Debtors and Priority Power Management, LLC, (II) Assumption of the EMCSA, (III) Entry Into the New Agreements and (IV) Granting Related Relief* (Docket No. 706) (the "**PPM Global Settlement Order**").

Debtors were unable to use on February 1, 2023,[11] and completed such sales, resulting in millions of dollars in additional liquidity for the Debtors' estates;

- negotiated a consensual resolution to the request of the Ad Hoc Equity Group to appoint an official committee of equity holders (the "**Equity Committee**"), on reasonable terms, including a negotiated scope and budget, that will limit costs to the Debtors' estates while providing a key partner with which to negotiate a chapter 11 plan;

- analyzed their contracts and leases to identify those where the Debtors could achieve cost savings through early rejection and filed a motion to reject certain contracts and leases on March 10, 2023;[12] and

- launched a sale process for certain non-core assets.

13.     In addition to the foregoing, the Debtors have also diligently performed various other duties as debtors-in-possessions, including, among others: (i) filing their schedules of assets and liabilities and statement of financial affairs (the "**Schedules and SOFAs**")[13] and (ii) obtaining Court approval of a bar date to enable the Debtors to commence the claims reconciliation process and appropriately size the claims pool in connection with a plan of reorganization. The Debtors have also begun negotiations with certain creditors to resolve their claims.[14]

14.     Moreover, throughout these chapter 11 cases, the Debtors and their advisors have communicated regularly with their key stakeholders, keeping them apprised of developments in the chapter 11 cases. The Debtors and/or their advisors hold calls weekly (if not more frequently) with each of the Replacement DIP Lender, the UCC, and the Ad Hoc Noteholder

---

[11] *Order (I) Authorizing and Approving Sale of Bitmain Coupons, Free and Clear of Lien, Claims, Interests, and Encumbrances, and (II) Granting Related Relief* (Docket No. 429) (the "**Bitmain Coupon Sale Order**").

[12] *Debtors' Motion for Order Authorizing Rejection of Executory Contracts and Unexpired Leases* (Docket No. 667) (the "**Rejection Motion**"). The Debtors filed a certificate of no objection regarding the Rejection Motion on April 4, 2023 (Docket No. 753).

[13] *Schedules of Assets and Liabilities and Statements of Financial Affairs* (Docket Nos. 461−91) filed on February 3, 2023 and filed those certain *Amended Schedules of Assets and Liabilities and Statements of Financial Affairs* in February and March 2023 (Docket Nos. 490; 625−30).

[14] *Order (I) Establishing Deadlines to File Proofs of Claim and (II) Approving Form and Manner of Notice Thereof* (Docket No. 652) (the "**Bar Date Order**").

Group.  The Debtors also engage in frequent communications on an as-needed basis with the Equity Committee.

15.     Importantly, this is the Debtors' first request for an exclusivity extension. The Debtors' stakeholders will benefit from, and will certainly not be prejudiced by, the requested extension because plan negotiations will be far more productive and fruitful when the Debtors finalize the Business Plan.  The extended timeline will enable the Debtors to build consensus on a plan of reorganization with as many constituents as possible.  Allowing other stakeholders to propose competing chapter 11 plans at this juncture, before the Debtors have finalized their Business Plan and have had a chance to try to build consensus around a chapter 11 plan, will be chaotic and detrimental to the restructuring process.  **Importantly, each of the Replacement DIP Lender, the UCC, the Ad Hoc Noteholder Group, and the Equity Committee has no objection to and supports the Debtors' request to extend the Exclusive Periods.**

16.     Accordingly, for the reasons set forth herein, the Debtors request that the Court extend the Exclusive Periods, in each case, by 90-days, without prejudice to the Debtors' rights to seek a further extension.[15]

## Relief Requested

17.     Pursuant to section 1121(d) of title 11 of the United States Code (the "**Bankruptcy Code**"), the Debtors request entry of an order extending the periods during which the Debtors have the exclusive right to: (i) file a chapter 11 plan (the "**Exclusive Filing Period**") and (ii) solicit acceptances thereof (the "**Exclusive Solicitation Period**" and, together with the Exclusive Filing Period, the "**Exclusive Periods**"), in each case, by 90-days, through and

---

[15] Although the Debtors have not filed an accompanying declaration with this Motion, to the extent the Motion is contested or the Court otherwise deems it appropriate, the Debtors will file an accompanying declaration(s) and make such parties available for cross examination.

including July 19, 2023 and September 17, 2023, respectively, without prejudice to the Debtors'

right to request further extensions of such periods in accordance with section 1121(d) of the

Bankruptcy Code.[16]

18.     A proposed form of order granting the relief requested herein is annexed

hereto as **Exhibit A** (the "**Proposed Order**").

### Jurisdiction

19.     The Court has jurisdiction to consider this matter pursuant to

28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper

before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Background

20.     Commencing on the Petition Date, the Debtors each filed with this Court a

voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue

to operate their business and manage their properties as debtors in possession pursuant to sections

1107(a) and 1108 of the Bankruptcy Code.

21.     The Debtors' chapter 11 cases are being jointly administered for procedural

purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure

(the "**Bankruptcy Rules**") and Rule 1015-1 of the Local Bankruptcy Rules for the United States

Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**").

---

[16] The Debtors' Exclusive Filing Period and Exclusive Solicitation Period are currently set to expire on April 20, 2023 and June 19, 2023, respectively.  Paragraph 30 of the *Procedures for Complex Chapter 11 Cases in the Southern District of Texas* provides that "with these procedures to extend the time to take any action before the expiration of the period prescribed by the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, or a confirmed plan, the time for taking the action is automatically extended until the Court rules on the motion."  By the filing of this Motion prior to the expiration of the Exclusive Filing Period, the Exclusive Filing Period will not expire until the Court resolves the Motion.

22.     On January 9, 2023, the United States Trustee for Region 7 (the "**U.S. Trustee**") appointed the UCC in these chapter 11 cases pursuant to section 1102 of the Bankruptcy Code.  On March 23, 2023, the U.S. Trustee appointed the Equity Committee in these chapter 11 cases pursuant to section 1102 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.

23.     Information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the First Day Declaration.

### The Court Should Grant the Relief Requested

24.     Section 1121(b) of the Bankruptcy Code provides for an initial period of 120-days after the commencement of a chapter 11 case during which a debtor has the exclusive right to file a chapter 11 plan.  Section 1121(c)(3) of the Bankruptcy Code provides that if a debtor files a plan within the 120-day Exclusive Filing Period, it has an exclusive period of 180-days after the commencement of the chapter 11 case to obtain acceptances of its plan.  The Debtors' initial Exclusive Filing Period and Exclusive Solicitation Period are currently set to expire on April 20, 2023 and June 19, 2023, respectively.

25.     Under section 1121(d) of the Bankruptcy Code, the Court may extend the Exclusive Periods for cause.  11 U.S.C. § 1121(d) ("[O]n request of a party in interest made within the respective periods specified in subsections (b) and (c) of this section and after notice and a hearing, the court may for cause reduce or increase the 120-day period or the 180-day period referred to in this section.").

26.     The Bankruptcy Code neither defines the term "cause" for purposes of section 1121(d) nor establishes formal criteria for an extension.  The legislative history of

section 1121 of the Bankruptcy Code indicates, however, that it is intended to be a flexible standard to balance the competing interests of a debtor and its creditors. *See* H.R. Rep. No. 95–595, at 231–32 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963 (noting that Congress intended to give Bankruptcy Courts great flexibility to protect a debtor's interests by allowing a debtor an unimpeded opportunity to negotiate settlement of debts without interference from other parties in interest); *In re Timbers of Inwood Forest Assoc., Ltd.*, 808 F.2d 363, 372 (5th Cir. 1987) ("Any bankruptcy court involved in an assessment of whether 'cause' exists should be mindful of the legislative goal behind § 1121."); *In re Mirant Corp.*, No. 4-04-CV-476-A, 2004 WL 2250986, at *2 (N.D. Tex. Sept. 30, 2004) ("In virtually every case where an extension has been granted, the debtor showed substantial progress had been made in negotiations toward reorganization.").

27.     The broad discretion conferred on the court in these circumstances enables the court to consider a variety of factors to assess the totality of circumstances in each case. *In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 587 (Bankr. S.D.N.Y. 2006) (identifying factors courts consider in determining whether to extend exclusivity); *In re Washington-St. Tammany Elec. Co-op., Inc.*, 97 B.R. 852, 854 (E.D. La. 1989) (noting that the decision to extend exclusivity "rests with the discretion of the Court"); *In re Hoffinger Indus., Inc.*, 292 B.R. 639, 643–44 (B.A.P. 8th Cir. 2003) (same); *In re Express One Int'l, Inc.*, 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996) (same).

28.     Courts in this district and others have identified the *Adelphia* factors as factors to consider in determining whether cause exists to extend exclusivity. *See, e.g.*, *In re New Millennium Mgmt., LLC*, No. 13-35719-H3-11, 2014 WL 792115, at *6 (Bankr. S.D. Tex. Feb. 25, 2014); *see also In re Borders Grp., Inc.*, 460 B.R. 818, 822 (Bankr. S.D.N.Y. 2011) (evaluating

the factors set forth in *Adelphia* to hold that debtor established cause to extend exclusivity). These non-exclusive factors include:

(i)     the size and complexity of the debtor's case;

(ii)     the necessity for sufficient time to permit the debtor to negotiate a chapter 11 plan and prepare adequate information;

(iii)     the existence of good faith progress towards reorganization;

(iv)     the fact that the debtor is paying its bills as they become due;

(v)     whether the debtor has demonstrated reasonable prospects for filing a viable plan;

(vi)     whether the debtor has made progress in negotiations with its creditors;

(vii)     whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and

(viii)     whether an unresolved contingency exists.

*See, e.g.*, *Millennium Mgmt.*, 2014 WL 792115, at *6; *see also In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 587 (Bankr. S.D.N.Y. 2006) (noting that the factors listed above are "objective factors which courts historically have considered in making determinations of this character").

      29.     Not all factors are relevant to every case, and courts tend to use a relevant subset of the above factors in determining whether cause exists to grant an exclusivity extension in a particular chapter 11 case. *See, e.g.*, *In re Hoffinger Indus., Inc.*, 292 B.R. 639, 644 (B.A.P. 8th Cir. 2003) ("It is within the discretion of the bankruptcy court to decide which factors are relevant and give the appropriate weight to each."); *In re Serv. Merch. Co., Inc.*, 256 B.R. 744, 751–54 (Bankr. M.D. Tenn. 2000) (finding cause to extend where the debtors established six of the aforementioned factors); *In re Express One Int'l, Inc.*, 194 B.R. 98, 101 (Bankr. E.D. Tex. 1996) (identifying four of the factors as relevant in determining whether "cause" existed to extend exclusivity); *see also In re Dow Corning Corp.*, 208 B.R. 661, 670 (Bankr. E.D. Mich. 1997)

("When the Court is determining whether to terminate a debtor's exclusivity, the primary consideration should be whether or not doing so would facilitate moving the case forward.  And that is a practical call that can override a mere toting up of the factors.").

30.     Moreover, courts regularly grant a debtor's first request for an extension of the debtor's exclusive period to file a chapter 11 plan.  *See In re Apex Pharm., Inc.*, 203 B.R. 432, 441 (N.D. Ind. 1996) ("It is true that during the initial one hundred twenty (120)-day period in which debtors have an exclusive right to file a plan of reorganization . . . the bankruptcy courts apply a lesser standard in determining whether the burden of showing 'a reasonable possibility of a successful reorganization within a reasonable time' has been satisfied.") (citation omitted); *see also In re Borders Grp., Inc.*, 460 B.R. 818, 825 (Bankr. S.D.N.Y. 2011) (same).

31.     Courts in this district have granted similar relief to that requested herein in a number of cases.  *See, e.g.*, *In re Talen Energy Supply, LLC, et al*, Case No. 22-90054 (MI) (Bankr. S.D. Tex. Sept. 27, 2022) (Docket No. 1285) (granting 105-day extension of the exclusive filing period and 45-day extension of the exclusive solicitation period); *In re Seadrill Ltd.*, No. 21-30427 (Bankr. S.D. Tex. Jul. 1, 2021) (Docket No. 829) (granting 120-day extension of exclusive periods); *In re CBL & Associates Properties, Inc.*, No. 20-35226 (Bankr. S.D. Tex. Mar. 19, 2021) (Docket No. 976) (granting 90-day extension); *In re Fieldwood Energy LLC*, No. 20-33948 (Bankr. S.D. Tex. Jan. 8, 2021) (Docket No. 751) (granting 90-day extension); *In re CEC Entm't, Inc.*, No. 20-33163 (Bankr. S.D. Tex. Nov. 20, 2020) (Docket No. 1303) (granting 90-day extension); *In re NPC Int'l, Inc.*, No. 20-33353 (Bankr. S.D. Tex. Nov. 17, 2020) (Docket No. 1065) (granting 120-day extension); *In re EP Energy Corp.*, No. 19-35654 (Bankr. S.D. Tex. Mar. 31, 2020) (Docket No. 1135) (granting 90-day extension); *In re Sheridan Holding Co. II, LLC*, No. 19-35198 (Bankr. S.D. Tex. Jan. 17, 2020) (Docket No. 287) (granting

180-day extension); *In re GenOn Energy, Inc.*, No. 17-33695 (Bankr. S.D. Tex. Oct. 3, 2017) (Docket No. 840) (granting 180-day extension); *In re CJ Holding Co.*, No. 16-33590 (Bankr. S.D. Tex. Nov. 3, 2016) (Docket No. 675) (granting 120-day extension); *In re SandRidge Energy Inc.*, No. 16-32488 (Bankr. S.D. Tex. Aug. 30, 2016) (Docket No. 800) (granting 120-day extension).

## **Cause Exists to Extend Exclusive Periods**

32.     As set forth below, an extension of the Exclusive Periods, in each case, by 90-days is appropriate, in the best interest of the Debtors' stakeholders, and consistent with the intent and purpose of chapter 11 of the Bankruptcy Code.   The requested extensions of the Exclusive Periods are necessary and appropriate to enable the Debtors to finalize the Business Plan and pursue a restructuring framework that will maximize the value of the Debtors' estates for the benefit of all stakeholders, without interruption.   Accordingly, application of the relevant above factors to the facts of these chapter 11 cases demonstrates that ample cause exists to grant the reasonable extension of the Exclusive Periods requested herein.

A.     **These Chapter 11 Cases Are Large and Complex**

33.     The scale and complexity of the Debtors' business and industry, which require the Debtors to navigate complex issues in their reorganization efforts, support the need for the extension of the Exclusive Periods.   This factor weighs heavily in favor of extending exclusivity.  *See In re Texaco Inc.*, 76 B.R. 322, 326 (Bankr. S.D.N.Y. 1987) ("The large size of a debtor and the consequent difficulty in formulating a plan of reorganization for a huge debtor with a complex financial structure are important factors which generally constitute cause for extending the exclusivity periods.").   The legislative history of section 1121 provides that "if an unusually large company were to seek reorganization under chapter 11, the court would probably need to extend the time in order to allow the debtor to reach an agreement."  H.R. Rep. No. 95-595, at 232 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963.

34.     These chapter 11 cases are complex.  As of Petition Date, the Debtors are one of the largest blockchain infrastructure, hosting provider, and digital asset mining companies in North America.  First Day Declaration ¶ 5.  The Debtors own and/or manage 8 operational data centers, which span 5 states and can collectively utilize up to approximately 814 megawatts (MW) of power.  *Id.*  The Debtors use these data centers to mine digital assets for their own account, as well as host miners for third-party customers.  *Id.* Importantly, the Debtors employ over 220 full time employees, along with the services of independent contractors and temporary workers.[17]

35.     Furthermore, the Debtors have a complex capital structure, with over $1 billion in total debt, including the Convertible Notes, equipment financings and leases, unsecured bridge notes, and various other unsecured claims.  The Debtors' creditors have different legal rights and priorities and are secured by different collateral packages.  As the Debtors have seen in both pre- and postpetition negotiations, including in connection with the PPM Global Settlement, the parties' varying rights and legal positions add complexity to negotiations.

36.     Moreover, the Debtors operate in the inherently complex cryptocurrency industry.  The Debtors' business performance is tied to an underlying decentralized asset – bitcoin – that is volatile and unpredictable.  Indeed, between the Petition Date and April 2023, the price of bitcoin has increased by 66%, from $16,000 to over $28,000. As discussed below, shifts in bitcoin prices result in corresponding shifts in potential enterprise value, making the development of the Business Plan a challenging and complex process that is subject to frequent updates and refinement.

---

[17] *Emergency Motion of Debtors for Entry of An Order (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation, and (B) Maintain Employee Benefits Programs and Pay Related Obligations; and (II) Granting Related Relief*  (Docket No. 6) ¶ 8.

37.     Accordingly, the Debtors' size and the complexity of these chapter 11 cases, and the breadth of financial and legal issues involved therein, warrant the requested extension of the Exclusive Periods.

**B.      The Debtors Need Sufficient Time to Finalize Their Business Plan, Discuss it With Their Constituents, and Negotiate a Chapter 11 Plan**

38.     This is the Debtors' first motion requesting an extension of the Exclusive Periods.  As discussed above, the Debtors are intently focused on formulating a viable—and, hopefully, consensual—chapter 11 plan that will enable them to emerge from these chapter 11 cases as a going concern in the near term.  A confirmable chapter 11 plan, however, is predicated upon a viable Business Plan which, in turn, informs valuation, post emergence capital structure, and stakeholder recoveries.  Given the significant developments in the industry since the Petition Date, the Debtors' prior business plan is outdated and must be updated to align with changing market conditions.  The Debtors and their advisors are working collaboratively to develop the updated Business Plan.  However, the development of the new Business Plan is a complex process, which must take into consideration numerous inputs and factors.

39.     First, on a macroeconomic level, the Business Plan is inherently tied to shifts in power pricing, the network hashrate, and price of bitcoin, which are volatile and unpredictable, and has increased significantly since the Petition Date.  Conversely, the price of power, another key input, has decreased significantly since the Petition Date.  Both bitcoin and power pricing contribute to projected EBITDA, which, in part, dictates the Debtors' valuation, post emergence capital structure, and potential stakeholder recoveries.  Forecasting these variables is challenging, and the Debtors are working diligently with their advisors to formulate the Business Plan to consist of reasonable underlying assumptions as to these inputs.

40.     Second, on an operational level, another key Business Plan input is the number of facilities the Debtors plan to operate going forward, as well as the size of such facilities. To that end, the Debtors are in the process of determining which facilities will be included in the go-forward Business Plan.  The Debtors and their advisors believe it may be more beneficial for the Debtors to monetize certain facilities than to operate them.  Consequently, the Debtors and their advisors are engaged in a marketing process for certain of their facilities.  The Debtors have fielded interest from various parties and, depending upon the attractiveness of the incoming bids, will decide whether to sell specific facilities (subject to Court approval) or instead retain them. Relatedly, certain of the existing facilities—including those that may be sold as part of the marketing process underway—are not completely built out, and the Debtors are considering whether to expend the funds to complete those facilities, taking both costs and potential revenues into account.  These are decisions that significantly impact the Business Plan.

41.     Third, and relatedly, the Business Plan must also take into consideration the number of miners the Debtors will operate and/or host at retained facilities.  The number of miners, in turn, drives the Debtors' revenue generation, if all else is equal.  Similarly, the Debtors must determine the percentage of their mining capacity to be utilized for self-mining and the percentage to be utilized for hosting third-party miners.

42.     In sum, the Debtors and their advisors are working with alacrity to develop the updated Business Plan that appropriately considers the Debtors' operations and market conditions.  The Debtors will use the extension of the Exclusive Periods—if it is granted by the Court—to finalize the Business Plan, vet it with key constituents, and, thereafter, propose a plan of reorganization to key constituents informed by the Debtors' view of their business going forward and negotiations with various stakeholders.

**C.**      **The Debtors have Demonstrated Good Faith Progress Towards Reorganization**

43.      Although the Debtors' timeline for these chapter 11 cases has been somewhat delayed by the volatile market conditions described above, the Debtors have been hard at work laying the groundwork for a successful reorganization.

44.      First, the Debtors have worked diligently to ensure that these chapter 11 cases are being managed efficiently and without unnecessary costs, all in an effort to preserve value for all stakeholders.  To that end, after the commencement of these chapter 11 cases, the Debtors obtained the Replacement DIP Facility on more favorable terms than the Original DIP Facility and that provides the Debtors with the runway to execute a restructuring strategy. Moreover, recognizing the changing marketing conditions, the Debtors negotiated a consensual resolution with the Ad Hoc Equity Group on their request for formation of the Equity Committee on reasonable terms that minimize costs to the Debtors' estates.  The Debtors have also obtained approval of the KERP to retain employees throughout the chapter 11 process, avoid costs related to potential employee attrition and departures, and maximize the Debtors' value.

45.      Second, since the Petition Date, the Debtors have taken various actions they believe will significantly enhance the value of their estates going forward and/or resolve key issues, including, among others:  (i) obtaining the Celsius Rejection Order, stemming significant losses arising from the Debtors' hosting contract with Celsius; (ii) negotiating the PPM Global Settlement and obtaining the PPM Global Settlement Order to resolve potentially large claims against the estates, stabilize the Debtors' relationship with PPM, and enhance the value of the Debtors' Cottonwood and Cedarvale facilities by potentially increasing the power generation at those facilities; (iii) resolving NYDIG's significant claim against the Debtors' estates through the NYDIG Stipulation and Order; and (iv) selling and monetizing the Bitmain coupons and resulting

in millions of dollars in additional liquidity for the Debtors' estates through the Bitmain Coupon Sale Order.

46.     In addition, the Debtors have diligently carried out their other responsibilities as debtors-in-possession, including, among others:  (i) filing their Schedules and SOFAs and their Amended Schedules and SOFAs in February and March 2023; (ii) obtaining entry of the Bar Date Order, with the intention of commencing the claims reconciliation process immediately upon the passage of the Bar Date (April 14, 2023, except for claims of governmental units) to size the general unsecured claims pool in connection with a plan of reorganization; and (iii) analyzing their portfolio of contract and leases to determine which contracts to assume or reject, and filing the Rejection Motion.

47.     Finally, the Debtors have launched an extensive sale process for their non-core facilities, including numerous discussions with potential purchasers.

48.     Accordingly, the Debtors have made significant progress in these cases, notwithstanding that the Business Plan is still being finalized.  On this basis alone, the requested extension of the Exclusive Periods is warranted.  *See In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 588 (Bankr. S.D.N.Y. 2006) (viewing the good faith progress factor "as one of the more important factors" in the analysis).

**D.     The Debtors Remain Engaged With Their Creditors Constituents and Will Be Prepared to Negotiate a Chapter 11 Plan in the Near Term**

49.     Although plan negotiations are yet to commence in earnest, as discussed above, the Debtors are in regular contact with their key creditor and shareholder constituencies, including the Replacement DIP Lender, the UCC, the Ad Hoc Noteholder Group, the Equipment Lenders, and the Equity Committee.  The Debtors speak to these stakeholder groups on a regular basis on a variety of issues in these chapter 11 cases, including to discuss developments in the

Debtors' business and industry, the DIP budget and variance reports, chapter 11 strategy, marketing process updates, and the parties' various legal positons.  The Debtors believe these discussions will lay the groundwork for upcoming plan negotiations and enable the parties to engage in constructive negotiations over a consensual plan of reorganization.

E.     **The Debtors Are Making Administrative Expense Payments and Will Continue to Do So**

50.     Courts considering an extension of exclusivity also assess a debtor's liquidity.  *See Adelphia*, 352 B.R. at 587 (listing "the fact that the debtor is paying its bills as they become due" as a factor courts consider when analyzing exclusivity).  Here, the Debtors are paying administrative expenses as they come due and will continue to do so.  The Debtors have access to $70 million in DIP financing under the Replacement DIP Facility.  Moreover, given the improved market conditions (higher bitcoin prices and lower power prices), the Debtors are operating ahead of budget, with tens of millions of dollars of permanent outperformance as compared to the budget initially included with the Replacement DIP Financing.  The Debtors continue to monitor their liquidity position closely and are confident that sufficient funding will be available to satisfy their postpetition payment obligations during the requested extension of the Exclusive Periods.

F.     **Relatively Little Time Has Elapsed in the Chapter 11 Cases and An Extension of the Exclusive Periods Will Not Prejudice Creditors**

51.     This is the Debtors' first request to extend the Exclusive Periods and comes less than four months after the Petition Date.  At the same time, the Debtors' industry and operating landscape have shifted considerably since the Petition Date.  The Debtors effectively reset the table in these chapter 11 cases upon entry into the Replacement DIP Facility on February 3, 2023, and termination of the RSA on February 9, 2023.  An extension of the Exclusive Periods is warranted to enable the Debtors to adapt to the evolving circumstances and propose a confirmable plan of reorganization based upon the updated Business Plan that aligns with current market conditions.

52.     Further, an extension of the Exclusive Periods will not prejudice the Debtors' stakeholders.  On the contrary, as discussed above, an extension of the Exclusive Periods will enable the Debtors to finalize the Business Plan, which will form the foundation for constructive negotiations with stakeholders over a chapter 11 plan and stakeholder recoveries. Allowing another party to propose a competing plan of reorganization at this juncture in the chapter 11 cases will only hamper the Debtors' chances of negotiating a consensual plan with their stakeholders.  Thus, the Debtors believe that an extension of the Exclusive Periods is in the best interest of the Debtors and their stakeholders.  **Indeed, each of the Replacement DIP Lender, the UCC, the Ad Hoc Noteholder Group, and the Equity Committee has no objection to and supports the Debtors' request to extend the Exclusive Periods.**

53.     Accordingly, for the reasons set forth herein, the Debtors submit that "cause" exists to extend the Exclusive Periods and respectfully request that the Court grant the relief requested herein.

### Notice

54.     Notice of this Motion will be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

WHEREFORE, the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:  April 10, 2023
       Houston, Texas

Respectfully submitted,

_/s/Alfredo R. Pérez_
WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
700 Louisiana Street, Suite 1700
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511
Email:  alfredo.perez@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock (admitted *pro hac vice*)
Ronit J. Berkovich (admitted *pro hac vice*)
Moshe A. Fink (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email: ray.schrock@weil.com
       ronit.berkovich@weil.com
       moshe.fink@weil.com

*Attorneys for Debtors*
*and Debtors in Possession*

**<u>Certificate of Service</u>**

I hereby certify that on April 10, 2023 a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

<u>  /s/ Alfredo R. Pérez                  </u>
Alfredo R. Pérez