**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | Chapter 11 |
| CORE SCIENTIFIC, INC., *et al.,* | ) | |
| | ) | Case No. 22-90341 (DRJ) |
| Debtors.[1] | ) | (Jointly Administered) |

**NOTICE OF PERFECTION OF MECHANIC'S LIEN
OF J.W. DIDADO ELECTRIC, LLC**

J.W. Didado Electric, LLC ("JW Didado"), by and through the undersigned counsel, hereby

provides Notice, in accordance with sections 362(b)(3) and 546(b)(2) of title 11 of the United

States Code (the "Bankruptcy Code"), of its Perfection, Maintenance and/or Continuation of its

rights in a Mechanic's or Materialman's Lien, created under the law of the State of Oklahoma,.

1.      On January 5, 2022 ("Contract Date"), prior to the commencement of these Cases

on December 21, 2022 (the "Petition Date"), JW Didado and Core Scientific, Inc. ("Core

Scientific") entered into certain agreements, including a Standard Form of Agreement between

Owner (Core Scientific, Inc.) and Designee Builder (J.W. Didado Electric, LLC) and a Subcontract

Services Agreement of even date, pursuant to which JW Didado performed labor, including

engineering, management, equipment procurement, design and construction services, and

furnished materials and equipment to develop, engineer, procure and construct a high voltage and

medium voltage utility-class electrical infrastructure upon that certain tract of real property located

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisitions, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisition I, LLC (9717); and American Property Acquisitions, VII, LLC (3198).

in Muskogee County, Oklahoma (the "Muskogee Project"), which is owned by Core Scientific, situated upon the property described in Exhibit "A" hereto (the "Real Property").

2.      The total amount due and owing JW Didado as of the Petition Date, with respect to the Muskogee Project, secured by Oklahoma statutory lien, is at least $26,049,229, plus any interest, attorneys' fees and other charges, if applicable.

3.      On March 30, 2023, within the time provided for filing of a Mechanic's or Materialman's Lien under Oklahoma law, JW Didado filed its Mechanic's or Materialman's Lien Statement with the Muskogee County Clerk.  The interest of JW Didado was and is perfected, maintained and continued by the Lien Filing (as described below), and extends in and to the Real Property, improvements and/or leasehold interest in the Real Property.  A true and correct copy of JW Didado's Mechanic's and Materialman's Lien Statement filed on March 30, 2023, under I-2023-003097 at Book 4847 Pgs 546-549 with the Muskogee County Clerk is attached hereto as Exhibit "B" (the "Lien Filing").  JW Didado caused the Muskogee County Clerk to provide notice in accordance with Oklahoma law.

4.      In accordance with Sections 362(b)(3) and 546(b)(2) of the Bankruptcy Code, JW Didado hereby provides notice of the Lien of JW Didado against the Real Property of the Muskogee Project.

5.      Bankruptcy Code, 11 U.S.C. section 362(b), provides that:

> The filing of a petition under section 301, 302, or 303 of this title. . .does not operate as a stay
>
> +++
>
> (3) under subsection (a) of this section, of any act to perfect, or to maintain or continue the perfection of, an interest in property to the extent that the trustee's rights and powers are subject to perfection under Section 546(b) of this title or to the extent that such act is accomplished within the period provide under section 547(e)(2)(A) of this title.  11 U.S.C. §362(b)(3).

Bankruptcy Code, 11 U.S.C. section 546(b), further provides that:

> (1) The rights and powers of a trustee under sections 544, 545, and 549 of this title are subject to any generally applicable law that –
>> (A)    permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection; or
>> (b)    provides for the maintenance or continuation of perfection of an interest in property to be effective against an entity that acquire rights in such property before the date on which action is taken to effect such maintenance or continuation.
> (2) If -
>> (A)    a law described in paragraph (1) requires seizure of such property or commencement of an action to accomplish such perfection, or maintenance or continuation of perfection of an interest in property; and
>> (B)    such property has not been seized or such an action has not been commenced before the date of the filing of the petition;
> Such interest in such property shall be perfected, or perfection of such interest shall be maintained or continued, by giving notice within the time fixed by such law for such seizure or such commencement.  11 U.S.C. §546(b).

6.      JW Didado's contracts were between Core Scientific and JW Didado.  After commencement of the Core Scientific Bankruptcy Cases, JW Didado learned that Core Scientific, as originally existed, changed its name on or about January 19, 2022, to "Core Scientific Operating Company" which is debtor in the Case with the last four numbers of its Federal ID Number being 5562.  The Schedules [Dkt. No. 463] as amended by Amended Schedules [Dkt. No. 490] filed by Core Scientific Operating Company, at page 148, reflect that Core Scientific Operating Company owns the subject property.  The Schedules further disclose at page 135  that Core Scientific Operating Company entered into three (3) Executory Contracts with JW Didado, and that a Mechanic's and Materialman's Lien is held by JW Didado against Core Scientific Operating Company.  Conversely, the Schedules of Core Scientific, with the last four numbers of its Federal ID Number being 3837, do not reflect Executory Contracts with JW Didado, ownership of the subject Real Property or a Mechanic's and Materialman's Lien by JW Didado against Core Scientific.

7.     Title to subject Real Property is shown in the name of Core Scientific, a Delaware corporation.  Out of abundance of caution, this notice is provided to Debtors, (1) Core Scientific and (2) Core Scientific Operating Company.  JW Didado asserts its Mechanic's and Materialman's Lien against the Real Property described in its Lien Filing is valid and enforceable against the Real Property.

8.     JW Didado is filing this notice out of an abundance of caution to advise, preserve, perfect, maintain and continue its rights in the Real Property, improvements and/or leasehold interest in the Real Property under Oklahoma State law and does not admit that such filing is required under applicable law.  JW Didado intends to enforce it Lien rights to the fullest extent permitted by applicable law and reserves its rights to amend or supplement its Lien Filing and any other claims against the Debtors.

9.     JW Didado reserves all rights to amend and/or supplement this notice, as may be appropriate.

Respectfully submitted,


/s/ *Gary M. McDonald*
Gary M. McDonald, Bar No. 5960
MCDONALD LAW, PLLC
15 West 6th Street, Suite 2606
Tulsa, Oklahoma 74119
(918) 430-3700
(918) 430-3770 – Facsimile
gmcdonald@mcdonaldpllc.com

*Attorneys for J.W. Didado Electric, LLC*

4

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on April 12, 2023, a true and correct copy of the foregoing pleading was served electronically on participants in the CM/ECF system according to local procedures.

/s/ *Gary M. McDonald*

# EXHIBIT A

# EXHIBIT A-1

DocuSign Envelope ID: 632AA8BD-6C6A-4A32-B464-B1FCED2C90E9

# TABLE OF CONTENTS

**Article     Name**
**Page**

Article 1   Scope of Work.........................................................................................2

Article 2   Contract Documents..............................................................................2

Article 3   Interpretation and Intent .......................................................................2

Article 4   Ownership of Work Product...................................................................3

Article 5   Contract Time........................................................................................4

Article 6   Contract Price........................................................................................5

Article 7   Procedure for Payment .........................................................................7

Article 8   Termination for Convenience ...............................................................8

Article 9    Representative of the Parties ..............................................................8

Article 10  Bonds and Insurance ...........................................................................9

Article 11  Other Provisions.................................................................................10



# Standard Form of Agreement Between Owner and Design-Builder - Lump Sum

*This document has important legal consequences. Consultation with
an attorney is recommended with respect to its completion or modification.*

This **AGREEMENT** is made as of the <u>5th</u> day of <u>January</u> in the year of <u>2022</u>, by and between the following parties, for services in connection with the Project identified below.

**OWNER:**
*CORE SCIENTIFIC, INC
106 E 6TH ST, STE 900-145
AUSTIN, TX 78701*

**DESIGN-BUILDER:**
*JW DIDADO ELECTRIC, LLC (A QUANTA SERVICES COMPANY)
1033 KELLY AVE
AKRON, OH 44306*

REMIT PAYMENT TO:
PO BOX 848031
DALLAS, TX 75281-8031

**PROJECT:**
*CORE SCIENTIFIC MUSKOGEE DATA CENTER SUBSTATION & DISTRIBUTION*

In consideration of the mutual covenants and obligations contained herein, Owner and Design-Builder agree as set forth herein.

# Article 1

## Scope of Work

**1.1**    Design-Builder shall perform all design and construction services, and provide all material, equipment, tools and labor, necessary to complete the Work described in and reasonably inferable from the Contract Documents.

# Article 2

## Contract Documents

**2.1**    The Contract Documents are comprised of the following:

> **2.1.1**    All written modifications, amendments, minor changes and Change Orders to this Agreement issued in accordance with DBIA Document No. 535, *Standard Form of General Conditions of Contract Between Owner and Design-Builder* (2010 Edition) ("General Conditions of Contract");
>
> **2.1.2**    The Basis of Design Documents, including the Owner's Project Criteria, Design-Builder's Proposal and the Deviation List, if any, contained in the Design-Builder's Proposal, which shall specifically identify any and all deviations from Owner's Project Criteria;
>
> **2.1.3**    This Agreement, including all exhibits and attachments, executed by Owner and Design-Builder (List for example, performance standard requirements, performance incentive requirements, markup exhibits, allowances, or unit prices);
>
> **2.1.4**    The General Conditions of Contract; and
>
> **2.1.5**    Construction Documents prepared and approved in accordance with Section 2.4 of the General Conditions of Contract.

# Article 3

## Interpretation and Intent

**3.1**    Design-Builder and Owner, prior to execution of the Agreement, shall carefully review all the Contract Documents, including the various documents comprising the Basis of Design Documents, for any conflicts or ambiguities. Design-Builder and Owner will discuss and resolve any identified conflicts or ambiguities prior to execution of the Agreement.

**3.2**    The Contract Documents are intended to permit the parties to complete the Work and all obligations required by the Contract Documents within the Contract Time(s) for the Contract Price. The Contract Documents are intended to be complementary and interpreted in harmony so as to avoid conflict, with words and phrases interpreted in a manner consistent with construction and design industry standards. In the event inconsistencies, conflicts, or ambiguities between or among the Contract Documents are discovered after execution of the Agreement, Design-Builder and Owner shall attempt to resolve any ambiguity, conflict or inconsistency informally, recognizing that the Contract Documents shall take precedence in the order in which they are listed in Section 2.1 hereof. Conflicts existing within Section 2.1.2 shall be resolved by giving precedence first to the Deviation List, if any, then the Owner's Project Criteria, and then the Design-Builder's Proposal.

**3.3**     Terms, words and phrases used in the Contract Documents, including this Agreement, shall have the meanings given them in the General Conditions of Contract.

**3.4**     If Owner's Project Criteria contain design specifications: (a) Design-Builder shall be entitled to reasonably rely on the accuracy of the information represented in such design specifications and their compatibility with other information set forth in Owner's Project Criteria, including any performance specifications; and (b) Design-Builder shall be entitled to an adjustment in the Contract Price and/or Contract Time(s) to the extent Design-Builder's cost and/or time of performance have been adversely impacted by such inaccurate design specification.

**3.5**     The Contract Documents form the entire agreement between Owner and Design-Builder and by incorporation herein are as fully binding on the parties as if repeated herein. No oral representations or other agreements have been made by the parties except as specifically stated in the Contract Documents.

# <u>Article 4</u>

## Ownership of Work Product

**4.1     Work Product.** All drawings, specifications and other documents and electronic data, including such documents identified in the General Conditions of Contract, furnished by Design-Builder to Owner under this Agreement ("Work Product") are deemed to be subject to the provisions set forth in Sections 4.2 through 4.5 below.

or

☒     Upon Owner's payment in full for all Work performed under the Contract Documents, Design-Builder transfers to Owner all ownership and property interests, including but not limited to any intellectual property rights, copyrights and/or patents, in the Work Product. Such transfer is conditioned on Owner's express understanding that its alteration of the Work Product without the involvement of Design-Builder is at Owner's sole risk and without liability or legal exposure to Design-Builder or anyone working by or through Design-Builder, including Design Consultants of any tier (collectively the "Indemnified Parties"), and on the Owner's obligations to provide the indemnity set forth in Section 4.5 below.

**4.3     Owner's Limited License upon Owner's Termination for Convenience or Design-Builder's Election to Terminate.** If Owner terminates this Agreement for its convenience as set forth in Article 8 hereof, or if Design-Builder elects to terminate this Agreement in accordance with Section 11.4 of the General Conditions of Contract, Design-Builder shall, upon Owner's payment in full of the amounts due Design-Builder under the Contract Documents, grant Owner a limited license to use the Work Product to complete the Project and subsequently occupy the Project, and Owner shall thereafter have the same rights as set forth in Section 4.2 above, conditioned on the following:

    **4.3.1**     Use of the Work Product is at Owner's sole risk without liability or legal exposure to any Indemnified Party and on the Owner's obligation to provide the indemnity set forth in Section 4.5 below; and

    **4.3.2**     Owner agrees to pay Design-Builder the additional sum of One Thousand Dollars Dollars ($1,000.00) as compensation for the right to use the Work Product to complete the Project and subsequently use the work Product in accordance with Section 4.2 if Owner resumes the Project through its employees, agents, or third parties.

**4.5     Owner's Indemnification for Use of Work Product.** If Owner is required to indemnify any Indemnified Parties based on the use or alteration of the Work Product under any of the circumstances identified in this Article 4, Owner shall defend, indemnify and hold harmless such Indemnified Parties from and against any and all claims, damages, liabilities, losses and expenses, including attorneys' fees, arising out of or resulting from the use or alteration of the Work Product.

# Article 5

## Contract Time

**5.1     Date of Commencement.** The Work shall commence within five (5) days of Design-Builder's receipt of Owner's Notice to Proceed ("Date of Commencement") unless the parties mutually agree otherwise in writing.

**5.2     Substantial Completion and Final Completion.**

**5.2.1**   Substantial Completion of the entire Work shall be achieved no later than  **March 31st, 2023** (TBD) calendar days after the Date of Commencement ("Scheduled Substantial Completion Date").

☒        The parties agree that the definition for Substantial Completion set forth in Section 1.2.18 of the General Conditions of Contract is hereby modified to read as follows:

"*Substantial Completion* is the date on which the Work, or an agreed upon portion of the Work, is sufficiently complete in accordance with the Contract Documents so that Owner can occupy and use the Project or a portion thereof for its intended purposes, provided, however, that Substantial Completion shall be deemed to have been achieved no later than the date of issuance of a Temporary Certificate of Occupancy issued by the local building official."

**5.2.2**    Interim milestones and/or Substantial Completion of identified portions of the Work ("Scheduled Interim Milestone Dates") shall be achieved as follows:

**125MW – December 31st,, 2022**
**125MW – January 31st, 2022**
**125MW – February 28th, 2023**
**125MW – March 31st, 2023**

**5.2.3**    Final Completion of the Work or identified portions of the Work shall be achieved as expeditiously as reasonably practicable. Final Completion is the date when all Work is complete pursuant to the definition of Final Completion set forth in Section 1.2.7 of the General Conditions of Contract.

**5.2.4**    All of the dates set forth in this Article 5 (collectively the "Contract Time(s)") shall be subject to adjustment in accordance with the General Conditions of Contract.

**5.3     Time is of the Essence.** Owner and Design-Builder mutually agree that time is of the essence with respect to the dates and times set forth in the Contract Documents.

**5.4     Liquidated Damages.** Design-Builder understands that if Substantial Completion is not attained by the Scheduled Substantial Completion Date, Owner will suffer damages which are difficult to determine and accurately specify. Anything to the contrary notwithstanding, in no event shall the total amount of Liquidated

Damages payable by Design Builder exceed then percent (10%) of Contract Price.  Design-Builder agrees that if Substantial Completion is not attained by <u>March 31st, 2023</u> (<u>10</u>) days after the Scheduled Substantial Completion Date (the "LD Date"), Designer-Builder shall pay Owner <u>Ten Thousand</u> Dollars ($10,000) as liquidated damages for each day that Substantial Completion extends beyond the LD Date.

☒      Design-Builder understands that if Final Completion is not achieved within 30 days of the Substantial Completion Date, Owner will suffer damages which are difficult to determine and accurately specify. Design-Builder agrees that if Final Completion is not achieved within 30 days of Substantial Completion, Design-Builder shall pay to Owner <u>Five Hundred</u> Dollars ($_____500), as liquidated damages for each calendar day that Final Completion is delayed beyond the above-referenced number of days.

**5.7**

☒      In addition to Design-Builder's right to a time extension for those events set forth in Section 8.2.1 of the General Conditions of Contract, Design-Builder shall also be entitled to an appropriate adjustment of the Contract Price for those events set forth in Section 8.2.1 of the General Conditions of Contract, provided, however, for Force Majeure Events, Design-Builder shall only be entitled to an increase in the Contract Price if said events exceed <u>30</u> cumulative days. Said additional compensation shall be limited to:

*[Check one box only]*

☒      $ <u>500</u> dollars a day for each day work is delayed beyond the Scheduled Substantial Completion Date.

# Article 6

## Contract Price

**6.1     Contract Price.** Owner shall pay Design-Builder in accordance with Article 6 of the General Conditions of Contract the sum of Fifty-Two Million, Two-Hundred & Seventy Thousand Dollars ($ <u>52,270,000</u>) ("Contract Price"), subject to adjustments made in accordance with the General Conditions of Contract. Unless otherwise provided in the Contract Documents, the Contract Price is deemed to include all sales, use, consumer and other taxes mandated by applicable Legal Requirements.

**6.2     Markups for Changes.** If the Contract Price requires an adjustment due to changes in the Work, and the cost of such changes is determined under Sections 9.4.1.3 or 9.4.1.4 of the General Conditions of Contract, the following markups shall be allowed on such changes:

**6.2.1**     For additive Change Orders, including additive Change Orders arising from both additive and deductive items, it is agreed that Design-Builder shall receive a Fee of _____<u>Five</u>_____ percent (_____<u>5</u>_____%) of the additional costs incurred for that Change Order, plus any other markups set forth at Exhibit _____ hereto.

**6.2.2**     For deductive Change Orders, including deductive Change Orders arising from both additive and deductive items, the deductive amounts shall include:

*[Check one box only]*

☒   No additional reduction to account for Design-Builder's Fee or any other markup.

or

☐   An amount equal to the sum of: (a) _____ percent (_____%) applied to the direct costs of the net reduction (which amount will account for a reduction associated with Design-Builder's Fee); plus (b) any other markups set forth at Exhibit _____ hereto applied to the direct costs of the net reduction.

**6.3     Allowance Items and Allowance Values.**

**6.3.1**   Any and all Allowance Items, as well as their corresponding Allowance Values, are set forth in an Exhibit hereto.

**6.3.2**   Design-Builder and Owner have worked together to review the Allowance Items and Allowance Values based on design information then available to determine that the Allowance Values constitute reasonable estimates for the Allowance Items. Design-Builder and Owner will continue working closely together during the preparation of the design to develop Construction Documents consistent with the Allowance Values. Nothing herein is intended in any way to constitute a guarantee by Design-Builder that the Allowance Item in question can be performed for the Allowance Value.

**6.3.3**   No work shall be performed on any Allowance Item without Design-Builder first obtaining in writing advanced authorization to proceed from Owner. Owner agrees that if Design-Builder is not provided written authorization to proceed on an Allowance Item by the date set forth in the Project schedule, due to no fault of Design-Builder, Design-Builder may be entitled to an adjustment of the Contract Time(s) and Contract Price.

**6.3.4**   The Allowance Value for an Allowance Item includes the direct cost of labor, materials, equipment, transportation, taxes and insurance associated with the applicable Allowance Item. All other costs, including design fees, Design-Builder's overall project management and general conditions costs, overhead and fee, are deemed to be included in the original Contract Price, and are not subject to adjustment, regardless of the actual amount of the Allowance Item.

*[In the alternative, the parties may want to delete Section 6.3.4 and add the following provision.]*

☐   In the event the actual direct cost of labor, materials, equipment, transportation, taxes and insurance associated with an Allowance Item is _____ percent (_____%) greater than or less than the Allowance Value for such Allowance Item, Design-Builder and Owner agree that Design-Builder's right to Fee and markup shall be adjusted in accordance with Section 6.2.

**6.3.5**   Whenever the actual costs for an Allowance Item is more than or less than the stated Allowance Value, the Contract Price shall be adjusted accordingly by Change Order, subject to Section 6.3.4. The amount of the Change Order shall reflect the difference between actual costs incurred by Design-Builder for the particular Allowance Item and the Allowance Value.

**6.4     Performance Incentives.**

**6.4.1**   Owner and Design-Builder have agreed to the performance incentive arrangements set forth in Exhibit <u>N/A</u>.

*[The parties are encouraged to discuss and agree upon performance incentives that will influence project success. These incentives may consist of Award Fees, incentives for safety, personnel retention, client satisfaction and similar items.]*

# Article 7

## Procedure for Payment

**7.1     Progress Payments.**

**7.1.1**     Design-Builder shall submit to Owner on the _____ (_____) day of each month, beginning with the first month after the Date of Commencement, Design-Builder's Application for Payment in accordance with Article 6 of the General Conditions of Contract.

**7.1.2**     Owner shall make payment within ten (10) days after Owner's receipt of each properly submitted and accurate Application for Payment in accordance with Article 6 of the General Conditions of Contract, but in each case less the total of payments previously made, and less amounts properly withheld under Section 6.3 of the General Conditions of Contract.

**7.2     Retainage on Progress Payments.**

**7.2.1**     Owner will retain TEN_____ percent (10_____%) of each Application for Payment provided, however, that when fifty percent (50%) of the Work has been satisfactorily completed by Design-Builder and Design-Builder is otherwise in compliance with its contractual obligations, Owner will not retain any additional retention amounts from Design-Builder's subsequent Applications for Payment. Owner will also reasonably consider reducing retainage for Subcontractors completing their work early in the Project.

**7.2.2**     Within fifteen (15) days after Substantial Completion of the entire Work or, if applicable, any portion of the Work, pursuant to Section 6.6 of the General Conditions of Contract, Owner shall release to Design-Builder all retained amounts relating, as applicable, to the entire Work or completed portion of the Work, less an amount equal to (a) the reasonable value of all remaining or incomplete items of Work as noted in the Certificate of Substantial Completion and (b) all other amounts Owner is entitled to withhold pursuant to Section 6.3 of the General Conditions of Contract.

**7.3     Final Payment.** Design-Builder shall submit its Final Application for Payment to Owner in accordance with Section 6.7 of the General Conditions of Contract. Owner shall make payment on Design-Builder's properly submitted and accurate Final Application for Payment within thirty (30) days after Owner's receipt of the Final Application for Payment, provided that Design-Builder has satisfied the requirements for final payment set forth in Section 6.7.2 of the General Conditions of Contract.

**7.4     Interest.** Payments due and unpaid by Owner to Design-Builder, whether progress payments or final payment, shall bear interest commencing five (5) days after payment is due at the rate of ONE   percent (1%) per month until paid.

**7.5     Record Keeping and Finance Controls.** With respect to changes in the Work performed on a cost basis by Design-Builder pursuant to the Contract Documents, Design-Builder shall keep full and detailed accounts and exercise such controls as may be necessary for proper financial management, using accounting and control systems in accordance with generally accepted accounting principles and as may be provided in the Contract Documents. During the performance of the Work and for a period of three (3) years after Final Payment, Owner and Owner's accountants shall be afforded access to, and the right to audit from time-to-time, upon reasonable notice, Design-Builder's records, books, correspondence, receipts, subcontracts, purchase orders, vouchers, memoranda and other data relating to changes in the Work performed on a cost basis in accordance with the Contract Documents, all of which Design-Builder shall preserve for a period of three (3) years after Final Payment. Such inspection shall take place at Design-Builder's offices during normal business hours unless another location and time is agreed to by the parties. Any multipliers or markups agreed to by the Owner and Design-Builder as part of this Agreement are only subject to audit to confirm that

such multiplier or markup has been charged in accordance with this Agreement, with the composition of such multiplier or markup not being subject to audit.

# Article 8

## Termination for Convenience

**8.1**     Upon ten (10) days' written notice to Design-Builder, Owner may, for its convenience and without cause, elect to terminate this Agreement. In such event, Owner shall pay Design-Builder for the following:

**8.1.1**     All Work executed in connection with the Work;

**8.2**     In addition to the amounts set forth in Section 8.1 above, Design-Builder shall be entitled to receive one of the following as applicable:

**8.2.1**     If Owner terminates this Agreement prior to commencement of construction, Design-Builder shall be paid N/A percent (_____N/A___%) of the remaining balance of the Contract Price.

**8.2.2**     If Owner terminates this Agreement after commencement of construction, Design-Builder shall be paid N/A__ percent (N/A___%) of the remaining balance of the Contract Price.

**8.3**     If Owner terminates this Agreement pursuant to Section 8.1 above and proceeds to design and construct the Project through its employees, agents or third parties, Owner's rights to use the Work Product shall be as set forth in Section 4.3 hereof.

*[The following Article 9 should be used only if the Owner and Design-Builder agree to establish their respective representatives at the time the Agreement is executed rather than during the performance of the Project.]*

# Article 9

## Representatives of the Parties

**9.1**     **Owner's Representatives.**

**9.1.1**     Owner designates the individual listed below as its Senior Representative ("Owner's Senior Representative"), which individual has the authority and responsibility for avoiding and resolving disputes under Section 10.2.3 of the General Conditions of Contract: *(Identify individual's name, title, address and telephone numbers)*

**9.1.2**     Owner designates the individual listed below as its Owner's Representative, which individual has the authority and responsibility set forth in Section 3.4 of the General Conditions of Contract: *(Identify individual's name, title, address and telephone numbers)*

**9.2**     **Design-Builder's Representatives.**

> **9.2.1**     Design-Builder designates the individual listed below as its Senior Representative ("Design-Builder's Senior Representative"), which individual has the authority and responsibility for avoiding and resolving disputes under Section 10.2.3 of the General Conditions of Contract: *(Identify individual's name, title, address and telephone numbers)*

> **9.2.2**     Design-Builder designates the individual listed below as its Design-Builder's Representative, which individual has the authority and responsibility set forth in Section 2.1.1 of the General Conditions of Contract: *(Identify individual's name, title, address and telephone numbers)*

# Article 10

## Bonds and Insurance

**10.1**     **Insurance.** Design-Builder and Owner shall procure the insurance coverages set forth in the Insurance Exhibit attached hereto and in accordance with Article 5 of the General Conditions of Contract.

**10.2**     **Bonds and Other Performance Security.**  Design-Builder shall provide the following performance bond and labor and material payment bond or other performance security:

> **Performance Bond.**
>
> *[Check one box only. If no box is checked, then no bond is required.]*
>
> ☐ Required          ☐ Not Required
>
> **Payment Bond.**
>
> *[Check one box only. If no box is checked, then no bond is required.]*
>
> ☐ Required          ☐ Not Required
>
> **Other Performance Security.**

☐ Required          ☒ Not Required

# Article 11

## Other Provisions

**11.1    Other provisions, if any, are as follows:** *(Insert any additional provisions)*

**11.1.1   Waiver of Certain Damages:**   Notwithstanding any other provisions of this Agreement to the contrary, neither Owner nor Design-Builder shall be liable under this Agreement or under any cause of action related to the subject matter of this Agreement, whether in contract, tort (including negligence), strict liability, products liability, indemnity, contribution, or any other cause of action for punitive, special, indirect, incidental or consequential losses or damages, including loss of profits, use, opportunity, revenues, financing, bonding capacity, or business interruptions; provided that the limitation of liability set forth in this Section shall not apply to Design-Builder's : (i) indemnity obligations with respect to Third-Party Claims, (ii) willful misconduct, (iii) gross negligence, and/or (iv) breach of confidentiality provisions.  "Third-Party Claim" means a claim by any person other than (i) a Party, (ii) person providing or receiving indemnity under this Contract, or (iii) a third-party beneficiary to this Agreement.

**11.1.2   Overall Liability Cap:**  Notwithstanding anything in this Agreement, any Order, or otherwise to the contrary, and in addition to, cumulative of and not in limitation of any other limits on liability herein, Design-Builder's maximum aggregate liability hereunder or with respect to any Order or the subject matter thereof, regardless of cause (whether in contract, tort, strict liability, or otherwise), other than third-party claims indemnified by Design-Builder hereunder, shall not exceed in the aggregate an amount equal to the greater of  the total amount of compensation paid to Design-Builder hereunder or for the Order or  (with respect to losses covered by policies of insurance Design-Builder is required to obtain and maintain under this Agreement) actual proceeds from the coverage amounts required under this Agreement for the policy covering such loss.

**11.1.3   Indemnity:**  Design-Builder shall have no obligation nor liability whatsoever to indemnify, defend, nor hold harmless any person, except to the extent of the fault or negligence of Design-Builder (and/or its subcontractors) in and during the performance of the Work.  Anything to the contrary notwithstanding, Design-Builder shall have no obligation nor liability whatsoever to indemnify, defend, nor hold harmless any person, to the extent of the fault or negligence of such person.

**11.1.4   Latent Site Conditions:**   Anything to the contrary notwithstanding, should concealed or unknown physical conditions be encountered in the performance of the Work, below the surface of the ground or in an existing structure, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in this Agreement, the Agreement sum and Agreement time for performance shall be equitably adjusted by Change Order.

**11.1.5   Hazardous Materials:** Anything to the contrary notwithstanding, Design-Builder shall have no liability for any hazardous material not introduced to the Work location by it, and Owner shall indemnify, defend and hold harmless Design-Builder for any claims or liabilities arising from preexisting or latent hazardous material, except to the extent Design-Builder negligently or willfully exacerbates same and fails to take action to mitigate any resultant damage.

**[Section 2.3.1 of the General Conditions of Contract sets forth a traditional negligence standard as it relates to the Design-Builder's performance of design professional services. If the Basis of Design Documents identify specific performance standards that can be objectively measured, the parties, by including the following language, agree that the Design-Builder is obligated to achieve such standards.]**

DocuSign Envelope ID: 632AA8BB-9C6A-4A32-B464-B1FCED2C99E6

☒     Notwithstanding Section 2.3.1 of the General Conditions of Contract, if the parties agree upon specific performance standards in the Basis of Design Documents, the design professional services shall be performed to achieve such standards.

***[In lieu of Sections 10.3.1 through 10.3.3 of the General Conditions of Contract, the parties may want to delete such sections and include the following alternative dispute resolution clause.]***

☐     Any claims, disputes, or controversies between the parties arising out of or related to the Agreement, or the breach thereof, which have not been resolved in accordance with the procedures set forth in Section 10.2 of the General Conditions of Contract shall be resolved in a court of competent jurisdiction in the state in which the Project is located.

In executing this Agreement, Owner and Design-Builder each individually represents that it has the necessary financial resources to fulfill its obligations under this Agreement, and each has the necessary corporate approvals to execute this Agreement, and perform the services described herein.

**OWNER:**                                    **DESIGN-BUILDER:**

CORE SCIENTIFIC, INC                          JW DIDADO

_____            _____
*(Name of Owner)*                             *(Name of Design-Builder)*

*Weston Adams*                                *Gary Didado*
_____            _____
*(Signature)*                                 *(Signature)*

WESTON ADAMS                                  GARY DIDADO
_____            _____
*(Printed Name)*                              *(Printed Name)*

CHIEF CONSTRUCTION OFFICER                    PRESIDENT
_____            _____
*(Title)*                                     *(Title)*

Date: __1/13/2022_____            Date: __1/13/2022_____


**Caution: You should sign an original DBIA document which has this caution printed in blue. An original assures that changes will not be obscured as may occur when documents are reproduced.**

The license for use of this document expires 1 year from the date of purchase.
To renew your license, visit store.dbia.org.

Questions? We're here to help.

# Contact us



**Design-Build Institute of America**
1331 Pennsylvania Ave. NW, 4th Floor
Washington, DC 20004

(202) 682-0110
dbia@dbia.org

# EXHIBIT A-2

SUBCONTRACT SERVICES
AGREEMENT

THIS AGREEMENT (hereafter referred to as the "Agreement"), made and entered into as of the ~~5~~ day of ~~December, 2021~~ (the "Effective Date"), by and between Core Scientific, Inc., a Delaware corporation, located at 106 East 6th Street, Suite 900-145, Austin, Texas 78701 (hereafter referred to as the "Owner") and J.W. Didado Electric, LLC, a Delaware limited liability company located at 1033 Kelly Avenue, Akron, OH 44306 (hereafter referred to as the "Contractor").

WHEREAS, the Owner wishes to enter into an agreement with the Contractor to provide certain services related to a certain Owner project, which services are set forth in Exhibit A hereto, Scope of Work, attached hereto and made a part hereof (hereafter referred to as the "Work"), and the Owner wishes to provide such Work, on the terms and subject to the conditions set forth herein.

NOW THEREFORE, the afore-named parties, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, agree as set forth above and as follows:

1.    **Services**

The Contractor shall provide the Work to the Owner and the Owner shall compensate Contractor there for exclusively in accordance with and subject to the terms and conditions of this Agreement, regardless of any other contract Owner may have or be bound by for or with respect to the project in question. The term of this Agreement shall commence on the Effective Date and shall continue in effect until completion of the Work by Contractor; provided that all terms and conditions of this Agreement which are continuing in nature (*e.g.,* liability limits, payment obligations) shall remain in full force and effect.

2.    **Compensation**

The Owner shall compensate the Contractor at the rate or rates in the Contractor's proposal dated 1-5-2022 ~~2021~~, incorporated hereunder and herewith as Exhibit B to this Agreement.

3.    **Payment**

Invoices shall be submitted monthly. The Owner will review each invoice submitted by the Contractor and advise the Contractor of any concerns relative to the acceptability of the invoice. The invoice will be due and payable within thirty (30) days from the date of the invoice. Payment of invoices shall not be subject to or conditioned upon payment to Owner by any other party or person, and, excepting legitimately disputed amounts, no amounts shall be withheld from any invoice payment.

4.    **Standard of Care**

The Contractor services shall be performed in a commercially reasonable manner consistent with that prevailing degree of skill and care exercised by experienced contractors performing similar services in the State where such services shall be performed, under the same or similar circumstances and conditions.

4.1    The Contractor makes no other representations or any warranties, whether expressed or implied, with respect to the services rendered hereunder, except as explicitly set forth in this

1

Agreement. All other representations and warranties, written or oral, including all implied representations and warranties, whether at law, via customs or usages of trade, or otherwise, and including all WARRANTIES OF MERCHANTABILITY, FITNESS FOR PURPOSE AND NON-INFRINGEMENT, are hereby waived and disclaimed.

4.2    Without limiting the foregoing, Contractor shall not be responsible or liable for or with respect to any acts, omissions, defects, non-conformance, mistakes, warranties, representations, or guarantees (including failures or breaches of any of the foregoing)of, made by, or attributable to Owner, any of its affiliates, agents, contractors, vendors, suppliers, or subcontractors, or any employees, agents or representatives of any thereof, and Owner hereby releases and discharges and shall indemnify, defend and hold harmless Contractor and all of its affiliates, agents, contractors, vendors, suppliers, and subcontractors, and all employees, agents and representatives of any thereof from and against any and all related damages, losses, liabilities, charges, assessments, penalties, costs, and expenses of any nature (including reasonable attorney's fees and costs and expenses of any legal proceedings including any response to requests or demands in connection therewith).

## 5.    Applicable Law

This Agreement shall be governed by and construed in accordance with the laws of the State of the place where Contractor's services will be performed, without reference to the conflict of laws principles thereof.

## 6.    Changes

The Owner may make changes within the general scope of Work through a written Change Order designed to be an amendment to the applicable individual Work Order and this Agreement and signed by the Owner's and Contractor's authorized representative.

If any change (or other condition or circumstance) causes or results in an increase or decrease in the cost, expense or time required for the Contractor to perform any part of the Work, an equitable adjustment shall be made to the compensation and/or schedule. Any adjustment shall be in the form of a Change Order to this Agreement.

## 7.    Force Majeure

The Contractor shall not be responsible for delays caused by, or re-sequencing compelled by, the Owner's failure to furnish necessary information, or to review or disapprove the Contractor's Work promptly as requested, or resulting from late, slow, or faulty performance by Owner or others whose performance is precedent to or concurrent with the performance of the Contractor's Work. The Contractor shall also not be responsible for any delays in the performance of the Work by reason of strikes, lockouts, accidents, acts of God, or other causes beyond the Contractor's reasonable control. In the event of any such cause or delay, the period of performance stipulated under this Agreement shall be extended accordingly, and the Contractor shall be entitled to reasonable additional compensation for any delays attributable to Owner and/or others. Any such adjustments to the period of performance and compensation shall be put in writing in the form of a Change Order to this Agreement.  Contractor shall also be entitled to equitable schedule and financial relief to the extent of any impacts from COVID-19 / Coronavirus.

2

**8.     Entire Agreement and Amendment**

The parties agree that the provisions of this Agreement, including all executed Change Orders, addenda, and documents attached hereto or incorporated herein by reference, shall constitute the entire Agreement between the parties and that this Agreement supersedes all prior agreements, written or verbal, relating to the subject matter of this Agreement. This Agreement may be amended only by a written instrument signed by both the Owner and the Contractor.

**9.     [Not Used]**

**10.    Insurance**

Contractor shall purchase and maintain during the term of this Agreement insurance coverage relating to the execution of Work under this agreement as follows:

a)   Commercial General Liability Insurance, with a limit of $1,000,000 for each occurrence and $2,000,000 in the general aggregate.

b)   Automobile Liability Insurance, with a limit of $1,000,000 for each accident, combined single limit for bodily injury and property damage.

c)   Worker's Compensation Insurance and Employer's Liability Insurance, in accordance with statutory requirements, with a limit of $1,000,000 for each accident.

d)   Professional Liability Insurance, only to the extent, if any, Contractor is providing engineering / design with a limit of $3,000,000 for each claim and aggregate.

The Contractor shall furnish certificates of insurance for such coverage.

10.1    To the extent damages are covered by insurance, whether within a deductible, self-insured layer, the Owner and Contractor and their insurers waive all subrogation claims (to the extent permitted by law) they may have against each other and against agents and employees of the other. This mutual waiver of subrogation shall not be limited to the period of construction and shall apply to claims after construction is completed.

**11. Limitation of Damages**

a)   Waiver of Certain Damages:  Notwithstanding any other provisions of this Agreement to the contrary or otherwise, in no event shall Contractor be liable or responsible for, whether in contract, tort, strict liability, products liability, indemnity, contribution, or any other cause of action, or otherwise, any special, punitive, indirect, incidental, exemplary, or consequential losses or damages, loss of actual or anticipated profits, use, opportunity, revenues, financing, bonding capacity, business opportunities or for business interruptions, whether or not such damages, *etc.* were foreseeable or Contractor was advised of the possibilities of such damages, *etc.*

b)   Contractor's Maximum Liability.  Notwithstanding anything in this Agreement or otherwise to the contrary, and in addition to, cumulative of and not in limitation of any other limits on liability herein, the maximum aggregate liability of Contractor under this Agreement, regardless of cause (whether in contract, tort, strict liability, or otherwise), shall not exceed in the aggregate an amount equal to the total amount of compensation paid to Contractor under this Agreement.

3

DocuSign Envelope ID: BA750970-2BA8-4331-B162-E56F10BB5931

## 12. Confidentiality

A party hereto ("Receiving Party") may be given access to information that the other party ("Disclosing Party") considers confidential or proprietary. The Disclosing Party shall mark such information as confidential or proprietary. The Receiving Party agrees to use such confidential or proprietary information only for the purposes of performing the Work pursuant to the respective Work Order authorized under this Agreement. Upon the completion of such Work, or other termination of this Agreement, all such confidential or proprietary information shall be returned to the Disclosing Party. However, Contractor may retain, in its law department files, and/or its electronic archiving system, one copy of such information transmitted pursuant to this Agreement solely for purposes of determining compliance with the confidentiality provisions hereof. Any such information that cannot be returned shall be held in confidence and not disclosed to any person at any time unless expressly authorized by the Disclosing Party.  Notwithstanding the foregoing, the obligations of confidentiality set forth in this Section with respect to Confidential Information shall not apply to any information that: (i) is or becomes publicly known without violation by the Receiving Party; (ii) is already known to the Receiving Party without restrictions at the time of its disclosure by the Disclosing Party, as evidenced by the written records of the Receiving Party; (iii) after its disclosure to the Receiving Party by the Disclosing Party, is made known to the Receiving Party without restrictions by a third party having the right to do so; or (iv) is legally required to be disclosed by the Receiving Party pursuant to a judicial order from a court of competent jurisdiction, or similar legal compulsion (provided that the Receiving Party promptly informs the Disclosing Party of the requirement and affords the disclosing party a reasonable  opportunity to contest the required disclosure).  The foregoing prohibitions shall not apply to Confidential Information required to be disclosed under securities laws applicable to publicly traded companies and their subsidiaries

## 13. Communication Protocol

The Contractor shall communicate through the Owner on all matters pertaining to Work performed authorized under this Agreement. Questions concerning the Work, requests for design decisions and sharing of project information shall all be communicated through the Owner.

## 14. Litigation and Claims

Each party shall give the other party immediate notice in writing of:

a) Any action, including any proceeding before a federal, state, or local government court or agency, filed against either party that relates to this Agreement.
b) Any claim asserted by a third party against either party that relates to this Agreement.

In the event of the occurrence of either of the above, each party shall immediately furnish copies of all non-privileged documents relating to the action or claim to the other party.

## 15. Differing Site Conditions

a) During the progress of the Work, if the Contractor encounters or the Owner discovers (1) subsurface or latent physical conditions at a site materially differing from any indicated within the Scope of Work attached hereto or (2) previously unknown physical conditions or physical conditions of an unusual nature at the site that are generally recognized as not being inherent

4

in Work of the nature provided for under this Agreement, and if such conditions cause an increase or decrease in the cost or time required for performance of any part of the Work under this Agreement, an equitable adjustment shall be made to the compensation, schedule, and scope of Work.  Any such adjustments shall be specified by amendment in a Change Order to this Agreement.

b)  Anything to the contrary notwithstanding, Contractor shall have no liability for any hazardous material not introduced to the Work location by it, and Owner shall indemnify, defend and hold harmless Contractor for any claims or liabilities arising from preexisting or latent hazardous material, except to the extent Contractor negligently or willfully exacerbates same and fails to take action to mitigate any resultant damage. Contractor shall at no time be deemed to be the Owner or be deemed to have title to such pre-existing hazardous materials.

**16. Agreement Interpretation**

In the event of any inconsistency or conflict among the terms of this Agreement document, and any other exhibits/addenda (excepting Change Orders), the specific terms and conditions of this Agreement shall control.

**17. General**

a)  The terms and provisions of this Agreement shall not be construed to alter, waive, or affect any lien rights that the Contractor may have for performance of Work under the Agreement.  The rights and remedies of the Contractor under the Agreement are not exclusive but rather are cumulative and in addition to all other rights and remedies.

b)  One or more waivers by either party of any term or condition of this Agreement or of any breach thereof shall not be deemed a waiver of any breach of any other term or condition or of any subsequent breach of the same term or condition.

c)  If any provision of this Agreement is determined to be invalid and unenforceable, the other provisions of the Agreement shall continue in full force and effect.

d)  Each party and its agents and representatives are independent Consultants in relation to the other party with respect to all matters arising under the Agreement.  Nothing in this Agreement shall be deemed to establish a partnership, joint venture, association, or employment relationship between the parties.

e)  This Agreement binds and is for the benefit of the Owner and the Contractor. Neither the Owner nor the Contractor shall assign or transfer this Agreement without the prior written consent of the other party.

**18. Survival of Terms**

The provisions of Sections 2, 3, 4.1, 4.2, 5, 8, 10.1, 11, 12, 15, and 17, specifically, shall survive the completion of the Work or other termination of this Agreement.



IN WITNESS whereof, the duly authorized representatives of the Owner and Contractor have executed this Agreement.

**OWNER**
**Core Scientific, Inc.**

By: _Wes Adams_
    9BFCC2BA595144F...
Print Name: Wes Adams

Title: CCO

**CONTRACTOR**
**J.W. Didado Electric, LLC**

By: _Gary Didado_

Print Name: Gary Didado

Title: President

**EXHIBITS A AND B** ATTACHED HERETO AND MADE A PART HEREOF.

# EXHIBIT B

I-2023-003097          **Book 4847 Pg 546**
03/30/2023 10:47am          Pg 0546-0549
Fee: $40.73   Doc: $0.00
POLLY IRVING - Muskogee County Clerk
State of OK

## MECHANIC'S OR MATERIALMAN'S LIEN STATEMENT

STATE OF OHIO         )
                        ) ss.

COUNTY OF AKRON    )

      J.W. Didado Electric, LLC, located at 1033 Kelly Avenue, Akron, Ohio 44306 ("J.W.

Didado"), has a claim against Core Scientific, Inc., a Delaware Corporation in the amount of

Twenty-Six Million Forty-Nine Thousand Two Hundred Twenty-Eight Dollars ($26,049,228),

plus interest, costs and attorneys' fees and claims due to J.W. Didado under written contracts dated

January 5, 2022. J.W. Didado claims a lien upon the land, the buildings, the appurtenances and

improvements situated in Muskogee County, Oklahoma, described on Exhibit "A," appended

hereto and incorporated herein by reference. This claim is made for and on account of materials

furnished, services rendered and equipment rented or leased, as set forth on the attached Exhibit

"B." Such materials, services and rentals were last furnished by J.W. Didado on February 13,

2023. The materials, services and equipment were furnished pursuant to contracts with Core

Scientific, Inc., a Delaware Corporation, and were acquired and furnished for the buildings and

improvements on the premises owned by Core Scientific, a Delaware Corporation, on the property

described in Exhibit "A." Such said sum is just, due and unpaid, and J.W. Didado claims a lien

upon the land, the buildings, appurtenances and improvements thereon and upon the said premises

on which the same is situated, to the amount of $26,049,229 as set forth above, according to the

laws of the State of Oklahoma. The property described on Exhibit "A" is titled in the name of

Core Scientific, Inc., a Delaware Corporation.

      Dated this __27TH__ day of March, 2023.

McDonald Law, PLLC
15 West 6th Street, Suite 2606
Tulsa, Oklahoma 74119

STATE OF OKLAHOMA   SS
COUNTY OF MUSKOGEE
I, POLLY IRVING, County clerk, of the County and State
aforesaid, hereby Certify that this is a true and correct
copy of an instrument filed in the Office of County Clerk
of Muskogee County
3-21-23 ........ Witness my hand
and Seal this 3-30-23
BY _____ POLLY IRVING, COUNTY CLERK _____ DEPUTY

I-2023-003097   **Book 4847 Pg 547**
03/30/2023 10:47am   **Pg 0546-0549**
Fee: $40.73  Doc: $0.00
POLLY IRVING - Muskogee County Clerk
State of OK

## **VERIFICATION**

STATE OF OHIO           )
                        )      ss.
COUNTY OF AKRON         )

Dan Sublett, of lawful age, being first duly sworn, upon oath says:  That he is the President

of  J.W. Didado, and is authorized to execute this verification; that he has read this statement and

knows the contents thereof; that the name of the owner, the name of the claimant, the description

of the property upon which the lien is claimed, and the items of the account as therein set forth,

are just, true, correct and unpaid and claimant has complied with the provisions of 42. O.S. §142.6.

_____
Dan Sublett

Subscribed and sworn to before this  **27ᵀᴴ**  day of March, 2023.

_____
Notary Public

My Commission Expires: _May 12, 2027_

My Commission No.: _2017- RE-632759_

ANN E BEZNOSKA
Notary Public, State of Ohio
My Commission Expires:
May 12, 2027

Mail Notices to:

Core Scientific, Inc.
106 6ᵗʰ Street, Suite 900-145
Austin, TX  78701

Core Scientific Operating Company (formerly Core Scientific, Inc., a Delaware Corporation)
c/o Moshe A. Fink, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153

Weil, Gotshal & Manges, LLP          Weil, Gotshal & Manges, LLP
Alfredo R. Perez                     Ray C. Schrock
700 Louisiana Street, Ste. 1700      Ronit J. Berkovich
Houston, TX 77002                    Moshe A. Fink
                                     767 Fifth Avenue
                                     New York, NY 10153

I-2023-003097        **Book 4847 Pg 548**
03/30/2023 10:47am        **Pg 0546-0549**
Fee: $40.73   Doc: $0.00
POLLY IRVING - Muskogee County Clerk
State of OK

EXHIBIT A

The east half of the east half of the NW¼ AND the east half of the west half of the east half of the NW¼ of Section 15, Township 14 North, Range 18 East of the Indian Base and Meridian, Muskogee County, Oklahoma.

AND

A tract of land in the NW¼ of Section 15, Township 14 North, Range 18 East of the Indian Meridian, Muskogee County, Oklahoma, more particularly described as follows:

Beginning at the northeast corner of the west half of the west half of the SE¼ of the NW¼; thence S01°37'08"E along the east line thereof 180.00 feet; thence S88°45'27"W 400.00 feet; thence N01°37'08"W 180.00 feet to the north line of said SW¼ of the NW¼; thence continuing N01°37'08"W 276.45 feet; thence N88°48'27"E 400.00 feet to a point on the east line of the west half of the west half of the NW¼ at 1043.58 feet south of the northeast corner thereof; thence S01°37'08"E along said line 276.45 feet to the point of beginning

I-2023-003097        **Book 4847 Pg 549**
03/30/2023 10:47am        **Pg 0546-0549**
Fee: $40.73   Doc: $0.00
POLLY IRVING - Muskogee County Clerk
State of OK

## EXHIBIT B

**Claim Composed of:**            **To Lien Statement**

| | |
|---|---:|
| Materials | $33,509,940 |
| Subcontractors | $2,133,753 |
| Labor & Equipment Costs | $3,667,556 |
| **Total Costs** | **$39,311,249** |
| Less Payments Received | ($13,262,021) |
| **Net Balance Outstanding** | **$26,049,228** |