**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **CORE SCIENTIFIC, INC.,** *et al.,* | § | **Case No. 22-90341 (DRJ)** |
| | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | |
| | § | |

**DEBTORS' OBJECTION TO
PROOF OF CLAIM NOS. 425 AND 497 FILED BY CELSIUS MINING LLC**

> **THIS IS AN OBJECTION TO YOUR CLAIM.  THIS OBJECTION ASKS THE COURT TO DISALLOW THE CLAIM THAT YOU FILED IN THIS BANKRUPTCY CASE.  YOU SHOULD IMMEDIATELY CONTACT THE OBJECTING PARTY TO RESOLVE THE DISPUTE.  IF YOU DO NOT FILE A RESPONSE WITHIN 30 DAYS AFTER THE OBJECTION WAS SERVED ON YOU, YOUR CLAIM MAY BE DISALLOWED WITHOUT A HEARING.**

Core Scientific Operating Company f/k/a Core Scientific, Inc. ("**Core**"),[2] and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), represent as follows in support of this claim objection (the "**Objection**"), and request entry of an order, substantially in the form attached hereto as **Exhibit A** ("the **Proposed Order**") disallowing Proof of Claim Nos. 425 and 497 filed by Celsius Mining LLC ("**Celsius**", and together with the Debtors, the "**Parties**") against Core:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6074); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198).  The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

[2] As discussed in the First Day Declaration (defined below), Core Scientific, Inc. changed its name to Core Scientific Operating Company in January 2022. *See* First Day Declaration at ¶ 31.  Therefore, any claims against Core Scientific, Inc., are more properly claims against Core Scientific Operating Company.

**Preliminary Statement**

1.      In a clear attempt to create shock value and manufacture a presumably stronger negotiating position, Celsius filed proofs of claim against Core Scientific, Inc. relating to the Parties' hosting agreements seeking over $312 million.  Even beyond the fact that the Celsius Hosting POC (defined below) is a litigation tactic untethered from the facts and applicable contract provisions, it is a filing that creates a very real and immediate impact on the Debtors and—if not resolved as soon as possible by this Court—threatens to cast a pall over the Debtors' business plan preparations and their relationships with their various stakeholders.

2.      More specifically, because proofs of claim are presumptively valid, even if they have no merit, the Debtors have to address the fact that Celsius claims it is allegedly entitled to over $300 million from the estates and its impact on the Debtors' efforts to create a business plan that does not contemplate paying Celsius anything even remotely approaching that figure— if anything at all.  There can be little doubt that Celsius's strategy in filing such a large claim was to make a big splash and cause a stir.

3.      For a number of reasons, it appears that the amounts reflected in the Celsius Hosting POC are being asserted for some ulterior purpose.

4.      First, even though it is impossible to determine how exactly Celsius came up with its over $300 million damages figure, as the Celsius Hosting POC does not explain its calculation, that amount appears to be comprised of amounts for lost profits, lost revenues, special damages and/or consequential damages.  Indeed, Celsius appears to suggest as much when it states that it "assume[s]" without any basis that "any limitations of liability in the contracts do not apply."

5.      The Parties' contract, however, expressly excludes recovery for lost profits, loss of business, loss of revenues, consequential or indirect damages, and any incidental, special, reliance, exemplary, or punitive damages.  Moreover, even for those types of damages the contract

may not expressly exclude, the contract further limits the aggregate amount of recovery to which Celsius could ever be entitled to an amount equal to one months fee per applicable order. Therefore, Celsius simply has no basis to assert damages in an amount anywhere close to the numbers in its Celsius Hosting POC.

6.      Second, to support to its claims, Celsius merely attached to the Celsius Hosting POC a two-page addendum identifying general categories of claims coupled with amounts; it does nothing to explain how it arrived at its damages figures.  Moreover, Celsius simply attached its prior Motion to Enforce the Automatic Stay and For Civil Contempt filed in its own bankruptcy as the basis for its claims—a motion that contains nothing to support alleged damages in the hundreds of millions of dollars.  In fact, that motion contained no damages figure at all.  This was Celsius's chance to explain the basis for its alleged right to recover what it claims are damages of over $300 million.  Instead, it repeated its prior assertions with nothing new.

7.      As noted, the Debtors need to address the filing of the Celsius Hosting POC as soon as possible given its stated damages and its potential impact on the Debtors' reorganization efforts.  As the Court is aware from prior filings in this case, in addition to defenses against Celsius's claims, Core has claims against Celsius relating to the very same contracts that are at the center of the Celsius Hosting POC.  *See generally* Dkt. No 189, Debtors' Emergency Motion for Entry of an Order Authorizing Rejection of Executory Contracts with Celsius Mining LLC, *In re Core Scientific, Inc.*, No. 22-90341-11 (Bankr. S.D. Tex., Dec. 28, 2022) at ¶ 13 (the "**Rejection Motion**");[3] Dkt. No. 5, Declaration of Michael Bros in Support of the Debtors' Chapter 11

---

[3]  The amounts referenced in the Rejection Motion include power pass through charges and interest on past due amounts owed by Celsius, prepetition and postpetition in the Celsius case, through November 31, 2022.  The amounts have since increased given the Debtors' hosting of Celsius machines in December 2022 and for the first days of January 2023 prior to Rejection.

Petitions and First Day Relief, *In re Core Scientific, Inc.*, No. 22-90341-11 (Bankr. S.D. Tex., Dec. 21, 2022) at ¶¶ 73–77 (the "**First Day Declaration**").

8.      To that end, the Debtors filed an objection to Celsius's Automatic Stay Motion six months ago, and also filed an affirmative motion seeking, among other things, an order compelling Celsius to pay administrative expenses owed to Core.  More recently, Core filed its own proofs of claim in Celsius's bankruptcy for prepetition claims of at least $3,886,169.41 in liquidated amounts and in excess of $30 million in amounts to be liquidated based on Celsius's breaches of the same contracts at issue in the Celsius Hosting POC.  Taken together with the amounts owed to Core that are postpetition in the Celsius Bankruptcy (as defined below), Celsius owes Core in excess of $11 million in liquidated amounts related to the Hosting Agreements (as defined below), as well as unliquidated amounts.

9.      The Celsius Hosting POC also claims Celsius is entitled to an administrative claim against the Debtors of approximately $4.7 million.  Contemporaneously with filing the Celsius Hosting POC, Celsius filed a motion seeking to recover on that alleged administrative claim.  *See* Dkt. No. 799, Celsius Mining LLC's Motion for Entry of an Order (i) Allowing and Directing Payment of its Administrative Expense Claim Pursuant to 11 U.S.C. § 503(b)(1)(A) and (ii) Granting Related Relief, *In re Core Scientific, Inc.*, No. 22-90341-11 (Bankr. S.D. Tex., Apr. 14, 2023) (the "**Celsius Admin Motion**").  That administrative claim relates to the same Hosting Agreements that are at issue in the Celsius Hosting POC and the Debtors' claims against Celsius.

10.     The Debtors will be responding separately to the Celsius Admin Motion.  Nevertheless, given the interconnectedness of all claims between the Debtors and Celsius relating to the Hosting Agreements, the Debtors submit that all of these claims should be decided in one

proceeding before this Court, and the currently scheduled May 22 hearing on the Celsius Admin Motion should be used as a status conference to discuss the most efficient and expedient manner to resolve these claims. This would include summary disposition of key legal issues as may be appropriate, such as the effect of the various limitations of damages provisions in the Hosting Agreements.

11.     In addition, given the complexities of the Parties' competing claims against each other, the fact that the Celsius Hosting POC needs to be addressed quickly in order to avoid disrupting the Debtors' reorganization and exit from chapter 11, and the fact that both Parties are debtors, the Debtors submit that this dispute would benefit from a mediation with Judge Isgur or another Judge at the Court's selection. The Debtors believe mediation may help the Parties to resolve their disputes relating to the Hosting Agreements more expeditiously than a costly litigation and benefit their respective chapter 11 estates.

## **Relief Requested**

12.     By this Objection, pursuant to sections 105(a) and 502(b) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 3007-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**"), the Debtors seek entry of the Proposed Order, disallowing Proofs of Claim Nos. 425 and 497 (together, the "**Celsius Hosting POC**" or the "**Claim**") filed by Celsius in their entirety because (i) Celsius is not entitled to any recovery on its Claim; (ii) any amounts to which Celsius may be entitled are subject to the limitations of damages provisions in the Hosting Agreements; and/or (iii) any amounts to which Celsius may be entitled are less than the amounts Celsius owes the Debtors on the same contracts that are the basis for the Celsius Hosting POC. The Debtors further request that the Court use the May 22, 2023 hearing date on the Celsius Admin Motion as

a status conference to discuss how best to proceed with resolving the various disputes between the Parties, including directing the Parties to mediation.

## Jurisdiction and Venue

13.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper pursuant to 28 U.S.C §§ 1408 and 1409.  The relief requested herein is sought pursuant to §§ 105(a) and 502(b) the Bankruptcy Code, Bankruptcy Rule 3007, and Bankruptcy Local Rule 3007-1.

## Background

### A.      The Hosting Agreements

14.     On December 18, 2020, Core and Celsius entered into a Master Services Agreement (the "**MSA**") for the Debtors to host Celsius's cryptocurrency mining equipment (the "**Miners**") at Core's data centers and provide certain related services to Celsius.  Pursuant to the MSA, the Debtors and Celsius executed ten separate related work orders, which are generally governed by the MSA but also set forth certain terms specific to each purchase order (the "**Orders**").[4]  A true and correct copy of the MSA and Order #10 are attached hereto as **Exhibit B**.

15.     On December 3, 2021, the Debtors and Celsius entered into another Master Services Agreement pursuant to which the Debtors agreed to provide services to Celsius in connection with hosting additional Miners for Celsius (the "**2021 MSA**").  In connection with the 2021 MSA, the Debtors and Celsius executed Master Services Agreement Order #1-A, dated

---

[4]  Although Core and the Debtors entered into ten Orders under the MSA, only eight were still in effect at the time of rejection in Core's Bankruptcy.  Order #8 was terminated in May 2021 and Order #9 replaced Order #5.  Order #10 is the Order at issue in Celsius's Automatic Stay Motion and Proof of Claim.

December 3, 2021 ("**Order #1-A**," together with the MSA and Orders, and the 2021 MSA, the "**Hosting Agreements**").

16.     The Hosting Agreements, which are governed by Delaware law, set forth the Parties' rights and obligations for the Debtors' provision of hosting services to Celsius.

17.     Under the Hosting Agreements, Celsius was obligated to pay a hosting fee rate per Miner, subject to the Debtors' right to pass through increases in electricity costs as an additional cost to host Celsius's Miners.  In addition, pursuant to Order #10, Celsius was required to prepay certain amounts in advance for hosting services in later months.  In return, the Debtors hosted Celsius's Miners at the Debtors' data centers and provided certain related services to Celsius.

18.     Prior to first raising the argument during its chapter 11 proceedings, and consistent with the unambiguous terms of the Hosting Agreements, Celsius paid the increased electricity costs associated with increased power costs charged by utility companies as passed through by the Debtors.  Only during its bankruptcy did Celsius abruptly introduce a new interpretation of the Hosting Agreements and refuse to make such payments owed to the Debtors.

19.     Before the Debtors rejected the Hosting Agreements, they continued to perform under these Hosting Agreements with Celsius in the ordinary course of business, and were thus, for several months, left shouldering the burden of the increased electricity costs that the Hosting Agreements required Celsius to pay.

20.     Celsius's failure to pay the amounts it owed to the Debtors had a deleterious impact on the Debtors' liquidity in the weeks leading up to their chapter 11 cases and helped precipitate their filing, as did the significant litigation costs the Debtors incurred in connection with Celsius's Automatic Stay Motion.

**B.       Procedural History**

21.      On July 13, 2022, Celsius filed voluntary petitions for relief under chapter

11 of title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern

District of New York (the "**Celsius Bankruptcy**").

22.      On September 28, 2022, Celsius filed a motion in the Celsius Bankruptcy

seeking to hold the Debtors in contempt of court for allegedly violating the automatic stay in the

Celsius Bankruptcy (the "**Automatic Stay Motion**").  The premise for the Automatic Stay Motion

was that Core allegedly breached the Hosting Agreements.  In short, Celsius sought to convert an

alleged breach of contract claim into a violation of the automatic stay.

23.      The Debtors disagreed with Celsius's contentions both as a matter of fact

and law and filed an opposition to the Automatic Stay Motion on October 19, 2022.  *See* Dkt. No.

1140, *In re Celsius Network LLC*, No. 22-10964 (MG) (Bankr. S.D.N.Y. Oct. 19, 2022).

Additionally, the Debtors filed their own motions in the Celsius Bankruptcy, seeking, among other

things, to compel immediate payment of administrative expense claims for the electricity

pass-through charges Celsius ceased paying after it filed for chapter 11.  *See generally* Dkt. No.

1144, *In re Celsius Network LLC*, No. 22-10964 (MG) (Bankr. S.D.N.Y. Oct. 19, 2022).

24.      On December 21, 2022 (the "**Petition Date**"), the Debtors each commenced

with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are

authorized to continue to operate their business and manage their properties as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

25.      On December 28, 2022, the Debtors filed an emergency motion to reject the

Hosting Agreements.  This Court held a hearing on the motion on January 3, 2023, and ordered

the rejection of the Hosting Agreements on January 4, 2023.

26.     On January 3, 2023, Core timely filed an initial proof of claim in the Celsius Bankruptcy and reserved all rights in that regard.  *See* Claim No. 17273 filed against Celsius Mining LLC.

27.     On February 9, 2023, after the bar date was extended in the Celsius Bankruptcy, Core timely filed an amended proof of claim, which amended and superseded its initial proof of claim in all respects.  *See* Claim No. 23022 filed against Celsius Mining LLC.

### C.      *Celsius's Proof of Claim*

28.     Celsius filed the Celsius Hosting POC[5] on April 14, 2023.[6]  Celsius asserts a claim for $312,318,000 plus additional unspecified and unliquidated amounts.  In support of its Claim, Celsius repurposed the contentions in its Automatic Stay Motion, without any further context as to its asserted Claim amount.  Celsius also included an Addendum in which it identified what it calls a "Prepetition Breach of Contract Claim" for $111,998,000; a "Postpetition, Pre-Rejection Breach of Contract Claim," in the amount of $1,497,000; and a Contract Rejection Damages Claim for $194,104,000.  It also lists an unliquidated "Claim for Damages to Mining Rigs," without any support other than an email from a Celsius employee and certain attached photos.

---

[5] Celsius originally filed Claim No. 425 but subsequently amended that claim with Claim No. 497, to which it added an Addendum and certain other materials and photographs.  This Objection relates to both claims to the extent Claim No. 497 does not supersede Claim No. 425.  For ease of reference, the two claims combined are referred to herein as the Celsius Hosting POC.

[6] Celsius US Holding LLC filed additional proofs of claim against certain of the Debtors on April 14, 2023.  *See* Claim No. 428 filed against Core Scientific, Inc.; Claim No. 434 filed against Core Scientific Mining LLC; Claim No. 436 filed against Core Scientific Acquired Mining LLC; Claim No. 439 filed against Core Scientific Operating Company; Claim No. 469 filed against American Property Acquisition, LLC; Claim No. 494 against American Property Acquisitions I, LLC; Claim No. 495 against Starboard Capital LLC; and Claim No. 496 against Core Scientific Specialty Mining (Oklahoma) LLC. This Objection does not relate to the aforementioned claims, and the Debtors reserve all rights to object to such claims.

29.    Finally, Celsius also contends that $4,719,000.00 of its Claim is entitled to priority under section 507(a) of the Bankruptcy Code as an administrative expense claim.

30.    On the same day, Celsius also filed the Celsius Admin Motion seeking entry of an order (i) allowing and directing payment of its administrative expense claim pursuant to 11 U.S.C. § 503(b)(1)(A) and (ii) granting related relief.  The Celsius Admin Motion relates to the same approximately $4.7 million priority amount listed in the Celsius Hosting POC.  A hearing on that motion is currently set for May 22, 2023.

## Basis for Relief

31.    As set forth in Bankruptcy Rule 3001(f), a properly executed and filed proof of claim constitutes prima facie evidence of the validity and the amount of the claim under section 502(a) of the Bankruptcy Code.  *See, e.g.*, *In re Jack Kline Co., Inc.*, 440 B.R. 712, 742 (Bankr. S.D. Tex. 2010).  However, prima facie validity under Bankruptcy Rule 3001(f) "can be overcome by rebuttal evidence . . . ." *In re Fidelity Holding Co., Ltd.*, 837 F.2d 696, 698 (5th Cir. 1988). "Upon production of this rebuttal evidence, the burden shifts to the claimant to prove its claim by a preponderance of the evidence."  *In re Armstrong*, 347 B.R. 581, 583 (Bankr. N.D. Tex. 2006) (citing *In re Fidelity Holding*, 837 F.2d at 698).  And, "the ultimate burden of proof always lies with the claimant."  *Id.* (citing *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15 (2000)).

32.    Celsius cannot meet its burden here.  Celsius has asserted a claim for $312,318,000 and additional unliquidated amounts.  Tellingly, nowhere in its Celsius Hosting POC does Celsius detail how it arrived at its damages amount.  If the amount is based on an alleged violation of the automatic stay, which argument Celsius appears to have abandoned, it would be disallowed because a breach of contract claims cannot be transmogrified into an automatic stay violation—as discussed below and as this Court has already noted.  If the amount is based on alleged breaches of the Hosting Agreements, as appears to be the case, the claims fail because the

facts demonstrate that the Debtors did not breach the Hosting Agreements prior to rejection. Moreover, even if Celsius's Claim was based solely on rejection damages and other breaches of the Hosting Agreements, the Hosting Agreements also preclude damages based on, among other things, lost profits, loss of revenues, and consequential and special damages, which, given the amounts Celsius is claiming, must be the alleged basis for its claims. Furthermore, even if Celsius could prove prepetition breach of the agreements and entitlement to damages that are not excluded by the Hosting Agreements, the MSA expressly limits the amount of recoverable damages to an aggregate of one months fee payable pursuant to the applicable order—measured in the single millions of dollars at most, not tens or hundreds of millions as Celsius claims.

33.    Finally, in addition to the above, any amounts that Celsius might ever be entitled to recover—and the Debtors submit there is none—would be subject to defenses (including under section 558 of the Bankruptcy Code), set off, and/or recoupment based on the tens of millions of dollars that Celsius owes Core as set forth in Core's proof of claim filed in the Celsius Bankruptcy.

34.    Given that Celsius seems to have adopted its Automatic Stay Motion as factual support for its Celsius Hosting POC, the Debtors also incorporate by reference in its entirety—and attach hereto as **Exhibit C**—Core's Objection to the Celsius Debtors' Motion to Enforce the Automatic Stay and For Civil Contempt. *See generally* Dkt. No. 1140, *In re Celsius Network LLC*, No. 22-10964 (MG) (Bankr. S.D.N.Y. Oct. 19, 2022).[7]

---

[7] The Debtors also incorporate by reference in their entirety and attach hereto as Exhibits D-F the declarations submitted in connection with their objection to Celsius's Automatic Stay Motion. *See generally* Dkt. No. 1141, Declaration of Jeff Pratt in Support of Core Scientific, Inc.'s Opposition to Debtors' Motion to Enforce the Automatic Stay and Civil Contempt, *In re Celsius Network LLC*, No. 22-10964 (MG) (Bankr. S.D.N.Y. Oct. 19, 2022), attached hereto as **Exhibit D**; Dkt. No. 1142, Declaration of Monica Xia in Support of Core Scientific, Inc.'s Opposition to Debtors' Motion to Enforce the Automatic Stay and Civil Contempt, *In re Celsius Network LLC*, No. 22-10964 (MG) (Bankr. S.D.N.Y. Oct. 19, 2022), attached hereto as **Exhibit E**; Dkt No. 1143, Declaration of KC

### A.  The MSA Limits The Type and Amount of Damages

35.  The Hosting Agreements, and more specifically the MSA, expressly limit both the type and amount of damages Celsius could potentially recover even if it could prove a claim.

36.  First, although the Debtors cannot be certain of Celsius's damages theories—as Celsius has failed to provide such detail in its Claim—the MSA's broad limitation of liability provisions explicitly bar recovery for lost profits, loss of business, loss of revenues, and any consequential or indirect damages:

> NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR *(I) LOST PROFITS; (II) LOSS OF BUSINESS; (III) LOSS OF REVENUES* (EXCEPT THAT [CELSIUS] SHALL BE LIABLE FOR ANY FEES OR OTHER AMOUNTS OWED TO [CORE] UNDER THIS AGREEMENT); (IV) LOSS, INTERRUPTION OR USE OF DATA OR LOSS OF USE OF [CELSIUS] EQUIPMENT; **(V) ANY CONSEQUENTIAL, OR INDIRECT DAMAGES; OR (VI) COST OF COVER, ANY INCIDENTAL, SPECIAL, RELIANCE, EXEMPLARY OR PUNITIVE DAMAGES** (IF APPLICABLE) EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

*See* MSA § 5(c) (Emphasis added).

37.  The MSA also explicitly limits the Debtors' total liability in the aggregate to Celsius to an amount equal to one months fee:

> NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, *[CORE'S] TOTAL LIABILITY TO [CELSIUS] IN THE AGGREGATE FOR THE ENTIRE TERM (REGARDLESS OF WHETHER THE CLAIMS ARE BROUGHT DURING OR AFTER THE TERM)* WITH RESPECT TO ALL CLAIMS ARISING FROM OR RELATED TO THE SUBJECT MATTER OF THIS AGREEMENT (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES) *WILL NOT EXCEED AN AMOUNT EQUAL TO ONE (1) MONTHS FEE PAYABLE TO [CORE] PURSUANT TO THE APPLICABLE ORDER.*

---

Mares, *In re Celsius Network LLC*, No. 22-10964 (MG) (Bankr. S.D.N.Y. Oct. 19, 2022), attached hereto as **Exhibit F**.

*See* MSA § 5(d) (Emphasis added).  Accordingly, any amounts the Debtors may be found to owe Celsius (and there should be none) would be capped at this amount—not the over $300 million Celsius has asserted.

38.    And, for the avoidance of any doubt, the MSA further specifies that "THE LIMITATIONS SET FORTH IN SECTIONS 5 c AND 5 d WILL APPLY TO ALL CLAIMS AND CAUSES OF ACTION, REGARDLESS OF WHETHER IN CONTRACT, TORT, STRICT LIABILITY OR OTHER THEORY."  *See* MSA § 5(e).

39.    The Celsius Hosting POC asserts that "[l]iquidated amounts relating to the applicable contracts assume that any limitations of liability do not apply."  However, Celsius does not provide any justification for simply assuming away contractual provisions that it deems inconvenient.

40.    When a debtor rejects an executory contract, rejection damages are measured based on the state law governing breach of contract, here, Delaware law.  *See In re Pilgrim's Pride Corp.,* 467 B.R. 871, 879 (Bankr. N.D. Tex. 2012) (applying the governing state law of the rejected contracts to evaluate and measure damages).  Delaware law holds that contracts are enforced as they are written.  *See eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, 2013 WL 5621678, at *45 (Del. Ch. Sept. 30, 2013) (enforcing a limitation of liability provision).  The language of the relevant contractual provisions is clear and unambiguous and is presented in recognizable capitalized text.

41.    Delaware courts routinely enforce limitation of liability provisions, especially where, as here, the limitation is plain and unambiguous.  *See In re Pilgrim's Pride Corp.,* 467 B.R. 871, 881 (Bankr. N.D. Tex. 2012) (applying Delaware law and granting summary judgment to the debtors because the contracts excluded consequential or non-compensatory

damages); *Iavarone v. Eagle Eye Home Inspections, LLC,* 2019 WL 5692265, at *2 (Del. Super. Ct. Nov. 4, 2019) (upholding limitation of liability provision where the plain language of the clause was clear regarding the people and types of conduct to which the limitation applied, the contract was not lengthy, and the limitations' language was clear); *eCommerce Indus., Inc.*, 2013 WL 5621678, at *45 (enforcing a limitation of liability provision and noting that "freedom of contract would suggest that parties … should be entitled to draft agreements so as to avoid certain duties and liabilities").

42.     The Parties plainly agreed upon the express exclusion of certain types of damages and the limitation of damages to one months fee.  This is further highlighted by Section 5(f) of the MSA, which explicitly states, "Each party recognizes and agrees that the warranty disclaimers, ***limitations of liability and remedy limitations*** in this Agreement ***are materially bargained for by the parties***." (Emphasis added).  Celsius cannot now—years later—ignore the Parties' intent and attempt to rewrite the Parties' clear language in order to seek additional damages.  These provisions were bargained for by Core in its agreement with Celsius, and are a material component of the MSA.

43.     The limitation of liability provisions were negotiated by two sophisticated commercial entities, with equal bargaining power, at arms' length; the provisions should, therefore, be enforced as written.  *See  Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co.*, 2002 WL 1558382, at *11 (Del. Ch. July 9, 2002) (upholding the terms of a contract as written because nothing prevented the plaintiff, a sophisticated commercial entity, from refusing to contract if it did not have the leverage to obtain favorable terms); *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 552 (Del. Super. Ct. 2005), *aff'd*, 886 A.2d 1278 (Del. 2005) (concluding that sophisticated parties cannot "escape the express language" of a contract).

44.     Accepting Celsius's claim for any of these categories of damages would render the Parties' explicit exclusion of such damages in the MSA's limitation of liability provisions meaningless and against the Parties' intent.

45.     In addition to being contractually unavailable, the Celsius Hosting POC seeks damages that are highly speculative, as it provides no basis for the claimed amounts.  Under Delaware law, recovering for lost profits—which the Celsius Hosting POC presumably seeks— must be "proved [] with a reasonable degree of certainty.  No recovery can be had for loss of profits which are determined to be uncertain, contingent, conjectural, or speculative." *Callahan v. Rafail*, No. CIV.A. 99C-02-024, 2001 WL 283012, at *1 (Del. Super. Ct. Mar. 16, 2001); *see also Pfizer Inc. v. Advanced Monobloc Corp.,* No. 97C-04-037-WTQ, 1999 WL 743927, at *15 (Del. Super. Ct. Sept. 2, 1999), *opinion corrected on denial of reconsideration*, No. 97C-04-037-WTQ, 1999 WL 1240864 (Del. Super. Ct. Sept. 24, 1999) (barring recovery of lost profits because lost profits were not contemplated at the time the parties contracted and were too speculative).

### B.     *Core Did Not Breach the MSA Prepetition*

46.     The purported prepetition breaches of the MSA alleged by Celsius are not supported by the law or the facts.  First, the Debtors' right to pass through increased electricity tariffs is not only permitted by the unambiguous terms of the MSA, but is confirmed by industry usage, the commercial context, and the parties' course of dealing.  Second, the Debtors had no contractual obligation to deploy Celsius's machines by predetermined dates, but even if they did, strict adherence to any such deadlines would be excused by factors beyond the Debtors' control. Finally, the Debtors' conditional obligation to notify Celsius of additional hosting availability, if available, was not triggered because the condition precedent of there *being* additional availability did not occur, or if it did, Celsius has suffered no harm as a result of any alleged failure to notify Celsius of such availability.

      i.       **Core's Pass-Through of Increased Electricity Tariffs Comports with the MSA, the Parties' Course of Dealing, Industry Usage, and Commercial Context**

47.      Contrary to Celsius's contention, the MSA does not contemplate Core bearing the significant risk of energy price increases; it contemplates the opposite.

48.      Specifically, Core had a clear and unambiguous contractual right in its "sole and absolute discretion" to "pass through" to Celsius "any increases, changes in . . . tariffs . . . with respect to the provision of Services" by Core under the MSA, and Celsius "shall pay all Increased Costs." *See* MSA § 4(f). Applying Delaware law, this Court should give effect to the plain meaning of Section 4(f). *See Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) ("A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction."); *Est. of Osborn v. Kemp*, 991 A.2d 1153, 1159-60 (Del. 2010) ("When the contract is clear and unambiguous, [Delaware courts] will give effect to the plain-meaning of the contract's terms and provisions.").

49.      The MSA comports with industry practice. The crypto mining industry is power-intensive and power reliant. In this industry, where electricity costs incurred by mining machines comprise the majority of input costs, it is standard practice to pass through increases in electricity costs to the entity for whose benefit the miners are operating in search of bitcoin.

50.      Celsius has previously understood that it would be responsible for any increase in power costs, and indeed paid for such increased power costs from October 2021 to April 2022. And when Core began charging all customers for these increases in power costs, Celsius paid those costs, beginning in June 2022, *before* Celsius filed for bankruptcy. Celsius also paid the postpetition charges for these increases in power costs before abruptly changing its position in September 2022.

ii.      **Core Did Not Unjustifiably Delay Deployment of Celsius's Machines**

51.      Contrary to Celsius's contention, Order #10 does not provide for a fixed "deployment schedule," but rather provided the expected timeframe for Celsius to deliver its machines to the Debtors for deployment.  Celsius's course of conduct confirms this, as it did not even finish delivering its first tranche of machines, scheduled to be delivered in September 2021, until late November 2021, and other deliveries similarly occurred months after the listed dates in Order #10.

52.      The MSA provides additional clarity on this point.  Section 2(b) of the MSA specifies that Celsius "shall be fully responsible for delivering all [Celsius] Equipment to [Core] at a specified [Core] Facility on or before the applicable scheduled delivery date."  In addition, Section 5(b) provides that "ALL [CORE] FACILITY AND SERVICES ARE PROVIDED ON AN "AS IS", "AS AVAILABLE" BASIS."  The months listed in Order #10 therefore created an obligation for Celsius, not Core.

53.      In addition, any purported delays in deploying Celsius's machines once delivered were attributable to factors beyond Core's control, including, among other things: (i) Celsius's own repeated late deliveries; (ii) significant supply chain disruptions; (iii) construction and permitting delays; (iv) power disruption issues; and (v) an outbreak of COVID-19 among Core's construction staff.

54.      Even if Core was obligated to deploy machines by the months listed in Order #10 (which they were not), any breach of such obligation would be excused because Celsius first breached its own related obligation by failing to timely deliver machines for deployment by the Debtors.  *See Hudson v. D&V Mason Contractors, Inc.*, 252 A.2d 166, 170 (Del. Sup. Ct. 1969) ("As a general rule the party first guilty of a material breach of contract cannot complain if the other party subsequently refuses to perform.").  These failures by Celsius were material, as

demonstrated by the fact that Order #10 allows Core to terminate the entire Order if Celsius delivers too late.  *See* Order #10, at 3.

55.    Still, Core deployed every cryptocurrency mining machine that Celsius delivered.

### iii.    Core Did Not Breach the "Notice of Hosting Availability Provision"

56.    Core did not have any additional hosting capacity to offer Celsius when the Hosting Agreements were in place.

57.    Order #10 provided that Core would notify Celsius as soon as practicable of additional hosting availability, *if any*, and noted that additional hosting availability *if available* will be the subject of a separate order.  *See* Order #10, at 4–5.  When this clause was included, Celsius knew that Core had a capacity deficit, needed to construct new facilities, and needed to first deploy many of their own machines.  The plain language of this clause created a condition precedent of additional hosting capacity even being available.  *See Cato Cap. LLC v. Hemispherx Biopharma, Inc.,* 70 F. Supp. 3d 607, 619 (D. Del. 2014), *aff'd*, 625 F. App'x 108 (3d Cir. 2015) ("A condition precedent [] is an act or event … that must exist or occur before a duty to perform something promised arises.").  Because the condition precedent never occurred, any obligation to notify Celsius of additional capacity never arose, and, accordingly, Celsius cannot recover damages from this purported breach.

### iv.    Celsius's Claim for Damages to Mining Rigs Also Fails

58.    In a further attempt to add to its damages claims with unliquidated amounts, Celsius attaches an email with descriptions and photos of mining rigs that were allegedly damaged by Core.  Celsius does not specify when this alleged damage occurred.  Therefore, the Debtors are left presuming that Celsius is claiming such damage took place during the return process following the rejection of the Hosting Agreements.

59.     Celsius's first claim regarding this alleged damage comes approximately four months after the Hosting Agreements were rejected.  Celsius never raised this issue with Core prior to filing its Celsius Hosting POC, and certainly not during the months following the rejection of the Hosting agreements and return of the Miners.  This is indeed the first Core has heard about such purported damages in connection with the Miners.

60.     Celsius also provides no other detail related to this claim, such as when the photos were taken, the location of the Miners when the photos were taken, where and how the Miners were being stored, who took the photos, which alleged damages pertain to which Miners, any elements the Miners may have been exposed to over multiple months, and any information regarding the chain of custody of the Miners before and during the time the photos were taken.

61.     Without more information, the Debtors dispute that any Miners were damaged by Core or as a result of Core's conduct and will address this issue during the course of this contested matter, including in any mediation, and reserve all of their rights related thereto.

### C.     *Core Did Not Violate Celsius's Automatic Stay*

62.     Celsius cannot recover damages for any claim that Core violated the automatic stay in the Celsius Bankruptcy (the "**Celsius Automatic Stay**") due to Core's alleged non-performance of the MSA, as it asserted in its Automatic Stay Motion.  While it appears that Celsius has abandoned this claim, to the extent it is still pursing this as a basis or support for recovery, the Debtors summarize below their prior arguments opposing the Automatic Stay Motion.

63.     First, this Court has already expressed a view rejecting Celsius's theory that the Debtors' purported non-performance of the MSA violated the Celsius Automatic Stay.  *See* Transcript of Motion Hearing, *In re Core Scientific, Inc.*, No. 22-90341-11 (Bankr. S.D. Tex., Jan. 3, 2023) at 20:3-18 (The Court: "It gives rise to a claim perhaps, but tell me what provision

of the automatic stay that simple non-performance violates." Mr. Koenig: "I think it's an attempt to exercise control over the property –" The Court: "Not even close."); *see also id.* at 18:15-25 (The Court: "And so how is it – because the Debtor could – the Debtor could just stop performing and that wouldn't violate the stay." Mr. Koenig: "That's before, Your Honor." The Court: "Yes. They could just stop performing and it doesn't violate the stay.").

64.     Core did not exercise control over Celsius's property, as contemplated by section 362(a)(3) of the Bankruptcy Code.

65.     In 2021, the U.S. Supreme Court concluded section 362(a)(3) is only implicated by an "*affirmative act* that would *alter the status quo* as of the time of the filing of a bankruptcy petition." *City of Chicago v. Fulton,* 141 S. Ct. 585, 590 (2021) (emphasis added). Based on this interpretation, the Supreme Court held that the mere retention of estate property after a bankruptcy filing does not violate section 362(a)(3), explicitly overruling courts that had interpreted it more broadly.

66.     *Fulton* is consistent with other U.S. Supreme Court precedent.  In *Citizens Bank of Maryland v. Strumpf*, the Court held that breaching a "promise to pay" a debtor is not an exercise of control over the debtor's property and does not implicate or violate sections 362(a)(3) or (a)(6) of the Code. 516 U.S. 16, 21 (1995).  The Court rejected as a "false premise" the debtor's argument that the bank "exercised dominion over property" of the estate, implicating section 362(a)(3), by failing to return deposited funds to the debtor. *Id*.

67.     Moreover, even if the Debtors' purported failure to perform under the MSA harmed or reduced the value of Celsius's estate, that still would not violate the Celsius Automatic Stay.  *See In re Albion Disposal, Inc.*, 217 B.R. 394, 405 (W.D.N.Y. 1997) ("[S]ection 362(a)(3) does not stay acts that reduce the value of property of the estate; it stays acts to exercise control

over estate property.").  The contrary argument "does not find any support in the Bankruptcy Code." *Id.* at 406.

68.     Section 362(a)(3) of the Bankruptcy Code does not stay all acts concerning estate property, however remote.  "The mere fact that the conduct may be wrongful or unlawful does not automatically convert it into a violation of the automatic stay."  *Windstream Holdings, Inc. v. Charter Commc'ns Inc. (In re Windstream Holdings, Inc.)*, No. 21-CV-4552 (CS), 2022 WL 5245633 at *8 (S.D.N.Y. Oct. 6, 2022).  Simply put, a purported breach of contract gives rise to a breach of contract claim against the counterparty—not a stay violation.

69.     Second, Core fully complied with the MSA prior to rejection.  And, even if they are found to have breached the MSA prior to rejection, Core still did not violate the Celsius Automatic Stay because it acted in accordance with its reasonable interpretation of the Hosting Agreements.

70.     Courts have held that a contract counterparty does not violate the automatic stay by acting in accordance with its reasonable interpretation of a contract with the debtor.  For example, in *United States v. Inslaw, Inc.*, the D.C. Circuit held that a non-debtor did not violate the automatic stay by retaining and using copies of the debtor's software pursuant to its interpretation of its contract with the debtor, which differed from the debtor's interpretation. 932 F.2d 1467, 1472–73 (D.C. Cir. 1991).  The D.C. Circuit warned against the broad interpretation of section 362(a)(3) that Celsius relies on in its Automatic Stay Motion, and now evidently in its proof of claim:

> If the bankruptcy court's idea of the scope of 'exercise of control' were correct, the sweep of § 362(a) would be extraordinary—with a concomitant expansion of the jurisdiction of the bankruptcy court. Whenever a party against whom the bankrupt holds a cause of action … acted in accord with his view of the dispute rather than that of the debtor-in-possession or bankruptcy trustee, he would risk a

> determination by a bankruptcy court that he had 'exercised control' over intangible
> rights (property) of the estate.

*Id.*  The court added, "[f]ulfillment of [the] purpose [of § 362] cannot require that every party who
acts in resistance to the debtor's view of its rights violates § 362(a) if found in error by the
bankruptcy court."  *Id.* at 1473; *see also In re Mountaineer Coal Co.*, 247 B.R. 633, 644 (Bankr.
W.D. Va. 2000) ("The Court does not believe that Congress intended to convert a matter of
contract dispute into a violation of the automatic stay.").  The evidence here demonstrates that
Core acted within its reasonable interpretation of the Agreement such that Celsius cannot convert
a contract dispute into a stay violation.

**D.     *Celsius's Own Breaches and Amounts That it Owes the Debtors Further Limit
the Amount of Damages it Can Recover from the Debtors***

71.     Any amounts the Debtors may owe to Celsius must be reduced given
Celsius's own breaches of the Hosting Agreements, and can be set off or recouped against the
claims the Debtors have against Celsius.  The Debtors retain all defenses available under Section
558 of the Bankruptcy Code.

72.     At a minimum, Celsius owes the Debtors approximately $11 million in
hosting prepayments and power pass through costs that span Celsius's pre and postpetition periods.
The Debtors also spent tens of millions of dollars building out the infrastructure to host Celsius's
machines.  As a result of Celsius's own breaches of the MSA, Core has suffered damages in an
amount to be liquidated at a later date, but believed to be in excess of $30 million.  *See* Claim No.
23022 filed against Celsius Mining LLC and attached hereto as **Exhibit G**.

73.     Obligations performed or services rendered by the Debtors to Celsius
pursuant to the Hosting Agreements and other costs incurred after Celsius's petition date constitute
claims entitled to administrative priority in the Celsius Bankruptcy pursuant to section 503 of the
Bankruptcy Code.  These are amounts Core has sought in Celsius's bankruptcy case.  *See generally*

Dkt. No. 1144, Motion of Core Scientific, Inc. (I) To Compel Immediate Payment of Administrative Expenses and (II)(A) For Relief From Automatic Stay to Exercise Rights Under Master Services Agreement and Related Orders or (B) In The Alternative, to Compel Assumption or Rejection of Master Services Agreement and Related Orders, *In re Celsius Network LLC*, No. 22-10964 (MG) (Bankr. S.D.N.Y. Oct. 19, 2022).[8]

74.   The Debtors also reserve all rights to assert claims of equitable subordination of Celsius's claims in these proceedings based on Celsius's misconduct that caused harm to the Debtors and their creditors.

## **Reservation of Rights**

75.   This Objection is limited to the grounds stated herein and accordingly is without prejudice to the rights of the Debtors or any other party in interest to object to any claim, including the any of Celsius's claims, on any further grounds, and the Debtors expressly reserve all other substantive or procedural objections that they may have.  Nothing contained herein is intended to be or shall be deemed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any appropriate party-in-interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Debtors' or any other party-in-interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, or (iv) an approval, adoption, assumption, or rejection of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.

---

[8] The amounts Celsius owes to the Debtors for costs incurred after Celsius's petition date have increased since October 19, 2022.

## **Notice**

76.     Notice of this Objection will be provided to (i) any party that has requested notice pursuant to Bankruptcy Rule 2002, (ii) the affected claimant, and (iii) any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).


[*Remainder of page intentionally left blank*]

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the

relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: April 24, 2023
Houston, Texas

                        */s/  Alfredo R. Perez*

WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:    (713) 546-5000
Facsimile:    (713) 224-9511
Email: Alfredo.Perez @weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock (admitted *pro hac vice*)
Ronit J. Berkovich (admitted *pro hac vice*)
Theodore E. Tsekerides (admitted *pro hac vice*)
Moshe A. Fink (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:    (212) 310-8000
Facsimile:    (212) 310-8007
Email: Ray.Schrock@weil.com
          Ronit.Berkovich@weil.com
          Theodore.Tsekerides@weil.com
          Moshe.Fink@weil.com

*Counsel for Debtors and Debtors in Possession*

**<u>Certificate of Service</u>**

I hereby certify that on April 24, 2023, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

<u>  /s/  Alfredo R. Perez                 </u>
Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:     (713) 546-5000
Facsimile:     (713) 224-9511
Email: Alfredo.Perez @weil.com