# **Exhibit D**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>CELSIUS NETWORK LLC, et al.,[1]<br><br>           Debtor. | Chapter 11<br><br>Case No. 22-10964 (MG)<br>Jointly Administered |

**DECLARATION OF JEFF PRATT IN SUPPORT OF CORE SCIENTIFIC, INC.'S OPPOSITION TO DEBTORS' MOTION TO ENFORCE THE AUTOMATIC STAY AND FOR CIVIL CONTEMPT**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

I, Jeff Pratt, declare:

1.      I am the Senior Vice President, Partnerships, of Core Scientific, Inc. ("Core").  I submit this Declaration in support of Core's Opposition to Celsius Mining LLC's ("Celsius") Motion to Enforce the Automatic Stay and for Civil Contempt and Core's Motions for Affirmative Relief.

2.      My responsibilities as Senior Vice President, Partnerships include managing client relationships, developing new business, overseeing sales deals, and purchasing mining hardware. With respect to Celsius, one of Core's top five accounts, I managed the relationship with Core's sales team, growing the Celsius fleet hosted at Core.  In this capacity, I was in regular contact with Celsius.

3.      As Senior Vice President, Partnerships, I am familiar with Core's contracts with Celsius and the relationship between them from the time periods before and after the Debtors' chapter 11 filings on July 13, 2022 (the "Petition Date").  The facts set forth in this declaration are based on my personal knowledge and experience, and my review of relevant documents and Core's books and records that are maintained and used in the ordinary course of Core's business.

## I.      THE MASTER SERVICES AGREEMENT

4.      On December 18, 2020, Core and Celsius entered into a Master Services Agreement whereby Core agreed to provide Celsius certain services in connection with hosting its digital-asset-mining machines.  MSA (Ex. A), § 1(a).  Core and Celsius supplemented the agreement with several "Orders" that incorporate the MSA and specify, among other things, the quantity of digital-asset-mining machines that Core will host for Celsius.  On September 20, 2021, Order #10—the order most relevant here—commenced.  Order #10 (Ex. B).

5.      Digital asset mining is the process of securing new digital cryptocurrency "coins" (like Bitcoin, Ethereum, Litecoin, Zcash, etc.) by continuously running digital-asset mining machines (also called "rigs," "miners," or "units") to crack a cryptocurrency code, which is rewarded with a cryptocurrency coin.  These machines process data extremely quickly, consume a large amount of power, and need to operate in a data center designed to maximize performance and machine longevity.  Core currently has eight data-center facilities, where it hosts machines that are mining for cryptocurrency, and is in the process of building out certain of these facilities to further expand Core's hosting availability.

6.      The MSA that Core and Celsius executed is a standard agreement that Core used with all of its customers.  At a high level, the way it works is that a customer either buys machines from Core that Core then "deploys" or a customer delivers machines to Core for deployment.  Order #10 is the first order where Celsius purchased its own data-mining machines and delivered them to Core for deployment.  In all previous orders, Celsius purchased machines directly through Core.  Once Core receives the machines, it goes through several steps before the machines are online at the hosting facility and considered fully "deployed."  To deploy the data-mining machines, in addition to identifying an adequate site and securing industrial-scale power, Core must, among other things: provide installation racks; make power and network connections; and ensure adequate airflow and cooling systems to dissipate the large amount of heat these machines generate.

7.      As a general rule, Core deploys machines received from customers, like Celsius, as soon as practicable and in accordance with our guiding "first in time" principle, which dictates that machines are deployed in chronological order based on when they are received from the customer or purchased by Core, who also hosts its own machines for cryptocurrency mining.  This is all

consistent with the MSA, which states in § 2(b) that Core has "the right to review and sole right to approve any delivery, installation (including without limitation, the location and position of Client Equipment at the Company Facility)...." Core has always followed this "first in time" principle, which Celsius—as a long-standing customer that has over 26,655 miners deployed across Core's data-center facilities—is familiar with.

8.     Another provision of the MSA that is particularly important to Core and included in all of Core's service agreements with its customers provides that Core has the "sole and absolute discretion" to charge for "any increases, changes in . . . tariffs." MSA (Ex. A), § 4(f) (defining "Increased Costs."). This provision is essential because it allows Core to pass through increased power costs—which fall within the definition of tariffs—and requires that the customer (here, Celsius) "pay all Increased Costs." *See id*. Because power costs are a key component in the profitability of cryptocurrency mining and can vary widely, the ability to pass through increases in power costs to customers is an absolute cornerstone of Core's business model, without which Core would be exposed to energy spikes and a level of volatility that does not make any business sense to assume. Core never agreed to undertake the risk of spikes in energy prices with Celsius or any other of its customers.

9.     The MSA also provides that Core's liability to Celsius for "all claims arising from or related to the subject matter of this agreement . . . will not exceed an amount equal to one (1) months fee." MSA (Ex. A), § 5(d). This provision is important from Core's business perspective because it provides Core with the safety-net option of effectively buying its way out of a failed business relationship. Core insists on including this safety-net provision in all of its agreements.

10.     The relevant Order that I understand is most at issue in this matter is Order #10. When Core and Celsius executed Order #10, Core had extremely limited hosting availability and

-4-

was in the process of building additional data-center facilities.  Core also had purchased thousands

of its own machines that it had yet to deploy.  Core communicated these points to Celsius, who

therefore knew that Core had very limited hosting availability and thousands of its own machines

in the queue to deploy first.  In this context, and after discussions and negotiations with Celsius,

Core agreed to "notify [Celsius] as soon as practicable of additional hosting availability, if any,

and provide [Celsius] up to 10 additional MW per month at a hosting services rate of $0.0625 per

KWh.  Additional hosting availability if available will be the subject of a separate order and

provided to Client on a priority basis, subject to Client acceptance."  Order #10 (Ex. B) at p. 4-5;

Am. to Order #10 (Ex. C).  After Order #10 was executed, Core had no additional hosting

availability.

11.    Additional hosting availability aside, my understanding is that Celsius was

planning to phase-out Core and host machines at its own data-center facilities, believing that it

would be more lucrative.  I first learned about this plan at a lunch with Celsius's Chief Operating

Officer Patrick Holert in July 2021.  A few months later, in November 2021, Celsius General

Counsel Ron Deutsch confirmed that Celsius intended to shift to a self-hosting business model that

excluded Core.

## II.    DEPLOYMENT

12.    Celsius contends that Core failed to deploy its machines.  This is incorrect.  As of

today, Core has deployed _all_ machines that Celsius has delivered.

13.    The way delivery works under Order #10 is that Celsius should deliver machines

to Core by the target "Deployment Month" listed in Order #10:

| Deployment Month | Quantity & Type of Unit (the "Units") | Assumed power consumption per Unit (KWh): |
|---|---|---|
| SEP 2021 | 2,250 - M30S+ or Equivalent | 3.57 |
| MAR 2022 | 3,530 - M30S+ or Equivalent | 3.57 |
| APR 2022 | 4,710 - M30S+ or Equivalent | 3.57 |
| MAY 2022 | 2,350 - M30S+ or Equivalent | 3.57 |
| JUNE 2022 | 2,350 - M30S+ or Equivalent | 3.57 |
| JUL 2022 | 2,350 - M30S+ or Equivalent | 3.57 |
| AUG 2022 | 2,350 - M30S+ or Equivalent | 3.57 |
| SEP 2022 | 2,350 - M30S+ or Equivalent | 3.57 |
| OCT 2022 | 2,350 - M30S+ or Equivalent | 3.57 |
| NOV 2022 | 2,350 - M30S+ or Equivalent | 3.57 |
| DEC 2022 | 2,350 - M30S+ or Equivalent | 3.57 |

14.     The dates set forth above are target dates for when Celsius was expected to deliver machines to Core for deployment.  *See* MSA § 2(b).  As of today, Celsius has delivered only the first three tranches of machines set forth in the chart above.

15.     The way payment works under Order #10 is that Celsius must pay certain prepayments set forth in Order #10 in full prior to deployment by Core.  Specifically, Celsius owed 35% of the prepayment for all units on September 20, 2021; another 35% six months before deployment; and the final 30% one month before deployment.  Core must receive payment in full before deployment.  After deployment, Celsius pays a hosting services rate in an amount set forth in the Order that may be adjusted in Core's "sole and absolute discretion" pursuant to Section 4(f) of the MSA.  Aside from prepayments, Core receives from Celsius only the hosting services rate and does not share in any upside on the coins that Celsius mines.

16.     Once Celsius delivers machines to Core, Core then deploys them.  As noted above, although Core seeks to deploy the machines as soon as practicable after they are delivered, there is no requirement in the agreement governing Core's deployment of the machines.  And as Celsius knew when entering into Order #10, Core needed to build new data-center facilities to house machines, including the Celsius machines set forth in Order #10.

17.     Because construction timelines are subject to external variables, Celsius also knew that Core's timeline for deployment could vary.  Indeed, Core communicated to Celsius the possibility of delay in deploying machines when the parties executed Order #10.

18.     After the parties executed Order #10, Core continued communicating with Celsius about external factors affecting the deployment schedule, including those closely tied to the Covid-19 pandemic.  Attached as **Exhibit D** is a true and correct copy of an email thread dated January 3, 2022, where I update Celsius on external factors affecting deployment, including a grounded cargo fleet, surging cases of Covid-19, non-existent commercial flights to/from Asia, and customs overload.

19.     Despite this knowledge, Celsius now complains that Core did not deploy the machines quickly enough.  But the fact is that Celsius was not entitled to any specific deployment timeline and, in any event, all delays were justifiable and not within Core's control:

### *First Tranche of Machines*

20.     Under Order #10, Celsius was targeting to deliver the first tranche of machines in September 2021.  But Celsius did not begin rolling deliveries of these machines until late November 2021, around Thanksgiving.  Once the machines were delivered, Core faced significant hurdles in preparing them for deployment at our data-center facility in Grand Forks, North Dakota.

21.     The first challenge that Core faced was that Celsius had delivered several types of machines that Core had never installed before.  This caused us to lose about two weeks on the front end as our engineers had to learn how to deploy these new machines, obtain the proper equipment needed to deploy them, and input them into our system, which is a tedious and time-consuming task.  To accomplish this, we needed Celsius to provide specific information for each machine: the miner type/firmware, processing speed, power consumption, fan speed/airflow, and pool

configuration. Without this information, Core could not energize the machines. Attached as **Exhibit E** is a true and correct copy of an email thread dated November 23, 2021, between Core and Celsius where Mitch Livingston and myself seek information from Celsius needed to deploy the first tranche of machines and explain to Celsius why preparing this first tranche of machines for installation is time consuming.

22. Core diligently pressed through these changes and deployed machines, on a rolling basis, as they became available. These rolling deployments began in early December 2021, only a few weeks after Celsius first delivered the machines.

23. Unfortunately, due to supply chain delays in sourcing materials like power distribution units (PDUs), dampers, and switchgears, we did not yet have sufficient availability at the new facility to deploy all Celsius machines that were ready for deployment. *See, e.g.*, **Exhibit F** (June 22, 2021 emails documenting delay in delivering switchgears); **Exhibit G** (July 23, 2021 email concerning delivery delays of PDUs); **Exhibit H** (September 14, 2021 email reporting damper shortage); **Exhibit I** (November 10, 2021 email concerning delivery delays of PDUs). Although these material delays predated Celsius's delivery of machines, they had a cascade effect on the deployment timeline because construction is a sequential process. In other words, if Core experiences a month-long delay in obtaining the materials necessary to ready its facilities for rig deployment, that delay in turn prevents it from beginning other preparatory steps and sets back the entire timeline.

24. Then, around December 15, 2021, before deployment was complete, a Covid-19 outbreak left the facility without its crew of electricians, who are essential to deployment. Once the electrician team returned to work, a severe winter storm shuttered the entire facility for a week. As a result, Core could not resume deploying any machines until January 1, 2022.

25.     Once deployment resumed on a rolling basis, delays in receiving a certificate of occupancy for one of the new-construction buildings—there are currently two buildings at the Grand Forks facility and we deployed Celsius machines across both—limited availability and slowed the rate of deployment. Once the building was ready to go online around the middle of January 2022, we immediately began deploying Celsius machines.

26.     Because of these external circumstances, which were entirely outside Core's control, the Celsius machines could not be fully deployed until late January 2022.

### *Second Tranche of Machines*

27.     After the issues with the various machines provided by Celsius in connection with the first tranche, Celsius decided to deliver different machines with lower power for the second tranche, which Celsius was targeted to deliver in March 2022. Celsius did not deliver the machines until late March 2022. Even though the Deployment Schedule for the March 2022 tranche listed only 3,530 machines, Core agreed to house additional machines from Celsius so that Celsius would be able to obtain the same amount of overall power (3.57 KWh) as set forth in the Schedule. Thus, the second tranche actually consisted of 3,780 machines, which meant that Celsius's machines took up more space at our facility than as set forth in the contract. Core agreed to accommodate Celsius once again in connection with the third tranche, with Celsius delivering 4,860 machines as compared to 4,710 in Order #10.

28.     The machines for the second tranche were slotted to be deployed at Core's new data-center facility in Denton, Texas. Deployment was delayed for two primary reasons. First, Core faced an unexpectedly prolonged timeline in securing building permits from the City of Denton, which further delayed the facility's opening. Attached as **Exhibit J** is a true and correct copy of an email thread with the City of Denton between December 20, 2021 – January 28, 2022

regarding building permits for the Denton data-center facility. Generally, securing building permits from the city is routine and takes only a week or so, but here, we had to work diligently with the City of Denton for thirty-nine days before the permits finally issued in January 28, 2022. Because any delays to the project timeline have a cascading effect, as discussed above, this contributed to deployment delays overall. Second, supply-chain disruptions and shortages caused by the Covid-19 pandemic that affected steel, network equipment, and electrical equipment pushed the construction timeline, which in turn delayed deployment of the machines. Due to these compounding delays, the Celsius machines were not deployed until July 2022.

29.     Mr. Lawlor states in paragraph 14 of his declaration that, "after the March rigs were deployed—between July 21, 2022, and September 16, 2022—Core Scientific had the March rigs online for a total of approximately eight days." Mr. Lawlor omits the reason why, which Celsius was fully aware of at the time: the forty transformers at Core's facility failed and were deemed a life-safety risk, and we could not use the facility until they were replaced. Attached as **Exhibit K** is a true and correct copy of a letter dated August 18, 2022, from a consulting engineer stating that a manufacturing defect is causing transformer failures and recommending that Core replace those affected transformers. This caused a 78-day delay that impacted all machines hosted at the Denton facility. Once the transformers were replaced, the facility was back online by September 16, 2022.

### ***Third Tranche of Machines***

30.     Under Order #10, Celsius was targeting to deliver the third tranche of machines in April 2022. Celsius did not deliver these units until June 2022.

31.     Once received, Core worked to deploy these machines at its Cottonwood, Texas facility, aiming for a July 22, 2022 deployment date. Deployment was delayed, however, because on March 25, 2022, the Electrical Reliability Council of Texas implemented a state-wide

regulatory change that prevented Texas-New Mexico Power ("TNMP") from supplying the amount of power that Core had already contracted with TNMP to receive. *See* **Exhibit L** (ERCOT Notice dated March 25, 2022, re: "Interim Large Load Interconnection Process"); **Exhibit M** (August 2021 energy contracts executed between Core and TNMP to secure energy for the Cottonwood and Cedarvale data-center facilities). This regulatory shift left Core unable to fully energize either of its brand-new Texas facilities for about six-months, impacting our power capacity and profitability overall.

32. We therefore worked urgently and persistently to have power implemented at our Texas data-center facilities. Carol Haines, Core Senior Vice President of Power and Sustainability, had at least weekly conversations with ERCOT, advocating for the immediate release of full power to our facilities. Attached as **Exhibit N** are true and correct copies of email threads between Core and the power company regarding power at Core's Texas facilities.

33. Finally, after our diligent efforts, on September 28, 2022, TNMP provided energy to the Cottonwood facility, albeit with a fraction (approximately 20%) of the power that we anticipated. Once the facility received power, we diligently prepared to deploy the machines that had been in line for deployment at the Cottonwood facility, including the Celsius machines. On October 6, 2022, about a week after Cottonwood received power, all machines at the facility, including the Celsius machines, were powered on.

\* \* \* \* \*

34. Mr. Lawlor's declaration states that Celsius delivered machines to Core but that Core just did not deploy them for several months. Celsius knows that this is not the case. Deployment is a standing topic at Core's weekly meeting with Celsius. And throughout the deployment process, Core regularly discussed in detail with Celsius the schedule and delays, which

were caused by external factors, as described above. *See e.g.*, **Exhibit O** (May 24, 2022 email thread between me, Mr. Holert, and Celsius Chief Executive Officer Amir Ayalon scheduling time to discuss deployment schedule); **Exhibit P** (August 10, 2022 email thread between me, Mr. Holert, Mr. Ayalon, Core Chief Executive Officer Mike Levitt, and Core Executive Vice President of Client Services, Russell Cann scheduling time to discuss deployment schedule); **Exhibit Q** (non-exhaustive compilation of invitations confirming discussions with Celsius regarding deployment schedule).

35.     As of today, Core has deployed all of the machines that Celsius has delivered. This amounts to 26,655 Celsius machines deployed in total, including the 10,885 machines deployed under Order #10.

### III.     ADDITIONAL HOSTING AVAILABILITY

36.     When Core and Celsius entered into Order #10, Core had very little hosting availability to offer Celsius. Celsius was aware of this but decided to enter into the Order anyway, fully understanding that Core was in a power-capacity deficit and early in the process of constructing new data-center facilities. Core also told Celsius that over 100,000 machines that Core had just purchased had to be deployed *before* Core would have any additional hosting availability to offer Celsius beyond the number of units set forth in Order #10. Attached as **Exhibits R-U** are true and correct copies of the contracts documenting Core's purchase of 108,900 machines between March and May 2021, before we executed Order #10.

37.     Against this backdrop, when executing Order #10, Celsius also wanted to add a clause that it would be entitled to priority over *any* additional hosting availability. Core, however, did not want to promise Celsius priority over an unlimited amount of availability. We both compromised, agreeing to add a "Notification of Hosting Availability" provision to the MSA,

providing that "Company will notify Client as soon as practicable of additional hosting availability, if any, and provide Client up to 10 additional MW per month at a hosting services rate of $0.0625 per KWh.  Additional hosting availability if available will be the subject of a separate order and provided to Client on a priority basis, subject to Client acceptance."  Order #10 (Ex. B) at 4-5.

38.     Celsius now claims that Core violated Order #10 by failing to notify Celsius of additional hosting availability.  Celsius Mot. ¶ 19.  But that is not correct: since the commencement of Order #10 on September 20, 2021, Core has not had any additional hosting availability.

39.     This lack of additional hosting availability is demonstrated by the fact that Core has still yet to deploy at least 14,513 of the 108,900 machines that Core purchased before Order #10 commenced.  Until these machines are deployed, Core will not have any additional hosting availability.

40.     Celsius argues that Core must have failed to offer it additional hosting availability because we expanded our fleet by at least 18,000 machines between December 2021 and April 2022.  But the fact that Core expanded its fleet has nothing to do with whether Core has additional hosting availability.

41.     For example, what Celsius claims was fleet expansion is in fact a fleet swap that Core agreed to with its largest client, Argo Blockchain.  Core and Argo agreed to exchange Argo's mining fleet—which is hosted at Core—for some data-mining machines that Core previously ordered but never deployed.  Attached as **Exhibit V** is a true and correct copy of an email dated August 1, 2022, confirming the Argo fleet swap.  This swap had no impact on hosting availability across Core's data-center facilities.

42.     Core's fleet also expanded due to a decision to test the usability of "antboxes," which are portable containers used to host data-mining machines.  After a brief testing period, Core has decided that these antboxes are not suitable hosting options and is working to decommission them across the board.  This likewise had no impact on hosting availability across Core's data-center facilities.

43.     Finally, in late July 2022 (after the Petition Date), Core executed a hosting agreement with a major existing client, Bitmain, from which Core purchases machines.  In exchange for significant funding and a substantial credit on machines, Core agreed, among other things, to deploy a limited set of Bitmain machines in place of machines that Core had purchased for itself before executing Order #10.  Other Bitmain machines will be housed in new "exclusive-use" facilities constructed for Bitmain machines only and run by Bitmain technicians.  This is a novel hosting model that Core has not previously used.

## IV.     POWER COST PASS-THROUGHS

44.     Section 4(f) of the MSA gives Core the right to pass through increases in tariffs to its customers.  In the data-mining industry, the term "tariffs" includes the rates charged by utility companies.  These rates are impacted by several different factors, including the cost of fuel.  A document prepared by the Tennessee Valley Authority ("TVA")—one of the utility companies that provides power to certain of Core's data-center facilities—demonstrates this point, stating that base power rates are subject to a "Fuel Cost Adjustment" that impacts monthly fuel costs.  Attached as **Exhibit W** is a true and correct copy of the TVA's "Large Direct Service Manufacturing Power Rates."  Consistent with this, the invoices that Core receives from the TVA are broken down to include line items for fuel and other adjustments that impact monthly power costs.  Attached as

**Exhibit X** is a true and correct copy of an October 3, 2022 power invoice for one of Core's data-center facilities.

45. Mr. Lawlor implies that the power costs that Core passed through to Celsius are not "tariffs" within the meaning of Section 4(f) of the MSA. Lawlor Decl. ¶¶ 25-26. Mr. Lawlor also suggests that Celsius enjoys a fixed power rate free from fuel-cost volatility. *Id.* Celsius knows that neither is true. Not only are these positions contrary to the industry standard and utility documents themselves, but Core's business communications with the Celsius team make clear that Celsius very well knew that power costs are tariffs that Core can pass through to Celsius.

46. For example, as a general matter, Core is in frequent communications with its customers regarding power prices and the monthly power-cost rate. Power prices are a central topic of conversation because operating the data-mining machines consumes such a tremendous amount of power that high power prices can undercut profitability. If Celsius were entitled to a fixed power rate, as Mr. Lawlor suggests, Celsius would have no reason to care about the monthly power-cost rate.

47. Additionally, prior to filing for bankruptcy, Celsius paid power cost pass-throughs to Core, with Mr. Holert, acknowledging in writing that the costs "make sense." Attached as **Exhibit Y** is a true and correct copy of an email dated November 20, 2021 from Mr. Holert to myself and Core's Accounting Manager, Monica Xia. This all directly undermines Mr. Lawlor's statement that Celsius's contract with Core is a fixed-fee contract or that the power cost pass-through charges "suddenly [arose] after the Petition Date." Lawlor Decl. ¶ 25. They did not.

48. Finally, Core charges the power cost pass-through to all of its customers. This makes clear that Core did not single out Celsius and that its decision to invoice its customers when

power costs are high has nothing to do with Celsius's decision to file for bankruptcy; it is Core's standard business practice.

## V.   CORE DID NOT THREATEN CELSIUS POSTPETITION

49.     Celsius claims that, during an August 22, 2022 telephone call, I threatened to withhold deploying new data-mining machines until Celsius made its outstanding _prepetition_ payments.  *See* Celsius Mot. at ¶¶ 25, 46.  This is false.  In response to Celsius requesting that Core consider deploying new data-mining machines beyond those that Celsius had paid for prepetition, I told Celsius that Core would not deploy any new data-mining machines until Celsius paid its outstanding balance on amounts that have accrued _postpetition_.

50.     Celsius appears to be attempting to renegotiate the MSA and extract postpetition benefits from Core that we are not obligated to provide.  It would not make any business sense for Core to voluntarily deploy new Celsius data-mining machines when we are currently losing approximately $53,226 per day, or around $1.65 million a month to cover the postpetition power cost pass-through amounts that Celsius refuses to pay.  With these losses continuing to accumulate daily, Core cannot afford to keep funding Celsius's operations.

## VI.   POSTPETITION RELATIONSHIP

51.     After the Petition Date, Core continued business with Celsius in the ordinary course.  This has benefitted Celsius's estate, as Celsius is generating revenue from data mining through the machines hosted at Core's data-center facilities.  Despite reaping this benefit, Celsius has refused to pay the power cost pass-through amounts that have accrued postpetition.  Because Celsius has not paid these outstanding amounts, Core is currently covering these costs to keep the Celsius machines running (and profitable for Celsius).  This is tying up Core's working capital and preventing us from using that capital to create the infrastructure that we need to host more

machines, including our own machines.  Covering these costs for Celsius thus poses a serious threat to Core's own financial stability.

52.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed on October 19, 2022, at Bellevue, Washington.

*/s/ Jeff Pratt*
Jeff Pratt

# MASTER SERVICES AGREEMENT

This Master Services Agreement ("**Agreement**") effective as of December 18, 2020 ("**Effective Date**") is between CORE SCIENTIFIC, INC. ("**Company**") and CELSIUS CORE LLC ("**Client**").

**WHEREAS**, Client desires access to locate its Client Equipment (as defined below) at the Company Facility (as defined below) and receive certain Services (as defined below); and

**WHEREAS**, Company desires to provide such Services at its Company Facility.

The parties agree as follows:

## 1. AGREEMENT STRUCTURE

a.      This Agreement provides general terms applicable to Company's provision of certain services, including, without limitation, colocation, hosting, rack space, security, monitoring, maintenance, utilities, Client Equipment maintenance and repair, facility management, account management, network and data access, technical support, and heat and thermal management services ("**Services**") to Client in a data center owned or operated by Company or its affiliates ("**Company Facility**") in mutually agreed transactions described in mutually executed ordering documents in the form of Exhibit A attached hereto that reference and are governed by this Agreement ("**Orders**"). Each Order will be a separate agreement between Company and Client and will be deemed to incorporate the terms of this Agreement by reference. Company may require Customer to provide evidence of creditworthiness or credit support acceptable to Company in its sole discretion as a condition to accepting any Order. In the event of any conflict or inconsistency between the terms of this Agreement and the specific terms of an Order, the specific terms of the Order govern with respect to such Order.

## 2. SERVICES AND COMPANY FACILITY

a.      Company will provide Client the Services at a Company Facility set forth in an Order. This Agreement is not intended to and does not constitute a lease of any real or personal property or a grant of any other real property interest.   Unless otherwise set forth in an Order, Client Equipment is owned by Client will not be construed as fixtures or fittings or otherwise attached to a Company Facility. Company retains title to all racking, connectors, fittings, parts and other materials used or provided by Company at a Company Facility to provide Client the Services. Client acknowledges and agrees that access to a Company Facility may be provided only during Company's ordinary business hours and only upon Company's prior written consent, which shall be subject in all events to the terms of this Agreement and may be withheld, conditioned or delayed in Company's sole discretion.. Client will be liable for the actions of all persons accessing Company Facility on its behalf.

b.      Company has the right to review and the sole right to approve any delivery, installation (including, without limitation, the location and position of Client Equipment at the Company Facility), replacement or removal work with respect to Client's computer hardware or other tangible equipment ("**Client Equipment**") at a Company Facility. Client shall be fully responsible for delivering all Client Equipment to Company at a specified Company Facility on or before the applicable scheduled delivery date, each as specified in an Order. Client will be responsible for all risk of loss or damage to Client Equipment at all times until such Client Equipment is accepted by Company at a designated Company Facility.

c.      Client Equipment will adhere to Company's specifications, procedures, rules, and regulations, including, without limitation, equipment labeling and tracking and security practices and policies for the Company Facility, all of which are incorporated herein by this reference. If Company determines in its sole

discretion that Client Equipment or related operating software does not conform to its policies or is not suitable for the provision of Services at the Company Facility, Company may suspend installation of Client Equipment and operating software or commencement of the Services until Company approves of the Client Equipment and operating software. Company has no responsibility or liability for any loss or damage to Client Equipment, including without limitation any damage to Client Equipment, failure to adhere to any manufacturer warranty, the voiding of any manufacturer warranty or loss of or inability to collect under any manufacturer warranty, unless directly caused by the gross negligence, bad faith or willful misconduct of Company.

d.       Client is responsible for costs and expenses regarding the installation, repair, replacement and removal of Client Equipment and tariffs, taxes, shipping costs or other expenses associated with owning, shipping, importing or transporting Client Equipment. Upon any expiration or termination of an applicable Order, Company will provide Client with a written notice, which may be by email (the "**Retrieval Notice**"), of the date when Client Equipment is ready to be removed from Company Facility, which will be at Client's sole expense. Such notice will document the condition of Client Equipment being prepared for shipment, any outstanding amounts owed by Client to Company and Client shall have five (5) calendar days from the date set forth in the Retrieval Notice to pay any outstanding amounts owed to Company and remove at Client's sole cost and expense Client Equipment from Company Facility. Client will hold Company harmless from any damage caused to Client Equipment during such pickup and removal of Client Equipment. The failure or delay by Client to retrieve Client Equipment on or before the date set forth in the Retrieval Notice will constitute abandonment of Client Equipment under the laws of the jurisdiction where the Client Equipment is located and Company will be entitled to pursue at Client's sole risk and expense all available remedies, including, without limitation, the actions set forth in Section 4(d), as applicable.

e.       In order to continue to provide the Services, from time to time Company may request, and Client shall promptly provide, information regarding Client Equipment, Client's related operating software, Client's systems, and other information reasonably necessary in Company's provision of the Services.

f.       If software and services of a third party are requested by Client in conjunction with the Services ("**Third Party Services**") and identified in an Order, Client acknowledges and agrees that such Third Party Services are the responsibility of the third party, subject to separate terms and conditions between such third party and Client and Company accepts no responsibility for the performance of such Third Party Services or any loss or damage arising from or associated with the provision of such Third Party Services.

## 3.       PAYMENT TERMS AND TAXES

a.       Company will invoice Client monthly in advance for all applicable fees for use of Company Facility and provision of Services as set forth in the applicable Order. Client will pay all invoiced amounts in US dollars within ten (10) calendar days of the date of the invoice. All payments must be (i) in US dollars into an ACH account number as set forth in the applicable Order; or (ii) to another account or form of payment directed by Company. Interest shall be charged on past due amounts at the lesser of (A) one and a half percent (1.5%) per month; or (B) the highest rate permitted by applicable law.

b.       Client may, in good faith, dispute any invoice or any part thereof (a "**Disputed Amount**") by submitting a written notice of such dispute along with reasonable supporting documentation within three (3) calendar days of the date of the initial invoice on which the Disputed Amount appears, failing which Client waives all rights to dispute such Disputed Amount and to file any claim. Company will review the Disputed Amount after its receipt of the relevant notice and if Company determines that Client was billed in error, a credit for the amount invoiced incorrectly will be made to the next invoice. If Company determines that the amount was invoiced correctly, Client will pay the amount by the due date of the next invoice. For clarity, Client shall promptly pay all undisputed amounts.

DocuSign Envelope ID: D28E8BG2-A01S-41CD-8E7A-E3641866909B

c.      All amounts payable to Company under this Agreement exclude applicable taxes. Client is responsible for (i) taxes related to its activities and the ownership and operation of Client Equipment; and (ii) taxes imposed, levied or assessed thereon by any governmental or other authorities. If Client is required to make any deduction, withholding or payment for taxes in any jurisdiction on amounts payable to Company, such amounts will be increased such that after making such deduction, Company receives an amount equal to what it would have received if such deduction, withholding or payment had not been made.

## 4.     TERM, TERMINATION, MODIFICATION AND SUSPENSION

a.      This Agreement commences on the Effective Date and continues until terminated as permitted by this Agreement. Each Order commences on the effective date set forth in the Order, has the initial term ("**Initial Term**") set forth in the Order, and thereafter automatically renews for the additional periods set forth in the Order, or if no renewal period is set forth then one (1) year periods, (each, a "**Renewal term**" and collectively, the "**Term**") unless Client notifies Company in writing not less than ninety (90) calendar days before such renewal of its desire for the order not to renew.

b.      Either party may terminate an Order upon written notice to the other party and take such other action identified in Section 4 d. below if the other party materially breaches such Order or this Agreement and fails to cure such breach within thirty (30) calendar days (5 days in the case of failure to pay an Unpaid Balance (as defined below) or 2 days in the case of failure to pay an Unpaid Balance two or more times during any twelve month period) . If the breach (other than Client failure to pay amounts when due) cannot be cured within thirty (30) calendar days, the breaching party shall be given a reasonable period of time, but not to exceed sixty (60) calendar days after receipt of the notice, to cure the breach, provided that the breaching party acts promptly and diligently to cure such breach.

c.      Either party may terminate this Agreement upon written notice to the other party if there have been no Orders in effect for twelve (12) consecutive months.

d.      In addition to the remedy set forth in Section 4 b. above if Client fails to pay all invoiced amounts when due (an "**Unpaid Balance**"), or otherwise fails to perform any of its obligations under this Agreement after opportunity to cure as provided in Section 4 b above Company may, in its sole discretion, take certain actions including, without limitation, the following actions, at Client's sole risk and expense:

     (i)      suspend the provision of the Services;
     (ii)     disconnect Client Equipment and store it;
     (iii)    declare all amounts due under the applicable Order through the balance of the Term to be immediately due and payable;
     (iv)    operate Client Equipment for cryptocurrency mining and other activities at Company's sole discretion and direct all resulting proceeds to Company's own account until Company has recovered all amounts due, including, without limitation, any reinstatement, disconnection or storage fees or costs;
     (v)     terminate this Agreement and all Orders; and
     (vi)    exercise all other rights under this Agreement, at law, in equity or otherwise.

Unless Company has terminated this Agreement, Company will reverse the suspension of the provision of the Company Facility and Services and disconnection of Client Equipment as soon as reasonably practical after it is satisfied Client has cured the acts or omissions giving rise to the suspension and disconnection. In connection with the foregoing, Company may charge a reinstatement fee. Thereafter, Company may, at its sole discretion, require an advance payment equal to the amount of one billing invoice.

e.      Notwithstanding anything in this Agreement to the contrary, Company may suspend its provision of

all or a portion of the Services and disconnect all of a portion of Client Equipment immediately if Company determines in its sole discretion that: Client's use of the Services or Client Equipment (i) may adversely impact or pose a security risk to Company's operation or maintenance of the Company Facility or Company's other clients; (ii) may subject Company to liability; or (iii) is not in compliance with this Agreement or Company's policies. Company will use commercially reasonable efforts to notify Client, which may be via email or telephone, of such suspension or disconnection. Company will use commercially reasonable efforts to reverse such suspension or disconnection as soon as reasonably practical after it is satisfied that Client has cured the acts or omissions giving rise to such suspension and disconnection. In connection with the foregoing, Company may charge a reinstatement fee as set forth in the applicable Order. Further, Company may terminate this Agreement and all Orders if such suspension or disconnection continues for at least two (2) calendar days or occurs more than three (3) times in any twelve (12) month period. For clarity, during the period of suspension or disconnection, Client remains responsible for all fees and charges Client incurs during such period. Further, after the Effective Date, if Company determines in its sole and absolute discretion that as a result of any change in, or interpretation, introduction or administration of, any laws, regulations, statutes, treaties, rules, guidelines, ordinances, codes or the like, or any proposed or anticipated changes in, or interpretations, introduction or administration of the foregoing (a "**Change in Law**"), has resulted in an increase in Company's cost of compliance with such Change in Law then Company may, in its commercially reasonable discretion, take certain actions, including, without limitation, the following actions, at Client's sole risk and expense: (i) terminate this Agreement, any or all Orders; and/or (ii) modify the Services as may be necessary to account for such Change in Law. Company will use commercially reasonable efforts to notify Client of such Company actions and the effective date of such actions.

f.        Further, and notwithstanding the Change in Law related costs above, after the Effective Date, if there are any increases, changes in, or introduction or administration of, any new taxes, levies, tariffs or governmental fees and charges with respect to the provision of Services, Company may, in its sole and absolute discretion, pass through all such amounts to Client ("**Increased Costs**") and Client shall pay all Increased Costs in accordance with the payment and invoicing procedures as set forth in this Agreement.

g.        Company shall not be liable for any Client loss or damage whatsoever as a result of the exercise of its rights under this Agreement. Upon termination of this Agreement or an Order by Company, Company is entitled to recover from Client all loss or damages incurred by Company as a result of such termination, outstanding fees, costs, charges, assessments, reimbursements, and expenses (including, without limitation, costs of collection and reasonable attorneys' fees).

h.        In addition to Section 4(f), the Company may terminate or suspend all or a portion of the Services if necessary to be in compliance with applicable law, rules, regulations, administrative or judicial orders or decree. Company will use commercially reasonable efforts to notify Client, which may be via email or telephone, of such suspension. Client agrees that the Company shall have no liability whatsoever to Client for any damage, loss, expense or cost as a result of such termination or suspension.

## 5.        WARRANTIES, LIMITATION OF LIABILITY, INDEMNITY

a.        Each party represents, warrants, and covenants that it has full legal capacity, right, power and authority to execute and perform its obligations under this Agreement. Company represents, warrants, and covenants that it will provide Company Facility and perform the Services in a professional and workmanlike manner. Client represents, warrants, and covenants (i) Client owns and has good title to Client Equipment, free and clear of any mortgage, pledge, lien, charge, security interest, claim or other encumbrance or has interest in Client Equipment as part of a financing or other arrangement disclosed and approved by Company; (ii) Client Equipment has no defects, is in good condition and is adequate for the purpose it will be used, and is not in need of maintenance or repair except for ordinary, routine maintenance and repairs that are not material in nature or cost; (iii) Client Equipment has not experienced any failure or outage and has

not been modified in any way from its original manufactured condition; (iv) Client Equipment is in a condition suitable for continued optimal cryptocurrency mining operations, including, without limitation, in the same manner as conducted prior to the Effective Date; (v) Client Equipment has been operated at all times indoors in an appropriate temperature-controlled environment and consistent with the manufacturer's recommended temperatures and operating conditions; (vi) Client Equipment has always been transported and/or handled in a protected manner normally expected when transporting and/or handling sensitive computer hardware; (vii) Client will use the Services only for lawful purposes, and Client will not transmit, retransmit or store material with or in Client Equipment or with or in Company Facility in violation of any federal or state law or regulations or local code, rule, regulation or ordinance; and (viii) Client will comply with  applicable laws and regulations in connection with this Agreement.  Without limiting the foregoing, Client further represents, warrants, and covenants neither Client, any officer, director, employee, partner, controlling shareholder, affiliated entity nor anyone acting on Client's behalf (A) has used or disclosed or will use or disclose non-public information obtained from Company, (B) has violated or will violate applicable anti-bribery or anti-corruption laws, including the U.S. Foreign Corrupt Practices Act and the U.K. Bribery Act 2010, (C) has violated or will violate applicable anti-money laundering statutes, or (D) is a Denied Party or subject to any U.S. sanction imposed by the Office of Foreign Assets Control of the U.S. Department of the Treasury.

b.      EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEMENT, COMPANY DOES NOT MAKE AND HEREBY DISCLAIMS ALL WARRANTIES, INCLUDING, WITHOUT LIMITATION, EXPRESS, IMPLIED AND STATUTORY WARRANTIES THAT COMPANY FACILITY  OR SERVICES WILL BE UNINTERRUPTED, ERROR-FREE, OR COMPLETELY SECURE, AND THE IMPLIED WARRANTIES OF MERCHANTABILITY OR SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT OF ANY THIRD PARTY'S INTELLECTUAL PROPERTY RIGHTS.  ALL COMPANY FACILITY AND SERVICES ARE PROVIDED OR PERFORMED ON AN "AS IS", "AS AVAILABLE" BASIS, AND CLIENT'S USE OF THE COMPANY FACILITY AND SERVICES IS SOLELY AT ITS OWN RISK.  CLIENT ACKNOWLEDGES AND AGREES THAT COMPANY DOES NOT AND CANNOT CONTROL THE FLOW OF DATA OR POWER TO OR FROM COMPANY'S NETWORK AND/OR THE INTERNET OR POWER GRID, WHICH ARE PROVIDED OR CONTROLLED BY THIRD PARTIES, AND THAT ACTIONS OR INACTIONS OF THIRD PARTIES CAN IMPAIR OR DISRUPT COMPANY'S CONNECTIONS TO THE INTERNET OR POWER GRID (OR PORTIONS THEREOF) INCLUDING, WITHOUT LIMITATION, INTERRUPTIONS IN SERVICE  CAUSED BY GOVERNMENT REGULATIONS OR ORDERS, SYSTEM CAPACITY LIMITATIONS OR LIMITATIONS IMPOSED BY, OR FAILURES OF, AN UNDERLYING COMMUNICATIONS CARRIER.  COMPANY WILL ENDEAVOR TO TAKE ACTIONS IT DEEMS APPROPRIATE IN ITS SOLE DISCRETION TO REMEDY AND AVOID  SUCH EVENTS.  HOWEVER, COMPANY CANNOT AND DOES NOT GUARANTEE THAT SUCH EVENTS WILL NOT OCCUR, AND COMPANY DISCLAIMS ANY AND ALL LIABILITY RESULTING FROM OR RELATED TO SUCH EVENTS.  COMPANY HEREBY DISCLAIMS ALL RESPONSIBILITY FOR THE ACTS OR OMISSIONS BY COMPANY'S OTHER CUSTOMERS AND CLIENTS AND OTHER THIRD PARTIES.

c.      NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR (I) LOST PROFITS; (II) LOSS OF BUSINESS; (III) LOSS OF REVENUES (EXCEPT THAT CLIENT SHALL BE LIABLE FOR ANY FEES OR OTHER AMOUNTS OWED TO COMPANY UNDER THIS AGREEMENT); (IV) LOSS, INTERRUPTION OR USE OF DATA OR LOSS OF USE OF CLIENT EQUIPMENT; (V) ANY CONSEQUENTIAL OR INDIRECT DAMAGES; OR (VI) COST OF COVER, ANY INCIDENTAL, SPECIAL, RELIANCE, EXEMPLARY OR PUNITIVE DAMAGES (IF APPLICABLE), EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

d.      NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT,

COMPANY'S TOTAL LIABILITY TO CLIENT IN THE AGGREGATE FOR THE ENTIRE TERM (REGARDLESS OF WHETHER THE CLAIMS ARE BROUGHT DURING OR AFTER THE TERM) WITH RESPECT TO ALL CLAIMS ARISING FROM OR RELATED TO THE SUBJECT MATTER OF THIS AGREEMENT (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES) WILL NOT EXCEED AN AMOUNT EQUAL TO ONE (1) MONTHS FEE PAYABLE TO COMPANY PURSUANT TO THE APPLICABLE ORDER.

e.        EXCEPT FOR CLIENT'S BREACH OF ITS OBLIGATIONS UNDER SECTIONS  4, 5 a, 5 h AND 6, AND LOSS OR DAMAGE ARISING OUT OF CLIENT'S GROSS NEGLIGENCE, BAD FAITH OR WILLFUL MISCONDUCT, THE LIMITATIONS SET FORTH IN SECTIONS 5 c AND 5  d WILL APPLY TO ALL CLAIMS AND CAUSES OF ACTION, REGARDLESS OF WHETHER IN CONTRACT, TORT, STRICT LIABILITY OR OTHER THEORY.

f.        Client hereby waives the right to bring any claim against Company arising out of or in any way relating to an Order more than one (1) year after the date such Order expires or is terminated.  Each party recognizes and agrees that the warranty disclaimers, limitations of liability and remedy limitations in this Agreement are materially bargained for by the parties.

g.        Client acknowledges that cryptocurrency price movement, cryptocurrency difficulty, and legal and regulatory risks could have a material adverse impact on cryptocurrencies, cryptocurrency mining, Client Equipment, Services, and this Agreement.  Client assumes responsibility for all such risks, and Company disclaims all types of liabilities or loss of funds that may arise as a result.

h.        Client shall indemnify, defend and hold harmless Company and its affiliates, stockholders, directors, officers, employees, subcontractors and invitees from and against any losses, liabilities, damages, costs and expenses (including, without limitation, reasonable attorneys' fees) arising from or relating to (i) death, personal injury, bodily injury or property damage caused by Client or Client's customers or clients or Client Equipment; (ii) breach of Client's representations, warranties, or covenants in this Agreement or in an Order or Sections 2 or 6; (iii) fraud, bad faith, negligence or willful or reckless conduct of or by Client or Client's customers or clients; (iv) Client's or Client's customers' or clients' use of the Company Facility, Services, or Client Equipment; (v) any claim whatsoever by Client's customers or clients, or any third party related to the Services or Client Equipment; or (vi) any change in, or interpretation or administration of, any laws, regulations, statutes, treaties, rules, guidelines, ordinances, codes or the like, or any proposed or anticipated changes in, or interpretations or administration of the foregoing.

## 6.        CONFIDENTIAL INFORMATION

a.        Each party acknowledges that it and its employees or agents may, in the course of performing its responsibilities under this Agreement, be exposed to or acquire information which is proprietary to or confidential to the other party, including, without limitation, business plans, strategies, forecasts and projections and information about business structures, operations, systems, finances, assets, investments, investment strategies, software and other technology systems, and personnel, customers and suppliers (collectively, "**Confidential Information**").  Company's Confidential Information also includes the design, address and location of the Company Facilities (which is deemed to be not publicly known), the Services provided, equipment used at the Company Facilities, the configuration of cables, networks and services at the Company Facilities and the terms of this Agreement.  Neither party may use or copy any Confidential Information except to the limited extent necessary to perform its obligations under this Agreement and will not disclose any Confidential Information to any person or entity other than to its employees who have a need to know the Confidential Information or as otherwise expressly permitted by this Agreement.  Each party shall use the same measures that it uses to protect its own most confidential and proprietary information to protect the Confidential Information from use or disclosure in violation of this Agreement, but in no event less than commercially reasonable measures.

DocuSign Envelope ID: D28E8BC2-A918-44CD-8E7A-5364486988BB

b.      The restrictions on use of Confidential Information do not apply to information if it (i) is known to the receiving party prior to receipt from the disclosing party directly or indirectly from a source other than one having an obligation of confidentiality to the disclosing party; (ii) becomes known (independently of disclosure by the disclosing party) to the receiving party directly or indirectly from a source other than one having an obligation of confidentiality to the disclosing party; (iii) becomes publicly known or otherwise ceases to be confidential, except through a breach of this Agreement by the receiving party; or (iv) is independently developed by the receiving party.  For the avoidance of doubt, the mere placement of materials or equipment containing information at a Company Facility does not constitute disclosure of such information to Company.

c.      Upon termination or expiration of this Agreement, or at any other time at the request of the other party, each party shall return to the other party, or destroy and delete, as applicable, all Confidential Information and any copies thereof in its possession or control.

d.      Neither party may use the other party's trademarks, service marks, trade names, copyrights, other intellectual property rights or other designations in any promotion, publication or press release without the prior written consent of the other party in each case, which consent may be given in an Order.

## 7.      INSURANCE

a.      Client agrees to maintain the following insurance, at its expense, during the Term, with insurers having a minimum AM Best rating of A- VII or S&P rating of A: (i) Commercial General Liability or Public Liability Insurance with a limit of US $2,000,000 per occurrence, US $4,000,000 in the aggregate (or the local currency equivalent), provided these limits may be achieved through a combination of primary and excess policies and such insurance will include coverage for bodily injury and property damage.

b.      Client will furnish Company with certificates of insurance upon request that evidence the minimum levels of insurance set forth herein, list Company as an additional insured or interested party on the Commercial General Liability or Public Liability Insurance and designate that Client's insurance is primary and non-contributory  Client will provide at least thirty (30) days' prior written notice to Company of any non-renewal or cancellation of the policies referenced above.

## 8.      MISCELLANEOUS

a.      <u>Notice</u>.  Except where expressly provided in this Agreement or an Order, all notices, consents, or approvals required by this Agreement will only be in writing and sent by overnight courier, certified or registered mail, overnight delivery requiring a signature upon receipt, or delivery by hand to the parties at the respective addresses set forth on the first page of this Agreement.  Notice is effective when received.

b.      <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement between the parties with respect to the subject matter of this Agreement, and supersedes and replaces all prior or contemporaneous discussions, negotiations, proposals, understandings and agreements, written or oral, as well as any industry custom.  Each party acknowledges that, in entering into this Agreement, it has not relied on, and shall have no right or remedy in respect of, any statement, representation, assurance or warranty other than as expressly set out in this Agreement.  This Agreement may be executed in two (2) or more counterparts (and the signature pages may be delivered with ink or electronic signature or by e-mail), each will be deemed an original, but all together will constitute one and the same instrument.  Except where otherwise expressly provided in this Agreement, this Agreement may be amended only by the written agreement of both parties.

c.      <u>Survival</u>.  Any provision of this Agreement, which, by its nature, would survive termination or expiration of this Agreement will survive any such termination or expiration, including, without limitation,

DocuSign Envelope ID: D385F8C2-A916-41CD-8E7A-53614866809B

those provisions concerning confidentiality, indemnification and limitation of liability.

d.    <u>Subcontracting and Assignment</u>.  Company may permit any affiliate, independent contractor or other third party to perform any of Company's obligations hereunder provided that Company remains primarily liable for the performance of its obligations.  Company may assign, delegate, or transfer this Agreement or any of its rights and obligations hereunder without notice to or prior written consent of Client.  Client may not assign, delegate or transfer this Agreement or any of its rights and obligations hereunder without the prior written consent of Company.  Any assignment or transfer in violation of this Agreement is void.  This Agreement will be binding upon and inure to the benefit of all permitted successors and assigns.  Nothing in this Agreement is intended to or will confer upon any third party any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement

e.    <u>Force Majeure</u>.  Except for Client's obligation to pay amounts owed under this Agreement, neither party will be responsible or in any way liable to the other party, and neither party will have any termination or other rights, arising out of or relating to a Force Majeure Event.  A "**Force Majeure Event**" is a failure by the other party to perform any of its obligations under this Agreement if such failure is caused by events or circumstances beyond its reasonable control, including, without limitation, acts of God, war, labor strike, terrorist act, fire, flood, earthquake, landslide, hurricane, typhoon, tsunami, volcanic eruption, inclement weather, health epidemic or any law, order, regulation or other action of any governing authority or agency.

f.    <u>Governing Law and Arbitration</u>.  This Agreement and all claims arising out of or related to this Agreement are governed by and construed in accordance with the laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any jurisdiction other than the State of Delaware.  Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including, without limitation, the determination of the scope or applicability of this Agreement to arbitrate, shall be determined exclusively by arbitration in King County, Washington before three (3) arbitrators.  The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules & Procedures.  Any award, order or judgment pursuant to arbitration ("**Award**") is final and may be entered and enforced in any court of competent jurisdiction, and each party shall submit to any court of competent jurisdiction for purposes of the enforcement of any Award.  The arbitrator may, in the Award, allocate all or part of the costs of the arbitration, including, without limitation, the fees of the arbitrator and the reasonable attorneys' fees of the prevailing party.

g.    <u>General</u>.  The rights and remedies provided for herein are cumulative and not exclusive of any rights or remedies that a party would otherwise have.  The parties are independent contractors, and this Agreement does not establish any relationship of partnership, joint venture, employment, franchise or agency between them.  Neither party may bind the other or incur obligations on the other's behalf without the other's prior written consent.  There are no third-party beneficiaries to this Agreement.  No waiver of any breach of any provision of this Agreement will constitute a waiver of any prior, concurrent or subsequent breach of the same or any other provisions hereof, and no waiver will be effective unless made in writing and signed by an authorized representative of the waiving party.

[*Signature page follows*]

**Core Scientific, Inc.**

By: _Michael Trzupek_

Name: Michael Trzupek

Title: Authorized Representative

Date: 12/18/2020

**Celsius Core LLC**

By: _S. Daniel Leon_

Name: S. Daniel Leon

Title: S. Daniel Leon, President/COO

Date: 12/18/2020

DocuSign Envelope ID: D29F8BC2-A916-44CD-8E7A-53614866809B

**MASTER SERVICES AGREEMENT ORDER #1**

    This Order, including the terms and conditions hereunder, incorporates by reference the terms of the Master Services Agreement dated as of December 18, 2020 (the "**Agreement**") between Provider and Client (as defined below). If any terms of this Order conflict with the terms of the Agreement, the terms of this Order shall govern with respect to this Order. Capitalized terms used but not defined in this Order shall have the meanings ascribed in the Agreement.

| | | | |
|---|---|---|---|
| **Commencement Date:** | April 15, 2021 or the actual date Units are delivered to Client at Provider Facility if such Units are not delivered on such date. | | |
| **Facility:** | Provider Facility as determined by Provider. | | |
| **Equipment hosted:** | **Manufacturing Batch Month** | **Quantity & Type of Unit (the "Units")** | **Assumed power consumption per Unit (KWh):** |
| | March | 2,940 S19 | 3.413 KWh |
| | March | 60 S19 PRO | 3.413 KWh |
| **Hosting-Services Rate:** | USD $.0556 / KWh | | |
| **Payment Due Prior to Installation:** | USD $460,520 no later than the earlier of (i) the date of installation of the Units or (ii) April 15, 2021 consisting of: <br>• A $415,520 prepayment to be applied as a credit against future monthly invoices for hosting services as they become due. <br>• A $45,000 Set-up Fee | | |
| **Equipment Purchase Payment Due Dates:** | Due Date | Amount (USD) | |
| | 12/22/2020 | $1,627,458.36 | |
| | 01/15/2021 | $2,441,187.54 | |
| | 02/15/2021 | $4,068,645.90 | |
| **Estimated Delivery Date:** | April 15, 2021. Provider to notify Client as soon as reasonably possible in advance if Units will not be delivered by this date. Provider may terminate this Order if substantially all the Units are not delivered within 60 days of the Estimated Delivery Date. | | |
| **Fees:** | Set-up fee: $15/Unit | | |
| **Fees payable pursuant to Section 4 in connection with Service Termination/ Suspension** | Equipment disconnection fee: $25/Unit <br>Storage Fee: $10/month/Unit <br>Reinstatement fee: $25/Unit | | |

**Order Term.** Subject to acceptance by Provider, the term of this Order shall commence on the **Commencement Date** and continue until the second Anniversary of the Commencement Date (the "**Initial Term**"), unless sooner terminated (i) by Provider, as provided above, (ii) by mutual agreement of the parties, or (iii) pursuant to Section 4 of the Agreement. Unless earlier terminated, this Order shall automatically renew for successive 12-month renewal terms ("**Renewal Term**") unless terminated during a renewal term as set forth in the Agreement.

**Fees**. Client shall pay the fees provided for in this Order. The Fees for Services will be determined initially by reference to the Assumed power consumption per Unit of each deployed Unit, multiplied by the Hosting Services Rate (each as set forth above in this Order). Subsequent invoices will contain any additional charges incurred by Client and adjustments resulting from any differences between the Fees for Services invoiced in the preceding month and the Fee for Services based on Provider's determination of power utilized by Client during that month, as well as any adjustments to Provider's estimate of power to be utilized by Client in the upcoming month. Fees for Services for each month shall be paid in advance, in accordance with Section 3 of the Agreement.

**Purchase/Delivery/Installation Schedule for Units:** Company will facilitate the procurement on behalf of Client at Client's expense the above referenced Units from Bitmain Malaysia. Company will facilitate the procurement, shipping, and installation of the Units on behalf of Client at Client's sole cost and expense (including any and all costs and expenses associated with shipping, importing and transporting the Units to the Facility as provided above. Client will pay $2,695 per S19 Unit and $3,566.53 per S19 PRO Unit (total of

$8,137,292). Client will make payments according to the Equipment Purchase Payment Due Dates listed above. Client will pay the Provider's invoice for Units within five business days of receipt and execute any necessary power of attorney and other documents required by customs broker to enable shipment of the Units to a Core Facility on Client's behalf. Risk of loss and ownership of the Units shall pass between Bitmain and Client. Any and all taxes with respect to the purchase of the equipment will be the responsibility of Client.

**Subcontracting and Assignment. Section 8d. of the Agreement is hereby amended to read in its entirety:**

d.      Subcontracting and Assignment.  Company may permit any affiliate, independent contractor or other third party to perform any of Company's obligations hereunder provided that Company remains primarily liable for the performance of its obligations.  Company may assign, delegate, or transfer this Agreement or any of its rights and obligations hereunder without notice to or prior written consent of Client.  Client may not assign, delegate or transfer this Agreement or any of its rights and obligations hereunder without the prior written consent of Company; provided, however, Client may assign, delegate or transfer an Order pursuant to this Agreement to a third party upon the written consent of the Company, which consent shall not be unreasonably, withheld, obstructed or delayed if such assignment is to a third party not competitive to Company and such party executes a new Order on standard terms and conditions containing the hosting price and hosting term set forth in the Order to be assigned.  Any assignment or transfer in violation of this Agreement is void. This Agreement will be binding upon and inure to the benefit of all permitted successors and assigns.  Nothing in this Agreement is intended to or will confer upon any third party any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement

**Right of First Offer:** Provided Client has executed one or more Orders on the date hereof with respect to Equipment having a total purchase price of more than $50 million, Provider agrees to make available for purchase by Client up to 45% of any newly available units during the calendar year 2021.  In the event units become available, Provider shall notify Client of such the units and the price at which such units are available. In the event Provider notifies Client of the availability of such newly additional units, Client shall have five days to execute an additional Order for such units on hosting terms and conditions mutually agreeable to both Client and Provider.

By: _____
**Celsius Core LLC, "Client"**
Name: _____
S. Daniel Leon
Title: _____
S. Daniel Leon, President/COO
Date: _____
12/18/2020

By: _____
**Core Scientific, Inc., "Provider"**
Name: _____
Michael Trzupek
Title: **Chief Financial Officer**
Date: _____
12/18/2020

11

## MASTER SERVICES AGREEMENT ORDER #2

This Order, including the terms and conditions hereunder, incorporates by reference the terms of the Master Services Agreement dated as of December 18, 2020 (the "**Agreement**") between Provider and Client (as defined below). If any terms of this Order conflict with the terms of the Agreement, the terms of this Order shall govern with respect to this Order. Capitalized terms used but not defined in this Order shall have the meanings ascribed in the Agreement.

| | | | |
|---|---|---|---|
| **Commencement Date:** | May 15, 2021 or the actual date Units are delivered to Client at Provider Facility if such Units are not delivered on such date. | | |
| **Facility:** | Provider Facility as determined by Provider. | | |
| **Equipment hosted:** | **Manufacturing Batch Month** | **Quantity & Type of Unit (the "Units")** | **Assumed power consumption per Unit (KWh):** |
| | April | 3,500 S19 | 3.413 KWh |
| **Hosting-Services Rate:** | USD $.0556 / KWh | | |
| **Payment Due Prior to Installation:** | USD $537,273 no later than the earlier of (i) the date of installation of the Units or (ii) May 15, 2021 consisting of: <br>• A $484,773 prepayment to be applied as a credit against future monthly invoices for hosting services as they become due. <br>• A $52,500 Set-up Fee | | |
| **Equipment Purchase Payment Due Dates:** | Due Date | | Amount (USD) |
| | 12/22/2020 | | $1,886,500.00 |
| | 01/15/2021 | | $2,829,750.00 |
| | 03/15/2021 | | $4,716,250.00 |
| **Estimated Delivery Date:** | May 15, 2021.  Provider to notify Client as soon as reasonably possible in advance if Units will not be delivered by this date. Provider may terminate this Order if substantially all the Units are not delivered within 60 days of the Estimated Delivery Date. | | |
| **Fees:** | Set-up fee: $15/Unit | | |
| **Fees payable pursuant to Section 4 in connection with Service Termination/ Suspension** | Equipment disconnection fee: $25/Unit <br>Storage Fee: $10/month/Unit <br>Reinstatement fee: $25/Unit | | |

**Order Term.**  Subject to acceptance by Provider, the term of this Order shall commence on the **Commencement Date** and continue until the second Anniversary of the Commencement Date (the "**Initial Term**"), unless sooner terminated (i) by Provider, as provided above, (ii) by mutual agreement of the parties, or (iii) pursuant to Section 4 of the Agreement. Unless earlier terminated, this Order shall automatically renew for successive 12-month renewal terms ("**Renewal Term**") as set forth in the Agreement.

**Fees**. Client shall pay the fees provided for in this Order. The Fees for Services will be determined initially by reference to the Assumed power consumption per Unit of each deployed Unit, multiplied by the Hosting Services Rate (each as set forth above in this Order).  Subsequent invoices will contain any additional charges incurred by Client and adjustments resulting from any differences between the Fees for Services invoiced in the preceding month and the Fee for Services based on Provider's determination of power utilized by Client during that month, as well as any adjustments to Provider's estimate of power to be utilized by Client in the upcoming month.  Fees for Services for each month shall be paid in advance, in accordance with Section 3 of the Agreement.

**Purchase/Delivery/Installation Schedule for Units:** Company will facilitate the procurement on behalf of Client at Client's expense the above referenced Units from Bitmain Malaysia. Company will facilitate the procurement, shipping, and installation of the Units on behalf of Client at Client's sole cost and expense (including any and all costs and expenses associated with shipping, importing and transporting the Units to the Facility as provided above. Client will pay $2,695 per S19 Unit (total of $9,432,500). Client will make payments according to the Equipment Purchase Payment Due Dates listed above. Client will pay the Provider's invoice for Units within five business days of receipt and execute any necessary power of attorney and other documents

required by customs broker to enable shipment of the Units to a Core Facility on Client's behalf. Risk of loss and ownership of the Units shall pass between Bitmain and Client. Any and all taxes with respect to the purchase of the equipment will be the responsibility of Client.

**Subcontracting and Assignment. Section 8d. of the Agreement is hereby amended to read in its entirety:**

d.  <u>Subcontracting and Assignment</u>.  Company may permit any affiliate, independent contractor or other third party to perform any of Company's obligations hereunder provided that Company remains primarily liable for the performance of its obligations. Company may assign, delegate, or transfer this Agreement or any of its rights and obligations hereunder without notice to or prior written consent of Client.  Client may not assign, delegate or transfer this Agreement or any of its rights and obligations hereunder without the prior written consent of Company; provided, however, Client may assign, delegate or transfer an Order pursuant to this Agreement to a third party upon the written consent of the Company, which consent shall not be unreasonably, withheld, obstructed or delayed if such assignment is to a third party not competitive to Company and such party executes a new Order on standard terms and conditions containing the hosting price and hosting term set forth in the Order to be assigned.  Any assignment or transfer in violation of this Agreement is void.  This Agreement will be binding upon and inure to the benefit of all permitted successors and assigns.  Nothing in this Agreement is intended to or will confer upon any third party any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement

**Right of First Offer:** Provided Client has executed one or more Orders on the date hereof with respect to Equipment having a total purchase price of more than $50 million, Provider agrees to make available for purchase by Client up to 45% of any newly available units during the calendar year 2021.  In the event units become available, Provider shall notify Client of such the units and the price at which such units are available. In the event Provider notifies Client of the availability of such newly additional units, Client shall have five days to execute an additional Order for such units on hosting terms and conditions mutually agreeable to both Client and Provider.

By: _S. Daniel Leon_
**Celsius Core LLC, "Client"**
Name: S. Daniel Leon
Title: S. Daniel Leon, President/COO
Date: 12/18/2020

By: _Michael Trzupek_
**Core Scientific, Inc., "Provider"**
Name: Michael Trzupek
Title: **Chief Financial Officer**
Date: 12/18/2020

**MASTER SERVICES AGREEMENT ORDER #3**

This Order, including the terms and conditions hereunder, incorporates by reference the terms of the Master Services Agreement dated as of December 18, 2020 (the "**Agreement**") between Provider and Client (as defined below). If any terms of this Order conflict with the terms of the Agreement, the terms of this Order shall govern with respect to this Order. Capitalized terms used but not defined in this Order shall have the meanings ascribed in the Agreement.

| | | | |
|---|---|---|---|
| **Commencement Date:** | June 15, 2021 or the actual date Units are delivered to Client at Provider Facility if such Units are not delivered on such date. | | |
| **Facility:** | Provider Facility as determined by Provider. | | |
| **Equipment hosted:** | **Manufacturing Batch Month** | **Quantity & Type of Unit (the "Units")** | **Assumed power consumption per Unit (KWh):** |
| | May | 3,000 S19 | 3.413 KWh |
| | May | 500 S19 PRO | 3.413 KWh |
| **Hosting-Services Rate:** | USD $.0556 / KWh | | |
| **Payment Due Prior to Installation:** | USD $537,273 no later than the earlier of (i) the date of installation of the Units or (ii) June 15, 2021 consisting of: <ul><li>A $484,773 prepayment to be applied as a credit against future monthly invoices for hosting services as they become due.</li><li>A $52,500 Set-up Fee</li></ul> | | |
| **Equipment Purchase Payment Due Dates:** | Due Date | | Amount (US) |
| | 12/22/2020 | | $1,973,653.00 |
| | 01/15/2021 | | $2,960,479.50 |
| | 04/15/2021 | | $4,934,132.50 |
| **Estimated Delivery Date:** | June 15, 2021. Provider to notify Client as soon as reasonably possible in advance if Units will not be delivered by this date. Provider may terminate this Order if substantially all the Units are not delivered within 60 days of the Estimated Delivery Date. | | |
| **Fees:** | Set-up fee: $15/Unit | | |
| **Fees payable pursuant to Section 4 in connection with Service Termination/ Suspension** | Equipment disconnection fee: $25/Unit Storage Fee: $10/month/Unit Reinstatement fee: $25/Unit | | |

**Order Term.** Subject to acceptance by Provider, the term of this Order shall commence on the **Commencement Date** and continue until the second Anniversary of the Commencement Date (the "**Initial Term**"), unless sooner terminated (i) by Provider, as provided above, (ii) by mutual agreement of the parties, or (iii) pursuant to Section 4 of the Agreement. Unless earlier terminated, this Order shall automatically renew for successive 12-month renewal terms ("**Renewal Term**") as set forth in the Agreement.

**Fees**. Client shall pay the fees provided for in this Order. The Fees for Services will be determined initially by reference to the Assumed power consumption per Unit of each deployed Unit, multiplied by the Hosting Services Rate (each as set forth above in this Order). Subsequent invoices will contain any additional charges incurred by Client and adjustments resulting from any differences between the Fees for Services invoiced in the preceding month and the Fee for Services based on Provider's determination of power utilized by Client during that month, as well as any adjustments to Provider's estimate of power to be utilized by Client in the upcoming month. Fees for Services for each month shall be paid in advance, in accordance with Section 3 of the Agreement.

**Purchase/Delivery/Installation Schedule for Units:** Company will facilitate the procurement on behalf of Client at Client's expense the above referenced Units from Bitmain Malaysia. Company will facilitate the procurement, shipping, and installation of the Units on behalf of Client at Client's sole cost and expense (including any and all costs and expenses associated with shipping, importing and transporting the Units to the Facility as provided above. Client will pay $2,695 per S19 Unit and $3,566.53 per S19 PRO Unit (total of $9,868,265). Client will make payments according to the Equipment Purchase Payment Due Dates listed above.

Client will pay the Provider's invoice for Units within five business days of receipt and execute any necessary power of attorney and other documents required by customs broker to enable shipment of the Units to a Core Facility on Client's behalf. Risk of loss and ownership of the Units shall pass between Bitmain and Client. Any and all taxes with respect to the purchase of the equipment will be the responsibility of Client.

**Subcontracting and Assignment. Section 8d. of the Agreement is hereby amended to read in its entirety:**

    d.  <u>Subcontracting and Assignment</u>.  Company may permit any affiliate, independent contractor or other third party to perform any of Company's obligations hereunder provided that Company remains primarily liable for the performance of its obligations. Company may assign, delegate, or transfer this Agreement or any of its rights and obligations hereunder without notice to or prior written consent of Client.  Client may not assign, delegate or transfer this Agreement or any of its rights and obligations hereunder without the prior written consent of Company; provided, however, Client may assign, delegate or transfer an Order pursuant to this Agreement to a third party upon the written consent of the Company, which consent shall not be unreasonably, withheld, obstructed or delayed if such assignment is to a third party not competitive to Company and such party executes a new Order on standard terms and conditions containing the hosting price and hosting term set forth in the Order to be assigned.  Any assignment or transfer in violation of this Agreement is void.  This Agreement will be binding upon and inure to the benefit of all permitted successors and assigns.  Nothing in this Agreement is intended to or will confer upon any third party any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement

**Right of First Offer:** Provided Client has executed one or more Orders on the date hereof with respect to Equipment having a total purchase price of more than $50 million, Provider agrees to make available for purchase by Client up to 45% of any newly available units during the calendar year 2021.  In the event units become available, Provider shall notify Client of such the units and the price at which such units are available. In the event Provider notifies Client of the availability of such newly additional units, Client shall have five days to execute an additional Order for such units on hosting terms and conditions mutually agreeable to both Client and Provider.

By: _S. Daniel Leon_           By: _Michael Trzupek_
Celsius Core LLC, "Client"        Core Scientific, Inc., "Provider"
Name: S. Daniel Leon           Name: Michael Trzupek
Title: S. Daniel Leon, President/COO    Title: **Chief Financial Officer**
Date: 12/18/2020              Date: 12/18/2020

## MASTER SERVICES AGREEMENT ORDER #4

This Order, including the terms and conditions hereunder, incorporates by reference the terms of the Master Services Agreement dated as of December 18, 2020 (the "**Agreement**") between Provider and Client (as defined below). If any terms of this Order conflict with the terms of the Agreement, the terms of this Order shall govern with respect to this Order. Capitalized terms used but not defined in this Order shall have the meanings ascribed in the Agreement.

| Commencement Date: | July 15, 2021 or the actual date Units are delivered to Client at Provider Facility if such Units are not delivered on such date. | | |
|---|---|---|---|
| Facility: | Provider Facility as determined by Provider. | | |
| Equipment hosted: | **Manufacturing Batch Month** | **Quantity & Type of Unit (the "Units")** | **Assumed power consumption per Unit (KWh):** |
| | June | 3,000 S19 | 3.413 KWh |
| | June | 500 S19 PRO | 3.413 KWh |
| Hosting-Services Rate: | USD $.0556 / KWh | | |
| Payment Due Prior to Installation: | USD $537,273 no later than the earlier of (i) the date of installation of the Units or (ii) July 15, 2021 consisting of: <ul><li>A $484,773 prepayment to be applied as a credit against future monthly invoices for hosting services as they become due.</li><li>A $52,500 Set-up Fee</li></ul> | | |
| Equipment Purchase Payment Due Dates: | Due Date | Amount (US) | |
| | 12/22/2020 | $1,973,653.00 | |
| | 01/15/2021 | $2,960,479.50 | |
| | 05/15/2021 | $4,934,132.50 | |
| Estimated Delivery Date: | July 15, 2021.  Provider to notify Client as soon as reasonably possible in advance if Units will not be delivered by this date. Provider may terminate this Order if substantially all the Units are not delivered within 60 days of the Estimated Delivery Date. | | |
| Fees: | Set-up fee: $15/Unit | | |
| Fees payable pursuant to Section 4 in connection with Service Termination/ Suspension | Equipment disconnection fee: $25/Unit<br>Storage Fee: $10/month/Unit<br>Reinstatement fee: $25/Unit | | |

**Order Term.** Subject to acceptance by Provider, the term of this Order shall commence on the **Commencement Date** and continue until the second Anniversary of the Commencement Date (the "**Initial Term**"), unless sooner terminated (i) by Provider, as provided above, (ii) by mutual agreement of the parties, or (iii) pursuant to Section 4 of the Agreement. Unless earlier terminated, this Order shall automatically renew for successive 12-month renewal terms ("**Renewal Term**") as set forth in the Agreement.

**Fees**. Client shall pay the fees provided for in this Order. The Fees for Services will be determined initially by reference to the Assumed power consumption per Unit of each deployed Unit, multiplied by the Hosting Services Rate (each as set forth above in this Order).  Subsequent invoices will contain any additional charges incurred by Client and adjustments resulting from any differences between the Fees for Services invoiced in the preceding month and the Fee for Services based on Provider's determination of power utilized by Client during that month, as well as any adjustments to Provider's estimate of power to be utilized by Client in the upcoming month.  Fees for Services for each month shall be paid in advance, in accordance with Section 3 of the Agreement.

**Purchase/Delivery/Installation Schedule for Units:** Company will facilitate the procurement on behalf of Client at Client's expense the above referenced Units from Bitmain Malaysia. Company will facilitate the procurement, shipping, and installation of the Units on behalf of Client at Client's sole cost and expense (including any and all costs and expenses associated with shipping, importing and transporting the Units to the Facility as provided above. Client will pay $2,695 per S19 Unit and $3,566.53 per S19 PRO Unit (total of $9,868,265). Client will make payments according to the Equipment Purchase Payment Due Dates listed above.

DocuSign Envelope ID: D30F8BG2-A916-44CD-8E7A-E3644866080B

Client will pay the Provider's invoice for Units within five business days of receipt and execute any necessary power of attorney and other documents required by customs broker to enable shipment of the Units to a Core Facility on Client's behalf. Risk of loss and ownership of the Units shall pass between Bitmain and Client. Any and all taxes with respect to the purchase of the equipment will be the responsibility of Client.

**Subcontracting and Assignment. Section 8d. of the Agreement is hereby amended to read in its entirety:**

d. <u>Subcontracting and Assignment</u>. Company may permit any affiliate, independent contractor or other third party to perform any of Company's obligations hereunder provided that Company remains primarily liable for the performance of its obligations. Company may assign, delegate, or transfer this Agreement or any of its rights and obligations hereunder without notice to or prior written consent of Client. Client may not assign, delegate or transfer this Agreement or any of its rights and obligations hereunder without the prior written consent of Company; provided, however, Client may assign, delegate or transfer an Order pursuant to this Agreement to a third party upon the written consent of the Company, which consent shall not be unreasonably, withheld, obstructed or delayed if such assignment is to a third party not competitive to Company and such party executes a new Order on standard terms and conditions containing the hosting price and hosting term set forth in the Order to be assigned. Any assignment or transfer in violation of this Agreement is void. This Agreement will be binding upon and inure to the benefit of all permitted successors and assigns. Nothing in this Agreement is intended to or will confer upon any third party any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement

**Right of First Offer:** Provided Client has executed one or more Orders on the date hereof with respect to Equipment having a total purchase price of more than $50 million, Provideragrees to make available for purchase by Client up to 45% of any newly available units during the calendar year 2021. In the event units become available, Provider shall notify Client of such the units and the price at which such units are available. In the event Provider notifies Client of the availability of such newly additional units, Client shall have five days to execute an additional Order for such units on hosting terms and conditions mutually agreeable to both Client and Provider.

By: *S. Daniel Leon*
**Celsius Core LLC, "Client"**
**Name:** S. Daniel Leon
**Title:** S. Daniel Leon, President/COO
**Date:** 12/18/2020

By: *Michael Trzupek*
**Core Scientific, Inc., "Provider"**
**Name:** Michael Trzupek
**Title:** Chief Financial Officer
**Date:** 12/18/2020

**MASTER SERVICES AGREEMENT ORDER #5**

This Order, including the terms and conditions hereunder, incorporates by reference the terms of the Master Services Agreement dated as of December 18, 2020 (the "**Agreement**") between Provider and Client (as defined below). If any terms of this Order conflict with the terms of the Agreement, the terms of this Order shall govern with respect to this Order. Capitalized terms used but not defined in this Order shall have the meanings ascribed in the Agreement.

| | | | |
|---|---|---|---|
| **Commencement Date:** | August 15, 2021 or the actual date Units are delivered to Client at Provider Facility if such Units are not delivered on such date. | | |
| **Facility:** | Provider Facility as determined by Provider. | | |
| **Equipment hosted:** | **Manufacturing Batch Month** | **Quantity & Type of Unit (the "Units")** | **Assumed power consumption per Unit (KWh):** |
| | July | 4,000 S19j | 3.255 KWh |
| **Hosting-Services Rate:** | USD $.0556 / KWh | | |
| **Payment Due Prior to Installation:** | USD $588,456 no later than the earlier of (i) the date of installation of the Units or (ii) August 15, 2021 consisting of: <ul><li>A $528,456 prepayment to be applied as a credit against future monthly invoices for hosting services as they become due.</li><li>A $60,000 Set-up Fee</li></ul> | | |
| **Equipment Purchase Payment Due Dates:** | Due Date | | Amount (US) |
| | 12/22/2020 | | $2,239,624.00 |
| | 01/15/2021 | | $3,359,436.00 |
| | 06/15/2021 | | $5,599,060.00 |
| **Estimated Delivery Date:** | August 15, 2021.   Provider to notify Client as soon as reasonably possible in advance if Units will not be delivered by this date. Provider may terminate this Order if substantially all the Units are not delivered within 60 days of the Estimated Delivery Date. | | |
| **Fees:** | Set-up fee: $15/Unit | | |
| **Fees payable pursuant to Section 4 in connection with Service Termination/ Suspension** | Equipment disconnection fee: $25/Unit<br>Storage Fee: $10/month/Unit<br>Reinstatement fee: $25/Unit | | |

**Order Term.** Subject to acceptance by Provider, the term of this Order shall commence on the **Commencement Date** and continue until the second Anniversary of the Commencement Date (the "**Initial Term**"), unless sooner terminated (i) by Provider, as provided above, (ii) by mutual agreement of the parties, or (iii) pursuant to Section 4 of the Agreement. Unless earlier terminated, this Order shall automatically renew for successive 12-month renewal terms (the "**Renewal Term**") as set forth in the Agreement.

**Fees**. Client shall pay the fees provided for in this Order. The Fees for Services will be determined initially by reference to the Assumed power consumption per Unit of each deployed Unit, multiplied by the Hosting Services Rate (each as set forth above in this Order).  Subsequent invoices will contain any additional charges incurred by Client and adjustments resulting from any differences between the Fees for Services invoiced in the preceding month and the Fee for Services based on Provider's determination of power utilized by Client during that month, as well as any adjustments to Provider's estimate of power to be utilized by Client in the upcoming month.  Fees for Services for each month shall be paid in advance, in accordance with Section 3 of the Agreement.

**Purchase/Delivery/Installation Schedule for Units:** Company will facilitate the procurement on behalf of Client at Client's expense the above referenced Units from Bitmain Malaysia. Company will facilitate the procurement, shipping, and installation of the Units on behalf of Client at Client's sole cost and expense (including any and all costs and expenses associated with shipping, importing and transporting the Units to the Facility as provided above. Client will pay $2,799.53 per S19j Unit (total of $11,198,120). Client will make payments according to the Equipment Purchase Payment Due Dates listed above. Client will pay the Provider's invoice for Units within five business days of receipt and execute any necessary power of attorney and other

documents required by customs broker to enable shipment of the Units to a Core Facility on Client's behalf. Risk of loss and ownership of the Units shall pass between Bitmain and Client. Any and all taxes with respect to the purchase of the equipment will be the responsibility of Client.

**Subcontracting and Assignment. Section 8d. of the Agreement is hereby amended to read in its entirety:**

> d.  <u>Subcontracting and Assignment</u>.  Company may permit any affiliate, independent contractor or other third party to perform any of Company's obligations hereunder provided that Company remains primarily liable for the performance of its obligations. Company may assign, delegate, or transfer this Agreement or any of its rights and obligations hereunder without notice to or prior written consent of Client.  Client may not assign, delegate or transfer this Agreement or any of its rights and obligations hereunder without the prior written consent of Company; provided, however, Client may assign, delegate or transfer an Order pursuant to this Agreement to a third party upon the written consent of the Company, which consent shall not be unreasonably, withheld, obstructed or delayed if such assignment is to a third party not competitive to Company and such party executes a new Order on standard terms and conditions containing the hosting price and hosting term set forth in the Order to be assigned.  Any assignment or transfer in violation of this Agreement is void.  This Agreement will be binding upon and inure to the benefit of all permitted successors and assigns.  Nothing in this Agreement is intended to or will confer upon any third party any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement

**Right of First Offer:** Provided Client has executed one or more Orders on the date hereof with respect to Equipment having a total purchase price of more than $50 million, Provider agrees to make available for purchase by Client up to 45% of any newly available units during the calendar year 2021.  In the event units become available, Provider shall notify Client of such the units and the price at which such units are available. In the event Provider notifies Client of the availability of such newly additional units, Client shall have five days to execute an additional Order for such units on hosting terms and conditions mutually agreeable to both Client and Provider.

By: _S. Daniel Leon_____
**Celsius Core LLC, "Client"**
Name: _S. Daniel Leon_____
Title: _S. Daniel Leon, President/COO_
Date: _12/18/2020_____

By: _Michael Trzupek_____
**Core Scientific, Inc., "Provider"**
Name: _Michael Trzupek_____
Title: **Chief Financial Officer**
Date: _12/18/2020_____

19

**MASTER SERVICES AGREEMENT ORDER #6**

This Order, including the terms and conditions hereunder, incorporates by reference the terms of the Master Services Agreement dated as of December 18, 2020 (the "**Agreement**") between Provider and Client (as defined below). If any terms of this Order conflict with the terms of the Agreement, the terms of this Order shall govern with respect to this Order. Capitalized terms used but not defined in this Order shall have the meanings ascribed in the Agreement.

| | | | |
|---|---|---|---|
| **Commencement Date:** | September 15, 2021 or the actual date Units are delivered to Client at Provider Facility if such Units are not delivered on such date. | | |
| **Facility:** | Provider Facility as determined by Provider. | | |
| **Equipment hosted:** | **Manufacturing Batch Month** | **Quantity & Type of Unit (the "Units")** | **Assumed power consumption per Unit (KWh):** |
| | August | 2,300 S19j | 3.255 KWh |
| **Hosting-Services Rate:** | USD $.0556 / KWh | | |
| **Payment Due Prior to Installation:** | USD $338,362   no later than the earlier of (i) the date of installation of the Units or (ii) September 15, 2021 consisting of: <br> • A $303,862 prepayment to be applied as a credit against future monthly invoices for hosting services as they become due. <br> • A $34,500 Set-up Fee | | |
| **Equipment Purchase Payment Due Dates:** | Due Date | Amount (US) | |
| | 12/22/2020 | $1,287,783.80 | |
| | 01/15/2021 | $1,931,675.70 | |
| | 07/15/2021 | $3,219,425.00 | |
| **Estimated Delivery Date:** | September 15, 2021.   Provider to notify Client as soon as reasonably possible in advance if Units will not be delivered by this date. Provider may terminate this Order if substantially all the Units are not delivered within 60 days of the Estimated Delivery Date. | | |
| **Fees:** | Set-up fee: $15/Unit | | |
| **Fees payable pursuant to Section 4 in connection with Service Termination/ Suspension** | Equipment disconnection fee: $25/Unit <br> Storage Fee: $10/month/Unit <br> Reinstatement fee: $25/Unit | | |

**Order Term.** Subject to acceptance by Provider, the term of this Order shall commence on the **Commencement Date** and continue until the second Anniversary of the Commencement Date (the "**Initial Term**"), unless sooner terminated (i) by Provider, as provided above, (ii) by mutual agreement of the parties, or (iii) pursuant to Section 4 of the Agreement. Unless earlier terminated, this Order shall automatically renew for successive 12-month renewal terms ("**Renewal Term**") as set forth in the Agreement.

**Fees**. Client shall pay the fees provided for in this Order. The Fees for Services will be determined initially by reference to the Assumed power consumption per Unit of each deployed Unit, multiplied by the Hosting Services Rate (each as set forth above in this Order).  Subsequent invoices will contain any additional charges incurred by Client and adjustments resulting from any differences between the Fees for Services invoiced in the preceding month and the Fee for Services based on Provider's determination of power utilized by Client during that month, as well as any adjustments to Provider's estimate of power to be utilized by Client in the upcoming month.  Fees for Services for each month shall be paid in advance, in accordance with Section 3 of the Agreement.

**Purchase/Delivery/Installation Schedule for Units: Company** will facilitate the procurement on behalf of Client at Client's expense the above referenced Units from Bitmain Malaysia. Company will facilitate the procurement, shipping, and installation of the Units on behalf of Client at Client's sole cost and expense (including any and all costs and expenses associated with shipping, importing and transporting the Units to the Facility as provided above. Client will pay $2,799.53 per S19j Unit (total of $6,438,919). Client will make payments according to the Equipment Purchase Payment Due Dates listed above. Client will pay the Provider's invoice for Units within five business days of receipt and execute any necessary power of attorney and other

documents required by customs broker to enable shipment of the Units to a Core Facility on Client's behalf. Risk of loss and ownership of the Units shall pass between Bitmain and Client. Any and all taxes with respect to the purchase of the equipment will be the responsibility of Client.

**Subcontracting and Assignment. Section 8d. of the Agreement is hereby amended to read in its entirety:**

d.  Subcontracting and Assignment.  Company may permit any affiliate, independent contractor or other third party to perform any of Company's obligations hereunder provided that Company remains primarily liable for the performance of its obligations. Company may assign, delegate, or transfer this Agreement or any of its rights and obligations hereunder without notice to or prior written consent of Client.  Client may not assign, delegate or transfer this Agreement or any of its rights and obligations hereunder without the prior written consent of Company; provided, however, Client may assign, delegate or transfer an Order pursuant to this Agreement to a third party upon the written consent of the Company, which consent shall not be unreasonably, withheld, obstructed or delayed if such assignment is to a third party not competitive to Company and such party executes a new Order on standard terms and conditions containing the hosting price and hosting term set forth in the Order to be assigned.  Any assignment or transfer in violation of this Agreement is void.  This Agreement will be binding upon and inure to the benefit of all permitted successors and assigns.  Nothing in this Agreement is intended to or will confer upon any third party any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement

**Right of First Offer:** Provided Client has executed one or more Orders on the date hereof with respect to Equipment having a total purchase price of more than $50 million, Provider agrees to make available for purchase by Client up to 45% of any newly available units during the calendar year 2021.  In the event units become available, Provider shall notify Client of such the units and the price at which such units are available. In the event Provider notifies Client of the availability of such newly additional units, Client shall have five days to execute an additional Order for such units on hosting terms and conditions mutually agreeable to both Client and Provider.

By: _S. Daniel Leon_____

**Celsius Core LLC, "Client"**

Name: S. Daniel Leon

Title: S. Daniel Leon, President/COO

Date: 12/18/2020

By: _Michael Trzupek_____

**Core Scientific, Inc., "Provider"**

Name: Michael Trzupek

Title: **Chief Financial Officer**

Date: 12/18/2020

## MASTER SERVICES AGREEMENT ORDER #7

This Order, including the terms and conditions hereunder, incorporates by reference the terms of the Master Services Agreement dated as of December 18, 2020 (the "**Agreement**") between Provider and Client (as defined below). If any terms of this Order conflict with the terms of the Agreement, the terms of this Order shall govern with respect to this Order. Capitalized terms used but not defined in this Order shall have the meanings ascribed in the Agreement.

| | | | |
|---|---|---|---|
| **Commencement Date:** | October 15, 2021 or the actual date Units are delivered to Client at Provider Facility if such Units are not delivered on such date. | | |
| **Facility:** | Provider Facility as determined by Provider. | | |
| **Equipment hosted:** | **Manufacturing Batch Month** | **Quantity & Type of Unit (the "Units")** | **Assumed power consumption per Unit (KWh):** |
| | September | 2,450 S19j | 3.255 KWh |
| | September | 1,000 S19j PRO | 3.15 KWh |
| **Hosting-Services Rate:** | USD $.0556 / KWh | | |
| **Payment Due Prior to Installation:** | USD $503,281 no later than the earlier of<br>(i) the date of installation of the Units or (ii) October 15, 2021 consisting of:<br>• $451,531 To be applied as a credit against invoices as they become due.<br>• $51,750 Set-up Fees | | |
| **Equipment Purchase Payment Due Dates:** | Due Date | Amount (US) | |
| | 12/22/2020 | $2,089,313.70 | |
| | 01/15/2021 | $3,133,970.55 | |
| | 08/15/2021 | $5,223,284.25 | |
| **Estimated Delivery Date:** | October 15, 2021.   Provider to notify Client as soon as reasonably possible in advance if Units will not be delivered by this date. Provider may terminate this Order if substantially all the Units are not delivered within 60 days of the Estimated Delivery Date. | | |
| **Fees:** | Set-up fee: $15/Unit | | |
| **Fees payable pursuant to Section 4 in connection with Service Termination/ Suspension** | Equipment disconnection fee: $25/Unit<br>Storage Fee: $10/month/Unit<br>Reinstatement fee: $25/Unit | | |

**Order Term.** Subject to acceptance by Provider, the term of this Order shall commence on the **Commencement Date** and continue until the second Anniversary of the Commencement Date (the "**Initial Term**"), unless sooner terminated (i) by Provider, as provided above, (ii) by mutual agreement of the parties, or (iii) pursuant to Section 4 of the Agreement. Unless earlier terminated, this Order shall automatically renew for successive 12-month renewal terms ("**Renewal Term**") as set forth in the Agreement.

**Fees**. Client shall pay the fees provided for in this Order. The Fees for Services will be determined initially by reference to the Assumed power consumption per Unit of each deployed Unit, multiplied by the Hosting Services Rate (each as set forth above in this Order).  Subsequent invoices will contain any additional charges incurred by Client and adjustments resulting from any differences between the Fees for Services invoiced in the preceding month and the Fee for Services based on Provider's determination of power utilized by Client during that month, as well as any adjustments to Provider's estimate of power to be utilized by Client in the upcoming month.  Fees for Services for each month shall be paid in advance, in accordance with Section 3 of the Agreement.

**Purchase/Delivery/Installation Schedule for Units:** Company will facilitate the procurement on behalf of Client at Client's expense the above referenced Units from Bitmain Malaysia. Company will facilitate the procurement, shipping, and installation of the Units on behalf of Client at Client's sole cost and expense (including any and all costs and expenses associated with shipping, importing and transporting the Units to the Facility as provided above. Client will pay $2,799.53 per S19j Unit and $3,587.72 per S19j PRO Unit (total of $10,446,568.5). Client will make payments according to the Equipment Purchase Payment Due Dates listed above. Client will pay the Provider's invoice for Units within five business days of receipt and execute any

necessary power of attorney and other documents required by customs broker to enable shipment of the Units to a Core Facility on Client's behalf. Risk of loss and ownership of the Units shall pass between Bitmain and Client. Any and all taxes with respect to the purchase of the equipment will be the responsibility of Client.

**Subcontracting and Assignment. Section 8d. of the Agreement is hereby amended to read in its entirety:**

d.  Subcontracting and Assignment.  Company may permit any affiliate, independent contractor or other third party to perform any of Company's obligations hereunder provided that Company remains primarily liable for the performance of its obligations. Company may assign, delegate, or transfer this Agreement or any of its rights and obligations hereunder without notice to or prior written consent of Client.  Client may not assign, delegate or transfer this Agreement or any of its rights and obligations hereunder without the prior written consent of Company; provided, however, Client may assign, delegate or transfer an Order pursuant to this Agreement to a third party upon the written consent of the Company, which consent shall not be unreasonably, withheld, obstructed or delayed if such assignment is to a third party not competitive to Company and such party executes a new Order on standard terms and conditions containing the hosting price and hosting term set forth in the Order to be assigned.  Any assignment or transfer in violation of this Agreement is void.  This Agreement will be binding upon and inure to the benefit of all permitted successors and assigns.  Nothing in this Agreement is intended to or will confer upon any third party any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement

**Right of First Offer:** Provided Client has executed one or more Orders on the date hereof with respect to Equipment having a total purchase price of more than $50 million, Provider agrees to make available for purchase by Client up to 45% of any newly available units during the calendar year 2021.  In the event units become available, Provider shall notify Client of such the units and the price at which such units are available. In the event Provider notifies Client of the availability of such newly additional units, Client shall have five days to execute an additional Order for such units on hosting terms and conditions mutually agreeable to both Client and Provider.

By: _S. Daniel Leon_
**Celsius Core LLC, "Client"**
**Name:** S. Daniel Leon
**Title:** S. Daniel Leon, President/COO
**Date:** 12/18/2020

By: _Michael Trzupek_
**Core Scientific, Inc., "Provider"**
**Name:** Michael Trzupek
**Title:** **Chief Financial Officer**
**Date:** 12/18/2020

## MASTER SERVICES AGREEMENT ORDER # 10

This Order, including the terms and conditions hereunder, incorporates by reference the terms of the Master Services Agreement dated as of December 18, 2020 (the "**Agreement**") between Provider and Client (as defined below). If any terms of this Order conflict with the terms of the Agreement, the terms of this Order shall govern with respect to this Order. Capitalized terms used but not defined in this Order shall have the meanings ascribed in the Agreement.

| Commencement Date: | September 20, 2021 and then the fifteenth of every remaining month beginning with October 15, 2021 until December 15, 2022, respectively. | | |
|---|---|---|---|
| Facility: | Provider Facility as determined by Provider. | | |
| Equipment hosted**: | **Deployment Month** | **Quantity & Type of Unit (the "Units")** | **Assumed power consumption per Unit (KWH):** |
| | SEP 2021 | 2,250 - M30S+ or Equivalent | 3.57 |
| | MAR 2022 | 3,530 - M30S+ or Equivalent | 3.57 |
| | APR 2022 | 4,710 - M30S+ or Equivalent | 3.57 |
| | MAY 2022 | 2,350 - M30S+ or Equivalent | 3.57 |
| | JUNE 2022 | 2,350 - M30S+ or Equivalent | 3.57 |
| | JUL 2022 | 2,350 - M30S+ or Equivalent | 3.57 |
| | AUG 2022 | 2,350 - M30S+ or Equivalent | 3.57 |
| | SEP 2022 | 2,350 - M30S+ or Equivalent | 3.57 |
| | OCT 2022 | 2,350 - M30S+ or Equivalent | 3.57 |
| | NOV 2022 | 2,350 - M30S+ or Equivalent | 3.57 |
| | DEC 2022 | 2,350 - M30S+ or Equivalent | 3.57 |
| Hosting-Services Rate: | **Deployment Month** | **Hosting-Services Rate:** | |
| | SEP 2021 | USD $.0575/ KWh; USD $.06/Kwh after hosting month 12 | |
| | MAR 2022 | USD $.0593/ KWh; USD $.06/kwh after hosting month 12 | |
| | APR 2022 – DEC 2022 | USD $.00625/ KWh; USD $0.6/kwh after hosting month 12 | |
| Payment Due Prior to Installation: | **USD $10,736,252.50 on or before September 20, 2021 consisting of:**<br>• $1,685,800.00, 100% of the prepayment for hosting services for SEP 2021 Units to be applied as a credit against future monthly invoices as they become due.<br>• $1,909,775.00, 70% of the prepayment for hosting services for MAR 2022 Units to be applied as a credit against future monthly invoices as they become due.<br>• $1,342,547.50, 35% of the prepayment for hosting services for APR 2022 Units to be applied as a credit against future monthly invoices as they become due.<br>• $5,358,780.00, 35% of the prepayment for hosting services for MAY 2022 – DEC 2022 Units ($669,847.50 for each of MAY 2022, JUN 2022, JUL 2022, AUG 2022, SEP 2022, OCT 2022, NOV 2022 and DEC 2022 Units) to be applied as a credit against future monthly invoices as they become due.<br>• $439,350.00, Equipment Configuration Fee for SEP 2021 – DEC 2022 Units listed above.<br><br>**USD $1,342,547.50 on or before October 20, 2021 consisting of:**<br>• $1,342,547.50, 35% of the prepayment for hosting services for APR 2022 | | |

Units to be applied as a credit against future monthly invoices as they become due.

**USD $669,847.50 on or before November 20, 2021** consisting of:
- $669,847.50, 35% of the prepayment for hosting services for MAY 2022 Units to be applied as a credit against future monthly invoices as they become due.

**USD $669,847.50 on or before December 20, 2021** consisting of:
- $669,847.50, 35% of the prepayment for hosting services for JUNE 2022 Units to be applied as a credit against future monthly invoices as they become due.

**USD $669,847.50 on or before January 20, 2022** consisting of:
- $669,847.50, 35% of the prepayment for hosting services for JUL 2022 Units to be applied as a credit against future monthly invoices as they become due.

**USD $1,488,322.50 on or before February 20, 2022** consisting of:
- $669,847.50, 35% of the prepayment for hosting services for AUG 2022 Units to be applied as a credit against future monthly invoices as they become due.
- $818,475.00, the remaining 30% of the prepayment for hosting services for MAR 2022 Units to be applied as a credit against future monthly invoices as they become due.

**USD $1,820,602.50 on or before March 20, 2022** consisting of:
- $669,847.50, 35% of the prepayment for hosting services for SEP 2022 Units to be applied as a credit against future monthly invoices as they become due.
- $1,150,755.00, the remaining 30% of the prepayment for hosting services for APR 2022 Units to be applied as a credit against future monthly invoices as they become due.

**USD $1,244,002.50 on or before April 20, 2022** consisting of:
- $669,847.50, 35% of the prepayment for hosting services for OCT 2022 Units to be applied as a credit against future monthly invoices as they become due.
- $574,155.00, the remaining 30% of the prepayment for hosting services for MAY 2022 Units to be applied as a credit against future monthly invoices as they become due.

**USD $1,244,002.50 on or before May 20, 2022** consisting of:
- $669,847.50, 35% of the prepayment for hosting services for NOV 2022 Units to be applied as a credit against future monthly invoices as they become due.
- $574,155.00, the remaining 30% of the prepayment for hosting services for JUN 2022 Units to be applied as a credit against future monthly invoices as they become due.

**USD $1,244,002.50 on or before June 20, 2022** consisting of:
- $669,847.50, 35% of the prepayment for hosting services for DEC 2022

| | Units to be applied as a credit against future monthly invoices as they become due.<br>• $574,155.00, the remaining 30% of the prepayment for hosting services for JUL 2022 Units to be applied as a credit against future monthly invoices as they become due.<br><br>**USD $574,155.00 on or before July 20, 2022 consisting of:**<br>• $574,155.00, the remaining 30% of the prepayment for hosting services for AUG 2022 Units to be applied as a credit against future monthly invoices as they become due.<br><br>**USD $574,155.00 on or before August 20, 2022 consisting of:**<br>• $574,155.00, the remaining 30% of the prepayment for hosting services for SEP 2022 Units to be applied as a credit against future monthly invoices as they become due.<br><br>**USD $574,155.00 on or before September 20, 2022 consisting of:**<br>• $574,155.00, the remaining 30% of the prepayment for hosting services for OCT 2022 Units to be applied as a credit against future monthly invoices as they become due.<br><br>**USD $574,155.00 on or before October 20, 2022 consisting of:**<br>• $574,155.00, the remaining 30% of the prepayment for hosting services for NOV 2022 Units to be applied as a credit against future monthly invoices as they become due.<br><br>**USD $574,155.00 on or before November 20, 2022 consisting of:**<br>• $574,155.00, the remaining 30% of the prepayment for hosting services for DEC 2022 Units to be applied as a credit against future monthly invoices as they become due. |
|---|---|
| **Estimated Delivery Date:** | As of fifteenth of every month beginning with December 15, 2021 until December 15, 2022, respectively.<br><br>Client to notify Provider as soon as reasonably possible in advance if Units will not be delivered by this date. Provider may terminate this Order if substantially all the Units are not delivered within 60 days of the Estimated Delivery Date, respectively. |
| **Fees:** | Equipment Configuration Fee: $15/Unit payable as provided above. |
| **Fees payable pursuant to Section 4 in connection with Service Termination/ Suspension** | Equipment disconnection fee: $25/Unit<br>Storage Fee: $10/month/Unit<br>Reinstatement fee: $25/Unit<br>Equipment Recycle fee: $25/Unit decommissioned or disposed of during the term |

**Order Term.** Subject to acceptance by Provider, the term of this Order shall commence on the **Commencement Date** and continue until the second anniversary of the Commencement Date (the "**Initial Term**"), unless sooner terminated (i) by Provider, as provided above, (ii) by mutual agreement of the parties, or (iii) pursuant to Section 4 of the Agreement. Unless earlier terminated, this Order shall automatically renew for successive 12-month renewal terms ("**Renewal Term**") unless terminated during a renewal term as set forth in the Agreement.

DocuSign Envelope ID: B3525485-39DF-46AA-85CE-4439968B6B09

**Fees**. Client shall pay the fees provided for in this Order. The Fees for Services will be determined initially by reference to the Assumed power consumption per Unit of each deployed Unit, multiplied by the Hosting-Services Rate (each as set forth above in this Order). Subsequent invoices will contain any additional charges incurred by Client and adjustments resulting from any differences between the Fees for Services invoiced in the preceding month and the Fee for Services based on Provider's determination of power utilized by Client during that month, as well as any adjustments to Provider's estimate of power to be utilized by Client in the upcoming month. Fees for Services for each month shall be paid in advance, in accordance with Section 3 of the Agreement.

**Third Party Code.** Except to the extent arising from or relating to Provider's gross negligence, fraud or willful misconduct, Client shall indemnify, defend and hold harmless Company and its affiliates, stockholders, directors, officers, employees, subcontractors and invitees from and against any losses, liabilities, damages, costs and expenses (including, without limitation, reasonable attorneys' fees) arising from or relating to Client's installation or use of any non-standard software or firmware in connection with the Client Equipment.

**Subcontracting and Assignment. Section 8d. of the Agreement is hereby amended to read in its entirety:**

d. <u>Subcontracting and Assignment</u>. Company may permit any affiliate, independent contractor or other third party to perform any of Company's obligations hereunder provided that Company remains primarily liable for the performance of its obligations. Company may assign, delegate, or transfer this Agreement or any of its rights and obligations hereunder without notice to or prior written consent of Client. Client may not assign, delegate or transfer this Agreement or any of its rights and obligations hereunder without the prior written consent of Company; provided, however, Client may assign, delegate or transfer an Order pursuant to this Agreement to a third party upon the written consent of the Company, which consent shall not be unreasonably, withheld, obstructed or delayed if such assignment is to a third party not competitive to Company and such party executes a new Order on standard terms and conditions containing the hosting price and hosting term set forth in the Order to be assigned. Any assignment or transfer in violation of this Agreement is void. This Agreement will be binding upon and inure to the benefit of all permitted successors and assigns. Nothing in this Agreement is intended to or will confer upon any third party any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement

**Warranty:** Company does not make and hereby disclaims all warranties with respect to the Units. Company shall initiate warranty claims with Unit manufacturer. Company cannot and does not guarantee that warranty claims will be accepted by manufacturer.

Client agrees and confirms that:

(i) It has clean title to the Client Equipment and has not entered into any agreement that would interfere with Provider's exercise of its remedies under section 4.d of the Agreement.
(ii) Neither Client nor Client's customers will use the Services for any illegal activity; and
(iii) Neither Client nor its customers are subject to any sanctions imposed by the Office of Foreign Asset control of the U.S. Department of the Treasury.

**Notification of Hosting Availability:** Company will notify Client as soon as practicable of additional hosting availability, if any, and provide Client up to 10 additional MW per month at a hosting services rate of $0.0625

per KWh. Additional hosting availability if available will be the subject of a separate order and provided to Client on a priority basis, subject to Client acceptance.

**Client agrees to replace sold, damaged and other inoperable Units within 90 days to maintain the aggregate number of Units subject to this Order. Provider agrees to a 500 Unit inoperable threshold for Client to replace, sold, damages and other inoperable Units. Additional equipment may be added to this Order at the Hosted Services Rate provided upon the mutual agreement of Provider and Client.

By: _Roni Cohen Pavon_____

**Celsius Core LLC "Client"**
Name: __Roni Cohen Pavon__
Title: __Chief Revenue Officer__
Date: __9/27/2021__

By: _Michael Trzupek_____

**Core Scientific, Inc., "Provider"**
Name: __Michael Trzupek__
Title: __CFO__
Date: __9/27/2021__

DocuSign Envelope ID: F0920021-B986-45A7-8B22-AEA5830141FB

**FIRST AMENDMENT TO MASTER SERVICES AGREEMENT ORDER #10**
**BY AND BETWEEN**
**CELSIUS CORE LLC**
**& CORE SCIENTIFIC, INC.**

This First Amendment ("Amendment"), including the terms and conditions hereunder, incorporates by reference the terms of the Master Services Agreement dated as of December 18, 2020 and Order #10 (collectively, the "Agreement") between Celsius Mining LLC (formerly Celsius Core LLC, hereinafter referred to as "Client") and Core Scientific, Inc., a Delaware corporation (hereinafter referred to as "Provider"), each a "Party" and collectively referred to as the "Parties".

Capitalized terms used in this Amendment but not defined have the meanings set for in Agreement.

**Hosting-Services Rate Definition** is hereby amended by replacing the existing Hosting-Services Rate Definition with the following**:**

| Deployment Month | Hosting-Services Rate: |
|---|---|
| SEP 2021 | USD $.0575/ KWh; USD $.06/Kwh after hosting month 12 |
| MAR 2022 | USD $.0593/ KWh; USD $.06/kwh after hosting month 12 |
| APR 2022 – DEC 2022 | USD $.0625/ KWh; USD $0.6/kwh after hosting month 12 |

Unless amended in this Amendment, all terms and conditions contained in the Agreement remain in effect; provided, however, that in the event of a conflict or inconsistency between a term contain in this Amendment and a term contained in the Agreement, the term contained in this Amendment prevails.

**Core Scientific, Inc.**                                    **Celsius Mining LLC**

By: _Michael Trzupek_                          By: _Roni Cohen Pavon_
Name: Michael Trzupek                          Name: Roni Cohen Pavon
Title:  CFO                                                 Title: Chief Revenue Officer
Dated: 12/20/2021                                    Dated: 12/18/2021

**To:** christy.barwick@celsius.network[christy.barwick@celsius.network]
**Cc:** 'Patrick Holert'[patrick.holert@celsius.network]; Ana Sweeney[asweeney@corescientific.com]; Taras Kulyk[tkulyk@corescientific.com]; Russell Cann[russell@corescientific.com]; Russell Cann[russell@corescientific.com]
**From:** Jeff Pratt[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=ED5A49A192414BD3B509D2DE6089BDFB-JPRATT]
**Sent:** Mon 1/3/2022 12:00:15 PM (UTC-06:00)
**Subject:** RE: Rig Deployment - 2022

Christy,
Yes, that's fine.   Please include Russell and Taras.

We were going to reach out to you as well to validate the dates in the contract.   I think we all need to understand manufacturing month vs deployment month.  In between is shipping method and timing and customs processing and timing.
On a related note, did you see Cathay Pacific grounded their cargo fleet for 7 days?  Add to that the surging COVID numbers, non-existent commercial flights to/from Asia, and customs overload, we are also trying to clearly understand manufacturing, arrival, and deployment schedules.

We are still on holiday until tomorrow but let's get something on the books for Friday.

Thanks,
Jeff



**Jeff Pratt**

**Core Scientific**

**(425) 309-1790 (M)**

---

**From:** christy.barwick@celsius.network <christy.barwick@celsius.network>
**Sent:** Monday, January 3, 2022 9:55 AM
**To:** Jeff Pratt <jpratt@corescientific.com>
**Cc:** 'Patrick Holert' <patrick.holert@celsius.network>
**Subject:** Rig Deployment - 2022

[EXTERNAL] Use caution when opening attachments or links.

Happy new year Jeff.  Are you available Friday for a call to discuss 2022 deployment schedule?  Please let me know if I should invite others.

Thank you,

Christy



**Christy Barwick, CFO**
**425.289.8651**
Celsius Mining

Reminder: Be aware of phishing sites and always make sure you are visiting the official https://celsius.network website and app. Celsius will never ask you for confidential information such as passwords, private keys, seed phrases, or secret codes. You should store this information privately and securely and report any suspicious activity.

©2021 Celsius Network

221 River Street, 9th Floor
Hoboken, NJ 07030 USA
Registered as a Money Services Business (MSB) number 31000192265811 with the US Financial Crimes Enforcement Network (FinCEN).

Celsius is not a bank, depository institution, custodian or fiduciary and the assets in your Celsius account are not insured by any private or governmental insurance plan (including FDIC or SIPC), nor are they covered by any compensation scheme (including FSCS).

Holding, trading or using crypto assets carry significant risks, please carefully read our Risk Disclosure page. Celsius does not provide any financial, legal or tax advice, nor should this email be viewed as an offer or inducement to make any financial decision.

**To:** Quinn Lawlor[quinn.lawlor@celsius.network]
**Cc:** Mitch Livingston[mlivingston@corescientific.com]; patrick.holert@celsius.network[patrick.holert@celsius.network]; christy.barwick@celsius.network[christy.barwick@celsius.network]; Jenny Ball[jenny.ball@celsius.network]; Client Success[client-success@corescientific.com]; Kevin Coker[kcoker@corescientific.com]; Matt Brown[mbrown@corescientific.com]; Kyle Buckett[kbuckett@corescientific.com]; Taras Kulyk[tkulyk@corescientific.com]
**From:** Jeff Pratt[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=ED5A49A192414BD3B509D2DE6089BDFB-JPRATT]
**Sent:** Tue 11/23/2021 10:01:52 PM (UTC-06:00)
**Subject:** RE: Celsius Microbt follow up

Quinn,

Thanks for sending us the detail.   What I am seeing is 19 different miner types vs the two in the original contract.   We will need to get these all set up in Minder and then we will need to create the order and billing groups to receive units and asset tag them correctly.

This is not a small amount of work and we are closed from 11/25 to 11/28.   We can commit to energizing the units, if the units received match this detail, by December 3rd.

We will also work with you in the future so that we can get this detail on future shipments before they start to arrive.   Future deployments, even with this many miner types will be faster but this time we need and ask your patience as we create and define these miner types in Minder.

| Model | Th | Units | Watts | Total MW | EXW Date |
|-------|-----|-------|-------|----------|-----------|
| M30S | 90 | 250 | 3,420 | 0.855 | 10/11/2021 |
| M30S | 86 | 250 | 3,268 | 0.817 | 10/11/2021 |
| | | | | | |
| M31S+ | 82 | 34 | 3,444 | 0.117 | 10/26/2021 |
| M31S+ | 80 | 74 | 3,360 | 0.249 | 10/26/2021 |
| M31S+ | 78 | 30 | 3,276 | 0.098 | 10/26/2021 |
| M31S+ | 76 | 5 | 3,192 | 0.016 | 10/26/2021 |
| M31S+ | 74 | 2 | 3,108 | 0.006 | 10/26/2021 |
| M31S+ | 84 | 7 | 3,528 | 0.025 | 10/28/2021 |
| M31S+ | 82 | 42 | 3,444 | 0.145 | 10/28/2021 |
| M31S+ | 80 | 132 | 3,360 | 0.444 | 10/28/2021 |
| M31S+ | 78 | 135 | 3,276 | 0.442 | 10/28/2021 |
| M31S+ | 76 | 6 | 3,192 | 0.019 | 10/28/2021 |
| | | | | | |
| M30S | 94 | 2 | 3,572 | 0.007 | 10/29/2021 |
| M30S | 92 | 53 | 3,496 | 0.185 | 10/29/2021 |
| M30S | 90 | 910 | 3,420 | 3.112 | 10/29/2021 |
| M30S | 88 | 40 | 3,344 | 0.134 | 10/29/2021 |
| M30S | 86 | 94 | 3,268 | 0.307 | 10/29/2021 |
| M30S | 84 | 179 | 3,192 | 0.571 | 10/29/2021 |
| M30S | 82 | 5 | 3,116 | 0.016 | 10/29/2021 |
| **Total** | | **2250** | | **7.6** | |

Regards,
Jeff



**Jeff Pratt**

**Core Scientific**

**(425) 309-1790 (M)**

---

**From:** Quinn Lawlor <quinn.lawlor@celsius.network>
**Sent:** Tuesday, November 23, 2021 5:21 PM
**To:** Jeff Pratt <jpratt@corescientific.com>
**Cc:** Mitch Livingston <mlivingston@corescientific.com>; patrick.holert@celsius.network; christy.barwick@celsius.network; Jenny Ball <jenny.ball@celsius.network>; Client Success <client-success@corescientific.com>
**Subject:** Re: Celsius Microbt follow up

[EXTERNAL] Use caution when opening attachments or links.

Mitch, Jeff - See attached for requested info.

When can we expect to have these units online?

Thanks,
Quinn

On Tue, Nov 23, 2021 at 1:44 PM Jeff Pratt <jpratt@corescientific.com> wrote:
  To add to Mitch's note, official manufacturer spec power consumption rating of each different model are needed.



**Jeff Pratt**

**Core Scientific**

**(425) 309-1790 (M)**

---

**From:** Mitch Livingston <mlivingston@corescientific.com>
**Sent:** Tuesday, November 23, 2021 1:36 PM
**To:** patrick.holert@celsius.network
**Cc:** quinn.lawlor@celsius.network; christy.barwick@celsius.network; Jenny Ball <jenny.ball@celsius.network>; Client Success <client-success@corescientific.com>; Jeff Pratt <jpratt@corescientific.com>
**Subject:** Celsius Microbt follow up

Hi Patrick,

We have received:
175 - 84Ths
312 - 86Ths

29 - 88Ths
336 - 90Ths
2 - 94Ths
Total - 854 units

22-10964-mg Doc 1041-5 Filed 10/19/22 Entered 10/19/22 21:48:52 Exhibit E
Pg 3 of 5

Please forward the breakdown of units from the invoice paid so we can validate what was received vs what is expected. We also need this information to create the orders to be able to deploy these units.

We need count by model type and spec power draw by model and ths model.

**Mitchell Livingston**

Client Success Manager

**Core Scientific**
mlivingston@corescientific.com

(803) 422-4484

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email noted above and destroy the original message.

Reminder: Be aware of phishing sites and always make sure you are visiting the official https://celsius.network website and app. Celsius will never ask you for confidential information such as passwords, private keys, seed phrases, or secret codes. You should store this information privately and securely and report any suspicious activity.

©2021 Celsius Network

221 River Street, 9th Floor
Hoboken, NJ 07030 USA
Registered as a Money Services Business (MSB) number 31000192265811 with the US Financial Crimes Enforcement Network (FinCEN).

Celsius is not a bank, depository institution, custodian or fiduciary and the assets in your Celsius account are not insured by any private or governmental insurance plan (including FDIC or SIPC), nor are they covered by any compensation scheme (including FSCS).

Holding, trading or using crypto assets carry significant risks, please carefully read our Risk Disclosure page. Celsius does not provide any financial, legal or tax advice, nor should this email be viewed as an offer or inducement to make any financial decision.

**Celsius Mining 2,250 October Batch MicroBT Deliveries**

| Model | w/th | Range |
|-------|------|-------|
| M30S | 38 | + / - 5% |
| M31S+ | 42 | + / - 5% |

| | | | | | | | Average | | |
|-----|-----------|-----------|-------|--------|--------|------|------------|-------|-------|
| Rig | In Transit | Delivered | Total | Min TH | Max TH | W/th | Spec Watts | Min | Max |
| M31S+ | 467 | 0 | 467 | 74 | 82 | 42 | 3,276 | 3,112 | 3,440 |
| M30S | 929 | 854 | 1783 | 82 | 94 | 38 | 3,344 | 3,177 | 3,511 |
| **Total** | | | **2250** | | | | **7,492,244** | | |

| Model | TH | Spec | Min | Max |
|-------|----|------|-----|-----|
| M30S | 82 | 3116 | 2,960 | 3,272 |
| M30S | 84 | 3192 | 3,032 | 3,352 |
| M30S | 86 | 3268 | 3,105 | 3,431 |
| M30S | 88 | 3344 | 3,177 | 3,511 |
| M30S | 90 | 3420 | 3,249 | 3,591 |
| M30S | 94 | 3572 | 3,393 | 3,751 |
| | | | | |
| M31S+ | 74 | 3108 | 2,953 | 3,263 |
| M31S+ | 76 | 3192 | 3,032 | 3,352 |
| M31S+ | 78 | 3276 | 3,112 | 3,440 |
| M31S+ | 80 | 3360 | 3,192 | 3,528 |
| M31S+ | 82 | 3444 | 3,272 | 3,616 |

| Model | Th | Units | Watts | Total MW | EXW Date |
|-------|----|-------|-------|----------|----------|
| M30S | 90 | 250 | 3,420 | 0.855 | 10/11/2021 |
| M30S | 86 | 250 | 3,268 | 0.817 | 10/11/2021 |
| | | | | | |
| M31S+ | 82 | 34 | 3,444 | 0.117 | 10/26/2021 |
| M31S+ | 80 | 74 | 3,360 | 0.249 | 10/26/2021 |
| M31S+ | 78 | 30 | 3,276 | 0.098 | 10/26/2021 |
| M31S+ | 76 | 5 | 3,192 | 0.016 | 10/26/2021 |
| M31S+ | 74 | 2 | 3,108 | 0.006 | 10/26/2021 |
| M31S+ | 84 | 7 | 3,528 | 0.025 | 10/28/2021 |
| M31S+ | 82 | 42 | 3,444 | 0.145 | 10/28/2021 |
| M31S+ | 80 | 132 | 3,360 | 0.444 | 10/28/2021 |
| M31S+ | 78 | 135 | 3,276 | 0.442 | 10/28/2021 |
| M31S+ | 76 | 6 | 3,192 | 0.019 | 10/28/2021 |
| | | | | | |
| M30S | 94 | 2 | 3,572 | 0.007 | 10/29/2021 |
| M30S | 92 | 53 | 3,496 | 0.185 | 10/29/2021 |
| M30S | 90 | 910 | 3,420 | 3.112 | 10/29/2021 |
| M30S | 88 | 40 | 3,344 | 0.134 | 10/29/2021 |
| M30S | 86 | 94 | 3,268 | 0.307 | 10/29/2021 |
| M30S | 84 | 179 | 3,192 | 0.571 | 10/29/2021 |
| M30S | 82 | 5 | 3,116 | 0.016 | 10/29/2021 |
| **Total** | | **2250** | | **7.6** | |

**Celsius Mining 2,250 October Batch MicroBT Deliveries**

| Model | w/th | Range |
|-------|------|-------|
| M30S | 38 | + / - 5% |
| M31S+ | 42 | + / - 5% |

| | | | | | | | Average | | |
|-----|-----------|-----------|-------|--------|--------|------|------------|-------|-------|
| Rig | In Transit | Delivered | Total | Min TH | Max TH | W/th | Spec Watts | Min | Max |
| M31S+ | 467 | 0 | 467 | 74 | 82 | 42 | 3,276 | 3,112 | 3,440 |
| M30S | 929 | 854 | 1783 | 82 | 94 | 38 | 3,344 | 3,177 | 3,511 |
| Total | | | 2250 | | | | 7,492,244 | | |

| Model | TH | Spec | Min | Max |
|-------|----|------|-----|-----|
| M30S | 82 | 3116 | 2,960 | 3,272 |
| M30S | 84 | 3192 | 3,032 | 3,352 |
| M30S | 86 | 3268 | 3,105 | 3,431 |
| M30S | 88 | 3344 | 3,177 | 3,511 |
| M30S | 90 | 3420 | 3,249 | 3,591 |
| M30S | 94 | 3572 | 3,393 | 3,751 |
| | | | | |
| M31S+ | 74 | 3108 | 2,953 | 3,263 |
| M31S+ | 76 | 3192 | 3,032 | 3,352 |
| M31S+ | 78 | 3276 | 3,112 | 3,440 |
| M31S+ | 80 | 3360 | 3,192 | 3,528 |
| M31S+ | 82 | 3444 | 3,272 | 3,616 |

| Model | Th | Units | Watts | Total MW | EXW Date |
|-------|----|-------|-------|----------|----------|
| M30S | 90 | 250 | 3,420 | 0.855 | 10/11/2021 |
| M30S | 86 | 250 | 3,268 | 0.817 | 10/11/2021 |
| | | | | | |
| M31S+ | 82 | 34 | 3,444 | 0.117 | 10/26/2021 |
| M31S+ | 80 | 74 | 3,360 | 0.249 | 10/26/2021 |
| M31S+ | 78 | 30 | 3,276 | 0.098 | 10/26/2021 |
| M31S+ | 76 | 5 | 3,192 | 0.016 | 10/26/2021 |
| M31S+ | 74 | 2 | 3,108 | 0.006 | 10/26/2021 |
| M31S+ | 84 | 7 | 3,528 | 0.025 | 10/28/2021 |
| M31S+ | 82 | 42 | 3,444 | 0.145 | 10/28/2021 |
| M31S+ | 80 | 132 | 3,360 | 0.444 | 10/28/2021 |
| M31S+ | 78 | 135 | 3,276 | 0.442 | 10/28/2021 |
| M31S+ | 76 | 6 | 3,192 | 0.019 | 10/28/2021 |
| | | | | | |
| M30S | 94 | 2 | 3,572 | 0.007 | 10/29/2021 |
| M30S | 92 | 53 | 3,496 | 0.185 | 10/29/2021 |
| M30S | 90 | 910 | 3,420 | 3.112 | 10/29/2021 |
| M30S | 88 | 40 | 3,344 | 0.134 | 10/29/2021 |
| M30S | 86 | 94 | 3,268 | 0.307 | 10/29/2021 |
| M30S | 84 | 179 | 3,192 | 0.571 | 10/29/2021 |
| M30S | 82 | 5 | 3,116 | 0.016 | 10/29/2021 |
| Total | | 2250 | | 7.6 | |

| From: | Lesa Lamberson |
| --- | --- |
| To: | Jeffory G Scioli; Shauna Kowalczik |
| Cc: | Harsh Patel |
| Subject: | Re: GRAND FORKS, ND SHIP SCHEDULE |
| Date: | Tuesday, June 22, 2021 8:59:11 AM |
| Attachments: | image001.png |

Thank you Jeff, I am just trying to get our schedule nailed down for all the other items that we
have to have to go with the Switchgear.

---

**From:** Jeffory G Scioli <Jeffory.Scioli@svesupply.com>
**Sent:** Monday, June 21, 2021 4:06 PM
**To:** Lesa Lamberson <llamberson@corescientific.com>; Shauna Kowalczik
<Shauna.Kowalczik@svesupply.com>
**Cc:** Harsh Patel <hpatel@corescientific.com>
**Subject:** RE: GRAND FORKS, ND SHIP SCHEDULE

Hi Lesa,
I wanted to let you know we tried to push for better days and they are still trying, but as of right now
this is the best we have.  The world is a disaster currently in trying to secure product.

I am sure all gear manufactures are in the same boat or worse – We will continue to push for better
dates..

**Thank you,**

**Jeff Scioli**

Manager
**Sun Valley Electric**
**Las Vegas | Salt Lake City**
Direct: 702-740-0036 | Cell: 702-325-3770 | Office: 702-649-7160 |  Fax: 702-597-5054
*** *Ask me how you can be sitting in Cabo in October!!****

---

**From:** Lesa Lamberson <llamberson@corescientific.com>
**Sent:** Monday, June 21, 2021 1:05 PM
**To:** Shauna Kowalczik <Shauna.Kowalczik@svesupply.com>
**Cc:** Harsh Patel <hpatel@corescientific.com>; Jeffory G Scioli <Jeffory.Scioli@svesupply.com>
**Subject:** Re: GRAND FORKS, ND SHIP SCHEDULE

I thought it was 45 working days, this is 90 days. Harsh will this work for ND?

---

**From:** Shauna Kowalczik <Shauna.Kowalczik@svesupply.com>
**Sent:** Monday, June 21, 2021 4:01 PM
**To:** Lesa Lamberson <llamberson@corescientific.com>

**Cc:** Harsh Patel <hpatel@corescientific.com>; Jeffory G Scioli <Jeffory.Scioli@svesupply.com>
**Subject:** GRAND FORKS, ND SHIP SCHEDULE

[EXTERNAL] Use caution when opening attachments or links.

Good afternoon,

Please see the attached ship schedule.

Thank you,
Shauna Kowalczik
Projects Dept Manager
Sun Valley Electric
(702) 649-7160



**\*\*All ship dates are estimates and subject to availability at time order is processed by SVE and with the mfg.\*\***

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email noted above and destroy the original message.

| From: | Lesa Lamberson |
|---|---|
| To: | Garry Fife; Harsh Patel |
| Subject: | Project update |
| Date: | Friday, July 23, 2021 11:39:38 AM |
| Attachments: | Outlook-go240hlg.png |

| Projects Tracking | DNN3 142MW | MBL 20MW Expansion | CAL 25MW Expansion | ND 100MW |
|---|---|---|---|---|
| Transformers | Complete, requested refund for freight issue | All on site | All on site | 8 deliverd; now 6 units arriving 7/29<br>6@7/19<br>6@7/26<br>5@8/2<br>6@8/9<br>6@8/16<br>10@9/6 |
| Switchgears | 48 delivered; 8 arriving 7/26; 8 on 8/5; 8 on 8/10 | All on site | All on site | shipping 3 per day from 8/9 to 9/2 |
| PDUs | 1640 on site<br>965 will arrive 7/29/21 | All on site | All on site | 960 @8/27<br>544 @9/24 |
| Foamboards | 4 buildings remaining on 8/10, took 5 pallets this week form Marble | on site | shipped  6 pallets from MBL 8/10/21 | contractor handling |
| Power Cords | 3500 on site;<br>6500 arrived 7/23;I have not verified count<br>16000 on 8/4;<br>18000 on 8/10<br>15000 on 10/8 | | | 8/17 13,500 9/1 24,500 |
| Filters | 5 buildings d'd 8/15 another | on site | 7/15/2021 1600 7/28 1600 | 8/15/2021 |

Sincerely
Lesa Lamberson
615-708-1319
Fax 1-425-974-7914
PURCHASING MANAGER



**CORE SCIENTIFIC INC**
**Corp address**
**2800 Northup Way Ste 220**
**Bellevue WA 98004**
**425-998-5300**

**Core Scientific NC**
**155 Palmer Ln**
**Marble NC 28905**
**Core Scientific  GA**
**2205 Industrial South Rd**

Dalton, GA  30721

Core Scientific GA 3

206 Boring Drive

Dalton GA 30721

Core Scientific  KY

1035 Shar-Cal Rd

Calvert City KY 42029

**Core Scientific ND**

**5601 11th Ave. S,**

**GRAND FORKS ND 58201**

**Core Scientific TX1**

8161 Jim Cristal Rd

Denton TX 76207

**To:** Harsh Patel[hpatel@corescientific.com]
**From:** Shawn Voeller[Shawn.voeller@icsgf.us]
**Sent:** Tue 9/14/2021 1:31:26 PM (UTC-05:00)
**Subject:** FW: Core Scientific - Dampers

[EXTERNAL] Use caution when opening attachments or links.

Harsh – I was also hoping to discuss further on tomorrows call.   As you can see below, Greenheck is standing by these dates.  Evidently they had an aluminum shortage around the same time the PO was given to them.

We are currently framing in the openings and Custome Aire will proceed with installing the hoods and birdscreens.
We are removing all the spray insulation, making most of the cuts of the siding but leaving it in place while we do the damper opening framing.  This way we are keeping the building as enclosed as possible.  The siding can come off quickly.

The dampers, as they arrive, can be installed from the inside.  So, Custom Aire will also continue ahead of the dampers with installing the hoods and birdscreens.

If we need to temporary enclose any openings due to weather conditions, we will do so with either poly or plywood.

Does this plan seem acceptable?

---

**From:** Jim Fristad <JimF@lunseth.com>
**Sent:** Monday, September 13, 2021 7:48 PM
**To:** Shawn Voeller <Shawn.Voeller@icsgf.us>
**Subject:** Core Scientific

Shawn;

I got some updated shipping info this afternoon from Greenheck.  They say they will try to get dedicated trucks to try to speed up the '*in transit*' time.  In the meantime, Custom Aire will work on getting the hoods and birdscreens installed so you can proceed with getting the wall openings done.

| | | |
|---|---|---|
| 8578799(1) | Core Scientific Dampers (MOD-3, qty 20) | 68958 |
| 8578799(2) | Core Scientific Dampers (MOD-3, qty 20) | 68958 |
| 8578799(3) | Core Scientific Dampers (MOD-3, qty 20) | 68958 |
| 8578799(4) | Core Scientific Dampers (MOD-3, qty 20) | 68958 |
| 8578799(5) | Core Scientific Dampers (MOD-3, qty 19) | 68958 |
| 8578838(1) | Core Scientific Dampers (MOD-1, qty 36) | 68959 |
| 8578838(2) | Core Scientific Dampers (MOD-1, qty 36, MOD-2, qty 26) | 68959 |
| 8578838(4) | Core Scientific Dampers (MOD-2, qty 26) | 68959 |

I have to admit, I don't fully understand what happened with this order.  Greenheck is saying that the size of the order caught them without enough aluminum extrusions, then an aluminum shortage is causing them delays.  Somehow this doesn't seem to ring true.  I thought Harsh had talked to them enough so that they understood the magnitude of the future order.  We sent our purchase order to the supplier on July 13th, so they had it long ago.  We may never know the truth.

I apologize but I don't know what else we can do.  At least the exterior work can proceed.  If we get terribly severe weather before all the dampers get installed, maybe the uncompleted openings can be covered with poly to at least keep the wind out.


Jim

**Proud to be employee owned! Apply here.**

**To:** Richard Lynn Lynn[rlynn@lynncriticalinfrastructure.com]; Harsh Patel[hpatel@corescientific.com]; Lesa Lamberson[llamberson@corescientific.com]
**From:** Shamel Bersiek[sam@trilogycorp.com]
**Sent:** Wed 11/10/2021 7:58:35 PM (UTC-06:00)
**Subject:** PDU AIR TRACKING 20211111.xlsx
PDU AIR TRACKING 20211111.xlsx

Pg 1 of 2

[EXTERNAL] Use caution when opening attachments or links.

Thank you

Sam Bersiek



Direct: 949.535.3001
Cell: 949.678.1515
Email: sam@trilogycorp.com
Website: http://trilogycorp.com
California | Nevada | Sweden | Dubai

CONFIDENTIALITY NOTICE: This communication and any documents, files or previous e-mail messages attached to it, constitute an electronic communication within the scope of the Electronic Communication Privacy Act, 18 USCA 2510. This communication may contain non-public, confidential, or legally privileged information intended for the sole use of the designated recipient(s). The unlawful interception, use or disclosure of such information is strictly prohibited pursuant to 18 USCA 2511 and any applicable laws. If you are not the intended recipient, or have received this communication in error, please notify the sender immediately by reply email and delete all copies of this communication, including attachments, without reading them or saving them to disk.

Case 22-90341 Document 1141 in TXSB on 04/29/23 Page 62 of 312

| | shpt | Ctn # | Shpt Qty | Courier | Tracking No.# | Status | Delivery Time |
|---|------|-------|----------|---------|---------------|--------|---------------|
| | | | **PDU AIR STATUS** | | | | **Nov. 11,2021** |
| 1 | 1st | 1-14 | 14pcs | TNT | 988744703 | Custom release, waiting for delivery | 11-Nov-21 |
| 6 | 2nd | 1-14 | 14pcs | TNT | 989189401 | in transit, partial delivered | 11-Nov-21 |
| 8 | 2nd | 19-22 | 4pcs | FedEx | 285662921723 | IN TRANSIT SENNAN-SHI, JP | 11-Nov-21 |
| 9 | 2nd | 23-26 | 4pcs | FedEx | 285663027024 | IN TRANSIT International shipment release MEMPHIS, TN | 11-Nov-21 |
| 10 | 2nd | 27-30 | 4pcs | FedEx | 285663140263 | IN TRANSIT SENNAN-SHI, JP | Pending |
| 11 | 3rd | 1-14 | 14pcs | TNT | 989824028 | Shipment In transit Sennan | 16-Nov-21 |
| 12 | 3rd | 15-18 | 4pcs | FedEx | 285744681334 | IN TRANSIT SENNAN-SHI, JP | Pending |
| 13 | 3rd | 19-22 | 4pcs | FedEx | 285744720232 | IN TRANSIT SENNAN-SHI, JP | Pending |
| 14 | 3rd | 23-26 | 4pcs | FedEx | 285744805853 | IN TRANSIT At local FedEx facility SHANGHAI, CN | Pending |
| 15 | 3rd | 27-30 | 4pcs | FedEx | 285744840693 | IN TRANSIT SENNAN-SHI, JP | Pending |
| 2 | 1st | 15-18 | 4pcs | FedEx | 285619757615 | 3pcs delivered; 1pc pending | partial delivered 11 November 2021 |
| 3 | 1st | 19-22 | 4pcs | FedEx | 285619940340 | 2pcs delivered; 2pc pending | partial delivered 11 November 2021 |
| 4 | 1st | 23-26 | 4pcs | FedEx | 285620099936 | 1pcs delivered; 3pc pending | partial delivered 11 November 2021 |
| 5 | 1st | 27-30 | 4pcs | FedEx | 285620305334 | Delivered | 8-Nov-21 |
| 7 | 2nd | 15-18 | 4pcs | FedEx | 285662766789 | Delivered | 9-Nov-21 |



| | |
|---|---|
| **From:** | Rodgers, Amber N. |
| **To:** | Steinkamp, Michael; Hurst, Rhonda; Kelsey Gallagher; Maldonado, Karina; Chris Wigginton; Plato, Robert W. |
| **Cc:** | Naulty, Terry; Zagurski, Hayley; Arpaia, Chris; Jeff Sears; Austin, Zach; Klekar, Eric; Joe Madrid |
| **Subject:** | RE: Core Scientific Data Center/Temporary Data Computers Operating |
| **Date:** | Friday, January 28, 2022 9:50:39 AM |
| **Attachments:** | image001.png |
| | image002.png |
| | image004.png |
| | image005.png |
| | image006.png |
| | image007.png |
| | image008.png |
| | 2110-0474 - South Site permit.pdf |
| | 2112-0523 South Bldg A.pdf |
| | 2112-0525 South Bldg B.pdf |
| | 2112-0526 South Building C.pdf |
| | 2112-0527 South Bldg D.pdf |
| | 2112-0531 South Guard Station.pdf |
| | 2112-0530 South Tech Bldg.pdf |

Please see attached. There is a main building permit for the overall site, and then there is a permit for each building so inspections can be called in accordingly.

Please let me know if you have any question!

**Amber Rodgers**

Assistant Building Official of Permitting Services

Department of Development Services | Building Safety

401 N Elm St

Denton, Texas 76201

Office: (940) 349-8934 | Fax: (940) 349-7208

www.cityofdenton.com



---

**From:** Steinkamp, Michael <MSteinkamp@McCarthy.com>
**Sent:** Thursday, January 27, 2022 5:05 PM
**To:** Hurst, Rhonda <Rhonda.Hurst@cityofdenton.com>; Kelsey Gallagher <kgallagher@corescientific.com>; Maldonado, Karina <Karina.Maldonado@cityofdenton.com>; Chris Wigginton <cwigginton@corescientific.com>; Plato, Robert W. <Robert.Plato@cityofdenton.com>
**Cc:** Rodgers, Amber N. <Amber.Rodgers@cityofdenton.com>; Naulty, Terry <Terrance.Naulty@cityofdenton.com>; Zagurski, Hayley <Hayley.Zagurski@cityofdenton.com>; Arpaia, Chris <CArpaia@McCarthy.com>; Jeff Sears <jsears@tnpinc.com>; Austin, Zach <ZAustin@mccarthy.com>; Klekar, Eric <EKlekar@mccarthy.com>; Joe Madrid <jmadrid@tnpinc.com>
**Subject:** RE: Core Scientific Data Center/Temporary Data Computers Operating

Good afternoon.  There are other correspondences floating around on other subjects, but I wanted to respond to this one directly.  Shortly after 3:00 PM CST this afternoon, the last payment was

made.  I was informed Amber or Robert will be issuing the building permit for the South site via email.

Please keep us informed at your earliest convenience.

Regards,

M. Steinkamp

---

**From:** Hurst, Rhonda <Rhonda.Hurst@cityofdenton.com>
**Sent:** Thursday, January 27, 2022 8:52 AM
**To:** Kelsey Gallagher <kgallagher@corescientific.com>; Maldonado, Karina <Karina.Maldonado@cityofdenton.com>; Chris Wigginton <cwigginton@corescientific.com>; Steinkamp, Michael <MSteinkamp@mccarthy.com>; Plato, Robert W. <Robert.Plato@cityofdenton.com>
**Cc:** Rodgers, Amber N. <Amber.Rodgers@cityofdenton.com>; Naulty, Terry <Terrance.Naulty@cityofdenton.com>; Zagurski, Hayley <Hayley.Zagurski@cityofdenton.com>; Arpaia, Chris <CArpaia@McCarthy.com>; Jeff Sears <jsears@tnpinc.com>; Austin, Zach <ZAustin@mccarthy.com>; Klekar, Eric <EKlekar@mccarthy.com>; Joe Madrid <jmadrid@tnpinc.com>
**Subject:** RE: Core Scientific Data Center/Temporary Data Computers Operating

Kelsey,

Rob Plato will be issuing the notice to proceed to release the building permits.  This should happen today once the payment is received.

**Rhonda Hurst, CFM** | Development Project Facilitator
Department of Development Services
Office: (940) 349-7783 | Fax: (940) 349-7208
401 N. Elm Street, Denton, TX 76201 **(Note: We have moved.)**
www.cityofdenton.com



*Your feedback is valuable in helping our service. Please take a few minutes to fill out a brief survey to let us know how we can continue to improve the City's Development Process* here.

---

**From:** Kelsey Gallagher <kgallagher@corescientific.com>
**Sent:** Thursday, January 27, 2022 8:11 AM
**To:** Maldonado, Karina <Karina.Maldonado@cityofdenton.com>; Chris Wigginton <cwigginton@corescientific.com>; Steinkamp, Michael <MSteinkamp@McCarthy.com>

**Cc:** Hurst, Rhonda <Rhonda.Hurst@cityofdenton.com>; Rodgers, Amber N. <Amber.Rodgers@cityofdenton.com>; Naulty, Terry <Terrance.Naulty@cityofdenton.com>; Zagurski, Hayley <Hayley.Zagurski@cityofdenton.com>; Arpaia, Chris <CArpaia@McCarthy.com>; Jeff Sears <jsears@tnpinc.com>; Austin, Zach <ZAustin@McCarthy.com>; Klekar, Eric <EKlekar@McCarthy.com>; Joe Madrid <jmadrid@tnpinc.com>
**Subject:** RE: Core Scientific Data Center/Temporary Data Computers Operating

Karina,

My understanding is that the AntBoxes are separate from the actual building permit. Can you please release the Building permit so that our trades can call for inspection on all of our UG as agreed yesterday on the Precon? All parties agreed that this project is approved and the only pending item was the final Public Works fee which is being submitted this morning.

Thank you!

**KELSEY GALLAGHER**
SVP, FACILITIES & CONSTRUCTION
**Core Scientific**
**(619) 954-9556**

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email noted above and destroy the original message. Thank you.

**From:** Maldonado, Karina <Karina.Maldonado@cityofdenton.com>
**Sent:** Thursday, January 27, 2022 7:39 AM
**To:** Chris Wigginton <cwigginton@corescientific.com>; Steinkamp, Michael <MSteinkamp@McCarthy.com>; Kelsey Gallagher <kgallagher@corescientific.com>
**Cc:** Hurst, Rhonda <Rhonda.Hurst@cityofdenton.com>; Rodgers, Amber N. <Amber.Rodgers@cityofdenton.com>; Zagurski, Hayley <Hayley.Zagurski@cityofdenton.com>; Arpaia, Chris <CArpaia@McCarthy.com>; Jeff Sears <jsears@tnpinc.com>; Austin, Zach <ZAustin@McCarthy.com>; Klekar, Eric <EKlekar@McCarthy.com>; Joe Madrid <jmadrid@tnpinc.com>
**Subject:** Re: Core Scientific Data Center/Temporary Data Computers Operating

[EXTERNAL] Use caution when opening attachments or links.

Please upload the updated plans to the permit associated with the temporary ANT boxes.

Karina Maldonado

Associate Planner
Department of Development Services | Planning Division

---

**From:** Chris Wigginton <cwigginton@corescientific.com>
**Sent:** Thursday, January 27, 2022 7:17:21 AM
**To:** Maldonado, Karina <Karina.Maldonado@cityofdenton.com>; Steinkamp, Michael
<MSteinkamp@McCarthy.com>; Kelsey Gallagher <kgallagher@corescientific.com>
**Cc:** Hurst, Rhonda <Rhonda.Hurst@cityofdenton.com>; Rodgers, Amber N.
<Amber.Rodgers@cityofdenton.com>; Zagurski, Hayley <Hayley.Zagurski@cityofdenton.com>;
Arpaia, Chris <CArpaia@McCarthy.com>; Jeff Sears <jsears@tnpinc.com>; Austin, Zach
<ZAustin@McCarthy.com>; Klekar, Eric <EKlekar@McCarthy.com>; Joe Madrid
<jmadrid@tnpinc.com>
**Subject:** RE: Core Scientific Data Center/Temporary Data Computers Operating

Good Morning

Thank you for your guidance on this permit. The Landscape Plans have been altered for the Southern
site to move proposed tree plantings around to accommodate the location of the ANT boxes. What
is our next step to get the permit released?

Thanks



**CHRIS WIGGINTON**
PROJECT MANAGER
**Core Scientific**
**(817) 575-7348**

---

**From:** Maldonado, Karina <Karina.Maldonado@cityofdenton.com>
**Sent:** Wednesday, December 29, 2021 12:27 PM
**To:** Steinkamp, Michael <MSteinkamp@McCarthy.com>
**Cc:** Hurst, Rhonda <Rhonda.Hurst@cityofdenton.com>; Rodgers, Amber N.
<Amber.Rodgers@cityofdenton.com>; Zagurski, Hayley <Hayley.Zagurski@cityofdenton.com>;
Arpaia, Chris <CArpaia@McCarthy.com>; Jeff Sears <jsears@tnpinc.com>; Austin, Zach
<ZAustin@McCarthy.com>; Klekar, Eric <EKlekar@McCarthy.com>; Joe Madrid
<jmadrid@tnpinc.com>
**Subject:** RE: Core Scientific Data Center/Temporary Data Computers Operating

Good Afternoon –

It looks like we can issue a temporary permit for the ANT boxes while Building A is being

constructed.. However, the location proposed appears to conflict with required landscape plantings. Since the temporary facilities have the potential to remain between the phasing of each building, we are requesting that the Landscape Plan be altered for the Southern site to move proposed tree plantings around to accommodate the location of the ANT boxes. I've copied the Project Engineer and Landscape Architect for this project so they are aware of the change.

This will not hold up the already approved applications as we can resolve this with the final permits. Jeff & Joe, you're welcome to give me a call or I can set one up at a time that works best to go over the requested changes. Let me know what works best for y'all.

**Karina E Maldonado**
Associate Planner
Department of Development Services, Planning Division

---

**From:** Steinkamp, Michael <MSteinkamp@McCarthy.com>
**Sent:** Tuesday, December 28, 2021 9:19 AM
**To:** Maldonado, Karina <Karina.Maldonado@cityofdenton.com>
**Cc:** Hurst, Rhonda <Rhonda.Hurst@cityofdenton.com>; Rodgers, Amber N. <Amber.Rodgers@cityofdenton.com>; Zagurski, Hayley <Hayley.Zagurski@cityofdenton.com>; Arpaia, Chris <CArpaia@McCarthy.com>; Austin, Zach <ZAustin@mccarthy.com>; Klekar, Eric <EKlekar@mccarthy.com>
**Subject:** RE: Core Scientific Data Center/Temporary Data Computers Operating

I appreciate the follow up and quick response. If we need to meet onsite with DME to go over anything, McCarthy would be happy to do so, let us know.

Have a good day.

Regards,

M. Steinkamp

---

**From:** Maldonado, Karina <Karina.Maldonado@cityofdenton.com>
**Sent:** Tuesday, December 28, 2021 9:17 AM
**To:** Steinkamp, Michael <MSteinkamp@McCarthy.com>
**Cc:** Hurst, Rhonda <Rhonda.Hurst@cityofdenton.com>; Rodgers, Amber N. <Amber.Rodgers@cityofdenton.com>; Zagurski, Hayley <Hayley.Zagurski@cityofdenton.com>; Arpaia, Chris <CArpaia@McCarthy.com>; Austin, Zach <ZAustin@mccarthy.com>; Klekar, Eric <EKlekar@mccarthy.com>
**Subject:** RE: Core Scientific Data Center/Temporary Data Computers Operating

Good Morning Michael –

We discussed internally within Planning and are meeting this week with DME first before circling

back to you. Sorry for the delay! The holidays are making it difficult to schedule meetings.

**Karina E Maldonado**
Associate Planner
Department of Development Services, Planning Division

---

**From:** Steinkamp, Michael <MSteinkamp@McCarthy.com>
**Sent:** Tuesday, December 28, 2021 9:12 AM
**To:** Maldonado, Karina <Karina.Maldonado@cityofdenton.com>
**Cc:** Hurst, Rhonda <Rhonda.Hurst@cityofdenton.com>; Rodgers, Amber N. <Amber.Rodgers@cityofdenton.com>; Zagurski, Hayley <Hayley.Zagurski@cityofdenton.com>; Arpaia, Chris <CArpaia@McCarthy.com>; Austin, Zach <ZAustin@mccarthy.com>; Klekar, Eric <EKlekar@mccarthy.com>
**Subject:** RE: Core Scientific Data Center/Temporary Data Computers Operating

Karina,

Good morning, hope you had a good holiday weekend. I wanted to follow up from our conversation a week ago to see if there has been any progress with your Director of Development on the temporary use permit from the subject below? If another call needs to be scheduled or you need additional information, please let me know. Please keep us posted.

Regards,

M. Steinkamp

-----Original Appointment-----
**From:** Steinkamp, Michael
**Sent:** Tuesday, December 21, 2021 2:28 PM
**To:** Maldonado, Karina
**Cc:** Hurst, Rhonda; Rodgers, Amber N.; Zagurski, Hayley
**Subject:** Core Scientific Data Center/Temporary Data Computers Operating
**When:** Tuesday, December 21, 2021 4:00 PM-4:30 PM (UTC-06:00) Central Time (US & Canada).
**Where:** Microsoft Teams Meeting

---

# Microsoft Teams meeting

**Join on your computer or mobile app**
Click here to join the meeting

**Join with a video conferencing device**

235457878@t.plcm.vc
Video Conference ID: 114 618 228 0
Alternate VTC instructions

**Or call in (audio only)**
+1 636-251-6401,,859698274# United States, St. Charles
Phone Conference ID: 859 698 274#
Find a local number | Reset PIN

Learn More | Meeting options

---

---

**From:** Maldonado, Karina <Karina.Maldonado@cityofdenton.com>
**Sent:** Tuesday, December 21, 2021 1:18 PM
**To:** Steinkamp, Michael <MSteinkamp@McCarthy.com>
**Cc:** Hurst, Rhonda <Rhonda.Hurst@cityofdenton.com>; Rodgers, Amber N.
<Amber.Rodgers@cityofdenton.com>; Zagurski, Hayley <Hayley.Zagurski@cityofdenton.com>
**Subject:** RE: Core Scientific Data Center/Temporary Data Computers Operating

Mr. Steinkamp,

Could you provide some additional information regarding the proposal? More information is
needed. I'm about to jump on a call but I'm available at 4pm if that works for you.

**Karina E Maldonado**
Associate Planner
Department of Development Services, Planning Division
401 N Elm Street
Denton, Texas 76201
Office: (940) 349-8176
www.cityofdenton.com



Please help us improve your service by taking a 2 minute survey.

---

**From:** Rodgers, Amber N.
**Sent:** Tuesday, December 21, 2021 11:18 AM
**To:** Maldonado, Karina <Karina.Maldonado@cityofdenton.com>
**Subject:** RE: Core Scientific Data Center/Temporary Data Computers Operating

This is the site plan he provided.

---

**From:** Maldonado, Karina
**Sent:** Tuesday, December 21, 2021 10:06 AM
**To:** Rodgers, Amber N. <Amber.Rodgers@cityofdenton.com>
**Subject:** RE: Core Scientific Data Center/Temporary Data Computers Operating

What is meant by the highlighted statement? Are they now proposing individual pods? I would need to consult with Tina if they are because it would contradict the use determination we made for warehousing. It would also impact the approved Landscape Plan.

**Karina E Maldonado**
Associate Planner
Department of Development Services, Planning Division

---

**From:** Rodgers, Amber N.
**Sent:** Tuesday, December 21, 2021 9:36 AM
**To:** Maldonado, Karina <Karina.Maldonado@cityofdenton.com>
**Subject:** FW: Core Scientific Data Center/Temporary Data Computers Operating

Any issues with them having a temporary operation?

AR

---

**From:** Steinkamp, Michael <MSteinkamp@McCarthy.com>
**Sent:** Monday, December 20, 2021 12:54 PM
**To:** Hurst, Rhonda <Rhonda.Hurst@cityofdenton.com>; Rodgers, Amber N. <Amber.Rodgers@cityofdenton.com>; Frazier, Carrie <Carrie.Frazier@cityofdenton.com>
**Cc:** Arpaia, Chris <CArpaia@McCarthy.com>; Austin, Zach <ZAustin@mccarthy.com>; Alvarez, Marc <MAlvarez@McCarthy.com>
**Subject:** Core Scientific Data Center/Temporary Data Computers Operating

This message has originated from an **External Source**. Please be cautious regarding links and attachments.

City of Denton,

Good afternoon. Not sure if I have the correct individual(s) on this correspondence with the City of Denton (CoD), but I wanted to reach out to get the conversation going and if I am not contacting the correct individual, could you guide me in that direction? Ownership on the Core Scientific Data Center is looking into having 36 to 39 temporary data computer's operating during the timeline of construction and with that being said, I wanted to see if the CoD has any permitting requirements on this? Attached is a preliminary layout of the temporary operation to give you some insight, but with this engaging quickly, wanted to reach out to see what requirements you hold from a permitting

standpoint.

Addition to this, wanted to see if it would be beneficial for us all to hold a call to get to know one another, understand all individuals at play/communication requirements, inspection list/requirements, etc. If this sounds reasonable, let me know your thoughts and we can get something scheduled.

Thanks in advance.

Regards,

**Michael Steinkamp | LEED GA | MBA**
Project Manager
McCarthy Building Companies, Inc.
12001 N. Central Expressway Ste 400 | Dallas, TX 75243
M 712-899-1626 | E msteinkamp@mccarthy.com
mccarthy.com

**\*\*\* This electronic mail message, including attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any unauthorized use, review, disclosure, distribution, or actions taken in reliance on the contents of this information, is prohibited. If you received this e-mail in error and are not the intended recipient, please notify me immediately by telephone or reply e-mail and destroy all copies of the original message. \*\*\***

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

**\*\*\* This electronic mail message, including attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any unauthorized use, review, disclosure, distribution, or actions taken in reliance on the contents of this information, is prohibited. If you received this e-mail in error and are not the intended recipient, please notify me immediately by telephone or reply e-mail and destroy all copies of the original message. \*\*\***

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

**\*\*\* This electronic mail message, including attachments, is intended only for the

person or entity to which it is addressed and may contain confidential and/or privileged material. Any unauthorized use, review, disclosure, distribution, or actions taken in reliance on the contents of this information, is prohibited. If you received this e-mail in error and are not the intended recipient, please notify me immediately by telephone or reply e-mail and destroy all copies of the original message. ***

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email noted above and destroy the original message.

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

*** This electronic mail message, including attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any unauthorized use, review, disclosure, distribution, or actions taken in reliance on the contents of this information, is prohibited. If you received this e-mail in error and are not the intended recipient, please notify me immediately by telephone or reply e-mail and destroy all copies of the original message. ***

# COMMERCIAL PERMIT
## City of Denton

<u>PERMIT NUMBER</u>
**2110-0474**

| | | |
|---|---|---|
| PERMIT TYPE: **COMMERCIAL** | SUBDIVISION/COMM SITE: **J.F. MEYERS** | TAX MAP NO: **36607** |
| PERMIT SUB TYPE : | | BLDG USE GROUP: |

JOB ADDRESS: **8171 JIM CHRISTAL RD**

DESCRIPTION: **DATA CENTER SOUTH SITE (1)**

| | | |
|---|---|---|
| ZONED AS: **LI** | TOTAL SQFT:**0** | SPRINKLERS: |
| TOTAL WORK VALUE:**$22,714,400.50** | TYPE OF CONSTRUCTION: **II-B** | BUILDING USE: |

| | |
|---|---|
| APPLICANT: **MICHAEL STEINKAMP** | PHONE: **(712)899-1626** |
| MAILING ADDRESS: **12001 N. CENTRAL EXPRESSWAY STE 400  DALLAS, TX  75243** | FAX: |
| CONTRACTOR: **MCCARTHY BUILDING COMPANIES, INC- GC** | PHONE: **(712)899-1626** |
| MAILING ADDRESS: **12001 NORTH CENTRAL EXPRESSWAY  DALLAS, TX  75243** | FAX: |
| OWNER: **City of Denton** | PHONE: |
| MAILING ADDRESS:   , | FAX: |
| ARCHITECT: | PHONE: |
| MAILING ADDRESS:   , | FAX: |

COMMENTS

| FEES | | | |
|---|---|---|---|
| **DESCRIPTION** | **ACCOUNT** | **QUANTITY** | **PAID AMOUNT** |
| BUILDING PERMIT | 1000.4116 PB | 0 | $75714.75 |
| CERTIFICATE OF OCCUPANCY | 1000.4132 CO | 0 | $450.00 |
| PARKING LOT PERMIT 1-50 SPACES | 1000.4116 PB | 0 | $394.00 |
| PLAN REVIEW | 1000.4474 PV | 0 | $37857.38 |
| TEMPORARY POWER POLE | 6000.5068 MU | 0 | $48.00 |
| TEMPORARY UTILITIES | 1000.4138 PM | 0 | $108.00 |
| | | | **TOTAL:$114,572.13** |

**ALL WORK TO CONFORM TO THE CURRENT EDITION OF THE INTERNATIONAL BUILDING  CODE (IBC).**
**A 24 HOUR NOTICE IS REQUIRED FOR ALL INSPECTIONS.**

**Building Official:**　　　　　Issued By: **AMBER RODGERS**　　　　　Date: **1/28/2022**

# BUILDING PERMIT
## City of Denton

<u>PERMIT NUMBER</u>
**2112-0523**

| | | |
|---|---|---|
| PERMIT TYPE: **BUILDING** | SUBDIVISION/COMM SITE: **J.F. MEYERS** | TAX MAP NO: **36607** |
| PERMIT SUB TYPE : **COMMERCIAL** | | BLDG USE GROUP: |

JOB ADDRESS: **8171 JIM CHRISTAL RD Building A**

DESCRIPTION: **DATA CENTER SOUTH SITE (1) Data Server Warehouse Building A**

| | | |
|---|---|---|
| ZONED AS: **LI** | TOTAL SQFT:**0** | SPRINKLERS: |
| TOTAL WORK VALUE:**$22,714,400.50** | TYPE OF CONSTRUCTION: **II-B** | BUILDING USE: |

| | |
|---|---|
| APPLICANT: **MICHAEL STEINKAMP** | PHONE: **(712)899-1626** |
| MAILING ADDRESS: **12001 N. CENTRAL EXPRESSWAY STE 400  DALLAS, TX  75243** | FAX: |
| CONTRACTOR: **MCCARTHY BUILDING COMPANIES, INC- GC** | PHONE: **(712)899-1626** |
| MAILING ADDRESS: **12001 NORTH CENTRAL EXPRESSWAY  DALLAS, TX  75243** | FAX: |
| OWNER: **City of Denton** | PHONE: |
| MAILING ADDRESS:  , | FAX: |
| ARCHITECT: | PHONE: |
| MAILING ADDRESS:  , | FAX: |

**COMMENTS**

| FEES | | | |
|---|---|---|---|
| **DESCRIPTION** | **ACCOUNT** | **QUANTITY** | **PAID AMOUNT** |
| | | | **TOTAL:** |

**ALL WORK TO CONFORM TO THE CURRENT EDITION OF THE INTERNATIONAL BUILDING  CODE (IBC).**
**A 24 HOUR NOTICE IS REQUIRED FOR ALL INSPECTIONS.**

**Building Official:**          Issued By: **AMBER RODGERS**          Date: **1/28/2022**

# BUILDING PERMIT
## City of Denton

**PERMIT NUMBER**
**2112-0525**

| | | |
|---|---|---|
| PERMIT TYPE: **BUILDING** | SUBDIVISION/COMM SITE: **J.F. MEYERS** | TAX MAP NO: **36607** |
| PERMIT SUB TYPE : **COMMERCIAL** | | BLDG USE GROUP: |

JOB ADDRESS: **8171 JIM CHRISTAL RD Building B**

DESCRIPTION: **DATA CENTER SOUTH SITE (1) Data Server Warehouse Building B**

| | | |
|---|---|---|
| ZONED AS: **LI** | TOTAL SQFT:**0** | SPRINKLERS: |
| TOTAL WORK VALUE:**$22,714,400.50** | TYPE OF CONSTRUCTION: **II-B** | BUILDING USE: |

| | |
|---|---|
| APPLICANT: **MICHAEL STEINKAMP** | PHONE: **(712)899-1626** |
| MAILING ADDRESS: **12001 N. CENTRAL EXPRESSWAY STE 400  DALLAS, TX  75243** | FAX: |
| CONTRACTOR: **MCCARTHY BUILDING COMPANIES, INC- GC** | PHONE: **(712)899-1626** |
| MAILING ADDRESS: **12001 NORTH CENTRAL EXPRESSWAY  DALLAS, TX  75243** | FAX: |
| OWNER: **City of Denton** | PHONE: |
| MAILING ADDRESS:  , | FAX: |
| ARCHITECT: | PHONE: |
| MAILING ADDRESS:  , | FAX: |

**COMMENTS**

| FEES | | | |
|---|---|---|---|
| **DESCRIPTION** | **ACCOUNT** | **QUANTITY** | **PAID AMOUNT** |
| | | | **TOTAL:** |

**ALL WORK TO CONFORM TO THE CURRENT EDITION OF THE INTERNATIONAL BUILDING  CODE (IBC).**
**A 24 HOUR NOTICE IS REQUIRED FOR ALL INSPECTIONS.**

**Building Official:**          Issued By: **AMBER RODGERS**          Date: **1/28/2022**

# BUILDING PERMIT
## City of Denton

| | | |
|---|---|---|
| PERMIT TYPE: **BUILDING** | SUBDIVISION/COMM SITE: **J.F. MEYERS** | TAX MAP NO: **36607** |
| PERMIT SUB TYPE : **COMMERCIAL** | | BLDG USE GROUP: |

JOB ADDRESS: **8171 JIM CHRISTAL RD Building C**

DESCRIPTION: **DATA CENTER SOUTH SITE (1) Data Server Warehouse Building C**

| | | |
|---|---|---|
| ZONED AS: **LI** | TOTAL SQFT:**0** | SPRINKLERS: |
| TOTAL WORK VALUE:**$22,714,400.50** | TYPE OF CONSTRUCTION: **II-B** | BUILDING USE: |

| | |
|---|---|
| APPLICANT: **MICHAEL STEINKAMP** | PHONE: **(712)899-1626** |
| MAILING ADDRESS: **12001 N. CENTRAL EXPRESSWAY STE 400  DALLAS, TX  75243** | FAX: |
| CONTRACTOR: **MCCARTHY BUILDING COMPANIES, INC- GC** | PHONE: **(712)899-1626** |
| MAILING ADDRESS: **12001 NORTH CENTRAL EXPRESSWAY  DALLAS, TX  75243** | FAX: |
| OWNER: **City of Denton** | PHONE: |
| MAILING ADDRESS:  **,** | FAX: |
| ARCHITECT: | PHONE: |
| MAILING ADDRESS:  **,** | FAX: |

**COMMENTS**

| FEES | | | |
|---|---|---|---|
| **DESCRIPTION** | **ACCOUNT** | **QUANTITY** | **PAID AMOUNT** |
| | | | **TOTAL:** |

**ALL WORK TO CONFORM TO THE CURRENT EDITION OF THE INTERNATIONAL BUILDING  CODE (IBC).
A 24 HOUR NOTICE IS REQUIRED FOR ALL INSPECTIONS.**

**Building Official:**          Issued By: **AMBER RODGERS**          Date: **1/28/2022**

# BUILDING PERMIT
## City of Denton

| | | |
|---|---|---|
| PERMIT TYPE: **BUILDING** | SUBDIVISION/COMM SITE: **J.F. MEYERS** | TAX MAP NO: **36607** |
| PERMIT SUB TYPE : **COMMERCIAL** | | BLDG USE GROUP: |

JOB ADDRESS: **8171 JIM CHRISTAL RD Building D**

DESCRIPTION: **DATA CENTER SOUTH SITE (1) Data Server Warehouse Building D**

| | | |
|---|---|---|
| ZONED AS: **LI** | TOTAL SQFT:**0** | SPRINKLERS: |
| TOTAL WORK VALUE:**$22,714,400.50** | TYPE OF CONSTRUCTION: **II-B** | BUILDING USE: |

| | |
|---|---|
| APPLICANT: **MICHAEL STEINKAMP** | PHONE: **(712)899-1626** |
| MAILING ADDRESS: **12001 N. CENTRAL EXPRESSWAY STE 400  DALLAS, TX  75243** | FAX: |
| CONTRACTOR: **MCCARTHY BUILDING COMPANIES, INC- GC** | PHONE: **(712)899-1626** |
| MAILING ADDRESS: **12001 NORTH CENTRAL EXPRESSWAY  DALLAS, TX  75243** | FAX: |
| OWNER: **City of Denton** | PHONE: |
| MAILING ADDRESS:  , | FAX: |
| ARCHITECT: | PHONE: |
| MAILING ADDRESS:  , | FAX: |

**COMMENTS**

| FEES | | | |
|---|---|---|---|
| **DESCRIPTION** | **ACCOUNT** | **QUANTITY** | **PAID AMOUNT** |
| | | | **TOTAL:** |

**ALL WORK TO CONFORM TO THE CURRENT EDITION OF THE INTERNATIONAL BUILDING  CODE (IBC).**
**A 24 HOUR NOTICE IS REQUIRED FOR ALL INSPECTIONS.**

**Building Official:**          Issued By: **AMBER RODGERS**          Date: **1/28/2022**

# BUILDING PERMIT
## City of Denton

**PERMIT NUMBER**
## 2112-0530

| | | |
|---|---|---|
| PERMIT TYPE: **BUILDING** | SUBDIVISION/COMM SITE: **J.F. MEYERS** | TAX MAP NO: **36607** |
| PERMIT SUB TYPE : **COMMERCIAL** | | BLDG USE GROUP: |

JOB ADDRESS: **8171 JIM CHRISTAL RD South Tech**

DESCRIPTION: **DATA CENTER SOUTH SITE (1) South Tech Building**

| | | |
|---|---|---|
| ZONED AS: **LI** | TOTAL SQFT:**0** | SPRINKLERS: |
| TOTAL WORK VALUE:**$22,714,400.50** | TYPE OF CONSTRUCTION: **II-B** | BUILDING USE: |

| | |
|---|---|
| APPLICANT: **MICHAEL STEINKAMP** | PHONE: **(712)899-1626** |
| MAILING ADDRESS: **12001 N. CENTRAL EXPRESSWAY STE 400  DALLAS, TX  75243** | FAX: |
| CONTRACTOR: **MCCARTHY BUILDING COMPANIES, INC- GC** | PHONE: **(712)899-1626** |
| MAILING ADDRESS: **12001 NORTH CENTRAL EXPRESSWAY  DALLAS, TX  75243** | FAX: |
| OWNER: **City of Denton** | PHONE: |
| MAILING ADDRESS:   , | FAX: |
| ARCHITECT: | PHONE: |
| MAILING ADDRESS:   , | FAX: |

**COMMENTS**

| FEES | | | |
|---|---|---|---|
| **DESCRIPTION** | **ACCOUNT** | **QUANTITY** | **PAID AMOUNT** |
| | | | **TOTAL:** |

**ALL WORK TO CONFORM TO THE CURRENT EDITION OF THE INTERNATIONAL BUILDING  CODE (IBC).**
**A 24 HOUR NOTICE IS REQUIRED FOR ALL INSPECTIONS.**

**Building Official:**　　　　　Issued By: **AMBER RODGERS**　　　　　Date: **1/28/2022**

# BUILDING PERMIT
## City of Denton

<u>PERMIT NUMBER</u>
## 2112-0531

| PERMIT TYPE: **BUILDING** | SUBDIVISION/COMM SITE: **J.F. MEYERS** | TAX MAP NO: **36607** |
|---|---|---|
| PERMIT SUB TYPE : **COMMERCIAL** | | BLDG USE GROUP: |

JOB ADDRESS: **8171 JIM CHRISTAL RD S Guard St**

DESCRIPTION: **DATA CENTER SOUTH SITE (1) South Guard Station**

| ZONED AS: **LI** | TOTAL SQFT:**0** | SPRINKLERS: |
|---|---|---|
| TOTAL WORK VALUE:**$22,714,400.50** | TYPE OF CONSTRUCTION: **II-B** | BUILDING USE: |

| APPLICANT: **MICHAEL STEINKAMP** | PHONE: **(712)899-1626** |
|---|---|
| MAILING ADDRESS: **12001 N. CENTRAL EXPRESSWAY STE 400  DALLAS, TX  75243** | FAX: |
| CONTRACTOR: **MCCARTHY BUILDING COMPANIES, INC- GC** | PHONE: **(712)899-1626** |
| MAILING ADDRESS: **12001 NORTH CENTRAL EXPRESSWAY  DALLAS, TX  75243** | FAX: |
| OWNER: **City of Denton** | PHONE: |
| MAILING ADDRESS:  , | FAX: |
| ARCHITECT: | PHONE: |
| MAILING ADDRESS:  , | FAX: |

**COMMENTS**

| FEES | | | |
|---|---|---|---|
| **DESCRIPTION** | **ACCOUNT** | **QUANTITY** | **PAID AMOUNT** |
| | | | **TOTAL:** |

**ALL WORK TO CONFORM TO THE CURRENT EDITION OF THE INTERNATIONAL BUILDING  CODE (IBC).**
**A 24 HOUR NOTICE IS REQUIRED FOR ALL INSPECTIONS.**

**Building Official:**           Issued By: **AMBER RODGERS**           Date: **1/28/2022**



August 18, 2022

Mr. Kelsey Gallagher
Core Scientific Holdings Co.
4207 S Congress Ave. Ste E-101
210 Barton Springs Rd. Suite 300
Austin, TX 78704

                        Re: Core Scientific – Denton Data Center
                             Transformer Failure Investigation
                             MEP Engineering Review

Mr. Gallagher:

I met with members of Core Scientific's construction and operations teams on-site at the Denton Data Center on the morning of August 16, 2022. At that time, Shermco Industries had technicians on-site actively testing a number of the Building D transformers. We walked the site and reviewed the installation of the electrical equipment and associated feeders. We also spoke to Shermco technicians about the results of their testing.

I was able to review the site conditions compared to the electrical engineering design. The following items were found to be installed correctly as designed and without visible defects:

- The 35 kV primary feeders and their associated terminations appeared to be properly sized, installed, and grounded at the pad mounted transformers.
- The 2,500 kVA pad mounted transformers appeared to be properly installed and adequately grounded.
- The secondary electrical feeders appeared to be properly sized, installed, and terminated at the transformers and at the associated switchboards
- The switchboards appeared to be properly grounded and their neutral to ground disconnect links appeared to be properly sized and installed.
- The adjustable trip settings on the switchboard main circuits breakers appeared to be properly set to coordinated device settings provided by K&A Engineering.
- The switchboard equipment electrical loading appeared to be well balanced and below the limits of the transformers.

It is our understanding that there has been no reported substation power surge or switching events that occurred during the time of the latest transformer failures. This information can be further confirmed by contacting Denton Municipal Electric and requesting their event logs.

When reviewing the potential transformer failure scenarios, it is our understanding that the initial transformer defects and deficiencies found during an initial transformer walk and inspection were repaired by Maddox and their subcontractor before Shermco's initial transformer testing. We have reviewed Shermco's testing report dated August 8, 2022. It was noted that there appeared to be a consistent "A phase Winding Resistance is out of tolerance on the Low Voltage windings" deficiency found on four (4) of the transformers tested. It is our understanding that all cable and transformer deficiencies found in the testing report were corrected before



Kelsey Gallagher
Core Scientific
August 18, 2022
Page 2

Building D was re-energized. We have also reviewed Shermco's testing report dated August 17, 2022. This additional round of testing was performed after the latest transformer failure. The test results again showed a consistent low voltage winding deficiency with a substantial level of winding resistance failure in a very short period of time.

After review of the site conditions, transformer loading, and Shermco testing results, it is our belief that there is a consistent manufacturing defect that is causing transformer failures. The defect appears to be on the A phase windings on the secondary side of the transformers. We recommend that the 35 kV transformers be replaced with similar transformers provided by a different manufacturer.

Please let me know if you have any questions or need any additional information.


Best Regards,

David M. Boon, P.E.
RWB Consulting Engineers

[EXTERNAL] Use caution when opening attachments or links.

**NOTICE DATE:** March 25, 2022

**NOTICE TYPE:** W-A032522-01 Operations

**SHORT DESCRIPTION:** Interim Large Load Interconnection Process

**INTENDED AUDIENCE:** Interconnecting Market Participants

**DAYS AFFECTED:** March 25, 2022

**LONG DESCRIPTION:** ERCOT has established an interim process to ensure compliance with existing NERC requirements and for the reliable interconnection of large loads to the ERCOT system. Transmission Service Providers (TSPs) should submit interconnection studies that meet the requirements of NERC Reliability Standard FAC-002-2 for each applicable large load proposing to interconnect to the ERCOT system. ERCOT will review these studies and identify any issues that must be resolved prior to allowing applicable loads to be included in ERCOT's Network Operations Model, register as Load Resources, and/or receive approval to energize.

The interim process is effective immediately and applies to load interconnection requests that have not been modeled and studied in a completed ERCOT planning assessment (e.g., Regional Transmission Plan, Full Interconnection Study, or Regional Planning Group review) and meet the following applicability requirements:

• New loads not co-located with a Resource with total demand within the next two years of 75 MW or greater;
• Existing loads not co-located with a Resource increasing total demand by 75 MW or greater within the next two years;
• New loads co-located with a Resource with total demand within the next two years of 20 MW or greater; or
• Existing loads co-located with a Resource increasing total demand by 20 MW or greater within the next two years.

**ADDITIONAL INFORMATION:** ERCOT provided a presentation on existing load interconnection requirements at the March 3rd, 2022 Reliability and Operations Subcommittee (ROS) meeting.

**CONTACT:** If you have any questions, please contact your ERCOT Account Manager. You may also call the general ERCOT Client Services phone number at (512) 248-3900 or contact ERCOT Client Services via email at ClientServices@ercot.com.

If you are receiving email from a public ERCOT distribution list that you no longer wish to receive, please follow this link in order to unsubscribe from this list: http://lists.ercot.com.

dg

# Transmission/Substation Facility Extension Agreement

This Agreement is made between C o r e   S c i e n t i f i c ,   I n c . , hereinafter called "Customer" and T e x a s   N e w   M e x i c o   P o w e r C o m p a n y , hereinafter called "Company" for the extension of Company Delivery System transmission/substation facilities, as hereinafter described. As used herein, the term "extension" shall mean the construction of new facilities or modification of existing  facilities.

Customer has requested that Company construct the following Company-owned Delivery System facilities: A new service terminal to be constructed at Cedarvale Substation and operated at a nominal 138,000 volts or higher. The service terminal is to consist of poles, conductors, breakers, switches and associated protection and metering equipment and communication devices and a single line terminal position for the  Customer's transmission line, ("Company Facilities") to serve the following Customer-Owned Facilities located at  31°30'44.30"N, 103°27'13.78"W ,("Customer Facilities"): A substation operated at a nominal 138,000 volts or higher. Customer substation will consist of multiple transformers rated at approximately 250MVA each with primary and secondary circuit breakers and relays compatible with TNMP's relays and protective schemes at Company service  meter station.

## ARTICLE I - PAYMENT BY CUSTOMER

1.  As payment for Customer's portion of the cost of the extension of the Company Facilities in accordance with this Agreement, Customer will pay to Company the amount(s) shown below, such payment(s) to be and remain the property of the Company.

    Customer will not be required to pay an  upfront contribution in aid of construction  as set forth on Exhibit A.

2.  If the Customer Facilities have not achieved the level of operation specified below by the date specified below, then Custom  er shall pay to Company those costs as described below  to  compensate Company for costs it has incurred asso ciated with the Company Facilities. The following will also address any security required associated with such payment obligation.

    At the end of thirty-six (36) monthly billing cycles following the  date the Company Facilities are completed , if the actual revenue is below the Minimum Facilities Revenue, Customer shall pay to TNMP an amount equal to the Minimum Facilities Revenue less the Actual Revenue, grossed up for federal, state and local taxes. In add ition, Customer shall deliver to TNMP a surety bond or irrevocable letter of credit, issued by a surety company or banking institution authorized to do business in the State of Texas and reasonably a  cceptable to TNMP, on or before the Effective Date of thi s Agreement.  The surety bond or irrevocable letter of credit shall have a face value equal to the Minimum Facilities Revenue and a 40-month term from the  date the Company Facilities are completed.  The surety bond or irrevocable letter of credit shall secure all duties and obligations of customer hereunder and ensure same are done and performed at the time and in the manner specified in this Agreement.

    Company shall provide an accounting of the Minimum Facilities Revenue balance to Customer  no more frequently than annually upon request from Customer.

3.  Upon termination pursuant to the provisions of Article III, Paragraph 2 below, Customer shall pay to Company all of: (a) the costs that Company has incurred prior to the date of termination for engineering, procuring equipment and materials, construction, and any other costs related to the Company Facilities; (b) the costs that Company has committed to incur prior to the date of te  rmination that it is unable to avoid using commercially reasonable  steps; and (c) such costs incurred by Company after the date of termination to return the Delivery System to a condition consistent with Company's construction standards and Company's Tariff for Retail Delivery Service.    Any cost obligations incurred by Customer under this paragraph will be reduced by any payments made by Customer under Paragraph 1 above.  The provisions of this paragraph shall survive termination of this Agreement.

4.  In calculating the costs Company has incurred (or committed to be  incurred), such costs shall include the normal loadings Company applies to construction projects of this nature and shall be increased by an adder to cover the effects of a Customer payment on the Company's tax liability and shall include an amount to reco ver franchise fees where applicable.

## ARTICLE II - TITLE AND OWNERSHIP

Company at all times shall have title to and complete ownership and control over the Company Facilities extended under this A  greement.

## ARTICLE III - TERM AND TERMINATION

1.  This Agreement becomes effecti ve on the date of execution by both parties and may be executed in two or more counterparts, each of which is deemed an original, but all constitute one and the same instrument.

2.  Customer may terminate this Agreement at any time  prior to completion of the Company Facilities by providing Company with seven (7) days advanced written notice.

## ARTICLE IV - GENERAL CONDITIONS

1.  Customer understands that, as a result of the installation provided for in this Agreement, the Delivery of Electric Power and Energy by Company to the specified location will be provided in accordance with Transmission Service  Rate Schedule, which may from time to time be amended or succeeded.

2.  This Agreement supersedes all previous agreements or representations, either written or oral, between Company and Customer made with respect to the matters herein contained, and when duly executed constitutes the agreement between the parties hereto and is not binding upon Company unless and until signed by  one of its duly authorized representatives.

DocuSign Envelope ID: A524A4B8-537E-45B4-A9EE-607E09A9A543

3. The services covered by this Agreement will be provided by Company, and accepted by Customer, in accordance with applicable Public Utility Commission of Texas ("PUCT") Substantive Rules and Company's Tariff for Retail Delivery Service (including the Service Regulations contained therein), as it may from time to time be fixed and approved by the PUCT ("Company's Retail Delivery Tariff"). Company's Retail Delivery Tariff is part of this Agreement to the same extent as if fully set out herein. Unless otherwise expressly stated in this Agreement, the terms used herein have the meanings ascribed thereto in Company's Retail Delivery Ta riff.

4. This Agreement may be amended only upon mutual agreement of the parties, which amendment will not be effective until reduced to writing and executed by the parties. Changes to applicable PUCT Substantive Rules and Company's Retail Delivery Tariff are applicable to this Agreement upon their effective date and do not require an amendment of this Agreement.

5. The failure of a party to this Agreement to insist, on any occasion, upon strict performance of any provision of this Agreement will not be considered to waive the obligations, rights, or duties imposed upon the parties.

6. Customer may not assign the Agreement without Compan y's prior written consent.

7. This Agreement was executed in the State of Texas and must in all respects be governed by, interpreted, construed, and enforced in accordance with the laws thereof. This Agreement is subject to all valid, applicable federal, state, and local laws, ordinances, and rules and regulations of duly constituted regulatory authorities having jurisdiction.

## ARTICLE V - OTHER SPECIAL CONDITIONS

1. TNMP shall use reasonable efforts to cons truct the TNMP Facilities by a target completion date of 12 m onths from the effective date of this agreement.

2. A Facility Schedule outlining TNMP and Customer facility responsibilities and including a one-line diagram of the TNMP and Customer-Owned Facilities is attached as Exhibit B.

3. Customer agrees to maintain a Power Factor of ninety -five percent (95%) lagging or greater as measured at the TNMP service tap station meter. If Customer does not maintain a Power Factor of ninety-five percent (95%), and Customer does not correct its Power Factor within 30 days of receipt of notice from TNMP, Company may install equipment on the Delivery System necessary to correct the Customer Power Factor . In the event TNMP installs such e quipment, Customer shall reimburse TNMP for all reasonable costs and expenses related to the procurement and installation of such equipment within thirty (30) days after rec eipt of TNMP's invoice therefor.

4. The Customer shall design, install, cons truct, operate and maintain the Customer Facilities and its other electrical equipment in compliance with the TNMP Tariff and Applicable Legal and Electrical Requirements.

5. This Agreement does not provide for interconnection of generation to TNMP's system or inter connection for any purpose other than for TNMP to provide retail delivery service.

6. Subject to any necessary ERCOT approval, each Party shall provide necessary equipment outages to allow the other Party to perform periodic testing, maintenance, repair or replacement of its facilities. Such outages shall be scheduled at mutually agreeable times, unless conditions exist which a Party believes, in accordance with Good Utility Practice, may endanger person or property.

7. Customer understands and agrees that ce rtain contingencies could affect delivery service to the CSI POD due to the system curtailment plans of the TNMP 138kV transmission loop system serving the area and therefore delivery service to the CSI POD may be interrupted.

8. Customer's full connected future load is estimated to be 700 MVA by 2026 and will coordinate load additions in excess with Company.

9. TNMP requires a detailed load ramp schedule to ensure the necessary shunt capacitance is available in the timeframe Customer requires load support. The cost to serve and security required will be revised upon determination of the final load ramp timi ng and shunt capacitor bank need.
.

ACCEPTED BY COMPANY:

Signature

**Keith Nix**
Name

Vice President
Title

8/20/2021
Date Signed

ACCEPTED BY CUSTOMER:

Signature

**Weston Adams**
Name

CCO
Title

8/19/2021
Date Signed

# Exhibit A

# Contribution in Aid of Construction

| Cost to Serve CSI Substation from Cedarvale Substation | |
|---|---|
| 138kV Service Station | |
| Engineering | $350,000.00 |
| Procurement | $2,000,000.00 |
| Construction | $1,900,000.00 |
| **Total Estimated Costs** | **$4,250,000.00** |
| | |
| **Less: Minimum Facilities Revenue** | **$4,250,000.00** |
| | |
| Balance of Estimated Costs | $0.00 |
| Gross-up for Federal Tax | $0.00 |
| State Tax | $0.00 |
| Local Tax | $0.00 |
| | |
| **Total Upfront Contribution** | **$0.00** |

## Revenue Credit Calculation

Transmission Customer Addition:CSI Substation fed from Cedarvale Substation

| Customer | Load (KVA) | In-Service | Monthly | Annual Revenue | Method |
|---|---|---|---|---|---|
| CSI | 50,000 | 1/1/2021 - 12/31/2021 | $207,623 | $2,491,473 | NCP |
| CSI | 100,000 | 1/1/2022 - 12/31/2022 | $414,055 | $4,968,664 | 4CP |
| CSI | 150,000 | 1/1/2023 - 12/31/2023 | $620,488 | $7,445,856 | 4CP |

| | |
|---|---|
| Composite Total | $14,905,993 |

| | Applied to Credit |
|---|---|
| Customer Charge | $31.96 |
| Meter Charge (per meter) | $1,158.21 |
| Transmission System Charge (per KVA)(TCRF) | $0.000000 |
| Distribution System Charge (per KVA) | $0.00 |
| TCRF (Per 4CP KVA) | $4.128652 |
| CTC Charge | $0.0000000 |
| SBF Charge | $0.0000000 |
| RCE#3 | $0.0000000 |
| HCRF | $0.0000000 |
| Rates effective as of September 1, 2021 | |

DocuSign Envelope ID: AF24A4B8-527E-4FB4-A9EE-607F09AD4543

# Exhibit B

# Facility Schedule

1. **Name:** CSI POD

2. **Point of Interconnection Location:**
   TNMP Cedarvale Substation, located at 3165 FM 516 N, Barstow, TX 79719 At approximately
   31°30'49.98"N, 103°27'8.22"W. The detailed location will be at the Company property line
   where the Customer can acquire transmission line easement.

3. **Delivery Voltage:** 138kV Nominal

4. **Metering (Voltage, Location, Other):**
   Metering is accomplished by using 138kV potential and current metering accuracy instrument
   transformers located at Company's Cedarvale substation. Metering equipment will provide for
   one retail transmission point of delivery.

5. **One line diagram attached:** YES

6. **Customer Facilities Furnished by Customer:**
   i. Customer will provide all necessary facilities on the load side of the TNMP Metering
      Station, consisting of a transmission line and substation operated at a nominal 138,000
      volts or higher.
   ii. Customer substation will consist of multiple transformers rated at approximately 250
      MVA each with primary and secondary circuit breakers and relays compatible with
      Company's relays and protective schemes at Company service station

7. **Company Facilities Furnished by TNMP:**
   Company will install and construct a metered line terminal at its Worsham substation consisting
   of a line terminal structure, breaker, relays, switches, metering instrument transformers and
   metering, control and communications cabinet at its Substation substation. In addition,
   Company will construct a portion of the service line to the boundary of TNMP fee owned
   property.

8. **Company One Line**



9. **Customer One Line**



# Transmission/Substation Facility Extension Agreement

This Agreement is made between C o r e  S c i e n t i f i c ,  I n c . , hereinafter called "Customer" and T e x a s  N e w  M e x i c o  P o w e r C o m p a n y , hereinafter called "Company" for the extension of Company Delivery System transmission/substation facilities, as hereinafter described. As used herein, the term "extension" shall mean the construction of new facilities or modification of existing facilities.

Customer has requested that Company construct the following Company-owned Delivery System facilities: A new service terminal to be constructed at Cottonwood Substation and operated at a nominal 138,000 volts or higher. The service terminal is to consist of poles, conductors, breakers, switches and associated protection and metering equipment and communication devices and a single line terminal position for the Customer's transmission line, ("Company Facilities") to serve the following Customer-Owned Facilities located at 31°30'44.30"N, 103°27'13.78"W ,("Customer Facilities"): A substation operated at a nominal 138,000 volts or higher. Customer substation will consist of multiple transformers rated at approximately 150MVA each with primary and secondary circuit breakers and relays compatible with TNMP's relays and protective schemes at Company service meter station.

## ARTICLE I - PAYMENT BY CUSTOMER

1. As payment for Customer's portion of the cost of the extension of the Company Facilities in accordance with this Agreement, Customer will pay to Company the amount(s) shown below, such payment(s) to be and remain the property of the Company.

   Customer will not be required to pay an upfront contribution in aid of construction as set forth on Exhibit A.

2. If the Customer Facilities have not achieved the level of operation specified below by the date specified below, then Custom er shall pay to Company those costs as described below to compensate Company for costs it has incurred asso ciated with the Company Facilities. The following will also address any security required associated with such payment obligation.

   At the end of thirty-six (36) monthly billing cycles following the date the Company Facilities are completed, if the actual revenue is below the Minimum Facilities Revenue, Customer shall pay to TNMP an amount equal to the Minimum Facilities Revenue less the Actual Revenue, grossed up for federal, state and local taxes. In add ition, Customer shall deliver to TNMP a surety bond or irrevocable letter of credit, issued by a surety company or banking institution authorized to do business in the State of Texas and reasonably a cceptable to TNMP, on or before the Effective Date of thi s Agreement. The surety bond or irrevocable letter of credit shall have a face value equal to the Minimum Facilities Revenue and a 40-month term from the date the Company Facilities are completed. The surety bond or irrevocable letter of credit shall sec ure all duties and obligations of customer hereunder and ensure same are done and performed at the time and in the manner specified in this Agreement.

   Company shall provide an accounting of the Minimum Facilities Revenue balance to Customer no more frequently than annually upon request from Customer.

3. Upon termination pursuant to the provisions of Article III, Paragraph 2 below, Customer shall pay to Company all of: (a) the costs that Company has incurred prior to the date of termination for engineering, procuring equipment and materials, construction, and any other costs related to the Company Facilities; (b) the costs that Company has committed to incur prior to the date of te rmination that it is unable to avoid using commercially reasonable steps; and (c) such costs incurred by Company after the date of termination to return the Delivery System to a condition consistent with Company's construction standards and Company's Tariff for Retail Delivery Service. Any cost obligations incurred by Customer under this paragraph will be reduced by any payments made by Customer under Paragraph 1 above. The provisions of this paragraph shall survive termination of this Agreement.

4. In calculating the costs Company has incurred (or committed to be incurred), such costs shall include the normal loadings Company applies to construction projects of this nature and shall be increased by an adder to cover the effects of a Customer payment on the Company's tax liability and shall include an amount to reco ver franchise fees where applicable.

## ARTICLE II - TITLE AND OWNERSHIP

Company at all times shall have title to and complete ownership and control over the Company Facilities extended under this A greement.

## ARTICLE III - TERM AND TERMINATION

1. This Agreement becomes effecti ve on the date of execution by both parties and may be executed in two or more counterparts, each of which is deemed an original, but all constitute one and the same instrument.

2. Customer may terminate this Agreement at any time prior to completion of the Company Facilities by providing Company with seven (7) days advanced written notice.

## ARTICLE IV - GENERAL CONDITIONS

1. Customer understands that, as a result of the installation provided for in this Agreement, the Delivery of Electric Power and Energy by Company to the specified location will be provided in accordance with Transmission Service Rate Schedule, which may from time to time be amended or succeeded.

2. This Agreement supersedes all previous agreements or representations, either written or oral, between Company and Customer made with respect to the matters herein contained, and when duly executed constitutes the agreement between the parties hereto and is not binding upon Company unless and until signed by one of its duly authorized representatives.

3.  The services covered by this Agreement will be provided by Company, and accepted by Customer, in accordance with applicable Public Utility Commission of Texas ("PUCT") Substantive Rules and Company's Tariff for Retail Delivery Service (including the Service Regulations contained therein), as it may from time to time be fixed and approved by the PUCT ("Company's Retail Delivery Tariff"). Company's Retail Delivery Tariff is part of this Agreement to the same extent as if fully set out herein. Unless otherwise expressly stated in this Agreement, the terms used herein have the meanings ascribed thereto in Company's Retail Delivery Ta riff.

4.  This Agreement may be amended only upon mutual agreement of the parties, which amendment will not be effective until reduced to writing and executed by the parties. Changes to applicable PUCT Substantive Rules and Company's Retail Delivery Tariff are applicable to this Agreement upon their effective date and do not require an amendment of this Agreement.

5.  The failure of a party to this Agreement to insist, on any occasion, upon strict performance of any provision of this Agreement will not be considered to waive the obligations, rights, or duties imposed upon the parties.

6.  Customer may not assign the Agreement without Compan y's prior written consent.

7.  This Agreement was executed in the State of Texas and must in all respects be governed by, interpreted, construed, and enforced in accordance with the laws thereof. This Agreement is subject to all valid, applicable federal, state, and local laws, ordinances, and rules and regulations of duly constituted regulatory authorities having jurisdiction.

### ARTICLE V - OTHER SPECIAL CONDITIONS

1.  TNMP shall use reasonable efforts to cons truct the TNMP Facilities by a target completion date of 12 m onths from the effective date of this agreement.
2.  A Facility Schedule outlining TNMP and Customer facility responsibilities and including a one-line diagram of the TNMP and Customer-Owned Facilities is attached as Exhibit B.
3.  Customer agrees to maintain a Power Factor of ninety -five percent (95%) lagging or greater as measured at the TNMP service tap station meter. If Customer does not maintain a Power Factor of ninety-five percent (95%), and Customer does not correct its Power Factor within 30 days of receipt of notice from TNMP, Company may install equipment on the Delivery System necessary to correct the Customer Power Factor . In the event TNMP installs such e quipment, Customer shall reimburse TNMP for all reasonable costs and expenses related to the procurement and installation of such equipment within thirty (30) days after rec eipt of TNMP's invoice therefor.
4.  The Customer shall design, install, cons truct, operate and maintain the Customer Facilities and its other electrical equipment in compliance with the TNMP Tariff and Applicable Legal and Electrical Requirements.
5.  This Agreement does not provide for interconnection of generation to TNMP's system or inter connection for any purpose other than for TNMP to provide retail delivery service.
6.  Subject to any necessary ERCOT approval, each Party shall provide necessary equipment outages to allow the other Party to perform periodic testing, maintenance, repair or replacement of its facilities. Such outages shall be scheduled at mutually agreeable times, unless conditions exist which a Party believes, in accordance with Good Utility Practice, may endanger person or property.
7.  Customer understands and agrees that ce rtain contingencies could affect delivery service to the CSI POD due to the system curtailment plans of the transmission loop system serving the area and therefore delivery service to the CSI POD may be interrupted.
8.  Customer's full connected future load is estimated to be 300 MVA by 2026 and will coordinate load additions in excess with Company.
9.  TNMP requires a detailed load ramp schedule to ensure the necessary shunt capacitance is available in the timeframe Customer requires load support. The cost to serve and security required will be revised upon determination of the final load ramp timi ng and shunt capacitor bank need.
.

ACCEPTED BY COMPANY:

Signature _____
04BD46EF23664C3

Keith Nix
Name _____

Vice President
Title _____

8/27/2021
Date Signed _____

ACCEPTED BY CUSTOMER:

Signature _____
631B456D5113460

Weston Adams
Name _____

CCO
Title _____

8/27/2021
Date Signed _____

# Exhibit A

## Contribution in Aid of Construction

| Cost to Serve CSI Substation from Cottonwood Substation | |
|---|---|
| 138kV Service Station | |
| Engineering | $250,000.00 |
| Procurement | $1,500,000.00 |
| Construction | $1,750,000.00 |
| **Total Estimated Costs** | **$3,500,000.00** |
| | |
| **Less: Minimum Facilities Revenue** | **$3,500,000.00** |
| | |
| Balance of Estimated Costs | $0.00 |
| Gross-up for Federal Tax | $0.00 |
| State Tax | $0.00 |
| Local Tax | $0.00 |
| | |
| **Total Upfront Contribution** | **$0.00** |

## Revenue Credit Calculation

Transmission Customer Addition: CSI Substation fed from Cottonwood Substation

| Customer | Load (KVA) | In-Service | Monthly | Annual Revenue | Method |
|---|---|---|---|---|---|
| CSI | 50,000 | 1/1/2021 - 12/31/2021 | $207,623 | $2,491,473 | NCP |
| CSI | 100,000 | 1/1/2022 - 12/31/2022 | $414,055 | $4,968,664 | 4CP |
| CSI | 150,000 | 1/1/2023 - 12/31/2023 | $620,488 | $7,445,856 | 4CP |
| | | | Composite Total | $14,905,993 | |

| | Applied to Credit |
|---|---|
| Customer Charge | $31.96 |
| Meter Charge (per meter) | $1,158.21 |
| Transmission System Charge (per KVA)(TCRF) | $0.000000 |
| Distribution System Charge (per KVA) | $0.00 |
| TCRF (Per 4CP KVA) | $4.128652 |
| CTC Charge | $0.0000000 |
| SBF Charge | $0.0000000 |
| RCE#3 | $0.0000000 |
| HCRF | $0.0000000 |
| Rates effective as of September 1, 2021 | |

DocuSign Envelope ID: 5B7EC780-09DA-4B35-A041-440D358498BF

# Exhibit B

# Facility Schedule

1. **Name:** CSI POD

2. **Point of Interconnection Location:**
   TNMP Cottonwood Substation, located at 2023 FM 2119, Pecos, TX 79772 At approximately 31°32'42.03"N, 103°49'36.14"W. The detailed location will be at the Company property line where the Customer can acquire transmission line easement.

3. **Delivery Voltage:** 138kV Nominal

4. **Metering (Voltage, Location, Other):**
   Metering is accomplished by using 138kV potential and current metering accuracy instrument transformers located at Company's Cottonwood substation. Metering equipment will provide for one retail transmission point of delivery.

5. **One line diagram attached:** YES

6. **Customer Facilities Furnished by Customer:**
   i. Customer will provide all necessary facilities on the load side of the TNMP Metering Station, consisting of a transmission line and substation operated at a nominal 138,000 volts or higher.
   ii. Customer substation will consist of multiple transformers rated at approximately 250 MVA each with primary and secondary circuit breakers and relays compatible with Company's relays and protective schemes at Company service station

7. **Company Facilities Furnished by TNMP:**
   Company will install and construct a metered line terminal at its Cottonwood substation consisting of a line terminal structure, breaker, relays, switches, metering instrument transformers and metering, control and communications cabinet at its substation. In addition, Company will construct a portion of the service line to the boundary of TNMP fee owned property.

DocuSign Envelope ID: 5B7EC78D-89DA-4B35-A041-440B35849BF5

8. **Company One Line**



DocuSign Envelope ID: 5B7EC780-08DA-4B35-A041-440B358498B5

## 9. **Customer One Line**



## TEXAS-NEW MEXICO POWER COMPANY

**ELECTRIC FACILITIES EXTENSION AGREEMENT**

Contract No. _____
Project/Year_____
Customer Account No:_____

This Agreement is made by and between Texas-New Mexico Power Company, a Texas Corporation (Company) and Core Scientific, Inc.,hereafter called (Customer) for the extension of Company's Electric Transmission and Distribution System facilities to the following location:

Location described by GPS Coordinates as: approximately 31°30'49.02"N, 103°27'3.56"W in Ward County, Texas, at the end of TNMPs existing line extension.

Customer's mailing address is:

2800 Northup Way, #220
Bellevue, WA 98004

Customer Has Requested Extension Of Service For The Following: [Check All That Apply]

**____**   **Standard Electric Facilities for Loads Less Than 12kW**

Company will extend its standard electric facilities that it determines are necessary to serve ____ Residential lot(s) or business (es). The character of these facilities is generally identified as _____ volt, _____ phase, alternating current, at 60 hertz, with reasonable variation permitted.

**__X__**   **Standard Electric Facilities for Loads Greater Than 12kW**

Company will extend its standard electric facilities that it determines are necessary to serve Customer's demand requirement of 3,982kW ("Threshold kW"). The character of these facilities is generally identified as 24,940 volts, 3 phase, alternating current, at 60 hertz, with reasonable variation permitted.

**____**   **Non-Standard Electric Facilities**

Company will extend, install, or modify the following non-standard electric facilities:

_____
_____
_____
_____

## ARTICLE I.  TARIFF

As approved by, and filed with, the Public Utility Commission of Texas (or its successor), the Company's current tariff (Tariff) will apply to this Agreement and for the class of service applicable to Customer's request. Both Company and Customer acknowledge and accept that the Tariff imposes obligations and limitations on both the Company and Customer. This Agreement, including the applicable Tariff, shall at all times be subject to change or modification by regulatory authority or other change in law. A copy of Company's current Tariff may be obtained from Company on request.

## ARTICLE II. CUSTOMER PAYMENT AND COMMITMENTS

Customer will pay a Contribution-In-Aid-Of-Construction (CIAC) to Company of $0.00 as payment f o r Customer's portion of the facility extension, installation, or modification costs in accordance with Company's Tariff. Per the Tariff the CIAC was calculated based on the following: CIAC = (Project Investment of 450,000.00 minus Standard Allowance of $450,000.00) plus Applicable Taxes of $0.00. Such payment is due within 15 days following Company's mailing, first class, an invoice to Customer at:

<div align="center">

Core Scientific Inc.
2800 Northup Way, #220
Bellevue, WA 98004

</div>

or such other billing address provided to Company by the Customer. Such non-refundable payment will remain the property of the Company.

The Customer will provide, without cost to Company, all rights-of-way (in a form acceptable to Company), permits and suitable space for the installation of poles, wires, transformers, meters, and such other equipment Company deems necessary to enable it to deliver the power and energy herein described.

The Customer will install and maintain in good working condition at all times adequate protection and protective devices for his electric motors and other equipment against overload, low voltage, single-phasing, and similar risks or hazards incident to the use of electricity. The Customer assumes all responsibility for the electric current upon the Customer's side of the point of delivery, and for the wires, apparatus, and appurtenances used in connection therewith. In addition to the terms of the Tariff, Customer will protect and save the Company harmless from all claims for injury or damage to persons or property occurring upon the Customer's side of such point of delivery, occasioned by such electric current or said wire and apparatus, except where said injury or damage shall be shown to have been occasioned solely by the negligence of the Company. In no event shall the Company be responsible for consequential damages whether or not found to have negligently caused injury to Customer.

## ARTICLE III. TERM

This Agreement shall expire three (3) years (the "Term") from the date agreement is executed. The Initial Date is the date this agreement is executed. Customer's payment obligations shall survive expiration of this Agreement.

## ARTICLE IV.  UNDER UTILIZATION CHARGE

A.      Based on estimated information provided by the Customer, Company calculated the CIAC amount referenced in Article II above. Such estimated information included, but was not limited to, the Threshold kW and the number of lots or businesses to be built, sold, and occupied. Company will review actual load or the number of lots or businesses at the pertinent location to evaluate the accuracy of the information supplied by Customer.  At the end of the Term, the Company will recalculate the CIAC amount if the estimated Threshold kW billing demand for the designated location has not been realized or the estimated number of lots or businesses have not been built, sold, and occupied. The CIAC amount, including applicable taxes, will be recalculated based on the actual kW billing demand achieved or the actual number of lots or businesses built, sold, and occupied at the time of the recalculation. Company may also make such recalculation in the event of a breach during the Term.

B.      If Customer does not realize the estimated Threshold kW or the number of estimated lots or businesses are not built, sold, and occupied, Customer will pay Company an amount (the "Under Utilization Charge") equal to the difference between the CIAC amount paid under Article I and the

amount of any recalculated CIAC, including any applicable taxes, determined under the preceding Subparagraph A of Article IV. Customer shall pay any such Under Utilization Charge within 15 days after Company deposits an invoice for such amount, addressed to Customer, in the U.S. mail.

C.       Article IV only applies to standard electrical facilities.

# ARTICLE V.  GENERAL PROVISION

Customer understands and agrees that Company shall retain title to, own, and control all electric facilities up to the point of delivery that are extended, installed, or modified under this Agreement. Company may use any such facilities to serve other customers when Company Determines that it is feasible to do so. Customer also understands that the delivery of service is not governed by this Agreement, but the delivery of electricity procured by customer will be provided in accordance with Company's Tariff and any subsequent amendments thereto. Customer understands that Company is not a generator, power marketer, or retail electric provider and therefore Company will not procure, generate, or supply power to Customer.   Customer accepts responsibility for selecting, enrolling and contracting with a retail electric provider of Customer's choice. The Company does not assume any responsibility associated with Customer's equipment used or the methods employed for the installation and/or maintenance thereof.

This Agreement supersedes all prior agreements between the Company and the Customer for service mentioned herein and all representations, promises or other inducements, written or verbal, made with respect to the matters herein contained.  This Agreement shall not be assignable by Customer without the written consent of the Company. This Agreement is not binding upon Company until executed by one of its authorized representatives.

# ARTICLE VI. SECURITY

In accordance with the Company's Tariff, Customer must furnish surety in the amount of $450,000.00 in a form acceptable to Company. The amount of the surety shall be equal to the Standard Allowance used to calculate the initial CIAC. The surety instrument may be a bond, letter of credit ("LOC") or other security acceptable to Company and shall survive the expiration of this Agreement.  Such surety instrument must be for a term of 48 months (the "Security Term") from the Initial Date. Company may, but is not required to, accept a LOC of a shorter term provided that such LOC is renewed annually for the length of the Security Term. If a LOC or other security instrument is terminated, canceled or withdrawn, or if Company receives notice that the LOC or other security instrument will not be renewed, the Customer will be considered to be in immediate breach. In addition to any other remedies permitted at law, Company may recalculate the CIAC amount, including applicable taxes, as set forth in Article IV as of the date of breach.  Any difference between the initial CIAC and the revised CIAC, including applicable taxes, will be due within 15 days of Company's mailing of an invoice to Customer as described in Article IV. Thereafter, Company may execute or draw on said LOC or other surety prior to the expiration of such LOC/surety and/or the Agreement. Any surety instrument/LOC shall be non-cancelable; however, the face amount of the instrument may be reduced each year when approved by the Company.  The surety instrument/LOC may not be replaced with other surety without consent of the Company.

# ARTICLE VII.  FORCE MAJEURE

The Company shall not be liable for damages occasioned by interruptions or failure to commence delivery or unsatisfactory service caused by an Act of God or the public enemy, inevitable accidents, fire, explosions, strikes, riots, war, delay in receiving shipments of required material, order of any court or judge granted in any bona fide adverse legal proceedings or

action, or any order of any commission or tribunal having jurisdiction in the premises; or, without limitation by the preceding enumeration, any other act or thing reasonably beyond its control or incident to interruptions necessary for repairs or changes in the Company's generating equipment, lines or other electric facilities.

## ARTICLE VIII. SPECIAL PROVISIONS

1. Notices -- Notices given under this Agreement are deemed to have been duly delivered if hand delivered, Currier Service or sent by United States certified mail, return receipt requested, postage prepaid, to:

   a. If to Company:

   > Jonathan Lozano,
   > Texas New-Mexico Power Company
   > 1126 Stafford Blvd
   > P. O. Drawer 1960
   > Pecos, Texas 79772

   b. If to Customer:

   > Weston Adams
   > Core Scientific Inc.
   > 2800 Northup Way, #220
   > Bellevue, WA 98004

   c. The above-listed names, titles, and addresses of either Party may be changed by written notification to the other.

2. Company shall provide one primary meter Points of Delivery (POD) located approximately at the edge of TNMPs Cedarvale Substation property as required by Customers site plan. TNMP will commence design and determine the final locations of the PODs upon coordination with Customer and delivery of Customer site plans suitable to determine the appropriate location. The final POD location as required by Customer, may require additional security to be provided , Customer and Company will coordinate any additional security as needed.

3. Customer shall provide all necessary facilities on the load side of the point of delivery.

4. Company shall use reasonable efforts to construct the PODs within 12 weeks from the effective date of this agreement or 4 weeks from determination of the POD locations, whichever is longer.

5. Customer agrees to maintain a Power Factor of ninety-five percent (95%) lagging or greater as measured at the COMPANY service tap station meter. If Customer does not maintain a Power Factor of ninety-five percent (95%), and Customer does not correct its Power Factor within 30 days of receipt of notice from Company, Company may install equipment on the Delivery System necessary to correct the Customer Power Factor. In the event Company installs such equipment, Customer shall reimburse Company for all reasonable costs and expenses related to the procurement and installation of such equipment within thirty (30) days after receipt of Company's invoice therefor.

6. The Customer shall design, install, construct, operate and maintain the Customer Facilities and its other electrical equipment in compliance with the Company Tariff and Applicable Legal and Electrical Requirements.

7. This Agreement does not provide for interconnection of generation to Company's system or interconnection for any purpose other than for Company to provide retail delivery service.

8. Customer's full connected future load is estimated to be 22.5 MW by 2022 and will coordinate load additions in excess with Company.

## CORE SCIENTIFIC, INC.

By (Print): Weston Adams

Signature: _____

Title: CCO

Date: 8/19/2021

## TEXAS-NEW MEXICO POWER COMPANY

By (Print): Keith Nix

Signature: _____

Title: Vice President

Date: 8/20/2021

DocuSign Envelope ID: 2A52F397-8FD5-4394-A643-7554A87B4263

**TEXAS-NEW MEXICO POWER COMPANY**

**ELECTRIC FACILITIES EXTENSION AGREEMENT**

Contract No. _____
Project/Year_____
Customer Account No:_____

This Agreement is made by and between Texas-New Mexico Power Company, a Texas Corporation (Company) and Core Scientific, Inc.,hereafter called (Customer) for the extension of Company's Electric Transmission and Distribution System facilities to the following location:

Location described by GPS Coordinates as: approximately 31°32'42.03"N, 103°49'36.14"W in Reeves County, Texas, at the end of TNMPs existing line extension.

Customer's mailing address is:

2800 Northup Way, #220
Bellevue, WA 98004

Customer Has Requested Extension Of Service For The Following: [Check All That Apply]

____ **Standard Electric Facilities for Loads Less Than 12kW**

Company will extend its standard electric facilities that it determines are necessary to serve ____ Residential lot(s) or business (es). The character of these facilities is generally identified as _____ volt, _____ phase, alternating current, at 60 hertz, with reasonable variation permitted.

__X__ **Standard Electric Facilities for Loads Greater Than 12kW**

Company will extend its standard electric facilities that it determines are necessary to serve Customer's demand requirement of 8,850kW ("Threshold kW"). The character of these facilities is generally identified as 24,940 volts, 3 phase, alternating current, at 60 hertz, with reasonable variation permitted.

____ **Non-Standard Electric Facilities**

Company will extend, install, or modify the following non-standard electric facilities:

_____
_____
_____
_____

## ARTICLE I.  TARIFF

As approved by, and filed with, the Public Utility Commission of Texas (or its successor), the Company's current tariff (Tariff) will apply to this Agreement and for the class of service applicable to Customer's request. Both Company and Customer acknowledge and accept that the Tariff imposes obligations and limitations on both the Company and Customer. This Agreement, including the applicable Tariff, shall at all times be subject to change or modification by regulatory authority or other change in law. A copy of Company's current Tariff may be obtained from Company on request.

## ARTICLE II. CUSTOMER PAYMENT AND COMMITMENTS

Customer will pay a Contribution-In-Aid-Of-Construction (CIAC) to Company of $0.00 as payment f o r Customer's portion of the facility extension, installation, or modification costs in accordance with Company's Tariff. Per the Tariff the CIAC was calculated based on the following: CIAC = (Project Investment of 1,000,000.00 minus Standard Allowance of $1,000,000.00) plus Applicable Taxes of $0.00. Such payment is due within 15 days following Company's mailing, first class, an invoice to Customer at:

Core Scientific Inc.
2800 Northup Way, #220
Bellevue, WA 98004

or such other billing address provided to Company by the Customer. Such non-refundable payment will remain the property of the Company.

The Customer will provide, without cost to Company, all rights-of-way (in a form acceptable to Company), permits and suitable space for the installation of poles, wires, transformers, meters, and such other equipment Company deems necessary to enable it to deliver the power and energy herein described.

The Customer will install and maintain in good working condition at all times adequate protection and protective devices for his electric motors and other equipment against overload, low voltage, single-phasing, and similar risks or hazards incident to the use of electricity. The Customer assumes all responsibility for the electric current upon the Customer's side of the point of delivery, and for the wires, apparatus, and appurtenances used in connection therewith. In addition to the terms of the Tariff, Customer will protect and save the Company harmless from all claims for injury or damage to persons or property occurring upon the Customer's side of such point of delivery, occasioned by such electric current or said wire and apparatus, except where said injury or damage shall be shown to have been occasioned solely by the negligence of the Company. In no event shall the Company be responsible for consequential damages whether or not found to have negligently caused injury to Customer.

## ARTICLE III. TERM

This Agreement shall expire three (3) years (the "Term") from the date agreement is executed. The Initial Date is the date this agreement is executed. Customer's payment obligations shall survive expiration of this Agreement.

## ARTICLE IV. UNDER UTILIZATION CHARGE

A.      Based on estimated information provided by the Customer, Company calculated the CIAC amount referenced in Article II above. Such estimated information included, but was not limited to, the Threshold kW and the number of lots or businesses to be built, sold, and occupied. Company will review actual load or the number of lots or businesses at the pertinent location to evaluate the accuracy of the information supplied by Customer. At the end of the Term, the Company will recalculate the CIAC amount if the estimated Threshold kW billing demand for the designated location has not been realized or the estimated number of lots or businesses have not been built, sold, and occupied. The CIAC amount, including applicable taxes, will be recalculated based on the actual kW billing demand achieved or the actual number of lots or businesses built, sold, and occupied at the time of the recalculation. Company may also make such recalculation in the event of a breach during the Term.

B.      If Customer does not realize the estimated Threshold kW or the number of estimated lots or businesses are not built, sold, and occupied, Customer will pay Company an amount (the "Under Utilization Charge") equal to the difference between the CIAC amount paid under Article I and the

amount of any recalculated CIAC, including any applicable taxes, determined under the preceding Subparagraph A of Article IV. Customer shall pay any such Under Utilization Charge within 15 days after Company deposits an invoice for such amount, addressed to Customer, in the U.S. mail.

C.      Article IV only applies to standard electrical facilities.

# ARTICLE V.  GENERAL PROVISION

Customer understands and agrees that Company shall retain title to, own, and control all electric facilities up to the point of delivery that are extended, installed, or modified under this Agreement. Company may use any such facilities to serve other customers when Company Determines that it is feasible to do so. Customer also understands that the delivery of service is not governed by this Agreement, but the delivery of electricity procured by customer will be provided in accordance with Company's Tariff and any subsequent amendments thereto. Customer understands that Company is not a generator, power marketer, or retail electric provider and therefore Company will not procure, generate, or supply power to Customer.   Customer accepts responsibility for selecting, enrolling and contracting with a retail electric provider of Customer's choice. The Company does not assume any responsibility associated with Customer's equipment used or the methods employed for the installation and/or maintenance thereof.

This Agreement supersedes all prior agreements between the Company and the Customer for service mentioned herein and all representations, promises or other inducements, written or verbal, made with respect to the matters herein contained. This Agreement shall not be assignable by Customer without the written consent of the Company. This Agreement is not binding upon Company until executed by one of its authorized representatives.

# ARTICLE VI. SECURITY

In accordance with the Company's Tariff, Customer must furnish surety in the amount of $1,000,000.00 in a form acceptable to Company. The amount of the surety shall be equal to the Standard Allowance used to calculate the initial CIAC. The surety instrument may be a bond, letter of credit ("LOC") or other security acceptable to Company and shall survive the expiration of this Agreement.  Such surety instrument must be for a term of 48 months (the "Security Term") from the Initial Date. Company may, but is not required to, accept a LOC of a shorter term provided that such LOC is renewed annually for the length of the Security Term. If a LOC or other security instrument is terminated, canceled or withdrawn, or if Company receives notice that the LOC or other security instrument will not be renewed, the Customer will be considered to be in immediate breach. In addition to any other remedies permitted at law, Company may recalculate the CIAC amount, including applicable taxes, as set forth in Article IV as of the date of breach.  Any difference between the initial CIAC and the revised CIAC, including applicable taxes, will be due within 15 days of Company's mailing of an invoice to Customer as described in Article IV. Thereafter, Company may execute or draw on said LOC or other surety prior to the expiration of such LOC/surety and/or the Agreement. Any surety instrument/LOC shall be non-cancelable; however, the face amount of the instrument may be reduced each year when approved by the Company.  The surety instrument/LOC may not be replaced with other surety without consent of the Company.

# ARTICLE VII.  FORCE MAJEURE

The Company shall not be liable for damages occasioned by interruptions or failure to commence delivery or unsatisfactory service caused by an Act of God or the public enemy, inevitable accidents, fire, explosions, strikes, riots, war, delay in receiving shipments of required material, order of any court or judge granted in any bona fide adverse legal proceedings or

DocuSign Envelope ID: 2A58F797-8FD5-429A-A642-755A4B7B4763

action, or any order of any commission or tribunal having jurisdiction in the premises; or, without limitation by the preceding enumeration, any other act or thing reasonably beyond its control or incident to interruptions necessary for repairs or changes in the Company's generating equipment, lines or other electric facilities.

## ARTICLE VIII. SPECIAL PROVISIONS

1. Notices -- Notices given under this Agreement are deemed to have been duly delivered if hand delivered, Currier Service or sent by United States certified mail, return receipt requested, postage prepaid, to:

    a.  If to Company:

        Jonathan Lozano,
        Texas New-Mexico Power Company
        1126 Stafford Blvd
        P. O. Drawer 1960
        Pecos, Texas 79772

    b.  If to Customer:

        Weston Adams
        Core Scientific Inc.
        2800 Northup Way, #220
        Bellevue, WA 98004

    c.  The above-listed names, titles, and addresses of either Party may be changed by written notification to the other.

2. Company shall provide four primary meter Points of Delivery (POD) located approximately at the edge of TNMPs Cottonwood Substation property as required by Customers site plan. TNMP will commence design and determine the final locations of the PODs upon coordination with Customer and delivery of Customer site plans suitable to determine the appropriate location. The final POD location as required by Customer, may require additional security to be provided , Customer and Company will coordinate any additional security as needed.

3. Customer shall provide all necessary facilities on the load side of the point of delivery.

4. Company shall use reasonable efforts to construct the PODs within 12 weeks from the effective date of this agreement or 4 weeks from determination of the POD locations, whichever is longer.

5. Customer agrees to maintain a Power Factor of ninety-five percent (95%) lagging or greater as measured at the COMPANY service tap station meter. If Customer does not maintain a Power Factor of ninety-five percent (95%), and Customer does not correct its Power Factor within 30 days of receipt of notice from Company, Company may install equipment on the Delivery System necessary to correct the Customer Power Factor. In the event Company installs such equipment, Customer shall reimburse Company for all reasonable costs and expenses related to the procurement and installation of such equipment within thirty (30) days after receipt of Company's invoice therefor.

6. The Customer shall design, install, construct, operate and maintain the Customer Facilities and its other electrical equipment in compliance with the Company Tariff and Applicable Legal and Electrical Requirements.

7. This Agreement does not provide for interconnection of generation to Company's system or interconnection for any purpose other than for Company to provide retail delivery service.

8. Customer's full connected future load is estimated to be 35MW on Transformer T2 and 45MW on Transformer T3 MW by 2022 and will coordinate load additions in excess with Company.

## CORE SCIENTIFIC, INC.

By (Print): Weston Adams

Signature: Weston Adams

Title: CCO

Date: 8/19/2021

## TEXAS-NEW MEXICO POWER COMPANY

By (Print): Keith Nix

Signature: Keith Nix

Title: Vice President

Date: 8/20/2021

| From: | Gerety, Christopher |
| --- | --- |
| To: | Carol Haines |
| Cc: | Hudson, Anthony; Nix, Keith; Whitehurst, Stacy |
| Subject: | Re: [External] FW: Core Scientific/TNMP Executive Meeting |
| Date: | Friday, April 29, 2022 5:55:30 PM |
| Attachments: | image001.png |

Yes, will get it out shortly.

Chris Gerety
505-280-3310

**From:** Carol Haines <chaines@corescientific.com>
**Sent:** Friday, April 29, 2022 4:42:49 PM
**To:** Gerety, Christopher <Christopher.Gerety@tnmp.com>
**Cc:** Hudson, Anthony <Anthony.Hudson@tnmp.com>; Nix, Keith <Keith.Nix@tnmp.com>; Whitehurst, Stacy <Stacy.Whitehurst@tnmp.com>
**Subject:** Re: [External] FW: Core Scientific/TNMP Executive Meeting

Yes. That works for our team. Will you send an invite at your convenience, please?

Thanks

Sent from my iPhone

> On Apr 29, 2022, at 5:13 PM, Gerety, Christopher <Christopher.Gerety@tnmp.com> wrote:

Greetings Carol,

Does Monday at 3PM work for you?

Thank you
Chris Gerety
505-280-3310

**From:** Carol Haines <chaines@corescientific.com>
**Sent:** Thursday, April 28, 2022 12:43 PM
**To:** Gerety, Christopher <Christopher.Gerety@tnmp.com>
**Subject:** [External] FW: Core Scientific/TNMP Executive Meeting

********
**CAUTION:** This email was received from an **EXTERNAL** source, use caution when clicking links or opening attachments. If you believe this to be a malicious and/or phishing email, please use the **Report Phishing** button.
********

********
**Is this a phishing email? - Look again!**
This email is from chaines@corescientific.com - do you know them?
********

Hi Chris,

It's nice to meet you. Our CEO will be reaching out to set up a call with Mr. Walker. In the meantime, I am hoping to schedule a call with you or whoever you deem appropriate for our working team to better understanding the timelines associated with our Cedarvale and Cottonwood projects. We have equipment and construction materials showing up to our job sites every day and are unsure how to proceed given the current environment.

Do you have time for a call tomorrow?

Thanks,



**CAROL HAINES**
SVP POWER & SUSTAINABILITY
**Core Scientific**
chaines@corescientific.com
**440.532.0057**

**From:** John Bick <jbick@prioritypower.com>
**Sent:** Wednesday, April 27, 2022 9:24 AM
**To:** Gerety, Christopher <Christopher.Gerety@tnmp.com>; Carol Haines <chaines@corescientific.com>
**Cc:** Blackwell, Linny <Linny.Blackwell@tnmp.com>; Walker, Neal <Neal.Walker@tnmp.com>; Nix, Keith <Keith.Nix@tnmp.com>
**Subject:** Re: Core Scientific/TNMP Executive Meeting

[EXTERNAL] Use caution when opening attachments or links.

Thanks, Chris.

Looping in Carol Haines, SVP Power & Sustainability for Core.  Carol will follow up with Linny.

John J. Bick
Sent from my iPhone

> On Apr 27, 2022, at 8:19 AM, Gerety, Christopher <Christopher.Gerety@tnmp.com> wrote:

[EXTERNAL ORIGIN – do not open attachments or links until sender and content are confirmed safe]

John, please reach out to Linny Blackwell to coordinate a meeting time between TNMP President Neal Walker and the Core Scientific CEO.

Linny Blackwell
214-222-4103
Linny.blackwell@tnmp.com
577 North Garden Ridge
Lewisville, TX 75067

Neal Walker
214-222-4102
neal.walker@tnmp.com

Thank you
Chris
505-280-3310

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email noted above and destroy the original message.

| From: | Gerety, Christopher |
|---|---|
| To: | Carol Haines; Nix, Keith; Hudson, Anthony |
| Cc: | Weston Adams; Kelsey Gallagher |
| Subject: | RE: [External] Follow Up - Core Scientific |
| Date: | Tuesday, June 28, 2022 9:34:41 AM |
| Attachments: | image001.png |
| | PPM Cedarvale Bitcoin System Impact Study_062822_Redacted.pdf |

Greetings Carol,

The attached Cedarvale study was submitted to the ERCOT Large Load Group early this morning and Cottonwood will be submitted before COB today. We will let you know as soon as we have ERCOTs review back.

There is no issue serving the PME load amounts from the transmission point of delivery before the capacitor banks are installed and in-service at both Cedarvale and Cottonwood.

Let me know if you have any further questions.

Thanks
Chris
505-280-3310

---

**From:** Carol Haines <chaines@corescientific.com>
**Sent:** Monday, June 27, 2022 4:17 PM
**To:** Gerety, Christopher <Christopher.Gerety@tnmp.com>; Nix, Keith <Keith.Nix@tnmp.com>; Hudson, Anthony <Anthony.Hudson@tnmp.com>
**Cc:** Weston Adams <wadams@corescientific.com>; Kelsey Gallagher <kgallagher@corescientific.com>
**Subject:** RE: [External] Follow Up - Core Scientific
**Importance:** High

Hi Chris, Keith and Tony,

I am still looking for clarity on the questions below.

Do we need to wait for the cap bank work to be completed to move the PME load over to transmission?

Can we please get an update on the restudy and information being submitted to ERCOT? Has this been resubmitted and if so, when? We have buildings fully erected with power to them and units ready to turn on. We need to know when we will be able to ramp up. Every day we go without answers from you costs us a great deal of money with construction and lost revenue. We have customer obligations to fulfill and are unable to even provide them with a timeline at this point.

Thanks,



**CAROL HAINES**

SVP POWER & SUSTAINABILITY

**Core Scientific**

chaines@corescientific.com

**440.532.0057**

---

**From:** Carol Haines
**Sent:** Friday, June 17, 2022 9:41 AM
**To:** Gerety, Christopher <Christopher.Gerety@tnmp.com>
**Cc:** Hudson, Anthony <Anthony.Hudson@tnmp.com>; Nix, Keith <Keith.Nix@tnmp.com>; Weston Adams <wadams@corescientific.com>; Kelsey Gallagher <kgallagher@corescientific.com>
**Subject:** Re: [External] Follow Up - Core Scientific

Do we need to wait for the cap bank work to be completed to move the PME load over to transmission?

> On Jun 17, 2022, at 9:35 AM, Gerety, Christopher <Christopher.Gerety@tnmp.com> wrote:

> [EXTERNAL] Use caution when opening attachments or links.

Good Morning Carol,

With regard to the timing of the transmission terminals at Cedarvale and Cottonwood, TNMP has those scheduled to be energized on 6/28 and 7/13 respectively. The cap banks for both yards will follow in July and August. I am not able to provide an exact or specific date because we are having trouble with the manufacturers of the banks and switching devices giving accurate delivery timing. We are continuing to push them for the soonest delivery possible.

There is no facility issue with moving the PME load over to the transmission service upon energization.

Tony, will need to comment on status of resubmission of the study for ERCOT's review.

Thanks
Chris
505-280-3310

---

**From:** Carol Haines <chaines@corescientific.com>
**Sent:** Friday, June 17, 2022 8:18 AM
**To:** Hudson, Anthony <Anthony.Hudson@tnmp.com>; Gerety, Christopher

<Christopher.Gerety@tnmp.com>; Nix, Keith <Keith.Nix@tnmp.com>
**Cc:** Weston Adams <wadams@corescientific.com>; Kelsey Gallagher
<kgallagher@corescientific.com>
**Subject:** [External] Follow Up - Core Scientific





Chris, Tony and Keith,

We need an update on the restudy and information being submitted to ERCOT. Has this been resubmitted and if so, when? Also, can you please answer the question below. We have buildings fully erected with power to them and units ready to turn on. We need to know when we will be able to ramp up. Every day we go without answers from you costs us a great deal of money with construction and lost revenue. We have customer obligations to fulfill and are unable to even provide them with a timeline at this point.


Thanks,



**CAROL HAINES**
SVP POWER & SUSTAINABILITY
**Core Scientific**
chaines@corescientific.com
**440.532.0057**

---

**From:** Carol Haines
**Sent:** Wednesday, June 15, 2022 1:19 PM
**To:** Hudson, Anthony <Anthony.Hudson@tnmp.com>
**Cc:** Weston Adams <wadams@corescientific.com>; Kelsey Gallagher

&lt;[kgallagher@corescientific.com](mailto:kgallagher@corescientific.com)&gt;
**Subject:** Question on PMEs vs Distribution
**Importance:** High

Hi Tony,

We are planning to have our first Cedarvale transmission transformer in service by the end of July. Are we able to move the PME load over to distribution as soon as the distribution is available?

Thanks,



**CAROL HAINES**

SVP POWER & SUSTAINABILITY

**Core Scientific**

[chaines@corescientific.com](mailto:chaines@corescientific.com)

**440.532.0057**

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email noted above and destroy the original message. Thank you.



**Priority Power Management, LLC**

**Cedarvale Bitcoin**

**System Impact Study**


**June 2022**

# Table of Contents

1    Executive Summary ......................................................................................................................... 1

2    Introduction ................................................................................................................................... 3

    2.1   Study Purpose, Composition, and Scope ................................................................................. 4

      2.1.1   Study Purpose .................................................................................................................. 4

      2.1.2   Study Composition .......................................................................................................... 4

      2.1.3   Study Scope ...................................................................................................................... 4

3    Model Data ..................................................................................................................................... 6

    3.1   Steady State Data ...................................................................................................................... 6

      3.1.1   Steady State Starting Cases ............................................................................................. 6

      3.1.2   Steady State Benchmark Cases ....................................................................................... 6

      3.1.3   Steady State Change Cases .............................................................................................. 7

    3.2   Stability Data ............................................................................................................................ 7

      3.2.1   Stability Starting Case ..................................................................................................... 7

      3.2.2   Stability Benchmark Case ................................................................................................ 7

      3.2.3   Stability Change Case ...................................................................................................... 8

4    Study Methodology ....................................................................................................................... 8

    4.1   Steady State Study Methodology ............................................................................................. 8

    4.2   Stability Study Methodology .................................................................................................... 9

5    Applicable Planning Criteria ........................................................................................................ 10

    5.1   Steady State Planning Criteria ................................................................................................ 10

    5.2   Stability Planning Criteria ....................................................................................................... 10

6    Assumptions ................................................................................................................................. 10

7    Study Results ................................................................................................................................ 11

    7.1   Summary of Steady State Results ........................................................................................... 11

      7.1.1   Identified System Upgrades and Project Load Limits .................................................... 11

      7.1.2   P2/P4, P5, and P6 Event Results .................................................................................. 12

    7.2   Steady State Results Discussion ............................................................................................. 13

    7.3   Stability Results Summary ...................................................................................................... 14

    7.4   Stability Results Discussion .................................................................................................... 15

8    Conclusions .................................................................................................................................. 16

9    Appendix A – Stability Plots, Redacted ........................................................................................ 18

10   Appendix B – Stability Plots, Redacted ........................................................................................ 21

11   Appendix C – Stability Plots, Redacted ........................................................................................ 25

12   Appendix D – Stability Plots, Redacted ........................................................................................ 28

## *1   Executive Summary*

In June 2021, Priority Power Management, LLC entered into an agreement with TNMP to study the impact of providing transmission service to their proposed bitcoin mine data center facility in Ward County, TX (Project). The Customer has estimated the electrical demand of the Project to be 700 MW. The Customer's proposed location for the Project is adjacent to TNMP's Cedarvale substation, so the transmission point of delivery (POD) for the Project will be located at Cedarvale substation. The customer has requested a July 2022 in-service date for the POD.

TNMP processed one other request for transmission service to a large load just prior to receiving the request for the Project and processed two other requests for transmission service to large loads in parallel with the Project, totaling 730 MW not including the Project, planned within the same general area of TNMP's West Texas transmission system as that of the proposed location for the Project. Therefore, it was required for this study to consider a total new load of 1.621 GW (921 MW load studied either just prior to or in parallel with the Project + 700 MW proposed Project load).

The steady state results indicate a total of 480 MVAR static reactive support, in four blocks of 120 MVAR, will be needed at the POD to maintain healthy transmission voltages.

The steady state results indicate numerous transmission system upgrades are needed to accommodate the Project along with the other three large loads included in the study. Corresponding load limits have been identified as part of the study process. It is important to note the limits presented in this study are based on a snapshot in time simulations and do not intend to provide any insight into the hourly performance of the proposed load and the congestion/curtailment risks therein.

System improvements needed within TNMP's transmission system to accommodate all proposed end-user facilities considered in this study, estimated timing of those projects, and associated most constraining Project load limit are summarized below in Table 8-1.

**Table 8-1: TNMP System Improvements Identified**

| System Improvement | Estimated Timing | Project Load Limit (MW) | Day/Night Constraint |
|---|---|---|---|
| Cut Wink – Bone Springs 138 kV line into Cholla station | 12/1/22 | 170 | Day |
| Oncor to build new Consavvy switching station with two 345-138 kV transformers. | Dec 2022 | 0 | Night |
| Cut Wink – Bone Springs 138 kV line into Cholla station | 12/1/22 | 173 | Night |
| Upgrade Wink – All American – Monument Draw – Cholla 138 kV line to 3000 Ampere | 6/1/23 | 237 | Both |
| Oncor to upgrade Wolf – Moss 138 kV line | Dec 2023 | 397 | Day |
| 345 kV interconnection at Cedarvale | Mid 2025 | 397 | Both |
| Bearkat – North McCamey – Cedarvale/Sand Lake 345 kV double circuit line | Jun 2026 | 397 | Day |
| Bearkat – North McCamey – Cedarvale/Sand Lake 345 kV double circuit line | Jun 2026 | 234 | Night |

TNMP performed stability simulations of (1) load reject scenario involving the Project load and (2) the critical most contingency identified from the steady state analysis to result in post-contingency voltage collapse within the far West Texas system at higher load levels than were simulated in this study. The stability simulations were performed for the peak and off-peak scenarios with all minor system upgrades but none of the RPG level system upgrades identified from the steady state analysis. The Project load was set at 397 MW (aggregate of all proposed end-user facilities operating at 1318 MW) in the 2024 summer peak case and at a load level of 234 MW (aggregate of all proposed end-user facilities set at

1023 MW) in the 2025 HWLL case.  UVLS was simulated at each of the four PODs serving the proposed end-user facilities.  Conclusions from the stability analysis are as follows:

1. No angular stability issues were observed.

2. The simulations indicate introduction of large load data centers within the study area significantly worsen system low voltages that occur post-fault due to stalling of native industrial motors and will require installation of UVLS at the POD of each large load data center.

3. Significant over-voltages can occur depending on the timing of tripping stalled motors at the various industrial load sites within TNMP's West Texas systems during undervoltage conditions versus the timing of UVLS tripping for large data center loads.  However, the simulations indicate these over-voltages can be rapidly mitigated through the use of over-voltage tripping of capacitor banks specified for installation at the various PODs for large data center loads.

4. There are no voltage stability or real power oscillation issues involved with **Redacted**, which is thought to be the worst case P7 contingency within the study area.

5. There are no expected frequency response issues associated with load rejection.  Frequency remains well within the 60.4 Hz criteria utilized within the ERCOT Interconnection with loss up to 397 MW during summer peak and loss up to 234 MW during off-peak at the Project site.

6. It will be necessary to conduct similar stability simulations at higher aggregate data center load levels, ultimately at the total requested load level, as TNMP and other TSPs develop system upgrade projects that allow for operation at load levels beyond the limits identified in this study.

## 2   Introduction

In June 2021, Priority Power Management, LLC (Customer) entered into an agreement with TNMP to study the impact of providing transmission service to their proposed bitcoin mine data center facility in Ward County, TX (referred to herein as Project).  The Customer has estimated the electrical demand of the Project to be 700 MW (Load Addition).  The Customer's proposed location for the Project is adjacent to TNMP's Cedarvale substation, so the transmission point of delivery (POD) for the Project will be located at Cedarvale substation.  The Customer has requested a July 2022 in-service date for the POD.

TNMP processed one other request for transmission service to a large load just prior to receiving the request for the Load Addition and processed two other requests for transmission service to large loads in parallel with the Load Addition, totaling 730 MW not including the Load Addition, planned within the same general area of TNMP's West Texas transmission system as that of the proposed location for the Load Addition.  The ramp schedule provided by the customer for the Load Addition in the context of the aggregate of ramp schedules provided for the other three requests for transmission service as well as aggregate of commitments to serve new distribution load within the area is detailed in Table 2-1.

Table 2-1: Load Ramp Schedules Provided by Large Load Developers

| Year | Month | Load Addition (MW) | Aggregate From All Current Requests (MW)[1] |
|------|-------|--------------------|---------------------------------------------|
| 2022 | May   | 22  | 162  |
| 2022 | Jun   | 22  | 224  |
| 2022 | July  | 22  | 408  |
| 2022 | Aug   | 72  | 561  |
| 2022 | Sep   | 122 | 706  |
| 2022 | Oct   | 172 | 796  |
| 2022 | Nov   | 222 | 886  |
| 2022 | Dec   | 272 | 976  |
| 2023 | Jan   | 322 | 1141 |
| 2023 | Feb   | 347 | 1226 |
| 2023 | Mar   | 372 | 1263 |
| 2023 | Apr   | 372 | 1263 |
| 2023 | May   | 397 | 1288 |
| 2023 | Jun   | 397 | 1288 |
| 2023 | Jul   | 397 | 1288 |
| 2023 | Aug   | 397 | 1288 |
| 2023 | Sep   | 422 | 1313 |
| 2023 | Oct   | 447 | 1338 |
| 2023 | Nov   | 472 | 1363 |
| 2023 | Dec   | 497 | 1388 |
| 2024 | Jan   | 522 | 1443 |
| 2024 | Feb   | 547 | 1468 |
| 2024 | Mar   | 572 | 1493 |
| 2024 | Apr   | 597 | 1518 |
| 2024 | May   | 622 | 1543 |
| 2024 | Jun   | 647 | 1568 |
| 2024 | Jul   | 672 | 1593 |
| 2024 | Aug   | 697 | 1618 |
| 2024 | Sep   | 700 | 1621 |

[1] Includes the aggregate of commitments to serve bitcoin load within the area via distribution level service.

### *2.1   Study Purpose, Composition, and Scope*

It was required for this study to consider a total new load of 1.621 GW (921 MW load studied either just prior to or in parallel with the Load Addition[1] + 700 MW Load Addition) (herein referred to as Total Load Addition).

#### *2.1.1   Study Purpose*

The first purpose of this study is to evaluate the reliability impact of the Total Load Addition on the interconnected transmission system. In that regard, the focus is on the following:

1.  Recommend solutions to address loading and voltage problems within the TNMP-owned transmission network that are identified to be attributed to or compounded by the Total Load Addition.

2.  Provide supporting documentation for coordinating and communicating with other transmission owners on any loading and voltage problems external to the TNMP-owned transmission network that are identified to be attributed to or compounded by the Total Load Addition.

The second purpose of this study is to identify load ramp limits associated with the Load Addition that are applicable in the interim before system improvement projects are in place to accommodate the full Load Addition.

#### *2.1.2   Study Composition*

To identify loading and voltage problems attributed to or compounded by the Total Load Addition and load ramp limits associated with the Load Addition, steady state studies were conducted with the Total Load Addition at projected ramp schedules to evaluate system performance under both normal and contingency conditions.

#### *2.1.3   Study Scope*

The normal methodology for conducting a steady state study for a new end-user load request is to simulate the full set of pertinent NERC TPL-001 planning events, pertinent ERCOT-1 contingencies, and pertinent contingencies defined in Section 4 of the ERCOT Planning Guide using benchmark cases (cases without the Load Addition and only planned system upgrades that have previously been tested through simulation and previously committed for capital expenditure) and change cases (case with the Load Addition and, again, only planned system upgrades that have previously been tested through simulation and previously committed for capital expenditure).  TNMP's West Texas transmission system and the wider area currently has a fair amount of available capacity, and the few currently planned system upgrades enhance that available capacity.  However, the Total Load Addition far outstrips available capacity (both current and planned capacity).  As a consequence, there are three aspects of the normal study methodology that make it unworkable for this large load study:

1.  First, plugging 1.621 GW into a relatively small part of the system in a power flow case is guaranteed to result in an unsolved case when attempting to solve for contingencies, if not when attempting to solve for normal system conditions, making it indiscernible what specific loading and voltage problems are occurring because of the Total Load Addition.  Therefore, the study approach must be to break the total load being studied into manageable portions that will yield coherent load flow solutions, study each portion sequentially in a sequence that makes sense (e.g., pursuant to the priority established by the request queue), and develop/test viable system

upgrades as needed along the way that allow for coherent load flow solutions throughout the sequence of adding load portions.

2. Second, even with the approach described above for incrementally adding load to the cases and developing/testing system upgrades as needed to maintain coherent load flow solutions as more load portions are added, it is not practical to simulate the full set of pertinent NERC TPL-001 planning events during this portion of the study process. Doing so would unnecessarily slow the study process down to an unacceptable pace. To keep the study moving forward as fast as possible while producing study results that are critical for identifying both system upgrade projects and interim end-user load limits applicable before upgrade projects are constructed, the set of contingencies used for this portion of the study are limited to those contingencies where non-consequential load loss is not allowed either by the NERC TPL-001 standard or by ERCOT requirements. The set of contingencies used in this portion of the study are therefore:

   a. P0
   b. P1
   c. P3
   d. P7/ERCOT-1
   e. The set of contingencies outlined in Section 4 of the ERCOT Planning Guide

3. Third, the normal study methodology does not generally require any special mechanism outside of simple manual load scaling with manual AC solutions to identify interim end-user load limits applicable prior to construction of system upgrade projects. Due to the magnitude of the load being analyzed in this study and the large quantity of system upgrades needed at intermediate points in time as the load ramps up, a more sophisticated approach is required such as use of tools that calculate incremental transfer limits to shorten the study time to a reasonable timeframe.

Considering the aspects of this study described above, the scope of this study includes the following steady state components:

1. Identify system upgrades needed to serve the Total Load Addition while maintaining a secure system for P0, P1, P3, P7/ERCOT-1, and ERCOT PG4 operating conditions. The goal here is to identify:

   a. System upgrade projects necessary to accommodate the Total Load Addition that could feasibly be completed within a two-year timeframe. These are more likely to be projects that are limited in scope to TNMP-owned facilities and do not require ERCOT Regional Planning Group (RPG) endorsement (i.e., neutral and Tier 4 projects as defined in Section 3.11.4 of the ERCOT Protocols).

   b. Preliminary indications for system upgrade projects necessary to accommodate the Total Load Addition that would likely take more than two years to complete. These are less straight-forward system upgrade concepts that require further study outside the scope of this study and will likely be larger scale and longer lead projects that require RPG endorsement.

2. Identify interim load limits applicable to the Load Addition associated with P0, P1, P3, P7/ERCOT-1, and ERCOT PG4 operating conditions before the system upgrades identified above in Item #1 are implemented.

3. Screen for potential cascading events that would be triggered by selected P2/P4, P5, and P6 events within the timeframe before the large-scale projects identified above in Item 1a are in implemented (years 2022 and 2023) and at the interim load limits identified above in item #2.

Because TNMP anticipates the Total Load Addition will have an impact on the performance of the far West Texas system from a stability perspective (i.e., voltage stability, frequency overshoot, and/or power system swings), the scope of this study also includes stability simulations at load levels consistent with the interim load limits identified from the steady state portion of this study. The goal of these simulations is to identify any stability concerns assuming the following about the study system:

1. All system upgrades identified above in Item #1a are in place.

2. None of the conceptual projects identified above in Item #1b are in place.

The following are not within the scope of this study:

1. Studying system response to P2/P4, P5, and P6 events in longer range time-frames where large scale/long lead projects are expected to be identified to address system performance issues. These operating scenarios will be studied during TNMP's annual system assessment processes.

2. Confirming acceptable system stability performance at the Total Load Addition load level is not within the scope of this study. This level of study will be conducted at a later time as TNMP and neighboring transmission owners further develop larger scale system upgrade projects that allow for full accommodation of the Total Load Addition under the operating conditions simulated in this study.

## 3   Model Data

### 3.1  Steady State Data

#### 3.1.1   Steady State Starting Cases

TNMP used the following ERCOT SSWG base cases, all dated February 2022, as a starting point for the most recent steady state simulations conducted for this study.

1. 2022 summer peak

2. 2022 summer off-peak

3. 2023 summer peak

4. 2024 summer peak

5. 2025 summer peak

6. 2025 minimum load

#### 3.1.2   Steady State Benchmark Cases

Notable revisions applied to the starting cases to derive the benchmark cases include the following[2]:

1. Applied all off-cycle IDEVs dated through 5/4/22.

2. Various circuit impedance and rating corrections.

---

[2] Note – All battery energy storage facilities modeled within the study area were left out-of-service within all cases used for this study.

3. Various load adjustments to maintain consistency with latest load forecasting.

### 3.1.3 Steady State Change Cases

Notable revisions applied to the benchmark cases to derive the change cases include addition of the following for each of the nine end-user load requests comprising the Total Load Addition.

1. A new 138 kV bitcoin customer bus
2. A load set at 0.0 MW and 0.0 MVAR
3. A continuously controlled switched shunt set to control voltage at the benchmark P0 voltage of the corresponding TNMP POD station.
4. A zero-impedance branch between the bitcoin customer bus and corresponding TNMP POD station.

Numerous change cases were created to determine both (1) system upgrades needed to accommodate the eight end-user load requests and (2) load ramp limits that would be applicable on an interim basis before system upgrades are in place.

For all change cases, generation outside of the study area was scaled up to maintain the swing generator within its real power limit.

## 3.2 Stability Data

### 3.2.1 Stability Starting Case

TNMP used the 2024 summer peak and 2025 HWLL cases from the DWG 2022 flat start set dated 1/28/22 as a starting point for the most recent stability simulations conducted for this study.

### 3.2.2 Stability Benchmark Case

Notable revisions applied to both the 2024 summer peak and 2025 HWLL starting cases to derive the benchmark cases include the following:

1. Added four Tier 4 projects identified from the steady state study to be necessary for accommodating the Total Load Addition.  These include:

    a. Upgrade the TNMP Wink – All American – Monument Draw – Cholla 138 kV line sections to 3000 Ampere.

    b. Cut the TNMP Wink – Bone Springs Tap 138 kV line section into the TNMP Cholla 138 kV station.

    c. Upgrade the TNMP Wink – Cholla 138 kV line to 3000 Ampere.

    d. Upgrade TNMP Wink – Oncor Wink 138 kV line #2 to 3000 Ampere.

2. Added the currently planned TNMP 138 kV stations Girvin, Holiday, and Alamo Street stations that will be within the study area.

3. Closed the Leon Creek – Tarbush 138 kV line.

4. TNMP utilized its own dynamic load models for the stability analysis (all PSSE CMLD models).

### 3.2.3 Stability Change Case

Notable revisions applied to the benchmark cases to derive the change cases include addition of the following for each of the four end-user load requests comprising the Total Load Addition.

1. A new 138 kV bitcoin customer bus
2. A load set at the limit identified in the steady state study to correspond with the applicable stability case (2024 summer peak and 2025 HWLL).
3. A discrete controlled switched shunt located at the POD and set at a susceptance capability identified from the steady state study.
4. A zero-impedance branch between the bitcoin customer bus and corresponding TNMP POD station.
5. UVLS relay modeled at the corresponding POD.
6. Overvoltage tripping relay for the switched shunt listed above in Item 3.
7. CMLD model representing a data center load

The specific Project load amounts studied in this analysis were:

1. 397 MW (Total Load Addition set at 1318 MW) in the 2024 summer peak case.
2. 234 MW (Total Load Addition set at 1023 MW) in the 2025 HWLL case.

For all change case versions, generation outside of the study area was scaled up to maintain the swing generator within its real power limit.

## 4  Study Methodology

### 4.1  Steady State Study Methodology

TNMP performed steady state simulations using the cases described in Section 3. For the first part of the study designed to identify upgrade projects and associated interim Project load limits, these simulations include the following operating scenarios within and adjacent to TNMP's West Texas North system.

1. P0
2. P1
3. P3
4. P7/ERCOT-1
5. The set of contingencies outlined in Section 4 of the ERCOT Planning Guide

Circuit loading within TNMP's West Texas North system and the surrounding ONCOR and AEP transmission systems were monitored and assessed according to the steady state planning criteria outlined in Section 5. Bus voltages within the TNMP West Texas North system were monitored and assessed according to the steady state planning criteria outlined in Section 5.

During the steady state study process, TNMP tested various system upgrade solutions for resolving thermal loading constraints observed within the TNMP transmission system. Additionally, TNMP tested the stage 2 Upgrade project (345-kV double circuit line from Bearkat to North McCamey to Sand Lake) identified from the ERCOT Delaware Basin Load Integration study against numerous constraints identified external to TNMP affecting Oncor-owned transmission lines.

Lastly, TNMP simulated selected P2/P4, P5, and P6 events to test system performance at the various interim Project load limits. The specific P2/P4, P5, and P6 events that were simulated along with the selection rationale are documented below in Table 4-1.

**Table 4-1: P2/P4, P5, and P6 Events Simulated at Various Project Load Limits**

| Category | Event Description | Selection Rationale |
|----------|-------------------|---------------------|
| P2/P4 | Internal fault or failure of IH20 breaker 138-187, which takes out (a) IH20 – Elm Street 138 kV and (b) IH20 – Salt Draw – Saddleback 138 kV. | IH20 is one of the two "hub" stations within the immediate study area where multiple network elements terminate. This event is thought to be the worst P2/P4 at IH20 station. |
| P2/P4 | Internal fault or failure of Cedarvale breaker 139-257, which takes out (a) Cedarvale – Sand Lake 138 kV line #1 and (b) Cedarvale - Pecos 138 kV line #1. | Cedarvale is one of the two "hub" stations within the immediate study area where multiple network elements terminate. This event is thought to be the worst P2/P4 at Cedarvale station. |
| P5 | Failure of a non-redundant relay protecting one of the two 138 kV buses at AEP Pig Creek station. Results in remote tripping all 138 kV lines terminated at Pig Creek. | The only known P5 within the immediate study area. |
| P6 | All N-1-1 permutations of the following list of 138 kV circuits:<br>(1) Wink – All American Pipeline – Monument Draw – Fishhook<br>(2) Wink – Fishhook<br>(3) Cedarvale – Sand Lake #1<br>(4) Cedarvale – Sand Lake #2<br>(5) Wickett – Staghorn<br>(6) Flat Top - Foxtail | All listed lines are network feeds into the study area. Previous steady state studies show these lines to be loaded the heaviest when combinations of two other circuits in the list are out of service and the worst-case P6 conditions to consider. |

## 4.2 Stability Study Methodology

To identify any adverse impacts to study area voltage stability, power system swings, and system frequency overshoot, TNMP performed stability simulations of the events listed below in Table 4-2.

**Table 4-2: Events for Stability Simulations**

| Category | Fault Type | Event Description | Selection Rationale |
|----------|-----------|-------------------|---------------------|
| Redacted | | | |
| Redacted | | | |

The following output channels were monitored and assessed according to the stability planning criteria outlined in Section 5:

1. Rotor angles for all online synchronous machines within the ERCOT Interconnection.

2. Bus voltages for all TNMP far West Texas transmission buses.

3. Bus voltages for key far West Texas 345 kV stations.

4. Real power flows on the following 345 kV lines (for the P7.1 event only):

   a. Redacted

   b. Redacted

   c. Redacted

5. Frequency at the Comanche Peak 345 kV bus.

## 5    Applicable Planning Criteria

### 5.1  Steady State Planning Criteria

Steady state planning criteria applied in the analysis are listed below in Table 5-1.

**Table 5-1: Steady State Planning Criteria for 138 kV, 69 kV, and Facilities Operated at 66 kV**

| NERC or ERCOT Defined Event | Circuit Loading Limit | Bus Voltages (per-unit of nominal operating voltage) | | Non-Consequential Load Loss Allowed |
|---|---|---|---|---|
| | | **Min** | **Max** | |
| P0 | Rate A | 0.95 | 1.05 (138 and 69 kV) 1.1 (66 kV) | No |
| P1 | Rate B | 0.9 | 1.05 (138 and 69 kV) 1.1 (66 kV) | No |
| P2.1 | Rate B | 0.9 | 1.05 (138 and 69 kV) 1.1 (66 kV) | No |
| P2.3 | Rate B | 0.9 | 1.05 (138 and 69 kV) 1.1 (66 kV) | Yes |
| P3 | Rate B | 0.9 | 1.05 (138 and 69 kV) 1.1 (66 kV) | No |
| P4 | Rate B | 0.9 | 1.05 (138 and 69 kV) 1.1 (66 kV) | Yes |
| P5 | Rate B | 0.9 | 1.05 (138 and 69 kV) 1.1 (66 kV) | Yes |
| P6 | Rate B | 0.9 | 1.05 (138 and 69 kV) 1.1 (66 kV) | Yes |
| ERCOT-1[3] | Rate B | 0.9 | 1.05 (138 and 69 kV) 1.1 (66 kV) | No |
| P7.1 | Rate B | 0.9 | 1.05 (138 and 69 kV) 1.1 (66 kV) | No[4] |
| ERCOT PG4 | Rate B | 0.9 | 1.05 (138 and 69 kV) 1.1 (66 kV) | No |

### 5.2  Stability Planning Criteria

The following stability planning criteria were applied in the analysis:

1. Bus voltages should recover to at least 90% of pre-disturbance voltage within five (5) seconds after clearing the fault, or after inception of the event for the scenario where no fault occurs.

2. Post-disturbance frequency should remain below 60.4 Hz.

3. Power oscillations should decay with a minimum of 3% damping ratio.

## 6    Assumptions

1. All battery energy storage facilities within the study area are offline.

2. All proposed bitcoin end-user facilities will ramp at the schedules provided to TNMP.

---

[3] ERCOT-1 events are defined in Table 1 of Section 4 in the ERCOT Planning Guide.
[4] The NERC Category P7.1 event is equivalent to the ERCOT-1 event defined in Table 1 of Section 4 of the ERCOT Planning Guide, which does not allow for non-consequential load loss.

3.  Although the data center loads considered in this study will likely operate at a power factor somewhat better than 0.95 lagging, the conservative approach taken in this study assumes all new data center loads will operate at worst case 0.95 lagging power factor.

4.  Adequate resources within the ERCOT Interconnection will be available to meet data center ramp schedules as forecasted in Table 2-1.

5.  No other significantly large loads are planned within the Oncor or AEP transmission systems within the study area.

6.  Application of UVLS at bitcoin sites will utilize a trip delay of 30 seconds.

7.  Existing industrial motor loads within TNMP's West Texas transmission system have protection settings such that motor load trips on undervoltage conditions after the 30 second timeframe for UVLS protection, which is the most conservative assumption.

## 7   Study Results

### 7.1   Summary of Steady State Results

#### 7.1.1   Identified System Upgrades and Project Load Limits

The steady state results indicate a total of 480 MVAR static reactive support will be needed at the POD to maintain healthy transmission voltages in the study area.  The reactive support will need to be divided into multiple stages to provide for acceptable post-switching voltage differential.  Simulations indicate switching 120 MVAR at the POD with the Load Addition interconnected results in 1% post-switching voltage delta during peak load conditions and 1.19% post-contingency voltage delta for off-peak conditions.  Therefore, four blocks of 120 MVAR will suffice.

System improvement projects needed to serve the Load Addition and corresponding load limits are summarized below in Table 7-1. It is important to note the limits are based on a snapshot in time simulations and do not intend to provide any insight into the hourly performance of the proposed load and the congestion/curtailment risks therein.

Cedarvale Bitcoin System Impact Study, Redacted

**Table 7-1: Steady State Results Summary**

| Case | Load Limit (MW)* | Contingency Category | Required System Improvement |
|------|------------------|----------------------|------------------------------|
| 22SP | 170 | X-1, ERCOT-1 | Cut line D into Cholla station** |
| 22OP | 0 | X-1, ERCOT-1 | Oncor to build new Consavvy switching station with two 345-138 kV transformers. |
| 22OP | 173 | X-1, ERCOT-1 | Cut line D into Cholla station** |
| 22SP 23SP | 237 | X-1, ERCOT-1 | Upgrade Wink – All American – Monument Draw 138 kV line sections |
| 23SP | 397 | G-1, ERCOT-1 | Oncor to upgrade Wolf – Moss 138 kV line |
| 23SP 24SP 25SP | 397 | X-1, ERCOT-1 | 345 kV interconnection at Cedarvale (overload of remaining Sand Lake 345-138 kV transformer) |
| 23SP 24SP 25SP | 397 | X-1, ERCOT-1 | Stage 2 of the Delaware Basin Load Integration Study (Odessa 345-138 kV transformer #2 overload and other wide area constraints) |
| 25OP | 234*** | X-1, ERCOT-1 | Stage 2 of the Delaware Basin Load Integration Study (Odessa 345-138 kV transformer #2 overload and other wide area constraints) |

\* Total load at the site to be served from the planned transmission POD as well as from distribution level service.

\*\* The Wink – Bone Springs – Cedarvale 138 kV line sections are referred to as Line D.

\*\*\* The reason this limit is significantly higher than zero in the 2025 Off-Peak case (a zero limit was observed in the 2022 Off-Peak case as shown in this table) is believed to be the presence of Oncor's Consavvy 345-138 kV switching station that loops several 345 kV and 138 kV lines together in the Odessa area. The in-service date for this project is currently set at December 2022. See the RPG submittal "Oncor Consavvy 345/138 kV Switch Project" for detailed information.

### 7.1.2   P2/P4, P5, and P6 Event Results

Table 7-2 shows the most severe P2/P4, P5, and P6 system loading results. None of the simulated scenarios are expected to result in cascading outages.

**Table 7-2: Notable P2/P4, P5, and P6 System Loading Results**

| Category | Year | Contingency Description | Overloaded Element | Relay Loadability Limit (MVA) | Percent Loaded on Relay Loadability Limit |
|----------|------|--------------------------|---------------------|-------------------------------|--------------------------------------------|
| P6.1.1 | 22 | Cedarvale – Sand Lake 138 kV line #1 Cedarvale – Sand Lake 138 kV line #2 | Wink – AA Pipeline 138 kV | 952 | 33.1 |
| P6.1.1 | 22 | Cedarvale – Sand Lake 138 kV line #1 Cedarvale – Sand Lake 138 kV line #2 | Wink – Cholla 138 kV | 952 | 27.9 |
| P6.1.1 | 22 | Cedarvale – Sand Lake 138 kV line #1 Cedarvale – Sand Lake 138 kV line #2 | Cholla – Monument Draw 138 kV | 952 | 27.8 |
| P6.1.1 | 22 | Flat Top – Pig Creek 138 kV Cedarvale – Sand Lake 138 kV line #2 | Cedarvale – Sand Lake 138 kV line #1 | 952 | 65.1 |
| P6.1.1 | 22 | Flat Top – Pig Creek 138 kV Cedarvale – Sand Lake 138 kV line #1 | Cedarvale – Sand Lake 138 kV line #2 | 952 | 65.2 |
| P6.1.1 | 23 | Flat Top – Foxtail 138 kV Cedarvale – Sand Lake 138 kV line #2 | Cedarvale – Sand Lake 138 kV line #1 | 952 | 81.2 |

**Table 7-2: Notable P2/P4, P5, and P6 System Loading Results**

| Category | Year | Contingency Description | Overloaded Element | Relay Loadability Limit (MVA) | Percent Loaded on Relay Loadability Limit |
|----------|------|-------------------------|--------------------|-------------------------------|-------------------------------------------|
| P6.1.1 | 23 | Flat Top – Foxtail 138 kV Cedarvale – Sand Lake 138 kV line #1 | Cedarvale – Sand Lake 138 kV line #2 | 952 | 81.5 |

### 7.2 Steady State Results Discussion

_Local TNMP Area Thermal Loading Issues_

The Project contributes to post-contingency overload of the following 138 kV lines between Cedarvale and Wink stations:

1. Wink – All American – Monument Draw – Cholla

2. Cedarvale – Mi Vida

3. Mi Vida – Cholla

TNMP's plan to address these issues is to:

1. Cut the Wink – Bone Springs 138 kV line section into the Cholla station. Estimated in-service date of 12/1/22.

2. Upgrade the Wink – All American – Monument Draw – Cholla 138 kV line to 3000 Ampere. Estimated in-service date of 6/1/23.

3. Upgrade the Wink – Cholla section of the cut-in from item 2 above to 3000 Ampere. Estimated in-service date of 3/1/23.

In the interim before a system upgrade project is in place, the Project is subject to a limit as low as 170 MW in anticipation of the next X-1, ERCOT-1 contingency.

As the Total Load Addition ramps upward, the Project is the primary contributor to significant constraints associated with the interconnection between Oncor Sand Lake station and TNMP Cedarvale station. These constraints appear as P1.2/P2.1 overloads of the two Cedarvale – Sand Lake 138 kV lines and P1.3 overloads of the two Sand Lake 345-138 kV transformers as the Total Load Addition ramps higher. TNMP's plan to address these issues is to implement a 345 kV interconnection at the TNMP Cedarvale station. Two options for accomplishing this are:

1. Construct a double circuit 345 kV line from Oncor Sand Lake to a new 345 kV Cedarvale switchyard, or

2. For the future double circuit North McCamey – Sand Lake 345 kV component of the proposed Stage 2 upgrade identified in the Delaware Basin Load Integration study, cut both North McCamey – Sand Lake 345 kV lines into a new 345 kV Cedarvale switchyard.

With either of the above two options, TNMP's studies indicate two 345-138 kV transformers will be needed at Cedarvale to accommodate the full build out of the Total Load Addition. This is a major system upgrade that will require RPG review and endorsement. TNMP estimates the earliest this project can be

13

implemented is late 2024.  In the interim before a system upgrade project is in place, the Project is subject to a limit as low as 397 MW in anticipation of the next X-1, ERCOT-1 contingency.

*Local TNMP Area Voltage Issues*

To maintain P0 voltages at benchmark levels, simulations indicate a total of 480 MVAR reactive support will be needed at the POD in four stages of 120 MVAR.

*Wide Area Thermal Loading Issues*

The three 345-138 kV transformers at Oncor's Odessa switching station are post-contingency overloaded in the 2022 Off-Peak benchmark case, meaning the Project will be limited to zero in the Off-Peak scenarios (at night when local solar plants are unavailable) until the appropriate upgrade project is put in place to address the post-contingency overloads.  The specific contingencies that result in the overloads are X-1 loss of one Odessa 345-138 kV transformer followed by ERCOT-1 loss of Odessa – Moss 345 kV and Odessa – Wolf 345 kV.

This set of post-contingency overloads will apparently be resolved by Oncor's planned Consavvy 345-138 kV switching station project, currently projected to be in-service by December 2022.

Even with the Consavvy 345-138 kV switching station project, the Project imposes post-contingency overloads of 345-138 kV transformer #2 at Oncor's Odessa switching station and underlying 138 kV network as the Project ramps above 234 MW during the Off-Peak scenario when local solar plants are unavailable.  The specific contingencies that result in the overloads are X-1 loss of Odessa 345-138 kV transformer #1 or #3 followed by ERCOT-1 loss of Odessa – Moss 345 kV and Odessa – Wolf 345 kV.

This set of constraints are remedied by the Stage 2 Upgrade identified from the Delaware Basin Load Integration study, currently slated for an in-service date of June 2026.

Post-contingency overload of Oncor's Wolf – Moss 138 kV line is expected during peak loading conditions as the Project ramps above 397 MW toward the end of summer 2023.  This constraint will be resolved after Oncor rebuilds the Wolf – Moss 138 kV line, currently slated to be completed in December 2023.

Lastly, the Project imposes post-contingency overloads of 345-138 kV transformer #2 at Oncor's Odessa switching station and underlying 138 kV network as the Project ramps above 397 MW during peak loading conditions.  The specific contingencies that result in the overloads are X-1 loss of Odessa 345-138 kV transformer #1 or #3 followed by ERCOT-1 loss of Odessa – Moss 345 kV and Odessa – Wolf 345 kV.

This set of constraints are remedied by the Stage 2 Upgrade identified from the Delaware Basin Load Integration study, currently slated for an in-service date of June 2026.

### 7.3  Stability Results Summary

The following stability simulation plots are provided in the appendices of this report:

1. Appendix A – Rotor angle, bus voltage, and frequency response for Redacted.  2024 summer peak case.

2. Appendix B – Rotor angle, bus voltage, real power swings across Redacted, and frequency response for Redacted.  2024 summer peak case.

3. Appendix C – Rotor angle, bus voltage, and frequency response for **Redacted**.  2025 high wind/low load case.

4. Appendix D – Rotor angle, bus voltage, real power swings across **Redacted**, and frequency response for **Redacted**.  2025 high wind/low load case.

### 7.4  Stability Results Discussion

None of the stability simulations indicate any system performance issues with the Project operating at a load level of 397 MW (Total Load Addition operating at 1318 MW) in the 2024 summer peak case nor with the Project operating at a load level of 234 MW (Total Load Addition set at 1023 MW) in the 2025 HWLL case.  Key takeaways are:

1. No angular stability issues were observed.

2. The simulations indicate introduction of large load data centers within the study area significantly worsen system low voltages that occur post-fault due to stalling of native industrial motors and will require installation of UVLS at the POD of each large load data center.

3. Due to the large amount of static reactive support required at the Project POD and at the other eight large load data center PODs included in this study, over-voltages within the study area can occur during load rejection scenarios depending on the magnitude of load loss.  The magnitude of the load loss is a function of the transmission voltages during a system event and the timing of tripping native industrial motor load during undervoltage/stalled motor conditions versus timing of UVLS tripping of large data center loads during those events.

   The simulations conducted in this study indicate a more favorable scenario, at least at the load levels simulated in this study, is when native industrial motor load trips faster than the 35 cycle timeframe TNMP would need to use for UVLS tripping of large data center loads (30 cycle delay plus 3 to 5 cycle breaker time).  In this scenario, the simulations indicate fast tripping of stalled motors corrects transmission voltages enough to preclude UVLS tripping of some or all large data center loads.

   On the other hand, the simulations indicate the worst-case scenario for maximum load loss would be where large data center loads trip offline via UVLS before or concurrently with motor protection significantly removing stalled motors from the system.  The simulations show these over-voltages can get very high.  Nonetheless, the simulations indicate these over-voltages can be mitigated in an automatic manner with over-voltage tripping of the static reactive support.  This is demonstrated in the voltage plots provided in Appendices A and C.

4. There are no voltage stability or real power oscillation issues involved with **Redacted**, which is thought to be the worst case P7 contingency within the study area.

5. There are no expected frequency response issues associated with load rejection.  Frequency remains well within the 60.4 Hz criteria utilized within the ERCOT Interconnection with loss up to 397 MW during summer peak and loss up to 234 MW during off-peak at the Project site.

6. It will be necessary to conduct similar stability simulations at higher aggregate data center load levels, ultimately at the Total Load Addition, as TNMP and other TSPs develop system upgrade projects that allow for operation at load levels beyond the limits identified in this study.

# 8   Conclusions

The steady state results indicate a total of 480 MVAR static reactive support, in four blocks of 120 MVAR, will be needed at the POD to maintain healthy transmission voltages.

The steady state results indicate numerous transmission system upgrades are needed to accommodate the Total Load Addition.  Corresponding load limits have been identified as part of the study process.  It is important to note the limits presented in this study are based on a snapshot in time simulations and do not intend to provide any insight into the hourly performance of the proposed load and the congestion/curtailment risks therein.

System improvements needed within TNMP's transmission system to accommodate the Total Load Addition, estimated timing of those projects, and associated most constraining Project load limit are summarized below in Table 8-1.

**Table 8-1: TNMP System Improvements Identified**

| System Improvement | Estimated Timing | Project Load Limit (MW) | Day/Night Constraint |
|---|---|---|---|
| Cut Wink – Bone Springs 138 kV line into Cholla station | 12/1/22 | 170 | Day |
| Oncor to build new Consavvy switching station with two 345-138 kV transformers. | Dec 2022 | 0 | Night |
| Cut Wink – Bone Springs 138 kV line into Cholla station | 12/1/22 | 173 | Night |
| Upgrade Wink – All American – Monument Draw – Cholla 138 kV line to 3000 Ampere | 6/1/23 | 237 | Both |
| Oncor to upgrade Wolf – Moss 138 kV line | Dec 2023 | 397 | Day |
| 345 kV interconnection at Cedarvale | Mid 2025 | 397 | Both |
| Bearkat – North McCamey – Cedarvale/Sand Lake 345 kV double circuit line | Jun 2026 | 397 | Day |
| Bearkat – North McCamey – Cedarvale/Sand Lake 345 kV double circuit line | Jun 2026 | 234 | Night |

TNMP performed stability simulations of (1) load reject scenario involving the Project load and (2) the critical most contingency identified from previous steady state analyses to result in post-contingency voltage collapse within the far West Texas system at higher load levels than were simulated in this study. The stability simulations were performed for the peak and off-peak scenarios with all minor system upgrades but none of the RPG level system upgrades identified from the steady state analysis.  The Project load was set at 397 MW (Total Load Addition operating at 1318 MW) in the 2024 summer peak case and at a load level of 234 MW (Total Load Addition set at 1023 MW) in the 2025 HWLL case. UVLS was simulated at each of the four PODs serving the proposed end-user facilities.  Conclusions from the stability analysis are as follows:

1. No angular stability issues were observed.

2. The simulations indicate introduction of large load data centers within the study area significantly worsen system low voltages that occur post-fault due to stalling of native industrial motors and will require installation of UVLS at the POD of each large load data center.

3. Significant over-voltages can occur depending on the timing of tripping stalled motors at the various industrial load sites within TNMP's West Texas systems during undervoltage conditions versus the timing of UVLS tripping for large data center loads.  However, the simulations indicate these over-voltages can be rapidly mitigated through the use of over-voltage tripping of capacitor banks specified for installation at the various PODs for large data center loads.

4.  There are no voltage stability or real power oscillation issues involved with **Redacted**, which is thought to be the worst case P7 contingency within the study area.

5.  There are no expected frequency response issues associated with load rejection.  Frequency remains well within the 60.4 Hz criteria utilized within the ERCOT Interconnection with loss up to 397 MW during summer peak and loss up to 234 MW during off-peak at the Project site.

6.  It will be necessary to conduct similar stability simulations at higher aggregate data center load levels, ultimately at the Total Load Addition, as TNMP and other TSPs develop system upgrade projects that allow for operation at load levels beyond the limits identified in this study.

## 9 Appendix A – Stability Plots, *Redacted*

**Plot redacted**

Cedarvale Bitcoin System Impact Study, Redacted

**Plot redacted**

Cedarvale Bitcoin System Impact Study, Redacted

**Plot redacted**

## 10  Appendix B – Stability Plots, *Redacted*

**Plot redacted**

Cedarvale Bitcoin System Impact Study, Redacted

**Plot redacted**

**Plot redacted**

Cedarvale Bitcoin System Impact Study, Redacted

**Plot redacted**

## 11  Appendix C – Stability Plots, Redacted

**Plot redacted**

**Plot redacted**

**Plot redacted**

## 12 Appendix D – Stability Plots, *Redacted*

**Plot redacted**

Cedarvale Bitcoin System Impact Study, Redacted

**Plot redacted**

Cedarvale Bitcoin System Impact Study, Redacted

**Plot redacted**

Cedarvale Bitcoin System Impact Study, Redacted

**Plot redacted**

| | |
|---|---|
| **From:** | Gerety, Christopher |
| **To:** | Tyler Randolph; Carol Haines |
| **Cc:** | John Bick; Roberts, Vincent; Hitchcock, Nicole |
| **Subject:** | Re: [External] Re: Core Updated Ramp Schedule for ERCOT - cap banks? |
| **Date:** | Monday, September 26, 2022 5:35:30 PM |
| **Attachments:** | image001.png |

The first cap bank is ready and is being prepared to be switched in this evening.

Vincent is following up with ercot ontheir study review. Seems like everyone was tied up in the LFLTF meeting today so it may be tomorrow before we get their latest feedback.

Chris Gerety
505-280-3310

---

**From:** Gerety, Christopher
**Sent:** Monday, September 26, 2022 4:11:26 PM
**To:** Tyler Randolph <trandolph@prioritypower.com>; Carol Haines <chaines@corescientific.com>
**Cc:** John Bick <jbick@prioritypower.com>; Roberts, Vincent <Vincent.Roberts@tnmp.com>; Hitchcock, Nicole <Nicole.Hitchcock@tnmp.com>
**Subject:** RE: [External] Re: Core Updated Ramp Schedule for ERCOT - cap banks?

Nicole is out of pocket this week. I will check and let you know.

---

**From:** Tyler Randolph <trandolph@prioritypower.com>
**Sent:** Monday, September 26, 2022 4:09 PM
**To:** Gerety, Christopher <Christopher.Gerety@tnmp.com>; Carol Haines <chaines@corescientific.com>
**Cc:** John Bick <jbick@prioritypower.com>; Roberts, Vincent <Vincent.Roberts@tnmp.com>; Hitchcock, Nicole <Nicole.Hitchcock@tnmp.com>
**Subject:** Re: [External] Re: Core Updated Ramp Schedule for ERCOT - cap banks?

All,  Nicole indicated Friday that cap & breaker 1 would be complete today. Did that occur? Needing an update for Core. Thanks all!

Tyler Randolph
Priority Power Management
Sr. Director, Business Development | Power Consultant
8000 Fair Oaks Pkwy, STE 201 | Boerne, TX 78015
C: 214.957.7032

---

**From:** Gerety, Christopher <Christopher.Gerety@tnmp.com>
**Sent:** Wednesday, September 21, 2022 11:47:02 AM
**To:** Carol Haines <chaines@corescientific.com>; Tyler Randolph <trandolph@prioritypower.com>
**Cc:** John Bick <jbick@prioritypower.com>; Roberts, Vincent <Vincent.Roberts@tnmp.com>; Hitchcock, Nicole <Nicole.Hitchcock@tnmp.com>
**Subject:** RE: [External] Re: Core Updated Ramp Schedule for ERCOT - cap banks?

[EXTERNAL ORIGIN – do not open attachments or links until sender and content are confirmed safe]

Latest and greatest from the field is 9/30 to energize the first bank.

I need to follow up on the ERCOT review status from our submission last week.

Will let you know as soon as I have those details.

Thanks
Chris
505-280-3310

---

**From:** Carol Haines <chaines@corescientific.com>
**Sent:** Wednesday, September 21, 2022 11:44 AM
**To:** Gerety, Christopher <Christopher.Gerety@tnmp.com>; Tyler Randolph
<trandolph@prioritypower.com>
**Cc:** John Bick <jbick@prioritypower.com>; Roberts, Vincent <Vincent.Roberts@tnmp.com>;
Hitchcock, Nicole <Nicole.Hitchcock@tnmp.com>
**Subject:** RE: [External] Re: Core Updated Ramp Schedule for ERCOT - cap banks?
**Importance:** High

Hi Chris,

Just checking in to see if you can provide an update on the installation of the capacitor banks.  Any
update you can provide would be greatly appreciated.

Thanks,



**CAROL HAINES**

SVP POWER & SUSTAINABILITY
**Core Scientific**
chaines@corescientific.com
**440.532.0057**

---

**From:** Gerety, Christopher <Christopher.Gerety@tnmp.com>
**Sent:** Thursday, September 15, 2022 5:59 PM
**To:** Tyler Randolph <trandolph@prioritypower.com>; Carol Haines <chaines@corescientific.com>
**Cc:** John Bick <jbick@prioritypower.com>; Roberts, Vincent <Vincent.Roberts@tnmp.com>;
Hitchcock, Nicole <Nicole.Hitchcock@tnmp.com>
**Subject:** Re: [External] Re: Core Updated Ramp Schedule for ERCOT - cap banks?

All, we have just now provided the answers to the two questions we believe will allow ercot to
provide approval. I will let you know when we get their response and what it is.

As far as the field side, 9/30 is still a good date to energize the first capacitor bank

Thank you

Chris Gerety
505-280-3310

---

**From:** Gerety, Christopher <Christopher.Gerety@tnmp.com>
**Sent:** Wednesday, September 14, 2022 5:08:23 PM
**To:** Tyler Randolph <trandolph@prioritypower.com>; Carol Haines <chaines@corescientific.com>
**Cc:** John Bick <jbick@prioritypower.com>; Roberts, Vincent <Vincent.Roberts@tnmp.com>; Hitchcock, Nicole <Nicole.Hitchcock@tnmp.com>
**Subject:** Re: [External] Re: Core Updated Ramp Schedule for ERCOT - cap banks?

Negative. We met with ercot this afternoon to clarify a few details and we are still analyzing based on their feedback. As soon as I have a sense of timing, I will let you know.

Chris Gerety
505-280-3310

---

**From:** Tyler Randolph <trandolph@prioritypower.com>
**Sent:** Wednesday, September 14, 2022 5:03:42 PM
**To:** Gerety, Christopher <Christopher.Gerety@tnmp.com>; Carol Haines <chaines@corescientific.com>
**Cc:** John Bick <jbick@prioritypower.com>; Roberts, Vincent <Vincent.Roberts@tnmp.com>; Hitchcock, Nicole <Nicole.Hitchcock@tnmp.com>
**Subject:** RE: [External] Re: Core Updated Ramp Schedule for ERCOT - cap banks?

Chris,

Checking to see if this went out the door?

Thank you,

***Your Trusted Energy Advisor***

**Tyler W. Randolph**
**Sr. Director, Business Development | Power Consultant**



**8000 Fair Oaks Pkwy, STE 201 | Boerne, TX 78015**
**C: 214.957.7032**

trandolph@prioritypower.net
www.prioritypower.net

**From:** Gerety, Christopher <Christopher.Gerety@tnmp.com>
**Sent:** Wednesday, September 14, 2022 10:39 AM
**To:** Tyler Randolph <trandolph@prioritypower.net>; Carol Haines <chaines@corescientific.com>
**Cc:** John Bick <jbick@prioritypower.com>; Roberts, Vincent <Vincent.Roberts@tnmp.com>;
Hitchcock, Nicole <Nicole.Hitchcock@tnmp.com>
**Subject:** RE: [External] Re: Core Updated Ramp Schedule for ERCOT - cap banks?

[EXTERNAL ORIGIN – do not open attachments or links until sender and content are confirmed safe]

We were not.

The remaining issue is Ercot's reluctance to TSPs using Under Voltage Load Shedding (UVLS) for large
load customers to solve voltage collapse upon contingency like we would with all other loads across
the system.

Because they wont allow the use of UVLS for the time being, we are having to re-run load limits to
ensure we can solve contingencies without the use of UVLS which has become tedious.

We are pushing to wrap up that analysis today and get the supporting documentation over to ERCOT
so they can finalize their review.

**From:** Tyler Randolph <trandolph@prioritypower.com>
**Sent:** Wednesday, September 14, 2022 10:23 AM
**To:** Gerety, Christopher <Christopher.Gerety@tnmp.com>; Carol Haines
<chaines@corescientific.com>
**Cc:** John Bick <jbick@prioritypower.com>; Roberts, Vincent <Vincent.Roberts@tnmp.com>;
Hitchcock, Nicole <Nicole.Hitchcock@tnmp.com>
**Subject:** RE: [External] Re: Core Updated Ramp Schedule for ERCOT - cap banks?

Chris,

Were you bale to get final answers to ERCOT by COB yesterday?

Thank you**,**

*Your Trusted Energy Advisor*

**Tyler W. Randolph**
**Sr. Director, Business Development | Power Consultant**

**8000 Fair Oaks Pkwy, STE 201 | Boerne, TX 78015**
**C: 214.957.7032**
**trandolph@prioritypower.net**
**www.prioritypower.net**

---

**From:** Gerety, Christopher <Christopher.Gerety@tnmp.com>
**Sent:** Tuesday, September 13, 2022 3:55 PM
**To:** Carol Haines <chaines@corescientific.com>
**Cc:** John Bick <jbick@prioritypower.com>; Tyler Randolph <trandolph@prioritypower.com>;
Roberts, Vincent <Vincent.Roberts@tnmp.com>; Hitchcock, Nicole <Nicole.Hitchcock@tnmp.com>
**Subject:** RE: [External] Re: Core Updated Ramp Schedule for ERCOT - cap banks?

[EXTERNAL ORIGIN – do not open attachments or links until sender and content are confirmed safe]

As of today, we are still targeting 9/30 for the first bank. We are also pushing to get the final answers to Ercot's planning study questions back by COB today.

I will keep pushing to get information out of the field and over to you both as soon as it is sent to me.

Thanks
Chris

---

**From:** Carol Haines <chaines@corescientific.com>
**Sent:** Tuesday, September 13, 2022 3:52 PM
**To:** Gerety, Christopher <Christopher.Gerety@tnmp.com>
**Cc:** John Bick <jbick@prioritypower.com>
**Subject:** [External] Re: Core Updated Ramp Schedule for ERCOT - cap banks?

***************************************************************
********************************
**CAUTION:** This email was received from an **EXTERNAL** source, use caution when clicking links or opening attachments.
If you believe this to be a malicious and/or phishing email, please use the **Report Phishing** button.
***************************************************************
********************************

***************************************************************
********************************
**Is this a phishing email? - Look again!**
This email is from chaines@corescientific.com - do you know them?

```
***************************************************************************
                    *******************************
```

Chris

As a follow up to Tyler's email below I also want to check in on the status of the cap bank project. Just looking for a status update. Are you still on track for the first cap bank to be complete by 9/19?

Thanks
Carol

> On Sep 13, 2022, at 1:26 PM, Tyler Randolph <trandolph@prioritypower.com> wrote:

[EXTERNAL] Use caution when opening attachments or links.

Chris,

ERCOT indicated that they are waiting on TNMP to update the ramp schedule in Section 8.1 of the studies that were submitted for Core so that they can approve capacity. Can you please send them that today? If not today, when can you commit to having this over to them as it seems to be a pretty straight forward ask per Bill Belvins.

We are at the cusp of capacity approvals, and are begging for TNMP's support in getting them the info they need to finalize. Thank you in advance.

Thank you,

*Your Trusted Energy Advisor*

**Tyler W. Randolph**
**Sr. Director, Business Development | Power Consultant**



**8000 Fair Oaks Pkwy, STE 201 | Boerne, TX 78015**
**C: 214.957.7032**
**trandolph@prioritypower.net**
**www.prioritypower.net**

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email noted above and destroy the original message.

**To:** Patrick Holert[patrick.holert@celsius.network]; Amir Ayalon[amir.ayalon@celsius.network]
**From:** Jeff Pratt[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=ED5A49A19241BD5B569D2DE6089BDFB-JPRATT]
**Sent:** Tue 5/24/2022 9:43:52 AM (UTC-05:00)
**Subject:** RE: Meeting

Our new capacity planner is finishing his major update today.  I can send a schedule tonight, PST time and then we can talk it through tomorrow?

---

**From:** Patrick Holert <patrick.holert@celsius.network>
**Sent:** Tuesday, May 24, 2022 6:24 AM
**To:** Amir Ayalon <amir.ayalon@celsius.network>
**Cc:** Jeff Pratt <jpratt@corescientific.com>
**Subject:** Re: Meeting

[EXTERNAL] Use caution when opening attachments or links.

Hi Jeff:

Would it be possible to have a quick chat now about deployment schedules, and then a longer meeting tomorrow at 9:30AM EST to discuss deployment and payments?

Thanks, Patrick

On Tue, May 24, 2022 at 9:22 AM Amir Ayalon <amir.ayalon@celsius.network> wrote:
 Works for me.
 Jeff if possible 930am et or afternoon
 Thank you

On Tue, 24 May 2022 at 9:19 Jeff Pratt <jpratt@corescientific.com> wrote:
 Patrick,

I was out yesterday with my son.  I need to catch up.  Any chance we can meet early Wednesday instead of today?

Jeff
The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email noted above and destroy the original message.
--
_____
Amir Ayalon
Celsius Mining-CEO
+972-54-7470099 (Global)
1-929-6082821(US)


Inline image


--



**Patrick Holert, CFA, CAIA, ERP**
Mining | Celsius

Reminder: Be aware of phishing sites and always make sure you are visiting the official https://celsius.network website and app. Celsius will never ask you for confidential information such as passwords, private keys, seed phrases, or secret codes. You should store this information privately and securely and report any suspicious activity.

©2022 Celsius Network

121 River Street,  Ste PH05
Hoboken, NJ 07030 USA
Registered as a Money Services Business (MSB) number 31000192265811 with the US Financial Crimes Enforcement Network (FinCEN).

Celsius is not a bank, depository institution, custodian or fiduciary and the assets in your Celsius account are not insured by any private or governmental insurance plan (including FDIC or SIPC), nor are they covered by any compensation scheme (including FSCS).

Holding, trading or using crypto assets carry significant risks, please carefully read our Risk Disclosure page. Celsius does not provide any financial, legal or tax advice, nor should this email be viewed as an offer or inducement to make any financial decision.

**To:** Amir Ayalon[amir.ayalon@celsius.network]; Patrick Holert[patrick.holert@celsius.network]
**Cc:** Mike Levitt[mlevitt@corescientific.com]; Russell Cann[rcann@corescientific.com]
**Sent:** Wed 8/10/2022 10:58:01 AM (UTC-05:00)
**Subject:** RE: Rig Deployment

Amir & Patrick,

Do you have time for a 30 min call with Russell and I today or tomorrow:

- 8/10 timeslots are  11:30am to 1:30pm Pacific
- 8/11 timeslots are  9:00am to 11:30 Pacific

**From:** amir.ayalon@celsius.network <amir.ayalon@celsius.network>
**Sent:** Monday, August 8, 2022 12:26 PM
**To:** Mike Levitt <mlevitt@corescientific.com>; Jeff Pratt <jpratt@corescientific.com>
**Cc:** amir.ayalon@celsius.network; 'Patrick Holert' <patrick.holert@celsius.network>
**Subject:** Rig Deployment

> [EXTERNAL] Use caution when opening attachments or links.

Gents,

Can we have a quick call to update on deployment schedule for contract 10.
I'm struggling to get some clarity on deployment this month and next.

Regards,
----------------------
Amir Ayalon
CEO, Celsius Mining
+972-54-7470099
----------------------



Reminder: Be aware of phishing sites and always make sure you are visiting the official https://celsius.network website and app. Celsius will never ask you for confidential information such as passwords, private keys, seed phrases, or secret codes. You should store this information privately and securely and report any suspicious activity.

©2022 Celsius Network

121 River Street,  Ste PH05
Hoboken, NJ 07030 USA
Registered as a Money Services Business (MSB) number 31000192265811 with the US Financial Crimes Enforcement Network (FinCEN).

Celsius is not a bank, depository institution, custodian or fiduciary and the assets in your Celsius account are not insured by any private or governmental insurance plan (including FDIC or SIPC), nor are they covered by any compensation scheme (including FSCS).

Holding, trading or using crypto assets carry significant risks, please carefully read our Risk Disclosure page. Celsius does not provide any financial, legal or tax advice, nor should this email be viewed as an offer or inducement to make any financial decision.



## Celsius/Core Scientific
## Weekly meeting

https://us02web.zoom.us/j/84414138888?
pwd=RC9sS05YTWhKM2YvQnhEOEtYSE1CQT09

📹 Zoom                    Join    ↑

Friday, Aug 5, 2022
from 2:30 PM to 3 PM

| 2 PM | NFN8 Bi-Weekly Follow Up ☐ Zoom |
| 3 PM | Celsius/Core Scientific Weekly meeting ☐ Zoom |
| 4 PM | |

Calendar                    • Calendar

Invitation from
**Mitch**                    ›

### Invitees                    6 ›

✓ Patrick Holert            ⊘ jenny.fan@celsius.network
✓ david.albert@celsius.net…    ⊘ quinn.lawlor@celsius.net…
✓ Moses Marure Jr. (option…    ⊘ Jacob Young (optional)

**Accept**        Maybe        Decline



# FUTURES SALES AND PURCHASE AGREEMENT

## BETWEEN

## Bitmain Technologies Limited
## ("Bitmain")

## AND

## Core Scientific, Inc.
## ("Purchaser")

1.    Definitions and Interpretations .................................................................... 3

2.    Sales of Product(s) ...................................................................................... 5

3.    Prices and Terms of Payment ...................................................................... 6

4.    Discount ....................................................................................................... 7

5.    Shipping of Product(s) ................................................................................. 7

6.    Customs ....................................................................................................... 9

7.    Warranty ...................................................................................................... 9

8.    Representations and Warranties ................................................................. 11

9.    Indemnification and Limitation of Liability ............................................. 12

10.   Distribution ............................................................................................... 13

11.   Intellectual Property Rights ...................................................................... 13

12.   Confidentiality and Communications ....................................................... 14

13.   Term of this Agreement ............................................................................ 14

14.   Contact Information ................................................................................... 14

15.   Compliance with Laws and Regulations ................................................... 16

16.   Force Majeure ........................................................................................... 17

17.   Entire Agreement and Amendment ........................................................... 17

18.   Assignment ................................................................................................ 18

19.   Severability ............................................................................................... 18

20.   Personal Data ............................................................................................ 18

21.   Conflict with the Terms and Conditions ................................................... 18

22.   Governing Law and Dispute Resolution ................................................... 19

23.   Waiver ....................................................................................................... 19

24.   Counterparts and Electronic Signatures ................................................... 19

25.   Further Assurance ..................................................................................... 19

26.   Third Party Rights ..................................................................................... 19

27.   Liquidated Damages Not Penalty ............................................................. 19

This futures sale and purchase agreement (this "Agreement") is made on March 17, 2021 by and between Bitmain Technologies Limited ("Bitmain") (Company number: 2024301), with its registered office at Unit A1 of Unit A, 11th Floor, Success Commercial Building, 245-251 Hennessy Road, Hong Kong, and Core Scientific, Inc. (the "Purchaser"), with its principal place of business at 2800 Northup Way, Bellevue, WA 98004, the US.

Bitmain and the Purchaser shall hereinafter collectively be referred to as the "Parties", and individually as a "Party".

Whereas:

1. Purchaser fully understands the market risks, the price-setting principles and the market fluctuations relating to the Products sold under this Agreement.
2. Purchaser has purchased Products through the website of Bitmain (i.e., https://shop.bitmain.com/, similarly hereinafter) for many times, and is familiar with the purchase order processes of Bitmain's website.
3. Based on the above consensus, the Purchaser is willing to purchase and Bitmain is willing to supply cryptocurrency mining hardware and other equipment in accordance with the terms and conditions of this Agreement.

The Parties hereto agree as follows:

## 1. Definitions and Interpretations

The following terms, as used herein, have the following meanings:

"Affiliate" means, with respect to any Person, any other Person directly or indirectly Controlling, Controlled by, or under common Control with such Person; "Person" means any individual, corporation, partnership, limited partnership, proprietorship, association, limited liability company, firm, trust, estate or other enterprise or entity (whether or not having separate legal personality); and "Control" means the power or authority, whether exercised or not, to direct the business, management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, provided that such power or authority shall conclusively be presumed to exist upon possession of beneficial ownership or power to direct the vote of more than fifty percent (50%) of the votes entitled to be cast at a meeting of the members or shareholders of such Person or power to control the composition of a majority of the board of directors of such Person. The terms "Controlled" and "Controlling" have meanings correlative to the foregoing.

"Applicable Law" means any treaty, law, decree, order, regulation, decision, statute, ordinance, rule, directive, code or other document that has legal force under any system of law, including, without limitation, local law, law of any other state or part thereof or international law, and which creates or purports to create any requirement or rule that may

affect, restrict, prohibit or expressly allow the terms of this Agreement or any activity contemplated or carried out under this Agreement.

"Bank Account" means the bank account information of Bitmain provided in Appendix A of this Agreement.

"Force Majeure" means in respect of either Party, any event or occurrence whatsoever beyond the reasonable control of that Party, which delays, prevents or hinders that Party from performing any obligation imposed upon that Party under this Agreement, including to the extent such event or occurrence shall delay, prevent or hinder such Party from performing such obligation, war (declared or undeclared), terrorist activities, acts of sabotage, blockade, fire, lightning, acts of god, national strikes, riots, insurrections, civil commotions, quarantine restrictions, epidemics, earthquakes, landslides, avalanches, floods, hurricanes, explosions and regulatory and administrative or similar action or delays to take actions of any governmental authority.

"Insolvency Event" in the context of the Purchaser means any of the following events:
i) a receiver, receiver and manager, judicial manager, official manager, trustee, administrator or similar official is appointed, or steps are taken for such appointment, over all or any part of the assets, equipment or undertaking of the Purchaser;
ii) if the Purchaser stops or suspends payments to its creditors generally, is unable to or admits its inability to pay its debts as they fall due, seeks to enter into any composition or other arrangement with its creditors, is declared or becomes bankrupt or insolvent or enters into liquidation;
iii) a petition is presented, a proceeding is commenced, an order is made or an effective resolution is passed or any other steps are taken by any person for the liquidation, winding up, insolvency, judicial management, administration, reorganisation, reconstruction, dissolution or bankruptcy of the Purchaser, otherwise than for the purpose of a bona fide scheme of solvent amalgamation or reconstruction; or
iv) if any event, process or circumstance analogous or having a substantially similar effect to any of the above, in any applicable jurisdiction, commences or exists.

"Intellectual Property Rights" means any and all intellectual property rights, including but not limited to those concerning inventions, patents, utility models, registered designs and models, engineering or production materials, drawings, trademarks, service marks, domain names, applications for any of the foregoing (and the rights to apply for any of the foregoing), proprietary or business sensitive information and/or technical know-how, copyright, authorship, whether registered or not, and any neighbor rights.

"Order" means the Purchaser's request to Bitmain for certain Product(s) in accordance with this Agreement.

"Product(s)" means the merchandise that Bitmain will provide to the Purchaser in accordance with this Agreement.

"Total Purchase Price" means the aggregate amount payable by the Purchaser as set out in Appendix A of this Agreement.

"Warranty Period" means the period of time that the Product(s) are covered by the warranty granted by Bitmain or its Affiliates in accordance with Clause 6 of this Agreement.

"Warranty Start Date" means the date on which the Product(s) are delivered to the carrier.

Interpretations:
i) Words importing the singular include the plural and vice versa where the context so requires.
ii) The headings in this Agreement are for convenience only and shall not be taken into consideration in the interpretation or construction of this Agreement.
iii) References to Clauses and Appendix(es) are references to Clauses and Appendix(es) of this Agreement.
iv) Unless specifically stated otherwise, all references to days shall mean calendar days.
v) Any reference to a code, law, statute, statutory provision, statutory instrument, order, regulation or other instrument of similar effect shall include any re-enactment or amendment thereof for the time being in force.

## 2. Sales of Product(s)

Bitmain will provide the Product(s) set forth in Appendix A (attached hereto as part of this Agreement) to the Purchaser in accordance with provisions of Clause 2, Clause 3, Clause 4, Clause 5 and Appendix A of this Agreement, and the Purchaser shall make payment in accordance with the terms specified in this Agreement.

2.1. Both Parties agree that the Product(s) shall be sold in accordance with the following steps:
   (i) The Purchaser shall place Order through Bitmain's website or through other methods accepted by Bitmain, and such Order shall constitute an irrevocable offer to purchase specific Product(s) from Bitmain.
   (ii) After receiving the Order, Bitmain will send an order receipt confirmation email to the Purchaser. The Purchaser's Order will be valid for a period of twenty-four (24) hours after its placement, and upon expiration of such period, Bitmain will have the right to cancel the Order at its sole discretion if the Purchaser fails to pay the down payment in accordance with Appendix A of this Agreement.
   (iii) The Purchaser shall pay the Total Purchase Price in accordance with Appendix A of this Agreement.
   (iv) Upon receipt of the Total Purchase Price, Bitmain will provide a payment receipt to the Purchaser.
   (v) Bitmain will send a shipping confirmation to the Purchaser after it has delivered the Product(s) to the carrier.

2.2. Both Parties acknowledge and agree that the order receipt confirmation and the payment receipt shall not constitute nor be construed as Bitmain's acceptance of the Purchaser's Order, but mere acknowledgement of the receipt of the Order and the Total Purchase Price.

2.3. Both Parties acknowledge and agree that in case of product unavailability, Bitmain shall have the right to cancel the Order after it has issued the order receipt confirmation, the payment receipt or the shipping confirmation without any penalty or liability.

2.4. The Purchaser acknowledges and confirms that the Order is irrevocable and cannot be cancelled by the Purchaser, and that the Product(s) ordered are neither returnable nor refundable. All sums paid by the Purchaser to Bitmain shall not be subject to any abatement, set-off, claim, counterclaim, adjustment, reduction, or defense for any reason. Down payment and payment of Total Purchase Price are not refundable, save as otherwise mutually agreed by the Parties.

## 3. Prices and Terms of Payment

3.1 The Total Purchase Price (inclusive of any tax payable) shall be paid in accordance with the payment schedule set forth in Appendix B of this Agreement.

3.2 In the event that the Purchaser fails to fully settle the respective percentage of the Total Purchase Price before the prescribed deadlines and fails to make a written request to Bitmain no less than 5 business days prior to the prescribed deadline and obtain Bitmain's written consent, Bitmain shall be entitled to terminate this Agreement and the Purchase shall be liable for a reasonable liquidated damage (not a penalty) of 20% of the purchase price of such batch of Products. If there are any remaining balance after deducting the liquidated damage, such remaining balance shall be refunded to the Purchase free of any interest. If the Purchaser fails to pay the down payment on a timely basis and Bitmain has arranged production or procurement, Bitmain shall be entitled to request the Purchaser to be responsible for the loss related to such production or procurement.

3.3 The Parties understand and agree that the applicable prices of the Product(s) are inclusive of applicable bank transaction fee, but are exclusive of any and all applicable import duties, taxes and governmental charges. The Purchaser shall pay or reimburse Bitmain for all taxes levied on or assessed against the amounts payable hereunder. If any payment is subject to withholding, the Purchaser shall pay such additional amounts as necessary, to ensure that Bitmain receives the full amount it would have received had payment not been subject to such withholding.

### 4. Discount

4.1. Discount amount**.**

4.1.1. The Products under this Agreement consists of 12 batches and the discount amount of each batch shall be calculated separately.

4.1.2. Bitmain may provide different discounts to the Purchaser based on the actual amount of the prepayment and the payment time.

Discount Amount = Amount of prepayment *1%*Number of months prepaid. The amount of prepayment shall be calculated at the end of each month. The number of months prepaid shall be calculated from the month of payment without counting the month of delivery. The prepayment date shall be the date as evidenced in the remittance copy of such payment. Discount amount shall be calculated when the respective amounts have been received by Bitmain in full according to the agreed payment schedule. Different clients may have different payment schedules. No discount amount shall be calculated on the remaining amount.

4.1.3. If the Purchaser fails to make the payments on time, the discount applicable to such batch shall be cancelled.

4.2. Application of discount amount.

The discount amount shall be applied in terms of the delivery of more rated hashrate, which shall be calculated with reference to the price/T of such batch of Products.

### 5. Shipping of Product(s)

5.1. Bitmain shall deliver the Products in accordance with the shipping schedule to the first carrier or the carrier designated by the Purchaser.

5.2. Subject to the limitations stated in Appendix A, the terms of delivery of the Product(s) shall be CIP (carriage and insurance paid to (named place of destination) according to Incoterms 2010) to the place of delivery designated by the Purchaser. Once the Product(s) have been delivered to the carrier, Bitmain shall have fulfilled its obligation to supply the Product(s) to the Purchaser, and the title and risk of loss or damage to the Product(s) shall pass to the Purchaser.

In the event of any discrepancy between this Agreement and Bitmain's cargo insurance policy regarding the insurance coverage, the then effective Bitmain cargo insurance policy shall prevail, and Bitmain shall be required to provide the then effective insurance coverage to the Purchaser.

5.3. If Bitmain fails to deliver the Products after 30 days after the prescribed deadline, the Purchaser shall be entitled to cancel the Order of such batch of Products and request Bitmain to refund the price of such undelivered batch of Products together with an interest at 0.0333% per day for the period from the next day of the full payment of the price of such batch of Products to the date immediately prior to the request. In the event that the Purchaser does not cancel the Order of the undelivered batch of Products and requests Bitmain to perform its delivery obligation, Bitmain shall continue to perform its delivery obligation and compensate the Purchaser in accordance with Article 5.4 of this Agreement.

5.4. If Bitmain postpones the shipping schedule of the Products and the Purchaser does not cancel the Order, Bitmain shall make a compensation to the Purchaser, the amount of which shall equal to 0.0333% of the price of such undelivered batch of Products, which compensation shall be made in the form of delivery of more rated hashrate. Amount less than one unit of Product shall be credited to the balance of the Purchaser in the user system on Bitmain's official website, which shall be viewable by the Purchaser.

5.5. There are 12 batches of Products under this Agreement and each batch shall constitute independent legal obligations of and shall be performed separately by the Parties. The delay of a particular batch shall not constitute waiver of the payment obligation of the Purchaser in respect of other batches. The Purchaser shall not be entitled to terminate this Agreement solely on the ground of delay of delivery of a single batch of Products.

5.6. Logistics costs shall be borne by the Purchaser. Bitmain may collect payments on behalf of the service providers and issue service invoices.

5.7. Bitmain shall not be responsible for any delivery delay caused by the Purchaser or any third party, including but not limited to the carrier, the customs, and the import brokers, nor shall it be liable for damages, whether direct, indirect, incidental, consequential, or otherwise, for any failure, delay or error in delivery of any Product(s) for any reason whatsoever.

5.8. Bitmain shall not be responsible and the Purchaser shall be fully and exclusively responsible for any loss of Product(s), personal injury, property damage, other damage or liability caused by the Product(s) or the transportation of the Product(s) either to the Purchaser or any third party, or theft of the Product(s) during transportation from Bitmain to the Purchaser.

5.9. Bitmain has the right to discontinue the sale of the Product(s) and to make changes to its Product(s) at any time, without prior approval from or notice to the Purchaser.

5.10.  If the Product(s) is rejected and/or returned back to Bitmain because of any reason and regardless of the cause of such delivery failure, the Purchaser shall be solely and exclusively liable for and shall defend, fully indemnify and hold harmless Bitmain against any and all related expenses, fees, charges and costs incurred, arising out of or incidental to such rejection and/or return (the "Return Expense"). Furthermore, if the Purchaser would like to ask for Bitmain's assistance in redelivering such Product(s) or assist in any other manner, and if Bitmain at its sole discretion decides to provide this assistance, then in addition to the Return Expense, the Purchaser shall also pay Bitmain an administrative fee in accordance with Bitmain's then applicable internal policy.

5.11.  If the Purchaser fails to provide Bitmain with the delivery place or the delivery place provided by the Purchaser is a false address or does not exist, any related costs occurred (including storage costs, warehousing charge and labor costs) shall be borne by the Purchaser. Bitmain may issue the Purchaser a notice of self-pick-up and ask the Purchaser to pick up the Products itself. Bitmain shall be deemed to have completed the delivery obligation under this Agreement after two (2) business days following the issue of the self-pick-up notice. After 30 days of the self-pick-up notice, the Purchaser shall be entitled to deal with the Products in any manner as it deems appropriate.

## 6.  Customs

6.1.  Bitmain shall obtain in due time and maintain throughout the term of this Agreement (if applicable), any and all approvals, permits, authorizations, licenses and clearances for the export of the Product(s) that are required to be obtained by Bitmain or the carrier under Applicable Laws.

6.2.  The Purchaser shall obtain in due time and maintain throughout the term of this Agreement (if applicable), any and all approvals, permits, authorizations, licenses and clearances required for the import of the Product(s) to the country of delivery as indicated in the Shipping Information, that are required to be obtained by the Purchaser or the carrier under Applicable Laws, and shall be responsible for any and all additional fees, expenses and charges in relation to the import of the Product(s).

## 7.  Warranty

7.1.  The Warranty Period shall start on the Warranty Start Date and end on the 365th day after the Warranty Start Date. During the Warranty Period, the Purchaser's sole and exclusive remedy, and Bitmain's entire liability, will be to repair or replace, at Bitmain's option, the defective part/component of the Product(s) or the defective Product(s) at no charge to the Purchaser.

7.2. The Parties acknowledge and agree that the warranty provided by Bitmain as stated in the preceding paragraph does not apply to the following:

(i)      normal wear and tear;

(ii)     damage resulting from accident, abuse, misuse, neglect, improper handling or improper installation;

(iii)    damage or loss of the Product(s) caused by undue physical or electrical stress, including but not limited to moisture, corrosive environments, high voltage surges, extreme temperatures, shipping, or abnormal working conditions;

(iv)    damage or loss of the Product(s) caused by acts of nature including, but not limited to, floods, storms, fires, and earthquakes;

(v)     damage caused by operator error, or non-compliance with instructions as set out in accompanying documentation;

(vi)    alterations by persons other than Bitmain, associated partners or authorized service facilities;

(vii)   Product(s), on which the original software has been replaced or modified by persons other than Bitmain, associated partners or authorized service facilities;

(viii)  counterfeit products;

(ix)    damage or loss of data due to interoperability with current and/or future versions of operating system, software and/or hardware;

(x)     damage or loss of data caused by improper usage and behavior which is not recommended and/or permitted in the product documentation;

(xi)    failure of the Product(s) caused by usage of products not supplied by Bitmain; and

(xii)   hash boards or chips are burnt.

In case the warranty is voided, Bitmain may, at its sole discretion, provide repair service to the Purchaser, and the Purchaser shall bear all related expenses and costs.

7.3. Notwithstanding anything to the contrary herein, the Purchaser acknowledges and agrees that the Product(s) provided by Bitmain do not guarantee any cryptocurrency mining time and, Bitmain shall not be liable for any cryptocurrency mining time loss or cryptocurrency mining revenue loss that are caused by downtime of any part/component of the Product(s). Bitmain does not warrant that the Product(s) will meet the Purchaser's requirements or the Product(s) will be uninterrupted or error free. Except as provided in Clause 7.1 of this Agreement, Bitmain makes no warranties to the Purchaser with respect to the Product(s), and no warranties of any kind, whether written, oral, express, implied or statutory, including warranties of merchantability, fitness for a particular purpose or non-infringement or arising from course of dealing or usage in trade shall apply.

7.4.  In the event of any ambiguity or discrepancy between this Clause 6 of this Agreement and Bitmain's After-sales Service Policy from time to time, it is intended that the After-sales Service Policy shall prevail and the Parties shall comply with and give effect to the After-sales Service Policy.

## 8.  Representations and Warranties

The Purchaser makes the following representations and warranties to Bitmain:

8.1.  It has the full power and authority to own its assets and carry on its businesses.

8.2.  The obligations expressed to be assumed by it under this Agreement are legal, valid, binding and enforceable obligations.

8.3.  It has the power to enter into, perform and deliver, and has taken all necessary action to authorize its entry into, performance and delivery of, this Agreement and the transactions contemplated by this Agreement.

8.4.  The entry into and performance by it of, and the transactions contemplated by, this Agreement do not and will not conflict with:

(i)  any Applicable Law;
(ii)  its constitutional documents; or
(iii)  any agreement or instrument binding upon it or any of its assets.

8.5.  All authorizations required or desirable:

(i)  to enable it lawfully to enter into, exercise its rights under and comply with its obligations under this Agreement;
(ii)  to ensure that those obligations are legal, valid, binding and enforceable; and
(iii)  to make this Agreement admissible in evidence in its jurisdiction of incorporation,

have been or will have been by the time, obtained or effected and are, or will be by the appropriate time, in full force and effect.

8.6.  It is not aware of any circumstances which are likely to lead to:

(i)  any authorization obtained or effected not remaining in full force and effect;
(ii)  any authorization not being obtained, renewed or effected when required or desirable; or
(iii)  any authorization being subject to a condition or requirement which it does not reasonably expect to satisfy or the compliance with which has or could reasonably be expected to have a material adverse effect.

8.7.   (a) It is not the target of economic sanctions administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, the United Nations Security Council, the European Union, Her Majesty's Treasury or Singapore ("Sanctions"), including by being listed on the Specially Designated Nationals and Blocked Persons (SDN) List maintained by OFAC or any other Sanctions list maintained by one of the foregoing governmental authorities, directly or indirectly owned or controlled by one or more SDNs or other Persons included on any other Sanctions list, or located, organized or resident in a country or territory that is the target of Sanctions, and (b) the purchase of the Product(s) will not violate any Sanctions or import and export control related laws and regulations.

8.8.   **All information supplied by the Purchaser is and shall be true and correct, and the information does not contain and will not contain any statement that is false or misleading.**

## 9.   Indemnification and Limitation of Liability

9.1.   The Purchaser shall, during the term of this Agreement and at any time thereafter, indemnify and save Bitmain and/or its Affiliates harmless from and against any and all damages, suits, claims, judgments, liabilities, losses, fees, costs or expenses of any kind, including legal fees, whatsoever arising out of or incidental to the Products pursuant to this Agreement.

9.2.   Notwithstanding anything to the contrary herein, Bitmain and its Affiliates shall under no circumstances, be liable to the Purchaser for any consequential loss, or loss of goodwill, business, anticipated profits, revenue, contract, or business opportunity arising out of or in connection with this Agreement, and the Purchaser hereby waives any claim it may at any time have against Bitmain and its Affiliates in respect of any such damages. The foregoing limitation of liability shall apply whether in an action at law, including but not limited to contract, strict liability, negligence, willful misconduct or other tortious action, or an action in equity.

9.3.   Bitmain and its Affiliates' cumulative aggregate liability pursuant to this Agreement, whether arising from tort, breach of contract or any other cause of action shall be limited to and not exceed the amount of one hundred percent (100%) of the down payment actually received by Bitmain from the Purchaser for the Product(s).

9.4.   The Product(s) are not designed, manufactured or intended for use in hazardous or critical environments or in activities requiring emergency or fail-safe operation, such as the operation of nuclear facilities, aircraft navigation or communication systems or in any other applications or activities in which failure of the Product(s) may pose the risk of environmental harm or physical injury or death to humans. Bitmain specifically disclaims any express or implied warranty of fitness for any of the above described application and any such use shall be at the Purchaser's sole risk.

9.5.   The above limitations and exclusions shall apply (1) notwithstanding failure of essential purpose of any exclusive or limited remedy; and (2) whether or not Bitmain has been advised of the possibility of such damages. This Clause allocates the risks under this Agreement and Bitmain's pricing reflects this allocation of risk and the above limitations.

## 10.  Distribution

10.1.  This Agreement does not constitute a distributor agreement between Bitmain and the Purchaser. Therefore, the Purchaser is not an authorized distributor of Bitmain.

10.2.  The Purchaser shall in no event claim or imply to a third party that it is an authorized distributor of Bitmain or Bitmain (Antminer) or any similar terms, or perform any act that will cause it to be construed as an authorized distributor of Bitmain or Bitmain (Antminer). As between the Purchaser and Bitmain, the Purchaser shall be exclusively and fully responsible for complying with the Applicable Laws regarding repackaging the Product(s) for the Purchaser's redistribution needs, and shall be solely liable for any and all liabilities or costs directly incurred or incidental to such redistribution.

## 11.  Intellectual Property Rights

11.1.  The Parties agree that the Intellectual Property Rights in any way contained in the Product(s), made, conceived or developed by Bitmain and/or its Affiliates for the Product(s) under this Agreement and/or, achieved, derived from, related to, connected with the provision of the Product(s) by Bitmain and/or acquired by Bitmain from any other person in performance of this Agreement shall be the exclusive property of Bitmain and/or its Affiliates.

11.2. Notwithstanding anything to the contrary herein, all Intellectual Property Rights in the Product(s) shall remain the exclusive property of Bitmain and/or its licensors. Except for licenses explicitly identified in Bitmain's Shipping Confirmation or in this Clause 10.2, no rights or licenses are expressly granted, or implied, whether by estoppel or otherwise, in respect of any Intellectual Property Rights of Bitmain and/or its Affiliates or any Intellectual Property residing in the Product(s) provided by Bitmain to the Purchaser, including in any documentation or any data furnished by Bitmain. Bitmain grants the Purchaser a non-exclusive, non-transferrable, royalty-free and irrevocable license of Bitmain and/or its Affiliates' Intellectual Property Rights to solely use the Product(s) delivered by Bitmain to the Purchaser for their ordinary function, and subject to the Clauses set forth herein. The Purchaser shall in no event violate the Intellectual Property Rights of Bitmain and/or its licensors.

11.3. If applicable, payment by the Purchaser of non-recurring charges to Bitmain for any special designs, or engineering or production materials required for Bitmain's performance of Orders for customized Product(s), shall not be construed as payment for the assignment from Bitmain to the Purchaser of title to the design or special materials. Bitmain shall be the sole owner of such special designs, engineering or production materials.

## 12. Confidentiality and Communications

12.1. All information concerning this Agreement and matters pertaining to or derived from the provision of Product(s) pursuant to this Agreement between the Parties, whether in oral or written form, or in the form of drawings, computer programs or other, as well as all data derived therefrom ("Confidential Information"), shall be deemed to be confidential and, as such, may not be divulged to any unauthorized person. The Purchaser undertakes and agrees to take all reasonable and practicable steps to ensure and protect the confidentiality of the Confidential Information which cannot be passed, sold, traded, published or disclosed to any unauthorized person.

## 13. Term of this Agreement

13.1. This Agreement will be effective upon Bitmain's issuance of the shipping confirmation to the Purchaser, provided that if there is more than one shipping confirmation, this Agreement will be effective to the Products contained in each shipping confirmation upon Bitmain's issuance of the respective shipping confirmation to the Purchaser.

13.2. This Agreement shall remain effective up to and until the delivery of the last batch of Products.

## 14. Contact Information

All communications in relation to this Agreement shall be made to the following contacts:

**Purchaser**'s **business contact:**

Name: Jeff Pratt

Phone: (+1)  425-241-0034

Email: jpratt@corescientific.com

**Bitmain's business contact:**

Name: Xinran He

Phone: (+86)15636130223

Email: Xinran.he@bitmain.com

### 15. Compliance with Laws and Regulations

15.1. The Purchaser undertakes that it will fully comply with all Applicable Laws in relation to export and import control and Sanctions and shall not take any action that would cause Bitmain or any of its Affiliates to be in violation of any export and import control laws or Sanctions. The Purchaser shall also be fully and exclusively liable for and shall defend, fully indemnify and hold harmless Bitmain and/or its Affiliates from and against any and all claims, demands, actions, costs or proceedings brought or instituted against Bitmain and/or its Affiliates arising out of or in connection with any breach by the Purchaser or the carrier of any Applicable Laws in relation to export and import control or Sanction.

15.2. The Purchaser acknowledges and agrees that the Product(s) in this Agreement are subject to the export control laws and regulations of all related countries, including but not limited to the Export Administration Regulations ("EAR") of the United States. Without limiting the foregoing, the Purchaser shall not, without receiving the proper licenses or license exceptions from all related governmental authorities, including but not limited to the U.S. Bureau of Industry and Security, distribute, re-distribute, export, re-export, or transfer any Product(s) subject to this Agreement either directly or indirectly, to any national of any country identified in Country Groups D:1 or E:1 as defined in the EARs. In addition, the Product(s) under this Agreement may not be exported, re-exported, or transferred to (a) any person or entity listed on the "Entity List", "Denied Persons List" or the SDN List as such lists are maintained by the U.S. Government, or (b) an end-user engaged in activities related to weapons of mass destruction. Such activities include but are not necessarily limited to activities related to: (1) the design, development, production, or use of nuclear materials, nuclear facilities, or nuclear weapons; (2) the design, development, production, or use of missiles or support of missiles projects; and (3) the design, development, production, or use of chemical or biological weapons. The Purchaser further agrees that it will not do any of the foregoing in violation of any restriction, law, or regulation of the European Union or an individual EU member state that imposes on an exporter a burden equivalent to or greater than that imposed by the U.S. Bureau of Industry and Security.

15.3. The Purchaser undertakes that it will not take any action under this Agreement or use the Product(s) in a way that will be a breach of any anti-money laundering laws, any anti-corruption laws, and/or any counter-terrorist financing laws.

15.4. The Purchaser warrants that the Product(s) have been purchased with funds that are from legitimate sources and such funds do not constitute proceeds of criminal conduct, or realizable property, or proceeds of terrorism financing or property of terrorist, within the meaning given in the Corruption, Drug Trafficking and Other Serious Crimes (Confiscation of Benefits) Act (Chapter 65A) and the Terrorism (Suppression of Financing) Act (Chapter 325), respectively. The Purchaser understands that if any Person resident in Singapore knows or suspects or has reasonable grounds for knowing or suspecting that another Person is engaged in criminal conduct or is involved with terrorism or terrorist property and the information for that knowledge or suspicion came to their attention in the course of business in the regulated sector, or other trade, profession, business or emplo yment, the Person will be required to report such knowledge or suspicion to the Suspicious Transaction Reporting Office, Commercial Affairs Department of the Singapore Police Force. The Purchaser acknowledges that such a report shall not be treated as breach of confidence or violation of any restriction upon the disclosure of information imposed by any Applicable Law, contractually or otherwise.

## 16. Force Majeure

16.1. To the extent that a Party is fully or partially delayed, prevented or hindered by an event of Force Majeure from performing any obligation under this Agreement (other than an obligation to make payment), subject to the exercise of reasonable diligence by the affected Party, the failure to perform shall be excused by the occurrence of such event of Force Majeure. A Party claiming that its performance is excused by an event of Force Majeure shall, promptly after the occurrence of such event of Force Majeure, notify the other Party of the nature, date of inception and expected duration of such event of Force Majeure and the extent to which the Party expects that the event will delay, prevent or hinder the Party from performing its obligations under this Agreement. The notifying Party shall thereafter use its best effort to eliminate such event of Force Majeure and mitigate its effects.

16.2. The affected Party shall use reasonable diligence to remove the event of Force Majeure, and shall keep the other Party informed of all significant developments.

16.3. Except in the case of an event of Force Majeure, neither party may terminate this Agreement prior to its expiry date.

## 17. Entire Agreement and Amendment

This Agreement, constitutes the entire agreement of the Parties hereto and can only be amended with the written consent of both Parties or otherwise as mutually agreed by both Parties.

**18. Assignment**

18.1. Bitmain may freely assign or transfer any of its rights, benefits or obligations under this Agreement in whole or in part to its Affiliates or to any third party. The Purchaser may not assign or transfer any of its rights, benefits or obligations under this Agreement in whole or in part without Bitmain's prior written consent.

18.2. This Agreement shall be binding upon and enure to the benefit of each Party to this Agreement and its successors in title and permitted assigns.

**19. Severability**

To the extent possible, if any provision of this Agreement is held to be illegal, invalid or unenforceable in whole or in part by a court, the provision shall apply with whatever deletion or modification is necessary so that such provision is legal, valid and enforceable and gives effect to the commercial intention of the Parties. The remaining provisions of this Agreement shall not be affected and shall remain in full force and effect.

**20. Personal Data**

Depending on the nature of the Purchaser's interaction with Bitmain, some examples of personal data which Bitmain may collect from the Purchaser include the Purchaser's name and identification information, contact information such as the Purchaser's address, email address and telephone number, nationality, gen der, date of birth, and financial information such as credit card numbers, debit card numbers and bank account information.

Bitmain generally does not collect the Purchaser's personal data unless (a) it is provided to Bitmain voluntarily by the Purchaser directly or via a third party who has been duly authorized by the Purchaser to disclose the Purchaser's personal data to Bitmain (the Purchaser's "authorized representative") after (i) the Purchaser (or the Purchaser's authorized representative) has been notified of the purposes for which the data is collected, and (ii) the Purchaser (or the Purchaser's authorized representative) has provided written consent to the collection and usage of the Purchaser's personal data for those purposes, or (b) collection and use of personal data without consent is permitted or required by related laws. Bitmain shall seek the Purchaser's consent before collecting any additional personal data and before using the Purchaser's personal data for a purpose which has not been notified to the Purchaser (except where permitted or authorized by law).

**21. Conflict with the Terms and Conditions**

In the event of any ambiguity or discrepancy between the Clauses of this Agreement and the Terms and Conditions from time to time, it is intended that the Clauses of this Agreement shall prevail and the Parties shall comply with and give effect to this Agreement.

## 22. Governing Law and Dispute Resolution

22.1. This Agreement shall be solely governed by and construed in accordance with the laws of Hong Kong.

22.2. Any dispute, controversy, difference or claim arising out of or relating to this Agreement, including the existence, validity, interpretation, performance, breach or termination hereof or any dispute regarding non-contractual obligations arising out of or relating to this Agreement shall be referred to and finally resolved by arbitration administered by the Hong Kong International Arbitration Center under the UNCITRAL Arbitration Rules in force when the notice of arbitration is submitted. The decision and awards of the arbitration shall be final and binding upon the parties hereto.

## 23. Waiver

Failure by either Party to enforce at any time any provision of this Agreement, or to exercise any election of options provided herein shall not constitute a waiver of such provision or option, nor affect the validity of this Agreement or any part hereof, or the right of the waiving Party to thereafter enforce each and every such provision or option.

## 24. Counterparts and Electronic Signatures

This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement, and all of which, when taken together, will be deemed to constitute one and the same agreement. The facsimile, email or other electronically delivered signatures of the Parties shall be deemed to constitute original signatures, and facsimile or electronic copies hereof shall be deemed to constitute duplicate originals.

## 25. Further Assurance

Each Party undertakes to the other Party to execute or procure to be executed all such documents and to do or procure to be done all such other acts and things as may be reasonable and necessary to give all Parties the full benefit of this Agreement.

## 26. Third Party Rights

A person who is not a Party to this Agreement has no right under the Contracts (Rights of Third Parties) Ordinance (Chapter 623 of the Laws of Hong Kong) to enforce or to enjoy the benefit of any term of this Agreement.

## 27. Liquidated Damages Not Penalty

It is expressly agreed that any liquidated damages payable under this Agreement do not constitute a penalty and that the Parties, having negotiated in good faith for such specific liquidated damages and having agreed that the amount of such liquidated damages is reasonable in light of the anticipated harm caused by the breach related thereto and the difficulties of proof of loss and inconvenience or nonfeasibility of obtaining any adequate

remedy, are estopped from contesting the validity or enforceability of such liquidated damages.

*(The rest part of the page is intentionally left in blank)*

Signed for and on behalf of Bitmain

**Bitmain Technologies Limited**

Signature_____

Title _____

Signed for and on behalf of the Purchaser

**Core Scientific, Inc.**

Signature_____

Title _____

# APPENDIX A

1.    Products:

1.1. The information (including but not limited to the quantity, rated hashrate, unit price ("**Unit Price**"), total price for one item ("**Total Price (One Item)**"), total price for all the items ("**Total Purchase Price**") of Products to be purchased by Party B from Party A is as follows ("**Products**"):

1.1.1    Product Type

| Type | Details |
|---|---|
| Product Name | HASH Super Computing Server，S19j |
| Rated hashrate / unit | ~90TH/s |
| Rated power / unit | ~3100W |
| J/T@25℃ environment temperature | ~34.5 |
| Description | ➢ Bitmain undertakes that the error range of "J/T@25℃ environment temperature"does not exceed 10%<br><br>➢ "Rated hashrate / unit" and "rated power / unit" are for reference only and may defer from each batch or unit. BitMain makes no representation on "Rated hashrate / unit" and "rated power / unit .<br><br>➢ Purchaser shall not reject the Products on the grounds that the actual parameters of the delivered Products are not in consistence with the reference indicators. |

1.1.2   Price, quantity and delivery:

| Batch | Product Name | Shipping Schedule | Reference Quantity | Total Rated Hashrate (T) | Pre-tax Price (US$/T) | Unit Price (US$) | Total Price (US$) |
|---|---|---|---|---|---|---|---|
| 1 | HASH Super Computing Server | November 2021 | 3000 | 270000 | 45 | 4050 | 12150000 |
| 2 | HASH Super Computing Server | December 2021 | 3000 | 270000 | 45 | 4050 | 12150000 |
| 3 | HASH Super Computing Server | January 2022 | 3000 | 270000 | 45 | 4050 | 12150000 |
| 4 | HASH Super Computing Server | February 2022 | 3000 | 270000 | 40.56 | 3650 | 10950000 |
| 5 | HASH Super Computing Server | March 2022 | 3000 | 270000 | 40.56 | 3650 | 10950000 |
| 6 | HASH Super Computing Server | April 2022 | 3000 | 270000 | 40.56 | 3650 | 10950000 |
| 7 | HASH Super Computing Server | May 2022 | 3000 | 270000 | 36.11 | 3250 | 9750000 |
| 8 | HASH Super Computing Server | June 2022 | 3000 | 270000 | 36.11 | 3250 | 9750000 |
| 9 | HASH Super Computing Server | July 2022 | 3000 | 270000 | 36.11 | 3250 | 9750000 |
| 10 | HASH Super Computing Server | August 2022 | 3000 | 270000 | 31.67 | 2850 | 8550000 |
| 11 | HASH Super Computing Server | September 2022 | 3000 | 270000 | 31.67 | 2850 | 8550000 |

| 12 | HASH Super Computing Server | October 2022 | 3000 | 270000 | 31.67 | 2850 | 8550000 |
|---|---|---|---|---|---|---|---|

1.1.3    Total price of the Products listed above:
Total Purchase Price (tax exclusive): US$124,200,000.00
Tax: US$0.00
Total contract price (tax inclusive): US$124,200,000.00

1.2. Both Parties confirm and agree that Bitmain may adjust the total quantity based on the total hashrate provided that the total hashrate of the Product(s) actually delivered by Bitmain to the Purchaser shall not be less than the total rated hashrate agreed in Article 1.1 of this Appendix A. Bitmain makes no representation that the quantity of the actually delivered Products shall be the same as the quantity set forth in Article 1.1. of this Appendix A.

1.3. In the event that Bitmain publishes any new type of products with less J/T value and suspends the production of the type of the Products as agreed in this Agreement, Bitmain shall be entitled to release itself from any future obligation to deliver any subsequent Products by 10-day prior notice to the Purchaser and continue to deliver new types of Products, the total rated hashrate of which shall be no less than such subsequent Products cancelled under this Agreement and the price of which shall be adjusted in accordance with the J/T value. In the event that the Purchaser explicitly refuses to accept new types of Products, the Purchaser is entitled to request for a refund of the remaining balance of the purchase price already paid by the Purchaser together with an interest at 0.0333% per day on such balance for the period from the next day following the payment date of such balance to the date immediately prior to the date of request of refund. If the Purchaser accepts the new types of Products delivered by Bitmain, Bitmain shall be obliged to deliver such new types of Products to fulfill its obligations under this Agreement. The Purchaser may request to lower the actual total hashrate of the Products delivered but shall not request to increase the actual total hashrate to the level exceeding the total rated hashrate as set out in this Agreement. After Bitmain publishes new types of Products and if Bitmain has not suspended the production of the types of Products under this Agreement, Bitmain shall continue to delivery such agreed types of Products in accordance with this Agreement and the Purchaser shall not terminate this Agreement or refuse to accept the Products on the grounds that Bitmain has published new type(s) of Products.

**2.   Cargo insurance coverage limitations:**
The cargo insurance coverage provided by Bitmain is subject to the following limitations and exceptions:
**Exclusions:**
-   loss damage or expense attributable to willful misconduct of the Assured

- ordinary leakage, ordinary loss in weight or volume, or ordinary wear and tear of the subject-matter insured
- loss damage or expense caused by insufficiency or unsuitability of packing or preparation of the subject-matter insured (for the purpose of this Clause, "packing" shall be deemed to include stowage in a container or liftvan but only when such stowage is carried out prior to attachment of this insurance or by the Assured or their servants)
- loss damage or expense caused by inherent vice or nature of the subject-matter insured
- loss damage or expense proximately caused by delay, even though the delay be caused by a risk insured against (except expenses payable)
- loss damage or expense arising from insolvency or financial default of the owners managers charterers or operators of the vessel
- loss, damage, or expense arising from the use of any weapon of war employing atomic or nuclear fission, and/or fusion or other like reaction or radioactive force or matter.
- Loss, damage or expense arising from unseaworthiness of vessel or craft, unfitness of vessel craft conveyance container or liftvan for the safe carriage of the subject-matter insured, where the Assured or their servants are privy to such unseaworthiness or unfitness, at the time the subject-matter insured is loaded therein.
- The Underwriters waive any breach of the implied warranties of seaworthiness of the ship and fitness of the ship to carry the subject-matter insured to destination, unless the Assured or their servants are privy to such unseaworthiness or unfitness.
- Loss, damage or expense caused by (1) war, civil war, revolution, rebellion, insurrection, or civil strife arising therefrom, or any hostile act by or against a belligerent power, (2) capture, seizure, arrest, restraint or detainment (piracy excepted), and the consequences thereof or any attempt threat, (3) derelict mines, torpedoes, bombs, or other derelict weapons of war.
- Loss, damage, or expense caused by strikers, locked-out workmen, or persons taking part in labor disturbances, riots or civil commotion, resulting from strikes, lock-outs, labor disturbances, riots or civil commotions, caused by any terrorist or any person acting from a political motive.

3. **Bitmain's BANK ACCOUNT info:**

Company Name：Bitmain Technologies Limited

Company address：FLAT/RM A1 11/F SUCCESS COMMERCIAL BUILDING 245-251 HENNESSY ROAD HK

Account No.：1503225561（USD）

Bank name：Signature Bank

Bank address：565 Fifth Avenue New York NY 10017, US

Swift Code：SIGNUS33XXX

ABA CODE：026013576 (for US local payment)

4.  The payment shall be arranged by the Purchaser as Appendix B.

5.  Without prejudice to the above, the unit price and the Total Purchase Price of the Product(s) and any amount paid by the Purchaser shall be all denominated in USD. Where the Parties agree that the payments shall be made in cryptocurrencies, the exchange rate between the USD and the cryptocurrency selected shall be determined and calculated as follows: (1) in the event that the Purchaser pays for any order placed on Bitmain's official website (the "Website", http://www.bitmain.com) which is valid and has not been fully paid yet, the exchange rate between the USD and the cryptocurrency fixed in such placed Order shall apply, or (2) in any other case, the real time exchange rate between the USD and the cryptocurrency displayed on the Website upon payment shall apply. The exchange rate between the USD and the cryptocurrency shall be fixed according to this provision. In any circumstance, the Purchaser shall not ask for any refund due to the change of exchange rate.

**APPENDIX B**

| Payment Percentage | Payment Date | Note | Example (Assuming this Agreement is signed on March 16.) |
|---|---|---|---|
| 20% | 3 days within the signing date | 20% of the Total Purchase Price | 20% of the Total Purchase Price shall be paid by March 19. |
| 30% | 6 months prior to the shipment | 30% per month of a single batch | 30% of the price for November batch shall be paid by May 30; 30% of the price for December batch shall be paid by June 30; etc. |
| Remaining 50% | 1 month prior to the shipment | 50% per month of a single batch | 50% of the price for November batch shall be paid by September 30; 50% of the price for December batch shall be paid by October 30; etc. |

**NON-FIXED PRICE**

**SALES AND PURCHASE AGREEMENT**

**BETWEEN**

**Bitmain Technologies Limited**
**("Bitmain")**

**AND**

**Core Scientific, Inc.**
**("Purchaser")**



| | | |
|---|---|---|
| 1. | Definitions and Interpretations | 3 |
| 2. | Sales of Product(s) | 5 |
| 3. | Prices and Terms of Payment | 5 |
| 4. | Product Discount | 7 |
| 5. | Shipping of Product(s) | 7 |
| 6. | Customs | 9 |
| 7. | Warranty | 9 |
| 8. | Representations and Warranties | 11 |
| 9. | Indemnification and Limitation of Liability | 12 |
| 10. | Distribution | 13 |
| 11. | Intellectual Property Rights | 13 |
| 12. | Confidentiality and Communications | 14 |
| 13. | Term of this Agreement | 14 |
| 14. | Contact Information | 15 |
| 15. | Compliance with Laws and Regulations | 15 |
| 16. | Force Majeure | 16 |
| 17. | Entire Agreement and Amendment | 17 |
| 18. | Assignment | 17 |
| 19. | Severability | 17 |
| 20. | Personal Data | 17 |
| 21. | Conflict with the Terms and Conditions | 18 |
| 22. | Governing Law and Dispute Resolution | 18 |
| 23. | Waiver | 18 |
| 24. | Counterparts and Electronic Signatures | 18 |
| 25. | Further Assurance | 18 |
| 26. | Third Party Rights | 19 |
| 27. | Liquidated Damages Not Penalty | 19 |

This non-fixed price sales and purchase agreement (this "Agreement") is made on April 22, 2021 by and between Bitmain Technologies Limited ("Bitmain") (Company number: 2024301), with its registered office at Unit A1 of Unit A, 11th Floor, Success Commercial Building, 245-251 Hennessy Road, Hong Kong, and Core Scientific, Inc. (the "Purchaser") (EIN: 82-3805526), with its principal place of business at 2800 Northup Way, Bellevue, WA 98004, the US.

Bitmain and the Purchaser shall hereinafter collectively be referred to as the "Parties", and individually as a "Party".

Whereas:

1. Purchaser fully understands the market risks, the price-setting principles and the market fluctuations relating to the Products sold under this Agreement.

2. Purchaser has purchased the Products through the website of Bitmain (i.e., https://shop.bitmain.com/, similarly hereinafter) for many times, and is familiar with the purchase order processes of Bitmain's website.

3. Based on the above consensus, the Purchaser is willing to purchase and Bitmain is willing to supply cryptocurrency mining hardware and other equipment in accordance with the terms and conditions of this Agreement.

The Parties hereto agree as follows:

## 1. Definitions and Interpretations

The following terms, as used herein, have the following meanings:

"Affiliate" means, with respect to any Person, any other Person directly or indirectly Controlling, Controlled by, or under common Control with such Person; "Person" means any individual, corporation, partnership, limited partnership, proprietorship, association, limited liability company, firm, trust, estate or other enterprise or entity (whether or not having separate legal personality); and "Control" means the power or authority, whether exercised or not, to direct the business, management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, provided that such power or authority shall conclusively be presumed to exist upon possession of beneficial ownership or power to direct the vote of more than fifty percent (50%) of the votes entitled to be cast at a meeting of the members or shareholders of such Person or power to control the composition of a majority of the board of directors of such Person. The terms "Controlled" and "Controlling" have meanings correlative to the foregoing.

"Applicable Law" means any treaty, law, decree, order, regulation, decision, statute, ordinance, rule, directive, code or other document that has legal force under any system of law, including, without limitation, local law, law of any other state or part thereof or international law, and which creates or purports to create any requirement or rule that may

affect, restrict, prohibit or expressly allow the terms of this Agreement or any activity contemplated or carried out under this Agreement.

"Bank Account" means the bank account information of Bitmain provided in Appendix A of this Agreement.

"Force Majeure" means in respect of either Party, any event or occurrence whatsoever beyond the reasonable control of that Party, which delays, prevents or hinders that Party from performing any obligation imposed upon that Party under this Agreement, including to the extent such event or occurrence shall delay, prevent or hinder such Party from performing such obligation, war (declared or undeclared), terrorist activities, acts of sabotage, blockade, fire, lightning, acts of god, national strikes, riots, insurrections, civil commotions, quarantine restrictions, epidemics, earthquakes, landslides, avalanches, floods, hurricanes, explosions and regulatory and administrative or similar action or delays to take actions of any governmental authority.

"Intellectual Property Rights" means any and all intellectual property rights, including but not limited to those concerning inventions, patents, utility models, registered designs and models, engineering or production materials, drawings, trademarks, service marks, domain names, applications for any of the foregoing (and the rights to apply for any of the foregoing), proprietary or business sensitive information and/or technical know-how, copyright, authorship, whether registered or not, and any neighbor rights.

"Order" means the Purchaser's request to Bitmain for certain Product(s) in accordance with this Agreement.

"Product(s)" means the merchandise that Bitmain will provide to the Purchaser in accordance with this Agreement.

"Total Purchase Price" means the aggregate amount payable by the Purchaser as set out in Appendix A of this Agreement.

"Warranty Period" means the period of time that the Product(s) are covered by the warranty granted by Bitmain or its Affiliates in accordance with Clause 7 of this Agreement.

"Warranty Start Date" means the date on which the Product(s) are delivered to the carrier.

Interpretations:

i)    Words importing the singular include the plural and vice versa where the context so requires.

ii)   The headings in this Agreement are for convenience only and shall not be taken into consideration in the interpretation or construction of this Agreement.

iii)  References to Clauses and Appendix(es) are references to Clauses and Appendix(es) of this Agreement.

4 / 27

iv)    Unless specifically stated otherwise, all references to days shall mean calendar days.

v)     Any reference to a code, law, statute, statutory provision, statutory instrument, order, regulation or other instrument of similar effect shall include any re-enactment or amendment thereof for the time being in force.

## 2.   Sales of Product(s)

Bitmain will provide the Product(s) set forth in Appendix A (attached hereto as part of this Agreement) to the Purchaser in accordance with provisions of Clause 2, Clause 3, Clause 4, Clause 5 and Appendix A of this Agreement, and the Purchaser shall make payment in accordance with the terms specified in this Agreement.

2.1.   Both Parties agree that the Product(s) shall be sold in accordance with the following steps:

   (i)     The Purchaser shall place Order through Bitmain's website or through other methods accepted by Bitmain, and such Order shall constitute an irrevocable offer to purchase specific Product(s) from Bitmain.

   (ii)    After receiving the Order, Bitmain will send an order receipt confirmation email to the Purchaser. The Purchaser's Order will be valid for a period of twenty-four (24) hours after its placement, and upon expiration of such period, Bitmain will have the right to cancel the Order at its sole discretion if the Purchaser fails to pay the down payment in accordance with Appendix A of this Agreement.

   (iii)   The Purchaser shall pay the Total Purchase Price in accordance with Appendix A of this Agreement.

   (iv)    Upon receipt of the Total Purchase Price, Bitmain will provide a payment receipt to the Purchaser.

   (v)     Bitmain will send a shipping confirmation to the Purchaser after it has delivered the Product(s) to the carrier.

2.2.   The Purchaser acknowledges and confirms that the Order is irrevocable and cannot be cancelled by the Purchaser, and that the Product(s) ordered are neither returnable nor refundable. All sums paid by the Purchaser to Bitmain shall not be subject to any abatement, set-off, claim, counterclaim, adjustment, reduction, or defense for any reason. Down payment and payment of Total Purchase Price are not refundable, save as otherwise mutually agreed by the Parties.

## 3.   Prices and Terms of Payment

3.1    The Total Purchase Price (inclusive of any tax payable) shall be paid in accordance with the payment schedule set forth in Appendix B of this Agreement.

3.2 In the event that the Purchaser fails to fully settle the respective percentage of the Total Purchase Price before the prescribed deadlines and fails to make a written request to Bitmain no less than five (5) business days prior to the prescribed deadline and obtain Bitmain's written consent, Bitmain shall be entitled to terminate this Agreement and the Purchase shall be liable for a reasonable liquidated damage (not a penalty) of 20% of the purchase price of such batch of Products. If there are any remaining balance after deducting the liquidated damage, such remaining balance shall be refunded to the Purchaser free of any interest. If the Purchaser fails to pay the down payment on a timely basis and Bitmain has arranged production or procurement, Bitmain shall be entitled to request the Purchaser to be responsible for the loss related to such production or procurement.

3.3 The Total Purchase Price set forth in this Agreement is merely an estimate of the price and not the actual price. The actual price will be determined [one] month before the current batch is shipped and with reference to the market circumstances, provided that the actual price shall not be higher than the estimated price.

3.4 Upon receipt of notification of the actual price provided by Bitmain, the Purchaser shall be entitled to three options:

    (i)      continue to perform the Order of the current batch of the Product(s) with the original rated hashrate and pay the remaining amount at the actual price; or

    (ii)    request Bitmain to increase the rated hashrate in equivalent to the difference in price. Under this circumstance, Bitmain shall have the right to negotiate with the Purchaser for the amount of the additional rated hashrate based on its then inventory; or

    (iii)   partially or wholly cancel the Order of the current batch of Product(s). Under this circumstance, the Purchaser shall not claim any refund from Bitmain. If the Purchaser has made payments and there is remaining balance, such remaining balance shall be credited to the balance of the Purchaser and its affiliates.

Furthermore, the Purchaser shall confirm in writing the result of its exercise of the options under this Clause within two (2) days after Bitmain provides the Purchaser with the actual price, and if it is overdue and no agreement is reached between the Parties, the Purchaser shall be deemed to have voluntarily and irrevocably waived its option under this Clause and the Parties shall continue to perform the Order of the current batch of Product(s) with the original rated hashrate and the Purchaser shall pay the remaining amount at the actual price.

3.5 The Parties understand and agree that the applicable prices of the Product(s) are inclusive of applicable bank transaction fee, but are exclusive of any and all applicable import duties, taxes and governmental charges. The Purchaser shall pay or reimburse Bitmain for all taxes levied on or assessed against the amounts payable hereunder. If any payment is subject to withholding, the Purchaser shall pay such additional amounts as necessary, to ensure that Bitmain receives the full amount it would have received had payment not been subject to such withholding.

**4. Product Discount**

Based on the sales results and sales strategy, Bitmain is willing to offer the following discount as set forth in clause 4.1:

4.1. With respect of the signing of this Agreement, Bitmain offers the following discount to the Purchaser:

4.1.1. The Products under this Agreement consists of twelve (12) batches and the discount amount of each batch shall be calculated separately.

4.1.2. Bitmain may provide difference discounts to the Purchaser based on the actual amount of the prepayment and the payment time.

Discount Amount = Amount of prepayment * 1% * Number of months prepaid. The amount of prepayment shall be calculated at the end of each month. The number of months prepaid shall be calculated from the month of payment without counting the month of delivery. For clarification, the payment date shall be the date as evidenced in the remittance copy of such payment, and the discount term shall be calculated when the respective amounts under this Agreement have been received by Bitmain in full and without further consideration of the remaining amount. Payment schedules may be further adjusted in accordance with the actual situations.

4.1.3. If the Purchaser fails to make the payments on time, the discount applicable to such batch shall be cancelled.

4.2. No discount will be offered by Bitmain to the Purchaser.

**5. Shipping of Product(s)**

5.1. Bitmain shall deliver the Products in accordance with the shipping schedule to the first carrier or the carrier designated by the Purchaser.

5.2. Subject to the limitations stated in Appendix A, the terms of delivery of the Product(s) shall be CIP (carriage and insurance paid to (named place of destination) according to Incoterms 2010) to the place of delivery designated by the Purchaser. Once the Product(s) have been delivered to the carrier, Bitmain shall have fulfilled its obligation to supply the Product(s) to the Purchaser, and the title and risk of loss or damage to the Product(s) shall pass to the Purchaser.

5.3. In the event of any discrepancy between this Agreement and Bitmain's cargo insurance policy regarding the insurance coverage, the then effective Bitmain cargo insurance policy shall prevail, and Bitmain shall be required to provide the then effective insurance coverage to the Purchaser.

5.4. If Bitmain fails to deliver the Products after thirty (30) days after the prescribed deadline, the Purchaser shall be entitled to cancel the Order of such batch of Products and request Bitmain to refund the price of such undelivered batch of Products

7 / 27

together with an interest at 0.0333% per day for the period from the next day of each payment of the price of such batch of Products to the date immediately prior to the request. In the event that the Purchaser does not cancel the Order of the undelivered batch of Products and requests Bitmain to perform its delivery obligation, Bitmain shall continue to perform its delivery obligation and compensate the Purchaser in accordance with Clause 5.5 of this Agreement.

5.5. If Bitmain postpones the shipping schedule of the Products and the Purchaser does not cancel the Order, Bitmain shall make a compensation to the Purchaser on daily basis, the amount of which shall equal to 0.0333% of the price of such undelivered batch of Products, which compensation shall be made in the form of delivery of more rated hashrate. Amount less than one unit of Product shall be credited to the balance of the Purchaser in the user system on Bitmain's official website, which shall be viewable by the Purchaser.

5.6. There are twelve (12) batches of Products under this Agreement and each batch shall constitute independent legal obligations of and shall be performed separately by the Parties. The delay of a particular batch shall not constitute waiver of the payment obligation of the Purchaser in respect of other batches. The Purchaser shall not be entitled to terminate this Agreement solely on the ground of delay of delivery of a single batch of Products.

5.7. The purchaser shall choose the following shipping method:

■Shipping by Bitmain via Fedex/DHL/UPS/other logistics company；□Self-pick

Note: Logistics costs shall be borne by the Purchaser. Bitmain may collect payments on behalf of the services providers and issue services invoices if the Purchaser requests Bitmain to send the Products.

5.8. Bitmain shall not be responsible for any delivery delay caused by the Purchaser or any third party, including but not limited to the carrier, the customs, and the import brokers, nor shall it be liable for damages, whether direct, indirect, incidental, consequential, or otherwise, for any failure, delay or error in delivery of any Product(s) for any reason whatsoever.

5.9. Bitmain shall not be responsible and the Purchaser shall be fully and exclusively responsible for any loss of Product(s), personal injury, property damage, other damage or liability caused by the Product(s) or the transportation of the Product(s) either to the Purchaser or any third party, or theft of the Product(s) during transportation from Bitmain to the Purchaser.

5.10. Bitmain has the right to discontinue the sale of the Product(s) and to make changes to its Product(s) at any time, without prior approval from or notice to the Purchaser.

5.11. If the Product(s) is rejected and/or returned back to Bitmain because of any reason and regardless of the cause of such delivery failure, the Purchaser shall be solely and

8 / 27

exclusively liable for and shall defend, fully indemnify and hold harmless Bitmain against any and all related expenses, fees, charges and costs incurred, arising out of or incidental to such rejection and/or return (the "Return Expense"). Furthermore, if the Purchaser would like to ask for Bitmain's assistance in redelivering such Product(s) or assist in any other manner, and if Bitmain at its sole discretion decides to provide this assistance, then in addition to the Return Expense, the Purchaser shall also pay Bitmain an administrative fee in accordance with Bitmain's then applicable internal policy.

5.12. If the Purchaser fails to provide Bitmain with the delivery place or the delivery place provided by the Purchaser is a false address or does not exist, or the Purchaser reject to accept the Products, any related costs occurred (including storage costs, warehousing charge and labor costs) shall be borne by the Purchaser. Bitmain may issue the Purchaser a notice of self-pick-up and ask the Purchaser to pick up the Products itself. Bitmain shall be deemed to have completed the delivery obligation under this Agreement after two (2) business days following the issue of the self-pick-up notice. After 30 days of the self-pick-up notice, the Purchaser shall be entitled to deal with the Products in any manner as it deems appropriate.

5.13. The Purchaser shall inspect the Products within 2 days (the "Acceptance Time") after receiving the Products (the date of signature on the carrier's delivery voucher shall be the date of receipt), if the Purchaser does not raise any written objection within the agreed Acceptance Time, the Products delivered by Bitmain shall be deemed to be in full compliance with the provisions of this Agreement.

## 6. Customs

6.1. Bitmain shall obtain in due time and maintain throughout the term of this Agreement (if applicable), any and all approvals, permits, authorizations, licenses and clearances for the export of the Product(s) that are required to be obtained by Bitmain or the carrier under Applicable Laws.

6.2. The Purchaser shall obtain in due time and maintain throughout the term of this Agreement (if applicable), any and all approvals, permits, authorizations, licenses and clearances required for the import of the Product(s) to the country of delivery as indicated in the shipping information, that are required to be obtained by the Purchaser or the carrier under Applicable Laws, and shall be responsible for any and all additional fees, expenses and charges in relation to the import of the Product(s).

## 7. Warranty

7.1. The Warranty Period shall start on the Warranty Start Date and end on the 365th day after the Warranty Start Date. During the Warranty Period, the Purchaser's sole and exclusive remedy, and Bitmain's entire liability, will be to repair or replace, at Bitmain's option, the defective part/component of the Product(s) or the defective Product(s) at no charge to the Purchaser. If the Purchaser requires Bitmain to provide any warranty services, the Purchaser shall create a maintenance order on Bitmain's

website during the Warranty Period (the time of creation of the maintenance order shall be determined by the display time of such order on Bitmain's website) and send the Product to the place designated by Bitmain within the time limit required by Bitmain. Otherwise, Bitmain shall be entitled to refuse to provide the warranty service.

7.2. The Parties acknowledge and agree that the warranty provided by Bitmain as stated in the preceding paragraph does not apply to the following:

(i)     normal wear and tear;

(ii)    damage resulting from accident, abuse, misuse, neglect, improper handling or improper installation;

(iii).  damage or loss of the Product(s) caused by undue physical or electrical stress, including but not limited to moisture, corrosive environments, high voltage surges, extreme temperatures, shipping, or abnormal working conditions;

(iv)    damage or loss of the Product(s) caused by acts of nature including, but not limited to, floods, storms, fires, and earthquakes;

(v)     damage caused by operator error, or non-compliance with instructions as set out in accompanying documentation;

(vi)    alterations by persons other than Bitmain, associated partners or authorized service facilities;

(vii)   Product(s), on which the original software has been replaced or modified by persons other than Bitmain, associated partners or authorized service facilities;

(viii)  counterfeit products;

(ix)    damage or loss of data due to interoperability with current and/or future versions of operating system, software and/or hardware;

(x)     damage or loss of data caused by improper usage and behavior which is not recommended and/or permitted in the product documentation;

(xi)    failure of the Product(s) caused by usage of products not supplied by Bitmain; and

(xii)   hash boards or chips are burnt.

In case the warranty is voided, Bitmain may, at its sole discretion, provide repair service to the Purchaser, and the Purchaser shall bear all related expenses and costs.

7.3. Notwithstanding anything to the contrary herein, the Purchaser acknowledges and agrees that the Product(s) provided by Bitmain do not guarantee any cryptocurrency mining time and, Bitmain shall not be liable for any cryptocurrency mining time loss or cryptocurrency mining revenue loss that are caused by downtime of any part/component of the Product(s). Bitmain does not warrant that the Product(s) will meet the Purchaser's requirements or the Product(s) will be uninterrupted or error free. Except as provided in Clause 7.1 of this Agreement, Bitmain makes no warranties to the Purchaser with respect to the Product(s), and no warranties of any kind, whether written, oral, express, implied or statutory, including warranties of merchantability, fitness for a particular purpose or non-infringement or arising from course of dealing or usage in trade shall apply.

7.4. In the event of any ambiguity or discrepancy between this Clause 7 of this Agreement and Bitmain's After-sales Service Policy from time to time, it is intended that the After-sales Service Policy shall prevail and the Parties shall comply with and give effect to the After-sales Service Policy. Please refer to the website of Bitmain for detailed terms of warranty and after-sales maintenance. Bitmain has no obligation to notify the Purchaser of the update or modification of such terms.

7.5. During the warranty period, if the hardware product needs to be repaired or replaced, the Purchaser shall bear the logistics costs of shipping the Product to the address designated by Bitmain, and Bitmain shall bear the logistics costs of shipping back the repaired or replaced Product to the address designated by the Purchaser. The Purchaser shall bear all and any additional costs incurred due to incorrect or incomplete delivery information provided by the Purchaser and all and any risks of loss or damage to the Product, or the parts or components of the Products during the transportation period (including the transportation period when the product is sent to Bitmain and returned by Bitmain to the Purchaser).

## 8. Representations and Warranties

The Purchaser makes the following representations and warranties to Bitmain:

8.1. It has the full power and authority to own its assets and carry on its businesses.

8.2. The obligations expressed to be assumed by it under this Agreement are legal, valid, binding and enforceable obligations.

8.3. It has the power to enter into, perform and deliver, and has taken all necessary action to authorize its entry into, performance and delivery of, this Agreement and the transactions contemplated by this Agreement.

8.4. The entry into and performance by it of, and the transactions contemplated by, this Agreement do not and will not conflict with:

    (i)    any Applicable Law;

    (ii)    its constitutional documents; or

    (iii)   any agreement or instrument binding upon it or any of its assets.

8.5. All authorizations required or desirable:

    (i)    to enable it lawfully to enter into, exercise its rights under and comply with its obligations under this Agreement;

    (ii)   to ensure that those obligations are legal, valid, binding and enforceable; and

    (iii)   to make this Agreement admissible in evidence in its jurisdiction of incorporation,

have been or will have been by the time, obtained or effected and are, or will be by the appropriate time, in full force and effect.

8.6. It is not aware of any circumstances which are likely to lead to:

    (i)    any authorization obtained or effected not remaining in full force and effect;

    (ii)   any authorization not being obtained, renewed or effected when required or desirable; or

    (iii)   any authorization being subject to a condition or requirement which it does not reasonably expect to satisfy or the compliance with which has or could reasonably be expected to have a material adverse effect.

8.7. (a) It is not the target of economic sanctions administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, the United Nations Security Council, the European Union, Her Majesty's Treasury or Singapore ("Sanctions"), including by being listed on the Specially Designated Nationals and Blocked Persons (SDN) List maintained by OFAC or any other Sanctions list maintained by one of the foregoing governmental authorities, directly or indirectly owned or controlled by one or more SDNs or other Persons included on any other Sanctions list, or located, organized or resident in a country or territory that is the target of Sanctions, and (b) the purchase of the Product(s) will not violate any Sanctions or import and export control related laws and regulations.

8.8. All information supplied by the Purchaser is and shall be true and correct, and the information does not contain and will not contain any statement that is false or misleading.

## 9. Indemnification and Limitation of Liability

9.1. The Purchaser shall, during the term of this Agreement and at any time thereafter, indemnify and save Bitmain and/or its Affiliates harmless from and against any and all damages, suits, claims, judgments, liabilities, losses, fees, costs or expenses of

any kind, including legal fees, whatsoever arising out of or incidental to the Products pursuant to this Agreement.

9.2. Notwithstanding anything to the contrary herein, Bitmain and its Affiliates shall under no circumstances, be liable to the Purchaser for any consequential loss, or loss of goodwill, business, anticipated profits, revenue, contract, or business opportunity arising out of or in connection with this Agreement, and the Purchaser hereby waives any claim it may at any time have against Bitmain and its Affiliates in respect of any such damages. The foregoing limitation of liability shall apply whether in an action at law, including but not limited to contract, strict liability, negligence, willful misconduct or other tortious action, or an action in equity.

9.3. Bitmain and its Affiliates' cumulative aggregate liability pursuant to this Agreement, whether arising from tort, breach of contract or any other cause of action shall be limited to and not exceed the amount of one hundred percent (100%) of the down payment actually received by Bitmain from the Purchaser for the Product(s).

9.4. The Product(s) are not designed, manufactured or intended for use in hazardous or critical environments or in activities requiring emergency or fail-safe operation, such as the operation of nuclear facilities, aircraft navigation or communication systems or in any other applications or activities in which failure of the Product(s) may pose the risk of environmental harm or physical injury or death to humans. Bitmain specifically disclaims any express or implied warranty of fitness for any of the above described application and any such use shall be at the Purchaser's sole risk.

9.5. The above limitations and exclusions shall apply (1) notwithstanding failure of essential purpose of any exclusive or limited remedy; and (2) whether or not Bitmain has been advised of the possibility of such damages. This Clause allocates the risks under this Agreement and Bitmain's pricing reflects this allocation of risk and the above limitations.

## 10. Distribution

10.1. This Agreement does not constitute a distributor agreement between Bitmain and the Purchaser. Therefore, the Purchaser is not an authorized distributor of Bitmain.

10.2. The Purchaser shall in no event claim or imply to a third party that it is an authorized distributor of Bitmain or Bitmain (Antminer) or any similar terms, or perform any act that will cause it to be construed as an authorized distributor of Bitmain or Bitmain (Antminer). As between the Purchaser and Bitmain, the Purchaser shall be exclusively and fully responsible for complying with the Applicable Laws regarding repackaging the Product(s) for the Purchaser's redistribution needs, and shall be solely liable for any and all liabilities or costs directly incurred or incidental to such redistribution.

## 11. Intellectual Property Rights

13 / 27

11.1. The Parties agree that the Intellectual Property Rights in any way contained in the Product(s), made, conceived or developed by Bitmain and/or its Affiliates for the Product(s) under this Agreement and/or, achieved, derived from, related to, connected with the provision of the Product(s) by Bitmain and/or acquired by Bitmain from any other person in performance of this Agreement shall be the exclusive property of Bitmain and/or its Affiliates.

11.2. Notwithstanding anything to the contrary herein, all Intellectual Property Rights in the Product(s) shall remain the exclusive property of Bitmain and/or its licensors. Except for licenses explicitly identified in Bitmain's Shipping Confirmation or in this Clause 11.2, no rights or licenses are expressly granted, or implied, whether by estoppel or otherwise, in respect of any Intellectual Property Rights of Bitmain and/or its Affiliates or any Intellectual Property residing in the Product(s) provided by Bitmain to the Purchaser, including in any documentation or any data furnished by Bitmain. Bitmain grants the Purchaser a non-exclusive, non-transferrable, royalty-free and irrevocable license of Bitmain and/or its Affiliates' Intellectual Property Rights to solely use the Product(s) delivered by Bitmain to the Purchaser for their ordinary function, and subject to the Clauses set forth herein. The Purchaser shall in no event violate the Intellectual Property Rights of Bitmain and/or its licensors.

11.3. If applicable, payment by the Purchaser of non-recurring charges to Bitmain for any special designs, or engineering or production materials required for Bitmain's performance of Orders for customized Product(s), shall not be construed as payment for the assignment from Bitmain to the Purchaser of title to the design or special materials. Bitmain shall be the sole owner of such special designs, engineering or production materials.

## 12. Confidentiality and Communications

12.1. All information concerning this Agreement and matters pertaining to or derived from the provision of Product(s) pursuant to this Agreement between the Parties, whether in oral or written form, or in the form of drawings, computer programs or other, as well as all data derived therefrom ("Confidential Information"), shall be deemed to be confidential and, as such, may not be divulged to any unauthorized person. The Purchaser undertakes and agrees to take all reasonable and practicable steps to ensure and protect the confidentiality of the Confidential Information which cannot be passed, sold, traded, published or disclosed to any unauthorized person.

## 13. Term of this Agreement

13.1. This Agreement will be effective upon Bitmain's issuance of the shipping confirmation to the Purchaser, provided that if there is more than one shipping confirmation, this Agreement will be effective to the Products contained in each shipping confirmation upon Bitmain's issuance of the respective shipping confirmation to the Purchaser.

13.2. This Agreement shall remain effective up to and until the delivery of the last batch

of Products.

## 14. Contact Information

All communications in relation to this Agreement shall be made to the following contacts:

**Purchaser's business contact:**

Name: Jeff Pratt

Phone: (+1)4252410034

Email: jpratt@corescientific.com

**Bitmain's business contact:**

Name: Xinran He

Phone: (+86)15636130223

Email: Xinran.he@bitmain.com

## 15. Compliance with Laws and Regulations

15.1. The Purchaser undertakes that it will fully comply with all Applicable Laws in relation to export and import control and Sanctions and shall not take any action that would cause Bitmain or any of its Affiliates to be in violation of any export and import control laws or Sanctions. The Purchaser shall also be fully and exclusively liable for and shall defend, fully indemnify and hold harmless Bitmain and/or its Affiliates from and against any and all claims, demands, actions, costs or proceedings brought or instituted against Bitmain and/or its Affiliates arising out of or in connection with any breach by the Purchaser or the carrier of any Applicable Laws in relation to export and import control or Sanction.

15.2. The Purchaser acknowledges and agrees that the Product(s) in this Agreement are subject to the export control laws and regulations of all related countries, including but not limited to the Export Administration Regulations ("EAR") of the United States. Without limiting the foregoing, the Purchaser shall not, without receiving the proper licenses or license exceptions from all related governmental authorities, including but not limited to the U.S. Bureau of Industry and Security, distribute, re-distribute, export, re-export, or transfer any Product(s) subject to this Agreement either directly or indirectly, to any national of any country identified in Country Groups D:1 or E:1 as defined in the EARs. In addition, the Product(s) under this Agreement may not be exported, re-exported, or transferred to (a) any person or entity for military purposes; (b) any person or entity listed on the "Entity List", "Denied Persons List" or the SDN List as such lists are maintained by the U.S. Government, or (c) an end-user engaged in activities related to weapons of mass

15 / 27

destruction. Such activities include but are not necessarily limited to activities related to: (1) the design, development, production, or use of nuclear materials, nuclear facilities, or nuclear weapons; (2) the design, development, production, or use of missiles or support of missiles projects; and (3) the design, development, production, or use of chemical or biological weapons. The Purchaser further agrees that it will not do any of the foregoing in violation of any restriction, law, or regulation of the European Union or an individual EU member state that imposes on an exporter a burden equivalent to or greater than that imposed by the U.S. Bureau of Industry and Security.

15.3. The Purchaser undertakes that it will not take any action under this Agreement or use the Product(s) in a way that will be a breach of any anti-money laundering laws, any anti-corruption laws, and/or any counter-terrorist financing laws.

15.4. The Purchaser warrants that the Product(s) have been purchased with funds that are from legitimate sources and such funds do not constitute proceeds of criminal conduct, or realizable property, or proceeds of terrorism financing or property of terrorist, within the meaning given in the Corruption, Drug Trafficking and Other Serious Crimes (Confiscation of Benefits) Act (Chapter 65A) and the Terrorism (Suppression of Financing) Act (Chapter 325), respectively. If Bitmain receives, including but not limited to investigation, evidence collection, restriction and other measures, from any competent organizations or institutions, the Purchaser shall immediately cooperate with Bitmain and such competent organizations or institutions in the investigation process, and Bitmain may request the Purchaser to provide necessary security if so required. The Purchaser understands that if any Person resident in Singapore knows or suspects or has reasonable grounds for knowing or suspecting that another Person is engaged in criminal conduct or is involved with terrorism or terrorist property and the information for that knowledge or suspicion came to their attention in the course of business in the regulated sector, or other trade, profession, business or employment, the Person will be required to report such knowledge or suspicion to the Suspicious Transaction Reporting Office, Commercial Affairs Department of the Singapore Police Force. The Purchaser acknowledges that such a report shall not be treated as breach of confidence or violation of any restriction upon the disclosure of information imposed by any Applicable Law, contractually or otherwise.

## 16. Force Majeure

16.1. To the extent that a Party is fully or partially delayed, prevented or hindered by an event of Force Majeure from performing any obligation under this Agreement (other than an obligation to make payment), subject to the exercise of reasonable diligence by the affected Party, the failure to perform shall be excused by the occurrence of such event of Force Majeure. A Party claiming that its performance is excused by an event of Force Majeure shall, promptly after the occurrence of such event of Force Majeure, notify the other Party of the nature, date of inception and expected duration of such event of Force Majeure and the extent to which the Party expects that the

**16 / 27**

event will delay, prevent or hinder the Party from performing its obligations under this Agreement. The notifying Party shall thereafter use its best effort to eliminate such event of Force Majeure and mitigate its effects.

16.2. The affected Party shall use reasonable diligence to remove the event of Force Majeure, and shall keep the other Party informed of all significant developments.

16.3. Except in the case of an event of Force Majeure, neither party may terminate this Agreement prior to its expiry date.

## 17. Entire Agreement and Amendment

This Agreement, constitutes the entire agreement of the Parties hereto and can only be amended with the written consent of both Parties or otherwise as mutually agreed by both Parties.

## 18. Assignment

18.1. Bitmain may freely assign or transfer any of its rights, benefits or obligations under this Agreement in whole or in part to its Affiliates or to any third party. The Purchaser may not assign or transfer any of its rights, benefits or obligations under this Agreement in whole or in part without Bitmain's prior written consent.

18.2. This Agreement shall be binding upon and enure to the benefit of each Party to this Agreement and its successors in title and permitted assigns.

## 19. Severability

To the extent possible, if any provision of this Agreement is held to be illegal, invalid or unenforceable in whole or in part by a court, the provision shall apply with whatever deletion or modification is necessary so that such provision is legal, valid and enforceable and gives effect to the commercial intention of the Parties. The remaining provisions of this Agreement shall not be affected and shall remain in full force and effect.

## 20. Personal Data

Depending on the nature of the Purchaser's interaction with Bitmain, some examples of personal data which Bitmain may collect from the Purchaser include the Purchaser's name and identification information, contact information such as the Purchaser's address, email address and telephone number, nationality, gender, date of birth, and financial information such as credit card numbers, debit card numbers and bank account information.

Bitmain generally does not collect the Purchaser's personal data unless (a) it is provided to Bitmain voluntarily by the Purchaser directly or via a third party who has been duly authorized by the Purchaser to disclose the Purchaser's personal data to Bitmain (the Purchaser's "authorized representative") after (i) the Purchaser (or the Purchaser's authorized representative) has been notified of the purposes for which the data is collected,

and (ii) the Purchaser (or the Purchaser's authorized representative) has provided written consent to the collection and usage of the Purchaser's personal data for those purposes, or (b) collection and use of personal data without consent is permitted or required by related laws. Bitmain shall seek the Purchaser's consent before collecting any additional personal data and before using the Purchaser's personal data for a purpose which has not been notified to the Purchaser (except where permitted or authorized by law).

### 21. Conflict with the Terms and Conditions

In the event of any ambiguity or discrepancy between the Clauses of this Agreement and the Terms and Conditions from time to time, it is intended that the Clauses of this Agreement shall prevail and the Parties shall comply with and give effect to this Agreement.

### 22. Governing Law and Dispute Resolution

22.1. This Agreement shall be solely governed by and construed in accordance with the laws of Hong Kong.

22.2. Any dispute, controversy, difference or claim arising out of or relating to this Agreement, including the existence, validity, interpretation, performance, breach or termination hereof or any dispute regarding non-contractual obligations arising out of or relating to this Agreement shall be referred to and finally resolved by arbitration administered by the Hong Kong International Arbitration Center under the UNCITRAL Arbitration Rules in force when the notice of arbitration is submitted. The decision and awards of the arbitration shall be final and binding upon the parties hereto.

### 23. Waiver

Failure by either Party to enforce at any time any provision of this Agreement, or to exercise any election of options provided herein shall not constitute a waiver of such provision or option, nor affect the validity of this Agreement or any part hereof, or the right of the waiving Party to thereafter enforce each and every such provision or option.

### 24. Counterparts and Electronic Signatures

This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement, and all of which, when taken together, will be deemed to constitute one and the same agreement. The facsimile, email or other electronically delivered signatures of the Parties shall be deemed to constitute original signatures, and facsimile or electronic copies hereof shall be deemed to constitute duplicate originals.

### 25. Further Assurance

Each Party undertakes to the other Party to execute or procure to be executed all such documents and to do or procure to be done all such other acts and things as may be

reasonable and necessary to give all Parties the full benefit of this Agreement.

## 26. Third Party Rights

A person who is not a Party to this Agreement has no right under the Contracts (Rights of Third Parties) Ordinance (Chapter 623 of the Laws of Hong Kong) to enforce or to enjoy the benefit of any term of this Agreement.

## 27. Liquidated Damages Not Penalty

It is expressly agreed that any liquidated damages payable under this Agreement do not constitute a penalty and that the Parties, having negotiated in good faith for such specific liquidated damages and having agreed that the amount of such liquidated damages is reasonable in light of the anticipated harm caused by the breach related thereto and the difficulties of proof of loss and inconvenience or nonfeasibility of obtaining any adequate remedy, are estopped from contesting the validity or enforceability of such liquidated damages.

*(The rest part of the page is intentionally left in blank)*

Signed for and on behalf of Bitmain

**Bitmain Technologies Limited**

Signature

Title

Signed for and on behalf of the Purchaser

**Core Scientific, Inc.**

Signature

Title _SVP OPERATIONS & FINANCE_

## APPENDIX A

1. Products:

1.1. The information (including but not limited to the quantity, rated hashrate, estimated unit price ("**Unit Price**"), estimated total price("**Total Price (One Item)**"), total price for all the items ("**Total Purchase Price**") of Products to be purchased by Party B from Party A is as follows ("**Products**"):

1.1.1  Product Type

| Type | Details |
|---|---|
| Product Name | HASH Super Computing Server，S19j Pro |
| Rated hashrate / unit | ~100TH/s |
| Rated power / unit | ~2950W |
| J/T@25°C environment temperature | ~29.5 |
| Description | 1. Bitmain undertakes that the error range of "J/T@25°C environment temperature"does not exceed 10%.<br><br>2. "Rated hashrate / unit" and "rated power / unit" are for reference only and may defer from each batch or unit. Bitmain makes no representation on "Rated hashrate / unit" and "rated power / unit".<br><br>3. Purchaser shall not reject the Products on the grounds that the actual parameters of the delivered Products are not in consistence with the reference indicators. |

1.1.2  The estimated delivery schedule, reference quantity, total rated hashrate, unit price and total price are as follows:

| Batch | Product Name | Shipping Schedule | Refer ence Quant ity | Total Rated Hashrate (T) | Estimated Price (US$/T) | Estimated Unit Price (US$) | Estimated Total Price (US$) |
|---|---|---|---|---|---|---|---|
| 1 | HASH Super Computing Server, S19j Pro | August 2021 | 1250 | 125000 | 83.77 | 8377 | 10471250 |

| Batch | Product Name | Shipping Schedule | Refer ence Quant ity | Total Rated Hashrate (T) | Estimated Price (US$/T) | Estimated Unit Price (US$) | Estimated Total Price (US$) |
|---|---|---|---|---|---|---|---|
| 2 | HASH Super Computing Server, S19j Pro | September 2021 | 1250 | 125000 | 83.77 | 8377 | 10471250 |
| 3 | HASH Super Computing Server, S19j Pro | October 2021 | 1250 | 125000 | 83.77 | 8377 | 10471250 |
| 4 | HASH Super Computing Server, S19j Pro | November 2021 | 1250 | 125000 | 77.01 | 7701 | 9626250 |
| 5 | HASH Super Computing Server, S19j Pro | December 2021 | 1250 | 125000 | 77.01 | 7701 | 9626250 |
| 6 | HASH Super Computing Server, S19j Pro | January 2022 | 1250 | 125000 | 77.01 | 7701 | 9626250 |
| 7 | HASH Super Computing Server, S19j Pro | February 2022 | 1250 | 125000 | 64.85 | 6485 | 8106250 |
| 8 | HASH Super Computing Server, S19j Pro | March 2022 | 1250 | 125000 | 64.85 | 6485 | 8106250 |

| Batch | Product Name | Shipping Schedule | Refer ence Quant ity | Total Rated Hashrate (T) | Estimated Price (US$/T) | Estimated Unit Price (US$) | Estimated Total Price (US$) |
|-------|--------------|-------------------|----------------------|--------------------------|-------------------------|----------------------------|------------------------------|
| 9 | HASH Super Computing Server, S19j Pro | April 2022 | 1250 | 125000 | 64.85 | 6485 | 8106250 |
| 10 | HASH Super Computing Server, S19j Pro | May 2022 | 1250 | 125000 | 58.10 | 5810 | 7262500 |
| 11 | HASH Super Computing Server, S19j Pro | June 2022 | 1250 | 125000 | 58.10 | 5810 | 7262500 |
| 12 | HASH Super Computing Server, S19j Pro | July 2022 | 1250 | 125000 | 58.10 | 5810 | 7262500 |

1.1.3 Total price of the Products listed above:

Total Purchase Price (tax exclusive): US$106,398,750.00

Tax: US$0.00

Total Purchase Price (tax inclusive): US$106,398,750.00

1.2. Both Parties confirm and agree that Bitmain may adjust the total quantity based on the total hashrate provided that the total hashrate of the Product(s) actually delivered by Bitmain to the Purchaser shall not be less than the total rated hashrate agreed in Article 1.1 of this Appendix A. Bitmain makes no representation that the quantity of the actually delivered Products shall be the same as the quantity set forth in Article 1.1. of this Appendix A.

1.3. In the event that Bitmain publishes any new type of products with less J/T value and

suspends the production of the type of the Products as agreed in this Agreement, Bitmain shall be entitled to release itself from any future obligation to deliver any subsequent Products by 10-day prior notice to the Purchaser and continue to deliver new types of Products, the total rated hashrate of which shall be no less than such subsequent Products cancelled under this Agreement and the price of which shall be adjusted in accordance with the J/T value. In the event that the Purchaser explicitly refuses to accept new types of Products, the Purchaser is entitled to request for a refund of the remaining balance of the purchase price already paid by the Purchaser together with an interest at 0.0333% per day on such balance for the period from the next day following the payment date of such balance to the date immediately prior to the date of request of refund. If the Purchaser accepts the new types of Products delivered by Bitmain, Bitmain shall be obliged to deliver such new types of Products to fulfill its obligations under this Agreement. The Purchaser may request to lower the actual total hashrate of the Products delivered but shall not request to increase the actual total hashrate to the level exceeding the total rated hashrate as set out in this Agreement. After Bitmain publishes new types of Products and if Bitmain has not suspended the production of the types of Products under this Agreement, Bitmain shall continue to delivery such agreed types of Products in accordance with this Agreement and the Purchaser shall not terminate this Agreement or refuse to accept the Products on the grounds that Bitmain has published new type(s) of Products.

## 2. Cargo insurance coverage limitations:

The cargo insurance coverage provided by Bitmain is subject to the following limitations and exceptions:

### Exclusions:

- loss damage or expense attributable to willful misconduct of the Assured
- ordinary leakage, ordinary loss in weight or volume, or ordinary wear and tear of the subject-matter insured
- loss damage or expense caused by insufficiency or unsuitability of packing or preparation of the subject-matter insured (for the purpose of this Clause, "packing" shall be deemed to include stowage in a container or liftvan but only when such stowage is carried out prior to attachment of this insurance or by the Assured or their servants)
- loss damage or expense caused by inherent vice or nature of the subject-matter insured
- loss damage or expense proximately caused by delay, even though the delay be caused by a risk insured against (except expenses payable)
- loss damage or expense arising from insolvency or financial default of the owners managers charterers or operators of the vessel
- loss, damage, or expense arising from the use of any weapon of war employing atomic or nuclear fission, and/or fusion or other like reaction or radioactive force or matter.
- Loss, damage or expense arising from unseaworthiness of vessel or craft, unfitness

of vessel craft conveyance container or liftvan for the safe carriage of the subject-matter insured, where the Assured or their servants are privy to such unseaworthiness or unfitness, at the time the subject-matter insured is loaded therein.

- The Underwriters waive any breach of the implied warranties of seaworthiness of the ship and fitness of the ship to carry the subject-matter insured to destination, unless the Assured or their servants are privy to such unseaworthiness or unfitness.

- Loss, damage or expense caused by (1) war, civil war, revolution, rebellion, insurrection, or civil strife arising therefrom, or any hostile act by or against a belligerent power, (2) capture, seizure, arrest, restraint or detainment (piracy excepted), and the consequences thereof or any attempt threat, (3) derelict mines, torpedoes, bombs, or other derelict weapons of war.

- Loss, damage, or expense caused by strikers, locked-out workmen, or persons taking part in labor disturbances, riots or civil commotion, resulting from strikes, lock-outs, labor disturbances, riots or civil commotions, caused by any terrorist or any person acting from a political motive.

3. **Bitmain's BANK ACCOUNT info:**

   Company Name: Bitmain Technologies Limited

   Company address: FLAT/RM A1 11/F SUCCESS COMMERCIAL BUILDING 245-251 HENNESSY ROAD HK

   Account No.: 1503225561

   Bank name: Signature Bank

   Bank address: 565 Fifth Avenue New York NY 10017, US

   Swift Code: SIGNUS33XXX

   ABA CODE: 026013576 (for US local payment)

4. The payment shall be arranged by the Purchaser as Appendix B.

5. At any time prior to the delivery, Bitmain is entitled to, by written notice, request the Purchaser to enter into a separate purchase agreement and Bitmain and the Purchaser, if so requested, shall cooperate with Bitmain to enter into such purchase agreement and shall pay the outstanding price for the Products in accordance with the terms and conditions of this Agreement, failing which Bitmain is entitled to request the Purchaser to continue to perform its obligations under this Agreement.

6. The Purchaser shall pay 25% of the Total Purchase Price as down payment to Bitmain by April 23 2021, with the remaining being settled in accordance with the payment schedule set forth in this Agreement.

7. Without prejudice to the above, the unit price and the Total Purchase Price of the

Product(s) and any amount paid by the Purchaser shall be all denominated in USD. Where the Parties agree that the payments shall be made in cryptocurrencies, the exchange rate between the USD and the cryptocurrency selected shall be determined and calculated as follows: (1) in the event that the Purchaser pays for any order placed on Bitmain's official website (the "Website", http://www.bitmain.com) which is valid and has not been fully paid yet, the exchange rate between the USD and the cryptocurrency fixed in such placed Order shall apply, or (2) in any other case, the real time exchange rate between the USD and the cryptocurrency displayed on the Website upon payment shall apply. The exchange rate between the USD and the cryptocurrency shall be fixed according to this provision. In any circumstance, the Purchaser shall not ask for any refund due to the change of exchange rate.

## APPENDIX B

| Payment Percentage | Payment Date | Note | Example (Assuming this Agreement is signed on April 22,) |
|---|---|---|---|
| At least 25% | by April 23 2021 | 25% of the Total Purchase Price | 25% of the Total Purchase Price shall be paid by April 23 2021 |
| At least 35% | six (6) months prior to the shipment | 35% per month of a single batch | 35% of the price for August/September/October/November batch shall be paid by May 30 2021; 35% of the price for December batch shall be paid by June 30 2021; 35% of the price for January batch shall be paid by July 30 2021; etc. |
| The remaining 40% | one (1) month prior to the shipment | 40% per month of a single batch | 40% of the price for August batch shall be paid by June 30 2021; 40% of the price for September batch shall be paid by July 30 2021; 40% of the price for October batch shall be paid by August 30 2021; etc. |

## NON-FIXED PRICE

## SALES AND PURCHASE AGREEMENT

### BETWEEN

**Bitmain Technologies Limited
("Bitmain")**

### AND

**Core Scientific, Inc.
("Purchaser")**



| | | |
|---|---|---|
| 1. | Definitions and Interpretations | 3 |
| 2. | Sales of Product(s) | 5 |
| 3. | Prices and Terms of Payment | 5 |
| 4. | Product Discount | 7 |
| 5. | Shipping of Product(s) | 7 |
| 6. | Customs | 9 |
| 7. | Warranty | 9 |
| 8. | Representations and Warranties | 11 |
| 9. | Indemnification and Limitation of Liability | 12 |
| 10. | Distribution | 13 |
| 11. | Intellectual Property Rights | 13 |
| 12. | Confidentiality and Communications | 14 |
| 13. | Term of this Agreement | 14 |
| 14. | Contact Information | 15 |
| 15. | Compliance with Laws and Regulations | 15 |
| 16. | Force Majeure | 16 |
| 17. | Entire Agreement and Amendment | 17 |
| 18. | Assignment | 17 |
| 19. | Severability | 17 |
| 20. | Personal Data | 17 |
| 21. | Conflict with the Terms and Conditions | 18 |
| 22. | Governing Law and Dispute Resolution | 18 |
| 23. | Waiver | 18 |
| 24. | Counterparts and Electronic Signatures | 18 |
| 25. | Further Assurance | 18 |
| 26. | Third Party Rights | 19 |
| 27. | Liquidated Damages Not Penalty | 19 |

This non-fixed price sales and purchase agreement (this "Agreement") is made on April 22, 2021 by and between Bitmain Technologies Limited ("Bitmain") (Company number: 2024301), with its registered office at Unit A1 of Unit A, 11th Floor, Success Commercial Building, 245-251 Hennessy Road, Hong Kong, and Core Scientific, Inc. (the "Purchaser") (EIN: 82-3805526), with its principal place of business at 2800 Northup Way, Bellevue, WA 98004, the US.

Bitmain and the Purchaser shall hereinafter collectively be referred to as the "Parties", and individually as a "Party".

Whereas:

1. Purchaser fully understands the market risks, the price-setting principles and the market fluctuations relating to the Products sold under this Agreement.

2. Purchaser has purchased the Products through the website of Bitmain (i.e., https://shop.bitmain.com/, similarly hereinafter) for many times, and is familiar with the purchase order processes of Bitmain's website.

3. Based on the above consensus, the Purchaser is willing to purchase and Bitmain is willing to supply cryptocurrency mining hardware and other equipment in accordance with the terms and conditions of this Agreement.

The Parties hereto agree as follows:

## 1. Definitions and Interpretations

The following terms, as used herein, have the following meanings:

"Affiliate" means, with respect to any Person, any other Person directly or indirectly Controlling, Controlled by, or under common Control with such Person; "Person" means any individual, corporation, partnership, limited partnership, proprietorship, association, limited liability company, firm, trust, estate or other enterprise or entity (whether or not having separate legal personality); and "Control" means the power or authority, whether exercised or not, to direct the business, management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, provided that such power or authority shall conclusively be presumed to exist upon possession of beneficial ownership or power to direct the vote of more than fifty percent (50%) of the votes entitled to be cast at a meeting of the members or shareholders of such Person or power to control the composition of a majority of the board of directors of such Person. The terms "Controlled" and "Controlling" have meanings correlative to the foregoing.

"Applicable Law" means any treaty, law, decree, order, regulation, decision, statute, ordinance, rule, directive, code or other document that has legal force under any system of law, including, without limitation, local law, law of any other state or part thereof or international law, and which creates or purports to create any requirement or rule that may

affect, restrict, prohibit or expressly allow the terms of this Agreement or any activity contemplated or carried out under this Agreement.

"Bank Account" means the bank account information of Bitmain provided in Appendix A of this Agreement.

"Force Majeure" means in respect of either Party, any event or occurrence whatsoever beyond the reasonable control of that Party, which delays, prevents or hinders that Party from performing any obligation imposed upon that Party under this Agreement, including to the extent such event or occurrence shall delay, prevent or hinder such Party from performing such obligation, war (declared or undeclared), terrorist activities, acts of sabotage, blockade, fire, lightning, acts of god, national strikes, riots, insurrections, civil commotions, quarantine restrictions, epidemics, earthquakes, landslides, avalanches, floods, hurricanes, explosions and regulatory and administrative or similar action or delays to take actions of any governmental authority.

"Intellectual Property Rights" means any and all intellectual property rights, including but not limited to those concerning inventions, patents, utility models, registered designs and models, engineering or production materials, drawings, trademarks, service marks, domain names, applications for any of the foregoing (and the rights to apply for any of the foregoing), proprietary or business sensitive information and/or technical know-how, copyright, authorship, whether registered or not, and any neighbor rights.

"Order" means the Purchaser's request to Bitmain for certain Product(s) in accordance with this Agreement.

"Product(s)" means the merchandise that Bitmain will provide to the Purchaser in accordance with this Agreement.

"Total Purchase Price" means the aggregate amount payable by the Purchaser as set out in Appendix A of this Agreement.

"Warranty Period" means the period of time that the Product(s) are covered by the warranty granted by Bitmain or its Affiliates in accordance with Clause 7 of this Agreement.

"Warranty Start Date" means the date on which the Product(s) are delivered to the carrier.

Interpretations:

i) Words importing the singular include the plural and vice versa where the context so requires.

ii) The headings in this Agreement are for convenience only and shall not be taken into consideration in the interpretation or construction of this Agreement.

iii) References to Clauses and Appendix(es) are references to Clauses and Appendix(es) of this Agreement.

iv) Unless specifically stated otherwise, all references to days shall mean calendar days.

v) Any reference to a code, law, statute, statutory provision, statutory instrument, order, regulation or other instrument of similar effect shall include any re-enactment or amendment thereof for the time being in force.

## 2. Sales of Product(s)

Bitmain will provide the Product(s) set forth in Appendix A (attached hereto as part of this Agreement) to the Purchaser in accordance with provisions of Clause 2, Clause 3, Clause 4, Clause 5 and Appendix A of this Agreement, and the Purchaser shall make payment in accordance with the terms specified in this Agreement.

2.1. Both Parties agree that the Product(s) shall be sold in accordance with the following steps:

   (i) The Purchaser shall place Order through Bitmain's website or through other methods accepted by Bitmain, and such Order shall constitute an irrevocable offer to purchase specific Product(s) from Bitmain.

   (ii) After receiving the Order, Bitmain will send an order receipt confirmation email to the Purchaser. The Purchaser's Order will be valid for a period of twenty-four (24) hours after its placement, and upon expiration of such period, Bitmain will have the right to cancel the Order at its sole discretion if the Purchaser fails to pay the down payment in accordance with Appendix A of this Agreement.

   (iii) The Purchaser shall pay the Total Purchase Price in accordance with Appendix A of this Agreement.

   (iv) Upon receipt of the Total Purchase Price, Bitmain will provide a payment receipt to the Purchaser.

   (v) Bitmain will send a shipping confirmation to the Purchaser after it has delivered the Product(s) to the carrier.

2.2. The Purchaser acknowledges and confirms that the Order is irrevocable and cannot be cancelled by the Purchaser, and that the Product(s) ordered are neither returnable nor refundable. All sums paid by the Purchaser to Bitmain shall not be subject to any abatement, set-off, claim, counterclaim, adjustment, reduction, or defense for any reason. Down payment and payment of Total Purchase Price are not refundable, save as otherwise mutually agreed by the Parties.

## 3. Prices and Terms of Payment

3.1 The Total Purchase Price (inclusive of any tax payable) shall be paid in accordance with the payment schedule set forth in Appendix B of this Agreement.

5 / 27

3.2 In the event that the Purchaser fails to fully settle the respective percentage of the Total Purchase Price before the prescribed deadlines and fails to make a written request to Bitmain no less than five (5) business days prior to the prescribed deadline and obtain Bitmain's written consent, Bitmain shall be entitled to terminate this Agreement and the Purchase shall be liable for a reasonable liquidated damage (not a penalty) of 20% of the purchase price of such batch of Products. If there are any remaining balance after deducting the liquidated damage, such remaining balance shall be refunded to the Purchaser free of any interest. If the Purchaser fails to pay the down payment on a timely basis and Bitmain has arranged production or procurement, Bitmain shall be entitled to request the Purchaser to be responsible for the loss related to such production or procurement.

3.3 The Total Purchase Price set forth in this Agreement is merely an estimate of the price and not the actual price. The actual price will be determined [one] month before the current batch is shipped and with reference to the market circumstances, provided that the actual price shall not be higher than the estimated price.

3.4 Upon receipt of notification of the actual price provided by Bitmain, the Purchaser shall be entitled to three options:

    (i)    continue to perform the Order of the current batch of the Product(s) with the original rated hashrate and pay the remaining amount at the actual price; or

    (ii)    request Bitmain to increase the rated hashrate in equivalent to the difference in price. Under this circumstance, Bitmain shall have the right to negotiate with the Purchaser for the amount of the additional rated hashrate based on its then inventory; or

    (iii)    partially or wholly cancel the Order of the current batch of Product(s). Under this circumstance, the Purchaser shall not claim any refund from Bitmain. If the Purchaser has made payments and there is remaining balance, such remaining balance shall be credited to the balance of the Purchaser and its affiliates.

Furthermore, the Purchaser shall confirm in writing the result of its exercise of the options under this Clause within two (2) days after Bitmain provides the Purchaser with the actual price, and if it is overdue and no agreement is reached between the Parties, the Purchaser shall be deemed to have voluntarily and irrevocably waived its option under this Clause and the Parties shall continue to perform the Order of the current batch of Product(s) with the original rated hashrate and the Purchaser shall pay the remaining amount at the actual price.

3.5 The Parties understand and agree that the applicable prices of the Product(s) are inclusive of applicable bank transaction fee, but are exclusive of any and all applicable import duties, taxes and governmental charges. The Purchaser shall pay or reimburse Bitmain for all taxes levied on or assessed against the amounts payable hereunder. If any payment is subject to withholding, the Purchaser shall pay such additional amounts as necessary, to ensure that Bitmain receives the full amount it would have received had payment not been subject to such withholding.

## 4. Product Discount

Based on the sales results and sales strategy, Bitmain is willing to offer the following discount as set forth in clause 4.1:

4.1. With respect of the signing of this Agreement, Bitmain offers the following discount to the Purchaser:

4.1.1. The Products under this Agreement consists of twelve (12) batches and the discount amount of each batch shall be calculated separately.

4.1.2. Bitmain may provide difference discounts to the Purchaser based on the actual amount of the prepayment and the payment time.

Discount Amount = Amount of prepayment * 1% * Number of months prepaid. The amount of prepayment shall be calculated at the end of each month. The number of months prepaid shall be calculated from the month of payment without counting the month of delivery. For clarification, the payment date shall be the date as evidenced in the remittance copy of such payment, and the discount term shall be calculated when the respective amounts under this Agreement have been received by Bitmain in full and without further consideration of the remaining amount. Payment schedules may be further adjusted in accordance with the actual situations.

4.1.3. If the Purchaser fails to make the payments on time, the discount applicable to such batch shall be cancelled.

4.2. No discount will be offered by Bitmain to the Purchaser.

## 5. Shipping of Product(s)

5.1. Bitmain shall deliver the Products in accordance with the shipping schedule to the first carrier or the carrier designated by the Purchaser.

5.2. Subject to the limitations stated in Appendix A, the terms of delivery of the Product(s) shall be CIP (carriage and insurance paid to (named place of destination) according to Incoterms 2010) to the place of delivery designated by the Purchaser. Once the Product(s) have been delivered to the carrier, Bitmain shall have fulfilled its obligation to supply the Product(s) to the Purchaser, and the title and risk of loss or damage to the Product(s) shall pass to the Purchaser.

5.3. In the event of any discrepancy between this Agreement and Bitmain's cargo insurance policy regarding the insurance coverage, the then effective Bitmain cargo insurance policy shall prevail, and Bitmain shall be required to provide the then effective insurance coverage to the Purchaser.

5.4. If Bitmain fails to deliver the Products after thirty (30) days after the prescribed deadline, the Purchaser shall be entitled to cancel the Order of such batch of Products and request Bitmain to refund the price of such undelivered batch of Products

together with an interest at 0.0333% per day for the period from the next day of each payment of the price of such batch of Products to the date immediately prior to the request. In the event that the Purchaser does not cancel the Order of the undelivered batch of Products and requests Bitmain to perform its delivery obligation, Bitmain shall continue to perform its delivery obligation and compensate the Purchaser in accordance with Clause 5.5 of this Agreement.

5.5. If Bitmain postpones the shipping schedule of the Products and the Purchaser does not cancel the Order, Bitmain shall make a compensation to the Purchaser on daily basis, the amount of which shall equal to 0.0333% of the price of such undelivered batch of Products, which compensation shall be made in the form of delivery of more rated hashrate. Amount less than one unit of Product shall be credited to the balance of the Purchaser in the user system on Bitmain's official website, which shall be viewable by the Purchaser.

5.6. There are twelve (12) batches of Products under this Agreement and each batch shall constitute independent legal obligations of and shall be performed separately by the Parties. The delay of a particular batch shall not constitute waiver of the payment obligation of the Purchaser in respect of other batches. The Purchaser shall not be entitled to terminate this Agreement solely on the ground of delay of delivery of a single batch of Products.

5.7. The purchaser shall choose the following shipping method:

■Shipping by Bitmain via Fedex/DHL/UPS/other logistics company: □Self-pick

Note: Logistics costs shall be borne by the Purchaser. Bitmain may collect payments on behalf of the services providers and issue services invoices if the Purchaser requests Bitmain to send the Products.

5.8. Bitmain shall not be responsible for any delivery delay caused by the Purchaser or any third party, including but not limited to the carrier, the customs, and the import brokers, nor shall it be liable for damages, whether direct, indirect, incidental, consequential, or otherwise, for any failure, delay or error in delivery of any Product(s) for any reason whatsoever.

5.9. Bitmain shall not be responsible and the Purchaser shall be fully and exclusively responsible for any loss of Product(s), personal injury, property damage, other damage or liability caused by the Product(s) or the transportation of the Product(s) either to the Purchaser or any third party, or theft of the Product(s) during transportation from Bitmain to the Purchaser.

5.10. Bitmain has the right to discontinue the sale of the Product(s) and to make changes to its Product(s) at any time, without prior approval from or notice to the Purchaser.

5.11. If the Product(s) is rejected and/or returned back to Bitmain because of any reason and regardless of the cause of such delivery failure, the Purchaser shall be solely and

8 / 27

exclusively liable for and shall defend, fully indemnify and hold harmless Bitmain against any and all related expenses, fees, charges and costs incurred, arising out of or incidental to such rejection and/or return (the "Return Expense"). Furthermore, if the Purchaser would like to ask for Bitmain's assistance in redelivering such Product(s) or assist in any other manner, and if Bitmain at its sole discretion decides to provide this assistance, then in addition to the Return Expense, the Purchaser shall also pay Bitmain an administrative fee in accordance with Bitmain's then applicable internal policy.

5.12. If the Purchaser fails to provide Bitmain with the delivery place or the delivery place provided by the Purchaser is a false address or does not exist, or the Purchaser reject to accept the Products, any related costs occurred (including storage costs, warehousing charge and labor costs) shall be borne by the Purchaser. Bitmain may issue the Purchaser a notice of self-pick-up and ask the Purchaser to pick up the Products itself. Bitmain shall be deemed to have completed the delivery obligation under this Agreement after two (2) business days following the issue of the self-pick-up notice. After 30 days of the self-pick-up notice, the Purchaser shall be entitled to deal with the Products in any manner as it deems appropriate.

5.13. The Purchaser shall inspect the Products within 2 days (the "Acceptance Time") after receiving the Products (the date of signature on the carrier's delivery voucher shall be the date of receipt), if the Purchaser does not raise any written objection within the agreed Acceptance Time, the Products delivered by Bitmain shall be deemed to be in full compliance with the provisions of this Agreement.

6. **Customs**

6.1. Bitmain shall obtain in due time and maintain throughout the term of this Agreement (if applicable), any and all approvals, permits, authorizations, licenses and clearances for the export of the Product(s) that are required to be obtained by Bitmain or the carrier under Applicable Laws.

6.2. The Purchaser shall obtain in due time and maintain throughout the term of this Agreement (if applicable), any and all approvals, permits, authorizations, licenses and clearances required for the import of the Product(s) to the country of delivery as indicated in the shipping information, that are required to be obtained by the Purchaser or the carrier under Applicable Laws, and shall be responsible for any and all additional fees, expenses and charges in relation to the import of the Product(s).

7. **Warranty**

7.1. The Warranty Period shall start on the Warranty Start Date and end on the 365th day after the Warranty Start Date. During the Warranty Period, the Purchaser's sole and exclusive remedy, and Bitmain's entire liability, will be to repair or replace, at Bitmain's option, the defective part/component of the Product(s) or the defective Product(s) at no charge to the Purchaser. If the Purchaser requires Bitmain to provide any warranty services, the Purchaser shall create a maintenance order on Bitmain's

website during the Warranty Period (the time of creation of the maintenance order shall be determined by the display time of such order on Bitmain's website) and send the Product to the place designated by Bitmain within the time limit required by Bitmain. Otherwise, Bitmain shall be entitled to refuse to provide the warranty service.

7.2. The Parties acknowledge and agree that the warranty provided by Bitmain as stated in the preceding paragraph does not apply to the following:

(i) normal wear and tear;

(ii) damage resulting from accident, abuse, misuse, neglect, improper handling or improper installation;

(iii) damage or loss of the Product(s) caused by undue physical or electrical stress, including but not limited to moisture, corrosive environments, high voltage surges, extreme temperatures, shipping, or abnormal working conditions;

(iv) damage or loss of the Product(s) caused by acts of nature including, but not limited to, floods, storms, fires, and earthquakes;

(v) damage caused by operator error, or non-compliance with instructions as set out in accompanying documentation;

(vi) alterations by persons other than Bitmain, associated partners or authorized service facilities;

(vii) Product(s), on which the original software has been replaced or modified by persons other than Bitmain, associated partners or authorized service facilities;

(viii) counterfeit products;

(ix) damage or loss of data due to interoperability with current and/or future versions of operating system, software and/or hardware;

(x) damage or loss of data caused by improper usage and behavior which is not recommended and/or permitted in the product documentation;

(xi) failure of the Product(s) caused by usage of products not supplied by Bitmain; and

(xii) hash boards or chips are burnt.

In case the warranty is voided, Bitmain may, at its sole discretion, provide repair service to the Purchaser, and the Purchaser shall bear all related expenses and costs.

10 / 27

7.3. Notwithstanding anything to the contrary herein, the Purchaser acknowledges and agrees that the Product(s) provided by Bitmain do not guarantee any cryptocurrency mining time and, Bitmain shall not be liable for any cryptocurrency mining time loss or cryptocurrency mining revenue loss that are caused by downtime of any part/component of the Product(s). Bitmain does not warrant that the Product(s) will meet the Purchaser's requirements or the Product(s) will be uninterrupted or error free. Except as provided in Clause 7.1 of this Agreement, Bitmain makes no warranties to the Purchaser with respect to the Product(s), and no warranties of any kind, whether written, oral, express, implied or statutory, including warranties of merchantability, fitness for a particular purpose or non-infringement or arising from course of dealing or usage in trade shall apply.

7.4. In the event of any ambiguity or discrepancy between this Clause 7 of this Agreement and Bitmain's After-sales Service Policy from time to time, it is intended that the After-sales Service Policy shall prevail and the Parties shall comply with and give effect to the After-sales Service Policy. Please refer to the website of Bitmain for detailed terms of warranty and after-sales maintenance. Bitmain has no obligation to notify the Purchaser of the update or modification of such terms.

7.5. During the warranty period, if the hardware product needs to be repaired or replaced, the Purchaser shall bear the logistics costs of shipping the Product to the address designated by Bitmain, and Bitmain shall bear the logistics costs of shipping back the repaired or replaced Product to the address designated by the Purchaser. The Purchaser shall bear all and any additional costs incurred due to incorrect or incomplete delivery information provided by the Purchaser and all and any risks of loss or damage to the Product, or the parts or components of the Products during the transportation period (including the transportation period when the product is sent to Bitmain and returned by Bitmain to the Purchaser).

## 8. Representations and Warranties

The Purchaser makes the following representations and warranties to Bitmain:

8.1. It has the full power and authority to own its assets and carry on its businesses.

8.2. The obligations expressed to be assumed by it under this Agreement are legal, valid, binding and enforceable obligations.

8.3. It has the power to enter into, perform and deliver, and has taken all necessary action to authorize its entry into, performance and delivery of, this Agreement and the transactions contemplated by this Agreement.

8.4. The entry into and performance by it of, and the transactions contemplated by, this Agreement do not and will not conflict with:

  (i)   any Applicable Law;

(ii)     its constitutional documents; or

(iii)    any agreement or instrument binding upon it or any of its assets.

8.5.  All authorizations required or desirable:

(i)     to enable it lawfully to enter into, exercise its rights under and comply with
its obligations under this Agreement;

(ii)    to ensure that those obligations are legal, valid, binding and enforceable; and

(iii)   to make this Agreement admissible in evidence in its jurisdiction of
incorporation,

have been or will have been by the time, obtained or effected and are, or will be by
the appropriate time, in full force and effect.

8.6.  It is not aware of any circumstances which are likely to lead to:

(i)     any authorization obtained or effected not remaining in full force and effect;

(ii)    any authorization not being obtained, renewed or effected when required or
desirable; or

(iii)   any authorization being subject to a condition or requirement which it does
not reasonably expect to satisfy or the compliance with which has or could
reasonably be expected to have a material adverse effect.

8.7.  (a) It is not the target of economic sanctions administered by the Office of Foreign
Assets Control of the U.S. Department of the Treasury, the U.S. Department of State,
the United Nations Security Council, the European Union, Her Majesty's Treasury
or Singapore ("Sanctions"), including by being listed on the Specially Designated
Nationals and Blocked Persons (SDN) List maintained by OFAC or any other
Sanctions list maintained by one of the foregoing governmental authorities,
directly or indirectly owned or controlled by one or more SDNs or other Persons
included on any other Sanctions list, or located, organized or resident in a country or
territory that is the target of Sanctions, and (b) the purchase of the Product(s) will not
violate any Sanctions or import and export control related laws and regulations.

8.8.  All information supplied by the Purchaser is and shall be true and correct, and the
information does not contain and will not contain any statement that is false or
misleading.

## 9.  Indemnification and Limitation of Liability

9.1.  The Purchaser shall, during the term of this Agreement and at any time thereafter,
indemnify and save Bitmain and/or its Affiliates harmless from and against any and
all damages, suits, claims, judgments, liabilities, losses, fees, costs or expenses of

12 / 27

any kind, including legal fees, whatsoever arising out of or incidental to the Products pursuant to this Agreement.

9.2. Notwithstanding anything to the contrary herein, Bitmain and its Affiliates shall under no circumstances, be liable to the Purchaser for any consequential loss, or loss of goodwill, business, anticipated profits, revenue, contract, or business opportunity arising out of or in connection with this Agreement, and the Purchaser hereby waives any claim it may at any time have against Bitmain and its Affiliates in respect of any such damages. The foregoing limitation of liability shall apply whether in an action at law, including but not limited to contract, strict liability, negligence, willful misconduct or other tortious action, or an action in equity.

9.3. Bitmain and its Affiliates' cumulative aggregate liability pursuant to this Agreement, whether arising from tort, breach of contract or any other cause of action shall be limited to and not exceed the amount of one hundred percent (100%) of the down payment actually received by Bitmain from the Purchaser for the Product(s).

9.4. The Product(s) are not designed, manufactured or intended for use in hazardous or critical environments or in activities requiring emergency or fail-safe operation, such as the operation of nuclear facilities, aircraft navigation or communication systems or in any other applications or activities in which failure of the Product(s) may pose the risk of environmental harm or physical injury or death to humans. Bitmain specifically disclaims any express or implied warranty of fitness for any of the above described application and any such use shall be at the Purchaser's sole risk.

9.5. The above limitations and exclusions shall apply (1) notwithstanding failure of essential purpose of any exclusive or limited remedy; and (2) whether or not Bitmain has been advised of the possibility of such damages. This Clause allocates the risks under this Agreement and Bitmain's pricing reflects this allocation of risk and the above limitations.

## 10. Distribution

10.1. This Agreement does not constitute a distributor agreement between Bitmain and the Purchaser. Therefore, the Purchaser is not an authorized distributor of Bitmain.

10.2. The Purchaser shall in no event claim or imply to a third party that it is an authorized distributor of Bitmain or Bitmain (Antminer) or any similar terms, or perform any act that will cause it to be construed as an authorized distributor of Bitmain or Bitmain (Antminer). As between the Purchaser and Bitmain, the Purchaser shall be exclusively and fully responsible for complying with the Applicable Laws regarding repackaging the Product(s) for the Purchaser's redistribution needs, and shall be solely liable for any and all liabilities or costs directly incurred or incidental to such redistribution.

## 11. Intellectual Property Rights

11.1. The Parties agree that the Intellectual Property Rights in any way contained in the Product(s), made, conceived or developed by Bitmain and/or its Affiliates for the Product(s) under this Agreement and/or, achieved, derived from, related to, connected with the provision of the Product(s) by Bitmain and/or acquired by Bitmain from any other person in performance of this Agreement shall be the exclusive property of Bitmain and/or its Affiliates.

11.2. Notwithstanding anything to the contrary herein, all Intellectual Property Rights in the Product(s) shall remain the exclusive property of Bitmain and/or its licensors. Except for licenses explicitly identified in Bitmain's Shipping Confirmation or in this Clause 11.2, no rights or licenses are expressly granted, or implied, whether by estoppel or otherwise, in respect of any Intellectual Property Rights of Bitmain and/or its Affiliates or any Intellectual Property residing in the Product(s) provided by Bitmain to the Purchaser, including in any documentation or any data furnished by Bitmain. Bitmain grants the Purchaser a non-exclusive, non-transferrable, royalty-free and irrevocable license of Bitmain and/or its Affiliates' Intellectual Property Rights to solely use the Product(s) delivered by Bitmain to the Purchaser for their ordinary function, and subject to the Clauses set forth herein. The Purchaser shall in no event violate the Intellectual Property Rights of Bitmain and/or its licensors.

11.3. If applicable, payment by the Purchaser of non-recurring charges to Bitmain for any special designs, or engineering or production materials required for Bitmain's performance of Orders for customized Product(s), shall not be construed as payment for the assignment from Bitmain to the Purchaser of title to the design or special materials. Bitmain shall be the sole owner of such special designs, engineering or production materials.

## 12. Confidentiality and Communications

12.1. All information concerning this Agreement and matters pertaining to or derived from the provision of Product(s) pursuant to this Agreement between the Parties, whether in oral or written form, or in the form of drawings, computer programs or other, as well as all data derived therefrom ("Confidential Information"), shall be deemed to be confidential and, as such, may not be divulged to any unauthorized person. The Purchaser undertakes and agrees to take all reasonable and practicable steps to ensure and protect the confidentiality of the Confidential Information which cannot be passed, sold, traded, published or disclosed to any unauthorized person.

## 13. Term of this Agreement

13.1. This Agreement will be effective upon Bitmain's issuance of the shipping confirmation to the Purchaser, provided that if there is more than one shipping confirmation, this Agreement will be effective to the Products contained in each shipping confirmation upon Bitmain's issuance of the respective shipping confirmation to the Purchaser.

13.2. This Agreement shall remain effective up to and until the delivery of the last batch

14 / 27

of Products.

## 14. Contact Information

All communications in relation to this Agreement shall be made to the following contacts:

**Purchaser's business contact:**

Name: Jeff Pratt

Phone: (+1)4252410034

Email: jpratt@corescientific.com

**Bitmain's business contact:**

Name: Xinran He

Phone: (+86)15636130223

Email: Xinran.he@bitmain.com

## 15. Compliance with Laws and Regulations

15.1. The Purchaser undertakes that it will fully comply with all Applicable Laws in relation to export and import control and Sanctions and shall not take any action that would cause Bitmain or any of its Affiliates to be in violation of any export and import control laws or Sanctions. The Purchaser shall also be fully and exclusively liable for and shall defend, fully indemnify and hold harmless Bitmain and/or its Affiliates from and against any and all claims, demands, actions, costs or proceedings brought or instituted against Bitmain and/or its Affiliates arising out of or in connection with any breach by the Purchaser or the carrier of any Applicable Laws in relation to export and import control or Sanction.

15.2. The Purchaser acknowledges and agrees that the Product(s) in this Agreement are subject to the export control laws and regulations of all related countries, including but not limited to the Export Administration Regulations ("EAR") of the United States. Without limiting the foregoing, the Purchaser shall not, without receiving the proper licenses or license exceptions from all related governmental authorities, including but not limited to the U.S. Bureau of Industry and Security, distribute, re-distribute, export, re-export, or transfer any Product(s) subject to this Agreement either directly or indirectly, to any national of any country identified in Country Groups D:1 or E:1 as defined in the EARs. In addition, the Product(s) under this Agreement may not be exported, re-exported, or transferred to (a) any person or entity for military purposes; (b) any person or entity listed on the "Entity List", "Denied Persons List" or the SDN List as such lists are maintained by the U.S. Government, or (c) an end-user engaged in activities related to weapons of mass

15 / 27

destruction. Such activities include but are not necessarily limited to activities related to: (1) the design, development, production, or use of nuclear materials, nuclear facilities, or nuclear weapons; (2) the design, development, production, or use of missiles or support of missiles projects; and (3) the design, development, production, or use of chemical or biological weapons. The Purchaser further agrees that it will not do any of the foregoing in violation of any restriction, law, or regulation of the European Union or an individual EU member state that imposes on an exporter a burden equivalent to or greater than that imposed by the U.S. Bureau of Industry and Security.

15.3. The Purchaser undertakes that it will not take any action under this Agreement or use the Product(s) in a way that will be a breach of any anti-money laundering laws, any anti-corruption laws, and/or any counter-terrorist financing laws.

15.4. The Purchaser warrants that the Product(s) have been purchased with funds that are from legitimate sources and such funds do not constitute proceeds of criminal conduct, or realizable property, or proceeds of terrorism financing or property of terrorist, within the meaning given in the Corruption, Drug Trafficking and Other Serious Crimes (Confiscation of Benefits) Act (Chapter 65A) and the Terrorism (Suppression of Financing) Act (Chapter 325), respectively. If Bitmain receives, including but not limited to investigation, evidence collection, restriction and other measures, from any competent organizations or institutions, the Purchaser shall immediately cooperate with Bitmain and such competent organizations or institutions in the investigation process, and Bitmain may request the Purchaser to provide necessary security if so required. The Purchaser understands that if any Person resident in Singapore knows or suspects or has reasonable grounds for knowing or suspecting that another Person is engaged in criminal conduct or is involved with terrorism or terrorist property and the information for that knowledge or suspicion came to their attention in the course of business in the regulated sector, or other trade, profession, business or employment, the Person will be required to report such knowledge or suspicion to the Suspicious Transaction Reporting Office, Commercial Affairs Department of the Singapore Police Force. The Purchaser acknowledges that such a report shall not be treated as breach of confidence or violation of any restriction upon the disclosure of information imposed by any Applicable Law, contractually or otherwise.

### 16. Force Majeure

16.1. To the extent that a Party is fully or partially delayed, prevented or hindered by an event of Force Majeure from performing any obligation under this Agreement (other than an obligation to make payment), subject to the exercise of reasonable diligence by the affected Party, the failure to perform shall be excused by the occurrence of such event of Force Majeure. A Party claiming that its performance is excused by an event of Force Majeure shall, promptly after the occurrence of such event of Force Majeure, notify the other Party of the nature, date of inception and expected duration of such event of Force Majeure and the extent to which the Party expects that the

16 / 27

event will delay, prevent or hinder the Party from performing its obligations under this Agreement. The notifying Party shall thereafter use its best effort to eliminate such event of Force Majeure and mitigate its effects.

16.2. The affected Party shall use reasonable diligence to remove the event of Force Majeure, and shall keep the other Party informed of all significant developments.

16.3. Except in the case of an event of Force Majeure, neither party may terminate this Agreement prior to its expiry date.

## 17. Entire Agreement and Amendment

This Agreement, constitutes the entire agreement of the Parties hereto and can only be amended with the written consent of both Parties or otherwise as mutually agreed by both Parties.

## 18. Assignment

18.1. Bitmain may freely assign or transfer any of its rights, benefits or obligations under this Agreement in whole or in part to its Affiliates or to any third party. The Purchaser may not assign or transfer any of its rights, benefits or obligations under this Agreement in whole or in part without Bitmain's prior written consent.

18.2. This Agreement shall be binding upon and enure to the benefit of each Party to this Agreement and its successors in title and permitted assigns.

## 19. Severability

To the extent possible, if any provision of this Agreement is held to be illegal, invalid or unenforceable in whole or in part by a court, the provision shall apply with whatever deletion or modification is necessary so that such provision is legal, valid and enforceable and gives effect to the commercial intention of the Parties. The remaining provisions of this Agreement shall not be affected and shall remain in full force and effect.

## 20. Personal Data

Depending on the nature of the Purchaser's interaction with Bitmain, some examples of personal data which Bitmain may collect from the Purchaser include the Purchaser's name and identification information, contact information such as the Purchaser's address, email address and telephone number, nationality, gender, date of birth, and financial information such as credit card numbers, debit card numbers and bank account information.

Bitmain generally does not collect the Purchaser's personal data unless (a) it is provided to Bitmain voluntarily by the Purchaser directly or via a third party who has been duly authorized by the Purchaser to disclose the Purchaser's personal data to Bitmain (the Purchaser's "authorized representative") after (i) the Purchaser (or the Purchaser's authorized representative) has been notified of the purposes for which the data is collected,

and (ii) the Purchaser (or the Purchaser's authorized representative) has provided written consent to the collection and usage of the Purchaser's personal data for those purposes, or (b) collection and use of personal data without consent is permitted or required by related laws. Bitmain shall seek the Purchaser's consent before collecting any additional personal data and before using the Purchaser's personal data for a purpose which has not been notified to the Purchaser (except where permitted or authorized by law).

## 21. Conflict with the Terms and Conditions

In the event of any ambiguity or discrepancy between the Clauses of this Agreement and the Terms and Conditions from time to time, it is intended that the Clauses of this Agreement shall prevail and the Parties shall comply with and give effect to this Agreement.

## 22. Governing Law and Dispute Resolution

22.1. This Agreement shall be solely governed by and construed in accordance with the laws of Hong Kong.

22.2. Any dispute, controversy, difference or claim arising out of or relating to this Agreement, including the existence, validity, interpretation, performance, breach or termination hereof or any dispute regarding non-contractual obligations arising out of or relating to this Agreement shall be referred to and finally resolved by arbitration administered by the Hong Kong International Arbitration Center under the UNCITRAL Arbitration Rules in force when the notice of arbitration is submitted. The decision and awards of the arbitration shall be final and binding upon the parties hereto.

## 23. Waiver

Failure by either Party to enforce at any time any provision of this Agreement, or to exercise any election of options provided herein shall not constitute a waiver of such provision or option, nor affect the validity of this Agreement or any part hereof, or the right of the waiving Party to thereafter enforce each and every such provision or option.

## 24. Counterparts and Electronic Signatures

This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement, and all of which, when taken together, will be deemed to constitute one and the same agreement. The facsimile, email or other electronically delivered signatures of the Parties shall be deemed to constitute original signatures, and facsimile or electronic copies hereof shall be deemed to constitute duplicate originals.

## 25. Further Assurance

Each Party undertakes to the other Party to execute or procure to be executed all such documents and to do or procure to be done all such other acts and things as may be

reasonable and necessary to give all Parties the full benefit of this Agreement.

### 26. Third Party Rights

A person who is not a Party to this Agreement has no right under the Contracts (Rights of Third Parties) Ordinance (Chapter 623 of the Laws of Hong Kong) to enforce or to enjoy the benefit of any term of this Agreement.

### 27. Liquidated Damages Not Penalty

It is expressly agreed that any liquidated damages payable under this Agreement do not constitute a penalty and that the Parties, having negotiated in good faith for such specific liquidated damages and having agreed that the amount of such liquidated damages is reasonable in light of the anticipated harm caused by the breach related thereto and the difficulties of proof of loss and inconvenience or nonfeasibility of obtaining any adequate remedy, are estopped from contesting the validity or enforceability of such liquidated damages.

*(The rest part of the page is intentionally left in blank)*

Signed for and on behalf of Bitmain

**Bitmain Technologies Limited**

Signature

Title

Signed for and on behalf of the Purchaser

**Core Scientific, Inc.**

Signature

Title _SVP OPERATIONS + FINANCE_

## APPENDIX A

1. Products:

1.1.The information (including but not limited to the quantity, rated hashrate, estimated unit price ("**Unit Price**"), estimated total price("**Total Price (One Item)**"), total price for all the items ("**Total Purchase Price**") of Products to be purchased by Party B from Party A is as follows ("**Products**"):

1.1.1  Product Type

| Type | Details |
|------|---------|
| Product Name | HASH Super Computing Server，S19j Pro |
| Rated hashrate / unit | ~100TH/s |
| Rated power / unit | ~2950W |
| J/T@25°C environment temperature | ~29.5 |
| Description | 1. Bitmain undertakes that the error range of "J/T@25°C environment temperature"does not exceed 10%.<br><br>2. "Rated hashrate / unit" and "rated power / unit" are for reference only and may defer from each batch or unit. Bitmain makes no representation on "Rated hashrate / unit" and "rated power / unit".<br><br>3. Purchaser shall not reject the Products on the grounds that the actual parameters of the delivered Products are not in consistence with the reference indicators. |

1.1.2  The estimated delivery schedule, reference quantity, total rated hashrate, unit price and total price are as follows:

| Batch | Product Name | Shipping Schedule | Refer ence Quant ity | Total Rated Hashrate (T) | Estimated Price (US$/T) | Estimated Unit Price (US$) | Estimated Total Price (US$) |
|-------|-------------|-------------------|---------|------------|----------|-----------|------------|
| 1 | HASH Super Computing Server, S19j Pro | August 2021 | 3250 | 325000 | 83.77 | 8377 | 27225250 |

| Batch | Product Name | Shipping Schedule | Reference Quantity | Total Rated Hashrate (T) | Estimated Price (US$/T) | Estimated Unit Price (US$) | Estimated Total Price (US$) |
|-------|-------------|-------------------|--------------------|-----------------------|----------------------|--------------------------|----------------------------|
| 2 | HASH Super Computing Server, S19j Pro | September 2021 | 3250 | 325000 | 83.77 | 8377 | 27225250 |
| 3 | HASH Super Computing Server, S19j Pro | October 2021 | 3250 | 325000 | 83.77 | 8377 | 27225250 |
| 4 | HASH Super Computing Server, S19j Pro | November 2021 | 3250 | 325000 | 77.01 | 7701 | 25028250 |
| 5 | HASH Super Computing Server, S19j Pro | December 2021 | 3250 | 325000 | 77.01 | 7701 | 25028250 |
| 6 | HASH Super Computing Server, S19j Pro | January 2022 | 3250 | 325000 | 77.01 | 7701 | 25028250 |
| 7 | HASH Super Computing Server, S19j Pro | February 2022 | 3250 | 325000 | 64.85 | 6485 | 21076250 |
| 8 | HASH Super Computing Server, S19j Pro | March 2022 | 3250 | 325000 | 64.85 | 6485 | 21076250 |

| Batch | Product Name | Shipping Schedule | Refer ence Quant ity | Total Rated Hashrate (T) | Estimated Price (US$/T) | Estimated Unit Price (US$) | Estimated Total Price (US$) |
|-------|--------------|-------------------|------------------|--------------------------|-------------------------|----------------------------|------------------------------|
| 9 | HASH Super Computing Server, S19j Pro | April 2022 | 3250 | 325000 | 64.85 | 6485 | 21076250 |
| 10 | HASH Super Computing Server, S19j Pro | May 2022 | 3250 | 325000 | 58.10 | 5810 | 18882500 |
| 11 | HASH Super Computing Server, S19j Pro | June 2022 | 3250 | 325000 | 58.10 | 5810 | 18882500 |
| 12 | HASH Super Computing Server, S19j Pro | July 2022 | 3250 | 325000 | 58.10 | 5810 | 18882500 |

1.1.3   Total price of the Products listed above:

Total Purchase Price (tax exclusive): US$276,636,750.00

Tax: US$0.00

Total Purchase Price (tax inclusive): US$276,636,750.00

1.2.Both Parties confirm and agree that Bitmain may adjust the total quantity based on the total hashrate provided that the total hashrate of the Product(s) actually delivered by Bitmain to the Purchaser shall not be less than the total rated hashrate agreed in Article 1.1 of this Appendix A. Bitmain makes no representation that the quantity of the actually delivered Products shall be the same as the quantity set forth in Article 1.1. of this Appendix A.

1.3.In the event that Bitmain publishes any new type of products with less J/T value and

23 / 27

suspends the production of the type of the Products as agreed in this Agreement, Bitmain shall be entitled to release itself from any future obligation to deliver any subsequent Products by 10-day prior notice to the Purchaser and continue to deliver new types of Products, the total rated hashrate of which shall be no less than such subsequent Products cancelled under this Agreement and the price of which shall be adjusted in accordance with the J/T value. In the event that the Purchaser explicitly refuses to accept new types of Products, the Purchaser is entitled to request for a refund of the remaining balance of the purchase price already paid by the Purchaser together with an interest at 0.0333% per day on such balance for the period from the next day following the payment date of such balance to the date immediately prior to the date of request of refund. If the Purchaser accepts the new types of Products delivered by Bitmain, Bitmain shall be obliged to deliver such new types of Products to fulfill its obligations under this Agreement. The Purchaser may request to lower the actual total hashrate of the Products delivered but shall not request to increase the actual total hashrate to the level exceeding the total rated hashrate as set out in this Agreement. After Bitmain publishes new types of Products and if Bitmain has not suspended the production of the types of Products under this Agreement, Bitmain shall continue to delivery such agreed types of Products in accordance with this Agreement and the Purchaser shall not terminate this Agreement or refuse to accept the Products on the grounds that Bitmain has published new type(s) of Products.

## 2.  Cargo insurance coverage limitations:

The cargo insurance coverage provided by Bitmain is subject to the following limitations and exceptions:

### Exclusions:

- loss damage or expense attributable to willful misconduct of the Assured
- ordinary leakage, ordinary loss in weight or volume, or ordinary wear and tear of the subject-matter insured
- loss damage or expense caused by insufficiency or unsuitability of packing or preparation of the subject-matter insured (for the purpose of this Clause, "packing" shall be deemed to include stowage in a container or liftvan but only when such stowage is carried out prior to attachment of this insurance or by the Assured or their servants)
- loss damage or expense caused by inherent vice or nature of the subject-matter insured
- loss damage or expense proximately caused by delay, even though the delay be caused by a risk insured against (except expenses payable)
- loss damage or expense arising from insolvency or financial default of the owners managers charterers or operators of the vessel
- loss, damage, or expense arising from the use of any weapon of war employing atomic or nuclear fission, and/or fusion or other like reaction or radioactive force or matter.
- Loss, damage or expense arising from unseaworthiness of vessel or craft, unfitness

24 / 27

of vessel craft conveyance container or liftvan for the safe carriage of the subject-matter insured, where the Assured or their servants are privy to such unseaworthiness or unfitness, at the time the subject-matter insured is loaded therein.

- The Underwriters waive any breach of the implied warranties of seaworthiness of the ship and fitness of the ship to carry the subject-matter insured to destination, unless the Assured or their servants are privy to such unseaworthiness or unfitness.
- Loss, damage or expense caused by (1) war, civil war, revolution, rebellion, insurrection, or civil strife arising therefrom, or any hostile act by or against a belligerent power, (2) capture, seizure, arrest, restraint or detainment (piracy excepted), and the consequences thereof or any attempt threat, (3) derelict mines, torpedoes, bombs, or other derelict weapons of war.
- Loss, damage, or expense caused by strikers, locked-out workmen, or persons taking part in labor disturbances, riots or civil commotion, resulting from strikes, lock-outs, labor disturbances, riots or civil commotions, caused by any terrorist or any person acting from a political motive.

3. **Bitmain's BANK ACCOUNT info:**

   Company Name: Bitmain Technologies Limited

   Company address: FLAT/RM A1 11/F SUCCESS COMMERCIAL BUILDING 245-251 HENNESSY ROAD HK

   Account No.: 1503225561

   Bank name: Signature Bank

   Bank address: 565 Fifth Avenue New York NY 10017, US

   Swift Code: SIGNUS33XXX

   ABA CODE: 026013576 (for US local payment)

4. The payment shall be arranged by the Purchaser as Appendix B.

5. At any time prior to the delivery, Bitmain is entitled to, by written notice, request the Purchaser to enter into a separate purchase agreement and Bitmain and the Purchaser, if so requested, shall cooperate with Bitmain to enter into such purchase agreement and shall pay the outstanding price for the Products in accordance with the terms and conditions of this Agreement, failing which Bitmain is entitled to request the Purchaser to continue to perform its obligations under this Agreement.

6. The Purchaser shall pay 25% of the Total Purchase Price as down payment to Bitmain by April 28 2021, with the remaining being settled in accordance with the payment schedule set forth in this Agreement.

7. Without prejudice to the above, the unit price and the Total Purchase Price of the

Product(s) and any amount paid by the Purchaser shall be all denominated in USD. Where the Parties agree that the payments shall be made in cryptocurrencies, the exchange rate between the USD and the cryptocurrency selected shall be determined and calculated as follows: (1) in the event that the Purchaser pays for any order placed on Bitmain's official website (the "Website", http://www.bitmain.com) which is valid and has not been fully paid yet, the exchange rate between the USD and the cryptocurrency fixed in such placed Order shall apply, or (2) in any other case, the real time exchange rate between the USD and the cryptocurrency displayed on the Website upon payment shall apply. The exchange rate between the USD and the cryptocurrency shall be fixed according to this provision. In any circumstance, the Purchaser shall not ask for any refund due to the change of exchange rate.

**APPENDIX B**

| Payment Percentage | Payment Date | Note | Example (Assuming this Agreement is signed on April 22th) |
|---|---|---|---|
| At least 25% | by April 28 2021. | 25% of the Total Purchase Price | 25% of the Total Purchase Price shall be paid by April 28 2021 |
| At least 35% | six (6) months prior to the shipment; 35% of the price for August/September/October/November batch shall be paid in May 2021 (US$15,000,000.00 shall be paid by May 21 2021; US$22,346,400.00 shall be paid by May 28 2021) | 35% per month of a single batch | 35% of the price for August/September/October/November batch shall be paid in May 2021; 35% of the price for December batch shall be paid by June 30 2021; 35% of the price for January batch shall be paid by July 30 2021; etc. |
| The remaining 40% | one (1) month prior to the shipment | 40% per month of a single batch | 40% of the price for August batch shall be paid by June 30 2021; 40% of the price for September batch shall be paid by July 30 2021; 40% of the price for October batch shall be paid by August 30 2021; etc. |

**NON-FIXED PRICE**

**SALES AND PURCHASE AGREEMENT**

**BETWEEN**

**Bitmain Technologies Limited**
**("Bitmain")**

**AND**

**Core Scientific, Inc.**
**("Purchaser")**

| | | |
|---|---|---|
| 1. | Definitions and Interpretations | 3 |
| 2. | Sales of Product(s) | 5 |
| 3. | Prices and Terms of Payment | 5 |
| 4. | Product Discount | 7 |
| 5. | Shipping of Product(s) | 7 |
| 6. | Customs | 9 |
| 7. | Warranty | 9 |
| 8. | Representations and Warranties | 11 |
| 9. | Indemnification and Limitation of Liability | 12 |
| 10. | Distribution | 13 |
| 11. | Intellectual Property Rights | 13 |
| 12. | Confidentiality and Communications | 14 |
| 13. | Term of this Agreement | 14 |
| 14. | Contact Information | 15 |
| 15. | Compliance with Laws and Regulations | 15 |
| 16. | Force Majeure | 16 |
| 17. | Entire Agreement and Amendment | 17 |
| 18. | Assignment | 17 |
| 19. | Severability | 17 |
| 20. | Personal Data | 17 |
| 21. | Conflict with the Terms and Conditions | 18 |
| 22. | Governing Law and Dispute Resolution | 18 |
| 23. | Waiver | 18 |
| 24. | Counterparts and Electronic Signatures | 18 |
| 25. | Further Assurance | 18 |
| 26. | Third Party Rights | 19 |
| 27. | Liquidated Damages Not Penalty | 19 |

This non-fixed price sales and purchase agreement (this "Agreement") is made on May 13, 2021 by and between Bitmain Technologies Limited ("Bitmain") (Company number: 2024301), with its registered office at Unit A1 of Unit A, 11th Floor, Success Commercial Building, 245-251 Hennessy Road, Hong Kong, and Core Scientific, Inc. (the "Purchaser") (EIN: 82-3805526), with its principal place of business at 2800 Northup Way, Bellevue, WA 98004, the US.

Bitmain and the Purchaser shall hereinafter collectively be referred to as the "Parties", and individually as a "Party".

Whereas:

1. Purchaser fully understands the market risks, the price-setting principles and the market fluctuations relating to the Products sold under this Agreement.

2. Purchaser has purchased the Products through the website of Bitmain (i.e., https://shop.bitmain.com/, similarly hereinafter) for many times, and is familiar with the purchase order processes of Bitmain's website.

3. Based on the above consensus, the Purchaser is willing to purchase and Bitmain is willing to supply cryptocurrency mining hardware and other equipment in accordance with the terms and conditions of this Agreement.

The Parties hereto agree as follows:

## 1. Definitions and Interpretations

The following terms, as used herein, have the following meanings:

"Affiliate" means, with respect to any Person, any other Person directly or indirectly Controlling, Controlled by, or under common Control with such Person; "Person" means any individual, corporation, partnership, limited partnership, proprietorship, association, limited liability company, firm, trust, estate or other enterprise or entity (whether or not having separate legal personality); and "Control" means the power or authority, whether exercised or not, to direct the business, management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, provided that such power or authority shall conclusively be presumed to exist upon possession of beneficial ownership or power to direct the vote of more than fifty percent (50%) of the votes entitled to be cast at a meeting of the members or shareholders of such Person or power to control the composition of a majority of the board of directors of such Person. The terms "Controlled" and "Controlling" have meanings correlative to the foregoing.

"Applicable Law" means any treaty, law, decree, order, regulation, decision, statute, ordinance, rule, directive, code or other document that has legal force under any system of law, including, without limitation, local law, law of any other state or part thereof or international law, and which creates or purports to create any requirement or rule that may

3 / 27

affect, restrict, prohibit or expressly allow the terms of this Agreement or any activity contemplated or carried out under this Agreement.

"Bank Account" means the bank account information of Bitmain provided in Appendix A of this Agreement.

"Force Majeure" means in respect of either Party, any event or occurrence whatsoever beyond the reasonable control of that Party, which delays, prevents or hinders that Party from performing any obligation imposed upon that Party under this Agreement, including to the extent such event or occurrence shall delay, prevent or hinder such Party from performing such obligation, war (declared or undeclared), terrorist activities, acts of sabotage, blockade, fire, lightning, acts of god, national strikes, riots, insurrections, civil commotions, quarantine restrictions, epidemics, earthquakes, landslides, avalanches, floods, hurricanes, explosions and regulatory and administrative or similar action or delays to take actions of any governmental authority.

"Intellectual Property Rights" means any and all intellectual property rights, including but not limited to those concerning inventions, patents, utility models, registered designs and models, engineering or production materials, drawings, trademarks, service marks, domain names, applications for any of the foregoing (and the rights to apply for any of the foregoing), proprietary or business sensitive information and/or technical know-how, copyright, authorship, whether registered or not, and any neighbor rights.

"Order" means the Purchaser's request to Bitmain for certain Product(s) in accordance with this Agreement.

"Product(s)" means the merchandise that Bitmain will provide to the Purchaser in accordance with this Agreement.

"Total Purchase Price" means the aggregate amount payable by the Purchaser as set out in Appendix A of this Agreement.

"Warranty Period" means the period of time that the Product(s) are covered by the warranty granted by Bitmain or its Affiliates in accordance with Clause 7 of this Agreement.

"Warranty Start Date" means the date on which the Product(s) are delivered to the carrier.

Interpretations:

i)     Words importing the singular include the plural and vice versa where the context so requires.

ii)    The headings in this Agreement are for convenience only and shall not be taken into consideration in the interpretation or construction of this Agreement.

iii)   References to Clauses and Appendix(es) are references to Clauses and Appendix(es) of this Agreement.

iv)    Unless specifically stated otherwise, all references to days shall mean calendar days.

v)    Any reference to a code, law, statute, statutory provision, statutory instrument, order, regulation or other instrument of similar effect shall include any re-enactment or amendment thereof for the time being in force.

## 2. Sales of Product(s)

Bitmain will provide the Product(s) set forth in Appendix A (attached hereto as part of this Agreement) to the Purchaser in accordance with provisions of Clause 2, Clause 3, Clause 4, Clause 5 and Appendix A of this Agreement, and the Purchaser shall make payment in accordance with the terms specified in this Agreement.

2.1.   Both Parties agree that the Product(s) shall be sold in accordance with the following steps:

(i)    The Purchaser shall place Order through Bitmain's website or through other methods accepted by Bitmain, and such Order shall constitute an irrevocable offer to purchase specific Product(s) from Bitmain.

(ii)    After receiving the Order, Bitmain will send an order receipt confirmation email to the Purchaser. The Purchaser's Order will be valid for a period of twenty-four (24) hours after its placement, and upon expiration of such period, Bitmain will have the right to cancel the Order at its sole discretion if the Purchaser fails to pay the down payment in accordance with Appendix A of this Agreement.

(iii)    The Purchaser shall pay the Total Purchase Price in accordance with Appendix A of this Agreement.

(iv)    Upon receipt of the Total Purchase Price, Bitmain will provide a payment receipt to the Purchaser.

(v)    Bitmain will send a shipping confirmation to the Purchaser after it has delivered the Product(s) to the carrier.

2.2.   The Purchaser acknowledges and confirms that the Order is irrevocable and cannot be cancelled by the Purchaser, and that the Product(s) ordered are neither returnable nor refundable. All sums paid by the Purchaser to Bitmain shall not be subject to any abatement, set-off, claim, counterclaim, adjustment, reduction, or defense for any reason. Down payment and payment of Total Purchase Price are not refundable, save as otherwise mutually agreed by the Parties.

## 3. Prices and Terms of Payment

3.1    The Total Purchase Price (inclusive of any tax payable) shall be paid in accordance with the payment schedule set forth in Appendix B of this Agreement.

3.2 In the event that the Purchaser fails to fully settle the respective percentage of the Total Purchase Price before the prescribed deadlines and fails to make a written request to Bitmain no less than five (5) business days prior to the prescribed deadline and obtain Bitmain's written consent, Bitmain shall be entitled to terminate this Agreement and the Purchase shall be liable for a reasonable liquidated damage (not a penalty) of 20% of the purchase price of such batch of Products. If there are any remaining balance after deducting the liquidated damage, such remaining balance shall be refunded to the Purchaser free of any interest. If the Purchaser fails to pay the down payment on a timely basis and Bitmain has arranged production or procurement, Bitmain shall be entitled to request the Purchaser to be responsible for the loss related to such production or procurement.

3.3 The Total Purchase Price set forth in this Agreement is merely an estimate of the price and not the actual price. The actual price will be determined [one] month before the current batch is shipped and with reference to the market circumstances, provided that the actual price shall not be higher than the estimated price.

3.4 Upon receipt of notification of the actual price provided by Bitmain, the Purchaser shall be entitled to three options:

(i) continue to perform the Order of the current batch of the Product(s) with the original rated hashrate and pay the remaining amount at the actual price; or

(ii) request Bitmain to increase the rated hashrate in equivalent to the difference in price. Under this circumstance, Bitmain shall have the right to negotiate with the Purchaser for the amount of the additional rated hashrate based on its then inventory; or

(iii) partially or wholly cancel the Order of the current batch of Product(s). Under this circumstance, the Purchaser shall not claim any refund from Bitmain. If the Purchaser has made payments and there is remaining balance, such remaining balance shall be credited to the balance of the Purchaser and its affiliates.

Furthermore, the Purchaser shall confirm in writing the result of its exercise of the options under this Clause within two (2) days after Bitmain provides the Purchaser with the actual price, and if it is overdue and no agreement is reached between the Parties, the Purchaser shall be deemed to have voluntarily and irrevocably waived its option under this Clause and the Parties shall continue to perform the Order of the current batch of Product(s) with the original rated hashrate and the Purchaser shall pay the remaining amount at the actual price.

3.5 The Parties understand and agree that the applicable prices of the Product(s) are inclusive of applicable bank transaction fee, but are exclusive of any and all applicable import duties, taxes and governmental charges. The Purchaser shall pay or reimburse Bitmain for all taxes levied on or assessed against the amounts payable hereunder. If any payment is subject to withholding, the Purchaser shall pay such additional amounts as necessary, to ensure that Bitmain receives the full amount it would have received had payment not been subject to such withholding.

6 / 27

### 4. Product Discount

Based on the sales results and sales strategy, Bitmain is willing to offer the following discount as set forth in clause 4.1:

4.1. With respect of the signing of this Agreement, Bitmain offers the following discount to the Purchaser:

4.1.1. The Products under this Agreement consists of twelve (12) batches and the discount amount of each batch shall be calculated separately.

4.1.2. Bitmain may provide difference discounts to the Purchaser based on the actual amount of the prepayment and the payment time.

Discount Amount = Amount of prepayment * 1% * Number of months prepaid. The amount of prepayment shall be calculated at the end of each month. The number of months prepaid shall be calculated from the month of payment without counting the month of delivery. For clarification, the payment date shall be the date as evidenced in the remittance copy of such payment, and the discount term shall be calculated when the respective amounts under this Agreement have been received by Bitmain in full and without further consideration of the remaining amount. Payment schedules may be further adjusted in accordance with the actual situations.

4.1.3. If the Purchaser fails to make the payments on time, the discount applicable to such batch shall be cancelled.

4.2. No discount will be offered by Bitmain to the Purchaser.

### 5. Shipping of Product(s)

5.1. Bitmain shall deliver the Products in accordance with the shipping schedule to the first carrier or the carrier designated by the Purchaser.

5.2. Subject to the limitations stated in Appendix A, the terms of delivery of the Product(s) shall be CIP (carriage and insurance paid to (named place of destination) according to Incoterms 2010) to the place of delivery designated by the Purchaser. Once the Product(s) have been delivered to the carrier, Bitmain shall have fulfilled its obligation to supply the Product(s) to the Purchaser, and the title and risk of loss or damage to the Product(s) shall pass to the Purchaser.

5.3. In the event of any discrepancy between this Agreement and Bitmain's cargo insurance policy regarding the insurance coverage, the then effective Bitmain cargo insurance policy shall prevail, and Bitmain shall be required to provide the then effective insurance coverage to the Purchaser.

5.4. If Bitmain fails to deliver the Products after thirty (30) days after the prescribed deadline, the Purchaser shall be entitled to cancel the Order of such batch of Products and request Bitmain to refund the price of such undelivered batch of Products

together with an interest at 0.0333% per day for the period from the next day of each payment of the price of such batch of Products to the date immediately prior to the request. In the event that the Purchaser does not cancel the Order of the undelivered batch of Products and requests Bitmain to perform its delivery obligation, Bitmain shall continue to perform its delivery obligation and compensate the Purchaser in accordance with Clause 5.5 of this Agreement.

5.5. If Bitmain postpones the shipping schedule of the Products and the Purchaser does not cancel the Order, Bitmain shall make a compensation to the Purchaser on daily basis, the amount of which shall equal to 0.0333% of the price of such undelivered batch of Products, which compensation shall be made in the form of delivery of more rated hashrate. Amount less than one unit of Product shall be credited to the balance of the Purchaser in the user system on Bitmain's official website, which shall be viewable by the Purchaser.

5.6. There are twelve (12) batches of Products under this Agreement and each batch shall constitute independent legal obligations of and shall be performed separately by the Parties. The delay of a particular batch shall not constitute waiver of the payment obligation of the Purchaser in respect of other batches. The Purchaser shall not be entitled to terminate this Agreement solely on the ground of delay of delivery of a single batch of Products.

5.7. The purchaser shall choose the following shipping method:

■Shipping by Bitmain via Fedex/DHL/UPS/other logistics company；□Self-pick

Note: Logistics costs shall be borne by the Purchaser. Bitmain may collect payments on behalf of the services providers and issue services invoices if the Purchaser requests Bitmain to send the Products.

5.8. Bitmain shall not be responsible for any delivery delay caused by the Purchaser or any third party, including but not limited to the carrier, the customs, and the import brokers, nor shall it be liable for damages, whether direct, indirect, incidental, consequential, or otherwise, for any failure, delay or error in delivery of any Product(s) for any reason whatsoever.

5.9. Bitmain shall not be responsible and the Purchaser shall be fully and exclusively responsible for any loss of Product(s), personal injury, property damage, other damage or liability caused by the Product(s) or the transportation of the Product(s) either to the Purchaser or any third party, or theft of the Product(s) during transportation from Bitmain to the Purchaser.

5.10. Bitmain has the right to discontinue the sale of the Product(s) and to make changes to its Product(s) at any time, without prior approval from or notice to the Purchaser.

5.11. If the Product(s) is rejected and/or returned back to Bitmain because of any reason and regardless of the cause of such delivery failure, the Purchaser shall be solely and

exclusively liable for and shall defend, fully indemnify and hold harmless Bitmain against any and all related expenses, fees, charges and costs incurred, arising out of or incidental to such rejection and/or return (the "Return Expense"). Furthermore, if the Purchaser would like to ask for Bitmain's assistance in redelivering such Product(s) or assist in any other manner, and if Bitmain at its sole discretion decides to provide this assistance, then in addition to the Return Expense, the Purchaser shall also pay Bitmain an administrative fee in accordance with Bitmain's then applicable internal policy.

5.12. If the Purchaser fails to provide Bitmain with the delivery place or the delivery place provided by the Purchaser is a false address or does not exist, or the Purchaser reject to accept the Products, any related costs occurred (including storage costs, warehousing charge and labor costs) shall be borne by the Purchaser. Bitmain may issue the Purchaser a notice of self-pick-up and ask the Purchaser to pick up the Products itself. Bitmain shall be deemed to have completed the delivery obligation under this Agreement after two (2) business days following the issue of the self-pick-up notice. After 30 days of the self-pick-up notice, the Purchaser shall be entitled to deal with the Products in any manner as it deems appropriate.

5.13. The Purchaser shall inspect the Products within 2 days (the "Acceptance Time") after receiving the Products (the date of signature on the carrier's delivery voucher shall be the date of receipt), if the Purchaser does not raise any written objection within the agreed Acceptance Time, the Products delivered by Bitmain shall be deemed to be in full compliance with the provisions of this Agreement.

## 6. Customs

6.1. Bitmain shall obtain in due time and maintain throughout the term of this Agreement (if applicable), any and all approvals, permits, authorizations, licenses and clearances for the export of the Product(s) that are required to be obtained by Bitmain or the carrier under Applicable Laws.

6.2. The Purchaser shall obtain in due time and maintain throughout the term of this Agreement (if applicable), any and all approvals, permits, authorizations, licenses and clearances required for the import of the Product(s) to the country of delivery as indicated in the shipping information, that are required to be obtained by the Purchaser or the carrier under Applicable Laws, and shall be responsible for any and all additional fees, expenses and charges in relation to the import of the Product(s).

## 7. Warranty

7.1. The Warranty Period shall start on the Warranty Start Date and end on the 365th day after the Warranty Start Date. During the Warranty Period, the Purchaser's sole and exclusive remedy, and Bitmain's entire liability, will be to repair or replace, at Bitmain's option, the defective part/component of the Product(s) or the defective Product(s) at no charge to the Purchaser. If the Purchaser requires Bitmain to provide any warranty services, the Purchaser shall create a maintenance order on Bitmain's

website during the Warranty Period (the time of creation of the maintenance order shall be determined by the display time of such order on Bitmain's website) and send the Product to the place designated by Bitmain within the time limit required by Bitmain. Otherwise, Bitmain shall be entitled to refuse to provide the warranty service.

7.2. The Parties acknowledge and agree that the warranty provided by Bitmain as stated in the preceding paragraph does not apply to the following:

  (i)     normal wear and tear;

  (ii)    damage resulting from accident, abuse, misuse, neglect, improper handling or improper installation;

  (iii)   damage or loss of the Product(s) caused by undue physical or electrical stress, including but not limited to moisture, corrosive environments, high voltage surges, extreme temperatures, shipping, or abnormal working conditions;

  (iv)    damage or loss of the Product(s) caused by acts of nature including, but not limited to, floods, storms, fires, and earthquakes;

  (v)     damage caused by operator error, or non-compliance with instructions as set out in accompanying documentation;

  (vi)    alterations by persons other than Bitmain, associated partners or authorized service facilities;

  (vii)   Product(s), on which the original software has been replaced or modified by persons other than Bitmain, associated partners or authorized service facilities;

  (viii)  counterfeit products;

  (ix)    damage or loss of data due to interoperability with current and/or future versions of operating system, software and/or hardware;

  (x)     damage or loss of data caused by improper usage and behavior which is not recommended and/or permitted in the product documentation;

  (xi)    failure of the Product(s) caused by usage of products not supplied by Bitmain; and

  (xii)   hash boards or chips are burnt.

In case the warranty is voided, Bitmain may, at its sole discretion, provide repair service to the Purchaser, and the Purchaser shall bear all related expenses and costs.

7.3. Notwithstanding anything to the contrary herein, the Purchaser acknowledges and agrees that the Product(s) provided by Bitmain do not guarantee any cryptocurrency mining time and, Bitmain shall not be liable for any cryptocurrency mining time loss or cryptocurrency mining revenue loss that are caused by downtime of any part/component of the Product(s). Bitmain does not warrant that the Product(s) will meet the Purchaser's requirements or the Product(s) will be uninterrupted or error free. Except as provided in Clause 7.1 of this Agreement, Bitmain makes no warranties to the Purchaser with respect to the Product(s), and no warranties of any kind, whether written, oral, express, implied or statutory, including warranties of merchantability, fitness for a particular purpose or non-infringement or arising from course of dealing or usage in trade shall apply.

7.4. In the event of any ambiguity or discrepancy between this Clause 7 of this Agreement and Bitmain's After-sales Service Policy from time to time, it is intended that the After-sales Service Policy shall prevail and the Parties shall comply with and give effect to the After-sales Service Policy. Please refer to the website of Bitmain for detailed terms of warranty and after-sales maintenance. Bitmain has no obligation to notify the Purchaser of the update or modification of such terms.

7.5. During the warranty period, if the hardware product needs to be repaired or replaced, the Purchaser shall bear the logistics costs of shipping the Product to the address designated by Bitmain, and Bitmain shall bear the logistics costs of shipping back the repaired or replaced Product to the address designated by the Purchaser. The Purchaser shall bear all and any additional costs incurred due to incorrect or incomplete delivery information provided by the Purchaser and all and any risks of loss or damage to the Product, or the parts or components of the Products during the transportation period (including the transportation period when the product is sent to Bitmain and returned by Bitmain to the Purchaser).

## 8. Representations and Warranties

The Purchaser makes the following representations and warranties to Bitmain:

8.1. It has the full power and authority to own its assets and carry on its businesses.

8.2. The obligations expressed to be assumed by it under this Agreement are legal, valid, binding and enforceable obligations.

8.3. It has the power to enter into, perform and deliver, and has taken all necessary action to authorize its entry into, performance and delivery of, this Agreement and the transactions contemplated by this Agreement.

8.4. The entry into and performance by it of, and the transactions contemplated by, this Agreement do not and will not conflict with:

    (i)     any Applicable Law;

(ii)    its constitutional documents; or

(iii)   any agreement or instrument binding upon it or any of its assets.

8.5.  All authorizations required or desirable:

(i)    to enable it lawfully to enter into, exercise its rights under and comply with its obligations under this Agreement;

(ii)   to ensure that those obligations are legal, valid, binding and enforceable; and

(iii)   to make this Agreement admissible in evidence in its jurisdiction of incorporation,

have been or will have been by the time, obtained or effected and are, or will be by the appropriate time, in full force and effect.

8.6.  It is not aware of any circumstances which are likely to lead to:

(i)    any authorization obtained or effected not remaining in full force and effect;

(ii)   any authorization not being obtained, renewed or effected when required or desirable; or

(iii)   any authorization being subject to a condition or requirement which it does not reasonably expect to satisfy or the compliance with which has or could reasonably be expected to have a material adverse effect.

8.7.  (a) It is not the target of economic sanctions administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, the United Nations Security Council, the European Union, Her Majesty's Treasury or Singapore ("Sanctions"), including by being listed on the Specially Designated Nationals and Blocked Persons (SDN) List maintained by OFAC or any other Sanctions list maintained by one of the foregoing governmental authorities, directly or indirectly owned or controlled by one or more SDNs or other Persons included on any other Sanctions list, or located, organized or resident in a country or territory that is the target of Sanctions, and (b) the purchase of the Product(s) will not violate any Sanctions or import and export control related laws and regulations.

8.8.  All information supplied by the Purchaser is and shall be true and correct, and the information does not contain and will not contain any statement that is false or misleading.

## 9.  Indemnification and Limitation of Liability

9.1.  The Purchaser shall, during the term of this Agreement and at any time thereafter, indemnify and save Bitmain and/or its Affiliates harmless from and against any and all damages, suits, claims, judgments, liabilities, losses, fees, costs or expenses of

12 / 27

any kind, including legal fees, whatsoever arising out of or incidental to the Products pursuant to this Agreement.

9.2. Notwithstanding anything to the contrary herein, Bitmain and its Affiliates shall under no circumstances, be liable to the Purchaser for any consequential loss, or loss of goodwill, business, anticipated profits, revenue, contract, or business opportunity arising out of or in connection with this Agreement, and the Purchaser hereby waives any claim it may at any time have against Bitmain and its Affiliates in respect of any such damages. The foregoing limitation of liability shall apply whether in an action at law, including but not limited to contract, strict liability, negligence, willful misconduct or other tortious action, or an action in equity.

9.3. Bitmain and its Affiliates' cumulative aggregate liability pursuant to this Agreement, whether arising from tort, breach of contract or any other cause of action shall be limited to and not exceed the amount of one hundred percent (100%) of the down payment actually received by Bitmain from the Purchaser for the Product(s).

9.4. The Product(s) are not designed, manufactured or intended for use in hazardous or critical environments or in activities requiring emergency or fail-safe operation, such as the operation of nuclear facilities, aircraft navigation or communication systems or in any other applications or activities in which failure of the Product(s) may pose the risk of environmental harm or physical injury or death to humans. Bitmain specifically disclaims any express or implied warranty of fitness for any of the above described application and any such use shall be at the Purchaser's sole risk.

9.5. The above limitations and exclusions shall apply (1) notwithstanding failure of essential purpose of any exclusive or limited remedy; and (2) whether or not Bitmain has been advised of the possibility of such damages. This Clause allocates the risks under this Agreement and Bitmain's pricing reflects this allocation of risk and the above limitations.

## 10. Distribution

10.1. This Agreement does not constitute a distributor agreement between Bitmain and the Purchaser. Therefore, the Purchaser is not an authorized distributor of Bitmain.

10.2. The Purchaser shall in no event claim or imply to a third party that it is an authorized distributor of Bitmain or Bitmain (Antminer) or any similar terms, or perform any act that will cause it to be construed as an authorized distributor of Bitmain or Bitmain (Antminer). As between the Purchaser and Bitmain, the Purchaser shall be exclusively and fully responsible for complying with the Applicable Laws regarding repackaging the Product(s) for the Purchaser's redistribution needs, and shall be solely liable for any and all liabilities or costs directly incurred or incidental to such redistribution.

## 11. Intellectual Property Rights

13 / 27

11.1. The Parties agree that the Intellectual Property Rights in any way contained in the Product(s), made, conceived or developed by Bitmain and/or its Affiliates for the Product(s) under this Agreement and/or, achieved, derived from, related to, connected with the provision of the Product(s) by Bitmain and/or acquired by Bitmain from any other person in performance of this Agreement shall be the exclusive property of Bitmain and/or its Affiliates.

11.2. Notwithstanding anything to the contrary herein, all Intellectual Property Rights in the Product(s) shall remain the exclusive property of Bitmain and/or its licensors. Except for licenses explicitly identified in Bitmain's Shipping Confirmation or in this Clause 11.2, no rights or licenses are expressly granted, or implied, whether by estoppel or otherwise, in respect of any Intellectual Property Rights of Bitmain and/or its Affiliates or any Intellectual Property residing in the Product(s) provided by Bitmain to the Purchaser, including in any documentation or any data furnished by Bitmain. Bitmain grants the Purchaser a non-exclusive, non-transferrable, royalty-free and irrevocable license of Bitmain and/or its Affiliates' Intellectual Property Rights to solely use the Product(s) delivered by Bitmain to the Purchaser for their ordinary function, and subject to the Clauses set forth herein. The Purchaser shall in no event violate the Intellectual Property Rights of Bitmain and/or its licensors.

11.3. If applicable, payment by the Purchaser of non-recurring charges to Bitmain for any special designs, or engineering or production materials required for Bitmain's performance of Orders for customized Product(s), shall not be construed as payment for the assignment from Bitmain to the Purchaser of title to the design or special materials. Bitmain shall be the sole owner of such special designs, engineering or production materials.

## 12. Confidentiality and Communications

12.1. All information concerning this Agreement and matters pertaining to or derived from the provision of Product(s) pursuant to this Agreement between the Parties, whether in oral or written form, or in the form of drawings, computer programs or other, as well as all data derived therefrom ("Confidential Information"), shall be deemed to be confidential and, as such, may not be divulged to any unauthorized person. The Purchaser undertakes and agrees to take all reasonable and practicable steps to ensure and protect the confidentiality of the Confidential Information which cannot be passed, sold, traded, published or disclosed to any unauthorized person.

## 13. Term of this Agreement

13.1. This Agreement will be effective upon Bitmain's issuance of the shipping confirmation to the Purchaser, provided that if there is more than one shipping confirmation, this Agreement will be effective to the Products contained in each shipping confirmation upon Bitmain's issuance of the respective shipping confirmation to the Purchaser.

13.2. This Agreement shall remain effective up to and until the delivery of the last batch

of Products.

## 14. Contact Information

All communications in relation to this Agreement shall be made to the following contacts:

**Purchaser's business contact:**

Name: Jeff Pratt

Phone: (+1)4252410034

Email: jpratt@corescientific.com

**Bitmain's business contact:**

Name: Xinran He

Phone: (+86)15636130223

Email: Xinran.he@bitmain.com

## 15. Compliance with Laws and Regulations

15.1. The Purchaser undertakes that it will fully comply with all Applicable Laws in relation to export and import control and Sanctions and shall not take any action that would cause Bitmain or any of its Affiliates to be in violation of any export and import control laws or Sanctions. The Purchaser shall also be fully and exclusively liable for and shall defend, fully indemnify and hold harmless Bitmain and/or its Affiliates from and against any and all claims, demands, actions, costs or proceedings brought or instituted against Bitmain and/or its Affiliates arising out of or in connection with any breach by the Purchaser or the carrier of any Applicable Laws in relation to export and import control or Sanction.

15.2. The Purchaser acknowledges and agrees that the Product(s) in this Agreement are subject to the export control laws and regulations of all related countries, including but not limited to the Export Administration Regulations ("EAR") of the United States. Without limiting the foregoing, the Purchaser shall not, without receiving the proper licenses or license exceptions from all related governmental authorities, including but not limited to the U.S. Bureau of Industry and Security, distribute, re-distribute, export, re-export, or transfer any Product(s) subject to this Agreement either directly or indirectly, to any national of any country identified in Country Groups D:1 or E:1 as defined in the EARs. In addition, the Product(s) under this Agreement may not be exported, re-exported, or transferred to (a) any person or entity for military purposes; (b) any person or entity listed on the "Entity List", "Denied Persons List" or the SDN List as such lists are maintained by the U.S. Government, or (c) an end-user engaged in activities related to weapons of mass

destruction. Such activities include but are not necessarily limited to activities related to: (1) the design, development, production, or use of nuclear materials, nuclear facilities, or nuclear weapons; (2) the design, development, production, or use of missiles or support of missiles projects; and (3) the design, development, production, or use of chemical or biological weapons. The Purchaser further agrees that it will not do any of the foregoing in violation of any restriction, law, or regulation of the European Union or an individual EU member state that imposes on an exporter a burden equivalent to or greater than that imposed by the U.S. Bureau of Industry and Security.

15.3. The Purchaser undertakes that it will not take any action under this Agreement or use the Product(s) in a way that will be a breach of any anti-money laundering laws, any anti-corruption laws, and/or any counter-terrorist financing laws.

15.4. The Purchaser warrants that the Product(s) have been purchased with funds that are from legitimate sources and such funds do not constitute proceeds of criminal conduct, or realizable property, or proceeds of terrorism financing or property of terrorist, within the meaning given in the Corruption, Drug Trafficking and Other Serious Crimes (Confiscation of Benefits) Act (Chapter 65A) and the Terrorism (Suppression of Financing) Act (Chapter 325), respectively. If Bitmain receives, including but not limited to investigation, evidence collection, restriction and other measures, from any competent organizations or institutions, the Purchaser shall immediately cooperate with Bitmain and such competent organizations or institutions in the investigation process, and Bitmain may request the Purchaser to provide necessary security if so required. The Purchaser understands that if any Person resident in Singapore knows or suspects or has reasonable grounds for knowing or suspecting that another Person is engaged in criminal conduct or is involved with terrorism or terrorist property and the information for that knowledge or suspicion came to their attention in the course of business in the regulated sector, or other trade, profession, business or employment, the Person will be required to report such knowledge or suspicion to the Suspicious Transaction Reporting Office, Commercial Affairs Department of the Singapore Police Force. The Purchaser acknowledges that such a report shall not be treated as breach of confidence or violation of any restriction upon the disclosure of information imposed by any Applicable Law, contractually or otherwise.

## 16. Force Majeure

16.1. To the extent that a Party is fully or partially delayed, prevented or hindered by an event of Force Majeure from performing any obligation under this Agreement (other than an obligation to make payment), subject to the exercise of reasonable diligence by the affected Party, the failure to perform shall be excused by the occurrence of such event of Force Majeure. A Party claiming that its performance is excused by an event of Force Majeure shall, promptly after the occurrence of such event of Force Majeure, notify the other Party of the nature, date of inception and expected duration of such event of Force Majeure and the extent to which the Party expects that the

16 / 27

event will delay, prevent or hinder the Party from performing its obligations under this Agreement. The notifying Party shall thereafter use its best effort to eliminate such event of Force Majeure and mitigate its effects.

16.2. The affected Party shall use reasonable diligence to remove the event of Force Majeure, and shall keep the other Party informed of all significant developments.

16.3. Except in the case of an event of Force Majeure, neither party may terminate this Agreement prior to its expiry date.

## 17. Entire Agreement and Amendment

This Agreement, constitutes the entire agreement of the Parties hereto and can only be amended with the written consent of both Parties or otherwise as mutually agreed by both Parties.

## 18. Assignment

18.1. Bitmain may freely assign or transfer any of its rights, benefits or obligations under this Agreement in whole or in part to its Affiliates or to any third party. The Purchaser may not assign or transfer any of its rights, benefits or obligations under this Agreement in whole or in part without Bitmain's prior written consent.

18.2. This Agreement shall be binding upon and enure to the benefit of each Party to this Agreement and its successors in title and permitted assigns.

## 19. Severability

To the extent possible, if any provision of this Agreement is held to be illegal, invalid or unenforceable in whole or in part by a court, the provision shall apply with whatever deletion or modification is necessary so that such provision is legal, valid and enforceable and gives effect to the commercial intention of the Parties. The remaining provisions of this Agreement shall not be affected and shall remain in full force and effect.

## 20. Personal Data

Depending on the nature of the Purchaser's interaction with Bitmain, some examples of personal data which Bitmain may collect from the Purchaser include the Purchaser's name and identification information, contact information such as the Purchaser's address, email address and telephone number, nationality, gender, date of birth, and financial information such as credit card numbers, debit card numbers and bank account information.

Bitmain generally does not collect the Purchaser's personal data unless (a) it is provided to Bitmain voluntarily by the Purchaser directly or via a third party who has been duly authorized by the Purchaser to disclose the Purchaser's personal data to Bitmain (the Purchaser's "authorized representative") after (i) the Purchaser (or the Purchaser's authorized representative) has been notified of the purposes for which the data is collected,

17 / 27

and (ii) the Purchaser (or the Purchaser's authorized representative) has provided written consent to the collection and usage of the Purchaser's personal data for those purposes, or (b) collection and use of personal data without consent is permitted or required by related laws. Bitmain shall seek the Purchaser's consent before collecting any additional personal data and before using the Purchaser's personal data for a purpose which has not been notified to the Purchaser (except where permitted or authorized by law).

## 21. Conflict with the Terms and Conditions

In the event of any ambiguity or discrepancy between the Clauses of this Agreement and the Terms and Conditions from time to time, it is intended that the Clauses of this Agreement shall prevail and the Parties shall comply with and give effect to this Agreement.

## 22. Governing Law and Dispute Resolution

22.1. This Agreement shall be solely governed by and construed in accordance with the laws of Hong Kong.

22.2. Any dispute, controversy, difference or claim arising out of or relating to this Agreement, including the existence, validity, interpretation, performance, breach or termination hereof or any dispute regarding non-contractual obligations arising out of or relating to this Agreement shall be referred to and finally resolved by arbitration administered by the Hong Kong International Arbitration Center under the UNCITRAL Arbitration Rules in force when the notice of arbitration is submitted. The decision and awards of the arbitration shall be final and binding upon the parties hereto.

## 23. Waiver

Failure by either Party to enforce at any time any provision of this Agreement, or to exercise any election of options provided herein shall not constitute a waiver of such provision or option, nor affect the validity of this Agreement or any part hereof, or the right of the waiving Party to thereafter enforce each and every such provision or option.

## 24. Counterparts and Electronic Signatures

This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement, and all of which, when taken together, will be deemed to constitute one and the same agreement. The facsimile, email or other electronically delivered signatures of the Parties shall be deemed to constitute original signatures, and facsimile or electronic copies hereof shall be deemed to constitute duplicate originals.

## 25. Further Assurance

Each Party undertakes to the other Party to execute or procure to be executed all such documents and to do or procure to be done all such other acts and things as may be

reasonable and necessary to give all Parties the full benefit of this Agreement.

## 26. Third Party Rights

A person who is not a Party to this Agreement has no right under the Contracts (Rights of Third Parties) Ordinance (Chapter 623 of the Laws of Hong Kong) to enforce or to enjoy the benefit of any term of this Agreement.

## 27. Liquidated Damages Not Penalty

It is expressly agreed that any liquidated damages payable under this Agreement do not constitute a penalty and that the Parties, having negotiated in good faith for such specific liquidated damages and having agreed that the amount of such liquidated damages is reasonable in light of the anticipated harm caused by the breach related thereto and the difficulties of proof of loss and inconvenience or nonfeasibility of obtaining any adequate remedy, are estopped from contesting the validity or enforceability of such liquidated damages.

*(The rest part of the page is intentionally left in blank)*

Signed for and on behalf of Bitmain

Bitmain Technologies Limited

Signature

Title _____

Signed for and on behalf of the Purchaser

Core Scientific, Inc.

Signature _____

Title SVP OPERATIONS + FINANCE

## APPENDIX A

1. Products:

1.1. The information (including but not limited to the quantity, rated hashrate, estimated unit price ("**Unit Price**"), estimated total price("**Total Price (One Item)**"), total price for all the items ("**Total Purchase Price**") of Products to be purchased by Party B from Party A is as follows ("**Products**"):

1.1.1 Product Type

| Type | Details |
|------|---------|
| Product Name | HASH Super Computing Server，S19j Pro |
| Rated hashrate / unit | ~100TH/s |
| Rated power / unit | ~2950W |
| J/T@25°C environment temperature | ~29.5 |
| Description | 1. Bitmain undertakes that the error range of "J/T@25°C environment temperature"does not exceed 10%.<br>2. "Rated hashrate / unit" and "rated power / unit" are for reference only and may defer from each batch or unit. Bitmain makes no representation on "Rated hashrate / unit" and "rated power / unit" .<br>3. Purchaser shall not reject the Products on the grounds that the actual parameters of the delivered Products are not in consistence with the reference indicators. |

1.1.2 The estimated delivery schedule, reference quantity, total rated hashrate, unit price and total price are as follows:

| Batch | Product Name | Shipping Schedule | Reference Quantity | Total Rated Hashrate (T) | Estimated Price (US$/T) | Estimated Unit Price (US$) | Estimated Total Price (US$) |
|-------|-------------|-------------------|------|------|------|------|------|
| 1 | HASH Super Computing Server, S19j Pro | August 2021 | 3175 | 317500 | 83.77 | 8377 | 26596975 |

| Batch | Product Name | Shipping Schedule | Refer ence Quant ity | Total Rated Hashrate (T) | Estimated Price (US$/T) | Estimated Unit Price (US$) | Estimated Total Price (US$) |
|-------|--------------|-------------------|------|------|------|------|------|
| 2 | HASH Super Computing Server, S19j Pro | September 2021 | 3175 | 317500 | 83.77 | 8377 | 26596975 |
| 3 | HASH Super Computing Server, S19j Pro | October 2021 | 3175 | 317500 | 83.77 | 8377 | 26596975 |
| 4 | HASH Super Computing Server, S19j Pro | November 2021 | 3175 | 317500 | 77.01 | 7701 | 24450675 |
| 5 | HASH Super Computing Server, S19j Pro | December 2021 | 3175 | 317500 | 77.01 | 7701 | 24450675 |
| 6 | HASH Super Computing Server, S19j Pro | January 2022 | 3175 | 317500 | 77.01 | 7701 | 24450675 |
| 7 | HASH Super Computing Server, S19j Pro | February 2022 | 3175 | 317500 | 64.85 | 6485 | 20589875 |
| 8 | HASH Super Computing Server, S19j Pro | March 2022 | 3175 | 317500 | 64.85 | 6485 | 20589875 |

| Batch | Product Name | Shipping Schedule | Refer ence Quant ity | Total Rated Hashrate (T) | Estimated Price (US$/T) | Estimated Unit Price (US$) | Estimated Total Price (US$) |
|---|---|---|---|---|---|---|---|
| 9 | HASH Super Computing Server, S19j Pro | April 2022 | 3175 | 317500 | 64.85 | 6485 | 20589875 |
| 10 | HASH Super Computing Server, S19j Pro | May 2022 | 3175 | 317500 | 58.10 | 5810 | 18446750 |
| 11 | HASH Super Computing Server, S19j Pro | June 2022 | 3175 | 317500 | 58.10 | 5810 | 18446750 |
| 12 | HASH Super Computing Server, S19j Pro | July 2022 | 3175 | 317500 | 58.10 | 5810 | 18446750 |

1.1.3    Total price of the Products listed above:

Total Purchase Price (tax exclusive): US$270,252,825.00

Tax: US$0.00

Total Purchase Price (tax inclusive): US$270,252,825.00

1.2. Both Parties confirm and agree that Bitmain may adjust the total quantity based on the total hashrate provided that the total hashrate of the Product(s) actually delivered by Bitmain to the Purchaser shall not be less than the total rated hashrate agreed in Article 1.1 of this Appendix A. Bitmain makes no representation that the quantity of the actually delivered Products shall be the same as the quantity set forth in Article 1.1. of this Appendix A.

1.3. In the event that Bitmain publishes any new type of products with less J/T value and

23 / 27

suspends the production of the type of the Products as agreed in this Agreement, Bitmain shall be entitled to release itself from any future obligation to deliver any subsequent Products by 10-day prior notice to the Purchaser and continue to deliver new types of Products, the total rated hashrate of which shall be no less than such subsequent Products cancelled under this Agreement and the price of which shall be adjusted in accordance with the J/T value. In the event that the Purchaser explicitly refuses to accept new types of Products, the Purchaser is entitled to request for a refund of the remaining balance of the purchase price already paid by the Purchaser together with an interest at 0.0333% per day on such balance for the period from the next day following the payment date of such balance to the date immediately prior to the date of request of refund. If the Purchaser accepts the new types of Products delivered by Bitmain, Bitmain shall be obliged to deliver such new types of Products to fulfill its obligations under this Agreement. The Purchaser may request to lower the actual total hashrate of the Products delivered but shall not request to increase the actual total hashrate to the level exceeding the total rated hashrate as set out in this Agreement. After Bitmain publishes new types of Products and if Bitmain has not suspended the production of the types of Products under this Agreement, Bitmain shall continue to delivery such agreed types of Products in accordance with this Agreement and the Purchaser shall not terminate this Agreement or refuse to accept the Products on the grounds that Bitmain has published new type(s) of Products.

## 2. Cargo insurance coverage limitations:

The cargo insurance coverage provided by Bitmain is subject to the following limitations and exceptions:

### Exclusions:

- loss damage or expense attributable to willful misconduct of the Assured
- ordinary leakage, ordinary loss in weight or volume, or ordinary wear and tear of the subject-matter insured
- loss damage or expense caused by insufficiency or unsuitability of packing or preparation of the subject-matter insured (for the purpose of this Clause, "packing" shall be deemed to include stowage in a container or liftvan but only when such stowage is carried out prior to attachment of this insurance or by the Assured or their servants)
- loss damage or expense caused by inherent vice or nature of the subject-matter insured
- loss damage or expense proximately caused by delay, even though the delay be caused by a risk insured against (except expenses payable)
- loss damage or expense arising from insolvency or financial default of the owners managers charterers or operators of the vessel
- loss, damage, or expense arising from the use of any weapon of war employing atomic or nuclear fission, and/or fusion or other like reaction or radioactive force or matter.
- Loss, damage or expense arising from unseaworthiness of vessel or craft, unfitness

24 / 27

of vessel craft conveyance container or liftvan for the safe carriage of the subject-matter insured, where the Assured or their servants are privy to such unseaworthiness or unfitness, at the time the subject-matter insured is loaded therein.

- The Underwriters waive any breach of the implied warranties of seaworthiness of the ship and fitness of the ship to carry the subject-matter insured to destination, unless the Assured or their servants are privy to such unseaworthiness or unfitness.
- Loss, damage or expense caused by (1) war, civil war, revolution, rebellion, insurrection, or civil strife arising therefrom, or any hostile act by or against a belligerent power, (2) capture, seizure, arrest, restraint or detainment (piracy excepted), and the consequences thereof or any attempt threat, (3) derelict mines, torpedoes, bombs, or other derelict weapons of war.
- Loss, damage, or expense caused by strikers, locked-out workmen, or persons taking part in labor disturbances, riots or civil commotion, resulting from strikes, lock-outs, labor disturbances, riots or civil commotions, caused by any terrorist or any person acting from a political motive.

3. **Bitmain's BANK ACCOUNT info:**

   Company Name： Bitmain Technologies Limited

   Company address： FLAT/RM A1 11/F SUCCESS COMMERCIAL BUILDING 245-251 HENNESSY ROAD HK

   Account No.： 1503225561

   Bank name： Signature Bank

   Bank address： 565 Fifth Avenue New York NY 10017, US

   Swift Code： SIGNUS33XXX

   ABA CODE： 026013576 (for US local payment)

4. The payment shall be arranged by the Purchaser as Appendix B.

5. At any time prior to the delivery, Bitmain is entitled to, by written notice, request the Purchaser to enter into a separate purchase agreement and Bitmain and the Purchaser, if so requested, shall cooperate with Bitmain to enter into such purchase agreement and shall pay the outstanding price for the Products in accordance with the terms and conditions of this Agreement, failing which Bitmain is entitled to request the Purchaser to continue to perform its obligations under this Agreement.

6. The Purchaser shall pay 25% of the Total Purchase Price as down payment and the remaining being settled in accordance with the payment schedule set forth in this Agreement.

7. Without prejudice to the above, the unit price and the Total Purchase Price of the

Product(s) and any amount paid by the Purchaser shall be all denominated in USD. Where the Parties agree that the payments shall be made in cryptocurrencies, the exchange rate between the USD and the cryptocurrency selected shall be determined and calculated as follows: (1) in the event that the Purchaser pays for any order placed on Bitmain's official website (the "Website", http://www.bitmain.com) which is valid and has not been fully paid yet, the exchange rate between the USD and the cryptocurrency fixed in such placed Order shall apply, or (2) in any other case, the real time exchange rate between the USD and the cryptocurrency displayed on the Website upon payment shall apply. The exchange rate between the USD and the cryptocurrency shall be fixed according to this provision. In any circumstance, the Purchaser shall not ask for any refund due to the change of exchange rate.

**APPENDIX B**



| Payment Percentage | Payment Date | Note | Example (Assuming this Agreement is signed on May 13.) |
|---|---|---|---|
| At least 25% | 25% of the Total Purchase Price shall be paid by May 27 2021 (US$40,000,000 shall be paid by May 20 2021; US$27,563,206.25 shall be paid by May 27 2021) | 25% of the Total Purchase Price | 25% of the Total Purchase Price shall be paid by May 27 2021 (US$40,000,000 shall be paid by May 20 2021; US$27,563,206.25 shall be paid by May 27 2021) |
| At least 35% | six (6) months prior to the shipment; 35% of the price for August/September/October/November batch shall be paid by May 27 2021 | 35% per month of a single batch | 35% of the price for August/September/October/November batch shall be paid by May 27 2021; 35% of the price for December batch shall be paid by June 30 2021; 35% of the price for January batch shall be paid by July 30 2021; etc. |
| The remaining 40% | one (1) month prior to the shipment | 40% per month of a single batch | 40% of the price for August batch shall be paid by June 30 2021; 40% of the price for September batch shall be paid by July 30 2021; 40% of the price for October batch shall be paid by August 30 2021; etc. |

**To:**      Kyle Buckett[kbuckett@corescientific.com]
**Cc:**      Baylor Landry[blandry@corescientific.com]
**From:**    Jeff Pratt[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=ED5A49A192414BD3B509D2DE6089BDFB-JPRATT]
**Sent:**    Mon 8/1/2022 9:05:51 AM (UTC-05:00)
**Subject:** Argo Swap Completed.

Kyle – for your updates, note that Baylor and Brett completed the Argo swap yesterday right on time.
Jeff



**Jeff Pratt**

SVP, Growth & Partnerships

**Core Scientific, Inc**

**(425) 309-1790**

# TENNESSEE VALLEY AUTHORITY

## LARGE DIRECT SERVICE MANUFACTURING POWER RATES

(October 2018)

### Availability

These rates shall apply to the firm electric power requirements of a customer that takes service directly from TVA and where (a) that customer's currently effective onpeak or offpeak contract demand, whichever is higher, is greater than 5,000 kW and (b) the major use of electricity is for activities conducted at the delivery point serving that customer which are classified with a 2-digit Standard Industrial Classification Code between 20 and 39, inclusive, or classified with 2002 North American Industry Classification System (NAICS) code 5181, or 2007 NAICS codes 5182, 522320, or 541214.

For a customer requesting that its onpeak contract demand be different from its offpeak contract demand, these rate schedules shall be available only for (1) a new contract, (2) a replacement or renewal contract following expiration of the existing contract, or (3) a replacement or renewal contract or an amended existing contract in which the customer is increasing its demand requirements above the existing contract demand level, but under this item (3) neither the new onpeak nor the new offpeak contract demand shall be lower than the customer's existing contract demand.

Seasonal Time-of-Use Direct Service Manufacturing Power Rate Schedule--TDDSMA shall apply to customers with an onpeak or offpeak contract demand, whichever is higher, greater than 1,000 kW but not more than 5,000 kW; Direct Service Manufacturing Power Rate Schedule--DSMB shall apply to customers with an onpeak or offpeak contract demand, whichever is higher, greater than 5,000 kW, but not more than 15,000 kW; Direct Service Manufacturing Power Rate Schedule--DSMC shall apply to customers with an onpeak or offpeak contract demand, whichever is higher, greater than 15,000 kW, but not more than 25,000 kW; and Direct Service Manufacturing Power Rate Schedule--DSMD shall apply to customers with an onpeak or offpeak contract demand, whichever is higher, greater than 25,000 kW.

### Base Charges

Customer Charge: $1,500 per delivery point per month
Administrative Charge: $350 per delivery point per month

**Demand Charges:**

|  |  | Schedule TDDSMA ($/kW) | Schedule DSMB ($/kW) | Schedule DSMC ($/kW) | Schedule DSMD ($/kW) |  |
|---|---|---|---|---|---|---|
| Summer Period | Onpeak Demand | 10.00 | 10.00 | 10.00 | 10.00 | per month of onpeak billing demand |
|  | Maximum Demand | 2.38 | 1.10 | 1.10 | 1.10 | per month of maximum billing demand |
|  | Excess Demand | 10.00 | 10.00 | 10.00 | 10.00 | per month of the amount, if any, by which (1) the customer's onpeak billing demand exceeds its onpeak contract demand or (2) the customer's offpeak billing demand exceeds its offpeak contract demand, whichever is higher. |

This table is continued on the following page

| | | | | | | |
|---|---|---|---|---|---|---|
| Winter Period | Onpeak Demand | 9.05 | 9.05 | 9.05 | 9.05 | per month of onpeak billing demand |
| | Maximum Demand | 2.38 | 1.10 | 1.10 | 1.10 | per month of maximum billing demand |
| | Excess Demand | 9.05 | 9.05 | 9.05 | 9.05 | per month of the amount, if any, by which (1) the customer's onpeak billing demand exceeds its onpeak contract demand or (2) the customer's offpeak billing demand exceeds its offpeak contract demand, whichever is higher. |
| Transition Period | Onpeak Demand | 9.05 | 9.05 | 9.05 | 9.05 | per month of onpeak billing demand |
| | Maximum Demand | 2.38 | 1.10 | 1.10 | 1.10 | per month of maximum billing demand |
| | Excess Demand | 9.05 | 9.05 | 9.05 | 9.05 | per month of the amount, if any, by which (1) the customer's onpeak billing demand exceeds its onpeak contract demand or (2) the customer's offpeak billing demand exceeds its offpeak contract demand, whichever is higher. |

**Energy Charges:**

| | | Schedule TDDSMA (¢/kWh) | Schedule DSMB (¢/kWh) | Schedule DSMC (¢/kWh) | Schedule DSMD (¢/kWh) | |
|---|---|---|---|---|---|---|
| Summer Period | Onpeak hours | 5.314 | 5.535 | 5.426 | 5.204 | per month for all metered onpeak kWh |
| | Offpeak hours Block 1 | 2.873 | 3.094 | 2.984 | 2.762 | per month for the first 200 hours use of metered onpeak demand multiplied by the ratio of offpeak energy to total energy |
| | Offpeak hours Block 2 | 0.194 | 0.194 | 0.332 | 0.167 | per month for the next 200 hours use of metered onpeak demand multiplied by the ratio of offpeak energy to total energy |
| | Offpeak Hours Block 3 | -0.055 | -0.055 | 0.332 | 0.109 | per month for the hours use of metered onpeak demand in excess of 400 hours multiplied by the ratio of offpeak energy to total energy |
| | Minimum offpeak energy | 2.873 | 3.094 | 2.984 | 2.762 | per month shall be applied to the portion, if any, of the minimum offpeak energy takings amount that is greater than the metered energy. |

This table is continued from the previous page

| | | | | | | |
|---|---|---|---|---|---|---|
| Winter Period | Onpeak hours | 4.199 | 4.422 | 4.312 | 4.089 | per month for all metered onpeak kWh |
| | Offpeak hours Block 1 | 3.090 | 3.312 | 3.201 | 2.979 | per month for the first 200 hours use of metered onpeak demand multiplied by the ratio of offpeak energy to total energy |
| | Offpeak hours Block 2 | 0.194 | 0.194 | 0.332 | 0.167 | per month for the next 200 hours use of metered onpeak demand multiplied by the ratio of offpeak energy to total energy |
| | Offpeak Hours Block 3 | -0.055 | -0.055 | 0.332 | 0.109 | per month for the hours use of metered onpeak demand in excess of 400 hours multiplied by the ratio of offpeak energy to total energy |
| | minimum offpeak energy | 3.090 | 3.312 | 3.201 | 2.979 | per month shall be applied to the portion, if any, of the minimum offpeak energy takings amount that is greater than the metered energy. |
| Transition Period | Onpeak hours | 3.177 | 3.397 | 3.286 | 3.064 | per month for all metered onpeak kWh |
| | Offpeak hours Block 1 | 3.177 | 3.397 | 3.287 | 3.064 | per month for the first 200 hours use of metered onpeak demand multiplied by the ratio of offpeak energy to total energy |
| | Offpeak hours Block 2 | 0.194 | 0.194 | 0.332 | 0.167 | per month for the next 200 hours use of metered onpeak demand multiplied by the ratio of offpeak energy to total energy |
| | Offpeak Hours Block 3 | -0.055 | -0.055 | 0.332 | 0.109 | per month for the hours use of metered onpeak demand in excess of 400 hours multiplied by the ratio of offpeak energy to total energy |
| | minimum offpeak energy | 3.177 | 3.397 | 3.287 | 3.064 | per month shall be applied to the portion, if any, of the minimum offpeak energy takings amount that is greater than the metered energy. |

## Adjustment

The base demand and energy charges shall be increased or decreased in accordance with the current Adjustment Addendum published by TVA. A resource cost allocation (RCA) methodology based on historical sales and fuel cost data will be applied to allocate amounts calculated under any Fuel Cost Adjustment (FCA) in the Adjustment Addendum in the manner described below.

The RCA methodology allocates a different percentage of total eligible fuel costs to (a) all distributor-served and directly served customers with contract demands greater than 5,000 kW served under manufacturing-designated rate schedules (LMS Customers), (b) all distributor-served and directly served customers with contract demands greater than 5,000 kW not served under manufacturing-designated rate schedules (LGS Customers), and (c) all other customers (All Other Customers).

The RCA methodology allocates total fuel costs in proportion to the average hourly load of LMS Customers, LGS Customers, and All Other Customers, weighted by the dispatch cost of TVA's Top 100 MW of incremental cost, in each hour, using the following formula:

$$RCA_j = \left( \frac{\sum_i h_{ij} C_i}{\sum_i \sum_j h_{ij} C_i} \right) \times FA$$

where $RCA_j$ is the RCA allocation for customer group: LMS Customers, LGS Customers, or All Other Customers

$h_{ij}$ is the hourly energy of each customer group

$C_i$ is the Top Cost (dispatch cost for the top 100 MW)

i is the hourly interval of the billing month,

j is the customer group : LMS Customers, LGS Customers, or All Other Customers

FA is the actual monthly fuel and purchased power expenses as used in any FCA as reflected in the Adjustment Addendum

Any FCA included in the Adjustment Addendum shall provide for TVA's estimated monthly fuel costs (estimated actual total fuel and purchased power expenses/estimated actual energy sales) to be adjusted based on the application of Seasonal Amounts set out below. To determine the Seasonal Amounts, using the above formula, TVA calculated an RCA allocation percentage for the Seasonal Periods set out in these rate schedules based on data from August 2011 through July 2017 (excluding the month of January 2014). The resulting percentage was applied to actual monthly fuel costs during each of the Seasonal Periods and divided by actual energy sales to obtain the following amounts:

| Seasonal Period | LMS Customers | LGS Customers | All Other Customers |
|---|---|---|---|
| Summer | -0.096 ¢ per kWh | -0.062 ¢ per kWh | 0.027 ¢ per kWh |
| Winter | -0.046 ¢ per kWh | -0.038 ¢ per kWh | 0.014 ¢ per kWh |
| Transition | -0.044 ¢ per kWh | -0.022 ¢ per kWh | 0.015 ¢ per kWh |

TVA may recalculate the Seasonal Amounts annually based on changes in sales and underlying fuel and purchased power costs within the latest 12-month period ending June 30 or to reflect projected changes in sales and fuel and purchased power costs in the next 12-month period ending June 30, or both. If the recalculated Seasonal Amounts increase or decrease by more than 10%, TVA will change the Seasonal Amounts by providing not less than 60 days' notice to customer. The changed Seasonal Amounts shall be included in any FCA that is included as part of the next effective Adjustment Addendum.

Any FCA included in the Adjustment Addendum shall provide for the RCA formula to be used to reconcile the estimated fuel costs applied to LMS Customers, LGS Customers, or All Other Customers to actual fuel costs and sales.

Loss adjustments are made to the monthly FCA adjustment under the Adjustment Addendum to recognize additional distribution cost of providing service to the retail customers. The loss factors applied to customers that own the transformation facilities and take service at the bulk transmission of 161 kV or higher shall be set to 0%.

In addition, base demand and energy charges shall be increased or decreased to (a) correspond to increases or decreases determined by TVA in the value of the hydro-generation benefit allocated to residential consumers or (b) ensure that (i) TVA does not pay out more in hydro-allocation credits for sales to residential consumers than it receives in hydro-allocation debits for sales to other consumers or (ii) TVA does not receive more in such debits for sales to other consumers than it pays out in such credits for sales to residential consumers. Facilities rental charges and reactive demand charges may also be increased or decreased by TVA, effective with the effective date of any such Adjustment Addendum, to reflect changes in the cost of providing for delivery at voltage levels below 161 kV and of providing reactive power, respectively.

## Facilities Rental Charge

There shall be no facilities rental charge under these rate schedules for delivery at bulk transmission voltage levels of 161 kV or higher. For delivery at less than 161 kV, there shall be added to the customer's bill a facilities rental charge. This charge shall be 36¢ per kW per month except for delivery at voltages below 46 kV, in which case the charge shall be 93¢ per kW per month for the first 10,000 kW and 73¢ per kW per month for the excess over 10,000 kW. Such charge shall be applied to the higher of (1) the highest billing demand established during the latest 12-consecutive-month period and (2) the customer's currently effective onpeak or offpeak contract demand, whichever is higher, and shall be in addition to all other charges under these rate schedules, including minimum bill charges.

## Reactive Demand Charges

If the reactive demand (in kVAR) is lagging during the 30-consecutive-minute period beginning or ending on a clock hour of the month in which the customer's highest metered demand occurs, there shall be added to the customer's bill a reactive charge of $1.46 per kVAR of the amount, if any, by which the reactive demand exceeds 33 percent of such metered demand. If the reactive demand (in kVAR) is leading during the 30-consecutive-minute period beginning or ending on a clock hour of the month in which the customer's lowest metered demand (excluding any metered demands which are less than 25 percent of the highest metered demand) occurs, there shall be added to the customer's bill a reactive charge of $1.14 per kVAR of the amount of reactive demand. Such charges shall be in addition to all other charges under these rate schedules, including minimum bill charges.

## Determination of Seasonal Periods

Summer Period shall mean the June, July, August, and September billing months. Winter Period shall mean the December, January, February, and March billing months. Transition Period shall mean the April, May, October, and November billing months.

## Determination of Onpeak and Offpeak Hours

Except for Saturdays, Sundays, November 1, and the weekdays that are observed as Federal holidays for New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, and Christmas Day, Onpeak hours for each day shall for purposes of these rate schedules be from 1 p.m. to 7 p.m. during the months of April, May, June, July, August, September and October and from 4 a.m. to 10 a.m. during the months of January, February, March, November, and December. For all other hours of each day and all hours of such excepted days shall be offpeak hours. Such times shall be Central Standard Time or Central Daylight Time, whichever is then in effect. Said onpeak and offpeak hours are subject to change by TVA. In the event TVA determines that such changed onpeak and offpeak hours are appropriate, it shall so notify customer at least 12 months prior to the effective date of such changed hours.

## Determination of Onpeak and Offpeak Demands, Maximum Metered Demand, and Energy Amounts

The onpeak and offpeak kWh for any month shall be the energy amounts taken during the respective hours of the month designated under these rate schedules as onpeak and offpeak hours; provided, however, that notwithstanding the metered energy amount, the offpeak energy for any month shall in no case be less than the product of (1) the offpeak billing demand as calculated in the last paragraph below and (2) 110 hours (reflecting a 15 percent load factor applied to the average number of hours in a month).

TVA shall meter the onpeak and offpeak demands in kW of all customers taking service under these rate schedules. The onpeak metered demand and offpeak metered demand for any month shall be determined separately for the respective hours of the month designated under these rate schedules as onpeak and offpeak hours and, in each case, shall be the highest average during any 30-consecutive-minute period beginning or ending on a clock hour.

Except as provided below, (1) the onpeak billing demand shall be the highest onpeak metered demand in the month, (2) the offpeak billing demand shall be the highest offpeak metered demand in the month, and (3) the maximum billing demand shall be the higher of the onpeak billing demand or offpeak billing demand in the month.

The onpeak billing demand shall in no case be less than the sum of (1) 30 percent of the first 5,000 kW, (2) 40 percent of the next 20,000 kW, (3) 50 percent of the next 25,000 kW, (4) 60 percent of the next 50,000 kW, (5) 70 percent of the next 100,000 kW, (6) 80 percent of the next 150,000 kW, and (7) 85 percent of all kW in excess of 350,000 kW of the higher of the currently effective onpeak contract demand and the highest onpeak billing demand established during the preceding 12 months.

The offpeak billing demand shall in no case be less than the sum of (1) 30 percent of the first 5,000 kW, (2) 40 percent of the next 20,000 kW, (3) 50 percent of the next 25,000 kW, (4) 60 percent of the next 50,000 kW, (5) 70 percent of the next 100,000 kW, (6) 80 percent of the next 150,000 kW, and (7) 85 percent of all kW in excess of 350,000 kW of the higher of the currently effective offpeak contract demand and the highest offpeak billing demand established during the preceding 12 months.

## Minimum Bill

The monthly bill under these rate schedules, excluding any facilities rental charges and any reactive charges, shall not be less than the sum of (1) the base customer charge and administrative charge, (2) the portion of the base demand charge, as adjusted, applicable to onpeak billing demand applied to the customer's onpeak billing demand, (3) the portion of the base demand charge, as adjusted, applicable to maximum billing demand applied to the to the customer's maximum billing demand, (4) the base onpeak energy charge, as adjusted, applied to the customer's onpeak energy takings, and (5) the base offpeak energy charge, as adjusted, applied to the higher of customer's actual offpeak energy takings or the minimum offpeak energy takings amount provided for in the first paragraph of the section of these rate schedules entitled "Determination of Onpeak and Offpeak Demands, Maximum Metered Demand, and Energy Amounts". Notwithstanding the foregoing, amounts calculated under any fuel cost adjustment that is included in the Adjustment Addendum shall not be applied to any billed offpeak energy that exceeds the metered offpeak energy.

## Single-Point Delivery

The charges under these rate schedules are based upon the supply of service through a single delivery and metering point, and at a single voltage. If service is supplied to the same customer through more than one point of delivery or at different voltages, the supply of service at each delivery and metering point and at each different voltage shall be separately metered and billed.

## TENNESSEE VALLEY AUTHORITY

ADJUSTMENT ADDENDUM

TO

DIRECT SERVICE POWER RATES SCHEDULES

Effective October 1, 2018

The following table lists the adjustments applicable to the designated rate schedules. All
adjustments shall be applicable to bills rendered from meter readings taken for TVA monthly
billing cycles scheduled to begin on or after the effective date of this Adjustment Addendum.
Column (1) indicates the Hydro Allocation Adjustment; Column (2) indicates the TVA revenue
requirement adjustment; Column (3) indicates the fuel cost adjustment.

| STANDARD SERVICE | | (1) | | (2) | (3) |
|---|---|---|---|---|---|
| **Residential Service** | | | | | |
| Schedule DRS | | | | | |
| Energy Charge | | | | | |
| Summer | | | | | |
| First 500 kWh | Add | $-0.297¢$ | + | $0.164¢$ | $+ ( 1.06664 \times A_m )$ |
| Next 500 kWh | Add | $-0.297¢$ | + | $0.164¢$ | $+ ( 1.06664 \times A_m )$ |
| Additional kWh | Add | $-0.297¢$ | + | $0.148¢$ | $+ ( 1.06664 \times A_m )$ |
| Winter | | | | | |
| First 500 kWh | Add | $-0.297¢$ | + | $0.163¢$ | $+ ( 1.06664 \times A_m )$ |
| Next 500 kWh | Add | $-0.297¢$ | + | $0.163¢$ | $+ ( 1.06664 \times A_m )$ |
| Additional kWh | Add | $-0.297¢$ | + | $0.146¢$ | $+ ( 1.06664 \times A_m )$ |
| Transition | | | | | |
| First 500 kWh | Add | $-0.297¢$ | + | $0.160¢$ | $+ ( 1.06664 \times A_m )$ |
| Next 500 kWh | Add | $-0.297¢$ | + | $0.160¢$ | $+ ( 1.06664 \times A_m )$ |
| Additional kWh | Add | $-0.297¢$ | + | $0.143¢$ | $+ ( 1.06664 \times A_m )$ |
| Customer Charge | Add | $-\$1.60$ | + | $\$0.00$ | |
| **General Power Service** | | | | | |
| Schedule DSA | | | | | |
| Part 1 | | | | | |
| Energy Charge | | | | | |
| Summer | | | | | |
| First 500 kWh | Add | $0.323¢$ | + | $0.176¢$ | $+ ( 1.05138 \times A_m )$ |
| Next 600 kWh | Add | $0.323¢$ | + | $0.176¢$ | $+ ( 1.05138 \times A_m )$ |
| Additional kWh | Add | $0.323¢$ | + | $0.159¢$ | $+ ( 1.05138 \times A_m )$ |
| Winter | | | | | |
| First 500 kWh | Add | $0.323¢$ | + | $0.174¢$ | $+ ( 1.05138 \times A_m )$ |
| Next 600 kWh | Add | $0.323¢$ | + | $0.174¢$ | $+ ( 1.05138 \times A_m )$ |
| Additional kWh | Add | $0.323¢$ | + | $0.157¢$ | $+ ( 1.05138 \times A_m )$ |
| Transition | | | | | |
| First 500 kWh | Add | $0.323¢$ | + | $0.172¢$ | $+ ( 1.05138 \times A_m )$ |
| Next 600 kWh | Add | $0.323¢$ | + | $0.172¢$ | $+ ( 1.05138 \times A_m )$ |
| Additional kWh | Add | $0.323¢$ | + | $0.155¢$ | $+ ( 1.05138 \times A_m )$ |
| Part 2 | | | | | |
| Demand Charge | | | | | |
| Summer | | | | | |
| First 50 kW | Add | $\$0.00$ | + | $\$0.02$ | |
| Excess over 50 kW | Add | $\$0.00$ | + | $\$0.27$ | |

*Applicable also to the third component of the demand charge
**[Reserved]
***Applicable also to minimum offpeak energy

| | | | | |
|---|---|---|---|---|
| Winter | | | | |
| First 50 kW | Add | $0.00 | + | $0.02 |
| Excess over 50 kW | Add | $0.00 | + | $0.25 |
| Transition | | | | |
| First 50 kW | Add | $0.00 | + | $0.02 |
| Excess over 50 kW | Add | $0.00 | + | $0.25 |

Energy Charge

| | | | | |
|---|---|---|---|---|
| Summer | | | | |
| First 15,000 kWh | Add | 0.323¢ | + | 0.158¢ + ( 1.05138 x $A_m$ ) |
| Additional kWh | Add | 0.323¢ | + | 0.084¢ + ( 1.03396 x $A_m$ ) |
| Winter | | | | |
| First 15,000 kWh | Add | 0.323¢ | + | 0.156¢ + ( 1.05138 x $A_m$ ) |
| Additional kWh | Add | 0.323¢ | + | 0.083¢ + ( 1.03396 x $A_m$ ) |
| Transition | | | | |
| First 15,000 kWh | Add | 0.323¢ | + | 0.154¢ + ( 1.05138 x $A_m$ ) |
| Additional kWh | Add | 0.323¢ | + | 0.082¢ + ( 1.03396 x $A_m$ ) |

Part 3

Demand Charge

| | | | | |
|---|---|---|---|---|
| Summer | | | | |
| First 1,000 kW | Add | $0.00 | + | $0.27 |
| Excess over 1,000 kW * | Add | $0.00 | + | $0.28 |
| Winter | | | | |
| First 1,000 kW | Add | $0.00 | + | $0.25 |
| Excess over 1,000 kW * | Add | $0.00 | + | $0.25 |
| Transition | | | | |
| First 1,000 kW | Add | $0.00 | + | $0.25 |
| Excess over 1,000 kW * | Add | $0.00 | + | $0.25 |

Energy Charge

| | | | | |
|---|---|---|---|---|
| Summer | | | | |
| First 100 hours | Add | 0.323¢ | + | 0.102¢ + ( 1.03396 x $A_m$ ) |
| Next 250 hours | Add | 0.323¢ | + | 0.090¢ + ( 1.03396 x $A_m$ ) |
| Additional kWh | Add | 0.323¢ | + | 0.069¢ + ( 1.03396 x $A_m$ ) |
| Winter | | | | |
| First 100 hours | Add | 0.323¢ | + | 0.101¢ + ( 1.03396 x $A_m$ ) |
| Next 250 hours | Add | 0.323¢ | + | 0.089¢ + ( 1.03396 x $A_m$ ) |
| Additional kWh | Add | 0.323¢ | + | 0.069¢ + ( 1.03396 x $A_m$ ) |
| Transition | | | | |
| First 100 hours | Add | 0.323¢ | + | 0.100¢ + ( 1.03396 x $A_m$ ) |
| Next 250 hours | Add | 0.323¢ | + | 0.088¢ + ( 1.03396 x $A_m$ ) |
| Additional kWh | Add | 0.323¢ | + | 0.069¢ + ( 1.03396 x $A_m$ ) |

Schedule DSMA

Demand Charge

| | | | | |
|---|---|---|---|---|
| Summer | | | | |
| Coincident kW * | Add | $0.00 | + | $0.27 |
| Maximum kW | Add | $0.00 | + | $0.00 |
| Winter | | | | |
| Coincident kW * | Add | $0.00 | + | $0.25 |
| Maximum kW | Add | $0.00 | + | $0.00 |
| Transition | | | | |
| Coincident kW * | Add | $0.00 | + | $0.25 |
| Maximum kW | Add | $0.00 | + | $0.00 |

Energy Charge

| | | | | |
|---|---|---|---|---|
| First 400 hours | Add | 0.000¢ | + | 0.014¢ + ( 0.00000 x $A_m$ ) |
| Summer | Add | 0.323¢ | + | 0.103¢ + ( 1.03396 x $A_m$ ) |
| Winter | Add | 0.323¢ | + | 0.095¢ + ( 1.03396 x $A_m$ ) |
| Transition | Add | 0.323¢ | + | 0.091¢ + ( 1.03396 x $A_m$ ) |

*Applicable also to the third component of the demand charge

**[Reserved]

***Applicable also to minimum offpeak energy

Schedule TDDSA
   Demand Charge
      Summer Period

| | | | | | |
|---|---|---|---|---|---|
| Onpeak * | Add | $0.00 | + | $0.26 | |
| Maximum | Add | $0.52 | + | $0.08 | |

      Winter Period

| | | | | | |
|---|---|---|---|---|---|
| Onpeak * | Add | $0.00 | + | $0.24 | |
| Maximum | Add | $0.52 | + | $0.08 | |

      Transition Period

| | | | | | |
|---|---|---|---|---|---|
| Onpeak * | Add | $0.00 | + | $0.24 | |
| Maximum | Add | $0.52 | + | $0.08 | |

   Energy Charge
      Summer Period

| | | | | |
|---|---|---|---|---|
| Onpeak | Add | 0.111¢ | + | $0.185¢ + ( $1.03000 \times A_m$ ) |

         Offpeak

| | | | | |
|---|---|---|---|---|
| First 200 hours *** | Add | 0.111¢ | + | $0.107¢ + ( $1.03000 \times A_m$ ) |
| Next 200 hours | Add | 0.111¢ | + | $0.008¢ + ( $1.03000 \times A_m$ ) |
| Additional kWh | Add | 0.111¢ | + | $0.001¢ + ( $1.03000 \times A_m$ ) |

      Winter Period

| | | | | |
|---|---|---|---|---|
| Onpeak | Add | 0.111¢ | + | $0.150¢ + ( $1.03000 \times A_m$ ) |

         Offpeak

| | | | | |
|---|---|---|---|---|
| First 200 hours *** | Add | 0.111¢ | + | $0.114¢ + ( $1.03000 \times A_m$ ) |
| Next 200 hours | Add | 0.111¢ | + | $0.008¢ + ( $1.03000 \times A_m$ ) |
| Additional kWh | Add | 0.111¢ | + | $0.001¢ + ( $1.03000 \times A_m$ ) |

      Transition Period

| | | | | |
|---|---|---|---|---|
| Onpeak | Add | 0.111¢ | + | $0.117¢ + ( $1.03000 \times A_m$ ) |

         Offpeak

| | | | | |
|---|---|---|---|---|
| First 200 hours *** | Add | 0.111¢ | + | $0.117¢ + ( $1.03000 \times A_m$ ) |
| Next 200 hours | Add | 0.111¢ | + | $0.008¢ + ( $1.03000 \times A_m$ ) |
| Additional kWh | Add | 0.111¢ | + | $0.001¢ + ( $1.03000 \times A_m$ ) |

Schedule DSB
   Demand Charge
      Summer Period

| | | | | |
|---|---|---|---|---|
| Onpeak * | Add | $0.00 | + | $0.26 |
| Maximum | Add | $0.52 | + | $0.08 |

      Winter Period

| | | | | |
|---|---|---|---|---|
| Onpeak * | Add | $0.00 | + | $0.23 |
| Maximum | Add | $0.52 | + | $0.08 |

      Transition Period

| | | | | |
|---|---|---|---|---|
| Onpeak * | Add | $0.00 | + | $0.23 |
| Maximum | Add | $0.52 | + | $0.08 |

   Energy Charge
      Summer Period

| | | | | |
|---|---|---|---|---|
| Onpeak | Add | 0.111¢ | + | $0.149¢ + ( $1.03000 \times A_m$ ) |

         Offpeak

| | | | | |
|---|---|---|---|---|
| First 200 hours *** | Add | 0.111¢ | + | $0.092¢ + ( $1.03000 \times A_m$ ) |
| Next 200 hours | Add | 0.111¢ | + | $0.010¢ + ( $1.03000 \times A_m$ ) |
| Additional kWh | Add | 0.111¢ | + | $0.003¢ + ( $1.03000 \times A_m$ ) |

      Winter Period

| | | | | |
|---|---|---|---|---|
| Onpeak | Add | 0.111¢ | + | $0.124¢ + ( $1.03000 \times A_m$ ) |

         Offpeak

| | | | | |
|---|---|---|---|---|
| First 200 hours *** | Add | 0.111¢ | + | $0.097¢ + ( $1.03000 \times A_m$ ) |
| Next 200 hours | Add | 0.111¢ | + | $0.010¢ + ( $1.03000 \times A_m$ ) |
| Additional kWh | Add | 0.111¢ | + | $0.003¢ + ( $1.03000 \times A_m$ ) |

*Applicable also to the third component of the demand charge
**[Reserved]
***Applicable also to minimum offpeak energy

| | | | | | |
|---|---|---|---|---|---|
| Transition Period | | | | | |
| Onpeak | Add | 0.111¢ | + | 0.091¢ | + ( 1.03000 × $A_m$ ) |
| Offpeak | | | | | |
| First 200 hours *** | Add | 0.111¢ | + | 0.091¢ | + ( 1.03000 × $A_m$ ) |
| Next 200 hours | Add | 0.111¢ | + | 0.010¢ | + ( 1.03000 × $A_m$ ) |
| Additional kWh | Add | 0.111¢ | + | 0.003¢ | + ( 1.03000 × $A_m$ ) |

Schedule DSC

| | | | | | |
|---|---|---|---|---|---|
| Demand Charge | | | | | |
| Summer Period | | | | | |
| Onpeak * | Add | $0.00 | + | $0.26 | |
| Maximum | Add | $0.52 | + | $0.08 | |
| Winter Period | | | | | |
| Onpeak * | Add | $0.00 | + | $0.23 | |
| Maximum | Add | $0.52 | + | $0.08 | |
| Transition Period | | | | | |
| Onpeak * | Add | $0.00 | + | $0.23 | |
| Maximum | Add | $0.52 | + | $0.08 | |
| Energy Charge | | | | | |
| Summer Period | | | | | |
| Onpeak | Add | 0.111¢ | + | 0.149¢ | + ( 1.03000 × $A_m$ ) |
| Offpeak | | | | | |
| First 200 hours *** | Add | 0.111¢ | + | 0.092¢ | + ( 1.03000 × $A_m$ ) |
| Next 200 hours | Add | 0.111¢ | + | 0.010¢ | + ( 1.03000 × $A_m$ ) |
| Additional kWh | Add | 0.111¢ | + | 0.003¢ | + ( 1.03000 × $A_m$ ) |
| Winter Period | | | | | |
| Onpeak | Add | 0.111¢ | + | 0.124¢ | + ( 1.03000 × $A_m$ ) |
| Offpeak | | | | | |
| First 200 hours *** | Add | 0.111¢ | + | 0.097¢ | + ( 1.03000 × $A_m$ ) |
| Next 200 hours | Add | 0.111¢ | + | 0.010¢ | + ( 1.03000 × $A_m$ ) |
| Additional kWh | Add | 0.111¢ | + | 0.003¢ | + ( 1.03000 × $A_m$ ) |
| Transition Period | | | | | |
| Onpeak | Add | 0.111¢ | + | 0.091¢ | + ( 1.03000 × $A_m$ ) |
| Offpeak | | | | | |
| First 200 hours *** | Add | 0.111¢ | + | 0.091¢ | + ( 1.03000 × $A_m$ ) |
| Next 200 hours | Add | 0.111¢ | + | 0.010¢ | + ( 1.03000 × $A_m$ ) |
| Additional kWh | Add | 0.111¢ | + | 0.003¢ | + ( 1.03000 × $A_m$ ) |

Schedule DSD

| | | | | | |
|---|---|---|---|---|---|
| Demand Charge | | | | | |
| Summer Period | | | | | |
| Onpeak * | Add | $0.00 | + | $0.26 | |
| Maximum | Add | $0.52 | + | $0.08 | |
| Winter Period | | | | | |
| Onpeak * | Add | $0.00 | + | $0.23 | |
| Maximum | Add | $0.52 | + | $0.08 | |
| Transition Period | | | | | |
| Onpeak * | Add | $0.00 | + | $0.23 | |
| Maximum | Add | $0.52 | + | $0.08 | |
| Energy Charge | | | | | |
| Summer Period | | | | | |
| Onpeak | Add | 0.111¢ | + | 0.149¢ | + ( 1.03000 × $A_m$ ) |
| Offpeak | | | | | |
| First 200 hours *** | Add | 0.111¢ | + | 0.092¢ | + ( 1.03000 × $A_m$ ) |
| Next 200 hours | Add | 0.111¢ | + | 0.008¢ | + ( 1.03000 × $A_m$ ) |
| Additional kWh | Add | 0.111¢ | + | 0.003¢ | + ( 1.03000 × $A_m$ ) |

*Applicable also to the third component of the demand charge
**[Reserved]
***Applicable also to minimum offpeak energy

| | | | | | |
|---|---|---|---|---|---|
| **Winter Period** | | | | | |
| Onpeak | Add | 0.111¢ | + | 0.124¢ | + ( 1.03000 x $A_m$ ) |
| Offpeak | | | | | |
| First 200 hours *** | Add | 0.111¢ | + | 0.097¢ | + ( 1.03000 x $A_m$ ) |
| Next 200 hours | Add | 0.111¢ | + | 0.008¢ | + ( 1.03000 x $A_m$ ) |
| Additional kWh | Add | 0.111¢ | + | 0.003¢ | + ( 1.03000 x $A_m$ ) |
| **Transition Period** | | | | | |
| Onpeak | Add | 0.111¢ | + | 0.091¢ | + ( 1.03000 x $A_m$ ) |
| Offpeak | | | | | |
| First 200 hours *** | Add | 0.111¢ | + | 0.091¢ | + ( 1.03000 x $A_m$ ) |
| Next 200 hours | Add | 0.111¢ | + | 0.008¢ | + ( 1.03000 x $A_m$ ) |
| Additional kWh | Add | 0.111¢ | + | 0.003¢ | + ( 1.03000 x $A_m$ ) |

**Manufacturing Service**
Schedule TDDSMA
Demand Charge

| | | | | |
|---|---|---|---|---|
| **Summer Period** | | | | |
| Onpeak * | Add | $0.00 | + | $0.24 |
| Maximum | Add | $0.52 | + | $0.05 |
| **Winter Period** | | | | |
| Onpeak * | Add | $0.00 | + | $0.22 |
| Maximum | Add | $0.52 | + | $0.05 |
| **Transition Period** | | | | |
| Onpeak * | Add | $0.00 | + | $0.22 |
| Maximum | Add | $0.52 | + | $0.05 |

Energy Charge

| | | | | | |
|---|---|---|---|---|---|
| **Summer Period** | | | | | |
| Onpeak | Add | 0.111¢ | + | 0.128¢ | + ( 1.03000 x $A_m$ ) |
| Offpeak | | | | | |
| First 200 hours *** | Add | 0.111¢ | + | 0.069¢ | + ( 1.03000 x $A_m$ ) |
| Next 200 hours | Add | 0.111¢ | + | 0.005¢ | + ( 1.03000 x $A_m$ ) |
| Additional kWh | Add | 0.111¢ | + | -0.001¢ | + ( 1.03000 x $A_m$ ) |
| **Winter Period** | | | | | |
| Onpeak | Add | 0.111¢ | + | 0.101¢ | + ( 1.03000 x $A_m$ ) |
| Offpeak | | | | | |
| First 200 hours *** | Add | 0.111¢ | + | 0.074¢ | + ( 1.03000 x $A_m$ ) |
| Next 200 hours | Add | 0.111¢ | + | 0.005¢ | + ( 1.03000 x $A_m$ ) |
| Additional kWh | Add | 0.111¢ | + | -0.001¢ | + ( 1.03000 x $A_m$ ) |
| **Transition Period** | | | | | |
| Onpeak | Add | 0.111¢ | + | 0.076¢ | + ( 1.03000 x $A_m$ ) |
| Offpeak | | | | | |
| First 200 hours *** | Add | 0.111¢ | + | 0.076¢ | + ( 1.03000 x $A_m$ ) |
| Next 200 hours | Add | 0.111¢ | + | 0.005¢ | + ( 1.03000 x $A_m$ ) |
| Additional kWh | Add | 0.111¢ | + | -0.001¢ | + ( 1.03000 x $A_m$ ) |

Schedule DSMB
Demand Charge

| | | | | |
|---|---|---|---|---|
| **Summer Period** | | | | |
| Onpeak * | Add | $0.00 | + | $0.24 |
| Maximum | Add | $0.52 | + | $0.02 |
| **Winter Period** | | | | |
| Onpeak * | Add | $0.00 | + | $0.22 |
| Maximum | Add | $0.52 | + | $0.02 |
| **Transition Period** | | | | |
| Onpeak * | Add | $0.00 | + | $0.22 |
| Maximum | Add | $0.52 | + | $0.02 |

*Applicable also to the third component of the demand charge
**[Reserved]
***Applicable also to minimum offpeak energy

ton22-10964-mg Doc 1141-28 Filed 10/19/22 Entered 10/19/22 21:18:19 Exhibit W Pg 13 of 17

Energy Charge
  Summer Period

| | | | | |
|---|---|---|---|---|
| Onpeak | Add | $0.111¢$ | + | $0.133¢ + ( 1.03000 \times A_m )$ |
| Offpeak | | | | |
|   First 200 hours *** | Add | $0.111¢$ | + | $0.074¢ + ( 1.03000 \times A_m )$ |
|   Next 200 hours | Add | $0.111¢$ | + | $0.005¢ + ( 1.03000 \times A_m )$ |
|   Additional kWh | Add | $0.111¢$ | + | $-0.001¢ + ( 1.03000 \times A_m )$ |
| Winter Period | | | | |
|   Onpeak | Add | $0.111¢$ | + | $0.106¢ + ( 1.03000 \times A_m )$ |
| Offpeak | | | | |
|   First 200 hours *** | Add | $0.111¢$ | + | $0.079¢ + ( 1.03000 \times A_m )$ |
|   Next 200 hours | Add | $0.111¢$ | + | $0.005¢ + ( 1.03000 \times A_m )$ |
|   Additional kWh | Add | $0.111¢$ | + | $-0.001¢ + ( 1.03000 \times A_m )$ |
| Transition Period | | | | |
|   Onpeak | Add | $0.111¢$ | + | $0.081¢ + ( 1.03000 \times A_m )$ |
| Offpeak | | | | |
|   First 200 hours *** | Add | $0.111¢$ | + | $0.081¢ + ( 1.03000 \times A_m )$ |
|   Next 200 hours | Add | $0.111¢$ | + | $0.005¢ + ( 1.03000 \times A_m )$ |
|   Additional kWh | Add | $0.111¢$ | + | $-0.001¢ + ( 1.03000 \times A_m )$ |

Schedule DSMC
  Demand Charge

| | | | | |
|---|---|---|---|---|
| Summer Period | | | | |
|   Onpeak * | Add | $0.00 | + | $0.24 |
|   Maximum | Add | $0.52 | + | $0.02 |
| Winter Period | | | | |
|   Onpeak * | Add | $0.00 | + | $0.22 |
|   Maximum | Add | $0.52 | + | $0.02 |
| Transition Period | | | | |
|   Onpeak * | Add | $0.00 | + | $0.22 |
|   Maximum | Add | $0.52 | + | $0.02 |

Energy Charge

| | | | | |
|---|---|---|---|---|
| Summer Period | | | | |
|   Onpeak | Add | $0.111¢$ | + | $0.130¢ + ( 1.03000 \times A_m )$ |
| Offpeak | | | | |
|   First 200 hours *** | Add | $0.111¢$ | + | $0.071¢ + ( 1.03000 \times A_m )$ |
|   Next 200 hours | Add | $0.111¢$ | + | $0.008¢ + ( 1.03000 \times A_m )$ |
|   Additional kWh | Add | $0.111¢$ | + | $0.008¢ + ( 1.03000 \times A_m )$ |
| Winter Period | | | | |
|   Onpeak | Add | $0.111¢$ | + | $0.103¢ + ( 1.03000 \times A_m )$ |
| Offpeak | | | | |
|   First 200 hours *** | Add | $0.111¢$ | + | $0.076¢ + ( 1.03000 \times A_m )$ |
|   Next 200 hours | Add | $0.111¢$ | + | $0.008¢ + ( 1.03000 \times A_m )$ |
|   Additional kWh | Add | $0.111¢$ | + | $0.008¢ + ( 1.03000 \times A_m )$ |
| Transition Period | | | | |
|   Onpeak | Add | $0.111¢$ | + | $0.078¢ + ( 1.03000 \times A_m )$ |
| Offpeak | | | | |
|   First 200 hours *** | Add | $0.111¢$ | + | $0.078¢ + ( 1.03000 \times A_m )$ |
|   Next 200 hours | Add | $0.111¢$ | + | $0.008¢ + ( 1.03000 \times A_m )$ |
|   Additional kWh | Add | $0.111¢$ | + | $0.008¢ + ( 1.03000 \times A_m )$ |

Schedule DSMD
  Demand Charge

| | | | | |
|---|---|---|---|---|
| Summer Period | | | | |
|   Onpeak * | Add | $0.00 | + | $0.24 |
|   Maximum | Add | $0.52 | + | $0.02 |
| Winter Period | | | | |
|   Onpeak * | Add | $0.00 | + | $0.22 |
|   Maximum | Add | $0.52 | + | $0.02 |

*Applicable also to the third component of the demand charge
**[Reserved]
***Applicable also to minimum offpeak energy

Page 6 of 9

| | | | | | |
|---|---|---|---|---|---|
| Transition Period | | | | | |
| Onpeak * | Add | $0.00 | + | $0.22 | |
| Maximum | Add | $0.52 | + | $0.02 | |
| Energy Charge | | | | | |
| Summer Period | | | | | |
| Onpeak | Add | 0.111¢ | + | 0.125¢ | + ( 1.03000 x $A_m$ ) |
| Offpeak | | | | | |
| First 200 hours *** | Add | 0.111¢ | + | 0.068¢ | + ( 1.03000 x $A_m$ ) |
| Next 200 hours | Add | 0.111¢ | + | 0.004¢ | + ( 1.03000 x $A_m$ ) |
| Additional kWh | Add | 0.111¢ | + | 0.003¢ | + ( 1.03000 x $A_m$ ) |
| Winter Period | | | | | |
| Onpeak | Add | 0.111¢ | + | 0.098¢ | + ( 1.03000 x $A_m$ ) |
| Offpeak | | | | | |
| First 200 hours *** | Add | 0.111¢ | + | 0.071¢ | + ( 1.03000 x $A_m$ ) |
| Next 200 hours | Add | 0.111¢ | + | 0.004¢ | + ( 1.03000 x $A_m$ ) |
| Additional kWh | Add | 0.111¢ | + | 0.003¢ | + ( 1.03000 x $A_m$ ) |
| Transition Period | | | | | |
| Onpeak | Add | 0.111¢ | + | 0.073¢ | + ( 1.03000 x $A_m$ ) |
| Offpeak | | | | | |
| First 200 hours *** | Add | 0.111¢ | + | 0.073¢ | + ( 1.03000 x $A_m$ ) |
| Next 200 hours | Add | 0.111¢ | + | 0.004¢ | + ( 1.03000 x $A_m$ ) |
| Additional kWh | Add | 0.111¢ | + | 0.003¢ | + ( 1.03000 x $A_m$ ) |

The amounts applicable for Am under column (3) in this Adjustment Addendum shall be determined each month by applying data from TVA's forecasts of TVA's actual operations, as well as actual data when it becomes available in accordance with the formula below. TVA will endeavor to publish the calculated amounts 20 days in advance of the month of application (but shall in no event publish these calculated amounts any later than 15 days in advance of the month of application), and such amounts will be applicable to bills rendered from meter readings taken for TVA monthly billing cycles beginning on and after the first day of each month beginning October 1, 2018.

*Applicable also to the third component of the demand charge
**[Reserved]
***Applicable also to minimum offpeak energy

$$A_{mj} = \frac{CF_{mj} + DAR_{mj}}{95\%}$$

$A_{mj}$ = The monthly fuel cost adjustment (FCA) to be applied to the kilowatt-hour sales during the current monthly billing period and rounded to the nearest one-thousandth of a cent per kilowatt-hour.

m = a particular month

j = the particular customer group of LMS Customers, LGS Customers, or All Other Customers as those categories are defined in the Wholesale Power Rate Schedule.

$CF_{mj}$ = The Core FCA adjustment for a particular month. $CF_{mj} = (FF_m / SF_m) + AD_{mj}$

    FF = TVA's estimate of FA (as described below) for month m, based on the latest TVA Financial Forecast.

    SF = TVA's estimate of SA (as described below) for month m, based on the latest TVA Financial Forecast.

    AD = Seasonal adjustments applied separately for customer group j, based on historical resource cost allocation (RCA) data

Seasonal Adjustments (AD) are as follows:

| Seasonal Period | LMS Customers | LGS Customers | All Other Customers |
|---|---|---|---|
| Summer | -0.096 ¢ per kWh | -0.062 ¢ per kWh | 0.027 ¢ per kWh |
| Winter | -0.046 ¢ per kWh | -0.038 ¢ per kWh | 0.014 ¢ per kWh |
| Transition | -0.044 ¢ per kWh | -0.022 ¢ per kWh | 0.015 ¢ per kWh |

$DAR_{mj}$ = The adjustment that collects a portion of DA (as described below) in a month, rounded to the nearest one-thousandth of a cent.

    $DAR_{mj} = R \times DA_{mj} / FiSF_{mj}$

    R = The collection ratio of 50%.

    FiSF = TVA's estimate of FiSA (as described below) for month m and customer group j, based on the latest TVA Financial Forecast

    DA = The deferred account that provides the true-up adjustment necessary to reconcile prior estimates to actual data, which shall be computed with the formulas below.



$$DA_{mj} = \overbrace{GLDA_{(m-2,j)}}^{\substack{\text{General Ledger}\\\text{DA Balance}}} - \overbrace{DAR_{(m-1,j)} \times FiSF_{(m-1,j)}}^{\substack{\text{Estimate of DAR}\\\text{collections prior months}}}$$

The DA balances accrued for Large Customers prior to August 1, 2018, shall be liquidated based upon the average monthly sales for each of these classes for the period April 1, 2011, through July 31, 2017. The average percentage of sales by class used to allocate the DA balance are:

    LMS Customers - 85%
    LGS Customers - 11%,
    All Other Customers - 4%

These allocations shall be made based on class specific adjustments to the deferred accounts of LMS Customers, LGS Customers, and All Other Customers for the October 2018 and November 2018 fuel cost adjustments. These adjustments are intended to properly allocate the costs based on how they were incurred prior to October 1, 2018.

    FiSA = Actual TVA energy sales subject to the FCA (in kWh) for month m and customer class j, as recorded in TVA's General Ledger with specific accounts 442000, 445000, 447000, 447100, and 448000 (or such similar or successor accounts as may be prescribed by FERC in the future).

GLDA = The general ledger deferred account balance that flows through to the balance sheet.

$$GLDA_{mj} = \overbrace{GLDA_{(m-1,j)}}^{\substack{\text{Accumulated} \\ \text{General Ledger} \\ \text{DA Balance}}} + \overbrace{TU_{mj}}^{\substack{\text{Core FCA} \\ \text{True - Up}}} + \overbrace{GLD_{mj}}^{\substack{\text{DA} \\ \text{Amortization}}}$$

TU = The core true-up amount.

$$TU_{mj} = (FISA_{mj}/SA_{mj}) \times RCA_{mj} - GLR_{mj}$$

RCA = The RCA methodology allocates total fuel costs in proportion to the average hourly load of each customer group j, weighted by the dispatch cost of TVA's Top 100 MW of incremental cost in each hour.

$$RCA_{mj} = \left( \frac{\Sigma_i h_{ij} c_i}{\Sigma_i \Sigma_j h_{ij} c_i} \right) \times FA_m$$

i = the hourly interval of the billing month

h = the hourly energy of each customer group

C = Top Cost (dispatch cost for the top 100 MW)

FA = Actual total fuel and purchased power expenses (in cents) under the framework and accounts provided below (or such similar or successor accounts as may be prescribed by FERC in the future).

(1) Fossil Fuel Expense - Account 501 - Direct cost of fuel burned in TVA coal plants, including transportation and fuel treatments. Costs to be excluded are lease payments for rail cars, maintenance on rail cars, sampling and fuel analysis, and fuel handling expenses in unloading fuel from shipping media and the handling of fuel up to the point where fuel enters the bunker or other boiler-house structure.

(2) Reagents Expense - Account 502 - Cost of emission reagents such as limestone and ammonia that are directly related to the level of generation output.

(3) Allowances Expense - Account 509 - Cost of emission allowance expense such as SO2 and NOx that are directly related to the level of generation output.

(4) Nuclear Fuel Expense - Account 518 - Cost of nuclear fuel amortization expense dependent upon burn, including DOE spent fuel disposal charges.

(5) Gas Turbine Fuel Expense - Account 547 - Direct cost of gas and oil burned in TVA plants, including transportation. Costs to be excluded are costs of gas storage facilities and sampling and fuel analysis that do not vary with changes in generation volume.

(6) Purchased Power Expense - Account 555 - Energy cost of purchased power to serve native load demand or to displace higher cost generation. Costs to be excluded are fixed demand or capacity payments in tolling agreements and purchased power agreements that do not vary with volume and costs of purchased power linked to off-system sales transactions.

(7) Audit Expenses - TVA's actual expenses incurred as the result of third party expenses for FCA audits.

SA = Actual total TVA energy sales (in kWh) for month m, as recorded in TVA's General Ledger with specific accounts 442000, 445000, 447000, 447100, and 448000 (or such similar or successor accounts as may be prescribed by FERC in the future), excluding any displacement sales reflected in account 447100.

$GLD_{mj}$ = Actual TVA DAR revenue (DA amortization) for month m and customer group j, for firm-based energy sales, as recorded in TVA's General Ledger with specific accounts 442000, 445000, 447000, 447100, and 448000 (or such similar or successor accounts as may be prescribed by FERC in the future).

$GLR_{mj}$ = Actual TVA Core FCA Revenue for month m and customer group j, for firm-based energy sales, as recorded in TVA's General Ledger with specific accounts 442000, 445000, 447000, 447100, and 448000 (or such similar or successor accounts as may be prescribed by FERC in the future).

## TERMS AND CONDITIONS

1. Conditions of Delivery. The power delivered under the contract shall be 3-phase alternating current at a frequency of approximately 60 hertz and at the nominal voltage specified in the contract. Except for temporary periods of abnormal operating conditions, voltage variations shall not exceed 7 percent up or down from a normal voltage to be determined from operating experience.

Company shall exercise all reasonable precautions and install all equipment necessary to limit its Total Demand to the amount to which it is entitled under the contract. If the Total Demand for any interval exceeds the amount to which Company is so entitled, Company shall not be entitled to continue such excess takings, whether or not it is obligated to pay for them.

Maintenance by TVA at the point of delivery of voltage within the above stated limits and the frequency contracted for will constitute availability of power for purposes of the contract.

TVA shall not be obligated to install protective equipment, but may install such equipment as TVA deems necessary for the protection of its own property and operations. The electrical equipment installed by Company shall be capable of satisfactory coordination with TVA's protective equipment.

The power and energy taken under the contract shall not be used in such a manner as to cause unusual fluctuations or disturbances on TVA's system. Company shall provide, at its expense, suitable apparatus which will reasonably limit such fluctuations. In the event that unreasonable fluctuations or disturbances, including, without limitation, harmonic currents resulting in interference with communication systems or in harmonic resonance of now-existing facilities, are caused by Company's facilities, TVA shall immediately notify Company's designated representative of the circumstances, and TVA shall then have the right, after reasonable notice, to discontinue the delivery of power and energy under this contract until the condition causing such fluctuations or disturbances is corrected by Company. TVA shall give Company written notice of these circumstances in addition to the above-mentioned notice, but the requirement of providing such written notice shall not limit or delay TVA's right to discontinue service to Company. Despite such discontinuance of service, Company shall be obligated to pay TVA the amounts due for power and energy under the contract, including the minimum bills for such power.

2. Billing.

(a) Definitions. As used in this section 2,

(i) "day" shall mean a calendar day;

(ii) "business day" shall mean any day except Saturday, Sunday, or a weekday that is observed by TVA as a Federal holiday (Federal holidays currently include New Year's Day, Martin Luther King, Jr.'s Birthday, Presidents' Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Veteran's Day, Thanksgiving Day, and Christmas Day); and

(iii) "Average Short Term Interest Rate" shall mean (a) the average of the interest rates payable on TVA's short-term borrowings (having maturities of less than one year) made during the calendar month preceding the month of the date of a bill, or (b) in the event that TVA made no short-term borrowings during such preceding calendar month, the Average Short Term Interest Rate shall be deemed to be the average effective interest rate on 91-day United States Treasury bills (based on the average of the closing bid and asked prices) during such preceding calendar month, plus 1/8 of one percent.

(b) General provisions. TVA will bill Company for all charges applicable under the contract for each Billing Month as soon as practicable. Payment of such bill by Company shall become due 10 days after the date of bill. To any amount remaining unpaid 10 days after the due date, there shall be added a charge equal to the sum of (1) $150 and (2) an amount calculated by applying the Average Short Term Interest Rate on a daily basis to the unpaid portion of the bill for each day of the period from and after the due date to and including the date of payment in full. TVA will prepare and send to Company appropriate invoices for such added charge, which shall be due and payable upon receipt. All payments shall be made to TVA at 400 West Summit Hill Drive, Knoxville, Tennessee 37902-1499, or at such other place as TVA may from time to time designate by notice to Company.

R051895
9505t&c



# POWER INVOICE

CORE SCIENTIFIC, INC. (CALVERT CITY)

CUSTOMER NUMBER: 0638

INVOICE NUMBER  E22-09-0638

INVOICE DATE  10/03/2022

SERVICE TO DATE  10/01/2022

CORE SCIENTIFIC, INC.

1035 SHAR-CAL ROAD

CALVERT CITY  KY 42029

| | | | |
|---|---|---|---|
| DEMAND CHARGES | 135,151 | KW | $1,564,365.78 |
| ENERGY CHARGES | 91,409,508 | KWH | $4,092,176.13 |
| OTHER CHARGES | | | ($4,871,926.48) |
| CREDITS | | | ($1,374,968.26) |
| CREDIT DUE | | | ($590,352.83) |

10/03/2022 13:51



# POWER INVOICE

CORE SCIENTIFIC, INC. (CALVERT CITY)

CUSTOMER NUMBER: 0638

INVOICE NUMBER   E22-09-0638

INVOICE DATE   10/03/2022

| DEMAND CHARGES | BASIS | KW * | RATE * | MINUTES AVAILABLE / | MINUTES IN PERIOD = | AMOUNT |
|---|---|---|---|---|---|---|
| DSMD SPP TOU ONPEAK SUMMER DEMAND - BASE | 135,042 | | 10.24 | 43,200 | 43,200 | $1,382,830.08 |
| DSMD SPP TOU MAX SUMMER DEMAND - BASE | | 135,151 | 1.12 | 43,200 | 43,200 | $151,369.12 |
| DSMD SPP TOU SUMMER DEMAND - HYDRO | 135,151 | | 0.52 | 43,200 | 43,200 | $70,278.52 |
| DSMD PANDEMIC RECOVERY CREDIT | | | | | | ($40,111.94) |
| TOTAL DEMAND CHARGES | | | | | | $1,564,365.78 |

| CONTRACT DEMANDS | KW | |
|---|---|---|
| SPP TOU ON-PEAK DEMAND | 1,000 | |
| SPP TOU OFF-PEAK DEMAND | 1,000 | |
| | | TIME |
| MAXIMUM MEASURED DEMAND | 135,151 | 09/29/2022 12:29:59 |
| MINIMUM MEASURED DEMAND | 39,561 | 09/22/2022 09:59:59 |



# POWER INVOICE

CORE SCIENTIFIC, INC. (CALVERT CITY)  INVOICE NUMBER  E22-09-0638

CUSTOMER NUMBER:  0638  INVOICE DATE  10/03/2022

| ENERGY CHARGES | BASIS | KWH * | RATE = | AMOUNT |
|---|---|---|---|---|
| DSMD SPP TOU ONPEAK SUMMER ENERGY - BASE | | 14,923,197 | 0.05329 | $795,257.17 |
| DSMD SPP TOU BLOCK 1 OFFPEAK SUMMER ENERGY - BASE | | 22,599,103 | 0.02828 | $639,102.63 |
| DSMD SPP TOU BLOCK 2 OFFPEAK SUMMER ENERGY - BASE | | 22,599,103 | 0.00171 | $38,644.47 |
| DSMD SPP TOU BLOCK 3 OFFPEAK SUMMER ENERGY - BASE | | 31,288,105 | 0.00112 | $35,042.68 |
| DSMD SPP TOU SUMMER ENERGY - HYDRO | 91,409,508 | | 0.00111 | $101,464.55 |
| DSMD SPP TOU SUMMER ENERGY - FUEL | 91,409,508 | | 0.02760 | $2,522,902.42 |
| DSMD PANDEMIC RECOVERY CREDIT | | | | ($40,237.79) |
| | | | | |
| TOTAL ENERGY CHARGES | | 91,409,508 | | $4,092,176.13 |

10/03/2022 13:51



# POWER INVOICE

CORE SCIENTIFIC, INC. (CALVERT CITY)  
CUSTOMER NUMBER: 0638

INVOICE NUMBER   E22-09-0638  
INVOICE DATE   10/03/2022

| OTHER CHARGES | KWH | AMOUNT |
|---|---|---|
| CUSTOMER CHARGE | | $1,500.00 |
| SPP TOU ADMINISTRATIVE CHARGE | | $350.00 |
| DSMD TOU IP30 5 YR ROLL UNDERPERFORMANCE CHARGE 1 | | $1,279.00 |
| DSMD TOU IP30 5 YR ROLL UNDERPERFORMANCE CHARGE 2 | | $1,392.20 |
| VALLEY INVESTMENT CREDIT | | ($768,872.71) |
| EARLY_PAYMENT_CREDIT | | ($3,254.79) |
| CREDIT FOR PREPAYMENT | | ($104,320.18) |
| PREVIOUS MONTH BALANCE | | $866,577.23 |
| PREPAYMENT RECEIVED Sep 02, 2022 - KET22-232 | | ($1,000,000.00) |
| PREPAYMENT RECEIVED Sep 08, 2022 - KET22-235 | | ($866,577.23) |
| PREPAYMENT RECEIVED Sep 09, 2022 - KET22-236 | | ($1,000,000.00) |
| PREPAYMENT RECEIVED Sep 16, 2022 - KET22-241 | | ($1,000,000.00) |
| PREPAYMENT RECEIVED Sep 23, 2022 - KET22-246 | | ($1,000,000.00) |
| TOTAL OTHER CHARGES | | ($4,871,926.48) |

10/03/2022 13:51



# POWER INVOICE

CORE SCIENTIFIC, INC. (CALVERT CITY)

INVOICE NUMBER   E22-09-0638

CUSTOMER NUMBER:  0638

INVOICE DATE   10/03/2022

| CREDITS | BASIS * | RATE * | MINUTES AVAILABLE | MINUTES IN PERIOD = | CREDIT |
|---|---|---|---|---|---|
| DSMD TOU IP30 5 YR ROLL CAPACITY CREDIT | 127,311 | (5.75) | | | ($1,292,206.65) |
| DSMD TOU IP30 5 YR ROLL EVENT CREDIT 2 | 429,643 | | | | ($40,184.51) |
| DSMD TOU IP30 5 YR ROLL EVENT CREDIT 1 | 455,224 | | | | ($42,577.10) |
| TOTAL CREDITS | | | | | ($1,374,968.26) |

**To:** Patrick Holert[patrick.holert@celsius.network]
**From:** Jeff Pratt[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=ED5A49A192414BD3B569D2DE6089BDFB-JPRATT]
**Sent:** Sat 11/20/2021 7:58:11 PM (UTC-06:00)
**Subject:** RE: Core Scientific Inc. November 2021 Hosting Invoices - Celsius Core LLC

Thanks,

Jeff



**Jeff Pratt**

**Core Scientific**

**(425) 309-1790 (M)**

---

**From:** Patrick Holert <patrick.holert@celsius.network>
**Sent:** Saturday, November 20, 2021 1:32 PM
**To:** Monica Xia <mxia@corescientific.com>
**Cc:** Christy Barwick <christy.barwick@celsius.network>; Accounts Receivable <ar@corescientific.com>; Client Success <client-success@corescientific.com>; Celsius Accounts-Payable <ap@celsius.network>; Krista Rhynard <krhynard@corescientific.com>
**Subject:** Re: Core Scientific Inc. November 2021 Hosting Invoices - Celsius Core LLC

Thanks, Monica. This makes sense.

Best, Patrick

On Sat, Nov 20, 2021, 4:30 PM Monica Xia <mxia@corescientific.com> wrote:
  Hi Patrick,

  Thanks for reaching out. Of course – the increased hosting rates for Marble 2 units' power consumption for certain days were due to increased power fees in October.

  The increase in hosting rates result from the power curtailment in Marble. Moses shared your approval of turning your rigs back on with me.
  Attached file shows the impacted hours and days with higher power price and how the $0.0834/kWh rate is calculated.
  Feel free to let us know if you have more questions or concerns.
  Have a great rest of your weekend!

  Thank you,
  Monica



**MONICA XIA, CPA**

ACCOUNTING MANAGER

**Core Scientific**

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email noted above and destroy the original message. Thank you.

**From:** Patrick Holert <patrick.holert@celsius.network>
**Sent:** Saturday, November 20, 2021 11:04 AM
**To:** Monica Xia <mxia@corescientific.com>
**Cc:** Christy Barwick <christy.barwick@celsius.network>; Accounts Receivable <ar@corescientific.com>; Client Success <client-success@corescientific.com>; Celsius Accounts-Payable <ap@celsius.network>; Krista Rhynard <krhynard@corescientific.com>
**Subject:** Re: Core Scientific Inc. November 2021 Hosting Invoices - Celsius Core LLC

[EXTERNAL] Use caution when opening attachments or links.

Hi Monica:

I would appreciate it if you could explain why our hosting rate over 10/8 to 10/19 is much higher than our contracted rate.

Thanks,

Patrick

On Mon, Nov 15, 2021, 8:01 PM Monica Xia <mxia@corescientific.com> wrote:
Hi Patrick and Christy,

Hope you are doing well! Please see attached invoices INV42116 and INV42118 and associated support for your Hosting Services.

Please note –
1. Hosting rate for the usage from 10/8 to 10/19 (12 days) is $0.0834/kWh.
2. Since the dedicated premium support technician has not been assigned, we would like to terminate the Service and Repair Order (attached) and credit back the $6,000 + $5,714.29 = $11,714.29 previously paid. You could locate the credits on INV42116.


Feel free to reach out if you have any questions or concerns.

Regards,
Monica


**MONICA XIA, CPA**

ACCOUNTING MANAGER

**Core Scientific**

**M. (425) 283-2982**

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email noted above and destroy the original message. Thank you.

Reminder: Be aware of phishing sites and always make sure you are visiting the official https://celsius.network website and app. Celsius will never ask you for confidential information such as passwords, private keys, seed phrases, or secret codes. You should store this information privately and securely and report any suspicious activity.

©2021 Celsius Network

221 River Street, 9th Floor
Hoboken, NJ 07030 USA

Registered as a Money Services Business (MSB) number 31000192265811 with the US Financial Crimes Enforcement Network (FinCEN).

Celsius is not a bank, depository institution, custodian or fiduciary and the assets in your Celsius account are not insured by any private or governmental insurance plan (including FDIC or SIPC), nor are they covered by any compensation scheme (including FSCS).

Holding, trading or using crypto assets carry significant risks, please carefully read our Risk Disclosure page. Celsius does not provide any financial, legal or tax advice, nor should this email be viewed as an offer or inducement to make any financial decision.

Reminder: Be aware of phishing sites and always make sure you are visiting the official https://celsius.network website and app. Celsius will never ask you for confidential information such as passwords, private keys, seed phrases, or secret codes. You should store this information privately and securely and report any suspicious activity.

©2021 Celsius Network

221 River Street, 9th Floor
Hoboken, NJ 07030 USA

Registered as a Money Services Business (MSB) number 31000192265811 with the US Financial Crimes Enforcement Network (FinCEN).

Celsius is not a bank, depository institution, custodian or fiduciary and the assets in your Celsius account are not insured by any private or governmental insurance plan (including FDIC or SIPC), nor are they covered by any compensation scheme (including FSCS).

Holding, trading or using crypto assets carry significant risks, please carefully read our Risk Disclosure page. Celsius does not provide any financial, legal or tax advice, nor should this email be viewed as an offer or inducement to make any financial decision.



# Invoice
**#INV42116**
11/15/2021

**Bill To**
c/o Patrick Holert
Celsius Core LLC
221 River Street
9th Floor
Hoboken
NJ 07030
United States

**Ship To**
c/o Patrick Holert
Celsius Core LLC
221 River Street
9th Floor
Hoboken
NJ 07030
United States

**TOTAL**

# $2,808,619.08

**Due Date: 11/24/2021**

| Terms | Due Date | PO # |
|---|---|---|
| | 11/24/2021 | Order 1 - 4, 6, and 9 |

| Quantity | Item | Rate | Amount |
|---|---|---|---|
| 1 | **Hosting Services*** <br> October 2021 Actual Usage | | $2,540,122.51 |
| 1 | **Hosting Services*** <br> Reverse October 2021 Estimated Prepayments and Order 9 Contractual Prepayment <br> INV41968 CM10127 | | ($2,271,507.38) |
| 1 | **Hosting Services*** <br> Estimated December 2021 Usage Prepayment | | $2,551,718.24 |
| 1 | **Premium Support Services** <br> Credit for October 2021 Premium Support Technician @$6,000.00/month - started on 10/3 (20 out of 21 business days in Oct) - INV42063 | | ($5,714.29) |
| 1 | **Premium Support Services** <br> Credit for November 2021 Premium Support Technician @$6,000.00/month - INV42063 | | ($6,000.00) |

| | | |
|---|---|---|
| **Subtotal** | | $2,808,619.08 |
| **Tax Total (0%)** | | $0.00 |
| **Total** | | $2,808,619.08 |
| **Amount Due** | | $2,808,619.08 |

1 of 1

Hosting Services includes Security, Monitoring, Maintenance, Facilities Management, Account Management, Usage, Network/Data Access, Technical Support, Rack/Colocation Space, Heat Management/Thermal Management.



# Invoice
#### #INV42118
11/15/2021

**Bill To**
Celsius Core LLC
221 River Street
9th Floor
Hoboken
NJ 07030
United States

**Ship To**
Celsius Core LLC
221 River Street
9th Floor
Hoboken
NJ 07030
United States

## TOTAL

# $472,031.02
**Due Date: 11/24/2021**

| Terms | Due Date | PO # |
|---|---|---|
| | 11/24/2021 | Argo Order 3-4 (AC Managed - Celsius Core) |

| Quantity | Item | Rate | Amount |
|---|---|---|---|
| 1 | **Hosting Services***<br>October 2021 Actual Usage | | $472,031.02 |
| 1 | **Hosting Services***<br>Reverse October 2021 Estimated Prepayment INV41969 | | ($497,542.19) |
| 1 | **Hosting Services***<br>Estimated December 2021 Usage Prepayment | | $497,542.19 |

| | |
|---|---|
| **Subtotal** | $472,031.02 |
| **Tax Total (0%)** | $0.00 |
| **Total** | $472,031.02 |
| **Amount Due** | $472,031.02 |

1 of 1

Hosting Services includes Security, Monitoring, Maintenance, Facilities Management, Account Management, Usage, Network/Data Access, Technical Support, Rack/Colocation Space, Heat Management/Thermal Management.

**MASTER SERVICES AGREEMENTSERVICE AND REPAIRORDER**

This Order, including the terms and conditions hereunder, incorporates by reference the terms of the Master Services Agreement dated as of December 18, 2020 (the "**Agreement**") and sets forth the terms of the Repair Services to be provided by Provider to Client (as defined below). If any terms of this Order conflict with the terms of the Agreement, the terms of this Order shall govern with respect to this Order. Capitalized terms used but not defined in this Order shall have the meanings ascribed in the Agreement.

| | |
|---|---|
| **Commencement Date:** | September 6, 2021. |
| **Facility:** | Provider Facility as determined by Provider and the Client. |
| **Services to be Provided:** | Customer directed Equipment repair services as directed by Client. Provider shall provide the equivalent of 1 (one) dedicated full-time repair technician, who will be exclusive to the Client. |
| | Customer and Provider shall identify and approve Equipment for repair and obtain appropriate authorization through proper channels. Repair technician will communicate directly with Client, via a mutually agreed channel. |
| **Service Fees:** | USD $6,000 per month payable on the first day of the month for which services are to be provided. Customer shall be responsible for the actual landed cost of replacement parts and the actual cost of any approved travel and other necessary out of pocket expenses. |

**Order Term.** Subject to acceptance by Provider, the term of this Order shall commence on the **Commencement Date** for an initial ninety (90) day period. During the initial ninety (90) term, a party hereto can terminate this Order without penalty by providing written notice to the other on or before December 6, 2021 (the "**Trial Period Termination Date**"). If this Order has not been terminated by a party on or before the Trial Period Termination Date this Order shall continue until the first Anniversary of the Commencement Date (the "**Initial Term**"), unless sooner terminated on not less than 30 days-notice (i) by Provider or (ii) by mutual agreement of the parties. Unless earlier terminated, this Order shall automatically renew for successive 12-month renewal terms ("**Renewal Term**") as set forth in the Agreement until terminated by a party on not less than 30 days-notice.

**Fees.** Client shall pay the Fees provided for in this Order. Fees for Services for each month shall be paid in advance, in accordance with this Order.

By: _Quinn Lawlor_
**Celsius Core LLC, "Client"**
**Name:** Quinn Lawlor
**Title:** Mining Operations
**Date:** 8/24/2021

By: _Michael Trzupek_
**Core Scientific, Inc., "Provider"**
**Name:** Michael Trzupek
**Title:** Chief Financial Officer
**Date:** 8/19/2021

DocuSign Envelope ID: B9658350-4AC9-4012-A349-7718655286EB



**Celsius Core LLC**

| Description | Amount | Subtotal | As of |
|---|---|---|---|
| October 2021 Actual Usage | $2,540,122.51 | | |
| INV41968 OA101.27 | | | |
| Reverse October 2021 Estimated Prepayments and Order 9 Contractual Prepayment | ($2,271,507.38) | | |
| **Difference between Estimated Usage Prepayment and Actual Usage** | | $268,615.13 | |
| November 2021 Estimated Prepayment and Order 9 Contractual Prepayment | ($2,489,218.89) | | |
| INV42063 INV40957 | | ($2,220,603.76) | November, 1 2021 |
| Estimated November 2021 Usage** | $2,489,218.89 | | |
| | – | $268,615.13 | December, 1 2021 Prior to Payment |
| Estimated December 2021 Usage Prepayment | $2,551,718.24 | | |
| **Total Usage to Invoice** | $2,820,333.37 | | |
| | | ($2,551,718.24) | December, 1 2021 After Payment |
| | $2,820,333.37 | | |

Notes:
**Expect to see November 2021 usage fees on the December 2021 invoice detail.

**December 2021 Estimate**

| Days | 31 |
|---|---|
| Hours / Day | 24 |
| Hour / Month | 744 |

| Order | Machine Type | Number of Units | Draw/Unit | Power/Hour | Rate/kWh | Fees |
|---|---|---|---|---|---|---|
| Order 1 | Antminer S19 95TH | 2,537 | 3.25 | 8245.25 | 0.0556 | 341,076.31 |
| Order 1 | Antminer S19 90TH | 426 | 3.25 | 1384.5 | 0.0556 | 57,271.78 |
| Order 1 | Antminer S19 Pro 110TH | 143 | 3.25 | 143 | 0.0556 | 5,915.40 |
| Order 1 | Antminer S19 Pro 105TH | 17 | 3.25 | 55.25 | 0.0556 | 2,285.49 |
| Order 2 | Antminer S19 | 3,500 | 3.25 | 11375 | 0.0556 | 470,542.80 |
| Order 3 | Antminer S19 95TH | 3,000 | 3.25 | 9750 | 0.0556 | 403,322.40 |
| Order 3 | Antminer S19 Pro 110TH | 500 | 3.25 | 1625 | 0.0556 | 67,220.40 |
| Order 4 | Antminer S19 95TH | 3,000 | 3.25 | 9750 | 0.0556 | 403,322.40 |
| Order 4 | Antminer S19 Pro 110TH | 500 | 3.25 | 1625 | 0.0556 | 67,220.40 |
| Order 9 | Antminer S19 Pro 110TH | 3,273 | 3.25 | 10637.25 | 0.0556 | 440,024.74 |
| Order 6 | Antminer S19 95TH | 2,106 | 3.25 | 6844.5 | 0.0556 | 283,133.32 |
| Order 6 | Antminer S19J 90TH | 77 | 3.26 | 251.02 | 0.0556 | 10,383.79 |
| | | | | | Total Usage Fee | 2,551,718.24 |

| Date | site | company | customer | ownership | machineType | to# machines | upHashing | machineHours | hashrate (MH/s) | Power | consumptionRate | Rate | Fees |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/1/2021 0:00 | Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 105TH | 8 | 7.993055556 | 191.8333333 | 851819196.4 | 623.4583333 | 3.25 | 0.0556 | 34.66 |
| 10/1/2021 0:00 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 90TH | 12 | 12 | 288 | 1150908888 | 936 | 3.25 | 0.0556 | 52.04 |
| 10/1/2021 0:00 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 90TH | 53 | 53 | 1272 | 4859808693 | 4134 | 3.25 | 0.0556 | 229.85 |
| 10/1/2021 0:00 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 90TH | 373 | 372.9583333 | 8951 | 34426805530 | 29090.75 | 3.25 | 0.0556 | 1,617.45 |
| 10/1/2021 0:00 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 1812 | 1811.631944 | 43479.16667 | 1.73102E+11 | 141307.2917 | 3.25 | 0.0556 | 7,856.69 |
| 10/1/2021 0:00 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 702 | 701.9513889 | 16846.83333 | 67049842506 | 54752.20833 | 3.25 | 0.0556 | 3,044.22 |
| 10/1/2021 0:00 | Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 105TH | 9 | 9 | 216 | 957712753.7 | 702 | 3.25 | 0.0556 | 39.03 |
| 10/1/2021 0:00 | Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 44 | 43.92361111 | 1054.166667 | 4910957105 | 3426.041667 | 3.25 | 0.0556 | 190.49 |
| 10/1/2021 0:00 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 1174 | 1173.861111 | 28172.66667 | 1.12052E+11 | 91561.16667 | 3.25 | 0.0556 | 5,090.80 |
| 10/1/2021 0:00 | Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 2326 | 2307.972222 | 55391.33333 | 2.20065E+11 | 180021.8333 | 3.25 | 0.0556 | 10,009.21 |
| 10/1/2021 0:00 | Dalton 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 1904 | 1896.659722 | 45519.83333 | 1.8117E+11 | 147939.4583 | 3.25 | 0.0556 | 8,225.43 |
| 10/1/2021 0:00 | Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 23 | 22.9375 | 550.5 | 2166010395 | 1789.125 | 3.25 | 0.0556 | 99.48 |
| 10/1/2021 0:00 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 500 | 12000 | 55560855489 | 39000 | 3.25 | 0.0556 | 2,168.40 |
| 10/1/2021 0:00 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 2978 | 2975.930556 | 71422.33333 | 2.83071E+11 | 232122.5833 | 3.25 | 0.0556 | 12,906.02 |
| 10/1/2021 0:00 | Dalton 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 36 | 31.51388889 | 756.3333333 | 3018372755 | 2458.083333 | 3.25 | 0.0556 | 136.67 |
| 10/1/2021 0:00 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 898 | 895.8819444 | 21501.16667 | 85613714251 | 69878.79167 | 3.25 | 0.0556 | 3,885.26 |
| 10/1/2021 0:00 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 150 | 149.8611111 | 3596.666667 | 1421731492 | 11689.16667 | 3.25 | 0.0556 | 649.92 |
| 10/1/2021 0:00 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 499.7430556 | 11993.83333 | 55464227166 | 38979.95833 | 3.25 | 0.0556 | 2,167.29 |
| 10/1/2021 0:00 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 22 | 21.98611111 | 527.6666667 | 2095473999 | 1714.916667 | 3.25 | 0.0556 | 95.35 |
| 10/1/2021 0:00 | Dalton 3 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 3132 | 3064.354167 | 73544.5 | 3.41374E+11 | 239019.625 | 3.25 | 0.0556 | 13,289.49 |
| 10/2/2021 0:00 | Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 2326 | 2309.881944 | 55437.16667 | 2.2021E+11 | 180170.7917 | 3.25 | 0.0556 | 10,017.50 |
| 10/2/2021 0:00 | Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 105TH | 8 | 8 | 192 | 851639126.4 | 624 | 3.25 | 0.0556 | 34.69 |
| 10/2/2021 0:00 | Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 90TH | 53 | 53 | 1272 | 4859718514 | 4134 | 3.25 | 0.0556 | 229.85 |
| 10/2/2021 0:00 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 90TH | 373 | 372.9861111 | 8951.666667 | 34428851112 | 29092.91667 | 3.25 | 0.0556 | 1,617.57 |
| 10/2/2021 0:00 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 1812 | 1811.729167 | 43481.5 | 1.73124E+11 | 141314.875 | 3.25 | 0.0556 | 7,857.11 |
| 10/2/2021 0:00 | Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 702 | 701.9236111 | 16846.16667 | 67036410313 | 54750.04167 | 3.25 | 0.0556 | 3,044.10 |
| 10/2/2021 0:00 | Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 105TH | 9 | 9 | 216 | 958327537.3 | 702 | 3.25 | 0.0556 | 39.03 |
| 10/2/2021 0:00 | Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 44 | 43 | 1032 | 4808617311 | 3354 | 3.25 | 0.0556 | 186.48 |
| 10/2/2021 0:00 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 1174 | 1173.597222 | 28166.33333 | 1.12032E+11 | 91540.58333 | 3.25 | 0.0556 | 5,089.66 |
| 10/2/2021 0:00 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 499.9583333 | 11999 | 55576606425 | 38996.75 | 3.25 | 0.0556 | 2,168.22 |
| 10/2/2021 0:00 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 2978 | 2977.180556 | 71452.33333 | 2.83202E+11 | 232220.0833 | 3.25 | 0.0556 | 12,911.44 |
| 10/2/2021 0:00 | Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 23 | 22.95138889 | 550.8333333 | 2167575158 | 1790.208333 | 3.25 | 0.0556 | 99.54 |
| 10/2/2021 0:00 | Dalton 3 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 3132 | 3069.569444 | 73669.66667 | 3.41948E+11 | 239426.4167 | 3.25 | 0.0556 | 13,312.11 |
| 10/2/2021 0:00 | Dalton 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 1904 | 1857.409722 | 44577.83333 | 1.77444E+11 | 144877.9583 | 3.25 | 0.0556 | 8,055.21 |
| 10/2/2021 0:00 | Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 36 | 34.97916667 | 839.5 | 3350722642 | 2728.375 | 3.25 | 0.0556 | 151.70 |
| 10/2/2021 0:00 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 898 | 895.9652778 | 21503.16667 | 85630550902 | 69885.29167 | 3.25 | 0.0556 | 3,885.62 |
| 10/2/2021 0:00 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 12 | 12 | 288 | 1150048770 | 936 | 3.25 | 0.0556 | 52.04 |
| 10/2/2021 0:00 | Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 150 | 149.9791667 | 3599.5 | 14235978539 | 11698.375 | 3.25 | 0.0556 | 650.43 |
| 10/2/2021 0:00 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 499.9375 | 11998.5 | 55494784030 | 38995.125 | 3.25 | 0.0556 | 2,168.13 |
| 10/3/2021 0:00 | Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 22 | 22 | 528 | 2096118742 | 1716 | 3.25 | 0.0556 | 95.41 |
| 10/3/2021 0:00 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 12 | 12 | 288 | 1150927566 | 936 | 3.25 | 0.0556 | 52.04 |
| 10/3/2021 0:00 | Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 105TH | 8 | 8 | 192 | 852282418.3 | 624 | 3.25 | 0.0556 | 34.69 |
| 10/3/2021 0:00 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 499.9652778 | 11999.16667 | 55566129947 | 38997.29167 | 3.25 | 0.0556 | 2,168.25 |
| 10/3/2021 0:00 | Dalton 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 1904 | 1830.5 | 43932 | 1.74882E+11 | 142779 | 3.25 | 0.0556 | 7,938.51 |
| 10/3/2021 0:00 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 36 | 35 | 840 | 3352877640 | 2730 | 3.25 | 0.0556 | 151.79 |
| 10/3/2021 0:00 | Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 90TH | 53 | 53 | 1272 | 4862107969 | 4134 | 3.25 | 0.0556 | 229.85 |
| 10/3/2021 0:00 | Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 1812 | 1811.75 | 43482 | 1.73107E+11 | 141316.5 | 3.25 | 0.0556 | 7,857.20 |
| 10/3/2021 0:00 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 702 | 701.9027778 | 16845.66667 | 67031854506 | 54748.41667 | 3.25 | 0.0556 | 3,044.01 |
| 10/3/2021 0:00 | Dalton 3 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 3132 | 3090.152778 | 74163.66667 | 3.4427E+11 | 241031.9167 | 3.25 | 0.0556 | 13,401.37 |
| 10/3/2021 0:00 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 898 | 895.8958333 | 21501.5 | 85621102206 | 69879.875 | 3.25 | 0.0556 | 3,885.32 |
| 10/3/2021 0:00 | Dalton 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 44 | 43 | 1032 | 4803959938 | 3354 | 3.25 | 0.0556 | 186.48 |
| 10/3/2021 0:00 | Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 1174 | 1173.541667 | 28165 | 1.12034E+11 | 91536.25 | 3.25 | 0.0556 | 5,089.42 |
| 10/3/2021 0:00 | Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 2326 | 2308.041667 | 55393 | 2.20029E+11 | 180027.25 | 3.25 | 0.0556 | 10,009.52 |

| Date | Rate | Facility | Party | Counterparty | Type | Machine | Count | Avg Count | Machine Hours | Hashrate | Power | Rate | Rate | Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/3/2021 | 0.000 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 2978 | 2970.465278 | 71291.16667 | 2.82513E+11 | 231696.2917 | 3.25 | 0.0556 | 12,882.31 |
| 10/3/2021 | 0.000 | Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 22 | 22 | 528 | 2095675397 | 1716 | 3.25 | 0.0556 | 95.41 |
| 10/3/2021 | 0.000 | Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 498.8611111 | 11972.66667 | 55350590970 | 38911.16667 | 3.25 | 0.0556 | 2,163.46 |
| 10/3/2021 | 0.000 | Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 150 | 149.9930556 | 3599.833333 | 14229977885 | 11699.45833 | 3.25 | 0.0556 | 650.49 |
| 10/3/2021 | 0.000 | Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 105TH | 9 | 9 | 216 | 957613161.9 | 702 | 3.25 | 0.0556 | 39.03 |
| 10/3/2021 | 0.000 | Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 23 | 22.9444444 | 550.6666667 | 2167892210 | 1789.666667 | 3.25 | 0.0556 | 99.51 |
| 10/4/2021 | 0.000 | Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 22 | 22 | 528 | 2095227336 | 1716 | 3.25 | 0.0556 | 95.41 |
| 10/4/2021 | 0.000 | Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 499.8958333 | 11997.5 | 55503632080 | 38991.875 | 3.25 | 0.0556 | 2,167.95 |
| 10/4/2021 | 0.000 | Dalton 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 150 | 149.9930556 | 3599.833333 | 14229982337 | 11699.45833 | 3.25 | 0.0556 | 650.49 |
| 10/4/2021 | 0.000 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 36 | 34.95138889 | 838.8333333 | 3346966394 | 2726.208333 | 3.25 | 0.0556 | 151.58 |
| 10/4/2021 | 0.000 | Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 499.9722222 | 11999.33333 | 55565327631 | 38997.83333 | 3.25 | 0.0556 | 2,168.28 |
| 10/4/2021 | 0.000 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 3132 | 3081.847222 | 73964.33333 | 3.43325E+11 | 240384.0833 | 3.25 | 0.0556 | 13,365.36 |
| 10/4/2021 | 0.000 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 12 | 12 | 288 | 1151353742 | 936 | 3.25 | 0.0556 | 52.04 |
| 10/4/2021 | 0.000 | Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 2978 | 2976.112103 | 71426.69048 | 2.83101E+11 | 232136.744 | 3.25 | 0.0556 | 12,906.80 |
| 10/4/2021 | 0.000 | Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 898 | 895.9513889 | 21502.83333 | 85624514503 | 69884.20833 | 3.25 | 0.0556 | 3,885.56 |
| 10/4/2021 | 0.000 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 1812 | 1811.791667 | 43483 | 1.73123E+11 | 14319.75 | 3.25 | 0.0556 | 7,857.38 |
| 10/4/2021 | 0.000 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 90TH | 2326 | 2307.076389 | 55369.83333 | 2.19882E+11 | 179951.9583 | 3.25 | 0.0556 | 10,005.33 |
| 10/4/2021 | 0.000 | Dalton 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 373 | 372.9861111 | 8951.666667 | 34429153725 | 29092.91667 | 3.25 | 0.0556 | 1,617.57 |
| 10/4/2021 | 0.000 | Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 90TH | 702 | 701.9652778 | 16847.16667 | 67034448781 | 54753.29167 | 3.25 | 0.0556 | 3,044.28 |
| 10/4/2021 | 0.000 | Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 1904 | 1828.576389 | 43885.83333 | 1.7469E+11 | 142628.9583 | 3.25 | 0.0556 | 7,930.17 |
| 10/4/2021 | 0.000 | Dalton 1 | Celsius | Celsius | HOSTED | Antminer S19 90TH | 23 | 22.95833333 | 551 | 2168940951 | 1790.75 | 3.25 | 0.0556 | 99.57 |
| 10/5/2021 | 0.000 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 53 | 53 | 1272 | 4859877236 | 4134 | 3.25 | 0.0556 | 229.85 |
| 10/5/2021 | 0.000 | Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 105TH | 9 | 9 | 216 | 958605429.3 | 702 | 3.25 | 0.0556 | 39.03 |
| 10/5/2021 | 0.000 | Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 8 | 8 | 192 | 852394388.8 | 624 | 3.25 | 0.0556 | 34.69 |
| 10/5/2021 | 0.000 | Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 44 | 42.42361111 | 1018.166667 | 4743176835 | 3309.041667 | 3.25 | 0.0556 | 183.98 |
| 10/5/2021 | 0.000 | Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 1174 | 1173.611111 | 28166.66667 | 1.1202E+11 | 91541.66667 | 3.25 | 0.0556 | 5,089.72 |
| 10/5/2021 | 0.000 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 1174 | 1173.708333 | 28169 | 1.1208E+11 | 91549.25 | 3.25 | 0.0556 | 5,090.14 |
| 10/5/2021 | 0.000 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 3132 | 3098.854167 | 74372.5 | 3.4521E+11 | 241710.625 | 3.25 | 0.0556 | 13,439.11 |
| 10/5/2021 | 0.000 | Dalton 1 | Celsius | Celsius | HOSTED | Antminer S19 90TH | 500 | 499.5902778 | 11990.16667 | 55520318811 | 38968.04167 | 3.25 | 0.0556 | 2,166.62 |
| 10/5/2021 | 0.000 | Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 1904 | 1829.618056 | 43910.83333 | 1.7478E+11 | 142710.2083 | 3.25 | 0.0556 | 7,934.69 |
| 10/5/2021 | 0.000 | Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 35 | 35 | 840 | 3352189296 | 2730 | 3.25 | 0.0556 | 151.79 |
| 10/5/2021 | 0.000 | Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 898 | 895.7222222 | 21497.33333 | 85595364895 | 69866.33333 | 3.25 | 0.0556 | 3,884.57 |
| 10/5/2021 | 0.000 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 150 | 149.9861111 | 3599.666667 | 14230031856 | 11698.91667 | 3.25 | 0.0556 | 650.46 |
| 10/5/2021 | 0.000 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 500 | 498.8819444 | 11997.16667 | 55473656214 | 38990.79167 | 3.25 | 0.0556 | 2,167.89 |
| 10/5/2021 | 0.000 | Dalton 2 | Celsius | Celsius | HOSTED | Antminer S19 90TH | 22 | 21.99305556 | 527.8333333 | 2094308308 | 1715.458333 | 3.25 | 0.0556 | 95.38 |
| 10/5/2021 | 0.000 | Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 12 | 12 | 288 | 1150518685 | 936 | 3.25 | 0.0556 | 52.04 |
| 10/5/2021 | 0.000 | Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 105TH | 53 | 53 | 1272 | 4858205033 | 4134 | 3.25 | 0.0556 | 229.85 |
| 10/5/2021 | 0.000 | Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 44 | 42.06944444 | 1009.666667 | 4704460246 | 3281.416667 | 3.25 | 0.0556 | 182.45 |
| 10/5/2021 | 0.000 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 8 | 7.979166667 | 191.5 | 849689527.8 | 622.375 | 3.25 | 0.0556 | 34.60 |
| 10/5/2021 | 0.000 | Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 9 | 9 | 216 | 958230059.9 | 702 | 3.25 | 0.0556 | 39.03 |
| 10/5/2021 | 0.000 | Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 23 | 23 | 552 | 2193951887 | 1794 | 3.25 | 0.0556 | 99.75 |
| 10/5/2021 | 0.000 | Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 90TH | 702 | 701.9097222 | 16845.83333 | 67024012638 | 54748.95833 | 3.25 | 0.0556 | 3,044.04 |
| 10/6/2021 | 0.000 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 1812 | 1811.951389 | 43486.83333 | 1.7311E+11 | 141332.2083 | 3.25 | 0.0556 | 7,858.07 |
| 10/6/2021 | 0.000 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 373 | 372.9166667 | 8950 | 34395886754 | 29087.5 | 3.25 | 0.0556 | 1,617.27 |
| 10/6/2021 | 0.000 | Dalton 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 2326 | 2302.868056 | 55268.83333 | 2.19462E+11 | 179623.7083 | 3.25 | 0.0556 | 9,987.08 |
| 10/6/2021 | 0.000 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 2978 | 2977.125 | 71451 | 2.83186E+11 | 232215.75 | 3.25 | 0.0556 | 12,911.20 |
| 10/6/2021 | 0.000 | Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 1925 | 1925.479167 | 46211.5 | 1.83126E+11 | 150187.375 | 3.25 | 0.0556 | 8,350.42 |
| 10/6/2021 | 0.000 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 8 | 7.743055556 | 185.8333333 | 741608937.3 | 603.9583333 | 3.25 | 0.0556 | 33.58 |
| 10/6/2021 | 0.000 | Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 323.3611111 | 7760.666667 | 35864471777 | 25222.16667 | 3.25 | 0.0556 | 1,403.35 |
| 10/6/2021 | 0.000 | Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 150 | 149.9722222 | 3599.333333 | 14229212200 | 11697.83333 | 3.25 | 0.0556 | 650.40 |
| 10/6/2021 | 0.000 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 898 | 580.4652778 | 13931.16667 | 55471843449 | 45276.29167 | 3.25 | 0.0556 | 2,517.36 |
| 10/6/2021 | 0.000 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 36 | 34.98611111 | 839.6666667 | 3350891878 | 2728.916667 | 3.25 | 0.0556 | 151.73 |
| 10/6/2021 | 0.000 | Dalton 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 3132 | 3093.354167 | 74240.5 | 1.74621E+11 | 142600.25 | 3.25 | 0.0556 | 13,415.26 |
| 10/6/2021 | 0.000 | Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 2326 | 2299.951389 | 55198.83333 | 3.44615E+11 | 241281.625 | 3.25 | 0.0556 | 9,974.43 |

| Date / Location | Provider | Type | Model | Count | Avg | kWh | Hash | Amount | | Rate | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/6/2021 0.000 Marble 2 | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 323.8125 | 7771.5 | 35976677871 | 25257.375 | 3.25 | 0.0556 | 1,404.31 |
| 10/6/2021 0.000 Calvert City 1 | Celsius | HOSTED | Antminer S19 Pro 110TH | 44 | 43 | 1032 | 4807351118 | 3354 | 3.25 | 0.0556 | 186.48 |
| 10/6/2021 0.000 Calvert City 1 | Celsius | HOSTED | Antminer S19 Pro 105TH | 9 | 8 | 192 | 851325074 | 624 | 3.25 | 0.0556 | 34.69 |
| 10/6/2021 0.000 Marble 1 | Celsius | HOSTED | Antminer S19 Pro 105TH | 9 | 8 | 216 | 958730617.3 | 702 | 3.25 | 0.0556 | 39.03 |
| 10/6/2021 0.000 Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 23 | 22.98611111 | 551.6666667 | 2199748986 | 1792.916667 | 3.25 | 0.0556 | 99.69 |
| 10/6/2021 0.000 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 702 | 454.1458333 | 10899.5 | 43362476059 | 35423.375 | 3.25 | 0.0556 | 1,969.54 |
| 10/6/2021 0.000 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 1812 | 1811.854167 | 43484.5 | 1.73106E+11 | 141324.625 | 3.25 | 0.0556 | 7,857.65 |
| 10/6/2021 0.000 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 373 | 241.2569444 | 5790.166667 | 22246210428 | 18818.04167 | 3.25 | 0.0556 | 1,046.28 |
| 10/6/2021 0.000 Marble 1 | Celsius | HOSTED | Antminer S19 90TH | 53 | 52.99305556 | 1271.833333 | 4857365261 | 4133.458333 | 3.25 | 0.0556 | 229.82 |
| 10/6/2021 0.000 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 22 | 22 | 528 | 2096012072 | 1716 | 3.25 | 0.0556 | 95.41 |
| 10/6/2021 0.000 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 1174 | 759.5833333 | 18230 | 72484360929 | 59247.5 | 3.25 | 0.0556 | 3,294.16 |
| 10/7/2021 0.000 Calvert City 2 | Celsius | HOSTED | Antminer S19 95TH | 534.2013889 | 520.5 | 12492 | 49702381354 | 40599 | 3.25 | 0.0556 | 2,257.30 |
| 10/7/2021 0.000 Marble 2 | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 409.6527778 | 9831.666667 | 45481714738 | 31952.91667 | 3.25 | 0.0556 | 1,776.58 |
| 10/7/2021 0.000 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 150 | 149.9722222 | 3599.333333 | 14225334532 | 11697.83333 | 3.25 | 0.0556 | 650.40 |
| 10/7/2021 0.000 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 898 | 733.8680556 | 17612.83333 | 70016719769 | 57241.70833 | 3.25 | 0.0556 | 3,182.64 |
| 10/7/2021 0.000 Dalton 1 | Celsius | HOSTED | Antminer S19 95TH | 36 | 34.20833333 | 821 | 3274543420 | 2668.25 | 3.25 | 0.0556 | 148.35 |
| 10/7/2021 0.000 Dalton 2 | Celsius | HOSTED | Antminer S19 95TH | 1904 | 1828.576389 | 43885.83333 | 1.74652E+11 | 142628.9583 | 3.25 | 0.0556 | 7,930.17 |
| 10/7/2021 0.000 Marble 2 | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 408.2152778 | 9797.166667 | 45384768886 | 31840.79167 | 3.25 | 0.0556 | 1,770.35 |
| 10/7/2021 0.000 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 12 | 9.833333333 | 236 | 942757461 | 767 | 3.25 | 0.0556 | 42.65 |
| 10/7/2021 0.000 Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 2326 | 2299.305556 | 55183.33333 | 2.19082E+11 | 179345.8333 | 3.25 | 0.0556 | 9,971.63 |
| 10/7/2021 0.000 Dalton 3 | Celsius | HOSTED | Antminer S19 Pro 110TH | 3132 | 3092.965278 | 74231.16667 | 3.44554E+11 | 241251.2917 | 3.25 | 0.0556 | 13,413.57 |
| 10/7/2021 0.000 Marble 2 | Celsius | HOSTED | Antminer S19 90TH | 53 | 53 | 1272 | 4857684139 | 4134 | 3.25 | 0.0556 | 229.85 |
| 10/7/2021 0.000 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 1174 | 959.9513889 | 23038.83333 | 91471695670 | 74876.20833 | 3.25 | 0.0556 | 4,163.12 |
| 10/7/2021 0.000 Calvert City 1 | Celsius | HOSTED | Antminer S19 Pro 110TH | 44 | 42.94444444 | 1030.666667 | 4800248326 | 3349.666667 | 3.25 | 0.0556 | 186.24 |
| 10/7/2021 0.000 Calvert City 1 | Celsius | HOSTED | Antminer S19 Pro 105TH | 8 | 7.979166667 | 191.5 | 849825315.8 | 622.375 | 3.25 | 0.0556 | 34.60 |
| 10/7/2021 0.000 Marble 1 | Celsius | HOSTED | Antminer S19 Pro 105TH | 9 | 9 | 216 | 958620258 | 702 | 3.25 | 0.0556 | 39.03 |
| 10/7/2021 0.000 Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 23 | 22.9375 | 550.5 | 2195659867 | 1789.125 | 3.25 | 0.0556 | 99.48 |
| 10/7/2021 0.000 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 702 | 575.1180556 | 13802.83333 | 54861278880 | 44859.20833 | 3.25 | 0.0556 | 2,494.17 |
| 10/7/2021 0.000 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 1812 | 1811.715278 | 43481.16667 | 1.73107E+11 | 141313.7917 | 3.25 | 0.0556 | 7,857.05 |
| 10/7/2021 0.000 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 373 | 305.5138889 | 7332.333333 | 28134233552 | 23830.08333 | 3.25 | 0.0556 | 1,324.95 |
| 10/8/2021 0.000 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 2978 | 2438.972222 | 58535.33333 | 2.31988E+11 | 190239.8333 | 3.25 | 0.0556 | 10,577.33 |
| 10/7/2021 0.000 Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 22 | 21.97916667 | 527.5 | 2091192437 | 1714.375 | 3.25 | 0.0556 | 95.32 |
| 10/8/2021 0.000 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 1174 | 1171.451389 | 28114.83333 | 1.11772E+11 | 91373.20833 | 3.25 | 0.0834 | 7,620.53 |
| 10/8/2021 0.000 Marble 1 | Celsius | HOSTED | Antminer S19 Pro 110TH | 44 | 42.95833333 | 1031 | 4803577351 | 3350.75 | 3.25 | 0.0556 | 186.30 |
| 10/8/2021 0.000 Calvert City 1 | Celsius | HOSTED | Antminer S19 Pro 105TH | 8 | 8 | 192 | 851453150.1 | 624 | 3.25 | 0.0556 | 34.69 |
| 10/8/2021 0.000 Marble 1 | Celsius | HOSTED | Antminer S19 90TH | 9 | 9 | 216 | 958158160.3 | 702 | 3.25 | 0.0556 | 39.03 |
| 10/8/2021 0.000 Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 23 | 23 | 552 | 2202390513 | 1794 | 3.25 | 0.0556 | 99.75 |
| 10/8/2021 0.000 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 702 | 702 | 16848 | 67007562427 | 54756 | 3.25 | 0.0834 | 4,566.65 |
| 10/8/2021 0.000 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 1812 | 1811.548611 | 43477.16667 | 1.73087E+11 | 141300.7917 | 3.25 | 0.0556 | 7,856.32 |
| 10/8/2021 0.000 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 53 | 52.99305556 | 1271.833333 | 4856584010 | 4133.458333 | 3.25 | 0.0556 | 229.82 |
| 10/8/2021 0.000 Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 2326 | 2300.666667 | 55240 | 55480698606 | 179530 | 3.25 | 0.0556 | 9,981.87 |
| 10/8/2021 0.000 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 373 | 372.9652778 | 8951.166667 | 34391758981 | 29091.29167 | 3.25 | 0.0556 | 2,426.21 |
| 10/8/2021 0.000 Dalton 1 | Celsius | HOSTED | Antminer S19 95TH | 12 | 12 | 288 | 1149800822 | 936 | 3.25 | 0.0556 | 78.06 |
| 10/8/2021 0.000 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 2978 | 2975.041667 | 71401 | 2.82966E+11 | 232053.25 | 3.25 | 0.0834 | 19,353.24 |
| 10/8/2021 0.000 Calvert City 2 | Celsius | HOSTED | Antminer S19 95TH | 570.6875 | 547.0138889 | 13128.33333 | 52204711688 | 42667.08333 | 3.25 | 0.0556 | 2,372.29 |
| 10/8/2021 0.000 Marble 1 | Celsius | HOSTED | Antminer S19 Pro 110TH | 3132 | 3076.215278 | 73829.16667 | 1.43215E+11 | 239944.7917 | 3.25 | 0.0556 | 13,340.93 |
| 10/8/2021 0.000 Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 500 | 490.0972222 | 11978.33333 | 55486988606 | 38929.58333 | 3.25 | 0.0834 | 3,246.73 |
| 10/8/2021 0.000 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 1904 | 1827.826389 | 43867.83333 | 1.74543E+11 | 142570.4583 | 3.25 | 0.0556 | 7,926.92 |
| 10/8/2021 0.000 Dalton 1 | Celsius | HOSTED | Antminer S19 95TH | 36 | 35 | 840 | 3352120140 | 2730 | 3.25 | 0.0556 | 151.79 |
| 10/9/2021 0.000 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 897.5555556 | 894.25 | 21462 | 85449636775 | 69751.5 | 3.25 | 0.0834 | 5,817.28 |
| 10/9/2021 0.000 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 150.444444 | 149.9305556 | 3599.833333 | 14235128164 | 11699.45833 | 3.25 | 0.0556 | 650.49 |
| 10/9/2021 0.000 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 22 | 22 | 528 | 5547678742 | 1716 | 3.25 | 0.0556 | 95.41 |
| 10/9/2021 0.000 Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 2326 | 2299.263889 | 55182.33333 | 2.19044E+11 | 179342.5833 | 3.25 | 0.0556 | 9,971.45 |
| 10/9/2021 0.000 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 12 | 12 | 288 | 1150228434 | 936 | 3.25 | 0.0556 | 78.06 |

| Date | Type | Type | Service | Model | n1 | n2 | n3 | n4 | G | T1 | T2 | T3 | $ | Rate | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/9/2021 0:00 Dalton 3 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 3132 | 3101.854167 | 500 | 499.2083333 | 74444.5 | 3.45484E+11 | 38938.25 | 241944.625 | 3.25 | 0.0556 | 13,452.12 |
| 10/9/2021 0:00 Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 499.0277778 | | | 11981 | 5550.532755 | 11692.41667 | 38938.25 | 3.25 | 0.0834 | 3,247.45 |
| 10/9/2021 0:00 Dalton 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 1815 | 1815.777778 | | | 43578.66667 | 1.73394E+11 | 141630.6667 | 141630.6667 | 3.25 | 0.0556 | 7,874.67 |
| 10/9/2021 0:00 Dalton 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 35 | 35 | | | 840 | 3350924049 | 2730 | 2730 | 3.25 | 0.0556 | 151.79 |
| 10/9/2021 0:00 Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 898 | 895.6041667 | | | 21494.5 | 8557984190 | 69857.125 | 69857.125 | 3.25 | 0.0834 | 5,826.08 |
| 10/9/2021 0:00 Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 150 | 149.9027778 | | | 35 | 14220551683 | 11692.41667 | 11692.41667 | 3.25 | 0.0556 | 650.10 |
| 10/9/2021 0:00 Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 499.7361111 | | | 3597.666667 | 5548617531 | 38979.41667 | 38979.41667 | 3.25 | 0.0834 | 3,250.88 |
| 10/9/2021 0:00 Calvert City 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 1080 | 1053.888889 | | | 11993.66667 | 1.00648E+11 | 82203.33333 | 82203.33333 | 3.25 | 0.0556 | 4,570.51 |
| 10/9/2021 0:00 Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 90TH | 373 | 372.7430556 | | | 25293.33333 | 3437047084 | 29073.95833 | 29073.95833 | 3.25 | 0.0834 | 2,424.77 |
| 10/9/2021 0:00 Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 22 | 21.95833333 | | | 8945.833333 | 2090266311 | 1712.75 | 1712.75 | 3.25 | 0.0556 | 95.23 |
| 10/9/2021 0:00 Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 90TH | 53 | 53 | | | 527 | 4861106983 | 4134 | 4134 | 3.25 | 0.0556 | 229.85 |
| 10/9/2021 0:00 Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 2978 | 2975.055556 | | | 1272 | 2.82553E+11 | 232054.3333 | 232054.3333 | 3.25 | 0.0834 | 19,353.33 |
| 10/9/2021 0:00 Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 1812 | 1811.8125 | | | 71401.33333 | 1.73104E+11 | 141321.375 | 141321.375 | 3.25 | 0.0556 | 7,857.47 |
| 10/9/2021 0:00 Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 702 | 701.9861111 | | | 43483.5 | 67014912946 | 54754.91667 | 54754.91667 | 3.25 | 0.0834 | 4,566.56 |
| 10/9/2021 0:00 Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 23 | 23 | | | 16847.66667 | 2203409828 | 1794 | 1794 | 3.25 | 0.0556 | 99.75 |
| 10/9/2021 0:00 Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 105TH | 9 | 9 | | | 552 | 957818356.6 | 702 | 702 | 3.25 | 0.0556 | 39.03 |
| 10/9/2021 0:00 Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 105TH | 8 | 8 | | | 216 | 8515877557.7 | 624 | 624 | 3.25 | 0.0556 | 34.69 |
| 10/9/2021 0:00 Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 44 | 42.95833333 | | | 1031 | 4804410405 | 3350.75 | 3350.75 | 3.25 | 0.0556 | 186.30 |
| 10/9/2021 0:00 Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 1174 | 1172.194444 | | | 28132.66667 | 1.1856E+11 | 91431.16667 | 91431.16667 | 3.25 | 0.0834 | 7,625.36 |
| 10/10/2021 0:00 Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 2326 | 2891.118056 | | | 55153.5 | 2.1891E+11 | 179248.875 | 179248.875 | 3.25 | 0.0556 | 9,966.24 |
| 10/10/2021 0:00 Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 498.9375 | | | 119374.5 | 1.70843E+11 | 139535.5 | 139535.5 | 3.25 | 0.0834 | 3,245.69 |
| 10/10/2021 0:00 Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 1793 | 1788.916667 | | | 42934 | 3.22E+11 | 2730 | 2730 | 3.25 | 0.0556 | 7,758.17 |
| 10/10/2021 0:00 Dalton 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 147 | 35 | | | 840 | 55464286575 | 225507.2083 | 225507.2083 | 3.25 | 0.0556 | 151.79 |
| 10/10/2021 0:00 Dalton 1 | Celsius | Celsius | HOSTED | Antminer S19 90TH | 898 | 896 | | | 21504 | 1150309903 | 38917.125 | 38917.125 | 3.25 | 0.0834 | 5,828.66 |
| 10/10/2021 0:00 Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 150 | 149.8888889 | | | 896 | 3352832404 | 936 | 936 | 3.25 | 0.0556 | 650.04 |
| 10/10/2021 0:00 Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 500 | 2361.111 | | | 3597.333333 | 8563251140 | 69888 | 69888 | 3.25 | 0.0834 | 3,247.63 |
| 10/10/2021 0:00 Calvert City 2 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 1080 | 1063.395833 | | | 11981.66667 | 14218253705 | 91481.54167 | 91481.54167 | 3.25 | 0.0834 | 4,611.74 |
| 10/10/2021 0:00 Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 373 | 372.4722222 | | | 25521.5 | 55419565312 | 179339.3333 | 179339.3333 | 3.25 | 0.0834 | 2,423.01 |
| 10/10/2021 0:00 Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 90TH | 22 | 22 | | | 8939.333333 | 1.0155E+11 | 241041.6667 | 241041.6667 | 3.25 | 0.0556 | 95.41 |
| 10/10/2021 0:00 Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 2978 | 2973.479167 | | | 528 | 34351984170 | 38901.41667 | 38901.41667 | 3.25 | 0.0834 | 19,343.08 |
| 10/10/2021 0:00 Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 90TH | 53 | 53 | | | 1272 | 2096176851 | 139678.5 | 139678.5 | 3.25 | 0.0556 | 229.85 |
| 10/10/2021 0:00 Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 1812 | 1811.833333 | | | 71363.5 | 2.82776E+11 | 4748.791667 | 4748.791667 | 3.25 | 0.0556 | 34.69 |
| 10/10/2021 0:00 Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 702 | 701.9861111 | | | 43484 | 4859845745 | 69888 | 69888 | 3.25 | 0.0556 | 7,857.56 |
| 10/10/2021 0:00 Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 23 | 23 | | | 16847.66667 | 1.7311E+11 | 11699.45833 | 11699.45833 | 3.25 | 0.0834 | 4,566.56 |
| 10/10/2021 0:00 Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 105TH | 8 | 8 | | | 552 | 67021850467 | 38972.375 | 38972.375 | 3.25 | 0.0556 | 99.75 |
| 10/10/2021 0:00 Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 105TH | 9 | 9 | | | 216 | 2202008375 | 82583.58333 | 82583.58333 | 3.25 | 0.0556 | 39.03 |
| 10/10/2021 0:00 Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 8 | 8 | | | 1272 | 9586908608 | 936 | 936 | 3.25 | 0.0556 | 34.69 |
| 10/10/2021 0:00 Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 44 | 42.93055556 | | | 1030.333333 | 852083588.5 | 4134 | 4134 | 3.25 | 0.0834 | 3,244.38 |
| 10/10/2021 0:00 Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 Pro 105TH | 1174 | 1172.840278 | | | 28148.16667 | 4798263299 | 3354 | 3354 | 3.25 | 0.0556 | 7,766.12 |
| 10/10/2021 0:00 Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 2326 | 2299.222222 | | | 55181.33333 | 1.11913E+11 | 624 | 624 | 3.25 | 0.0556 | 264.03 |
| 10/11/2021 0:00 Calvert City 2 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 3132 | 3090.277778 | | | 74166.66667 | 2.18954E+11 | 702 | 702 | 3.25 | 0.0834 | 5,828.66 |
| 10/11/2021 0:00 Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 500 | 498.7361111 | | | 11969.66667 | 3.44152E+11 | | | 3.25 | 0.0834 | 650.49 |
| 10/11/2021 0:00 Dalton 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 53 | 53 | | | 42978 | 55459286107 | | | 3.25 | 0.0556 | 9,971.27 |
| 10/11/2021 0:00 Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 90TH | 1174 | 1172.201389 | | | 1461.166667 | 1.11842E+11 | | | 3.25 | 0.0834 | 13,401.92 |
| 10/11/2021 0:00 Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 44 | 43 | | | 21504 | 4861562587 | | | 3.25 | 0.0834 | 78.06 |
| 10/11/2021 0:00 Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 90TH | 8 | 8 | | | 192 | 1.11842E+11 | | | 3.25 | 0.0556 | 229.85 |
| 10/11/2021 0:00 Dalton 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 9 | 60.38194444 | | | 3599.833333 | 4809264420 | | | 3.25 | 0.0834 | 7,625.40 |
| 10/11/2021 0:00 Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | | 149.9930556 | | | 11991.5 | 852671139.3 | | | 3.25 | 0.0834 | 186.48 |
| 10/11/2021 0:00 Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | | 499.6458333 | | | 25410.33333 | | | | 3.25 | 0.0556 | 34.69 |
| 10/11/2021 0:00 Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 105TH | | 1058.763889 | | | 288 | 9576613666 | | | 3.25 | 0.0556 | 39.03 |

| Date / Location | | | Model | V1 | V2 | V3 | V4 | V5 | | | Value |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/11/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 23 | 23 | 552 | 2201422278 | 1794 | 3.25 | 0.0556 | 99.75 |
| 10/11/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 702 | 702 | 16848 | 67011663446 | 54756 | 3.25 | 0.0556 | 4,566.65 |
| 10/11/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 1812 | 1811.951389 | 43486.83333 | 1.73113E+11 | 141332.2083 | 3.25 | 0.0556 | 7,858.07 |
| 10/11/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 90TH | 373 | 372.9791667 | 8951.5 | 34396594691 | 29092.375 | 3.25 | 0.0556 | 2,426.30 |
| 10/11/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 2978 | 2975.701389 | 71416.83333 | 2.82974E+11 | 232104.7083 | 3.25 | 0.0556 | 19,357.53 |
| 10/11/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 22 | 22 | 528 | 2096063335 | 1716 | 3.25 | 0.0556 | 95.41 |
| 10/12/2021 0:00 Calvert City 2 | Celsius | HOSTED | Antminer S19 95TH | 702 | 702 | 16848 | 67008937643 | 54756 | 3.25 | 0.0556 | 4,566.65 |
| 10/12/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 1080 | 1064.805556 | 25555.33333 | 1.01668E+11 | 83054.83333 | 3.25 | 0.0556 | 4,617.85 |
| 10/12/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 90TH | 373 | 372.9791667 | 8951.5 | 34398225706 | 29092.375 | 3.25 | 0.0556 | 2,426.30 |
| 10/12/2021 0:00 Dalton 1 | Celsius | HOSTED | Antminer S19 90TH | 53 | 53 | 1272 | 4859972067 | 4134 | 3.25 | 0.0556 | 229.85 |
| 10/12/2021 0:00 Dalton 2 | Celsius | HOSTED | Antminer S19 95TH | 141.25 | 138.0416667 | 3313 | 13190966013 | 10767.25 | 3.25 | 0.0556 | 598.66 |
| 10/12/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 Pro 110TH | 1798.75 | 1795.493056 | 43091.83333 | 55428219303 | 140048.4583 | 3.25 | 0.0556 | 7,786.69 |
| 10/12/2021 0:00 Dalton 3 | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 499.4305556 | 11986.33333 | 3.45141E+11 | 38955.58333 | 3.25 | 0.0556 | 3,248.90 |
| 10/12/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 3132 | 3098.770833 | 74370.5 | 2.19987E+11 | 241704.125 | 3.25 | 0.0556 | 13,438.75 |
| 10/12/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 23 | 23 | 552 | 1149004970 | 1794 | 3.25 | 0.0556 | 99.75 |
| 10/12/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 12 | 12 | 288 | 85631256064 | 936 | 3.25 | 0.0556 | 78.06 |
| 10/12/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 898 | 896 | 21504 | 957264344.2 | 69888 | 3.25 | 0.0556 | 5,828.66 |
| 10/12/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 Pro 105TH | 9 | 9 | 216 | 1.73105E+11 | 702 | 3.25 | 0.0556 | 39.03 |
| 10/12/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 1812 | 1811.923611 | 43486.16667 | 14229337671 | 141330.0417 | 3.25 | 0.0556 | 7,857.95 |
| 10/12/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 150 | 150 | 3600 | 5550404753 | 11700 | 3.25 | 0.0556 | 650.52 |
| 10/12/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 500 | 12000 | 2094172656 | 39000 | 3.25 | 0.0556 | 3,252.60 |
| 10/12/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 22 | 22 | 528 | 2.83178E+11 | 1716 | 3.25 | 0.0556 | 95.41 |
| 10/13/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 2326 | 2299.923611 | 55198.16667 | 2.18968E+11 | 179340.4167 | 3.25 | 0.0556 | 19,371.45 |
| 10/13/2021 0:00 Dalton 3 | Celsius | HOSTED | Antminer S19 Pro 110TH | 43 | 43 | 1032 | 4808932406 | 3354 | 3.25 | 0.0556 | 9,971.33 |
| 10/13/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 3132 | 3090.541667 | 74173 | 2.19056E+11 | 179394.0417 | 3.25 | 0.0556 | 7,628.84 |
| 10/13/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 Pro 110TH | 12 | 12 | 288 | 852094179.3 | 624 | 3.25 | 0.0556 | 186.48 |
| 10/13/2021 0:00 Dalton 1 | Celsius | HOSTED | Antminer S19 95TH | 500 | 500 | 12000 | 1150365372 | 936 | 3.25 | 0.0556 | 34.69 |
| 10/13/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 1799 | 1795.865278 | 43100.76667 | 3.44185E+11 | 241062.25 | 3.25 | 0.0556 | 9,974.31 |
| 10/13/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 141 | 139.9861111 | 3359.666667 | 55475124726 | 39000 | 3.25 | 0.0556 | 78.06 |
| 10/13/2021 0:00 Calvert City 2 | Celsius | HOSTED | Antminer S19 Pro 110TH | 898 | 896 | 21504 | 1.71512E+11 | 140077.4917 | 3.25 | 0.0556 | 13,403.06 |
| 10/13/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 150 | 500 | 28145.5 | 1337825207.1 | 10918.91667 | 3.25 | 0.0556 | 3,252.60 |
| 10/13/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 499.8888889 | 192 | 8561774993.2 | 69888 | 3.25 | 0.0556 | 7,788.31 |
| 10/13/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 90TH | 1120.479167 | 1079.261111 | 28145.5 | 14226900139 | 11693.5 | 3.25 | 0.0556 | 607.09 |
| 10/13/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 373 | 372.9791667 | 25902.26667 | 5549412887.0 | 38991.33333 | 3.25 | 0.0556 | 5,828.66 |
| 10/13/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 90TH | 22 | 22 | 8952 | 34401376899 | 84182.36667 | 3.25 | 0.0556 | 650.16 |
| 10/13/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 53 | 53 | 288 | 2096864572 | 29094 | 3.25 | 0.0556 | 3,251.88 |
| 10/13/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 2978 | 2976.138889 | 1272 | 4861279838 | 1716 | 3.25 | 0.0556 | 4,680.54 |
| 10/13/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 90TH | 1812 | 1808.645833 | 71427.33333 | 2.83014E+11 | 4134 | 3.25 | 0.0556 | 2,426.44 |
| 10/14/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 702 | 702 | 43407.5 | 1.72811E+11 | 232138.8333 | 3.25 | 0.0556 | 95.41 |
| 10/14/2021 0:00 Dalton 3 | Celsius | HOSTED | Antminer S19 Pro 105TH | 23 | 22.99305556 | 16848 | 6701282408.0 | 141074.375 | 3.25 | 0.0556 | 229.85 |
| 10/14/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 Pro 105TH | 8 | 8 | 552 | 220215814.3 | 54756 | 3.25 | 0.0556 | 19,360.38 |
| 10/14/2021 0:00 Dalton 1 | Celsius | HOSTED | Antminer S19 95TH | 44 | 43.20138889 | 192 | 958275450.9 | 702 | 3.25 | 0.0556 | 7,843.74 |
| 10/14/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 1174 | 1174 | 1036.833333 | 851480881.1 | 624 | 3.25 | 0.0556 | 4,566.65 |
| 10/14/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 Pro 110TH | 2978 | 2974.854167 | 28176 | 4831149619 | 232038.625 | 3.25 | 0.0556 | 99.72 |
| 10/14/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 Pro 110TH | 3132 | 3087.972222 | 71396.5 | 2.82798E+11 | 240861.8333 | 3.25 | 0.0556 | 39.03 |
| 10/14/2021 0:00 Dalton 3 | Celsius | HOSTED | Antminer S19 95TH | 500 | 499.5277778 | 74111.33333 | 3.43875E+11 | 38963.16667 | 3.25 | 0.0556 | 34.69 |
| 10/14/2021 0:00 Dalton 2 | Celsius | HOSTED | Antminer S19 95TH | 1799 | 1794.548611 | 11988.66667 | 5542111590.2 | 139974.7917 | 3.25 | 0.0556 | 187.36 |
| 10/14/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 141 | 139.7986111 | 43069.16667 | 1.71371E+11 | 10904.29167 | 3.25 | 0.0556 | 7,637.10 |
| 10/14/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 898 | 895.8888889 | 3355.166667 | 1358853707 | 69879.33333 | 3.25 | 0.0556 | 19,352.02 |
| 10/14/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 150 | 149.7777778 | 21501.33333 | 8561467599.7 | 11682.66667 | 3.25 | 0.0556 | 13,391.92 |
| 10/14/2021 0:00 Dalton 3 | Celsius | HOSTED | Antminer S19 95TH | | | 3594.666667 | 14210450657 | | 3.25 | 0.0556 | 3,249.53 |
| 10/14/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | | | | | | 3.25 | 0.0556 | 7,782.60 |
| 10/14/2021 0:00 Dalton 2 | Celsius | HOSTED | Antminer S19 95TH | | | | | | 3.25 | 0.0556 | 606.28 |
| 10/14/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | | | | | | 3.25 | 0.0556 | 5,827.94 |
| 10/14/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | | | | | | 3.25 | 0.0556 | 649.56 |

| Date/Location | | | | Miner | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/14/2021 0:00 Calvert City 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 1566 | 1499.381944 | 35985.16667 | 1.43222E+11 | 116951.7917 | 3.25 | 0.0556 | 6,502.52 |
| 10/14/2021 0:00 Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 22 | 21.80555556 | 523.3333333 | 2075514505 | 1700.833333 | 3.25 | 0.0556 | 94.57 |
| 10/14/2021 0:00 Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 12 | 12 | 288 | 1150197255 | 936 | 3.25 | 0.0834 | 78.06 |
| 10/14/2021 0:00 Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 90TH | 53 | 53 | 1272 | 4858735343 | 4134 | 3.25 | 0.0556 | 229.85 |
| 10/14/2021 0:00 Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 1174 | 1173.486111 | 28163.66667 | 1.11955E+11 | 91531.91667 | 3.25 | 0.0834 | 7,633.76 |
| 10/14/2021 0:00 Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 44 | 44 | 1056 | 4917391235 | 3432 | 3.25 | 0.0556 | 190.82 |
| 10/14/2021 0:00 Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 105TH | 8 | 8 | 192 | 851783234.7 | 624 | 3.25 | 0.0556 | 34.69 |
| 10/14/2021 0:00 Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 105TH | 9 | 9 | 216 | 958454644.6 | 702 | 3.25 | 0.0556 | 39.03 |
| 10/14/2021 0:00 Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 23 | 23 | 552 | 2202853323 | 1794 | 3.25 | 0.0556 | 99.75 |
| 10/14/2021 0:00 Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 702 | 701.9791667 | 16847.5 | 6700654677 | 54754.375 | 3.25 | 0.0834 | 4,566.51 |
| 10/14/2021 0:00 Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 1812 | 1811.8125 | 43483.5 | 1.73098E+11 | 141321.375 | 3.25 | 0.0556 | 7,857.47 |
| 10/14/2021 0:00 Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 90TH | 373 | 373 | 8952 | 34394291013 | 29094 | 3.25 | 0.0834 | 2,426.44 |
| 10/14/2021 0:00 Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 499.3263889 | 11983.83333 | 55430079610 | 38947.45833 | 3.25 | 0.0834 | 3,248.22 |
| 10/15/2021 0:00 Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 2326 | 2277.701389 | 54664.83333 | 2.16965E+11 | 177660.7083 | 3.25 | 0.0556 | 9,877.94 |
| 10/15/2021 0:00 Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 2326 | 2291.451389 | 54994.83333 | 2.18287E+11 | 178733.2083 | 3.25 | 0.0556 | 9,937.57 |
| 10/15/2021 0:00 Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 44 | 44 | 1056 | 4920401053 | 3432 | 3.25 | 0.0556 | 190.82 |
| 10/15/2021 0:00 Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 105TH | 8 | 8 | 192 | 851280358.8 | 624 | 3.25 | 0.0556 | 34.69 |
| 10/15/2021 0:00 Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 105TH | 9 | 9 | 216 | 958707022.5 | 702 | 3.25 | 0.0556 | 39.03 |
| 10/15/2021 0:00 Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 23 | 23 | 552 | 2202416852 | 1794 | 3.25 | 0.0556 | 99.75 |
| 10/15/2021 0:00 Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 702 | 701.9791667 | 16847.5 | 67005145045 | 54754.375 | 3.25 | 0.0834 | 4,566.51 |
| 10/15/2021 0:00 Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 1812 | 1811.833333 | 43484 | 1.73103E+11 | 141323 | 3.25 | 0.0556 | 7,857.56 |
| 10/15/2021 0:00 Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 90TH | 53 | 53 | 1272 | 4859754838 | 4134 | 3.25 | 0.0556 | 229.85 |
| 10/15/2021 0:00 Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 2978 | 2970.805556 | 71299.33333 | 2.824E+11 | 231722.8333 | 3.25 | 0.0834 | 19,325.68 |
| 10/15/2021 0:00 Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 90TH | 373 | 373 | 8952 | 34401511783 | 29094 | 3.25 | 0.0834 | 2,426.44 |
| 10/15/2021 0:00 Dalton 3 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 3132 | 3085.625 | 74055 | 3.43571E+11 | 240678.75 | 3.25 | 0.0556 | 13,381.74 |
| 10/15/2021 0:00 Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 105TH | 1174 | 1172.520833 | 28140.5 | 1.11873E+11 | 91456.625 | 3.25 | 0.0834 | 7,627.48 |
| 10/15/2021 0:00 Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 22 | 22 | 528 | 2096552307 | 1716 | 3.25 | 0.0556 | 95.41 |
| 10/15/2021 0:00 Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 12 | 12 | 288 | 1150035968 | 936 | 3.25 | 0.0556 | 78.06 |
| 10/15/2021 0:00 Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 499 | 11976 | 55355295357 | 38922 | 3.25 | 0.0834 | 3,246.09 |
| 10/15/2021 0:00 Dalton 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 1799 | 1782.854167 | 42788.5 | 1.70672E+11 | 139062.625 | 3.25 | 0.0556 | 7,731.88 |
| 10/15/2021 0:00 Dalton 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 141 | 139.6805556 | 3352.333333 | 13373013117 | 10895.08333 | 3.25 | 0.0556 | 605.77 |
| 10/15/2021 0:00 Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 898 | 894.9722222 | 21479.33333 | 85521262602 | 69807.83333 | 3.25 | 0.0834 | 5,821.97 |
| 10/15/2021 0:00 Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 150 | 149.7916667 | 3595 | 14212744571 | 11683.75 | 3.25 | 0.0556 | 649.62 |
| 10/15/2021 0:00 Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 498.2013889 | 11956.83333 | 55297649566 | 38859.70833 | 3.25 | 0.0834 | 3,240.90 |
| 10/15/2021 0:00 Calvert City 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 1566 | 1539.465278 | 36947.16667 | 1.47019E+11 | 120078.2917 | 3.25 | 0.0556 | 6,676.35 |
| 10/16/2021 0:00 Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 90TH | 53 | 53 | 1272 | 4857779349 | 4134 | 3.25 | 0.0556 | 229.85 |
| 10/16/2021 0:00 Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 44 | 44 | 1056 | 4919783406 | 3432 | 3.25 | 0.0556 | 190.82 |
| 10/16/2021 0:00 Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 22 | 22 | 528 | 2094647431 | 1716 | 3.25 | 0.0556 | 95.41 |
| 10/16/2021 0:00 Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 2978 | 2969.472222 | 71267.33333 | 2.82057E+11 | 231618.8333 | 3.25 | 0.0834 | 19,317.01 |
| 10/16/2021 0:00 Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 2326 | 2301.625 | 55239 | 2.19179E+11 | 179526.75 | 3.25 | 0.0556 | 9,981.69 |
| 10/16/2021 0:00 Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 1174 | 1172.916667 | 28150 | 1.11904E+11 | 91487.5 | 3.25 | 0.0834 | 7,630.06 |
| 10/16/2021 0:00 Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 105TH | 8 | 8 | 192 | 852464907.8 | 624 | 3.25 | 0.0556 | 34.69 |
| 10/16/2021 0:00 Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 9 | 8.722222222 | 209.3333333 | 928344135.3 | 680.3333333 | 3.25 | 0.0556 | 37.83 |
| 10/16/2021 0:00 Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 23 | 23 | 552 | 2203557116 | 1794 | 3.25 | 0.0556 | 99.75 |
| 10/16/2021 0:00 Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 702 | 702 | 16848 | 67000984282 | 54756 | 3.25 | 0.0834 | 4,566.65 |
| 10/16/2021 0:00 Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 90TH | 373 | 373 | 8952 | 34393002384 | 29094 | 3.25 | 0.0556 | 2,426.44 |
| 10/16/2021 0:00 Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 898 | 895.4722222 | 21491.33333 | 85572953336 | 69846.83333 | 3.25 | 0.0834 | 5,825.23 |
| 10/16/2021 0:00 Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 1812 | 1811.965278 | 43487.16667 | 1.73113E+11 | 141333.2917 | 3.25 | 0.0556 | 7,858.13 |
| 10/16/2021 0:00 Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 150 | 149.9861111 | 3599.666667 | 14230855839 | 11698.91667 | 3.25 | 0.0556 | 650.46 |
| 10/16/2021 0:00 Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 499.4583333 | 11987 | 55405876411 | 38957.75 | 3.25 | 0.0834 | 3,249.08 |
| 10/16/2021 0:00 Dalton 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 141 | 140 | 3360 | 13413539322 | 10920 | 3.25 | 0.0556 | 607.15 |
| 10/16/2021 0:00 Dalton 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 1799 | 1787.784722 | 42906.83333 | 1.71163E+11 | 139447.2083 | 3.25 | 0.0556 | 7,753.26 |
| 10/16/2021 0:00 Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 499 | 11976 | 55344380566 | 38922 | 3.25 | 0.0834 | 3,246.09 |
| 10/16/2021 0:00 Dalton 3 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 3132 | 3098 | 74352 | 3.44998E+11 | 241644 | 3.25 | 0.0834 | 13,435.41 |
| 10/16/2021 0:00 Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 12 | 12 | 288 | 1149341240 | 936 | 3.25 | 0.0834 | 78.06 |

| Date / Location | °C | Status | Model | V1 | V2 | V3 | V4 | V5 | V6 | V7 | V8 | V9 | V10 | Rate1 | Rate2 | Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/16/2021 0:00 Calvert City 2 | Celsius | HOSTED | Antminer S19 95TH | 1566 | 1542.027778 | 149.9583333 | 37008.66667 | 3599 | 21504 | 1.47241E+11 | 14243771966 | 120278.1667 | 11696.75 | 3.25 | 0.0556 | 6,687.47 |
| 10/17/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 150 | 149.9583333 | | | | 896 | 14243771966 | | 11696.75 | | 3.25 | 0.0556 | 650.34 |
| 10/17/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 898 | 896 | | 21504 | | | 85617745593 | | 69888 | | 3.25 | 0.0556 | 5,828.66 |
| 10/17/2021 0:00 Dalton 1 | Celsius | HOSTED | Antminer S19 95TH | 141 | 139.9861111 | | 3359.666667 | | | 13410737756 | | 10918.91667 | | 3.25 | 0.0556 | 607.09 |
| 10/17/2021 0:00 Dalton 2 | Celsius | HOSTED | Antminer S19 95TH | 1799 | 1789.284722 | | 42942.83333 | | | 1.7129E+11 | | 139564.2083 | | 3.25 | 0.0556 | 7,759.77 |
| 10/17/2021 0:00 Dalton 3 | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 499.0069444 | | 11976.16667 | | | 55364731450 | | 38922.54167 | | 3.25 | 0.0556 | 3,246.14 |
| 10/17/2021 0:00 Dalton 3 | Celsius | HOSTED | Antminer S19 Pro 110TH | 3132 | 3100.069444 | | 74401.66667 | | | 3.45276E+11 | | 241805.4167 | | 3.25 | 0.0556 | 13,444.38 |
| 10/17/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 22 | 22 | | 528 | | | 2094655980 | | 1716 | | 3.25 | 0.0556 | 95.41 |
| 10/17/2021 0:00 Calvert City 2 | Celsius | HOSTED | Antminer S19 95TH | 1566 | 1542.0625 | | 37009.5 | | | 1.47269E+11 | | 120280.875 | | 3.25 | 0.0556 | 6,687.62 |
| 10/17/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 2978 | 2976.291667 | | 71431 | | | 2.82925E+11 | | 232150.75 | | 3.25 | 0.0556 | 19,361.37 |
| 10/17/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 90TH | 12 | 12 | | 288 | | | 1149742663 | | 936 | | 3.25 | 0.0556 | 78.06 |
| 10/17/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 Pro 110TH | 1812 | 1811.916667 | | 43486 | | | 1.73126E+11 | | 141329.5 | | 3.25 | 0.0556 | 7,857.92 |
| 10/17/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 90TH | 500 | 500 | | 12000 | | | 55468535018 | | 39000 | | 3.25 | 0.0556 | 3,252.60 |
| 10/17/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 373 | 373 | | 8952 | | | 34396451743 | | 29094 | | 3.25 | 0.0556 | 2,426.44 |
| 10/17/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 702 | 702 | | 16848 | | | 67017501806 | | 54756 | | 3.25 | 0.0556 | 4,566.65 |
| 10/17/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 Pro 105TH | 23 | 23 | | 552 | | | 2202250697 | | 1794 | | 3.25 | 0.0556 | 99.75 |
| 10/17/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 Pro 105TH | 9 | 9 | | 216 | | | 957774855.8 | | 702 | | 3.25 | 0.0556 | 39.03 |
| 10/17/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 Pro 110TH | 8 | 8 | | 192 | | | 851497817.5 | | 624 | | 3.25 | 0.0556 | 34.69 |
| 10/17/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 44 | 44 | | 1056 | | | 4918977864 | | 3432 | | 3.25 | 0.0556 | 190.82 |
| 10/17/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 1174 | 1172.388889 | | 28137.33333 | | | 1.11838E+11 | | 91446.33333 | | 3.25 | 0.0556 | 7,626.62 |
| 10/17/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 2326 | 2299.9375 | | 55198.5 | | | 2.19031E+11 | | 179395.125 | | 3.25 | 0.0556 | 9,974.37 |
| 10/17/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 90TH | 53 | 53 | | 1272 | | | 4858083048 | | 4134 | | 3.25 | 0.0556 | 229.85 |
| 10/18/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 2978 | 2976.4375 | | 71434.5 | | | 2.82904E+11 | | 232162.125 | | 3.25 | 0.0556 | 19,362.32 |
| 10/18/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 2326 | 2299.090278 | | 55178.16667 | | | 2.18953E+11 | | 179329.0417 | | 3.25 | 0.0556 | 9,709.69 |
| 10/18/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 90TH | 53 | 53 | | 1272 | | | 4860955513 | | 4134 | | 3.25 | 0.0556 | 229.85 |
| 10/18/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 373 | 372.9791667 | | 8951.5 | | | 34391988401 | | 29092.375 | | 3.25 | 0.0556 | 2,426.30 |
| 10/18/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 1812 | 1811.673611 | | 43480.16667 | | | 1.73104E+11 | | 141310.5417 | | 3.25 | 0.0556 | 7,856.87 |
| 10/18/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 702 | 701.5208333 | | 16836.5 | | | 66963740588 | | 54718.625 | | 3.25 | 0.0556 | 4,563.53 |
| 10/18/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 23 | 23 | | 552 | | | 2202989161 | | 1794 | | 3.25 | 0.0556 | 99.75 |
| 10/18/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 Pro 105TH | 9 | 9 | | 216 | | | 958620695 | | 702 | | 3.25 | 0.0556 | 39.03 |
| 10/18/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 Pro 105TH | 8 | 8 | | 192 | | | 851725661.4 | | 624 | | 3.25 | 0.0556 | 190.82 |
| 10/18/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 Pro 110TH | 44 | 44 | | 1056 | | | 4918150357 | | 3432 | | 3.25 | 0.0556 | 34.69 |
| 10/18/2021 0:00 Dalton 3 | Celsius | HOSTED | Antminer S19 Pro 110TH | 3132 | 3099.236111 | | 74381.66667 | | | 3.45177E+11 | | 241740.4167 | | 3.25 | 0.0556 | 13,440.77 |
| 10/18/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 1174 | 1172.513889 | | 28140.33333 | | | 1.11853E+11 | | 91456.08333 | | 3.25 | 0.0556 | 7,627.44 |
| 10/18/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 12 | 12 | | 288 | | | 1150830646 | | 936 | | 3.25 | 0.0556 | 78.06 |
| 10/18/2021 0:00 Dalton 2 | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 499.0138889 | | 11976.33333 | | | 55358051345 | | 38923.08333 | | 3.25 | 0.0556 | 3,246.19 |
| 10/18/2021 0:00 Dalton 2 | Celsius | HOSTED | Antminer S19 95TH | 1799 | 1766.375 | | 42393 | | | 1.69051E+11 | | 137777.25 | | 3.25 | 0.0556 | 7,660.42 |
| 10/18/2021 0:00 Dalton 1 | Celsius | HOSTED | Antminer S19 95TH | 141 | 139.9722222 | | 3359.333333 | | | 13406844373 | | 10917.83333 | | 3.25 | 0.0556 | 607.03 |
| 10/18/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 898 | 896 | | 21504 | | | 85622724199 | | 69888 | | 3.25 | 0.0556 | 5,828.66 |
| 10/18/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 150 | 149.9236111 | | 3598.166667 | | | 14236671178 | | 11694.04167 | | 3.25 | 0.0556 | 650.19 |
| 10/18/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 500 | | 12000 | | | 55475254380 | | 39000 | | 3.25 | 0.0556 | 3,252.60 |
| 10/18/2021 0:00 Calvert City 2 | Celsius | HOSTED | Antminer S19 95TH | 1566 | 1539.840278 | | 36956.16667 | | | 1.47015E+11 | | 120107.5417 | | 3.25 | 0.0556 | 6,677.98 |
| 10/18/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 22 | 21.98611111 | | 527.6666667 | | | 2093549369 | | 1714.916667 | | 3.25 | 0.0556 | 95.35 |
| 10/19/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 22 | 22 | | 528 | | | 2095836561 | | 1716 | | 3.25 | 0.0556 | 95.41 |
| 10/19/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 90TH | 373 | 373 | | 8952 | | | 34401484312 | | 29094 | | 3.25 | 0.0556 | 2,426.44 |
| 10/19/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 1812 | 1810.743056 | | 43457.83333 | | | 1.73004E+11 | | 141237.9583 | | 3.25 | 0.0556 | 7,852.83 |
| 10/19/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 702 | 701.9097222 | | 16845.83333 | | | 67002406300 | | 54748.95833 | | 3.25 | 0.0556 | 4,566.05 |
| 10/19/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 23 | 23 | | 552 | | | 2203278904 | | 1794 | | 3.25 | 0.0556 | 99.75 |
| 10/19/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 Pro 105TH | 9 | 9 | | 216 | | | 958578262.3 | | 702 | | 3.25 | 0.0556 | 39.03 |
| 10/19/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 Pro 105TH | 8 | 8 | | 192 | | | 851503292.3 | | 624 | | 3.25 | 0.0556 | 34.69 |
| 10/19/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 Pro 110TH | 44 | 44 | | 1055.5 | 43.9791667 | | 4898614307 | | 3430.375 | | 3.25 | 0.0556 | 190.73 |
| 10/19/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 1174 | 1172.777778 | | 28146.66667 | 1172.777778 | | 4859109569 | | 91476.66667 | | 3.25 | 0.0556 | 7,629.15 |
| 10/19/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 90TH | 53 | 53 | | 1272 | 53 | | 4859109569 | | 4134 | | 3.25 | 0.0556 | 229.85 |
| 10/19/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 90TH | 12 | 12 | | 288 | 12 | | 1149469973 | | 936 | | 3.25 | 0.0556 | 78.06 |
| 10/19/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 2326 | 2298.527778 | | 55164.66667 | 2298.527778 | | 2.18873E+11 | | 179285.1667 | | 3.25 | 0.0556 | 9,968.26 |

| Date | Location | | | Model | n1 | n2 | n3 | n4 | n5 | n6 | | | Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/19/2021 0:00 | Calvert City 2 | Celsius | HOSTED | Antminer S19 95TH | 1566 | 1420.729167 | 34097.5 | 71461.33333 | 1.356536E+11 | 110816.875 | 3.25 | 0.0556 | 6,161.42 |
| 10/19/2021 0:00 | Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 2978 | 2977.555556 | 71461.33333 | 71461.33333 | 2.82957E+11 | 232249.3333 | 3.25 | 0.0834 | 19,369.59 |
| 10/19/2021 0:00 | Dalton 3 | Celsius | HOSTED | Antminer S19 Pro 110TH | 3132 | 3097.923611 | 74350.16667 | 74350.16667 | 3.45006E+11 | 241638.0417 | 3.25 | 0.0556 | 13,435.08 |
| 10/19/2021 0:00 | Dalton 2 | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 499.0138889 | 11976.33333 | 11976.33333 | 55350227602 | 38923.08333 | 3.25 | 0.0834 | 3,246.19 |
| 10/19/2021 0:00 | Dalton 1 | Celsius | HOSTED | Antminer S19 95TH | 1799 | 1790.243056 | 42965.83333 | 42965.83333 | 1.71366E+11 | 139638.9583 | 3.25 | 0.0556 | 7,763.93 |
| 10/19/2021 0:00 | Dalton 1 | Celsius | HOSTED | Antminer S19 95TH | 141 | 140 | 3360 | 3360 | 13410508025 | 10920 | 3.25 | 0.0556 | 607.15 |
| 10/19/2021 0:00 | Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 898 | 896 | 21504 | 21504 | 85624278285 | 69888 | 3.25 | 0.0834 | 5,828.66 |
| 10/19/2021 0:00 | Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 150 | 149.9722222 | 3599.333333 | 3599.333333 | 14238721648 | 11697.83333 | 3.25 | 0.0556 | 650.40 |
| 10/19/2021 0:00 | Marble 2 | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 499.7847222 | 11994.83333 | 11994.83333 | 55448158214 | 38983.20833 | 3.25 | 0.0834 | 3,251.20 |
| 10/20/2021 0:00 | Calvert City 1 | Celsius | HOSTED | Antminer S19 Pro 105TH | 8 | 8 | 192 | 192 | 852508324.8 | 624 | 3.25 | 0.0556 | 34.69 |
| 10/20/2021 0:00 | Dalton 3 | Celsius | HOSTED | Antminer S19 Pro 110TH | 3132 | 3090.868056 | 74180.83333 | 74180.83333 | 3.44205E+11 | 241087.7083 | 3.25 | 0.0556 | 13,404.48 |
| 10/20/2021 0:00 | Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 12 | 12 | 288 | 288 | 1149828816 | 936 | 3.25 | 0.0556 | 52.04 |
| 10/20/2021 0:00 | Calvert City 2 | Celsius | HOSTED | Antminer S19 95TH | 1566 | 1539.208333 | 36941 | 36941 | 1.46919E+11 | 120058.25 | 3.25 | 0.0556 | 6,675.24 |
| 10/20/2021 0:00 | Dalton 1 | Celsius | HOSTED | Antminer S19 90TH | 53 | 53 | 1272 | 1272 | 4857725776 | 4134 | 3.25 | 0.0556 | 229.85 |
| 10/20/2021 0:00 | Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 373 | 373 | 8952 | 8952 | 34405725225 | 29094 | 3.25 | 0.0556 | 1,617.63 |
| 10/20/2021 0:00 | Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 1812 | 1810.597222 | 43454.33333 | 43454.33333 | 1.72988E+11 | 141226.5833 | 3.25 | 0.0556 | 7,852.20 |
| 10/20/2021 0:00 | Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 702 | 702 | 16848 | 16848 | 67010536533 | 54756 | 3.25 | 0.0556 | 3,044.43 |
| 10/20/2021 0:00 | Marble 1 | Celsius | HOSTED | Antminer S19 Pro 105TH | 9 | 9 | 216 | 216 | 958884395.8 | 702 | 3.25 | 0.0556 | 39.03 |
| 10/20/2021 0:00 | Calvert City 1 | Celsius | HOSTED | Antminer S19 Pro 110TH | 44 | 44 | 1056 | 1056 | 4880979919 | 3432 | 3.25 | 0.0556 | 190.82 |
| 10/20/2021 0:00 | Dalton 1 | Celsius | HOSTED | Antminer S19 95TH | 141 | 139.9652778 | 3359.166667 | 3359.166667 | 13408122639 | 10917.29167 | 3.25 | 0.0556 | 607.00 |
| 10/20/2021 0:00 | Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 1174 | 1172.909722 | 28149.83333 | 28149.83333 | 1.11888E+11 | 91486.95833 | 3.25 | 0.0556 | 5,086.67 |
| 10/20/2021 0:00 | Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 1799 | 1787.819444 | 42907.66667 | 42907.66667 | 1.71144E+11 | 139449.9167 | 3.25 | 0.0556 | 7,753.42 |
| 10/20/2021 0:00 | Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 898 | 896 | 21504 | 21504 | 8561829713 | 69888 | 3.25 | 0.0556 | 3,885.77 |
| 10/20/2021 0:00 | Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 150 | 149.9513889 | 3598.833333 | 3598.833333 | 14233833835 | 11696.20833 | 3.25 | 0.0556 | 650.31 |
| 10/20/2021 0:00 | Calvert City 1 | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 500 | 12000 | 12000 | 55465682367 | 39000 | 3.25 | 0.0556 | 2,168.40 |
| 10/20/2021 0:00 | Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 22 | 22 | 528 | 528 | 2097039712 | 1716 | 3.25 | 0.0556 | 95.41 |
| 10/20/2021 0:00 | Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 2978 | 2977.666667 | 71464 | 71464 | 2.82979E+11 | 232258 | 3.25 | 0.0556 | 12,913.54 |
| 10/20/2021 0:00 | Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 23 | 23 | 552 | 552 | 220180202 | 1794 | 3.25 | 0.0556 | 99.75 |
| 10/20/2021 0:00 | Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 2326 | 2296.270833 | 55110.5 | 55110.5 | 2.18621E+11 | 179109.125 | 3.25 | 0.0556 | 9,958.47 |
| 10/20/2021 0:00 | Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 500 | 498.8680556 | 11972.83333 | 11972.83333 | 5532700748 | 38911.70833 | 3.25 | 0.0556 | 2,163.49 |
| 10/21/2021 0:00 | Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 2326 | 2295.104167 | 55082.5 | 55082.5 | 2.1847E+11 | 179018.125 | 3.25 | 0.0556 | 9,953.41 |
| 10/21/2021 0:00 | Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 12 | 12 | 288 | 288 | 1150497764 | 936 | 3.25 | 0.0556 | 52.04 |
| 10/21/2021 0:00 | Dalton 3 | Celsius | HOSTED | Antminer S19 Pro 110TH | 3132 | 3098.652778 | 74567.66667 | 74567.66667 | 3.45108E+11 | 241694.9167 | 3.25 | 0.0556 | 13,438.24 |
| 10/21/2021 0:00 | Dalton 2 | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 499 | 11976 | 11976 | 5536074711 | 38922 | 3.25 | 0.0556 | 2,164.06 |
| 10/21/2021 0:00 | Dalton 1 | Celsius | HOSTED | Antminer S19 95TH | 1799 | 1790.506944 | 42972.16667 | 42972.16667 | 1.71399E+11 | 139659.5417 | 3.25 | 0.0556 | 7,765.07 |
| 10/21/2021 0:00 | Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 141 | 139.9861111 | 3359.666667 | 3359.666667 | 13408187687 | 10918.91667 | 3.25 | 0.0556 | 607.09 |
| 10/21/2021 0:00 | Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 898 | 896 | 21504 | 21504 | 8561363116 | 69888 | 3.25 | 0.0556 | 3,885.77 |
| 10/21/2021 0:00 | Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 150 | 149.9722222 | 3599.333333 | 3599.333333 | 14215740021 | 11697.83333 | 3.25 | 0.0556 | 650.40 |
| 10/21/2021 0:00 | Marble 1 | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 500 | 12000 | 12000 | 55461988715 | 39000 | 3.25 | 0.0556 | 2,168.40 |
| 10/21/2021 0:00 | Calvert City 2 | Celsius | HOSTED | Antminer S19 95TH | 1566 | 1550.1875 | 37204.5 | 37204.5 | 1.47978E+11 | 120914.625 | 3.25 | 0.0556 | 6,722.85 |
| 10/21/2021 0:00 | Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 373 | 373 | 8952 | 8952 | 34393344859 | 29094 | 3.25 | 0.0556 | 1,617.63 |
| 10/21/2021 0:00 | Calvert City 1 | Celsius | HOSTED | Antminer S19 90TH | 22 | 22 | 528 | 528 | 2094029306 | 1716 | 3.25 | 0.0556 | 95.41 |
| 10/21/2021 0:00 | Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 53 | 53 | 1272 | 1272 | 4859925389 | 4134 | 3.25 | 0.0556 | 229.85 |
| 10/21/2021 0:00 | Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 2978 | 2977.909722 | 71469.83333 | 71469.83333 | 2.8298E+11 | 232276.9583 | 3.25 | 0.0556 | 12,914.60 |
| 10/21/2021 0:00 | Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 1812 | 1810.888889 | 43461.33333 | 43461.33333 | 1.73023E+11 | 141249.3333 | 3.25 | 0.0556 | 7,853.46 |
| 10/21/2021 0:00 | Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 702 | 702 | 16848 | 16848 | 67013305269 | 54756 | 3.25 | 0.0556 | 3,044.43 |
| 10/21/2021 0:00 | Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 23 | 23 | 552 | 552 | 2203401456 | 1794 | 3.25 | 0.0556 | 99.75 |
| 10/21/2021 0:00 | Calvert City 1 | Celsius | HOSTED | Antminer S19 Pro 105TH | 9 | 9 | 216 | 216 | 958497507.4 | 702 | 3.25 | 0.0556 | 39.03 |
| 10/21/2021 0:00 | Calvert City 1 | Celsius | HOSTED | Antminer S19 Pro 105TH | 8 | 7.986111111 | 191.6666667 | 191.6666667 | 849705971.2 | 622.9166667 | 3.25 | 0.0556 | 34.63 |
| 10/21/2021 0:00 | Calvert City 1 | Celsius | HOSTED | Antminer S19 Pro 110TH | 44 | 43.99305556 | 1055.833333 | 1055.833333 | 4881591586 | 3431.458333 | 3.25 | 0.0556 | 190.79 |
| 10/21/2021 0:00 | Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 1174 | 1172.715278 | 28145.16667 | 28145.16667 | 1.11845E+11 | 91471.79167 | 3.25 | 0.0556 | 5,085.83 |
| 10/21/2021 0:00 | Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 2326 | 2293.902778 | 55053.66667 | 55053.66667 | 2.18401E+11 | 178924.4167 | 3.25 | 0.0556 | 9,948.20 |
| 10/21/2021 0:00 | Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 3132 | 3098.576389 | 74365.83333 | 74365.83333 | 3.45023E+11 | 241688.9583 | 3.25 | 0.0556 | 13,437.91 |
| 10/22/2021 0:00 | Dalton 3 | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 499 | 11976 | 11976 | 5535050897 | 38922 | 3.25 | 0.0556 | 2,164.06 |
| 10/22/2021 0:00 | Dalton 2 | Celsius | HOSTED | Antminer S19 95TH | 1799 | 1790.895833 | 42981.5 | 42981.5 | 1.74439E+11 | 139689.875 | 3.25 | 0.0556 | 7,766.76 |

| Date / Location | | | Miner | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/22/2021 0:00 Dalton 1 | Celsius | HOSTED | Antminer S19 95TH | 141 | 140 | 3360 | 13411858451 | 10920 | 3.25 | 0.0556 | 607.15 |
| 10/22/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 898 | 896 | 21504 | 85618549214 | 69888 | 3.25 | 0.0556 | 3,885.77 |
| 10/22/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 150 | 150 | 3600 | 14203379905 | 11700 | 3.25 | 0.0556 | 650.52 |
| 10/22/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 498.9236111 | 11974.16667 | 55329436006 | 38916.04167 | 3.25 | 0.0556 | 2,163.73 |
| 10/22/2021 0:00 Calvert City 2 | Celsius | HOSTED | Antminer S19 95TH | 1566 | 1553.368056 | 37280.83333 | 1.482961E+11 | 121162.7083 | 3.25 | 0.0556 | 6,736.65 |
| 10/22/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 12 | 12 | 288 | 1150317899 | 936 | 3.25 | 0.0556 | 52.04 |
| 10/22/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 90TH | 53 | 53 | 1272 | 4860763532 | 4134 | 3.25 | 0.0556 | 229.85 |
| 10/22/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 1174 | 1172.402778 | 28137.66667 | 1.11841E+11 | 91447.41667 | 3.25 | 0.0556 | 5,084.48 |
| 10/22/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 Pro 110TH | 44 | 44 | 1056 | 4882408281 | 3432 | 3.25 | 0.0556 | 190.82 |
| 10/22/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 Pro 105TH | 8 | 8 | 192 | 850647478.7 | 624 | 3.25 | 0.0556 | 34.69 |
| 10/22/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 Pro 105TH | 9 | 9 | 216 | 958422907.2 | 702 | 3.25 | 0.0556 | 39.03 |
| 10/22/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 23 | 23 | 552 | 2202910334 | 1794 | 3.25 | 0.0556 | 99.75 |
| 10/22/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 702 | 702 | 16848 | 67013240683 | 54756 | 3.25 | 0.0556 | 3,044.43 |
| 10/22/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 1812 | 1810.958333 | 43463 | 1.73034E+11 | 141254.75 | 3.25 | 0.0556 | 7,853.76 |
| 10/22/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 90TH | 373 | 373 | 8952 | 34398812314 | 29094 | 3.25 | 0.0556 | 1,617.63 |
| 10/22/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 22 | 22 | 528 | 2096764114 | 1716 | 3.25 | 0.0556 | 95.41 |
| 10/22/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 2978 | 2965.270833 | 71166.5 | 2.81731E+11 | 231291.125 | 3.25 | 0.0556 | 12,859.79 |
| 10/23/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 Pro 110TH | 1174 | 1165.763158 | 27978.31579 | 1.112E+11 | 90929.52632 | 3.25 | 0.0556 | 5,055.68 |
| 10/23/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 Pro 105TH | 44 | 44 | 1056 | 4880089549 | 3432 | 3.25 | 0.0556 | 190.82 |
| 10/23/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 Pro 105TH | 8 | 8 | 192 | 851936170 | 624 | 3.25 | 0.0556 | 34.69 |
| 10/23/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 9 | 9 | 216 | 957252895.7 | 702 | 3.25 | 0.0556 | 39.03 |
| 10/23/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 23 | 23 | 552 | 2202111567 | 1794 | 3.25 | 0.0556 | 99.75 |
| 10/23/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 702 | 702 | 16848 | 66943566253 | 54756 | 3.25 | 0.0556 | 3,044.43 |
| 10/23/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 1812 | 1806.964912 | 43367.15789 | 1.72609E+11 | 140943.2632 | 3.25 | 0.0556 | 7,836.45 |
| 10/23/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 90TH | 53 | 53 | 1272 | 4862204698 | 4134 | 3.25 | 0.0556 | 229.85 |
| 10/23/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 22 | 22 | 528 | 2095283885 | 1716 | 3.25 | 0.0556 | 95.41 |
| 10/23/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 90TH | 373 | 373 | 8952 | 34395800958 | 29094 | 3.25 | 0.0556 | 1,617.63 |
| 10/23/2021 0:00 Dalton 3 | Celsius | HOSTED | Antminer S19 Pro 110TH | 3132 | 3098.263158 | 74358.31579 | 3.44807E+11 | 241664.5263 | 3.25 | 0.0556 | 13,436.55 |
| 10/23/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 2326 | 2281.008772 | 54744.21053 | 2.17106E+11 | 177918.6842 | 3.25 | 0.0556 | 9,892.28 |
| 10/23/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 2978 | 2973.114035 | 71354.73684 | 2.82487E+11 | 231902.8947 | 3.25 | 0.0556 | 12,893.80 |
| 10/23/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 12 | 11.9122807 | 285.8947368 | 1141171671 | 929.1578947 | 3.25 | 0.0556 | 51.66 |
| 10/23/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 495.3333333 | 11888 | 54959178411 | 38636 | 3.25 | 0.0556 | 2,148.16 |
| 10/23/2021 0:00 Dalton 2 | Celsius | HOSTED | Antminer S19 95TH | 1799 | 1775.315789 | 42607.57895 | 1.69922E+11 | 138474.6316 | 3.25 | 0.0556 | 7,699.19 |
| 10/23/2021 0:00 Dalton 1 | Celsius | HOSTED | Antminer S19 95TH | 141 | 139.7192982 | 3353.263158 | 13381247703 | 10898.10526 | 3.25 | 0.0556 | 605.93 |
| 10/23/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 898 | 889.245614 | 21341.89474 | 84970627907 | 69361.15789 | 3.25 | 0.0556 | 3,856.48 |
| 10/23/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 150 | 148.8596491 | 3572.631579 | 14098806208 | 11611.05263 | 3.25 | 0.0556 | 645.57 |
| 10/23/2021 0:00 Calvert City 2 | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 499.2280702 | 11981.47368 | 55415.29500 | 38939.78947 | 3.25 | 0.0556 | 2,165.05 |
| 10/23/2021 0:00 Calvert City 2 | Celsius | HOSTED | Antminer S19 95TH | 1566 | 1544.201754 | 37060.84211 | 1.47206E+11 | 120447.7368 | 3.25 | 0.0556 | 6,696.89 |
| 10/24/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 22 | 22 | 528 | 2093141610 | 1716 | 3.25 | 0.0556 | 95.41 |
| 10/24/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 898 | 896 | 21504 | 85618338113 | 69888 | 3.25 | 0.0556 | 3,885.77 |
| 10/24/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 500 | 12000 | 55495085488 | 39000 | 3.25 | 0.0556 | 2,168.40 |
| 10/24/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 150 | 150 | 3600 | 14192884487 | 11700 | 3.25 | 0.0556 | 650.52 |
| 10/24/2021 0:00 Calvert City 2 | Celsius | HOSTED | Antminer S19 95TH | 1566 | 1556.861111 | 37364.66667 | 1.4853E+11 | 121435.1667 | 3.25 | 0.0556 | 6,751.80 |
| 10/24/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 9 | 9 | 216 | 958104653 | 702 | 3.25 | 0.0556 | 39.03 |
| 10/24/2021 0:00 Dalton 1 | Celsius | HOSTED | Antminer S19 95TH | 141 | 140 | 3360 | 13413211639 | 10920 | 3.25 | 0.0556 | 607.15 |
| 10/24/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 Pro 110TH | 1799 | 1790.361111 | 42968.66667 | 1.71357E+11 | 139648.1667 | 3.25 | 0.0556 | 7,764.44 |
| 10/24/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 499 | 11976 | 55317795671 | 38922 | 3.25 | 0.0556 | 2,164.05 |
| 10/24/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 12 | 12 | 288 | 1151703617 | 936 | 3.25 | 0.0556 | 52.04 |
| 10/24/2021 0:00 Dalton 3 | Celsius | HOSTED | Antminer S19 Pro 110TH | 3132 | 3083.194444 | 73996.66667 | 3.43209E+11 | 240489.1667 | 3.25 | 0.0556 | 13,371.20 |
| 10/24/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 Pro 110TH | 44 | 44 | 1056 | 4875063929 | 3432 | 3.25 | 0.0556 | 190.82 |
| 10/24/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 2978 | 2976.111111 | 71426.66667 | 2.82767E+11 | 232136.6667 | 3.25 | 0.0556 | 12,906.80 |
| 10/24/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 90TH | 53 | 53 | 1272 | 4856736490 | 4134 | 3.25 | 0.0556 | 229.85 |
| 10/24/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 90TH | 373 | 373 | 8952 | 34386307985 | 29094 | 3.25 | 0.0556 | 1,617.63 |
| 10/24/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 1812 | 1810.638889 | 43455.33333 | 1.72955E+11 | 141229.8333 | 3.25 | 0.0556 | 7,852.38 |
| 10/24/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 702 | 702 | 16848 | 66924272964 | 54756 | 3.25 | 0.0556 | 3,044.43 |

| Date | | | Model | Type | A | B | C | D | E | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/24/2021 0:00 Calvert City 1 | Celsius | Celsius | Antminer S19 95TH | HOSTED | 23 | 23 | 552 | 2200711010 | 1794 | 3.25 | 0.0556 | 99.75 |
| 10/24/2021 0:00 Calvert City 1 | Celsius | Celsius | Antminer S19 Pro 105TH | HOSTED | 8 | 8 | 192 | 852222099 | 624 | 3.25 | 0.0556 | 34.69 |
| 10/24/2021 0:00 Marble 2 | Celsius | Celsius | Antminer S19 95TH | HOSTED | 1174 | 1173 | 28152 | 1.11876E+11 | 91494 | 3.25 | 0.0556 | 5,087.07 |
| 10/24/2021 0:00 Calvert City 1 | Celsius | Celsius | Antminer S19 95TH | HOSTED | 2326 | 2294.277778 | 55062.66667 | 2.18342E+11 | 178953.6667 | 3.25 | 0.0556 | 9,949.82 |
| 10/25/2021 0:00 Calvert City 1 | Celsius | Celsius | Antminer S19 95TH | HOSTED | 2326 | 2296.493056 | 55115.83333 | 2.18548E+11 | 179126.4583 | 3.25 | 0.0556 | 9,959.43 |
| 10/25/2021 0:00 Marble 2 | Celsius | Celsius | Antminer S19 Pro 110TH | HOSTED | 500 | 500 | 12000 | 55493090237 | 936 | 3.25 | 0.0556 | 2,168.40 |
| 10/25/2021 0:00 Marble 2 | Celsius | Celsius | Antminer S19 95TH | HOSTED | 12 | 12 | 288 | 1150259131 | 936 | 3.25 | 0.0556 | 52.04 |
| 10/25/2021 0:00 Dalton 3 | Celsius | Celsius | Antminer S19 Pro 110TH | HOSTED | 3132 | 3090.881944 | 74181.16667 | 3.441E+11 | 241088.7917 | 3.25 | 0.0556 | 13,404.54 |
| 10/25/2021 0:00 Marble 2 | Celsius | Celsius | Antminer S19 Pro 110TH | HOSTED | 500 | 499 | 11976 | 55316625816 | 38922 | 3.25 | 0.0556 | 2,164.06 |
| 10/25/2021 0:00 Dalton 2 | Celsius | Celsius | Antminer S19 95TH | HOSTED | 1799 | 1790.763889 | 42978.33333 | 1.7141E+11 | 139679.5833 | 3.25 | 0.0556 | 7,766.18 |
| 10/25/2021 0:00 Dalton 1 | Celsius | Celsius | Antminer S19 95TH | HOSTED | 141 | 140 | 3360 | 13410340115 | 10920 | 3.25 | 0.0556 | 607.15 |
| 10/25/2021 0:00 Marble 1 | Celsius | Celsius | Antminer S19 95TH | HOSTED | 898 | 896 | 21504 | 85610588920 | 69888 | 3.25 | 0.0556 | 3,885.77 |
| 10/25/2021 0:00 Marble 1 | Celsius | Celsius | Antminer S19 95TH | HOSTED | 150 | 149.9027778 | 3597.666667 | 14214328899 | 11692.41667 | 3.25 | 0.0556 | 650.10 |
| 10/25/2021 0:00 Calvert City 2 | Celsius | Celsius | Antminer S19 95TH | HOSTED | 1566 | 1556.465278 | 37355.16667 | 1.48451E+11 | 121404.2917 | 3.25 | 0.0556 | 6,750.08 |
| 10/25/2021 0:00 Marble 1 | Celsius | Celsius | Antminer S19 95TH | HOSTED | 1812 | 1810.923611 | 43462.16667 | 1.72989E+11 | 141252.0417 | 3.25 | 0.0556 | 7,853.61 |
| 10/25/2021 0:00 Marble 2 | Celsius | Celsius | Antminer S19 95TH | HOSTED | 22 | 22 | 528 | 2094839413 | 1716 | 3.25 | 0.0556 | 95.41 |
| 10/25/2021 0:00 Marble 2 | Celsius | Celsius | Antminer S19 90TH | HOSTED | 373 | 372.9930556 | 8951.833333 | 34390056693 | 29093.45833 | 3.25 | 0.0556 | 1,617.60 |
| 10/25/2021 0:00 Marble 2 | Celsius | Celsius | Antminer S19 95TH | HOSTED | 2978 | 2961.520833 | 71076.5 | 2.81369E+11 | 230998.625 | 3.25 | 0.0556 | 12,843.52 |
| 10/25/2021 0:00 Marble 2 | Celsius | Celsius | Antminer S19 90TH | HOSTED | 702 | 702 | 16848 | 66939349067 | 54756 | 3.25 | 0.0556 | 3,044.43 |
| 10/25/2021 0:00 Calvert City 1 | Celsius | Celsius | Antminer S19 95TH | HOSTED | 23 | 23 | 552 | 2201765545 | 1794 | 3.25 | 0.0556 | 99.75 |
| 10/25/2021 0:00 Marble 1 | Celsius | Celsius | Antminer S19 Pro 105TH | HOSTED | 9 | 9 | 216 | 9582700345.7 | 702 | 3.25 | 0.0556 | 39.03 |
| 10/25/2021 0:00 Calvert City 1 | Celsius | Celsius | Antminer S19 Pro 105TH | HOSTED | 8 | 8 | 192 | 852578137.5 | 624 | 3.25 | 0.0556 | 34.69 |
| 10/25/2021 0:00 Calvert City 1 | Celsius | Celsius | Antminer S19 Pro 110TH | HOSTED | 44 | 44 | 1056 | 4880318101 | 3432 | 3.25 | 0.0556 | 190.82 |
| 10/25/2021 0:00 Marble 1 | Celsius | Celsius | Antminer S19 95TH | HOSTED | 1174 | 1172.4375 | 28138.5 | 1.11817E+11 | 91450.125 | 3.25 | 0.0556 | 5,084.63 |
| 10/26/2021 0:00 Marble 2 | Celsius | Celsius | Antminer S19 95TH | HOSTED | 2978 | 2977.254167 | 71454.1 | 2.82864E+11 | 232225.825 | 3.25 | 0.0556 | 12,911.76 |
| 10/26/2021 0:00 Calvert City 1 | Celsius | Celsius | Antminer S19 95TH | HOSTED | 22 | 22 | 528 | 2094654678 | 1716 | 3.25 | 0.0556 | 95.41 |
| 10/26/2021 0:00 Marble 2 | Celsius | Celsius | Antminer S19 95TH | HOSTED | 1566 | 1557.994444 | 37391.86667 | 1.48596E+11 | 121523.5667 | 3.25 | 0.0556 | 6,756.71 |
| 10/26/2021 0:00 Marble 2 | Celsius | Celsius | Antminer S19 95TH | HOSTED | 12 | 12 | 288 | 1149324700 | 936 | 3.25 | 0.0556 | 52.04 |
| 10/26/2021 0:00 Dalton 3 | Celsius | Celsius | Antminer S19 Pro 110TH | HOSTED | 3132 | 3087.988889 | 74111.73333 | 3.43743E+11 | 240863.13333 | 3.25 | 0.0556 | 13,391.99 |
| 10/26/2021 0:00 Marble 2 | Celsius | Celsius | Antminer S19 Pro 110TH | HOSTED | 500 | 499 | 11976 | 55307878265 | 38922 | 3.25 | 0.0556 | 2,164.06 |
| 10/26/2021 0:00 Dalton 2 | Celsius | Celsius | Antminer S19 95TH | HOSTED | 1799 | 1790.755556 | 42978.13333 | 1.7139E+11 | 139678.9333 | 3.25 | 0.0556 | 7,766.15 |
| 10/26/2021 0:00 Dalton 1 | Celsius | Celsius | Antminer S19 95TH | HOSTED | 141 | 139.9791667 | 3359.5 | 13407717239 | 10918.375 | 3.25 | 0.0556 | 607.06 |
| 10/26/2021 0:00 Marble 1 | Celsius | Celsius | Antminer S19 95TH | HOSTED | 898 | 896 | 21504 | 85595745274 | 69888 | 3.25 | 0.0556 | 3,885.77 |
| 10/26/2021 0:00 Marble 1 | Celsius | Celsius | Antminer S19 95TH | HOSTED | 150 | 149.9444444 | 3598.666667 | 14233318806 | 11695.66667 | 3.25 | 0.0556 | 650.28 |
| 10/26/2021 0:00 Marble 1 | Celsius | Celsius | Antminer S19 95TH | HOSTED | 1812 | 1810.920833 | 43462.1 | 1.73017E+11 | 141251.825 | 3.25 | 0.0556 | 7,853.60 |
| 10/26/2021 0:00 Marble 2 | Celsius | Celsius | Antminer S19 Pro 110TH | HOSTED | 500 | 500 | 12000 | 55488140460 | 39000 | 3.25 | 0.0556 | 2,168.40 |
| 10/26/2021 0:00 Marble 2 | Celsius | Celsius | Antminer S19 90TH | HOSTED | 373 | 372.9930556 | 8951.833333 | 34389459044 | 29093.45833 | 3.25 | 0.0556 | 1,617.60 |
| 10/26/2021 0:00 Marble 2 | Celsius | Celsius | Antminer S19 90TH | HOSTED | 702 | 702 | 16848 | 66937191400 | 54756 | 3.25 | 0.0556 | 3,044.43 |
| 10/26/2021 0:00 Calvert City 1 | Celsius | Celsius | Antminer S19 95TH | HOSTED | 23 | 23 | 552 | 2188476294 | 1794 | 3.25 | 0.0556 | 99.75 |
| 10/26/2021 0:00 Calvert City 1 | Celsius | Celsius | Antminer S19 Pro 105TH | HOSTED | 9 | 9 | 216 | 957785114.3 | 702 | 3.25 | 0.0556 | 39.03 |
| 10/26/2021 0:00 Calvert City 1 | Celsius | Celsius | Antminer S19 Pro 105TH | HOSTED | 8 | 8 | 192 | 851759538.3 | 624 | 3.25 | 0.0556 | 34.69 |
| 10/26/2021 0:00 Calvert City 1 | Celsius | Celsius | Antminer S19 Pro 110TH | HOSTED | 44 | 44 | 1056 | 4882791398 | 3432 | 3.25 | 0.0556 | 190.82 |
| 10/26/2021 0:00 Marble 1 | Celsius | Celsius | Antminer S19 95TH | HOSTED | 1174 | 1172.625 | 28143 | 1.11837E+11 | 91464.75 | 3.25 | 0.0556 | 5,085.44 |
| 10/26/2021 0:00 Marble 1 | Celsius | Celsius | Antminer S19 95TH | HOSTED | 53 | 53 | 1272 | 4858373727 | 4134 | 3.25 | 0.0556 | 229.85 |
| 10/27/2021 0:00 Calvert City 1 | Celsius | Celsius | Antminer S19 95TH | HOSTED | 2326 | 2295.75 | 55098 | 2.18462E+11 | 179068.5 | 3.25 | 0.0556 | 9,956.21 |
| 10/27/2021 0:00 Calvert City 1 | Celsius | Celsius | Antminer S19 95TH | HOSTED | 2326 | 2297.152778 | 55131.66667 | 2.18601E+11 | 179177.9167 | 3.25 | 0.0556 | 9,962.29 |
| 10/27/2021 0:00 Marble 2 | Celsius | Celsius | Antminer S19 95TH | HOSTED | 12 | 12 | 288 | 1149230169 | 936 | 3.25 | 0.0556 | 52.04 |
| 10/27/2021 0:00 Dalton 3 | Celsius | Celsius | Antminer S19 Pro 110TH | HOSTED | 3132 | 3093.902778 | 74253.66667 | 3.44386E+11 | 241324.4167 | 3.25 | 0.0556 | 13,417.64 |
| 10/27/2021 0:00 Calvert City 1 | Celsius | Celsius | Antminer S19 Pro 110TH | HOSTED | 500 | 498.5763889 | 11965.83333 | 55267604684 | 38888.59583 | 3.25 | 0.0556 | 2,162.23 |
| 10/27/2021 0:00 Dalton 2 | Celsius | Celsius | Antminer S19 95TH | HOSTED | 1799 | 1790.395833 | 42969.5 | 1.71364E+11 | 139650.875 | 3.25 | 0.0556 | 7,764.59 |
| 10/27/2021 0:00 Dalton 1 | Celsius | Celsius | Antminer S19 95TH | HOSTED | 141 | 139.9861111 | 3359.666667 | 13409212675 | 10918.91667 | 3.25 | 0.0556 | 607.09 |
| 10/27/2021 0:00 Marble 2 | Celsius | Celsius | Antminer S19 95TH | HOSTED | 898 | 896 | 21504 | 85619408788 | 69888 | 3.25 | 0.0556 | 3,885.77 |
| 10/27/2021 0:00 Marble 1 | Celsius | Celsius | Antminer S19 95TH | HOSTED | 150 | 149.9027778 | 3597.666667 | 14239020988 | 11692.41667 | 3.25 | 0.0556 | 650.10 |
| 10/27/2021 0:00 Marble 2 | Celsius | Celsius | Antminer S19 Pro 110TH | HOSTED | 500 | 500 | 12000 | 55487932078 | 39000 | 3.25 | 0.0556 | 2,168.40 |

| Date / Location | Unit | Type | Model | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/27/2021 0:00 Calvert City 2 | Celsius | HOSTED | Antminer S19 95TH | 1566 | 1564.951389 | 37558.83333 | 1.49201E+11 | 122066.2083 | 3.25 | 0.0556 | 6,786.88 |
| 10/27/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 702 | 702 | 16848 | 66938628343 | 54756 | 3.25 | 0.0556 | 3,044.43 |
| 10/27/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 22 | 22 | 528 | 2095143918 | 1716 | 3.25 | 0.0556 | 95.41 |
| 10/27/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 2978 | 2977.0625 | 71449.5 | 2.82839E+11 | 232210.875 | 3.25 | 0.0556 | 12,910.92 |
| 10/27/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 1812 | 1810.791667 | 43459 | 1.72994E+11 | 141241.75 | 3.25 | 0.0556 | 7,853.04 |
| 10/27/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 90TH | 53 | 53 | 1272 | 4857369786 | 4134 | 3.25 | 0.0556 | 229.85 |
| 10/27/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 23 | 22.98611111 | 551.6666667 | 2182112536 | 1792.916667 | 3.25 | 0.0556 | 99.69 |
| 10/27/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 Pro 105TH | 9 | 9 | 216 | 958037058.5 | 702 | 3.25 | 0.0556 | 39.03 |
| 10/27/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 Pro 105TH | 8 | 8 | 192 | 852364748.4 | 624 | 3.25 | 0.0556 | 34.69 |
| 10/27/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 Pro 110TH | 44 | 44 | 1056 | 4882242295 | 3432 | 3.25 | 0.0556 | 190.82 |
| 10/27/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 1174 | 1172.673611 | 28144.16667 | 1.11841E+11 | 91468.54167 | 3.25 | 0.0556 | 5,085.65 |
| 10/27/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 90TH | 373 | 373 | 8952 | 34393662947 | 29994 | 3.25 | 0.0556 | 1,617.63 |
| 10/28/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 702 | 702 | 16848 | 66936343909 | 54756 | 3.25 | 0.0556 | 3,044.43 |
| 10/28/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 Pro 105TH | 9 | 9 | 216 | 957619960.4 | 702 | 3.25 | 0.0556 | 39.03 |
| 10/28/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 Pro 105TH | 8 | 8 | 192 | 852060248.4 | 624 | 3.25 | 0.0556 | 34.69 |
| 10/28/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 23 | 22.95833333 | 551 | 2166554803 | 1790.75 | 3.25 | 0.0556 | 99.57 |
| 10/28/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 1566 | 1565.673611 | 37576.16667 | 1.49301E+11 | 122122.5417 | 3.25 | 0.0556 | 6,790.01 |
| 10/28/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 Pro 110TH | 44 | 44 | 1056 | 4881711526 | 3432 | 3.25 | 0.0556 | 190.82 |
| 10/28/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 1812 | 1810.652778 | 43455.66667 | 1.73004E+11 | 141230.9167 | 3.25 | 0.0556 | 7,852.44 |
| 10/28/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 90TH | 373 | 372.9861111 | 8951.666667 | 34393029293 | 29092.91667 | 3.25 | 0.0556 | 1,617.57 |
| 10/28/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 12 | 12 | 288 | 1151223109 | 936 | 3.25 | 0.0556 | 52.04 |
| 10/28/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 90TH | 898 | 882.4236111 | 21178.16667 | 84313713922 | 68829.04167 | 3.25 | 0.0556 | 3,826.89 |
| 10/28/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 90TH | 53 | 53 | 1272 | 4858144961 | 4134 | 3.25 | 0.0556 | 229.85 |
| 10/28/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 498.7638889 | 11970.33333 | 55340621410 | 38903.58333 | 3.25 | 0.0556 | 2,163.04 |
| 10/28/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 1174 | 1172.347222 | 28136.33333 | 1.1180TE+11 | 91443.08333 | 3.25 | 0.0556 | 5,084.24 |
| 10/28/2021 0:00 Dalton 3 | Celsius | HOSTED | Antminer S19 Pro 110TH | 3132 | 3091.965278 | 74207.16667 | 3.44185E+11 | 241173.2917 | 3.25 | 0.0556 | 13,409.24 |
| 10/28/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 498.25 | 11958 | 55229203971 | 38863.5 | 3.25 | 0.0556 | 2,160.81 |
| 10/28/2021 0:00 Dalton 2 | Celsius | HOSTED | Antminer S19 95TH | 1799 | 1790.173611 | 42964.16667 | 1.71342E+11 | 139633.5417 | 3.25 | 0.0556 | 7,763.62 |
| 10/28/2021 0:00 Dalton 1 | Celsius | HOSTED | Antminer S19 95TH | 141 | 140 | 3360 | 13412255203 | 10920 | 3.25 | 0.0556 | 607.15 |
| 10/28/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 150 | 149.9305556 | 3598.333333 | 14240153356 | 11694.58333 | 3.25 | 0.0556 | 650.22 |
| 10/28/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 22 | 22 | 528 | 2094744144 | 1716 | 3.25 | 0.0556 | 95.41 |
| 10/28/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 2978 | 2965.201389 | 71164.83333 | 2.81595E+11 | 231285.7083 | 3.25 | 0.0556 | 12,859.49 |
| 10/28/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 2326 | 2299.451389 | 55186.83333 | 2.18829E+11 | 179357.2083 | 3.25 | 0.0556 | 9,972.26 |
| 10/29/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 2978 | 2975.979167 | 71423.5 | 2.82762E+11 | 232126.375 | 3.25 | 0.0556 | 12,906.23 |
| 10/29/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 22 | 22 | 528 | 2093203808 | 1716 | 3.25 | 0.0556 | 95.41 |
| 10/29/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 12 | 12 | 288 | 1148682959 | 936 | 3.25 | 0.0556 | 52.04 |
| 10/29/2021 0:00 Dalton 3 | Celsius | HOSTED | Antminer S19 Pro 110TH | 3132 | 3061.819444 | 73483.66667 | 3.4085E+11 | 238821.9167 | 3.25 | 0.0556 | 13,278.50 |
| 10/29/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 498.6875 | 11968.5 | 55310725340 | 38897.625 | 3.25 | 0.0556 | 2,162.71 |
| 10/29/2021 0:00 Dalton 2 | Celsius | HOSTED | Antminer S19 95TH | 1799 | 1791.440972 | 42994.58333 | 1.71449E+11 | 139732.3958 | 3.25 | 0.0556 | 7,769.12 |
| 10/29/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 90TH | 141 | 139.9722222 | 3359.333333 | 13409217677 | 10917.83333 | 3.25 | 0.0556 | 607.03 |
| 10/29/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 Pro 105TH | 898 | 896 | 21504 | 85617430084 | 69888 | 3.25 | 0.0556 | 3,885.77 |
| 10/29/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 Pro 105TH | 150 | 149.9305556 | 3598.333333 | 14227003644 | 11694.58333 | 3.25 | 0.0556 | 650.22 |
| 10/29/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 Pro 110TH | 44 | 43.875 | 1053 | 4885921174 | 3422.25 | 3.25 | 0.0556 | 190.28 |
| 10/29/2021 0:00 Calvert City 2 | Celsius | HOSTED | Antminer S19 95TH | 1566 | 1565.010417 | 37560.25 | 1.49239E+11 | 122070.8125 | 3.25 | 0.0556 | 6,787.14 |
| 10/29/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 23 | 23 | 552 | 2170532719 | 1794 | 3.25 | 0.0556 | 99.75 |
| 10/29/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 500 | 12000 | 5545147872 | 39000 | 3.25 | 0.0556 | 2,168.40 |
| 10/29/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 90TH | 53 | 53 | 1272 | 4858897410 | 4134 | 3.25 | 0.0556 | 229.85 |
| 10/29/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 Pro 110TH | 702 | 701.9930556 | 16847.83333 | 66931576377 | 54755.45833 | 3.25 | 0.0556 | 3,044.00 |
| 10/29/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 90TH | 373 | 372.9930556 | 8951.833333 | 34385583297 | 29093.45833 | 3.25 | 0.0556 | 1,617.60 |
| 10/29/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 Pro 105TH | 9 | 9 | 216 | 959046549.9 | 702 | 3.25 | 0.0556 | 39.03 |
| 10/29/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 Pro 105TH | 8 | 8 | 192 | 852478268.9 | 624 | 3.25 | 0.0556 | 34.69 |
| 10/29/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 Pro 110TH | 44 | 43.875 | 1053 | 4885921174 | 3422.25 | 3.25 | 0.0556 | 190.28 |
| 10/29/2021 0:00 Marble 1 | Celsius | HOSTED | Antminer S19 95TH | 1174 | 1173 | 28152 | 1.11865E+11 | 91494 | 3.25 | 0.0556 | 5,087.07 |
| 10/29/2021 0:00 Calvert City 1 | Celsius | HOSTED | Antminer S19 95TH | 2326 | 2297.611111 | 55142.66667 | 2.18649E+11 | 179213.6667 | 3.25 | 0.0556 | 9,964.28 |
| 10/29/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 1812 | 1810.694444 | 43456.66667 | 1.72991E+11 | 141234.1667 | 3.25 | 0.0556 | 7,852.62 |
| 10/30/2021 0:00 Marble 2 | Celsius | HOSTED | Antminer S19 95TH | 1174 | 1173 | 28152 | 1.11886E+11 | 91494 | 3.25 | 0.0556 | 5,087.07 |

| Date | Time | Site | | | Status | Model | Qty | | | | | | | Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/30/2021 | 0:00 | Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 44 | 43.97222222 | 1055.333333 | 4914191184 | 3429.833333 | 3.25 | 0.0556 | 190.70 |
| 10/30/2021 | 0:00 | Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 105TH | 8 | 8 | 192 | 850316216.6 | 624 | 3.25 | 0.0556 | 34.69 |
| 10/30/2021 | 0:00 | Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 90TH | 53 | 52.98611111 | 1271.666667 | 485737501.2 | 4132.916667 | 3.25 | 0.0556 | 229.79 |
| 10/30/2021 | 0:00 | Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 105TH | 9 | 9 | 216 | 957988850 | 702 | 3.25 | 0.0556 | 39.03 |
| 10/30/2021 | 0:00 | Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 23 | 22.99305556 | 551.8333333 | 2170503420 | 1793.458333 | 3.25 | 0.0556 | 99.72 |
| 10/30/2021 | 0:00 | Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 702 | 702 | 16848 | 66939009003 | 54756 | 3.25 | 0.0556 | 3,044.43 |
| 10/30/2021 | 0:00 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 90TH | 373 | 372.9861111 | 8951.666667 | 34398558482 | 29092.91667 | 3.25 | 0.0556 | 1,617.57 |
| 10/30/2021 | 0:00 | Dalton 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 1799 | 1791.719444 | 43001.26667 | 1.71481E+11 | 139754.1167 | 3.25 | 0.0556 | 7,770.33 |
| 10/30/2021 | 0:00 | Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 2326 | 2297.833333 | 55148 | 2.18694E+11 | 179231 | 3.25 | 0.0556 | 9,965.24 |
| 10/30/2021 | 0:00 | Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 1812 | 1810.326389 | 43447.83333 | 1.72966E+11 | 141205.4583 | 3.25 | 0.0556 | 7,851.02 |
| 10/30/2021 | 0:00 | Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 22 | 22 | 528 | 2096191116 | 1716 | 3.25 | 0.0556 | 95.41 |
| 10/30/2021 | 0:00 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 500 | 12000 | 5545826013 | 39000 | 3.25 | 0.0556 | 2,168.40 |
| 10/30/2021 | 0:00 | Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 150 | 149.9513889 | 3598.833333 | 14253295995 | 11696.20833 | 3.25 | 0.0556 | 650.31 |
| 10/30/2021 | 0:00 | Dalton 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 141 | 140 | 3360 | 13409969380 | 10920 | 3.25 | 0.0556 | 607.15 |
| 10/30/2021 | 0:00 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 498.9930556 | 11975.83333 | 55333894505 | 38921.45833 | 3.25 | 0.0556 | 2,164.03 |
| 10/30/2021 | 0:00 | Dalton 3 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 3132 | 3078.848611 | 73892.36667 | 3.42776E+11 | 240150.1917 | 3.25 | 0.0556 | 13,352.35 |
| 10/30/2021 | 0:00 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 12 | 12 | 288 | 1150208558 | 936 | 3.25 | 0.0556 | 52.04 |
| 10/30/2021 | 0:00 | Calvert City 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 1566 | 1565.580556 | 37573.93333 | 1.49304E+11 | 122115.2833 | 3.25 | 0.0556 | 6,789.61 |
| 10/30/2021 | 0:00 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 898 | 896 | 21504 | 8561466905 | 69888 | 3.25 | 0.0556 | 3,885.77 |
| 10/30/2021 | 0:00 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 2978 | 2975.847222 | 71420.33333 | 2.82753E+11 | 232116.0833 | 3.25 | 0.0556 | 12,905.65 |
| 10/31/2021 | 0:00 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 12 | 12 | 288 | 1151122909 | 936 | 3.25 | 0.0556 | 52.04 |
| 10/31/2021 | 0:00 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 500 | 500 | 12000 | 55456916641 | 39000 | 3.25 | 0.0556 | 2,168.40 |
| 10/31/2021 | 0:00 | Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 150 | 150 | 3600 | 14231301798 | 11700 | 3.25 | 0.0556 | 650.52 |
| 10/31/2021 | 0:00 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 898 | 896 | 21504 | 8562709440 | 69888 | 3.25 | 0.0556 | 3,885.77 |
| 10/31/2021 | 0:00 | Dalton 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 141 | 139.9861111 | 3359.666667 | 13405284423 | 10918.91667 | 3.25 | 0.0556 | 607.09 |
| 10/31/2021 | 0:00 | Dalton 2 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 1799 | 1794.216944 | 43062.16667 | 1.71722E+11 | 139952.0417 | 3.25 | 0.0556 | 7,781.33 |
| 10/31/2021 | 0:00 | Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 22 | 22 | 528 | 2094743309 | 1716 | 3.25 | 0.0556 | 95.41 |
| 10/31/2021 | 0:00 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 3132 | 3087.243056 | 74093.83333 | 3.43708E+11 | 240804.9583 | 3.25 | 0.0556 | 13,388.76 |
| 10/31/2021 | 0:00 | Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 23 | 23 | 552 | 2171833274 | 1794 | 3.25 | 0.0556 | 99.75 |
| 10/31/2021 | 0:00 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 500 | 499 | 11976 | 5535495208 | 38922 | 3.25 | 0.0556 | 2,164.06 |
| 10/31/2021 | 0:00 | Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 2978 | 2977.590278 | 71462.16667 | 2.82938E+11 | 232252.0417 | 3.25 | 0.0556 | 12,913.21 |
| 10/31/2021 | 0:00 | Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 2326 | 2297.875 | 55149 | 2.18702E+11 | 179234.25 | 3.25 | 0.0556 | 9,965.42 |
| 10/31/2021 | 0:00 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 1174 | 1173 | 28152 | 1.11882E+11 | 91494 | 3.25 | 0.0556 | 5,087.07 |
| 10/31/2021 | 0:00 | Calvert City 2 | Celsius | Celsius | HOSTED | Antminer S19 Pro 110TH | 44 | 43.375 | 1041 | 4850259612 | 3383.25 | 3.25 | 0.0556 | 188.11 |
| 10/31/2021 | 0:00 | Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 105TH | 9 | 9 | 216 | 958272029.4 | 702 | 3.25 | 0.0556 | 39.03 |
| 10/31/2021 | 0:00 | Marble 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 702 | 702 | 16848 | 66938694419 | 54756 | 3.25 | 0.0556 | 3,044.43 |
| 10/31/2021 | 0:00 | Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 1812 | 1810.902778 | 43461.66667 | 1.73013E+11 | 141250.4167 | 3.25 | 0.0556 | 7,853.52 |
| 10/31/2021 | 0:00 | Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 90TH | 373 | 373 | 8952 | 34393675322 | 29094 | 3.25 | 0.0556 | 1,617.63 |
| 10/31/2021 | 0:00 | Marble 1 | Celsius | Celsius | HOSTED | Antminer S19 90TH | 53 | 53 | 1272 | 4859657537 | 4134 | 3.25 | 0.0556 | 229.85 |
| 10/31/2021 | 0:00 | Calvert City 2 | Celsius | Celsius | HOSTED | Antminer S19 95TH | 1566 | 1564.145833 | 37539.5 | 1.49163E+11 | 122003.375 | 3.25 | 0.0556 | 6,783.39 |
| 10/31/2021 | 0:00 | Calvert City 1 | Celsius | Celsius | HOSTED | Antminer S19 Pro 105TH | 8 | 8 | 192 | 852507662.9 | 624 | 3.25 | 0.0556 | 34.69 |
| **Total** | | | | | | | | | | | | | | **2,540,122.51** |

# CORE SCIENTIFIC

**Celsius Core LLC**

| Description | Amount | Subtotal | As of |
|---|---|---|---|
| October 2021 Actual Usage | $472,031.02 | | |
| Reverse October 2021 Estimated Prepayment | ($497,542.19) | | |
| INV41969 | | | |
| **Difference between Estimated Usage Prepayment and Actual Usage** | | ($25,511.17) | |
| November 2021 Estimated Prepayment | ($481,492.44) | | |
| INV42064 | | ($507,003.61) | November, 1 2021 |
| Estimated November 2021 Usage** | $481,492.44 | | |
| | -- | ($25,511.17) | December, 1 2021 Prior to Payment |
| Estimated December 2021 Usage Prepayment | $497,542.19 | | |
| **Total Usage to Invoice** | $472,031.02 | ($497,542.19) | December, 1 2021 After Payment |

Notes:
**Expect to see November 2021 usage fees on the December 2021 invoice detail.

### December 2021 Estimate

| | |
|---|---|
| Days | 31 |
| Hours / Day | 24 |
| Hours / Month | 744 |

| Order | Machines Type | Number of Units | Draw/Unit | Power/Hour | Rate/kWh | Fees |
|---|---|---|---|---|---|---|
| Argo Order 3-4 | Antminer S19 | 4,111 | 3.25 | 13360.75 | 0.047 | 467,198.71 |
| Argo Order 3 | Antminer S19 Pro | 267 | 3.25 | 867.75 | 0.047 | 30,343.48 |
| | | | | | Total Usage Fee | 497,542.19 |

| Date | site | company | customer | ownership | machineType | totl machines | machineHours | upHashing | hashrate (MH/s) | Power | consumptionRate | Rate | Fees |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/1/2021 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1996 | 1974.805556 | 47395.33333 | 1.88699E+11 | 15404.8333 | 3.25 | 0.047 | 7,239.64 |
| 10/1/2021 0:00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 Pro 110TH | 267 | 252.2222222 | 6053.333333 | 27884556849 | 19673.33333 | 3.25 | 0.047 | 924.65 |
| 10/1/2021 0:00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1734 | 1575.208333 | 37805 | 1.5004E+11 | 122866.25 | 3.25 | 0.047 | 5,774.71 |
| 10/1/2021 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 14 | 13.97222222 | 335.3333333 | 1338296969 | 1089.833333 | 3.25 | 0.047 | 51.22 |
| 10/1/2021 0:00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 238 | 228.9375 | 5494.5 | 2175534.0014 | 1857.125 | 3.25 | 0.047 | 839.28 |
| 10/1/2021 0:00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 129 | 128.9444444 | 3094.666667 | 1234458.7534 | 10057.66667 | 3.25 | 0.047 | 472.71 |
| 10/2/2021 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1734 | 1567.611111 | 37622.66667 | 1.49343E+11 | 122273.6667 | 3.25 | 0.047 | 5,746.86 |
| 10/2/2021 0:00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 14 | 13.95833333 | 335 | 1336583633 | 1088.75 | 3.25 | 0.047 | 51.17 |
| 10/2/2021 0:00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 Pro 110TH | 267 | 252.875 | 6069 | 2795910.1459 | 19724.25 | 3.25 | 0.047 | 927.04 |
| 10/2/2021 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1996 | 1976.506944 | 47436.16667 | 1.889E+11 | 154167.5417 | 3.25 | 0.047 | 7,245.87 |
| 10/2/2021 0:00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 129 | 128.8541667 | 3092.5 | 12335176627 | 10050.625 | 3.25 | 0.047 | 472.38 |
| 10/3/2021 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 238 | 228.6111111 | 5486.666667 | 21724316630 | 17831.66667 | 3.25 | 0.047 | 838.09 |
| 10/3/2021 0:00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 129 | 128.2361111 | 3077.666667 | 12274347131 | 10002.41667 | 3.25 | 0.047 | 470.11 |
| 10/3/2021 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1996 | 1971.631944 | 47319.16667 | 1.88411E+11 | 153787.2917 | 3.25 | 0.047 | 7,228.00 |
| 10/3/2021 0:00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 Pro 110TH | 267 | 252.0069444 | 6048.166667 | 27867004760 | 19656.54167 | 3.25 | 0.047 | 923.86 |
| 10/3/2021 0:00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1734 | 1560.75 | 37458 | 1.48671E+11 | 121738.5 | 3.25 | 0.047 | 5,721.71 |
| 10/3/2021 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 14 | 14 | 336 | 1340016607 | 1092 | 3.25 | 0.047 | 51.32 |
| 10/3/2021 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 238 | 227.9583333 | 5471 | 2166497012 | 17780.75 | 3.25 | 0.047 | 835.70 |
| 10/4/2021 0:00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 Pro 110TH | 267 | 252.2708333 | 6054.5 | 2789280737 | 19677.125 | 3.25 | 0.047 | 924.82 |
| 10/4/2021 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1996 | 1963.192857 | 47116.62857 | 1.87607E+11 | 153129.0429 | 3.25 | 0.047 | 7,197.07 |
| 10/4/2021 0:00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 Pro 110TH | 238 | 227.5357143 | 5460.857143 | 21627299645 | 17747.78571 | 3.25 | 0.047 | 6,391.17 |
| 10/4/2021 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 14 | 13.93055556 | 335.3333333 | 1340144260 | 1091.458333 | 3.25 | 0.047 | 51.30 |
| 10/4/2021 0:00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1734 | 1556.734177 | 37361.61905 | 1.48273E+11 | 121425.2619 | 3.25 | 0.047 | 5,706.99 |
| 10/4/2021 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 129 | 128.867063 | 3092.809524 | 12335018364 | 10051.63095 | 3.25 | 0.047 | 472.43 |
| 10/5/2021 0:00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 238 | 226.6875 | 5440.5 | 21536835015 | 17681.625 | 3.25 | 0.047 | 831.04 |
| 10/5/2021 0:00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 14 | 14 | 336 | 1339333590 | 1092 | 3.25 | 0.047 | 51.32 |
| 10/5/2021 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1734 | 1552.618056 | 37262.83333 | 1.4788E+11 | 121104.2083 | 3.25 | 0.047 | 5,691.90 |
| 10/5/2021 0:00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 Pro 110TH | 267 | 251.2638889 | 6030.333333 | 27781255627 | 19598.58333 | 3.25 | 0.047 | 921.13 |
| 10/5/2021 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1996 | 1904.465278 | 45707.16667 | 1.81583E+11 | 148548.2917 | 3.25 | 0.047 | 6,981.77 |
| 10/5/2021 0:00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 129 | 128.9722222 | 3095.333333 | 12345082142 | 10059.83333 | 3.25 | 0.047 | 472.81 |
| 10/6/2021 0:00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 14 | 13.98611111 | 335.6666667 | 1339323954 | 1090.916667 | 3.25 | 0.047 | 51.27 |
| 10/6/2021 0:00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 129 | 128.9652778 | 3095.166667 | 12345355242 | 10059.29167 | 3.25 | 0.047 | 472.79 |
| 10/6/2021 0:00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1996 | 1953.701389 | 46888.83333 | 1.86683E+11 | 152388.7083 | 3.25 | 0.047 | 7,162.27 |
| 10/6/2021 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1734 | 1545.625 | 37095 | 1.472E+11 | 120558.75 | 3.25 | 0.047 | 5,666.26 |
| 10/6/2021 0:00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 238 | 223.9375 | 5374.5 | 2127081458 | 17467.125 | 3.25 | 0.047 | 820.95 |
| 10/6/2021 0:00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 Pro 110TH | 267 | 248.9305556 | 5974.333333 | 27551963158 | 19416.58333 | 3.25 | 0.047 | 912.58 |
| 10/7/2021 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 238 | 221.9722222 | 5327.333333 | 21089934555 | 17313.83333 | 3.25 | 0.047 | 51.27 |
| 10/7/2021 0:00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 14 | 13.98611111 | 335.6666667 | 1338946852 | 1090.916667 | 3.25 | 0.047 | 51.27 |
| 10/7/2021 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1734 | 1543.25 | 37038 | 1.47004E+11 | 120373.5 | 3.25 | 0.047 | 5,657.55 |
| 10/7/2021 0:00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 Pro 110TH | 267 | 247.0347222 | 5928.833333 | 27339151947 | 19268.70833 | 3.25 | 0.047 | 905.63 |
| 10/7/2021 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1996 | 1891.0625 | 45385.5 | 1.79647E+11 | 147502.875 | 3.25 | 0.047 | 6,932.64 |
| 10/7/2021 0:00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 129 | 128 | 3072 | 12249093059 | 9984 | 3.25 | 0.047 | 469.25 |
| 10/7/2021 0:00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 14 | 14 | 336 | 1341234324 | 1092 | 3.25 | 0.047 | 51.32 |
| 10/8/2021 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1734 | 1537.847222 | 36908.33333 | 1.4649E+11 | 119952.0833 | 3.25 | 0.047 | 5,637.75 |
| 10/8/2021 0:00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 Pro 110TH | 129 | 127.9583333 | 3071 | 12248155679 | 9980.75 | 3.25 | 0.047 | 469.10 |
| 10/8/2021 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1996 | 1942.569444 | 46621.66667 | 1.8560E+11 | 151520.4167 | 3.25 | 0.047 | 7,121.46 |
| 10/8/2021 0:00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 Pro 110TH | 267 | 245.2638889 | 5886.333333 | 27144175052 | 19130.58333 | 3.25 | 0.047 | 899.14 |
| 10/8/2021 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 238 | 215.9027778 | 5181.666667 | 20532582675 | 16840.41667 | 3.25 | 0.047 | 791.50 |
| 10/8/2021 0:00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 238 | 227.6527778 | 5463.666667 | 21648362770 | 17756.91667 | 3.25 | 0.047 | 834.58 |
| 10/9/2021 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 14 | 13.95833333 | 335 | 1336682139 | 1088.75 | 3.25 | 0.047 | 51.17 |
| 10/9/2021 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1734 | 1527.534722 | 36660.83333 | 1.45517E+11 | 119147.7083 | 3.25 | 0.047 | 5,599.94 |
| 10/9/2021 0:00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 Pro 110TH | 267 | 247.0486111 | 5929.166667 | 27344489732 | 19269.79167 | 3.25 | 0.047 | 905.68 |
| 10/9/2021 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1996 | 1957.680556 | 46984.33333 | 1.87047E+11 | 152699.0833 | 3.25 | 0.047 | 7,376.86 |
| 10/9/2021 0:00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 129 | 127.5694444 | 3061.666667 | 12212373166 | 9950.416667 | 3.25 | 0.047 | 467.67 |

| Date | Time | Location | | | | Miner | n1 | n2 | n3 | n4 | n5 | n6 | n7 | Rate1 | Rate2 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/10/2021 | 0:00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 14 | 14 | | 336 | 1339975253 | 1225253457 | 9983.916667 | 3.25 | 0.047 | 51.32 |
| 10/10/2021 | 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 129 | 127.9861111 | 1956.291667 | 3071.666667 | 46951 | 1252510653 | 18179.75 | 3.25 | 0.047 | 469.20 |
| 10/10/2021 | 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1996 | 1956.291667 | | 46951 | 1.86925E+11 | 152590.75 | | 3.25 | 0.047 | 7171.77 |
| 10/10/2021 | 0:00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1734 | 1515.125 | 36363 | 1.44337E+11 | 11818179.75 | 11691.375 | | 3.25 | 0.047 | 831.49 |
| 10/10/2021 | 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 238 | 226.8125 | 5443.5 | 2158408507 | 2725209567 | 19202.625 | | 3.25 | 0.047 | 902.52 |
| 10/10/2021 | 0:00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 Pro 110TH | 267 | 246.1875 | 5908.5 | 2725209567 | 17694.08333 | | | 3.25 | 0.047 | 831.62 |
| 10/11/2021 | 0:00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 14 | 14 | 336 | 1339922798 | 1092 | | | 3.25 | 0.047 | 51.32 |
| 10/11/2021 | 0:00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1734 | 1518.729167 | 36449.5 | 1.44668E+11 | 118460.875 | | | 3.25 | 0.047 | 5567.66 |
| 10/11/2021 | 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 Pro 110TH | 267 | 242.7222222 | 5825.333333 | 2686080727 | 18932.33333 | | | 3.25 | 0.047 | 889.82 |
| 10/11/2021 | 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1995.25 | 1958.888889 | 47013.33333 | 1.87146E+11 | 152793.3333 | | | 3.25 | 0.047 | 7181.29 |
| 10/11/2021 | 0:00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 129.75 | 128.6388889 | 3087.333333 | 1230937723 | 10033.83333 | | | 3.25 | 0.047 | 471.59 |
| 10/12/2021 | 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1987.75 | 1970.631944 | 47295.16667 | 2162793957 | 153709.2917 | | | 3.25 | 0.047 | 7224.34 |
| 10/12/2021 | 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 14 | 13.98611111 | 335.6666667 | 1339970751 | 1090.916667 | | | 3.25 | 0.047 | 51.27 |
| 10/12/2021 | 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 238 | 227.9375 | 5470.5 | 2168112296 | 17779.125 | | | 3.25 | 0.047 | 835.62 |
| 10/12/2021 | 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 137.25 | 136.9861111 | 3287.666667 | 1311146020 | 10684.91667 | | | 3.25 | 0.047 | 502.19 |
| 10/12/2021 | 0:00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 Pro 110TH | 1734 | 1563.847222 | 37532.33333 | 1.48982E+11 | 121980.0833 | | | 3.25 | 0.047 | 5733.06 |
| 10/12/2021 | 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 267 | 243.2361111 | 5837.666667 | 2691835729 | 18972.41667 | | | 3.25 | 0.047 | 891.70 |
| 10/13/2021 | 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 238 | 227.2902778 | 5454.966667 | 2162793957 | 77728.64167 | | | 3.25 | 0.047 | 833.25 |
| 10/13/2021 | 0:00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 14 | 13.99305556 | 335.8333333 | 1340286795 | 1091.458333 | | | 3.25 | 0.047 | 51.30 |
| 10/13/2021 | 0:00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 Pro 110TH | 1734 | 1597.930556 | 38350.33333 | 1.52242E+11 | 124638.5833 | | | 3.25 | 0.047 | 5858.01 |
| 10/13/2021 | 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 Pro 110TH | 267 | 242.6208333 | 5822.9 | 2682344422 | 18924.425 | | | 3.25 | 0.047 | 889.45 |
| 10/13/2021 | 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1988 | 1967.95 | 47230.8 | 1.18002E+11 | 153500.1 | | | 3.25 | 0.047 | 7214.50 |
| 10/13/2021 | 0:00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 137 | 136.9652778 | 3287.166667 | 1310898484 | 10683.29167 | | | 3.25 | 0.047 | 51.32 |
| 10/14/2021 | 0:00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1734 | 1615.402778 | 38769.66667 | 1311227063 | 126001.4167 | | | 3.25 | 0.047 | 5922.07 |
| 10/14/2021 | 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 137 | 137 | 3288 | 13112270638 | 10686 | | | 3.25 | 0.047 | 502.24 |
| 10/14/2021 | 0:00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 Pro 110TH | 267 | 242.7847222 | 5826.833333 | 2682750407 | 18937.20833 | | | 3.25 | 0.047 | 890.05 |
| 10/14/2021 | 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 14 | 14 | 336 | 1340229033 | 1092 | | | 3.25 | 0.047 | 51.32 |
| 10/15/2021 | 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 238 | 223.0555556 | 5353.333333 | 2330796727 | 17398.33333 | | | 3.25 | 0.047 | 817.72 |
| 10/15/2021 | 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1988 | 1908.506944 | 45804.16667 | 1.82113E+11 | 148863.5417 | | | 3.25 | 0.047 | 6996.59 |
| 10/15/2021 | 0:00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 Pro 110TH | 137 | 136.8541667 | 3284.5 | 1309676226 | 15252.0333 | | | 3.25 | 0.047 | 501.71 |
| 10/15/2021 | 0:00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1988 | 1955.388889 | 46929.33333 | 1.87137E+11 | 19197.75 | | | 3.25 | 0.047 | 7168.46 |
| 10/15/2021 | 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 Pro 110TH | 267 | 1627.013889 | 5907 | 2719786074 | 1260970833 | | | 3.25 | 0.047 | 902.29 |
| 10/16/2021 | 0:00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 238 | 246.125 | 336 | 1341501287 | 1092 | | | 3.25 | 0.047 | 5964.63 |
| 10/16/2021 | 0:00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 14 | 14 | 5305.166667 | 2114786928 | 1241.79167 | | | 3.25 | 0.047 | 51.32 |
| 10/16/2021 | 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 238 | 221.0486111 | 39357.83333 | 1.56242E+11 | 127912.9583 | | | 3.25 | 0.047 | 810.36 |
| 10/16/2021 | 0:00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1734 | 1639.909722 | 5210.166667 | 20780568027 | 16933.04167 | | | 3.25 | 0.047 | 6011.91 |
| 10/16/2021 | 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 267 | 217.0902778 | 5910.166667 | 27218444613 | 19208.04167 | | | 3.25 | 0.047 | 795.85 |
| 10/16/2021 | 0:00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 Pro 110TH | 1988 | 246.2569444 | 46575.66667 | 1.86522E+11 | 15202.09167 | | | 3.25 | 0.047 | 902.78 |
| 10/16/2021 | 0:00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 137 | 1948.986111 | 3261.5 | 13007842606 | 10599.875 | | | 3.25 | 0.047 | 7144.98 |
| 10/17/2021 | 0:00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 238 | 135.8958333 | 328.6666667 | 1310947561 | 1068.166667 | | | 3.25 | 0.047 | 498.19 |
| 10/17/2021 | 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 14 | 13.69444444 | 5352.833333 | 21344210677 | 7396.70833 | | | 3.25 | 0.047 | 50.20 |
| 10/17/2021 | 0:00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 238 | 223.0347222 | 332.3333333 | 1265095672 | 1080.083333 | | | 3.25 | 0.047 | 817.65 |
| 10/17/2021 | 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 14 | 13.84722222 | 39196.33333 | 1.5558E+11 | 127288.0833 | | | 3.25 | 0.047 | 50.76 |
| 10/17/2021 | 0:00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1734 | 1633.180556 | 5919.333333 | 27264631953 | 19237.83333 | | | 3.25 | 0.047 | 5987.24 |
| 10/17/2021 | 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 Pro 110TH | 267 | 246.6388889 | 47024.33333 | 1.87515E+11 | 152829.0833 | | | 3.25 | 0.047 | 904.18 |
| 10/18/2021 | 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1988 | 1959.347222 | 3263.833333 | 1301271972 | 10607.45833 | | | 3.25 | 0.047 | 7182.97 |
| 10/18/2021 | 0:00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 Pro 110TH | 137 | 135.9930556 | 5923.5 | 27285310946 | 19251.375 | | | 3.25 | 0.047 | 498.55 |
| 10/18/2021 | 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 267 | 246.8125 | 5420.666667 | 2157415934 | 7617.16667 | | | 3.25 | 0.047 | 904.81 |
| 10/18/2021 | 0:00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 238 | 225.8611111 | 39042.16667 | 1.54948E+11 | 126887.0417 | | | 3.25 | 0.047 | 828.01 |
| 10/18/2021 | 0:00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1734 | 1626.756944 | 47009.5 | 1.86709E+11 | 157780.875 | | | 3.25 | 0.047 | 5963.69 |
| 10/18/2021 | 0:00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1988 | 1958.729167 | 3241.666667 | 1292826790 | 10535.41667 | | | 3.25 | 0.047 | 7180.70 |
| 10/18/2021 | 0:00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 137 | 135.0694444 | 335.6666667 | 1339650918 | 1090.916667 | | | 3.25 | 0.047 | 495.16 |
| 10/19/2021 | 0:00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 137 | 13.98611111 | 335.6666667 | 1301271972 | 1090.916667 | | | 3.25 | 0.047 | 51.27 |
| 10/19/2021 | 0:00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 137 | 135.9097222 | 3261.833333 | 1308108933 | 10600.95833 | | | 3.25 | 0.047 | 498.25 |

| Date | | Location | | | | Device | Qty | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/19/2021 | 0.00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1988 | 1954.819444 | 247.2222222 | 46915.66667 | 1.870944E+11 | 152475.9167 | 3.25 | 0.047 | 7,166.37 |
| 10/19/2021 | 0.00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 Pro 110TH | 267 | 247.2222222 | 5933.333333 | 7236.304716 | 19283.33333 | 126380.0417 | 3.25 | 0.047 | 906.32 |
| 10/19/2021 | 0.00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1734 | 1620.256944 | 38886.16667 | 1.54346E+11 | 126380.0417 | | 3.25 | 0.047 | 5,399.86 |
| 10/19/2021 | 0.00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 14 | 14 | 336 | 1340.131985 | 1092 | | 3.25 | 0.047 | 51.32 |
| 10/19/2021 | 0.00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 238 | 224.4305556 | 5386.333333 | 21447183206 | 17505.58333 | | 3.25 | 0.047 | 822.76 |
| 10/20/2021 | 0.00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 Pro 110TH | 267 | 247.4305556 | 5938.333333 | 27347902975 | 19299.58333 | | 3.25 | 0.047 | 907.08 |
| 10/20/2021 | 0.00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1734 | 1613.930556 | 38734.33333 | 1.5373E+11 | 125886.5833 | | 3.25 | 0.047 | 5,916.67 |
| 10/20/2021 | 0.00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 238 | 224.3402778 | 5384.166667 | 21435840085 | 17498.54167 | | 3.25 | 0.047 | 822.43 |
| 10/20/2021 | 0.00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1988 | 1957.895833 | 46989.5 | 1.87391E+11 | 152715.875 | | 3.25 | 0.047 | 7,177.65 |
| 10/20/2021 | 0.00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 137 | 135.8888889 | 3261.333333 | 13010611472 | 10599.33333 | | 3.25 | 0.047 | 498.17 |
| 10/20/2021 | 0.00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 238 | 14 | 336 | 1340562549 | 1092 | | 3.25 | 0.047 | 51.32 |
| 10/21/2021 | 0.00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 238 | 223.3541667 | 5360.5 | 21343221121 | 17421.625 | | 3.25 | 0.047 | 818.82 |
| 10/21/2021 | 0.00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 14 | 14 | 336 | 1340117846 | 1092 | | 3.25 | 0.047 | 51.32 |
| 10/21/2021 | 0.00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1734 | 1611.805556 | 38683.33333 | 1.5353E+11 | 125720.8333 | | 3.25 | 0.047 | 5,908.88 |
| 10/21/2021 | 0.00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 Pro 110TH | 267 | 264.6458333 | 5895.5 | 27147324732 | 19160.375 | | 3.25 | 0.047 | 900.54 |
| 10/21/2021 | 0.00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1988 | 1953.402778 | 46881.66667 | 1.86936E+11 | 152365.4167 | | 3.25 | 0.047 | 7,161.17 |
| 10/21/2021 | 0.00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 137 | 135.8888889 | 3261.333333 | 13005915310 | 10599.33333 | | 3.25 | 0.047 | 498.17 |
| 10/22/2021 | 0.00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1734 | 1612.125 | 38691 | 1.5355E+11 | 125745.75 | | 3.25 | 0.047 | 5,910.05 |
| 10/22/2021 | 0.00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 137 | 135.9166667 | 3262 | 13011583519 | 10601.5 | | 3.25 | 0.047 | 498.27 |
| 10/22/2021 | 0.00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 Pro 110TH | 267 | 246.4305556 | 5914.333333 | 27235558054 | 19221.58333 | | 3.25 | 0.047 | 903.41 |
| 10/22/2021 | 0.00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 14 | 14 | 336 | 1339720027 | 1092 | | 3.25 | 0.047 | 51.32 |
| 10/22/2021 | 0.00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 238 | 224.6597222 | 5391.833333 | 21459111805 | 17523.45833 | | 3.25 | 0.047 | 823.60 |
| 10/22/2021 | 0.00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 137 | 1922.736111 | 46145.66667 | 1.8363E+11 | 149973.4167 | | 3.25 | 0.047 | 7,048.75 |
| 10/23/2021 | 0.00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1988 | 135.9669123 | 3263.157895 | 13017648531 | 10605.26316 | | 3.25 | 0.047 | 498.45 |
| 10/23/2021 | 0.00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1734 | 1956.315789 | 46951.57895 | 1.87244E+11 | 152592.6316 | | 3.25 | 0.047 | 7,171.85 |
| 10/23/2021 | 0.00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 Pro 110TH | 267 | 247.7807018 | 5946.736842 | 27357521756 | 19326.89474 | | 3.25 | 0.047 | 908.36 |
| 10/23/2021 | 0.00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1734 | 1620.026316 | 38880.63158 | 1.54291E+11 | 126362.0526 | | 3.25 | 0.047 | 5,399.02 |
| 10/23/2021 | 0.00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 238 | 225.9122807 | 5421.894737 | 21591435249 | 17621.15789 | | 3.25 | 0.047 | 828.19 |
| 10/24/2021 | 0.00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 14 | 14 | 336 | 1340398741 | 1092 | | 3.25 | 0.047 | 51.32 |
| 10/24/2021 | 0.00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 238 | 224.7222222 | 5393.333333 | 21462689794 | 17528.33333 | | 3.25 | 0.047 | 823.83 |
| 10/24/2021 | 0.00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 137 | 135.8055556 | 3259.333333 | 13000830946 | 10592.83333 | | 3.25 | 0.047 | 497.86 |
| 10/24/2021 | 0.00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1988 | 1961.722222 | 47081.33333 | 1.87765E+11 | 153014.3333 | | 3.25 | 0.047 | 7,191.67 |
| 10/24/2021 | 0.00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 14 | 14 | 336 | 13411434626 | 1092 | | 3.25 | 0.047 | 51.32 |
| 10/24/2021 | 0.00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 Pro 110TH | 267 | 240.25 | 5766 | 26520684368 | 18739.5 | | 3.25 | 0.047 | 880.76 |
| 10/25/2021 | 0.00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1734 | 1607.388889 | 38577.33333 | 1.53115E+11 | 125376.3333 | | 3.25 | 0.047 | 5,892.69 |
| 10/25/2021 | 0.00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 238 | 225.5 | 5412 | 21544277337 | 17589 | | 3.25 | 0.047 | 826.68 |
| 10/25/2021 | 0.00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1734 | 13.98263889 | 335.5833333 | 13377218840 | 1090.645833 | | 3.25 | 0.047 | 51.26 |
| 10/25/2021 | 0.00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 Pro 110TH | 267 | 1609.194444 | 3620.66667 | 1.53294E+11 | 12551.71667 | | 3.25 | 0.047 | 5,899.31 |
| 10/25/2021 | 0.00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 137 | 243.6875 | 5848.5 | 26882781875 | 19007.625 | | 3.25 | 0.047 | 893.36 |
| 10/25/2021 | 0.00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 238 | 1960.229167 | 47045.5 | 1.8759E+11 | 152897.875 | | 3.25 | 0.047 | 7,186.20 |
| 10/26/2021 | 0.00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 137 | 135.9444444 | 3262.666667 | 13017748072 | 10603.66667 | | 3.25 | 0.047 | 498.37 |
| 10/26/2021 | 0.00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 Pro 110TH | 1734 | 1605.636111 | 38535.26667 | 1.52935E+11 | 15239.6167 | | 3.25 | 0.047 | 5,886.26 |
| 10/26/2021 | 0.00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 137 | 135.9236111 | 3262.166667 | 13011175459 | 10602.04167 | | 3.25 | 0.047 | 498.30 |
| 10/26/2021 | 0.00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 238 | 244.7291667 | 5873.5 | 27012229972 | 19088.875 | | 3.25 | 0.047 | 897.18 |
| 10/26/2021 | 0.00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 14 | 14 | 336 | 1341166344 | 1092 | | 3.25 | 0.047 | 51.32 |
| 10/27/2021 | 0.00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 238 | 225.8263889 | 5419.833333 | 21574590165 | 17614.45833 | | 3.25 | 0.047 | 827.88 |
| 10/27/2021 | 0.00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1988 | 1741.313889 | 41791.53333 | 1.66442E+11 | 13582.4833 | | 3.25 | 0.047 | 6,383.66 |
| 10/27/2021 | 0.00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 238 | 225.9236111 | 5422.166667 | 21585649345 | 17622.04167 | | 3.25 | 0.047 | 828.24 |
| 10/27/2021 | 0.00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 14 | 14 | 336 | 1340210686 | 1092 | | 3.25 | 0.047 | 51.32 |
| 10/27/2021 | 0.00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 Pro 110TH | 1734 | 1603.409722 | 38481.83333 | 1.52702E+11 | 125065.9583 | | 3.25 | 0.047 | 5,878.10 |
| 10/27/2021 | 0.00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 Pro 110TH | 267 | 247.8125 | 5947.5 | 27324226780 | 19329.375 | | 3.25 | 0.047 | 908.48 |
| 10/28/2021 | 0.00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1988 | 1960.111111 | 47042.66667 | 1.87598E+11 | 152888.6667 | | 3.25 | 0.047 | 7,185.77 |
| 10/28/2021 | 0.00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 137 | 135.9513889 | 3262.833333 | 13011964074 | 10604.20833 | | 3.25 | 0.047 | 498.40 |
| 10/28/2021 | 0.00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 137 | 136 | 3264 | 13018864735 | 10608 | | 3.25 | 0.047 | 498.58 |
| 10/28/2021 | 0.00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 238 | 225.9444444 | 5422.666667 | 21592733827 | 17623.66667 | | 3.25 | 0.047 | 828.31 |

| Date | | Location | | | | Product | Qty | Avg Qty | Miner Hrs | Col K | Col L | kWh | Rate | $/kWh | Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/28/2021 | 0.00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 14 | 14 | 336 | 1340457921 | 1.87217E+11 | 1092 | 3.25 | 0.047 | 51.32 |
| 10/28/2021 | 0.00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1988 | 1956.243056 | 46949.83333 | 27163421210 | 1.52465E+11 | 152586.9583 | 3.25 | 0.047 | 7,171.59 |
| 10/28/2021 | 0.00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1734 | 1601.4375 | 38434.5 | 21569583637 | 124912.125 | | 3.25 | 0.047 | 5,870.87 |
| 10/28/2021 | 0.00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 Pro 110TH | 267 | 246.4166667 | 5914 | 1341012724 | 19220.5 | | 3.25 | 0.047 | 903.36 |
| 10/29/2021 | 0.00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 238 | 225.7395833 | 5417.75 | 21569583637 | 17607.6875 | | 3.25 | 0.047 | 827.56 |
| 10/29/2021 | 0.00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 14 | 14 | 336 | 1341012724 | 1092 | | 3.25 | 0.047 | 51.32 |
| 10/29/2021 | 0.00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 Pro 110TH | 1734 | 1606.232639 | 38549.58333 | 1.52953E+11 | 125286.1458 | | 3.25 | 0.047 | 5,888.45 |
| 10/29/2021 | 0.00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 Pro 110TH | 267 | 244.9305556 | 5878.333333 | 26988652498 | 19104.58333 | | 3.25 | 0.047 | 897.92 |
| 10/29/2021 | 0.00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1988 | 1955.1875 | 46924.5 | 1.87122E+11 | 152504.625 | | 3.25 | 0.047 | 7,167.72 |
| 10/29/2021 | 0.00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 137 | 135.9444444 | 3262.666667 | 13012214717 | 10603.66667 | | 3.25 | 0.047 | 498.37 |
| 10/30/2021 | 0.00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 137 | 135.9722222 | 3263.333333 | 13012032641 | 10605.83333 | | 3.25 | 0.047 | 498.47 |
| 10/30/2021 | 0.00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 238 | 225.0208333 | 5400.5 | 21501107304 | 17551.625 | | 3.25 | 0.047 | 824.93 |
| 10/30/2021 | 0.00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 14 | 14 | 336 | 1341354136 | 1092 | | 3.25 | 0.047 | 51.32 |
| 10/30/2021 | 0.00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 Pro 110TH | 1734 | 1619.541667 | 38869 | 1.54212E+11 | 126324.25 | | 3.25 | 0.047 | 5,937.24 |
| 10/30/2021 | 0.00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1988 | 1954.95 | 46918.8 | 1.87091E+11 | 152486.1 | | 3.25 | 0.047 | 7,166.85 |
| 10/31/2021 | 0.00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 Pro 110TH | 267 | 244.5555556 | 5869.333333 | 26957012443 | 19075.33333 | | 3.25 | 0.047 | 896.54 |
| 10/31/2021 | 0.00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 137 | 135.9513889 | 3262.833333 | 13015743487 | 10604.20833 | | 3.25 | 0.047 | 498.40 |
| 10/31/2021 | 0.00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 238 | 224.9236111 | 5398.166667 | 21490703524 | 17544.04167 | | 3.25 | 0.047 | 824.57 |
| 10/31/2021 | 0.00 | Dalton 2 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 14 | 13.98611111 | 335.6666667 | 1339266171 | 1090.916667 | | 3.25 | 0.047 | 51.27 |
| 10/31/2021 | 0.00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1734 | 1621.736111 | 38921.66667 | 1.54384E+11 | 126495.4167 | | 3.25 | 0.047 | 5,945.28 |
| 10/31/2021 | 0.00 | Calvert City 1 | AC Managed | AC Managed | HOSTED | Antminer S19 Pro 110TH | 267 | 244.9444444 | 5878.666667 | 27005891898 | 19105.66667 | | 3.25 | 0.047 | 897.97 |
| 10/31/2021 | 0.00 | Dalton 1 | AC Managed | AC Managed | HOSTED | Antminer S19 95TH | 1988 | 1959.326389 | 47023.83333 | 1.87536E+11 | 152827.4583 | | 3.25 | 0.047 | 7,182.89 |
| **Total** | | | | | | | | | | | | | | | **472,031.02** |