IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Core Scientific, Inc., *et al.*[1] | § | Case No. 22-90341 |
| | § | |
| Debtors. | § | Jointly Administered |

**OBJECTION TO THE MOTION OF THE DEBTORS FOR
ORDER EXTENDING EXCLUSIVE PERIODS PURSUANT TO
SECTION 1121(D) OF THE BANKRUPTCY CODE**

Wingspire Equipment Finance LLC f/k/a Liberty Commercial Finance LLC, Prime Alliance Bank, Inc., and 36th Street Capital Partners, LLC (the "***Objectors***"), creditors in these chapter 11 cases holding claims secured by equipment collateral, hereby file this objection (this "***Objection***")[2] to the *Motion of the Debtors for Order Extending Exclusive Periods Pursuant to Section 1121(d) of the Bankruptcy Code* [Doc. No. 773] (the "***Exclusivity Motion***")[3] and, in support thereof, respectfully state as follows:

**PRELIMINARY STATEMENT**

1. While the Debtors boast that in the four (4) months since the Petition Date, they have secured final post-petition financing, addressed certain hosting issues, settled material financial disputes with certain creditors, and initiated targeted sale proceedings, the Debtors have

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisitions, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisition I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

[2] The Exclusivity Motion's notice caption provides negative notice language and states that any response must specifically answer each paragraph of the pleading. This Objection does not specifically answer each paragraph of the Exclusivity Motion, but addresses the relief requested and the asserted basis therefore and otherwise complies with Local Rule 9013-1.

[3] Capitalized terms not otherwise defined herein have the meaning given them in the Exclusivity Motion.

Page 1

thus far failed to develop an exit strategy from these Chapter 11 cases. Though the Debtors do not even have a framework of a chapter 11 plan that can be discussed among their key constituents, they are now asking this Court to extend the Exclusive Periods because they have finally begun thinking about their go-forward Business Plan and exit from bankruptcy. The Debtors' delay in addressing the Business Plan—which Business Plan will likely be predicated, in part, on the currently favorable trends in bitcoin prices, hashrates, and utility prices, all while making potentially fatal assumptions that such factors will remain in the Debtors' favor through emergence from these chapter 11 cases—prejudices the very Equipment Lenders and other secured lenders that are and have been supporting these cases without postpetition payments.

2.  The Debtors predicate their requested extension of exclusivity on one erroneous and one incomplete premise: (a) contrary to the Debtors' assertion that their stakeholders will benefit from (and not be prejudiced by) the extension of the Exclusivity Period, the Equipment Lenders – on whose backs the Debtors are financing these cases – will be harmed by any extension of exclusivity; and (b) the Debtors are incomplete in their analysis when they claim to have "tens of millions of dollars of permanent outperformance" to finance a prolonged stay in chapter 11, when perhaps the primary reason they have the money to remain in chapter 11 is that they are using the Objectors' and Equipment Lenders' collateral to drive revenue by mining bitcoin without making any payments to these creditors. The Objectors and similarly situated creditors[4] cannot afford the Debtors' high stakes gamble of delaying their exit from these chapter 11 cases given the admittedly unpredictable nature of the bitcoin mining business.

3.  The Debtors repeatedly contend that the cryptocurrency mining business is volatile and success (or failure) is tied to the price of bitcoin, hashrates, and utility prices, none of

---

[4] The Objectors' collateral includes miners as well as other infrastructure equipment that enables the miners to operate.

which are stable, predictable, or impervious to external factors.[5]  Yet the tone of the Exclusivity Motion suggests that none of these factors will unexpectedly change or negatively impact the Debtors in the foreseeable future.  Indeed, in the Exclusivity Motion, the Debtors suggest, as though it is a foregone conclusion, that the price of bitcoin will continue rising, or at least maintain current pricing, while the Debtors finish developing a Business Plan (which they assert will be final "by mid to late April"), socialize the Business Plan among the key constituent groups (including Equipment Lenders), and eventually turn the Business Plan into a chapter 11 plan.

4.  What the Debtors leave unsaid, but which fact is critical, is that if the price of bitcoin declines or utility prices increase over the Debtors' proposed extension, the Debtors' Business Plan may be rendered obsolete.  And, during this passage of time, the Debtors will have been using the Objectors' collateral (without payment), forcing, in effect, the Objectors (and other, similarly situated creditors) to, in part, finance these chapter 11 cases without any benefit while bearing all the risk.  Further, the price of bitcoin, mining difficulty, or utility costs notwithstanding, the value of the Objectors' and all Equipment Lenders' collateral is necessarily deteriorating due to its continued use during the course of these chapter 11 cases.

5.  This Court itself has observed that all parties are better off the sooner the Debtors exit bankruptcy.  There is no good basis to extend the Exclusive Periods and allow the Debtors more time to develop an exit strategy from these chapter 11 cases when additional time may undercut a potentially stakeholder-friendly outcome.  Indeed, knowing the volatility and

---

[5] The value of the Equipment Lenders' collateral, in particular the miners, is tied directly to the price of cryptocurrency. Demand for miners increases as the cryptocurrency market turns favorable (i.e., the price of the underlying cryptocurrency increases and electricity costs decrease), so the value of the miners increases. Further, the reward for successfully mining blocks of transactions in the blockchain is the receipt of some number of bitcoin. So the higher the price of bitcoin, the more valuable is each successful mining; thereby, increasing the value of miners.

uncertainty of the cryptocurrency industry, creditors stand to suffer severe payment shortfalls.[6] By contrast, denial of the Exclusivity Motion does not prevent the Debtors from continuing to draft their Business Plan or proposing or soliciting a plan of reorganization. Accordingly, on the present facts, including the uncertainty of the future of the cryptocurrency market, the Debtors should not be permitted to extend their exclusive right to propose and confirm a plan of reorganization.

## FACTUAL BACKGROUND

### A. The anticipated timing of these chapter 11 cases.

6. On December 21, 2022 (the "**Petition Date**"), the Debtors each filed with this Court a voluntary case under chapter 11 of the Bankruptcy Code.

7. A first day hearing was held the very next day (the "**First Day Hearing**"), at which this Court considered, among other relief, approval of the Debtors' requested Original DIP Facility on an interim basis. At the First Day Hearing, the duration of these chapter 11 cases was discussed at length because, among other reasons, Equipment Lenders had raised their concerns that the proposed Original DIP Facility provided no cash payments to Equipment Lenders (or any other equipment lessors), despite the Debtors stated intent to use and derive revenue from the Equipment Lenders' (and other equipment lessors') collateral during the pendency of these chapter 11 cases.[7]

8. At the First Day Hearing, the Debtors represented that "we're contemplating a six-month case" *i.e.,* an exit in keeping with the original Exclusive Filing Period and Exclusive Solicitation Period—April 19, 2023, and June 19, 2023, respectively . *First Day*

---

[6] The Objectors acknowledge that the volatility could prove positive and bring further increases to the price of bitcoin or decreases in the cost of energy prices. However, the issue for the Objectors is that the uncertainty is being drawn out under extensions of the Exclusive Periods, which the Objectors and other Equipment Lenders are financing.

[7] On March 1, 2023, the Court entered the order approving the Replacement DIP Facility on a final basis. The Replacement DIP Facility likewise does not provide the Objectors or other Equipment Lenders with cash payments.

Page 4

*Hearing (Via Zoom)* [Doc. No. 225] (the "**Transcript**") p. 23, ¶ 15.  In response, the Court commented that "[a]ll I'm trying to convey is I do think that the company's better off, the employees are better off, the process is better off to the extent the company is going to survive, is that it get out sooner rather than later" and that the Court would be "prepared for a process that's quicker than the one outlined."  Transcript p. 25, ¶¶ 6-12.

9. On April 10, 2023, the Debtors filed the Exclusivity Motion seeking a ninety (90) day extension of both the Exclusive Filing Period and Exclusive Solicitation Period; thereby extending these cases through September 2023.  In their Exclusivity Motion, the Debtors leave open the possibility of seeking even further extensions (and delay).  As detailed below, the costs and risks of the Debtors' proposed extension will be borne by the Equipment Lenders.

**B.  Contributions of Equipment Lenders and other lessors to the Debtors' estates without compensation or assurance of repayment.**

10. The Objectors' specific relationships with the Debtors have been described previously in the Objectors' *Joinder in Reservation of Rights and Limited Objection of Barings BDC, Inc., Barings Capital Investment Corporation, and Barings Private Credit Corp. to the Emergency Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims With Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief* [Doc. No. 297] that the Objectors incorporate herein by reference.  The Objectors include certain Equipment Lenders and lessors of other infrastructure equipment (*e.g.*, PDUs, switches, and gears) critical to the operations and success of the Debtors' business.

11. The Objectors' and other Equipment Lenders' collateral is the miners and the equipment infrastructure that enables the miners to operate the Debtors' business, which equipment, collectively, is the source of the Debtors' most profitable business activities. Transcript p. 10, ¶¶ 7-9 ("[The Debtors'] most profitable business segment comes from mining bitcoin with machines that it owns that they're self-mining."). Despite the importance of this equipment to the Debtors and the Debtors' having "tens of millions of dollars of permanent outperformance" against budget, the Debtors have refused to make any payments to the Equipment Lenders, citing the adequacy of the Equipment Lenders' existing liens; the additional, junior liens provided under the Replacement DIP Facility; and increases in the price of bitcoin that protects the value of the Equipment Lenders' collateral. Equipment Lenders have not formally sought adequate protection payments because the value of their equipment has increased during this case notwithstanding the Debtors' continued use because of the increase in the value of bitcoin. Nevertheless, the combination of these facts—the lack of payments, continuing use of the Objector's equipment (including non-mining equipment), and volatility of the cryptocurrency market—is the cause of this Objection.

12. The combination of these facts—the lack of payments and volatility of the cryptocurrency market—is cause for serious concern when considering an extension of the Exclusive Periods because the Equipment Lenders will not receive regular payments from the Debtors, while at the same time being exposed to the market volatility of the Debtors' business (which may include the Debtors' strategic valuation of the collateral) for an even further extended period of time.

13. The lack of payments, continued use of the Objector's equipment, and the volatility issues, notwithstanding, the Equipment Lenders have worked cooperatively with the

Debtors throughout these cases. Indeed, the Debtors acknowledged at the First Day Hearing that the "the main players with whom [the Debtors] were negotiating pre-petition include the ad hoc convertible noteholders . . . as well as equipment lenders from a number of firms." Transcript p. 16, ¶¶ 16-19. As stated in the Exclusivity Motion, the Debtors identify the Equipment Lenders as a key creditor constituency with whom they remain in regular contact. *See* Exclusivity Motion, ¶ 49. Yet, the Debtors never sought approval from the Objectors or any of the Equipment Lenders for the extension requested therein—perhaps knowing that Equipment Lenders would object for the reasons set forth herein—and tellingly, the Equipment Lenders are not listed among those stakeholders in support of the Debtors' request to extend the Exclusive Periods. *See* Exclusivity Motion, ¶ 52.

### C. The Debtors' liquidity and progress in these chapter 11 cases.

14. The Debtors highlight the fact they have greatly out-performed their own projections as to their liquidity and value. *See* Exclusivity Motion, ¶¶ 2 and 50. While the Objectors agree the current improvement in the cryptocurrency industry is good news for the Debtors and their stakeholders, the Objectors cannot ignore—and nor should this Court—that the Debtors have achieved this, in substantial part, on the backs of Equipment Lenders and other lessors in refusing to make payments[8] to these critical stakeholders despite "operating ahead of budget, with tens of millions of dollars of permanent outperformance as compared to the budget initially included with the Replacement DIP Financing." *See* Exclusivity Motion, ¶ 50.

---

[8] The Objectors acknowledge that the Debtors are not, at this time, compelled to make payments to the Objectors or other creditors secured in equipment, and that the Debtors are choosing not to make these payments.

Page 7

**OBJECTION**

A. **The requested extension fails to balance the interests of the Debtors with those of its creditors.**

15. In support of the Exclusivity Motion, the Debtors conveniently emphasize only half of the legislative intent behind section 1121 of the Bankruptcy Code—their own interests. Notably, however, the legislative intent puts equal import and emphasis on protecting creditors' legitimate interests. H.R. Rep. No. 95-595, at 208 (1978); *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Inc.*), 808 F.2d 363, 372 (5th Cir. 1987), *aff'd* 484 U.S. 365 (1988) ("The bankruptcy court must avoid reinstituting the imbalance between the debtor and its creditors that characterized proceedings under the old Chapter XI. Section 1121 was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors."). Accordingly, the purpose of the flexibility of 1121 is the dual-goal of balancing the competing interests of the Debtors **and** their creditors. *In re Sw. Oil Co. of Jourdanton, Inc.*, 84 B.R. 448, 450 (Bankr. W.D. Tex. 1987) ("The 120-day exclusivity period then represents a compromise between the dual goals of giving the debtor time to reorganize and protecting the creditors' legitimate interests. A bankruptcy court, considering whether to extend the exclusivity period, should consider these twin legislative goals.").

16. The Debtors' request does not benefit the Equipment Lenders; rather, an extension of the Exclusive Periods holds them hostage, transfers the risk of a decline in the price of bitcoin or increase in mining difficulty to them, and further funds these chapter 11 cases through the Objectors' and other Equipment Lenders' collateral without making any payments. This request is tantamount to "delay that makes the creditors the hostages of the Chapter 11 debtor." *In re Timbers of Inwood Forest Assocs., Ltd.*, 808 F.2d at 372. Here, the creditors should not be held

hostage—unpaid and vulnerable to a volatile industry—while the Debtors' shore up cash reserves and determine how they want to exit these chapter 11 cases.

### B. The Debtors' do not demonstrate sufficient "cause" for the requested extension.

17. To support the Exclusivity Motion, the Debtors argue that the *Adelphia* factors support an extension of the Exclusive Periods and opine that courts regularly grant a debtor's first request for an extension of the exclusive period to file a chapter 11 plan. Exclusivity Motion ¶ 51 ("[t]his is the Debtors' first request to extend the Exclusive Periods and comes less than four months after the Petition Date."). But such conjecture is neither a factor nor the legal standard. *See In re Borders Grp., Inc.*, 460 B.R. at 821 ("Although this is the Debtors' first request to extend their Exclusive Periods, that fact, by itself, does not constitute cause for an extension."). Courts have discretion in determining what constitutes "cause." *See In re Borders Grp., Inc.*, 460 B.R. 818, 822 (Bankr. S.D.N.Y. 2011) (citations omitted). Extensions should "be granted neither routinely nor cavalierly." *In re McLean Indus., Inc.*, 87 B.R. 830 (Bankr. S.D.N.Y. 1987); *In re Sw. Oil Co. of Jourdanton, Inc.*, 84 B.R. 448, 450 (Bankr. W.D. Tex. 1987). The number of requests is not an enumerated factor and, by definition, any first request to extend the Exclusive Periods necessarily would have to be made in less than four (4) months after the Petition Date. Further, the most relevant of the *Adelphia* factors do not support the requested extension of the Exclusive Periods.

18. The Debtors tout the support of their stakeholders for the requested extensions. *See* Exclusivity Motion ¶ 52 ("**Indeed, each of the Replacement DIP Lender, the UCC, the Ad Hoc Noteholder Group, and the Equity Committee has no objection to and supports the Debtors' request to extend the Exclusive Periods**.") (emphasis in original). Notably absent from this list are the Equipment Lenders. The reason is twofold: *first*, the Debtors

never sought the Equipment Lenders' support. Indeed, despite regular weekly meetings between the Debtors and Equipment Lenders, support for the extension was neither requested nor discussed. *Second*, the other stakeholders who support the request to extend the Exclusive Period are benefitting from the status quo (because the Debtors are running "tens of millions of dollars of permanent outperformance" ahead of budget thanks to the Equipment Lenders' collateral) while the Equipment Lenders continue to involuntarily absorb the risk.

19. Additionally, the Debtors emphasize their enhanced liquidity and that they are paying administrative expenses as they come due and will continue to do so. In fact, "the Debtors are operating ahead of budget, with tens of millions of dollars of permanent outperformance as compared to the budget initially included with the Replacement DIP Financing." Exclusivity Motion ¶ 50. This heralded good fortune is not celebrated by all parties—to be sure, it is easy to increase cash reserves when not paying critical stakeholders.

20. Finally, the Debtors assert, "an extension of the Exclusive Periods, in each case, by 90-days is appropriate, in the best interest of the Debtors' stakeholders, and consistent with the intent and purpose of chapter 11 of the Bankruptcy Code. The requested extensions of the Exclusive Periods are necessary and appropriate to enable the Debtors to finalize the Business Plan and pursue a restructuring framework that will maximize the value of the Debtors' estates for the benefit of all stakeholders, without interruption." Exclusivity Motion ¶ 32. To be sure, the extension *may* maximize value for the benefit of *some* stakeholders *if* bitcoin prices remain stable along with key mining cost inputs. This benefit *may* inure to the Equipment Lenders who have seen the value of their collateral increase substantially throughout the course of these cases along with the price of bitcoin. But an extension of the Exclusive Periods necessarily comes with the risk that bitcoin prices will not harmonize with the Debtors optimistic tone. While the Debtors

state that they have "taken various actions they believe will significantly enhance the value of their estates going forward and/or resolve key issues" and believe they will be able to "engage in constructive negotiations over a consensual plan of reorganization" in the "near term," the longer the case continues—a direct outcome of the requested extension—the greater risk of a negative shift in the bitcoin market and the Equipment Lenders should not be forced to bear the risk of a negative shift in bitcoin prices for the extended Exclusive Periods without a corresponding premium paid for absorbing that risk.

21. The Debtors need to capitalize now on their good fortune and current position rather than extend these chapter 11 cases. The potential detriment to the stakeholders of spending more time in chapter 11 without a path forward outweighs the Debtors' request to extend the Exclusive Periods. A quick and focused exit from these chapter 11 cases is the best path for all parties.

WHEREFORE, the Objectors respectfully request that the Court enter an order:

1. denying the Debtors' Exclusivity Motion; and

2. granting them such other relief as may be appropriate and just.

Dated: May 1, 2023              Respectfully submitted,

**REED SMITH LLP**

By: */s/ Devan J. Dal Col*
Devan J. Dal Col (SBN 24116244)
REED SMITH LLP
2850 N. Harwood, Suite 1500
Dallas, Texas 75201
T: 469.680.4200
F: 469.680.4299
ddalcol@reedsmith.com
*Counsel for Wingspire Equipment Finance LLC f/k/a Liberty Commercial Finance LLC, Prime Alliance Bank, Inc., and 36th Street Capital Partners, LLC*

**CERTIFICATE OF SERVICE**

      I hereby certify that, on May 1, 2023, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on those parties registered to receive electronic notices.

                                             */s/ Devan J. Dal Col*
                                             Devan J. Dal Col