IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § | Chapter 11 |
| CORE SCIENTIFIC, INC., *et al.*, | § § § | Case No. 22-90341 (DRJ) |
| | § § | (Jointly Administered) |
| Debtors.[1] | § § § | |

**DEBTORS' OBJECTION TO PROOF OF CLAIM NOS. 503, 505, 506, 508, 570, 571, AND 572 FILED BY GEM MINING 1, LLC, GEM MINING 2B, LLC, GEM MINING 4, LLC, GEM MINING 2, LLC, GEM MINING 2, LLC, GEM MINING 2B, LLC, AND GEM MINING 4, LLC, RESPECTIVELY**

> **THIS IS AN OBJECTION TO YOUR CLAIMS. THIS OBJECTION ASKS THE COURT TO DISALLOW THE CLAIMS THAT YOU FILED IN THIS BANKRUPTCY CASE. YOU SHOULD IMMEDIATELY CONTACT THE OBJECTING PARTY TO RESOLVE THE DISPUTE. IF YOU DO NOT FILE A RESPONSE WITHIN 30 DAYS AFTER THE OBJECTION WAS SERVED ON YOU, YOUR CLAIMS MAY BE DISALLOWED WITHOUT A HEARING.**

Core Scientific Operating Company f/k/a Core Scientific, Inc. ("**Core**"),[2] and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), represent as follows in support of this claim objection (the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6074); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

[2] As discussed in the *Declaration of Michael Bros in Support of the Debtors' Chapter 11 Petitions and First Day Relief*, Dec. 21, 2022 (Dkt. No. 5), Core Scientific, Inc. changed its name to Core Scientific Operating Company in January 2022. *See id.* at ¶ 31. Therefore, any claims against Core Scientific, Inc. are more properly claims against Core Scientific Operating Company. The GEM POCs (as defined below) state that out of an abundance of caution GEM filed duplicate claims against the Core Scientific, Inc. and Core Scientific Operating Company, clarifying that GEM only seeks recovery once against the correct Debtor entity. Accordingly, the Debtors expect the true amount of claims asserted in the GEM POCs to be less than $7 million.

"**Objection**"), and request entry of an order, substantially in the form attached hereto as **Exhibit A** ("the **Proposed Order**") disallowing Proof of Claim Nos. 503, 505, 506, 508, 570, 571, and 572 (the "**GEM POCs**") filed by Gem Mining 1, LLC, Gem Mining 2B, LLC, Gem Mining 4, LLC, and Gem Mining 2, LLC (collectively, "**GEM**," and together with the Debtors, the "**Parties**") against Core:

### Preliminary Statement

1.      For nearly a year, consistent with the terms of the Hosting Agreements, Core has charged various GEM entities for, and GEM has paid, power-pass through charges ("**PPT**") in invoices issued to GEM. After months of performing consistent with that interpretation of the Hosting Agreements, however, GEM now opportunistically asserts in the GEM POCs that the Debtors may not charge, and GEM need not pay, such PPT amounts.

2.      But the GEM POCs are untethered from facts and applicable contract provisions. To be sure, GEM's claims (i) are time-barred under the terms of the Hosting Agreements, (ii) contradict a plain language interpretation of the Hosting Agreements (including Section 4(f) of the MSAs), and (iii) fail to recognize the industry standard and course of performance established between the Parties. The Court, therefore, should recognize the GEM POCs for what they are: an attempt to alter GEM's contractual obligation to pay PPT as required under the MSAs.[3]

3.      Contemporaneously with filing the GEM POCs, GEM also filed a motion to compel Core to assume or reject the Hosting Agreements. *See GEM Mining's Emergency*

---

[3] As the Court is aware, similar issues relating to PPT amounts have been briefed with respect to ongoing disputes between Core and Celsius Mining, LLC ("**Celsius**") regarding substantially similar language in Core's agreements with Celsius. To that end, the Debtors have addressed many of the issues raised by GEM in their objection to the Celsius POC (*see* Dkt. No. 819, Debtors' Objection to Proof of Claim Nos. 425 and 497 Filed by Celsius Mining LLC, *In re Core Scientific, Inc.*, No. 22-90341-11 (Bankr. S.D. Tex., Apr. 24, 2022)).

*Motion to Compel Assumption or Rejection of Executory Contracts or, in the Alternative, for Adequate Protection*, *In re Core Scientific, Inc.*, dated Apr. 13, 2023 (Dkt. No. 787) (the "**Motion to Compel**"). The Court entered an order on the same day the Motion to Compel was filed, ordering that: (i) if GEM made its April 21, 2023 payment, the Debtors shall continue to provide services to GEM pending further order of the Court; (ii) the Court shall conduct a hearing on May 22, 2023, at 10:30 a.m. (Central Time) to consider the Motion to Compel; and (iii) at the hearing, the Parties shall present at a minimum (a) all written communications concerning the events set forth in the Motion to Compel and (b) witness testimony concerning the alleged conversations that form the basis of the Motion to Compel. *See Order*, dated Apr. 13, 2023 (Dkt. No. 792). The Motion to Compel relates to the same Hosting Agreements at issue in the GEM POCs. Despite allegations in the Motion to Compel, the Debtors have performed, currently are performing, and will continue to perform under the Hosting Agreements unless and until such time as they either are terminated by their terms or rejected, as the case may be. The Debtors separately will respond to the Motion to Compel.

4. Nevertheless, given the interconnectedness of all claims between the Debtors and GEM relating to the Hosting Agreements, the Debtors submit that all claims raised in the GEM POCs and the Motion to Compel should be decided at one hearing before this Court at the May 22 hearing or such later date as may be appropriate. The Debtors plan to address summary disposition of key legal issues, including all arguments raised by the Debtors in this Objection at such hearing(s). Additionally, the Debtors anticipate that it may be appropriate, at a minimum, for the Court to hold a status conference at the hearing on the Motion to Compel to discuss the GEM POCs.

**Relief Requested**

5.      By this Objection, pursuant to sections 105(a) and 502(b) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 3007-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**"), the Debtors seek entry of the Proposed Order, disallowing the GEM POCs filed by GEM in their entirety because (i) to the extent certain of the claims are asserted against multiple Debtor entities, such claims are duplicates, (ii) all the claims are untimely per Section 3(a) of the MSAs (as defined below) because the GEM POCs seek reimbursement for prepetition amounts that are barred by the MSAs' three-day deadline to raise a dispute regarding invoiced amounts, and (iii) even if the invoice disputes were not untimely, GEM is not entitled to any recovery on its claims because the MSAs require GEM to pay PPT amounts, by both their plain language and interpretation in light of industry standards and the course of performance between the Parties.

**Jurisdiction and Venue**

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The relief requested herein is sought pursuant to §§ 105(a) and 502(b) the Bankruptcy Code, Bankruptcy Rule 3007, and Bankruptcy Local Rule 3007-1.

**Background**

*A.     The Hosting Agreements*

7.      Between February 2021 and July 2021, Core and various GEM entities entered into the following Master Services Agreements (collectively, the "**MSAs**"), which govern the Parties' relationship with respect to cryptocurrency equipment mining hosting (the "**Miners**") at Core's data centers and related services (the "**Services**"):

4

| MSA Date | GEM Counterparty | Associated GEM POC Nos. |
|---|---|---|
| February 5, 2021 | GEM Mining 1, LLC | 503 |
| May 24, 2021 | GEM Mining 2, LLC | 508, 570 |
| July 9, 2021 | GEM Mining 4, LLC | 506, 572 |
| July 16, 2021 | GEM Mining 2 B, LLC | 505, 571 |

8. The terms of each MSA are substantially similar. Pursuant to the MSAs, the Debtors and GEM executed numerous orders, which generally are governed by the terms of the applicable MSA except where expressly overridden by specific terms of the applicable order (the "**Orders**," together with the MSAs, the "**Hosting Agreements**"). True and correct copies of each of the MSAs and latest Order for each are attached to each of the GEM POCs. *See* GEM POC Nos. 503 Exhibit 1 at 7–16; 505 Exhibit 1 at 7–16; 506 Exhibit 1 at 7–16; 506 Exhibit 1 at 7–16; 508 Exhibit 1 at 7–16; 570 Exhibit 1 at 7–16; 571 Exhibit 1 at 7–16; and 572 Exhibit 1 at 7–16.

9. All the Hosting Agreements are governed by Delaware law and set forth the Parties' rights and obligations for the Services. Under the Hosting Agreements, GEM is obligated to pay a hosting fee rate per Miner, subject to the Debtors' right to pass through increases in electricity costs as an additional cost to host GEM's Miners. In addition, pursuant to each Order, GEM is required to prepay certain amounts in advance for future Services.

### B.  *GEM's Proofs of Claim*

10. GEM filed the GEM POCs on April 14, 2023.  GEM asserts claims totaling approximately $7 million across all the GEM POCs.[4]  A summary of the GEM POCs follows:

| GEM POC No. | Debtor Entity | GEM Entity | Amounts |
|---|---|---|---|
| 503 | Core Scientific, Inc. | GEM Mining 1, LLC | $560,253.50 |
| 505 | Core Scientific, Inc. | GEM Mining 2 B, LLC | $269,236 |
| 506 | Core Scientific, Inc. | GEM Mining 4, LLC | $403,278.13 |
| 508 | Core Scientific, Inc. | GEM Mining 2, LLC | $2,862,274.67 |
| 570 | Core Scientific Operating Company | GEM Mining 2, LLC | $2,862,274.67 |
| 571 | Core Scientific Operating Company | GEM Mining 2 B, LLC | $269,236 |
| 572 | Core Scientific Operating Company | GEM Mining 4, LLC | $403,278.13 |

11. In each of the GEM POCs, GEM asserted that each of the claims arose from Core charging the applicable GEM entity for PPT, which GEM asserts was "in contravention of the terms of the MSA."  *See* POC Nos. 503 at 5; 505 at 5; 506 at 5; 508 at 5; 570 at 5; 571 at 5; and 572 at 5.

### C.  *Hosting Agreement Terms & Parties' Course of Performance*

12. Prior to first raising this argument with respect to PPT in the GEM POCs, and consistent with the unambiguous terms of the MSAs and invoices issued pursuant to the Hosting Agreements, GEM paid the increased electricity costs associated with increased power

---

[4] As further discussed below, several of the GEM POCs are duplicative by GEM's own admission.  *See* GEM POC Nos. 503 at 5–6; 505 at 5–6; 506 at 5–6; 508 at 5–6; 570 at 5–6; 571 at 5–6; and 572 at 5–6.

6

costs charged by utility companies as passed through by the Debtors. Indeed, starting in July 2022, Core has included a specific line item for "Power Costs Pass-through" in each of the invoices issued pursuant to the Hosting Agreements, which each GEM entity has paid—both before and during these chapter 11 cases—without any objection or dispute. *See, e.g.*, GEM POC No. 572, Invoice No. 42594 dated July 15, 2022, at 56. For nearly a year, starting approximately in May 2022, Core has been charging—and GEM has been paying without dispute—the PPT. *See, e.g.*, *id.* (invoice for July 2022 showing PPT of $3,170.47 for May 2022 and $45,577.14 for June 2022). For instance, the following is a partial screen shot of GEM Mining 4, LLC's July 2022 invoice, which shows PPT charges of $3,170.47 for May 2022 and $45,577.14 for June 2022:



*Id.*

   13. The following chart lists invoiced PPT amounts per GEM entity, and the date of payment thereon:

| PPT Amount Per Invoice and Payment Date | | | GEM Entity Name | | | |
|---|---|---|---|---|---|---|
| Invoice Number | Invoice Date | Payment date | GEM Mining 1 LLC | GEM Mining 2 B LLC | GEM Mining 2 LLC | GEM Mining 4 LLC |
| INV42591 | 7/15/2022 | 8/31/2022 | $ 69,229.76 | | | |
| INV42592 | 7/15/2022 | 7/20/2022 | | $ 33,324.19 | | |
| INV42593 | 7/15/2022 | 7/20/2022 | | | $ 412,476.27 | |
| INV42594 | 7/15/2022 | 7/26/2022 | | | | $ 48,747.61 |
| INV42637 | 8/15/2022 | 8/31/2022 | $ 81,945.67 | | | |
| INV42638 | 8/15/2022 | 8/25/2022 | | $ 35,710.11 | | |
| INV42639 | 8/15/2022 | 8/25/2022 | | | $ 426,701.53 | |
| INV42640 | 8/15/2022 | 8/25/2022 | | | | $ 52,198.37 |
| INV42681 | 9/15/2022 | 10/4/2022 | $ 120,561.16 | | | |
| INV42682 | 9/15/2022 | 9/29/2022 | | $ 59,671.01 | | |
| INV42683 | 9/15/2022 | 9/29/2022 | | | $ 735,043.43 | |
| INV42684 | 9/15/2022 | 9/26/2022 | | | | $ 85,426.11 |
| INV42727 | 10/14/2022 | 10/31/2022 | $ 84,318.14 | | | |
| INV42728 | 10/14/2022 | 10/31/2022 | | $ 58,876.37 | | |
| INV42729 | 10/14/2022 | 10/31/2022 | | | $ 706,513.03 | |
| INV42730 | 10/14/2022 | 11/9/2022 | | | | $ 75,295.79 |
| INV42784 | 11/15/2022 | 11/29/2022 | $ 72,927.05 | | | |
| CM10239 | 11/15/2022 | Credit Memo (n/a) | | $ 58,788.84 | | |
| CM10240 | 11/15/2022 | Credit Memo (n/a) | | | $ 600,419.94 | |
| INV42785 | 11/15/2022 | 11/29/2022 | | | | $ 59,601.14 |
| INV42804 | 12/2/2022 | 1/20/2023 | | $ 411.00 | | |
| INV42805 | 12/2/2022 | 1/20/2023 | | | $ 2,072.58 | |
| INV42823 | 12/13/2022 | 1/20/2023 | $ 42,054.66 | | | |
| INV42824 | 12/13/2022 | 1/10/2023 | | | | $ 26,045.23 |
| INV42846 | 1/12/2023 | 1/31/2023 | $ 35,935.12 | | | |
| INV42847 | 1/12/2023 | 1/31/2023 | | | | $ 25,108.32 |
| INV42868 | 2/13/2023 | 2/24/2023 | $ 41,392.90 | | | |
| INV42869 | 2/13/2023 | 2/27/2023 | | | | $ 26,179.56 |
| INV42892 | 3/13/2023 | 3/24/2023 | $ 23,110.04 | | | |
| INV42893 | 3/13/2023 | 3/24/2023 | | | | $ 5,577.70 |
| INV42906 | 4/11/2023 | 4/21/2023 | $ 8,492.41 | | | |
| INV42907 | 4/11/2023 | 4/20/2023 | | | | $ 3,142.05 |
| **Grand Total** | | | $ 579,966.91 | $ 246,781.52 | $ 2,883,226.78 | $ 407,321.88   $ 4,117,297.09 |

14. Only now does GEM seek to depart abruptly from the express terms of the Hosting Agreements and the Parties' course of performance. In doing so, GEM ignores the plain language of the MSAs, which gives Core a clear and unambiguous contractual right in its "sole and absolute discretion" to "pass through" to GEM "any increases, changes in . . . tariffs . . . with respect to the provision of Services" by Core under the applicable MSA, and GEM "shall pay all Increased Costs." *See, e.g.*, GEM POC No. 503, Exhibit 1 MSA § 4(f) at 11. Further, each of the Orders requires GEM to pay "any differences between the Fees for Services invoiced in the preceding month and the Fee for Services based on [Core's] determination of power utilized by [GEM] during that month." *See, e.g.*, GEM POC No. 503, Exhibit 2 Amended and Restated Order

8

#8 under the MSA dated February 5, 2021 at 19. Identical language appears in each of the MSAs and Orders, respectively.

15. Importantly too, by waiting months from the payment of these amounts to raise these disputes, GEM has ignored the terms of the Hosting Agreements, which expressly limit GEM's ability to raise such disputes to three calendar days after the date of the applicable invoice. *See, e.g.*, GEM POC No. 503, Exhibit 1 MSA § 3(b) at 9. Failure to dispute any of the charges within the time period prescribed by the Parties' binding contractual agreements is fatal to GEM's claims.

16. Despite this plain language, GEM improperly attempts to foist the increased cost of powering Miners onto the Debtors.

### Basis for Relief

17. Bankruptcy Rule 3001(f) provides that a properly executed and filed proof of claim constitutes prima facie evidence of the validity and the amount of the claim under section 502(a) of the Bankruptcy Code. *See, e.g.*, *In re Jack Kline Co.*, 440 B.R. 712, 742 (Bankr. S.D. Tex. 2010). However, prima facie validity under Bankruptcy Rule 3001(f) "can be overcome by rebuttal evidence." *Cal. State Bd. of Equalization v. Off. Unsecured Creditors' Comm. (In re Fidelity Holding Co.)*, 837 F.2d 696, 698 (5th Cir. 1988). "Upon production of this rebuttal evidence, the burden shifts to the claimant to prove its claim by a preponderance of the evidence." *In re Armstrong*, 347 B.R. 581, 583 (Bankr. N.D. Tex. 2006) (citing *In re Fidelity Holding Co.*, 837 F.2d 696, 698 (5th Cir. 1988)). And, "the ultimate burden of proof always lies with the claimant." *Id.* (citing *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15 (2000)).

18. GEM has not carried its burden. GEM has asserted claims for approximately $7 million in the aggregate, based entirely on prepetition PPT payments made by GEM but not disputed until now. By waiting months to raise any disputes related to the PPT

9

amounts, GEM has forfeited any right to these claims under the terms of the MSAs. Further, even if the claims are not time-barred under the MSAs' terms, the plain language of the Hosting Agreements allows Core to charge GEM for PPT amounts. Moreover, even if the Hosting Agreements do not support the PPT charges by their plain language, course of performance established by the Parties and industry standards support the Debtors charging GEM for PPT amounts. Thus, despite how GEM may now see the words in the Hosting Agreements, GEM acquiesced to the Debtors' reading of those same words for nearly a year and now improperly asserts claims for amounts the Debtors properly charged and collected from GEM.

### A. Several of GEM POCs Are Duplicative and Should be Disallowed on That Basis

19. In each of the GEM POCs, the respective GEM entity states that it "only seeks one recovery of the [applicable] Claim," but that each GEM entity "has filed a proof of claim against both Core Scientific, Inc. and Core Scientific Operating Company out of an abundance of caution." *See* GEM POC Nos. 503 at 5–6; 505 at 5–6; 506 at 5–6; 508 at 6; 570 at 6; 571 at 5–6; and 572 at 5–6. Thus, several of the GEM POCs are duplicates that the Court should disallow.

20. Based on the terms of the Hosting Agreements, all of which were signed prior to January 2022, the correct Debtor entity against which the claims should have been asserted is Core Scientific Operating Company. Accordingly, the Debtors request that the Court disallow and direct Stretto, Inc., as claims, noticing and solicitation agent in these chapter 11 cases, to expunge 505, 506, and 508 all of which are duplicates, as well as 503 which is not a duplicate, which were filed against Core Scientific, Inc.—an incorrect Debtor entity.

### B. GEM Did Not Dispute PPT Amounts By the Deadline Set Forth in the MSAs

21. The MSAs expressly limit GEM's ability to dispute invoiced amounts to three calendar days from the invoice date. Paragraph 3(b) of each MSA, labeled "Payment Terms and Taxes," states in its entirety the following:

10

> Client [i.e., applicable GEM entity] may, in good faith, dispute any invoice or any part thereof (a "**Disputed Amount**") **by submitting a written notice of such dispute along with reasonable supporting documentation within three (3) calendar days of the date of the initial invoice on which the Disputed Amount appears, failing which Client waives all rights to dispute such Disputed Amount and to file any claim**. Company [i.e., Core] will review the Disputed Amount after its receipt of the relevant notice and if Company determines that Client was billed in error, a credit for the amount invoiced incorrectly will be made to the next invoice. If Company determines that the amount was invoiced correctly, Client will pay the amount by the due date of the next invoice. For clarity, Client shall promptly pay all undisputed amounts.

*See, e.g.*, GEM POC No. 503, Exhibit 1MSA § 3(b) at 9 (emphasis added).[5]

22. The language could not be more clear and unambiguous: GEM had three calendar days after the invoice date to dispute amounts therein. GEM did not so dispute within the allotted time. Thus GEM's claims are now barred by the terms of the bargained-for MSAs.

23. To be sure, under applicable Delaware law, "[w]hen the contract is clear and unambiguous, [courts] will give effect to the plain-meaning of the contract's terms and provisions." *Alkek & Williams, Ltd. v. Tuckerbrook Alt. Invs., L.P.*, 419 F. App'x 492, 495 (5th Cir. 2011) (alterations in original) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159–60 (Del. 2010)). Accordingly, this is an easy issue to resolve. Core invoiced PPT amounts, consistent with the terms of the Hosting Agreements (as further described below). GEM paid those amounts for almost a year, without providing a written notice of any such dispute—within the three calendar days provided for in the MSAs or in the months following such invoices, until mid-April 2023.

24. Indeed, the only claims included in the GEM POCs seek reimbursement of prepetition PPT payments; GEM asserts no other claims (nor could it because the Debtors have

---

[5] Each of the MSAs attached to the GEM POCs contain this exact language.

11

not breached the Hosting Agreements). *See, e.g.*, GEM POC No. 503 at 5. Yet GEM provides no explanation for why these claims were filed months after the prepetition invoices were issued and in contravention of the terms of the MSAs. Nor does GEM raise any arguments to dispute the interpretation or effect of Section 3(b) of the MSAs.

25. The Court, therefore, should give effect to the plain meaning of the MSAs, which limits GEM's ability to assert Disputed Amounts to three calendar days following the invoice date. Accordingly, for this reason alone, the Court should disallow the GEM POCs.

    C.    *Core's Pass-Through of Increased Electricity Tariffs Comports with the MSA, the Parties' Course of Performance, Industry Usage, and Commercial Context*

26. Beyond the time bar set forth in the MSAs, the Debtors also complied with the terms of the Hosting Agreements when they passed through increased electricity tariffs to GEM. Indeed, such PPT charges not only are permitted by the terms of the MSA but also are confirmed by industry usage, the commercial context, and the Parties' course of performance.

27. Contrary to GEM's contention, the MSAs do not contemplate Core bearing the significant risk of energy price increases; they contemplate the opposite. Specifically, pursuant to Section 4(f) of the MSAs, Core had a clear and unambiguous contractual right in its "sole and absolute discretion" to "pass through" to GEM "any increases, changes in . . . tariffs . . . with respect to the provision of Services" by Core under the MSAs, and GEM "shall pay all Increased Costs." *See* MSA § 4(f). As with Section 3 of the MSAs, the language of Section 4(f) of the MSAs is identical across all the MSAs.

28. Applying Delaware law, the Court should give effect to the plain meaning of Section 4(f) of the MSAs. *See Kemp*, 991 A.2d at 1159–60 ("When the contract is clear and unambiguous, [Delaware courts] will give effect to the plain-meaning of the contract's terms and provisions."); *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196

(Del. 1992) ("A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction.").

29.     The plain meaning of Section 4(f) of the MSAs supports Core's ability to charge PPT amounts to GEM. "Tariffs," as used in Section 4(f) of the MSAs, include the rates charged by electric utilities to their customers. These tariffs are comprised of multiple elements, such as fees for maintaining the utility's infrastructure and repaying debt, variable rates based on what time of day or season the electricity was consumed, and demand charges. *See, e.g.*, Texas-New Mexico Power Company, Tariff for Retail Delivery Service, https://ftp.puc.texas.gov/public/puct-info/industry/electric/rates/Trans/TNMP.pdf (defining Tariff as "[t]he document filed with, and approved by, the PUC pursuant to which Company provides Delivery Service. It is comprised of Rate Schedules, Riders, and service rules and regulations. The service rules and regulations include definitions, terms and conditions, policies, and Service Agreements."); New York State Department of Public Service, Electric Tariffs, https://dps.ny.gov/electric-tariffs (defining Electric Tariffs as follows: "Utilities set out the rates, terms and conditions of service in Commission-reviewed filings referred to as tariffs. The Public Service Commission (PSC) keeps utility tariffs for Electric, Gas, Water, and Telecommunication companies doing business in New York State."). One element of an electric utility tariff that accounts for fuel prices is a "Fuel Cost Adjustment," which automatically adjusts based on fluctuations in the prevailing price of the fuel(s) burned by the utility's power plants.

30.     In addition to the plain meaning of "tariff" as used in the MSAs, industry usage shows that this term includes utility rates. Tariffs include fuel adjustments, and the pass-through of increased power tariffs is consistent with industry practices. Electricity is by far the largest cost for cryptocurrency mining infrastructure providers like Core, typically comprising 60–

75% of total operating costs. Thus, it is standard practice for hosting firms like Core to pass through electricity price increases to customers, and doing so is a cornerstone of Core's business model. Fixed-rate service agreements without an option to pass through increased electricity costs would not make business sense.

31. The MSAs, thus, comport with industry practice. The crypto mining industry is power-intensive and power-reliant. In this industry, where electricity costs incurred by mining machines comprise the majority of input costs, it is standard practice to pass through increases in electricity costs to the entity for whose benefit the miners are operating in search of bitcoin.

32. Even if the Hosting Agreements were ambiguous as to PPT charges, GEM paid those amounts for almost a year, which established a course of performance between the Parties. Delaware law adopts the common law understanding of course of performance, under which "any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement[,]" especially "[w]here an agreement involves repeated occasions for performance" and each party has knowledge and an opportunity to object to performance by the other. Restatement (Second) of Contracts § 202 (1981); *see Viking Pump, Inc. v. Century Indem. Co.*, 2 A.3d 76, 101 (Del. Ch. 2009) (quoting *Sun–Times Media Grp., Inc. v. Black*, 954 A.2d 380, 398 (Del. Ch. 2008) and Restatement (Second) of Contracts § 202 cmt. g ("The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning.")).

33. Here, the Parties' course of performance evinces that, as between Core and GEM, each Party accepted that GEM would be responsible for any increase in power costs, which were passed through on each invoice. Indeed, for almost a year, until the filing of the GEM POCs,

GEM did not dispute PPT amounts included in any of the invoices attached to the GEM POCs. Rather, when Core began charging all customers for these increases in power costs, GEM paid those PPT amounts—beginning around May 2022, **before** Core filed these chapter 11 cases—without dispute.  Notably too, in the GEM POCs, GEM has sought reimbursement only for PPT amounts paid by GEM *pre*petition.  Yet GEM has continued to pay *post*petition PPT, including most recently for the month of April 2023, without dispute.  Thus, by accepting PPT charges for almost a year, Core and GEM established a course of performance under the Hosting Agreements, pursuant to which the Parties continue to perform on a postpetition basis.  Despite GEM's opportunistic attempt at reimbursement for prepetition PPT amounts, the Parties both expressly and tacitly agreed:  the Hosting Agreements place the burden of increased power costs on GEM.

        34.       Accordingly, the Debtors request that the Court disallow the GEM POCs.

## Reservation of Rights

        35.       This Objection is limited to the grounds stated herein and accordingly is without prejudice to the rights of the Debtors or any other party in interest to object to any claim, including any of GEM's claims, on any further grounds, and the Debtors expressly reserve all other substantive or procedural objections that they may have, including as it relates to the liability provisions in the Hosting Agreements.  Nothing contained herein is intended to be or shall be deemed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any appropriate party-in-interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Debtors' or any other party-in-interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, or (iv) an approval, adoption, assumption, or rejection of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.

**Notice**

36. Notice of this Objection will be provided to (i) any party that has requested notice pursuant to Bankruptcy Rule 2002, (ii) the affected claimant, and (iii) any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

[*Remainder of page intentionally left blank*]

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: May 4, 2023
Houston, Texas

        /s/ Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:     (713) 546-5000
Facsimile:      (713) 224-9511
Email: Alfredo.Perez @weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock (admitted *pro hac vice*)
Ronit J. Berkovich (admitted *pro hac vice*)
Theodore E. Tsekerides (admitted *pro hac vice*)
Moshe A. Fink (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:     (212) 310-8000
Facsimile:      (212) 310-8007
Email: Ray.Schrock@weil.com
       Ronit.Berkovich@weil.com
       Theodore.Tsekerides@weil.com
       Moshe.Fink@weil.com

*Counsel for Debtors and Debtors in Possession*

**Certificate of Service**

I hereby certify that on May 4, 2023, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

                                            /s/ Alfredo R. Pérez
                                            Alfredo R. Pérez
                                            WEIL, GOTSHAL & MANGES LLP
                                            Alfredo R. Pérez (15776275)
                                            700 Louisiana Street, Suite 1700
                                            Houston, Texas 77002
                                            Telephone:     (713) 546-5000
                                            Facsimile:     (713) 224-9511
                                            Email: Alfredo.Perez@weil.com