**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **CORE SCIENTIFIC, INC.,** *et al.,* | § | **Case No. 22-90341 (DRJ)** |
| | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | |
| | § | |

**DEBTORS' OBJECTION TO CELSIUS**
**MINING LLC'S MOTION FOR ENTRY OF AN ORDER (I) ALLOWING**
**AND DIRECTING PAYMENT OF ITS ADMINISTRATIVE EXPENSE CLAIM**
**PURSUANT TO 11 U.S.C. 503(B)(1)(A) AND (II) GRANTING RELATED RELIEF**

Core Scientific Operating Company f/k/a Core Scientific, Inc. ("**Core**")[2] and its

debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession

(collectively, the "**Debtors**"), hereby file this objection (the "**Objection**") to *Celsius Mining LLC's*

*Motion for Entry of an Order (I) Allowing and Directing Payment of its Administrative Expense*

*Claim Pursuant to 11 U.S.C. 503(b)(1)(A) and (II) Granting Related Relief* (Dkt. No. 801)

(the "**Celsius Motion**") and respectfully represent as follows in support of this Objection:

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6074); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198).  The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

[2]   As discussed in the First Day Declaration (defined below) and the Notice of Deadlines for Filing Proofs of Claim, in January 2022 (i) the entity formerly known as Core Scientific, Inc. changed its name to Core Scientific Operating Company and (ii) the entity formerly known as Power & Digital Infrastructure Acquisition Corp. changed its name to Core Scientific, Inc.  *See* First Day Declaration at ¶ 31; Order (I) Establishing Deadlines to File Proofs of Claim and (II) Approving Form and Manner of Notice Thereof (Docket No. 652), Ex. 1.  Therefore, any claims asserted against Core Scientific, Inc. by Celsius pursuant to contracts signed by Core Scientific, Inc. prior to January 2022 are more properly claims against Core Scientific Operating Company.

## Preliminary Statement

1.      In yet another round of the ongoing Celsius-Core dispute, on the same day it filed a proof of claim against Core for over $300 million, Celsius Mining LLC f/k/a Celsius Core LLC ("**Celsius**" and, together with Core, the "**Parties**") filed a motion seeking allowance and immediate payment of an alleged administrative expense claim (the "**Celsius Alleged Admin Claim**") arising from payments it made under the Hosting Agreements (as defined below).  As detailed below, the Celsius Motion should be denied because Celsius has not satisfied its burden of proving that it is entitled to an administrative expense claim.  Moreover, Celsius's request for allowance and immediate payment of the Celsius Alleged Admin Claim ignores that Core has substantial claims against Celsius, which Core believes exceed the Celsius Alleged Admin Claim. And even if the Court determines Celsius should have an allowed administrative claim, the Court should exercise its discretion to deny immediate payment in light of the Parties' competing claims, the intertwined nature of those claims, as well as equitable considerations.

2.      The Celsius Motion is but one piece of the larger Celsius-Core dispute.  In addition to competing motions filed by the Parties in the Celsius Bankruptcy (as defined below), which remain pending, including a motion by Core for immediate payment of its own administrative expense claim against Celsius (the "**Core Admin Claim**"), Core filed a proof of claim in the Celsius Bankruptcy for its prepetition claims, Celsius filed proofs of claim in these chapter 11 cases for its prepetition claims, and Core filed an objection to Celsius's proof of claim. These disputed claims all relate to the Hosting Agreements.  Adding to the complexity is the fact that the Hosting Agreements expressly limit any recovery Celsius may obtain from Core relating to those agreements to one month's fee, as well as limiting the types of any damages that Celsius

may recover.  The Court will need to consider how these contractual limitations impact the Parties'
prepetition and postpetition claims against one another.

3.      Rather than litigating the complex Celsius-Core dispute in piecemeal
fashion, the Debtors submit that the entire dispute, which arises from the same contract and the
same facts, should be heard together.  Resolving the various claims each Party has against the other
simultaneously will avoid unnecessary payments from one to the other, only for the other to then
return the money, with the potential for additional back and forth transfers if the Parties' separate
administrative expense claims are considered independently from their prepetition claims.

4.      Moreover, the Debtors submit that allowance of the Celsius Alleged Admin
Claim at this juncture is premature because under section 558 of the Bankruptcy Code (as defined
below), the Debtors may assert all available defenses, including setoff and recoupment based on
their claims against Celsius under the Hosting Agreements.  Among the amounts Celsius owes
Core is the Core Admin Claim for amounts Celsius failed to pay Core under the Hosting
Agreement after Celsius filed for chapter 11.  Although Celsius disputed these charges at the time
(despite paying similar charges prior to its petition date), it decided not to adhere to the clear
dispute mechanism in the Hosting Agreements, which required Celsius to pay such disputed
amounts and put the burden on Celsius to initiate an action if it wished to continue the dispute.
Instead, Celsius withheld payment indefinitely, knowing the Celsius Bankruptcy precluded Core
from exercising its contractual remedies for Celsius's postpetition payment shortfall.

5.      Further using its bankruptcy as a sword, Celsius filed a motion against Core
asserting that Core's alleged postpetition breach of contract (which Core denies) violated Celsius's
automatic stay, a dubious position.  In October 2022, Core moved in the Celsius Bankruptcy for
allowance and immediate payment of the Core Admin Claim.  The millions of dollars Celsius

shortchanged Core after Celsius's bankruptcy filing plus the millions of dollars in litigation costs Core incurred in the dubious Celsius litigation significantly contributed to Core's liquidity drain and eventual chapter 11 filing.

6.      Even if Celsius were entitled to an administrative expense claim—which the Debtors contest—immediate payment is not warranted or appropriate.  Despite conclusory statements to the contrary, Celsius would not be harmed by waiting for payment, if any, until the end of Core's chapter 11 case.  Rather, Celsius's publicly filed monthly operating reports for the months of February and March show that Celsius has more than $30 million in cash on hand, is generating positive cash flow, and has hundreds of millions of dollars in assets.  This is a far cry from being cash-strapped.  Celsius has also announced it has secured new hosting agreements for its miners, which will produce additional cash flow, and, with a chapter 11 plan on file, is in the midst of a competitive auction for its mining business that will presumably yield additional value for the Celsius estate.  Celsius's argument that immediate payment is critical is further belied by Celsius's decision to wait over three months before filing the Celsius Motion, doing so only on the general bar date for unsecured claims, a seeming afterthought.

7.      Conversely, immediate payment of the Celsius Alleged Admin Claim at this juncture in the case would harm Core and its creditors because, among other reasons, it may cause a default under the Final DIP Order (defined below), placing the Debtors' postpetition financing and consensual use of cash collateral at risk.  Such result would be detrimental at a point in these chapter 11 cases where the Debtors are set to begin negotiations with their stakeholders regarding a plan of reorganization.  Moreover, payment of the Celsius Alleged Admin Claim in advance of a chapter 11 plan would catapult Celsius ahead of Core's senior creditors, which have priority over the Celsius Alleged Admin Claim given their liens on the Debtors' cash, as well as certain secured

4

creditors' superpriority administrative expense claims.  Equitable considerations also support the Court exercising its discretion to deny Celsius's request, particularly the fact that Celsius has failed to pay Core the Core Admin Claim for more than six months and violated the Parties' agreed dispute resolution procedure.

8.       Recognizing its weak legal and contractual theories, Celsius has attempted to plead around the express terms of the Hosting Agreements by asserting claims under extra-contractual theories of unjust enrichment and *quantum meruit*.  However, it is black letter law that a party is unable to assert such theories when a contract expressly governs the subject matter of the dispute, and Celsius concedes in its motion that the prepayment at issue was made pursuant to the Hosting Agreements.  This tactic, like Celsius's previous attempt to convert a simple contract dispute into an automatic stay violation, must fail.  In any case, if anyone has been unjustly enriched here, it is Celsius, which has been sitting on almost $8 million of money it owes to Core due to its blatant *postpetition* violation of the Hosting Agreements' clear dispute resolution mechanism, a ploy that only its status as a chapter 11 debtor allowed it to pursue with relative impunity.

9.       As noted in their objection to Celsius's proofs of claim, the Debtors submit that this dispute would benefit from mediation with Judge Isgur or another Judge at the Court's selection given the intricacies of the Parties' competing claims against each other, the fact that the ongoing dispute needs to be addressed quickly to avoid disrupting the Debtors' exit from chapter 11, and the fact that both Parties are chapter 11 debtors.  The Debtors believe mediation may help the Parties to resolve their disputes relating to the Hosting Agreements more expeditiously than a costly litigation and will benefit their respective chapter 11 estates.

## Relief Requested

10.     The Debtors respectfully request that the Court deny the Celsius Motion in its entirety.  The Debtors further request that the Court use the May 22, 2023 hearing date on the Celsius Motion as a status conference to discuss how best to proceed with resolving the various disputes between the Parties, including directing the Parties to mediation.

## Background

### A.  The Hosting Agreements

11.     On December 18, 2020, Core and Celsius entered into a Master Services Agreement (the "**MSA**") for the Debtors to host Celsius's cryptocurrency mining equipment (the "**Miners**") at Core's data centers and provide certain related services to Celsius.  Pursuant to the MSA, Core and Celsius executed ten separate related work orders, which are generally governed by the MSA but also set forth certain terms specific to each purchase order (the **"Orders"**).[3]  A true and correct copy of the MSA and Order #10 are attached hereto as **Exhibit A**.

12.     On December 3, 2021, Core and Celsius entered into another Master Services Agreement, pursuant to which the Debtors agreed to provide services to Celsius in connection with hosting additional Miners for Celsius (the "**2021 MSA**").  In connection with the 2021 MSA, Core and Celsius executed Master Services Agreement Order #1-A, dated December 3, 2021 ("**Order #1-A**," together with the MSA and Orders, and the 2021 MSA, the "**Hosting Agreements**").  A true and correct copy of the 2021 MSA and Order #1-A are attached hereto as

---

[3]   Although Core and Celsius entered into ten Orders under the MSA, only eight were still in effect at the time of the Debtors' rejection of the Hosting Agreements.  Order #8 was terminated in May 2021 and Order #9 replaced Order #5.  Order #10 is the Order at issue in the Automatic Stay Motion and Celsius Hosting POC (each as defined below).

**Exhibit B**.  The Hosting Agreements and all claims arising out of or related thereto are governed by and construed in accordance with the laws of the state of Delaware.  *See* MSA § 8(f).

13.     Pursuant to the Hosting Agreements, Celsius was required to prepay certain amounts in advance for hosting services in later months, as well as pay a hosting fee rate per Miner, subject to Core's right to pass through increases in electricity costs, as further described below.  In return, the Debtors hosted Celsius's Miners at the Debtors' data centers and provided certain related services to Celsius, enabling Celsius to mine bitcoin for its account.

**B. Celsius Bankruptcy**

14.     On July 13, 2022, Celsius and certain affiliates filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "**Celsius Bankruptcy**").

15.     Shortly after it filed for chapter 11, Celsius changed the way it was doing business with Core by adopting a new interpretation of the Hosting Agreements.  Pursuant to the Hosting Agreements, Core was permitted to pass through increases in electricity costs as an additional cost to host Celsius's Miners.  Specifically, Core had a clear and unambiguous contractual right in its "sole and absolute discretion" to "pass through" to Celsius "any increases, changes in . . . tariffs . . . with respect to the provision of Services" by Core under the MSA (the "**PPT Charges**"), and Celsius "shall pay all Increased Costs."  *See* MSA § 4(f).

16.     Celsius has previously understood that it would be responsible for any increase in power costs, and indeed paid PPT Charges from October 2021 to April 2022.  And when Core began charging all customers for the more recent increases in power costs, Celsius paid those PPT Charges beginning in June 2022, *before* Celsius filed for bankruptcy.  *See* Dkt. No. 1142, Declaration of Monica Xia in Support of Core Scientific, Inc.'s Opposition to Debtors'

Motion to Enforce the Automatic Stay and for Civil Contempt (Celsius Bankruptcy, Sept. 28, 2022) ¶¶ 9–12, 14–17.  Celsius also initially paid the *postpetition* PPT Charges before abruptly changing its position in September 2022.  *Id*. ¶ 18.

17.     Even if Celsius had a good faith basis to dispute whether it owed the PPT Charges notwithstanding the clear terms of the contract permitting Core to recover energy price increases, it was required to pay such charges and then seek reimbursement.  Specifically, in the Hosting Agreements, the Parties agreed that if there were any disputes as to amounts Core was charging Celsius that the Parties could not resolve before the next invoice, Celsius would pay Core the full disputed amount and then had the right to pursue an action against Core.  Specifically, the MSA provides that

> Client [Celsius] may, in good faith, dispute any invoice or any part thereof (a "Disputed Amount") by submitting a written notice of such dispute along with reasonable supporting documentation within three (3) calendar days of the date of the initial invoice on which the Disputed Amount appears, failing which Client waives all rights to dispute such Disputed Amount and to file any claim. Company [Core] will review the Disputed Amount after its receipt of the relevant notice and if Company determines that Client was billed in error, a credit for the amount invoiced incorrectly will be made to the next invoice. If Company determines that the amount was invoiced correctly, Client will pay the amount by the due date of the next invoice. For clarity, Client shall promptly pay all undisputed amounts.

MSA § 3(b).

18.     Rather than following the process agreed by the Parties in the Hosting Agreements, Celsius breached the MSA postpetition by improperly withholding payment and putting the burden on Core to go after Celsius for the missed payments.  This route was available to Celsius only because of its bankruptcy.  Outside of bankruptcy, Celsius would not have been able to get away with this clear violation of the Hosting Agreements because the Parties had agreed that Core could assert a variety of self-help measures upon Celsius's payment breach, including redirecting Celsius's Miners to produce bitcoin for Core's account until the shortfall was

recouped.[4]  Once Celsius filed for chapter 11, however, it knew that the automatic stay protected it from Core exercising its bargained-for self-help remedies even for postpetition breaches.  The cost to Celsius of adopting a new and aggressive interpretation of the Hosting Agreements, and of violating the dispute resolution procedures in those agreements, went down considerably once it became a chapter 11 debtor.

19.     While the Parties were exchanging letters about the PPT Charges, Celsius decided to use its bankruptcy as a sword in yet another way.  On September 28, 2022, Celsius filed a motion seeking to hold Core in contempt of court for allegedly violating the automatic stay in the Celsius Bankruptcy.  *See* Dkt. No. 917 (Celsius Bankruptcy, Sept. 28, 2022) (the "**Automatic Stay Motion**").  The primary premise[5] of the Automatic Stay Motion was that Core violated the automatic stay by allegedly breaching the Hosting Agreements through failing to perform thereunder (*i.e.,* not deploying Celsius's Miners).[6]  The Debtors disagreed with Celsius's contentions both as a matter of fact and law and filed an opposition to the Automatic Stay Motion on October 19, 2022.  *See* Dkt. No. 1140 (Celsius Bankruptcy, Oct. 19, 2022) (the "**Automatic**

---

[4]   *See* MSA § 4(d) ("[I]f [Celsius] fails to pay all invoices amounts when due [], or otherwise fails to perform any of its obligations under [the MSA] . . . Company may, in its sole discretion, take certain actions including, without limitation, the following actions, at [Celsius's] sole risk and expense: (i) suspend the provision of the Services; (ii) disconnect [Celsius's] Equipment and store it; (iii) declare all amounts due under the applicable Order through the balance of the Term to be immediately due and payable; (iv) operate [Celsius's] Equipment for cryptocurrency mining and other activities at [Core's] sole discretion and direct all resulting proceeds to [Core's] own account until [Core] has recovered all amounts due, including, without limitation, any reinstatement, disconnection, or storage fees or costs; (v) terminate [the MSA] and all Orders; and (vi) exercise all other rights under [the MSA], at law, in equity or otherwise.").

[5]   Celsius made other factually erroneous allegations in its Automatic Stay Motion, but the crux of it related to Core's alleged failure to perform by deploying Celsius's machines (which Core disputes).

[6]   In a different context, this Court noted the frivolous nature of the argument that a failure to perform a contract is a stay violation.  *See In re Core Scientific, Inc.*, No. 22-90341-11 (Bankr. S.D. Tex., Jan. 4, 2023) Hr'g Tr. at 19:5– 8–20:17–18 (The Court: "If I just decided not to perform -- I'm a third party dealing with your Celsius Debtor.  If I choose not to perform, how could that possibly violate the automatic stay in your case, and what provision? . . . So if I told you that I consider that to be a frivolous argument, where would you like to go from here?").

**Stay Response**").  In short, Celsius sought to convert an alleged breach of contract claim into a violation of the automatic stay, seemingly to put Core on the defensive when Celsius was the one violating the Hosting Agreements.

20.     Simultaneously with the Automatic Stay Response, the Debtors filed their own motions in the Celsius Bankruptcy, including, among other things, a motion to compel immediate payment of administrative expense claims for the PPT Charges Celsius ceased paying after it filed for chapter 11.  *See generally* Dkt. No. 1144 (Celsius Bankruptcy, Oct. 19, 2022) (the "**Core Admin Expense Motion**").  The total amount Celsius now owes for unpaid postpetition PPT Charges and related interest for late payments is approximately $7.7 million.

21.     The Debtors and Celsius initially agreed to have the Automatic Stay Motion and the Core Admin Expense Motion heard in the Celsius Bankruptcy on November 18, 2022.  *See* Dkt. No. 1283 (Celsius Bankruptcy, Nov. 4, 2022).  The Parties then engaged in discussions in an effort to resolve the dispute, and at the Parties' request, the Celsius Bankruptcy Court adjourned the November 18 hearing in favor of a status conference in December.  *See* Dkt. No. 1335 (Celsius Bankruptcy, Nov. 14, 2022); Dkt. No. 1366 (Celsius Bankruptcy, Nov. 15, 2022).  Several times, the Parties agreed to further adjourn the status conference, and the status conference is currently scheduled to take place on May 17, 2023.  *See* Dkt. No. 1694 (Celsius Bankruptcy, Dec. 14, 2022); Dkt. No. 1907 (Celsius Bankruptcy, Jan. 23, 2023); Dkt. No. 2055 (Celsius Bankruptcy, Feb. 14, 2023); Dkt. No. 2181 (Celsius Bankruptcy, Mar. 6, 2023); Dkt. No. 2413 (Celsius Bankruptcy, Apr. 13, 2023).

**C.  Core Bankruptcy**

22.     As discussed in the Debtors' First Day Declaration, the significant costs incurred in defending against Celsius's Automatic Stay Motion, as well as Celsius's failure to pay

the millions of dollars owed under the Hosting Agreements, had a deleterious impact on the Debtors' liquidity in the weeks leading up to their chapter 11 cases and helped precipitate their filing on December 21, 2022. *See* Dkt. No. 5 (the "**First Day Declaration**"), ¶¶ 73–77.  Indeed, one of the reasons the Debtors filed chapter 11 was to obtain the ability to get out of the Hosting Agreements under which they were subsidizing Celsius by millions of dollars a month. *See id*.

23.    On December 21, 2022, the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  During the First Day Hearing on December 22, 2022, the Debtors discussed the ongoing Celsius disputes with the Court and the potential rejection. *See In re Core Scientific, Inc.*, No. 22-90341-11 (Bankr. S.D. Tex., Dec. 22, 2022) Hr'g Tr. at 29:1–11 (Mr. Schrock: "You know, I'm not even sure if that's really going to be necessary to have that trial at this point, just given that . . . it's one thing to interpret the contract. I think it's another thing if we can't work it out just -- to deal with rejection issues.").  Celsius acknowledged the possibility of rejection during the First Day Hearing, as well. *See id.* at 41:14–17 (Mr. Koenig: "And of course, in light of Core's own Chapter 11 filing, I understand and appreciate Mr. Schrock's comments that this litigation and disagreement about the contract may be irrelevant given the powers that Core now has.").

24.    On December 22, 2022, Celsius sent a wire transfer to Core for $4,894,386.19, noting in the wire transfer payment detail that the payment was for "#INV42818," which was the invoice dated December 15, 2022.  Consistent with the payment structure contemplated by the Orders, the December 15 invoice included hosting services, PPT Charges, and estimated January 2023 usage prepayment.  Of the $5,537,515.64 invoiced, $4,719,000 was allocated for estimated January 2023 usage prepayment.

25.     Before the Debtors rejected the Hosting Agreements, they continued to perform thereunder in the ordinary course of business even while Celsius breached each month by not paying the PPT Charges.  While the Debtors wanted to terminate the Hosting Agreements or exercise their contractual self-help remedies as soon as Celsius breached (such as directing the bitcoin mined from Celsius's Miners to Core's account to make up for the shortfall)—actions they took in response to other customers' payment breaches—they were unable to do so due to the Celsius Bankruptcy.  After they filed chapter 11, the Debtors sought to use their own chapter 11 powers to stop the losses.

26.     On December 28, 2022, the Debtors filed a motion to reject the Hosting Agreement, along with a supporting declaration,[7] which are incorporated herein by reference in their entirety.  As of the date of the Rejection Motion, Celsius's increased power costs had already cost the Debtors almost $7.8 million, and this amount was continuing to accrue at over $28,840 per day.[8]  *See* Rejection Motion ¶ 13.  The Debtors could not afford to continue shouldering the burden of Celsius's unpaid power costs.  The Debtors were open to discussions with Celsius to determine if a commercial resolution was feasible that would enable the Debtors to avoid the significant daily cash burn; the Parties had discussions, but were unable to reach an agreement prior to the hearing.

---

[7]   Debtors' Emergency Motion for Entry of an order Authorizing Rejection of Executory Contracts with Celsius Mining LLC.  *See generally* Dkt. No. 189 (the "**Rejection Motion**").  In support of the Rejection Motion, the Debtors submitted the Declaration of Michael Bros in Support of Debtors' Emergency Motion for Entry of an Order Authorizing Rejection of Executory Contracts with Celsius Mining LLC, attached to the Rejection Motion as Exhibit B (the "**Bros Rejection Declaration**").

[8]   This amount included all PPT Charges to Celsius, prepetition and postpetition in their case, through November 31, 2022.  It does not include the December 2022 power pass through charges or the prorated power pass through charges from January 2023.

27.     On January 2, 2023, Celsius filed a "Preliminary Objection" to the Rejection Motion.  *See* Dkt. No. 211 (the "**Celsius Objection**").  Celsius did not oppose the relief sought in the Rejection Motion and even "agree[d] that Core can power down all of the Celsius rigs on January 3rd to stop the losses that Core alleges it suffers from continuing to perform under the Celsius Contracts."  *Id*. ¶ 1.  Celsius instead requested that the Rejection Motion be heard on January 23, 2023, at Core's "second day hearing."  Celsius then spent the bulk of its objection repeating its arguments regarding the PPT Charges and asserting that the filing of the Rejection Motion violated the automatic stay in the Celsius Bankruptcy (which this Court summarily rejected), yet a further attempt to continue to use its automatic stay as a sword.

28.     This Court held a hearing on the Rejection Motion on January 3, 2023 (the "**Rejection Hearing**") and entered an order approving the rejection of the Hosting Agreements on January 4, 2023.  *See* Dkt. No. 232.  During the Rejection Hearing, and without objection from Celsius, the Court authorized the Debtors to power down the Miners immediately after the conclusion of the Rejection Hearing.  Prior to powering down the Miners, Core continued to host Celsius's Miners for the first three days of January, for which Core incurred costs.

29.     As of the rejection date, Celsius owes Core in excess of $11 million in liquidated amounts related to the Hosting Agreements (and much more in unliquidated amounts).  Of this amount, approximately $9 million is owed for unpaid PPT Charges and related interest for late payments, most of which (*i.e.*, approximately $7.7 million) was incurred after Celsius's petition date and thus are administrative claims Core holds in the Celsius Bankruptcy.

**D.  Proofs of Claim and Celsius Motion.**

30.     On January 3, 2023, Core timely filed an initial proof of claim in the Celsius Bankruptcy and reserved all rights in that regard.  *See* Claim No. 17273 filed against Celsius Mining LLC (the "**Initial Core POC**").

31.     On February 9, 2023, after the bar date was extended in the Celsius Bankruptcy, Core timely filed an amended proof of claim, which amended and superseded its initial proof of claim in all respects.  *See* Claim No. 23022 filed against Celsius Mining LLC (the "**Amended Core POC**" and, together with the Initial Core POC, the "**Core POC**").

32.     On April 14, 2023, Celsius filed Proof of Claim Nos. 425 and 497 against Core Scientific, Inc.,[9] which relates to purported breaches of the Hosting Agreements by Core (the "**Celsius Hosting POC**") and seeks over $312 million in damages while assuming, without any explanation, that the limitations of liability provisions in the Hosting Agreements do not apply. As part of its Celsius Hosting POC, Celsius asserted a claim for "Return of Postpetition Pre-Rejection Prepayment" in the amount of $4,719,000—the same prepayment amount that is at issue in the Celsius Motion.

33.     On April 14, 2023, Celsius filed the Celsius Motion.

34.     On April 24, 2023, the Debtors filed their Objection to Proof of Claim Nos. 425 and 497 filed by Celsius.  *See* Dkt. No. 819 (the "**Celsius Hosting POC Objection**"), which is incorporated herein by reference in its entirety.

---

[9]   Celsius filed the proofs of claim against Debtor Core Scientific, Inc. but, as noted in footnote 2 of this Objection, any claims Celsius has arising from or relating to the Hosting Agreements are more properly claims against Debtor Core Scientific Operating Company.

### E.  Celsius Liquidity and Status of Chapter 11

35.     In the Celsius Motion, Celsius cites the monthly operating report of Celsius Network LLC, an affiliate of Celsius.  However, the more relevant monthly operating report is Celsius's Chapter 11 Monthly Operating Report for the Month Ending: 02/28/2023, No. 22-10964 (MG), Dkt. No. 12 (the "**February MOR**").  The February MOR shows Celsius ended the month of February with approximately $36,990,000 in cash and total current assets of approximately $151,219,000.

36.     In addition, one week after filing the Celsius Motion, Celsius filed its Chapter 11 Monthly Operating Report for the Month Ending: 03/31/2023, No. 22-10964 (MG), Dkt. No. 14 (the "**March MOR**").  The March MOR reflects a cash inflow of $1,670,000 for Celsius during the month of March, leaving Celsius with an end of the month cash balance of approximately $38,660,000.  The March MOR also reflects total current assets of approximately $153,850,000.[10]

37.     Furthermore, in a presentation Celsius gave to the Celsius Bankruptcy court on April 18, 2023, Celsius touted new hosting agreements it has signed to replace the Hosting Agreements with Core, pursuant to which Celsius is expected to deploy 13,000 miners in early May, which will presumably increase Celsius's cash flow.  *See* Dkt. No. 2490 (Celsius Bankruptcy, Apr. 17, 2023).  As the Celsius CRO Chris Ferraro stated at that April hearing, Celsius is "well on

---

[10]  Note that the February MOR and March MOR pertain to Celsius only (the entity that is party to the Hosting Agreements) and does not reflect the cash available to the Celsius Bankruptcy debtors on a consolidated basis. Notably, the Celsius Bankruptcy debtors have filed a plan of reorganization that expressly substantively consolidates two debtors but appears to substantively consolidate other debtors as well, including Celsius, as there is no separate class for Celsius's creditors. *See* Dkt. No. 2358 (Celsius Bankruptcy, Mar. 31, 2023).  The Debtors continue to monitor the Celsius plan process to protect Core's rights and await the filing of a disclosure statement.

[its] way to mitigating the impact" of Core's rejection of the Hosting Agreements.  *See* Dkt. No. 2540 (Celsius Bankruptcy, Apr. 26, 2023).

38.     In addition to the cash Celsius generates from its mining operations, an additional form of liquidity may be soon forthcoming through a contemplated cash infusion from Celsius's stalking horse bidder, NovaWulf Digital Management, L.P. ("**NovaWulf**").   On February 15, 2023 when Celsius unveiled the potential NovaWulf transaction, Celsius represented that NovaWulf would provide $50 million to capitalize the mining operation as part of the transaction.  *See* Dkt. No. 2066 (Celsius Bankruptcy, Feb. 15, 2023).  Through the marketing process, Celsius has received two additional qualified bids from (i) Fahrenheit, LLC and (ii) the Blockchain Recovery Investment Committee.  *See* Dkt. No. 2519 (Celsius Bankruptcy, Apr. 22, 2023).  After receiving the additional bids, Celsius has adjourned its auction a total of five (5) times and continued the auction one (1) time to negotiate with the three (3) bidders.  In Celsius's April 28, 2023 notice of adjournment of auction, Celsius disclosed that because of such negotiations the bidders "all have made significant improvements on their original bids."  *See* Dkt. No. 2555 (Celsius Bankruptcy, Apr. 28, 2023).  Presumably, each of these bidders would provide a sufficient cash infusion to ensure the reorganized Celsius will not emerge from the transaction with any liquidity problem.

## Basis for Relief

39.     Section 503 of the Bankruptcy Code provides, in pertinent part, that, "[a]fter notice and a hearing, there shall be allowed administrative expenses . . . including—the actual, necessary costs and expenses of preserving the estate[.]" 11 U.S.C. § 503(b)(1)(A).  "The claimant seeking administrative expenses bears the burden of proof."  *Nabors Offshore Corp. v. Whistler Energy II, L.L.C. (In re Whistler Energy II, L.L.C.)*, 931 F.3d 432, 441 (5th Cir. 2019) (citation

omitted).   Moreover, "section 503(b) priorities should be narrowly construed to maximize the value of the estate for all creditors."   *In re Northstar Offshore Grp.*, LLC, 628 B.R. 286, 299 (Bankr. S.D. Tex. 2020) (internal citation omitted).

**A.      The Court Should Defer Ruling on the Celsius Motion and Hear All Disputes Arising from the Hosting Agreements at One Time**

40.      As evidenced by the Automatic Stay Motion, the Automatic Stay Response, the Core Admin Expense Motion, the Core POC, the Celsius Hosting POC, the Celsius Hosting POC Objection, the Celsius Motion, and this Objection, the ongoing disputes between Celsius and Core are complex and interconnected.   Each has asserted claims against the other based on the same set of facts that arise out of the Hosting Agreements.   The claims asserted span two chapter 11 cases and are pre and post the petition dates in both chapter 11 cases.   Moreover, the Hosting Agreements contain limitations of liability that need to be considered in determining claim amounts, as the limitations of liability provision will limit the total amount of Core's liability to Celsius in the aggregate—whether that is pursuant to the Celsius Motion, the Celsius Hosting POC, or both.[11]   Given the interconnected nature of the claims and the myriad issues in dispute under the Hosting Agreements, the Debtors submit that the parties and the Court would benefit from

---

[11] Specifically, the MSA expressly limits the Debtors' total liability in the aggregate to Celsius—regardless of whether the claims are brought during or after the contract term—to an amount equal to one month's fee.   *See* MSA § 5(d).   The MSA further specifies that "THE LIMITATIONS SET FORTH IN SECTIONS 5 c AND 5 d WILL APPLY TO ALL CLAIMS AND CAUSES OF ACTION, REGARDLESS OF WHETHER IN CONTRACT, TORT, STRICT LIABILITY OR OTHER THEORY."   *See* MSA § 5(e).   Thus, any claims Celsius asserts arising from or relating to the Hosting Agreements—including the Celsius Alleged Admin Claim and the Celsius Hosting POC—are subject to these provisions, and the maximum amount of liability Core may have to Celsius in the aggregate on account of the Claim and the Celsius Hosting POC is limited to one month's fee.

having all ongoing disputes, to the extent possible, heard simultaneously at one time rather than in piecemeal fashion.

41.     In addition, the Debtors submit that the parties would benefit from a mediation with Judge Isgur or another Judge at the Court's selection.  The Debtors believe mediation may help the parties resolve their disputes more expeditiously than a costly litigation and benefit their respective chapter 11 estates.

42.     Accordingly, the Debtors request that, to the extent the Court is not inclined to deny the Celsius Motion in its entirety, the Court defer ruling on the Celsius Motion until the Court is able to hear and determine all or most disputes together at one time, and in any event, request that the Court order the parties to mediate the disputes prior to resorting to costly, time-consuming litigation to the detriment of each respective debtor's estate.

**B.      Celsius Is Not Entitled to an Allowed Administrative Expense Claim**

      **1.      The December 22 Payment Can Be Applied for Prepetition Services Core Provided to Celsius and Does Not Give Rise to an Administrative Expense Claim**

43.     Celsius's argument that it is entitled to an administrative claim is premised on the December 22 payment being a payment for January services it did not receive post-rejection. *See* Celsius Motion ¶ 12.  Indeed, it is undisputed that an administrative claim must have benefited the debtor postpetition.  *In re Am. Coastal Energy Inc.*, 399 B.R. 805, 808 (Bankr. S.D. Tex. 2009) ("The Fifth Circuit has held that a § 503(b)(1)(A) expense 'must have been of benefit to the estate and its creditors.'") (quoting *Tex. v. Lowe (In re H.L.S. Energy Co., Inc.)*, 151 F.3d 434, 437 (5th Cir.1998)).

44.     To the extent, however, that a customer pays a debtor postpetition for goods or services the debtor provided *prepetition*, that payment, by definition, does not give rise to an

administrative expense claim.  As explained above, soon after it filed for bankruptcy, Celsius ceased paying Core the PPT Charges due under the Hosting Agreements, even though it was contractually obligated to do so regardless of any dispute over those charges.  *See* MSA § 3(b). As such, Celsius was "in a hole" under the contract by December 2022, and the payments Celsius made on December 22 can be viewed as payments on the outstanding amounts accrued in prior months, not payments for January services, regardless of how Celsius seeks to apply those payments.  When viewed in that light, Celsius still owes Core payment for services for the first few days of January (as well as December), and there is no administrative expense claim.[12]

### 2. Celsius Is Not Entitled to an Administrative Expense Claim, Because Core Is Entitled to Setoff and Recoupment in Addition to All Other Defenses Under Section 558

45.     Celsius is not entitled to allowance of its Celsius Alleged Admin Claim, and certainly not at this time, because section 558 of the Bankruptcy Code entitles Core to assert (and Core hereby expressly reserves the right to assert) all defenses available to it against any potential administrative expense claim, including the defenses of setoff and recoupment.

46.     Section 558 of the Bankruptcy Code provides that

The estate shall have the benefit of any defense available to the debtor as against any entity other than the estate, including statutes of limitation, statutes of frauds, usury, and other personal defenses.  A waiver of any such defense by the debtor after the commencement of the case does not bind the estate.

11 U.S.C. § 558.  "Section 558 provides the trustee with every defensive weapon available to the debtor, including both affirmative and negative defenses."  *In re 1701 Commerce, LLC*, 2014 WL 4657314, at *13 (Bankr. N.D. Tex. Sept. 17, 2014) (internal quotations and citations omitted); *see*

---

[12]  To be clear, Core is not suggesting that Celsius's payments can or should be applied to amounts Celsius owed Core before it filed for bankruptcy (i.e. prepetition claims in the Celsius Bankruptcy); rather they should be applied to unpaid amounts for services Core provide in periods following Celsius's filing (e.g., August 2022, September 2022, etc.).

*also*, *e.g.*, *Second Pa. Real Estate Corp. v. Papercraft Corp. (In re Papercraft Corp.)*, 127 B.R. 346, 150 (Bankr. W.D. Pa. 1991) ("Section 558 preserves to the Debtor its prepetition defenses to causes of action.").  "In order to defeat unjust or improper claims against the estate, the trustee [or debtor] must be able to assert all the defenses that the Debtor could have asserted had bankruptcy not intervened." *In re PSA, Inc.*, 277 B.R. 51, 53 (Bankr. D. Del. 2002) (internal quotations omitted).

> ### A. Core Is Entitled to Set Off the Celsius Alleged Admin Claim With Amounts Celsius Owes to Core

47.    The Court should not grant Celsius an allowed claim at this time because the Celsius Alleged Admin Claim should first be set off by Core's related claims against Celsius.[13] Delaware state law, which governs the MSA (§ 8(f)), recognizes the right of setoff.  *See, e.g.,* *Pettinaro Const. Co. v. Lindh*, 428 A.2d 1161, 1164 (Del. 1981).

48.    Where nonbankruptcy law provides a debtor a right to setoff, it is preserved by section 558 of the Bankruptcy Code.  *In re Circuit City Stores, Inc.*, 2009 WL 4755253, at *3 (Bankr. E.D. Va. Dec. 3, 2009) ("The Debtors' right to effectuate setoffs, as it exists under state law, is one of the personal defenses preserved by this section of the Bankruptcy Code."). Furthermore, "[c]ourts have held that section 558 preserves any right of setoff the debtors may have under state law, including the right to setoff debtor's prepetition claims against administrative expense claims." *In re PSA, Inc.*, 277 B.R. at 53; *In re Circuit City Stores, Inc.*, 2009 WL 4755253, at *3 ("Further, 'because § 558 preserves to the Debtor the defenses it would have had prepetition, the court must examine the transaction as though the bankruptcy had not been filed.  Doing so eliminates the prepetition/postpetition distinction and, in essence, obliterates the requirement that

---

[13]  For the avoidance of doubt, Core is not proposing to effectuate any setoff that would violate section 362(a)(7) of the Bankruptcy Code as applicable in the Celsius Bankruptcy.

the mutual debts must both be prepetition obligations in a § 558 context.'") (quoting *In re*

*Papercraft*, 127 B.R. 346, 250 (Bankr. W.D. Pa. 1991)); *In re Women First Healthcare, Inc.*, 345

B.R. 131, 134 (Bankr. D. Del. 2006) ("The Court agrees with the Trust that section 558 is

applicable in this case because it is the estate, not the creditor McKesson, that is exercising its right

of setoff.  Therefore, the estate need not establish that the debts to be set off are both pre-petition.");

*In re 1701 Commerce, LLC*, 2014 WL 4657314, at *13 (holding that the debtor was entitled to set

off its prepetition claim against a creditor's administrative expense claim and noting that "[s]everal

courts have held that the debtor's setoff rights are not bounded by the prepetition/post-petition

distinction for mutuality of debts" and "one such weapon [under section 558] is the ability to setoff

against administrative expenses amounts owed to the debtor.") (citation omitted).[14]

       49.    Celsius and Core both have alleged claims in disputed amounts against the

other, which have yet to be litigated, as outlined by the Celsius Hosting POC, the Celsius Hosting

POC Objection, the Core POC, and the Core Admin Expense Motion.  Before deciding whether

Celsius has an allowed administrative expense claim, the amounts owing between the Parties

should be finalized, and the claims should be offset against one another.  Notably, the Core Admin

Claim exceeds those alleged in the Celsius Motion.  As such, forcing Core to transfer millions of

---

[14] The Debtors are aware of *In re Galaz*, an unreported Fifth Circuit case that purports to disagree with this line of cases.  *Galaz v. Galax (In re Galaz)*, 480 Fed. Appx. 790, 792 (5th Cir. 2012).  However, the Debtors submit that the unreported *Galaz* opinion is not binding on this Court because (i) the Fifth Circuit case, *Braniff Airways, Inc. v. Exxon Co., U.S.A.*, 814 F.2d 1030, 1036–37 (5th Cir. 1987), that the *Galaz* court uses to support its disagreement addresses section 553 (i.e. a creditor's right to setoff), not section 558 or its predecessor (and not a debtor's right to setoff) and (ii) the portion of the *Galaz* opinion expressing the disagreement is *dicta* and thus not binding.  The latter point is supported by footnote 3 of the opinion, wherein the court remarks that "[b]ecause Raul waived his mutuality arguments by failing to raise them in the bankruptcy court, the split over this issue is not determinative here."  *Galaz*, 480 Fed. App'x. at n.3.  Furthermore, the non-binding nature of the *Galaz* remarks is highlighted by *In re 1701 Commerce, LLC*, a bankruptcy case from the Northern District of Texas that post-dates *Galaz* and applies the aforementioned line of cases holding that section 558 permits a setoff by a debtor of postpetition debt with prepetition debt.  *See In re 1701 Commerce, LLC*, 2014 WL 4657314, at *13.  The Debtors are aware of no cases citing *Galaz* in the context of a debtor exercising the defense of setoff pursuant to section 558 of the Bankruptcy Code.

dollars to Celsius, only for those amounts to be transferred back to satisfy Core's own claims, is illogical and unnecessary.  *Cf. Citzens Bank of Md. v. Strumpf*, 516 U.S. 16, 18 (holding that the right of setoff "allows entities that owe each other money to apply their mutual debt against each other, thereby avoiding the absurdity of making A pay B when B owes A") (internal quotations and citations omitted).  For the sake of judicial expediency, the Debtors submit that setoff should occur before the Court determines whether to grant Celsius an allowed claim to avoid the unnecessary shuffling of funds back and forth between parties.

**B.**   ***Core Is Entitled to Recoup Amounts Owed to It By Celsius Before Celsius Is Entitled to an Administrative Expense Claim***

50.   Before Celsius could be granted an allowed claim, Core is entitled to withhold amounts Celsius owes it via a recoupment defense.  Recoupment as recognized by the Fifth Circuit "allows a defendant to reduce the amount of a plaintiff's claim by asserting a claim against the plaintiff which arose out of the same transaction to arrive at a just and proper liability on the plaintiff's claim." *Kosadnar v. Metropolitan Life Ins. Co. (In re Kosadnar)*, 157 F.3d 1011, 1014–15 (5th Cir. 1998).[15]   Courts routinely apply the common law doctrine of recoupment in bankruptcy cases.  *See, e.g., Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.)*, 973 F.2d 1065, 1079–82 (3d Cir. 1992).  Moreover, recoupment is available to a debtor as a defense to a creditor's claim for allowance of an administrative claim.  *See, e.g., In re Prince Sports, Inc.*, 2013 WL

---

[15]   Delaware law also recognizes the right of recoupment.  *See, e.g., Deere & Co. v. Exelon Generation Acquisitions, LLC*, 2014 WL 6674471, at *3 (Del. Super. Ct. Nov. 10, 2014) ("Generally, '[r]ecoupment is a common-law equitable doctrine that permits a defendant to assert a defensive claim aimed at reducing the amount of damages recoverable by a plaintiff.'") (quoting *TIFD III–X LLC v. Fruehauf Production Co., L.L.C.*, 883 A.2d 854, 859 (Del. Ch. 2004)).

22

6906717, *1 (Bankr. D. Del. 2013) (finding that recoupment was available to offset a postpetition administrative rent claim against a prepetition rent adjustment return).[16]

51.     A recoupment defense generally can be asserted if both claims arise from the same transaction. *See Deere & Co*, 2014 WL 6674471, at *3; *In re Univ. Med. Ctr.*, 973 F.2d at 1081 ("[B]oth debts must arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations"); *In re Prince Sports, Inc.*, 2013 WL 6906717, *1 (holding that because both parties' claims arose from an integrated transaction, debtors would first assert their right to recoupment as a defense before granting the creditors' administrative claim).

52.     "The same transaction requirement is generally met where the relevant claims arise from a single contract[]" and "[t]he transactions must have a common factual core and be factually related." *In re World Access, Inc.*, 324 B.R. at 686 (applying Delaware law).   In contrast, where the claims arise from "separate and factually unrelated transactions," recoupment is not appropriate. *Id.* (concluding that the claims at issue arose from completely separate transactions—one under an agreement between the parties and the other as a result of tax refunds). There is no bright line test that courts apply to discern whether parties' claims against one another came from the "same transaction." *In re Kosadnar*, 157 F.3d at 1015.   Rather, "courts have

---

[16] In *TransAmerican*, the Fifth Circuit held that a debtor's recoupment "objection and supporting evidence are relevant and must be considered in making [the] determination" on whether a movant seeking payment of its administrative expense claim satisfied its burden; however, the bankruptcy court has discretion whether to rule on the merits of the debtor's defense. *In re TransAmerican Natural Gas Corp.* (*Toma Steel Supply, Inc. v. TransAmerican Natural Gas Corp.*), 978 F.2d 1409, 1419 (5th Cir. 1992).   The court upheld the bankruptcy court's allowance of an administrative expense claim for delivered product only after finding that "the bankruptcy court adequately considered [the debtor's] objection" to the claim, including its defense based on the product being allegedly defective. *Id.* at 1418–19.   It provided a lengthy summary of the bankruptcy court's findings that the allegedly defective product at best impacted only a small portion of goods underlying the administrative claim and noted that the bankruptcy court ordered that a portion of the payment on the creditor's administrative claim covering the allegedly defective portion be placed in escrow and the creditor's insurance be assigned to debtor, all pending the outcome of the debtor's claim against the creditor. *Id.* at 1420–21.

refrained from precisely defining the same-transaction standard, focusing instead on the facts and the equities of each case." *Id.*

53.     Here, the claims asserted by Celsius and Core each arise from the same agreement, the Hosting Agreements.  The Orders to the MSA were a part of and incorporated the MSA.  As evidenced by the subsequent orders to the MSA, Core and Celsius expected to negotiate and implement additional terms throughout the Parties' business relationship.  *Id.* at 1015–16 (holding that all of the components of debtors' compensation plan should be considered part of the same transaction, even though they arose under separate agreements/schedules, because (i) the parties had agreed that the debtor was "bound and covered by ... [the experience plan], which [was] a part of [the creditor's] overall compensation plan" and (ii) the experience plan "did not contain all material terms . . . between the parties [and] itself was "a part of the overall [c]ompensation [p]lan.).   The Hosting Agreements, on their face, contemplate that over the life of the contract, Celsius will prepay certain amounts with true ups each month and adjustments made from time to time based on actual service charges and PPT Charges.  *See* MSA §§ 3(a), 4(f); Orders.  Moreover, "[b]oth claims arise from services provided (and alleged breaches of obligations) under the same agreement during a relatively short period of time."  *MBNA America Bank, N.A. v. Trans World Airlines, Inc.* (*In re Trans World Airlines, Inc.*), 275 B.R. 712, 720 (Bankr. D. Del. 2002) (distinguishing *University Medical Center* case where "the Third Circuit concluded that claims for overpayments arising under the 1985 cost year could not be recouped from payments due to the debtor for services rendered in the 1988 cost year," particularly where the contract was clear that each year was separate from an accounting perspective).

54.     Moreover, as in *Kosadnar*, "the facts and equities of this case support a conclusion that the pre-petition debts and post-petition [claim] arose from the same transaction."

*Kosadnar*, 157 F.3d at 1016.  Specifically, both claims relate to services to be provided under the Hosting Agreements, and it would be inequitable to allow Celsius to receive money back for services it did not receive under the Hosting Agreements when it has obligations outstanding for services it did receive under the Hosting Agreements.  *See Trans World Airlines*, 275 B.R. at 721 (finding that "it would be inequitable for Debtor/American to enjoy the benefits of the Affinity Agreement (the royalty payments) without meeting its obligations (the exclusivity and confidentiality provisions)").  Furthermore, "recoupment [is] not dependent on the parties' contract; rather, [it is an] equitable remed[y] available independent of any contractual remedy."  *In re Prince Sports*, Inc., 2013 WL 6906717, *1 (reasoning that because recoupment is an equitable remedy, the movant's right to assert recoupment was not impaired by provisions in the contract placing restrictions around the right to offset).

55.     Accordingly, both the claims the Debtors assert against Celsius and the Celsius Alleged Admin Claim arise out of the same transaction, and the Debtors are permitted to assert the defense of recoupment.  *In re Prince Sports, Inc.*, 2013 WL 6906717 at *3.

### 3.   Celsius Is Not Entitled to an Administrative Expense Claim Under Theories of Unjust Enrichment or *Quantum Meruit*

56.     Celsius's argument that "[i]n addition to the contractual basis" for the Celsius Alleged Admin Claim, it is also entitled to an allowed claim under theories of unjust enrichment and *quantum meruit* deserves short shrift.  It is well established—including in cases cited by Celsius—that a party may not recover under a theory of unjust enrichment or *quantum meruit* when an express contract governs the subject matter of the dispute.  *See Credos Indus. Supplies & Rentals, L.L.C. v. Targa Pipeline Mid-Continent Westtex, L.L.C. (In re KP Eng'g, L.P.)*, 63 F.4th 452, 456 (5th Cir. 2023) ("the unjust enrichment claim would nevertheless fail for the same reasons the quantum meruit claim fails. Under Texas law, an unjust enrichment claim is

unavailable when a valid, express contract governing the subject matter of the dispute exists as it does here.") (internal quotations and citation omitted); *Vortt Expl. Co. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990) ("Generally, a party may recover under quantum meruit only when there is no express contract covering the services or materials furnished.").[17]

57.     Celsius concedes that it was "operating under the Celsius Contracts when it provided the prepayment."   Celsius Motion ¶ 20.   The fact that the Hosting Agreements contractually govern all payments that are the basis of Celsius's Claim forecloses relief under theories of unjust enrichment or *quantum meruit*.

58.     Celsius cites *UNUM Life Ins. Co. of Am. v. Long*, 227 F.Supp.2d 609, 614–15 (N.D. Tex. 2002) for the proposition that an unjust enrichment claim is appropriate where a plaintiff had an "expectation of reimbursement for overpayments," but that case is inapposite. *UNUM* is entirely distinguishable, as it dealt with an unjust enrichment claim seeking to recover overpayments to an ERISA plan beneficiary who elected to receive the full amount of monthly benefits available during the pendency of her social security claim and promised to "reimburse UNUM immediately for the full amount of any overpayment."   *Id.* at 614.   That scenario is far different from here, where the Hosting Agreements govern the parties' dealings and expectations, and Celsius's contractual claims are limited by the Hosting Agreements' express limitation of

---

[17]  Celsius cites Texas law in support of its unjust enrichment and *quantum meruit* theories.  *See* Celsius Motion at 7–8.  However, Delaware law, which governs the MSA, also precludes claims for unjust enrichment and *quantum meruit* when a contract governs the subject matter of the dispute.  *See, e.g.*, *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 891 (Del. Ch. 2009) (quoting *Bakerman v. Sidney Frank Importing Co.*, 2006 WL 3927242, at *18 (Del.Ch. Oct.10, 2006) (revised Oct. 16, 2006) ("[w]hen the complaint alleges an express, enforceable contract that controls the parties' relationship . . . a claim for unjust enrichment will be dismissed."); *Chrysler Corp. v. Airtemp Corp.*, 426 A.2d 845, 854 (Del. Super. Ct. 1980) ("If it is determined that the relationship of the parties and the services involved in this claim are the subject of an express contract, the terms of that contract control and there is no occasion to pursue the theory of quantum meruit or contract implied in law.").

liability provision.  *See* MSA § 5.  Moreover, there is no contractual provision that allows for any reimbursement of amounts paid by Celsius, and certainly not when Celsius owes money to Core. Simply put, Celsius cannot circumvent the Hosting Agreements to seek a claim under theories of unjust enrichment or *quantum meruit*.

59.     Celsius's reliance on these equitable theories is also ironic given its own breaches, including its failure to pay the disputed PPT Charges in clear violation of the Hosting Agreements, which contributed to Core's chapter 11 filing.  By holding on to the PPT Charges instead of paying all disputed amounts pending resolution of the dispute, Celsius is the party that has been unjustly enriched.

**C.     Even if Celsius Is Entitled to an Administrative Expense Claim, Celsius Is Not Entitled to Immediate Payment Thereof**

60.     Assuming, *arguendo*, that Celsius has satisfied its burden to prove it is entitled to an allowed claim for the Celsius Alleged Admin Claim, it has failed to meet its burden to demonstrate that immediate payment is warranted.

61.     Section 503 of the Bankruptcy Code does not provide a creditor with a right to immediate payment of its administrative expense claims.  Instead, "[t]he timing of payment of administrative expenses is within the Court's discretion."  *In re ATP Oil & Gas Corp.*, 2014 WL 1047818, at *10 (Bankr. S.D. Tex. Mar. 18, 2014).  Courts generally "prefer to postpone payment of [an] administrative claim until after confirmation of a plan," but may exercise discretion regarding immediate payment once a claimant has requested payment.  *Id.* at *10 (quoting 2 Norton Bankr. L. & Prac. 2d § 42:14) (1998)).

62.     Courts in the Fifth Circuit analyze the following three factors when determining whether immediate payment of an administrative expense is warranted: "(1) the prejudice to the debtor; (2) the hardship to the claimant; and (3) potential detriment to other

creditors." *In re Texas Pellets*, Inc., 2017 WL 6508974, at *4 (Bankr. E.D. Tex. Dec. 19, 2017) (citing *In re ATP Oil & Gas Corp.*, 2014 WL 1047818, at *10). "In making this determination, one of the chief factors courts consider is bankruptcy's goal of an orderly and equal distribution among creditors and the need to prevent a race to a debtor's assets." *In re HQ Glob. Holdings, Inc.*, 282 B.R. 169, 173 (Bankr. D. Del. 2002). Creditors seeking immediate payment must show that "there is a necessity to pay and not merely that the Debtor has the ability to pay." *In re NE Opco, Inc.* 501 B.R. 233, 259 (Bankr. D. Del. 2013) (quoting *In re Glob. Home Products, LLC*, 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006)).

63.    Celsius has failed to prove that the three-factor analysis weighs in favor of immediate payment of the Celsius Alleged Admin Claim or demonstrate that there is any necessity for immediate payment thereof.

64.    ***Immediate Payment Will Prejudice the Debtors***.  Factor one considers the prejudice to a debtor if immediate payment is required.  *See In re ATP Oil & Gas Corp.*, 2014 WL 1047818, at *10; *see also In re Glob. Home Products, LLC*, 2006 WL 3791955, at *4.  The Celsius Motion does not address this factor.

65.    The facts and circumstances of these chapter 11 cases do not support immediate payment of the Celsius Alleged Admin Claim.  A requirement to pay this amount now will immediately impact the Debtors' liquidity and risk putting the Debtors in default of their debtor-in-possession credit facility and consensual cash collateral arrangement.  It would also elevate Celsius above creditors with senior priority to the Celsius Alleged Admin Claim.

66.     The Debtors' authority to pay the Celsius Alleged Admin Claim is expressly limited by the Approved Budget as defined and referenced in the Final DIP Order,[18] which provides standard limits on the Debtors' ability to use credit facility proceeds and cash collateral.[19] The Approved Budget does not provide for the payment of the Celsius Alleged Admin Claim prior to the effective date of a chapter 11 plan.  It is an Event of Default (as defined in the Final DIP Order) for the Debtors to expend funds in a manner inconsistent with the Approved Budget.  *See* Final DIP Order at ¶¶ H(d), 2(b), 8(a), 9, 10(e); Replacement DIP Credit Agreement (as defined in Final DIP Order) at §§ 2.1.3, 10.3.3, 11.1(e).  Triggering an Event of Default would entitle the Debtors' postpetition lenders (which provided the replacement debtor-in-possession credit facility) and their prepetition lenders (which granted consent to the Debtors' use of cash collateral in accordance with the Approved Budget) to exercise remedies and could result in the Debtors' losing access to the liquidity provided by the Final DIP Order.  Without this liquidity, the Debtors will almost certainly struggle to pay their operating expenses and the restructuring and administrative expenses of these chapter 11 cases.

67.     In its order denying a motion for immediate payment of an administrative expense claim, the *ATP* court noted that much of the debtors' cash resources were subject to super-

---

[18] *Final Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Non-priming Superpriority Replacement Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay and (IV) Granting Related Relief* (Dkt. No. 608) (the "**Final DIP Order**").

[19] Section H(d) of the Final DIP Order states in relevant part as follows:

As a condition to providing the Replacement DIP Facility and their consent to the use of Prepetition Secured Notes Collateral (including Cash Collateral), each of the Replacement DIP Secured Parties and the Prepetition Secured Parties (as applicable) require, and the Debtors have agreed, that all proceeds of the Replacement DIP Loans and all Cash Collateral shall be used and/or applied solely for the purposes expressly permitted in, and in a manner consistent with, the Approved Budget . . . .

Final DIP Order at ¶ H(d).

priority senior secured liens.  *See In re ATP Oil & Gas Corp.*, 2014 WL 1047818, at *10; *see also, e.g.*, *In re Glob. Home Products, LLC*, 2006 WL 3791955, at *4 (finding that the debtors would be harmed by immediate payment when, *inter alia*, they were prohibited from using proceeds from the debtor-in-possession financing for expenditures that were not included in the budget).

68.     Although the Debtors are not claiming that their restructuring will "completely collapse" if forced to pay the Celsius Alleged Admin Claim at some point, payment of almost $5 million will place a strain on the Debtors' cash reserves and cause them to incur higher interest charges on their postpetition financing.  The strain on the Debtors' cash reserves will be further exacerbated if other potential administrative claim holders seek similar relief. Indeed, if the Court grants the Celsius Motion, it would open the door for immediate payment to other potential disputed administrative expense claimants, which would reduce the Debtors' liquidity at a time when the Debtors are focused on building consensus and progressing toward negotiating, filing, and confirming a plan of reorganization so that they may exit these chapter 11 cases.

69.     In addition, although the Debtors currently have the liquidity to pay the Celsius Alleged Admin Claim, the Debtors operate in a highly volatile industry in which the Debtors' liquidity can change swiftly.  The swings in bitcoin prices may further exasperate the Debtors' liquidity if other administrative expense claimants are awarded immediate payment.

70.     It is also worth noting that if Celsius has liquidity concerns of its own, as it asserts (a point addressed below), this weighs in favor of Core not paying Celsius until the Core Admin Claim is resolved.  If the claims get adjudicated as Core believes they will, with Celsius owing Core money, Core may suffer the double prejudice of having paid Celsius for its

administrative claim while not being able to receive payment on Core's larger administrative claim.

71.    ***Celsius Will Not Suffer Hardship if the Motion is Denied***.   Factor two considers the prejudice to a claimant from a delay in payment of its administrative expense claims. *See In re ATP Oil & Gas Corp.*, 2014 WL 1047818, at *10; *see also In re Glob. Home Products, LLC*, 2006 WL 3791955, at *4 (Bankr. D. Del. Dec. 21, 2006).   This is the one factor Celsius addressed, albeit in a conclusory manner.   *See* Celsius Motion ¶ 21.

72.    In *ATP*, the court was unpersuaded that immediate payment was warranted based on the claimant's bare assertion that its prejudice from a delay in payment was "self-evident."   *See In re ATP Oil & Gas Corp.*, 2014 WL 1047818, at *10.   The court in *Glob. Home Products* reached a similar conclusion after finding that the claimant had not provided sufficient evidence to support its hardship claim and that more was needed than the bare assertion that the claimant's hardship was "self-evident."   *In re Glob. Home Products, LLC*, 2006 WL 3791955, at *4.

73.    The Celsius Motion provides little more than the bare assertions made by the claimants in *ATP* and *Glob. Home Products*.   The entirety of Celsius's claim of hardship is contained in a few lines of a single paragraph at the end of the motion.   *See* Celsius Motion at ¶ 21. Therein, Celsius states in conclusory fashion that it will be prejudiced if it is not awarded immediate payment of the Celsius Alleged Admin Claim because it "currently has net cash outflows and limited cash on hand."   *Id.* (citing to the Celsius Network LLC Monthly Operating Report at Celsius Bankruptcy Dkt. No. 2295).   However, a review of Celsius's publicly filed documents reveals Celsius's liquidity position is not nearly as bleak as it would have the Court believe.

74.     Specifically, the Celsius Motion fails to mention that Celsius ended the month of February with approximately $36,990,000 in cash and total current assets of approximately $151,219,000, a far cry from being short on cash.  *See* February MOR at 2.  The February MOR shows that Celsius's cash expenses (net of depreciation) are approximately $4,300,000.  *Id.* at 21.[20]  During this same period, Celsius generated approximately $5,300,000 in revenues from its bitcoin mining operation.  *Id.*  The March MOR, which Celsius filed one week after filing the Celsius Motion, reflects a net cash inflow of $1,670,000 for Celsius during the month of March, leaving Celsius with an end of the month cash balance of approximately $38,660,000.  Accordingly, Celsius does not appear to have an urgent cash need.

75.     The Celsius Motion's bare assertion that the Celsius Alleged Admin Claim is a drain on Celsius's liquidity is no different from the bare assertions made in the *ATP* and *Glob. Home Products* cases that the harm of not receiving immediate payment was "self-evident." Furthermore, Celsius's assertion that immediate payment is needed rings hollow given that it waited over three months since the Hosting Agreements were rejected to request allowance and payment of the Celsius Alleged Admin Claim.  Celsius has failed to demonstrate that it will be prejudiced in any meaningful way if it is required to wait until a plan of reorganization becomes effective to receive payment, if any, on the Celsius Alleged Admin Claim.

76.     ***Other Creditors Are Harmed by Immediate Payment***.  Factor three considers the potential detriment to other creditors of immediate payment.  *See In re ATP Oil & Gas Corp.*, 2014 WL 1047818, at *10; *see also In re Glob. Home Products, LLC*, 2006 WL 3791955, at *5.  Like factor one, the Celsius Motion also does not address this factor.

---

[20]  The February MOR states that total expenses are approximately $19.4 million and depreciation expense is approximately $15.1 million, resulting in net cash expenses of approximately $4.3 million.

77.     Courts addressing this factor assess whether an immediate payment will prejudice other creditors.  *See Glob. Home*, 2006 WL 3791955, at *5 (denying immediate payment and stating that the debtors' "other creditors are benefitted by the ruling to the extent that by denying immediate payment, the Court preserves a later equitable distribution to other administrative claimants[]"); *In re Arts Dairy, LLC*, 414 B.R. 219, 222 (Bankr. N.D. Ohio 2009) (stating that where the timing of the payment of an administrative expense will not have a significant impact on the debtor or claimant, "the potential detriment to other creditors [] becomes significant," and finding that the secured creditor would be "significantly prejudiced" if the court ordered the debtor to use cash collateral to pay an administrative claim); *In re Modern Metal Products Co.*, 2009 WL 1362632, at *3 (Bankr. N.D. Ill. May 13, 2009) (stating that other creditors could be harmed if debtor is ordered to pay an administrative claim immediately, because there may be other claimants that may bring administrative expense claims prior to confirmation).

78.     In *In re Arts Dairy*, the court sustained an objection to immediate payment of an administrative expense to avoid prejudice to other creditors.  414 B.R. at 222–23.  The issue of immediate payment came down to the prejudice to other creditors.  The court reasoned that, "unless otherwise authorized by the Code, administrative expenses in bankruptcy, being unsecured debts, do not take priority over secured claims."  *Id.* (citing *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 120 S. Ct. 1942, 1946 (2000)).  The secured creditors in *Arts Dairy* had first priority liens and "security interests in substantially all of the Debtor's assets – including . . . cash collateral."  *Id.*  Furthermore, the court noted that "[n]o party has been able to identify to the [c]ourt a source of funds, outside [the secured creditor's] interest in cash collateral, which would be presently available to pay the [c]laimants their administrative claim."  *Id.*  Therefore, the court concluded that any administrative expense payment would necessarily come

out of the secured creditor's cash collateral. *Id.* The court concluded that its prior order authorizing the use of cash collateral did not contemplate immediate payment of administrative expenses, and that changing course to allow such payments would prejudice the secured creditor. *Id.* Accordingly, the court held that the administrative claimant would be entitled to payment at the same time as other similarly situated creditors. *Id.* at 223.

79.     Like the debtors in *Arts Dairy*, all of the Debtors' assets are subject to first priority liens, including the Debtors' cash. The Celsius Motion points to no source of unencumbered cash the Debtors may use to make an immediate payment, and the Debtors are aware of none. The Debtors' secured creditors have priority over that cash and would be prejudiced by an administrative expense creditor like Celsius receiving payments before them. Indeed, it would be particularly inequitable for the Celsius payment to be made while the debtors' prepetition secured noteholders, which have priority over administrative creditors, are not being paid any amounts (other than professional fees).

80.     In addition, under the Final DIP Order, other secured creditors, including equipment lenders, were granted adequate protection liens and superpriority administrative expense claims under section 507(b) for any diminution in value of their collateral. *See* Final DIP Order ¶¶ 6(c), 10(a)–(b), 42(a)–(b). The Celsius Alleged Admin Claims are junior to such liens and claims, and those senior creditors would be prejudiced by Celsius's junior claim being paid ahead of them. Rather, it is more equitable for all creditors if the Celsius Alleged Admin Claim, if any, were paid only under a chapter 11 plan.

81.     Although the Debtors make no claim that they are administratively insolvent, it does not follow that other creditors will not be prejudiced by immediate payment of the Celsius Alleged Admin Claim. While the market for bitcoin appears to be strengthening, as

34

this Court noted, there are no "forward curves" or "correlations to consumer confidence . . . that we can rely on in an effort to try and figure out where [bitcoin prices] [are] headed." *In re Core Scientific, Inc.*, No. 22-90341 (Bankr. S.D. Tex. Mar. 1, 2023) Hr'g Tr. at 6:5–10.  Other potential administrative claimants may conclude, as this court did, that Core is "a very fragile Debtor," and rush to the courthouse to seek immediate payment. *Id.* at 5:14–15.  Rather than opening this door, the Court should "preserve[] a later equitable distribution to other administrative claimants." *See In re Glob. Home Products, LLC*, 2006 WL 3791955, at *5.

82.  ***Other Considerations***.  The Court should exercise its discretion to deny immediate payment of the Celsius Alleged Admin Claim, assuming any payment is owed at all, because considerations beyond the three-factor analysis also weigh in favor of denying any immediate payment.  As set forth above, the ongoing dispute between Celsius and the Debtors is complex; there are multiple claims, pre and post both Celsius's and the Debtors' petition dates, alleged by each Party against the other arising out of the same contract and set of facts.  As such, the Debtors submit that the entire dispute should be litigated and resolved together at one time, thus providing clarity on the claims each Party may have against the other and the amounts each Party may owe the other.  This is better than the Debtors prematurely paying Celsius any amounts when, ultimately, Celsius may be the Party that owes the Debtors on a net basis after application of setoff and recoupment theories, among other defenses.  Indeed, if Celsius does have liquidity issues, this weighs in favor of Celsius paying Core now for the Core Admin Claim.

83.  Equitable considerations also weigh in favor of denying the request for allowance and immediate payment.  *Cf. In re Energy Future Holdings Corp.,* 990 F.3d 728, 743 (3d Cir. 2021) (holding that courts can consider the equities when determining whether to award an administrative expense claim).  Celsius itself has yet to pay the approximately $7.7 million

administrative claim it owes Core, and it would be unfair to allow Celsius to be paid the Celsius Alleged Admin Claim while the Core Admin Claim is still pending.  Any analysis of the equities must take into account that Celsius breached the Hosting Agreements by failing to pay the disputed PPT Charges.  Instead, it violated those provisions, relying on its own bankruptcy to protect it from Core exercising remedies, and put the burden on Core to chase Celsius for the non-payment while Core was in financial turmoil.  This Court's discretion should not be exercised to reward Celsius given its actions toward Core under the Hosting Agreements.  *Cf. MKP Prod. Co.v. Compression Sols., Co., (In re Magnolia Gas Co., L.L.C.)*, 255 B.R. 900, 925 (Bankr. W.D. Okla. 2000) (finding that the unclean hands doctrine "has been applied in the context of a bankruptcy administrative expense claim[]"); *Wallace v. Perry (In re Perry)*, 423 B.R. 215, 286–87 (Bankr. S.D. Tex. 2010) ("The clean hands doctrine requires that one who seeks equity, does equity. Equitable relief is not warranted when the plaintiff has engaged in unlawful or inequitable conduct with regard to the issue in dispute.") (internal citations omitted).  It is also relevant that Celsius waited over three months since the Hosting Agreements were rejected and the payment at issue in the Celsius Motion were made before seeking relief.

84.     For the foregoing reasons, the Debtors request that the Court exercise its discretion and deny Celsius's request for immediate payment of the Celsius Alleged Admin Claim, if any are owed to Celsius.

## Reservation of Rights

85.     This Objection is limited to the grounds stated herein and accordingly is without prejudice to the rights of the Debtors or any other party in interest to object to any claim, including the any of Celsius's claims, on any further grounds, and the Debtors expressly reserve

all other substantive or procedural objections that they may have, including as it relates to the limitation of liability provisions in the Hosting Agreements.

### **Notice**

86.     Notice of this Objection will be provided to (i) any party that has requested notice pursuant to Bankruptcy Rule 2002, (ii) the affected claimant, and (iii) any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

[*Remainder of page intentionally left blank*]

WHEREFORE the Debtors respectfully request that the Court deny the Celsius Motion and grant Core such other and further relief as the Court may deem just and appropriate.

Dated: May 5, 2023
Houston, Texas

/s/ Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:    (713) 546-5000
Facsimile:    (713) 224-9511
Email: Alfredo.Perez @weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock (admitted *pro hac vice*)
Ronit J. Berkovich (admitted *pro hac vice*)
Theodore E. Tsekerides (admitted *pro hac vice*)
Moshe A. Fink (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:    (212) 310-8000
Facsimile:    (212) 310-8007
Email: Ray.Schrock@weil.com
        Ronit.Berkovich@weil.com
        Theodore.Tsekerides@weil.com
        Moshe.Fink@weil.com

*Attorneys for Debtors and Debtors in Possession*

**<u>Certificate of Service</u>**

I hereby certify that, on May 5, 2023, a true and correct copy of the foregoing document was served as provided by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

      <u>   /s/  Alfredo R. Pérez                       </u>
      Alfredo R. Pérez

## Exhibit A

**MSA and Order #10**

## MASTER SERVICES AGREEMENT

This Master Services Agreement ("**Agreement**") effective as of December 18, 2020 ("**Effective Date**") is between CORE SCIENTIFIC, INC. ("**Company**") and CELSIUS CORE LLC ("**Client**").

**WHEREAS**, Client desires access to locate its Client Equipment (as defined below) at the Company Facility (as defined below) and receive certain Services (as defined below); and

**WHEREAS**, Company desires to provide such Services at its Company Facility.

The parties agree as follows:

1.  **AGREEMENT STRUCTURE**

a.       This Agreement provides general terms applicable to Company's provision of certain services, including, without limitation, colocation, hosting, rack space, security, monitoring, maintenance, utilities, Client Equipment maintenance and repair, facility management, account management, network and data access, technical support, and heat and thermal management services ("**Services**") to Client in a data center owned or operated by Company or its affiliates ("**Company Facility**") in mutually agreed transactions described in mutually executed ordering documents in the form of Exhibit A attached hereto that reference and are governed by this Agreement ("**Orders**").  Each Order will be a separate agreement between Company and Client and will be deemed to incorporate the terms of this Agreement by reference. Company may require Customer to provide evidence of creditworthiness or credit support acceptable to Company in its sole discretion as a condition to accepting any Order.  In the event of any conflict or inconsistency between the terms of this Agreement and the specific terms of an Order, the specific terms of the Order govern with respect to such Order.

2.       **SERVICES AND COMPANY FACILITY**

a.       Company will provide Client the Services at a Company Facility set forth in an Order.  This Agreement is not intended to and does not constitute a lease of any real or personal property or a grant of any other real property interest.   Unless otherwise set forth in an Order, Client Equipment is owned by Client will not be construed as fixtures or fittings or otherwise attached to a Company Facility.  Company retains title to all racking, connectors, fittings, parts and other materials used or provided by Company at a Company Facility to provide Client the Services.  Client acknowledges and agrees that access to a Company Facility may be provided only during Company's ordinary business hours and only upon Company's prior written consent, which shall be subject in all events to the terms of this Agreement and may be withheld, conditioned or delayed in Company's sole discretion.. Client will be liable for the actions of all persons accessing Company Facility on its behalf.

b.       Company has the right to review and the sole right to approve any delivery, installation (including, without limitation, the location and position of Client Equipment at the Company Facility), replacement or removal work with respect to Client's computer hardware or other tangible equipment ("**Client Equipment**") at a Company Facility.  Client shall be fully responsible for delivering all Client Equipment to Company at a specified Company Facility on or before the applicable scheduled delivery date, each as specified in an Order.  Client will be responsible for all risk of loss or damage to Client Equipment at all times until such Client Equipment is accepted by Company at a designated Company Facility.

c.       Client Equipment will adhere to Company's specifications, procedures, rules, and regulations, including, without limitation, equipment labeling and tracking and security practices and policies for the Company Facility, all of which are incorporated herein by this reference.  If Company determines in its sole

discretion that Client Equipment or related operating software does not conform to its policies or is not suitable for the provision of Services at the Company Facility, Company may suspend installation of Client Equipment and operating software or commencement of the Services until Company approves of the Client Equipment and operating software. Company has no responsibility or liability for any loss or damage to Client Equipment, including without limitation any damage to Client Equipment, failure to adhere to any manufacturer warranty, the voiding of any manufacturer warranty or loss of or inability to collect under any manufacturer warranty, unless directly caused by the gross negligence, bad faith or willful misconduct of Company.

d.    Client is responsible for costs and expenses regarding the installation, repair, replacement and removal of Client Equipment and tariffs, taxes, shipping costs or other expenses associated with owning, shipping, importing or transporting Client Equipment. Upon any expiration or termination of an applicable Order, Company will provide Client with a written notice, which may be by email (the "**Retrieval Notice**"), of the date when Client Equipment is ready to be removed from Company Facility, which will be at Client's sole expense. Such notice will document the condition of Client Equipment being prepared for shipment, any outstanding amounts owed by Client to Company and Client shall have five (5) calendar days from the date set forth in the Retrieval Notice to pay any outstanding amounts owed to Company and remove at Client's sole cost and expense Client Equipment from Company Facility. Client will hold Company harmless from any damage caused to Client Equipment during such pickup and removal of Client Equipment. The failure or delay by Client to retrieve Client Equipment on or before the date set forth in the Retrieval Notice will constitute abandonment of Client Equipment under the laws of the jurisdiction where the Client Equipment is located and Company will be entitled to pursue at Client's sole risk and expense all available remedies, including, without limitation, the actions set forth in Section 4(d), as applicable.

e.    In order to continue to provide the Services, from time to time Company may request, and Client shall promptly provide, information regarding Client Equipment, Client's related operating software, Client's systems, and other information reasonably necessary in Company's provision of the Services.

f.    If software and services of a third party are requested by Client in conjunction with the Services ("**Third Party Services**") and identified in an Order, Client acknowledges and agrees that such Third Party Services are the responsibility of the third party, subject to separate terms and conditions between such third party and Client and Company accepts no responsibility for the performance of such Third Party Services or any loss or damage arising from or associated with the provision of such Third Party Services.

## 3.    PAYMENT TERMS AND TAXES

a.    Company will invoice Client monthly in advance for all applicable fees for use of Company Facility and provision of Services as set forth in the applicable Order. Client will pay all invoiced amounts in US dollars within ten (10) calendar days of the date of the invoice. All payments must be (i) in US dollars into an ACH account number as set forth in the applicable Order; or (ii) to another account or form of payment directed by Company. Interest shall be charged on past due amounts at the lesser of (A) one and a half percent (1.5%) per month; or (B) the highest rate permitted by applicable law.

b.    Client may, in good faith, dispute any invoice or any part thereof (a "**Disputed Amount**") by submitting a written notice of such dispute along with reasonable supporting documentation within three (3) calendar days of the date of the initial invoice on which the Disputed Amount appears, failing which Client waives all rights to dispute such Disputed Amount and to file any claim. Company will review the Disputed Amount after its receipt of the relevant notice and if Company determines that Client was billed in error, a credit for the amount invoiced incorrectly will be made to the next invoice. If Company determines that the amount was invoiced correctly, Client will pay the amount by the due date of the next invoice. For clarity, Client shall promptly pay all undisputed amounts.

c.      All amounts payable to Company under this Agreement exclude applicable taxes.  Client is responsible for (i) taxes related to its activities and the ownership and operation of Client Equipment; and (ii) taxes imposed, levied or assessed thereon by any governmental or other authorities.  If Client is required to make any deduction, withholding or payment for taxes in any jurisdiction on amounts payable to Company, such amounts will be increased such that after making such deduction, Company receives an amount equal to what it would have received if such deduction, withholding or payment had not been made.

## 4.      TERM, TERMINATION, MODIFICATION AND SUSPENSION

a.      This Agreement commences on the Effective Date and continues until terminated as permitted by this Agreement.  Each Order commences on the effective date set forth in the Order, has the initial term ("**Initial Term**") set forth in the Order, and thereafter automatically renews for the additional periods set forth in the Order, or if no renewal period is set forth then one (1) year periods, (each, a "**Renewal term**" and collectively, the "**Term**") unless Client notifies Company in writing not less than ninety (90) calendar days before such renewal of its desire for the order not to renew.

b.      Either party may terminate an Order upon written notice to the other party and take such other action identified in Section 4 d. below if the other party materially breaches such Order or this Agreement and fails to cure such breach within thirty (30) calendar days (5 days in the case of failure to pay an Unpaid Balance (as defined below) or 2 days in the case of failure to pay an Unpaid Balance two or more times during any twelve month period) .  If the breach (other than Client failure to pay amounts when due) cannot be cured within thirty (30) calendar days, the breaching party shall be given a reasonable period of time, but not to exceed sixty (60) calendar days after receipt of the notice, to cure the breach, provided that the breaching party acts promptly and diligently to cure such breach.

c.      Either party may terminate this Agreement upon written notice to the other party if there have been no Orders in effect for twelve (12) consecutive months.

d.      In addition to the remedy set forth in Section 4 b. above if Client fails to pay all invoiced amounts when due (an "**Unpaid Balance**"), or otherwise fails to perform any of its obligations under this Agreement after opportunity to cure as provided in Section 4 b above Company may, in its sole discretion, take certain actions including, without limitation, the following actions, at Client's sole risk and expense:

(i)      suspend the provision of the Services;
(ii)     disconnect Client Equipment and store it;
(iii)    declare all amounts due under the applicable Order through the balance of the Term to be immediately due and payable;
(iv)     operate Client Equipment for cryptocurrency mining and other activities at Company's sole discretion and direct all resulting proceeds to Company's own account until Company has recovered all amounts due, including, without limitation, any reinstatement, disconnection or storage fees or costs;
(v)      terminate this Agreement and all Orders; and
(vi)     exercise all other rights under this Agreement, at law, in equity or otherwise.

Unless Company has terminated this Agreement, Company will reverse the suspension of the provision of the Company Facility and Services and disconnection of Client Equipment as soon as reasonably practical after it is satisfied Client has cured the acts or omissions giving rise to the suspension and disconnection.  In connection with the foregoing, Company may charge a reinstatement fee.  Thereafter, Company may, at its sole discretion, require an advance payment equal to the amount of one billing invoice.

e.      Notwithstanding anything in this Agreement to the contrary, Company may suspend its provision of

all or a portion of the Services and disconnect all of a portion of Client Equipment immediately if Company determines in its sole discretion that: Client's use of the Services or Client Equipment (i) may adversely impact or pose a security risk to Company's operation or maintenance of the Company Facility or Company's other clients; (ii) may subject Company to liability; or (iii) is not in compliance with this Agreement or Company's policies.  Company will use commercially reasonable efforts to notify Client, which may be via email or telephone, of such suspension or disconnection.  Company will use commercially reasonable efforts to reverse such suspension or disconnection as soon as reasonably practical after it is satisfied that Client has cured the acts or omissions giving rise to such suspension and disconnection.  In connection with the foregoing, Company may charge a reinstatement fee as set forth in the applicable Order. Further, Company may terminate this Agreement and all Orders if such suspension or disconnection continues for at least two (2) calendar days or occurs more than three (3) times in any twelve (12) month period.  For clarity, during the period of suspension or disconnection, Client remains responsible for all fees and charges Client incurs during such period.  Further, after the Effective Date, if Company determines in its sole and absolute discretion that as a result of any change in, or interpretation, introduction or administration of, any laws, regulations, statutes, treaties, rules, guidelines, ordinances, codes or the like, or any proposed or anticipated changes in, or interpretations, introduction or administration of the foregoing (a "**Change in Law**"), has resulted in an increase in Company's cost of compliance with such Change in Law then Company may, in its commercially reasonable discretion, take certain actions, including, without limitation, the following actions, at Client's sole risk and expense: (i) terminate this Agreement, any or all Orders; and/or (ii) modify the Services as may be necessary to account for such Change in Law. Company will use commercially reasonable efforts to notify Client of such Company actions and the effective date of such actions.

f.      Further, and notwithstanding the Change in Law related costs above, after the Effective Date, if there are any increases, changes in, or introduction or administration of, any new taxes, levies,  tariffs or governmental fees and charges with respect to the provision of  Services, Company may, in its sole and absolute discretion, pass through all such amounts to Client ("**Increased Costs**") and Client shall pay all Increased Costs in accordance with the payment and invoicing procedures as set forth in this Agreement.

g.      Company shall not be liable for any Client loss or damage whatsoever as a result of the exercise of its rights under this Agreement.  Upon termination of this Agreement or an Order by Company, Company is entitled to recover from Client all loss or damages incurred by Company as a result of such termination, outstanding fees,  costs, charges, assessments, reimbursements, and expenses (including, without limitation, costs of collection and reasonable attorneys' fees).

h.      In addition to Section 4(f), the Company may terminate or suspend all or a portion of the Services if necessary to be in compliance with applicable law, rules, regulations, administrative or judicial orders or decree.   Company will use commercially reasonable efforts to notify Client, which may be via email or telephone, of such suspension.  Client agrees that the Company shall have no liability whatsoever to Client for any damage, loss, expense or cost as a result of such termination or suspension.

## 5.      WARRANTIES, LIMITATION OF LIABILITY, INDEMNITY

a.      Each party represents, warrants, and covenants that it has full legal capacity, right, power and authority to execute and perform its obligations under this Agreement.  Company represents, warrants, and covenants that it will provide Company Facility and perform the Services in a professional and workmanlike manner.  Client represents, warrants, and covenants (i) Client owns and has good title to Client Equipment, free and clear of any mortgage, pledge, lien, charge, security interest, claim or other encumbrance or has interest in Client Equipment as part of a financing or other arrangement disclosed and approved by Company; (ii) Client Equipment has no defects, is in good condition and is adequate for the purpose it will be used, and is not in need of maintenance or repair except for ordinary, routine maintenance and repairs that are not material in nature or cost; (iii) Client Equipment has not experienced any failure or outage and has

not been modified in any way from its original manufactured condition; (iv) Client Equipment is in a condition suitable for continued optimal cryptocurrency mining operations, including, without limitation, in the same manner as conducted prior to the Effective Date; (v) Client Equipment has been operated at all times indoors in an appropriate temperature-controlled environment and consistent with the manufacturer's recommended temperatures and operating conditions; (vi) Client Equipment has always been transported and/or handled in a protected manner normally expected when transporting and/or handling sensitive computer hardware; (vii) Client will use the Services only for lawful purposes, and Client will not transmit, retransmit or store material with or in Client Equipment or with or in Company Facility in violation of any federal or state law or regulations or local code, rule, regulation or ordinance; and (viii) Client will comply with  applicable laws and regulations in connection with this Agreement.  Without limiting the foregoing, Client further represents, warrants, and covenants neither Client, any officer, director, employee, partner, controlling shareholder, affiliated entity nor anyone acting on Client's behalf (A) has used or disclosed or will use or disclose non-public information obtained from Company, (B) has violated or will violate applicable anti-bribery or anti-corruption laws, including the U.S. Foreign Corrupt Practices Act and the U.K. Bribery Act 2010, (C) has violated or will violate applicable anti-money laundering statutes, or (D) is a Denied Party or subject to any U.S. sanction imposed by the Office of Foreign Assets Control of the U.S. Department of the Treasury.

b.      EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEMENT, COMPANY DOES NOT MAKE AND HEREBY DISCLAIMS ALL WARRANTIES, INCLUDING, WITHOUT LIMITATION, EXPRESS, IMPLIED AND STATUTORY WARRANTIES THAT COMPANY FACILITY  OR SERVICES WILL BE UNINTERRUPTED, ERROR-FREE, OR COMPLETELY SECURE, AND THE IMPLIED WARRANTIES OF MERCHANTABILITY OR SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT OF ANY THIRD PARTY'S INTELLECTUAL PROPERTY RIGHTS.  ALL COMPANY FACILITY AND SERVICES ARE PROVIDED OR PERFORMED ON AN "AS IS", "AS AVAILABLE" BASIS, AND CLIENT'S USE OF THE COMPANY FACILITY AND SERVICES IS SOLELY AT ITS OWN RISK.  CLIENT ACKNOWLEDGES AND AGREES THAT COMPANY DOES NOT AND CANNOT CONTROL THE FLOW OF DATA OR POWER TO OR FROM COMPANY'S NETWORK AND/OR THE INTERNET OR POWER  GRID, WHICH ARE PROVIDED OR CONTROLLED BY THIRD PARTIES, AND THAT ACTIONS OR INACTIONS OF THIRD PARTIES CAN IMPAIR OR DISRUPT COMPANY'S CONNECTIONS TO THE INTERNET OR POWER GRID (OR PORTIONS THEREOF) INCLUDING, WITHOUT LIMITATION, INTERRUPTIONS IN SERVICE  CAUSED BY GOVERNMENT REGULATIONS OR ORDERS, SYSTEM CAPACITY LIMITATIONS OR LIMITATIONS IMPOSED BY, OR FAILURES OF, AN UNDERLYING COMMUNICATIONS CARRIER.  COMPANY WILL ENDEAVOR TO TAKE ACTIONS IT DEEMS APPROPRIATE IN ITS SOLE DISCRETION TO REMEDY AND AVOID  SUCH EVENTS.  HOWEVER, COMPANY CANNOT AND DOES NOT GUARANTEE THAT SUCH EVENTS WILL NOT OCCUR, AND COMPANY DISCLAIMS ANY AND ALL LIABILITY RESULTING FROM OR RELATED TO SUCH EVENTS.  COMPANY HEREBY DISCLAIMS ALL RESPONSIBILITY FOR THE ACTS OR OMISSIONS BY COMPANY'S OTHER CUSTOMERS AND CLIENTS AND OTHER THIRD PARTIES.

c.      NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR (I) LOST PROFITS; (II) LOSS OF BUSINESS; (III) LOSS OF REVENUES (EXCEPT THAT CLIENT SHALL BE LIABLE FOR ANY FEES OR OTHER AMOUNTS OWED TO COMPANY UNDER THIS AGREEMENT); (IV) LOSS, INTERRUPTION OR USE OF DATA OR LOSS OF USE OF CLIENT EQUIPMENT; (V) ANY CONSEQUENTIAL OR INDIRECT DAMAGES; OR (VI) COST OF COVER, ANY INCIDENTAL, SPECIAL, RELIANCE, EXEMPLARY OR PUNITIVE DAMAGES (IF APPLICABLE), EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

d.      NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT,

COMPANY'S TOTAL LIABILITY TO CLIENT IN THE AGGREGATE FOR THE ENTIRE TERM (REGARDLESS OF WHETHER THE CLAIMS ARE BROUGHT DURING OR AFTER THE TERM) WITH RESPECT TO ALL CLAIMS ARISING FROM OR RELATED TO THE SUBJECT MATTER OF THIS AGREEMENT (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES) WILL NOT EXCEED AN AMOUNT EQUAL TO ONE (1) MONTHS FEE PAYABLE TO COMPANY PURSUANT TO THE APPLICABLE ORDER.

e.       EXCEPT FOR CLIENT'S BREACH OF ITS OBLIGATIONS UNDER SECTIONS  4, 5 a, 5 h AND 6, AND LOSS OR DAMAGE ARISING OUT OF CLIENT'S GROSS NEGLIGENCE, BAD FAITH OR WILLFUL MISCONDUCT, THE LIMITATIONS SET FORTH IN SECTIONS 5 c AND 5  d WILL APPLY TO ALL CLAIMS AND CAUSES OF ACTION, REGARDLESS OF WHETHER IN CONTRACT, TORT, STRICT LIABILITY OR OTHER THEORY.

f.       Client hereby waives the right to bring any claim against Company arising out of or in any way relating to an Order more than one (1) year after the date such Order expires or is terminated.  Each party recognizes and agrees that the warranty disclaimers, limitations of liability and remedy limitations in this Agreement are materially bargained for by the parties.

g.       Client acknowledges that cryptocurrency price movement, cryptocurrency difficulty, and legal and regulatory risks could have a material adverse impact on cryptocurrencies, cryptocurrency mining, Client Equipment, Services, and this Agreement.  Client assumes responsibility for all such risks, and Company disclaims all types of liabilities or loss of funds that may arise as a result.

h.       Client shall indemnify, defend and hold harmless Company and its affiliates, stockholders, directors, officers, employees, subcontractors and invitees from and against any losses, liabilities, damages, costs and expenses (including, without limitation, reasonable attorneys' fees) arising from or relating to (i) death, personal injury, bodily injury or property damage caused by Client or Client's customers or clients or Client Equipment; (ii) breach of Client's representations, warranties, or covenants in this Agreement or in an Order or Sections 2 or 6; (iii) fraud, bad faith, negligence or willful or reckless conduct of or by Client or Client's customers or clients; (iv) Client's or Client's customers' or clients' use of the Company Facility, Services, or Client Equipment; (v) any claim whatsoever by Client's customers or clients, or any third party related to the Services or Client Equipment; or (vi) any change in, or interpretation or administration of, any laws, regulations, statutes, treaties, rules, guidelines, ordinances, codes or the like, or any proposed or anticipated changes in, or interpretations or administration of the foregoing.

**6.       CONFIDENTIAL INFORMATION**

a.       Each party acknowledges that it and its employees or agents may, in the course of performing its responsibilities under this Agreement, be exposed to or acquire information which is proprietary to or confidential to the other party, including, without limitation, business plans, strategies, forecasts and projections and information about business structures, operations, systems, finances, assets, investments, investment strategies, software and other technology systems, and personnel, customers and suppliers (collectively, "**Confidential Information**").  Company's Confidential Information also includes the design, address and location of the Company Facilities (which is deemed to be not publicly known), the Services provided, equipment used at the Company Facilities, the configuration of cables, networks and services at the Company Facilities and the terms of this Agreement.  Neither party may use or copy any Confidential Information except to the limited extent necessary to perform its obligations under this Agreement and will not disclose any Confidential Information to any person or entity other than to its employees who have a need to know the Confidential Information or as otherwise expressly permitted by this Agreement.  Each party shall use the same measures that it uses to protect its own most confidential and proprietary information to protect the Confidential Information from use or disclosure in violation of this Agreement, but in no event less than commercially reasonable measures.

DocuSign Envelope ID: D20E8BC9-A946-44CD-8E7A-E36448669995

b.      The restrictions on use of Confidential Information do not apply to information if it (i) is known to the receiving party prior to receipt from the disclosing party directly or indirectly from a source other than one having an obligation of confidentiality to the disclosing party; (ii) becomes known (independently of disclosure by the disclosing party) to the receiving party directly or indirectly from a source other than one having an obligation of confidentiality to the disclosing party; (iii) becomes publicly known or otherwise ceases to be confidential, except through a breach of this Agreement by the receiving party; or (iv) is independently developed by the receiving party.  For the avoidance of doubt, the mere placement of materials or equipment containing information at a Company Facility does not constitute disclosure of such information to Company.

c.      Upon termination or expiration of this Agreement, or at any other time at the request of the other party, each party shall return to the other party, or destroy and delete, as applicable, all Confidential Information and any copies thereof in its possession or control.

d.      Neither party may use the other party's trademarks, service marks, trade names, copyrights, other intellectual property rights or other designations in any promotion, publication or press release without the prior written consent of the other party in each case, which consent may be given in an Order.

## 7.      INSURANCE

a.      Client agrees to maintain the following insurance, at its expense, during the Term, with insurers having a minimum AM Best rating of A- VII or S&P rating of A: (i) Commercial General Liability or Public Liability Insurance with a limit of US $2,000,000 per occurrence, US $4,000,000 in the aggregate (or the local currency equivalent), provided these limits may be achieved through a combination of primary and excess policies and such insurance will include coverage for bodily injury and property damage.

b.      Client will furnish Company with certificates of insurance upon request that evidence the minimum levels of insurance set forth herein, list Company as an additional insured or interested party on the Commercial General Liability or Public Liability Insurance and designate that Client's insurance is primary and non-contributory  Client will provide at least thirty (30) days' prior written notice to Company of any non-renewal or cancellation of the policies referenced above.

## 8.      MISCELLANEOUS

a.      Notice.  Except where expressly provided in this Agreement or an Order, all notices, consents, or approvals required by this Agreement will only be in writing and sent by overnight courier, certified or registered mail, overnight delivery requiring a signature upon receipt, or delivery by hand to the parties at the respective addresses set forth on the first page of this Agreement.  Notice is effective when received.

b.      Entire Agreement.  This Agreement constitutes the entire agreement between the parties with respect to the subject matter of this Agreement, and supersedes and replaces all prior or contemporaneous discussions, negotiations, proposals, understandings and agreements, written or oral, as well as any industry custom.  Each party acknowledges that, in entering into this Agreement, it has not relied on, and shall have no right or remedy in respect of, any statement, representation, assurance or warranty other than as expressly set out in this Agreement.  This Agreement may be executed in two (2) or more counterparts (and the signature pages may be delivered with ink or electronic signature or by e-mail), each will be deemed an original, but all together will constitute one and the same instrument.  Except where otherwise expressly provided in this Agreement, this Agreement may be amended only by the written agreement of both parties.

c.      Survival.  Any provision of this Agreement, which, by its nature, would survive termination or expiration of this Agreement will survive any such termination or expiration, including, without limitation,

those provisions concerning confidentiality, indemnification and limitation of liability.

d.      Subcontracting and Assignment.  Company may permit any affiliate, independent contractor or other third party to perform any of Company's obligations hereunder provided that Company remains primarily liable for the performance of its obligations.  Company may assign, delegate, or transfer this Agreement or any of its rights and obligations hereunder without notice to or prior written consent of Client.  Client may not assign, delegate or transfer this Agreement or any of its rights and obligations hereunder without the prior written consent of Company.  Any assignment or transfer in violation of this Agreement is void.  This Agreement will be binding upon and inure to the benefit of all permitted successors and assigns.  Nothing in this Agreement is intended to or will confer upon any third party any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement

e.      Force Majeure.  Except for Client's obligation to pay amounts owed under this Agreement, neither party will be responsible or in any way liable to the other party, and neither party will have any termination or other rights, arising out of or relating to a Force Majeure Event.  A "**Force Majeure Event**" is a failure by the other party to perform any of its obligations under this Agreement if such failure is caused by events or circumstances beyond its reasonable control, including, without limitation, acts of God, war, labor strike, terrorist act, fire, flood, earthquake, landslide, hurricane, typhoon, tsunami, volcanic eruption, inclement weather, health epidemic or any law, order, regulation or other action of any governing authority or agency.

f.      Governing Law and Arbitration.  This Agreement and all claims arising out of or related to this Agreement are governed by and construed in accordance with the laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any jurisdiction other than the State of Delaware.  Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including, without limitation, the determination of the scope or applicability of this Agreement to arbitrate, shall be determined exclusively by arbitration in King County, Washington before three (3) arbitrators.  The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules & Procedures.  Any award, order or judgment pursuant to arbitration ("**Award**") is final and may be entered and enforced in any court of competent jurisdiction, and each party shall submit to any court of competent jurisdiction for purposes of the enforcement of any Award.  The arbitrator may, in the Award, allocate all or part of the costs of the arbitration, including, without limitation, the fees of the arbitrator and the reasonable attorneys' fees of the prevailing party.

g.      General.  The rights and remedies provided for herein are cumulative and not exclusive of any rights or remedies that a party would otherwise have.  The parties are independent contractors, and this Agreement does not establish any relationship of partnership, joint venture, employment, franchise or agency between them.  Neither party may bind the other or incur obligations on the other's behalf without the other's prior written consent.  There are no third-party beneficiaries to this Agreement.  No waiver of any breach of any provision of this Agreement will constitute a waiver of any prior, concurrent or subsequent breach of the same or any other provisions hereof, and no waiver will be effective unless made in writing and signed by an authorized representative of the waiving party.

[*Signature page follows*]

**Core Scientific, Inc.**

By: _Michael Trzupek_

Name: _Michael Trzupek_

Title: Authorized Representative

Date: _12/18/2020_

**Celsius Core LLC**

By: _S. Daniel Leon_

Name: _S. Daniel Leon_

Title: _S. Daniel Leon, President/COO_

Date: _12/18/2020_

**MASTER SERVICES AGREEMENT ORDER #1**

This Order, including the terms and conditions hereunder, incorporates by reference the terms of the Master Services Agreement dated as of December 18, 2020 (the "**Agreement**") between Provider and Client (as defined below). If any terms of this Order conflict with the terms of the Agreement, the terms of this Order shall govern with respect to this Order. Capitalized terms used but not defined in this Order shall have the meanings ascribed in the Agreement.

| Commencement Date: | April 15, 2021 or the actual date Units are delivered to Client at Provider Facility if such Units are not delivered on such date. | | |
|---|---|---|---|
| Facility: | Provider Facility as determined by Provider. | | |
| Equipment hosted: | **Manufacturing Batch Month** | **Quantity & Type of Unit (the "Units")** | **Assumed power consumption per Unit (KWh):** |
| | March | 2,940 S19 | 3.413 KWh |
| | March | 60 S19 PRO | 3.413 KWh |
| Hosting-Services Rate: | USD $.0556 / KWh | | |
| Payment Due Prior to Installation: | USD $460,520 no later than the earlier of<br>(i) the date of installation of the Units or (ii) April 15, 2021 consisting of:<br>• A $415,520 prepayment to be applied as a credit against future monthly invoices for hosting services as they become due.<br>• A $45,000 Set-up Fee | | |
| Equipment Purchase Payment Due Dates: | Due Date | Amount (USD) | |
| | 12/22/2020 | $1,627,458.36 | |
| | 01/15/2021 | $2,441,187.54 | |
| | 02/15/2021 | $4,068,645.90 | |
| Estimated Delivery Date: | April 15, 2021.  Provider to notify Client as soon as reasonably possible in advance if Units will not be delivered by this date. Provider may terminate this Order if substantially all the Units are not delivered within 60 days of the Estimated Delivery Date. | | |
| Fees: | Set-up fee: $15/Unit | | |
| Fees payable pursuant to Section 4 in connection with Service Termination/ Suspension | Equipment disconnection fee: $25/Unit<br>Storage Fee: $10/month/Unit<br>Reinstatement fee: $25/Unit | | |

**Order Term.** Subject to acceptance by Provider, the term of this Order shall commence on the **Commencement Date** and continue until the second Anniversary of the Commencement Date (the "**Initial Term**"), unless sooner terminated (i) by Provider, as provided above, (ii) by mutual agreement of the parties, or (iii) pursuant to Section 4 of the Agreement. Unless earlier terminated, this Order shall automatically renew for successive 12-month renewal terms ("**Renewal Term**") unless terminated during a renewal term as set forth in the Agreement.

**Fees**. Client shall pay the fees provided for in this Order. The Fees for Services will be determined initially by reference to the Assumed power consumption per Unit of each deployed Unit, multiplied by the Hosting Services Rate (each as set forth above in this Order).  Subsequent invoices will contain any additional charges incurred by Client and adjustments resulting from any differences between the Fees for Services invoiced in the preceding month and the Fee for Services based on Provider's determination of power utilized by Client during that month, as well as any adjustments to Provider's estimate of power to be utilized by Client in the upcoming month.  Fees for Services for each month shall be paid in advance, in accordance with Section 3 of the Agreement.

**Purchase/Delivery/Installation Schedule for Units:** Company will facilitate the procurement on behalf of Client at Client's expense the above referenced Units from Bitmain Malaysia. Company will facilitate the procurement, shipping, and installation of the Units on behalf of Client at Client's sole cost and expense (including any and all costs and expenses associated with shipping, importing and transporting the Units to the Facility as provided above. Client will pay $2,695 per S19 Unit and $3,566.53 per S19 PRO Unit (total of

DocuSign Envelope ID: D20E8BC9-A946-44CD-8E7A-E36448669998

$8,137,292). Client will make payments according to the Equipment Purchase Payment Due Dates listed above. Client will pay the Provider's invoice for Units within five business days of receipt and execute any necessary power of attorney and other documents required by customs broker to enable shipment of the Units to a Core Facility on Client's behalf. Risk of loss and ownership of the Units shall pass between Bitmain and Client. Any and all taxes with respect to the purchase of the equipment will be the responsibility of Client.

**Subcontracting and Assignment. Section 8d. of the Agreement is hereby amended to read in its entirety:**

    d.      Subcontracting and Assignment.  Company may permit any affiliate, independent contractor or other third party to perform any of Company's obligations hereunder provided that Company remains primarily liable for the performance of its obligations.  Company may assign, delegate, or transfer this Agreement or any of its rights and obligations hereunder without notice to or prior written consent of Client.  Client may not assign, delegate or transfer this Agreement or any of its rights and obligations hereunder without the prior written consent of Company; provided, however, Client may assign, delegate or transfer an Order pursuant to this Agreement to a third party upon the written consent of the Company, which consent shall not be unreasonably, withheld, obstructed or delayed if such assignment is to a third party not competitive to Company and such party executes a new Order on standard terms and conditions containing the hosting price and hosting term set forth in the Order to be assigned.  Any assignment or transfer in violation of this Agreement is void. This Agreement will be binding upon and inure to the benefit of all permitted successors and assigns.  Nothing in this Agreement is intended to or will confer upon any third party any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement

**Right of First Offer:** Provided Client has executed one or more Orders on the date hereof with respect to Equipment having a total purchase price of more than $50 million, Provider agrees to make available for purchase by Client up to 45% of any newly available units during the calendar year 2021.  In the event units become available, Provider shall notify Client of such the units and the price at which such units are available. In the event Provider notifies Client of the availability of such newly additional units, Client shall have five days to execute an additional Order for such units on hosting terms and conditions mutually agreeable to both Client and Provider.

By: _S. Daniel Leon_

**Celsius Core LLC, "Client"**
**Name:** S. Daniel Leon
**Title:** S. Daniel Leon, President/COO
**Date:** 12/18/2020

By: _Michael Trzupek_

**Core Scientific, Inc., "Provider"**
**Name:** Michael Trzupek
**Title:** **Chief Financial Officer**
**Date:** 12/18/2020

**MASTER SERVICES AGREEMENT ORDER #2**

This Order, including the terms and conditions hereunder, incorporates by reference the terms of the Master Services Agreement dated as of December 18, 2020 (the "**Agreement**") between Provider and Client (as defined below). If any terms of this Order conflict with the terms of the Agreement, the terms of this Order shall govern with respect to this Order. Capitalized terms used but not defined in this Order shall have the meanings ascribed in the Agreement.

| Commencement Date: | May 15, 2021 or the actual date Units are delivered to Client at Provider Facility if such Units are not delivered on such date. | | |
|---|---|---|---|
| Facility: | Provider Facility as determined by Provider. | | |
| Equipment hosted: | **Manufacturing Batch Month** | **Quantity & Type of Unit (the "Units")** | **Assumed power consumption per Unit (KWh):** |
| | April | 3,500 S19 | 3.413 KWh |
| Hosting-Services Rate: | USD $.0556 / KWh | | |
| Payment Due Prior to Installation: | USD $537,273 no later than the earlier of (i) the date of installation of the Units or (ii) May 15, 2021 consisting of:<br>• A $484,773 prepayment to be applied as a credit against future monthly invoices for hosting services as they become due.<br>• A $52,500 Set-up Fee | | |
| Equipment Purchase Payment Due Dates: | Due Date | | Amount (USD) |
| | 12/22/2020 | | $1,886,500.00 |
| | 01/15/2021 | | $2,829,750.00 |
| | 03/15/2021 | | $4,716,250.00 |
| Estimated Delivery Date: | May 15, 2021.  Provider to notify Client as soon as reasonably possible in advance if Units will not be delivered by this date. Provider may terminate this Order if substantially all the Units are not delivered within 60 days of the Estimated Delivery Date. | | |
| Fees: | Set-up fee: $15/Unit | | |
| Fees payable pursuant to Section 4 in connection with Service Termination/ Suspension | Equipment disconnection fee: $25/Unit<br>Storage Fee: $10/month/Unit<br>Reinstatement fee: $25/Unit | | |

**Order Term.**  Subject to acceptance by Provider, the term of this Order shall commence on the **Commencement Date** and continue until the second Anniversary of the Commencement Date (the "**Initial Term**"), unless sooner terminated (i) by Provider, as provided above, (ii) by mutual agreement of the parties, or (iii) pursuant to Section 4 of the Agreement. Unless earlier terminated, this Order shall automatically renew for successive 12-month renewal terms ("**Renewal Term**") as set forth in the Agreement.

**Fees**. Client shall pay the fees provided for in this Order. The Fees for Services will be determined initially by reference to the Assumed power consumption per Unit of each deployed Unit, multiplied by the Hosting Services Rate (each as set forth above in this Order).  Subsequent invoices will contain any additional charges incurred by Client and adjustments resulting from any differences between the Fees for Services invoiced in the preceding month and the Fee for Services based on Provider's determination of power utilized by Client during that month, as well as any adjustments to Provider's estimate of power to be utilized by Client in the upcoming month.  Fees for Services for each month shall be paid in advance, in accordance with Section 3 of the Agreement.

**Purchase/Delivery/Installation Schedule for Units:** Company will facilitate the procurement on behalf of Client at Client's expense the above referenced Units from Bitmain Malaysia. Company will facilitate the procurement, shipping, and installation of the Units on behalf of Client at Client's sole cost and expense (including any and all costs and expenses associated with shipping, importing and transporting the Units to the Facility as provided above. Client will pay $2,695 per S19 Unit (total of $9,432,500). Client will make payments according to the Equipment Purchase Payment Due Dates listed above. Client will pay the Provider's invoice for Units within five business days of receipt and execute any necessary power of attorney and other documents

12

required by customs broker to enable shipment of the Units to a Core Facility on Client's behalf. Risk of loss and ownership of the Units shall pass between Bitmain and Client. Any and all taxes with respect to the purchase of the equipment will be the responsibility of Client.

**Subcontracting and Assignment. Section 8d. of the Agreement is hereby amended to read in its entirety:**

    d.    <u>Subcontracting and Assignment</u>.  Company may permit any affiliate, independent contractor or other third party to perform any of Company's obligations hereunder provided that Company remains primarily liable for the performance of its obligations. Company may assign, delegate, or transfer this Agreement or any of its rights and obligations hereunder without notice to or prior written consent of Client.  Client may not assign, delegate or transfer this Agreement or any of its rights and obligations hereunder without the prior written consent of Company; provided, however, Client may assign, delegate or transfer an Order pursuant to this Agreement to a third party upon the written consent of the Company, which consent shall not be unreasonably, withheld, obstructed or delayed if such assignment is to a third party not competitive to Company and such party executes a new Order on standard terms and conditions containing the hosting price and hosting term set forth in the Order to be assigned.  Any assignment or transfer in violation of this Agreement is void.  This Agreement will be binding upon and inure to the benefit of all permitted successors and assigns.  Nothing in this Agreement is intended to or will confer upon any third party any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement

**Right of First Offer:** Provided Client has executed one or more Orders on the date hereof with respect to Equipment having a total purchase price of more than $50 million, Provider agrees to make available for purchase by Client up to 45% of any newly available units during the calendar year 2021.  In the event units become available, Provider shall notify Client of such the units and the price at which such units are available. In the event Provider notifies Client of the availability of such newly additional units, Client shall have five days to execute an additional Order for such units on hosting terms and conditions mutually agreeable to both Client and Provider.

By: _S. Daniel Leon_         By: _Michael Trzupek_
**Celsius Core LLC, "Client"**       **Core Scientific, Inc., "Provider"**
Name: S. Daniel Leon        Name: Michael Trzupek
Title: S. Daniel Leon, President/COO    **Title: Chief Financial Officer**
Date: 12/18/2020            Date: 12/18/2020

**MASTER SERVICES AGREEMENT ORDER #3**

This Order, including the terms and conditions hereunder, incorporates by reference the terms of the Master Services Agreement dated as of December 18, 2020 (the "**Agreement**") between Provider and Client (as defined below). If any terms of this Order conflict with the terms of the Agreement, the terms of this Order shall govern with respect to this Order. Capitalized terms used but not defined in this Order shall have the meanings ascribed in the Agreement.

| Commencement Date: | June 15, 2021 or the actual date Units are delivered to Client at Provider Facility if such Units are not delivered on such date. | | |
|---|---|---|---|
| Facility: | Provider Facility as determined by Provider. | | |
| Equipment hosted: | **Manufacturing Batch Month** | **Quantity & Type of Unit (the "Units")** | **Assumed power consumption per Unit (KWh):** |
| | May | 3,000 S19 | 3.413 KWh |
| | May | 500 S19 PRO | 3.413 KWh |
| Hosting-Services Rate: | USD $.0556 / KWh | | |
| Payment Due Prior to Installation: | USD $537,273 no later than the earlier of (i) the date of installation of the Units or (ii) June 15, 2021 consisting of: <ul><li>A $484,773 prepayment to be applied as a credit against future monthly invoices for hosting services as they become due.</li><li>A $52,500 Set-up Fee</li></ul> | | |
| Equipment Purchase Payment Due Dates: | Due Date | | Amount (US) |
| | 12/22/2020 | | $1,973,653.00 |
| | 01/15/2021 | | $2,960,479.50 |
| | 04/15/2021 | | $4,934,132.50 |
| Estimated Delivery Date: | June 15, 2021.  Provider to notify Client as soon as reasonably possible in advance if Units will not be delivered by this date. Provider may terminate this Order if substantially all the Units are not delivered within 60 days of the Estimated Delivery Date. | | |
| Fees: | Set-up fee: $15/Unit | | |
| Fees payable pursuant to Section 4 in connection with Service Termination/ Suspension | Equipment disconnection fee: $25/Unit <br> Storage Fee: $10/month/Unit <br> Reinstatement fee: $25/Unit | | |

**Order Term.**  Subject to acceptance by Provider, the term of this Order shall commence on the **Commencement Date** and continue until the second Anniversary of the Commencement Date (the "**Initial Term**"), unless sooner terminated (i) by Provider, as provided above, (ii) by mutual agreement of the parties, or (iii) pursuant to Section 4 of the Agreement. Unless earlier terminated, this Order shall automatically renew for successive 12-month renewal terms ("**Renewal Term**") as set forth in the Agreement.

**Fees**. Client shall pay the fees provided for in this Order. The Fees for Services will be determined initially by reference to the Assumed power consumption per Unit of each deployed Unit, multiplied by the Hosting Services Rate (each as set forth above in this Order).  Subsequent invoices will contain any additional charges incurred by Client and adjustments resulting from any differences between the Fees for Services invoiced in the preceding month and the Fee for Services based on Provider's determination of power utilized by Client during that month, as well as any adjustments to Provider's estimate of power to be utilized by Client in the upcoming month.  Fees for Services for each month shall be paid in advance, in accordance with Section 3 of the Agreement.

**Purchase/Delivery/Installation Schedule for Units:** Company will facilitate the procurement on behalf of Client at Client's expense the above referenced Units from Bitmain Malaysia. Company will facilitate the procurement, shipping, and installation of the Units on behalf of Client at Client's sole cost and expense (including any and all costs and expenses associated with shipping, importing and transporting the Units to the Facility as provided above. Client will pay $2,695 per S19 Unit and $3,566.53 per S19 PRO Unit (total of $9,868,265). Client will make payments according to the Equipment Purchase Payment Due Dates listed above.

DocuSign Envelope ID: D20E8BC9-A946-44CD-8E7A-E36448669995

Client will pay the Provider's invoice for Units within five business days of receipt and execute any necessary power of attorney and other documents required by customs broker to enable shipment of the Units to a Core Facility on Client's behalf. Risk of loss and ownership of the Units shall pass between Bitmain and Client. Any and all taxes with respect to the purchase of the equipment will be the responsibility of Client.

**Subcontracting and Assignment. Section 8d. of the Agreement is hereby amended to read in its entirety:**

> d.  <u>Subcontracting and Assignment</u>.  Company may permit any affiliate, independent contractor or other third party to perform any of Company's obligations hereunder provided that Company remains primarily liable for the performance of its obligations. Company may assign, delegate, or transfer this Agreement or any of its rights and obligations hereunder without notice to or prior written consent of Client.  Client may not assign, delegate or transfer this Agreement or any of its rights and obligations hereunder without the prior written consent of Company; provided, however, Client may assign, delegate or transfer an Order pursuant to this Agreement to a third party upon the written consent of the Company, which consent shall not be unreasonably, withheld, obstructed or delayed if such assignment is to a third party not competitive to Company and such party executes a new Order on standard terms and conditions containing the hosting price and hosting term set forth in the Order to be assigned.  Any assignment or transfer in violation of this Agreement is void.  This Agreement will be binding upon and inure to the benefit of all permitted successors and assigns.  Nothing in this Agreement is intended to or will confer upon any third party any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement

**Right of First Offer:** Provided Client has executed one or more Orders on the date hereof with respect to Equipment having a total purchase price of more than $50 million, Provider agrees to make available for purchase by Client up to 45% of any newly available units during the calendar year 2021.  In the event units become available, Provider shall notify Client of such the units and the price at which such units are available. In the event Provider notifies Client of the availability of such newly additional units, Client shall have five days to execute an additional Order for such units on hosting terms and conditions mutually agreeable to both Client and Provider.

By: _S. Daniel Leon_
Celsius Core LLC, "Client"
Name: S. Daniel Leon
Title: S. Daniel Leon, President/COO
Date: 12/18/2020

By: _Michael Trzupek_
Core Scientific, Inc., "Provider"
Name: Michael Trzupek
Title: **Chief Financial Officer**
Date: 12/18/2020

DocuSign Envelope ID: D20E8BC9-A946-44CD-8E7A-E36448669995

## MASTER SERVICES AGREEMENT ORDER #4

This Order, including the terms and conditions hereunder, incorporates by reference the terms of the Master Services Agreement dated as of December 18, 2020 (the "**Agreement**") between Provider and Client (as defined below). If any terms of this Order conflict with the terms of the Agreement, the terms of this Order shall govern with respect to this Order. Capitalized terms used but not defined in this Order shall have the meanings ascribed in the Agreement.

| Commencement Date: | July 15, 2021 or the actual date Units are delivered to Client at Provider Facility if such Units are not delivered on such date. | | |
|---|---|---|---|
| Facility: | Provider Facility as determined by Provider. | | |
| Equipment hosted: | **Manufacturing Batch Month** | **Quantity & Type of Unit (the "Units")** | **Assumed power consumption per Unit (KWh):** |
| | June | 3,000 S19 | 3.413 KWh |
| | June | 500 S19 PRO | 3.413 KWh |
| Hosting-Services Rate: | USD $.0556 / KWh | | |
| Payment Due Prior to Installation: | USD $537,273 no later than the earlier of (i) the date of installation of the Units or (ii) July 15, 2021 consisting of: <ul><li>A $484,773 prepayment to be applied as a credit against future monthly invoices for hosting services as they become due.</li><li>A $52,500 Set-up Fee</li></ul> | | |
| Equipment Purchase Payment Due Dates: | Due Date | Amount (US) | |
| | 12/22/2020 | $1,973,653.00 | |
| | 01/15/2021 | $2,960,479.50 | |
| | 05/15/2021 | $4,934,132.50 | |
| Estimated Delivery Date: | July 15, 2021.  Provider to notify Client as soon as reasonably possible in advance if Units will not be delivered by this date. Provider may terminate this Order if substantially all the Units are not delivered within 60 days of the Estimated Delivery Date. | | |
| Fees: | Set-up fee: $15/Unit | | |
| Fees payable pursuant to Section 4 in connection with Service Termination/ Suspension | Equipment disconnection fee: $25/Unit<br>Storage Fee: $10/month/Unit<br>Reinstatement fee: $25/Unit | | |

**Order Term.**  Subject to acceptance by Provider, the term of this Order shall commence on the **Commencement Date** and continue until the second Anniversary of the Commencement Date (the "**Initial Term**"), unless sooner terminated (i) by Provider, as provided above, (ii) by mutual agreement of the parties, or (iii) pursuant to Section 4 of the Agreement. Unless earlier terminated, this Order shall automatically renew for successive 12-month renewal terms ("**Renewal Term**") as set forth in the Agreement.

**Fees**. Client shall pay the fees provided for in this Order. The Fees for Services will be determined initially by reference to the Assumed power consumption per Unit of each deployed Unit, multiplied by the Hosting Services Rate (each as set forth above in this Order). Subsequent invoices will contain any additional charges incurred by Client and adjustments resulting from any differences between the Fees for Services invoiced in the preceding month and the Fee for Services based on Provider's determination of power utilized by Client during that month, as well as any adjustments to Provider's estimate of power to be utilized by Client in the upcoming month.  Fees for Services for each month shall be paid in advance, in accordance with Section 3 of the Agreement.

**Purchase/Delivery/Installation Schedule for Units:** Company will facilitate the procurement on behalf of Client at Client's expense the above referenced Units from Bitmain Malaysia. Company will facilitate the procurement, shipping, and installation of the Units on behalf of Client at Client's sole cost and expense (including any and all costs and expenses associated with shipping, importing and transporting the Units to the Facility as provided above. Client will pay $2,695 per S19 Unit and $3,566.53 per S19 PRO Unit (total of $9,868,265). Client will make payments according to the Equipment Purchase Payment Due Dates listed above.

DocuSign Envelope ID: D20E8BC9-A946-44CD-8E7A-E36448669995

Client will pay the Provider's invoice for Units within five business days of receipt and execute any necessary power of attorney and other documents required by customs broker to enable shipment of the Units to a Core Facility on Client's behalf. Risk of loss and ownership of the Units shall pass between Bitmain and Client. Any and all taxes with respect to the purchase of the equipment will be the responsibility of Client.

**Subcontracting and Assignment. Section 8d. of the Agreement is hereby amended to read in its entirety:**

    d.  <u>Subcontracting and Assignment</u>.  Company may permit any affiliate, independent contractor or other third party to perform any of Company's obligations hereunder provided that Company remains primarily liable for the performance of its obligations. Company may assign, delegate, or transfer this Agreement or any of its rights and obligations hereunder without notice to or prior written consent of Client.  Client may not assign, delegate or transfer this Agreement or any of its rights and obligations hereunder without the prior written consent of Company; provided, however, Client may assign, delegate or transfer an Order pursuant to this Agreement to a third party upon the written consent of the Company, which consent shall not be unreasonably, withheld, obstructed or delayed if such assignment is to a third party not competitive to Company and such party executes a new Order on standard terms and conditions containing the hosting price and hosting term set forth in the Order to be assigned.  Any assignment or transfer in violation of this Agreement is void.  This Agreement will be binding upon and inure to the benefit of all permitted successors and assigns.  Nothing in this Agreement is intended to or will confer upon any third party any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement

**Right of First Offer:** Provided Client has executed one or more Orders on the date hereof with respect to Equipment having a total purchase price of more than $50 million, Provider agrees to make available for purchase by Client up to 45% of any newly available units during the calendar year 2021.  In the event units become available, Provider shall notify Client of such the units and the price at which such units are available. In the event Provider notifies Client of the availability of such newly additional units, Client shall have five days to execute an additional Order for such units on hosting terms and conditions mutually agreeable to both Client and Provider.

By: _S. Daniel Leon_           By: _Michael Trzupek_

Celsius Core LLC, "Client"          Core Scientific, Inc., "Provider"

Name: S. Daniel Leon          Name: Michael Trzupek

Title: S. Daniel Leon, President/COO          Title: **Chief Financial Officer**

Date: 12/18/2020          Date: 12/18/2020

17

## MASTER SERVICES AGREEMENT ORDER #5

     This Order, including the terms and conditions hereunder, incorporates by reference the terms of the Master Services Agreement dated as of December 18, 2020 (the "**Agreement**") between Provider and Client (as defined below). If any terms of this Order conflict with the terms of the Agreement, the terms of this Order shall govern with respect to this Order. Capitalized terms used but not defined in this Order shall have the meanings ascribed in the Agreement.

| Commencement Date: | August 15, 2021 or the actual date Units are delivered to Client at Provider Facility if such Units are not delivered on such date. | | |
| --- | --- | --- | --- |
| Facility: | Provider Facility as determined by Provider. | | |
| Equipment hosted: | **Manufacturing Batch Month** | **Quantity & Type of Unit (the "Units")** | **Assumed power consumption per Unit (KWh):** |
| | July | 4,000 S19j | 3.255 KWh |
| Hosting-Services Rate: | USD $0.0556 / KWh | | |
| Payment Due Prior to Installation: | USD $588,456 no later than the earlier of (i) the date of installation of the Units or (ii) August 15, 2021 consisting of:<ul><li>A $528,456 prepayment to be applied as a credit against future monthly invoices for hosting services as they become due.</li><li>A $60,000 Set-up Fee</li></ul> | | |
| Equipment Purchase Payment Due Dates: | Due Date | | Amount (US) |
| | 12/22/2020 | | $2,239,624.00 |
| | 01/15/2021 | | $3,359,436.00 |
| | 06/15/2021 | | $5,599,060.00 |
| Estimated Delivery Date: | August 15, 2021.  Provider to notify Client as soon as reasonably possible in advance if Units will not be delivered by this date. Provider may terminate this Order if substantially all the Units are not delivered within 60 days of the Estimated Delivery Date. | | |
| Fees: | Set-up fee: $15/Unit | | |
| Fees payable pursuant to Section 4 in connection with Service Termination/ Suspension | Equipment disconnection fee: $25/Unit<br>Storage Fee: $10/month/Unit<br>Reinstatement fee: $25/Unit | | |

**Order Term.** Subject to acceptance by Provider, the term of this Order shall commence on the **Commencement Date** and continue until the second Anniversary of the Commencement Date (the "**Initial Term**"), unless sooner terminated (i) by Provider, as provided above, (ii) by mutual agreement of the parties, or (iii) pursuant to Section 4 of the Agreement. Unless earlier terminated, this Order shall automatically renew for successive 12-month renewal terms ("**Renewal Term**") as set forth in the Agreement.

**Fees**. Client shall pay the fees provided for in this Order. The Fees for Services will be determined initially by reference to the Assumed power consumption per Unit of each deployed Unit, multiplied by the Hosting Services Rate (each as set forth above in this Order).  Subsequent invoices will contain any additional charges incurred by Client and adjustments resulting from any differences between the Fees for Services invoiced in the preceding month and the Fee for Services based on Provider's determination of power utilized by Client during that month, as well as any adjustments to Provider's estimate of power to be utilized by Client in the upcoming month.  Fees for Services for each month shall be paid in advance, in accordance with Section 3 of the Agreement.

**Purchase/Delivery/Installation Schedule for Units:** Company will facilitate the procurement on behalf of Client at Client's expense the above referenced Units from Bitmain Malaysia. Company will facilitate the procurement, shipping, and installation of the Units on behalf of Client at Client's sole cost and expense (including any and all costs and expenses associated with shipping, importing and transporting the Units to the Facility as provided above. Client will pay $2,799.53 per S19j Unit (total of $11,198,120). Client will make payments according to the Equipment Purchase Payment Due Dates listed above. Client will pay the Provider's invoice for Units within five business days of receipt and execute any necessary power of attorney and other

documents required by customs broker to enable shipment of the Units to a Core Facility on Client's behalf. Risk of loss and ownership of the Units shall pass between Bitmain and Client. Any and all taxes with respect to the purchase of the equipment will be the responsibility of Client.

**Subcontracting and Assignment. Section 8d. of the Agreement is hereby amended to read in its entirety:**

d. <u>Subcontracting and Assignment</u>. Company may permit any affiliate, independent contractor or other third party to perform any of Company's obligations hereunder provided that Company remains primarily liable for the performance of its obligations. Company may assign, delegate, or transfer this Agreement or any of its rights and obligations hereunder without notice to or prior written consent of Client. Client may not assign, delegate or transfer this Agreement or any of its rights and obligations hereunder without the prior written consent of Company; provided, however, Client may assign, delegate or transfer an Order pursuant to this Agreement to a third party upon the written consent of the Company, which consent shall not be unreasonably, withheld, obstructed or delayed if such assignment is to a third party not competitive to Company and such party executes a new Order on standard terms and conditions containing the hosting price and hosting term set forth in the Order to be assigned. Any assignment or transfer in violation of this Agreement is void. This Agreement will be binding upon and inure to the benefit of all permitted successors and assigns. Nothing in this Agreement is intended to or will confer upon any third party any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement

**Right of First Offer:** Provided Client has executed one or more Orders on the date hereof with respect to Equipment having a total purchase price of more than $50 million, Provider agrees to make available for purchase by Client up to 45% of any newly available units during the calendar year 2021. In the event units become available, Provider shall notify Client of such the units and the price at which such units are available. In the event Provider notifies Client of the availability of such newly additional units, Client shall have five days to execute an additional Order for such units on hosting terms and conditions mutually agreeable to both Client and Provider.

By: _S. Daniel Leon_____

**Celsius Core LLC, "Client"**
Name: ___S. Daniel Leon_____
Title: ___S. Daniel Leon, President/COO___
Date: ___12/18/2020_____

By: _Michael Trzupek_____

**Core Scientific, Inc., "Provider"**
Name: ___Michael Trzupek_____
Title: __**Chief Financial Officer**_____
Date: ___12/18/2020_____

19

**MASTER SERVICES AGREEMENT ORDER #6**

This Order, including the terms and conditions hereunder, incorporates by reference the terms of the Master Services Agreement dated as of December 18, 2020 (the "**Agreement**") between Provider and Client (as defined below). If any terms of this Order conflict with the terms of the Agreement, the terms of this Order shall govern with respect to this Order. Capitalized terms used but not defined in this Order shall have the meanings ascribed in the Agreement.

| | | | |
|---|---|---|---|
| **Commencement Date:** | September 15, 2021 or the actual date Units are delivered to Client at Provider Facility if such Units are not delivered on such date. | | |
| **Facility:** | Provider Facility as determined by Provider. | | |
| **Equipment hosted:** | **Manufacturing Batch Month** | **Quantity & Type of Unit (the "Units")** | **Assumed power consumption per Unit (KWh):** |
| | August | 2,300 S19j | 3.255 KWh |
| **Hosting-Services Rate:** | USD $.0556 / KWh | | |
| **Payment Due Prior to Installation:** | USD $338,362   no later than the earlier of (i) the date of installation of the Units or (ii) September15, 2021 consisting of: <br> • A $303,862 prepayment to be applied as a credit against future monthly invoices for hosting services as they become due. <br> • A $34,500 Set-up Fee | | |
| **Equipment Purchase Payment Due Dates:** | Due Date | Amount (US) | |
| | 12/22/2020 | $1,287,783.80 | |
| | 01/15/2021 | $1,931,675.70 | |
| | 07/15/2021 | $3,219,425.00 | |
| **Estimated Delivery Date:** | September 15, 2021.  Provider to notify Client as soon as reasonably possible in advance if Units will not be delivered by this date. Provider may terminate this Order if substantially all the Units are not delivered within 60 days of the Estimated Delivery Date. | | |
| **Fees:** | Set-up fee: $15/Unit | | |
| **Fees payable pursuant to Section 4 in connection with Service Termination/ Suspension** | Equipment disconnection fee: $25/Unit <br> Storage Fee: $10/month/Unit <br> Reinstatement fee: $25/Unit | | |

**Order Term.** Subject to acceptance by Provider, the term of this Order shall commence on the **Commencement Date** and continue until the second Anniversary of the Commencement Date (the "**Initial Term**"), unless sooner terminated (i) by Provider, as provided above, (ii) by mutual agreement of the parties, or (iii) pursuant to Section 4 of the Agreement. Unless earlier terminated, this Order shall automatically renew for successive 12-month renewal terms ("**Renewal Term**") as set forth in the Agreement.

**Fees**. Client shall pay the fees provided for in this Order. The Fees for Services will be determined initially by reference to the Assumed power consumption per Unit of each deployed Unit, multiplied by the HostingServices Rate (each as set forth above in this Order).  Subsequent invoices will contain any additional charges incurred by Client and adjustments resulting from any differences between the Fees for Services invoiced in the preceding month and the Fee for Services based on Provider's determination of power utilized by Client during that month, as well as any adjustments to Provider's estimate of power to be utilized by Client in the upcoming month.  Fees for Services for each month shall be paid in advance, in accordance with Section 3 of the Agreement.

**Purchase/Delivery/Installation Schedule for Units:** Company will facilitate the procurement on behalf of Client at Client's expense the above referenced Units from Bitmain Malaysia. Company will facilitate the procurement, shipping, and installation of the Units on behalf of Client at Client's sole cost and expense (including any and all costs and expenses associated with shipping, importing and transporting the Units to the Facility as provided above. Client will pay $2,799.53 per S19j Unit (total of $6,438,919). Client will make payments according to the Equipment Purchase Payment Due Dates listed above. Client will pay the Provider's invoice for Units within five business days of receipt and execute any necessary power of attorney and other

DocuSign Envelope ID: D30E8BC9-A946-44CD-8E7A-E36448669995

documents required by customs broker to enable shipment of the Units to a Core Facility on Client's behalf. Risk of loss and ownership of the Units shall pass between Bitmain and Client. Any and all taxes with respect to the purchase of the equipment will be the responsibility of Client.

**Subcontracting and Assignment. Section 8d. of the Agreement is hereby amended to read in its entirety:**

d. <u>Subcontracting and Assignment</u>. Company may permit any affiliate, independent contractor or other third party to perform any of Company's obligations hereunder provided that Company remains primarily liable for the performance of its obligations. Company may assign, delegate, or transfer this Agreement or any of its rights and obligations hereunder without notice to or prior written consent of Client. Client may not assign, delegate or transfer this Agreement or any of its rights and obligations hereunder without the prior written consent of Company; provided, however, Client may assign, delegate or transfer an Order pursuant to this Agreement to a third party upon the written consent of the Company, which consent shall not be unreasonably, withheld, obstructed or delayed if such assignment is to a third party not competitive to Company and such party executes a new Order on standard terms and conditions containing the hosting price and hosting term set forth in the Order to be assigned. Any assignment or transfer in violation of this Agreement is void. This Agreement will be binding upon and inure to the benefit of all permitted successors and assigns. Nothing in this Agreement is intended to or will confer upon any third party any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement

**Right of First Offer:** Provided Client has executed one or more Orders on the date hereof with respect to Equipment having a total purchase price of more than $50 million, Provider agrees to make available for purchase by Client up to 45% of any newly available units during the calendar year 2021. In the event units become available, Provider shall notify Client of such the units and the price at which such units are available. In the event Provider notifies Client of the availability of such newly additional units, Client shall have five days to execute an additional Order for such units on hosting terms and conditions mutually agreeable to both Client and Provider.

By: _S. Daniel Leon_
**Celsius Core LLC, "Client"**
Name: S. Daniel Leon
Title: S. Daniel Leon, President/COO
Date: 12/18/2020

By: _Michael Trzupek_
**Core Scientific, Inc., "Provider"**
Name: Michael Trzupek
Title: **Chief Financial Officer**
Date: 12/18/2020

21

**MASTER SERVICES AGREEMENT ORDER #7**

This Order, including the terms and conditions hereunder, incorporates by reference the terms of the Master Services Agreement dated as of December 18, 2020 (the "**Agreement**") between Provider and Client (as defined below). If any terms of this Order conflict with the terms of the Agreement, the terms of this Order shall govern with respect to this Order. Capitalized terms used but not defined in this Order shall have the meanings ascribed in the Agreement.

| | | | |
|---|---|---|---|
| **Commencement Date:** | October 15, 2021 or the actual date Units are delivered to Client at Provider Facility if such Units are not delivered on such date. | | |
| **Facility:** | Provider Facility as determined by Provider. | | |
| **Equipment hosted:** | **Manufacturing Batch Month** | **Quantity & Type of Unit (the "Units")** | **Assumed power consumption per Unit (KWh):** |
| | September | 2,450 S19j | 3.255 KWh |
| | September | 1,000 S19j PRO | 3.15 KWh |
| **Hosting-Services Rate:** | USD $.0556 / KWh | | |
| **Payment Due Prior to Installation:** | USD $503,281 no later than the earlier of<br>(i) the date of installation of the Units or (ii) October 15, 2021 consisting of<br>• $451,531 To be applied as a credit against invoices as they become due.<br>• $51,750 Set-up Fees | | |
| **Equipment Purchase Payment Due Dates:** | Due Date | | Amount (US) |
| | 12/22/2020 | | $2,089,313.70 |
| | 01/15/2021 | | $3,133,970.55 |
| | 08/15/2021 | | $5,223,284.25 |
| **Estimated Delivery Date:** | October 15, 2021.  Provider to notify Client as soon as reasonably possible in advance if Units will not be delivered by this date. Provider may terminate this Order if substantially all the Units are not delivered within 60 days of the Estimated Delivery Date. | | |
| **Fees:** | Set-up fee: $15/Unit | | |
| **Fees payable pursuant to Section 4 in connection with Service Termination/ Suspension** | Equipment disconnection fee: $25/Unit<br>Storage Fee: $10/month/Unit<br>Reinstatement fee: $25/Unit | | |

**Order Term.** Subject to acceptance by Provider, the term of this Order shall commence on the **Commencement Date** and continue until the second Anniversary of the Commencement Date (the "**Initial Term**"), unless sooner terminated (i) by Provider, as provided above, (ii) by mutual agreement of the parties, or (iii) pursuant to Section 4 of the Agreement. Unless earlier terminated, this Order shall automatically renew for successive 12-month renewal terms ("**Renewal Term**") as set forth in the Agreement.

**Fees**. Client shall pay the fees provided for in this Order. The Fees for Services will be determined initially by reference to the Assumed power consumption per Unit of each deployed Unit, multiplied by the Hosting Services Rate (each as set forth above in this Order).  Subsequent invoices will contain any additional charges incurred by Client and adjustments resulting from any differences between the Fees for Services invoiced in the preceding month and the Fee for Services based on Provider's determination of power utilized by Client during that month, as well as any adjustments to Provider's estimate of power to be utilized by Client in the upcoming month.  Fees for Services for each month shall be paid in advance, in accordance with Section 3 of the Agreement.

**Purchase/Delivery/Installation Schedule for Units:** Company will facilitate the procurement on behalf of Client at Client's expense the above referenced Units from Bitmain Malaysia. Company will facilitate the procurement, shipping, and installation of the Units on behalf of Client at Client's sole cost and expense (including any and all costs and expenses associated with shipping, importing and transporting the Units to the Facility as provided above. Client will pay $2,799.53 per S19j Unit and $3,587.72 per S19j PRO Unit (total of $10,446,568.5). Client will make payments according to the Equipment Purchase Payment Due Dates listed above. Client will pay the Provider's invoice for Units within five business days of receipt and execute any

22

DocuSign Envelope ID: D20E8BC9-A946-44CD-8E7A-E36448669998

necessary power of attorney and other documents required by customs broker to enable shipment of the Units to a Core Facility on Client's behalf. Risk of loss and ownership of the Units shall pass between Bitmain and Client. Any and all taxes with respect to the purchase of the equipment will be the responsibility of Client.

**Subcontracting and Assignment. Section 8d. of the Agreement is hereby amended to read in its entirety:**

    d.    <u>Subcontracting and Assignment</u>.  Company may permit any affiliate, independent contractor or other third party to perform any of Company's obligations hereunder provided that Company remains primarily liable for the performance of its obligations. Company may assign, delegate, or transfer this Agreement or any of its rights and obligations hereunder without notice to or prior written consent of Client.  Client may not assign, delegate or transfer this Agreement or any of its rights and obligations hereunder without the prior written consent of Company; provided, however, Client may assign, delegate or transfer an Order pursuant to this Agreement to a third party upon the written consent of the Company, which consent shall not be unreasonably, withheld, obstructed or delayed if such assignment is to a third party not competitive to Company and such party executes a new Order on standard terms and conditions containing the hosting price and hosting term set forth in the Order to be assigned.  Any assignment or transfer in violation of this Agreement is void.  This Agreement will be binding upon and inure to the benefit of all permitted successors and assigns.  Nothing in this Agreement is intended to or will confer upon any third party any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement

**Right of First Offer:** Provided Client has executed one or more Orders on the date hereof with respect to Equipment having a total purchase price of more than $50 million, Provider agrees to make available for purchase by Client up to 45% of any newly available units during the calendar year 2021.  In the event units become available, Provider shall notify Client of such the units and the price at which such units are available. In the event Provider notifies Client of the availability of such newly additional units, Client shall have five days to execute an additional Order for such units on hosting terms and conditions mutually agreeable to both Client and Provider.

By: *S. Daniel Leon*

**Celsius Core LLC, "Client"**
**Name:** S. Daniel Leon
**Title:** S. Daniel Leon, President/COO
**Date:** 12/18/2020

By: *Michael Trzupek*

**Core Scientific, Inc., "Provider"**
**Name:** Michael Trzupek
**Title:** **Chief Financial Officer**
**Date:** 12/18/2020

**MASTER SERVICES AGREEMENT ORDER # 10**

This Order, including the terms and conditions hereunder, incorporates by reference the terms of the Master Services Agreement dated as of December 18, 2020 (the "**Agreement**") between Provider and Client (as defined below). If any terms of this Order conflict with the terms of the Agreement, the terms of this Order shall govern with respect to this Order. Capitalized terms used but not defined in this Order shall have the meanings ascribed in the Agreement.

| Commencement Date: | September 20, 2021 and then the fifteenth of every remaining month beginning with October 15, 2021 until December 15, 2022, respectively. | | |
|---|---|---|---|
| Facility: | Provider Facility as determined by Provider. | | |
| Equipment hosted**: | **Deployment Month** | **Quantity & Type of Unit (the "Units")** | **Assumed power consumption per Unit (KWh):** |
| | SEP 2021 | 2,250 - M30S+ or Equivalent | 3.57 |
| | MAR 2022 | 3,530 - M30S+ or Equivalent | 3.57 |
| | APR 2022 | 4,710 - M30S+ or Equivalent | 3.57 |
| | MAY 2022 | 2,350 - M30S+ or Equivalent | 3.57 |
| | JUNE 2022 | 2,350 - M30S+ or Equivalent | 3.57 |
| | JUL 2022 | 2,350 - M30S+ or Equivalent | 3.57 |
| | AUG 2022 | 2,350 - M30S+ or Equivalent | 3.57 |
| | SEP 2022 | 2,350 - M30S+ or Equivalent | 3.57 |
| | OCT 2022 | 2,350 - M30S+ or Equivalent | 3.57 |
| | NOV 2022 | 2,350 - M30S+ or Equivalent | 3.57 |
| | DEC 2022 | 2,350 - M30S+ or Equivalent | 3.57 |
| Hosting-Services Rate: | **Deployment Month** | **Hosting-Services Rate:** | |
| | SEP 2021 | USD $.0575/ KWh; USD $.06/Kwh after hosting month 12 | |
| | MAR 2022 | USD $.0593/ KWh; USD $.06/kwh after hosting month 12 | |
| | APR 2022 – DEC 2022 | USD $.00625/ KWh; USD $0.6/kwh after hosting month 12 | |
| Payment Due Prior to Installation: | **USD $10,736,252.50 on or before September 20, 2021 consisting of:**<br>• $1,685,800.00, 100% of the prepayment for hosting services for SEP 2021 Units to be applied as a credit against future monthly invoices as they become due.<br>• $1,909,775.00, 70% of the prepayment for hosting services for MAR 2022 Units to be applied as a credit against future monthly invoices as they become due.<br>• $1,342,547.50, 35% of the prepayment for hosting services for APR 2022 Units to be applied as a credit against future monthly invoices as they become due.<br>• $5,358,780.00, 35% of the prepayment for hosting services for MAY 2022 – DEC 2022 Units ($669,847.50 for each of MAY 2022, JUN 2022, JUL 2022, AUG 2022, SEP 2022, OCT 2022, NOV 2022 and DEC 2022 Units) to be applied as a credit against future monthly invoices as they become due.<br>• $439,350.00, Equipment Configuration Fee for SEP 2021 – DEC 2022 Units listed above.<br><br>**USD $1,342,547.50 on or before October 20, 2021 consisting of:**<br>• $1,342,547.50, 35% of the prepayment for hosting services for APR 2022 | | |

Units to be applied as a credit against future monthly invoices as they become due.

**USD $669,847.50 on or before November 20, 2021 consisting of:**
- $669,847.50, 35% of the prepayment for hosting services for MAY 2022 Units to be applied as a credit against future monthly invoices as they become due.

**USD $669,847.50 on or before December 20, 2021 consisting of:**
- $669,847.50, 35% of the prepayment for hosting services for JUNE 2022 Units to be applied as a credit against future monthly invoices as they become due.

**USD $669,847.50 on or before January 20, 2022 consisting of:**
- $669,847.50, 35% of the prepayment for hosting services for JUL 2022 Units to be applied as a credit against future monthly invoices as they become due.

**USD $1,488,322.50 on or before February 20, 2022 consisting of:**
- $669,847.50, 35% of the prepayment for hosting services for AUG 2022 Units to be applied as a credit against future monthly invoices as they become due.
- $818,475.00, the remaining 30% of the prepayment for hosting services for MAR 2022 Units to be applied as a credit against future monthly invoices as they become due.

**USD $1,820,602.50 on or before March 20, 2022 consisting of:**
- $669,847.50, 35% of the prepayment for hosting services for SEP 2022 Units to be applied as a credit against future monthly invoices as they become due.
- $1,150,755.00, the remaining 30% of the prepayment for hosting services for APR 2022 Units to be applied as a credit against future monthly invoices as they become due.

**USD $1,244,002.50 on or before April 20, 2022 consisting of:**
- $669,847.50, 35% of the prepayment for hosting services for OCT 2022 Units to be applied as a credit against future monthly invoices as they become due.
- $574,155.00, the remaining 30% of the prepayment for hosting services for MAY 2022 Units to be applied as a credit against future monthly invoices as they become due.

**USD $1,244,002.50 on or before May 20, 2022 consisting of:**
- $669,847.50, 35% of the prepayment for hosting services for NOV 2022 Units to be applied as a credit against future monthly invoices as they become due.
- $574,155.00, the remaining 30% of the prepayment for hosting services for JUN 2022 Units to be applied as a credit against future monthly invoices as they become due.

**USD $1,244,002.50 on or before June 20, 2022 consisting of:**
- $669,847.50, 35% of the prepayment for hosting services for DEC 2022

|  | Units to be applied as a credit against future monthly invoices as they become due.<br>• $574,155.00, the remaining 30% of the prepayment for hosting services for JUL 2022 Units to be applied as a credit against future monthly invoices as they become due.<br><br>**USD $574,155.00 on or before July 20, 2022 consisting of:**<br>• $574,155.00, the remaining 30% of the prepayment for hosting services for AUG 2022 Units to be applied as a credit against future monthly invoices as they become due.<br><br>**USD $574,155.00 on or before August 20, 2022 consisting of:**<br>• $574,155.00, the remaining 30% of the prepayment for hosting services for SEP 2022 Units to be applied as a credit against future monthly invoices as they become due.<br><br>**USD $574,155.00 on or before September 20, 2022 consisting of:**<br>• $574,155.00, the remaining 30% of the prepayment for hosting services for OCT 2022 Units to be applied as a credit against future monthly invoices as they become due.<br><br>**USD $574,155.00 on or before October 20, 2022 consisting of:**<br>• $574,155.00, the remaining 30% of the prepayment for hosting services for NOV 2022 Units to be applied as a credit against future monthly invoices as they become due.<br><br>**USD $574,155.00 on or before November 20, 2022 consisting of:**<br>• $574,155.00, the remaining 30% of the prepayment for hosting services for DEC 2022 Units to be applied as a credit against future monthly invoices as they become due. |
|---|---|
| **Estimated Delivery Date:** | As of fifteenth of every month beginning with December 15, 2021 until December 15, 2022, respectively.<br><br>Client to notify Provider as soon as reasonably possible in advance if Units will not be delivered by this date. Provider may terminate this Order if substantially all the Units are not delivered within 60 days of the Estimated Delivery Date, respectively. |
| **Fees:** | Equipment Configuration Fee: $15/Unit payable as provided above. |
| **Fees payable pursuant to Section 4 in connection with Service Termination/ Suspension** | Equipment disconnection fee: $25/Unit<br>Storage Fee: $10/month/Unit<br>Reinstatement fee: $25/Unit<br>Equipment Recycle fee: $25/Unit decommissioned or disposed of during the term |

**Order Term.** Subject to acceptance by Provider, the term of this Order shall commence on the **Commencement Date** and continue until the second anniversary of the Commencement Date (the "**Initial Term**"), unless sooner terminated (i) by Provider, as provided above, (ii) by mutual agreement of the parties, or (iii) pursuant to Section 4 of the Agreement. Unless earlier terminated, this Order shall automatically renew for successive 12-month renewal terms ("**Renewal Term**") unless terminated during a renewal term as set forth in the Agreement.

**Fees**. Client shall pay the fees provided for in this Order. The Fees for Services will be determined initially by reference to the Assumed power consumption per Unit of each deployed Unit, multiplied by the Hosting-Services Rate (each as set forth above in this Order). Subsequent invoices will contain any additional charges incurred by Client and adjustments resulting from any differences between the Fees for Services invoiced in the preceding month and the Fee for Services based on Provider's determination of power utilized by Client during that month, as well as any adjustments to Provider's estimate of power to be utilized by Client in the upcoming month. Fees for Services for each month shall be paid in advance, in accordance with Section 3 of the Agreement.

**Third Party Code.** Except to the extent arising from or relating to Provider's gross negligence, fraud or willful misconduct, Client shall indemnify, defend and hold harmless Company and its affiliates, stockholders, directors, officers, employees, subcontractors and invitees from and against any losses, liabilities, damages, costs and expenses (including, without limitation, reasonable attorneys' fees) arising from or relating to Client's installation or use of any non-standard software or firmware in connection with the Client Equipment.

**Subcontracting and Assignment. Section 8d. of the Agreement is hereby amended to read in its entirety:**

d. <u>Subcontracting and Assignment</u>. Company may permit any affiliate, independent contractor or other third party to perform any of Company's obligations hereunder provided that Company remains primarily liable for the performance of its obligations. Company may assign, delegate, or transfer this Agreement or any of its rights and obligations hereunder without notice to or prior written consent of Client. Client may not assign, delegate or transfer this Agreement or any of its rights and obligations hereunder without the prior written consent of Company; provided, however, Client may assign, delegate or transfer an Order pursuant to this Agreement to a third party upon the written consent of the Company, which consent shall not be unreasonably, withheld, obstructed or delayed if such assignment is to a third party not competitive to Company and such party executes a new Order on standard terms and conditions containing the hosting price and hosting term set forth in the Order to be assigned. Any assignment or transfer in violation of this Agreement is void. This Agreement will be binding upon and inure to the benefit of all permitted successors and assigns. Nothing in this Agreement is intended to or will confer upon any third party any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement

**Warranty:** Company does not make and hereby disclaims all warranties with respect to the Units. Company shall initiate warranty claims with Unit manufacturer. Company cannot and does not guarantee that warranty claims will be accepted by manufacturer.

Client agrees and confirms that:

(i)     It has clean title to the Client Equipment and has not entered into any agreement that would interfere with Provider's exercise of its remedies under section 4.d of the Agreement.

(ii)    Neither Client nor Client's customers will use the Services for any illegal activity; and

(iii)   Neither Client nor its customers are subject to any sanctions imposed by the Office of Foreign Asset control of the U.S. Department of the Treasury.

**Notification of Hosting Availability:** Company will notify Client as soon as practicable of additional hosting availability, if any, and provide Client up to 10 additional MW per month at a hosting services rate of $0.0625

per KWh. Additional hosting availability if available will be the subject of a separate order and provided to Client on a priority basis, subject to Client acceptance.

**Client agrees to replace sold, damaged and other inoperable Units within 90 days to maintain the aggregate number of Units subject to this Order. Provider agrees to a 500 Unit inoperable threshold for Client to replace, sold, damages and other inoperable Units. Additional equipment may be added to this Order at the Hosted Services Rate provided upon the mutual agreement of Provider and Client.

By: _Roni Cohen Pavon_

**Celsius Core LLC "Client"**
**Name:** __Roni Cohen Pavon__
**Title:** __Chief Revenue Officer__
**Date:** __9/27/2021__

By: _Michael Trzupek_

**Core Scientific, Inc., "Provider"**
**Name:** __Michael Trzupek__
**Title:** __CFO__
**Date:** __9/27/2021__

## Exhibit B

**2021 MSA and Order #1-A**

# MASTER SERVICES AGREEMENT

This Master Services Agreement ("**Agreement**") effective as of December 3, 2021 ("**Effective Date**") is between CORE SCIENTIFIC, INC. ("**Company**") and CELSIUS MINING LLC ("**Client**").

**WHEREAS**, Client desires access to locate its Client Equipment (as defined below) at the Company Facility (as defined below) and receive certain Services (as defined below); and

**WHEREAS**, Company desires to provide such Services at its Company Facility.

The parties agree as follows:

## 1. AGREEMENT STRUCTURE

a.      This Agreement provides general terms applicable to Company's provision of certain services, including, without limitation, colocation, hosting, rack space, security, monitoring, maintenance, utilities, Client Equipment maintenance and repair, facility management, account management, network and data access, technical support, and heat and thermal management services ("**Services**") to Client in a data center owned or operated by Company or its affiliates ("**Company Facility**") in mutually agreed transactions described in mutually executed ordering documents in the form of Exhibit A attached hereto that reference and are governed by this Agreement ("**Orders**"). Each Order will be a separate agreement between Company and Client and will be deemed to incorporate the terms of this Agreement by reference. Company may require Customer to provide evidence of creditworthiness or credit support acceptable to Company in its sole discretion as a condition to accepting any Order. In the event of any conflict or inconsistency between the terms of this Agreement and the specific terms of an Order, the specific terms of the Order govern with respect to such Order.

## 2. SERVICES AND COMPANY FACILITY

a.      Company will provide Client the Services at a Company Facility set forth in an Order. This Agreement is not intended to and does not constitute a lease of any real or personal property or a grant of any other real property interest. Unless otherwise set forth in an Order, Client Equipment is owned by Client will not be construed as fixtures or fittings or otherwise attached to a Company Facility. Company retains title to all racking, connectors, fittings, parts and other materials used or provided by Company at a Company Facility to provide Client the Services. Client acknowledges and agrees that access to a Company Facility may be provided only during Company's ordinary business hours and only upon Company's prior written consent, which shall be subject in all events to the terms of this Agreement and may be withheld, conditioned or delayed in Company's sole discretion.. Client will be liable for the actions of all persons accessing Company Facility on its behalf.

b.      Company has the right to review and the sole right to approve any delivery, installation (including, without limitation, the location and position of Client Equipment at the Company Facility), replacement or removal work with respect to Client's computer hardware or other tangible equipment ("**Client Equipment**") at a Company Facility. Client shall be fully responsible for delivering all Client Equipment to Company at a specified Company Facility on or before the applicable scheduled delivery date, each as specified in an Order. Client will be responsible for all risk of loss or damage to Client Equipment at all times until such Client Equipment is accepted by Company at a designated Company Facility.

c.      Client Equipment will adhere to Company's specifications, procedures, rules, and regulations,

including, without limitation, equipment labeling and tracking and security practices and policies for the Company Facility, all of which are incorporated herein by this reference.  If Company determines in its sole discretion that Client Equipment or related operating software does not conform to its policies or is not suitable for the provision of Services at the Company Facility, Company may suspend installation of Client Equipment and operating software or commencement of the Services until Company approves of the Client Equipment and operating software.  Company has no responsibility or liability for any loss or damage to Client Equipment, including without limitation any damage to Client Equipment, failure to adhere to any manufacturer warranty, the voiding of any manufacturer warranty or loss of or inability to collect under any manufacturer warranty, unless directly caused by the gross negligence, bad faith or willful misconduct of Company.

d.      Client is responsible for costs and expenses regarding the installation, repair, replacement and removal of Client Equipment and tariffs, taxes, shipping costs or other expenses associated with owning, shipping, importing or transporting Client Equipment.  Upon any expiration or termination of an applicable Order, Company will provide Client with a written notice, which may be by email (the "**Retrieval Notice**"), of the date when Client Equipment is ready to be removed from Company Facility, which will be at Client's sole expense. Such notice will document the condition of Client Equipment being prepared for shipment, any outstanding amounts owed by Client to Company and Client shall have five (5) calendar days from the date set forth in the Retrieval Notice to pay any outstanding amounts owed to Company and remove at Client's sole cost and expense Client Equipment from Company Facility. Client will hold Company harmless from any damage caused to Client Equipment during such pickup and removal of Client Equipment.  The failure or delay by Client to retrieve Client Equipment on or before the date set forth in the Retrieval Notice will constitute abandonment of Client Equipment under the laws of the jurisdiction where the Client Equipment is located and Company will be entitled to pursue at Client's sole risk and expense all available remedies, including, without limitation, the actions set forth in Section 4(d), as applicable.

e.      In order to continue to provide the Services, from time to time Company may request, and Client shall promptly provide, information regarding Client Equipment, Client's related operating software, Client's systems, and other information reasonably necessary in Company's provision of the Services.

f.      If software and services of a third party are requested by Client in conjunction with the Services ("**Third Party Services**") and identified in an Order, Client acknowledges and agrees that such Third Party Services are the responsibility of the third party, subject to separate terms and conditions between such third party and Client and Company accepts no responsibility for the performance of such Third Party Services or any loss or damage arising from or associated with the provision of such Third Party Services.

**3.      PAYMENT TERMS AND TAXES**

a.      Company will invoice Client monthly in advance for all applicable fees for use of Company Facility and provision of Services as set forth in the applicable Order.  Client will pay all invoiced amounts in US dollars within ten (10) calendar days of the date of the invoice.  All payments must be (i) in US dollars into an ACH account number as set forth in the applicable Order; or (ii) to another account or form of payment determined by Company. Interest shall be charged on past due amounts at the lesser of (A) one and a half percent (1.5%) per month; or (B) the highest rate permitted by applicable law.

b.      Client may, in good faith, dispute any invoice or any part thereof (a "**Disputed Amount**") by submitting a written notice of such dispute along with reasonable supporting documentation within three (3) calendar days of the date of the initial invoice on which the Disputed Amount appears, failing which Client waives all rights to dispute such Disputed Amount and to file any claim.  Company will review the

Disputed Amount after its receipt of the relevant notice and if Company determines that Client was billed in error, a credit for the amount invoiced incorrectly will be made to the next invoice. If Company determines that the amount was invoiced correctly, Client will pay the amount by the due date of the next invoice. For clarity, Client shall promptly pay all undisputed amounts.

c.      All amounts payable to Company under this Agreement exclude applicable taxes. Sales tax on equipment will be billed to the Client, collected by the Company and remitted to the appropriate state tax authority as required, unless Client presents the Company with a valid sales tax exemption certificate. Client is responsible for (i) taxes related to its activities and the ownership and operation of Client Equipment; and (ii) taxes imposed, levied or assessed thereon by any governmental or other authorities. If Client is required to make any deduction, withholding or payment for taxes in any jurisdiction on amounts payable to Company, such amounts will be increased such that after making such deduction, Company receives an amount equal to what it would have received if such deduction, withholding or payment had not been made.

**4.      TERM, TERMINATION, MODIFICATION AND SUSPENSION**

a.      This Agreement commences on the Effective Date and continues until terminated as permitted by this Agreement. Each Order commences on the effective date set forth in the Order, has the initial term ("**Initial Term**") set forth in the Order, and thereafter automatically renews for the additional periods set forth in the Order, or if no renewal period is set forth then one (1) year periods, (each, a "**Renewal term**" and collectively, the "**Term**") unless Client notifies Company in writing not less than ninety (90) calendar days before such renewal of its desire for the order not to renew.

b.      Either party may terminate an Order upon written notice to the other party and take such other action identified in Section 4 d. below if the other party materially breaches such Order or this Agreement and fails to cure such breach within thirty (30) calendar days (5 days in the case of failure to pay an Unpaid Balance (as defined below) or 2 days in the case of failure to pay an Unpaid Balance two or more times during any twelve month period) . If the breach (other than Client failure to pay amounts when due) cannot be cured within thirty (30) calendar days, the breaching party shall be given a reasonable period of time, but not to exceed sixty (60) calendar days after receipt of the notice, to cure the breach, provided that the breaching party acts promptly and diligently to cure such breach.

c.      Either party may terminate this Agreement upon written notice to the other party if there have been no Orders in effect for twelve (12) consecutive months.

d.      In addition to the remedy set forth in Section 4 b. above if Client fails to pay all invoiced amounts when due (an "**Unpaid Balance**"), or otherwise fails to perform any of its obligations under this Agreement after opportunity to cure as provided in Section 4 b above Company may, in its sole discretion, take certain actions including, without limitation, the following actions, at Client's sole risk and expense:

      (i)      suspend the provision of the Services;
      (ii)     disconnect Client Equipment and store it;
      (iii)    declare all amounts due under the applicable Order through the balance of the Term to be immediately due and payable;
      (iv)     operate Client Equipment for cryptocurrency mining and other activities at Company's sole discretion and direct all resulting proceeds to Company's own account until Company has recovered all amounts due, including, without limitation, any reinstatement, disconnection or storage fees or costs;
      (v)      terminate this Agreement and all Orders; and

3

DocuSign Envelope ID: 6968ZB22-FBFD-435E-BCP2-CFE0FC6C03CF

(vi)     exercise all other rights under this Agreement, at law, in equity or otherwise.

Unless Company has terminated this Agreement, Company will reverse the suspension of the provision of the Company Facility and Services and disconnection of Client Equipment as soon as reasonably practical after it is satisfied Client has cured the acts or omissions giving rise to the suspension and disconnection. In connection with the foregoing, Company may charge a reinstatement fee. Thereafter, Company may, at its sole discretion, require an advance payment equal to the amount of one billing invoice.

e.     Notwithstanding anything in this Agreement to the contrary, Company may suspend its provision of all or a portion of the Services and disconnect all or a portion of Client Equipment immediately if Company determines in its sole discretion that: Client's use of the Services or Client Equipment (i) may adversely impact or pose a security risk to Company's operation or maintenance of the Company Facility or Company's other clients; (ii) may subject Company to liability; or (iii) is not in compliance with this Agreement or Company's policies. Company will use commercially reasonable efforts to notify Client, which may be via email or telephone, of such suspension or disconnection. Company will use commercially reasonable efforts to reverse such suspension or disconnection as soon as reasonably practical after it is satisfied that Client has cured the acts or omissions giving rise to such suspension and disconnection. In connection with the foregoing, Company may charge a reinstatement fee as set forth in the applicable Order. Further, Company may terminate this Agreement and all Orders if such suspension or disconnection continues for at least two (2) calendar days or occurs more than three (3) times in any twelve (12) month period. For clarity, during the period of suspension or disconnection, Client remains responsible for all fees and charges Client incurs during such period. Further, after the Effective Date, if Company determines in its sole and absolute discretion that as a result of any change in, or interpretation, introduction or administration of, any laws, regulations, statutes, treaties, rules, guidelines, ordinances, codes or the like, or any proposed or anticipated changes in, or interpretations, introduction or administration of the foregoing (a "**Change in Law**"), has resulted in an increase in Company's cost of compliance with such Change in Law then Company may, in its commercially reasonable discretion, take certain actions, including, without limitation, the following actions, at Client's sole risk and expense: (i) terminate this Agreement, any or all Orders; and/or (ii) modify the Services as may be necessary to account for such Change in Law. Company will use commercially reasonable efforts to notify Client of such Company actions and the effective date of such actions.

f.     Further, and notwithstanding the Change in Law related costs above, after the Effective Date, if there are any increases, changes in, or introduction or administration of, any new taxes, levies, tariffs or governmental fees and charges with respect to the provision of Services, Company may, in its sole and absolute discretion, pass through all such amounts to Client ("**Increased Costs**") and Client shall pay all Increased Costs in accordance with the payment and invoicing procedures as set forth in this Agreement.

g.     Company shall not be liable for any Client loss or damage whatsoever as a result of the exercise of its rights under this Agreement. Upon termination of this Agreement or an Order by Company, Company is entitled to recover from Client all loss or damages incurred by Company as a result of such termination, outstanding fees, costs, charges, assessments, reimbursements, and expenses (including, without limitation, costs of collection and reasonable attorneys' fees).

h.     In addition to Section 4(f), the Company may terminate or suspend all or a portion of the Services if necessary to be in compliance with applicable law, rules, regulations, administrative or judicial orders or decree. Company will use commercially reasonable efforts to notify Client, which may be via email or telephone, of such suspension. Client agrees that the Company shall have no liability whatsoever to Client for any damage, loss, expense or cost as a result of such termination or suspension.

DocuSign Envelope ID: 6968ZB22-FBED-435F-BC82-CEF0EC6C03CF

**5.      WARRANTIES, LIMITATION OF LIABILITY, INDEMNITY**

a.      Each party represents, warrants, and covenants that it has full legal capacity, right, power and authority to execute and perform its obligations under this Agreement.  Company represents, warrants, and covenants that it will provide Company Facility and perform the Services in a professional and workmanlike manner.  Client represents, warrants, and covenants (i) Client owns and has good title to Client Equipment, free and clear of any mortgage, pledge, lien, charge, security interest, claim or other encumbrance or has interest in Client Equipment as part of a financing or other arrangement disclosed and approved by Company; (ii) Client Equipment has no defects, is in good condition and is adequate for the purpose it will be used, and is not in need of maintenance or repair except for ordinary, routine maintenance and repairs that are not material in nature or cost; (iii) Client Equipment has not experienced any failure or outage and has not been modified in any way from its original manufactured condition; (iv) Client Equipment is in a condition suitable for continued optimal cryptocurrency mining operations, including, without limitation, in the same manner as conducted prior to the Effective Date; (v) Client Equipment has been operated at all times indoors in an appropriate temperature-controlled environment and consistent with the manufacturer's recommended temperatures and operating conditions; (vi) Client Equipment has always been transported and/or handled in a protected manner normally expected when transporting and/or handling sensitive computer hardware; (vii) Client will use the Services only for lawful purposes, and Client will not transmit, retransmit or store material with or in Client Equipment or with or in Company Facility in violation of any federal or state law or regulations or local code, rule, regulation or ordinance; and (viii) Client will comply with  applicable laws and regulations in connection with this Agreement.  Without limiting the foregoing, Client further represents, warrants, and covenants neither Client, any officer, director, employee, partner, controlling shareholder, affiliated entity nor anyone acting on Client's behalf (A) has used or disclosed or will use or disclose non-public information obtained from Company, (B) has violated or will violate applicable anti-bribery or anti-corruption laws, including the U.S. Foreign Corrupt Practices Act and the U.K. Bribery Act 2010, (C) has violated or will violate applicable anti-money laundering statutes, or (D) is a Denied Party or subject to any U.S. sanction imposed by the Office of Foreign Assets Control of the U.S. Department of the Treasury.

b.      EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEMENT, COMPANY DOES NOT MAKE AND HEREBY DISCLAIMS ALL WARRANTIES, INCLUDING, WITHOUT LIMITATION, EXPRESS, IMPLIED AND STATUTORY WARRANTIES THAT COMPANY FACILITY OR SERVICES WILL BE UNINTERRUPTED, ERROR-FREE, OR COMPLETELY SECURE, AND THE IMPLIED WARRANTIES OF MERCHANTABILITY OR SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT OF ANY THIRD PARTY'S INTELLECTUAL PROPERTY RIGHTS.  ALL COMPANY FACILITY AND SERVICES ARE PROVIDED OR PERFORMED ON AN "AS IS", "AS AVAILABLE" BASIS, AND CLIENT'S USE OF THE COMPANY FACILITY AND SERVICES IS SOLELY AT ITS OWN RISK.  CLIENT ACKNOWLEDGES AND AGREES THAT COMPANY DOES NOT AND CANNOT CONTROL THE FLOW OF DATA OR POWER TO OR FROM COMPANY'S NETWORK AND/OR THE INTERNET OR POWER GRID, WHICH ARE PROVIDED OR CONTROLLED BY THIRD PARTIES, AND THAT ACTIONS OR INACTIONS OF THIRD PARTIES CAN IMPAIR OR DISRUPT COMPANY'S CONNECTIONS TO THE INTERNET OR POWER GRID (OR PORTIONS THEREOF) INCLUDING, WITHOUT LIMITATION, INTERRUPTIONS IN SERVICE CAUSED BY GOVERNMENT REGULATIONS OR ORDERS, SYSTEM CAPACITY LIMITATIONS OR LIMITATIONS IMPOSED BY, OR FAILURES OF, AN UNDERLYING COMMUNICATIONS CARRIER.  COMPANY WILL ENDEAVOR TO TAKE ACTIONS IT DEEMS APPROPRIATE IN ITS SOLE DISCRETION TO REMEDY AND AVOID SUCH EVENTS.  HOWEVER, COMPANY CANNOT AND DOES NOT GUARANTEE THAT SUCH EVENTS WILL NOT OCCUR, AND COMPANY DISCLAIMS ANY AND ALL LIABILITY RESULTING FROM OR RELATED TO SUCH EVENTS.  COMPANY HEREBY DISCLAIMS ALL RESPONSIBILITY FOR THE ACTS OR OMISSIONS BY COMPANY'S

OTHER CUSTOMERS AND CLIENTS AND OTHER THIRD PARTIES.

c.      NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR (I) LOST PROFITS; (II) LOSS OF BUSINESS; (III) LOSS OF REVENUES (EXCEPT THAT CLIENT SHALL BE LIABLE FOR ANY FEES OR OTHER AMOUNTS OWED TO COMPANY UNDER THIS AGREEMENT); (IV) LOSS, INTERRUPTION OR USE OF DATA OR LOSS OF USE OF CLIENT EQUIPMENT; (V) ANY CONSEQUENTIAL OR INDIRECT DAMAGES; OR (VI) COST OF COVER, ANY INCIDENTAL, SPECIAL, RELIANCE, EXEMPLARY OR PUNITIVE DAMAGES (IF APPLICABLE), EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

d.      NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, COMPANY'S TOTAL LIABILITY TO CLIENT IN THE AGGREGATE FOR THE ENTIRE TERM (REGARDLESS OF WHETHER THE CLAIMS ARE BROUGHT DURING OR AFTER THE TERM) WITH RESPECT TO ALL CLAIMS ARISING FROM OR RELATED TO THE SUBJECT MATTER OF THIS AGREEMENT (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES) WILL NOT EXCEED AN AMOUNT EQUAL TO ONE (1) MONTHS FEE PAYABLE TO COMPANY PURSUANT TO THE APPLICABLE ORDER.

e.      EXCEPT FOR CLIENT'S BREACH OF ITS OBLIGATIONS UNDER SECTIONS  4, 5 a, 5 h AND 6, AND LOSS OR DAMAGE ARISING OUT OF CLIENT'S GROSS NEGLIGENCE, BAD FAITH OR WILLFUL MISCONDUCT, THE LIMITATIONS SET FORTH IN SECTIONS 5 c AND 5 d WILL APPLY TO ALL CLAIMS AND CAUSES OF ACTION, REGARDLESS OF WHETHER IN CONTRACT, TORT, STRICT LIABILITY OR OTHER THEORY.

f.      Client hereby waives the right to bring any claim against Company arising out of or in any way relating to an Order more than one (1) year after the date such Order expires or is terminated.  Each party recognizes and agrees that the warranty disclaimers, limitations of liability and remedy limitations in this Agreement are materially bargained for by the parties.

g.      Client acknowledges that cryptocurrency price movement, cryptocurrency difficulty, and legal and regulatory risks could have a material adverse impact on cryptocurrencies, cryptocurrency mining, Client Equipment, Services, and this Agreement.  Client assumes responsibility for all such risks, and Company disclaims all types of liabilities or loss of funds that may arise as a result.

h.      Client shall indemnify, defend and hold harmless Company and its affiliates, stockholders, directors, officers, employees, subcontractors and invitees from and against any losses, liabilities, damages, costs and expenses (including, without limitation, reasonable attorneys' fees) arising from or relating to (i) death, personal injury, bodily injury or property damage caused by Client or Client's customers or clients or Client Equipment; (ii) breach of Client's representations, warranties, or covenants in this Agreement or in an Order or Sections 2 or 6; (iii) fraud, bad faith, negligence or willful or reckless conduct of or by Client or Client's customers or clients; (iv) Client's or Client's customers' or clients' use of the Company Facility, Services, or Client Equipment; (v) any claim whatsoever by Client's customers or clients, or any third party related to the Services or Client Equipment; or (vi) any change in, or interpretation or administration of, any laws, regulations, statutes, treaties, rules, guidelines, ordinances, codes or the like, or any proposed or anticipated changes in, or interpretations or administration of the foregoing.

## 6.      CONFIDENTIAL INFORMATION

a.      Each party acknowledges that it and its employees or agents may, in the course of performing its

responsibilities under this Agreement, be exposed to or acquire information which is proprietary to or confidential to the other party, including, without limitation, business plans, strategies, forecasts and projections and information about business structures, operations, systems, finances, assets, investments, investment strategies, software and other technology systems, and personnel, customers and suppliers (collectively, "**Confidential Information**"). Company's Confidential Information also includes the design, address and location of the Company Facilities (which is deemed to be not publicly known), the Services provided, equipment used at the Company Facilities, the configuration of cables, networks and services at the Company Facilities and the terms of this Agreement. Neither party may use or copy any Confidential Information except to the limited extent necessary to perform its obligations under this Agreement and will not disclose any Confidential Information to any person or entity other than to its employees who have a need to know the Confidential Information or as otherwise expressly permitted by this Agreement. Each party shall use the same measures that it uses to protect its own most confidential and proprietary information to protect the Confidential Information from use or disclosure in violation of this Agreement, but in no event less than commercially reasonable measures.

b.        The restrictions on use of Confidential Information do not apply to information if it (i) is known to the receiving party prior to receipt from the disclosing party directly or indirectly from a source other than one having an obligation of confidentiality to the disclosing party; (ii) becomes known (independently of disclosure by the disclosing party) to the receiving party directly or indirectly from a source other than one having an obligation of confidentiality to the disclosing party; (iii) becomes publicly known or otherwise ceases to be confidential, except through a breach of this Agreement by the receiving party; or (iv) is independently developed by the receiving party. For the avoidance of doubt, the mere placement of materials or equipment containing information at a Company Facility does not constitute disclosure of such information to Company.

c.        Upon termination or expiration of this Agreement, or at any other time at the request of the other party, each party shall return to the other party, or destroy and delete, as applicable, all Confidential Information and any copies thereof in its possession or control.

d.        Neither party may use the other party's trademarks, service marks, trade names, copyrights, other intellectual property rights or other designations in any promotion, publication or press release without the prior written consent of the other party in each case, which consent may be given in an Order.

## 7.        INSURANCE

a.        Client agrees to maintain the following insurance, at its expense, during the Term, with insurers having a minimum AM Best rating of A- VII or S&P rating of A: (i) Commercial General Liability or Public Liability Insurance with a limit of US $2,000,000 per occurrence, US $4,000,000 in the aggregate (or the local currency equivalent), provided these limits may be achieved through a combination of primary and excess policies and such insurance will include coverage for bodily injury and property damage.

b.        Client will furnish Company with certificates of insurance upon request that evidence the minimum levels of insurance set forth herein, list Company as an additional insured or interested party on the Commercial General Liability or Public Liability Insurance and designate that Client's insurance is primary and non-contributory Client will provide at least thirty (30) days' prior written notice to Company of any non-renewal or cancellation of the policies referenced above.

## 8.        MISCELLANEOUS

a.      Notice.  Except where expressly provided in this Agreement or an Order, all notices, consents, or approvals required by this Agreement will only be in writing and sent by overnight courier, certified or registered mail, overnight delivery requiring a signature upon receipt, or delivery by hand to the parties at the respective addresses set forth on the first page of this Agreement.  Notice is effective when received.

b.      Entire Agreement.  This Agreement constitutes the entire agreement between the parties with respect to the subject matter of this Agreement, and supersedes and replaces all prior or contemporaneous discussions, negotiations, proposals, understandings and agreements, written or oral, as well as any industry custom.  Each party acknowledges that, in entering into this Agreement, it has not relied on, and shall have no right or remedy in respect of, any statement, representation, assurance or warranty other than as expressly set out in this Agreement.  This Agreement may be executed in two (2) or more counterparts (and the signature pages may be delivered with ink or electronic signature or by e-mail), each will be deemed an original, but all together will constitute one and the same instrument.  Except where otherwise expressly provided in this Agreement, this Agreement may be amended only by the written agreement of both parties.

c.      Survival.  Any provision of this Agreement, which, by its nature, would survive termination or expiration of this Agreement will survive any such termination or expiration, including, without limitation, those provisions concerning confidentiality, indemnification and limitation of liability.

d.      Subcontracting and Assignment.  Company may permit any affiliate, independent contractor or other third party to perform any of Company's obligations hereunder provided that Company remains primarily liable for the performance of its obligations.  Company may assign, delegate, or transfer this Agreement or any of its rights and obligations hereunder without notice to or prior written consent of Client.  Client may not assign, delegate or transfer this Agreement or any of its rights and obligations hereunder without the prior written consent of Company.  Any assignment or transfer in violation of this Agreement is void.  This Agreement will be binding upon and inure to the benefit of all permitted successors and assigns.  Nothing in this Agreement is intended to or will confer upon any third party any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement

e.      Force Majeure.  Except for Client's obligation to pay amounts owed under this Agreement, neither party will be responsible or in any way liable to the other party, and neither party will have any termination or other rights, arising out of or relating to a Force Majeure Event.  A "**Force Majeure Event**" is a failure by the other party to perform any of its obligations under this Agreement if such failure is caused by events or circumstances beyond its reasonable control, including, without limitation, acts of God, war, labor strike, terrorist act, fire, flood, earthquake, landslide, hurricane, typhoon, tsunami, volcanic eruption, inclement weather, health epidemic or any law, order, regulation or other action of any governing authority or agency.

f.      Governing Law and Arbitration.  This Agreement and all claims arising out of or related to this Agreement are governed by and construed in accordance with the laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any jurisdiction other than the State of Delaware.  Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including, without limitation, the determination of the scope or applicability of this Agreement to arbitrate, shall be determined exclusively by arbitration in King County, Washington before three (3) arbitrators.  The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules & Procedures.  Any award, order or judgment pursuant to arbitration ("**Award**") is final and may be entered and enforced in any court of competent jurisdiction, and each party shall submit to any court of competent jurisdiction for purposes of the enforcement of any Award.  The arbitrator may, in the Award, allocate all or part of the costs of the arbitration, including, without limitation, the fees of the arbitrator

and the reasonable attorneys' fees of the prevailing party.

g.      <u>General</u>.  The rights and remedies provided for herein are cumulative and not exclusive of any rights or remedies that a party would otherwise have.  The parties are independent contractors, and this Agreement does not establish any relationship of partnership, joint venture, employment, franchise or agency between them.  Neither party may bind the other or incur obligations on the other's behalf without the other's prior written consent.  There are no third-party beneficiaries to this Agreement.  No waiver of any breach of any provision of this Agreement will constitute a waiver of any prior, concurrent or subsequent breach of the same or any other provisions hereof, and no waiver will be effective unless made in writing and signed by an authorized representative of the waiving party.

*[Signature page follows]*

**Core Scientific, Inc.**

By: _Michael Trzupek_

Name: Michael Trzupek

Title: Authorized Representative

Date: 12/3/2021

**Celsius Mining LLC**

By: _[signature]_

Name: Roni Pavon

Title: Chief Revenue Officer

Date: 12/3/2021

DocuSign Envelope ID: 6968ZB22-FBED-435F-BCB2-CEF0EC6C03CF

## MASTER SERVICES AGREEMENT ORDER # 1-A

This Order, including the terms and conditions hereunder, incorporates by reference the terms of the Master Services Agreement dated as of December 3, 2021 (the "**Agreement**") between Provider and Client (as defined below). If any terms of this Order conflict with the terms of the Agreement, the terms of this Order shall govern with respect to this Order. Capitalized terms used but not defined in this Order shall have the meanings ascribed in the Agreement.

| Commencement Date: | December 7, 2021 | |
|---|---|---|
| Facility: | Provider Facility as determined by Provider. | |
| Equipment hosted: | **Quantity & Type of Unit (the "Units")** | **Assumed power consumption per Unit (KWh):** |
| | 4,111 S19 (95TH) | 3.413 KWh |
| | 267 S19 PRO (110TH) | 3.413 KWh |
| Hosting-Services Rate: | USD $.047 / KWh | |
| Payment Due Prior to Installation: | **USD $497,542.19 on or before December 9, 2021 consisting of:** <br> • $497,542.19, one month prepayment for hosting services for the Units to be applied as a credit against future monthly invoices as they become due. Provider hereby confirms receipt of this payment prior to the date hereof. | |
| Estimated Delivery Date: | December 3, 2021. Provider to notify Client as soon as reasonably possible in advance if Units will not be delivered by this date. Provider may terminate this Order if substantially all the Units are not delivered within 60 days of the Estimated Delivery Date. | |
| Fees: | Equipment Configuration Fee: None | |
| Fees payable pursuant to Section 4 in connection with Service Termination/ Suspension/ Repair | Equipment disconnection fee scale: <br> $25/Unit under 100 Units <br> $15/Unit 100 units to 4000 units <br> $10/Unit 4000+ units <br> Storage Fee: $10/month/Unit <br> Reinstatement fee: $25/Unit <br> Repair Cost: $35 per hour plus cost of replacement parts | |

**Order Term.** Subject to acceptance by Provider, the term of this Order shall commence on the **Commencement Date** and continue until the February 28, 2023 (the "**Initial Term**"), unless sooner terminated (i) by Provider, as provided above, (ii) by mutual agreement of the parties, or (iii) pursuant to Section 4 of the Agreement. Unless earlier terminated, this Order shall automatically renew for successive 12-month renewal terms ("**Renewal Term**") unless terminated during a renewal term as set forth in the Agreement.

**Fees.** Client shall pay the fees provided for in this Order. The Fees for Services will be determined initially by reference to the Assumed power consumption per Unit of each deployed Unit, multiplied by the Hosting-Services Rate (each as set forth above in this Order). Subsequent invoices will contain any additional charges incurred by Client and adjustments resulting from any differences between the Fees for Services invoiced in the preceding month and the Fee for Services based on Provider's determination of power utilized by Client during that month, as well as any adjustments to Provider's estimate of power to be utilized by Client in the upcoming month. Fees for Services for each month shall be paid in advance, in accordance with Section 3 of the Agreement.

**Service Levels.** Attached as Exhibit A.

By: _____
**Celsius Mining LLC "Client"**
Name: Roni Pavon
Title: Chief Revenue Officer
Date: 12/3/2021

By: _____
**Core Scientific, Inc., "Provider"**
Name: Michael Trzupek
Title: **Chief Financial Officer**
Date: 12/3/2021

# EXHIBIT A

**A. SERVICE LEVELS.** The Provider shall maintain the Service Levels for Client Equipment in this Order as set forth below:

| Client Equipment Location | Client Equipment State | Service Level Metric | Provider Obligation |
|---|---|---|---|
| On-rack | Online | Uptime 98% or greater | None required. |
| On-rack | Degraded | Uptime less than 98%. | One hour to respond to error detection for 1 issue. If error is persistent and occurs multiple times in one hour, the state shall change from Degraded to Fault or Off-line. |
| On-rack or off-rack | Fault | Minor repair (fault light, Unit unreachable and not detected by the management software or pool). | Four (4) hours to respond to error detection and eight (8) hours to initiate repair where Spare Parts are available. [Spare replacement, performance optimization or repair carried out on the rack] [as approved by Client] [labor cost] |
| Off-rack | Off-line | Medium repair requiring removal from the rack and repaired in-house (power or fan failure.) | In the event any single machine is down, Provider has one hour to respond to error detection and 24 hours to initiate repair in order to return the Client Equipment to online state or reclassify as a major error. Obtain Client approval if extra cost will be incurred for the repair. |
| Off-rack | Off-site | Major repair. Off-site repair is required. | Obtain Client approval if extra cost will be incurred for the repair. Must be sent to off-site repairer within three (3) Business days for domestic service and five (5) days for international service following receipt of both Client and Servicer approval. |
| On-Rack | Degraded | State of Facility | The operating conditions of Provider facility will be maintained within the machine manufacturers recommended operating parameters. Should these parameters not be met, provider will initiate immediate steps to remedy it within 12 hours and will be fully remedied within 72 hours. |

"**Uptime**" means the percentage of time of uninterrupted performance during a billing month for the total quantity of units of Equipment subject to the Order, excluding (i) Client Equipment that is "off-line" (as described above, (ii) Client Equipment that is being commissioned, (iii) Client Equipment that is undergoing Client-requested configuration changes; (iv) scheduled or emergency maintenance; (v) interruptions caused by ancillary service providers contracted by Client or engaged at request of Client, including Force Majeure Events; (vi) interruptions caused by third party services, Client Equipment or software/service pools elected by Client; (vii) Client Equipment the operation of which has been suspended by Client; and (viii) Client Equipment awaiting RMA or warranty service.

DocuSign Envelope ID: 6968ZB22-FBFD-435F-BC92-CEF0EC6C03CF

"**Spare Parts**" means the inventoried fans, hash boards, ASIC chips, and power supply units needed for repair. Spare Parts are provided by the Client and stored with the Provider. At Client request, provider will use commercial reasonable efforts to provide spare parts to the Client.

### B. ADJUSTMENT TO FEES FOR SERVICE LEVEL DEFICIENCY

(1) No adjustment shall be made to amounts payable by Client for Service Level deficiencies in Uptime due to Client Equipment malfunction, manufacturing defect or normal wear and tear.

(2) Failure to meet the Service Levels for 3 months in total or 6 consecutive weeks during any 12-month period constitutes a deemed material breach entitling Client to immediately terminate the services upon written notice to Provider. Provider is not liable for interruptions to the operation of the Client Equipment for reasons beyond its control or Force Majeure. Such interruptions include those caused by Client directed ancillary service providers or providers engaged by Client. Provider is not liable for interruption in the availability to Provider of utilities such as internet, electricity or fuel regardless of cause, including War, economic disturbances, rationing, civil unrest, Acts of God or other natural disasters and events constituting Force Majeure. Such downtime shall not be counted in calculating Uptime, so long as Provider takes commercially reasonable steps to remedy such downtime.