# **EXHIBIT 1**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **CORE SCIENTIFIC, INC.,** *et al.,* | § | **Case No. 22-90341 (DRJ)** |
| | § | |
| | § | **(Joint Administration Requested)** |
| **Debtors.**[1] | § | **(Emergency Hearing Requested)** |
| | § | |

**DECLARATION OF MICHAEL BROS IN SUPPORT OF THE**
**DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF**

I, Michael Bros, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1.      I am the Senior Vice President of Capital Markets & Acquisitions at Core Scientific, Inc. ("**Core**", "**Core Parent**", and together with its subsidiaries and affiliates, the "**Company**"). I have served in this capacity since January 2022. Before that, starting in December 2018, I was the Debtors' Vice President of Corporate Development. Prior to joining the Company, I held various positions at Kayne Anderson from 2014 to 2018 and Merrill Lynch from 2011 to 2014. I hold a Bachelor's of Arts from the University of Saint Thomas and a Master's in Business Administration from the University of California, Los Angeles Anderson School of Management.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

2.      I am generally knowledgeable and familiar with the Company's day-to-day operations, business and financial affairs, books and records, and the circumstances leading to the commencement of these chapter 11 cases. I am authorized to submit this declaration ("**Declaration**") on behalf of the Debtors to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") filed with the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") on the date hereof (the "**Petition Date**") and the motions filed concurrently herewith (the "**First Day Motions**").

3.      Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents (including the Debtors' books and records), information provided to me by the Debtors' employees, my opinion based upon experience, knowledge, and information concerning the Debtors' operations and financial condition, or my discussions with the Debtors' officers and advisors, including professionals at Weil, Gotshal & Manges LLP ("**Weil**"), AlixPartners LP ("**Alix**"), and PJT Partners LP ("**PJT**" and, collectively, with Weil and Alix, the "**Advisors**"). If called upon to testify, I would testify competently to the facts set forth in this Declaration.

4.      This Declaration has been organized into four (4) sections. The **first** provides an overview of the Debtors and their chapter 11 cases, including the general framework for the Debtors' restructuring. The **second** provides a short primer on cryptocurrency and describes the Company's business, its organizational and capital structure, its history, and its current operations. The **third** describes the events leading to the filing of these chapter 11 cases

and the Debtors' prepetition restructuring efforts.  The **fourth** summarizes the relief requested in, and the legal and factual bases supporting, the First Day Motions.

## I.    <u>OVERVIEW</u>

5.    Headquartered in Austin, Texas, the Company is one of the largest blockchain infrastructure, hosting provider, and digital asset mining companies in North America, with approximately 814MW of capacity across eight operational data centers in Georgia (2), Kentucky, North Carolina (2), North Dakota, and Texas (2) (the "**Data Centers**").  The Company mines digital assets for its own account ("**Self-Mining**") and hosts miners for third-party customers ("**Hosting Operations**").  Since inception, the Debtors have built a considerable asset base, gained market trust as a premier hosting provider, and demonstrated a multi-year track record of successful management of their businesses.

6.    A confluence of events, however, has rendered the Debtors' capital structure and debt burden unsustainable, as well as significantly affected the Debtors' liquidity position and led to their need to seek chapter 11 protection.

- <u>First</u>, the Debtors' financial performance has been drastically impacted by the precipitous and prolonged decline in the price of bitcoin during the so-called "crypto winter" that began in the spring of 2022.

- <u>Second</u>, as a bitcoin mining company heavily dependent on power to operate the computing power necessary to sustain Self-Mining and Hosting Operations, power price increases that began in early 2022 have negatively impacted the Debtors' margins and, as a result, the Debtors' liquidity position.

- <u>Third</u>, the chapter 11 filing of Celsius Mining LLC (together with its debtor affiliates, "**Celsius**"), one of the Debtors' largest hosting customers, exacerbated the Debtors' problems.  In addition to the amounts Celsius owed the Debtors for the period prior to Celsius's bankruptcy, for which the automatic stay in Celsius's chapter 11 case protected it from having to pay, Celsius has continuously failed to pay the "power pass through" charges owed to Debtors, even for the period after Celsius's chapter 11 filing.  These unpaid amounts total approximately $7 million, most of which has accrued during the Celsius postpetition period.

- <u>Fourth</u>, the Debtors significantly overcommitted for construction costs to build out additional mining capacity. As of the Petition Date, the Debtors were committed on over $200 million in construction costs, while contractors had asserted more than $70 million in past due invoices and asserted mechanics liens.

- <u>Fifth</u>, the Debtors were indebted on approximately $275 million of equipment financing, and they were not making payments on significant amounts of equipment financing as of the Petition Date. This equipment financing is largely undersecured, and as of the Petition Date, the Debtors believe that the value of the collateral securing the equipment may be $90 million or less.

- <u>Sixth</u>, as the Debtors' liquidity waned, one of the Debtors' equipment lenders accelerated the debt owed, which caused a cross default to the Debtors' secured convertible notes, which have a principal balance of over $550 million.

- <u>Seventh</u>, the Debtors faced other litigation and debts that made pursuit of an out-of-court path simply unworkable in the Debtors' judgment when considering the totality of circumstances.

7.      Taken together, these factors, along with the Debtors' significant debt service costs and construction commitments, placed a considerable strain on the Debtors' liquidity. As stock prices fell[2] and the industry deteriorated, the Company was unable to access the capital markets after October 2022 to raise equity for additional liquidity. As of the Petition Date, the Debtors have only approximately $4 million in total liquidity.

8.      Several important events occurred in the months leading up to these cases that bear on the Debtors' position before the Court today. First, in the months leading up to these cases, the Debtors' experienced management actively took steps to decrease operating costs, eliminate and delay construction expenses, reduce and delay capital expenditures, and increase hosting revenues, including beginning discussions in late summer 2022 with certain creditors to address impending amortization issues. These actions, however, were insufficient to enable the Company to continue to service its substantial debt and liquidity issues. Given the Company's

---

[2]  After announcing in an SEC filing that the Company was exploring a potential restructuring and would not make certain debt payments, the Company's stock fell from approximately $1.00 to under $0.15 per share.

financial difficulties and decreasing liquidity, the Company recognized the need to explore alternatives to inject liquidity and potentially de-lever its balance sheet, ensure its continuation as a going concern, preserve jobs, and maximize value for the benefit of all stakeholders.

9.      To that end, in October 2022, the Debtors engaged Weil and PJT to explore restructuring alternatives, and soon thereafter engaged Alix.  To preserve liquidity while analyzing restructuring alternatives and negotiating with creditors, the Debtors decided in late October 2022 not to make payments on certain of their equipment and other financings.

10.     In the weeks leading up to these cases, the Company and its Advisors also reached out to certain holders of the Company's Convertible Notes and encouraged them to form a group with other holders to negotiate a restructuring.  This resulted in the formation of the ad hoc group of holders of over 66% of the Company's Convertible Notes (as defined below) (the "**Ad Hoc Noteholder Group**"), which retained Paul Hastings LLP and Moelis & Company LLC as its financial and legal advisors (the "**Ad Hoc Group Advisors**").  The Debtors and their Advisors began negotiations with the Ad Hoc Noteholder Group regarding the terms of a comprehensive restructuring, while the Debtors simultaneously pursued other options to address their liquidity and overleverage issues.

11.     The Debtors also engaged with other parties, both inside and outside the corporate structure, including (i) B. Riley Financial, Inc. ("**B. Riley**"), the holder of the Debtors' Unsecured Bridge Notes (as defined below), which also had been hired to sell equity to the public markets for the Debtors, (ii) the Debtors' equipment financing lenders, (iii) the Debtors' construction contract counterparties, (iv) potential third-party financing providers, and (v) potential asset purchasers.

12.     Over the very recent past, three primary paths emerged: (i) an out-of-court financing offered by B. Riley that would secure and/or pay down B. Riley's Unsecured Bridge Notes, grant liens on unencumbered assets, and provide additional capital to operate the Debtors' business, the success of which was contingent upon, among other things, to-be-negotiated restructurings with certain of the Debtors' equipment lenders, (ii) a pre-arranged chapter 11 case to consummate a comprehensive restructuring set forth in a Restructuring Support Agreement (as defined below), including debtor-in-possession financing provided by members of the Ad Hoc Noteholder Group (and/or their affiliates, partners, and investors), and (iii) a chapter 11 case funded with debtor-in-possession financing provided by a third-party DIP provider.

13.     Ultimately, the Debtors and their advisors, under the supervision of a Special Committee of Independent Directors of the Debtors' board, explored all three options in parallel in the weeks leading up to the filing of these chapter 11 cases, trying to improve each deal to make it as beneficial as possible for the Company and its stakeholders.  The Special Committee, the Debtors, and the Advisors discussed all three options frequently and extensively, assessing in detail the advantages and disadvantages of each option.  After extensive discussion with the Advisors, the Special Committee concluded, for the reasons discussed in more detail below, that the restructuring proposed by the Ad Hoc Noteholder Group represented the optimal path forward and best positons the Debtors for long term success.

14.     As discussed further below, the restructuring contemplated by the Restructuring Support Agreement will reduce the Company's funded indebtedness by hundreds of millions of dollars and reduce the Company's interest expenses by tens of millions of dollars annually.  The restructuring provides for the near full equitization of the Convertible Notes, as well as New Common Shares and warrants to general unsecured creditors and existing equity holders.

15.     Specifically, the Restructuring Support Agreement, which is expected to be signed on the Petition Date, contemplates a chapter 11 plan that will incorporate the following key terms, among other things:[3]

- At emergence, (i) the refinancing of the DIP Facility with third-party exit financing for 112% of the then-outstanding debt amount or (ii) the rolling of the DIP Facility into 4-year exit term loan facility on the same terms and the issuance of warrants to the DIP lenders for a certain percentage of the New Common Shares,[4] subject to dilution by the Management Incentive Plan and warrants issued to holders of general unsecured claims and existing equityholders.

- The equitization of the Convertible Notes in exchange for 97% of the New Common Shares, subject to dilution by the Management Incentive Plan, the warrants issued in connection with the rolling of the DIP Facility and the warrants issued to holders of general unsecured claims and existing equityholders;

- The issuance of $75 million in New Second Lien Notes to certain holders of Convertible Notes at their option;

- The issuance of Miner Equipment Takeback Debt to holders of Miner Equipment Financing Claims (for the secured portion of their claims);

- The reinstatement of secured Non-Miner Financing Claims; and

- Meaningful recoveries to holders of General Unsecured Claims and existing equity in the form of New Common Shares and warrants exercisable as certain enterprise values are achieved.

16.     Additionally, as discussed herein, the Restructuring Support Agreement contains certain agreed-upon milestones to facilitate efficient and expeditious chapter 11 cases to preserve and maximize the going concern value of Debtors' estates.  The proposed timeline for these chapter 11 cases appropriately balances the Debtors' need to complete their restructuring process generally and their need to effectuate a comprehensive restructuring that will deleverage their capital structure to reduce the go-forward debt burden for their otherwise healthy operations.

---

[3] Capitalized terms in this summary shall have the meaning ascribed to them in the Restructuring Support Agreement

[4] The exact percentage of New Common Shares is still being negotiated, but it is expected to be 30% assuming the DIP Facility is fully drawn.

And importantly, the Restructuring Support Agreement contains a fiduciary out so that the Debtors can pursue better proposals should those proposals present themselves.

17.     The Debtors, supervised by the Special Committee, have run the best process possible in light of the facts presented and are confident this path is the best path for the Company and all stakeholders.  By utilizing the chapter 11 process and tools made available by the Bankruptcy Code, the Debtors hope to emerge as a reorganized and stronger enterprise for the benefit of all of their stakeholders.

## II.     THE DEBTORS' BUSINESS

### A.  Cryptocurrency and Mining Generally

18.     To better understand the Company's history, business operations, and events leading to these chapter 11 cases, it is helpful to provide a brief primer on cryptocurrency and mining.

### 1.     Blockchains

19.     Blockchains are decentralized digital ledgers that record and enable secure peer-to-peer transactions without third-party intermediaries.  Blockchains enable the existence of digital assets by allowing participants to confirm transactions without the need for a central certifying authority.  When a participant requests a transaction, a peer-to-peer computer network uses algorithms to validate the transaction and the user's status and then combines the transaction with other transactions to create a new block of data.  The new block is added to the existing blockchain in a manner that is permanent and unalterable, which completes the transaction.  As each new block refers back to and "connects" with the immediately prior solved block associated with it, the addition of each new block adds to the blockchain, similar to a new link being added to a chain.

2.      **Digital Assets/Cryptocurrency**

20.      Cryptocurrency (sometimes just called "crypto") is a medium of exchange that uses encryption techniques to control the creation of units and to verify the transfer of funds. Every single transaction, and the ownership of every single digital asset in circulation, is recorded on the blockchain, which effectively contains a record of all account balances. Each account on the blockchain is identified solely by its unique public key, which renders it effectively anonymous, and is secured with its associated private key, which is kept secret, like a password. The combination of private and public cryptographic keys constitutes a secure digital identity in the form of a digital signature, providing strong control of ownership.  By executing and digitally signing a bitcoin transaction with a private key, people can send bitcoin to and receive it from anyone in the world.

21.      No single entity owns or operates the network; instead, the infrastructure is collectively maintained by a decentralized public user base.  Thus, the network does not rely on governmental authorities, financial institutions, or any central certifying authority to create, transmit, or determine the value of digital assets.  Rather, value is determined by supply and demand for the units, with prices being set via transfers by mutual agreement or through barter among transacting parties, as well as by a number of merchants that accept the digital asset.  Units of digital assets can be converted to fiat currencies, such as the U.S. dollar, at rates determined on various exchanges.  Digital asset prices are quoted on various exchanges and are extremely volatile.

22.      The two most popular cryptocurrencies are bitcoin and ether. Bitcoin was the first cryptocurrency to be created, and as of December 16, 2022, the market value of all bitcoins in circulation was approximately $321 billion.  Ether is the second largest cryptocurrency, with a market capitalization of approximately $143 billion as of December 16, 2022.

23.    Prior to the conflux of energy prices and concerns regarding the stability of digital currencies, the market for digital assets had been growing exponentially.  Bitcoin's daily exchange volume rose from $92 million in January 2017 to more than $50 billion in May 2021. The initial exchange rate recorded on October 5, 2009 was $0.000764 for every bitcoin; at its all-time high on November 10, 2021, one bitcoin was worth $68,789.  As described below, the price of bitcoin declined through most of 2022 and as of the Petition Date, the price of bitcoin dropped to approximately $16,800.

### 3.    Digital Asset Mining

24.    The verification of transactions over the blockchain can occur through one of two processes—(i) proof of work and (ii) proof of stake. For proof of work systems, such as bitcoin, a blockchain algorithm uses mining to validate a transaction; the participating computers on the network, called nodes, compete to validate a transaction by solving cryptographic puzzles using computer processing power to confirm and add new blocks to the blockchain; the first node to validate the transaction receives a reward, generally in the form of more cryptocurrency.[5] Notably, mining activities require massive amounts of computing power and energy costs.

25.    More specifically, specialized computers, or "miners," power and secure blockchains by solving complex cryptographic algorithms to validate transactions on specific digital asset networks.  To add blocks to the blockchain, a miner must map an input data set consisting of the existing blockchain, plus a block of the most recent digital asset transactions and an arbitrary number called a "nonce," to an output data set of a predetermined length using the hash algorithm.  Solving these algorithms is also known as "solving or completing a block."

---

[5] In proof of stake transaction verification, a blockchain algorithm that does not use mining instead allows owners of cryptocurrency to stake their coins, giving owners the right to check new blocks of transactions and add them to the blockchain in exchange for rewards following a lock-up period.

Solving a block results in a reward of digital assets, such as bitcoin. This is "mining." The rewards of digital assets can be sold profitably when the sale price of the digital asset exceeds the direct costs of "mining," which generally consists of the cost of mining hardware, the cost of the electrical power to operate the machine, and other facility costs to house and operate the equipment.

26.     Mining processing power is generally referred to as "hashing power." A "hash" is the computation run by mining hardware in support of the blockchain. A miner's "hash rate" refers to the rate at which it is capable of solving such computations per second. Miners with higher rated hash rate when operating at maximum efficiency have a higher chance of completing a block in the blockchain and receiving a digital asset reward. Thus, revenues from digital asset mining are impacted not only by volatility in bitcoin prices, but also by increases in the bitcoin blockchain's network hash rate resulting from the growth in the overall quantity and quality of miners working to solve blocks on the bitcoin blockchain and the difficulty index associated with the secure hashing algorithm employed in solving the blocks.

27.     The likelihood that an individual mining participant acting alone will solve a block and be awarded a digital asset is extremely low. As a result, to maximize the opportunities to receive a reward, most large-scale miners, including the Debtors, have joined with other miners in "mining pools" where the computing power of each pool participant is coordinated to complete the block on the blockchain and mining rewards are distributed to participants in accordance with the rules of the mining pool. The Debtors have agreements with their mining pools such that they pay no fees and receive the entire pro rata share of bitcoins that they mine.

28.     The method for creating new bitcoin is mathematically controlled in a manner such that the supply of bitcoin grows at a limited rate based on a pre-determined schedule. The number of bitcoin awarded for solving a new block is automatically halved every 210,000

blocks.  This means every block up to and including block 210,000 produced a reward of 50 bitcoin, while blocks beginning with 210,001 produced a reward of 25 bitcoin.  Blocks are mined on average every 10 minutes, which means 144 blocks are mined per day on average.  This deliberately controlled rate of bitcoin creation means that the number of bitcoin in existence will never exceed 21 million and that bitcoin cannot be devalued through excessive production unless the bitcoin network's source code (and the underlying protocol for bitcoin issuance) is altered. The current fixed reward for solving a new block is 6.25 bitcoin per block and it is anticipated that the reward will decrease by half to become 3.125 bitcoin per block in early 2024.  All 21 million bitcoin are slated to be mined in approximately the year 2140.

**B.  Company History and SPAC Merger**

**1.      Company History and SPAC Merger**

29.     The Company traces its roots back to 2017.  On December 13, 2017, MineCo Holdings, Inc. was incorporated and, six months later, it changed its name to Core Scientific, Inc. ("**Initial Core Scientific**").  On August 17, 2020, Initial Core Scientific engaged in a holdco restructuring to facilitate a borrowing arrangement whereby Initial Core Scientific was merged with and into a wholly owned subsidiary of Core Scientific Holding Co., a Delaware corporation ("**Core Scientific Holding Co.**" or "**Legacy Core Scientific**") and Initial Core Scientific became a wholly owned subsidiary of Core Scientific Holding Co.  The stockholders of Initial Core Scientific became the stockholders of Core Scientific Holding Co.

30.     On July 30, 2021, the Company acquired 100% of the equity interest in one of its largest customers, Blockcap, Inc. ("**Blockcap**"), a blockchain technology company with industrial scale digital asset mining operations.  Blockcap's primary historical business was the mining of digital asset coins and tokens, primarily bitcoin.  In addition to mining, holding, and exchanging digital assets, Blockcap also evaluated and completed investments in related

technologies and ancillary businesses, including Radar Relay, Inc. ("**RADAR**"), an early stage company focused on technology enhancement and development in the digital asset industry that Blockcap acquired on July 1, 2021.  The acquisition of Blockcap significantly expanded the Company's self-mining operations and increased the number of miners it owned.

31.      The Company's current corporate structure is the product of a "SPAC merger." Power & Digital Infrastructure Acquisition Corp., a Delaware corporation ("**XPDI**"), entered into a certain Agreement and Plan of Reorganization and Merger, dated as of July 20, 2021, as amended on October 1, 2021, and as further amended on December 29, 2021, by and among Legacy Core, XPDI Merger Sub Inc., a Delaware corporation and wholly owned subsidiary of XPDI, and XPDI (the "**Merger Agreement**").  XPDI's stockholders approved the transactions contemplated by the Merger Agreement (collectively, the "**de-SPAC Transactions**") at a special meeting of stockholders held on January 19, 2022.  Upon consummation of the de-SPAC Transactions, Legacy Core merged with XPDI, with XPDI surviving the merger.   Immediately prior to the effective time of the de-SPAC Transactions, XPDI changed its name to Core Scientific, Inc. and Initial Core Scientific changed its name to Core Scientific Operating Company ("**Core Scientific OpCo**").[6]  The de-SPAC Transactions resulted in the Company receiving approximately $195 million in net cash proceeds, which the Company used to fund mining equipment purchases and infrastructure build-out.

---

[6] Prior to the de-SPAC Transactions, XPDI was a blank check company incorporated for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization, or similar business combination with one or more businesses.  As a result of the de-SPAC Transactions, shareholders of XPDI that did not exercise their right to redeem their shares in cash became stockholders of Core Scientific. Inc.  Immediately following the de-SPAC Transactions, the stock of Core Scientific, Inc. was owned (i) 90.7% by former Core Scientific stockholders, (ii) 6.7% by former XPDI public stockholders, and (iii) 2.6% by XPDI's sponsor, excluding the impact of unvested restricted stock units and options.

32.     After going public in 2022, the Company initially experienced tremendous growth, as measured by cash flow increases.  During the second quarter of 2022, market conditions led management to evaluate the Company's operations and refocus its efforts and resources on the core activities of its Hosting Operations and Self-Mining operations.  Management initiated a plan to exit certain activities, technologies, and ancillary businesses and to reduce portions of the Company's workforce including those acquired through Blockcap's acquisition of RADAR. Management completed this operational restructuring plan in October 2022.

### 2.     Data Centers and Business Operations

33.     The Company is a large-scale operator of dedicated, purpose-built facilities for digital asset mining and a premier provider of blockchain infrastructure, software solutions, and services.  The Company's primary business activities include (i) mining digital currency assets utilizing owned and leased computer equipment (the miners) to process transactions conducted on one or more blockchain networks in exchange for transaction processing fees awarded in digital currency assets (Self-Mining), (ii) providing colocation and hosting services to customers' miners by owning and operating Data Center facilities in the United States (Hosting Operations), and (iii) developing blockchain-based platforms and applications (including infrastructure management, security technologies, mining optimization, and recordkeeping).  The Company is one of the largest blockchain infrastructure, hosting provider, and digital asset mining companies in North America, with approximately 457MW of power as of December 31, 2021 and 814MW of power as of the Petition Date.[7]

34.     The Company owns or leases the following facilities:

---

[7]  In October 2021, the Company announced the entry of an agreement with the City of Denton, Texas and an affiliate of Tenaska Energy, Inc. to develop its seventh facility, a blockchain Data Center in Denton, Texas, which became operational in February 2022 with an initial operating capacity approaching 22MW and expected to have 300MW of power when completed.

| Location | Type of Ownership | Land (acres) | Total Capacity (in MWs) | Buildings (Square Feet) | Status |
|---|---|---|---|---|---|
| Marble, NC (Marble 1) | Owned | 30 | 35 | +/- 200,000 | At Capacity |
| Marble, NC (Marble 2) | Owned | 42 | 69 | +/- 50,000 | At Capacity |
| Dalton, GA (Dalton Green)[8] | Leased | 13 | 142 | +/- 100,000 | At Capacity |
| Dalton, GA (Dalton Brown)[9] | Leased | 7 | 53 | +/- 200,000 | At Capacity |
| Calvert City, KY | Owned | 15 | 150 | +/- 60,000 | At Capacity |
| Grand Forks, ND[10] (Prairie Site) | Leased | 20 | 100 | +/- 90,000 | At Capacity, Possible Expansion |
| Denton, TX | Leased | 31 | 125 | +/- 300,000 | At Capacity, Possible Expansion |
| Barstow, TX (Cedarvale) | Owned | 136 | 22 | +/- 5,000 | Not in Use |
| Pecos, TX (Cottonwood) | Leased | 100 | 140 | +/- 125,000 | At Capacity, Possible Expansion |
| Muskogee, OK | Owned | 90 | 0 | +/- 525,000 | Under Construction; Not Operational |

35.     The Debtor's primary sources of revenue are (i) revenues generated from Self-Mining, the sale of bitcoin mined by Debtors' owned (and leased) mining machines and (ii) revenues generated from Hosting Operations, hosting customers' miners at the Company's Data

---

[8] The lease provides that, at the expiration (on December 1, 2030) or earlier termination of the lease, Core Parent is obligated to purchase the property nominal consideration.

[9] The lease provides that, at the expiration (on December 1, 2030) or earlier termination of the lease, Core Parent is obligated to purchase the property nominal consideration.

[10] Grand Forks is comprised of two leased properties.  The leases provide that, at any time during the lease term or during the 60 days following the lease term, Core Parent has the option to purchase one leased property for $5,400,000 less the value of any rent paid under that lease and the other leased property for $210,000.

Centers.  Historically, the Company also earned revenue from equipment sales, but as part of its revised business plan, the Company has shifted away from equipment sales.

      i.      **Self-Mining**

36.      The Company has participated in Self-Mining since its inception.  The Company's share of owned miners (or "self-miners") versus "hosted miners" at its Data Centers has grown substantially, from approximately 10% in 2020 to approximately 60% today, in part due to the Blockcap acquisition in July 2021.  Core has approximately 150,000 bitcoin self-miner rigs operational, with anticipated deployments of approximately 30,000 incremental self-miners through April 2023.  Costs related to miners to be delivered are limited to shipping and customs.

37.      Currently, the Debtors convert their mined Bitcoin into U.S. dollars on a regular basis, generally within 2.5 days of mining.  Consequently, the Debtors currently do not generally hold large amounts of bitcoin on their balance sheet at any given time.  As of the Petition Date, the Debtors hold approximately 50 bitcoin.

      ii.      **Hosting Operations**

38.      In 2020, access to mining equipment was limited for a variety of reasons and Core had the unique ability to provide third-parties with access to miners due to, among other things, relationships in the industry.  Core was able to sell hardware "bundled" with hosting capabilities.  The proceeds from the bundled hardware sales and prepayments on the hosting contracts helped Core to continue to build out its Data Centers to provide additional capacity for its own miners, as well as for hosted miners in connection with its Hosting Operations.

39.      Since 2017, Core has positioned itself as a premium provider of hosting services to third-party miners, with high quality facilities that provide the optimal operating environment for consistent performance.  The Data Centers include onsite technicians available 24/7 for repair, adding value to Core's customers by prolonging the life of the mining equipment.

Core uses custom software to manage miners which allows for real-time performance monitoring, historical data analysis, deployment tracking, and instant adjustment of voltage draws. Customers can take advantage of high uptime percentage—despite slightly higher hosting price with Core— by producing additional bitcoin.

40.     For these reasons, Core's Hosting Operations business has grown considerably since 2017. Core continues to focus on larger customers, generally with greater than 1,000 miners, as larger, professionally-managed customers benefit more from Core's hosting value proposition (i.e., high uptime, software solutions, etc.) and such customers are more likely to be generating consistent cash flow for the Company. Currently, across their Data Centers, the Debtors host over 85,000 miners on behalf of approximately 15 customers.

41.     Customer mining goes directly to the respective customers' wallets, and the Debtors do not hold any bitcoin mined by customers on the Debtors' balance sheet.

**3.     Corporate Structure**

42.     A chart illustrating the Debtors' complete organizational structure as of the Petition Date is attached as **Exhibit A** to this Declaration. The following chart depicts the Company's simplified corporate structure:



43.     Core Scientific, Inc. is publicly traded on the NASDAQ stock exchange under the symbol "CORZ."  All of the other Debtors are wholly owned, directly or indirectly, by Core Parent.[11]

### 4.     Corporate Governance and Management

44.     The board of directors of Core Parent (the "**Board**") consists of six (6) directors:  Darin Feinstein, Neal Goldman, Jarvis Hollingsworth, Mike Levitt, Matthew Minnis, and Kneeland Youngblood.  Mike Levitt and Darin Feinstein serve as Co-Chairmen of the Board.

45.     The Company's highly experienced management team consists of the following individuals:

---

[11] Additionally, in connection with a potential venture that was never consummated, the Company formed several nondebtor affiliates (the "**Non-Debtor Affiliates**"), which are currently dormant.  These entities are (i) Core Scientific Partners, LP, (ii) Core Scientific Partners GP, LLC, (iii) CSP Advisors, LLC, (iv) CSP Liquid Opportunities GP, LP, (v) CSL Liquid Opportunities Master Fund, LP, (vi) CSP Liquid Opportunities Fund, LP, and (vii) CSP Liquid Opportunities Offshore Fund.

| Name | Position |
|---|---|
| Mike Levitt | Chief Executive Officer |
| Todd DuChene | President and Chief Legal Officer |
| Darin Feinstein | Executive Vice President, Strategy |
| Weston Adams | Executive Vice President, Construction |
| Matt Brown | Executive Vice President, Data Center Operations |
| Russell Cann | Executive Vice President, Client Services |
| Denise Sterling | Executive Vice President, Chief Financial Officer |
| Jeff Pratt | Senior Vice President, Partnerships |
| Michael Bros | Senior Vice President, Capital Markets and Acquisitions |
| Jeff Taylor | Senior Vice President, Chief Information Security Officer |
| Katy Hall | General Counsel |

**5.      Prepetition Capital Structure**

46.     The following description of the Debtors' capital structure is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of the Debtors' obligations and any related agreements.

47.     **April Secured Convertible Notes**:  On April 19, 2021, certain of the Debtors entered into that certain Secured Convertible Note Purchase Agreement (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**April NPA**"), by and among Legacy Core Scientific, as issuer, the NPA Guarantors,  as guarantors, U.S. Bank National Association, as note agent and collateral agent (together with any successor in such capacity, the "**Note Agent**"), and the purchasers of the notes issued thereunder. Core Scientific, Inc. assumed Legacy Core Scientific's obligations under the April NPA upon consummation of the de-SPAC Transactions. The April NPA provides for the issuance of up to an aggregate principal amount of $215 million of 10% convertible secured notes due 2025 (the "**April**

**Convertible Secured Notes**"), and an aggregate principal amount of $215 million of April Convertible Secured Notes were issued in April 2021 thereunder.

48.     The April Convertible Secured Notes mature on April 19, 2025 and bear interest at 10.0% per annum, of which 4.0% is payable in cash ("**Cash Interest**") and 6.0% is payable in kind by capitalizing such interest payment and increasing the aggregate principal amount of the Note by the amount thereof ("**PIK Interest**"). In addition, the April Convertible Secured Notes are convertible into shares of common stock of Core Scientific, Inc. at a conversion price of $8.00 per share. As of the Petition Date, the aggregate principal amount of April Convertible Secured Notes outstanding under the April NPA was approximately $234 million, which amount does not include any accretion of original issue discount.  Pursuant to the terms of the April NPA and the April Convertible Secured Notes, Core Scientific, Inc. is obligated to repay 200% of principal amount of the April Convertible Secured Notes at their stated maturity and under certain other circumstances.  The RSA reflects a compromise amongst the members Ad Hoc Noteholder Group and the Debtors with respect to the claims under the April NPA and the April Convertible Secured Notes at the stipulated claim amount set forth therein.

49.     The obligations under the April NPA are secured pursuant to (i) that certain Security Agreement, dated as of April 19, 2021 (the "**April Convertible Notes Security Agreement**"), by and among Legacy Core Scientific, the NPA Guarantors, as guarantors, and the Note Agent (in its capacity as collateral agent), and (ii) that certain Intellectual Property Security Agreement, dated as of April 19, 2021 (the "**April Convertible Notes IP Security Agreement**"), by and among Core Scientific Operating Company (f/k/a Core Scientific, Inc.)  and the Note Agent (in its capacity as collateral agent).  Pursuant to such security agreements and as a result of the de-SPAC Transactions, the April Convertible Secured Notes are secured by a first lien security

interest in all of the Company's and the NPA Guarantors' accounts, chattel paper, commercial tort claims, commodity accounts, contracts, deposit accounts, documents, general intangibles, goods, instruments, investment property, letter-of-credit rights and letters of credit, money, securities accounts, supporting obligations, property, other goods and personal property, certain intellectual property and proceeds of each, other than "Excluded Property" (as defined under the April Convertible Notes Security Agreement) (the "**NPA Collateral**").

50.     **August Convertible Notes**:  On August 20, 2021, certain of the Debtors entered into that certain Convertible Note Purchase Agreement (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, and including all related credit documents, the "**August NPA**"), by and among Legacy Core Scientific, as issuer, the NPA Guarantors, as guarantors, the Note Agent, as note agent, and the purchasers of the notes issued thereunder. Core Scientific, Inc. assumed Legacy Core Scientific's obligations under the August NPA upon consummation of the de-SPAC Transactions. The August NPA provides for the issuance of up to an aggregate principal amount of $300 million of 10% convertible secured notes due 2025 (the "**August Convertible Notes**" and together with the April Convertible Secured Notes, the "**Convertible Notes**"), and an aggregate principal amount of $299.8 million of August Convertible Notes were issued in August 2021 thereunder.

51.     The August Convertible Notes were issued with substantially the same terms as the April Convertible Secured Notes, including the same maturity date of April 19, 2025 and the same interest rate (10.0% *per annum*, of which 4.0% is Cash Interest and 6.0% is PIK Interest).  Likewise, the August Convertible Notes are convertible into shares of common stock of Core Scientific, Inc. at a conversion price of $8.00 per share. As of the Petition Date, the aggregate

principal amount of August Convertible Notes outstanding under the August NPA was approximately $318 million.

52.     In addition, the August NPA included a covenant requiring certain of the Debtors to provide the same collateral securing the April Convertible Secured Notes as collateral to secure the August Convertible Notes upon the occurrence of a Conversion Event (as defined in the August NPA).  A Conversion Event occurred as a result of the de-SPAC Transactions, and the August Convertible Notes became secured by the NPA Collateral in February 2022.   The obligations of the Debtors under the August NPA are secured pursuant to (i) that certain Security Agreement, dated as of February 7, 2022 (the "**August Convertible Notes Security Agreement**"), by and among Core Parent, the NPA Guarantors, as guarantors, and the Note Agent (in its capacity as collateral agent for the August Convertible Notes), and (ii) that certain Intellectual Property Security Agreement, dated as of February 7, 2022 (the "**August Convertible Notes IP Security Agreement**" and collectively with the April Convertible Notes Security Agreement, the April Convertible Notes IP Security Agreement, and the August Convertible Notes Security Agreement, the "**Convertible Notes Security Agreements**"), by and among Core Scientific OpCo, Core Scientific Acquired Mining LLC, and the Note Agent (in its capacity as collateral agent).

53.     **Secured Mining Equipment Financings and Leases.**[12]  Since 2020, the Company has entered into numerous equipment financing agreements and leases to purchase mining equipment.  As part of their operations, the Debtors utilize equipment leases or secured financing or arrangements to finance application-specific integrated circuit equipment for the mining of Bitcoin ("**ASIC Miners**").  Of the Company's approximately 150,000 Self-Mining rigs,

---

[12] Although these financings purport to be secured, the Debtors reserve the right to challenge the validity and perfection of any security interests.  The Debtors also reserve the right to challenge the categorization of any arrangement as a financing versus a lease.

approximately 91,000 (or 60%) are collateral or leased under various equipment financing arrangements.[13]  As of the October 31, 2022, the Debtors have an aggregate of approximately $284 million of principal balance of equipment leases and secured equipment financing outstanding (including accrued and unpaid interest), under different facilities with respective first lien security interests against approximately 91,000 of the Debtors' ASIC Miners.

54.    A summary of the largest outstanding secured mining equipment financing and equipment lease arrangements is below:

| Lender | Borrower[14] | Principal and Interest Outstanding as of October 31, 2022 | Collateral (# of ASIC Miners) |
|---|---|---|---|
| Mass Mutual | Initial Core Scientific | $41.4 million | 15,894 |
| Barings[15] | Core Parent | $63.8 million | 13,353 |
| BlockFi Lending LLC | Initial Core Scientific | $53.9 million | 14,508 |
| NYDIG ABL LLC (fka Arctos Credit LLC) | Initial Core Scientific | $39.0 million | 26,964 |
| Liberty Commercial Finance[16] | Core Parent | $7.0 million | 1,465 |
| Liberty Commercial Finance[17] | Initial Core Scientific | $20.6 million | 7,810 |
| Anchorage Lending CA, LLC | Core Parent | $25.2 million | 5,354 |
| Trinity Capital Inc. | Initial Core Scientific | $22.6 million | 5,812 |

[13] These ASIC Miners are considered Excluded Property under the Convertible Notes Security Agreements, such that they are not collateral for the Convertible Secured Notes.  Furthermore, one of the equipment lenders disputes whether a particular tranche of its debt, securing approximately 500 miners, remains outstanding. The numbers herein reflect the Company's position that such debt was repaid and the lender's lien should have been released.

[14] These financings are not guaranteed by any Debtor.

[15] Loans from various Barings-related entities, including Barings BDC, Barings Capital Investment Corp., and Barings Private Credit Corp.

[16] This secured mining equipment financing was assigned to Stonebriar Commercial Finance LLC.

[17] As of October 31, 2022, approximately $18.2 million of the $20.6 million of secured mining equipment financings with Liberty Commercial Finance was assigned to other third-parties, including affiliates of Atalaya Capital Management LP and 36th Street Capital Partners LLC.

55.    **Secured Non-Mining Financings and Leases.**[18] In addition to financing secured against mining equipment, the Debtors utilize secured financing and leases against non-mining assets to finance and utilize various infrastructure needs of the Debtors for their day-to-day operations. As of the October 31, 2022, the Debtors have approximately $800,000 of facility mortgages, $20.8 million of non-mining equipment financing, and $9.3 million of non-mining equipment leases, each secured by various assets, such real estate, trucks, scissorlifts, servers, switchboards, and other non-mining equipment.[19]

56.    A summary of the largest outstanding secured non-mining financing arrangements is below:

| Lender | Borrower | Principal and Interest Outstanding as of October 31, 2022[20] | Collateral |
|---|---|---|---|
| **Facility Mortgages** | | | |
| Brown Corporation | American Property Acquisitions VI, LLC | $0.2 million | Facilities in Dalton, GA |
| Holliwood LLC | American Property Acquisition, LLC | $0.6 million | Facilities Calvert City, KY |
| **Equipment Financing** | | | |
| Bremer Bank, N.A. | Initial Core Scientific | $18.9 million | Non-mining equipment and leasehold interests in Grand Forks, ND |
| VFS, LLC | Initial Core Scientific | $1.4 million | Non-mining equipment |
| Dell Financial Services | Initial Core Scientific | $0.2 million | Non-mining equipment |

---

[18] Although these financings purport to be secured, the Debtors reserve the right to challenge the validity and perfection of any security interests.  The Debtors also reserve the right to challenge categorization of any arrangement as a financing versus a lease.

[19] These assets that secure the non-mining financing and leases are considered Excluded Property under the Convertible Notes Security Agreements.

[20] The total amounts as of the Petition Date may, in some cases, be less than the amount in this chart due to payments subsequent to October 31, 2022.

| Lender | Borrower | Principal and Interest Outstanding as of October 31, 2022[20] | Collateral |
|---|---|---|---|
| **Equipment Leases** | | | |
| Liberty Commercial Finance[21] | Initial Core Scientific | $7.3 million | Non-mining equipment |
| VFS, LLC | Initial Core Scientific | $0.9 million | Non-mining equipment |
| Tech. Fin. Corp. | Initial Core Scientific | $0.3 million | Non-mining equipment |
| Toyota Commercial Finance. | Initial Core Scientific | $0.2 million | Non-mining equipment |
| 36th Street Capital | Initial Core Scientific | $0.1 million | Non-mining equipment |
| Garic, Inc. | Initial Core Scientific | $0.1 million | Non-mining equipment |

57.    **Unsecured Bridge Notes**:  In April 2022, Core Parent entered into a $60 million Bridge Promissory Note with BRF Finance Co, LLC and a $15 million Bridge Promissory Note with B. Riley Commercial Capital, LLC ("together with BR Finance Co, LLC, "**B. Riley**", and such unsecured financing, the "**Unsecured Bridge Notes**"), each of which were further amended and restated in August 2022.  The Unsecured Bridge Notes mature on June 1, 2023.

58.    The Unsecured Bridge Notes require that 25% of the net proceeds from the issuance of any shares of common stock of the Core Parent under its equity line of credit ("**ELOC**")[22] must be applied to repay the outstanding principal amount of the Unsecured Bridge Notes.  Core Parent has repaid approximately $33 million of principal under the Unsecured Bridge Notes, including from proceeds under the ELOC.  As of the Petition Date, the aggregate principal amount outstanding under the Unsecured Bridge Notes was approximately $42 million.

---

[21] As of October 31, 2022, approximately $6.0 million of the $7.3 million of secured non-mining equipment financings with Liberty Commercial Finance was assigned to other third-parties, including affiliates of Indigo Direct Lending, LLC, Prime Alliance Bank, Inc., North Mill Equipment Finance LLC, and North Star Leasing.

[22] On July 20, 2022, Core Parent entered into an equity purchase agreement with B. Riley Principal Capital II ("**B. Riley Capital**"), pursuant to which, Core Parent has the right to sell to B. Riley Capital up to $100 million of shares of Core Parent's common stock, subject to certain limitations and conditions set forth in the purchase agreement.

59.    **Other Unsecured Claims**:  The Debtors have numerous other unsecured claims outstanding as of the Petition Date, including vendor claims, unpaid construction debt (some of which has resulted in mechanics liens), and litigation claims (described in more detail below).

60.    **Common Stock**:  The common stock of Core Parent trades on the Nasdaq Global Select Market under the ticker symbol "CORZ".  As of November 14, 2022, Core Parent had approximately 374,527,988 shares of common stock outstanding.

### 6.    Ongoing Litigation against the Company

61.    The Company also faces litigation, discussed below.

- Breach of Contract (Assignment of Hosting Agreement).  In October 2022, Sphere 3D Corp. ("Sphere") filed a demand for arbitration against Core Scientific, Inc.  Sphere asserts breach of contract claims alleging, among other things, that another Core customer assigned its hosting-services agreement to Sphere 3D and that Core was obligated to deploy Sphere's cryptocurrency data-mining machines on a specific schedule and failed to do so.  Sphere seeks return of a $35 million deposit and other asserted damages.

- Breach of Contract (Contractor).  In October 2022, plaintiff, a contractor, filed a complaint against Core Scientific, Inc. in the Eastern District of Texas asserting breach of contract claims, specifically alleging that Core failed to (1) fund the parties' escrow agreement with retainage, (2) furnish a payment bond, and (3) timely pay as required by the Texas Property Code.  Plaintiff seeks over $5 million in damages.

- Executive Employment Agreement Litigation.  In September 2022, a former employee filed a complaint against Core Scientific Inc. asserting that Core violated his executive employment agreement and owes him $8,000,000 in compensation.  Core has not yet responded to the complaint.

- Securities Class Action.  In November 2022, plaintiff filed a class-action complaint against Core Scientific, Inc. and certain current and former officers in the Western District of Texas.  Plaintiff asserts that Core violated the Securities and Exchange Act by allegedly failing to disclose to its investors that—among other things—the Company was vulnerable to litigation given its decision to pass power costs to its customers, that certain clients had breached their contracts, and that this impacted the Company's profitability and ability to continue as a going concern.  The Court has not yet appointed a lead plaintiff.

7.    **Recent Financial Performance**

62.    Given the recent struggles in the cryptocurrency sector, the Company's financial performance has been declining.  The Company had a net loss of approximately $434.8 million for the three months ending September 30, 2022 as compared to a net loss of approximately $16.6 million in the three months ending September 30, 2021.

63.    As of September 30, 2022, the Company reported approximately $1.4 billion in total assets and approximately $1.3 billion in total liabilities.  For the three months ending September 30, 2022, the Company reported total revenue of approximately $162.6 million.

### III.    SIGNIFICANT EVENTS LEADING TO CHAPTER 11 FILING

**A.  Challenges Facing Debtors' Business**

64.    Although the Debtors' operating performance has been, and remains, strong, a number of factors have rendered the Debtors' balance sheet unsustainable.  These primary factors include, among other things: (i) the recent decline in bitcoin prices; (ii) increased energy costs; and (iii) ongoing litigation costs, including litigation with Celsius.  These events leading to the chapter 11 filing are discussed in further detail below.

1.    **The Decline in the Price of Bitcoin and Increase in Bitcoin Network Difficulty**

65.    The period between October 2020 and November 2021 saw exponential growth in the price of and consumer interest in bitcoin and cryptocurrency generally.  Although there was significant fluctuation in bitcoin prices throughout this period, bitcoin prices reached an all-time high of $68,789 in November 2021.  The increased consumer interest and bitcoin prices, in turn, led to a demand for the hosting capabilities from companies interested in mining bitcoin.  During this period, the Debtors increased their market presence in the digital mining industry by mining and selling bitcoin on the open market and hosting mining machines for customers.  The Debtors also benefited from lower energy costs during this period, resulting in higher profitability.

66.     After November 2021, however, the price of bitcoin steadily declined.  In May 2022, the value of stablecoin UST ("**Terra**") fell below that of the U.S. dollar.  Because the purpose of the stablecoin was to maintain an equal value to the U.S. dollar, the drop in value resulted in a "run" on the coin as holders sought to sell before the value of their assets diminished. This crash rendered both Terra and its linked cryptocurrency Luna worthless.  Many crypto firms and crypto-focused hedge funds that owned Luna incurred significant losses through the Terra/Luna crash.  The collapse erased nearly $18 billion of value and contributed to further selloffs in the crypto sector.

67.     Additionally, on May 5, 2022, the Federal Reserve raised interest rates by 0.5%, triggering another round of market selloffs.  Thereafter, bitcoin fell 27% during an eight day period.  By July 2022, multiple companies in the cryptocurrency sector commenced chapter 11 proceedings, each one affecting and further pushing the next to the same conclusion as a result of significant interconnectedness and contagion within the industry. Notably, Three Arrows Capital, Ltd., Voyager Digital Holdings, Inc. ("**Voyager**"), and Celsius all filed for chapter 11 in July 2022. More recently, the cryptocurrency market was further rattled by the chapter 11 filing of FTX— one of the world's largest cryptocurrency exchange—and the allegations of fraud and mismanagement related thereto.  BlockFi, a leading crypto lender, filed its own chapter 11 case shortly thereafter, citing connections to FTX as a precipitating factor of its filing.  Although the aforementioned chapter 11 cases did not directly impact Core, with the exception of Celsius as discussed further below, bitcoin prices declined throughout this period, negatively impacting the Debtors' financial performance.  On November 9, 2022, the price of bitcoin dropped below $16,000.  Year-to-date, the price of bitcoin has fallen by approximately 65%.

68.     Additionally, the decrease in bitcoin prices have been accompanied by an increase in network difficulty resulting from increased network "hash rates"—or the measure of computational power active on a particular blockchain network—resulting in reduced revenues and profitability.

**2.     Increased Energy Costs**

69.     As discussed above, the Debtors have Self-Mining and Hosting Operations at eight Data Centers across the United States.  To generate the computing power necessary to operate Data Centers and the miners, the Debtors rely on tremendous amounts of power.  The Debtors' power costs for the first half of 2022 totaled approximately $106 million, comprising approximately 40% of cost of revenue.

70.     Prior to 2021, in line with natural gas prices, the Debtors' power costs were relatively low.  Beginning in the spring of 2022, however, fossil fuel prices—especially natural gas prices—increased due to Russia's invasion of Ukraine and increasing fuel usage in many countries, among other things.

71.     Energy costs and availability typically increase during the summer months due to greater demand for electricity, bringing with it higher risks of outages and power grid damage as a result of inclement weather, animal incursion, sabotage and other events out of the Company's control.  Between July 2022 and September 2022, significantly higher energy prices, inflation, and supply chain disruptions increased the Company's electricity costs, and together with delays in facility development and miner deployments reduced profits.  Due to requests by power providers to curtail usage at certain of the Company's facilities, it became necessary to curtail power usage more frequently.

72.     The Debtors are exploring fixed power pricing at certain facilities via potential hedging structures to mitigate power costs.  Nonetheless, given the Debtors' dependent

on high volumes of power consumption at the Data Centers, the recent steep increase in power costs have significantly impacted the Debtors' bottom line.

### 3. Celsius Litigation

73.     The Company's struggles have been compounded by Celsius's own chapter 11 filing, Celsius's failure to perform on its hosting contract with the Company, and the resulting ongoing litigation with Celsius.

74.     Celsius is one of the Company's largest hosting customers, owning approximately 37,536 miners hosted by Core.  The Company provides hosting services to Celsius pursuant to two Master Services Agreements, dated December 18, 2020 and December 3, 2021 (together with the Orders entered into in connection therewith, the "**Celsius Contracts**").  Pursuant to the Celsius Contracts, the Company may pass through any tariffs to Celsius (the "**PPT Charges**"), which is a standard provision in all of the Company's hosting contracts.

75.     On July 13, 2022, Celsius commenced its own chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York (the "**Celsius Chapter 11 Cases**").  Celsius claims it is not responsible for paying increased power costs and has refused to pay all PPT Charges that have been invoiced postpetition. By doing so, Celsius has foisted millions of dollars of increased power costs onto Core's balance sheet instead of its own.  In total, Celsius owes the Company (i) approximately $1.4 million of outstanding prepetition (based on Celsius's filing date) amounts and (ii) approximately $5.5 million in outstanding postpetition (based on Celsius's filing date) amounts (which excludes the November PPT Charges of $843,129.45 invoiced to Celsius on December 15, 2022), the latter of which Celsius has wrongly withheld. Although power costs have decreased since the summer, Core continues to lose approximately $29,000 per day, or around $900,000 a month, to cover the increased electricity tariffs that Celsius refuses to pay since Celsius filed for chapter 11 protection.

76.     Celsius's conduct resulted in costly and protracted litigation.  On September 28, 2022, Celsius filed a motion in the Celsius Chapter 11 Cases seeking to hold the Debtors in contempt of court for allegedly violating the automatic stay and for otherwise breaching the Celsius Contract (the "**Automatic Stay Motion**").   The Company disagrees with Celsius's allegations and filed an opposition to the Automatic Stay Motion.  Additionally, the Company filed its own motion, seeking (i) to compel immediate payment of administrative expenses and either (ii) (a) relief from the automatic stay to permit Core to exercise all remedies, including termination, under the Celsius Contracts or (b) to compel assumption or rejection of the Celsius Contracts. Until the issue is resolved, the Company is left shouldering the burden of the costs.  Because the Company cannot afford to cover these amounts, Celsius's improper refusal to pay has severely and negatively impacted the Company.

77.     As of the date hereof, the litigation with Celsius has been stayed pursuant to an agreement between the parties as they endeavor to negotiate a consensual resolution. Nonetheless, Celsius's failure to pay the PPT Charges had a detrimental impact on the Debtors' liquidity in the weeks leading up to the filing, as did the significant litigation costs the Debtors incurred in connection with the Celsius litigation.

**B.  Liquidity Constraints**

78.     The aforementioned factors—decreasing bitcoin prices, rising power costs, and ongoing litigation—have, in turn, placed a significant strain on the Debtors' liquidity.  The strain has been compounded by certain customers' inability or unwillingness to pay components of their hosting bills.  Given that the Debtors' access to the capital markets—like others in the industry—is limited, the Debtors explored various liquidity enhancing initiatives, including, pausing certain debt service payments, pausing construction and expansion activities, bringing

additional self-miners online, and monitoring payables.  Despite these efforts, as of the Petition Date, the Debtors' liquidity stands at approximately $4 million.

**C. Appointment of New Independent Director and Formation of Special Committee to Consider Strategic Options and Engage with Creditors**

79.     On October 26, 2022, the Board unanimously appointed Neal P. Goldman as an additional independent director.  Mr. Goldman has extensive restructuring experience and the Board believed that Mr. Goldman's experience would be beneficial to the Company as it navigated through the restructuring process.

80.     Further, on November 14, 2022, in connection with the Company's evaluation of strategic alternatives, the Board approved the formation of a special committee of three (3) independent directors: Neal Goldman, Jarvis Hollingsworth, and Kneeland Youngblood (the "**Special Committee**").  The Special Committee is authorized to, among other things, evaluate and, if deemed by the Special Committee to be in the best interests of the Company, authorize the Company to enter into any potential restructuring transactions and strategic alternatives for and on behalf of the Company with respect to its outstanding indebtedness and contractual and other liabilities.

**D. Debt Restructuring Effort and Restructuring Support Agreement**

81.     Facing both the industry headwinds discussed above and declining liquidity, in October, 2022, the Debtors began to explore options for a comprehensive restructuring solution and engaged Weil and PJT with respect thereto.  Shortly thereafter, the Debtors engaged Alix.

82.     In October, the Debtors engaged with the Ad Hoc Group Advisors, providing them with extensive diligence information concerning the Debtors and their operations. Subsequently, the members of the Ad Hoc Noteholder Group executed non-disclosure agreements and became restricted to negotiate a restructuring transaction.  The extensive and arms' length

negotiations with the Ad Hoc Noteholder Group culminated in the Restructuring Support Agreement (the "**Restructuring Support Agreement**" or "**RSA**"), attached hereto as **Exhibit B**, and the restructuring contemplated therein. In addition, the Ad Hoc Noteholder Group agreed to provide the Debtors with debtor-in-possession financing to provide the Debtors with the liquidity and runway to execute on their restructuring strategy. The Debtors expect to execute the RSA with the Ad Hoc Noteholder Group on the Petition Date.

83. The key economic terms of the restructuring contemplated by Restructuring Support Agreement are described above. The Restructuring Support Agreement also contemplates the following milestones to facilitate the Debtors' expeditious exit from these chapter 11 cases:

- No later than five (5) days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;

- No later than thirty-five (35) days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order;

- No later than seventy-five (75) days after the Petition Date, the Company shall have filed with the Bankruptcy Court the Plan and the Disclosure Statement;

- No later than one hundred and fifty (150) days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order, subject to an extension in accordance with the terms of the Restructuring Support Agreement; and

- No later than one hundred and sixty-five (165) days after the Petition Date, the Plan Effective Date shall have occurred, subject to an extension in accordance with the terms of the Restructuring Support Agreement.

**E. Negotiations with Other Creditor Constituents**

84. Concurrently with the negotiations with the Ad Hoc Noteholder Group, the Debtors and their advisors also engaged with other creditor constituents, including B. Riley, about alternative paths forward. B. Riley initially presented a financing proposal to the Company for an out-of-court transaction, as discussed above in more detail. The Debtors and B. Riley exchanged term sheets but B. Riley's offers became progressively less beneficial to the Company as

negotiations progressed.  On December 8, 2022, B. Riley made a "best and final" proposal to the Company, which contemplated, among other things, the conversion of B. Riley's unsecured claim into secured debt with liens on certain of the Debtors' assets (the "**B. Riley Final Proposal**").

85.     On December 13, 2022, the Debtors notified B. Riley that the Special Committee elected not to pursue the B. Riley Final Proposal because, among other things: (i) the B. Riley Final Proposal did not provide the Company with a comprehensive and long-term deleveraging and capital structure solution, which the Special Committee believes is critical in light of the Company's liquidity position and current market conditions; (ii) the B. Riley Final Proposal converted B. Riley's unsecured position into a fully secured position, while severely restricting the Company's ability to provide collateral to other potential lenders; and (iii) the B. Riley Final Proposal was subject to significant contingencies for it to avoid the need for a near-term comprehensive restructuring, including consensual agreements with equipment lenders, which the Debtors had been negotiating, but none of which had been reached.  The Debtors informed B. Riley that they remained open to engaging with B. Riley on further proposals, including potential debtor-in-possession financing.

86.     On December 14, 2022, despite being party to a non-disclosure agreement with the Company (the "**B. Riley NDA**"), B. Riley issued a press release (the "**B. Riley Press Release**") disclosing, among other things, that B. Riley had made an offer to the Debtors and claiming that a chapter 11 filing was unnecessary.[23]  The Company disagreed—and continues to disagree—with B. Riley's press release and reserves all rights with respect thereto, including that

---

[23] The B. Riley Press Release is available at https://www.prnewswire.com/news-releases/b-riley-financial-issues-open-letter-to-core-scientific-investors-301703337.html.

the B. Riley Press Release violated the B. Riley NDA.  The Debtors are still assessing what harm (if any) they suffered as a result of the B. Riley Press Release.

87.    After it issued the B. Riley Press Release, B. Riley made subsequent proposals to the Debtors contemplating a variety of different transaction structures, including asset sales and additional loans to the Company, which the Debtors and their Advisors considered and analyzed.  The Special Committee reviewed all of B. Riley's proposals and concluded, among other things, that they did not provide a comprehensive restructuring solution, would likely subject the Company to litigation with other creditor constituents (potentially including the Ad Hoc Noteholder Group), and did not solve certain issues the Company was facing, such as its litigation with Celsius.  In addition, despite extensive negotiations with equipment lenders regarding a payment holiday (discussed below), it was not clear the Company would reach the support of the 60-65% of the equipment lenders necessary for the out-of-court path to be workable.[24]

88.    Beginning in the summer of 2022, the Debtors also engaged in discussions with certain of their equipment lenders on restructurings of the underlying equipment loans.  In the months leading up to the Petition Date, the Debtors and their Advisors exchanged term sheets with various equipment lenders in an attempt to reach an out-of-court transaction.  The Debtors ultimately were unsuccessful in reaching agreement with any of the equipment lenders.  Additionally, the Company explored the possibility of certain asset sales, including an asset sale proposal from B. Riley.

89.    Finally, the Debtors engaged in a competitive marketing process to obtain debtor in possession financing on the most favorable terms to fund operations while the Debtors

---

[24] This paragraph is a high level summary of the B. Riley proposals and does not purport to discuss all of their terms or iterations.

restructure their balance sheet in a chapter 11 case.  A more detailed description of the debtor in possession financing process is provided in the Singh Declaration (as defined in the DIP Motion), filed contemporaneously herewith.  As of the Petition Date, the Debtors did not receive any actionable proposals for third party postpetition financing.

90.     Although the Debtors, the Special Committee, and their Advisors carefully considered—and discussed at length—the potential transactions with other constituents, the Special Committee ultimately determined that the transaction contemplated by the Restructuring Support Agreement will maximize value for all stakeholders and best position the Debtors for future success.

91.     Moreover, although other constituents are not party to the Restructuring Support Agreement, the Debtors intend to continue to negotiate with other constituents during these chapter 11 cases to reach consensual agreements with as many constituents as possible to avoid the costs and delay associated with litigation.

**F.   DIP Financing**

92.     As discussed above, the Company's liquidity is highly strained.  As of the Petition Date, the Debtors have approximately $4 million cash on hand and require immediate access to the DIP Facility (as defined in the DIP Motion) and authority to use the Cash Collateral (as defined in the DIP Motion) to fund ongoing operations and expenses for the projected duration of the chapter 11 cases, including costs associated with these chapter 11 cases.

93.     Prior to the Petition Date, the Debtors, with their advisors, including Alix and PJT, reviewed and analyzed the Debtors' projected cash needs and prepared a weekly cash flow analysis to determine the need for and size of postpetition financing.  The Debtors' projected operating expenses are expected to total approximately $60 million over approximately the first four (4) weeks of these chapter 11 cases.  This total includes expenses specifically arising from

the commencement of these chapter 11 cases, such as payments contemplated under the First Day Motions, as well as professional fees and expenses that are to be funded into an escrow account.

94.     In connection with the RSA, the Debtors are close to a deal with the Ad Hoc Noteholder Group to provide DIP Facility commitments of up to $56 million and support the syndication of up to $75 million in new money DIP Facility loans to all holders of Convertible Notes.  $40 million of the DIP Facility will available after entry of the Interim DIP Order and will immediately solidify the Debtors' financial position.  Absent the authority to enter into and access the DIP Facility, even for a limited period of time, the Company will be unable to continue operating its businesses, which will cause immediate and irreparable harm to the Debtors and their stakeholders.

95.     I believe that the current debtor-in-possession budget (the "**DIP Budget**"), attached an exhibit to the Interim DIP Order (as defined in the DIP Motion), provides an accurate reflection of the Debtors' funding needs over the identified period and is reasonable and appropriate given the circumstances.

96.     The DIP Facility (as defined in the DIP Motion) will provide the Company with the liquidity necessary to, among other things, to fund payroll and satisfy its other working capital and general corporate purposes, including the payment of significant utilities expenses.

97.     I believe it is important that the Company sends a clear message to its business partners, employees, creditors, and other stakeholders, that it will be well-capitalized during the chapter 11 cases and continue to operate its business.  Any market perception that the Company will not be able to sustain itself through the bankruptcy process will negatively impact the Company's relationships with vendors, hosting customers, and other parties and impede its

future prospects.  It is my belief that the proposed DIP Financing is in the best interests of the Company and its stakeholders.

## IV.   **THE FIRST DAY MOTIONS**

98.    The Debtors have filed, or expect to file, with the Court First Day Pleadings seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these chapter 11 cases, and expedite a swift and smooth reorganization.  The First Day Pleadings include the following:

- (i) *Emergency Motion of Debtors Pursuant to Fed. R. Bankr. P. 1015(b) and Bankruptcy Local Rule 1015-1 for Entry of an Order Directing Joint Administration of Chapter 11 Cases* (the "**Joint Administration Motion**");

- (ii) *Emergency Motion of Debtors for Entry of an Order (I) Authorizing Debtors to (A) File a Consolidated Creditor Matrix and a Consolidated List of 30 Largest Unsecured Creditors and (B) Redact Certain Personal Identification Information; (II) Modifying Requirement to File a List of Equity Security Holders; and (III) Approving Form and Manner of Notifying Creditors of Commencement of Chapter 11 Cases and Other Information* (the "**Creditor Matrix Motion**");

- (iii) *Emergency Ex Parte Application of Debtors for Entry of an Order Authorizing Employment and Retention of Stretto as Claims, Noticing, and Solicitation Agent (*the "**Stretto Retention Application**");

- (iv) *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue Their Existing Cash Management System, (B) Maintain Existing Business Forms and Intercompany Arrangements, and*

(C) *Continue Intercompany Transactions, and (D) Continue Utilizing Employee Credit Cards; and (II) Granting Related Relief* (the "**Cash Management Motion**");

- (v) *Emergency Motion of Debtors for Entry of an Order (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation, (B) Maintain Employee Benefits Programs and Pay Related Obligations; and (II) Granting Related Relief* (the "**Employee Wages Motion**");

- (vi) *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay (A) Critical Vendor Claims and (B) Lien Claims; and (II) Granting Related Relief* (the "**Critical Vendors Motion**");

- (vii) *Emergency Motion of Debtors for Entry of an Order (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Fees Owed to Taxing Authorities and (II) Granting Related Relief* (the "**Taxes Motion**");

- (viii) *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue Insurance Programs and Surety Bonds, and (B) Pay Certain Obligations with Respect Thereto; (II) Granting Relief from Automatic Stay with Respect to Workers' Compensation Claims; and (III) Granting Related Relief* (the "**Insurance Motion**");

- (ix) *Emergency Motion of Debtors for Entry of an Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies; (II) Establishing Procedures for Resolving Objections by Utility Companies; (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service; and (IV) Granting Related Relief* (the "**Utilities Motion**");

- (x) *Emergency Motion of the Debtors Pursuant to Section 362 and 105(a) of the Bankruptcy Code for Interim and Final Orders Establishing Notification Procedures and Approving Restrictions on (A) Certain Transfers of Interests in the Debtors, and (B) Claiming of Certain Worthless Stock Deductions* (the "**NOL Motion**");

- (xi) *Emergency Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition First Lien Secured Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief* (the "**DIP Motion**"); and

- (xii) *Emergency Motion of Debtors for Entry of an Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Current Expenditures, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Reports* (the "**SOFA and SOAL Extension Motion**").

99.    The First Day Motions seek authority to, among other things, obtain postpetition financing, honor employee-related wages and benefits obligations, pay claims of certain vendors and suppliers critical to the Debtors' business operations, and ensure the continuation of the Debtors' cash management system and other operations in the ordinary course of business with as minimal interruption as possible on account of the commencement of these chapter 11 cases.  In my capacity as Senior Vice President of Capital Markets & Acquisitions, and based on my experience and knowledge, I believe that the relief requested in the First Day Motions

is necessary to provide the Debtors an opportunity to work towards a successful restructuring that will inure to the benefit of each stakeholder.

100.     Several of the First Day Motions request authority to pay certain prepetition claims against the Debtors.  The Debtors have narrowly tailored these requests for immediate authority to pay certain prepetition claims to those instances where the failure to pay would cause immediate and irreparable harm to the Debtors and their estates.  The Debtors will defer seeking other relief to subsequent hearings before the Court.

101.     I am familiar with the content and substance of each of the First Day Motions and hereby reference and expressly incorporate into this Declaration the facts in each First Day Motion with the exception of certain of the sections of the DIP Motion, which rely on the Singh Declaration (as defined in the DIP Motion).  In my capacity as Senior Vice President of Capital Markets & Acquisitions, and based on my experience and knowledge, I believe approval of the relief sought in each of the First Day Motions is critical to the Debtors' ability to successfully implement their chapter 11 strategy, with minimal disruption to their business operations. Obtaining the relief sought in the First Day Motions will permit the Debtors to preserve and maximize the value of their estates for the benefit of all of their stakeholders.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:   December 21, 2022
         Bellevue, Washington

                          Respectfully submitted,

                          By:    */s/ Michael Bros*
                                 Michael Bros
                                 Senior Vice President of Capital Markets &
                                 Acquisitions


                          on behalf of Core Scientific, Inc. and its Debtor affiliates