1            IN THE UNITED STATES BANKRUPTCY COURT

2            FOR THE SOUTHERN DISTRICT OF TEXAS

3                     HOUSTON DIVISION

4   IN RE:                      §      CASE NO. 22-90341-11
                                §      JOINTLY ADMINISTERED
5   CORE SCIENTIFIC, INC.,      §      HOUSTON, TEXAS
    ET AL,                      §      MONDAY,
6                               §      MAY 22, 2023
              DEBTORS.          §      1:30 P.M. TO 2:40 P.M.
7
                    **MOTIONS HEARING (VIA ZOOM)**
8
             BEFORE THE HONORABLE DAVID R. JONES
9                UNITED STATES BANKRUPTCY JUDGE

10

11

12

         APPEARANCES:                   SEE NEXT PAGE
13
                   **(RECORDED VIA COURTSPEAK)**
14

15

16

17

18

19

20
                  TRANSCRIPTION SERVICE BY:
21
            JUDICIAL TRANSCRIBERS OF TEXAS, LLC
22               935 Eldridge Road, #144
                  Sugar Land, TX  77478
23                   281-277-5325
              www.judicialtranscribers.com
24

25      Proceedings recorded by electronic sound recording;
          transcript produced by transcription service.

1                          APPEARANCES (VIA ZOOM):

2    FOR DEBTORS:                 WEIL GOTSHAL & MANGES, LLP
                                  Alfredo R. Perez, Esq.
3                                 Roni Berkovich, Esq.
                                  700 Louisiana
4                                 Suite 1700
                                  Houston, TX  77002
5                                 713-546-5040

6    FOR SPEAR 3D CORP:           HUNTON ANDREWS KURTH, LLP
                                  Ashley Harper, Esq.
7                                 600 Travis
                                  Suite 4200
8                                 Houston, TX  77002
                                  713-220-3810
9
     FOR NORTH MILL
10   EQUIPMENT FINANCE:           PADFIELD & STOUT
                                  Christopher Arisco, Esq.
11                                420 Throckmorton St.
                                  Suite 1210
12                                Fort Worth, TX  76102
                                  817-338-1616
13

14   FOR GEM MINING, LLC:         MAYNARD COOPER GALE, PC
                                  Christian Pereydaa, Esq.
15                                1901 6th Avenue N.
                                  Suite 2400
16                                Birmingham, AL  35203
                                  205-254-1000
17

18   FOR THE CREDITORS, 36TH
     STREET CAPITAL PARTNERS:     REED SMITH
19                                Jared S. Roach, Esq.
                                  Reed Smith Centre
20                                225 Fifth Avenue
                                  Pittsburgh, PA  15222
21                                412-288-3131

22
     FOR THE AD HOC COMMITTEE:    PAUL HASTINGS, LLP
23                                Kris Hansen, Esq.
                                  600 Travis Street
24                                58th Floor
                                  Houston, TX  77002
25                                713-860-7300

1                  APPEARANCES (CONT'D) (VIA ZOOM):

2

    FOR MASS MUTUAL ASSET
3   FINANCE, LLC:                      NUTTER, MCCLENMEN & FISH
                                       Thomas O. Bean, Esq.
4                                      One Portland Square
                                       155 Seaport Blvd.
5                                      Boston, MA  02210
                                       617-309-2600
6

7   FOR BLOCK BY LENDING:             HAYNES AND BOONE
                                       J. Frasher Murphy, Esq.
8                                      2323 Victory Avenue, Ste. 700
                                       Dallas, TX  75219
9                                      214-651-5000

10

11  FOR THE EQUITY COMMITTEE:         VINSON & ELKINS, LLP
                                       David S. Meyer, Esq.
12                                     1114 Avenue of the Americas
                                       32nd Floor
13                                     New York, NY  10036
                                       212-237-0000
14
    FOR THE OFFICIAL COMMITTEE
15  OF UNSECURED CREDITORS:           WILLKIE FARR GALLAGHER, LLP
                                       Todd M. Goren, Esq.
16                                     600 Travis St., Ste. 2310
                                       Houston, TX  77002
17                                     713-510-1700

18

19

20  (Please also see Electronic Appearances.)

21

22

23

24

25

1          **HOUSTON, TEXAS; MONDAY, MAY 22, 2023; 1:30 P.M.**

2          THE COURT:  Okay, good afternoon everyone.  This

3   is Judge Jones.  The time is 1:30 Central.  Today is May the

4   22nd, 2023.  This is the Docket for Houston, Texas.

5          On the 1:30 Docket we have the jointly

6   administered cases under Case No. 22-90341, Core Scientific,

7   Inc.

8          Folks, please don't forget to record your

9   electronic appearance.  That's a quick trip to the website.

10  You can do that at any time prior to the conclusion of the

11  hearing.

12         I have activated the hand-raising feature, so if

13  you know you're going to be speaking, if you'd go ahead and

14  give me a five star on your telephone, I'll get you unmuted.

15         First time that you do speak, if you would, please

16  state your name and who you represent.  That really helps

17  the court reporter.

18         And if you are in the courtroom this afternoon, if

19  you'd please and try and make sure that you come to the

20  lectern to speak just everyone can both see you and hear

21  you.

22         Finally, we are recording using CourtSpeak.  We'll

23  have the audio up on the Docket shortly after the conclusion

24  of this afternoon's hearing.

25         And with that, all right, I think I have

1  everybody.

2          Mr. Perez, coming to the lectern.  Wow, it's an

3  honor.

4          MR. PEREZ:  Good afternoon, Your Honor.  Alfredo

5  Perez on behalf of the Debtors.

6          Your Honor, Mr. Schrock apologizes for not being

7  able to be here.  Apparently there was an order entered in

8  another case compelling him to attend a settlement --

9          THE COURT:  Oh, that's right.  I signed that,

10 didn't I?  Okay, fair enough he doesn't have --

11         MR. PEREZ:  And he trusted me enough for me to

12 handle the uncontested matters.  And then Ms. Berkovich, my

13 partner, will handle the only contested matter left.

14         But I do, before I get started, I wanted to

15 introduce Ms. Berkovich who's going to handle exclusivity.

16 Austin Crabtree who will be --

17     (Electronic noise.)

18         THE COURT:  Keep going.  I had somebody with a

19 really soft voice so I had turned -- I had turned the volume

20 way up.

21         MR. PEREZ:  I'll be a whisper.

22         THE COURT:  There's such a response to that.

23     (Laughter)

24         MR. PEREZ:  So, Your Honor, Mr. Austin Crabtree,

25 who's going to be handling the exhibits.

1          And then I also wanted to introduce Ash Media

2    (phonetic).  Why don't you stand up?  He's one of John

3    Singh's minions with PJT.  So he's here for that.

4          So with that, Your Honor, if I could just kind of

5    proceed through the Agenda?

6          THE COURT:  Certainly.

7          MR. PEREZ:  And I want to take them in reverse

8    order though for -- I don't know exactly what reason we

9    ended up putting the contested matter first.

10          But if I could go to the uncontested matters.  And

11    the first one we have is the Debtors' motion to quash, the

12    Spear 3D, Rule 2004.

13          Your Honor, we've had extensive discussions with

14    counsel for Spear 3D.  They are going to withdraw their 2004

15    as a result our motion to quash will be moot.  That will all

16    be reflected in a stipulation.

17          I believe counsel is here to confirm that.

18          THE COURT:  Ms. Harper, come on up, please ma'am.

19          Good afternoon.

20          MS. HARPER:  Good afternoon, Your Honor, Ashley

21    Harper, Hunton Andrews Kurth on behalf of Spear 3D Corp.

22    Mr. Perez is correct.  We will file a stipulation on the

23    Docket after this hearing to memorialize that agreement.

24          THE COURT:  Thank you.

25          Is that going to be something that you're going to

1    want me to sign or just between the two parties?

2           MS. HARPER:  Because it affects the deadline, it's

3    on the Court's calendar, we would request that Your Honor

4    sign it.

5           THE COURT:  If you just let Mr. Alonzo know once

6    it's been uploaded and I will jump right on it.

7           MS. HARPER:  Thank you.

8           THE COURT:  All right.  Thank you.

9           MR. PEREZ:  Your Honor, the next matter that we

10   had was a motion to lift stay for a party by the name of

11   North Mail counsel.  Their counsel is on the line,

12   Mr. Arisco.

13          We did file a form of a notice of adjournment and

14   I think that has been pushed.  And I think that the notice

15   of adjournment is Docket 909.

16          THE COURT:  I saw that.  Is there anything that

17   you need for me to do or --

18          MR. PEREZ:  No, we already have a date for that

19   already, Your Honor.  So there's nothing for you to do.

20          THE COURT:  All right, thank you.

21          Mr. Arisco, is there anything you needed to add or

22   wanted to be heard about?

23      (No audible response.)

24          THE COURT:  Mr. Arisco -- ah, hold on.  There we

25   go.  How about now?

1          MR. ARISCO:  Good afternoon, Your Honor.
2   Christopher Arisco on behalf of North Mill.

3          There's nothing further I want to add except for I
4   need to send an email to Mr. Alonzo formally requesting the
5   agreed upon date of July 10th.  But other than that, I think
6   we have an agreement to reset.

7          THE COURT:  So hold on just one second.  He does
8   let me once in a while set my own hearings.

9          MR. PEREZ:  It's dangerous.

10          THE COURT:  I know.  If you -- if the two of you
11   could look at your calendar.  Beginning -- it starts right
12   after Labor Day, I teach at TSU on Mondays and Wednesdays.
13   So the mornings go away.

14          But if you could live with the afternoon, July the
15   10th will be just fine.

16          MR. PEREZ:  That's good with us, Your Honor.

17          THE COURT:  Mr. Arisco, would that work for you?

18          MR. ARISCO:  Yes, Your Honor.

19          THE COURT:  So let's go ahead and the adjourn date
20   is July the 10th, 2023, at 2:00 o'clock Central.

21          MR. ARISCO:  Very good.

22          THE COURT:  All right, thank you.

23          MR. PEREZ:  Next, Your Honor, is a GEM Mining's
24   emergency motion to compel assumption or rejection.

25          We did file a stipulation on that for the Court's

1   signature.  We don't have a date.

2           THE COURT:  I saw -- I actually -- I read it this

3   morning and I just didn't know -- I didn't see anything as

4   to dates that you had agreed to, so I decided not to guess.

5           MR. PEREZ:  So, Your Honor, Mr. Christian Pereydaa

6   is on the line for GEM.  Your Honor, if the Court -- we

7   talked about 30 days.

8           So if the Court has availability on June 21st,

9   that would be acceptable for us and I think it would be

10  acceptable for GEM's counsel as well.

11          THE COURT:  All right, is it Pereydaa, am I close?

12          Could you go ahead and hit five star for me so

13  that I can hear you on your phone?

14      (No audible response.)

15          THE COURT:  How about now?

16          MR. PEREYDAA:  Thank you, Your Honor.  Yes,

17  Christian Pereydaa here on behalf of GEM Mining.

18          And June 21st is perfectly fine for our client.

19          THE COURT:  Okay, let me -- hold on a second.

20  Because that is a Wednesday, I have exactly the same issue.

21          Could you live with the afternoon?

22          MR. PEREZ:  Yes, Your Honor.

23          MR. PEREYDAA:  Yes, Your Honor.  The afternoon

24  would be fine.

25          THE COURT:  All right so I've got the order.  And

1  I'm going to interlineate -- so June 21st at 2:00 p.m.

2  Central Time.  And if you've talked about the 21st as your

3  hearing date, had you-all talked about an agreement on the

4  objection deadline?

5         MR. PEREZ:  I think we already filed our

6  objection, Your Honor.

7         THE COURT:  But for the response, I meant.  My

8  apologies.

9         MR. PEREZ:  I think, you know, three days before

10  is fine, Your Honor.

11         THE COURT:  So just normal so that I have a chance

12  to read it, can everybody live with June 14th?

13         MR. PEREZ:  Absolutely, Your Honor.

14         THE COURT:  Mr. Pereydaa, are you okay with that?

15         MR. PEREYDAA:  Yes, Your Honor.

16         THE COURT:  All right.  So in paragraph two of

17  that order.

18         MR. PEREZ:  Your Honor, that's a different

19  response.  That's the response to the objection of claims,

20  which we agreed to push beyond the motion to compel.

21         THE COURT:  Oh.  Okay, there was a blank in there.

22  What date would you like in there?

23         MR. PEREZ:  The 28th, the week after this.

24         THE COURT:  The 28th.

25         MR. PEREZ:  Again, the week after.

1        THE COURT:  My apologies for that, so.

2      (Pause in the proceedings.)

3        THE COURT:  All right.

4      (Pause in the proceedings.)

5        THE COURT:  It won't look very pretty just because

6  the formatting had changed, but it's all in there.  That has

7  been signed and it's on its way to docketing.

8        Mr. Pereydaa, thank you, sir.  You're free to go,

9  if you wish.

10        MR. PEREYDAA:  Thank you, Your Honor.

11        MR. PEREZ:  And finally, Your Honor, the last one

12  is the Celsius motion for administrative expense.  I don't

13  see Mr. Koenig on the line.  I don't know who's here.  Oh,

14  there he is.  I see him now.

15        THE COURT:  There he is.  Always lurking in the

16  shadows.

17        MR. PEREZ:  So, Your Honor, I think we'd like to

18  basically -- we're abating all of this pending mediation.

19  We're still in -- and they've reported to Judge Glenn last

20  Thursday.

21        THE COURT:  Okay.

22        MR. PEREZ:  So we've -- and we're reporting to

23  you.

24        We're still in search of a mediator.  But that'll

25  eventually come to you; otherwise, we'll be back in court.

1    But this is just -- we're presenting this.

2            THE COURT:  Fair enough.  And I see Mr. Koenig

3    nodding and there I think he just popped up.

4            MR. KOENIG:  Good afternoon, Your Honor, Chris

5    Koenig for Celsius.

6            THE COURT:  Yes.  Thank you.

7            MR. KOENIG:  We agree -- I'm sorry, Your Honor.

8            THE COURT:  No, my fault.  Go ahead, please.

9            MR. KOENIG:  I was just going to agree.  We're

10   looking forward to mediation.  We're still working through

11   some of the mechanics and putting the identity of the

12   mediator, but we hope to engage in mediation in the near

13   term.

14           THE COURT:  All right.  Then let's do this.  We'll

15   just note that the matter has been abated.  Either party can

16   get it back on the calendar by contacting Mr. Alonzo.

17           Does that work for everybody?

18           MR. PEREZ:  Works for us, Your Honor.

19           THE COURT:  All right, Mr. Koenig?

20           MR. KOENIG:  Yes.  Thank you, Your Honor.

21           THE COURT:  All right, thank you, sir.

22           MR. PEREZ:  And Your Honor, with that I'll turn it

23   over to Mr. Berkovich.

24           THE COURT:  All right, thank you.

25           Ms. Berkovich, good afternoon.

1          MS. BERKOVICH:  Good afternoon, Your Honor.  Roni
2   Berkovich, Weil Gotshal & Manges for the Debtors.
3          The only item going forward today is the Debtors'
4   exclusivity motion at Docket 773.  For this contested
5   matter, we filed the Declaration of Michael Brows at Docket
6   919.  He is available virtually for questioning.
7          We'd like to move for the admission of the Brows
8   Declaration at Docket 924-1 filed with the Witness and
9   Exhibit List.
10          THE COURT:  Got it.  Let me do -- and we'll come
11   back to that.
12          So, I really didn't understand where everybody was
13   in this.  No one's, you know, -- no one wants to give you
14   any additional time, but no one's got an alternative either.
15   And I'm just -- has that discussion occurred?  Has there
16   been -- I don't really understand what we're going today.
17          MS. BERKOVICH:  Yes, Your Honor, to clarify,
18   everyone is willing to give us additional time except for a
19   handful of the equipment lenders.
20          THE COURT:  Right.
21          MS. BERKOVICH:  They're all -- everyone -- no one
22   likes Chapter 11, not the creditors, not the Debtor.  No one
23   likes to be here and everyone would like to move quickly.
24          But we've made a lot of progress --
25          THE COURT:  Right.

1          MS. BERKOVICH:  -- even since the filing of the

2     exclusivity motion.  So the Debtors have presented now a

3     business plan to the advisors of each of their five

4     constituents and are in the process of answering diligence

5     questions and meeting with them further about the business

6     plan.

7          The next step will be to present it to the

8     constituents themselves.  You know, we have five groups.

9     The DIP Lender, the Official Creditors Committee, the

10    Official Equity Committee, the Ad Hoc Group, and the DIP

11    Lender, who's also the large unsecured creditor, as well as,

12    of course, the equipment lenders.

13         The equipment lenders have been included in all

14    that and then the step after that, which we intend to

15    commence in the next week or so, would be discussions on a

16    Chapter 11 Plan.

17         But Your Honor is correct that nothing in the

18    objections that were filed suggested that anyone had a

19    better alternative or something different.  I think they

20    just would like it to move faster.

21         THE COURT:  All right.  Let me ask is there -- is

22    there anybody -- is there anybody on the line for any of the

23    objecting parties that would like to give me what I'll just

24    take as -- and Mr. Roach, you don't need to raise your hand.

25         If you hit five star for me so that I can hear

1   you.  And you only had to do it once.  I just don't -- there

2   you go.

3           Mr. Roach?

4           MR. ROACH:  Yes, Your Honor.  Thank you.

5           Certainly while we didn't put in our objection

6   specific next steps, if you will, I think Ms. Berkovich is

7   correct that this is a very unique case that has severe

8   impact on our clients, that is the equipment lenders and

9   others that have joined, you know, filed joinders to our

10  leading objection.

11          And what we're looking to impress upon the Court

12  is that at the opening hearing, First Day Hearing, you know,

13  this was represented as a six-month case.  It was moved

14  quickly.

15          The Court indicated it could move even more

16  quickly if necessary.  And we seem to be bogged down here

17  recently where there's been delays in providing business

18  plan, the business plan can't be shared with our clients who

19  are the experts in this arena -- not necessarily the lawyers

20  or other advisors, but our clients have hired.

21          And so, there needs to be focus on moving more

22  quickly, staying the course and frankly, getting a little

23  bit more accomplished in less time.

24          THE COURT:  So I hear that.  I'm not sure that

25  that helps me in my inquiry.

1          So let's assume for a second that your objection
2    carries the day.

3          MR. ROACH:  Yes, Your Honor.

4          THE COURT:  What's next?

5          MR. ROACH:  Well, I mean the Debtor is still free
6    to propose its Plan -- certainly nothing in removing
7    exclusivity or allowing exclusivity to expire.

8          Prejudice is to the Debtor in filing its Plan, or
9    if another party comes in and files a Plan and the Debtor
10   and the stakeholders will have to deal with that.

11         But what we think may occur in that situation is
12   that the Debtors will be focused and forced to focus on
13   getting a Plan on file and moving this case to conclusion,
14   which we just haven't seen so far.

15         THE COURT:  And so, okay.  That just seems like to
16   me to be the worst possible way to get what you want.  But
17   okay.

18         Anyone else want to make what I'll just take as an
19   opening statement?

20      (No audible response.)

21         THE COURT:  All right, then Ms. Berkovich --

22         MR. HANSEN:  Yes, Your Honor.

23         THE COURT:  Oh, Mr. Hansen.  I'm sorry.

24         MR. HANSEN:  Yes, Your Honor, Kris Hansen with
25   Paul Hastings, on behalf of the Ad Hoc Committee.

1          Your Honor, I feel like I can't let a hearing go

2   by without making a few remarks, so I know Ms. Berkovich

3   appreciates that.

4          So, Your Honor, I did just think -- from our

5   perspective, it has been a frustrating process.  Right, we

6   filed our reservation of rights so to speak or statements or

7   however you want to phrase it.

8          We are (indiscernible) accordingly supporting the

9   extensions.  I think the frustration that many of the

10  creditors in the case share is that back when the case

11  altered course, we were promised a business plan in a matter

12  of weeks.  It's been a matter of months.  We just got it.

13         So we're working through it.  We're doing the work

14  that's necessary to be done and we recognize sometimes these

15  cases take longer than others.  But I think that frustration

16  that literally everyone shares is:  Where are we and where

17  are we going?

18         And people generally view the business as not as

19  complex as it might be made out to be.  And so we're working

20  through the business plan.  We see the timeline that the

21  Debtors' provided in connection their demonstratives that --

22  we'll see if that can be held.

23         Nobody has a Plan of Reorganization at this point.

24  We're still at the business plan phase.  There has not been

25  a draft PRR circulated.  And so obviously that's a pretty

1  specific timeline when we're looking at Memorial Day weekend

2  to a filing in three weeks.  And hopefully there will be

3  consensus around that.

4          Like, you know, no one can tell you whether

5  there's consensus around a business plan yet, so we'll be

6  diligent.

7          So I think the heads up that we wanted to give the

8  Court today was more than, again while we welcomed to the

9  Court the extension and we want to see the cases move

10 quickly.  What we don't want to see the cases turn into --

11 and I'm sure no one here does -- is to evolve into

12 litigation.  That's time consuming and expensive.

13          And so we want to work together and try to get

14 through this process.  Things haven't changed in awhile in

15 terms of the PTC market and in terms of power market.  But

16 we want to get going and we appreciate the Debtors saying

17 that, you know, now is the time to move.  But I think the

18 frustration is that (indiscernible) creditors and other

19 constituents, is that that matter at least turned into a

20 matter of months and everybody was -- for lack of better way

21 of describing -- pulling their hair out.

22          THE COURT:  Got it.  Is there anything that I can

23 do to help keep everybody focused from your viewpoint?  Such

24 as, you know, I can do a weekly status conference and --

25 you-all know when things get on my radar and stay on my

1 radar, things typically tend to move.

2          And I'm happy to do that.  I just didn't see the

3 need because I know all of the professionals involved.  And

4 I, you know, I was leaving that to you-all to do what you

5 know how to do so well.

6          But I'm perfectly happy to get back involved in

7 terms of oversight on a weekly basis, a bi-weekly basis,

8 whatever you think would keep everybody focused.

9          MR. ROACH:  Your Honor, obviously Ms. Berkovich

10 can speak on behalf of the Debtors.  As a matter of

11 perspective I don't think it's necessary for us to be in

12 front of you on a weekly status conference.  I think they're

13 telling us to move this process now with the Plan of

14 Reorganization and we all know how to get in touch with you

15 to the extent that it is a (glitch in the audio) set the

16 date.  I think that nobody has come running to the Court is

17 because it was a little bit of like, you know, I just got

18 back from a trip to Italy with my wife and a little bit of

19 (glitch in the audio).  I thought it was the next day

20 (glitch in the audio).

21          So I think that Ms. Berkovich can speak on behalf

22 of the Debtors, obviously I can speak to mine, but I think a

23 weekly status conference would probably too much at this

24 point and we should let the parties try to work this out and

25 if we can't, I think we all know how to come back in front

1    of you quickly.

2              THE COURT:  All right.  Thank you.

3              Anyone else?  Mr. Bean, had you hit five star?

4         (No audible response.)

5              THE COURT:  You only had to do it once.  I think I

6    hear you moving around.

7              Could you just say something?

8              MR. BEAN:  Yes, Your Honor.

9              THE COURT:  You're loud and clear.  Thank you,

10   sir.

11             MR. BEAN:  Thank you very much.  My name is Thomas

12   Bean.  I represent MassMutual Asset Finance, an equipment

13   lender to join (indiscernible)'s objection.

14             I wanted to throw out one idea because I

15   understand the Court is looking for ideas in terms of what

16   might address some of the equipment lenders' concerns.

17             We are being asked -- we are dealing with a very

18   volatile immature market in the crypto-currency industry.

19   And we're very fortunate that the price of Bitcoin has gone

20   up according to the Debtor about 66 percent during the life

21   of the case.

22             The risk is that over the coming months the hash

23   price could decline from where it is today, thus making the

24   equipment lenders bear the risk of a potential decline in

25   the market value in the coming months with absolutely no

1    premium in the form of cash payments that the Debtor has

2    declined and they can make payments or otherwise for that

3    risk.  So we think we're being prejudiced.

4              And I want to throw out this one idea.  It may be

5    premature, but I wanted to get it before the Court.  At or

6    about the time of Plan Confirmation, absent agreement

7    between the Debtor and equipment lenders as to the value of

8    the collateral, the Court will be required to value that

9    collateral.

10             And as the Court is well aware, under the Fifth

11   Circuit's decision in the *Matter of Houston Regional Sports*

12   *Network*, this Court in determining the date for valuing

13   MassMutual and other credit commitment lenders' collateral

14   for Plan Confirmation purposes, may take into account the

15   development of proceedings, so long as it also takes into

16   account the proposed use or disposition of the collateral.

17             Here, development of the proceedings may include

18   the Debtors' decision not to make payments to MassMutual,

19   while exhausting some of MassMutual's collateral and useful

20   life and exposing, if the Court grants the Debtors'

21   request for an extension of exclusivity, exposing those

22   equipment lenders to a risk of downturn in the

23   cryptocurrency market.

24             So the idea is like a float, is that if the Court

25   is inclined to grant exclusivity, grant the motion, it also

1   decides to exercise its discretion to value the equipment

2   lenders' collateral as of the date the equipment lender's

3   request, or even if it doesn't do that today, say, that's

4   something the Court is going to consider down the road.

5   Equipment lenders have been supporting this case.  The big

6   part of the Debtors' over performance over budget is based

7   on using our equipment, which they're using without making

8   any payments.  You know, we don't want to also bear the risk

9   of decline in the market while this case plays out over the

10  coming months.

11          So the idea to float is that the Court would

12  decide -- would agree to value the collateral as of the date

13  the equipment lenders request.

14          THE COURT:  All right.  Anyone else?

15      (Pause in the proceedings.)

16          THE COURT:  Yes, sir.

17          MR. MURPHY:  This is Frasher Murphy.

18          THE COURT:  Oh, I'm -- absolutely, Mr. Murphy.  I

19  was looking at the gentleman who was coming to the lectern.

20  But go ahead, go ahead.

21          MR. MURPHY:  No problem, Your Honor.  It actually

22  took a minute for my camera to come on anyway.

23          Yes, Your Honor.  Frasher Murphy with Haynes and

24  Boone.  I represent Block by Lending.  We filed a joinder to

25  Wing Spire's (phonetic) objection and we joined in their

1   arguments that were advanced today, but there was one issue

2   that I did hear the Court ask for, suggestions or commentary

3   on anything that could be helpful in moving this process

4   forward.

5          I think one of the things that's been holding this

6   case back somewhat from an equipment lender's standpoint is

7   that -- and I believe Mr. Roach touched on this -- all the

8   materials that the Debtors have provided, including their

9   business plan, has been provided under a "Professional Eyes

10  Only" designation.  And likewise, Block By, is subject to a

11  non-disclosure agreement with the Debtor that was signed up

12  back in December of 2022 in connection with some

13  pre-petition restructuring transactions or in discussions.

14         So all of the information that's in the business

15  plan that's been provided on a PEO basis are things that

16  already subject to an NDA and could easily be shared with

17  our client.

18         We have made the request to the Debtors that they

19  drop the PEO designation and that request has been denied.

20  We've not been persuaded by the Debtors that there's good

21  business justification for keeping the PEO designation in

22  place.

23         And obviously I had experience over the last year

24  in the crypto case from the legal perspective and the

25  lawyer's perspective, so another business person and that is

1   hamstringing me and my ability have meaningful discussions

2   with my client and obtain meaningful feedback from my client

3   that I could share with the Debtors and their counsel that

4   could maybe help move this case forward.

5           So in response to Your Honor's question, I think

6   that would be extremely helpful if we could open up the

7   process a little bit more, be able to share some information

8   with our clients particularly since we're under an NDA and

9   see where it goes from there.

10          THE COURT:  Terrific.  That's helpful.  Thank you.

11          Yes, sir.

12          MR. GOREN:  Thank you, Your Honor.  Todd Goren,

13  Willkie, Farr & Gallagher on behalf of the Official

14  Creditors Committee.

15          As Your Honor probably saw, we filed a statement

16  in support of the proposed exclusivity extension.  I mean,

17  like everybody else, we're very anxious to get the case

18  moving, but from our perspective the way we looked at it and

19  I think really helped our question over the case law is will

20  terminating exclusivity help advance the case and I think

21  you hit on it, no, it's not going to help advance the case.

22          You know, there's a lot of work that's still to be

23  done.  The Debtors have presented a business plan to

24  advisors.  The Committee itself still hasn't seen it.  As

25  Mr. Murphy just noted I think that's universal across

1  everyone whose advisors that have seen it.  I'm sure

2  Ms. Berkovich will get into it.  There's a reason for that.

3          Our understanding at least is that they want the

4  advisors to see it, they wanted to gather feedback from the

5  advisors.  It's a collaborative process and then once

6  they've gathered feedback from advisors, they'll present a

7  business plan to all of the constituents.

8          So while we're anxious to get things done, that

9  process made sense to us, so we're going along with that

10  process.

11          THE COURT:  All right.

12          MR. GOREN:  There's still significant issues that

13  need to be resolved.  Valuation is going to be a huge

14  question in this case.  There's also the question of the

15  200 percent premium that the lenders have asserted

16  entitlement to.  Those issues are going to require some

17  significant negotiation.  I'm hopeful we'll be able to find

18  common ground on that stuff and that the creditors and

19  equity will be able to find a Plan that is acceptable to

20  everybody.

21          Fortunately, the business is performing well.  You

22  know, the Debtors, I believe, are going to run through a

23  little presentation for you and as you'll see in a moment,

24  you know, this isn't a -- it's not a melting ice cube.

25  We're not generating more debt during the case, the Debtors

1 | paid down the DIP this month.

2 |      So things at the moment are going well.  Obviously

3 | things can change, but at the moment things are going well

4 | and we need the time afforded by this exclusivity extension

5 | to see how far we can get.

6 |      If we can advance the case and even if we can't

7 | get to a Plan, because really the 90-day extension is only

8 | 60 days from now.  It's July 19th, I believe, is the date.

9 |      There's a lot that needs to get done between now

10 | and then, so hopefully we'll be able to get a Plan done, or

11 | if not, it'll just need significant progress on the Plan.

12 | If we don't, we might take a different position, you know,

13 | at that point, but for now, we believe that terminating

14 | exclusivity would be a disaster and that the best course of

15 | action is for the parties to try to get together and try to

16 | advance the ball.

17 |      THE COURT:  Right.  All right.  Thank you.

18 |      MR. GOREN:  Thank you, Your Honor.

19 |      THE COURT:  Mr. Meyer?  Good afternoon.

20 |      MR. MEYER:  Good afternoon, Your Honor.  David

21 | Meyer of Vinson & Elkins on behalf of the Equity Committee.

22 | I didn't want to lose my opportunity to present to you, as

23 | well, today.

24 |      I'm joined, Your Honor, by my colleagues, Paul

25 | Heath and Karen (indiscernible) from Vinson & Elkins, as

1  well as David Rush and Ann Atarie (phonetic) from FTI.

2          Your Honor, a couple of quick points.  Since V&E

3  and FTI were selected by the Equity Committee in April,

4  we've been working quickly to get up-to-speed, and Your

5  Honor, I think the point that I expect will be important to

6  you and I can represent to you is that the process is

7  working the way that it should.

8          The company is engaged fully with us.  We've been

9  working hard and taking note of your prior remarks about

10  avoiding snippy comments and we've followed your direction

11  on that front and are working to pursue a consensual path.

12  We'd love for that to occur in the next budget basis.  But

13  from my perspective, the company's advisors are feeding

14  information to the other advisors to diligence.

15          I expect, as Ms. Berkovich will lay out for you,

16  clients will get restricted thereafter like you'd expect the

17  process to work.

18          THE COURT:  Right.

19          MR. MEYER:  And to see if we can come together

20  consensually over the upcoming weeks on a path forward.

21          Thank you, Your Honor.

22          THE COURT:  Mr. Meyers, thank you.

23          Anyone else?

24     (No audible response.)

25          THE COURT:  All right.  Ms. Berkovich, I

1   interrupted you mid-flow.  Can we start over on the offer?

2                MS. BERKOVICH:  Your Honor --

3                THE COURT:  On the evidentiary offer.

4                MS. BERKOVICH:  Sure, Your Honor.  We'd like to

5   move into evidence the admission of the Brows Declaration at

6   Docket 924-1 filed with the Witness and Exhibit List.

7                THE COURT:  All right.  Thank you.  Thank you.

8                Anybody have an objection for purposes of today's

9   hearing only the Declaration of Mr. Brow that is found at

10  924-1?

11       (No audible response.)

12               THE COURT:  All right.  It's admitted.

13       (Exhibit 924-1 received in evidence.)

14               THE COURT:  Anyone wish to cross-examine Mr. Brow?

15       (No audible response.)

16               THE COURT:  All right.  Then thank you.

17  Mr. Brow's testimony is accepted.  He's excused as a

18  witness.

19               MS. BERKOVICH:  Thank you, Your Honor.

20               We've prepared a presentation on the business that

21  we thought would be helpful to provide in connection with

22  exclusivity.  While some of these comments from the opening

23  statements are fresh on Your Honor's mind, perhaps I should

24  address those first?

25               THE COURT:  Totally up to you.

1          MS. BERKOVICH:  Sure.  I'll do that.  Really,

2   there's two I'd like to address.

3          First of all, I'll start with Mr. Murphy's point

4   about us not providing the business plan to the equipment

5   lenders themselves.  First, his particular client does have

6   a financial advisor, BRG, that's been invited to call us and

7   like other lenders have had financial advisors that are very

8   involved in the diligence process.

9          We could theoretically give the existing version

10  of the business plan to the equipment lenders themselves, we

11  could and we will if Your Honor thinks that could be

12  helpful, but the reason we have not is not because we're

13  trying to slow play anything.  It's because we think that

14  would be efficient -- inefficient, excuse me.

15         We're trying to get feedback from each of our five

16  major constituents onto the business plan -- into the

17  business plan after they do their diligence and there might

18  be some changes to the business plan.  So we think it's more

19  helpful if the constituents themselves review a further

20  along business plan than the one we have now.

21         That's our thinking on it.

22         THE COURT:  All right.

23         MS. BERKOVICH:  Secondly on Mr. Bean's suggestion

24  about the timing for the valuation of collateral, we have

25  weekly calls with equipment lenders.  We're open to

1  discussing any of these ideas.  I think it's -- I don't

2  think now is the right time to make a decision on when the

3  collateral should be valued.  We should each consider it and

4  discuss it.  Maybe we can come up -- the parties come up

5  with a consensual resolution on that question.  It's really

6  not relevant exclusivity either and I don't see how it moves

7  this particular contested matter forward.

8          THE COURT:  All right.  All right.

9          And you had a presentation?

10          MS. BERKOVICH:  Yes, Your Honor.

11          THE COURT:  And who is going to run that?

12          MS. BERKOVICH:  Mr. Crabtree will be running it at

13  Docket 923.

14          THE COURT:  All right.  And what is Mr. Crabtree's

15  first name?

16          MS. BERKOVICH:  Austin.

17          THE COURT:  Austin, all right.

18      (Pause in the proceedings.)

19          THE COURT:  Mr. Crabtree, you now have control.

20          MS. BERKOVICH:  We'll start with the roadmap of

21  Slide 2.

22          MALE SPEAKER:  He must be related to Mr. Carlson.

23      (Laughter)

24          THE COURT:  Here you go.

25          MS. BERKOVICH:  We'll invest in more computer

1  training in our Houston office.

2          THE COURT:  No, he's got it.  He's going to get

3  there in just a minute.

4      (Pause in the proceedings.)

5          MS. BERKOVICH:  I can get started.  I mean, the

6  main purpose of the first part of the presentation is to

7  provide the Court and other parties-in-interest with a more

8  in-depth discussion about the Debtors' business, the factors

9  that impact the business and profitability, sort of beyond

10 what we did five months ago at the First Day Hearing.

11         If that will help set the backdrop for the changes

12 that have happened in the last five months and why it's

13 taken a while to get to the business plan, but where we're

14 going.

15         All right.  Let's jump to Slide 5.

16         So the Debtor is in the business of mining and so

17 a little background in what mining is, mining is the process

18 in which transactions involving cryptocurrency.  It

19 transfers Bitcoin between two individuals are verified and

20 added to the block chain public ledger.

21         One mine, by solving a computational encryption

22 puzzle and one does that using a miner and a miner is really

23 a specialized computer that's specifically designed to solve

24 these particular mathematical algorithms.  And by doing so,

25 validates the process.

1        Here in the middle of this Slide 5, you have an

2   illustration of the way it works, so transactions involving

3   cryptocurrency are pooled together in a block and encrypted

4   by a complex puzzle.  Once the block is formed, all the

5   miners around the world compete to solve the puzzle.  And

6   once that puzzle is solved, the transactions are verified by

7   the network.

8        The new block of verified transactions is attached

9   to the chain of prior block and sending block chains.  And

10  for solving this puzzle, the miners are rewarded with

11  cryptocurrency.  And that's the way that Bitcoin is actually

12  created, simply by these computers solving these puzzles.

13        Next slide, please.

14        Okay.  So this illustration depicts how the

15  Debtors machine works in the whole process.  So in the

16  middle you have cores data centers and cores miner.  The

17  miner core runs data centers in numerous dates and has tens

18  of thousands of miners of its own, as well as listing other

19  people's miners.

20        So the key to powering the computer is

21  electricity.  So electricity is a huge cost for the Debtor

22  and that was one of the high costs of electricity in 2022 is

23  one of the reasons leading to the Debtors financial issues.

24        So core takes these computers and uses something

25  called hashing.  Hashing power is the power of the computer

1   to solve these particular algorithms to make puzzles and

2   uses that to compete with other computers to solve the

3   problem -- solve these problems.  And as a result, it get

4   Bitcoin rewarded.

5          Bitcoins are rewarded for set amounts released by

6   the network for each block and that's 6.25 Bitcoins per

7   block currently and sometimes the network also pays

8   transaction fees for solving the problem.  So electricity is

9   the input.  Power is the output.  And from that you get the

10  rewards, which are the Debtors' revenue, which is Bitcoin.

11          Next slide.

12          So the key in Debtors' profitability are the

13  inputs on this page.  First, you have Bitcoin price.  That's

14  pretty obviously because the Debtor sells all the Bitcoin it

15  mines.  The higher the Bitcoin price, the more the Debtors

16  profitability increases.

17          Second, you have something more complex that's

18  unique to crypto mining, which is hash rate.  Hash rate is

19  the -- talk about the network hash rate, that is the overall

20  computing power of all the Bitcoin miners in the world.

21  Together that's hash rate.

22          So how much power are these computers around the

23  world putting into solving these problems?  Hash rate, when

24  it goes up, it's not good for any particular miner because

25  their hash rate, their hashing power becomes a smaller

1  percentage of the overall computer power going for a limited

2  amount of Bitcoin.

3          Terahash rate is its computing power.  Hash price

4  is really the key to it all.  Hash price is a single metric

5  that applies to everybody at the same time.  It tells you

6  exactly how much Bitcoin you will get for each terahash per

7  second of computing power.

8          So currently hash price is eight cents per

9  terahash.  Everyone who mines Bitcoin will be eight cents

10 per each terahash of power that its miner will support,

11 terahash per second.

12         And hash price takes into effect a combination of

13 (indiscernible) input, most notably the network cash rate,

14 you know, the number of people that are going after the same

15 Bitcoin.  The Bitcoin price and the reward and transaction

16 fees that are paid, so you want a higher hash price.

17         And of course, electricity costs impact the

18 Debtor, as well, as I explained.

19         Next slide.

20         This is just another depiction of how these

21 different variables impact the Debtors' business.  As the

22 network cash rate goes up, that hurts the Debtors

23 profitability, but as its own hash rate goes up -- for

24 example, if it acquires additional miners, then its

25 profitability increases and of course, BTC price and rewards

1  and transaction fees are both positively correlated to

2  profitability.

3          We didn't put hash price on here.  We could have.

4  Again, hash price is a combination of the network hash rate

5  the BTC price and the reward and transaction fees, working

6  sometimes in different directions to get you to the actual

7  input that you -- the actual amount of revenue that you get

8  for each unit of computer power.

9          And then, of course, costs, as the costs go up,

10 then profitability decreases.

11         Now turning to -- that's just a lot about the

12 business.  In this section we'll get to how those factors

13 have lately impacted the Debtors' business.

14         So the first few months of the Chapter 11 case

15 were spent, of course, transitioning into Chapter 11,

16 obtaining replacement DIP financing on more favorable term,

17 and dealing with issues like the Equity Committee, but the

18 Debtors soon thereafter turn their attention to revising

19 their go-forward business plan.

20         And a revised business plan was necessary due to

21 several market conditions that have shifted materially since

22 the petition date.  We have increased Bitcoin prices,

23 increased network cash rate, and decreasing power costs.

24         Overall, as I'll show in the next slide, these

25 have been very positive for the Debtors.  And have caused

1   the Debtors' financial position and liquidity to improve

2   since the petition date.

3          So these factors take into account the input the

4   Debtor must utilize to determine their business plan,

5   including what capacity for their facilities should they be

6   using?  The long-term Plan for each of their facilities, how

7   many facilities, what's the size of those facilities, where

8   are they located and the allocation of their resources in

9   their facilities between self-mining and hosting.

10          I think Slide 11 is the most interesting and

11   helpful slide in the entire deck, and this shows you what's

12   happened since the petition date.  So you know, we tend to

13   talk about the most since they're the most obvious is the

14   increase in Bitcoin price, which has gone up 61 percent

15   since the petition date and the decrease in power costs.

16          Here in the bottom right, we show just one type of

17   power costs.  These are the ERCOT North power price

18   forwards.  As Your Honor knows, a little bit difference in

19   each region, but I think these are fairly representative of

20   what we've seen overall.

21          The power costs have gone down 24 percent since

22   the petition date.  These two things together have been

23   very, very positive for the Debtor.

24          Working in the other direction is what you have in

25   the top right-hand corner, which is network cash rate and

1 the network cash rate has gone up 54 percent since the

2 petition date.  Now why has it gone up?  Well, the Bitcoin

3 prices have gone up, Bitcoin mining become more profitable.

4 You have more miners competing to solve the theme algorithm,

5 which impacts the Debtor and impacts every miner.

6          However, if you combine all of those -- not

7 prioritize, but if you combine Bitcoin prices and network

8 cash rates, you get hash price.  Again, what are we getting

9 for each unit of power that we're putting into the system?

10 And you'll see the hash price has gone up 30 percent since

11 the petition date.

12          Now, you know, so Bitcoin has gone up 61 percent,

13 hash price has gone up 30 percent, so still a market

14 improvement.  That taken together with the power price

15 decreases have really positively impacted the Debtors.

16          And if Your Honor has any questions, obviously

17 free free to stop me, but I'll keep going on the slide.

18          THE COURT:  No, keep going.

19          MS. BERKOVICH:  And so this slide gives a good

20 illustration of how those combination of factors have

21 positively impacted the Debtors.  So despite increasing the

22 length of our case by -- Chapter 11 case by four months, our

23 liquidity -- ending liquidity now is projected to be

24 $46 million higher than what we project at the very

25 beginning of the case.  And that end results in materially

1    lower use of Bitcoin.

2         And liquidity was so high that as required by the

3    DIP, that's required as to pay down if we had excess cash of

4    $50 million, we recently gave back six million of the DIP.

5    So, you know, and having looked behind the numbers to see

6    what's really causing it, it really is -- the out

7    performance really is primarily belated to the -- both

8    realized the projected increase in receipts from self-mining

9    and the hash price going up, and the decrease in power

10   disbursements.

11        We've discussed a little bit of this already, but

12   really the status is that we are exactly where we should be

13   now that we have the first iteration of our business plan

14   done.  We're doing exactly as one would expect at this

15   status in the case with all of the constituents and I think

16   you've heard that from everybody today.

17        Even the objectors sort of admitted that now that

18   we are where we are, these are the right next steps.  So we

19   have five different constituents and we've had separate

20   sessions with each of them with key senior management

21   present, presenting the business plan and answering

22   questions with the advisors to each of these groups.

23        And right now, we're getting diligence questions

24   from them.  I've been called, we're doing what we can to try

25   to get as many people onboard for the business plan prior to

1  sharing it with the constituents, and then getting into Plan

2  negotiations.

3        Of course, the next step is negotiations over the

4  terms of the Plan.  We've been thinking about the Plan of

5  Reorganization, of course, it's very important to us.  But

6  we'd like to build as much consensus as possible.  We have a

7  complex capital structure, different types of secured

8  lenders on different assets.  We have Equity Committee in

9  the mix here.  We'd like to build as much consensus as

10  possible.

11        We'll get a Plan on file in the near term, even if

12  you don't have consensus, but we would continue -- we will

13  continue to work with each of the major parties to try to

14  build their support from the Plan, even if we start the

15  train running.

16        We are targeting emergence from Chapter 11 by the

17  end of the September.  It's helpful to have goals.  That's

18  our goal.  We'd like to inform the Court and everybody that

19  our Special Committee of independent directors is overseeing

20  the Plan formulation and negotiation process and they're

21  very involved.

22        The next page that Mr. Hansen previewed, it's

23  illustrative, a Plan confirmation time line.  If we get a

24  Plan on file by June 15th, we calculate that we will be able

25  to emerge from Chapter 11 by September 25th.

1          As Your Honor knows, as everybody who does this

2     all the time knows, these dates are subject to change.

3     They're making these shorter or longer, depending on the

4     amount of consensus that we need, depending on the Court's

5     calendar, and depending on other factors.  Again, it's

6     merely illustrative.

7          Okay.  So the other major item that we've been

8     working on -- and you saw some of this on the Docket of

9     things that got adjourned and you'll see others coming as a

10    claims process.  We were very diligent in reviewing our

11    claims quickly, objecting to large claims, trying to get a

12    very good handle in our claims pool, that will make the

13    confirmation process smoother, it will also enable us to

14    make distributions to our stakeholders more quickly once we

15    emerge from bankruptcy.

16         Now turning more specifically to the request for

17    the extension of exclusivity, this is at Docket 773.  We're

18    seeking to extend our exclusive filing period through and

19    including July 18th, 2023.  As somebody noted, that's two

20    months from now and the exclusive solicitation period

21    through and including September 17th, each of these is an

22    extension of 90 days.  This extension was requested to

23    enable us to finalize our business plan.

24         Your Honor, I think our papers very well lay out

25    the factors that courts examine in connection with requests

1    for exclusivity and how we satisfy those.  I propose to give

2    a 62nd summary of our position, rather than going through

3    all of the factors, unless Your Honor would like along and

4    detailed --

5             THE COURT:  So can I get to the business plan for

6    a second?

7             MS. BERKOVICH:  Yes.

8             THE COURT:  Just part of what is so fascinating

9    about this for me is I don't understand where all the curves

10   cross.  And that's a generic statement, but you know, now,

11   past couple of months, power is as cheap as it gets during

12   the year and over the next couple of months, it's going to

13   rise.  I mean, just historically spot prices in the summer,

14   they tend to go up.

15            I have always wondered how the events really

16   correlate to the price.  You know, because theoretically

17   every time you have an event, price at least logically to me

18   seems it has to double in order to stay in the same sort of

19   -- in the same profitability realm as you were prior to the

20   event.

21            Does the business plan deal with all of this and

22   has somebody got all these curves and at some point is

23   somebody going to educate me?  Because I would just love to

24   see how all this fits together.  I mean, I know there are

25   people out there that are way smarter than me that are

1    dealing with this.

2           But I would just -- at some point I would love to

3    understand how all this works.

4           MS. BERKOVICH:  The answer to your questions are

5    yes, yes, and yes.

6           THE COURT:  Okay.

7           MS. BERKOVICH:  We do have people -- those are

8    factored into the business plan.  We do have people that can

9    explain that very well.

10          This one -- to confirm, when you talk about

11   events, are you talking about the halving events?

12          THE COURT:  Yes.

13          MS. BERKOVICH:  Okay.  I mean, I can tell you --

14          THE COURT:  I'm just trying to tell you some

15   things that I find interesting that at some point I'm hoping

16   people answer those questions for me.

17          MS. BERKOVICH:  And those are --

18          THE COURT:  I wouldn't try to put you on the spot.

19          MS. BERKOVICH:  -- those are very good questions

20   and questions that the company has to take into account in

21   formulating its business plan.  How do you take halving an

22   event into account and how do you develop a business plan

23   around that?  And I can assure you that a lot of thought has

24   been put into that and I can say just very short if the

25   halving event happens and now the Bitcoin received per block

1   was down by half, right?  What happens then is the network

2   hash rate goes down a lot as well for the same reason that

3   it went up when the Bitcoin price went up, right?  Because

4   it's less profitable at the very outset.

5           THE COURT:  So people get out of the market?

6           MS. BERKOVICH:  People get out of the market.

7           THE COURT:  Got it.

8           MS. BERKOVICH:   And so those things tend to --

9           THE COURT:  But at some point, don't you have to

10  cross your fixed cost line?  I mean, price of electricity

11  isn't going to keep going down proportionately, right?

12          MS. BERKOVICH:  Electricity is a different input

13  than you use the forward curves to predict what the

14  electricity will be.

15          THE COURT:  Right.

16          MS. BERKOVICH:  But I can say even though numerous

17  halving events have occurred over the last year, generally

18  speaking, other than recent events of the last year, Bitcoin

19  prices have continued to go up.

20          But we understand it's our job to educate the

21  Court about these factors and to support the business plan

22  that we present in connection with our Chapter 11 Plan and

23  we will present evidence that hopefully explains all of that

24  and answer all of the Court's questions.

25          THE COURT:  But can we go back to your tentative

1   schedule?  And I get that this is just something that you're

2   targeting.

3          There we go.  So -- and again, I'm not trying to

4   put my finger on the scale at all, but it would seem to me

5   that it could help the process if you really do file a Plan

6   and Disclosure Statement on June the 15th and given all of

7   the work that you are doing on the front end, I don't why

8   you wouldn't take advantage of perhaps just seeking

9   conditional approval of the Disclosure Statement and at

10  least trimming that time off and to the extent that there

11  are Plan negotiations even after you file your Plan that are

12  going to have to occur, it would seem to me that would be a

13  better use of that time.

14         And could actually perhaps trim this -- and not

15  that I'm criticizing the September exit date, but it seems

16  to me that you could trim that down by at least a month.

17  But again, I'm just -- I don't have -- I don't have any

18  issues at all with what you've proposed, I just think that

19  to the extent that people are wanting it to go faster,

20  sooner, have it done yesterday-type of approach, that you

21  could certainly expedite the process if you thought it made

22  sense to do so and it's not going to bother me one bit.

23         MS. BERKOVICH:  That's very helpful feedback, Your

24  Honor.  We would love to shorten the process and we and the

25  objectors and all the other parties share a common goal of

1   time to make this process go as quickly as possible, so

2   knowing that Your Honor is open to conditional approval of

3   the Disclosure Statement would enable us to shorten the

4   deadline and we will consider that.

5         THE COURT:  Good.  And I would think, too, you

6   know, obviously you want to be communicating with the

7   US Trustee's Office, just in terms of, you know, where their

8   comfort level lies, as well as the Committee, but again,

9   given the time that you are spending with all of the major

10  constituents saying, look, here's what it's going to look

11  like, that's going to give me an awful lot of comfort.

12        MS. BERKOVICH:  That's an excellent suggestion,

13  Your Honor.

14        THE COURT:  All right.  All right.  I interrupted

15  you, my apologies.

16        MS. BERKOVICH:  Okay.  So back to the support for

17  exclusivity extension is the dramatic market changes that

18  we've noted in this industry since the petition date

19  required us to completely scrap our old business plan to

20  reflect -- or prepare a new one that reflected market

21  reality.  And the business plan, of course, is a necessary

22  prerequisite for a Chapter 11 Plan, which will be fairer to

23  all stakeholders than the RSA plan we filed in December.

24        The business plan is complex, but the reasons I've

25  stated for the reasons that Your Honor has touched on, and

1  we've worked quickly to develop it, but we wanted to get it

2  right.  The Debtors are pleased with the business plan we've

3  presented to our constituents and we hope that once they

4  complete their diligence, they will be satisfied, too, and

5  we can all turn to Plan negotiations.

6          You know, as I've said, the Debtors share our

7  creditors' goal of wanting to exit Chapter 11 as quickly as

8  possible.  As much as the Debtors like, Mr. Schrock,

9  Mr. Perez and me personally, they want us out of their

10  lives, the sooner the better.  They are eager to move on

11  with Plan negotiations, Plan confirmation, and emergence.

12          And I do also want to highlight that this is the

13  Debtors' first extension request and this is supported by

14  both Official Committees, the Ad Hoc Group, and the DIP

15  Lender, which again is also our largest pre-petition

16  unsecured creditor.

17          Your Honor, I can turn to the objections now,

18  unless you'd prefer for the objectors to first present?

19          THE COURT:  Yeah, I'll give you a chance to come

20  back around and respond to it, but I don't see the need for

21  you to go through and anticipate what they're going to tell

22  me, given sort of how the hearing has gone.

23          So let's do that.

24          MS. BERKOVICH:  Thank you, Your Honor.

25          THE COURT:  All right.  Let me ask:  Is there any

1    of the objecting parties want to make argument, have a slide

2    deck of their own?  Anyone?

3              MR. ROACH:  Your Honor, this is Jared Roach with

4    Reed Smith.

5              THE COURT:  Yes, sir.

6              MR. ROACH:  We had sort of organized among

7    ourselves that I would kick it off and others may follow.

8    We do not have a slide deck, but I do have a few minutes of

9    argument.

10              THE COURT:  Okay.

11              MR. ROACH:  Your Honor, good afternoon again.  For

12    the Record, Jarod Roach with Reed Smith on behalf of 36th

13    Street Capital, which is client secured in the miners, Prime

14    Alliance Bank, which is secured in the infrastructure

15    equipment, and Wing Spire Equipment Finance, which is

16    secured in both infrastructure equipment and miners.

17              Your Honor, our clients filed the objection, which

18    is at Docket No. 836 on May 1st, as part of an organized

19    effort by a number of the equipment lenders, many of whom

20    you've seen have filed joinders or supporting statements.

21              We didn't take filing this objection lightly.  It

22    was very thoughtful and organized on the part of our

23    clients, but we thought it appropriate to tell our story and

24    given the Debtors' unique nature of this case, it's

25    important to put our thoughts out on the public record.

1            THE COURT:  Yep.

2            MR. ROACH:  The joining parties here are

3   MassMutual Asset Finance, Barings, Lockfly and North Mill.

4   I'll have our initial presentation and then, as I said,

5   others may join.

6            Your Honor, the objection is born from a few

7   ongoing issues:  First, the Debtors are seeking more time

8   when the nature of the industry in which they operate

9   demands quick and decisive decision and action.  They're

10  indicating here that not only do they need this exclusivity

11  extension, but further extensions may be forthcoming.

12           Second, the Debtors do not appear to have

13  determined their exit strategy.  They appear content to

14  manage their assets as Debtors-in-Possession without any

15  sense of urgency.  The exclusivity extension request is

16  evidence of this point as others have mentioned today that

17  if the motion is granted, the Debtors' Plan is due July 19th

18  or 58 days from today.  Yet, the Debtors just circulated the

19  business plan to the equipment lender group on May 12th.

20           The equipment of business plan provides no insight

21  into the Plan structure or Plan treatment for our clients

22  and there's no definitive time for when the Plan will be

23  circulated.  Indeed, we've seen for the first time a

24  proposed schedule, but as everyone has said today, that

25  proposed schedule is illustrative only and may slide as

1   other, you know, proposed deadlines, for instance, that the

2   business plan was going to be forthcoming shortly after the

3   April 10th filing of the motion to extend exclusivity.

4           And the third point, Your Honor, is that the

5   equipment lenders shared frustration that the Debtors can,

6   but are not interested in making payments to the equipment

7   lenders, despite the critical value provided to the estate.

8           The Debtors' financial picture is improving

9   materially.  We believe they're using the equipment lenders'

10  collateral without making payments.

11          The Court and even the Debtors themselves have

12  recognized the urgency with which they should emerge from

13  bankruptcy.  As I mentioned in the opening remarks at the

14  First Day Hearing, the Debtors advised the Court that they

15  were contemplating a six-month case, in other words, a case

16  in which the Plan would be filed within the original

17  exclusivity period.

18          In response, the Court acknowledged and indicated

19  that it would be happy to move at a fast pace.

20          The Debtors talk about the complexities and large

21  size of its business.  These are facts that were known at

22  the time it advised the Court at the First Day Hearing that

23  this could be a six-month case.  The Debtors say they need

24  time to address evolving business conditions in this

25  industry, but this is the nature of the crypto industry

1   right now.  It is an immature industry that is always

2   evolving.

3         There's a fail to identify a challenge that was

4   not aware or could not have foreseen at the First Day

5   Hearing when it indicated a six-month stay in Chapter 11.

6         Your Honor, as these factors apply to a

7   (indiscernible), which of course are the governing factors

8   of 11, the Court should grant the request for an exclusivity

9   extension, we believe there are three of the factors cut

10   distinctly against granting the extension here.

11         First, the existence of good faith progress toward

12   reorganization.  Your Honor, it's been repeated *ad nauseam*

13   here.  I won't go into every detail, but we were just

14   provided the business plan on May 12th.  The business plan

15   starts only after the proposed date of emergence from

16   Chapter 11.  It's a bit like providing the ending to the

17   movie and then asking what we think of the ending to the

18   movie when we have no idea what's going on in the middle or

19   how we get to that point.

20         Whether the -- second, whether the Debtor has

21   demonstrated reasonable prospects for filing a viable Plan,

22   again, we're 30-plus days late on the business plan,

23   according to the timeline set forth in its own motion for

24   exclusivity extensions, and now we're looking just based

25   upon the schedule that was attached to Docket No. 923, a

1  proposed Plan that's filed within roughly three weeks of

2  today, and yet, we're not anywhere near to its final on a

3  business plan being allowed to share that with our clients,

4  as other objectors have raised, and so moving forward with

5  even a term sheet or any sort of idea of what a Plan would

6  look like.

7         And finally, the third factor cutting against

8  extending the exclusivity periods, whether the Debtors have

9  made progress in negotiations with its creditors and I think

10 you've heard from all parties today that any discussions are

11 in their infancy, they are, again, revolving around a

12 business plan on a post-effective date treatment and what

13 the business may look like.  None of these discussions

14 indicate any progress towards resolving what a Plan

15 structure may look like or even -- are in broad terms there.

16        So with that, Your Honor, unless you have more

17 questions, I would cede the virtual podium to others on my

18 side who would like to present.

19        THE COURT:  All right.  Thank you.

20        Anyone else wish to add comments that are part of

21 the objection?

22        MR. BEAN:  Yes, Your Honor, briefly.

23        THE COURT:  Yes, sir.  Ah, go ahead.

24        MR. BEAN:  Thank you.  Thomas Bean again.

25        Your Honor, I want to thank you for your

52

1   suggestion of potentially providing conditional approval of

2   the Disclosure Statement.  Speed here is the order of the

3   day.

4           As Mr. Roach said, the Debtor has been using our

5   collateral for the last several months.  Our collateral has

6   facilitated the Debtors' over performance relative to budget

7   -- dramatical over performance.  The Debtor has not paid the

8   equipment lenders a dime and so frankly, they're in -- they

9   will have to pay the equipment lenders once the Plan is

10  confirmed on the equipment lenders' secured claims.

11          So right now, the Debtor is incentivized to slow

12  walk the case --

13          THE COURT:  Right.

14          MR. BEAN:  -- insofar as the equipment lenders are

15  concerned.

16          So we really appreciate your suggestion and hope

17  that Your Honor will -- you know, you offered to stay and

18  meet more regularly, stay on top of the case and we really

19  appreciate that offer.

20          We look forward to Debtors' emergence from

21  Chapter 11 as soon as possible.

22          Thank you very much.

23          THE COURT:  All right.  Thank you.

24          Anyone else?

25      (No audible response.)

1          THE COURT:  Mr. Ruff, what is US Trustee's view of

2   the world right now?

3          MR. RUFF:  Your Honor, good afternoon.  Jayson

4   Ruff from the US Trustee's Office.

5          Honestly we want to see the Debtors get through as

6   quickly as possible and successfully as possible.

7          We don't really have a position on what the best

8   pathway forward is.  I think we've heard some good

9   suggestions here today, both from the Court and from others.

10          And really that's about all where we're at right

11   now, Your Honor.  The Debtors are not delinquent as far as

12   any of their obligations while they're in the 11.  But

13   things have been a little bit longer, I think, than

14   originally anticipated, so.

15          But I think we're -- we've got a business plan and

16   now they're moving forward, so.

17          THE COURT:  All right.  Thank you.

18          Ms. Berkovich, did you want to respond to any of

19   the comments that you heard?

20          MS. BERKOVICH:  Your Honor, responding to the

21   objections from the equipment lenders, they really have not

22   provided a good legal basis for denying exclusivity.

23          THE COURT:  Yeah, so let me start again.  So I

24   agree.  The arguments that you heard were not particularly

25   persuasive.  They, if anything, they slow the process down

1 more, as opposed to speeding it up.  I tried to tell

2 everyone that when I came out and started the hearing.  I

3 mean, I want practicality.

4        I don't want -- you know, I don't want a "I just

5 want to do something."  I want a solution.  I want a

6 direction.  I want there to be a method to the madness and

7 haven't seen it from the objecting parties at all.  It's not

8 a criticism, it's just an observation.

9        There are a million things that could have been

10 done to address some of the issues that were raised and what

11 I got was an objection to a motion.

12        What I do want is I want to start -- I want to

13 institute some things by which I can measure performance.

14 One of those is you've given a tentative date for the filing

15 of a Plan and Disclosure Statement.  You know, I'm willing

16 to test to see how committed you are to that date and give

17 you a hearing date shortly after that date, just as a

18 status/scheduling conference.

19        And you know, I get the world can change.  I am

20 not -- I'm not going to say that anything is ever an

21 absolute, but I will -- I'm inclined, unless you can give me

22 a good reason not to, to say I'm going to grant your motion

23 to extend exclusivity, but I'm going to set a

24 status/scheduling conference shortly after the date that

25 you've picked by which you think you're going to file a Plan

1   and Disclosure Statement.  And I would hope to see a Plan

2   and Disclosure Statement at that time.

3        It doesn't mean that if you haven't made

4   substantial progress, and there's a joint request to

5   continue that status/scheduling conference, I wouldn't do

6   it.  Again, people are frustrated.  I hear it, but

7   frustration shouldn't come in the form of complaining.

8        I mean, you guys are all good lawyers.

9   Frustration should come in the form of "Here's how we go

10  about prompting action."  And so that's what I want to see.

11       So you want to tell me that what I proposed is a

12  bad idea, is a good idea?

13       MS. BERKOVICH:  Your Honor, I think the idea to

14  schedule a status conference is an excellent idea, even if

15  there's no Plan on file, and hopefully there will be.  I

16  think it's a good chance to update the Court on the progress

17  that we will have made by then.

18       If it's possible, we'd like to deal with selecting

19  a date afterwards because I'd like to confer with

20  Mr. Schrock and just make sure that we pick a date that

21  works for all.

22       THE COURT:  So long as you plug in the other

23  folks --

24       MS. BERKOVICH:  Yes.

25       THE COURT:  -- who were on the call today.

1          MS. BERKOVICH:  Yes.

2          THE COURT:  And just put that in the Order

3    extending exclusivity, setting that status/scheduling

4    conference, and again, without prejudice to anybody to raise

5    any issue they want.  I just want to see where we are.  I

6    want to see what progress has been made.

7          By then, hopefully you will have made substantial

8    progress, hopefully there will be something on file that I

9    can read as a Disclosure Statement and Plan or a combined

10   Plan and Disclosure Statement 'cause it shouldn't be that

11   difficult, but you know, I leave all of that to you-all.

12         Unless there are scheduling conflicts with

13   everybody, I'd like to have it within, say, a week after the

14   date that you had put -- which I think -- wasn't it the

15   18th?

16         MS. BERKOVICH:  15th.

17         THE COURT:  15th was your slide?  Well, that's a

18   Saturday.

19      (Pause in the proceedings.)

20         MS. BERKOVICH:  We put the 15th, but that's a

21   Saturday.  We work on Saturdays here.  So it wouldn't --

22         THE COURT:  So I mean this in a legal sense, boo.

23      (Laughter)

24         THE COURT:  So but let's do this:  Let's go ahead

25   and say that -- because I had in my head the 18th.  So you

1 know, Plan and Disclosure Statement, we're going to target

2 for July the 18th and I would like a status/scheduling

3 conference within a week of the 18th and just try to be --

4 try to make it as convenient for everyone as you possibly

5 can and just reach out to Mr. Alonzo, get everybody on the

6 string and he'll get you a date that hopefully will work for

7 everybody.

8         MS. BERKOVICH:  Yes, Your Honor.  We'll confer

9 with the major constituents and we will add something to the

10 exclusivity order that sets a scheduling conference for

11 something within the week of June 18th.

12         THE COURT:  Oh, I was -- June 18th.

13         MALE SPEAKER:  Yeah, Your Honor?

14         THE COURT:  Yeah, I was focused on July.  Let's

15 start that over.

16         So the 15th is a Thursday.  All right?

17         MS. BERKOVICH:  Yes.

18         THE COURT:  Okay.  Now we're back on, so my

19 apologies.  You should just jump right in.

20         MS. BERKOVICH:  Well, I don't have a calendar.  I

21 didn't know if --

22         THE COURT:  So you know, let's again, so 15th, so

23 the 18th, so really want to see something filed by the 20th

24 and if you will get a hearing within a week of the 20th.

25 Again, that would be June of the 2023.

1          MS. BERKOVICH:  That is understood and we will do.

2          THE COURT:  All right.  And it goes without saying

3  with respect to everyone else, if there are changed

4  circumstances, I want to know about it and it's not hard to

5  get a hearing.  All you need to do is to reach out and tell

6  Mr. Alonzo that you have an emergency and you generally --

7  he finds time that meets your schedules.  All right?

8          MS. BERKOVICH:  Yes.

9          THE COURT:  Anything else we need to talk about

10  today?

11          MS. BERKOVICH:  No, Your Honor.  Thank you very

12  much.

13          THE COURT:  Anyone else on the line?

14      (No audible response.)

15          THE COURT:  All right, terrific.  Then everyone

16  have a good day.  We'll be adjourned.

17      (Hearing adjourned at 2:40 p.m.)

18

19

20

21

22

23

24

25                  *  *  *  *  *

1          I certify that the foregoing is a correct

2    transcript to the best of my ability due to the condition of

3    the electronic sound recording of the ZOOM/video/telephonic

4    proceedings in the above-entitled matter.

5    /S/ MARY D. HENRY

6    CERTIFIED BY THE AMERICAN ASSOCIATION OF

7    ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337

8    JUDICIAL TRANSCRIBERS OF TEXAS, LLC

9    JTT TRANSCRIPT #67248

10   DATE FILED:  MAY 29, 2023

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25