IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § § § | Chapter 11 |
| CORE SCIENTIFIC, INC., *et al.*, | § § § | Case No. 22-90341 (DRJ) |
|  | § § | (Jointly Administered) |
| Debtors.[1] | § § § |  |

**DEBTORS' MOTION FOR PARTIAL SUMMARY JUDGMENT WITH RESPECT TO
PROOF OF CLAIM NOS. 425 AND 497 FILED BY CELSIUS MINING LLC**

> **THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**
>
> **REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

Core Scientific Operating Company f/k/a Core Scientific, Inc. ("**Core**")[2] and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6074); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

[2] As discussed in the First Day Declaration, Core Scientific, Inc. changed its name to Core Scientific Operating Company in January 2022. *See* First Day Decl. ¶ 31. Therefore, any claims against Core Scientific, Inc., are more properly claims against Core Scientific Operating Company.

(collectively, the "**Debtors**"), hereby move for summary judgment (the "**Motion**") with respect to certain purely legal issues identified in the Debtors' objection (the "**Objection**") to Proofs of Claim Nos. 425 and 497 (together, the "**Celsius Claim**") filed by Celsius Mining LLC ("**Celsius**," and, together with Core, the "**Parties**") that substantially reduce the amounts that Celsius could potentially recover in connection with the Celsius Claim. A proposed order is attached hereto as **Exhibit A**.

### Preliminary Statement

1. Celsius has filed proofs of claim against Core seeking over $312 million in alleged damages related to Hosting Agreements[3] between the Parties. This is the largest single claim submitted against the Debtors and, as the Objection makes plain, is strenuously disputed by the Debtors. Given the asserted amount, resolution of the Celsius Claim as quickly as possible will aid in the administration of the Debtors' estate and will benefit all stakeholders. To that end, resolving the purely legal issues relating to the applicability of the contractual limitations of liability provisions will materially impact the size of the Celsius Claim and set outer parameters of the Debtors' potential liability, if any, to Celsius. Indeed, in asserting its claim for over $312 million, Celsius itself indicated that the claim amounts were based on the "assum[ption] that any limitations of liability in the contracts do not apply." Thus, Celsius acknowledges the significance of these provisions and their impact on the Celsius Claim. Accordingly, a ruling that the limitations of liability provisions contained in the underlying contract apply, as a matter of law, will materially advance resolution of the Celsius Claim.[4]

---

[3] Capitalized terms not defined herein have the meaning ascribed to them in the Objection.

[4] The Parties are working to schedule a mediation with Judge Christopher Lopez in the coming weeks in an effort to determine if they can reach a global resolution of their competing claims. While the Debtors are hopeful that the mediation will be successful, given the amount of the Celsius Claim and the Debtors' eagerness to move swiftly to a plan of reorganization and emergence, adjudication of this Motion as soon as possible after the mediation has

2. As set forth more fully below, the Debtors respectfully request that the Court enter judgment that, as a matter of law, the unambiguous limitations of liability provisions set forth in the MSA (1) limit Core's total liability to one-months fee (here, $5.7 million), and separately also (2) prevent Celsius from recovering lost profits; loss of business; loss of revenues; loss, interruption or use of data or loss of use of Celsius equipment; any consequential, or indirect damages; or cost of cover, incidental, special, reliance or punitive damages (which reduces Celsius's claim as asserted by over $300 million).

## Relevant Facts

### A. The Hosting Agreements

3. On December 18, 2020, Core and Celsius entered into a Master Services Agreement (the "**2020 MSA**") for Core to host Celsius's Bitcoin mining equipment (the "**Miners**") at Core's data centers and provide certain related services to Celsius. Pursuant to the 2020 MSA, the Debtors and Celsius executed separate work orders (the "**Orders**"),[5] which are governed by the 2020 MSA and contain certain additional specific terms. A true and correct copy of the 2020 MSA and the Orders are attached to the accompanying Declaration of Jeff Pratt (the "***Pratt Decl.***") as **Exhibit A**.

4. On December 3, 2021, Core and Celsius entered into another Master Services Agreement (the "**2021 MSA**" and, together with the **2020 MSA**, the "**MSA**"). In connection with the 2021 MSA, the Debtors and Celsius executed Master Services Agreement Order #1-A, dated December 3, 2021 ("**Order #1-A**," together with the 2020 MSA, the Orders,

---

concluded (assuming no resolution is reached) is necessary and appropriate and will aid the administration of these chapter 11 cases.

[5] Order No. 8 was terminated in May 2021 and Order No. 5 was replaced by Order No. 9, and thus cannot be the subject of the Celsius Claim. To the extent Celsius contends that those Orders are still relevant, they are also subject to the same limitations provisions discussed herein, as they too were governed by the 2020 MSA.

and the 2021 MSA, the "**Hosting Agreements**"). A true and correct copy of the 2021 MSA and Order #1-A are attached as **Exhibit B** to the *Pratt Decl*.

5. The 2020 MSA and the 2021 MSA contain the same terms and are otherwise indistinguishable for purposes of the Motion. For ease of reference, they are therefore referred to and cited herein as one singular MSA.

6. Delaware law governs the Hosting Agreements. *Pratt Decl.*, Exhibit A, MSA § 8(f). As relevant to this Motion, the MSA contains two unambiguous provisions that limit Core's potential liability to Celsius in both amount and type of damages:

7. **First**, the MSA limits the amount of Core's total liability to Celsius:

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, *[CORE'S] TOTAL LIABILITY TO [CELSIUS] IN THE AGGREGATE FOR THE ENTIRE TERM (REGARDLESS OF WHETHER THE CLAIMS ARE BROUGHT DURING OR AFTER THE TERM)* WITH RESPECT TO ALL CLAIMS ARISING FROM OR RELATED TO THE SUBJECT MATTER OF THIS AGREEMENT (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES) *WILL NOT EXCEED AN AMOUNT EQUAL TO ONE (1) MONTHS FEE PAYABLE TO [CORE] PURSUANT TO THE APPLICABLE ORDER.*

*See Pratt Decl.*, Exhibit A, MSA § 5(d) (emphasis added).

8. **Second**, the MSA limits the type of damages that give rise to liability:

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR *(I) LOST PROFITS; (II) LOSS OF BUSINESS; (III) LOSS OF REVENUES* (EXCEPT THAT [CELSIUS] SHALL BE LIABLE FOR ANY FEES OR OTHER AMOUNTS OWED TO [CORE] UNDER THIS AGREEMENT); (IV) LOSS, INTERRUPTION OR USE OF DATA OR LOSS OF USE OF [CELSIUS] EQUIPMENT; **(V) ANY CONSEQUENTIAL OR INDIRECT DAMAGES; OR (VI) COST OF COVER, ANY INCIDENTAL, SPECIAL, RELIANCE, EXEMPLARY OR PUNITIVE DAMAGES** (IF APPLICABLE), EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

*See Id.* § 5(c) (emphasis added).

9. Additionally, the MSA is clear that, "THE LIMITATIONS SET FORTH IN SECTIONS 5 c AND 5 d WILL APPLY TO ALL CLAIMS AND CAUSES OF ACTION,

REGARDLESS OF WHETHER IN CONTRACT, TORT, STRICT LIABILITY OR OTHER THEORY." *See Id.* § 5(e).

10. And to avoid any confusion regarding the materiality of these provisions, the MSA goes on to say: "Each party recognizes and agrees that the warranty disclaimers, limitations of liability and remedy limitations in this Agreement are materially bargained for by the parties." *See Id.* § 5(f).

11. On December 28, 2022, the Debtors filed an emergency motion to reject the Hosting Agreements. ECF No. 189. This Court granted the Debtors' motion, authorizing rejection of the Hosting Agreements on January 4, 2023. ECF No. 232.

**B.  The Automatic Stay Motion**

12. On July 13, 2022, Celsius filed voluntary petitions for relief under chapter 11 of title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "**Celsius Bankruptcy**").

13. On September 28, 2022, Celsius filed a motion in the Celsius Bankruptcy seeking to hold the Debtors in contempt of court for allegedly violating the automatic stay in the Celsius Bankruptcy (the "**Automatic Stay Motion**"). A true and correct copy of the Automatic Stay Motion is attached hereto as **Exhibit B**. The premise for the Automatic Stay Motion was that Core allegedly breached the Hosting Agreements. As relates to its alleged damages, Celsius made clear in a declaration submitted in support of the Automatic Stay Motion by its Chief Strategy Officer, Quinn Lawlor, that its damages were predicated on a contention that it "has suffered and continues to suffer significant lost revenue and lost profits while its mining rigs sit idle." *See* Exhibit B, Lawlor Decl. ¶ 16.

14. In addition, Exhibit K to the Lawlor Declaration is a letter from Celsius's outside counsel in which counsel contends, on behalf of Celsius, that "[a]s a result of Core's delays, as of the end of August 2022, Celsius has suffered losses in excess of $20 million, and continues to suffer additional loses with each day that Core refuses to satisfy its contractual obligations and immediately deploy Celsius's mining rigs." *See* Exhibit B, Lawlor Decl., Exhibit K at 3. Mr. Lawlor later confirmed in his deposition in connection with the Automatic Stay Motion that he was the one who provided the lawyers with the $20 million figure and that it was based on Celsius's alleged loss of operating profit. Attached hereto as **Exhibit C** are excerpts from the Lawlor deposition transcript, dated November 1, 2022.

15. Core filed its opposition to the Automatic Stay Motion on October 19, 2022, arguing that Celsius's claims failed both on the facts and as a matter of law. A true and correct copy of Core's opposition to the Automatic Stay Motion is attached hereto as **Exhibit D**. Additionally, the Debtors filed their own motions in the Celsius Bankruptcy, seeking, among other things, to compel immediate payment of administrative expense claims for the electricity pass-through charges Celsius ceased paying after it filed for chapter 11. *See generally* Motion to Compel, *In re Celsius Network LLC*, No. 22-10964 (MG) (Bankr. S.D.N.Y. Oct. 19, 2022), ECF No. 1144.

    **C.**    **The Celsius Claim**

16. On April 14, 2023, Celsius filed the Celsius Claim. The previously stated $20 million claim had now ballooned to an alleged $312,318,000 claim, plus further unliquidated

6

amounts.[6] Proofs of Claim Nos. 425 and 497 are attached hereto as **Exhibits E and F**, respectively. The Debtors' Objection to the Celsius Claim is attached hereto as **Exhibit G**.

17. Celsius provided an addendum to its claim (the "**Celsius Addendum**"), dividing its claim as follows:

| Prepetition Breach of Contract Claim | $111,998,000 |
| --- | --- |
| Postpetition, Pre-Rejection Breach of Contract Claim | $1,497,000 |
| Claim for Return of Postpetition Pre-Rejection Payment | $4,719,000 |
| Contract Rejection Damages Claim | $194,104,000 |
| Claim for Damages to Mining Rigs | Unliquidated |

*See* attached Exhibit F, Celsius Claim.

18. The Celsius Addendum contains a disclaimer that "[l]iquidated amounts related to the applicable contracts assume that any limitations of liability in the contracts do not apply." Celsius does not provide any explanation or justification for this assumption. It also states that the basis for its claim is set out in the Automatic Stay Motion.

### Legal Standard

**D. Summary Judgment in a Contested Matter**

19. Once a debtor objects to a proof of claim, the validity of the claim becomes a "contested matter." *In re Gilbreath,* 395 B.R. 356, 365 (Bankr. S.D. Tex. 2008). A party to a contested matter can move for summary judgment. Fed. R. Bankr. P. 9014(c) (stating that Federal Rule of Bankruptcy Procedure 7056, which incorporates Federal Rule of Civil Procedure 56,

---

[6] Celsius first filed Proof of Claim No. 425, which Celsius subsequently amended in Proof of Claim No. 497 to include an addendum and certain other materials and photographs. The Objection covered both Proofs of Claim Nos. 425 and 497. By extension, the Motion likewise applies to both Proofs of Claim Nos. 425 and 497.

applies to contested matters); *see In re Alta Mesa Res., Inc.*, No. 19-35133, 2022 WL 17984306 (Bankr. S.D. Tex. Dec. 28, 2022) (applying Federal Rules of Bankruptcy Procedure 9014 and 7056 to grant summary judgment on a proof of claim); *Cimerring v. ORIX Cap. Mkts., LLC (In re Canoco Inc.)*, 323 F. App'x 306, 308 (5th Cir. 2009) (holding that "[b]ankruptcy courts can render summary judgment in contested matters").

20. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). The movant must demonstrate the absence of a genuine dispute of material fact by establishing the absence of evidence supporting an essential element of the non-movant's case. *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009), *aff'd*, 563 U.S. 277 (2011). To avoid summary judgment, an opposing party must identify a genuine dispute of material fact—one that could allow a reasonable fact finder to find for the nonmoving party. *See, e.g., Gorman v. Verizon Wireless Tex., L.L.C.*, 753 F.3d 165, 170 (5th Cir. 2014); *Hartman v. Ultra Petroleum Corp. (In re Ulta Petroleum Corp.)*, 571 B.R. 755, 761 (Bankr. S.D. Tex. 2017). Although a court views the facts and evidence in the light most favorable to the non-moving party, "[s]ummary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 538 (5th Cir. 2015).

### E. Summary Judgment in a Contract Dispute

21. Under Delaware law—which governs the MSA and likewise dictates rejection damages here—courts routinely grant summary judgment to enforce unambiguous contract provisions. *See In re Pilgrim's Pride Corp.,* 467 B.R. 871, 879 (Bankr. N.D. Tex. 2012) (applying the governing state law of the rejected contracts to evaluate and measure damages);

*Riverbend Cmty., LLC v. Green Stone Eng'g, LLC*, 55 A.3d 330, 334 (Del. 2012) ("We have long upheld awards of summary judgment in contract disputes where the language at issue is clear and unambiguous." (internal citation and quotation marks omitted)); *Comet Sys., Inc. S'holders' Agent v. MIVA, Inc.*, 980 A.2d 1024, 1030 (Del. Ch. 2008) ("Summary judgment is an appropriate process for the enforcement of unambiguous contracts because there is no material dispute of fact for the court to resolve."); *see also El Paso Energy E.S.T. Co. v. Chevron U.S.A. Inc.*, No. 4:20-cv-4250, 2022 WL 1663096, at *4 (S.D. Tex. May 25, 2022) (granting summary judgment based on unambiguous provisions of contract governed by Delaware law).

22. Summary judgment is appropriate "where a contract term is objectively clear and there is only one 'reasonable interpretation.'" *Seidensticker v. Gasparilla Inn, Inc.*, No. Civ. A. 2555-CC, 2007 WL 4054473, at *3 (Del. Ch. Nov. 8, 2007); *see also eCommerce Indus., Inc. v. MWA Intel., Inc.*, No. 7471-VCP, 2013 WL 5621678, at *45 (Del. Ch. Sept. 30, 2013) (enforcing a limitation of liability provision and holding that contracts are to be enforced as written); *In re Pilgrim's Pride,* 467 B.R. at 881 (applying Delaware law and granting summary judgment to the debtors where the contracts excluded the asserted consequential and/or non-compensatory damages); *Iavarone v. Eagle Eye Home Inspections, LLC,* No. N18C-05-217 ALR, *2*019 WL 5692265, at *2 (Del. Super. Ct. Nov. 4, 2019) (upholding limitation of liability provision where the plain language of the clause was clear regarding the people and types of conduct to which the limitation applied, the contract was not lengthy, and the limitations language was clear).

23. A court interpreting a contract must "give priority to the parties' intentions as reflected in the four corners of the agreement." *Bathla v. 913 Mkt., LLC*, 200 A.3d 754, 759-60 (Del. 2018) (internal quotations omitted). The Court must "interpret clear and unambiguous terms according to their ordinary meaning . . . ." *Id*. In an "unambiguous, integrated written

9

contract," the Court may not use extrinsic evidence to "vary or contradict the terms of that contract." *Id.* (internal brackets and quotations omitted).

## Argument

24. Summary judgment is warranted here, where two unambiguous contract provisions each limit Core's liability and foreclose the Celsius Claim as asserted. As detailed above, Celsius asserts a claim for over $312 million, noting that its claim is based on the "assum[ption] that any limitations of liability in the contracts do not apply." Exhibit F, Celsius Claim. This assumption is false as a matter of law based on the clear and unambiguous terms of the MSA, warranting partial summary judgment in favor of Core.

### A.   The MSA Limits Core's Total Liability to One-Months Fee

25. The MSA limits Core's "total liability . . . in the aggregate" to "an amount equal to one (1) months fee payable to [Core] pursuant to the applicable order." *See Pratt Decl.*, Exhibit A, MSA § 5(d). This one-months fee is a clear and unambiguous limitation on Core's liability that applies to limit, as a matter of law, the Celsius Claim as asserted. The Court should therefore rule that, based on this limitation of damages provision set forth in the contract, Celsius cannot—as a matter of law—recover from the Debtors more than one-months fee payable to Core pursuant to the applicable Orders extant at the time of the breach.

26. Section 3(a) of the MSA states that Core "will invoice [Celsius] monthly in advance for all applicable fees for use of [Core's] Facility and provision of Services as set forth in the applicable Order." *See Pratt Decl.*, Exhibit A, MSA § 3(a). Thus, the *amount* of the one-months fee is determined based on the monthly invoice for the applicable Orders reflecting the amount due at the time of the alleged breach. *Pratt Decl.*, ¶¶ 7–8. Here, the last monthly invoice that Core sent to Celsius—before Core rejected the Hosting Agreements and stopped hosting

Celsius's Miners—was in the amount of $5,737,515.64 (the "**December Invoice**"). *See Pratt Decl.*, Exhibit C, December Invoice. Under the plain terms of the MSA, Celsius's total recovery cannot exceed this amount. The one-month limitation of liability provision therefore reduces Celsius's claim from over $312 million to *at most* $5.7 million. The Court should therefore also rule that Celsius cannot—as a matter of law—recover more than $5.7 million in total from the Debtors in connection with the Celsius Claim.[7]

27. In any event, even if there were to be a dispute regarding the precise amount of the one-months fee, that would not preclude the Court from ruling, as a matter of law, that the limitation of liability provision limits Celsius to recovering no more than one-months fee.

**B.  The MSA Limits the Type of Damages That Celsius Can Recover**

28. The MSA also limits the *type* of damages that Celsius can recover, providing that "in no event will either party be liable to the other party for (i) lost profits; (ii) loss of business; (iii) loss of revenues . . . ; (iv) loss, interruption or use of data or loss of use of [Celsius] equipment; (v) any consequential, or indirect damages; or (vi) cost of cover, any incidental, special, reliance, exemplary or punitive damages." *See Pratt Decl.*, Exhibit A, MSA § 5(c). This provision is likewise a clear and unambiguous limitation on Core's liability. The Court should therefore rule that, based on the limitation set forth in the contract, Celsius cannot—as a matter of law—recover for lost profits; loss of business; loss of revenues; loss, interruption or use of data or loss of use of

---

[7] It would be premature to decide in this Motion, as a matter of law, what portion of the $5.7 million maximum liability (if any) Celsius is entitled to recover. As set forth in the Objection, the Debtors' position is that Celsius is not entitled to any recovery because of Celsius's own breaches of the Hosting Agreement that resulted in Core sustaining damages that offset any potential recovery by Celsius.

Celsius equipment; any consequential, or indirect damages; or cost of cover, incidental, special, reliance exemplary or punitive damages.

29. In effect, this means that when assessing what portion of the one-months fee Celsius may recover (if any), the asserted damages must be the type of damages that are not precluded under the MSA. But as noted above, in its filings in the Celsius Bankruptcy (which it contends support the Celsius Claims here), Celsius's alleged damages—lost profits and lost revenue—are of the type expressly excluded by the MSA. Therefore, for these reasons, and as further detailed below, there can be no doubt that summary judgment in favor of the Debtors is appropriate on this provision as well.

### i. Celsius Cannot Recover $113.5 Million In Damages For "Prepetition Breach of Contract" and "Postpetition, Pre-Rejection Breach of Contract" Claims

30. In the Celsius Addendum, Celsius identifies "prepetition breach of contract" and "postpetition, pre-rejection breach of contract" claims that total $113.5 million combined ($111,998,000 and $1,497,000, respectively). Exhibit F, Celsius Claim. While Celsius provides no detailed support for these amounts, the justification that it does provide is enough to determine that the MSA expressly excludes the type of damages that Celsius seeks.

31. Specifically, both of these damages amounts are predicated on Core's purported breaches of the Hosting Agreements, as "discussed more fully" in the Automatic Stay Motion. In the Automatic Stay Motion—as relevant here—Celsius alleges that Core breached the MSA by unjustifiably delaying deployment of Celsius's Miners and failing to notify Celsius that Core had additional hosting capacity to offer Celsius when the Hosting Agreements were in place. Setting aside that these allegations fail on the merits—as detailed in Core's response to the

Automatic Stay Motion—Celsius cannot recover damages based on these purported breaches because both seek damages that are excluded under the MSA.

32. Celsius's Chief Strategy Officer has admitted in a sworn declaration, and again under oath in a deposition, in connection with the Automatic Stay Motion, that the damages for delayed deployment are "calculated based off of lost operating profit, assuming Core deployed on time." Exhibit C, Lawlor Dep. Tr. at 169:16-21. The MSA plainly precludes liability for lost-profit damages. For the second alleged breach—failing to notify Celsius that Core had additional hosting capacity to offer Celsius when the Hosting Agreements were in place—even if Celsius's allegations were true (they are not), the only consequence would be Celsius hosting fewer Miners with Core and therefore losing potential profits that those machines could have generated. But again, the MSA precludes recovery for lost profits and loss of revenue. These claims, therefore, cannot support Celsius's $113.5 million claim for "prepetition breach of contract" and "postpetition, pre-rejection breach of contract" claims, and Core is entitled to judgment as a matter of law with respect to these amounts.

    ii.  **Celsius Cannot Recover $194.1 Million In Damages For Its "Contract Rejection Damages" Claim**

33. Celsius's "contract rejection damages claim" for $194.1 million stemming from the Debtors' rejection of the Hosting Agreements is subject to the same limitations provision and similarly seeks damages that are excluded by the MSA. Exhibit F, Celsius Claim. Again, although Celsius does not detail how it determined this damages amount, there can be no other basis than those relating to the breach of contract claims discussed above. Core's rejection of the Hosting Agreements (or "Celsius Contracts" as Celsius refers to them), gave rise to a rejection of the damages claim as though Core breached the Hosting Agreements on the Petition Date. *See Mission Prod. Holdings, Inc. v. Tempnology, LLC,* 139 S. Ct. 1652, 1661 (2019) (holding that

rejection of a contract in bankruptcy operates as a breach and gives rise to a claim for damages); *In re Chesapeake Energy Corp.,* 622 B.R. 274, 280 (Bankr. S.D. Tex. 2020) ("The rejection of an executory contract constitutes a breach by the debtor of the contract immediately before the petition date.") (citing 11 U.S.C. § 365(g)(1)); *In re Talen Energy Supply, LLC,* No. *22-90054*, 2023 WL 2816683, at *4 (Bankr. S.D. Tex. Apr. 6, 2023) (same); *In re Greenville Auto Mall, Inc*. 278 B.R. 414, 423 (Bankr. N.D. Miss. 2001) ("[T]he rejection of an executory contract constitutes a breach of the contract as of the day before the filing of the bankruptcy case. This in turn gives the non-debtor party a pre-petition 'claim' in the bankruptcy case for breach of contract damages.").

34. But the consequences from that breach are the same consequences that Celsius has already identified in its other breach of contract claims, i.e., Core's failure to deploy and host Miners under the Hosting Agreements. While the claimed damages are larger—presumably because the alleged breach implicates more Miners over a longer time period—the type of alleged damages are the same, i.e., the alleged lost operating profits/revenues Celsius believes it would have made if Core had continued to perform under the Hosting Agreements. Those types of damages (as well as any costs of cover, among others), however, are precisely the type of damages that the MSA expressly precludes Celsius from recovering. Accordingly, Core is entitled to summary judgment as relates to this aspect of the Celsius Claim as well.[8]

---

[8] Celsius also claims $4.7 million for "return of postpetition pre-rejection payment" (which it seeks to recover as an administrative claim) and an unliquidated amount for "claims for damages to mining rigs." Core disputes Celsius's claims, as set forth in the Objection (ECF. No. 819) and Debtors' Objection to Celsius's Motion for Entry of an Order Allowing and Directing Payment of its Administrative Expense Claim (ECF No. 861). Nevertheless, to the extent Celsius is entitled to any recovery on these claims, including its administrative claim, such recovery would still be capped at the one-months fee set forth in the MSA and detailed above.

**<u>Conclusion</u>**

WHEREFORE, the Debtors respectfully request that this Court grant the Motion and enter summary judgment against Celsius as relates to the contractual limitations of liability provisions. Debtors further request all other just relief to which they may be entitled.

[*Remainder of page intentionally left blank*]

Dated: May 30, 2023
Houston, Texas

        */s/ Alfredo R. Pérez*
WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
Clifford W. Carlson
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:	(713) 546-5000
Facsimile:	(713) 224-9511
Email: Alfredo.Perez @weil.com
      Clifford.Carlson@weil.com
-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock (admitted *pro hac vice*)
Ronit J. Berkovich (admitted *pro hac vice*)
Theodore E. Tsekerides (admitted *pro hac vice*)
Christine A. Calabrese (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:	(212) 310-8000
Facsimile:	(212) 310-8007
Email: Ray.Schrock@weil.com
      Ronit.Berkovich@weil.com
      Theodore.Tsekerides@weil.com
      Christine.Calabrese@weil.com

*Counsel for Debtors and Debtors in Possession*

**Certificate of Service**

I hereby certify that on May 30, 2023, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

                                         */s/ Alfredo R. Pérez*
                                         Alfredo R. Pérez