**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **CORE SCIENTIFIC, INC.,** *et al.*, | § | **Case No. 22-90341 (DRJ)** |
| | § | |
| **Debtors.**[1] | § | **(Jointly Administered)** |

**SPHERE 3D CORP.'S OBJECTION TO DEBTORS' MOTION**
**FOR SUMMARY JUDGMENT WITH RESPECT TO**
**PROOF OF CLAIM NOS. 358 AND 359 FILED BY SPHERE 3D CORP.**
[Relates to Docket No. 959]

Sphere 3D Corp. ("Sphere") files this objection ("Objection") to the *Debtors' Motion for Summary Judgment with Respect to Proof of Claim Nos. 358 and 359 Filed by Sphere 3D Corp.* [Docket No. 959] (the "Motion" or the "Motion for Summary Judgment") filed by the above-captioned debtors and debtors in possession (collectively, the "Debtors"), and in support, respectfully states as follows:

**SUMMARY OF OBJECTION**

1.      The Motion for Summary Judgment should have never been brought and must be denied for numerous reasons, including because *no discovery* has been taken in this contested matter and because, even without the benefit of discovery, genuine disputes of material fact exist with respect to the issues raised in the Motion.

2.      By way of background, the liability of Debtor Core Scientific Operating Company (f/k/a Core Scientific, Inc.) ("Core") to Sphere arises out of Core's conversion of Sphere's digital

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are as follows: Core Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198) (each a "Debtor" and collectively, the "Debtors"). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

assets and miners and failure to perform under the Master Services Agreement dated September 12, 2021 (the "MSA", attached as Exhibit 2 to the Trompeter Decl.), and an accompanying order dated October 5, 2021 ("Order #2", attached as Exhibit 3 to the Trompeter Decl.), pursuant to which Core agreed to provide certain services, including colocation, hosting, and rack space for Sphere's miners.  Per the terms of Order #2, Sphere delivered to Core $35,104,363 in cash deposits (collectively, the "Deposit") to be applied as "credit against future monthly invoices as they become due."  Core, however, refused to host Sphere's miners, made clear it would no longer honor the hosting rate provided for in Order #2, and ran Sphere's miners for its own benefit (thus siphoning bitcoin for itself), among other things.  After Core made clear it would no longer honor the terms of Order #2, Sphere demanded the return of its property, *i.e.*, the Deposit, its miners, and the bitcoin that Core had mined for its own account using Sphere's miners.  Core refused and Sphere initiated an arbitration in October 2022 seeking the return of its property and damages. Shortly thereafter, Core initiated these Chapter 11 proceedings and, on June 9, 2023, Sphere filed proofs of claim numbers 358 and 359 (together, the "Proofs of Claim").[2]  The property Core is holding is Sphere's property.  Through the Proofs of Claim, Sphere asserts, among other things, that Core intentionally converted Sphere's property; that Core breached its contractual obligations, including in bad faith, and is thus liable under repudiation, breach of contract, and breach of the implied covenant theories; and that Core is also liable in equity under estoppel theories for failing to return the property.

3.     Core desperately wants to avoid discovery in this case, as it will validate Sphere's Proofs of Claim.  Before filing the Proofs of Claim, Sphere served requests for production of

---

[2] Following Core's practice (*see* Motion, at 6 n.4), because Proofs of Claim Nos. 358 and 359 are identical in all material respects, for ease of reference the citations set forth herein are uniformly to Proof of Claim No. 358 (Ex. 1, hereto).

documents on Core pursuant to Federal Rule of Bankruptcy Procedure 2004 (the "Bankruptcy Rules"), *see Notice of Bankruptcy Rule 2004 Requests for Production of Documents from Core Scientific Inc.* [Docket No. 678] (the "Bankruptcy Rule 2004 RFP"), which Core resisted *in toto*. *See Debtors' Motion to Quash Sphere 3D's Bankruptcy Rule 2004 Requests for Production of Documents* [Docket No. 711]. Thereafter, Core filed the *Debtors' Objection to Proofs of Claim Nos. 358 and 359 Filed by Sphere 3D Corp.* (the "Claim Objection"), and requested that the parties set forth a rational schedule for this contested matter. The parties entered into a stipulation so-ordered by this Court on June 6, 2023 (the "Stipulation and Agreed Order", Docket. No. 956) that (i) "deferred and suspended" all discovery "until after a non-evidentiary scheduling conference with the Court to set relevant discovery and litigation deadlines and a trial date"[3]; and (ii) provided for the parties "to confer on a proposed scheduling order for discovery, litigation schedule, and trial date on the Claim Objection to file and present to the Court for consideration at a scheduling conference to be held after Sphere files its response to the Claim Objection."[4] Three days later, before Sphere filed its response to the Claim Objection, Core filed this Motion without meeting and conferring and in disregard of the Stipulation and Order that the Court would set all "litigation deadlines."[5]

4. Given that the parties have not had *any* discovery, the Motion is, at this juncture, procedurally improper. Summary judgment is usually premature unless the parties have "had a full opportunity to conduct discovery." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Brown v. Miss. Valley State Univ.*, 311 F.3d 328, 333 (5th Cir. 2002) ("Summary judgment assumes some discovery."); *see also Ins. Distribution Consulting, LLC v. Freedom Equity Group,*

---

[3] Stipulation and Agreed Order, ¶ 4.
[4] *Id*. ¶ 7.
[5] Sphere reserves the right to seek appropriate relief here.

*LLC*, No. 3:20-CV-00096, 2020 WL 5803249, at *3 (S.D. Tex. Sept. 4, 2020), ("Because granting summary judgment is improper when basic discovery has not been completed, I do not doubt that, even if I thought summary judgment was appropriate at the present time, the Fifth Circuit would reverse that ruling faster than a Nolan Ryan heater.") (citing *Xerox Corp. v. Genmoora Corp.*, 888 F.2d 345, 355-56 (5th Cir. 1989) (finding that district court abused its discretion by granting a motion for summary judgment when plaintiff had not been allowed to conduct any discovery at all)), *report and recommendation adopted*, No. 3:20-CV-00096, 2020 WL 5802898 (S.D. Tex. Sept. 29, 2020).  Here, Core has produced no discovery whatsoever, which provides a basis to reject the Motion out of hand.

5.     Setting aside that the Motion is procedurally improper, the Motion is also substantively deficient.  To give the Motion a (thinnest-of-thin) veneer of propriety, Core claims that it is moving on "purely legal issues" and "unambiguous" language in the MSA and Order #2 that warrant either (i) granting summary judgment in full and dismissing the claims based on a purportedly void assignment of rights to Sphere; or (ii) granting partial summary judgment on the basis that limitation of liability provisions severely cap Core's potential liability.  *See* Motion, at 1–2.  Core is wrong.

6.     Beginning with the assignment of rights to Sphere, it is undisputed that third-party Gryphon Digital Mining, Inc. ("Gryphon")—which serves as the exclusive manager of Sphere's crypto-related operations—entered into Order #2 with Core and that Gryphon entered into the Sub-License and Delegation Agreement with Sphere dated October 5, 2021, as subsequently amended (the "Delegation Agreement", attached as Exhibit 4 to the Trompeter Decl.), that expressly provided for the assignment of Gryphon's rights in Order #2 to Sphere.  It is also undisputed that Order #2 expressly provided that Gryphon could "sub-license, assign, delegate or transfer" any of

4

"its rights . . . to *Sphere*" under the "[MSA]" or "Order [#]2 . . . without . . . prior written consent of [Core] as long as [Sphere] satisfies [Core's] requirements prior to . . . ." *See* Order #2.  This provision is hereinafter referred to as the "Sphere Assignment Provision."

7.      Based on a single paragraph in a single declaration from Russell Cann, an EVP at Core (the "Cann Declaration"), Core claims that the phrase "as long as [Sphere] satisfies [Core's] requirements prior to" *unambiguously* required Sphere to satisfy no less than *six categories of requirements*, including, apparently without limitation:

- *First*, "creditworthiness";

- *Second*, "Foreign Corrupt Practices Act [FCPA] considerations";

- *Third*, "Know Your Customer [KYC] considerations (*e.g.*, business with Chinese entities/Chinese government)";

- *Fourth*, "form of assignment (e.g., how and which rights and obligations were transferred, allocated or retained)";

- *Fifth*, "whether any such assignment would implicate securities laws or constitute an investment contract";

- *Sixth*, "whether any assignment would impact Core's own rights and obligations under the Gryphon Hosting Agreements;" and

- *Finally*, many other undisclosed requirements.[6]

8.      Mr. Cann goes on to declare in two sentences, based on his "personal knowledge" (no elaboration on how he has that knowledge), that Sphere never met Core's six (and counting) requirements.  No other evidence is proffered before Core declares it is undisputed that Sphere did not meet Core's requirements and therefore any assignment from Gryphon to Sphere is void.

---

[6] *See* Cann Decl. ¶ 8.

5

9.      The phrase "requirements prior to" cannot support the *unambiguous* construction Core advances.  And, far from presenting a legal issue, whether Sphere met any of Core's purported requirements is a fact-bound question and the evidence, even without the benefit of discovery, refutes Core's claim that Sphere somehow failed to meet its requirements.  That evidence includes:  (1) the sworn statements of Sphere CEO Patricia Trompeter and former Sphere CEO Peter Tassiopoulos (*see* Trompeter Decl. ¶ 6; Tassiopoulos Decl. ¶ 5) that Core's then-CEO Mike Levitt acknowledged to each in April 2022 that Sphere in fact had an enforceable contract with Core (admissions sufficient on their own to defeat summary judgment); (2) the text of Order #2 itself, which plainly contemplated an assignment of rights to Sphere; (3) text messages from Core representatives reflecting Core's contemporaneous approval of a public press release in which Sphere announced the Delegation Agreement (*see* Tassiopoulos Decl., Ex. 2); and (4) a letter from Gryphon CFO Brian Chase in which Gryphon affirmed that Sphere "exclusively maintains any and all right and claim to" the Deposit (*see* Trompeter Decl., Ex. 5).

10.     In addition, Core's claim that the Court can, on this record, determine that the limitation of liability provisions unambiguously cap its liability at $84,685.94, *see* Motion, ¶ 8, citing MSA, § 5.d, and eliminate the possibility that Core can be liable for various categories of damages, such as consequential damages, Motion, ¶ 9, citing MSA, § 5.c, is without merit for at least three reasons:

11.     *First*, Delaware courts and federal courts applying Delaware law generally refuse to decide issues related to the applicability of limitation of liability provisions until after trial.  One Delaware court recently surveyed the landscape and observed that it had been "unable to locate any case where a Delaware court enforced a purported limitation on damages upon a motion to dismiss."  *Data Centers, LLC v. 1743 Holdings LLC*, 2015 WL 9464503, at *5 (Del. Super. Ct.

Oct. 27, 2015).  That is functionally the case here, where Core seeks an order either disallowing the claims outright by grant of summary judgment, or capping any recovery on such claims, before *any* discovery has been conducted.

12.     *Second*, as a matter of public policy, Delaware—like the vast majority of jurisdictions—will not permit a defendant to limit its tort or contractual liability from acts taken intentionally or in bad faith.  *See, e.g.*, *Petroleum v. Magellan Terminals Holdings, L.P.*, No. CV N12C-02-302 FWW, 2015 WL 3885947, at *24 (Del. Super. Ct. June 23, 2015) (denying summary judgment on "contractual" and "implied covenant" claims with respect to applicability of limitation of liability clause purporting to exclude "lost profits, lost business opportunities, or other indirect, special, incidental, punitive, or consequential damages").  Core cannot limit its liability, for example, for conversion or to the extent its contractual breaches were in bad faith.

13.     *Third*, as a matter of contract construction, Core is wrong that Section 5.d of the MSA—which provides that Core's "total liability . . . will not exceed an amount equal to one (1) months' fee payable to [Core] pursuant to [Order #2]"—unambiguously means that Core's liability is capped at the amount *actually charged* in the "last invoice" submitted *prior to Core's filing a motion for summary judgment—i.e.*, $84,658.94 in charges for "Hosting Services," "Replacement Parts" and "Replacement Service" as reflected on its May 2023 invoice (the "May 2023 Invoice").  At the outset, the property Core is holding belongs to Sphere, and should not be subject to a limitation of liability provision.  But, regardless, Section 5.d does not reference fees "actually charged," let alone on an arbitrarily selected invoice, as Core contends; rather, the more sensible interpretation of Section 5.d is that any cap is determined by reference to the greatest amount of fees called for in one month by (*i.e.*, payable under) Order #2 as written—a sum in excess of ▮▮▮▮▮▮▮ .  But even if Section 5.d were interpreted to refer to fees actually charged (an

7

interpretation the Court cannot adopt on this Motion), there would still be an open question of which "fees" paid in which "month" cap liability, as the relevant agreements do not define the terms fees.  Core's own documents show that the payments to Core that comprise the Deposit (more than ██████ in a single month) may be considered "fees" for purposes of Section 5.d. By way of illustration, just as the May 2023 Invoice charged $84,658.94 for (among other things) Hosting Services—which Core contends must be considered fees for purposes of Section 5.d—an invoice from April of 2022 (the "April 2022 Invoice")[7] included a charge of $██████ for *Hosting Services*, which included a payment toward the Deposit:

| Terms | | Due Date | | PO # | | Sales Rep | |
|---|---|---|---|---|---|---|---|
| | | 5/22/2023 | | Order 1-2 | | | |

| Quantity | Item | Tax Location | Tax Rate | Amount |
|---|---|---|---|---|
| 1 | **Hosting Services*** <br> April 2023 Actual Usage | | 0% | $84,083.25 |
| 1 | **Hosting Services*** <br> Reverse April 2023 Estimated Prepayment <br> INV42894 | | 0% | ($82,174.34) |
| 1 | **Hosting Services*** <br> Estimated June 2023 Usage Prepayment | | 0% | $82,174.34 |
| 1 | **Replacement Parts** <br> 04/03/2023 to 05/03/2023 - Dalton, GA - Parts | Dalton, GA | 7% | $456.25 |
| 1 | **Replacement Service** <br> 04/03/2023 to 05/03/2023 - Dalton, GA - Labor | Dalton, GA | 0% | $87.50 |

| | | |
|---|---|---|
| **Subtotal** | $84,627.00 |
| **Tax Total (%)** | $31.94 |
| **Total** | $84,658.94 |
| **Amount Due** | $84,658.94 |

*See* Cann Decl., Ex. C (excerpt from the May 2023 Invoice).

---

[7]The April 2022 Invoice is attached to the Kalbfleisch Declaration as Exhibit 1.

8



*See* Kalbfleisch Decl., Ex. 1 (excerpt from the April 2022 Invoice).

14.     As further confirmation, Core in its Claim Objection characterizes the Deposit payments—including ████████████████—as payments made pursuant to Order #2's "*fee schedule.*"  Claim Objection at ¶ 19.

15.     Core provides no principled basis for selecting payments to it in one month over another as the cap in liability—in fact, Core does not even address the issue.  In all events, it is plain that genuine disputes of material fact exist with respect to whether Section 5.d, as a matter contract interpretation, unambiguously caps Core's liability at the charges reflected on an invoice self-servingly selected by Core—$84,658.94—or at a different number.

16.     The Motion for Summary Judgment should be denied.

## STATEMENT OF FACTS

17.     The following statement of facts is presented solely as needed to explain why the Court should deny the Motion and must be construed in the light most favorable to Sphere.

I.      **BACKGROUND ON CRYPTOCURRENCY MINING**

18.      Sphere is in the business of what is known in the crypto industry as "mining" for bitcoin.  Mining ensures that the payment network underlying bitcoin functions.  Through mining, mining companies generate new bitcoin for themselves and also earn revenues through transaction fees.  To mine for bitcoin, mining companies use purchased or leased "miners," which are (usually) sophisticated, high-capacity computers that run programs designed to support the network underlying bitcoin.

19.      Mining companies frequently turn to third parties to host their miners.  As a general matter, hosts will (in exchange for fees) provide hosting services for the miners, such as warehouse space, electricity, security, Internet access, and cooling.  Hosting space is finite and limits the number of miners a host can accommodate.

II.     **ON BEHALF OF SPHERE, GRYPHON ENTERED INTO ORDER #2 WITH CORE AND ASSIGNED ITS RIGHTS TO SPHERE—WHICH CORE EXPRESSLY ACKNOWLEDGED**

   A.      **On Behalf Of Sphere, Gryphon Entered Into Order #2, Which As Written Called For Over ▇▇▇▇▇▇▇▇▇ In Fees For Services In A Single Month**

20.      Pursuant to an agreement between third-party Gryphon and Sphere, Gryphon acts as the "exclusive provider of any and all management services for all blockchain and cryptocurrency-related operations" for Sphere.  *See* Trompeter Decl., Ex. 1.

21.      On September 12, 2021, Gryphon and Core entered into the MSA and, on October 5, 2021, into Order #2 to the MSA on Sphere's behalf.  Order #2 sets forth the terms under which Core would host Sphere's miners, including the fees called for by Order #2.

22.      The term "fees" is not defined in the MSA or Order #2.  Order #2 provides that "Client shall pay the fees provided for in this Order" and includes a schedule of payments.  For example, Order #2 provides for "Fees for Service," which "will be determined initially by

10

reference to the Assumed power consumption per Unit of each deployed Unit, multiplied by the

Hosting-Services Rate (each as set forth above in this Order)" and is then subject to adjustments

in future months depending on "additional charges" and "estimates of power to be utilized."  Order

#2 further sets forth the hosting rate per KWh at ▇▇▇▇ (decreasing to $▇▇ after 30 months),

assumed power consumption per unit at 3.255 KWh, and the miners to be "deployed" at Core by

month, with 70,000 miners due to be online in November 2022:

| Client Equipment hosted**: | Deployment Month | Quantity & Type of Unit (the "Units") | Assumed power consumption per Unit (KWh): |
|---|---|---|---|
| | OCT 2021 | 100 S19 or equivalent | 3.255 |
| | NOV 2021 | 100 S19 or equivalent | 3.255 |
| | DEC 2021 | 100 S19 or equivalent | 3.255 |
| | JAN 2022 | 100 S19 or equivalent | 3.255 |
| | FEB 2022 | 100 S19 or equivalent | 3.255 |
| | MAR 2022 | 2,500 S19 or equivalent | 3.255 |
| | APR 2022 | 5,000 S19 or equivalent | 3.255 |
| | MAY 2022 | 7,500 S19 or equivalent | 3.255 |
| | JUN 2022 | 10,000 S19 or equivalent | 3.255 |
| | JUL 2022 | 10,000 S19 or equivalent | 3.255 |
| | AUG 2022 | 10,000 S19 or equivalent | 3.255 |
| | SEP 2022 | 10,000 S19 or equivalent | 3.255 |
| | OCT 2022 | 10,000 S19 or equivalent | 3.255 |
| | NOV 2022 | 4,500 S19 or equivalent | 3.255 |
| Hosting-Services Rate: | ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ | | |

23.     To calculate the Fees for Services called for by the MSA in any given month, one

multiplies the number of miners hosted in the month, by the "Assumed power consumption per

Unit (KWh)", by the applicable Hosting-Services Rate, by the number of hours in a given month.

24.     As written, beginning in April 2022, ▇▇▇▇▇▇▇▇▇▇ were due in Fees for

Services under Order #2.  In December 2022, the Fees for Services called for by MSA as written

were ▇▇▇▇▇▇.[8]

---

[8] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

25.     Order #2 also references "prepayment(s) for hosting services," with as much as ███████████ due as of October 12, 2021 and ████████████████████ due in ensuing months:



*See* Order #2 at 1 (excerpt showing October 2021 payments due).

**B.     Core Explicitly Agreed Gryphon Could "Assign . . . Order #2" To "Sphere"**

26.     Core at all points understood that Gryphon was acting as a manager for Sphere. As reflected in Order #2, Core expressly agreed that Gryphon could assign its rights under the MSA and Order #2 to *Sphere* without seeking prior written consent from Core. Specifically, Order #2 provides:

> **Amendment to Section 8.d of the Agreement**. Both [Core] and [Gryphon] agree that Section 8.d (Assignment and Subcontracting) of the Agreement is amended so that [Gryphon] is permitted to sub-lease, sub-license, assign, delegate or transfer the Agreement, Order 1 and Order 2, or any of its rights and obligations hereunder to Sphere 3D Corp. and thereunder without the prior written consent

12

of [Core] as long as Sphere 3D Corp. satisfies [Core's] requirements prior to.[9]

**C.      Gryphon Assigned Rights In Order #2 To Sphere Pursuant To The Delegation Agreement And Core Approved Of Sphere's Press Release Disclosing The Delegation Agreement**

27.      On October 5, 2021, the same date it entered into Order #2, Gryphon entered into the Delegation Agreement with Sphere in which it assigned rights in Order #2 to Sphere.  *See* Trompeter Decl., Ex. 4 § 1 (providing that Gryphon "exclusively sub-licenses to Sphere its rights to access and use [Core's] Facility pursuant to Order 2" and "delegates to Sphere all of its obligations to make payments to Core pursuant to Order 2").  At no point in the Motion does Core suggest that it informed Sphere, prior to these bankruptcy proceedings, that Sphere had failed to satisfy any requirements necessary for Gryphon's assignment to Sphere of rights under Order #2. On the contrary, on October 13, 2021, in reference to the Delegation Agreement, Sphere in a Form 6-K publicly filed with the U.S. Securities & Exchange Commission (the "SEC") "announce[d] that it [had] entered into an agreement with [Gryphon] for approximately 230 MW of carbon neutral bitcoin mining hosting capacity to be managed by [Core] as hosting partner."  *See* Tassiopoulos Decl., Ex. 1.  In a text chain involving Gryphon and representatives from Core— including Mr. Cann and SVP Taras Kulyak—Mr. Kulyak signed off on the press release on behalf of Core.  *See* Tassiopoulos Decl., Ex. 2.

**D.      In April 2022, Core's Then-CEO Mr. Levitt Acknowledged That Sphere Had A Valid Contract With Core**

28.      On or around April 7, 2022 Ms. Trompeter, Sphere's CEO, had a meeting with Mr. Levitt, Core's then-CEO, at the Setai hotel in Miami, Florida, to discuss the state of affairs between Sphere and Core, including that Core had not accepted Sphere's miners for hosting despite

---

[9] Order #2, at 4.

DMS 302733999

requesting Sphere to continue making deposit payments.   Trompeter Decl. ¶ 6. During that meeting, Mr. Levitt acknowledged that Sphere and Core were in a contractual relationship.   *Id.* Mr. Levitt stated that Sphere was one of Core's largest customers and that the relationship was important to him.   *Id.*   Mr. Tassiopoulos, Sphere's former CEO, dialed in for part of that meeting and confirms that Mr. Levitt characterized Sphere as a "customer" of Core, indicated that the parties had a contractual relationship, and stated that the parties should improve their communication.   Tassiopoulos Decl. ¶ 5.

### E. Sphere Paid The $35 Million Deposit To Core, Which Gryphon Acknowledged Was Sphere's Property

29.   Through Gryphon, Sphere made all payments to Core that comprised the Deposit, including by paying ████████ to Core in October 2021.   *See* Kalbfleisch Decl. ¶ 2. Gryphon's CFO in a letter conclusively affirmed that Sphere "exclusively maintains any and all right and claim to" the Deposit.   *See* Trompeter Decl., Ex. 5.

### ARGUMENT

30.   The Court must deny summary judgment when a genuine dispute of material fact exists.[10]   *See* Fed. R. Civ. P. 56(a). "The moving party bears the burden of establishing that there are no genuine issues of material fact," *In re Sadler Clinic, PLLC*, Adv. Proc. No. 14-3229, 2016 WL 921983, at *2 (Bankr. S.D. Tex. Mar. 7, 2016), and "always bears the initial responsibility of informing the district court of the basis for its motion," *Young v. Johnson*, No. SA: 19-CV-00270, 2020 WL 4194015, at *1 (W.D. Tex. July 21, 2020).  On summary judgment, "[a] court views the facts and evidence in the light most favorable to the non-moving party at all times." *Sadler Clinic*, 2016 WL 921983, at *2. "A court cannot make a credibility determination in light of conflicting

---

[10] Fed. R. Bankr. P. 7056 incorporates Fed. R. Civ. P. 56 in adversary proceedings.  *See In re Sadler Clinic, PLLC*, No. 12-34546, 2016 WL 921983, at *2 (Bankr. S.D. Tex. Mar. 7, 2016).

evidence or competing inferences.  If there appears to be some support for disputed allegations, such that 'reasonable minds could differ as to the import of the evidence,' the motion must be denied." *United States v. One Fossilized Tyrannosaurus Bataar Skull*, 365 F. Supp. 3d 759, 763 (N.D. Tex. 2018) (citations omitted).

31.    Under Delaware law, which controls the interpretation of the MSA and Order #2, in a contract interpretation case, summary judgment is appropriate "only if the contract in question is unambiguous." *Barton v. Club Ventures Invs. LLC*, No. CV 8865-VCN, 2013 WL 6072249, at *5 (Del. Ch. Nov. 19, 2013).  Contracts are ambiguous "when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *United Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007).  When "two equally reasonable, but conflicting, interpretations" exist, that is an unresolved issue of material fact that "renders summary judgment inappropriate." *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 784 (Del. 2012).  The moving party must show that its construction of the contract "is the only reasonable interpretation" to be entitled to summary judgment.  *Bean v. Fursa Cap. Partners, LP*, C.A. No. 7566-VCP, 2013 WL 755792, at *8 (Del. Ch. Feb. 28, 2013).

## I.    CORE SPECIFICALLY INFORMED SPHERE THAT "SPHERE HAD AN ENFORCEABLE CONTRACT" WITH CORE, WHICH PRECLUDES SUMMARY JUDGMENT

32.    Genuine disputes of material fact preclude granting Core summary judgment on whether Sphere had rights in the MSA and Order #2.  It is undisputed the Sphere Assignment Provision in Order #2 specifically contemplated that Gryphon could assign rights to *Sphere* without the prior written consent of Core, as it provided that Gryphon was "permitted to sub-lease, sub-license, assign, delegate or transfer the [MSA] . . . and Order 2, or any of its rights and obligations hereunder to [*Sphere*] and thereunder without the *prior written consent of [Core]* as

15

long as [Sphere] satisfies [Core's] requirements prior to."  And there can be no reasonable dispute that Gryphon entered into the Delegation Agreement with Sphere and that the Delegation Agreement provided that it assigned rights in Order #2 to Sphere.  *See* Trompeter Decl. Ex. 4.

33.     To argue that the assignment was ineffective, however, Core rests on the phrase "as long as [Sphere] satisfies [Core's] requirements prior to." which Core contends "*unambiguous[ly]*" required Sphere to satisfy no fewer than *six categories of "requirements"*— ranging from "creditworthiness" to "form of assignment"—as well as additional requirements that Core chose not to disclose. Motion, ¶ 25.  To support this extrapolation from the phrase "requirements prior to," Core relies on a paragraph in a single declaration based on the "personal knowledge" of a Core EVP, Mr. Cann.  *See* Cann Decl. ¶ 8.  How Mr. Cann acquired his personal knowledge is not stated and Core submits no documentary evidence—no contemporaneous emails or documents related to the negotiation of the Sphere Assignment Provision, nothing—to support this interpretation.  From there, Core asserts that it is "undisputed . . . that Sphere at no time has satisfied Core's requirements to obtain any rights" under the MSA and Order #2.  Motion, ¶ 25. The only support for the assertion is two sentences in the declaration of the Mr. Cann based on his "personal knowledge" (again, no elaboration on how he acquired the knowledge) denying that Sphere satisfied Core's many requirements—both those listed and unlisted in his declaration.  *See* Cann Decl. ¶ 8.

34.     The phrase "requirements prior to" is not self-defining; Core's contention that that phrase must be *unambiguously* interpreted to mean that Sphere had to satisfy the six enumerated "requirements" in the Cann Declaration—and any other requirements Core might come forward

with during the course of this proceeding—is without merit.  The actual requirements (if any) Sphere had to meet will need to await discovery.

35.     But whatever the actual requirements, it is very much disputed that Sphere did not meet them, or that Core actually required that they be met.  As set forth in the Trompeter and Tassiopoulos declarations, Coe's CEO acknowledged in April 2022 that the parties had an enforceable contractual relationship.  *See* Trompeter Decl. ¶ 6; Tassiopoulos Decl. ¶ 5.  These admissions are in-and-of-themselves raise genuine disputes of material fact as to whether the assignment from Gryphon to Sphere was effective, including whether Sphere satisfied Core's "requirements" (whatever those might be) or if Core did not actually require Sphere to meet any such requirements.

36.     But there are additional reasons to believe that Core's claim that Sphere did not satisfy its "requirements" is nothing more than pretext.

37.     For starters, Core agreed to the Sphere Assignment Provision, which specifically referenced Sphere and indicates that Core understood that Gryphon would be assigning rights in Order #2 to Sphere.

38.     Next, Gryphon entered into Order #2 with Core on October 5, 2021, and on the same date assigned rights in Order #2 to Sphere through the Delegation Agreement.  A mere eight days later, on October 13, 2021, Sphere announced that it had entered into the Delegation Agreement.  Contemporaneous text communications reflect that Core reviewed and specifically signed off on the press release, which was filed publicly with the SEC.  And Core in its Motion never claims it ever informed Sphere that it had not met its requirements, including in connection

17

with reviewing the press release.  Construed in the light most favorable to Sphere, as required on this Motion, the exchange shows that Core was aware of the assignment and approved of it.

39.     Moreover, Gryphon's CFO, Mr. Chase, conclusively affirmed that Sphere "exclusively maintains any and all right and claim to" the Deposit, demonstrating that Gryphon plainly believed it did what was required to assign its rights under Order #2 to Sphere.

40.     Consequently, viewing the evidence in the light most favorable to Sphere, disputed issues of material fact preclude summary judgment.[11]

## II.     THE LIMITATION OF LIABILITY ISSUES CANNOT BE RESOLVED AGAINST SPHERE ON THIS MOTION

41.     Genuine disputes of material fact preclude granting Core summary judgment on the applicability of the limitation of liability provisions in the MSA.  At the outset, "[c]ontract clauses which exonerate a party from the consequences of its own actions are disfavored" under Delaware law.  *Hampton v. Warren-Wolfe Assocs.*, 2004 WL 838847, at *3 (Del. Super. Ct. Mar. 25, 2004); *accord Gabriels Tech. Sols., Inc. v. PNJP, LLC*, No. 17 CIV. 6410 (AT), 2018 WL 11309883, at

---

[11] The foregoing grounds are sufficient to reject Core's argument that summary judgment may be granted on the assignment issue; Sphere thus need not address every argument Core raised in its Motion.  Briefly, however:

*First*, that Sphere was not an express third-party beneficiary in Order #2 is irrelevant; rather, the operative question is whether Gryphon validly assigned rights to Sphere pursuant to the Sphere Assignment Provision.

*Second*, Core argues that Gryphon was not acting as an agent of Sphere during its negotiations with Sphere, but "[t]he existence of an agency relationship is a mixed question of law and fact that should generally be decided by a jury."  *Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 452 (S.D.N.Y. 2015).  Whether Gryphon held itself out as an agent of Sphere during negotiations, and the ramifications of whether Sphere may sue as a principal on a contract entered its behalf by its agent, is a subject that will be addressed in discovery.  Sphere does not presently have sufficient discovery on this issue—which itself presents a ground to deny the Motion, *see* Wolfe Decl. ¶ 4.

*Finally*, Sphere's conversion and equitable claims may be asserted irrespective of whether the parties were in contractual privity, which is not an element of either claim.  Indeed, Core continues to hold Sphere's property against its will long after Core purportedly terminated the MSA.  Accordingly, there is in all events no basis to grant the Motion in favor of Core.

*4 (S.D.N.Y. Sept. 7, 2018) (applying close scrutiny to limitation of liability clause that limited liability without completely exculpating it).

42.     Core is wrong that Section 5.d limits its total liability to $84,685.94 and that Section 5.c excludes a variety of damages, including lost profits, loss of business, and consequential damages.  *See* Motion, at 12–14.  On the contrary, these provisions do not limit Core's liability at all as a matter of public policy for the type of misconduct at issue here, namely, intentional acts and acts taken in bad faith.  *See* Section III.B, *infra*.  Setting aside public policy, Core is also wrong as a matter of contract interpretation that Section 5.d limits its total liability to $84,685.94.  *See* Section III.C.

   **A.    Courts Generally Refuse To Resolve The Applicability Of Limitation Of Liability Clauses Pre-Trial, Which Provides An Adequate Basis To Reject Core's Request That The Court Grant Core Partial Summary Judgment On The Limitation Of Liability Provisions**

43.     At the outset, as a matter of Delaware law, "[g]enerally, the enforceability of liability limitation provisions should not be decided on the pleadings or on summary judgment." *Data Centers, LLC v. 1743 Holdings LLC*, 2015 WL 9464503, at *5 (Del. Super. Ct. Oct. 27, 2015); *see also Kainos Evolve, Inc. v. InTouch Techs., Inc.*, 2019 WL 7373796, at *2 (Del. Ch. Dec. 31, 2019) ("[I]n recognition of the fact that it is preferable for the court to have a factual record before ruling out available remedies, particularly when issues of public policy may be implicated, Delaware courts have held that 'the enforceability of liability limitations should not be decided on the pleadings or on summary judgment.'" (citation omitted)); *Hampton*, 2004 WL 838847, at *3 (denying motion for summary judgment on limitation of liability where, as here, "[t]he case [was] still in the discovery stages").  "Relying on this principle, multiple federal courts applying Delaware law have declined to enforce limitation of liability provisions on motions to

dismiss and motions for summary judgment." *Gabriels Tech. Sols.,* 2018 WL 11309883, at *4 (collecting cases).

44.    In *Data Centers*, the court noted that it had been "unable to locate any case where a Delaware court enforced a purported limitation on damages upon a motion to dismiss." 2015 WL 9464503, at *5. That is functionally the case here, where Core has moved for summary judgment before the parties have taken *any* discovery, and before the agreed-upon extended deadline for Sphere to file its response to the Claim Objection—and, pointedly, summary judgment on the applicability of limitation of liability provisions is typically rejected even after the close of discovery. This Court should follow the well-trodden rule applied by Delaware courts and federal courts applying Delaware law and reject Core's request for partial summary judgment on the limitation of liability provisions out of hand.

### B.    As A Matter Of Public Policy, Core's Liability Cannot Be Limited For Acts Of Intentional Misconduct Or Bad Faith

45.    Like other jurisdictions, Delaware courts generally permit parties to limit or eliminate liability for acts committed before a contract is entered into, but will not as a matter of public policy permit parties to prospectively limit their liability for intentional acts or acts of bad faith committed after contract execution. *See New Enter. Assocs. 14, L.P. v. Rich*, No, 2022-0406-JTL, 2023 WL 3195927, at *8. 52–54 (Del. Ch. May 2, 2023) (observing that "extant decisions hold that a provision in a commercial contract cannot eliminate tort liability for intentional or reckless conduct" and distinguishing Delaware decisions that have permitted a party entering into a contract to disclaim liability for pre-contract extracontractual fraud through non-reliance provisions); *Data Mgmt. Internationale, Inc. v. Saraga*, No. CIV.A. 05C-05-108, 2007 WL 2142848, at *5 & n.41 (Del. Super. Ct. July 25, 2007) (collecting authority and observing that if the contract "expressed an unambiguous intent to relieve [defendant] of liability for his own

intentional torts, it is exceedingly doubtful that such a provision would be enforceable as a matter of public policy"); *James v. Getty Oil Co. (E. Operations)*, 472 A.2d 33, 38 (Del. Super. Ct. 1983) ("to the extent that paragraph 6 seeks to indemnify [the defendant] against its willful acts, as opposed to its negligence, the agreement is void and unenforceable"); 8 Williston on Contracts § 19:24 (4th ed.) ("An attempted exemption from liability for a future intentional tort . . . or for a future willful or grossly negligent act is generally held void." (footnotes omitted)).

46.    Sphere asserts in its Proofs of Claim that Core is liable to it based on its intentional acts, including for the tort of conversion, namely, for Core wrongfully seizing Sphere's Deposit and other digital assets generated for the benefit of Sphere.  No limitation of liability can apply to such claims.  *See Saraga*, 2007 WL 2142848, at *5 & n.41 (citing *I.C.C. Metals, Inc. v. Municipal Warehouse Co.*, 409 N.E.2d 849, 853 (N.Y. 1980) ("Although public policy will in many situations countenance voluntary prior limitations upon that liability which the law would otherwise impose upon one who acts carelessly . . . such prior limitations may not properly be applied so as to diminish one's liability for injuries resulting from an affirmative and intentional act of misconduct . . such as a conversion.  Any other rule would encourage wrongdoing by allowing the converter to retain the difference between the value of the converted property and the limited amount of liability. . . . That result would be absurd.").); *accord Solis v. Evins*, 951 S.W.2d 44, 50 (Tex. App.—Corpus Christi 1997) ("We find no authority for the proposition that a party may prospectively contractually exculpate itself with respect to intentional torts. That would be contrary to public policy.").

47.    Sphere also asserts that Core acted in bad faith in performing under the MSA.  In Delaware, where "bad faith" is present, a limitation of liability is ineffective as a matter of public policy with respect to liability sounding in contract; indeed, Delaware courts have rejected the

precise relief Core seeks here, holding that it is "premature on summary judgment" to rule that a "limitations of damages clause is enforceable and that it applies to cap damages on claims for breach" of contract claims where "bad faith" is claimed.[12]  *Petroleum v. Magellan Terminals Holdings, L.P.*, No. CV N12C-02-302 FWW, 2015 WL 3885947, at *24 (Del. Super. Ct. June 23, 2015) (denying summary judgment on "contractual" and "implied covenant" claims with respect to applicability of limitation of liability clause purporting to exclude "lost profits, lost business opportunities, or other indirect, special, incidental, punitive, or consequential damages"); *see also, e.g.*, *J. A. Jones Const. Co. v. City of Dover*, 372 A.2d 540, 545 (Del. Super. Ct. 1977) ("Even if a contract purports to give a general exoneration from 'damages,' it will not protect a party from a claim involving its own . . . bad faith."); *accord Fort Howard Cup Corp. v. Quality Kitchen Corp.*, No. C.A. 89C-DE-34,  1992 WL 207276, at *5 (Del. Super. Ct. Aug. 17, 1992); *Aventis Env't Sci. USA LP v. Scotts Co.*, 383 F. Supp. 2d 488, 508 (S.D.N.Y. 2005).  As in Delaware, courts in other jurisdiction generally hold that a party cannot limit its liability for a bad faith breach of contract.[13] *See e.g.*, *Vermont Telephone Co., Inc. v. FirstLight Fiber, Inc.*, No. 216-2020-CV-00312, 2022

---

[12] Core has not argued that Sphere failed to adduce facts to support its claims; rather, it has only argued that the contractual language unambiguously limits the damages Sphere can recover regardless of the evidence Sphere can muster.  Given the limited contours of the Motion, and that no discovery has been taken, Sphere does not set forth the evidence that Core acted intentionally or in bad faith, the vast majority of which is in Core's possession.  Suffice to say, Core stealing Sphere's Deposit and digital assets generated for Sphere's account, rejecting the delivery of Spheres' miners so that it can host its own miners, and wrongfully holding onto Sphere's property long after purported contract termination is more than sufficient to support the claims at this stage, in particular given that Core has not moved on those issues.

And, even on this limited record, there is evidence that Core acted in bad faith.  As but one example, although Core now claims that it never used Sphere's miners for its own benefit (*see* Claim Objection at ¶ 24), it at the time conceded that it had and informed Sphere that it had compensated Sphere by "point[ing] extra hash" to Sphere's wallet, which it never did.  *See* Trompeter Decl. ¶ 7.  It was plausibly bad faith for Core to hook up Sphere's miners as its own, generate proceeds for itself, and then inform Sphere that it had in fact provided compensation, which itself was a misrepresentation.

[13] Sphere acknowledges that at least one Delaware court has held, in a post-trial opinion, that public policy will invalidate provisions that purport to limit tort liability, but not contract liability.  *See eCommerce Indus., Inc. v. MWA Intel., Inc.*, 2013 WL 5621678, at *45 (Del. Ch. Sept. 30, 2013).  As described above, *eCommerce* is out of sync with the vast majority of decisional law nationally.  In any event, rather than resolve an issue of potentially disputed law regarding the scope of Delaware public policy, the prudent course for this Court is to rule on the issue, if needed, post-trial with the benefit of a full evidentiary record—*i.e.*, when courts generally assess the applicability of limitation of liability clauses in any event.  *See* Section III,A, *supra*.

DMS 302733999

WL 19236267, at *6 (N.H. Super. Jan. 14, 2022) ("New Hampshire would adopt the rule the rule [*sic*] that a limitation clause may not be enforceable in instances where the party seeking to enforce it has acted in bad faith" and collecting cases for the proposition that numerous courts across the U.S. have applied this rule to breach claims "for bad faith" in "contract performance"); *Airfreight Exp. Ltd v. Evergreen Air Ctr., Inc.*, 215 Ariz. 103, 110–11 (Az. Ct. App. 2007) (collecting cases).

48.     Accordingly, summary judgment must be denied to the extent that Core seeks to invoke the MSA to limit its liability for any intentional or bad faith acts.

### C.     As A Matter Of Contract Construction, Core's Potential Liability Is Not Limited To $84,685.94

49.     Setting aside public policy, as a matter of contract construction, Core seriously misreads Section 5.d to argue that its total liability is unambiguously limited to $84,685.94.  *See* Motion, at 12–13.  Section 5.d provides that Core's "total liability . . . will not exceed an amount equal to one (1) months' fee payable to [Core] pursuant to [Order #2.]"  At the outset, Section 5.d—a provision designed to cap damages—cannot be understood to apply where, as here, a party is seeking the return of its own property, namely, the Deposit, the miners, and the digital assets Core wrongfully generated for its own account.

50.     But, regardless, Core's argument regarding the construction of Section 5.d is unreasonable, namely, that it must be interpreted, unambiguously, to mean that Core's damages are capped at the amount *actually charged* in the "last invoice" submitted *prior to Core's filing a motion for summary judgment*—here, $84,658.94 for Hosting Services (among other things) in the May 2023 Invoice.  *See* Cann. Decl., Ex. C.  It would be easy to imagine a limitation of liability provision that limited liability to the amount actually reflected on a specific invoice—even on the last invoice submitted before filing for summary judgment.

DMS 302733999

51.     But that is not what Section 5.d provides; it does not cap liability based on amounts actually charged, let alone amounts reflected on an arbitrarily selected invoice.

52.     Rather, Section 5.d by its plain terms instructs that Core's "total liability . . . will not exceed an amount equal to one (1) months' fee payable to [Core] pursuant to [Order #2.]"  The question is not what was actually charged or paid to Core under Order #2, but what is the greatest amount of fees called for in a single month by (*i.e.*, payable under) Order #2 under its terms as written.

53.     Neither Order #2 nor the MSA define the term "fees," which is ambiguous.  Order #2 provides that "Client shall pay the fees provided for in [Order #2]" and further states that "Fees for Services will be determined initially by reference to the Assumed power consumption per Unit of each deployed Unit, multiplied by the Hosting-Services Rate)," subject to certain fee adjustments.  Based on Order #2 as written, that amount is ███████████████████ in certain months and constitutes fees for purposes of Section 5.d.  *See* Section II, *supra*.

54.     Moreover, "payment due prior to installation"—*i.e.*, the payments that went toward the Deposit—is listed among the payments called for in Order #2 and may properly be considered fees for purposes of Section 5.d.  In October 2021, Sphere sent Core ██████████████ in Deposit funds, as called for by Order #2.  Tellingly, Core in its Claim Objection characterizes the Deposit payments—including the October 2021 payments—as payments made pursuant to Order #2's "fee schedule."  Claim Objection at 11.  Core's own documents confirm that Core cannot disclaim that "payments due prior to installation" may constitute fees: just as the May 2023 Invoice charged $84,658.94 for (among other things) Hosting Services—which Core contends must be considered fees for purposes of Section 5.d—Core's April 2022 Invoice too charged $██████████ for *Hosting Services*.

24

55.    And even if Core were right, and the amount actually charged in an invoice represented the cap on damages, there would still be no principled basis to select the May 2023 Invoice as the controlling invoice.  To the extent prepayments constitute fees, the more natural reading of Section 5.d dictates that the month in which Core received the greatest payment should control—namely, October 2021, when Core received approximately ███████ from Sphere.

56.    Sphere's construction is far more sensible, while Core's construction is unreasonable.  Core cannot arbitrarily select an invoice most favorable to it (here, the last invoice before filing for summary judgment) and declare that it provides the cap on its liabilities.

57.    In addition, Core's construction leads to the sort of "absurd" results that Delaware law will not countenance.  *See Osborn ex rel. Osorn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010) ("An unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract.").  While Order #2 called for a large deposit payment of ███████ by October 12, 2021, it only provided for 100 miners to be operational in October 2021, which would be expected to generate hosting service fees of ███████ in October 2021.[14]  Under Core's interpretation, Core could have taken the deposit payment of ███████ and *immediately* defaulted on its obligations, with its liability capped at under ███████ That makes no sense.

58.    Sphere has not endeavored to show definitively the amount at which Section 5.d, as a matter of contract construction, caps Core's liability (if at all); that is not its burden.  Rather, it is clear that genuine disputes of material fact exist as to whether Core's damages are capped at $84,658.94 (and they are plainly not capped at that number).  That suffices at this stage, especially

---

[14] ███████████████████████████████████████████████████

where, as here, Core has offered no extrinsic evidence (*e.g.*, from negotiations, course of performance, industry custom, or otherwise) to support its unreasonable construction of Section 5.d.

59.     Accordingly, at the very least, as a matter of contract construction, ambiguities in the contract language preclude granting summary judgment in favor of Core on its claim that Section 5.d caps its damages at $84,658.94.

### III.    AS A MATTER OF PROCEDURE, THE MOTION SHOULD BE SUMMARILY REJECTED BECAUSE SPHERE HAS YET TO TAKE ANY DISCOVERY

60.     Finally, as a matter of procedure, the Court should dismiss the Motion out of hand because discovery has yet to begin.  *Brown v. Miss. Valley State Univ.*, 311 F.3d at 333 ("Summary judgment assumes some discovery."); *see also Ins. Distribution Consulting, LLC*, 2020 WL 5803249, at *3 ("Because granting summary judgment is improper when basic discovery has not been completed, I do not doubt that, even if I thought summary judgment was appropriate at the present time, the Fifth Circuit would reverse that ruling faster than a Nolan Ryan heater."); *Gilbert v. French*, CIV.A. H-06-3986, 2008 WL 2513690, at *5 (S.D. Tex. June 19, 2008) ("Discovery has not meaningfully commenced in this matter and Defendants' summary judgment motion is premature.").

61.     Federal Rule of Civil Procedure 56(d) provides that the Court "may defer considering or deny" a motion for summary judgment, or "allow" for the "tak[ing]" of "discovery," in the event that the "nonmovant shows . . . it cannot present facts essential to justify its opposition."  Fed. R. Civ. P. 56(d). "Rule 56(d) is 'usually invoked when a party claims that it has had insufficient time for discovery or that the relevant facts are in the exclusive control of the opposing party.'"  *VDF FutureCeuticals, Inc. v. Freed Foods, Inc.*, No. 1-20-CV-855-LY, 2021 WL 1667129, at *2 (W.D. Tex. Apr. 27, 2021) (quoting *Union City Barge Line, Inc. v. Union*

*Carbide Corp.*, 823 F.2d 129, 136 (5th Cir. 1987)), *report and recommendation adopted*, No. A-20-CV-00855-LY, 2021 WL 4127785 (W.D. Tex. May 19, 2021).  In this Circuit, "Rule 56(d) motions for additional discovery are broadly favored and should be liberally granted because the rule is designed to safeguard non-moving parties from summary judgment motions that they cannot adequately oppose." *Am. Fam. Life Assur. Co. of Columbus v. Biles*, 714 F.3d 887, 894 (5th Cir. 2013) (cleaned up).

62.     For the foregoing reasons, Sphere submits that it presented adequate facts to warrant denying the Motion.  As set forth in Declaration of Gregory N. Wolfe, however, the truth remains, however, that Sphere is dealing with a major handicap because it has conducted no discovery and did not directly negotiate the relevant agreements with Core.  *See* Wolfe Decl. ¶ 4. It has no discovery whatsoever, including into contract negotiations and industry custom, which would help elucidate the relevant contract language.  *See id.*  Likewise, it has no discovery on the issue of Core's view of Sphere's satisfaction of its purported "requirements"—or even how Core interpreted that provision contemporaneously.  *See id*.  And it has had no discovery into any of Core's misconduct, as needed to validate its claims that Core acted intentionally and in bad faith. *See id*.  In such circumstances, Rule 56(d) provides an independent basis to deny or defer the Motion to give Sphere an opportunity to conduct discovery.

## CONCLUSION

For the reasons set forth above, Sphere respectfully requests that the Court (i) deny the Motion and (ii) grant Sphere such other and further relief as is appropriate under the circumstances.

*[Remainder of page left blank intentionally]*

Dated: July 7, 2023                                    Respectfully submitted,

*/s/ Timothy A. ("Tad") Davidson II*
  Timothy A. ("Tad") Davidson II                  Tibor L. Nagy, Jr.
  TX Bar No. 24012503                              TX Bar No. 24041562
  Ashley L. Harper                                 Gregory N. Wolfe (admitted *pro hac vice*)
  TX Bar No. 24065272                              **DONTZIN NAGY & FLEISSIG LLP**
  **HUNTON ANDREWS KURTH LLP**                       980 Madison Avenue
  600 Travis Street, Suite 4200                    New York, New York 10075
  Houston, Texas 77002                             Telephone: (212) 717-2900
  Telephone:  (713) 220-4200                       Email:      tibor@dnfllp.com
  Facsimile:  (713) 220-4285                                  greg@dnfllp.com
  E-mail:     taddavidson@HuntonAK.com
              ashleyharper@HuntonAK.com

  - and -

  Seth H. Lieberman (admitted *pro hac vice*)
  Matthew W. Silverman (admitted *pro hac vice*)
  **PRYOR CASHMAN LLP**
  7 Times Square
  New York, New York 10036
  Telephone:  (212) 421-4100
  Facsimile:  (212) 326-0806
  E-mail:     slieberman@pryorcashman.com
              msilverman@pryorcashman.com

  - and -

*Co-Counsel for Sphere 3D Corp.*


## CERTIFICATE OF SERVICE

I certify that on July 7, 2023, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on those parties registered to receive electronic notices.

*/s/ Timothy A. ("Tad") Davidson II*
Timothy A. ("Tad") Davidson II

DMS 302733999

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **CORE SCIENTIFIC, INC.,** *et al.,* | § | **Case No. 22-90341 (DRJ)** |
| | § | |
| **Debtors.**[1] | § | **(Jointly Administered)** |

**ORDER DENYING DEBTORS' MOTION FOR SUMMARY JUDGMENT WITH
RESPECT TO PROOF OF CLAIM NOS. 358 AND 359 <u>FILED BY SPHERE 3D CORP.</u>**
[Relates to Docket No. 959, [•]]

Upon consideration of the *Debtors' Motion for Summary Judgment with Respect to Proof of Claim Nos. 358 and 359 Filed by Sphere 3D Corp.* [Docket No. 959] (the "<u>Motion</u>") and Sphere 3D Corp.'s objection (the "<u>Objection</u>") to the Motion, and upon all of the proceedings had before this Court, it is **HEREBY ORDERED THAT:**

1.    The Debtors' Motion is denied.

2.    This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Signed: _____

_____
DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.