**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **CORE SCIENTIFIC, INC.,** *et al.,* | § | **Case No. 22-90341 (DRJ)** |
| | § | |
| **Debtors.**[1] | § | **(Jointly Administered)** |

**SPHERE 3D CORP.'S RESPONSE TO DEBTORS' OBJECTION TO PROOFS OF**
**CLAIM NOS. 358 AND 359 FILED BY SPHERE 3D CORP.**
[Relates to Docket No. 869]

Sphere 3D Corp. ("Sphere") files this response ("Response") to the *Debtors' Objection to Proofs of Claim Nos. 358 and 359 Filed by Sphere 3D Corp.* [Docket No. 869] (the "Claim Objection"), and in support thereof, respectfully states as follows[2]:

**PRELIMINARY STATEMENT**

1.       Over the course of approximately six months, Sphere paid approximately $35.1 million in deposit payments (the "Deposit") to Core, to be drawn upon as Core provided hosting services for Sphere's miners at a hosting services rate of $ ▮▮▮▮▮▮ .  It did so pursuant to a Master Services Agreement dated September 12, 2021 (the "MSA", attached as Exhibit 1), and an accompanying order dated October 5, 2021 ("Order #2", attached as Exhibit 2).

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198) (collectively, the "Debtors"). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

[2] Many of the arguments set forth in the Claim Objection were addressed in *Sphere's Opposition to Debtors' Motion for Summary Judgment with Respect to Proof of Claim Nos. 358 and 359 Filed by Sphere 3D Corp.* [Docket Nos. 1039, 1040] (the "MSJ Opposition").  To the extent practicable, Sphere has endeavored to avoid reiterating certain points addressed in the MSJ Opposition in the preliminary statement.

2.       While Sphere upheld its end of the bargain, Core did not.  Core declined to deploy hundreds of Sphere's miners, as required, because it did not have the space to do so; hooked up the few miners it did deploy as its own to generate bitcoin for its own benefit; and all together delivered to Sphere a few hundred thousand dollars' worth of services—before repudiating the MSA and Order #2 because the cost of hosting had risen and Core no longer found the agreed-upon hosting services rate to be as advantageous.  Although it delivered almost nothing to Sphere, Core now contends it is entitled to a windfall and should be allowed to retain Sphere's Deposit (of which close to $35 million remains), Sphere's miners (the "Miners")—which have an approximate book value of $8.5 million—and the unknown amount of bitcoin (the "Coins") that Core wrongfully seized from Sphere.  This is palpably unfair and impermissible under the law; the Debtors have no right to retain Sphere's property, which must be returned to Sphere.

3.       Through the Proofs of Claim[3], Sphere asserts, among other things, that Core intentionally converted Sphere's property; that Core breached its contractual obligations, including in bad faith, and is thus liable under repudiation, breach of contract, and breach of the implied covenant theories; and that Core is also liable in equity under estoppel theories for failing to return the property.  The Claim Objection is without merit and will almost certainly require a full evidentiary hearing to resolve.  To that end, on June 2, 2023, the parties filed a joint stipulation and agreed order, which the Court entered on June 6, 2023 (the "Stipulation and Agreed Order")[4], that requires the parties to confer on and present "a proposed scheduling order for discovery, litigation schedule, and trial date on the Claim Objection . . . to the Court for consideration at a scheduling conference to be held after Sphere files its response to the Claim Objection."

---

[3] Proofs of Claim Numbers 358 and 359 (together, the "Proofs of Claim").

[4] Docket No. 956.

4.      *First*, as also explained in the MSJ Opposition, Core's headline argument that Sphere does not have enforceable contractual rights here is wrong.  Core seeks to take advantage of the fact that third-party Gryphon Digital Mining, Inc. ("Gryphon")—which serves as the exclusive manager of Sphere's crypto-related operations and an agent of Sphere—entered into Order #2 with Core on behalf of Sphere.  But Gryphon entered into the Sub-License and Delegation Agreement with Sphere dated October 5, 2021, as subsequently amended (the "Delegation Agreement", attached as Exhibit 3), which expressly provided for the assignment of Gryphon's rights in Order #2 to Sphere.  Gryphon was allowed to do so:  Order #2 expressly provided that Gryphon could "sub-license, assign, delegate or transfer" any of "its rights . . . to *Sphere*" under the "[MSA]" or "Order [#]2 . . . without . . . prior written consent as long as [Sphere] satisfies [Core's] requirements prior to." *See* Order #2 at 4.  This provision is hereinafter referred to as the "Sphere Assignment Provision."

5.      Core incorrectly contends that the assignment was void because the phrase "requirements prior to" unambiguously required Sphere to satisfy, at least, six listed categories of requirements, as well as additional, unspecified, requirements—all of which Core claims Sphere failed to meet.  Claim Objection, ¶ 3.  The meagre phrase "requirements prior to" cannot support Core's "unambiguous" construction.  Moreover, the record—including the contemporaneous admissions of Core's then-CEO Mike Levitt to Sphere's current CEO Patti Trompeter and former CEO Peter Tassiopoulos that the parties, in fact, had a contractual relationship—reflects that either Sphere satisfied Core's requirements or that Core did not require Sphere to meet any requirements.

6.      Core's remaining arguments rely on distortions of the Delegation Agreement.  Core contends that the Delegation Agreement did not assign *all* of Gryphon's rights to Sphere, but Core cannot deny the plain language of Section 1 of the Delegation Agreement, where Gryphon

3

expressly assigned its material rights to Sphere—*i.e.*, the right to "access and use [Core's] Facility" and "to make payments to Core pursuant to Order [#]2."  And Core makes no effort to explain why that assignment cannot support Sphere's claims here.

7.     In any event, Sphere is entitled to pursue its claims because Gryphon entered into Order No. #2 as an agent of Sphere's, irrespective of any assignment.

8.     *Second*, there can be no serious dispute that Core breached Order #2 and converted Sphere's assets.  From the outset, Core has proven unable to host Sphere's miners due to lack of space at its facilities.  Rather than keeping sufficient space open, as required by Order #2, Core overbooked its facilities and prioritized its own mining operations to the detriment of Sphere and Core's other customers.  Between December 2021 and April 2022, Core rejected the delivery of hundreds of miners.  On information and belief, over the same period, Core rejected the delivery of thousands of miners from its other customers, which have hosting arrangements similar to Sphere's. Meanwhile, Core increased its own personal mining fleet from 67,000 miners to 85,000 miners, which occupied the space that should have been allocated to its other customers, including Sphere. And, in April 2022, Core informed Sphere it could not accommodate additional miners "until this summer sometime" due to space constraints, and later recommended that Sphere send its miners to a competitor.

9.     Core's primary argument is that, under the MSA, it was only required to provide its services on an "as available" basis, meaning, incredibly, that it had no obligation to host any miners under Order #2 on any timeline.  According to Core, it could have accepted 70,000 miners and let them all lie fallow, but Core ignores that Order #2 included a detailed deployment schedule (the "Deployment Schedule") that provided for the deployment of miners in specific months:

DMS 302863949

| Client Equipment hosted\*\*: | Deployment Month | Quantity & Type of Unit (the "Units") | Assumed power consumption per Unit (KWh): |
|---|---|---|---|
| | OCT 2021 | 100 S19 or equivalent | 3.255 |
| | NOV 2021 | 100 S19 or equivalent | 3.255 |
| | DEC 2021 | 100 S19 or equivalent | 3.255 |
| | JAN 2022 | 100 S19 or equivalent | 3.255 |
| | FEB 2022 | 100 S19 or equivalent | 3.255 |
| | MAR 2022 | 2,500 S19 or equivalent | 3.255 |
| | APR 2022 | 5,000 S19 or equivalent | 3.255 |
| | MAY 2022 | 7,500 S19 or equivalent | 3.255 |
| | JUN 2022 | 10,000 S19 or equivalent | 3.255 |
| | JUL 2022 | 10,000 S19 or equivalent | 3.255 |
| | AUG 2022 | 10,000 S19 or equivalent | 3.255 |
| | SEP 2022 | 10,000 S19 or equivalent | 3.255 |
| | OCT 2022 | 10,000 S19 or equivalent | 3.255 |
| | NOV 2022 | 4,500 S19 or equivalent | 3.255 |

10.     Core's construction would impermissibly render the Deployment Schedule superfluous.  Furthermore, the MSA is explicit that, in the event of a conflict between the MSA and Order #2, Order #2 controls.

11.     And Core does not seriously dispute that it disavowed the $▮▮▮▮ hosting services rate when it asserted it would not host additional miners unless Sphere agreed to sign a new contract with a much higher rate of $▮▮▮▮.  Core's extracontractual demand was an attempt to pass rising power costs onto Sphere—which is not permissible under Order #2.

12.     Beyond its breaches, this is a clear case of conversion, as Core is holding Sphere's property—the Deposit, the Miners, and the Coins—without its permission.  With respect to the Coins, Core inexplicably installed Sphere's Miners as its own and for weeks used them to mine an undisclosed amount of bitcoin for its own account.  Core claimed to Sphere that this was a mistake and promised in writing to compensate Sphere for the loss, but never did.  The conversion claims, along with Core's claims in equity, stand irrespective of whether Sphere and Core have a contractual relationship.

13.     *Third*, Core's claims that Sphere did not adhere to the Deployment Schedule fails because Core already breached Order #2, releasing Sphere from any obligation to adhere to Order

#2, and, independently, because Core frustrated the agreement by refusing to accept Sphere's miner deliveries.

14.      But even if Sphere had breached Order #2 (it did not), Core would still not be entitled to a windfall—namely, Core's Deposit, Miners, and Coins, collectively worth tens of millions of dollars.  Instead, Core would be entitled to its provable damages, which would be *de minimis* because it was overbooked and thus could not host and generate revenues from Sphere's miners in any event.

15.      *Finally*, Core's claim that the limitation of liability provisions unambiguously cap Core's liability at $84,685.94 and eliminate the possibility that Core can be liable for various categories of damages, such as consequential damages, is without merit.

16.      As a matter of public policy, Delaware—like the vast majority of jurisdictions—will not permit a defendant to limit its tort or contractual liability from acts taken intentionally or in bad faith.  This means that Core cannot limit its liability, for example, for conversion or to the extent its contractual breaches were in bad faith.

17.      As a matter of contract construction, Section 5.d of the MSA—which provides that Core's "total liability . . . will not exceed an amount equal to one (1) months' fee payable to [Core] pursuant to [Order #2]"—does not, as Core claims, cap its liability at the amount actually charged in the "last invoice" submitted prior to Core's filing a motion for summary judgment—*i.e.*, $84,658.94 in charges for "Hosting Services," "Replacement Parts" and "Replacement Service" as reflected on its May 2023 invoice (the "May 2023 Invoice").  At the outset, the property Core is holding belongs to Sphere, and should not be subject to a limitation of liability provision.  But, regardless, Section 5.d does not reference fees "actually charged," let alone on an arbitrarily selected invoice, as Core contends; rather, the more sensible interpretation of Section 5.d is that

any cap is determined by reference to the greatest amount of fees called for in one month by (*i.e.*, payable under) Order #2 as written—a sum in excess of ten million dollars.  But even if Section 5.d were interpreted to refer to fees actually charged, the better interpretation of fees (an undefined term) would include the payments that comprise the Deposit, which were more than $▉▉▉▉▉ in a single month.  That is a reasonable construction, as it avoids the absurd consequence that a party like Sphere could make a deposit payment of $▉▉▉▉▉ in the first month of the parties' relationship and then immediately be reduced to recovering less than one percent of that payment if Core decided to breach.

18.     In any event, consistent with Delaware law and the practice of federal courts applying Delaware law, the applicability of the limitation of liability provisions should not be resolved until after trial.

19.     The Claim Objection should be overruled.

## **BACKGROUND**

20.     The following provides the background needed to explain why the Court should overrule the Claim Objection based on the limited record available to Sphere.[5]

## I.     BACKGROUND ON CRYPTOCURRENCY MINING

21.     Sphere is in the business of what is known in the crypto industry as "mining" for bitcoin.  Mining ensures that the payment network underlying bitcoin functions.  Through mining, mining companies generate new bitcoin for themselves and also earn revenues through transaction fees.  To mine for bitcoin, mining companies use purchased or leased "miners," which are (usually) sophisticated, high-capacity computers that run programs designed to support the network underlying bitcoin.

---

[5] At present, the parties have not exchanged any discovery.

22.     Mining companies frequently turn to third parties to host their miners. As a general matter, hosts will (in exchange for fees) provide hosting services for the miners, such as warehouse space, electricity, security, Internet access, and cooling.  Hosting space is finite and limits the number of miners a host can accommodate.

## II.     CORE AGREED TO PROVIDE SPHERE WITH HOSTING AT A RATE OF $▇ — AND SPHERE PROVIDED $35.1 MILLION IN CASH AS A DEPOSIT BASED ON THAT AGREEMENT

23.     Pursuant to an agreement between third-party Gryphon and Sphere (the "Gryphon-Sphere Agreement"), Gryphon acts as the "exclusive provider of any and all management services for all blockchain and cryptocurrency-related operations" for Sphere.  *See* Exhibit 4.

24.     On September 12, 2021, Gryphon and Core entered into the MSA and, on October 5, 2021, into Order #2 to the MSA on Sphere's behalf.  Order #2 sets forth the terms under which Core would host Sphere's miners.  Core agreed to, among other things:

- Charge $▇ as the rate for hosting services over the ▇ of the life of Order #2, a rate that would decrease to $▇ thereafter.[6]

- Receive $▇ in Deposit funds according to a payment schedule, with the deposit funds to be applied as "credit against future monthly invoices as they become due."[7]

25.     The hosting services rate was a material term of Order #2, as power consumption costs are among the most significant and variable costs associated with the mining for, and hosting of, digital assets. Nowhere does either Order #2 or the MSA permit Core to vary the rate or pass through other costs, such as those attributable to inflation, the forces of supply and demand, and so on.

---

[6] Order #2, at 1.

[7] *Id*. at 1-3.

DMS 302863949

26.      Order #2 contains terms with respect to "fees" but does not in fact define the term; nor does the MSA.  Order #2 provides "Client shall pay the fees provided for in this Order" and then includes a schedule of payments.  For example, Order #2 provides for "Fees for Service," which "will be determined initially by reference to the Assumed power consumption per Unit of each deployed Unit, multiplied by the Hosting-Services Rate (each as set forth above in this Order)"[8] and is then subject to adjustments in future months depending on "additional charges" and "estimates of power to be utilized."[9]  Order #2 further sets forth the hosting rate, assumed power consumption per unit at 3.255 KWh, and the miners to be "deployed" by Core by month, with 70,000 miners due to be online in November 2022.[10]

27.      To calculate the Fees for Services called for by the MSA in any given month, one multiplies the number of miners hosted in the month, by the "Assumed power consumption per Unit (KWh)", by the applicable Hosting-Services Rate, by the number of hours in a given month.[11]

28.      As written, beginning in April 2022, over a ████████ were due in Fees for Services under Order #2.   In December 2022, the Fees for Services called for by MSA as written were $████████.[12]

29.      Order #2 also references "prepayment(s) for hosting services," with as much as $████████ due as of October 12, 2021, and ███████████████████ due in ensuing months:

---

[8] *Id*. at 4.

[9] *Id*.

[10] *Id*. at 1.

[11] *Id*. at 4.

[12] This figure is derived by multiplying the number of miners to be hosted under Order #2 in December 2022 (70,000), by the "Assumed power consumption per Unit" (3.255), by the "Hosting Service Rate ████, by the number of days in December (31), by the number of hours in a day (24).



*See* Order #2, at 1 (excerpt showing October 2021 payments due).

30.      Between October 2021 and April 2022, Sphere made Deposit payments according to the schedule set forth in Order #2.  Per the terms of Order #2, Sphere delivered to Core $35,104,363 in Deposit payments to be applied as "credit against future monthly invoices as they become due."

## III.    GRYPHON ASSIGNED RIGHTS UNDER ORDER #2 TO SPHERE—WHICH CORE EXPRESSLY ACKNOWLEDGED

### A.      Core Explicitly Agreed Gryphon Could "Assign . . . Order #2" To "Sphere"

31.      Core at all points understood that Gryphon was acting as a manager for Sphere. As reflected in Order #2, Core expressly agreed that Gryphon could assign its rights under the MSA and Order #2 to Sphere without seeking prior written consent from Core. Specifically, Order #2 provides:

> **Amendment to Section 8.d of the Agreement**. Both [Core] and [Gryphon] agree that Section 8.d (Assignment and Subcontracting) of the Agreement is amended so that [Gryphon] is permitted to sub-

DMS 302863949

lease, sub-license, assign, delegate or transfer the Agreement, Order 1 and Order 2, or any of its rights and obligations hereunder to Sphere 3D Corp. and thereunder without the prior written consent of [Core] as long as Sphere 3D Corp. satisfies [Core's] requirements prior to.[13]

**B.      Gryphon Assigned Rights In Order #2 To Sphere Pursuant To The Delegation Agreement And Core Approved Of Sphere's Press Release Disclosing The Delegation Agreement**

32.      On October 5, 2021, the same date it entered into Order #2, Gryphon entered into the Delegation Agreement with Sphere in which it assigned rights in Order #2 to Sphere.  At no point in the Claim Objection does Core suggest that it informed Sphere, prior to these bankruptcy proceedings, that Sphere failed to satisfy any requirements necessary for Gryphon's assignment to Sphere of rights under Order #2.  On the contrary, on October 13, 2021, in reference to the Delegation Agreement, Sphere in a Form 6-K publicly filed with the U.S. Securities & Exchange Commission (the "SEC") "announce[d] that it [had] entered into an agreement with [Gryphon] for approximately 230 MW of carbon neutral bitcoin mining hosting capacity to be managed by [Core] as hosting partner."  *See* Exhibit 5.  In a text chain involving Gryphon and representatives from Core—including Mr. Cann and SVP Taras Kulyak—Mr. Kulyak signed off on the press release on behalf of Core.

**C.      In April 2022, Core's Then-CEO Mr. Levitt Acknowledged That Sphere Had A Valid Contract With Core**

33.      On or around April 7, 2022 Ms. Trompeter, Sphere's CEO, had a meeting with Mr. Levitt, Core's then-CEO, at the Setai hotel in Miami, Florida, to discuss the state of affairs between Sphere and Core, including that Core had not accepted Sphere's miners for hosting despite requesting Sphere to continue making deposit payments. During that meeting, Mr. Levitt

---

[13] Order #2, at 4.

DMS 302863949

acknowledged that Sphere and Core were in a contractual relationship.  Mr. Levitt stated that Sphere was one of Core's largest customers and that the relationship was important to him.  Mr. Tassiopoulos, Sphere's former CEO, dialed in for part of that meeting and confirms that Mr. Levitt characterized Sphere as a "customer" of Core, indicated that the parties had a contractual relationship, and stated that the parties should improve their communication.

## IV.   CORE BREACHED AND REPUDIATED ORDER #2 AND CONVERTED SPHERE'S DEPOSIT, MINERS, AND COINS.

### A.   Core Disavowed The Deployment Schedule

34.     Order #2 included a Deployment Schedule that, as written, called for incremental deployment of Sphere's miners to Core (*e.g.*, 500 miners deployed at Core by the end of February 2022) and, ultimately, envisioned Core hosting 70,000 of Sphere's miners by the end of November 2022.  Order #2, at 2-4.  Core, however, never hosted more than a few hundred of Sphere's miners.

35.     Since executing Order #2, Core has repeatedly made clear that it cannot abide by the Deployment Schedule as written, both in terms of timing and absolute number of miners to be hosted—because it lacks sufficient space at its facilities. By way of illustration:

- In December 2021, 493 miners were supposed to be shipped to Core.  Core, however, could not accommodate any of the miners due to lack of space.

- As written, the Deployment Schedule stated that Core could accommodate 500 miners as of February 2022.  Although Sphere wished to send Core approximately 500 miners in February 2022, Core could only accept 297 miners at that time.

- On April 8, 2022, Sphere attempted to move 496 miners to Core.  Core responded that it could not accommodate the units until this summer sometime, as April and May are tight deployment wise.

- Because Core could not accommodate Sphere's miners, it resorted to encouraging Sphere to host miners with Core's hosting competitors.

- After May 2022, Core became unwilling to accept any additional miners from Sphere.

36.     Similarly, Core has been unable to host the miners of its other contract-counterparties, which reinforces that Core could not—and never could—host Sphere's miners as required by the Deployment Schedule.  For example, in April 2022, Core informed Gryphon that it could not host 600 of Gryphon's own miners due to lack of space.  Since October 2021, Core has let thousands of miners that belong to non-party Celsius Network LLC and its affiliates (collectively, "Celsius") idle at its facilities. *See In re: Celsius Network LLC, et al.*, Case No. 22-10964 (MG) (Bankr. S.D.N.Y. Sept. 28, 2022), Dkt. 915 ¶ 21.  Core's unwillingness to host Sphere's miners and the miners of its other customers is attributable to oversubscription at its facilities and Core's decision to prioritize hosting its own miners over honoring its contractual-hosting obligations. Tellingly, according to Core's own public securities filings, between December 2021 and April 2022, Core increased its own mining fleet from 67,000 miners to 85,000 miners. *See* Exhibit 99.1 to Core Scientific Inc./tx's Form 8-K, filed May 5, 2022.  This is space that should have been, but was not, allocated to Sphere and Core's other customers.

37.     As this series of events demonstrates, Core disavowed Order #2's Deployment Schedule.  If Core could not in April 2022 accommodate 496 Sphere miners or the many miners of its other customers, it is exceedingly unlikely that Core could have accommodated the thousands of miners otherwise called for by the Deployment Schedule.

**B.     Core Repudiated The $.███████ Rate And Order #2**

38.     Although it was holding approximately $35.1 million in Deposit payments from Sphere, Core decided it would no longer honor the most critical term of Order #2: the parties' agreed-upon rate of $ ██████.  No provision in Order #2 or the MSA permits Core to unilaterally change the rate, but that is exactly what Core has done.

39.     Since at least May 2022, Core has refused to honor the contractual $███████

rate.  Instead, Core has insisted it will only host Sphere miners at a much higher Rate of

$███████

**C.     When Core Received Sphere's Miners, It Breached Order #2 By Installing Them As Its Own**

40.     Core also breached its contractual obligations by hosting hundreds of Sphere's

miners for its own benefit.  As noted, Core first received 297 of Sphere's miners in February 2022.

Rather than hosting them for the benefit of Sphere, however, Core inexplicably installed them as

its own miners and used them to mine bitcoin for its own account.

41.     At the time, Core claimed that it compensated Sphere for the time it

misappropriated Sphere's miners.  For example, Core EVP Russell Cann assured Ms. Trompeter

that Core compensated Sphere by "point[ing] extra hash" to Sphere—which, in crypto industry

parlance, meant that Core sent bitcoin generated by Core's own proprietary miners to Sphere.  But

Sphere has no record of ever receiving any additional bitcoin, which Core now denies that it sent.

**V.     CORE ASSURED SPHERE THAT IT WOULD FOLLOW ITS DIRECTION ON THE DEPOSIT—AND THEN REFUSED TO RETURN THE DEPOSIT, AS WELL AS THE COINS AND MINERS**

42.     Sphere attempted in good faith to negotiate a resolution following Core's demand

that Sphere adhere to the non-contractual $██████  Rate.  It did so in reliance on Core's May

12, 2022, written assurance from Mr. Cann to Ms. Trompeter that Core would follow any

"instructions. . . by [Sphere] and Gryphon" regarding the disposition of the "[D]eposit."

43.     Gryphon had no right to the Deposit and thus no instruction was required to release

the Deposit.  Core, however, ostensibly requested an instruction from Gryphon as well to avoid

any possibility that it would be held liable to Gryphon, as Sphere's manager, for releasing Sphere's

Deposit.

14

44.     Sphere knew that Gryphon would cooperate with Sphere to instruct Core to release the Deposit back to Sphere, as it later did.  *See infra*.  Accordingly, Sphere agreed to continue to negotiate with Core and forebear taking, among other things, immediate legal action against Core because it was secure in the knowledge that Core would release the Deposit funds back to it upon request.  It appears that Core's promise was a delay tactic.

45.     For about two months, Sphere engaged in good faith negotiations regarding Core's refusal to accept further miners unless Sphere acceded to a higher Rate.  Unable to reach common ground, on July 15, 2022, Sphere unequivocally demanded the return of the Deposit.

46.     On September 6, 2022, Sphere through a demand letter reiterated its demand for the Deposit and also demanded the return of its Coins and miners.  Attached to the demand letter was a letter from Gryphon's CFO Brian Chase (the "Chase Letter"), which affirmed that Sphere "solely and exclusively maintain[s] any and all right" to the Deposit.  The Chase Letter further instructed Core to "transfer, refund, apply, or otherwise direct the [Deposit] in a manner as instructed by Sphere 3D in its sole discretion."

47.     Given Core's prior representation that it would adhere to any "instructions… by [Sphere] and Gryphon" regarding the disposition of the "[D]eposit," Core should have immediately transferred the Deposit to Sphere.  To date, however, Core has improperly withheld Sphere's Deposit, miners, and coins.

## PROCEDURAL HISTORY

48.     Since the summer of 2022, Sphere has sought the return of its property, but to no avail.  Following the exchange of correspondence, on October 31, 2022, Sphere filed a demand for arbitration against Core seeking the return of its property and all damages.  Nothing substantive transpired in the arbitration—Core never filed an answer and the parties neither selected a panel

DMS 302863949

nor exchanged discovery.  The arbitration was automatically stayed when Core initiated these bankruptcy proceedings on December 21, 2022.

49.     On March 13, 2023, Sphere served requests for production of documents on Core pursuant to Federal Rule of Bankruptcy Procedure 2004 (the "Bankruptcy Rules"). *See Notice of Bankruptcy Rule 2004 Requests for Production of Documents from Core Scientific, Inc.* [Docket No. 678] (the "Bankruptcy Rule 2004 RFP").  Core refused to produce any discovery in response and filed a motion to quash, which Sphere opposed.  *See Debtors' Motion to Quash Sphere 3D's Bankruptcy Rule 2004 Requests for Production of Documents* [Docket No. 711]; and *Sphere 3D's Objection to Debtors' Motion to Quash Sphere 3D's Bankruptcy Rule 2004 Requests for Production of Documents* [Docket No. 729].

50.     On April 13, 2023, Sphere filed its Proofs of Claim, to which Core objected on May 9, 2023 by filing the Claim Objection.  Core also served discovery requests on Sphere on May 10, 2023.

51.     In anticipation that this dispute would require comprehensive discovery, motion practice, and a trial, the parties entered into the Stipulation and Agreed Order that (i) "deferred and suspended" all discovery "until after a non-evidentiary scheduling conference with the Court to set relevant discovery and litigation deadlines and a trial date"; and (ii) provided for the parties "to confer on a proposed scheduling order for discovery, litigation schedule, and a trial date on the Claim Objection to file and present to the Court for consideration at a scheduling conference to be held after Sphere files its response to the Claim Objection."  *See* Stipulation and Order ¶¶ 4, 7.

52.     Three days later, Core filed a Motion for Summary Judgment [Docket No. 959] (the "MSJ").  Sphere opposed the MSJ on July 7, 2023.

## ARGUMENT

### I.    SPHERE HAS ENFORCEABLE CONTRACTUAL RIGHTS AGAINST CORE

53.    Core's principal argument for why the Proofs of Claim should be disallowed—namely, that Sphere had no rights under Order #2 and the MSA—is without merit and relies on repeated misrepresentations of the record.  Core disingenuously argues that "the MSA . . . makes no reference to Sphere," and that the MSA forbids "assign[ment]" . . . without the prior written consent of [Core]," which is incorrect.  Claim Objection ¶ 35.  Order #2 specifically amended the MSA to provide that Gryphon could assign rights to *Sphere* without the prior written consent of Gryphon, as it provided that Gryphon was "permitted to sub-lease, sub-license, assign, delegate or transfer the [MSA] . . . and Order 2, or any of its rights and obligations hereunder to [*Sphere*] and thereunder without the *prior written consent of [Core]* as long as [Sphere] satisfies [Core's] requirements prior to."

54.    Next, while Core eventually concedes that "Gryphon is *permitted* to assign its rights to Sphere," it disingenuously claims that Gryphon never did so and further argues that "Sphere falsely asserts that Gryphon assigned its contractual rights pursuant to the Sub-License Agreement."  Claim Objection ¶ 36-37 (emphasis in original).  Again, Core is incorrect.  Section 1 of the Delegation Agreement expressly provides that Gryphon "exclusively sub-licenses to Sphere its rights to access and use [Core's] Facility pursuant to Order 2" and "delegates to Sphere all of its obligations to make payments to Core pursuant to Order 2."  Delegation Agreement § 1.  Accordingly, Gryphon assigned its material rights under Order #2 to Sphere and these are the precise rights that give rise to Core's liability:  Sphere was denied the use of Core's facility in accordance with Order #2 when Core refused to host Sphere's miners and did not receive the benefit of the bargain from its payments.  By any metric, it is outrageous for Core to claim that Gryphon did not assign *any* rights to Sphere through the Delegation Agreement.

55.     Similarly outrageous is Core's claim that the assignment was "contingent."  *See* Claim Objection ¶¶ 37, 39.  A wholly separate provision of the Delegation Agreement—Section 2—provided for the assignment of "all of Gryphon's rights and obligations under Order No. 2" to Sphere in the event a merger between Sphere and Gryphon was consummated (which it was not). But Sphere relies on Section 1 of the Delegation Agreement, which unambiguously did assign rights to Sphere.  Section 2 in no way diminishes the effectiveness of Section 1 and Core never explains why the rights Sphere received pursuant to Section 1 are insufficient to maintain its claims.  And while Core asserts that Gryphon did not assign *all* of its rights to Sphere, it points to nothing suggesting a partial assignment was improper; to the contrary, the Sphere Assignment Provision specifically envisioned that Gryphon could "assign . . . rights" in Order #2 without assigning all of those rights.  *See* Claim Objection ¶¶ 39-40.

56.     Finally, Core contends that the phrase "as long as [Gryphon] satisfies [Core's] requirements prior to" in the Sphere Assignment Provision "*unambiguous[ly]*" required Sphere to satisfy no fewer than *six categories of "requirements*":

- *First*, "creditworthiness";

- *Second*, "Foreign Corrupt Practices Act [FCPA] considerations";

- *Third*, "Know Your Customer [KYC] considerations (*e.g.*, business with Chinese entities/Chinese government)";

- *Fourth*, "form of assignment (e.g., how and which rights and obligations were transferred, allocated or retained)";

- *Fifth*, "whether any such assignment would implicate securities laws or constitute an investment contract";

- *Sixth*, "whether any assignment would impact Core's own rights and obligations under the Gryphon Hosting Agreements;" and

- *Finally*, many other undisclosed requirements.

18

57.     Core further contends that Sphere never met Core's supposed "requirements."  In its MSJ, Core offered only the *ipse dixit* of a single employee to support this interpretation of the Sphere Assignment Provision.  *See* MSJ, Cann Decl. ¶ 8.

58.     The phrase "requirements prior to" is not self-defining and cannot support the weight Core puts on it.  Core's contention that that phrase must be *unambiguously* interpreted to mean that Sphere had to satisfy the six enumerated "requirements"—and any other requirements Core may add during the course of this proceeding—is without merit.  The actual requirements (if any) Sphere had to meet will need to await discovery.

59.     But whatever the actual requirements, it is apparent that Sphere either met the requirements or that Core, whether through estoppel, acquiescence, waiver, or otherwise, did not actually require Sphere to meet them.   Indeed, in April 2022, Core's then-CEO Mr. Levitt specifically told Ms. Trompeter and Mr. Tassiopoulos that Sphere had an enforceable contractual relationship with Core.

60.     Beyond the admissions of its then-CEO, there are additional reasons to believe that Core's claim that Sphere did not satisfy its "requirements" is nothing more than pretext.  For example, Core agreed to the Sphere Assignment Provision, which specifically referenced Sphere and indicates that Core understood that Gryphon would be assigning rights in Order #2 to Sphere. The fact that Gryphon entered into the Delegation Agreement with Sphere the same date that it entered into Order #2 is further evidence that the parties—including Core—planned this arrangement.  A mere eight days later, on October 13, 2021, Sphere announced in a press release publicly filed with the SEC that it had entered into the Delegation Agreement.  Contemporaneous text communications reflect that Core reviewed and specifically signed off on the press release. Core in its Claim Objection never claims it ever informed Sphere that it had not met Core's

requirements, including in connection with reviewing the press release.  Furthermore, in the Chase Letter, Gryphon affirmed that Sphere "exclusively maintains any and all right and claim to" the Deposit, demonstrating that Gryphon plainly believed it did what was required to assign its rights under Order #2 to Sphere.  Even if Gryphon's assignment to Sphere had not reached the payment of the Deposit (which it did), the Chase Letter would have cured the issue and assigned any of Gryphon's rights in the Deposit to Sphere.

61.     In sum, Sphere plainly has enforceable contractual rights against Core.

## II.     CORE'S COUNTERARGUMENTS AGAINST SPHERE'S BREACH CLAIMS FAIL

62.     As set forth in the Proofs of Claim, Core breached Order #2 in several ways.  *See also* Section IV, *supra*.  Core's arguments to the contrary are without merit.

### A.     Core's Argument That It Could Disregard The Deployment Schedule Is Without Merit

63.     Core could not abide by the deployment schedule set forth in Order #2—which called for Core to host 500 miners by February 2022—due to lack of space, as confirmed by Core's (1) refusal to accommodate hundreds of Sphere's miners in December 2021; (2) refusal to accommodate hundreds of Sphere's miners in February 2022; (3) refusal to accommodate hundreds of Sphere's miners in April 2022; (4) refusal to accommodate any of Sphere's miners after May 2022; (5) refusal to accommodate the miners of other parties, including Gryphon and Celsius; (6) baffling suggestion that Sphere should seek hosting with competitors; and (7) own dramatic increase in its proprietary mining fleet between December 2021 and April 2022.[14]

64.     Against this backdrop, Core argues that "[n]o provision in" the MSA or Order #2 "requires Core to deploy machines on or before a certain date."  Claim Objection ¶ 46.  Core's

---

[14] Core states it only rejected miners in April 2022, which Sphere disputes.  *See* Claim Objection ¶¶ 46-47.

construction is unreasonable, as it effectively reads the very detailed Deployment Schedule out of

the MSA and renders it meaningless, in derogation of well-settled Delaware law that "[c]ontractual

interpretation operates under the assumption that the parties would never include superfluous

verbiage in their agreement, and that every word should be given meaning and effect by the court."

*NAMA Holdings, LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007), *aff'd*,

945 A.2d 594 (Del. 2008).  Indeed, the phrase "Deployment Month" in the Deployment Schedule

can only be understood to mean that Core would actually deploy the miners delivered to it in the

given month.

65.     Core also points to Section 5.b of the MSA, which provides that Core's "facility

and services are provided or performed on an 'as is', 'as available' basis, and Client's use of the

company facility and services is solely at its own risk."  MSA, § 5b.  But Section 5.b does not

speak to when a miner must be deployed—Order #2 does.   In any event, the MSA expressly

provides that Order #2 controls "[i]n the event of any conflict or inconsistency" with the MSA.

*See* MSA § 1.  Order #2 requires deployment in the given deployment month and accordingly

controls.[15]

66.     Core also implies that it was free to disregard the Deployment Schedule because

Sphere did not deliver the miners called for in the Deployment Schedule.  *See* Claim Objection

¶¶ 43-43, 49.  But it is axiomatic that "the party first guilty of a material breach of contract cannot

complain if the other party subsequently refuses to perform."  *In re Est. of Bickling*, No. CIV.A.

20002, 2004 WL 1813291, at *13 (Del. Ch. Aug. 6, 2004).  Likewise, a party cannot frustrate

performance, as Core did by refusing delivery of miners.  *See Murphy Marine Servs. of Del., Inc.*

---

[15] Even taken on its terms, Section 5.b requires deployment when space is available and would not permit Core to
reserve space for its own miners.

*v. GT USA Wilmington, LLC*, No. 2018-0664-LWW, 2022 WL 4296495, at *12 (Del. Ch. Sept. 19, 2022) ("Refusing to permit one party to perform or ordering it to stop performance may constitute prevention excusing performance.") (cleaned up). Because Core failed to honor its obligations, Sphere was relieved of any obligation to perform under Order #2, such as by delivering additional miners.

### B. Core Repudiated The Hosting Services Rate Of $██████

67.      Core does not appear to seriously dispute that it refused to honor the hosting services rate of $██████ and demanded that Sphere accede to a higher, extracontractual rate. It claims that is continuing to host Miners at that rate but in the same breath states that it would not host additional miners unless Sphere agreed to pay a higher rate.  Claim Objection ¶ 10.  Core's "wrongfully demanded price increases" constitute a material breach and repudiation of Order #2. *See, e.g.*, *In re Meridian*, 372 B.R. 710, 716-17 (Bankr. D. Del. 2007). That repudiation entitles Sphere "to recover its prepayment."  *See, e.g.*, *In re Asia Glob. Crossing, Ltd.*, 404 B.R. 335, 343 (S.D.N.Y. 2009); *see also* 3 Dan B. Dobbs, The Law of Remedies § 12.7(1) (3d ed. 2018) ("The general principle is that upon the defendant's substantial breach or repudiation of an enforceable contract, the plaintiff is entitled to recover restitution of any benefits he has conferred in performance of the contract, for example, any part of the price which he has prepaid").

68.      Against this, Core argues only that Sphere breached first.  As noted, the argument inverts the chronology and is a non-starter.

### III. EVEN IF THE ASSIGNMENT WERE INEFFECTIVE, CORE WOULD STILL BE LIABLE TO SPHERE

### A. Core Is Liable To Sphere For Conversion Other Tort And Equitable Theories Regardless Of Whether There Was A Contract Between The Parties

69.     Sphere may recover irrespective of a contractual relationship.  As Sphere alleges, Core is liable to it for converting its Deposit, Miners, and Coins.  Sphere also alleges that Core is liable to it under estoppel theories, including based on its promise to return the Deposit upon receipt of instructions from both Gryphon and Sphere to do so and based on its representation that Core had compensated Sphere, by routing extra hash to Sphere, to compensate Sphere for the time Core was using Sphere's miners to mine digital assets for its own account.  None of these claims require privity of contract or, otherwise, rely on the assignment of Gryphon's rights to Sphere having been effective.

70.     Moreover, while the theories above are not predicated on the parties being in contractual privity, Sphere could, in fact, establish and pursue its claim through quasi-contract.  For example, Mike Levitt's representations in April of 2022, which caused Sphere to wire additional monies to Core, could serve as the basis for estoppel.

**B.     Gryphon Was Acting As Sphere's Agent, Meaning Sphere Can Recover Irrespective Of Any Assignment**

71.     In addition, even if the assignment were ineffective, Sphere may sue under Order #2 under basic agency principles.  Under the Gryphon-Sphere Agreement, which is governed by New York law, Gryphon as "the exclusive provider of management services" to Sphere acts as an agent of Sphere and negotiates agreements on its behalf.  *See Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 452 (S.D.N.Y. 2015) (under New York law, an agency relationship is created "where a writing erects the essential structure of an agency relationship").

72.     It is well-settled that, in the ordinary course, a principal is party to a contract made by its agent on its behalf.  *See* Restatement (Third) Of Agency § 6.01 ("When an agent acting with actual or apparent authority makes a contract on behalf of a disclosed principal, . . . the principal and the third party are parties to the contract."); *id*. § 6.02 (2006) ("When an agent acting with

actual or apparent authority makes a contract on behalf of an unidentified principal . . . the principal and the third party are parties to the contract."); *see also Wenske v. Blue Bell Creameries, Inc.*, No. CV 2017-0699-JRS, 2018 WL 5994971, at *4 (Del. Ch. Nov. 13, 2018) ("When an agent acting with actual authority makes a contract on behalf of an undisclosed principal, (1) unless [specifically] excluded by the contract, the principal is a party to the contract; (2) the agent and the third party are parties to the contract; and (3) the principal, if a party to the contract, and the third party have the same rights, liabilities, and defenses against each other as if the principal made the contract personally[.]" (quoting Restatement (Third) Of Agency § 6.03 (2006)).

73.     Here, employing a belt-and-suspenders approach, Gryphon assigned rights in Order #2 to Sphere pursuant to the Delegation Agreement.  The effectiveness of the assignment, however, is ultimately irrelevant: under basic agency principles, Sphere still has rights by virtue of its status as a principal in Order #2, which was entered into on its behalf.  Sphere can thus sue Gryphon directly for a breach of Order #2.

## IV.     IN ALL EVENTS, CORE CANNOT RETAIN SPHERE'S PROPERTY BECAUSE IT HAS SUFFERED NO DAMAGES

74.     As set forth above, Sphere did not breach Order #2.  Even if it had, however, Core would not be able to retain Sphere's property.  Although Core's argument is somewhat unclear, it appears to be arguing that Sphere's breach entitles it to retain the Deposit as damages for Sphere's alleged breach of Order #2 as a windfall for services it undisputedly never delivered (it wrongly denies that it mined digital assets for its own account and that it is hosting Sphere's miners).

75.     But the general rule is that a party who prevails on a breach of contract claim may only recover the damages it actually suffered.  *See Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 146 (Del. 2009) ("Contract damages 'are designed to place the injured party in an action for breach of contract in the same place as he would have been if the contract had been performed.").  It is

24

axiomatic that "[s]uch damages should not act as a windfall." *Id*.  Core has not even attempted to contend that it suffered any damages from any purported nonperformance by Sphere.  Core had no space to host even hundreds of Sphere's miners much less the 70,000 miners called for by the Deployment Schedule.  Given the fact that Core was overbooked, it is highly unlikely that Core could prove any damages, let alone $35 million worth.

76.     Nevertheless, even though Core delivered to Sphere only a few hundred thousand dollars' worth of service, it contends that it should be entitled to retain the Deposit as a windfall.  Core contends it may do so under Section 5.d, which provides that if:

> Client fails to pay all invoiced amounts when due (an "Unpaid Balance"), or otherwise fails to perform any of its obligations under this Agreement after opportunity to cure as provided in Section 4 b above Company may, in its sole discretion, take certain actions including, without limitation, the following actions, at Client's sole risk and expense . . . declare all amounts due under the applicable Order through the balance of the Term to be immediately due and payable[.][16]

77.     Initially, Core neither provides evidence nor even contends that it actually declared all amounts due under Order #2 under Section 5.d.  Core's continued practice of drawing down on the Deposit notwithstanding its purported termination of the MSA and Order #2 is a tacit acknowledgment that Core realizes that the Deposit is Sphere's property and that it did not invoke Section 5.d—or if it did invoke Section 5.d, that it recognizes the provision is unenforceable.

78.     On the latter point, Section 5.d is unenforceable as a "penalt[y] . . . disguised as [a] liquidated damages provision[]."  *See Unbound Partners Ltd. P'ship v. Invoy Holdings Inc.*, 251 A.3d 1016, 1033 (Del. Super. Ct. 2021) ("A liquidated damages provision may be best described as any 'contract provision that requires payment in the event of a termination.'" (citation omitted)).

---

[16] Order #2, §5.d.

DMS 302863949

"[A] penalty is a 'punishment for default, rather than a measure of compensation for … breach,' that inserts with blunt instruments 'a stipulated sum ... irrespective of the damage sustained.'" *Id*.

79.     Liquidated damages provisions are subject to "close scrutiny." *Id*.   Determining the enforceability of such clauses is a "a mixed question of law and fact" and subject to a "two-prong analysis":

> First, the Court must determine whether damages were certain, *i.e.*, capable of accurate calculation, at the time of contracting. If damages were calculable with a fair amount of precision, then a clause that concocts an aggravated total is a penalty. And second, if damages were uncertain or at least could not be forecasted reliably, then the Court must determine whether the amount selected is reasonable. To be unreasonable, the amount at issue must be unconscionable or not rationally related to any measure of damages a party might conceivably sustain.

*Id*. at 1032–33 (cleaned up).

80.     The liquidated damages provision flunks both prongs.  On the first prong, Core's damages were determinable at the time of contracting because it had no room to host Sphere's miners and thus would not have suffered any damages through a breach.  But even if Core had been ready and able to perform, damages would still be ascertainable, as they would equal the revenues generated through the term of Order #2 minus the cost performance.

81.     On the second prong, the damages are not reasonable in that they treat every penny due under the MSA and Order #2—hundreds of millions of dollars—as pure profit without taking into account whether Core could actually meet the Deployment Schedule or the costs of performing to Core, which would decrease profit and could not be treated as compensable damages.  Core never tries to justify its contention that it should be entitled to every penny it could have been paid under Order #2 other than a vague reference to the "undertaking and investment Core must make to prepare its facilities," an expense it never attempts to quantify and that could

26

not possibly equal all amounts due under Order #2 through the end of the term.  *See* Claim Objection ¶ 19.

## V.     THE MSA DOES NOT BAR RECOVERY OF ANY OF THE DAMAGES SPHERE SEEKS

82.     "Contract clauses which exonerate a party from the consequences of its own actions are disfavored" under Delaware law.  *Hampton v. Warren-Wolfe Assocs.*, 2004 WL 838847, at *3 (Del. Super. Ct. Mar. 25, 2004); *accord Gabriels Tech. Sols., Inc. v. PNJP, LLC*, No. 17 CIV. 6410 (AT), 2018 WL 11309883, at *4 (S.D.N.Y. Sept. 7, 2018) (applying close scrutiny to limitation of liability clause that limited liability without completely exculpating it).  Core is wrong that Section 5.d limits its total liability to $84,658.94 and that Section 5.c excludes a variety of damages, including consequential, expectation, reliance, and punitive damages.  On the contrary, these provisions do not limit Core's liability at all as a matter of public policy for the type of misconduct at issue here, namely, intentional acts and acts taken in bad faith.  *See* Section III.B, *infra*.  Setting aside public policy, Core is also wrong as a matter of contract interpretation that Section 5.d limits its total liability to approximately $84,685.94.   *See* Section III.C, *supra*.

### A.     Courts Generally Refuse To Resolve The Applicability Of Limitation Of Liability Clauses Pre-Trial, A General Standard From Which This Court Should Not Deviate

83.     At the outset, as a matter of Delaware law, "[g]enerally, the enforceability of liability limitation provisions should not be decided on the pleadings or on summary judgment." *Data Centers, LLC v. 1743 Holdings LLC*, C.A. No. N15C-02-041, 2015 WL 9464503, at *5 (Del. Super. Ct. Oct. 27, 2015); *see also Kainos Evolve, Inc. v. InTouch Techs., Inc.*, No. CV 2018-0712-ABG, 2019 WL 7373796, at *2 (Del. Ch. Dec. 31, 2019) ("[I]n recognition of the fact that it is preferable for the court to have a factual record before ruling out available remedies, particularly when issues of public policy may be implicated, Delaware courts have held that 'the enforceability of liability limitations should not be decided on the pleadings or on summary judgment.'" (citation

DMS 302863949

omitted)); *Hampton*, 2004 WL 838847, at *3 (denying motion for summary judgment on limitation of liability where "[t]he case [was] still in the discovery stages").   "Relying on this principle, multiple federal courts applying Delaware law have declined to enforce limitation of liability provisions on motions to dismiss and motions for summary judgment."  *Gabriels Tech. Sols., Inc.*, 2018 WL 11309883, at *4 (collecting cases).

84.    In *Data Centers*, the court noted that it had been "unable to locate any case where a Delaware court enforced a purported limitation on damages upon a motion to dismiss."  2015 WL 9464503, at *5.   This Court should follow the well-trodden rule applied by Delaware courts and federal courts applying Delaware law and only resolve the applicability of the limitation of liability provisions post-trial.

### B.    As A Matter Of Public Policy, Core's Liability Cannot Be Limited For Acts Of Intentional Misconduct Or Bad Faith

85.    Like other jurisdictions, Delaware courts generally permit parties to limit or eliminate liability for acts committed before a contract is entered into, but will not as a matter of public policy permit parties to prospectively limit their liability for intentional acts or acts of bad faith committed after contract execution.  *See New Enter. Assocs. 14, L.P. v. Rich*, No. 2022-0406-JTL, 2023 WL 3195927, at *8 (Del. Ch. May 2, 2023) (observing that "[e]xtant decisions hold that a provision in a commercial contract cannot eliminate tort liability for intentional or reckless conduct" and distinguishing Delaware decisions that have permitted a party entering into a contract to disclaim liability for pre-contract extracontractual fraud through non-reliance provisions); *Data Mgmt. Internationale, Inc. v. Saraga*, No. CIV.A. 05C-05-108, 2007 WL 2142848, at *5 & n.41 (Del. Super. Ct. July 25, 2007) (collecting authority and observing that if the contract "expressed an unambiguous intent to relieve [defendant] of liability for his own intentional torts, it is exceedingly doubtful that such a provision would be enforceable as a matter of public policy");

*James v. Getty Oil Co. (E. Operations)*, 472 A.2d 33, 38 (Del. Super. Ct. 1983) ("to the extent that paragraph 6 seeks to indemnify [the defendant] against its willful acts, as opposed to its negligence, the agreement is void and unenforceable"); 8 Williston on Contracts § 19:24 (4th ed.) ("An attempted exemption from liability for a future intentional tort . . . or for a future willful or grossly negligent act is generally held void." (footnotes omitted)).

86.     Sphere asserts that Core is liable to it based on its intentional acts, including for the tort of conversion, namely, for Core wrongfully seizing the Deposit and other digital assets generated for the benefit of Sphere.  No limitation of liability can apply to such claims.  *See Saraga*, 2007 WL 2142848, at \*5 & n.41 (citing *I.C.C. Metals, Inc. v. Municipal Warehouse Co.,* 409 N.E.2d 849, 853 (N.Y. 1980) ("Although public policy will in many situations countenance voluntary prior limitations upon that liability which the law would otherwise impose upon one who acts carelessly . . . such prior limitations may not properly be applied so as to diminish one's liability for injuries resulting from an affirmative and intentional act of misconduct . . such as a conversion.  Any other rule would encourage wrongdoing by allowing the converter to retain the difference between the value of the converted property and the limited amount of liability. . . . That result would be absurd.").); *accord Solis v. Evins*, 951 S.W.2d 44, 50 (Tex. App. 1997) ("We find no authority for the proposition that a party may prospectively contractually exculpate itself with respect to intentional torts. That would be contrary to public policy.").

87.     Sphere also asserts that Core acted in bad faith in performing under the MSA.  In Delaware, where "bad faith" is present, a limitation of liability is ineffective as a matter of public policy with respect to liability sounding in contract.  *Petroleum v. Magellan Terminals Holdings, L.P.*, No. CV N12C-02-302 FWW, 2015 WL 3885947, at \*24 (Del. Super. Ct. June 23, 2015) (denying summary judgment on "contractual" and "implied covenant" claims with respect to

DMS 302863949

applicability of limitation of liability clause purporting to exclude "lost profits, lost business opportunities, or other indirect, special, incidental, punitive, or consequential damages"); *see also, e.g.*, *J. A. Jones Const. Co. v. City of Dover*, 372 A.2d 540, 545 (Del. Super. Ct. 1977) ("Even if a contract purports to give a general exoneration from 'damages,' it will not protect a party from a claim involving its own . . . bad faith."); *accord Fort Howard Cup Corp. v. Quality Kitchen Corp.*, No. C.A. 89C-DE-34, 1992 WL 207276, at *5 (Del. Super. Ct. Aug. 17, 1992); *Aventis Env't Sci. USA LP v. Scotts Co.*, 383 F. Supp. 2d 488, 508 (S.D.N.Y. 2005). As in Delaware, courts in other jurisdictions generally hold that a party cannot limit its liability for a bad faith breach of contract.[17] *See, e.g.*, *Vermont Telephone Co., Inc. v. FirstLight Fiber, Inc.*, No. 216-2020-CV-00312, 2022 WL 19236267, at *6 (N.H. Super. Jan. 14, 2022) ("New Hampshire would adopt the rule the rule that a limitation clause may not be enforceable in instances where the party seeking to enforce it has acted in bad faith" and collecting cases for the proposition that numerous courts across the U.S. have applied this rule to breach claims "for bad faith" in "contract performance"); *Airfreight Exp. Ltd v. Evergreen Air Ctr., Inc.*, 215 Ariz. 103, 110–11 (Az. Ct. App. 2007) (collecting cases).

88.     Accordingly, Core may not as a matter of public policy invoke the MSA to limit its liability for any intentional or bad faith acts.

---

[17] Sphere acknowledges that at least one Delaware court has held, in a post-trial opinion, that public policy will invalidate provisions that purport to limit tort liability, but not contract liability. *See eCommerce Indus., Inc. v. MWA Intel., Inc.*, 2013 WL 5621678, at *45 (Del. Ch. Sept. 30, 2013). As described above, *eCommerce* is out of sync with the vast majority of decisional law nationally. Core's other cases (at 25–26) do not appear to have been confronted with the issue of public policy.

In any event, rather than resolve an issue of potentially disputed law regarding the scope of Delaware public policy, the prudent course for this Court is to rule on the issue, if needed, post-trial with the benefit of a full evidentiary record—*i.e.*, when courts generally assess the applicability of limitation of liability clauses in any event. *See __, supra*.

### C.   As A Matter Of Contract Construction, Core's Potential Liability Is Not Limited To $84,658.94

89.   Setting aside public policy, as a matter of contract construction, Core seriously misreads Section 5.d to argue that its total liability is unambiguously limited to $84,658.94.[18] Section 5.d provides that Core's "total liability . . . will not exceed an amount equal to one (1) months' fee payable to [Core] pursuant to [Order #2.]"  At the outset, Section 5.d—a provision designed to cap damages—cannot be understood to apply to a situation where, as here, a party is seeking the return of its own property, namely, the Deposit, the miners, and the digital assets Core wrongfully generated for its own account.

90.   But, regardless, Core's construction of Section 5.d is unreasonable, namely, that it must be interpreted, unambiguously, to mean that Core's damages are capped at the amount *actually charged* in the "last invoice" submitted *prior to Core's filing a motion for summary judgment*—here, $84,658.94 for Hosting Services (among other things) in the May 2023 Invoice. *See* Cann. Decl., Ex. C.  It would be easy to imagine a limitation of liability provision that limited liability to the amount actually reflected on a specific invoice—even on the last invoice submitted before filing for summary judgment.

91.   But that is not what Section 5.d provides; it does not cap liability based on amounts actually charged, let alone amounts reflected on an arbitrarily selected invoice.

92.   Rather, Section 5.d by its plain terms instructs that Core's "total liability . . . will not exceed an amount equal to one (1) months' fee payable to [Core] pursuant to [Order #2.]"  The question is not what was actually charged or paid to Core under Order #2, but what is the greatest

---

[18] Core argues, without elaboration, that its liability is limited to approximately $84,000.  Claim Objection, at ¶ 57.

31

amount of fees called for in a single month by (*i.e.*, payable under) Order #2 under its terms as written.

93.     Neither Order #2 nor the MSA define the term "fees," but the term at the very least encompasses "Fees for Services."  Order #2 provides that "Client shall pay the fees provided for in [Order #2]" and further states that "Fees for Services will be determined initially by reference to the Assumed power consumption per Unit of each deployed Unit, multiplied by the Hosting-Services Rate)," subject to certain fee adjustments.  Based on Order #2, as written, that amount is in excess of $██████[19] and constitutes fees for purposes of Section 5.d.

94.     Moreover, "payment due prior to installation"—*i.e.*, the payments that went toward the Deposit—is listed as among the payments called for in Order #2 and may properly be considered to be fees for purposes of Section 5.d.  In October 2021, Sphere sent Core just over $██ ████ towards the Deposit, as called for by Order #2.  Core's own documents confirm that Core cannot disclaim that "payments due prior to installation" may constitute fees:  just as the May 2023 Invoice charged $84,658.94 for (among other things) Hosting Services—which Core contends must be considered fees for purposes of Section 5.d—Core's April Invoice 2022 too charged $██████ for *Hosting Services*:

---

[19] In December 2022, for example, the amount is $██████, a sum that equals the maximum number of miners to be hosted under Order #2 (70,000), multiplied by the "Assumed power consumption per Unit" (3.255), multiplied by the "Hosting Service Rate ($0 ████"), multiplied by the number of days in December (31), multiplied by the number of hours in a day (24).

| Terms | Due Date | PO # | Sales Rep |
|---|---|---|---|
|  | 5/22/2023 | Order 1-2 |  |

| Quantity | Item | Tax Location | Tax Rate | Amount |
|---|---|---|---|---|
| 1 | Hosting Services* <br> April 2023 Actual Usage |  | 0% | $84,083.25 |
| 1 | Hosting Services* <br> Reverse April 2023 Estimated Prepayment <br> INV42894 |  | 0% | ($82,174.34) |
| 1 | Hosting Services* <br> Estimated June 2023 Usage Prepayment |  | 0% | $82,174.34 |
| 1 | Replacement Parts <br> 04/03/2023 to 05/03/2023 - Dalton, GA - Parts | Dalton, GA | 7% | $456.25 |
| 1 | Replacement Service <br> 04/03/2023 to 05/03/2023 - Dalton, GA - Labor | Dalton, GA | 0% | $87.50 |

|  |  |  | Subtotal | $84,627.00 |
|---|---|---|---|---|
|  |  |  | Tax Total (%) | $31.94 |
|  |  |  | Total | $84,658.94 |
|  |  |  | Amount Due | $84,658.94 |

*See* Cann Decl., Ex. C (excerpt from the May 2023 Invoice).



| Terms | Due Date | PO # | Sales Rep |
|---|---|---|---|
|  | 4/15/2022 | Order 2 - 10000 Units S19 |  |

*See* Exhibit 6 (excerpt from the April 2022 Invoice).

95.    And even if Core were right, and the amount actually charged in an invoice represented the cap on damages, there would still be no principled basis to select the May 2023

Invoice as the controlling invoice. To the extent prepayments constitute fees, the more natural reading of Section 5.d dictates that the month in which Core received the greatest payment should control—namely, October 2021, when Core received approximately $███████ from Sphere.

96.     Sphere's construction is far more sensible and Core's construction is unreasonable. It cannot be that Core can arbitrarily select an invoice (here, the last invoice before filing for summary judgment) and declare that it provides the cap on its liabilities.

97.     In addition, Core's construction leads to the sort of "absurd" results that Delaware law will not countenance. *See Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010) ("An unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract."). While Order #2 called for a large deposit of $███████ by October 12, 2021, it only provided for 100 miners to be operational in October 2021, which would be expected to generate hosting service fees of under $█████ in October 2021.[20]   Under Core's interpretation, Core could have taken the deposit of $███████ and *immediately* defaulted on its obligations, with its liability capped at under $█████. That makes no sense.

98.     It is accordingly clear, as a matter of contract construction, that Sphere's liability cannot be capped at $84,658.94.

## CONCLUSION

For the reasons set forth above, Sphere respectfully requests that the Court (i) overrule the Claim Objection, (ii) allow the Proofs of Claim, and (iii) grant Sphere such other and further relief as is appropriate under the circumstances.

---

[20] Specifically, $█████ if the miners were hosted the entire month of October 2021, a figure arrived at by multiplying the miners to be hosted in October 2021 (100), by the "Assumed power consumption per Unit" (3.255), by the "Hosting Service Rate ($█████)," by the number of days in October (31), by the number of hours in a day (24).

34

Dated: July 10, 2023

Respectfully submitted,

*/s/ Timothy A. ("Tad") Davidson II*
 Timothy A. ("Tad") Davidson II
 TX Bar No. 24012503
 Ashley L. Harper
 TX Bar No. 24065272
 **HUNTON ANDREWS KURTH LLP**
 600 Travis Street, Suite 4200
 Houston, Texas 77002
 Telephone:  (713) 220-4200
 Facsimile:  (713) 220-4285
 E-mail:    taddavidson@HuntonAK.com
          ashleyharper@HuntonAK.com

 - and -

 Seth H. Lieberman (admitted *pro hac vice*)
 Matthew W. Silverman (admitted *pro hac vice*)
 **PRYOR CASHMAN LLP**
 7 Times Square
 New York, New York 10036
 Telephone:  (212) 421-4100
 Facsimile:  (212) 326-0806
 E-mail:    slieberman@pryorcashman.com
          msilverman@pryorcashman.com

 - and -

*Co-Counsel for Sphere 3D Corp.*

Tibor L. Nagy, Jr.
TX Bar No. 24041562
Gregory N. Wolfe (admitted *pro hac vice*)
**DONTZIN NAGY & FLEISSIG LLP**
980 Madison Avenue
New York, New York 10075
Telephone: (212) 717-2900
Email:      tibor@dnfllp.com
           greg@dnfllp.com

## CERTIFICATE OF SERVICE

I certify that on July 10, 2023, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on those parties registered to receive electronic notices.

*/s/ Timothy A. ("Tad") Davidson II*
Timothy A. ("Tad") Davidson II

DMS 302863949