1          IN THE UNITED STATES BANKRUPTCY COURT

2         FOR THE SOUTHERN DISTRICT OF TEXAS

3                HOUSTON DIVISION

4   IN RE:                    §      CASE NO. 22-90341-11
                              §      JOINTLY ADMINISTERED
5   CORE SCIENTIFIC, INC.,    §      HOUSTON, TEXAS
    ET AL,                    §      THURSDAY,
6                             §      JUNE 29, 2023
            DEBTORS.          §      1:30 P.M. TO 2:02 P.M.
7
            **STATUS CONFERENCE (VIA ZOOM)**
8
       BEFORE THE HONORABLE DAVID R. JONES
9           UNITED STATES BANKRUPTCY JUDGE

10

11

12    APPEARANCES:                  SEE NEXT PAGE

13

14            **(Recorded via CourtSpeak)**

15

16

17

18

19

20           TRANSCRIPTION SERVICE BY:

21       JUDICIAL TRANSCRIBERS OF TEXAS, LLC
            935 Eldridge Road, #144
22            Sugar Land, TX 77478
                281-277-5325
23          www.judicialtranscribers.com

24
     Proceedings recorded by electronic sound recording;
25      transcript produced by transcription service.

```
 1                    APPEARANCES (VIA ZOOM):

 2

 3  FOR THE DEBTORS:              WEIL GOTSHAL & MANGES, LLP
                                 Ray Schrock, Esq.
 4                               Roni Berkovich, Esq.
                                 767 Fifth Avenue
 5                               New York, NY  10153-0119
                                 212-310-8000
 6
    FOR THE OFFICIAL COMMITTEE
 7  OF UNSECURED CREDITORS:      WILLKIE FARR & GALLAGHER, LLP
                                 Brett Miller, Esq.
 8                               787 Seventh Avenue
                                 New York, NY  10019-6099
 9                               212-728-8000

10  FOR THE AD HOC COMMITTEE
    OF CONVERTIBLE NOTEHOLDERS:  PAUL HASTINGS
11                               Kris Hansen, Esq.
                                 200 Park Avenue
12                               New York, NY  10166
                                 212-318-6000
13

14  FOR BARINGS:                 ARNOLD PORTER
                                 Brian J. Lohan, Esq.
15                               70 West Madison Street
                                 Suite 4200
16                               Chicago, IL  60602-4231

17  FOR THE EQUITY COMMITTEE:    VINSON & ELKINS
                                 David S. Meyer, Esq.
18                               1114 Avenue of the Americas
                                 32nd Floor
19                               New York, NY  10036
                                 212-237-0000
20

21

22  (Please also see Electronic Appearances.)

23

24

25
```

**HOUSTON, TEXAS; THURSDAY, JUNE 29, 2023; 1:30 P.M.**

1

2          THE COURT:  This is Judge Jones.  The time is 1:30

3   Central.  Today is June the 29th, 2023.  This is the Docket

4   for Houston, Texas.

5          On the 1:30 Docket, we have the jointly

6   administered cases under Case No. 22-90341, Core Scientific,

7   Inc.

8          Folks, please don't forget to record your

9   electronic appearance.  That's a quick trip to the website,

10  a couple of mouse clicks, you can do that at any time prior

11  to the conclusion of this afternoon's hearing.

12         First time that you speak, if you would, please

13  state your name and who you represent.  That really does

14  help the court reporters in the event that a transcript

15  request is made.

16         For those parties who are in the courtroom, if you

17  choose to speak, if you would, please come to the lectern so

18  that everyone can both see you and hear you.

19         For those folks who are on GoToMeeting, I have

20  activated the hand-raising feature.  If you haven't already

21  done so, know you're going to be speaking, if you could give

22  me a five star, I'll get you unmuted.  If you change your

23  mind during the hearing, you can, again, hit five star at

24  any time.

25         Finally, we are recording this afternoon using

1   CourtSpeak.  We'll get the audio up on the Docket shortly

2   after the conclusion of the hearing this afternoon.

3         I've got a couple of people that have raised their

4   hands.

5         All right.  Mr. Schrock, are you starting us off

6   this afternoon?

7         MR. SCHROCK:  I am, Your Honor.  Ray Schrock, Weil

8   Gotshal, counsel for the Debtors.  I'll be kicking it off

9   and good afternoon.

10         First of all, Your Honor, thanks for allowing us

11   to appear electronically.  It was a very strange thing.

12   I've never had this happen, but we actually couldn't get

13   flights Wednesday or Thursday.  It was a bizarre thing that

14   was occurring with all the cancellations, so we appreciate

15   the accommodation.

16         THE COURT:  Certainly.

17         MR. SCHROCK:  We did coordinate with the other

18   parties on the zoom appearance, as well.

19         So Your Honor, I'm going to start off.  We did

20   file a demonstrative --

21         THE COURT:  So with the --

22         MR. SCHROCK:  -- that we'd like to --

23         THE COURT:  -- if it helps you, I've looked at the

24   PowerPoint.  I've also read the Plan and Disclosure

25   Statement.

1           MR. SCHROCK:  Okay, perfect.

2           Would you like me to put it up, Your Honor, for

3    others?  Or I'm happy not to.

4           THE COURT:  Are you going to do it yourself?

5           MR. SCHROCK:  No.  No, Your Honor.  I was going to

6    ask my colleague, Austin Crabtree, to put it up.

7           THE COURT:  Of course.  I was going to say, yes, I

8    want to -- I want to see -- I want everyone to see the

9    PowerPoint.  I was just going to be amazed if you were going

10   to ask for control.

11          MR. SCHROCK:  No.  No, no, Your Honor.  I wouldn't

12   do that.

13          THE COURT:  And Mr. Crabtree, you should have

14   control at this point.

15          MR. SCHROCK:  Great.  Austin, if you could put up

16   the presentation?

17       (Pause in the proceedings.)

18          THE COURT:  Okay.  He's got control.  I just

19   checked again.

20          MR. SCHROCK:  Okay.  We have a backup plan just in

21   case if Cliff has to do it.  Okay, there we go.

22          THE COURT:  There we go.

23          MR. SCHROCK:  Perfect.  Okay.  If you could flip

24   to the next page, please, Austin?

25          Okay.  So here's what we're going to cover today:

1   Plan negotiations, a summary of the plan treatment, a

2   liquidity update, as well as next steps, Your Honor.

3            So Austin, please flip one more.

4            So overall, I'd say we've had a busy last several

5   weeks since we were last in front of Your Honor.  We, you

6   know, did present the business plan, have gotten, you know,

7   feedback from all the major constituent groups.

8            As you know, we had the exclusivity hearing and

9   following that we did submit the consensual plan framework

10  to the key stakeholder groups.  We first met with the

11  advisors and then later we were able to meet with all of the

12  principles, as well, and you know, we do have those parties

13  restricted at this point.

14           You know, there was a lot of back-and-forth, you

15  know, among the advisors, but on June 16th -- you know, we

16  did receive some feedback prior to that point, but June 16th

17  we submitted a draft of the Plan to the key stakeholder

18  groups' advisors.  We filed the Plan and Disclosure

19  Statement on the 20th, consistent with the goal that Your

20  Honor had set and that we appreciate, frankly, for just

21  keeping the cases moving.

22           That Plan and Disclosure Statement does reflect,

23  as you noticed, there's two options, you know, with regard

24  to the convertible noteholders.  There's a cram up plan and

25  there's a consensual plan.  Why did we file that?  I guess

1  is one, you know, consistent -- or one question that people

2  may have.

3         We're going to try really, really hard to get to a

4  consensual plan, Your Honor, and I want to emphasize that.

5  We did reserve time with Judge Isgur for later in July in

6  the event that we can't get there, but unless somebody else

7  is aware of, you know, how to handle when you believe

8  there's equity value at a company and you've got secured

9  creditors that aren't onboard, it's really your option.

10         And we are in a unique situation where we're

11  coming out of a period of, you know, great turmoil for

12  bitcoin and for this particular asset and we're going to

13  have to see, you know, how open the capital markets are, you

14  know, for this company.

15         TKT is already out there, you know, doing -- you

16  know, putting together capital raise efforts that's, you

17  know, in process.  But overall, our fundamental belief is

18  that there's equity value, you know, and that with the rise

19  in the bitcoin price with, you know, where the company has

20  come, compared to where it started, and we'll take you

21  through some of that.

22         We think there's very little doubt, listen, there

23  is equity value here.  We're going to have to find a way,

24  frankly, to get all of the constituents to accept, you know,

25  some compromises around how are we going to -- you know, we

1  want -- we would very much like the company deleveraged so

2  it doesn't end up in this situation again, if it doesn't --

3  you know, if it doesn't have -- the bitcoin price goes down

4  or some other adverse event.

5          But fundamentally we have to get the parties to

6  focus on it and get in a room.

7          So we've gotten responses back so far from the

8  Equity Committee.  We've got a response back from the UCC.

9  I'm relatively optimistic that at the end of the day we're

10  going to have consensus with those two groups.  The

11  equipment lenders, there's a good dialog and a back-and-

12  forth.  I think that, you know, relatively optimistic we

13  could find a solution there, as well.

14          The convertible noteholders are, you know,

15  probably going to be the most challenging party for us to

16  reach consensus with, but I do think, you know, we're being

17  very creative in terms of what we're thinking about.  I know

18  that, you know, I have great respect for my friend,

19  Mr. Hansen and I know that he's reasonable at the end of the

20  day.  And if there's any way to try and bridge the gap,

21  either through, you know, true-up mechanisms, the company

22  just doesn't want, obviously, to leave all the value and

23  have people recover more than 100 cents.

24          I think, you know, Mr. Hansen's perspective, I'm

25  sure he'll give you, but you know, they have a different

1    view of value and they don't want to, you know, be left with

2    something less than 100 cents if we believe there is equity.

3          So that's where the rub is.  I would prefer not to

4    have the novel valuation, you know, bitcoin mining company

5    trial, if we can avoid it, but if we have to, we're prepared

6    to go down that road.  We are working really hard to get,

7    you know, consensus where we can and I think that at the end

8    of the day, I don't want to just run the mediation and just

9    have, you know, Judge Isgur say, "Listen, here we are."  I'd

10   really like to try and narrow the differences at least

11   before we get in a room with him.  But I think getting the

12   parties frankly in person and getting people focused, you

13   know, at the end of next month, that's going to be what

14   really -- you know, if there's a way to turn the corner and

15   get people to a consensus, that's what's going to do it.

16         But we've been busy at work.  We are going to be

17   prepared to file the motion to approve the Disclosure

18   Statement by the middle of this month because we want to

19   keep the timing that we've set, which is to still trying to

20   emerge by the middle -- or you know, by the end of September

21   certainly.

22         But we're not disillusioned in that we think that

23   we know we still have work to do with these parties.  The

24   good news is the company is doing well.

25         THE COURT:  Let me ask --

1          MR. SCHROCK:  Sorry, Your Honor, did you want to

2    say something?

3          THE COURT:  No, I was just again, because I want

4    to -- I want to be helpful to the process.  Would it be

5    helpful to give you a hearing date for the Disclosure

6    Statement?

7          MR. SCHROCK:  Yes, it would, Your Honor.

8          THE COURT:  What were you thinking?

9          MR. SCHROCK:  You know, Ms. Berkovich, do you want

10   to help me out there with -- you know, I know we were

11   planning for a mid-July filing and we did have a -- hold on

12   just a second.

13         THE COURT:  No, I asked a bad question.

14         Ms. Berkovich, what was Mr. Schrock thinking?

15      (Laughter)

16         MS. BERKOVICH:  Your Honor, if we can get to an

17   early consensual plan and DS by mid-July, I think the first

18   week in August is the week that they're doing, beginning

19   July 31st would be a good week for the Disclosure Statement

20   hearing.

21         THE COURT:  Do you want the Disclosure Statement

22   hearing on July 31st?

23         MR. SCHROCK:  I think that's a little too early.

24         THE COURT:  Okay.

25         MR. SCHROCK:  I think if we could get, Your Honor,

1    like around August 3rd or certainly the week following, that

2    would be sufficient.

3           THE COURT:   And let me ask, again, Disclosure

4    Statement hearings don't typically generate that many

5    sparks.  I am happy to do it later that week.

6           I have a Laredo Docket on Thursday, the 3rd, so we

7    could do it by video on the 3rd, if that would work for

8    everybody.  I could also do it on the 7th, if that is

9    preferable.

10           MR. SCHROCK:  I will just go ahead and say, Your

11    Honor, just given where we are at the moment, to avoid

12    everybody else piping in and suggesting the 7th, I'll

13    suggest the 7th just in the event that we don't have -- in

14    the event we don't have consensus.

15           THE COURT:  All right.  Has anyone got a

16    scheduling conflict for the 7th that can't be managed?

17        (No audible response.)

18           THE COURT:  All right.  Then why don't we do this?

19    Mr. Schrock, I'll go ahead and schedule a hearing on the

20    Disclosure Statement that is filed, as it may be

21    subsequently amended, for August the 7th, 2023 at -- do you

22    want late in the day or early in the morning, or at lunch

23    time?

24           MR. SCHROCK:  Lunch time would be great, Your

25    Honor, you know, shortly after lunch.

1              THE COURT:  Then if I did it at noon my time that

2     would be 1:00 o'clock for the folks on the East Coast.

3     Would that work?

4              MR. SCHROCK:  That's fine for me, Your Honor.

5              THE COURT:  All right.  Then go ahead and notice

6     it for August the 7th at noon Central.

7              MR. SCHROCK:  Will do, Your Honor, and thank you

8     very much.

9              THE COURT:  All right.

10             MR. SCHROCK:  So I'm probably going to have some

11     comments at the end of the Status Conference, Your Honor,

12     but I want to hand the lectern, absent any more questions,

13     over to Ms. Berkovich.

14             THE COURT:  All right.  Thank you.

15             Ms. Berkovich, good afternoon.

16             MS. BERKOVICH:  Good afternoon, Your Honor.  Roni

17     Berkovich from Weil Gotshal for the Debtor.

18             Moving on to Slide 6.

19             I know Your Honor read the Plan and Disclosure

20     Statement, so we don't need to delve into details here, but

21     really the theory of our plan is to provide a plan that

22     hopefully gets the consensus with everyone, but provides a

23     consensual path for emergence if we can't reach consensus

24     (indiscernible) with the secured noteholders.

25             You know, we need a way out of Chapter 11.

1    There's two classes of noteholders, the "April Notes" and

2    "August Notes," as we call them.  They have slightly

3    different rates.  We classified them separately.  And for

4    each of those classes, if they accept the Plan, they get

5    their treatment 50 percent in equity and 50 percent in a new

6    note, you know, total paid for them.  But if either of those

7    classes reject the Plan, the Plan provides for standard cram

8    up notes for the full value of the claim.

9         The default treatment for everyone else, or

10   (indiscernible) actually, simply reflect the priorities that

11   the Bankruptcy Code tells us and provides a waterfall value.

12   DIP claims are on top, they get paid in full.  Every secured

13   creditors gets the present value of their secured claims and

14   they get to keep their collateral.

15        There are many different classes of secured

16   creditors here.  Beyond the convertible noteholders, we have

17   our binding equipment lenders, we have our non-binding

18   equipment lenders, we have credit mechanic's lien

19   noteholders, and we have mortgage claims, so all of them get

20   their Bankruptcy Code extended treatment.

21        Then unsecured creditors receive a 100 percent

22   recovery in the form of new equity and only after all

23   non-priority creditors -- or I should say, all non-

24   subordinated creditors are paid in full to the value -- the

25   residual value disclosed to equity holders and if there are

1   any subordinated creditors.

2          As Mr. Schrock said, we do expect there to be

3   value and so equity does get a recovery here.

4          In addition, as Mr. Schrock said, we tried to be

5   creative here and we understand that creditors may have

6   different interests in terms of what type of consideration

7   they receive, but some of the classes have options and will

8   receive different treatment.  There is a default treatment,

9   you know, mandated by the Bankruptcy Code, but there's also

10  option to select the different form of consideration for a

11  slightly lesser claim and the like.

12          We really tried -- are trying to save as many

13  people as possible here, (indiscernible) satisfy Bankruptcy

14  Code requirements.

15          THE COURT:  I appreciate the approach.  It was an

16  enjoyable read.

17          MS. BERKOVICH:  Good.  The next couple of slides

18  get into very much detail about the Plan treatment.  Your

19  Honor has read the Plan and I'm sure that everyone on this

20  call has read the Plan.  I don't know that we need to get

21  into each one, but I'm happy to do so, if the Court would

22  like.

23          THE COURT:  I think that you've given everybody --

24  if people want to know more, again, the documents are there.

25  We're early on in the process.  If you want to go through

1  it, I'm happy for you to do that for folks, but I don't need

2  it.

3         MS. BERKOVICH:  Okay.  No, I don't think it's

4  necessary because we've been having lots of conversations

5  with all the major stakeholders.  We've also had smaller

6  creditors reach out to us and we're taking all calls, you

7  know, want to know about the question about the plan

8  details, please feel free to call Mr. Schrock, me,

9  Mr. Carlson, who is on the line, too.  We're happy to talk

10  to you.

11         THE COURT:  And again, for those folks who are on

12  the video, if you want a copy of the PowerPoint, it can be

13  found at Docket Entry No. 1009.

14         Sorry for the interruption.

15         MS. BERKOVICH:  No, we can also acknowledge.

16         So next we go to Slide 10.

17         You know, there are different ways of showing that

18  the business is doing well, as Mr. Schrock said.  Here we

19  show just some of the company's cash position and this slide

20  is an update for something we showed the Court previously

21  that really shows that we are doing well, as compared to our

22  initial forecast in December.

23         Not only that, but we've updated the budget

24  periodically and we've exceeded all of our budget in the

25  cash position, so you know, it's (indiscernible) even though

1   the expected (indiscernible) has been extended by four

2   months, or rejected ended in liquidated, it's forecast to be

3   $48 million greater than our initial budget, when excluding

4   the impacts of DIP draws and payments.

5          And we're pleased to report that we have not had

6   to draw on the DIP any further in support in terms of the

7   replacement DIP in early February.  We've actually retained

8   the DIP in the last few months (glitch in the audio) excess

9   cash.

10          THE COURT:  Ms. Berkovich --

11          MS. BERKOVICH:  Yes.  Yes, Your Honor?

12          THE COURT:  No, my apologies.  I was just going to

13   say, the improvements or the improvement that has occurred,

14   is it just solely due to rise in price of the commodity or

15   have there been structural changes that the expense

16   structure is now much better, or both?

17          MS. BERKOVICH:  Your Honor, it's primarily as a

18   result of increased receipts from self-mining through the

19   factors we discussed last time that impact how much we get

20   from our mining of the bitcoin, as well as very importantly

21   the decrease in power disbursements with much favorable

22   interview pricing since the beginning of the case, as well

23   as obviously always, the good management of the company that

24   there haven't been many structural changes to the business.

25          There have been a few, we mentioned some in our

1    Disclosure Statement, some changes in the way we contract,

2    for example, with our existing customers and overall it's

3    been moved to factors.

4            THE COURT:  Okay.  Thank you.

5            MS. BERKOVICH:  And let's go to the next step,

6    (glitch in the audio) presentation (glitch in the audio).

7            Again, we're going to continue with our daily

8    conversations with all of our major stakeholders and minor

9    stakeholders.  We hope -- if necessary, we'll go to

10   mediation to resolve remaining disputes.  So until we get

11   there, we've got a date there -- you know, having a date

12   just like Your Honor gave us a date to file the Plan, that

13   was very helpful and you know, having those couple of nights

14   around the clock to get the Plan on file and I think having

15   a date for mediation will cause people to work hard to try

16   to get to the date before then.

17           And we will file our Disclosure Statement and be

18   back before Your Honor on August 7th for approval.

19           You know, that bring us to confirmation, you know,

20   early to mid-September with a hopeful exit by the end of the

21   first quarter.

22           THE COURT:  Okay.  Thank you.

23           MS. BERKOVICH:  That concludes my presentation,

24   unless Your Honor has any further questions.

25           THE COURT:  I don't, but thank you.

1          MR. SCHROCK:  Other parties want to talk to you,

2   to be heard, Your Honor, so we're happy to turn over the

3   podium.

4          THE COURT:  No, of course, thank you.  I just

5   didn't know if there was anything else the Debtors wanted to

6   address.

7          Let me ask, let's see.  Somebody raised their

8   hand.

9          Ah, Mr. Willkie?

10      (No audible response.)

11         THE COURT:  Ah, had you hit five star on your

12   phone or do you have me double safety?

13      (No audible response.)

14         THE COURT:  It's become my standard question.

15         MR. MILLER:  Can you hear me now?

16         THE COURT:  I can.  Thank you.

17         I always wanted to meet Mr. Willkie.

18         MR. MILLER:  Brett Miller -- he's been long dead,

19   but I'm here in his place today.  Brett Miller, Willkie Farr

20   & Gallagher.  I'm not quite sure why it automatically pops

21   up as Willkie in the box, but for the Official Committee of

22   Unsecured Creditors.

23         We have been working with the Debtors regarding

24   negotiations, regarding the business plan.  We've provided

25   comments to the Plan.  Some of our comments made it into the

1    filed draft; others remain on an open list.

2            And we absolutely agree with the comments that

3    creditors should be paid in full.  I mean, I support

4    Mr. Schrock and Ms. Berkovich completely that it's 100-cent

5    case, but the devil is in the details and getting there is

6    going to be interesting regarding valuation, regarding

7    currency.

8            We did make a counter-proposal regarding the

9    proposed note that's in the draft plan, which, you know,

10   we're happy to sit down further and work out the details on

11   that one, but the Committee does see the value here.  Your

12   Honor is correct, the bitcoin pricing has helped and as

13   Ms. Berkovich just said, the other factors make this a real

14   solid case for hundred cents to creditors and something left

15   over for equity.

16           I'll let Mr. Hansen speak for his clients, but we

17   also have opened up the dialog with them, as well as with

18   the Equity Committee, and the Equipment Lenders.  So the

19   Creditors Committee is open for business in speaking with

20   everyone and hope to facilitate getting a deal done as

21   quickly as possible.

22           THE COURT:  I really appreciate the comments.

23           MR. MILLER:  Thank you.

24           THE COURT:  Because everyone is going to have to

25   figure out how to manage uncertainty in this because it can

1    just move really far really quick, and so I appreciate

2    everybody being flexible and creative in trying to figure

3    out how to deal with that uncertainty.  But thank you.

4            Mr. Autry, you raised your hand?

5            MR. AUTRY:  Your Honor, I was just demonstrating

6    my technical -- my lack of technical skills, I apologize.

7            THE COURT:  No, you should have said I was just

8    testing in case I has something important to say.  I would

9    have enjoyed that.

10           Anyone else have comments they want to make?

11           Mr. Hansen, or Mr. Lohan, I'll come back to you.

12           MR. HANSEN:  Yes, Your Honor.

13           THE COURT:  Yes.  Go ahead, please.

14           Good afternoon.

15           MR. HANSEN:  Can you -- Good afternoon, Your

16   Honor.  Can you hear me okay?

17           THE COURT:  Loud and clear and thank you for

18   checking.

19           MR. HANSEN:  Okay.  Kris Hansen with Paul Hastings

20   on behalf of the Ad Hoc Committee of Convertible

21   Noteholders, Your Honor.

22           Your Honor, I'd just say that we obviously echo

23   the Debtors' sentiments.  We'd like nothing more than an

24   agreeable deal where we all come back to you and present a

25   Plan that everybody is on board with, or most people are on

1  board with, and we can proceed to confirmation.

2      I think the problem that we're having on our end

3  is we're struggling a little bit.  You know, the valuation

4  -- the business plan and the valuation that flows from the

5  business plan, the exit in the Plan of Reorganization that

6  was filed has equity in (indiscernible) and if you look at

7  the Plan, right, it basically says that everybody consents

8  to it and if you don't, we'll cram you down.

9      And on the cram down side, especially when you

10 think about what the Debtor purports as a solvent entity,

11 cramming down looks like we'll have an 1129(b) compliant

12 debt from a convertible note perspective is one very

13 interesting aspect.

14     Another angle that's interesting is the Plan

15 contemplates needing new capital in order to at least

16 partially pay debt service.  So in the context of that, it

17 really raises some interesting questions around the business

18 plan value.  And the business plan itself is really only

19 applicable in the consensual sense.  If there's a cram down

20 here, and those debt service costs rise dramatically across

21 the capital structure, there kind of needs to be a new

22 business plan.

23     And so that's something that we need to evaluate,

24 too.

25     And as I said, Your Honor, one of the struggles

1  that we're having in terms of responding to the Debtor --

2  and again, just trying to be really open with Your Honor --

3  is that we're struggling because it's not as easy as saying,

4  "Oh, well, why don't we just adjust a little bit here or

5  there on our treatment?"

6          As you can tell, there are an awful lot of classes

7  and creditors around this capital structure and as

8  Mr. Miller just pointed out, the Debtor is saying, "Hey,

9  we're going to pay everybody in full," and it just doesn't

10  appear that that's possible and so we're struggling a little

11  bit with how to respond because we're turning around to

12  think well, if we pull Lever A, that that basically makes

13  the entirety of the process move and how does that look?

14          So it's been a little bit difficult for us to get

15  there.  We also obviously don't want to wind up in

16  bankruptcy again any time soon, if we're taking back

17  material amounts of debt based upon the (indiscernible)

18  currency, which for the most part dictates to how you hear.

19  We all know how power goes up and down pretty regularly.

20  We've got a curve that we can look at there in connection.

21  We'd like to plan for it, as opposed to bitcoin, which seems

22  to be a little bit difficult to guess where it's going.

23          So we just want to make sure, you know, the Court

24  understands that we understand that Judge Isgur has time at

25  the end of the month.  You know, that's fine.  We're happy

1   -- always happy to go talk to Judge Isgur if we need to.

2   We'll see what we can work out on our own between here and

3   then, you know?  But if we don't get there, then obviously

4   we know Your Honor is always open to giving everybody their

5   day in court and we'll go through the evidence and all legal

6   issues and then make rules.

7           So I just wanted to give you a little bit of a

8   feel for where we are, Your Honor.

9           THE COURT:  That it -- no, thank you.  And again,

10  it all gets back, I think.  I think we're just saying the

11  same thing.  You don't know how to manage the uncertainty.

12          There are a couple of things that pop into my head

13  and again, I'm not a party, I'm not an advocate, I'm not a

14  lawyer and so I'm going to keep those thoughts to myself.

15  The only reason I bring that up is that we all know who made

16  me what I am, that's why so many people hate him, and it

17  might be worth having a conversation with Isgur sooner

18  rather than later 'cause my guess is, he'll probably tell

19  you pretty close to the same thing.

20          But again, you guys do what you want to do.

21  Again, I agree with everything you said and I will just wait

22  to see what happens.

23          MR. HANSEN:  Thank you, Your Honor.

24          THE COURT:  Mr. Lohan, I think you raised your

25  hand.  Did you opt to pull it back?

1          MR. LOHAN:  No, Your Honor.  I just took it down,

2    but I appreciate just one second of your time.

3          THE COURT:  Of course.

4          MR. LOHAN:  Again for the Record, Brian Lohan,

5    Arnold Porter, on behalf of Barings, one of the Equipment

6    Lenders.

7          And we agree with Mr. Schrock and Ms. Berkovich

8    that this company needs a way out of bankruptcy.  And we

9    appreciate that the Plan they filed is definitely the means

10   to push this case forward.

11         Now we disagree with our treatment that was

12   proposed under the Plan, but like Mr. Miller, we have sent

13   the Debtors a counterproposal and we appreciate that the

14   Debtors have been constructive in their engagement and you

15   know, we hope that the Debtors and the Court understands

16   that we tried to work together, the Equipment Lenders as a

17   group.  And we did band together six Equipment Lenders to

18   create a counterproposal to try to streamline the

19   discussion.

20         Hopefully we don't need to, but of course, you

21   know, we're always happy to participate in Plan mediation

22   and we certainly appreciate Judge Isgur's time and guidance

23   in the process.

24         THE COURT:  I'm just trying to keep him busy.

25   When he has idle time, he's a pain to deal with.

1          So no, it's -- I'm --

2          MR. LOHAN:  He's going to get --

3          THE COURT:  -- I'm thinking you guys --

4          MR. LOHAN:  -- bored.  He had his last big

5    confirmation hearing yesterday, he told us, so he's going to

6    need some stuff to fill up his summer.

7          THE COURT:  See.  What you heard, you got on

8    video.  I get the other 23 hours a day in person, so no,

9    he's -- again, I quite frankly for this, I encourage that

10   conversation sooner rather than later 'cause I'm going to

11   guess that he'll probably tell you something close to what I

12   would say and then none of you will like it and then you'll

13   go tweak it and then you'll find common ground.

14         So I encourage that sooner rather than later.  In

15   all seriously I do think that he would be really helpful,

16   but again, you folks, as I say before, you're the best there

17   are, so I trust your judgment.  You do what you think is

18   right for your constituents.

19         Anyone else want to weigh in on any of this?

20      (No audible response.)

21         THE COURT:  All right.  So Mr. Schrock --

22         MR. MEYER:  Your Honor, can you --

23         THE COURT:  Mr. Meyer?

24         MR. MEYER:  Apologies, Your Honor.  David Meyer of

25   Vinson & Elkins on behalf of the Equity Committee.

1        Just a few brief comments.  I think no one can
2   dispute here that all the market trends are working in the
3   Debtors' favor.  And I think --
4        THE COURT:  Today.
5        MR. MEYER:  -- Mr. Schrock and Ms. Berkovich --
6   today -- Mr. Schrock and Ms. Berkovich have highlighted that
7   well.
8        Look, we, too, we believe this is a solvent Debtor
9   case.  We believe the equity holders should receive
10  significant and meaningful recoveries.  The thing, Your
11  Honor, our client has the -- seems to have the why-is-the-
12  company-here type attitude in the first instance, but we are
13  where we are and we, too, would welcome a conversation with
14  Judge Isgur if it comes to that and would eagerly
15  participate in mediation to the extent we're not able to
16  reach a constructive resolution in the upcoming weeks, but I
17  echo Mr. Schrock's comments that we're here and we'll
18  continue to work with the company and all of its
19  stakeholders.
20       THE COURT:  Thank you.
21       I expect nothing else because you are who you are.
22       Mr. Schrock, let me ask you:  I've given you --
23       MR. SCHROCK:  Yes.
24       THE COURT:  -- hearing date for Disclosure
25  Statement.  Is there anything else that you believe that I

1  can do to help move the process forward?

2          MR. SCHROCK:  I don't think so at this time, Your

3  Honor.  I think setting the dates, you know, for filing the

4  Plan and giving us a Disclosure Statement hearing is really

5  what we needed.  I will say that we take to heart your

6  comments about getting Judge Isgur involved.  Certainly if

7  we need to get him involved sooner, we won't wait.

8          We do have some ideas about how to bridge the gap,

9  but I do want to note that, you know, the senior management

10  team I think we'll have with us in court the next time we're

11  together, so if we need to talk a little bit more about the

12  business, you know, questions around the business, how it's

13  performing, whether some of the issues that we're dealing

14  with, we're going to be prepared to do that.

15          I do think also that the fact that this company --

16  you know, we do intend -- it's going to be a public company

17  when we emerge and so when you have that kind of public

18  market that will be there for the company post-emergence, it

19  does provide, I think, compared to at least with a private

20  company, it provides a basis upon which you can start to

21  see, how can I solve for value?  Are people going to be

22  right or are there going to be people wrong?  You know, you

23  can pick up true-up mechanisms and the like and especially

24  if people think that the value is there, you know, the proof

25  will be in the pudding.

1    So we're very cognizant of that and at the same

2  time, you know, we're trying to do the right thing by

3  everybody here.  So we really appreciate the time and we're

4  going to continue working on it.

5    THE COURT:  Got it.  Thank you.

6    Anyone else have any requests or any comments they

7  want to make?

8    (No audible response.)

9    THE COURT:  All right.  Then everyone please have

10  a wonderful and safe holiday.  Don't fly -- joking, sort of.

11    But anyway, please have a wonderful holiday and

12  I'll see everybody soon.

13    Thank you.

14    We'll be adjourned until 2:30.

15    (The parties thank the Court.)

16    (Hearing adjourned at 2:02 p.m.)

17    *  *  *  *  *

18    *I certify that the foregoing is a correct

19  transcript to the best of my ability from the electronic

20  sound recording of the ZOOM/video/telephonic proceedings in

21  the above-entitled matter.*

22  */S/ MARY D. HENRY*

23  *CERTIFIED BY THE AMERICAN ASSOCIATION OF*
   *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*
24  *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*
   *JTT TRANSCRIPT #67471*
25  *DATE FILED:  JULY 14, 2023*