## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **CORE SCIENTIFIC, INC.,** *et al.,* | § | **Case No. 22-90341 (DRJ)** |
| | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | |
| | § | |

## MOTION OF THE DEBTORS FOR ENTRY OF
## AN ORDER FURTHER EXTENDING EXCLUSIVE PERIODS
## PURSUANT TO SECTION 1121(D) OF THE BANKRUPTCY CODE

> IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING, SPECIFICALLY ANSWERING EACH PARAGRAPH OF THIS PLEADING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT WITHIN TWENTY-ONE (21) DAYS FROM THE DATE YOU WERE SERVED WITH THIS PLEADING. YOU MUST SERVE A COPY OF YOUR RESPONSE ON THE PERSON WHO SENT YOU THE NOTICE; OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.

Core Scientific, Inc. and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**" or the "**Company**"), file this motion (the "**Motion**") for entry of an order extending the periods during which the Debtors have the exclusive right to (i) file a chapter 11 plan (the "**Exclusive Filing Period**") and (ii) to solicit acceptances thereof (the "**Exclusive Solicitation Period**" and together with the Exclusive Filing period, the "**Exclusive Periods**") in each case, by 90 days, through and including

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6074); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

October 17, 2023 and December 18, 2023,[2] respectively.  In support of the Motion, the Debtors respectfully represent as follows:

**Preliminary Statement**

1. Since the May 22 hearing on the Debtors' first exclusivity motion, the Debtors have made meaningful progress towards confirming a value-maximizing chapter 11 plan and emerging from bankruptcy.  After finalizing their updated business plan to reflect significant changes in the cryptocurrency and power markets, the Debtors developed a consensual plan framework.  On May 31, 2023, the Debtors began presenting the consensual plan framework to each of their key stakeholder groups, including the Ad Hoc Noteholder Group,[3] the DIP Lender (which is also the Debtors' largest unsecured creditor), the Creditors' Committee, the Debtors' primary equipment lenders (the "**Equipment Lenders**"), and the Equity Committee (collectively, the "**Key Stakeholder Groups**").  Following three (3) weeks of frequent engagement with each of the Key Stakeholder Groups, on June 20, the Debtors filed the Plan[4] and Disclosure Statement[5] in accordance with the target filing date set by the Court at the May 22 hearing.

2. The Plan allows the Debtors to move forward under either a consensual path or a nonconsensual (cram-up) path.  Under either path, the Plan provides for one-hundred percent (100%) recoveries to all classes of creditors and for all residual equity value to be distributed to equity holders and holders (if any) of allowed subordinated section 510(b) claims.  The Debtors' efforts have been -- and will continue to be -- focused on reaching as much consensus as possible

---

[2] 90 days after September 17, 2023 is Saturday, December 16, 2023.  Consequently, in accordance with Bankruptcy Rule 9006(a)(1)(C), the Debtors seek to extend the deadline to Monday, December 18, 2023.

[3] Capitalized terms used but not defined in the Motion shall have the meanings ascribed to such terms in the Plan (as defined below).

[4] *Joint Chapter 11 Plan of Core Scientific, Inc. and Its Affiliated Debtors* (Docket No. 974) (as may be amended, supplemented, or modified from time to time, the "**Plan**").

[5] *Disclosure Statement for Joint Chapter 11 Plan of Core Scientific, Inc. and Its Debtor Affiliates* (Docket No. 975) (as may be amended, supplemented, or modified from time to time, the "**Disclosure Statement**").

leading up to, and following, the mediation (the "**Mediation**") with the Honorable Marvin Isgur, which is scheduled to commence on July 26, 2023.[6]  All of the Key Stakeholder Groups have agreed to participate at the Mediation.

3.     Since filing the Plan and Disclosure Statement, the Debtors have narrowed the issues between the parties whenever parties have engaged with the Debtors and have progressed in negotiations with certain of the Key Stakeholder Groups, including (i) the Equipment Lenders (which hold a total of approximately $240 million in aggregate claims), (ii) the DIP Lender, (iii) the Creditors' Committee, and (iv) the Equity Committee.

4.     As the Debtors previewed at the June 29 status conference, the biggest challenge to reaching global consensus will be bridging the gap with the Ad Hoc Noteholder Group regarding the appropriate allocation of value among secured creditors, unsecured creditors, and existing equity holders in a solvent-debtor case where there is material residual value available for equity holders after repaying all creditors in full.  Unfortunately, despite repeated requests for engagement and having had the Debtors' plan construct for over a month-and-a-half (May 31), the Debtors' draft chapter 11 plan for over a month (June 16), and the Debtors' filed Plan for almost a month (June 20), the Ad Hoc Noteholder Group has yet to respond with any counterproposal to the Debtors on the Plan.  Although this may be due to understandably challenging intercreditor dynamics within the Ad Hoc Noteholder Group arising from different legal rights held by the April Noteholders versus the August Noteholders,[7] the lack of any response has made it impossible to make progress with the convertible noteholders in advance of mediation.  The Debtors are hopeful

---

[6]  *See Agreed Mediation Order Appointing Judge Marvin Isgur as Mediator Regarding Debtors' Chapter 11 Plan* (Docket No. 1052).

[7]  These may include (i) the April Noteholders' assertion that they are entitled to a 2X premium payment (200% of principal) under their notes purchase agreement and (ii) the April Noteholders' liens being senior to those of the August Noteholders.

that plan mediation can be helpful, but this is the true state of play with the Ad Hoc Noteholder Group at the moment.

5.     Unfortunately, the lack of any meaningful engagement (at least with the Debtors) by the Ad Hoc Noteholder Group has made it difficult to reach final agreements with other stakeholders where meaningful progress has been made.  This is because without certainty on the Debtors' capital structure, which depends on the final agreement reached with the Debtors' senior secured creditors (*e.g.*, split of debt versus equity consideration, as well as the terms of any takeback debt), "final" arrangements on a consensual plan are impossible to make definitive with other stakeholders.  Although the Debtors could proceed to confirmation more quickly by obtaining Court approval to solicit votes on the Plan currently on file and pursue the nonconsensual path, the Debtors believe it is prudent to engage with the Ad Hoc Noteholder Group, whether that be the current incarnation of one group or more than one group if that comes to pass, to provide a meaningful chance for a consensual path to succeed.  The Debtors are optimistic that the Mediation will help narrow the issues among the parties and ultimately (if not immediately) lead to a chapter 11 plan that has global consensus, treats all stakeholders fairly, and provides a path towards maximizing the value of the estate.

6.     Given the current status of Plan negotiations, it is critical that the Debtors be allowed to continue to lead the chapter 11 plan process without the risks, costs, and disruption that would result from a competing plan process.  The additional time requested will enable the Debtors to continue to build as much consensus as possible and move forward with solicitation and prosecution of a chapter 11 plan that maximizes value for all of the Debtors' stakeholders.

7.     In addition to progressing negotiations with the Key Stakeholder Groups, the Debtors have taken a number of other critical steps to maximize value for the Debtors' estates

and clear a path to confirmation and emergence, including, but not limited to, the following accomplishments:

- **Capital Raise Process**. The Debtors and their advisors have made significant progress in their ongoing efforts to fund new money capital to fund potential cash needs at and following emergence, including receiving a proposal from the DIP Lender (which the Debtors are currently negotiating) and other parties have expressed interest in potentially submitting proposals as well.  The process remains ongoing and the deadline to submit indications of interest is July 20, 2023.

- **Key Settlements and Agreements**.  The Debtors have entered into a number of key settlements with multiple M&M lien claimants asserting more than $80 million in aggregate M&M lien claims[8] and a few key agreements with lease counterparties.

- **Claims Reconciliation and Lease/Contract Review:**  The Debtors have also made significant progress (i) reconciling claims filed against the Debtors through claims objections[9] and various settlements and (ii) reviewing their executory contracts and unexpired leases, including filing a motion to assume all of their unexpired real estate leases.[10]

8. Accordingly, for the reasons set forth herein, the Debtors request that the Court extend the Exclusive Periods, in each case, by 90 days, without prejudice to the Debtors' rights to seek a further extension.[11]

---

[8] The terms of each settlement are described in detail in the Debtors' motions requesting Court approval of such settlements filed at Docket Nos. 1057, 1058, 1061, & 1062.

[9] *See, e.g., Debtors' Objection to Proof of Claims Nos. 425 and 497 filed by Celsius Mining LLC* (Docket No. 819); *Debtors' Objection to Proofs of Claim Nos. 358 and 359 Filed By Sphere 3d Corp* (Docket No. 869); *Debtors' Objection to Proof of Claim Nos. 503, 505, 506, 508, 570, 571, and 572 Filed By Gem Mining 1, LLC, Gem Mining 2b, LLC, Gem Mining 4, LLC, Gem Mining 2, LLC, Gem Mining 2, LLC, Gem Mining 2b, LLC, And Gem Mining 4, LLC, Respectively* (Docket No. 854); and *Debtors' Objection to Proof of Claim Nos. 19 and 120 Filed By Bryce Johnson* (Docket No. 871).

[10] *Motion of Debtors for Entry of an Order (I) Approving Assumption Of (A) Unexpired Nonresidential Real Property Leases and (B) An Executory Contract, as Amended and (II) Granting Related Relief* (Docket No. 1005) (the "**Assumption Motion**").

[11] Although the Debtors have not filed an accompanying declaration with this Motion, to the extent the Motion is contested or the Court otherwise deems it appropriate, the Debtors may file an accompanying declaration(s) and make such parties available for cross examination.

## Relief Requested

9.      Pursuant to section 1121(d) of title 11 of the United States Code (the "**Bankruptcy Code**"), the Debtors request entry of an order extending the Exclusive Filing Period and the Exclusive Solicitation Period, in each case, by 90 days, through and including October 17, 2023 and December 18, 2023,[12] respectively, without prejudice to the Debtors' right to request further extensions of such periods in accordance with section 1121(d) of the Bankruptcy Code.[13]

10.      A proposed form of order granting the relief requested herein is annexed hereto as **Exhibit A** (the "**Proposed Order**").

## Jurisdiction and Venue

11.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

12.      On December 21, 2022 (the "**Petition Date**"), the Debtors each filed with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

[12] 90-days after September 17, 2023 is Saturday, December 16, 2023.  Consequently, in accordance with Bankruptcy Rule 9006(a)(1)(C), the Debtors seek to extend the deadline to Monday, December 18, 2023.

[13] The Debtors' first extension of the Exclusive Filing Period and Exclusive Solicitation Period are currently set to expire on July 19, 2023 and September 17, 2023, respectively.  Paragraph 30 of the *Procedures for Complex Chapter 11 Cases in the Southern District of Texas* provides that "with these procedures to extend the time to take any action before the expiration of the period prescribed by the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, or a confirmed plan, the time for taking the action is automatically extended until the Court rules on the motion."  By the filing of this Motion prior to the expiration of the Exclusive Filing Period, the Exclusive Filing Period will not expire prior to resolution of the Motion.

13.     The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**").

14.     On January 9, 2023, the United States Trustee for Region 7 (the "**U.S. Trustee**") appointed the Creditors' Committee in these chapter 11 cases pursuant to section 1102 of the Bankruptcy Code.  On March 23, 2023, the U.S. Trustee appointed the Equity Committee in these chapter 11 cases pursuant to section 1102 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.

15.     On April 10, 2023, the Debtors filed the *Motion of the Debtors for Order Extending Exclusive Periods Pursuant to Section 1121(D) of the Bankruptcy Code* (Docket No 773) (the "**First Exclusivity Motion**").  On June 13, 2023, the Court entered the *Order Pursuant to Section 1121(D) of the Bankruptcy Code Extending Exclusive Periods*, extending (i) the Exclusive Filing Period through and including July 19, 2023 and (ii) the Exclusive Solicitation Period through and including September 17, 2023, in each case, without prejudice to the Debtors' rights to seek additional extensions of such periods (Docket No. 962) (the "**First Exclusivity Order**").

16.     On June 20, 2023, the Debtors filed the Plan and Disclosure Statement.  The Plan provides for a comprehensive restructuring of the Debtors' balance sheet that will strengthen the Debtors by substantially reducing their debt and preserving in excess of 230 jobs.  Specifically, the Plan provides for (i) one-hundred percent (100%) recoveries to all classes of creditors in the form of equity in the Reorganized Parent ("**New Common Interests**"), take-back debt, a combination of equity and take-back debt, or reinstatement of claims, and (ii) distributions to

existing equity holders and any holders of allowed section 510(b) claims, of all residual value (in the form of New Common Interests) remaining after the payment of creditors' claims in full.

### The Court Should Grant the Relief Requested

17.    Section 1121(b) of the Bankruptcy Code provides for an initial period of 120-days after the commencement of a chapter 11 case during which a debtor has the exclusive right to file a chapter 11 plan.  Section 1121(c)(3) of the Bankruptcy Code provides that if a debtor files a plan within the 120-day Exclusive Filing Period, it has an exclusive period of 180-days after the commencement of the chapter 11 case to obtain acceptances of its plan.  The Debtors' extended Exclusive Filing Period and Exclusive Solicitation Period are currently set to expire on July 19, 2023 and September 17, 202, respectively.

18.    Under section 1121(d) of the Bankruptcy Code, the Court may extend the Exclusive Periods for cause.  11 U.S.C. § 1121(d) ("[O]n request of a party in interest made within the respective periods specified in subsections (b) and (c) of this section and after notice and a hearing, the court may for cause reduce or increase the 120-day period or the 180-day period referred to in this section.").

19.    The Bankruptcy Code neither defines the term "cause" for purposes of section 1121(d) nor establishes formal criteria for an extension.  The legislative history of section 1121 of the Bankruptcy Code indicates, however, that it is intended to be a flexible standard to balance the competing interests of a debtor and its creditors.  *See* H.R. Rep. No. 95–595, at 231– 32 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963 (noting that Congress intended to give Bankruptcy Courts great flexibility to protect a debtor's interests by allowing a debtor an unimpeded opportunity to negotiate settlement of debts without interference from other parties in interest); *In re Timbers of Inwood Forest Assoc., Ltd.*, 808 F.2d 363, 372 (5th Cir. 1987) ("Any

8

bankruptcy court involved in an assessment of whether 'cause' exists should be mindful of the legislative goal behind § 1121."); *In re Mirant Corp.*, No. 4-04-CV-476-A, 2004 WL 2250986, at *2 (N.D. Tex. Sept. 30, 2004) ("In virtually every case where an extension has been granted, the debtor showed substantial progress had been made in negotiations toward reorganization.").

20.     The broad discretion conferred on the court in these circumstances enables the court to consider a variety of factors to assess the totality of circumstances in each case. *In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 587 (Bankr. S.D.N.Y. 2006) (identifying factors courts consider in determining whether to extend exclusivity); *In re Washington-St. Tammany Elec. Co-op., Inc.*, 97 B.R. 852, 854 (E.D. La. 1989) (noting that the decision to extend exclusivity "rests with the discretion of the Court"); *In re Hoffinger Indus., Inc.*, 292 B.R. 639, 643–44 (B.A.P. 8th Cir. 2003) (same); *In re Express One Int'l, Inc.*, 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996) (same).

21.     Courts in this district and others have identified the *Adelphia* factors as factors to consider in determining whether cause exists to extend exclusivity. *See, e.g.*, *In re New Millennium Mgmt., LLC*, No. 13-35719-H3-11, 2014 WL 792115, at *6 (Bankr. S.D. Tex. Feb. 25, 2014); *see also In re Borders Grp., Inc.*, 460 B.R. 818, 822 (Bankr. S.D.N.Y. 2011) (evaluating the factors set forth in *Adelphia* to hold that debtor established cause to extend exclusivity). These non-exclusive factors include:

(i)      the size and complexity of the debtor's case;

(ii)     the necessity for sufficient time to permit the debtor to negotiate a chapter 11 plan and prepare adequate information;

(iii)    the existence of good faith progress towards reorganization;

(iv)     the fact that the debtor is paying its bills as they become due;

(v)      whether the debtor has demonstrated reasonable prospects for filing a viable plan;

(vi)   whether the debtor has made progress in negotiations with its creditors;

(vii)   whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and

(viii)   whether an unresolved contingency exists.

*See, e.g.*, *Millennium Mgmt.*, 2014 WL 792115, at *6; *see also In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 587 (Bankr. S.D.N.Y. 2006) (noting that the factors listed above are "objective factors which courts historically have considered in making determinations of this character").

22.     Not all factors are relevant to every case, and courts tend to use a relevant subset of the above factors in determining whether cause exists to grant an exclusivity extension in a particular chapter 11 case.  *See, e.g.*, *In re Hoffinger Indus., Inc.*, 292 B.R. 639, 644 (B.A.P. 8th Cir. 2003) ("It is within the discretion of the bankruptcy court to decide which factors are relevant and give the appropriate weight to each."); *In re Serv. Merch. Co., Inc.*, 256 B.R. 744, 751–54 (Bankr. M.D. Tenn. 2000) (finding cause to extend where the debtors established six of the aforementioned factors); *In re Express One Int'l, Inc.*, 194 B.R. 98, 101 (Bankr. E.D. Tex. 1996) (identifying four of the factors as relevant in determining whether "cause" existed to extend exclusivity); *see also In re Dow Corning Corp.*, 208 B.R. 661, 670 (Bankr. E.D. Mich. 1997) ("When the Court is determining whether to terminate a debtor's exclusivity, the primary consideration should be whether or not doing so would facilitate moving the case forward.  And that is a practical call that can override a mere toting up of the factors.").

23.     Indeed, courts in this district routinely grant second extensions of exclusivity. *See, e.g.*, *In re Talen Energy Supply, LLC*, No. 22-90054 (Bankr. S.D. Tex. Jan, 13, 2023) (Docket No. 1820) (further extending exclusive filing period by an additional 192 days and the exclusive soliciting period by 80 days); *In re Cineworld Group PLC*, No. 22-

90168 (Bankr. S.D. Tex. Apr. 5, 2023) (Docket No. 1405) (further extending exclusive periods by 60 days); *In re Fieldwood Energy LLC*, No. 20-33948 (Bankr. S.D. Tex. Apr. 9, 2021) (Docket No. 1247) (further extending exclusive periods by an additional 106 days); *In re CBL & Assocs. Props., Inc.*, No. 20-35226 (Bankr. S.D. Tex. Mar. 19, 2021) (Docket No. 1144) (further extending exclusive periods by an additional 90 days); *In re Speedcast Int'l Ltd.*, No. 20-32243 (Bankr. S.D. Tex. Jan. 1, 2021) (Docket No. 1391) (further extending exclusive periods by an additional 81 days).

### Cause Exists to Further Extend Exclusive Periods

24.     As set forth below, a further extension of the Exclusive Periods, in each case, by 90 days is appropriate, in the best interest of the Debtors' stakeholders, and consistent with the intent and purpose of chapter 11.  The requested further extensions of the Exclusive Periods will enable the Debtors to build consensus and pursue confirmation of a chapter 11 plan that maximizes the value of the Debtors' estates for the benefit of all stakeholders, without interruption.  Accordingly, application of the relevant above factors to the facts of these chapter 11 cases demonstrates that ample cause exists to grant the reasonable extension of the Exclusive Periods requested herein.

**A. The Debtors Have Made Good Faith Progress Towards Reorganization and Substantial Progress in Negotiations with Their Creditors**

25.     The Debtors made significant progress towards confirmation of a chapter 11 plan by, among other things, (i) filing their Plan and Disclosure Statement on June 20 and substantially advancing negotiations with each of the Key Stakeholder Groups, (ii) negotiating and entering into a number of value-maximizing settlements (including with several M&M lien claimants), and (iii) progressing the Debtors' process to raise new money exit capital.

11

i.   **The Debtor Have Made Substantial Progress in their Plan Negotiations with the Key Stakeholder Groups**

26.     The Plan allows the Debtors to move forward with either a consensual plan framework (with the Convertible Noteholders' support) or a non-consensual, cram-up path to confirmation.  The Debtors have been (and remain) focused on reaching consensus with the Ad Hoc Noteholder Group and each of the other Key Stakeholder Groups.  Over the past few months, the Debtors have been in constant discussions with those groups, starting with delivering a business plan to each group in mid-May, a consensual plan construct to each group on May 31, 2023, and a draft chapter 11 plan on June 16, 2023.

27.     As noted above, the biggest challenge in these cases will be to reach consensus with the Ad Hoc Noteholder Group regarding the appropriate allocation of value among secured creditors, unsecured creditors, and equity holders.  Based on current discussions, it appears that each of the Key Stakeholder Groups has a different view on the enterprise value of the Debtors based on where they sit in the capital structure, with each group (perhaps not surprisingly) advocating for a value that will give its constituents the largest share of the pie.  As fiduciaries to all stakeholders with a duty to maximize value, the Debtors have worked hard to try to bridge the gap on this issue and have proposed a chapter 11 plan that provides one-hundred percent (100%) recoveries to all creditors and distributes any residual equity value to existing equity holders (and any section 510(b) claimants).

28.     At this point, the Debtors are concerned that certain creditor groups may be advocating for an unreasonably low valuation to obtain recoveries for their constituents of greater than 100% of their claims, in violation of the Bankruptcy Code.  However, the Debtors are continuing to engage with all Key Stakeholder Groups to narrow the gap on various key issues, and are hopeful that mediation will assist in their efforts.

29.     As noted above, the Ad Hoc Noteholder Group's failure to respond with any counterproposal to the Debtors' May 31 plan construct proposal (which was subsequently implemented into the Plan filed on June 20) has made it impossible to make progress with the Ad Hoc Noteholder Group.  This lack of engagement has also made it difficult for the Debtors to finalize agreements with other stakeholder groups where substantial progress has been made.  As a result, the Debtors proposed and have organized an agreed mediation with Judge Isgur to help facilitate resolution on this gating issue.  The Debtors have done all they can to try to reach a consensual plan, and they should not be penalized, and their exclusive periods should not be terminated, due to the Ad Hoc Noteholder Group's failure to progress negotiations.  Rewarding the Ad Hoc Noteholder Group for their delays (whether tactical or not in this case) would create incentives for creditor groups in other cases to slow down the negotiation process to further their chances of ending the Debtors' Exclusivity Periods, a result wholly at odds with what the Bankruptcy Code seeks to encourage.

30.     Indeed, notwithstanding the Ad Hoc Noteholder Group's failure to provide a counterproposal, the Debtors have made significant progress with each of the other Key Stakeholder Groups, as summarized below:

- **B. Riley (DIP Lender and Largest Holder of Unsecured Claims)**:  The Debtors have been in regular discussions with B. Riley (the DIP Lender and holder of $42 million in unsecured claims) and have exchanged term sheets regarding the treatment of B. Riley's DIP claims and unsecured claims and proposed new money capital for the Debtors;

- **The Creditors' Committee**:  The Debtors and the Creditors' Committee have exchanged proposals and have held regular meetings, including an in-person meeting with the Creditors' Committee's advisors on July 12, 2023;

- **The Equipment Lenders**:  The Debtors have had several meetings, including an in-person meeting on July 11, 2023, with the Equipment Lenders and their advisors, and the parties have exchanged multiple term

13

sheets regarding the amount and treatment of the Equipment Lenders' claims under the Plan; and

- **The Equity Committee**:   The Debtors have regular meetings and discussions with the Equity Committee regarding the Plan and the proposed capital raise and are optimistic they will support the Debtors' Plan.

31.     To be clear, the Debtors are also in frequent discussions with the Ad Hoc Noteholder Group's advisors and also met with them last week, but the calls are short and not particularly productive, as the Ad Hoc Noteholder Group's advisors have not been able to tell the Debtors what the specific terms of their proposal will be and when it is finally delivered, except that their perspective on valuation will be lower than the valuation contemplated by the Debtors' Plan.

32.     The Debtors intend to use the extension of the Exclusive Periods to continue discussions with each of the Key Stakeholder Groups before, during, and after Mediation in the hopes of reaching as much as consensus as possible.  However, to the extent a deal cannot be reached with the Ad Hoc Noteholder Group at and following Mediation, the Debtors will need to consider moving forward with the cram-up path under the Plan, particularly if the Ad Hoc Noteholder Group insists on the Convertible Noteholders' receiving a recovery greater than the Bankruptcy Code permits.

**ii.     The Debtors have Executed Several Value-Maximizing Settlements with Claimants**

33.     In addition, since the First Exclusivity Order, the Debtors have taken various other actions to help clear a path to confirmation and emergence, including executing several value-maximizing settlements or agreements (subject to Court approval) that eliminate or otherwise substantially reduce claims against the estate, including:

- **M&M Lien Settlements**:   The Debtors have entered into a number of settlements with several of the Debtors' largest holders of M&M Liens and

14

filed motions seeking approval of the following settlements and agreements:

- o **Condair Settlement**:[14]  In full and final satisfaction of approximately $11.8 million in asserted secured and unsecured claims and release of any liens securing such claims, the Debtors agreed to pay Condair $2.4 million in cash 5 days after entry of an order approving the settlement;

- o **Didado Settlement**:[15]  In full and final satisfaction of approximately $26 million in asserted secured claims and release of any liens securing such claims, the Debtors agreed to deliver to Didado a note in the principal amount of $13 million 5 days after entry of an order approving the settlement;

- o **HMC Settlement**:[16]  In full and final satisfaction of approximately $27.9 million in asserted secured claims and release of any liens securing such claims, the Debtors agreed to (i) pay HMC $2 million in cash and (ii) deliver to HMC a note in the principal amount of $15.5 million, in each case 5 days after entry of an order approving the settlement; and

- o **Trilogy**:[17]  In full and final satisfaction of approximately $14.9 million in asserted secured and unsecured claims and release of any liens securing such claims, the Debtors agreed to (i) pay Trilogy $2.8 million in cash and (ii) deliver to Trilogy a note in the

---

[14] On July 14, 2023 the Debtors filed a motion for approval of a settlement with Condair Inc. ("**Condair**"), resolving all disputes between the Company and Condair (the "**Condair Settlement**"). *See Debtors' Motion for Order Approving (I) Global Settlement Between Debtors and Condair Inc. and (II) Granting Related Relief* (Docket No. 1057).

[15] On July 14, 2023 the Debtors filed a motion for approval of a settlement with J.W. Didado Electric, LLC ("**Didado**"), resolving all disputes between the Company and Didado (the "**Didado Settlement**"). *See Debtors' Motion for Order Approving (I) Global Settlement Between Debtors and J.W. Didado Electric, LLC and (II) Granting Related Relief* (Docket No. 1061).

[16] On July 14, 2023 the Debtors filed a motion for approval of a settlement with Huband Mantor Construction ("**HMC**"), resolving all disputes between the Company and HMC (the "**HMC Settlement**"). *See Debtors' Motion for Order Approving (I) Global Settlement Between Debtors and Huband-Mantor Construction, Inc. and (II) Granting Related Relief* (Docket No. 1062).

[17] On July 14, 2023 the Debtors filed a motion for approval of a settlement with Trilogy, LLC ("**Trilogy**"); resolving all disputes between the Company and Trilogy (the "**Trilogy Settlement**"). *See Debtors' Motion for Order Approving (I) Global Settlement Between Debtors and Trilogy, LLC and (II) Granting Related Relief* (Docket No. 1058).

principal amount of $2.9 million, in each case 5 days after entry of an order approving the settlement;

- **Atalaya Settlement**:[18]   The Debtors negotiated a global settlement with Atalaya, a lessor of 5,770 miners to the Debtors, to allow for assumption of the Debtors' equipment lease with Atalaya, as amended to: (i) extend the term of the lease enabling the Debtors to utilize the Atalaya miners in their self-mining operations for a longer period of time and (ii) lower the Debtors' monthly payment obligations to Atalaya.  In return, the Debtors will cure all prepetition missed payments and grant Atalaya an administrative expense claim for unpaid postposition lease payments for the 60 days following the Petition Date; and

- **Denton Lease Amendment**:[19]   The Debtors have filed a motion to assume their as amended lease with the city of Denton (a lessor of certain premises to the Debtors), that provides for, among other things, the extension of the term and wavier of the default that otherwise arises from the mechanics liens that have attached to the property.

34.     In addition to reaching numerous settlements with creditors, the Debtors have also been advancing the claims reconciliation process by, among other things, (a) obtaining Court approval of omnibus claims objection procedures and claim settlement procedures and (b) filing objections[20] to disputed claims, including (i) Celsius,[21] (ii) Sphere,[22] (iii) GEM Mining

---

[18] On June 28, 2023 the Debtors filed a motion for approval of a settlement with ACM ELF ST LLC ("**Atalaya**") to, among other things, assume certain of leases of Atalaya, establish administrative claims asserted by Atalaya, stabilize the Debtors' relationship with Atalaya, and reduce the monthly lease payments under the certain of the leases as soon as possible (the "**Atalaya Settlement**").

[19] On June 28, 2023, 2023 the Debtors *filed Motion of Debtors for Entry of an Order (I) Approving Assumption of (A) Unexpired Nonresidential Real Property Leases and (B) An Executory Contract, as Amended and (II) Granting Related Relief* (Docket No. 1005), which includes the amendment with the City of Denton, a Texas home-rule municipal corporate ("**Denton**") to, among other things, the extension of the term and wavier of the default that otherwise arises from the mechanics liens that have attached to the property (the "**Denton Lease Amendment**").

[20] Further information regarding the details of the entire timeline of the Debtors' the circumstances leading to the filing of the objections listed herein in these chapter 11 cases is set forth in the Disclosure Statement.

[21] *Debtors' Objection to Proofs of Claim Nos. 425 and 497 Filed By Celsius Mining LLC* (Docket No. 819).

[22] *Debtors' Objection to Proofs of Claim Nos. 358 and 359 Filed By Sphere 3d Corp* (Docket No. 869).

1, LLC, GEM Mining 2, LLC, GEM Mining 2B, LLC, and GEM Mining 4, LLC;[23] and (iv) Bryce Johnson.[24]

35.      As described above, the Debtors have made substantial progress in their negotiations and settlements with numerous stakeholders and the Debtors would use the extension of the Exclusive Periods to implement the foregoing settlements and continue to advance their claims reconciliation process by negotiating settlements with additional creditors or otherwise filing claim objections, including to finalize negotiations with certain of their litigation claimants.

### iii.      Debtors' New Money Capital Raise Process

36.      In connection with the potential need to raise new capital to fund the Debtors' exit and post-emergence capital needs, the Debtors and their advisors formally commenced a marketing process to raise capital on June 12, 2023 and have reached out to a number of potential investors within and outside of the Debtors' capital structure. Although the process remains ongoing and the July 20 deadline to submit indications of interest has not yet passed, the Debtors and PJT are far along in the process and have already received one proposal for new money capital (which the Debtors are currently evaluating and negotiating) from the DIP Lender (which the Debtors are currently negotiating) and other parties have expressed interest in potentially submitting proposals as well.  Accordingly, an extension of the Exclusive Periods will allow the Debtors to complete their capital raise process without causing any interruption or distraction in the capital markets.

---

[23] *Debtors' Objection to Proof of Claim Nos. 503, 505, 506, 508, 570, 571, and 572 Filed By Gem Mining 1, LLC, Gem Mining 2B, LLC, Gem Mining 4, LLC, Gem Mining 2, LLC, Gem Mining 2, LLC, Gem Mining 2B, LLC, And Gem Mining 4, LLC, Respectively* (Docket No. 854).

[24] *Debtors' Objection to Proof of Claim Nos. 19 and 120 Filed By Bryce Johnson* (Docket No. 871).  Mr. Johnson subsequently agreed to withdraw all of his proofs of claim with prejudice (Docket Nos. 978, 987).

**B.      These Chapter 11 Cases are Large and Complex**

37.     The scale and complexity of the Debtors' business and industry, which require the Debtors to navigate complex issues in their reorganization efforts, support the need for the extension of the Exclusive Periods.  This factor weighs heavily in favor of extending exclusivity.  *See In re Texaco Inc.*, 76 B.R. 322, 326 (Bankr. S.D.N.Y. 1987) ("The large size of a debtor and the consequent difficulty in formulating a plan of reorganization for a huge debtor with a complex financial structure are important factors which generally constitute cause for extending the exclusivity periods.").  The legislative history of section 1121 provides that "if an unusually large company were to seek reorganization under chapter 11, the court would probably need to extend the time in order to allow the debtor to reach an agreement."  H.R. Rep. No. 95-595, at 232 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963.

38.     These chapter 11 cases are complex.  The Debtors are one of the largest blockchain infrastructure, hosting provider, and digital asset mining companies in North America.  First Day Declaration ¶ 5.  The Debtors own and/or manage 8 data centers (7 of which are operational) that span 5 states and can collectively utilize up to approximately 814 megawatts (MW) of power.  *Id.*  The Debtors use these data centers to mine digital assets for their own account, as well as host miners for third-party customers.  *Id.*  Importantly, the Debtors employ over 230 full-time employees, along with the services of independent contractors and temporary workers.

39.     Furthermore, the Debtors have a complex capital structure, with over $1 billion in total debt, including the Convertible Notes, equipment financings and leases, several M&M lien claims, an unsecured bridge note, and various other unsecured claims.  The Debtors' creditors have different legal rights and priorities and are secured by different collateral packages.  As the Debtors have seen in both pre- and postpetition negotiations, including in connection with

18

their various settlements, the parties' varying rights and legal positions add complexity to negotiations.

40.     Moreover, the Debtors operate in the inherently complex cryptocurrency industry.  The Debtors' business performance is tied to economics related to mining a volatile underlying decentralized asset – bitcoin.  As detailed in the First Exclusivity Motion, shifts in bitcoin prices, and (more importantly) their impact on hashprices, result in corresponding shifts in potential enterprise value, making the development of the Plan and distribution of value a complex process that is subject to frequent updates and refinement.

41.     Accordingly, the Debtors' size and the complexity of these chapter 11 cases, and the breadth of financial and legal issues involved therein, warrant the requested extension of the Exclusive Periods.

## C.     Relatively Little Time Has Elapsed in the Chapter 11 Cases Under the Circumstances

42.     As further detailed in the First Exclusivity Motion, the Debtors entered these chapter 11 cases, during the worst moments of the "crypto winter," with an RSA with the Ad Hoc Noteholder Group for a chapter 11 plan that would have provided ninety-seven percent (97%) of the Debtors' equity value to the holders of Convertible Notes.  Soon after filing, dramatic and positive changes in the Debtors' industry and operating landscape made it clear that the RSA plan was unreasonable and unconfirmable, as it did not reflect market realities and would provide greater than one-hundred percent (100%) recoveries to the holders of Convertible Notes, to the detriment of all other stakeholders.  This caused the Debtors and their advisors to focus most of their efforts during the first few months of these chapter 11 cases on resetting the table by, among other things, (i) conducting a renewed marketing effort to obtain replacement DIP financing and negotiating and obtaining Court approval of the Replacement DIP Facility, (ii) terminating the

RSA, (iii) negotiating a consensual resolution with the parties regarding the appointment of the Equity Committee, and (iv) developing an updated business plan and presenting such plan to each Key Stakeholder Group.  Only after completing each of these critical steps could the Debtors develop and begin presenting the consensual plan framework to each of the Key Stakeholder Groups, as they did at the end of May.  In other words, months into the chapter 11 cases, the Debtors were back at "square one," due to industry forces outside of their control.

43.     Therefore, although this is the Debtors' second request for an extension of the Exclusive Periods, the unusual circumstances of these cases necessarily delayed plan negotiations until the end of May.  Importantly, the Plan being filed at the six month mark of the cases, and the fact that the parties have not yet reached agreement on a consensual plan, are not due to the Debtors' bad faith or slow-rolling of the process.  In many ways, given that chapter 11 plan negotiations only just begun less than two months ago, this is like a first extension of exclusivity.  Accordingly, a further extension of the Exclusive Periods is warranted.

**D.     The Debtors are Making Administrative Expense Payments and Will Continue to Do So**

44.     Courts considering an extension of exclusivity also assess a debtor's liquidity.  *See In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 587 (Bankr. S.D.N.Y. 2006) (listing "the fact that the debtor is paying its bills as they become due" as a factor courts consider when analyzing exclusivity).  Here, the Debtors are paying administrative expenses as they come due and will continue to do so.  Furthermore, the Debtors have outperformed every budget they have prepared to date and have generated positive cash flow since the Petition Date.  As a result, the Debtors have repaid a total of $14 million in DIP principal, while still having $45 million of liquidity as of June 30, 2023 and access to an incremental $35 million in DIP financing under the Replacement DIP Facility (if necessary).  The Debtors continue to monitor their liquidity position

closely and are confident that sufficient cash flow and liquidity will be available to satisfy their postpetition payment obligations during the requested extension of the Exclusive Periods.

**E.      An Extension of the Exclusive Periods Will Not Prejudice Creditors**

45.      An extension of the Exclusive Periods will not prejudice any of the Debtors' stakeholders.  On the contrary, an extension of the Exclusive Periods will enable the Debtors to continue to have constructive negotiations with stakeholders to facilitate as much consensus as possible.

46.      Since the Debtors filed the Plan on June 20, 2023 the Debtors have made significant progress towards reaching consensus with various stakeholder groups and have mediation scheduled for July 26, 2023 to attempt to resolve the value allocation issue described above, as well as any other unresolved Plan issues.  To terminate exclusivity now and allow for a competing plan process at this juncture in these chapter 11 cases would hamper the Debtors' chances of achieving a consensual chapter 11 plan with their stakeholders and disrupt the orderly process the Debtors are leading.  Thus, the Debtors believe that an extension of the Exclusive Periods is in the best interest of the Debtors and their stakeholders.

47.      Accordingly, for the reasons set forth herein, the Debtors submit that "cause" exists to further extend the Exclusive Periods and respectfully request that the Court grant the relief requested herein.

## **Notice**

48.      Notice of this Motion will be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

## **No Prior Request**

49.     Except for the First Exclusivity Motion, no previous request for the relief

sought herein has been made by the Debtors to this or any other court.

[*Remainder of the page left intentionally blank*]

**WHEREFORE**, the Debtors respectfully request entry of the Proposed Order granting the

relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:  July 18, 2023
        Houston, Texas

Respectfully submitted,

  /s/ Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 1700
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511
Email:  alfredo.perez@weil.com
        clifford.carlson@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock (admitted *pro hac vice*)
Ronit J. Berkovich (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:   (212) 310-8007
Email: ray.schrock@weil.com
        ronit.berkovich@weil.com


*Attorneys for Debtors*
*and Debtors in Possession*

**<u>Certificate of Service</u>**

I hereby certify that on July 18, 2023 a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

<u>  /s/ Alfredo R. Pérez            </u>
Alfredo R. Pérez