## Exhibit B

**Hoffman POC**

Date Filed: 04/14/2023
Claim No: 556

| Fill in this information to identify the case: |
|---|

Debtor 1    Core Scientific Inc.

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:   Southern District of Texas

Case number   4:22-BK-90341

## Official Form 410

# Proof of Claim

04/22

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309)** that you received.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Lead Plaintiff in securities litigation (SEE ATTACHED)
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom?

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Phillip Kim
Name

275 Madison Ave., 40th Fl.
Number        Street

New York              NY          10016
City                  State       ZIP Code

Contact phone   (212) 686-1060

Contact email   pkim@rosenlegal.com

**Where should payments to the creditor be sent?** (if different)

Name

Number        Street

City                  State       ZIP Code

Contact phone

Contact email

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known) _____

Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____



Official Form 410

page 1

**Part 2:**     Give Information About the Claim as of the Date the Case Was Filed

| | | |
|---|---|---|
| 6. | **Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____ |

| | | |
|---|---|---|
| 7. | **How much is the claim?** | $_____188,600,000.00 . **Does this amount include interest or other charges?**<br>☑ No<br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

| | |
|---|---|
| 8. | **What is the basis of the claim?** |
| | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. |
| | Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c). |
| | Limit disclosing information that is entitled to privacy, such as health care information. |
| | SEE ATTACHED |

9. **Is all or part of the claim secured?**

☑ No
☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*
☐ Motor vehicle
☐ Other. Describe: _____

**Basis for perfection:** _____
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**    $_____
**Amount of the claim that is secured:**    $_____
**Amount of the claim that is unsecured:**    $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**    $_____

**Annual Interest Rate** (when case was filed) _____%
☐ Fixed
☐ Variable

| | | |
|---|---|---|
| 10. | **Is this claim based on a lease?** | ☑ No<br><br>☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____ |

| | | |
|---|---|---|
| 11. | **Is this claim subject to a right of setoff?** | ☑ No<br><br>☐ Yes. Identify the property: _____ |

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    04/14/2023
                 MM / DD / YYYY

/s/Phillip Kim
_____
Signature

Print the name of the person who is completing and signing this claim:

Name        Phillip Kim
            First name          Middle name          Last name

Title       Partner

Company     The Rosen Law Firm, P.A.
            Identify the corporate servicer as the company if the authorized agent is a servicer.

Address     275 Madison Ave., 40th Fl.
            Number        Street

            New York                    NY        10016
            City                        State     ZIP Code

Contact phone   (212) 686-1060          Email   pkim@rosenlegal.com

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| CORE SCIENTIFIC, INC., *et al.*,[1] | Case No. 22-90341 (DRJ) |
| Debtors. | (Jointly Administered) |

## PROOF OF CLAIM ATTACHMENT

DATED: November 7, 2022

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

## I. Basis of Claim

Lead Plaintiff Morgan Hoffman ("Lead Plaintiff"), individually and on behalf of the putative Class (defined below) in the following securities class action pending against the debtor, submits this proof of claim (the "Claim"). The Claim is based upon a securities class action entitled *Pang v. Levitt, et al.*, No. 1:22-CV-1191-LY (the "Securities Litigation") filed in the United States District Court for the Western District of Texas (the "District Court") on behalf of Lead Plaintiff and all persons who purchased the securities of Core Scientific, Inc. ("Core Scientific" or the "Debtor") between January 3, 2022 and October 26, 2022, both dates inclusive (the "Class Period") and who were damaged thereby (collectively, the "Class"). Lead Plaintiff and the Class are collectively referred to herein as "Plaintiffs." A copy of the Class Action Complaint for Violations of the Federal Securities Laws, filed with the District Court on November 14, 2022 as docket entry 1 is attached hereto and incorporated by reference as if fully set forth herein.[2]

## II. General Unsecured Claim and Amount

Plaintiffs assert that this Claim is a general unsecured claim in an amount in excess of $188.6 million in connection with the causes of action set forth in the Securities Litigation, including interest thereon and reasonable costs and expenses incurred including counsel and expert fees.

## III. Reservation of Rights

Plaintiffs reserve the right to amend, supplement, or supersede this Claim at any time and as may be necessary during the Debtor's bankruptcy proceedings. In addition, Plaintiffs reserve all rights with respect to any indebtedness owed to them by the Debtor or any other defendants in the

---

[2] Lead Plaintiff was appointed by the Court after this complaint was filed, and intends to file an amended complaint on or by May 5, 2023.

Securities Litigation including but not limited to certain officers and or directors of the Debtor as set forth in the Securities Litigation.

Nothing contained in this Claim shall be construed as limiting any of Plaintiffs' rights, remedies, and interests with respect to the subject matter contained herein.

**IV.**  **Name and Address of Where Notices Should be Sent**

All communications in connection with this proof of claim should be sent to:

**COCHRAN LAW, PLLC**
Stuart L. Cochran
Texas Bar No.: 24027936
8140 Walnut Hill Ln., Suite 250
Dallas, Texas 75231
Telephone: (469) 333-3405
Facsimile: (469) 333-3406
stuart@scochranlaw.com

*Liaison Counsel for Lead Plaintiff*

**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen
Phillip Kim
Joshua Baker
275 Madison Avenue, 40th Floor
New York, NY 10116
Phone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com
Email: jbaker@rosenlegal.com

*Lead Counsel for Lead Plaintiff*

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | |
|---|---|
| MEI PANG, Individually and on Behalf of All Others Similarly Situated,<br><br>             Plaintiff,<br><br>   v.<br><br>CORE SCIENTIFIC INC., MICHAEL LEVITT, MICHAEL TRZUPEK, and DENISE STERLING,<br><br>             Defendants. | Case No. 1:22-cv-01191<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

Plaintiff Mei Pang ("Plaintiff"), individually and on behalf of all others similarly situated, by and through her attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, her counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Core Scientific Inc. ("Core Scientific" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Core Scientific; and (c) review of other publicly available information concerning Core Scientific.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired Core Scientific securities between January 3, 2022 and October 26, 2022, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Core Scientific is a blockchain computing data center provider and digital asset mining company. It mines digital assets for its own account and provides hosting services for other large-scale miners. It became a public company via business combination with Power & Digital Infrastructure Acquisition Corp. ("XPDI") consummated on January 19, 2022 (the "Business Combination").

3.      On March 3, 2022, Culper Research published a report about Core Scientific alleging, among other things, that the Company had overstated its profitability and that the Company's largest customer lacked the financial resources to deliver the rigs pursuant to its contract.

4.      On this news, Core Scientific's stock fell $0.72, or 9.4%, to close at $6.98 on March 3, 2022, thereby injuring investors.

5.      On September 28, 2022, Celsius Network LLC and related entities filed a motion to enforce the automatic stay and for civil contempt in bankruptcy proceedings alleging that Core Scientific "has knowingly and repeatedly violated the automatic stay provisions" by refusing to perform its contractual obligations, threatening to terminate the companies' agreement, and adding improper surcharges.

6.      On this news, Core Scientific's stock price fell $0.15, or 10.3%, to close at $1.30 on September 29, 2022, thereby injuring investors.

7.      On October 27, 2022, before the market opened, Core Scientific disclosed that "given the uncertainty regarding the Company's financial condition, substantial doubt exists about the Company's ability to continue as a going concern," and that it is exploring alternatives to its capital structure. Moreover, the Company held 24 bitcoins, compared to 1,051 bitcoins as of September 30, 2022.

8.      On this news, Core Scientific's stock fell $0.789, or 78.1%, to close at $0.221 per share on October 27, 2022, on unusually high trading volume.

9.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that, due in part to the expiration of a favorable pricing agreement, the Company was experiencing increasing power costs; (2) that the Company's largest customer, Gryphon, lacked the financial resources to purchase the necessary miner rigs for Core Scientific to host; (3) that the Company was not providing hosting services to Celsius as required by their contract; (4) that the Company had

2

implemented an improper surcharge to pass through power costs to Celsius; (5) that, as a result of the foregoing alleged breaches of contract, the Company was reasonably likely to incur liability to defend itself against Celsius; (6) that, as a result of the foregoing, the Company's profitability would be adversely impacted; (7) that, as a result, there was likely substantial doubt as to the Company's ability to continue as a going concern; (8) and that as a result of the foregoing, Defendant's positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

12.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this Judicial District.

13.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

14.     Plaintiff Mei Pang, as set forth in the accompanying certification, incorporated by reference herein, purchased Core Scientific securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

15.     Defendant Core Scientific is incorporated under the laws of Delaware with its principal executive offices located in Austin, Texas. Core Scientific's common stock trades on the NASDAQ Exchange under the symbol "CORZ" and its redeemable warrants trade under the symbol "CORZW."

16.     Defendant Michael Levitt ("Levitt") was the Company's President and Chief Executive Officer ("CEO") at all relevant times.

17.     Defendant Michael Trzupek ("Trzupek") was the Company's Chief Financial Officer ("CFO") between October 12, 2020 and April 4, 2022.

18.     Defendant Denise Sterling ("Sterling") has been the Company's Chief Financial Officer ("CFO") since April 4, 2022.

19.     Defendants Levitt, Trzupek, and Sterling (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the

4

public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

20.    Core Scientific is a blockchain computing data center provider and digital asset mining company. It mines digital assets for its own account and provides hosting services for other large-scale miners.

### Materially False and Misleading

### Statements Issued During the Class Period

21.    The Class Period begins on January 3, 2022.[1] On that day, the Company issued a proxy statement soliciting shareholder approval of a merger between XPDI and Core Scientific (the "Proxy Statement"). The Proxy Statement stated that "electricity costs" were one of the key factors affecting the Company's performance:

*Electricity Costs*

***Electricity cost is the major operating cost for the mining fleet, as well as for the hosting services provided to customers and related parties***. See "*Power Providers and Facility Development*" for additional information related to *Electricity Costs*.

22.    The Proxy Statement purported to warn that increases in power costs could impact the Company's profitability:

Our success depends in large part on our ability to mine digital assets profitably and to attract customers for our hosting capabilities*. **Increases in power costs or our inability to mine digital assets efficiently and to sell digital assets at favorable prices will reduce our operating margins,*** impact our ability to attract customers for our services and harm our growth prospects and could have a material adverse effect on our business, financial condition and results of operations.

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added and footnotes are omitted.

Our growth depends in large part on our ability to successfully mine digital assets and to attract customers for our hosting capabilities. We may not be able to attract customers to our hosting capabilities for a number of reasons, including if:

- there is a reduction in the demand for our services due to macroeconomic factors in the markets in which we operate;

- we fail to provide competitive pricing terms or effectively market them to potential customers;

- *we provide hosting services that are deemed by existing and potential customers or suppliers to be inferior to those of our competitors, or that fail to meet customers' or suppliers' ongoing and evolving program qualification standards, based on a range of factors, including available power, preferred design features, security considerations and connectivity*;

- businesses decide to host internally as an alternative to the use of our services;

- we fail to successfully communicate the benefits of our services to potential customers;

- we are unable to strengthen awareness of our brand;

- we are unable to provide services that our existing and potential customers desire; or

- our customers are unable to secure an adequate supply of new generation digital asset mining equipment to host with us.

If we are unable to obtain hosting customers at favorable pricing terms or at all, it could have a material adverse effect on our business, financial condition and results of operations.

23. The Proxy Statement contained the following risk factor related to its power costs:

We are subject to risks associated with our *need for significant electric power and the limited availability of power resources, which could have a material adverse effect on our business, financial condition and results of operations*.

Our mining and hosting services require a significant amount of electric power. *The costs of electric power account for a significant portion of our cost of revenue. We require a significant electric power supply to conduct our mining activity and to provide many hosting services we offer*, such as powering and cooling our and our customers' servers and network equipment and operating critical mining and hosting facility and equipment infrastructure.

The amount of power required by us and our customers will increase commensurate with the demand for our services and the increase in miners we operate for ourselves and our hosting customers. Energy costs and availability are vulnerable to seasonality, with increased costs primarily in the summer months and risks of outages and power grid damage as a result of inclement weather, animal incursion, sabotage and other events out of our control. Although we aim to build and operate energy efficient hosting facilities, there can be no assurance such facilities will be able to deliver sufficient power to meet the growing needs of our business. ***The cost of power at our hosting facilities is dependent on our ability to perform under the terms in the power contracts we are a party to, which we may be unable to do successfully.*** Pursuant to these power contracts, if we fail to curtail our power usage when called upon or fail to satisfy certain eligibility requirements for monthly bill credits, our power costs would increase...

24.     The Proxy Statement also stated the following about its hosting facilities:

***Electric Service Agreements with Dalton Utilities***

On October 11, 2018, Core Scientific, through its wholly-owned subsidiary, American Property Acquisitions VII, LLC, entered into an Amended and Restated Electric Service Agreement with The Board of Water, Light and Sinking Fund Commissioners of the City of Dalton, Georgia (d/b/a Dalton Utilities, "Dalton") for the supply of electric power to each of its hosting sites located at Boring Drive, Dalton, Georgia (the "Boring Drive Site") and Industrial South, Dalton, Georgia (the "Industrial South Site"). The agreement for the Boring Drive Site provides for an electrical power capacity of up to 120,000kW, and the agreement for the Industrial South Site provides for an electrical power capacity of up to 50,000kW. ***Under each agreement, Core Scientific agreed to pay to Dalton $0.0364 on a kW per hour basis as modified from time to time, but not to exceed $0.042 prior to December 31, 2021.*** Each agreement has an indefinite term, which can be terminated by Core Scientific for convenience by providing 60 days written notice to Dalton.

25.     The above statements identified in ¶¶ 21-24 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that, due in part to the expiration of a favorable pricing agreement, the Company was experiencing increasing power costs; (2) that the Company's largest customer, Gryphon, lacked the financial resources to purchase the necessary miner rigs for Core Scientific to host; (3) that the Company was not providing hosting services to Celsius as required by their contract; (4) that the Company had

implemented an improper surcharge to pass through power costs to Celsius; (5) that, as a result of the foregoing alleged breaches of contract, the Company was reasonably likely to incur liability to defend itself against Celsius; (6) that, as a result of the foregoing, the Company's profitability would be adversely impacted; (7) that, as a result, there was likely substantial doubt as to the Company's ability to continue as a going concern; (8) and that as a result of the foregoing, Defendant's positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

26.     The truth began to emerge on March 3, 2022 when Culper Research issued a report entitled "Core Scientific, Inc. (CORZ): Rigged Deals" (the "Culper Report"). The Culper Report alleged that the Company's largest customer, Gryphon Digital Mining ("Gryphon") (also referred to as ANY and Sphere) is a stock promotion "with little financial wherewithal to purchase or install miners in Core's facilities, hence leaving Core holding the bag." Specifically, the Culper Report alleged, in relevant part:

**We Think Core's Largest Would-Be Hosting Customer, ANY, is a Stock Promotion**

In October 2021, Core Scientific formed its largest ever hosting deal with Gryphon Digital Mining, for 230 MW of capacity, which can support up to 71,000 machines (7.1 EH/s). However, Gryphon appears to us to be a stock promotion, with little financial wherewithal to purchase or install its miners in Core's facilities, hence leaving Core holding the bag. Gryphon most recently disclosed that as of January 6, 2022, the company had just 3,000 S19J Pro machines. The agreement provides for deployment of the miners [pursuant to a monthly schedule].

[table omitted]

We don't think these miners will ever make it to Core's facilities. The miners appear to originate via Sphere's July 2021 agreement with FuFu Technology Limited ("BitFuFu") for the purchase of 60,000 miners for $305.7 million. Yet of the total price, Sphere has paid only $85.0 million, while the remaining $220.7 million remains payable "over the next 12 months".[] As far as the remainder, we don't think ANY has the cash: pro forma cash for the combined company as of Q3 2021 was just $106.1 million, far short of the $220.7 million in remaining payments Gryphon must make for the miners. Sphere has also not been able to file a 10-Q for

the entirety of 2021, and the Company's last audited financials were for year-end 2020.

In February 2022, ANY's promotion kicked into high gear as the company announced that it entered into an agreement with "NuMiner" to purchase $1.7 billion worth of "NM 440" 440 TH/s miners. We think these miners do not exist, [and] will never exist. . . .

- NuMiner's rendering of its miners is a laughably juvenile rip-off of the CS-2 by Cerebras, not a bitcoin mining rig but a 660lb supercomputer. Cerebras has since publicly admonished NuMiner and claimed no affiliation with the Company.

- NuMiner has also issued a feeble attempt at third-party validation, claiming its miners were tested and verified by TUV Nord (a German company) to BTL standards. However, we inquired with both TUV Nord and with BTL, who each disclaimed this theory. BTL stated that NuMiner was prohibited from using their mark. TUV Nord claimed to have "no entry in our database about a customer named NuMiner".

- NuMiner has claimed that TSMC is a production partner, but we inquired with TSMC who stated to us that "We can confirm to you that Numiner is not a direct customer of TSMC."

- NuMiner has also claimed Xilinx as a production partner, yet when we inquired with Xilinx, a representative told us that "I'm not sure if they have our permission to use our logo… That's typically reserved for folks who participate in our Xilinx Partner Program." NuMiner does not appear in Xilinx's partner list and thus does not appear to be a participant in the partner program.

\*       \*       \*

- Taiwanese corporate documents also disclose that NuMiner was capitalized with just ~$40,000 USD, suggesting to us that the group has little ability to produce these miners, nor to provide the contemplated $1.1 billion in vendor financing to Sphere to purchase them, even if they existed.

In sum, we view Core Scientific as having lent itself to a blatantly transparent stock promotion, and doubt that Sphere will ever fill out the 230 MW capacity called of it in its hosting agreement.

27.     The Culper Report also alleged that Core Scientific overstated its profitability. While the Company claimed "a mining breakeven of $2,700 in power costs per bitcoin," the Culper Report "estimate[d] Core's true go-forward power costs are $10,845 per BTC . . . and the Company's all-in cost to mine (including miner costs and G&A) is $41,723 per bitcoin." Core

Scientific's profitability was allegedly overstated because it: (i) incorrectly assumed a network hash rate of 106 EH/s; (ii) understated the power bills for its Georgia facilities; and (iii) ignored miner costs and expenses. Specifically, the Culper Report alleged, in relevant part:

<u>Core Assumed a Network Hash Rate of Just 106 EH/s</u>

Core's first mining breakeven assumption is a network hash rate of 106 EH/s. We believe Core took advantage of what we view as a temporary depression in the BTC network hash rate to artificially inflate purported self-mining profitability. In the meantime, hash rate has almost doubled to 197.2 EH/s. Moreover, Core's own Michael Levitt has stated that he anticipates the global hash rate will continue to grow at an aggressive pace. Sell-side models we reviewed also expect global hash rate to continue growing, while the next halving event is currently estimated at just over 2 years away. As such, we see this 106 EH/s assumption as cherry-picking a very convenient data point, yet wholly unreflective of the economics of Core's go-forward economics.

*       *       *

<u>Core's Sweetheart Power Agreement Price Cap Expired at Year-End 2021</u>

Core's cost of mining is primarily determined by its power costs, which are governed by its power agreements at each of its facilities. We find that Core's commentary on such agreements does not disclose its approximate monthly power bills for the Dalton, Georgia facilities as it does for each of the others:

[chart omitted]

We think it's possible that Core avoided such disclosers to sidestep scrutiny of its Boring Drive and Industrial South sites, which we find have been aided by a sweetheart power deal that was set to expire at year-end 2021: [The deal provided that] "Core Scientific agreed to pay to Dalton $0.0364 on a kW per hour basis as modified from time to time, **but not to exceed $0.042 prior to December 31, 2021."**

The Georgia rate survey showed Dalton Utilities held a Winter 2021 rate of $0.0962 per kWh. Thus, illustratively, Core's fully-baked costs for its Georgia facilities at full capacity[] would more than double:

| Georgia Facility Illustrative Economics | Old Rate | New Rate |
|---|---|---|
| Cost per KWH | $0.0420 | $0.0962 |
| Cost per MWH | $42.0 | $96.2 |
| MW | 175 | 175 |
| MWH Usage | 1,533,000 | 1,533,000 |
| Electricity Costs ($ millions) | $64 | $147 |
| Incremental Costs ($ millions) | | $83 |

We assume power costs of $0.06 per kWh, a network hash rate of 220 EH, a 2% pool fee, and 95% uptime, which results in **energy costs of $10,845 per BTC, or 4.0x what the Company touted** in its investor presentation[.]

[chart omitted]

<u>Core's Analysis Ignores Miner Costs and Operating Expenses</u>

However, Core's supposed "breakeven" figures also ignored the cost of miner and operating expenses, relatively fundamental items to running a bitcoin mining operation.

Consider that a 100 TH/s miner can be expected to mine 0.158 BTC per year. Core executive Taras Kulyk has stated that miners ought to last 24 to 36 months, so we assume a 2.5 year useful life of the Company's miners.15 While secondary market prices for S19 Pro miners are $10,000 to $15,000 as of late, we assume conservatively that Core pays $6,000 per 110 TH/s miner. We thus estimate rig costs of $15,238 per BTC mined:

| Culper Research Economic Estimates | |
|---|---|
| Miner Cost (110 TH/s miner) | $6,000 |
| Useful life (years) | 2.5 |
| Annual cost of miner | $2,400 |
| Annual BTC mined per miner | 0.158 |
| BTC breakeven cost (miners) | $15,238 |

Finally, consider that in 2020, Core spent $16,847 in operating expenses for each BTC mined, 16 while for the 9 months ended Q3 2021, this figure was remarkably similar at $16,328 in operating expenses per BTC mined:

| CORZ Operating Expenses | FY 2020 | 9 mo Q3 21 |
|---|---|---|
| Operating Expenses ($ millions) | 21.6 | 53.4 |
| BTC mined | 1,282 | 3,271 |
| Opex per BTC mined ($) | $16,847 | $16,328 |

11

Thus, when fully accounting for the Company's power costs, miner costs, and operating expenses, we estimate that Core's true "economic" breakeven cost to mine a single BTC is $41,723, making its entire operation barely profitable at current BTC prices:

| Culper Estimates - CORZ Breakeven Costs | |
| --- | --- |
| Miner Costs per BTC Mined | $15,238 |
| Power Costs per BTC Mined | $10,485 |
| Operating Expenses per BTC Mined | $16,000 |
| BTC Price for CORZ Economic Breakeven | $41,723 |

28.     On this news, Core Scientific's stock fell $0.72, or 9.4%, to close at $6.98 on March 3, 2022, thereby injuring investors.

29.     On March 7, 2022, the Company announced preliminary fiscal 2021 financial results in a press release, stating "We expect 2021 revenue to be $515 million to $545 million, net income of $50 million to $60 million and adjusted EBITDA of $225 million to $235 million."

30.     On March 29, 2022, Core Scientific announced its fiscal 2021 financial results in a press release that stated, in relevant part:

**Fiscal Year 2021 Financial Highlights (Compared to Fiscal Year 2020)**

- Total revenue increased by 803% to $544.5 million

- ***Gross profit increased by 2,443% to $238.9 million***

- Net Income increased to $47.3 million

- Adjusted EBITDA[] increased by 3,849% to $238.9 million

31.     On March 30, 2022, the Company filed a Form 10-K for the year ended December 31, 2021 (the "2021 10-K"), affirming the previously reported financial results. The 2021 10-K contained substantially the same statements identified in the Proxy Statement.

32.     On April 5, 2022, Core Scientific issued a press release announcing "March Updates and CFO Transition." Therein, the Company stated, in relevant part:

*Hosting*

In addition to its self-mining fleet, as of March 31, 2022, Core Scientific provided infrastructure, technology and operating support for a growing, diverse group of customers representing 7.9 EH/s.

33.     On May 5, 2022, Core Scientific announced its "April Updates" in a press release that stated, in relevant part:

*Hosting*

In addition to its self-mining fleet, as of April 30, 2022, Core Scientific provided infrastructure, technology and operating support for a growing, diverse group of customers representing 8.1 EH/s.

34.     On May 12, 2022, the Company issued a press release announcing first quarter 2022 results, stating in relevant part:

**First Quarter 2022 Financial Highlights (Compared to First Quarter 2021)**

- Total revenue increased by 255% to $192.5 million

- ***Gross profit increased by 382% to $70.0 million***

- Net loss of $466.2 million, driven by a noncash mark-to-market adjustment on convertible notes of $386.0 million and an impairment on digital assets of $54.0 million

- Adjusted EBITDA[] increased by 644% to $93.0 million

35.     On May 13, 2022, the Company filed its Form 10-Q for the quarter ended March 31, 2022, which contained substantially the same statements identified in the Proxy Statement.

36.     On June 6, 2022, Core Scientific announced its "May Updates" in a press release that stated, in relevant part:

*Colocation Services*

In addition to its self-mining fleet, as of May 31, 2022, Core Scientific provided data center colocation services, technology and operating support for a growing, diverse group of customers representing 7.9 EH/s and more than 80,000 ASICs servers.

13

37.     On July 5, 2022, Core Scientific announced its "June Updates" in a press release that stated, in relevant part:

*Colocation Services*

In addition to its self-mining fleet, as of June 30, 2022, Core Scientific provided data center colocation services, technology and operating support for approximately 79,000 customer owned ASIC servers generating 7.6 EH/s. Colocated EH/s declined slightly from May to June as a result of the Company's long-planned acquisition of Argo's ASIC servers that were colocated in the Company's data centers.

As of June month end, colocation services accounted for approximately 43% of the Company's data center capacity and digital asset mining operations. Inquiries for colocation services continue to exceed the Company's available infrastructure.

38.     On August 5, 2022, Core Scientific announced its "July Updates" in a press release that stated, in relevant part:

*Colocation Services*

In addition to its self-mining fleet, as of July 31, 2022, Core Scientific provided data center colocation services, technology and operating support for approximately 86,000 customer owned ASIC servers, a net monthly increase of approximately 7,600 or 10%, generating 8.4 EH/s. During the month of July the Company signed colocation agreements with customers totaling 75MW and representing approximately $50 million in annual revenue when fully deployed. On July 19, Core Scientific deployed the first BITMAIN ANTMINER S19 XP servers in the United States for its customer, NFN8 Group, Inc. The S19 XP servers are rated to operate at up to 140 TH/s and represent the first of many planned for deployment by the Company for self-mining and colocation customers.

As of July month end, colocation services accounted for approximately 44% of the Company's total hashrate. Inquiries for colocation services continue to exceed the Company's available infrastructure.

39.     On August 11, 2022, Core Scientific announced its second quarter 2022 financial results in a press release that stated, in relevant part:

Gross profit of $12.7 million decreased by $11.8 million, or 48%, from $24.5 million. The decrease in gross profit was driven primarily by a $18.9 million decrease in gross profit in the hosting and equipment segment, partially offset by an $7.1 million increase in gross profit for the mining segment, driven by an increase in mining revenue. The decrease in gross margin for the mining segment

was driven by higher miner depreciation as well as higher power costs and lower average price per bitcoin mined.

40.     On August 22, 2022, the Company filed its Form 10-Q for the quarter ended June 30, 2022, which contained substantially the same statements identified in the Proxy Statement.

41.     On September 6, 2022, Core Scientific announced its "August Updates" in a press release that stated, in relevant part:

*Colocation Services*

In addition to its self-mining fleet, as of August 31, 2022, Core Scientific provided data center colocation services, technology and operating support for more than 97,000 customer-owned ASIC servers. As of August month end, colocation services accounted for approximately 41% of the Company's total hashrate. Inquiries for colocation services continue to exceed the Company's available infrastructure.

42.     On October 5, 2022, Core Scientific announced its "September Updates" in a press release that stated, in relevant part:

*Colocation Services*

In addition to its self-mining fleet, as of September 30, 2022, Core Scientific provided data center colocation services, technology and operating support for approximately 102,000 customer-owned ASIC servers representing approximately 9.5 EH/s. In September, the Company deployed approximately 8,400 new servers for its colocation customers. As of September month end, colocation services accounted for approximately 42% of the Company's total hashrate. Inquiries for colocation services continue to exceed the Company's available infrastructure.

43.     The above statements identified in ¶¶ 29-42 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that, due in part to the expiration of a favorable pricing agreement, the Company was experiencing increasing power costs; (2) that the Company was not providing hosting services to Celsius as required by their contract; (3) that the Company had implemented an improper surcharge to pass through power costs to Celsius; (4) that, as a result of the foregoing alleged breaches of contract, the Company

was reasonably likely to incur liability to defend itself against Celsius; (5) that, as a result of the foregoing, the Company's profitability would be adversely impacted; (6) that, as a result, there was likely substantial doubt as to the Company's ability to continue as a going concern; (7) and that as a result of the foregoing, Defendant's positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

### Disclosures at the End of the Class Period

44.     On September 28, 2022, Celsius Network LLC ("Celsius") and related entities filed a motion to enforce the automatic stay and for civil contempt in bankruptcy proceedings alleging that Core Scientific "has knowingly and repeatedly violated the automatic stay provisions." Specifically, Celsius alleged that Core Scientific breached their agreement before Celsius filed its bankruptcy petition by failing to deliver rigs pursuant to the contractual schedule. The motion stated, in relevant part:

**B. Core Scientific's Failure to Deploy Celsius' Rigs**

16. Celsius has delivered 10,885 rigs into Core Scientific's possession under Order #10 [i.e., the operative section of the parties' Master Services Agreement ("MSA")]. ***To this day, Core Scientific is deploying only 6,564 of Celsius' rigs and is providing Celsius with only 21.5 MWs of power. But Celsius is entitled to 79.4 MWs as of September 2022***, which is the hosting capacity to operate approximately 22,000 rigs of the type specified in Order #10. Core Scientific's current shortfall under Order #10 is 58 MWs of power and at least 15,700 rigs.

17. Core Scientific's current shortfalls are a direct consequence of its pre-petition conduct. Since the MSA was signed, Core Scientific has performed a now-familiar routine: it delays deployment of Celsius' rigs; it follows those delays with empty promises to catch up; and it follows those promises with even more delays, in contravention of the Agreement and its own interim representations.

18. Celsius delivered its 10,885 rigs under Order #10 to Core Scientific in three tranches prior to the petition, and each time, Celsius had to wait months for its rigs to come online. ***For nearly half those rigs, Celsius is still waiting***. . . .

(Internal citations omitted.)

45.     Celsius also claimed that Core Scientific imposed improper surcharges in an
attempt to "pass through" its power costs. The motion stated, in relevant part:

### E. Core Scientific's Attempt to "Pass Through" Its Power Costs

26. Finally, since the Petition Date, Core Scientific has begun adding certain
surcharges to Celsius' invoices that **contravene the fixed-price structure** of the
orders between the parties. Worse**, Core Scientific has misrepresented the nature
of these surcharges.**

\*       \*       \*

32. In response, Core Scientific provided information showing increased power
rates in the various jurisdictions where Celsius rigs are located. This confirmed that
the "Power Cost Pass-through" surcharges Core Scientific had been adding to
Celsius' post-petition invoices were not new "tariffs," as Core Scientific had
claimed, but rather, were simply the incremental increases in power costs to **Core
Scientific**—which were not subject to pass through under the MSA.

(Internal citations omitted and second emphasis in original.)

46.     On this news, Core Scientific's stock price fell $0.15, or 10.3%, to close at $1.30
on September 29, 2022, thereby injuring investors.

47.     On October 27, 2022, Core Scientific filed a Form 8-K with the SEC, stating that
due to the "prolonged decrease in the price of bitcoin, the increase in electricity costs, the increase
in the global bitcoin network hash rate and the litigation with Celsius," the Company would not
make outstanding payments for financing and was exploring strategic alternatives to its capital
structure." Core Scientific also disclosed that its cash resources would be "depleted by the end of
2022 or sooner." It stated, in relevant part:

As previously disclosed, **the Company's operating performance and liquidity
have been severely impacted by the prolonged decrease in the price of bitcoin, the
increase in electricity costs, the increase in the global bitcoin network hash rate
and the litigation with Celsius Networks LLC and its affiliates** ("Celsius"). As a
result, management has been actively taking steps to decrease monthly costs, delay
construction expenses, reduce and delay capital expenditures and increase hosting
revenues. In addition, **the Board has decided that the Company will not make
payments coming due in late October and early November 2022 with respect to
several of its equipment and other financings, including its two bridge promissory**

17

*notes.* As a result, the creditors under these debt facilities may exercise remedies following any applicable grace periods, including electing to accelerate the principal amount of such debt, suing the Company for nonpayment or taking action with respect to collateral, where applicable. Any such creditor actions may result in events of default under the Company's other indebtedness agreements, including its two series of convertible notes due 2025, and the potential exercise of remedies by creditors under such agreements.

*In light of the foregoing, the Company is in the process of exploring a number of potential strategic alternatives with respect to the Company's capital structure, including hiring strategic advisers, raising additional capital or restructuring its existing capital structure*.

*     *     *

It is very difficult to estimate our future liquidity requirements. The Company *anticipates that existing cash resources will be depleted by the end of 2022 or sooner.*

*     *     *

Given the uncertainty regarding the Company's financial condition, substantial doubt exists about the Company's ability to continue as a going concern for a reasonable period of time.

48.     On this news, Core Scientific's stock fell $0.789, or 78.1%, to close at $0.221 per share on October 27, 2022, on unusually high trading volume.

## CLASS ACTION ALLEGATIONS

49.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Core Scientific securities between January 3, 2022 and October 26, 2022, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

50.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Core Scientific's shares actively traded on the

18

NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Core Scientific shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Core Scientific or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

51.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

52.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

53.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

        (a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

        (b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Core Scientific; and

        (c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

54.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

55.     The market for Core Scientific's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Core Scientific's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Core Scientific's securities relying upon the integrity of the market price of the Company's securities and market information relating to Core Scientific, and have been damaged thereby.

56.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Core Scientific's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Core Scientific's business, operations, and prospects as alleged herein.

57.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Core Scientific's financial well-being and prospects.  These material

misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

58.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

59.     During the Class Period, Plaintiff and the Class purchased Core Scientific's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

60.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Core Scientific, their control over, and/or receipt and/or modification of Core Scientific's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential

proprietary information concerning Core Scientific, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

61.     The market for Core Scientific's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Core Scientific's securities traded at artificially inflated prices during the Class Period. On February 8, 2022, the Company's share price closed at a Class Period high of $10.88 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Core Scientific's securities and market information relating to Core Scientific, and have been damaged thereby.

62.     During the Class Period, the artificial inflation of Core Scientific's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Core Scientific's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Core Scientific and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

63.     At all relevant times, the market for Core Scientific's securities was an efficient market for the following reasons, among others:

(a)     Core Scientific shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Core Scientific filed periodic public reports with the SEC and/or the NASDAQ;

(c)     Core Scientific regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Core Scientific was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

64.     As a result of the foregoing, the market for Core Scientific's securities promptly digested current information regarding Core Scientific from all publicly available sources and reflected such information in Core Scientific's share price. Under these circumstances, all purchasers of Core Scientific's securities during the Class Period suffered similar injury through their purchase of Core Scientific's securities at artificially inflated prices and a presumption of reliance applies.

65.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse

information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

66.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Core Scientific who knew that the statement was false when made.

## **FIRST CLAIM**

### **Violation of Section 10(b) of The Exchange Act and**
### **Rule 10b-5 Promulgated Thereunder**
### **Against All Defendants**

67.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

68.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Core Scientific's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

69.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Core Scientific's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

70.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Core Scientific's financial well-being and prospects, as specified herein.

71.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course

of conduct as alleged herein in an effort to assure investors of Core Scientific's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Core Scientific and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

72. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

73. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such

defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Core Scientific's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

74.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Core Scientific's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Core Scientific's securities during the Class Period at artificially high prices and were damaged thereby.

75.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Core Scientific was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Core Scientific

securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

76.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

77.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

78.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

79.     Individual Defendants acted as controlling persons of Core Scientific within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

80.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

81.     As set forth above, Core Scientific and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: November 14, 2022.        Respectfully submitted,

*/s/ Bruce W. Steckler*
Bruce W. Steckler
Texas Bar I.D. 00785039
**STECKLER WAYNE CHERRY & LOVE PLLC**
12720 Hillcrest Road, Suite 1045
Dallas, TX 75230
T: 972-387-4040
F: 972-387-4041
bruce@swclaw.com

**GLANCY PRONGAY & MURRAY LLP**
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007

*Attorneys for Plaintiff Mei Pang*