## Exhibit C

**Amended Complaint**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| MEI PANG, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:22-CV-1191-DAE |
| Plaintiff, | CLASS ACTION |
| v. | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| MICHAEL LEVITT, MICHAEL TRZUPEK, and DENISE STERLING, | |
| Defendants. | JURY TRIAL DEMANDED |

## TABLE OF CONTENTS

NATURE OF THE ACTION ........................................................................... 1

JURISDICTION AND VENUE ....................................................................... 7

PARTIES .......................................................................................................... 8

A BRIEF PRIMER ON BLOCKCHAIN, CRYPTOCURRENCY, AND DIGITAL ASSET MINING ...................................................................... 12

RELEVANT NON-PARTY CORE SCIENTIFIC, INC. ............................... 16

    Company Background ............................................................................... 17

    XPDI and Core's De-SPAC Transaction (the "Merger") ........................ 19

THE COMPANY'S PROXY STATEMENT AND REGISTRATION STATEMENT CONTAINED FALSE AND MISLEADING STATEMENTS AND OMISSIONS .................. 21

    The Proxy Statement and Registration Statement Contained Misleading Statements and Omissions of Material Fact ............................ 21

    Defendants Failed to Disclose Known Material Trends ........................... 25

PUBLIC FILINGS REVEALED CORE'S ATTEMPTS TO PASS THROUGH ITS INCREASED POWER COSTS ......................................... 26

CORE GOES BANKRUPT, TANKING ITS STOCK AND HARMING INVESTORS ........... 35

CLASS ACTION ALLEGATIONS ............................................................... 38

COUNT I (Violations of Section 14(a) of the Exchange Act and Rule 14a-9) ............................ 41

COUNT II (Violations of Section 20(a) of the Exchange Act) .................... 42

COUNT III (Violations of Section 11 of the Securities Act) ....................... 44

COUNT IV (Violations of Section 15 of the Securities Act) ....................... 45

EXCHANGE ACT ALLEGATIONS ............................................................. 46

    Defendants Made Additional False and Misleading Statements and Omissions During the Class Period ......................................................... 46

    Defendants Misleadingly Failed to Disclose Known Material Trends ..................... 59

    Each of the Challenged Statements Was Made With Scienter .................. 60

        Defendants Knew or Were Severely Reckless in Disregarding Material Facts Contradicting Their Statements ........................... 61

        Defendants Had Financial Motives to Conceal the Truth and Complete the Merger ........................... 64

COUNT V (Violations of Section 10(b) of the Exchange Act and Rule 10b-5) ............................ 65

COUNT VI (Violations of Section 20(a) of the Exchange Act) .................... 67

PRAYER FOR RELIEF .................................................................................. 68

JURY DEMAND ............................................................................................ 68

Lead Plaintiff Morgan Hoffman and named plaintiffs Evan Achee and William J. Emanuel ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned attorneys, allege the following facts and assert the following claims. Plaintiffs' allegations are based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by Plaintiffs' attorneys, including without limitation: review and analysis of Defendants' public statements, public documents, conference calls, and announcements, United States Securities and Exchange Commission ("SEC") filings, and wire and press releases published by and regarding Core Scientific Inc. ("Core") or Power & Digital Infrastructure Acquisition Corp. ("XPDI")[1], media and analyst reports and advisories about Core or XPDI, interviews with confidential witnesses, information from related court filings, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support exists for the allegations set forth herein and will be shown after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to Defendants (defined below) or are exclusively within their control.

## NATURE OF THE ACTION

1.     Plaintiffs bring this action as a federal securities class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class defined as (a) all persons and entities that purchased or acquired the publicly traded common stock or warrants of Core or XPDI, or purchased call options or sold put options on XPDI or Core common stock, between January 3,

---

[1] As described in further detail below, Core merged with XPDI in January 2022, with the merged company renamed "Core Scientific, Inc." For the purposes of this complaint, references to the "Company" are to the publicly traded company: pre-merger XPDI and/or post-merger Core. References to "Core" are to pre- and/or post-merger Core.

2022 and December 20, 2022, both dates inclusive ("Class Period"); and (b) all persons and entities who held the common stock of XPDI at the close of business on December 7, 2021, and were entitled to vote on the approval of the Merger (defined below) at the special meeting of XPDI stockholders on January 19, 2022.[2]

2.　　Plaintiffs bring the following claims on behalf of the Class: (1) claims pursuant to Sections 11 and 15 of the Securities Act of 1933 ("Securities Act") for all persons and entities who acquired XPDI or Core publicly traded common stock or warrants pursuant or traceable to the Registration Statement (defined below) issued in connection with the Merger (defined below); (2) claims pursuant to Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act") for all persons and entities who held the common stock of XPDI at the close of business on December 7, 2021, and were entitled to vote on the approval of the Merger at the special meeting of XPDI stockholders on January 19, 2022, and (3) claims pursuant to Sections 10(b) and 20(a) of the Exchange Act for all persons and entities who purchased XPDI or Core publicly traded common stock or warrants, or purchased call options or sold put options on XPDI or Core common stock, during the Class Period.

3.　　XPDI was a public special purpose acquisition company, known as a "SPAC" or "blank check" company, formed in January 2021. In July 2021, XPDI and Core entered into a merger agreement in what is known as a "de-SPAC" transaction. XPDI's shareholders approved the de-SPAC merger transaction with Core (the "Merger") at a special meeting of XPDI stockholders in January 2022, pursuant to a Proxy Statement issued in connection with the Merger.

---

[2] Excluded from the Class are: (a) persons who suffered no compensable losses; and (b) Defendants; the present and former officers and directors of the Company at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any of the Defendants, or any person excluded under this subsection (b), has or had a majority ownership interest at any time.

4.      In the Merger, unredeemed shares of XPDI were converted on a one-for-one basis to shares of the new post-Merger Company, which adopted the name Core Scientific Inc., pursuant to a Registration Statement filed in connection with the new securities.

5.      Core operates blockchain computing data centers and engages in digital asset mining. Core mines digital assets (also known as cryptocurrency), primarily Bitcoin, for its own account and provides hosting services at its data center facilities for other large-scale miners.

6.      Bitcoin mining on a commercial scale involves operating thousands of specialized computing machines ("miners") working to solve complex cryptographic algorithms to validate decentralized Bitcoin transactions, which generates or earns Bitcoins. Commercial Bitcoin mining requires purpose-designed facilities capable of housing, maintaining, and most importantly, powering, these fleets of machines. Core provides these facilities and services at large scale, with some of their capacity devoted to their own machines ("self-mining") and some to third parties who contract with Core to host and operate machines for the third party's benefit ("hosting").

7.      Electricity is the principal operating cost for Core's (or any miner's) mining fleet, as the miners consume large amounts of electricity. Leveraging its scale and buying power, Core sought to obtain favorable long-term power contracts from utility providers to streamline power costs and make the self-mining and hosting business segments more profitable.

8.      Core's ability to obtain favorable power rates appealed to Core's hosting customers, who entered fixed rate contracts with Core where the customer would pay, among other minor fees for hosting services, a fixed rate per kilowatt-hour (kWh, a measurement of energy usage) based on the actual monthly energy consumption attributed to the customer's hosted miners. Under the fixed rate arrangement, the customer did not bear the risk of power increases or reap the benefit of power decreases.

9.     The fixed rate nature of these contracts was the primary reason Core was able to attract customers as it gave their customers predictable input costs in order to run their mining operations.  In exchange for this stability, customers made substantial advance payments to Core, who could then negotiate power purchase agreements with knowledge of its fixed hosting rates and potentially hedge its power costs to better manage the risk of power cost fluctuations.

10.     Beginning in late 2021, Core began to experience rising power costs. Core's hosting business operated with thin profit margins, and those margins evaporated when Core was squeezed between persistent increases in power costs and its fixed rate contracts with its hosting customers. In an attempt to combat this adverse trend, Core's Chief Executive Officer, Defendant Michael Levitt, decided that Core would pass through its increased power costs to its hosting customers.

11.     In late 2021, Levitt instructed Core employees to "come up with a suggested plan," including a "Power Surcharge Fee" that would be charged to hosting customers in the event of power cost increases. At that same time, Core began rolling out a new version of its hosting contracts which, unlike the existing fixed rate contracts, included new language explicitly permitting Core to pass through increases in power costs to its customers. Core tried to migrate all of its hosting customers to these new contracts as soon as possible. Some new customers, or those whose contracts were up for renewal, signed the new agreements.

12.     However, Core's efforts to pass through their increased power costs did not stop there. In late 2021, Core's legal team got "comfortable" with the idea that the existing fixed rate agreements allowed Core to pass through its increased power costs. The language in the existing contracts permitted Core to pass through to its customers "any new taxes, levies, tariffs or governmental fees and charges," and Core decided, beginning in late 2021, that "tariffs" now

included utility costs. On this basis, Core began adding power cost pass-through charges to its hosting customers' invoices.

13.     Not surprisingly, Core's opportunistic reading that "tariffs" included Core's own utility costs was met with internal and external resistance. Core's own auditor, Ernst & Young ("EY"), evaluated Core's attempt to pass through its own increased power costs to hosting customers. EY pushed back on the practice and questioned the legal validity of passing through Core's power costs under the "tariff" language of the existing customers' fixed rate contracts. In fact, EY told Core that it should include an offsetting allowance in its financial statements, as opposed to merely recording revenue, to account for the likelihood that customers would dispute Core's attempts to pass through its power cost increases. Core rejected EY's concerns and fired EY shortly thereafter.

14.     Core's customers also rebuffed Core's efforts to pass through its increased power costs. Most notably, Celsius Network LLC ("Celsius"), one of Core's two largest customers, ardently disputed Core's imposition of these new power cost pass-through fees. Core also received challenges to the legality of its pass-through practices from several other customers.

15.     Core lost at least 5-10 hosting customers as a result of Core's attempts to pass through its rising power costs to hosting customers in contravention of their fixed rate contracts. In fact, a total of 24 of Core's hosting contracts were terminated in the fourth quarter of 2022, leaving Core with only 14 remaining hosting customers by mid-December.

16.     In September 2022, Celsius filed a motion for civil contempt in Celsius' bankruptcy proceedings, alleging that Core "knowingly and repeatedly violated the automatic stay provisions" by, among other things, adding improper power cost pass-through surcharges. In its motion, Celsius explained how these surcharges clearly contravened the parties' hosting agreement.

17.     In October 2022, Core revealed that due to the "prolonged decrease in the price of bitcoin, the increase in electricity costs, the increase in the global bitcoin network hash rate and the litigation with Celsius," the Company would not make outstanding debt payments and was exploring strategic alternatives to its capital structure. Core also disclosed that its cash resources would be "depleted by the end of 2022 or sooner," and that "substantial doubt exists about the Company's ability to continue as a going concern for a reasonable period of time."

18.     In December 2022, Core filed for bankruptcy protection and its securities were delisted from NASDAQ shortly thereafter—rendering Core's securities virtually worthless.

19.     In Core's bankruptcy proceedings, Celsius filed an objection to a motion filed by Core "to set the record straight with respect to the terms of the Celsius Contracts."

20.     Celsius explained that the parties had engaged in significant discovery in connection with Celsius' September 2022 motion in its own bankruptcy proceedings. Celsius summarized the results of that discovery, providing details from Core's internal documents and deposition testimony from Core employees and executives. Celsius explained in detail how, among other things, Core's attempts to pass through its own increased power costs to its hosting customers (including Celsius), contravened the customers' fixed rate contracts and resulted in Core losing the business of many of its hosting customers.

21.     The Company's public statements throughout the Class Period, including its Proxy Statement and Registration Statement concerning the merger with XPDI, failed to disclose to investors that (1) by late 2021, the Company was experiencing increases in power costs which threatened the viability of Core's hosting business due to fixed rate contracts with Core's hosting customers which did not permit Core to pass through its increased power costs; and (2) Core was

attempting to foist power cost pass-through surcharges upon its fixed rate hosting customers, foreseeably causing many of Core's hosting customers to cease doing business with Core.

22. The mass departure of Core's hosting customers was a material contributing factor to the deterioration of Core's financial condition, resulting in the October "going concern" warning and eventual bankruptcy. Defendants' failure to disclose the material adverse facts concerning Core's power cost pass-through ploy concealed the risk of those consequences and caused Plaintiffs and the Class to suffer significant losses.

23. As a result of Defendants' violations of the securities laws, in the span of less than a year Plaintiffs and the Class lost nearly the entire value of their investment. The Company's common stock closed at $10.43 per share at the beginning of the Class Period in January 2022, and the redemption value of XPDI shares at the time the Merger was approved was approximately $10 per share. By the time Core filed for bankruptcy in December 2022, its stock price had collapsed entirely, falling to $0.05 per share before being delisted.

## JURISDICTION AND VENUE

24. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5), Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 promulgated thereunder by the SEC (17 C.F.R. § 240.14a-9), and Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

25. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

26.     This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

27.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) because the alleged false and misleading public filings and statements were made in or issued from this District and the Company's headquarters are located in this District.

28.     In connection with the acts, transactions, and conduct alleged in this complaint, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, the Internet, and the facilities of a national securities exchange.

## **PARTIES**

29.     Lead Plaintiff Morgan Hoffman ("Hoffman"), as set forth in his certification on file with the Court (Dkt. No. 17-2) and incorporated by reference herein, purchased Core common stock and call options on Core common stock at artificially inflated prices during the Class Period and was damaged thereby. Hoffman also held XPDI common stock at the close of business on December 7, 2021, and was entitled to vote on the approval of the Merger at the Company's Special Meeting on January 19, 2022. Hoffman also acquired Core common stock when his pre-Merger shares of XPDI common stock were exchanged for shares of Core common stock issued pursuant to the Registration Statement.

30.     Named Plaintiff Evan Achee ("Achee"), as set forth in his certification attached hereto as Exhibit 1, purchased Core common stock at artificially inflated prices during the Class Period and was damaged thereby. Achee also held XPDI common stock at the close of business on December 7, 2021, and was entitled to vote on the approval of the Merger at the Company's

Special Meeting on January 19, 2022. Achee also acquired Core common stock when his pre-Merger shares of XPDI common stock were exchanged for shares of Core common stock issued pursuant to the Registration Statement.

31.     Named Plaintiff William J. Emanuel ("Emanuel"), as set forth in his certification attached hereto as Exhibit 2, purchased Core common stock at artificially inflated prices during the Class Period and was damaged thereby. Emanuel also held XPDI common stock at the close of business on December 7, 2021, and was entitled to vote on the approval of the Merger at the Company's Special Meeting on January 19, 2022. Emanuel also acquired Core common stock when his pre-Merger shares of XPDI common stock were exchanged for shares of Core common stock issued pursuant to the Registration Statement.

32.     Defendant Michael Levitt ("Levitt") served as Core's Chief Executive Officer ("CEO") and as Co-Chair and a member of Core's board of directors at all relevant times. Levitt served as the CEO of Core since May 2021, and as Chairman and a member of Core's board of directors from June 2018 until the merger.

33.     Defendant Michael Trzupek ("Trzupek") served as the Chief Financial Officer ("CFO") of Core between September 21, 2020 and April 4, 2022.

34.     Defendant Denise Sterling ("Sterling") served as Core's CFO since April 4, 2022. Sterling previously served as Core's Senior Vice President of Finance from May 2021 to April 2022.

35.     Defendant Darin Feinstein ("Feinstein") founded Core and served as Core's Chief Vision Officer (listed as an Executive Officer position in the Proxy Statement) and Co-Chair of the Company's board of directors following the merger with XPDI.

36.     Defendant Brian Neville ("Neville") served as Core's Chief Accounting Officer from January 2021 until October 19, 2022.

37.     Defendant Jarvis Hollingsworth ("Hollingsworth") was named as an incoming director of the post-merger Company in the Registration Statement and Proxy Statement. Hollingsworth served as a member of Core's board of directors since the consummation of the Merger and served on the Audit Committee of Core's board of directors.

38.     Defendant Matt Minnis ("Minnis") was a co-founder of Core. Minnis was named as an incoming director of the post-merger Company in the Registration Statement and Proxy Statement. Minnis served as a member of Core's board of directors since June 2018.

39.     Defendant Stacie Olivares ("Olivares") was named as an incoming director of the post-merger Company in the Registration Statement and Proxy Statement. Olivares served as a member of Core's board of directors since the consummation of the Merger and served on the Audit Committee of Core's board of directors.

40.     Defendant Kneeland Youngblood ("Youngblood") was named as an incoming director of the post-merger Company in the Registration Statement and Proxy Statement. Youngblood served as a member of Core's board of directors since the consummation of the Merger and served as the chair of the Audit Committee of Core's board of directors.

41.     Defendant Patrick C. Eilers ("Eilers") served as XPDI's CEO and a member of its board of directors at all relevant times prior to the Merger.

42.     Defendant Theodore J. Brombach ("Brombach") served as the Chairman of XPDI's board of directors at all relevant times prior to the Merger.

43.     Defendant Paul Gaynor ("Gaynor") served as a member of XPDI's board of directors at all relevant times prior to the Merger.

44.     Defendant Paul Dabbar ("Dabbar") served as a member of XPDI's board of directors at all relevant times prior to the Merger.

45.     Defendant Colleen Sullivan ("Sullivan") served as a member of XPDI's board of directors at all relevant times prior to the Merger.

46.     Defendant Scott Widham ("Widham") served as a member of XPDI's board of directors at all relevant times prior to the Merger.

47.     Defendants Levitt, Feinstein, Hollingsworth, Minnis, Olivares, and Youngblood (collectively, the "Core Director Defendants"), became directors of the Company upon the completion of the Merger, and participated in Core's board meetings as well as its day-to-day operations. The Core Director Defendants permitted the use of their names in connection with the solicitation of proxies from the XPDI shareholders via the Proxy Statement. By virtue of their high-ranking positions, the Core Director Defendants possessed the power and authority to control the contents of Core's post-Merger statements, including the Company's filings with the SEC, press releases, and presentations to investors, analysts, and the media.

48.     Defendants Eilers, Brombach, Gaynor, Dabbar, Sullivan, and Widham (collectively, the "XPDI Director Defendants"), were directors of the Company prior to the Merger and participated in XPDI's board meetings and conference calls. The XPDI Director Defendants voted to approve the Merger, approved the Proxy Statement and Registration Statement, solicited approval of the Merger from shareholders through the XPDI's board's unanimous recommendation that XPDI's shareholders vote in favor of the Merger, which appeared in the Proxy Statement and Registration Statement, and permitted the use of their names in connection with the solicitation of proxies from the XPDI shareholders. By virtue of their authority to approve the Merger, the XPDI Director Defendants possessed the power and authority to control the

contents of the Registration Statement and Proxy Statement, as well as the contents of the Company's other pre-Merger statements, including the Company's filings with the SEC, press releases, and presentations to investors, analysts, and the media.

49.     The Core Director Defendants, the XPDI Director Defendants, Trzupek, Sterling, and Neville are sometimes referred to collectively herein as "Defendants."

50.     Each of the Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

## A BRIEF PRIMER ON BLOCKCHAIN, CRYPTOCURRENCY, AND DIGITAL ASSET MINING

51.     Blockchains are decentralized digital ledgers that record and enable secure peer-to-peer transactions without third-party intermediaries.

52.     Blockchains enable the existence of digital assets (also known as cryptocurrency) by allowing participants to confirm transactions without the need for a central certifying authority. When a participant requests a transaction, a peer-to-peer computer network consisting of nodes validates the transaction and the user's status using known algorithms. After the transaction is verified, it is combined with other transactions to create a new block of data for the ledger. The new block is added to the existing blockchain in a way that is permanent and unalterable, thereby completing the transaction.

53.     As each new block refers back to and "connects" with the immediately prior block associated with it, the addition of a new block adds to the blockchain in a manner similar to a new link being added to a chain.

54.     Digital assets, or cryptocurrency, are a medium of exchange that uses encryption techniques to control the creation of units and to verify the transfer of funds. Digital assets offer lower cost and faster peer-to-peer payment options without the need to provide personal details. Every single transaction, and the ownership of every single digital asset in circulation, is recorded in the blockchain, which effectively contains a record of all account balances.

55.     Digital asset miners use powerful computers that tally digital asset transactions to operate the blockchain. These miners update stored records each time a transaction is made and ensure the authenticity of information. The miners receive a transaction fee for their service in the form of a portion of the new digital "coins" that are issued.

56.     Each account on the blockchain is identified solely by its unique public key, which renders it effectively anonymous, and is secured with its associated private key, which is kept secret, like a password. The combination of private and public cryptographic keys constitutes a secure digital identity in the form of a digital signature, providing strong control of ownership.

57.    No single entity owns or operates the blockchain network. The infrastructure is collectively maintained by a decentralized public user base and does not rely on governments or financial institutions to create, transmit or determine the value of digital assets. Rather, value is determined by market factors, supply and demand for the units, with prices being set in transfers by mutual agreement or through barter among transacting parties, as well as by the number of merchants that may accept the digital asset.

58.    As digital asset transactions can be broadcast to the digital asset network by any user's blockchain and digital assets can be transferred without the involvement of intermediaries or third parties, there are currently little to no transaction costs in direct peer-to-peer transactions.

59.    Units of digital assets can be converted to fiat currencies, such as the U.S. dollar, at rates determined on various exchanges. Digital asset prices are quoted on various exchanges and demonstrate extreme volatility.

60.    The market for digital assets has been growing exponentially. In 2017, there were an estimated 2.7 million users of digital assets, whereas today estimated users are 100 million.

61.    Bitcoin remains the leading digital asset in terms of market capitalization. As of November 1, 2021, the trading price of one Bitcoin (BTC) was $60,954.50.

62.    Specialized computers, or "miners," power and secure blockchains by solving complex cryptographic algorithms to validate transactions on specific digital asset networks. In order to add blocks to the blockchain, a miner must map an input data set consisting of the existing blockchain, plus a block of the most recent digital asset transactions and an arbitrary number called a "nonce," to an output data set of a predetermined length using the SHA256 cryptographic hash algorithm. Solving these algorithms is also known as "solving or completing a block." Solving a block results in a reward of digital assets, such as Bitcoin, in a process known as "mining."

63.     These rewards of digital assets can be sold profitably when the sale price of the digital asset exceeds the cost of "mining," which generally consists of the cost of mining hardware, the cost of the electrical power to operate the machine, and other facility costs to house and operate the equipment.

64.     Mining processing power is generally referred to as "hashing power." A "hash" is the computation run by mining hardware in support of the blockchain. A miner's "hash rate" refers to the rate at which it is capable of solving such computations. Hash rates are measured in astronomically high rates, such as exahash per second (EH/s). One exahash is one quintillion hashes, or one billion billion.

65.     Miners with a higher total hash rate (the combined hash rate of all its miners dedicated to mining a specific digital asset) relative to the overall network's hash rate have a higher chance of completing a block in the blockchain and receiving a digital asset reward.

66.     However, as the market price for a digital asset increases, more users are incentivized to mine that digital asset, which increases the network's overall hash rate. As a result, a mining participant must increase its total hash rate in order to maintain its relative chances of solving a block on the network blockchain and earning rewards. Achieving greater hash rate power by deploying increasingly sophisticated miners in ever greater quantities has become one of the Bitcoin mining industry's great sources of competition.

67.     The method for creating new Bitcoin is mathematically controlled in a manner such that the supply of Bitcoin grows at a limited rate based on a pre-determined schedule. The number of Bitcoin awarded for solving a new block is automatically halved every 210,000 blocks. This means every block up to and including block 210,000 produced a reward of 50 Bitcoin, while blocks beginning with 210,001 produced a reward of 25 Bitcoin.

68.     The current fixed reward for solving a new block is 6.25 Bitcoin per block and it is anticipated that the reward will decrease by half again in early 2024. This deliberately controlled rate of Bitcoin creation means that the number of Bitcoin in existence will never exceed 21 million and that Bitcoin cannot be devalued through excessive production unless the Bitcoin network's source code (and the underlying protocol for Bitcoin issuance) is altered. As of August 1, 2021, approximately 18.77 million Bitcoin had been mined.

## RELEVANT NON-PARTY CORE SCIENTIFIC, INC.

69.     Core Scientific, Inc. ("Core") is incorporated under the laws of Delaware with its principal executive offices located in Austin, Texas. During the Class Period, upon completion of the Merger, Core's common stock traded on the NASDAQ under the symbol "CORZ," and its redeemable warrants traded under the symbol "CORZW."

70.     On December 21, 2022, Core (along with its debtor affiliates) filed voluntary petitions for relief under Chapter 11 of the U.S. Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas. *In Re: Core Scientific, Inc., et al.*, Case No. 22-90341. On April 14, 2023, Lead Plaintiff timely filed a proof of claim (Claim No. 49) in Core's bankruptcy proceedings in connection with the claims of Plaintiffs and the Class in this action.

71.     Plaintiffs do not bring claims against non-party Core at this time due to the ongoing bankruptcy proceedings and automatic stay pursuant to 11 U.S.C. § 362. Nonetheless, Plaintiffs submit that the facts alleged herein are sufficient to establish primary violations of the securities laws by Core for the purposes of Plaintiffs' control person claims against other Defendants, as alleged in greater detail below. Plaintiffs reserve their right to amend their pleadings to add Core as a defendant after the conclusion of Core's bankruptcy proceedings.

**Company Background**

72.     Core operates blockchain computing data centers and engages in digital asset mining. Core mines digital assets, primarily Bitcoin, for its own account and provides hosting services at its data center facilities for other large-scale miners.

73.     Core began digital asset mining in July 2018, and by 2020 became one of the largest providers of hosting services for third-party mining customers in North America. Through 2020, Core derived almost all of its revenue from third-party hosting fees and the resale of digital asset mining machines.

74.     Core's Proxy Statement and its annual report for 2021 each stated that "[g]oing forward, we anticipate that our mining and hosting operations will comprise all or substantially all of our business activities." Core's quarterly report for the second quarter of 2022, filed on August 11, 2022, confirmed that "[t]oday, our mining and hosting operations comprises all or substantially all of our business activities."

75.     According to Core's annual report for 2022, Core reported nearly $80 million in hosting revenue in 2021, which comprised approximately 15% of Core's total revenues for the year. In 2022, Core reported nearly $160 million in hosting revenue, which comprised approximately 25% of Core's total revenues for 2022.

76.     In July 2021, Core agreed to acquire one of its largest hosting customers, Blockcap, Inc. ("Blockcap"), a blockchain technology company with industrial scale Bitcoin mining operations. At the time of the acquisition Blockcap claimed to be the largest independent cryptocurrency mining operator in North America.

77.     Core mines Bitcoin, Ethereum and other digital assets for third-party hosting customers and for its own account at data centers (existing or planned) in North Carolina, Georgia, Kentucky, North Dakota, and Texas. Core's full-service hosting business provides customers with

17

deployment, monitoring, troubleshooting, optimization and maintenance of customer's digital asset mining equipment, and providing the necessary electrical power, repair, and other infrastructure services necessary to operate and maintain digital miners.

78.     Core focuses on hosting customers with large-scale deployments of miners, and provides power, racks, proprietary thermodynamic management (heat dissipation and airflow management), redundant connectivity, 24/7 security, and proprietary software platforms that provide infrastructure management and custom firmware designed to increase performance and energy efficiency. Core's data centers are purpose-built facilities designed for high density blockchain computer servers, with favorable long-term power contracts at stable rates and high emissions-free content.

79.     Core has developed a proprietary design for its mining facilities, including an air flow system for optimal cooling of the mining rigs. This allows the rigs to run more efficiently, require less maintenance, and last longer, which provides a lower direct cost of mining. Core has also developed a proprietary software platform for managing the mining rigs it deploys at its facilities.

80.     Core's "Hosting and Equipment Sales" business consists primarily of its blockchain infrastructure and third-party hosting business and equipment sales. The hosting business generates revenue through the sale of consumption-based contracts for hosting services. Hosting contracts are generally based on the use of power (measured in megawatts, or "MW") by the hosted machines. Core also generates revenues from equipment sales (primarily resales of mining rigs) to its customers.

81.     The original equipment used for mining Bitcoin utilized the Central Processing Unit ("CPU") of a computer, but due to performance limitations, CPU mining was rapidly replaced

by the Graphics Processing Unit ("GPU"), and then by application-specific integrated circuit ("ASIC") chips such as those found in the S17 and S19 miners that Core and its customers use to mine Bitcoin. These ASIC chips are the current standard in the mining industry and are designed specifically to maximize the rate of hashing operations.

82.     Substantially all of the miners Core owns and hosts were manufactured by Bitmain and incorporate ASIC chips specialized to solve blocks on the Bitcoin blockchains.

### XPDI and Core's De-SPAC Transaction (the "Merger")

83.     XPDI was a public special purpose acquisition company, also known as a "SPAC" or "blank check" company. XPDI was formed in January 2021, per its initial registration statement, for the purpose of "effect[ing] a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses or entities."

84.      XPDI's initial registration statement stated that the Company "intend[ed] to pursue opportunities that are driving the electrical power grid transition, both on the supply and demand side, as well as seeking co-optimization opportunities between supply and demand, of the electrical grid in the United States," and that "[o]n the demand side, we plan to target businesses comprised of, but not limited to (i) data centers and data center management; (ii) blockchain infrastructure; and (iii) frontier technology infrastructure that incorporates these high-density energy consumers into the electrical grid."

85.     XPDI completed its initial public offering ("IPO") of 34.5 million "Units" at $10.00 each on February 12, 2021. Each Unit consisted of one share of Class A common stock and one-fourth of a redeemable warrant. One warrant entitled the holder to purchase one share of the Company's Class A common stock for $11.50. Prior to the Merger, XPDI's Class A common stock, Units, and warrants traded on NASDAQ under ticker symbols XPDI, XPDIU, and XPDIW, respectively.

19

86.     XPDI's IPO generated gross proceeds of $345 million, which was placed into a trust account (including approximately $12.1 million in deferred underwriting commissions).

87.     On July 20, 2021, XPDI and Core entered into an Agreement and Plan of Merger and Reorganization in what is known as a "de-SPAC" transaction.

88.     XPDI's stockholders approved the de-SPAC merger transaction with Core at a special meeting of XPDI stockholders held on January 19, 2022.

89.     Holders of record of XPDI common stock as of the close of business on December 7, 2021 were entitled to, and received, notice of the special meeting via the Proxy Statement (defined below), and were entitled to vote at the special meeting.

90.     The Merger was effected by (i) the merger of an XPDI subsidiary with and into pre-Merger Core on January 19, 2022, with Core surviving the merger as a wholly owned subsidiary of XPDI, (ii) the merger of Core with and into XPDI on January 20, 2022, with XPDI surviving the second merger, and (iii) following the closing of the second merger, on January 20, 2022, the merger of Blockcap (a wholly owned subsidiary of pre-Merger Core) with and into another XPDI subsidiary, with the subsidiary surviving the third merger as a wholly owned subsidiary of XPDI under the name "Core Scientific Acquired Mining LLC."

91.     Upon the Merger, XPDI changed its name to "Core Scientific, Inc." and redesignated its Class A and Class B common stock as Core common stock on a one-for-one basis. Upon the Merger, XPDI's warrants were also redesignated as Core warrants on a one-for-one basis. XPDI's Units no longer traded upon the consummation of the Merger.

92.     Prior to, and but for, the consummation of the Merger, XPDI's shareholders were entitled to redeem their shares for a *pro rata* portion of the trust account funds, which was approximately $10 per share at the time of the Merger.

## THE COMPANY'S PROXY STATEMENT AND REGISTRATION STATEMENT
## CONTAINED FALSE AND MISLEADING STATEMENTS AND OMISSIONS

93.     On January 3, 2022, the Company issued a proxy statement soliciting shareholder

approval of the Merger between XPDI and Core, as well as other proposals related to the Merger

("Proxy Statement"). Defendants Eilers and Brombach signed the Proxy Statement.

94.     On August 11, 2021, the Company filed a Registration Statement with the SEC on

Form S-4, to register the post-Merger shares of Core common stock, which registration statement

was amended several times before being declared effective on December 30, 2021 ("Registration

Statement"). On January 3, 2022, the Company filed a prospectus with the SEC on Form 424B3,

which prospectus was incorporated into and formed part of the Registration Statement. Defendants

Eilers and Brombach signed the Registration Statement.

95.     Each of the XPDI Director Defendants were listed in the Proxy Statement and

Registration Statement as directors of the Company. Each of the Core Director Defendants were

listed in the Proxy Statement and Registration Statement as incoming directors of the Company

upon completion of the Merger.

96.     The Proxy Statement and Registration Statement each stated that "XPDI's board of

directors has unanimously approved the merger agreement and the transactions contemplated

thereby and recommends that XPDI stockholders vote 'FOR' the approval of the merger

agreement, 'FOR' the issuance of New Core common stock in connection with the merger and

'FOR' the other matters to be considered at the Special Meeting."

### The Proxy Statement and Registration Statement Contained
### Misleading Statements and Omissions of Material Fact

97.     The Proxy Statement and the Registration Statement each stated, under "Key

Factors Affecting Our Performance":

Our financial performance and continued growth depend in large part on our ability … to attract customers for our hosting services. ***Increases in power costs, … will reduce our operating margins, impact our ability to attract customers for our services, may harm our growth prospects and could have a material adverse effect on our business, financial condition and results of operations***.

98.     This statement was misleading because Defendants failed to disclose that (1) by late 2021, the Company had already started to experience increases in power costs which threatened the viability of Core's hosting business due to fixed rate contracts with Core's hosting customers which did not permit Core to pass through its increased power costs; and (2) Core was attempting to foist additional power cost pass-through charges upon its fixed rate hosting customers, foreseeably causing hosting customers to cease doing business with Core—a material adverse effect on Core's business and financial condition. The statement misleadingly portrayed increased power costs as a future hypothetical scenario, when they had already materialized, and the cause of the material adverse effect on Core's business was not the increased power costs themselves but Core's attempts to force its hosting customers to pay Core's increased power costs in contravention of the customers' fixed rate contracts.

99.     The Proxy Statement and the Registration Statement also each stated that:

Hosting revenue from customers and related parties is based on consumption-based contracts with our customers and related parties. ***Most contracts are renewable, and our customers are generally billed on a fixed and recurring basis each month for the duration of their contract***, which vary from one to three years in length.

100.     This statement was misleading because Defendants failed to disclose that while the Company's hosting customers were "generally billed on a fixed and recurring basis," Core was nonetheless attempting to force its hosting customers to pay Core's increased power costs in contravention of their fixed rate contracts, which foreseeably risked and eventually caused those customers to cease doing business with Core.

101.     The Proxy Statement and the Registration Statement each contained the following purported risk disclosure:

> Our growth depends in large part on our ability to successfully mine digital assets and to attract customers for our hosting capabilities. ***We may not be able to attract customers to our hosting capabilities for a number of reasons, including if:***
>
> …
>
> - ***we fail to provide competitive pricing terms or effectively market them to potential customers;***
>
> …
>
> If we are unable to obtain hosting customers at favorable pricing terms or at all, it could have a material adverse effect on our business, financial condition and results of operations.

102.     This purported risk disclosure was inadequate and misleading because Defendants failed to disclose that (1) by late 2021, the Company had already started to experience increases in power costs which threatened the viability of Core's hosting business due to fixed rate contracts with Core's hosting customers which did not permit Core to pass through its increased power costs; and (2) Core was attempting to foist additional power cost pass-through charges upon its fixed rate hosting customers, which foreseeably risked and eventually caused those customers to cease doing business with Core—a material adverse effect on Core's business and financial condition. The highlighted statement misleadingly portrayed the Company's failure to provide its hosting customers with competitive pricing terms as a future, hypothetical scenario, when Core had already begun attempting to contravene the fixed rate pricing terms of its hosting customers' contracts.

103.     The Proxy Statement and the Registration Statement also each contained the following purported risk disclosure:

> Our revenue comes from a small number of customers, and the loss of, or significant decrease in business from, a number of these customers or our failure to continually attract new customers could

23

have a material adverse effect on our business, financial condition and results of operations.

We have generated a significant portion of our historical revenue from a small number of hosting customers. … ***Any failure to meet our end-users' expectations, including, but not limited to, any inability to meet their requirements for increased hosting capacity at attractive rates, could result in cancellation or non-renewal of our business relationships.*** … If these customers reduced spending on our services, or changed their outsourcing strategy by moving to in-house facilities or outsourcing to other service providers, and we are not able to offset that lost revenue or replace the reduced capacity utilization with our own mining equipment, it could have a material adverse effect on our business, financial condition and results of operations. …

104.    This purported risk disclosure was inadequate and misleading because Defendants failed to disclose that by late 2021, Core had begun attempting to contravene the fixed rate terms of its hosting customers' contracts by imposing additional power cost pass-through charges on its customers, which foreseeably risked and eventually caused those customers to cease doing business with Core—a material adverse effect on Core's business and financial condition. The highlighted statement misleadingly portrayed the Company's failure to provide its hosting customers with attractive rates as a future hypothetical scenario, when Core had already begun attempting to contravene the fixed rate pricing terms of its customers' contracts.

105.    The Proxy Statement and the Registration Statement also each contained the following purported risk disclosure:

***If we fail to accurately estimate the factors upon which we base our contract pricing, we may generate less profit than expected or incur losses on those contracts, which could have a material adverse effect on our business, financial condition and results of operations.***

Our hosting contracts are generally priced on the basis of estimated power consumption by our clients, along with other costs of service, as adjusted for actual costs. Our ability to earn a profit on such contracts requires that we accurately estimate the costs involved and outcomes likely to be achieved and assess the probability of

generating sufficient hosting and colocation capacity within the
contracted time period. …

106.    This purported risk disclosure was inadequate and misleading because Defendants
failed to disclose that by late 2021, the Company had already started to experience increases in
power costs which threatened the viability of Core's hosting business due to fixed rate contracts
with Core's hosting customers which did not permit Core to pass through its increased power costs.
The statement misleadingly portrayed the Company's failure to accurately estimate its power costs
(a major factor upon which the Company based its hosting contract pricing) as a future hypothetical
scenario when it had already materialized. Core's inability to accurately estimate its power costs
in entering fixed rate contracts with hosting customers resulted in those hosting contracts becoming
unprofitable and served as the basis for Core's attempts to contravene the fixed rate pricing terms
of its hosting customers' contracts, which foreseeably risked and eventually caused those
customers to cease doing business with Core.

**Defendants Failed to Disclose Known Material Trends**

107.    The Proxy Statement and Registration Statement were materially false and
misleading in that they failed to "[d]escribe any known trends or uncertainties that have had or that
the registrant reasonably expects will have a material favorable or unfavorable impact on net sales
or revenues or income from continuing operations," and to "provide such other information that
the registrant believes to be necessary to an understanding of its financial condition, changes in
financial condition and results of operations," as mandated by Item 303 of Regulation S-K (17
C.F.R. § 229.303) ("Item 303") and the SEC's related interpretive releases thereto.

108.    The SEC's Instructions to Item 303 further require that the Management's
Discussion and Analysis of Financial Condition and Results of Operations "shall focus specifically
on material events and uncertainties known to management that would cause reported financial

information not to be necessarily indicative of future operating results or of future financial condition."

109.     The Proxy Statement and Registration Statement each failed to disclose that (1) by late 2021, the Company had already started to experience increases in power costs which threatened the viability of Core's hosting business due to fixed rate contracts with Core's hosting customers which did not permit Core to pass through its increased power costs; and (2) Core was attempting to foist additional power cost pass-through charges upon its fixed rate hosting customers, which foreseeably risked and eventually caused those customers to cease doing business with Core. These undisclosed facts were likely to, and ultimately did, have materially adverse impacts on the Company's overall financial condition.

110.     These omissions violated Item 303 because these undisclosed facts were known to Defendants, as was the high likelihood (which was later realized) that they would have a material impact on the Company's overall financial condition.

111.     Indeed, the Company's risk disclosures in the Proxy Statement and Registration Statement, as referenced above, acknowledged the likely material impact of these undisclosed trends on the Company's financial condition (while misleadingly describing the sources of those foreseeable risks as future hypotheticals, when in fact they were already transpiring).

## PUBLIC FILINGS REVEALED CORE'S ATTEMPTS TO PASS THROUGH ITS INCREASED POWER COSTS

112.     Celsius was one of Core's two largest and most important customers, if not the largest. On December 18, 2020, Core and Celsius entered into a Master Services Agreement, in which Core agreed to provide hosting services for Celsius' digital asset mining rigs.

113.     In August 2022, Core described Celsius Mining LLC (a subsidiary of Celsius Networks LLC, collectively referred to herein as Celsius) in Core's SEC filings as "one of our two

largest customers." According to a Lender Presentation attached as Exhibit 99.1 to a current report Core filed with the SEC on Form 8-K, dated December 15, 2022, as of October 31, 2022, approximately 36,000 of Core's 88,000 hosted miners, or roughly 41%, belonged to Celsius.

114.    Core's quarterly report for the second quarter of 2022 stated that "[f]or the six months ended June 30, 2022…, the top three customers accounted for approximately 54% … of the Equipment Sales and Hosting segment total revenue." Core's quarterly report for the third quarter of 2022 stated that "[f]or the nine months ended September 30, 2022, our largest and second largest customers accounted for approximately 41.7% and 20.1% of the Company's Equipment Sales and Hosting segment revenue, respectively, and approximately 15.7% and 7.6% of the Company's total revenue, respectively." According to the same report, Core's Equipment Sales and Hosting segment revenue and total revenue for the nine months ending September 30, 2022 were $195.7 million and $519.1 million, respectively. That means that Core's largest two customers—one of whom was Celsius—accounted for approximately $81.5 million and $39.4 million of revenue in the first three quarters of 2022.

115.    On July 13, 2022, Celsius filed voluntary petitions for relief under Chapter 11 of the U.S. Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of New York. *In re: Celsius Network LLC, et al.*, Case No. 22-10964 (MG).

116.    On September 28, 2022, after the close of trading, Celsius filed a motion for civil contempt in its bankruptcy proceedings alleging that Core "has knowingly and repeatedly violated the automatic stay provisions." Specifically, Celsius alleged that Core breached its agreement by, among other things, adding improper surcharges to its invoices to Celsius in an attempt to "pass through" its increased power costs. The motion stated, in relevant part:

### E. Core Scientific's Attempt to "Pass Through" Its Power Costs

26.     Finally, since the Petition Date, Core Scientific has begun adding certain surcharges to Celsius' invoices that contravene the fixed-price structure of the orders between the parties. Worse, Core Scientific has misrepresented the nature of these surcharges.

27.     On July 15, 2022, Celsius received its first post-petition invoice from Core Scientific, which totaled approximately $4.6 million. The July 15 invoice contained a new line item that had never before appeared on any previous (*i.e.*, prepetition) invoice, called "Power Costs Pass-through." The charges for "Power Costs Pass-through" totaled just over $911,000. According to the invoice, these charges were being retroactively imposed for services provided to Celsius between May 2022 and June 2022.

28.     Core Scientific explained these charges as follows:

> Core Scientific has incurred continuing significant tariff increases since the implementation of our Master Services Agreement – Core Scientific has been notified by its electrical utility suppliers of significant tariff increases due to rising fuel costs. As an ***Increased Costs under the Master Services Agreement (Section 4f), Core will be passing through such tariff increases without markup.***

*     *     *

31.     Giving the timing of these new costs, Celsius became concerned, and on September 20, 2022, Celsius disputed the "Power Costs Pass-through." Celsius also asked Core Scientific to provide "any documents and materials reflecting both the 'tariff increases' that Core Scientific claims it has incurred and the payment of those charges by Core Scientific."

32.     In response, Core Scientific provided information showing increased power rates in the various jurisdictions where Celsius rigs are located. This confirmed that the "Power Cost Pass-through" surcharges Core Scientific had been adding to Celsius' post-petition invoices were not new "tariffs," as Core Scientific had claimed, but rather, were simply the incremental increases in power costs to ***Core Scientific***—which were not subject to pass through under the MSA.

[Internal citations omitted, emphasis in original.]

117.    This public filing partially revealed to investors for the first time that Core had been incurring increased power costs and attempting to pass through those increased costs to its hosting customers in contravention of the hosting customers' fixed rate agreements with Core. This filing demonstrated to investors for the first time the partially materialized undisclosed risk that Core's actions would jeopardize its hosting business and financial condition, which risk had begun to materialize as one of the Company's largest customers rebuffed the Company's improper maneuvers and began litigating claims against the Company.

118.    On this news, Core's stock price fell $0.15, or 10.3%, to close at $1.30 on September 29, 2022, harming investors.

119.    On October 19, 2022, the Official Committee of Unsecured Creditors of Celsius joined Celsius' motion, stating that "the breaches [by Core] set forth in the Debtors' [Celsius'] Motion clearly violate the automatic stay and harm the Debtors' estates and their creditors."

120.    On December 28, 2022, in Core's own bankruptcy proceedings, Core filed an emergency motion to reject its contracts with Celsius. On January 2, 2023, Celsius filed a preliminary objection to Core's motion ("Celsius Objection").[3] Celsius did not oppose the rejection of the contracts between Core and Celsius, noting that "Celsius believes the Celsius Contracts are even worse for Core economically than what Core believes," and that Celsius "has no desire to continue doing business with Core's existing management team, which has repeatedly proven to be uncommercial and even duplicitous." Celsius filed the objection on procedural grounds and "to set the record straight with respect to the terms of the Celsius Contracts."

_____

[3] The Celsius Objection was partially redacted. An unredacted version of the Celsius Objection was filed on January 9, 2023.

121. Celsius explained that the parties had "engaged in significant discovery" in connection with Celsius' September 2022 motion in the Celsius bankruptcy proceedings and summarized the results of that discovery:

> Core's internal documents confirmed that Core knew it had no legal basis for unilaterally imposing these so-called "pass-through" charges on Celsius, and that Core always has understood the Celsius Contracts to impose a "fixed" rate or "pass-through cap." Indeed, it was on the promise of a "flat" rate that Core induced Celsius to enter into hosting agreements with Core. Core devised a plan of passing through its increased power costs when its hosting business became unsustainable as energy costs rose and Core's equipment resale market deteriorated.

122. According to the Celsius Objection, "Core conceived the idea of routinely passing through its increased power costs only after its hosting business became unsustainable as energy costs rose and Core had apparently not adequately hedged against power price increases, and Core's equipment resale market deteriorated."

123. The Celsius Objection continued, providing significant further detail from several of Core's internal documents and deposition testimony from Core's employees and executives:

> 28. In late 2021 and early 2022, however, Core began to face significant headwinds in its hosting business, including rising power costs. *See* Ex. 4, 11/8/22 M. Levitt Dep. Tr. at 34:8–35:3. Core's already-thin hosting margins evaporated when it faced increasing power costs to utilities on one side and a fixed hosting rate with customers on the other. Id. at 176:22–177:2 ("Q. And so what you're saying here effectively is over the last couple of years, the hosting business was break-even or losing money from a profit perspective, correct? A. Correct."); Ex. 6, 11/7/22 R. Cann Dep. Tr. at 112:21–113:4 ("I mean, the margins on hosting are de minimis."); Ex. 15 at CEL_CS-00006978 ("Historically, the [hosting] business delivered low profitability."). As Core's Senior Vice President of Partnerships (and Rule 30(b)(6) witness) Jeff Pratt testified, it was becoming clear that Core's entire hosting business "might not be viable" unless Core could come up with some way to "improve [its] performance." Ex. 3, 11/1/22 J. Pratt Dep. Tr. at 177:10–178:13.
>
> 29. Instead of accepting that it had made a bad business bet on power costs, Core's recently-appointed Chief Executive Officer,

Mike Levitt, decided that Core simply would no longer bear the cost of power fluctuations; instead, Core would pass those costs on to its customers. …

30. To that end, towards the end of 2021, Mr. Levitt asked Core's team to "come up with a suggested plan" for reworking the fee structure of the hosting business. Ex. 16 at CORE-00000006. This included a "Power Surcharge Fee" that would be charged "in the event power costs to a specific facility at Core encounters material seasonal or economic increases." *Id.* at -00000005.

31. Around the same time, Core decided to roll out a "new" version of the MSA, with a revised Section 4(f) that "include[d] new language around energy price increase pass throughs." *Id.*; *see* Ex. 5, 10/31/22 M. Xia Dep. Tr. at 30:25–31:11. The "new" MSAs retained the prior language allowing Core to pass through increases in tariffs, but added a clause enabling Core to pass through to customers "increases or changes in ***utility costs*** for one or more company facilities." Ex. 17 at CORE-00017187 (emphasis added); see also Ex. 18 at CORE-00000720 ("***New MSA that explicitly allows pass through of power costs for all new contracts as of 4/18***.") (emphasis added).

32. Core planned "to migrate all customers to the new MSA as soon as possible." Ex. 18 at CORE-00000720; Ex. 19 at CORE-0008415 ("[W]e should use this as an opportunity to migrate the client to a new MSA that allows for escalating power costs pass through."). Core successfully convinced some hosting customers to sign the new MSA, all of which were either newly signed customers or customers whose contracts were up for renewals. *See* Ex. 5, 10/31/22 M. Xia Dep. Tr. at 26:19–27:8.

33. Of course, for customers like Celsius who did not sign the "new" MSA, Core nevertheless has contended that "'tariff' equals utility costs," … allowing it to pass through increased power costs. …

34. ***Third***, the evidence makes clear that Core did not believe the term "tariff" referred to power costs until the end of 2021—after entering Order #10 with Celsius—when its legal team got "comfortable" with the idea. See Ex. 20 at CORE-00015187. …

35. ***Fourth***, despite Core's insistence that "tariff" equals utility costs or power costs, others did not share that understanding—including Core's auditor EY and many of Core's other hosting customers.

36.     Core's external auditor, Ernst & Young ("EY"), evaluated Core's effort at passing through rising powers costs in June and July 2022. EY viewed "the impact of the pass through to be material," Ex. 21 at CORE-00017174, and harbored reservations about Core's pass-through maneuver. EY questioned "the legal validity of passing through [power] cost" under the "tariff" language in the "old" MSAs, like Celsius'. Ex. 22 at CORE-00017158. As EY explained to Core in June, "[EY's] understanding is that tariffs can be defined as government imposed levies." *Id.* EY suggested that Core include in its financials "an offsetting allowance . . . as opposed to merely recording of revenue" in case customers disputed the pass through of increased utility costs. *Id.* at -00017158– -00017159.

37.     Core, however, dismissed its auditors' concerns, representing to EY that legal had determined that it was "no[t] probabl[e]" that customers would "challenge the pricing increases down the road." Ex. 22 at CORE-00017157. When EY asked for a meeting on the issue, Core's Vice President of Accounting Policy, Ed Haney, wrote back on July 18, 2022 and claimed "the potential reversal of revenue recognized from the power pass-through charges is not significant, as the contract clearly provides for the power pass-through in the monthly charge." *Id.* at -00017155– -00017156. He punctuated his assessment by representing that Core's customers were accepting, and paying, the pass-through amounts: "***There is currently no challenge from any client on the legality of the pass-through charges.***" 10/31/22 M. Xia Dep. Tr. at 219:5-10 (emphasis added).

38.     That representation was not true. See Ex. 5, 10/31/22 M. Xia Dep. Tr. at 219:5-10 ("This sentence is not as accurate as it's supposed to be."). At the time, Core had received multiple direct challenges to the legality of its pass-through practices. On June 23, 2022, for example, Core had received an email from Atlas stating, "Atlas hereby disputes Core's June 2022 invoice because Core has inappropriately and without any contractual basis increased the price of KWh." Ex. 23 at CORE-00007809.[4] On July 16, 2022, just two days before Mr. Haney's email to EY, Core had received a letter from the general counsel of its client CoreWeave, stating, "[Y]ou are hereby notified that CoreWeave disputes charges 1 and 2 of the

---

[4] On October 5, 2021, Core announced that "Atlas Mining, one of the largest digital asset miners in the world, has selected Core Scientific to host a large quantity of new Bitcoin miners that will require more than 100 MW of power when fully implemented. Installation of the new miners is expected to take place over a 15-month period."

Invoice; namely, the two charges for May and June 2022 'Power Costs Pass-through.'" Ex. 24 at CORE-00002521.[fn.17]

> [fn. 17] Core has now fired EY, simultaneously disclosing that EY had found "material weaknesses" in Core's "internal control over financial reporting." *See* Ex. 25, Core Scientific Form 8-K, dated Oct. 24, 2022.

39.     Core received many other questions and concerns from customers prior to July 18, 2022, as well. On June 19, 2022, Poolin Technology Pte. wrote, "I remembered the hosting fee is 6.5cents in the hosting contract, could you explain why the hosting price was changed?" Ex. 26 at CORE-00004157. On June 25, 2022, Alloy Ventures Management wrote to Core, "This is a bit unexpected as conversations in the past had led me to believe our rate would be guaranteed through end of term in March 2023." Ex. 27 at CORE-00004165. By July 12, 2022, Core had nearly $800,000 in overdue accounts receivable related to pass-through disputes. Ex. 28 at CORE-00009801. *See, also, e.g.*, Ex. 29 at CORE-00004132.

40.     But that was not the end. Core received more disputes after July 18, 2022, too. Altogether, Core lost between five to ten clients as a result of its new decision to pass through rising power costs. Ex. 5, 10/31/22 M. Xia Dep. Tr. at 22:1–25.

124.    According to a Lender Presentation attached as an exhibit to a current report Core filed with the SEC on Form 8-K, dated December 15, 2022, after Core had lost at least 5-10 of its hosting clients as a result of its improper attempts to pass through its increased power costs to fixed rate hosting customers, "Core currently has 14 [hosting] customers."

125.    According to Core's annual report for 2022, during the fourth quarter of 2022 "the hosting contracts for 24 customers, (including two related-party customers) were terminated." The report revealed that those 24 customers had accounted for total hosting revenue of $60.1 million in 2022, which was approximately 37.6% of Core's hosting revenue for the year ($159.7 million) and 9.4% of Core's total revenues in 2022 ($640.3 million).

126.    On January 3, 2023, the first business day of 2023, the bankruptcy court granted Core's motion and terminated the Celsius contracts. As noted above, Celsius accounted for either

$81.5 million or $39.4 million of Core's revenue for the first nine months of 2022. Even assuming Core recognized no additional revenue from Celsius beyond the third quarter of 2022 (during which it filed for bankruptcy), that means that in the span of one quarter and a day, Core lost hosting customers accounting for either 62.3% or 88.7% of its hosting revenues, and either 15.5% or 22.1% of its total revenues for 2022.

127.    Although Core purported in its 2022 annual report that Core "terminated the contracts of several of our hosting customers to improve overall Company profitability," Core's purported explanation does not rule out that the cause of those terminated hosting contracts was Core's improper attempts to pass through its increased power costs to customers with fixed rate contracts. For example, of the 24 contracts that "were terminated," Core does not say how many contracts Core itself terminated, whether any of those terminations were mutual, or whether Core had to terminate those contracts to improve profitability precisely *because* those customers had fixed rate hosting contracts and would not permit Core to pass through the increased power costs that had rendered those contracts unprofitable for Core. Accordingly, Plaintiffs infer and allege that all of the 24 terminated hosting contracts were a direct or indirect result of Core's rebuffed attempts to pass through its increased power costs to its fixed rate hosting customers.

128.    Former Employee 1 ("FE1") served as an accounting manager and a senior accountant for Core from October 2021 to December 2022. FE1 reported to Defendant Neville, Core's Chief Accounting Officer at the time.

129.    FE1 corroborated that Core was charging power cost pass-through costs to all of its hosting customers, including Celsius, in an effort to "help alleviate [Core's] quite substantially increased power costs."

130.    FE1 reported that Core experienced a particularly acute increase in power costs around the start of Russia's invasion of Ukraine, in the first quarter of 2022, and then again in the summer of 2022 due to a major heat wave and power disruptions in Texas, where some of Core's facilities are located. FE1 estimated that Core's power costs increased as much as threefold at some facilities, and that power costs increased "across the board" at all of Core's facilities.

131.    FE1 first learned about Core passing through its increased power costs to its hosting customers during one of the Company's monthly budget review meetings in the summer of 2022. According to FE1, the entire finance and accounting teams participated in those meetings, including Defendants Sterling and Neville. FE1 also learned at the same meeting that Celsius was one of the customers that pushed back on Core's new pass-through surcharges. FE1 recalled that that information was shared by Monica Xia, Core's Revenue Accounting Manager, who worked on Core's billing with respect to its hosting customers.[5]

132.    FE1 also confirmed that Core received pushback from multiple customers on its efforts to pass through its increased power costs.

### CORE GOES BANKRUPT,
### TANKING ITS STOCK AND HARMING INVESTORS

133.    On October 27, 2022, before markets opened, Core filed a current report with the SEC on Form 8-K, revealing that due to the "prolonged decrease in the price of bitcoin, the increase in electricity costs, the increase in the global bitcoin network hash rate and the litigation with Celsius," the Company would not make outstanding payments for financing and was exploring strategic alternatives to its capital structure. Core also disclosed that its cash resources would be

---

[5] Ms. Xia was also deposed in the Celsius litigation and her testimony—including that 5-10 of Core's hosting customers left because of Core's attempts to pass through its power costs—is attributed to "M. Xia" in the Celsius Objection.

"depleted by the end of 2022 or sooner," and that "substantial doubt exists about the Company's ability to continue as a going concern for a reasonable period of time."

134. On this news, Core's stock price fell $0.789, or 78.1%, on unusually high trading volume, to close at $0.221 per share on October 27, 2022, and Core's warrant price fell $0.1812, or 82.4%, on unusually high trading volume to close at $0.0388, harming investors.

135. On December 21, 2022, Core filed for relief under Chapter 11 of the U.S. Bankruptcy Code.

136. On this news, Core's stock price fell $0.157, or 75.5%, on unusually high trading volume, to close at $0.051 per share on December 21, 2022, and Core's warrant price fell $0.0368, or 59.4%, to close at $0.0251 per warrant, harming investors.

137. On December 22, 2022, the Company received a "Delisting Notice" from NASDAQ notifying the Company that, as a result of the Company filing for bankruptcy protection under Chapter 11, the staff of NASDAQ had determined that the Company's common stock and warrants would be delisted. The Company initially requested an appeal of the decision but later withdrew its appeal.

138. On January 3, 2023, NASDAQ suspended trading of the Company's listed securities. On April 10, 2023, NASDAQ delisted Core's common stock and warrants from the exchange. As a result, the Company's securities were rendered effectively worthless.

139. Defendants' failure to disclose Core's attempts to improperly pass through its increased power costs to its hosting customers, in contravention of the customers' fixed rate agreements with Core, concealed the material risk that Core was unable to offset its increasing power costs without damaging its relationship with its hosting customers, and thus seriously jeopardizing its hosting business and overall financial condition. That risk materialized as Core

lost most of its hosting customers—including one of its two largest customers in Celsius, who also was forced to engage in expensive litigation with Core—and a substantial amount of Core's hosting and total revenues.

140.    Core's diminished hosting business was a material contributing factor in the implosion of the Company's financial condition, resulting in the Company's October 2022 "going concern" warning and eventual bankruptcy. When the Company's dire financial condition was revealed in the October current report and December bankruptcy filing, the price of the Company's securities plummeted.

141.    Subsequent to, and due at least in part to, the misleading statements and omissions contained in the Registration Statement and the materializations of the risks concealed by those statements and omissions, Core's stock price fell as low as $0.051, losing nearly all of its value from the time of the Merger.

142.    In addition to the dissipation of the artificial inflation in Core securities caused by the materializations of the risks concealed by the misleading statements and omissions alleged above, XPDI shareholders who were eligible to vote on the Merger were also damaged as a result of the misleading statements and omissions. Had these shareholders known the true financial condition and operations of Core, including the concealed risks, they would have voted against the Merger and/or exercised their redemption rights to receive approximately $10 in cash per share of XPDI stock. Instead, Plaintiffs and other members of the Class did not redeem their shares, which were exchanged via the Merger for Core common stock, which lost essentially all of its value as the true financial condition and operations of Core eventually came to light and the concealed risks materialized.

143.     It was foreseeable to Defendants that (i) the misleading statements and omissions alleged above would cause those members of the Class that could have received approximately $10 in cash per share of XPDI stock upon exercising their redemption rights to exchange them for Core shares, in lieu of receiving $10 in cash per share; and (ii) eventually the materialization of the undisclosed risks would cause those members of the Class to instead receive substantially less value (or no value at all) for each share retained or sold after September 29, 2022.

## CLASS ACTION ALLEGATIONS

144.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class.

145.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, shares of the Company's common stock and warrants were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Millions of shares of Company common stock and warrants were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Core or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

146.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

147.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

148.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.      whether Defendants violated the federal securities laws as alleged herein;

b.      whether, during the Class Period, Defendants made false or misleading statements of material fact to the investing public, or omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

c.      whether the Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

d.      whether Defendants acted negligently, knowingly, or recklessly in issuing, or causing the Company to issue, false and misleading SEC filings and public statements during the Class Period;

e.      whether the price of the Company's common stock during the Class Period was artificially inflated because of Defendants' conduct complained of herein; and

f.      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

149.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

150.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

151.    Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*,

406 U.S. 128, 92 S. Ct. 2430 (1972), because the Class's claims are in large part grounded on Defendants' omissions of material facts in their Class Period statements in violation of Defendants' duty to disclose such facts. Thus, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld were material in that a reasonable investor might have considered them important in making investment decisions. Here, the misleadingly omitted facts were material, so the presumption applies.

152. Alternatively, Plaintiffs and the Class are entitled to a presumption of reliance on Defendants' material misrepresentations pursuant to the fraud-on-the-market doctrine because the Company's common stock and warrants traded in efficient markets during the Class Period, in that, among other things:

  a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

  b. As a regulated issuer, the Company filed periodic public reports with the SEC;

  c. The Company regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of Current Reports in their SEC filings;

  d. The Company's shares and warrants were liquid and traded with moderate to heavy volume during the Class Period. On average, approximately 18.8 million shares of the Company's common stock, or roughly 5.3% of Core's total shares outstanding, were traded weekly during the Class Period, permitting a very strong presumption that its shares traded on an efficient market;

  e. During the Class Period, the Company's common stock and warrants met the requirements for listing, and were listed and traded on the NASDAQ, a highly efficient and automated market;

  f. The Company was covered by multiple securities analysts employed by brokerage firms who wrote reports about the Company, which were distributed to customers, made publicly available, and entered the public marketplace;

  g. The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

h.  Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's securities prices during the Class Period.

153. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT I
### Violations of Section 14(a) of the Exchange Act and Rule 14a-9
### Against the XPDI Director Defendants and the Core Director Defendants

154. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

155. Any proceeding allegations of fraud, fraudulent conduct, or improper motive are specifically excluded from this Count. For the purposes of this Count, Plaintiffs do not allege that the Defendants named in this Count had scienter or fraudulent intent, which are not elements of this claim.

156. This Count is brought pursuant to Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder, on behalf of the members of the Class who held the common stock of XPDI at the close of business on December 7, 2021, and were entitled to vote on the approval of the Merger at the special meeting of XPDI stockholders on January 19, 2022, against the XPDI Director Defendants (Defendants Eilers, Brombach, Gaynor, Dabbar, Sullivan, and Widham) and the Core Director Defendants (Defendants Levitt, Feinstein, Hollingsworth, Minnis, Olivares, and Youngblood) (collectively, the "Section 14 Defendants").

157. The Section 14 Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder in that they solicited proxies from Plaintiffs and other members of the Class by means of a Proxy Statement that, through the Section 14 Defendants' negligence, contained statements which, at the time and in the light of the circumstances under which they

were made, were false and misleading with respect to material facts, and omitted to state material facts necessary in order to make the statements therein not false or misleading.

158.     Plaintiffs and other members of the Class were misled by the Section 14 Defendants' false and misleading statements and omissions, and were denied the opportunity to make an informed decision in voting on the Merger or redeeming their shares. As a result of the Section 14 Defendants' false and misleading statements and omissions, the Merger was approved. Accordingly, Plaintiffs and other members of the Class did not receive their fair share of the value of the assets and business of the combined entity, and suffered damages when the price of the Company's securities declined.

159.     By reason of the foregoing, the Section 14 Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder and are liable to Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with the Merger and the ensuing decline in the price of the Company's securities upon revelation of the truth behind the Section 14 Defendants' material misrepresentations and omissions.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the XPDI Director Defendants

160.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

161.     Any proceeding allegations of fraud, fraudulent conduct, or improper motive are specifically excluded from this Count. For the purposes of this Count, Plaintiffs do not allege that the Defendants named in this Count had scienter or fraudulent intent, which are not elements of this claim.

162.     Plaintiffs and the Class do not assert claims or seek to recover in this action as against the Company. Nonetheless, the Company's conduct as alleged above violated Section

14(a) of the Exchange Act, constituting a primary violation for purposes of Plaintiffs' claims against the XPDI Director Defendants under Section 20(a) of the Exchange Act.

163.    At all relevant times prior to the consummation of the Merger, the XPDI Director Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.

164.    As officers and/or directors of a publicly owned company, the XPDI Director Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

165.    Because of their positions of control and authority as officers and directors of the Company, the XPDI Director Defendants were able to, and did, control the contents of the Proxy Statement which the Company disseminated in the marketplace. At all relevant times prior to the consummation of the Merger, the XPDI Director Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The XPDI Director Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act.

166.    In particular, the XPDI Director Defendants participated in meetings and conference calls, reviewed the Merger agreement and all of the underlying due diligence materials, voted to approve the Merger, signed the Proxy Statement and solicited the approval of the Merger through the XPDI Board's recommendation to vote in favor of the Merger, which appeared in the Proxy Statement.

167.    By reason of the above conduct, the XPDI Director Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations of Section 14(a) of the Exchange Act

committed by the Company, which caused Plaintiffs and the Class to suffer substantial damages in connection with the Merger and the ensuing decline in the price of the Company's securities upon revelation of the truth behind the Company's material misrepresentations and omissions.

### COUNT III
**Violations of Section 11 of the Securities Act**
**Against the XPDI Director Defendants and the Core Director Defendants**

168.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

169.    Any proceeding allegations of fraud, fraudulent conduct, or improper motive are specifically excluded from this Count. For the purposes of this Count, Plaintiffs do not allege that the Defendants named in this Count had scienter or fraudulent intent, which are not elements of this claim.

170.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the members of the Class who acquired the Company's securities pursuant and/or traceable to the Registration Statement, against the XPDI Director Defendants (Defendants Eilers, Brombach, Gaynor, Dabbar, Sullivan, and Widham) and the Core Director Defendants (Defendants Levitt, Feinstein, Hollingsworth, Minnis, Olivares, and Youngblood) (collectively, the "Section 11 Defendants").

171.    The Registration Statement for the Merger was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

172.    XPDI was the registrant for the Merger. The Section 11 Defendants named herein were responsible for the contents and dissemination of the Registration Statement, and/or were directors who are appropriate defendants as to this Count.

173.    The Section 11 Defendants are strictly liable to Plaintiffs and the other members of the Class for the misrepresentations and omissions in the Registration Statement.

174.    None of the Section 11 Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

175.    By reasons of the conduct herein alleged, each Section 11 Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

176.    Plaintiffs and the other members of the Class acquired the Company securities pursuant and/or traceable to the Registration Statement.

177.    Plaintiffs and the other members of the Class have sustained damages. The value of the Company's securities has declined substantially subsequent to and due to the Section 11 Defendants' violations.

## COUNT IV
### Violations of Section 15 of the Securities Act
### Against the XPDI Director Defendants

178.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

179.    Any proceeding allegations of fraud, fraudulent conduct, or improper motive are specifically excluded from this Count. For the purposes of this Count, Plaintiffs do not allege that the Defendants named in this Count had scienter or fraudulent intent, which are not elements of this claim.

180.    Plaintiffs and the Class do not assert claims or seek to recover in this action as against the Company. Nonetheless, the Company's conduct as alleged above violated Section 11 of the Securities Act, constituting a primary violation for purposes of Plaintiffs' claims against the XPDI Director Defendants under Section 15 of the Securities Act.

181. This count is asserted against the XPDI Director Defendants and is based upon Section 15 of the Securities Act.

182. The XPDI Director Defendants, by virtue of their offices, directorship and specific acts were in positions to control and did control, the issuance of the false and misleading statements and omissions contained in the Registration Statement. The XPDI Director Defendants had the power and influence and exercised the same to cause the Company to engage in the acts described herein.

183. None of the XPDI Director Defendants made reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misrepresentations and omissions alleged herein.

184. Plaintiffs and the Class have sustained damages. The value of the Company's securities has declined substantially due to the Securities Act violations alleged herein.

## EXCHANGE ACT ALLEGATIONS

### Defendants Made Additional False and Misleading Statements and Omissions During the Class Period

185. Defendants made a number of false and misleading statements and omissions of material fact during the Class Period, in addition to those contained in the Proxy Statement and Registration Statement as alleged above and incorporated by reference herein.

186. On March 30, 2022, the Company filed its 2021 annual report with the SEC on Form 10-K ("2021 10-K"). Defendants Levitt, Trzupek, Feinstein, Neville, Hollingsworth, Minnis, Olivares, and Youngblood signed the 2021 10-K.

187. The 2021 10-K stated, under "Key Factors Affecting Our Performance After the Business Combination":

Our financial performance and continued growth depend in large part on our ability … to attract customers for our hosting services. ***Increases in power costs, … will reduce our operating margins, impact our ability to attract customers for our services, may harm our growth prospects and could have a material adverse effect on our business, financial condition and results of operations.***

188.    This statement was misleading because Defendants failed to disclose that (1) by late 2021, the Company had already started to experience increases in power costs which threatened the viability of Core's hosting business due to fixed rate contracts with Core's hosting customers which did not permit Core to pass through its increased power costs; and (2) Core was attempting to foist additional power cost pass-through charges upon its fixed rate hosting customers, foreseeably causing many major hosting customers to terminate their business with Core—a material adverse effect on Core's business and financial condition. The statement misleadingly portrayed increased power costs as a future hypothetical scenario, when they had already materialized, and the cause of the material adverse effect on Core's business was not the increased power costs themselves but Core's attempts to force its hosting customers to pay Core's increased power costs in contravention of their fixed rate contracts.

189.    The 2021 10-K also contained the following purported risk disclosure:

Our revenue comes from a small number of customers, and the loss of, or significant decrease in business from, a number of these customers or our failure to continually attract new customers could have a material adverse effect on our business, financial condition and results of operations.

We have generated a significant portion of our historical revenue from a small number of hosting customers. … ***Any failure to meet our end-users' expectations, including, but not limited to, any inability to meet their requirements for increased hosting capacity at attractive rates, could result in cancellation or non-renewal of our business relationships.*** … If these customers reduced spending on our services, or changed their outsourcing strategy by moving to in-house facilities or outsourcing to other service providers, and we are not able to offset that lost revenue or replace the reduced capacity utilization with our own mining equipment, it could have a

material adverse effect on our business, financial condition and results of operations. …

190.     This purported risk disclosure was inadequate and misleading because Defendants

failed to disclose that by late 2021, Core had begun attempting to contravene the fixed rate terms

of its hosting customers' contracts by imposing additional power cost pass-through charges on its

customers, foreseeably causing many major hosting customers to terminate their business with

Core—a material adverse effect on Core's business and financial condition. The highlighted

statement misleadingly portrayed the Company's failure to provide its hosting customers with

attractive rates as a future hypothetical scenario, when Core had already begun attempting to

contravene the fixed rate pricing terms of its customers' contracts.

191.     The 2021 10-K also contained the following purported risk disclosure:

> Our growth depends in large part on our ability to successfully mine digital assets and to attract customers for our hosting capabilities. ***We may not be able to attract customers to our hosting capabilities for a number of reasons, including if:***
>
>  …
>
> - ***we fail to provide competitive pricing terms or effectively market them to potential customers;***
>
> …
>
> If we are unable to obtain hosting customers at favorable pricing terms or at all, it could have a material adverse effect on our business, financial condition and results of operations.

192.     This purported risk disclosure was inadequate and misleading because Defendants

failed to disclose that (1) by late 2021, the Company had already started to experience increases in

power costs which threatened the viability of Core's hosting business due to fixed rate contracts

with Core's hosting customers which did not permit Core to pass through its increased power costs;

and (2) Core was attempting to foist additional power cost pass-through charges upon its fixed rate

hosting customers, foreseeably causing many major hosting customers to terminate their business with Core—a material adverse effect on Core's business and financial condition. The highlighted statement misleadingly portrayed the Company's failure to provide its hosting customers with competitive pricing terms as a future hypothetical scenario, when Core had already begun attempting to contravene the fixed rate pricing terms of its existing hosting customers' contracts.

193.    The 2021 10-K also contained the following purported risk disclosure:

> ***If we fail to accurately estimate the factors upon which we base our contract pricing, we may generate less profit than expected or incur losses on those contracts, which could have a material adverse effect on our business, financial condition and results of operations.***
>
> Our hosting contracts are generally priced on the basis of estimated power consumption by our clients, along with other costs of service, as adjusted for actual costs. Our ability to earn a profit on such contracts requires that we accurately estimate the costs involved and outcomes likely to be achieved and assess the probability of generating sufficient hosting and colocation capacity within the contracted time period. …

194.    This purported risk disclosure was inadequate and misleading because Defendants failed to disclose that by late 2021, the Company had already started to experience increases in power costs which threatened the viability of Core's hosting business due to fixed rate contracts with Core's hosting customers which did not permit Core to pass through its increased power costs. The statement misleadingly portrayed the Company's failure to accurately estimate its power costs (a major factor upon which the Company based its hosting contract pricing) as a future hypothetical scenario when it had already materialized. Core's inability to accurately estimate its power costs in entering fixed rate contracts with hosting customers resulted in those hosting contracts becoming unprofitable and served as the basis for Core's attempts to contravene the fixed rate pricing terms of its hosting customers' contracts, which foreseeably risked and eventually caused those customers to cease doing business with Core.

195. Appended as exhibits to the 2021 10-K were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Levitt and Trzupek, wherein they certified that the 2021 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "[t]he information contained in the [2021 10-K] Annual Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

196. These SOX certifications were false and/or misleading because Defendants Levitt and Trzupek knew or were severely reckless in not knowing, that the 2021 10-K did contain misleading statements and omissions of material fact as outlined above, and accordingly, the information contained in the 2021 10-K did not fairly present the financial condition and results of operations of the Company.

197. On May 13, 2022, the Company filed its quarterly report with the SEC on Form 10-Q for the first quarter of 2022 ("22Q1 10-Q"). Defendant Sterling signed the 22Q1 10-Q.

198. The 22Q1 10-Q stated, under "Key Factors Affecting Our Performance":

> Our financial performance and continued growth depend in large part on our ability … to attract customers for our hosting services. ***Increases in power costs, … will reduce our operating margins, impact our ability to attract customers for our services, may harm our growth prospects and could have a material adverse effect on our business, financial condition and results of operations.***

199. This statement was misleading because Defendants failed to disclose that (1) by late 2021, the Company had already started to experience increases in power costs which threatened the viability of Core's hosting business due to fixed rate contracts with Core's hosting customers which did not permit Core to pass through its increased power costs; and (2) Core was attempting to foist additional power cost pass-through charges upon its fixed rate hosting

customers, foreseeably causing many major hosting customers to terminate their business with Core—a material adverse effect on Core's business and financial condition. The statement misleadingly portrayed increased power costs as a future hypothetical scenario, when they had already materialized, and the cause of the material adverse effect on Core's business was not increased power costs themselves but Core's already-materialized decision to attempt to force its hosting customers to pay Core's increased power costs in contravention of their fixed rate contracts.

200.    The 22Q1 10-Q also stated that: "Hosting revenue from customers and related parties is based on consumption-based contracts with our customers and related parties. ***Most contracts are renewable, and our customers are generally billed on a fixed and recurring basis*** each month for the duration of their contracts, which vary from one to three years in length."

201.    This statement was misleading because Defendants failed to disclose that while the Company's hosting customers were "generally billed on a fixed and recurring basis," Core was nonetheless attempting to force its hosting customers to pay Core's increased power costs in contravention of their fixed rate contracts, which foreseeably risked and eventually caused those customers to cease doing business with Core.

202.    The 22Q1 10-Q also contained the following purported risk disclosure:

> Our growth depends in large part on our ability to successfully mine digital assets and to attract customers for our hosting capabilities. ***We may not be able to attract customers to our hosting capabilities for a number of reasons, including if:***
>
> …
>
> - ***we fail to provide competitive pricing terms or effectively market them to potential customers;***
>
> …

If we are unable to obtain hosting customers at favorable pricing terms or at all, it could have a material adverse effect on our business, financial condition and results of operations.

203.     This purported risk disclosure was inadequate and misleading because Defendants failed to disclose that (1) by late 2021, the Company had already started to experience increases in power costs which threatened the viability of Core's hosting business due to fixed rate contracts with Core's hosting customers which did not permit Core to pass through its increased power costs; and (2) Core was attempting to foist additional power cost pass-through charges upon its fixed rate hosting customers, foreseeably causing many major hosting customers to terminate their business with Core—a material adverse effect on Core's business and financial condition. The highlighted statement misleadingly portrayed the Company's failure to provide its hosting customers with competitive pricing terms as a future hypothetical scenario, when Core had already begun attempting to contravene the fixed rate pricing terms of its existing hosting customers' contracts.

204.     The 22Q1 10-Q also contained the following purported risk disclosure:

Our revenue comes from a small number of customers, and the loss of, or significant decrease in business from, a number of these customers or our failure to continually attract new customers could have a material adverse effect on our business, financial condition and results of operations.

We have generated a significant portion of our historical revenue from a small number of hosting customers. … ***Any failure to meet our end-users' expectations, including, but not limited to, any inability to meet their requirements for increased hosting capacity at attractive rates, could result in cancellation or non-renewal of our business relationships.*** … If these customers reduced spending on our services, or changed their outsourcing strategy by moving to in-house facilities or outsourcing to other service providers, and we are not able to offset that lost revenue or replace the reduced capacity utilization with our own mining equipment, it could have a material adverse effect on our business, financial condition and results of operations.

205.    This purported risk disclosure was inadequate and misleading because Defendants failed to disclose that by late 2021, Core had begun attempting to contravene the fixed rate terms of its hosting customers' contracts by imposing additional power cost pass-through charges on its customers, foreseeably causing many major hosting customers to terminate their business with Core—a material adverse effect on Core's business and financial condition. The highlighted statement misleadingly portrayed the Company's failure to provide its hosting customers with attractive rates as a future hypothetical scenario, when Core had already begun attempting to contravene the fixed rate pricing terms of its customers' contracts.

206.    The 22Q1 10-Q also contained the following purported risk disclosure:

> ***If we fail to accurately estimate the factors upon which we base our contract pricing, we may generate less profit than expected or incur losses on those contracts, which could have a material adverse effect on our business, financial condition and results of operations.***
>
> Our hosting contracts are generally priced on the basis of estimated power consumption by our clients, along with other costs of service, as adjusted for actual costs. Our ability to earn a profit on such contracts requires that we accurately estimate the costs involved and outcomes likely to be achieved and assess the probability of generating sufficient hosting and colocation capacity within the contracted time period. …

207.    This purported risk disclosure was inadequate and misleading because Defendants failed to disclose that by late 2021, the Company had already started to experience increases in power costs which threatened the viability of Core's hosting business due to fixed rate contracts with Core's hosting customers which did not permit Core to pass through its increased power costs. The statement misleadingly portrayed the Company's failure to accurately estimate its power costs (a major factor upon which the Company based its hosting contract pricing) as a future hypothetical scenario when it had already materialized. Core's inability to accurately estimate its power costs in entering fixed rate contracts with hosting customers resulted in those hosting contracts becoming

unprofitable and served as the basis for Core's attempts to contravene the fixed rate pricing terms of its hosting customers' contracts, which foreseeably risked and eventually caused those customers to cease doing business with Core.

208.    Appended as exhibits to the 22Q1 10-Q were SOX certifications signed by Defendants Levitt and Sterling, wherein they certified that the 22Q1 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "the information contained in the [22Q1 10-Q] Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

209.    These SOX certifications were false and/or misleading because Defendants Levitt and Sterling knew or were severely reckless in not knowing, that the 22Q1 10-Q did contain misleading statements and omissions of material fact as outlined above, and accordingly, the information contained in the 22Q1 10-Q did not fairly present the financial condition and results of operations of the Company.

210.    On August 22, 2022, the Company filed its quarterly report with the SEC on Form 10-Q for the second quarter of 2022 ("22Q2 10-Q"). Defendant Sterling signed the 22Q2 10-Q.

211.    The 22Q2 10-Q stated that:

> Celsius is one of our two largest customers. As of June 30, 2022, we had $0.9 million due from Celsius that is presented within accounts receivable, net, of which $0.8 million was outstanding in July 2022 at the time of bankruptcy petition. *Celsius may take actions in its Chapter 11 proceeding to terminate or renegotiate its agreements with us and/or seek to reduce our claims for services and damages to which we may be entitled. Our recovery on our claims will be subject to factors outside of our control.*

212.     This statement was misleading because Defendants failed to disclose that (1) by late 2021, the Company had already started to experience increases in power costs which threatened the viability of Core's hosting business due to fixed rate contracts with Core's hosting customers, including Celsius, which did not permit Core to pass through its increased power costs; and (2) by July 15, 2022, Core was attempting to foist additional power cost pass-through charges upon Celsius in contravention of its contract with Celsius, foreseeably leading to Celsius bringing significant litigation against Core. The highlighted statement misleadingly portrayed the risk of Celsius bringing claims against Core as a hypothetical risk that Core might not recover all of its claims for payments from Celsius simply because of Celsius' bankruptcy. In truth, Celsius was likely to bring expensive and extensive claims against Core due to Core's own actions, including Core's imposition of unauthorized power cost pass-throughs charges on Celsius.

213.     The 22Q2 10-Q also stated that: "Hosting revenue from customers and related parties is based on consumption-based contracts with our customers and related parties. ***Most contracts are renewable, and our customers are generally billed on a fixed and recurring basis*** each month for the duration of their contracts, which vary from one to three years in length."

214.     This statement was misleading because Defendants failed to disclose that while the Company's hosting customers were "generally billed on a fixed and recurring basis," Core was nonetheless attempting to force its hosting customers to pay Core's increased power costs in contravention of their fixed rate contracts, which foreseeably risked and eventually caused those customers to cease doing business with Core.

215.     The 22Q2 10-Q also contained the following purported risk disclosure:

> Our success depends in large part on our ability to mine digital assets profitably and to attract customers for our hosting capabilities. Increases in power costs have impacted our inability to mine digital assets efficiently and reduced bitcoin pricing have reduced our

operating margins. ***Continued increases in power costs and unfavorable prices for digital assets will impact our ability to attract customers for our services, harm our growth prospects and could have a continuing material adverse effect on our business, financial condition and results of operations.***

*… **If we are unable to obtain hosting customers at favorable pricing terms or at all, it could have a material adverse effect on our business, financial condition and results of operations.***

216. This purported risk disclosure was inadequate and misleading because, although Defendants finally acknowledged the existence and some of the impact from increased power costs the Company was experiencing, Defendants failed to disclose that by late 2021, Core had reacted to its increased power costs by attempting to contravene the fixed rate terms of its hosting customers' contracts by imposing additional power cost pass-through charges on its customers, foreseeably causing many major hosting customers to terminate their business with Core—a material adverse effect on Core's business and financial condition. The first highlighted statement misleadingly portrayed continued increased power costs as the cause of the material adverse effect on Core's business, when in truth it was Core's attempts to force its hosting customers to pay Core's increased power costs in contravention of their fixed rate contracts which foreseeably risked and eventually caused those customers to cease doing business with Core. The second highlighted statement misleadingly portrayed the Company's failure to provide its hosting customers with favorable pricing terms as a future hypothetical scenario, when Core had already begun attempting to contravene the fixed rate pricing terms of its customers' contracts.

217. The 22Q2 10-Q also contained the following purported risk disclosure:

Our revenue comes from a small number of customers, and the insolvency of, loss of, or significant decrease in business from, a number of these customers or our failure to continually attract new customers could have a material adverse effect on our business, financial condition and results of operations.

We have generated a significant portion of our historical revenue from a small number of hosting customers. For the six months ended June 30, 2022, our largest and second largest customers accounted for approximately 25.4% and 21.2% of the Company's Equipment Sales and Hosting segment revenue, respectively, and approximately 8.1% and 6.7% of the Company's total revenue, respectively. ***Any failure to meet our end-users' expectations, including, but not limited to, any inability to meet their requirements for increased hosting capacity at attractive rates, could result in cancellation or non-renewal of our business relationships.*** … If these customers reduced spending on our services, or changed their outsourcing strategy by moving to in-house facilities or outsourcing to other service providers, and we are not able to offset that lost revenue or replace the reduced capacity utilization with our own mining equipment, it could have a material adverse effect on our business, financial condition and results of operations. …

218.     This purported risk disclosure was inadequate and misleading because Defendants failed to disclose that by late 2021, Core had begun attempting to contravene the fixed rate terms of its hosting customers' contracts by imposing additional power cost pass-through charges on its customers, foreseeably causing many major hosting customers to terminate their business with Core—a material adverse effect on Core's business and financial condition. The highlighted statement misleadingly portrayed the Company's failure to provide its hosting customers with attractive rates as a future hypothetical scenario, when Core had already begun attempting to contravene the fixed rate pricing terms of its customers' contracts.

219.     The 22Q2 10-Q also contained the following purported risk disclosure:

***If we fail to accurately estimate the factors upon which we base our contract pricing, we may generate less profit than expected or incur losses on those contracts, which could have a material adverse effect on our business, financial condition and results of operations.***

Our hosting contracts are generally priced on the basis of estimated power consumption by our clients, along with other costs of service, as adjusted for actual costs. Our ability to earn a profit on such contracts requires that we accurately estimate the costs involved and outcomes likely to be achieved and assess the probability of

generating sufficient hosting and colocation capacity within the contracted time period. … The inability to accurately estimate the factors upon which we base our contract pricing could have a material adverse effect on our business, financial condition and results of operations.

220. This purported risk disclosure was inadequate and misleading because Defendants failed to disclose that by late 2021, the Company had already started to experience increases in power costs which threatened the viability of Core's hosting business due to fixed rate contracts with Core's hosting customers which did not permit Core to pass through its increased power costs. The statement misleadingly portrayed the Company's failure to accurately estimate its power costs (a major factor upon which the Company based its hosting contract pricing) as a future hypothetical scenario when it had already materialized. Core's inability to accurately estimate its power costs in entering fixed rate contracts with hosting customers resulted in those hosting contracts becoming unprofitable and served as the basis for Core's attempts to contravene the fixed rate pricing terms of its hosting customers' contracts, which foreseeably risked and eventually caused those customers to cease doing business with Core.

221. Appended as exhibits to the 22Q2 10-Q were SOX certifications signed by Defendants Levitt and Sterling, wherein they certified that the 22Q2 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "the information contained in the [22Q2 10-Q] Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

222. These SOX certifications were false and/or misleading because Defendants Levitt and Sterling knew or were severely reckless in not knowing, that the 22Q2 10-Q did contain misleading statements and omissions of material fact as outlined above, and accordingly, the

information contained in the 22Q2 10-Q did not fairly present the financial condition and results of operations of the Company.

223.    On August 11, 2022, Core held an earnings conference call to discuss the Company's second quarter 2022 results. During the call, Defendant Levitt stated:

> We took a long hard look at our hosting business. Historically, the business delivered low profitability. We will no longer take on hosting business that is not sufficiently profitable from day 1. ***We have restructured our pricing to improve margins over time, including refinements to price per kilowatt hour, contract term, infrastructure and configuration fees and prepayment terms.*** …
>
> *… **Initial customer acceptance, … validate[s] our new strategy. Even during this challenging digital asset market, customers are eager to co-locate their servers at Core Scientific because of the value they see in our offering.***

224.    The first highlighted statement was misleading because Levitt failed to disclose that by late 2021, Core's attempts to "restructure[] our pricing" for its hosting business actually entailed attempting to contravene the fixed rate terms of its hosting customers' contracts by imposing additional power cost pass-through charges on its customers. The second highlighted statement was false and misleading because Levitt failed to disclose that by July 2022, several of Core's hosting customers, including Celsius (one of Core's two largest customers), had disputed Core's attempts to pass through its increased power costs and expressly challenged the legality of Core's actions, which did not "validate" Core's strategy and showed that customers were not "eager" to engage in Core's hosting business.

### Defendants Misleadingly Failed to Disclose Known Material Trends

225.    The 2021 10-K, 22Q1 10-Q, and 22Q2 10-Q were also materially false and misleading in that they failed to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations," and to "provide such other information that

the registrant believes to be necessary to an understanding of its financial condition, changes in financial condition and results of operations," as mandated by Item 303.

226.    The 2021 10-K, 22Q1 10-Q, and 22Q2 10-Q each failed to disclose that (1) by late 2021, the Company had already started to experience increases in power costs which threatened the viability of Core's hosting business due to fixed rate contracts with Core's hosting customers which did not permit Core to pass through its increased power costs; and (2) Core was attempting to foist additional power cost pass-through charges upon its fixed rate hosting customers, foreseeably causing many major hosting customers to terminate their business with Core. These undisclosed facts were likely to, and ultimately did, have materially adverse impacts on the Company's overall financial results.

227.    These omissions violated Item 303, because these undisclosed facts were known to Defendants, as was the high likelihood (which was later realized) that they would have a material impact on the Company's overall financial results.

228.    Indeed, the Company's risk disclosures in the 2021 10-K, 22Q1 10-Q, and 22Q2 10-Q, as well as the Proxy Statement and Registration Statement, acknowledged the likely material impact of these undisclosed trends on the Company's financial condition (while misleadingly describing the sources of those foreseeable risks as future hypotheticals, when in fact they were already transpiring).

## Each of the Challenged Statements Was Made With Scienter

229.    With respect to Plaintiffs' claims under Section 10(b) of the Exchange Act, Plaintiffs allege that each of the false and misleading statements and omissions, including the statements in the Proxy Statement, Registration Statement, 2021 10-K, 22Q1 10-Q, 22Q2 10-Q, and Defendant Levitt's comments during the August 11, 2022 earnings call, was made with

Defendants' and/or the Company's knowledge or severely reckless disregard of the falsity of those statements.

230. The scienter of Defendants and other agents of the Company is imputed to the non-party Company (for the purposes of establishing a primary violation with respect to Plaintiffs' control person claims) under *respondeat superior* and agency principles.

### *Defendants Knew or Were Severely Reckless in Disregarding Material Facts Contradicting Their Statements*

231. Several material adverse facts underlying the falsity or misleading nature of Defendants' statements were already known to, or recklessly disregarded by, Core's executives at the time the statements were made, supporting a strong inference that these Defendants acted knowingly or with severe recklessness in making those statements.

232. At all relevant times, Core had only two appreciable business segments – its self-mining operations and its hosting and equipment sales business. Core's Proxy Statement and 2021 annual report stated that "[g]oing forward, we anticipate that our mining and hosting operations will comprise all or substantially all of our business activities." Core's quarterly report for the second quarter of 2022, filed on August 11, 2022, stated that "[t]oday, our mining and hosting operations comprises all or substantially all of our business activities."

233. According to Core's annual report for 2022, Core reported nearly $80 million in hosting revenue in 2021, which comprised approximately 15% of Core's total revenues for the year. In 2022, Core reported nearly $160 million in hosting revenue, which comprised approximately 25% of Core's total revenues for 2022.

234. Accordingly, it would be unreasonable to infer that Core's executive officers were unaware of large-scale events, strategies, and impacts affecting Core's hosting business.

235.     At the end of 2021, prior to the Proxy Statement and Registration Statement, Core was already experiencing increased power costs. Those elevated power costs were the primary expense associated with Core's self-mining and hosting business segments, which segments comprised substantially all of Core's revenues.

236.     Several Core executives admitted during their depositions in the Celsius litigation that Core's profit margins in its hosting business were negligible even before the increase in power costs at the end of 2021. As Core's Senior Vice President of Partnerships testified, it was becoming clear that Core's entire hosting business "might not be viable" as a result of the broad increases in Core's power costs, unless Core took action to defray those costs.

237.     Defendant Levitt, as Core's CEO, decided that Core would attempt to pass its increased power costs on to its hosting customers. Internal documents produced by Core in the Celsius litigation show that Levitt asked Core employees to "come up with a suggested plan" that included a "Power Surcharge Fee" charged to hosting customers for increased power rates.

238.     Around the same time, Core rolled out a new version of its Master Services Agreement ("MSA") – the main form of the agreement with Core's hosting customers – which added new language expressly permitting Core to pass through increased power costs. This new language would not have been necessary if Core's existing MSAs allowed Core to pass through increased power costs. Nonetheless, internal documents produced by Core in the Celsius litigation show that in late 2021, Core's legal team got "comfortable" with the idea of claiming that the existing MSAs implicitly permitted Core's power cost pass-through surcharges anyway.

239.     Internal documents produced by Core in the Celsius litigation show that Core's auditor, EY, expressly disagreed with Core's interpretation of the MSAs. EY evaluated Core's efforts to pass through its rising power costs and questioned the legal validity of the pass-through

tactic. Accordingly, in June 2022 EY told Core that it should include an offsetting allowance in its financials as opposed to merely recording revenue, to account for the likelihood that customers would dispute Core's attempts to pass through its power cost increases.

240.    Core, including its Vice President of Accounting Policy, dismissed EY's concerns and forged ahead with its scheme, firing EY as its auditor shortly thereafter. Core's internal documents showed that EY viewed "the impact of the pass through to be material." EY's recommendation that Core include an allowance for customers disputing Core's attempts to pass through increased power costs show that Core's executives were on notice by at least June 2022 that Core's auditor had identified a reasonable likelihood that Core's customers would reject Core's pass-through scheme.

241.    By at least June 2022, Core was receiving vigorous pushback from its hosting customers on the power cost pass-through surcharges Core was attempting to impose, including multiple direct challenges to the legality of Core's practices. Core's executives were aware of, or recklessly disregarded, these challenges and the ensuing exodus of hosting customers, demonstrating that they knew or recklessly disregarded the undisclosed risk that their power cost pass-through scheme was likely to jeopardize Core's hosting business.

242.    For example, Core received an email from Atlas on June 23, 2022, in which Atlas disputed Core's June 2022 invoice for hosting services, "because Core has inappropriately and without any contractual basis increased the price of [power consumption]."

243.    On July 16, 2022, Core received a letter from its client, CoreWeave, disputing the "Power Costs Pass-through" charges from its May and June 2022 invoice.

244.    Core had also received less formal pushback from its hosting customers. On June 19, 2022, Poolin Technology Pte. asked Core to explain "why the hosting price was changed." On

June 25, 2022, Alloy Ventures Management informed Core that the rate changes imposed by Core were "unexpected" and not aligned with the parties' past discussions and agreements that "our rate would be guaranteed through end of term in March 2023."

245.    Additionally, by July 12, 2022, Core had already racked up nearly $800,000 in overdue accounts receivable related to pass-through disputes, further demonstrating Core and its executives' awareness of, or reckless disregard for, the undisclosed risk that their power cost pass-through scheme was likely to jeopardize Core's hosting business, as customers were already disputing and refusing to pay these surcharges.

246.    Core continued to receive additional disputes from its hosting customers. In deposition testimony, Monica Xia, testifying as Core's corporate representative, estimated that Core had lost between five to ten hosting clients due to its attempts to pass through rising power costs to its hosting customers in contravention of the customers' fixed rate contracts.

### *Defendants Had Financial Motives to Conceal the Truth and Complete the Merger*

247.    Defendants Levitt and Feinstein were particularly motivated to conceal the scheme to foist Core's increased power costs on Core's hosting customers in contravention of those customers' fixed rate contracts.

248.    Levitt and Feinstein each beneficially owned tens of millions of pre-Merger Core common stock shares that, upon the approval of the Merger, were converted into publicly tradable shares of post-Merger Core common stock. According to the Proxy Statement, Levitt beneficially owned nearly 22 million shares of Core common stock after the Merger, and Feinstein beneficially owned over 38 million shares. On the day the Proxy Statement was filed, the Company's common stock price closed at $10.43 per share, meaning Levitt and Feinstein's post-Merger holdings were estimated to be worth approximately $230 million and $403 million, respectively, upon consummation of the Merger.

249.     Moreover, Feinstein sold 6 million shares of his Core common stock during the Class Period, between May 27, 2022 and June 3, 2022, at prices artificially inflated by the misrepresentations and omissions alleged herein. Feinstein's sales generated gross proceeds of over $18.3 million. Feinstein's stock sales were unusual because they represented over 16% of his holdings and he had not sold any shares of Company stock prior to the Class Period.

**COUNT V**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants Eilers, Brombach, Levitt, Trzupek, Feinstein, and Sterling**

250.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein, except for the allegations of Counts I-IV.

251.     This Count is asserted against Defendants Eilers, Brombach, Levitt, Trzupek, Feinstein, and Sterling (the "10(b) Defendants") and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

252.     During the Class Period, the 10(b) Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they, individually and in concert, directly or indirectly, disseminated or approved the false and/or misleading statements specified above, which they knew or recklessly disregarded were false and/or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

253.     The 10(b) Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These 10(b) Defendants, by virtue of their

receipt of information reflecting the true facts of the Company, their control over and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

254.    The 10(b) Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company personnel to members of the investing public, including Plaintiffs and the Class.

255.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

256.    Had Plaintiffs and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

257.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

258.    By reason of the foregoing, the 10(b) Defendants have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

## COUNT VI
### Violations of Section 20(a) of the Exchange Act
### Against All Defendants

259.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein, except for the allegations in Counts I-IV.

260.    Plaintiffs and the Class do not assert claims or seek to recover in this action as against the Company. Nonetheless, the Company's conduct as alleged above violated Section 10(b) of the Exchange Act, constituting a primary violation for purposes of Plaintiffs' claims against Defendants under Section 20(a) of the Exchange Act.

261.    During the Class Period, Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.

262.    As officers and/or directors of a publicly owned company, Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

263.    Because of their positions of control and authority as senior officers, Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein.

Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

264. By reason of the above conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations of Section 10(b) of the Exchange Act committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

(a) Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, designating Plaintiffs as class representatives and Plaintiffs' counsel as class counsel;

(b) Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all of the Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiffs and the Class prejudgment and post-judgment interest and their reasonable costs and expenses incurred in the prosecution of this action, including reasonable attorneys' fees and expert fees; and

(d) Awarding such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: May 5, 2023

**COCHRAN LAW, PLLC**

*/s/ Stuart L. Cochran*
Stuart L. Cochran
Texas Bar No.: 24027936
8140 Walnut Hill Ln., Suite 250
Dallas, Texas 75231
Telephone: (469) 333-3405
Facsimile: (469) 333-3406
stuart@scochranlaw.com

*Liaison Counsel for Lead Plaintiff*

**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen (*pro hac vice*)
Phillip Kim (*pro hac vice*)
Joshua Baker (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, NY 10116
Phone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com
Email: jbaker@rosenlegal.com

*Lead Counsel for Lead Plaintiff*

**THE SCHALL LAW FIRM**
Brian Schall
Rina Restaino
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Phone: (310) 301-3335
Fax: (213) 519-5876
Email: brian@schallfirm.com
Email: rina@schallfirm.com

*Additional Counsel for Lead Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on this 5th day of May 2023, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

                         */s/Stuart L. Cochran*
                         Stuart L. Cochran

# EXHIBIT 1

# CERTIFICATION

The individual or institution listed below (the "Plaintiff") authorizes the firm to file an action or amend a current action under the federal securities laws to recover damages and to seek other relief against Core Scientific Inc. f/k/a Power & Digital Infrastructure Acquisition Corp. ("Core")[1] and its current and former officers, and others in connection with the purchase and sale of securities issued by Core.

Plaintiff declares, as to the claims asserted under the federal securities laws, that:

1.    I have reviewed a complaint against Core and certain of its officers and directors, I authorize The Rosen Law Firm, P.A. to file an amended complaint, and I retained The Rosen Law Firm, P.A.

2.    I did not engage in transactions in the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this or any other litigation under the securities laws of the United States.

3.    I am willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.    The following is a list of all of the purchases and sales I have made in Core securities during the Class Period set forth in the complaint. I have made no transactions during the class period in the securities that are the subject of this lawsuit except those set forth below.

See Schedule A

5.    I have not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action involving alleged violations of the federal securities laws, except for the following company(ies):

6.    I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as travel expenses and lost wages directly related to the class representation, as ordered or approved by the court pursuant to law.

7.    I also affirm that I held shares of Power & Digital Infrastructure Acquisition Corp. ("XPDI") common stock at the close of business on December 7, 2021 and was entitled to vote in the special meeting of XPDI shareholders on January 19, 2022.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _____5/4/2023_____ .          Signature: _____
                                                                             DocuSigned by:
                                                                             578AE0C3EA374B5

Name: Evan Achee

---

[1] Core merged with Power & Digital Infrastructure Acquisition Corp. ("XPDI") in January 2022, with the merged company renamed Core Scientific, Inc.

## SCHEDULE A

## EVAN ACHEE

## CLASS PERIOD STOCK TRANSACTIONS

| | PURCHASES | | | SALES | |
|---|---|---|---|---|---|
| **DATE** | **SHARES** | **PRICE** | **DATE** | **SHARES** | **PRICE** |
| 6/13/2022 | 372 | $1.99 | N/A | N/A | N/A |
| 6/13/2022 | 128 | $1.99 | | | |
| 6/28/2022 | 281.69014 | $1.78 | | | |
| 7/6/2022 | 154.320987 | $1.62 | | | |
| 7/12/2022 | 0.112956 | $1.50 | | | |
| 7/12/2022 | 165.450331 | $1.51 | | | |
| 7/12/2022 | .050505 | $1.48 | | | |
| 7/12/2022 | 504.527717 | $1.49 | | | |

## CLASS PERIOD OPTION TRANSACTIONS

| DATE | DESCRIPTION | QUANTITY | SYMBOL | PRICE |
|---|---|---|---|---|
| 7/28/2022 | Purchase | 3 | CORZ March 17 2023 3.50 Call | $0.50 |

# EXHIBIT 2

# CERTIFICATION

The individual or institution listed below (the "Plaintiff") authorizes the firm to file an action or amend a current action under the federal securities laws to recover damages and to seek other relief against Core Scientific Inc. f/k/a Power & Digital Infrastructure Acquisition Corp. ("Core")[1] and its current and former officers, and others in connection with the purchase and sale of securities issued by Core.

Plaintiff declares, as to the claims asserted under the federal securities laws, that:

1. I have reviewed a complaint against Core and certain of its officers and directors, I authorize The Rosen Law Firm, P.A. to file an amended complaint, and I retained The Rosen Law Firm, P.A.

2. I did not engage in transactions in the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this or any other litigation under the securities laws of the United States.

3. I am willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4. The following is a list of all of the purchases and sales I have made in Core securities during the Class Period set forth in the complaint. I have made no transactions during the class period in the securities that are the subject of this lawsuit except those set forth below.

   See Schedule A

5. I have not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action involving alleged violations of the federal securities laws, except for the following company(ies):

6. I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as travel expenses and lost wages directly related to the class representation, as ordered or approved by the court pursuant to law.

7. I also affirm that I held shares of Power & Digital Infrastructure Acquisition Corp. ("XPDI") common stock at the close of business on December 7, 2021 and was entitled to vote in the special meeting of XPDI shareholders on January 19, 2022.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on ____5/4/2023____.          Signature: _____

Name: William J. Emanuel

---

[1] Core merged with Power & Digital Infrastructure Acquisition Corp. ("XPDI") in January 2022, with the merged company renamed Core Scientific, Inc.

DocuSign Envelope ID: 23FDD3DF-6217-4A53-B4EF-0C14D6D9E835

**SCHEDULE A**

**WILLIAM J. EMANUEL**

**CLASS PERIOD TRANSACTIONS**

| | PURCHASES | | | SALES | | |
|---|---|---|---|---|---|---|
| DATE | SHARES | PRICE | | DATE | SHARES | PRICE |
| 4/13/2022 | 100 | $7.94 | | N/A | N/A | N/A |
| 6/17/2022 | 300 | $2.32 | | | | |