**<u>Exhibit D</u>**

**Motion to Dismiss**

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

MEI PANG, Individually and on Behalf of
All Others Similarly Situated

        Plaintiff,

    v.

MICHAEL LEVITT, MICHAEL
TRZUPEK, and DENISE STERLING,

        Defendants.

Case No. 1:22-cv-01191-DAE

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ............................................................................................... 2

    A.    Core's Business.................................................................................................. 2

    B.    Core's Disclosures in its Proxy and Registration Statements ........................ 3

    C.    Events Following Core's De-SPAC .............................................................. 5

ARGUMENT ................................................................................................................. 7

I.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE SECURITIES ACT ................. 7

    A.    Plaintiffs Fail to Plead A Misrepresentation in the Registration Statement ........... 8

        1.    Risk Disclosures Regarding Increasing Power Costs ................................. 8

            (a)    Increasing Power Costs ......................................................... 9

            (b)    "Foisting" Power Costs ....................................................... 11

        2.    Risk Disclosures Regarding Core's Customer Base ................................. 14

        3.    Statement Regarding Core's Billing Practices ............................................ 14

    B.    Plaintiffs Fail to Plead A Duty to Disclose Under Item 303 ................................... 16

II.    PLAINTIFFS FAIL TO STATE AN EXCHANGE ACT CLAIM ................................. 18

    A.    Plaintiffs Fail to State a Claim Under Section 14(a) of the Exchange Act ........... 18

    B.    Plaintiffs Fail to State a Claim Under Section 10(b) of the Exchange Act........... 18

        1.    Plaintiffs Cannot State A Claim For Misstatements After July 2022 ........ 19

        2.    Plaintiffs Do Not Plead an Actionable Misrepresentation ......................... 19

            (a)    Risk Disclosures Regarding Increasing Power Costs.................... 21

            (b)    Risk Disclosures Regarding Core's Customer Base...................... 21

            (c)    Statements Regarding Core's Billing Practices ............................ 22

            (d)    Statement Regarding Celsius Dispute ............................................ 23

            (e)    Statement Regarding Restructuring of Pricing ............................. 24

            (f)    SOX Certifications.............................................................. 25

        3.    Plaintiffs Do Not Plead an Actionable Omission ...................................... 25

    C.    Plaintiffs Fail to Plead a Strong Inference of Scienter ........................................ 25

        1.    Plaintiffs Improperly Rely on Group Pleading........................................... 26

        2.    Plaintiffs Fail to Plead Intent to Defraud ................................................... 27

        3.    Plaintiffs Fail to Plead Motive .................................................................... 32

        4.    Plaintiffs Fail to Address Nonculpable Inferences..................................... 33

        D.      Plaintiffs Fail to Plead Loss Causation.................................................................34

III.    PLAINTIFFS FAIL TO STATE A CONTROL PERSON CLAIM ..................................35

CONCLUSION ...................................................................................................................................35

# TABLE OF AUTHORITIES

<strong>Page</strong>

## Cases

*Abrams v. Baker Hughes Inc*.,
   292 F.3d 424 (5th Cir. 2002) ................................................................. 26, 32

*Alaska Elec. Pension Fund v. Asar*,
   768 F. App'x 175 (5th Cir. 2019) .......................................................... 26, 33

*In re Alcatel Alsthom Sec. Litig*.,
   2000 WL 34217789 (E.D. Tex. June 23, 2000) ........................................ 20

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
   980 F. Supp. 2d 564 (S.D.N.Y. 2013) .................................................... 10

*Matter of Beach*,
   731 F. App'x 322 (5th Cir. 2018) ............................................................ 5

*In re Biogen Inc. Sec. Litig*.,
   193 F. Supp. 3d 5 (D. Mass. 2016), *aff'd*, 857 F.3d 34 (1st Cir. 2017) .................................. 33

*Borderplex Inv. Partners v. Borderplex Realty Trust*,
   2017 WL 1738080 (W.D. Tex. Apr. 2017) ......................................... 12, 24

*Brasher v. Broadwind Energy, Inc*.,
   2012 WL 1357699 (N.D. Ill. Apr. 19, 2012) ............................................ 20

*Braun v. Eagle Rock Energy Partners, L.P.*,
   223 F. Supp. 3d 644 (S.D. Tex. 2016) ................................................. 11, 18

*In re Capstead Mortg. Corp. Sec. Litig*.,
   258 F. Supp. 2d 533 (N.D. Tex. 2003) ................................................. 10, 14

*Carvelli v. Ocwen Fin. Corp.*,
   934 F.3d 1307 (11th Cir. 2019) .............................................................. 9

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*,
   497 F.3d 546 (5th Cir. 2007) ................................................................. 33

*City of Brockton Retirement Sys. v. Shaw Grp. Inc.*,
   540 F. Supp. 2d 464 (S.D.N.Y. 2008) ..................................................... 29

*Crutchfield v. Match Grp., Inc*.,
   529 F. Supp. 3d 570 (N.D. Tex. 2021) ................................................. 28, 29

iii

*Dawes v. Imperial Sugar Co.*,
  975 F. Supp. 2d 666 (S.D. Tex. 2013) ................................................................. 13, 18, 34

*Delaware Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*,
  620 F. Supp. 3d 603 (S.D. Tex. 2022) ...................................................................... 21

*In re Dell Inc., Sec. Litig.*,
  591 F. Supp. 2d 877 (W.D. Tex. 2008) ............................................................ 29, 34, 35

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
  2017 WL 4049253 (S.D.N.Y. June 28, 2017) ............................................................ 27

*Drzala v. Horizon Blue Cross Blue Shield*,
  2016 WL 2932545 (D.N.J. May 18, 2016) ................................................................ 15

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005) ...................................................................................................... 34

*In re Express Scripts Holding Co. Sec. Litig.*,
  2017 WL 3278930 (S.D.N.Y. Aug. 1, 2017) ............................................................. 22

*Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn*,
  53 F. Supp. 3d 882 (E.D. La. 2014) .......................................................................... 17

*Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn*,
  2015 WL 4879217 (E.D. La. Aug. 14, 2015) ......................................................... 10, 14

*In re First Chicago Corp. Sec. Litig.*,
  769 F. Supp. 1444 (N.D. Ill. 1991) ........................................................................... 24

*Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*,
  565 F.3d 200 (5th Cir. 2009) ..................................................................................... 26

*In re Franklin Bank Corp. Sec. Litig.*,
  782 F. Supp. 2d 364 (S.D. Tex. 2011), *aff'd sub nom.* 464 F. App'x 334 (5th
  Cir. 2012) .............................................................................................................. 32, 35

*Gamboa v. Citizens, Inc.*,
  2018 WL 2107205 (W.D. Tex. May 7, 2018) ............................................................ 32

*Genesee Cnty. Emps' Ret. Sys. v. FirstCash Holdings Inc.*,
  2023 WL 2752846 (N.D. Tex. Mar. 31, 2023) ...................................................... 25, 35

*Glassman v. Computervision Corp.*,
  90 F.3d 617 (1st Cir. 1996) ........................................................................................ 15

*Gomez v. Credit Suisse AG*,
  2023 WL 2744415 (S.D.N.Y. Mar. 31, 2023) ............................................................ 23

*In re Greenlane Holdings, Inc. Sec. Litig.*,
  511 F. Supp. 3d 1283 (S.D. Fla. 2021) ...................................................22

*Hensley v. Imprivata, Inc.*,
  260 F. Supp. 3d 101 (D. Mass. 2017) ....................................................33

*In re Hi-Crush Partners L.P. Sec. Litig.*,
  2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ...........................................10

*Huang v. EZCorp, Inc.*,
  2016 WL 6092717 (W.D. Tex. Oct. 18, 2016)..........................................31

*Hulliung v. Bolen*,
  548 F. Supp. 2d 336 (N.D. Tex. 2008)......................................................5

*Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*,
  537 F.3d 527 (5th Cir. 2008) ...........................................................26, 31

*In re ITT Educ. Servs., Inc. Sec. and S'holder Derivs. Litig.*,
  859 F. Supp. 2d 572 (S.D.N.Y. 2012) ........................................ 12, 15, 23

*Izadjoo v. Helix Energy Sols. Grp., Inc.*,
  237 F. Supp. 3d 492 (S.D. Tex. 2017) ...............................................27, 33

*Jacobowitz v. Range Res. Corp.*,
  596 F. Supp. 3d 659 (N.D. Tex. 2022)...............................................25, 35

*Kapps v. Torch Offshore, Inc.*,
  379 F.3d 207 (5th Cir. 2004) ........................................................ 8, 11, 17

*Kelly v. Elec. Arts, Inc.*,
  71 F. Supp. 3d 1061 (N.D. Cal. 2014) ....................................................19

*In re Key Energy Servs., Inc. Sec. Litig.*,
  166 F. Supp. 3d 822 (S.D. Tex. 2016) ....................................................34

*Kurtzman v. Compaq Computer Corp.*,
  2000 WL 34292632 (S.D. Tex. Dec. 12, 2000)..........................................8

*U.S. ex rel. Lam v. Tenet Healthcare Corp.*,
  481 F. Supp. 2d 673 (W.D. Tex. 2006).....................................................5

*Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*,
  810 F.3d 951 (5th Cir. 2016) ......................................................17, 29, 31

*Lovelace v. Software Spectrum Inc.*,
  78 F.3d 1015 (5th Cir. 1996) .................................................................29

*Magruder v. Halliburton Co.*,
  359 F. Supp. 3d 452 (N.D. Tex. 2018) ..................................... 12, 15, 18, 19, 23, 26, 27, 34, 35

*Markman v. Whole Foods Mkt., Inc.*,
  2016 WL 10567194 (W.D. Tex. Aug. 19, 2016) ...................................................... 25

*McCloskey v. Match Grp., Inc.*,
  2018 WL 4053362 (N.D. Tex. Aug. 24, 2018) ......................................................... 17

*McNulty v. Kanode*,
  2013 WL 12077503 (W.D. Tex. Nov. 6, 2013) .................................................... 5, 26

*Mun. Emps.' Ret. Sys. Of Michigan v. Pier 1 Imports, Inc.*,
  935 F.3d 424 (5th Cir. 2019) ............................................................................... 18

*N. Port Firefighters' Pension—Loc. Option Plan v. Temple-Inland, Inc.*,
  936 F. Supp. 2d 722 (N.D. Tex. 2013) .................................................................. 16

*In re N. Telecom Ltd. Sec. Litig.*,
  116 F. Supp. 2d 446 (S.D.N.Y. 2000) ................................................................... 22

*Nasyrova v. Immunomedics, Inc.*,
  2015 WL 382846 (D.N.J. Jan. 28, 2015) ............................................................... 16

*Nathenson v. Zonagen Inc.*,
  267 F.3d 400 (5th Cir. 2001) ............................................................................... 28

*Neiman v. Bulmahn*,
  854 F.3d 741 (5th Cir. 2017) ............................................................................... 28

*In re Noah Educ. Holdings, Ltd. Sec. Litig.*,
  2010 WL 1372709 (S.D.N.Y. Mar. 31, 2010) ..................................................... 9, 22

*Nolte v. Cap. One Fin. Corp.*,
  390 F.3d 311 (4th Cir. 2004) ............................................................................... 27

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) ................................................................................ 23

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
  538 F. Supp. 2d 662 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 617 (2d Cir. 2009) ................. 9, 13

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*,
  307 F. Supp. 3d 583 (S.D. Tex. 2018) ............................................................... 18, 27

*Monroe Cnty. Emps.' Ret. Sys. v. YPF Sociedad Anonima*,
  15 F. Supp. 3d 336 (S.D.N.Y. 2014) .................................................................... 34

*S.E.C. v. Snyder*,
    292 F. App'x 391 (5th Cir. 2008) .................................................................................... 30

*Sorkin, LLC v. Fischer Imaging Corp.*,
    2005 WL 1459735 (D. Col. June 21, 2005) ................................................................... 30

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
    365 F.3d 353 (5th Cir. 2004) .......................................................................................... 26

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ................................................................................................. 26, 33

*Tuchman v. DSC Commc'ns Corp.*,
    14 F.3d 1061 (5th Cir. 1994) .......................................................................................... 32

*Veal v. LendingClub Corp.*,
    423 F. Supp. 3d 785 (N.D. Cal. 2019) ........................................................................... 30

*Walker v. Beaumont Indep. Sch. Dist.*,
    938 F.3d 724 (5th Cir. 2019) ............................................................................................ 5

*White v. H&R Block, Inc.*,
    2004 WL 1698628 (S.D.N.Y. July 28, 2004) ................................................................ 11

*In re XP Inc. Sec. Litig.*,
    524 F. Supp. 3d 23 (E.D.N.Y. 2021) .............................................................................. 16

*Yoshikawa v. Exxon Mobil Corp.*,
    2022 WL 4677621 (N.D. Tex. Sept. 29, 2022) .......................................................... 8, 25

## **Statutes**

15 U.S.C. § 77k .......................................................................................... 1, 7, 8, 18, 25

15 USC § 77o ..................................................................................................... 1, 35

15 U.S.C. § 78j(b) ..................................................................................... 1, 18, 19, 21, 25

15 U.S.C. § 78n ................................................................................................. 1, 18

15 U.S.C. § 78t(a) ............................................................................................. 1, 35

Private Securities Litigation Reform Act of 1995,
    Pub. L. No. 104-67, 109 Stat. 737 .................................................. 1, 2, 18, 19, 24, 26

### Rules and Regulations

17 C.F.R. § 229.303...................................................................................................16, 17

FED. R. CIV. P. 12(b)(6)............................................................................................... 1

FED. R. CIV. P. 9(b)...................................................................................................8, 18

### Other Authorities

*Electricity: Current Issues & Trends*, U.S. ENERGY INFORMATION
ADMINISTRATION, https://www.eia.gov/electricity/ (last visited June 15, 2023) .....................11

Defendants respectfully submit this Memorandum of Law in Support of Their Motion to Dismiss the Amended Class Action Complaint (ECF No. 62) (the "Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state causes of action under Sections 11 and 15 of the Securities Act of 1933 ("Securities Act"), and Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

## PRELIMINARY STATEMENT

Core Scientific Inc. ("Core") is a large-scale digital asset mining operator. Its revenue primarily derives from its self-mining segment, for which it manages its own fleet of cryptocurrency "miners." Core also provides hosting services for large-scale, third party cryptocurrency mining rigs. As disclosed at the time it went public—and repeatedly throughout the Class Period—Core's business depended in part on the cost of electricity. Core warned investors that an increase in electricity costs could have a material negative impact on its business. Indeed, following unanticipated and significant increases in electricity costs, Core disclosed on October 26, 2022 that its cash reserves would soon be depleted and that it was considering bankruptcy. Within two months, on December 21 2022, Core filed for Chapter 11 bankruptcy.

Although the causes of Core's bankruptcy were repeatedly disclosed as risks to Core's business, Plaintiffs seek an "insurance policy" due to the materialization of those risks and allege that Defendants fraudulently concealed issues facing Core's business. But the Complaint does not meet the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which Congress enacted to curb abusive securities fraud claims such as this one.

*First*, the Complaint fails to allege an actionable misstatement or omission. Plaintiffs' theory is Core made material misstatements by omitting that it was experiencing rising energy prices and—consistent with its hosting contracts—was "foisting" these costs onto customers. But Plaintiffs do not point to a single statement where Defendants claimed that energy costs—which

are public—were not rising, nor where Defendants claimed they were not passing on costs to customers. To the contrary, Core both disclosed when it began experiencing increased energy costs, and that its hosting contracts were "*adjusted for actual costs*." Plaintiffs also fail to allege that these issues were occurring at the time of the alleged misrepresentations—their own confidential witness supposedly claims that the "pass through" of energy costs did not occur until the "summer of 2022," after the vast majority of the alleged misrepresentations. Notably, any alleged misrepresentations made after July 2022 post-date Plaintiffs' purchases, meaning no Plaintiff could have possibly (let alone plausibly) purchased based on those alleged misstatements.

*Second*, Plaintiffs' allegations fail to support a "strong inference of scienter," *i.e.*, one that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent" as required under the PSLRA. Instead, Plaintiffs' allegations undermine any inference of scienter: Defendants (i) repeatedly warned investors of the allegedly omitted information; (ii) were advised by counsel that the pass-through of increased energy costs to customers was permitted under the relevant contracts; and (iii) increased the amount of their stock ownership throughout the Class Period.

*Finally*, Plaintiffs fail to demonstrate any causal connection between the alleged misrepresentations and their losses, *i.e.*, loss causation. At most, Plaintiffs' "corrective disclosures" were simply the result of the materialization of previously-disclosed risks, which do not qualify as "corrective" under the federal securities laws. The Complaint should be dismissed with prejudice.

## STATEMENT OF FACTS

### A.    Core's Business

Core is a leading large-scale operator of facilities for digital asset mining and a provider of blockchain infrastructure. Ex. A (Registration Statement) at 144.[1]  Core primarily mines digital

---

[1]    Citations to Core's Registration Statement have parallel citations to the Proxy Statement.

assets for its own account, but also provides hosting services for other large-scale cryptocurrency miners. ¶ 72.[2] Its self-mining business is its highest grossing segment, comprising an average 62% of Core's total revenue during the Class Period. Ex. B (Q3 2022 10-Q) at 5.

Because Core's mining operations are tied to the price of digital assets, Core's business is subject to unpredictable market swings as confidence in cryptocurrencies, such as bitcoin, wax and wane. *See* ¶¶ 60, 66. And because cryptocurrency miners consume large amounts of electricity, power is a principal cost for Core's mining fleet. ¶ 7. Accordingly, Core's bottom-line is dependent on power prices set by the public power markets where Core's facilities are located. *See* Ex. A at 144. Power prices are influenced by several variables, including the price of natural gas, weather, and location, among others. *See* Ex. C (Q1 2022 10-Q) at 50. Core thus provided investors with warnings to enable them to assess the risks associated with investing in Core.

In July 2021, Core entered into an Agreement and Plan of Merger and Reorganization with Power & Digital Infrastructure Acquisition Corp. ("XPDI") to go public via a "de-SPAC." ¶ 87. XPDI stockholders approved the merger pursuant to a Proxy Statement (Ex. D, the "Proxy Statement"), ¶¶ 88-89, and unredeemed shares of XDPI were converted to shares of Core pursuant to a Registration Statement filed on December 30, 2022 (the "Registration Statement"), ¶ 91.

### B. Core's Disclosures in its Proxy and Registration Statements

Core's Proxy and Registration Statements contained nearly 60 pages of risk disclosures. Among them, Core highlighted risks specifically related to the volatility of power costs. In particular, Core flagged that its "mining and hosting services *require a significant amount of electric power. The costs of electric power account for a significant portion of our cost of*

---

[2] Citations to "¶ __" refer to the Complaint. All emphasis is added and quotations, citations, and alterations omitted unless otherwise noted.

*revenue.*"  Ex. A at 37.  It went on to warn that "*[e]nergy costs and availability are vulnerable to seasonality, with increased costs primarily in the summer months . . . . Increased power costs* and limited availability and curtailment of power resources *will reduce our revenue and have a material and adverse effect on our cost of revenue and results of operations.*"  *Id.*  Core explicitly warned investors that "*[i]ncreases in power costs . . . could have a material adverse effect on our business*, financial condition and results of operations."  *Id.* at 33.

Core explained how its contracts with hosting customers were structured and warned of risks given the volatility of the costs underlying its pricing.  For example, Core disclosed that its "hosting contracts are *generally priced on the basis of estimated power consumption* by our clients, along with other costs of service, *as adjusted for actual costs.  Our ability to earn a profit on such contracts requires that we accurately estimate the costs involved and outcomes likely to be achieved[.]*"  *Id.* at 40.  Core reiterated elsewhere that its "customers are *generally billed on a fixed and recurring basis*," *id.* at 177, but clarified that those contracts are subject to "adjust[ments] for actual costs," *id.* at 40.  Core also warned that if it "*fail[ed] to accurately estimate the factors upon which we base our contract pricing,* we may generate less profit than expected or incur losses on those contracts, which could have a material adverse effect on our business[.]"  *Id.*

Core also warned of the impact rising power costs could have on its customer relationships, and specifically disclosed that it "may not be able to attract customers to our hosting capabilities . . . if . . . *we fail to provide competitive pricing terms* or effectively market them to potential customers[.]"  *Id.* at 33.  Core warned that the impact of any customer relationship issues could be magnified given that the Company's "*revenue comes from a small number of customers, and the loss of, or significant decrease in business from, a number of these customers* . . . could have a material adverse effect on our business[.]"  *Id.* at 36.

4

It is with the benefit of these detailed and comprehensive risk disclosures that Plaintiffs approved Core's de-SPAC and invested in Core's business.

## C. **Events Following Core's De-SPAC**

The summer and fall of 2022 brought widespread increases in power costs, Ex. E (WSJ), plummeting bitcoin prices, Ex. F (WSJ), and an influx of cryptocurrency miners that strained states' power grids, Ex. G (NYT)—events Core warned about but could not control or predict. These events—which were widely publicized—ultimately forced Core into bankruptcy. ¶¶ 17-18.[3]

In particular, the Complaint attributes "acute power increases" Core experienced in 2022 to only two primary events: first, Russia's invasion of Ukraine, which commenced on February 24, 2022, and second, an unprecedented heat wave in the summer of 2022. ¶ 130. Recognizing these rising power costs and the potential impact on Core's business, Defendants disclosed to investors during every single earnings conference call Core held during 2022 following its de-SPAC that energy costs were rising and the Company would likely be impacted. For example, during Core's 2021 fourth quarter earnings call held on March 29, 2022, Defendant Michael Levitt, Core's Chief Executive Offer, cautioned that "*energy costs have been going up all over.* . . . That said, it's probably fair to assume that energy costs will . . . go up a bit." Ex. H at 5 (Q4 2021 Call Transcript). Thereafter, during the Company's first quarter 2022 earnings call on May 12, 2022 Mr. Levitt stated that Core's "*average cost of electricity has risen by approximately 15% to 20% over prior assumptions for 2022*." Ex. I at 3 (Q1 2022 Call Transcript).

---

[3] The Court may take judicial notice of SEC filings, *Hulliung v. Bolen*, 548 F. Supp. 2d 336, 339 n.2 (N.D. Tex. 2008), earnings call transcripts, *McNulty v. Kanode*, 2013 WL 12077503, at *5 (W.D. Tex. Nov. 6, 2013), the existence of news articles, *U.S. ex rel. Lam v. Tenet Healthcare Corp.*, 481 F. Supp. 2d 673, 680 (W.D. Tex. 2006), and matters of public record such as power costs, *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019); *see Matter of Beach*, 731 F. App'x 322, 327 n.3 (5th Cir. 2018).

As volatile bitcoin and power markets persisted throughout 2022, Core filed its required annual and quarterly reports with the SEC containing equally as robust and comprehensive risk disclosures as those in Core's Proxy and Registration Statements. The disclosures in Core's 2021 Form 10-K and 2022 Form 10-Qs again warned that "increasing power costs" could negatively impact Core's business. ¶¶ 187, 198, 215. Core reiterated its risk disclosures regarding its ability to "meet [its] end users' expectations" including its ability to provide hosting capacity at "attractive rates" in the face of increasing power costs and decreasing prices for bitcoin. ¶¶ 189, 204, 217. And Core reminded investors that while its hosting customers are "generally billed" on a "fixed" basis, its contracts were subject to "***adjust[ment] for actual costs.***" ¶ 193. Given the unanticipated power costs brought on by geopolitical and weather events in 2022, Core was forced to make strategic decisions about how to address these increases. Consistent with Core's risk disclosures that Core's hosting contracts were subject to "adjustment for actual costs," Core allegedly adjusted for these unexpectedly high power costs into its contract pricing for certain customers, ¶ 123.

Celsius Network LLC ("Celsius"), one of Core's largest hosting customers, disputed these charges and subsequently filed for bankruptcy on July 13, 2022. ¶ 115. Given Celsius' outstanding balance and Core's impending liquidity issues, Core sought to collect on the charges incurred by Celsius prior to its bankruptcy. ¶ 116. On September 28, 2022, Celsius filed a motion for civil contempt in bankruptcy publicly alleging that Core breached its agreement with Celsius by attempting to "pass through" power costs to Celsius under its contract. ¶¶ 116-17. That litigation is ongoing. On September 29, 2022, Core's stock price closed at $1.30. ¶ 118.

Unable to combat persistently and historically high power costs and low cryptocurrency prices, on October 27, 2022, Core filed a Form 8-K informing investors that, "[a]s previously disclosed, the Company's operating performance and liquidity have been severely impacted by the

prolonged decrease in the price of bitcoin, the increase in electricity costs, . . . and the litigation with Celsius," and that it was "exploring a number of potential strategic alternatives with respect to the Company's capital structure, including . . . raising additional capital or restructuring its existing capital structure" and "potentially could seek relief under the applicable bankruptcy or insolvency laws." Ex. J at 3 (October 2022 Form 8-K). That day, Core's stock price closed at $.0221 per share, and its warrant price closed at $0.0388 per share. ¶ 134. As previewed in its October 27 Form 8-K, on December 21, 2022, Core filed for bankruptcy. ¶ 135. That day, Core's stock price closed at $.051 per share, and its warrant price closed at $0.0251 per share. ¶ 136.

## ARGUMENT

Plaintiffs' claims under the Securities Act and the Exchange Act should be dismissed for the simple reason that Plaintiffs fail to identify any false or misleading statements. These statutes provide protection for investors who unknowingly relied on false statements by Defendants. But Plaintiffs' allegations do not even come close to adequately alleging false or misleading statements. This deficiency is clear on the face of the Complaint. As just one example, Plaintiffs allege that statements made in January 2022 were misleading for failing to disclose increased power costs while simultaneously alleging that power costs did not increase until the end of February 2022, as a result of Russia's invasion of Ukraine, no less. *See* ¶ 130. And had Plaintiffs pled any actionable statements, they set forth no facts suggesting that any Defendant knew those statements were false when made, a prerequisite to securities fraud liability. These claims constitute nothing more than an attempt to transform an unadjudicated breach of contract dispute between Celsius and Core into a securities fraud case. These deficiencies foreclose Plaintiffs' claims.

## I. PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE SECURITIES ACT

To plead a Section 11 claim, Plaintiffs must allege facts sufficient to show that the Registration Statement contained: (i) a misrepresentation of material fact; (ii) an omission of

material fact in contravention of an affirmative legal disclosure obligation; or (iii) an omission of material information that was necessary to prevent other disclosures from being misleading. *Kapps v. Torch Offshore, Inc*., 379 F.3d 207, 210 n.3 (5th Cir. 2004).

Further, where, as here, a Securities Act claim is "grounded in fraud rather than negligence," Plaintiffs must meet Rule 9(b)'s heightened pleading standard, which requires pleading the circumstances of fraud with particularity, including that any allegedly false statements were made with "actual knowledge" of their falsity. *Kurtzman v. Compaq Computer Corp*., 2000 WL 34292632, at *62 (S.D. Tex. Dec. 12, 2000). Plaintiffs allege that Defendants knew, but failed to disclose, that power costs were increasing and that they sought to pass those costs onto their customers in contravention of their "fixed rate" contracts. ¶¶ 112-32. These are fraud allegations, which are subject to Rule 9(b). Regardless of the pleading standard, Plaintiffs' Section 11 claim must be dismissed because Plaintiffs fail to allege an actionable material misstatement or omission.

## A.     Plaintiffs Fail to Plead A Misrepresentation in the Registration Statement

Plaintiffs allege that five statements in the Registration Statement are misleading. These statements fall into three categories: (1) two risk disclosures concerning increasing power costs, ¶¶ 97, 105; (2) two risk disclosures concerning Core Scientific's ability to attract and maintain customers, ¶¶ 101, 103; and (3) a statement regarding Core Scientific's general billing practices, ¶ 99. Plaintiffs allege not that these statements are literally false, rather that they are materially misleading for omitting to disclose certain alleged facts. But where statements are literally true, Plaintiffs must plead facts showing that the statements "created an impression of a state of affairs that differ[ed] in a material way from [the] one that actually existed." *Yoshikawa v. Exxon Mobil Corp.*, 2022 WL 4677621, at *16 (N.D. Tex. Sept. 29, 2022). Plaintiffs do not meet this standard.

### 1.     Risk Disclosures Regarding Increasing Power Costs

Plaintiffs challenge as misleading the risk disclosure that "[i]ncreases in power costs . . .

will reduce our operating margins, impact our ability to attract customers for our services, may harm our growth prospects and could have a material adverse effect on our business, financial condition and results of operations." ¶ 97; *see also* ¶ 105 (alleging as misleading Company's disclosure that "fail[ure] to accurately estimate the factors upon which we base our contract pricing" could have a material impact on the business). Plaintiffs do not argue these disclosures were false. Instead, Plaintiffs argue they were "misleading" because Core was experiencing increasing power costs and was "foisting" these costs upon customers in contravention of their contracts. ¶¶ 98, 106. These allegedly omitted pieces of information do not render the risk warnings actionable.

### (a)      Increasing Power Costs

*First*, although Plaintiffs complain that the Registration Statement did not disclose the risk of increasing power costs, the Registration Statement explicitly disclosed that an increase in power costs could harm Core's business. *See Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 670 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 617 (2d Cir. 2009) (risk disclosures that the "semiconductor industry is highly cyclical and subject to rapid change" were "more than adequate to warn investors of the possibility of future downturn in the market"); *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1327 (11th Cir. 2019) (risk disclosures sufficient where they "warn an investor of risks *of a significance similar to that actually realized* and provide adequate notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward.").

*Second*, faced with these extensive risk warnings, Plaintiffs resort to arguing that the risk warnings themselves were misleading because Core "had already started to experience increases in power costs . . . ." ¶ 98. But courts have repeatedly recognized that risk disclosures like Core's are not guarantees that a company is not presently facing that risk. *In re Noah Educ. Holdings, Ltd. Sec. Litig.*, 2010 WL 1372709, at *7-8 (S.D.N.Y. Mar. 31, 2010) (holding warning that

"increases in the cost of raw materials 'could'" impact business "cannot reasonably be read to imply that [ ] cost of raw materials had not increased, to some extent, in the current quarter"). Nor can Core be held liable for securities fraud for the inevitability of volatility in power costs in the face of its robust disclosures. *See In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 579 (S.D.N.Y. 2013) ("[N]o reasonable investor could have read BoA's extensive risk disclosures as negating the possibility that litigants would file suits such as the AIG suit. The possibility of such increasing litigation was explicitly disclosed[.]").

*Third*, regardless, risk disclosures are not misleading unless they warn of a risk that has already materialized. *See, e.g.*, *Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn*, 2015 WL 4879217, at *16 (E.D. La. Aug. 14, 2015) (risk factors not misleading where plaintiff alleged that relevant events did not occur until "some three months after the Effective Date [of the Registration Statement]"). Here, Plaintiffs set forth only conclusory allegations suggesting that the risks warned of in these disclosures—that power costs could increase, and that such increases could harm Core's business—had begun to materialize **at the time the Registration Statement became effective** on December 30, 2021. *E.g.*, *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *11 (S.D.N.Y. Dec. 2, 2013) ("A corporation's duty to disclose is adjudged by the facts as they existed when the registration statement became effective.").

The Complaint undermines these allegations: rather than alleging well-pled facts establishing that Core "had already started to experience increases in power costs," ¶ 98, or "fail[ed] to accurately estimate the factors upon which we base our contract pricing," ¶ 105, the Complaint instead asserts that Core's first "acute increase in power costs" did not occur until "the start of Russia's invasion of Ukraine," **on February 24, 2022**, ¶ 130, nearly two months after Core's Registration Statement was filed. *See* Ex. W (CNBC); *In re Capstead Mortg. Corp. Sec. Litig.*,

258 F. Supp. 2d 533, 550 (N.D. Tex. 2003) (dismissing securities fraud claims where plaintiff did not "provid[e] the underlying facts to support those conclusory statements"). Recognizing the fact that geopolitical factors could impact Core's business, Defendants warned that Core "is heavily impacted by social, political, economic and other events and circumstances in countries outside of the [U.S.]." Ex. A at 34. Plaintiffs, of course, do not allege that this disclosure was misleading.

*Finally*, even had Plaintiffs adequately alleged that power costs had risen at the time of the Registration Statement, power rates are public.[4] Anyone—Plaintiffs included—could access Core's rates throughout the Class Period. "This is not a case involving private information held internally by the company, hidden away from the public and available only to the officers or directors. To the contrary, the information that plaintiffs allege [Defendants] concealed" was publicly available. *White v. H&R Block, Inc.*, 2004 WL 1698628, at *6 (S.D.N.Y. July 28, 2004). What's more, the fact that power costs were increasing was widely publicized. This alone forecloses Plaintiffs' claims. *Kapps*, 379 F.3d at 216 (statements about natural gas prices not actionable given "the ready public availability of natural gas prices" and where defendant used "cautionary language . . . in relation to the volatility of natural gas prices"); *Braun v. Eagle Rock Energy Partners, L.P.*, 223 F. Supp. 3d 644, 651 (S.D. Tex. 2016) (no misstatements where "debt covenants were publicly available" and the "specific risk was identified by cautionary language").

### (b)    "Foisting" Power Costs

Plaintiffs' allegations that the power cost risk disclosures were misleading for failing to disclose that Core was "foisting" additional power costs onto its customers similarly fall flat.

*First*, these risk disclosures do not address Core's hosting contracts and thus cannot be

---

[4] *Electricity: Current Issues & Trends*, U.S. ENERGY INFORMATION ADMINISTRATION, https://www.eia.gov/electricity/ (last visited June 15, 2023).

misleading "because they do not suggest that the undisclosed improper activity alleged by Plaintiff[s] was not occurring." *In re ITT Educ. Servs., Inc. Sec. and S'holder Derivs. Litig.*, 859 F. Supp. 2d 572, 579 (S.D.N.Y. 2012). Core's disclosures that "increases in power costs," ¶ 97, and the "fail[ure] to accurately estimate the factors upon which we base our contract pricing," ¶ 105, could harm Core's business make no representation about power pass through costs or Core's hosting contracts. There "simply is too attenuated a relationship between the allegedly misleading statements and the omissions, and the [Complaint] makes no attempt to bridge this analytical gap." *Magruder v. Halliburton Co.*, 359 F. Supp. 3d 452, 465 (N.D. Tex. 2018).

*Second*, even assuming these risk disclosures had anything to do with pass through costs, Plaintiffs' allegations undermine their claim that any such pass through was occurring at the time of the Registration Statement. Plaintiffs baselessly allege that Core was "attempting to contravene the fixed rate terms" of its hosting contracts as of December 2021, *e.g.*, ¶ 104, but Plaintiffs' own confidential witness—who purportedly attended weekly accounting meetings—did not learn about any pass through costs until the summer of 2022. ¶¶ 130-31. This is consistent with both the fact that there was an acute spike in power costs in the summer of 2022 and Plaintiffs' own allegations that in the "*summer* of 2022" Core received "questions and concerns from customers" regarding pass through costs. ¶¶ 123, 131. Indeed, even Celsius—whose public filings Plaintiffs hinge their case on—did not dispute any charges until September 2022. ¶ 116. Plaintiffs simply allege no facts that *any* hosting customers were charged pass through costs prior to the summer of 2022. Even more fundamentally, Plaintiffs do not allege the specifics of any customer contracts, or what provisions of those contracts were allegedly breached and when. *See Borderplex Inv. Partners v. Borderplex Realty Trust*, 2017 WL 1738080, at *9 (W.D. Tex. Apr. 2017) ("[T]he Court must reject this claim because it is imprecise and is not alleged with the particularity required to meet

the pleading requirements of the PSLRA."). The Complaint is simply a "'backwards' pleading—an attempt to allege liability for disclosures not made because the material fact was unknowable or had not even occurred as of the critical date." *Panther Partners*, 538 F. Supp. 2d at 673.

*Third*, even had Plaintiffs adequately alleged that Core was passing on power costs to its "fixed rate hosting customers" at the time of the Registration Statement, Plaintiffs' claim would still fail because Core expressly disclosed that it generally adjusted its contract pricing for actual costs. *See Dawes v. Imperial Sugar Co*., 975 F. Supp. 2d 666, 706-07 (S.D. Tex. 2013) (no misstatements concerning joint venture where defendants disclosed details of joint venture and impact it would have on company). The Registration Statement specifically discloses that Core's "hosting contracts are generally priced on the basis of estimated power consumption by our clients, along with other costs of service, *as adjusted for actual costs*." ¶ 105. That a contract may have a "fixed rate" accounting for certain components does not foreclose the possibility that *specific variable costs* may ultimately be billed to the customer. *See, e.g.*, *Dawes*, 975 F. Supp. 2d at 705. For example, a lawyer might charge at a fixed hourly rate but pass through actual costs (WestLaw, travel, printing) to the client. Here, Plaintiffs set forth no allegations explaining how Core's hosting contracts were priced, what the inputs were, or why "pass through" costs are inconsistent with the disclosure that its contract pricing would be "adjusted for actual costs."

Plaintiffs last allege that Core's disclosures were misleading because the pass through costs resulted in a "material adverse effect on Core's business," *e.g.*, ¶ 98, but do not plead *any* facts setting forth what this alleged effect was either at the time of the Registration Statement or at all throughout the Class Period. In fact, Plaintiffs allege no contract terminations occurred until "*the fourth quarter of 2022*." ¶ 15. Worse, Plaintiffs *concede* they have no support for the allegation that any terminations were the result of pass through disputes, simply alleging that Core's

explanation for those terminations "does not rule out" Plaintiffs' conclusory allegation. ¶ 127.

### 2. Risk Disclosures Regarding Core's Customer Base

Plaintiffs next allege as misleading two risk disclosures concerning Core's ability to attract and maintain hosting customers: first, Core's warning that it "may not be able to attract customers to our hosting capabilities for a number of reasons, including if . . . we fail to provide competitive pricing terms or effectively market them to potential customers[,]" ¶ 101, and second, Core's disclosure that "[a]ny failure to meet our end-users' expectations, including . . . any inability to meet their requirements for increased hosting capacity at attractive rates, could result in cancellation or non-renewal of our business relationships," ¶ 103. Plaintiffs allege not that these risk disclosures are false, rather that they are misleading because Core was allegedly experiencing increases in power costs and was "foisting" these costs upon its customers. ¶¶ 102, 104.

*First*, Plaintiffs do not allege any connection between these risk disclosures and the allegedly omitted information. Because these risk disclosures make no representations about power or pass through costs, they cannot be rendered misleading for omitting such information. *Supra* Section I.A.1.(b). *Second*, even assuming a connection between these risk disclosures and the allegedly omitted information, the disclosures are still not actionable for the reasons set forth in Sections IA.1.(a)-(b). In particular, Plaintiffs allege no facts establishing that the risks warned of had materialized at the time the Registration Statement became effective. *Firefighters Pension & Relief Fund*, 2015 WL 4879217, at *16. In fact, the Complaint is devoid of *any* facts from *any* time period suggesting that Core struggled to "attract customers," "effectively market" its "competitive pricing terms," or "fail[ed] to meet [its] end-users' expectations" at the time these statements were made. ¶¶ 101, 103. *See Capstead Mortg. Corp.*, 258 F. Supp. 2d at 550.

### 3. Statement Regarding Core's Billing Practices

Plaintiffs allege as misleading Core's statement that "[m]ost contracts are renewable, and

14

our customers are ***generally billed on a fixed and recurring basis*** each month for the duration of their contract . . . ." ¶ 99. Plaintiffs complain that this statement was misleading because it omits that Core was passing power costs onto its hosting customers. ¶ 100. But an alleged omission is actionable "only if it alters the meaning of an allegedly misleading statement. Accordingly, the relationship between the statement and the omission must be sufficiently clear and addressed with particularity in the complaint." *Magruder*, 359 F. Supp. 3d at 464. Where, like here, "the misleading nature of the statement is not apparent from the content of the statement and the substance of the omissions, the . . . complaint must set forth an explanation of why the omission rendered the statement misleading." *Id.* at 460. Plaintiffs do not even come close to meeting this standard—indeed, the statement that Core's customers are "generally billed on a fixed and recurring basis" makes no representation about pass through costs and thus cannot be rendered misleading on that basis. *See ITT Educ. Servs.*, 859 F. Supp. 2d at 579; *supra* Section I.A.1.(b).

Defendants stated that Core's customers are "***generally*** billed on a fixed" basis, not that they are ***always*** billed on a fixed basis, nor that every component of each bill was fixed. ¶ 100. The word "generally" naturally suggests that there are cases where the rule does not apply. *See Drzala v. Horizon Blue Cross Blue Shield*, 2016 WL 2932545, at *4 (D.N.J. May 18, 2016) ("The plain meaning of this term is clear: 'generally' means most of the time (but not always) and necessarily implies exceptions."). And in fact, as explained above, elsewhere the Registration Statement identifies precisely what component of the bills is ***not*** calculated on a fixed basis: "actual costs," which are passed on to customers via adjustments. *Supra* Section I.A.1.(b).

Further, Plaintiffs do not allege how many of Core's customers were ***not*** billed on a fixed basis, how "fixed" pricing worked, or how many customers were asked to pay power pass through costs. Plaintiffs' vague allegation that ***some*** of Core's customers were billed for power pass

through costs is not enough to render this statement materially misleading. *See, e.g., Glassman v. Computervision Corp.*, 90 F.3d 617, 634 (1st Cir. 1996) (no material misrepresentation where defendant stated that shipments were "***generally*** made within thirty days of receiving an order, not that they were ***always*** made within thirty days," and plaintiffs alleged that sixty-one percent of orders were shipped out in less than thirty days because that "sixty-one percent of orders . . . is perfectly consistent with the statement that orders were generally shipped within thirty days.").

At best, Plaintiffs complain that Core should have disclosed that it was in breach of its contracts with its hosting customers. But even had Plaintiffs sufficiently pled a breach, the federal securities laws do not "require a company to accuse itself of wrongdoing." *In re XP Inc. Sec. Litig.*, 524 F. Supp. 3d 23, 37 (E.D.N.Y. 2021); *see also Nasyrova v. Immunomedics, Inc.*, 2015 WL 382846, at *8 (D.N.J. Jan. 28, 2015) ("That the Agreement presented a significant and substantial source of revenue does not render Defendants' silence about the breach actionable"). And even were there such a duty to disclose, Plaintiffs' claim is belied by their own allegations suggesting that, ***at the earliest***, these pass through costs began months later in the summer of 2022. *E.g.*, ¶ 116. Plaintiffs thus cannot establish that these statements were misleading when made. *Supra* Section I.A.1.(b); *see N. Port Firefighters' Pension—Loc. Option Plan v. Temple-Inland, Inc.*, 936 F. Supp. 2d 722, 749-50 (N.D. Tex. 2013) (dismissing complaint that did not allege statements "were false or misleading when made").

## B. Plaintiffs Fail to Plead A Duty to Disclose Under Item 303

Recognizing the nonviability of their misstatement claims, Plaintiffs assert that Item 303 of Regulation S-K, 17 C.F.R. § 229.303 required Defendants to disclose that Core was experiencing increased power costs and was allegedly passing those costs to its hosting customers. ¶¶ 107-11. This claim fails. Item 303 compels disclosure of "unusual or infrequent events . . . that materially affected the amount of reported income from continuing operations" and "***known trends***

*or uncertainties* that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues . . . ." 17 C.F.R. § 229.303(b)(2)(i)–(ii); *see also Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn*, 53 F. Supp. 3d 882, 898 (E.D. La. 2014) (Item 303 "requires that a plaintiff plead, with some specificity, facts establishing that the defendant had *actual knowledge* of the purported trend."). "Item 303 does not require issuers to anticipate a future trend or event or a less predictable impact of a known event, trend, or uncertainty." *McCloskey v. Match Grp., Inc.*, 2018 WL 4053362, at \*5 (N.D. Tex. Aug. 24, 2018).

Plaintiffs do not establish a duty to disclose under Item 303, and their claim—premised entirely on fraud-by-hindsight—fails. Plaintiffs fail to allege that there was any known "trend" or "uncertainty" with respect to increasing power costs and Core's hosting contracts requiring disclosure at the time the Registration Statement became effective. *See Kapps*, 379 F.3d at 221 (no Item 303 claim because "the price of natural gas was not a trend required to be disclosed by Item 303" and defendants "highlighted [price] volatility"). Worse, Plaintiffs do not allege any contemporaneous increase in power costs, ¶¶ 130-31 (first acute increase in costs occurred in February 2022), nor do they allege that Core had issues with its hosting customers at the time the Registration Statement became effective, let alone any that were "reasonably likely" to have a material impact on its operations. *E.g.*, *McCloskey*, 2018 WL 4053362, at \*6.

Further, because Plaintiffs elected to assert their omission claims under Item 303, Plaintiffs must plead that Defendants knew, but failed to disclose, material information. Allegations of knowledge and intent must be pleaded with particularity. *See, e.g.*, *Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 956-60 (5th Cir. 2016). Plaintiffs set forth no such allegations. *Infra* Section II.C. In any event, power costs are public, and Defendants

17

repeatedly disclosed the risk that increased costs could impact Core's business.  *See Mun. Emps.'* *Ret. Sys. Of Michigan v. Pier 1 Imports, Inc*., 935 F.3d 424, 437 (5th Cir. 2019) (no Item 303 claim where defendants repeatedly disclosed the likelihood of markdowns on inventory).

## II.  PLAINTIFFS FAIL TO STATE AN EXCHANGE ACT CLAIM

### A.  Plaintiffs Fail to State a Claim Under Section 14(a) of the Exchange Act

Plaintiffs' Section 14(a) claim is based on alleged misstatements in the Proxy Statement which are identical to those alleged as misleading in the Registration Statement that underlie Plaintiffs' Section 11 claim.  *Supra* Section I.  For the reasons explained above, Plaintiffs fail to allege any actionable misstatements in the Proxy Statement.  Their Section 14(a) claim must be dismissed.  *Braun*, 223 F. Supp. 3d at 651 ("A proxy statement need not negatively characterize all the facts that are disclosed or expressly verbalize all adverse inferences from those facts[.]").

### B.  Plaintiffs Fail to State a Claim Under Section 10(b) of the Exchange Act

To state a claim under Section 10(b) of the Exchange Act, Plaintiffs must allege (i) a material misrepresentation or omission, (ii) reliance on such misrepresentation or omission; (iii) scienter, and (iv) loss causation.  *Dawes*, 975 F. Supp. 2d at 686.  Plaintiffs' Section 10(b) claims are subject to the heightened pleading requirements of the PSLRA and Rule 9(b), which require that the Complaint "(1) specify each statement alleged to have been misleading; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representation; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, *i.e.*, why the statement is fraudulent."  *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 614 (S.D. Tex. 2018).  To adequately plead a material omission, Plaintiffs must "plead the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the representations misleading."  *Magruder*, 359 F. Supp.

3d at 459-60. The PSLRA further requires Plaintiffs establish scienter by "stat[ing] with particularity facts giving rise to a strong inference that each defendant acted with intent to deceive, manipulate, or defraud or [with] severe recklessness." *Id.* at 460. Plaintiffs fail to adequately allege at least three elements, each of which provides an independent basis for dismissal.

### 1.  Plaintiffs Cannot State A Claim For Misstatements After July 2022

Plaintiffs' Section 10(b) claim is premised in large part on statements made in Core's second quarter 2022 Form 10-Q filed on August 22, 2022. ¶¶ 210-23. But according to Plaintiffs' PSLRA certifications filed with the Complaint, no Plaintiff purchased Core shares or warrants after July 2022. ECF No. 62 at 75, 78. It is thus not possible that Plaintiffs invested in Core "in reliance upon" any alleged misstatements or omissions made ***after*** their last purchases as is required to state a claim under Section 10(b). Indeed, "[s]tatements issued after a plaintiff's purchase of stock cannot form the basis of a Section 10(b) . . . claim because the statements could not have affected the plaintiff's decision to purchase stock." *Kelly v. Elec. Arts, Inc.*, 71 F. Supp. 3d 1061, 1069 (N.D. Cal. 2014). Plaintiffs thus cannot state a claim for the alleged misstatements in ¶¶ 210-23. And because Plaintiffs fail to plead ***any*** scienter facts for the earlier alleged misstatements, they are left with no actionable statements underlying their 10(b) claim.

### 2.  Plaintiffs Do Not Plead an Actionable Misrepresentation

Plaintiffs again hinge their Section 10(b) claim on the allegation that Defendants failed to disclose increases in power costs and that Core was passing those costs onto its hosting customers, rendering statements in Core's Class Period Forms 10-K and 10-Q misleading. These allegations fail for the simple reason that Defendants disclosed everything Plaintiffs claim was concealed.

*First*, Defendants repeatedly warned in real time throughout 2022 that Core's power costs were increasing. For example, during Core's fourth quarter 2021 earnings conference call on March 29, 2022, Defendant Levitt acknowledged that "***energy costs have been going up all over***,"

and that "it's probably *fair to assume that energy costs will just as inflation . . . go up a bit.* We would anticipate the range, roughly speaking, in the *plus or minus 15% area, more or less.*" Ex. H at 5. Defendant Levitt made similar disclosures during Core's first quarter 2022 earnings call on May 12, 2022—the *day before* Core's 10-Q was filed—warning investors that, as "we previously indicated, our *average cost of electricity has risen by approximately 15% to 20% over prior assumptions for 2022.*" Ex. I at 3. Defendants again disclosed during Core's second quarter 2022 earnings call that "*[w]ith increases in energy prices generally, we expect our average power price for the year to now come in at about $0.05 to $0.055 per kilowatt hour.* Prices do move around seasonally and the extreme heat across the South has impacted our pricing for the second quarter and will continue to do so in the third quarter." Ex. L (Q2 2022 Call Transcript) at 3.

Not only did Core disclose that power costs were increasing, it also quantified those increases for investors. Core disclosed in each of its quarterly filings its "cost of hosting services," alongside a disclosure that "electric power account[s] for a significant portion" of those costs. *E.g.*, Ex. C at 38, 77. In light of these disclosures, Plaintiffs could not reasonably be misled about the impact that increasing power costs were having on Core's business. Indeed, Plaintiffs do not allege that Core's financials were false, and courts routinely hold that a defendant's choice not to characterize information negatively is not actionable where the "underlying data, and the reasons therefore, were available to investors." *In re Alcatel Alsthom Sec. Litig.*, 2000 WL 34217789, at *10 (E.D. Tex. June 23, 2000); *see also Brasher v. Broadwind Energy, Inc.*, 2012 WL 1357699, at *18 (N.D. Ill. Apr. 19, 2012) (investors could not be "materially misled about the state of the wind gear market when furnished with truthful, albeit general, warnings of substantial market decline coupled with entirely accurate quarterly revenue reports").

*Second*, Core disclosed that its "hosting contracts" might be "*adjusted for actual costs.*"

¶¶ 193, 206, 219.  Thus, rather than conceal that costs were passed through to customers, Defendants disclosed that possibility.  These disclosures doom any claims premised on an alleged failure to disclose.  Plaintiffs' claims otherwise suffer from the fatal flaws described below.[5]

### (a)  Risk Disclosures Regarding Increasing Power Costs

Plaintiffs allege that risk disclosures in Core's Class Period Forms 10-K and 10-Q, identical to those in Core's Registration Statement, ¶¶ 97, 105, regarding the impact of increased power costs were materially misleading for omitting to disclose that Core was experiencing increases in power costs and passing those costs on to its hosting customers.  ¶¶ 187, 193, 198, 206, 215.  These disclosures are not actionable for the reasons set forth above, including that Plaintiffs allege no facts suggesting that Core passed through power costs prior to June 2022. Regardless, the disclosures bear no connection to the allegedly omitted information concerning pass through costs; and Core disclosed that its hosting contracts were subject to "adjust[ments] for actual costs." ¶¶ 193, 206, 219.  And, as noted above, Core repeatedly warned both that power costs were increasing, and of the risks of such increases on Core's business.  *Supra* Section I.A.1.(a)-(b).

### (b)  Risk Disclosures Regarding Core's Customer Base

Plaintiffs allege that risk disclosures in Core's Class Period Forms 10-K and 10-Q, identical to those in Core's Registration Statement, ¶¶ 101, 103, regarding Core's ability to maintain its customer base were materially misleading for omitting to disclose increases in power costs and

---

[5]  Mr. Trzupek resigned from Core in April 2022, Ex. M (April 18, 2022 Form 8-K), and thus cannot be held liable for any alleged misstatements after that time.  Messrs. Eilers and Brombach neither served as directors of Core following its merger with XPDI nor signed the SEC filings underlying Plaintiffs' Section 10(b) claim, and thus must be dismissed from that claim. *Delaware Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*, 620 F. Supp. 3d 603, 627 (S.D. Tex. 2022).  Further, any allegations relating to activities of the Company after the closing of the merger on January 19, 2022 fail against all of the XPDI directors because none of them continued in director roles following the merger.

that Core was passing these costs on to its hosting customers.  ¶¶ 189, 191, 202-07, 217.  These risk disclosures are not actionable for the reasons set forth in Section I.A.1.(a)-(b), including that power costs are public information, and that Plaintiffs allege no facts suggesting that Core passed through power costs prior to June 2022.  In any event, the disclosures bear no connection to the allegedly omitted information concerning pass through costs and Core disclosed that its hosting contracts were subject to "adjust[ments] for actual costs."

Even if these risk disclosures bore some connection to the allegedly omitted information (they do not), Plaintiffs' allegations that Core received customer complaints in June 2022, ¶ 123, do not render the risk disclosures in Core's second quarter 2022 Form 10-Q filed on August 22, 2022 actionable.  That Core received complaints from *some* of its hosting customers does not render Core's risk disclosures materially misleading.  *See Noah Educ. Holdings*, 2010 WL 1372709, at *7-8;  *In re Greenlane Holdings, Inc. Sec. Litig.*, 511 F. Supp. 3d 1283, 1311 (S.D. Fla. 2021) ("That . . . Plaintiffs would have wanted to hear about the . . . Ordinances doesn't render an otherwise-extensive risk disclosure misleading.").  *Supra* Section A.1.(a).

Plaintiffs' allegations boil down to an assertion that Core should have disclosed the receipt of customer complaints, but courts consistently hold that disputes with customers do not need to be disclosed absent a disclosed intent to terminate.  *E.g.*, *In re Express Scripts Holding Co. Sec. Litig.*, 2017 WL 3278930, at *13 (S.D.N.Y. Aug. 1, 2017) ("[T]he duty to disclose did not ripen earlier because no intent of termination was provided during the Class Period."); *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 459 (S.D.N.Y. 2000) ("[C]ourts generally do not impose a duty to disclose . . . internal problems merely because those problems were potentially significant").

**(c)**     **<u>Statements Regarding Core's Billing Practices</u>**

Plaintiffs allege that statements in Core's Class Period Forms 10-K and 10-Q, identical to those in Core's Registration Statement, ¶ 99, that "our customers are generally billed on a fixed

and recurring basis" were materially misleading for omitting to disclose that Core was passing increased power costs on to its hosting customers. ¶¶ 200-01, 213-14. These statements are not actionable for the reasons set forth in Section I.A.1.(a)-(b), including that the alleged omission is not related to these statements and cannot render them misleading. Further, as explained *supra*, Section I.A.3., any failure to disclose that *some* customers or components are not billed on a fixed basis cannot render misleading a statement that customers are "***generally***" billed on a fixed basis.

### (d)  Statement Regarding Celsius Dispute

Plaintiffs allege that Core's statement in its second quarter Form 10-Q that "Celsius may take actions in its Chapter 11 proceeding to terminate or renegotiate its agreements with us" was materially misleading because it omitted that Core was experiencing increased power costs and was passing those costs through to its hosting customers. ¶¶ 211-12.

*First*, the allegedly omitted information is unrelated to the statement concerning the Celsius case—accordingly, "the relationship between the statement and the omission" is not "sufficiently clear and addressed with particularity in the complaint." *Magruder*, 359 F. Supp. 3d at 464. This statement makes no representation about power costs or related costs to Core's hosting customers. *See In re ITT Edu. Serv.*, 859 F. Supp. 2d at 579. *Second*, it is simply false that Core did not disclose that its power costs were increasing or that it might pass costs on to customers.

*Finally*, substituting clairvoyance for well-pled facts, Plaintiffs assert that this statement "misleadingly portrayed" the risk of litigation as "hypothetical" when "[i]n truth Celsius was likely to bring expensive and extensive claims against Core[.]" ¶ 212. Plaintiffs plead no facts to support the conclusory assertion that Defendants knew what Celsius was "likely" to do in the future, and the securities laws do not require prescience, *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("[A]llegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud."),

23

nor do they "require issuers to predict the precise manner in which disclosed risks will manifest themselves." *Gomez v. Credit Suisse AG*, 2023 WL 2744415, at *9 (S.D.N.Y. Mar. 31, 2023).

### (e) Statement Regarding Restructuring of Pricing

Plaintiffs allege as misleading Mr. Levitt's statement during Core's second quarter 2022 earnings call that Core "restructured [its] pricing to improve margins over time" and that "initial customer acceptance validates our new strategy." ¶¶ 223-24. Plaintiffs allege that this statement was misleading because Mr. Levitt's reference to "restructuring" referred to Core's efforts to pass through power costs onto its customers. ¶ 224. *First*, Core disclosed that it may adjust contracts for actual costs. *Second*, Mr. Levitt explained what he meant—"refinements to price per kilowatt hour, contract term, infrastructure and configuration fees and prepayment terms"—and Plaintiffs provide no compelling reason to discount this explanation. *See In re First Chicago Corp. Sec. Litig.*, 769 F. Supp. 1444, 1453 (N.D. Ill. 1991) ("Vague and conclusory allegations that the defendant's representations were not true . . . are insufficient for 9(b) purposes.").

*Third*, Plaintiffs allege that because "several" hosting customers allegedly disputed pass through power costs, customers did not "validate" Core's strategy, ¶ 224, but their allegations do not support this conclusory assertion. Plaintiffs allege only that by August 2022, **two** of Core's customers disputed the pass through costs, and that Core otherwise received additional "informal" complaints and inquiries. ¶ 123 (Atlas and CoreWeave disputed charges). Plaintiffs' own allegations also contradict their assertion that this statement was misleading because "by July 2022" "Celsius (one of Core's two largest customers)" had disputed pass through costs, ¶ 224—indeed, Plaintiffs elsewhere quote Celsius as stating that it disputed these costs on September 20, 2022, ¶ 116, **a month after** the last alleged misstatement. And to the extent Plaintiffs rely on the vague quote from a Celsius filing that Core "received more disputes after" July 2022, such imprecise allegations of falsity hardly suffice to satisfy the PSLRA. *Borderplex*, 2017 WL 1738080, at *9.

**(f)**     **SOX Certifications**

Plaintiffs allege that the SOX certifications in Core's first and second quarter Forms 10-Q were false and misleading, ¶¶ 208-09, 221-22, but do not allege any inaccuracies in Core's financials, any material weaknesses in Core's internal controls, or any accounting issues, let alone any allegations that the certifications were somehow ***knowingly*** false when made.  These deficient allegations cannot support a claim for falsity.  *See Jacobowitz v. Range Res. Corp.*, 596 F. Supp. 3d 659, 685 (N.D. Tex. 2022) (SOX certifications not false where plaintiff failed to plead "that there is anything false or misleading about the content of the certifications themselves," did "not identif[y] any accounting errors," and did "not suggest[] that [defendant] lacked internal controls").

**3.**     **Plaintiffs Do Not Plead an Actionable Omission**

Like their Section 11 claim, Plaintiffs again resort to Item 303 as an alleged basis for Section 10(b) liability.  This claim fails on its face for all of the reasons discussed *supra*, and for the additional reason that the Fifth Circuit has "never held that Item 303 creates a duty to disclose under the Securities Exchange Act."  *Genesee Cnty. Emps' Ret. Sys. v. FirstCash Holdings Inc.*, 2023 WL 2752846, at *14 (N.D. Tex. Mar. 31, 2023).  Instead, "for purposes of Section 10(b) and Rule 10b-5, material information need not be disclosed unless omission of that information would cause other information that is disclosed to be misleading."  *Markman v. Whole Foods Mkt., Inc.*, 2016 WL 10567194, at *10 (W.D. Tex. Aug. 19, 2016).  Plaintiffs thus "cannot seek to bring an action under Rule 10b–5 in the guise of an Item 303 violation when the same underlying alleged omissions are not sufficient to state a Rule 10b–5 violation."  *Id.*

**C.**     **Plaintiffs Fail to Plead a Strong Inference of Scienter**

Plaintiffs' Section 10(b) claim fails for the independent reason that they do not allege facts sufficient to give rise to a "strong inference" of an "intent to deceive, manipulate, or defraud or severe recklessness" as is required to state a claim under Section 10(b).  *Yoshikawa*, 2022 WL

4677621, at *2. Severe recklessness is a high bar, "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care." *Abrams v. Baker Hughes Inc*., 292 F.3d 424, 430 (5th Cir. 2002). It is not enough to allege facts from which an inference of scienter "could be drawn"—instead, "[t]o qualify as 'strong' . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rts., Ltd*., 551 U.S. 308, 314 (2007).

To plead scienter under the PSLRA, Plaintiffs must allege "specific facts" such as "how and when [Defendants] became aware of specific information that rendered the [statements] intentionally false or severely reckless"; "a pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company." *Magruder*, 2009 WL 854656, at *19. "[A]llegations of motive and opportunity standing alone will not suffice" to satisfy the PSLRA. *Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc*., 537 F.3d 527, 533 (5th Cir. 2008). Plaintiff's allegations fail to create any inference of scienter, let alone the cogent and compelling inference required under the PSLRA.

### 1. Plaintiffs Improperly Rely on Group Pleading

Plaintiffs must "distinguish among those they sue and enlighten *each defendant* as to his or her particular part in the alleged fraud." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 365 (5th Cir. 2004); *see McNulty v. Kanode*, 2013 WL 12077503 at *5 (W.D. Tex. Nov. 2013) (the PSLRA "requires a plaintiff to plead specific, particularized facts giving rise to a 'strong inference' of scienter as to *each* act or omission for *each* defendant."). Allegations against Defendants, as a group, without specific allegations as to the individuals are insufficient. *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp*., 565 F.3d 200, 208 (5th Cir. 2009).

Plaintiffs' allegations are impermissible group pleading—they refer only to "Defendants" as a group, or "Core" generally, ¶¶ 229-46, and set forth no particularized allegations of who knew what information and when they knew it. *Alaska Elec. Pension Fund v. Asar*, 768 F. App'x 175, 186 (5th Cir. 2019) (group allegations insufficient because they do not speak to an individual's "state of mind" or "individual intent"). Indeed, for nearly all Defendants, the Complaint alleges *only* that they signed the Registration Statement, Proxy Statement or SEC filings—their names otherwise do not appear in *any substantive allegations* in the Complaint. *See Izadjoo v. Helix Energy Sols. Grp., Inc.*, 237 F. Supp. 3d 492, 516–17 (S.D. Tex. 2017) (that defendants "signed the SEC filings does not support a strong inference of scienter.").

### 2. Plaintiffs Fail to Plead Intent to Defraud

To establish an intent to defraud or severe recklessness, Plaintiffs must plead "an extreme departure from the standards of ordinary care" to the extent that "the danger of misleading buyers or sellers [] was either known to [the defendant] or was so obvious that the defendant must have been aware of it." *Magruder*, 2009 WL 854656, at *18. In particular, Plaintiffs must allege that Defendants had knowledge of facts or access to information contradicting their statements. *See Plains Am. Pipeline*, 245 F. Supp. 3d at 909. Plaintiffs fail to allege either.

At the threshold, to the extent Plaintiffs' scienter allegations are based on filings in the Celsius litigation, such allegations must be discounted. *E.g.*, ¶¶ 237-41 (allegations that Defendant Levitt "decided" to pass through power costs). Whether any costs were improperly passed through has not yet been adjudicated, and this Court should reject Plaintiffs' opportunistic attempt to turn an ancillary contract dispute into securities fraud. *See Nolte v. Cap. One Fin. Corp*., 390 F.3d 311, 317 (4th Cir. 2004) ("A court cannot take notice of (and so assume the truth of) mere allegations that Capital One or its management made false statements or omissions during the class period."); *In re Deutsche Bank Aktiengesellschaft Sec. Litig*., 2017 WL 4049253, at *8

(S.D.N.Y. June 28, 2017) ("Plaintiffs' citation to . . . lawsuits and government investigations involving [the defendants] provides no evidence of scienter."). Plaintiffs' allegations otherwise do not raise a "strong" and "cogent" inference of scienter—they undermine any such inference.

*Core Operations:* Lacking any specific scienter facts, Plaintiffs fall back on vague allegations that because alleged misstatements related to Defendants' "core" business, they must have known of any falsity. ¶¶ 232-34. The "core operations" doctrine is an extremely narrow exception to the rule that "scienter may not rest on the inference that defendants must have been aware of" the alleged misconduct "based on their positions within the company." *Crutchfield v. Match Grp., Inc.*, 529 F. Supp. 3d 570, 603 (N.D. Tex. 2021). Such allegations do not suffice to plead an inference of scienter absent "special circumstances" which are not present here. *See id.* Core operations is indicative of scienter only in cases which satisfy four factors: (1) a small company where it is more likely executives are familiar with day-to-day operations; (2) the transaction at issue is critical to the company's continued vitality; (3) the omitted information was readily apparent to the speaker; and (4) Defendants' statements were internally inconsistent. *Id.*

Plaintiffs have not sufficiently alleged that the purported fraud warrants application of the narrow exception here. *First*, with 118 employees, Ex. A at 267, Core is larger than any of the companies in which the Fifth Circuit has found "special circumstances." *E.g.*, *Natheson v. Zonagen Inc.*, 267 F.3d 400, 425 (5th Cir. 2001) (32 to 35 employees); *Neiman v. Bulmahn*, 854 F.3d 741, 750 (5th Cir. 2017) (no "special circumstances" where company had "over 60 employees"). *Second*, Plaintiffs do not quantify the impact on Core's business *during the Class Period* of any alleged issues, nor do they allege any specifics concerning Core's hosting contracts. And rather than being critical to Core's business, Core's third party hosting segment constituted between only 14% and 22% of the Company's total revenue throughout the Class Period. Exs. B,

28

C, K (Q2 2022 10-Q); *Neiman*, 854 F.3d at 750 "(this court has previously found that the 'special circumstances' doctrine was not implicated by statements concerning an asset that comprised 22% of" company's total portfolio).  *Third*, Plaintiffs set forth no allegations that it was "readily apparent" to Defendants that  any pass through was improper to begin with.  *See id. Fourth*, rather than being "internally inconsistent," Defendants repeatedly disclosed, for example, that power costs would continue to rise.  *See Diodes*, 810 F.3d at 959 ("defendants' statements were both consistent and accurate: management consistently maintained that labor shortages were affecting its output and accurately predicted the impact that this shortage would have on the company's" financials).  Plaintiffs thus do not pled "sufficient facts to show that this is the rare case where the special circumstances exception should apply." *Crutchfield*, 529 F. Supp. 3d at 604.

*EY's Advice and Termination*:  Plaintiffs allege that Core's alleged June 2022 dispute with its auditor, EY, concerning whether Core's hosting contracts permitted power pass through costs, and the ultimate termination of that relationship, support a strong inference of scienter.  *See* ¶¶ 238-40.  Plaintiffs' vague allegations that Core "dismissed EY's concerns and forged ahead with its scheme" are insufficient. "Without specific allegations the Individual Defendants themselves" were actually aware of EY's alleged recommendations, took part in any discussions, or chose to ignore the supposed advice, "the pleadings are simply too vague to support a strong inference of scienter." *In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 894 (W.D. Tex. 2008).

A dispute between an auditor and a client is otherwise insufficient to establish scienter. *See Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1021 (5th Cir. 1996) ("[T]he fact that Defendants changed auditors because of a difference in judgment about generally accepted accounting principles does not establish conscious behavior on the part of Defendants.").  Further, Core's Form 8-K, Ex. N at 2, announcing EY's termination states that "there were no []

29

disagreements . . . between [Core] and EY" on matters bearing on EY's audit, further undermining an inference of scienter. *See City of Brockton Retirement Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 474-75 (S.D.N.Y. 2008) (no inference of scienter drawn from auditor's resignation where filings disclosed that there were no disagreements between auditor and company).

**Core Sought Legal Approval on Pass Through Costs:** Plaintiffs' allegations that Core's legal team was comfortable with power pass through surcharges under Core's existing hosting contracts undermine an inference of scienter. *E.g.*, ¶¶ 123, 238 ("Core's legal team got comfortable with the idea of claiming that the existing MSAs implicitly permitted Core's power cost pass-through surcharges[.]"). That Core's legal team signed off on these pass through charges supports a non-culpable inference. *See, e.g.*, *S.E.C. v. Snyder*, 292 F. App'x 391, 406 (5th Cir. 2008) (relying on counsel's advice is "a means of demonstrating good faith and represents possible evidence of an absence of any intent to defraud").

**Receipt of Customer Complaints:** Plaintiffs allege that Core's receipt of complaints from hosting customers supports a finding of scienter, ¶¶ 241-46, but most of what Plaintiffs call "vigorous pushback" on pass through costs ¶ 241, was apparently nothing more than inquiries about certain charges, *e.g.*, ¶ 244 (customers asked "why the hosting price was changed"). Regardless, customer complaints, without more, do not give rise to a strong inference of scienter. *See Sorkin, LLC v. Fischer Imaging Corp.*, 2005 WL 1459735, at *10 (D. Col. June 21, 2005) (allegations about customer complaints or quality control problems do not establish scienter). Plaintiffs do not allege that any Defendant knew about these complaints, who received the complaints, who was responsible for adjudicating them, and when Defendants were otherwise made aware of them. Allegations that "Core executives" received such complaints are insufficient. *See Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 815 (N.D. Cal. 2019) (no scienter where

30

complaint "does not identify any specific information that was either received or communicated by" Defendants "that would contradict any public statement at the time it was made" and "fails to connect any . . . Defendant[] to the customer complaints.").

***Plaintiffs' FE1 Allegations***: Plaintiffs' allegations attributed to FE1 also do not support a strong inference of scienter. At the threshold, "[t]hat these allegations derive from confidential sources further detracts from their weight in the scienter analysis. . . . Such [confidential] sources afford no basis for drawing the plausible competing inferences required by *Tellabs*." *Indiana Elec. Workers' Pension Tr. Fund IBEW*, 537 F.3d at 535. At the very least, Plaintiffs must describe FE1 "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information pleaded." *Id.* Plaintiffs have not established FE1's credibility: they allege no detail concerning FE1's job responsibilities and do not explain why an accountant would have information about Core's hosting services agreements. *See Diodes*, 810 F.3d at 958 ("it is unclear from the descriptions of these witnesses . . . whether their employment status at the [company] conferred sufficient insights into the effect of the company policies").

In any event, FE1's reports doom Plaintiffs' scienter allegations. FE1 reported that the Core's first "acute increase in power costs" followed Russia's invasion of Ukraine at the end of February 2022, and that the second occurred with a heat wave in summer 2022. ¶ 130. That these increases in power costs occurred as a result of unforeseen geopolitical factors and weather both strongly undermine a finding of scienter, and suggests Defendants did not begin passing costs onto customers until around summer 2022. Indeed, FE1 did not learn of the alleged pass through costs until "budget review meetings in the summer of 2022." ¶ 131. Allegations that meetings happened in "summer of 2022" are not sufficiently detailed to establish scienter. *See Huang v. EZCorp, Inc.*, 2016 WL 6092717, at *9 (W.D. Tex. Oct. 18, 2016) ("plaintiffs must allege with particularity

when a comment was made to a confidential source, or, if the source alleges a conversation took place, when and where the conversation occurred."). And to the extent FE1's reports are credible and sufficient (they are not), they doom any scienter allegations prior to the summer of 2022, which is the only period Plaintiffs can pursue given their trading history.

### 3. **Plaintiffs Fail to Plead Motive**

Plaintiffs' generalized motive allegations are similarly insufficient. To plead motive, Plaintiff must show "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. Merely alleging facts that lead to a strained and tenuous inference of motive is insufficient to satisfy the pleading requirement." *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 377 (S.D. Tex. 2011), *aff'd sub nom.* 464 F. App'x 334 (5th Cir. 2012). Plaintiffs rely on two sets of allegations to establish motive, each of which fail.

*Increase Stock Price:* Plaintiffs allege that Defendants Levitt and Feinstein had motive to commit fraud to increase the value of their stock holdings, ¶ 248, but these generalized motives "are not the types of motive that support a strong inference of scienter." *Abrams*, 292 F.3d at 434. "Allegations that a defendant was motivated to commit fraud to enhance his position or compensation or to raise capital are also inadequate, because the executives of virtually every corporation in the United States would be subject to fraud allegations." *Franklin Bank*, 782 F. Supp. 2d at 377; *see also Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994) (motive to inflate value of defendants' investments insufficient to establish scienter).

*Defendants Acquired Stock During the Class Period:* Save for a single Defendant out of fifteen, Plaintiffs do not allege that Defendants profited from the alleged misrepresentations or omissions in the Complaint. The absence of these allegations "supports an inference opposing the claim that a defendant acted with scienter." *Gamboa v. Citizens, Inc*., 2018 WL 2107205, at *4 (W.D. Tex. May 7, 2018), *report and rec. adopted*, 2018 WL 2422764 (W.D. Tex. May 29, 2018).

Plaintiffs' allegations that Feinstein sold 6 million shares of Core stock, ¶ 249, fail because they do not allege with particularity that these sales were "at suspicious times or in suspicious amounts." *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 552-53 (5th Cir. 2007). And that not a single other Defendant sold stock negates any inference of scienter as to *all* Defendants. *See Izadjoo v. Helix Energy Sols. Grp., Inc*., 237 F. Supp. 3d 492, 518 (S.D. Tex. 2017) ("Courts typically find that the fact that the other defendants did not sell their shares during the relevant class period undermines plaintiffs' claim of scienter."). To the contrary, Defendants *acquired* Core stock during the Class Period, which weighs strongly against an inference of scienter. *See In re Biogen Inc. Sec. Litig*., 193 F. Supp. 3d 5, 50 n.21 (D. Mass. 2016), *aff'd*, 857 F.3d 34 (1st Cir. 2017) (that defendants increased holdings during class period and suffered significant losses undermined inference of scienter). Defendants collectively acquired over 23 million shares during the Class Period, dwarfing Feinstein's alleged sale.[6] Exs. O-V (Form 4s).

### 4.      Plaintiffs Fail to Address Nonculpable Inferences

Under *Tellabs*, an inference of scienter "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." 551 U.S. at 310. There is a strong, nonculpable inference here that, to the extent costs were being "passed through" in response to unforeseen cost increases, Defendants concluded, with input from their audit team and legal team, that this was permitted under the relevant contracts. The Complaint does not set forth even the most basic details concerning how Defendants' intended to defraud investors by concealing this fact. Instead, Core provided risk warnings addressing the same issues that Plaintiffs claim were concealed and ultimately caused the Company to fail, which undermine an intent to defraud. *See Hensley v.*

---

[6]   Taking judicial notice of Form 4s is "congruent with the requirement that we consider plausible nonculpable explanations for the defendants' conduct." *Alaska Elec.*, 768 F. App'x at 182.

*Imprivata, Inc.*, 260 F. Supp. 3d 101, 121 (D. Mass. 2017) ("[R]isk disclosures undermine any claim that Defendants engaged in an extreme departure from the standards of ordinary care.").

### D.    **Plaintiffs Fail to Plead Loss Causation**

Plaintiffs' failure to plead loss causation is an independent grounds for dismissal.  Loss causation is the "causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  "*Dura* made clear there must be sufficient allegations the misrepresentations caused the plaintiffs' loss; it is insufficient to simply allege the misrepresentation 'touches upon' a later economic loss." *Dell*, 591 F. Supp. 2d at 905.  Plaintiffs allege that Core's stock price dropped when purportedly "concealed" risks materialized through Celsius' motion for civil contempt; Core's announcement that it was considering bankruptcy; and Core's ultimate bankruptcy filing.  ¶¶ 117-18, 133-41.  These allegations fail.  *First*, Plaintiffs' materialization of the risk theory fails on its face because this "Circuit has not adopted the materialization of the risk theory of loss causation." *Dawes*, 975 F. Supp. 2d at 709.  *Second*, even if this theory was viable, Plaintiffs' allegations fail because these were *known* risks.  *Supra* Section I.A.; *Monroe Cnty. Emps.' Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 358 (S.D.N.Y. 2014) (no loss causation where "share price after the announcement of nationalization likely represented the materialization of a known risk, rather than the disclosure of a concealed one").

*Third*, Plaintiffs' allegations also fail under a corrective disclosure theory of loss causation because a disclosure that does not reveal the falsity of a prior representation cannot qualify as "corrective." *In re Key Energy Servs., Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 864 (S.D. Tex. 2016) ("Simply alleging that Plaintiffs purchased Key's common stock at inflated prices and that the stock price fell after negative news of the Company's finances and operations came out is insufficient to plead loss causation.").  None of Plaintiffs' alleged corrective disclosures "revealed" to the market that Defendants' prior statements were false—indeed, there is a glaring disconnect

between the facts allegedly concealed and the purported corrective disclosures. *See Magruder*, 2009 WL854656, at *15 (no loss causation because "Plaintiffs simply fail to connect the alleged misrepresentations with correlative corrective disclosures during the Class Period.").

Plaintiffs' allegations are independently deficient for other reasons. For example, Plaintiffs allege Celsius' motion for civil contempt as a corrective disclosure, ¶¶ 116-17, but "a corrective disclosure that is entirely based on another party's allegation in a separate suit" does not pass muster. *Genesee Cnty. Emps' Ret. Sys.*, 2023 WL 2752846, at *20. Plaintiffs' allegation that Core's bankruptcy was a corrective disclosure is particularly uncompelling. The "[d]isclosure of financial losses generally—even if those financial losses are a result of the specific concealed fact—is not sufficient" to establish—or allege—loss causation." *Dell Inc.*, 591 F. Supp. 2d at 909. Further, Core already disclosed in its October 2022 Form 8-K that it was considering bankruptcy, ¶ 133, and "the revelation of confirmatory information, or information already known to the market, cannot constitute a corrective disclosure." *Magruder*, 2009 WL 854656, at *11.

## III. <u>PLAINTIFFS FAIL TO STATE A CONTROL PERSON CLAIM</u>

Plaintiffs assert control person liability claims under Section 15 of the Securities Act and Section 20(a) of the Exchange Act. To plead control liability, Plaintiffs must plead as to each Defendant both a primary violation, and that the defendant had the power to control the primary violator. *See, e.g.*, *Jacobowitz v. Range Res. Corp.*, 596 F. Supp. 3d 659, 690 (N.D. Tex. 2022). As discussed, Plaintiffs fail to plead a primary violation, so their control person claims necessarily fail. *Franklin Bank*, 782 F. Supp. 2d at 380. Further, the allegations of control are insufficient as Plaintiffs "must allege some facts beyond a defendant's position or title that show the defendant had actual power or control over the controlled person." *Id.*

## <u>CONCLUSION</u>

For the reasons discussed herein, Plaintiffs' Complaint should be dismissed with prejudice.

Dated: June 20, 2023                    Respectfully submitted,

                                        **QUINN EMANUEL URQUHART &
                                        SULLIVAN, LLP**

                                        By: */s/ John Bash*
                                        John Bash
                                        Texas Bar I.D. 24067504
                                        300 W. Sixth Street, Suite 2010
                                        Austin, TX 78701
                                        Telephone: (737) 667-6100
                                        Facsimile: (737) 667-6110
                                        johnbash@quinnemanuel.com

                                        John B. Quinn (*pro hac vice forthcoming*)
                                        865 S. Figueroa St., 10th Floor
                                        Los Angeles, CA 90017
                                        Telephone: (213) 443-3000
                                        Facsimile: (213) 443-3100
                                        johnquinn@quinnemanuel.com

                                        Jesse Bernstein (*pro hac vice forthcoming*)
                                        Brenna Nelinson (*pro hac vice forthcoming*)
                                        51 Madison Avenue, 22nd Floor
                                        New York, New York 10010
                                        Telephone: (212) 849-7000
                                        Facsimile: (212) 849-7100
                                        jessebernstein@quinnemanuel.com
                                        brennanelinson@quinnemanuel.com

                                        *Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 20th day of June 2023, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/ John Bash*