# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **CORE SCIENTIFIC, INC., *et al.*,** | § | **Case No. 22-90341 (DRJ)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | |
| | § | |

## DEBTORS' MOTION FOR ORDER APPROVING (I) SETTLEMENT BETWEEN DEBTORS AND FOUNDRY DIGITAL LLC AND (II) GRANTING RELATED RELIEF

> **IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE ELECTRONICALLY AT HTTPS://ECF.TXSB.USCOURTS.GOV/ WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. IF YOU DO NOT HAVE ELECTRONIC FILING PRIVILEGES, YOU MUST FILE A WRITTEN OBJECTION THAT IS ACTUALLY RECEIVED BY THE CLERK WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

Core Scientific, Inc. ("**Core**" or "**New Core**") and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), hereby submit this motion (the "**Motion**"), pursuant to sections 105(a), 362(d), and 365 of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), rule 9019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and rule 9013 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6074); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

**Rules**") requesting entry of an order, substantially in the form annexed hereto as **Exhibit 1** (the

"**Proposed Order**"), (i) approving the Foundry Settlement Documents (as defined below) and the

settlements and transactions embodied therein, (ii) authorizing and directing the Debtors to

execute, deliver and perform under the Foundry Settlement Documents and amend the Plan (as

defined herein) to incorporate the terms thereof, (iii) authorizing the Debtors to take any and all

actions necessary or appropriate to implement the Foundry Settlement Documents and the

settlements and transactions embodied therein, and (iv) granting related relief.

## Jurisdiction

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§ 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this

Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

2.      On December 21, 2022 (the "**Petition Date**"), the Debtors each commenced

with this Court a voluntary case under the Bankruptcy Code.  The Debtors are authorized to

continue to operate their business and manage their properties as debtors in possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code.

3.      The Debtors' chapter 11 cases are being jointly administered for procedural

purposes only pursuant to Rule 1015(b) of the Bankruptcy Rules, and Rule 1015-1 of the Local

Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of Texas.

4.      On January 9, 2023, the United States Trustee for Region 7 (the "**U.S.**

**Trustee**") appointed an official committee of unsecured creditors in these chapter 11 cases

pursuant to section 1102 of the Bankruptcy Code.  On March 23, 2023, the U.S. Trustee appointed

an official committee of equity security holders (the "**Equity Committee**").  No trustee or

examiner has been appointed in these chapter 11 cases.

2

5.      On August 8, 2023, the Debtors filed their *Amended Joint Chapter 11 Plan of Reorganization of Core Scientific, Inc. and its Affiliated Debtors* (Docket No. 1115) (as may be amended, modified or supplemented, in form and substance reasonably acceptable to Foundry to the extent it relates to or affects Foundry or its rights or claims, the "**Plan**") and related Disclosure Statement (Docket No. 1116) (as may be amended, modified, or supplemented, the "**Disclosure Statement**").

I.      **The Parties' Business Relationship and Related Dispute**

6.      The Debtors are one of the largest blockchain infrastructure, hosting provider, and digital asset mining companies in North America, with fully operational data centers in Texas, Kentucky, North Carolina, North Dakota, and Georgia.  The Debtors provide hosting solutions for third parties and also operate their own digital asset mining machines.

7.      Foundry Digital LLC ("**Foundry**") is a digital asset mining-focused subsidiary of Digital Currency Group.  Foundry and Core Scientific Operating Company ("**CSOC**" or "**Old Core**") entered into that certain Master Services Agreement dated November 23, 2019 (the "**2019 MSA**") and Foundry and Core entered into that certain Master Services Agreements dated September 21, 2022 (the "**2022 MSA**", and together with the 2019 MSA, the "**MSAs**"). Pursuant to the MSAs and the orders issued thereunder or entered into in connection therewith (the "**Orders**", and together with the MSAs, the "**Foundry Hosting Agreements**"), Core and CSOC agreed to provide services, including, without limitation, colocation, hosting and other services (as more fully described in the MSAs and the Orders) for Foundry's cryptocurrency mining equipment identified in the Orders (the "**Existing Miners**") in accordance with the MSAs and the Orders.

8.      On February 2, 2022, Foundry, Core, and Core Scientific Acquired Mining LLC (formerly known as Blockcap, Inc., "**CSAM**") entered into that certain Amended and Restated Asset Purchase Agreement ("**A&R APA**") pursuant to which Foundry sold 2,106

3

Bitmain Antminer S19 machines (the "**Purchased Assets**") to CSAM for a total purchase price of $21,312,720.00 (the "**Purchase Price**").  The sale of the Purchased Assets closed on May 5, 2021, on which date ownership of and title to the Purchased Assets was transferred by Foundry to CSAM.

9. Pursuant to the A&R APA, within five (5) business days following the effective date of the A&R APA, CSAM was obligated to cause the Purchase Price to be paid to Foundry by causing Core to issue to Foundry 1,580,288 shares of its common stock (the "**CORZ Share Consideration**"), which shares were subsequently issued to Foundry.  Section 3.2 of the A&R APA further provides that:

> Notwithstanding the foregoing, in the event the product of (i) the VWAP at the expiration of the Lockup Period . . . multiplied by (ii) the CORZ Share Consideration shall be less than the Purchase Price, [CSAM] shall pay the difference to [Foundry] in cash . . . .

10. Under the A&R APA, "VWAP means the weighted average of the closing price per CORZ Common Share for each day there was a closing price during the thirty (30) consecutive days immediately prior to the expiration of the Lockup Period."[2] Pursuant to Section 3.2 of the A&R APA, CSAM was obligated to pay Foundry an amount equal to the Purchase Price minus the Adjusted CORZ Share Value (i.e., $21,312,720.00 minus $2,907,729.92), which is $18,404,990.08.

11. On April 13, 2023, Foundry filed proofs of claim against New Core and CSAM, each asserting an unsecured claim in the amount of at least $18,404,990.08, relating to claims arising under the A&R APA (the "**Foundry APA POCs**"), and proofs of claim against

---

[2] "Lockup Period" means "the date from the XPDI Closing Date through 180 days thereafter." A&R APA, § 1.1.  The XPDI Closing Date was January 20, 2022. A&R APA, Recital D. Accordingly, the Lockup Period was from January 20, 2022 through July 19, 2022.

WEIL:\99227465\8\39031.0014

New Core and CSOC relating to claims arising under the Foundry Hosing Agreements (together with the Foundry APA POCs, the "**Foundry POCs**").[3]

## II.     The Foundry Settlement

12.     After engaging in extensive, good faith, arms'-length negotiations regarding the Foundry POCs and the existing Foundry Hosting Agreements, the Debtors and Foundry reached a settlement (the "**Foundry Settlement**") on the terms and conditions provided in the following documents (collectively, the "**Foundry Settlement Documents**"):

     i.    the Proposed Order; and

     ii.    the Settlement Agreement, dated August 15, 2023, by and among Foundry and the Debtors, attached to the Proposed Order as <u>Exhibit A</u> (the "**Foundry Settlement Agreement**"),[4] which includes Order #2 and the Bill of Sale[5] (each as defined and described below), the Foundry Hosting Agreements, and any other document or agreement entered or entered into in connection therewith, each in form and substance acceptable to Foundry and the Debtors in their respective sole discretion (the "**Other Transaction Documents**").

13.     Subject to the terms of, and as more fully set forth in, the Foundry Settlement Documents, the Foundry Settlement resolves all claims and issues between the Debtors and Foundry, except for any claims and issues arising (i) from and after the effective date of the Plan or (ii) under or related to the Foundry Settlement Documents or the transactions contemplated thereunder.   Furthermore, such settlement and Foundry Settlement Documents shall be incorporated into the Plan and Confirmation Order (as defined below).

---

[3] *See* Claim Numbers 360, 361, 393, and 394.

[4] Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to such terms in the Foundry Settlement Agreement.

[5] Although Order #2 and the Bill of Sale are exhibits to the Settlement Agreement, they are also standalone agreements enforceable in accordance with their respective terms.

WEIL:\99227465\8\39031.0014

14.     As further detailed below and in the Foundry Settlement Documents, the Foundry Settlement Agreement provides, among other things, that, subject to and upon the Effective Date (as defined in the Foundry Settlement Agreement, and which includes, among other things, the occurrence of the effective date of the Plan), (i) New Core and Foundry shall enter into a new order under the 2022 MSA pursuant to which New Core shall host, colocate and operate the Identified Miners (as defined below) and split the profits generated thereby with Foundry during the Term (as defined below) in accordance with the terms of Order #2, (ii) Old Core and Foundry shall enter into the Bill of Sale pursuant to which, on the earlier of the first anniversary of the date of the Foundry Settlement Agreement and the termination or expiration of the Term, Old Core shall convey, transfer and deliver title to and possession of the Identified Miners to Foundry free and clear of all Encumbrances, (iii) the Debtors shall assume the existing Foundry Hosting Agreements and perform thereunder, (iv) Foundry's claims related to the A&R APA shall constitute Allowed General Unsecured Claims against each of CSAM and New Core in the amount of at least $18,404,990.08 plus interest and shall be satisfied by the consummation of the Foundry Settlement Documents and settlements and transactions contemplated therein, and (v) Foundry and the Debtors shall mutually release their respective claims against each other arising prior to the Effective Date, other than any claims arising under or related to any of the Foundry Settlement Documents or the transactions contemplated therein.  For the avoidance of doubt, (i) Foundry's Allowed General Unsecured Claims shall be fully and finally satisfied on the Effective Date in accordance with the Foundry Settlement Documents, and (ii) Foundry's Existing Common Interests in New Core shall remain unaffected, and Foundry shall receive the same treatment as other holders of Existing Common Interests of New Core pursuant to the Plan.[6]

---

[6] Notwithstanding anything in the Foundry Settlement Agreement, nothing therein shall affect Foundry's rights, remedies or interests as an equity holder, its ability to participate in any rights offering, capital raise, financing or

6

15.    The principal terms of the Foundry Settlement include the following:[7]

a)   The Plan shall incorporate the terms of the Foundry Settlement and all transactions thereunder, and the Debtors shall seek entry of an order confirming such Plan, which order shall be in form and substance reasonably acceptable to the Debtors and Foundry (each in its sole discretion) as it relates to the Foundry Settlement Agreement and the transactions contemplated thereby and/or as it relates to or affects Foundry or any of its rights or claims (the "**Confirmation Order**") and, among other things, contains the provisions set forth in Section 3.e. of the Foundry Settlement Agreement.

b)   On the Effective Date, the Debtors shall assume the Foundry Hosting Agreements and perform thereunder and any cure claims shall be preserved and addressed pursuant to the terms of the Foundry Hosting Agreements.

c)   No later than two (2) days following the entry of the Proposed Order (the "**Closing Date**"), New Core and Foundry shall each execute and deliver Order #2 in the form attached to the Proposed Order as Exhibit B ("**Order #2**"), pursuant to which, among other things, during the Term (as defined in Order #2 and which, for the avoidance of doubt, shall commence on the Effective Date), New Core shall host, colocate and operate the Identified Miners, distribute the Mining Proceeds (as defined in Order #2) and perform its other obligations under Order #2, in each case, in accordance with the terms and conditions set forth in Order #2, including the "Mining Proceeds Sharing" provision therein.  On the Effective Date, New Core shall commence and continue the hashing related to the Identified Miners to the mining pool and subaccount(s) owned by Foundry, as provided in, and in accordance with, Order #2.

d)   On the Closing Date, Old Core and Foundry shall each execute and deliver a bill of sale in the form attached to the Proposed Order as Exhibit C (the "**Bill of Sale**"), which, subject to the occurrence of the Effective Date, shall become effective upon the Transfer Date.

e)   On the Closing Date, the applicable Parties shall execute and deliver the applicable Other Transaction Documents, which shall be subject to and become effective upon the Effective Date.

f)   Subject to, and effective upon, the Effective Date, pursuant to the Bill of Sale, on the earliest to occur of (i) the first anniversary of the date of the Foundry Settlement Agreement, and (ii) the termination or expiration of the Term in accordance with the terms thereof (each, a "**Transfer Date**"), Old Core shall sell, assign, transfer, convey and deliver to Foundry all of Old Core's rights, title and interest in, to and under, and possession of, the 2,106 Bitmain Antminer S19 XP mining machines identified by

---

similar transaction, its rights or duties as a member of the Equity Committee, or otherwise be deemed as support for the Plan in Foundry's capacity as equity holder.

[7] The summary below is qualified in its entirety by the terms of the Foundry Settlement Agreement, including Order #2 and the Bill of Sale.

7

serial number, and set forth, on Exhibit D attached to the Foundry Settlement Agreement and in condition and at location(s) reasonably acceptable to Foundry (collectively, the "**Identified Miners**") free and clear of all Encumbrances, which sale, assignment, transfer, conveyance and delivery shall occur automatically on the Transfer Date without the need for any Party to take any further action.

g) Subject to, and effective upon, the Effective Date, Foundry's Claims (as defined in the Plan) arising under or related to the A&R APA (including the Foundry APA POCs) shall constitute, and the Plan and Confirmation Order shall provide that Foundry has, Allowed General Unsecured Claims (as each such term is defined in the Plan), in the amount of not less than $18,404,990.08 plus interest at the applicable rate, against each of CSAM and New Core (collectively, the "**Foundry Allowed Claims**").

h) Subject to, and effective upon, the Effective Date, Foundry shall vote the Foundry Allowed Claims to accept the Plan that incorporates the terms of, and is otherwise consistent with, the Foundry Settlement Agreement and the agreements and transactions contemplated therein.

i) Subject to, and effective upon, the Effective Date, the Foundry Allowed Claims shall be satisfied by the consummation of the settlement, agreements and transactions contemplated under the Foundry Settlement Agreement. No other compensation or distribution shall be provided to Foundry under the Plan on account of the Foundry Allowed Claims, other than as provided in the Foundry Settlement Agreement. Subject to, and upon, the Effective Date, Foundry's Claims (but not Interests), including the Foundry Allowed Claims, against any of the Debtors, and each of the Debtors' Claims against Foundry, in each case, arising prior to the Effective Date shall be released; *provided*, *however*, that nothing in the Foundry Settlement Agreement, in the Plan or Confirmation Order shall release or affect any rights, claims, interests or obligations of Foundry or any of the Debtors arising (x) from and after the Effective Date or (y) under or related to the Foundry Settlement Agreement, the Bill of Sale, Order #2, the Foundry Hosting Agreements, the Proposed Order, the Other Transaction Documents or the transactions contemplated thereunder.

j) Consistent with the Settlement Agreement, Foundry's Interests in New Core shall constitute, and the Plan and Confirmation Order shall provide that Foundry has, Existing Common Interests in New Core (such Existing Common Interests, the "**Foundry Interests**") and, with respect to the Foundry Interests, shall receive the same treatment as other holders of Existing Common Interests in New Core.[8]

k) On the Transfer Date, (i) the Debtors or the reorganized Debtors, as applicable, shall deliver to Foundry UCC-3 termination statements and/or other documents necessary or requested by Foundry to document the release of any and all Encumbrances relating to the Identified Miners, the cryptocurrency mined by the Identified Miners and/or the

---

[8] All references herein to Foundry Interests shall also mean and constitute Allowed Existing Common Interests (as defined in the Plan) to the extent the Plan requires Foundry to hold Allowed Existing Common Interests to be entitled to treatment or distributions under the Plan on account of its Interests.

proceeds, offsprings and/or products thereof, including, without limitation, as applicable, any and all DIP Liens, adequate protection liens, and any other Encumbrances of the Replacement DIP Secured Parties, the Prepetition Secured Parties[9] and/or any other party (such statements and/or documents, collectively, the "**Termination Statements**"), or (ii) Foundry shall be authorized and entitled to file any such Termination Statements.

l)   Upon any breach by New Core of the Foundry Settlement Agreement that is not cured within five (5) calendar days thereof, New Core shall (i) promptly assign, transfer, convey and deliver all of its rights, title and interest in, to and under, and possession of, the Identified Miners free and clear of all Encumbrances to Foundry, or (ii) if the assignment, transfer, conveyance and delivery of title to, and possession of, the Identified Miners is due to an impossibility (as described in a written notice delivered by New Core to Foundry upon the occurrence of the breach), New Core shall promptly pay Foundry an amount equal to the fair market value of the Identified Miners as of the date of the breach (the "**FMV**") as determined by an independent third party to the extent Foundry and New Core are unable to agree on the FMV.  The remedy provided by Section 2.m of the Foundry Settlement Agreement shall be the exclusive remedy available to Foundry with respect to such breach following the Effective Date. The assignment, transfer, conveyance and delivery made pursuant to clause 2.m(i) of the Foundry Settlement Agreement shall be deemed to have been made in accordance with the Bill of Sale and all the conditions thereunder, including the occurrence of a "Transfer Date", shall be deemed to have been satisfied.

## Relief Requested Should Be Granted

## III.   The Foundry Settlement Is Fair, Reasonable, and in the Best Interest of the Debtors' Estates

16.   The Court should authorize the Debtors to enter into the Foundry Settlement Documents pursuant to Bankruptcy Rule 9019(a).  Bankruptcy Rule 9019(a) provides that "[o]n motion by the [debtors in possession] and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).  Further, pursuant to Bankruptcy Rule 9019(a), a bankruptcy court may approve a compromise or settlement so long as the proposed settlement is fair, reasonable, and in the best interests of the estate.  *See Off. Comm. of Unsecured*

---

[9] Capitalized terms used in this subsection but not otherwise defined herein shall have the meanings ascribed to such terms in the *Final Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Non-Priming Superpriority Replacement Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims With Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* (Docket No. 608)

*Creditors v. Moeller (In re Age Refin., Inc.)*, 801 F.3d 530, 540 (5th Cir. 2015).   Ultimately,

approval of a compromise is within the discretion of the bankruptcy court.   *See United States v.*

*AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984); *Rivercity v. Herpel (In re*

*Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980) (citations omitted) (decided under the

Bankruptcy Act).   Settlements are considered a "normal part of the process of reorganization" and

a "desirable and wise method[] of bringing to a close proceedings otherwise lengthy, complicated,

and costly."   *Rivercity*, 624 F.2d at 602–03 (citing *Protective Comm. for Indep. Stockholders of*

*TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424–25 (1968)).

   17. The Fifth Circuit has established a three-factor balancing test under which

bankruptcy courts analyze proposed settlements.   *Id.*   The factors courts consider are: "(1) the

probability of success in litigating the claim subject to settlement, with due consideration for the

uncertainty in fact and law; (2) the complexity and likely duration of litigation and any attendant

expense, inconvenience, and delay; and (3) all other factors bearing on the wisdom of the

compromise."   *See Age Refin.*, 801 F.3d at 540 (internal citations omitted).

   18. Under the rubric of the third factor, the Fifth Circuit has specified two

additional factors that bear on a decision to approve a proposed settlement.   First, the Court should

consider "the paramount interest of creditors with proper deference to their reasonable views."   *Id.*;

*Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917

(5th Cir. 1995).   Second, the Court should consider the "extent to which the settlement is truly the

product of arms-length bargaining, and not of fraud or collusion."   *Age Refin.*, 801 F.3d at 540;

*Foster Mortg.*, 68 F.3d at 918 (citations omitted).

   19. Generally, the role of the bankruptcy court is not to decide the issues in

dispute when evaluating a settlement.   *Watts v. Williams*, 154 B.R. 56, 59 (S.D. Tex. 1993).   Rather,

the court should determine whether the settlement as a whole is fair and equitable. *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).

20. The Debtors bear the burden of establishing that the balance of the above factors leads to a fair and equitable compromise vis-à-vis the Foundry Settlement. *In re Allied Properties, LLC*, 2007 WL 1849017, at *4 (Bankr. S.D. Tex. June 25, 2007) (citing *In re Lawrence & Erausquin, Inc.*, 124 B.R. 37, 38 (Bankr. N.D. Ohio 1990)); *see also In re GHR Companies, Inc.*, 50 B.R. 925, 931 (Bankr. D. Mass. 1985). "The burden is not high;" rather, the Debtors "*need only show that [their] decision falls within the 'range of reasonable litigation alternatives.'*" *In re Allied Properties, LLC*, 2007 WL 1849017, at *4 (emphasis added) (citing *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983)); *see also Cook v. Waldron*, 2006 WL 1007489 at *4 (S.D. Tex. Apr. 18, 2006).

21. Here, weighing the foregoing factors demonstrates that the Foundry Settlement is reasonable and supports finding that the Debtors' entry into the Foundry Settlement is in the best interest of creditors and other stakeholders.

22. First, the likelihood of success of litigating the Foundry POCs is uncertain. What is not uncertain, however, is that the litigation would likely require the expenditure of significant funds and cause substantial, detrimental impact to the Debtors. Having the benefit of certainty between the Debtors and Foundry, at an amount lower than the total claim amount that the Court may determine is allowed is a substantial benefit to the Debtors and their estates.

23. Second, the Foundry Settlement is also the product of good-faith, arm's-length bargaining between the Debtors and Foundry, each of which were represented by counsel.

24. Third, the Foundry Settlement is reasonable and is in the best interests of the Debtors' estates. Subject to the terms of the Foundry Settlement Documents, the Debtors will satisfy Foundry's pre-Effective Date claims (other than claims arising under or related to the

Foundry Settlement Documents), including a large unsecured claim in the amount of at least $18.4 million against the Debtors' estates, without utilizing the Debtors' current cash resources. Instead, through mutually beneficial agreements, the Debtors have agreed to provide Foundry with 50% of the profits earned by the Identified Miners pursuant to Order #2 for the Term of Order #2, and to transfer the Identified Miners to Foundry free and clear of Encumbrances in accordance with the terms of the Foundry Settlement Documents. Taking all factors and costs into account, the Debtors believe that the benefits of the Foundry Settlement (i.e., settlement of an asserted claim in the amount of at least $18.4 million and avoiding substantial litigation costs) exceed the costs of such settlement.

25.     Accordingly, the Debtors respectfully submit that the Court should approve the Foundry Settlement based upon the factors considered by courts in the Fifth Circuit.

## IV.    The Debtors Assumption of the Foundry Hosting Agreements Is a Reasonable Exercise of Debtors' Sound Business Judgment and in the Best Interests of the Estates

26.     The Court should authorize the Debtors to assume the Foundry Hosting Agreements, as amended and restated, pursuant to section 365 of the Bankruptcy Code, effective upon the occurrence of the Effective Date. Pursuant to section 365(a), a debtor in possession, "subject to the court's approval, may assume or reject any . . . executory contract or unexpired lease of the debtor." Although the Bankruptcy Code does not define the term "executory contract," the Supreme Court has noted that an executory contract is "a contract where neither party has finished performing." *In re Avianca Holdings S.A.*, 618 B.R. 684, 695 (Bankr. S.D.N.Y. 2020) (citing *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1657 (2019)); *Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co*., 83 F.3d 735, 741 (5th Cir. 1996) ("Although the Bankruptcy Code does not define 'executory contract,' generally an agreement is considered executory 'if at the time of the bankruptcy filing, the failure of either party to complete

12

performance would constitute a material breach of the contract, thereby excusing the performance

of the other party.'") (quoting *In re Murexco Petorleum, Inc.*, 15 F. 3d 60, 62 (5th Cir. 1994)).

This allows the debtor in possession to maximize the value of its estate by assuming executory

contracts or unexpired leases that benefit the estate and by rejecting those that do not. *In re Nat'l*

*Gypsum Co*., 208 F.3d 498, 504–05 (5th Cir. 2000).

27.     Additionally, section 365(b)(1) of the Bankruptcy Code establishes certain

conditions that must be satisfied before the assumption of an executory contract:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . .
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

28.     Once the statutory predicates to assumption are satisfied, courts apply the

"business judgment" standard to determine whether to authorize the rejection of an executory

contract. *See Matter of J.C. Penney Direct Marketing Servs., LLC*, 50 F.4th 532, 534 (5th Cir.

2022) ("A bankruptcy court reviews a debtor's decision to . . . reject an executory contract under

the deferential 'business judgment' standard.") (citing *Mission Prod. Holdings, Inc. v.*

*Tempnology, LLC*, —U.S.—, 139 S. Ct. 1652, 1658 (2019); *see also In re Pilgrim's Pride Corp.*,

403 B.R. 413, 422 (Bankr. N.D. Tex. 2009) ("The general rule is that the decision to reject a given

contract should be left to the trustee's (or debtor in possession's) sound business judgment.").

29.     The "business judgment" standard requires only a showing that either

assumption or rejection of the executory contract or unexpired lease will benefit the debtor's estate.

*See In re Idearc Inc.*, 423 B.R. 138, 162 (Bankr. N.D. Tex. 2009) (stating that the business judgment standard only "requires a showing that the proposed course of action will be advantageous to the estate." (citation omitted)).   In applying the business judgment standard, bankruptcy courts give deference to a debtor's decision to assume or reject executory contracts. *See, e.g.*, *In re Pisces Energy, LLC*, Case No. 09-36591-H5-11, 2009 WL 7227880, at *6 (Bankr. S.D. Tex. Dec. 21, 2009) ("Courts apply the 'business judgment test,' which requires a showing that the proposed course of action will be advantageous to the estate and the decision be based on sound business judgment.").   Further, under the business judgment standard, "[a] debtor's decision to reject an executory contract must be summarily affirmed unless it is the product of 'bad faith, or whim or caprice.'"   *In re Pilgrim's Pride Corp.*, 403 B.R. at 422 (citing *Wheeling–Pittsburgh Steel Corp. v. W. Penn Power Co.* (*In re Wheeling–Pittsburgh Steel Corp.*), 72 B.R. 845, 849–50 (Bankr. W.D. Pa. 1987)).

30.     Here, all statutory predicates to assumption under section 365 are satisfied. The Foundry Hosting Agreements are "executory contracts" within the meaning of section 365 of the Bankruptcy Code because all parties involved have material ongoing obligations under these agreements as of the Petition Date.   Specifically, Core is required to host the Existing Miners, and Foundry is required to pay Core for hosting the Existing Miners.   Second, through the Foundry Settlement, cure costs, to the extent there are any, shall be addressed pursuant to the terms of the Foundry Hosting Agreement.   Third, the Debtors have also provided adequate assurance of future performance as they project having sufficient liquidity to satisfy their postpetition operating expenses as set forth in the Debtors' most recent budget for their debtor-in-possession financing.

31.     Additionally, the assumption of the Foundry Hosting Agreements is a proper exercise of the Debtors' business judgment for the reasons set forth above.

14

32.     For the foregoing reasons, the Court should authorize the Debtors to assume the Foundry Hosting Agreements.

**V.      The Debtors' Entry into the Foundry Settlement Documents Is A Reasonable Exercise of the Debtors' Sound Business Judgment**

33.     Section 363(b)(1) of the Bankruptcy Code authorizes a debtor in possession to "use, sell, or lease, other than in the ordinary course of business, property of the estate," after notice and a hearing.  It is well-established in this jurisdiction that a debtor may use property of the estate outside the ordinary course of business under this provision if there is a good business reason for doing so.  *See, e.g., ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors, and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (quoting *In re Cont'l Air Lines, Inc.*, 780 F.3d 1223, 1226 (5th Cir. 1986)); *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd. (In re State Park Bldg. Grp., Ltd.)*, 331 B.R. 251, 254 (Bankr. N.D. Tex. 2005); *In re Filene's Basement*, LLC, No. 11-13511 (KJC) (Bankr. D. Del. Apr. 29, 2014) (stating that, under the business judgment standard, once the debtor presents "a reasonable basis for is business decisions … courts will generally not entertain objections to the debtor's conduct").

34.     Here, the Debtors' entry into the Foundry Settlement Documents is a reasonable exercise of the Debtors' business judgement and should be approved.  If approved, in exchange for entry into the Foundry Settlement Documents and subject to the terms thereof, Foundry's asserted claims in excess of $18.4 million will be satisfied by the consummation of those agreements and the transactions contemplated thereby.  Moreover, Order Form #2 will allow New Core to continue to recover 50% of the profits from the Identified Miners for a meaningful portion of the useful life of the Identified Miners.

35.     Accordingly, the Debtors submit that entry into the Foundry Settlement Documents is a reasonable exercise of the Debtors' business judgment and should be approved.

## **Reservation of Rights**

36.     Nothing contained in this Motion is intended or should be construed as: (i) an admission as to the validity of any claim against the Debtors, or (ii) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law.

## **No Previous Request**

37.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

16

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:  August 25, 2023
       Houston, Texas

Respectfully submitted,

  */s/ Alfredo R. Pérez*
WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 1700
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511
Email:  Alfredo.Perez@weil.com
       Clifford.Carlson@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock (admitted *pro hac vice*)
Ronit J. Berkovich (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:   (212) 310-8007
Email:  Ray.Schrock@weil.com
       Ronit.Berkovich@weil.com

*Attorneys for Debtors*
*and Debtors in Possession*

17

**<u>Certificate of Service</u>**

I hereby certify that on August 25, 2023, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.


           *<u>/s/  Alfredo R. Pérez</u>*
           Alfredo R. Pérez