UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CORE SCIENTIFIC, INC., *et al*, | ) | Case No.22-90341 (DRJ) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |

**GEM MINING'S RESPONSE IN OPPOSITION TO DEBTORS'
OBJECTION TO PROOF OF CLAIM NOS. 503, 505, 506, 508, 570, 571,
AND 572 FILED BY GEM MINING 1, LLC, GEM MINING 2B, LLC,
GEM MINING 4, LLC, GEM MINING 2, LLC, GEM MINING 2, LLC,
GEM MINING 2B, LLC, AND GEM MINING 4, LLC, RESPECTIVELY**

GEM Mining 1, LLC ("GEM Mining 1"); GEM Mining 2, LLC ("GEM Mining 2"), GEM Mining 2 B, LLC ("GEM Mining 2 B"); and GEM Mining 4, LLC ("GEM Mining 4" or, together with GEM Mining 1, GEM Mining 2, GEM Mining 2 B, and GEM Mining 4, the "GEM Mining Entities") hereby file this response to *Debtors' Objection to Proof of Claim Nos. 503, 505, 506, 508, 570, 571, and 572 filed by GEM Mining 1, LLC, GEM Mining 2B, LLC, GEM Mining 4, LLC, GEM Mining 2, LLC, GEM Mining 2, LLC GEM Mining 2B, LLC, and GEM Mining 4, LLC, respectively* (Doc. 854) (as supplemented by Doc. 862, the "Core Objection") filed by Core Scientific Operating Company f/k/a Core Scientific, Inc. and its debtor affiliates (collectively, "Core") and submit the *Declaration of Joseph Poore in Support of GEM Mining's*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

*Response in Opposition to Debtors' Objection to Proofs of Claim* attached hereto as **Exhibit A** (the "Poore Declaration"). Accordingly, the GEM Mining Entities respectfully state as follows:

## Background

1. In 2021, Core entered into a Master Services Agreement with each of the GEM Mining Entities (the "MSAs") wherein Core agreed to provide hosting services for computer hardware and other tangible equipment at data centers owned or operated by Core or its affiliates as further provided in individual ordering documents (the "Orders"). Specifically, Core agreed to provide various services to the GEM Mining Entities, including but not limited to, colocation, hosting, rack space, security, monitoring, maintenance, utilities, equipment maintenance and repair, facility management, account management, network and data access, technical support, and heat and thermal management services.

2. In connection with the MSAs, Core and the GEM Mining Entities executed, among other things, the following Orders:

   i. On June 8, 2021, GEM Mining 1 and Core executed that certain Amended and Restated Order # 8 (the "GEM Mining 1 Order"), wherein Core agreed to host approximately 7,295 Miners for an initial three-year term;

   ii. Between June 30, 2021 and August 30, 2021, GEM Mining 2 and Core executed that certain Amended and Restated Order # 1, that certain Order #3, and that certain Order #4 (collectively, the "GEM Mining 2 Orders"), wherein Core agreed to host approximately 8,385 Miners for an initial three-year term;

   iii. Between July 16, 2021 and August 27, 2021, GEM Mining 2 B and Core executed that certain Master Services Agreement Order # 1, that certain Master Services Agreement Order # 2, and that certain Master Services Agreement Order # 3 (collectively, the "GEM Mining 2 B Orders"), wherein Core agreed to host approximately 1,609 Miners for an initial three-year term; and

   iv. On July 9, 2021, GEM Mining 4 and Core executed that certain Master Services Agreement Order # 1 (the "GEM Mining 4 Order"), wherein

Core agreed to host approximately 3,105 Miners for an initial three-year term.

3. Pursuant to the MSAs and Orders, Core is obligated to provide the GEM Mining Entities with hosting services at a fixed, not variable, rate based on the GEM Mining Entities' power usage. In particular, the Orders specify a fixed "Hosting-Services Rate" based on the amount of power consumed each month. (*See e.g.*, GEM Mining 1 Order attached as Exhibit 2 to GEM Mining POC No. 503).

4. Notwithstanding the language of the MSAs and Orders, Core charged the GEM Mining Entities a variable rate dictated by the price of power charged to Core. Specifically, on February 15, 2022, Core provided the GEM Mining Entities with the first invoices improperly including pass-through energy costs. *See* Poore Declaration at ¶ 7. That same day, Poore sent written notice to Core disputing the inclusion of the pass-through energy costs on any invoices under any applicable agreement. *See id.* at ¶ 7.

5. Between February 15, 2022 and the Petition Date, Core improperly charged the GEM Mining Entities with the following pass-through energy costs:

    i. $560,253.50 in pass-through energy costs to GEM Mining 1;

    ii. $2,862,274.67 in pass-through energy costs to GEM Mining 2;

    iii. $403,278.13 in pass-through energy costs to GEM Mining 2 B; and

    iv. $269,236.00 in pass-through energy costs to GEM Mining 4.

6. On December 21, 2022 (the "Petition Date"), Core initiated the above styled bankruptcy cases (the "Bankruptcy Cases") by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

7. On April 14, 2023, the GEM Mining Entities filed the following proofs of claim (collectively, the "GEM Mining Proofs of Claim") in the Bankruptcy Cases:

| GEM Mining Entity | POC | Debtor Entity | Amount |
|---|---|---|---|
| GEM Mining 1 | 503 | Core Scientific, Inc. | $560,253.50 |
| | 617 | Core Scientific Operating Company | $560,253.50 |
| GEM Mining 2 | 508 | Core Scientific, Inc. | $2,862,274.67 |
| | 570 | Core Scientific Operating Company | $2,862,274.67 |
| GEM Mining 2 B | 505 | Core Scientific, Inc. | $269.236.00 |
| | 571 | Core Scientific Operating Company | $269.236.00 |
| GEM Mining 4 | 506 | Core Scientific, Inc. | $403,278.13 |
| | 572 | Core Scientific Operating Company | $403,278.13 |

8. As explained in the GEM Mining Proofs of Claim, the GEM Mining Entities have claims against Core resulting from Core's breach of the MSAs and Orders by improperly charging pass-through power costs. Further, while each GEM Mining entity seeks only one recovery against Core, each GEM Mining entity filed, out of an abundance of caution, a proof of claim against both Core Scientific, Inc. and Core Scientific Operating Company f/k/a Core Scientific, Inc. because the MSAs and Orders are executed by "Core Scientific, Inc." True and correct copies of the respective MSAs and Orders, as well as spreadsheets and invoices reflecting the pass-through energy costs charged to each respective GEM Mining Entity prior to the Petition Date, are attached to each of the GEM Mining Proofs of Claim.

9. On May 4, 2023, Core filed the Core Objection objecting to the GEM Mining Proofs of Claim on the following grounds: (i) several of the GEM Mining Proofs of Claim are duplicative; (ii) the GEM Mining Entities did not dispute the pass-through power costs by the deadline set forth in the MSAs; and (iii) the pass-through power costs comports with the MSAs, the Parties' course of performance, industry usage, and commercial context. The only evidence

4

presented in support of the Core Objection is the *Declaration of Jeff Pratt in Support of Debtors' Objection to Proof of Claim Nos. 503, 505, 506, 508, 570, 571, and 572 filed by GEM Mining 1, LLC, GEM Mining 2B, LLC, GEM Mining 4, LLC, GEM Mining 2, LLC, GEM Mining 2, LLC GEM Mining 2B, LLC, and GEM Mining 4, LLC, respectively* (Doc. 858) (the "Pratt Declaration").

10. For the reasons stated herein, the Court should reject each of Core's arguments, overrule the Core Objection, and allow the GEM Mining Proofs of Claim.

## Argument

Rule 3001 of the Federal Rules of Bankruptcy Procedure provides that a properly filed proof of claim shall constitute prima facie evidence of the validity and amount of the claim. FED. R. BANKR. P. 3001. If a party objects to the claim and produces evidence to rebut the claim, the burden shifts to the claimant to be prove its claim by a preponderance of the evidence. *In re Armstrong*, 347 B.R. 581, 583 (Bankr. N.D. Tex. 2006) (citing *In re Fidelity Holding Co.*, 837 F.2d 696, 698 (5th Cir. 1988)). Here, Core has failed to produce sufficient evidence to rebut the GEM Mining Proofs of Claim. Moreover, even if Core were to rebut the presumption of the GEM Mining Proofs of Claim, the preponderance of the evidence establishes that the GEM Mining Proofs of Claim are valid. For these reasons, the Court should overrule the Core Objection and allow the GEM Mining Proofs of Claim.

### I. Core has failed to produce any evidence identifying the debtor entity against whom the GEM Mining Entities have claims.

Core argues that certain of the GEM Mining Proofs of Claim should be disallowed because they are duplicative of other claims. As explained in the GEM Mining Proofs of Claim, GEM Mining asserts claims against "Core Scientific Inc.," which is the entity that executed the MSAs and Orders. In the *Notice of Deadlines for Filing Proof of Claim, attached to the Order (I)*

*Establishing Deadlines to File Proofs of Claim and (II) Approving Form and Manner of Notice Thereof* (Doc. 652), Core indicates that "[t]he name 'Core Scientific, Inc.' was used by Core Scientific Operating Company from June 13, 2018 until January 19, 2022, when Power & Digital Infrastructure Acquisition Corp. changed its name to the current Core Scientific, Inc." (Doc. 652 at n.2). Thus, while each of the GEM Mining Entities seek only one recovery, each of the GEM Mining Entities filed a proof of claim against both Core Scientific, Inc. and Core Scientific Operating Company out of an abundance of caution.

Core contends, without providing any evidence, that the GEM Mining Proofs of Claim should have been asserted against Core Scientific Operating Company because Core Scientific, Inc. changed its name to Core Scientific Operating Company after the execution of the MSAs. Accordingly, Core has failed to produce sufficient evidence to rebut the presumption of validity of the GEM Mining Proofs of Claim. Nevertheless, the undersigned believes the Parties should be able to mutually resolve this issue upon Core's production of sufficient evidence concerning the appropriate debtor entity that is party to the MSAs and Orders.

## II.     The GEM Mining Entities properly disputed the pass-through power costs as required by the MSAs.

Core argues that the GEM Mining Proofs of Claim should be disallowed because the GEM Mining Entities did not dispute, in accordance with the terms of the MSAs, the pass-through power charges in writing within three (3) calendar days of the date of the initial invoice on which the charges appeared. In support of this argument, Core relies on the Pratt Declaration, in which Pratt states that the GEM Mining Entities never submitted a written notice of dispute of the pass-through power costs as required under Section 3(b) of the MSAs. (*See* Pratt Declaration at ¶ 8).

Core's and Pratt's representations are demonstrably false. As shown by the Poore Declaration and the email thread attached thereto, Poore, the Chief Financial Officer of the GEM Mining Entities, sent Core written notice disputing the inclusion of the pass-through power costs on any invoice under any applicable agreement **on the same day** the initial invoices including the pass-through power costs were submitted to the GEM Mining Entities. (*See* Poore Declaration at ¶ 7). Specifically, Section 3(b) of the MSAs provides:

> Client [*i.e.*, the GEM Mining Entities] may, in good faith, dispute any invoice or any part thereof (a "**Disputed Amount**") by submitting a written notice of such dispute along with reasonable supporting documentation within three (3) calendar days of the date of the initial invoice on which the Disputed Amount appears, failing which Client waives all rights to dispute such Disputed Amount and to file any claim. Company [*i.e.*, Core] will review the Disputed Amount after its receipt of the relevant notice and if Company determines that Client was billed in error, a credit for the amount invoiced incorrectly will be made to the next invoice. If Company determines that the amount was invoiced correctly, Client will pay the amount by the due date of the next invoice. For clarity, Client shall promptly pay all undisputed amounts.

(*See e.g.*, MSA attached as Exhibit 1 to GEM Mining POC No. 503 at § 3(b)).

On February 15, 2022, Core sent Poore the following email providing the initial invoice on which the pass-through power costs appeared:

7

**From:** Core Scientific Inc. Billing <billing@corescientific.com>
**Sent:** Tuesday, February 15, 2022 9:01 PM
**To:** Core Scientific Inc. Billing <billing@corescientific.com>; Joe Poore <joe.poore@gemmining.com>; Ryan Irvin <Ryan.Irvin@gemmining.com>; AccountsPayable <AccountsPayable@gemmining.com>
**Cc:** Accounts Receivable <ar@corescientific.com>; Client Success <client-success@corescientific.com>
**Subject:** [External]Core Scientific Inc. February 2022 Hosting Invoice - GEM Mining 1 LLC

Hi Ryan and Joe,

Hope you are doing well! Please see attached invoice INV42316 for **GEM Mining1 LLC** and associated support for your Hosting Services.

Please note – for power consumption in Marble 2 site, , the hosting rate for 19 days in Jan 2022 is $0.094/kWh due to increased power costs.

Feel free to reach out if you have any questions or concerns.

We appreciate your business and trust in Core Scientific!



HAILUN ZHANG, CMA, MBA
SR. REVENUE ACCOUNTANT
Core Scientific
hzhang@corescientific.com

(*See* Poore Declaration at ¶ 7 and Ex. 1). Almost immediately, Poore responded to Core's email with two successive emails disputing Core's ability to charge the GEM Mining Entities pass-through power costs under the written dispute procedures outlined in the MSAs:

**From:** Joe Poore
**Sent:** Tuesday, February 15, 2022 9:31 PM
**To:** Hailun Zhang <hzhang@corescientific.com>; Billing <billing@corescientific.com>
**Cc:** Client Success <client-success@corescientific.com>; Ryan Irvin <Ryan.Irvin@gemmining.com>; John Warren <jw@gemmining.com>
**Subject:** RE: [External]Core Scientific Inc. February 2022 Hosting Invoice - GEM Mining 1 LLC

Holy smokes. That's a > 60% increase in power costs.

My understanding is that the rate is fixed under the GEM-Core agreements. Can you please provide the following:

1) Specific reference to the portion of the agreement that allows Core to adjust the rate
2) What caused the increased power rate and is it likely to recur?
3) Can you provide some proof of the actual increased power costs (e.g. power bills or other records from the utility provider)?

\*      \*      \*

> From: Joe Poore <joe.poore@gemmining.com>
> Sent: Tuesday, February 15, 2022 6:33 PM
> To: Hailun Zhang <hzhang@corescientific.com>; Core Scientific Inc. Billing <billing@corescientific.com>
> Cc: Client Success <client-success@corescientific.com>; Ryan Irvin <Ryan.Irvin@gemmining.com>; John Warren <jw@gemmining.com>
> Subject: RE: [External]Core Scientific Inc. February 2022 Hosting Invoice - GEM Mining 1 LLC
>
> [EXTERNAL] Use caution when opening attachments or links.
>
> To be clear, my prior email should be considered a written dispute of all invoices with a rate above the Services rate listed in the applicable agreement. These invoices should be considered subject to the written dispute procedures outlined in the master service agreement.

(*See id.*).

As demonstrated by the Poore Declaration and the email thread attached thereto, the GEM Mining Entities clearly submitted written notice disputing any pass-through power costs within three (3) calendar days of the date of the initial invoice on which the disputed amount appeared. Thus, the Court should reject Core's argument that the GEM Mining Entities failed to dispute the pass-through power costs under the terms of the MSAs.

### III. Core improperly charged the GEM Mining Entities pass-through power costs.

Core argues that the GEM Mining Proofs of Claim should be disallowed because they properly charged the GEM Mining Entities the pass-through power costs. Specifically, Core contends that the charges are permitted under the terms of the MSA and are consistent with industry usage, the commercial context, and the Parties' course of performance. The Court should reject each of these arguments.

As a preliminary matter, Core's arguments have been addressed for this Court in another filing at the outset of the Bankruptcy Cases. On December 28, 2022, Core filed the *Debtors' Emergency Motion for Entry of an Order Authorizing Rejection of Executory Contracts with Celsius Mining LLC* (Doc. 189) seeking approval of Core's rejection of hosting contracts with another one of its customers, Celsius Mining, LLC ("Celsius"), because Celsius was not paying Core pass-through power costs. In response, Celsius filed the *Celsius Mining LLC's Preliminary*

*Objection to the Debtors' Emergency Motion for Entry of an Order Authorizing Rejection of Executory Contracts with Celsius Mining LLC* (Doc. 265) (the "Celsius Objection") in which Celsius addressed Core's arguments that it could charge pass-through energy costs to customers.

Celsius and its affiliates are debtors in their own chapter 11 cases pending in the United States Bankruptcy Court for the Southern District of New York. At the outset of these Bankruptcy Cases, Celsius was party to a master services agreement and related order substantively identical to the MSAs and Orders between Core and the GEM Mining Entities. In 2022, Core began charging pass-through power costs to customers, such as Celsius and the GEM Mining Entities. Celsius, however, refused to pay these costs, and, therefore, Core sought to reject its contracts with Celsius in the Bankruptcy Cases.

In the Celsius Objection, Celsius notes that in its own bankruptcy case, it filed a motion to compel Core to honor the Celsius contracts, and, as a result, Celsius and Core engaged in "significant discovery" on the issue of past-through power costs. According to Celsius, Core's internal documents confirmed that Core knew it had no legal basis for unilaterally charging customers with pass-through power costs and that Core always understood the Celsius contracts imposed a "fixed" rate or "pass-through cap." In the Celsius Objection, Celsius goes on to explain in detail, "for the benefit of Core's and Celsius' stakeholders", how Core does not have any valid claim to pass-through power costs from customers. (*See* Doc. 265 at ¶¶ 11-41).

While the GEM Mining Entities have not engaged in discovery on this issue, Celsius' arguments concerning Core's ability to charge pass-through power costs under substantively identical contracts equally apply here. As a result, the GEM Mining Entities hereby adopt and incorporate Celsius' arguments in the Celsius Objection concerning Core's ability to charge pass-through power costs to customers as if fully stated herein. With that, the GEM Mining

Entities hereby address the specific points raised in the Core Objection as to the propriety of the charges.

### A. The pass-through power costs violate the unambiguous plain language of the MSAs and Orders.

Core argues that the terms of the MSAs give Core the ability to charge the GEM Mining Entities with the pass-through power costs. Core, however, does not argue that the express terms of the MSAs or Orders give Core the ability to pass through these costs. Instead, Core argues that it is permitted implicitly to pass through these costs to its customers because of Section 4(f) of the MSAs, which provides, in relevant part:

> [A]fter the Effective Date, if there are any increases, changes in, or introduction or administration of, any new taxes, levies, tariffs or governmental fees and charges with respect to the provision of Services, Company may, in its sole and absolute discretion, pass through all such amounts to Client ("**Increased Costs**") and Client shall pay all Increased Costs in accordance with the payment and invoicing procedures as set forth in this Agreement.

(*See e.g.*, MSA attached as Exhibit 1 to GEM Mining POC No. 503 at § 4(f)). Specifically, Core argues that the pass-through power costs constitute "tariffs" as that term is used in Section 4(f) of the MSAs. Core's position is inconsistent with common sense and the plain language of the MSAs.

First, Core's argued interpretation of the MSAs is inconsistent with the plain meaning of the MSAs and the Order as a whole. The MSA and Orders clearly and unambiguously provide that Core is obligated to provide the GEM Mining Entities with hosting services at a fixed, not variable, hosting-services rate. As previously explained, the Orders specified a fixed "Hosting-Services Rate" based on the amount of power consumed each month. (*See e.g.*, GEM Mining 1 Order attached as Exhibit 2 to GEM Mining POC No. 503). Accordingly, the GEM Mining Entities pay a fixed rate based upon their actual power usage, not variable rates based upon the

11

spot price of power charged to Core. *See Cox Commc's., Inc. v. T-Mobile US, Inc.*, 273 A.3d 752, 760 (Del. 2022) ("[A] 'contract's construction should be that which would be understood by an objective, reasonable third party.'").[2]

Second, Core's argument is contradicted by the plain language and common-sense reading of Section 4(f) of the MSAs. Section 4(f) allows Core to pass through a limited group of government obligations: "taxes," "levies," "tariffs," and "governmental fees and charges." (*Id.*). The traditional plain meaning of the word "tariff," as well as the context in which it is used in Section 4(f) of the MSAs, makes clear that that "tariff" refers to import or export duties. *See* TARIFF, Black's Law Dictionary (11th ed. 2019) ("A schedule or system of duties imposed by a government on imported or exported goods."); *Tariff*, Oxford English Dictionary (Online Ed.) ("[D]uties to be imposed on imports and exports"); *Tariff*, Collins Dictionary (Online Ed.) ("A tariff is a tax that a government collects on goods coming into a country.").[3] The use of the word "tariff" in Section 4(f) does not give Core the ability to unilaterally change the fixed Hosting-Services Rate set forth in the Orders by passing through increases in the variable aspects of Core's own costs to purchase power. *Rhone-Poulenc Basic Chems., Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) ("Courts will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty.").

---

[2] The MSAs provide that they are to be governed by and construed in accordance with the laws of the State of Delaware. (*See e.g.*, MSA attached as Exhibit 1 to GEM Mining POC No. 503 at § 8(f)).

[3] Core's attempt to bypass the common sense meaning of "tariff" and rely on two resources respectively published by the TexasNew Mexico Power Company and the New York State Department of Public Service is misplaced. Both of the resources cited by Core define the term "tariff" as a required filing made by a utility company with a governmental regulatory body setting forth the company's service rules and regulations. If anything, these resources bolster the fact that a tariff, like a tax, levy, or other governmental fee or charge, is a governmental obligation.

Nevertheless, even if Core's argued interpretation of the word "tariff" was appropriate, the Orders' fixed Hosting-Services Rate would still control the contract pricing because the Orders provide: "If any terms of this [Order] conflict with the terms of the [MSA], the terms of this [Order] shall govern with respect to this [Order]." (*See e.g.*, GEM Mining 1 Order attached as Exhibit 2 to GEM Mining POC No. 503). If Core could pass through increases in power costs to the GEM Mining Entities, then the fixed Hosting-Service Rate in the Orders would be transformed into a variable rate, which directly contradicts the fixed price term in the Orders. Thus, pursuant to the terms of the Orders, the fixed Hosting-Service Rate set out in the Orders controls.

Third, as more particularly detailed in the Celsius Objection, Core's argued interpretation of the MSAs and Orders makes little economic sense for the Parties. *See Viking Pump, Inc. v. Century Indem. Co.*, 2 A.3d 76, 98 n.70 (Del. Ch. 2009) ("[I]f one interpretation would lead to an absurd conclusion, then such interpretation should be abandoned and the one adopted which would accord with reason and probability." (quoting another source)). If the Parties intended to shift the risk of power-price fluctuations to the GEM Mining Entities, they could have structured the contract as a "direct pass-through" of power costs, in which the GEM Mining Entities would directly pay for power and Core would be entitled to a fixed margin. This hosting pricing structure is common in the crypto mining industry, as it allows the recipients of hosting services to capture the upside in power-price declines, as opposed to only bearing the downside of price increases. In the Core Objection, Core argues that "it is standard practice to pass through increases in electricity costs to the entity for whose benefit the miners are operating in search of bitcoin." (Doc. 854 at ¶ 31). Presumably, Core is referring to contracts utilizing these "direct

pass-through" pricing structures. Unfortunately for Core, the MSAs and Orders are not structured this way.

To the contrary, the Orders are structured to make the most economic sense for all Parties. The GEM Mining Entities agreed to a fixed Hosting-Services Rate, which provided the GEM Mining Entities stability: the GEM Mining Entities would not bear the risk of power increases or reap the benefit of power decreases. In exchange, the GEM Mining Entities agreed to pre-pay tens of millions of dollars to Core prior to the deployment of miners and to pre-pay hosting fees one month in advance. (*See e.g.*, GEM Mining 1 Order attached as Exhibit 2 to GEM Mining POC No. 503). This allowed Core to obtain cash in advance, negotiate power purchase agreements with knowledge of its hosting rates, and have resources to hedge its power costs against power cost fluctuations. The MSAs and Orders allocate the risk of power fluctuations to Core, who has the relationships with power providers and is in the best position to know when and how to hedge its power costs. For these reasons, the pass-through power costs violate the unambiguous plain language of the MSAs and Orders.

> **B. Even if the MSAs and Orders were ambiguous, extrinsic evidence establishes that pass-through power costs are improper.**

Core argues that its interpretation of the MSAs and Orders is consistent with industry usage and the Parties' course of performance. It is unnecessary for the Court to consider extrinsic evidence because the MSAs and Orders are unambiguous. Nevertheless, Core's arguments about extrinsic evidence are meritless.

First, Core argues, without providing any evidence or support, that it is standard practice for hosting firms like Core to pass through electricity price increases to customers. Presumably, Core is referring to the previously discussed "direct pass-through" pricing structure contracts, not the MSAs and Orders executed by the Parties here. Regardless, if Core wanted the ability to pass

through power costs to customers, Core could revise its form MSAs and Orders, which the GEM Mining Entities executed here, to give Core the express ability to charge its customers for these costs. As previously explained, the MSAs and Orders provide for a fixed hosting rate, which is why Core has to resort to trying to shoehorn these power charges into a definition of "tariff."

Second, Core argues that the pass-through power costs are consistent with the Parties' course of performance because the GEM Mining Entities paid the pass-through power charges for approximately one year. However, this argument ignores the plain language of the MSAs and the GEM Mining Entities' obligations thereunder. Section 3(b) of the MSAs provide that if a customer submits written notice of a disputed charge and Core determines that the amount was invoiced correctly, the customer "will pay the amount by the due date of the next invoice." (*See e.g.*, MSA attached as Exhibit 1 to GEM Mining POC No. 503 at § 3(b)). As shown by the Poore Declaration, the email thread attached thereto, and the Core Objection, Core took the position that pass-through power costs were invoiced correctly. Thus, under the terms of the MSAs and Orders, the GEM Mining Entities were required to make those payments. Moreover, Core's position ignores the fact that the GEM Mining Entities disputed the inclusion of the pass-through energy costs on any invoices under any applicable agreement. Thus, the GEM Mining Entities' compliance with the terms of the MSAs and Orders following the submission of a written notice disputing the pass-through power costs does not create a course of performance supporting Core's unreasonable interpretation of the contracts.

Finally, as explained in great detail by Celsius in the Celsius Objection, Core's "damning" internal documents, conduct, and testimony show, among other things, that Core (a) had no legal basis for charging pass-through power costs; (b) always understood that the relevant contracts imposed a "fixed" rate or "pass-through cap;" (c) conceived the idea of passing through

its increased power costs only after its hosting business became unsustainable as energy costs rose; (d) did not understand "tariff" to permit it to pass through increased power costs; (e) revised its form master services agreement at or around late 2021 to include new language allowing it to pass through increases or changes in utility costs to customers; (f) planned to migrate existing customers to the new master services agreement because of the new language allowing it to pass through such costs; and (g) lost several customers because of its decision to pass through power costs. (*See* Doc. 265 at ¶¶ 24-41).

As previously explained, the GEM Mining Entities maintain that the pass-through power costs violate the unambiguous plain language of the MSAs and Orders. However, in the event the Court determines that the terms of the MSAs and Orders are ambiguous as to Core's ability to charge the GEM Mining Entities pass-through power costs, the GEM Mining Entities request the ability to conduct discovery as to extrinsic evidence concerning the Parties' contractual relationship and pass-through power costs.

## CONCLUSION

WHEREFORE, the GEM Mining Entities respectfully requests the Court to enter an order, substantially similar to the Proposed Order attached hereto as **Exhibit B**, overruling the Core Objection, allowing the GEM Mining Proofs of Claim, and granting the GEM Mining Entities such other, further relief as the Court deems appropriate.

Respectfully submitted this the 6th day of September, 2023.

                Respectfully submitted,

                BY: */s/ Evan N. Parrott*
                    Evan N. Parrott

                    *Attorney for GEM Mining 1, LLC; GEM Mining 2, LLC; GEM Mining 2B, LLC; and GEM Mining 4, LLC*

**MAYNARD NEXSEN, P.C.**
Stephen C. Jackson, Texas Bar No. 24090637
1901 Sixth Avenue North
Suite 1700
Birmingham, AL 35203
(205) 254-1000
sjackson@maynardnexsen.com

*and*

**MAYNARD NEXSEN, P.C.**
Evan N. Parrott, Ala. Bar No. ASB-1950-O65A
(Admitted *Pro Hac Vice*)
11 North Water Street
RSA Battle House Tower
Suite 24290
Mobile, AL 36602
(251) 432-0001
eparrott@maynardnexsen.com

## CERTIFICATE OF SERVICE

     I hereby certify that I have served a copy of the foregoing on all parties identified on the Debtors' Master Service List attached hereto either via the CM/ECF system, e-mail, or regular mail on this the 6th day of September, 2023.

                                        */s/ Evan N. Parrott*
                                        *Of Counsel*