**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | § | **Chapter 11** |
|  | § | |
| **CORE SCIENTIFIC, INC.,** *et al.,* | § | **Case No. 22-90341 (DRJ)** |
|  | § | |
| **Debtors**[1] | § | **(Jointly Administered)** |
|  | § | **Re: Docket Nos. 974, 975, 1115, 1116** |
|  | | **1199, and 1200** |

**NOTICE OF FILING OF (I) SECOND AMENDED JOINT**
**CHAPTER 11 PLAN OF CORE SCIENTIFIC, INC. AND ITS**
**AFFILIATED DEBTORS AND (II) RELATED DISCLOSURE STATEMENT**

**PLEASE TAKE NOTICE** that on June 20, 2023, Core Scientific, Inc. and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), filed the *Joint Chapter 11 Plan of Core Scientific, Inc. and its Affiliated Debtors* (Docket No. 974) and the *Disclosure Statement for Joint Chapter 11 Plan of Core Scientific, Inc. and its Debtor Affiliates* (Docket No. 975).

**PLEASE TAKE FURTHER NOTICE** that on August 8, 2023, the Debtors, filed the *Amended Joint Chapter 11 Plan of Core Scientific, Inc. and its Affiliated Debtors* (Docket No. 1115) (the "**First Amended Plan**") and the *Disclosure Statement for Amended Joint Chapter 11 Plan of Core Scientific, Inc. and its Debtor Affiliates* (Docket No. 1116) (the "**Disclosure Statement for the First Amended Plan**").

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6074); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisitions, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisition I, LLC (9717); and American Property Acquisitions VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

**PLEASE TAKE FURTHER NOTICE** that on September 7, 2023, the Debtors, hereby file a revised the *Second Amended Joint Chapter 11 Plan of Core Scientific, Inc. and its Affiliated Debtors* (Docket No. 1199) (the "**Second Amended Plan**")[2] and *Disclosure Statement for Second Amended Joint Chapter 11 Plan of Core Scientific, Inc. and its Affiliated Debtors* (Docket No. 1200) (the "**Disclosure Statement for the Second Amended Plan**").

**PLEASE TAKE FURTHER NOTICE THAT** annexed hereto as **<u>Exhibit A</u>** is a changed-pages-only redline of the Second Amended Plan compared against the First Amended Plan.

**PLEASE TAKE FURTHER NOTICE THAT** annexed hereto as **<u>Exhibit B</u>** is a changed-pages-only redline of the Disclosure Statement for the Second Amended Plan compared against the Disclosure Statement for the First Amended Plan.

*[Remainder of page intentionally left blank]*

---

[2]   Capitalized terms used but not defined herein, have the meanings ascribed to them in the Second Amended Plan.

Dated: September 7, 2023
        Houston, Texas

        /s/  Alfredo R. Pérez
        WEIL, GOTSHAL & MANGES LLP
        Alfredo R. Pérez (15776275)
        Clifford Carlson (24090024)
        700 Louisiana Street, Suite 1700
        Houston, Texas 77002
        Telephone: (713) 546-5000
        Facsimile:  (713) 224-9511
        Email:  Alfredo.Perez@weil.com
                Clifford.Carlson@weil.com

        -and-

        WEIL, GOTSHAL & MANGES LLP
        Ray C. Schrock (admitted *pro hac vice*)
        Ronit J. Berkovich (admitted *pro hac vice*)
        767 Fifth Avenue
        New York, New York 10153
        Telephone:  (212) 310-8000
        Facsimile:  (212) 310-8007
        Email:   Ray.Schrock@weil.com
                 Ronit.Berkovich@weil.com

        *Attorneys for Debtors*
        *and Debtors in Possession*

3

**<u>Certificate of Service</u>**

I hereby certify that on September 7, 2023, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

<div align="right">

<u>/s/  Alfredo R. Pérez</u>

Alfredo R. Pérez

</div>

<u>**Exhibit A**</u>

**Redline of Second Amended Plan**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| **CORE SCIENTIFIC, INC.,** *et al.,* | § | Case No. 22-90341 (DRJ) |
| | § | |
| Debtors[1] | § | (Jointly Administered) |
| | § | |

**SECOND AMENDED JOINT CHAPTER 11 PLAN OF
CORE SCIENTIFIC, INC. AND ITS AFFILIATED DEBTORS**

THIS PLAN (AS MAY BE AMENDED) WILL BE SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THE INFORMATION IN THE PLAN IS SUBJECT TO CHANGE.  THIS PLAN IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY SECURITIES.

**WEIL, GOTSHAL & MANGES LLP**
Alfredo R. Pérez (15776275)
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock (admitted *pro hac vice*)
Ronit J. Berkovich (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for the Debtors
and Debtors in Possession*

Dated:  ~~August 8~~September 7, 2023
Houston, Texas

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6074); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

Table of Contents

Page

**ARTICLE I.** DEFINITIONS AND INTERPRETATION. ..................................................... 1
  A. **Definitions.** ................................................................................................................ 1
  B. **Interpretation; Application of Definitions and Rules of Construction.** ......... ~~32~~33
  C. **Computation of Time** ............................................................................................ ~~32~~34
  D. **Reference to Monetary Figures.** ......................................................................... ~~32~~34
  E. **Reference to the Debtors or the Reorganized Debtors** ................................... ~~33~~34
  F. **Controlling Document.** ......................................................................................... ~~33~~34

**ARTICLE II.** ADMINISTRATIVE EXPENSE CLAIMS, PROFESSIONAL FEE CLAIMS,
             DIP CLAIMS, AND PRIORITY TAX CLAIMS. ......................................... ~~33~~35
  2.1. *Administrative Expense Claims.* ......................................................................... ~~33~~35
  2.2. *Professional Fee Claims.* ..................................................................................... ~~33~~35
  2.3. *Priority Tax Claims.* ............................................................................................. ~~34~~35
  2.4. *DIP Claims.* ........................................................................................................... ~~34~~36
  2.5. *Restructuring Fees and Expenses and Notes Agent Fees and Expenses.* ...... ~~34~~36
  2.6. *Professional Fee Escrow.* ..................................................................................... ~~35~~36
  2.7. *Professional Fee Claims Estimate.* ..................................................................... ~~35~~37
  2.8. *Post-Effective Date Fees and Expenses.* ............................................................ ~~35~~37

**ARTICLE III.** CLASSIFICATION OF CLAIMS AND INTERESTS. ................................. ~~36~~37
  3.1. *Classification in General.* .................................................................................... ~~36~~37
  3.2. *Summary of Classification.* .................................................................................. ~~36~~37
  3.3. *Special Provision Governing Unimpaired Claims.* ............................................ ~~37~~38
  3.4. *Elimination of Vacant Classes.* ........................................................................... ~~37~~38
  3.5. *No Waiver.* ............................................................................................................. ~~37~~39
  3.6. *Voting Classes; Presumed Acceptance by Non-Voting Classes.* ...................... ~~37~~39
  3.7. *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.* .............. ~~37~~39
  3.8. *Substantive Consolidation of Certain Debtors.* ................................................ ~~37~~39

**ARTICLE IV.** TREATMENT OF CLAIMS AND INTERESTS. ......................................... ~~38~~39
  4.1. *April Convertible Notes Secured Claims (Class 1).* .......................................... ~~38~~39
  4.2. *August Convertible Notes Secured Claims (Class 2).* ....................................... ~~39~~40
  4.3. *Miner Equipment Lender Secured Claims (Class 3).* ........................................ ~~39~~41
  4.4. *Other Secured Claims (Class 4).* ......................................................................... ~~40~~42
  4.5. *M&M Lien Secured Claims (Class 5).* ................................................................ ~~41~~42
  4.6. *Secured Mortgage Claims (Class 6).* .................................................................. ~~42~~43
  4.7. *Priority Non-Tax Claims (Class 7).* .................................................................... ~~43~~44
  4.8. *General Unsecured Claims (Class 8).* ................................................................. ~~43~~44
  4.9. *B. Riley Unsecured Claims (Class 9)* .................................................................. ~~43~~45
  4.10. *Intercompany Claims (Class 10).* ...................................................................... ~~44~~45
  4.11. *Intercompany Interests (Class 11).* ................................................................... ~~44~~45
  4.12. *Section 510(b) Claims (Class 12).* ..................................................................... ~~45~~46
  4.13. *Existing Common Interests (Class 13).* ............................................................. ~~45~~46

**ARTICLE V.** MEANS FOR IMPLEMENTATION. ............................................................ ~~45~~46
  5.1. *Compromise and Settlement of Claims, Interests, and Controversies.* ............ ~~45~~46
  5.2. *Continued Corporate Existence; Effectuating Documents; Corporate Action;*
       *Restructuring Transactions.* ................................................................................ ~~46~~47
  5.3. *Intercompany Interests~~; Corporate Reorganization~~.* ..................................... ~~47~~48

Table of Contents
(continued)

5.4.    *Authorization and Issuance of New April Secured Notes (Option 1Default).*...................... 4748
5.5.    *Authorization and Issuance of New August Secured Notes (Option 1Default).*.................. 4849
5.6.    *Authorization and Issuance of New April Secured Notes (Option 2Settlement Election).*........................................................................................................ 4950
5.7.    *Authorization and Issuance of New August Secured Notes (Option 2Settlement Election).*........................................................................................................ 5051
5.8.    *New Notes Indenture.*........................................................................................ 52
5.89.   *New Miner Equipment Lender Debt Facilities.*.................................................. 5153
5.95.10.*Exit Facility.*...................................................................................................... 5254
5.101.  *New B. Riley ELOC Facility.*.............................................................................. 5254
5.112.  *New Intercreditor Agreements.*.......................................................................... 5355
5.123.  *Substantive Consolidation of Certain Debtors.*................................................. 5355
5.134.  *Miner Equipment Lender Settlement.*................................................................ 5456
5.145.  *Brown Settlement.*............................................................................................. 5457
5.156.  *Holliwood Settlement.*........................................................................................ 5557
5.167.  *B. Riley Settlement.*........................................................................................... 5558
5.178.  *Foundry Settlement.*.......................................................................................... 5658
5.189.  *Rights Offering*.................................................................................................. 5660
5.1920.20.  *Exemption from Securities Laws.*................................................................ 5760
5.201.  *Cancellation of Existing Securities and Agreements.*....................................... 5862
5.212.  *Cancellation of Liens.*....................................................................................... 5962
5.223.  *Officers and Boards of Directors.*..................................................................... 5963
5.234.  *Management Incentive Plan.*............................................................................. 6063
5.245.  *Authorization, Issuance, and Delivery of New Common Interests and New Warrants; New Listing.*........................................................................................ 6064
5.256.  *Nonconsensual Confirmation.*........................................................................... 6164
5.267.  *Closing of the Chapter 11 Cases.*...................................................................... 6164
5.278.  *Notice of Effective Date.*................................................................................... 6165

**ARTICLE VI.** DISTRIBUTIONS....................................................................................... 6165
6.1.    *Distributions Generally.*.................................................................................... 6165
6.2.    *Distribution Record Date.*................................................................................. 6165
6.3.    *Date of Distributions.*....................................................................................... 6266
6.4.    *Disbursing Agent.*............................................................................................. 6266
6.5.    *Rights and Powers of Disbursing Agent.*.......................................................... 6366
6.6.    *Expenses of Disbursing Agent.*.......................................................................... 6367
6.7.    *No Postpetition Interest on Claims.*.................................................................. 6367
6.8.    *Delivery of Distributions.*.................................................................................. 6367
6.9.    *Distributions after Effective Date.*.................................................................... 6468
6.10.   *Unclaimed Property.*.......................................................................................... 6468
6.11.   *Time Bar to Cash Payments.*............................................................................. 6468
6.12.   *Manner of Payment under Plan.*....................................................................... 6568
6.13.   *Satisfaction of Claims.*...................................................................................... 6568
6.14.   *Fractional Stock and Notes.*.............................................................................. 6568
6.15.   *Minimum Cash Distributions.*........................................................................... 6569
6.16.   *Setoffs and Recoupments.*................................................................................. 6569
6.17.   *Allocation of Distributions between Principal and Interest.*............................. 6669

Table of Contents
(continued)

| 6.18. | *No Distribution in Excess of Amount of Allowed Claim or Existing Common Interest*. | 6669 |
| 6.19. | *Withholding and Reporting Requirements*. | 6670 |
| **ARTICLE VII.** | PROCEDURES FOR DISPUTED CLAIMS. | 6770 |
| 7.1. | *Disputed Claims Generally*. | 6770 |
| 7.2. | *Objections to Claims*. | 6771 |
| 7.3. | *Estimation of Claims*. | 6771 |
| 7.4. | *Adjustment to Claims Register Without Objection*. | 6871 |
| 7.5. | *Disallowance of Claims*. | 6871 |
| 7.6. | *No Distributions Pending Allowance*. | 6872 |
| 7.7. | *Distributions after Allowance*. | 6872 |
| 7.8. | *Claim Resolution Procedures Cumulative*. | 6872 |
| 7.9. | *Disputed Claims Reserves*. | 6872 |
| 7.10. | *Single Satisfaction of Claims and Interests*. | 7073 |
| 7.11. | *Amendments to Claims*. | 7073 |
| **ARTICLE VIII.** | EXECUTORY CONTRACTS AND UNEXPIRED LEASES. | 7073 |
| 8.1. | *General Treatment*. | 7073 |
| 8.2. | *Determination of Assumption and Cure Disputes and Deemed Consent*. | 7174 |
| 8.3. | *Rejection Claims*. | 7275 |
| 8.4. | *Survival of the Debtors' Indemnification Obligations*. | 7276 |
| 8.5. | *Employee Arrangements and Employee Obligations*. | 7376 |
| 8.6. | *Insurance Policies/Claims Payable By Third Parties*. | 7578 |
| 8.7. | *Intellectual Property Licenses and Agreements*. | 7679 |
| 8.8. | *Assignment*. | 7679 |
| 8.9. | *Modifications, Amendments, Supplements, Restatements, or Other Agreements*. | 7680 |
| 8.10. | *Reservation of Rights*. | 7680 |
| **ARTICLE IX.** | CONDITIONS PRECEDENT TO EFFECTIVE DATE. | 7780 |
| 9.1. | *Conditions Precedent to the Effective Date*. | 7780 |
| 9.2. | *Timing of Conditions Precedent*. | 7881 |
| 9.3. | *Waiver of Conditions Precedent*. | 7881 |
| 9.4. | *Effect of Failure of a Condition*. | 7882 |
| **ARTICLE X.** | EFFECT OF CONFIRMATION OF PLAN. | 7882 |
| 10.1. | *Vesting of Assets in the Reorganized Debtors*. | 7882 |
| 10.2. | *Binding Effect*. | 7982 |
| 10.3. | *Discharge of Claims and Termination of Interests*. | 7982 |
| 10.4. | *Term of Injunctions or Stays*. | 7983 |
| 10.5. | *Injunction*. | 8083 |
| 10.6. | *Releases*. | 8184 |
| 10.7. | *Exculpation*. | 8386 |
| 10.8. | *Retention of Causes of Action/Transfer of Causes of Action and Reservation of Rights*. | 8487 |
| 10.9. | *Ipso Facto and Similar Provisions Ineffective*. | 8487 |
| 10.10. | *Solicitation of Plan*. | 8488 |
| 10.11. | *Corporate and Limited Liability Company Action*. | 8488 |

Table of Contents
(continued)

Page

**ARTICLE XI.** RETENTION OF JURISDICTION. ............................................. ~~85~~88
    11.1. *Retention of Jurisdiction*. ....................................................... ~~85~~88
    11.2. *Courts of Competent Jurisdiction*. ............................................ ~~86~~90

**ARTICLE XII.**             MISCELLANEOUS PROVISIONS. ............................ ~~87~~90
    12.1. *Payment of Statutory Fees*. ..................................................... ~~87~~90
    12.2. *Substantial Consummation of the Plan*. .................................. ~~87~~90
    12.3. *Request for Expedited Determination of Taxes*. ....................... ~~87~~91
    12.4. *Exemption from Certain Transfer Taxes*. .................................. ~~87~~91
    12.5. *Amendments*. ........................................................................... ~~88~~91
    12.6. *Effectuating Documents and Further Transactions*. ................. ~~88~~92
    12.7. *Revocation or Withdrawal of the Plan*. ..................................... ~~88~~92
    12.8. *Severability of Plan Provisions*. ............................................... ~~88~~92
    12.9. *Governing Law*. ....................................................................... ~~89~~92
    12.10. *Time*. ........................................................................................ ~~89~~      92
    12.11. *Dates of Actions to Implement the Plan*. ................................. ~~89~~93
    12.12. *Immediate Binding Effect*. ....................................................... ~~89~~93
    12.13. *Deemed Acts*. .......................................................................... ~~89~~      93
    12.14. *Successor and Assigns*. ............................................................ ~~89~~93
    12.15. *Entire Agreement*. .................................................................... ~~90~~93
    12.16. *Exhibits to Plan*. ~~90~~93
    12.17. *Dissolution of Creditors' Committee and Equity Committee*. ... ~~90~~93
    12.18. *Notices*. .................................................................................... ~~90~~      94

iv

Each of Core Scientific, Inc.; Core Scientific Mining LLC; Core Scientific Acquired Mining LLC; Core Scientific Operating Company; Radar Relay, Inc.; Core Scientific Specialty Mining (Oklahoma) LLC; American Property Acquisition, LLC; Starboard Capital LLC; RADAR LLC; American Property Acquisitions I, LLC; and American Property Acquisitions VII, LLC (each, a "***Debtor***" and, collectively, the "***Debtors***") proposes the following joint chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code.  Capitalized terms used herein shall have the meanings set forth in Article I.A.  Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan, the settlements and transactions contemplated thereby, and certain related matters.  The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I.** 　　　**DEFINITIONS AND INTERPRETATION**.

A. 　　**Definitions.** The following terms shall have the respective meanings specified below:

~~*1.1 "1145 Rights Offering"* means the portion of the Rights Offering to be conducted in reliance upon the exemption from registration under the Securities Act provided in section 1145 of the Bankruptcy Code, in such amount that the New Common Interests issued pursuant to the 1145 Rights Offering are principally in exchange for a Claim or Interest pursuant to section 1145 of the Bankruptcy Code.~~

~~*1.2 "1145 Subscription Rights"* means the Rights Offering Subscription Rights to be distributed pursuant to the 1145 Rights Offering.~~

*1.1* 　　*1.3* "***2018 Equity Plan***" means the Core Scientific, Inc. 2018 Omnibus Incentive Plan f/k/a MineCo Holdings, Inc. 2018 Omnibus Incentive Plan.

*1.2* 　　*1.4* "***2021 Equity Plan***" means the Core Scientific, Inc. 2021 Equity Incentive Plan.

*1.3* 　　*1.5* "***36th Street Miner Agreement***" means that certain Equipment Schedule No. 13, dated December 17, 2021, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and Core Scientific Holding Co. (now known as Core Scientific, Inc.), on one hand, and Liberty Commercial Finance LLC, on the other hand, issued in connection with the Liberty Master Lease Agreement and subsequently assigned by Liberty Commercial Finance LLC to 36th Street Capital Partners LLC pursuant to that certain Notice and Acknowledgement of Assignment.  For the avoidance of doubt, (i) the 36th Street Miner Agreement is not an Unexpired Lease and is a financing agreement and (ii) the equipment that is the subject of the 36th Street Miner Agreement are Assets owned by the applicable Debtor.

*1.4* 　　*1.6* "***36th Street Non-Miner Agreements***" means, collectively, (i) that certain Equipment Lease Schedule No. 002, dated December 6, 2019, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and 36th Street Capital Partners, LLC, issued in connection with that certain Master Lease Agreement, dated July 18, 2019, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and 36th Street Capital Partners, LLC and (ii) that certain Equipment Lease Schedule No. 004 (including the First Amendment to Equipment Lease Schedule No. 4), dated December 27, 2019, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and 36th Street Capital Partners, LLC, issued in connection with that certain Master

Lease Agreement, dated July 18, 2019, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and 36th Street Capital Partners, LLC.  For the avoidance of doubt, (i) the 36th Street Non-Miner Agreements are not Unexpired Leases and are financing agreements and (ii) the equipment that is the subject of the 36th Street Non-Miner Agreements are Assets owned by the applicable Debtor.

~~1.7 "4(a)(2)/Reg D Rights Offering" means the portion of the Rights Offering to be conducted in reliance upon the exemption from registration under the Securities Act provided in section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder, in such amount that is equal to the total size of the Rights Offering minus the size of the 1145 Rights Offering.~~

~~1.8 "4(a)(2)/Reg D Subscription Rights" means the Rights Offering Subscription Rights to be distributed pursuant to the 4(a)(2)/Reg D Rights Offering.~~

~~1.9 "Accepting Class" means a Class that votes to accept the Plan in accordance with section 1126 of the Bankruptcy Code.~~

*1.5* ~~1.10~~ **"Ad Hoc Noteholder Group"** means the ad hoc group of certain Convertible Noteholders, or investment advisors, subadvisors, or managers of discretionary accounts that hold Convertible Notes, which is represented by the Ad Hoc Noteholder Group Advisors.

*1.6* ~~1.11~~ **"Ad Hoc Noteholder Group Advisors"** means (i) Paul Hastings LLP and (ii) Moelis & Company LLC.

*1.7* ~~1.12~~ **"Administrative Expense Claim"** means any Claim for a cost or expense of administration incurred during the Chapter 11 Cases pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries or commissions for services and payments for good and other services and leased premises) and (b) Professional Fee Claims.  For the avoidance of doubt, the Backstop Commitment Premium payable to the respective Backstop Parties in accordance with Backstop Order, are Allowed Administrative Expense Claims; *provided*, that the Backstop Commitment Premium shall be satisfied in accordance with the terms of the Backstop Order.

*1.8* ~~1.13~~ **"Affiliate"** shall, with respect to an Entity, have the meaning set forth in section 101(2) of the Bankruptcy Code as if such Entity were a debtor in a case under the Bankruptcy Code.

*1.9* ~~1.14~~ **"Allowed"** means, with respect to any Claim, except as otherwise provided herein: (i) a Claim that is evidenced by a Proof of Claim Filed by the applicable Bar Date established in the Chapter 11 Cases (or for which Claim under the Plan, the Bankruptcy Code or a Final Order of the Bankruptcy Court, a Proof of Claim explicitly is not or shall not be required to be Filed); (ii) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed that asserts a Claim different in amount or priority from that listed in the Schedule; or (iii) a Claim Allowed pursuant to the Plan or a Final Order; *provided* that with respect to a Claim described in clauses (i) and (ii) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim, no objection to the allowance thereof has been interposed by the Claim Objection Deadline; *provided*, *further* that notwithstanding the foregoing, (x) unless expressly waived by the Plan, the Allowed amount of Claims shall be subject to and shall not exceed the limitations under or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable, and (y) the Reorganized Debtors shall retain all claims and

defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan. "Allow," "Allowing," and "Allowance," shall have correlative meanings.

1.10 ~~1.15~~ "**Allowed August Convertible Notes Secured Claims Amount**" means (i) the aggregate amount of (a) $325,167,300.73, which is the sum of the principal amount of August Convertible Notes plus accrued and unpaid interest at ten percent (10%) per annum through the Petition Date, plus (b) accrued interest at ten percent (10%) from the Petition Date through the Effective Date or (ii) such higher amount as determined by Final Order.

1.11 ~~1.16~~ "**Allowed M&M Lien Secured Claims Amounts**" means the amounts set forth on the M&M Lien Claims Schedule in the column titled "Amount of Allowed M&M Lien Secured Claim."

1.12 ~~1.17~~ "**Allowed Miner Equipment Lender Deficiency Claims Amounts**" means the amounts set forth on the Miner Equipment Lender Claims Schedule in the column titled "Allowed Deficiency Claim (as of the Petition Date)."

1.13 ~~1.18~~ "**Allowed Miner Equipment Lender Secured Claims Amounts**" means the amounts set forth on the Miner Equipment Lender Claims Schedule in the column titled "Allowed Secured Claim (as of the Petition Date)."

1.14 ~~1.19~~ "**Allowed Non-Settled April Convertible Notes Secured Claims Amount**" means (i) the aggregate amount of (a) $239,626,200.28, which is the sum of the principal amount of April Convertible Notes plus accrued and unpaid interest at ten percent (10%) per annum through the Petition Date, plus (b) accrued interest at ten percent (10%) from the Petition Date through the Effective Date or (ii) such higher amount as determined by Final Order.

1.15 ~~1.20~~ "**Allowed Secured Mortgage Claims Amounts**" means the amounts set forth on the Secured Mortgage Claims Schedule in the column titled "Allowed Secured Claim (as of Petition Date)."

1.16 ~~1.21~~ "**Anchorage Agreements**" means, collectively, (i) that certain Equipment Loan and Security Agreement, dated March 11, 2022, by and between Core Scientific, Inc. and Anchorage Lending CA, LLC and that certain Promissory Note, dated March 11, 2022, issued in connection therewith and (ii) that certain Equipment Loan and Security Agreement, dated May 23, 2022, by and between Core Scientific, Inc. and Anchorage Lending CA, LLC and that certain Promissory Note, dated May 23, 2022, issued in connection therewith.

1.17 "***April Convertible Noteholder Treatment Settlement Election***" has the meaning set forth in section 4.1(c) hereof.

1.18 ~~1.22~~ "**April Convertible Notes**" means the secured convertible notes issued pursuant to the April NPA.

1.19 ~~1.23~~ "**April Convertible Notes Secured Claims**" means any Claim arising under or related to the April NPA.

1.20 ~~1.24~~ "**April NPA**" means that certain Secured Convertible Note Purchase Agreement, dated April 19, 2021, by and among Core Scientific Holding Co. (now known as Core Scientific, Inc.), as issuer, the guarantors thereof, the Notes Agent, and the purchasers of the notes issued thereunder, as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time, and including all related credit documents.

*1.21*   ~~*1.25*~~ **"Asset"** means all of the rights, title, and interests of a Debtor in and to property of whatever type or nature, including real, personal, mixed, intellectual, tangible, and intangible property.

*1.22*   ~~*1.26*~~ **"Assumption Dispute"** means an unresolved objection regarding assumption, Cure Amount, "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), or any other issue relating to assumption of an Executory Contract or Unexpired Lease.

*1.23*   **"August Convertible Noteholder Treatment Settlement Election"** has the meaning set forth in section 4.2(c) hereof.

*1.24*   ~~*1.27*~~ **"August Convertible Notes"** means the secured convertible notes issued pursuant to the August NPA.

*1.25*   ~~*1.28*~~ **"August Convertible Notes Secured Claims"** means any Claim arising under or related to the August NPA.

*1.26*   ~~*1.29*~~ **"August NPA"** means that certain Convertible Note Purchase Agreement, dated on or about August 20, 2021, by and among Core Scientific Holding Co. (now known as Core Scientific, Inc.), as issuer, the guarantors thereof, the Notes Agent, and the purchasers of the notes issued thereunder, as may be amended, restated, amended and restated, supplemented, or otherwise modified form time to time, and including all related credit documents.

*1.27*   ~~*1.30*~~ **"Avoidance Actions"** means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors arising under chapter 5 of the Bankruptcy Code, including sections 502(d), 544, 545, 547, 548, 549, 550, 551, and 553(b) of the Bankruptcy Code and applicable non-bankruptcy law.

*1.28*   ~~*1.31*~~ **"Backstop Commitment"** means a "Commitment" as defined in the Backstop Commitment Agreement.

*1.29*   ~~*1.32*~~ **"Backstop Commitment Agreement"** means that certain Backstop Commitment Agreement, dated as of [●], entered into by the Debtors and the Backstop Parties, as the same may be amended, restated, or otherwise modified in accordance with its terms, and approved by the Bankruptcy Court pursuant to the Backstop Order.

*1.30*   ~~*1.33*~~ **"Backstop Commitment Premium"** means the aggregate amount of $~~[●]~~5,500,000 to be paid to the Backstop Parties on the Effective Date in the form of New Common Interests ~~issued~~, pursuant to the terms and conditions in this Plan and the Backstop Commitment Agreement.

*1.31*   ~~*1.34*~~ **"Backstop Order"** means the *Order (I) Authorizing the Debtors to Enter into Backstop Commitment Agreement, (II) Approving All Obligations Thereunder, and (III) Granting Related Relief* (Docket No. [●]).

*1.32*   ~~*1.35*~~ **"Backstop Parties"** means those parties that agree to backstop the Rights Offering pursuant to the Backstop Commitment Agreement, each in its respective capacity as such.

*1.33*   ~~*1.36*~~ **"Backstop Shares"** means the Rights Offering Shares purchased by the Backstop Parties pursuant to their respective Backstop Commitments as set forth in and in accordance with the terms of the Backstop Commitment Agreement.

1.34    ~~1.37~~ "*Ballot*" means the form distributed to each holder of a Claim or Interest in a Class entitled to vote on the Plan (as set forth herein), on which is to be indicated, among other things, acceptance or rejection of the Plan.

1.35    ~~1.38~~ "*Bank of the West Agreement*" means that certain Equipment Financing Agreement, dated March 15, 2021, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and Bank of the West.

1.36    ~~1.39~~ "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. § 101, *et seq.*, as amended from time to time, as applicable to the Chapter 11 Cases.

1.37    ~~1.40~~ "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division having jurisdiction over the Chapter 11 Cases, and to the extent of any reference made under section 157 of title 28 of the United States Code or if the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

1.38    ~~1.41~~ "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code and any Local Bankruptcy Rules of the Bankruptcy Court, in each case, as amended from time to time and applicable to the Chapter 11 Cases.

1.39    ~~1.42~~ "*Bar Date*" means, collectively, the General Bar Date and the Governmental Bar Date.

1.40    ~~1.43~~ "*Bar Date Order*" means the *Order (I) Establishing Deadlines to File Proofs of Claim and (II) Approving Form and Manner of Notice Thereof* (Docket No. 652).

1.41    ~~1.44~~ "*Barings Agreements*" means, collectively, (i) that certain Collateral Schedule No. 1, dated March 24, 2022, by and between Core Scientific, Inc. and Barings BDC, Inc., issued in connection with that certain Master Security Agreement, dated March 24, 2022, by and between Core Scientific, Inc., on one hand, and Barings BDC, Inc., Barings Capital Investment Corporation, and Barings Private Credit Corp., on the other hand, and as amended by that certain Amendment No. 1 to Collateral Schedule No. 1, dated August 12, 2022, by and between Core Scientific Inc. and Barings BDC, Inc., (ii) that certain Collateral Schedule No. 2, dated March 24, 2022, by and between Core Scientific, Inc. and Barings Capital Investment Corporation, issued in connection with that certain Master Security Agreement, dated March 24, 2022, by and between Core Scientific, Inc., on one hand, and Barings BDC, Inc., Barings Capital Investment Corporation, and Barings Private Credit Corp., on the other hand, and as amended by that certain Amendment No. 1 to Collateral Schedule No. 2, dated August 12, 2022, by and between Core Scientific Inc. and Barings Capital Investment Corporation, (iii) that certain Collateral Schedule No. 3, dated March 24, 2022, by and between Core Scientific, Inc. and Barings Private Credit Corp., issued in connection with that certain Master Security Agreement, dated March 24, 2022, by and between Core Scientific, Inc., on one hand, and Barings BDC, Inc., Barings Capital Investment Corporation, and Barings Private Credit Corp., on the other hand, and as amended by that certain Amendment No. 1 to Collateral Schedule No. 3, dated August 12, 2022, by and between Core Scientific Inc. and Barings Private Credit Corp., (iv) that certain Collateral Schedule No. 4, dated April 27, 2022, by and between Core Scientific, Inc. and Barings BDC Inc., issued in connection with that certain Master Security Agreement, dated March 24, 2022, by and between Core Scientific, Inc., on one hand, and Barings BDC, Inc., Barings Capital Investment Corporation, and Barings Private Credit Corp., on the other hand, and as amended by that certain Amendment No. 1 to Collateral Schedule No. 4, dated August 12, 2022, by and between Core Scientific Inc. and Barings BDC Inc., (v) that certain Collateral Schedule

No. 5, dated April 27, 2022, by and between Core Scientific, Inc. and Barings Capital Investment Corporation, issued in connection with that certain Master Security Agreement, dated March 24, 2022, by and between Core Scientific, Inc., on one hand, and Barings BDC, Inc., Barings Capital Investment Corporation, and Barings Private Credit Corp., on the other hand, and as amended by that certain Amendment No. 1 to Collateral Schedule No. 5, dated August 12, 2022, by and between Core Scientific Inc. and Barings Capital Investment Corporation, and (vi) that certain Collateral Schedule No. 6, dated April 27, 2022, by and between Core Scientific, Inc. and Barings Private Credit Corp., issued in connection with that certain Master Security Agreement, dated March 24, 2022, by and between Core Scientific, Inc., on one hand, and Barings BDC, Inc., Barings Capital Investment Corporation, and Barings Private Credit Corp., on the other hand, and as amended by that certain Amendment No. 1 to Collateral Schedule No. 6, dated August 12, 2022, by and between Core Scientific Inc. and Barings Private Credit Corp.

*1.42*   ~~*1.45*~~ **"Bitmain Transaction"** means the transaction described in the *Debtors' Motion for Entry of an Order (I) Authorizing Core Scientific, Inc.'s Entry Into Asset Purchase Agreement and (II) Granting Related Relief* (Docket No. [●]) and approved by the Bankruptcy Court pursuant to the *Order (I) Authorizing Core Scientific, Inc.'s Entry Into Asset Purchase Agreement and (II) Granting Related Relief* (Docket No. [●]).

*1.43*   ~~*1.46*~~ **"BlockFi Agreements"** means those certain Facility and Security Agreements, each dated December 30, 2021, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and BlockFi Lending LLC.

*1.44*   ~~*1.47*~~ **"Bremer Agreements"** means (i) that certain Loan Agreement, dated October 4, 2021, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and Bremer Bank, National Association, as amended by that certain 2021 Amendment to Loan Agreement, dated December 10, 2021, (ii) that certain Security Agreement, dated October 4, 2021, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and Bremer Bank, National Association, as amended by that certain Leasehold Mortgage Modification Agreement and Extension Affidavit, dated December 10, 2021, (iii) those certain Promissory Notes, dated October 4, 2021, October 4, 2021, and December 10, 2021, issued in connection therewith, and (iv) those certain other Loan Documents (as defined in the Loan Agreement described in clause (i) hereof).

*1.45*   ~~*1.48*~~ **"Bremer Secured Claim"** means the Claim held by Bremer Bank, National Association arising from the Bremer Agreements.

*1.46*   ~~*1.49*~~ **"Brown Agreement"** means that certain Purchase Money Deed to Secured Debt, dated September 28, 2018, by and between American Property Acquisitions VI, LLC (and assigned by operation of law to American Property Acquisition, LLC, the sole member of American Property Acquisitions VI, LLC, following the dissolution of American Property Acquisitions VI, LLC) and Brown Corporation, securing the indebtedness evidenced by that certain Promissory Note, dated September 28, 2018, issued in connection therewith, which is secured by that certain facility leased by the Core Scientific Operating Company located in Dalton, Georgia.

*1.47*   ~~*1.50*~~ **"Brown Settlement"** means the settlement of all Claims and controversies among the Debtors and Brown Corporation and the consideration given or received, as applicable, by each as set forth in the Plan and as summarized in section ~~5.14~~5.15 hereof.

1.48   1.51 "**Business Day**" means any day other than a Saturday, Sunday, "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or day on which banking institutions in New York, New York are authorized by law or other governmental action to close.

1.49   1.52 "**B. Riley Unsecured Claims**" means any Claim arising under or related to (i) that certain Bridge Promissory Note, dated April 7, 2022, by and between Core Scientific, Inc. and B. Riley Commercial Capital, LLC, as amended by that certain Amended and Restated Bridge Promissory Note, dated August 1, 2022, by and between Core Scientific, Inc. and B. Riley Commercial Capital, LLC and (ii) that certain Bridge Promissory Note, dated April 7, 2022, by and between Core Scientific, Inc. and BRF Finance Co, LLC, as amended by that certain Amended and Restated Bridge Promissory Note, dated August 1, 2022, by and between Core Scientific, Inc. and BRF Finance Co, LLC.

1.50   1.53 "**B. Riley Settlement**" means the settlement of all Claims and controversies among the Debtors, on one hand, and B. Riley Commercial Capital, LLC and BRF Finance Co, LLC, on the other hand, and the consideration given or received, as applicable, by each as set forth in the Plan and as summarized in section 5.16 5.17 hereof.

1.51   1.54 "**Cash**" means the legal tender of the United States of America.

1.52   1.55 "**Causes of Action**" means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, proceeding, demand, right, lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), choate or inchoate, reduced to judgment or otherwise, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including, without limitation, under any state or federal securities laws). Causes of Action also includes: (i) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (ii) the right to object to Claims or Interests; (iii) any claim pursuant to section 362 of the Bankruptcy Code; (iv) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; (v) any state law fraudulent transfer claim; and (vi) any Avoidance Actions.

1.53   1.56 "**Chapter 11 Cases**" means, with respect to a Debtor, such Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Bankruptcy Court, jointly administered with all other Debtors' cases under chapter 11 of the Bankruptcy Code.

1.54   1.57 "**Claim**" has the meaning set forth in section 101(5) of the Bankruptcy Code, as against any Debtor.

1.55   1.58 "**Claim Objection Deadline**" means the deadline for objecting to Filed Proofs of Claim or scheduled claims, which shall be, unless otherwise extended pursuant to the Plan (i) the one hundred eightieth (180th) day following the later of (a) the Effective Date and (b) the date that a Proof of Claim is Filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a Holder of such Claim; or (ii) such later date as may be fixed by the Bankruptcy Court; *provided*, *however*, that the Debtors may extend the Claim Objection Deadline for an additional ninety (90) days in their sole discretion upon the filing of a notice with the Bankruptcy Court, with further extensions thereafter permitted after notice and a hearing.

1.56     1.59 **"Claims and Noticing Agent"** means Stretto, Inc., the claims, noticing, and solicitation agent retained by the Debtors pursuant to the *Order Authorizing the Employment and Retention of Stretto, Inc. as Claims, Noticing, and Solicitation Agent* (Docket No. 28).

1.57     1.60 **"Class"** means any group of Claims or Interests classified as set forth in Article III of the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

1.58     1.61 **"Collateral"** means any Asset of an Estate that is subject to a Lien securing the payment or performance of a Claim, which Lien is not invalid and has not been avoided under the Bankruptcy Code or applicable nonbankruptcy law.

1.59     1.62 "**Company**" means, collectively, the Debtors and their non-Debtor Affiliates.

1.60     1.63 **"Confirmation"** means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

1.61     1.64 **"Confirmation Date"** means the date on which the Bankruptcy Court enters the Confirmation Order.

1.62     1.65 **"Confirmation Hearing"** means the hearing to be held by the Bankruptcy Court to consider Confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.63     1.66 **"Confirmation Order"** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.64     1.67 **"Convertible Noteholders"** means Holders of the April Convertible Notes and/or the August Convertible Notes.

1.65     1.68 **"Convertible Notes"** means, collectively, the August Convertible Notes and the April Convertible Notes.

1.66     1.69 **"Convertible Notes Agreements"** means, collectively, the April NPA and the August NPA.

1.67     1.70 **"Convertible Notes Secured Claims"** means, collectively, the April Convertible Notes Secured Claims and the August Convertible Notes Secured Claims.

1.68     1.71 **"Creditors' Committee"** means the official committee of unsecured creditors of the Debtors, appointed by the U.S. Trustee in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code on January 9, 2023 (Docket No. 256) and reconstituted on February 3, 2023 (Docket No. 456), the membership of which may be further reconstituted from time to time.

1.69     1.72 **"Cure"** means the payment of Cash by the Debtors, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to (i) cure a monetary default by the Debtors in accordance with the terms of an Executory Contract or Unexpired Lease of the Debtors and (ii) permit the Debtors to assume such Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code.

1.70     1.73 **"Cure Amount"** means the payment of Cash by the Debtors, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to (i) cure a monetary default by the Debtors in accordance with the terms of an Executory Contract or Unexpired

Lease of the Debtors and (ii) permit the Debtors to assume such Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code.

*1.71*   ~~*1.74*~~ "**Cure Notice**" means a notice to parties to Executory Contracts or Unexpired Leases to be assumed or assumed and assigned reflecting the Debtors' intention to potentially assume or assume and assign the contract or lease in connection with the Plan and, where applicable, setting forth the proposed Cure Amount (if any).

*1.72*   ~~*1.75*~~ "**D&O Policy**" means, collectively, all insurance policies (including any "tail policy") issued or providing coverage to any of the Debtors for current or former directors', managers', and officers' liability, and all agreements, documents, or instruments related thereto.

*1.73*   ~~*1.76*~~ "**Debtor or Debtors**" has the meaning set forth in the introductory paragraph of the Plan.

*1.74*   ~~*1.77*~~ "**Debtors in Possession**" means the Debtors in their capacity as debtors in possession in the Chapter 11 Cases pursuant to sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

*1.75*   "**Default April Convertible Noteholder Treatment**" has the meaning set forth in section 4.1(c) hereof.

*1.76*   "**Default August Convertible Noteholder Treatment**" has the meaning set forth in section 4.2(c) hereof.

*1.77*   ~~*1.78*~~ "**Default Miner Equipment Lender Treatment**" has the meaning set forth in section 4.3 hereof.

*1.78*   ~~*1.79*~~ "**Default Mortgage Treatment**" has the meaning set forth in section 4.6 hereof.

*1.79*   ~~*1.80*~~ "**Dell Agreements**" means that certain Payment Agreement, dated February 25, 2021, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and Dell Financial Services L.L.C.

*1.80*   ~~*1.81*~~ "**DIP Agent**" means B. Riley Commercial Capital, LLC, solely in its capacity as administrative agent and collateral agent under the DIP Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Credit Agreement.

*1.81*   ~~*1.82*~~ "**DIP Claims**" means all Claims held by the DIP Lenders or the DIP Agent on account of, arising under, or relating to the DIP Credit Agreement, the DIP Facility, or the DIP Order, including Claims for all principal amounts outstanding, and any and all fees, interest, expenses, indemnification obligations, reimbursement obligations, and other amounts due under the DIP Loan Documents, which, for the avoidance of doubt, shall include all "Replacement DIP Obligations" as such term is defined in the DIP Order.

*1.82*   ~~*1.83*~~ "**DIP Commitment**" shall have the meaning ascribed to the term "DIP Term Loan Commitment" in the DIP Credit Agreement.

*1.83*   ~~*1.84*~~ "**DIP Credit Agreement**" means that certain *Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement*, dated February 27, 2023, by and among Core Scientific, Inc., as borrower, the other guarantors party thereto, the DIP Agent, and the DIP

Lenders, as approved by the DIP Order, as may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms.

    *1.84*   ~~*1.85*~~ "**DIP Facility**" means the multiple-draw term-loan credit facility with aggregate DIP Commitment of $70,000,000, as approved by the DIP Order.

    *1.85*   ~~*1.86*~~ "**DIP Lenders**" means the lenders from time to time party to the DIP Credit Agreement.

    *1.86*   ~~*1.87*~~ "**DIP Loan Documents**" means the Replacement DIP Loan Documents (as defined in the DIP Order).

    *1.87*   ~~*1.88*~~ "**DIP Order**" means, as applicable, the *Final Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Non-Priming Superpriority Replacement Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims With Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* (Docket No. 608) or the *Order (I) Authorizing the Debtors on an Interim Basis to (A) Obtain Senior Secured Non-Priming Superpriority Replacement Postpetition Financing and (B) Use Cash Collateral, (II) Authorizing the Debtors to Refinance Existing Postpetition Financing on a Final Basis, (III) Granting Liens and Providing Claims With Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Secured Parties on a Final Basis, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (Docket No. 447), authorizing the Debtors to enter into the DIP Credit Agreement and access the DIP Facility, as may be amended, supplemented or modified from time to time.

    *1.88*   ~~*1.89*~~ "**Disallowed**" means any Claim, or any portion thereof, that (i) has been disallowed by Final Order or settlement; (ii) is scheduled at zero or as contingent, disputed, or unliquidated on the Schedules and as to which no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, including any claims bar date order, or otherwise deemed timely Filed under applicable law; or (iii) is not scheduled on the Schedules and as to which no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law.   "Disallow" and "Disallowance" shall have correlative meanings.

    *1.89*   ~~*1.90*~~ "**Disbursing Agent**" means any Entity (including any applicable Debtor or Reorganized Debtor if it acts in such capacity) in its capacity as a disbursing agent under Article VI of the Plan.

    *1.90*   ~~*1.91*~~ "**Disclosure Statement**" means the disclosure statement for the Plan, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, and all exhibits, schedules, supplements, modifications, amendments, annexes, and attachments to such disclosure statement.

    *1.91*   ~~*1.92*~~ "**Disclosure Statement Approval Order**" means the ~~*[●]*~~*Order (I) Approving Disclosure Statement and Form and Manner of Notice of Disclosure Statement Hearing; (II) Establishing Solicitation and Voting Procedures; (III) Establishing Notice and Objection Procedures for Confirmation of Proposed Plan; (IV) Approving Notice Procedures for the Assumption or Rejection of Executory Contracts and Unexpired Leases; and (V) Granting Related Relief* (Docket No. [●]).

    *1.92*   ~~*1.93*~~ "**Disputed**" means with respect to a Claim, (i) any Claim, which Claim is disputed under Section 7.1 of the Plan or as to which the Debtors have interposed and not withdrawn an objection

or request for estimation that has not been determined by a Final Order; (ii) any Claim, proof of which was required to be Filed by order of the Bankruptcy Court but as to which a Proof of Claim was not timely or properly Filed by the applicable claims bar date; (iii) any Claim that is listed in the Schedules as unliquidated, contingent, or disputed, and as to which no request for payment or Proof of Claim has been Filed by the applicable claims bar date; or (iv) any Claim that is otherwise disputed by any of the Debtors or the Reorganized Debtors, as applicable, in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled by a Final Order.  To the extent the Debtors dispute only the amount of a Claim, such Claim shall be deemed Allowed in the amount the Debtors do not dispute, if any, and Disputed as to the balance of such Claim.

*1.93*     ~~*1.94*~~ **"Disputed Claims Reserve"** means any reserve for Disputed Claims established pursuant to section 7.9 of the Plan.

*1.94*     ~~*1.95*~~ **"Distribution Record Date"** means, other than with respect to Holders of public Securities, the record date for purposes of determining which Holders of Allowed Claims are eligible to receive distributions under the Plan, which, unless otherwise specified, shall be the earlier of (i) the date that is two (2) Business Days before the Effective Date or such other date as is designated by the Debtors and (ii) the date such Claim becomes Allowed.  The Distribution Record Date shall not apply to any public Securities the Holders of which shall receive a distribution in accordance with Article VI of the Plan and the customary procedures of DTC, as applicable.

*1.95*     ~~*1.96*~~ **"DTC"** means The Depository Trust Company.

*1.96*     ~~*1.97*~~ **"Effective Date"** means, with respect to the Plan, the date that is a Business Day selected by the Debtors on which: (i) no stay of the Confirmation Order is in effect; (ii) all conditions precedent specified in section 9.1 have been satisfied or waived (in accordance with section 9.3); and (iii) the Plan is declared effective.  Without limiting the foregoing, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

~~*1.98* "**Eligible Holder**" means each holder of Existing Common Interests that is an "accredited investor" within the meaning of 501 of Regulation D under the Securities Act, as verified pursuant to the Rights Offering Procedures.~~

*1.97*     **"Elected Percentage"** has the meaning set forth in section 4.1(c) hereof.

*1.98*     ~~*1.99*~~ **"Employee Arrangements"** means all employment or employee-related arrangements, agreements, programs, and policies, and all compensation and benefits plans, policies, award letters, key employee retention agreements, and programs of the Debtors applicable to their respective employees, retirees, consultants, contractors, and non-employee directors, including all agreements with professional employer organizations, savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans (including equity and equity-based plans), welfare benefits plans, life and accidental death and dismemberment insurance plans, and the Unvested RSUs.

*1.99*     ~~*1.100*~~ **"Enterprise Value"** means the enterprise value of the Reorganized Debtors, which shall be ~~[●]~~$2,000,000,000.

*1.100*     ~~*1.101*~~ **"Entity"** means an individual, corporation, partnership, limited liability partnership, limited liability company, association, joint stock company, joint venture, estate, trust,

11

unincorporated organization, Governmental Unit or any political subdivision thereof, or other Person or other entity.

*1.101* ~~*1.102*~~ **"Equity Committee"** means the official committee of equity security Holders, appointed by the U.S. Trustee in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code on March 23, 2023 (Docket No. 724), the membership of which may be reconstituted from time to time.

*1.102* ~~*1.103*~~ **"Equity Incentive Plans"** means, collectively, the (i) 2018 Equity Plan and (ii) 2021 Equity Plan.

*1.103* ~~*1.104*~~ **"Estate or Estates"** means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

*1.104* ~~*1.105*~~ **"Executory Contract"** means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

*1.105* ~~*1.106*~~ **"Existing Common Interests"** means (i) the common stock issued by Core Scientific, Inc. that existed immediately prior to the Effective Date, including any Restricted Stock and (ii) any Vested RSUs, in each case held by the Holders as reflected in the Debtors' books and records, including the records of the Debtors' transfer agent(s), and/or DTC's records immediately prior to the Effective Date.

*1.106* ~~*1.107*~~ **"Exit Agent"** means the administrative agent and collateral agent under the Exit Credit Agreement.

*1.107* ~~*1.108*~~ **"Exit Credit Agreement"** means that certain Credit Agreement to be entered into in connection with the Exit Facility, to be dated as of the Effective Date, by and among Reorganized Parent, as borrower, the Exit Agent, and the Exit Lenders, which shall be in form and substance consistent with the Exit Term Sheet.

*1.108* ~~*1.109*~~ **"Exit Facility"** means the first-lien delayed draw term loan exit facility to be provided on the terms and conditions set forth in the Exit Term Sheet and arising pursuant to the Exit Credit Agreement in an aggregate principal amount of approximately $82,000,000, comprised of (i) the Allowed DIP Claims, which are estimated to be approximately $19,000,000, (ii) approximately $38,000,000 on account of the Allowed B. Riley Unsecured Claims, and (iii) approximately $25,000,000.00 in new delayed draw term loan commitments.

*1.109* **"Exit Facility Documents"** means, collectively, the Exit Credit Agreement and all other loan documents, including all other agreements, documents, and instruments delivered or entered into pursuant thereto or in connection therewith (including any guarantee agreements and collateral documentation) (in each case, as amended, restated, modified, or supplemented from time to time), each of which shall, to the extent applicable, contain terms consistent with the Exit Term Sheet.

*1.110* **"Exit Lenders"** means the lenders from time to time party to the Exit Credit Agreement, including any permitted assignees thereof.

*1.111* **"Exit Term Sheet"** means that certain term sheet attached hereto as **Exhibit A** that sets forth the principal terms of the Exit Facility.

1.112   ***Exculpated Parties*** means each of the following in their capacity as such and, in each case, to the maximum extent permitted by law: (i) the Debtors; and (ii) Equity Committee and its members, solely in their capacity as such.

1.113   ***Federal Judgment Rate*** means the interest rate of 4.64% per annum as provided under 28 U.S.C. § 1961(a), calculated as of the Petition Date.

1.114   ***File," "Filed," or "Filing"*** means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim or proof of Interest, with the Claims and Noticing Agent.

1.115   ***Final Order*** means as applicable, an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, including any order subject to appeal but for which no stay of such order has been entered, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been withdrawn with prejudice, resolved by the highest court to which the order or judgment was appealed or from which certiorari could be sought, or any request for new trial, reargument, or rehearing has been denied, resulted in no stay pending appeal or modification of such order, or has otherwise been dismissed with prejudice; *provided*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be Filed with respect to such order or judgment.

1.116   ***Foundry*** means Foundry Digital LLC ~~(f/k/a DCG Foundry LLC)~~.

*1.117*   ***Foundry 9019 Motion*** means the *Debtors' Motion for Order Approving (I) Settlement Between Debtors and Foundry Digital LLC and (II) Granting Related Relief* (Docket No. 1180).

*1.118*   ~~*1.117*~~ "***Foundry Allowed Claims***" has the meaning set forth in section ~~5.17~~5.18(~~g~~e) hereof.

*1.119*   ***"Foundry Claims"*** means the Claims held by Foundry arising under or related to the A&R Purchase Agreement (as defined in the Foundry Settlement Agreement), including the Claims set forth in the Foundry POCs.

*1.120*   ~~*1.118*~~ "***Foundry Hosting Agreements***" means, collectively, (i) the Master Services Agreement, dated November 23, 2019, between Core Scientific Operating Company (f/k/a Core Scientific, Inc.) and Foundry (the "**2019 Foundry MSA**"), and each of the Orders (as defined in the 2019 Foundry MSA) entered into or executed between Core Scientific Operating Company or Core Scientific, Inc. (as applicable) pursuant to or in connection with the 2019 Foundry MSA, including the Master Services Agreement Order #5, Master Services Agreement Order #6 and Master Services Agreement Order #7, in each case, as amended, supplemented or modified in accordance with the terms thereof and (ii) the Master Services Agreement, dated September 21, 2022, between Core Scientific, Inc. and Foundry (the "**2022 Foundry MSA**"), and each of the Orders (as defined in the 2022 Foundry MSA) entered into or executed between Core Scientific Operating Company or Core Scientific, Inc. (as applicable) pursuant to or in connection with the 2022 Foundry MSA, including the Master Services Agreement Order #1, in each case, as amended, supplemented or modified in accordance with the terms thereof.

*1.121*   ~~*1.119*~~ "***Foundry POCs***" means Proofs of Claim numbers 360 and 361, each in the amount of not less than $18,404,990.08, plus interest, filed by Foundry against certain of the Debtors.

*1.122*   ~~*1.120*~~ "***Foundry Settlement***" means the settlement, transactions and agreements among the Debtors and Foundry, and the consideration given or received, as applicable, by each, as set forth in, and subject to the terms and conditions of, the Foundry Settlement Documents~~, and as provided in section 5.17 hereof~~.

*1.123*   ~~*1.121*~~ "***Foundry Settlement Agreement***" means that certain Settlement Agreement, dated as of [•]August 15, 2023, by and among Foundry, Core Scientific, Inc. and the other Debtors, ~~to be included in the Plan Supplement (with any appropriate redactions), which the Debtors shall have obtained or shall seek approval of from the Bankruptcy Court,~~ including all appendices, exhibits, and schedules thereto, which Foundry Settlement Agreement, together with any other Foundry Settlement Documents, shall be included in the Plan Supplement.

*1.124*   ~~*1.122*~~ "***Foundry Settlement Documents***" means the Foundry Settlement Agreement, the Foundry Hosting Agreements, the Bill of Sale (as defined in the Foundry Settlement Agreement), Order #2 (as defined in the Foundry Settlement Agreement), any other hosting agreement, any bill of sale and any other agreement or document entered or entered into, or to be entered or entered into, in connection therewith or with the Foundry Settlement, each in form and substance acceptable to Foundry and the Debtors in their respective sole discretion.  Notwithstanding anything to the contrary herein, the Foundry Settlement Documents shall govern in the event of a conflict between any such document, on the one hand, and the Plan and/or any other document or agreement entered or entered into in connection therewith, on the other hand.

*1.125*   "***Foundry Settlement Effective Date***" means the Effective Date as such term is defined in the Foundry Settlement Agreement.

*1.126*   ~~*1.123*~~ "***General Bar Date***" means April 14, 2023, at 5:00 p.m. (prevailing Central Time), which is the deadline by which all Persons, except Governmental Units, were required to have Filed Proofs of Claim against the Debtors as established by the Bar Date Order.

*1.127*   ~~*1.124*~~ "***General Contract***" means any agreement, contract, or purchase order between a Debtor that owns or leases real property and a General Contractor for the provision of labor, materials, equipment, and/or services in connection with the construction, development, or improvement of any real property owned or leased by such Debtor.

*1.128*   ~~*1.125*~~ "***General Contractor***" means a Person contracting directly with any Debtor pursuant to a General Contract.

*1.129*   ~~*1.126*~~ "***General Contractor Unsecured Claim***" means a Claim held by a General Contractor arising from a General Contract that is not a Secured Claim, which Claim shall be Allowed as a General Unsecured Claim in the amount set forth on the M&M Lien Claims Schedule in the column titled "Allowed Unsecured Claim Amount".

*1.130*   ~~*1.127*~~ "***General Unsecured Claim***" means all Claims, excluding the B. Riley Unsecured Claims, that are not a Secured Claim, Priority Tax Claim, Priority Non-Tax Claim, Professional Fee Claim, DIP Claim, Intercompany Claim, 510(b) Claim, or an Administrative Expense Claim.  For the avoidance of doubt, except as otherwise provided herein, all Miner Equipment Lender Deficiency Claims

are General Unsecured Claims.  Any interest accruing on General Unsecured Claims from the Petition Date through the Effective Date shall accrue at the Federal Judgment Rate.

*1.131*  ~~*1.128*~~ "**Governmental Bar Date**" means June 19, 2023, at 5:00 p.m. (prevailing Central Time), which is the deadline by which all Governmental Units were required to have Filed Proofs of Claim against the Debtors, as established by Bankruptcy Local Rule 3003-1 and ratified by the Bar Date Order.

*1.132*  ~~*1.129*~~ "**Governmental Unit**" has the meaning set forth in section 101(27) of the Bankruptcy Code.

*1.133*  ~~*1.130*~~ "**Holder**" means any Person holding (including as successor or assignee pursuant to a valid succession or assignment) a Claim or an Interest, as applicable, solely in its capacity as such.

*1.134*  ~~*1.131*~~ "**Holliwood Agreements**" means that certain Purchase Money Mortgage, dated December 19, 2018, by and between American Property Acquisition, LLC and Holliwood LLC, securing the indebtedness evidenced by ~~that certain Promissory Note, dated December 19, 2018, by and between American Property Acquisition, LLC and Holliwood LLC~~the Holliwood Note, which is secured by that certain facility owned by American Property Acquisition, LLC located in Calvert City, Kentucky.

*1.135*  "**Holliwood Note**" means that certain Promissory Note, dated December 19, 2018, by and between American Property Acquisition, LLC and Holliwood LLC.

*1.136*  ~~*1.132*~~ "**Holliwood Settlement**" means the settlement of all Claims and controversies among the Debtors and Holliwood LLC and the consideration given or received, as applicable, by each as set forth in the Plan and as summarized in section ~~5.15~~5.16 hereof.

*1.137*  ~~*1.133*~~ "**Identified Miners**" means the 2,106 Bitmain Antminer S19 XP mining machines owned by certain of the Debtors and identified in the Foundry Settlement Agreement, each in condition and at location(s) reasonably acceptable to Foundry.

*1.138*  ~~*1.134*~~ "**Impaired**" means, with respect to a Claim, Interest, or Class of Claims or Interests, "impaired" within the meaning of section 1124 of the Bankruptcy Code.

*1.139*  ~~*1.135*~~ "**Indemnification Obligation**" means any existing or future obligation of any Debtor to indemnify current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity, with respect to or based upon such service or any act or omission taken or not taken in any of such capacities, or for or on behalf of any Debtor, whether pursuant to agreement, the Debtors' respective memoranda, articles or certificates of incorporation or formation, corporate charters, bylaws, operating agreements, limited liability company agreements, or similar corporate or organizational documents or other applicable contract or law in effect as of the Effective Date, excluding any obligation to indemnify any of the foregoing parties with respect to any act or omission for or on behalf of the Debtors arising out of any act or omission determined by a Final Order to constitute actual fraud, willful misconduct, or gross negligence.

*1.140*  ~~*1.136*~~ "**Indigo Agreement**" means that certain Equipment Schedule No. 1, dated December 10, 2021, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and Core Scientific Holding Co. (now known as Core Scientific, Inc.), on one hand, and Liberty Commercial Finance LLC, on the other hand, issued in connection with the Liberty Master Lease Agreement and subsequently assigned by Liberty Commercial Finance LLC to Indigo Direct Lending, LLC pursuant to that certain Notice and Acknowledgement of Assignment.  For the avoidance of doubt,

(i) the Indigo Agreement is not an Unexpired Lease and is a financing agreement and (ii) the equipment that is the subject of the Indigo Agreement are Assets owned by the applicable Debtor.

*1.137* **"*Ineligible Holder*"** means each holder of an Existing Common Interest who duly certifies in accordance with the Rights Offering Procedures that it is not an "Accredited Investor" as defined in Rule 501(a) of the Securities Act.

*1.141*  *1.138* **"*Initial DIP Loan Documents*"** means the DIP Loan Documents as defined in the *Interim Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (Docket No. 130).

*1.142*  *1.139* **"*Initial KERP*"** means the Debtors' key employee retention program that was approved by the Bankruptcy Court pursuant to the KERP Order.

*1.143*  *1.140* **"*Insured Litigation Claims*"** means any insured claims constituting General Unsecured Claims or Section 510(b) Claims, as applicable.

*1.144*  *1.141* "**Intercompany Claim**" means any Claim against a Debtor held by another Debtor.

*1.145*  *1.142* "**Intercompany Interest**" means an Interest in a Debtor held by another Debtor.

*1.146*  *1.143* **"*Interests*"** means any equity in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all ordinary shares, units, common stock, preferred stock, membership interest, partnership interest, or other instruments evidencing an ownership interest, or equity security (as defined in section 101(16) of the Bankruptcy Code) in any of the Debtors, whether or not transferable, and any restricted stock (including the Restricted Stock), warrant or right, contractual or otherwise, including, without limitation, equity-based employee incentives, grants, stock appreciation rights, Vested RSUs, performance shares/units, incentive awards, or other instruments issued to employees of the Debtors, to acquire any such interests in a Debtor that existed immediately before the Effective Date (in each case whether or not arising under or in connection with any employment agreement); *provided*, that the foregoing shall not apply to any entitlement to participate in or receive any Interests of the Reorganized Debtors; *provided*, *further*, that Interests shall include neither the Unvested RSUs nor the Stock Options.

*1.147*  *1.144* **"*KERP Order*"** means the *Order Approving and Authorizing Payments Under Key Employee Retention Plan* (Docket No. 738).

*1.148*  *1.145* **"*KERPs*"** means the Initial KERP and the Supplemental KERP.

*1.149*  *1.146* **"*Liberty Master Lease Agreement*"** means that certain Master Equipment Lease Agreement #32109, dated June 3, 2021, by and between Liberty Commercial Finance LLC and Core Scientific, Inc. (now known as Core Scientific Operating Company).

*1.150*  *1.147* **"*Liberty Miner Agreement*"** means that certain Equipment Schedule No. 16, dated December 22, 2021, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and Core Scientific Holding Co. (now known as Core Scientific, Inc.), on one hand, and Liberty Commercial Finance LLC, on the other hand, issued in connection with the Liberty Master Lease Agreement. For the avoidance of doubt, (i) the Liberty Miner Agreement is not an Unexpired Lease and

is a financing agreement and (ii) the equipment that is the subject of the Liberty Miner Agreement are Assets owned by the applicable Debtor.

*1.151*   *1.148* **"Liberty Non-Miner Agreements"** means, collectively, (i) that certain Equipment Schedule No. 6, dated July 16, 2021, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and Liberty Commercial Finance LLC, issued in connection with the Liberty Master Lease Agreement, (ii) that certain Equipment Schedule No. 7, dated July 16, 2021, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and Liberty Commercial Finance LLC, issued in connection with the Liberty Master Lease Agreement, (iii) that certain Equipment Schedule No. 14, dated December 29, 2021, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and Core Scientific Holding Co. (now known as Core Scientific, Inc.), on one hand, and Liberty Commercial Finance LLC, on the other hand, issued in connection with the Liberty Master Lease Agreement, and (iv) that certain Equipment Schedule No. 15, dated December 29, 2021, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and Core Scientific Holding Co. (now known as Core Scientific, Inc.), on one hand, and Liberty Commercial Finance LLC, on the other hand, issued in connection with the Liberty Master Lease Agreement.  For the avoidance of doubt, (i) the Liberty Non-Miner Agreements are not Unexpired Leases and are financing agreements and (ii) the equipment that is the subject of the Liberty Non-Miner Agreements are Assets owned by the applicable Debtor.

*1.152*   *1.149* **"Lien"** has the meaning set forth in section 101(37) of the Bankruptcy Code.

*1.153*   *1.150* **"Local Bankruptcy Rules"** means the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas.

*1.154*   *1.151* **"M&M Lien" or "M&M Liens"** means the mechanics', materialmens', workmens', and repairmens' Liens and other similar Liens and encumbrances arising under state law, including any Liens filed, asserted, or held by General Contractors and Subcontractors, encumbering any real property owned or leased by any Debtor, regardless of whether a Proof of Claim has been filed relating to such Liens, which Liens and encumbrances (i) may be determined to be validly perfected prepetition or may be deemed to be validly perfected prepetition pursuant to applicable state laws permitting relation back, in each case, if the applicable lienholder complied with the state law procedures required to perfect the same and (ii) allegedly satisfy the requirements of Bankruptcy Code section 546(b).

*1.155*   *1.152* **"M&M Lien Claims Schedule"** means the schedule attached hereto as **Exhibit ~~I~~K**.

*1.156*   *1.153* **"M&M Lien Secured Claims"** means, collectively, the Claims, the amount of which the Debtors' books and records reflect are attributable to the provision by General Contractors and Subcontractors of labor, materials, equipment and/or services in connection with the construction, development or improvement of any real property owned or leased by any Debtor and for which such General Contractors and Subcontractors may be entitled to an M&M Lien, as set forth on the M&M Lien Claims Schedule in the column titled "Amount of Allowed M&M Lien Secured Claim," in each case held by the applicable Holder, secured by the applicable Collateral, and in the applicable amounts as set forth on the M&M Lien Claims Schedule.

*1.157*   *1.154* **"M&M Lien Settlement"** means any settlement of an M&M Lien Secured Claim approved by the Bankruptcy Court, each in accordance with the terms and provisions of the relevant settlement agreement, including the settlements approved by the Bankruptcy Court pursuant to the (i) *Order Approving (I) Global Settlement Between Debtors and Condair Inc. and (II) Granting Related Relief* (Docket No. [●]1057), (ii) *Order Approving (I) Global Settlement Between Debtors and*

*Huband-Mantor Construction, Inc. and (II) Granting Related Relief* (Docket No. 1167), (iii) *Order Approving (I) Global Settlement Between Debtors and Trilogy LLC and (II) Granting Related Relief* (Docket No. [●]), (iii~~iv~~) *Order Approving (I) Global Settlement Between Debtors and JW Didado Electric LLC and (II) Granting Related Relief* (Docket No. [●]), and (~~iv~~v) *Order Approving (I) Global Settlement Between Debtors and ~~Huband-Mantor~~Harper Construction Company, Inc. and (II) Granting Related Relief* (Docket No. [●]).

*1.158* ~~1.155~~ "**M&M Lien Takeback Debt**" means the secured debt to be issued to each Holder of an M&M Lien Secured Claim (unless receiving a different form of consideration pursuant to an M&M Lien Settlement) by the applicable Debtor that owns or leases the real property encumbered by the applicable M&M Lien, in each case in the principal amount equal to the amount of the applicable Allowed M&M Lien Secured Claim Amount, on the terms and conditions set forth in the New M&M Lien Debt Term Sheet. The M&M Lien Takeback Debt issued by a Debtor to each such Holder of an M&M Lien Secured Claim shall (i) evidence such Holder's M&M Liens encumbering an applicable real property owned or leased by such Debtor, (ii) be *pari passu* to all other M&M Lien Takeback Debt issued by such Debtor in respect of, and secured by, M&M Liens encumbering such applicable real property owned or leased by such Debtor, and (iii) be senior to all other Liens encumbering such applicable real property owned or leased by such Debtor.

*1.159* ~~1.156~~ "**Management Incentive Plan**" means a post-emergence equity-based management incentive plan under which up to ten percent (10%) of the New Common Interests outstanding on a fully diluted basis issued on the Effective Date may be issued to members of the Reorganized Debtors' management on the terms described in section ~~5.23~~5.24 of the Plan.

*1.160* ~~1.157~~ "**MassMutual Agreements**" means, collectively, (i) that certain Schedule No. 001, dated December 15, 2021, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and MassMutual Asset Finance LLC, issued in connection with that certain Master Lease Agreement, dated December 3, 2021, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and MassMutual Asset Finance LLC, and as amended by that certain Amendment No. 1 to Schedule No. 001, dated August 12, 2022, by and between Core Operating Company and MassMutual Asset Finance LLC, (ii) that certain Schedule No. 002, dated December 15, 2021, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and MassMutual Asset Finance LLC, issued in connection with that certain Master Lease Agreement, dated December 3, 2021, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and MassMutual Asset Finance LLC, and as amended by that certain Amendment No. 1 to Schedule No. 002, dated August 12, 2022, by and between Core Scientific Operating Company and MassMutual Asset Finance LLC, (iii) that certain Schedule No. 003, dated December 15, 2021, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and MassMutual Asset Finance LLC, issued in connection with that certain Master Lease Agreement, dated December 3, 2021, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and MassMutual Asset Finance LLC, and as amended by that certain Amendment No. 1 to Schedule No. 003, dated August 12, 2022, by and between Core Scientific Operating Company and MassMutual Asset Finance LLC, (iv) that certain Schedule No. 004, dated December 15, 2021, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and MassMutual Asset Finance LLC, issued in connection with that certain Master Lease Agreement, dated December 3, 2021, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and MassMutual Asset Finance LLC, and as amended by that certain Amendment No. 1 to Schedule No. 004, dated August 12, 2022, by and between Core Scientific Operating Company and MassMutual Asset Finance LLC, and (v) that certain Schedule No. 005, dated December 15, 2021, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and MassMutual Asset Finance LLC, issued in connection with that certain Master Lease Agreement, dated December 3, 2021, by and between Core Scientific, Inc. (now known as Core

Scientific Operating Company) and MassMutual Asset Finance LLC, and as amended by that certain Amendment No. 1 to Schedule No. 005, dated August 12, 2022, by and between Core Scientific Operating Company and MassMutual Asset Finance LLC.  For the avoidance of doubt, (i) the MassMutual Agreements are not Unexpired Leases and are financing agreements and (ii) the equipment that is the subject of the MassMutual Agreements are Assets owned by the applicable Debtor.

1.161   1.158  **"Meridian Agreement"** means that certain Equipment Lease Agreement, dated June 8, 2021, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and Meridian Equipment Finance LLC.  For the avoidance of doubt, (i) the Meridian Agreement is not an Unexpired Lease and is a financing agreement and (ii) the equipment that is the subject of the Meridian Agreement are Assets owned by the applicable Debtor.

1.162   1.159  **"Miner Equipment Lender Agreements"** means, collectively, the 36th Street Miner Agreement, the Anchorage Agreements, the Barings Agreements, the BlockFi Agreements, the Liberty Miner Agreements, the MassMutual Agreements, the Novak Agreements, the Stonebriar Agreement, the Trinity Agreements OpCo, and the Trinity Agreement Parent.

1.163   1.160  **"Miner Equipment Lender Claims"** means, collectively, the Miner Equipment Lender Secured Claims and Miner Equipment Lender Deficiency Claims ~~and~~ listed on the Miner Equipment Lender Claims Schedule, in each case, held by the applicable Holder, arising pursuant to the applicable Miner Equipment Lender Agreement(s), secured by the applicable Collateral, and in the applicable amounts as set forth the Miner Equipment Lender Claims Schedule.  Any interest accruing on Miner Equipment Lender Claims from the Petition Date through the Effective Date shall accrue at the Federal Judgment Rate and shall be added to the Miner Equipment Lender Deficiency Claim, not the Miner Equipment Lender Secured Claim.

1.164   1.161  **"Miner Equipment Lender Claims Schedule"** means the schedule attached hereto as **Exhibit J**L.

1.165   1.162  **"Miner Equipment Lender Deficiency Claims"** means, collectively, the Miner Equipment Lender Claims that are not Secured Claims.

1.166   1.163  **"Miner Equipment Lender Secured Claims"** means, collectively, Miner Equipment Lender Claims that are Secured Claims.

1.167   1.164  **"Miner Equipment Lender Settlement"** means the settlement of all Claims and controversies among the Debtors and the Settling Miner Equipment Lenders and the consideration given or received, as applicable, by each as set forth in the Plan and as summarized in section 5.13 5.14 hereof.

1.168   1.165  **"Miner Equipment Lender Takeback Debt (Default)"** means the secured debt to be issued by the Debtor that is party to the applicable Miner Equipment Lender Agreement to each Holder of a Miner Equipment Lender Secured Claim that is receiving the Default Miner Equipment Lender Treatment, in the principal amount of each applicable Holder's Allowed Miner Equipment Lender Secured Claim Amount, on the terms and conditions set forth in the New Miner Equipment Lender Debt Documents (Default), which shall contain terms consistent with the New Miner Equipment Lender Debt Term Sheet (Default).

1.169   1.166  **"Miner Equipment Lender Takeback Debt (Election 2)"** means the secured debt to be issued by the Debtor that is party to the applicable Miner Equipment Lender Agreement to each Holder of a Miner Equipment Lender Secured Claim that elects and is entitled to receive Miner Equipment Lender Treatment Election 2, in each case, in the principal amount of eighty percent (80%) of

each applicable Holder's Allowed Miner Equipment Lender Claim as of the Effective Date, on the terms and conditions set forth in the New Miner Equipment Lender Debt Documents (Election 2), which shall contain terms consistent with the New Miner Equipment Lender Debt Term Sheet (Election 2).

*1.170*   *1.167* **"Miner Equipment Lender Treatment Election 1"** has the meaning set forth in section 4.3 hereof.

*1.171*   *1.168* **"Miner Equipment Lender Treatment Election 2"** has the meaning set forth in section 4.3 hereof.

*1.172*   *1.169* **"Mortgage Agreements"** means, collectively, the Holliwood Agreements and the Brown Agreement.

*1.173*   *1.170* **"Mortgage Takeback Debt"** means, collectively, the Mortgage Takeback Debt (Holliwood) and Mortgage Takeback Debt (Brown).

*1.174*   *1.171* **"Mortgage Takeback Debt (Brown)"** means the secured debt to be issued by Core Scientific Operating Company to Brown Corporation, if Brown Corporation does not elect the Mortgage Treatment Election, in the principal amount of Brown Corporation's Allowed Secured Mortgage Claim Amount, on the terms and conditions set forth in the Brown Agreement but with a maturity of December 31, 2025.

*1.175*   *1.172* **"Mortgage Takeback Debt (Holliwood)"** means the secured debt to be issued by American Property Acquisition, LLC to Holliwood LLC, if Holliwood, LLC does not elect the Mortgage Treatment Election, in the principal amount of Holliwood, LLC's Allowed Secured Mortgage Claim Amount, on the terms and conditions set forth in the Holliwood Agreements but with a maturity of December 31, 2025.

*1.176*   *1.173* **"Mortgage Treatment Election"** has the meaning set forth in section 4.6 hereof.

*1.177*   *1.174* **"New April Secured Notes (~~Option 1~~Default)"** means the secured notes to be issued~~, if Class 1 is an Accepting Class,~~ to Holders of Allowed April Convertible Notes Secured Claims in Class 1 that receive the Default April Convertible Noteholder Treatment by Reorganized Parent and guaranteed by the applicable Debtors that are currently guarantors under the April NPA, ~~in the principal amount up to seventy-five percent (75%) of the Settled April Convertible Notes Secured Claims Amount based on Holders' elections in accordance with section 4.1 hereof,~~ on the terms and conditions set forth in the New April Secured Notes Documents (~~Option 1~~Default), which shall contain terms consistent with the New April Secured Notes Term Sheet (~~Option 1~~Default).

*1.178*   *1.175* **"New April Secured Notes (~~Option 2~~Settlement Election)"** means the secured notes to be issued~~, if Class 1 is not an Accepting Class,~~ to Holders of Allowed April Convertible Notes Secured Claims in Class 1 that elect and are entitled to receive the April Convertible Noteholder Treatment Settlement Election by Reorganized Parent and guaranteed by the applicable Debtors that are currently guarantors under the April NPA, ~~in the principal amount equal to the Allowed Non-Settled April Convertible Notes Secured Claims Amount,~~ on the terms and conditions set forth in the New April Secured Notes Documents (~~Option 2~~Settlement Election), which shall contain terms consistent with the New April Secured Notes Term Sheet (~~Option 2~~Settlement Election).

*1.179*   *1.176* **"New April Secured Notes Agent"** means the note agent and collateral agent under the New April Secured Notes Indenture (~~Option 1~~Default) or New April Secured Notes Indenture (~~Option~~

~~2), as the case may be depending on whether Class 1 is an Accepting Class~~Settlement Election), as applicable.

*1.180* ~~*1.177*~~ ***"New April Secured Notes Documents (~~Option 1~~Default)"*** means, collectively, the New April Secured Notes Indenture (~~Option 1~~Default) and all other "Note Documents" (as defined in the New April Secured Notes Indenture (~~Option 1~~Default)), including all other agreements, documents, and instruments delivered or entered into pursuant thereto or in connection therewith (including any guarantee agreements and collateral documentation) (in each case, as amended, restated, modified, or supplemented from time to time), each of which shall, to the extent applicable, contain terms consistent with the New April Secured Notes Term Sheet (~~Option 1~~Default).

*1.181* ~~*1.178*~~ ***"New April Secured Notes Documents (~~Option 2~~Settlement Election)"*** means, collectively, the New April Secured Notes Indenture (~~Option 2~~Settlement Election) and all other "Note Documents" (as defined in the New April Secured Notes Indenture (~~Option 2~~Settlement Election)), including all other agreements, documents, and instruments delivered or entered into pursuant thereto or in connection therewith (including any guarantee agreements and collateral documentation) (in each case, as amended, restated, modified, or supplemented from time to time), each of which shall, to the extent applicable, contain terms consistent with the New April Secured Notes Term Sheet (~~Option 2~~Settlement Election).

*1.182* ~~*1.179*~~ ***"New April Secured Notes Indenture (~~Option 1~~Default)"*** means that certain indenture, dated as of the Effective Date (as the same may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof), which shall contain terms consistent with the New April Secured Notes Term Sheet (~~Option 1~~Default).

*1.183* ~~*1.180*~~ ***"New April Secured Notes Indenture (~~Option 2~~Settlement Election)"*** means that certain indenture, dated as of the Effective Date (as the same may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof), which shall contain terms consistent with the New April Secured Notes Term Sheet (~~Option 2~~Settlement Election).

*1.184* ~~*1.181*~~ ***"New April Secured Notes Term Sheet (~~Option 1~~Default)"*** means that certain term sheet attached hereto as **Exhibit ~~B~~C** that sets forth the principal terms of the New April Secured Notes (~~Option 1~~Default).

*1.185* ~~*1.182*~~ ***"New April Secured Notes Term Sheet (~~Option 2~~Settlement Election)"*** means that certain term sheet attached hereto as **Exhibit ~~C~~D** that sets forth the principal terms of the New April Secured Notes (~~Option 2~~Settlement Election).

*1.186* ~~*1.183*~~ ***"New August Secured Notes (~~Option 1~~Default)"*** means the secured notes to be issued~~, if Class 2 is an Accepting Class,~~ to Holders of Allowed August Convertible Notes Secured Claims in Class 2 that that receive the Default August Convertible Noteholder Treatment by Reorganized Parent and guaranteed by the applicable Debtors that are currently guarantors under the August NPA, ~~in the principal amount up to seventy-five percent (75%) of the Allowed August Convertible Notes Secured Claims Amount based on Holders' elections in accordance with section 4.2 hereof,~~ on the terms and conditions set forth in the New August Secured Notes Documents (~~Option 1~~Default), which shall contain terms consistent with the New August Secured Notes Term Sheet (~~Option 1~~Default).

*1.187* ~~*1.184*~~ ***"New August Secured Notes (~~Option 2~~Settlement Election)"*** means the secured notes to be issued~~, if Class 2 is not an Accepting Class,~~ to Holders of Allowed August Convertible Notes Secured Claims in Class 2 that that elect and are entitled to receive the August Convertible Noteholder

Treatment Settlement Election by Reorganized Parent and guaranteed by the applicable Debtors that are currently guarantors under the August NPA, in the principal amount equal to the Allowed August Convertible Notes Secured Claims Amount, on the terms and conditions set forth in the New August Secured Notes Documents (Option 2Settlement Election), which shall contain terms consistent with the New August Secured Notes Term Sheet (Option 2Settlement Election).

1.188   1.185 "**New August Secured Notes Agent**" means the note agent and collateral agent under the New August Secured Notes Indenture (Option 1Default) or New August Secured Notes Indenture (Option 2), as the case may be depending on whether Class 2 is an Accepting ClassSettlement Election), as applicable.

1.189   1.186 "**New August Secured Notes Documents (Option 1Default)**" means, collectively, the New August Secured Notes Indenture (Option 1Default) and all other "Note Documents" (as defined in the New August Secured Notes Indenture (Option 1Default)), including all other agreements, documents, and instruments delivered or entered into pursuant thereto or in connection therewith (including any guarantee agreements and collateral documentation) (in each case, as amended, restated, modified, or supplemented from time to time), each of which shall, to the extent applicable, contain terms consistent with the New August Secured Notes Term Sheet (Option 1Default).

1.190   1.187 "**New August Secured Notes Documents (Option 2Settlement Election)**" means, collectively, the New August Secured Notes Indenture (Option 2Settlement Election) and all other "Note Documents" (as defined in the New August Secured Notes Indenture (Option 2Settlement Election)), including all other agreements, documents, and instruments delivered or entered into pursuant thereto or in connection therewith (including any guarantee agreements and collateral documentation) (in each case, as amended, restated, modified, or supplemented from time to time), each of which shall, to the extent applicable, contain terms consistent with the New August Secured Notes Term Sheet (Option 2Settlement Election).

1.191   1.188 "**New August Secured Notes Indenture (Option 1Default)**" means that certain indenture, dated as of the Effective Date (as the same may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof), which shall contain terms consistent with the New August Secured Notes Term Sheet (Option 1Default).

1.192   1.189 "**New August Secured Notes Indenture (Option 2Settlement Election)**" means that certain indenture, dated as of the Effective Date (as the same may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof), which shall contain terms consistent with the New August Secured Notes Term Sheet (Option 2Settlement Election).

1.193   1.190 "**New August Secured Notes Term Sheet (Option 1Default)**" means that certain term sheet attached hereto as **Exhibit DF** that sets forth the principal terms of the New August Secured Notes (Option 1Default).

1.194   1.191 "**New August Secured Notes Term Sheet (Option 2Settlement Election)**" means that certain term sheet attached hereto as **Exhibit EG** that sets forth the principal terms of the New August Secured Notes (Option 2Settlement Election).

1.195   1.192 "**New B. Riley ELOC Facility**" means that certain common stock purchase agreement, by and between Reorganized Parent and B. Riley Principal Capital II, LLC, in which B. Riley Principal Capital II has committed to purchase from Reorganized Parent, at Reorganized Parent's

direction, up to $150,000,000 of shares of New Common Interests, subject to terms and conditions specified therein.

*1.196* *1.193* **"New B. Riley ELOC Facility Term Sheet"** means that certain term sheet attached hereto as **Exhibit [●]B** that sets forth the principal terms of the New B. Riley ELOC Facility.

*1.197* *1.194* **"New Board"** means the board of directors or managers of Reorganized Parent.

*1.198* *1.195* **"New Common Interests"** means the new common equity of Reorganized Parent to be issued (a) on the Effective Date or thereafter under the Plan or (b) as otherwise permitted pursuant to the Plan and the New Corporate Governance Documents.

*1.196* **"New Secured Notes"** means, as applicable, the New April Secured Notes (Option 1), if any, the New August Secured Notes (Option 1), if any, the New April Secured Notes (Option 2), if any, and/or the New August Secured Notes (Option 2), if any.

*1.197* **"New Secured Notes Documents"** means, as applicable, the New April Secured Notes Documents (Option 1), if any, the New August Secured Notes Documents (Option 1), if any, the New April Secured Notes Documents (Option 2), if any, and/or the New August Secured Notes Documents (Option 2), if any.

*1.198* **"New Secured Notes Indentures"** means, as applicable, the New April Secured Notes Indenture (Option 1), if any, the New August Secured Notes Indenture (Option 1), if any, the New April Secured Notes Indenture (Option 2), if any, and/or the New August Secured Notes Indenture (Option 2), if any.

*1.199* **"New Corporate Governance Documents"** means the certificate of incorporation, certificate of formation, bylaws, limited liability company agreements, shareholder agreement (if any), operating agreement or other similar organizational or formation documents, as applicable, of the Reorganized Debtors.

*1.200* **"New Intercreditor Agreement (New Secured Notes and New Notes)"** means that certain intercreditor agreement, to be entered into, or deemed entered into, on the Effective Date, by and between the New April Secured Notes Agent, the New August Secured Notes Agent, and the New Notes Agent, substantially in the form to be included in the Plan Supplement.

*1.201* *1.200* **"New Intercreditor Agreement (New Secured Notes, New Notes, and Exit Facility)"** means that certain intercreditor agreement, to be entered into, or deemed entered into, on the Effective Date, by and between the Exit Agent, the New April Secured Notes Agent, the New August Secured Notes Agent, and Holders of Allowed Miner Equipment Lender Claims electing the Default Miner Equipment Lender Treatment or Miner Equipment Lender Treatment Election 2the New Notes Agent, substantially in the form to be containedincluded in the Plan Supplement.

*1.202* **"New Intercreditor Agreements"** means, collectively, the New Intercreditor Agreement (New Secured Notes and New Notes) and New Intercreditor Agreement (New Secured Notes, New Notes, and Exit Facility).

*1.203* *1.201* **"New M&M Lien Debt Term Sheet"** means that certain term sheet attached hereto as **Exhibit HJ** that sets forth the principal terms of the M&M Lien Takeback Debt.

*1.204*   ~~*1.202*~~ *"New Miner Equipment Lender Debt Documents"* means, as applicable, the New Miner Equipment Lender Debt Documents (Default), if any, and the New Miner Equipment Lender Debt Documents (Election 2), if any, in each case in form and substance reasonably acceptable to the Debtors and the Settling Miner Equipment Lenders party thereto.

*1.205*   ~~*1.203*~~ *"New Miner Equipment Lender Debt Documents (Default)"* means, collectively, the New Miner Equipment Lender Debt Facilities (Default) and all other agreements, documents, and instruments delivered or entered into pursuant thereto or in connection therewith (including any collateral documentation) (in each case, as amended, restated, modified, or supplemented from time to time in accordance with the terms thereof), each of which shall, to the extent applicable, contain terms consistent with the New Miner Equipment Lender Debt Term Sheet (Default) and be in form and substance otherwise reasonably acceptable to the Debtors and the Settling Miner Equipment Lenders party thereto.

*1.206*   ~~*1.204*~~ *"New Miner Equipment Lender Debt Documents (Election 2)"* means, collectively, the New Miner Equipment Lender Debt Facilities (Election 2) and all other agreements, documents, and instruments delivered or entered into pursuant thereto or in connection therewith (including any collateral documentation) (in each case, as amended, restated, modified, or supplemented from time to time in accordance with the terms thereof), each of which shall, to the extent applicable, contain terms consistent with the New Miner Equipment Lender Debt Term Sheet (Election 2) and be in form and substance otherwise reasonably acceptable to the Debtors and the Settling Miner Equipment Lenders party thereto.

*1.207*   ~~*1.205*~~ *"New Miner Equipment Lender Debt Term Sheet (Default)"* means that certain term sheet attached hereto as **Exhibit ~~F~~H** that sets forth the principal terms of the Miner Equipment Takeback Debt (Default).

*1.208*   ~~*1.206*~~ *"New Miner Equipment Lender Debt Term Sheet (Election 2)"* means that certain term sheet attached hereto as **Exhibit ~~G~~I** that sets forth the principal terms of the Miner Equipment Takeback Debt (Election 2).

*1.209*   ~~*1.207*~~ *"New Miner Equipment Lender Debt Facilities (Default)"* means those certain loan and security agreements, dated as of the Effective Date (as the same may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof), in each case, by and between the Debtor that is party to the applicable Miner Equipment Lender Agreement and the applicable Holder, which shall contain terms consistent with the New Miner Equipment Lender Debt Term Sheet (Default) and be in form and substance otherwise reasonably acceptable to the Debtors and the Settling Miner Equipment Lenders party thereto.

*1.210*   ~~*1.208*~~ *"New Miner Equipment Lender Debt Facilities (Election 2)"* means those certain loan and security agreements, dated as of the Effective Date (as the same may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof), in each case, by and between the Debtor that is party to the applicable Miner Equipment Lender Agreement and the applicable Holder, which shall contain terms consistent with the New Miner Equipment Lender Debt Term Sheet (Election 2) and be in form and substance otherwise reasonably acceptable to the Debtors and the Settling Miner Equipment Lenders party thereto.

*1.211*   *"New Notes"* means new notes in an aggregate principal amount up to $150,000,000, based on Holders' elections in accordance with section 4.1(c) hereof, pursuant to the New Notes Indenture.

*1.212* **"New Notes Agent"** means an Entity in its capacity as indenture trustee and collateral agent under the New Notes Indenture.

*1.213* **"New Notes Documents"** means, collectively, the New Notes Indenture and all other notes documents, including all other agreements, documents, and instruments delivered or entered into pursuant thereto or in connection therewith (including any guarantee agreements and collateral documentation) (in each case, as amended, restated, modified, or supplemented from time to time), each of which shall, to the extent applicable, contain terms consistent with the New Notes Term Sheet.

*1.214* **"New Notes Indenture"** means that certain indenture pursuant to which the New Notes shall be issued, to be dated as of the Effective Date, by and among, inter alia, the Reorganized Parent, as issuer, the applicable Debtors that are currently guarantors under the April NPA, the New Notes Agent, and the applicable Holders of April Convertible Notes Secured Claims, each of which shall contain terms consistent with the New Notes Term Sheet.

*1.215* **"New Notes Term Sheet"** means that certain term sheet attached hereto as **Exhibit E** that sets forth the principal terms of the New Notes Indenture.

*1.216* **"New Secured Notes"** means, as applicable, the New April Secured Notes (Default), if any, the New August Secured Notes (Default), if any, the New April Secured Notes (Settlement Election), if any, and/or the New August Secured Notes (Settlement Election), if any.

*1.217* **"New Secured Notes Documents"** means, as applicable, the New April Secured Notes Documents (Default), if any, the New August Secured Notes Documents (Default), if any, the New April Secured Notes Documents (Settlement Election), if any, and/or the New August Secured Notes Documents (Settlement Election), if any.

*1.218* **"New Secured Notes Indentures"** means, as applicable, the New April Secured Notes Indenture (Default), if any, the New August Secured Notes Indenture (Default), if any, the New April Secured Notes Indenture (Settlement Election), if any, and/or the New August Secured Notes Indenture (Settlement Election), if any.

*1.219* **"New Warrant Agreement"** means a warrant agreement governing the New Warrants, substantially in the form to be included in the Plan Supplement.

*1.220* **"New Warrants"** means two series of warrants: (i) Series A: warrants to purchase up to ten percent (10%) of the New Common Interests on a fully diluted basis which will vest upon the total enterprise value of the Reorganized Debtors being at least $2,250,000,000 with an exercise price equal to the equity value of the New Common Interests, calculated as an enterprise value of $2,250,000,000 less the difference of indebtedness and cash of the Reorganized Debtors at the time of vesting and (ii) Series B: warrants to purchase up to ten percent (10%) of the New Common Interests on a fully diluted basis which will vest upon the total enterprise value of the Reorganized Debtors being at least $2,500,000,000 with an exercise price equal to the equity value of the New Common Interests, calculated as an enterprise value of $2,500,000,000 less the difference of indebtedness and cash of the Reorganized Debtors at the time of vesting. Each series of New Warrants will be exercisable for seven (7) years, and otherwise on the terms and subject to the conditions set forth in the New Warrant Agreement.

*1.221* ~~*1.209*~~ **"Non-Miner Equipment Lender Claim (36th Street)"** means the Claim held by 36th Street Capital Partners, LLC arising from the 36th Street Non-Miner Agreements.

1.222 ~~1.210~~ **"Non-Miner Equipment Lender Claim (Bank of the West)"** means the Claim held by Bank of the West arising from the Bank of the West Agreement.

1.223 ~~1.211~~ **"Non-Miner Equipment Lender Claim (Dell)"** means the Claim held by Dell Financial Services L.L.C. arising from the Dell Agreements.

1.224 ~~1.212~~ **"Non-Miner Equipment Lender Claim (Indigo)"** means the Claim held by Indigo Direct Lending, LLC arising from the Indigo Agreement.

1.225 ~~1.213~~ **"Non-Miner Equipment Lender Claim (Meridian)"** means the Claim held by Meridian Equipment Finance LLC arising from the Meridian Agreement.

1.226 ~~1.214~~ **"Non-Miner Equipment Lender Claim (North Mill)"** means the Claim held by North Mill Equipment Finance LLC arising from the North Mill Agreements.

1.227 ~~1.215~~ **"Non-Miner Equipment Lender Claim (North Star)"** means the Claim held by North Star Leasing arising from the North Star Agreements.

1.228 ~~1.216~~ **"Non-Miner Equipment Lender Claim (Prime)"** means the Claim held by Prime Alliance Bank, Inc. arising from the Prime Agreements.

1.229 ~~1.217~~ **"Non-Miner Equipment Lender Claim (Wingspire)"** means the Claim held by Wingspire Equipment Finance LLC (f/k/a Liberty Commercial Finance LLC) arising from the Liberty Non-Miner Agreements.

1.230 ~~1.218~~ **"North Mill Agreements"** means, collectively, the North Mill Agreement (Schedule 3) and the North Mill Agreement (Schedule 5).  For the avoidance of doubt, (i) the North Mill Agreements are not Unexpired Leases and are financing agreements and (ii) the equipment that is the subject of the North Mill Agreements are Assets owned by the applicable Debtor.

1.231 ~~1.219~~ **"North Mill Agreement (Schedule 3)"** means that certain Equipment Schedule No. 3, dated November 16, 2021, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and Liberty Commercial Finance LLC, issued in connection with the Liberty Master Lease Agreement and subsequently assigned by Liberty Commercial Finance LLC to North Mill Equipment Finance LLC pursuant to that certain Notice and Acknowledgement of Assignment.

1.232 ~~1.220~~ **"North Mill Agreement (Schedule 5)"** means that certain Equipment Schedule No. 5, dated November 16, 2021, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and Liberty Commercial Finance LLC, issued in connection with the Liberty Master Lease Agreement and subsequently assigned by Liberty Commercial Finance LLC to North Mill Equipment Finance LLC pursuant to that certain Notice and Acknowledgement of Assignment.

1.233 ~~1.221~~ **"North Star Agreements"** means that certain Amended and Restated Equipment Schedule No. 4, dated November 16, 2021, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and Liberty Commercial Finance LLC, issued in connection with the Liberty Master Lease Agreement and subsequently assigned by Liberty Commercial Finance LLC to North Star Leasing pursuant to that certain Notice and Acknowledgement of Assignment.  For the avoidance of doubt, (i) the North Star Agreements are not Unexpired Leases and are financing agreements and (ii) the equipment that is the subject of the North Star Agreements are Assets owned by the applicable Debtor.

1.234   1.222 **"Notes Agent"** means U.S. Bank National Association, as note agent and collateral agent under the April NPA and the August NPA, and any successor in such capacity.

1.235   1.223 **"Notes Agent Fees and Expenses"** means the claims for reasonable fees, indemnities, compensation, expenses, disbursements, advancements, and any other amounts due to the Notes Agent or its predecessor arising under the April NPA or August NPA, including, among other things, attorneys' fees, expenses and disbursements, incurred by the Notes Agent or its predecessor prior to the Petition Date and through and including the Effective Date, and reasonable fees and expenses incurred in connection with distributions made pursuant to the Plan or the cancellation and discharge of the Convertible Notes.

1.236   1.224 **"Novak Agreements"** means that certain Term Loan and Purchase Money Security Agreement, dated January 30, 2021, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and Jack Novak, and that certain Promissory Note, dated January 30, 2021, issued in connection therewith.

1.237   1.225 **"Other Beneficial Owner"** means any current or former beneficial owner of equity securities of Core Scientific, Inc., purchased during the period from January 3, 2022 through December 20, 2022, inclusive.

1.238   1.226 **"Other Secured Claims"** means, collectively, the Bremer Secured Claim, Non-Miner Equipment Lender Claim (36th Street), Non-Miner Equipment Lender Claim (Bank of the West), Non-Miner Equipment Lender Claim (Dell), Non-Miner Equipment Lender Claim (Indigo), Non-Miner Equipment Lender Claim (Meridian), Non-Miner Equipment Lender Claim (North Mill), Non-Miner Equipment Lender Claim (North Star), Non-Miner Equipment Lender Claim (Prime), and Non-Miner Equipment Lender Claim (Wingspire).

1.239   1.227 **"Other Secured Claims Agreements"** means, collectively, the 36th Street Non-Miner Agreements, the Bremer Agreements, the Dell Agreements, the Indigo Agreement, the Liberty Non-Miner Agreements, the Meridian Agreement, the North Mill Agreements, the North Star Agreements, and the Prime Agreements.

1.240   1.228 "**Person**" means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, Governmental Unit, or other Entity.

1.241   1.229 "**Petition Date**" means, with respect to a Debtor, the date on which such Debtor commenced its Chapter 11 Case.

1.242   1.230 **"Plan"** means this joint chapter 11 plan, including all appendices, exhibits, schedules, and supplements hereto (including, without limitation, any appendices, schedules, and supplements to the Plan contained in the Plan Supplement), as the same may be amended, supplemented, or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof.

1.243   1.231 **"Plan Distribution"** means the payment or distribution of consideration to Holders of Allowed Claims and Existing Common Interests under the Plan.

1.244 ~~1.232~~ **"Plan Documents"** means any of the documents, other than the Plan, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, including the documents to be included in the Plan Supplement.

1.245 ~~1.233~~ **"Plan Settlements"** means, collectively, the Miner Equipment Lender Settlement, the B. Riley Settlement, the Brown Settlement, the Holliwood Settlement, and the Foundry Settlement.

1.246 ~~1.234~~ **"Plan Supplement"** means a supplemental appendix to the Plan containing certain documents and forms of documents, schedules, and exhibits relevant to the implementation of the Plan, as may be amended, modified, or supplemented from time to time in accordance with the terms hereof and the Bankruptcy Code and Bankruptcy Rules, which shall include, but not be limited to: (i) the New Corporate Governance Documents solely with respect to the Reorganized Parent; (ii) the New April Secured Notes ~~Indenture (Option 1~~Documents (Default)); (iii) the New August Secured Notes ~~Indenture (Option 1~~Documents (Default)); (iv) the New April Secured Notes ~~Indenture (Option 2~~Documents (Settlement Election); (v) the New August Secured Notes ~~Indenture (Option 2~~Documents (Settlement Election); (vi) the New Notes Documents; (vii) the New Miner Equipment Lender Debt Documents; ~~(vii) the Exit Credit Agreement;~~ (viii) the Exit Facility Documents; (ix) the New B. Riley ELOC Facility; ~~(ix) the Rights Offering Procedures;~~ (x) the New ~~Intercreditor~~Warrant Agreement; (xi) the ~~Foundry Settlement Agreement (with any appropriate redactions); (xii)~~Rights Offering Procedures; (xii) the New Intercreditor Agreements; (xiii) the Foundry Settlement Documents; (xiv) to the extent known, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; ~~(xiii~~xv) the Restructuring Transactions Exhibit; ~~(xiv~~xvi) the Schedule of Retained Causes of Action; ~~(xv~~xvii) the Schedule of Rejected Contracts; (xviii) the Schedule of Assumed Contracts; and ~~(xvii~~xix) any Management Incentive Plan allocation and related documents, if applicable; *provided,* that through the Effective Date, the Debtors shall have the right to amend the Plan Supplement and any schedules, exhibits, or amendments thereto, in accordance with the terms of the Plan; *provided, further,* that the New Corporate Governance Documents of the Reorganized Parent, the New Warrant Agreement, the Rights Offering Procedures and related documents shall be in form and substance otherwise reasonably acceptable to the Equity Committee.

1.247 ~~1.235~~ "**Plan Supplement Date**" means the Business Day that is at least ~~ten~~seven (~~10~~7) days before the Voting Deadline or such other later date determined by the Debtors.

1.248 ~~1.236~~ **"Plan Value"** means the value of a New Common Interest taking into account Enterprise Value, total debt issued by the Reorganized Debtors under the Plan, and the total number of New Common Interests issued under the Plan to Holders of Allowed Claims and Existing Common Interests in Classes 1, 2, 3, 8, 12, and 13 (but not including New Common Interests issued upon conversion, if any, of the New April Secured Notes (~~Option 1~~Settlement Election) or the New August Secured Notes (~~Option 1~~Settlement Election)); *provided, however,* Plan Value shall not take into account any New Common ~~Shares~~Interests issued under the Management Incentive Plan or issued upon exercise of the New Warrants, or any later issuance not specifically contemplated by the Plan.

1.249 ~~1.237~~ **"Prerequisite Condition"** shall have the meaning ascribed to such term in Section 9.2 of the Plan.

1.250 ~~1.238~~ **"Prime Agreements"** means, collectively, (i) that certain Equipment Schedule No. 2, dated November 16, 2021, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and Liberty Commercial Finance LLC, issued in connection with the Liberty Master Lease Agreement and subsequently assigned by Liberty Commercial Finance LLC to Prime Alliance Bank, Inc. pursuant to that certain Notice and Acknowledgement of Assignment, (ii) that certain Equipment Schedule No. 8, dated December 10, 2021, by and between Core Scientific, Inc. (now known

as Core Scientific Operating Company) and Core Scientific Holding Co. (now known as Core Scientific, Inc.), on one hand, and Liberty Commercial Finance LLC, on the other hand, issued in connection with the Liberty Master Lease Agreement and subsequently assigned by Liberty Commercial Finance LLC to Prime Alliance Bank, Inc. pursuant to that certain Notice and Acknowledgement of Assignment, and (iii) that certain Equipment Schedule No. 9, dated December 10, 2021, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and Core Scientific Holding Co. (now known as Core Scientific, Inc.), on one hand, and Liberty Commercial Finance LLC, on the other hand, issued in connection with the Liberty Master Lease Agreement and subsequently assigned by Liberty Commercial Finance LLC to Prime Alliance Bank, Inc. pursuant to that certain Notice and Acknowledgement of Assignment.  For the avoidance of doubt, (i) the Prime Agreements are not Unexpired Leases and are financing agreements and (ii) the equipment that is the subject of the Prime Agreements are Assets owned by the applicable Debtor.

1.251   1.239 "**Priority Non-Tax Claim**" means any Claim other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

1.252   1.240 "**Priority Tax Claim**" means any Secured Claim or unsecured Claim of a Governmental Unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.253   1.241 "**Professional**" means an Entity (i) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered on or after the Petition Date and before or on the Effective Date pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code; or (ii) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code that are not Restructuring Fees and Expenses.

1.254   1.242 "**Professional Fee Claims**" means all Claims for fees and expenses (including transaction and success fees) incurred by a Professional on or after the Petition Date and before or on the Effective Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court; *provided*, that any Professional Fee Claims of the Equity Committee shall be consistent with the *Agreed Order Directing the Appointment of an Official Committee of Equity Security Holders* (Docket No. 642).

1.255   1.243 "**Professional Fee Claims Estimate**" means the aggregate unpaid Professional Fee Claims through the Effective Date as estimated in accordance with section 2.7 of the Plan.

1.256   1.244 "**Professional Fee Escrow**" means an escrow account established and funded pursuant to section 2.6 of the Plan.

1.257   "**Pro Rata Equity Share**" means the proportion that a Holder of an Allowed Section 510(b) Claim or a Holder of an Existing Common Interest bears to the aggregate amount of Allowed Claims in Class 12 and Existing Common Interests in Class 13, which shall value the Existing Common Interests in Class 13 as equal to one-hundred percent (100%) of the value, at Plan Value, of the New Common Interests in the Residual Equity Pool, the New Warrants, and the Subscription Rights.

1.258   1.245 "**Pro Rata Share**" means the proportion that an Allowed Claim or Existing Common Interest in a particular Class bears to the aggregate amount of Allowed Claims or Existing Common Interests in that Class, or the proportion that Allowed Claims or Existing Common Interests in a particular Class bear to the aggregate amount of Allowed Claims and Disputed Claims or Existing

Common Interests in a particular Class and other Classes entitled to share in the same recovery as such Class under the Plan.

*1.259* *1.246* **"Proof of Claim"** means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

*1.260* *1.247* **"Reinstate, Reinstated, or Reinstatement"** means, with respect to Claims and Interests, the treatment provided for in section 1124(2) of the Bankruptcy Code.

*1.261* *1.248* **"Related Parties"** means with respect to a Person, that Person's current and former Affiliates, and such Person's and its current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, fiduciaries, trustees, advisory board members, financial advisors, partners, limited partners, general partners, attorneys, accountants, managed accounts or funds, management companies, fund advisors, investment bankers, consultants, representatives, and other professionals, and such Person's respective heirs, executors, estates, and nominees, each in their capacity as such.

*1.262* *1.249* **"Released Parties"** means, collectively: (i) the Debtors; (ii) the Reorganized Debtors; (iii) the Equity Committee and its members, solely in their capacity as such; (iv) the Backstop Parties; (v) B. Riley Commercial Capital, LLC; (vi) BRF Finance Co., LLC; (vii) the Settling Miner Equipment Lenders; (viii) Brown Corporation; (ix) Holliwood LLC; (x) Foundry; and (xi) with respect to each of the foregoing Persons in clauses (i) through (x), all current and former Related Parties. Notwithstanding the foregoing, any Person that opts out of the releases set forth in section 10.6(b) of the Plan shall not be deemed a Released Party thereunder.

*1.263* *1.250* **"Releasing Parties"** means collectively, and in each case solely in their capacity as such, (i) the Debtors; (ii) the Reorganized Debtors; (iii) with respect to each of the foregoing Persons in clauses (i) through (ii), all Related Parties; (iv) the Holders of all Claims or Interests that vote to accept the Plan; (v) the Holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan and do not opt out of granting the releases set forth herein; (vi) the Holders of all Claims or Interests that vote, or are deemed, to reject the Plan or that are presumed to accept the Plan but do not opt out of granting the releases set forth herein; and (vii) the Holders of all Claims and Interests and all Other Beneficial Owners that were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out.

*1.264* **"Remaining Claim Amount"** has the meaning set forth in section 4.1(c) hereof.

*1.265* *1.251* **"Reorganized Debtors"** means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, including Reorganized Parent.

*1.266* *1.252* **"Reorganized Parent"** means Core Scientific, Inc., a Delaware corporation, on and after the Effective Date.

*1.267* *1.253* **"Residual Equity Pool"** means the New Common Interests remaining following (i) any and all distributions of New Common Interests to (a) Holders of Allowed April Convertible Notes Secured Claims in Class 1 pursuant to section 4.1 hereof, (b) Holders of Allowed August Convertible Notes Secured Claims in Class 2 pursuant to section 4.2 hereof, (c) Holders of Allowed Miner Equipment

Lender Secured Claims pursuant to section 4.3 hereof, (d) Holders of Allowed General Unsecured Claims in Class 8 pursuant to section 4.8 hereof, (e) Holders of Existing Common Interests that participate in the Rights Offering on account of Rights Offering Shares, and (f) the Backstop Parties on account of the Backstop Commitment Premium and (ii) the issuance and reservation of New Common Interests pursuant to the Bitmain Transaction.  For the avoidance of doubt, the following shall dilute the Residual Equity Pool: (i) the Rights Offering Shares and (ii) the New Common Interests issued (a) upon conversion of the New Secured Notes, (b) upon exercise of the New Warrants, (c) pursuant to the Management Incentive Plan, and (d) pursuant to the assumed Stock Option Award Agreements and RSU Award Agreements (if and when the Stock Options and Unvested RSUs are exercised or become vested, respectively) shall dilute the Residual Equity Pool.

1.268    1.254 "**Restricted Stock**" means restricted stock that is outstanding pursuant to the terms of the 2018 Equity Plan and the applicable individual Restricted Stock Award Agreement.

1.269    1.255 "**Restricted Stock Award Agreement**" means an award agreement by and between Core Scientific, Inc. (or any of its predecessors in interest, including MineCo Holdings, Inc.) and a grantee evidencing a grant of restricted stock pursuant to the 2018 Equity Plan.

1.270    1.256 "**Restructuring Fees and Expenses**" means the reasonable and documented fees, costs and expenses of the Ad Hoc Noteholder Group Advisors, the Backstop Parties pursuant to the Backstop Commitment Agreement, the Settling Miner Equipment Lenders subject to the terms and conditions set forth in the Miner Equipment Lender Settlement, and the DIP Lenders, in each case, in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and/or enforcement of the Plan, the Rights Offering, and/or the transactions contemplated hereby and, to the extent applicable, consistent with the terms and provisions of the DIP Order.

1.271    1.257 "**Restructuring Transactions**" means one or more transactions to occur on the Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary or appropriate to effectuate the Plan, including: (i) the execution and delivery of any appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Persons may agree, including the documents comprising the Plan Supplement; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Persons agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, amalgamation, consolidation, conversion, or dissolution pursuant to applicable state law; (iv) such other transactions that are required to effectuate the Restructuring Transactions Exhibit in the most tax efficient manner for the Debtors and Reorganized Debtors, including any mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; (v) the issuance of securities, all of which shall be authorized and approved in all respects, in each case, without further action being required under applicable law, regulation, order or rule; and (vi) any mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations necessary or appropriate to simplify or otherwise optimize the Debtors' organizational structure; and (vii) all other actions that the applicable Persons determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

*1.272* *1.258* **"Restructuring Transactions Exhibit"** means a memorandum setting forth the transactions that are required to effectuate the Restructuring Transactions contemplated by the Plan and included in the Plan Supplement.

*1.273* *1.259* **"Rights Offering"** means, collectively, the 1145 Rrights Ooffering and the 4(a)(2)/Reg D Rights Offering, in each case to be conducted pursuant to the Rights Offering Procedures in reliance upon the exemption from registration under the Securities Act provided in section 1145 of the Bankruptcy Code.

*1.274* *1.260* **"Rights Offering Procedures"** means the procedures in form and substance acceptable to the Backstop Parties for the implementation of the Rights Offering, as approved by the Bankruptcy Court pursuant to the Backstop Order.

*1.275* *1.261* "**Rights Offering Record Date**" means AugustSeptember [●●], 2023.

*1.276* *1.262* **"Rights Offering Shares"** means the New Common Interests purchased via the exercise of Subscription Rights pursuant to the Rights Offering Procedures.

*1.277* *1.263* "**RSA**" means that certain Restructuring Support Agreement, dated December 22, 2022, by and among Core Scientific, Inc. and the Consenting Creditors (as defined in the RSA), which was terminated on February 9, 2023.

*1.278* *1.264* "**RSU**" means a restricted stock unit that is outstanding pursuant to the terms of an Equity Incentive Plan and the applicable individual RSU Award Agreement.

*1.279* *1.265* **"RSU Award Agreement"** means an individual award agreement, by and between Core Scientific, Inc. (or any of its predecessors in interest, *e.g.*, MineCo Holdings, Inc.) and a grantee evidencing a grant of RSUs pursuant to the 2018 Equity Plan or the 2021 Equity Plan, as applicable.

*1.280* *1.266* **"Schedule of Assumed Contracts"** means the schedule of Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time, and to be included in the Plan Supplement.

*1.281* *1.267* **"Schedule of Rejected Contracts"** means the schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, if any, as the same may be amended, modified, or supplemented from time to time, and to be included in the Plan Supplement.

*1.282* *1.268* **"Schedule of Retained Causes of Action"** means the schedule of Causes of Action to be retained by the Reorganized Debtors as set forth in the Plan Supplement.

*1.283* *1.269* "**Schedules**" means any schedules of Assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, as the same may have been amended, modified, or supplemented from time to time.

*1.284* *1.270* "**Section 510(b) Claims**" means any Claim against any Debtor (i) arising from the rescission of a purchase or sale of an Interest of any Debtor or an Affiliate of any Debtor (including the Existing Common Interests); (ii) for damages arising from the purchase or sale of such Interest; or (iii) for reimbursement or contribution Allowed under section 502 of the Bankruptcy Code on account of such a Claim.   For the avoidance of doubt, (i) any claims asserted or assertable against the Debtors in the

Securities Class Action and (ii) Proofs of Claim Nos. 52, 54, 81, 82, 241, 351, ~~and~~ 556, and 632 shall, in each case, constitute Section 510(b) Claims.

*1.285* ~~*1.271*~~ *"Secured Claim"* means a Claim (i) secured by a Lien on Collateral to the extent of the value of such Collateral as (a) set forth in the Plan, (b) agreed to by the Holder of such Claim and the Debtors, or (c) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code exceeds the value of the Claim, or (ii) secured by the amount of any right of setoff of the Holder thereof in accordance with section 553 of the Bankruptcy Code.

*1.286* ~~*1.272*~~ *"Secured Mortgage Claim (Brown)"* means the Secured Claim held by Brown Corporation arising from the Brown Agreement.

*1.287* ~~*1.273*~~ *"Secured Mortgage Claim (Holliwood)"* means the Secured Claim held by Holliwood LLC arising from the Holliwood Agreements.

*1.288* ~~*1.274*~~ *"Secured Mortgage Claims"* means, collectively, the Secured Mortgage Claim (Brown) and the Secured Mortgage Claim (Holliwood).

*1.289* ~~*1.275*~~ *"Secured Mortgage Claims Schedule"* means the schedule attached hereto as **Exhibit ~~K~~M**.

*1.290* ~~*1.276*~~ *"Securities Act"* means the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder.

*1.291* ~~*1.277*~~ *"Securities Class Action"* means the class action pending in the United States District Court for the Western District of Texas, Austin Division, styled as *Pang v. Levitt et al.*, Case No. 1:22-cv-01191.

*1.292* ~~*1.278*~~ *"Security"* means any Security, as such term is defined in section 101(49) of the Bankruptcy Code.

*1.293* ~~*1.279*~~ *"Settled B. Riley Unsecured Claims Amount"* means approximately $38,000,000.

*1.294* ~~*1.280*~~ *"Settled April Convertible Notes Secured Claims Amount"* means, in the aggregate, (i) $316,581,246.28, which is the sum of (a) the principal amount of April Convertible Notes, plus (b) accrued and unpaid interest at ten percent (10%) per annum through the Petition Date, plus (c) $76,955,046.00 in accreted original issue discount through the Petition Date, plus (ii) accrued interest at ten percent (10%) from the Petition Date through the Effective Date.

*1.295* ~~*1.281*~~ *"Settling Miner Equipment Lenders"* means 36th Street Capital Partners LLC; Anchorage Lending CA, LLC; Barings BDC, Inc.; Barings Capital Investment Corporation; Barings Private Credit Corp.; BlockFi Lending LLC, MassMutual Asset Finance LLC; Stonebriar Commercial Finance LLC; Trinity Capital Inc.; and any other Holder of Miner Equipment Lender Claims that agrees with the Debtors to become a Settling Miner Equipment Lender prior to the Voting Deadline.

*1.296* ~~*1.282*~~ "*SIR*" means self-insured retention or similar deductible.

*1.297* ~~*1.283*~~ *"Solicitation Materials*" means materials used in connection with the solicitation of votes on the Plan, including the Disclosure Statement, the Disclosure Statement Approval Order, and any procedures established by the Bankruptcy Court with respect to solicitation of votes on the Plan.

1.298   1.284 "**Stock Option**" means a stock option that is outstanding (and unexercised) pursuant to the terms of the 2018 Equity Plan and the applicable individual Stock Option Award Agreement.

1.299   1.285 "**Stock Option Award Agreement**" means an award agreement by and between Core Scientific, Inc. (or any of its predecessors in interest, including MineCo Holdings, Inc.) and a grantee evidencing a grant of stock options pursuant to the 2018 Equity Plan.

1.300   1.286 "**Stonebriar Agreement**" means that certain Equipment Finance Agreement #50324, dated March 22, 2022, by and between Core Scientific, Inc. and Liberty Commercial Finance LLC, and subsequently assigned by Liberty Commercial Finance LLC to Stonebriar Commercial Finance LLC pursuant to that certain Notice and Acknowledgment of Assignment.  For the avoidance of doubt, (i) the Stonebriar Agreement is not an Unexpired Lease and is a financing agreement and (ii) the equipment that is the subject of the Stonebriar Agreement are Assets owned by the applicable Debtor.

1.301   1.287 "**Subcontractor**" means a Person that labors or has furnished labor, materials equipment and/or services to fulfill an obligation to a General Contractor or to a Subcontractor of any tier to perform all or part of the work required by a General Contract.

1.302   1.288 "**Subscription Rights**" means the right to participate in the Rights Offering and shall encompass both the 1145 Subscription Rights and the 4(a)(2)/Reg D Subscription Rights.

1.303   1.289 "**Subcontractor Claim**" means a Claim held by a Subcontractor, which Claim shall be Disallowed.

1.304   1.290 "**Subsequent Condition**" shall have the meaning ascribed to such term in Section 9.2 of the Plan.

1.305   1.291 "**Substantive Consolidation Settlement**" means a settlement, approved by the Bankruptcy Court pursuant to Bankruptcy Rule 9019 and implemented in accordance with the Plan, authorizing the substantive consolidation of the of the Assets and liabilities of the Substantively Consolidated Debtors.

1.306   1.292 "**Substantively Consolidated Debtors**" means, collectively, American Property Acquisition, LLC, American Property Acquisitions I, LLC, American Property Acquisitions VII, LLC, and Core Scientific Operating Company.

1.307   1.293 "**Supplemental KERP**" means the Debtors' supplemental key employee retention program, which the Debtors are requesting that the Bankruptcy Court approve pursuant to the Supplemental KERP Motion.

1.308   1.294 "**Supplemental KERP Motion**" means the *Motion of Debtors for Entry of Order Approving and Authorizing Implementation of Supplemental Non-Insider Key Employee Retention Plan* (Docket No. [●]).

1.309   1.295 "**Supplemental KERP Order**" means any order approving the Supplemental KERP Motion.

1.310   1.296 "**Trading Order**" means the *Final Order Establishing Noticing Procedures and Approving Restrictions on (A) Certain Transfers of Interests in the Debtors, and (B) Claiming of Certain*

*Worthless Stock Deductions, Pursuant to Section 362 and 105(a) of the Bankruptcy Code* (Docket No. 120).

*1.311* ~~*1.297*~~ **"Trinity Agreements OpCo"** means, collectively, (i) that certain Equipment Financing Schedule No. 1, dated August 31, 2021, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and Trinity Capital Inc., issued in connection with that certain Master Equipment Financing Agreement, dated August 31, 2021, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and Trinity Capital Inc., (ii) that certain Equipment Financing Schedule No. 2, dated ~~August 31~~November 19, 2021, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and Trinity Capital Inc., issued in connection with that certain Master Equipment Financing Agreement, dated August 31, 2021, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and Trinity Capital Inc., and (iii) that certain Equipment Financing Schedule No. 3, dated December 10, 2021, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and Trinity Capital Inc., issued in connection with that certain Master Equipment Financing Agreement, dated August 31, 2021, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and Trinity Capital Inc.

*1.312* ~~*1.298*~~ **"Trinity Agreement Parent"** means that certain Equipment Financing Schedule No. 4, dated February 9, 2022, by and between Core Scientific, Inc. and Trinity Capital Inc., issued in connection with that certain Master Equipment Financing Agreement, dated August 31, 2021, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and Trinity Capital Inc.

*1.313* ~~*1.299*~~ "**U.S. Trustee**" means the United States Trustee for Region 7.

*1.314* ~~*1.300*~~ **"Unexpired Lease"** means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

*1.315* ~~*1.301*~~ "**Unimpaired**" means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of section 1124 of the Bankruptcy Code.

*1.316* ~~*1.302*~~ **"Unvested Restricted Stock"** means any Restricted Stock that, as of immediately prior to the Effective Date, remains unvested pursuant to the terms of the 2018 Equity Plan and the applicable Restricted Stock Award Agreement.

*1.317* ~~*1.303*~~ **"Unvested RSU"** means any RSU that, as of immediately prior to the Effective Date, remains unvested pursuant to the terms of the applicable Equity Incentive Plan and RSU Award Agreement.

*1.318* ~~*1.304*~~ **"Unvested Stock Option"** means any Stock Option that, as of immediately prior to the Effective Date, remains unvested pursuant to the terms of the applicable Equity Incentive Plan and Stock Option Award Agreement.

*1.319* ~~*1.305*~~ **"Vested Restricted Stock"** means any Restricted Stock that, as of immediately prior the Effective Date, has vested (but remains unsettled) in accordance with the terms of the applicable Equity Incentive Plan and Restricted Stock Award Agreement.

*1.320* ~~*1.306*~~ **"Vested RSU"** means any RSU that, as of immediately prior to the Effective Date, has vested (but remains unsettled) in accordance with the terms of the applicable Equity Incentive Plan and RSU Award Agreement.

1.321   ~~1.307~~ "**Vested Stock Option**" means any Stock Option that, as of immediately prior to the Effective Date, has vested (but remains unsettled) in accordance with the terms of the applicable Equity Plan and Stock Option Award Agreement.

1.322   ~~1.308~~ "**Voting Deadline**" means the date and time as may be set by the Bankruptcy Court pursuant to the Solicitation Materials.

1.323   ~~1.309~~ "**Workers' Compensation Programs**" has the meaning as set forth in the *Final Order (I) Authorizing Debtors to (A) Continue Insurance Programs and Surety Bond, (B) Pay Certain Obligations with Respect Thereto; (II) Granting Relief from the Automatic Stay with Respect to Workers' Compensation Claims; and (III) Granting Related Relief* (Docket No. 118).

B.     **Interpretation; Application of Definitions and Rules of Construction**.

For purposes herein: (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) except as otherwise provided herein, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) except as otherwise provided, any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the Plan and/or the Confirmation Order, as applicable; (iv) unless otherwise specified herein, all references herein to "Articles" are references to Articles of the Plan or hereto; (v) unless otherwise stated herein, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (vi) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (vii) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (viii) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the Plan; (ix) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (x) any docket number references in the Plan shall refer to the docket number of any document Filed with the Bankruptcy Court in the Chapter 11 Cases; (xi) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (xii) except as otherwise provided herein, any reference to a document or agreement that is to be issued or entered into that is dependent on an election to be made pursuant to the Plan or an event occurring shall be deemed to be followed by the words "if applicable"; (xiii) any immaterial effectuating provisions may be interpreted by the Debtors, or after the Effective Date, the Reorganized Debtors, in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; *provided*, that any effectuating provision that has an economic impact will not be considered "immaterial"; and (xiv) except as otherwise provided, any references to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter.  To the extent that the treatment, allowance, or disallowance of any Claim herein is interpreted as a claim objection, the Plan shall be deemed a Claim objection to such Claim.

C.     **Computation of Time**

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next Business Day but shall be deemed to have been completed as of the required date.

D.     **Reference to Monetary Figures**.

All references in the Plan to monetary figures shall refer to the legal tender of the United States of America, unless otherwise expressly provided.

E.     **Reference to the Debtors or the Reorganized Debtors**

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

F.     **Controlling Document**.

In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or the Confirmation Order).  In the event of an inconsistency between the Plan and any other instrument or document created or executed pursuant to the Plan, or between the Plan and the Disclosure Statement, the Plan shall control.  The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; *provided*, that, if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of the Plan.

## ARTICLE II.     ADMINISTRATIVE EXPENSE CLAIMS, PROFESSIONAL FEE CLAIMS, DIP CLAIMS, AND PRIORITY TAX CLAIMS.

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims (including DIP Claims, Professional Fee Claims, Priority Tax Claims, and postpetition Intercompany Claims) have not been classified and, thus, are excluded from the classification of Claims and Interests set forth in Article III.

2.1.     *Administrative Expense Claims*.

Except to the extent that a Holder of an Allowed Administrative Expense Claim agrees to different treatment, each Holder of an Allowed Administrative Expense Claim (other than a Professional Fee Claim or Restructuring Fees and Expenses) shall receive, in full and final satisfaction of such Claim, (i) Cash in an amount equal to such Allowed Administrative Expense Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code; *provided*, *however*, Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in

Possession, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders, course of dealing or agreements governing, instruments evidencing, or other documents relating to such transactions.  For the avoidance of doubt, the Administrative Expense Claim asserted by Celsius Mining LLC shall not be an Allowed Administrative Expense Claim unless and until Allowed by a Final Order.

2.2.      *Professional Fee Claims*.

(a)      All Professionals seeking approval by the Bankruptcy Court of Professional Fee Claims shall (i) File, on or before the date that is forty-five (45) days after the Effective Date (unless extended by the Reorganized Debtors), their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (ii) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or allowing any such Professional Fee Claims.

(b)      The Reorganized Debtors are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

2.3.      *Priority Tax Claims*.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, at the sole option of the Debtors or the Reorganized Debtors, as applicable, (i) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date, (b) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course, or (ii) such other treatment reasonably acceptable to the Debtors or Reorganized Debtors (as applicable) and consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code; *provided* that the Debtors and the Reorganized Debtors, as applicable, are authorized in their absolute discretion, but not directed, to prepay all or a portion of any such amounts at any time without penalty or premium.  For the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

2.4.      *DIP Claims*.

On the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim, each Holder of an Allowed DIP Claim shall receive, on a dollar-for-dollar basis, first-lien delayed draw term loans under the Exit Credit Agreement in the principal amount equal to such Allowed DIP Claim.  Upon the indefeasible payment or satisfaction of the Allowed DIP Claims in Cash and/or in the form of first-lien loans under the Exit Credit Agreement, on the Effective Date, all Liens granted to secure the Allowed DIP Claims shall be terminated and of no further force and effect.

2.5.     ***Restructuring Fees and Expenses and Notes Agent Fees and Expenses.***

(a)      The Restructuring Fees and Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as soon as reasonably practicable thereafter (to the extent not previously paid or satisfied during the course of the Chapter 11 Cases) without any requirement to File a fee application with the Bankruptcy Court or without any requirement for Bankruptcy Court review or approval.  All Restructuring Fees and Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least three (3) Business Days before the anticipated Effective Date; *provided*, *however*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Fees and Expenses.  On the Effective Date, or as soon as practicable thereafter, final invoices for all Restructuring Fees and Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.

(b)      Pursuant to the August NPA and April NPA, all accrued and unpaid reasonable and documented Notes Agent Fees and Expenses incurred up to (and including) the Effective Date shall be paid in full in Cash on the Effective Date, in each case without (i) any reduction to recoveries of the holders of April Convertible Notes Secured Claims or August Convertible Notes Secured Claims, (ii) any– requirement to File a fee application with the Bankruptcy Court, (iii) the need for itemized time detail, or (iv) any requirement for Bankruptcy Court review.

2.6.     ***Professional Fee Escrow***.

(a)      As soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow with Cash equal to the Professional Fee Claims Estimate, and no Liens, Claims, or interests shall encumber the Professional Fee Escrow in any way.  The Professional Fee Escrow (including funds held in the Professional Fee Escrow) (i) shall not be and shall not be deemed property of the Debtors, the Debtors' Estates, or the Reorganized Debtors and (ii) shall be held in trust for the Professionals; *provided* that funds remaining in the Professional Fee Escrow after all Allowed Professional Fee Claims have been irrevocably paid in full shall revert to the Reorganized Debtors.  Allowed Professional Fee Claims shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow when such Claims are Allowed by an order of the Bankruptcy Court; *provided* that the Debtors' obligations with respect to Professional Fee Claims shall not be limited nor deemed to be limited in any way to the balance of funds held in the Professional Fee Escrow.

(b)      If the amount of funds in the Professional Fee Escrow is insufficient to fund payment in full of all Allowed Professional Fee Claims and any other Allowed amounts owed to Professionals, the deficiency shall be promptly funded to the Professional Fee Escrow from the Debtors' Estates without any further action or order of the Bankruptcy Court.

(c)      Any objections to Professional Fee Claims shall be served and Filed no later than twenty-one (21) days after Filing of the final applications for compensation or reimbursement.

2.7.     ***Professional Fee Claims Estimate.***

Each Professional shall estimate in good faith its unpaid Professional Fee Claim and other unpaid fees and expenses incurred in rendering services to the Debtors, the Creditors' Committee, or the Equity Committee, as applicable, before and as of the Effective Date and shall deliver such reasonable, good faith estimate to the Debtors no later than five (5) Business Days prior to the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that

are the subject of the Professional's final request for payment of Filed Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors shall estimate in good faith the unpaid and unbilled fees and expenses of such Professional.

2.8.　　*Post-Effective Date Fees and Expenses*.

(a)　　Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash all reasonable legal, professional, or other fees and expenses related to implementation of the Plan incurred by the Debtors or the Reorganized Debtors, as applicable.

(b)　　Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention for services rendered after such date shall terminate, and the Debtors or the Reorganized Debtors, as applicable, may employ any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE III.　　CLASSIFICATION OF CLAIMS AND INTERESTS.

3.1.　　*Classification in General*.

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided* that a Claim or Interest is placed in a particular Class for the purpose of receiving Plan Distributions only to the extent that such Claim or Interest is an Allowed Claim or Existing Common Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.  All of the potential Classes for the Debtors are set forth herein.  Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in section 3.6.

3.2.　　*Summary of Classification*.

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (c) presumed to accept or deemed to reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified.  The classification of Claims and Interests set forth herein shall apply separately to each Debtor, with the Substantively Consolidated Debtors treated as a single Debtor for classification purposes to the extent that the Bankruptcy Court determines that an Impaired accepting Class of Claims is required at each Debtor entity pursuant to section 1129(a)(10) of the Bankruptcy Code.

| Class | Designation | Treatment | Entitled to Vote |
|:---:|:---|:---:|:---:|
| 1 | April Convertible Notes Secured Claims | Impaired | Yes |
| 2 | August Convertible Notes Secured Claims | Impaired | Yes |
| 3 | Miner Equipment Lender Secured Claims | Impaired | Yes |
| 4 | Other Secured Claims | Unimpaired | No (Presumed to Accept) |

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 5 | M&M Lien Secured Claims | Impaired | Yes |
| 6 | Secured Mortgage Claims | Impaired | Yes |
| 7 | Priority Non-Tax Claims | Unimpaired | No (Presumed to Accept) |
| 8 | General Unsecured Claims | Impaired | Yes |
| 9 | B. Riley Unsecured Claims | Impaired | Yes |
| 10 | Intercompany Claims | Unimpaired/Impaired | No (Presumed to Accept/Deemed to Reject) |
| 11 | Intercompany Interests | Unimpaired/Impaired | No (Presumed to Accept/Deemed to Reject) |
| 12 | Section 510(b) Claims | Impaired | Yes |
| 13 | Existing Common Interests | Impaired | Yes |

3.3.     ***Special Provision Governing Unimpaired Claims***.

Except as otherwise provided in the Plan, nothing under the Plan shall affect, diminish, or impair the rights of the Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims or Reinstated Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims or Reinstated Claims; and, except as otherwise specifically provided in the Plan, nothing herein shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Petition Date, against or with respect to any Claim that is Unimpaired (including, for the avoidance of doubt, any Claim that is Reinstated) by the Plan.  Except as otherwise specifically provided in the Plan, the Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff, and other legal or equitable defenses that the Debtors had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights with respect to any Reinstated Claim or Claim that is Unimpaired by this Plan may be asserted after the Confirmation Date and the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

3.4.     ***Elimination of Vacant Classes***.

Any Class of Claims against or Interests in a Debtor that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan of such Debtor for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether such Debtor's Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

3.5.     ***No Waiver***.

Nothing contained in the Plan shall be construed to waive a Debtor's or other Person's right to object on any basis to any Disputed Claim.

3.6.     ***Voting Classes; Presumed Acceptance by Non-Voting Classes***.

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class.

3.7.     ***Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.***

The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan to the extent, if any, confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including to implement a merger of two or more Debtor Entities, the assignment of Assets from one Debtor Entity to one or more Debtor Entities, and/or other transactions.

3.8.     ***Substantive Consolidation of Certain Debtors.***

As further described in section 5.12 5.13 hereof, to the extent that the Bankruptcy Court determines that an Impaired accepting Class of Claims is required at each Debtor Entity under section 1129(a)(10) of the Bankruptcy Code, the Plan may, in the Debtors' sole discretion, be implemented through a substantive consolidation of the Assets and liabilities of the Substantively Consolidated Debtors in accordance with the Substantive Consolidation Settlement or otherwise.  Accordingly, in the event of the substantive consolidation of the Assets and liabilities of the Substantively Consolidated Debtors, each Class of Claims or Interests for the Substantively Consolidated Debtors shall be considered a Class of Claims or Interests for the consolidated Estate of the Substantively Consolidated Debtors.

**ARTICLE IV.      TREATMENT OF CLAIMS AND INTERESTS.**

4.1.     ***April Convertible Notes Secured Claims (Class 1).***

(a)     *Classification*:  Class 1 consists of the April Convertible Notes Secured Claims.

(b)     *Allowance*:  The Each April Convertible Notes Secured Claims are is Allowed pursuant to section 506(a) of the Bankruptcy Code as follows:

(i)     if the Holder of an April Convertible Notes Secured Claim does not timely elect the April Convertible Noteholder Treatment Settlement Election, such Holder's April Convertible Notes Secured Claim is Allowed in the amount of such Holder's Pro Rata Share of the Allowed Non-Settled April Convertible Notes Secured Claims Amount; or

(ii)     (i) if Class 1 is an Accepting Class, in the aggregate amount the Holder of an April Convertible Notes Secured Claim timely elects the April Convertible Noteholder Treatment Settlement Election, such Holder's April Convertible Notes Secured Claim is Allowed in amount of such Holder's Pro Rata Share of the Settled April Convertible Notes Secured Claims Amount, which represents a settlement of the parties' dispute over whether any amounts are owed in respect of the "Repayment Amount" (as defined in the April NPA); or.

(ii) if Class 1 is not an Accepting Class, in the aggregate amount of the Allowed Non-Settled April Convertible Notes Secured Claims Amount.

(c)     *Treatment*:  Except to the extent that a Holder of an Allowed April Convertible Notes Secured Claim (i) agrees to a less favorable treatment of such Claim or (ii) timely elects the April Convertible Noteholder Treatment Settlement Election (as set forth below) on or before the Voting Deadline, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date or as soon as reasonably practicable thereafter:, a

New April Secured Note (Default) in the principal amount of such Holder's Pro Rata Share of the Allowed Non-Settled April Convertible Notes Secured Claims Amount (the "**Default April Convertible Noteholder Treatment**").

Each Holder of an Allowed April Convertible Notes Secured Claim may elect on its Ballot to receive on the Effective Date, or as soon as reasonably practicable thereafter, in lieu of the Default April Convertible Noteholder Treatment, in each case in full and final satisfaction, settlement, release, and discharge of such Holder's Allowed April Convertible Notes Secured Claim, (a) New Notes in the principal amount of a percentage (up to one hundred percent (100%)) of such Holder's Pro Rata Share of the Settled April Convertible Notes Secured Claims Amount, which percentage such Holder shall elect on its Ballot (the "**Elected Percentage**") and (b) on account of the Holder's remaining Pro Rata Share of the Settled April Convertible Notes Secured Claims Amount after taking into account the Elected Percentage (the "**Remaining Claim Amount**"), (i) a New April Secured Note (Settlement Election) in the principal amount of fifty percent (50%) of the Remaining Claim Amount and (ii) New Common Interests with a value, based on Plan Value, equal to fifty percent (50%) of the Remaining Claim Amount; *provided*, that if Holders in Class 1 elect to receive a recovery in New Notes that would result in more than $150,000,000 in New Notes in the aggregate, then each such Holder's Elected Percentage shall be reduced on a pro rata basis, taking into account the total amount of Allowed April Convertible Notes Secured Claims on account of which the Holders have elected to receive New Notes, such that the aggregate amount of New Notes equals $150,000,000, and the proportion of the Holder's Settled April Convertible Notes Secured Claim Amount commensurate with the amount of such reduction shall receive the Remaining Claim Amount treatment.

(i) If Class 1 is an Accepting Class, (a) a New April Secured Note (Option 1) in the principal amount, of seventy-five percent (75%) of such Holder's Pro Rata Share of the Settled April Convertible Notes Secured Claims Amount and (b) New Common Interests with a value, based on Plan Value, equal to twenty-five percent (25%) of such Holder's Pro Rata Share of the Settled April Convertible Notes Secured Claims Amount; *provided*, that each Holder shall have the option to elect on its Ballot to receive (y) a New April Secured Note (Option 1) in the principal amount of any amount less than (but never more than) seventy-five percent (75%) of such Holder's Pro Rata Share of the Settled April Convertible Notes Secured Claims Amount and (z) New Common Interests with a value, based on Plan Value, equal to any amount more than (but never less than) twenty-five percent (25%) of such Holder's Pro Rata Share of the Settled April Convertible Notes Secured Claims Amount; *provided*, that for the avoidance of doubt, the percentages such Holder elects on its Ballot pursuant to (y) and (z) must equal one hundred percent (100%) of such Holder's Pro Rata Share of the Settled April Convertible Notes Secured Claims Amount; and, *provided*, *further*, that if such percentages set forth on a Holder's Ballot, when added together, exceed one-hundred percent (100%) of such Holder's Pro Rata Share of the Settled April Convertible Notes Secured Claims Amount, the percentage such Holder elects to receive in a New April Secured Note (Option 1) will be reduced down such that the percentages elected pursuant to (y) and (z), when added together, equal one hundred percent (100%) of such Holder's Pro Rata Share of the Settled April Convertible Notes Secured Claims Amount.

(ii) If Class 1 is not an Accepting Class, such Holder's Pro Rata Share of New April Secured Notes (Option 2).

43

(d)      *Impairment and Voting*:  Class 1 is Impaired, and the Holders of April Convertible Notes Secured Claims in Class 1 are entitled to vote to accept or reject the Plan.

### 4.2.      *August Convertible Notes Secured Claims (Class 2)*.

(a)      *Classification*:  Class 2 consists of August Convertible Notes Secured Claims.

(b)      *Allowance*:  The August Convertible Notes Secured Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code in the aggregate amount of Allowed August Convertible Notes Secured Claims Amount.

(c)      *Treatment*:  Except to the extent that a Holder of an Allowed August Convertible Notes Secured Claim (i) agrees to a less favorable treatment of such Claim or (ii) timely elects the August Convertible Noteholder Treatment Settlement Election (as set forth below) on or before the Voting Deadline, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date or as soon as reasonably practicable thereafter:

~~(i) If Class 2 is an Accepting Class, (a),~~ a New August Secured Note (~~Option 1~~Default) in the principal amount~~, of seventy-five percent (75%)~~ of such Holder's Pro Rata Share of the Allowed August Convertible Notes Secured Claims Amount ~~and (b) New Common Interests with a value, based on Plan Value, equal to twenty-five percent (25%)~~ (the "**Default August Convertible Noteholder Treatment**").

~~of such Holder's Pro Rata Share of the~~Each Holder of an Allowed August Convertible Notes Secured Claims ~~Amount; *provided*, that each Holder shall have the option to~~may elect on its Ballot to receive (~~yon~~ the Effective Date, or as soon as reasonably practicable thereafter, in lieu of the Default August Convertible Noteholder Treatment, in each case in full and final satisfaction, settlement, release, and discharge of such Holder's Allowed August Convertible Notes Secured Claim, (i) a New August Secured Note (~~Option 1~~Settlement Election) in the principal amount of ~~any amount less than (but never more than) seventy-five~~fifty percent (~~75~~50%) of such Holder's Pro Rata Share of the Allowed August Convertible Notes Secured Claims Amount and (~~zii~~) New Common Interests with a value, based on Plan Value, equal to ~~any amount more than (but never less than) twenty-five percent (25~~fifty-percent (50%) of such Holder's Pro Rata Share of the Allowed August Convertible Notes Secured Claims Amount~~; *provided*, that for the avoidance of doubt, the percentages such Holder elects on its Ballot pursuant to (y) and (z) must equal one-hundred percent (100%) of such Holder's Pro Rata Share of the Allowed~~ (the "**August Convertible** ~~Notes Secured Claims Amount; and, *provided*, *further*, that if such percentages set forth on a Holder's Ballot, when added together, exceed one-hundred percent (100%) of such Holder's Pro Rata Share of the Allowed August Convertible Notes Secured Claims Amount, the percentage such Holder elects to receive in a New August Secured Note (Option 1) will be reduced down such that the percentages elected pursuant to (y) and (z), when added together, equal one-hundred percent (100%) of such Holder's Pro Rata Share of the Allowed August Convertible Notes Secured Claims Amount.~~**Noteholder Treatment Settlement Election**").

~~(ii) If Class 2 is not an Accepting Class, such Holder's Pro Rata Share of New August Secured Notes (Option 2).~~

(d)      *Impairment and Voting*:  Class 2 is Impaired, and the Holders of August Convertible Notes Secured Claims in Class 2 are entitled to vote to accept or reject the Plan.

4.3.    *Miner Equipment Lender Secured Claims (Class 3)*.

(a)    *Classification*:  Class 3 consists of Miner Equipment Lender Secured Claims. Each Miner Equipment Lender Secured Claim shall be treated as a separate subclass of Class 3 for purposes of voting to accept or reject the Plan and receiving Plan Distributions.

(b)    *Allowance*:  Each Miner Equipment Lender Secured Claim and Miner Equipment Lender Deficiency Claim is Allowed pursuant to section 506(a) of the Bankruptcy Code in the applicable Allowed Miner Equipment Lender Secured Claims Amount and the applicable Allowed Miner Equipment Lender Deficiency Claims Amount, respectively.

(c)    *Treatment*:  Except to the extent that a Holder of an Allowed Miner Equipment Lender Secured Claim (i) agrees to a less favorable treatment of such Claim or (ii) timely elects the Miner Equipment Lender Treatment Election 1 or Miner Equipment Lender Treatment Election 2 (each as set forth below) on or before the Voting Deadline, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date, or as soon as reasonably practicable thereafter, such Holder's applicable Miner Equipment Lender Takeback Debt (the "**Default Miner Equipment Lender Treatment**"), and such Holder's Allowed Miner Equipment Lender Deficiency Claim shall be treated as a General Unsecured Claim in accordance with the terms and provisions set forth in section 4.8 of the Plan.

Each Holder of an Allowed Miner Equipment Lender Secured Claim may elect on its Ballot to receive on the Effective Date, or as soon as reasonably practicable thereafter, in lieu of the Default Miner Equipment Lender Treatment, in each case in full and final satisfaction, settlement, release, and discharge of such Holder's Allowed Miner Equipment Lender Secured Claim, New Common Interests with a value, based on Plan Value, equal to one hundred percent (100%) of such Holder's Allowed Miner Equipment Lender Secured Claim Amount ("**Miner Equipment Lender Treatment Election 1**").

Each Holder of an Allowed Miner Equipment Lender Secured Claim that is a Settling Miner Equipment Lender may elect on its Ballot to receive on the Effective Date, or as soon as reasonably practicable thereafter, in lieu of the Default Miner Equipment Lender Treatment, in each case in full and final satisfaction, settlement, release, and discharge of such Holder's Allowed Miner Equipment Lender Secured Claim, such Holder's applicable Miner Equipment Lender Takeback Debt (Election 2) ("**Miner Equipment Lender Treatment Election 2**"); *provided, that any Holder electing Miner Equipment Lender Treatment Election 2 shall waive its recovery on account of its Allowed Miner Equipment Lender Deficiency Claim*.

For the avoidance of doubt, the Allowed Miner Equipment Lender Deficiency Claim of each Holder of a Miner Equipment Lender Secured Claim shall be treated as a General Unsecured Claim under in accordance with the terms and provisions set forth in section 4.8 of the Plan; *provided*, that any Holder electing Miner Equipment Lender Treatment Election 2 shall waive its recovery on account of its Allowed Miner Equipment Lender Deficiency Claim.

(d)    *Impairment and Voting*:  Class 3 is Impaired, and the Holders of Miner Equipment Lender Secured Claims in Class 3 are entitled to vote to accept or reject the Plan.

4.4.     *Other Secured Claims (Class 4)*.

(a)     *Classification*:  Class 4 consists of Other Secured Claims.  Each Other Secured Claim shall be treated as a separate subclass of Class 4 for purposes of voting to accept or reject the Plan and receiving Plan Distributions.

(b)     *Treatment*:  On the Effective Date, all Allowed Other Secured Claims shall (i) be Reinstated in accordance with section 1124(2) of the Bankruptcy Code and the applicable Other Secured Claims Agreement and continued after the Effective Date in accordance with the terms and provisions of the applicable Other Secured Claims Agreement.

(c)     *Impairment and Voting*:  Class 4 is Unimpaired, and the Holders of Other Secured Claims in Class 4 are not entitled to vote to accept or reject the Plan.

4.5.     *M&M Lien Secured Claims (Class 5)*.

(a)     *Classification*: Class 5 consists of M&M Lien Secured Claims.  Each M&M Lien Secured Claim shall be treated as a separate subclass of Class 5 for purposes of voting to accept or reject the Plan and receiving Plan Distributions.

(b)     *Allowance*:  Each M&M Lien Secured Claim is Allowed pursuant to section 506(a) of the Bankruptcy Code in the applicable Allowed M&M Lien Secured Claims Amount.

(c)     *Treatment*:  Except to the extent that a Holder of an Allowed M&M Lien Secured Claim agrees to a less favorable treatment of such Claim or settles such Claim pursuant to an M&M Lien Settlement (in which case, such Holder's recovery shall be limited to the terms of the applicable M&M Lien Settlement and such Holder shall not be entitled to any recovery under the Plan), each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date or as soon as reasonably practicable thereafter, such Holder's applicable M&M Lien Takeback Debt; *provided* that to the extent any Subcontractor has filed an M&M Lien against a Debtor's real property with respect to amounts which are secured, in duplication, by an M&M Lien filed by a General Contractor and evidenced by such General Contractor's M&M Secured Lien Claim, as set forth on the M&M Lien Claims Schedule, (i) the Holder of the M&M Lien Secured Claim shall be the General Contractor, (ii) such Subcontractor shall not be entitled to a separate M&M Secured Lien Claim with respect to any such amounts secured in duplication, (iii) the Reorganized Debtors shall issue M&M Lien Takeback Debt with respect to any such amounts secured in duplication in favor of the General Contractor only as the Holder of the M&M Lien Secured Claim, (iv) the Reorganized Debtors shall repay the M&M Lien Takeback Debt issued to each such General Contractor by making payments directly to the General Contractor and each Subcontractor, pro rata in the percentages set forth next to each such General Contractor and Subcontractor on the M&M Lien Claims Schedule in the column titled "Pro Rata Percentage of applicable M&M Lien Takeback Debt to be repaid to such General Contractor or Subcontractor," and (v) each payment made directly to a Subcontractor shall reduce the amount of such General Contractor's M&M Secured Lien Claim, such General Contractor's M&M Lien, and such Subcontractor's M&M Lien, in each case on a dollar-for-dollar basis; *provided*, *however*, that upon delivery to the Debtors of a final and unconditional lien waiver and release duly executed by a Subcontractor, in recordable form and substance sufficient to permanently waive and release such Subcontractor's M&M Liens, the Reorganized Debtors shall make all further payments on account of such M&M Lien Takeback Debt attributable to such Subcontractor's pro rata percentages set forth next to such Subcontractor on the M&M Lien Claims Schedule directly to the Holder of such Allowed M&M Lien Secured Claim; and *provided*, *further*, that to the extent any Subcontractor has

~~filed an M&M Lien that is valid and perfected against a Debtor's real property with respect to amounts which are not secured, in duplication, by an M&M Lien filed by a General Contractor and not evidenced by any General Contractor's M&M Secured Lien Claim, as set forth on the M&M Lien Claims Schedule, the Subcontractor shall (i) be deemed to be a (a) General Contractor for purposes of the Plan and (b) Holder of an Allowed M&M Lien Secured Claim in the amount set forth on the M&M Lien Claims Schedule and (ii) receive in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date or as soon as reasonably practicable thereafter, such Holder's applicable M&M Lien Takeback Debt.~~.

Unless and until there is an Event of Default (as defined in the New M&M Lien Debt Term Sheet) under the terms of the applicable M&M Lien Takeback Debt, each Person asserting an M&M Lien shall be precluded from foreclosing or otherwise enforcing such M&M Lien or otherwise taking adverse action against the applicable Debtor with regard to the amounts secured by such M&M Lien.

Any M&M Lien (i) of a Subcontractor, (ii) of a General Contractor, or (iii) otherwise securing an Allowed M&M Lien Secured Claim and/or M&M Lien Takeback Debt shall be (a) fixed, as of the Effective Date, in the amount set forth on the M&M Lien Claims Schedule in the column titled "Amount of Allowed M&M Lien," (b) reduced on a dollar-for-dollar basis in the amount of each payment made on account of such M&M Lien pursuant to the terms of the M&M Lien Takeback Debt, and (c) fully and finally extinguished upon the repayment in full of all amounts payable under the applicable M&M Lien Takeback Debt, which extinguishment may be evidenced by recording in the applicable real property records a final, unconditional lien waiver, release of lien, and such other documents or certificates required to fully and unconditionally release any such M&M Lien. The Debtors and Reorganized Debtors, as applicable, are hereby authorized to record (and granted power of attorney to effectuate such recordation) such final, unconditional lien waiver, release of lien, and such other documents or certificates required to fully and unconditionally release any such M&M Lien in the applicable real property records, and each applicable clerk is directed to accept such documentation.

Any M&M Lien not on the M&M Lien Claims Schedule is hereby extinguished.

~~The Debtors shall have no further interest, if any, in the goods in the possession of the General Contractor or Subcontractor set forth on the M&M Lien Claims Schedule opposite such Person's name, and the amount of the applicable Holder's Allowed M&M Lien Secured Claim and M&M Lien has been reduced by the value of such equipment as set forth on the M&M Lien Claims Schedule.~~

For the avoidance of doubt, all General Contractor Unsecured Claims shall be General Unsecured Claims Allowed in the amounts set forth on the M&M Lien Claims Schedule in the column titled "Allowed Unsecured Claim Amount" and treated in accordance with section 4.8 hereof.

(d)     *Impairment and Voting*:  Class 5 is Impaired, and the Holders of M&M Lien Secured Claims in Class 5 are entitled to vote to accept or reject the Plan.

4.6.     ***Secured Mortgage Claims (Class 6).***

(a)     *Classification*:  Class 6 consists of Secured Mortgage Claims.  Each Secured Mortgage Claim shall be treated as a separate subclass of Class 6 for purposes of voting to accept or reject the Plan and receiving Plan Distributions.

(b)      *Allowance*:  Each Secured Mortgage Claim is Allowed pursuant to section 506(a) of the Bankruptcy Code in the applicable Allowed Secured Mortgage Claims Amount.

(c)      *Treatment*:  Except to the extent that a Holder of an Allowed Secured Mortgage Claim (i) agrees to a less favorable treatment of such Claim or (ii) timely elects the Mortgage Treatment Election (as set forth below) on or before the Voting Deadline, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date, or as soon as reasonably practicable thereafter, such Holder's applicable Mortgage Takeback Debt (the "**Default Mortgage Treatment**").   The Mortgage Agreements (and any applicable related documents) of Holders of Allowed Secured Mortgage Claims receiving the Default Mortgage Treatment shall be deemed amended to include a maturity date of December 31, 2025.   The Debtors and Reorganized Debtors, as applicable, are hereby authorized to record (and granted power of attorney to effectuate such recordation) any memorandum or such other documents or certificates required to effectuate such deemed amendment in the applicable real property records, and each applicable clerk is directed to accept such documentation.

Each Holder of an Allowed Secured Mortgage Claim may elect on its Ballot to receive, no later than sixty (60) days following the Effective Date, in lieu of the Default Mortgage Treatment, in each case in full and final satisfaction, settlement, release, and discharge of such Holder's Allowed Secured Mortgage Claim, Cash in an amount equal to ninety-five percent (95%) of such Holder's Allowed Secured Mortgage Claim Amount (the "**Mortgage Treatment Election**").

(d)      *Impairment and Voting*:  Class 6 is Impaired, and the Holders of Secured Mortgage Claims in Class 6 are entitled to vote to accept or reject the Plan.

### 4.7.      *Priority Non-Tax Claims (Class 7)*.

(a)      *Classification*:  Class 7 consists of Priority Non-Tax Claims.

(b)      *Treatment:*  The legal, equitable, and contractual rights of the Holders of Priority Non-Tax Claims are unaltered by the Plan.  Except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of such Allowed Priority Non-Tax Claim, at the option of the Debtors or the Reorganized Debtors, (i) each such Holder shall receive payment in Cash in an amount equal to such Claim, (ii) such Holder's Allowed Priority Non-Tax Claim shall be Reinstated, or (iii) such Holder shall receive such other treatment so as to render such Holder's Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.

(c)      *Impairment and Voting*:  Class 7 is Unimpaired, and the Holders of Priority Non-Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.   Therefore, Holders of Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to Priority Non-Tax Claims.

### 4.8.      *General Unsecured Claims (Class 8)*.

(a)      *Classification*:  Class 8 consists of General Unsecured Claims.

(b)      *Treatment*:  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of such Claim, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date, or as soon

as reasonably practicable thereafter, New Common Interests with a value, based on Plan Value, equal to one-hundred percent (100%) of such Holder's Allowed General Unsecured Claim.

For purposes of this section 4.8, the Allowed amount of any General Unsecured Claim shall include all interest accrued from the Petition Date through the date of distribution at the Federal Judgment Rate.

For the avoidance of doubt, the Allowed Miner Equipment Lender Deficiency Claim of each Holder of a Miner Equipment Lender Secured Claim shall be treated as an Allowed General Unsecured Claim under the Plan; *provided*, that any Holder electing Miner Equipment Lender Treatment Election 2 shall waive its recovery on account of its Allowed Miner Equipment Lender Deficiency Claim.

(c)   *Impairment and Voting*:   Class 8 is Impaired, and the Holders of General Unsecured Claims in Class 8 are entitled to vote to accept or reject the Plan.

### 4.9.   *B. Riley Unsecured Claims (Class 9)*

(a)   *Classification*:  Class 9 consists of B. Riley Unsecured Claims.

(b)   *Allowance*:  The B. Riley Unsecured Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code in the Settled B. Riley Unsecured Claims Amount.

(c)   *Treatment*:  In connection with the B. Riley Settlement, each such Holder of an Allowed B. Riley Unsecured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, and taking into account the commitments made by ~~B. Riley Commercial Capital~~BRF Finance Co., LLC and B. Riley Principal Capital II, LLC pursuant to the Exit Facility and the New B. Riley ELOC Facility, respectively, on the Effective Date, or as soon as reasonably practicable thereafter, on a dollar-for-dollar basis, first-lien delayed draw term loans under the Exit Credit Agreement in the principal amount equal to the Settled B. Riley Unsecured Claims Amount.  For the avoidance of doubt, and in connection with the B. Riley Settlement, any additional recovery on account of the B. Riley Unsecured Claims shall be waived.

(d)   *Impairment and Voting*:   Class 9 is Impaired, and the Holders of B. Riley Unsecured Claims in Class 8 are entitled to vote to accept or reject the Plan.

### 4.10.   *Intercompany Claims (Class 10)*.

(a)   *Classification*:  Class 10 consists of Intercompany Claims.

(b)   *Treatment*:  On the Effective Date, or as soon as practicable thereafter, all Intercompany Claims shall be adjusted, Reinstated, or discharged (each without any distribution) to the extent reasonably determined to be appropriate by the Debtors or Reorganized Debtors, as applicable.

(c)   *Impairment and Voting*:  Holders of Class 10 Claims are ~~either (i)~~ Unimpaired and such Holders are conclusively presumed to have accepted the Plan pursuant to section 1126(f~~) of the Bankruptcy Code, or (ii) Impaired and such Holders are conclusively deemed to have rejected the Plan pursuant to section 1126(g~~) of the Bankruptcy Code.  Therefore, Holders of Intercompany

Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Intercompany Claims.

### 4.11. *Intercompany Interests (Class 11)*.

(a)  *Classification*:  Class 11 consists of Intercompany Interests.

(b)  *Treatment*:  On the Effective Date, and without the need for any further corporate or limited liability company action or approval of any board of directors, management, or shareholders of any Debtor or Reorganized Debtor, as applicable, all Intercompany Interests shall be unaffected by the Plan and continue in place following the Effective Date, solely for the administrative convenience of maintaining the existing corporate structure of the Debtors.

(c)  *Impairment and Voting*:  Class 11 is either (i) Unimpaired and such Holders are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or (ii) Impaired, and such Holders are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Intercompany Interests.

### 4.12. *Section 510(b) Claims (Class 12)*.

(a)  Classification:  Class 12 consists of Section 510(b) Claims.

(b)  *Treatment*:  Except to the extent that a Holder of an Allowed Section 510(b) Claim agrees to a less favorable treatment of such Claim, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date, or as soon as reasonably practicable thereafter, (i) such Holder's Pro Rata Equity Share (taking into account Allowed Claims in Class 12 and Existing of the Residual Equity Pool, (ii) such Holder's Pro Rata Equity Share of New Warrants, and (iii) in lieu of the right to participate in the Rights Offering, either Cash, New Common Interests in Class 13 and valuing the Existing, New Warrants, or some combination thereof, at the option of the Debtors or Reorganized Debtors, as applicable, in an amount equal to the value (if New Common Interests in Class 13 as equal to one-hundred percent (100%) of the value, at Plan Value, of the New Common Interests in the Residual Equity Pool) of the Residual Equity Pool) of the Subscription Rights that would have been distributable to such Holder if Subscription Rights were distributed to Holders in Class 12.

(c)  *Impairment and Voting*:  Section 510(b) Claims are Impaired, and the Holders of Section 510(b) Claims in Class 12 are entitled to vote to accept or reject the Plan.

### 4.13. *Existing Common Interests (Class 13)*.

(a)  *Classification*:  Class 13 consists of Existing Common Interests.

(b)  *Treatment*:  Except to the extent that a Holder of an Existing Common Interest agrees to a less favorable treatment of such Interest, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of such Interest, on the Effective Date, or as soon as reasonably practicable thereafter, (i)(a) with respect to Eligible Holders,  such Holder's Pro Rata Equity Share of the Residual Equity Pool, (ii) such Holder's Pro Rata Equity Share of the New Warrants, and (iii) the right to participate in the Rights Offering in accordance with the Rights Offering Procedures and (b) with respect to Ineligible Holders, (x) the right to participate in the 1145

~~Rights Offering in accordance with the Rights Offering Procedures and (y) solely if such Holder fully exercises its 1145 Subscription Rights, New Common Interests or Cash, at the option of the Reorganized Debtors, in an amount equal to the value (if New Common Interests, at Plan Value) of the 4(a)(2)/Reg D Subscription Rights that would have been distributable to such Holder if such Holder was an Eligible Holder and (ii) such Holder's Pro Rata Share (taking into account Allowed Claims in Class 12 and Existing Common Interests in Class 13 and valuing the Existing Common Interests in Class 13 as equal to one-hundred percent (100%) of the value, at Plan Value, of the New Common Interests in the Residual Equity Pool) of the Residual Equity Pool~~; *provided*, that with respect to any Existing Common Interests that are Unvested Restricted Stock, any New Common Interests distributed to Holders on account of such Unvested Restricted Stock will be subject to the same restrictions/vesting conditions applicable to such Unvested Restricted Stock as of the Effective Date.

(c)     *Impairment and Voting*:   Existing Common Interests are Impaired, and the Holders of Existing Common Interests in Class 13 are entitled to vote to accept or reject the Plan.

**ARTICLE V.        MEANS FOR IMPLEMENTATION.**

5.1.        ***Compromise and Settlement of Claims, Interests, and Controversies.***

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distribution, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Claim Holder or an Interest Holder may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest, including pursuant to the transactions set forth in the Restructuring Transactions Exhibit.   Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Allowed Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise, settlement, and transactions are in the best interests of the Debtors, their Estates, and Holders of Allowed Claims and Interests, and is fair, equitable, and is within the range of reasonableness.   Subject to the provisions of this Plan governing distributions, all distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

5.2.        ***Continued Corporate Existence; Effectuating Documents; Corporate Action; Restructuring Transactions***.

(a)     Except as otherwise provided in the Plan or the Plan Documents, the Debtors shall continue to exist after the Effective Date as Reorganized Debtors as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the respective certificate of incorporation or bylaws (or other analogous formation documents) in effect before the Effective Date or the New Corporate Governance Documents, as applicable, except to the extent such certificate of incorporation or bylaws (or other analogous formation, constituent, or governance documents) are amended by the Plan or otherwise, and to the extent any such document is amended, such document is deemed to be amended pursuant to the Plan and requires no further action or approval (other than any requisite filings required under applicable state or federal law).

(b)       Notwithstanding anything herein to the contrary, on or about the Effective Date, or as soon as reasonably practicable thereafter, the Debtors or the Reorganized Debtors, as applicable, shall take all actions set forth in and contemplated by the Restructuring Transactions Exhibit, and enter into any transaction and may take all actions as may be necessary or appropriate to effectuate the transactions described in, approved by, contemplated by, or necessary or appropriate to effectuate the Plan, including the Restructuring Transactions and the Rights Offering. If a Restructuring Transaction is consummated that results in the merger of one or more Debtor entities issuing debt pursuant to the Plan, then the debt issued by such Debtor will be issued by the surviving Debtor entity.

(c)       Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (i) the assumption of Executory Contracts and Unexpired Leases as provided herein, (ii) the selection of the managers, directors, or officers for the Reorganized Debtors, (iii) the distribution of the New Common Interests, (iv) the entry into or execution of the New Secured Notes Documents, the New Notes Documents, New Miner Equipment Lender Debt Documents, the Exit ~~Credit Agreement, and~~Facility Documents, the New B. Riley ELOC Facility, and the New Warrant Agreement, as applicable, in each case, including definitive documentation related thereto, (v) any necessary action with respect to the Management Incentive Plan in accordance with section ~~5.23~~5.24 hereof, and (vi) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), in each case in accordance with and subject to the terms hereof.

(d)       The Confirmation Order shall and shall be deemed to, pursuant to sections 363, 1123, and 1142 of the Bankruptcy Code, authorize and direct parties, as applicable, among other things, to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

(e)       Each officer, member of the board of directors, or manager of the Debtors is (and each officer, member of the board of directors, or manager of the Reorganized Debtors shall be) authorized and directed to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, all of which shall be authorized and approved in all respects, in each case, without the need for any approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including, without limitation, any action by the stockholders or directors or managers of the Debtors or the Reorganized Debtors) except for those expressly required pursuant to the Plan.

(f)       All matters provided for in the Plan involving the corporate or limited liability company structure of the Debtors or the Reorganized Debtors, and any corporate or limited liability company action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors or by any other stakeholder, and with like effect as though such action had been taken unanimously by the stockholders, directors, managers, or officers, as applicable, of the Debtors or Reorganized Debtors.

5.3.     ***Intercompany Interests~~; Corporate Reorganization~~.***

On the Effective Date, the Intercompany Interests (i) shall be Reinstated for the ultimate benefit of the Holders of Claims that receive New Common Interests under the Plan, and shall receive no recovery or distribution, and (ii) without the need for any further corporate action or approval of any board of directors, board of managers, managers, management, or stockholders of any Debtor or Reorganized Debtor, as applicable, the certificates and all other documents representing the Intercompany Interests shall be deemed to be in full force and effect.

5.4.     ***Authorization and Issuance of New April Secured Notes (~~Option 1~~Default).***

(a)     On the Effective Date, ~~if Class 1 is an Accepting Class,~~ the Reorganized Parent shall issue the New April Secured Notes (~~Option 1~~Default) to Holders of Allowed April Convertible Notes Secured Claims that receive the Default April Convertible Noteholder Treatment on the terms set forth in the Plan and the New April Secured Notes Documents (~~Option 1~~Default).

(b)     On the Effective Date~~, if Class 1 is an Accepting Class~~, the New April Secured Notes Documents (~~Option 1~~Default), if any, shall be executed and delivered.  The Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the New April Secured Notes Documents (~~Option 1) (including the issuance of New Common Interests upon conversion of the New April Secured Notes (Option 1)~~Default) without the need for any further corporate or limited liability company action and without further action by the holders of Claims or Interests.  The New April Secured Notes Documents (~~Option 1~~Default) shall constitute legal, valid, binding, and authorized obligations of the Reorganized Parent, enforceable in accordance with their terms, and, except as provided for thereunder, such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination (including equitable subordination) under applicable law, the Plan, or the Confirmation Order and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable nonbankruptcy law.

(c)     Confirmation of the Plan shall be deemed (i) approval of the New April Secured Notes Documents (~~Option 1~~Default), and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the applicable Reorganized Debtors in connection therewith and (ii) authorization to enter into and perform under the New April Secured Notes Documents (~~Option 1~~Default).

(d)     On the Effective Date, all Liens and security interests granted pursuant to, or in connection with the New April Secured Notes Documents (~~Option 1~~Default) (i) shall be deemed to be approved and shall, without the necessity of the execution, recordation, or filing of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, be valid, binding, fully perfected, fully enforceable Liens on, and security interests in, the property described in the New April Secured Notes Documents (~~Option 1~~Default), with the priorities established in respect thereof under applicable non-bankruptcy law and as provided for in the New Intercreditor Agreements, and (ii) shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law, the Plan, or the Confirmation Order.

(e)     The Reorganized Debtors and the Persons granted Liens and security interests under the New April Secured Notes Documents (~~Option 1~~Default) are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and the occurrence of the Effective Date without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

5.5.     ***Authorization and Issuance of New August Secured Notes (~~Option 1~~Default).***

(a)     On the Effective Date, ~~if Class 2 is an Accepting Class,~~ the Reorganized Parent shall issue the New August Secured Notes (~~Option 1~~Default) to Holders of Allowed August Convertible Notes Secured Claims that receive the Default August Convertible Noteholder Treatment on the terms set forth in the Plan and the New August Secured Notes Documents (~~Option 1~~Default).

(b)     On the Effective Date~~, if Class 2 is an Accepting Class~~, the New August Secured Notes Documents (~~Option 1~~Default), if any, shall be executed and delivered.  The Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the New August Secured Notes Documents (~~Option 1~~) ~~(including the issuance of New Common Interests upon conversion of the New August Secured Notes (Option 1)~~Default) without the need for any further corporate or limited liability company action and without further action by the holders of Claims or Interests.  The New August Secured Notes Documents (~~Option 1~~Default) shall constitute legal, valid, binding, and authorized obligations of the Reorganized Parent, enforceable in accordance with their terms, and, except as provided for thereunder, such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination (including equitable subordination) under applicable law, the Plan, or the Confirmation Order and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable nonbankruptcy law.

(c)     Confirmation of the Plan shall be deemed (i) approval of the New August Secured Notes Documents (~~Option 1~~Default), and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the applicable Reorganized Debtors in connection therewith and (ii) authorization to enter into and perform under the New August Secured Notes Documents (~~Option 1~~Default).

(d)     On the Effective Date, all Liens and security interests granted pursuant to, or in connection with the New August Secured Notes Documents (~~Option 1~~Default) (i) shall be deemed to be approved and shall, without the necessity of the execution, recordation, or filing of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, be valid, binding, fully perfected, fully enforceable Liens on, and security interests in, the property described in the New August Secured Notes Documents (~~Option 1~~Default), with the priorities established in respect thereof under applicable non-bankruptcy law and as provided for in the New Intercreditor Agreements, and (ii) shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other

voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law, the Plan, or the Confirmation Order.

(e)      The Reorganized Debtors and the Persons granted Liens and security interests under the New August Secured Notes Documents (~~Option 1~~Default) are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and the occurrence of the Effective Date without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

5.6.      ***Authorization and Issuance of New April Secured Notes (~~Option 2~~Settlement Election)***.

(a)      On the Effective Date, ~~if Class 1 is not an Accepting Class,~~ the Reorganized Parent shall issue the New April Secured Notes (~~Option 2~~Settlement Election) to Holders of Allowed April Convertible Notes Secured Claims that timely elected the April Convertible Noteholder Treatment Settlement Election on the terms set forth in the Plan and the New April Secured Notes Documents (~~Option 2~~Settlement Election).

(b)      On the Effective Date, ~~if Class 1 is not an Accepting Class~~, the New April Secured Notes Documents (~~Option 2~~Settlement Election), if any, shall be executed and delivered. The Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the New April Secured Notes Documents (~~Option 2~~Settlement Election) (including the issuance of New Common Interests upon conversion of the New April Secured Notes (Settlement Election)) without the need for any further corporate or limited liability company action and without further action by the holders of Claims or Interests.  The New April Secured Notes Documents (~~Option 2~~Settlement Election) shall constitute legal, valid, binding, and authorized obligations of the Reorganized Parent, enforceable in accordance with their terms, and, except as provided for thereunder, such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination (including equitable subordination) under applicable law, the Plan, or the Confirmation Order and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable nonbankruptcy law.

(c)      Confirmation of the Plan shall be deemed (i) approval of the New April Secured Notes Documents (~~Option 2~~Settlement Election), and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the applicable Reorganized Debtors in connection therewith and (ii) authorization to enter into and perform under the New April Secured Notes Documents (~~Option 2~~Settlement Election).

(d)      On the Effective Date, all Liens and security interests granted pursuant to, or in connection with the New April Secured Notes Documents (~~Option 2~~Settlement Election) (i) shall be deemed to be approved and shall, without the necessity of the execution, recordation, or filing of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, be valid, binding, fully perfected, fully enforceable Liens on, and security interests in, the property described in the New April Secured Notes Documents (~~Option 2~~Settlement Election), with the priorities established in respect thereof under applicable non-bankruptcy law and

as provided for in the New Intercreditor Agreements, and (ii) shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law, the Plan, or the Confirmation Order.

(e)    The Reorganized Debtors and the Persons granted Liens and security interests under the New April Secured Notes Documents (~~Option 2~~Settlement Election) are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and the occurrence of the Effective Date without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

5.7.    *Authorization and Issuance of New August Secured Notes (~~Option 2~~Settlement Election).*

(a)    On the Effective Date, ~~if Class 2 is not an Accepting Class,~~ the Reorganized Parent shall issue the New August Secured Notes (~~Option 2~~Settlement Election) to Holders of Allowed August Convertible Notes Secured Claims that timely elected the August Convertible Noteholder Treatment Settlement Election on the terms set forth in the Plan and the New August Secured Notes Documents (~~Option 2~~Settlement Election).

(b)    On the Effective Date~~, if Class 2 is not an Accepting Class~~, the New August Secured Notes Documents (~~Option 2~~Settlement Election), if any, shall be executed and delivered. The Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the New August Secured Notes Documents (~~Option 2~~Settlement Election) (including the issuance of New Common Interests upon conversion of the New August Secured Notes (Settlement Election)) without the need for any further corporate or limited liability company action and without further action by the holders of Claims or Interests.  The New August Secured Notes Documents (~~Option 2~~Settlement Election) shall constitute legal, valid, binding, and authorized obligations of the Reorganized Parent, enforceable in accordance with their terms, and, except as provided for thereunder, such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination (including equitable subordination) under applicable law, the Plan, or the Confirmation Order and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable nonbankruptcy law.

(c)    Confirmation of the Plan shall be deemed (i) approval of the New August Secured Notes Documents (~~Option 2~~Settlement Election), and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the applicable Reorganized Debtors in connection therewith and (ii) authorization to enter into and perform under the New August Secured Notes Documents (~~Option 2~~Settlement Election).

(d)    On the Effective Date, all Liens and security interests granted pursuant to, or in connection with the New August Secured Notes Documents (~~Option 2~~Settlement Election) (i) shall be deemed to be approved and shall, without the necessity of the execution, recordation, or filing of mortgages, security agreements, control agreements, pledge agreements, financing statements, or

other similar documents, be valid, binding, fully perfected, fully enforceable Liens on, and security interests in, the property described in the New August Secured Notes Documents (~~Option 2~~Settlement Election), with the priorities established in respect thereof under applicable non-bankruptcy law and as provided for in the New Intercreditor Agreements, and (ii) shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law, the Plan, or the Confirmation Order.

(e)     The Reorganized Debtors and the Persons granted Liens and security interests under the New August Secured Notes Documents (~~Option 2~~Settlement Election) are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and the occurrence of the Effective Date without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### 5.8.     *New Notes Indenture.*

(a)     On the Effective Date, the Reorganized Parent will enter into the New Notes Documents.  On the Effective Date, all Liens and security interests granted pursuant to, or in connection with the New Notes Documents (i) shall be deemed to be approved and shall, without the necessity of the execution, recordation, or filing or mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, be valid, binding, fully-perfected, fully-enforceable Liens on, and security interests in, the property described in the New Notes Documents, with the priorities established in respect thereof under applicable non-bankruptcy law and as provided for in the New Intercreditor Agreements, and (ii) shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law, the Plan, or the Confirmation Order.

(b)     On the Effective Date, or as soon as reasonably practicable thereafter, the New Notes Documents shall be delivered.  The Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the New Notes Documents without (i) the need for any further corporate or limited liability company action; (ii) notice to or order or other approval of the Bankruptcy Court; (iii) act or omission under applicable law, regulation, order, or rule; (iv) vote, consent, authorization, or approval of any Person; or (v) action by the Holders of Claims or Interests. The New Notes Documents shall constitute legal, valid, binding and authorized obligations of the applicable Reorganized Debtors, enforceable in accordance with their terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination (including equitable subordination) under applicable law, the Plan, or the Confirmation Order and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable nonbankruptcy law.  The New Notes Documents (and other definitive documentation related thereto) are reasonable and are being entered into, and shall be deemed to have been entered into, in good faith and for legitimate business purposes.

(c)     Confirmation of the Plan shall be deemed (i) approval of the New Notes Documents, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the applicable Reorganized Debtors in connection therewith and (ii) authorization to enter into and perform under the New Notes Documents.

(d)     The Reorganized Debtors and the Persons granted Liens and security interests under the New Notes Documents are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

5.9.     ~~5.8.~~ *New Miner Equipment Lender Debt Facilities*.

(a)     On the Effective Date, the applicable Reorganized Debtors will enter into the New Miner Equipment Lender Debt Documents.  On the Effective Date, all Liens and security interests granted pursuant to, or in connection with the New Miner Equipment Lender Debt Documents (i) shall be deemed to be approved and shall, without the necessity of the execution, recordation, or filing or mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, be valid, binding, fully-perfected, fully-enforceable Liens on, and security interests in, the property described in the New Miner Equipment Lender Debt Documents, with the priorities established in respect thereof under applicable non-bankruptcy law ~~and as provided for in the New Intercreditor Agreement~~, and (ii) shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law, the Plan, or the Confirmation Order.

(b)     On the Effective Date, ~~or as soon as reasonably practicable thereafter,~~ the New Miner Equipment Lender Debt Documents shall be delivered.  The Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the New Miner Equipment Lender Debt Documents without (i) the need for any further corporate or limited liability company action; (ii) notice to or order or other approval of the Bankruptcy Court; (iii) act or omission under applicable law, regulation, order, or rule; (iv) vote, consent, authorization, or approval of any Person; or (v) action by the Holders of Claims or Interests.  The New Miner Equipment Lender Debt Documents shall constitute legal, valid, binding and authorized obligations of the applicable Reorganized Debtors, enforceable in accordance with their terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination (including equitable subordination) under applicable law, the Plan, or the Confirmation Order and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable nonbankruptcy law.  The New Miner Equipment Lender Debt Documents (and other definitive documentation related thereto) are reasonable and are being entered into, and shall be deemed to have been entered into, in good faith and for legitimate business purposes.

(c)     Confirmation of the Plan shall be deemed (i) approval of the New Miner Equipment Lender Debt Documents, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the applicable Reorganized

Debtors in connection therewith and (ii) authorization to enter into and perform under the New Miner Equipment Lender Debt Documents.

(d)   The Reorganized Debtors and the Persons granted Liens and security interests under the New Miner Equipment Lender Debt Documents are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

5.10.   ~~5.9.~~ *Exit Facility.*

(a)   On the Effective Date, the Reorganized Debtors shall be authorized to execute, deliver, and enter into the Exit ~~Credit Agreement~~Facility Documents without further (i) notice to or order or other approval of the Bankruptcy Court, (ii) act or omission under applicable law, regulation, order, or rule, (iii) vote, consent, authorization, or approval of any Person, or (iv) action by the Holders of Claims or Interests.   The Exit ~~Credit Agreement~~Facility Documents shall constitute legal, valid, binding and authorized joint and several obligations of the applicable Reorganized Debtors, enforceable in accordance with its terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan, or the Confirmation Order.   The financial accommodations to be extended pursuant to the Exit ~~Credit Agreement~~Facility Documents (and other definitive documentation related thereto) are reasonable and are being extended, and shall be deemed to have been extended, in good faith and for legitimate business purposes.

(b)   On the Effective Date, all Liens and security interests granted pursuant to the Exit ~~Credit Agreement~~Facility Documents shall be (i) valid, binding, perfected, and enforceable Liens and security interests in the personal and real property described in and subject to such document, with the priorities established in respect thereof under applicable non-bankruptcy law and as provided for in the New Intercreditor Agreement (New Secured Notes, New Notes, and Exit Facility) and (ii) not subject to avoidance, recharacterization, or subordination under any applicable law, the Plan, or the Confirmation Order.

(c)   The Reorganized Debtors and the Persons granted Liens and security interests under the Exit ~~Credit Agreement~~Facility Documents are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

5.11.   ~~5.10.~~ *New B. Riley ELOC Facility.*

~~(a)~~ On the Effective Date, the Reorganized Debtors shall be authorized to execute, deliver, and enter into the New B. Riley ELOC Facility without further (i) notice to or order or other approval of the Bankruptcy Court, (ii) act or omission under applicable law, regulation, order, or rule,

(iii) vote, consent, authorization, or approval of any Person, or (iv) action by the Holders of Claims or Interests.   The New B. Riley ELOC Facility shall constitute legal, valid, binding and authorized obligations of the Reorganized Parent, enforceable in accordance with its terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan, or the Confirmation Order.   The financial accommodations to be extended pursuant to the New B. Riley ELOC Facility (and other definitive documentation related thereto) are reasonable and are being extended, and shall be deemed to have been extended, in good faith and for legitimate business purposes.

### 5.12.    ~~5.11.~~*New Intercreditor Agreements*.

(a)     On the Effective Date, the New April Secured Notes Agent, the New August Secured Notes Agent, and the New Notes Agent shall enter into, or be deemed to have entered into, the New Intercreditor Agreement (New Secured Notes and New Notes).   Each lender under the New April Secured Notes Indenture (Default), the New April Secured Notes Indenture (Settlement Election), or the New Notes Indenture, as the case may be, and the New August Secured Notes Indenture (Default) or New August Secured Notes Indenture (Settlement Election), as the case may be, shall be deemed to have directed the New April Secured Notes Agent, the New August Secured Notes Agent, or the New Notes Agent, as applicable, to execute the New Intercreditor Agreement (New Secured Notes and New Notes) and shall be bound to the terms of the New Intercreditor Agreement (New Secured Notes and New Notes) from and after the Effective Date as if it were a signatory thereto.

(b)     On the Effective Date, the Exit Agent, the New April Secured Notes Agent, the New August Secured Notes Agent, and ~~Holders of Allowed Miner Equipment Lender Claims electing the Default Miner Equipment Lender Treatment or Miner Equipment Lender Treatment Election 2~~the New Notes Agent shall enter into, or be deemed to have entered into, the New Intercreditor Agreement (New Secured Notes, New Notes, and Exit Facility).   Each lender under the Exit Credit Agreement, the New April Secured Notes Indenture (~~Option 1~~Default)~~or~~, the New April Secured Notes Indenture (~~Option 2~~Settlement Election), or the New Notes Indenture, as the case may be, and the New August Secured Notes Indenture (~~Option 1~~Default) or New August Secured Notes Indenture (~~Option 2~~Settlement Election), as the case may be, shall be deemed to have directed the Exit Agent, the New April Secured Notes Agent, ~~or~~the New August Secured Notes Agent, or the New Notes Agent, as applicable, to execute the New Intercreditor Agreement (New Secured Notes, New Notes, and Exit Facility) and shall be bound to the terms of the New Intercreditor Agreement (New Secured Notes, New Notes, and Exit Facility) from and after the Effective Date as if it were a signatory thereto.

### 5.13.    ~~5.12.~~*Substantive Consolidation of Certain Debtors.*

Except as provided in this section, the Plan is a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan for each Debtor.

As set forth in section 3.8 hereof, the Plan may, in the Debtors' sole discretion, be implemented through a substantive consolidation of the Assets and liabilities of the Substantively Consolidated Debtors either in accordance with the Substantive Consolidation Settlement or otherwise. In the event of such substantive consolidation, (i) the Confirmation Order shall contain findings supporting the conclusions providing for limited substantive consolidation for purposes of distribution to holders of Claims and Interests at the Substantively Consolidated Debtors on the terms set forth in this section of the Plan and (ii) the Assets and liabilities of American Property Acquisition, LLC, American Property Acquisitions I, LLC, and American Property Acquisitions VII, LLC shall be substantively

consolidated with Core Scientific Operating Company pursuant to the Plan. The substantive consolidation of the Assets and liabilities and properties of the Substantively Consolidated Debtors shall have the following effects:~~Solely~~: Solely for voting, Confirmation, and distribution purposes hereunder, the Chapter 11 Cases of the Substantively Consolidated Debtors shall be consolidated, with each being treated as a single consolidated case with respect to Claims against each Debtor. All property of the Estate of each Substantively Consolidated Debtor shall be deemed to be property of the consolidated Estate of the Substantively Consolidated Debtors with respect to the payment of Claims against the consolidated Estate of the Substantively Consolidated Debtors.

(a)     All Claims against each Substantively Consolidated Debtor's Estate shall be deemed to be Claims against the consolidated Estate of the Substantively Consolidated Debtors, and all Proofs of Claim filed against one or more of the Debtors shall be deemed to be a single Claim filed against one or more of the Substantively Consolidated Debtors ~~shall be deemed to be a single Claim filed against the consolidated Estate of the Substantively Consolidated Debtors~~, and all duplicate Proofs of Claim for the same Claim filed against more than one Substantively Consolidated Debtor shall be deemed expunged.

(b)     The substantive consolidation shall not affect (i) the legal and organizational structure of the Debtors, (ii) defenses to any Causes of Action or requirements for any third party to establish mutuality to assert a right of setoff, and (iii) distributions out of any insurance policies or proceeds of such policies.

### 5.14.     ~~5.13.~~ *Miner Equipment Lender Settlement.*

The treatment of the Miner Equipment Lender Claims of the Settling Miner Equipment Lenders under the Plan, together with the other terms and conditions set forth in the Plan and the Confirmation Order (including the releases and exculpations set forth herein and in the Confirmation Order), reflects the proposed compromise and settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code of the Miner Equipment Lender Claims. The Miner Equipment Lender Settlement is incorporated into the Plan and includes the following material terms and conditions in consideration of the value provided by the respective and applicable part~~y~~ies pursuant to the Miner Equipment Lender Settlement as summarized below, which summary is subject to, and qualified entirely by reference to, the New Miner Equipment Lender Debt Documents:

a.   The Miner Equipment Lender Claims of the Settling Miner Equipment Lenders shall be Allowed on the Effective Date in the amounts set forth on the Miner Equipment Lender Claims Schedule.

b.   The Miner Equipment Lender Claims of the Settling Miner Equipment Lenders shall receive the treatment set forth in sections 4.3 and 4.8 hereof, and the Settling Miner Equipment Lenders electing Miner Equipment Lender Treatment Election 2 agree to waive their recovery in Class 8.

c.   Each Settling Miner Equipment Lender shall be entitled to reasonable and documented fees and expenses; *provided*, that in no event shall the aggregate fees and expenses payable to all Settling Miner Equipment Lenders exceed $3,~~0~~500,000.

d.   The Settling Miner Equipment Lenders shall support Confirmation of the Plan and shall timely submit Ballots accepting the Plan, subject to receipt of a Bankruptcy Court approved Disclosure Statement~~.~~; *provided*, that any changes to

the Plan and Disclosure Statement are in form and substance reasonably acceptable to the Settling Miner Equipment Lenders (solely to the extent it materially affects the Settling Miner Equipment Lenders' rights or claims) and incorporates the terms of and is consistent with the Miner Equipment Lender Settlement.

e.  The Debtors shall have sought or shall seek entry of the Confirmation Order confirming the Plan, which Confirmation Order and the Plan (i) shall be in form and substance reasonably acceptable to the Debtors and the Settling Equipment Lenders (each in its sole discretion) solely to the extent it materially affects the Settling Miner Equipment Lenders' rights or claims, and (ii) shall incorporate the terms of the Miner Equipment Lender Settlement and all transactions and agreements thereunder.

Notwithstanding anything to the contrary contained in the Plan (including any Plan Document or Plan Supplement), including sections 5.21, 5.22, and 10.3 through 10.7 hereof, nothing herein shall, or shall be deemed to, (i) cancel, terminate, release, waive, discharge or affect the Miner Equipment Lender Settlement, the New Miner Equipment Lender Debt Documents and/or the transactions thereunder, and/or (ii) cancel, terminate, release, waive, discharge or affect any rights, claims, causes of action, remedies, interests or obligations of any of the Debtors, Reorganized Debtors or the Settling Miner Equipment Lenders (including their respective successors or assigns) (x) arising from and after the Effective Date and/or (y) under or related to the Miner Equipment Lender Settlement, the New Miner Equipment Lender Debt Documents, and/or any of the transactions contemplated thereunder.

5.15.    5.14. *Brown Settlement.*

The treatment of the Secured Mortgage Claim (Brown) under the Plan, together with the other terms and conditions set forth in the Plan and the Confirmation Order (including the releases and exculpations set forth herein and in the Confirmation Order), reflects the proposed compromise and settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code of the Secured Mortgage Claim (Brown). The Brown Settlement is incorporated into the Plan and includes the following material terms and conditions in consideration of the value provided by the respective and applicable party pursuant to the Brown Settlement:

a.  The Secured Mortgage Claim (Brown) shall be Allowed on the Effective Date against Debtor American Property Acquisition, LLC in the amount of $187,819.93.

b.  The Secured Mortgage Claim (Brown) shall receive the treatment set forth in section 4.6 hereof.

c.  Brown Corporation shall support Confirmation of the Plan and shall timely submit a Ballot accepting the Plan, subject to receipt of a Bankruptcy Court approved Disclosure Statement.

5.16.    5.15. *Holliwood Settlement.*

The treatment of the Secured Mortgage Claim (Holliwood) under the Plan, together with the other terms and conditions set forth in the Plan and the Confirmation Order (including the releases and exculpations set forth herein and in the Confirmation Order), reflects the proposed compromise and settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code of the Secured

Mortgage Claim (Holliwood). The Holliwood Settlement is incorporated into the Plan and includes the following material terms and conditions in consideration of the value provided by the respective and applicable party pursuant to the Holliwood Settlement:

    a. The Secured Mortgage Claim (Holliwood) shall be Allowed on the Effective Date against Debtor American Property Acquisition, LLC in the amount of (i) $571,961.55, plus (ii) post-petition interest accruing at ten-percent (10%), plus (iii) reasonable and documented legal fees and expenses of Holliwood LLC relating to the Secured Mortgage Claim (Holliwood) and the Chapter 11 Cases not to exceed $25,000.

    b. The Secured Mortgage Claim (Holliwood) shall receive the treatment set forth in section 4.6 hereof.

    c. Holliwood LLC shall support Confirmation of the Plan and shall timely submit a Ballot accepting the Plan, subject to receipt of a Bankruptcy Court approved Disclosure Statement.

5.17. 5.16. *B. Riley Settlement.*

The treatment of the B. Riley Unsecured Claims and DIP Claims under the Plan, together with the other terms and conditions set forth in the Plan and the Confirmation Order (including the releases and exculpations set forth herein and in the Confirmation Order), reflects the proposed compromise and settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code of the B. Riley Unsecured Claims and DIP Claims. The B. Riley Settlement is incorporated into the Plan and includes the following material terms and conditions in consideration of the value provided by the respective and applicable party pursuant to the B. Riley Settlement:

    a. The DIP Claims shall receive the treatment set forth in section 2.4 hereof.

    b. The B. Riley Unsecured Claims shall (i) be Allowed on the Effective Date at the Settled B. Riley Unsecured Claims Amount, with the remainder of the B. Riley Unsecured Claims waived and (ii) receive the treatment set forth in section 4.9 hereof on the Effective Date.

    c. a. B. Riley Commercial CapitalBRF Finance Co., LLC shall enter into commitments to provide the Exit Facility on the terms set forth in the Exit Term Sheet no later than [●].

    d. b. B. Riley Principal Capital II, LLC shall enter into commitments to provide the New B. Riley ELOC Facility on the terms set forth in the New B. Riley ELOC Facility Term Sheet no later than [●].

    e. c. B. Riley Commercial Capital, LLC and BRF Finance Co., LLC shall support Confirmation of the Plan and shall timely submit Ballots accepting the Plan, subject to receipt of a Bankruptcy Court approved Disclosure Statement.

5.18. 5.17. *Foundry Settlement.*

The treatment of the Foundry Claims pursuant to the Foundry Settlement Documents reflects the proposed compromise and settlement pursuant to Bankruptcy Rule 9019 and section 1123 of

the Bankruptcy Code of the Foundry Claims, as described in the Foundry 9019 Motion.  The Foundry Settlement and the Foundry Settlement Documents are incorporated into the Plan as if fully set forth herein, and include the following material terms and conditions in consideration of the value provided by the respective and applicable party pursuant to the Foundry Settlement:

a.   The Debtors shall assume the existing hosting agreements with Foundry, including the Foundry Hosting Agreements, on the Effective Date and perform thereunder.

b.   The Debtors and Foundry have executed a new hosting agreement, in the form of Order #2, in connection with the Identified Miners pursuant to which, effective and commencing on the Effective Date and subject to the terms thereof, Core Scientific, Inc. shall host and operate, and split the profits with Foundry generated by, the Identified Miners in accordance with the terms of Order #2.

c.   The Debtors shall convey, transfer and deliver all of their rights, title and interest in, to, and under, and possession of, the Identified Miners to Foundry free and clear of all Encumbrances (as defined in the Foundry Settlement Agreement) on the earlier of the first anniversary of the date of the Foundry Settlement Agreement and the termination or expiration of the term of Order #2, and, on such date, the Debtors or Reorganized Debtors (as applicable) shall deliver, or Foundry shall be authorized and entitled to file, any statement or document terminating any and all Encumbrances related to the Identified Miners.

d.   The transfer, sale, conveyance and/or delivery of the Identified Miners to Foundry (and/or any bill of sale, instrument or documents in connection therewith) shall constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code, and shall not be subject to or taxed under any law imposing any document recording tax, stamp tax, conveyance fee, or other similar tax, transfer tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, purchase tax, franchise tax, asset tax, stamp tax, sales tax, use tax, or other similar tax or governmental assessment.

e.   The Foundry Claims shall constitute Allowed General Unsecured Claims on the Effective Date against each of Core Scientific Acquired Mining LLC and Core Scientific, Inc. in the amount of at least $18,404,990.08 plus interest (collectively, the "**Foundry Allowed Claims**"), which Foundry Allowed Claims, subject to and upon the Foundry Settlement Effective Date, shall be satisfied by the consummation of the Foundry Settlement Documents and the settlements and transactions contemplated therein.

f.   Foundry shall, subject to and effective upon the Foundry Settlement Effective Date, vote the Foundry Allowed Claims to accept the Plan that incorporates the terms of, and is otherwise consistent with, the Foundry Settlement Agreement and the agreements and transactions contemplated therein.

g.   Foundry's Existing Common Interests, and its rights, remedies and interests as an equity holder, are unaffected by the Foundry Settlement.

The ~~Foundry Settlement and~~ summary above is qualified in its entirety by the terms and conditions of the Foundry Settlement Documents ~~shall be deemed to be incorporated into the Plan as if fully set forth herein~~ and does not reflect all of the material terms of the Foundry Settlement.  The failure to include a particular term in the above summary shall not be construed as such term not being a material term of the Foundry Settlement.  Notwithstanding anything to the contrary herein, or in any Plan Document or Plan Supplement, in the event of a conflict between any of the Foundry Settlement Documents, on the one hand, and the Plan or any other document, agreement, pleading or order, on the other hand, the Foundry Settlement Documents shall govern and control.  ~~The terms and conditions of the Foundry Settlement and the Foundry Settlement Documents shall be set forth in the Foundry Settlement Documents.~~

Notwithstanding anything to the contrary contained in the Plan ~~(including,~~ any Plan Document or Plan Supplement~~)~~, including sections ~~5.20,~~ 5.21, 5.22, and 10.3 through ~~10.7~~10.8 hereof, nothing herein shall, or shall be deemed to, (i) cancel, terminate, release, waive, discharge or affect the Foundry Settlement, the Foundry Settlement Documents ~~and/or the transactions thereunder~~, and/or the transactions thereunder and/or (ii) cancel, terminate, release, waive, discharge, or affect any rights, claims, causes of action, remedies, interests, or obligations of any of the Debtors, Reorganized Debtors, or Foundry (including its successors or assigns) (x) arising from and after the Effective Date and/or (y) under or related to the Foundry Settlement, any of the Foundry Settlement Documents, and/or any of the transactions contemplated thereunder.

~~Notwithstanding anything to the contrary herein, the Foundry Settlement, the Foundry Settlement Documents, and the applicable provisions of the Plan incorporating the Foundry Settlement and the Foundry Settlement Documents remain subject to ongoing negotiations between Foundry and the Debtors.  The Debtors and Foundry have not yet agreed, and nothing herein shall be construed as Foundry's or the Debtors' agreement to the Foundry Settlement, any of the Foundry Settlement Documents, and/or any descriptions thereof herein, and Foundry's and the Debtors' rights with respect to the foregoing and the Plan are fully reserved.~~

5.19.   ~~5.18.~~  *Rights Offering*

(a)   General.  Following approval by the Bankruptcy Court of the Rights Offering Procedures, the Debtors will commence the Rights Offering in accordance therewith and, on the Effective Date, the Debtors shall consummate the Rights Offering subject to the terms and conditions of the Plan, the Rights Offering Procedures, the Backstop Commitment Agreement, and the Confirmation Order.  In accordance with the Backstop Commitment Agreement and the Rights Offering Procedures, each holder of Existing Common Interests as of the Rights Offering Record Date shall have a Subscription Right to purchase up to its pro rata allocation of the New Common Interests to be issued pursuant to the Rights Offering.  ~~For the avoidance of doubt, both Eligible and Ineligible Holders may participate in the 1145 Rights Offering, while only Eligible Holders may participate in the 4(a)(2)/Reg D Rights Offering.~~ In addition, each Holder of Existing Common Interests shall have an oversubscription right to elect to purchase additional New Common Interests offered in the Rights Offering that are not timely, duly and validly subscribed for in the Rights Offering in accordance with the Rights Offering Procedures; *provided*, *however*, that no Holder may exercise an oversubscription right until it has fully exercised its Subscription Right.

(b)   The right to participate in the Rights Offering may not be sold, transferred, or assigned.  The Rights Offering shall be fully backstopped pursuant to the Backstop Commitment Agreement.

(c)     Purpose.  On the Effective Date, the proceeds of the Rights Offering may be used to (i) pay all reasonable and documented Restructuring Fees and Expenses, (ii) fund Plan Distributions, case administration expenses, and exit costs, and (iii) provide the Reorganized Debtors with additional liquidity for working capital and general corporate purposes.

(d)     Backstop Commitment.  In accordance with the Backstop Commitment Agreement and subject to the terms and conditions thereof, each of the Backstop Parties has agreed, severally but not jointly, to purchase for Cash, on or prior to the Effective Date, its respective Backstop Commitment Percentage (as defined in the Backstop Commitment Agreement) of the unsubscribed New Common Interests offered in the Rights Offering.

(e)     Backstop Commitment Premium.  As consideration for providing the backstop commitment for the Rights Offering, on the Effective Date, the Backstop Commitment Premium shall be allocated among the Backstop Parties in accordance with the Backstop Commitment Agreement.

5.20.     ~~5.19.~~ *Exemption from Securities Laws.*

(a)     Except as set forth in section ~~5.19(b)~~5.20(b) hereof, the offer, issuance, and distribution under the Plan of the New Secured Notes, the New Warrants, and the New Common Interests (including those (i) issued upon the conversion of the New Secured Notes, if any and (ii) issued upon exercise of the New Warrants) shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without further act or action by any Entity, from registration under (i) the Securities Act and (ii) any state or local law requiring registration for the offer, issuance, or distribution of Securities.

(b)     The offer, sale, issuance, and distribution of the Rights Offering Shares to be issued pursuant to the ~~1145~~ Rights Offering shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without further act or action by any Entity, from registration under (i) the Securities Act and (ii) any state or local law requiring registration for the offer, issuance, or distribution of Securities.  The ~~offer, sale, issuance, and distribution of the Rights Offering Shares to be issued pursuant to the 4(a)(2)/Reg D Rights Offering, as well as the~~ Backstop Shares~~,~~ shall be exempt, pursuant to section 4(a)(2) of the Securities Act and Regulation D thereunder, from registration under (i) the Securities Act and (ii) any state or local law requiring registration for the offer, issuance, or distribution of Securities.

(c)     The offer, issuance and sale of the New Common Interests issued to the Backstop Parties under the Backstop Commitment Agreement comprising the Backstop Commitment Premium is being made in reliance on the exemption pursuant to section 1145 of the Bankruptcy Code, without further act or action by any Entity, from registration under (i) the Securities Act and (ii) any state or local law requiring registration for the offer, issuance, or distribution of Securities.

(d)     ~~(c)~~ The New Common Interests (other than ~~the Rights Offering Shares issued in the 4(a)(2)/Reg D Rights Offering, as well as~~ the Backstop Shares), New Secured Notes, the New Warrants, and the New Common Interests issued (i) upon conversion of the New Secured Notes, if any and (ii) upon exercise of the New Warrants, may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, (ii) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments, (iii) applicable regulatory approval, and

(iv) the transfer provisions, if any, and other applicable provisions set forth in, as applicable, the New Corporate Governance Documents, and the New Secured Notes Documents, and the New Warrant Agreement.

(d) The offer, issuance and sale of the New Common Interests issued to the Backstop Parties under the Backstop Commitment Agreement comprising the Backstop Commitment Premium is being made in reliance on the exemption pursuant to section 1145 of the Bankruptcy Code, without further act or action by any Entity, from registration under (i) the Securities Act and (ii) any state or local law requiring registration for the offer, issuance, or distribution of Securities.

(e)      Persons who purchase the New Common Interests pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will hold "restricted securities." Such securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act.  Transfers of such securities will also be subject to the transfer provisions, if any, and other applicable provisions set forth in the New Corporate Governance Documents.

(f)      Subject to section 6.8 hereof, the Reorganized Debtors may elect, on or after the Effective Date, to reflect all or any portion of the ownership of New Common Interests, the New Secured Notes, the New Warrants, and the New Common Interests issued (i) upon conversion of the New Secured Notes, if any and (ii) upon exercise of the New Warrants, through the facilities of DTC.  If the Reorganized Debtors make such election, they shall not be required to provide any further evidence other than the Plan or Confirmation Order with respect to the treatment of such applicable portion of New Common Interests, New Secured Notes, or the New Common Interests issued upon conversion thereof, if any, or New Warrants or New Common Interests issued pursuant thereto, as applicable, and such Plan or Confirmation Order shall be deemed to be legal and binding obligations of the Reorganized Debtors in all respects.

(g)      DTC and all other Persons shall be required to accept and conclusively rely upon the Plan and the Confirmation Order in lieu of a legal opinion regarding whether the New Common Interests, the New Secured Notes, the New Warrants, or the New Common Interests issued (i) upon conversion of the New Secured Notes, if any, or (ii) upon payment of the exercise price in accordance with the terms of the New Warrant Agreement, if any, are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

(h)      Notwithstanding anything to the contrary in the Plan or otherwise, no Person or Entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Interests, the New Secured Notes, the New Warrants, or the New Common Interests issued (i) upon conversion of the New Secured Notes, if any or (ii) upon exercise of the New Warrants, are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services or validly issued, fully paid, and non-assessable.

5.21.   5.20. *Cancellation of Existing Securities and Agreements*.

Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, including with respect to Executory Contracts or Unexpired Leases that shall be assumed by the Reorganized Debtors, or any contract, instrument, or other agreement or document created in connection with the Plan, on the Effective Date, all Interests (including, for the

avoidance of doubt, any warrants), agreements, instruments, notes, certificates, mortgages, security documents, and any other instruments or documents evidencing any Claim or Interest (other than Intercompany Interests that are not modified by the Plan and the Reinstated Other Secured Claims in Class 4) and any rights of any Holder in respect thereof (including, for the avoidance of doubt, any warrants) shall be deemed cancelled, discharged, and of no force or effect, without any further act or action under any applicable agreement, instrument, document, law, regulation, order, or rule, and the obligations of the Debtors thereunder shall be deemed fully and finally satisfied, settled, released, and discharged. Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors or their interests, as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in this section shall be deemed null and void and shall be of no force and effect, and the Debtors shall be entitled to continue to use (in accordance with the remaining provisions of such document, instrument, lease, or other agreement) any land, facilities, improvements, or equipment financed with the proceeds of the Mortgage Agreements, Miner Equipment Lender Agreements, or the Convertible Notes Agreements, as applicable. Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties (i) under any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or hereunder, (ii) relating to the Reinstated Other Secured Claims in Class 4, (iii) relating to allowing the Notes Agent to enforce its rights, claims, and interest vis-à-vis any party other than the Debtors or any Released Party, (iv) relating to allowing the Notes Agent to make distributions in accordance with the Plan (if any), as applicable, (v) relating to preserving any rights of the Notes Agent to payment of fees, expenses and indemnification obligations as against any money or property distributable to holders of April Convertible Secured Notes Claims or August Convertible Secured Notes Claims, (vi) relating to allowing the Notes Agent to enforce any obligations owed to it under the Plan and perform any rights or duties, if any, related thereto, (vii) relating to allowing the Notes Agent to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court; and (viii) relating to permitting the Notes Agent to perform any functions that are necessary to effectuate the forgoing; *provided, further*, that notwithstanding the foregoing, nothing in this section 5.205.21 shall affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Reorganized Debtors, except to the extent set forth in or provided for under the Plan.

5.22.    5.21. *Cancellation of Liens*.

(a)    Except as otherwise specifically provided herein, including sections 4.4 and 4.6 hereof, all notes, instruments, certificates evidencing debt of the Debtors and Existing Common Interests will be cancelled and obligations of the Debtors thereunder will be discharged and of no further force or effect, except for the purpose of allowing the applicable agents and trustees to receive distributions from the Debtors under the Plan and to make any further distributions to the applicable Holders on account of their Allowed Claims and Interests.

(b)    After the Effective Date and following (i) the distributions to Holders on account of Allowed Convertible Notes Secured Claims and Allowed Miner Equipment Lender Secured Claims and/or (ii) with regard to Allowed M&M Lien Secured Claims, satisfaction of the applicable M&M Lien Takeback Debt, the Debtors or the Reorganized Debtors, at their expense, may, in their sole discretion, take any action necessary to terminate, cancel, extinguish, and/or evidence the release of any and all mortgages, deeds of trust, Liens, pledges, and other security interests with respect to the Convertible Notes Secured Claims, Miner Equipment Lender Secured Claims, and M&M Lien Secured Claims, including, without limitation, the preparation and filing of any and all documents necessary to terminate, satisfy, or release any mortgages, deeds of trust, Liens, pledges, and other security interests held by the Holders of the M&M Lien Secured Claims, Miner Equipment

Lender Secured Claims, the Notes Agent, and/or Convertible Noteholders, including, without limitation, UCC-3 termination statements.

5.23.   5.22. *Officers and Boards of Directors*.[2]

(a)   On or after the Effective Date, the members of the New Board shall be appointed to serve pursuant to the terms of the applicable New Corporate Governance Documents.  The current chief executive officer of Core Scientific, Inc. as of the Effective Date shall serve as a member of the New Board.  The composition of each board of directors or managers of a Reorganized Debtor, as applicable, and, to the extent applicable, the officers of each Reorganized Debtor, shall be disclosed prior to the Confirmation Hearing in accordance with section 1129(a)(5) of the Bankruptcy Code.

(b)   The officers of the respective Debtors immediately before the Effective Date, as applicable, shall serve as the initial officers of each of the respective Reorganized Debtors on and after the Effective Date and in accordance with any employment agreement with the Reorganized Debtors and applicable non-bankruptcy law.  After the Effective Date, the selection of officers of the Reorganized Debtors shall be as provided by their respective organizational documents.

(c)   Except to the extent that a member of the board of directors or a manager, as applicable, of a Debtor continues to serve as a director or manager of such Debtor on and after the Effective Date, the members of the board of directors or managers of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date and each such director or manager will be deemed to have resigned or shall otherwise cease to be a director or manager of the applicable Debtor on the Effective Date.  Commencing on the Effective Date, each of the directors and managers of each of the Reorganized Debtors shall be elected and serve pursuant to the terms of the applicable organizational documents of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

5.24.   5.23. *Management Incentive Plan*.

On or after the Effective Date, but in event no later than thirty (30) days after the Effective Date, the New Board shall adopt the Management Incentive Plan.  Up to ten percent (10%) of the New Common Interests on the Effective Date, on a fully diluted basis (including shares issuable under any employee incentive plan), will be reserved for issuance under the Management Incentive Plan.

5.25.   5.24. *Authorization, Issuance, and Delivery of New Common Interests and New Warrants; New Listing*.

(a)   On the Effective Date, Reorganized Parent is authorized to issue or cause to be issued and shall issue the New Common Interests and the New Warrants for distribution or reservation, as the case may be, in accordance with the terms of the Plan without the need for any further board, stockholder or other corporate action.  All of the New Common Interests and New Warrants issuable under the Plan, including, but not limited to, (i) New Common Interests that may be issued upon conversion of the New Secured Notes, if any, in accordance with the terms and provisions of the applicable New Secured Notes Indenture, and (ii) New Common Interests that may be issued upon exercise of the New Warrants, when so issued, shall be duly authorized and validly issued.  Reorganized Parent shall issue or reserve for issuance a sufficient number of common equity

---

[2] [**NTD:**  TBD]

issuances to effectuate all issuances of New Common Interests contemplated by the Plan, including, but not limited to, the Management Incentive Plan, issuances to Holders of Disputed Claims following the allowance of such Claims, issuances pursuant to the assumed Stock Option Award Agreements and RSU Award Agreements (if and when Stock Options and Unvested RSUs are exercised or become vested, respectively), issuances pursuant to the Bitmain Transaction, and any additional issuances following the Effective Date to the extent necessary to ensure that each Holder of an Allowed Claim in Classes 1, 2, 3, and 8 that is entitled to receive New Common Interests pursuant to sections 4.1(c)(i)4.1(c), 4.2(c)(i), 4.3(c), or 4.8(b) of the Plan, as applicable, receives a distribution of New Common Interests equal to the value to which such Holder is entitled pursuant to sections 4.1(c)(i)4.1(c), 4.2(c)(i), 4.3(c), or 4.8(b) of the Plan, as applicable.  Additionally, on the Effective Date, each holder of New Common Interests and New Warrants shall be deemed, without further notice or action, to have agreed to be bound by the New Corporate Governance Documents, which shall be deemed to be valid, binding, and enforceable in accordance with their terms, as the same may be amended from time to time following the Effective Date in accordance with their terms, and in each case without the need for execution by any party thereto other than Reorganized Parent.  The New Corporate Governance Documents shall be binding on all Entities receiving New Common Interests (and their respective successors and assigns) or New Warrants (and their respective successors and assigns), whether received pursuant to the Plan or otherwise and regardless of whether such Entity executes or delivers a signature page to any New Corporate Governance Document.

(b)     Upon the Effective Date, the Reorganized Debtors anticipate that they will continue to be a reporting company under the Exchange Act, 15 U.S.C. §§ 78(a)–78(pp). The Reorganized Debtors anticipate using commercially reasonable efforts to have the New Common Interests listed on the NASDAQ, NYSE, or another nationally recognized exchange, as soon as reasonably practicable, subject to meeting applicable listing requirements following the Effective Date.

5.26.       5.25. *Nonconsensual Confirmation*.

The Debtors intend to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code as to any Classes that reject or are deemed to reject the Plan.

5.27.       5.26. *Closing of the Chapter 11 Cases*.

After the Effective Date, the Reorganized Debtors shall be authorized, but not directed, to submit an order to the Bankruptcy Court under certification of counsel that is in form and substance reasonably acceptable to the U.S. Trustee that closes and issues a final decree for each of the Chapter 11 Cases.

5.28.       5.27. *Notice of Effective Date*.

As soon as practicable, the Debtors shall File a notice of the occurrence of the Effective Date with the Bankruptcy Court.

**ARTICLE VI.     DISTRIBUTIONS.**

6.1.     *Distributions Generally*.

Except as otherwise provided in the Plan, the Disbursing Agent shall make all applicable Plan Distributions to the appropriate Holders of Allowed Claims and Existing Common Interests in

accordance with the terms of the Plan. The Reorganized Debtors shall be authorized to cause partial distributions to be made on account of Allowed Claims and Existing Common Interests before all Claims are Allowed. The Reorganized Debtors shall also be authorized to cause distributions of New Common Interests following the Effective Date to carry out the terms of the Plan, including causing distributions to Holders of Disputed Claims that become Allowed Claims and subsequent distributions to the extent necessary to ensure that each Holder of an Allowed Claim in Classes 1, 2, 3, and 8 that is entitled to receive New Common Interests pursuant to section 4.1(c)(i)4.1(c), 4.2(c)(i), 4.3(c), or 4.8(b) of the Plan, as applicable, receives a distribution of New Common Interests equal to the value to which such Holder is entitled pursuant to sections 4.1(c)(i)4.1(c), 4.2(c)(i), 4.3(c), or 4.8(b) of the Plan, as applicable.

6.2.      *Distribution Record Date*.

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors or their respective agents, shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims or Interests. The Debtors or the Reorganized Debtors shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date. In addition, with respect to payment of any Cure Amounts or disputes over any Cure Amounts, neither the Debtors nor the applicable Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the close of business on the Distribution Record Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount. The Distribution Record Date shall not apply to Securities deposited with DTC, the Holders of which shall receive distributions in accordance with the customary procedures of DTC.

All distributions to Convertible Noteholders shall be deemed to be made to or by the Notes Agent. Regardless of whether such distributions are made by the Notes Agent or by the Disbursing Agent at the reasonable direction of the Notes Agent, the charging liens shall attach to the property to be distributed to the Convertible Noteholders in the same manner as if such distributions were made through the Notes Agent.

Notwithstanding anything in the Plan to the contrary, in connection with any distribution under the Plan to be effected through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise), the Debtors or the Reorganized Debtors, as applicable, shall be entitled to recognize and deal for all purposes under the Plan with Holders of Claims in each Class to the extent consistent with the customary practices of DTC used in connection with such distributions. All New Common Interests or New Secured Notes to be distributed under the Plan pursuant to section 1145 of the Bankruptcy Code shall be issued in the names of such Holders or their nominees in accordance with DTC's book-entry exchange procedures or on the books and records of a transfer agent; *provided*, that such New Common Interests or New Secured Notes will only be issued in accordance with DTC book-entry procedures if the same are permitted to be held through DTC's book-entry system.

6.3.      *Date of Distributions*.

Except as otherwise provided in this Plan (including payments made in the ordinary course of the Debtors' business) or as paid pursuant to a prior Bankruptcy Court order, on the Effective Date or, if a Claim or Interest is not Allowed on the Effective Date, on the date that such Claim or Interest becomes Allowed, or, in each case, as soon as reasonably practicable thereafter, or as otherwise determined in accordance with the Plan and Confirmation Order, including, without limitation, the treatment provisions of Article IV of the Plan, each Holder of an Allowed Claim or Existing Common Interest shall receive the full amount of the distributions that the Plan provides for Allowed Claims or

Existing Common Interests in the applicable Class provided in the Plan; *provided* that the Reorganized Debtors may implement periodic distribution dates to the extent they determine them to be appropriate; *provided, further,* that the Reorganized Debtors may make distributions of New Common Interests following the Effective Date, including to Holders of Disputed Claims that become Allowed Claims and subsequent distributions to the extent necessary to ensure that each Holder of an Allowed Claim in Classes 1, 2, 3, and 8 that is entitled to receive New Common Interests pursuant to section ~~4.1(c)(i)~~4.1(c), 4.2(c)(i), 4.3(c), or 4.8(b) of the Plan, as applicable, receives a distribution of New Common Interests equal to the value to which such Holder is entitled pursuant to sections ~~4.1(c)(i)~~4.1(c), 4.2(c)(i), 4.3(c), or 4.8(b) of the Plan, as applicable.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII; *provided* that any New Common Interest and any New Warrant that ~~is~~are issuable to Holders of Allowed Claims but ~~is~~are withheld from distribution on account of a Holder of a Disputed Claim shall not be issued until such time such Disputed Claim is resolved and the ~~shares~~New Common Interests and/or New Warrants are to be distributed.  Except as specifically provided in the Plan, Holders of Allowed Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

### 6.4. *Disbursing Agent*.

All distributions under the Plan shall be made by the applicable Reorganized Debtor or applicable Disbursing Agent on or after the Effective Date or as otherwise provided herein.  A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties, and all reasonable fees and expenses incurred by such Disbursing Agent directly related to distributions hereunder shall be reimbursed by the Reorganized Debtors.

### 6.5. *Rights and Powers of Disbursing Agent*.

(a) From and after the Effective Date, each Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, Holders of Claims against and Interests in the Debtors and other parties in interest, from any and all claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent.  No Holder of a Claim or Interest or other party in interest shall have or pursue any claim or Cause of Action vested in a Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by such Disbursing Agent to be necessary and proper to implement the provisions hereof.

(b) Powers of Disbursing Agent.  Each Disbursing Agent shall be empowered to: (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all applicable distributions or payments provided for under the Plan; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers (A) as may be vested in such Disbursing Agent by order of the Bankruptcy Court (including any Final Order issued after the Effective Date) or pursuant to the Plan or (B) as deemed by such Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

(c) Expenses Incurred on or After the Effective Date.  Except as otherwise ordered by the Bankruptcy Court and subject to the written agreement of the Reorganized Debtors, the amount of any reasonable fees and expenses incurred by a Disbursing Agent on or after the Effective

Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including for reasonable attorneys' and other professional fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors in the ordinary course of business.

6.6.       *Expenses of Disbursing Agent*.

Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by a Disbursing Agent acting in such capacity (including reasonable and documented attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash by the Reorganized Debtors in the ordinary course of business.

6.7.       *No Postpetition Interest on Claims*.

Except as otherwise specifically provided for in the Plan, the Confirmation Order, or another order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

6.8.       *Delivery of Distributions*.

Subject to Bankruptcy Rule 9010, all distributions to any Holder of an Allowed Claim or Existing Common Interest shall be made to a Disbursing Agent, which shall transmit such distribution to the applicable Holders of Allowed Claims and Existing Common Interests as and when required by the Plan at (i) the address of such Holder on the books and records of the Debtors or their agents or (ii) at the address in any written notice of address change delivered to the Debtors or the Disbursing Agent, including any addresses including on any transfers of Claim Filed pursuant to Bankruptcy Rule 3001.  In the event that any distribution to any Holder is returned as undeliverable, no further distributions shall be made to such Holder unless and until such Disbursing Agent is notified in writing of such Holder's then-current address, at which time, or as soon thereafter as reasonably practicable, all currently-due, missed distributions shall be made to such Holder without interest.  Nothing herein shall require any Disbursing Agent to attempt to locate Holders of undeliverable distributions and, if located, assist such Holders in complying with section 6.19 of the Plan.

Distributions of the New Common Interests or New Secured Notes to be distributed under the Plan pursuant to section 1145 of the Bankruptcy Code will be made through the facilities of DTC in accordance with DTC's customary practices; *provided* that such New Common Interests or New Secured Notes will only be issued in accordance with DTC book-entry procedures if the same are permitted to be held through DTC's book-entry system.  To the extent distributions are to be made through the facilities of DTC, any distribution that otherwise would be made to any Holder eligible to receive a distribution who does not own or hold an account eligible to receive such a distribution through DTC on a relevant distribution date will be forfeited.  For the avoidance of doubt, DTC shall be considered a single holder for purposes of distributions.

6.9.       *Distributions after Effective Date*.

Distributions made after the Effective Date to (i) Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims or (ii) Holders of Allowed Claims in Classes 1, 2, 3, and 8 that are entitled to receive New Common Interests pursuant to section ~~4.1(c)(i)~~4.1(c), 4.2(c)(i)~~)~~, 4.3(c), or 4.8(b) of the Plan, as applicable, that are necessary to ensure that each such Holder receives a distribution of New Common Interests equal to the value to which such

Holder is entitled pursuant to sections ~~4.1(c)(i)~~4.1(c), 4.2(c)(i), 4.3(c), or 4.8(b) of the Plan, as applicable, shall, in each case, be deemed to have been made on the Effective Date.

### 6.10. *Unclaimed Property*.

One year from the later of (i) the Effective Date and (ii) the date that is ten (10) Business Days after the date of a distribution on an Allowed Claim or Existing Common Interest, all distributions payable on account of such Claim that are undeliverable or otherwise unclaimed shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to the Reorganized Debtors or their successors or assigns, and all claims of any other Person (including the Holder of a Claim in the same Class) to such distribution shall be discharged and forever barred.  The Reorganized Debtors and the Disbursing Agent shall have no obligation to attempt to locate any Holder of an Allowed Claim or Existing Common Interest other than by reviewing the Debtors' books and records, including the records of the Debtors' transfer agent(s), and the Bankruptcy Court's Filings.

### 6.11. *Time Bar to Cash Payments*.

Checks issued by a Disbursing Agent in respect of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of first issuance thereof.  Thereafter, the amount represented by such voided check shall irrevocably revert to the Reorganized Debtors, and any Claim in respect of such voided check shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.  Requests for re-issuance of any check shall be made to the applicable Disbursing Agent by the Holder of the Allowed Claim to which such check was originally issued, prior to the expiration of the ninety (90) day period.

### 6.12. *Manner of Payment under Plan*.

Except as otherwise specifically provided in the Plan, at the option of the Debtors or the Reorganized Debtors, as applicable, any Cash payment to be made hereunder by the Debtors or Reorganized Debtors may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

### 6.13. *Satisfaction of Claims*.

Except as otherwise specifically provided in the Plan, any distributions and deliveries to be made on account of Allowed Claims or Existing Common Interests under the Plan shall be in complete and final satisfaction, release, settlement, and discharge of and exchange for such Allowed Claims or Existing Common Interests.

### 6.14. *Fractional Stock and Notes*.

No fractional New Common Interests shall be distributed.  If any distributions of New Common Interests pursuant to the Plan would result in the issuance of a fractional share of New Common Interests, then the number of shares of New Common Interests to be issued in respect of such distribution will be calculated to one decimal place and rounded up or down to the closest whole share (with a half share or greater rounded up and less than a half share rounded down).  The total number of shares of New Common Interests to be distributed in connection with the Plan shall be adjusted as necessary to account for the rounding provided for in this section 6.14.  No consideration shall be provided in lieu of fractional shares that are rounded down.  Neither the Reorganized Debtors nor the Disbursing Agent shall have any obligation to make a distribution that is less than one (1) share of New Common Interests.  Fractional shares of New Common Interests that are not distributed in accordance with this section shall be returned

to, and the ownership thereof shall vest in, the Reorganized Debtors.  The New Secured Notes shall be issued in a denomination of $1.00 and integral multiples of $1.00 and any other amounts shall be rounded down.

6.15. ***Minimum Cash Distributions***.

A Disbursing Agent shall not be required to make any distribution of Cash less than one hundred dollars ($100) to any Holder of an Allowed Claim; *provided*, *however*, that if any distribution is not made pursuant to this section 6.15, such distribution shall be added to any subsequent distribution to be made on behalf of such Holder's Allowed Claim.

6.16. ***Setoffs and Recoupments***.

(a)     Each Debtor, Reorganized Debtor, or such entity's designee as instructed by such Debtor or Reorganized Debtor, may, but shall not be required to, set off or recoup against any Claim, and any distribution to be made pursuant to the Plan on account of such Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that a Debtor, Reorganized Debtor, or its successors may have against the Holder of such Claim; *provided*, *however*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by a Debtor, a Reorganized Debtor, or its successor of any claims, rights, or Causes of Action that a Debtor, Reorganized Debtor, or its successor or assign may possess against the Holder of such Claim.

(b)     In no event shall any Holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor or Reorganized Debtor, unless (i) the Debtors or the Reorganized Debtors, as applicable, have consented or (ii) such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.  Notwithstanding the foregoing, this paragraph does not create any new rights to setoff or recoupment that did not exist under any applicable law or agreement in existence prior to the Effective Date.

6.17. ***Allocation of Distributions between Principal and Interest***.

Except as otherwise provided in the Plan and subject to section 6.7 of the Plan or as otherwise required by law (as reasonably determined by the Reorganized Debtors), distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

6.18. ***No Distribution in Excess of Amount of Allowed Claim or Existing Common Interest***.

Notwithstanding anything in the Plan to the contrary, no Holder of an Allowed Claim or Existing Common Interest shall receive, on account of such Allowed Claim or Existing Common Interest, Plan Distributions in excess of the Allowed amount of such Claim (plus any postpetition interest on such Claim solely to the extent permitted by the Plan) or Existing Common Interest.

6.19.    ***Withholding and Reporting Requirements***.

(a) *Withholding Rights*.   In connection with the Plan, any Person issuing any instrument or making any distribution described in the Plan (or any other related agreement) or payment in connection therewith shall comply with all applicable withholding and reporting requirements imposed by any federal, state, local or non-U.S. taxing authority, and, notwithstanding any provision in the Plan to the contrary, any such Person shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of any distribution or payment to be made under or in connection with the Plan (or any other related agreement) to generate sufficient funds to pay applicable withholding taxes, using its own funds to pay any applicable withholding taxes and retaining a portion of the applicable distribution, withholding distributions pending receipt of information necessary or appropriate to facilitate such distributions or establishing any other mechanisms it believes are reasonable and appropriate.  Any amounts withheld shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.  Notwithstanding the foregoing, each Holder of an Allowed Claim or Interest or any other Person that receives a distribution pursuant to the Plan or payment in connection therewith shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such Holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.  The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

(b)    *Forms*.  Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the applicable Disbursing Agent or such other Person designated by the Reorganized Debtors (which Person shall subsequently deliver to the applicable Disbursing Agent any applicable Internal Revenue Service ("**IRS**") Form W-8 or Form W-9 received) an appropriate IRS Form W-9 or an appropriate IRS Form W-8 and any other forms or documents reasonably requested by any Reorganized Debtor to reduce or eliminate any withholding required by any federal, state, or local taxing authority.  If such request is made by the Reorganized Debtors, the Disbursing Agent, or such other Person designated by the Reorganized Debtors or a Disbursing Agent and such party fails to comply before the date that is 180 days after the request is made, the amount of such distribution shall irrevocably revert to the applicable Reorganized Debtor and any Claim in respect of such distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property.

**ARTICLE VII.    PROCEDURES FOR DISPUTED CLAIMS**.

7.1.    ***Disputed Claims Generally***.

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed pursuant to the Plan or Final Order, including the Confirmation Order (when it becomes a Final Order) Allowing such Claim.  Except insofar as a Claim is Allowed under the Plan or was Allowed prior to the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall have and retain any and all rights and defenses such Debtor has with respect to any Disputed Claim.  Any objections to Claims shall be served and Filed on or before the Claim Objection

Deadline.  All Disputed Claims not objected to by the end of such period shall be deemed Allowed unless such period is extended upon approval of the Bankruptcy Court.

       7.2.       ***Objections to Claims***.

       Except insofar as a Claim is Allowed under the Plan, the Debtors or Reorganized Debtors, as applicable, shall be entitled to object to Claims.  Except as otherwise expressly provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors shall have the authority to (i) file, withdraw, or litigate to judgment objections to Claims, (ii) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court, and (iii) administer and adjust the Debtors' claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

       7.3.       ***Estimation of Claims***.

       The Debtor or Reorganized Debtors, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or Reorganized Debtors, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated.

       7.4.       ***Adjustment to Claims Register Without Objection***.

       Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the claims register by the Debtors or Reorganized Debtors, as applicable, upon stipulation between the parties in interest without a Claims objection having to be Filed and without any further notice or action, order, or approval of the Bankruptcy Court.

       7.5.       ***Disallowance of Claims.***

       Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or Reorganized Debtors, as applicable.

7.6.    ***No Distributions Pending Allowance***.

If an objection, motion to estimate, or other challenge to a Claim or Interest is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim or Interest unless and until (and only to the extent that) such Claim or Interest becomes an Allowed Claim or Allowed Interest.

7.7.    ***Distributions after Allowance***.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan, including the treatment provisions provided in Article IV of the Plan.

7.8.    ***Claim Resolution Procedures Cumulative***.

All of the Claims, objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

7.9.    ***Disputed Claims Reserves***.

(a) The Debtors, Reorganized Debtors or Disbursing Agent, as applicable, shall establish one or more reserves with respect to amounts that would otherwise be distributable to Holders of Claims that are Disputed Claims as of the Distribution Record Date, which reserves shall be administered by the Debtors, Reorganized Debtors, or Disbursing Agent, as applicable. In the case of New Common Interests, there shall be withheld from the and New Warrants, New Common Interests (which withheldand New Common InterestsWarrants shall not be issued by the Reorganized Debtors on account of any Disputed Claims until such time as the respective Disputed Claims are resolved) an amount of New Common Interests that would be distributable to Holders of Disputed Claims had such Disputed Claims been Allowed on the Effective Date. In the case of cash and other property (other than New Common Interests and New Warrants), the Debtors, Reorganized Debtors or Disbursing Agent shall hold such assets in such reserve(s) in trust for the benefit of those Holders, if any, of Claims that are Disputed Claims as of the Distribution Record Date to whom such assets would be distributed has such Disputed Claims been Allowed Claims as of the Effective Date. As and when (or as soon as reasonably practicable thereafter) any Disputed Claims are resolved by a Final Order or agreed to by settlement for which New Common Interests, New Warrants, or other amounts have been withheld, (i) the Reorganized Debtors shall issue as appropriate such New Common Interests or New Warrants and (ii) the Reorganized Debtors or the Disbursing Agent, as applicable, shall distribute such New Common Interests (and any dividends that would have been payable on such New Common Interests had such New Common Interests been issued and distributed on the Effective Date), New Warrants, or other amounts (net of any expenses, including any allocable taxes incurred or payable by the Disputed Claims Reserve(s), including in connection with such distribution) on account of such Claims as such New Common Interests, New Warrants, or other amounts would have been distributable had such Disputed Claims been resolved as of the Effective Date under Articles IV and VI of the Plan, solely to the extent of any New Common Interests so issued and such other amounts available in the applicable Disputed Claims Reserve(s).

(b)    At such time as all Claims that are Disputed Claims as of the Distribution Record Date have been resolved, any remaining assets in the Disputed Claims Reserve(s) (net of any

expenses, including any allocable taxes incurred or payable by the Disputed Claims Reserve(s), including in connection with such distribution) shall be distributed to Holders of Allowed Claims in accordance with the terms of Article IV of the Plan and, thereafter, to the Reorganized Debtors.

(c)      Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary, or the receipt of a determination by the Internal Revenue Service, the Debtors, the Reorganized Debtors or the Disbursing Agent, as applicable, shall treat any cash and other property (other than the New Common Interests) held in the Disputed Claims Reserve(s) established under this section 7.9 of the Plan as one or more "disputed ownership funds" governed by Treasury Regulation section 1.468B-9 and, to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  For the avoidance of doubt, New Common Interests and New Warrants which are not issued and outstanding until Disputed Claims are resolved shall not be treated as held by a disputed ownership fund for U.S. federal income tax purposes; rather, as set forth in this section 7.9, such New Common Interests and New Warrants shall be issued by the Reorganized Debtors and distributed by the Reorganized Debtors or the Disbursing Agent, as applicable, to the applicable claimant once its Disputed Claim becomes an Allowed Claim.  All parties (including the Debtors, the Reorganized Debtors, the Disbursing Agent, and the Holders of Disputed Claims) shall be required to report for tax purposes consistently with the foregoing.  The Reorganized Debtors or the Disbursing Agent, as applicable, may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for or on behalf of the Disputed Claims Reserve(s) for all taxable periods through the date on which final distributions are made.

(d)      Each Disputed Claims Reserve shall be responsible for payment, out of the assets of such reserve, of any taxes imposed on the Disputed Claims Reserve or its assets.  In the event, and to the extent, any Cash in the Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of such reserve (including any income that may arise upon the distribution of the assets in such reserve) or other expenses, assets of the Disputed Claims Reserve may be sold to pay such taxes or other expenses.

7.10.      *Single Satisfaction of Claims and Interests*.

In no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim or Interest exceed 100 percent of the underlying Allowed Claim or Interest plus applicable interest required to be paid hereunder, if any.

7.11.      *Amendments to Claims*.

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of (i) the Bankruptcy Court or (ii) the Reorganized Debtors.

**ARTICLE VIII.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES**.

8.1.      *General Treatment*.

(a)      As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, and subject to section 8.5 of the Plan, all Executory Contracts and Unexpired Leases to which any of the Debtors are parties shall be deemed assumed, unless such contract or lease (i) was previously assumed or rejected by the Debtors, pursuant to Final Order of the Bankruptcy Court, (ii) previously expired or terminated pursuant to its own terms or by

agreement of the parties thereto, (iii) is the subject of a motion to reject Filed by the Debtors on or before the Confirmation Date, or (iv) is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Contracts.

(b)     Subject to (i) satisfaction of the conditions set forth in section 8.1(a) of the Plan, (ii) resolution of any disputes in accordance with section 8.2 of the Plan with respect to the Executory Contracts or Unexpired Leases subject to such disputes, and (iii) the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Each Executory Contract and Unexpired Lease assumed or assumed and assigned pursuant to the Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor or assignee in accordance with its terms, except as modified by any provision of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption or assumption and assignment, or applicable law.

(c)     To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

(d)     The Debtors reserve the right, on or before the Effective Date, to amend the Schedule of Rejected Contracts or the Schedule of Assumed Contracts to add or remove any Executory Contract or Unexpired Lease; *provided* that the Debtors or Reorganized Debtors, as applicable, may amend the Schedule of Rejected Contracts or Schedule of Assumed Contracts to add or delete any Executory Contracts or Unexpired Leases after such date to the extent agreed with the relevant counterparties and entry of an order of the Bankruptcy Court.

8.2.     ***Determination of Assumption and Cure Disputes and Deemed Consent***.

(a)     The Debtors shall File, as part of the Plan Supplement, the Schedule of Rejected Contracts and the Schedule of Assumed Contracts.  At least ten (10) days before the deadline to object to Confirmation of the Plan, the Debtors shall serve a notice on parties to Executory Contracts or Unexpired Leases to be assumed, assumed and assigned, or rejected reflecting the Debtors' intention to potentially assume, assume and assign, or reject the contract or lease in connection with the Plan and, where applicable, setting forth the proposed Cure Amount (if any).  If a counterparty to any Executory Contract or Unexpired Lease that the Debtors or Reorganized Debtors, as applicable, intend to assume or assume and assign is not listed on such a notice, the proposed Cure amount for such Executory Contract or Unexpired Lease shall be deemed to be Zero Dollars ($0).  **Any objection by a counterparty to an Executory Contract or Unexpired Lease to the proposed assumption, assumption and assignment, or related Cure Amount must be Filed, served, and actually received by the Debtors within fourteen (14) days of the service of the assumption notice, or such shorter period as agreed to by the parties or authorized by the Bankruptcy Court**.  Any counterparty to an Executory Contract or Unexpired Lease that does not timely object to the notice of the proposed assumption of such Executory Contract or Unexpired Lease shall be deemed to have assented to assumption of the applicable Executory Contract or Unexpired Lease notwithstanding any provision thereof that purports to (i) prohibit, restrict, or condition the transfer or assignment of such contract or lease; (ii) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct or indirect transfer or assignment of the

rights of any Debtor under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan; (iii) increase, accelerate, or otherwise alter any obligations or liabilities of any Debtor or any Reorganized Debtor, as applicable, under such Executory Contract or Unexpired Lease; or (iv) create or impose a Lien upon any property or Asset of any Debtor or any Reorganized Debtor, as applicable. Each such provision shall be deemed to not apply to the assumption of such Executory Contract or Unexpired Lease pursuant to the Plan and counterparties to assumed Executory Contracts or Unexpired Leases that fail to object to the proposed assumption in accordance with the terms set forth in this section 8.2(a), shall forever be barred and enjoined from objecting to the proposed assumption or to the validity of such assumption (including with respect to any Cure Amounts or the provision of adequate assurance of future performance), or taking actions prohibited by the foregoing or the Bankruptcy Code on account of transactions contemplated by the Plan.

(b)      If there is an Assumption Dispute pertaining to assumption of an Executory Contract or Unexpired Lease (other than a dispute pertaining to a Cure Amount), such dispute shall be heard by the Bankruptcy Court prior to such assumption being effective; *provided* that the Debtors or the Reorganized Debtors, as applicable, may settle any dispute regarding the Cure Amount or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(c)      To the extent an Assumption Dispute relates solely to the Cure Amount, the Debtors may assume and/or assume and assign the applicable Executory Contract or Unexpired Lease prior to the resolution of the Assumption Dispute; *provided* that the Debtors or the Reorganized Debtors, as applicable, reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the non-Debtor party to such Executory Contract or Unexpired Lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such non-Debtor party and the applicable Reorganized Debtor).

(d)      Subject to resolution of any dispute regarding any Cure Amount, all Cure Amounts shall be satisfied promptly, or otherwise as soon as practicable, by the Debtors or Reorganized Debtors, as the case may be, upon assumption or assumption and assignment, as applicable, of the underlying Executory Contracts and Unexpired Leases. Assumption or assumption and assignment, as applicable, of any Executory Contract or Unexpired Lease pursuant to the Plan, or otherwise, shall result in the full and final satisfaction, settlement, release, and discharge of any Claims or defaults, subject to satisfaction of the Cure Amount, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of the assumption or assumption and assignment, as applicable. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned, as applicable, shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court or any other Entity, upon the deemed assumption of such Executory Contract or Unexpired Lease.

8.3.      ***Rejection Claims***.

Unless otherwise provided by an order of the Bankruptcy Court, Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court by the later of thirty (30) days from (i) the date of entry of an order of the Bankruptcy Court approving such rejection, (ii) the effective date of the rejection of such Executory

Contract or Unexpired Lease, and (iii) the Effective Date.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time shall be Disallowed pursuant to the Confirmation Order or such other order of the Bankruptcy Court, as applicable, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Estates, the Reorganized Debtors, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary**.  Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and may be objected to in accordance with the provisions of section 7.2 of the Plan and applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

### 8.4.        *Survival of the Debtors' Indemnification Obligations*.

(a)        Notwithstanding anything in the Plan (including section 10.3 of the Plan), all Indemnification Obligations shall (i) remain in full force and effect, (ii) not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, or the Confirmation Order, (iii) not be limited, reduced or terminated after the Effective Date, and (iv) survive unimpaired and unaffected irrespective of whether such Indemnification Obligation is owed for an act or event occurring before, on or after the Petition Date; *provided* that the Reorganized Debtors shall not indemnify officers, directors, members, or managers, as applicable, of the Debtors for any claims or Causes of Action that are not indemnified by such Indemnification Obligation.  All such obligations shall be deemed and treated as Executory Contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Debtors.  Any Claim based on the Debtors' Indemnification Obligations shall not be a Disputed Claim or subject to any objection, in either case, by reason of section 502(e)(1)(B) of the Bankruptcy Code.

(b)        In accordance with the foregoing, the Reorganized Debtors shall cooperate with current and former officers, directors, members, managers, agents, or employees in relation to the Indemnification Obligations assumed under the Plan, including responding to reasonable requests for information and providing access to attorneys, financial advisors, accountants, and other professionals with knowledge of matters relevant to any such claim covered by an Indemnification Obligation assumed under the Plan, including any claim or Cause of Action arising under any state or federal securities laws.

### 8.5.        *Employee Arrangements and Employee Obligations*.

(a)        With respect to the KERPs, any amounts outstanding pursuant to the terms and conditions of the individual participants' KERP agreements shall be paid to such KERP participants within fifteen (15) days following the Effective Date, in accordance with the terms of such KERP agreements, consistent with the KERP Order and Supplemental KERP Order and in full satisfaction of the Debtors' obligations under such KERP agreements.

(b)        All employment agreements and offer letters shall be deemed assumed on the Effective Date as Executory Contracts pursuant to sections 365 and 1123 of the Bankruptcy Code (which assumption shall include any modifications to such employments agreements).  Any such assumption shall not trigger any applicable change of control, immediate vesting, termination, or similar provisions therein, including, *e.g.*, any right to severance pay in connection with a change in control.  No participant shall have rights under the assumed Employee Arrangements other than those existing immediately before such assumption (with respect to services performed prior to the

Effective Date); *provided* that new rights may arise relating to the performance of services on or after the Effective Date pursuant to the terms of such assumed Employee Arrangements (*e.g.*, go-forward salary and bonus) and any vesting of rights under such Employee Arrangements will be recognized as continuous through the Effective Date (*e.g.*, annual bonus for calendar year 2023).

(c)     As of the Effective Date, the Equity Incentive Plans will be terminated as to the issuance of any new equity awards under the plan and no new equity awards may be granted under the Equity Incentive Plans.  Outstanding awards under the Equity Incentive Plans will be treated as follows:

(i)     *Restricted Stock*.  Restricted Stock shall be Existing Common Interests treated in accordance with Class 13; *provided* that, as set forth in section 4.13 hereof, any New Common Interests distributed to Holders on account of Unvested Restricted Stock shall be subject to the same restrictions/vesting conditions applicable to such Unvested Restricted Stock as of the Effective Date. Consistent with the Equity Incentive Plans, for any Vested Restricted Stock for which tax withholding obligations have not been satisfied, the Debtors may reduce the number of New Equity Interests that would otherwise be deliverable as Plan Distributions on account of such Restricted Stock and pay the equivalent cash amount to the applicable tax authorities in respect of such tax obligations.

(ii)    *Vested RSUs*.  Vested RSUs shall be deemed settled as of immediately prior to the Effective Date and shall be Existing Common Interests treated in accordance with Class 13.  Consistent with the Equity Incentive Plans, for any Vested RSUs for which tax withholding obligations have not been satisfied, the Debtors may reduce the number of New Equity Interests that would otherwise be deliverable as Plan Distributions on account of such Vested RSUs and pay the equivalent cash amount to the applicable tax authorities in respect of such tax obligations.

(iii)   *Unvested RSUs*.  RSU Award Agreements shall be treated as Executory Contracts under the Plan and deemed assumed on the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code; *provided*, that the Unvested RSUs shall be the only outstanding RSUs under such RSU Award Agreements on the Effective Date (consistent with (b)(ii), above); *provided further*, that such RSU Award Agreements shall be subject to adjustment by the current Board of Directors of Debtor Core Scientific, Inc. such that the number of New Common Interests deliverable on account of Unvested RSUs, if and when such Unvested RSUs vest, shall be equal to the proportion of New Common Interests that Holders of Existing Common Interests receive as Plan Distributions on account of their Existing Common Interests (in accordance with the treatment prescribed to Class 13).  Consistent with the Equity Incentive Plans, as and when the Unvested RSUs vest, to satisfy the holder's withholding tax obligations, the Debtors may reduce the number of New Equity Interests that would otherwise be deliverable on account of the assumed RSU Award Agreement and pay the equivalent cash amount to the applicable tax authorities in respect of such tax obligations.

(iv)    *Stock Options*.  Stock Option Award Agreements shall be treated as Executory Contracts under the Plan and deemed assumed on the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code; *provided* that such Stock Option Award Agreements shall be subject to adjustment by the current Board of

Directors of Debtor Core Scientific, Inc. such that the aggregate number of New Common Interests deliverable if all Stock Options subject to the Stock Option Award Agreement were exercised shall be equal to the proportion of New Common Interests that Holders of Existing Common Interests receive as Plan Distributions on account of their Existing Common Interests (in accordance with the treatment prescribed to Class 13).

(d)        As of the Effective Date, the Debtors and the Reorganized Debtors shall continue to honor their obligations under all applicable Workers' Compensation Programs and in accordance with all applicable workers' compensation Laws in states in which the Reorganized Debtors operate. Any Claims arising under Workers' Compensation Programs shall be deemed withdrawn once satisfied without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that nothing in this Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable Law, including non-bankruptcy Law, with respect to any such Workers' Compensation Programs; *provided, further,* that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state Law.

(e)        With respect to any Employee Arrangements that are Executory Contracts and are not otherwise addressed in this section 8.5, all such Employee Arrangements shall be deemed assumed on the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code; *provided,* that any Employee Arrangements that provide for or contemplate (in whole or in part) rights to Interests (whether actual or contingent) shall not be assumed pursuant to this section 8.5(e).

(f)        With respect to any Employee Arrangements that are not Executory Contracts and were not otherwise addressed in this section 8.5, all such Employee Arrangements shall be continued in the ordinary course of business following the Effective Date; *provided,* that any Employee Arrangements that provide for or contemplate (in whole or in part) rights to Interests (whether actual or contingent) shall not be continued as a result of this section 8.5(f).  For the avoidance of doubt, the Equity Incentive Plans will remain effective with respect to assumed RSU Award Agreements and Stock Option Award Agreements.

8.6.        ***Insurance Policies/Claims Payable By Third Parties***.

(a)        All insurance policies to which any Debtor is a party as of the Effective Date, including any D&O Policy, shall be deemed to be and treated as Executory Contracts and shall be assumed by the applicable Debtors or the Reorganized Debtors and shall continue in full force and effect thereafter in accordance with their respective terms, and all such insurance policies shall vest in the Reorganized Debtors.  Coverage for defense and indemnity under the D&O Policy shall remain available to all individuals within the definition of "Insured Persons" in any D&O Policy.

(b)        In addition, after the Effective Date, all officers, directors, agents, or employees who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any D&O Policy (including any "tail" policy) for the full term of such policy regardless of whether such officers, directors, agents, and/or employees remain in such positions after the Effective Date, in each case, to the extent set forth in such policies.

(c)        In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any D&O Policy (including any "tail policy") in effect as of the Petition Date, and any current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity at any time prior to the Effective Date

shall be entitled to the full benefits of any such D&O Policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date to the extent set forth in such policies.

(d)     In the event that the Debtors determine that an Allowed Claim is covered in full or in part under one of the Debtors' insurance policies, no distributions under the Plan shall be made on account of such Allowed Claim unless and until, and solely to the extent that, (i) the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy, and (ii) an insurer authorized to issue a coverage position under such insurance policy, or the agent of such insurer, issues a formal determination, which the Debtors in their sole discretion do not contest, that coverage under such insurance policy is excluded or otherwise unavailable for losses arising from such Allowed Claim. Any proceeds available pursuant to one of the Debtors' insurance policies shall reduce the Allowed amount of a Claim on a dollar-for-dollar basis. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court. If an applicable insurance policy has a SIR, the Holder of an Insured Litigation Claim shall have an Allowed General Unsecured Claim or a Section 510(b) Claim, as applicable, against the applicable Debtor's Estate solely up to the amount of the SIR that may be established upon the liquidation of the Insured Litigation Claim. Such SIR shall be considered satisfied pursuant to the Plan through allowance of the General Unsecured Claim or Section 510(b) Claim, as applicable, solely in the amount of the applicable SIR, if any; *provided*, however that nothing herein obligates the Debtors or the Reorganized Debtors to otherwise satisfy any SIR under any insurance policy. Any recovery on account of the Insured Litigation Claim in excess of the SIR established upon the liquidation of the Claim shall be recovered solely from the Debtors' insurance coverage, if any, and only to the extent of available insurance coverage and any proceeds thereof. Nothing in this Plan shall be construed to limit, extinguish, or diminish the insurance coverage that may exist or shall be construed as a finding that liquidated any Claim payable pursuant to an insurance policy. Nothing herein relieves any Entity from the requirement to timely File a Proof of Claim by the applicable claims bar date.

### 8.7.     *Intellectual Property Licenses and Agreements*.

All intellectual property contracts, licenses, royalties, or other similar agreements to which the Debtors have any rights or obligations in effect as of the date of the Confirmation Order shall be deemed and treated as Executory Contracts pursuant to the Plan and shall be assumed by the respective Debtors and Reorganized Debtors and shall continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion Filed by the Debtors in accordance with the Plan. Unless otherwise noted hereunder, all other intellectual property contracts, licenses, royalties, or other similar agreements shall vest in the Reorganized Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to ensure such vesting as contemplated herein.

### 8.8.     *Assignment*.

To the extent provided under the Bankruptcy Code or other applicable law, any Executory Contract or Unexpired Lease transferred and assigned hereunder shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such Executory Contract or Unexpired Lease (including, without limitation, those of the type set forth in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer

or assignment.  To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts, or conditions the assignment or transfer of any such Executory Contract or Unexpired Lease or that terminates or modifies such Executory Contract or Unexpired Lease or allows the counterparty to such Executory Contract or Unexpired Lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment, constitutes an unenforceable anti-assignment provision and is void and of no force or effect.

8.9.    ***Modifications, Amendments, Supplements, Restatements, or Other Agreements***.

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each Executory Contract and Unexpired Lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such Executory Contract or Unexpired Lease, without regard to whether such agreement, instrument, or other document is listed in the Schedule of Assumed Contracts.

8.10.    ***Reservation of Rights***.

(a)    Neither the exclusion nor inclusion of any contract or lease by the Debtors on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, will constitute an admission by the Debtors that any such contract or lease is or is not in fact an Executory Contract or Unexpired Lease or that the Debtors or the Reorganized Debtors or their respective Affiliates has any liability thereunder.

(b)    Except as otherwise provided in the Plan, nothing in the Plan will waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtors or the Reorganized Debtors under any executory or non-Executory Contract or any unexpired or expired lease.

(c)    Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors under any executory or non-Executory Contract or any unexpired or expired lease.

(d)    If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection under the Plan, the Debtors or Reorganized Debtors, as applicable, shall have sixty (60) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease by filing a notice indicating such altered treatment.

**ARTICLE IX.    CONDITIONS PRECEDENT TO EFFECTIVE DATE**.

9.1.    ***Conditions Precedent to the Effective Date***.

The following are conditions precedent to the Effective Date of the Plan:

(a)    the Plan Supplement shall have been Filed;

(b)    the Bankruptcy Court shall have entered the Confirmation Order and such Confirmation Order shall not have been reversed, stayed, amended, modified, dismissed, vacated or reconsidered;

(c)       the Bankruptcy Court shall have entered the Backstop Order, in form and substance acceptable to the Backstop Parties, and such order shall not have been reversed, stayed, amended, modified, dismissed, vacated, or reconsidered;

(d)       the Backstop Commitment Agreement shall remain in full force and effect and shall not have been terminated, and the parties thereto shall be in compliance therewith;

(e)       the Rights Offering shall have been conducted, in all material aspects, in accordance with the Rights Offering Procedures;

(f)       all conditions precedent, if any, to the effectiveness of the New Secured Notes Documents, if any, the New Notes Documents, and the Exit Facility shall have been satisfied or waived in accordance with the terms thereof, and the New Secured Notes Documents, if any, the New Notes Documents, and the Exit Facility shall be in full force and effect and binding on all parties thereto;

(g)       all conditions precedent, if any, to the effectiveness of the New Miner Equipment Lender Debt Documents shall have been satisfied or waived in accordance with the terms thereof, and the New Miner Equipment Lender Debt Documents shall be in full force and effect and binding on all parties thereto;

(h)       the New Common Interests distributable on the Effective Date shall have been issued by the Reorganized Parent;

(i)       the Professional Fee Escrow shall have been established and funded in Cash;

(j)       no court of competent jurisdiction (including the Bankruptcy Court) or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, limiting, preventing, prohibiting, or materially affecting the consummation of any of the Restructuring Transactions;

(k)       the Restructuring Fees and Expenses shall have been paid in full;

(l)       the Debtors shall have implemented the Restructuring Transactions in a manner consistent in all material respects with the Plan; and

(m)       all governmental and third-party approvals and consents necessary, if any, in connection with the transactions contemplated by the Plan shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions.

9.2.       ***Timing of Conditions Precedent.***

Notwithstanding when a condition precedent to the Effective Date occurs, unless otherwise specified in the Plan or any Plan Supplement document, for the purposes of the Plan, such condition precedent shall be deemed to have occurred simultaneously upon the completion of the applicable conditions precedent to the Effective Date; *provided* that to the extent a condition precedent (the "**Prerequisite Condition**") may be required to occur prior to another condition precedent (a "**Subsequent Condition**") then, for purposes of the Plan, the Prerequisite Condition shall be deemed to

have occurred immediately prior to the applicable Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred.

    9.3.   ***Waiver of Conditions Precedent.***

    (a)  Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action. Each of the conditions precedent of the Plan may be waived by the Debtors (and, solely with respect to the conditions set forth in section 9.1(g) hereof, with the consent of the Settling Miner Equipment Lenders).

    (b)  The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

    9.4.   ***Effect of Failure of a Condition***.

    If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (i) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (ii) prejudice in any manner the rights of any Person, or (iii) constitute an admission, acknowledgement, offer, or undertaking by the Debtors or any other Person.

**ARTICLE X.**    **EFFECT OF CONFIRMATION OF PLAN**.

    10.1.   ***Vesting of Assets in the Reorganized Debtors***.

    Except as otherwise provided in the Plan or any Plan Document, on the Effective Date, pursuant to section 1141(b) and (c) of the Bankruptcy Code, all Assets of the Estates, including all claims, rights, and Causes of Action and any property acquired by the Debtors under or in connection with the Plan, shall vest in each respective Reorganized Debtor free and clear of all Liens, Claims, charges, or other interests or encumbrances unless expressly provided otherwise by the Plan or Confirmation Order. In addition, all rights, benefits, and protections provided to any of the Creditors' Committee, the Debtors, or their Estates pursuant to the Plan, the Plan Supplement, or the Confirmation Order including, but not limited to, the release, exculpation, and injunction provisions provided in Article X of the Plan, shall vest in each respective Reorganized Debtor unless expressly provided otherwise by the Plan or the Confirmation Order. On and after the Effective Date, except as otherwise provided herein, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and pursue, compromise or settle any Claims (including any Administrative Expense Claims), Interests, and Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

    10.2.   ***Binding Effect***.

    As of the Effective Date, the Plan shall bind all Holders of Claims against and Interests in the Debtors and their respective successors and assigns, notwithstanding whether any such Holders were

(a) Impaired or Unimpaired under the Plan, (b) deemed to accept or reject the Plan, (c) failed to vote to accept or reject the Plan, or (d) voted to reject the Plan.

   10.3.    ***Discharge of Claims and Termination of Interests***.

   Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in a contract, instrument, or other agreement or document executed pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their Assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (i) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has voted to accept the Plan.  Any default or "event of default" by the Debtors with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date with respect to a Claim that is Unimpaired by the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

   10.4.    ***Term of Injunctions or Stays***.

   Unless otherwise provided herein or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.  For the avoidance of doubt, the Trading Order shall remain enforceable beyond the Effective Date.  The Trading Order has no applicability or effect with respect to the trading of New Common Interests or New Secured Notes.

   10.5.    ***Injunction***.

   **Except as otherwise expressly provided in the Plan or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to Section 10.6(a) or Section 10.6(b), shall be discharged pursuant to Section 10.3 of the Plan, or are subject to exculpation pursuant to Section 10.7, and all Subcontractors and all other parties in interest are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, and/or the Exculpated Parties (to the extent of the exculpation provided pursuant to Section 10.7 with respect to the Exculpated Parties): (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in**

connection with or with respect to any such Claims or Interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless (x) such Entity has timely asserted such setoff right either in a Filed Proof of Claim, or in another document Filed with the Bankruptcy Court explicitly preserving such setoff or that otherwise indicates that such entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise or (y) such right to setoff arises under a postpetition agreement with the Debtors or an Executory Contract that has been assumed by the Debtors as of the Effective Date; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released, settled, and/or treated, entitled to a distribution, or cancelled pursuant to the Plan or otherwise Disallowed; *provided* that such persons who have held, hold, or may hold Claims against, or Interests in, a Debtor, a Reorganized Debtor, or an Estate shall not be precluded from exercising their rights and remedies, or obtaining the benefits, solely pursuant to and consistent with the terms of the Plan.

Subject in all respects to Section 11.1, no entity or person may commence or pursue a Claim or Cause of Action of any kind against any Released Party or Exculpated Party that arose or arises from, in whole or in part, the Chapter 11 Cases, the Debtors, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of the Debtors or the Reorganized Debtors (which includes, for the avoidance of doubt, all claims and Causes of Action asserted or assertable in the Securities Class Action), the DIP Facility, the Convertible Notes Agreements, the Miner Equipment Lender Agreements, the Mortgage Agreements, the General Contracts, any and all agreements relating to M&M Liens, and any and all related agreements, instruments, and/or other documents, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Plan (including the Plan Supplement), the Disclosure Statement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Plan, the Plan Supplement, the Disclosure Statement, the Plan Settlements, the New Secured Notes Documents, the New Notes Documents, the New Miner Equipment Lender Debt Documents, the Exit ~~Credit Agreement~~Facility Documents, the New B. Riley ELOC Facility, the New Warrant Agreement, the Rights Offering, the Backstop Commitment Agreement, the Initial DIP Loan Documents, the DIP Facility, the RSA, the Chapter 11 Cases, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan (including, but not limited to, the New Common Interests), or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a claim of~~ ~~ willful misconduct, fraud or gross negligence against a Released Party or Exculpated Party and (ii) specifically authorizing such Entity or Person to bring such Claim or Cause of Action against any such Released Party or Exculpated Party.  The Bankruptcy Court shall have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and, only to the extent legally permissible and as provided for in Section 11.1, shall have jurisdiction to adjudicate the underlying colorable Claim or Cause of Action.

10.6.     *Releases*.

(a)     **Releases by the Debtors**.

Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, except as otherwise provided in the Plan or in the Confirmation Order, on and after the Effective Date, the Released Parties are deemed conclusively, absolutely, unconditionally and irrevocably, released and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of the Debtors or the Reorganized Debtors (which includes, for the avoidance of doubt, all claims and Causes of Action asserted or assertable in the Securities Class Action), the DIP Facility, the Convertible Notes Agreements, the Miner Equipment Lender Agreements, the Mortgage Agreements, the General Contracts, any and all agreements relating to M&M Liens, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Plan (including the Plan Supplement), the Disclosure Statement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Plan, the Plan Supplement, the Disclosure Statement, the Plan Settlements, the New Secured Notes Documents, the New **Notes Documents, the New** Miner Equipment Lender Debt Documents, the Exit ~~Credit Agreement~~**Facility Documents**, the New B. Riley ELOC Facility, the **New Warrant Agreement, the** Rights Offering, the Backstop Commitment Agreement, the Initial DIP Loan Documents, the DIP Facility, the RSA, the Chapter 11 Cases, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan (including, but not limited to, the New Common Interests), or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth in this Section 10.6(a) (i) shall only be applicable to the maximum extent permitted by law; (ii) shall not be construed as (a) releasing any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (*provided* that actual fraud shall not exempt from the scope of these Debtor releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence, ~~or~~ **(b)** **releasing any Released Party from Claims or Causes of Action held by the Debtors arising from an act or omission that is determined by a Final Order or by a federal government agency to have constituted a violation of any federal securities laws or (c)** releasing any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in

the Plan Supplement) executed to implement the Plan.  This section 10.6(a) is subject to approval of the Special Committee of the Board of Directors of Core Scientific, Inc.

        (b)        **Releases by Holders of Claims and Interests**.

        Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, except as otherwise provided in the Plan or in the Confirmation Order, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each Releasing Party, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released, and discharged the Debtors, the Reorganized Debtors, and the Released Parties from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or that may be asserted on behalf of the Debtors or their Estates, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of the Debtors or the Reorganized Debtors (which includes, for the avoidance of doubt, all claims and Causes of Action asserted or assertable in the Securities Class Action), the DIP Facility, the Convertible Notes Agreements, the Miner Equipment Lender Agreements, the Mortgage Agreements, the General Contracts, any and all agreements relating to M&M Liens, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Plan (including the Plan Supplement), the Disclosure Statement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Plan, the Plan Supplement, the Disclosure Statement, the Plan Settlements, the New Secured Notes Documents, the New Notes Documents, the New Miner Equipment Lender Debt Documents, the Exit ~~Credit Agreement~~Facility Documents, the New B. Riley ELOC Facility, the New Warrant Agreement, the Rights Offering, the Backstop Commitment Agreement, the Initial DIP Loan Documents, the DIP Facility, the RSA, the Chapter 11 Cases, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan (including, but not limited to, the New Common Interests), or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth in this Section 10.6(b) (i) shall only be applicable to the maximum extent permitted by law; and (ii) shall not be construed as (a) releasing any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (*provided* that actual fraud shall not exempt from the scope of these third-party releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence, or (b) releasing any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

10.7.     *Exculpation*.

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out, in whole or in part, from the Petition Date through the Effective Date, of the Chapter 11 Cases, the Debtors, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of the Debtors or the Reorganized Debtors, the DIP Facility, the Convertible Notes Agreements, the Miner Equipment Lender Agreements, the Mortgage Agreements, the General Contracts, any and all agreements relating to M&M Liens, and related agreements, instruments, or other documents, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Plan (including the Plan Supplement), the Disclosure Statement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Plan, the Plan Supplement, the Disclosure Statement, the Plan Settlements, the New Secured Notes Documents, the New <span style="color:blue;text-decoration:underline">Notes Documents, the New</span> Miner Equipment Lender Debt Documents, the Exit <span style="color:red;text-decoration:line-through">Credit Agreement</span><span style="color:blue;text-decoration:underline">Facility Documents</span>, the New B. Riley ELOC Facility, <span style="color:blue;text-decoration:underline">the New Warrant Agreement,</span> the Rights Offering, the Backstop Commitment Agreement, the Initial DIP Loan Documents, the DIP Facility, the RSA, the Chapter 11 Cases, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan (including, but not limited to, the New Common Interests), or the distribution of property under the Plan, or any other related agreement, except for Claims or Causes of Action arising from an act or omission that is judicially determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects, such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities.  The Exculpated Parties have, and upon completion of the Plan, shall be deemed to have, participated in good faith and in compliance with all applicable laws with regard to the solicitation and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.  Notwithstanding anything to the contrary in the foregoing, the exculpations set forth in this Section 10.7 (i) shall only be applicable to the maximum extent permitted by law; and (ii) shall not be construed as (a) exculpating any Exculpated Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (*provided* that actual fraud shall not exempt from the scope of these exculpations any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence, or (b) exculpating any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

10.8.     *Retention of Causes of Action/Transfer of Causes of Action and Reservation of Rights*.

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to this Article X, the Reorganized Debtors shall have, retain, reserve and be entitled to assert, and may enforce all rights to commence and pursue, as appropriate, any and all claims or Causes of Action,

whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced. **The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity not released pursuant to the Plan.**

10.9.    ***Ipso Facto and Similar Provisions Ineffective.***

Any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any Entity based on any of the following: (a) the insolvency or financial condition of a Debtor; (b) the commencement of the Chapter 11 Cases; (c) the Confirmation or consummation of the Plan, including any change of control that shall occur as a result of such consummation; or (d) the restructuring.

10.10.    ***Solicitation of Plan.***

As of the Confirmation Date   (a) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation and (b) the Debtors and each of their respective directors, officers, employees, Affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer, issuance, and solicitation will not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any Securities under the Plan.

10.11.    ***Corporate and Limited Liability Company Action.***

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (i) the assumption of all employee compensation and Employee Arrangements of the Debtors as provided herein, (ii) the selection of the managers, directors, and officers for the Reorganized Debtors, (iii) the distribution of the New Common Interests, (iv) the entry into the New Secured Notes Documents, the New ~~Notes Documents, the New~~ Miner Equipment Lender Debt Documents, the M&M Lien Takeback Debt, the Mortgage Takeback Debt, the Exit ~~Credit Agreement, and~~Facility Documents, the New B. Riley ELOC Facility, and the New Warrant Agreement, and (v) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), in each case in accordance with and subject to the terms hereof. All matters provided for in the Plan involving the corporate or limited liability company structure of the Debtors or the Reorganized Debtors, and any corporate or limited liability company action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors. On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute, and

deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including, but not limited to, (us) the New Secured Notes Documents, (vt) the New Notes Documents, (u) the New Miner Equipment Lender Debt Documents, (wv) the Exit Credit Agreement, (xw) the New B. Riley ELOC Facility, (x) the New Warrant Agreement, (y) the New Corporate Governance Documents, and (z) any and all other agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by this section 10.11 shall be effective notwithstanding any requirements under non-bankruptcy law.

**ARTICLE XI.     RETENTION OF JURISDICTION**.

11.1.     ***Retention of Jurisdiction***.

On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

(a)     to hear and determine motions and/or applications for the assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases, including Assumption Disputes, and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

(b)     to determine any motion, adversary proceeding, proceeding, application, contested matter, and/or other litigated matter pending on or commenced after the Confirmation Date;

(c)     to hear and resolve any disputes arising from or related to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)     to ensure that distributions to Holders of Allowed Claims and Existing Common Interests are accomplished as provided for in the Plan and Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under the Plan;

(e)     to consider the allowance, classification, priority, compromise, estimation, or payment of any Claim or any counterclaim related thereto;

(f)     to enter, implement or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)     to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)     to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)        to hear and determine all Professional Fee Claims;

(j)        to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Plan Supplement, the Confirmation Order, any transactions or payments in furtherance of either, or any agreement, instrument, or other document governing or relating to any of the foregoing (including, but not limited to, the Rights Offering and the Rights Offering Procedures);

(k)        to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan;

(l)        to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)        to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(n)        to hear, adjudicate, decide, or resolve any and all matters related to Article X of the Plan, including, without limitation, the releases, discharge, exculpations, and injunctions issued thereunder;

(o)        to resolve disputes concerning Disputed Claims or the administration thereof;

(p)        to resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any claims bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purposes;

(q)        to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

(r)        to enter a final decree closing the Chapter 11 Cases;

(s)        to recover all Assets of the Debtors and property of the Debtors' Estates, wherever located; and

(t)        to hear and determine any rights, claims, or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory.

11.2.        ***Courts of Competent Jurisdiction***.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE XII.    MISCELLANEOUS PROVISIONS.

### 12.1.    *Payment of Statutory Fees*.

All fees due and payable pursuant to 28 U.S.C. § 1930(a) prior to the Effective Date shall be paid by the Debtors in full in Cash on the Effective Date.  The Debtors shall File all monthly operating reports through the Effective Date.  On and after the Effective Date, the Reorganized Debtors or any Disbursing Agent shall pay any and all such fees in full in Cash when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Debtor or Reorganized Debtor, as applicable, shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's, or Reorganized Debtor's, as applicable, case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.  Notwithstanding anything to the contrary herein, the U.S. Trustee shall not be required to File a Proof of Claim or any other request for payment of quarterly fees.

### 12.2.    *Substantial Consummation of the Plan*.

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 12.3.    *Request for Expedited Determination of Taxes*.

The Debtors and the Reorganized Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

### 12.4.    *Exemption from Certain Transfer Taxes*.

Pursuant to section 1146 of the Bankruptcy Code, (i) the issuance, transfer or exchange of any securities, instruments or documents, (ii) the creation, filing or recording of any Lien, mortgage, deed of trust, or other security interest, (iii) the making, assignment, filing or recording of any lease or sublease or the making or delivery of any deed, bill of sale, assignment or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, bills of sale (including any bill of sale referenced in the Foundry Settlement Agreement), or assignments executed in connection with any of the transactions contemplated under the Plan or the reinvesting, transfer, or sale of any real or personal property of the Debtors pursuant to, in implementation of or as contemplated in the Plan and Restructuring Transactions Exhibit (whether to one or more of the Reorganized Debtors or otherwise), including in connection with the Foundry Settlement (and the transfer or sale of the Identified Miners in connection therewith), (iv) the grant of collateral under the New Secured Notes Documents, the New Notes Documents, the New Miner Equipment Lender Debt Documents, the M&M Lien Takeback Debt, the Mortgage Takeback Debt, and the Exit Facility, and (v) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code and shall not be subject to or taxed under any law imposing any document recording tax, stamp tax, conveyance fee, or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax, or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the

Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

12.5.    *Amendments*.

(a)    *Plan Modifications*.  The Plan may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of Holders of Allowed Claims or Existing Common Interests pursuant to the Plan or the Rights Offering, the Debtors may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of effects of the Plan, and any Holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.

(b)    *Other Amendments*.  Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court.

12.6.    **Effectuating Documents and Further Transactions**.

Each of the officers of the Reorganized Debtors is authorized, in accordance with his or her authority under the resolutions of the applicable member(s), board of directors or managers, to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

12.7.    **Revocation or Withdrawal of the Plan**.

The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date as to any or all of the Debtors.  If, with respect to a Debtor, the Plan has been revoked or withdrawn prior to the Effective Date, or if Confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption of Executory Contracts or Unexpired Leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (iii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Person, (b) prejudice in any manner the rights of such Debtor or any other Person, or (c) constitute an admission of any sort by any Debtor or any other Person.

12.8.    **Severability of Plan Provisions**.

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a

judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (i) valid and enforceable pursuant to its terms, (ii) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be), and (iii) nonseverable and mutually dependent.

### 12.9.   *Governing Law*.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent a Plan Document provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

### 12.10.   *Time*.

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 12.11.   *Dates of Actions to Implement the Plan*.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 12.12.   *Immediate Binding Effect*.

Notwithstanding any Bankruptcy Rule providing for a stay of the Confirmation Order or Plan, including Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Holders of Claims and Interests, the Released Parties, each of their respective successors and assigns, including, without limitation, the Reorganized Debtors, all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim, Interest, or debt has voted on the Plan.

### 12.13.   *Deemed Acts*.

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

### 12.14.   *Successor and Assigns*.

The rights, benefits, and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each Entity.

12.15.    ***Entire Agreement***.

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

12.16.    ***Exhibits to Plan.***

All exhibits, schedules, supplements, and appendices to the Plan (including the Plan Supplement) are incorporated into and are a part of the Plan as if set forth in full herein.

12.17.    ***Dissolution of Creditors' Committee and Equity Committee.***

On the Effective Date, any official committees appointed in the Chapter 11 Cases, including the Creditors' Committee and the Equity Committee, shall dissolve; *provided* that following the Effective Date, any such committees, including the Creditors' Committee and the Equity Committee, shall continue in existence solely for the purposes of (i) Filing and prosecuting applications for allowance of Professional Fee Claims and (ii) seeking removal of the committee as a party in interest in any proceeding on appeal.  Upon the dissolution of any official committees appointed in the Chapter 11 Cases, including the Creditors' Committee and the Equity Committee, such committee members and their respective Professionals shall cease to have any duty, obligation, or role arising from or related to the Chapter 11 Cases and shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases; *provided* that for the avoidance of doubt, any Claims or Causes of Action asserted by the Creditors' Committee or the Equity Committee, whether direct or derivative (including any Claims seeking declaratory judgments) shall be withdrawn with prejudice and/or vest in the Debtors' Estates, to be immediately fully and indefensibly released in accordance with section 10.6 of the Plan.

12.18.    ***Notices***.

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by electronic transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or addressed as follows:

(a)    if to the Debtors or the Reorganized Debtors:

Core Scientific, Inc.
210 Barton Springs Road, Suite 300
Austin, Texas 78704
Attn:  Todd DuChene
Email: tduchene@corescientific.com

- and -

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn:    Ray C. Schrock
         Ronit J. Berkovich

Email:  ray.schrock@weil.com
          ronit.berkovich@weil.com

- and -

700 Louisiana Street, Suite 1700
Houston, Texas 77002
Attn:   Alfredo R. Pérez
         Clifford W. Carlson
Email:  alfredo.perez@weil.com
          clifford.carlson@weil.com


(b)      if to the Creditors' Committee

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Attn:   Brett H. Miller
         Todd M. Goren
         James H. Burbage
Email:  bmiller@willkie.com
          tgoren@willkie.com
          jburbage@willkie.com

- and -

600 Travis Street
Houston, Texas 77002
Attn:   Jennifer J. Hardy
Email:  jhardy2@willkie.com

(c)      if to the Equity Committee

Vinson & Elkins LLP
1114 Avenue of the Americas, 32nd Floor
New York, New York 10036
Attn:   David S. Meyer
         Lauren R. Kanzer
         Zachary A. Paiva
Email:  dmeyer@velaw.com
          lkanzer@velaw.com
          zpaiva@velaw.com

- and -

845 Texas Avenue, Suite 4700
Houston, Texas 77002
Attn:   Paul E. Heath
         Harry A. Perrin
         Kiran Vakamudi

Email:  pheath@velaw.com
           hperrin@velaw.com
           kvakamudi@velaw.com

(d)     if to the DIP Agent:

B. Riley Commercial Capital, LLC
11100 Santa Monica Blvd., Suite 800
Los Angeles, California 90025
Attn:    Perry Mandarino
Email:   pmandarino@brileyfin.com

- and -

Choate, Hall & Stewart LLP
Two International Place, 34th Floor
Boston, Massachusetts 02110
Attn:   John Ventola
Email:  jventola@choate.com

(e)     If to the Ad Hoc Noteholder Group:

Paul Hastings LLP
600 Travis Street, 58th Floor
Houston, Texas 77002
Attn:   James T. Grogan III
Email:  jamesgrogan@paulhastings.com

- and -

200 Park Avenue
New York, New York 10166
Attn:   Kristopher M. Hansen
        Sayan Bhattacharyya
        Erez E. Gilad
        Joanne Lau
Email:  krishansen@paulhastings.com
       sayanbhattacharyya@paulhastings.com
       erezgilad@paulhastings.com
       joannelau@paulhastings.com

(f)     If to the U.S. Trustee:

Office of the United States Trustee
515 Rusk Avenue, Suite 3516
Houston, Texas 77002
Attn:   Jayson B. Ruff
        Alicia Barcomb
Email:  Jayson.b.ruff@usdoj.gov
       aliciabarcomb@usdoj.gov

After the Effective Date, the Debtors have authority to send a notice to Entities providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, they must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

[*Remainder of page intentionally left blank*]

Dated: ~~August 8~~September 7, 2023
      Houston, Texas

                                      Respectfully submitted,

                                      By:    /s/_____
                                                Name: Michael Bros
                                              Title:  Authorized Signatory

                                      On behalf of Core Scientific, Inc.
                                      and each of its Debtor affiliates

**<u>Exhibit A</u>**

**Exit Term Sheet**

**<u>(To Be Filed at a Later Date)</u>**

**Exhibit B**

**New B. Riley ELOC Facility Term Sheet**

**(To Be Filed at a Later Date)**

**Exhibit C**

**New April Secured Notes Term Sheet (~~Option 1~~<u>Default</u>)**

**Terms of New April Secured Notes (~~Option 1~~Default)**

Set forth below is a summary of certain key terms for the New April Secured Notes (~~Option 1~~Default), to be issued by the Issuer (as defined below) to each Holder of April Convertible Notes Secured Claims~~, if Class 1 is an Accepting Class~~ that does not timely elect the April Convertible Noteholder Treatment Settlement Election, pursuant to that certain joint chapter 11 plan, including all appendices, exhibits, schedules, and supplements hereto (including, without limitation, any appendices, schedules, and supplements to the Plan contained in the Plan Supplement), (as the same may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms thereof, the "**Plan**"). This summary of proposed terms and conditions does not purport to summarize all of the terms, conditions, representations and other provisions with respect to the transactions referred to herein, which will be set forth in the New April Secured Notes Documents (~~Option 1~~Default). Capitalized terms used herein but not otherwise defined shall have the meanings given to such terms in the Plan.

| | |
|---|---|
| **Issuer:** | Reorganized Parent (the "**Issuer**"). |
| **Security Description:** | Secured ~~convertible~~ notes (the "**New April Secured Notes (~~Option 1~~Default)**"). |
| **Guarantors:** | Same guarantors that guarantee the pre-petition Convertible Notes (the "**April 2021 Convertible Notes**") issued pursuant to the Note Purchase Agreement, dated April 19, 2021 (the "**April NPA**"). |
| **Principal Amount: ~~Initial Conversion Price:~~** | ~~Up to seventy-five~~One hundred percent (~~75~~100%) of the ~~Settled~~Allowed April Convertible Notes Secured Claims ~~Amount based on Holders' elections in accordance with section 4.1 of the Plan.~~Calculated based on a 20% premium to Plan Value (the "~~**Conversion Price**~~") ~~assuming for the purposes of such calculation that all of the New Secured Notes have been converted pursuant to the terms thereof as of the Effective Date, subject to adjustment for issuances of New Common Interests to Holders of Disputed Claims pursuant to the Disputed Claims Reserves and as otherwise specified herein.~~ |
| **Interest Rate:** | Each New April Secured Note (~~Option 1~~Default) will bear interest at a fixed rate equal to ~~4~~8.0% for cash interest ("**Cash Interest**") and ~~6~~2.0% for payment-in-kind interest ("**PIK Toggle Interest**"). The Issuer will elect on each payment interest date whether to pay Cash Interest or the PIK Toggle Interest on the next interest payment date; *provided*, *however*, for PIK Toggle Interest, the New April Secured Notes (~~Option 1~~Default) will accrue interest at the rate for PIK Toggle Interest, and be payable in-kind, if the Issuer has not made |

such election.

| | |
|---|---|
| **Maturity Date**: | ~~Five~~Seven (~~5~~7) years from the Effective Date. |
| **Amortization:** | None. |
| **Security:** | ~~(A)~~First priority lien in all perfected collateral securing the April 2021 Convertible Notes as of the Petition Date (the "**April 2021 Convertible Notes Collateral**"), excluding for the avoidance of doubt, (i) any money and bank accounts, and (ii) any property acquired after the Petition Date that was not constituting proceeds of the disposition of April 2021 Convertible Notes Collateral, including any new contracts executed after the Petition Date and any bitcoin mined after such date or the proceeds of any bitcoin sold after the Petition Date~~; and (B) any additional collateral to be discussed with the Ad Hoc Noteholder Group~~. The security interests in the April 2021 Convertible Notes Collateral under the New April Secured Notes (Default) shall be *pari passu* with the security interests under the New Notes and the New April Secured Notes (Settlement Election). |
| **Ranking:** | Same as the April 2021 Convertible Notes. |
| ~~**Conversion at Option of Holders:**~~ | ~~Holders may elect to convert their New April Secured Notes (Option 1) into New Common Interests at any time prior to maturity at the then applicable Conversion Price. The Issuer may elect to deliver cash, New Common Interests or a combination of both upon any holder conversion election.~~ ~~No holder drag-along rights.~~ |
| ~~**Conversion at Option of the Company:**~~ | ~~From and after the Effective Date, the Company may, at its option, cause outstanding New April Secured Notes (Option 1) (including accrued but unpaid interest) to convert into a number of New Common Interests at the then applicable Conversion Price if the volume weighted average price of the New Common Interests exceeds 150% of the per share Plan Value for at least 20 trading days in a 30 consecutive day period. The Issuer may elect to deliver cash, New Common Interests or a combination of both.~~ |
| ~~**Anti-Dilution Protection**~~**Covenants**: | ~~Customary adjustments to the Conversion Price for stock splits, stock dividends, rights offerings at discount, asset or other distribution on the New Common Interests, tender offers or exchange offers a premium, including customary exceptions~~None. |
| ~~**Repurchase at O**~~**Redem**ption ~~**of Holders**~~: | ~~At the o~~Redemption ~~of each holder, for all or part of its New April Secured Notes (Option 1), right to put New April~~ |

2

| | |
|---|---|
| | ~~Secured Notes (Option 1) to Issuer in the event of a Fundamental Change (such defined~~ terms to be customary for <u>secured non</u>convertible notes issued by other public companies~~) at the principal amount thereof plus accrued interest to the repurchase date~~. |
| ~~**Redemption:**~~ | ~~Redemption terms to be agreed between the Ad Hoc Noteholder Group and the Company.~~ |
| ~~**Other Covenants:**~~ | ~~Covenants to be discussed with the Ad Hoc Noteholder Group.~~ |
| **Tradability / Liquidity:** | The offer, issuance, and distribution of New April Secured Notes (~~Option 1) (and the issuance of the New Common Interests upon conversion thereunder~~<u>Default</u>) will be exempt, pursuant to section 1145 of the Bankruptcy Code from registration under the Securities Act and the New April Secured Notes (~~Option 1) (and the issuance of New Common Interests upon conversion thereunder~~<u>Default</u>) will be freely tradable on the Effective Date, subject to any contractual limitations or restrictions for "control securities" under the U.S. securities laws, if applicable. |

3

**Exhibit ~~C~~D**

**New April Secured Notes Term Sheet (~~Option 2~~Settlement Election)**

**Terms of New April Secured Notes (~~Option 2~~Settlement Election)**

Set forth below is a summary of certain key terms for the New April Secured Notes (~~Option 2~~Settlement Election), to be issued by the Issuer (as defined below) to each Holder of April Convertible Notes Secured Claims, ~~if Class 1 is not an Accepting Class~~ that timely elects the April Convertible Noteholder Treatment Election, pursuant to that certain joint chapter 11 plan, including all appendices, exhibits, schedules, and supplements hereto (including, without limitation, any appendices, schedules, and supplements to the Plan contained in the Plan Supplement), (as the same may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms thereof, the "**Plan**"). This summary of proposed terms and conditions does not purport to summarize all of the terms, conditions, representations and other provisions with respect to the transactions referred to herein, which will be set forth in the New April Secured Notes Documents (~~Option 2~~Settlement Election). Capitalized terms used herein but not otherwise defined shall have the meanings given to such terms in the Plan.

| | |
|---|---|
| **Issuer:** | Reorganized Parent (the "**Issuer**"). |
| **Security Description:** | Secured convertible notes (the "**New April Secured Notes (~~Option 2~~Settlement Election)**"). |
| **Guarantors:** | Same guarantors that guarantee the pre-petition Convertible Notes (the "**April 2021 Convertible Notes**") issued pursuant to the Note Purchase Agreement, dated April 19, 2021 (the "**April NPA**"). |
| **Principal Amount:** | ~~One hundred percent~~Up to fifty (~~100~~50%) of the ~~Allowed~~Settled April Convertible Notes Secured Claims Amount based on Holders' elections in accordance with section 4.1 of the Plan. |
| **Initial Conversion Price:** | Calculated based on Plan Value (the "**Conversion Price**"). |
| **Interest Rate**: | Each New April Secured Note (~~Option 2~~Settlement Election) will bear interest at a fixed rate equal to ~~8~~6.0% for cash interest ("**Cash Interest**") and ~~2~~6.0% for payment-in-kind interest ("**PIK Toggle Interest**"). The Issuer will elect on each payment interest date whether to pay Cash Interest or the PIK Toggle Interest on the next interest payment date; *provided, however*, for PIK Toggle Interest, the New April Secured Notes (~~Option 2~~Settlement Election) will accrue interest at the rate for PIK Toggle Interest, and be payable in-kind, if the Issuer has not made such election. |
| **Maturity Date**: | ~~Seven~~Five (~~7~~5) years from the Effective Date. |
| **Amortization:** | None. |
| **Security:** | (A) First priority lien in all perfected collateral securing the April 2021 Convertible Notes as of the Petition Date (the |

"**April 2021 Convertible Notes Collateral**"), excluding for the avoidance of doubt, (i) any money and bank accounts, and (ii) any property acquired after the Petition Date that was not constituting proceeds of the disposition of April 2021 Convertible Notes Collateral, including any new contracts executed after the Petition Date and any bitcoin after such date or the proceeds of any bitcoin sold after the Petition Date; and (B) any additional collateral to be discussed with the Ad Hoc Noteholder Group in connection with a consensual settlement. The security interests in the April 2021 Convertible Notes Collateral under the New April Secured Notes (Settlement Election) shall be *pari passu* with the security interests under the New Notes and the New April Secured Notes (Default).

| | |
|---|---|
| **Ranking:** | Same as the April 2021 Convertible Notes. |
| ~~Covenants~~**Conversion at Option of Holders:** | Holders may elect to convert their New April Secured Notes (Settlement Election) into New Common Interests at any time prior to maturity at the then applicable Conversion Price. The Issuer may elect to deliver cash, New Common Interests or a combination of both upon any holder conversion election. |
| | ~~None.~~No holder drag-along rights. |
| **Conversion at Option of the Company:** | From and after the Effective Date, the Company may, at its option, cause outstanding New April Secured Notes (Settlement Election) (including accrued but unpaid interest) to convert into a number of New Common Interests at the then applicable Conversion Price if the total enterprise value of the Company equals $2,250,000,000. |
| **Anti-Dilution Protection:** | Customary adjustments to the Conversion Price for stock splits, stock dividends, rights offerings at discount, asset or other distribution on the New Common Interests, tender offers or exchange offers a premium, including customary exceptions. |
| **Repurchase at ~~Redem~~Option of Holders:** | At the ~~Redem~~option of each holder, for all or part of its New April Secured Notes (Settlement Election), right to put New April Secured Notes (Settlement Election) to Issuer in the event of a Fundamental Change (such defined term~~s~~ to be customary for ~~secured non~~convertible notes issued by other public companies) at the principal amount thereof plus accrued interest to the repurchase date. |
| **Redemption:** | Redemption terms to be agreed between the Ad Hoc Noteholder Group and the Company. |

2

| | |
|---|---|
| **Other Covenants:** | Covenants to be discussed with the Ad Hoc Noteholder Group. |
| **Tradability / Liquidity:** | The offer, issuance, and distribution of New April Secured Notes (~~Option 2~~Settlement Election) (and the issuance of the New Common Interests upon conversion thereunder) will be exempt, pursuant to section 1145 of the Bankruptcy Code from registration under the Securities Act and the New April Secured Notes (~~Option 2~~Settlement Election) (and the issuance of New Common Interests upon conversion thereunder) will be freely tradable on the Effective Date, subject to any contractual limitations or restrictions for "control securities" under the U.S. securities laws, if applicable. |

**Exhibit ~~D~~E**

**New Notes Term Sheet**

**New Notes Term Sheet**

Set forth below is a summary of certain key terms for the New Notes, to be issued by the Borrower to each Holder of April Convertible Notes Secured Claims that elects to receive New Notes pursuant to the April Convertible Noteholder Treatment Settlement Election pursuant to that certain joint chapter 11 plan, including all appendices, exhibits, schedules, and supplements hereto (including, without limitation, any appendices, schedules, and supplements to the Plan contained in the Plan Supplement), (as the same may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms thereof, the "**Plan**"). This summary of proposed terms and conditions does not purport to summarize all of the terms, conditions, representations and other provisions with respect to the transactions referred to herein, which will be set forth in the New Notes Documents. Capitalized terms used herein but not otherwise defined shall have the meanings given to such terms in the Plan.

| | |
|---|---|
| **Borrower:** | Reorganized Parent (the "**Borrower**"). |
| **Guarantors:** | Same guarantors that guarantee the pre-petition Convertible Notes (the "**April 2021 Convertible Notes**") issued pursuant to the Note Purchase Agreement, dated April 19, 2021 (the "**April NPA**"). |
| **Lenders:** | Each Holder of April Convertible Notes Secured Claims that elects to receive New Notes pursuant to the April Convertible Noteholder Treatment Settlement Election. |
| **Trustee/Collateral Agent:** | An Entity in its capacity as trustee and collateral agent under the New Notes Indenture (the "**New Notes Agent**"). |
| **Closing Date:** | The Plan Effective Date. |
| **New Notes Indenture:** | A senior secured U.S. dollar denominated senior secured indenture (the "**New Notes Indenture**" and the notes issued thereunder, the "**New Notes**") in an aggregate principal amount up to $150 million based on Holders' elections in accordance with section 4.1 of the Plan, to be deemed issued in partial satisfaction of the April Convertible Notes Secured Claims upon the Effective Date of the Plan (the "**Plan Effective Date**"). |
| **Maturity Date:** | The New Notes will mature five (5) years from the Closing Date (the "**Maturity Date**"). The full principal amount of the New Notes and all accrued interest and other amounts due thereon will be due at maturity. |
| **Use of Proceeds:** | The proceeds of the New Notes will be deemed issued in partial satisfaction of the April Convertibles Notes Secured Claims upon the Plan Effective Date. |

| | |
|---|---|
| **New Notes Documents:** | The New Notes Indenture will be documented in an and security agreement and shall contain terms reasonably satisfactory to the New Notes Agent and the Borrower and will be secured pursuant to a customary security agreement (subject to customary exclusions). The documents referred to in the preceding sentence and documents ancillary or related thereto are referred to as the "**New Notes Documents**". The New Notes Documents will be in form and substance reasonably satisfactory to the New Notes Agent and the Borrower. |
| **Interest Rate:** | The New Notes will bear interest at 12.5% per annum. Interest shall be payable in cash on a quarterly basis on the first Business Day of each fiscal quarter subject to a three (3) Business Day grace period. |
| **Amortization:** | None. |
| **Optional Prepayments:** | The New Notes, including interest, may be prepaid in whole or in part at any time and from time to time without premium or penalty. |
| **Mandatory Prepayments:** | None. |
| **Prepayment / Make Whole Premium:** | None. |
| **Security:** | (A) First lien in all perfected collateral securing the April 2021 Convertible Notes as of the Petition Date (the "**April 2021 Convertible Notes Collateral**"), excluding for the avoidance of doubt, (i) any money and bank accounts, and (ii) any property acquired after the Petition Date that was not constituting proceeds of the disposition of April 2021 Convertible Notes Collateral, including any new contracts executed after the Petition Date and any bitcoin mined after such date or the proceeds of any bitcoin sold after the Petition Date; and (B) any additional collateral to be discussed with the Ad Hoc Noteholder Group.  The security interests in the April 2021 Convertible Notes Collateral under the New Notes Indenture shall be *pari passu* with the security interests under the New April Secured Notes (Default) and the New April Secured Notes (Settlement Election). |
| **Conditions Precedent:** | The New Notes Indenture will become effective and the New Notes will be deemed issued upon the occurrence of the Plan Effective Date. |
| **Representations and Warranties:** | Financial statements; no material adverse change; corporate existence and status; power and authority; taxes; enforceability of New Notes Documents; no conflict with law, contractual obligations or organizational documents; litigation; ownership |

2

|  | of property and permits; intellectual property; ERISA and foreign pension plans; Investment Company Act; equity interests and ownership; accuracy of disclosure; anti-corruption laws and sanctions; necessary governmental and third party approvals; compliance with applicable laws; environmental matters; no defaults; margin regulations; compliance with material agreements; solvency; insurance; PATRIOT Act; anti-money laundering; not an EEA Financial Institution; and accuracy of beneficial ownership information. |
|---|---|
| **Affirmative Covenants:** | Delivery of financial statements, reports, officers' certificates and other information reasonably requested by the Administrative Agent; continuation of business and maintenance of existence and rights and privileges; compliance with laws (including implementation and maintenance of policies and procedures in respect of anti-corruption laws and sanctions); maintenance of property and insurance; maintenance of books and records; right of the Administrative Agent and the Lenders to inspect property and books and records; notices of defaults, litigation and other material events; use of proceeds (including in respect of anti-corruption laws and sanctions); taxes; guarantor requirements and future subsidiaries; and intellectual property; environmental compliance. |
| **Reporting Requirements:** | Usual and customary for facilities of this type. |
| **Negative Covenants:** | Limitations on the following, in each case subject to baskets, carve-outs and exceptions to be agreed: |

(a)    Indebtedness (subject to baskets and carve-outs for capital leases, permitted unsecured indebtedness, permitted subordinated indebtedness and other indebtedness, in each case to be agreed);

(b)    liens;

(c)    mergers, consolidations, liquidations, dissolutions and fundamental changes;

(d)    dispositions of the assets of the Borrower and its subsidiaries;

(e)    dividends and other payments in respect of equity interests;

(f)    investments, loans, advances, guarantees and

|  | | acquisitions; |
|---|---|---|
|  | (g) | prepayments, purchases or redemptions of any subordinated or junior lien indebtedness for borrowed money; |
|  | (h) | transactions with affiliates; |
|  | (i) | modifications of organizational documents and documentation governing certain indebtedness; |
|  | (j) | negative pledges and restrictive agreements; and |
|  | (k) | changes to fiscal year end. |
| **Financial Covenants:** | None. | |
| **Events of Defaults:** | Nonpayment of principal when due; nonpayment of interest, fees or other amounts after 3 Business days; material inaccuracy of representations and warranties; a material provision in the New Notes Documents ceasing to be in full force and effect or any party thereto so asserting; violation of covenants (subject, in the case of certain affirmative covenants, to certain grace periods); cross-default in respect of indebtedness in excess of an aggregate amount to be agreed; bankruptcy events of the Borrower or any of its subsidiaries; certain ERISA events; undischarged, or creditor action to enforce, monetary judgments in excess of an aggregate amount to be agreed and non-monetary judgments that could reasonably be expected to have a material adverse effect on the business, assets, contracts, agreements, liabilities (including contingent liabilities), operations, condition (financial or otherwise) or prospects of the Notes Parties; a change of control. | |
| **Required Lenders:** | Lenders holding greater than 50.00% of the outstanding notes under the New Notes Indenture (the "**Required Lenders**"). | |
| **Expenses and Indemnification:** | The New Notes Documents will include expense reimbursement, indemnification and other provisions as are usual and customary for facilities of this kind. | |
| **Other Provisions:** | The New Notes Documents will include customary provisions regarding increased costs, illegality, tax indemnities, waiver of trial by jury and other similar provisions. | |
| **Assignments and Participations:** | Assignments and participations (other than to certain eligible assignees) shall be subject to the consent of the Borrower, unless a payment or bankruptcy event of default exists at the time of any such assignment or participation. | |

4

| | |
|---|---|
| **Amendments:** | The New Notes Indenture will include amendment provisions that are usual and customary for facilities of this kind. |
| **Governing Law and Submission to Exclusive Jurisdiction:** | State of New York. |

**Exhibit F**

**New August Secured Notes Term Sheet (~~Option 1~~Default)**

**Terms of New August Secured Notes (~~Option 1~~Default)**

Set forth below is a summary of certain key terms for the New August Secured Notes (~~Option 1~~Default), to be issued by the Issuer (as defined below) to each Holder of August Convertible Notes Secured Claims~~, if Class 2 is an Accepting Class~~ that does not timely elect the August Convertible Noteholder Treatment Settlement Election, pursuant to that certain joint chapter 11 plan, including all appendices, exhibits, schedules, and supplements hereto (including, without limitation, any appendices, schedules, and supplements to the Plan contained in the Plan Supplement), (as the same may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms thereof, the "**Plan**"). This summary of proposed terms and conditions does not purport to summarize all of the terms, conditions, representations and other provisions with respect to the transactions referred to herein, which will be set forth in the New August Secured Notes Documents (~~Option 1~~Default). Capitalized terms used herein but not otherwise defined shall have the meanings given to such terms in the Plan.

| | |
|---|---|
| **Issuer:** | Reorganized Parent (the "**Issuer**"). |
| **Security Description:** | Secured ~~convertible~~ notes (the "**New August Secured Notes (~~Option 1~~Default)**"). |
| **Guarantors:** | Same guarantors that guarantee the pre-petition Convertible Notes (the "**August 2021 Convertible Notes**") issued pursuant to the Note Purchase Agreement, dated August 20, 2021 (the "**August NPA**"). |
| **Principal Amount: ~~Initial Conversion Price:~~** | ~~Up to seventy five~~One hundred percent (~~75~~100%) of the Allowed August Convertible Notes Secured Claims ~~based on Holders' elections in accordance with section 4.2 of the Plan.Calculated based on a 20% premium to Plan Value (the "~~**Conversion Price**~~") assuming for the purposes of such calculation that all of the New Secured Notes have been converted pursuant to the terms thereof as of the Effective Date, subject to adjustment for issuances of New Common Interests to Holders of Disputed Claims pursuant to the Disputed Claims Reserves and as otherwise specified herein.~~ |
| **Interest Rate:** | Each New August Secured Note (~~Option 1~~Default) will bear interest at a fixed rate equal to ~~4~~8.0% for cash interest ("**Cash Interest**") and ~~6~~2.0% for payment-in-kind interest ("**PIK Toggle Interest**"). The Issuer will elect on each payment interest date whether to pay Cash Interest or the PIK Toggle Interest on the next interest payment date; *provided*, *however*, for PIK Toggle Interest, the New August Secured Notes (~~Option 1~~Default) will accrue interest at the rate for PIK Toggle Interest, and be payable in-kind, if the Issuer has not made such election. |

| | |
|---|---|
| **Maturity Date**: | ~~Five~~Seven (~~5~~7) years from the Effective Date. |
| **Amortization**: | None. |
| **Security**: | ~~(A) Lien (~~Second priority ~~to be agreed) on~~lien in all perfected collateral securing the August 2021 Convertible Notes as of the Petition Date (the "**August 2021 Convertible Notes Collateral**"), excluding for the avoidance of doubt, (i) any money and bank accounts, and (ii) any property acquired after the Petition Date that was not constituting proceeds of the disposition of August 2021 Convertible Notes Collateral, including any new contracts executed after the Petition Date and any bitcoin mined after such date or the proceeds of any bitcoin sold after the Petition Date~~; and (B) any additional collateral to be discussed with the Ad Hoc Noteholder Group~~. |
| **Ranking**: | Same as the August 2021 Convertible Notes. |
| ~~**Conversion at Option of Holders**~~**Covenants**: | ~~Holders may elect to convert their New August Secured Notes (Option 1) into New Common Interests at any time prior to maturity at the then applicable Conversion Price. The Issuer may elect to deliver cash, New Common Interests or a combination of both upon any holder conversion election.~~ |
| | ~~No holder drag-along rights.~~None. |
| ~~**Conversion at Option of the Company:**~~ | ~~From and after the Effective Date, the Company may, at its option, cause outstanding New August Secured Notes (Option 1) (including accrued but unpaid interest) to convert into a number of New Common Interests at the then applicable Conversion Price if the volume weighted average price of the New Common Interests exceeds 150% of the per share Plan Value for at least 20 trading days in a 30 consecutive day period. The Issuer may elect to deliver cash, New Common Interests or a combination of both.~~ |
| ~~**Anti-Dilution Protection:**~~ | ~~Customary adjustments to the Conversion Price for stock splits, stock dividends, rights offerings at discount, asset or other distribution on the New Common Interests, tender offers or exchange offers a premium, including customary exceptions.~~ |
| ~~**Repurchase at O**~~**Redem**~~**ption of Holders**~~: | ~~At the o~~Redemption ~~of each holder, for all or part of its New August Secured Notes (Option 1), right to put New August Secured Notes (Option 1) to Issuer in the event of a Fundamental Change (such defined ~~terms to be customary for secured nonconvertible notes issued by other public companies~~) at the principal amount thereof plus accrued interest to the repurchase date~~. |

2

| | |
|---|---|
| **Redemption:** | ~~Redemption terms to be agreed between the Ad Hoc Noteholder Group and the Company.~~ |
| **Other Covenants:** | ~~Covenants to be discussed with the Ad Hoc Noteholder Group.~~ |
| **Tradability / Liquidity:** | The offer, issuance, and distribution of New August Secured Notes (~~Option 1) (and the issuance of the New Common Interests upon conversion thereunder~~Default) will be exempt, pursuant to section 1145 of the Bankruptcy Code from registration under the Securities Act and the New August Secured Notes (~~Option 1) (and the issuance of New Common Interests upon conversion thereunder~~Default) will be freely tradable on the Effective Date, subject to any contractual limitations or restrictions for "control securities" under the U.S. securities laws, if applicable. |

**Exhibit ~~E~~G**

**New August Secured Notes Term Sheet (~~Option 2~~<u>Settlement Election</u>)**

**Terms of New August Secured Notes (~~Option 2~~Settlement Election)**

Set forth below is a summary of certain key terms for the New August Secured Notes (~~Option 2~~Settlement Election), to be issued by the Issuer (as defined below) to each Holder of August Convertible Notes Secured Claims~~, if Class 2 is not an Accepting Class~~ that timely elects the August Convertible Noteholder Treatment Settlement Election, pursuant to that certain joint chapter 11 plan, including all appendices, exhibits, schedules, and supplements hereto (including, without limitation, any appendices, schedules, and supplements to the Plan contained in the Plan Supplement), (as the same may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms thereof, the "**Plan**"). This summary of proposed terms and conditions does not purport to summarize all of the terms, conditions, representations and other provisions with respect to the transactions referred to herein, which will be set forth in the New August Secured Notes Documents (~~Option 2~~Settlement Election). Capitalized terms used herein but not otherwise defined shall have the meanings given to such terms in the Plan.

| | |
|---|---|
| **Issuer:** | Reorganized Parent (the "**Issuer**"). |
| **Security Description:** | Secured convertible notes (the "**New August Secured Notes** (~~Option 2~~Settlement Election)"). |
| **Guarantors:** | Same guarantors that guarantee the pre-petition Convertible Notes (the "**August 2021 Convertible Notes**") issued pursuant to the Note Purchase Agreement, dated August 20, 2021 (the "**August NPA**"). |
| **Principal Amount:** | ~~One hundred percent~~Up to fifty (~~100~~50%) of the Allowed August Convertible Notes Secured Claims based on Holders' elections in accordance with section 4.2 of the Plan. |
| **Initial Conversion Price:** | Calculated based on Plan Value (the "**Conversion Price**"). |
| **Interest Rate:** | Each New August Secured Note (~~Option 2~~Settlement Election) will bear interest at a fixed rate equal to ~~8~~6.0% for cash interest ("**Cash Interest**") and ~~2~~6.0% for payment-in-kind interest ("**PIK Toggle Interest**"). The Issuer will elect on each payment interest date whether to pay Cash Interest or the PIK Toggle Interest on the next interest payment date; *provided*, *however*, for PIK Toggle Interest, the New August Secured Notes (~~Option 2~~Settlement Election) will accrue interest at the rate for PIK Toggle Interest, and be payable in-kind, if the Issuer has not made such election. |
| **Maturity Date:** | ~~Seven~~Five (~~7~~5) years from the Effective Date. |
| **Amortization:** | None. |
| **Security:** | (A) Second priority lien ~~in~~on all perfected collateral securing the August 2021 Convertible Notes as of the Petition Date (the "**August 2021 Convertible Notes Collateral**"), excluding for |

the avoidance of doubt, (i) any money and bank accounts, and (ii) any property acquired after the Petition Date that was not constituting proceeds of the disposition of August 2021 Convertible Notes Collateral, including any new contracts executed after the Petition Date and any bitcoin mined after such date or the proceeds of any bitcoin sold after the Petition Date; and (B) any additional collateral to be discussed with the Ad Hoc Noteholder Group in connection with a consensual settlement.

| | |
|---|---|
| **Ranking:** | Same as the August 2021 Convertible Notes. |
| ~~**Covenants**~~**Conversion at Option of Holders:** | Holders may elect to convert their New August Secured Notes (Settlement Election) into New Common Interests at any time prior to maturity at the then applicable Conversion Price. The Issuer may elect to deliver cash, New Common Interests or a combination of both upon any holder conversion election. |
| | ~~None.~~No holder drag-along rights. |
| **Conversion at Option of the Company:** | From and after the Effective Date, the Company may, at its option, cause outstanding New August Secured Notes (Settlement Election) (including accrued but unpaid interest) to convert into a number of New Common Interests at the then applicable Conversion Price if the total enterprise value of the Company equals $2,250,000,000. |
| **Anti-Dilution Protection:** | Customary adjustments to the Conversion Price for stock splits, stock dividends, rights offerings at discount, asset or other distribution on the New Common Interests, tender offers or exchange offers a premium, including customary exceptions. |
| **Repurchase at** ~~**Redem**~~**Option of Holders:** | At the ~~Redem~~option of each holder, for all or part of its New August Secured Notes (Settlement Election), right to put New August Secured Notes (Settlement Election) to Issuer in the event of a Fundamental Change (such defined term~~s~~ to be customary for ~~secured non~~convertible notes issued by other public companies) at the principal amount thereof plus accrued interest to the repurchase date. |
| **Redemption:** | Redemption terms to be agreed between the Ad Hoc Noteholder Group and the Company. |
| **Other Covenants:** | Covenants to be discussed with the Ad Hoc Noteholder Group. |
| **Tradability / Liquidity:** | The offer, issuance, and distribution of New August Secured Notes (~~Option 2~~Settlement Election) (and the issuance of the New Common Interests upon conversion thereunder) will be exempt, pursuant to section 1145 of the Bankruptcy Code from |

2

registration under the Securities Act and the New August Secured Notes (~~Option 2~~Settlement Election) (and the issuance of New Common Interests upon conversion thereunder) will be freely tradable on the Effective Date, subject to any contractual limitations or restrictions for "control securities" under the U.S. securities laws, if applicable.

**Exhibit ~~F~~H**

**New Miner Equipment Lender Debt Term Sheet (Default)**

**New Miner Equipment Lender Debt Term Sheet (Default)[1]**

Set forth below is a summary of certain key terms for the Miner Equipment Loans (as defined below), to be issued by the New Equipment Borrower (as defined below) to each Miner Equipment Lender (as defined below) that (i) is an existing lender under a Miner Equipment Lender Agreement described in the Plan (as defined below) and (ii) does not elect either Miner Equipment Lender Treatment Election 1 or Miner Equipment Lender Election 2 (each as defined in the Plan), pursuant to that certain joint chapter 11 plan, including all appendices, exhibits, schedules, and supplements hereto (including, without limitation, any appendices, schedules, and supplements to the Plan contained in the Plan Supplement), (as the same may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms thereof, the "**Plan**"). This summary of proposed terms and conditions does not purport to summarize all of the terms, conditions, representations and other provisions with respect to the transactions referred to herein, which will be set forth in the Miner Equipment Facility Documents (as defined below). Capitalized terms used herein but not otherwise defined shall have the meanings given to such terms in the Plan.

| | |
|---|---|
| **Borrower**: | The Debtor that is party to the applicable Miner Equipment Lender Agreement (as defined in the Plan), a [●] [corporation] (the "**New Equipment Borrower**"). |
| **Lender**: | The Holder of a Miner Equipment Lender Secured Claim (the "**Miner Equipment Lender**") that does not ~~timely~~ elect Miner Equipment Lender Treatment Election 1 or Miner Equipment Lender Treatment Election 2. |
| **Closing Date:** | The Effective Date. |
| **Principal Amount:** | The amount listed next to a Miner Equipment Lender's name under the column "Principal of New Debt – Default Miner Equipment Lender Treatment" on **Exhibit ~~J~~L** of the Plan (the "**Miner Equipment Facility Loan Amount**"). For the avoidance of doubt, no Miner Equipment Lender that elects Miner Equipment Lender Treatment Election 1 or Miner Equipment Lender Treatment Election 2 is bound by the Miner Equipment Facility Loan Amount or the "Allowed Secured Claim (as of the Petition Date)" set forth on Exhibit L of the Plan in this proceeding or any future proceeding. |
| **Miner Equipment Facility**: | A senior secured U.S. dollar denominated term loan facility in an aggregate principal amount equal to the applicable Miner Equipment Facility Loan Amount (the "**Miner Equipment Facility**" and the loans made thereunder, the "**Miner Equipment Loans**") to be issued in full and final satisfaction of the applicable Miner Equipment Lender Secured Claims upon the Effective Date. |
| **Maturity Date:** | The Miner Equipment Loans will mature five (5) years from the Effective Date. |
| **Miner Equipment Facility Agreement Documents:** | The Miner Equipment Facility will be documented in a loan and security agreement (the "**Miner Equipment Facility Agreement**") and will be secured pursuant thereto. The document referred to in the preceding sentence and documents ancillary or related thereto are referred to as the "**Miner Equipment Facility Documents**." The Miner Equipment Facility Documents will reflect the terms set forth therein and otherwise be in form and substance reasonably acceptable to the New Equipment Borrower and the applicable Miner Equipment Lender if such Miner Equipment Lender is a ~~Settlement~~Settling Equipment Lender. |
| **Interest Rate**: | 9.00% per annum, consisting of 5.00% cash and 4.00% paid-in-kind~~[~~, subject to a ~~five~~three (~~5~~3)-day grace period~~]~~. |
| | For ~~Settlement~~Settling Equipment Lenders, upon the occurrence and during the continuance of an Event of Default (as defined below), the obligations under the Miner |

---

[1]   **This term sheet remains subject to ongoing review and comment by the Settling Equipment Lenders and the Debtors. The Settling Equipment Lenders have not yet signed off on this term sheet.**

|  | Equipment Facility shall bear interest at a rate equal to an additional [●]2.0% per annum over the rate otherwise applicable, with such interest being payable in cash on demand. |
|---|---|
| **Scheduled Amortization** | Commencing with the thirty-seventh (37th) month after the Effective Date: |
|  | (A) Beginning at the end of the first quarter following the third anniversary of the Effective Date: 30.00 % of the outstanding principal amount of the applicable Miner Equipment Loan (including PIK interest) as of the third anniversary of the Effective Date, payable quarterly; |
|  | (B) Beginning at the end of the first quarter following the fourth anniversary of the Effective Date: 30.00 % of the remaining outstanding principal amount of the applicable Miner Equipment Loan (including PIK interest) as of the third anniversary of the Effective Date, payable quarterly; and |
|  | (C) all remaining amounts outstanding shall be due on the Maturity Date. |
| **Optional Prepayments**: | No restrictions on optional prepayment, and the Miner Equipment Loans, including accrued interest, may be prepaid at any time and from time to time at par, without premium or penalty. |
| **Mandatory Prepayments** | Limited to net cash proceeds from sales of Equipment Collateral (as defined below) and net cash proceeds of casualty events; *provided, that,* at the New Equipment Borrower's option, such disposed Equipment Collateral may be replaced by equipment assigned to the Miner Equipment Lender as Equipment Collateral, the value of which shall not exceed the reasonably equivalent value of the replaced Equipment Collateral. |
| **Prepayment / Make Whole Premium:** | None. |
| **Equipment Collateral:** | The Collateral securing the Miner Equipment Lender's existing equipment loan/lease (the "**Equipment Collateral**"). |
| **Conditions Precedent:** | The Miner Equipment Facility will become effective and the Miner Equipment Loans will be issued upon satisfaction (or waiver) of conditions precedent acceptable to the Miner Equipment Lenders including, without limitation:  (i) the Miner Equipment Lender not timely electing Miner Equipment Lender Treatment Election 1 or Miner Equipment Lender Treatment Election 2 pursuant to the Plan, or such Miner Equipment Lender making one of such elections but such elections becoming unavailable pursuant to the terms of the Plan;  (ii) the applicable Miner Equipment Facility Documents being in form and substance reasonably acceptable to the applicable Miner Equipment Lender if such Miner Equipment Lender is a Settling Equipment Lender; and (iii) the occurrence of the Effective Date. |
| **Covenants** | Usual and cCustomary for an equipment loan, limited to use of Equipment Collateral, no further encumbrance, limitations on sales and dispositions of Equipment Collateral to be agreed, fees and taxes, insurance, and further assurances. |
| **Financial Covenants**: | NoneCustomary for an equipment loan. |
| **Representations and Warranties** | Limited to existence, requisite power and authority, no consents, enforceability and no violation of lawCustomary for an equipment loan. |
| **Reporting:** | Customary for an equipment loan. |
| **Events of Default**: | Limited to cCustomary events of default [including cross acceleration to material debt]for an equipment loan. |
| **Governing Law and Submission to Exclusive** | State of New York. |

**Jurisdiction**:

**Professional Fees:**     Capped at $[3.0~~0~~5] million ~~in the aggregate assuming full participation in Election 2, which shall be reduced~~among the Settling Miner Equipment Lenders on a pro rata basis ~~to the extent any Miner Equipment Lenders do not elect or otherwise will receive treatment under this Default Option~~.

**Exhibit ~~G~~I**

**New Miner Equipment Lender Debt Term Sheet (Election 2)**

**New Miner Equipment Lender Debt Term Sheet (Election 2)[1]**

Set forth below is a summary of certain key terms for the ~~New~~Miner Equipment ~~Loans~~Facility Documents (as defined below), to be issued by the New Equipment Borrower (as defined below) to each Miner Equipment Lender (as defined below) that (i) is an existing lender under a Miner Equipment Lender Agreement described in the Plan (as defined below) and (ii) elects Miner Equipment Lender Treatment Election 2 (as defined in the Plan), pursuant to that certain joint chapter 11 plan, including all appendices, exhibits, schedules, and supplements hereto (including, without limitation, any appendices, schedules, and supplements to the Plan contained in the Plan Supplement), (as the same may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms thereof, the "**Plan**"). This summary of proposed terms and conditions does not purport to summarize all of the terms, conditions, representations and other provisions with respect to the transactions referred to herein, which will be set forth in the Miner Equipment Facility Documents ~~(as defined below)~~. Capitalized terms used herein but not otherwise defined shall have the meanings given to such terms in the Plan.

| | |
|---|---|
| **Borrower**: | The Debtor that is party to the applicable Miner Equipment Lender Agreement (as defined in the Plan), a [●] [corporation] (the "**New Equipment Borrower**"). |
| **Lender**: | The Holder of a Miner Equipment Lender Secured Claim (the "**Miner Equipment Lender**") that timely elects Miner Equipment Lender Treatment Election 2. |
| **Closing Date:** | The Effective Date. |
| **Original Principal Amount:** | The amount listed next to a Miner Equipment Lender's name under the column "Principal of New Debt – Miner Equipment Lender Treatment Election 2" on **Exhibit ~~J~~L** of the Plan, (the "**Miner Equipment Facility Loan Amount**"), which is equal to eighty percent (80%) of each Miner Equipment Lender Claim, and is subject to an aggregate cap of $[197,000,000].[2] |
| **Miner Equipment Facility**: | A senior secured U.S. dollar denominated term loan facility in an aggregate principal amount equal to the applicable Miner Equipment Facility Loan Amount (the "**Miner Equipment Facility**"~~;~~ and the loans made thereunder, the "**Miner Equipment Loans**") secured by the Equipment Collateral (as defined below) to be deemed issued in full and final satisfaction of the applicable Miner Equipment Lender Secured Claims upon the Effective Date. |
| **Maturity Date:** | The Miner Equipment Loans will mature five (5) years from the Effective Date. |
| **Miner Equipment Facility Agreement Documents:** | The Miner Equipment Facility will be documented in a loan and security agreement (the "**Miner Equipment Facility Agreement**") and will be secured pursuant thereto. The document referred to in the preceding sentence and documents ancillary or related thereto are referred to as the "**Miner Equipment Facility Documents**." The Miner Equipment Facility Documents will reflect the terms set forth herein and otherwise be in form and substance reasonably acceptable to the applicable New Equipment Borrower and the applicable Miner Equipment Lender. |
| **Interest Rate**: | Interest shall be payable quarterly in arrears on the last day of each calendar quarter~~[~~, subject to a ~~five~~three (~~5~~3)-day grace period~~]~~: |
| | (A) during the first two (2) years of the term~~,~~: |
| | 1.   13.0% annual interest, consisting of 3.0% cash interest and 10.0% paid-in-kind |

---

[1] **This term sheet remains subject to ongoing review and comment by the Settling Equipment Lenders and the Debtors.** The Settling Equipment Lenders have not yet signed off on this term sheet.

[2] $197 million is approximately 80% of the aggregate projected $247 million ~~Equipment~~ Miner Equipment Lender Claims assuming an Effective Date of September 30, 2023. This figure will be updated prior to the Effective Date to reflect the actual aggregate ~~Equipment~~ Miner Equipment Lender Claims as of the Effective Date

(the "**Standard Interest Rate Payment**");

*provided, that,* at the New Equipment Borrower's option, made with notice at least [three]five (5) days prior to the ~~beginning of each calendar quarter for such calendar quarter (or, in the case of the period from the Effective Date until the end of first calendar quarter to occur after the Effective Date, made on the Effective Date) (it being agreed that if~~due date of any interest payment during this period, the New Equipment Borrower ~~fails to select an option below within such time period, it shall be deemed to have selected the option selected in the immediate preceding quarter)~~may instead elect to pay such quarterly interest payment at a rate of:

~~1. 13.0% annual interest, consisting of 3.0% cash interest and 10.0% paid-in-kind;~~

1.   ~~2.~~ 12.0% annual interest, consisting of 5.0% cash interest and 7.0% paid-in-kind; or

2.   ~~3.~~ 8.0% annual interest payable in cash.

Should no timely election be made by the New Equipment Borrower for a quarterly interest payment during this period, then the New Equipment Borrower shall pay the Standard Interest Rate Payment.

(B) following the first two (2) years of the term, 10.0% annual interest payable in cash.

Upon the occurrence and during the continuance of an Event of Default (as defined below), the obligations under the Miner Equipment Facility shall bear interest at a rate equal to an additional [●]2.0% per annum over the rate otherwise applicable, with such interest being payable in cash on demand.

| | |
|---|---|
| **Scheduled Amortization** | Commencing with the twenty-fifth (25th) month after the Effective Date: |
| | (A) Beginning at the end of the first quarter following the second anniversary of the Effective Date: 50.00 % of the aggregate outstanding principal amount of the applicable Miner Equipment Loan (including PIK interest) as of the second anniversary of the Effective Date, payable quarterly; |
| | (B) Beginning at the end of the first quarter following the third anniversary of the Effective Date: 25.00 % of the aggregate outstanding principal amount of the applicable Miner Equipment Loan (including PIK interest) as of the second anniversary of the Effective Date, payable quarterly; and |
| | (C) Beginning at the end of the first quarter following the fourth anniversary of the Effective Date: 25.00 % of the aggregate outstanding principal amount of the applicable Miner Equipment Loan (including PIK interest) as of the second anniversary of the Effective Date, payable quarterly. |
| **Optional Prepayments**: | No restrictions on optional prepayment, and the Miner Equipment Loans, including accrued interest, may be prepaid at any time and from time to time at par, without premium or penalty. |
| **Mandatory Prepayments** | Limited to (i) the Excess Cash Flow Sweep (as defined below) and (ii) net cash proceeds from sales of such sold Equipment Collateral (as defined below) and net cash proceeds of casualty events. ~~Mandatory prepayments will be applied to the scheduled amortization payments in inverse order of maturity~~. |
| **Prepayment / Make Whole Premium** | None. |
| **Equipment Collateral**: | (A) The existing collateral securing the Miner Equipment Lender's existing equipment loan/lease (the "**Existing Collateral**"); and |
| | ~~(B)~~ Each Settling Miner Equipment Lender that elects Miner Equipment Lender |

2

|  | Takeback Debt (Election 2) will receive ~~an amount of the~~a first-priority, duly-perfected, and validly enforceable lien on new, non-financed miners acquired by the Reorganized Debtors following the Effective Date, in an aggregate amount for all Settling Miner Equipment Lenders of up to $52,500,000 (the "Additional Collateral") calculated as $52,500,000 multiplied by the quotient of such Settling Equipment Lender's Allowed Miner Equipment Lender Claim (as of the Petition Date) divided by the aggregate amount of all Allowed Miner Equipment Lender Claims (as of the Petition Date) electing Miner Equipment Lender Takeback Debt (Election 2); provided that the $52,500,000 of the Additional Collateral allocated to the Settling Equipment Lenders shall be reduced on a pro rata basis to the extent more than 15% (based on claim size) of the Settling Equipment Lenders do not elect Miner Equipment Lender Takeback Debt (Election 2) calculated as (1) $52,500,000 multiplied by (2)(a) the quotient of (i) all Settling Equipment Lender's Allowed Miner Equipment Lender Claims (as of the Petition Date) electing Miner Equipment Lender Takeback Debt (Election 2) divided by (ii) the aggregate amount of all Allowed Miner Equipment Lender Claims of the Settling Equipment Lenders (as of the Petition Date) divided by (b) 85%; *provided*, *however*, such Settling Equipment Lenders may agree to allocate such Additional Collateral amongst themselves in a different manner than as set forth herein upon written notice to the Debtors prior to the start of the Confirmation Hearing (such clauses (A) and (B) above, together, the "**Equipment Collateral**"). |
| **Conditions Precedent**: | The Miner Equipment Facility will become effective and the Miner Equipment Loans will be issued upon satisfaction (or waiver) of conditions precedent acceptable to the Miner Equipment Lenders including, without limitation:   (i) the Miner Equipment Lender timely electing Miner Equipment Lender Treatment Election 2 pursuant to the Plan ~~and such option being available under the Plan~~; (ii) the applicable Miner Equipment Facility Documents being in form and substance reasonably acceptable to the applicable Miner Equipment Lender if such Miner Equipment Lender elects Miner Equipment Lender Treatment Election 2 pursuant to the Plan; and (iii) the occurrence of the Effective Date. |
| **Excess Cash Flow Sweep / Prepay** | [TBD] (the "*Excess Cash Flow Sweep*"). |
| **Asset Sales** | The New Equipment Borrower may sell Equipment Collateral for fair market value to the extent that (i) the net cash proceeds of such sale are used to repay the New Equipment Loans as contemplated by the Mandatory Prepayments section above or (ii) it assigns replacement Equipment Collateral of reasonably equivalent value to the Miner Equipment Lender; *provided* that any such net cash proceeds used to repay the New Equipment Loans during the first 24 months after the Effective Date may be credited against future quarterly amortization payments beginning with the first quarterly amortization payment due following such sale ~~and shall be applied to the scheduled~~; if net cash proceeds are in excess of the amount of the first quarterly amortization payment, any remaining proceeds will credit against the next quarterly amortization payment due, and then against subsequent quarterly amortization payments, in ~~inverse~~ order of ~~maturity~~earliest due date, to the extent net cash proceeds are in excess of the amount of the quarterly amortization payment in a given quarter.  For the avoidance of doubt, nothing in the New Miner Equipment Facility or New Miner Equipment Loans shall restrict the sale of any other assets or equipment by the New Equipment Borrower that is not Equipment Collateral. |
| **Covenants** | ~~Usual and c~~Customary for an equipment loan~~, limited to use of Equipment Collateral, no further encumbrance, limitations on sales and dispositions of Equipment Collateral to be agreed, fees and taxes, insurance, and further assurances~~. |
| **Financial Covenants**: | ~~None~~Customary for an equipment loan. |
| **Representations and** | ~~Limited to existence, requisite power and authority, no consents, enforceability and no~~ |

3

| | |
|---|---|
| **Warranties** | ~~violation of law~~<u>Customary for an equipment loan</u>. |
| **Reporting:** | Customary for an equipment loan. |
| **Events of Default**: | ~~Limited to e~~Customary ~~events of default[, including cross-acceleration to material debt~~<u>for an equipment loan</u>. |
| **Governing Law and Submission to Exclusive Jurisdiction**: | State of New York. |
| **Professional Fees:** | Capped at $[3.0<u>5</u>] million ~~in the aggregate assuming full participation in Election 2, which shall be reduced~~<u>among the Settling Miner Equipment Lenders</u> on a pro rata basis ~~to the extent any Miner Equipment Lenders do not elect treatment under Election 2~~. |

**Exhibit ~~H~~ J**

**New M&M Lien Debt Term Sheet**

**New M&M Lien Debt Term Sheet**

This term sheet (the "<u>Term Sheet</u>") is Exhibit ~~H~~J to the Joint Chapter 11 Plan of Core Scientific, Inc. and its affiliated Debtors (the "<u>Plan</u>"). Capitalized terms used but not defined herein have the meanings given to them in the Plan.

Set forth below are the principal terms of each M&M Lien Takeback Debt obligation (each, an "<u>Obligation</u>") to be issued to each Debt Holder (as defined herein) in respect of each M&M Lien Secured Claim of such Debt Holder.  The Obligations will be subject to (a) the approval of the Bankruptcy Court and (b) emergence by the Debtors from the Chapter 11 Cases on the Effective Date, in accordance with (i) the Plan and (ii) any order entered by the Bankruptcy Court authorizing the M&M Lien Takeback Debt, which may be part of the order confirming the Plan (the "<u>Confirmation Order</u>").

| | |
|---|---|
| **Debt Issuer:** | The applicable Debtor that owns or leases the real property encumbered by the M&M Liens which secure the M&M Lien Secured Claim (such Debtor, the "**Issuer**"), in each case, as set forth on Exhibit ~~I~~K attached to the Plan. |
| **Debt Holder:** | The General Contractor which is the Holder of the M&M Lien Secured Claim (the "**Debt Holder**"), in each case, as set forth on Exhibit ~~I~~K attached to the Plan. |
| **Principal Amount:** | The amount of the Debt Holder's M&M Lien Secured Claim attributable to the applicable real property encumbered by the M&M Liens which secure such Debt Holder's Allowed M&M Lien Secured Claim (such amount, the "**Principal**"), in each case, as set forth on Exhibit ~~I~~K attached to the Plan. |
| **Payment Recipient:** | With respect to Obligations in respect of M&M Lien Secured Claims attributable to amounts secured by M&M Liens of only the Debt Holder:  the Debt Holder. |
| | With respect to Obligations in respect of M&M Lien Secured Claims attributable to amounts secured by M&M Liens of the Debt Holder and, in duplication, by M&M Liens of one or more Subcontractors:  Issuer shall make payments directly to each Debt Holder and Subcontractor, pro rata in the percentages set forth next to each such Debt Holder and Subcontractor on Exhibit ~~I~~K attached to the Plan; *provided*, *however*, that upon delivery to the Issuer of a final and unconditional lien waiver |

and release duly executed by a Subcontractor, in recordable form and substance sufficient to permanently waive and release such Subcontractor's M&M Liens, the Issuer shall make all further payments on account of such Obligations attributable to such Subcontractor's pro rata percentages set forth next to such Subcontractor on Exhibit IK attached to the Plan directly to the Debt Holder.

Each payment made directly to a Subcontractor shall reduce the amount of such Obligation, such Debt Holder's M&M Secured Lien Claim, such Debt Holder's M&M Lien, and such Subcontractor's M&M Lien, in each case on a dollar-for-dollar basis.

**Interest Rate:** Interest shall accrue at a rate of five percent (5.00%) per annum.

**Payment Date:** The Obligations shall be payable in quarterly installments, payable on the last of each calendar quarter (each such payment date, a "**Payment Date**") beginning on the first such date to occur after the Effective Date (e.g., if the Effective Date is on October 1, the first monthly payment date will be December 31) (such initial payment date, the "**Initial Payment Date**").

**Maturity Date:** The date that is ten (10) years after the Initial Payment Date.

**Scheduled Amortization:** Years 1–2: Interest only shall be payable.

Years 3–10: The Principal shall be fully amortized and payable in equal monthly installments.

**Collateral and Security:** Each Obligation shall be secured by the M&M Liens in favor of the Debt Holder that encumber the applicable property (the "**Collateral**").

**Voluntary Prepayments:** Each Issuer shall have the right, exercisable at any time and from time to time, to voluntarily prepay the M&M Lien Takeback Debt in whole or in part, without premium or penalty.

Any voluntary prepayment of the Obligations shall be applied in inverse or direct order of maturity in the discretion of, and as specified in a notice accompanying such prepayment from, the Issuer.

| | |
|---|---|
| **Automatic Release of Mechanic's Liens:** | Any M&M Lien (i) of a Subcontractor, (ii) of the Debt Holder, or (iii) otherwise securing an Obligation shall be fully and finally extinguished upon the repayment in full of the applicable Obligation. Upon repayment in full of an Obligation, the Issuer is authorized to record (and granted power of attorney to effectuate such recordation) final, unconditional lien waivers, releases of lien, and such other documents or certificates required to fully and unconditionally release any such M&M Lien in the applicable real property records, and each applicable clerk is directed to accept such documentation. |
| **Events of Default:** | The occurrence of the following event shall constitute an "**Event of Default**" by Issuer:   Issuer fails to pay any quarterly installment on the Payment Date when such quarterly installment becomes due, and such failure continues for sixty (60) days after the Debt Holder gives written notice thereof to Issuer. |
| | With respect to each Obligation, unless and until an Event of Default occurs, each Debt Holder and Subcontractor whose M&M Liens secure amounts attributable to M&M Lien Secured Claims in respect of such Obligation shall be barred from foreclosing or otherwise enforcing such M&M Lien or otherwise taking adverse action against the Issuer of such Obligation with regard to any amounts secured by such M&M Lien. |
| **Governing Law:** | With respect of each Obligation, the State in which the real property encumbered by the M&M Liens securing the M&M Lien Secured Claims in respect of such Obligations is situated. |
| **Documentation:** | Each M&M Lien Takeback Debt Obligation shall be automatically deemed to be issued upon the Effective Date of the Plan. |

**Exhibit ~~I~~K**

**M&M Lien Claims Schedule**

# M&M Lien Claims Schedule*[1]

---

[1] ~~This Schedule is subject to ongoing review and revision by the Debtors and their advisors, and thus is subject to change.~~ This schedule assumes approval is obtained with respect to all M&M Lien and Claim settlements for which the Debtors have sought Bankruptcy Court approval.

| holder/ aimant | General Contractor or Subcontractor | General Contractor under applicable General Contract which gives rise to the M&M Liens and/or Claims | Proof of Claim Numbers Filed by Lienholder/ Claimant | ~~Unreduced Amount of Allowed M&M Lien Secured Claim³~~ | Allowed Unsecured Claim Amount | ~~Unreduced Amount of Allowed M&M Lien³~~ | ~~Materials and Equipment Held by such General Contractor or Subcontractor~~ | ~~Value of Materials and Equipment Held by such General Contractor or Subcontractor~~ | Amount of Allowed M&M Lien⁴ A. ~~²(equal to Unreduced Allowed M&M Lien Amount less Value of~~ | Amount of Allowed M&M Lien Secured Claim⁵³ (which | Amount of applicable M&M Takeback Debt to be repaid directly to suc |
|---|---|---|---|---|---|---|---|---|---|---|---|

~~²  The proposed unreduced allowed amount of each M&M Lien Secured Claim set forth on this Schedule is subject to the Debtors' ongoing analysis regarding whether each of the related M&M Liens are valid and were properly perfected in accordance with applicable law.~~

~~³  The proposed allowed unreduced amount of each M&M Lien set forth on this Schedule is subject to the Debtors' ongoing analysis regarding whether each M&M Lien is valid and was properly perfected in accordance with applicable law.~~

~~⁴  The proposed allowed amount of each M&M Lien set forth on this Schedule is subject to the Debtors' ongoing analysis regarding whether each M&M Lien is valid and was properly perfected in accordance with applicable law.~~

² The proposed allowed amount of each M&M Lien set forth on this Schedule is subject to the Debtors' ongoing analysis regarding whether each M&M Lien is valid and was properly perfected in accordance with applicable law.

~~⁵~~    ³ The proposed allowed amount of each M&M Lien Secured Claim set forth on this Schedule is subject to the Debtors' ongoing analysis regarding whether each of the related M&M Liens are valid and were properly perfected in accordance with applicable law.

2

| | | | | | | | | | (~~Equipment~~) | shall equal the amount of M&M Lien Takeback Debt to be issued to each General Contractor) | Gener Contracto r or Subcon actors |
|---|---|---|---|---|---|---|---|---|---|---|---|
| cCarthy uilding mpanies, Inc. | General Contractor | McCarthy Building Companies, Inc. | 468 | ~~$17,052,583.65~~ | $1,746,915.35 | ~~$17,052,583.65~~ | ~~N/A~~ | ~~N/A~~ | $17,052,583.65 | $17,052,583.65 | $5,814,0.32 |
| e Steel – xas, L.P. | Subcontractor | McCarthy Building Companies, Inc. | 110 | ~~$0~~ | $0 | ~~$695,277.03~~ | ~~N/A~~ | ~~N/A~~ | $695,277.03 | $0 | $695,27 03 |
| Way chanical | Subcontractor | McCarthy Building | N/A | ~~$0~~ | $0 | ~~$436,029.00~~ | ~~N/A~~ | ~~N/A~~ | $436,029.00 | $0 | $436,02 00 |

3

| Lienholder/Claimant | General Contractor or Subcontractor | General Contractor under applicable General Contract which gives rise to the M&M Liens and/or Claims | Proof of Claim Numbers Filed by Lienholder/Claimant | Unreduced Amount of Allowed M&M Lien Secured Claim³ | Allowed Unsecured Claim Amount | Unreduced Amount of Allowed M&M Lien³ | Materials and Equipment Held by such General Contractor or Subcontractor | Value of Materials and Equipment Held by such General Contractor or Subcontractor | Amount of Allowed M&M Lien⁴ A. ²(equal to Unreduced Allowed M&M Lien Amount *less* Value of Equipment) | Amount of Allowed M&M Lien Secured Claim⁵³ (which shall equal the amount of M&M Lien Takeback Debt to be issued to each General Contractor) | Amount of applicable M&M Takeback Debt to be repaid directly to such General Contractor or Subcontractor |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Companies, Inc. | | | | | | | | | |
| Corvey Sheet Metal Works, LP | Subcontractor | McCarthy Building Companies, Inc. | N/A | $0 | $0 | $20,895.50 | N/A | N/A | $20,895.50 | $0 | $20,895.50 |
| GEAM Concrete Construction, Inc. | Subcontractor | McCarthy Building Companies, Inc. | 187 | $0 | $0 | $878,306.82 | N/A | N/A | $878,306.82 | $0 | $878,306.82 |
| Humphrey & Associates, Inc. | Subcontractor | McCarthy Building Companies, Inc. | 510 | $0 | $0 | $7,036,021.06 | N/A | N/A | $7,036,021.06 | $0 | $7,036,021.06 |
| Imperial Fire Protection, LLC | Subcontractor | McCarthy Building Companies, Inc. | 122 | $0 | $0 | $209,210.00 | N/A | N/A | $209,210.00 | $0 | $209,210.00 |
| | Subcontractor | McCarthy | 538 | $0 | $0 | $1,004,059.64 | N/A | N/A | $1,004,059.64 | $0 | $1,004,... |

| nholder/ aimant | General Contractor or Subcontractor | General Contractor under applicable General Contract which gives rise to the M&M Liens and/or Claims | Proof of Claim Numbers Filed by Lienholder/ Claimant | ~~Unreduced Amount of Allowed M&M Lien Secured Claim³~~ | Allowed Unsecured Claim Amount | ~~Unreduced Amount of Allowed M&M Lien³~~ | ~~Materials and Equipment Held by such General Contractor or Subcontractor~~ | ~~Value of Materials and Equipment Held by such General Contractor or Subcontractor~~ | Amount of Allowed M&M Lien⁴ A.  ²(equal to Unreduced Allowed M&M Lien Amount *less* Value of Equipment) | Amount of Allowed M&M Lien Secured Claim⁵³ (which shall equal the amount of M&M Lien Takeback Debt to be issued to each General Contractor) | Amount of applicable M&M Takeback Debt to be repaid directly to such General Contractor or Subcontractor |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | es, Inc. | | | | | | | | | |
| r Electric up, LP | Subcontractor | McCarthy Building Companies, Inc. | N/A | ~~$0~~ | $0 | ~~$28,266.49~~ | ~~N/A~~ | ~~N/A~~ | $28,266.49 | $0 | $28,266.49 |
| Power gineering ices, Inc. | Subcontractor | McCarthy Building Companies, Inc. | N/A | ~~$0~~ | $0 | ~~$98,440.00~~ | ~~N/A~~ | ~~N/A~~ | $98,440.00 | $0 | $98,440.00 |
| th Texas tracting, Inc. | Subcontractor | McCarthy Building Companies, Inc. | N/A | ~~$0~~ | $0 | ~~$189,425.90~~ | ~~N/A~~ | ~~N/A~~ | $189,425.90 | $0 | $189,425.90 |
| RPM nstruction, LLC | Subcontractor | McCarthy Building Companies, Inc. | N/A | ~~$0~~ | $0 | ~~$19,394.12~~ | ~~N/A~~ | ~~N/A~~ | $19,394.12 | $0 | $19,394.12 |
| | | McCarth | | | | | | | | | |

| Lienholder/ Claimant | General Contractor or Subcontractor | General Contractor under applicable General Contract which gives rise to the M&M Liens and/or Claims | Proof of Claim Numbers Filed by Lienholder/ Claimant | ~~Unreduced Amount of Allowed M&M Lien Secured Claim³~~ | Allowed Unsecured Claim Amount | ~~Unreduced Amount of Allowed M&M Lien³~~ | ~~Materials and Equipment Held by such General Contractor or Subcontractor~~ | ~~Value of Materials and Equipment Held by such General Contractor or Subcontractor~~ | Amount of Allowed M&M Lien⁴ A. ²(equal to Unreduced Allowed M&M Lien Amount *less* Value of Equipment) | Amount of Allowed M&M Lien Secured Claim⁶³ (which shall equal the amount of M&M Lien Takeback Debt to be issued to each General Contractor) | Amount of applicable M&M Takeback Debt to be repaid directly to such General Contractor or Subcontractor |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ...ousley ...munications | Subcontractor | McCarthy Building Companies, Inc. | 167 | ~~$0~~ | $0 | ~~$0~~ | ~~N/A~~ | ~~N/A~~ | $0 | $0 | $0 |
| ...addox ...dustrial ...ansformer, LLC⁶⁴ | General Contractor | Maddox Industrial Transformer, LLC | 295 | ~~$0~~ | $0 | ~~$0~~ | ~~[TBD]~~ | ~~[TBD]~~ | $0 | $0 | N/A |
| ...e Rentals, Inc. | General Contractor | Herc Rentals, Inc. | 340 | ~~$0~~ | $127,512.03 | ~~$0~~ | ~~N/A~~ | ~~N/A~~ | $0 | $0 | ~~$0~~N/A |
| ~~T&D Mech-⁶ vits & Co., LLC~~ | ~~D.~~ | ~~S w e o n t r a~~ | ~~E.~~ | ~~F. [ T D ]~~ | ~~G. [TBD]~~ | ~~H. $~~ | ~~I. [TBD]~~ | ~~J. N/ A~~ | ~~K. N/A~~ | ~~L. [TBD]~~ | ~~M. [ B D ]~~ ~~N.~~ |

⁴ The Debtors dispute the claims and liens asserted by Maddox Industrial Transformer, LLC and contend that they have counterclaims against Maddox Industrial Transformer, LLC which, if successful, will likely result in recoveries in favor of the Debtors.

| Lienholder/ Claimant | General Contractor or Subcontractor | General Contractor under applicable General Contract which gives rise to the M&M Liens and/or Claims | Proof of Claim Numbers Filed by Lienholder/ Claimant | ~~Unreduced Amount of Allowed M&M Lien Secured Claim[3]~~ | Allowed Unsecured Claim Amount | ~~Unreduced Amount of Allowed M&M Lien[3]~~ | ~~Materials and Equipment Held by such General Contractor or Subcontractor~~ | ~~Value of Materials and Equipment Held by such General Contractor or Subcontractor~~ | Amount of Allowed M&M Lien[4] A. ~~[2](equal to Unreduced Allowed M&M Lien Amount less Value of Equipment)~~ | Amount of Allowed M&M Lien Secured Claim[53] (which shall equal the amount of M&M Lien Takeback Debt to be issued to each General Contractor) | Amount of applicable M&M Takeback Debt to be repaid directly to such General Contractor or Subcontractor |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | ~~ctor~~ | | | | | | | | | |
| ~~Harper Construction Company, Inc.~~ | R. ~~General Contractor~~ | S. ~~Harper Construction ti~~ | T. 437 | U. $9,700,571.00 | V. [TBD] | W. $9,700,571.00 | X. N/A | Y. N/A | Z. $9,700,571.00 | AA. [TBD] | BB. |

7

| ...nholder/ ...aimant | General Contractor or Subcontractor | General Contractor under applicable General Contract which gives rise to the M&M Liens and/or Claims | Proof of Claim Numbers Filed by Lienholder/ Claimant | Unreduced Amount of Allowed M&M Lien Secured Claim[3] | Allowed Unsecured Claim Amount | Unreduced Amount of Allowed M&M Lien[3] | Materials and Equipment Held by such General Contractor or Subcontractor | Value of Materials and Equipment Held by such General Contractor or Subcontractor | Amount of Allowed M&M Lien[4] A. [2](equal to Unreduced Allowed M&M Lien Amount less Value of Equipment) | Amount of Allowed M&M Lien Secured Claim[5][3] (which shall equal the amount of M&M Lien Takeback Debt to be issued to each General Contractor) | Amount of Allowed M&M Lien Takeback Debt to be repaid directly to such General Contractor or Subcontractor | Amount of applicable M&M... |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Conte ch, Inc. | FF. Subcontra... | GG. | HH. N/A | II. $0 | JJ. $0 | KK. $602,556.08 | LL. N/A | MM. N/A | NN. $602,556.08 | OO. $0 | PP. | |

8

| ...enholder/ ...aimant | | General Contractor or Subcontractor | General Contractor under applicable General Contract which gives rise to the M&M Liens and/or Claims | Proof of Claim Numbers Filed by Lienholder/ Claimant | ~~Unreduced Amount of Allowed M&M Lien Secured Claim³~~ | Allowed Unsecured Claim Amount | ~~Unreduced Amount of Allowed M&M Lien³~~ | ~~Materials and Equipment Held by such General Contractor or Subcontractor~~ | ~~Value of Materials and Equipment Held by such General Contractor or Subcontractor~~ | Amount of Allowed M&M Lien⁴ A. ~~²(equal to Unreduced Allowed M&M Lien Amount less Value of Equipment)~~ | Amount of Allowed M&M Lien Secured Claim⁵³ (which shall equal the amount of M&M Lien Takeback Debt to be issued to each General Contractor) | Amoun... of applica... e M&M... Takeba... Debt t... be repa... directl... to suc... Gener... Contra... r or... Subcon...actor |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | ~~et or~~ | ~~nstruction Company, Inc.~~ | | | | | | | | | |

| Lienholder/ Claimant | General Contractor or Subcontractor | General Contractor under applicable General Contract which gives rise to the M&M Liens and/or Claims | Proof of Claim Numbers Filed by Lienholder/ Claimant | Unreduced Amount of Allowed M&M Lien Secured Claim[3] | Allowed Unsecured Claim Amount | Unreduced Amount of Allowed M&M Lien[3] | Materials and Equipment Held by such General Contractor or Subcontractor | Value of Materials and Equipment Held by such General Contractor or Subcontractor | Amount of Allowed M&M Lien[4] A. [2](equal to Unreduced Allowed M&M Lien Amount *less* Value of Equipment) | Amount of Allowed M&M Lien Secured Claim[5][3] (which shall equal the amount of M&M Lien Takeback Debt to be issued to each General Contractor) | Amount of applicable M&M Takeback Debt to be repaid directly to such General Contractor or Subcontractor |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Gaylor Electric, Inc. | TT. Subcontractor | UU. Harper Construction Compa | VV. 374, 378 | WW. $0 | XX. $0 | YY. [TBD] | ZZ. [TBD] | AAA. [TBD] | BBB. [TBD] | CCC. $0 | DDD. |

10

| ...nholder/ ...aimant | General Contractor or Subcontractor | General Contractor under applicable General Contract which gives rise to the M&M Liens and/or Claims | Proof of Claim Numbers Filed by Lienholder/ Claimant | ~~Unreduced Amount of Allowed M&M Lien Secured Claim³~~ | Allowed Unsecured Claim Amount | ~~Unreduced Amount of Allowed M&M Lien³~~ | ~~Materials and Equipment Held by such General Contractor or Subcontractor~~ | ~~Value of Materials and Equipment Held by such General Contractor or Subcontractor~~ | Amount of Allowed M&M Lien[4]  A. ___ [2]~~(equal to Unreduced Allowed M&M Lien Amount *less* Value of Equipment)~~ | Amount of Allowed M&M Lien Secured Claim[5] (which shall equal the amount of M&M Lien Takeback Debt to be issued to each General Contractor) | Amoun... of applica... e M&M... Takeba... Debt t... be repa... directl... to suc... Genera... Contra... r or Subcon... actor |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | ~~n y , 1 n e .~~ | | | | | | | | | |

**Exhibit ~~J~~L**

**Miner Equipment Lender Claims Schedule**

**Miner Equipment Lender Claims Schedule*[1]**

| Holder | Agreement(s) | Proof of Claim Number | Miner Equipment Lender Claim (as of Petition Date)[21] | Allowed Miner Equipment Lender Secured Claim (as of Petition Date) | Allowed Miner Equipment Lender Deficiency Claim (as of Petition Date) | Collateral (# of Miners) | Principal of New Debt | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Default Miner Equipment Lender Treatment[32] | Miner Equipment Lender Treatment Election 2[43] |
| 36th Street Capital Partners, LLC | 36th Street Miner Agreement | 294 | $4,066,802.27 | $1,016,211.33 | $3,050,590.93 | 970 | $1,016,211.33 | ~~$3,372,112.91~~3,385,112.22 |
| Anchorage Lending CA, LLC | Anchorage Agreements | 362 | $25,931,198.54 | $4,732,276.58 | $21,198,921.96 | 5,354 | $4,732,276.58 | ~~$21,491,277.20~~21,573,029.39 |
| Barings (Consolidated)[54] | Barings (Consolidated) | | $65,971,295.24 | $12,316,472.00 | $53,654,823.24 | 14,181 | $12,316,472.00 | ~~$54,675,737.06~~54,883,721.96 |

[1] ~~This schedule is subject to ongoing review and revision by the Debtors and their advisors, and thus is subject to change.~~

[21] The amounts reflected herein do not include any legal or advisor fees or expenses, which shall be treated pursuant to section 2.5 of the Plan in accordance with section 5.1~~3~~4 of the Plan.

[32]    Equal to Allowed Secured Claim.

[43]    Equal to 80% of the sum of Allowed Secured Claim plus Allowed Deficiency Claim (as of Effective Date).

[54]    The Debtors have reflected the Barings entities on a consolidated basis.  The Debtors may amend this schedule to reflect amounts allocated for each entity.

| Holder | Agreement(s) | Proof of Claim ~~Number~~ | Miner Equipment Lender Claim (as of Petition Date)[21] | Allowed **Miner Equipment Lender Secured** Claim (as of Petition Date) | Allowed **Miner Equipment Lender Deficiency** Claim (as of Petition Date) | Collateral (# of Miners) | Principal of New Debt | |
|---|---|---|---|---|---|---|---|---|
| Barings BDC, Inc. | Barings Agreements | [65] | | | | | | |
| Barings Capital Investment Corporation | Barings Agreements | 443[76] | | | | | | |
| ~~Barings Private Credit Corp.~~ | Barings Agreements | 442[87] | | | | | | |
| BlockFi Lending LLC | BlockFi Agreements | 447[98] | $55,712,407.48 | $15,064,256.50 | $40,648,150.98 | 14,508 | $15,064,256.50 | $~~46,195,638.79~~ 6,373,720.41 |
| Jack Novak | Novak Agreements | 224[109] | $10,059,404.11 | $0.00 | $10,059,404.11 | N/A | $0.00 | $~~8,337,040.10~~8,368,753.96 |
| MassMutual Asset Finance LLC | MassMutual Agreements | 298[1110] | $43,679,664.81 | $14,899,759.00 | $28,779,905.81 | 15,066 | $14,899,759.00 | $~~36,200,863.71~~3 |

[65] ~~Any other Proofs of Claim filed by Barings BDC, Inc., including Proofs of Claim Nos. 438, 444, 453, 455, 460, 466, 467, 473, 477, and 478, are Disallowed.~~

[76] Any other Proofs of Claim filed by Barings Capital Investment Corporation, including Proofs of Claim Nos. 440, 449, 451, 454, 457, 461, 463, 464, 472, and 475, are Disallowed.

[87] Any other Proofs of Claim filed by Barings Private Credit Corp., including Proofs of Claim Nos. 433, 446, 450, 452, 458, 462, 465, 470, 471, and 474, are Disallowed.

[98] A Proof of Claim No. 423 filed by BlockFi Lending LLC is Disallowed.

[109] Any other Proofs of Claim filed by Jack Novak, including Proof of Claim No. 201, are Disallowed.

[1110] Any other Proofs of Claim filed by MassMutual Asset Finance LLC, including Proof of Claim No. 319, are Disallowed.

2

| Holder | Agreement(s) | Proof of Claim Number | Miner Equipment Lender Claim (as of Petition Date) | Allowed Miner Equipment Lender Secured Claim (as of Petition Date) | Allowed Miner Equipment Lender Deficiency Claim (as of Petition Date) | Collateral (# of Miners) | Principal of New Debt | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 6,338,570.74 |
| Stonebriar Commercial Finance LLC | Stonebriar Agreement | 490 | $7,291,478.10 | $1,516,622.67 | $5,774,855.43 | 1,465 | $1,516,622.67 | $6,~~012,371.53~~035,242.41 |
| Trinity Capital Inc. | Trinity Agreements OpCo | 370 | $[~~16,932,454.36~~16,937,857.69] | $[3,983,286.67] | $[~~10,949,167.69~~10,954,571.03] | [5,812] | $[5,983,286.67] | $[~~14,331,864.48~~15,040,000.00] |
| Trinity Capital Inc. | Trinity Agreement Parent | 371 | $[10,000,000.00] | $[0.00] | $[10,000,000.00] | | $[0.00] | $[8,000,000.00] |
| Wingspire Equipment Finance LLC (f/k/a Liberty Commercial Finance LLC) | Liberty Miner Agreements | 402[211] | $2,508,444.25 | $1,113,778.67 | $1,394,665.5~~9~~8 | 1,070 | $1,113,778.67 | $~~2,078,950.21~~2,086,858.47 |

[211] For the avoidance of doubt, the Allowed Claim amounts set forth in this schedule relate only to the Liberty Miner Agreements and not the Liberty Non-Miner Agreements.  Wingspire Equipment Finance LLC's Claim with regard to the Liberty Non-Miner Agreements is treated in Class 4 as set forth in section 4.4 of the Plan.

3

**Exhibit ~~K~~M**

**Secured Mortgage Claims Schedule**

**Secured Mortgages Claims Schedule[*][1]**

| Holder | Agreement(s) | Proof of Claim Number or Schedule Number | Allowed Secured Claim |
|---|---|---|---|
| Brown Corporation | Brown Agreement | 502[21] | $187,819.93 |
| Holliwood LLC | Holliwood Agreements | 504 | $571,961.55, plus (i) post-petition interest accruing at ten-percent (10%), plus (ii) reasonable and documented legal fees and expenses of Holliwood LLC relating to the Secured Mortgage Claim (Holliwood) and the Chapter 11 Cases not to exceed $25,000. |

[1] This schedule is subject to ongoing review and revision by the Debtors and their advisors, and thus is subject to change.

[21] Proof of Claim No. 502 shall be deemed Allowed only against American Property Acquisition, LLC.

**<u>Exhibit B</u>**

**Redline of Disclosure Statement for the Second Amended Plan**

THIS DISCLOSURE STATEMENT (AS MAY BE AMENDED) WILL BE SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **CORE SCIENTIFIC, INC.,** *et al.,* | § | Case No. 22-90341 (DRJ) |
| | § | |
| | § | (Jointly Administered) |
| Debtors.[1] | § | |

**DISCLOSURE STATEMENT FOR SECOND AMENDED JOINT ~~CHAPTER 11~~ CHAPTER 11 PLAN OF CORE SCIENTIFIC, INC. AND ITS ~~DEBTOR~~ AFFILIATE~~S~~D DEBTORS**

**WEIL, GOTSHAL & MANGES LLP**
Alfredo R. Pérez (15776275)
Clifford Carlson (24090024)
700 Louisiana Street, Suite 1700
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock, (admitted pro hac vice)
Ronit J. Berkovich (admitted pro hac vice)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Debtors*
*and Debtors in Possession*

Dated: ~~August 8~~September 7, 2023
Houston, Texas

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6074); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198).  The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

**DISCLOSURE STATEMENT, DATED** ~~AUGUST 8~~SEPTEMBER 7**, 2023**

**Solicitation of Votes on the Plan of**

**CORE SCIENTIFIC, INC.,** *ET AL.*

THIS SOLICITATION OF VOTES (THE "SOLICITATION") IS BEING CONDUCTED TO OBTAIN SUFFICIENT VOTES TO ACCEPT THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF CORE SCIENTIFIC, INC. AND ITS DEBTOR AFFILIATES IN THE ABOVE-CAPTIONED CHAPTER 11 CASES (COLLECTIVELY, THE "DEBTORS"), ATTACHED HERETO AS EXHIBIT A (THE "PLAN").

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS [●] (PREVAILING CENTRAL TIME) ON [●], 2023 UNLESS EXTENDED BY THE DEBTORS IN WRITING.

THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS OR INTERESTS MAY VOTE ON THE PLAN IS [●], 2023 (THE "RECORD DATE").

### RECOMMENDATION BY THE DEBTORS

The Special Committee (as defined herein) has unanimously approved the transactions contemplated by the Plan. The Debtors believe the Plan is in the best interests of all stakeholders and recommend that all creditors and equity holders whose votes are being solicited submit ballots to accept the Plan.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE CASTING A VOTE WITH RESPECT TO THE PLAN.

NEITHER THIS DISCLOSURE STATEMENT NOR THE MOTION SEEKING APPROVAL THEREOF CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS UNLAWFUL.

THE OFFER, ISSUANCE, AND DISTRIBUTION UNDER THE PLAN OF THE NEW COMMON INTERESTS AND THE NEW WARRANTS (AND THE NEW COMMON INTERESTS ISSUED UPON EXERCISE THEREOF) (I) TO THE HOLDERS OF ALLOWED APRIL CONVERTIBLE NOTES SECURED CLAIMS, ALLOWED AUGUST CONVERTIBLE NOTES SECURED CLAIMS, ALLOWED GENERAL UNSECURED CLAIMS ~~AND~~, ALLOWED ~~EQUITY~~SECTION 510(B) CLAIMS, AND EXISTING COMMON INTERESTS AND (II) IF APPLICABLE, CONSTITUTING THE BACKSTOP COMMITMENT PREMIUM, WILL, IN EACH CASE, BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND ANY OTHER APPLICABLE SECURITIES LAWS PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE. THE OFFER, SALE, ISSUANCE, AND DISTRIBUTION UNDER THE PLAN OF THE RIGHTS OFFERING SHARES TO BE ISSUED PURSUANT TO THE ~~1145~~ RIGHTS OFFERING WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND ANY OTHER APPLICABLE SECURITIES LAWS PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE. ~~IF~~

~~APPLICABLE, THE NEW COMMON INTERESTS ISSUED IN THE 4(A)(2)/REG D RIGHTS OFFERING (IF ANY), AS WELL AS THE BACKSTOP SHARES, WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND ANY OTHER APPLICABLE SECURITIES LAWS PURSUANT TO SECTION 4(A)(2) OF THE SECURITIES ACT AND REGULATION D THEREUNDER.~~

THE OFFER, ISSUANCE, AND DISTRIBUTION UNDER THE PLAN OF THE NEW SECURED NOTES (AS DEFINED IN THE PLAN) AND THE NEW COMMON INTERESTS ISSUED UPON CONVERSION THEREOF, IF ANY, WILL, IN EACH CASE, BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND ANY OTHER APPLICABLE SECURITIES LAWS PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE. THE BACKSTOP SHARES WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND ANY OTHER APPLICABLE SECURITIES LAWS PURSUANT TO SECTION 4(A)(2) OF THE SECURITIES ACT AND REGULATION D THEREUNDER.

WITH RESPECT TO THE SECURITIES ISSUED PURSUANT TO THE EXEMPTION UNDER SECTION 1145 OF THE BANKRUPTCY CODE, SUCH SECURITIES MAY BE RESOLD WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR OTHER FEDERAL SECURITIES LAWS PURSUANT TO THE EXEMPTION PROVIDED BY SECTION 4(A)(1) OF THE SECURITIES ACT, UNLESS THE HOLDER IS AN "UNDERWRITER" WITH RESPECT TO SUCH SECURITIES, AS THAT TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE. IN ADDITION, SUCH SECURITIES GENERALLY MAY BE RESOLD WITHOUT REGISTRATION UNDER STATE SECURITIES LAWS PURSUANT TO VARIOUS EXEMPTIONS PROVIDED BY THE RESPECTIVE LAWS OF THE SEVERAL STATES.

WITH RESPECT TO ANY SECURITIES ISSUED IN RELIANCE ON THE EXEMPTION FROM REGISTRATION SET FORTH IN SECTION 4(A)(2) OF THE SECURITIES ACT AND REGULATION D THEREUNDER, SUCH SECURITIES WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND CONSIDERED "RESTRICTED SECURITIES" (WITHIN THE MEANING OF RULE 144 UNDER THE SECURITIES ACT) AND MAY NOT BE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR UNDER AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

THE AVAILABILITY OF THE EXEMPTION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR ANY OTHER APPLICABLE SECURITIES LAWS WILL NOT BE A CONDITION TO THE OCCURRENCE OF THE EFFECTIVE DATE.

THE SECURITIES ISSUED PURSUANT TO THE PLAN HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE, PROJECTED FINANCIAL INFORMATION (SUCH AS THAT REFERRED TO UNDER THE CAPTION "FINANCIAL PROJECTIONS" ELSEWHERE IN THIS DISCLOSURE STATEMENT), THE LIQUIDATION ANALYSIS (AS DEFINED HEREIN), THE VALUATION ANALYSIS (AS DEFINED HEREIN), AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL

OUTCOMES.  FORWARD-LOOKING STATEMENTS SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

FURTHERMORE, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN, INCLUDING ANY PROJECTIONS, ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN.  IMPORTANT ASSUMPTIONS AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY INCLUDE, BUT ARE NOT LIMITED TO, THOSE FACTORS, RISKS AND UNCERTAINTIES DESCRIBED IN MORE DETAIL UNDER THE HEADING "CERTAIN RISK FACTORS TO BE CONSIDERED" BELOW, AS WELL AS CERTAIN RISKS INHERENT IN THE DEBTORS' BUSINESS AND OTHER FACTORS LISTED IN THE DEBTORS' SEC FILINGS.  PARTIES ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED, ARE BASED ON THE DEBTORS' CURRENT BELIEFS, INTENTIONS AND EXPECTATIONS, AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.  THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE ANY FORWARD-LOOKING STATEMENTS, INCLUDING ANY PROJECTIONS CONTAINED HEREIN, TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS OR THE LIQUIDATION ANALYSIS HEREIN.

THE DEBTORS HAVE NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, IN CONNECTION WITH THE PLAN OR THIS DISCLOSURE STATEMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.  THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR OBJECTING TO CONFIRMATION. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.

NOTHING IN THIS DISCLOSURE STATEMENT SHALL PREJUDICE OR WAIVE THE RIGHTS OF ANY PARTY WITH RESPECT TO THE CLASSIFICATION, TREATMENT, OR IMPAIRMENT OF ANY CLAIMS SHOULD THIS PLAN NOT BE CONFIRMED.

ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

THE PLAN PROVIDES THAT THE FOLLOWING PARTIES ARE DEEMED TO GRANT THE RELEASES PROVIDED FOR THEREIN: (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) WITH RESPECT TO EACH OF THE FOREGOING PERSONS IN CLAUSES (A) THROUGH (B), ALL RELATED PARTIES; (D) THE HOLDERS OF ALL CLAIMS OR INTERESTS THAT VOTE TO ACCEPT THE PLAN; (E) THE HOLDERS OF ALL CLAIMS OR INTERESTS WHOSE VOTE TO ACCEPT OR REJECT THE PLAN IS SOLICITED BUT THAT DO NOT VOTE EITHER TO ACCEPT OR TO REJECT THE PLAN AND DO NOT OPT OUT OF GRANTING THE RELEASES SET FORTH IN

ARTICLE X OF THE PLAN; (F) THE HOLDERS OF ALL CLAIMS OR INTERESTS THAT VOTE, OR ARE DEEMED, TO REJECT THE PLAN OR THAT ARE PRESUMED TO ACCEPT THE PLAN BUT DO NOT OPT OUT OF GRANTING THE RELEASES SET FORTH IN ARTICLE X OF THE PLAN; AND (G) THE HOLDERS OF ALL CLAIMS AND INTERESTS AND ALL OTHER BENEFICIAL OWNERS THAT WERE GIVEN NOTICE OF THE OPPORTUNITY TO OPT OUT OF GRANTING THE RELEASES SET FORTH IN ARTICLE XSECTION 10.6(b) OF THE PLAN BUT DID NOT OPT OUT.

HOLDERS OF CLAIMS OR INTERESTS IN VOTING CLASSES (APRIL CONVERTIBLE NOTES SECURED CLAIMS, AUGUST CONVERTIBLE NOTES SECURED CLAIMS, MINER EQUIPMENT LENDER SECURED CLAIMS, M&M LIEN SECURED CLAIMS, SECURED MORTGAGE CLAIMS, GENERAL UNSECURED CLAIMS, B. RILEY UNSECURED CLAIMS, SECTION 510(B) CLAIMS, AND EXISTING COMMON INTERESTS) HAVE RECEIVED A BALLOT THAT INCLUDES THE OPTION TO OPT OUT OF THE RELEASES CONTAINED IN ARTICLE (XSECTION 10.6(b) OF THE PLAN. HOLDERS OF CLAIMS AND INTERESTS IN CERTAIN NON-VOTING CLASSES (OTHER SECURED CLAIMS, PRIORITY NON-TAX CLAIMS, INTERCOMPANY CLAIMS, AND INTERCOMPANY INTERESTS) HAVE RECEIVED A RELEASE OPT-OUT FORM ATTACHED TO THEIR NOTICE OF NON-VOTING STATUS AND NOTICE OF RIGHT TO OPT OUT OF CERTAINTHE RELEASES CONTAINED IN SECTION 10.6(b) OF THE PLAN..  SEE EXHIBIT (B) FOR A DESCRIPTION OF THE RELEASES AND RELATED PROVISIONS.

> **PLEASE BE ADVISED THAT ARTICLE X OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS. YOU SHOULD REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MAY BE AFFECTED**

PLEASE BE ADVISED THAT ARTICLE X OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS. YOU SHOULD REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MAY BE AFFECTED

**Table of Contents**

I. INTRODUCTION .................................................................................................................... 1

    **A.**      Background and Overview of the Plan and Restructuring ........................................ 1

         i.      Overview of Restructuring .......................................................................... 2

         ii.      Key ~~Settlements~~   ~~3~~Agreements Reached With Parties in Debtors' Capital Structure ............ 4

         iii.      Updates to First Amended Plan ................................................................. 5

         ~~iii~~iv.      Key Plan Concepts ...................................................................................... ~~4~~5

         ~~iv~~v.      Summary of Plan Treatment ....................................................................... ~~7~~8

    **B.**      Pro Forma Equity Chart ......................................................................................... 17

    ~~B~~C.      Recommendation ................................................................................................... ~~19~~18

    ~~C~~D.      Confirmation Timeline ........................................................................................... ~~19~~18

    ~~D~~E.      Inquiries ................................................................................................................. ~~20~~18

II. SUMMARY OF PLAN CLASSIFICATION AND TREATMENT OF CLAIMS ................ ~~20~~19

    **A.**      Voting Classes ........................................................................................................ ~~20~~19

    **B.**      Treatment of Claims .............................................................................................. ~~21~~20

    **C.**      Pro Forma Equity Split ........................................................................................... ~~32~~29

III. THE DEBTORS' BUSINESS ............................................................................................. ~~32~~29

    **A.**      General Overview ................................................................................................... ~~32~~29

    **B.**      Digital Asset Mining ............................................................................................. ~~32~~29

    **C.**      Debtors' History ..................................................................................................... ~~33~~30

    **D.**      Business Operations and Properties ....................................................................... ~~34~~30

         ~~i~~vi.      Business Model .......................................................................................... ~~34~~30

         vii.      Data Centers ............................................................................................. ~~35~~31

IV. DEBTORS' CORPORATE AND CAPITAL STRUCTURE ............................................ ~~37~~33

    **A.**      Corporate Structure ............................................................................................... ~~37~~33

    **B.**      Corporate Governance and Management ............................................................... ~~38~~33

    **C.**      Prepetition Capital Structure ................................................................................. ~~38~~34

         ~~i~~viii.      April Secured Convertible Notes: ............................................................. ~~38~~34

         ~~ii~~i.      August Convertible Notes: ........................................................................ ~~40~~35

         iii.      Secured Mining Equipment Financings and Leases: ................................ ~~41~~36

         ~~iv~~iii.      Secured Non-Mining Financings and Leases. .......................................... ~~43~~38

         ~~v~~iv.      M&M Liens: .............................................................................................. ~~44~~39

| | | | |
|---|---|---|---|
| | vi~v~. | Unsecured Bridge Notes: | 45~40~ |
| | vii~i~. | General Unsecured Claims: | 46~40~ |
| | viii~i~. | Common Stock | 48~43~ |
| **V.** **and** | SIGNIFICANT EVENTS LEADING~-~ TO THE CHAPTER 11 FILINGS | | 49~43~ |
| **A.** | The Decline in the Price of Bitcoin and Increase in Bitcoin Network Difficulty | | 49~43~ |
| **B.** | Increased Energy Costs | | 50~44~ |
| **C.** | Celsius's Chapter 11 Filing and PPT Dispute | | 50~44~ |
| **D.** | Prepetition Initiatives | | 51~45~ |
| **E.** | Appointment of New Independent Director and Formation of Special Committee to Consider Strategic Options and Engage with Creditors | | 52~45~ |
| **F.** | ~Prepetition Employee~ Retention ~Programs~52~of Restructuring Professionals and Prepetition Stakeholder Enga~ | | |
| **VI. OVERVIEW OF CHAPTER 11 CASES** | | | 53~47~ |
| **A.** | Commencement of Chapter 11 Cases | | 53~47~ |
| | i~viii~. | First/Second Day Relief | 53~47~ |
| | ii~ix~. | Other Procedural and Administrative Motions | 54~47~ |
| **B.** | DIP Financing | | 55~48~ |
| | i~x~. | Original DIP Financing | 55~48~ |
| | ii~xi~. | Replacement DIP Financing | 56~48~ |
| **C.** | Rejection of Celsius Hosting Contract | | 57~50~ |
| **D.** | Appointment of Creditors' Committee | | 57~50~ |
| **E.** | Appointment of Equity Committee | | 58~50~ |
| **F.** | Debtors' Key Employee Retention Program~s~58 **and Proposed Amendment to CFO's Employment Agreement** | | |
| **G.** | Sale Process for Certain of the Debtors' Facilities | | 60~52~ |
| **H.** | Sale of Bitmain Coupons | | 60~52~ |
| **I.** | Settlements/Agreements with Creditors | | 60~52~ |
| | i. | NYDIG Stipulation and Agreed Order | 60~52~ |
| | ii. | Priority Power Management Settlement | 61~52~ |
| | iii. | Atalaya Settlement | 61~53~ |
| | iv. | Denton Agreement | 61~53~ |
| | v. | ~Condair~M&M Lien Settlements | 62 53 |
| | vi. | ~Trilogy~Celsius Settlement | 62~56~ |
| | ~vii..~ | ~J.W. Didado Settlement~ | ~63~ |
| | ~viii.~ | ~Hubbard-Mantor-Construction Settlement~ | ~64~ |

ix.   Celsius Settlement ............................................................................... 65

x.vii.   Foundry Settlement ............................................................................ 67.58

xi.viii.   Miner Equipment Lender Settlement .............................................. 67.58

xii.ix.   Bitmain Purchase Agreement ......................................................... 68.59

J.   Claims ................................................................................................................. 69.59

i.x.   Schedules of Assets and Liabilities and Statements of Financial Affairs ......... 69.59

ii.xi.   Claims Bar Dates ............................................................................. 69.59

iii.xii.   Claims Reconciliation Process ...................................................... 69.59

K.   Exclusivity ......................................................................................................... 72.62

L.   Formulation of the Business Plan .................................................................. 73.62

M.   Postpetition Stakeholder Discussions and Plan Mediation ....................... 74.63

N.   Exit Capital Marketing Process ...................................................................... 76.65

i.   Rights Offering and Backstop ...................................................... 76.65

ii.   B. Riley Agreement ....................................................................... 77.66

iii.   ExitNew B. Riley ELOC Facility ................................................. 77.66

VII. TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL
SECURITIES LAWS77 TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES LAWS

A.   Section 1145 of the Bankruptcy Code Exemption and Subsequent Transfers ......... 78.66

B.   Section 4(a)(2) and Regulation D of the Securities Act Exemption and Subsequent
Transfers ............................................................................................................. 79.67

VIII. CERTAINCERTAIN FEDERAL INCOME TAX CONSEQUENCES OF PLAN ............... 81.69

A.   Consequences to the Debtors .......................................................................... 82.70

i.   Cancellation of Debt ..................................................................... 83.70

ii.   Limitation of NOL Carryforwards and Other Tax Attributes ......... 83.71

iii.   Potential Limitations on Interest Deductions ......................... 85.72

B.   Consequences to Holders of Certain Allowed Claims ................................ 86.73

i.   Taxable Exchange .......................................................................... 88.74

ii.   Distributions in Discharge of Accrued Interest or OID ............ 88.74

iii.   Character of Gain or Loss ............................................................ 89.75

iv.   Ownership and Disposition of New Debt ................................... 89.75

v.   Disposition of New Common Interests by U.S. Holders ........... 93.78

vi.C.   Tax Treatment of DisputedConsequences to Holders of Section 510(b) Claims
Reserve .................................................................................................... 93.78

|  | C̶D. | Consequences to Holders of Existing Common Interests | 9478 |
|  |  | i. | Tax Treatment of Exchange | 9478 |
|  |  | ii. | Treatment of Right to Participate in Rights Offering | 9579 |
|  |  | iii. | Ownership and Disposition of New Warrants | 79 |
|  | E. | Tax Treatment of Disputed Claims Reserve | 80 |
|  | D̶F. | Information Reporting and Backup Withholding | 9580 |
| IX. | C̶E̶R̶T̶A̶I̶N̶ ̶R̶I̶S̶K̶ ̶F̶A̶C̶T̶O̶R̶S̶ ̶T̶O̶ ̶B̶E̶ ̶C̶O̶N̶S̶I̶D̶E̶R̶E̶D̶9̶6̶CERTAIN RISK FACTORS TO BE CONSIDERED | 81 |
|  | A. | Certain Bankruptcy Law Considerations | 9681 |
|  |  | i. | The Plan Contemplates Multiple Options for Distributions to Certain Classes Consisting of Various Types of Debt Instruments | 9681 |
|  |  | ii. | Parties in Interest May Object to Plan's Classification of Claims and Interests | 9781 |
|  |  | iii. | Distributions to Allowed Existing Common Interests Claims and Allowed Section 510(b) Claims (if any) May Change | 9781 |
|  |  | iv. | The Plan Provides Certain Classes Multiple Options Regarding the Manner of their Distributions; A Particular Election by One Class Will Affect the Allocation of New Common Interests Received by Other Classes and the Overall Capital Structure of the Reorganized Debtors | 9882 |
|  |  | v. | The Amount of Allowed Claims in the Classes Will Affect the Allocation of New Common Interests | 9882 |
|  |  | vi. | Debtors May Require and May Not Obtain Additional Financing | 9882 |
|  |  | vii. | Risks Related to Settlements Not Yet Finalized or Approved By the Court | 9882 |
|  |  | viii. | Risks Related to Possible Objections to the Plan | 9883 |
|  |  | ix. | Risk of Non-Confirmation of the Plan | 9983 |
|  |  | x. | Risk of Non-Consensual Confirmation | 9983 |
|  |  | xi. | Conversion into Chapter 7 Cases | 9983 |
|  |  | xii. | Risk of Non-Occurrence of the Effective Date | 9983 |
|  |  | xiii. | DIP Facility | 10083 |
|  |  | xiv. | Releases, Injunctions, and Exculpations Provisions May Not Be Approved | 10084 |
|  | B. | Additional Factors Affecting the Value of Reorganized Debtors | 10084 |
|  |  | i. | Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary | 10084 |
|  |  | ii. | Risks Associated with the Debtors' Business and Industry | 10184 |
|  |  | iii. | Post-Effective Date Indebtedness | 10487 |
|  | C. | Risks Relating to the New Common Interests to be Issued u̶Under the Plan | 10487 |
|  |  | i. | Market for Equity of Reorganized Parent Debtor | 10487 |

ii.      Potential Dilution ............................................................ ~~105~~87

iii.     New Common Interests Subordinated to Reorganized Debtors' Indebtedness ...... ~~105~~87

iv.     Valuation of Debtors Not Intended to Represent Trading Value of New Common Interests of Debtors ............................................ ~~105~~88

**D.**    Risks Relating to the New Debt .......................................... ~~105~~88

i.       Insufficient Cash Flow to Meet Debt Obligations ........................ ~~105~~88

ii.      Rating of New Debt ...................................................... ~~106~~88

iii.     Defects in Guarantees and Collateral Securing the New Debt ............ ~~106~~88

iv.     Failure to Perfect Security Interests in New Debt Collateral ............ ~~107~~89

v.       There May Not be an Active Trading Market for the New Debt ............ ~~107~~89

vi.     Risk of Recharacterization of New Secured Notes ...................... ~~107~~89

vii.    Changes to New Common Interests Affect Holders of New Secured Notes ... ~~108~~89

**E.**    Risks Relat~~ing~~ed to the Rights Offering .................................. ~~108~~90

i.       Debtors Could Modify the Rights Offering Procedures .................... ~~108~~90

ii.      The Backstop Commitment Agreement Could Be Terminated or the Parties Thereto Could Fail to Live Up to Their Commitment~~s~~ ................ ~~108~~90

**F.**    Risks Relat~~ing~~ed to ~~Exit~~the New B. Riley ELOC Facility and the ~~Delayed Draw Term Loan~~ ......................................... ~~108~~Exit Facility    90

**G.**    Additional Factors ...................................................... ~~109~~90

i.       Debtors Could Withdraw Plan ............................................ ~~109~~90

ii.      Debtors Have No Duty to Update .......................................... ~~109~~90

iii.     No Representations Outside the Disclosure Statement Are Authorized ...... ~~109~~91

iv.     No Legal or Tax Advice Is Provided by the Disclosure Statement .......... ~~109~~91

v.       No Admission Made ...................................................... ~~109~~91

vi.     Certain Tax Consequences ................................................ ~~109~~91

X.  ~~VOTING PROCEDURES AND REQUIREMENTS110~~VOTING PROCEDURES AND REQUIREMENTS   91

**A.**    Voting Deadline .......................................................... ~~110~~91

**B.**    Voting Procedures ........................................................ ~~110~~92

**C.**    Parties Entitled to Vote .................................................. ~~111~~92

i.       Fiduciaries and Other Representatives .................................. ~~112~~93

ii.      Agreements Upon Furnishing Ballots .................................... ~~112~~93

iii.     Change of Vote .......................................................... ~~113~~94

**D.**    Waivers of Defects, Irregularities, etc. .................................. ~~113~~94

**E.**     Opt Out Form ................................................................................................................. 94

~~E~~**F.**     Further Information, Additional Copies ......................................................... ~~113~~94

XI. ~~CONFIRMATION OF PLAN~~ .................................................... ~~113~~CONFIRMATION OF PLAN     94

**A.**     Confirmation Hearing ....................................................................................... ~~113~~94

**B.**     Objections to Confirmation ............................................................................. ~~114~~95

**C.**     Requirements for Confirmation of Plan ....................................................... ~~117~~97

   i.     Acceptance of Plan ...................................................................................... ~~117~~97

   ii.     Best Interests Test ....................................................................................... ~~118~~98

   iii.     Feasibility ................................................................................................... ~~118~~98

XII. ~~ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN~~119ALTERNATIVES TO CON

**A.**     Alternative Plan of Reorganization ............................................................... ~~119~~99

**B.**     Sale under Section 363 of the Bankruptcy Code ......................................... ~~120~~99

**C.**     Liquidation Under Chapter 7 of Bankruptcy Code ..................................... ~~120~~99

XIII. ~~CONCLUSION AND RECOMMENDATION~~ ................. ~~120~~CONCLUSION AND RECOMMENDATION     100

**EXHIBITS**

| | |
|---|---|
| **EXHIBIT A** | **Plan — (Filed Separately)** |
| **EXHIBIT B** | **Plan Release, Exculpation, and Injunction Provisions** |
| **EXHIBIT C** | **Liquidation Analysis** ~~**— (To be filed at a later date)**~~ |
| **EXHIBIT D** | **Valuation Analysis** ~~**— (To be filed at a later date)**~~ |
| **EXHIBIT E** | **Financial Projections** |
| **EXHIBIT F** | **Organizational Chart** |
| **EXHIBIT G** | **Schedule of Other Secured Claims** |

# I.
# INTRODUCTION

### A.  Background and Overview of the Plan and Restructuring

Core Scientific, Inc. and its direct and indirect subsidiaries that are debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**") submit this disclosure statement (as may be amended, supplemented, or modified from time to time, the "**Disclosure Statement**") in connection with the solicitation of votes (the "**Solicitation**") on the *Second Amended Joint Chapter 11 Plan of Core Scientific, Inc. and its ~~Debtor~~ Affiliates d Debtors*, dated ~~August 8~~September [●], 2023 (the "**Plan**"), attached hereto as **Exhibit A**.[2]

The Debtors commenced chapter 11 cases (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") on December 21, 2022 (the "**Petition Date**").

The purpose of this Disclosure Statement is to provide information of a kind, and in sufficient detail, to enable Holders of April Convertible Notes Secured Claims, August Convertible Notes Secured Claims, Miner Equipment Lender Secured Claims, M&M Lien Secured Claims, Secured Mortgage Claims, General Unsecured Claims, B. Riley Unsecured Claims, and Section 510(b) Claims (collectively, "**Claims**") against the Debtors and holders of existing common stock issued by Core Scientific, Inc. ("**Existing Common Interests**") that are entitled to vote on the Plan to make an informed decision on whether to vote to accept or reject the Plan.  This Disclosure Statement contains summaries of the Plan, certain statutory provisions, events in the Chapter 11 Cases, and certain documents related to the Plan.

The Debtors believe the Plan provides a full recovery (100% of the Claim plus postpetition interest) to all creditors (other than Holders of Section 510(b) Claims[3] and creditors that have agreed to take lesser treatment) and a meaningful recovery to their shareholders.

During the Chapter 11 Cases, the Debtors and their restructuring advisors, including Weil, Gotshal & Manges LLP ("**Weil**"), PJT Partners, LP ("**PJT**"), and AlixPartners, LLP ("**Alix**" and, collectively with Weil and PJT, the "**Advisors**"), engaged in discussions with ~~thethe~~the Debtors' key stakeholder groups, including (i) the ad hoc group of the Debtors' convertible noteholders (the "**Ad Hoc Noteholder Group**"), (ii) the official committee of unsecured creditors (the "**Creditors' Committee**"), (iii)  the official committee of equity holders (the "**Equity Committee**"), (iv) B. Riley Commercial Capital, LLC (the "~~Replacement~~ DIP Lenders"), and (v) certain secured equipment lenders (the "**Equipment Lenders**" and collectively with the Ad Hoc Noteholder Group, the Creditors' Committee, the Equity Committee, and the ~~Replacement~~ DIP Lenders, the "**Key Stakeholder Groups**").  The Debtors' goal was to design a Plan that ensures the continuation of the Debtors' businesses as a going concern, maximizes value, and treats all stakeholders fairly.  The Debtors believe the Plan achieves such goal.

As of the date hereof, the ~~Debtors believe they have~~Plan has the support of three of their five Key Stakeholder Groups: B. Riley (the ~~Replacement~~ DIP Lenders and the Debtors' largest unsecured creditor), the Equipment Lenders, and the Equity Committee[4].  The Debtors have also reached final settlements or settlements in principle with several other creditors, including the Holders of a majority of the M&M Lien Claims, the Holders of Secured Mortgage Claims, and Celsius (the Debtors' largest litigation claimant), as described further herein.  The ~~Debtors~~Plan currently ~~do~~does not have the support of Ad Hoc Noteholder Group or the Creditors' Committee.  Although the Debtors intend to continue to negotiate with such groups during mediation (which is currently set to

---

[2]  Capitalized terms used in this Disclosure Statement, but not defined herein, have the meanings ascribed to them in the Plan as applicable.  To the extent any inconsistencies exist between this Disclosure Statement and the Plan, the Plan will govern.

[3] Section 510(b) Claims are defined below.

[4]  Although the Equity Committee supports the Plan, it reserves all rights to provide further comments to the Plan and this Disclosure Statement, including to align with final terms of the Backstop Commitment Agreement (as defined below).

expire on September 7, 2023) and thereafter, the Debtors decided that the optimal path towards emergence is to move forward with the current version of the Plan so that they may proceed to exit these Chapter 11 Cases and make distributions to stakeholders expeditiously. For any Class that ultimately rejects the Plan, the Debtors will seek confirmation of the Plan over such rejection under the "cramdown" provisions of the Bankruptcy Code.

In addition, as further discussed below, the Debtors are in advanced discussions with multiple parties to secure committed new money exit capital for emergence and post-emergence needs, including (i) $25 million in new money exit financing from B. Riley as part of an Exit Facility (as defined below), (ii) an equity rights offering of at least $55 million (the "**Rights Offering**"), backstopped by members of the Equity Committee and various otherthe Backstop pParties (as defined below), and (iii) a $150 million committed equity line of credit (an "**New B. Riley ELOC Facility**") from B. Riley. Moreover, the Debtors alsowill significantly reducedd their new-money capital needs by more than $30 million through the Bitmain Transaction (as defined below) and the Celsius Settlement (which will resulted in an approximately $1418.5 million reduction in new money capital needs).

*i.* *Overview of Restructuring*

The Plan provides for a comprehensive restructuring of the Debtors' balance sheet pursuant to which holders of Claims and Interests will receive either (i) equity in Core Scientific, Inc. (after the Effective Date, the "**Reorganized Parent**"), (ii) debt ("take-back debt") in a Debtor (on and after the Effective Date, collectively, the "**Reorganized Debtors**"), (iii) a combination of New Common Interests and take-back debt, or (iv) the reinstatement of their Claims, as further described in subsection 2 below. The transactions contemplated by the Planand will strengthen the Debtors by substantially reducing their debt and preserving in excess of 240 jobs.

Specifically, the proposed restructuring contemplates, among other things:

- 100% recoveries to all Classes of creditors (other than Section 510(b) Claims and creditors that have agreed to accept lesser treatment) in the form of (i) equity in the Reorganized Parent ("**New Common Interests**") in in Core Scientific, Inc. (after the Effective Date, the "**Reorganized Parent**"), (ii) debt ("take-back debt,") issued and/or guaranteed by one or more of the Debtors (on and after the Effective Date, collectively, the "**Reorganized Debtors**"), (iii) a combination of New Common Interests and take-back debt, or (iv) reinstatement of claims, as further described in subsection 2 below.

- Distributions to Holders of Existing Common Interests in the form of (i) New Common Interests, consisting of all residual value remaining after providing recoveries to all other Claims, (ii) warrants (the "**New Warrants**")[5], and (iii) a right to subscribe for New Common Interests at a price per share that reflects a 20% discount to the Plan Equity Value, based on an Enterprise Value of $2 billion ("**Subscription Rights**").

- Distributions to existing equity holders and Holders of Allowed Section 510(b) Claims (if any) in the form of (i) New Common Interests, consisting of all residual value remaining after providing recoveries to

---

[5] The New Warrants are comprised of two series of warrants: (i) Series A: warrants to purchase up to ten percent (10%) of the New Common Interests on a fully diluted basis which will vest upon the total enterprise value of the Reorganized Debtors being at least $2,250,000,000 with an exercise price equal to the equity value of the New Common Interests, calculated as an enterprise value of $2,250,000,000 less the difference of indebtedness and cash of the Reorganized Debtors at the time of vesting and (ii) Series B: warrants to purchase up to ten percent (10%) of the New Common Interests on a fully diluted basis which will vest upon the total enterprise value of the Reorganized Debtors being at least $2,500,000,000 with an exercise price equal to the equity value of the New Common Interests, calculated as an enterprise value of $2,500,000,000 less the difference of indebtedness and cash of the Reorganized Debtors at the time of vesting.. Each series of New Warrants will be exercisable for seven (7) years and otherwise on the terms and subject to the conditions set forth in the New Warrant Agreement.

all other Claims, (ii) New Warrants, and (iii) either Cash, New Common Interests, New Warrants, or some combination thereof with a substantially similar value to the Subscription Rights.

- A minimum $55 million ~~equity rights offering (the~~ "Rights Offering~~")~~ made available to holders of Existing Common Interests, as more fully described below, which is expected to be backstopped by the Backstop Parties pursuant to a ~~to-be-negotiated~~to-be-finalized backstop commitment agreement (the "**Backstop Commitment Agreement**"~~.~~ and will be implemented through customary subscription documentation and procedures (the "**Rights Offering Procedures**"), which will be filed in a form and substance reasonably acceptable to the Debtors and the Backstop Parties.  The Rights Offering Procedures will be subject to Bankruptcy Court approval and will be provided to all Holders of Existing Common Interests.  As of the date hereof, the Debtors are close to finalizing the Backstop Commitment Agreement.  Once finalized, the Debtors' intend to file motion seeking Bankruptcy Court approval of the Backstop Commitment Agreement to be heard at the hearing to consider conditional approval of the Disclosure Statement.

- An approximately $80 million delayed draw term loan from the ~~Replacement~~ DIP Lenders (the "~~**Delayed Draw Term Loan**~~**Exit Facility**"), consisting of (i) $25 million of new money financing, (ii) a roll-up of the outstanding balance of the ~~Replacement~~ DIP Facility, and (iii) ~~treatment on~~a roll-up of the B. Riley Unsecured Claim, which B. Riley has agreed to reduce from $44.3 million (as of the assumed Effective Date of ~~September 30~~October 31, 2023) to $38 million~~, and (iii) $25 million of new money financing~~.

- ~~An~~A committed equity line of credit from the ~~Replacement~~ DIP Lenders in the amount of $150 million (the "~~Exit~~New B. Riley ELOC Facility").

- The assumption of most Executory Contracts and Unexpired Leases of the Debtors.

- A reduction of current debt on the Debtors' balance sheet by approximately $~~30–105~~54–239 million and a reduction in the Debtors' annual debt service by approximately $~~60–85~~42–56 million, each depending upon certain creditor elections under the Plan.

Upon the Effective Date, the Reorganized Debtors anticipate that they will continue to be a reporting company under the Exchange Act, 15 U.S.C. §§ 78(a)–78(pp).  The Reorganized Debtors anticipate using commercially reasonable efforts to have the New Common Interests listed on the NASDAQ, NYSE, or another nationally recognized exchange, as soon as reasonably practicable, subject to meeting applicable listing requirements following the Effective Date.  In connection with the contemplated listing of New Common Interests, the Debtors have submitted an initial listing application to Nasdaq Global Select Market.

The below chart shows a summary of the Debtors 'estimated capital structure upon the Effective Date, assuming an Effective Date of October 31, 2023:

| Post-emergence Capital Structure | | |
|---|---|---|
| *Lenders* | Debt Instrument(s) | Amount Outstanding on Effective Date |
| B. Riley | a.  Exit Facility | a.  $82 million |
| M&M Lienholders | a.  M&M Lien Takeback Debt | a.  $1 million |
|  | b.  M&M Lien Settlements | b.  $36 million |
| April Convertible Noteholders | a.  New Notes<br>b.  New April Secured Notes | a.  $0 - $150 million |

| Post-emergence Capital Structure | | |
|---|---|---|
| **Lenders** | **Debt Instrument(s)** | **Amount Outstanding on Effective Date** |
| | (Default) | b. $0 - $261 million |
| | c. New April Secured Notes (Settlement Election) | c. $0 - $105 million |
| August Convertible Noteholders | a. New August Secured Notes (Default) | a. $0 - $354 million |
| | b. New August Secured Notes (Settlement Election) | b. $0 - $177 million |
| Non-Miner Equipment Lenders | a. Reinstated Notes | a. $22 million |
| Miner Equipment Lenders | a. Miner Equipment Lender Takeback Debt (Default) | a. $2 million |
| | b. Miner Equipment Lender Takeback Debt (Election 2) | b. $175 million |
| Secured Mortgage Claims | a. Mortgage Takeback Debt | a. $0 – $1 million |
| **Total** | | $750 - $934 million |

### ii.    *Key Agreements Reached With Parties in Debtors' Capital Structure*

On June 20, 2023 (the "**Initial Plan Filing Date**"), the Debtors filed the *Joint Chapter 11 Plan of Core Scientific, Inc. and its ~~Debtor~~ Affiliate~~s~~d Debtors*, dated (Docket No. 974), without the support of any of the Debtors' Key Stakeholder Groups.  After the Initial Plan Filing Date, the Debtors continued to engage in negotiations with each of the Key Stakeholder Groups and organized and participated in a global plan mediation before Judge Isgur, ~~which remains ongoing,~~ as further discussed below.  Through these extensive good faith negotiations, the Debtors formulated the ~~current Plan, which is supported by the~~*Amended Joint Chapter 11 Plan of Core Scientific, Inc. and its Affiliated Debtors filed on August 8, 2023 (Docket No. 1115 (the "First Amended Plan"), which incorporated (i) agreements in principle with the DIP Lenders, the* Equipment Lenders, ~~the Replacement DIP Lender,~~ and the Equity Committee~~.~~

~~*ii.*~~  (ii) exit financing from the DIP Lenders, and (iii) an equity rights offering of at least $55 million, backstopped by the Backstop Parties.  *~~Key Settlements~~*

As ~~further described below~~of the date hereof, in addition to the foregoing key agreements, the Debtors have reached ~~multiple~~numerous other agreements (or ~~agreements in principle~~ ~~that are subject to ongoing negotiations, including with respect to the applicable definitive documents and/or provisions of the Plan incorporating~~).  The Debtors continue to work to finalize and document such agreements and/or obtain separate Court approval of such agreements (as applicable)~~, including, but not limited to, the Miner Equipment Lender Settlement, Backstop Commitment Agreement, the B. Riley Settlement, the Bitmain Transaction, the Celsius Settlement, the Brown Settlement, the Holliwood Settlement, and the Foundry Settlement Agreement~~.  The Debtors and the parties to such agreements reserve all rights with respect to the Plan, the Disclosure Statement, and the relevant definitive documents.

Below is a summary of the Debtors' various settlements and agreements.

*Miner Equipment Lender Settlement*. The Debtors have reached a favorable settlement (the "**Miner Equipment Lender Settlement**") with the substantial majority of their Equipment Lenders in which the participating Equipment Lenders (each a "**Settling Equipment Lender**")[6] will vote in favor of the Plan (subject to receipt of a Court-approved Disclosure Statement) in exchange for negotiated Plan treatment, discussed in greater detail below. The Miner Equipment Lender Settlement will benefit stakeholders, as the Debtors believe the majority of the Equipment Lenders have agreed to waive recovery on a portion of their Miner Equipment Lender Claims pursuant to the Miner Equipment Lender Settlement.

*B. Riley Settlement*. The Debtors have reached an agreement in principle with B. Riley, their largest unsecured creditor and ~~Replacement~~ DIP Lenders, in relation to both the B. Riley Unsecured Claim and Allowed DIP Claim. The agreement provides for a reduction of the B. Riley General Unsecured Claim from approximately $44.3 million[47] to $38 million. As part of the settlement, the ~~Replacement~~ DIP Lender has agreed to provide $25 million of new money exit financing, in the Exit Facility, as well as roll its Allowed DIP Claim~~, as well as the~~ and reduced B. Riley Unsecured Claim, into ~~a Delayed Draw Term Loan, and~~ an Exit Facility. It has also agreed to provide the $150 million ~~Exit~~ New B. Riley ELOC Facility. This settlement ~~is~~ provides substantial benefi~~cial~~t to the Debtors, as they were unable to obtain alternative exit financing on comparable terms.

*Equity Rights Offering / Backstop Commitment Agreement*. The Debtors have reached an agreement in principle with members of the Official Equity Committee and various other parties (collectively, the "**Backstop Parties**") to provide a backstop commitment for $55 million of the Rights Offering.

*Bitmain Transaction*. The Debtors have also reached an agreement in principle with Bitmain regarding a Miner purchase agreement in which the Debtors will acquire new Miners in exchange for Cash and New Common Interests, at Plan Equity Value, reducing the Debtors' post-emergence capital expenditures. The Bitmain Transaction also demonstrates that a third party is willing to invest capital in Reorganized Debtors at Plan Equity Value by agreeing to accept approximately $53 million of equity at Plan Equity Value in exchange for the new Miners Bitmain is selling to the Reorganized Debtors.

*Other Settlements*. The Debtors have also reached settlement agreements (or settlements in principle) with many of their ~~Debtors'~~ other major creditors, ~~particularly~~ including Celsius, Foundry, the largest Holders of M&M Lien Secured Claims, and ~~the~~ both Holders of Secured Mortgage Claims. These settlements, which are described below in more detail, resolve sizeable Claims against the Debtors, some at a significant discount, providing additional value to the Debtors and their estates. For example, through the M&M Lien Settlements, the Debtors were able to resolve approximately $112 million in Claims[8] asserted by five General Contractors through (i) cash payments in an aggregate amount of approximately $9 million and (ii) secured and unsecured notes in the aggregate principal amount of approximately $36.1 million, bearing interest at 5% per annum with maturities ranging from 30–36 months.[9]

~~The Debtors have reached agreements in principle to satisfy Debtors' future capital needs through the Rights Offering and the Delayed Draw Term Loan. In addition, although the~~

---

[6] The Settling Equipment Lenders include: Anchorage Lending CA, LLC; Barings BDC, Inc.; Barings Capital Investment Corporation; Barings Private Credit Corp.; BlockFi Lending LLC, MassMutual Asset Finance LLC; Stonebriar Commercial Finance LLC; and Trinity Capital Inc. The Settling Equipment Lenders hold, in the aggregate, approximately $230 million of the Miner Equipment Lender Claims out of the approximately $247 million in Miner Equipment Lender Claims.

[47] The B. Riley General Unsecured Claim was $42.7 million as of the Petition Date.

[8] Of this $112 million, approximately $80.1 million were M&M Lien Secured Claims.

[9] Of this $36.1 million approximately $15.5 million of the notes are secured by a mortgage on the Cottonwood 1 Facility and $3 million of the notes are secured by liens on the Muskogee Facility.

Debtors do not believe that they need the Exit ELOC to service their post-emergence needs, securing the Exit ELOC will provide the Debtors with even greater financial flexibility and certainty following emergence.

Finally, the Debtors have also reached an agreement in principle with Bitmain regarding a Miner purchase agreement in which the Debtors will acquire new Miners in exchange for Cash and equity in the Reorganized Debtors, reducing the Debtors' post-emergence capital expenditures. Each of these is discussed in more detail below.

### *iii.  Updates to First Amended Plan*

The current Plan has been modified to include updated treatment for the "settlement option" available to Holders of the Convertible Notes Secured Claims.  Although the Ad Hoc Noteholder Group does not support the Plan, the Debtors believe certain Holders of the Convertible Notes Secured Claims may view the updated "settlement" option more favorably and may vote to accept the Plan.  Most notably, the "settlement" treatment options provided to Holders of Claims in Class 1 and Class 2 are no longer conditioned on whether such classes vote to accept the Plan. As further described below in section (I)(A)(iv), the settlement options provided to Holders of Claims in Class 1 and Class 2 (i.e., the alternative to the default cram-up note) are available to each individual Convertible Noteholder at such Holder's option, regardless of such Holder's vote on the Plan.

The Debtors will continue to pursue a consensual plan framework with the Ad Hoc Noteholder Group and an in-person meeting between the Debtors and Ad Hoc Noteholder Group is scheduled to occur on September 7. If the Debtors do not reach a consensual resolution with the Ad Hoc Noteholder Group, the Debtors will proceed towards confirmation of the Plan.  However, if the Debtors ultimately reach a deal with the Ad Hoc Noteholder Group, the Debtors will file an amended plan reflecting the terms of such settlement.

### *iv.  iii.  Key Plan Concepts*

Plan Elections

Because the Debtors are solvent on a balance sheet basis (their value exceeds their debt), the Plan generally provides for a "waterfall," where all creditors are entitled to payment in full, unless they agree to a lesser treatment, with the residual value going to the Debtors' current equity holders (and subordinated creditors to the extent any obtain allowed claims).

Plan Elections

The Plan provides certain creditor Classes with either a Class choice or individual creditor elections between different forms of recovery.  Creditors must make these elections on their Ballots.  In each case, the Plan provides a default option that a creditor in a Class will receive if it does not make an affirmative election on its timely filed Ballot.

Plan Value

As will be further described in the valuation analysis in **Exhibit D** (the "**Valuation Analysis**"), the "Plan Value" refers to the value of the new common equity (*i.e.*, the New Common Interests) to be issued pursuant to the Plan. The starting point for Plan Value is the enterprise value of the Reorganized Debtors (the "**Enterprise Value**"), which is $[        ]2 billion.  The assumptions and methodology with respect to the Enterprise Value are set forth in the Valuation Analysis.  Plan Value is calculated by taking into account Enterprise Value, adding excess cash at emergence, and subtracting the total debt to be issued by the Reorganized Debtors under the Plan (which is subtracted from Enterprise Value), and the total number of shares to be issued to holders of Claims and Interests under the Plan (but not including any New Common Interests issued upon

~~conversion of New Secured Notes or any New Common Interests issued under the Management Incentive Plan).~~.

The Debtors will not know the total amount of New Debt ~~or New Common Interests~~ issued under the Plan until they have ~~(1)~~ received and processed the treatment elections made by ~~h~~Holders of Claims ~~and Interests~~ under the Plan ~~and (2) resolved all Disputed Claims~~. Therefore, the "Plan Value" cannot be determined prior to solicitation of the Plan. ~~Moreover, b~~Because certain Disputed Claims may not be resolved prior to the implementation of the Plan~~, the final "Plan Value" may not be determined prior to the Effective Date. As a result,~~ the Reorganized Debtors may need to ~~reserve for issuance (~~issue New Common Interests after the Effective Date~~) a sufficient number of New Common Interests~~ to effectuate all issuances of New Common Interests contemplated by the Plan, including, but not limited to, to Holders of Disputed Claims following the allowance of such Claims and any additional post-Effective Date issuances to the extent necessary to ensure that each Holder of an Allowed Claim in Classes 1, 2, 3, and 8 that receives New Common Interests under the Plan receives a distribution that is equal to the value to which such Holder is entitled to under the Plan.

As additional New Common Interests or additional debt is issued to holders of Disputed Claims that are resolved after the Effective Date, the ~~Plan V~~value of each existing New Common Interest will necessarily decrease. As a result, the Plan provides for the issuance of New Common Interests to Holders of Allowed Claims in Classes 1, 2, 3, and 8 that receive New Common Interests under the Plan to protect them from such dilution such that the aggregate value they receive after any subsequent issuance of New Common Interests or New Debt to Holders of Disputed Claims is equal to the value to which they are entitled under the Plan.

Holders of Interests (and Allowed Section 510(b) Claims) are entitled to the Residual Equity Pool, which is the value remaining after all payments to all creditors under the Plan, transfers of New Common Interests to Bitmain on account of the Bitmain Transaction, and all payments with regard to the Rights Offering, including the Backstop Commitment Premium.

<u>Substantive Consolidation</u>

To the extent that the Bankruptcy Court determines that an impaired accepting Class of Claims is required at each Debtor entity under section 1129(a)(10) of the Bankruptcy Code, the Plan may, in the Debtors' sole discretion, pursuant to a settlement under Bankruptcy Rule 9019 or otherwise, propose to substantively consolidate three Debtor entities (i) American Property Acquisitions VII, LLC, (ii) American Property Acquisitions I, LLC, and (iii) American Property Acquisition, LLC (collectively the "**Property Debtors**") into their parent Debtor entity, Core Scientific Operating Company, which is the Debtors' primary operating entity (together with the Property Debtors, the "**Substantively Consolidated Debtors**"). The Property Debtors~~' sole function is to own~~ were formed for the purpose of acquiring certain ~~of the Debtors'~~ real property~~ assets, specifically the~~. Certain of the Property Debtors~~' (i)~~ continue fulfil their sole function by owning the underlying real property upon which the Marble Facility and ~~(ii)~~the Calvert City Facility are located, whereas the other Property Debtors no longer own the real property which they were formed to acquire. Additionally, Core Scientific Operating Company, not the Property Debtors, operates both the Marble Facility and Calvert City Facility. The~~se entities~~Property Debtors do not make requisite payments to creditors relating to their assets, borrow or raise capital (except to serve as guarantors on certain debt), or engage in any additional business activities.

Substantive consolidation is a judicially created equitable doctrine that treats separate legal entities as if they were merged into a single consolidated surviving entity, with all the assets and liabilities becoming assets and liabilities of the consolidated survivor for certain purposes (other than inter-entity liabilities, including the Intercompany Claims, and guarantees, which are extinguished). The effect of substantive consolidation here is that the Claims against the Substantively Consolidated Debtors will be consolidated for purposes of voting on the Plan, and the Holders of such Claims will receive distributions from a common fund of the consolidated assets of the Substantively Consolidated Debtors. In the absence of consolidation, the creditors of an individual debtor could only look to the assets of that particular individual debtor to satisfy such creditor's claim. As a result of the consolidation, a creditor of one individual debtor is treated as a creditor of the Substantively Consolidated Debtors,

and issues of individual corporate ownership of assets and individual corporate liability on obligations are no longer pertinent for Plan purposes.  The Plan may consolidate the Substantively Consolidated Debtors for the purposes of voting, assessing whether Confirmation standards have been met, calculating and making distributions under the Plan, and filing post-Confirmation reports and paying quarterly fees to the U.S. Trustee.

Specifically, if substantive consolidation is implemented, pursuant to the Confirmation Order, ~~as~~effective immediately prior to the occurrence of the Effective Date: (a) all assets and liabilities of the Substantively Consolidated Debtors will be deemed merged; (b) all guarantees by one Substantively Consolidated Debtor of the obligations of any other Substantively Consolidated Debtor will be deemed eliminated so that any Claim against any Substantively Consolidated Debtor and any guarantee thereof executed by any other Substantively Consolidated Debtor and any joint or several liability of any of the Substantively Consolidated Debtors shall be deemed to be a single obligation of the Substantively Consolidated Debtors; (c) each and every Claim filed or to be filed in the Chapter 11 Case of any Substantively Consolidated Debtor will be deemed filed against the Substantively Consolidated Debtors and will be deemed one Claim against and a single obligation of the Substantively Consolidated Debtors, and the Substantively Consolidated Debtors may file and the Bankruptcy Court will sustain objections to Claims for the same liability that are filed against multiple Substantively Consolidated Debtors; and (d) Intercompany Claims between any Substantively Consolidated Debtors will be eliminated and extinguished.

This consolidation will not: (i) affect the legal and corporate organizational structures of the Substantively Consolidated Debtors; (ii) affect the vesting of assets in the Substantively Consolidated Debtors; (iii) affect the rights of any Claimant with respect to the collateral securing such Claim, if any; (iv) constitute a change of control of any Substantively Consolidated Debtor for any purpose, (v) cause a merger or consolidation of any legal entity, (vi) affect executory contracts that were entered into during the Chapter 11 Cases or that have been or will be assumed, assumed and assigned, or rejected; (vii) affect the Substantively Consolidated Debtors' ability to subordinate or challenge Claims on an entity by entity basis; or (viii) prejudice the rights of any Substantively Consolidated Debtor with respect to the prosecution or defense of any Cause of Action including, but not limited to, preferential transfers and fraudulent conveyances, against any person or entity as if there was no substantive consolidation, including payments or transfers by and among the Substantively Consolidated Debtors and any related or affiliated entity prior to the Petition Date.

The Debtors believe that consolidation of the Substantively Consolidated Debtors is appropriate in this instance because:

- No creditor or equity holder will have its recovery reduced by the consolidation.  Moreover, all creditors[10] are expected to receive a 100% recovery under the Plan.

- The financial records and accounting of the Property Debtors are hopelessly entangled with the financial records and accounting of Core Scientific Operating Company.  Prior to the Petition Date, Core Scientific Operating Company and its parent Core Scientific, Inc. paid all expenses relating to the property owned by the Property Debtors and serviced the debts of the Property Debtors without accounting for such intercompany transactions on their own books and records.

- No parties relied upon the separate identities of the Substantively Consolidated Debtors.

- Without substantive consolidation of the Substantively Consolidated Debtors, most of the Debtors' creditors and equity holders may be prejudiced due to the (i) ~~the~~ potential for certain creditors of the Property Debtors (particularly the Convertible Noteholders) to use their technical position as the only creditor group (or one of the only creditor groups) at such Property Debtors to block confirmation of the

---

[10] Holders of Section 510(b) Claims will not receive a full recovery under the Plan.  Such Claims, which are based on common stock of Core Scientific Inc. are asserted against Core Scientific, Inc., which is not a Substantively Consolidated Debtor.  Holders of Section 510(b) Claims will not be impacted by the proposed substantive consolidation.

Plan to seek to obtain more than full recovery on their claims (hold-up value)[511] and (ii) the administrative costs associated with untangling the financial records of the Substantively Consolidated Debtors.

Potential Restructuring Transaction

The Debtors may enter into any transaction and take all actions contemplated by the Plan and its supplementary Restructuring Transactions Exhibit, including but not limited to (i) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or law and (iv) any mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations necessary or appropriate to simplify or otherwise optimize the Debtors' organizational structure. The Debtors are considering implementing one or more of these types of transactions pursuant to the Plan for operational, tax, or other reasons. If certain assets are transferred between Debtor entities, the liabilities associated with such assets will also be transferred. Additionally, if a Restructuring Transaction is consummated that results in the merger of one or more Debtor entities issuing debt pursuant to the Plan, then the debt issued by such Debtor will be issued by the surviving Debtor entity.

In connection therewith, the Debtors are considering consolidating certain Debtor and non-Debtor entities. Additionally, the Debtors are considering eliminating the current holding company structure. Any such Restructuring Transaction will be separate from the aforementioned substantive consolidation.

#### *v.* ~~iv.~~ Summary of Plan Treatment

The following summary is qualified in its entirety by reference to the full text of the Plan. **YOU SHOULD READ THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

In accordance with applicable law, the Plan defines and treats the rights and obligations of parties based on the substance of each underlying transaction, notwithstanding the label placed on a written agreement. For example, although certain of the Miner Equipment Lender Agreements were styled as equipment leases, such agreements constitute financing agreements and any claims arising under such agreement are treated in accordance with sections 4.3 and 4.8 of the Plan.

The proposed restructuring embodied in the Plan contemplates, among other things, the following treatment of holders of Claims and Interests:

**DIP Claims**

The Plan provides that, on the Effective Date, each holder of an Allowed DIP Claim will receive, in the principal amount equal to such Allowed DIP Claim, the first-lien ~~Delayed Draw Term Loan~~Exit Facility under the Exit Credit Agreement. As of the date hereof, $13.6 million in principal remains outstanding under the ~~Replacement~~ DIP Facility. The Debtors expect the Allowed DIP Claims as of the Effective Date to total approximately $19

---

[511] The Debtors believe that (i) the Bankruptcy Court should apply a "per plan" approach in these cases and find that section 1129(a)(10) may be satisfied with an impaired accepting class at only one debtor; and (ii) alternatively, even if a strict "per debtor" rule is applied, the Debtors may be able to confirm the Plan without substantive consolidation because the Plan may have one or more impaired accepting classes. However, substantive consolidation provides an additional layer of protection given the uncertainty on whether the Court will adopt a "per plan" or "per debtor" view of the requirement of section 1129(a)(10) of the Bankruptcy Code.

million, accounting for principal plus fees and interest assuming a projected Effective Date of ~~September 30~~October 31, 2023.

**Administrative Expense Claims**

The Plan provides that each holder of an Allowed Administrative Expense Claim (other than Professional Fee Claim or Restructuring Fees and Expenses) will receive Cash in full on, or as soon as reasonably practicable thereafter, the later of (i) the Effective Date and (ii) the first Business Day after the date that is thirty (30) days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim or such other treatment consistent with section 1129(a)(9) of the Bankruptcy Court; *provided*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business will be paid by the Debtors or Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders, course of dealing or agreements governing, instruments evidencing, or other documents relating to such transactions.

**Priority Tax Claims**

The Plan provides that each holder of an Allowed Priority Tax Claim will receive, at the sole option of the Debtors or Reorganized Debtors, as applicable, (i) Cash in full on, or as soon as reasonably practicable thereafter, the later of (a) the Effective Date, (b) the first Business Day after the date that is thirty (30) days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course, or (ii) such other treatment reasonably acceptable to the Debtors or Reorganized Debtors (as applicable) and consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

**Convertible Notes Secured Claims (Classes 1 and 2)**

As further discussed in section (IV)(C)(i) below, Claims arising under or related to the April NPA (the "**April Convertible Notes Secured Claims**") are secured by liens that are senior in priority to those liens securing Claims arising under or related to the August NPA (the "**August Convertible Notes Secured Claims**"). Accordingly, the April Convertible Notes Secured Claims (Class 1) and the August Convertible Notes Secured Claims (Class 2) have been separately classified under the Plan.

        (a)        April Convertible Notes Secured Claims (Class 1)

*Allowance*

Pursuant to the Plan, the Debtors are requesting allowance of the April Convertible Notes Secured Claims in the following manner:

- If ~~Class 1 votes to accept the Plan, the~~the Holder of an April Convertible Notes Secured Claim~~s~~ timely elects the April Convertible Noteholder Treatment Settlement Election, such Holder's Claim will be Allowed in the ~~aggregate as follows (the "~~amount of such Holder's Pro Rata Share of the Settled April Convertible Notes Secured Claims Amount~~"~~), which is: (i) $316,581.246.28, which is the sum of (x) the principal amount of April Convertible Notes, plus (y) accrued and unpaid interest at ten percent (10%) per annum through the Petition Date, plus (z) $76,955,046.00 in accreted original issue discount through the Petition Date, plus (ii) accrued interest at ten percent (10%) from the Petition Date through the Effective Date. This amount would constitute a settlement, pursuant to Bankruptcy Rule 9019, of the dispute between the Debtors and the Holders of April Convertible Notes Secured Claims as to whether the Debtors owe any amounts in respect of the 2X Amount (as defined below).

- If ~~Class 1 does not vote to accept the Plan, the~~the Holder of an April Convertible Notes Secured Claim~~s~~ does not timely elect the April Convertible Noteholder Treatment Settlement Election, such Holder's Claim will be Allowed ~~as follows (the "~~in the amount of such Holder's Pro Rata Share of the Allowed Non-Settled April Convertible Notes Secured Claims Amount~~"~~), which is: (i) the aggregate amount of (a) $239,626,200.28[612] plus (b) accrued interest at ten percent (10%) from the Petition Date through the Effective Date or (ii) such higher amount as determined by Final Order.[713]

*Treatment*

*Default Treatment*

~~If~~Except to the ~~Class of~~extent that a Holder of a April Convertible Notes Secured Claim~~s votes to accept the Plan~~(i) agrees to a less favorable treatment of such Claim or (ii) timely elects on its Ballot the treatment election option described below, each Holder ~~in Class 1 (each a "**Settling**~~of an April Convertible Notes Secured Claim~~ant")~~ will receive, ~~unless such Holder makes a different election, (i) secured debt with a~~on the Effective Date or as soon as reasonably practicable thereafter, a New April Secured Note (Default) in the principal amount ~~equal to seventy-five percent (75%)~~ of such Holder's Pro Rata Share of the Allowed Non-Settled April Convertible Notes Secured Claims Amount ~~on the terms and conditions set forth in the term sheet attached as Exhibit B to the Plan (the "**New April Secured Notes (Option 1)**") and (ii) New Common Interests representing a value (based on Plan Value) (see discussion of Plan Value above) equal to twenty-five percent (25%) of such Holder's Pro Rata Share of the Settled~~(the "**Default** April Convertible ~~Notes Secured Claims Amount.~~ Noteholder Treatment"):

*Treatment Settlement Election*

~~The Plan provides that Holders of~~In lieu of the Default April Convertible Noteholder Treatment above, each Holder of an Allowed April Convertible Notes Secured Claim may ~~elect a different mix of debt and equity for their recovery as~~make the follow~~ing, with such~~ elections ~~to be made on a timely submitted~~on such Holder's Ballot:

---

[612] This amount is calculated as the sum of the principal amount of April Convertible Notes plus accrued and unpaid interest at ten percent (10%) per annum through the Petition Date.

[713] If the Bankruptcy Court disagrees with the Debtors' position that no portion of the 2X Amount is payable, then it may allow the April Convertible Notes Secured Claims in a higher amount.

~~The Holder may elect to receive (i)~~A distribution of New ~~April Secured~~ Notes ~~(Option 1) with a~~in the principal amount ~~from zero percent (0%) to up to seventy-five~~equal to an elected percentage (up to one hundred percent (~~75~~100%)) of such Holder's Pro Rata Share of the Settled April Convertible Notes Secured Claims Amount ~~and (ii) New Common Interests representing a value (based~~ the "**Elected Percentage**").

~~on Plan Value) (see discussion of Plan Value above) of twenty-five percent (25%) to up to one hundred percent (100%) of such~~A distribution if applicable, on account of the Holder's remaining Pro Rata Share of the Settled April Convertible Notes Secured Claims Amount~~.  The sum of (i) and (ii) must equal 100%.~~ after taking into account the above Elected Percentage (the "**Remaining Claim Amount**") comprised of:

A New April Secured Note (Option 1) in the principal amount of fifty percent (50%) of the Remaining Claim Amount; and

~~If the elections on the Holder's Ballot exceed one hundred percent (100%) when added together, then the percentage of the Settled April Convertible Notes Secured Claims Amount shall be reduced down (but no lower than seventy-five percent (75%)) such that the percentages of the Holder's recovery in New April Secured Notes (Option 1) and~~ New Common Interests~~, when added together, equal one hundred~~ (with a value based on Plan Value), equal to fifty percent (~~100~~50%) of ~~such Holder's Pro Rata Share of the Settled April Convertible Notes Secured~~the Remaining Claims Amount.

If Holders in Class 1 elect more than $150,000,000 in New Notes in the aggregate, each Holder's distribution shall be reduced on a pro rata basis so that the aggregate amount of New Notes equals $150,000,000.  On account of the value of such Holder's Claim remaining after the reduction (the "**Oversubscribed Remaining Claim Amount**"), such Holder will receive a 50/50 split of New April Secured Note (Option 1) and New Common Interests in the amount of such Holder's Oversubscribed Remaining Claim Amount.

~~To demonstrate, if a Settling April Convertible Notes Claimant's Pro Rata Share of the Settled April Convertible Notes Secured Claims Amount is $10 million, such Settling April Convertible Notes Claimant may elect to receive $4 million of its recovery in a note and $6 million of its recovery in equity.  However, the largest note such Settling April Convertible Notes Claimant may elect to receive is a $7.5 million note and the least amount of equity such Settling April Convertible Notes Claimant may elect to receive is $2.5 million.~~

~~If the Class of April Convertible Notes Secured Claims does not vote to accept the Plan, each Holder in Class 1 will receive its Pro Rata share of secured notes issued by the Reorganized Parent in the principal amount equal to one hundred percent (100%) of the Allowed April Convertible Notes Secured Claims, on the terms and conditions set forth in the term sheet attached as Exhibit C of the Plan (the "**New April Secured Notes Term Sheet (Option 2)**").~~

~~(b) August Convertible Notes Secured Claims (Class 2)~~

*Allowance*

Pursuant to the Plan the Debtors are requesting allowance of the August Convertible Notes Secured Claims as follows (the "**Allowed August Convertible Notes Secured Claims Amount**"): (i) the aggregate amount of (a)

$325,167,300.~~73~~[8][14] plus (b) accrued interest at ten percent (10%) per annum from the Petition Date through the Effective Date or (ii) such higher amount as determined by Final Order.[9][15]

***Treatment***

*Default Treatment*

~~If~~Except to the ~~Class of~~extent that a Holder of an August Convertible Notes Secured Claim~~s votes to accept the Plan~~(i) agrees to a less favorable treatment of such Claim or (ii) timely elects on its Ballot the treatment election option described below, each Holder ~~in Class 1 (each a "**Settling**~~of an August Convertible Notes Secured Claim~~ant")~~ will receive, ~~unless such Holder makes a different election, (i) secured debt with a~~on the Effective Date or as soon as reasonably practicable thereafter, a New August Secured Note (Default) in the principal amount ~~equal to seventy-five percent (75%)~~ of such Holder's Pro Rata Share of the Allowed August Convertible Notes Secured Claims Amount ~~on the terms and conditions set forth in the term sheet attached as Exhibit B to the Plan (the "**New August Secured Notes (Option 1)**") and (ii) New Common Interests representing a value (based on Plan Value above) equal to twenty-five percent (25%)~~ of such Holder's Pro Rata Share of the Allowed (the "**Default** August Convertible ~~Notes Secured Claims Amount.~~ Noteholder Treatment"):

*Treatment Settlement Election*

~~The Plan provides that Holders of~~In lieu of the Default August Convertible ~~Notes Secured Claim may elect~~ Noteholder Treatment above, each Holder of an Allowed August Convertible Notes Secured Claim may elect ~~a different mix of debt and equity for their recovery as follows, with elections to be made on a timely-submitted Ballot~~on such Holder's Ballot to receive the following distribution:

~~The Holder may elect to receive (i)~~A New August Secured Notes (Option 1) ~~with a~~in the principal amount ~~from zero~~of fifty percent (~~0%) to up to seventy-five percent (75~~50%) of such Holder's Pro Rata Share of the Allowed August Convertible Notes Secured Claims Amount~~; and (ii)~~

~~-~~New Common Interests ~~representing~~(with a value ~~(~~based on Plan Value~~) (see discussion of Plan Value above) of twenty-five percent (25%) to up to one hundred percent (100%) of such Holder's Pro Rata Share of the Allowed August Convertible Notes Secured Claims Amount.  The sum of (i) and (ii) must equal 100%. If the elections on the Holder's Ballot exceed one-hundred percent (100%) when added together, then the percentage of the Allowed August Convertible Notes Secured Claims Amount shall be reduced down (but no lower than seventy-five percent (75%)) such that the percentages of the Holder's recovery in New August Secured Notes (Option 1) and New Common Interests, when added together, equal one-hundred percent (100~~, equal to fifty percent (50%) of such Holder's Pro Rata Share of the Allowed August Convertible Notes Secured Claims Amount~~.~~;

~~If the Class of August Convertible Notes Secured Claims does not vote to accept the Plan, each Holder in Class 2 will receive its Pro Rata share of secured notes issued by the Reorganized~~

---

[8][14] This amount is calculated as the sum of the principal amount of August Convertible Notes plus accrued and unpaid interest at ten percent (10%) per annum through the Petition Date,

[9][15] If the Bankruptcy Court disagrees with the Debtors' position that no portion of the 2X Amount is payable, then it may set a higher Allowed August Convertible Notes Secured Claims Amount.

~~Parent in the principal amount equal to one hundred percent (100%) of the Allowed August Convertible Notes Secured Claims, on the terms and conditions set forth in the term sheet attached as Exhibit E of the Plan (the "New August Secured Notes Term Sheet (Option 2)").~~

**Miner Equipment Lender Claims (Class 3)**

*Bifurcation and Allowance*

Pursuant to the Plan, Claims held by each ~~Miner~~ Equipment Lender (collectively the "**Miner Equipment Lender Claims**") will be bifurcated into (i) a secured Claim equal to the value of the collateral securing the Miner Equipment Lender Claim (collectively, the "**Miner Equipment Lender Secured Claims**") and (ii) an unsecured Claim for amounts in excess of the applicable collateral value (collectively the "**Miner Equipment Lender Deficiency Claims**").  Miner Equipment Lender Deficiency Claims shall be treated as General Unsecured Claims and shall vote in Class 8 ~~except the portion of any Miner Equipment Lender Deficiency Claim that gets treated with Miner Equipment Lender Takeback Debt (Election 2) in accordance with Miner Equipment Lender Treatment Election 2~~.

Pursuant to the Plan, the Debtors seek allowance of Miner Equipment Lender Secured Claims and Miner Equipment Lender Deficiency Claims held by each ~~Miner~~ Equipment Lender as set forth on Exhibit ~~J~~L attached to the Plan (the "**Miner Equipment Lender Claims Schedule**").  Any interest accruing on Allowed Miner Equipment Lender Claims from the Petition Date through the Effective Date shall accrue at 4.64% per annum, which is the federal judgment rate as provided under 28 U.S.C. § 1961(a), calculated as of the Petition Date (the "**Federal Judgment Rate**"), and shall be added to the Miner Equipment Lender Deficiency Claim.

*Treatment*

Each holder of a Miner Equipment Lender <u>Secured</u> Claim will have three options for treatment of its Claim.  To receive any option other than the Default Miner Equipment Lender Treatment (described below), Holders of Miner Equipment Lender <u>Secured</u> Claims must elect such option on a timely submitted Ballot.  Any holder of a Miner Equipment Lender <u>Secured</u> Claim that does not properly elect an option will receive the Default Miner Equipment Lender Treatment.

> *Default Treatment*

Except to the extent that a Holder of a Miner Equipment Lender <u>Secured</u> Claim~~s~~ timely elects on its Ballot one of the treatment election options described below, each Holder of an Allowed Miner Equipment Lender Secured Claim will receive, on the Effective Date or as soon as reasonably practicable thereafter, the following treatment (the "**Default Miner Equipment Lender Treatment**"):

- **Miner Equipment Lender Takeback Debt -** secured debt to be issued by the Debtor that is party to the applicable Miner Equipment Lender Agreement in the principal amount of each applicable Holder's Miner Equipment Lender Secured Claim, on the terms and conditions set forth in the term sheet attached as Exhibit ~~F~~H to the Plan (the "**New Equipment Lender Debt Term Sheet (Default)**"); and

- **Deficiency Claim Treatment -** Any Allowed Miner Equipment Lender Deficiency Claim (in accordance with the Miner Equipment Lender Claims Schedule) shall be treated in Class 8 as a General Unsecured Claim.

*Potential Treatment Elections*

In lieu of the Default Miner Equipment Lender Treatment above, each Holder of an Allowed Miner Equipment Lender Secured Claim may elect one of the following settlement options:

- **Miner Equipment Lender Treatment Election 1** – Such Holder may elect to receive New Common Interests with a value, based on Plan Value, equal to one hundred percent (100%) of such Holder's Allowed Miner Equipment Lender Secured Claim.  Such Holder's Miner Equipment Lender Deficiency Claim will be treated in Class 8 as a General Unsecured Claim in accordance with the terms and provisions set forth in section 4.8 of the Plan.

- **Miner Equipment Lender Treatment Election 2** – Any Holder that is a Settling Equipment Lender may elect to receive secured debt to be issued by the Debtor that is party to the applicable Miner Equipment Lender Agreement in the principal amount of eighty percent (80%) of each applicable Holder's Allowed Miner Equipment Lender Claim, on the terms and conditions set forth in the term sheet attached as Exhibit ~~G~~I to the Plan (the "**New Equipment Lender Debt Term Sheet (Election 2)**")".  Each Holder's applicable Miner Equipment Lender Takeback Debt (Election 2) will be secured by such Holder's prepetition collateral and such Holder's pro rata share of the Settling Miner Equipment Lender Additional Collateral (as defined below).  By electing this treatment, such Holder will have agreed to waive any additional recovery on account of its Miner Equipment Lender Deficiency Claim in Class 8.

Pursuant to the Miner Equipment Lender Settlement, the Debtors have agreed to grant the Settling Equipment Lender additional collateral comprised of up to $52,500,000 of the first unencumbered Miners acquired by the Reorganized Debtors after the Effective Date (the "**Settling Miner Equipment Lender Additional Collateral**").  Each Settling Equipment Lender that elects Miner Equipment Lender Takeback Debt (Election 2) will receive an amount of the Settling Miner Equipment Lender Additional Collateral calculated as $52,500,000 multiplied by the quotient of such Settling Equipment Lender's Allowed Miner Equipment Lender Claim (as of the Petition Date) divided by the aggregate amount of all Allowed Miner Equipment Lender Claims (as of the Petition Date); provided that the amount of the Additional Collateral allocated to each Settling Equipment Lender shall be reduced on a pro rata basis to the extent more than 15% (based on claim size) of the Settling Equipment Lenders do not elect Miner Equipment Lender Takeback Debt (Election 2); provided, however, such Settling Equipment Lenders may agree to allocate such Additional Collateral amongst themselves in a different manner as set forth herein upon written notice to the Debtors prior to the start of the Confirmation Hearing.  For the avoidance of all doubt, any amount of available collateral under the $52,500,000 cap that is not apportioned to a Settling Equipment Lender will not be included in the Settling Miner Equipment Lender Additional Collateral.

## Other Secured Claims (Class 4)

The Other Secured Claims in Class 4 consist of the Secured Claims held by (i) all non-miner equipment lenders (the "**Non-Miner Equipment Lenders**") and (ii) Bremer Bank, National Association arising from the Bremer Agreements, which is a non-miner equipment lender that also has real estate collateral.

### *Treatment*

On the Effective Date, all Allowed Other Secured Claims will be reinstated in accordance with section 1124(2) of the Bankruptcy Code.  ~~A description of the amounts owed under the Other Secured Claims is attached hereto as **Exhibit G** (the "**Schedule of Other Secured Claims**").~~

## M&M Lien Secured Claims (Class 5)

As further detailed in section (IV)(C)(v) of the Disclosure Statement, M&M Lien Secured Claims in Class 5 consist of the Claims that are secured by mechanics', materialmens', workmens', and repairmens' Liens and other similar Liens and encumbrances arising under state law (the "**M&M Liens**") for the provision by General Contractors and Subcontractors of labor, materials, equipment and/or services in connection with the construction, development or improvement of any real property owned or leased by any Debtor.

*Allowance*

Pursuant to the Plan, the Debtors seek allowance of the M&M Lien Secured Claims as set forth on Exhibit ~~I~~K attached to the Plan (the "**M&M Lien Claims Schedule**").  The M&M Lien Claims Schedule also sets forth the applicable collateral securing each M&M Lien Secured Claim and reflects the proposed allowed amount of any General Unsecured Claims held by any General Contractor or Subcontractor.  All Subcontractor Claims are Disallowed under the Plan; however, Subcontractors retain their M&M Liens to the extent set forth on the M&M Lien Claims Schedule.

*Treatment*

On the Effective Date, or as soon reasonably practicable thereafter, each Holder of an Allowed M&M Lien Secured Claim, to the extent not resolved pursuant to ~~either the (i) Condair~~an M&M Lien Settlement~~, (ii) Trilogy Settlement, (iii) HMC Settlement or (iv) Didado Settlement, which are settlements with four of the Debtors' largest General Contractor Claims~~in which case, such Holder's recovery shall be limited to the terms of the applicable M&M Lien Settlement and shall not be entitled to any recovery under the Plan), will receive secured debt (the "**M&M Lien Takeback Debt**") issued by the applicable Debtor that owns or leases the real property encumbered by the applicable M&M Lien, in each case in the principal amount equal to the amount of the applicable M&M Lien Secured Claim, on the terms and conditions set forth in the term sheet attached as Exhibit ~~H~~J to the Plan (the "**New M&M Lien Debt Term Sheet**").

> (b)    ~~(a)~~ Duplicate Subcontractor Liens

To the extent any Subcontractor has filed an M&M Lien against real property owned or leased by a Debtors with respect to amounts which are secured, in duplication, by an M&M Lien filed by a General Contractor and evidenced by such Contractor's M&M Secured Lien Claim, as set forth on the M&M Lien Claims Schedule, then the Reorganized Debtors will (i) issue M&M Lien Takeback Debt with respect to any such amounts secured in duplication in favor of the General Contractor only as the Holder of the M&M Lien Secured Claim and (ii) repay the M&M Lien Takeback Debt issued to each such General Contractor by making payments directly to the General Contractor and each Subcontractor, pro rata in the percentages set forth next to each such General Contractor and Subcontractor on the M&M Lien Claims Schedule, subject to the terms and provision set forth in section 4.5 of the Plan.

Each payment made directly to a Subcontractor shall reduce the amount of such General Contractor's M&M Secured Lien Claim, such General Contractor's M&M Lien, and such Subcontractor's M&M Lien, in each case on a dollar-for-dollar basis. ~~To the extent any Subcontractor has filed an M&M Lien that is valid and perfected against a Debtor's real property with respect to amounts which are not secured, in duplication, by an M&M Lien filed by a General Contractor and evidenced by such General Contractor's M&M Secured Lien Claim, as set forth on the M&M Lien Claims Schedule, the Subcontractor shall (i) be deemed to be a (a) General Contractor for purposes of the Plan and (b) Holder of an Allowed M&M Lien Secured Claim in the amount set forth on the M&M Lien Claims Schedule and (ii) receive on the Effective Date such Holder's applicable M&M Lien Takeback Debt.~~

> (c)    ~~(b)~~ Limitation on Enforcement Remedies

Unless and until there is an Event of Default (as defined in the New M&M Lien Debt Term Sheet) under the terms of the applicable M&M Lien Takeback Debt, each Person asserting an M&M Lien shall be precluded from foreclosing or otherwise enforcing such M&M Lien or otherwise taking adverse action against the applicable Debtor with regard to the amounts secured by such M&M Lien.

(d)   (c) Extinguishment of M&M Liens

Any M&M Lien (i) of a Subcontractor, (ii) of a General Contractor, or (iii) otherwise securing an Allowed M&M Lien Secured Claim and/or M&M Lien Takeback Debt will be fully and finally extinguished upon the repayment in full of all amounts payable under the applicable M&M Lien Takeback Debt, which may be evidenced by recording in the applicable real property records a final, unconditional lien waiver, release of lien, and such other documents or certificates required to fully and unconditionally release any such M&M Lien.

Pursuant to the Plan, the Debtors and Reorganized Debtors, as applicable, are authorized to record (and granted power of attorney to effectuate such recordation) such final, unconditional lien waiver, release of lien, and such other documents or certificates required to fully and unconditionally release any such M&M Lien in the applicable real property records, and each applicable clerk is directed to accept such documentation.

Any M&M Lien that is not listed on the M&M Lien Claim Amounts Schedule will be extinguished upon the Effective Date of the Plan.

(d) M&M Lien Claims Schedule

Upon the Effective Date, the Debtors will have no further interest, if any, in the goods in the possession of the General Contractor or Subcontractor set forth on the M&M Lien Claims Schedule opposite such Person's name, and the amount of the applicable Holder's Allowed M&M Lien Secured Claim has been reduced by the value of such equipment as set forth on the M&M Lien Claims Schedule.

**Secured Mortgage Claims (Class 6)**

*Allowance*

The Secured Mortgage Claims in Class 5 consist of the (i) Secured Mortgage Claim (Brown), (ii) the Secured Mortgage Claim (Holliwood).  Pursuant to the Plan, the Debtors seek allowance of Secured Mortgage Claims against Debtor American Property Acquisition, LLC in the following manner:

- **Secured Mortgage Claim (Brown)** shall be Allowed in the amount of $187,819.93.

- **Secured Mortgage Claim (Holliwood)** shall be Allowed in the amount of $571,961.55, plus post-petition interest accruing at ten-percent (10%), plus reasonable and documented legal fees and expenses of Holliwood LLC relating to the Secured Mortgage Claim (Holliwood) and the Chapter 11 Cases.

*Treatment*

Each Holder of an Allowed Secured Mortgage Claim will have two options for treatment of its Claim.  To select the Mortgage Treatment Election (option 2 below), holders must elect such option on a timely submitted Ballot.  Any holder that does not properly elect the Mortgage Treatment Election (Option 2) will receive the Default Mortgage Treatment (Option 1).

(a)   Default Mortgage Treatment (Option 1)

Except to the extent that a Holder of an Allowed Secured Mortgage Claim timely elects the Secured Mortgage Treatment Election on its Ballot, such Holder will receive the secured debt (the "**Mortgage Takeback Debt**") to be issued by the applicable Debtor that owns or leases the real property encumbered by the applicable Mortgage Agreement to each Holder of a Secured Mortgage Claim in the principal amount of each applicable Holder's Secured Mortgage Claim, on the terms and

~~conditions set forth in the New Mortgage Documents, which shall contain terms consistent with the applicable New Mortgage Term Sheet.~~<u>have its Mortgage Agreements (and any applicable related documents) of Holders amended to include a maturity date of December 31, 2025.</u>

(b)        ~~Secured~~ Mortgage <u>Treatment</u> Election ~~(Option 2)~~

In lieu of the default treatment above, each Holder of an Allowed Secured Mortgage Claim may elect on its Ballot to receive, no later than 60 days following the Effective Date, Cash in an amount equal to ninety-five percent (95%) of such Holder's Allowed Secured Mortgage Claim (the "**Mortgage Treatment Election**").

**General Unsecured Claims (Class 8)**

General Unsecured Claims consist of all Claims that are not Secured Claims, Priority Tax Claims, Priority Non-Tax Claims, Professional Fee Claims, DIP Claims, Intercompany Claims, Section 510(b) Claims, B. Riley Unsecured Claims, or Administrative Expense Claims.  General Unsecured Claims include (i) ~~unwaived~~ Miner Equipment Lender Deficiency Claims, (ii) all Claims arising from litigation ~~filed~~ against a Debtor including Insured Litigation <u>Claims and excluding Section 510(b)</u> Claims (the "**Litigation Claims**"), (iii) all unsecured Claims arising from General Contracts (the "**General Contractor Unsecured Claims**"), (iv) all Claims of the Debtors' utility providers ("**Utility Unsecured Claims**"), and (v) other unsecured Claims against the Debtors (collectively, the "**Other Unsecured Claims**").

The Debtors estimate the General Unsecured Clams (not including any Miner Equipment Lender Deficiency Claims) to total approximately $~~41~~<u>32.6</u> million (not including postpetition interest), as detailed in section (IV)(C)(vii)(c) below, although certain Claims are Disputed and may be Allowed at higher amounts than estimated.

The Debtors estimate that the Miner Equipment Lender Deficiency Claims are equal to $185.2 million (not including postpetition interest), but the~~y~~ <u>Debtors</u> are unable to estimate the recoveries on account Miner Equipment Lender Deficiency Claims at this time due to the potential for a Holder of a Miner Equipment Lender Secured Claim to elect Miner Equipment Lender Treatment Election 2 and thereby waive ~~a portion of~~ its recovery on account of Miner Equipment Lender Deficiency Claim.  Based on the Miner Equipment Lender Settlement, the Debtors believe that most of the Equipment Lenders intend to opt for the Miner Equipment Lender Treatment Election 2 and will, therefore, waive their recoveries on ~~a portion of~~ such Miner Equipment Lender Deficiency Claims and not receive a recovery in Class 8.

*Treatment*

Except to the extend~~t~~ a Holder of a General Unsecured Claim has agreed to waive its recovery on its General Unsecured Claim (such as certain of the Settling Miner Equipment Lenders) <u>or agrees to less favorable treatment of such Claim</u>, each Holder of a General Unsecured Claim will receive New Common Interests with a value, based on Plan Value (see description of Plan Value above), equal to one-hundred percent (100%) of such Holder's Allowed General Unsecured Claim.  All Allowed General Unsecured Claims will accrue interest at the Federal Judgment Rate from the Petition Date to the Effective Date.

**B. Riley Unsecured Claims (Class 9)**

In connection with the B. Riley Settlement, each Holder of an Allowed B. Riley Unsecured Claim shall receive, taking into account the commitments made by ~~B. Riley Commercial Capital~~BRF Finance Co., LLC and B. Riley Principal Capital II, LLC pursuant to the Exit Facility and the New B. Riley ELOC Facility, respectively, on the Effective Date, or as soon as reasonably practicable thereafter conversion into the ~~Delayed Draw Term Loan~~Exit Facility in the principal amount equal to $38 million (the "**Settled B. Riley Unsecured Claims Amount**"), which is a reduction of $6.3 million (greater than a 10% reduction) relative to total B. Riley Unsecured Claims assuming an Effective Date of ~~September 30~~October 31, 2023.   For the avoidance of doubt, and in connection with the B. Riley Settlement, any additional recovery on account of the B. Riley Unsecured Claims shall be waived.

**Section 510(b) Claims (Class 12)**

Section 510(b) Claims in Class 11 consist of any Claim against any Debtor (i) arising from the rescission of a purchase or sale of an Interest of any Debtor or an Affiliate of any Debtor (including the Existing Common Interests); (ii) for damages arising from the purchase or sale of such Interest; or (iii) for reimbursement or contribution Allowed under section 502 of the Bankruptcy Code on account of such a Claim.   Section 510(b) Claims include both (i) Claims asserted or assertable against the Debtors in the Securities Class Action (as defined below) and (ii) proofs of claim (each a "**POC**") Nos. 52, 54, 81, 82, 241, 351, 556, and 632, including the Securities Class Action POC (as defined below).

In accordance with section 510(b) of the Bankruptcy Code, each Allowed Section 510(b) Claim (i) is subordinated to all Claims, (ii) has the same priority as the ~~Allowed~~ Existing Common Interests (Class ~~12~~13), and (iii) will receive treatment of the same ~~treatment~~value as the ~~Allowed~~ Existing Common Interests (Class ~~12~~13).

*Treatment*

Each Holder of a Section 510(b) Claim will receive, on the Effective Date, or as soon as reasonably practicable thereafter, (i) such Holder's Pro Rata Equity Share ~~(taking into account Allowed Claims in Classes 12 and 13 and valuing the Allowed Interests in Class 13 as equal to one-hundred percent (100%) of the value of the New Common Interests in the Residual Equity Pool at any given moment in time) of the Residual Equity Pool.~~ as defined below) of the Residual Equity Pool and (b) such Holder's Pro Rata Equity Share of New Warrants, and (iii) in lieu of the ability to participate in the Rights Offering, such Holders will receive, Cash, New Common Interests, or New Warrants, at the option of the Debtors or Reorganized Debtors, as applicable, in an amount equal to the value of the Subscription Rights that would have been distributable to such Holder if Subscription Rights were distributed to Holders in Class 12.

~~The amount of New Common Interests the Holders of Section 510(b) Claims will receive, in the aggregate, is equal to a percentage of the New Common Interests in the Residual Equity Pool, with such percentage~~"Pro Rata Equity Share" is calculated by taking the amount of asserted Section 510(b) Claims divided by the amount of asserted 510(b) Claims and Existing Common Interests, valuing such Existing Common Interests as being equal to the entire value of the New Common Interests in the Residual Equity Pool, the New Warrants, and the Subscription Rights for purposes of this calculation.

For example, if there are (i) $100 million of Allowed Section 510(b) Claims, (ii) 400 million shares of Existing Common Interests, and (iii) a $1.5 billion value of New Common Interests in the Residual Equity Pool, the Section 510(b) Class would receive 6.25% of the New Common Interests, which would be a recovery of $93.75 million in New Common Interests.   This is calculated by assuming the value of Existing Common Interests is equal to the $1.5 billion of value of New Common Interests in the Residual Equity Pool and providing the Holders of Allowed Section 510(b) Claims a recovery equal to $100 million over the total assumed value of the Existing Common Interests plus the Allowed Section 510(b) Claims ($1.5 billion plus $100 million), which leads to the Allowed 510(b) Claims receiving 6.25% of the New Common Interests.   The Holders of Existing Common Interests would

19

receive the remaining 93.75% of the shares of New Common Interests in the Residual Equity Pool ($1.406 billion of New Common Interests) or $3.52 per share.

The "Residual Equity Pool" is comprised of all remaining New Common Interests following distributions of New Common Interests to (i) Holders of Allowed April Convertible Notes Secured Claims, (ii) Holders of Allowed August Convertible Notes Secured Claims, (iii) Holders of Allowed Miner Equipment Lender Secured Claims, (iv) Holders of Allowed General Unsecured Claims, (v) Holders of Existing Common Interests that participate in the Rights Offering on account of Rights Offering Shares, and (vi) the Backstop Parties on account of the Backstop Commitment Premium.  For the avoidance of doubt, the following shall dilute the Residual Equity Pool: (i) the Rights Offering Shares and (ii) the New Common Interests issued (a) upon conversion of the New Secured Notes, (b) upon exercise of the New Warrants, (c) pursuant to the Management Incentive Plan, and (d) pursuant to the assumed Stock Option Award Agreements and RSU Award Agreements once(if and when the Stock Options and Unvested RSUs are exercised or become vested, respectively, shall dilute the Residual Equity Pool).

**Existing Common Interests (Class 13)**

• If aEach Holder of an Existing Common Interest is an "Accredited Investor" within the meaning of 501 of Regulation D under the Securities Act (an "**Eligible Holder**"), such Holder will receive, on the Effective Date, or as soon as reasonably practicable thereafter, (i) the right to participate in the Rights Offering in accordance with the Rights Offering Procedures and, (ii) such Holder's Pro Rata Equity Share (taking into account Allowed Claims in Classes 12 and 13 and valuing the Interests in Class 13 as equal to one-hundred percent (100%) of the value of the New Common Interests in the Residual Equity Pool at any moment in time) of the Residual Equity Pool (which shall be distributed to Holders of Existing Common Interests on the Effective Date, or as soon as reasonably practicable thereafter), and (iii) such Holder's Pro Rata Equity Share of the New Warrants;

- If a Holder of an Existing Common Interest duly certifies in accordance with the Rights Offering Procedures that it is not an "Accredited Investor" as defined in Rule 501(a) of the Securities Act. (an "**Ineligible Holder**"), such Holder will receive (i) (a) 1145 Subscription Rights and (b) if such Holder fully exercises its 1145 Subscription Rights, New Common Interests or Cash, at the option of the Reorganized Debtors, subject to the Rights Offering Procedures, in an amount equal to the value (if New Common Interests, at Plan Value) of the 4(a)(2)/Reg D Subscription Rights that would have been distributable to such Holder if such Holder was an Eligible Holder and (ii) such Holder's Pro Rata Share (taking into account Allowed Claims in Classes 12 and 13 and valuing the Interests in Class 13 as equal to one-hundred percent (100%) of the value of the New Common Interests in the Residual Equity Pool at any moment in time) of the Residual Equity Pool (which shall be distributed to Holders of Existing Common Interests on the Effective Date, or as soon as reasonably practicable thereafter).

The amount of ~~New Common Interests~~Pro Rata Equity Share the Holders of Existing Common Interests will receive, in the aggregate, ~~under (i) above is equal to a percentage of the New Common Interests in the Residual Equity Pool, with such percentage~~is calculated by taking the amount of Existing Common Interests divided by the amount of ~~asserted~~Allowed Section 510(b) Claims and Existing Common Interests valuing such Existing Common Interests as being equal to the entire value of the New Common Interests in the Residual Equity Pool, the New Warrants, and the Subscription Rights for purposes of this calculation.

With respect to any Existing Common Interests that are Unvested Restricted Stock, any New Common Interests distributed to Holders on account of such Unvested Restricted Stock will be subject to the same restrictions/vesting conditions applicable to such Unvested Restricted Stock as of the Effective Date.

Please see the calculation example under the description of how New Common Interests in the Residual Equity Pool are allocated between Section 510(b) Claims (Class 12) and Existing Common Interests (Class 13).

**B.      Pro Forma Equity Chart**

The chart below provides the percentage of New Common Interests the Debtors estimate will be held by various parties as of the Effective Date, based on certain assumptions, including regarding Allowed Claims, as discussed herein.  If Claims are Allowed in amounts different than the Debtors' estimate, the percentages below may differ from the estimates.

| Class | % of Effective Date New Common Interests | |
|---|---|---|
| | (assumes all Holders elect default option) | (assumes all Holders elect settlement option) |
| Class 1 (April Notes) | 0% | 8% |
| Class 2 (August Notes) | 0% | 14% |

| | | |
|---|---|---|
| **Class 3**<br>**(Miner Equipment Lenders)** | **3%**[16] | **3%**[17] |
| **Class 8**<br>**(GUC Claims)** | **2%** | **2%** |
| **Class 12**<br>**(510(b) Claims)** | **0%** | **0%** |
| **Class 13**<br>**(Existing Interests)** | **83%** | **63%** |
| **Backstop Parties** | **7%** | **6%** |
| **Shares reserved for Bitmain** | **5%** | **4%** |

## C. ~~B.~~ Recommendation

The Debtors are confident that they can implement the Restructuring described above to maximize stakeholder recoveries consistent with the Bankruptcy Code.

For ~~these~~this reason~~s~~, among others, the Debtors strongly recommend that Holders of Claims and Existing Common Interests entitled to vote on the Plan vote to accept the Plan.

## D. ~~C.~~ Confirmation Timeline[18]

The Debtors seek to move forward expeditiously with the Solicitation of votes and a hearing on Confirmation of the Plan in an effort to minimize the continuing accrual of administrative expenses.  Accordingly, subject to the Bankruptcy Court's approval, the Debtors are proceeding on the following timeline with respect to this Disclosure Statement and the Plan:

| | |
|---|---|
| Hearing on Conditional Approval of Disclosure Statement | ~~August 24~~September 15, 2023 |
| ~~Solicitation Begins and~~ Rights Offering Launched | ~~August 31~~September 15, 2023 |
| Solicitation Mailing Deadline | September 22, 2023 |

---

[16] This percentage assumes that only Anchorage Lending elects Miner Equipment Lender Treatment Election 1 (the equitization option available to Class 3 under the Plan).  This assumption is based on the Debtors' understanding of Anchorage Lending CA, LLC's intent learned through Debtors' conversations with the Settling Equipment Lenders.  This percentage also assumes that Settling Equipment Lenders Wingspire Equipment Finance LLC f/k/a Liberty Commercial Finance LLC and 36th Street Capital Partners LLC elect the Default Miner Equipment Lender Treatment.

[17] This percentage assumes that only Anchorage Lending elects Miner Equipment Lender Treatment Election 1 (the equitization option available to Class 3 under the Plan).  This assumption is based on the Debtors' understanding of Anchorage Lending CA, LLC's intent learned through Debtors' conversations with the Settling Equipment Lenders.  This percentage also assumes that Settling Equipment Lenders Wingspire Equipment Finance LLC f/k/a Liberty Commercial Finance LLC and 36th Street Capital Partners LLC elect the Default Miner Equipment Lender Treatment.

[18] The debtors expect the scheduled Hearing on Conditional Approval of Disclosure Statement to be rescheduled to a later date in September. Accordingly, the dates and deadlines herein will change based on the rescheduled hearing date.

| Voting Deadline | October 3~~3~~20, 2023 |
|---|---|
| Deadline to Object to Confirmation of Plan | October 3~~3~~20, 2023 |
| Rights Offering Subscription Deadline | October 3~~3~~20, 2023 |
| Debtors' Deadline to Reply to Plan Objections | October 10~~10~~25, 2023 |
| ~~Confirmation~~Combined Hearing to Consider Confirmation of Plan and Final Approval of Disclosure Statement | October 12~~12~~27, 2023[~~10~~19] |
| Effective Date | October 30, 2023 – November 13~~ – October 27~~, 2023 |

The hearing to determine confirmation of the Plan (the "**Confirmation Hearing**") may be adjourned from time to time by the Bankruptcy Court or the Debtors without further notice, except for adjournments announced in open court or as indicated in any notice of agenda of matters scheduled for hearing filed with the Bankruptcy Court.

### E. ~~D.~~ Inquiries

If you have any questions regarding the packet of materials you have received, please reach out to Stretto, Inc., the Debtors' voting agent (the "**Voting Agent**"), at (949) 404-4152 (for holders of Claims or Interests in the U.S. and Canada; toll-free) or +1 (888) 765-7875 (for holders of Claims or Interests located outside of the U.S. and Canada) or by sending an electronic mail message to:

**CoreScientificInquiries@stretto.com**

Copies of this Disclosure Statement, which includes the Plan are also available on the Voting Agent's website, https://cases.stretto.com/CoreScientific/.   PLEASE DO NOT DIRECT INQUIRIES TO THE BANKRUPTCY COURT.

WHERE TO FIND ADDITIONAL INFORMATION: The Debtors may provide additional information, including, but not limited to, financial reports, which may be obtained by visiting the Debtors' website at https://investors.corescientific.com/investors/financials/sec-filings/default.aspx. The Debtors' Annual Report on Form 10-K for the fiscal year ended December 31, 2022, filed with the SEC on April 4, 2023 is incorporated as if fully set forth herein and is a part of this Disclosure Statement.

## II.
## SUMMARY OF PLAN CLASSIFICATION AND TREATMENT OF CLAIMS

## ~~SUMMARY OF PLAN CLASSIFICATION AND TREATMENT OF CLAIMS~~

### A.    Voting Classes

Pursuant to the Bankruptcy Code, only Holders of Claims or Interests in "impaired" Classes are entitled to vote on the Plan (unless, for reasons discussed in more detail below, such Holders are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code).   Under section 1124 of the Bankruptcy Code, a Class of Claims or Interests is deemed to be "impaired" unless (i) the Plan leaves unaltered the legal, equitable, and contractual rights to which such Claim or Interest entitles the Holder thereof or (ii) notwithstanding any legal right to an accelerated

---

[~~10~~19] This date is subject to the Bankruptcy Court's availability.

payment of such Claim or Interest, the Plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such Claim or Interest as it existed before the default.

The groups of Claims or Interests classified as set forth in Plan (each group a "**Class**") include Holders of Claims and Interests in the following Classes (the "**Non-Voting Classes**", and each a "**Non-Voting Class**") are deemed unimpaired, and therefore are not entitled to vote on, the Plan:

- Other Secured Claims (Class 4)

- Priority Non-Tax Claims (Class 7)

- Intercompany Claims (Class 10)

- Intercompany Interests (Class 11)

Holders of Claims and Interests in the following Classes (the "**Voting Classes**", and each a "**Voting Class**") are being solicited under, and are entitled to vote on, the Plan:

- April Convertible Notes Secured Claims (Class 1)

- August Convertible Notes Secured Claims (Class 2)

- Miner Equipment Lender Secured Claims (Class 3)

- M&M Lien Secured Claims (Class 5)

- Secured Mortgage Claims (Class 6)

- General Unsecured Claims (Class 8)

- B. Riley Unsecured Claims (Class 9)

- Section 510(b) Claims (Class 12)

- Existing Common Interests (Class 13)

     **B.**      **Treatment of Claims**

The following table summarizes: (1) the treatment of Claims and Interests under the Plan; (2) which Classes are impaired by the Plan; (3) which Classes are entitled to vote on the Plan; and (4) the estimated recoveries for holders of Claims and Interests.  The table is qualified in its entirety by reference to the full text of the Plan.[11][20]  For a more detailed summary of the terms and provisions of the Plan, see section (I)(A)(ii) "Summary of the Plan Treatment". A detailed discussion of the analysis underlying the estimated recoveries in the form of New Common Interests, including the assumptions underlying such analysis, will be set forth in the Valuation Analysis.

---

[11][20] The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.

| Class and Designation | Treatment under the Plan | Impairment and Entitlement to Vote | Estimated Allowed Amount[~~1~~22][21] | Approx. Percentage Recovery |
|---|---|---|---|---|
| **Class 1** April Convertible Notes Secured Claims | Except to the extent that a Holder of an Allowed April Convertible Notes Secured Claim (i) agrees to a less favorable treatment of such Claim or (ii) timely elects the April Convertible Noteholder Treatment Election (as set forth below) on or before the Voting Deadline, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date or as soon as reasonably practicable thereafter~~:~~ ~~(i) If Class 1 is an Accepting Class, (a),~~ a New April Secured Note (~~Option 1~~Default) in the principal amount~~, of seventy-five percent (75%)~~ of such Holder's Pro Rata Share of the Allowed Non-Settled April Convertible Notes Secured Claims Amount ~~and (b) New Common Interests with a value, based on Plan Value, equal to twenty-five percent (25%),~~ ~~of such Holder's Pro Rata Share of the Settled~~Each Holder of an Allowed April Convertible Notes Secured Claims ~~Amount; provided, that each Holder shall have the option to~~may elect on its Ballot to receive ~~(y) a New April Secured Note (Option 1) in the principal amount of any amount less than (but never more than) seventy five percent (75%) of such Holder's Pro Rata Share of the Settled April Convertible Notes Secured Claims Amount and (z) New Common Interests with a value, based on Plan Value, equal to any amount more than~~ | Impaired (Entitled to Vote) | $239.6[~~13~~22] million (~~if Class rejects)~~settlement option is not elected or $316.6 million (~~if Class accepts)~~settlement option is elected | 100% |

---

[21] ‑Unless otherwise specified the amounts in this column include estimated Allowed Claim amounts plus applicable postpetition interest through an assumed Effective Date of O~~September 30~~ctober 31, 2023.  These figures are solely estimates and may not reflect the value of the Claims that will ultimately be Allowed.

[21] ‑Unless otherwise specified the amounts in this column include estimated Allowed Claim amounts plus applicable postpetition interest through an assumed Effective Date of O~~September 30~~ctober 31, 2023.  These figures are solely estimates and may not reflect the value of the Claims that will ultimately be Allowed.

[~~13~~22] This amount does not include postpetition interest through an assumed Effective Date of October 31, 2023.

| Class and Designation | Treatment under the Plan | Impairment and Entitlement to Vote | Estimated Allowed Amount[1][122] | Approx. Percentage Recovery |
|---|---|---|---|---|
| | ~~(but never less than) twenty-five percent (25%) of such Holder's Pro Rata Share of the Settled April Convertible Notes Secured Claims Amount; provided, that for the avoidance of doubt, the percentages such Holder elects on its Ballot pursuant to (y) and (z) must equal~~ on the Effective Date, or as soon as reasonably practicable thereafter, in lieu of the Default April Convertible Noteholder Treatment, in each case in full and final satisfaction, settlement, release, and discharge of such Holder's Allowed April Convertible Notes Secured Claim, (a) New Notes in the principal amount of a percentage (up to one ~~one~~ hundred percent (100% ~~of such Holder's Pro Rata Share of the Settled April Convertible Notes Secured Claims Amount; and, provided, further, that if such percentages set forth on a Holder's Ballot, when added together, exceed one hundred percent (100%)~~) of such Holder's Pro Rata Share of the Settled April Convertible Notes Secured Claims Amount, ~~the~~which percentage such Holder shall elects ~~to receive in a New April Secured Note (Option 1) will be reduced down (but no lower than seventy-five percent (75%)) such that the percentages elected pursuant to (y) and (z), when added together, equal one hundred percent (100%) of such~~on its Ballot (the "Elected Percentage") and (b) on account of the Holder's remaining Pro Rata Share of the Settled April Convertible Notes Secured Claims Amount~~ when taking into account the Elected Percentage

(~~ii~~iii) ~~If Class 1 is not an Accepting Class, such Holder's Pro Rata Share of~~a New April Secured Notes (Option ~~2~~1)~~.~~ in the principal amount of fifty percent (50%) of the Remaining Claim Amount and

(ii) New Common Interests with a value, based on Plan Value, equal to fifty percent (50%) of the Remaining Claim Amount; provided, that if Holders in Class 1 elect to receive a recovery in New Notes that would result in more than $150,000,000 in New Notes in the aggregate, then each such Holder's Elected Percentage shall be reduced on a pro rata basis, taking into account the total amount of Allowed April | | | |

| Class and Designation | Treatment under the Plan | Impairment and Entitlement to Vote | Estimated Allowed Amount[122][1] | Approx. Percentage Recovery |
|---|---|---|---|---|
| | Convertible Notes Secured Claims on account of which the Holders have elected to receive New Notes, such that the aggregate amount of New Notes equals $150,000,000, and the proportion of the Holder's Settled April Convertible Notes Secured Claim Amount commensurate with the amount of such reduction shall receive the Remaining Claim Amount treatment. | | | |
| **Class 2** August Convertible Notes Secured Claims | Except to the extent that a Holder of an Allowed August Convertible Notes Secured Claim (i) agrees to a less favorable treatment of such Claim or (ii) timely elects the August Convertible Noteholder Treatment Election (as set forth below) on or before the Voting Deadline, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date or as soon as reasonably practicable thereafter: (i) If Class 2 is an Accepting Class, (a), a New August Secured Notes (Option 1Default) in the principal amount, of seventy-five percent (75%) of such Holder's Pro Rata Share of the Allowed August Convertible Notes Secured Claims Amount and (b) New Common Interests with a value, based on Plan Value, equal to twenty-five percent (25%). of such Holder's Pro Rata Share of theEach Holder of an Allowed August Convertible Notes Secured Claims Amount; provided, that each Holder shall have the option tomay elect on its Ballot to receive on the Effective Date, or as soon as reasonably practicable thereafter, in lieu of the Default August Convertible Noteholder Treatment, in each case in full and final satisfaction, settlement, release, and discharge of such Holder's Allowed August Convertible Notes Secured Claim, (yi) a New August Secured Note (Option 1Settlement Election) in the principal amount of any amount less than (but never more than) seventy-fivefifty percent (7550%) of such Holder's Pro Rata Share of the Allowed August Convertible Notes Secured Claims Amount and (zii) New Common Interests with a value, | Impaired (Entitled to Vote) | $351.1 million | 100% |

| Class and Designation | Treatment under the Plan | Impairment and Entitlement to Vote | Estimated Allowed Amount[122][1] | Approx. Percentage Recovery |
|---|---|---|---|---|
| | based on Plan Value, equal to ~~any amount more than (but never less than) twenty-five percent (25~~fifty-percent (50%) of such Holder's Pro Rata Share of the Allowed August Convertible Notes Secured Claims Amount~~; provided, that for the avoidance of doubt, the percentages such Holder elects on its Ballot pursuant to (y) and (z) must equal one-hundred percent (100%) of such Holder's Pro Rata Share of the Allowed August Convertible Notes Secured Claims Amount; and, provided, further, that if such percentages set forth on a Holder's Ballot, when added together, exceed one hundred percent (100%) of such Holder's Pro Rata Share of the Allowed August Convertible Notes Secured Claims Amount, the percentage such Holder elects to receive in a New August Secured Note (Option 1) will be reduced down (but no lower than seventy-five percent (75%)) such that the percentages elected pursuant to (y) and (z), when added together, equal one-hundred percent (100%) of such Holder's Pro Rata Share of the Allowed August Convertible Notes Secured Claims Amount.~~ ~~(ii) If Class 2 is not an Accepting Class, such Holder's Pro Rata Share of New August Secured Notes (Option 2)~~ | | | |
| **Class 3** Miner Equipment Lender Secured Claims | Except to the extent that a Holder of an Allowed Miner Equipment Lender Secured Claim (i) agrees to a less favorable treatment of such Claim or (ii) timely elects the Miner Equipment Lender Treatment Election 1 or Miner Equipment Lender Treatment Election 2 on or before the Voting Deadline, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date, or as soon as reasonably practicable thereafter, such Holder's applicable Miner Equipment Lender Takeback Debt~~, and such Holder's~~ ~~Allowed Miner Equipment Lender Deficiency Claim shall be treated as a General Unsecured Claim in accordance with the terms and provisions set forth in section 4.8 of the Plan.~~ | Impaired (Entitled to Vote) | $247.5 million[23] | 100% |

[23] $247.5 million reflects the aggregate Miner Equipment Lender Claims as of the Petition Date, including the Miner Equipment Lender Deficiency Claims.

| Class and Designation | Treatment under the Plan | Impairment and Entitlement to Vote | Estimated Allowed Amount[122][1] | Approx. Percentage Recovery |
|---|---|---|---|---|
| | Each Holder of an Allowed Miner Equipment Lender Secured Claim may elect on its Ballot to receive on the Effective Date, or as soon as reasonably practicable thereafter, in lieu of the Default Miner Equipment Lender Treatment, in each case in full and final satisfaction, settlement, release, and discharge of such Holder's Allowed Miner Equipment Lender Secured Claim, New Common Interests with a value, based on Plan Value, equal to one hundred percent (100%) of such Holder's Miner Equipment Lender Secured Claim.<br><br>Each Holder of an Allowed Miner Equipment Lender Secured Claim that is a Settling Equipment Lender may elect on its Ballot to receive on the Effective Date, or as soon as reasonably practicable thereafter, in lieu of the Default Miner Equipment Lender Treatment, in each case in full and final satisfaction, settlement, release, and discharge of such Holder's Allowed Miner Equipment Lender Claim, such Holder's applicable Miner Equipment Lender Takeback Debt (Election 2); provided, that any Holder electing Miner Equipment Lender Treatment Election 2 shall waive its recovery on account of its Allowed Miner Equipment Lender Deficiency Claim.<br><br>For the avoidance of doubt, the Allowed Miner Equipment Lender Deficiency Claim of each Holder of a Miner Equipment Lender Secured Claim shall be treated as a General Unsecured Claim under in accordance with the terms and provisions set forth in section 4.8 of the Plan; provided, that any Holder electing Miner Equipment Lender Treatment Election 2 shall waive its recovery on account of its Allowed Miner Equipment Lender Deficiency Claim. | | | |
| **Class 4** Other Secured Claims | On the Effective Date, all Allowed Other Secured Claims shall (i) be reinstated in accordance with section 1124(2) of the Bankruptcy Code and the applicable Other Secured Claims Agreement and continued after the Effective Date in accordance with the terms and provisions of the applicable Other Secured Claims Agreement. | Unimpaired No (Presumed to Accept) | $30.4 million | 100% |
| **Class 5** | Except to the extent that a Holder of an | Impaired | $28.619 | 100% |

| Class and Designation | Treatment under the Plan | Impairment and Entitlement to Vote | Estimated Allowed Amount[122][1] | Approx. Percentage Recovery |
|---|---|---|---|---|
| M&M Lien Secured Claims | Allowed M&M Lien Secured Claim agrees to a less favorable treatment of such Claim or settles such Claim pursuant to an M&M Lien Settlement— (in which case, such Holder's recovery shall be limited to the terms of the applicable M&M Lien Settlement and shall not be entitled to any recovery under the Plan), each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date or as soon as reasonably practicable thereafter, such Holder's applicable M&M Lien Takeback Debt; provided that to the extent any Subcontractor has filed an M&M Lien against a Debtor's real property with respect to amounts which are secured, in duplication, by an M&M Lien filed by a General Contractor and evidenced by such General Contractor's M&M Secured Lien Claim, as set forth on the M&M Lien Claims Schedule, (i) the Holder of the M&M Lien Secured Claim shall be the General Contractor, (ii) such Subcontractor shall not be entitled to a separate M&M Secured Lien Claim with respect to any such amounts secured in duplication, (iii) the Reorganized Debtors shall issue M&M Lien Takeback Debt with respect to any such amounts secured in duplication in favor of the General Contractor only as the Holder of the M&M Lien Secured Claim, (iv) the Reorganized Debtors shall repay the M&M Lien Takeback Debt issued to each such General Contractor by making payments directly to the General Contractor and each Subcontractor, pro rata in the percentages set forth next to each such General Contractor and Subcontractor on the M&M Lien Claims Schedule in the column titled "Pro Rata Percentage of applicable M&M Lien Takeback Debt to be repaid to such General Contractor or Subcontractor", and (v) each payment made directly to a Subcontractor shall reduce the amount of such General Contractor's M&M Secured Lien Claim, such General Contractor's M&M Lien, and such Subcontractor's M&M Lien, in each case on a dollar-for-dollar basis; provided, however, that upon delivery to the Debtors | (Entitled to Vote) | million | |

| Class and Designation | Treatment under the Plan | Impairment and Entitlement to Vote | Estimated Allowed Amount[122][1] | Approx. Percentage Recovery |
|---|---|---|---|---|
| | of a final and unconditional lien waiver and release duly executed by a Subcontractor, in recordable form and substance sufficient to permanently waive and release such Subcontractor's M&M Liens, the Reorganized Debtors shall make all further payments on account of such M&M Lien Takeback Debt attributable to such Subcontractor's pro rata percentages set forth next to such Subcontractor on the M&M Lien Claims Schedule directly to the Holder of such Allowed M&M Lien Secured ~~Claims, provided, further, that to the extent any Subcontractor has filed an M&M Lien that is valid and perfected against a Debtor's real property with respect to amounts which are not secured, in duplication, by an M&M Lien filed by a General Contractor and not evidenced by such General Contractor's M&M Secured Lien Claim, as set forth on the M&M Lien Claims Schedule, the Subcontractor shall (i) be deemed to be a (a) General Contractor for purposes of the Plan and (b) Holder of an Allowed M&M Lien Secured Claim in the amount set forth on the M&M Lien Claims Schedule and (ii) receive in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date or as soon as reasonably practicable thereafter, such Holder's applicable M&M Lien Takeback Debt.~~Claim.<br><br>Unless and until there is an Event of Default (as defined in the New M&M Lien Debt Term Sheet) under the terms of the applicable M&M Lien Takeback Debt, each Person asserting an M&M Lien shall be precluded from foreclosing or otherwise enforcing such M&M Lien or otherwise taking adverse action against the applicable Debtor with regard to the amounts secured by such M&M Lien.<br><br>Any M&M Lien (i) of a Subcontractor, (ii) of a General Contractor, or (iii) otherwise securing an Allowed M&M Lien Secured Claim and/or M&M Lien Takeback Debt shall be (a) fixed, as of the Effective Date, in the amount set forth on the M&M Lien Claims Schedule in the column titled "Amount of Allowed M&M Lien", (b) | | | |

| Class and Designation | Treatment under the Plan | Impairment and Entitlement to Vote | Estimated Allowed Amount[122] | Approx. Percentage Recovery |
|---|---|---|---|---|
| | reduced on a dollar-for-dollar basis in the amount of each payment made on account of such M&M Lien pursuant to the terms of the M&M Lien Takeback Debt, and (c) fully and finally extinguished upon the repayment in full of all amounts payable under the applicable M&M Lien Takeback Debt, which extinguishment may be evidenced by recording in the applicable real property records a final, unconditional lien waiver, release of lien, and such other documents or certificates required to fully and unconditionally release any such M&M Lien.  The Debtors and Reorganized Debtors, as applicable, are hereby authorized to record (and granted power of attorney to effectuate such recordation) such final, unconditional lien waiver, release of lien, and such other documents or certificates required to fully and unconditionally release any such M&M Lien in the applicable real property records, and each applicable clerk is directed to accept such documentation.<br><br>Any M&M Lien not on the M&M Lien Claims Schedule is hereby extinguished.<br><br>The Debtors shall have no further interest, if any, in the goods in the possession of the General Contractor or Subcontractor set forth on the M&M Lien Claims Schedule opposite such Person's name, and the amount of the applicable Holder's Allowed M&M Lien Secured Claim and M&M Lien has been reduced by the value of such equipment as set forth on the M&M Lien Claims Schedule.<br><br>For the avoidance of doubt, all General Contractor Unsecured Claims shall be General Unsecured Claims Allowed in the amounts set forth on the M&M Lien Claims Schedule in the column titled "Allowed Unsecured Claim Amount" and treated in accordance with section 4.8 hereof. | | | |

| Class and Designation | Treatment under the Plan | Impairment and Entitlement to Vote | Estimated Allowed Amount[122][1] | Approx. Percentage Recovery |
|---|---|---|---|---|
| **Class 6**<br>Secured Mortgage Claims | Except to the extent that a Holder of an Allowed Secured Mortgage Claim (i) agrees to a less favorable treatment of such Claim or (ii) timely elects the Mortgage Treatment Election (as set forth below) on or before the Voting Deadline, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date, or as soon as reasonably practicable thereafter, such Holder's applicable Mortgage Takeback Debt. The Mortgage Agreements (and any applicable related documents) of Holders of Allowed Secured Mortgage Claims receiving the Default Mortgage Treatment shall be deemed amended to include a maturity date of December 31, 2025. The Debtors and Reorganized Debtors, as applicable, are hereby authorized to record (and granted power of attorney to effectuate such recordation) any memorandum or such other documents or certificates required to effectuate such deemed amendment in the applicable real property records, and each applicable clerk is directed to accept such documentation.<br><br>Each Holder of an Allowed Secured Mortgage Claim may elect on its Ballot to receive, no later than 60 days following the Effective Date, in lieu of the Default Mortgage Treatment, in each case in full and final satisfaction, settlement, release, and discharge of such Holder's Allowed Secured Mortgage Claim, Cash in an amount equal to ninety-five percent (95%) of such Holder's Allowed Secured Mortgage Claim. | Impaired (Entitled to Vote) | $0.76 million | 100% |
| **Class 7**<br>Priority Non-Tax Claims | The legal, equitable, and contractual rights of the Holders of Priority Non-Tax Claims are unaltered by the Plan. Except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of such Allowed Priority Non-Tax Claim, at the option of the Debtors or the Reorganized Debtors, (i) each such Holder shall receive payment in Cash in an amount equal to such Claim, (ii) such Holder's Allowed Priority Non-Tax Claim shall be Reinstated, or (iii) | Unimpaired No (Presumed to Accept) | | 100% |

| Class and Designation | Treatment under the Plan | Impairment and Entitlement to Vote | Estimated Allowed Amount[122][1] | Approx. Percentage Recovery |
|---|---|---|---|---|
| | such Holder shall receive such other treatment so as to render such Holder's Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code. | | | |
| **Class 8** General Unsecured Claims | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of such Claim, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date, or as soon as reasonably practicable thereafter, New Common Interests with a value, based on Plan Value, equal to one-hundred percent (100%) of such Holder's Allowed General Unsecured Claim.<br><br>For purposes of this section 4.8, the Allowed amount of any General Unsecured Claim shall include all interest accrued from the Petition Date through the date of distribution at the Federal Judgment Rate.<br><br>For the avoidance of doubt, the Allowed Miner Equipment Lender Deficiency Claim of each Holder of a Miner Equipment Lender Secured Claim shall be treated as an Allowed General Unsecured Claim under the Plan; provided, that any Holder electing Miner Equipment Lender Treatment Election 2 shall waive its recovery on account of its Allowed Miner Equipment Lender Deficiency Claim. | Impaired (Entitled to Vote) | $~~41~~35 million[~~14~~24] | 100% |

---

[~~14~~24] This amount does not include Miner Lender Deficiency Claims.  This amount assumes the Debtors will consummate the Celsius Settlement, the Foundry Settlement, and will be successful in their litigation against counterparties Morgan Hoffman and Sphere.

| Class and Designation | Treatment under the Plan | Impairment and Entitlement to Vote | Estimated Allowed Amount[122][1] | Approx. Percentage Recovery |
|---|---|---|---|---|
| **Class 9** B. Riley Unsecured Claims | Except to the extent that a Holder of an Allowed B. Riley Unsecured Claim agrees to a less favorable treatment of such Claim, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, and taking into account the commitments made by ~~B. Riley Commercial Capital~~BRF Finance Co. LLC and B. Riley Principal Capital II, LLC pursuant to the Exit Facility and the ELOC Facility, respectively, on the Effective Date, or as soon as reasonably practicable thereafter, on a dollar-for-dollar basis, first-lien delayed draw term loans under the Exit Credit Agreement in the principal amount equal to the Settled B. Riley Unsecured Claims Amount. | Impaired (Entitled to Vote) | $44.3 million[15][25] | 85.5% of Allowed Claim 100% of settled Claim |
| **Class 10** Intercompany Claims | On the Effective Date, or as soon as practicable thereafter, all Intercompany Claims shall be adjusted, Reinstated, or discharged (each without any distribution) to the extent reasonably determined to be appropriate by the Debtors or Reorganized Debtors, as applicable. | Unimpaired/ Impaired No (Presumed to Accept/Dee med to Reject) | | 100% |
| **Class 11** Intercompany Interests | On the Effective Date, and without the need for any further corporate or limited liability company action or approval of any board of directors, management, or shareholders of any Debtor or Reorganized Debtor, as applicable, all Intercompany Interests shall be unaffected by the Plan and continue in place following the Effective Date, solely for the administrative convenience of maintaining the existing corporate structure of the Debtors. | Unimpaired/ Impaired No (Presumed to Accept/Dee med to Reject) | | 100% |
| **Class 12** Section 510(b) Claims | Except to the extent that a Holder of an Allowed Section 510(b) Claim agrees to a less favorable treatment of such Claim, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date, or as soon as reasonably practicable thereafter, (i) such Holder's Pro Rata Equity Share ~~(taking into account Allowed Claims in Classes 12 and 13 and valuing~~ | Impaired (Entitled to Vote) | $0 | n/a[16][26] |

---

[15][25] B. Riley has settled its B. Riley Unsecured Claim for $38 million.

[16][26] The Debtors do not believe any of the Section 510(b) Claims should be Allowed.

| Class and Designation | Treatment under the Plan | Impairment and Entitlement to Vote | Estimated Allowed Amount[122][1] | Approx. Percentage Recovery |
|---|---|---|---|---|
| | ~~the Allowed Interests in Class 13 as equal to one-hundred percent (100%) of the value of the New Common Interests in the~~(of the Residual Equity Pool)~~ of the Residual Equity Pool~~, (ii) such Holder's Pro Rata Equity Share of New Warrants, and (iii) in lieu of the right to participate in the Rights Offering, either Cash, New Common Interests, New Warrants, or some combination thereof, at the option of the Debtors or Reorganized Debtors, as applicable, in an amount equal to the value (if New Common Interests, at Plan Value) of the Subscription Rights that would have been distributable to such Holder if Subscription Rights were distributed to Holders in Class 12. | | | |
| **Class 13** Existing Common Interests | Except to the extent that a Holder of an Existing Common Interest agrees to a less favorable treatment of such Interest, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of such Interest, on the Effective Date, or as soon as reasonably practicable thereafter, (i)~~(a) with respect to Eligible Holders,~~ such Holder's Pro Rata Equity Share of the Residual Equity Pool, (ii) such Holder's Pro Rata Equity Share of the New Warrants, and (iii) the right to participate in the Rights Offering in accordance with the Rights Offering Procedures~~and (b) with respect to Ineligible Holders, (x) the right to participate in the 1145 Rights Offering in accordance with the Rights Offering Procedures and (y) solely if such Holder fully exercises its 1145 Subscription Rights, New Common Interests or Cash, at the option of the Reorganized Debtors, in an amount equal to the value (if New Common Interests, at Plan Value) of the 4(a)(2)/Reg D Subscription Rights that would have been distributable to such Holder if such Holder was an Eligible Holder and (ii) such Holder's Pro Rata Share (taking into account Allowed Claims in Class 12 and Existing Common Interests in Class 13 and valuing the Existing Common Interests in Class 13 as equal to one-hundred percent (100%) of the value, at Plan Value, of the New Common Interests in the Residual Equity Pool) of the Residual Equity Pool~~; provided, that with respect to any Existing | Impaired (Entitled to Vote) | n/a | n/a |

| Class and Designation | Treatment under the Plan | Impairment and Entitlement to Vote | Estimated Allowed Amount[122][1] | Approx. Percentage Recovery |
|---|---|---|---|---|
| | Common Interests that are Unvested Restricted Stock, any New Common Interests distributed to Holders on account of such Unvested Restricted Stock will be subject to the same restrictions/vesting conditions applicable to such Unvested Restricted Stock as of the Effective Date | | | |

THE ESTIMATED ALLOWED CLAIM AMOUNTS SET FORTH IN THE TABLES ABOVE ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR THE AVOIDANCE OF DOUBT, THE DEBTORS ARE CONTINUING TO REVIEW CLAIMS FILED AGAINST THEM, AND PARTIES MAY OBJECT TO THE ALLOWED AMOUNTS OF CLAIMS SET FORTH IN THE PLAN.  REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS.

### C.      Pro Forma Equity Split

The forthcoming chart will set forth the percentage of New Common Interests to be allocated to each Class.

# III.
# THE DEBTORS' BUSINESS

### A.      General Overview

Headquartered in Austin, Texas, the Debtors are one of the largest blockchain infrastructure, hosting provider, and digital asset mining companies in North America, with approximately 814MW of capacity across eight operational data centers in Texas (2), Georgia (2), Kentucky, North Carolina, and North Dakota (the "**Data Centers**").  The Debtors mine digital assets (also known as cryptocurrency), primarily bitcoin, for their own account ("**Self-Mining**") and host Miners for third-party customers ("**Hosting Operations**").  Since inception, the Debtors have built a considerable asset base, gained market trust as a premier hosting provider, and demonstrated a multi-year track record of successful management of their businesses.

### B.      Digital Asset Mining[17][27]

Digital asset mining ("**Mining**") is the process in which transactions involving cryptocurrency are verified and added to the blockchain public ledger through specialized computers ("**Miners**") solving a computational encryption puzzle.  Mining secures the blockchain network and is also the process through which new coins are added to the existing circulating supply.  The Debtors mine the cryptocurrency bitcoin, which operates on a proof of work system.  Under a proof of work system, Miners compete with each other to solve complex algorithms to validate a block of transactions; as a reward for being the first to solve an algorithm, the Miner is rewarded with newly created bitcoin.  Miners can work together in mining pools to increase their likelihood of solving an algorithm.

The profitability of Mining is driven by a number of key variables, including (1) the price of bitcoin, (2) the Miner's hash rate, (3) the network hash price,[18][28] and (4) electricity costs.  Hash rate refers to a Miner's ability to solve

---

[17][27] A more detailed explanation of Mining can be found in paragraphs 18-28 of the *Declaration of Michael Bros in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (Docket No. 5).

[18][28] Network hash price reflects a combination of network hashrate, bitcoin price, and reward/transaction fees, distilled into one metric, that is expressed as the $ value of bitcoin derived per 1 Th/s (terahashes per second) of computing power

algorithmic computations per second; a higher hash rate is more likely to be the first to solve the computation and be rewarded with bitcoin.  Hash price is expressed as the monetary value of bitcoin per each terahash per second of computing power generated by a Miner.  Electricity costs are important because electricity is used to power the Miners and other equipment within a Mining facility.

### C.  Debtors' History

The Debtors trace their roots back to 2017.  On December 13, 2017, the Debtors were founded and incorporated as MineCo Holdings, Inc.  Six months later, MineCo Holdings, Inc. changed its name to Core Scientific, Inc. ("**Initial Core Scientific**").  On August 17, 2020, Initial Core Scientific engaged in a holdco restructuring to facilitate a borrowing arrangement whereby Initial Core Scientific was merged with and into a wholly owned subsidiary of Core Scientific Holding Co., a Delaware corporation, and became a wholly owned subsidiary of Core Scientific Holding Co.  As a result, the stockholders of Initial Core Scientific became the stockholders of Core Scientific Holding Co.

On July 30, 2021, the Debtors acquired 100% of the equity interest in one of their largest customers, Blockcap, Inc. ("**Blockcap**"), a blockchain technology company with industrial scale Mining operations.  Blockcap's primary historical business was the Mining of digital asset coins and tokens, primarily bitcoin.  Blockcap also evaluated and completed investments in related technologies and ancillary businesses, including Radar Relay, Inc., an early stage company Blockcap acquired on July 1, 2021 that focused on technology enhancement and development in the digital asset industry.  The acquisition of Blockcap significantly expanded the Debtors' Self-Mining operations and increased the number of Miners they owned.

The Debtors' current corporate structure is the product of a "SPAC merger."  Power & Digital Infrastructure Acquisition Corp., a Delaware corporation ("**XPDI**"), entered into a certain Agreement and Plan of Reorganization and Merger, dated as of July 20, 2021, as amended on October 1, 2021, and as further amended on December 29, 2021, by and among Core Scientific Holding Co., XPDI Merger Sub Inc., a Delaware corporation and wholly owned subsidiary of XPDI, and XPDI (the "**Merger Agreement**").  XPDI's stockholders approved the transactions contemplated by the Merger Agreement (collectively, the "**de-SPAC Transactions**") at a special meeting of stockholders held on January 19, 2022.  Upon consummation of the de-SPAC Transactions, Core Scientific Holding Co. merged with XPDI, with XPDI surviving the merger.  Immediately prior to the effective time of the de-SPAC Transactions, XPDI changed its name to Core Scientific, Inc. and Initial Core Scientific changed its name to Core Scientific Operating Company and the common stock of Core Scientific, Inc. was traded on the Nasdaq Global Select Market under the symbol "CORZ".  The de-SPAC Transactions resulted in the Debtors receiving approximately $195 million in net cash proceeds, which the Debtors used to fund Miner purchases and the Debtors' infrastructure build-out.

After going public in early 2022 as a result of undergoing the de-SPAC Transactions, the Debtors flourished, experiencing tremendous growth measured both by total revenue and gross profit.  The increases in revenue and gross profit were due, in large part, to the execution of new customer hosting contracts for Miners deployed during 2021, increased equipment sales (formerly a component of the Debtors' business), and growth of the Debtors' efforts in Mining.  The increase in the price of bitcoin from $7,200.17 on January 1, 2020 to $46,387.98 on December 31, 2021, also contributed to the Debtors' overall growth.

### D.  Business Operations and Properties

#### *vi.*  ~~*i.*~~  Business Model

The Debtor's primary sources of revenue are (i) Self-Mining, where the Debtors earn and subsequently sell bitcoin mined by the Debtors' owned and leased Miners, and (ii) Hosting Operations, where customers pay the Debtors to host the customers' Miners at the Debtors' Data Centers.  Historically, the Debtors also earned revenue from equipment sales, but the Debtors shifted away from equipment sales prior to the Petition Date.

(a)        Self-Mining

The Debtors have participated in Self-Mining since their inception.  The Debtors' share of owned/leased Miners or "self-Miners" versus "hosted Miners" at their Data Centers has grown substantially, from approximately 10% in 2020 to approximately 67% today, in part due to the Blockcap acquisition in July 2021.  As of May 3, 2023, the Debtors own or lease approximately 144,370 operational Miners used for Self-Mining.

Currently, the Debtors convert their mined bitcoin into U.S. dollars on a regular basis, generally within 2.5 days of Mining.  Consequently, the Debtors currently do not generally hold large amounts of bitcoin on their balance sheet at any given time.

(b)        Hosting Operations

In 2020, access to Miners was limited for a variety of reasons, and the Debtors had the unique ability to provide third parties with access to Miners due among other things, to relationships in the industry.  The Debtors were able to sell hardware "bundled" with hosting capabilities.  Proceeds from bundled hardware sales and prepayments on hosting contracts helped the Debtors to continue to build out their Data Centers to provide additional capacity for their self-Miners, as well as for hosted Miners in connection with their Hosting Operations.

Since 2017, the Debtors have positioned themselves as a premium provider of hosting services to third-party Miners, with high quality facilities that provide the optimal operating environment for consistent performance.  The Data Centers include onsite technicians available 24/7 for repair, adding value to the Debtors' customers by prolonging the life of their Miners.  The Debtors use custom software to manage Miners, which allows for real-time performance monitoring, historical data analysis, deployment tracking, and instant adjustment of voltage draws.  Customers can take advantage of high uptime percentage to produce additional bitcoin.

For these reasons, the Debtors' Hosting Operations business has grown considerably since 2017.  The Debtors continue to focus on larger customers (generally customers with greater than 1,000 Miners), as larger, professionally-managed customers benefit more from the Debtors' hosting value proposition (i.e., high uptime, software solutions, etc.) and such customers are more likely to generate consistent cash flow for the Debtors.

In line with the Debtors' profit-maximization efforts, the Debtors terminated and/or rejected some of their less profitable hosting contacts to free up rack space in their Data Centers.  The Debtors also sought to maximize the potential profits from their newly opened rack space by adding a new product offering to their Hosting Operations.  This product offering enables customers to enter into agreements with the Debtors to host customer Miners at the Debtors' Data Centers in return for the Debtors retaining a percentage of the Mining revenue attributable to such customers' Miners ("**RevShare Agreements**").  Since the Petition Date, the Debtors have signed RevShare Agreements with 2 customers.  As of June 8, 2023, 17,583 Miners are being hosted at Debtors' Data Centers under RevShare Agreements.

As of May 3, 2023, across their Data Centers, the Debtors host 72,487 Miners on behalf of 10 customers.  Any bitcoin customers mine goes directly to the respective customers' wallets.  The Debtors neither hold any bitcoin mined by customers on the Debtors' balance sheet nor serve as custodian of bitcoin on behalf of their hosting customers.

### vii.  ~~ii.~~ Data Centers

The Debtors own or lease facilities in Texas (3), Georgia (2), Kentucky, North Carolina (2), Oklahoma, and North Dakota, of which all are operational Data Centers except for the Muskogee Facility and the Cedarvale Facility.  The Data Centers house and provide power to both the Debtors' Miners, as well as the hosting customers' Miners, enabling such Miners to mine digital assets efficiently.  The table below illustrates the ten facilities that the Debtors currently own or lease.

| Location | Type of Ownership | Land (acres) | Current MWs Operational | Buildings (Square Feet) |
|---|---|---|---|---|
| Marble, NC ("**Marble 1**") | Owned | 30 | 35 | +/- 200,000 |
| Marble, NC (together with Marble 1, the "**Marble Facility**") | Owned | 42 | 69 | +/- 50,000 |
| Dalton, GA ("**Dalton Green**")[19][29] | Leased | 13 | 142 | +/- 100,000 |
| Dalton, GA (together with Dalton Green, the "**Dalton Facility**")[20][30] | Leased | 7 | 53 | +/- 200,000 |
| Calvert City, KY (the "**Calvert City Facility**") | Owned | 15 | 150 | +/- 60,000 |
| Grand Forks, ND (the "**Prairie Site Facility**")[21][31] | Leased | 20 | 100 | +/- 90,000 |
| Denton, TX (the "**Denton Facility**") | Leased | 31 | 125 | +/- 300,000 |
| Barstow, TX (the "**Cedarvale Facility**") | Owned | 136 | 0 | +/- 5,000 |
| Pecos, TX (the "**Cottonwood 1 Facility**") | Leased | 60 | 50 | +/- 125,000 |
| Pecos, TX (the "**Cottonwood 2 Facility**" and collectively with the Cottonwood 1 Facility the "**Cottonwood Facility**") | Leased | 50 | 0 | +/- 20,000 |
| Muskogee, OK (the "**Muskogee Facility**") | Owned | 90 | 0 | +/- 525,000 |

---

[19][29]    The lease provides that, at the expiration (on December 1, 2030) or earlier termination of the lease, Core Scientific Operating Company is obligated to purchase the property for nominal consideration.

[20][30]    The lease provides that, at the expiration (on December 1, 2030) or earlier termination of the lease, Core Scientific Operating Company is obligated to purchase the property for nominal consideration.

[21][31] Grand Forks is comprised of two leased properties.  The leases provide that, at any time during the lease term or during the 60 days following the lease term, the Debtors have the option to purchase one leased property for $5,400,000 less the value of any rent paid under that lease and the other leased property for $210,000.

<p style="text-align:center"><s>IV.</s></p>

<p style="text-align:center">IV.</p>

## DEBTORS' CORPORATE AND CAPITAL STRUCTURE

### A.    Corporate Structure

A chart illustrating the Debtors' complete organizational structure as of the Petition Date is attached as **Exhibit F** to this Disclosure Statement.  The following chart depicts the Debtors' simplified corporate structure:



All of the other Debtors are wholly owned, directly or indirectly, by Core Scientific, Inc.<s>22</s>32

### B.    Corporate Governance and Management

---

<s>22</s>32 Additionally, in connection with a potential venture that was never consummated, the Debtors formed several non-Debtor affiliates, which are currently dormant.  These entities are (i) Core Scientific Partners, LP, (ii) Core Scientific Partners GP, LLC, (iii) CSP Advisors, LLC, (iv) CSP Liquid Opportunities GP, LP, (v) CSL Liquid Opportunities Master Fund, LP, (vi) CSP Liquid Opportunities Fund, LP, and (vii) CSP Liquid Opportunities Offshore Fund.

The board of directors of Core Scientific, Inc. (the "**Board**") consists of six (6) directors:  Darin Feinstein, Neal Goldman, Jarvis Hollingsworth, Mike Levitt, Matthew Minnis, and Kneeland Youngblood.  Mike Levitt serves as Chairman of the Board.[2333]   The Debtors' highly experienced management team consists of the following individuals:

| Name | Position |
| --- | --- |
| Adam Sullivan | Interim Chief Executive Officer[2434] |
| Todd DuChene | Chief Legal Officer and Chief Administrative Officer |
| Michael Bros | Senior Vice President, Capital Markets and Acquisitions |
| Matt Brown | Executive Vice President, Data Center Operations |
| Russell Cann | Executive Vice President, Client Services |
| Denise Sterling | Executive Vice President, Chief Financial Officer |
| Steve Gitlin | Senior Vice President, Investor Relations |
| Carol Haines | Senior Vice President, Sustainability |
| Jeff Pratt | Senior Vice President, Partnerships |
| Jeff Taylor | Senior Vice President, Chief Information Security Officer |
| Katy Hall | General Counsel |

## C.    Prepetition Capital Structure

The following description of the Debtors' capital structure is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of the Debtors' obligations and any related agreements.

### viii. i. April Secured Convertible Notes:

On April 19, 2021, certain of the Debtors entered into that certain Secured Convertible Note Purchase Agreement (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**April NPA**"), by and among Core Scientific Holding Co., as issuer, the guarantors (the "**NPA Guarantors**"), as guarantors, U.S. Bank National Association, as note agent and collateral agent (together with any successor in such capacity, the "**Note Agent**"), and the purchasers of the notes issued thereunder.  Core Scientific, Inc. assumed Core Scientific Holding Co.'s obligations under the April NPA upon consummation of the de-SPAC Transactions.  The April NPA provides for the issuance of up to an aggregate principal amount of $215 million of 10% convertible secured notes due 2025 (the "**April Notes**"), and an aggregate principal amount of $215 million of April Notes were issued in April 2021 thereunder.

The April Notes mature on April 19, 2025 and bear interest at 10.0% per annum, of which 4.0% is payable in cash ("**Cash Interest**") and 6.0% is payable in kind by capitalizing such interest payment and increasing the aggregate principal amount of the notes by the amount thereof ("**PIK Interest**").  In addition, the April Notes are convertible into shares of common stock of Core Scientific, Inc. at a conversion price of $8.00 per share.  As of the Petition

---

[2333] On August 2, 2023, Darin Feinstein stepped down from his position as co-chairman of the Board, but has retained his position as a director.  Mike Levitt is now the sole chairman of the Board.

[2434] On August 2, 2023, Mike Levitt resigned as Chief Executive Officer of Core Scientific, Inc. and Adam Sullivan was appointed Chief Executive Officer.

Date, the aggregate principal amount of April Notes outstanding under the April NPA was approximately $234 million.

Pursuant to the terms of the April NPA, Core Scientific, Inc. is obligated to repay 200% of the principal and all accrued and unpaid interest under the April Notes (the "**April 2X Amounts**") upon certain events, including a voluntary prepayment, a change of control of the Debtors, or the April 19, 2025 maturity date (the "**April 2X Provision**").  The terms of the April NPA do not provide for payment of the April 2X Amounts upon acceleration after an event of default, including the automatic acceleration that follows a bankruptcy filing.  The Debtors believe that the April 2X Provision is not applicable or enforceable for that reason, as well as others, and, accordingly, the April 2X Amounts should not be allowed as part of the April Convertible Notes Secured Claims.  The POC the Note Agent filed on behalf of the holders of the April Notes (POC No. 526, the "**April Notes POC**") classifies the Claim as unliquidated and does not assert a dollar amount.  However, the April Notes POC contains an addendum asserting that the holders of the April Convertible Notes Secured Claims are entitled to the accrued portion of the April 2X Amounts as of the Petition Date in an amount of approximately $76.9 million and expect their liquidated Claim to include such portion of the April 2X Amounts.[25][35]

The obligations under the April NPA are secured pursuant to (i) that certain Security Agreement, dated as of April 19, 2021 (the "**April Notes Security Agreement**"), by and among Core Scientific Holding Co., the NPA Guarantors, as guarantors, and the Note Agent (in its capacity as collateral agent), and (ii) that certain Intellectual Property Security Agreement, dated as of April 19, 2021 (the "**April Notes IP Security Agreement**" and together with the April Notes Security Agreement, the "**April Security Agreements**"), by and among Core Scientific Operating Company and the Note Agent (in its capacity as collateral agent).  Pursuant to such security agreements and as a result of the de-SPAC Transactions, the April Notes are secured by a first lien security interest in all of the Debtors' and the NPA Guarantors' accounts, chattel paper, commercial tort claims, commodity accounts, contracts, deposit accounts, documents, general intangibles, goods, instruments, investment property, letter-of-credit rights or letters of credit, money, securities accounts, supporting obligations, property, other goods and personal property, certain intellectual property and proceeds of each, other than "Excluded Property" (as defined under the April Notes Security Agreement) (the "**NPA Collateral**").  The NPA Collateral does not include any of the Debtors' real estate, except fixtures.  In addition, the NPA Agent did not perfect its security interests in certain personal property which would require action beyond the filing of an all-assets financing statement with the secretary of state of the Debtors' jurisdiction of organization including (a) the Debtors' commercial tort claims which would be perfected by separate financing statement and (b) cash or accounts which would be perfected by control.[26][36]

### ix.   ~~ii.~~  August Convertible Notes:

On August 20, 2021, certain of the Debtors entered into that certain Convertible Note Purchase Agreement (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, and including all related credit documents, the "**August NPA**"), by and among Core Scientific Holding Co., as issuer, the NPA Guarantors, as guarantors, the Note Agent, as note agent, and the purchasers of the notes issued thereunder.  Core Scientific, Inc. assumed Core Scientific Holding Co.'s obligations under the August NPA upon consummation of the de-SPAC Transactions.  The August NPA provides for the issuance of up to an aggregate principal amount of $300 million of 10% convertible secured notes due 2025 (the "**August Notes**" and together with the April Notes,

---

[25][35] As explained below, under the Original DIP Facility and the RSA, which was entered into between the Debtors and certain of the convertible noteholders in connection with the Original DIP Facility, the parties stipulated to include the accrued portion of the April 2X Amounts in the allowed Claims of the holders of the April Notes.  The Debtors subsequently terminated the RSA upon repayment of the Original DIP Facility, and the ~~Replacement~~ DIP Order does not contain any stipulation regarding whether the accrued portion of the April 2X Amounts are allowed as part of the claims of the holders of the April Notes.

[26][36] The NPA Agent did perfect its interest through possession and control of (i) all of the common stock in Core Scientific Operating Company and (ii) the indebtedness evidenced by that certain secured promissory note issued by RME Black 200, LLC on May 12, 2020 (as may be amended, amended and restated, supplemented or modified from time to time) as of the Petition Date.

the "**Convertible Notes**"), and an aggregate principal amount of $299.8 million of August Notes were issued in August 2021 thereunder.

The August Notes were issued with substantially the same terms as the April Notes, including the same maturity date of April 19, 2025 and the same interest rate (10.0% per annum, of which 4.0% is Cash Interest and 6.0% is PIK Interest). Likewise, the August Notes are convertible into shares of common stock of Core Scientific, Inc. at a conversion price of $8.00 per share. As of the Petition Date, the aggregate principal amount of August Notes outstanding under the August NPA was approximately $318 million.

Pursuant to the terms of the August NPA, Core Scientific, Inc. is obligated to repay 200% of the principal and all accrued and unpaid interest under the August Notes (the "**August 2X Amounts**" and together with the April 2X Amounts, the "**2X Amounts**") upon certain events, including a voluntary prepayment or a change of control of the company (the "**August 2X Provision**"). Unlike the April 2X Provision, the August 2X Provision does not provide for payment of the August 2X Amounts upon the maturity date of the August Notes. Similar to the April NPA, the terms of the August NPA do not provide for payment of the August 2X Amounts upon acceleration after an event of default, including the automatic acceleration that follows a bankruptcy filing. The Debtors believe that the August 2X Provision is not applicable or enforceable for a number of different reasons and, accordingly, the August 2X Amounts should not be allowed as part of the August Convertible Notes Secured Claims. The POC the Note Agent filed on behalf of the holders of the August Notes (claim number 523, the "**August POC**") classifies the Claim as unliquidated and does not assert a dollar amount. However, unlike the April POC, the August POC does not state in its addendum that the holders of the August Notes believe they are entitled to the accrued portion of the August 2X Amounts, but rather the August POC reserves all rights to seek inclusion of the August 2X Amounts, as an unpaid original issue discount, in the calculation of the allowed Claim for the holders of the August Notes.

The obligations of the Debtors under the August NPA are secured pursuant to (i) that certain Security Agreement, dated as of February 7, 2022 (the "**August Notes Security Agreement**"), by and among Core Scientific, Inc., the NPA Guarantors, as guarantors, and the Note Agent (in its capacity as collateral agent for the August Notes), and (ii) that certain Intellectual Property Security Agreement, dated as of February 7, 2022 (the "**August Notes IP Security Agreement**" and together with the August Convertible Notes Security Agreement, the "**August Security Agreements**", and collectively with the April Security Agreements, the "**Convertible Notes Security Agreements**"), by and among Core Scientific Operating Company, Core Scientific Acquired Mining LLC, and the Note Agent (in its capacity as collateral agent).[27][37]

The August Notes are secured by the NPA Collateral, but are junior in priority to the April Notes with respect to the NPA Collateral. In connection with the de-SPAC Transactions, within 30 days, the August Notes would have been entitled to delivery of (i) a counterpart of the Security Agreement and the Intellectual Property Security Agreement and filed UCC-1s and (ii) an intercreditor agreement (effective on the secured parties). A Security Agreement and an Intellectual Property Agreement for the August Notes were entered into in connection with the de-SPAC Transactions and the appropriate UCC-1s were filed; however, an intercreditor agreement between the April Notes and August Notes was never executed. As the UCC-1s in connection with August Notes were filed after the UCC-1s filed in connection with April Notes, the liens securing the August Notes are likely junior to the liens securing the April Notes. There does not appear to be any mechanism for holders of the August Notes to force holders of the April Notes to enter into an intercreditor agreement, nor is there any incentive for holders of the April Notes to do so absent a broader restructuring transaction.

<center>

**x.   iii.  Secured Mining Equipment Financings and Leases**

</center>

---

[27][37] The August NPA included a covenant requiring certain of the Debtors to provide the same collateral securing the April Notes as collateral to secure the August Notes upon the occurrence of a "Conversion Event" (as defined in the August NPA). A Conversion Event occurred as a result of the de-SPAC Transactions, and the August Notes became secured by the NPA Collateral in February 2022.

Since 2020, the Debtors have entered into numerous equipment financing agreements and leases to acquire Miners. As of May 3, 2023, of the Debtors' 144,370 Miners, approximately 64,196 (or 44%) are collateral or leased under various equipment financing arrangements.[2838]

As of Petition Date, the Debtors had an aggregate of approximately $284 million of principal balance of equipment leases and secured equipment financing outstanding (including accrued and unpaid interest), under different facilities with respective first lien security interests (or lease interests) against approximately 91,000 Miners in the Debtors' possession at that time.  As discussed in further detail below, NYDIG ABL LLC (fka Arctos Credit LLC) ("**NYDIG**") provided financing for 26,964 Miners, but the Debtors transferred such Miners to NYDIG in exchange for cancellation of NYDIG's Claim pursuant to the NYDIG Settlement.  Accordingly, as of May 3, 2023, the Debtors possess 58,426 Miners are that subject to financing agreements and 5,770 Miners subject to a lease agreement with Atalaya Capital Management LP ("**Atalaya**").[2939]

A summary of the largest outstanding secured Miner financings is below:

| Lender | Borrower[30] | Debtors' Estimate of Outstanding under Financing Agreement as of Petition Date Including Principal and Interest | Collateral (# of Miners) |
|---|---|---|---|
| **Equipment Financings** | | | |
| Mass Mutual | Core Scientific Operating Company | $43.7 million | 15,066 |
| Barings[3141] | Core Scientific, Inc. | $66 million | 14,181 |
| BlockFi Lending LLC | Core Scientific Operating Company | $55.7 million | 14,508 |
| Stonebriar Commercial Finance LLC.[3242] | Core Scientific, Inc. | $7.2 million | 1,465 |
| 36th Street Capital Partners LLC.[3343] | Core Scientific Operating Company | $3.8 million | 970 |
| Anchorage Lending CA, LLC | Core Scientific, Inc. | $25.9 million | 5,354 |

---

[2838] Although certain of the Miner Equipment financing agreements were styled as equipment leases, the Debtors assert that such agreements constitute financing agreements.

[2939] As of the Petition Date there were approximately $14.5 million of lease payments remaining to Atalaya.  As discussed in greater detail below, the Debtors negotiated amended terms on the Miner equipment leases with Atalaya as set forth in the approved Atalaya Assumption Motion (as defined below).

[3040] These financings are not guaranteed by any Debtor.

[3141] Loans from various Barings-related entities, including Barings BDC, Barings Capital Investment Corp., and Barings Private Credit Corp (collectively "**Barings**").

[3242] This secured Miner financing was assigned to Stonebriar Commercial Finance LLC from Liberty Commercial Finance.

[3343] This secured Miner financing was assigned to 36th Street Capital Partners LLC from Liberty Commercial Finance.

| Lender | Borrower*[40] | Debtors' Estimate of Outstanding under Financing Agreement as of Petition Date Including Principal and Interest | Collateral (# of Miners) |
|---|---|---|---|
| Trinity Capital Inc. | Core Scientific Operating Company | $23.6 million | 5,812[44] |
| Jack Novak | Core Scientific Operating Company | $10.1 million | n/a[45] |
| Wingspire Equipment Finance LLC (f/k/a Liberty Commercial Finance LLC) | Core Scientific Operating Company | $2.5 million | 1070 |

### xi. iv. Secured Non-Mining Financings and Leases.

In addition to financing secured against Miners, the Debtors have utilized both secured financings[46] and operating leases to finance certain non-Mining assets deployed to satisfy the Debtors' various infrastructure needs for their day-to-day operations.  As of the Petition Date, the Debtors had approximately $700,000 of facility-only mortgages, $18.4 million of mixed collateral financing, $8.9 million of non-Mining equipment financing, and $1.6 million of non-Mining equipment leases.  These financings and leases consist of various assets, such as real estate, trucks, scissorlifts, servers, switchboards, and other non-Mining equipment.[47]

A summary of outstanding secured non-Mining financing arrangements is below:

| Lender | Borrower | Principal and Interest Outstanding as of the Petition Date | Collateral |
|---|---|---|---|
| **Facility Mortgages** | | | |
| Brown Corporation[48] | American Property Acquisition, LLC | $0.2 million | Dalton Facility |
| Holliwood LLC[49] | American Property Acquisition, LLC | $0.5 million | Calvert City Facility |
| **Mixed Collateral Financing** | | | |
| Bremer Bank, N.A. | Core Scientific Operating Company | $18.4 million | non-Mining equipment and leasehold interests in Prairie Site Facility |
| **Equipment Financing** | | | |
| VFS, LLC | Core Scientific Operating Company | $1.3 million | Non-Mining equipment |

[44] Trinity Capital Inc. properly perfected its liens as to the 2,585 Miners issued pursuant to Schedule 1 under the Master Equipment Financing Agreement, but did not properly perfect as to additional collateral issued under Schedule 3 and 4 of.  On November 4, 2022, within the 90-day preference period prior to the Petition Date, Trinity Capital filed an amended UCC-1 to perfect its interests in an additional 3,227 Miners that serve as collateral on the remaining schedules under the Master Equipment Financing Agreement.

[45] The Debtors have not been able to locate collateral for Jack Novak's Miner Equipment Loan.

[46] Although certain of the non-Miner Equipment financing agreements were styled as equipment leases, the Debtors assert that such agreements constitute financing agreements.

[47] These assets that secure the non-Mining financing and leases are considered Excluded Property under the Convertible Notes Security Agreements.

[48] The maturity date for the Debtors' mortgage with Brown Corporation is September 28, 2023.

[49] The maturity date for the Debtors' mortgage with Holliwood LLC is December 19, 2023.

| Lender | Borrower | Principal and Interest Outstanding as of the Petition Date | Collateral |
|---|---|---|---|
| Bank of the West | Core Scientific Operating Company | $50,000 | Non-Mining equipment |
| Dell Financial Services | Core Scientific Operating Company | $0.2 million | Non-Mining equipment |
| Indigo Direct Lending LLC[40][50] | Core Scientific Operating Company | $2.2 million | Non-Mining equipment |
| North Mill Equipment Finance LLC[41][51] | Core Scientific Operating Company | $0.7 million | Non-Mining equipment |
| Prime Alliance Bank, Inc.[42][52] | Core Scientific Operating Company | $2.3 million | Non-Mining equipment |
| North Star Leasing[43][53] | Core Scientific Operating Company | $0.6 million | Non-Mining equipment |
| 36th Street Capital | Core Scientific Operating Company | $0.1 million | Non-Mining equipment |
| Liberty Commercial Finance LLC | Core Scientific Operating Company | $1.2 million | Non-Mining equipment |
| Meridian Equipment Finance, LLC | Core Scientific Operating Company | $0.1 million | Non-Mining equipment |
| **Equipment Leases** | | | |
| VFS, LLC | Core Scientific Operating Company | $0.9 million | Non-Mining equipment |
| Fidelity Funding Services, LLC | Core Scientific Operating Company | $80,000 | Non-Mining equipment |
| Tech. Fin. Corp. | Core Scientific Operating Company | $0.3 million | Non-Mining equipment |
| Toyota Commercial Finance. | Core Scientific Operating Company | $0.2 million | Non-Mining equipment |
| Marco | Core Scientific Operating Company | $10,000 | Non-Mining equipment |
| Garic, Inc. | Core Scientific Operating Company | $0.1 million | Non-Mining equipment |

### *xii.* ~~v.~~ M&M Liens

M&M Liens arise under state law and provide General Contractors and Subcontractors with a lien on the real property that is the subject of the General Contract with respect to all labor, materials, equipment and/or services actually performed or furnished by such General Contractor or Subcontractor with respect to such real property. Under applicable state law (i.e., Texas and Oklahoma), (i) a General Contractor may be entitled to an M&M Lien with respect to all labor, materials, equipment and/or services actually furnished pursuant to its General Contract, whether performed by the General Contractor or any of its Subcontractors and (ii) a Subcontractor engaged by a

---

[40][50] This non- Miner financing was assigned to Indigo Direct Lending LLC from Liberty Commercial Finance.

[41][51] This non- Miner financing was assigned to North Mill Equipment Finance LLC from Liberty Commercial Finance.

[42][52] This non- Miner financing was assigned to Prime Alliance Bank, Inc. from Liberty Commercial Finance.

[43][53] This non- Miner financing was assigned to North Star Leasing from Liberty Commercial Finance.

General Contractor may be entitled to an M&M Lien with respect to all labor, materials, equipment, and/or services actually furnished by such Subcontractor.  Therefore, in certain instances a General Contractor's M&M Lien and a Subcontractor's M&M Lien may each secure certain amounts in duplication.  Under state law, all such M&M Liens which secure amounts in duplication are each reduced on a dollar-for-dollar basis upon repayment of any such amounts secured in duplication.

The Debtors entered into General Contracts with the General Contractors set forth on the M&M Lien Claim Amounts Schedule in connection with the construction, development, or improvement of the Debtors'(i) Denton Facility, (ii) Cottonwood Facility, (iii) Cedarvale Facility, (iv) Muskogee Facility (collectively with the Denton Facility, the Cottonwood Facility, and the Cedarvale Facility, the "**M&M Facilities**").  The General Contractors engaged the Subcontractors set forth on the M&M Lien Claim Amounts Schedule to fulfill certain components of the applicable General Contracts.  Pursuant to the General Contracts, multiple General Contractors and Subcontractors labored or furnished labor, materials, equipment, and/or services at the Facilities for which such General Contractors and Subcontractors hold M&M Liens.

The M&M Lien Claim Amounts Schedule sets forth the amounts the Debtors' books and records reflect are attributable to the provision by General Contractors and Subcontractors of labor, materials, equipment, and/or services in connection with the construction, development, or improvement of the M&M Facilities for which such General Contractors and Subcontractors may be entitled to an M&M Lien.  Those M&M Liens give rise to the M&M Lien Secured Claims in favor of the General Contractors with which the Debtors have directly entered into the General Contracts and are in privity of contract.  The Debtors are not party to any agreements with the Subcontractors and, therefore, the Debtors are not in privity of contract with any such Subcontractors.  Nevertheless, 13 Subcontractors filed proofs of claim against one or more of the Debtors (the "**Subcontractor POCs**").  For the reasons set forth above, the Debtors will seek disallowance of the Subcontractor POCs pursuant to a forthcoming omnibus claim objection.

As discussed in greater detail in section VI(I) below, the Debtors have reached settlements with ~~four~~five (~~4~~5) of their General Contractors, which in the aggregate ~~held~~asserted $~~64,581,815.52~~80,130,544.42 of M&M Lien~~s~~ Secured Claims.

~~The~~According to the Debtors' books and records, and not taking into account any of the M&M Lien Settlements, the total amount of M&M Liens encumbering each M&M Facility (after subtracting amounts secured in duplication by both a General Contractor and a Subcontractor and all settled M&M lien amounts) and securing the M&M Lien Secured Claims are set forth below:

| Facility | Total M&M Liens |
|---|---|
| Denton Facility | $18,799,499.00 |
| Cottonwood Facility | $134,296.42 |
| Cedarvale Facility | $16,084.86 |
| Muskogee Facility | $9,700,571.00 |

### *xiii.* ~~*vi.*~~ *Unsecured Bridge Notes:*

In April 2022, Core Scientific, Inc. entered into a $60 million Bridge Promissory Note with BRF Finance Co, LLC and a $15 million Bridge Promissory Note with B. Riley Commercial Capital, LLC (such unsecured financing, the "**Unsecured Bridge Notes**"), each of which was further amended and restated in August 2022.  The Unsecured Bridge Notes were to mature on June 1, 2023.

The Unsecured Bridge Notes required that 25% of the net proceeds from the issuance of any shares of common stock of Core Scientific, Inc. under its equity line of credit ("**Prepetition** ELOC")[44][45] must be applied to repay the

---

[44][45] On July 20, 2022, Core Scientific, Inc. entered into an equity purchase agreement with B. Riley Principal Capital II, pursuant to which, Core Scientific, Inc. has the right to sell to B. Riley Principal Capital II up to $100 million of shares of Core Scientific, Inc.'s common stock, subject to certain limitations and conditions set forth in the purchase agreement.

outstanding principal amount of the Unsecured Bridge Notes.  Prior to the Petition Date, Core Scientific, Inc. repaid approximately $33 million of principal under the Unsecured Bridge Notes, including from proceeds under the Prepetition ELOC.  As of the Petition Date, the B. Riley Unsecured Claims arising under or related to B. Riley's Unsecured Bridge Notes are estimated by the Debtors to total approximately $42.7 million (the "**B. Riley Unsecured Claim**").[45][55]

### xiv.  vii.  General Unsecured Claims:

The Debtors have had numerous other General Unsecured Claims outstanding as of the Petition Date, including Litigation Claims, General Contractor Unsecured Claims, Utility Unsecured Claims, and various Other Unsecured Claims.  Based upon the Debtors' review of the POCs, General Unsecured Claims of approximately $795 million have been filed against the Debtors in the aggregate.  While the Debtors continue to review and reconcile all POCs, the Debtors believe that approximately $41 32.6 million (not including postpetition interest) of filed General Unsecured Claims, not including the Miner Equipment Lender Deficiency Claims remain valid/allowable or will remain outstanding prior to the Effective Date.[46] or B. Riley Unsecured Claim, and after giving effect to various settlements discussed herein, remain valid/allowable or will remain outstanding prior to the Effective Date.[56]  This $32.6 million estimated amount assumes that (i) the Celsius Settlement will be consummated resolving the Celsius Hosting POCs,[57] (ii) the Foundry Settlement will be consummated, (iii) the Debtors will prevail on the litigation with Sphere,[58] (iv) the Debtors will prevail in the litigation with Morgan Hoffman[59], Jonathan Barrett, and Harlin Dean, and (v) no rejection damage claims will be Allowed against the Debtors including any potential rejection damage claims of GEM.  However, if the Debtors fail to consummate the Celsius Settlement, the Foundry Settlement, or lose against their litigation counterparties, the amount of Allowed General Unsecured Claims outstanding could significantly exceed the Debtors' estimates.  The below Section (V)(J)(iii) describes in greater detail each of the Claims asserted by Holders of General Unsecured Claims to which the Debtors have objected or intended to object.  The below Section (V)(H) describes in greater detail each of the settlements the Debtors have entered into with Holders of General Unsecured Claims.

As explained above, the Debtors estimate that the Allowed Miner Equipment Lender Deficiency Claims are equal to $185.2 million (not including postpetition interest), but they are unable to estimate the recoveries on account Miner Equipment Lender Deficiency Claims at this time due to the potential for a Holder of a Miner Equipment Lender Secured Claim to elect Miner Equipment Lender Treatment Election 2 and thereby waive its recovery on account of Miner Equipment Lender Deficiency Claim as a General Unsecured Claim.  Based on the Miner Equipment Lender Settlement, and the Debtors' discussions with the Equipment Lenders, the Debtors believe that

---

[45][55] The B. Riley Unsecured Claim is estimated to total approximately $44.3 million including post-petition interest at the Federal Judgement Rate through the expected Effective Date.

[46] As discussed below, the Foundry Settlement Agreement seeks to resolve the nearly $19 million unsecured claim asserted by Foundry Digital Mining LLC.

[56] As discussed below, the Foundry Settlement Agreement, if consummated, would resolve the nearly $19 million unsecured claim asserted by Foundry Digital LLC against each of Core Scientific Acquired Mining LLC and Core Scientific, Inc.

[57] As detailed below the Celsius Hosting POCs assert over $312 million in General Unsecured Claims, which the Debtors believe should be a significantly lower amount for the reasons set forth in the Celsius Hosting POC Objection.

[58] As detailed below the Sphere POCs assert over $39.5 million in General Unsecured Claims, which the Debtors contend Sphere cannot recover for the reasons set forth in the Sphere POC Objection.

[59] As detailed below the Securities POC filed by Morgan Hoffman asserts a $188.6 million General Unsecured Claim, which the Debtors believe should be Disallowed for the reasons set forth in the Securities POC Objection.

most of the Equipment Lenders intend to opt for the Miner Equipment Lender Treatment Election 2 and are, therefore, waiving their recoveries on such Miner Equipment Lender Deficiency Claims.

        (a)        Litigation Claims Filed Against the Debtors

A summary of the largest Litigation Claims filed against the Debtors is below:[47][60]

| Claimant | Debtor Entity Claim Filed Against[48][61] | Dollar Value Asserted on Filed Claim | Claim Number |
|---|---|---|---|
| Celsius Mining LLC | Core Scientific, Inc. | $312.3 million | 497 |
| Morgan Hoffman | Core Scientific, Inc. | $188.6 million | 632 |
| Sphere 3D Corp. | Core Scientific, Inc. | $39.5 million | 358 |
| Bryce Johnson[62] | Core Scientific Operating Company | $10.5 million | 120 |
| Oklahoma Gas and Electric Company | Core Scientific, Inc. | $8 million | 34 |
| Harlin Dean | Core Scientific Acquired Mining LLC | $8 million | 383 |
| GEM Mining 2, LLC | Core Scientific, Inc. | $2.9 million[63] | 508 |
| Jonathan Barrett | Core Scientific, Inc. | $1.3 million | 409 |

As explained in greater detail in section (XV)(J)(iii) regarding the Debtors' Claims reconciliation process, the Debtors either (i) already objected to the Litigation Claim, (ii) plan to file an objection to the Litigation Claim, (iii) are currently in negotiation with the Holder of such Litigation Claim or (iv) are still reconciling the Litigation Claim.  The Debtors believe that most of the Litigation Claims have no merit and will either be Disallowed in their entirety or Allowed for a small fraction of filed amount.

        (b)        General Contractor Unsecured Claims Filed Against the Debtors

A summary of the largest General Contractor Unsecured Claims filed against the Debtors is below:

| Claimant | Debtor Entity Claim Filed Against[49][64] | Dollar Value Asserted on Filed Claim | Claim Number |
|---|---|---|---|
| Harper Construction Company, Inc.[65] | Core Scientific, Inc. | $10.6 million | 437 |
| Condair Inc.[50][66] | Core Scientific, Inc. | $7.9 million | 430 |
| Trilogy LLC[51][67] | Core Scientific, Inc. | $3.3 million | 1 |

---

[47][60] The below chart does not include duplicate Claims filed by the same Claimant.

[48][61] Inclusion of the Debtor's entity name is not an admission by the Debtors that the Claim was properly filed against such Debtor entity.

[62] Bryce Johnson has withdrawn his POC.

[63] This amount does not include GEM's potential rejection damage claims.  GEM has until October 30, 2023 to submit its rejection damage claims

[49][64] Inclusion of the Debtor's entity name is in no way an admission of the Debtors' that the Claim was properly filed against such Debtor entity.

[65] Pursuant to the Harper Settlement, this Claim has been resolved.

[50][66] Pursuant to the Condair Settlement, this Claim has been resolved.

[51][67] Pursuant to the Trilogy Settlement, this Claim has been resolved.

The Debtors are currently in settlement discussions or have reached settlements with each of the Holders of the above listed General Contractor Unsecured Claims. The Debtors generally believe such General Contractor Unsecured claims are without merit or will be Allowed at a significantly lower dollar value.

        (c)        Utilities Unsecured Claims

Utilities Unsecured Claims arise from the Debtors' agreements with utility providers that provide power to the Debtors' Data Centers or other utility services which enable the Debtors to operate their business.

        (d)        Other Unsecured Claims

The Other Unsecured Claims include Claims not mentioned above. Of note are Claims arising out of trade contracts providing goods and services that enable the Debtors to operate their business.

### *xv.* ~~*viii.*~~ Common Stock

Core Scientific, Inc. was publicly traded on the NASDAQ Global Select Market under the symbol "CORZ." Following the Petition Date, on December 22, 2022, Core Scientific, Inc. received written notice from the staff of the Nasdaq Stock Market LLC ("**Nasdaq**") notifying Core Scientific, Inc. that, as a result of the Chapter 11 Cases, Nasdaq determined that Core Scientific, Inc.'s common stock would be delisted from the Nasdaq Global Select Market and that trading of Core Scientific, Inc.'s common stock would be suspended at the opening of business on January 3, 2023. On December 29, 2022, Core Scientific, Inc. requested an appeal of Nasdaq's determination and a hearing before a Nasdaq hearings panel, which appeal stayed the Debtors' delisting and the filing of a Form 25-NSE with the SEC. After careful deliberation, on January 24, 2023, Core Scientific, Inc. decided to withdraw its appeal of the delisting proceedings. Core Scientific, Inc.'s common stock was subsequently delisted from the NASDAQ Global Select Market and a Form 25-NSE was filed with the SEC on April 4, 2023.

Core Scientific, Inc. currently trades on the OTC Pink market under the symbol "CORZQ". As of May 5, 2023, Core Scientific, Inc. had approximately 376,566,674 shares of common stock outstanding.

<div align="center">

# V.**AND**
# SIGNIFICANT EVENTS LEADING<br>TO THE CHAPTER 11 FILINGS

</div>

Although the Debtors' operating performance remained strong at all times, a number of factors rendered the Debtors' balance sheet unsustainable as of the Petition Date, leading the Debtors to file the Chapter 11 Cases. The primary factors were: (i) the decline in bitcoin prices and bitcoin hashprices; (ii) increased energy costs; and (iii) the dispute and corresponding litigation with Celsius Mining LLC ("**Celsius**"). These events leading to the chapter 11 filing are discussed in further detail below.

        **A.**        **The Decline in the Price of Bitcoin and Increase in Bitcoin Network Difficulty**

The period between October 2020 and November 2021 saw exponential growth in the price of and consumer interest in bitcoin and cryptocurrency generally. Although there was significant fluctuation in bitcoin prices throughout this period, bitcoin prices reached an all-time high of $68,789 in November 2021. The increased bitcoin prices, in turn, led to a demand for hosting capabilities from companies interested in Mining bitcoin. During this period, the Debtors increased their market presence in the Mining industry through Self-Mining and selling bitcoin on the open market, as well as by hosting Miners for customers. The Debtors also benefited from lower energy costs during this period, resulting in higher profitability.

After November 2021, however, the price of bitcoin steadily declined. In May 2022, this was exacerbated by the beginning of the "crypto winter" when the value of stablecoin UST ("**Terra**") fell below that of the U.S. dollar. Because the purpose of the stablecoin was to maintain an equal value to the U.S. dollar, the drop in value resulted in a "run" on the coin, as holders sought to sell before the value of their assets diminished. This crash rendered both Terra and its linked cryptocurrency Luna worthless. Many crypto firms and crypto-focused hedge funds that owned

Luna incurred significant losses through the Terra/Luna crash. The collapse erased nearly $18 billion of value and contributed to further selloffs in the crypto sector.

In addition, on May 5, 2022, the Federal Reserve raised interest rates by 0.5%, triggering another round of market selloffs. Thereafter, bitcoin fell 27% during an eight-day period. By July 2022, multiple companies in the cryptocurrency sector commenced insolvency cases. Each one affected and further pushed the next towards insolvency as a result of significant interconnectedness and contagion within the industry. Notably, Three Arrows Capital, Ltd., Voyager Digital Holdings, Inc., and Celsius all filed for bankruptcy protection under either chapter 15 or chapter 11 of the Bankruptcy Code in July 2022.

Subsequently, the cryptocurrency market was further rattled in November 2022 by the chapter 11 filing of FTX Trading Ltd. ("**FTX**")—one of the world's largest cryptocurrency exchanges—and the allegations of fraud and mismanagement related thereto. BlockFi Inc., a leading crypto lender, filed a chapter 11 case shortly thereafter, citing connections to FTX as a precipitating factor of its filing. Although these chapter 11 cases did not directly impact the Debtors, with the exception of Celsius as discussed further below, the declining price of bitcoin throughout this period did negatively impact the Debtors' financial performance.

In general, a significant reduction in the price of bitcoin over the course of 2022 contributed to the decline in the Debtors' financial performance. From November 2021 through November 2022, the price of bitcoin decreased from $68,789 to $16,000. The decrease in bitcoin prices was accompanied by an increase in network difficulty resulting from increased network hash rates (described above), resulting in reduced revenues and profitability for the Debtors.

### B.    Increased Energy Costs

As noted, the Debtors maintain Self-Mining and Hosting Operations at eight Data Centers across the United States. To generate the computing power necessary to operate Data Centers and the Miners, the Debtors rely on tremendous amounts of power.

Prior to 2021, in line with natural gas prices, the Debtors' power costs were relatively low. Beginning in the spring of 2022, however, fossil fuel prices—especially natural gas prices—increased due to, among other things, Russia's invasion of Ukraine and increasing fuel usage in many countries. The Debtors' power costs for the first half of 2022 totaled approximately $106 million, comprising approximately 40% of their annual revenue.

Energy costs typically increase during the summer months due to greater demand for electricity. These months also bring higher risks of outages and power grid damage as a result of inclement weather, animal incursion, sabotage, and other events out of the Debtors' control. Between July 2022 and September 2022, significant increases in energy prices increased the Debtors' electricity costs. In addition, it became necessary to curtail power usage at the Debtors' Data Centers more frequently at the request of Debtors' power providers.

The Debtors explored fixed power pricing at certain facilities via potential hedging structures to mitigate power costs pre-petition. Nonetheless, given the Debtors' dependence on high volumes of power consumption at the Data Centers, the steep increase in power costs significantly impacted the Debtors' profitability in 2022.

### C.    Celsius's Chapter 11 Filing and PPT Dispute

The Debtors' financial difficulties were exacerbated by disputes with Celsius following Celsius's chapter 11 filing and subsequent failure to perform under its hosting contract with the Debtors.

Prior to the Petition Date, Celsius was one of the Debtors' largest hosting customers, with approximately 37,536 Miners hosted at the Debtors' Data Centers. The Debtors provided hosting services to Celsius pursuant to two Master Services Agreements, dated December 18, 2020 and December 3, 2021 (together with the orders entered into in connection therewith, the "**Celsius Contracts**"). Pursuant to the Celsius Contracts, the Debtors were entitled

to pass through to Celsius any tariffs (the "**PPT Charges**"), which is a standard provision in all of the Debtors' hosting contracts.

On July 13, 2022, Celsius, along with its affiliates, commenced chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York (the "**Celsius Chapter 11 Cases**"). Although Celsius paid PPT Charges prior to the Celsius Chapter 11 Cases, Celsius subsequently asserted it was not responsible for paying increased power costs and refused to pay all PPT Charges the Debtors invoiced to Celsius following Celsius's chapter 11 filing.

By failing to pay the PPT Charges that Celsius owed to the Debtors, Celsius foisted millions of dollars of increased power costs onto the Debtors' balance sheet instead of its own. As of Celsius's petition date, Celsius owed the Debtors approximately $1.3 million in unpaid PPT Charges. As of the date the Bankruptcy Court approved the rejection of the Celsius Contracts (discussed further below), Celsius owed the Debtors approximately $7.7 million for unpaid postpetition (based on Celsius's filing date) PPT Charges and related interest for late payments.

Celsius's conduct also resulted in costly and protracted litigation. On September 28, 2022, Celsius filed a motion in the Celsius Chapter 11 Cases seeking to hold the Debtors in contempt of court for allegedly violating the automatic stay and for otherwise breaching the Celsius Contract (the "**Automatic Stay Motion**"). The Debtors disputed Celsius's allegations and filed an opposition to the Automatic Stay Motion on October 19, 2022 (Celsius Docket No. 1140) (the "**Automatic Stay Motion Opposition**").

Concurrently with the Automatic Stay Motion Opposition, the Debtors also filed their own motion on October 19, 2022, seeking (i) to compel immediate payment of administrative expenses and either (ii) (a) relief from the automatic stay to permit the Debtors to exercise all remedies, including termination, under the Celsius Contracts or (b) to compel assumption or rejection of the Celsius Contracts (Celsius Docket No. 1144) (the "**Core Administrative Claim Motion**"). At the time of the filing of the Core Administrative Claim Motion, Celsius owed the Debtors millions of dollars. Since that date, the amount of administrative expense Claims Celsius owes the Debtors as a result of unpaid PPT Charges increased through the date the Debtors rejected the Celsius Contracts (as described below). Celsius disputes that it owes the Debtors any administrative expense Claims. In the fall of 2022, just as the Debtors were experiencing financial distress due to industry conditions, the Debtors and Celsius engaged in significant discovery relating to the competing motions.

Shortly before the Petition Date, the Debtors and Celsius agreed to stay the litigation as they endeavored to negotiate a consensual resolution.

Celsius's failure to pay the PPT Charges had a detrimental impact on the Debtors' liquidity in the months and weeks leading up to the filing, as did the significant litigation costs the Debtors incurred in connection with the Celsius litigation.

### D.       Prepetition Initiatives

Throughout 2021, the Debtors engaged in various operational and other initiatives to navigate through the challenges presented by the tumultuous cryptocurrency market. Given the price volatility of bitcoin, the Debtors took steps to mitigate the effects of such volatility and increase liquidity in the months leading up to their chapter 11 filing. The Debtors' management actively sought to decrease operating costs, eliminate and delay construction expenses, reduce and delay capital expenditures, and increase hosting revenues. The Debtors also began discussions in late summer 2022 with certain creditors to address potential debt service amendments. These actions, however, were insufficient to enable the Debtors to continue to service their substantial debt and manage their liquidity issues. Given the Debtors' financial difficulties and decreasing liquidity, the Debtors recognized the need to explore alternatives to inject liquidity and potentially de-lever their balance sheet, ensure their continuation as a going concern, preserve jobs, and maximize value for the benefit of all stakeholders.

To preserve liquidity while analyzing restructuring alternatives and negotiating with creditors, the Debtors decided in late October 2022 to cease making payments on certain of their equipment and other financings.

E.      **Appointment of New Independent Director and Formation of Special Committee to Consider Strategic Options and Engage with Creditors**

On October 26, 2022, the Board unanimously appointed Neal P. Goldman as an additional independent director. Mr. Goldman has extensive restructuring experience, and the Board believed that Mr. Goldman's experience would be beneficial to the Debtors as they navigated through the restructuring process. Further, on November 14, 2022, in connection with the Debtors' evaluation of strategic alternatives, the Board approved the formation of a special committee of three (3) independent directors: Neal Goldman, Jarvis Hollingsworth, and Kneeland Youngblood (the "**Special Committee**").   On January 28, 2023, Mr. Hollingsworth resigned as a member of the Special Committee, but has continued to serve on the Board.

The Special Committee is authorized to, among other things, evaluate and, if deemed by the Special Committee to be in the best interests of the Debtors, authorize the Debtors to enter into any potential restructuring transactions and strategic alternatives for and on behalf of the Debtors with respect to their outstanding indebtedness and contractual and other liabilities.

F.      **Retention of Restructuring Professionals and Prepetition Stakeholder Engagement**

In October 2022, the Debtors engaged Weil and PJT to explore restructuring alternatives and engage in negotiations with stakeholders.  Soon thereafter, the Debtors engaged Alix as their financial advisor.

The Debtors and their Advisors reached out to certain holders of the Debtors' Convertible Notes and encouraged them to form a group with other holders to negotiate a restructuring.  This resulted in the formation of the Ad Hoc Noteholder Group, which retained Paul Hastings LLP as its legal counsel and Moelis & Company LLC as its financial advisor.  In the months leading up to the filing of the Chapter 11 Cases, the Debtors and their Advisors engaged in negotiations with the Ad Hoc Noteholder Group regarding the terms of a comprehensive restructuring.

In parallel, the Debtors pursued other options and engaged with other parties (both inside and outside of their capital structure) to address their overleveraged balance sheet and liquidity issues, including (i) B. Riley Financial, Inc. ("**B. Riley**"), the parent company of the holders of the Debtors' Unsecured Bridge Notes, which also had been hired to sell equity to the public markets for the Debtors, (ii) the Debtors' Equipment Lenders, (iii) the Debtors' construction contract counterparties, (iv) potential third-party financing providers, and (v) potential asset purchasers.

Initially, three primary paths emerged: (i) an out-of-court financing offered by B. Riley that would secure and/or pay down B. Riley's Unsecured Bridge Notes, grant liens on unencumbered assets to B. Riley, and provide additional capital to operate the Debtors' business, (ii) a pre-arranged chapter 11 case to consummate a comprehensive restructuring set forth in a restructuring support agreement negotiated with the Ad Hoc Noteholder Group ( the "**RSA**"), including debtor-in-possession financing provided by members of the Ad Hoc Noteholder Group (and/or their affiliates, partners, and investors) (the "**Original DIP Facility**"), and (iii) a chapter 11 case funded with debtor-in-possession financing provided by a third-party DIP provider and not tied to an RSA.

Ultimately, after extensive discussion with the Advisors, the Special Committee concluded entry into the RSA was the Debtors' best course of action as it would reduce both the Debtors' funded indebtedness and interest expense by the respective magnitudes of hundreds of millions of dollars and tens of millions of dollars annually.  Additionally, the other two of the Debtors' potential transactions were unable to be consummated as of the Petition Date.  First, B. Riley's best and final proposal to the Debtors contemplated, among other things, the conversion of B. Riley's Unsecured Claim into secured debt with liens on certain of the Debtors' assets.  In addition, B. Riley's proposal (i) did not provide the Debtors with a comprehensive and long-term deleveraging and capital structure solution and (ii) was contingent on the Debtors reaching consensual agreements with their Equipment Lenders.  Second, although the Debtors engaged in an extensive marketing process for a third-party DIP, the Debtors did not receive any actionable proposals for third party postpetition financing by the Petition Date.  As of the Petition Date, the Debtors had approximately $4 million of cash on hand.

Accordingly, the Debtors entered into the RSA and Original DIP Facility with the Ad Hoc Noteholder Group before commencing the Chapter 11 Cases. The RSA contemplated the convertible noteholders receiving approximately 97% of the reorganized equity in the reorganized Debtors, among other terms. Unsecured creditors and equity holders would share 3% of the equity in the reorganized Debtors. As discussed in more detail below, following a substantial increase in the price of bitcoin and hashprices, the Debtors subsequently repaid the Original DIP Facility with proceeds of the ~~Replacement~~ DIP Facility (as defined below) and terminated the RSA.

# ~~VI.~~
# VI.
# OVERVIEW OF CHAPTER 11 CASES

### A.    Commencement of Chapter 11 Cases

#### *xvi.* ~~*i.*~~ *First/Second Day Relief*

On or about the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code, the Debtors filed several motions (the "**First Day Motions**") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations by, among other things, easing the strain on the Debtors' relationships with employees and vendors resulting from the commencement of the Chapter 11 Cases. The Debtors also filed an application to retain Stretto, Inc., as claims, noticing, and solicitation agent (the "**Claims Agent Application**").

Following the first-day hearing held on December 22, 2022, the Bankruptcy Court granted all of relief requested in the First Day Motions on an interim or final basis. Following the final hearing held on January 23, 2023, the Bankruptcy Court entered orders granting the rest of the relief on a final basis. The first day relief included authority to:

- Continue paying employee wages and benefits (Docket No. 121);

- Pay certain prepetition taxes and regulatory fees (Docket No. 123);

- Pay certain prepetition claims of critical vendors (Docket No. 333);

- Restrict certain transfers of equity interests in the Debtors (Docket No. 120);

- Continue and maintain insurance and surety bond programs (Docket No. 118);

- Continue the use of the Debtors' cash management system, bank accounts, and business forms (Docket No. 332); and

- Establish procedures for utility companies to request adequate assurance and prohibit utility companies from altering or discontinuing service (Docket No. 334).

The First Day Motions, the Claims Agent Application, and all orders for relief granted in the Chapter 11 Cases can be viewed free of charge at https://cases.stretto.com/corescientific.

### xvii.~~ii.~~ Other Procedural and Administrative Motions

The Debtors also obtained procedural relief to facilitate further the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- Complex Case Designation.  The Debtors obtained an order designating their Chapter 11 Cases as a Complex Case and applying the Procedures for Complex Cases in the Southern District of Texas (Docket No. 29).

- Joint Administration.  The Debtors obtained an order enabling the joint administration of their Chapter 11 Cases under the case name Core Scientific, Inc. (Docket No. 105).

- Extension of Time to file Schedules and SOFAs.  The Debtors obtained an order (i) granting them an extension of time to file their schedules of assets and liabilities and statements of financial affairs detailing known Claims against the Debtors (the "**Schedules and SOFAs**"), (ii) enabling the Debtors to file a matrix of their creditors on a consolidated basis, and (iii) waiving the Debtors' requirement to file Bankruptcy Rule 2015.3 reports (Docket No. 122).

- Retention of Chapter 11 Professionals.  The Debtors obtained orders authorizing the retention of various professionals to assist them in carrying out their duties under the Bankruptcy Code during the Chapter 11 Cases, including: (i) Weil, as counsel to the Debtors (Docket No. 504); (ii) PJT, as investment banker (Docket No. 502); (iii) Alix, as financial advisor (Docket No. 503); (iv) Scheef & Stone, L.L.P., as counsel to Neal Goldman and Kneeland Youngblood in their capacity as independent directors of the Board and members of the Special Committee (Docket No. 540); (v) Deloitte Financial Advisory Services LLP, as financial services provider (Docket No. 789); and (vi) Deloitte Tax LLP, as tax services provider (Docket No. 790).

- Ordinary Course Professionals Order.  The Debtors obtained entry of an order establishing procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operations of their businesses (Docket No. 543).

- Interim Compensation Procedures.  The Debtors obtained entry of an order establishing procedures for interim compensation and reimbursement of expenses of estate professionals (Docket No. 541).

### B.      DIP Financing

### xviii.~~i.~~ Original DIP Financing

As of the Petition Date, the Debtors had approximately $4 million cash on hand and required immediate access to the Original DIP Facility and authority to use their prepetition secured creditors' cash collateral to fund their operations and the Chapter 11 Cases.  In the days leading up to the chapter 11 filing, the Original DIP Facility, provided by certain holders of the Convertible Notes or their affiliates (the "Original DIP Lenders") was the Debtors' only actionable financing proposal.  The Original DIP Facility included commitments for up to $57 million and support for the syndication of up to $75 million in new money loans, $37.5 million of which was available after entry of an interim order to provide Debtors with needed liquidity immediately.

The Original DIP Facility placed numerous onerous obligations upon the Debtors, such as stringent milestones throughout the Chapter 11 Cases and a commitment to the RSA.  In addition, it provided for a 1:1 roll-up of the Convertible Notes of the Original DIP Lenders or their affiliates in the aggregate amount of up to $75 million upon entry of a final order (the "**Roll-Up**").  The Original DIP Facility further required that the Debtors pay the Original DIP Lenders 115% of all new money loans issued pursuant to the Original DIP Facility in connection with any pay off the Original DIP Facility (the "**Exit Fees**").

Certain of the Debtors' stakeholders objected to certain provisions in the Original DIP Facility, including the Exit Fees and Roll-Up.  At the Debtors' first day hearing, the Debtors noted that no party other than the Original DIP Lenders was willing to provide the Debtors with DIP financing sufficient for the Debtors' liquidity needs.  The Court approved the Original DIP Facility on an interim basis (Docket No. 130).  The Original DIP Facility included a milestone, among others, requiring that the Debtors obtain entry of a final order authorizing entry into the Original DIP Facility no later than February 2, 2023.[52][68]

### *xix. ii.* Replacement DIP Financing

At the outset of the Chapter 11 Cases, the Debtors announced they would seek to replace the Original DIP Facility with a replacement DIP facility with more favorable terms and flexibility.  Following the Petition Date, the Debtors and their Advisors engaged in an extensive marketing process to find alternative financing to replace the Original DIP Facility.

As discussed below in more detail, bitcoin prices and hashprices, as well as the financial condition of the cryptocurrency industry more generally, began to improve shortly after the Petition Date.  As a result, the Debtors' marketing process for a replacement DIP facility led to DIP proposals from multiple prospective parties, including from the ~~Replacement~~ DIP Lenders.  Following extensive negotiations, the Debtors reached an agreement with the ~~Replacement~~ DIP Lenders to provide replacement DIP financing (the "**Replacement** **DIP Facility**") on a non-priming basis.  On January 30, 2023, the Debtors filed a motion requesting approval of the ~~Replacement~~ DIP Facility and the repayment of the Original DIP Facility (Docket No. 378).

The ~~Replacement~~ DIP Facility provided the Debtors a replacement senior secured super-priority debtor-in-possession credit facility in an aggregate principal amount of up to $70 million, of which an aggregate principal amount of $35 million was made available on an interim basis and borrowed in a lump sum on the closing date.  Among other beneficial terms, the ~~Replacement~~ DIP Facility represented a significantly lower total cost of capital than the Original DIP Facility, included more favorable exit terms, and did not require that the Debtors enter into a restructuring support agreement, support any particular chapter 11 plan, or agree to any other milestones.  It thus provided the Debtors with up to 13 months of additional runway.

The ~~Replacement~~ DIP Facility was a non-priming financing facility, as the Debtors were able to provide the ~~Replacement~~ DIP Lenders with a first-priority lien on valuable unencumbered real property assets[53][69] and provide the Debtors' convertible noteholders and Equipment Lenders with adequate protection in the form of replacement liens (junior to the liens under the Replacement DIP Facility) and super-priority administrative priority Claims for any diminution in the value of their collateral during the Chapter 11 Cases.

On February 2, 2023, the Bankruptcy Court entered an order approving the ~~Replacement~~ DIP Facility on an interim basis and approving the repayment of the Original DIP Facility (Docket No. 447) (the "**Interim Replacement DIP Order**").  Prior to the hearing to approve the ~~Replacement~~ DIP Facility on an interim basis, the Creditors' Committee filed a statement objecting to the Debtors' proposed payment of the Exit Fees under the Original DIP Facility.  However, consistent with the Debtors' interpretation of the Original DIP Order, the Bankruptcy Court overruled the objection and held that the Debtors were required to pay the Exit Fees.

---

[52][68] The original deadline for the Debtors to obtain entry of a final order approving the Original DIP Facility was January 25, 2023.  However, following the appointment of the Creditors' Committee, the Debtors and Original DIP Lenders agreed to extend such deadline (Docket No. 306).

[53][69] The real property assets were only subject to the Convertible Noteholder's liens on any fixtures.

Upon entry of the Interim ~~Replacement~~ DIP Order, the Debtors terminated the Original DIP Facility and paid the $46.4 million balance owed under the Original DIP Facility, including Exit Fees of approximately $6 million, with the proceeds of ~~Replacement~~ DIP Facility.

Shortly thereafter, the Debtors exercised the fiduciary out contained in the RSA and terminated the RSA (Docket No. 517).

On March 1, 2023, the Bankruptcy Court entered an order approving the Debtors' entry into the ~~Replacement~~ DIP Facility on a final basis (Docket No. 608) (the "**~~Replacement~~ DIP Order**").

On July 4, 2023, an amendment to the ~~Replacement~~ DIP Facility became effective (the "**~~Replacement~~ DIP Amendment**") (Docket No. 1032).  The ~~Replacement~~ DIP Amendment provided, among other things, (i) that the Debtors may make certain transfers or payments in connection with settlements of certain third-party claims as described in the ~~Replacement~~ DIP Amendment and (ii) for a reduction in the Excess Cash (as defined in the ~~Replacement~~ DIP Order) threshold amount to the sum of $40.0 million and an amount (which shall not be less than zero) equal to $5.0 million less the amount of any payments on account of prepetition claims, liens or cure costs made by any obligor after June 30, 2023. This Excess Cash threshold amount reduction resulted in the Debtors' making a $6.5 million mandatory prepayment under the ~~Replacement~~ DIP Facility on July 7, 2023 and a $7.6 million mandatory prepayment under the ~~Replacement~~ DIP Facility on August 7, 2023.

Subsequent to the entry of the ~~Replacement~~ DIP Order, the Debtors have repaid approximately $21.4 million of principal under the ~~Replacement~~ DIP Facility pursuant to terms thereof that require a repayment to the ~~Replacement~~ DIP Lender~~s~~ for any amount of unrestricted cash above the applicable threshold at the end of a month.  The Debtors exceeded this threshold in each of April, May, June, and July.

As of August 7, 2023, $13.6 million of principal remains outstanding under the ~~Replacement~~ DIP Facility.

### C.    Rejection of Celsius Hosting Contract

To minimize losses incurred by the Debtors under the Celsius Contracts from Celsius's unpaid PPT Charges, the Debtors filed a motion to reject the Celsius Contracts on December 28, 2022 (the "**Rejection Motion**") (Docket No. 189).  Celsius filed a "Preliminary Objection," not opposing the relief sought, but objecting to the timing of the hearing on the motion.  The Court held a hearing on the Rejection Motion on January 3, 2023 and entered an order approving the rejection of the Celsius Contracts on January 4, 2023 (Docket No. 232).  The Celsius dispute is discussed in more detail below.

### D.    Appointment of Creditors' Committee

On January 9, 2023, the Office of the United States Trustee for Region 7 (the "**U.S. Trustee**") appointed the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code to represent the interests of unsecured creditors in these Chapter 11 Cases (Docket No. 257).  On February 3, 2023, the U.S. Trustee reconstituted the Creditors' Committee (Docket No. 456).  The current members of the Creditors' Committee are: (i) Dalton Utilities; (ii) Sphere 3D Corp.; (iii) MP2 Energy LLC d/b/a Shell Energy Solutions; and (iv) Tenaska Power Services Co.[470] The Creditors' Committee retained Willkie Farr & Gallagher LLP, as counsel, Gray, Reed & McGraw LLP, as conflicts and efficiency counsel, and Ducera Partners LLP, as financial advisor.  *See* (Docket Nos. 664, 602, and 675).

---

[470] B. Riley was originally appointed as a member of the Creditors' Committee and participated on the Creditors' Committee through January 24, 2023, on which date its affiliate determined to engage in discussions regarding providing an alternative DIP financing proposal to the Debtors.  B. Riley resigned from the Creditors' Committee upon the Bankruptcy Court's entry of the Interim ~~Replacement~~ DIP Order.

E. **Appointment of Equity Committee**

As the price of bitcoin began to increase after the Petition Date, an ad hoc group of the Debtors' equity holders (the "**Ad Hoc Equity Group**") formed and reached out to both the Debtors and the U.S. Trustee seeking the appointment of an official equity committee. Following the U.S. Trustee's denial of such request, on February 3, 2023, the Ad Hoc Equity Group filed a motion with the Bankruptcy Court seeking the appointment of an official equity committee (Docket No. 458).

Although the Debtors initially opposed the appointment of an official equity committee, as the price of bitcoin continued to increase, the Debtors ultimately engaged in negotiations with the Ad Hoc Equity Group and ultimately supported the appointment of an official equity committee on certain conditions, including a budget of $4.75 million and a scope limited to issues of valuation and plan negotiation. *See* (Docket No. 570). The Debtors shifted their position on the official equity committee because (i) rising bitcoin prices and lower energy costs suggested the Debtors may be solvent and (ii) principles of fairness supported the equity holders receiving representation with respect to the issues of valuation and plan negotiation. On March 1, 2023, the Bankruptcy Court entered an order (Docket No. 642) directing the appointment of an Equity Committee on the terms set forth therein.

On March 23, 2023, the U.S. Trustee appointed the Equity Committee pursuant to section 1102 of the Bankruptcy Code to represent the interests of equity security holders in these Chapter 11 Cases (Docket No. 724). The Equity Committee is comprised of (i) The Rudolph Family Trust, (ii) ~~Two Trees Capital Limited BVI Custodian CSPB, (iii) Lukasz Gottwald~~Douglas S. Wall, (iii) Brent Berge, (iv) Foundry Digital LLC, (v) ~~Todd Deutsch, (vi) Douglas Abrams, (vii) Jay Deutsch, (viii) Mark Beaven, and (ix) Eddie Griffin~~RBH Holdings LLC, and (vi) Aaron Baker. The Equity Committee subsequently retained Vinson & Elkins LLP as its counsel and FTI Consulting, Inc. as its financial advisor. *See* (Docket Nos. 933 and 934).

F. **Debtors' Key Employee Retention Program and Proposed Amendment to CFO's Employment Agreement**

In December 2022, with input from their Advisors and an independent compensation consultant, the Debtors adopted a two-tier key employee retention program (the "**Original KERP**") to retain certain key employees (the "**Key Employees**") throughout the Debtors' restructuring efforts.

The first tier of the Original KERP provided certain key executives with awards designed to retain such executives through these Chapter 11 Cases. The Debtors paid the awards for Tier 1 of the Original KERP prior to the Petition Date.

The second tier of the Original KERP provided for discretionary bonuses to certain non-executive Key Employees (the "**Second Tier Original KERP Members**"), approximately 110 members of the Debtors' non-executive workforce, who perform a variety of important business functions for the Debtors, including accounting, legal, business development and intelligence, information technology, finance, facility and project management, and operational functions. The second tier KERP provides for quarterly cash payments to the applicable Second Tier Original KERP Member, upon signing a retention agreement, in the amount of $5,000 to $50,000 (the "**Second Tier Original KERP Payments**"), with the first installment of Second Tier KERP Payments to be paid on the first regular payroll date following Bankruptcy Court approval of the KERP and the remaining three installments of the Second Tier Original KERP Payments each to be paid quarterly on the last payroll date in May, August, and November 2023. In the event a "Restructuring Event" (as defined in the KERP Motion) is consummated prior to any scheduled payment, any remaining, unpaid Second Tier Original KERP Payments will be paid within fifteen (15) days following such Restructuring Event. Additionally, all Second Tier Original KERP Members who are employed at the Cottonwood Facility will receive their Second Tier Original KERP Payment in a single installment on the first payroll date following August 31, 2023. In return for accepting the terms of their retention agreement, each Second Tier Original KERP Member forfeits his or her rights to annual bonuses or other cash-based incentive awards.

On March 3, 2023, the Debtors filed a motion seeking approval from the Bankruptcy Court, and pay the amounts due under the second tier of the KERP (the "**KERP Motion**") (Docket No. 633). On March 30, 2023, the

Bankruptcy Court entered an order granting the relief requested (Docket No. 738) (the "**KERP Order**"). The Debtors are authorized under the KERP Order to pay out up to $1.365 million in the aggregate for all payments under the second tier of the KERP.

In the near term, the Debtors intend to file a motion seeking approval from the Bankruptcy Court for a supplemental key employee retention program (the "**Supplemental KERP**") (Docket No. [●]) (the "**Supplemental KERP Motion**"). Subject to the Court's approval, the Supplemental KERP provides for incremental payments of bonuses, in the aggregate amount not to exceed $675,000, to 22 non-insider key employees (the "**Supplemental KERP Participants**"), who perform a variety of core business functions for the Debtors, including engineering, data centers, human resources, finance, and IT. The Supplemental KERP will provide for quarterly cash payments to the applicable Supplemental KERP Participants, upon signing a supplemental retention agreement, in the amount of $10,000 to $75,000 (the "**Supplemental KERP Payments**"), with the first installment of Supplemental KERP Payments to be paid on the first regular payroll date following Bankruptcy Court approval of the Supplemental KERP Motion and the remaining ~~three~~ installment~~s~~(s), if any, of the Supplemental KERP Payments each be paid quarterly and in sync (if possible) with any prior payouts approved under the Original KERP. In the event a "Restructuring Event" (as defined in the Supplemental KERP Motion) is consummated prior to any scheduled payment, any remaining, unpaid Supplemental KERP Payments will be paid within fifteen (15) days following such Restructuring Event.

The Debtors also intend to file a motion seeking approval from the Bankruptcy Court to enter into an amended employment agreement for the Debtors' Executive Vice President and Chief Financial Officer, Denise Sterling (the "**Amended CFO Agreement**", and such amendment, the "**CFO Agreement Amendment**") (Docket No. [●]) (the "**Amended CFO Agreement Motion**"). Subject to the Court's approval, the CFO Agreement Amendment provides an incentive-based compensation program for CFO Sterling based on a performance metric tied to the Debtors' selling, general, and administrative expense margin ("**SG&A Margin**"). Under the Amended CFO Agreement, the performance metric will be tested at the end of each month from September 1, 2023 to November 30, 2023. For each month, CFO Sterling will receive (i) $25,000 at threshold performance (26% SG&A Margin), (ii) $28,000 at target performance (22% SG&A Margin), or (iii) $32,000 at maximum performance (20% SG&A Margin). If at least threshold performance is achieved each month, payouts will occur upon the first scheduled salary payment date after performance results are certified. The CFO Agreement Amendment does not provide a payout unless CFO Sterling achieves performance at or above the threshold level of the performance metric. In the event the Debtors emerge from bankruptcy prior to any of the dates during the performance period, the outstanding remaining balance of the payout will be payable on the date of emergence contingent upon actual performance at that time. The CFO Agreement Amendment does not amend CFO Sterling's original employment agreement in any material aspect.

### G.  Sale Process for Certain of the Debtors' Facilities

Before the Petition Date, when the Debtors were identifying potential means to improve liquidity to avoid a chapter 11 filing, the Debtors engaged in an informal marketing process for the sale of three of their facilities: the Muskogee Facility; the Cedarvale Facility; and the Cottonwood Facility (collectively, the "**Sale Facilities**"). After engaging PJT, the Debtors and PJT together continued a marketing process of the Sale Facilities.

After the Petition Date, the Debtors and PJT continued to market the Sale Facilities. The Debtors and their Advisors spoke to numerous interested purchasers and ultimately received six (6) indications of interest from potential purchasers. After discussions with the potential purchasers, the Debtors determined that either the potential offers were either of insufficient value and/or the potential purchasers did not have sufficient funds to complete the purchase. After several months, the Debtors abandoned the formal Sale Process. As further described below, the Debtors will sell the Cedarvale Facility to Celsius pursuant to the Celsius Settlement (as defined below). The Debtors decided to include the Cottonwood Facility in their Business Plan (as defined below); however, they remain open to any offers that provide them sufficient value for the Muskogee Facility.

### H.      Sale of Bitmain Coupons

Prior to the Petition Date, the Debtors acquired Miners from Bitmain Technologies Ltd. ("**Bitmain**") in the ordinary course of business.  In connection with these purchases, Bitmain provided coupons to the Debtors valid for future acquisitions of new S19 Miners from Bitmain (the "**Bitmain Coupons**"), with expiration dates between March 22, 2023 and April 23, 2023.  After engaging in discussions with potential purchasers of the Bitmain Coupons, on January 25, 2023, Debtors filed a motion for authority to sell their Bitmain Coupons (Docket No. 346).  Following a hearing on February 1, 2023, the Bankruptcy Court granted the relief requested in the Debtors' motion (Docket No. 429).  The Debtors ultimately generated approximately $3 million in proceeds from the sale of Bitmain Coupons.

### I.      Settlements/Agreements with Creditors

#### i.     NYDIG Stipulation and Agreed Order

As of the Petition Date, Debtors owed NYDIG approximately $38.6 million of principal, plus certain interest, fees, expenses, and other obligations under various equipment financing loans (the "**NYDIG Debt**").  The NYDIG Debt was secured by 27,403 Miners (the "**NYDIG Collateral**").

After extensive negotiations between the Debtors and NYDIG, on February 2, 2023, the Debtors entered into a stipulation with NYDIG for the Debtors to transfer the NYDIG Collateral to NYDIG in exchange for the cancellation of the NYDIG Debt and the Debtors filed a motion to approve the settlement (Docket No. 448).  The Bankruptcy Court approved the stipulation on February 27, 2023 (Docket No. 574).  As of the date hereof, the Debtors have completed the transfer of the NYDIG Collateral to NYDIG and the NYDIG Debt has been discharged.

#### ii.    Priority Power Management Settlement

The Debtors achieved a significant milestone in the Chapter 11 Cases by settling their substantial disputes with Priority Power Management ("**PPM**").  Prior to the Petition Date, the Debtors had engaged PPM, an energy management services procurement and infrastructure development firm, to perform various consulting, energy management, and energy infrastructure development services in connection with power at their two facilities in west Texas, the Cottonwood Facility and the Cedarvale Facility (together, the "**West Texas Facilities**"), including the build out and construction of certain electrical infrastructure at the West Texas Facilities.

In May 2022, as it became clear the West Texas Facilities would not be supplied with the power capabilities PPM and the Debtors had anticipated, the Debtors ceased making payments to PPM.  With both parties alleging that the other party was in breach of the agreement, PPM and the Debtors began negotiating a global settlement.  As discussions between the parties continued, PPM asserted mechanics' liens against the Debtors based on goods, labor, and materials supplied to, for, or in connection with the work performed at the West Texas Facilities (collectively, the "**PPM Liens**").  The Debtors asserted claims against PPM for significant losses they incurred as a result of PPM's failure to secure the anticipated energy load for the West Texas Facilities (the "**Debtors' PPM Claims**").

After extensive and good faith negotiations, the Debtors and PPM reached a global settlement (the "**PPM Settlement**"), further detailed in the Debtors' motion to approve the PPM Settlement (Docket No. 655).  Pursuant to the PPM Settlement: (i) PPM's allowed Claim for $20.8 million was deemed paid and satisfied in full; (ii) PPM agreed to release the PPM Liens and any claims against the Debtors; and (iii) the Debtors agreed to release the Debtors' Claims.  On March 20, 2023, the Bankruptcy Court entered an order (Docket No. 706) approving the PPM Settlement.

#### iii.   Atalaya Settlement

After considerable negotiations, the Debtors reached a settlement with Atalaya, a lessor of 5,770 Miners to the Debtors.  Pursuant to the settlement, the parties amended the lease to (i) extend the lease term enabling Debtors to utilize the Atalaya Miners in their Self-Mining operations for a longer period of time and (ii) lower the Debtors'

monthly payment obligations to Atalaya.  In return, within thirty days of assumption of the Atalaya lease, the Debtors must (i) cure all prepetition missed payments, (ii) grant Atalaya with an administrative expense Claim for unpaid postposition lease payments for the sixty (60) days following the Petition Date, and (iii) pay Atalaya's professional fees subject to a $200,000 cap.  June 30, 2023 the Debtors filed a motion to assume the Atalaya lease, as amended (Docket No. 1021) (the "**Atalaya Assumption Motion**").  ~~The deadline for parties to object to~~On August 16, 2023, the Bankruptcy Court entered an order (Docket No. 1154) granting the relief requested in the Atalaya Assumption Motion ~~has passed and no objections to the Atalaya Assumption Motion were filed prior to such date~~.

### iv.  Denton Agreement

On June 28, 2023 the Debtors filed a motion to assume, as amended, their lease with the city of Denton, a lessor of nonresidential real property (Docket No. 1005) (the "**Denton Lease Assumption Motion**").  The amendments to the lease provide for, among other things, the extension of the lease term and a waiver of the default that would have otherwise arisen from the mechanic's liens that have attached to the property.  ~~The deadline for parties to object to~~On August 16, 2023, the Bankruptcy Court entered an order (Docket No. 1153) granting the relief requested in the Denton Lease Assumption Motion ~~has passed and no objections to~~.  Within three business days of the entry of the order approving the Denton Lease Assumption Motion ~~were filed prior to such date~~, the Debtors were required to pay the applicable agreed cure costs to Denton totaling approximately $1.5 million.

### v.  M&M Lien Settlements

The Debtors have reached settlements or agreements in principle with the following General Contractors who have asserted M&M Liens against the Debtors' assets: (i) Condair and HMC, which have been approved by the Bankruptcy Court (see Docket Nos. 1155 & 1167); and (ii) Trilogy, Didado, and Harper which are subject to pending motions before the Bankruptcy Court (see Docket Nos. 1058, 1061, & 1189) (collectively, the "**M&M Lien Settlements**").  Each of the M&M Lien Settlements is explained in further detail below:

#### (a)  ~~v.~~Condair Settlement

The Debtors recently entered into a settlement agreement with Condair Inc. ("**Condair**") to resolve Condair's claims, as set forth in the Debtors' motion (Docket No. 1057) filed on July 14, 2023 (the "**Condair Settlement**").  ~~The Condair Settlement remains subject to Bankruptcy Court approval.  The deadline for parties to object to the Condair Settlement was August 4, 2023, but the Ad Hoc Noteholder Group was granted an extension until August 7, 2023 to conduct additional diligence.  As of the date hereof, no objections to the Condair Settlement have been filed.~~

In connection with the Debtors' West Texas Facilities, the Debtors had contracted with Condair, a producer of industrial humidification, dehumidification and evaporative cooling products, to build six wet-wall cooling products (each a "**Wet-Wall**").  Condair specially designed and produced the Wet-Walls, two of which were successfully delivered to the Debtors, another two of which were completed and are being warehoused by Condair, and another two of which are in the process of being specially fabricated.  In the time between contracting with Condair to construct the Wet-Walls and receiving the Wet-Walls from Condair, the Debtors decided to use an alternate cooling system at their West Texas Facilities.

For the work done on the Wet-Walls, Condair asserted mechanics' liens against the Debtors' West Texas Facilities and filed POC No. 430 asserting a Claim of $11,784,176.80.  After negotiations, the Debtors and Condair agreed to the Condair Settlement, which, among other things, provides that in exchange for the Debtors making a $2.4 million payment to Condair within five days of the Bankruptcy Court's approval of the Condair Settlement, (i) Condair will release its mechanics liens on the Debtors' West Texas Facilities and (ii) all Condair's claims against the Debtors shall be deemed paid in full and expunged.  The Condair Settlement further provides that the Debtors no longer have any interest in the two completed and two partially fabricated Wet-Walls that remain in Condair's possession, any and all contracts and outstanding purchase orders between the Debtors and Condair are terminated, and Condair

shall not have claims for rejection damages based on the termination of those contracts.  Condair and the Debtors further granted a complete and final release of all claims against each other.

On August 16, 2023, the Bankruptcy Court entered an order (Docket No. 1155) approving the Condair Settlement.

(b)    vi. Trilogy Settlement

The Debtors recently entered into a settlement agreement with Trilogy LLC ("Trilogy") to resolve Trilogy's claims, as set forth in the Debtors' motion (Docket No. 1058) filed on July 14, 2023 (the "**Trilogy Settlement**").  The Trilogy Settlement remains subject to Bankruptcy Court approval.  The deadline for parties to object to the Trilogy Settlement was August 4, 2023, but the Ad Hoc Noteholder Group was granted an extension until August 714, 2023 to conduct additional diligence.  As of the date hereof, noNo objections to the Trilogy Settlement have beenwere filed prior to the respective objection deadlines.

In connection with the Debtors' Texas Facilities, the Debtors contracted with Trilogy, a manufacturer of commercial and industrial power distribution units ("**PDUs**") that provides a variety of services in connection with the manufacturing, assembly, and installation of PDUs for use in bitcoin mining facilities.  The Debtors entered into a series of purchase orders with Trilogy to purchase PDUs for use in its facilities (the "**Trilogy Contracts**").  Trilogy manufactured, assembled, and installed PDUs and associated components for use in the Debtors' Facilities pursuant to the Trilogy Contracts.  For the work done under the Trilogy Contracts, Trilogy asserted mechanics' liens against the Debtors' Texas Facilities and filed POC Nos. 1, 5 and 7 in the total amount of $14,849,165.90 in the Debtors' Chapter 11 Cases.  To resolve these claims, the Debtors entered into negotiations with Trilogy and reached the Trilogy Settlement.

The Trilogy Settlement provides that the Debtors will (i) make a $2,750,890 payment to Trilogy within five days of the Bankruptcy Court's approval of the Trilogy Settlement and (ii) deliver a duly executed promissory note (the "**Trilogy Note**") in the principal amount of $2,926,639 to Trilogy, which shall bear interest at the rate of 5% per annum, have a term of 30 months, and be payable in equal monthly installments.  In consideration for the foregoing, (a) Trilogy will deliver to Debtors final unconditional lien releases for all worked performed and all goods, labor and materials supplied to Debtors, (b) Trilogy will release its mechanics liens on the Debtors' Texas Facilities, (c) all claims against the Debtors shall be deemed paid in full and expunged, (d) all contracts and purchase orders between Trilogy and Debtors are terminated and Trilogy will not have claims for rejection damages based on the terminations of those contracts, (e) any amounts repaid under the Trilogy Note shall be available to Debtors as a credit (the "**Repaid Note Credit**") which may be applied toward the purchase of future orders of PDUs in satisfaction of up to twenty percent (20%) of the total purchase price of any future order; provided that, to the extent the Repaid Note Credit has not been applied in full on or prior to the date which is the fifth (5th) anniversary of court approval of the Trilogy Settlement- (such date, the "**Repaid Note Credit Expiration Date**"), the Repaid Note Credit shall expire on the Repaid Note Credit Expiration Date and no longer be available for application by, or refundable to, the Debtors thereafter, (f) following court approval of the Trilogy Settlement, the maximum purchase price of all goods purchased by the Debtors from Trilogy in the future shall be the manufacturers' suggested retail price, and (g) Trilogy shall have no further interest, if any, in goods which Debtor ordered from Trilogy which were previously delivered to the Debtors on or prior to December 31, 2022.

(c)    vii. J.W. Didado Settlement

The Debtors recently entered into a settlement agreement with J.W. Didado Electric, LLC ("**Didado**") to resolve Didado's claims, as set forth in the Debtors' motion (Docket No. 1061) filed on July 14, 2023 (the "**Didado Settlement**").  The Didado Settlement remains subject to Bankruptcy Court approval.  The deadline for parties to object to the Didado Settlement was August 4, 2023, but the Ad Hoc Noteholder Group was granted an extension until August 711, 2023 to conduct additional diligence.  As of the date hereof, noNo objections to the Didado Settlement have beenwere filed prior to the respective objection deadlines.

In connection with the Debtors' Muskogee Facility, the Debtors contracted with Didado, a full service electrical contractor, to develop and construct electrical infrastructure.  For the work done on the Muskogee Facility, Didado

63

asserted mechanics' liens on the Debtors' Muskogee Facility and filed POC Nos. 263 and 310 asserting a Claim of $26,049,229.00 in the Debtors' Chapter 11 Cases.  To resolve these claims, the Debtors engaged in negotiations with Didado and ultimately reached the Didado Settlement.  Among other things, the Didado Settlement provides that in exchange for the Debtors delivering a duly executed promissory note in the principal amount of $13,000,000 to Didado, which shall bear interest at the rate of 5% per annum, have a term of 36 months, be subject to certain mandatory prepayments, and be payable in equal monthly installments, (i) Didado will deliver to the Debtors final unconditional lien releases for all worked performed and all goods, labor and materials supplied to the Debtors, (ii) Didado will release its mechanics liens on the Debtors' Muskogee Facility and (iii) all claims against the Debtors shall be deemed paid in full and expunged.  The Didado Settlement further provides that all contracts and outstanding purchase orders between the Debtors and Didado are terminated, and Didado shall not have claims for rejection damages based on the termination of those contracts.

(d)    ~~viii. Hubbar~~Huband-Mantor Construction Settlement

The Debtors recently entered into a settlement agreement with Huband-Mantor Construction, Inc. ("**HMC**") to resolve HMC's claims, as set forth in the Debtors' motion (Docket No. 1062) filed on July 14, 2023 (the "**HMC Settlement**").  ~~The HMC Settlement remains subject to Bankruptcy Court approval.  The deadline for parties to object to the HMC Settlement was August 4, 2023, but the Ad Hoc Noteholder Group was granted an extension until August 7, 2023 to conduct additional diligence.~~  ~~As of the date hereof, no objections to the HMC Settlement have been filed.~~

In connection with the Debtors' West Texas Facilities, the Debtors contracted with HMC, a general contractor that provides contracting and project management services for residential and commercial construction projects.  The Debtors entered into a series of agreements with HMC to develop and construct physical infrastructure at the West Texas Facilities.

For the work done on the West Texas Facilities, HMC asserted mechanics' liens against the Debtors' West Texas Facilities and filed POC Nos. 55 and 90 asserting a Claim of $27,869,128.61 in the Debtors' Chapter 11 Cases.  In addition, certain subcontractors and sub-subcontractors of HMC have asserted mechanics' liens against the Debtors' West Texas Facilities and filed POC Nos. 3, 43, 44, 45, 46, 47, 84, 85, 91, 114, 163, 171, 186, 193, 194, 273, 274, 275, 276, 341, 343, 356, and 514, asserting Claims (collectively, the "**HMC Sub Claims**") in the Debtors' Chapter 11 Cases.  To resolve the Claims filed by HMC and the mechanics' asserted by each of HMC and its subcontractors and sub-subcontractors, the Debtors engaged in negotiations with HMC and ultimately reached the HMC Settlement.  Among other things, the HMC Settlement provides that for the Debtors will (i) make a $2,000,000 payment to HMC in immediately available funds, (ii) deliver a duly executed promissory note (the "**HMC Note**") in the principal amount of $15,500,000 to HMC, which HMC Note shall bear interest at the rate of 5% per annum, with a default interest rate of 12% per annum, have a term of 36 months, be subject to certain mandatory prepayments, and be secured by a duly executed leasehold deed of trust encumbering the Debtors' leasehold estate in the Cottonwood 1 Facility, which Mortgage shall have the same priority as the mechanics' liens filed by HMC, (iii) deliver an estoppel agreement duly executed by the landlord under the lease of the Cottonwood 1 Facility, (iv) use commercially reasonable efforts to deliver an estoppel agreement duly executed by Engie Resources LLC ("**Engie**"), the electric power supplier for the Cottonwood 1 Facility.  In consideration for the foregoing, (a) HMC, its subcontractors and its sub-subcontractors will release their mechanics liens on the Debtors' West Texas Facilities, HMC will release its Claims, and HMC will support any objections filed by the Debtors to the HMC Sub Claims, and (b) all claims against the Debtors shall be deemed paid in full and expunged.  The HMC Settlement further provides that all contracts and outstanding purchase orders between the Debtors and HMC are terminated, and HMC shall not have claims for rejection damages based on the termination of those contracts.

On August 18, 2023, the Bankruptcy Court entered an order (Docket No. 1167) approving the HMC Settlement.

(e)    Harper Construction Settlement

The Debtors recently entered into a settlement agreement with Harper Construction Company Inc. ("**Harper**") to resolve Harper's claims, as set forth in the Debtors' motion (Docket No. 1189) filed on August 30, 2023 (the

"**Harper Settlement**").  The Harper Settlement remains subject to Bankruptcy Court approval.  The deadline for parties to object to the Harper Settlement is September 20, 2023.

In connection with the Debtors' Muskogee Facility, the Debtors contracted with Harper, a general contractor, to develop and construct the physical infrastructure at the Muskogee Facility.  For the work done on the Muskogee Facility, Harper asserted mechanics' liens on the Muskogee Facility totaling $9,700,571.00 and filed POC No. 437 asserting a Claim of $20,738,602.00 in the Debtors' Chapter 11 Cases.  Additionally, certain of the subcontractors Harper engaged to assist with the construction of the Muskogee Facility asserted mechanics' liens on the Muskogee Facility totaling $5,848,157.89 (the "**Sub-Liens**").  To resolve these claims and Sub-Liens, the Debtors engaged in negotiations with Harper and ultimately reached the Harper Settlement.  Among other things, the Harper Settlement provides for the Debtors to (i) make a $1.5 million cash payment to Harper within 5 days of entry of the proposed order, (ii) deliver a duly executed promissory note in the principal amount of $4,678,388.00 to Harper, which shall bear interest at the rate of 5% per annum, have a term of 30 months, be fully amortizing with interest beginning to accrue 45 days after the Effective Date, and be subject to certain mandatory prepayments, and (iii) make a $445,636.00 payment to Harper within 15 days of the Effective Date.  In consideration for the foregoing, (x) Harper will deliver to the Debtors final unconditional lien releases for all of the Sub-Liens, (y) Harper will waive a portion of its mechanics' liens on the Muskogee Facility so that the remaining mechanics' liens held by Harper do not secure an amount in excess of $3 million, and (z) all Harper's other claims against the Debtors shall be deemed paid in full and expunged.  The Harper Settlement further provides that the outstanding contracts between the Debtors and Harper are each terminated on or prior to September 30, 2023, and the parties shall not have claims for damages any other cause of action based on the termination of those contracts.

### vi. ~~ix.~~ Celsius Settlement

(a)     Celsius's Claims

i.     Celsius's Proofs of Claim

On April 14, 2023, Celsius filed POCs Nos. 425 and 497 against Core Scientific, Inc., asserting purported breaches of the Celsius Contracts by Core (the "**Celsius Hosting POCs**") and seeking over $312 million.[571]  The Celsius Hosting POCs does not explain its damages calculation, but the $312 million appears to be comprised of lost profits, lost revenues, special damages and/or consequential damages, which are expressly barred by the limitations of liability provisions set forth in the Celsius Contracts.  Without any basis, Celsius notes in the Celsius Hosting POCs that its Claims are contingent on the assumption that "any limitations of liability in the contracts do not apply."

On April 24, 2023, the Debtors filed an objection to the Celsius Hosting POCs (the "**Celsius Hosting POC Objection**") (Docket No. 819).  The Debtors contend that Celsius' asserted Claims are not recoverable because the Celsius Contracts explicitly limit the aggregate amount of recovery to which Celsius could ever be entitled to an amount equal to one month's fee per applicable order.  In addition, the Celsius Contracts expressly exclude recovery for lost profits, loss of business, loss of revenues, consequential or indirect damages, and any incidental, special reliance, exemplary, or punitive damages.  The Debtors also disputed that they breached the Celsius Contracts prior to rejection.  The parties stayed Celsius's deadline to respond to the Celsius Hosting POC Objection pending the parties' Mediation (as defined below) and did not have a hearing for consideration of these Claims.

On May 30, 2023, the Debtors filed a motion for partial summary judgment with respect to the Celsius Hosting POCs (Docket No. 942) (the "**Summary Judgment Motion**").  The Debtors requested that the Bankruptcy Court

---

[571] Celsius US Holding LLC filed additional POCs against certain of the Debtors on April 14, 2023. See Claim No. 428 filed against Core Scientific, Inc.; Claim No. 434 filed against Core Scientific Mining LLC; Claim No. 436 filed against Core Scientific Acquired Mining LLC; Claim No. 439 filed against Core Scientific Operating Company; Claim No. 469 filed against American Property Acquisition, LLC; Claim No. 494 against American Property Acquisitions I, LLC; Claim No. 495 against Starboard Capital LLC; and Claim No. 496 against Core Scientific Specialty Mining (Oklahoma) LLC. The Debtors have not yet objected to these additional POCs, but reserve all rights in that regard.

enter judgment that, as a matter of law, the unambiguous limitations of liability provisions set forth in the Celsius Contracts (1) limit Debtors' total liability to one month's fee (here, approximately $5.7 million) and (2) prevent Celsius from recovering lost profits; loss of business; loss of revenues; loss, interruption or use of data or loss of use of Celsius equipment; any consequential, or indirect damages; or cost of cover, incidental, special, reliance or punitive damages (which reduces Celsius's Claim as asserted by over $300 million).

On June 21, 2023, Celsius filed its opposition to the Summary Judgment Motion (Docket No. 942) (the "**Summary Judgment Opposition**"). Due to settlement discussions, the Debtors did not file a reply to the Summary Judgment Opposition, and no hearing on the Summary Judgment motion has been scheduled.

ii.      Celsius's Administrative Claim Motion

In addition to the Celsius Hosting POC, Celsius also filed a motion directing immediate payment of its asserted administrative expense claim (Docket No. 801) (the "**Celsius Administrative Claim Motion**"). On May 5, Debtors filed an objection in response to the Celsius Administrative Claim Motion (Docket No. 861) (the "**Celsius Administrative Claim Objection**"). The Debtors contend that Celsius is not entitled to an administrative claim, due to the claims that Debtors and Celsius have asserted against each other in their respective chapter 11 cases and that even if Celsius does have an administrative claim, it should be limited by the doctrines of recoupment and setoff.

The parties stayed Celsius's deadline to respond to the Celsius Administrative Claim Objection pending the parties' Mediation, and the hearing on the Celsius Administrative Claim Motion was similarly adjourned pending the parties' Mediation.

(b)      Debtors' Claims Against Celsius

On January 3, 2023, the Debtors timely filed an initial POC in the Celsius Chapter 11 Cases (Claim No. 17273 filed against Celsius Mining LLC) (the "**Initial Core POC**"). On February 9, 2023, after the bar date was extended in the Celsius Chapter 11 Cases, the Debtors timely filed an amended POC, which amended and superseded the Initial Core POC in all respects (Claim No. 23022 filed against Celsius Mining LLC) (the "**Amended Core POC**" and, together with the Initial Core POC, the "**Core POCs**").

Pursuant to the Core POCs, the Debtors assert that Celsius owes them approximately $3,886,169.41 in liquidated prepetition amounts relating to hosting services and in excess of $30 million in amounts to be liquidated, and the Debtors reserved the right to seek the equitable subordination of Celsius's Claims in the Debtors' Chapter 11 Cases. Celsius has not filed an objection to the Core POCs.

The Debtors also reserved their rights to assert administrative claims against Celsius relating to unpaid PPT Charges following the filing of Celsius Chapter 11 Cases through the date the Debtors rejected the Celsius Contracts and the significant legal fees the Debtors incurred as a result of defending against the Celsius's Claims.

(c)      Proposed Mediation

The Debtors and Celsius had previously agreed to mediate the issues and disputes underlying the Automatic Stay Motion, the Core Administrative Claim Motion, the Rejection Motion, the Core POCs, the Celsius Hosting POCs, the Celsius Administrative Claim Motion, and the Summary Judgment Briefing (the "**Mediation**"). The Mediation was scheduled to commence on July 11, 2023 at 1:30 pm (Prevailing Central Time) in Houston, Texas before the Honorable Marvin Isgur, United States Bankruptcy Judge for the Southern District of Texas (Docket No. 968). However, as further described below, prior to Mediation, the Debtors and Celsius reached an agreement in principle to resolve their disputes and claims and as a result of such negotiations have agreed to cancel the Mediation.

(d)      Celsius Settlement

After extensive and good faith negotiations, the Debtor and Celsius reached an agreement in principle that provides for a global resolution of all claims and disputes between the Debtors and Celsius, except for Celsius's convertible

notes claims (the "**Celsius Settlement**").  The Celsius Settlement is subject to final agreement, documentation, and the approval by both the Bankruptcy Court and the bankruptcy court in the Celsius Chapter 11 Cases.

### vii.  ~~x.~~ Foundry Settlement

The Debtors have reached an agreement ~~in principle~~, subject to the terms and conditions of the Foundry Settlement Documents, with hosting client Foundry Digital LLC ("**Foundry**") to, among other things, resolve Foundry's filed POCs Nos. 360 and 361 against Debtor entities Core Scientific Acquired Mining LLC and Core Scientific, Inc., each in the amount of not less $18,404,990.08 plus interest (the "**Foundry POCs**").  The Claims asserted in the Foundry POCs arose from the Debtors' non-payments of amounts owed under a~~that~~ certain Amended and Restated Asset Purchase Agreement, dated February 2, 2022, between Foundry and Core Scientific Acquired Mining LLC and Core Scientific, Inc.  The Debtors and Foundry ~~are currently~~have negotiat~~ing~~ed a settlement agreement ~~(the "~~**Foundry Settlement Agreement**~~")~~ to fully resolve the Foundry POCs.  ~~The Debtors plan to file a motion, within five business days of the execution of the Foundry Settlement Agreement,~~ in accordance with, and subject to the terms and conditions of, the Foundry Settlement Documents, as described in the Debtors' motion (Docket No. 1080), filed on August 25, 2023 (the "**Foundry Settlement Motion**").  Pursuant to the Foundry Settlement Documents, in satisfaction of the Foundry POCs, among other agreements or transactions, the Debtors (i) have agreed to assume their existing hosting agreements with Foundry; (ii) have entered into a new hosting agreement in connection with 2,106 Bitmain Antminer S19 XP mining machines identified in the Foundry Settlement Agreement (the "**Identified Miners**") that are currently in the possession of the Debtors, pursuant to which, effective and commencing on the Effective Date, the Debtors will host and operate the Identified Miners and split the profits therefrom with Foundry in accordance with such hosting agreement; and (iii) will transfer, convey and deliver all of their rights, title and interest in, to and under, and possession of, the Identified Miners to Foundry on the earlier of first anniversary of the date of the Foundry Settlement Agreement and the termination or expiration of the term of the hosting agreement referenced in the immediately preceding clause (ii) of this subsection (vii).  The Debtors have filed the Foundry Settlement Motion requesting Bankruptcy Court approval of the Foundry Settlement ~~Agreement.[56]~~Documents under Bankruptcy Rule 9019.  If approved, the Foundry Settlement Agreement, and subject to the other terms and conditions of the Foundry Settlement Documents, the Foundry Settlement will go into effect on the Foundry Settlement Effective Date.

### viii.  ~~xi.~~ Miner Equipment Lender Settlement

As discussed above, the Debtors recently entered into a settlement agreement with one of their largest secured creditor groups, the Equipment Lenders.  The settlement resolves disputes with the Settling Equipment Lenders[57] relating to (i) the Debtors' valuation of the Equipment Lenders' collateral (impacting the Allowed Miner Equipment Lender Secured Claim Amounts as set forth on the Miner Equipment Claims Schedule), (ii) the terms of the take-back debt the Debtors were providing to the Holders of Miner Equipment Lender Secured Claims under the initial Plan, and (iii) adequate protection/diminution of value.

Due to the complexity of these legal issues as well as the novel issue of valuing Miner collateral, a dispute of such issues could delay confirmation of the Plan and be costly to litigate.  In addition, although the Debtors believed they

---

[56] ~~The Foundry Settlement Agreement, the Foundry Settlement Documents, and the applicable provisions of the Plan incorporating the Foundry Settlement Agreement and the Foundry Settlement Documents remain subject to ongoing negotiations between Foundry and the Debtors.  Neither the Debtors nor Foundry have yet agreed, and nothing herein shall be construed as the Debtors' or Foundry's agreement, to the Foundry Settlement Agreement, any of the Foundry Settlement Documents and/or any descriptions thereof herein, and Foundry's and the Debtors' rights with respect to the foregoing, the Disclosure Statement and the Plan are fully reserved.~~

[57] ~~The Debtors believe the following are the Settling Equipment Lenders: Mass Mutual Asset Finance LLC; Barings; BlockFi Lending LLC.; Stonebriar Commercial Finance LLC; 36th Street Capital Partners LLC.; Anchorage Lending CA, LLC; Trinity Capital Inc.; Wingspire Equipment Finance LLC (f/k/a Liberty Commercial Finance LLC).~~

would prevail in litigation, they could not be certain, and a loss on certain of these issues could have resulted in the need to make additional cash payments to the Equipment Lenders. Rather than expend time and money disputing these issues to the detriment of all stakeholders, the parties came to terms on the Miner Equipment Lender Settlement.

The Miner Equipment Lender Settlement provides the Settling Equipment Lenders will vote in favor of the Plan (subject to receipt of a Court-approved Disclosure Statement) in exchange for an election of the following negotiated treatment: (i) secured debt with a principal amount that is 80% of the Settling Equipment Lender's Allowed Claims in the form of Miner Equipment Lender Takeback Debt (Election 2), with a waiver of any recovery on account of any Miner Equipment Lender Deficiency Claims (the "**Negotiated Settlement**"); (ii) full equitization of the Settling Equipment Lender's Allowed Miner Equipment Lender Secured Claim (the "**Equitization Option**") in the form of Miner Equipment Lender Treatment Election 1, or (iii) the Default Miner Equipment Lender Treatment. In addition, pursuant to the Miner Equipment Lender Settlement (i) the Debtors and the Settling Equipment Lenders reach an agreement as to the Allowed amounts of the Miner Equipment Lender Claims of the Settling Equipment Lenders; (ii) the Settling Equipment Lenders electing the Negotiated Settlement have agreed to waive recoveries on their Miner Equipment Lender Deficiency Claims and vote in favor of the Plan, and (iii) the Settling Equipment Lenders will be entitled to reimbursement of reasonable and documented fees and expenses up to a cap of $3 million in the aggregate for all Settling Equipment Lenders. The Debtors intend to effectuate the Miner Equipment Lender Settlement pursuant to the Plan under Bankruptcy Rule 9019.

The below chart details each of the Settling Equipment Lenders' anticipated settlement election as well as their estimated Claim amounts inclusive of postpetition interest assuming an Effective Date of ~~September 30~~October 31, 2023:

| Settling Equipment Lender | Anticipated Settlement Election |
| --- | --- |
| Mass Mutual Asset Finance LLC | Negotiated Settlement |
| Barings | Negotiated Settlement |
| BlockFi Lending LLC. | Negotiated Settlement |
| 36th Street Capital Partners LLC. | ~~Negotiated Settlement~~Default Miner Equipment Lender Treatment |
| Anchorage Lending CA, LLC; | Equitization Option |
| Trinity Capital Inc | Negotiated Settlement |
| Wingspire Equipment Finance LLC (f/k/a Liberty Commercial Finance LLC). | Default Miner Equipment Lender Treatment |

### ix. ~~xii.~~ Bitmain Purchase Agreement

The Debtors and Bitmain have agreed in principle to enter into an asset purchase agreement (the "**Bitmain Transaction**"). Subject to documentation and the Bankruptcy Court's approval, under the Bitmain Transaction, the Debtors will acquire 27,000 units of S19j XP Miners from Bitmain for a purchase price of $77.1 million. The purchase price includes (i) $23.1 million of cash, to be paid in three equal monthly installments upon and following the Effective Date and (ii) $53.9 million of the New Common Interests (valued at Plan Equity Value) upon the Effective Date. The acquired mining equipment will be delivered by Bitmain in monthly installments following the Effective Date. The Debtors' Business Plan (as defined below) contemplates the Reorganized Debtors making additional Miner purchases each year. Through the Bitmain Transaction, the Debtors are able to acquire a portion of these Miners in exchange for equity rather than cash (which decreases the Reorganized Debtors' go forward cash needs). Additionally, the Bitmain Transaction has the added benefit of locking in current Miner prices for 27,000 future Miner purchases.

J.        **Claims**

*x.*   *i.* *Schedules of Assets and Liabilities and Statements of Financial Affairs*

On February 3, 2023, the Debtors filed their Schedules and SOFAs (Docket Nos. 461-491). The Debtors filed amended SOFAs for entities Core Scientific, Inc., Core Scientific Operating Company, Core Scientific Acquired Mining LLC, and Radar Relay, Inc. and amended Schedules for Core Scientific, Inc. and Core Scientific Operating Company on March 3, 2023 (Docket Nos. 625-630). The Schedules and SOFAs provide information on the assets held at each Debtor entity along with Claims the Debtors know exist at each Debtor entity.

*xi.*   *ii.* *Claims Bar Dates*

On March 9, 2023, the Bankruptcy Court entered an order, among other things, approving (i) April 14, 2023 at 5:00 p.m. (prevailing Central Time) as the deadline for all non-governmental creditors or other parties in interest to file POCs (the "**General Bar Date**") and (ii) June 19, 2023 at 5:00 p.m. (prevailing Central Time) as the deadline for governmental units to file POCs against any of the Debtors (the "**Governmental Bar Date**" and, together with the General Bar Date, the "**Bar Dates**") (Docket No. 652).

As of June 19, 2023, 627 POCs have been filed against the Debtors. The Debtors continue to review and refine their analysis of the filed POCs.

*xii.*   *iii.* *Claims Reconciliation Process*

In anticipation of the Bar Date, the Debtors considered how they could expedite the Claims resolution process to minimize the amount of disputed Claims remaining as of the Effective Date, providing certainty to stakeholders and ensuring a quicker and larger distribution to all stakeholders.

To that end, the Debtors filed motions to approve (i) omnibus claims objection procedures (Docket No. 782) and (ii) claim settlement procedures (Docket No 781). On May 18, 2023, the Bankruptcy Court entered orders granting the relief requested in the motions (Docket No. 899) and (Docket No. 901). After the General Bar Date, the Debtors filed objections to several POCs. Certain key objections are described in further detail below.

(a)        Sphere's Proofs of Claim

On April 13, 2023, Sphere 3D Corp. ("**Sphere**") filed POCs Nos. 358 and 359 (the "**Sphere POCs**"), asserting claims of approximately $39 million based on hosting contracts the Debtors executed with Gryphon Digital Mining, Inc. ("**Gryphon**"), an entity to which the Sphere POCs refer as Sphere's "manager." The Debtors and Gryphon entered into a Master Services Agreement ("**Gryphon MSA**") and two orders governed by the Gryphon MSA: Order #1 and Order #2 (collectively with the Gryphon MSA, the "**Gryphon Hosting Agreements**"). Pursuant to the Gryphon Hosting Agreements, the Debtors hosted (and currently host) hundreds of Gryphon's Miners. Sphere alleges that the Debtors failed to perform according to the Gryphon Hosting Agreements.

On May 9, 2023, the Debtors filed an objection to the Sphere POCs (Docket No. 869) (the "**Sphere POC Objection**"). The Debtors contend that Sphere cannot recover on its filed claim because, among other things: (i) Sphere is not a party to the Gryphon Hosting Agreements and third party beneficiaries are not permitted under the Gryphon Hosting Agreements, (ii) Sphere cannot assume Gryphon's rights under the Gryphon Hosting Agreements without complying with certain requirements, which Sphere failed to do, and (iii) Gryphon had breached the Gryphon Hosting Agreements and neither Gryphon nor Sphere could have performed under those agreements.

On June 9, 2023, the Debtors filed a motion for summary judgment with respect to the Sphere POCs (Docket No. 959) (the "**Sphere Summary Judgment Motion**"), along with a supporting declaration of Russell Cann (Docket No. 960). The Sphere Summary Judgment Motion argues that (i) Sphere does not have any rights under the Gryphon Hosting Agreements and thus the Bankruptcy Court should dismiss the Sphere POCs and (ii) in the alternative, the claims asserted in Sphere POCs should be limited by the limitation of liabilities provision under the Gryphon Hosting Agreements. Sphere responded to both the Sphere Summary Judgment Motion and the Sphere

POC Objection on July 7, 2023 and July 10, 2023, respectively (Docket Nos. 1039 and 1044).  On July 31, 2023, the Debtors filed a reply in further support of the Sphere Summary Judgement Motion.  On August ~~7~~8, 2023, the Bankruptcy Court ~~denied~~entered an order (Docket No. 1122) denying the Sphere Summary Judgment Motion.  On August 14, 2023, the parties submitted an agreed scheduling order to resolve the Sphere POC Objection (Docket No. 1147) (the "**Sphere Scheduling Order**").  The Sphere Scheduling Order sets: (i) an October 23, 2023 deadline to complete discovery; (ii) a December 6, 2023 deadline to file motions for summary judgement; (iii) a December 8, 2023 deadline to file any other pretrial motions; and (iv) a trial on January. 3, 2024 at 9:00 a.m. (prevailing Central Time).

        (b)        GEM ~~Mining~~ Proofs of Claim

On April 13, 2023, GEM Mining 1, LLC ("**GEM 1**") and GEM Mining 4, LLC ("**GEM 4**") filed a motion seeking (i) to compel the Debtors to assume or reject those certain hosting contracts in which the Debtors agreed to host Miners for GEM 1 and GEM 4, or (ii) in the alternative for adequate protection (Docket No. 787) (the "**GEM Motion**").  The Court entered an order (Docket No. 792) scheduling a hearing on May 22, 2023 to consider the relief requested in the GEM Motion.  Contemporaneously with filing the GEM Motion, GEM 1, GEM Mining 2, LLC, GEM Mining 2B, LLC, and GEM 4 (collectively, "**GEM**") filed POCs Nos. 503, 617, 508, 570, 505, 571, 506, 572 (the "**GEM POCs**") against the Debtors asserting a Claim of over $7 million on account of alleged prepetition overpayments made by GEM on account of PPT Charges.

On May 4, 2023, the Debtors filed an objection to the GEM Motion (Docket No. 856), arguing that GEM 1 and GEM 4 did not satisfy their required burdens.  On the same day, the Debtors also filed an objection to the GEM POCs (Docket No. 854) (the "**GEM POC Objection**"), as well as a declaration of Jeff Pratt in support of the GEM POC Objection (Docket No. 858).

Prior to the hearing on the GEM Motion, the parties agreed to adjourn the hearing three times to enable the parties to engage in global settlement negotiations (Docket Nos. 926, 980 and 1077).  Prior to ~~T~~the hearing on the GEM Motion ~~is currently~~ scheduled for August 16, 2023 ~~and~~, the parties entered into a stipulation, which was entered by the Bankruptcy Court on August 14, 2023 (Docket No. 1146) (the "**GEM Stipulation**").  Pursuant to the GEM Stipulation, (i) the Debtors rejected all hosting contracts with GEM, (ii) the parties established a schedule by which the Debtors will return GEM's Miners to GEM, and (iii) GEM's deadline to ~~respond to the GEM~~submit a POC for ~~Ob~~rejection ~~has been extended to August 23~~damages is October 30, 2023.

        (c)        Bryce Johnson's Proofs of Claim

Bryce Johnson, the Debtors' former CEO and chairman of the board of directors, filed POCs Nos. 19 and 120, seeking approximately $10 million on account of a certain Restricted Stock Unit Award Agreement ("**RSU Agreement**") between Mr. Johnson and the Debtors.  The RSU Agreement provides Mr. Johnson a right to receive 605,261 shares of Core Scientific, Inc.'s common stock if and only if he paid the withholding tax amount prior to the issuance of the stock.  The Debtors objected to the claims on May 11, 2023 (Docket No. 871).  On June 21, 2023, Mr. Johnson withdrew all of his claims with prejudice (Docket No. 978).

        (d)        Maddox's Proof of Claim

On April 12, 2023, Maddox Industrial Transformer LLC ("**Maddox**") filed a POC against Core Scientific, Inc., alleging a secured claim of $7,742,403.52 stemming from transformers the Debtors purchased from Maddox.

The Debtors dispute Maddox's POC and believe Maddox owes the Debtors $3 million stemming from defective transformers Maddox sold to the Debtors.  The Debtors have engaged in discussions with Maddox's counsel about a potential resolution and awaiting a proposal amenable to the Debtors.  If no resolution is reached, the Debtors intend to file an adversary complaint in response to Maddox's POC.

(e)        Hoffman Securities Proof of Claim

On November 14, 2022, a class action lawsuit, Pang v. Levitt, et. al 1:22-cv-01191, was filed in the Western District of Texas against Core Scientific, Inc., Chief Executive Officer Michael Levitt, former Chief Financial Officer Michael Trzupek, and Chief Financial Officer Denise Sterling alleging violations of the Securities Exchange Act (the "**Securities Class Action**").  After the Debtors filed the Chapter 11 Cases, the plaintiff in the Securities Class Action filed a notice of voluntary dismissal as to the Debtors on December 27, 2022. On May 5, 2023, an amended complaint was filed refining the allegations and naming additional defendants: Chief Vision Officer Darin Feinstein, former Chief Accounting Officer Brian Neville, Director Jarvis Hollingsworth, Director Matt Minnis, and Director Kneeland Youngblood.  The Debtors are no longer a named party in the suit, but are identified as a relevant non-party.

On April 12, 2023, the Debtors filed a motion to advance proceeds of the Debtors' directors and officers liability insurance policies for defense costs of the named defendants in the Securities Class Action (Docket No. 777).  On May 18, 2023, the Bankruptcy Court entered an order granting the relief requested (Docket No. 900).

Morgan Hoffman, on behalf of himself and ostensibly the plaintiffs in the Securities Class Action, filed POC No. 632 against Debtor Core Scientific Inc. in the amount of $188.6 million (the "**Securities POC**").  On July 24, 2023, the Debtors filed an objection to the Securities POC (Docket No. 1080) (the "**Securities POC Objection**") asserting the Securities POC should be Disallowed as the filing of a class proof of claim was inappropriate.  In addition, the Debtors believe any claim arising from the Securities Class Action should be treated as a Section 510(b) Claim.  Morgan Hoffman~~'s~~ respon~~se~~ded to the Securities POC Objection ~~is due~~ on August 23, 2023~~.~~ (Docket. No. 1178), asserting (i) Morgan Hoffman has authority to assert a class proof of claim and (ii) the Securities POC should be allowed.  To date, no hearing with the Bankruptcy Court has been scheduled to consider the Securities POC Objection.

(f)        Harlin Dean Proof of Claim

On March 13, 2023, Harlin Dean filed POCs Nos. 364 and 383 (the "**Harlin Dean POCs**") against Core Scientific, Inc. and Core Scientific Acquired Mining LLC, respectively, alleging a claim for $8 million stemming from an employment contract dispute.  Dean alleges the Debtors failed to pay his severance, failed to convert his equity-based compensation, and failed to reach a settlement with him.  Mr. Dean asserts claims for (i) breach of contract; (ii) quantum meruit; (iii) promissory estoppel; (iv) fraudulent inducement; (v) conversion; (vi) declaratory judgment; (vii) equitable relief/specific performance; (viii) imposition of constructive trust; (ix) accounting; and (x) attorney's fees, costs, and expenses incurred.

The Debtors are currently in the process of negotiating with Dean's counsel to resolve the Harlin Dean POCs.  If negotiations are unsuccessful, the Debtors plan to file an objection to the Harlin Dean POCs.

(g)        Kentucky Department of Revenue Proof of Claim

On April 3, 2023, the Kentucky Department of Revenue filed POC No. 176 (the "**Kentucky DoR POC**") against Core Scientific Mining LLC alleging a claim for approximately $4 million comprised of an over $3 million Priority Tax Claim and an approximately $1 million General Unsecured Claim stemming from alleged unpaid taxes.  The Debtors dispute the validity of the Kentucky POC and plan to file an objection to the Kentucky DoR POC. Additionally, the Debtors are currently pursuing a tax appeal in the state of Kentucky related to the validity of the unpaid taxes giving rise to the claim asserted in the Kentucky DoR POC.

**K.        Exclusivity**

On April 10, 2023, the Debtors filed a motion seeking extensions of the Debtors' exclusive periods to file a chapter 11 plan and solicit acceptances thereof through and including July 19, 2023 and September 17, 2023, respectively (Docket No. 773) (the "**First Exclusivity Motion**").  A number of the Equipment Lenders filed or joined an objection to the First Exclusivity Motion (the "**Exclusivity Objection**").~~58~~72   In their Exclusivity Objection, the

---

~~58~~ The original objection was filed by Equipment Lenders Wingspire Equipment Finance LLC f/k/a Liberty Commercial Finance LLC, Prime Alliance Bank, Inc., and 36th Street Capital Partners, LLC, who filed the

Equipment Lenders alleged the Debtors were delaying their exit from chapter 11 to take advantage of the Equipment Lenders' collateral without making payments on the debt.  The Ad Hoc Noteholder Group filed a statement (Docket No. 839), supporting the relief requested in the First Exclusivity Motion, but imploring the Debtors to advance Plan negotiations.  The Debtors filed a reply to the statement and the Exclusivity Objection on May 19, 2023 (Docket No. 912).  During the May 22, 2023 hearing on the First Exclusivity Motion, the Debtors provided a presentation to the Bankruptcy Court outlining a proposed timeline to exit chapter 11, indicating a desire to file the Plan by mid-June.  The Bankruptcy Court responded by stating it would like to see the Plan and Disclosure Statement filed by June 20, 2023 and requesting the Debtors coordinate with the Key Stakeholder Groups to schedule a status/scheduling conference to be held within a week of the filing of the Plan.  On June 13, 2023, the Bankruptcy Court entered an order (Docket No. 962) granting the relief requested in the First Exclusivity Motion and scheduling a status conference to be held on June 29, 2023.

On July 18, 2023 the Debtors filed a motion seeking further extensions of the Debtors' exclusive periods to file a chapter 11 plan and solicit acceptances thereof through and including October 17, 2023 and December 18, 2023, respectively (Docket No. 1065) (the "**Second Exclusivity Motion**").  On August 8, 2023, Barings filed a statement in support of the Second Exclusivity Motion (Docket No. 1123), which was joined to by MassMutual Asset Finance LLC (Docket No. 1124).  The deadline for parties to object to the Second Exclusivity Motion ~~is~~was August 8, 2023 and no parties subject to that deadline filed an objection; however, the Debtors granted Ad Hoc Noteholder Group an extension of the objection deadline until ~~August 14~~September 7, 2023.

<p style="text-align:center">L.   **Formulation of the Business Plan**</p>

Favorable changes in the cryptocurrency and power markets rendered the Debtors' prior business plan obsolete and the allocation of value set forth in the RSA unsupportable and unfair to most of the Debtors' stakeholders.  The change in circumstances required the Debtors to pivot to a new business plan anchored to assumptions reflecting the current economic backdrop.

On April 30, 2023, the Debtors finalized a preliminary business plan for the reorganized Debtors (the "**Business Plan**"), covering the period from October 2023 (the projected emergence from chapter 11) until December 2026 (the "**Forecast Period**").  The Business Plan was crafted by the Debtors' management, including Mike Levitt (Executive Chairman and CEO until August 2, 2023) Adam Sullivan (CEO since August 2, 2023 and prior thereto, President), and Michael Bros (current Senior VP of Capital Markets and Acquisitions), each of whom has years of experience in, and an intimate understanding of, the bitcoin mining industry.  The Debtors' management presented the Business Plan to the Board (including the Special Committee) on May 1, 2023 and presented a revised Business Plan to the Special Committee on May 12, 2023.

The Business Plan was created with management's expectation of post-emergence operational execution in mind, with initiatives including: (i) optimizing self-Miner fleet efficiency by refreshing existing Miners; (ii) expanding capacity at certain facilities; (iii) expanding self-Mining presence; and (iv) focusing on cost discipline.  The Debtors expect to grow the number of operating self-Miners from approximately 145,000 in September 2023 to approximately 282,000 by December 2026.  The Debtors also expect to utilize six (6) facilities with an aggregate capacity of 1,096MW by the end of the Forecast Period, following planned expansion of their Denton Facility (by 172MWs) and Cottonwood Facility (by 200 MWs).

The Debtors built flexibility into the Business Plan to ensure it can withstand unexpected changes in variables that could impact projected cash flow.  This ensures that actual results deviating from any one or more of the

---

Commercial Finance LLC, Prime Alliance Bank, Inc., and 36th Street Capital Partners, LLC, who filed the *Objection to the Motion of the Debtors of Order Extending Exclusive Periods Pursuant to Section 1121(D) of the Bankruptcy Code* (Docket No. 834).  Joinders were then filed by MassMutual Asset Finance LLC (Docket No. 836); Baring BDC, Inc., Barings Capital Investment Corporation, and Barings Private Credit Corp. (ECF. No. 838); and Blockfi Lending LLC (ECF No. 840).

assumptions would continue to result in the Debtors' commercial viability, and therefore, the Plan's continued feasibility.

Most importantly, the Business Plan provides the flexibility to adapt to changes in hashprice, which is one of the most important factors influencing the economic performance of the Debtors' business. Specifically, because anticipated capital expenditures contemplated as part of the Business Plan are largely discretionary in nature, any unanticipated decrease in hashprice can be offset by deferring and/or reducing any planned discretionary capital expenditures in such year. In addition, the cost of Miners is dynamic based on mining economics, as the cost of purchasing new Miners decreases as their profitability decreases. Miner purchase prices have historically been, and are expected to continue to be, based on a 12-month payback period.

In addition, should hashprice decrease further, the Debtors anticipate that they (and others) would power down certain Miners, in accordance with existing industry practice, as the profitability of certain Miners would decline (i.e., the lower revenues may not exceed certain Miners' operating costs). Powering down Miners would then reduce the network hashrate and, all else equal, increase hashprice (and thus, increases profitability of the then-powered and operating Miners). Certain less efficient Miners may go offline permanently. It may be challenging for other mining companies to replace those less efficient Miners with newer, more efficient Miners; doing so would require time and capital. The global chip and silicone shortage may exacerbate the issue. In contrast, the Debtors believe they will be in a preferred position to purchase new Miners, because the Debtors are one of the largest customers of Bitmain (the leading manufacturer of Miners), and Bitmain is one of the Debtors' hosting customers.

### M. Postpetition Stakeholder Discussions and Plan Mediation

Commencing on May 10, 2023, the Debtors and the Advisors presented the Business Plan to the advisors to each of the Ad Hoc Noteholder Group, the ~~Replacement~~ DIP Lenders, the Creditors' Committee, the Equity Committee, and the Equipment Lenders (the "**Key Stakeholder Advisors**") during a series of meetings and solicited such advisors' feedback on the Business Plan. After finalizing the Business Plan, the Debtors and their Advisors drafted a construct for a chapter 11 plan of reorganization.

On May 31, 2023, the Debtors and the Advisors began presenting the construct for a consensual plan of reorganization to the Key Stakeholder Advisors and solicited their feedback, starting with their largest creditor group, the Ad Hoc Noteholder Group. The Debtors and Advisors presented the proposal to principals in the Ad Hoc Noteholder Group on June 9, 2023. That proposal is similar to the proposal set forth in the Plan, but without the New April Secured Notes Term Sheet (Option 1) and New August Secured Notes Term Sheet (Option 1) for Classes 1 and 2. Despite the Debtors' repeated requests to the Ad Hoc Noteholder Group for feedback on the consensual plan framework or a counterproposal, as of the Initial Plan Filing Date, the Ad Hoc Noteholder Group had failed to submit a counterproposal or formally respond to the Debtors' Plan Proposal. Faced with the Court's June 20 target date for filing a chapter 11 plan and the Ad Hoc Noteholder Group's failure to meaningfully engage with the Debtors on a consensual plan construct prior such date the Debtors filed a Plan on the Initial Plan Filing Date that could be confirmed with or without the acceptance of the Classes of Convertible Noteholders.

Prior to the Initial Plan Filing Date the Debtors had been in regular discussions with the ~~Replacement~~ DIP Lenders, the Creditors' Committee, Equipment Lenders, and Equity Committee with respect to both the consensual plan framework and the Plan. In addition to engaging with each of the Key Stakeholder Groups for approximately 3 weeks on a consensual plan framework, on June 16, 2023, the Debtors shared a draft of the Plan with the advisors to each of the Key Stakeholder Groups and invited feedback and comments from each such group.

After the Initial Plan Filing Date, the Debtors continued discussions with each of the Key Stakeholder Groups, including the Ad Hoc Noteholder Group, in the hopes of reaching as much consensus as possible. To facilitate the process, the Debtors and the Key Stakeholder Groups agreed to participate in mediation in front of Judge Isgur and signed an agreed mediation order (Docket No. 1052) (the "**Mediation Order**"). The Mediation Order scheduled a (i) a pre-mediation conference on July 17, 2023 and (ii) a mediation session on July 26, 2023 (the "**Plan Mediation**").

Prior to the pre-mediation conference, the Debtors held in-person and/or zoom meetings with each of the Key Stakeholder Groups in an attempt to bridge the gap prior to Plan Mediation and discuss the Debtors' proposals and any counterproposals the Debtors received.  To this end, the Debtors shared proposals regarding alternative Plan treatment options with the Ad Hoc Noteholder Group, the Equipment Lenders, and the Creditors' Committee.

On July 11, 2023, the Debtors and their advisors held an in-person meeting with the Equipment Lenders and their advisors at Weil's New York office.  The meeting with the Equipment Lenders was highly constructive as both parties had regularly exchanged proposals prior to the meeting and have since reached the aforementioned Miner Equipment Lender Settlement.

On July 12, 2023, the Debtors' advisors held an in-person meeting with the Creditors' Committee's advisors at Weil's New York office.  Although the parties engaged in a productive discussion, the parties acknowledged due to the group's position in the creditor waterfall, the treatment provided to the General Unsecured Claim Class would be predicated on the treatment provided to other creditor Classes.

On July 14, 2023 the Debtors' advisors held a zoom meeting with the Ad Hoc Noteholder Group's advisors. However, the Ad Hoc Noteholder Group's advisors noted they were not yet ready to provide a proposal to the Debtors and were unable to progress negotiations in a meaningful fashion.  On July 19, only two business days prior to the submission of statements for Plan Mediation, the Ad Hoc Noteholder Group shared a proposal with the Debtors, which contemplated an extremely low valuation of the Debtors' business.  Thus, the Debtors remained extremely distant from the Ad Hoc Noteholder Group going into Plan Mediation.

Throughout this time, the Debtors and their advisors had multiple meetings with both the ~~Replacement~~ DIP Lenders and the Equity Committee.  Both of these groups were interested in providing exit financing and noted they would negotiate their respective plan treatments in connection with the provision of such financing.

At the pre-mediation conference Judge Isgur requested the parties submit mediation statements on four issues: (i) whether the 2X Amounts should be included in the Convertible Noteholders' Claims; (ii) whether the terms of the takeback paper offered to Convertible Noteholders under the Plan satisfied the requirements of section 1129(b) of the Bankruptcy Code, (iii) whether the Debtors' Plan was feasible; and (iv) whether the Debtors' proposed valuation was proper.

After an in-person Plan Mediation session on July 26, 2023, Judge Isgur asked the parties agree to extend the Plan Mediation through August 4, 2023.  Plan Mediation was further extended ~~to August 11, 2023.~~

multiple times as the ~~The~~ Debtors ~~intend to move forward with the Plan Mediation to try to~~and the Ad Hoc Noteholder Group continued to share proposals regarding a consensual Plan construct.  Due to this progress and the possibility of reaching a deal with the Ad Hoc Noteholder Group with the assistance of Judge Isgur.  ~~In parallel~~, the parties agreed to extend mediation to September 7, 2023.

If the Debtors and the Ad Hoc Noteholder Group are unable to come to an agreement, the Debtors will ~~continue to~~ move forward with the non-consensual Plan construct as this may be the Debtors' only viable path out of chapter 11 given the positions taken by the Ad Hoc Noteholder Group.  Specifically, the Plan is designed to be confirmable whether or not the Debtors reach a resolution with the Ad Hoc Noteholder Group.  The Plan provides ~~convertible~~the ~~note~~hHolders ~~in each Class~~of April Secured Notes with the option of receiving ~~either the consensual construct (for either Class of Convertible Notes that votes to accept the Plan) or~~New Notes and a 50/50 split of the remaining claim amount in New Common Interests and secured take-back notes (~~for either Class of Convertible Notes that votes to reject the Plan), as~~a full recovery in secured take-back notes.  The Plan provides the Holders of August Secured Notes with the option of receiving a 50/50 split of New Common Interests and secured take-back notes or a full recovery in secured take-back notes.  Each Classes' treatment is further described above in section (I)(A)(ii).

N.      **Exit Capital Marketing Process**

The Debtors engaged in a process to seek new money capital to fund potential cash needs, including to pay down the balance of the ~~Replacement~~ DIP Facility and fund any liquidity needs that may arise post-emergence, based upon the Business Plan.

The PJT team drafted marketing materials, populated a virtual dataroom, and identified potential outreach parties in connection with the exit financing capital raise.  PJT and the Debtors have worked together to contact over 75 parties, comprised of (i) parties inside the Debtors' capital structure, (ii) parties previously interested in investing in the Debtors, (iii) hedge funds, (iv) private equity / venture capital firms, and (v) certain strategic parties.  As a result of this outreach, PJT was able to organize 42 introductory calls, culminating in 19 parties executing non-disclosure agreements and accessing the virtual dataroom.

The Debtors engaged in active dialogue with remaining potential capital providers.  As of the July 20, 2023 deadline for all parties to submit indications of interest, five interested parties remained.  The Debtors and their Advisors engaged in rounds of negotiations with certain of the interested parties, sharing rounds of proposals and counter-proposals.

As a result of such negotiations, three transactions emerged that collectively would satisfy the Debtors' capital needs at a reasonable cost, as described below in more detail.

The Debtors have also reached several agreements in principle that collectively lower their cash needs at emergence.  The B. Riley Transaction and the Bitmain Transaction are each described in greater detail above, but each substantially lowered the overall capital needs of the Debtors.  The B. Riley Transaction includes a roll of the amounts outstanding under the ~~Replacement~~ DIP Facility, thus reducing the need for a cash repayment of this amount on the Effective Date.  The Business Plan contemplates the Reorganized Debtors increasing the number of Miners in their fleet, and the Bitmain Transaction provides the Debtors with a portion of these Miners in exchange for equity in the Reorganized Debtors rather than in exchange for cash.  In addition, the Celsius Settlement further reduced the Debtors' estimated cash need, by settling Administrative Claims that would have otherwise been paid in cash upon the Effective Date and providing for a cash payment from Celsius to the Debtors of $~~9.5~~14.5 million.  The Bitmain Transaction combined with the Celsius Settlement lowered the Debtors' estimated cash need upon emergence from $75 million to approximately $40 million.

i.      *Rights Offering and Backstop*

The Equity Committee submitted a proposal for certain equity holders and other parties to backstop the Rights Offering.  While negotiations for a Backstop Commitment Agreement are continuing, the Debtors are hopeful that such parties will commit to backstop the Rights Offering in exchange for a Backstop Commitment Premium and other rights.  A Backstop Commitment Agreement is also anticipated to include certain reasonable milestones, termination ~~fees, expense reimbursements~~payments, and indemnifications.  The Rights Offering is projected to generate at least $55 million of new money proceeds, which Rights Offering is backstopped up to $55 million pursuant to the Backstop Commitment Agreement, though the Rights Offering could result in significantly more new money proceeds to the Company depending on the participation of equity holders.

The Rights Offering is ~~anticipated~~ to be conducted in ~~two parts: (1) an 1145 Rights Offering to Eligible Holders and Ineligible Holders conducted in reliance upon the exemption from registration under the Securities Act provided in section 1145 of the Bankruptcy Code, in such amount that the~~ accordance with the Backstop Commitment Agreement and the Rights Offering Procedures.  Each holder of Existing Common Interests as of the Rights Offering Record Date shall have a Subscription Right to purchase up to its pro rata allocation of the New Common Interests to be issued pursuant to the Rights Offering.  In addition, each holder of Existing Common Interests shall have an Oversubscription Right to elect to purchase additional New Common Interests offered in the Rights Offering that are not timely, duly and validly subscribed for in the Rights Offering in accordance with the Rights Offering Procedures, in an amount not to exceed the total New Common Interests issued ~~pursuant to~~in the ~~1145~~ Rights Offering ~~are principally in exchange for an Interest~~

pursuit to section 1145 of the Bankruptcy Code and (2) the 4(a)(2)/Reg D Rights Offering to Eligible Holders to be conducted in reliance upon the exemption from registration under the Securities Act provided in section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder. minus the total number of New Common Interests that such holder duly, validly and timely elected to purchase pursuant to its Subscription Right; provided, however, that no holder may exercise any Oversubscription Right until it has fully exercised in fully its Subscription Right.

### ii. i. B. Riley Agreement

After negotiations between the Debtors and the Replacement DIP Lenders, the parties agreed in principle to a transaction to be effectuated under the Effective Date, under which (i) the Replacement DIP Lenders would convert the outstanding balance under the Replacement DIP LoanFacility into the Delayed Draw Term LoanExit Facility, (ii) the Replacement DIP Lenders will provide $25 million of new money financing under the Delayed Draw Term LoanExit Facility, (iii) the Replacement DIP Lenders would waive a recovery on $6.3 million of the B. Riley Unsecured Claim and roll the remainder into the Delayed Draw Term LoanExit Facility, and (iv) the Replacement DIP Lenders will provide a commitment to provide the ExitNew B. Riley ELOC Facility (the "**B. Riley Transaction**").

### iii. ii. ExitNew B. Riley ELOC Facility

The Debtors also received two separate proposals, including one from the Replacement DIP Lenders, for an equity line of credit in the amount of $150 million. The Debtors are currently in negotiations with the Replacement DIP Lenders regarding the ExitNew B. Riley ELOC Facility.

The Debtors received an additional proposal to provide debt financing and an additional proposal to provide equity financing, but neither proposal was as advantageous as the combination of the proposals mentioned above.

Through the combination of the Rights Offering, the ExitNew B. Riley ELOC Facility, the B. Riley Transaction, the Celsius Settlement and the Bitmain Transaction, the Debtors have more than enough capital commitments in place to satisfy all capital needs required under the Debtors' Business Plan.

## VII.
## ~~TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES LAWS~~TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES LAWS

Except as set forth in the following paragraph, the offer, issuance, and distribution under the Plan of the New Secured Notes and the New Common Interests (including those issued upon the conversion of the New Secured Notes, if any) shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without further act or action by any Entity, from registration under (i) the Securities Act and (ii) any state or local law requiring registration for the offer, issuance, or distribution of the Securities.

The offer, sale, issuance and distribution of the Rights Offering Shares to be issued pursuant to the 1145 Rights Offering and the Backstop Commitment Premium shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without further act or action by any Entity, from registration under (i) the Securities Act and (ii) any state or local law requiring registration for the offer, sale, issuance and distribution of the Rights Offering Shares to be issued pursuant to the 4(a)(2)/Reg D Rights Offering, as well as the. The Backstop Shares, shall be exempt, pursuant to section 4(a)(2) of the Securities Act and Regulation D thereunder, from registration under (i) the Securities Act and (ii) any state or local law requiring registration for the offer, issuance, or distribution of Securities.

### A.    Section 1145 of the Bankruptcy Code Exemption and Subsequent Transfers

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale under a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a claim against, or an interest in, the debtor or such affiliate, or principally in such exchange and partly for cash.  Section 1145 of the Bankruptcy Code also exempts from registration (i) the offer of a security through any right to subscribe that is sold in the manner provided in the prior sentence, and (ii) the sale of a security upon the exercise of such right.  In reliance upon this exemption, the New Secured Notes ~~and~~ , the New Warrants (and the New Common Interests issued upon exercise thereof), and the New Common Interests issued under the Plan pursuant to section 1145 of the Bankruptcy Code, including the securities issued pursuant to the ~~1145~~ Rights Offering ("**1145 Securities"**) or upon conversion of the New Secured Notes will be exempt from the registration requirements of the Securities Act, and any other applicable securities laws.  These securities may be resold without registration under the Securities Act pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, 1145 Securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to ordinary trading transactions, (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution or (d) is an issuer, as used in section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

"Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  The legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of voting securities of a reorganized debtor may be presumed to be a "controlling person" and, therefore, an underwriter.

Notwithstanding the foregoing, control person underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 of the Securities Act which, in effect, permit the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, and certain other conditions.  Parties who believe they may be underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisers as to the availability of the exemption provided by Rule 144.

Transfers of 1145 Securities may be subject to the transfer provisions and other applicable provisions that may be set forth in the New Corporate Governance Documents.

### B.    Section 4(a)(2) and Regulation D of the Securities Act Exemption and Subsequent Transfers

Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving a public offering is exempt from the registration requirements under the Securities Act. Regulation D is a non-exclusive safe harbor from the registration requirements promulgated by the SEC under section 4(a)(2) of the Securities Act. In reliance upon this exemption, New Common Interests issued under the Plan pursuant to section 4(a)(2) of the Securities Act and Regulation D thereunder, including the ~~securities issued pursuant to the 4(a)(2) Rights Offering~~ Backstop Shares will be exempt from registration under the Securities Act. Such securities will be considered "restricted securities" (within the meaning of Rule 144 under the Securities Act), will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 under the Securities Act. Rule 144 provides a limited

safe harbor for the public resale of restricted securities if certain conditions are met.  These conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer (Rule 144 defines an affiliate of the issuer as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer").

\* \* \* \* \*

*Legends*.  To the extent certificated or issued by way of direct registration on the records of the Reorganized Debtors' transfer agent, certificates evidencing the New Common Interests held by holders of 10% or more of the outstanding New Common Interests, or who are otherwise underwriters as defined in section 1145(b) of the Bankruptcy Code, will bear a legend substantially in the form below:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [●], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

The Debtors and Reorganized Debtors, as applicable, reserve the right to reasonably require certification, legal opinions or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of such securities.  The Debtors and Reorganized Debtors, as applicable, also reserve the right to stop the transfer of any such securities if such transfer is not in compliance with Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws.

In any case, recipients of securities issued under or in connection with the Plan are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

\* \* \* \* \*

Distributions of 1145 Securities made under the Plan may be made through the facilities of the Depository Trust Company (the "**DTC**") in accordance with DTC's customary practices; provided, that such New Common Interests will only be issued in accordance with DTC book-entry procedures if the same are permitted to be held through DTC's book-entry system; provided, further, that to the extent that the 1145 Securities are not distributed pursuant to section 1145 of the Bankruptcy Code or eligible for distribution in accordance with DTC's customary practices, the Debtors or Reorganized Debtors, as applicable, will take such reasonable actions as may be required to cause distributions of the 1145 Securities under the Plan.

To the extent the Reorganized Debtors reflect all or any portion of the ownership of the 1145 Securities through the facilities of DTC, the Reorganized Debtors shall not be required to provide any further evidence other than the Plan or Confirmation Order with respect to the treatment of such applicable portion of the 1145 Securities, and such Plan or Confirmation Order shall be deemed to be legal and binding obligations of the Reorganized Debtors in all respects.

DTC and all other Persons and Entities shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the 1145 Securities are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in the Plan or otherwise, no Person or Entity (including, for the avoidance of doubt, the DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the 1145 Securities are exempt from registration and/or eligible for

DTC book-entry delivery, settlement, and depository services or, as applicable, validly issued, fully paid and non-assessable.

* * * * *

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN.  THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES.

# VIII.
## CERTAINCERTAIN FEDERAL INCOME TAX CONSEQUENCES OF PLANTAX CONSEQUENCES OF PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors and to certain holders of Claims and Existing Common Interests.  The following summary does not address the U.S. federal income tax consequences to Holders of Claims who are paid in full in cash, unimpaired or deemed to reject the Plan to Holders of the B. Riley Unsecured Claims (as the Debtors understand that such Holders have engaged counsel to advise them in connection with the B. Riley Settlement and the implementation of the Plan), or to holders of Claims and Interests in their capacity as Backstop Parties under the Backstop Commitment Agreement.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), U.S. Treasury regulations ("**Treasury Regulations**"), judicial authorities, published positions of the Internal Revenue Service ("**IRS**"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect).  The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties.  The Debtors have not requested an opinion of tax counsel or its tax advisors or a ruling from the IRS with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or any court.  No assurance can be given that the IRS will not assert, or that a court will not sustain, a contrary position than any position discussed herein.

This summary does not address state, local or non-U.S. income or other tax consequences of the Plan, nor does it address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (*e.g.*, non-U.S. persons, broker-dealers, mutual funds, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt entities or organizations, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold their Claims or Existing Common Interests through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, holders whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders in securities that mark-to-market their securities, certain expatriates or former long-term residents of the United States, persons who use the accrual method of accounting and report income on an "applicable financial statement," persons subject to the alternative minimum tax or the "Medicare" tax on net investment income, and persons whose Claims are part of a straddle, hedging, constructive sale or conversion transaction or other integrated investment or who may hold both Claims and Existing Common Interests, and persons who received their Claim or Interest as compensation).  In addition, this summary does not address the Foreign Account Tax Compliance Act or U.S. federal taxes other than income taxes.

The following discussion assumes that all Claims and Existing Common Interests, and any new debt or equity interests issued or distributed pursuant to the Plan are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code (unless otherwise indicated), and that the various debt and other arrangements to which the Debtors are parties are respected for U.S. federal income tax purposes in accordance with their form.

The Debtors currently contemplate, and the following discussion also assumes, that (i) Reorganized Parent will be the existing Core Scientific, Inc. corporate entity (and not a reincorporated entity or a new entity), and will be the common parent of the post-emergence consolidated tax group, and (ii) each of the Reorganized Debtors that are currently treated as entities disregarded as separate from Core Scientific, Inc. for U.S. federal income tax purposes will continue to be disregarded as separate from Core Scientific, Inc. following the Effective Date (the "**Current Structure**").  Any deviations from the Current Structure could materially change the U.S. federal income tax consequences of the Plan to the Debtors, holders of Claims and holders of Existing Common Interests described herein.

*The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon your individual circumstances.  All holders of Claims and Interests are urged to consult their own tax advisors for the U.S. federal, state, local and other tax consequences applicable under the Plan.*

### A.        Consequences to the Debtors

Each of the Debtors is either a member of an affiliated group of corporations that files consolidated U.S. federal income tax returns with Core Scientific, Inc. as the common parent (such group, the "**Tax Group**") or an entity disregarded as separate from its owner for U.S. federal income tax purposes whose business activities and operations are reflected on the consolidated U.S. federal income tax returns of the Tax Group.  The Debtors estimate that, as of December 31, 2022, the Tax Group had net operating loss ("**NOL**") carryforwards of approximately $344 million (all of which are post-2017 NOLs that are subject to an 80% taxable income limitation) and certain other tax attributes.  The Debtors expect the amount of their NOLs to increase as a result of operations for their 2023 taxable year (before taking into account the implementation of the Plan).

The Debtors do not believe that their ability to utilize their NOL carryforwards and other tax attributes is currently limited under section 382 of the Tax Code. However, certain equity trading activity and other actions could result in an ownership change of the Tax Group independent of the Plan, which could adversely affect the ability of the Debtors to utilize their tax attributes.  In an attempt to minimize the likelihood of such an ownership change occurring prior to the Effective Date of the Plan, the Debtors obtained a final order from the Bankruptcy Court authorizing certain protective equity trading and worthless stock deduction procedures (Docket No. 7).  The amount of the Tax Group's NOL carryforwards and other tax attributes, and the extent to which any limitations might apply, remain subject to audit and adjustment by the IRS.

As discussed below, in connection with and as a result of the implementation of the Plan, the amount of the Tax Group's NOL carryforwards, and possibly certain other tax attributes, may be reduced, though such reduction is not expected to be material.  In addition, the subsequent utilization of the Tax Group's NOL carryforwards and other tax attributes following the Effective Date may be restricted as a result of the implementation of the Plan or subsequent changes in the stock ownership of Reorganized Parent.

Effective for taxable years beginning after December 31, 2022, the Tax Code generally imposes a 15% corporate alternative minimum tax on corporations with book net income (subject to certain adjustments) exceeding on average $1 billion over any three-year testing period (the "**New AMT**").  The Debtors do not believe they are currently subject to the New AMT.

### i.    *Cancellation of Debt*

In general, the Tax Code provides that a debtor in a bankruptcy case must reduce certain of its tax attributes—such as NOL carryforwards and current year NOLs, capital loss carryforwards, tax credits, and tax basis in assets—by

the amount of any cancellation of debt ("**COD**") incurred pursuant to a confirmed chapter 11 plan.  The amount of COD incurred is generally the amount by which the adjusted issue price of indebtedness discharged exceeds the sum of the amount of cash, the issue price of any debt instrument and the fair market value of any other property exchanged therefor.  Certain statutory or judicial exceptions may apply to limit the amount of COD incurred for U.S. federal income tax purposes.  If advantageous, the debtor can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other Tax Attributes.  Where the debtor joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury Regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of the debtor and other members of the group must also be reduced.  Any reduction in Tax Attributes in respect of COD generally does not occur until after the determination of the debtor's net income or loss for the taxable year in which the COD is incurred.

Based on the Plan Value, the Debtors do not expect to incur material COD for U.S. federal income tax purposes as a result of the implementation of the Plan and, thus, do not expect that the Tax Group's NOL carryforwards or other tax attributes will be meaningfully reduced as a result of any COD incurred.  The amount of COD and resulting attribute reduction, however, will primarily depend on the fair market value of the New Common Interests and the issue price (as defined below) of the New Secured Notes, the New Notes, and the Miner Equipment Lender Takeback Debt which will not be known with certainty until after the Effective Date.

### ii.    Limitation of NOL Carryforwards and Other Tax Attributes

Following the Effective Date, the Debtors' ability to utilize their NOL carryforwards and certain other tax attributes ("**Pre-Change Losses**") may be subject to limitation under section 382 of the Tax Code.  Any such limitation would apply in addition to, and not in lieu of, the reduction of tax attributes that results from COD arising in connection with the Plan and the 80% taxable income limitation on the use of NOL carryforwards.

Under section 382 of the Tax Code, if a corporation (or consolidated group) undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception in section 382(l)(5) of the Tax Code discussed below, the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally are subject to an annual limitation.  The issuance of the New Common Interests pursuant to the Plan may result in an ownership change of the Tax Group.  The following addresses the limitations that may apply if an ownership change occurs as a result of the implementation of the Plan, or thereafter due to subsequent changes in the stock ownership of Reorganized Parent.

(a)    Annual Limitation

In the event of an ownership change, the amount of the annual limitation to which a corporation (or consolidated group) that undergoes an ownership change will be subject is generally equal to the product of (A) the fair market value of the stock of the corporation (or common parent of the consolidated group) immediately before the ownership change (with certain adjustments) multiplied by (B) the "long term tax exempt rate" in effect for the month in which the ownership change occurs (e.g., 3.053.17% for ownership changes occurring in AugustSeptember 2023.  For a corporation (or consolidated group) in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the fair market value of the stock of the corporation is generally determined immediately after (rather than before) the ownership change after giving effect to the discharge of creditors' claims, but subject to certain adjustments; in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets.  Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year.

In addition, if a loss corporation (or consolidated group) has a net unrealized built-in gain at the time of an ownership change (taking into account most assets and items of "built-in" income, gain, loss and deduction), any built-in gains recognized (or, according to a currently effective IRS notice treated as recognized) during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation (or consolidated group) would be permitted to use its Pre-Change Losses against such built-in gain income in addition to its regular annual allowance.  Alternatively, if a loss corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change, then any built-in losses recognized during the following five years (up to the amount of the original net unrealized

built-in loss) generally will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a loss corporation's (or consolidated group's) net unrealized built-in gain or loss will be deemed to be zero unless the actual amount of such gain or loss is greater than the lesser of (1) $10 million or (2) fifteen percent of the fair market value of its assets (with certain adjustments) before the ownership change. In 2019, the IRS issued proposed regulations that would significantly modify the calculation and treatment of net unrealized built-in gains and losses which generally would be effective prospectively from 30 days after the time they become final, but would not apply with respect to ownership changes pursuant to chapter 11 cases filed prior to the regulations becoming effective. Thus, even if finalized prior to the Effective Date, such regulations should not apply to an ownership change of the Debtors that occurs pursuant to the Plan. It is expected that the Debtors will be in a substantial net unrealized built-in gain position as of the Effective Date.

If a corporation (or consolidated group) does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's Pre-Change Losses (absent any increases due to the recognition of any built-in gains as of the time of the ownership change).

(b)      Special Bankruptcy Exception

A special bankruptcy exception to the foregoing annual limitation rules, in section 382(l)(5) of the Tax Code, generally applies when shareholders and "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their equity interests or claims (as applicable), at least fifty percent (50%) of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan of reorganization. Under this exception, a debtor's Pre-Change Losses are not subject to the annual limitation. However, if this exception applies, the debtor's Pre-Change Losses generally will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. Also, if the reorganized debtor thereafter undergoes another "ownership change" within two years, the annual limitation with respect to such later ownership change would be zero, effectively precluding any future use of their Pre-Change Losses. A debtor that qualifies for this exception may, if it desires, elect not to have the exception apply and instead remain subject to the annual limitation described above. The Debtors have not determined whether or not this exception will apply in connection with the Plan. Accordingly, it is possible that the Debtors will not qualify for this exception or that the Debtors will elect not to apply this exception.

### iii.   Potential Limitations on Interest Deductions

In addition to the general limitations on the deductibility of interest under the Tax Code, such as the 30% income limitation under section 163(j) of the Tax Code with respect to business interest expense, certain special limitations may apply with respect to the deductibility of interest on the New Secured Notes.

Based on the principal terms of the New Debt as currently described in the Plan, certain of the New Secured Notes may be subject to the provisions of the Tax Code dealing with "applicable high yield discount obligations" ("**AHYDOs**"). These provisions can result in the deferral, and even disallowance, of an issuer's deduction of interest with respect to "original issue discount" ("**OID**"). A debt obligation is generally treated as an AHYDO if it is issued with substantial OID (meaning that there is accrued unpaid OID as of the close of the first accrual period ending after the fifth (5th) anniversary of issuance in excess of one year's interest, both actual and imputed), has a yield to maturity of at least five (5) percentage points over the applicable federal rate in effect for the calendar month in which such notes are issued, and has a maturity of over five (5) years.

In the event that a debt instrument constitutes an AHYDO, the issuer's deduction with respect to any interest is generally deferred until such interest is paid in cash. Moreover, if the yield to maturity on the debt instrument is more than six percentage points over the applicable federal rate, a portion of the issuer's interest deduction is disallowed. Accordingly, it is possible that the deductibility of interest relating to certain of the New Secured Notes may, in part, be deferred or disallowed.

Regardless of the application of the AHYDO rules, deductions of stated interest and OID with respect to certain of the New Secured Notes are also subject to potential disallowance under section 163(l) of the Tax Code. Section 163(l) of the Tax Code disallows a deduction for interest paid or accrued with respect to a "disqualified debt instrument." A disqualified debt instrument includes any indebtedness of a corporation if, when issued, (i) a substantial amount of the principal or interest is required to be paid or converted, or at the option of the issuer or a related party is payable in, or convertible into, equity of such corporation, a related person or equity held by such corporation or related person in any other person, (ii) a substantial amount of the principal or interest is required to be determined, or at the option of the issuer or a related party is determined, by reference to the value of such equity, or (iii) the indebtedness is part of an arrangement which is reasonably expected to result in a transaction described in clause (i) or (ii). For this purpose, principal or interest is treated as required to be so paid, converted or determined if it may be required at the option of the holder or a related party and there is a "substantial certainty" that the option will be exercised.

The proper application of section 163(l) in the case of the New Secured Notes is subject to varying interpretations, depending in part on facts and circumstances existing on the Effective Date. Pursuant to the current terms of certain of the New Secured Notes, the Debtors may, under certain circumstances, require the conversion of such notes into stock. In addition, a holder of certain of the New Secured Notes may at its option convert the note into stock. The Debtors currently expect to take the position that section 163(l) does not disallow the deductibility of interest with respect to such New Secured Notes.

### B. Consequences to Holders of Certain Allowed Claims

The following discusses certain U.S. federal income tax consequences of the implementation of the Plan to holders of Allowed April Convertible Notes Secured Claims, Allowed August Convertible Notes Secured Claims, Allowed Miner Equipment Lender Secured Claims, Allowed M&M Lien Secured Claims, Allowed Secured Mortgage Claims, and Allowed General Unsecured Claims, and. Consequences to holders of Allowed Section 510(b) Claims are addressed below in section (VIII)(C). The below discussion does not address holders of Allowed M&M Lien Secured Claims for which the Reorganized Debtors would be required to make payments under the M&M Lien Takeback Debt to a person other than the holder of such M&M Lien Secured Claim.

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of their Claims:

    (i)    Holders of Allowed April Convertible Notes Secured Claims will receive the, depending on whether the election option is chosen, either (a) New Notes and/or applicable New Secured Notes and, in the case that Class 1 is an Accepting Class, New Common Interests or (b) applicable New Secured Notes.

    (ii)    Holders of Allowed August Convertible Notes Secured Claims will receive thedepending on whether the election option is chosen, either (a) applicable New Secured Notes and in the case that Class 2 is an Accepting Class, New Common Interests or (b) applicable New Secured Notes.

    (iii)    Holders of Allowed Miner Equipment Lender Secured Claims will receive depending on the election option chosen or the default option, either (a) New Common Interests or (b) such Holder's applicable Miner Equipment Lender Takeback Debt, and, for any deficiency (except for a Holder electing the Miner Equipment Lender Treatment Election 2), an Allowed Miner Equipment Lender Deficiency Claim treated as an Allowed General Unsecured Claim,

    (iv)    Holders of Allowed M&M Lien Secured Claims will receive M&M Lien Takeback Debt,

    (v)    Holders of Secured Mortgage Claims will receive Mortgage Takeback Debt or Cash, and

    (vi)    Holders of Allowed General Unsecured Claims will receive New Common Interests, and.

(vii)   Holders of Allowed Section 510(b) Claims will receive  New Common Interests.

The discussion of the U.S. federal income tax consequences of the receipt and ownership of the respective debt instruments is based on the principal terms of such debt as currently described in the Plan (and thus, among other things, assumes that none of the respective debt instruments constitute "contingent payment debt obligations" for U.S. federal income tax purposes).  *Accordingly, depending on the final terms of the respective debt instruments, the U.S. federal income tax treatment of U.S. Holders could vary materially from that described herein.*  For ease of description, the New Secured Notes, the New Notes, the Miner Equipment Lender Takeback Debt, the Mortgage Takeback Debt and the M&M Lien Takeback Debt are collectively referred to as (the "**New Debt**").

As used throughout the tax discussion, the term "**U.S. Holder**" means a beneficial owner of an Allowed Claim or Existing Common Interest that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

If a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes holds such Claims (or Existing Common Interests), the tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership.  If you are a partner in such a partnership holding any Claims or Existing Common Interests, you should consult your own tax advisor.

### i.    *Taxable Exchange*

In general, a U.S. Holder of an Allowed Claim will recognize gain or loss equal to the difference, if any, between (i) the sum of the "issue price" of any New Debt, the fair market value of any New Common Interests and/or the amount of any eCash received in respect of its Claim (other than any consideration received in respect of a Claim for accrued but unpaid interest and possibly accrued OID) and (ii) the U.S. Holder's adjusted tax basis in its Claim (other than any tax basis attributable to accrued but unpaid interest and possibly accrued OID).  It is expected that the issue price of any New Debt will be equal to the principal amount of such debt, other than possibly the New Secured Notes, the New Notes, and the Miner Equipment Lender Takeback Debt which may equal or approximate the fair market value of the debt.  *See* section (VIII)(B)(vi)(a) below ("Issue Price of New Debt").  A U.S. Holder of a Claim will have ordinary interest income to the extent of any consideration allocable to accrued but unpaid interest or accrued OID not previously included in income.  *See* section (VIII)(B)(ii) below ("Distributions in Discharge of Accrued Interest or OID").  For a discussion of the character of any gain or loss, *see* section (VIII)(B)(iii) below ("Character of Gain or Loss").

This discussion assumes that neither the Allowed April Convertible Notes Secured Claims nor Allowed August Convertible Notes Secured Claims are considered "securities" for U.S. federal income tax purposes because, among other things, each such debt obligation had a weighted average maturity at issuance of less than five (5) years.  Whether a debt instrument constitutes a "security" depends on an overall evaluation of the nature of the debt, including whether the holder of such debt obligation is subject to a material level of entrepreneurial risk and whether a continuing proprietary interest is intended.  If such a Claim were treated as a "security" the U.S. federal income consequences to a U.S. Holder thereof would be materially different from that described herein.

Accordingly, holders of such Claims are urged to consult their own tax advisors regarding the appropriate status for U.S. federal income tax purposes of such Claims.

A U.S. Holder of an Allowed Claim generally will have an aggregate tax basis in any New Debt and any New Common Interests received in satisfaction of its Claim equal to the issue price of such debt and the fair market value of the New Common Interests received. The U.S. Holder's holding period in each should begin on the day following the Effective Date.

### ii.   Distributions in Discharge of Accrued Interest or OID

In general, to the extent that any consideration received pursuant to the Plan by a U.S. Holder of an Allowed Claim is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the U.S. Holder as interest income (if not previously included in the U.S. Holder's gross income). Conversely, a U.S. Holder may be entitled to recognize a loss to the extent any accrued interest claimed or accrued OID was previously included in its gross income and is not paid in full. However, the IRS has privately ruled that a holder of a "security" of a corporate issuer in an otherwise tax-free exchange could not claim a current deduction with respect to any unpaid OID. Accordingly, it is unclear whether, by analogy, any U.S. holder of an Allowed Claim that does not constitute a "security" would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

The Plan provides that, except as otherwise provided therein or as otherwise required by law (as reasonably determined by the Reorganized Debtors), distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for U.S. federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim (in contrast, for example, to a pro rata allocation of a portion of the exchange consideration received between principal and interest, or an allocation first to accrued but unpaid interest). *See* section 6.17 of the Plan. There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes. *U.S. Holders of Allowed Claims are urged to consult their own tax advisor regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest (including OID) and the character of any loss claimed with respect to accrued but unpaid interest (including OID) previously included in gross income for U.S. federal income tax purposes.*

### iii.   Character of Gain or Loss

The character of any gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss of a U.S. Holder will be determined by a number of factors, including the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether such Claim was acquired at a market discount and whether and to what extent the holder previously claimed a bad debt deduction with respect to such Claim.

A U.S. Holder of Claims that purchased its Claims from a prior holder at a "market discount" (relative to the principal amount of the Claims at the time of acquisition) may be subject to the market discount rules of the Tax Code. A holder that purchased its Claim from a prior holder will be considered to have purchased such Claim with "market discount" if the holder's adjusted tax basis in its Claim is less than the stated redemption price at maturity of such Claim by at least a statutorily defined *de minimis* amount. Under these rules, any gain recognized on the exchange of Claims (other than in respect of a Claim for accrued but unpaid interest) generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the holder, on a constant yield basis) during the holder's period of ownership, unless the holder elected to include the market discount in income as it accrued. If a holder of Claims did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claims, such deferred amounts would become deductible at the time of the exchange.

### iv.   Ownership and Disposition of New Debt

(a)      Issue Price of New Debt

The "issue price" of each issue of New Debt depends on whether, at any time during the 31-day period ending 15 days after the Effective Date, such New Debt or a substantial amount of the Claims exchanged therefor are considered traded on an "established market."  Pursuant to applicable Treasury Regulations, an "established market" need not be a formal market.  It is sufficient if there is a readily available sales price for an executed purchase or sale of such New Debt or the Claims exchanged therefor, or if there is one or more "firm quotes" or "indicative quotes" with respect to such New Debt or Claims exchanged therefor, in each case, as such terms are defined in applicable Treasury Regulations. However, a debt instrument will not be treated as traded on an established market under the "small debt issues" exception if at the applicable time the outstanding stated principal amount of the issue that includes such debt instrument does not exceed $100 million.

If any issue of New Debt received is considered traded on an established market, the issue price of such New Debt for U.S. federal income tax purposes will equal its fair market value as of the Effective Date.  If an issue of New Debt is not considered traded on an established market but a substantial amount of the Claims exchanged therefor are so treated, the issue price of such New Debt for U.S. federal income tax purposes will be based on the fair market value of the Claims exchanged therefor as adjusted to take into account the receipt of any New Common Interests (or other property) received in the same exchange.  If neither the New Debt nor a substantial amount of the Claims exchanged therefor are considered traded on an established market, the issue price of such New Debt for U.S. federal income tax purposes generally will be its stated principal amount.

Other than the New Secured Notes ~~and~~, the Miner Equipment Lender Takeback Debt, and possibly the New Notes, the Debtors expect that the New Debt received will have an issue price equal to its stated principal amount (due to the application of the "small debt issues" exception as to the New Debt received and the Claims exchanged therefor).  If the Debtors determine that the New Secured Notes, the New Notes, or the Claims exchanged therefor or the Miner Equipment Lender Takeback Debt are considered traded on an established market, such determination and the determination of issue price will be binding on a holder unless such holder discloses, on a timely-filed U.S. federal income tax return for the taxable year that includes the Effective Date, that such holder's determination is different from the Debtors' determination, the reasons for such holder's different determination and, if applicable, how such holder determined the fair market value.

(b)      Payments of Qualified Stated Interest on New Debt

Payments of qualified stated interest on the New Debt generally should be taxable to a U.S. Holder as ordinary interest income at the time such payments are accrued or are received in accordance with the holder's regular method of accounting for U.S. federal income tax purposes.  Qualified stated interest generally means stated interest that is unconditionally payable in cash or in property (other than debt instruments of the issuer) at least annually at a single fixed rate or a single qualified floating rate.

(c)      Computation, Accrual and Amortization of OID

A debt instrument will be treated as issued with OID for U.S. federal income tax purposes if the "stated redemption price at maturity" exceeds its "issue price" by an amount equal to or more than a statutorily defined *de minimis* amount (generally, 0.25% multiplied by the product of the stated redemption price at maturity and the number of complete years to maturity).  The "stated redemption price at maturity" of a debt instrument is the total of all payments to be made under such debt instrument other than qualified stated interest, and thus will include a portion of the stated interest if not all interest is required to be paid at a fixed (or qualified floating) annual rate in cash.

Other than the New Secured Notes, the Notes, and certain of the Miner Equipment Lender Takeback Debt, none of the New Debt is expected to be issued with OID for U.S. federal income tax purposes.  The New Secured Notes, and certain of the Miner Equipment Lender Takeback Debt will be considered issued with OID. Whether the New

Term Loans will be considered to be issued with OID will depend on their issue price which may not be known with certainty until after the Effective Date.

The amount of OID that a U.S. Holder of a debt must include in income will be determined under the applicable Treasury Regulations based upon the following assumptions: (i) no election to call the debt will be made and (ii) interest will be accrued, rather than paid in cash, in a manner to minimize the yield on the debt.  These assumptions are made solely for U.S. federal income tax purposes and do not constitute a representation by the Debtors regarding the actual amounts, or timing thereof, that will be paid on the New Secured Notes, the New Notes, or the Miner Equipment Lender Takeback Debt.  If the assumptions made are contrary to actual circumstances (a "change in circumstances"), then solely for purposes of determining the amount of OID, such New Secured Notes, the New Notes, or Miner Equipment Lender Takeback Debt will be treated as retired and reissued on the date of the change in circumstances for an amount equal to the "adjusted issue price" (as defined below) of such New Secured Notes, New Notes, or Miner Equipment Lender Takeback Debt.  In addition, OID will include the portion of stated interest that is payable in kind (*i.e.*, the portion that is not qualified stated interest) regardless of whether such interest is actually paid in kind.

A U.S. Holder generally must include OID in gross income on an annual basis under the "constant yield method" without regard to its regular method of accounting for U.S. federal income tax purposes.  The amount of OID includible in income for a taxable year by a U.S. Holder generally will equal the sum of the "daily portions" of the total OID on the debt for each day during the taxable year (or portion thereof) on which such U.S. Holder held the debt.  Generally, to determine the daily portions of the OID, the amount of OID allocable to an accrual period is determined, and a ratable portion of such OID is allocated to each day in the accrual period.  An accrual period may be of any length and the length of the accrual periods may vary over the life of the debt, provided that no accrual period may be longer than one year and each scheduled payment of interest or principal on the debt must occur on either the first day or last day of an accrual period.  The amount of OID allocable to each accrual period generally will equal (i) the product of (x) the "adjusted issue price" of the debt at the beginning of such accrual period and (y) its "yield to maturity" less (ii) any qualified stated interest payments allocable to the accrual period.

The "adjusted issue price" of the debt at any time generally will equal the original issue price, increased by the total OID accrued for each prior accrual period and decreased by the amount of payments made on such debt (other than qualified stated interest).  The "yield to maturity" of the debt will be the discount rate that, when used in computing the present value of all principal and interest payments to be made on the debt produces an amount equal to the original issue price.

The rules regarding the determination of OID are complex and, as indicated above, the discussion herein is based on the principal terms the New Debt as currently described in the Plan (and thus, among other things, assumes that none of the respective debt instruments constitute "contingent payment debt obligations" for U.S. federal income tax purposes).  Accordingly, you are urged to consult your own tax advisor regarding the application of the OID rules.

(d)     Potential Application of AHYDO Provisions to New Secured Notes

Certain of the New Secured Notes may be subject to the provisions of the Tax Code addressing "applicable high yield discount obligations." *See* section (VIII)(A)(iii) above ("*Potential Limitations on Interest Deductions*").  To the extent a portion of the deduction for OID is disallowed, an equivalent amount of a corporate holder's OID income may be treated as a dividend for purposes of the dividend-received deduction to the extent such amount would have been treated as a dividend if it had been a distribution made by the issuer with respect to its stock.  This determination is dependent upon the extent to which the issuer has sufficient earnings and profits (either current or accumulated) such that a distribution in respect of its stock would constitute a dividend for U.S. federal income tax purposes and, presumably, subject to certain holding period and taxable income requirements and other limitations on the dividend-received deduction.

(e)      Conversion of New Secured Notes

Certain of the New Secured Notes will be convertible into New Common Interests.  In general, the conversion of such New Secured Notes into New Common Interests will not be a taxable event. A, a U.S. Holder's tax basis in the New Common Interests received upon a conversion of the New Secured Notes will equal the tax basis of the New Secured Notes that were converted, and the U.S. Holder's holding period for the New Common Interests received will include the U.S. Holder's holding period for the New Secured Notes converted.

(f)      "Constructive Distributions" on New Secured Notes

The conversion ratio or exercise price of the New Secured Notes that are convertible into New Common Interests and the exercise price of the New Warrants will be adjusted in certain circumstances.  Under section 305 of the Tax Code, certain transactions that effect an increase in the proportionate interest of a shareholder in the corporation's assets are treated as creating deemed distributions to such shareholder in respect of such "stock" interest, including certain "anti-dilution" adjustments to the exercise price or conversion ratio of a right to acquire stock in the corporation.  For this purpose, a holder of a right to acquire stock from the corporation, including a holder of convertible securities of the corporation, is treated as a deemed shareholder in the corporation.

Any deemed distribution to U.S. Holders of New Secured Notes resulting from an adjustment in the conversion ratio or exercise price of such the New Secured Notes that are convertible into New Common Interests or from an inadequate adjustment in the exercise price of the New Warrants (thereby increasing the proportionate equity interests of the New Secured Notes in the corporation's assets) will be taxed, and reported to the IRS, in the same manner as an actual distribution made by a corporation to its shareholders.  U.S. Holders should consult their tax advisors as to the tax consequences of receiving deemed distributions.

(g)      Sale or Other Taxable Disposition

U.S. Holders generally will recognize capital gain or loss upon the sale, redemption or other taxable disposition of the New Debt in an amount equal to the difference between (i) the sum of the cash plus the fair market value of any property received from such disposition (other than amounts attributable to accrued but unpaid stated interest, which will be taxable as ordinary income for U.S. federal income tax purposes to the extent not previously so taxed) and (ii) the U.S. Holder's adjusted tax basis in the New Debt.  Generally, a U.S. Holder's adjusted tax basis will be equal to its initial tax basis in such obligation increased by any OID previously included in income, and reduced by cash payments received on such obligation other than payments of qualified stated interest.  Any capital gain or loss generally should be long-term if the U.S. Holder's holding period for the New Debt is more than one year at the time of disposition.  A reduced tax rate on long-term capital gain may apply to non-corporate U.S. Holders.  The deductibility of capital loss is subject to significant limitations.

### *v.  Disposition of New Common Interests by U.S. Holders*

In general, unless a nonrecognition provision applies to a future disposition, U.S. Holders generally will recognize capital gain or loss upon the sale or exchange of the New Common Interests in an amount equal to the difference between (i) the holder's adjusted tax basis in the New Common Interests held and (ii) the sum of the cash and the fair market value of any property received from such disposition and (ii) the holder's adjusted tax basis in the New Common Interests held.  Any such gain or loss generally should be long-term capital gain or loss if the U.S. Holder's holding period in its New Common Interests is more than one year at the time of disposition.  A reduced tax rate on long-term capital gain may apply to non-corporate U.S. Holders.  The deductibility of capital loss is subject to significant limitations.

However, any gain recognized by a U.S. Holder upon a disposition of the New Common Interests received in exchange for its Claim (or any stock or property received for such New Common Interests in a later tax-free exchange) generally will be treated as ordinary income for U.S. federal income tax purposes to the extent of (i) any ordinary loss deductions previously claimed as a result of the write-down of the Claim, decreased by any income (other than interest income) recognized by the U.S. Holder upon exchange of the Claim, and (ii) with respect to a

cash-basis U.S. Holder and in addition to clause (i) above, any amounts which would have been included in its gross income if the holder's Claim had been satisfied in full but which was not included by reason of the cash method of accounting.

**C.      Consequences to Holders of Section 510(b) Claims**

Pursuant to the Plan, Holders of Allowed Section 510(b) Claims will receive, in full and final satisfaction, settlement, release, and discharge of their Claims, (i) New Common Interests, (ii) New Warrants and (iii) in lieu of Subscription Rights, either Cash, additional New Common Interests, additional New Warrants, or some combination thereof. The U.S. federal income tax treatment of the Allowed Section 510(b) Claims by a U.S. Holder is complex and will depend on, among other things, whether or not the holder receives Cash (in addition to receiving New Common Interests and New Warrants), the nature of such holder's Claims, whether the holder continues to hold the equity underlying such Claims, whether the holder is the original holder thereof, and the extent to which, if at all, the holder has previously claimed a loss in respect of its Claims. U.S. Holders of Allowed Section 510(b) Claims are urged to consult their own tax advisors as to the U.S. federal income tax consequences to them of receiving New Common Interests, New Warrants and, if any, Cash, including the extent to which any recovery may or may not be taxable (for example, in the case of a prior U.S. Holder of Existing Equity Interests, it is possible that the receipt of New Common Interests and New Warrants might be treated as a tax-free recapitalization or similar non-recognition transaction for U.S. federal income tax purposes (except if such holder would also receive Cash, in which case such holder may recognize gain (but not loss) to the extent of the amount of any Cash received)) and the character of any income or loss. For a discussion of the U.S. federal income tax treatment of the ownership and disposition of New Warrants, see section (VIII)(D)(iii) below ("*Ownership and Disposition of New Warrants*"). U.S. Holders of Allowed Section 510(b) Claims should consult their tax advisors regarding the U.S. federal income tax consequences of the Plan.

*Tax Treatment of Disputed Claims Reserve*

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Disbursing Agent will (i) treat any cash or other property held in the Disputed Claims Reserve(s) on account of Disputed Claims, as held in a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including the Debtors, the Reorganized Debtors, the Disbursing Agent, and the Holders of Disputed Claims) shall be required to report for tax purposes consistently with the foregoing. Accordingly, the Disputed Claims Reserve(s) will be a separate taxable entity for U.S. federal income tax purposes, and all interest and earnings of the reserve will be taxable to such entity.

Any distributions from the reserve to holders of Allowed Claims will be treated for U.S. federal income tax purposes as if received directly from the Debtors on their Allowed Claims. Each Disputed Claims Reserve will be responsible for payment, out of the assets of such reserve, of any taxes imposed on the Disputed Claims Reserve or its assets. Accordingly, distributions from the reserve will be net of any taxes relating to the retention, disposition and distribution of assets in the reserve. In the event, and to the extent, any Cash in the Disputed Claims Reserve(s) is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of such reserve (including any income that may arise upon the distribution of the assets in such reserve) or other expenses, assets of the Disputed Claims Reserve(s) may be sold to pay such taxes or other expenses.

The Plan provides that any New Common Interests withheld from distribution on account of Disputed Claims will not be issued by Reorganized Parent until such time as the respective Disputed Claims are resolved and the shares are distributable by the Disbursing Agent to holders

of Allowed Claims.  Accordingly, such shares should not be treated as held in and taxable to the Disputed Claims Reserve(s).

### D. C. Consequences to Holders of Existing Common Interests

Pursuant to the Plan, hHolders of Existing Common Interests will receive in exchange for their Existing Common Interests New Common Interests and (i) in the case of Eligible Holders, Subscription Rights or (ii) in the case of Ineligible Holders, 1145 Subscription Rights solely if such rights are fully exercised, either additional New Common Interests or Cash (as determined at the option of the Reorganized Debtors) in lieu of 4(a)(2)/Reg D Subscription Rights., and the New Warrants.

#### i.   Tax Treatment of Exchange

Based on the anticipated terms of Reorganized Parent's certificate of incorporation, it is expected that the exchange by holders of Existing Common Interests for the consideration under the Plan will qualify as a "recapitalization" for U.S. federal income tax purposes.  So treated, U.S. Holders generally will not recognize any gain or loss upon the exchange of their Existing Common Interests, except U.S. Holders that are Ineligible Holders will recognize any realized gain (but not loss) to the extent of the amount of any Cash received in respect of their Existing Common Interests.  Such realized gain generally will equal the excess, if any, of (i) the sum of the amount of any Cash and the aggregate fair market value of the New Common Interests and Subscription Rights received in respect of its Existing Common Interests, over (ii) the adjusted tax basis of its Existing Common Interests.  For a discussion of the U.S. federal income tax treatment of the Subscription Rights, see the next section.

A U.S. Holder's aggregate tax basis in its New Common Interests and, Subscription Rights, and New Warrants generally will equal such U.S. Holder's adjusted tax basis in its Existing Common Interests, increased by any gain recognized in the exchange, and decreased by the amount of any Cash received.  Such U.S. Holder's holding period in the New Common Interests and, Subscription Rights, and New Warrants generally will include its holding period in its Existing Common Interests.

In the event that such exchange by a U.S. hHolders does not qualify as a "recapitalization" for U.S. federal income tax consequences, the tax consequences of such exchange may differ materially from those described above, including that the Subscription Rights and any CashNew Warrants received by a holder could be taxable as a dividend to the extent of the Reorganized Parent's current and accumulated earnings and profits (if any), with any excess first reducing asuch U.S. Holder's tax basis in its New Common Interests (but not below zero), and thereafter giving rise to gain from the sale or exchange of property.

As discussed above under section (VIII)(B)(iiv)(f) ("Constructive Distributions" on New Secured Notes), certain transactions that effect an increase in the proportionate interest of a shareholder in a corporation's assets are treated as creating deemed distributions to such shareholder in respect of its stock.  It is possible that an inadequate adjustment in the conversion ratio or exercise price of the New Secured Notes that are convertible into New Common Interests or in the exercise price of the New Warrants could cause such a deemed distribution to U.S. Holders of New Common Interests.  U.S. Holders should consult their tax advisors as to the tax consequences of receiving deemed distributions.

#### ii.   Treatment of Right to Participate in Rights Offering

The characterization of a Subscription Right and its subsequent exercise for U.S. federal income tax purposes – as the exercise of an option to acquire a portion of the New Common Interests or, alternatively, as an integrated transaction pursuant to which the New Common Interests are acquired directly in the exchange – is uncertain.

Regardless of the characterization of a Subscription Right for U.S. federal income tax purposes, a U.S. Holder of Existing Common Interests generally would not recognize any gain or loss upon the exercise of such right.  A U.S. Holder's aggregate tax basis in the New Common Interests received upon exercise of a Subscription Right should be equal to the sum of (i) the amount paid for the New Common Interests and (ii) the Holder's tax basis, if any, in either (a) the Subscription Rights, or (b) under an integrated transaction analysis, any New Common Interests received pursuant to the exercise of a Subscription Right.

In general, a U.S. Holder's holding period in the New Common Interests received upon the exercise of a Subscription Right that is respected as an option generally should commence the day following the Effective Date. However, under an integrated transaction analysis, and assuming the exchanges qualifies as a "recapitalization" for U.S. federal income tax purposes, a U.S. Holder's holding period in the New Common Interests received upon the exercise of a Subscription Right (other than the portion attributable to the amount paid for the New Common Interests) generally will include its holding period in the Existing Common Interests.

It is uncertain whether a U.S. Holder that receives but does not exercise its Subscription Rights should be treated as receiving anything of additional value in respect of its Existing Common Interests.  If the U.S. Holder is treated as having received a Subscription Right of value (despite its subsequent lapse), such that it obtains a tax basis in the right, the U.S. Holder generally would recognize a loss to the extent of the U.S. Holder's tax basis in the Subscription Right.  In general, such loss would be a capital loss, long-term or short-term, depending upon whether the requisite holding period was satisfied (which, assuming that the transaction qualified as a "recapitalization" for U.S. federal income tax purposes should include the holding period of the Existing Common Interests exchanged therefor).

### *iii.  Ownership and Disposition of New Warrants*

A U.S. Holder of a New Warrant generally will not recognize gain or loss upon the exercise of such warrant. A U.S. Holder's tax basis in New Common Interests received upon exercise of a New Warrant will be equal to the sum of the holder's tax basis in the New Warrant and the exercise price. The holder will commence a new holding period with respect to the New Common Interests received.

As discussed above under section (VIII)(B)(iv)(f) (*"Constructive Distributions" on New Secured Notes*), certain transactions that effect an increase in the proportionate interest of a shareholder (including for this purpose, a holder of a right to acquire stock from the corporation) in a corporation's assets are treated as creating deemed distributions to such shareholder in respect of its stock, including certain "anti-dilution" adjustments. Accordingly, if the terms of the New Warrants provide for any adjustment to the number of shares of New Common Interests for which the New Warrants may be exercised and/or to the exercise price thereof, or if an inadequate adjustment is made in the conversion ratio or exercise price of the New Secured Notes that are convertible into New Common Interests (thereby increasing the proportionate equity interests of the New Warrants in the corporation's assets), such adjustments may, under certain circumstances, result in constructive distributions that could be taxable to the Holder of the New Warrants. Conversely, the absence of an appropriate adjustment may result in a constructive distribution that could be taxable to the U.S. Holders of the New Common Interests (among others).

Upon the lapse or disposition of a New Warrant, the U.S. Holder generally would recognize gain or loss equal to the difference between the amount received (zero in the case of a lapse) and its tax basis in the warrant. In general, such gain or loss would be a capital gain or loss, long-term or short-term, depending on whether the requisite holding period was satisfied.

### E.      Tax Treatment of Disputed Claims Reserve

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Disbursing Agent will (i) treat any Cash or other property held in the Disputed Claims Reserve(s) on account of Disputed Claims, as held in a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  All parties (including the Debtors, the Reorganized Debtors, the Disbursing Agent, and the Holders of Disputed Claims) shall be required to report for tax purposes consistently

with the foregoing.  Accordingly, the Disputed Claims Reserve(s) will be a separate taxable entity for U.S. federal income tax purposes, and all interest and earnings of the reserve will be taxable to such entity.

Any distributions from the reserve to holders of Allowed Claims will be treated for U.S. federal income tax purposes as if received directly from the Debtors on their Allowed Claims.  Each Disputed Claims Reserve will be responsible for payment, out of the assets of such reserve, of any taxes imposed on the Disputed Claims Reserve or its assets.  Accordingly, distributions from the reserve will be net of any taxes relating to the retention, disposition and distribution of assets in the reserve.  In the event, and to the extent, any Cash in the Disputed Claims Reserve(s) is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of such reserve (including any income that may arise upon the distribution of the assets in such reserve) or other expenses, assets of the Disputed Claims Reserve(s) may be sold to pay such taxes or other expenses.

The Plan provides that any New Common Interests and any New Warrants withheld from distribution on account of Disputed Claims will not be issued by Reorganized Parent until such time as the respective Disputed Claims are resolved and the New Common Interests and/or New Warrants are distributed by the Disbursing Agent to holders of Allowed Claims.  Accordingly, such New Common Interests and New Warrants should not be treated as held in and taxable to the Disputed Claims Reserve(s).

> **F.** **~~D.~~ Information Reporting and Backup Withholding**

All distributions to U.S. Holders under the Plan are subject to any applicable tax withholding, including backup withholding.  Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 24%).  Backup withholding generally applies if the U.S. Holder (i) fails to furnish its social security number or other taxpayer identification number, (ii) furnishes an incorrect taxpayer identification number, (iii) has been notified by the IRS that it is subject to backup withholding as a result of a failure to properly report interest or dividends, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.  Holders are urged to consult their own tax advisors regarding the potential application of U.S. withholding taxes to the transactions contemplated under the Plan and whether any distributions to them would be subject to withholding.

*The foregoing summary has been provided for informational purposes only.  All holders of Claims and Interests are urged to consult their own tax advisors concerning the federal, state, local and other tax consequences applicable under the Plan.*

# IX.
# ~~CERTAIN RISK FACTORS TO BE CONSIDERED~~CERTAIN RISK FACTORS TO BE CONSIDERED

Before voting to accept or reject the Plan, holders of Claims and Interests should read and carefully consider the risk factors set forth below, in addition to the information set forth in the Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference hereto.  The factors below should not be regarded as the only risks associated with the Plan or its implementation.  Documents filed with the SEC may also contain important risk factors that differ from those discussed below, and such risk factors are incorporated as if fully set forth herein and are a part of this Disclosure Statement.  Copies of any document filed with the SEC, certain of which are referenced below, may be obtained by visiting the SEC website at http://www.sec.gov.

THIS SECTION PROVIDES INFORMATION REGARDING POTENTIAL RISKS IN CONNECTION WITH THE PLAN.  THE FACTORS BELOW SHOULD NOT BE REGARDED AS THE ONLY RISKS ASSOCIATED WITH THE PLAN OR ITS IMPLEMENTATION.  ADDITIONAL RISK FACTORS IDENTIFIED IN THE DEBTORS' PUBLIC FILINGS WITH THE SEC MAY ALSO BE APPLICABLE TO THE MATTERS SET OUT HEREIN AND SHOULD BE REVIEWED AND CONSIDERED IN CONJUNCTION WITH THIS

DISCLOSURE STATEMENT, TO THE EXTENT APPLICABLE.  THE RISK FACTORS SET FORTH IN THE DEBTORS' ANNUAL REPORT ON FORM 10-K FOR THE FISCAL YEAR ENDED DECEMBER 31, 2022 FILED WITH THE SEC ON APRIL 4, 2023 AND THE DEBTORS' QUARTERLY REPORT ON FORM 10-Q FOR THE QUARTER ENDED MARCH 31, 2023 FILED WITH THE SEC ON MAY 15, 2023 ARE HEREBY INCORPORATED BY REFERENCE.  NEW FACTORS, RISKS AND UNCERTAINTIES EMERGE FROM TIME TO TIME AND IT IS NOT POSSIBLE TO PREDICT ALL SUCH FACTORS, RISKS AND UNCERTAINTIES.

### A.  Certain Bankruptcy Law Considerations

#### i.  The Plan Contemplates Multiple Options for Distributions to Certain Classes Consisting of Various Types of Debt Instruments

The Plan contemplates that the Reorganized Debtors may issue secured debt in the form of the New Debt.  Certain forms of New Debt may have different terms and conditions, such as principal amount, interest rate, maturity.  You are encouraged to carefully consider the terms of the potential New Debt you may receive or elect to receive under the Plan.

#### ii.  Parties in Interest May Object to Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### iii.  Distributions to Allowed Existing Common Interests Claims and Allowed Section 510(b) Claims (if any) May Change

Under the Plan, Holders of Allowed Claims (other than Section 510(b) Claims) will be paid the full value of their Claims, depending on individual elections, regardless of the amount of Claims that are ultimately Allowed. However, Holders of Allowed 510(b) Claims and Allowed Existing Common Interests are entitled to the Residual ~~Equity~~Plan Value, which is the remaining value of the Reorganized Debtors after payments to all Allowed Claims (other than Section 510(b) Claims).  Accordingly, the value of their distributions will depend on the amount of Claims ultimately Allowed as well as the outcome of certain creditor elections.  The value of the projected distributions to Holders of Allowed Existing Common Interests are based upon good faith estimates of the total amount of Claims ultimately allowed.  The Debtors believe that these assumptions and estimates are reasonable. However, unanticipated events or circumstances could result in such estimates or assumptions increasing or decreasing materially and the actual amount of allowed Claims in a particular Class may change.  If the total amount of allowed Claims in a Class is higher than the Debtors' estimates, the recovery to holders of Allowed Existing Common Interests may be less than projected.  For example, the Bankruptcy Court may allow for Claims in a higher amount than the Debtors have estimated or may require a higher rate of postpetition interest to be applied to certain Claims.

The Claims of the Holders of the April Notes and August Notes represent a significant portion of the Debtors' total Claims.  The Holders of April Notes and August Notes may seek the allowance, in whole or in part, of the April 2X Amounts and August 2X Amounts respectively.  While the Debtors believe that, pursuant to the terms of the April Notes and August Notes, and applicable law, the holders of April Notes and August Notes are not entitled to include the April 2X Amounts and August 2X Amounts in their respective Claims, should the Bankruptcy Court allow such amounts, in whole or in part, such allowance would result in a significant increase in the Claims against the Debtors and may significantly decrease the value of the projected distributions to holders of Allowed 510(b) Claims and Allowed Existing Common Interests Claims under the Plan.

#### iv. The Plan Provides Certain Classes Multiple Options Regarding the Manner of their Distributions; A Particular Election by One Class Will Affect the Allocation of New Common Interests Received by Other Classes and the Overall Capital Structure of the Reorganized Debtors

The Plan provides various options to certain Voting Classes regarding the treatment of their Claims and the distributions such Voting Class receives under the Plan. For example, if either Class of Convertible Notes Claims (Class 1 and Class 2) votes to accept the Plan (an "**Accepting Class**") then such Accepting Class will receive at least 25% of their recovery in New Common Interests and up to 75% of their recovery in new secured debt; however, if either such Class rejects, Holders in such rejecting Class will receive 100% of their recovery in new secured debt. Moreover, the Plan provides individual treatment options for Holders of Claims in Class 3 (Miner Equipment Lender Secured Claims).

The elections made by members of such Voting Classes may significantly affect the allocation of New Common Interests among the Classes that may receive New Common Interests and may significantly affect the allocation of New Debt among the Classes issued by the Reorganized Debtors.

#### v. The Amount of Allowed Claims in the Classes Will Affect the Allocation of New Common Interests

The amount of Allowed Claims in each Class may also affect the allocation of New Common Interests among the Classes. If the Bankruptcy Court Allows or Disallows Claims in amounts that are different than the Debtors' estimates, the proportion of Allowed Claims in one Class may change relative to other Classes, and thus, the allocation of New Common Interests and/or New Debt to the various Classes may significantly change.

#### vi. Debtors May Require and May Not Obtain Additional Financing

The Debtors anticipate they may require additional financing to implement the Plan. While the Debtors have agreed in principle to exit financing the Debtors have not yet signed commitment letters and cannot guarantee that such commitment letters will be executed prior to the Confirmation Hearing. Failure execute such agreements for exit financing could prevent the Debtors from consummating the Plan and the transactions contemplated thereby.

#### vii. Risks Related to Settlements Not Yet Finalized or Approved By the Court

As described in further detail in section (VI)(I) hereof, certain settlements and agreements with certain of the Debtors' creditors are still under negotiation and/or have yet to be approved by the Bankruptcy Court. If the Debtors are unable to consummate such settlements with their creditors, it may materially affect the Debtors' ability to consummate the Plan.

#### viii. i. Risks Related to Possible Objections to the Plan

There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan. Although the Debtors believe that the Plan complies with all applicable Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

#### ix. ii. Risk of Non-Confirmation of the Plan

Although the Debtors believe that the Plan will satisfy all requirements necessary for Confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for Confirmation or that such modifications would not necessitate re-solicitation of votes.

Moreover, the Debtors can make no assurances that they will receive the requisite votes for acceptance to confirm the Plan. Even if all Voting Classes vote in favor of the Plan or the requirements for "cramdown" are met with

respect to any Class that rejected the Plan, the Bankruptcy Court could decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation of the Plan are not met. If the Plan is not confirmed, it is unclear what distributions holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of reorganization.

### x. ~~iii.~~ *Risk of* Non-Consensual Confirmation

If any impaired class of claims or equity interests does not accept or is deemed not to accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has voted to accept the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. If any class votes to reject the plan, then these requirements must be satisfied with respect to such rejecting classes. The Debtors believe that the Plan satisfies these requirements.

### xi. ~~iv.~~ Conversion into Chapter 7 Cases

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. *See* section (XI)(C) hereof, as well as the Liquidation Analysis attached hereto as **Exhibit C**, for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests.

### xii. ~~v.~~ Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date will occur soon after the Confirmation of the Plan and that there is not a material risk that the Debtors will not be able to obtain any necessary governmental approvals (including any antitrust approval), there can be no assurance as to the timing of the Effective Date. The transactions contemplated under the Plan may require a review under the Hart-Scott-Rodino Antitrust Improvements Act. If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article IX of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to claims and Interests would remain unchanged.

### xiii. ~~vi.~~ DIP Facility

The ~~Replacement~~ DIP Facility, along with the use of cash on hand (cash collateral), is intended to provide liquidity to the Debtors during the pendency of the Chapter 11 Cases. If the Chapter 11 Cases take longer than expected to conclude, the Debtors may exhaust or lose access to their financing. The ~~Replacement~~ DIP Facility matures on December 21, 2023. There is no assurance that the Debtors will be able to obtain additional financing from the Debtors' existing lenders or otherwise. In either such case, the liquidity necessary for the orderly functioning of the Debtors' business may be materially impaired.

### xiv. ~~vii.~~ Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article X of the Plan provides for certain releases, injunctions, and exculpations, for claims and causes of action that may otherwise be asserted against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases and exculpations are not approved, certain parties may not be considered Releasing Parties, Released Parties, or Exculpated Parties, and certain Released Parties or Exculpated Parties may withdraw their support for the Plan.

### B.      Additional Factors Affecting the Value of Reorganized Debtors

#### i.      *Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary*

Certain of the information contained herein is, by nature, forward-looking, and contains estimates and assumptions, which might ultimately prove to be incorrect, and projections, which may be materially different from actual future experiences.  Many of the assumptions underlying the projections are subject to significant uncertainties that are beyond the control of the Debtors or Reorganized Debtors, including the timing, confirmation, and consummation of the Plan, unanticipated market, policitcal, and economic conditions, customer demand for the Reorganized Debtors' products, and inflation.  There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be Allowed.  Some assumptions may not materialize, and unanticipated events and circumstances may affect the actual results.  Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, regulatory, economic, and competitive risks, and the assumptions underlying the projections may be inaccurate in material respects.  In addition, unanticipated events and circumstances occurring after the approval of this Disclosure Statement by the Bankruptcy Court including any natural disasters, terrorist attacks, pandemics, or other catastrophic events may affect the actual financial results achieved.  Such results may vary significantly from the forecasts and such variations may be material.

#### ii.      *Risks Associated with the Debtors' Business and Industry*

The risks associated with the Debtors' businesses and industry are more fully described in the Debtors' SEC filings, including the Debtors' Annual Report on Form 10-K for the fiscal year ended December 31, 2022, filed with the SEC on April 4, 2023 and the Debtors' Quarterly Report on Form 10-Q for the quarter ended March 31, 2022, filed with the SEC on May 15, 2023.  The risks associated with the Debtors' businesses and industry described in the Debtors' SEC filings include, but are not limited to, the following:

- Risk and uncertainties relating to the effects of disruption from the Chapter 11 Cases make it more difficult to maintain business, financing and operational relationships, to retain key executives.

- Digital assets are subject to extreme price volatility.

- The Debtors' business is highly dependent on a small number of Miner suppliers.

- The Debtors' business is capital intensive, and failure to obtain the necessary capital when needed will force the Debtors to delay, limit or terminate the Debtors' expansion efforts or other operations, which would have a material adverse effect on the Debtors' business, financial condition and results of operations.

- There is substantial doubt about the Debtors' ability to continue as a going concern.

- Governments and government regulators may potentially restrict the ability of electricity suppliers to provide electricity to transaction processing operations of cryptocurrency mining companies, such as the Debtors', which could have a material adverse effect on the Debtors' business, financial condition and results of operations.

- Recent events have increased the likelihood that U.S. federal and state legislatures and regulatory agencies will enact laws and regulations to regulate digital assets and digital asset intermediaries, such as digital asset exchanges and custodians.

- The Debtors' substantial level of indebtedness and liquidity constraints have adversely affected their financial condition and the Debtors' ability to service their indebtedness.

- The Debtors will need to raise additional capital to grow their business and satisfy their anticipated future liquidity needs, and the Debtors may not be able to raise it on terms acceptable to them, or at all.

- If future prices of bitcoin are not sufficiently high, the Debtors' business, results of operations and financial condition will be materially and adversely affected, which will have a negative impact on the trading price of the Debtors' securities.

- The Debtors' success depends in large part on the Debtors' ability to mine digital assets profitably and to attract customers for their hosting capabilities.

- A slowdown in the demand for blockchain technology or blockchain hosting resources and other market and economic conditions could have a material adverse effect on the Debtors' business, financial condition and results of operations.

- A significant portion of the Debtors' assets including their Miners and their Mining facilities are pledged to various of the Debtors' creditors

- The Debtors' revenue comes from the bitcoin they mine and sell and from a small number of hosting customers.

- The Debtors are subject to risks associated with their need for significant electric power and the limited availability of power resources, which could have a material adverse effect on the Debtors' business, financial condition and results of operations.  An inability to purchase and develop additional sources of low-cost renewable sources of energy effectively will have a material adverse effect on the Debtors' business, financial condition and results of operations.

- The Debtors may not be able to obtain new hosting and transaction processing hardware or purchase such hardware at competitive prices.

- The Debtors' business is heavily impacted by social, political, economic and other events and circumstances in the United States and in countries outside of the United States, most particularly Asian and other non-Western countries.

- The Debtors generate significant revenue from a limited number of facilities in Georgia, Kentucky, North Carolina, North Dakota, and Texas.

- The Debtors may be vulnerable to security breaches.

- The Debtors' future success depends on their ability to keep pace with rapid technological changes that could make the Debtors' current or future technologies less competitive or obsolete.

- The further development and acceptance of cryptographic and algorithmic protocols governing transaction validation and the issuance of, and transactions in, digital assets are subject to a variety of factors that are difficult to evaluate.  The slowing or stoppage of development or acceptance of blockchain networks and digital assets would have an adverse material effect on the successful development of the Mining operation and value of mined digital assets.

- The Debtors' ability to use net operating losses to offset future taxable income may be subject to limitations.

- The Debtors operate in a rapidly developing industry and have an evolving business model with a limited history of generating revenue from services.  In addition, the Debtors' evolving business

model increases the complexity of the Debtors' business, which makes it difficult to evaluate the Debtors' future business prospects.

- The Debtors have experienced difficulties in establishing relationships with banks, leasing companies, insurance companies and other financial institutions to provide the Debtors with customary financial products, and services.

- Digital assets exchanges and other trading venues are relatively new and, in some cases, unregulated, and some have experienced fraud and failure.

- The Debtors may not have adequate sources of recovery if the digital assets held by the Debtors are lost, stolen or destroyed due to third-party digital asset services.

- Losses relating to the Debtors' business may be uninsured, or insurance may be limited.

- There has been limited precedent set for financial accounting for bitcoin and other digital assets, thus the determinations that the Debtors have made for how to account for digital assets transactions may be subject to change.

- As more processing power is added to a network, the Debtors' relative percentage of total processing power on that network is expected to decline absent significant capital investment, which has an adverse impact on the Debtors' ability to generate revenue from processing transactions on that network.

- The Debtors' reliance on third-party Mining pool service providers for their Mining revenue payouts may have a negative impact on the Debtors' operations.

- Malicious actors or botnet may obtain control of more than 50% of the processing power on the bitcoin or other network.

- Any loss or destruction of a private key required to access a digital asset of the Debtors is irreversible. The Debtors also may temporarily lose access to their digital assets.

- The digital assets held by the Debtors are not subject to protections of either the Federal Deposit Insurance Corporation or Securities Investor Protection Corporation.

- Changes in tariffs or import restrictions could have a material adverse effect on the Debtors' business, financial condition and results of operations.

- The Debtors' interactions with a blockchain may expose them to specially designated nationals or blocked persons or cause the Debtors to violate provisions of law that did not contemplate distribute ledger technology.

- The Debtors have identified material weaknesses in their internal control over financial reporting. Such material weaknesses may result in material misstatements of our financial statements or cause the Debtors to fail to meet their periodic reporting obligations. The Debtors may also identify additional material weaknesses in the future or otherwise fail to maintain an effective system of internal control.

- The common stock of Core Scientific, Inc. was delisted from Nasdaq and its shares currently trade on the OTC.

### iii.  Post-Effective Date Indebtedness

Following the Effective Date, the Reorganized Debtors may have approximately $743.5 million of secured funded indebtedness outstanding composed of the New Debt, which amount may vary depending on the Allowed amount of the various Claims exchanged for such New Debt, as well as whether Class 1 is an Accepting Class, whether Class 2 is an Accepting Class, and the elections made by the Holders of Allowed Miner Equipment Lender Claims. The Reorganized Debtors' ability to service their debt obligations will depend, among other things, on their future operating performance, which depends partly on economic, financial, competitive, and other factors beyond the Reorganized Debtors' control.  The Reorganized Debtors may not be able to generate sufficient cash from operations to meet their debt service obligations as well as fund necessary capital expenditures.  In addition, if the Reorganized Debtors need to refinance their debt, obtain additional financing, or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

## C.  Risks Relating to the New Common Interests to be Issued Under the Plan

### i.  Market for Equity of Reorganized Parent Debtor

While the common stock of Core Scientific, Inc. was formerly traded on The Nasdaq Global Select Market, and is currently traded on the OTC Pink market under the symbol "CORZQ", there can be no assurance as to the development or liquidity of any market for the New Common Interests of the Reorganized Debtors.  The Debtors are under no obligation to list the New Common Interests on any national securities exchange.  Therefore, there can be no assurance that the New Common Interests will be tradable on a nationally recognized exchange or liquid at any time after the Effective Date. If a trading market does not develop or is not maintained, holders of the foregoing securities may experience difficulty in reselling such securities or may be unable to sell them at all.  Even if such a market were to exist, such New Common Interests could trade at prices higher or lower than the estimated value set forth in the Disclosure Statement depending upon many factors including, without limitation, prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for the Reorganized Debtors.  Accordingly, holders of these securities may bear certain risks associated with holding securities for an indefinite period of time.

### ii.  Potential Dilution

The ownership percentage represented by the New Common Interests of Reorganized Debtors distributed on the Effective Date under the Plan will be subject to dilution from the New Common Interests issuable upon conversion of the New Secured Notes and New Warrants, pursuant to the Rights Offering, under the Management Incentive Plan, pursuant to the Disputed Claims Reserve or issuances made by the Debtors after the Effective Date, and the conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence.  In the future, similar to all companies, additional equity financings or other share issuances by the Reorganized Debtors could adversely affect the value of the issuable securities upon such conversion.  The amount and dilutive effect of any of the foregoing could be material.

### iii.  New Common Interests Subordinated to Reorganized Debtors' Indebtedness

In any subsequent liquidation, dissolution, or winding up of Reorganized Debtors, the New Common Interests would rank below all debt Claims against Reorganized Debtors.  As a result, holders of the New Common Interests will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all of the Reorganized Debtors' obligations to their debt holders have been satisfied.

### iv.   Valuation of Debtors Not Intended to Represent Trading Value of New Common Interests of Debtors

The valuation of Debtors is not intended to represent the trading value of equity in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such New Common Interests at issuance will depend upon, among other things: (i) prevailing interest rates; (ii) conditions in the financial markets; (iii) the anticipated initial securities holdings of prepetition creditors, some of which may prefer to liquidate their investment rather than hold it on a long-term basis; and (iv) other factors that generally influence the prices of the equity securities. The actual market price of the New Common Interests, if a market develops, is likely to be volatile. Many factors, including factors unrelated to the Debtors' actual operating performance and other factors not possible to predict, could cause the market price of equity to rise and fall. Accordingly, the value, stated herein and in the Plan, of the securities to be issued does not necessarily reflect, and should not be construed as reflecting, values that will be attained for the New Common Interests in the public or private markets.

### D.      Risks Relating to the New Debt

### i.    Insufficient Cash Flow to Meet Debt Obligations

The Reorganized Debtors' ability to make scheduled payments on or refinance their debt obligations depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest on their indebtedness, including, without limitation, principal and interest payments with respect to the New Debt.

### ii.   Rating of New Debt

It is not expected that the Reorganized Debtors will seek a rating on any New Debt. If, however, one or more rating agencies rates any New Debt and assigns them a rating lower than the rating expected by investors, or reduces its rating in the future, the market price of the New Debt, as applicable, could be reduced.

### iii.  Defects in Guarantees and Collateral Securing the New Debt

The indebtedness under the New Debt will be secured, subject to certain exceptions and permitted liens, by direct or indirect security interests in certain of the assets of the Reorganized Debtors (henceforth, the **"New Debt Collateral"**). The New Debt Collateral and any related secured guarantees will be subject to any and all exceptions, defects, encumbrances, liens, and other imperfections as may be accepted by the respective trustee and collateral agent of New Debt, if any, and any other creditors that also have the benefit of equivalent priority liens on the Notes Debt Collateral from time to time. The existence of any such exceptions, defects, encumbrances, liens, and other imperfections could adversely affect the value of any New Debt, as well as the ability of the collateral agent, notes agent, notes trustee, or similar agent for any New Debt, or the applicable holder of New Debt, to realize or foreclose on such New Debt Collateral, as applicable. In addition, the New Debt Collateral may be subject to other liens permitted under the terms of the instrument governing the terms of applicable New Debt Collateral, as applicable, whether arising on or after the date such New Debt is issued. To the extent that third parties hold prior liens, such third parties may have rights and remedies with respect to the property subject to such liens that, if exercised, could adversely affect the value of New Debt Collateral.

The New Debt Collateral and any related secured guarantees may include a pledge of certain issued and outstanding equity interests held by the Reorganized Parent and certain subsidiaries of the Reorganized Parent. To the extent the assets directly or indirectly owned by those subsidiaries are subject to any encumbrances or liens or otherwise not available, the pledges of such capital stock may be worth less than otherwise anticipated.

The security interest with respect to New Debt Collateral may be subject to practical problems generally associated with the realization of security interests in New Debt Collateral.  For example, third-party consent may be required to enforce a security interest in a contract.

The Debtors have not conducted appraisals of any of their assets constituting New Debt Collateral to determine if the value of any New Debt Collateral upon foreclosure or liquidation equals or exceeds the amount of any associated New Debt, or such other obligation secured by New Debt Collateral.  It cannot be assured that the remaining proceeds from a sale of any New Debt Collateral would be sufficient to repay holders of the applicable New Debt all amounts owed under them.  The fair market value of New Debt Collateral is subject to fluctuations based on factors that include, among others, the ability to sell New Debt Collateral in an orderly manner, general economic conditions, the availability of buyers, the Reorganized Debtors' failure to implement their business strategy, and similar factors.  The amount received upon a sale of any New Debt Collateral would be dependent on numerous factors, including the actual fair market value of such New Debt Collateral at such time, and the timing and manner of the sale.  By its nature, portions of New Debt Collateral may be illiquid and may have no readily ascertainable market value.  In the event of a subsequent foreclosure, liquidation, bankruptcy, or similar proceeding, it cannot be assured that the proceeds from any sale or liquidation of any New Debt Collateral will be sufficient to pay the Reorganized Debtors' obligations under the applicable New Debt, in full or at all.  There can also be no assurance that any New Debt Collateral will be saleable, and, even if saleable, the timing of its liquidation would be uncertain.  Accordingly, there may not be sufficient collateral to pay all or any of the amounts due on the New Debt.

### iv.   Failure to Perfect Security Interests in New Debt Collateral

The failure to properly perfect liens on New Debt Collateral could adversely affect the ability to enforce rights with respect to New Debt Collateral for the benefit of the holders of applicable New Debt.  In addition, applicable law requires that certain property and rights acquired after the grant of a general security interest or lien can only be perfected at the time such property and rights are acquired and identified.  There can be no assurance that the holders of New Debt will monitor, or that the Reorganized Debtors will inform the holders of New Debt of, the future acquisition of property and rights that constitute New Debt Collateral, and that the necessary action will be taken to properly perfect the security interest in such after-acquired New Debt Collateral.  Failure to monitor the acquisition of additional property or rights that constitute New Debt Collateral or the perfection of any security interests therein may result in the loss of the practical benefits of the liens thereon or of the priority of the liens securing New Debt against third parties.

### v.   There May Not be an Active Trading Market for the New Debt

To the extent any New Debt is freely tradable, there is not and there may not be a public market for any such New Debt, and the Reorganized Debtors do not intend to seek any listing of any New Debt on any stock exchange or other trading market of any type whatsoever.  Accordingly, there can be no assurance that an active trading market for any New Debt will ever develop or, if such a market does develop, that it will be maintained.

### vi.   Risk of Recharacterization of New Secured Notes

Recharacterization of a debt obligation to a capital contribution is an equitable remedy a bankruptcy court may direct if it determines, upon an objection raised by a party in interest, a purported debt obligation is more properly characterized as a capital contribution.  In making such a determination, bankruptcy courts consider, among other things, whether the parties intended to create a debt obligation and the nature of the instrument evidencing the obligation.  Although the Debtors believe, and intend, the New Secured Notes to be a bona fide debt obligation, there can be no assurance a bankruptcy court would agree with the Debtors' interpretation.

### vii.   Changes to New Common Interests Affect Holders of New Secured Notes

Holders of the New Secured Notes will not be entitled to any rights with respect to the New Common Interests (including, without limitation, voting rights and rights to participate in any dividends or other distributions on the New Common Interests), but holders of the New Secured Notes will be subject to all changes affecting the New

Common Interests.  Holders of the New Secured Notes will have rights with respect to the New Common Interests only upon conversion, if any.  For example, in the event an amendment is proposed to the Reorganized Debtors' certificate of incorporation or by-laws requiring shareholder approval and the record date for determining the shareholders of record entitled to vote on the amendment occurs prior to delivery of the New Common Interests, such holders will not be entitled to vote on the amendment, although they will, nevertheless, be subject to any changes in the powers, preferences, or rights of the New Common Interests.

### E.    Risks Related to the Rights Offering

#### i.    *Debtors Could Modify the Rights Offering Procedures*

The Debtors may modify the Rights Offering Procedures to, among other things, adopt additional detailed procedures if necessary to administer the distribution and exercise of Rights Offering Subscription Rights or to comply with applicable law.  Such modifications may adversely affect the rights of those participating in the Rights Offering.

#### ii.   *The Backstop Commitment Agreement Could Be Terminated or the Parties Thereto Could Fail to Live Up to Their Commitment*

While the Debtors have obtained a backstop to the Rights Offering and will enter into a Backstop Commitment Agreement, there is no assurance that the Backstop Commitment Agreement will not be terminated if various conditions are not satisfied.  Termination of the Backstop Commitment Agreement could prevent the Debtors from consummating the Plan.  Additionally, the Backstop Parties may fail to live up to their commitment, which could also prevent the Debtors from consummating the Plan.

### F.    Risks Related to the ~~Exit~~New B. Riley ELOC Facility and the ~~Delayed Draw Term Loan~~Exit Facility

While the Debtors have reached an agreement in principal with the ~~Replacement~~ DIP Lenders regarding the provision of the ~~Exit~~New B. Riley ELOC Facility and ~~Delayed Draw Term Loan~~Exit Facility, the underlying agreements for these facilities and the material terms thereof remain under negotiation.  There can be no assurance that either the ~~Exit~~New B. Riley ELOC Facility or the ~~Delayed Draw Term Loan~~Exit Facility is finalized and agreed to by the Debtors and the ~~Replacement~~ DIP Lenders.  If the Debtors and the ~~Replacement~~ DIP Lenders do reach agreement and definitive documentation regarding the ~~Exit~~New B. Riley ELOC Facility and/or ~~Delayed Draw Term Loan~~Exit Facility, the effectiveness of these agreements will likely be subject to material conditions precedent that the Debtors may have difficulty satisfying prior to the Effective Date.

Additionally, the agreement governing the ~~Exit~~New B. Riley ELOC Facility will likely include a condition that the Reorganized Debtors file with the SEC a registration statement on Form S-1 to register any securities issued as a commitment fee and/or any securities that may be issued and sold pursuant to the ~~Exit~~New B. Riley ELOC Facility, and there is a possibility that effectiveness of this registration statement may~~be~~ be delayed or not occur.  The inability for the Debtors to finalize or consummate the ~~Exit ELOC or Delayed Draw Term Loan~~ New B. Riley ELOC Facility or Exit Facility could prevent the Debtors from consummating the Plan.

### G.    Additional Factors

#### i.    *Debtors Could Withdraw Plan*

The Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtors.

#### ii.   *Debtors Have No Duty to Update*

The statements contained in the Disclosure Statement are made by the Debtors as of the date hereof, unless

otherwise specified herein, and the delivery of the Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update the Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### *iii.   No Representations Outside the Disclosure Statement Are Authorized*

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in the Disclosure Statement.

Any representations or inducements made to secure your vote for acceptance or rejection of the Plan that are other than those contained in, or included with, the Disclosure Statement should not be relied upon in making the decision to vote to accept or reject the Plan.

### *iv.   No Legal or Tax Advice Is Provided by the Disclosure Statement*

The contents of the Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim or Interest should consult their own legal counsel and accountant as to legal, tax, and other matters concerning its Claim or Interest.

The Disclosure Statement is not legal advice to you. The Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

### *v.   No Admission Made*

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or holders of Claims or Interests.

### *vi.   Certain Tax Consequences*

For a discussion of certain tax considerations to the Debtors and certain holders of Claims in connection with the implementation of the Plan, see Article VII thereof.

# X.
# ~~VOTING PROCEDURES AND REQUIREMENTS~~VOTING PROCEDURES AND REQUIREMENTS

Before voting to accept or reject the Plan, each Holder of a Claim in a Voting Class as of the Record Date (an "**Eligible Holder**") should carefully review the Plan attached hereto as **Exhibit A**. All descriptions of the Plan set forth in the Disclosure Statement are subject to the terms and conditions of the Plan.

### A.        Voting Deadline

All Eligible Holders have been sent a voting ballot (a "**Ballot**") together with the Disclosure Statement. Such holders should read the Ballot carefully and follow the instructions contained therein. Please use only the Ballot that accompanies the Disclosure Statement to cast your vote.

The Debtors have engaged Stretto, Inc. as their Voting Agent to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan. **FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE VOTING AGENT AT THE ADDRESS SET FORTH BELOW ON OR BEFORE THE VOTING DEADLINE OF 4:00 P.M. (PREVAILING CENTRAL TIME) ON [●], 2023, UNLESS EXTENDED BY THE DEBTORS.**

IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE VOTING AGENT AT THE NUMBER SET FORTH BELOW TO RECEIVE A REPLACEMENT BALLOT. ANY BALLOT THAT IS EXECUTED

AND RETURNED BUT WHICH DOES NOT INDICATE A VOTE FOR ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.

IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE VOTING AGENT AT:

**Stretto, Inc.**
**Telephone: (949) 404-4152 (domestic toll free) or (888) 765-7875 (international)**
**E-mail: CoreScientificInquiries@stretto.com (with "Core Scientific" in the subject line)**

Additional copies of the Disclosure Statement are available upon request made to the Voting Agent, at the telephone numbers or e-mail address set forth immediately above.

### B.    Voting Procedures

The Debtors are providing copies of the Disclosure Statement (including all exhibits and appendices), related materials, and a Ballot to record holders in the Voting Classes.

Eligible Holders in the Voting Classes should provide all of the information requested by the Ballot, and should (a) complete and return all Ballots received in the enclosed, self-addressed, postage-paid envelope provided with each such Ballot to the Voting Agent, or electronically via e-mail to CoreScientificInquiries@stretto.com with "Core Scientific" in the subject line, or (b) submit a Ballot electronically via the E-Ballot voting platform on Stretto's website by visiting https://cases.stretto.com/corescientific/, clicking on the "Submit E-Ballot" link, and following the instructions set forth on the website.

HOLDERS ARE STRONGLY ENCOURAGED TO SUBMIT THEIR BALLOTS VIA THE E-BALLOT PLATFORM.

### C.    Parties Entitled to Vote

Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on a plan. Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless: (1) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof; or (2) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and interests do not actually vote on the plan.  If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a class of: (1) claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims that cast ballots for acceptance or rejection of the Plan; and (2) Interests as acceptance by interest holders in that class that hold at least two-thirds (2/3) in amount of the Interests that cast Ballots for acceptance or rejection of the Plan.

The Claims and Interests in the following Classes are impaired under the Plan and entitled to vote to accept or reject

the Plan:

- April Convertible Notes Secured Claims (Class 1)

- August Convertible Notes Secured Claims (Class 2)

- Miner Equipment Lender Secured Claims (Class 3)

- M&M Lien Secured Claims (Class 5)

- Secured Mortgage Claims (Class 6)

- General Unsecured Claims (Class 8)

- B. Riley Unsecured Claims (Class 9)

- Section 510(b) Claims (Class 12)

- Existing Common Interests (Class 13)

An Eligible Holder should vote on the Plan by completing a Ballot in accordance with the instructions therein and as set forth above.

All Ballots must be signed by the Eligible Holder, or any person who has obtained a properly completed Ballot proxy from the Eligible Holder by the Record Date. Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted. The Debtors, in their sole discretion, may request that the Voting Agent attempt to contact such voters to cure any such defects in the Ballots. Any Ballot marked to both accept and reject the Plan will not be counted. If you return more than one Ballot voting different Claims, the Ballots are not voted in the same manner, and you do not correct this before the Voting Deadline, those Ballots will not be counted. An otherwise properly executed Ballot that attempts to partially accept and partially reject the Plan will likewise not be counted.

The Ballots provided to Eligible Holders will reflect the principal amount of such Eligible Holder's Claim; however, when tabulating votes, the Voting Agent may adjust the amount of such Eligible Holder's Claim by multiplying the principal amount by a factor that reflects all amounts accrued between the Record Date and the Petition Date including interest.

Under the Bankruptcy Code, for purposes of determining whether the requisite votes for acceptance have been received, only Eligible Holders who actually vote will be counted. The failure of a holder to deliver a duly executed Ballot to the Voting Agent will be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

Except as provided below, unless the Ballot is timely submitted to the Voting Agent before the Voting Deadline together with any other documents required by such Ballot, the Debtors may, in their sole discretion, reject such Ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

### i.   Fiduciaries and Other Representatives

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another, acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested, must submit proper evidence satisfactory to the Debtors of authority to so act. Authorized signatories should submit the separate Ballot of each Eligible Holder for whom they are voting.

### ii.   *Agreements Upon Furnishing Ballots*

The delivery of an accepting Ballot pursuant to one of the procedures set forth above will constitute the agreement of the creditor with respect to such Ballot to accept: (a) all of the terms of, and conditions to, this Solicitation; and (b) the terms of the Plan including the injunction, releases, and exculpations set forth in sections 10.5, 10.6, 10.7, 10.8, and 10.9 therein.  All parties in interest retain their right to object to confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code.

### iii.   *Change of Vote*

Any party who has previously submitted to the Voting Agent before the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Voting Agent before the Voting Deadline a subsequent, properly completed Ballot voting for acceptance or rejection of the Plan.

### D.      Waivers of Defects, Irregularities, etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Voting Agent or the Debtors, as applicable, in their sole discretion, which determination will be final and binding.  The Debtors reserve the right to reject any and all Ballots submitted by any of their creditors or shareholders not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful.  The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot.  The interpretation (including the Ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determines.  Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

### E.      Opt Out Form

Both (i) the Non-Voting Classes of (a) Class 4 Other Secured Claims and (b) Class 7 Priority Non-Tax Claims and (ii) any current or former beneficial owner of equity securities of Core Scientific, Inc., purchased during the period from January 3, 2022 through December 20, 2022, (the "**Other Beneficial Owners**" and together with the Class 4 Other Secured Claims and Class 7 Priority Non-Tax Claims the "**Opt Out Form Recipients**") will receive a form to complete and return if the party elects to opt out of the releases contemplated by the Plan ("**Opt Out Form**"). To the extent an Opt Out Form Recipient wishes to elect to opt-out of the releases, such Opt Out Form Recipient must return the Opt Out Form, with the box checked indicating such Opt Out Form Recipient is electing to opt-out of the releases, to the Solicitation Agent before 4:00 p.m. (Central Time) on  October [●], 2023

### F.      ~~E.~~ Further Information, Additional Copies

If you have any questions or require further information about the voting procedures for voting your Claims or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, the Disclosure Statement, or any exhibits to such documents, please contact the Voting Agent.

# XI.
# ~~CONFIRMATION OF PLAN~~CONFIRMATION OF PLAN

### A.      Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon

appropriate notice to all required parties.  On, or as promptly as practicable after, the Petition Date, the Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing.  Notice of the Confirmation Hearing will be provided to all known creditors and equity holders or their representatives.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing, at any subsequent continued Confirmation Hearing, or pursuant to a notice filed on the docket for the Chapter 11 Cases.

### B.      Objections to Confirmation

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules, must set forth the name of the objector, the nature and amount of the claims held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, with a copy to the chambers of the Honorable David R. Jones United States Bankruptcy Judge, together with proof of service thereof, and served upon the following parties, including such other parties as the Bankruptcy Court may order.

(a)      To the Debtors or the Reorganized Debtors:

Core Scientific, Inc.
210 Barton Springs Road, Suite 300
Austin, Texas 78704
Attn:  Todd DuChene
Email: tduchene@corescientific.com

- and –

To the Counsel of the Debtors:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn:    Ray C. Schrock
         Ronit J. Berkovich
Email:   ray.schrock@weil.com
         ronit.berkovich@weil.com

- and -

700 Louisiana Street, Suite 1700
Houston, Texas 77002
Attn:    Alfredo R. Pérez
         Clifford W. Carlson
Email:   alfredo.perez@weil.com
         clifford.carlson@weil.com

(b)      To the Creditors' Committee

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Attn:   Brett H. Miller
Todd M. Goren
James H. Burbage
Email: bmiller@willkie.com

tgoren@willkie.com
jburbage@willkie.com

- and -

600 Travis Street
Houston, Texas 77002
Attn:  Jennifer J. Hardy
Email: jhardy2@willkie.com


(c)      To the Equity Committee

Vinson & Elkins LLP
1114 Avenue of the Americas, 32nd Floor
New York, New York 10036
Attn:   David S. Meyer
            Lauren R. Kanzer

~~Zachary A. Paiva~~

Email: dmeyer@velaw.com
          lkanzer@velaw.com

~~zpaiva@velaw.com~~

-and -

845 Texas Avenue, Suite 4700
Houston, Texas 77002
Attn:   Paul E. Heath
           Harry A. Perrin
           Kiran Vakamudi
Email: pheath@velaw.com
          hperrin@velaw.com
          kvakamudi@velaw.com


(d)      To the DIP Agent:

B. Riley Commercial Capital, LLC
11100 Santa Monica Blvd., Suite 800
Los Angeles, California 90025
Attn:   Perry Mandarino
Email:  pmandarino@brileyfin.com

- and -

Choate, Hall & Stewart LLP
Two International Place, 34th Floor
Boston, Massachusetts 02110
Attn:   John Ventola
Email:  jventola@choate.com

(e)     To the Ad Hoc Noteholder Group:

Paul Hastings LLP
600 Travis Street, 58th Floor
Houston, Texas 77002
Attn:   James T. Grogan III
Email:  jamesgrogan@paulhastings.com

- and -

200 Park Avenue
New York, New York 10166
Attn:   Kristopher M. Hansen
        Sayan Bhattacharyya
        Erez E. Gilad
        Joanne Lau
Email:  krishansen@paulhastings.com
        sayanbhattacharyya@paulhastings.com
        erezgilad@paulhastings.com
        joannelau@paulhastings.com

(f)     To the U.S. Trustee:

Office of the United States Trustee
515 Rusk Avenue, Suite 3516
Houston, Texas 77002
Attn:   Jayson B. Ruff
        Alicia Barcomb
Email:  Jayson.b.ruff@usdoj.gov
        aliciabarcomb@usdoj.gov

> **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

### C.     Requirements for Confirmation of Plan

The Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation are that the Plan is (1) accepted by all Impaired Classes of Claims and Interests entitled to vote or, if rejected or deemed rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (2) in the "best interests" of the holders of Claims and Interests Impaired under the Plan; and (3) feasible.

### i.     Acceptance of Plan

If any Impaired Class of Claims or Interests does not accept the Plan (or is deemed to reject the Plan), the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each Impaired Class of Claims or Interests that has not accepted the Plan (or is deemed to reject the Plan), the Plan "does not discriminate unfairly" and is "fair and equitable" under the so-called "cramdown" provisions set forth in section 1129(b) of the Bankruptcy Code.  The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan.  A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class

of claims or interests receives more than it legally is entitled to receive for its claims or interests. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured; claims versus interests) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to the dissenting class, the test sets different standards that must be satisfied for the Plan to be confirmed, depending on the type of claims or interests in such class. The following sets forth the "fair and equitable" test that must be satisfied as to each type of class for a plan to be confirmed if such class rejects the Plan:

- **Secured Creditors**. Each holder of an impaired secured claim either (a) retains its liens on the property, to the extent of the allowed amount of its secured claim, and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such secured claim, (b) has the right to credit bid the amount of its claim if its property is sold and retains its lien on the proceeds of the sale, or (c) receives the "indubitable equivalent" of its allowed secured claim.

- **Unsecured Creditors**. Either (a) each holder of an impaired unsecured claim receives or retains under the plan, property of a value, as of the effective date of the plan, equal to the amount of its allowed claim or (b) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

- **Interests**. Either (a) each equity interest holder will receive or retain under the plan property of a value equal to the greater of (i) the fixed liquidation preference or redemption price, if any, of such equity interest and (ii) the value of the equity interest or (b) the holders of interests that are junior to the interests of the dissenting class will not receive or retain any property under the plan.

The Debtors believe the Plan satisfies both the "unfair discrimination" and "fair and equitable" requirement with respect to any rejecting Class.

IF ALL OTHER CONFIRMATION REQUIREMENTS ARE SATISFIED AT THE CONFIRMATION HEARING, THE DEBTORS WILL ASK THE BANKRUPTCY COURT TO RULE THAT THE PLAN MAY BE CONFIRMED ON THE GROUND THAT THE SECTION 1129(b) REQUIREMENTS HAVE BEEN SATISFIED.

### ii. Best Interests Test

As noted above, with respect to each impaired class of claims and equity interests, confirmation of a plan requires that each such holder either: (a) accept the plan; or (b) receive or retain under the plan property of a value, s of the effective date of the plan, that is not less than the value such holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code. This requirement is referred to as the "best interests test."

This test requires a bankruptcy court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtors believe that under the Plan all holders of impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code. The Debtors' belief is based primarily on: (a) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests; and (b) the Liquidation Analysis attached hereto as **Exhibit C.**

The Debtors believe that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors. The Liquidation Analysis provided in **Exhibit C** is solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors,

subject to the assumptions set forth therein.  There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that a bankruptcy court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

### iii.  Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.  As part of this analysis, the Debtors have prepared the consolidated financial projections for the Reorganized Debtors ("**Financial Projections**") for the period beginning with the fourth quarter of 2023 through fiscal year-end 2026.  The Financial Projections, and the assumptions on which they are based, are annexed hereto as **Exhibit E**.  Based upon such Financial Projections, the Debtors believe they will have sufficient resources to make all payments required pursuant to the Plan and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

The Debtors do not, as a matter of course, publish their business plans or strategies, projections or anticipated financial position.  Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or Financial Projections to parties in interest after the Confirmation Date, or to include such information in documents required to be filed with the SEC or otherwise make such information public, unless required to do so by the SEC or other regulatory bodies.  In connection with the planning and development of the Plan, the Financial Projections were prepared by the Debtors, with the assistance of their professionals, to present the anticipated impact of the Plan.  The Financial Projections assume that the Plan will be implemented in accordance with its stated terms.  The Financial Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, bitcoin hashprices, energy prices, regulatory changes, and a variety of other factors.  Consequently, the estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to material business, economic, and other uncertainties.  Therefore, such Financial Projections, estimates, and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein.

The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement, the Plan, and the Plan Supplement, in their entirety, and the historical consolidated financial statements (including the notes and schedules thereto).

# XII.
# ~~ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN~~ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN

The Debtors have evaluated several alternatives to the Plan.  After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan.  If the Plan is not confirmed and consummated, the alternatives to the Plan are: (A) the preparation and presentation of an alternative reorganization; (B) the a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code; or (C) a liquidation under chapter 7 of the Bankruptcy Code.

### A.    Alternative Plan of Reorganization

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan.  Such a plan might involve either: (a) a reorganization and continuation of the Debtors' businesses or (b) an orderly liquidation of their assets.  The Debtors, however, believe that the Plan, as described herein, enables their creditors and shareholders to realize

the most value under the circumstances.

### B.      Sale under Section 363 of the Bankruptcy Code

If the Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and hearing, authorization to sell their assets under section 363 of the Bankruptcy Code. The security interests in the Debtors' assets held by Holders of the April Convertible Notes Secured Claims, Holders of the August Convertible Notes Secured Claims, Holders of the M&M Lien Claims, Holders of the Mortgage Secured Claims, the Equipment Lenders, and the ~~Replacement~~ DIP Lenders would attach to the proceeds of any sale of the Debtors' assets to the extent of their secured interests therein. Upon analysis and consideration of this alternative, the Debtors do not believe a sale of their assets under section 363 of the Bankruptcy Code would yield a higher recovery for the holders of claims under the Plan.

### C.      Liquidation Under Chapter 7 of Bankruptcy Code

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code. The effect that a chapter 7 liquidation would have on the recovery of holders of Allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit C.**

The Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of, among other things, the delay resulting from the conversion of the Chapter 11 Cases, the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals who would be required to become familiar with the many legal and factual issues in the Chapter 11 Cases, and the loss in value attributable to an expeditious liquidation of the Debtors' assets as required by chapter 7.

# XIII.
# ~~CONCLUSION AND RECOMMENDATION~~CONCLUSION AND RECOMMENDATION

The Debtors believe the Plan is in the best interests of all stakeholders and urge the holders of Claims and Interests in Classes 1, 2, 3, 5, 6, 8, 9, 12, and 13 to vote in favor thereof.

**<u>Exhibit A</u>**

**The Plan**

**(Filed Separately)**

**Exhibit B**

**Plan Release, Exculpation, and Injunction Provisions**

**Definitions**:

"*Related Parties*" means with respect to a Person, that Person's current and former Affiliates, and such Person's and its current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, fiduciaries, trustees, advisory board members, financial advisors, partners, limited partners, general partners, attorneys, accountants, managed accounts or funds, management companies, fund advisors, investment bankers, consultants, representatives, and other professionals, and such Person's respective heirs, executors, estates, and nominees, each in their capacity as such.

"*Released Parties*" means, collectively: (i) the Debtors; (ii) the Reorganized Debtors; (iii) the Equity Committee and its members, solely in their capacity as such; (iv) the Backstop Parties; (v) B. Riley Commercial Capital, LLC; (vi) BRF Finance Co., LLC; (vii) the Settling Miner Equipment Lenders; (viii) Brown Corporation; (ix) Holliwood LLC; (x) Foundry; and (xi) with respect to each of the foregoing Persons in clauses (i) through (x), all current and former Related Parties. Notwithstanding the foregoing, any Person that opts out of the releases set forth in section 10.6(b) of the Plan shall not be deemed a Released Party thereunder.

"*Releasing Parties*" means collectively, and in each case solely in their capacity as such, (i) the Debtors; (ii) the Reorganized Debtors; (iii) with respect to each of the foregoing Persons in clauses (i) through (ii), all Related Parties; (iv) the Holders of all Claims or Interests that vote to accept the Plan; (v) the Holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan and do not opt out of granting the releases set forth herein; (vi) the Holders of all Claims or Interests that vote, or are deemed, to reject the Plan or that are presumed to accept the Plan but do not opt out of granting the releases set forth herein; and (vii) the Holders of all Claims and Interests and all Other Beneficial Owners that were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out.

"*Exculpated Parties*" means each of the following in their capacity as such and, in each case, to the maximum extent permitted by law: (i) the Debtors; and (ii) Equity Committee and its members, solely in their capacity as such.

**Provisions**:

   **10.5**   *Injunction.*

   Except as otherwise expressly provided in the Plan or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to Section ~~10.6(a)~~10.6(a) or Section ~~10.6(b)~~10.6(b), shall be discharged pursuant to Section ~~10.3~~10.3 of the Plan, or are subject to exculpation pursuant to Section ~~10.7~~10.7, and all Subcontractors and all other parties in interest are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, and/or the Exculpated Parties (to the extent of the exculpation provided pursuant to Section ~~10.7~~10.7 with respect to the Exculpated Parties): (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless (x) such Entity has timely asserted such setoff right either in a Filed Proof of Claim, or in another document Filed with the Bankruptcy Court explicitly preserving such setoff or that otherwise indicates that such entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise or (y) such right to setoff arises under a postpetition agreement with the Debtors or an Executory Contract that has been assumed by the Debtors as of the Effective Date; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released, settled, and/or treated, entitled to a distribution, or cancelled pursuant to the Plan or otherwise Disallowed; *provided* that such persons who have held, hold, or may hold Claims against, or Interests in, a Debtor, a Reorganized Debtor, or an Estate shall not be precluded from exercising their rights and remedies, or obtaining the benefits, solely pursuant to and consistent with the terms of the Plan.

   Subject in all respects to Section ~~11.1~~11.1, no entity or person may commence or pursue a Claim or Cause of Action of any kind against any Released Party or Exculpated Party that arose or arises from, in whole or in part, the Chapter 11 Cases, the Debtors, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of the Debtors or the Reorganized Debtors (which includes, for the avoidance of doubt, all claims and Causes of Action asserted or assertable in the Securities Class Action), the DIP Facility, the Convertible Notes Agreements, the Miner Equipment Lender Agreements, the Mortgage Agreements, the General Contracts, any and all agreements relating to M&M Liens, and any and all related agreements, instruments, and/or other documents, the formulation, preparation,

dissemination, solicitation, negotiation, entry into, or filing of the Plan (including the Plan Supplement), the Disclosure Statement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Plan, the Plan Supplement, the Disclosure Statement, the Plan Settlements, the New Secured Notes Documents, the New **Notes Documents, the New** Miner Equipment Lender Debt Documents, the Exit ~~Credit Agreement~~**Facility Documents**, the New B. Riley ELOC Facility, the **New Warrant Agreement, the** Rights Offering, the Backstop Commitment Agreement, the Initial DIP Loan Documents, the DIP Facility, the RSA, the Chapter 11 Cases, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan (including, but not limited to, the New Common Interests), or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a claim of willful misconduct, fraud or gross negligence against a Released Party or Exculpated Party and (ii) specifically authorizing such Entity or Person to bring such Claim or Cause of Action against any such Released Party or Exculpated Party. The Bankruptcy Court shall have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and, only to the extent legally permissible and as provided for in Section ~~11.1~~**11.1**, shall have jurisdiction to adjudicate the underlying colorable Claim or Cause of Action.

### 10.6    *Releases*

### (a)    Releases by the Debtors.

Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, except as otherwise provided in the Plan or in the Confirmation Order, on and after the Effective Date, the Released Parties are deemed conclusively, absolutely, unconditionally and irrevocably, released and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of the Debtors or the Reorganized Debtors (which includes, for

the avoidance of doubt, all claims and Causes of Action asserted or assertable in the Securities Class Action), the DIP Facility, the Convertible Notes Agreements, the Miner Equipment Lender Agreements, the Mortgage Agreements, the General Contracts, any and all agreements relating to M&M Liens, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Plan (including the Plan Supplement), the Disclosure Statement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Plan, the Plan Supplement, the Disclosure Statement, the Plan Settlements, the New Secured Notes Documents, the New **Notes Documents, the New** Miner Equipment Lender Debt Documents, the Exit ~~Credit Agreement~~**Facility Documents**, the New B. Riley ELOC Facility, the **New Warrant Agreement, the** Rights Offering, the Backstop Commitment Agreement, the Initial DIP Loan Documents, the DIP Facility, the RSA, the Chapter 11 Cases, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan (including, but not limited to, the New Common Interests), or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth in this Section ~~10.6(a)~~**10.6(a)** (i) shall only be applicable to the maximum extent permitted by law; (ii) shall not be construed as (a) releasing any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (*provided* that actual fraud shall not exempt from the scope of these Debtor releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence, ~~or~~ **(b) releasing any Released Party from Claims or Causes of Action held by the Debtors arising from an act or omission that is determined by a Final Order or by a federal government agency to have constituted a violation of any federal securities laws or (c** ) releasing any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.  This section ~~10.6(a)~~**10.6(a)** is subject to approval of the Special Committee of the Board of Directors of Core Scientific, Inc.

(b)      **Releases by Holders of Claims and Interests**.

Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, except as otherwise provided in the Plan or in the Confirmation Order, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each Releasing Party, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released, and discharged the Debtors, the Reorganized Debtors, and the Released Parties from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any

derivative Claims or Causes of Action asserted or that may be asserted on behalf of the Debtors or their Estates, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner

arising from, in whole or in part, the Chapter 11 Cases, the Debtors, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of the Debtors or the Reorganized Debtors (which includes, for the avoidance of doubt, all claims and Causes of Action asserted or assertable in the Securities Class Action), the DIP Facility, the Convertible Notes Agreements, the Miner Equipment Lender Agreements, the Mortgage Agreements, the General Contracts, any and all agreements relating to M&M Liens, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Plan (including the Plan Supplement), the Disclosure Statement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Plan, the Plan Supplement, the Disclosure Statement, the Plan Settlements, the New Secured Notes Documents, the New **Notes Documents, the New** Miner Equipment Lender Debt Documents, the Exit ~~Credit Agreement~~**Facility Documents**, the New B. Riley ELOC Facility, the **New Warrant Agreement, the** Rights Offering, the Backstop Commitment Agreement, the Initial DIP Loan Documents, the DIP Facility, the RSA, the Chapter 11 Cases, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan (including, but not limited to, the New Common Interests), or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth in this Section ~~10.6(b)~~**10.6(b)** (i) shall only be applicable to the maximum extent permitted by law; and (ii) shall not be construed as (a) releasing any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (*provided* that actual fraud shall not exempt from the scope of these third-party releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence, or (b) releasing any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

     **10.7**    **Exculpation**

5

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out, in whole or in part, from the Petition Date through the Effective Date, of the Chapter 11 Cases, the Debtors, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of the Debtors or the Reorganized Debtors, the DIP Facility, the Convertible Notes Agreements, the Miner Equipment Lender Agreements, the Mortgage Agreements, the General Contracts, any and all agreements relating to M&M Liens, and related agreements, instruments, or other documents, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Plan (including the Plan Supplement), the Disclosure Statement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Plan, the Plan Supplement, the Disclosure Statement, the Plan Settlements, the New Secured Notes Documents, the New Notes Documents, the New Miner Equipment Lender Debt Documents, the Exit ~~Credit Agreement~~Facility Documents, the New B. Riley ELOC Facility, the New Warrant Agreement, the Rights Offering, the Backstop Commitment Agreement, the Initial DIP Loan Documents, the DIP Facility, the RSA, the Chapter 11 Cases, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan (including, but not limited to, the New Common Interests), or the distribution of property under the Plan, or any other related agreement, except for Claims or Causes of Action arising from an act or omission that is judicially determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects, such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities. The Exculpated Parties have, and upon completion of the Plan, shall be deemed to have, participated in good faith and in compliance with all applicable laws with regard to the solicitation and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the exculpations set forth in this Section ~~10.7~~10.7 (i) shall only be applicable to the maximum extent permitted by law; and (ii) shall not be construed as (a) exculpating any Exculpated Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (*provided* that actual fraud shall not exempt from the scope of these exculpations any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence, or (b) exculpating any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring

**Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

      **10.8**      *Retention of Causes of Action/Transfer of Causes of Action and Reservation of Rights.*

      In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to this ~~Article X~~Article X, the Reorganized Debtors shall have, retain, reserve and be entitled to assert, and may enforce all rights to commence and pursue, as appropriate, any and all claims or Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced. **The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity not released pursuant to the Plan.**

**Exhibit C**

**Liquidation Analysis**

**(To be Filed at a Later Date)**

**<u>Exhibit D</u>**

**Valuation Analysis**

~~**(To Be Filed at a  Later Date)**~~

**Valuation Analysis**[1]

THE INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES OR FUNDED INDEBTEDNESS TO BE ISSUED PURSUANT TO THE PLAN.  THE INFORMATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS OR ANY OF THEIR AFFILIATES.

Solely for the purposes of the Plan and the Disclosure Statement, PJT Partners LP ("**PJT**"), as investment banker to the Debtors, has estimated a range of total enterprise value (the "**Enterprise Value**") and implied equity value (the "**Equity Value**") for the Reorganized Debtors pro forma for the transactions contemplated by the Plan (the "**Valuation Analysis**").  The Valuation Analysis is based on financial and other information provided by the Debtors' management, including the Financial Projections, attached to the Disclosure Statement as **Exhibit E** thereto, and information provided by other sources.  The Valuation Analysis is as of September 1, 2023, with an assumed Plan Effective Date of October 31, 2023.  The Valuation Analysis utilizes market data as of September 1, 2023.  The valuation estimates set forth herein represent valuation analyses of the Reorganized Debtors utilizing customary valuation techniques to the extent deemed appropriate by PJT.

In preparing the Valuation Analysis, PJT considered a variety of factors and evaluated a variety of financial analyses, including: (a) a discounted cash flow ("**DCF**") analysis; (b) a comparable companies analysis; and (c) a precedent transactions analysis. In performing the Valuation Analysis, PJT relied primarily upon the DCF analysis and comparable companies analysis. While PJT considered the precedent transactions analysis, PJT deemed this methodology to be of limited relevance due to a lack of precedent transactions in respect to the Reorganized Debtors.

The preparation of a valuation analysis is a complex analytical process involving subjective determinations about (a) which financial analysis methodologies are most appropriate and relevant to the subject company and (b) the application of those methodologies to particular facts and circumstances in a manner that is not readily suitable to summary description.

Based on the aforementioned analyses, and other information described herein and solely for purposes of the Plan, the estimated range of Enterprise Value of the Reorganized Debtors, collectively, as of an assumed Effective Date of October 31, 2023, is approximately $2,000 million to approximately $2,500 million.

In addition, based on the estimated range of Enterprise Value of the Reorganized Debtors and other information described herein and solely for purposes of the Plan, PJT estimated a potential range of total Equity Value of the Reorganized Debtors, which consists of the Enterprise Value,

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the Disclosure Statement.

1

less estimated indebtedness, plus estimated balance sheet cash on the assumed Effective Date. PJT has assumed that the Reorganized Debtors will have, as of the assumed Effective Date of October 31, 2023, a capital structure reflective of either (i) a non-consensual Plan (i.e. assuming all holders of April Convertible Notes Secured Claims elect or otherwise receive the Default April Convertible Noteholder Treatment and all holders of August Convertible Notes Secured Claims elect or otherwise receive the Default August Convertible Noteholder Treatment) or (ii) a consensual Plan (i.e. assuming all holders of April Convertible Notes Secured Claims elect the April Convertible Noteholder Treatment Settlement Election and all holders of August Convertible Notes Secured Claims elect the August Convertible Noteholder Treatment Settlement Election).

Under a non-consensual Plan, the Reorganized Debtors are assumed to have a pro forma excess cash balance of approximately $21 million and estimated pro forma indebtedness of approximately $909 million, which consists of (a) $57 million of new Exit Facility debt, (b) $615 million of New April Secured Notes (Default) and New August Secured Notes (Default), (c) $177 million of New Miner Equipment Lender Debt Facilities (Default) debt and New Miner Equipment Lender Debt Facilities (Election 2) debt, (d) $22 million of Reinstated Other Secured Claims, (e) $1 million of Mortgage Takeback Debt, (f) $36 million of debt with respect to M&M Lien Settlements, and (g) $1 million of M&M Lien Takeback Debt. Therefore, PJT estimated that the potential range of Equity Value for the Reorganized Debtors as of the assumed Effective Date under a Non-Consensual Plan is between approximately $1,112 million and approximately $1,612 million.

Under a Consensual Plan, the Reorganized Debtors are assumed to have a pro forma excess cash balance of approximately $21 million and estimated pro forma indebtedness of approximately $726 million, which consists of (a) $57 million of new Exit Facility debt, (b) $150 million of New Notes, (c) $282 million of New April Secured Notes (Settlement Election) and New August Secured Notes (Settlement Election) , (d) $177 million of New Miner Equipment Lender Debt Facilities (Default) debt and New Miner Equipment Lender Debt Facilities (Election 2) debt, (e) $22 million of Reinstated Other Secured Claims, (f) $1 million of Mortgage Takeback Debt , (g) $36 million of debt with respect to M&M Lien Settlements, and (h) $1 million of M&M Lien Takeback Debt.  Therefore, PJT estimated that the potential range of Equity Value for the Reorganized Debtors as of the assumed Effective Date under a Consensual Plan is between approximately $1,295 million and approximately $1,795 million.

For purposes of the Valuation Analysis, PJT assumed that no material changes that would affect estimated value will occur between the date of filing of the Disclosure Statement and the assumed Effective Date.  In addition, PJT assumed that there will be no material change in economic, monetary, market, industry, and other conditions that would impact any of the material information made available to PJT, including the Financial Projections, as of the assumed Effective Date.  PJT makes no representation as to the achievability or reasonableness of such assumptions.  The Debtors undertake no obligation to update or revise statements to reflect events or circumstances that arise after the date of the Disclosure Statement or to reflect the occurrence of unanticipated events.  PJT's Valuation Analysis does not constitute an opinion as to the fairness from a financial point of view of the consideration to be received or paid under the Plan, of the terms and provisions of the Plan, or with respect to any other matters.

THE VALUATION ANALYSIS REFLECTS WORK PERFORMED BY PJT ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESSES AND ASSETS OF THE DEBTORS AVAILABLE TO PJT AS OF SEPTEMBER 1, 2023.  IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY HAVE AFFECTED OR MAY AFFECT PJT'S CONCLUSIONS, PJT DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE, OR REAFFIRM THE VALUATION ANALYSIS AND DOES NOT INTEND TO DO SO.

PJT DID NOT INDEPENDENTLY VERIFY THE FINANCIAL PROJECTIONS OR OTHER INFORMATION THAT PJT USED IN THE VALUATION ANALYSIS, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF THE DEBTORS OR THEIR ASSETS WERE SOUGHT OR OBTAINED IN CONNECTION THEREWITH.  THE VALUATION ANALYSIS WAS DEVELOPED SOLELY FOR PURPOSES OF THE PLAN.  THE VALUATION ANALYSIS REFLECTS THE APPLICATION OF VARIOUS VALUATION TECHNIQUES, DOES NOT PURPORT TO BE AN OPINION, AND DOES NOT PURPORT TO REFLECT OR CONSTITUTE AN APPRAISAL, LIQUIDATION VALUE, OR PREDICTION OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES OR FUNDED INDEBTEDNESS TO BE ISSUED PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH IN THE VALUATION ANALYSIS.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES THAT ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS.  AS A RESULT, THE VALUATION ANALYSIS IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN.  BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NONE OF THE DEBTORS, PJT, OR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY.  IN ADDITION, THE ACTUAL VALUE OF NEWLY ISSUED SECURITIES AND FUNDED INDEBTEDNESS IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT.  ACTUAL MARKET PRICES OF SUCH SECURITIES AND FUNDED INDEBTEDNESS AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL POST-EMERGENCE DEBT AND EQUITY HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT IMMEDIATELY RATHER THAN HOLD THEIR INVESTMENT ON A LONG-TERM BASIS, AND THE POTENTIALLY DILUTIVE IMPACT OF CERTAIN EVENTS, INCLUDING THE ISSUANCE OF EQUITY SECURITIES PURSUANT TO THE MIP, UPON EXERCISE OF THE NEW WARRANTS, THE ISSUANCE OF EQUITY SECURITIES FOR ANY OTHER REASON AND/OR THE CONVERSION OF THE NEW AUGUST SECURED NOTES (SETTLEMENT ELECTION) AND/OR THE NEW APRIL SECURED NOTES (SETTLEMENT ELECTION).

The Debtors' management team advised PJT that the Financial Projections were reasonably prepared in good faith and on a basis reflecting the Debtors' best estimates and judgments as to the future operating and financial performance of the Reorganized Debtors. The Valuation Analysis assumed that the actual performance of the Reorganized Debtors will correspond to the Financial Projections in all material respects. If the business performs at levels below or above those set forth in the Financial Projections, such performance may have a materially negative or positive impact, respectively, on the valuation of the Reorganized Debtors and the Enterprise Value thereof.

In preparing the Valuation Analysis, PJT: (a) reviewed certain historical financial information of the Debtors for recent years and interim periods provided by the Debtors; (b) discussed the Debtors' performance, future prospects, and industry observations with certain members of the Debtors' senior management; (c) considered certain economic and industry information relevant to the Debtors' operating businesses; (d) prepared discounted cash flow analyses based on the Financial Projections, utilizing various discount rates and assumptions in the calculation of terminal values; and (e) conducted such other studies and analyses as PJT deemed appropriate. PJT assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors' management and other parties as well as publicly available information.

The Valuation Analysis does not constitute a recommendation to any Holder of Allowed Claims or Existing Common Interests or any other person as to how such person should vote or otherwise act with respect to the Plan. PJT has not been requested to, and does not express any view as to, the potential trading value of the Reorganized Debtors' securities and/or funded indebtedness on issuance or at any other time.

The Financial Projections include certain illustrative assumptions regarding expected cash tax liabilities. The impact of any changes to these illustrative assumptions regarding cash tax liabilities, including as a result of the tax consequences of the Restructuring Transactions (which could include elimination of or limitation of tax attributes, changes to the tax basis of assets, and the triggering of other tax implications) could materially impact the Valuation Analysis. Such matters are subject to various uncertainties and contingencies that are difficult to predict, certain of which rely on the form of the Restructuring Transactions, and some of which cannot be determined with certainty until after the Restructuring Transactions are consummated.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE VALUATION ANALYSIS PERFORMED BY PJT. THE PREPARATION OF A VALUATION ANALYSIS INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ANALYSIS IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION. THE VALUATION ANALYSIS PERFORMED BY PJT IS NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE DESCRIBED HEREIN.

4

PJT IS ACTING AS INVESTMENT BANKER TO THE DEBTORS AND HAS NOT AND WILL NOT BE RESPONSIBLE FOR, AND HAS NOT AND WILL NOT PROVIDE, ANY TAX, ACCOUNTING, ACTUARIAL, LEGAL, OR OTHER SPECIALIST ADVICE TO THE DEBTORS OR ANY OTHER PARTY IN CONNECTION WITH THE DEBTORS' CHAPTER 11 CASES, THE PLAN OR OTHERWISE

| Summary report:<br>Litera Compare for Word 11.2.0.54 Document comparison done on<br>9/7/2023 9:34:47 AM | |
|---|---|
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** Blank.docx | |
| **Modified filename:** Project Cobalt - DS Valuation Analysis Exhibit  (Final).docx | |
| **Changes:** | |
| Add | 23 |
| Delete | 1 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 24 |

## ~~Exhibit~~EXHIBIT E

**Financial Projection~~s~~**

**Introduction**

Section 1129(a)(11) of the Bankruptcy Code requires that a debtor to demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization of the reorganized debtor or any successor to the debtor. For purposes of demonstrating that the Plan meets this requirement, the Debtors have prepared these projections (the "Financial Projections") based on, among other things, the anticipated future financial condition and results of operations of the Debtors. In conjunction with the Company's advisors, the Company's management team developed and refined the business plan and prepared consolidated financial projections of the Debtors for OctoberNovember 1, 2023, through December 31, 2026 (the "Projection Period").

The Financial Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated by the Plan will be consummated pursuant to the Bankruptcy Court's order confirming the PlanScheduling Motion. Any significant delay in confirmation of the Plan may have a significant negative impact on the operations and financial performance of the Debtors, including, but not limited to, an increased risk or inability to meet forecasts and the incurrence of higher reorganization expenses.

Although the Financial Projections represent the Debtors' best estimates and good faith judgment (for which the Company's management team believes it has a reasonable basis) of the results of future operations, financial position, and cash flows of the Debtors, they are only estimates and actual results may vary considerably from such Financial Projections. Consequently, the inclusion of the Financial Projections herein should not be regarded as a representation by the Debtors, the Debtors' advisors, or any other person that the projected results of operations, financial position, and cash flows of the Debtors will be achieved. Additional information relating to the principal assumptions used in preparing the Financial Projections are set forth below.

The Financial Projections are based on the Company's long-term forecast developed in 2023. Additional information relating to the principal assumptions used in preparing the Financial Projections are set forth below. The Financial Projections have been prepared by the Company's management team, in conjunction with the Debtors' advisors. The Financial Projections were not prepared to comply with the guidelines for prospective financial statements published by the American Institute of Certified Public Accountants or the rules and regulations of the SEC, and by their nature are not financial statements prepared in accordance with accounting principles generally accepted in the United States of America.

The Debtors' independent accountants have neither examined nor compiled the accompanying financial projections and accordingly do not express an opinion or any other form of assurance with respect to the Financial Projections, assume no responsibility for the Financial Projections, and disclaim any association with the Financial Projections.

The Financial Projections do not reflect the impact of fresh start reporting in accordance with American Institute of Certified Public Accountants statement of position 90-7 "Financial Reporting by Entities in Reorganization under the Bankruptcy Code."

The Financial Projections contains certain statements that are forward-looking statements and are based on estimates and assumptions and are necessarily speculative. No representations or warranties

are made as to accuracy of any financial information contained herein or assumptions regarding the debtors' businesses and their future results and operations.

The Financial Projections and any forward-looking statements in the Financial Projections are being made by the Debtors as of the date hereof, unless specifically noted. The Debtors are under no obligation to (and expressly disclaim any obligation to) update or alter the Financial Projections and any forward-looking statements whether because of new information, future events, or otherwise.

**General Assumptions & Methodology**

The Financial Projections for the Debtors are based on the Debtors' business plan as informed by current and projected conditions in the Debtors' markets and were prepared on a holistic basis. The Financial Projections consist of the following unaudited pro forma financial statements: (i) projected income statement, (ii) projected balance sheet and (iii) projected cash flow statement.

The Company's management team reports and uses the Adjusted EBITDA metric to assess the ongoing performance of the Debtors' core operations, adjusted for certain non-operating and one-time costs.

**Projected Income Statement Assumptions**

Revenue: Revenue mainly consists of sales generated from the Debtors' bitcoin self-mining activities, where the Debtors operate specialized computers known as "miners" to solve complex cryptographic algorithms in support of the bitcoin blockchain, and the Debtors receive bitcoins in exchange for performing such services. The Debtors also generate revenue from their hosting operations, where the Debtors host miners for third-party customers. Bitcoin self-mining revenue is forecasted based on a detailed projection of the Debtors' total self-mining computational power (known as "hashrate") and revenue generated per each unit of computational power (known as "hashprice"). Hosting revenue is forecasted based on the number of hosted miners and the terms specified in each hosting contract.

Cost of Revenue: Cost of revenue primarily consists of electricity costs, facility operations costs, depreciation of property, plant and equipment used for hosting services and mining operations, and other related costs. Electricity costs are forecasted on a bottoms-up basis, utilizing anticipated power usage at each facility, as well as tariffs built into the power contracts, and/or forward power pricing. Facility operations costs are forecasted based on historical costs and management estimates for optimized operations.

Operating Expenses: Operating expenses consists of research and development, sales and marketing, and general and administrative expenses. Operating expenses are forecasted based on historical costs and management estimates.

**Projected Balance Sheet Assumptions**

The projected balance sheet takes into account the pro forma capital structure, estimated adjustments to the balance sheet based on cancellation of debt or other liabilities, and the exit capital raise, all in conjunction with the Plan.

Under ~~a~~the ~~e~~Consensual Plan ~~(which assumes that Classes 1 and 2 both vote to accept the Plan)~~, the balance sheet forecast assumes $~~852~~726 million of total beginning funded debt balance, consisting of $~~58~~57 million of ~~Exit Facility~~Delayed Draw Term Loan, $~~532~~150 million of takeback term loan, $282 million of takeback secured convertible notes, $~~197~~177 million of takeback secured miner equipment ~~takeback debt~~financings, $~~23~~22 million of reinstated non-miner equipment ~~takeback debt~~financings, and $~~42~~37 million of debt associated with M&M liens.

Under ~~a~~the ~~non-e~~Non-Consensual Plan ~~(which assumes that Classes 1 and 2 both vote to reject the Plan)~~, the balance sheet forecast assumes $~~929~~909 million of total beginning funded debt balance, consisting of $~~58~~57 million of ~~Exit Facility~~Delayed Draw Term Loan, $610~~0~~5 million of takeback secured convertible notes, $~~197~~177 million of takeback secured miner equipment ~~takeback debt~~financings, $~~23~~22 million of reinstated non-miner equipment ~~takeback debt~~financings, and $~~42~~37 million of debt associated with M&M liens.


**Projected Cash Flow Statement Assumptions**

<u>Changes in Working Capital</u>: Changes in working capital reflect the ordinary course changes in accounts receivable, accounts payables, other current assets and other current liabilities, among other items.

<u>Cash Interests</u>: Cash interests are forecasted based upon the capital structure proposed under ~~a~~the ~~e~~Consensual Plan and ~~a~~the ~~non-e~~Non-Consensual Plan.

<u>Cash Taxes</u>: Cash taxes are forecasted based upon analyses conducted by the Debtors' tax advisors in conjunction with the Plan.

<u>Capital Expenditures</u>: Capital expenditures reflect the Debtors' forecast of new miner purchases, refreshes of existing miners, and facility expansion construction costs.

<u>Cash Flows from Financing Activities:</u> Reflect principal repayments on post emergence debt.

4

**PROJECTED INCOME STATEMENT (UNAUDITED) – CONSENSUAL AND NON-CONSENSUAL PLAN**

(Modified)

| | 2023E | 2024E | 2025E | 2026E |
|---|---|---|---|---|
| | Nov-Dec | FY | FY | FY |
| **Total Revenue** | 190 | 727 | 965 | 1,131 |
| *YoY Growth (%)* | | 52% | 33% | 17% |
| Cost of Revenue | 187 | 532 | 600 | 648 |
| *% of Revenue* | 107% | 73% | 62% | 57% |
| **Gross Profit** | (3) | 196 | 365 | 483 |
| *Margin (%)* | -3% | 27% | 38% | 43% |
| SG&A, R&D and Other | 10 | 56 | 56 | 57 |
| *% of Revenue* | 11% | 8% | 6% | 5% |
| **Adj. EBIT** | (13) | 130 | 308 | 427 |
| *Margin (%)* | -12% | 19% | 32% | 38% |
| **Adj. EBITDA** | 39 | 341 | 508 | 628 |
| *Margin (%)* | 37% | 47% | 53% | 56% |

5

**PROJECTED BALANCE SHEET (UNAUDITED) – CONSENSUAL PLAN**

(Modified)

| | 2023E | 2024E | 2025E | 2026E |
|---|---|---|---|---|
| | FY | FY | FY | FY |
| **Assets** | | | | |
| Cash and Equivalents | 59 | 162 | 243 | 588 |
| Prepaid Expenses | 33 | 41 | 55 | 54 |
| Property, Plant and Equipment | 472 | 462 | 548 | 418 |
| Other Assets | 35 | 35 | 35 | 35 |
| **Total Assets** | 599 | 660 | 881 | 1,095 |
| | | | | |
| **Liabilities** | | | | |
| Accounts Payable and Accrued Expenses | 69 | 85 | 87 | 89 |
| Deferred Revenue | 60 | 62 | 62 | 62 |
| Debt | 782 | 893 | 981 | 592 |
| Other Liabilities | 16 | 16 | 16 | 16 |
| **Total Liabilities** | 1,006 | 1,086 | 1,008 | 949 |
| | | | | |
| **Total Equity** | (285) | (332) | (126) | 298 |
| | | | | |
| **Total Liabilities and Equity** | 599 | 660 | 881 | 1,095 |

**PROJECTED BALANCE SHEET (UNAUDITED) – NON-CONSENSUAL PLAN**

6

(Modified)

| | 2023E | 2024E | 2025E | 2026E |
|---|---|---|---|---|
| | FY | FY | FY | FY |
| **Assets** | | | | |
| Cash and Equivalents | 51 | 100 | 216 | 497 |
| Prepaid Expenses | 33 | 41 | 55 | 54 |
| Property, Plant and Equipment | 472 | 462 | 548 | 418 |
| Other Assets | 35 | 35 | 35 | 35 |
| **Total Assets** | **591** | **638** | **850** | **1,005** |
| | | | | |
| **Liabilities** | | | | |
| Accounts Payable and Accrued Expenses | 79 | 77 | 78 | 80 |
| Deferred Revenue | 60 | 62 | 62 | 62 |
| Debt | 905 | 911 | 923 | 768 |
| Other Liabilities | 16 | 16 | 16 | 16 |
| **Total Liabilities** | **1,060** | **1,065** | **1,079** | **915** |
| | | | | |
| **Total Equity** | **(469)** | **(427)** | **(224)** | **89** |
| | | | | |
| **Total Liabilities and Equity** | **591** | **638** | **850** | **1,005** |

**PROJECTED CASH FLOW STATEMENT (UNAUDITED) – CONSENSUAL PLAN**

(Modified)

| | 2023E Nov-Dec | 2024E FY | 2025E FY | 2026E FY |
|---|---|---|---|---|
| **Cash Flows from Operations** | | | | |
| Adj. EBITDA | 89 | 341 | 508 | 628 |
| Changes in Working Capital | (1) | (8) | (13) | 3 |
| Cash Interests | (9) | (48) | (50) | (60) |
| Cash Taxes | (1) | (3) | (9) | (26) |
| **Total Cash Flows from Operations** | **30** | **299** | **436** | **549** |
| | | | | |
| **Cash Flows from Investing Activities** | | | | |
| Capex and Other | (23) | (192) | (286) | (72) |
| **Total Cash Flows from Investing Activities** | **(23)** | **(192)** | **(286)** | **(72)** |
| | | | | |
| **Cash Flows from Financing Activities** | **(3)** | **(25)** | **(27)** | **(178)** |
| | | | | |
| **Net Cash Inflows / (Outflows)** | **14** | **83** | **129** | **290** |

**PROJECTED CASH FLOW STATEMENT (UNAUDITED) – NON-CONSENSUAL PLAN**

(Modified)

| | 2023E Nov-Dec | 2024E FY | 2025E FY | 2026E FY |
|---|---|---|---|---|
| **Cash Flows from Operations** | | | | |
| Adj. EBITDA | 89 | 341 | 508 | 628 |
| Changes in Working Capital | (1) | (8) | (13) | 3 |
| Cash Interests | (16) | (63) | (68) | (74) |
| Cash Taxes | (1) | (3) | (9) | (26) |
| **Total Cash Flows from Operations** | **30** | **266** | **428** | **531** |
| | | | | |
| **Cash Flows from Investing Activities** | | | | |
| Capex and Other | (23) | (192) | (286) | (72) |
| **Total Cash Flows from Investing Activities** | **(23)** | **(192)** | **(286)** | **(72)** |
| | | | | |
| **Cash Flows from Financing Activities** | **(3)** | **(25)** | **(27)** | **(178)** |
| | | | | |
| **Net Cash Inflows / (Outflows)** | **4** | **50** | **136** | **284** |

**Exhibit F**

**Organizational Chart**

**Exhibit G**

Schedule of Payments to Reinstated Loans and Leases[1]

| Assumed Non-Miner Loans and Lease Agreements | Prepetition Missed Payments | Projected Missed Postpetition Payments through September 30, 2023 | ~~Projected Missed Postpetition Payments through September 30, 2023~~ Total Effective Date Payments for Reinstatement[1] | ~~Total Effective Date Payments for Reinstatement[1]~~ Projected Post-Effective Remaining Payments after Reinstatement |
|---|---|---|---|---|
| Toyota Commercial Finance | $ - | $ 10,783.80 | ~~$ -~~ $ 10,783.80 | ~~$ 161,204.70~~ $ 154,004.00 |
| Fidelity Capital | $ - | $ 7,446.50 | ~~$ -~~ $ 7,446.50 | ~~$ 1,050.00~~ $ 7,025.00 |
| VFS, LLC #2 | $ - | $ 47,821.17 | ~~$ 21,880.70~~ $ 47,821.17 | ~~$ 120,404.80~~ $ 105,266.70 |
| VFS, LLC #3 | $ - | $ 95,165.40 | ~~$ 53,916.90~~ $ 95,165.40 | ~~$ 185,408.03~~ $ 355,758.48 |

~~[1] NTD: Under review~~

[1] To the extent provided for in the underlying lease and loan agreements, in addition to these amounts, lessors/lenders are also entitled to reasonable legal and/or advisor fees incurred postpetition through the Effective Date.

~~[1] NTD: Under review~~

~~[1] To the extent provided for in the underlying lease and loan agreements, in addition to these amounts, lessors/lenders are also entitled to reasonable legal and/or advisor fees incurred postpetition through the Effective Date.~~



| | | | | |
|---|---|---|---|---|
| VFS, LLC #4 | $ - | $ 88,985.82 | $ 64,323.35 $ 88,985.82 | $ 415,834.69 $ 388,100.16 |
| VFS, LLC #5 | $ - | $ 84,145.17 | $ 56,096.79 $ 84,145.17 | $ 460,055.61 $ 471,842.10 |
| Marco | $ 235.48 $ 235.48 | $ 1,224.52 | $ 851.52 $ 1,460.00 | $ 11,896.45 $ 11,555.58 |
| Technology Finance Corporation 2540-05 | $ 27,885.48 $ 27,885.48 | $ 56,864.52 | $ 29,014.52 $ 84,750.00 | $ 189,354.35 $ 183,360.60 |

2



| | | | |
|---|---|---|---|
| Meridian Equipment Finance, LLC | $ - | $ 40,504.70 | $ 39,454.23 $ 40,504.70 | $ 78,581.80 $ 66,798.00 |
| Liberty Commercial Finance #1 - Indigo | $ - | $ 771,758.40 | $ 694,587.50 $ 71,758.40 | $ 8,862,874.64 $ 1,775,045.32 |
| Liberty Commercial Finance #2 - Prime | $ - | $ 142,502.00 | $ 138,381.89 $ 2,502.00 | $ 833,766,603 $ 313,505.40 |
| Liberty Commercial Finance #3 - North Mill | $ - | $ 140,261.30 | $ 136,235.17 $ 40,261.30 | $ 321,801.59 $ 308,575.86 |
| Liberty Commercial Finance #4 - North Star Leasing | $ - | $ 233,613.50 | $ 240,262.19 | $ 537,157.66 $ 513,950.70 |

| | | | |
|---|---|---|---|
| | | $ 233,613.50 | |
| Liberty Commercial Finance #5 - North Mill | $ - | $ 96,643.70 | $ 88,878.12 / $ 96,643.70 | $ 472,384.51 / $ 212,617.14 |
| Liberty Commercial Finance #6 - Liberty | $ - | $ 207,321.10 | $ 184,688.07 / $ 207,321.10 | $ 279,854.24 / $ 207,322.10 |
| Liberty Commercial Finance #7 - Liberty | $ - | $ 115,195.50 | $ 101,625.95 / $ 115,195.50 | $ 120,738.79 / $ 115,196.50 |
| Liberty Commercial Finance #8 - Prime | $ - | $ 465,468.80 | $ 413,321.61 / $ 465,468.80 | $ 1,117,135.82 / $ 1,070,579.24 |



| | | | | | |
|---|---|---|---|---|---|
| Liberty Commercial Finance #9 - Prime | $ | - | $ 214,704.80 | $ ~~194,334.31~~<br>$ 214,704.80 | ~~$ 935,493.52~~ $<br>493,822.04 |
| Liberty Commercial Finance #14 - Liberty | $ | - | $ 155,112.80 | $ ~~139,604.62~~<br>$ 155,112.80 | ~~$ 185,139.36~~ $<br>170,625.08 |
| Liberty Commercial Finance #15 - Liberty | $ | - | $ 219,809.30 | $ ~~197,828.37~~<br>$ 219,809.30 | ~~$ 263,770.16~~ $<br>241,791.23 |
| Del Financial | $ | - | $ 53,570.00 | $ ~~48,200.00~~<br>$ 53,570.00 | ~~$ 136,271.14~~ $<br>131,500.80 |

5

| | | | | |
|---|---|---|---|---|
| Bank of the West | $ - | $ 37,530.00 | ~~$ 13,777.56~~ $ 37,530.00 | ~~$ 44,253.36~~ $ 11,257.77 |
| Bremer Loan A | $ - | $ 1,299,322.75 | ~~$ 1,171,161.36~~ $ 1,299,322.75 | ~~$ 6,016,287.85~~ $ 5,457,155.57 |
| Bremer Loan B | $ - | $ 1,068,405.55 | ~~$ 1,011,895.48~~ $ 1,068,405.55 | ~~$ 7,701,275.42~~ $ 4,487,303.30 |
| Bremer Loan C | $ - | $ 1,577,409.22 | ~~$ 297,176.62~~ $ 1,577,409.22 | ~~$ 8,836,960.91~~ $ 6,940,600.55 |



| | | | |
|---|---|---|---|
| ~~$ 28,120.97~~ $ 28,120.97 | $ 7,231,570.31 | ~~$ 6,346,839.28~~ ~~$ 8,874,085.15~~ $ 7,259,691.28 | $ 24,194,559.22 |

7