**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | § | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **CORE SCIENTIFIC, INC.,** *et al.,* | § | **Case No. 22-90341 (DRJ)** |
| | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | |

**MOTION OF DEBTORS FOR ENTRY OF
ORDER APPROVING AND AUTHORIZING IMPLEMENTATION OF
<u>SUPPLEMENTAL NON-INSIDER KEY EMPLOYEE RETENTION PLAN</u>**

> **IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE ELECTRONICALLY AT HTTPS://ECF.TXSB.USCOURTS.GOV/ WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. IF YOU DO NOT HAVE ELECTRONIC FILING PRIVILEGES, YOU MUST FILE A WRITTEN OBJECTION THAT IS ACTUALLY RECEIVED BY THE CLERK WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

Core Scientific, Inc. ("**Core**") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (this "**Motion**"):

<u>**Preliminary Statement**</u>

1.     The Debtors' business has performed exceptionally well during these chapter 11 cases and the Debtors have made meaningful progress towards confirming a

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6074); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

value-maximizing chapter 11 plan, each in large part due to their employees' expertise, hard work, and dedication.  Among other accomplishments, the Debtors have filed a chapter 11 plan[2] and disclosure statement,[3] entered into numerous settlements with various creditors, obtained support for the Plan from a number of key stakeholders, and a hearing to consider approval of the Disclosure Statement is scheduled for September 27, 2023.  Notwithstanding the substantial progress to date, significant work remains to emerge from these chapter 11 cases and the Debtors' employees will continue to play a central role in advancing these chapter 11 cases to their conclusion.  The prolonged chapter 11 cases and increased workload have resulted in notable employee attrition, and the Debtors cannot risk losing additional employees at this juncture.

2.      To best position themselves to consummate a value-maximizing restructuring, ensure the continued trust of their employees, and support the stability of their business, the Debtors file this Motion seeking authority to implement a supplemental key employee retention program (the "**Supplemental KERP**").[4]  The Supplemental KERP, which does not include any statutory "insiders," provides for incremental payments of bonuses to 22 non-insider employees in an aggregate amount not to exceed $675,000 (the "**Supplemental KERP Payments**").  Pursuant to the Supplemental KERP, each participating key employee (each, a "**Supplemental KERP Participant**") is entitled to receive cash retention bonuses on an installment schedule beginning on the first regular payroll date following entry of an order approving the relief requested in this Motion or as soon as reasonably practicable thereafter.  The

---

[2] *Second Amended Joint Chapter 11 Plan of Core Scientific, Inc. and Its Affiliated Debtors* (Docket No. 1199) (as may be amended, supplemented, or modified from time to time, the "**Plan**").

[3] *Disclosure Statement for Second Amended Joint Chapter 11 Plan of Core Scientific, Inc. and Its Debtor Affiliates* (Docket No. 1200) (as may be amended, supplemented, or modified from time to time, the "**Disclosure Statement**").

[4] As detailed herein, the Court has previously authorized the Debtors to make payments under tier 2 of the Original KERP pursuant to the Original KERP Order (each as defined herein).

Supplemental KERP further contemplates that remaining installment(s), if any, will be paid quarterly under the same payment schedule as the Original KERP and in accordance with the terms of the applicable supplemental retention agreement signed by each Supplemental KERP Participant. However, if a "Restructuring Event"[5] is consummated prior to any scheduled payment, any remaining, unpaid bonus payments will be paid within fifteen (15) days following such Restructuring Event. As detailed herein, the Supplemental KERP Participants perform a variety of core business functions for the Debtors and possess in-depth institutional knowledge of the Debtors' business, assets, liabilities, facilities, and mining and hosting operations. Their continued retention will preserve institutional knowledge and provide stability as the Debtors enter the final stages of these chapter 11 cases.

3.     At this important point in the Debtors' restructuring, maintaining and promoting morale and providing appropriate compensation incentives are essential to the Debtors' business and ability to preserve and maximize value. As such, the Debtors believe that implementing the Supplemental KERP and paying the modest Supplemental KERP Payments would serve these ends and promote continued success through these chapter 11 cases. Indeed, failure to implement the Supplemental KERP could result in losing one or more employees that (i) are necessary to the Debtors' continued operational success and (ii) play a significant role in the Debtors' efforts to confirm their Plan and exit bankruptcy. The Debtors simply cannot afford to lose momentum due to distractions or the loss of critical employees.

---

[5] The term "Restructuring Event" is defined in each employee retention letter as "a transaction or series of transactions consummated after the date hereof, involving (i) the sale of all or substantially all of the [Debtors'] assets, including under Section 363 of the Bankruptcy Code, or (ii) the recapitalization or restructuring of all or substantially all of the equity and/or debt securities and/or other indebtedness of the [Debtors], which recapitalization or restructuring is effected pursuant to an exchange transaction, tender offer, plan of reorganization pursuant to chapter 11 of the United States Bankruptcy Code or otherwise."

4.      For these reasons and for those set forth herein, the Debtors' respectfully request that the Court authorize the Debtors' implementation of the Supplemental KERP and payment of the Supplement KERP Payments.

**Background**

5.      On December 21, 2022 (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").   The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Local Rules**").   On January 9, 2023, the United States Trustee for Region 7 (the "**U.S. Trustee**") appointed an official committee of unsecured creditors (the "**Creditors' Committee**").   On March 23, 2023, the U.S. Trustee appointed an official committee of equity security holders (the "**Equity Committee**").   No trustee or examiner has been appointed in these chapter 11 cases.

7.      Prior to the Petition Date, in December 2022, the Debtors, with input from their advisors, adopted a two-tier employee retention program (the "**Original KERP**" and together with the Supplemental KERP, the "**KERPs**") for certain key employees to retain such employees throughout the Debtors' chapter 11 cases.   Tier 1 of the Original KERP provided certain key executives with awards designed to retain such executives through these chapter 11 cases.   The Debtors paid the awards for tier 1 of the Original KERP prior to the Petition Date.

**Original KERP Order**

8.       Following the Petition Date, on March 3, 2023, the Debtors filed *the Motion of Debtors for Entry of Order Approving and Authorizing Payments under Non-Insider Key Employee Retention Plan* (Docket No. 633) (the **"Original KERP Motion"**) to seek the Court's approval of tier 2 of the Original KERP.  Tier 2 of the Original KERP provides for the payment of bonuses not to exceed $1.365 million to approximately 110 non-executive key employees.  Pursuant to tier 2 of the Original KERP, each participant who is not employed at the Debtors' facility in Cottonwood, Texas (the "**Cottonwood Facility**") is entitled to receive cash retention bonuses, payable in quarterly installments in accordance with the terms of the applicable retention agreement signed by each key employee.  The first installment was scheduled to be paid on the first regular payroll date following the approval of the Original KERP, or as soon as reasonably practicable thereafter, with the remaining three installments each to be paid quarterly on the last payroll date in May, August, and November 2023.  However, if a "Restructuring Event"[6] is consummated prior to any scheduled payment, any remaining, unpaid quarterly bonus payments will be paid within fifteen (15) days following such Restructuring Event.  In contrast, the participants of tier 2 of the Original KERP who are employed at the Cottonwood Facility will receive their awards in a single installment on the earlier of (i) the first payroll date following August 31, 2023 or (ii) the day that is 45 days after the closing of the sale of the Cottonwood Facility.  On March 30, 2023, this Court entered the *Order Approving and Authorizing Payments under Key Employee Retention Plan* (Docket No. 738) (the "**Original KERP Order**"), which authorized the Debtors to make payments under tier 2 of the Original KERP.  Since that time, the

---

[6] The definition of "Restructuring Event" is the same in each employee retention letter under both the Original KERP and Supplemental KERP.

Debtors have made authorized payments under the Original KERP in accordance with the Original KERP Order.

## Jurisdiction

9.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

10.      Pursuant to sections 105(a), 363, and 503(c) of the Bankruptcy Code, the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Proposed Order**"), approving and authorizing the Debtors to implement the Supplemental KERP and make Supplemental KERP Payments.

11.      In support of this Motion, the Debtors submit the declaration of Michael Bros attached hereto as **Exhibit B** (the "**Bros Declaration**").

## Development of Supplemental KERP

12.      As detailed herein, the Debtors' chapter 11 cases have lasted longer than initially anticipated, which has resulted in an increased workload for their employees.  As a result, the Debtors have experienced notable employee attrition, in particular amongst employees across various finance-related departments and functions.  To appropriately reward such employees' hard work and dedication, encourage employee retention, and prevent further employee attrition, the Debtors' management, with the assistance of the Debtors' advisors, including independent compensation consultants at Compensation Advisory Partners ("**CAP**"), continued the process to maintain and improve employee programs that would appropriately retain employees and ensure that the Debtors' business needs would be met during the chapter 11 process.  The resulting Supplemental KERP aligns with market standards and promotes employee trust and continuity as

the Debtors continue to navigate these work-intensive chapter 11 cases. The Debtors' advisors at CAP compared the KERPs, including the total scope and cost, to retention plans implemented in chapter 11 cases of companies of similar size to ensure that both the Supplemental KERP in isolation and the KERPs altogether were within the range of reasonableness and consistent with market practices. In fact, the total costs under the KERPs (i.e., combined awards under both the Original KERP and Supplement KERP) are still well below the average of other key employee retention programs of comparable companies. The Supplemental KERP was carefully evaluated both in isolation and together with the Original KERP and approved by the Compensation Committee of the Board of Directors (the "**Compensation Committee**") and the full Board of Directors (the "**Board**") of Debtor Core Scientific, Inc.[7]

13.     The Supplemental KERP Participants are among the many employees critical to the Debtors' business and were selected for participation in the Supplemental KERP based on their experience, skillset, position, unique abilities, importance to their respective business segment, and role over the upcoming months in continuing to the Debtors' emergence from chapter 11. The Supplemental KERP Participants perform a variety of core business functions for the Debtors—including, among other things, engineering, data centers, human resources, finance, and IT—all of which are vital to the Debtors' ability to maintain operational stability and preserve and enhance stakeholder value. The Supplemental KERP Participants will execute the supplemental retention agreements prior to the receipt of the first installment of their respective Supplemental KERP Payments.

14.     The Supplemental KERP Participants, if lost, would likely cost the Debtors more in replacement expenses and lost revenues than the Supplemental KERP Payments

---

[7] On July 21, 2023, the Compensation Committee and the Board approved the Supplemental KERP.

contemplated by this Motion.  Losing such employees would challenge the Debtors' operational stability during these chapter 11 cases and the Debtors' reorganization efforts generally.  The loss of even a few of the Supplemental KERP Participants could have a material, detrimental impact on the Debtors, especially given the notable attrition rate of employees, which resulted in many of the Supplemental KERP Participants undertaking an increased workload in an already challenging time.

15.    Accordingly, the Debtors modeled the Supplemental KERP to (i) retain employees who are essential to the Debtors' ability to meet business objectives and facilitate a successful outcome in these cases, (ii) appropriately balance the need to retain employees critical to the Debtors' restructuring efforts while protecting creditor interests, and (iii) harmonize with market practice.  The Supplemental KERP helps ensure that the Supplemental KERP Participants, who are critical to the Debtors' operations and ability to properly effectuate a successful restructuring, remain with the Debtors throughout the restructuring process.

16.    The Supplemental KERP is summarized as follows:

| Summary of Supplemental KERP | |
|---|---|
| **Supplemental KERP Participants** | 22 non-insider key employees.[8] |
| **Total Cost of Supplemental KERP** | Aggregate amount not to exceed approximately $675,000 (the maximum amount if all Supplemental KERP Payments are paid in full).<br><br>Individual KERP awards range from $10,000 to $75,000 per Supplemental KERP Participant. |
| **Timing of Payments** | The first installment is scheduled to be paid on the first |

---

[8] For confidentiality reasons, the specific details for each Supplemental KERP Participant are not included in this filing, but the Debtors will provide or have provided this information on a confidential basis to the U.S. Trustee, the advisors to the Ad Hoc Noteholder Group, the advisors to the Creditors' Committee, and the advisors to the Equity Committee and can make it available to the Court or file it under seal if requested to do so.

| Summary of Supplemental KERP | |
|---|---|
| | regular payroll date following the approval of the Supplemental KERP, or as soon as reasonably practicable thereafter, with the remaining installment(s), if any, to be paid in sync (if possible) with any remaining quarterly payouts approved under the Original KERP; *provided*, that if a "Restructuring Event' is consummated prior to any scheduled payment, any remaining, unpaid quarterly installment payments will be paid within fifteen (15) days following such Restructuring Event. |
| **Structure** | The Supplemental KERP Payments are to be paid in cash lump sums minus taxes.<br><br>In order to receive each installment payment, the supplemental retention agreements require the Supplemental KERP Participants to stay at Core during the period through the date that is the earlier of (i) each applicable payment date and (ii) the date of consummation of a Restructuring Event. Termination of employment prior to such events will result in forfeiture of any remaining payments. |

## Basis for Relief

**A.     Implementing the Supplemental KERP is a Sound Exercise of the Debtors' Business Judgment and Authorized by Section 363 of the Bankruptcy Code**

17.     The Debtors' decision to implement the Supplemental KERP reflects a sound exercise of the Debtors' business judgment, which the Court should approve pursuant to section 363(b)(1) of the Bankruptcy Code.

18.     Pursuant to section 363(b)(1) of the Bankruptcy Code, a debtor "may use, sell, or lease, other than in the ordinary course of business, property of the estate" if the debtor demonstrates a "sound business reason" for such use.  11 U.S.C. § 363(b)(1); *e.g.*, *Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("For the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *In re Viking*

*Offshore (USA), Inc.*, No. 08-312-H3-11, 2008 WL 1930056, at *2 (Bankr. S.D. Tex. Apr. 30, 2008) (holding debtor's proposed bonus payments were outside ordinary course of business and therefore subject to business judgment standard); *In re Mesa Air Grp., Inc.*, No. 10-10018 (MG), 2010 WL 3810899, at *3 (Bankr. S.D.N.Y. Sept. 24, 2010) (approving employee bonus programs as "valid exercise of their business judgment" under section 363(b)).

19.     Courts in the Fifth Circuit have granted a debtor's request to use or sell property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use or sale is supported by sound business reasons.  *See, e.g.*, *In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010) ("A sale of assets under § 363 . . . must be supported by an articulated business justification, good business judgment, or sound business reasons"); *In re BNP Petroleum Corp.*, 642 Fed. App'x 429, 435 (5th Cir. 2016) (same); *In re Cont'l Air Lines*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *see also In re Gulf Coast Oil Corp.*, 404 B.R. 407, 415 (Bankr. S.D. Tex. 2009) (noting that a debtor-in-possession has authority to exercise business judgment given to officer or director of corporation when engaging in a section 363(b) sale of property of the estate outside the ordinary course of business); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) (noting that the variety of factors considered by courts when evaluating a section 363(b) transfer "essentially represent a 'business judgment test'") (citation omitted); *In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in

approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale.").

20.     Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.").  When applying the business judgment rule, courts show great deference to a debtor's business decisions and are "loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence."  *Official Comm. Of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992); *see also Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985) ("More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially.").  In sum, "[t]he business judgment standard in section 363 is flexible and encourages discretion."  *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011).

21.     A compelling business purpose exists here: the Supplemental KERP Participants are critical to driving the Debtors' financial and operational performance and generating value for the benefit of all stakeholders.  The Supplemental KERP advances the best interests of the Debtors, their estates, and their stakeholders by best positioning the Debtors to efficiently emerge from chapter 11.  The efforts of the Debtors' employees during the chapter 11

cases have been and will continue to be essential to preserve the value of the Debtors' estates and maximize value for all stakeholders.  The Supplemental KERP Participants are familiar with the Debtors' operations and the Debtors' chapter 11 cases.  It is imperative that those employees who possess institutional knowledge and are in a position to drive the outcome of a value-maximizing transaction be retained during these chapter 11 cases.  It is equally critical that the Debtors' business operations run smoothly and that employees throughout the Debtors' ranks remain focused on performing their job functions and motivated during the chapter 11 process.  Given the added pressures on and responsibilities of the Supplemental KERP Participants due to these chapter 11 cases (which are above and beyond their ordinary responsibilities), the Debtors believe it is both necessary and reasonable for the Debtors to implement the Supplemental KERP.

22.      To prevent employee attrition and to maintain continuity and trust in the Debtors among employees and the benefits obtained from implementing the Original KERP, the Debtors must implement the Supplemental KERP.  If the Supplemental KERP Participants were to resign, the value and benefits of these employees' experience and institutional knowledge would be lost, and the Debtors' operations and their pursuit of a value-maximizing transaction would be significantly impaired.  The resignation of the Supplemental KERP Participants would deplete estate resources by causing the Debtors to spend significant time and expense to hire and train replacement employees, which would, in turn, be detrimental to their efforts to efficiently reorganize.

23.      Furthermore, the Original KERP was structured prior to the Petition Date,

at a time when the Debtors contemplated an earlier exit from the Debtors' chapter 11 cases.[9]  The Debtors entered chapter 11 with a Restructuring Support Agreement (together with all exhibits and schedules thereto, the "**RSA**") with the ad hoc group of secured convertible noteholders (the "**Ad Hoc Noteholder Group**") during the worst of the "crypto winter."  Soon after filing, dramatic and positive changes in the Debtors' industry and operating landscape made it clear that the path forward and restructuring transaction contemplated by the RSA were unreasonable and not confirmable.  In other words, months into the chapter 11 cases, the Debtors were back at "square one" due to industry forces outside of their control.  This prolonged the Debtors' chapter 11 cases and, additionally, significantly increased the workload of the Supplemental KERP Participants.  To retain these employees throughout the chapter 11 cases, it is necessary and prudent to provide them with additional compensation in accordance with the Supplemental KERP.  Accordingly, implementing the Supplemental KERP is a valid exercise of the Debtors' business judgment.

24.     Finally, the Debtors followed best governance practice while formulating the Supplemental KERP.  As described above, with the help of independent outside advisors, the Debtors crafted the Supplemental KERP to be reasonable both in isolation and together with the Original KERP, with the total costs under the KERPs combined well below the average of comparable chapter 11 key employee retention programs.  The Supplemental KERP was also approved by the Compensation Committee and the Board approved the Supplemental KERP

---

[9] For example, in the Debtors' *Emergency Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief* (Docket No. 38) that the Debtors filed on December 21, 2022 (the "**Original DIP Motion**"), the DIP Loan Agreement (as defined in the Original DIP Motion) contemplated confirmation within 150 days of the Petition Date (240 days if extended) and emergence within 165 Days of the Petition Date (255 days if extended).

following the review of materials prepared by the Debtors and their advisors and discussions related thereto.

**B.      The Debtors' Decision to Implement the Supplemental KERP is Justified by Facts and Circumstances of these Chapter 11 Cases**

25.      Implementation of the Supplemental KERP also satisfies the requirements of section 503(c)(3) of the Bankruptcy Code.  Section 503(c)(3) of the Bankruptcy Code prohibits certain transfers "that are outside the ordinary course of business" unless such transfers are "justified by the facts and circumstances of the case."  11 U.S.C. § 503(c)(3).[10]  Generally, the standards for approval under sections 503(c)(3) and 363(b) are substantially similar—a court will approve a transfer if made as a result of a sound exercise of the debtor's business judgment.  *See, e.g.*, *Viking Offshore*, 2008 WL 1930056, at *2 n.1 (noting the standard under section 503(c)(3) is "substantially similar" to the business judgment test).  As discussed above, when analyzed under the business judgment standard, implementation of the Supplemental KERP clearly passes muster.

26.      Some courts, however, have interpreted section 503(c)(3) to require a slightly higher bar for bonus payments during a chapter 11 case, which the relief requested herein also satisfies.  *See, e.g.*, *In re Pilgrim's Pride Corp.*, 401 B.R. 229, 236–37 (Bankr. N.D. Tex. 2009) (requiring proposed transfer be in best interests of creditors and debtor's estate in addition to satisfying business judgment standard); Hr'g Tr. at 40:17–41:2, *In re Dura Automotive Sys., Inc.*, No. 06-11202 (Bankr. D. Del. Apr. 25, 2007) (KJC) (Docket No. 1170) (describing the section 503(c)(3) standard as "something above the business judgment standard but maybe not much farther above it").  Courts that have applied this slightly higher bar in assessing employee

---

[10] In addition, sections 503(c)(1) and (c)(2) prohibit payment of sums to "insiders" for (i) the purposes of inducing such persons to remain with the business, absent satisfying certain stringent standards, and (ii) severance, absent satisfying equally stringent standards.  *See In re Dana Corp.*, 358 B.R. 567, 575–76 (Bankr. S.D.N.Y. 2006).  Notably, however, these statutory provisions are limited to "insider" payments.  *See, e.g.*, *id.*  As discussed below, section 503(c)(1)'s limitation on certain retention payments to "insiders" is not applicable, as the payments at issue herein are directed solely to non-insider employees.  11 U.S.C. § 503(c)(1).

programs under section 503(c)(3) have held that whether a proposed transaction is in the best interests of the creditors and the debtor's estate depends on the facts of the case. *See Pilgrim's Pride*, 401 B.R. at 237. A court "need only determine that Debtors have provided a sound business reason for the [transaction] and that, even at [its] projected cost, the benefit to creditors and Debtors' estates is of commensurate value." *Id.* at 237 n.14. In evaluating plans under section 503(c)(3), courts consider whether (i) the plan is calculated to achieve the desired performance; (ii) the cost of the plan is reasonable in the context of a debtor's assets, liabilities, and earning potential; (iii) the scope of the plan is fair and reasonable or discriminates unfairly among employees; (iv) the plan is consistent with industry standards; (v) the debtor performed due diligence in investigating the need for the plan; and (vi) the debtor received independent counsel in performing due diligence, creating, and authorizing the plan. *See In re Glob. Home Prods., LLC*, 369 B.R. 778, 786 (Bankr. D. Del. 2007); *In re Dana Corp.*, 358 B.R. 567, 576–77 (Bankr. S.D.N.Y. 2006). As set forth below, the proposed Supplemental KERP satisfies each of these factors.

27. First, the Supplemental KERP was structured to achieve the continuity of the desired performance. The Debtors and their advisors designed the Supplemental KERP to avoid the loss of a carefully selected group of personnel who are key to ongoing operations, and to motivate and reward the Supplemental KERP Participants for their significant efforts given the increased demands placed upon them in connection with the chapter 11 process. A failure to retain the Supplemental KERP Participants through the remainder of these chapter 11 cases would likely cause the Debtors' financial performance to suffer and jeopardize the Debtors' ability to consummate a value-maximizing restructuring.

28.     Second, the cost of the Supplemental KERP, up to approximately $675,000, and the total cost of the KERPs, up to approximately $2,025,000, are reasonable in light of the Debtors' assets, liabilities, and revenues, and are consistent with, and within the range of reasonableness of, similar programs implemented in chapter 11 cases with debtors of similar size. As discussed above and in the Bros Declaration, the Debtors' advisors engaged CAP, an independent consultant, to assist the Debtors with the design of the Supplemental KERP.  CAP conducted an analysis to confirm that the terms of the Supplemental KERP were consistent with the terms of retention plans approved in comparable chapter 11 cases.

29.     Third, the scope of the proposed Supplemental KERP is fair and reasonable. The Supplemental KERP Participants represent a reasonable percentage of the Debtors' total employee base.  The Debtors undertook a careful selection process and received input from their advisors in determining which employees should be eligible; the vast majority of the Supplemental KERP Participants were in fact selected from the non-insider participants under the Original KERP that the Court previously approved.[11]

30.     Finally, as mentioned above, the Supplemental KERP in isolation and the KERPs together are consistent with industry standards and reasonable under the circumstances with respect to size, scope, and total cost.

## C.     Section 503(c)(1) Does Not Apply to Proposed Supplemental KERP.

31.     Section 503(c)(1) is not applicable in evaluating the proposed Supplemental KERP because none of the Supplemental KERP Participants are "insiders" as that term is defined in section 101(31) of the Bankruptcy Code.  The Bankruptcy Code defines an "insider" to include, among other things, an "officer of the debtor" and a "person in control of the debtor."  11 U.S.C.

---

[11] 18 of the 22 Supplemental KERP Participants were also the non-insider participants under the tier 2 of the Original KERP.

§ 101(31).  Courts have also concluded that an employee may be an "insider" if such employee has "at least a controlling interest in the debtor or . . . exercise[s] sufficient authority over the debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets."  *In re Velo Holdings, Inc.*, 472 B.R. 201, 208 (Bankr. S.D.N.Y. 2012) (citations omitted).  It is well-established that an employee's job title, alone, does not make such employee an "insider" as defined by the Bankruptcy Code.  *See In re Fabricators, Inc.*, 926 F.2d 1458, 1466 (5th Cir. 1991) (noting that the insider analysis focuses on indicia of "control" rather than job title or other formalities); *In re Borders Grp. Inc.*, 453 B.R. 459, 469 (Bankr. S.D.N.Y. 2011) (noting that "[c]ompanies often give employees the title 'director' or 'director level,' but do not give them decision-making authority akin to an executive" and concluding that certain "director level" employees in that case were not insiders).

33. 32.     Here, none of the Supplemental KERP Participants are statutory "insiders."  First, none of the Supplemental KERP Participants has discretionary control over any substantial budgetary amounts or the ability to dictate company policy.  Second, although certain of the Supplemental KERP Participants hold titles such as "general counsel," "vice president," or "senior vice president," such employees are supervised by senior management and must obtain approval from senior management before taking any action with respect to the disposition of significant assets or the Debtors' corporate policy.  In other words, the mere designation of a Supplemental KERP Participant as an "officer" for internal purposes does not evince sufficient indicia of "control" to render that individual an "insider" under the Bankruptcy Code.  *See Fabricators*, 926 F.2d at 1466 (noting that the insider analysis focuses on indicia of "control" rather than job title or other formalities).  Third, none of the Supplemental KERP Participants is a member of the Board or participates in the Debtors' corporate governance.  The Supplemental KERP Participants thus

do not have the authority to dictate corporate policy or the disposition of corporate assets. Therefore, section 503(c)(1) is inapplicable in evaluating the proposed Supplemental KERP. Accordingly, the Debtors respectfully request that this Court authorize them to implement the Supplemental KERP and make the essential Supplemental KERP Payments to retain the talent of the Supplemental KERP Participants and promote the success of the enterprise during and through these chapter 11 cases.

**Compliance with Bankruptcy Rule 6004(a)**
**<u>and Waiver of Bankruptcy Rule 6004(h)</u>**

33.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion satisfies Bankruptcy Rule 6004(a), and that the Court waive the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). As explained herein, immediate entry of an Order granting the relief requested herein is necessary to boost employee morale and avoid immediate and irreparable consequences if the Supplemental KERP Participants were to end their employment with the Debtors. Accordingly, ample cause exists to justify finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

**<u>Reservation of Rights</u>**

34.     Nothing contained herein is intended to be or shall be deemed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver or limitation of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Debtors' or any other party in interest's respective rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (iv) an agreement or obligation to pay any claims, (v) a waiver of any claims or causes of action which may exist against any creditor

or interest holder, or (vi) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## **<u>Notice</u>**

35.     Notice of this Motion will be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Local Rule 9103-1(d).

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: September 9, 2023
       Houston, Texas

Respectfully submitted,

   /s/ Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 1700
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511
Email:  Alfredo.Perez@weil.com
        Clifford.Carlson@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock (admitted *pro hac vice*)
Ronit J. Berkovich (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:  Ray.Schrock@weil.com
        Ronit.Berkovich@weil.com


*Attorneys for Debtors*
*and Debtors in Possession*

## <u>Certificate of Service</u>

I hereby certify that, on September 9, 2023, a true and correct copy of the foregoing document was served as provided by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.


           */s/ Alfredo R. Pérez*

           Alfredo R. Pérez