**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **CORE SCIENTIFIC, INC., *et al.*,** | § | **Case No. 22-90341 (DRJ)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | |
| | § | |

**DEBTORS' EMERGENCY MOTION FOR ORDER APPROVING (I)**
**GLOBAL SETTLEMENT BETWEEN DEBTORS AND CELSIUS, (II) SALE**
**OF CEDARVALE FACILITY AND RELATED ASSETS, (III) ENTRY INTO**
**AMENDED TNMP CONTRACT AND ASSUMPTION AND ASSIGNMENT**
**OF TRANSFERRED CONTRACTS AND (IV) GRANTING RELATED RELIEF**

> **EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN 5 P.M. (CENTRAL PREVAILING TIME) ON OCTOBER 3, 2023.**
>
> **IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**
>
> **A HEARING WILL BE CONDUCTED ON THIS MATTER ON MONDAY, OCTOBER 2, 2023 AT 3 P.M. (CENTRAL PREVAILING TIME) IN COURTROOM 400, 4TH FLOOR, 515 RUSK AVENUE, HOUSTON, TX 77002.**
>
> **YOU MAY PARTICIPATE IN THE HEARING EITHER IN PERSON OR BY AN AUDIO AND VIDEO CONNECTION. AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT 832-917-1510.  ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER.  JUDGE JONES'S CONFERENCE ROOM NUMBER IS 205691. VIDEO COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE JONES'S HOME PAGE. THE MEETING CODE IS "JUDGEJONES".  CLICK THE SETTINGS ICON IN THE UPPER**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6074); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198).  The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

> **RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**
>
> **HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF BOTH ELECTRONIC AND IN-PERSON HEARINGS.  TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE JONE'S HOME PAGE.  SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

Core Scientific Operating Company f/k/a Core Scientific, Inc. ("**Core**") and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), hereby submit this motion (the "**Motion**"), pursuant to sections 363(b), 365(a), and 105(a) of title 11 of the United States Code (the "**Bankruptcy Code**"), rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and rule 9013 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**").  The Debtors request entry of an order, substantially in the form annexed hereto as **Exhibit 1** (the "**Proposed Order**"), approving (i) a global settlement of all disputes and claims (except for the Excluded Claims, as defined below) between the Debtors and Celsius Mining LLC and certain of its affiliates (collectively, "**Celsius**", and together with the Debtors, collectively, the "**Parties**"), on the terms set forth in that certain Purchase and Sale Agreement, dated as September 14, 2023, by and between Core and Celsius (the "**PSA**"), attached to this Motion as **Exhibit 2** and the Proposed Order, (ii) the sale and conveyance to Celsius of all right, title, and interest of the Debtors in and to: (A) the real property comprising the bitcoin mining facility located on approximately 43.41 acres in Ward County, Texas as described in <u>Exhibit A</u> to the PSA, and all improvements thereon and all rights and appurtenances pertaining thereto (collectively, the "**Cedarvale Facility**"), (B) the Transferred Personal Property identified in <u>Exhibit C</u> to the PSA and all manufacturer or other express warranties relating to such Transferred Personal Property (the "**Personal Property**"), and (C) the Debtors' membership interests in Cedarvale Meter Holding Company, LLC, a Delaware limited

2

liability company and a wholly-owned non-Debtor subsidiary of the Debtors ("**Meter Holding**") (such membership interests, "**Meter Holding Interests**", and collectively with the Cedarvale Facility and the Personal Property, the "**Purchased Assets**"), free and clear of all liens, claims, and encumbrances (other than Permitted Title Exceptions[2]), (iii) in accordance with the terms of the PSA, the grant by the Debtors to Celsius of a perpetual, non-transferable, non-exclusive limited license to use certain of the Debtors' intellectual property in connection with Celsius's use of the Debtors' materials identified in <u>Exhibit K</u> to the PSA (the "**Licensed Materials**", and such license being granted, the "**License**"), (iv) the assumption and assignment of certain executory contracts and agreements identified in <u>Exhibit B</u> to the PSA, as may be modified or amended (collectively, the "**Transferred Contracts**")[3], and (v) granting related relief.

### <u>Preliminary Statement</u>

1.      After extensive negotiations, the Debtors and Celsius reached an agreement that provides for (i) the global resolution of all claims and disputes between the Parties (the "**Celsius Settlement**")[4] except for Celsius's convertible notes claims, (ii) the sale of the Purchased Assets to Celsius, and (iii) the License to use the Licensed Materials.  On September 14, 2023, the Parties memorialized the terms of such settlement in the PSA.  Subject to and effective upon three business days after approval by both this Court and the Bankruptcy Court in Celsius's chapter 11 cases (the "**Effective Date**"), under the Celsius Settlement, the Debtors will (i) sell the Purchased Assets to Celsius free and clear of all liens, claims, and encumbrances (other than Permitted Title

---

[2] As defined in the PSA.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the PSA or the Plan (as defined herein).

[3] For the avoidance of doubt and as set forth in the PSA, the Amended TNMP Contract will be a Transferred Contract to be assigned to Celsius as part of the Celsius Settlement.

[4] For the avoidance of doubt, all terms of the PSA are incorporated as part of the Celsius Settlement; any reference to the Celsius Settlement also includes the transactions contemplated under the PSA and the terms thereof.

WEIL:\99226237\18\39031.0011

Exceptions); (ii) grant Celsius the License to use the Licensed Materials; (iii) assume and assign the Transferred Contracts to Celsius, and (iv) release Core's claims against Celsius. In exchange, on the Effective Date, the Debtors will receive (i) a cash payment of $14 million and (ii) the full and final release of more than $312 million in claims asserted by Celsius against the Debtors, consisting of approximately $112 million in prepetition claims, $1.5 million in postpetition claims, $194 million in rejection damages, and $4.7 million in postpetition administrative expense claims, plus any unspecified and unliquidated amounts (but not including any release of the Excluded Claims).

2.       As further discussed below and in the Sullivan Declaration (as defined below), the Celsius Settlement is in the best interests of the Debtors and their estates as the benefits of the settlement substantially outweigh the costs. The benefits of the Celsius Settlement include (i) $14 million cash, (ii) the resolution of more than $312 million of claims by Celsius against the Debtors, and (iii) substantial cost savings of an estimated $4-6 million in litigation costs, which could occur in two different courts and the outcome and recovery of which is uncertain. Moreover, as further discussed below and in the Bros Declaration, given that the Cedarvale Facility is not a part of the Debtors' go-forward business plan and based on the exhaustive marketing process the Debtors previously conducted to sell the Cedarvale Facility, the Debtors are confident that the consideration received in exchange for such facility and related assets maximizes value for the Debtors and their estates. Accordingly, the Debtors request the Court's approval to enter into the Celsius Settlement and perform all of the Debtors' obligations thereunder.

### Relief Requested

3.       By this Motion, pursuant to sections 363(b), 365(a), and 105(a) of the Bankruptcy Code, rules 2002 and 9019 of the Bankruptcy Rules, and rule 9013 of the Bankruptcy Local Rules, the Debtors request entry of an order, substantially in the form annexed hereto as

**Exhibit 1** (the "**Proposed Order**"), approving (i) the Celsius Settlement, (ii) the sale of the Purchased Assets to Celsius and transfer free and clear of all liens, claims, and encumbrances (other than Permitted Title Exceptions), (iii) the grant of the License to use the Licensed Materials to Celsius, (iv) the assumption and assignment of the Transferred Contracts to Celsius, and (v) granting related relief.  In support of the Motion, the Debtors submit the *Declaration of Adam Sullivan in Support of Debtors' Emergency Motion for Order Approving (I) Global Settlement Between Debtors and Celsius, (II) Sale of Cedarvale Facility and Related Assets, (III) Entry into Amended TNMP Contract and Assumption and Assignment of Transferred Contracts, and (IV) Granting Related Relief* (the "**Sullivan Declaration**") attached here to as **Exhibit 3**, and the *Declaration of Michael Bros in Support of Debtors' Emergency Motion for Order Approving (I) Global Settlement Between Debtors and Celsius, (II) Sale of Cedarvale Facility and Related Assets, (III) Entry into Amended TNMP Contract and Assumption and Assignment of Transferred Contracts, and (IV) Granting Related Relief* (the "**Bros Declaration**") attached here to as **Exhibit 4**.

## Jurisdiction

4.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

### I.      The Debtors' Chapter 11 Cases, Disclosure Statement, and Plan

5.      On December 21, 2022 (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under the Bankruptcy Code.  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Bankruptcy Rules, and Rule 1015-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of Texas.  On January 9, 2023, the United States Trustee for Region 7 (the "**U.S. Trustee**") appointed an official committee of unsecured creditors in these chapter 11 cases pursuant to section 1102 of the Bankruptcy Code (the "**Creditors' Committee**").  On March 23, 2023, the U.S. Trustee appointed an official committee of equity security holders (the "**Equity Committee**").  No trustee or examiner has been appointed in these chapter 11 cases.

7.      In addition, on September 7, 2023, the Debtors filed their *Second Amended Joint Chapter 11 Plan of Reorganization of Core Scientific, Inc. and its Debtor Affiliates* (Docket No. 1199) (as may be amended, modified or supplemented, the "**Plan**") and related Disclosure Statement (Docket No. 1200) (as may be amended, modified, or supplemented, the "**Disclosure Statement**").

## II.     The Parties' Business Relationship and Related Disputes

8.      The Debtors are one of the largest blockchain infrastructure, hosting provider, and digital asset mining companies in North America, with fully operational data centers in Texas, Kentucky, North Carolina, North Dakota, and Georgia.  The Debtors provide hosting solutions for third parties and also operate their own digital asset mining machines.

9.      Prior to the Petition Date, Celsius was one of the Debtors' largest hosting customers, owning approximately 37,536 miners hosted by the Debtors.  The Debtors provided hosting services to Celsius pursuant to two Master Services Agreements, dated December 18, 2020 and December 3, 2021 (together with the orders entered into in connection therewith, the "**Celsius Contracts**").  Pursuant to the Celsius Contracts, the Debtors may pass through any tariffs to

Celsius (the "**PPT Charges**"), which is a standard provision in all of the Debtors' hosting contracts.

10.     On July 13, 2022, Celsius, along with its affiliates, commenced chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York (the "**Celsius Chapter 11 Cases**").  Prior to the Celsius Chapter 11 Cases, Celsius had paid those PPT Charges but, after commencing the Celsius Chapter 11 Cases, refused to pay all PPT Charges the Debtors invoiced to Celsius.

11.     Litigation between the Parties ensued after the filing of the Celsius Chapter 11 Cases.  On September 28, 2022, Celsius filed a motion in the Celsius Chapter 11 Cases seeking to hold the Debtors in contempt of court for allegedly violating the automatic stay and for otherwise breaching the Master Services Agreements dated December 18, 2020 (the "**Automatic Stay Motion**") (Celsius Docket No. 917).  The Debtors disputed Celsius's allegations and filed an opposition to the Automatic Stay Motion on October 19, 2022 (the "**Automatic Stay Motion Opposition**") (Celsius Docket No. 1140).

12.     Concurrently with the Automatic Stay Motion Opposition, on October 19, 2022, the Debtors also filed their own motion in the Celsius Chapter 11 Cases, seeking (i) to compel immediate payment of administrative expenses and either (ii) (a) relief from the automatic stay to permit the Debtors to exercise all remedies, including termination, under the Celsius Contracts or (b) to compel assumption or rejection of the Celsius Contracts (the "**Core Administrative Claim Motion**") (Celsius Docket No. 1144).  In the fall of 2022, just as the Debtors were experiencing financial distress due to industry conditions, the Debtors and Celsius engaged in discovery relating to the competing motions.

13.     Shortly after the Petition Date, on December 28, 2022, to minimize losses incurred by the Debtors under the Celsius Contracts from Celsius's unpaid PPT Charges, the

7

Debtors filed a motion to reject the Celsius Contracts (the "**Rejection Motion**") (Docket No. 189). Celsius filed a "Preliminary Objection," not opposing the relief sought, but objecting to the emergency nature of the motion. The Court held a hearing on the Rejection Motion on January 3, 2023 and entered an order approving the rejection of the Celsius Contracts on January 4, 2023 (Docket No. 232).

14. On April 14, 2023, Celsius filed proof of claims Nos. 425 and 497 against Core Scientific, Inc., asserting purported breaches of the Celsius Contracts by the Debtors (the "**Celsius Hosting POCs**") and seeking damages of over $312 million against the Debtors. On April 24, 2023, the Debtors filed an objection to the Celsius Hosting POCs (the "**Celsius Hosting POC Objection**") (Docket No. 819). On May 30, 2023, the Debtors filed a motion for partial summary judgment with respect to the Celsius Hosting POCs (Docket No. 942) (the "**Summary Judgment Motion**"), where the Debtors sought a judgment from the Court to, as a matter of law, disallow over $300 million of Celsius's claims on the basis that such claims were precluded by the limitations of liability provisions set forth in the Celsius Contracts. The parties previously agreed that Celsius's opposition to the Summary Judgment Motion would be due June 21, 2023 (the "**Summary Judgment Opposition**") and the Debtors' reply in support of the Summary Judgment Motion would be due June 30, 2023 (the "**Summary Judgment Reply**", and together with the Summary Judgment Motion and the Summary Judgment Opposition, the "**Summary Judgment Briefing**").

15. In addition to the Celsius Hosting POC, Celsius also filed a motion directing immediate payment of its asserted administrative expense claim for approximately $4.7 million (Docket No. 801) (the "**Celsius Administrative Claim Motion**"). On May 5, Debtors filed an objection in response to the Celsius Administrative Claim Motion (Docket No. 861) (the "**Celsius Administrative Claim Objection**").

16.     On the other hand, on January 3, 2023, the Debtors timely filed an initial proof of claim in the Celsius Chapter 11 Cases (Claim No. 17273 filed against Celsius Mining LLC) (the "**Initial Core POC**").   On February 9, 2023, after the bar date was extended in the Celsius Chapter 11 Cases, the Debtors timely filed an amended proof of claim, which amended and superseded the Initial Core POC in all respects (Claim No. 23022 filed against Celsius Mining LLC) (together with the Initial Core POC, the "**Core POCs**").

17.     Pursuant to the Core POCs, the Debtors assert that Celsius owes them approximately $3,886,169.41 in liquidated prepetition amounts relating to hosting services and in excess of $30 million in amounts to be liquidated, and the Debtors reserved the right to seek the equitable subordination of Celsius's claims in the Debtors' Chapter 11 Cases.   The Debtors also reserved their rights to assert administrative claims against Celsius relating to unpaid PPT Charges following the filing of Celsius Chapter 11 Cases through the date the Debtors rejected the Celsius Contracts and the significant legal fees the Debtors incurred as a result of defending against the Celsius's claims.   Celsius had not filed an objection to the Core POCs prior to the Parties reaching a settlement, though no deadline for any such objection was set.

18.     The Debtors and Celsius previously agreed to mediate the issues and disputes underlying the competing motions and proof of claims before the Honorable Marvin Isgur, United States Bankruptcy Judge for the Southern District of Texas on July 11, 2023 (the "**Mediation**") (Docket No. 968).   The Mediation was subsequently canceled following entry into the settlement term sheet. In addition, on June 30, 2023, the Parties filed an agreed order postponing the deadline for the Debtors to file the Summary Judgment Reply to July 31, 2023 (Docket No. 1023), staying Celsius's deadline to respond to the Celsius Administrative Claim Objection, and adjourning the hearing on the Celsius Administrative Claim Motion, which was entered on July 7, 2023 (Docket No. 1037).   The Parties filed a second agreed order further

9

postponing the deadline for the Debtors to file the Summary Judgment Reply to September 29, 2023 (Docket No. 1103).

## III.     Debtors' Chapter 11 Plan

19.     The Debtors' Plan provides for a comprehensive restructuring of the Debtors' balance sheet pursuant to which holders of claims and interests will receive either (i) equity in the reorganized Core Scientific, Inc. (the "**Reorganized Parent**"), (ii) take-back debt in a reorganized Debtor on and after the emergence of the Debtors' Chapter 11 Cases, (iii) a combination of equity and take-back debt, or (iv) reinstatement of claims.  In relevant part, the Plan provides holders of general unsecured claims with a 100% recovery in the form of equity to be issued by the Reorganized Parent (as defined in the Plan), in accordance with the terms and conditions set forth in section 4.8 of the Plan. The Plan also provides that holders of allowed administrative expense claims shall receive cash payments in full for such claims.  Therefore, under the Plan, Celsius would be entitled to a 100% recovery on account of any allowed prepetition claims and would be entitled to payment in cash in full to the extent its administrative expense claim were allowed.

## IV.     The Celsius Settlement

20.     The Parties entered into the Celsius Settlement on September 14, 2023.  The terms of the Celsius Settlement have been memorialized in the PSA (including all exhibits and annexes) and the Proposed Order attached hereto.

21.     The principal terms of the Celsius Settlement are set forth below:[5]

- The total purchase price under the PSA is $45 million, comprising the following:

    o   a cash payment of $14 million from Celsius to the Debtors; and

---

[5] The below only provides a summary of the principal terms of the Celsius Settlement; to the extent of any conflict between the below summary and the PSA, the terms of the PSA control.

WEIL:\99226237\18\39031.0011

- o on or prior to the Closing Date, the Purchase Price, less the cash Closing Payment of $14 million, shall be deemed to be paid upon a full and final release, satisfaction in full and expungement of all claims by Celsius against the Debtors (except for the Excluded Claims, as defined below), including, but not limited to, (i) any and all claims, including administrative claims and unliquidated claims, set forth in Celsius's proof of claim numbers 425 and 497, and (ii) all claims asserted in the Celsius Administrative Claim Motion (collectively, the "**Released Claims**").[6]

- In exchange, the Debtors will:

  - o unequivocally, fully, irrevocably and forever release the Core POCs, and the Debtors shall not have any right to assert the Core POCs (whether affirmatively or as a defense) to offset the Excluded Claims; and

  - o subject to certain conditions set forth in the PSA:

    - ▪ sell the Purchased Assets (including, among other things, the Cedarvale Facility, Personal Property, and Meter Holding Interests) free and clear of all liens, claims, and encumbrances (other than, with respect to the Cedarvale Facility, Permitted Title Exceptions); and

    - ▪ Grant Celsius the License to use the Licensed Materials;

- Upon consummation of the Celsius Settlement, the Debtors shall assume and assign to Celsius, and Celsius shall assume from the Debtors, the Transferred Contracts.

  - o The Debtors shall pay any and all monetary liabilities in connection with the assumption and assignment of the Transferred Contracts that must be satisfied pursuant to section 365 of the Bankruptcy Code (the "**Cure Costs**"). As set forth on the cure schedule attached hereto as **Exhibit 5**, the Debtors assert that no cure amounts are owed in connection with the assumption of the Transferred Contracts.

- As further set forth in the PSA, the Debtors will use commercially reasonable efforts to cause Meter Holding to qualify for the Electric Reliability Council of Texas's Four Coincident Peak program. In addition, the Debtors shall enter into the Amended TNMP Contract,[7] which (i) will be included as a Transferred Contract to be assumed and

---

[6] The following claims will remain outstanding: (i) the secured claims of approximately $54 million in principal, plus prepetition and postpetition interest, and other unliquidated amounts set forth on proofs of claim 428, 434, 436, 439, 469, 494, 495, 496 filed by Celsius US Holding LLC, and (ii) the claims asserted on Celsius's behalf on proofs of claim 379 and 526 filed by U.S. Bank National Association (items (i) and (ii) together, the "**Excluded Claims**").

[7] As defined in the PSA. The Amended TNMP Contract amends or restates that that certain Transmission/Substation Facility Extension Agreement, between Seller and Texas New Mexico Power Company, dated August 20, 2021 (the "**TNMP Contract**"). As described further therein the PSA, the Amended TNMP will be in the same form of the

assigned to Celsius, and (ii) will provide that the Cedarvale Facility shall be allocated at least 215 megawatts of power at the consummation of the Celsius Settlement, and Celsius shall be entitled to any and all future capacity, if any, allocated to the Cedarvale Facility or the substation at the Cedarvale Facility.

- If the PSA is terminated through no fault of the Debtors and solely by a default by Celsius under the PSA, the Debtors may pursue a remedy for specific performance of Celsius's obligations to require Celsius to purchase the Purchased Assets or to otherwise perform actions required of Celsius thereunder; if the PSA is terminated through no fault of Celsius and solely by a default by the Debtors under the PSA, Celsius may pursue a remedy for specific performance of the Debtors' obligations to require the Debtors to sell the Purchased Assets or to otherwise perform actions required of the Debtors thereunder.

22. Consummation of the Celsius Settlement is conditioned upon, among other things, (i) the approval of the Celsius Settlement by the Court and (ii) an order from the court in the Celsius Chapter 11 Cases approving the Celsius Settlement.

**Relief Requested Should Be Granted**

23. By this Motion, the Debtors seek the Court's approval of (i) the Celsius Settlement pursuant to section 9019 of the Bankruptcy Rules, (ii) the sale of Purchased Assets and granting of the license of the Licensed Materials pursuant to section 363 of the Bankruptcy Code, and (iii) the assumption and assignment of the Transferred Contracts pursuant to section 365 of the Bankruptcy Code.

**I.    The Celsius Settlement Is Fair, Reasonable, and in the Best Interest of the Debtors' Estates**

24. Bankruptcy Rule 9019(a) provides that "[o]n motion by the [debtors in possession] and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).  Further, pursuant to Bankruptcy Rule 9019(a), a bankruptcy court may approve a compromise or settlement so long as the proposed settlement is fair, reasonable, and in

---

TNMP and has substantially the same terms other than the megawatts of power to be provided at the Cedarvale Facility.

WEIL:\99226237\18\39031.0011

the best interests of the estate. *See Off. Comm. of Unsecured Creditors v. Moeller (In re Age Refin., Inc.)*, 801 F.3d 530, 540 (5th Cir. 2015). Ultimately, approval of a compromise is within the discretion of the bankruptcy court. *See United States v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984); *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980) (citations omitted) (decided under the Bankruptcy Act). Settlements are considered a "normal part of the process of reorganization" and a "desirable and wise method[] of bringing to a close proceedings otherwise lengthy, complicated, and costly." *Rivercity*, 624 F.2d at 602–03 (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424–25 (1968)).

25.     The Fifth Circuit has established a three-factor balancing test under which bankruptcy courts analyze proposed settlements*. Id.* The factors courts consider are: "(1) the probability of success in litigating the claim subject to settlement, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay; and (3) all other factors bearing on the wisdom of the compromise." *See Age Refin.*, 801 F.3d at 540 (internal citations omitted).

26.     Under the rubric of the third factor, the Fifth Circuit has specified two additional factors that bear on a decision to approve a proposed settlement. First, the Court should consider "the paramount interest of creditors with proper deference to their reasonable views." *Id.*; *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995). Second, the Court should consider the "extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Age Refin.*, 801 F.3d at 540; *Foster Mortg.*, 68 F.3d at 918 (citations omitted).

27.     Generally, the role of the bankruptcy court is not to decide the issues in dispute when evaluating a settlement. *Watts v. Williams*, 154 B.R. 56, 59 (S.D. Tex. 1993). Rather,

13

the court should determine whether the settlement as a whole is fair and equitable. *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).

28.     The Debtors bear the burden of establishing that the balance of the above factors leads to a fair and equitable compromise vis-à-vis the Celsius Settlement. *In re Allied Props., LLC*, 2007 WL 1849017, at *4 (Bankr. S.D. Tex. June 25, 2007) (citing *In re Lawrence & Erausquin, Inc.*, 124 B.R. 37, 38 (Bankr. N.D. Ohio 1990)); *see also In re GHR Cos., Inc.*, 50 B.R. 925, 931 (Bankr. D. Mass. 1985). "The burden is not high"; rather, the Debtors "***need only show that [their] decision falls within the 'range of reasonable litigation alternatives.'***" *In re Allied Props., LLC*, 2007 WL 1849017, at *4 (emphasis added) (citing *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983)); *see also Cook v. Waldron*, 2006 WL 1007489 at *4 (S.D. Tex. Apr. 18, 2006).

29.     Here, weighing the foregoing factors demonstrates that the Celsius Settlement is reasonable and supports finding that the Debtors' entry into the Celsius Settlement is in the best interest of creditors and other stakeholders.

30.     First, the likelihood of success of litigating against Celsius all the issues and disputes underlying the Automatic Stay Motion, the Core Administrative Claim Motion, the Rejection Motion, the Core POCs, the Celsius Hosting POCs, the Celsius Administrative Claim Motion, and the Summary Judgment Briefing is uncertain. Celsius has asserted substantial claims against the Debtors' estates, including approximately $112 million in prepetition claims, $1.5 million in postposition claims, $194 million in rejection damages, and $4.7 million in postpetition administrative expense claims, plus any unspecified and unliquidated amounts. Although the Debtors believe they have strong arguments that could substantially reduce the amount of Celsius's claims against the Debtors' estates, there is litigation risk of losing on certain of these claims if the Court finds that certain damages limitations provisions did not apply to Celsius's various claims.

The Debtors' ability to prevail on their claims against Celsius in the Celsius Chapter 11 Cases is also uncertain. In addition, if a resolution were not reached, the parties would need to litigate the competing claims in both chapter 11 cases to judgment that involve complex factual and legal issues. This would entail significant discovery, additional briefing, and preparation for trial or other evidentiary hearings, and would take several months to complete, if not more. As set forth in the Sullivan Declaration, the Debtors estimate that it could cost the Debtors' estates between $4-6 million in litigation expenses if these issues were fully litigated to judgment. Even if the Debtors' claims against Celsius were successfully litigated and resulted in allowed claims in the Celsius Chapter 11 Cases, the Debtors' recovery on account of such claims remains uncertain and depends on the ultimate outcome of the Celsius Chapter 11 Cases and the classification and treatment of each of the claims asserted by the Debtors. Accordingly, the certainty of outcome realized by entry into the Celsius Settlement provides significant benefits to the Debtors and their estates.

31.     Second, the Celsius Settlement is the product of good-faith, arms-length bargaining between the Debtors and Celsius, each of which were represented by counsel. The Parties have already expended a significant amount of time and resources litigating disputes in each other's bankruptcy cases. The Parties have also exchanged a number of proposals and counter-proposals for the terms of the Celsius Settlement and the PSA.

32.     Third, the Celsius Settlement is reasonable and is in the best interests of the Debtors' estates. The Celsius Settlement provides the Debtors with (i) $14 million in cash and (ii) the full and final satisfaction and release of claims of all of Celsius's claims against the Debtors (except for the Excluded Claims), including approximately $112 million in prepetition claims, $1.5 million in postposition claims, $194 million in rejection damages, and $4.7 million in postpetition administrative expense claims, plus any unspecified and unliquidated amounts. As further

15

described below and set forth in the Bros Declaration, the Celsius Settlement allows the Debtors to sell the Purchased Assets and License the Licensed Materials, and the Debtors believe that the value they will receive in exchange for the Purchased Assets and the grant of the License to use the Licensed Materials pursuant to the Celsius Settlement significantly exceeds the value it would otherwise realize if the Cedarvale Facility was sold to a third party, as evidenced by the Debtors' previous efforts to sell the Cedarvale Facility earlier on in these chapter 11 cases.

33.     Accordingly, the Celsius Settlement should be approved.  In addition, as more fully set forth below, because the entry into the Celsius Settlement constitutes a sound exercise of the Debtors' business judgment, the Debtors, their respective current members, managers, officers, directors, employees, advisors, professionals or agents, shall have or incur no liability to the estates or any holder of a claim against or interest in the Debtors for any act or omission in connection with, related to, or arising out of the negotiations of the Celsius Settlement contemplated thereunder, other than liability of the Debtors arising out of or relating to any willful misconduct or fraud, in each case as determined by a court of competent jurisdiction.

**II.    Sale of the Purchased Assets and the Grant of the License to the Licensed Materials under the Celsius Settlement Is A Sound Exercise of Debtors' Business Judgment and Should Be Approved "Free and Clear"**

*I.    The Sale and License Transactions Should be Approved as an Exercise of the Debtors' Sound Business Judgment*

34.     Section 363(b) of the Bankruptcy Code authorizes a debtor in possession to "use, sell, or lease, other than in the ordinary course of business, property of the estate," after notice and a hearing.  The Fifth Circuit recognizes that a debtor may use property of the estate outside the ordinary course of business under this provision if there is a good business reason for doing so.  *See, e.g.*, *ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor,

16

creditors, and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (quoting *In re Cont'l Air Lines, Inc.*, 780 F.3d 1223, 1226 (5th Cir. 1986)); 441 B.R. 813, 830 (Bankr. S.D. Tex. 2010); *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd. (In re State Park Bldg. Grp., Ltd.)*, 331 B.R. 251, 254 (Bankr. N.D. Tex. 2005).

35.     Once the Debtors articulate a good business reason, "the business judgment rule . . . 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill. 1995); *see also Integrated Res.*, 147 B.R. at 656; *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[A] presumption of reasonableness attaches to a debtor's management decisions.").

36.     The Debtors have a sound business justification for selling the Purchased Assets and granting the License to the Licensed Materials pursuant to the Celsius Settlement.  First, the Debtors believe they are receiving fair market value for the Purchased Assets under the Celsius Settlement.  Before the Petition Date, the Debtors determined that three of their facilities, including the Cedarvale Facility, may not be essential to the Debtors' go-forward business plan.  These facilities would require a material amount of additional capital expenditure in order to become fully operational, and the Debtors had identified other low-cost, high-reward opportunities to further develop other existing infrastructure.  The Debtors believed that they would both improve their near-term liquidity and maximize long-term value by selling the Cedarvale Facility.  As a result, the Debtors commenced a formal marketing process to sell these three facilities along with certain equipment located at such facilities, which lasted approximately 8 months from and after October 2022 (collectively, the "**Previous Marketing Process**").  The Debtors and their advisors

17

contacted a total of forty-six (46) parties who might be interested in one or more of the non-core facilities being marketed, including the Cedarvale Facility.  Ultimately, following discussions with certain parties who submitted indications of interests, the Debtors determined that either (i) the received indication of interests were of insufficient value and/or (ii) the potential purchasers did not have sufficient funds to complete the purchase.  As described in Bros Declaration, the Previous Marketing Process was a series of fair marketing processes for obtaining the highest and best offer and sale of the Purchased Assets for the benefit of the Debtors' estates and their stakeholders, and the fair and reasonable consideration to be received from Celsius allows the Debtors and their estates to maximize the value received for the Purchased Assets as part of the Celsius Settlement. The sale of the Purchased Assets pursuant to the Celsius Settlement will provide a greater recovery for the Debtors' estates than would otherwise be available under any other alternative transaction. As such, the Debtors' determination to sell the Purchased Assets and the grant the License to the Licensed Materials pursuant to the Celsius Settlement is a valid and sound exercise of the Debtors' business judgment.

37.     Second, the grant of the License to the Licensed Materials is an integral part of the sale of the Purchased Assets, which allows Celsius and any subsequent operators to continue to develop the Cedarvale Facility to full operation. The sale of the Purchased Assets and the grant of the License to the Licensed Materials are also integral parts of the Celsius Settlement, which resolves significant commercial disputes between the Parties by providing the full release and settlement of the Released Claims asserted by Celsius against the Debtors and all the Core POCs asserted by the Debtors against Celsius.  As established above, the Celsius Settlement avoids costly and protracted litigation and mediation over the issues and disputes underlying the Automatic Stay Motion, the Core Administrative Claim Motion, the Rejection Motion, the Core POCs, the Celsius Hosting POCs, the Celsius Administrative Claim Motion, and the Summary Judgment Briefing.

WEIL:\99226237\18\39031.0011

Accordingly, entry into the Celsius Settlement, including the sale of the Purchased Assets and the grant of the License to the Licensed Materials thereunder, is a sound exercise of the Debtors' business judgment and should be approved.

II.    *Adequate and Reasonable Notice of the Sale of the Purchased Assets Are Provided*

38.    This Motion (a) informs interested parties of the deadlines for objecting to the Celsius Settlement, and (b) otherwise includes all information relevant to parties interested in, or affected by, the Celsius Settlement.  Notice of this Motion will be provided to any party entitled to notice pursuant to Bankruptcy Rule 2002 and 6004 any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d), and cause to be published on the website of the Debtors' claims and noticing agent, Stretto, Inc. (https://cases.stretto.com/corescientific).   Accordingly, adequate and reasonable notice of the sale of the Purchased Assets and the Celsius Settlement will be provided to all interested parties.

III.    *Sale of the Purchased Assets Should Be Approved "Free and Clear" Under Section 363(f) of the Bankruptcy Code*

39.    Section 363(f) of the Bankruptcy Code permits the Debtors to sell assets free and clear of all liens, claims, interests, charges, and encumbrances (with any such liens, claims, interests, charges, and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets).  As section 363(f) of the Bankruptcy Code is stated in the disjunctive, when proceeding pursuant to section 363(f), it is only necessary to meet one of the five conditions of section 363(f).  *In re Nature Leisure Times, LLC*, No. 06-41357, 2007 WL 4554276, at *3 (Bankr. E.D. Tex. Dec. 19, 2007) ("The language of § 363(f) is in the disjunctive such that a sale free and clear of an interest can be approved if any one of the aforementioned conditions contained in § 363(f) are satisfied.").

19

40.     Additionally, the Court also may authorize the sale of a debtor's assets free and clear of any liens pursuant to section 105 of the Bankruptcy Code, even if section 363(f) did not apply.  *See In re Trans World Airlines, Inc.*, No. 01–0056 (PJW), 2001 WL 1820325, at *3 (Bankr. D. Del. Mar. 27, 2001) ("[B]ankruptcy courts have long had the authority to authorize the sale of estate assets free and clear even in the absence of § 363(f)."); *see also Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of liens] is within the court's equitable powers when necessary to carry out the provisions of Title 11.").

41.     The Debtors believe that one or more of the conditions of section 363(f) of the Bankruptcy Code will be satisfied with respect to the transfer of the Purchased Assets pursuant to the Celsius Settlement.  For example, the DIP Lenders have consented to the sale of the Purchased Assets free and clear under section 363(f)(2) of the Bankruptcy Code.  In addition, to the extent the Debtors have a bona fide dispute with respect to claims, liens, or other alleged interests in the Purchased Assets with certain holders of asserted interests in the Purchased Assets, a sale free and clear may proceed pursuant to section 363(f)(4) of the Bankruptcy Code.

IV.     *The Celsius Settlement Has Been Proposed in Good Faith and Without Collusion, and Celsius Will Be a "Good Faith Buyer"*

42.     Pursuant to section 363(m) of the Bankruptcy Code, a good-faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. *O'Dwyer v. O'Dwyer* (*In re O'Dwyer*), 611 F. App'x 195, 200 (5th Cir. 2015); *Mark Bell Furniture Warehouse, Inc. v. D.M. Reid Assocs., Ltd. (In re Mark Bell Furniture Warehouse), Inc.*, 992 F.2d 7, 9 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985); *see also In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (to constitute lack of good faith, a party's conduct in connection with the sale must usually amount to fraud, collusion between the

20

buyer and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders).

43.     In other words, a party would have to show fraud or collusion between the successful bidder and the debtor-in-possession or trustee or other bidders in order to demonstrate a lack of good faith.  An appropriate characterization of good faith in a bankruptcy sale is a lack of "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512, 521 (5th Cir. 2014) (quoting *Bleaufontaine, Inc. v. Roland International (In re Bleaufontaine, Inc.)*, 634 F.2d 1383, 1388 n.7 (5th Cir. 1981)).

44.     Celsius is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code, and terms of the Celsius Settlement were negotiated at arms-length and in good faith without any collusion or fraud.[8]  In addition, the Previous Marketing Process was designed to produce a fair, transparent, and competitive market-check process, but the Debtors did not receive any indication of interests during the Previous Marketing Process that yields higher or better value for the Purchased Assets.  The consideration provided by Celsius for the Purchased Assets reflects the fair market value of such assets.  Accordingly, Celsius is a good-faith purchaser of the Purchased Assets under the Celsius Settlement and is entitled to the full protections of the Bankruptcy Code.

---

[8] Section 363(m) provides that, "[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal."  11 U.S.C. § 363(m).

**III.    The Debtors' Entry into the Amended TNMP Contract and Assumption and Assignment of the Transferred Contracts Is a Reasonable Exercise of Debtors' Sound Business Judgment and in the Best Interests of Estates**

45.    The Court should authorize the Debtors to (i) enter into the Amended TNMP Contract pursuant to section 363 of the Bankruptcy Code, and (ii) assume and assign the Transferred Contracts to Celsius pursuant to section 365 of the Bankruptcy Code.

*I.    Entry into the Amended TNMP Contract Is A Reasonable Exercise of the Debtors' Sound Business Judgment*

46.    Although entering into or amending power transmission, distribution, and substation facility agreements generally falls within the Debtors' ordinary course of business, out of an abundance of caution and in satisfaction of a condition to the effectiveness of such agreement, the Debtors seek the Court's authority under section 363(b) of the Bankruptcy Code to enter into the Amended TNMP Contract.

47.    As established above, section 363(b) of the Bankruptcy Code authorizes a debtor in possession to "use, sell, or lease, other than in the ordinary course of business, property of the estate," after notice and a hearing.  The Fifth Circuit recognizes that a debtor may use property of the estate outside the ordinary course of business under this provision if there is a good business reason for doing so.  *See, e.g.*, *In re ASARCO* at 601 (5th Cir. 2011).  Once the Debtors articulate a good business reason, "the business judgment rule . . . 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'"  *See, e.g.*, *In re S.N.A. Nut Co.* at 102.

48.    Entry into the Amended TNMP Contract, which amends the TNMP Contract and will be subsequently assigned to Celsius as a Transferred Contract, is an integral part of the sale of the Purchased Assets and the Celsius Settlement and is necessary for the Debtors to

22

be able to obtain a fair market value for the Purchased Assets for the benefit of the Debtors' estates and their stakeholders.  Entry into the Amended TNMP Contract reflects a sound exercise of a valid business judgement by the Debtors and should be approved pursuant to section 363 of the Bankruptcy Code.

> II.     *Assumption and Assignment of the Transferred Contracts Is A Reasonable Exercise of the Debtors' Sound Business Judgment*

49.     Pursuant to section 365(a), a debtor in possession, "subject to the court's approval, may assume or reject any . . . executory contract or unexpired lease of the debtor." Although the Bankruptcy Code does not define the term "executory contract," the Supreme Court has noted that an executory contract is "a contract where neither party has finished performing." *In re Avianca Holdings S.A.*, 618 B.R. 684, 695 (Bankr. S.D.N.Y. 2020) (citing *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1657 (2019)); *Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co*., 83 F.3d 735, 741 (5th Cir. 1996) ("Although the Bankruptcy Code does not define 'executory contract,' generally an agreement is considered executory 'if at the time of the bankruptcy filing, the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the performance of the other party.'") (quoting *In re Murexco Petorleum, Inc.*, 15 F. 3d 60, 62 (5th Cir. 1994)).  This allows the debtor in possession to maximize the value of its estate by assuming executory contracts or unexpired leases that benefit the estate and by rejecting those that do not.  *In re Nat'l Gypsum Co*., 208 F.3d 498, 504–05 (5th Cir. 2000).

50.     Furthermore, section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the executory contracts to be assigned must be cured or that adequate assurance be provided that such defaults will be promptly cured.  Section 365(f) of the Bankruptcy Code provides that a debtor may assign an executory contract only if adequate assurance of future

23

performance by the assignee is provided, whether or not there has been a default under the contract. *See* 11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *See Carlisle Homes, Inc. v. Azzari* (*In re Carlisle Homes, Inc.*), 103 B.R. 524, 538 (Bankr. D.N.J. 1988); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (finding that adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.,* 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance").  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (noting that adequate assurance of future performance is present when the prospective assignee of a lease has financial resources and expressed a willingness to devote sufficient funding to the business to give it a strong likelihood of succeeding).

51.    Once the statutory predicates to assumption and assignments are satisfied, the Debtors' decision to assume, assume and assign, or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment.  *See, e.g.*, *Richmond Leasing Co. v. Cap. Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) (applying a business judgment standard to debtor's determination to assume an unexpired lease); *COR Route 5 Co. v. Penn Traffic Co. (In re Penn Traffic Co.)*, 524 F.3d 373, 383 (2d Cir. 2008) (explaining that the business judgment test "rather obviously presupposes that the estate will assume a contract only where doing so will be to its economic advantage"); *In re Del Grosso*, 115 B.R. 136, 138 (Bankr. N.D. Ill. 1990) ("[T]he

24

standard to be applied for approval of the assumption [of an executory contract] is the business judgment standard. . . .").

52.     The "business judgment" standard requires only a showing that either assumption or rejection of the executory contract or unexpired lease will benefit the debtor's estate. *See In re Idearc Inc.*, 423 B.R. 138, 162 (Bankr. N.D. Tex. 2009) (stating that the business judgment standard only "requires a showing that the proposed course of action will be advantageous to the estate." (citation omitted)).   In applying the business judgment standard, bankruptcy courts give deference to a debtor's decision to assume or reject executory contracts. *See, e.g.*, *In re Pisces Energy, LLC*, Case No. 09-36591-H5-11, 2009 WL 7227880, at \*6 (Bankr. S.D. Tex. Dec. 21, 2009) ("Courts apply the 'business judgment test,' which requires a showing that the proposed course of action will be advantageous to the estate and the decision be based on sound business judgment.").   Furthermore, under the business judgment standard, "[a] debtor's decision to reject an executory contract must be summarily affirmed unless it is the product of 'bad faith, or whim or caprice.'"   *In re Pilgrim's Pride Corp*., 403 B.R. at 422 (citing *Wheeling–Pittsburgh Steel Corp. v. W. Penn Power Co.* (*In re Wheeling–Pittsburgh Steel Corp.*), 72 B.R. 845, 849–50 (Bankr. W.D. Pa. 1987)).

53.     Here, all statutory predicates to assumption and assignment of the Transferred Contracts under section 365 are satisfied.   First, the Transferred Contracts are "executory contracts" within the meaning of section 365 of the Bankruptcy Code because all parties involved have material ongoing obligations under these agreements as of the Petition Date. Under each Transferred Contract, among other obligations, each counterparty remains obligated to continue to provide electricity, construction infrastructure for the electricity distribution, or internet services, as applicable, and the Debtors have the obligation to continue the payments for such services and/or other material non-monetary obligations to the applicable counterparty.

WEIL:\99226237\18\39031.0011

Second, the Cure Costs under the Transferred Contracts are $0.[9]   Third, Celsius will provide adequate assurance of its future performance because (1) pursuant to the Celsius Settlement, Celsius will be responsible for performing all of the Debtors' obligations under the Transferred Contracts that become due from and after the consummation of the Celsius Settlement, and (2) after the consummation of the Celsius Settlement, Celsius and any subsequent operator will need the Transferred Contracts to develop the Cedarvale Facility to full operation.

54.    Additionally, the assumption and assignment of the Transferred Contracts is a proper exercise of the Debtors' business judgment.  The assumption and assignment of these Contracts to Celsius is an integral part of the sale of the Purchased Assets and the Celsius Settlement and is necessary for the Debtors to be able to obtain a fair market value for the Purchased Assets for the benefit of the Debtors' estates and their stakeholders.

55.    For the foregoing reasons, the Court should authorize the Debtors to assume and assign the Transferred Contracts under the Celsius Settlement.  In addition, to facilitate the assumption and assignment of the Transferred Contracts, the Debtors further request that the Court find that all anti-assignment provisions in the Transferred Contracts, whether such provisions expressly prohibit or have the effect of restricting or limiting assignment of such contract or lease, to be unenforceable under section 365(f) of the Bankruptcy Code.[10]

---

[9] The Debtors' estimate of the Cure Costs are provided in Schedule 1 of the Assumption and Assignment Notice, attached to this Motion as **Exhibit 5**.

[10] Section 365(f)(1) provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease[.]"   11 U.S.C. § 365(f)(1).   Section 365(f)(3) further provides that, "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee."  11 U.S.C. § 365(f)(3).

WEIL:\99226237\18\39031.0011

## **Emergency Consideration is Requested**

56.     The Debtors seek relief on an emergency basis. The Debtors are working to bring approximately $14 million in additional funds into the estate for the immediate benefit of the Debtors and their stakeholders.  The Debtors seek to enter into and consummate the Celsius Settlement as soon as possible in order to maximize benefits for the Debtors and their estates.  The Debtors believe that emergency consideration of this Motion is necessary and appropriate.

## **Reservation of Rights**

57.     Except to the extent that this Motion is granted, nothing contained in this Motion or any actions taken by the Debtors pursuant to the relief granted is intended or should be construed as: (i) an admission as to the validity of any claim against the Debtors, or (ii) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law.

## **Notice**

58.     Notice of this Motion will be provided to any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

## **No Previous Request**

59.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:  September 15, 2023
        Houston, Texas

Respectfully submitted,

  /s/  Alfredo R. Pérez                
WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 1700
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511
Email:  Alfredo.Perez@weil.com
        Clifford.Carlson@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock (admitted *pro hac vice*)
Ronit J. Berkovich (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:   (212) 310-8007
Email:  Ray.Schrock@weil.com
       Ronit.Berkovich@weil.com

*Attorneys for Debtors*
*and Debtors in Possession*

28

**<u>Certificate of Service</u>**

I hereby certify that on September 15, 2023, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.


　　　　　*/s/  Alfredo R. Pérez*　　　
Alfredo R. Pérez