**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| **CORE SCIENTIFIC, INC.,** *et al.,* | § | Case No. 22-90341 (DRJ) |
| | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | |
| | § | |

**DEBTORS' OBJECTION TO PROOF OF CLAIM**
**NOS. 364 AND 383 FILED BY HARLIN DEAN**

---

**THIS IS AN OBJECTION TO YOUR CLAIM. THIS OBJECTION ASKS THE COURT TO DISALLOW THE CLAIM THAT YOU FILED IN THIS BANKRUPTCY CASE. YOU SHOULD IMMEDIATELY CONTACT THE OBJECTING PARTY TO RESOLVE THE DISPUTE. IF YOU DO NOT FILE A RESPONSE WITHIN 30 DAYS AFTER THE OBJECTION WAS SERVED ON YOU, YOUR CLAIM MAY BE DISALLOWED WITHOUT A HEARING.**

---

Core Scientific, Inc. ("**Core**")[2] and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), represent as follows in support of this claim objection (the "**Objection**"), and request entry of an order, substantially in the form attached hereto as Exhibit A (the "**Proposed Order**") disallowing

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6074); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

[2] As discussed in the Declaration of Michael Bros in Support of the Debtors' Chapter 11 Petitions and First Day Relief, In re Core Scientific, Inc., No. 22-90341-11 (Bankr. S.D. Tex., Dec. 21, 2022) at ¶31, Dkt. No. 5, Core Scientific, Inc. changed its name to Core Scientific Operating Company in January 2022. Therefore, any claims against Core Scientific, Inc., are more properly claims against Core Scientific Operating Company. Given that the Proofs of Claim are identical, this Objection applies equally to both, and references to "Core" shall include Core Scientific Operating Company and Core Scientific, Inc. for purposes of this Objection.

Proof of Claim Nos. 364 and 383 (the "**Proofs of Claims**" or "**Dean POCs**") filed by Harlin Dean ("**Dean,**") against Core.

## I.    Preliminary Statement

1.      Harlin Dean, former Chief Legal Officer of Core Scientific Acquired Mining LLC, a subsidiary of Core, seeks to recover approximately $8,000,000 in executive compensation based on severance pay and a hypothetical sale of Core stock he claims he was entitled to receive.  But based on the unequivocal facts, Mr. Dean is not entitled to anything beyond that portion of his base salary ($200,000) that remained unpaid on the date he resigned from Core without cause.  While Mr. Dean was awarded certain shares of restricted stock and stock options under various equity grants by Blockcap, Inc. ("**Blockcap**"), a company that merged with Core's predecessor, Mr. Dean resigned from Core—without "Good Reason" as defined by his employment agreement—before any of his shares and options vested. Accordingly, based on the clear terms of his employment agreement, Mr. Dean is entitled to, at most, only that portion of his salary that remained unpaid when he resigned without "Good Reason" on February 10, 2022.[3]

2.      Furthermore, even if any of Mr. Dean's shares and options had vested— and even if his resignation were to be deemed for "Good Reason"—which the facts confirm it was not—Mr. Dean would still not be entitled to anything near the amounts he claims because he would not have been able to sell any shares until months after the date he resigned.  For example, even assuming that his shares vested (which Core disputes), Mr. Dean was still subject

---

[3] To the extent Mr. Dean is entitled to recover beyond that portion of his salary that remained unpaid, the Debtors reserve the right to seek to reclassify his claim, or any portion thereof, as a Section 510(b) Claim pursuant to any plan of reorganization that may be filed in these chapter 11 cases or otherwise as appropriate under section 510(b) of the Bankruptcy Code.

to certain lock-ups and other restrictions on his sale of shares such that he would not have been able to sell some of his shares no sooner than March 10, 2022, (the date the waiver of a lock-up period became effective) and the rest no sooner than April 20, 2022 (the date Core filed its Form S-8 Registration Statement with the Securities and Exchange Commission), subject even then to compliance with Core's insider trading policy, clearance policies, and any other requirements imposed by Fidelity (Core's employee stock plan administrator) or Computershare (Core's transfer agent).  By that time, Mr. Dean's shares would have been worth only a fraction of the value he now seeks to collect from Core.  Moreover, whether Mr. Dean would have even sold all of his shares at those times or could have found a broker through which to sell those shares is speculation.  In any event, because Mr. Dean resigned without "Good Reason" prior to the vesting of his equity grants, his claim should be limited to only that portion of his base salary that remained unpaid at the time of his resignation.

## II.    Relief Requested

3.    By this Objection, pursuant to sections 105(a) and 502(b) of title 11 of the United States Code (the **"Bankruptcy Code"**), Rule 3007 of the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**), and Rule 3007-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the **"Bankruptcy Local Rules"**), the Debtors seek entry of the Proposed Order, disallowing Proofs of Claim Nos. 364 and 383 filed by Harlin Dean and limiting any recovery solely to that portion of his salary that remained unpaid.  Alternatively, even if this Court were to find that Mr. Dean is entitled to additional recovery on his Claims, and even if Mr. Dean could prove that he could have sold his shares, such amount would be significantly less than the amount asserted in the Dean POCs.

### III.    Jurisdiction and Venue

4.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper pursuant to 28 U.S.C §§ 1408 and 1409.  The relief requested herein is sought pursuant to §§ 105(a) and 502(b) the Bankruptcy Code, Bankruptcy Rule 3007, and Bankruptcy Local Rule 3007-1.

### IV.    Background

#### A.    *Dean's Employment and Equity Grants*

5.      Starting March 17, 2021, Mr. Dean served as General Counsel of Blockcap.  He was promoted to Chief Legal Officer of Blockcap effective June 1, 2021.  Upon his promotion, Mr. Dean and Blockcap entered into an Executive Employment Agreement (the "**Employment Agreement**"), attached to the accompanying declaration of Todd DuChene dated September 19, 2023 ("DuChene Decl.") as Exhibit 1.  Under the Employment Agreement, Mr. Dean's annual base salary was $200,000.

6.      Blockcap entered into three equity award agreements with Mr. Dean between March and June of 2021 (the "**Award Agreements**").  On March 4, 2021, Mr. Dean was awarded 350,000 shares of nonqualified stock options, with 25% of the options scheduled to vest annually for each of the next four years, starting on March 4, 2022, and ending on March 4, 2025.  On May 6, 2021, Mr. Dean was awarded 50,000 shares of restricted stock of Blockcap, with 25% of the shares scheduled to vest annually for each of the next four years, starting on May 6, 2022, and ending on May 6, 2025.  On June 1, 2021, Mr. Dean was awarded an additional 800,000 shares of restricted stock of Blockcap, with 25% of the shares scheduled to vest annually for each of the next four years, starting on June 1, 2022, and ending on June 1, 2025.  In total, Mr. Dean was awarded 350,000 shares of nonqualified stock options and 850,000 shares of restricted stock of Blockcap.

7.      Blockcap was acquired by Core Scientific Holding Co. on July 30, 2021, pursuant to a merger between Blockcap and a subsidiary of Core Scientific Holding Co., in which Blockcap was the surviving entity as a subsidiary of Core Scientific Holding Co.  Mr. Dean asserts that as a result of the merger, Mr. Dean's options and restricted shares of Blockcap stock were converted into Core Scientific Holding Co. restricted shares and options at an exchange ratio of 0.5074.  Dean POCs ¶ 15.  Regardless of whether Mr. Dean's shares and options under his Award Agreements converted to restricted shares and options of Core Scientific Holding Co. following the merger, none of those shares or options vested at that time.

8.      Core's current corporate structure is the result of a series of transactions that resulted in a "de-SPAC merger."  DuChene Decl. ¶ 6.  On January 19, 2022, Core Scientific Holding Co. merged with a subsidiary of Power & Digital Infrastructure Acquisition Corp. ("XPDI"), with Core Scientific Holding Co. surviving the merger as a wholly owned subsidiary of XPDI.  *Id.*  A second merger occurred on January 20, 2022 between XPDI and Core Scientific Holding Co., with XPDI surviving this second merger.  *Id.*  Following the close of the second merger, on January 20, 2022, Blockcap merged with and into a subsidiary of XPDI, with the surviving entity named Core Scientific Acquired Mining LLC.  *Id.*  In connection with the mergers, XPDI changed its name to Core Scientific, Inc.  *Id.*  Core Scientific, Inc., went public on January 20, 2022.  *Id.*  Core Scientific Inc. is the Core debtor whose shares are relevant to the issues here.

9.      Mr. Dean asserts that as a result of the XPDI merger, Mr. Dean's options and restricted shares were converted into restricted shares and options of Core stock, at an exchange ratio of 1.6001528688.  Dean POCs ¶ 16.  Regardless of whether Mr. Dean's shares

and options under his Award Agreements converted to restricted shares and options of Core following the merger, none of those shares or options vested at that time.

### B. *Dean's Employment Agreement and Resignation*

10.     Following the January 20, 2022 transaction in which Blockcap changed its name to Core Scientific Acquired Mining LLC, Mr. Dean continued serving as the Chief Legal Officer for that entity, a subsidiary of Core. *See* DuChene Decl. ¶¶ 6, 7.  However, only three weeks after Core went public, on February 10, 2022, Mr. Dean resigned from Core. In his resignation letter (the "**Resignation Letter**," attached to the DuChene Decl. as <u>Exhibit 2</u>), Mr. Dean claimed that he was resigning for "Good Reason," though he did not provide any explanation or support for that assertion.   As explained below, this purported "Good Reason" resignation was an attempt to accelerate and cash out equity incentives that would have taken years to vest.

11.     Under Section 8(d)(ii) of the Employment Agreement, upon resigning without Good Reason, as Mr. Dean did here, Mr. Dean is entitled to the following:

> Executive shall be entitled to resign his employment at any time upon 30 days written notice. Provided the resignation is not for Good Reason, the Company shall have no further obligations to Executive, except: (i) any unpaid Base Salary up to the Termination Date; (ii) reimbursement for unreimbursed business expenses properly incurred by Executive, which shall be subject to and paid in accordance with the Company's expense reimbursement policy; (iii) such benefits, if any, to which Executive may be entitled under the Company's benefit plans as of the Termination Date; and (iv) the portion of any award granted to Executive under the Plan for services in any capacity to the Company **which shall have vested pursuant to the terms of such award prior to the Termination Date**, subject to Section 8(b) of the Plan. Executive shall not be entitled to any other payments, including any Severance Pay. (Emphasis added.)

12.     After Mr. Dean resigned from Core on February 10, 2022, Core informed him on February 14, 2022 that it disputed his resignation was for "Good Reason" and that his resignation was deemed effective immediately.  DuChene Decl. ¶ 9.

13.     Additionally, the Restrictive Stock Agreement attached to Mr. Dean's June 1, 2021 Award Agreement provides in relevant part that, notwithstanding the agreement's default schedule for the vesting of shares of restricted stock, upon the first date that the Company, or any successor entity or controlling affiliate thereof, becomes subject to the public company reporting requirements of the Securities and Exchange Commission, the following will occur:

> [A] total of 400,000 shares of Restricted Stock granted pursuant to the Award Agreement shall automatically become fully vested and be released from any repurchase or forfeiture rights (other than repurchase rights exercisable at Fair Market Value) for all of the Shares (or other consideration) at the time represented by such portion of this Award; **provided, however, that if Grantee shall be subject to a contractual lock-up restriction at the time of such accelerated vesting which restriction prohibits the sale by Grantee of the portion of the Award so accelerated, the vesting of such 400,000 shares of Restricted Stock shall be delayed until the expiration of such lock-up restriction.**

June 1, 2021 Award Agreement, Attachment 1-D, § 2(a) (Emphasis added).

14.     Section 8(d)(i) of the Employment Agreement narrowly defines the circumstances in which Mr. Dean may resign for "Good Reason":

> Executive shall be entitled to resign for "Good Reason," which shall mean (i) a reduction in Executive's Base Salary, (ii) a change of Executive's title not consented to by Executive; (iii) a relocation of Executive's principal place of employment more than 50 miles from Executive's initial location of employment, (iv) a material diminution in Executive's duties or responsibilities; or (v) a request or instruction by the Company for Executive to resign under any circumstances not involving an act or omission by Executive that meets the definition of "Cause" set forth in Section 8(a).

15.     Section 8(d)(i) of the Employment Agreement also provides what Mr.

Dean would be entitled to receive if he resigned for Good Reason:

> In the event Executive resigns for Good Reason, Executive shall be
> entitled to receive: (i) any unpaid Base Salary up to the Termination
> Date; (ii) reimbursement for unreimbursed business expenses
> properly incurred by Executive, which shall be subject to and paid
> in accordance with the Company's expense reimbursement policy;
> (iii) such benefits, if any, to which Executive may be entitled under
> the Company's Employee benefits as of the Termination Date; and
> (iv) the Severance Pay outlined in Section 8(h), subject to
> Executive's compliance with the terms and conditions therein.

16.     Section 8(h) of the Employment Agreement provides that Mr. Dean

would only be entitled to severance pay in the event of a Termination without Cause,

Resignation for Good Reason, or Death or Disability:

> In the event of Termination of the Agreement and Employment,
> pursuant to Sections 8(b) (Termination without Cause), 8(d)(i)
> (Resignation for Good Reason), or 8(e) (Death or Disability),
> Executive will be eligible for Severance Pay, subject to Executive,
> or Executive's estate or representative, if applicable, executing and
> not revoking a customary and reasonable general and mutual release
> of claims that includes a mutual non-disparagement provision and
> Executive's reaffirmation of the Restrictive Covenants in this
> Agreement ("Release").

17.     Section 8(h) of the Employment Agreement further provides:

> Severance Pay consists of: (1) One (1) year Base Salary in the
> amount in effect at the time of the termination; provided that if the
> termination is a result of Executive's resignation for good reason
> due to a decrease in Executive's salary, such Base Salary shall be in
> the amount in effect immediately prior to the decrease; (2) the
> maximum amount of onus for which the Executive would be eligible
> for the year in which termination occurs, prorated for the current
> year of termination, together with Executive's bonus for the prior
> year if not yet then paid; and (3) at the date of termination, all
> Awards granted to Executive under the Plan for services in any
> capacity to the Company shall immediately and automatically
> become fully vested, exercisable and payable and shall be released
> from any repurchase or forfeiture provisions with respect to all

shares of the Company' [sic] common stock at the time represented by such Award.

**C.**    ***Core's Lock-Up Period and S-8 Registration Statement***

18.    In connection with the go-public de-SPAC merger, Core issued a bylaw imposing a lock-up period, which prevented certain shareholders from trading the following for 180 days: (i) any shares of Class A Core common stocks, (ii) any shares of Class B common stock that was converted into Class A common stock pursuant to the Merger Agreement, (iii) any shares of common stock issuable upon the exercise of options to purchase shares of common stock held by such Lock-Up Holder immediately after the Closing, and (iv) any common stock underlying the warrants issued and sold in private placement at the time of the closing. DuChene Decl. ¶ 8. Thus, as of January 20, 2022, none of these shares could be traded for at least 180 days.  The lock-up period was ultimately waived on February 24, 2022, allowing the trading of these Core shares starting on March 10, 2022, if otherwise not subject to any other restrictions. *See id.*

19.    On April 20, 2022, Core filed its Form S-8 Registration Statement with the Securities and Exchange Commission, a prerequisite for providing shares to employees they might have received as part of any benefits or incentive packages.  DuChene Decl. ¶ 10.  Prior to that date, even if employees' shares had vested, they could not be sold because Core could not even issue such shares until the Form S-8 was filed.  More specifically, compensatory equity awards and issuances of stock for outstanding compensatory awards, like Mr. Dean's equity award, were subject to Core  having an effective S-8 on file, compliance with  Core's Insider Trading Policy,[4]  and  completion of the transaction by Fidelity, Core's employee stock plan

---

[4] Core's Insider Trading Policy provides, in relevant part, that a former employee is prohibited from trading for the remainder of a blackout period, if his employment ends during said blackout period. In addition, former employees are prohibited from trading if they are aware of material nonpublic public information. The

administrator.  *Id.*  ¶¶ 10-12.  Mr. Dean would have been required to provide additional assurances to Fidelity that his transactions were permitted under Core's equity plan and applicable law.  *Id.*  Furthermore, even when the shares were available for trading, a seller would not be able to sell them without first finding a broker to execute the trade.

### D.    Procedural History

20.    On December 21, 2022 (the "Petition Date"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the Bankruptcy Code. The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### E.    Dean's Proofs of Claims

21.    Mr. Dean filed his Proofs of Claim No. 364 and 383 against Core Scientific, Inc. and Core Scientific Acquired Mining LLC, respectively, on April 13, 2023, seeking a general unsecured claim in the amount of $8,000,000.  *See* Claim Nos. 364 and 383. In addition to claiming breach of the Employment Agreement, Mr. Dean asserts claims for (i) quantum meruit; (ii) promissory estoppel; (iii) fraudulent inducement; and (iv) conversion. Dean POCs, 9–14.  Mr. Dean also asserts counts for declaratory judgment, specific performance of the Employment Agreement, imposition of constructive trust, accounting, and indemnification of the attorneys' fees he has incurred in connection with his attempt to obtain shares of Core stock, and severance pay.  *Id.* at 14–18.

---

Insider Trading Policy also applies to shareholders' ability to engage in the sale of Core common stock acquired as a result of the exercise or vesting of compensatory equity granted by Core or its predecessor entities. DuChene Decl. ¶ 11.

## V.    Basis for Relief

22.    As set forth in Bankruptcy Rule 3001(f), a properly executed and filed proof of claim constitutes prima facie evidence of the validity and the amount of the claim under section 502(a) of the Bankruptcy Code.  *See, e.g.*, *In re Jack Kline Co., Inc.*, 440 B.R. 712, 742 (Bankr. S.D. Tex. 2010).  However, prima facie validity under Bankruptcy Rule 3001(f) "can be overcome by rebuttal evidence . . . ."  *In re Fidelity Holding Co., Ltd.*, 837 F.2d 696, 698 (5th Cir. 1988).  "Upon production of this rebuttal evidence, the burden shifts to the claimant to prove its claim by a preponderance of the evidence." *In re Armstrong*, 347 B.R. 581, 583 (Bankr. N.D. Tex. 2006) (citing *In re Fidelity Holding*, 837 F.2d at 698). And, "the ultimate burden of proof always lies with the claimant."  *Id.* (citing *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15 (2000)).

23.    Mr. Dean cannot meet his burden here for any of his claims.

### A.    Core Did Not Breach the Employment Agreement

24.    Mr. Dean's claim for breach of the Employment Agreement is premised on Core's alleged failure to pay Mr. Dean severance pay in the form of a lump sum payment of Mr. Dean's base salary in the amount of $200,000, plus the automatic and immediate vesting of the stock options and restricted stocks issued to Mr. Dean under the Award Agreements after Mr. Dean purportedly resigned for "Good Reason."

25.    Although Mr. Dean stated in his Resignation Letter that he was resigning for "Good Reason," he failed to provide any explanation or details supporting that the resignation was for a "Good Reason."  But saying that the resignation was for a "Good Reason" does not make it so.  Mr. Dean chose this characterization because he hoped to profit handsomely in the immediate wake of Core's go-public event and he sought to collect not only

a full year's worth of salary but *four years'* worth of equity awards, none of which had vested when Mr. Dean tendered his resignation.

26.     None of the specific enumerated grounds for resignation for "Good Reason" under Section 8(d)(i) of Mr. Dean's Employment Agreement were satisfied:  Core did not reduce Dean's salary; Core did not change Dean's title without his consent; Core did not ask Dean to relocate from his initial place of employment; and Core did not diminish Dean's duties or responsibilities. The fact that Dean did not specify any purported reason(s) for his resignation in his Resignation Letter speaks volumes.

27.     Mr. Dean now attempts to justify his resignation *post hoc* by claiming that there was a "material and substantial diminution in Plaintiff's duties or responsibilities following the acquisition of Blockcap by Core Scientific Holding Co."  Dean POCs ¶ 24.  This purported explanation is too little too late, in addition to being incorrect.  Mr. Dean worked for Core for more than six months following its acquisition of Blockcap, despite the "material and substantial diminution" in his duties he now alleges, without ever raising such issues to Core. *See* DuChene Decl. ¶ 7.  However, just three weeks after Core went public, Mr. Dean tendered a resignation claiming it was for "Good Reason" to try and take advantage of the payouts that come with such a resignation.  Mr. Dean's financial motivation, however, is not one of the conditions that qualify as a "Good Reason."

28.     Mr. Dean's argument that he was "terminated without cause," and that he therefore deserves the same severance pay as if he resigned for Good Reason, is similarly misguided and post-hoc.  *See* Dean POCs ¶ 25.  It is undisputed that Core did not terminate Mr. Dean prior to him tendering his Resignation Letter.  After Mr. Dean resigned on February 10, 2022, Core informed Mr. Dean on February 14, 2022 that it disputed that his resignation was

for Good Cause and that Mr. Dean's employment would end that day—essentially treating his resignation as one without "Good Reason." *See* Employment Agreement § 8(d)(ii) ("Provided the resignation is not for Good Reason, the Company shall have no further obligations to Executive."). Because Mr. Dean resigned without Good Reason, he is not entitled to Severance Pay under Section 8(h) of the Employment Agreement or the automatic vesting of his restricted stocks and options—*none* of which had vested at the time of Mr. Dean's resignation. Indeed, even the 400,000 shares that would have been awarded to Mr. Dean pursuant to his June 1, 2021 Award Agreement based on Core going public did not vest prior to Mr. Dean's resignation because those shares were subject to a contractual lock-up which was not lifted until March 10, 2022. June 1, 2021 Award Agreement, Attachment 1-D, § 2(a); *S. Cent. Jurisdictional Conf. of United Methodist Church v. S. Methodist Univ.*, No. 05-21-00151-CV, 2023 WL 4758676, at *15 (Tex. App. July 26, 2023) (collecting cases and stating "Texas courts have long held that a corporation's governing documents…are a contract…between the corporation on one side and individual members or shareholders on the other").

        **B.**      **Even if Mr. Dean Could State A Claim for Breach of the Employment Agreement, His Alleged Damages Are Speculative, and Subject to Reduction**

      29.    Mr. Dean's claim for $8,000,000 is premised on the assumptions that (i) all of the 84,171 stock options and 690,129 restricted shares of Core common stock that he asserts he is entitled to under his Award Agreements automatically vested on February 14, 2022—the date Core rejected his resignation for "Good Reason,"[5]  and (ii) the closing stock

---

[5] Mr. Dean asserts that 324,767 of these shares should have vested on January 19, 2022 on account of Core becoming a public reporting company, at a closing price of $9.60. Dean POCs ¶ 27, n. 5.

price of $9.89 on February 14, 2022 is the appropriate measure for the value of his claim. Both assumptions are wrong.

30. As explained above, Mr. Dean was not entitled to any shares or stock options under his Award Agreements because he resigned without Good Reason before any shares or options vested. In any event, even if Mr. Dean had any valid basis for claiming vesting rights, the closing stock price of $9.89 on January 19, 2022 or February 14, 2022 would not be appropriate for valuing Mr. Dean's alleged damages because multiple restrictions would have prevented Mr. Dean from selling any of his hypothetical shares until months later, at the earliest.

31. First the lock-up imposed in connection with the de-SPAC going public event prevented certain Core shareholders, which would have included Mr. Dean, from trading Core stock. In fact, that restriction was not waived until February 24, 2022, effective March 10, 2022. Thus, even if Mr. Dean claims to have had stock vested on January 19, 2022 when Core went public, he would not have been able to sell those shares until at least March 10, 2022, assuming those shares were not subject to further restrictions, which they were.

32. Moreover, following Core's de-SPAC transaction, it could not legally issue stock to employees as part of their benefits or incentive packages until after filing a Form S-8 Registration Statement with the Securities and Exchange Commission. Therefore, even if Mr. Dean was entitled to the shares he claims he was—which he was not—he could not have received those shares from Core prior to its Form S-8 filing on April 20, 2022. Accordingly, April 20, 2022 is the earliest Mr. Dean could have sold any of those shares, assuming he would have been able to fulfill any requirements from Fidelity and Core's Insider Trading Policy, and that he could have found a broker at that time.

33.     On April 20, 2022, Core's trading price was $7.18, significantly less than the $9.89 share price on February 14, 2022 that forms the basis of Mr. Dean's claim.  On this basis alone, even assuming all of Mr. Dean's stocks and options vested as he alleges, Mr. Dean's claim must be reduced based on the stock price on the date when Core's Form S-8 was filed and Mr. Dean actually could have received shares from Core.  Had Mr. Dean sold his shares later than April 20, 2022, they would have been worth even less, since the value of Core's stock continued to decrease during that time period.[6]  And, of course, if the date Mr. Dean could have sold the shares was even later, or if he could not have found a broker to sell his shares, the stock price was even lower.

34.     Furthermore, there is simply no reason to believe that in this counterfactual scenario that Mr. Dean would or could have sold all shares of Core common stock as soon as he received them, and Mr. Dean provides no basis for this assumption. Accordingly, even if Mr. Dean were entitled to any recovery, which he is not for all of the reasons stated herein, the amount of that recovery must account for the fact that his claim is not plausible and premised on speculation. These issues would be further explored and addressed during the claims resolution process and the contested matter related to the Dean POCs.

### C.     Mr. Dean's Claims for Quantum Meruit, Promissory Estoppel

35.     Mr. Dean asserts claims for quantum meruit and promissory estoppel in the alternative to his claim for breach of the Employment Agreement.  Those claims fail for the reasons set forth above.  Furthermore, Mr. Dean's claims for quantum meruit and promissory estoppel fail as a matter of law because there is a governing contract—Mr. Dean's Employment Agreement. Quantum meruit and promissory estoppel are equitable remedies, generally

---

[6] On April 21, 2022, Core's stock price was $6.59, and by May 1, 2022, the stock price had decreased to $5.98.

available only where there is no contract governing the dispute. *See In re Pearl Res. LLC*, 645 B.R. 530, 553 (Bankr. S.D. Tex. 2022); *see also Lombana v. AIG Am. Gen. Life Ins. Co.*, No. 01-12-00168-CV, 2014 WL 810858, at *8 (Tex. App. Feb. 27, 2014); *Vortt Expl. Co. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990) ("Generally, a party may recover under quantum meruit only when there is no express contract covering the services or materials furnished.").

### D.   Mr. Dean's Claim for Conversion Fails Because His Shares Never Vested

36.   Mr. Dean alleges that the shares and options awarded to him under the Award Agreements are his personal property, and that Core has intentionally and unlawfully converted Mr. Dean's personal property.  This claim likewise fails as a matter of law for the reasons stated above.  Mr. Dean alleges that prior to his resignation from Core, "the shares of restricted stock issued to Plaintiff were owned by Plaintiff through an account with Core's transfer agent."  Dean POCs ¶ 29, n. 6.  But for the reasons stated above, Mr. Dean never owned the shares and options he claims he is entitled to because they never vested before his resignation.  Nor can Mr. Dean reconcile his claim to ownership of the shares and options prior to his resignation with his own argument that the shares and options did not vest until February 14, 2022.  Accordingly, Mr. Dean's claim for conversion is meritless.

### E.   Mr. Dean's Claim for Fraudulent Inducement Fails as a Matter of Law

37.   There is no support for Mr. Dean's fraudulent inducement claim, as he has not identified any allegedly false statement or representation that could form the basis for a fraudulent inducement claim. *See, e.g. Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001)("[P]roof that a party relied to its detriment on an alleged misrepresentation is an essential element of a fraud claim."); *See also UV Logistics, LLC v. Patsfield*, No. 01-20-00191-CV,

2022 WL 963276, at *8 (Tex. App. Mar. 31, 2022); *Vanderbol v. State Farm Mut. Auto Ins. Co.*, No. 4:19-CV-119-SDJ-KPJ, 2020 WL 7327996, at *16 (E.D. Tex. Sept. 1, 2020). Dean POCs ¶¶ 49, 50.

38. Mr. Dean has failed to identify any specific alleged misrepresentation to support the heightened pleading standard of this claim. Under Texas law, fraud claims are improper and must be dismissed where, as here, they plead damages that simply rehash alleged breach of contract damages. *See Haase*, at 801.

39. Moreover, in the Employment Agreement, Mr. Dean expressly acknowledged that "[n]either party is relying on the other party's representations in entering into this Agreement," and that "[t]his Agreement supersedes and replaces all prior negotiations and/or agreements made between the parties or any third parties relating to the provision of Executive's services or any other matter, whether oral or written, and contains the entire understanding and agreement among the parties with respect thereto." Employment Agreement §§ 16, (c), (h). These acknowledgements preclude Mr. Dean's claim for fraudulent inducement. *See Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex. 1997).

40. At any rate, Mr. Dean does not assert any damages unique to his fraud in the inducement claim, as the total value of Mr. Dean's claim was based on the severance pay he claims he was entitled to under his Employment Agreement and the hypothetical sale of the number of shares he claims vested under his Award Agreements.

41. Accordingly, Mr. Dean's claim for fraudulent inducement fails as a matter of law.

### F. Mr. Dean is not Entitled to a Declaratory Judgment

42. Mr. Dean is not entitled to declaratory judgment because the declaratory relief Mr. Dean seeks is duplicative of his other claims. *See In re Trevino*, 615 B.R. 108, 144

(Bankr. S.D. Tex. 2020) ("dismissal of a declaratory judgment action is warranted where the declaratory relief plaintiff seeks is duplicative of other causes of action.").

43.     Dean seeks seven declarations, including (i) that the Employment Agreement and Award Agreements are valid; (ii) that he fully or substantially performed his obligations under both Agreements; (iii) that he resigned for "Good Reason" (iv) that he was terminated without cause; (v) that he is entitled to receive one year's salary and the value of his shares on the day that they vested; (vi) a declaration of each Defendant's liability; (vii) and a declaration that Mr. Dean is entitled to damages due to Core's breach of the Employment Agreement. Dean POCs ¶ 67.

44.     Any such declaratory relief would be duplicative of Mr. Dean's other claims, including his claim for breach of the Employment Agreement.  Accordingly, these claims fail as a matter of law.

### G.     Mr. Dean is not Entitled to Specific Performance or an Accounting.

45.     Specific performance is an equitable remedy, only available when available legal remedies cannot adequately provide the relief sought. *W & T Offshore, Inc. v. Bernhardt*, 946 F.3d 227, 240 (5th Cir. 2019).  As a threshold matter, Mr. Dean failed to assert that money damages would not be an adequate remedy, though specific performance is also not warranted because the other remedies sought by Mr. Dean, namely money damages, would be sufficient (if he were entitled to them).  *Stemmons Enter., L.L.C. v. Fisker, Inc.*, No. 4:22-CV-01487, 2023 WL 2652251, at *3 (S.D. Tex. Mar. 27, 2023), report and recommendation adopted, No. 4:22-CV-01487, 2023 WL 3261760 (S.D. Tex. May 3, 2023) (a plaintiff may not seek both monetary damages for breach of contract and specific performance of the contract). An accounting is inappropriate in this context for the same reasons. *See Watson v. Citimortgage, Inc.*, 814 F. Supp. 2d 726, 738 (E.D. Tex. 2011).

### H.      Mr. Dean is not Entitled to the Imposition of a Constructive Trust.

46.     Mr. Dean is not entitled to the imposition of a constructive trust because he cannot establish that Core obtained "his" shares through fraud or a breach of fiduciary duty. The imposition of a constructive trust requires a claimant to show that the defendant acquired the trust property through actual fraud or breach of a fiduciary duty. *Matter of Haber Oil Co., Inc.*, 12 F.3d 426, 437 (5th Cir. 1994).

47.     Here, Dean has not properly pleaded that Core obtained any of his shares through actual fraud. *See supra* ¶ 37; *see also Matter of Haber Oil Co., Inc.*, 12 F.3d at 437. Furthermore, Core did not owe a fiduciary duty to Mr. Dean. *See Gregan v. Kelly*, 355 S.W.3d 223, 227 (Tex. App. 2011). Accordingly, Mr. Dean's claim for the imposition of a constructive trust fail as a matter of law.

### VI.      Reservation of Rights

48.     This Objection is limited to the grounds stated herein and accordingly is without prejudice to the rights of the Debtors or any other party in interest to object to any claim, including any of Harlin Dean's claims, on any further grounds, and the Debtors expressly reserve all other substantive or procedural objections that they may have, including the right to seek to reclassify any portion of Mr. Dean's claim as a claim under section 510(b) of the Bankruptcy Code. Nothing contained herein is intended to be or shall be deemed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any appropriate party-in-interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Debtors' or any other party-in-interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, or (iv) an approval, adoption, assumption, or rejection of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.

## VII.    <u>Notice</u>

49.    Notice of this Objection will be provided to (i) any party that has requested notice pursuant to Bankruptcy Rule 2002, (ii) the affected claimant, and (iii) any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: September 19, 2023
Houston, Texas

/s/ Alfredo Pérez
WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:   (713) 546-5000
Facsimile:   (713) 224-9511
Email:        Alfredo.Perez @weil.com
-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock (admitted *pro hac vice*)
Ronit J. Berkovich (admitted *pro hac vice*)
Theodore E. Tsekerides (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:   (212) 310-8000
Facsimile:   (212) 310-8007
Email:        Ray.Schrock@weil.com
              Ronit.Berkovich@weil.com
              Theodore.Tsekerides@weil.com

*Counsel for Debtors and Debtors in Possession*

### Certificate of Service

I hereby certify that on September 19, 2023, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ Alfredo Pérez
WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:       Alfredo.Perez @weil.com