**Exhibit 4**

**The Bros Declaration**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| CORE SCIENTIFIC, INC., *et al.*, | § | Case No. 22-90341 (DRJ) |
| | § | |
| | § | (Jointly Administered) |
| Debtors.[1] | § | |
| | § | |

**DECLARATION OF MICHAEL BROS IN SUPPORT OF
DEBTORS' EMERGENCY MOTION FOR ORDER APPROVING (I)
GLOBAL SETTLEMENT BETWEEN DEBTORS AND CELSIUS, (II) SALE
OF CEDARVALE FACILITY AND RELATED ASSETS, (III) ENTRY INTO
AMENDED TNMP CONTRACT AND ASSUMPTION AND ASSIGNMENT
OF TRANSFERRED CONTRACTS AND (IV) GRANTING RELATED RELIEF**

I, Michael Bros, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1. I am the Senior Vice President of Capital Markets & Acquisitions at Core Scientific Operating Company f/k/a Core Scientific, Inc. ("**Core**", and together with its above-captioned debtor affiliates, the "**Debtors**"). I have served in this capacity since January 2022. Before that, starting in December 2018, I was Core's Vice President of Corporate Development. Prior to joining Core, I held various positions at Kayne Anderson from 2014 to 2018 and Merrill Lynch from 2011 to 2014. I hold a Bachelor of Arts from the University of Saint Thomas and a

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6074); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

WEIL:\99239327\8\39031.0011

Master in Business Administration from the University of California, Los Angeles Anderson School of Management.

2. I make this declaration in support of the *Debtors' Emergency Motion for Order Approving (I) Global Settlement Between Debtors and Celsius, (II) Sale of Cedarvale Facility and Related Assets, (III) Entry into Amended TNMP Contract and Assumption and Assignment of the Transferred Contracts and (IV) Granting Related Relief* (the "**Motion**").[2] Except as otherwise indicated herein, all facts and personal opinion set forth in this declaration (the "**Declaration**") are based on my experience and personal knowledge of the Debtors, their operations and finances, discussion with potential buyers, and information learned during the course of my employment. I have also reviewed relevant documents and have received information from conversations with the Debtors' management team, the Debtors' advisors, or employees of the Debtors working directly with me or under my supervision, direction, or control. If called upon to testify, I could and would competently testify to the facts and personal opinions set forth in this Declaration on that basis.

3. I am familiar with the Cedarvale Facility (defined below) and the Previous Marketing Process (defined below) and believe that the Previous Marketing Process was a comprehensive sale process and that the sale of the Purchased Assets (as defined in the Motion) to Celsius Mining LLC and certain of its affiliates (collectively, "**Celsius**") under that certain Purchase and Sale Agreement, dated as September 14, 2023 and the contemplated settlement between the Debtors and Celsius (the "**Celsius Settlement**") is in the best interest of the Debtors and their estates. I further believe that the sale of the Purchased Assets under the Celsius

---

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

Settlement is the best transaction available for the Debtors and therefore maximizes value for the Debtors and their estates.

### Previous Marketing Process

4. Prior to the Petition Date, as the Debtors were identifying potential means to improve liquidity to avoid a chapter 11 filing, the Debtors began an informal but robust marketing process for several non-core facilities that the Debtors either own or lease. Specifically, the Debtors began marketing the bitcoin mining facility in development located in Muskogee, Oklahoma (the "**Muskogee Facility**") and reached out to several well-known participants in the bitcoin mining industry, including both U.S.-based and international strategic investors and financial investors. As discussions progressed, certain potential purchasers also began showing interest in the bitcoin mining facility located in Ward County, Texas (the "**Cedarvale Facility**") and the bitcoin mining facility located in Pecos, Texas (the "**Cottonwood Facility**", and collectively with the Muskogee Facility and the Cedarvale Facility, the "**Sale Facilities**").

5. As part of evaluating capital structure alternatives, the Debtors and their advisors engaged in discussions regarding potential transactions. The Debtors ultimately determined that some or all of the Sale Facilities may not be essential to the Debtors' go-forward business plan because (i) the Sale Facilities would require a material amount of additional capital expenditure in order to become fully operational and (ii) the Debtors had identified low-cost, high-reward opportunities to further develop existing infrastructure. The Debtors believed that they may both improve their near-term liquidity and maximize long-term value by selling the Sale Facilities.

6. To implement this strategy, the Debtors and their advisors designed a process to solicit interests for the Sale Facilities both as a combined package and on an individual basis. Beginning in October 2022, the Debtors commenced a formal marketing process to sell the

Sale Facilities along with certain equipment located at the Sale Facilities (the "**Previous Marketing Process**").  The Debtors and their advisors contacted a broad array of parties that were expected to have an interest and the ability to consummate the purchase of the Sale Facilities on terms acceptable to the Debtors.  Over the course of the next several months, the Debtors and their advisors contacted a total of forty-six (46) parties who might be interested in one or more of the Sale Facilities, including the Cedarvale Facility.

7. In connection with this solicitation, the Debtors and their advisors prepared, among other things, marketing materials and an electronic data room to provide potential investors and bidders with information upon which to make a proposal.  During this process, twenty-six (26) parties who were interested in one or more of the Sale Facilities executed non-disclosure agreements and twenty-three (23) parties were granted access to the electronic data room, which contained significant diligence and other confidential information about the Sale Facilities.  The interested parties were invited to submit an indication of interest and/or a formal written letter of intent to act as a stalking horse bidder for the sale of the Sale Facilities.

8. Specifically for the Cedarvale Facility, after the Debtors received indications of interests (the "**IOIs**", and such parties that submitted the IOIs, the "**Potential Purchasers**"), the Debtors and their advisors evaluated the IOIs and analyzed, among other considerations: (i) the structure of the proposed transaction; (ii) the amount of consideration offered; (iii) the assets to be acquired and liabilities to be assumed; (iv) the Potential Purchasers' ability to fund the purchase, and (iv) execution or other risks.  The Debtors also shared the IOIs with the Debtors' major stakeholders, including the lenders under the debtor-in-possession financing facility, advisors to an ad hoc group of the Debtors' convertible notes, and advisors to the official committee of unsecured creditors.  Ultimately, following discussions with the Potential Purchasers, the Debtors determined that either (i) the received IOIs were of insufficient value

and/or (ii) the Potential Purchasers did not have sufficient funds to complete the purchase, which the Debtors and their Advisors relayed to the Potential Purchasers who submitted IOIs for the Cedarvale Facility. While the Debtors decided to include the Cottonwood Facility in their go-forward business plan, they remained open to any offers that would provide them sufficient value for the Cedarvale Facility and/or the Muskogee Facility. Prospective bidders, including Celsius, have continued to express interest and stay engaged, which eventually led to the opportunity to sell the Cedarvale Facility and other Purchased Assets to Celsius as part of the Celsius Settlement.

9. In light of the foregoing, I believe the Previous Marketing Process was a comprehensive sale process for the Sale Facilities, including the Cedarvale Facility. Even though the Debtors did not receive an acceptable offer for the Cedarvale Facility under the Previous Marketing Process, I believe the comprehensive Previous Marketing Process and the IOIs received thereunder confirms that the consideration received by the Debtors for the Cedarvale Facility and related assets under the Celsius Settlement (which includes $14 million in cash and release of substantial claims against the Debtors and their estates) is the best transaction available to sell the Cedarvale Facility.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: September 15, 2023
Bellevue, Washington

        Respectfully submitted,

        By: */s/ Michael Bros*
           Michael Bros
           Senior Vice President of Capital Markets &
           Acquisitions