WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
David J. Lender
Ronit J. Berkovich
Theodore E. Tsekerides

*Counsel to Core Scientific, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------x
In re                                    :    Chapter 11
                                         :
CELSIUS NETWORK LLC, et al.,             :    Case No. 22-10964 (MG)
                                         :
           Debtors.¹                     :    (Jointly Administered)
-----------------------------------------------------------x
```

### CORE SCIENTIFIC, INC.'S OBJECTION TO DEBTORS' MOTION TO ENFORCE THE AUTOMATIC STAY AND FOR CIVIL CONTEMPT

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

# TABLE OF CONTENTS

Page

**PRELIMINARY STATEMENT** ................................................................................1

**FACTUAL BACKGROUND** ..................................................................................5

A.    Core Agrees to Provide Specific Hosting Services—Not to Insure against the Risk of Rising Electricity Costs ..........................................................5

B.    Core's Variable Payment Structure ........................................................7

C.    Over the Years, Core Rigorously Deploys Celsius's Machines ...............8

D.    Celsius Pays Increased Electricity Costs prior to Bankruptcy................11

E.    Electricity Costs Spike, Causing Core to Pass Through Increased Tariffs to All Its Customers ..........................................................................12

F.    Core Never Threatened to Terminate the MSA—Though It Does Have a Termination Right ............................................................................13

G.    Core Did Not Have Additional Hosting Availability ...............................15

H.    Core's Ongoing Losses Stemming from Celsius ....................................16

**ARGUMENT** ................................................................................................17

**I.    EVEN IF A BREACH OF CONTRACT CLAIM COULD BE AN AUTOMATIC STAY VIOLATION, CORE DID NOT BREACH THE AGREEMENT** ............................................................................................18

A.    Core's Pass-Through of Increased Electricity Tariffs Comports with the MSA, Industry Usage, Commercial Context, and the Course of Dealing ............18

B.    Core Did Not Unjustifiably Delay Deployment of Celsius's Machines................22

C.    Core Did Not Breach the "Notification of Hosting Availability" Provision, But Even If It Did, Celsius Has Suffered No Harm................................26

**II.   CORE DID NOT VIOLATE THE AUTOMATIC STAY** .........................................29

A.    Core Did Not Violate the Automatic Stay Because It Acted on Its Reasonable Interpretation of the Contract ....................................................29

B.    Core Did Not Exercise Control over the Debtors' Property, Thus Section 362(a)(3) of the Bankruptcy Code Is Not Implicated ............................30

(i)    *Stay Violation under Section 362(a)(3) Requires That a Counterparty "Exercise Control" Over Estate Property* .........................30

(ii)   *Core Did Not "Exercise Control" over Celsius's Property* ....................32

**Debtors' Exhibit No. 4**
**Page 2 of 44**

**III.** **THE DEBTORS' OTHER ARGUMENTS THAT CORE VIOLATED THE AUTOMATIC STAY ALL FAIL** ........................................................................33

    A.    Core Properly Charging the Postpetition PPT Charges and Mistakenly Including Prepetition Amounts in Postpetition Invoices Does Not Violate the Automatic Stay................................................................................33

    B.    Neither Core's Automated Emails Nor Conversations with Celsius Constitute Stay Violations ..................................................................35

**IV.** **EVEN IF THE COURT WERE TO FIND THAT CORE VIOLATED THE STAY, CONTEMPT IS INAPPROPRIATE**................................................36

**CONCLUSION** ........................................................................................................40

**Debtors' Exhibit No. 4**
**Page 3 of 44**

Core Scientific, Inc. ("**Core**"), by and through its undersigned counsel, hereby files this objection (the "**Objection**") to the *Debtors' Motion to Enforce the Automatic Stay and for Civil Contempt* (D.E. 917) (the "**Contempt Motion**") and respectfully states as follows:

## PRELIMINARY STATEMENT

1.      As Core will show using record evidence in opposition to the Contempt Motion and in support of Core's separately requested affirmative relief, the Contempt Motion is a desperate attempt—in the midst of what appears to be a very challenging chapter 11 process that is far from the Debtors' hoped-for outcome in these cases—to use the Debtors' bankruptcy case as a sword to rewrite a hosting contract between Core and Celsius Mining LLC ("**Celsius**") and in the process attempt to foist millions of dollars of increased power costs onto Core's balance sheet instead of their own.  Celsius's attempt is contrary to the contract, the parties' course of conduct, and the contractual relationship Core has had with virtually every other customer.  Quite simply, Core did not violate the stay—it is Celsius that has breached and is breaching the contract.  Celsius either needs to adhere to the contract, or Core and Celsius must terminate their relationship before Celsius causes yet another business partner to enter insolvency proceedings.

2.      The Debtors' postpetition interpretation of the contract—that unlike virtually every other Core customer, Celsius did not have to pay the increased tariffs charged by utilities—is unsupported by the plain language of the contract, the general industry understanding of the contract's terms, and how arrangements between data hosting companies and cryptocurrency miners work.  It is also contravened by Celsius's prepetition course of conduct, in which Celsius has willingly paid these increased power costs (the "**PPT Charges**") without objection.

3.      The Contempt Motion also claims that Core delayed its implementation of Celsius's machines and threatened to terminate the contract.  Not so.  Here, the Lawlor Declaration (D.E. 918) omits critical facts—that Celsius knew all about at the time—which explain the external

1

causes for delays in deployment.  And, in any event, it is undisputed that every machine delivered by Celsius so far has been deployed.  As for the claimed threat, Jeffrey Pratt, who was at the meeting from Core, explains in his declaration that no such threat was ever made.

4.  The Contempt Motion also claims that Core failed to offer additional hosting availability to Celsius.  Here again, Celsius is wrong—Core had no "additional hosting availability" to offer Celsius, as that term is used in the contract.  Nor has Celsius been harmed by any alleged failure to notify Celsius of purported additional hosting availability.

5.  In the end, the Contempt Motion is an aggressive step taken by Debtors facing dropping Bitcoin prices and increasing natural gas prices, looking for a way to have someone else pay for the losses sustained by their investors.  But there is simply no basis under the contract or at equity to force Core to subsidize the Debtors' unprofitable business.

6.  Even if Core were not performing its obligations under the contract (though it is), such inaction would not constitute an attempt to "exercise control over property of the estate" in violation of the automatic stay.  11 U.S.C. § 362(a)(3).  The Contempt Motion cites older cases to suggest otherwise, while ignoring a recent, on-point U.S. Supreme Court case stating unequivocally that an "affirmative act" is required to implicate section 362(a)(3) of the Bankruptcy Code.  *City of Chicago v. Fulton*, 141 S. Ct. 585, 590 (2021) ("*Fulton*").  Mere non-compliance with an obligation is insufficient.  Celsius has no answer to this.

7.  One need look no further than the form of relief the Debtors are seeking to recognize their desperate ploy.  Rather than filing an adversary proceeding on what is essentially a breach of contract claim, the Debtors instead filed a motion for contempt based on an alleged automatic stay violation.  The reason, though not apparent from the face of the Contempt Motion, is that the Debtors are attempting to use bankruptcy doctrines to rewrite the contract.  Of particular

2

importance, the contract effectively provides Core the right to terminate it for any reason whatsoever by limiting Core's liability for any damages to one month's fee:

> Notwithstanding anything to the contrary in this Agreement, [Core]'s total liability to [Celsius] in the aggregate for the entire term … with respect to all claims arising from or related to the subject matter of this Agreement … will not exceed an amount equal to one (1) months [sic] fee payable to [Core] pursuant to the applicable Order.

Pratt Decl. Ex. A (Master Services Agreement) § 5.d (the "**MSA**" or, together with Order #10, as amended,[2] and prior Orders, the "**Agreement**").  The MSA also eliminates Core's liability for Celsius's lost profits, loss of business, loss of revenues, any consequential or indirect damages, any punitive damages, and the like.  MSA § 5.c.  Thus, Celsius takes the aggressive position that Core should be held in *civil contempt* for violating the automatic stay for nonperformance, in order to try to use the happenstance of bankruptcy to tag Core with uncapped damages—Celsius's mining losses, lost profits, etc.—in contravention of the parties' prepetition contract.

8.     Along with making baseless factual allegations of breach, the Contempt Motion grounds its theory of relief (contempt) on a single case, *Windstream Holdings*, where a bankruptcy court found a contract counterparty in contempt for violating the automatic stay by taking actions that impacted the debtors' customers.  Contempt Motion ¶ 54 (citing *In re Windstream Holdings, Inc.*, 627 B.R. 32, 47, 49 (Bankr. S.D.N.Y. 2021) ("*Windstream I*")).

9.     Unfortunately for the Debtors, *Windstream I* is not only distinguishable on the facts, as discussed below, but the case was recently *reversed on appeal*.  *Windstream Holdings, Inc. v. Charter Commc'ns Inc. (In re Windstream Holdings, Inc.)*, No. 21-CV-4552 (CS), 2022 WL 5245633 (S.D.N.Y. Oct. 6, 2022) ("*Windstream II*").  The District Court held that for a court to find a party in civil contempt for a stay violation against a corporate debtor, the movant must

---

[2] *See* Pratt Decl. Ex. C (December 20, 2021 First Amendment to MSA Order #10).

**Debtors' Exhibit No. 4**
**Page 6 of 44**

satisfy the high *Taggart* standard, *i.e.* that contempt is unavailable where the stay violation is a close call.  Even if the allegations in the Contempt Motion were true (they are not), they do not rise to the level of conduct needed for a court to invoke the serious remedy of civil contempt.

10.     The Debtors' attempt to rewrite the parties' Agreement, including their effort to eliminate the limitation of liability provisions and shift to Core the increased cost of electricity they agreed to pay, is contrary to doctrines establishing that a debtor does not gain additional rights under a contract simply by filing for bankruptcy.  *See Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1663 (2019) ("[I]f the not-yet debtor was subject to a counterparty's contractual right …, so too is the trustee or debtor once the bankruptcy petition has been filed.").

11.     Indeed, *Celsius* is the party breaching the Agreement by refusing to pay Core all amounts due and owing under the Agreement, including for postpetition power costs.  The Debtors have no right under the Agreement to refuse to pay the PPT Charges, even if disputed.  Despite Core's clear contractual right, if Celsius fails to pay, to cease providing services or exercise self-help from Celsius's machines by using them for itself to remedy its losses, Core instead has continued providing postpetition services to Celsius for months, effectively bankrolling the Debtors' failing business to Core's own detriment.  This is unsustainable.  Core needs this issue resolved promptly.  To put it bluntly, making Core continue to pay for Celsius's increased power costs and depriving Core of its contractual right to end its business arrangement with Celsius when it so chooses will force Core to consider its own strategic options, as its business model is not based on having to pay its customers' increased electricity costs, and it cannot afford to do so.

12.     As a result of the precarious position in which Celsius's actions have put Core, contemporaneously with this Objection, Core is filing a motion seeking affirmative relief to ensure that it is not unduly prejudiced as a result of Celsius's chapter 11 case.  First, Core is filing a motion

**Debtors' Exhibit No. 4
Page 7 of 44**

for immediate payment of its administrative expense claims, particularly the over $1 million in postpetition PPT Charges Celsius has refused to pay.  Second, Core is filing a motion to lift the stay (or confirmation that the stay does not apply) to exercise its termination right, pursue remedies under the Agreement, and/or cease performing under the Agreement and cap any damages at one month of fees pursuant to Section 5.d of the MSA.  In the alternative, Core seeks an order compelling Celsius to assume or reject the Agreement as soon as possible.

13.     Importantly, *Core requests that the Court rule on the disputed contract interpretation issues as quickly as possible*, so that Core can consider its options, consistent with its fiduciary duties to its own stakeholders, rather than being kept in limbo regarding whether it needs to continue covering millions of dollars of Celsius's costs.  Once again, U.S. Supreme Court precedent rejects any contention that Celsius can continue to receive benefits under the Agreement while not paying for those benefits.  *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984) ("If the debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services.").

## **FACTUAL BACKGROUND**

### A.     **Core Agrees to Provide Specific Hosting Services—Not to Insure against the Risk of Rising Electricity Costs**

14.     On December 18, 2020, Core agreed to provide certain services to Celsius in connection with hosting Celsius's cryptocurrency mining machines, which work to create (or "mine") new cryptocurrency.  MSA § 1.a; Mares Decl. ¶ 14; Pratt Decl. ¶ 4.[3]  These mining machines are powerful computers that solve complex equations associated with the use and

---

[3] Core has since executed various Orders with Celsius regarding tranches of machines for Core to host, the latest of which is Order #10 (executed on September 27, 2021).  *See* Pratt Decl. Ex B.

**Debtors' Exhibit No. 4**
**Page 8 of 44**

creation of cryptocurrency coins.  Mares Decl. ¶¶ 12-15.  Hosting such machines, as Core does, involves industrial-scale power delivery and cooling systems, trained personnel, and specialized equipment.  *Id.* ¶¶ 16-17, 23.  Thus, cryptocurrency mining firms like Celsius often use hosting providers like Core to scale their capacity.  *Id.* ¶¶ 16-17, 30.

15.      Cryptocurrency mining machines consume vast quantities of electricity.  Pratt Decl. ¶ 5; Mares Decl. ¶ 16 (industry expert explaining that large mining facilities can consume more power than entire cities).  Increases in the cost of electricity therefore present a significant financial risk for mining firms like Celsius.

16.      The MSA explicitly gives Core the "sole and absolute discretion" to pass through to Celsius "any increases, changes in … tariffs … with respect to the provision of Services."  MSA § 4.f.  If Core decides to pass through any increased tariffs, the MSA requires that Celsius "shall pay all Increased Costs."  *Id.*  Section 4.f of the MSA, which is incorporated by reference into Order #10 with Celsius, is a standard clause that Core included in its service agreements with all its customers.  Xia Decl. ¶¶ 3, 5; Pratt Decl. ¶ 8.

17.      "Tariffs," as used in Section 4.f, include the rates charged by electric utilities to their customers.  Xia Decl. ¶ 4; Pratt Decl. ¶¶ 8, 44-45; Mares Decl. ¶¶ 19-20, 24-29. These tariffs are comprised of multiple elements, such as fees for maintaining the utility's infrastructure and repaying debt, variable rates based on what time of day or season the electricity was consumed, and demand charges.  Mares Decl. ¶ 20.  One element of an electric utility tariff that accounts for fuel prices is a "Fuel Cost Adjustment," which automatically adjusts based on fluctuations in the prevailing price of the fuel(s) burned by the utility's power plants.  *Id.*; *see also* Pratt Decl. ¶ 44. This is shown by the rate tariff published by the Tennessee Valley Authority, which explicitly includes a fuel cost adjustment as part of its rate formula.  Pratt Decl. ¶ 44.

**Debtors' Exhibit No. 4**
**Page 9 of 44**

18.     In addition to the plain meaning of "tariff" as used in the MSA, industry usage shows that this term includes utility rates.  Xia Decl. ¶ 4 (confirming this understanding); Pratt Decl. ¶¶ 8, 44-45 (same); *see also* Mares Decl. ¶¶ 24-29 (expert testifying that tariffs include fuel adjustments and that pass-through of increased power tariffs is consistent with industry practices).

19.     Electricity is by far the largest cost for cryptocurrency mining infrastructure providers like Core, typically comprising 60-75% of total operating costs.  Mares Decl. ¶ 18.  Thus, it is standard practice for hosting firms like Core to pass through electricity price increases to customers.  *Id.* ¶¶ 24-29; *see also* Pratt Decl. ¶ 8 (explaining that this is a "cornerstone of Core's business model").  Fixed-rate service agreements without an option to pass through increased electricity costs would not make business sense.  *See* Pratt Decl. ¶ 8.

**B.    Core's Variable Payment Structure**

20.     Contrary to Celsius's unsupported assertion that Core agreed to a "fixed rate" for its services (Lawlor Decl., D.E. 918 at ¶ 7), Order #10 provides that Core's fees:

> will be determined ***initially*** by reference to the Assumed power consumption per Unit of each deployed Unit, multiplied by the Hosting-Services Rate (each as set forth above in this Order).  ***Subsequent invoices will contain any additional charges incurred by [Celsius] and adjustments*** resulting from any differences between the Fees for Services invoiced in the preceding month and the Fee for Services based on [Core's] determination of power utilized by [Celsius] during that month, as well as any adjustments to [Core's] estimate of power to be utilized by [Celsius] in the upcoming month.

Order #10 (Pratt Decl. Ex. B), page 4 (emphasis added).[4]

21.     That is, Order #10 specifically contemplates adjustment of Core's initially estimated fees to account for "additional charges" such as the increased tariffs in Section 4.f.  *Id.*

---

[4] This is a good example of how Mr. Lawlor omitted key facts to support Celsius's motion.  Although Mr. Lawlor quotes this section, he omitted the bold and italicized language.  *See* Lawlor Decl., D.E. 918 at ¶ 7.

**Debtors' Exhibit No. 4**
**Page 10 of 44**

22.     What's more, Celsius routinely discussed power pricing with Core.  Pratt Decl. ¶¶ 46-47.  This would be irrelevant if Celsius paid a fixed rate, as it now contends.  *Id.*

23.     Order #10 also sets out a prepayment schedule, whereby certain payments are due from Celsius before its machines are deployed.  *See* Order #10, pages 1-3.[5]

24.     Core does not receive any of the cryptocurrency coins mined by Celsius's machines or share in any appreciation of such coins.  Pratt Decl. ¶ 15.

**C.     Over the Years, Core Rigorously Deploys Celsius's Machines**

25.     Once Celsius delivers a cryptocurrency mining machine to Core, Core goes through a process to "deploy" that machine, *i.e.* render it operational.  Pratt Decl. ¶ 6.  To deploy a cryptocurrency mining machine, Core must, among other things: (i) provide installation racks; (ii) make power and network connections; (iii) ensure adequate airflow and cooling systems to dissipate the large amount of heat these machines generate; and (iv) secure industrial-scale power supply from the utility.  Pratt Decl. ¶ 6; *see also* Mares Decl. ¶¶ 12-17, 23.

26.     As of today, Core has deployed all machines that Celsius has delivered, including 10,885 machines under Order #10 and 26,655 machines total.  Pratt Decl. ¶¶ 12, 35.

27.     While Celsius now claims that Core unreasonably delayed deployment of some machines, that is not accurate.  The "Deployment Month" listed in Order #10 simply indicates when Celsius was expected to deliver its machines to Core for deployment.  Pratt Decl. ¶¶ 13-14, 16, 19; *see also* MSA § 2.b ("Client shall be fully responsible for delivering all Client Equipment to [Core] at a specified Company Facility on or before the applicable scheduled delivery date, each as specified in an Order."); Order #10, page 1.

---

[5] If Celsius does not timely make payments, "Interest shall be charged on past due amounts at the lesser of (A) one and a half percent (1.5%) per month; or (B) the highest rate permitted by applicable law."  MSA § 3.a.

8

**Debtors' Exhibit No. 4**
**Page 11 of 44**

28.     Core's rights regarding deployment are set forth in Section 2.b of the MSA—it "has
the right to review and the sole right to approve any … installation [of Celsius's equipment at its
facility]." It is in Core's interest to deploy customer machines, because Core earns hosting services
fees based on the actual operation of customer machines.

29.     When Celsius entered Order #10, Core discussed with Celsius that it had limited
hosting availability, was just beginning to construct additional facilities, and needed to deploy
numerous machines of its own that it had already purchased. Pratt Decl. ¶¶ 16-17, 36. Despite the
significant challenges discussed below, Core diligently deployed Celsius's machines. *Id.* ¶ 16; *see
also* Mares Decl. ¶ 23 (expert discussing disruptions to the cryptocurrency mining industry caused
by COVID-19, including labor shortages, supply chain issues, and health restrictions). Core also
kept in regular communication with Celsius regarding the challenges it faced in deployment. Pratt
Decl. ¶¶ 18, 34 & Exs. D, O-Q. It is surprising that Celsius could argue Core delayed deployment
of its machines while omitting the reasons for any delays, which it knew about at the time. Each
of the three tranches delivered by Celsius is discussed below.

30.     *First tranche of machines.* The first machine delivery date in Order #10 was
September 2021. Pratt Decl. ¶ 20. First, Celsius did not meet that date, but rather delivered the
machines beginning in late November 2021. *Id.* Second, there was a COVID-19 outbreak as well
as a severe winter storm at the facility where machines in this tranche were to be deployed, which
unavoidably impacted deployment. *Id.* ¶ 24. Third, Celsius delivered several types of machines
that Core had never installed before, which caused additional delays as Core had to learn how to
deploy these machines. *Id.* ¶ 21 & Ex. E. Fourth, there were significant supply chain delays
affecting parts and materials necessary for machine deployment. Pratt Decl. ¶ 23 & Exs. F-I.
Finally, there was a delay associated with receiving a governmental certificate of occupancy at the

facility. *Id.* ¶ 25. Despite all these issues, Core began deploying the machines in early December 2021, and Core completed deployment in late January 2022. *Id.* ¶¶ 22, 26.

31. *Second tranche of machines.* The second delivery date was March 2022. Pratt Decl. ¶ 27. Because of the issues with the first tranche, Celsius delivered lower-power machines in its second tranche. *Id.* In order to accommodate Celsius and meet the total power level in Order #10, Core agreed to deploy more machines than specified, taking up additional space at its facility. *Id.* Core experienced construction delays in completing the relevant facility due to supply chain disruptions (which affected its ability to procure steel, network equipment, and electrical equipment) and an extended timeline to obtain building permits. Pratt Decl. ¶ 28 & Ex. J. As a result, Core was not able to deploy these machines until July 2022. Pratt Decl. ¶ 28.

32. Celsius claims that after the second tranche of machines was deployed, "between July 21, 2022, and September 16, 2022, Core Scientific had the March rigs online for a total of approximately eight days." Lawlor Decl., D.E. 918 at ¶ 14. But Celsius omits the reason for this, which it knew at the time. Pratt Decl. ¶ 29. Shortly after deploying these machines, forty power transformers at the relevant facility experienced critical failures. *Id.* This caused unexpected downtime for these machines until the transformers could be replaced. *Id.* The facility was brought back online by September 16, 2022. *Id.*

33. *Third tranche of machines.* The third delivery date was April 2022, but Celsius did not deliver those machines until June 2022. Pratt Decl. ¶ 30. Deployment was delayed by a regulatory change on March 25, 2022, which prevented the relevant utility from supplying the quantity of power it had previously agreed to provide Core. *Id.* ¶ 31 & Exs. L-M. This, in turn, prevented Core from fully energizing two of its brand-new facilities. *Id.* Core continued to diligently pursue power for the facilities and remained in regular contact with the utility. *Id.* ¶¶ 32-

10

33 & Ex. N.  Core's efforts resulted in the utility supplying at least some of the originally anticipated power.  *Id.* at ¶ 33.  Celsius's machines were deployed by October 6, 2022.  *Id.*

### D.    Celsius Pays Increased Electricity Costs

34.    Celsius has repeatedly paid increased electricity costs as required by the MSA without objection.  Xia Decl. ¶ 7.  Celsius only objected to paying increased tariffs after filing for bankruptcy.  *Id.*

35.    *First*, Celsius paid an increased tariff related to utility curtailment in 2020-2021.[6] Xia Decl. ¶¶ 8-10.  In October 2021, Core notified Celsius that due to curtailment, the tariffs charged by utilities would increase.  *Id.* ¶ 8.  Core turned off the machines of its customers, including Celsius, but offered each of its customers to turn the machines back on if they paid the increased tariffs from curtailment.  *Id.*  On October 6, 2021, Celsius confirmed that it would pay these increased utility tariffs.  *Id.* ¶ 8 & Ex. A.

36.    Core invoiced Celsius for these increased utility tariffs monthly between October 2021 and April 2022.  Xia Decl. ¶ 9 & Ex. B.  The cover email indicated that Core was passing through "increased power costs."  *Id.* ¶ 10.  Without objection, Celsius paid these invoices in full— including the increased power costs.  *Id.*

37.    On November 20, 2021, Celsius's Chief Operating Officer, Patrick Holert, inquired about the increased charge in October 2021.  Xia Decl. ¶ 11 & Ex. C.  Core again explained that it was "due to increased power fees."  *Id.*  Mr. Holert responded, "Thanks Monica.  This makes sense."  *Id.*; *see also* Pratt Decl. ¶ 47 & Ex. Y.

---

[6] Curtailment occurs when demand for electricity exceeds available supply and a utility directs energy users like Core to use less power or choose instead to pay higher energy tariffs.  Mares Decl. ¶ 21; *see also* Xia Decl. ¶ 8.

**Debtors' Exhibit No. 4**
**Page 14 of 44**

38.     *Second*, prior to and in the months after its bankruptcy, Celsius also paid increased utility tariffs related to increased fuel costs—the same costs at issue here.  Xia Decl. ¶ 12.  On June 17, 2022, Core invoiced Celsius for May hosting services.  *Id.* ¶ 15 & Ex. D.  The cover email clearly indicated, "Core Scientific has incurred continuing significant tariff increases since the implementation of our Master Services Agreement – Core Scientific has been notified by its electrical utility suppliers of significant tariff increases due to rising fuel costs.  As an Increased Cost under the Master Services Agreement (Section 4f), Core will be passing through such tariff increases without markup."  *Id.*  The invoice included $440,179.34 for increased tariffs.  Xia Decl. ¶ 16 & Ex. E.

39.     Celsius paid that invoice too, including the increased utility tariffs, without objection on June 27, 2022.  Xia Decl. ¶ 17 & Ex. F.  Celsius also initially paid postpetition PPT Charges invoiced in August 2022, as discussed below.

### E.     Electricity Costs Spike, Causing Core to Pass Through Increased Tariffs to All Its Customers

40.     Beginning in spring 2022, fossil fuel prices—especially natural gas prices—increased due to Russia's invasion of Ukraine and increasing fuel usage in many countries.  This sharp uptrend continued such that by August 2022, the fuel cost adjustment rate components set by Murphy Electric and the Tennessee Valley Authority (relevant utilities) were both about *three times higher* than when the MSA was executed in December 2020.  *See* Xia Decl. Ex. H.

41.     While Core had previously decided not to exercise its discretion to pass through minor increases in electricity tariffs, this major, sudden increase in tariffs was too great for Core to absorb.  Xia Decl. ¶ 14.  As a result, in June 2022 Core exercised its unequivocal right under its customer agreements—including the MSA with Celsius—to pass through these increased tariffs.  *Id.* ¶¶ 13-14; *see also* Pratt Decl. ¶ 48.

**Debtors' Exhibit No. 4**
**Page 15 of 44**

42.    Core issued the first affected invoice in June 2022. *See supra* ¶¶ 38-39. Celsius did not object and paid the June 2022 invoice, including the PPT Charge, in full. *See id.*

43.    Celsius also initially paid $598,743.20 of postpetition PPT Charges invoiced in August 2022. Xia Decl. ¶ 18 & Ex. G. The next month, however, Celsius offset this payment as a credit against payment then due under the September 2022 invoice. *Id.* at ¶ 18 & Ex. H. Celsius did not pay any prepetition PPT Charges invoiced postpetition. *Id.* at ¶ 18.

44.    All but one of Core's 33 other cryptocurrency mining customers paid the increased electricity tariffs, which were due under substantially similar contracts. Xia Decl. ¶ 19. The one exception was a very small customer with only 60 units, where Core had previously notified that it was ending its relationship with that customer. *Id.* Core did not agree to provide continued services without payment of increased tariffs—as Celsius now demands—to any of its customers.

### F.    Core Never Threatened to Terminate the MSA—Though It Does Have a Termination Right

45.    Core has not threatened to terminate the MSA, either through the automated email or the phone call cited by Celsius.

46.    Since November 2020, Core has used an accounting system called NetSuite to automatically send form emails to its customers regarding payment. Xia Decl. ¶ 20. Core automatically sends such emails to customers at various points before a payment is due, and, if the payment is missed, at various points after as well. *Id.* These emails serve as payment reminders to customers and facially do not purport to terminate any agreement. *See id.* & Ex. J (examples).

47.    Core sent Celsius NetSuite automated emails regarding past-due payments long before Celsius filed for bankruptcy. For example, Core sent Celsius at least four prepetition emails regarding three-day-overdue invoices, which are dated between October 3, 2021 and June 23,

13

2022.  Xia Decl. ¶ 21 & Ex. K.  Celsius never contended that any of these prepetition emails constituted threats to terminate the MSA—though they are the same type it now complains of.  *Id.*

48.      On August 29, 2022, a NetSuite automated email was sent to Celsius, reminding it of a three-day-overdue invoice.  Xia Decl. ¶ 21 & Ex. J.  Like its predecessors mentioned above, this form email stated, "We remind you of the following penalties for non-payment," and then listed rights and remedies under the MSA—without purporting to exercise any.  Xia Decl. Ex. J.

49.      Core subsequently disabled the NetSuite automated payment reminder system as to Celsius on September 12, 2022.  Xia Decl. ¶ 22.[7]  Core also disclaimed that this email indicated any intent to terminate the MSA, a point that Celsius concedes.  *See* Contempt Motion ¶ 25.

50.      Celsius also cites a call on August 22, 2022, during which it alleges that "a representative for Core Scientific stated that no new deployments would go forward until Celsius caught up on its payments."  Contempt Motion ¶ 25; *see also id.* ¶ 46.  In fact, Mr. Pratt—who was the Core representative on the call—simply said that Core would not deploy new machines until Celsius paid its outstanding balance on *post*-petition amounts.  Pratt Decl. ¶ 49.

51.      Notwithstanding that Core has not threatened to exercise its termination right, it does have such a right.

   a.   Section 4(d) of the MSA provides:  "[I]f [Celsius] fails to pay all invoiced amounts when due (an 'Unpaid Balance') … after opportunity to cure as provided in Section 4b above[8] Company may, in its sole discretion, take certain actions including … (v) terminate this Agreement and all Orders."  As discussed above, Celsius has failed to pay (and continues to fail to pay) invoiced amounts for postpetition services.  *See supra* ¶¶ 43, 61-63.

   b.   The MSA also provides a dispute-resolution mechanism, and that mechanism requires Celsius to pay disputed amounts if Core determines the amounts were

_____

[7] Three additional automated e-mails were inadvertently sent to Celsius after that date due to a system limitation issue; the last one was sent on October 1, 2022.  *Id.*

[8] Section 4(b) provides for a 5-day cure period for a single failure by Celsius to pay an Unpaid Balance, and a 2-day cure period if Celsius fails to pay an Unpaid Balance two or more times during any twelve-month period.

14

invoiced correctly.  MSA § 3.b.  Celsius did not adhere to this dispute-resolution mechanism and has withheld disputed postpetition amounts.  Xia Decl. ¶ 18.

52.    In these circumstances, a termination by Core will occur "at [Celsius's] sole risk and expense."  MSA § 4.d.  Core may also exercise other remedies for nonpayment, including (but not limited to) suspension of services and shutting off Celsius's machines.  *Id.*

53.    On the other hand, Core's total liability for all claims arising from or related to the Agreement is limited to "an amount equal to one (1) months [*sic*] fee payable to [Core] pursuant to the applicable Order."  MSA § 5.d.[9]  This provision is important to Core's business, as it provides a safety net for Core to effectively buy its way out of a failed business relationship; it is standard in Core's customer agreements.  Pratt Decl. ¶ 9.

### G.    Core Did Not Have Additional Hosting Availability

54.    Hosting availability refers to an infrastructure company's ability to provide machines with (i) electrical power, and (ii) the infrastructure needed for operation, including cooling, rack space, and so on.  *See* Mares Decl. ¶¶ 15-17, 22-23.  Without these things, a cryptocurrency mining machine cannot operate.

55.    Under Order #10, Core "will notify [Celsius] as soon as practicable of additional hosting availability, *if any*," up to 10 additional megawatts, and provide such additional availability on a priority basis "*if available*" as "the subject of a separate order."  Order #10, pages 4-5 (emphasis added).  This clause was included at a time when, as Celsius knew, Core had limited availability, was in the process of building new facilities, and already had over 100,000 of its own machines to deploy on a priority basis.[10]  Pratt Decl. ¶¶ 10, 36.

---

[9] The MSA also waives any damages for lost profits, loss of business, and loss of revenues, as well as incidental, special, reliance, exemplary, and punitive damages.  MSA § 5.c.

[10] Core's typical practice is to deploy machines on a "first in time" basis, meaning they are deployed in the order received from a customer or purchased by Core.  Pratt Decl. ¶ 7.  Celsius was familiar with this typical practice.  *Id.*

56.     In negotiating this clause, Celsius had sought more and specifically asked to receive priority over *any* additional hosting availability—without limitation.  Pratt Decl. ¶ 37.  Core did not agree to such a term, as reflected in the text of Order #10.  *Id.*

57.     Celsius infers that Core had additional hosting availability because Core announced a larger machine fleet in April 2022 as compared to December 2021.  Contempt Motion ¶ 24.

58.     This apparent fleet expansion resulted from two factors not related to additional customer hosting availability.  Pratt Decl. ¶ 40.  First, Core and a client, Argo Blockchain, agreed to a fleet swap whereby Core exchanged machines it had previously ordered (but not deployed) with machines owned by Argo.  *Id.* ¶ 41 & Ex. V.  Core's aggregate customer hosting availability remained unchanged as a result.  *Id.* ¶ 41.  Second, Core temporarily expanded its fleet to test new mobile hosting containers called "antboxes."  *Id.* ¶ 42.  The testing was not successful, and the antboxes are being decommissioned.  *Id.* (noting that testing did not impact availability).

59.     Similarly, in late July 2022, Core and a major existing customer, Bitmain, agreed to allow certain Bitmain machines to take the place of machines that Core had previously ordered for itself before executing Order #10 but had not yet deployed, and for Bitmain to provide funding to Core in exchange, among other things.  Pratt Decl. ¶ 43.  Under a new and unique hosting model, exclusive-use facilities would also be built for a number of Bitmain machines, with Bitmain technicians at those facilities.  *Id.*

60.     Since Order #10, Core has not had additional customer hosting availability across its data centers.  Pratt Decl. ¶ 38.  This is demonstrated by the fact that Core has yet to deploy over 10,000 of the machines that Core purchased for itself before Order #10.  *See id.* ¶ 39.

### H.     Core's Ongoing Losses Stemming from Celsius

61.     Core has suffered, and is suffering, serious losses from Celsius's refusal to honor the Agreement.  These losses call into question Core's own ability to continue as a going concern.

16

62.    Celsius owes Core $598,743.20 for postpetition PPT Charges related to the August 2022 invoice.  Xia Decl. ¶ 18 & Ex. G.  Celsius owes Core another $1,505,940.08 for postpetition PPT Charges related to the September 2022 invoice.  *Id.*  This yields a grand total of $2,104,683.28 in postpetition PPT Charges just for these two invoices.

63.    Core continues to lose approximately $53,000 per day to cover the postpetition increased electricity tariffs that Celsius refuses to pay.  Pratt Decl. ¶ 50.

**ARGUMENT**

64.    The Court should deny the Contempt Motion.  The Debtors have the burden of proving that Core violated the automatic stay, and they must prove their case by clear and convincing evidence.  *In re Bennett*, 135 B.R. 72, 76 (Bankr. S.D. Ohio 1992).

65.    Core has not violated the automatic stay because it has fully complied with the terms of the Agreement.  Moreover, even if Core had not fully performed (which it has), Core has relied on its reasonable interpretation of the Agreement, and the Code does not transform a legitimate contract dispute into a stay violation.  In addition, non-performance of a contract does not constitute a violation of the automatic stay because passively failing to perform does not constitute an affirmative act to exercise control of estate property as required under *Fulton*.

66.    The Debtors are left with their weak arguments that Core violated the automatic stay based on (i) automated emails sent by a Core computer, which were quickly disclaimed by Core; (ii) a single conversation between the parties' employees, wherein Core disputes what was said; and (iii) the PPT Charges being an attempt to set off prepetition amounts, which is a ridiculous argument given that Celsius paid similar charges prepetition, as have other customers.

67.    Lastly, even if Core breached the contract (it did not), none of the alleged violations rise to the level necessary to hold Core in civil contempt.  There is, and was, at least a reasonable doubt as to whether the alleged contractual non-performance and invoicing of the PPT Charges

17

constitute a stay violation.  It is, at worst, a "close call."  They are certainly not the egregious types of behavior for which the contempt power is reserved.  And at all times, Core diligently attempted to comply with the stay.  Moreover, ordering uncapped damages under a contempt standard would impermissibly rewrite the Agreement.

## I.   EVEN IF A BREACH OF CONTRACT CLAIM COULD BE AN AUTOMATIC STAY VIOLATION, CORE DID NOT BREACH THE AGREEMENT

68.     The three purported breaches of the Agreement alleged by Celsius are not supported by the law or the facts.  First, Core's right to pass through increased electricity tariffs is not only permitted by the unambiguous terms of the Agreement, but it is confirmed by industry usage, the commercial context, and the parties' course of dealing.  Second, Core had no contractual obligation to deploy Celsius's machines by predetermined dates, but even if it did, strict adherence to any such deadlines would be excused by factors beyond Core's control.  And at any rate, Core has now deployed every machine Celsius delivered.  Finally, Core's conditional obligation to notify Celsius of additional hosting availability, if available, was not triggered because the condition precedent of there *being* additional availability did not occur, or if it did, Celsius has suffered no harm as a result.  Moreover, Order #10's vague reference to a possible future order for such hosting, if available, is an unenforceable agreement to agree.

### A.   Core's Pass-Through of Increased Electricity Tariffs Comports with the MSA, Industry Usage, Commercial Context, and the Course of Dealing

69.     Core did not breach the MSA by passing through PPT Charges to Celsius.  "When the contract is clear and unambiguous, [Delaware courts] will give effect to the plain-meaning of the contract's terms and provisions."  *Est. of Osborn v. Kemp*, 991 A.2d 1153, 1159-60 (Del. 2010).[11]  "A contract is not rendered ambiguous simply because the parties do not agree upon its

---

[11] The MSA is governed by Delaware law.  MSA § 8.f.

Debtors' Exhibit No. 4
Page 21 of 44

proper construction." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992). Here, Core has a clear and unambiguous contractual right in its "sole and absolute discretion" to "pass through" to Celsius "any increases, changes in … tariffs … with respect to the provision of Services" by Core, and Celsius "shall pay all Increased Costs." MSA § 4.f.[12] That is exactly what Core did.

70.     "Tariff" is not defined in the MSA, and thus should be given its plain and ordinary meaning as understood by those in the industry. Although Celsius selectively cites a dictionary definition of "tariff" in order to claim that it does not encompass electric utility rates (Contempt Motion ¶ 50), a full review of the term's definitions—including from one of the very dictionaries cited by Celsius—demonstrates that it clearly *does* include such rates. *Merriam-Webster's* defines "tariff" as "a listing or scale of rates or charges for a business or a *public utility*." *Merriam-Webster's Unabridged Dictionary*, "Tariff," https://unabridged.merriam-webster.com/unabridged/tariff (last visited Oct. 17, 2022) (emphasis added); *see also Oxford English Dictionary*, "tariff, n.," https://www.oed.com/—view/Entry/197851?rskey=wYwHeD&result =1&print (last visited Oct. 18, 2022) (defining "tariff" as "A classified list or scale of charges made in any private or public business; as, a hotel tariff, a railroad tariff"). The Court need look no further than the plain meaning of "tariff" to resolve this straightforward issue. *See Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 740 (Del. 2006) ("When a term's definition is not altered or has no 'gloss' in the [relevant] industry it should be construed in accordance with its ordinary dictionary meaning." (citation omitted)).

---

[12] "Services" refers to the various machine hosting services that Core provides to Celsius, which include provision of "utilities." *See* MSA § 1.a. Thus, Section 4(f)'s reference to "tariffs" must be read in the context of the entire Agreement, which directly implicates utility services. *See Osborn*, 991 A.2d at 1160.

Debtors' Exhibit No. 4
Page 22 of 44

71.     In addition to its dictionary definition, the industry usage of "tariff" confirms that it encompasses electric utility rates.  Industry usage can aid in interpreting an unambiguous contract term.  *See Aleynikov v. Goldman Sachs Grp., Inc.*, 765 F.3d 350, 361-62 (3d Cir. 2014). Here, multiple declarants, including an expert with decades of experience concerning data centers, have testified that "tariff" is commonly understood in the industry to include electric rates.  *See supra* ¶¶ 17-19.  In fact, the rate tariff published by the Tennessee Valley Authority explicitly confirms this—it includes a fuel cost adjustment as part of its rate formula.  Pratt Decl. ¶ 44.

72.     The commercial context and relationship of the parties further support Core's unambiguous right to pass through PPT Charges.  Delaware courts read contracts "in full and situated in the commercial context of the parties," such that the "basic business relationship between parties must be understood to give sensible life to any contract."  *Chi. Bridge & Iron Co. v. Westinghouse Elec. Co.*, 166 A.3d 912, 926-27 (Del. 2017).  Here, the commercial context is a power-intensive industry where the electricity costs incurred by cryptocurrency mining machines comprise the majority of input costs.  *See supra* ¶¶ 14-15, 19.  It is standard practice in this industry for infrastructure providers like Core to pass through increases in electricity costs—indeed, it would be economically irrational for them to bear the significant risk of energy price increases while forfeiting the fruits of mining.  *See supra* ¶¶ 14, 19, 24.

73.     The "basic business relationship" in this case tasks Core with hosting the machines, whereas Celsius owns them and obtains the valuable cryptocurrency they mine.  In this context, it would make no sense to read "tariff" to exclude increased fuel costs that comprise a portion of electric utility rates—which are far and away the most relevant, impactful "tariff."  Such a reading must be rejected.  *See Osborn*, 991 A.2d at 1160 & n.21 (courts will not adopt "[a]n unreasonable interpretation [that] produces an absurd result or ones that no reasonable person would have

20

accepted when entering the contract"); *Wilmington Firefighters Ass'n, Local 1590 v. City of Wilmington*, 2002 WL 418032, at *8-9 (Del. Ch. Mar. 12, 2002) (rejecting a party's interpretation as unreasonable when viewed in the context of the contract).

74.     Celsius's other textual arguments are unavailing.  *First*, it claims that pass-through was inappropriate because Core has a "fixed-rate pricing structure" under Order #10.  Contempt Motion ¶ 50.  That is false.  Order #10 makes clear that while there is an *initial* estimated service charge, that will be adjusted to include "*additional charges* incurred by [Celsius] *and adjustments*…."  *Supra* ¶ 20.  And, as already noted, Section 4.f of the MSA allows Core to pass through various "Increased Costs," including tariffs.  Thus, the parties' Agreement expressly contemplates "additional charges" and "adjustments" on an invoice to the initial estimated pricing—exactly what the increased electricity tariffs were.  *Second*, Celsius seizes on the word "new" in Section 4.f to argue that an increased electricity tariff is not covered because it is not new.  Contempt Motion ¶ 50.[13]  But if the word "new" in Section 4.f were read as Celsius now proposes, it would render the preceding phrase "any increases, changes in" entirely superfluous, because there can only be an "increase" or a "change in" an *existing* tariff—not an entirely new one.  And that outcome would violate a fundamental principle of contract interpretation.  *See NAMA Holdings, LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007), *aff'd*, 945 A.2d 594 (Del. 2008) ("Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court."); *Osborn*, 991 A.2d at 1159 (similar).

---

[13] Specifically, Celsius focuses only on the bolded part of Section 4.f, while ignoring the italicized part:  "…if there are *any increases, changes in*, or introduction or administration of, any **new** taxes, levies, tariffs or governmental fees and charges with respect to the provision of Services…"

21

75.    Even if Section 4.f's use of the term "tariff" were ambiguous—and it is not—the parties' course of dealing strongly supports Core's pass-through of PPT Charges.  "It is hornbook law that the contracting parties' course of conduct may be considered as evidence of their intended meaning of an ambiguous contractual term."  *AT&T Corp. v. Lillis*, 970 A.2d 166, 172 (Del. 2009); *see also Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232-33 (Del. 1997) (relevant extrinsic evidence includes "prior agreements and communications of the parties as well as … course of dealing").  Celsius repeatedly paid for increased electricity tariffs without objection.  From October 2021 to April 2022, Celsius paid increased tariffs related to utility curtailment, and its Chief Operating Officer agreed that it "ma[d]e sense" to pay "increased power fees."  *See supra* ¶¶ 35-37.  Beyond that, Celsius paid the *exact kind of increased tariff at issue here* on its June 2022 invoice.  *See supra* ¶¶ 38-39.  Indeed, the email from Core attaching this prepetition invoice explicitly referenced Section 4.f and explained that the invoice included increased energy costs.  *See supra* ¶ 38.  These facts also belie Celsius's claim that pass-through of the increased tariffs only began postpetition.  *See* Contempt Motion ¶ 49; Lawlor Decl., D.E. 918 at ¶ 21.  And, with only one exception, every other Core customer paid these increased tariffs—further evidence that the MSA permits pass-through of PPT Charges.  *See supra* ¶ 44.

76.    Thus, Core's decision to pass through PPT Charges to Celsius did not breach the MSA and could not have violated the automatic stay.  Though Celsius may wish postpetition to escape the increased tariffs it agreed to in Section 4.f of the MSA and repeatedly paid, sophisticated parties cannot "escape the express language" of a contract.  *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 552 (Del. Super. Ct. 2005), *aff'd*, 886 A.2d 1278 (Del. 2005).

### B.    Core Did Not Unjustifiably Delay Deployment of Celsius's Machines

77.    Celsius is also incorrect that Core breached the Agreement by not deploying machines as quickly as Celsius wished.  Contempt Motion ¶¶ 43-44.  Celsius offers two arguments:

**Debtors' Exhibit No. 4**
**Page 25 of 44**

(i) that Core breached by not adhering to the so-called deployment schedule in Order #10; and

(ii) that Core breached by not deploying machines "in a professional and workmanlike manner"

under Section 5.a of the MSA.  *Id.*  Both are wrong.

78.    First, Celsius is mistaken that Order #10 institutes a fixed "deployment schedule."

The months listed on page 1 are simply the expected timeframe for Celsius to deliver its

cryptocurrency mining machines to Core for deployment.  *See supra* ¶¶ 27-28.  This is borne out

by the fact that Celsius did not even finish delivering its first tranche of machines, scheduled to be

delivered for deployment in September 2021, until late November 2021, and other deliveries

likewise occurred after the months listed in Order #10.  *See supra* ¶¶ 30, 33.  The months listed in

Order #10 therefore create an obligation for Celsius, not for Core.  Core cannot have breached any

of *its* obligations by deploying machines later than *Celsius's* expected delivery date.  Core's rights

regarding deployment are set forth in Section 2.b of the MSA—it "has the right to review and the

sole right to approve any … installation [of Celsius's equipment at its facility]."

79.    Second, Celsius's barebones argument that Core did not perform "in a professional

and workmanlike manner" under Section 5.a falls flat.  Celsius conspicuously fails to explain what

this standard means or how Core failed to abide by it.  *See* Contempt Motion ¶ 43.

80.    Any delays in deploying Celsius's machines had nothing to do with an alleged lack

of professionalism or workmanship on Core's part, and everything to do with outside factors

beyond Core's control.  Core experienced unavoidable delays in the deployment of some machines

due, among other things, to: (i) Celsius's own repeated late deliveries; (ii) significant supply chain

disruptions; (iii) construction and permitting delays; (iv) power disruption issues; and (v) an

outbreak of COVID-19 among Core's construction staff.  *See supra* ¶¶ 29-33.  Celsius knows this

**Debtors' Exhibit No. 4
Page 26 of 44**

because Core kept it apprised of these facts (*see supra* ¶ 29); this makes it especially surprising that Celsius fails to mention these highly relevant facts in its Contempt Motion.

81.    Celsius cannot reasonably contend that, when the parties agreed *ex ante* to perform "in a professional and workmanlike manner," they intended to create an obligation so onerous that Core had to deploy machines using COVID-infected employees, in half-finished facilities, or with inadequate power supply.[14]  Such an interpretation would be manifestly unreasonable—and the "true test" of a contract term's meaning is "what a reasonable person in the position of the parties would have thought it meant." *Lorillard Tobacco*, 903 A.2d at 740 (citation omitted).

82.    Alternatively, even if Celsius were correct about supposed deployment obligations created by either of these contract terms (and it is not), Core's strict adherence to them would be excused due to impracticability.  Under Delaware law, the defense of impracticability requires: "(1) the occurrence of an event, the nonoccurrence of which was a basic assumption of the contract; (2) the continued performance is not commercially practicable; and (3) the party claiming impracticability did not expressly or impliedly agree to performance in spite of impracticability that would otherwise justify nonperformance." *Chase Manhattan Bank v. Iridium Africa Corp.*, 474 F. Supp. 2d 613, 620 (D. Del. 2007).  Each element is met here.  First, to the extent Core had an obligation to deploy machines by a specific date, any such obligation would have assumed the nonoccurrence of Celsius's own delivery delays and unprecedented supply chain shortages, among other things.  Second, in these circumstances, strict adherence to deployment by a specific date would not be commercially practicable—Core could not deploy machines that Celsius had not yet

---

[14] After all, Celsius knew that Core's timeline for deployment could vary based on construction timelines and other outside factors, and Core kept Celsius abreast of these developments. *See supra* ¶¶ 25, 29.  For example, while Celsius complains that certain machines were taken offline shortly after being deployed, it omits the reason for this outage, which it knew—the failure of power transformers. *See supra* ¶ 32.

Debtors' Exhibit No. 4
Page 27 of 44

delivered, nor could it build a building without steel, nor could it violate governmental health restrictions. Third, Core did not agree to deployment by a specific date *at all*, let alone in spite of impracticability.[15]

83.    Similarly, even if Core were obligated to deploy machines by the months listed in Order #10 (it is not), any breach of such obligation would be excused because Celsius first breached its own related obligation to timely deliver machines for deployment by Core. "As a general rule the party first guilty of a material breach of contract cannot complain if the other party subsequently refuses to perform." *Hudson v. D&V Mason Contractors, Inc.*, 252 A.2d 166, 170 (Del. Sup. Ct. 1969). Celsius repeatedly delivered machines months after these supposed deployment deadlines passed. *See supra* ¶¶ 30, 33. These failures were material, as demonstrated by the fact that Order #10 allows Core to terminate the entire Order if Celsius delivers too late. *See* Order #10, at page 3. In these circumstances, Celsius "cannot complain" of any alleged missed deadlines for deployment. *Hudson*, 252 A.2d at 170.

84.    Finally, even if this Court were to find that Core breached by not deploying machines quickly enough, there is no "ongoing failure to perform its deployment obligations" as Celsius alleges. Contempt Motion ¶ 43. Despite all the recent challenges—including a pandemic and associated supply chain disruptions—Core has deployed every cryptocurrency mining machine that Celsius has delivered to it. *See supra* ¶ 26. Thus, any breach has been cured.[16]

---

[15] For substantially the same reasons, strict adherence by Core to purported deployment deadlines would be excused under the MSA's force majeure clause. That clause excuses Core's failure to perform any of its obligations under the Agreement "if such failure is caused by events or circumstances beyond its reasonable control, including, without limitation … inclement weather, health epidemic or any law, order, regulation or other action of any governing authority or agency." MSA § 8.e.

[16] Celsius's speculative theory that its motion prompted machine deployment is incorrect. 10/10/22 Celsius Letter to the Court, D.E. 1003 at page 2. The deployment timeline is, and has always been, dictated by practical considerations such as the timing of Celsius's deliveries, hosting availability, power availability, and other factors discussed above.

Debtors' Exhibit No. 4
Page 28 of 44

C.     **Core Did Not Breach the "Notification of Hosting Availability" Provision, But Even If It Did, Celsius Has Suffered No Harm**

85.     The other purported breach alleged by Celsius is that it "has never once been notified of additional hosting availability." Contempt Motion ¶ 45. Order #10 (at pages 4-5) states that Core will "notify [Celsius] as soon as practicable of additional hosting availability, *if any*, and provide Client up to 10 additional [megawatts] per month at a hosting services rate of $0.0625 per KWh. Additional hosting availability *if available* will be the subject of a separate order and provided to [Celsius] on a priority basis, subject to [Celsius's] acceptance." When this clause was included, Celsius knew that Core had an availability deficit, needed to construct new facilities, and planned to first deploy many machines of its own. *See supra* ¶ 55.

86.     The plain language of this clause indicates that Core's notification obligation arises if, and only if, the condition precedent of additional hosting availability is satisfied. "A condition precedent [] is an act or event … that must exist or occur before a duty to perform something promised arises." *Cato Cap. LLC v. Hemispherx Biopharma, Inc.*, 70 F. Supp. 3d 607, 619 (D. Del. 2014), *aff'd*, 625 F. App'x 108 (3d Cir. 2015) (citation omitted and alteration adopted). The clause here states that notification will occur as to additional hosting availability, "if any," and then goes on to refer to a possible future order regarding additional hosting availability, "if available." This confirms that the existence of additional hosting availability is a condition precedent to any notification obligation. *See id.* ("Words such as 'if, provided that, on the condition that' can be useful to establishing that the parties intended a condition, … but any phrase that conditions performance suffices."). Because the condition precedent of additional hosting availability did not occur, *see supra* ¶¶ 58-60, the obligation to notify Celsius never arose. *See Cato Cap. LLC*, 70 F. Supp. 3d at 619.

26

87.     While Celsius speculates that Core had additional hosting availability based on a superficial comparison of fleet counts in two press releases (Contempt Motion ¶ 45; Lawlor Decl., D.E. 918 at ¶ 19), Celsius's counting exercise is flawed.  This seeming fleet expansion was no expansion at all but actually resulted from Core *swapping* machines with an existing customer, and from performance-testing new antbox containers for mining machines.  *See supra* ¶ 58. Neither of these events involved Core expanding its customer hosting availability or failing to notify Celsius of additional customer hosting availability.

88.     Similarly, Core's agreement with Bitmain did not implicate "additional hosting availability" within the meaning of Order #10.  That agreement also involved Core agreeing to allow an existing customer to deploy machines in place of Core's machines that it had previously ordered for itself (before Order #10) but not yet deployed.  *See supra* ¶ 59.  And the new, exclusive-use Bitmain facilities contemplated by that agreement cannot logically be construed as "additional hosting" that could be "available" for Celsius—these special facilities would be exclusively for Bitmain and not any other customer.  Order #10, pages 4-5.  Nor could Core preempt Bitmain in these exclusive-use facilities by providing them to Celsius "on a priority basis."  *Id.*

89.     To the extent Celsius contends that Core breached because it was obligated to enter an agreement regarding additional hosting availability—notwithstanding the nonexistence of such availability and the failure of that condition precedent—such an interpretation would be an unenforceable agreement to agree.  Delaware courts have a "general aversion to enforcing agreements to agree," *Centreville Veterinary Hosp., Inc. v. Butler-Baird*, 2007 WL 1965538, at *8 (Del. Ch. July 6, 2007), and "will not enforce a contract that is indefinite in any of its material and essential provisions."  *Omega Cap. Mgmt. Partners, LLC v. Schrage*, 2021 WL 2036672, at *2 (D. Del. May 21, 2021) (citation omitted); *see also id.* ("Delaware law requires that, to be enforceable,

27

a contract to enter into a future contract must specify *all its material and essential terms*, and leave *none* to be agreed upon as the result of future negotiations." (citation omitted and emphasis added)).  The reference in this clause of Order #10 (at page 5) to agreeing on additional hosting as "the subject of a separate order" is a classic agreement to agree.  Among other missing material terms, it does not specify what this possible future order would include regarding the number or type of mining machines; assumed power consumption; delivery date; and prepayment schedule— all essential terms included prominently in Order #10.  *See* Pratt Ex. B at page 1.  Thus, Core was not bound to enter any such inchoate agreement.

90.     Finally, even if the Court were to find (i) that Core had additional hosting availability within the meaning of Order #10, and (ii) that the clause at issue is not an unenforceable agreement to agree, Celsius suffered no harm as a result and therefore cannot establish a claim for breach.  The clause does not reference any terms of the yet-to-be-negotiated "separate order" by which additional availability would be provided to Celsius, except the base hosting services rate and a 10-megawatt capacity cap.  *See* Order #10, pages 4-5.  In negotiating the terms of such an order, Core would insist, among other things, on pass-through of PPT Charges—which Celsius has already made abundantly clear it will not pay.  Thus, the parties' positions in the current dispute prove that there would be no meeting of the minds, and no such order would ever be executed.  Celsius cannot have suffered harm from the purported lost opportunity to participate in utterly futile negotiations, and absent harm cannot establish a breach of contract claim.  *See Connelly v. State Farm Mut. Auto. Ins. Co.*, 135 A.3d 1271, 1279 n.28 (Del. 2016) ("Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff." (citation omitted)).

28

## II.     CORE DID NOT VIOLATE THE AUTOMATIC STAY

### A.     Core Did Not Violate the Automatic Stay Because It Acted on Its Reasonable Interpretation of the Contract

91.     As discussed above, Core fully complied with the Agreement.  Even if this Court were to disagree with that conclusion, Core still did not violate the automatic stay because it acted in accordance with its reasonable interpretation of the Agreement.

92.     Courts have held that a contract counterparty does not violate the automatic stay by acting in accordance with its reasonable interpretation of a contract with the debtor.  For example, in *United States v. Inslaw, Inc.*, the D.C. Circuit held that a non-debtor did not violate the automatic stay by retaining and using copies of the debtor's software pursuant to its interpretation of its contract with the debtor, which differed from the debtor's interpretation.  932 F.2d 1467, 1472-73 (D.C. Cir. 1991).  The D.C. Circuit warned against the broad interpretation of section 362(a)(3) that the Contempt Motion now advocates:

> If the bankruptcy court's idea of the scope of 'exercise of control' were correct, the sweep of § 362(a) would be extraordinary—with a concomitant expansion of the jurisdiction of the bankruptcy court.  Whenever a party against whom the bankrupt holds a cause of action … acted in accord with his view of the dispute rather than that of the debtor-in-possession or bankruptcy trustee, he would risk a determination by a bankruptcy court that he had 'exercised control' over intangible rights (property) of the estate.

*Id.*  The court added, "[f]ulfillment of [the] purpose [of § 362] cannot require that every party who acts in resistance to the debtor's view of its rights violates § 362(a) if found in error by the bankruptcy court."  *Id.* at 1473; *see also In re Mountaineer Coal Co.*, 247 B.R. 633, 644 (Bankr. W.D. Va. 2000) ("The Court does not believe that Congress intended to convert a matter of contract dispute into a violation of the automatic stay.").  The evidence here demonstrates that Core acted within its reasonable interpretation of the Agreement.  The Court should not permit Celsius to convert a contract dispute into a stay violation.

29

**B.    Core Did Not Exercise Control over the Debtors' Property, Thus Section 362(a)(3) of the Bankruptcy Code Is Not Implicated**

(i)    *Stay Violation under Section 362(a)(3) Requires That a Counterparty "Exercise Control" Over Estate Property*

93.    Section 362(a)(3) of the Bankruptcy Code does not stay all acts concerning estate property, however remote.  "The mere fact that the conduct may be wrongful or unlawful does not automatically convert it into a violation of the automatic stay." *Windstream II*, 2022 WL 5245633, at *8.  Indeed, section 362(a)(3) is limited to acts undertaken by third parties "to obtain possession of property of the estate or of property from the estate or to *exercise control* over property of the estate." *Id.* at *4 (citation omitted and emphasis added).  The Code does not define "control." Consequently, when determining whether particular conduct could "be regarded as an act to exercise control, [courts have been] left with the language of the statute and the manner in which other courts have construed section 362(a)(3)'s control provision." *In re Albion Disposal, Inc.*, 217 B.R. 394, 405 (W.D.N.Y. 1997).

94.    Last year, the U.S. Supreme Court concluded that section 362(a)(3) is only implicated by an "*affirmative act* that would *alter the status quo* as of the time of the filing of a bankruptcy petition." *Fulton*, 141 S. Ct. at 590 (emphasis added).  Based on this interpretation, the Supreme Court held that the mere retention of estate property after a bankruptcy filing does not violate section 362(a)(3), explicitly overruling courts that had interpreted it more broadly.

95.    *Fulton* is consistent with other U.S. Supreme Court precedent.  In *Citizens Bank of Maryland v. Strumpf*, the Court held that breaching a "promise to pay" a debtor is not an exercise of control over the debtor's property and does not implicate or violate sections 362(a)(3) or (a)(6) of the Code.  516 U.S. 16, 21 (1995).[17]  The Court rejected as a "false premise" the debtor's

---

[17] *Strumpf*'s more famous holding is that a bank's administrative hold on a debtor's bank account pending the bankruptcy court's grant of relief from the automatic stay was not a setoff within the meaning of 362(a)(7), and hence

**Debtors' Exhibit No. 4**
**Page 33 of 44**

argument that the bank "exercised dominion over property" of the estate, implicating section 362(a)(3), by failing to return deposited funds to the debtor. *Id*.

96.    Courts in this District have likewise concluded that a contract counterparty's breach of contract is not an attempt to exercise control of estate property in violation of § 362(a)(3).  For example, in *In re Golden Distributors, Ltd.*, Judge Schwartzberg of this Court held that:

> the fact that the defendants may have breached the restrictive covenants in their employment contracts … for which the defendants might ultimately be liable to the debtor for damages or enjoined from engaging in such improper conduct, does not mean that the defendants attempted to obtain possession or control of property of the estate in violation of 11 U.S.C. § 362(a)(3).

122 B.R. 15, 19-20 (Bankr. S.D.N.Y. 1990) (cited approvingly in *Windstream II*, 2022 WL 5245633, at *8).[18]  A breach of contract gives rise to a breach of contract claim against the counterparty—not a stay violation.

97.    Like the U.S. Supreme Court in *Fulton*, other courts have drawn a distinction between "affirmative acts," which violate the stay, and passive inaction, which does not.[19]

---

did not violate the automatic stay.  In addition to that issue, the Court in *Strumpf* squarely addressed, and rejected, the debtor's alternative contention that the bank's actions violated 362(a)(3). *Id*. at 21.  The Court first noted that money in a bank account is not legally a debtor's property, just "a promise to pay from the bank to the depositor," and it therefore concluded that "petitioner's temporary refusal to pay was neither a taking of possession of respondent's property nor an exercising of control over it, but merely a refusal to perform its promise." *Id*.  The Court's discussion of the section 362(a)(3) "exercise control" provision was independent of its discussion of the "setoff" provision in section 362(a)(7), and courts have applied *Strumpf*'s holding on section 362(a)(3) outside the setoff context. *See, e.g.*, *In re Calvin*, 329 B.R. 589, 603 (Bankr. S.D. Tex. 2005) (applying *Strumpf* to determine whether § 363(a)(3) was violated outside a setoff context); *In re Brown*, 210 B.R. 878, 884 (Bankr. S.D. Ga. 1997) (same).

[18] *See also In re APF Co.*, 2001 Bankr. LEXIS 1298, at *16 (Bankr. D. Del. Aug. 31, 2001) ("[T]he mere breach of the contract itself is not a violation of the stay." (citing 1 DAVID G. EPSTEIN ET AL., BANKRUPTCY, § 3.14 at 174 (West, 1992) ("Nothing is lost by failing to stay a breach of contract.  The cause of action for the breach belongs to the estate.  It can remedy the wrong by any appropriate means as in any other action for breach of contract.")); *In re Wilkinson*, 2003 WL 25273854, at *8 (Bankr. D. Idaho Nov. 10, 2003) ("Even assuming [the counterparty's] actions constituted a breach of the contracts with Debtor, a continuing breach that does not effect a termination of the contract does not amount to a violation of the automatic stay.").

[19] *See, e.g.*, *In re Denby-Peterson*, 941 F.3d 115, 125-26 (3d Cir. 2019) ( "[T]he text of section 362(a)(3) requires a post-petition affirmative act to exercise control over property of the estate.); *In re Cowen*, 849 F.3d 943, 948-50 (10th Cir. 2017) (distinguishing between active and passive actions, and holding that only the former violates § 362(a)(3)); *In re Boy Scouts of Am. & Del. BSA, LLC*, 642 B.R. 504, 578 n.362 (Bankr. D. Del. 2022) ("The Supreme Court's most recent pronouncement instructs that § 362(a)(3) prohibits affirmative actions, not passive actions such as non-

31

A counterparty's failing to perform under an executory contract is not an affirmative act and does not violate section 362(a)(3).  After *Fulton*, this point can no longer be seriously debated.

(ii)      *Core Did Not "Exercise Control" over Celsius's Property*

98.      The main thrust of the Contempt Motion is that Core is violating the automatic stay by "failing to perform its obligations under the Agreement," specifically failing to deploy Celsius's machines quickly enough and failing to notify Celsius of purported additional hosting availability (allegations Core disputes).  Contempt Motion ¶¶ 42-44.  Under *Fulton*, however, a party's failure to do something is not an "affirmative act" that constitutes an exercise of control under section 362(a)(3).  141 S. Ct. at 590.  Celsius cannot explain how Core's alleged failure to act "alter[ed] the status quo" that existed on the Petition Date.  *Id.*  The alleged failure of Core to notify Celsius of additional hosting availability is certainly not an affirmative act, as it is premised on Core *not* taking action.  Similarly, the alleged failure of Core to deploy additional machines cannot be said to be an affirmative act, as it also is premised on Core *not* taking action.

99.      The result would be no different if Core's failure to perform harmed or reduced the value of Celsius's estate.  In *Albion*, the bankruptcy court rejected the argument that a town violated the automatic stay by enacting a law that greatly reduced the value of the debtors' property.  217 B.R. at 405.  Stated plainly, "section 362(a)(3) does not stay acts that reduce the value of property of the estate; it stays acts to exercise control over estate property."  *Id.* at 405-06.  The contrary argument "does not find any support in the Bankruptcy Code."  *Id.* at 406.

---

performance."); *In re Lucre, Inc.*, 339 B.R. 649, 658-60 (Bankr. W.D. Mich. 2006) (holding there is no stay violation where the debtor's sole complaint is nonperformance by executory contract counterparty).

*Windstream II* is in accord.  In that case, the District Court concluded that the debtor's competitor did not violate the automatic stay by advertising to the debtor's customers, and that the bankruptcy court abused its discretion in holding the competitor in civil contempt therefor.  2022 WL 5245633, at *4-9.  The District Court's rationale was that the counterparty did not "exercise control" over estate property, a necessary component of a stay violation.  *Id.* at *9.

32

**Debtors' Exhibit No. 4**

**Page 35 of 44**

100.    The Contempt Motion does not cite *Fulton*, instead relying on cases that preceded *Fulton* or are otherwise distinguishable and involve situations where the debtor sought to terminate the contract: (i) without seeking relief from the automatic stay, (ii) based on non-payment of a prepetition claim in violation of section 362(a)(6), or (iii) based on the debtor's bankruptcy filing in violation of section 365(e).[20]   Here, Core did not attempt to terminate the Agreement, and any delay in performance was unavoidable and had nothing to do with Celsius not paying its prepetition claims or having filed for bankruptcy.

## III.   THE DEBTORS' OTHER ARGUMENTS THAT CORE VIOLATED THE AUTOMATIC STAY ALL FAIL

### A.   Core Properly Charging the Postpetition PPT Charges and Mistakenly Including Prepetition Amounts in Postpetition Invoices Does Not Violate the Automatic Stay

101.    Seeking to have Celsius avoid paying the PPT Charges, the Debtors claim that Core billing Celsius for the PPT Charges, as permitted by the MSA, is somehow an attempt to "offset Celsius' pre-petition debts."   Contempt Motion ¶ 48.   But the evidence is to the contrary and confirms that Core previously charged (and Celsius paid) these types of charges, and that Core passed on power costs to virtually all its other customers.   *See supra* ¶¶ 34-44.   The idea that this charge is somehow contrived or an attempt to offset a prepetition debt is therefore preposterous.

---

[20] *See, e.g., In re 48th St. Steakhouse, Inc.*, 835 F.2d 427, 429 (2d Cir. 1987) (pertaining to a landlord that attempted to terminate the lease of a debtor's assignee); *In re Enron Corp.*, 300 B.R. 201, 212 (Bankr. S.D.N.Y. 2003) (holding that counterparty violated the automatic stay by sending a demand letter and termination notice); *In re Monarch Cap. Corp.*, 163 B.R. 899, 907 (Bankr. D. Mass 1994) (stating a party may not terminate a contract by reason of the debtor's defaults thereunder, but reasoning that "to require [the counterparty's] continued services, the bankruptcy estate was obligated only to do the same"); *In re Elder-Beerman Stores Corp.*, 195 B.R. 1019, 1024 (Bankr. S.D. Ohio 1996) (holding that a counterparty violated the stay by sending a notice of termination to the debtor); *United States ex rel. U.S. Postal Serv. v. Dewey Freight Sys., Inc.*, 31 F.3d 620, 625 (8th Cir. 1994) (stating that a counterparty cannot terminate a contract by reason of the debtor's defaults thereunder); *In re Broadstripe, LLC*, 402 B.R. 646, 657 (Bankr. D. Del. 2009) (pertaining to a counterparty that attempted to terminate and refused to perform in an attempt to collect on a prepetition debt); *In re Ernie Haire Ford, Inc.*, 403 B.R. 750, 760 (Bankr. M.D. Fla. 2009) (reasoning that a counterparty cannot terminate a contract without seeking relief from the stay).

**Debtors' Exhibit No. 4**
**Page 36 of 44**

102.    Furthermore, the Debtors falsely allege that Core is attempting to "siphon 'possession of property of the estate' without any lawful basis" pursuant to section 362(a)(3), and to "modify its contractual obligations." Contempt Motion ¶ 48. But Core has a lawful basis—*i.e.*, the Agreement—to charge the Debtors for such amounts, and all of its other hosting customers but one (with which Core is terminating its relationship) paid such charges pursuant to the commercially reasonable interpretation of the Agreement. Thus, the allegation that Core is attempting to modify its contractual obligations falls flat, and the Debtors' reliance on *AMR* is misplaced. *See id.* (citing *In re AMR Corp.*, 730 F.3d 88, 102 (2d Cir. 2013) ("[A]n attempt to modify contract rights [is] subject to the automatic stay.")).

103.    The cases the Debtors cite acknowledge that it is permissible to invoice a debtor for postpetition services rendered. *See, e.g.*, *Bildisco*, 465 U.S. at 531 ("If the debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services, which, depending on the circumstances of a particular contract, may be what is specified in the contract."); *Monarch*, 163 B.R. at 907-08 ("The bankruptcy estate, on the other hand, can require the nondebtor to continue performance, so long as the estate performs."). Thus, this line of argument fails.

104.    Celsius also points to the inclusion of prepetition PPT Charges in two postpetition invoices—one of which was sent a mere two days after the petition date. *See supra* ¶ 43. However, it is not uncommon for vendors to chapter 11 debtors to send invoices in the days following the petition that may also include the prepetition period. And Celsius did not actually pay any prepetition PPT Charges invoiced postpetition, so Celsius has suffered no harm based on this

Debtors' Exhibit No. 4
Page 37 of 44

inadvertence.  *See supra* ¶ 43.  Celsius' desperate attempt to paint common, innocent occurrences as nefarious stay violations fails.

**B.    Neither Core's Automated Emails Nor Conversations with Celsius Constitute Stay Violations**

105.    The Debtors allege that Core violated the automatic stay by threatening to terminate the Agreement and to withhold performance due to Celsius' outstanding prepetition debts.  *See* Contempt Motion ¶ 25.  Specifically, the Debtors' declaration alleges that on an August 22, 2022 phone call, a representative for Core "stated … that no new deployments would go forward until Celsius caught up on its payment schedule."  Lawlor Decl., D.E. 918 at ¶ 17.  This is incorrect. The evidence shows that Mr. Pratt simply stated that Core would not deploy new machines until Celsius paid *post*-petition amounts owing under the Agreement (now over $1 million).  *See supra* ¶¶ 50, 62-63.  No threat was made.  Because it is neither an automatic stay violation to fail to perform (*Fulton*) nor to request payment of amounts owed for postpetition services, it cannot be an automatic stay violation to condition future postpetition performance on payment of past-due obligations for postpetition performance.  Thus, the Debtors' theory must fail.  And regardless, the evidence is that Core did not stop performing even though Celsius still has not paid.

106.    The Debtors also point to an unintentional, harmless automated email sent by Core's accounting system, programmed nearly two years ago to remind customers of their bills. The Debtors exaggerate the automated email as a "threat to terminate the MSA."  Contempt Motion ¶ 46.  Core did not intentionally send the emails and disclaimed them, which the Debtors do not contest, *id.*, and the automated email system was disabled after Core was made aware of the issue. *See supra* ¶¶ 46-49.  Celsius should not have been surprised by the receipt of these automatic emails—it received similar emails prepetition and never once suggested it thought Core was threatening to terminate the Agreement, another set of facts omitted from Mr. Lawlor's

**Debtors' Exhibit No. 4**
**Page 38 of 44**

declaration.  *See supra* ¶ 47.  And in the end, given that Core rescinded and disclaimed the emails, whether or not the emails constituted a stay violation is now moot.

107.    Finally, Core understands the serious nature of attempts in individual bankruptcy cases to collect on prepetition obligations.  Indeed, the harassment of individual debtors by debt collectors and other bad actors adds to an already stressful situation that individuals may find themselves in when they have to file a bankruptcy petition.[21]  However, this case is markedly different.   Core was not willfully, intentionally, and maliciously attempting to collect on a prepetition claim.  Furthermore, Celsius is a large, complex business entity with sophisticated leaders at the helm and competent financial and legal advisors.  Not only can Celsius not legitimately claim that the invoices constituted harassment, but there is also no evidence of any resulting harm or economic damages.  Automated emails and invoices that mistakenly and innocently include prepetition amounts do not rise to the level of an egregious attempt to collect prepetition amounts owed.  Common sense should prevail, and Celsius's request to hold Core in violation of the automatic stay for these discrete past (and void) events should be rejected.

108.    Finally, even if Core violated the Agreement, there is no ongoing stay violation.  Indeed, as explained above, Core has deployed all machines delivered by Celsius to date.  *See supra* ¶ 26.  Thus, there is no ongoing stay violation and nothing to remedy.

## IV.    EVEN IF THE COURT WERE TO FIND THAT CORE VIOLATED THE STAY, CONTEMPT IS INAPPROPRIATE

109.    The Debtors' contempt argument cites but a single case, *Windstream I*.  That case is no longer valid, as the District Court just reversed it on appeal in *Windstream II*.  Of particular

---

[21] *See, e.g., Demel v. Grp. Benefits Plan for Emps. of N. Telecom, Inc.*, 2010 WL 167947, at *2 (S.D.N.Y. Jan. 8, 2010) ("[The purpose of § 362(a)(6)] is to benefit a debtor by preventing harassment and frustration of rehabilitation efforts through pursuit by creditors in individual actions." (citation omitted)).

36

importance, the District Court disagreed with the standard the bankruptcy court had applied to impose contempt as a remedy for an automatic stay violation.  It held that the contempt standard is higher than the *Windstream I* court stated—one that, as discussed below, is not met here.  The Debtors' already-weak position cannot stand after *Windstream II*.

110.    The burden to prove all elements of contempt falls on the movant.  *See In re DiBattista*, 615 B.R. 31, 39 (S.D.N.Y. 2020).  A contempt order may be issued only where "(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner."  *In re Blair Ventures, LLC*, 581 B.R. 728, 732 (S.D.N.Y. 2017).

111.    Under U.S. Supreme Court precedent, a bankruptcy court may hold a party in civil contempt pursuant to section 105 only "if there is *no fair ground of doubt* as to whether the order barred the creditor's conduct."  *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1799 (2019).  The *Taggart* standard "reflects the fact that civil contempt is a *severe remedy* and that principles of basic fairness require that those enjoined receive explicit notice of what conduct is outlawed before being held in civil contempt."  *Id.* at 1802 (citation omitted and emphasis added).[22]  "[C]lose questions of interpretation are resolved in the defendant's favor in order to prevent unfair surprise."  *Schering Corp. v. Ill. Antibiotics Co.*, 62 F.3d 903, 906 (7th Cir. 1995).

112.    Although *Taggart* concerned holding a creditor in contempt for violating a discharge order, recent courts have applied *Taggart* when deciding civil contempt actions pursuant to section 105 for automatic stay violations.  *See, e.g., Windstream II*, 2022 WL 5245633, at *9-

---

[22] To support contempt, an order—here, the automatic stay—must leave "no doubt in the minds of those to whom it was addressed … precisely what acts are forbidden."  *Drywall Tapers & Pointers v. Local 530*, 889 F.2d 389, 395 (2d Cir. 1989).  "The proper measure of clarity… is not whether the decree is clear in some general sense, but whether it unambiguously proscribes the challenged conduct."  *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 292 (2d Cir. 2008).

Debtors' Exhibit No. 4
Page 40 of 44

12 (applying the "fair ground of doubt" standard to determine whether a creditor should be held in

contempt for an alleged violation of a corporate debtor's automatic stay);[23] *In re GYPC, Inc.*, 634

B.R. 983, 991 (Bankr. S.D. Ohio 2021).

113.    In reversing and vacating *Windstream I*'s contempt finding, the *Windstream II* court

held that the lower court "erred" by reasoning that "it is logical to require those in doubt whether

the stay applies to seek clarification from the court or be sanctioned for shooting first and aiming

later." 2022 WL 5245633, at *10-11. It found this standard, which is more in line with "the

standard applicable to individual debtors under § 362(k)," at odds with *Taggart*. *Id*. What's more,

the court reiterated that "close calls" on stay violations do not merit contempt:

> [T]he Bankruptcy Court's conclusion that there could have been objectively "no
> fair ground of doubt" on [defendant's] part that its advertisements would violate
> the automatic stay was outside the permissible range of decisions and thus an abuse
> of discretion. The Bankruptcy Court's conclusion that [defendant's] advertising
> campaign "exercises control" over estate property is at least highly debatable. The
> plain language of the automatic stay does not clearly proscribe the conduct here ….
> Even if I were to accept the theory of the stay violation here – that because the
> advertisements were false, they were improperly influential – it is not an objectively
> obvious reading of the statute or the caselaw. Particularly under the more searching
> standard that I must apply in assessing sanctions awarded under 11 U.S.C. § 105(a),
> *see In re Blair Ventures*, 581 B.R. at 732, the Bankruptcy Court abused its
> discretion in holding [defendant] in civil contempt.

*Id*. at *11-12. Simply put, the Debtors cannot establish the necessary elements of contempt here.

114.    ***First***, as explained above, Core did not violate the automatic stay.

115.    ***Second***, even if the Court finds that Core breached the Agreement, there is a fair

ground of doubt as to whether such alleged breaches are barred by the automatic stay. *See Fulton*,

141 S. Ct. at 590. Core had at least a reasonable contractual basis for its conduct. Because "the

---

[23] *See also Windstream II*, 2022 WL 5245633, at *12 ("[T]his Court is bound by both the *Taggart* Court's holding with regard to § 105(a) and binding Second Circuit authority on § 362(k)'s application to corporate debtors. Because, under *In re Chateaugay*, the Bankruptcy Court's source of authority for the sanctions at issue on this appeal is § 105(a), the Court is bound to follow the Supreme Court's interpretation of that provision.").

38

plain language of the automatic stay does not clearly proscribe the conduct here," and *failing to perform* (inaction) "is not typically understood to exercise control over property," Core's alleged breach premised on a failure to perform cannot "clearly" be an act to "exercise control over property of the estate." *Windstream II*, 2022 WL 5245633, at *10-11. "Even if [this Court] were to accept the theory of the stay violation here … it is not an objectively obvious reading of the statute or the caselaw." *Id.* Thus, the Debtors' Contempt Motion must fail.

116.    Furthermore, Core was not required to first prove in this Court its good-faith, logical interpretation of the Agreement prior to acting in accordance with its view, because "there is no requirement that the would-be violator move to lift the stay prior to acting." *Id*.

117.    **Third**, Core has not terminated the Agreement but continues to perform despite losing approximately $53,000 per day based on running Celsius's machines, without Celsius paying the postpetition PPT Charges. *See supra* ¶ 63.

118.    Nor is this a case where sanctions are necessary to ensure compliance with the automatic stay due to repeated and ongoing stay violations. *See, e.g.*, *In re Ionosphere Clubs, Inc.*, 171 B.R. 18, 20 (S.D.N.Y. 1994) (awarding damages to compensate the Trustee for prosecuting a motion and fining the contemnor $750 for each day he failed to withdraw claims in a bankruptcy case). Accordingly, Core submits that the Court should exercise its broad discretion to deny any damages arising from such alleged violations. *See In re Lehman Bros. Holdings Inc.*, 2013 WL 6283572, at *4 (Bankr. S.D.N.Y. Dec. 3, 2013), *aff'd*, 526 B.R. 481 (S.D.N.Y. 2014) ("Courts are 'vested with wide discretion' to fashion a proper remedy to achieve future compliance.").

119.    Finally, the Court should not permit the Debtors to shoehorn Celsius's breach of contract claim against Core into an automatic stay/contempt theory and thus effectively rewrite the parties' agreement on damages. Celsius agreed to limit any damages for breach to one month's

**Debtors' Exhibit No. 4**
**Page 42 of 44**

fees, which was an important element of the bargain.  *See supra* ¶¶ 7, 53.  By attempting to avoid this key provision of the Agreement while seeking to enforce the Agreement, Celsius is improperly and unfairly weaponizing the automatic stay.  *See In re Scarborough St. James Corp.*, 535 B.R. 60, 67 (Bankr. D. Del. 2015) ("The [automatic] stay is not meant … to be used by a debtor to pursue its creditors, as more litigation is hardly consistent with the concept of a breathing spell for the debtor.  Instead, the stay is a shield, not a sword.").

120.    Celsius's attempt to rewrite its Agreement in this manner is contrary to the vast body of case law holding that "filing of a bankruptcy petition does not alter a debtor's contractual rights or obligations."  *In re Penn Traffic Co.*, 2005 U.S. Dist. LEXIS 20407, at *20 (S.D.N.Y. Sept. 16, 2005) (citing *In re M.J. & K. Co.*, 161 B.R. 586, 593 (Bankr. S.D.N.Y. 1993)); *see also Mission Prod*, 139 S. Ct. at 1662.[24]

## <u>CONCLUSION</u>

WHEREFORE, Core respectfully requests that the Court deny the Contempt Motion.

---

[24] *See also, e.g.*, *Tidewater Fin. Co. v. Kenney*, 531 F.3d 312, 314 (4th Cir. 2008); *In re Carroll*, 903 F.2d 1266, 1271 (9th Cir. 1990); *Hazen First State Bank v. Speight*, 888 F.2d 574, 576 (8th Cir. 1989); *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984); *In re Schokbeton Indus., Inc.*, 466 F.2d 171, 177 (5th Cir. 1972); *In re Advent Corp.*, 24 B.R. 612, 614 (B.A.P. 1st Cir. 1982); *In re Heaven Sent Ltd.*, 37 B.R. 597, 598 (Bankr. E.D. Pa. 1984); *In re Holland Enters., Inc.*, 25 B.R. 301, 303 (E.D.N.C. 1982).

Debtors' Exhibit No. 4
Page 43 of 44

### Notice

Notice of this Objection has been given in accordance with the *Final Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures, and (II) Granting Related Relief* (D.E. 528).  Core submits that such notice is sufficient and no other or further notice need be provided.


Dated: October 19, 2022
       New York, New York


                                        */s/ Ray C. Schrock, P.C.*

                                        **WEIL, GOTSHAL & MANGES LLP**
                                        767 Fifth Avenue
                                        New York, New York 10153
                                        Telephone:  (212) 310-8000
                                        Facsimile:   (212) 310-8007
                                        Ray C. Schrock, P.C.
                                        David J. Lender
                                        Ronit J. Berkovich
                                        Theodore E. Tsekerides


                                        *Counsel to Core Scientific, Inc.*

41